# Exhibit 1

# THE FINANCIAL CRISIS INQUIRY REPORT

FINANCIAL CRISIS INQUIRY COMMISSION
UNITED STATES OF AMERICA

**Final Report of the National Commission on the Causes of the Financial and Economic Crisis in the United States**

• OFFICIAL GOVERNMENT EDITION •

decades. With new financial products like the home equity line of credit, households could borrow against their homes to compensate for investment losses or unemployment. Deflation, against which the Fed had struck preemptively, did not materialize.

At a congressional hearing in November 2002, Greenspan acknowledged—at least implicitly—that after the dot-com bubble burst, the Fed cut interest rates in part to promote housing. Greenspan argued that the Fed's low-interest-rate policy had stimulated the economy by encouraging home sales and housing starts with "mortgage interest rates that are at lows not seen in decades." As Greenspan explained, "Mortgage markets have also been a powerful stabilizing force over the past two years of economic distress by facilitating the extraction of some of the equity that homeowners had built up."[17] In February 2004, he reiterated his point, referring to "a large extraction of cash from home equity."[18]

## SUBPRIME LOANS: "BUYERS WILL PAY A HIGH PREMIUM"

The subprime market roared back from its shakeout in the late 1990s. The value of subprime loans originated almost doubled from 2001 through 2003, to $310 billion. In 2000, 52% of these were securitized; in 2003, 63%.[19] Low interest rates spurred this boom, which would have long-term repercussions, but so did increasingly widespread computerized credit scores, the growing statistical history on subprime borrowers, and the scale of the firms entering the market.

Subprime was dominated by a narrowing field of ever-larger firms; the marginal players from the past decade had merged or vanished. By 2003, the top 25 subprime lenders made 93% of all subprime loans, up from 47% in 1996.[20]

There were now three main kinds of companies in the subprime origination and securitization business: commercial banks and thrifts, Wall Street investment banks, and independent mortgage lenders. Some of the biggest banks and thrifts—Citigroup, National City Bank, HSBC, and Washington Mutual—spent billions on boosting subprime lending by creating new units, acquiring firms, or offering financing to other mortgage originators. Almost always, these operations were sequestered in nonbank subsidiaries, leaving them in a regulatory no-man's-land.

When it came to subprime lending, now it was Wall Street investment banks that worried about competition posed by the largest commercial banks and thrifts. Former Lehman president Bart McDade told the FCIC that the banks had gained their own securitization skills and didn't need the investment banks to structure and distribute.[21] So the investment banks moved into mortgage origination to guarantee a supply of loans they could securitize and sell to the growing legions of investors. For example, Lehman Brothers, the fourth-largest investment bank, purchased six different domestic lenders between 1998 and 2004, including BNC and Aurora.[22] Bear Stearns, the fifth-largest, ramped up its subprime lending arm and eventually acquired three subprime originators in the United States, including Encore. In 2006, Merrill Lynch acquired First Franklin, and Morgan Stanley bought Saxon Capital; in 2007, Goldman Sachs upped its stake in Senderra Funding, a small subprime lender.

Meanwhile, several independent mortgage companies took steps to boost growth.

misrepresentations" in the registration statements and prospectuses provided to investors who purchased securities. They generally allege violations of the Securities Exchange Act of 1934 and the Securities Act of 1933.

Both private and government entities have gone to court. For example, the investment brokerage Charles Schwab has sued units of Bank of America, Wells Fargo, and UBS Securities.[63] The Massachusetts attorney general's office settled charges against Morgan Stanley and Goldman Sachs, after accusing the firms of inadequate disclosure relating to their sales of mortgage-backed securities. Morgan Stanley agreed to pay $102 million and Goldman Sachs agreed to pay $60 million.[64]

To take another example, the Federal Home Loan Bank of Chicago has sued several defendants, including Bank of America, Credit Suisse Securities, Citigroup, and Goldman Sachs, over its $3.3 billion investment in private mortgage-backed securities, claiming they failed to provide accurate information about the securities. Similarly, Cambridge Place Investment Management has sued units of Morgan Stanley, Citigroup, HSBC, Goldman Sachs, Barclays, and Bank of America, among others, "on the basis of the information contained in the applicable registration statement, prospectus, and prospective supplements."[65]

## LOSSES: "WHO OWNS RESIDENTIAL CREDIT RISK?"

Through 2007 and into 2008, as the rating agencies downgraded mortgage-backed securities and CDOs, and investors began to panic, market prices for these securities plunged. Both the direct losses as well as the marketwide contagion and panic that ensued would lead to the failure or near failure of many large financial firms across the system. The drop in market prices for mortgage-related securities reflected the higher probability that the underlying mortgages would actually default (meaning that less cash would flow to the investors) as well as the more generalized fear among investors that this market had become illiquid. Investors valued liquidity because they wanted the assurance that they could sell securities quickly to raise cash if necessary. Potential investors worried they might get stuck holding these securities as market participants looked to limit their exposure to the collapsing mortgage market.

As market prices dropped, "mark-to-market" accounting rules required firms to write down their holdings to reflect the lower market prices. In the first quarter of 2007, the largest banks and investment banks began complying with a new accounting rule and for the first time reported their assets in one of three valuation categories: "Level 1 assets," which had observable market prices, like stocks on the stock exchange; "Level 2 assets," which were not as easily priced because they were not actively traded; and "Level 3 assets," which were illiquid and had no discernible market prices or other inputs. To determine the value of Level 3 and in some cases Level 2 assets where market prices were unavailable, firms used models that relied on assumptions. Many financial institutions reported Level 3 assets that substantially exceeded their capital. For example, for the first quarter of 2007, Bear Stearns reported about $19 billion in Level 3 assets, compared to $13 billion in capital; Morgan Stanley re-

including April 9 and June 22—S&P had confirmed Bear's strong ratings, noting in April that "Bear's risk profile is relatively conservative" and "strong senior management oversight and a strong culture throughout the firm are the foundation of Bear's risk management process." On June 22, Moody's had also confirmed its A1 rating, and Fitch had confirmed its "stable" outlook.

Now, in early August, Upton provided them information about Bear and argued that management had learned its lesson about governance and risk management from the failure of the two hedge funds and was going to rely less on short-term unsecured funding and more on the repo market. Bear and other market participants did not foresee that Bear's own repo lenders might refuse to lend against risky mortgage assets and eventually not even against Treasuries.

"I requested some forbearance" from S&P, Upton told the FCIC.[14] He did not get it. On August 3, just three days after the two Bear Stearns hedge funds declared bankruptcy, S&P highlighted the funds, Bear's mortgage-related investments, and its relatively small capital base as it placed Bear on a "negative outlook."[15]

Asked how he felt about the rating agency's actions, Jimmy Cayne, Bear's CEO until 2008, said, "A negative outlook can touch a number of parts of your businesses. . . . It was like having a beautiful child and they have a disease of some sort that you never expect to happen and it did. How did I feel? Lousy."[16]

To reassure investors that no more shoes would drop, Bear invited them on a conference call that same day. The call did not go well. By the end of the day, Bear's stock slid 6%, to $108.35, 36% below its all-time high of $169.61, reached earlier in 2007.

## "WE WERE SUITABLY SKEPTICAL"

On Sunday, August 5, two days after the conference call, Bear had another opportunity to make its case: this time, with the SEC. The two SEC supervisors who visited the company that Sunday were Michael Macchiaroli and Matthew Eichner, respectively, associate director and assistant director of the division of market regulation. The regulators reviewed Bear's exposures to the mortgage market, including the $13 billion in adjustable-rate mortgages on the firm's books that were waiting to be securitized. Bear executives gave assurances that inventory would shrink once investors returned in September from their retreats in the Hamptons. "Obviously, regulators are not supposed to listen to happy talk and go away smiling," Eichner told the FCIC. "Thirteen billion in ARMs is no joke." Still, Eichner did not believe the Bear executives were being disingenuous. He thought they were just emphasizing the upside.[17]

Alan Schwartz, the co-president who later succeeded Jimmy Cayne as CEO, and Thomas Marano, head of Global Mortgages and Asset Backed Securities, seemed unconcerned. But other executives were leery. Wendy de Monchaux, the head of proprietary trading, urged Marano to trim the mortgage portfolio, as did Steven Meyer, the co-head of stock sales and trading.[18] According to Chief Risk Officer Michael Alix, former chairman Alan Greenberg would say, "the best hedge is a sale."[19] Bear finally reduced the portfolio from $56 billion in the third quarter of 2007 to $46.1 billion in the fourth quarter, but it was too little too late.

That summer, the SEC felt Bear's liquidity was adequate for the immediate future, but supervisors "were suitably skeptical," Eichner insisted. After the August 5 meeting, the SEC required that Bear Stearns report daily on Bear's liquidity. However, Eichner admitted that he and his agency had grossly underestimated the possibility of a liquidity crisis down the road.[20]

Every weeknight Upton updated the SEC on Bear's $400 billion balance sheet, with specifics on repo and commercial paper. On September 27, Bear Stearns raised approximately $2.5 billion in unsecured 10-year bonds. The reports slowed to once a week.[21] The SEC's inspector general later criticized the regulators, writing that they did not push Bear to reduce leverage or "make any efforts to limit Bear Stearns' mortgage securities concentration," despite "aware[ness] that risk management of mortgages at Bear Stearns had numerous shortcomings, including lack of expertise by risk managers in mortgage backed securities" and "persistent understaffing; a proximity of risk managers to traders suggesting a lack of independence; turnover of key personnel during times of crisis; and the inability or unwillingness to update models to reflect changing circumstances."[22]

Michael Halloran, a senior adviser to SEC Chairman Christopher Cox, told the FCIC the SEC had ample information and authority to require Bear Stearns to decrease leverage and sell mortgage-backed securities, as other financial institutions were doing. Halloran said that as early as the first quarter of 2007, he had asked Erik Sirri, in charge of the SEC's Consolidated Supervised Entities program, about Bear Stearns (and Lehman Brothers), "Why can't we make them reduce risk?" According to Halloran, Sirri said the SEC's job was not to tell the banks how to run their companies but to protect their customers' assets.[23]

## "TURN INTO A DEATH SPIRAL"

In August, after the rating agencies revised their outlook on Bear, Cayne tried to obtain lines of credit from Citigroup and JP Morgan. Both banks acknowledged Bear had always been a very good customer and maintained they were interested in helping.[24] "We wanted to try to be belts-and-suspenders," said CFO Samuel Molinaro, as Bear attempted both to obtain lines of credit with banks and to reinforce traditional sources of short-term liquidity such as money market funds. But, Cayne told the FCIC, nothing happened. "Why the [large] banks were not more willing to participate and provide lines during that period of time, I can't tell you," Molinaro said.[25]

A major money market fund manager, Federated Investors, had decided on October 1 to drop Bear Stearns from its list of approved counterparties for unsecured commercial paper,[26] illustrating why unsecured commercial paper was traditionally seen as a riskier lifeline than repo. Throughout 2007, Bear Stearns reduced its unsecured commercial paper (from $20.7 billion at the end of 2006 to only $3.9 billion at the end of 2007) and replaced it with secured repo borrowing (which rose from $69 billion to $102 billion). But Bear Stearns's growing dependence on overnight repo would create a different set of problems.

The tri-party repo market used two clearing banks, JP Morgan and BNY Mellon.

During every business day, these clearing banks return cash to lenders; take possession of borrowers' collateral, essentially keeping it in escrow; and then lend their own cash to borrowers during the day. This is referred to as "unwinding" the repo transaction; it allows borrowers to change the assets posted as collateral every day. The transaction is then "rewound" at the end of the day, when the lenders post cash to the clearing banks in return for the new collateral.

The little-regulated tri-party repo market had grown from $800 billion in average daily volume in 2002 to $1.7 trillion in 2005, $2.4 trillion in 2007, and $2.8 trillion by early 2008.[27] It had become a very deep and liquid market. Even though most borrowers rolled repo overnight, it was also considered a very safe market, because transactions were overcollateralized (loans were made for less than the collateral was worth). That was the general view before the onset of the financial crisis.

As Bear increased its tri-party repo borrowing, it became more dependent on JP Morgan, the clearing bank. A risk that was little appreciated before 2007 was that JP Morgan and BNY Mellon could face large losses if a counterparty such as Bear defaulted during the day. Essentially, JP Morgan served as Bear's daytime repo lender.

Even long-term repo loans have to be unwound every day by the clearing bank, if not by the lender. Seth Carpenter, an officer at the Federal Reserve Board, compared it to a mortgage that has to be refinanced every week: "Imagine that your mortgage is only a week. Instead of a 30-year mortgage, you've got a one-week mortgage. If everything's going fine, you get to the end of the week, you go out and you refinance that mortgage because you don't have enough cash on hand to pay off the whole mortgage. And then you get to the end of another week and you refinance that mortgage. And that's, for all intents and purposes, what repos are like for many institutions."[28]

During the fall, Federated Investors, which had taken Bear Stearns off its list of approved commercial paper counterparties, continued to provide secured repo loans.[29] Fidelity Investments, another major lender, limited its overall exposure to Bear, and shortened the maturities.[30] In October, State Street Global Advisors refused any repo lending to Bear other than overnight.[31]

Often, backing Bear's borrowing were mortgage-related securities and of these, $17.2 billion—more than Bear's equity—were Level 3 assets.

In the fourth quarter of 2007, Bear Stearns reported its first quarterly loss, $379 million. Still, the SEC saw "no evidence of any deterioration in the firm's liquidity position following the release and related negative press coverage." The SEC concluded, "Bear Stearns' liquidity pool remains stable."[32]

In the fall of 2007, Bear's board had commissioned the consultant Oliver Wyman to review the firm's risk management. The report, "Risk Governance Diagnostic: Recommendations and Case for Economic Capital Development," was presented on February 5, 2008, to the management committee. Among its conclusions: risk assessment was "infrequent and ad hoc" and "hampered by insufficient and poorly aligned resources," "risk managers [were] not effectively positioned to challenge front office decisions," and risk management was "understaffed" and considered a "low priority." Schwartz told the FCIC the findings did not indicate substantial deficiencies. He wasn't looking for positive feedback from the consultants, because the Wyman re-

That startled Kyle Bass, Hayman's managing partner. He told the FCIC he could not recall any counterparty rejecting a routine novation.[59] Pressed for an explanation, Goldman the next morning offered no details: "Our trading desk would prefer to stay facing Hayman. We do not want to face Bear."[60] Adding to the mystery, 16 minutes later Goldman agreed to accept Bear Sterns as the counterparty after all.[61] But the damage was done. The news hit the street that Goldman had refused a routine transaction with one of the other big five investment banks. The message: don't rely on Bear Stearns.

CEO Alan Schwartz hoped an appearance on CNBC would reassure markets. Questioned about this incident, Schwartz said he had no knowledge of such a refusal and rhetorically asked, "Why do rumors start?"[62] SEC Chairman Cox told reporters his agency was monitoring capital levels at Bear Stearns and other securities firms "on a constant basis" and has "a good deal of comfort about the capital cushions at these firms at the moment."[63]

Still, the run on Bear accelerated. Many investors believed the Fed's announcement about its new loan program was directed at Bear Stearns, and they worried about the facility's not being available for several weeks. On Wednesday, March 12, the SEC noted that Bear paid another $1.1 billion for margin calls from 142 nervous derivatives counterparties.[64]

Repo lenders who had already tightened the terms for their contracts over the preceding four or five months shortened the leash again, demanding more collateral from Bear Stearns.[65] Worries about a default quickly mounted.[66]

By that evening, Bear's ability to borrow in the repo market was drying up. The SEC noted that some large and important money funds, including Fidelity and Mellon, had told Bear after the close of business Wednesday they "might be hesitant to roll some funding tomorrow." The SEC said that though they believed the amounts were "very manageable (between $1 and $2 billion)," the withdrawals would not send a helpful signal to the market.[67] But the issue was almost moot. Schwartz called New York Fed President Timothy Geithner that night to discuss possible Fed flexibility in the event that some repo lenders did pull away.[68]

Upton, the treasurer, said that before that week, he had never worried about the disappearance of repo lending. By Thursday, he believed the end was near.[69] Bear executives informed the board that the rumors were dissuading counterparties from doing business with Bear, that Bear was receiving and meeting significant margin calls, that $14 billion in repo was not going to roll over, and that "there was a reasonable chance that there would not be enough cash to meet [Bear's] needs."[70] Some repo lenders were already so averse to Bear that they stopped lending to the company at all, not even against Treasury collateral, Upton told the FCIC.[71] Derivatives counterparties continued to run from Bear. By that night, liquidity had dwindled to a mere $2 billion (see figure 15.1).

Bear had run out of cash in one week. Executives and regulators continued to believe the firm was solvent, however. Former SEC Chairman Cox testified before the FCIC, "At all times during the week of March 10 to 17, up to and including the time of its agreement to be acquired by JP Morgan, Bear Stearns had a capital cushion well above what is required."[72]

Molinaro, Alix, and others spent the weekend in due diligence meetings with JP Morgan and other potential buyers, including the private equity firm J.C. Flowers and Co. According to Schwartz, the participants determined JP Morgan was the only candidate with the size and stature to make a credible offer within 48 hours.[77] As Bear Stearns's clearing bank for repo trades, JP Morgan held much of Bear Stearns's assets as collateral and had been assessing their value daily.[78] This knowledge let JP Morgan move more quickly.

On Sunday, March 16, JP Morgan informed the New York Fed and the Treasury that it was interested in a deal if it included financial support from the Fed.[79] The Federal Reserve Board, again finding "unusual and exigent circumstances" as required under section 13(3) of the Federal Reserve Act, agreed to purchase $29.97 billion of Bear's assets to get them off the firm's books through a new entity called Maiden Lane LLC (named for a street alongside the New York Fed). Those assets—mostly mortgage-related securities, other assets, and hedges from Bear's mortgage trading desk—would be under New York Fed management. To finance the purchases, JP Morgan made a $1.15 billion subordinated loan and the New York Fed lent $28.82 billion. Because of its loan, JP Morgan bore the risk of the first $1.15 billion of losses; the Fed would bear any further losses up to $28.82 billion.[80] The Fed's loan would be repaid as Maiden Lane sold the collateral.

On Sunday night, with Maiden Lane in place, JP Morgan publicly announced a deal to buy Bear Stearns for $2 a share. Minutes of Bear's board meeting indicate that JP Morgan had considered $4 but cut it to $2 "because the government would not permit a higher number. . . . The Fed and the Treasury Department would not support a transaction where [Bear Stearns] equity holders received any significant consideration because of the 'moral hazard' of the federal government using taxpayer money to 'bail out' the investment bank's stockholders."[81]

Eight days later, on March 24, Bear Stearns and JP Morgan agreed to increase the price to $10. John Chrin, co-head of the financial institutions mergers and acquisitions group at JP Morgan, told the FCIC they increased the price to make Bear shareholders' approval more likely.[82] Bear CEO Schwartz told the FCIC the increase let Bear preserve the company's value "to the greatest extent possible under the circumstances for our shareholders, our 14,000 employees, and our creditors."[83]

## "IT WAS HEADING TO A BLACK HOLE"

The SEC regulators Macchiaroli and Eichner were as stunned as everyone else by the speed of Bear's collapse. Macchiaroli had had doubts as far back as August, he told the FCIC, but he and his colleagues expected Bear would be able to fund itself through the repo market, albeit at higher margins.[84]

Fed Chairman Ben Bernanke later called the Bear Stearns decision the toughest of the financial crisis. The $2.8 trillion tri-party repo market had "really [begun] to break down," Bernanke said. "As the fear increased," short-term lenders began demanding more collateral, "which was making it more and more difficult for the financial firms to finance themselves and creating more and more liquidity pressure on

At 1:40 P.M., Fed officials circulated the outline of a plan to create a "Lehman Default Management Group," a group of Lehman counterparties and creditors who would make plans to cope with a Lehman bankruptcy. They would agree to hold off on fully exercising their rights to close out their trades with Lehman; instead, they would establish a process to "net down"—that is, reduce—all exposures using a common valuation method.[67] A little before midnight on Thursday, Boesky notified colleagues that panicked hedge funds had called to say they were "expecting [a] full blown recession" and that there was a "full expectation that Leh goes, wamu and then ML [Merrill Lynch]." They were "ALL begging, pleading for a large scale solution which spans beyond just LEH." Boesky compared the level of panic to the failure of Bear Stearns—"On a scale of 1 to 10, where 10 is Bear-Stearns-week-panic, I would put sentiment today at a 12."[68]

At almost the same time, JP Morgan demanded that Lehman post another $5 billion in cash "by the opening of business tomorrow in New York"; if it didn't, JP Morgan would "exercise our right to decline to extend credit to you."[69] JP Morgan CEO Dimon, President Black, and CRO Zubrow had first made the demand in a phone call earlier that evening to Lehman CEO Fuld, CFO Ian Lowitt, and Treasurer Paolo Tonucci.[70] Tonucci told the JP Morgan executives on the call that Lehman could not meet the demand. Dimon said Lehman's difficulties in coming up with the money were not JP Morgan's problem, Tonucci told the FCIC. "They just wanted the cash. We made the point that it's too much cash to mobilize. There was no give on that. Again, they said 'that's not our problem, we just want the cash.'"[71] When Tonucci asked what would keep JP Morgan from asking for $10 billion tomorrow, Dimon replied, "Nothing, maybe we will."[72]

Under normal circumstances, Tonucci would not have tolerated this treatment, but circumstances were far from normal. "JPM as 'clearing bank' continues to ask for more cash collateral. If we don't provide the cash, they refuse to clear, we fail," was the message circulated in an email to Lehman executives on Friday, September 12. So Lehman "delivered the $5 billion in cash only by pulling virtually every unencumbered asset it could deliver."[73]

JP Morgan's Zubrow saw it differently. He told the FCIC that the previously posted $3.6 billion of collateral by Lehman was "inappropriate" because it was "illiquid" and "could not be reasonably valued." Moreover, Zubrow said the potential collateral shortfall was greater than $5 billion.[74] Lehman's former CEO, Fuld, told the FCIC that he agreed to post the $5 billion because JP Morgan said it would be returned to Lehman at the close of business the following day.[75] The Lehman bankruptcy estate made the same allegation. This dispute is now the subject of litigation; the Lehman bankruptcy estate is suing JP Morgan to retrieve the $5 billion—and the original $3.6 billion.[76]

## "HEADS OF FAMILY"

Should Lehman be allowed to go bankrupt? Within the government, sentiments varied. On Friday morning, as Secretary Paulson headed to New York to "sort through

# Exhibit 2

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION

Washington, D.C. 20549

## Form 10-K

(Mark One)

☒ **Annual Report Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934 for the fiscal year ended November 30, 2007**

**OR**

☐ **Transition Report Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934 for the transition period from to**

Commission File Number 1-9466

## Lehman Brothers Holdings Inc.

(Exact Name of Registrant as Specified in its Charter)

| | |
|---|---|
| Delaware<br>(State or other jurisdiction of incorporation or organization) | 13-3216325<br>(I.R.S. Employer Identification No.) |
| 745 Seventh Avenue<br>New York, New York<br>(Address of principal executive offices) | 10019<br>(Zip Code) |

Registrant's telephone number, including area code: (212) 526-7000

Securities registered pursuant to Section 12(b) of the Act:

| Title of each class | Name of each exchange on which registered |
|---|---|
| Common Stock, $.10 par value | New York Stock Exchange |
| Depositary Shares representing 5.94% Cumulative Preferred Stock, Series C | New York Stock Exchange |
| Depositary Shares representing 5.67% Cumulative Preferred Stock, Series D | New York Stock Exchange |
| Depositary Shares representing 6.50% Cumulative Preferred Stock, Series F | New York Stock Exchange |
| Depositary Shares representing Floating Rate Cumulative Preferred Stock, Series G | New York Stock Exchange |
| 5.857% Mandatory Capital Advantaged Preferred Securities of Subsidiary Trust (and Registrant's guarantee thereof) | New York Stock Exchange |
| Floating Rate Mandatory Capital Advantaged Preferred Securities of Subsidiary Trust (and Registrant's guarantee thereof) | New York Stock Exchange |
| 6.375% Trust Preferred Securities, Series K, of Subsidiary Trust (and Registrant's guarantee thereof) | New York Stock Exchange |
| 6.375% Trust Preferred Securities, Series L, of Subsidiary Trust (and Registrant's guarantee thereof) | New York Stock Exchange |
| 6.00% Trust Preferred Securities, Series M, of Subsidiary Trust (and Registrant's guarantee thereof) | New York Stock Exchange |
| 6.24% Trust Preferred Securities, Series N, of Subsidiary Trust (and Registrant's guarantee thereof) | New York Stock Exchange |
| 2.00% Medium Term Notes, Series H, Due March 3, 2009 Performance Linked to the Common Stock of Morgan Stanley (MS) | American Stock Exchange |
| 0.25% Medium Term Notes, Series I, Due February 16, 2012 Performance Linked to a Basket of Two Stocks | American Stock Exchange |
| 0.00% Medium Term Notes, Series I, Due May 15, 2010 Performance Linked to the Common Stock of General Electric Company (GE) | American Stock Exchange |
| Absolute Buffer Notes Due July 29, 2008, Linked to the Dow Jones EURO STOXX 50® Index (SX5E) | American Stock Exchange |
| Absolute Buffer Notes Due July 7, 2008, Linked to the Dow Jones EURO STOXX 50® Index (SX5E) | American Stock Exchange |
| Currency Basket Warrants Expiring February 13, 2008 | American Stock Exchange |
| Dow Jones Global Titans 50 Index℠ SUNS® Stock Upside Note Securities Due February 9, 2010 | American Stock Exchange |
| Dow Jones Industrial Average SUNS® Stock Upside Note Securities Due April 29, 2010 | American Stock Exchange |
| Index-Plus Notes Due December 23, 2009, Performance Linked to the Russell 2000® INDEX (RTY) | American Stock Exchange |
| Index-Plus Notes Due March 5, 2010, Linked to the S&P 500® Index (SPX) | American Stock Exchange |
| Index-Plus Notes Due November 15, 2009, Linked to the Dow Jones STOXX 50® Index (SX5P) | American Stock Exchange |
| Index-Plus Notes Due September 28, 2009, Performance Linked to S&P 500® Index (SPX) | American Stock Exchange |
| Japanese Yen Linked Warrants Expiring June 20, 2008 | American Stock Exchange |
| Nasdaq-100® Index RANGERS℠ Rebound Risk AdjustiNG Equity Range Securities Notes Due June 7, 2008 | American Stock Exchange |
| Nikkei 225℠ Index SUNS® Stock Upside Note Securities Due June 10, 2010 | American Stock Exchange |
| S&P 500® Index Callable SUNS® Stock Upside Note Securities Due November 6, 2009 | American Stock Exchange |
| S&P 500® Index SUNS® Stock Upside Note Securities Due August 5, 2008 | American Stock Exchange |

EXHIBIT
242
5/17/13
PENGAD 800-631-6989

Securities registered pursuant to Section 12(g) of the Act: None

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act. Yes ☒ No ☐

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act. Yes ☐ No ☒

Indicate by check mark whether the Registrant: (1) has filed all reports required to be filed by Section 13 or 15 (d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the Registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☒ No ☐

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K (Section 229.405 of this chapter) is not contained herein, and will not be contained, to the best of Registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K. ☐

**Exhibit Index**

**Exhibits**

**LEHMAN BROTHERS HOLDINGS INC.**

**AVAILABLE INFORMATION**

Lehman Brothers Holdings Inc. ("Holdings") files annual, quarterly and current reports, proxy statements and other information with the United States Securities and Exchange Commission ("SEC"). You may read and copy any document Holdings files with the SEC at the SEC's Public Reference Room at 100 F Street, NE, Washington, DC 20549, U.S.A. You may obtain information on the operation of the Public Reference Room by calling the SEC at 1-800-SEC-0330 (or 1-202-551-8090). The SEC maintains an internet site that contains annual, quarterly and current reports, proxy and information statements and other information regarding issuers that file electronically with the SEC. Holdings' electronic SEC filings are available to the public at http://www.sec.gov.

Holdings' public internet site is http://www.lehman.com. Holdings makes available free of charge through its internet site, via a link to the SEC's internet site at http://www.sec.gov, its annual reports on Form 10-K, quarterly reports on Form 10-Q, current reports on Form 8-K and amendments to those reports filed or furnished pursuant to Section 13(a) or 15(d) of the Securities Exchange Act of 1934, as amended (the "Exchange Act"), as soon as reasonably practicable after it electronically files such material with, or furnishes it to, the SEC. Holdings also makes available through its internet site, via a link to the SEC's internet site, statements of beneficial ownership of Holdings' equity securities filed by its directors, officers, 10% or greater shareholders and others under Section 16 of the Exchange Act.

In addition, Holdings currently makes available on http://www.lehman.com its most recent annual report on Form 10-K, its quarterly reports on Form 10-Q for the current fiscal year, its most recent proxy statement and its most recent annual report to stockholders, although in some cases these documents are not available on that site as soon as they are available on the SEC's site.

Holdings also makes available on http://www.lehman.com (i) its Corporate Governance Guidelines, (ii) its Code of Ethics (including any waivers therefrom granted to executive officers or directors) and (iii) the charters of the Audit, Compensation and Benefits, and Nominating and Corporate Governance Committees of its Board of Directors. These documents are also available in print without charge to any person who requests them by writing or telephoning:

Lehman Brothers Holdings Inc.
Office of the Corporate Secretary
1271 Avenue of the Americas
42nd Floor
New York, New York 10019, U.S.A.
1-212-526-0858

In order to view and print the documents referred to above (which are in the .PDF format) on Holdings' internet site, you will need to have installed on your computer the Adobe® Acrobat® Reader® software. If you do not have Adobe Acrobat, a link to Adobe Systems Incorporated's internet site, from which you can download the software, is provided.

"ECAPS", "LehmanLive", "RANGERS" and "SUNS" are registered trademarks or service marks of Lehman Brothers Holdings Inc. in the United States and/or other countries. All other marks are the property of their respective owners.



**LEHMAN BROTHERS HOLDINGS INC.**

**PART I**

**ITEM 1. BUSINESS**

As used herein, "Holdings" or the "Registrant" means Lehman Brothers Holdings Inc., a Delaware corporation, incorporated on December 29, 1983. Holdings and its subsidiaries are collectively referred to as the "Company," "Lehman Brothers," the "Firm," "we," "us" or "our." Our executive offices are located at 745 Seventh Avenue, New York, New York 10019, U.S.A., and our telephone number is 1-212-526-7000.

**Forward-Looking Statements**

Some of the statements contained or incorporated by reference in this Report, including those relating to the Company's strategy and other statements that are predictive in nature, that depend upon or refer to future events or conditions or that include words such as "expects," "anticipates," "intends," "plans," "believes," "estimates" and similar expressions, are forward-looking statements within the meaning of Section 21E of the Exchange Act. These statements are not historical facts but instead represent only management's expectations, estimates and projections

regarding future events. Similarly, these statements are not guarantees of future performance and involve certain risks and uncertainties that are difficult to predict, which may include, but are not limited to, the risk factors discussed in Item 1A below and the factors listed in "Management's Discussion and Analysis of Financial Condition and Results of Operations—Certain Factors Affecting Results of Operations" in Part II, Item 7, of this Report.

As a global investment bank, the nature of our business makes predicting future performance difficult. Revenues and earnings may vary from quarter to quarter and from year to year. Caution should be used when extrapolating historical results to future periods. Our actual results and financial condition may differ, perhaps materially, from the anticipated results and financial condition in any such forward-looking statements and, accordingly, readers are cautioned not to place undue reliance on such statements, which speak only as of the date on which they are made. We undertake no obligation to update any forward-looking statements, whether as a result of new information, future events or otherwise.

**Lehman Brothers**

Lehman Brothers, an innovator in global finance, serves the financial needs of corporations, governments and municipalities, institutional clients and high-net-worth individuals worldwide. We provide a full array of services in equity and fixed income sales, trading and research, investment banking, asset management, private investment management and private equity. Our worldwide headquarters in New York and regional headquarters in London and Tokyo are complemented by a network of offices in North America, Europe, the Middle East, Latin America and the Asia Pacific region. The Firm, through predecessor entities, was founded in 1850.

Through our subsidiaries, we are a global market-maker in all major equity and fixed income products. To facilitate our market-making activities, we are a member of all principal securities and commodities exchanges in the United States, as well as FINRA (the Financial Industry Regulatory Authority, formed in 2007 by the consolidation of NASD, Inc. and the member regulation, enforcement and arbitration functions of the New York Stock Exchange, Inc. ("NYSE")), and we hold memberships or associate memberships on several principal international securities and commodities exchanges, including the London, Tokyo, Hong Kong, Frankfurt, Paris, Milan, Singapore and Australian stock exchanges.

Through our investment banking, trading, research, structuring and distribution capabilities in equity and fixed income products, we continue to build on our client-flow business model, which is based on our principal focus of facilitating client transactions in all major global capital markets products and services. We generate client-flow revenues from institutional, corporate, government and high-net-worth clients by (i) advising on and structuring transactions specifically suited to meet client needs; (ii) serving as a market maker and/or intermediary in the global marketplace, including having securities and other financial instrument products available to allow clients to adjust their portfolios and risks across different market cycles; (iii) originating loans for distribution to clients in the securitization or principals market; (iv) providing investment management and advisory services; and (v) acting as an underwriter to clients. As part of our client-flow activities, we maintain inventory positions of varying amounts across a broad range of financial instruments. In addition, we also take proprietary trading and principal investment positions. The financial services industry is significantly influenced by worldwide economic conditions as well as other factors inherent in the global financial markets. As a result, revenues and earnings may vary from quarter to quarter and from year to year. We believe our client-flow orientation and the diversity of our business helps to mitigate overall revenue volatility. See Part I, Item 1A, "Risk Factors," in this Report for a discussion of certain material risks to our business, financial condition and results of operations.

We operate in three business segments (each of which is described below): Capital Markets, Investment Banking and Investment Management. Financial information concerning the Company for the fiscal years ended November 30, 2007,





2006 and 2005, including the amount of net revenues contributed by each segment in such periods, is set forth in the Consolidated Financial Statements and Notes thereto in Part II, Item 8, of this Report. Information with respect to our operations by business segment and net revenues by geographic area is set forth under the captions "Management's Discussion and Analysis of Financial Condition and Results of Operations—Business Segments" and "—Geographic Revenues" in Part II, Item 7, of this Report, and in Note 2 to the Consolidated Financial Statements in Part II, Item 8, of this Report.

**Capital Markets**

Capital Markets primarily represents institutional client-flow activities, including secondary trading, financing, mortgage origination and securitization, prime brokerage and research activities in fixed income and equity products. These products include a wide range of cash, derivative, secured financing and structured instruments and investments. We are a leading global market-maker in numerous equity and fixed income products, including U.S., European and Asian equities, government and agency securities, money market products, corporate high-grade, high-yield and emerging market securities, mortgage- and asset-backed securities, preferred stock, municipal securities, commodities and energy products, bank loans, foreign exchange, financing and derivative products. We are one of the largest investment banks in terms of U.S. and pan-European listed equities trading volume and maintain a major presence in over-the-counter U.S. stocks, major Asian large capitalization stocks, warrants, convertible debentures and preferred issues. In addition, the secured financing business manages our equity and fixed income matched book activities, supplies secured financing to institutional clients and provides secured funding for our inventory of equity and fixed income products.

We facilitate client transactions by serving as an agent, market-maker and/or intermediary in the global marketplace, including making available securities and other financial instruments and products to clients to adjust their portfolios and risks across different market cycles, enabling clients to sell large positions of securities through block trades and originating loans for distribution to clients through securitizations and/or syndications.

The Capital Markets segment also includes principal investing and proprietary trading activities including investments in real estate, private equity and other long-term investments.

Lehman Brothers combines the skills from the sales, trading and research areas of our Equities and Fixed Income Capital Markets businesses to serve the financial needs of our clients. This integrated approach enables us to structure and execute global transactions for clients and to provide worldwide liquidity in marketable securities.

***Equities Capital Markets.*** The Equities Capital Markets business is responsible for our equities and equity-related operations and products worldwide. These products include listed and over-the-counter securities, American Depositary Receipts and convertibles, as well as equity options, futures, warrants and other derivatives. We make markets in equity and equity-related securities as well as take positions for our own account. We participate in global equity markets through our worldwide presence and membership in major stock and option exchanges. During 2007, we acquired the institutional equities business, including the institutional research group, of Brics Securities Limited, a brokerage firm in India. Equities Capital Markets is composed of Liquid Markets, Leveraged Businesses and Private Equity.

Liquid Markets. Liquid Markets consists of our Cash Trading, Flow Derivatives and Program Trading businesses, which also includes connectivity services. Cash trades are executed for clients in both conventional (calls to a sales person) or electronic fashion through external systems as well as our own execution management platform. These trades can be executed manually or via algorithmic trading strategies based on client needs. Our Flow Derivatives business facilitates client orders in listed options markets and vanilla over-the-counter options and derivatives. Program Trading specializes in execution of trades on baskets of stocks, which can be executed on an agency or principal basis. We deliver global electronic connectivity services to our clients, offering seamless electronic access to our trading desks and sources of liquidity around the world.

Leveraged Businesses. Leveraged Businesses include Structured Derivatives and Convertibles. Our Structured Derivatives business offers customized equity derivative products across a wide spectrum of equity-related assets globally, leveraging sales, trading and research into a global solution for the customer. We have experienced significant growth in a number of products, including Exchange Traded Funds (ETFs), options and warrants, spread-trading, agency/risk baskets, index rebalancing and other structured products. We are a leading participant in the development and trading of new equity derivative instruments. Our product development capabilities enable investors to take risk positions tailored to their specific needs or undertake sophisticated hedging and monetization strategies. The Convertibles business trades and makes markets in conventional and structured convertible securities.

Private Equity. The Equities Capital Markets segment also includes realized and unrealized gains and losses related to private equity principal investments. See "Investment Management—Asset Management—Private Equity" below.





Specialist Business. In December 2007, we acquired certain assets related to Van der Moolen Specialists, including its NYSE portfolio of listed company specialist's assignments and certain technology. As a result, Lehman Brothers Market Makers, a division of Lehman Brothers Inc., our U.S. registered broker dealer, acts as specialist for approximately 400 NYSE-listed issues and is the fourth-largest specialist firm on the NYSE.

***Fixed Income Capital Markets.*** Lehman Brothers actively participates in key fixed income markets worldwide and maintains a 24-hour trading presence in global fixed income securities. We are a market-maker and participant in the new issue and secondary markets for, and take positions for our own account in, a broad variety of fixed income securities. During 2007, we acquired Grange Securities Limited, a full service Australian broker-dealer specializing in fixed income products. Fixed Income businesses include the following:

Government and Agency Obligations. Lehman Brothers is one of the leading primary dealers in U.S. government securities, participating in the underwriting of and market-making in U.S. Treasury bills, notes and bonds, and securities of federal agencies. We are also a market-maker in the government securities of all G-7 countries, and participate in other major European and Asian government bond markets.

Corporate Debt Securities and Loans. We make markets in fixed and floating rate investment grade debt worldwide. We are also a major participant in preferred stock and hybrid capital securities, including long-term and perpetual preferred stock and preferred securities, and auction rate securities.

Global Family of Indices. Lehman Brothers' Global Family of Indices provides comprehensive performance and risk measurements for the major bond markets. The Index Group produces some of the most widely followed benchmarks in the global debt markets.

High Yield Securities and Leveraged Bank Loans. We also make markets in non-investment grade debt securities. Through our high grade and high yield sales, trading and underwriting activities, we make commitments to extend credit in loan syndication transactions. We also provide contingent commitments to high-grade and high-yield counterparties related to acquisition financings.

Money Market Products. We hold leading market positions in the origination and distribution of medium-term notes and commercial paper. We are a dealer or agent for numerous active commercial paper and medium-term note programs on behalf of companies and government agencies worldwide.

Mortgage and Loan Origination and Mortgage- and Asset-Backed Securities. Lehman Brothers Bank, FSB ("LB Bank"), offers traditional and online mortgage banking services to individuals and institutions. Lehman Brothers Bankhaus AG ("Bankhaus"), a German bank, offers lending and real estate financing to corporate and institutional borrowers worldwide. We originate commercial and residential mortgage loans through LB Bank, Bankhaus and other subsidiaries in the U.S., Europe and Asia. We are a leading underwriter of and market-maker in residential and commercial mortgage- and asset-backed securities and are active in all areas of secured lending, structured finance and securitized products. We underwrite

The Prime Broker business engages in full operations, clearing and processing services for its hedge fund and other clients. Along with Secured Financing, it offers a full suite of prime brokerage products and services, including margin financing and yield enhancement through synthetic and traditional products, global securities lending (including eBorrow, our online securities lending tool), full-service global execution platforms and research teams, customized risk management solutions, introduction of clients to suitable institutional investors, portfolio accounting and reporting solutions and personalized client service.

Our Futures business executes and clears futures transactions for clients on an agency basis. The Clearing and Execution business provides these services to broker-dealers and other clients that do not have the capacity themselves.





***Capital Markets Global Distribution.*** Our institutional sales organizations encompass distinct global sales forces that have been integrated into the Capital Markets businesses to provide investors with the full array of products offered by Lehman Brothers.

Equities Sales. Our Equities Capital Markets sales force provides an extensive range of services to institutional investors, focusing on developing long-term relationships through a comprehensive understanding of clients' investment objectives, while providing proficient execution and consistent liquidity in a wide range of global equity securities and derivatives.

Fixed Income Sales. Our Fixed Income Capital Markets sales force is one of the most productive in the industry, serving the investing and liquidity needs of major institutional investors by employing a relationship management approach that provides superior information flow and product opportunities for our clients.

***Research.*** Research at Lehman Brothers encompasses the full range of research disciplines, including fundamental, quantitative, economic, strategic, credit, relative value and market-specific analysis. To ensure in-depth expertise within various markets, Equity Research has established regional teams on a worldwide basis that are staffed with industry and strategy specialists. Fixed Income Research provides expertise in U.S., European and Asian government and agency securities, derivatives, sovereign issues, corporate securities, high yield, asset- and mortgage-backed securities, indices, emerging market debt and municipal securities.

**Investment Banking**

Investment Banking provides advice to corporate, institutional and government clients throughout the world on mergers, acquisitions and other financial matters. Investment Banking also raises capital for clients by underwriting public and private offerings of debt and equity instruments. Our Investment Banking professionals are responsible for developing and maintaining relationships with these clients to gain a thorough understanding of their specific needs and for bringing together the full resources of Lehman Brothers to accomplish their financial and strategic objectives.

Investment Banking is comprised of Corporate Finance, Mergers & Acquisitions ("M&A") and Global Finance units that serve our corporate, institutional and government clients. The Corporate Finance unit is organized into global industry groups—Communications, Consumer/Retail, Financial Institutions, Financial Sponsors, Healthcare, Industrial, Media, Middle Markets, Natural Resources, Power, Real Estate and Technology—that include bankers who deliver industry knowledge and expertise to meet clients' objectives. M&A is comprised of Advisory and Restructuring groups. Global Finance serves our clients' capital-raising needs through specialized product groups in Equity Capital Markets, Debt Capital Markets, Leveraged Finance, Private Capital Markets and Risk Solutions. Bankers in these specialized product groups partner with industry coverage bankers in the global industry groups to provide comprehensive financial solutions for clients.

Lehman Brothers maintains investment banking offices in North America, Europe, the Middle East, Latin America and the Asia Pacific region.

The high degree of integration among our industry, product and geographic groups has allowed us to become a leading source of "one-stop" financial solutions for our global clients.

***M&A Advisory.*** Lehman Brothers' global M&A Advisory group delivers strategic advisory services to companies worldwide. Our capabilities cover the entire spectrum of strategic alternatives available to clients, including acquisitions, divestitures, restructurings, leveraged buyouts, takeover defenses, special committee assignments and exclusive sales. Lehman Brothers' global team of M&A professionals works in partnership with industry coverage bankers, to provide strategic insight, tactical advice and execution capabilities in approaching clients' most challenging issues.

***Restructuring.*** Our Restructuring group provides full-service restructuring expertise on a global basis, including financing capabilities and traditional restructuring advice. The group provides advisory services to distressed companies, their creditors and potential purchasers, including providing out-of-court options for companies seeking to avoid bankruptcy, helping companies and creditors move efficiently through the bankruptcy process and advising strategic and financial buyers on the unique challenges of buying distressed and bankrupt companies. The Restructuring group has significant cross-border transaction expertise.

***Equity Capital Markets.*** Lehman Brothers is a leading underwriter in the global equity capital markets. Our capabilities include initial public offerings, follow-on offerings, monetizations, preferred stock, convertible securities, equity-linked securities, equity derivatives and share repurchases. We have a global team of equity product specialists who work closely with industry coverage bankers globally to develop solutions that meet our clients' needs.

***Debt Capital Markets.*** Lehman Brothers is also a leading underwriter in the global fixed income markets. The Firm takes a comprehensive approach, working closely with clients to develop and implement tailored solutions to specific





issues and problems. Our capabilities span the spectrum of fixed income products, including high grade and high yield debt, commercial paper, hybrid capital, government and agency securities, mortgage- and asset-backed securities and collateralized debt obligations, together with risk management and structured finance solutions. Our debt product specialists work closely with industry coverage bankers globally to originate, structure and market fixed income securities to investors.

***Leveraged Finance.*** Our global Leveraged Finance group provides comprehensive financing solutions for below-investment grade clients across many industries through our leveraged loan, high yield bond, bridge financing and mezzanine debt products. Lehman Brothers provides "one-stop" leveraged financing solutions for corporate and financial acquirers and high yield issuers, including multi-tranche, multi-product acquisition financing. We have a leading leveraged loan and bond franchise.

***Private Capital Markets.*** We have a dedicated Private Capital Markets group focused on raising capital in the private equity and debt markets. The Firm's Private Capital Markets professionals work closely with our industry coverage bankers to assist clients in establishing optimal capital structures. Clients range from pre-initial public offering companies to well-established corporations that span many industries. The Private Capital Markets group has experience in identifying sources, establishing structures and placing common stock, convertible preferred stock, preferred stock, subordinated and/or mezzanine debt and senior debt, as well as utilizing a variety of financing techniques, including private investments in public equity (PIPEs), securitizations, project financings and sale-leasebacks.

***Risk Solutions Group.*** Our Risk Solutions group works with clients to identify and manage their interest rate, inflation, commodities and currency and commodity risks, among other risks. The group's solutions typically draw upon a range of swap and derivative products.

**Investment Management**

Investment Management provides strategic investment advice and services to institutional and high-net-worth clients on a global basis.

Information with respect to changes in and composition of assets under management is set forth under the caption "Management's Discussion and Analysis of Financial Condition and Results of Operations—Business Segments—Investment Management" in Part II, Item 7, of this Report. Investment Management consists of our Asset Management and Private Investment Management businesses.

During 2007, we acquired H.A. Schupf, a high net worth boutique asset manager with approximately $2.3 billion in assets under management; LightPoint Capital Management LLC, a leveraged loan investment manager based in Chicago, Illinois, with approximately $3.2 billion in assets under management; Dartmouth Capital, a U.K.-based investment advisory firm with approximately $340 million in assets under advisory; and MNG Securities, an equity securities brokerage firm in Turkey. We also purchased an initial 20% interest and a subsequent 5% interest in both Spinnaker Asset Management Limited and Spinnaker Financial Services, part of Spinnaker Capital, an emerging markets investment management firm, and a 20% interest in the D.E. Shaw group, a global investment management firm.

***Asset Management.*** Asset Management provides proprietary asset management products across traditional and alternative asset classes, through a variety of distribution channels, to individuals and institutions. It includes both the Neuberger Berman and Lehman Brothers Asset Management brands as well as our Private Equity business.

<u>Neuberger Berman.</u> Neuberger Berman has provided money management products and services to individuals and families since 1939. We acquired Neuberger Berman in October 2003.

Neuberger Berman's Private Asset Management business provides discretionary, customized portfolio management across equity and fixed income asset classes for high-net-worth clients. Experienced money managers, each with a distinct investment style and discipline, tailor investment strategies to fit clients' individual goals, financial needs and tolerance for risk.

The Neuberger Berman family of funds spans asset classes, investment styles and capitalization ranges. Its open-end mutual funds are available directly to investors or through distributors, and its closed-end funds trade on major stock exchanges. Neuberger Berman is also a leading sub-advisor of funds for institutional clients, including insurance companies, banks and other financial services firms. We serve as the investment advisor or sub-advisor for numerous defined contribution plans, and for insurance companies offering variable annuity and variable life insurance products, and we provide portfolio management through both mutual fund and separate account wrap programs.





<u>Lehman Brothers Asset Management.</u> Lehman Brothers Asset Management specializes in investment strategies for institutional and qualified individual investors. While our strategies are numerous and diverse, our managers share a dedication to investment discipline that includes quantitative screening, fundamental analysis and risk management.

**Risk Management**

A description of our Risk Management infrastructure and procedures is contained in "Management's Discussion and Analysis of Financial Condition and Results of Operations—Risk Management" in Part II, Item 7, of this Report. Information regarding our use of derivative financial instruments to hedge interest rate, currency, security and commodity price and other market risks is contained in Notes 1, 3, 4, 6, 8 and 9 to the Consolidated Financial Statements in Part II, Item 8, of this Report.

**Competition**

All aspects of our business are highly competitive. Lehman Brothers competes in U.S. and international markets directly with numerous other firms in the areas of securities underwriting and placement, corporate finance and strategic advisory services, securities sales and trading, prime brokerage, research, foreign exchange and derivative products, asset management and private equity, including investment banking firms, traditional and online securities brokerage firms, mutual fund companies and other asset managers, investment advisers, venture capital firms, certain commercial banks, insurance companies and others. Our competitive ability depends on many factors, including our reputation, the quality of our services and advice, product innovation, execution ability, pricing, advertising and sales efforts and the talent of our personnel. See Part I, Item 1A, "Risk Factors – Competitive Environment," for a further discussion of the competitive risks to which we are exposed.

**Regulation**

The financial services industry is subject to extensive regulation in the various jurisdictions in which we do business. Violation of applicable regulations can result in legal and/or administrative proceedings, which may impose censures, fines, cease-and-desist orders, prohibitions from engaging in, or limitations or conditions on, some of our business activities, which could result in significant losses or reputational damage. We believe that we are in material compliance with applicable regulations.

Currently, U.S. and other international regulators are considering adopting a "mutual recognition" regulatory scheme to lower the barriers for financial institutions and markets seeking to conduct business in other jurisdictions. The objective is to provide investors with greater access to foreign investment opportunities while preserving important investor protection safeguards. Under "mutual recognition," non-U.S. financial intermediaries might be able to provide services to U.S. investors without registering in the U.S. so long as those intermediaries are supervised in an approved jurisdiction that offers comparable regulatory oversight and reciprocity to U.S. firms. U.S. regulators are also considering eliminating or loosening some of the restrictive requirements under Rule 15a-6, which sets forth a process by which a non-U.S. broker can access certain U.S. customers without full registration with the SEC. Both mutual recognition and Rule 15a-6 reform could prompt changes to the status of U.S. and non-U.S. entities through which the Firm conducts its business, how and by whom the Firm is regulated internationally, and how certain cross-border transactions are structured.

***U.S. Regulation.*** Holdings and its subsidiaries are subject to group-wide supervision and examination by the SEC as a Consolidated Supervised Entity ("CSE"). See "Capital Requirements" below and "Management's Discussion and Analysis of Financial Condition and Results of Operations—Accounting and Regulatory Developments—Basel II" in Part II, Item 7, of this Report.

Lehman Brothers Inc. ("LBI"), Neuberger Berman, LLC ("NB LLC") and Neuberger Berman Management Inc. ("NBMI") are registered with the SEC as broker-dealers; Lehman Brothers OTC Derivatives Inc. ("LB OTC") is registered with the SEC as an OTC derivatives dealer; and LBI, NB LLC, NBMI, Lehman Brothers Asset Management LLC ("LBAM"), and certain other of our subsidiaries are registered with the SEC as investment advisers. As such, these entities are subject to regulation by the SEC and by self-regulatory organizations, principally FINRA (which has been designated by the SEC as





LBI's, NB LLC's and NBMI's primary regulator), national securities exchanges such as the NYSE and the Municipal Securities Rulemaking Board, among others. Securities firms are also subject to regulation by state securities administrators in those states in which they conduct business. Various subsidiaries are registered as broker-dealers in all 50 states, the District of Columbia and the Commonwealth of Puerto Rico.

Broker-dealers are subject to regulations, including those contained in the Securities Act of 1933 and the Securities Exchange Act of 1934, and rules promulgated thereunder, that cover all aspects of the securities business, including sales practices, market making and trading among broker-dealers, publication of research, margin lending, use and safekeeping of clients' funds and securities, capital structure, recordkeeping and the conduct of directors, officers and employees.

Registered investment advisers are subject to regulations under the Investment Advisers Act of 1940. Such requirements relate to, among other things, recordkeeping and reporting requirements, disclosure requirements, limitations on agency cross and principal transactions between an adviser and advisory clients, as well as general anti-fraud prohibitions.

Certain investment funds that we manage are registered investment companies under the Investment Company Act of 1940. Those funds and the Lehman Brothers entities that serve as the funds' investment advisers are subject to that act and the rules thereunder, which, among other things, regulate the relationship between a registered investment company and its investment adviser and prohibit or severely restrict principal transactions and joint transactions.

LBI and NB LLC are also registered with the Commodity Futures Trading Commission (the "CFTC") as futures commission merchants, and NB LLC, LBAM and other subsidiaries are registered as commodity pool operators and/or commodity trading advisers. These entities are subject to

regulation by the CFTC and various domestic boards of trade and other commodity exchanges. Our U.S. commodity futures and options business is also regulated by the National Futures Association, a not-for-profit membership corporation that has been designated as a registered futures association by the CFTC.

LB Bank, a federally chartered savings bank incorporated under the laws of the United States of America, is regulated by the Office of Thrift Supervision and the Federal Deposit Insurance Corporation ("FDIC"). LB Commercial Bank is subject to regulation by the FDIC and the Utah Commissioner of Financial Institutions. Lehman Brothers Trust Company N.A., which holds a national bank charter, is regulated by the Office of the Comptroller of the Currency of the United States. Lehman Brothers Trust Company of Delaware, a non-depository limited purpose Delaware trust company, is subject to oversight by the State Bank Commissioner of the State of Delaware. These bodies regulate such matters as policies and procedures on conflicts of interest, account administration and overall governance and supervisory procedures.

Lehman Brothers Commodity Services Inc. ("LBCS") is authorized by the Federal Energy Regulatory Commission ("FERC") to sell wholesale physical power at market-based rates. As a FERC-authorized power marketer, LBCS is subject to regulation under the Federal Power Act and FERC regulations.

Our U.S. insurance subsidiaries are subject to state insurance regulation in the states in which they are domiciled and in the other states in which they are licensed.

***Non-U.S. Regulation.*** We do business in the international fixed income and equity markets and undertake international investment banking and investment management activities, principally through our regional headquarters in London and Tokyo. Lehman Brothers International (Europe) ("LB Europe") is an authorized investment firm in the United Kingdom and is a member of the London, Frankfurt, Paris and Milan exchanges, among others. The U.K. Financial Services and Markets Act 2000 (the "FSMA") and rules promulgated thereunder govern all aspects of the United Kingdom investment business, including regulatory capital, sales, research and trading practices, use and safekeeping of client funds and securities, record keeping, margin practices and procedures, approval standards for individuals, periodic reporting and settlement procedures. Pursuant to the FSMA, certain of our subsidiaries are subject to regulations promulgated and administered by the U.K.'s Financial Services Authority ("FSA").

The investment services that are subject to oversight by the FSA and other European regulators are regulated in accordance with European Union ("EU") directives requiring, among other things, customer protection requirements and conduct of business rules. These standards, requirements and rules are similarly implemented, under the same directives, throughout the EU and are broadly comparable in scope and purpose to the customer protection requirements imposed under the SEC and CFTC rules. Some EU directives also permit local regulation in each jurisdiction, including those in which we operate, to be more restrictive than the requirements of such directives.

The EU Markets in Financial Instruments Directive ("MiFID"), a major piece of legislation that updates and expands the current framework for regulating exchanges, multilateral trading facilities and investment firms on a pan-European basis, was implemented in the U.K. and most other EU member states on November 1, 2007. MiFID facilitates cross-border





business by investment firms by generally establishing the regulatory regime of the member state in which an investment firm has its registered or head office as controlling the investment business of that firm. Once a firm has been authorized by its home member state, it will be able to use the MiFID passport to provide services to customers in other EU member states, which will be regulated by the home member state (whereas previously a service was regulated by the EU member state in which the service was provided). MiFID imposes a new set of organizational and conduct of business requirements on investment firms. Ongoing efforts by EU member countries to adopt national laws and regulations under MiFID could subject the Firm to new regulatory requirements in 2008.

Various Lehman Brothers subsidiaries are regulated by the banking and regulatory authorities of the other European countries in which we operate, including the German Federal Supervisory Authority for the Financial Service Industry (BaFin), the Commission Bancaire and other agencies in France, the Banca d'Italia and the Commissione Nazionale per le Società e la Borsa (CONSOB) in Italy, the Commission de Surveillance du Secteur Financier in Luxembourg and the Swiss Federal Banking Commission, as well as by the European securities, derivatives and commodities exchanges of which they are members. The rules and requirements of these European regulators and exchanges are broadly comparable to the rules and the requirements of the U.S. regulators and exchanges.

Lehman Brothers Japan Inc. ("LB Japan") is a registered securities company in Japan and a member of the Tokyo Stock Exchange Inc., the Osaka Securities Exchange Co., Ltd., the Jasdaq Securities Exchange Inc., the Tokyo Financial Exchange Inc. and the Tokyo Commodity Exchange and, as such, is regulated by the Financial Services Agency, the Securities Exchange Surveillance Commission, the Japan Securities Dealers Association, the Financial Futures Association of Japan, the Tokyo Metropolitan Government and those exchanges.

Other Lehman Brothers subsidiaries in Asia are regulated by the Securities and Futures Commission in Hong Kong, the Monetary Authority of Singapore, the China Securities Regulatory Commission, the Korean Financial Supervisory Service, the Australian Securities and Investments Commission, the Securities and Exchange Board of India and the Reserve Bank of India, as well as by the Asian securities, derivatives and commodities exchanges of which they are members. The rules and requirements of these Asian regulators and exchanges are broadly comparable to the rules and the requirements of the U.S. regulators and exchanges.

In the Americas, LBI and certain other subsidiaries are regulated by the Ontario Securities Commission in Canada, and certain of our Bermuda-based insurance subsidiaries are regulated by the Bermuda Monetary Authority.

| | | | | | |
|---|---|---|---|---|---|
| Employee transactions[2] | 355,501 | | | 355,501 | |
| Total | 370,401 | $ | 62.70 | 370,401 | 61,838,053 |
| Month 3 (November 1, 2007 – November 30, 2007) | | | | | |
| Common stock repurchases[1] | 83,800 | | | 83,800 | |
| Employee transactions[2] | 4,791,483 | | | 4,791,483 | |
| Total | 4,875,283 | $ | 62.46 | 4,875,283 | 56,962,770 |
| Total (September 1, 2007 – November 30, 2007) | | | | | |
| Common stock repurchases[1] | 98,923 | | | 98,923 | |
| Employee transactions[2] | 5,188,276 | | | 5,188,276 | |
| Total | 5,287,199 | $ | 62.43 | 5,287,199 | 56,962,770 |

(1) We have an ongoing common stock repurchase program, pursuant to which we repurchase shares in the open market. As previously announced, in January 2007 our Board of Directors authorized the repurchase, subject to market conditions, of up to 100 million shares of Holdings' common stock, for the management of the Firm's equity capital, including offsetting dilution due to employee stock awards. This authorization superseded the stock repurchase program authorized in January 2006. The number of shares authorized to be repurchased in the open market is reduced by the actual number of Employee Offset Shares (as defined below) received.

(2) Represents shares of common stock withheld in satisfaction of the exercise price of stock options and tax withholding obligations upon option exercises and conversion of restricted stock units (collectively, "Employee Offset Shares").

In January 2008, our Board of Directors authorized the repurchase, subject to market conditions, of up to 100 million shares of Holdings' common stock for the management of the Firm's equity capital, including consideration of dilution due to employee stock awards. This resolution supersedes the stock purchase program authorized in 2007. For more information about the repurchase program and employee stock plans, see "Management's Discussion and Analysis of Financial Condition and Results of Operations—Liquidity, Funding and Capital Resources—Equity Management" in Part II, Item 7, and Note 11 to the Consolidated Financial Statements in Part II, Item 8, in this Form 10-K, and Notes 10 and 12 to the Consolidated Financial Statements in Part II, Item 8, and "Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters" in Part III, Item 12, of this Form 10-K.



LEHMAN BROTHERS HOLDINGS INC.

## ITEM 6. SELECTED FINANCIAL DATA

| | As of or for the Year Ended November 30, | | | | |
|---|---|---|---|---|---|
| | 2007 | 2006 | 2005 | 2004 | 2003 |
| **Consolidated Statement of Income (in millions)** | | | | | |
| Total revenues | $ 59,003 | $ 46,709 | $ 32,420 | $ 21,250 | $ 17,287 |
| Interest expense | 39,746 | 29,126 | 17,790 | 9,674 | 8,640 |
| Net revenues | 19,257 | 17,583 | 14,630 | 11,576 | 8,647 |
| Non-interest expenses: | | | | | |
| Compensation and benefits | 9,494 | 8,669 | 7,213 | 5,730 | 4,318 |
| Non-personnel expenses[1] | 3,750 | 3,009 | 2,588 | 2,309 | 1,716 |
| Real estate reconfiguration charge | — | — | — | 19 | 77 |
| Total non-interest expenses | 13,244 | 11,678 | 9,801 | 8,058 | 6,111 |
| Income before taxes and cumulative effect of accounting change | 6,013 | 5,905 | 4,829 | 3,518 | 2,536 |
| Provision for income taxes | 1,821 | 1,945 | 1,569 | 1,125 | 765 |
| Dividends on trust preferred securities[2] | — | — | — | 24 | 72 |
| Income before cumulative effect of accounting change | 4,192 | 3,960 | 3,260 | 2,369 | 1,699 |
| Cumulative effect of accounting change | — | 47 | — | — | — |
| Net income | $ 4,192 | $ 4,007 | $ 3,260 | $ 2,369 | $ 1,699 |
| Net income applicable to common stock | $ 4,125 | $ 3,941 | $ 3,191 | $ 2,297 | $ 1,649 |
| **Consolidated Statement of Financial Condition (in millions)** | | | | | |
| Total assets | $ 691,063 | $ 503,545 | $ 410,063 | $ 357,168 | $ 312,061 |
| Net assets[3][4] | 372,959 | 268,936 | 211,424 | 175,221 | 163,182 |
| Long-term borrowings[2][5] | 123,150 | 81,178 | 53,899 | 49,365 | 35,885 |
| Preferred securities subject to mandatory redemption[6] | — | — | — | — | 1,310 |
| Total stockholders' equity | 22,490 | 19,191 | 16,794 | 14,920 | 13,174 |
| Tangible equity capital[3][4] | 23,103 | 18,567 | 15,564 | 12,636 | 10,681 |
| Total long-term capital[8] | 145,640 | 100,369 | 70,693 | 64,285 | 50,369 |
| **Per Common Share Data (in millions, except per share amounts)[7]** | | | | | |
| Earnings per share: | | | | | |
| Basic | $ 7.63 | $ 7.26 | $ 5.74 | $ 4.18 | $ 3.36 |
| Diluted | $ 7.26 | $ 6.81 | $ 5.43 | $ 3.95 | $ 3.17 |
| Weighted average common shares outstanding: | | | | | |
| Basic | 540.6 | 543.0 | 556.3 | 549.4 | 491.3 |
| Diluted | 568.3 | 578.4 | 587.2 | 581.5 | 519.7 |
| Dividends declared and paid per common share | $ 0.60 | $ 0.48 | $ 0.40 | $ 0.32 | $ 0.24 |
| Book value per common share[9] | $ 39.44 | $ 33.87 | $ 28.75 | $ 24.66 | $ 22.09 |

| | | | | | |
|---|---|---|---|---|---|
| **Selected Data** | | | | | |
| Leverage ratio[9] | 30.7x | 26.2x | 24.4x | 23.9x | 23.7x |
| Net leverage ratio[10] | 16.1x | 14.5x | 13.6x | 13.9x | 15.3x |
| Employees | 28,556 | 25,936 | 22,919 | 19,579 | 16,188 |
| Assets under management (in billions) | $ 282 | $ 225 | $ 175 | $ 137 | $ 120 |
| **Financial Ratios** | | | | | |
| Compensation and benefits/net revenues | 49.3% | 49.3% | 49.3% | 49.5% | 49.9% |
| Pre-tax margin | 31.2% | 33.6% | 33.0% | 30.4% | 29.3% |
| Return on average common stockholders' equity[11] | 20.8% | 23.4% | 21.6% | 17.9% | 18.2% |
| Return on average tangible common stockholders' equity[11] | 25.7% | 29.1% | 27.8% | 24.7% | 19.2% |



## LEHMAN BROTHERS HOLDINGS INC.

**Notes to Selected Financial Data:**

(1) Non-personnel expenses exclude real estate reconfiguration charges of $19 million and $77 million for the years ended November 30, 2004 and 2003, respectively.

(2) We adopted FIN 46(R) effective February 29, 2004, which required us to deconsolidate the trusts that issued the preferred securities. Accordingly, at and subsequent to February 29, 2004, preferred securities subject to mandatory redemption were reclassified to junior subordinated notes, a component of long-term borrowings. Dividends on preferred securities subject to mandatory redemption, which were presented as Dividends on trust preferred securities in the Consolidated Statement of Income through February 29, 2004, are included in Interest expense in periods subsequent to February 29, 2004.

(3) We calculate net assets by excluding from total assets: (i) cash and securities segregated and on deposit for regulatory and other purposes; (ii) collateralized lending agreements; and (iii) identifiable intangible assets and goodwill. We believe net assets to be a more useful measure of our assets than total assets because it excludes certain low-risk, non-inventory assets. Net assets as presented are not necessarily comparable to similarly-titled measures provided by other companies in the securities industry because of different methods of presentation.

| | At November 30, | | | | |
|---|---|---|---|---|---|
| In millions | 2007 | 2006 | 2005 | 2004 | 2003 |
| Total assets | $ 691,063 | $ 503,545 | $ 410,063 | $ 357,168 | $ 312,061 |
| Cash and securities segregated and on deposit for regulatory and other purposes | (12,743) | (6,091) | (5,744) | (4,085) | (3,100) |
| Collateralized lending agreements | (301,234) | (225,156) | (189,639) | (174,578) | (142,218) |
| Identifiable intangible assets and goodwill | (4,127) | (3,362) | (3,256) | (3,284) | (3,561) |
| Net assets | $ 372,959 | $ 268,936 | $ 211,424 | $ 175,221 | $ 163,182 |

(4) Long-term borrowings exclude borrowings with remaining contractual maturities within twelve months of the financial statement date.

(5) We calculate tangible equity capital by including stockholders' equity and junior subordinated notes (at November 30, 2003, preferred securities subject to mandatory redemption), and excluding identifiable intangible assets and goodwill. See "MD&A—Liquidity, Funding and Capital Resources—Balance Sheet and Financial Leverage" for additional information about tangible equity capital. We believe tangible equity capital to be a more meaningful measure of our equity base as it includes instruments we consider to be equity-like due to their subordinated nature, long-term maturity and interest deferral features and excludes assets we do not consider available to support our remaining net assets (see note 3 above). These measures may not be comparable to other, similarly titled calculations by other companies as a result of different calculation methodologies.

| | At November 30, | | | | |
|---|---|---|---|---|---|
| In millions | 2007 | 2006 | 2005 | 2004 | 2003 |
| Total stockholders' equity | $ 22,490 | $ 19,191 | $ 16,794 | $ 14,920 | $ 13,174 |
| Junior subordinated notes (subject to limitation) [a] [b] | 4,740 | 2,738 | 2,026 | 1,000 | 1,068 |
| Identifiable intangible assets and goodwill | (4,127) | (3,362) | (3,256) | (3,284) | (3,561) |
| Tangible equity capital | $ 23,103 | $ 18,567 | $ 15,564 | $ 12,636 | $ 10,681 |

(a) Preferred securities subject to mandatory redemption at November 30, 2003.

(b) Our definition for tangible equity capital limits the amount of junior subordinated notes and preferred stock included in the calculation to 25% of tangible equity capital. The amount excluded was approximately $237 million at November 30, 2007. No amounts were excluded in prior periods.

(6) Total long-term capital includes long-term borrowings (excluding any borrowings with remaining contractual maturities within twelve months of the financial statement date) and total stockholders' equity and, at November 30, 2003, preferred securities subject to mandatory redemption. We believe total long-term capital is useful to investors as a measure of our financial strength.

(7) Common share and per share amounts have been retrospectively adjusted to give effect for the 2-for-1 common stock split, effected in the form of a 100% stock dividend, which became effective April 28, 2006.

(8) The book value per common share calculation includes amortized restricted stock units granted under employee stock award programs, which have been included in total stockholders' equity.

(9) Leverage ratio is defined as total assets divided by total stockholders' equity.

(10) Net leverage ratio is defined as net assets (see note 3 above) divided by tangible equity capital (see note 5 above). We believe net leverage based on net assets and tangible equity capital to be a more meaningful measure of leverage as net assets excludes certain low-risk, non-inventory assets and we believe tangible equity capital to be a more meaningful measure of our equity base. Net leverage as presented is not necessarily comparable to similarly-titled measures provided by other companies in the securities industry because of different methods of presentation.





(11) Return on average common stockholders' equity is computed by dividing net income applicable to common stock for the period by average common stockholders' equity. Return on average tangible common stockholders' equity is computed by dividing net income applicable to common stock for the period by average tangible common stockholders' equity. Average tangible common stockholders' equity equals average total common stockholders' equity less average identifiable intangible assets and goodwill. We believe tangible common stockholders' equity is a meaningful measure because it reflects the common stockholders' equity deployed in our businesses. Average common stockholders' equity, Average identifiable intangible assets and goodwill and Average tangible common stockholders' equity are calculated as:

| In millions | As of or for the Year Ended November 30, 2007 | 2006 | 2005 | 2004 | 2003 |
|---|---|---|---|---|---|
| Net income applicable to common stock | $ 4,125 | $ 3,941 | $ 3,191 | $ 2,297 | $ 1,649 |
| Average stockholders' equity | $ 20,910 | $ 17,971 | $ 15,936 | $ 14,059 | $ 9,899 |
| Less: average preferred stock | (1,095) | (1,095) | (1,195) | (1,217) | (838) |
| Average common stockholders' equity | $ 19,815 | $ 16,876 | $ 14,741 | $ 12,842 | $ 9,061 |
| Less: average identifiable intangible assets and goodwill | (3,756) | (3,312) | (3,272) | (3,547) | (471) |
| Average tangible common stockholders' equity | $ 16,059 | $ 13,564 | $ 11,469 | $ 9,295 | $ 8,590 |
| Return on average common stockholders' equity | 20.8% | 23.4% | 21.6% | 17.9% | 18.2% |
| Return on average tangible common stockholders' equity | 25.7% | 29.1% | 27.8% | 24.7% | 19.2% |





## ITEM 7. MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS

Contents

Management's Discussion and Analysis of Financial Condition and Results of Operations


Introduction 33

Forward-Looking Statements 33

Executive Overview 33

Certain Factors Affecting Results of Operations 36

Critical Accounting Policies and Estimates 38

Consolidated Results of Operations 42

Business Segments 46

Geographic Revenues 54

Liquidity, Funding and Capital Resources 56

Contractual Obligations and Lending-Related Commitments 65

Off-Balance-Sheet Arrangements 66

*Other.* When we do not consolidate an entity or apply the equity method of accounting, we present our investment in the entity at fair value. We have formed various non-consolidated private equity or other alternative investment funds with third-party investors that are typically organized as limited partnerships. We typically act as general partner for these funds, and when third-party investors have (i) rights to either remove the general partner without cause or to liquidate the partnership; or (ii) substantive participation rights, we do not consolidate these partnerships in accordance with Emerging Issue Task Force ("EITF") No. 04-5, *Determining Whether a General Partner, or the General Partners as a Group, Controls a Limited Partnership or Similar Entity When the Limited Partners Have Certain Rights* ("EITF 04-5").

A determination of whether we have a controlling financial interest in an entity and therefore our assessment of consolidation of that entity is initially made at the time we become involved with the entity. Certain events may occur which





cause us to re-assess our initial determination of whether an entity is a VIE or non-VIE or whether we are the primary beneficiary if the entity is a VIE and therefore our assessment of consolidation of that entity. Those events generally are:

- The entity's governance structure is changed such that either (i) the characteristics or adequacy of equity at risk are changed, or (ii) expected returns or losses are reallocated among the participating parties within the entity.
- The equity investment (or some part thereof) is returned to the equity investors and other interests become exposed to expected returns or losses.
- Additional activities are undertaken or assets acquired by the entity that were beyond those anticipated previously.
- Participants in the entity acquire or sell interests in the entity.
- The entity receives additional equity at risk or curtails its activities in a way that changes the expected returns or losses.

**Valuation of Financial Instruments**

We measure Financial instruments and other inventory positions owned, excluding Real estate held for sale, and Financial instruments and other inventory positions sold but not yet purchased at fair value. We account for Real estate held for sale at the lower of its carrying amount or fair value less cost to sell. Both realized and unrealized gains or losses from Financial instruments and other inventory positions owned and Financial instruments and other inventory positions sold but not yet purchased are reflected in Principal transactions in the Consolidated Statement of Income.

We adopted SFAS No. 157, *Fair Value Measurements* ("SFAS 157"), in the first quarter of 2007. SFAS 157 defines fair value, establishes a framework for measuring fair value, establishes a fair value hierarchy based on the inputs used to measure fair value and enhances disclosure requirements for fair value measurements. Additionally and also in the first quarter of 2007, we adopted SFAS 159, and applied this option to certain hybrid financial instruments not previously accounted for at fair value under SFAS No. 155, *Accounting for Certain Hybrid Financial Instruments—an amendment of FASB Statements No. 133 and 140*, as well as certain deposit liabilities at our U.S. banking subsidiaries.

SFAS 157 defines "fair value" as the price that would be received to sell an asset or paid to transfer a liability in an orderly transaction between market participants at the measurement date, or an exit price. The degree of judgment utilized in measuring the fair value of financial instruments generally correlates to the level of pricing observability. Financial instruments with readily available active quoted prices or for which fair value can be measured from actively quoted prices in active markets generally have more pricing observability and less judgment utilized in measuring fair value. Conversely, financial instruments rarely traded or not quoted have less observability and are measured at fair value using valuation models that require more judgment. Pricing observability is impacted by a number of factors, including the type of financial instrument, whether the financial instrument is new to the market and not yet established, the characteristics specific to the transaction and overall market conditions generally.

The overall valuation process for financial instruments may include adjustments to valuations derived from pricing models. These adjustments may be made when, in management's judgment, either the size of the position in the financial instrument or other features of the financial instrument such as its complexity, or the market in which the financial instrument is traded (such as counterparty, credit, concentration or liquidity) require that an adjustment be made to the value derived from the pricing models. An adjustment may be made if a trade of a financial instrument is subject to sales restrictions that would result in a price less than the computed fair value measurement from a quoted market price. Additionally, an adjustment from the price derived from a model typically reflects management's judgment that other participants in the market for the financial instrument being measured at fair value would also consider such an adjustment in pricing that same financial instrument.

We have categorized our financial instruments measured at fair value into a three-level classification in accordance with SFAS 157. Fair value measurements of financial instruments that use quoted prices in active markets for identical assets or liabilities are generally categorized as Level I, and fair value measurements of financial instruments that have no direct observable levels are generally categorized as Level III. The lowest level input that is significant to the fair value measurement of a financial instrument is used to categorize the instrument and reflects the judgment of management. Financial assets and liabilities presented at fair value in Holdings' Condensed Consolidated Statement of Financial Condition generally are categorized as follows:

Level I – Inputs are unadjusted, quoted prices in active markets for identical assets or liabilities at the measurement date.





The types of assets and liabilities carried at Level I fair value generally are G-7 government and agency securities, equities listed in active markets, investments in publicly traded mutual funds with quoted market prices and listed derivatives.

Level II – Inputs (other than quoted prices included in Level I) are either directly or indirectly observable for the asset or liability through correlation with market data at the measurement date and for the duration of the instrument's anticipated life.

Fair valued assets and liabilities that are generally included in this category are non-G-7 government securities, municipal bonds, certain hybrid financial instruments, certain mortgage and asset backed securities, certain corporate debt, certain commitments and guarantees, certain private equity investments and certain derivatives.

Level III – Inputs reflect management's best estimate of what market participants would use in pricing the asset or liability at the measurement date. Consideration is given to the risk inherent in the valuation technique and the risk inherent in the inputs to the model.

Generally, assets and liabilities carried at fair value and included in this category are certain mortgage and asset-backed securities, certain corporate debt, certain private equity investments, certain commitments and guarantees and certain derivatives.

Financial assets and liabilities presented at fair value and categorized as Level III are generally those that are marked to model using relevant empirical data to extrapolate an estimated fair value. The models' inputs reflect assumptions that market participants would use in pricing the instrument in a current period transaction and outcomes from the models represent an exit price and expected future cash flows. Our valuation models are calibrated to the market on a frequent basis. The parameters and inputs are adjusted for assumptions about risk and current market conditions. Changes to inputs in valuation models are not changes to valuation methodologies; rather, the inputs are modified to reflect direct or indirect impacts on asset classes from changes in market conditions. Accordingly, results from valuation models in one period may not be indicative of future period measurements. Valuations are independently reviewed by employees outside the business unit and, where applicable, valuations are back tested comparing instruments sold to where they were marked.

During the 2007 fiscal year, our Level III assets increased, ending the year at 13% of Financial instruments and other inventory positions owned, measured at fair value and with our derivatives on a net basis. The increase in Level III assets resulted largely from the reclassification of approximately $11.4 billion of mortgage and asset-backed securities, including approximately $5.3 billion in U.S. subprime residential mortgage-related assets, previously categorized as Level II assets into the Level III category. This reclassification generally occurred in the second half of 2007, reflecting the reduction of liquidity in the capital markets that resulted in a decrease in the observability of market prices. Approximately half of the residential mortgage-related assets that were classified as Level III at the end of the 2007 fiscal year were whole loan mortgages. In particular, the decline in global trading activity impacted our ability to directly correlate assumptions in valuation models used in pricing mortgage-related assets, including those for cumulative loss rates and changes in underlying collateral values to current market activity. Additionally and during the fiscal year, the increase of assets characterized as Level III was also attributable to the acquisition of private equity and other principal investment assets, funded lending commitments that had not been fully syndicated at the end of the fiscal year as well as certain commercial mortgage-backed security positions.

For a further discussion regarding the measure of Financial instruments and other inventory positions owned, excluding Real estate held for sale, and Financial instruments and other inventory positions sold but not yet purchased at fair value, see Note 4, "Fair Value of Financial Instruments," to the Consolidated Financial Statements.

**Identifiable Intangible Assets and Goodwill**

Determining the carrying values and useful lives of certain assets acquired and liabilities assumed associated with business acquisitions—intangible assets in particular—requires significant judgment. At least annually, we are required to assess whether goodwill and other intangible assets have been impaired by comparing the estimated fair value, calculated based on price-earnings multiples, of each business segment with its estimated net book value, by estimating the amount of stockholders' equity required to support each business segment. Periodically estimating the fair value of a reporting unit and carrying values of intangible assets with indefinite lives involves significant judgment and often involves the use of significant estimates and assumptions. These estimates and assumptions could have a significant effect on whether or not an impairment charge is recognized and the magnitude of such a charge. We completed our last impairment test on goodwill and other intangible assets as of August 31, 2007, and no impairment was identified.





**Legal, Regulatory and Tax Proceedings**

In the normal course of business, we have been named as a defendant in a number of lawsuits and other legal and regulatory proceedings. Such

| | | |
|---|---|---|
| Bonds and loans in established trading markets | $ 31,457 | $ 11,481 |
| Bonds and loans held awaiting securitization and/or syndication | 157 | 4,132 |
| Bonds and loans with little or no pricing transparency | 1,118 | 316 |
| High yield instruments | 32,732 | 15,929 |
| Credit risk hedges[1] | (2,337) | (3,111) |
| High yield position, net | $ 30,395 | $ 12,818 |

(1) Credit risk hedges represent financial instruments with offsetting risk to the same underlying counterparty, but exclude other credit and market risk mitigants which are highly correlated, such as index, basket and/or sector hedges.

The increase in high-yield positions from 2006 to 2007 is primarily from funded lending commitments that have not been syndicated. At November 30, 2007 and 2006, the largest industry concentrations were 26% and 20%, respectively, and were in the finance and insurance industry classifications. The largest geographic concentrations at November 30, 2007 and 2006 were 66% and 53%, respectively, in the Americas. We mitigate our aggregate and single-issuer net exposure through the use of derivatives, non-recourse financing and other financial instruments.

***Private equity and other principal investments.*** Our Private Equity business operates in six major asset classes: Merchant Banking, Real Estate, Venture Capital, Credit-Related Investments, Private Funds Investments and Infrastructure. We have raised privately-placed funds in these asset classes, for which we act as a general partner and in which we have general and in many cases limited partner interests. In addition, we generally co-invest in the investments made by the funds or may make other non-fund-related direct investments. At November 30, 2007 and 2006, our private equity related investments totaled $4.2 billion and $2.1 billion, respectively. The real estate industry represented the highest concentrations at 41% and 30% at November 30, 2007 and 2006, respectively, and the largest single investment was approximately $275 million and $80 million, at those respective dates.

Our private equity investments are measured at fair value based on our assessment of each underlying investment, incorporating valuations that consider expected cash flows, earnings multiples and/or comparisons to similar market transactions, among other factors. Valuation adjustments, which usually involve the use of significant management estimates, are an integral part of pricing these instruments, reflecting consideration of credit quality, concentration risk, sale restrictions and other liquidity factors. For additional information about our private equity and other principal investment activities, including related commitments, see Note 9, "Commitments, Contingencies and Guarantees," to the Consolidated Financial Statements.

**Equity Management**

The management of equity is a critical aspect of our capital management. Determining the appropriate amount of equity capital base is dependent on a number of variables, including the amount of equity needed given our estimation of risk in our business activities, the capital required by laws or regulations, leverage thresholds required by the consolidated supervised entity ("CSE") rules and credit rating agencies' perspectives of capital sufficiency.

We continuously evaluate deployment alternatives for our equity with the objective of maximizing shareholder value. In periods where we determine our levels of equity to be beyond those necessary to support our business activities, we may return capital to shareholders through dividend payments or stock repurchases.

We maintain a common stock repurchase program to manage our equity capital. In January 2007, our Board of Directors authorized the repurchase, subject to market conditions, of up to 100 million shares of Holdings common stock for the management of our equity capital, including offsetting dilution due to employee stock awards. This authorization superseded the stock repurchase program authorized in 2006. Our stock repurchase program is effected through





open-market purchases, as well as through employee transactions where employees tender shares of common stock to pay for the exercise price of stock options and the required tax withholding obligations upon option exercises and conversion of restricted stock units ("RSUs") to freely-tradable common stock.

Over the course of our 2007 fiscal year, we repurchased through open-market purchases or withheld from employees for the purposes described above approximately 43.0 million shares of our common stock at an aggregate cost of approximately $3.2 billion, or $73.85 per share. During 2007, we issued 15.4 million shares resulting from employee stock option exercises and another 24.5 million shares were issued out of treasury stock to an irrevocable grantor trust that holds shares for issuance to employees in satisfaction of restricted stock units granted under the Firm's equity compensation plans (the "RSU Trust").

In January 2008, our Board of Directors authorized the repurchase, subject to market conditions, of up to 100 million shares of Holdings' common stock for the management of the Firm's equity capital, including consideration of dilution due to employee stock awards. This resolution supersedes the stock repurchase program authorized in 2007.

**Capital Ratios**

***Leverage Ratios.*** The relationship of assets to equity is one measure of a company's capital adequacy. Generally, this leverage ratio is computed

by dividing assets by stockholders' equity. We believe that a more meaningful, comparative ratio for companies in the securities industry is net leverage, which is the result of net assets divided by tangible equity capital.

Our net leverage ratio is calculated as net assets divided by tangible equity capital. We calculate net assets by excluding from total assets: (i) cash and securities segregated and on deposit for regulatory and other purposes; (ii) collateralized lending agreements; and (iii) identifiable intangible assets and goodwill. We believe net leverage based on net assets to be a more useful measure of leverage, because it excludes certain low-risk, non-inventory assets and utilizes tangible equity capital as a measure of our equity base. We calculate tangible equity capital by including stockholders' equity and junior subordinated notes and excluding identifiable intangible assets and goodwill. We believe tangible equity capital to be a more meaningful measure of our equity base for purposes of calculating net leverage because it includes instruments we consider to be equity-like due to their subordinated nature, long-term maturity and interest deferral features and we do not view the amount of equity used to support identifiable intangible assets and goodwill as available to support our remaining net assets. These measures may not be comparable to other, similarly titled calculations by other companies as a result of different calculation methodologies.





**Tangible Equity Capital and Capital Ratios**

| In millions | At November 30, 2007 | At November 30, 2006 |
|---|---|---|
| Total stockholders' equity | $ 22,490 | $ 19,191 |
| Junior subordinated notes (1) (2) | 4,740 | 2,738 |
| Identifiable intangible assets and goodwill | (4,127) | (3,362) |
| Tangible equity capital | $ 23,103 | $ 18,567 |
| Total assets | $ 691,063 | $ 503,545 |
| Leverage ratio | 30.7x | 26.2x |
| Net assets | $ 372,959 | $ 268,936 |
| Net leverage ratio | 16.1x | 14.5x |

(1) See Note 8, "Borrowings and Deposit Liabilities," to the Consolidated Financial Statements.

(2) Our definition for tangible equity capital limits the amount of junior subordinated notes and preferred stock included in the calculation to 25% of tangible equity capital. The amount excluded was approximately $237 million in 2007 and no amount was excluded in 2006.

Included below are the changes in our tangible equity capital at November 30, 2007 and 2006:

**Tangible Equity Capital**

| In millions | At November 30, 2007 | At November 30, 2006 |
|---|---|---|
| Beginning tangible equity capital | $ 18,567 | $ 15,564 |
| Net income | 4,192 | 4,007 |
| Dividends on common stock | (351) | (276) |
| Dividends on preferred stock | (67) | (66) |
| Common stock open-market repurchases | (2,605) | (2,678) |
| Common stock withheld from employees (1) | (573) | (1,003) |
| Equity-based award plans (2) | 2,829 | 2,396 |
| Net change in junior subordinated notes included in tangible equity (3) | 2,002 | 712 |
| Change in identifiable intangible assets and goodwill | (765) | (106) |
| Other, net (4) | (126) | 17 |
| Ending tangible equity capital | $ 23,103 | $ 18,567 |

(1) Represents shares of common stock withheld in satisfaction of the exercise price of stock options and tax withholding obligations upon option exercises and conversion of RSUs.

(2) This represents the sum of (i) proceeds received from employees upon the exercise of stock options, (ii) the incremental tax benefits from the issuance of stock-based awards and (iii) the value of employee services received — as represented by the amortization of deferred stock compensation.

(3) Junior subordinated notes are deeply subordinated and have a long-term maturity and interest deferral features and are utilized in calculating equity capital by leading rating agencies.

(4) Other, net for 2007 includes a $67 million net increase to Retained earnings from adoption of SFAS 157 and SFAS 159 and a $210 million decrease to Accumulated other comprehensive income/(loss) from the adoption of SFAS 158. See "Accounting and Regulatory Developments" below for additional information. Other, net for 2006 includes a $6 million net decrease to Retained earnings from the initial adoption of under SFAS 155 and SFAS No. 156, *Accounting for Servicing of Financial Assets—an amendment of FASB Statement No. 140* ("SFAS 156").

***Primary Equity Double Leverage.*** Primary equity double leverage ratio is the comparison of Holdings' equity investments in subsidiaries to total equity capital (the sum of total stockholders' equity and junior subordinated notes). As of November 30, 2007, our equity investment in subsidiaries

was $25.1 billion and our total equity capital calculated was $27.5 billion. We aim to maintain a primary equity double leverage ratio of 1.0x or below. Our primary equity double leverage ratio was 0.91x and 0.88x as of November 30, 2007 and 2006, respectively. We believe total equity capital to be a more meaningful measure of our equity than stockholders' equity because we consider junior subordinated notes to be equity-like due to their subordinated nature, long-term maturity and interest deferral features. We believe primary equity double leverage based on total equity capital to be a useful measure of our equity investments in subsidiaries. Our calculation of primary equity double leverage may not be comparable to other, similarly titled calculations by other companies as a result of different calculation methodologies.





## Contractual Obligations and Lending-Related Commitments

### Contractual Obligations

In the normal course of business, we enter into various contractual obligations that may require future cash payments. The following table summarizes the contractual amounts at November 30, 2007 in total and by remaining maturity, and at November 30, 2006. Excluded from the table are a number of obligations recorded in the Consolidated Statement of Financial Condition that generally are short-term in nature, including secured financing transactions, trading liabilities, deposit liabilities at our banking subsidiaries, commercial paper and other short-term borrowings and other payables and accrued liabilities.

| | Expiration Per Period at November 30, | | | | Total Contractual Amount November 30, | |
|---|---|---|---|---|---|---|
| In millions | 2008 | 2009 | 2010-2011 | 2012-Later | 2007 | 2006 |
| Long-term borrowings | $ — | $ 25,023 | $ 28,146 | $ 69,981 | $ 123,150 | $ 81,178 |
| Operating lease obligations | 281 | 269 | 493 | 1,562 | 2,605 | 1,714 |
| Capital lease obligations | 74 | 99 | 206 | 2,597 | 2,976 | 3,043 |
| Purchase obligations | 316 | 10 | 9 | 13 | 348 | 783 |

For additional information about long-term borrowings, see Note 8, "Borrowings and Deposit Liabilities," to the Consolidated Financial Statements. For additional information about operating and capital lease obligations, see Note 9, "Commitments, Contingencies and Guarantees," to the Consolidated Financial Statements.

Purchase obligations include agreements to purchase goods or services that are enforceable and legally binding and that specify all significant terms, including fixed or minimum quantities to be purchased, fixed, minimum or variable price provisions and the approximate timing of the transaction. Purchase obligations with variable pricing provisions are included in the table based on the minimum contractual amounts. Certain purchase obligations contain termination or renewal provisions. The table reflects the minimum contractual amounts likely to be paid under these agreements assuming the contracts are not terminated.

### Lending–Related Commitments

The following table summarizes the contractual amounts of lending-related commitments at November 30, 2007 and 2006:

| | Expiration Per Period at November 30, | | | | | Total Contractual Amount November 30, | |
|---|---|---|---|---|---|---|---|
| In millions | 2008 | 2009 | 2010-2011 | 2012-2013 | Later | 2007 | 2006 |
| Lending commitments | | | | | | | |
| High grade [1] | $ 5,579 | $ 1,039 | $ 6,554 | $ 10,411 | $ 403 | $ 23,986 | $ 17,945 |
| High yield [2] | 4,051 | 411 | 2,103 | 4,850 | 2,658 | 14,073 | 7,558 |
| Contingent acquisition facilities | | | | | | | |
| High grade | 10,230 | — | — | — | — | 10,230 | 1,918 |
| High yield | 9,749 | — | — | — | — | 9,749 | 12,766 |
| Mortgage commitments | 5,082 | 670 | 1,378 | 271 | 48 | 7,449 | 12,162 |
| Secured lending transactions | 122,661 | 455 | 429 | 468 | 1,846 | 125,859 | 83,071 |

(1) We view our net credit exposure for high grade commitments, after consideration of hedges, to be $12.2 billion and $4.9 billion at November 30, 2007 and 2006, respectively.

(2) We view our net credit exposure for high yield commitments, after consideration of hedges, to be $12.8 billion and $5.9 billion at November 30, 2007 and 2006, respectively.

We use various hedging and funding strategies to actively manage our market, credit and liquidity exposures on these commitments. We do not believe total commitments necessarily are indicative of actual risk or funding requirements because the commitments may not be drawn or fully used and such amounts are reported before consideration of hedges.

*Lending commitments.* Through our high grade (investment grade) and high yield (non-investment grade) sales, trading and underwriting

LEHMAN BROTHERS HOLDINGS INC.

Report of Independent Registered Public Accounting Firm

To The Board of Directors and Stockholders of Lehman Brothers Holdings Inc.

We have audited Lehman Brothers Holdings Inc.'s (the "Company") internal control over financial reporting as of November 30, 2007, based on criteria established in Internal Control—Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (the COSO criteria). The Company's management is responsible for maintaining effective internal control over financial reporting, and for its assessment of the effectiveness of internal control over financial reporting included in the accompanying Management's Assessment of Internal Control over Financial Reporting. Our responsibility is to express an opinion on the Company's internal control over financial reporting based on our audit.

We conducted our audit in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether effective internal control over financial reporting was maintained in all material respects. Our audit included obtaining an understanding of internal control over financial reporting, assessing the risk that a material weakness exists, testing and evaluating the design and operating effectiveness of internal control based on the assessed risk, and performing such other procedures as we considered necessary in the circumstances. We believe that our audit provides a reasonable basis for our opinion.

A company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. A company's internal control over financial reporting includes those policies and procedures that (1) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (2) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and (3) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the company's assets that could have a material effect on the financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

In our opinion, the Company maintained, in all material respects, effective internal control over financial reporting as of November 30, 2007, based on the COSO criteria.

We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States), the consolidated statement of financial condition of the Company as of November 30, 2007 and 2006, and the related consolidated statements of income, changes in stockholders' equity, and cash flows for each of the three years in the period ended November 30, 2007 of the Company and our report dated January 28, 2008 expressed an unqualified opinion thereon.

Ernst + Young LLP

New York, New York
January 28, 2008



LEHMAN BROTHERS HOLDINGS INC.

Report of Independent Registered Public Accounting Firm

To The Board of Directors and Stockholders of Lehman Brothers Holdings Inc.

We have audited the accompanying consolidated statement of financial condition of Lehman Brothers Holdings Inc. (the "Company") as of November 30, 2007 and 2006, and the related consolidated statements of income, changes in stockholders' equity, and cash flows for each of the three years in the period ended November 30, 2007. Our audits also included the financial statement schedule listed in the Index at Item 15(a). These financial statements and schedule are the responsibility of the Company's management. Our responsibility is to express an opinion on these financial statements based on our audits.

We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the financial statements referred to above present fairly, in all material respects, the consolidated financial position of Lehman

Brothers Holdings Inc. at November 30, 2007 and 2006, and the consolidated results of its operations and its cash flows for each of the three years in the period ended November 30, 2007, in conformity with U.S. generally accepted accounting principles. Also, in our opinion, the related financial statement schedule, when considered in relation to the basic financial statements taken as a whole, presents fairly in all material respects the information set forth therein.

We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States), the effectiveness of Lehman Brothers Holdings Inc.'s internal control over financial reporting as of November 30, 2007, based on criteria established in Internal Control-Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission and our report dated January 28, 2008 expressed an unqualified opinion thereon.

Ernst & Young LLP

New York, New York
January 28, 2008



**LEHMAN BROTHERS HOLDINGS INC.**
**Consolidated Statement of Income**

| In millions, except per share data | Year Ended November 30, 2007 | | 2006 | | 2005 | |
|---|---|---|---|---|---|---|
| **Revenues** | | | | | | |
| Principal transactions | $ | 9,197 | $ | 9,802 | $ | 7,811 |
| Investment banking | | 3,903 | | 3,160 | | 2,894 |
| Commissions | | 2,471 | | 2,050 | | 1,728 |
| Interest and dividends | | 41,693 | | 30,284 | | 19,043 |
| Asset management and other | | 1,739 | | 1,413 | | 944 |
| Total revenues | | 59,003 | | 46,709 | | 32,420 |
| Interest expense | | 39,746 | | 29,126 | | 17,790 |
| Net revenues | | 19,257 | | 17,583 | | 14,630 |
| **Non-Interest Expenses** | | | | | | |
| Compensation and benefits | | 9,494 | | 8,669 | | 7,213 |
| Technology and communications | | 1,145 | | 974 | | 834 |
| Brokerage, clearance and distribution fees | | 859 | | 629 | | 548 |
| Occupancy | | 641 | | 539 | | 490 |
| Professional fees | | 466 | | 364 | | 282 |
| Business development | | 378 | | 301 | | 234 |
| Other | | 261 | | 202 | | 200 |
| Total non-personnel expenses | | 3,750 | | 3,009 | | 2,588 |
| Total non-interest expenses | | 13,244 | | 11,678 | | 9,801 |
| Income before taxes and cumulative effect of accounting change | | 6,013 | | 5,905 | | 4,829 |
| Provision for income taxes | | 1,821 | | 1,945 | | 1,569 |
| Income before cumulative effect of accounting change | | 4,192 | | 3,960 | | 3,260 |
| Cumulative effect of accounting change | | — | | 47 | | — |
| Net income | $ | 4,192 | $ | 4,007 | $ | 3,260 |
| Net income applicable to common stock | $ | 4,125 | $ | 3,941 | $ | 3,191 |
| Earnings per basic common share: | | | | | | |
| Before cumulative effect of accounting change | $ | 7.63 | $ | 7.17 | $ | 5.74 |
| Cumulative effect of accounting change | | — | | 0.09 | | — |
| Earnings per basic common share | $ | 7.63 | $ | 7.26 | $ | 5.74 |
| Earnings per diluted common share: | | | | | | |
| Before cumulative effect of accounting change | $ | 7.26 | $ | 6.73 | $ | 5.43 |
| Cumulative effect of accounting change | | — | | 0.08 | | — |
| Earnings per diluted common share | $ | 7.26 | $ | 6.81 | $ | 5.43 |
| Dividends paid per common share | $ | 0.60 | $ | 0.48 | $ | 0.40 |

See Notes to Consolidated Financial Statements.



**LEHMAN BROTHERS HOLDINGS INC.**

**Consolidated Statement of Financial Condition**

| In millions | November 30, 2007 | November 30, 2006 |
|---|---|---|
| **Assets** | | |
| Cash and cash equivalents | $ 7,286 | $ 5,987 |
| Cash and securities segregated and on deposit for regulatory and other purposes | 12,743 | 6,091 |
| Financial instruments and other inventory positions owned (includes $63,499 in 2007 and $42,600 in 2006 pledged as collateral) | 313,129 | 226,596 |
| Collateralized agreements: | | |
| Securities purchased under agreements to resell | 162,635 | 117,490 |
| Securities borrowed | 138,599 | 107,666 |
| Receivables: | | |
| Brokers, dealers and clearing organizations | 11,005 | 7,449 |
| Customers | 29,622 | 18,470 |
| Others | 2,650 | 2,052 |
| Property, equipment and leasehold improvements (net of accumulated depreciation and amortization of $2,438 in 2007 and $1,925 in 2006) | 3,861 | 3,269 |
| Other assets | 5,406 | 5,113 |
| Identifiable intangible assets and goodwill (net of accumulated amortization of $340 in 2007 and $293 in 2006) | 4,127 | 3,362 |
| Total assets | $ 691,063 | $ 503,545 |

See Notes to Consolidated Financial Statements.



**LEHMAN BROTHERS HOLDINGS INC.**
**Consolidated Statement of Financial Condition—(Continued)**

| In millions, except share data | November 30, 2007 | November 30, 2006 |
|---|---|---|
| **Liabilities and Stockholders' Equity** | | |
| Short-term borrowings and current portion of long-term borrowings (including $9,035 in 2007 and $6,064 in 2006 at fair value) | $ 28,066 | $ 20,638 |
| Financial instruments and other inventory positions sold but not yet purchased | 149,617 | 125,960 |
| Collateralized financings: | | |
| Securities sold under agreements to repurchase | 181,732 | 133,547 |
| Securities loaned | 53,307 | 23,982 |
| Other secured borrowings (including $9,149 in 2007 and $0 in 2006 at fair value) | 22,992 | 19,028 |
| Payables: | | |
| Brokers, dealers and clearing organizations | 3,101 | 2,217 |
| Customers | 61,206 | 41,695 |
| Accrued liabilities and other payables | 16,039 | 14,697 |
| Deposit liabilities at banks (including $15,986 in 2007 and $14,708 in 2006 at fair value) | 29,363 | 21,412 |
| Long-term borrowings (including $27,204 in 2007 and $11,025 in 2006 at fair value) | 123,150 | 81,178 |
| Total liabilities | 668,573 | 484,354 |
| Commitments and contingencies | | |
| **Stockholders' Equity** | | |
| Preferred stock | 1,095 | 1,095 |
| Common stock, $0.10 par value: | | |
| Shares authorized: 1,200,000,000 in 2007 and 2006; | | |

| | | |
|---|---|---|
| Shares issued: 612,882,506 in 2007 and 609,832,302 in 2006; Shares outstanding: 531,887,419 in 2007 and 533,368,195 in 2006 | 61 | 61 |
| Additional paid-in capital [1] | 9,733 | 8,727 |
| Accumulated other comprehensive loss, net of tax | (310) | (15) |
| Retained earnings | 19,698 | 15,857 |
| Other stockholders' equity, net | (2,263) | (1,712) |
| Common stock in treasury, at cost [1] (80,995,087 shares in 2007 and 76,464,107 shares in 2006) | (5,524) | (4,822) |
| Total common stockholders' equity | 21,395 | 18,096 |
| Total stockholders' equity | 22,490 | 19,191 |
| Total liabilities and stockholders' equity | $ 691,063 | $ 503,545 |

(1) Balances and share amounts at November 30, 2006 reflect the April 28, 2006 2-for-1 common stock split, effected in the form of a 100% stock dividend.

See Notes to Consolidated Financial Statements.



**LEHMAN BROTHERS HOLDINGS INC.**
**Consolidated Statement of Changes in Stockholders' Equity**

| In millions | Year Ended November 30, 2007 | 2006 | 2005 |
|---|---|---|---|
| **Preferred Stock** | | | |
| 5.94% Cumulative, Series C: | | | |
| Beginning and ending balance | $ 250 | $ 250 | $ 250 |
| 5.67% Cumulative, Series D: | | | |
| Beginning and ending balance | 200 | 200 | 200 |
| 7.115% Fixed/Adjustable Rate Cumulative, Series E: | | | |
| Beginning balance | — | — | 250 |
| Redemptions | — | — | (250) |
| Ending balance | — | — | — |
| 6.50% Cumulative, Series F: | | | |
| Beginning and ending balance | 345 | 345 | 345 |
| Floating Rate (3% Minimum) Cumulative, Series G: | | | |
| Beginning and ending balance | 300 | 300 | 300 |
| Total preferred stock, ending balance | 1,095 | 1,095 | 1,095 |
| **Common Stock, Par Value $0.10 Per Share** | | | |
| Beginning and ending balance | 61 | 61 | 61 |
| **Additional Paid-In Capital** | | | |
| Beginning balance | 8,727 | 6,283 | 5,834 |
| Reclass from Common Stock Issuable and Deferred Stock Compensation under SFAS No. 123(R) | — | 2,275 | — |
| RSUs exchanged for Common Stock | (580) | (647) | 184 |
| Employee stock-based awards | (832) | (881) | (760) |
| Tax benefit from the issuance of stock-based awards | 434 | 836 | 1,005 |
| Amortization of RSUs, net | 1,898 | 804 | — |
| Other, net | 86 | 57 | 20 |
| Ending balance | 9,733 | 8,727 | 6,283 |
| **Accumulated Other Comprehensive Income/(Loss), net of tax** | | | |
| Beginning balance | (15) | (16) | (19) |
| Translation adjustment, net[1] | (85) | 1 | 3 |
| Adoption of SFAS No. 158[2] | (210) | — | — |
| Ending balance | $ (310) | $ (15) | $ (16) |

(1) Net of income tax benefit/(expense) of $2 in 2007, ($2) in 2006 and ($1) in 2005.

(2) Net of income tax benefit of $134.

See Notes to Consolidated Financial Statements.



**LEHMAN BROTHERS HOLDINGS INC.**
**Consolidated Statement of Changes in Stockholders' Equity—(Continued)**

| | | | |
|---|---|---|---|
| Securities borrowed, net of securities loaned | (1,608) | (18,383) | (5,165) |
| Other secured borrowings | 3,964 | (4,088) | 11,495 |
| Receivables from brokers, dealers and clearing organizations | (3,556) | 5 | (4,054) |
| Receivables from customers | (11,152) | (5,583) | 354 |
| Financial instruments and other inventory positions sold but not yet purchased | 23,415 | 15,224 | 14,156 |
| Payables to brokers, dealers and clearing organizations | 884 | 347 | 165 |
| Payables to customers | 19,511 | 9,552 | 4,669 |
| Accrued liabilities and other payables | 302 | 2,032 | (801) |
| Other receivables and assets and minority interests | (1,703) | (1,267) | 345 |
| Net cash used in operating activities | (45,595) | (36,376) | (12,205) |
| **Cash Flows From Investing Activities** | | | |
| Purchase of property, equipment and leasehold improvements, net | (966) | (586) | (409) |
| Business acquisitions, net of cash acquired | (965) | (206) | (38) |
| Proceeds from sale of business | 233 | — | — |
| Net cash used in investing activities | (1,698) | (792) | (447) |
| **Cash Flows From Financing Activities** | | | |
| Derivative contracts with a financing element | 242 | 159 | 140 |
| Tax benefit from the issuance of stock-based awards | 434 | 836 | — |
| Issuance of short-term borrowings, net | 3,381 | 4,819 | 84 |
| Deposit liabilities at banks | 7,068 | 6,345 | 4,717 |
| Issuance of long-term borrowings | 86,302 | 48,115 | 23,705 |
| Principal payments of long-term borrowings, including the current portion of long term borrowings | (46,255) | (19,636) | (14,233) |
| Issuance of common stock | 84 | 119 | 230 |
| Issuance of treasury stock | 359 | 518 | 1,015 |
| Purchase of treasury stock | (2,605) | (2,678) | (2,994) |
| Retirement of preferred stock | — | — | (250) |
| Dividends paid | (418) | (342) | (302) |
| Net cash provided by financing activities | 48,592 | 38,255 | 12,112 |
| Net change in cash and cash equivalents | 1,299 | 1,087 | (540) |
| Cash and cash equivalents, beginning of period | 5,987 | 4,900 | 5,440 |
| Cash and cash equivalents, end of period | $ 7,286 | $ 5,987 | $ 4,900 |

**Supplemental Disclosure of Cash Flow Information (in millions):**
Interest paid totaled $39,454, $28,684 and $17,893 in 2007, 2006 and 2005, respectively.
Income taxes paid totaled $1,476, $1,037 and $789 in 2007, 2006 and 2005, respectively.

See Notes to Consolidated Financial Statements.



**LEHMAN BROTHERS HOLDINGS INC.**
**Notes to Consolidated Financial Statements**

**Contents**


| | | |
|---|---|---|
| Note 1 | Summary of Significant Accounting Policies | 92 |
| Note 2 | Business Segments and Geographic Information | 101 |
| Note 3 | Financial Instruments and Other Inventory Positions | 103 |
| Note 4 | Fair Value of Financial Instruments | 106 |
| Note 5 | Securities Received and Pledged as Collateral | 110 |
| Note 6 | Securitizations and Special Purpose Entities | 110 |
| Note 7 | Identifiable Intangible Assets and Goodwill | 113 |
| Note 8 | Borrowings and Deposit Liabilities | 115 |
| Note 9 | Commitments, Contingencies and Guarantees | 119 |
| Note 10 | Stockholders' Equity | 122 |
| Note 11 | Earnings per Common Share | 124 |
| Note 12 | Shared-Based Employee Incentive Plans | 124 |

| | | |
|---|---|---|
| Note 13 | Employee Benefit Plans | 128 |
| Note 14 | Income Taxes | 132 |
| Note 15 | Regulatory Requirements | 134 |
| Note 16 | Quarterly Information (unaudited) | 135 |




**LEHMAN BROTHERS HOLDINGS INC.**
**Notes to Consolidated Financial Statements**

## Note 1 Summary of Significant Accounting Policies

### Description of Business

Lehman Brothers Holdings Inc. ("Holdings") and subsidiaries (collectively, the "Company," the "Firm," "Lehman Brothers," "we," "us" or "our") serves the financial needs of corporations, governments and municipalities, institutional clients and high net worth individuals worldwide with business activities organized in three segments, Capital Markets, Investment Banking and Investment Management. Founded in 1850, Lehman Brothers maintains market presence in equity and fixed income sales, trading and research, investment banking, asset management, private investment management and private equity. The Firm is headquartered in New York, with regional headquarters in London and Tokyo, and operates in a network of offices in North America, Europe, the Middle East, Latin America and the Asia-Pacific region. We are a member of all principal securities and commodities exchanges in the U.S., and we hold memberships or associate memberships on several principal international securities and commodities exchanges, including the London, Tokyo, Hong Kong, Frankfurt, Paris, Milan and Australian stock exchanges.

### Basis of Presentation

The Consolidated Financial Statements are prepared in conformity with U.S. generally accepted accounting principles and include the accounts of Holdings, our subsidiaries, and all other entities in which we have a controlling financial interest or are considered to be the primary beneficiary. All material inter-company accounts and transactions have been eliminated upon consolidation. Certain prior-period amounts reflect reclassifications to conform to the current year's presentation.

On April 5, 2006, the stockholders of Holdings approved an increase of its authorized shares of common stock to 1.2 billion from 600 million, and the Board of Directors approved a 2-for-1 common stock split, in the form of a stock dividend, that was effected on April 28, 2006. All share and per share amounts have been retrospectively adjusted for the increase in authorized shares and the stock split. For additional information about the stock split, see Note 11, "Earnings per Common Share," and Note 12, "Share-Based Employee Incentive Plans," to the Consolidated Financial Statements.

### Use of Estimates

In preparing our Consolidated Financial Statements and accompanying notes, management makes various estimates that affect reported amounts and disclosures. Broadly, those estimates are used in:

- measuring fair value of certain financial instruments;
- accounting for identifiable intangible assets and goodwill;
- establishing provisions for potential losses that may arise from litigation, regulatory proceedings and tax examinations;
- assessing our ability to realize deferred taxes; and
- valuing equity-based compensation awards.

Estimates are based on available information and judgment. Therefore, actual results could differ from our estimates and that difference could have a material effect on our Consolidated Financial Statements and notes thereto.

### Consolidation Policies

The Consolidated Financial Statements include the accounts of Holdings and the entities in which the Company has a controlling financial interest. We determine whether we have a controlling financial interest in an entity by first determining whether the entity is a voting interest entity (sometimes referred to as a non-VIE), a variable interest entity ("VIE") or a qualified special purpose entity ("QSPE").

***Voting Interest Entity.*** Voting interest entities are entities that have (i) total equity investment at risk sufficient to fund expected future operations independently; and (ii) equity holders who have the obligation to absorb losses or receive residual returns and the right to make decisions about the entity's activities. In accordance with Accounting Research Bulletin ("ARB") No. 51, *Consolidated Financial Statements*, and Statement of

period provisions prescribed by SFAS 123(R) include requirements to: (i) estimate forfeitures of share-based awards at the date of grant, rather than recognizing forfeitures as incurred as was permitted by SFAS 123; (ii) expense share-based awards granted to retirement-eligible employees and those employees with non-substantive non-compete agreements immediately, while our accounting practice under SFAS 123 was to recognize such costs over the stated service periods; (iii) attribute compensation costs of share-based awards to the future vesting periods, while our accounting practice under SFAS 123 included a partial attribution of compensation costs of share-based awards to services performed during the year of grant; and (iv) recognize compensation costs of all share-based awards (including amortizing pre-fiscal-2004 options) based on the grant-date fair value, rather than our accounting methodology under SFAS 123 which recognized pre-fiscal-2004 option awards based on their intrinsic value.

Prior to adopting SFAS 123(R) we presented the cash flows related to income tax deductions in excess of the compensation cost recognized on stock issued under RSUs and stock options exercised during the period ("excess tax benefits") as operating cash flows in the Consolidated Statement of Cash Flows. SFAS 123(R) requires excess tax benefits to be classified as financing cash flows. In addition, as a result of adopting SFAS 123(R), certain balance sheet amounts associated with share-based compensation costs have been reclassified within the equity section of the balance sheet. This change in presentation had no effect on our total equity. Effective December 1, 2005, Deferred stock compensation (representing unearned costs of RSU awards) and Common stock issuable are presented on a net basis as a component of Additional paid-in capital. See "Accounting and Regulatory Developments—SFAS 123(R)" below for a further discussion of SFAS 123(R) and the cumulative effect of this accounting change recognized in fiscal 2006.

**Earnings per Share**

We compute earnings per share ("EPS") in accordance with SFAS No. 128, *Earnings per Share*. Basic EPS is computed by dividing net income applicable to common stock by the weighted-average number of common shares outstanding, which includes RSUs for which service has been provided. Diluted EPS includes the components of basic EPS and also includes the dilutive effects of RSUs for which service has not yet been provided and employee stock options.

**Financial Instruments and Other Inventory Positions**

Financial instruments and other inventory positions owned, excluding real estate held for sale, and Financial instruments and other inventory positions sold but not yet purchased are carried at fair value. Real estate held for sale is accounted for at the lower of its carrying amount or fair value less cost to sell. For further discussion of our financial instruments and other inventory positions, see Note 3, "Financial Instruments and Other Inventory Positions," to the Consolidated Financial Statements.

Firm-owned securities pledged to counterparties who have the right, by contract or custom, to sell or repledge the securities are classified as Financial instruments and other inventory positions owned and are disclosed as pledged as collateral. For further discussion of our securities received and pledged as collateral, see Note 5, "Securities Received and Pledged as Collateral," to the Consolidated Financial Statements.

We adopted SFAS No. 157, *Fair Value Measurements* ("SFAS 157") effective December 1, 2006. SFAS 157 defines fair value as the price that would be received to sell an asset or paid to transfer a liability in an orderly transaction between market participants at the measurement date. When observable prices are not available, we either use implied pricing from similar instruments or valuation models based on net present value of estimated future cash flows, adjusted as appropriate for liquidity, credit, market and/or other risk factors.

Prior to December 1, 2006, we followed the American Institute of Certified Public Accountants ("AICPA") Audit and Accounting Guide, *Brokers and Dealers in Securities*, when determining fair value for financial instruments, which permitted the recognition of a discount to the quoted price when determining the fair value for a substantial block of a particular security, when the quoted price was not considered to be readily realizable (*i.e.*, a block discount).

For further discussion of our adoption of SFAS 157, see "Accounting and Regulatory Developments—SFAS 157" below.

***Derivative financial instruments.*** Derivatives are financial instruments whose value is based on an underlying asset (*e.g.*, Treasury bond), index (*e.g.*, S&P 500) or reference rate (*e.g.*, LIBOR), and include futures, forwards, swaps, option contracts, or other financial instruments with similar characteristics. A derivative contract generally represents a future commitment to exchange interest payment streams or currencies based on the contract or notional amount or to purchase or sell other financial instruments or physical assets at specified terms on a specified date. Over-the-counter ("OTC") derivative products are privately-negotiated contractual agreements that can be tailored to meet individual client needs and include forwards, swaps and certain options including caps, collars and floors. Exchange-traded derivative products are standardized contracts transacted through regulated exchanges and include futures and certain option contracts listed on an exchange.





Derivatives are recorded at fair value and included in either Financial instruments and other inventory positions owned or Financial instruments and other inventory positions sold but not yet purchased in the Consolidated Statement of Financial Condition. Derivatives are presented net-by-counterparty when a legal right of offset exists; net across different products or positions when applicable provisions are stated in a master netting

agreement; and/or net of cash collateral received or paid on a counterparty basis, provided legal right of offset exists.

We enter into derivative transactions both in a trading capacity and as an end-user. Acting in a trading capacity, we enter into derivative transactions to satisfy the needs of our clients and to manage our own exposure to market and credit risks resulting from our trading activities (collectively, "Trading-Related Derivatives"). For Trading-Related Derivatives, margins on futures contracts are included in receivables and payables from/to brokers, dealers and clearing organizations, as applicable.

As an end-user, we primarily use derivatives to hedge our exposure to market risk (including foreign currency exchange and interest rate risks) and credit risks (collectively, "End-User Derivatives"). When End-User Derivatives are interest rate swaps they are measured at fair value through earnings and the carrying value of the related hedged item is adjusted through earnings for the effect of changes in the risk being hedged. The hedge ineffectiveness in these relationships is recorded in Interest expense in the Consolidated Statement of Income. When End-User Derivatives are used in hedges of net investments in non-U.S. dollar functional currency subsidiaries, the gains or losses are reported within Accumulated other comprehensive income/(loss), net of tax, in Stockholders' equity.

Prior to December 1, 2006, we followed EITF Issue No. 02-3, *Issues Involved in Accounting for Derivative Contracts Held for Trading Purposes and Contracts Involved in Energy Trading and Risk Management Activities* ("EITF 02-3"). Under EITF 02-3, recognition of a trading profit at inception of a derivative transaction was prohibited unless the fair value of that derivative was obtained from a quoted market price supported by comparison to other observable inputs or based on a valuation technique incorporating observable inputs. Subsequent to the inception date ("Day 1"), we recognized trading profits deferred at Day 1 in the period in which the valuation of the instrument became observable. The adoption of SFAS 157 nullified the guidance in EITF 02-3 that precluded the recognition of a trading profit at the inception of a derivative contract, unless the fair value of such derivative was obtained from a quoted market price or other valuation technique incorporating observable inputs. For further discussion of our adoption of SFAS 157, see "Accounting and Regulatory Developments—SFAS 157" below.

***Securitization activities.*** In accordance with SFAS 140, we recognize transfers of financial assets as sales, if control has been surrendered. We determine control has been surrendered when the following three criteria have been met:

- The transferred assets have been isolated from the transferor—put presumptively beyond the reach of the transferor and its creditors, even in bankruptcy or other receivership (*i.e.*, a true sale opinion has been obtained);
- Each transferee (or, if the transferee is a QSPE, each holder of its beneficial interests) has the right to pledge or exchange the assets (or beneficial interests) it received, and no condition both constrains the transferee (or holder) from taking advantage of its right to pledge or exchange and provides more than a trivial benefit to the transferor; and
- The transferor does not maintain effective control over the transferred assets through either (i) an agreement that both entitles and obligates the transferor to repurchase or redeem them before their maturity or (ii) the ability to unilaterally cause the holder to return specific assets.





**Collateralized Lending Agreements and Financings**

Treated as collateralized agreements and financings for financial reporting purposes are the following:

- *Repurchase and resale agreements.* Securities purchased under agreements to resell and securities sold under agreements to repurchase are collateralized primarily by government and government agency securities and are carried net by counterparty, when permitted, at the amounts at which the securities subsequently will be resold or repurchased plus accrued interest. We take possession of securities purchased under agreements to resell. The fair value of the underlying positions is compared daily with the related receivable or payable balances, including accrued interest. We require counterparties to deposit additional collateral or return collateral pledged, as necessary, to ensure the fair value of the underlying collateral remains sufficient.
- *Securities borrowed and securities loaned.* Securities borrowed and securities loaned are carried at the amount of cash collateral advanced or received plus accrued interest. We value the securities borrowed and loaned daily and obtain additional cash as necessary to ensure these transactions are adequately collateralized. When we act as the lender of securities in a securities-lending agreement and we receive securities that can be pledged or sold as collateral, we recognize an asset, representing the securities received and a liability, representing the obligation to return those securities.
- *Other secured borrowings.* Other secured borrowings principally reflect transfers accounted for as financings rather than sales under SFAS 140. Additionally, Other secured borrowings includes non-recourse financings of entities that we have consolidated because we are the primary beneficiaries of such entities.

**Long-Lived Assets**

Property, equipment and leasehold improvements are recorded at historical cost, net of accumulated depreciation and amortization. Depreciation is recognized using the straight-line method over the estimated useful lives of the assets. Buildings are depreciated up to a maximum of 40 years. Leasehold improvements are amortized over the lesser of their useful lives or the terms of the underlying leases, which range up to 30 years.

Equipment, furniture and fixtures are depreciated over periods of up to 10 years. Internal-use software that qualifies for capitalization under AICPA Statement of Position 98-1, *Accounting for the Costs of Computer Software Developed or Obtained for Internal Use*, is capitalized and subsequently amortized over the estimated useful life of the software, generally three years, with a maximum of seven years. We review long-lived assets for impairment periodically and whenever events or changes in circumstances indicate the carrying amounts of the assets may be impaired. If the expected future undiscounted cash flows are less than the carrying amount of the asset, an impairment loss is recognized to the extent the carrying value of the asset exceeds its fair value.

**Identifiable Intangible Assets and Goodwill**

Identifiable intangible assets with finite lives are amortized over their expected useful lives, which range up to 15 years. Identifiable intangible assets with indefinite lives and goodwill are not amortized. Instead, these assets are evaluated at least annually for impairment. Goodwill is reduced upon the recognition of certain acquired net operating loss carryforward benefits.

**Cash Equivalents**

Cash equivalents include highly liquid investments not held for resale with maturities of three months or less when we acquire them.

**Accounting and Regulatory Developments**

The following summarizes accounting standards that have been issued during the periods covered by the Consolidated Financial Statements and the effect of adoption on our results of operations, if any, actual or estimated.

***SFAS 123(R).*** In December 2004, the FASB issued SFAS 123(R) which established standards of accounting for transactions in which an entity exchanges its equity instruments for goods and services and focuses primarily on accounting for transactions in which an entity obtains employee services in share-based payment transactions. Two key differences between SFAS 123 and SFAS 123(R) relate to attribution of compensation costs to reporting periods and accounting for award forfeitures. SFAS 123(R) generally requires the immediate expensing of equity-based awards granted to retirement-eligible employees or awards granted subject to substantive non-compete agreements to be expensed over the non-compete period. SFAS 123(R) also requires expected forfeitures to be included in determining stock-based employee compensation expense. We adopted SFAS 123 (R) as of the beginning of our 2006 fiscal year and recognized an after-tax gain of approximately $47 million as the cumulative effect of a change in accounting principle attributable to the requirement to estimate forfeitures at the date of grant instead of recognizing them as incurred. For additional information, see "Share-





Based Compensation" above and Note 12, "Share-Based Employee Incentive Plans," to the Consolidated Financial Statements.

***SFAS 155.*** In February 2006, the FASB issued SFAS No. 155, *Accounting for Certain Hybrid Financial Instruments—an amendment of FASB Statements No. 133 and 140* ("SFAS 155"), which permits an entity to measure at fair value any hybrid financial instrument that contains an embedded derivative that otherwise would require bifurcation. As permitted, we early adopted SFAS 155 in the first quarter of 2006. The effect of adoption resulted in a $24 million after-tax ($43 million pre-tax) decrease to opening retained earnings as of the beginning of our 2006 fiscal year, representing the difference between the fair value of these hybrid financial instruments and the prior carrying value as of November 30, 2005.

***SFAS 156.*** In March 2006, the FASB issued SFAS No. 156, *Accounting for Servicing of Financial Assets— an amendment of FASB Statement No. 140* ("SFAS 156"), which permits entities to elect to measure servicing assets and servicing liabilities at fair value and report changes in fair value in earnings. As a result of adopting SFAS 156, we recognized an $18 million after-tax ($33 million pre-tax) increase to opening retained earnings in our 2006 fiscal year.

***SFAS 157.*** In September 2006, the FASB issued SFAS 157. SFAS 157 defines fair value, establishes a framework for measuring fair value, outlines a fair value hierarchy based on inputs used to measure fair value and enhances disclosure requirements for fair value measurements. SFAS 157 does not change existing guidance as to whether or not an instrument is carried at fair value.

SFAS 157 also (i) nullifies the guidance in EITF 02-3 that precluded the recognition of a trading profit at the inception of a derivative contract, unless the fair value of such derivative was obtained from a quoted market price or other valuation technique incorporating observable inputs; (ii) clarifies that an issuer's credit standing should be considered when measuring liabilities at fair value; (iii) precludes the use of a liquidity or block discount when measuring instruments traded in an active market at fair value; and (iv) requires costs related to acquiring financial instruments carried at fair value to be included in earnings as incurred.

We elected to early adopt SFAS 157 at the beginning of our 2007 fiscal year and we recorded the difference between the carrying amounts and fair values of (i) stand-alone derivatives and/or certain hybrid financial instruments measured using the guidance in EITF 02-3 on recognition of a trading profit at the inception of a derivative, and (ii) financial instruments that are traded in active markets that were measured at fair value using block discounts, as a cumulative-effect adjustment to opening retained earnings. As a result of adopting SFAS 157, we recognized a $45 million after-tax ($78 million pre-tax) increase to opening retained earnings. For additional information regarding our adoption of SFAS 157, see Note 4, "Fair Value of Financial Instruments," to the Consolidated Financial Statements.

***SFAS 158.*** In September 2006, the FASB issued SFAS No. 158, *Employers' Accounting for Defined Benefit Pension and Other Retirement Plans*

*Equities* – We make markets in and trade equities and equity-related products and enter into a variety of derivative transactions. We also provide equity-related research coverage as well as execution and clearing activities for clients. Through our capital markets prime services, we provide prime brokerage services to the hedge fund community. We also engage in certain proprietary trading activities and private equity and other related investments.

***Investment Banking.*** We take an integrated approach to client coverage, organizing bankers into industry, product and geographic groups within our Investment Banking segment. Business activities provided to corporations and governments worldwide can be separated into:

*Global Finance* – We serve our clients' capital raising needs through underwriting, private placements, leveraged finance and other activities associated with debt and equity products.

*Advisory Services* – We provide business advisory services with respect to mergers and acquisitions, divestitures, restructurings, and other corporate activities.

***Investment Management.*** The Investment Management business segment consists of:

*Asset Management* – We provide customized investment management services for high net worth clients, mutual funds and other small and middle market institutional investors. Asset Management also serves as general partner for private equity and other alternative investment partnerships and has minority stake investments in certain alternative investment managers.

*Private Investment Management* – We provide investment, wealth advisory and capital markets execution services to high net worth and middle market institutional clients.

**Business Segments**

| In millions | Capital Markets | Investment Banking | Investment Management | Total |
|---|---|---|---|---|
| **At and for the year ended November 30, 2007** | | | | |
| Gross revenues | $ 51,897 | $ 3,903 | $ 3,203 | $ 59,003 |
| Interest expense | 39,640 | — | 106 | 39,746 |
| Net revenues | 12,257 | 3,903 | 3,097 | 19,257 |
| Depreciation and amortization expense | 432 | 48 | 97 | 577 |
| Other expenses | 7,626 | 2,832 | 2,209 | 12,667 |
| Income before taxes | $ 4,199 | $ 1,023 | $ 791 | $ 6,013 |
| Segment assets (in billions) | $ 680.5 | $ 1.4 | $ 9.2 | $ 691.1 |
| **At and for the year ended November 30, 2006** | | | | |
| Gross revenues | $ 41,074 | $ 3,160 | $ 2,475 | $ 46,709 |
| Interest expense | 29,068 | — | 58 | 29,126 |
| Net revenues | 12,006 | 3,160 | 2,417 | 17,583 |
| Depreciation and amortization expense | 377 | 42 | 95 | 514 |
| Other expenses | 6,909 | 2,458 | 1,797 | 11,164 |
| Income before taxes | $ 4,720 | $ 660 | $ 525 | $ 5,905 |
| Segment assets (in billions) | $ 493.5 | $ 1.3 | $ 8.7 | $ 503.5 |
| **At and for the year ended November 30, 2005** | | | | |
| Gross revenues | $ 27,545 | $ 2,894 | $ 1,981 | $ 32,420 |
| Interest expense | 17,738 | — | 52 | 17,790 |
| Net revenues | 9,807 | 2,894 | 1,929 | $ 14,630 |
| Depreciation and amortization expense | 308 | 36 | 82 | 426 |
| Other expenses | 5,927 | 2,003 | 1,445 | 9,375 |
| Income before taxes | $ 3,572 | $ 855 | $ 402 | $ 4,829 |
| Segment assets (in billions) | $ 401.9 | $ 1.2 | $ 7.0 | $ 410.1 |





**Net Revenues by Geographic Region**

We organize our operations into three geographic regions:

- Europe and the Middle East, inclusive of our operations in Russia and Turkey;

- Asia-Pacific, inclusive of our operations in Australia and India; and
- the Americas.

Net revenues presented by geographic region are based upon the location of the senior coverage banker or investment advisor in the case of Investment Banking or Asset Management, respectively, or where the position was risk managed within Capital Markets and Private Investment Management. Certain revenues associated with U.S. products and services that result from relationships with international clients have been classified as international revenues using an allocation process. In addition, expenses contain certain internal allocations, such as regional transfer pricing, which are centrally managed. The methodology for allocating the firm's revenues and expenses to geographic regions is dependent on the judgment of management.

The following presents, in management's judgment, a reasonable representation of each region's contribution to our operating results.

**Geographic Operating Results**

| In millions | | Year Ended November 30, 2007 | 2006 | 2005 |
|---|---|---|---|---|
| Europe and the Middle East | | | | |
| | Net revenues | $ 6,296 | $ 4,536 | $ 3,601 |
| | Non-interest expense | 4,221 | 3,303 | 2,689 |
| | Income before taxes | 2,075 | 1,233 | 912 |
| Asia-Pacific | | | | |
| | Net revenues | 3,145 | 1,809 | 1,650 |
| | Non-interest expense | 1,831 | 1,191 | 872 |
| | Income before taxes | 1,314 | 618 | 778 |
| Americas | | | | |
| | U.S. | 9,634 | 11,116 | 9,270 |
| | Other Americas | 182 | 122 | 109 |
| | Net revenues | 9,816 | 11,238 | 9,379 |
| | Non-interest expense | 7,192 | 7,184 | 6,240 |
| | Income before taxes | 2,624 | 4,054 | 3,139 |
| Total | | | | |
| | Net revenues | 19,257 | 17,583 | 14,630 |
| | Non-interest expense | 13,244 | 11,678 | 9,801 |
| | Income before taxes | $ 6,013 | $ 5,905 | $ 4,829 |

**Note 3 Financial Instruments and Other Inventory Positions**

Financial instruments and other inventory positions owned and Financial instruments and other inventory positions sold but not yet purchased were comprised of the following:

| In millions | Owned Nov 30, 2007 | Owned Nov 30, 2006 | Sold But Not Yet Purchased Nov 30, 2007 | Sold But Not Yet Purchased Nov 30, 2006 |
|---|---|---|---|---|
| Mortgage and asset-backed securities | $ 89,106 | $ 57,726 | $ 332 | $ 80 |
| Government and agencies | 40,892 | 47,293 | 71,813 | 70,453 |
| Corporate debt and other | 54,098 | 43,764 | 6,759 | 8,836 |
| Corporate equities | 58,521 | 43,087 | 39,080 | 28,464 |
| Real estate held for sale | 21,917 | 9,408 | — | — |
| Commercial paper and other money market instruments | 4,000 | 2,622 | 12 | 110 |
| Derivatives and other contractual agreements | 44,595 | 22,696 | 31,621 | 18,017 |
| | $ 313,129 | $ 226,596 | $ 149,617 | $ 125,960 |





***Mortgage and asset-backed securities.*** Mortgage and asset-backed securities include residential and commercial whole loans and interests in residential and commercial mortgage-backed securitizations. Also included within Mortgage and asset-backed securities are securities whose cash flows are based on pools of assets in bankruptcy-remote entities, or collateralized by cash flows from a specified pool of underlying assets. The pools of assets may include, but are not limited to mortgages, receivables and loans.

It is our intent to sell through securitization or syndication activities, residential and commercial mortgage whole loans we originate, as well as those we acquire in the secondary market. We originated approximately $47 billion and $60 billion of residential mortgage loans in 2007 and 2006, respectively, and approximately $60 billion and $34 billion of commercial mortgage loans in 2007 and 2006, respectively.

Balances reported for Mortgage and asset-backed securities include approximately $12.8 billion and $5.5 billion in 2007 and 2006, respectively, of loans transferred to securitization vehicles where such transfers were accounted for as secured financings rather than sales under SFAS 140. The securitization vehicles issued securities that were distributed to investors. We do not consider ourselves to have economic exposure to the underlying assets in those securitization vehicles. For further discussion of our securitization activities, see Note 6, "Securitizations and Special Purpose Entities," to the Consolidated Financial Statements.

In 2007 and 2006, our inventory of Mortgage and asset-backed securities, excluding those that were accounted for as financings rather than sales under SFAS 140, generally included the following types of assets:

| In millions | November 30, 2007 | November 30, 2006 |
|---|---|---|
| Residential and Asset Backed: | | |
| Whole loans | $ 19,587 | $ 18,749 |
| Securities(1) | 16,488 | 7,923 |
| Servicing | 1,183 | 829 |
| Other | 86 | 16 |
| | $ 37,344 | $ 27,517 |
| Commercial: | | |
| Whole loans | $ 26,200 | $ 22,426 |
| Securities(2) | 12,180 | 1,948 |
| Other | 558 | 351 |
| | $ 38,938 | $ 24,725 |
| Total | $ 76,282 | $ 52,242 |

(1) Includes approximately $7.1 billion of investment grade retained interests in securitizations and approximately $1.6 billion of non-investment grade retained interests in securitizations at November 30, 2007. Includes approximately $5.3 billion of investment grade retained interests in securitizations and approximately $2.0 billion of non-investment grade retained interests in securitizations at November 30, 2006.

(2) Includes approximately $2.4 billion of investment grade retained interests in securitizations and approximately $0.03 billion of non-investment grade retained interests in securitizations at November 30, 2007. Includes approximately $0.6 billion of investment grade retained interests in securitizations at November 30, 2006.





In 2007 and 2006, our portfolio of U.S. subprime residential mortgages, a component of our Mortgage and asset-backed securities inventory, were:[1]

| In millions | November 30, 2007 | November 30, 2006 |
|---|---|---|
| U.S. residential subprime mortgages | | |
| Whole loans(1) | $ 3,226 | $ 4,978 |
| Retained interests in securitizations | 1,995 | 1,817 |
| Other | 55 | 54 |
| Total | $ 5,276 | $ 6,849 |

(1) Excludes loans which were accounted for as financings rather than sales under SFAS 140 which were approximately $2.9 billion and $3.0 billion at November 30, 2007 and 2006, respectively.

*Government and agencies.* Included within these balances are instruments issued by a national government or agency thereof, denominated in the country's own currency or in a foreign currency (*e.g.*, sovereign) as well as municipals.

*Corporate debt and other.* Longer-term debt instruments, generally with a maturity date falling at least a year after their issue date, not issued by governments and may or may not be traded on major exchanges, are included within this component.

Non-derivative, physical commodities are reported as a component of this line item and were approximately $308 million in 2007. In 2006, we did not have any non-derivative, physical commodities.

*Corporate equities.* Balances generally reflect held positions in any instrument that has an equity ownership component, such as equity-related positions, public ownership equity securities that are listed on public exchanges, private equity-related positions and non-public ownership equity securities that are not listed on a public exchange.

*Real estate held for sale.* Real estate held for sale of $21.9 billion and $9.4 billion at November 30, 2007 and 2006, respectively, reflects our investments in parcels of land and related physical property. We invest in entities whose underlying assets are Real estate held for sale. We consolidate those entities in which we are the primary beneficiary in accordance with FIN 46(R). We do not consider ourselves to have economic exposure to the total underlying assets in those entities. Our net investment positions related to Real estate held for sale, excluding the amounts that have been consolidated but for which we do not consider ourselves to have economic exposure, was $12.8 billion and $5.9 billion at November 30, 2007 and 2006, respectively.

*Commercial paper and other money market instruments.* Commercial paper and other money market instruments include short-term obligations, generally issued by financial institutions or corporations, with maturities within a calendar year of the financial statement date. These instruments may include promissory notes, drafts, checks and certificates of deposit.

*Derivatives and other contractual agreements.* These balances generally represent future commitments to exchange interest payment streams or currencies based on contract or notional amounts or to purchase or sell other financial instruments or physical assets at specified terms on a specified date. Both over-the-counter and exchange-traded derivatives are reflected.

The following table presents the fair value of Derivatives and other contractual agreements at November 30, 2007 and 2006. Assets included in the table represent unrealized gains, net of unrealized losses, for situations in which we have a master netting agreement. Similarly, liabilities represent net amounts owed to counterparties. The fair value of derivative contracts represents our net receivable/payable for derivative financial instruments before consideration of securities collateral. Asset and liabilities are presented below net of cash collateral of approximately $19.7 billion and $17.5 billion, respectively, at November 30, 2007 and $11.1 billion and $8.2 billion, respectively, at November 30, 2006.

[1] We generally define U.S. subprime residential mortgage loans as those associated with borrowers having a credit score in the range of 620 or lower using the Fair Isaac Corporation's statistical model, or having other negative factors within their credit profiles. Prior to its closure in our third quarter, we originated subprime residential mortgage loans through BNC Mortgage LLC ("BNC"), a wholly-owned subsidiary of our U.S. regulated thrift Lehman Brothers Bank, FSB. BNC served borrowers with subprime qualifying credit profiles but also served borrowers with stronger credit history as a result of broker relationships or product offerings and such loans are also included in our subprime business activity. For residential mortgage loans purchased from other mortgage originators, we use a similar subprime definition as for our origination activity. Additionally, second lien loans are included in our subprime business activity.





**Fair Value of Derivatives and Other Contractual Agreements**

| | Nov 30, 2007 | | Nov 30, 2006 | |
|---|---|---|---|---|
| In millions | Assets | Liabilities | Assets | Liabilities |
| Over-the-Counter: [1] | | | | |
| Interest rate, currency and credit default swaps and options | $ 22,028 | $ 10,915 | $ 8,634 | $ 5,691 |
| Foreign exchange forward contracts and options | 2,479 | 2,888 | 1,792 | 2,145 |
| Other fixed income securities contracts (including TBAs and forwards) | 8,450 | 6,024 | 4,308 | 2,604 |
| Equity contracts (including equity swaps, warrants and options) | 8,357 | 9,279 | 4,739 | 4,744 |
| Exchange Traded: | | | | |
| Equity contracts (including equity swaps, warrants and options) | 3,281 | 2,515 | 3,223 | 2,833 |
| | $ 44,595 | $ 31,621 | $ 22,696 | $ 18,017 |

(1) Our net credit exposure for OTC contracts is $34.6 billion and $15.6 billion at November 30, 2007 and 2006, respectively, representing the fair value of OTC contracts in a net receivable position, after consideration of collateral.

At November 30, 2007, our Derivatives and other contractual agreements include approximately $1.5 billion of both commodity derivative assets and liabilities. At November 30, 2006, our commodity derivative assets and liabilities were $268 million and liabilities of $277 million, respectively.

**Concentrations of Credit Risk**

A substantial portion of our securities transactions are collateralized and are executed with, and on behalf of, financial institutions, which includes other brokers and dealers, commercial banks and institutional clients. Our exposure to credit risk associated with the non-performance of these clients and counterparties in fulfilling their contractual obligations with respect to various types of transactions can be directly affected by volatile or illiquid trading markets, which may impair the ability of clients and counterparties to satisfy their obligations to us.

Financial instruments and other inventory positions owned include U.S. government and agency securities, and securities issued by non-U.S. governments, which in the aggregate represented 6% and 9% of total assets at November 30, 2007 and 2006, respectively. In addition, collateral held for resale agreements represented approximately 24% and 23% of total assets at November 30, 2007 and 2006, respectively, and primarily consisted of securities issued by the U.S. government, federal agencies or non-U.S. governments. Our most significant industry concentration is financial institutions, which includes other brokers and dealers, commercial banks and institutional clients. This concentration arises in the normal course of business.

## Note 4 Fair Value of Financial Instruments

Financial instruments and other inventory positions owned, excluding Real estate held for sale, and Financial instruments and other inventory positions sold but not yet purchased, are presented at fair value. In addition, certain long and short-term borrowing obligations, principally certain hybrid financial instruments, and certain deposit liabilities at banks, are presented at fair value.

Fair value is defined as the price at which an asset could be exchanged in a current transaction between knowledgeable, willing parties. A liability's fair value is defined as the amount that would be paid to transfer the liability to a new obligor, not the amount that would be paid to settle the liability with the creditor. Where available, fair value is based on observable market prices or parameters or derived from such prices or parameters. Where observable prices or inputs are not available, valuation models are applied. These valuation techniques involve some level of management estimation and judgment, the degree of which is dependent on the price transparency for the instruments or market and the instruments' complexity.

Beginning December 1, 2006, assets and liabilities recorded at fair value in the Consolidated Statement of Financial Condition are categorized based upon the level of judgment associated with the inputs used to measure their fair value. Hierarchical levels – defined by SFAS 157 and directly related to the amount of subjectivity associated with the inputs to fair valuation of these assets and liabilities – are as follows:

Level I – Inputs are unadjusted, quoted prices in active markets for identical assets or liabilities at the measurement date.





The types of assets and liabilities carried at Level I fair value generally are G-7 government and agency securities, equities listed in active markets, investments in publicly traded mutual funds with quoted market prices and listed derivatives.

Level II – Inputs (other than quoted prices included in Level I) are either directly or indirectly observable for the asset or liability through correlation with market data at the measurement date and for the duration of the instrument's anticipated life.

Fair valued assets and liabilities that are generally included in this category are non-G-7 government securities, municipal bonds, certain hybrid financial instruments, certain mortgage and asset backed securities, certain corporate debt, certain commitments and guarantees, certain private equity investments and certain derivatives.

Level III – Inputs reflect management's best estimate of what market participants would use in pricing the asset or liability at the measurement date. Consideration is given to the risk inherent in the valuation technique and the risk inherent in the inputs to the model.

Generally, assets and liabilities carried at fair value and included in this category are certain mortgage and asset-backed securities, certain corporate debt, certain private equity investments, certain commitments and guarantees and certain derivatives.

**Fair Value on a Recurring Basis**

Assets and liabilities measured at fair value on a recurring basis are categorized in the tables below based upon the lowest level of significant input to the valuations.

| | Assets at Fair Value as of November 30, 2007 | | | |
|---|---|---|---|---|
| In millions | Level I | Level II | Level III | Total |
| Mortgage and asset-backed securities[1] | $ 240 | $ 63,672 | $ 25,194 | $ 89,106 |
| Government and agencies | 25,393 | 15,499 | — | 40,892 |
| Corporate debt and other | 324 | 50,692 | 3,082 | 54,098 |
| Corporate equities | 39,336 | 11,054 | 8,131 | 58,521 |
| Commercial paper and other money market instruments | 4,000 | — | — | 4,000 |
| Derivative assets[2] | 3,281 | 35,742 | 5,572 | 44,595 |
| | $ 72,574 | $ 176,659 | $ 41,979 | $ 291,212 |

(1) Includes loans transferred to securitization vehicles where such transfers were accounted for as secured financings rather than sales under SFAS 140. The securitization vehicles issued securities that were distributed to investors. We do not consider ourselves to have economic exposure to the underlying assets in those securitization vehicles. The loans are reflected as an asset within Mortgages and asset-backed positions and the proceeds received from the transfer are reflected as a liability within Other secured borrowings. These loans are classified as Level II assets.

(2) Derivative assets are presented on a net basis by level. Inter- and intra-level cash collateral, cross-product and counterparty netting at November 30, 2007 was approximately $38.8 billion.

| | Liabilities at Fair Value as of November 30, 2007 | | | |
|---|---|---|---|---|
| In millions | Level I | Level II | Level III | Total |
| Mortgage and asset-backed positions | $ — | $ 332 | $ — | $ 332 |
| Government and agencies | 67,484 | 4,329 | — | 71,813 |
| Corporate debt and other | 22 | 6,737 | — | 6,759 |
| Corporate equities | 39,080 | — | — | 39,080 |
| Commercial paper and other money market instruments | 12 | — | — | 12 |
| Derivative liabilities[1] | 2,515 | 26,011 | 3,095 | 31,621 |
| | $ 109,113 | $ 37,409 | $ 3,095 | $ 149,617 |

(1) Derivative liabilities are presented on a net basis by level. Inter- and intra-level cash collateral, cross-product and counterparty netting at November 30, 2007 was

approximately $36.6 billion.

**Level III Gains and Losses**

Net revenues (both realized and unrealized) for Level III financial instruments are a component of Principal transactions in the Consolidated Statement of Income. Net realized gains associated with Level III financial instruments were approximately $1.3 billion for the fiscal year ended November 30, 2007. The net unrealized loss on Level III non-derivative financial instruments was approximately $2.5 billion for the fiscal year ended November 30, 2007, primarily consisting of unrealized losses from mortgage and asset-backed positions. The net unrealized gain on Level III derivative financial





instruments was approximately $1.6 billion for the fiscal year ended November 30, 2007, primarily consisting of unrealized gains from equity and interest rate-related derivative positions. Level III financial instruments may be economically hedged with financial instruments not classified as Level III; therefore, gains or losses associated with Level III financial instruments are offset by gains or losses associated with financial instruments classified in other levels of the fair value hierarchy.

The table presented below summarizes the change in balance sheet carrying values associated with Level III financial instruments during the fiscal year ended November 30, 2007. Caution should be utilized when evaluating reported net revenues for Level III Financial instruments. The values presented exclude economic hedging activities that may be transacted in instruments categorized within other fair value hierarchy levels. Actual net revenues associated with Level III financial instruments inclusive of hedging activities could differ materially.

| In millions | Mortgage and asset-backed positions | Corporate debt and other | Corporate equities | Net derivatives | Total |
|---|---|---|---|---|---|
| Balance at December 1, 2006 | $ 8,575 | $ 1,924 | $ 2,427 | $ 686 | $ 13,612 |
| Net Payments, Purchases and Sales | 6,914 | 472 | 4,567 | 376 | 12,329 |
| Net Transfers In/(Out) | 11,373 | 567 | 687 | (90) | 12,537 |
| Gains/(Losses)[1] | | | | | |
| Realized | 995 | 110 | 309 | (78) | 1,336 |
| Unrealized | (2,663) | 9 | 141 | 1,583 | (930) |
| Balance at November 30, 2007 | $ 25,194 | $ 3,082 | $ 8,131 | $ 2,477 | $ 38,884 |

(1) Realized or unrealized gains/(losses) from changes in values of Level III Financial instruments represent gains/(losses) from changes in values of those Financial instruments only for the period(s) in which the instruments were classified as Level III.

The table presented below summarizes the change in balance sheet carrying value associated with Level III financial instruments during each quarterly period in the 2007 fiscal year. Caution should be utilized when evaluating reported net revenues for Level III financial instruments. The values presented exclude economic hedging activities that may be transacted in instruments categorized within other fair value hierarchy levels. Actual net revenues associated with Level III financial instruments inclusive of hedging activities could differ materially.

| In millions | Mortgage and asset-backed positions | Corporate debt and other | Corporate equities | Net derivatives | Total |
|---|---|---|---|---|---|
| Balance at December 1, 2006 | $ 8,575 | $ 1,924 | $ 2,427 | $ 686 | $ 13,612 |
| Net Payments, Purchases and Sales | 2,349 | 428 | 210 | 283 | 3,270 |
| Net Transfers In/(Out) | 137 | — | — | — | 137 |
| Gains/(Losses)[1] | | | | | |
| Realized | 176 | 19 | 21 | 7 | 223 |
| Unrealized | (80) | 13 | 13 | 158 | 104 |
| Balance at February 28, 2007 | 11,157 | 2,384 | 2,671 | 1,134 | 17,346 |
| Net Payments, Purchases and Sales | 1,677 | 50 | 972 | (6) | 2,693 |
| Net Transfers In/(Out) | (101) | 95 | 352 | 39 | 385 |
| Gains/(Losses)[1] | | | | | |
| Realized | 274 | 31 | 5 | 48 | 358 |
| Unrealized | (131) | (11) | 135 | 65 | 58 |
| Balance at May 31, 2007 | 12,876 | 2,549 | 4,135 | 1,280 | 20,840 |
| Net Payments, Purchases and Sales | 1,674 | (299) | 446 | (59) | 1,762 |
| Net Transfers In/(Out) | 9,856 | (144) | 232 | (160) | 9,784 |
| Gains/(Losses)[1] | | | | | |
| Realized | 210 | 7 | 37 | (4) | 250 |
| Unrealized | (825) | 19 | 62 | 543 | (201) |
| Balance at August 31, 2007 | 23,791 | 2,132 | 4,912 | 1,600 | 32,435 |
| Net Payments, Purchases and Sales | 1,213 | 292 | 2,939 | 157 | 4,601 |
| Net Transfers In/(Out) | 1,480 | 615 | 103 | 31 | 2,229 |

| | | | | | |
|---|---|---|---|---|---|
| Gains/(Losses) [1] | | | | | |
| Realized | 255 | 47 | 227 | (166) | 363 |
| Unrealized | (1,545) | (4) | (50) | 855 | (744) |
| Balance at November 30, 2007 | $ 25,194 | $ 3,082 | $ 8,131 | $ 2,477 | $ 38,884 |

(1) Realized or unrealized gains/(losses) from changes in values of Level III Financial instruments represent gains/(losses) from changes in values of those Financial instruments only for the period(s) in which the instruments were classified as Level III.





**Fair Value Option**

SFAS 159 permits certain financial assets and liabilities to be measured at fair value, using an instrument-by-instrument election. Changes in the fair value of the financial assets and liabilities for which the fair value option was made are reflected in Principal transactions in our Consolidated Statement of Income. As indicated above in the fair value hierarchy tables and further discussed in Note 1, "Summary of Significant Accounting Policies, Accounting and Regulatory Developments—SFAS 159," we elected to account for the following financial assets and liabilities at fair value:

***Certain hybrid financial instruments.*** These instruments are primarily structured notes that are risk managed on a fair value basis and within our Capital Market activities and for which hedge accounting under SFAS No. 133, *Accounting for Derivative Instruments and Hedging Activities*, had been complex to maintain. Changes in the fair value of these liabilities, excluding any interest income or interest expense, are reflected in Principal transactions in our Consolidated Statement of Income. We calculate the impact of our own credit spread on hybrid financial instruments carried at fair value by discounting future cash flows at a rate which incorporates observable changes in our credit spread. The estimated changes in the fair value of these liabilities were gains of approximately $1.3 billion, attributable to the widening of our credit spreads during fiscal year 2007. As of November 30, 2007, the aggregate principal amount of hybrid financial instruments classified as short-term borrowings and measured at fair value exceeded the fair value by approximately $152 million. Additionally and as of November 30, 2007, the aggregate principal amount of hybrid financial instruments classified as long-term borrowings and measured at fair value exceeded the fair value by approximately $2.1 billion.

***Other secured borrowings.*** Certain liabilities recorded as Other secured borrowings include the proceeds received from transferring loans to securitization vehicles where such transfers were accounted for as secured financings rather than sales under SFAS 140. The transferred loans are reflected as an asset within Mortgages and asset-backed positions and also accounted for at fair value and categorized as Level II in the fair value hierarchy. We do not consider ourselves to have economic exposure to the underlying assets in these securitization vehicles. The change in fair value attributable to the observable impact from instrument-specific credit risk was not material to our results of operations.

***Deposit liabilities at banks.*** We elected to account for certain deposits at our U.S. banking subsidiaries at fair value. The change in fair value attributable to the observable impact from instrument-specific credit risk was not material to our results of operations. As of November 30, 2007, the difference between the fair value and the aggregate principal amount of deposit liabilities at banks carried at fair value was not material.

Liabilities for which the fair value option was elected are categorized in the table below based upon the lowest level of significant input to the valuations.

| | At Fair Value as of November 30, 2007 | | | |
|---|---|---|---|---|
| **In millions** | **Level I** | **Level II** | **Level III** | **Total** |
| Certain hybrid financial instruments: | | | | |
| Short-term borrowings | — | $ 9,035 | — | $ 9,035 |
| Long-term borrowings | — | $ 27,204 | — | $ 27,204 |
| Other secured borrowings | — | $ 9,149 | — | $ 9,149 |
| Deposit liabilities at banks | — | $ 15,986 | — | $ 15,986 |

**Fair Value on a Nonrecurring Basis**

The Company uses fair value measurements on a nonrecurring basis in its assessment of assets classified as Goodwill and other inventory positions classified as Real estate held for sale. These assets and inventory positions are recorded at fair value initially and assessed for impairment periodically thereafter. During the fiscal year ended November 30, 2007, the carrying amount of Goodwill assets were compared to their fair value. No change in carrying amount resulted in accordance with the provisions of SFAS No. 142, *Goodwill and Other Intangible Assets*. Additionally and on a nonrecurring basis during the fiscal year ended November 30, 2007, the carrying amount of Real estate held for sale positions were compared to their fair value less cost to sell. No change in carrying amount resulted in accordance with the provisions of SFAS No. 66, *Accounting for Sales of Real Estate*, SFAS No. 144, *Accounting for Impairment or Disposal of Long Lived Assets*, and other relevant accounting guidance. The lowest level of inputs for fair value measurements for Goodwill and Real estate held for sale are Level III.

For additional information regarding Goodwill, see Note 7, "Identifiable Intangible Assets and Goodwill," to the Consolidated Financial Statements. For additional information regarding our inventory of Real estate held for sale, see Note 3, "Financial Instruments and Other Inventory Positions," to the Consolidated Financial Statements.

**Valuation Techniques**

In accordance with SFAS 157, valuation techniques used for assets and liabilities accounted for at fair value are generally categorized into three types:

***Market Approach.*** Market approach valuation techniques use prices and other relevant information from market transactions involving identical or comparable assets or liabilities. Valuation techniques consistent with the market approach include comparables and matrix pricing. Comparables use market multiples, which might lie in ranges with a different multiple for each comparable. The selection of where within the range the appropriate multiple falls requires judgment, considering both quantitative and qualitative factors specific to the measurement. Matrix pricing is a mathematical technique used principally to value certain securities without relying exclusively on quoted prices for the specific securities but comparing the securities to benchmark or comparable securities.

***Income Approach.*** Income approach valuation techniques convert future amounts, such as cash flows or earnings, to a single present amount, or a discounted amount. These techniques rely on current market expectations of future amounts. Examples of income approach valuation techniques include present value techniques; option-pricing models, binomial or lattice models that incorporate present value techniques; and the multi-period excess earnings method.

***Cost Approach.*** Cost approach valuation techniques are based upon the amount that, at present, would be required to replace the service capacity of an asset, or the current replacement cost. That is, from the perspective of a market participant (seller), the price that would be received for the asset is determined based on the cost to a market participant (buyer) to acquire or construct a substitute asset of comparable utility.

The three approaches described within SFAS 157 are consistent with generally accepted valuation methodologies. While all three approaches are not applicable to all assets or liabilities accounted for at fair value, where appropriate and possible, one or more valuation techniques may be used. The selection of the valuation method(s) to apply considers the definition of an exit price and the nature of the asset or liability being valued and significant expertise and judgment is required. For assets and liabilities accounted for at fair value, excluding Goodwill and Real estate held for sale, valuation techniques are generally a combination of the market and income approaches. Goodwill and Real estate held for sale valuation techniques generally combine income and cost approaches. For the fiscal year ended November 30, 2007, the application of valuation techniques applied to similar assets and liabilities has been consistent.

## Note 5 Securities Received and Pledged as Collateral

We enter into secured borrowing and lending transactions to finance inventory positions, obtain securities for settlement and meet clients' needs. We receive collateral in connection with resale agreements, securities borrowed transactions, borrow/pledge transactions, client margin loans and derivative transactions. We generally are permitted to sell or repledge these securities held as collateral and use them to secure repurchase agreements, enter into securities lending transactions or deliver to counterparties to cover short positions.

At November 30, 2007 and 2006, the fair value of securities received as collateral that we were permitted to sell or repledge was approximately $798 billion and $621 billion, respectively. The fair value of securities received as collateral that we sold or repledged was approximately $725 billion and $568 billion at November 30, 2007 and 2006, respectively.

We also pledge our own assets, primarily to collateralize certain financing arrangements. These pledged securities, where the counterparty has the right by contract or custom to sell or repledge the financial instruments, were approximately $63 billion and $43 billion at November 30, 2007 and 2006, respectively. The carrying value of Financial instruments and other inventory positions owned that have been pledged or otherwise encumbered to counterparties where those counterparties do not have the right to sell or repledge, was approximately $87 billion and $75 billion at November 30, 2007 and 2006, respectively.

## Note 6 Securitizations and Special Purpose Entities

Generally, residential and commercial mortgages, home equity loans, municipal and corporate bonds, and lease and trade receivables are financial assets that we securitize through SPEs. We may continue to hold an interest in the financial assets securitized in the form of the securities created in the transaction, including residual interests ("interests in securitizations") established to facilitate the securitization transaction. Interests in securitizations are presented within Financial instruments and other inventory positions owned (primarily in mortgages and asset-backed securities and government and agencies) in the Consolidated Statement of Financial Condition. For additional information regarding the accounting for securitization





transactions, see Note 1, "Summary of Significant Accounting Policies— Consolidation Accounting Policies," to the Consolidated Financial Statements.

We have completed the appeals process with respect to the 1997 through 2000 IRS examination. Although most issues were settled on a basis acceptable to us, two issues remain unresolved and will carry into litigation with the IRS. Based on the strength of its positions, we have not reserved any part of these issues. The aggregate tax benefits previously recorded with regard to these two issues is approximately $185 million.

The IRS has recently begun an examination with respect to the 2001 through 2005 tax years. The audit is in its initial stages and no adjustments have been proposed. We believe we are adequately reserved for any issues that may arise from this audit. The two issues from the 1997 through 2000 cycle which we plan to litigate also have an impact on the 2001 through 2005 tax years. The aggregate tax benefit previously recorded with regard to these two issues is approximately $500 million.

## Note 15 Regulatory Requirements

For regulatory purposes, Holdings and its subsidiaries are referred to collectively as a CSE. CSEs are supervised and examined by the SEC, which requires minimum capital standards on a consolidated basis. At November 30, 2007, Holdings was in compliance with the CSE capital requirements and had allowable capital in excess of the minimum capital requirements on a consolidated basis.

In the United States, Lehman Brothers Inc. ("LBI") and Neuberger Berman, LLC ("NB LLC") are registered broker-dealers in the U.S. that are subject to SEC Rule 15c3-1 and Rule 1.17 of the Commodity Futures Trading Commission, which specify minimum net capital requirements for the registrants. LBI and NB LLC have consistently operated with net capital in excess of their respective regulatory capital requirements. LBI has elected to calculate its minimum net capital in accordance with Appendix E of the Net Capital Rule which establishes alternative net capital requirements for broker-dealers that are part of CSEs. In addition to meeting the alternative net capital requirements, LBI is required to maintain tentative net capital in excess of $1 billion and net capital in excess of $500 million. LBI is also required to notify the SEC in the event that its tentative net capital is less than $5 billion. As of November 30, 2007, LBI had net capital of approximately $2.7 billion, which exceeded the minimum net capital requirement by approximately $2.1 billion. As of November 30, 2007, NB LLC had net capital of approximately $188 million, which exceeded the minimum net capital requirement by approximately $183 million.

Lehman Brothers International (Europe) ("LB Europe"), a United Kingdom registered broker-dealer and subsidiary of Holdings, is subject to the capital requirements of the Financial Services Authority ("FSA") in the United Kingdom. Financial resources, as defined, must exceed the total financial resources requirement of the FSA. At November 30, 2007, LB Europe's financial resources of approximately $16.2 billion exceeded the minimum requirement by approximately $3.8 billion. Lehman Brothers Japan ("LB Japan"), a regulated broker-dealer, is subject to the capital requirements of the Financial Services Agency in Japan and the Bank of Japan. At November 30, 2007, LB Japan had net capital of approximately $1.3 billion, which was approximately $748 million in excess of Financial Services Agency in Japan's required level and approximately $512 million in excess of Bank of Japan's required level.

Lehman Brothers Bank, FSB ("LB Bank"), our thrift subsidiary, is regulated by the Office of Thrift Supervision. Lehman Brothers Commercial Bank ("LB Commercial Bank"), our Utah industrial bank subsidiary is regulated by the Utah Department of Financial Institutions and the Federal Deposit Insurance Corporation. LB Bank and LB Commercial Bank exceeded all regulatory capital requirements and are considered to be well capitalized as of November 30, 2007. Bankhaus is subject to the capital requirements of the Federal Financial Supervisory Authority of the German Federal Republic. At November 30, 2007, Bankhaus' financial resources exceeded its minimum financial resources requirement.

Certain other subsidiaries are subject to various securities, commodities and banking regulations and capital adequacy requirements promulgated by the regulatory and exchange authorities of the countries in which they operate. At November 30, 2007, these other subsidiaries were in compliance with their applicable local capital adequacy requirements.

In addition, our "AAA" rated derivatives subsidiaries, Lehman Brothers Financial Products Inc. ("LBFP") and Lehman Brothers Derivative Products Inc. ("LBDP"), have established certain capital and operating restrictions that are reviewed by various rating agencies. At November 30, 2007, LBFP and LBDP each had capital that exceeded the requirements of the rating agencies.

The regulatory rules referred to above, and certain covenants contained in various debt agreements, may restrict Holdings' ability to withdraw capital from its regulated subsidiaries, which in turn could limit its ability to pay dividends to shareholders. Holdings fully guarantees the payment of all liabilities, obligations and commitments of certain of its subsidiaries.





## Note 16 Quarterly Information (unaudited)

The following table presents unaudited quarterly results of operations for 2007 and 2006. Certain amounts reflect reclassifications to conform to the current period's presentation. These quarterly results reflect all normal recurring adjustments that are, in the opinion of management, necessary for a fair presentation of the results. Revenues and net income can vary significantly from quarter to quarter due to the nature of our business activities.