UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

In re:

LEHMAN BROTHERS SECURITIES AND
ERISA LITIGATION

This Document Applies to:

*In re Lehman Brothers Equity/Debt Securities
Litigation*, 08 Civ. 5523 (LAK)

Civil Action 09 MD 2017

ECF CASE

<u>JURY TRIAL DEMANDED</u>

**SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**

# TABLE OF CONTENTS

Page

I. SUMMARY OF THE ACTION .................................................................2

II. OVERVIEW OF THE SEPARATE CLAIMS ..........................................6

III. JURISDICTION AND VENUE ...............................................................6

IV. PARTIES AND RELEVANT NON-PARTIES .......................................7

    A.    Plaintiffs ........................................................................................7

    B.    Relevant Non-Parties ....................................................................8

    C.    Defendants ....................................................................................9

        1.    Insider Defendants ............................................................9

        2.    Director Defendants........................................................11

        3.    Underwriter Defendants..................................................12

V. VIOLATIONS OF THE SECURITIES ACT ..........................................18

    A.    Substantive Allegations ..............................................................19

        1.    The Offering Materials Failed To Disclose
                Lehman's High-Risk Residential Mortgage Lending
                Practices ..........................................................................20

                a.    Aurora And BNC Engaged In High-Risk
                        Lending Practices.................................................20

                b.    High-Risk Lending Practices Resulted In
                        Increasing Repurchase Requests...................25

        2.    The Offering Materials Failed To Disclose
                Lehman's Significant And Increasing Concentration
                Of Mortgage Related Risks........................................28

        3.    The Offering Materials Overstated Lehman's
                Financial Results And Omitted Material Facts
                Regarding Lehman's Mortgage Related Assets And
                Real Estate Related Investments..................................29

i

        a.      The Offering Materials Overstated The
                 Value Of Lehman's Commercial Mortgage
                 and Real Estate Related Assets ....................................................30

        b.      The Offering Materials Overstated The
                 Value Of Lehman's Residential Mortgages
                 And Mortgage Related Assets .....................................................37

    4.      The Offering Materials Contained Untrue
           Statements And Omitted Material Facts Regarding
           Lehman's Purported Risk Mitigation And Hedging.................................43

    5.      The Offering Materials Contained Untrue
           Statements Regarding Lehman's Capitalization,
           Liquidity And The Risks Of Bankruptcy .....................................45

B.     The Offerings .........................................................................................47

C.     The False and Misleading Offering Materials .......................................48

    1.      2006 Fiscal Year-End Results .......................................................48

    2.      1Q07 Financial Results .................................................................51

    3.      2Q07 Financial Results .................................................................53

    4.      3Q07 Financial Results .................................................................54

    5.      4Q07 Financial Results .................................................................55

    6.      2007 Fiscal Year-End Results .......................................................56

    7.      1Q08 Financial Results .................................................................57

    8.      2Q08 Financial Results .................................................................58

    9.      Misstatements Common To Lehman's Quarterly
           And Annual Reports .....................................................................60

        a.      SOX Certifications........................................................60

        b.      Conformity To GAAP...................................................62

        c.      Disclosure and Internal Controls .................................62

        d.      Risk Management .........................................................63

        e.      Fair Value......................................................................64

        f.       Capital and Liquidity ...................................................................64

    D.      The Principal Protection Note Offerings .................................................65

VI.     CAUSES OF ACTION UNDER THE SECURITIES ACT...................................71

COUNT I  Violations Of Section 11 Of The Securities Act Against The
    Securities Act Defendants.............................................................................71

COUNT II  Violations Of Section 12(a)(2) Of The Securities Act Against
    The Underwriter Defendants........................................................................74

COUNT III  Violations Of Section 15 Of The Securities Act Against The
    Securities Act Individual Defendants And Defendants Gregory
    And Lowitt ....................................................................................................76

VII.    VIOLATIONS OF THE EXCHANGE ACT ...................................................77

    A.      The Insider Defendants' False And Misleading Statements
           During The Exchange Act Period ...........................................................77

           1.      2Q07 Financial Results...........................................................77

           2.      3Q07 Financial Results...........................................................79

           3.      4Q07 Financial Results...........................................................84

           4.      2007 Fiscal Year-End Results..................................................86

           5.      1Q08 Financial Results...........................................................87

           6.      2Q08 Financial Results...........................................................91

           7.      3Q08 Pre-Released Financial Results And Write-
                   down Announcement ...............................................................95

    B.      The Insider Defendants' Scienter.........................................................96

           1.      Insider Defendants' Positions As Lehman's
                   Executive Management And On Its Executive
                   Committee Afforded Them Extensive Knowledge
                   Of Lehman's Core Business Operations..................................96

           2.      The Insider Defendants Knew Of And/Or
                   Recklessly Disregarded Fraudulent Conduct Within
                   Lehman's Mortgage Operations .............................................98

           3.      Insider Defendants' Regular Contact With
                   Lehman's Mortgage Subsidiaries Made Them

Aware Of The Deterioration Of The Company's
Mortgage And Real Estate Related Assets ................................................102

4.      Insider Defendants Were Aware That Lehman Did
Not Adequately Manage Risk ................................................................104

5.      The Insider Defendants Were Aware That
Lehman's Real Estate And Mortgage Related
Assets Were Overvalued And Severely Affected
Lehman's Capital And Liquidity Positions
Throughout The Exchange Act Period ....................................................105

6.      Motive And Opportunity........................................................................107

C.      Loss Causation ..................................................................................................110

VIII.   CAUSES OF ACTION UNDER THE EXCHANGE ACT ...........................................112

COUNT IV  Violations Of Section 10(b) Of The Exchange Act And Rule
10b-5 Promulgated Thereunder Against The Insider Defendants ..................................112

COUNT V  Violations Of Section 20(a) Of The Exchange Act Against
The Insider Defendants ..........................................................................................115

COUNT VI  Violations Of Section 20A Of The Exchange Act Against
Defendant Fuld..........................................................................................................116

IX.     CLASS ACTION ALLEGATIONS APPLICABLE TO ALL
CLAIMS ............................................................................................................117

X.      PRAYER FOR RELIEF ..............................................................................................120

Plaintiffs, as defined below, bring claims arising under the Securities Act of 1933 (the "Securities Act")  individually and on behalf of all persons and entities, except Defendants and their affiliates, who purchased or otherwise acquired Lehman Brothers Holdings Inc. ("Lehman" or the "Company") securities identified on Appendix A attached hereto (collectively, the "Offerings"), between February 13, 2007 and September 15, 2008, inclusive (the "Relevant Period") pursuant or traceable to materially false and misleading registration statement and prospectuses and certain documents incorporated therein by reference, and who were damaged thereby.[1]  The Securities Act claims allege solely **strict liability** and **negligence** causes of action.

Separately, Plaintiffs bring claims arising under the Securities and Exchange Act of 1934 (the "Exchange Act") individually and on behalf of all persons and entities, except Defendants and their affiliates, who purchased or otherwise acquired Lehman common stock, call options, and/or who sold put options between June 12, 2007 and September 15, 2008 (the "Exchange Act Period"), inclusive, and who were damaged thereby.

Plaintiffs allege the following upon personal knowledge as to themselves and their own acts and upon information and belief as to all other matters.  Plaintiffs' information and belief are based on the investigation of their undersigned counsel, Bernstein Litowitz Berger & Grossmann LLP and Barroway Topaz Kessler Meltzer & Check, LLP, which investigation continues.  Many of the facts related to Plaintiffs' allegations are known only by Lehman and the Defendants named herein, or are exclusively within their custody or control.   Plaintiffs believe that

---

[1]  "Offerings" means the offerings that occurred pursuant to a shelf registration statement dated May 30, 2006, filed with the SEC on Form S-3 (the "Shelf Registration Statement").  The Shelf Registration Statement, together with the prospectuses, prospectus supplements, product supplements and pricing supplements, as well as all SEC filings incorporated therein, are collectively referred to herein as the "Offering Materials."

1

substantial additional evidentiary support for the allegations set forth below will be developed after a reasonable opportunity for discovery.

## I.       SUMMARY OF THE ACTION

1.      This case arises from Lehman's issuance of hundreds of public offerings of debt and equity securities, for collective proceeds of more than $47 billion, pursuant to Offering Materials that contained untrue statements and omitted material information regarding Lehman's:  (1) significant, and increasing, concentration of mortgage related risks; (2) failure to timely or adequately record write downs of its mortgage related assets and real estate related investments; (3) high-risk residential mortgage lending practices; (4) risk mitigation and inability to effectively hedge against losses in its mortgage-related portfolio; and (5) capitalization, liquidity and risks of bankruptcy.    Ultimately, Lehman petitioned for bankruptcy on September 15, 2008 – the largest corporate bankruptcy in the history of the United States.

2.      Lehman was a major participant in all aspects of the mortgage and real estate markets, including originating residential and commercial mortgages, securitizing loans, marketing various asset-backed instruments, and investing directly in real estate.  Prior to and throughout the Relevant Period, the real estate and mortgage markets were in the midst of an unprecedented meltdown that adversely affected the market value of mortgage related assets and real estate related investments.  Dozens of companies with mortgage exposure had taken massive mortgage related write downs, ceased operations or petitioned for bankruptcy, and firms like Citigroup, Merrill Lynch, Morgan Stanley, Bear Stearns and UBS booked enormous gross losses related to their mortgage related assets and the credit squeeze in 2007.

3.      While others booked massive mortgage and real estate related losses in 2007, Lehman recorded only modest write downs, despite having enormous exposure to mortgage related assets and real estate related investments and having rapidly expanded its portfolio.

Lehman's mortgage and asset-backed securities, including its mortgage related assets, grew from $57.7 billion as of its fiscal 2006 year-end to over $89.1 billion as of its fiscal 2007 year-end, reaching an unprecedented and dangerous ratio of over thirty times shareholder equity by the end of the first quarter of 2008.  Further, Lehman's portfolio of real estate held for sale, including its real estate related investments, grew from $9.4 billion as of its 2006 year-end to over $21.9 billion as of its 2007 year-end.[2]

4.      Lehman was exposed to massive write downs and losses when the housing and mortgage markets declined and the value of Lehman's mortgage related assets and real estate related investments deteriorated.  Lehman failed to timely and adequately write down these assets, however, and continued to overvalue them, in violation of Generally Accepted Accounting Principles ("GAAP").  As a consequence, Lehman's financial results were not prepared in accordance with GAAP, making the Offering Materials false and misleading.

5.      Lehman's situation was aggravated by its very high leverage and strong reliance on short-term debt financing.  Even though commercial banks may not leverage their assets-to-equity ratio by more than fifteen to one, Lehman's leverage ratio was more than double that amount.  With such a high leverage, "a mere 3.3% drop in the value of assets wipes out the entire value of equity and makes the company insolvent," according to Luigi Zingales, Professor of Finance at the University of Chicago.  Lehman's failure to properly write down its real estate

---

[2]  Lehman's quarterly periods did not conform to the calendar year.  Its fourth quarter ("4Q06") and its fiscal year 2006 ("FY06") ended on November 30, 2006; first quarter 2007 ("1Q07") ended on February 28, 2007; second quarter 2007 ("2Q07") ended on May 31, 2007; third quarter 2007 ("3Q07") ended on August 31, 2007; fourth quarter 2007 ("4Q07") and fiscal year 2007 ("FY07") ended on November 30, 2007; first quarter 2008 ("1Q08") ended on February 29, 2008; second quarter 2008 ("2Q08") ended on May 31, 2008; and third quarter 2008 ("3Q08") ended on August 31, 2008.

related assets to market value concealed how close it was to insolvency, or that it was in fact effectively insolvent long before it ultimately filed for bankruptcy on September 15, 2008.

6.      Ultimately, the truth about Lehman's financial condition and illiquid assets materialized in a series of announcements and events.  Before the markets opened on June 9, 2008, Lehman announced its first ever quarterly loss as a public company – a net loss of $2.8 billion, or approximately $5.14 per share, for the second quarter of its 2008 fiscal year, and disclosed that it incurred losses on hedges in the quarter.  The loss was due in part to Lehman's $4 billion in mark-to-market write downs, including $2.4 billion for residential mortgage related holdings, $700 million for commercial mortgage related positions and $300 million for real estate held for sale.  Lehman continued to reassure investors that the Company was financially strong, however, by stating on June 9 that, among other things, it grew its liquidity pool to $45 billion, decreased gross assets by $130 billion, reduced its leverage, and increased long-term capital.  Additionally, in the conference call with analysts following the June 9 earnings announcement, Lehman's Chief Financial Officer ("CFO") (and a defendant herein) Erin Callan characterized the deleveraging as over, stating:  "Our deleveraging was as aggressive, as you can see, and is complete."  Because Lehman's June 9 announcement only partially revealed the truth about Lehman's true exposure and its ability (or lack thereof) to hedge, and because misrepresentations about Lehman's true financial condition and results of operations continued, Lehman was able to raise an additional $6 billion through the offering of common and preferred shares immediately following the announcement.  Three days later, on June 12, Lehman announced that Callan was demoted and that Joseph Gregory, Lehman's president (and a defendant herein), were replaced.

7.      By September 9, 2008, Lehman executives internally calculated that the Company required at least $3 billion in additional capital.  Lehman also received demands from JPMorgan for $10 billion to cover lending positions.

8.      Nonetheless, the following day, on September 10, 2008, Lehman Chief Executive Officer ("CEO") Richard Fuld and new Lehman CFO Ian Lowitt held a conference call to assure investors that the Company did not need additional capital.  In an earnings pre-release, Lehman reported a $3.9 billion loss for the third quarter of 2008 and $7.8 billion in gross write downs, including $5.3 billion on residential mortgage related positions and $1.7 billion on commercial mortgage and real estate related investments.  Lehman also announced that it planned to spin off approximately $25 to $30 billion, or almost all, of its commercial real estate portfolio into a separate publicly traded company in order to remove these bad assets from Lehman's balance sheet.

9.      In a conference call with analysts following the September 10, 2008 announcement, Defendant Fuld stated that "the decisions announced today will best protect the core client franchise, and create a very clean, liquid balance sheet."  Defendant Ian Lowitt, who replaced Callan as Lehman's CFO on June 12, 2008, stated:  "our liquidity position . . . remains very strong," "we have maintained our strong liquidity and capital profiles even in this difficult environment," and "we think that clearly with our capital position at the moment is, it's strong."

10.     Around the same time, however, Lehman was privately trying to sell its commercial real estate assets to various banks.  But the mortgage securities experts from Citigroup, Credit Suisse, Deutsche Bank and Goldman Sachs who analyzed Lehman's portfolio found that the portfolio was overvalued by billions of dollars, with Lehman's $32.6 billion in commercial real estate holdings overvalued by as much as 35%.  Additionally, the federal government refused to

provide Lehman with a bailout because its toxic assets created a "huge hole" in its balance sheet. As then Treasury Secretary Paulson later explained, "'[w]e didn't have the powers,' because by law the Federal Reserve could bailout Lehman with a loan only if the bank had enough good assets to serve as collateral, which it did not."

11.     On September 15, 2008, Lehman filed for bankruptcy.  In stark contrast to Defendant Lowitt's affirmative representations made just days before regarding Lehman's purportedly strong liquidity position and capital, Lehman sought bankruptcy protection because it had "significant liquidity problems."

## II.     OVERVIEW OF THE SEPARATE CLAIMS

12.     In Counts I through III, Plaintiffs assert claims for violations of Sections 11, 12(a)(2), and 15 of the Securities Act, 15 U.S.C. §§ 77k, 77l(a)(2), and 77o, against the Securities Act Defendants, defined below in ¶244, who are statutorily liable for the materially false and misleading statements set forth in the Offering Materials.  Plaintiffs specifically disclaim any allegations of fraud in connection with the Securities Act claims, which sound in strict liability and negligence and are not based on any allegations of knowing or reckless misconduct on the part of any Defendant.

13.     In Counts IV through VI, Plaintiffs assert claims for violations of Sections 10(b), 20(a), and 20A of the Exchange Act, 15 U.S.C. §§ 78j(b), 78t(a), 78t-1(a), and the rules and regulations promulgated thereunder, including Rule 10b-5, 17 C.F.R. § 240.10b-5 ("Rule 10b-5"), against the Insider Defendants identified below in ¶30.

## III.    JURISDICTION AND VENUE

14.     This Court has jurisdiction over the subject matter of this action pursuant to Section 22 of the Securities Act, 15 U.S.C. § 77v; Section 27 of the Exchange Act, 15 U.S.C. § 78aa; and 28 U.S.C. § 1331.

15.     Venue is proper in this District pursuant to Section 22 of the Securities Act, 15 U.S.C. § 77v; Section 27 of the Exchange Act, 15 U.S.C. § 78aa; and 28 U.S.C. § 1391(b), (c), and (d).  Many of the acts and transactions described herein, including the preparation and dissemination of materially false and misleading public filings, occurred in this District.  At all times relevant herein, Lehman's headquarters and principal offices were located in this District at 745 Seventh Avenue, New York, New York.

16.     In connection with the acts alleged herein, Defendants directly or indirectly used the means and instrumentalities of interstate commerce, including, but not limited to, the United States mails, interstate telephone communications, and the facilities of national securities exchanges.

IV.    **PARTIES AND RELEVANT NON-PARTIES**

A.    **Plaintiffs**

17.     Court-appointed Lead Plaintiff Alameda County Employees' Retirement Association ("ACERA") is located in Oakland, California, and provides retirement, disability, and death benefits to the employees, retirees, and former employees of the County of Alameda. ACERA manages $5.6 billion in assets for over 10,000 members.  ACERA's purchases of Lehman securities include Lehman common stock, Lehman 7.95% Non-Cumulative Perpetual Convertible Preferred Stock, Series J, and Lehman 6.875% Subordinated Notes Due 2037.

18.     Court-appointed Lead Plaintiff Government of Guam Retirement Fund ("GGRF") is located in Maite, Guam, and provides annuities and other benefits to its members who complete a prescribed number of years in government service.  Guam maintains over $1.6 billion in net assets held in trust for pension benefits.  Guam's purchases of Lehman securities include Lehman common stock, as well as Lehman 6.875% Subordinated Notes Due 2037.

7

19.     Court-appointed Lead Plaintiff Northern Ireland Local Government Officers' Superannuation Committee ("NILGOSC") is located in Belfast, Northern Ireland, and administers the Local Government Pension Scheme for Northern Ireland.  NILGOSC maintains a pension fund with net assets of over £3.1 billion.  NILGOSC's purchases of Lehman securities include Lehman common stock.

20.     Court-appointed Lead Plaintiff City of Edinburgh Council as Administering Authority of the Lothian Pension Fund ("Lothian") is located in Scotland, and pays pensions to former employees of the City Council, East, Mid and West Lothian Councils, the former Regional and District Councils, and the Lothian and Borders Fire and Rescue Service, as well as a number of public sector organizations.  The Lothian Pension Fund is valued at over £2.976 billion.  Lothian's purchases of Lehman securities include Lehman common stock.

21.     Court-appointed Lead Plaintiff Operating Engineers Local 3 Trust Fund ("Operating Engineers") is located in Alameda, California, and provides pension plans for working and retired members throughout its four-state jurisdiction.   Operating Engineers' purchases of Lehman securities include Lehman common stock.

22.     Additional Plaintiffs are identified in Appendix B, attached hereto.

**B.     Relevant Non-Parties**

23.     Lehman is a corporation organized under the laws of the state of Delaware with its headquarters located at 745 Seventh Avenue, New York, New York.  Lehman operated as a global investment bank and purported to be "an innovator in global finance" with a "leadership position in equity and fixed income sales, trading and research."  Lehman's common stock traded on the New York Stock Exchange.  On September 15, 2008, in this District, Lehman filed a voluntary petition for bankruptcy protection under Chapter 11 of the Bankruptcy Code.  For this reason, Lehman is not named as a defendant in this action.

8

24.     Lehman Brothers Inc. ("LBI"), based in New York, New York, is a wholly-owned subsidiary of Lehman and operated as a registered broker-dealer under the Exchange Act.  LBI's services included brokerage, mergers and acquisitions and restructuring advice, debt and equity underwriting, market making, debt and equity research, and real estate and private equity investments.  On September 17, 2008, the Securities Investor Protection Corporation ("SIPC") moved for an order commencing liquidation and protection under the automatic stay provisions of the Bankruptcy Code.  The Bankruptcy Court granted the request on September 19, 2008.  For this reason, LBI is not named as a defendant in this action.

C.     **Defendants**

1.     **Insider Defendants**

25.     Defendant Richard S. Fuld, Jr. ("Fuld") joined Lehman in 1969, was elected Chairman of the Board of Directors of the Company in April 1994 and named Chief Executive Officer ("CEO") of the Company in November 1993, and remained as Chairman and CEO throughout the Relevant Period.  Throughout the Relevant Period, Fuld also served as chair of Lehman's Executive Committee, which had the authority, in the intervals between meetings of the Board of Directors, to exercise all the authority of the Board of Directors, except for those matters that the Delaware General Corporation Law or the Company's Restated Articles of Incorporation reserved to the full Board of Directors.  Fuld was also Chairman and CEO of LBI throughout the Relevant Period.  Fuld signed the Shelf Registration Statement in his capacity as Lehman Chairman and CEO.

26.     Defendant Christopher M. O'Meara ("O'Meara") served as the Company's CFO, Controller, and Executive Vice President from 2004 until December 1, 2007, when he became Lehman's head of Worldwide Risk Management.   O'Meara signed the Shelf Registration Statement in his capacity as CFO, Controller and Executive Vice President of Lehman.

27.     Defendant Joseph M. Gregory ("Gregory") was, at all relevant times, the Company's President and Chief Operating Officer ("COO"), until he resigned in June 2008.  As COO, Gregory was responsible for the day-to-day management of Lehman's operations.  He previously served as head of Lehman's Equities Division, in charge of the overall equities business, and Fixed Income division, including Lehman's mortgage related businesses.

28.     Defendant Erin Callan ("Callan") joined Lehman in 1995, became the Company's CFO and Executive Vice President on December 1, 2007, and served in that position until she resigned in June 2008.

29.     Defendant Ian Lowitt ("Lowitt") replaced Callan as CFO in June 2008 and also served as the Co-Chief Administrative Officer.  Lowitt oversaw Lehman's finance organization, including Financial Control, Investor Relations, Planning and Analysis, Product Control, Tax, and Treasury.  As Co-Chief Administrative Officer, Lowitt was responsible for the global oversight of Risk Management.  Lowitt was also a member of Lehman's Executive Committee during the Relevant Period.

30.     Defendants Fuld, O'Meara, Gregory, Callan, and Lowitt are referred to collectively as the "Insider Defendants."  The Insider Defendants, because of their senior positions at Lehman, were controlling persons of the Company and possessed the power and authority to control the contents of Lehman's reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors – *i.e.*, the market.

2.      **Director Defendants**

31.     Defendant Michael L. Ainslie ("Ainslie") was at all relevant times a director of Lehman and signed the Shelf Registration Statement in his capacity as a director of Lehman.

32.     Defendant John F. Akers ("Akers") was at all relevant times a director of Lehman and signed the Shelf Registration Statement in his capacity as a director of Lehman.

33.     Defendant Roger S. Berlind ("Berlind") was at all relevant times a director of Lehman and signed the Shelf Registration Statement in his capacity as a director of Lehman. Defendant Berlind was also a director of LBI.

34.     Defendant Thomas H. Cruikshank ("Cruikshank") was at all relevant times a director of Lehman and signed the Shelf Registration Statement in his capacity as a director of Lehman.  Defendant Cruikshank was also a director of LBI.

35.     Defendant Marsha Johnson Evans ("Evans") was at all relevant times a director of Lehman and signed the Shelf Registration Statement in her capacity as a director of Lehman.

36.     Defendant Sir Christopher Gent ("Gent") was at all relevant times a director of Lehman and signed the Shelf Registration Statement in his capacity as a director of Lehman. Defendant Gent was also a director of LBI.

37.     Defendant Roland A. Hernandez ("Hernandez") was at all relevant times a director of Lehman and signed the Shelf Registration Statement in his capacity as a director of Lehman.

38.     Defendant Henry Kaufman ("Kaufman") was at all relevant times a director of Lehman and signed the Shelf Registration Statement in his capacity as a director of Lehman.

39.     Defendant John D. Macomber ("Macomber") was at all relevant times a director of Lehman and signed the Shelf Registration Statement in his capacity as a director of Lehman.

### 3.   Underwriter Defendants

40.     Defendant ABN Amro Holding N.V. ("ABN"), based in Amsterdam, The Netherlands, is an international bank that provides investment services.

41.     Defendant ANZ Securities, Inc. ("ANZ") is an affiliated company of ANZ Bank, based in Melbourne, Australia, that provides a full range of financial products and services to business, corporate, and institutional clients.

42.     Defendant Banc of America Securities LLC ("BOA"), based in New York City, is the investment banking arm of its parent corporation, Bank of America, and provides commercial and investment banking services and commercial loans to corporate entities.

43.     Defendant BBVA Securities Inc. ("BBVA"), based in New York City, provides securities brokerage and research services.

44.     Defendant M.R. Beal & Company ("Beal"), based in New York City, is an investment bank that provides investment, underwriting, and corporate banking services.

45.     Defendant BNP Paribas S.A. ("BNP"), based in Paris, France, is a financial services institution that, through its subsidiaries and divisions, provides full range of financial products and services business, corporate, institutional and consumer clients.

46.     Defendant BNY Mellon Capital Markets, LLC ("BNY"), based in New York City, is a boutique investment banking firm that offers corporate finance advisory services.  BNY also provides fixed-income securities.  BNY is a subsidiary of The Bank of New York Mellon Corporation.

47.     Defendant Cabrera Capital Markets, LLC ("Cabrera"), based in Chicago, Illinois, is an institutional brokerage firm that offers municipal and corporate financial advisory services, securities clearance, public agency financings, and brokerage services.

12

48.     Defendant Caja de Ahorros y Monte de Piedad de Madrid ("Caja Madrid") operates as a savings bank in Spain.

49.     Defendant Calyon Securities (USA) Inc. ("Calyon"), based in New York City, provides securities brokerage, investment banking and underwriting services.  Calyon is a subsidiary of Credit Agricole S.A.

50.     Defendant Charles Schwab & Co., Inc., ("Charles Schwab"), based in San Francisco, California, is a securities broker dealer.  Charles Schwab is a subsidiary of The Schwab Corporation.

51.     Defendant CIBC World Markets Corp. ("CIBC"), based in New York City, provides a range of credit and capital market products, investment banking, and merchant banking services in North America and worldwide.  CIBC is a subsidiary of the Canadian Imperial Bank of Commerce.

52.     Defendant Citigroup Global Markets Inc. ("CGMI"), based in New York City, is a subsidiary of Citigroup Inc., a financial services institution that, through its subsidiaries and divisions, provides commercial and investment banking services and commercial loans to corporate entities.

53.     Defendant Commerzbank Capital Markets Corp. ("Commerzbank"), based in New York City, provides securities brokerage and underwriting services.  Commerzbank is a subsidiary of Commerzbank Aktiengesellschaft.

54.     Defendant Daiwa Securities SMBC Europe Limited ("Daiwa"), based in London, England, is an investment banking firm that provides equity, fixed income, investment banking, underwriting derivatives, and strategic advisory services.  Daiwa is a subsidiary of Daiwa Securities SMBC Co. Ltd.

55.     Defendant DnB NOR Markets ("DnB NOR"), based in Oslo, Norway, provides capital markets services.  DnB NOR is a subsidiary of DnB NOR ASA.

56.     Defendant DZ Financial Markets LLC ("DZ Financial"), based in New York City, provides securities brokerage and underwriting services.

57.     Defendant Edward D. Jones & Co., L.P. ("E.D. Jones"), based in St. Louis, Missouri, is a provider of financial services.

58.     Defendant Fidelity Capital Markets Services ("Fidelity Capital"), based in Boston, Massachusetts, is the institutional trading arm of Fidelity Investments providing trading, products, and services.

59.     Defendant RBS Greenwich Capital ("Greenwich"), based in Greenwich, Connecticut, is a securities brokerage firm.  Greenwich operates as a subsidiary of Greenwich Capital Holdings, Inc.

60.     Defendant Harris Nesbitt Corp. ("Harris Nesbitt"), based in New York City, is an investment bank that provides investment, underwriting, and corporate banking services.

61.     Defendant HSBC Securities (USA) Inc. ("HSBC"), based in New York City, is an investment banking firm.  HSBC is a subsidiary of HSBC Holdings plc.

62.     Defendant HVB Capital Markets, Inc. ("HVB"), based in New York City, is a securities broker/dealer.

63.     Defendant Incapital LLC ("Incapital"), with offices in Chicago, Boca Raton and London, is a securities and investment banking firm.

64.     Defendant ING Financial Markets LLC ("ING"), based in New York City, provides investment banking and corporate financial services.  ING is a subsidiary of ING Groep NV.

14

65.     Defendant Loop Capital Markets, LLC ("Loop Capital"), based in Chicago, Illinois, is a boutique investment banking and brokerage firm.

66.     Defendant Mellon Financial Markets, LLC ("Mellon"), based in Pittsburgh, Pennsylvania, is an underwriting subsidiary of Mellon Financial Corporation and provides underwriting, trading, and sales services to investors.

67.     Defendant Merrill Lynch, Pierce, Fenner & Smith Inc. ("Merrill Lynch"), based in New York City, is a financial services institution that, through its subsidiaries and divisions, provides commercial and investment banking services and commercial loans to corporate entities.

68.     Defendant Mizuho Securities USA, Inc. ("Mizuho"), based in New York City, is a securities brokerage firm that provides underwriting services.  Mizuho operates as a subsidiary of Mizuho Securities Co., Ltd.

69.     Defendant Morgan Stanley & Co. Inc. ("Morgan Stanley"), based in New York City, is a financial services institution that, through its subsidiaries and divisions, provides commercial and investment banking services and commercial loans to corporate entities.

70.     Defendant Muriel Siebert & Co., Inc., ("Muriel Siebert"), based in New York City, is a stock discount brokerage firm engaged in stock and bond trading.  Muriel Siebert is a wholly owned subsidiary of Siebert Financial.

71.     Defendant nabCapital Securities, LLC ("nabCapital"), based in New York City, is a division of National Australia Bank Limited ("National") based in Melbourne, Australia, a financial services firm that operates as an international financial services organization that provides a comprehensive and integrated range of financial products and services.

72.     Defendant Natixis Bleichroeder Inc. ("Natixis"), based in New York City, provides investment, banking, underwriting and brokerage services.  Natixis is a subsidiary of Natixis bank based in Paris, France.

73.     Defendant Raymond James & Associates, Inc. ("Raymond James"), based in St. Petersburg, Florida, is a retail brokerage firm.  It is a subsidiary of Raymond James Financial.

74.     Defendant RBC Dain Rauscher Inc. ("RBC"), based in Minneapolis, Minnesota, is a financial services institution that, through its subsidiaries and divisions, provides commercial and investment banking services and commercial loans to corporate entities.

75.     Defendant Santander Investment Securities Inc. ("Santander"), based in New York City, is a wholly-owned subsidiary of Banco Santander, S.A.  Santander provides various financial services including asset management, brokerage, and corporate finance.

76.     Defendant Scotia Capital (USA) Inc. ("Scotia"), based in New York City, is an investment bank that provides securities underwriting and brokerage services.  Scotia is a subsidiary of The Bank of Nova Scotia.

77.     Defendant Siebert Capital Markets ("Siebert"), based in New York City, is a brokerage firm.  Siebert is a division of Muriel Siebert & Co., a wholly owned subsidiary of Siebert Financial Corp.

78.     Defendant SG Americas Securities LLC ("SG Americas"), based in New York City, is a provider of investment banking services.  SG Americas is the subsidiary of Societé Generale.

79.     Defendant SG Corporate & Investment Banking ("Societe Generale"), based in Paris, France, is an investment bank that focuses on corporate finance, structured finance, mergers and acquisitions.  Societe Generale operates as a subsidiary of Societe Generale Group.

80.     Defendant Sovereign Securities Corporation, LLC ("Sovereign"), based in Philadelphia, Pennsylvania, is a securities brokerage firm that provides underwriting services. Sovereign operates as a subsidiary of Sovereign Bank.

81.     Defendant SunTrust Robinson Humphrey, Inc. ("SunTrust"), based in Atlanta, Georgia, is a financial services institution that, through its subsidiaries and divisions, provides commercial and investment banking services and commercial loans to corporate entities. SunTrust is a division of SunTrust Banks.

82.     Defendant TD Securities (USA) LLC ("TD Securities"), based in New York City, is an investment banking and securities brokerage firm.  TD Securities is a subsidiary of TD Holdings II Inc.

83.     Defendant UBS Securities LLC ("UBSS"), based in New York City, is a financial services institution that, through its subsidiaries and divisions, provides commercial and investment banking services and commercial loans to corporate entities.

84.     Defendant UBS Financial Services Inc. ("UBSF"), based in New York City, is a financial services institution that offers investment advisory and brokerage services to its Wealth Management clients.  Defendants UBSS and USBF are referred to collectively herein as "UBS," unless otherwise denoted.

85.     Defendant Utendahl Capital Partners, L.P. ("Utendahl"), based in New York City, is an investment bank.

86.     Defendant Wachovia Capital Markets, LLC ("Wachovia"), based in Charlotte, North Carolina, is a financial services institution that, through its subsidiaries and divisions, provides commercial and investment banking services and commercial loans to corporate entities.  Wachovia is a subsidiary of Wells Fargo.

17

87.     Defendant Wachovia Securities, LLC, ("Wachovia Securities"), based in St. Louis, Missouri, is a provider of financial services.

88.     Defendant Wells Fargo Securities, LLC ("Wells Fargo"), based in San Francisco, California, is a financial services institution that, through its subsidiaries and divisions, provides commercial and investment banking services and commercial loans to corporate entities.

89.     Defendant Williams Capital Group, L.P. ("Williams Capital"), based in New York City, is an investment banking firm providing debt and equity underwriting and corporate finance advisory services.

90.     The Defendants described in ¶¶40-89 are referred to collectively as the "Underwriter Defendants."   Each Underwriter Defendant was responsible for ensuring the truthfulness and accuracy of statements contained in or incorporated by reference into the Offering Materials with respect to the Offerings that it underwrote, and each Underwriter Defendant is liable under the Securities Act to Plaintiffs and members of the Class for the materially false and misleading statements contained therein.

91.     The Underwriter Defendants' respective liabilities for the Offerings are set forth in Appendix A attached hereto.

**V.      VIOLATIONS OF THE SECURITIES ACT**

92.     Allegations set forth in this section of the Complaint assert strict liability and negligence claims pursuant to the Securities Act.  As noted above, the Securities Act claims are not based on any allegation that any Defendant engaged in fraud or any other deliberate and intentional misconduct, and Plaintiffs specifically disclaim any reference to or reliance upon allegations of fraud in connection with the Securities Act claims.

A. **Substantive Allegations**

93.     Lehman participated directly in all aspects of the residential and commercial mortgage markets.  Lehman's mortgage related businesses comprised the Company's single largest revenue component.  This participation included originating mortgages, purchasing mortgages, packaging mortgages into securities, and marketing the securities to investors.  The Company promoted itself as "a market leader in securitization transactions, including securitizations on residential and commercial loans" and a "fully vertically integrated mortgage business" that was "involved in every step of the financial process," including "the origination, structuring and underwriting of asset-backed securities."

94.     Lehman's exposure to both the mortgage market and real estate market was substantial and expanded over the Relevant Period.  Lehman's mortgage and asset-backed securities, including its mortgage related assets, increased 54% from $57.7 billion at year-end 2006 to over $89.1 billion by year-end 2007, exposing Lehman to the concomitant risk of massive losses when the value of Lehman's assets deteriorated as the mortgage market and the market for mortgage related assets collapsed.

95.     Although authorities such as Dr. Ben S. Bernanke, Chairman of the Federal Reserve Board, have opined that a "substantial correction" in the housing market had occurred by October 2006, Lehman's Offering Materials misrepresented or omitted material facts about Lehman's mortgage related holdings, including Lehman's true exposure to highly risky loans on its balance sheet, the risky lending practices that Lehman and third party lenders engaged in to originate the underlying loans, and the increasing concentration of risk that these assets posed to Lehman's balance sheet.  Moreover, as the residential and commercial real estate markets continued to deteriorate from 2006 onward, Lehman became increasingly unable to securitize these loans into mortgage-backed securities ("MBS") to be sold to investors.  As the value of

Lehman's residential and commercial real estate holdings became increasingly impaired, Lehman failed to timely and adequately write down their value, thereby causing Lehman's financial results to be materially overstated, in violation of GAAP.

### 1. The Offering Materials Failed To Disclose Lehman's High-Risk Residential Mortgage Lending Practices

96.     As a direct result of Lehman's undisclosed high-risk residential mortgage lending practices, loans that Lehman either originated through wholly-owned subsidiaries or purchased from third party loan originators experienced alarming levels of payment delinquencies and mortgage defaults.  Mortgages are generally categorized as prime, "Alt-A," or subprime.  As described by the Federal Reserve Bank of New York, a subprime borrower generally has a Fair Issac Corporation ("FICO") credit score below 660.  Alt-A, or Alternative A-paper, are loans that are supposed to be less risky than subprime and closer in risk to prime.  The Alt-A loans held by Lehman, however, were actually more akin to subprime loans.  As Lehman became increasingly unable to securitize and sell these subprime and Alt-A loans to third parties in the form of MBS or other mortgage related assets, the assets remained on Lehman's balance sheet in the form of unsecuritized whole loans and other mortgage related assets and became ever-increasingly impaired.

### a. Aurora And BNC Engaged In High-Risk Lending Practices

97.     During the Relevant Period, Lehman's wholly-owned subsidiaries, BNC Mortgage LLC ("BNC"), a California-based subprime mortgage originator, and Aurora Loan Services LLC ("Aurora"), a leading Alt-A mortgage originator, issued tens of billions of dollars in subprime and Alt-A mortgages, respectively. Lehman's Form 10-Q for first quarter 2008 described Aurora's Alt-A loans as having creditworthiness close to prime, stating: "The Company generally defines U.S. Alt-A residential mortgage loans as those associated with

borrowers who may have creditworthiness of 'prime' quality but may have traits that prevent the loans from qualifying as 'prime.'"   In truth, however, Aurora's Alt-A mortgages were more comparable to high-risk subprime mortgages than prime loans.

98.     According to former Aurora employees, Aurora's Alt-A mortgage loans were of poor quality and suffered from an increasing level of delinquencies and defaults throughout the Relevant Period.  For example, CW14, an underwriter in Aurora's correspondent division from late 2006 until April 2008, explained that Aurora offered high-risk products, such as Mortgage Maker, that were better described as "Alt-B," which comprised over half of Aurora's mortgage production by early 2007.   CW14 also stated that approximately 80% of the loans s/he underwrote were "stated income" loans, often referred to in the mortgage industry as "liar loans," where the borrowers provided no documentation to support their claimed income.

99.     CW15, a Credit Policy Coordinator at Aurora from 2004 until the beginning of 2008, also recalled that Aurora began loan programs in mid-2004 which would be considered subprime, although Aurora did not label them as such, including a program that allowed for loans to be made to borrowers with lower credit scores in the 500s, lower income documentation requirements, and relaxed bankruptcy and mortgage delinquency restrictions.  Likewise, CW2, a Vice President of Credit Policy at Aurora from 2005 until January 2008, explained that Aurora started producing Alt-B products in late 2005, which accepted FICO scores as low as 540.  CW2 recalled that even with a FICO score of 560 or 580 and a blemished credit history of recent bankruptcy, a borrower could get a "stated income" loan.  Aurora also had products that allowed for financing of the entire purchase price of a home, another high-risk lending practice in which borrowers put no money down.

100.    Similarly, CW16, a Vice President of Credit Policy for Aurora from late 2004 to the fall of 2007, also described how Aurora had numerous no documentation and stated income products.  CW16 described that Aurora had a "very, very subprime product" called Expanded Options that started around mid to late 2006 and allowed for credit scores of approximately 540.

101.    Aurora documents describing its various mortgage guidelines also confirm that Aurora produced numerous risky loan products with subprime, rather than Alt-A, characteristics. According to Aurora documents, its guidelines permitted loans for the full value of a property (*i.e.*, no down payment) to persons with FICO scores in the low 600s.  Aurora guidelines also described numerous loan products with no documentation requirements.  For example, for a one million dollar mortgage, at 95% of the value of the property, and without documentation, Aurora's guidelines allowed credit scores down to 620.  Aurora also had mortgage products allowing for loans to be made that would result in mortgage payments up to half of a borrower's gross monthly income, not taking into account additional expenses for taxes, food, and other necessities.  Further, Aurora offered various negative amortization products pursuant to which borrowers could make monthly payments less than the interest due each month, with the unpaid interest added to the principal.  Additionally, as to no-documentation loans, Aurora guidelines simply required that the borrower's job had to be one that "reasonably supports" the ability to repay the mortgage debt.  Finally, for full documentation programs, the guidelines allowed for loans up to four million dollars with a credit score of 600.

102.    In addition to originating its own loans, Aurora purchased mortgages from third-party brokers and correspondent networks around the country that were also of poor quality. According to various former employees involved in reviewing Aurora's loans or buying bulk

pools of loans from correspondents or "strategic partners," Aurora bought extremely large volumes of loans that were of low quality.

103.     According to CW3, a Vice President of Aurora from 2002 through the fall of 2007 who was responsible for buying bulk pools of loans from correspondents, Lehman and Aurora were much slower than the rest of the industry to tighten their underwriting guidelines. CW3 said that Lehman had to approve the underwriting guidelines and dictated what Aurora bought from third party lenders.  CW3 also corroborated CW14's allegations that Aurora's Mortgage Maker product was more of an "Alt-B" product and comprised of over half of Aurora's loan production.  Similarly, CW4, who worked for Aurora from the fall of 2005 until April 2008 as a Transactions Analyst, said that although the loans Aurora purchased were supposed to meet underwriting guidelines, Aurora "made hundreds and hundreds of exceptions" in order "to get the loans through."  All the loans from Aurora were signed over to Lehman, and Lehman decided the security category in which to put the loans.

104.     CW5 and CW22, investigators in Aurora's Special Investigations Unit from 2005 until 2008, also corroborated that Aurora bought mortgages from thousands of brokers and originators around the country, including from certain "strategic partners" who produced high volume loans of lesser quality.  Even though Aurora had a Quality Control unit, Quality Control only spot checked a small percentage of the loans.  Likewise, CW18, a mortgage fraud analyst for Aurora from January 2007 to January 2008, found that 30-40% of the 100 to 125 loans that s/he reviewed each month contained false information.  Similarly, CW11, a High Risk Specialist/Mortgage Fraud Investigator for Aurora from late 2004 to March 2008, stated that 60-70% of the loans s/he reviewed were determined to contain false information.

105.    As a consequence of undisclosed high-risk lending practices by Aurora, between the end of 2005 and spring 2008, the performance of the Alt-A loans serviced by Aurora deteriorated sharply:

| Delinquencies, Foreclosures, and Bankruptcies in Aurora's Conventional Alt-A Loan Servicing Portfolio | | | |
|---|---|---|---|
| As of | Principal Balance of Loan Servicing Portfolio ($ Billions) | Percent of Loans Delinquent at Least 30 Days, in Foreclosure, or in Bankruptcy | Principal Balance of Loans Delinquent at Least 30 Days, in Foreclosure, or in Bankruptcy ($ Billions) |
| 12/31/2005 | 62.1 | 2.0% | 1.2 |
| 12/31/2006 | 73.6 | 4.2% | 3.1 |
| 12/31/2007 | 68.8 | 9.5% | 6.5 |
| 3/31/2008 | 67.3 | 11.9% | 8.0 |

106.    Like Aurora, BNC employed high-risk lending practices in originating subprime loans.  According to CW6, BNC's COO from January 2006 through 2007, these practices led to first-payment defaults throughout 2006 and into 2007.  A first payment default is when a borrower fails to pay the first mortgage payment on time or within the grace period.  Because someone who does not make the first payment is likely to go into foreclosure and never to pay, first payment defaults were a reliable and "early indicator of defaults to come."

107.    By August 2007, Lehman closed BNC, stating that "market conditions [] necessitated a substantial reduction in its resources and capacity in the subprime space."  In January 2008, Lehman also suspended the wholesale and correspondent lending activities at Aurora "in light of the dislocation in the mortgage markets."

108.    The Offering Materials failed to disclose that Lehman, through its wholly owned subsidiaries Aurora and BNC, issued high-risk no documentation and low documentation loans to borrowers with blemished credit histories and recent bankruptcies, for up to 100% of the value of the mortgaged property.  Nor did the Offering Materials disclose the concomitant risk that

such high-risk lending practices posed to the value of the subprime and Alt-A mortgage related assets on Lehman's balance sheet.

**b.      High-Risk Lending Practices
Resulted In Increasing Repurchase Requests**

109.      Multiple confidential witnesses formerly employed by Lehman or Aurora have confirmed that, due to the poor quality and increased delinquencies associated with high-risk subprime and Alt-A loans bought by Aurora from others, Aurora made numerous repurchase requests to correspondents and strategic partners.  Repurchase requests were generally made pursuant to representations and warranties concerning loan quality, such as when mortgage loans went into first payment default or early payment default, *i.e.*, when the borrower failed to make the first or second monthly mortgage payments within thirty days of the due date.  The rising number of repurchase requests reflected the poor quality and further deterioration of loans underlying Lehman's mortgage related assets held on its balance sheet and, thereby, the value of such assets.

110.      For example, CW15, who worked on repurchase requests while employed by Aurora from 2004 to early 2008, said that the number of repurchase requests was high while s/he worked in the department.  During the last half of 2007, many of the correspondents were unable to honor the repurchase requests, and many were declaring bankruptcy.  When Lehman pushed one of its largest correspondents, First Magnus, to repurchase the defaulting and delinquent loans, First Magnus filed for bankruptcy.

111.      Likewise, according to CW9, a contract administrator and repurchase coordinator at Aurora from the fall of 2004 to the fall of 2006 who processed Aurora's repurchase claims to correspondents, many of the loans Aurora acquired went into default immediately upon their acquisition.  Given the early defaults, Lehman was faced with a large number of repurchase

25

requests from its securitizations.  In turn, Aurora attempted to force the parties from which it acquired the loans to repurchase the problem loans.  CW9 recalled that many of the originators from which Aurora bought loans were unable to repurchase problem loans, however, and large amounts of Aurora's repurchase requests to mortgage originators became outstanding, with some delinquent over 400 days.  Nonetheless, according to CW9, Aurora continued to buy loans from certain lenders even though they had large numbers of outstanding unpaid repurchase claims.

112.     Similarly, CW4, a Transaction Analyst employed by Aurora from the fall of 2005 until April 2008, stated that in the beginning of 2007, Aurora "started to see a lot of loans default.  It seemed to just get worse after that."  According to CW4, Lehman then began "hiring like crazy" in the loan default area, such as the contract administration department, which was in charge of getting the defaulted loans repurchased by entities from which Aurora had purchased these loans.  As the volume of defaults increased, the companies that originally made the loans either refused to buy back the loans or went out of business, so it was a "lost cause" trying to get these defaulted loans repurchased, and they sat on Lehman's books.  CW4 learned about these increased loan defaults in meetings and emails.

113.     CW3, a vice president at Aurora from 2002 until the fall of 2007, also confirmed that Aurora's repurchase requests to correspondents increased.  CW3 described the group working on repurchases at Aurora as "buried" with repurchase work beginning in the fall of 2006.  Although Aurora needed the correspondents to repurchase the loans, many were going out of business.  According to CW3, there were a lot of outstanding repurchases, including repurchase requests that were two years old.  Yet, Aurora continued to do business with the company.

26

114.   CW12, a managing director in Lehman's contract finance department from 1987 to early 2008, also recalled that repurchase requests increased in 2007 and that Lehman "got stuck" with the loans because counterparties were not able to honor the repurchases.  According to CW12, Aurora's "loss management" unit (which reported to CW12) dealt with the various counterparties with respect to repurchases.

115.   As a result of unfulfilled repurchase requests, Lehman sued counterparties for failing to repurchase loans.  On June 22, 2006, Lehman sued Master Financial, Inc. ("MFI"), a loan originator based in California, for failing to repurchase loans that it had sold to Lehman. According to Lehman's complaint, MFI failed to follow the contractually required practices in originating the loans at issue, and "[t]he misrepresentations and other irregularities, including payment defaults [on the loans] . . . lowered their value considerably as investment loans. Because MFI failed and refused to repurchase the irregular, non-conforming and poorly-performing loans when demand was made, [Lehman] was then obligated to liquidate them by foreclosure or resale at a considerable discount due to their reduced value, resulting in significant losses."  Lehman also sued other correspondents, including Fieldstone Mortgage Company in August 2007 for failing to repurchase delinquent loans, and Nationwide Lending Corporation in January 2009 for failing to repurchase various mortgages that Lehman bought in 2006 and 2007, which suffered from early payment defaults.

116.   In addition to making repurchase requests to correspondents, Lehman also received its own repurchase requests from investors who bought non-performing loans from Lehman.  This was another sign that the mortgage assets on Lehman's books were impaired. According to CW10, a due diligence underwriter who worked almost exclusively with repurchase requests from loan investors while employed at BNC from mid 2005 to October

2007, repurchase requests to Lehman from loan investors like GMAC increased from 2006 to 2007. CW10 also said s/he started seeing problems with Lehman being unable to sell loans in the first or second quarter of 2007. Likewise, CW20, a former manager of the Due Diligence and Repurchase Department at BNC from January 2006 until late 2007, said that Lehman sent repurchase requests to BNC from loan investors such as Citigroup. CW20 noticed a significant increase in repurchase requests in mid 2006, as the market changed and BNC was "bombarded" with requests.

### 2. The Offering Materials Failed To Disclose Lehman's Significant And Increasing Concentration Of Mortgage Related Risks

117. The Offering Materials also omitted material information necessary for investors to meaningfully assess the Company's exposure to the U.S. mortgage market and the increasing riskiness of Lehman's portfolio of mortgages and mortgage related assets.

118. Although the housing boom had ended by the summer of 2005, and the deterioration in the real estate market continued from 2006 onward, Lehman's portfolio of mortgages and asset-backed securities expanded to almost $90 billion at fiscal year end 2007. As the market for MBS backed by subprime and Alt-A mortgages dissipated and as Lehman's exposure significantly increased, Lehman failed to break out its specific exposure to residential and commercial mortgages, real estate held for sale, or other asset-backed securities, including collateralized debt obligations ("CDOs"), until it filed its 2007 Form 10-K on January 29, 2008.

119. Additionally, although Lehman was a leading originator of Alt-A loans, its Offering Materials did not even include the term "Alt-A" until Lehman filed its first quarter 2008 Form 10-Q. When Lehman finally began to identify Alt-A holdings on its balance sheet in its second quarter 2008 Form 10-Q, Lehman consolidated them with prime holdings into a single category labeled "Alt-A/Prime," despite the fact that less than $1 billion of the reported $14.6

billion "Alt-A/Prime" exposure consisted of prime loans.  By grouping "Alt-A" with "Prime" mortgage related assets, the Offering Materials did not adequately disclose Lehman's true exposure to the riskier Alt-A loans that were experiencing rising delinquencies and mortgage defaults throughout the Relevant Period.

120.    GAAP, specifically FAS 107, *Disclosures About Fair Value of Financial Instruments* ("FAS 107"), as amended by FAS 133, *Accounting for Derivative Instruments and Hedging Activities* ("FAS 133"), requires disclosure of certain information regarding "significant concentrations of credit risk arising from **all** financial instruments, whether from an individual counterparty or groups of counterparties."  In violation of GAAP, Lehman's financial statements, incorporated in the Offering Materials, omitted the required disclosures related to significant concentrations of credit risk from Lehman's mortgage related assets, in particular, its subprime and Alt-A exposures.

        3.      **The Offering Materials Overstated Lehman's Financial Results And Omitted Material Facts Regarding Lehman's Mortgage Related Assets And Real Estate Related Investments**

121.    GAAP required that Lehman report its financial instruments and other inventory, which included its mortgage related assets and real estate related investments, at fair value, with the exception of its real estate held for sale, which was required to be reported at the lower of the carrying amount or fair value (less costs to sell) at the measurement date. As such, Lehman stated in its SEC filings that "[s]ubstantially all of the Company's Financial instruments and other inventory positions owned and Financial instruments and other inventory positions sold but not yet purchased are reported at fair value.  The Company accounts for these assets and liabilities at fair value . . . ."  Additionally, GAAP, specifically FAS 5, *Accounting for*

*Contingencies* ("FAS 5"), requires "disclos[ures] [of] the [loss] contingency be made when there is at least a reasonable possibility that a loss or additional loss may have been incurred."

122.    As set forth below, the values of Lehman's mortgage related assets and real estate related investments were overstated during the Relevant Period because Lehman failed to timely and adequately record losses on these assets as they declined in value.  Further, the Company failed to disclose that it was reasonably possible that it had incurred substantial losses and that there were potential substantial additional losses.

**a.     The Offering Materials Overstated
The Value Of Lehman's Commercial
Mortgage and Real Estate Related Assets**

123.    Prior to and during the Relevant Period, Lehman became increasingly involved in all aspects of the commercial real estate market.  As of November 30, 2007, Lehman reported $51.7 billion in commercial mortgage and real estate related investments.  As of March 2008, Lehman had more commercial holdings than any other firm, according to a Goldman Sachs analyst.

124.    Lehman's commercial mortgage and real estate related investments were overvalued and not timely or adequately written down during the Relevant Period.  Further, Lehman did not disclose related loss contingencies that were reasonably possible.

125.    During the Relevant Period, the fair value of Lehman's commercial mortgage and real estate related investments deteriorated, as evidenced by observable market inputs that existed at the time, as well as by accounts of various confidential witnesses.

126.    Starting in mid 2007, the CMBX – which provides value and pricing information on the commercial mortgage-backed securities ("CMBS") market and represents the cost of insuring against default – indicated that the risk of default increased dramatically for all tranches of CMBSs.  An ***increase*** in the CMBX spreads (or the difference between the yield of the bonds

30

being tracked and the yield offered by government bonds) indicates that the market expects rising defaults.  The CMBX spreads widened beginning in mid 2007 even for the highest rated tranches:



127.    From May 2008 through the end of the Relevant Period, spreads continued to widen for the AAA and BBB tranches of CMBSs:

31





128.    Additionally, from October 2007 to August 2008, Moody's/REAL Commercial Property Price Index dropped nearly 12%.  From mid 2007 through mid 2008, European

commercial property prices also declined, including 20% in Britain, according to Capital Economics.

129.    Lehman, however, invested aggressively in commercial mortgage and real estate assets throughout 2006 and 2007, even as the real estate market collapsed.   These projects included, for example, the following:

(a)    In 2006, Lehman invested $2 billion in deals with SunCal Companies ("SunCal").  Lehman invested heavily in SunCal's McAllister Ranch development northeast of Los Angeles, in the Inland Empire, where land values have plummeted as much as 60% in some areas.

(b)    In March 2007, Lehman paid €2.1 billion ($3 billion) for the Coeur Defense property in Paris, the highest amount paid for a European office building.   By September 2008, analysts estimated that the building was worth between €1.1 and €1.6 billion.

(c)    In April 2007, Lehman provided debt financing for about 75% of the purchase price when Morgan Stanley bought seven San Francisco office towers.  These buildings probably lost 15% of their value from the time they were purchased in April 2007, according to a September 2008 Bloomberg article.

(d)    In May 2007, Lehman partnered with Tishman Speyer to pay $22.2 billion for the acquisition of Archstone-Smith Trust ("Archstone"), the owner of hundreds of upscale apartment buildings throughout the United States.  Lehman contributed $250 million in equity and led a group of lenders that brought another $4.6 billion in bridge equity that they planned to then sell to other investors.  By the time the deal closed in October 2007, however, the commercial real estate market had already plummeted, and Lehman was stuck with more than $2 billion in bridge equity that it was unable to sell.

33

(e)    In May 2007, at the peak of the market, Lehman and a partner spent $1.3 billion on a large office complex in Arlington, Virginia, in which Lehman retained a 75% equity interest.

(f)    In June 2007, Lehman and partners invested $1.15 billion to buy ten office buildings in Austin, Texas.  As of the summer of 2008, Lehman still had $1 billion in debt and equity in the deal.  Lehman paid an average price of $328 per square foot for the Austin deal, but according to *The New York Times,* buyers of office buildings in Austin in 2007 paid an average of just $221 per square foot.

(g)    In July 2007, Lehman teamed with a partner to buy a national portfolio of warehouse mortgages for $1.85 billion, a deal for which Lehman provided 80% of the equity in addition to financing.  According to an analyst who estimated that the portfolio had lost 15% of its worth, however, "[p]roperty values started declining shortly after the deal closed."  Lehman was unable to sell the warehouse mortgages or its equity position.

130.    Additionally, various former Lehman employees in its Real Estate Group that handled commercial assets described the overvaluation of these assets.  According to CW7, a former employee in Lehman's Real Estate Group involved in commercial real estate finance from 1996 until early 2008, many of Lehman's commercial real estate deals were "troubling" and "difficult," and were definitely not being marked down the way they should have been.  In particular, CW7 recalled that Lehman marked down its California land loans, projects and equity positions only 3-4%, when they should have been marked down further because property values in California had plummeted.  According to CW7, many of Lehman's problem loans were securitized in a collateral debt obligation ("CDO"), a type of structured finance security.

131.    CW7 also explained that problems occurred with respect to Lehman's "Bridge Equity Program," in which Lehman provided equity to companies.  "The play there" was that Lehman would buy or put money into assets and would only be paid back when the assets were syndicated or when the deal was sold.  Lehman moved aggressively into an overheated market, and the assets could not be sold once the market cooled.  According to CW7, the problem on the commercial side was that by providing equity to acquire assets, Lehman could get "wiped out" if the assets declined in value.  While CW7 was at the Company, Lehman continued to hold tens of billions of dollars worth of these assets on its books without marking them down significantly. CW7 had knowledge of the equity deals because during the Relevant Period s/he helped manage a large portion of Lehman's retained assets in the Bridge Equity Program, where s/he dealt with assets the Company could not sell.  CW7 knew Lehman had a problem because nothing was moving; billions of dollars of assets were just sitting on the books.

132.    Additionally, according to CW23, a Product Controller in Lehman's Global Real Estate Group from late 2007 through the fall of 2008, Lehman's commercial mortgage and real estate assets were overvalued on the books, ranging from private transactions to CMBSs to real estate investment trusts.  CW23 said that there were discussions about the overvaluation all the time and it was often discussed that the Company should be taking write downs.  CW23 explained that the Global Real Estate Group had meetings every month, and that asset valuations were part of the meetings.  According to CW23, these discussions regarding pricing occurred monthly and had taken place since s/he joined the Company.

133.    Despite the deterioration of the commercial real estate markets, Lehman, which had the largest exposure to commercial real estate of any investment bank, failed to timely or adequately write down its commercial mortgage and real estate related investments, thereby

materially overstating its financial results.  For example, Lehman only took a $1.4 billion gross write-down, or less than 3%, of its $49 billion commercial real estate portfolio as of the end of first quarter 2008.  During this time, however, the index of "AAA" commercial mortgage-backed securities declined about 10%, and lower-rated securities fell even further.

134.    Because of Lehman's exposure to approximately $51.7 billion worth of commercial mortgages and real estate related investments on its balance sheet as of the end of year end 2007, Lehman attempted unsuccessfully to sell these mortgages/assets during 2008.  According to a media report, one person who reviewed Lehman's commercial offering said that a large part of this portfolio was the high-risk bridge loan made for the Archstone transaction described above, and that most of the rest were floating rate loans, which were even riskier.

135.    On June 16, 2008, Defendant Lowitt disclosed in Lehman's second quarter 2008 conference call with analysts and investors that Lehman had marked down its $1.6 billion SunCal position to the mid 70s (*i.e.*, 75 cents or so on the dollar) and carried its Archstone exposure at 75 for a value of less than $1.8 billion.  These markdowns were too late and too little.

136.    On September 10, 2008, Lehman announced that it expected its largest quarterly loss ever of $3.9 billion, driven in large part by $1.7 billion in gross write downs on its commercial mortgage and real estate related investments.  Moreover, Lehman announced a plan to rid itself of its troubled commercial real estate assets by spinning off approximately $25 to $30 billion of its $32.6 billion commercial real estate portfolio into a separate publicly traded company.  However, Lehman was forced into bankruptcy just five days later before this plan took effect.

137.    In the days before filing for bankruptcy, Lehman tried to sell its commercial real estate assets to various banks.  However, the mortgage securities experts from Citigroup, Credit Suisse, Deutsche Bank and Goldman Sachs who analyzed its $32.6 billion commercial portfolio found that "the effective marks on the assets should probably have been $12 billion lower," or $21 billion, according to a December 15, 2008 *Fortune* article.  An October 7, 2008 *Wall Street Journal* article similarly reported that the executives from the firms which declined to buy Lehman's portfolio said that they believed Lehman's commercial portfolio was overvalued by as much as 35%.

138.    As reported by *The New York Times* on October 31, 2008, Treasury Secretary Henry Paulson later explained that the absence of a federal bailout of Lehman was due to its impaired assets, stating:  "'We didn't have the powers,' because by law the Federal Reserve could bailout Lehman with a loan only if the bank had enough good assets to serve as collateral, which it did not."

139.    After Lehman's bankruptcy, Barclays acquired certain of Lehman's assets for $1.54 billion.  Barclay's acquisition specifically excluded Lehman's commercial real estate holdings because they were overvalued.  As Robert E. Diamond, Jr., Barclay's President, recalled:  "Our proposal was to buy everything out of Lehman, but leave the commercial real estate.  We did not feel the valuations [of the commercial real estate] were supportable . . . ."  Indeed, one of the handwritten insertions in the purchase agreement between Lehman and Barclays specifically carved out "all [of Lehman's] Archstone debt and equity positions."

> **b.    The Offering Materials Overstated
> The Value Of Lehman's Residential
> Mortgages And Mortgage Related Assets**

140.    Prior and during the Relevant Period, Lehman also increased its residential mortgages and mortgage related positions.  At year-end 2007, Lehman had over $37 billion

residential mortgages and mortgage-backed securities, an increase of 36% from year-end 2006 of $27.5 billion.

141.    During the Relevant Period, the value of Lehman's positions backed by residential mortgages also deteriorated.  In violation of GAAP, Lehman did not timely or adequately write down its residential mortgages and mortgage related positions and did not disclose that related loss contingencies were reasonably possible, despite that Lehman had engaged in high-risk residential lending practices that resulted in poor quality, deteriorating loans, increasing payment delinquencies, and rising mortgage defaults, and that Lehman experienced rising repurchase requests by 2006, which escalated in 2007, as set forth in Section V.A.1.

142.    Additionally, starting in early 2007, the ABX – an index created by several banks, including Lehman, which served as a barometer to assess the performance of mortgage-backed securities in the market – dropped precipitously, indicating that the value of securities backed by residential subprime mortgages was deteriorating at a rapidly increasing pace throughout 2007. For example, BBB rated tranches of the ABX dramatically declined in 2007:

**Figure 5: ABX.BBB 06-2**



Source: Markit

143.    Further, data on the performance of residential mortgage-backed securities issued and sold by Lehman from 2005 to 2007 also indicated that the loans in Lehman's securitization pools experienced increased deficiencies and defaults prior to and throughout the Relevant Period.   For example, based on mortgage pool data, loans that Lehman originated in 2006 experienced markedly higher rates of delinquency and foreclosure than comparable loans originated in 2005.   Lehman's 2007-originated loans fared significantly worse still.   In fact, by July 2007, residential loans issued in 2007 were becoming delinquent nearly twice as fast as comparable loans originated in 2006, and more than three times faster than comparable loans originated in 2005.

144.    Also, starting in first quarter of 2007, as both the mortgage and MBS markets deteriorated, the percentage of Lehman's inventory that did not qualify for sales treatment increased.   Lehman preferred that securitizations be accounted for as sales rather than secured financings because, in contrast to secured financings, sales resulted in an increase in revenue and

39

allowed the Company to move the securitized assets and their concomitant risk off its balance sheet. The decrease in Lehman's ability to qualify its securitizations as sales rather than financings also demonstrates that Lehman's mortgage related assets had become increasingly illiquid and had suffered deteriorations in value before and during the Relevant Period, a trend that required disclosure under SEC Regulation S-K.

145.   Further, by early 2007, given the rapidly declining performance of non-prime mortgages, Lehman had begun making margin calls on loan originators to whom it had extended credit lines, due to the decreased value of mortgage assets used as collateral underlying such credit lines. For example, in March 2007, Lehman made the first in a series of margin calls on its warehouse line of credit to Alt-A mortgage lender American Home Mortgage ("AHM"), claiming that the value of AHM's notes had dropped significantly. In August 2007, following three months of margin calls by Lehman, and after Lehman had declared AHM in default of its payment obligations, AHM declared bankruptcy. In early 2007, Lehman also issued numerous margin calls to Accredited Home Lenders, another mortgage lender to whom the Company extended a line of credit. Again, these margin calls resulted from a decline in the value of the collateral used to secure those credit facilities – the lender's mortgages. On July 5, 2007, due to the risks connected to subprime mortgages, Lehman also cut off a $1.5 billion credit line to subprime mortgage originator Option One Mortgage Corporation.

146.   According to CW13, a Vice President at Lehman employed from the beginning of 2006 until July 2007 who dealt with mortgage product control on the trading desk focused on prime and Alt-A mortgages, by the summer of 2007, securitizations slowed and Lehman had difficulty selling the lower-rated tranches on even the prime deals.

147.    Despite the foregoing indicia of the fair value of its residential mortgage assets, Lehman failed to disclose the true state of affairs concerning its mortgage related assets, and failed to timely and adequately write down the value of these assets.  Indeed, while Lehman's peers recorded massive write downs of their mortgage related holdings in 2007, Lehman did not. For example, in June 2007, two Bear Stearns-managed funds suffered significant losses related to securities linked to impaired subprime loans.  Additionally, during the third quarter of 2007, Merrill Lynch announced a $7.9 billion mark-to-market write-down, leaving it with a $20.9 billion portfolio of residential subprime mortgages and CDOs at the end of the quarter. Citigroup also disclosed "credit and trading losses of $5.9 billion on loans and mortgage-backed securities."  Further, UBS wrote down roughly $3.7 billion on its mortgage-backed securities, which totaled approximately $15.3 billion at the end of the quarter.  In stark contrast, on September 18, 2007, Lehman disclosed that it took only a $700 million write-down (net of hedging gains), and did not disclose how much of this was attributed to its mortgage related assets.  When asked directly about this on a conference call later that day, Defendant O'Meara refused to reveal the amount of gross write downs, stating that "knowing the gross numbers particularly in that business, I don't think is really a meaningful thing."

148.    In the fourth quarter of 2007, because of the continued decline in the U.S. residential mortgage market, Citigroup recorded write downs of $17.4 billion, leaving it with approximately $37 billion in subprime related assets as of year end.  Likewise, Merrill Lynch recorded net write downs of $9.9 billion of its approximately $14.7 billion in asset-backed CDOs in the fourth quarter, and also recorded a net write-down of $1.6 billion related specifically to its U.S. subprime residential mortgages, leaving it with $2.7 billion of those assets at year end.  At the same time, Lehman did not disclose how much of its write-down was attributable to

mortgage related assets for fourth quarter 2007.   However, for its **entire 2007 fiscal year**, Lehman wrote down only $1.3 billion of its $32.1 billion portfolio of residential mortgage related positions.

149.    Moreover, during the Relevant Period, Lehman's Level III assets increased substantially, from $17.3 billion in first quarter of 2007 to $40 billion by first quarter of 2008. FAS 157 establishes a hierarchy for inputs used in measuring "fair value" ranging from Level I through Level III.   Level I inputs are derived from the observed market prices of a particular asset.   Level II inputs are derived principally from or corroborated by observable market data by correlation or other means.   Level III inputs are non-observable, internal model-driven inputs. Level III allows for the greatest degree of management discretion and is to be used only "to the extent that observable inputs are not available."   Although observable data, such as the ABX and CMBX indices were available to show that comparable securities prices had deteriorated, Lehman used internal valuation models to assess the fair value of these assets.

150.    On March 20, 2008, in an article titled "The Debt Shuffle," *Condé Nast Portfolio* reported upon the lack of transparency and the size of Lehman's write downs:

> **Lehman's write downs seem tiny**:  Lehman finished the quarter with $87.3 billion of real estate assets.   These include residential mortgages and commercial real estate paper.   The bank only wrote these assets down by 3 percent.   And its Level III assets — the hardest to value portion of these instruments — were written down by only the same percentage. ***The indexes and publicly traded instruments and companies that serve as proxies for these securities generally fell more than that in the quarter.***[3]

151.    On June 9, 2008, Lehman reported its preliminary 2Q08 financial results, and disclosed a $2.8 billion net loss, which included $2.4 billion in residential mortgage related write downs.   In a conference call relating to the write-down, Defendant Lowitt disclosed: "The

---

[3]  All emphasis is added, unless otherwise noted.

majority of our write downs were in Alt-A driven by increase in Alt-A delinquencies which were specific to Alt-A prices . . . ."  Even so, Lehman did not disclose the amount and quality of its Alt-A holdings or that it could not adequately hedge those assets.

152.   On June 10, 2008, as reported by *Bloomberg News*, David Einhorn, president and co-founder of hedge fund Greenlight Capital Inc., questioned the reasons for the lack of transparency, stating:

> The burden is on [Lehman] to be much more forthcoming and transparent in their disclosures and discussion and analysis of their high-risk assets . . . .  This confirms a lot of things we've been saying.  The credit market did not really deteriorate between February and May.  ***Most of these losses are losses that were probably evident quarters ago.***

153.   Further, in a June 10, 2008, research report titled "Too Many Inconsistencies," Wachovia Capital Markets analyst Douglas Sipkin downgraded Lehman's rating from "Outperform" to "Market perform" and wrote that:

> ***We underestimated how poorly marked [Lehman's] assets were***.  In addition, the larger capital raise at meaningfully lower prices indicates that the Company did not have, and potentially still does not have, a complete grasp of its exposures.

154.   On September 10, 2008, Lehman pre-announced its 3Q08 financial results, reporting a $3.9 billion net loss – its largest quarterly loss ever – driven largely by $7.8 billion in gross write downs, including $5.3 billion on residential mortgage related positions.

155.   Just five days later, on September 15, 2008, Lehman filed for bankruptcy.

### 4.   The Offering Materials Contained Untrue Statements And Omitted Material Facts Regarding Lehman's Purported Risk Mitigation And Hedging

156.   Lehman stated in its second quarter 2007 Form 10-Q that the Company actively managed its "mortgage related positions through dynamic risk management strategies." Additionally, in the Company's 2007 fiscal year-end Form 10-K, Lehman stated that a "comprehensive risk management structure" existed, with several risk control processes in place

to document "risk capacity and tolerance levels" and to "monitor and enforce" adherence to risk control policies.  Further, Lehman stated that the Company measured "quantifiable risks using methodologies and models based on tested assumptions" and that it identified emerging risks through monitoring of "portfolios, new business development, unusual or complex transactions and external events and market influences."   Moreover, Lehman's Executive Committee purportedly reviewed "risk exposures, position concentrations and risk-taking activities on a weekly basis, or more frequently as needed."  The Committee also "allocate[d] the usage of capital to each of [its] businesses and establishes trading and credit limits for counterparties."

157.    The Offering Materials misrepresented the Company's adherence to risk control policies and omitted to disclose the true risk of loss associated with Lehman's mortgage related positions.  In particular, Lehman failed to disclose that its hedging activities could actually *increase*, as opposed to mitigate, Lehman's exposure to mortgage and real estate related losses.  Moreover, it failed to disclose the dollar amounts and percentage of mortgage assets hedged.  While Lehman's competitors wrote down net billions of dollars in their mortgage related assets, Lehman and the Insider Defendants instead emphasized Lehman's ability to avoid losses through hedges, and it focused investors on write downs net of claimed hedging gains rather than gross mortgage write downs.  For example, during the Company's earnings conference call for the first quarter of 2008, Defendant Callan falsely represented that "[w]e are very well hedged . . . we would consider ourselves at this point net short in the residential asset class."  Indeed, even when specifically asked on September 18, 2007, for a simple breakdown of the gross versus net write downs (offset by hedges) associated with Lehman's mortgage assets, Defendant O'Meara refused to provide the information and instead emphasized that net write downs were the relevant

figures for investors, stating:  "[K]nowing the gross numbers particularly in that business, I don't think is really a meaningful thing."

158.   These misrepresentations and undisclosed risks associated with Lehman's economic hedges materialized near the end of the Relevant Period, when Lehman's "economic hedges" actually increased the Company's losses by an additional $700 million dollars in the second quarter of 2008.

159.   Additionally, as set forth above, Lehman amassed a significant amount of what it characterized as Alt-A mortgage related assets prior to and during the Relevant Period. Defendants failed to disclose that these Alt-A mortgage related assets suffered from defaults and delinquencies and could not be directly or adequately hedged.  On September 10, 2008, near the end of the Relevant Period, Lehman reported a massive $3.9 billion loss and $7.8 billion in gross write downs, "the majority [of which] were in Alt-A driven by increase in Alt-A delinquencies and loss expectations."  As Defendant Lowitt admitted that day, "there is no direct hedge for Alt-A assets."

### 5.   The Offering Materials Contained Untrue Statements Regarding Lehman's Capitalization, Liquidity And The Risks Of Bankruptcy

160.   Capital and liquidity were critical to Lehman's operations.  As Lehman's 2006 and 2007 fiscal year-end report on Forms 10-K stated, "[l]iquidity, that is ready access to funds, is essential to our businesses."  However, the declining, delinquent and defaulting mortgage assets that Lehman accumulated prior to and during the Relevant Period, as set forth above, substantially impacted its liquidity and capital resources.

161.   As the value of Lehman's mortgage related assets and real estate related investments declined, this adversely affected the Company's financial results and reduced its shareholder equity.  As of the first quarter of 2008, Lehman had $786 billion of assets and

approximately $25 billion of capital – a ratio of about 32 to 1, which left the Company relatively little cushion to absorb losses. Moreover, as of the second quarter of 2008, Lehman had approximately $65 billion in mortgage and real estate related investments on its balance sheet. According to Brad Hintz, an analyst at Sanford C. Bernstein and a former CFO of Lehman, any losses greater than $1.5 billion – or selling just $30 billion of these assets at a discount of at least 5 percent to their value on Lehman's books – would likely force Lehman to issue as least some common equity.

162.   Additionally, Lehman's situation was aggravated by its very high leverage and strong reliance on short term debt financing. As Luigi Zingales, Professor of Finance at the University of Chicago, testified before Congress on October 6, 2008, even though commercial banks may not leverage their assets-to-equity ratio by more than 15 to 1, Lehman's leverage ratio was more than double that amount. With such a high leverage, "a mere 3.3% drop in the value of assets wipes out the entire value of equity and makes the company insolvent." Lehman's failure to properly write down its real estate related assets to market value during the Relevant Period concealed its proximity to insolvency and that it was effectively insolvent long before it ultimately filed for bankruptcy on September 15, 2008.

163.   Defendants, however, maintained during the Relevant Period that Lehman had more than enough capital and liquidity and omitted the risks of its bankruptcy. For example, Lehman's 2007 Form 10-K filed on January 29, 2008 and Form 10-Qs filed throughout the Relevant Period, which were incorporated into the Offering Materials, contained the untrue statement that the Company "maintain[ed] a liquidity pool that covered expected cash outflows for twelve months in a stressed liquidity environment," and omitted disclosure of going-concern issues for the Company. Even as late as July 10, 2008, Lehman's Form 10-Q contained the same

misrepresentation and stated that even despite a series of credit and liquidity events in the industry, the Company was able to strengthen its position with "record levels of liquidity." Lehman's public statements omitted material facts concerning its likelihood of insolvency.  As such, Lehman was able to sell over $6 billion of common and preferred stock as late as mid June, 2008.

164.    As Defendant Lowitt later revealed in his affidavit (dated September 14, 2008) submitted in connection with Lehman's bankruptcy petition, the Company filed for bankruptcy because it had "significant liquidity problems."   Lowitt also stated that when "government officials later indicated that emergency federal funding would not be forthcoming to stabilize Lehman Brothers and provide the liquidity needed for its operations," Lehman filed for bankruptcy.  These material facts about Lehman's capitalization and liquidity, including its risks of bankruptcy, were omitted from the Offering Materials.

B.    **The Offerings**

165.    The Securities Act claims are brought on behalf of investors who purchased Lehman securities in or traceable to the Offerings set forth in Appendix A.

166.    Each of the Offerings was conducted pursuant to the May 30, 2006 Shelf Registration Statement filed with the SEC on Form S-3, a prospectus dated May 30, 2006 (the "2006 Prospectus"), and either a prospectus supplement or pricing supplement issued in connection with that Offering.

167.    The 2006 Prospectus stated that it was part of the Shelf Registration Statement. Because the Offerings were conducted pursuant to a shelf registration statement, the date of each offering – and not the prior date of the registration statement – was the "effective date" of the Shelf Registration Statement for purposes of Section 11 liability under 17 C.F.R. § 230.415 and 17 C.F.R. § 229.512(a)(2).

168.    The 2006 Prospectus expressly incorporated by reference Lehman's Forms 10-K, 10-Q and 8-K that were filed with the SEC prior to the date of every Offering conducted pursuant to the 2006 Prospectus.  Specifically, the 2006 Prospectus stated:

> We incorporated by reference . . . any future filings made with the SEC under Section 13(a), 13(c), 14 or 15(d) of the Securities Exchange Act of 1934 (other than information in the documents or filings that is deemed to have been furnished and not filed).
>
> *   *   *
>
> All documents we file pursuant to Section 13(a), 13(c), 14 or 15(d) of the Exchange Act after the date of this prospectus and before the later of (1) the completion of the offering of the securities described in this prospectus and (2) the date our affiliates stop offering securities pursuant to this prospectus shall be incorporated by reference in this prospectus from the date of filing of such documents.

169.    Accordingly, on the date of each Offering identified on Appendix A, the 2006 Prospectus and Shelf Registration Statement incorporated by reference each of the documents that had been filed with the SEC on Forms 10-K, 10-Q or 8-K prior to the date of each such Offering.  As to each Offering, the documents that were incorporated in the Shelf Registration Statement and 2006 Prospectus, which contained untrue statements of material fact and omissions of material fact, as well as the underwriters for each such Offering, are set forth in Appendix A.

C.    **The False and Misleading Offering Materials**

1.    **2006 Fiscal Year-End Results**

170.    On February 13, 2007, Lehman filed its annual report with the SEC on Form 10-K for the fiscal year-ended November 30, 2006 ("2006 10-K").  The 2006 10-K was signed by Defendants Fuld, O'Meara, Ainslie, Akers, Berlind, Cruikshank, Evans, Gent, Hernandez, Kaufman, and Macomber.  The 2006 10-K reported that Lehman's inventory of mortgages, mortgage-backed positions, and asset-backed securities (excluding those that were accounted for

48

as financings rather than sales) amounted to $57.7 billion.  This statement was materially untrue because, as set forth above in Sections V.A.1 and V.A.3, the fair value of Lehman's mortgages and MBS were overstated, in violation of GAAP, as its mortgage related assets consisted of significant amounts of poor quality, delinquent and defaulting loans which were not reflected at fair value.  Additionally, Lehman omitted to disclose material facts regarding the amount, and nature of, its mortgage-related assets despite having originated more than $60 billion in residential mortgage loans in 2006 and in light of the downturn in the residential real estate market.

171.    The 2006 10-K also omitted material information regarding Lehman's significant concentrations of credit risk associated with its mortgages and asset-backed positions, including any details regarding those concentrations, such as how much risk was concentrated in (1) residential versus commercial mortgage related assets and real estate held for sale, (2) in whole loans versus mortgage-backed securities, (3) in subprime or second lien versus Alt-A mortgages and mortgaged-backed securities; (4) in asset-backed CDOs; and (5) geographically where any of the foregoing risks were concentrated.  Rather, all Lehman's 2006 10-K stated regarding its concentrations of credit risk was that:

> A substantial portion of our securities transactions are collateralized and are executed with, and on behalf of, financial institutions, which includes other brokers and dealers, commercial banks and institutional clients. Our exposure to credit risk associated with the non-performance of these clients and counterparties in fulfilling their contractual obligations pursuant to securities transactions can be directly affected by volatile or illiquid trading markets, which may impair the ability of clients and counterparties to satisfy their obligations to us.

> Financial instruments and other inventory positions owned include U.S. government and agency securities, and securities issued by non–U.S. governments, which in the aggregate, represented 9% of total assets at November 30, 2006. In addition, collateral held for resale agreements represented approximately 23% of total assets at November 30, 2006, and primarily consisted of securities issued by the U.S. government, federal agencies or non–U.S. governments. ***Our most significant industry concentration is financial***

*institutions, which includes other brokers and dealers, commercial banks and institutional clients. This concentration arises in the normal course of business.*

172.    The foregoing statements were materially untrue in light of Lehman's omissions regarding the significant concentrations of credit risk in its mortgage related inventory, which omissions also violated Lehman's disclosure requirements under GAAP, including FAS 107 and 103.

173.    The 2006 10-K also discussed Lehman's mortgage origination and securitization activities, stating:

> When we originate or purchase residential mortgage loans, we rely heavily upon information supplied by third parties, including the information contained in the loan application, property appraisal, title information and employment and income documentation.  If any of this information is intentionally or negligently misrepresented, whether by the loan applicant, the mortgage broker, another third party or one of our employees, and such misrepresentation is not detected prior to loan funding, the value of the loan may be significantly lower than expected and/or be unsaleable or subject to repurchase if it is sold prior to detection of the misrepresentation.

174.    In addition, the 2006 10-K stated:

> In connection with certain asset sales and securitization transactions, including those associated with prime and subprime residential mortgage loans, we often make representations and warranties about the assets. Violations of these representations and warranties, such as early payment defaults by borrowers, may require us to repurchase loans previously sold, or indemnify the purchaser against any losses. To mitigate these risks, to the extent the assets being securitized may have been originated by third parties, we seek to obtain appropriate representations and warranties from these third parties when we are obligated to reacquire the assets. We have established reserves which we believe to be adequate in connection with such representations and warranties.

175.    Lehman's statements about potential misrepresentations in loan applications, potential repurchases and the potential effects on loan value were untrue or materially misleading because it referred to misrepresentations in loan documents only as a possibility, when such misrepresentations had already existed in its mortgage assets.  Additionally, the 2006 Form 10-K omitted to disclose that, as early as mid-2006, Lehman had received increased repurchase

requests from purchasers of BNC- and Aurora-originated loans and that Lehman itself made increasing repurchase requests to correspondents, as borrowers defaulted on their mortgages, as set forth in Section V.A.1(b), above.  The foregoing statements were also false and misleading because Lehman failed to disclose its exposure to subprime and Alt-A residential loans, or that Lehman, through its wholly-owned subsidiaries, BNC and Aurora, originated billions of dollars in low-quality mortgages that included no documentation loans, mortgages to borrowers with FICO credit scores as low as 540, mortgages to borrowers with poor credit histories and recent bankruptcies, and stated income loans, as discussed above in Section V.A.1(a).

176.    The 2006 10-K was also misleading because it failed to disclose the rising trend in repurchase requests to and from Lehman, which demonstrated that Lehman's mortgage related assets had become increasingly illiquid.  Item 303 of Regulation S-K requires registrants to "[d]escribe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations."

## 2.    1Q07 Financial Results

177.    On March 14, 2007, Lehman issued a press release, filed with the SEC on form 8-K, announcing its financial results for the quarter ended February 28, 2007 (the "3/14/07 8-K"). The 3/14/07 8-K reported that Lehman achieved record net income of $1.15 billion or $1.96 per common share and record net revenues of $5.0 billion, which included $2.9 billion of revenue from Principal Transactions.  Gains on Lehman's inventory of mortgages and mortgage-backed securities flowed into Principal Transactions, the largest contributor to Lehman's revenues for fiscal 2007.

178.    Thereafter, on April 9, 2007, Lehman filed with the SEC its quarterly report on Form 10-Q for quarter ended February 28, 2007 ("1Q07 10-Q").  The 1Q07 10-Q was signed by

Defendant O'Meara and reported financial results substantially similar to those previously reported in the 3/14/07 8-K.

179.    The statements described in ¶¶177-178 above were materially false or misleading because, among other things, Lehman's financial statements overstated the fair value of its mortgage and real estate related assets, in violation of GAAP.  As a result of the foregoing, Lehman's reported financial metrics, including its reported assets, net revenues, net income, earnings per share and shareholder's equity, were overvalued.  In addition, the 1Q07 10-Q failed to disclose (1) whether Lehman even took any mortgage related write downs during the quarter, the amount of the write down, and which assets it wrote-down; (2) the full extent of Lehman's exposure to losses on its subprime and Alt-A mortgage related positions; (3) that certain mortgage related assets, including Alt-A mortgage related positions, could not be effectively hedged to mitigate losses; and (4) that Lehman's hedging activities actually exposed investors to additional losses.

180.    In the 1Q07 10-Q, Lehman also stated that while "the U.S. subprime residential mortgage market experienced challenges in the first quarter of 2007 with increased delinquencies and significantly wider credit spreads, we believe that these challenges will be relatively contained to this asset class."

181.    These statements were materially false and misleading for omitting any reference to Lehman's subprime exposure, and failing to disclose that delinquencies affected not only the subprime mortgage market, but also negatively impacted Lehman's Alt-A mortgage related assets, which were closer to subprime than prime, and which experienced huge rates of delinquency, defaults and impairment.

182.    The 1Q07 10-Q also contained statements regarding Lehman's concentration of

52

risk substantially similar to the disclosures set forth in ¶171 above, which were materially untrue and misleading for the reasons set forth above in ¶¶172.

183.    The 1Q07 10-Q also contained statements regarding representations and warranties about Lehman's asset sales and securitization transactions substantially similar to those set forth in ¶174, which were materially untrue for the reasons set forth in ¶175.

### 3.    2Q07 Financial Results

184.    On June 12, 2007, Lehman issued a press release, filed with the SEC on Form 8-K, announcing its financial results for the second quarter ended May 31, 2007 ("6/12/07 8-K"). The 6/12/07 8-K reported "record net revenues" of $5.5 billion, a 25% increase over the prior year quarter, which included $2.9 billion in revenue from Principal Transactions; a 27% increase in net income to $1.3 billion; a 31% increase in diluted earnings per common share to $2.21; and total assets of $605 billion.

185.    Thereafter, on July 10, 2007, Lehman filed with the SEC its quarterly report on Form 10-Q for the quarter ended May 31, 2007 ("2Q07 10-Q").  The 2Q07 10-Q was signed by Defendant O'Meara and reported financial results substantially similar to those previously reported in the 6/12/07 8-K.  The 2Q07 10-Q additionally reported that $79.63 billion of Lehman's total assets at quarter end consisted of mortgages and mortgage-backed positions, and stated that the Company "continue[d] to actively risk manage [its] mortgage related positions through dynamic risk management strategies."

186.    The statements described in ¶¶184-185 above were materially false or misleading because, among other things, Lehman's financial statements overstated the fair value of its mortgage and real estate related assets, in violation of GAAP, and as a result of the foregoing, Lehman's reported financial metrics, including its reported assets, net revenues, net income, earnings per share and shareholder's equity, were overvalued.  In addition, the 2Q07 10-Q failed

to disclose (1) whether Lehman had even taken any mortgage related write downs during the quarter, the amount of the write down, and which assets it wrote down; (2) the full extent of Lehman's exposure to losses on its subprime and Alt-A mortgage related positions; (3) that certain mortgage related assets, including Alt-A mortgages, could not be effectively hedged to mitigate losses; and (4) that Lehman's hedging activities actually exposed investors to additional losses.

187.    The 2Q07 10-Q also contained statements regarding Lehman's concentration of credit risk substantially similar to those set forth in ¶171 above, which were materially untrue and misleading for the reasons set forth above in ¶¶172.

188.    The 2Q07 10-Q also contained statements regarding representations and warranties about Lehman's asset sales and securitization transactions substantially similar to those set forth in ¶174, which were materially untrue and misleading for the reasons set forth in ¶175.

### 4.    3Q07 Financial Results

189.    On September 18, 2007, Lehman issued a press release filed with the SEC on Form 8-K announcing its financial results for the quarter ended August 31, 2007 ("9/18/07 8-K").  The 9/18/07 8-K reported total assets of $659 billion as of August 31, 2007, net income of $887 million, diluted earnings per common share of $1.54, and net revenues of $4.3 billion.

190.    On October 10, 2007, Lehman filed with the SEC its quarterly report on Form 10-Q for the quarter ended August 31, 2007 ("3Q07 10-Q").  The 3Q07 10-Q was signed by Defendant O'Meara and reported financial results substantially similar to those released in the 9/18/07 8-K.  In addition, the 3Q07 10-Q reported that Lehman had an $88 billion inventory of financial instruments related to mortgages and mortgage-backed positions.

191.    The statements described in ¶¶189-190 above contained false statements of

material facts and omitted to state material facts for the reasons set forth in Sections V.A.1 and V.A.3, as Lehman's financial results were materially false and misleading because it failed to take timely and adequate write downs with respect to its deteriorating mortgage and real estate related assets, thereby overstating its financial results.

192.    In addition, Lehman's 3Q07 10-Q did not disclose that Lehman had significant concentrations of credit risk in its mortgages and real estate related positions, or provide any detail regarding those concentrations.  Rather, the 3Q07 10-Q contained a concentration of risk disclosure substantially similar to the disclosure set forth in ¶171 above, that were materially misleading for the reasons set forth above in ¶172.

193.    The 3Q07 10-Q also contained statements regarding representations and warranties about Lehman's asset sales and securitization transactions which were substantially similar to those set forth in ¶174, and were materially untrue for the reasons set forth in ¶175.

### 5.    4Q07 Financial Results

194.    On December 13, 2007, Lehman issued a press release filed with the SEC on Form 8-K announcing its financial results for the fourth quarter and full year ended November 30, 2007 ("12/13/07 8-K").  The 12/31/07 8-K reported total assets of $691 billion at November 30, 2007, and net income of $886 million, or $1.54 per common share (diluted), for the fourth quarter of 2007.  The 12/13/07 8-K also reported fourth quarter net revenues of $4.4 billion.

195.    For the 2007 full fiscal year, Lehman reported record net income of $4.2 billion and record earnings per diluted common share of $7.26.  The Company also reported net revenues of $19.26 billion for 2007.

196.    The 12/13/07 8-K contained untrue statements of material fact and omitted to state material facts because Lehman's financial results were overstated for the reasons set forth

above in Sections V.A.1 and V.A.3.

### 6.     2007 Fiscal Year-End Results

197.    On January 29, 2008, Lehman filed its annual report on Form 10-K with the SEC for the fiscal year ended November 30, 2007 ("2007 10-K"), reporting fourth quarter and fiscal year 2007 financial results substantially similar to those reported in the 12/31/07 8-K.  In addition, Lehman reported that its assets included $89.106 billion related to mortgage and asset-backed positions.  The 2007 10-K was signed by Defendants Fuld, Callan, Ainslie, Akers, Berlind, Cruikshank, Evans, Gent, Hernandez, Kaufman, and Macomber.

198.    In the 2007 10-K, Lehman stated that its balance sheet included $37.4 billion in residential mortgage and asset-backed securities, including $19.6 billion in residential whole loans, $16.5 billion in residential securities and $1.2 billion in residential servicing rights.  In addition, Lehman reported that at least $5.3 billion of its residential mortgage inventory was comprised of subprime mortgages, including $3.2 billion in whole loans and $2.0 billion in retained interests in securitizations.

199.    The 2007 10-K reported $6.8 billion in gross write downs, including $4.7 billion in gross write downs to its residential mortgage related positions and $1.2 billion gross write downs to its commercial mortgage related positions.

200.    While the 2007 10-K disclosed, for the first time, its gross and net residential and commercial mortgage related write downs, these write downs were nonetheless inadequate and failed to reflect the true market value of Lehman's mortgage and real estate related assets, thereby overstating its financial results, for the reasons set forth above in Sections V.A.1 and V.A.3.

201.    The 2007 10-K also contained untrue and misleading statements because it omitted disclosures regarding concentrations of credit risk in Lehman's mortgage related

portfolio, including (1) its exposure to and the amount of Alt-A mortgage related assets; (2) the geographic concentrations of risk in Lehman's residential and commercial mortgage portfolios; and (3) its concentration of risk in other asset-backed securities, including CDOs.

202.    The 2007 10-K also contained statements substantially similar to those set forth in ¶¶173-174 regarding representations and warranties in connection with Lehman's asset sales and securitization transactions, which were untrue or materially misleading for the reasons set forth in ¶175.

### 7.    1Q08 Financial Results

203.    On March 18, 2008, Lehman issued a press release filed with the SEC on Form 8-K announcing its financial results for Lehman's first quarter ended February 29, 2008 ("3/18/08 8-K").  The 3/18/08 8-K reported total assets of $786 billion, net income of $489 million, $0.81 in earning per common share (diluted), and net revenues of $3.5 billion. According to Lehman, the reported net revenues reflected "negative mark to market adjustments of $1.8 billion, net of gains on certain risk mitigation strategies and certain debt liabilities."

204.    On April 8, 2008, Lehman filed its quarterly report with the SEC on Form 10-Q for the 2007 quarter ended February 29, 2008 ("1Q08 10-Q"), signed by Defendant Callan, reporting first quarter 2008 financial results substantially similar to those pre-reported in the 3/18/08 8-K.

205.    In the 1Q08 10-Q, Lehman reported that $84.6 billion – or more than 10% of its total assets – consisted of mortgage and asset-backed positions, including:  (1) $31.8 billion in residential mortgages (consisting of $18.2 billion in securities, $11.9 billion in whole loans and $1.7 billion in servicing rights and other residential mortgage assets); (2) $36.1 billion in commercial mortgages (consisting of $24.9 in whole loans and $11.2 billion in securities and

other commercial assets); and (3) $6.5 billion in other asset-backed securities.

206.   The 1Q08 10-Q also reported that $14.6 billion of Lehman's U.S. residential mortgage inventory were Alt-A/Prime mortgage assets, while $4.0 billion related to subprime mortgages as of February 29, 2008.

207.   In addition, Lehman reported $4.7 billion in gross write downs, including $3.0 billion in gross write downs to its residential mortgage related positions and $1.1 billion gross write downs to its commercial mortgage related positions during the three months ended February 29, 2008.

208.   The foregoing statements were materially untrue or misleading because they failed to reflect the true market value of Lehman's mortgage and real estate related assets, thereby overstating its financial results, for the reasons set forth above in Sections V.A.1 and V.A.3.

209.   In addition, the 1Q08 10-Q (1) failed to break out which portion of Lehman's residential U.S. Alt-A/Prime mortgage portfolio consisted of Alt-A assets; (2) omitted material disclosures regarding the geographic concentrations of risk in the Company's commercial mortgage portfolio; and (3) omitted material disclosures regarding Lehman's risk concentrations within the U.S. real estate market, particularly with respect to troubled real estate markets such as California, Florida and Nevada.

210.   The 1Q08 10-Q also contained statements regarding representations and warranties about Lehman's asset sales and securitization transactions which are substantially similar to those set forth in ¶174 which were untrue or misleading for the reasons set forth in ¶175.

## 8.   2Q08 Financial Results

211.   On June 9, 2008, before the markets opened, Lehman issued a press release filed

with the SEC on Form 8-K pre-announcing its financial results for the quarter ended May 31, 2008 ("6/9/08 8-K").  The 6/9/08 8-K reported that Lehman expected a net loss for the quarter of $2.8 billion or $5.14 per share, and net revenues of negative $0.7 billion.  The 6/9/08 8-K further reported that Lehman's net revenues for the second quarter "reflect negative mark to market adjustments and principal trading losses, net of gains on certain debt liabilities."

212.    In the Form 8-K, the Company also disclosed that, in addition to mark-to-market losses, it also "incurred losses on hedges this quarter, as gains from some hedging activity were more than offset by other hedging losses."

213.    The 6/9/08 8-K contained untrue statements of material fact and omitted to state material facts for the reasons set forth above in Sections V.A.1 and V.A.3, as Lehman's reported financial results were overstated because the write-downs for the quarter were insufficient to reflect that fair value of the Company's assets.  Additionally, statement concerning hedging were false and misleading, as set forth in above in Section V.A.4, for omitting to disclose that Lehman could not effectively hedge.

214.    On July 10, 2008, Lehman filed its quarterly report on Form 10-Q with the SEC for the quarter ended May 31, 2008 (the "2Q08 10-Q"), signed by Defendant Lowitt.  The 2Q08 10-Q contained financial results substantially similar to those pre-reported in the 6/9/08 8-K.  Lehman also reported total assets of $639.432 billion, and financial instruments and inventory positions owned of $269.409 billion, of which $72.461 billion related to mortgages and asset-backed positions.

215.    The 2Q08 10-Q also discussed the impact of current market events upon the Company's second quarter performance, noting that in marking its positions to market, the

Company "recorded negative valuation adjustments of approximately $4.0 billion on certain components of its financial inventory."

216.    In addition, the Company reported $3.6 billion in gross ($3.7 billion net) negative valuation adjustments to its real estate and mortgage related positions for the three months ended May 31, 2008, including $2.4 billion gross ($2.0 billion net) write downs of its residential mortgage related positions and $0.9 billion gross ($1.3 billion net) write downs of its commercial mortgage and real estate related investments.

217.    With respect to its residential mortgage exposure, the Company reported $10.2 billion in Alt-A/Prime assets and $2.8 billion in subprime/second lien assets as of May 31, 2008, and $14.6 billion and $4.0 billion, respectively, as of February 29, 2008.  The Company also reported $39.8 billion in commercial mortgage holdings for the quarter.

218.    The foregoing statements in ¶¶214-217, while partial disclosures, were materially false and misleading for the reasons set forth above in Sections V.A.1, V.A.3 and V.A.4, and in ¶213.  In addition, Lehman continued to lump together Alt-A/prime assets and resorted to again masking Lehman's subprime exposure by lumping it together with second lien assets.

### 9.    Misstatements Common To Lehman's Quarterly And Annual Reports

#### a.    SOX Certifications

219.    In addition to the statements set forth above, each of Lehman's quarterly and annual reports filed with the SEC on Forms 10-Q and 10-K during the Relevant Period contained identical certifications signed by Defendants Fuld (as CEO) and O'Meara or Callan (as CFO), as required by the Sarbanes-Oxley Act of 2002 ("SOX").

220.    Specifically, in Lehman's 2006 10-K and its 1Q07, 2Q07 and 3Q07 10-Qs, Defendants Fuld and O'Meara certified that:  (1) they reviewed the filing; (2) it did "not contain

any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report"; (3) the financial information and statements contained in the report fairly presented, in all material respects, the financial condition and results of operations of the Company; (4) they designed or caused to be designed appropriate internal disclosure controls over financial reporting; (5) they evaluated the effectiveness of such controls; and (6) they have disclosed any material change in such controls, and any fraud or material weakness or deficiency in such controls, to the Company's Board and its independent auditors.  Defendants Fuld and Callan made substantially similar certifications in Lehman's 2007 10-K and 1Q08 10-Q.  Defendants Fuld and Lowitt also made substantially similar certifications with respect to Lehman's 2Q08 10-Q.

221.    Further, pursuant to SOX Section 906, 18 U.S.C. § 1350, Defendants Fuld and O'Meara certified in Lehman's 2006 10-K and 1Q07, 2Q07 and 3Q07 10-Qs that "as of the end of the fiscal quarter covered by this Report, [Lehman's] disclosure controls and procedures [were] effective."  Defendants Fuld and Callan made substantially similar certifications with respect to Lehman's 2007 10-K and 1Q08 10-Q.  Defendants Fuld and Lowitt also made substantially similar certifications with respect to Lehman's 2Q08 10-Q.

222.    The foregoing statements were false and misleading at the times they were made because, among other things: (1) each of Lehman's SEC filings contained untrue statements of material fact and omitted to state material facts, as set forth herein; (2) Lehman's reported financial results, including its assets, revenue, net income and earnings per share, were overstated because certain mortgage related assets and real estate related investments were not reflected at their fair value and, therefore, did not fairly present the financial condition of the

Company; and (3) Lehman lacked adequate internal disclosure controls over financial reporting to prevent its financial results from becoming overstated and to prevent other material misstatements or omissions from being made.

### b.    Conformity To GAAP

223.    Each of Lehman's Forms 10-Q and 10-K during the Offering Period also stated that the Company's financial statements were prepared in conformity with GAAP.  In truth, the Company's financial statements were not prepared in accordance with GAAP because, among other things:  (1) its mortgage related assets and real estate related investments were not timely and adequately written down to reflect their fair value, thereby overstating Lehman's reported assets, shareholders' equity, revenue and net income; (2) Lehman failed to disclose significant losses, and significant potential additional losses, that may have been incurred, although such losses were reasonably possible, in violation of FAS 5; and (3) Lehman did not fully or completely disclose significant concentrations of credit risk in its mortgage related inventory, in violation of FAS 107, as amended by FAS 133.   Lehman also failed to provide the comprehensive disclosures required by SEC regulations, including Item 303 of Regulation S-K, which requires a registrant to "describe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable impact on net sales or revenues or income from continuing operations."  As explained herein, Lehman failed to disclose material events and negative trends as required.

### c.    Disclosure and Internal Controls

224.    Lehman's annual and quarterly reports during the Relevant Period also stated that management "evaluated [Lehman's] disclosure controls and procedures as of the end of the fiscal quarter covered by this Report" and that, based on that evaluation, Lehman's "disclosure controls and procedures are effective . . . ."  Lehman further stated in these reports filed with the SEC

during the Relevant Period that there "was no change in [Lehman's] internal control over financial reporting that occurred during the fiscal quarter covered by this Report that has materially affected, or is reasonably likely to materially affect, [its] internal control over financial reporting."

225.    The foregoing statements contained untrue statements of material fact and omitted to state material facts because Lehman lacked effective internal disclosure controls over financial reporting sufficient to prevent Lehman's financial results from becoming overstated and to prevent other material misstatements or omissions from being made.

        **d.**    **Risk Management**

226.    Lehman's annual and quarterly reports during the Relevant Period also contained misstatements concerning Lehman's risk management procedures.  Its 2006 10-K and its 1Q07, 2Q07 and 3Q07 10-Qs stated that Lehman had a "comprehensive risk management measurement framework" and that it considered risk management "to be of paramount importance in [Lehman's] day-to-day operations.  Consequently, we devote significant resources … to the measurement, analysis and management of risk."  Lehman's 2007 10-K, and 1Q08 and 2Q08 10-Qs also stated that the Company had a "comprehensive risk management" structure to manage various risks, including market, credit, liquidity, operational and reputational exposures.

227.    The foregoing statements were materially untrue and omitted material fact because Lehman did not have adequate risk management procedures.  Among other things:  (1) Lehman lacked adequate risk controls, as Lehman amassed low-credit quality loans that caused Lehman's mortgage related assets to be overstated on its balance sheet; (2) Lehman increased its mortgage and real estate related assets despite deterioration of both the residential and commercial real estate markets; (3) Lehman's hedges were ineffective to counteract the deteriorating condition of Lehman's mortgage assets or the mortgage market; and (4) Lehman's

risk management processes were inadequate to keep the Company from suffering from a liquidity crisis and from seeking bankruptcy protection.

### e.    Fair Value

228.    Lehman's annual and quarterly reports during the Relevant Period also stated or contained similar representations that Lehman's "Financial instruments and other inventory positions owned . . . are carried at fair value," with the exception of real estate held for sale, which was purportedly reported at lower of the carrying value or fair value (less costs to sell), and that, where available, "fair value is based on observable market prices or parameters derived from such prices or parameters."

229.    The foregoing statements were materially false and omitted to state material facts because Lehman's financial instruments and other inventory positions were not written down in an adequate and timely fashion.  As a result, Lehman's financial instruments and other inventory positions were not reported at fair value.  Additionally, while observable market prices were available, such as from the ABX and CMBX indices, Lehman nevertheless evaluated fair value using its own internal models.

### f.    Capital and Liquidity

230.    Finally, each of Lehman's quarterly and annual reports filed with the SEC during the Relevant Period contained untrue statements of material fact and omitted to state material facts regarding the Company's capital position.  Specifically, each of these documents represented that Lehman was well-capitalized and possessed capital in excess of all applicable minimum capital requirements established by the SEC and other regulatory bodies, as well as those established by the ratings agencies.  These statements, however, were false and misleading because Lehman was not well capitalized nor did it have sufficient liquidity because (1) the value of its mortgage related assets and real estate related investments were overstated; (2) write

downs of such assets would have forced Lehman to incur large losses, which Lehman did not have sufficient capital and liquidity to absorb, and (3) there was significant risk of additional related losses.

231.     Further, Lehman's 3Q07 10-Q, 2007 10-K, 1Q08 10-Q and 2Q08 10-Q stated that "the Company "maintain[ed] a liquidity pool . . . that covers expected cash outflows for twelve months in a stressed liquidity environment," or contained substantially similar language.  This statement was materially untrue because the Company omitted to disclose that its liquidity pool was insufficient, as it sought bankruptcy protection within twelve months of the time of making these statements due to "significant liquidity problems."

### D.     The Principal Protection Note Offerings

232.     Beginning in early 2007, Lehman began to rely increasingly on sales to retail investors to fund its ongoing operations.  To effectively market its offerings to individual investors, Lehman needed specialized investment vehicles that incorporated the features typically sought out by conservative, retirement-oriented investors.  These features included low minimum investment amounts, a promise of protection from the risk of principal loss (or limitations on "downside risk"), the potential for appreciation under selected market conditions, and the perception that the investor would benefit from Lehman's expertise in matters of high finance and investment strategy.

233.     Lehman's interests, in contrast, were best served by offering investments that retail investors typically lacked the economic and legal expertise to evaluate, with opaque but lucrative fee structures.  Lehman interests were also served by an investment that could not readily be compared to other competing investments and which lacked a secondary market that would allow investors to readily determine the market value of their investments.  From Lehman's perspective, the investment vehicle needed to be flexible enough so that it could

ostensibly be tailored to the investment objectives of a wide range of retail investors, yet simple enough that the investment could be persuasively pitched by investment advisors and securities brokers who lacked specialized expertise or training.

234.    The ideal vehicle for Lehman's fundraising efforts was the "structured note," and more particularly, the "principal protection note," a form of structured note generally linked to the performance of an underlying derivative (such as a single security, a basket of securities, an index, a commodity, a debt issuance, a foreign currency or a derivative based on the difference between currency swap rates) (hereinafter "Principal Protection Note").  Principal Protection Notes featured the guaranteed return of all or some predetermined percentage of the investor's principal.  A listing of Principal Protection Notes is set forth in Appendix A.

235.    Principal Protection Notes were intended to attract conservative, retirement-oriented investors seeking to protect all or some percentage of their investment.  Principal Protection Notes purported to provide the investor with a guaranteed return of principal coupled with an additional return contingent upon the performance of an extrinsic index.  Principal Protection Notes issued by Lehman during the Relevant Period (listed in Appendix A) had a term of three to eight years and were generally linked to indices such as the S&P 500, the NASDAQ 100, the Dow Jones Industrial Average, or international equities indices.

236.    During the Relevant Period, Lehman and UBS co-underwrote the issuance of $913 million of Principal Protection Notes.  Lehman also individually underwrote the issuance of more than $789 million of Principal Protection Notes.  Lehman's Principal Protection Notes were issued pursuant to the Shelf Registration Statement, the 2006 Prospectus, the Medium-Term Notes, Series I Prospectus Supplement dated May 30, 2006, and either a product supplement or pricing supplement issued in connection with each particular offering (the "PPN

66

Offering Materials").  As discussed below, the PPN Offering Materials contained false and misleading statements and omissions and incorporated certain Lehman SEC filings issued during the Relevant Period that also contained false and misleading statements and omissions (see Appendix A).

237.    The PPN Offering Materials emphasized the guaranteed preservation of all or some specified percentage of the investor's capital stating, for example, "At maturity, you will receive a cash payment equal to at least 100% of your principal," or "100% principal protection if held to maturity," or "At maturity of the Notes, investors will receive a cash payment equal to at least the applicable Protection Percentage multiplied by the principal amount."

238.    As a co-underwriter, UBS was closely involved in the design and marketing of the Principal Protection Notes, and UBS actively participated in the development with Lehman of a short (typically six to seven page) document titled a "Pricing Supplement."  Beginning in or about March 2007, UBS began disseminating Pricing Supplements for a series of Principal Protection Note offerings that Lehman and UBS had customized to emphasize the purported "principal protection" guarantee underlying the notes.  To facilitate the marketing of the principal protection feature, Lehman and UBS included on the first page of the Pricing Supplement a "Features" box containing in large type a capsule summary of the principal-protection characteristics of the notes.  Similarly, the second page of the UBS pricing supplement contained a "Suitability" section emphasizing principal protection.

239.    The Pricing Supplement was the only document physically delivered by Lehman and UBS to investors in connection with the sale of Principal Protection Notes co-underwritten by Lehman and UBS.  Each Pricing Supplement was false and misleading in that it uniformly misstated or omitted the following material facts which needed to be stated in order to prevent

other statements contained in the Pricing Supplement from being misleading:

a)   For the reasons set forth herein at ¶¶93 through 164, the Principal Protection Notes were unlikely to provide full or partial principal protection, whether or not the Notes were held to maturity, as Lehman's financial condition was deteriorating rapidly throughout the Relevant Period, and Lehman's ability to meet its principal protection obligations under the terms of the Principal Protection Notes was at all times a highly speculative proposition;

b)   Contrary to the assertions in the Pricing Supplement, the Principal Protection Notes were not suitable for persons who sought full or partial principal protection;

c)   The Pricing Supplements failed to disclose that the Lehman financial statements incorporated by reference into the PPN Offering Materials contained misstatements and omissions of material fact, as alleged herein at ¶¶170 through 231;

d)   The Pricing Supplements failed to disclose that Lehman's credit ratings were based upon materially false and misleading financial statements incorporated by reference into the PPN Offering Materials, including the matters alleged herein at ¶¶170 through 231;

e)   The Pricing Supplements failed to disclose that Lehman's credit ratings were based upon materially false and misleading information concerning Lehman's business practices incorporated by reference into the PPN Offering Materials, including the matters alleged herein at ¶¶93 through 164;

f)   The Pricing Supplements failed to identify the securities offered as senior unsecured debt obligations of Lehman; and

g)   The Pricing Supplements failed to disclose that repayment of the Principal Protection Notes was dependent on the ability of Lehman to repay the Notes.

240.   The PPN Offering Materials required that an investor assemble and review as many as six separate documents for "complete details" about an investment in Principal Protection Notes.  For example, an investor wishing to review all of the disclosures that Lehman and UBS considered pertinent to an investment in "100% Principal Protection Absolute Return Barrier Notes Linked to the S&P 500 Index" was directed to obtain and review (1) the Pricing Supplement; (2) the base prospectus; (3) the Medium Term Note ("MTN") prospectus supplement relating to the Series I medium-term notes; (4) product supplement no. 550-I; (5)

underlying supplement no. 100; (6) "and any other relevant free writing prospectus . . . .," plus twelve separate Lehman's SEC filings incorporated by reference.  The Pricing Supplement for that Note further cautioned that:  "To the extent that there are any inconsistencies among the documents listed below, this pricing supplement shall supersede product supplement no. 550-I, which shall, likewise, supersede the base prospectus and the MTN prospectus supplement." With the exception of the Pricing Supplement, however, Lehman and UBS did not provide any of the foregoing documents to the investor.

241.    To obtain a copy of all of the documents listed above, an investor would have had to (1) correctly input over 320 characters printed in the Pricing Supplement in 10 point type into an internet search engine and review securities disclosure documents directly on an SEC website, assuming the investor possessed the necessary equipment and software, or (2) call a telephone number and leave the full name of the security, issuer and CUSIP number, along with the caller's name, address and telephone number in response to a recorded message, and wait an indeterminate amount of time in anticipation of the requested documents' arrival by mail.

242.    Given all of the relevant circumstances surrounding the offer and sale of Principal Protection Notes, the omission from the Pricing Supplement of an unambiguous disclosure that purchasers of Principal Protection Notes were (1) lending money to Lehman and (2) dependent solely on Lehman's solvency for repayment, rendered the PPN Offering Materials materially misleading, notwithstanding any other disclosures scattered throughout the Offering Materials. The relevant circumstances that rendered the omission of these facts from the Pricing Supplement materially misleading include without limitation:

    a)    The use of phrases such as "100% Principal Protection" or "Partial Principal Protection" in the title of the Principal Protection Notes and emphasized throughout the Pricing Supplements unaccompanied by cautionary language

stating that any "principal protection" was entirely dependent on the issuer's ability to repay principal and interest on the Notes;

b)      The failure to provide investors with a single prospectus with comprehensive disclosures pertaining to the characteristics of any particular offering and the use instead of a "Pricing Supplement" designed as a sales piece as the only written material distributed to investors;

c)      The failure of the Pricing Supplement to disclose that the Principal Protection Notes were unsecured debt obligations of Lehman;

d)      The failure to disclose the possibility of default of the issuer as one of the enumerated risk factors that investors should consider before investing in Principal Protection Notes;

e)      The impediments to access to the multiple disclosure documents an investor was expected to consult (including multiple financial disclosure documents incorporated by reference in the PPN Offering Materials) in order to evaluate an investment in the Principal Protection Notes, including requiring investors to search websites or wait indeterminate amounts of time for mailed copies, thereby discouraging investors from obtaining and reviewing a copy of the complete PPN Offering Materials;

f)      The complex and novel character of the Principal Protection Notes, which precluded investors from readily comparing an investment in the Notes with other investments, thereby preventing investors from evaluating the suitability of the notes in relation to their investment objectives;

g)      Lehman and UBS's distribution, as part of the promotional scheme for the Principal Protection Notes, of offering materials emphasizing the objective of preservation of capital on the part of retirement age investors, including brochures circulated a few months before Lehman's bankruptcy stating that: "[a]s baby boomers approach retirement with the expectation of ever-increasing life spans, principal protection has become more of an investment focus. Principal Protected Notes are one type of structured investment that offer [sic] some degree of upside return potential while also ensuring the return of at least the invested principal if held to maturity;"

h)      The failure of Lehman and UBS to disclose clearly and unambiguously in the Pricing Supplements that the hedging strategies and derivative transactions typically referenced in the PPN Offering Materials did not alter or mitigate the risk characteristics of Principal Protection Notes; and

i)      The Pricing Supplements' enumeration of risk factors such as fluctuation in the value of the underlying derivative without referencing the risk of the issuer's

default, thereby encouraging investors to underestimate the likely default risk associated with an investment in Principal Protection Notes.

## VI.   CAUSES OF ACTION UNDER THE SECURITIES ACT

### COUNT I

#### Violations Of Section 11 Of The Securities
#### Act Against The Securities Act Defendants

243.   Plaintiffs repeat and reallege each and every allegation contained above as if set forth fully herein and further allege as follows.

244.   This Count is asserted against Defendants Fuld, O'Meara, Callan, Ainslie, Akers, Berlind, Cruikshank, Evans, Gent, Hernandez, Kaufman, and Macomber (the "Securities Act Individual Defendants"), and the Underwriter Defendants (together, the "Securities Act Defendants") for violations of Section 11 of the Securities Act, 15 U.S.C. § 77k, on behalf of Plaintiffs and all members of the Class who purchased or otherwise acquired Lehman securities pursuant or traceable to the materially false and misleading Shelf Registration Statement and Offering Materials incorporated by reference in those Shelf Registration Statement.

245.   This Count is not based on and does not sound in fraud.  Any allegations of fraud or fraudulent conduct and/or motive are specifically excluded from this Count.  For purposes of asserting this claim under the Securities Act, Plaintiffs do not allege that the Securities Act Defendants acted with scienter or fraudulent intent.

246.   The Shelf Registration Statement, including the Offering Materials incorporated by reference therein at the time of each Offering, contained untrue statements of material fact and omitted to state other material facts necessary to make the statements made therein not misleading.  The specific documents containing such untrue statements and omissions that were incorporated by reference in the Shelf Registration Statement with regard to each Offering are identified in Appendix A.

71

247.     Defendants Fuld, O'Meara and Callan were executive officers and representatives of the Company responsible for the contents and dissemination of the Shelf Registration Statement.  Defendants Ainslie, Akers, Berlind, Cruikshank, Evans, Gent, Hernandez, Kaufman and Macomber were directors of Lehman at the time the Shelf Registration Statement became effective as to each Offering.  Further, the Securities Act Individual Defendants signed the Shelf Registration Statement, or documents incorporated by reference, in their capacities as officers or directors of Lehman.  As such, the Securities Act Individual Defendants caused to be issued, and participated in the issuance of the Shelf Registration Statement.  By reasons of the conduct alleged herein, each of these Defendants violated Section 11 of the Securities Act.

248.     The Underwriter Defendants were underwriters of certain of the Offerings set forth in Appendix A.  The Underwriter Defendants acted negligently and are liable to members of the Class who purchased Lehman securities sold on the respective Offering in which each Underwriter Defendant participated.

249.     The Securities Act Defendants owed to the purchasers of the securities issued in the Offerings the duty to make a reasonable and diligent investigation of the statements contained in the Shelf Registration Statement, and any incorporated documents, at the time it became effective to ensure that said statements were true and that there were no omissions of material fact which rendered the statements therein materially untrue and misleading.  The Securities Act Defendants did not make a reasonable investigation or possess reasonable grounds to believe that the statements contained in the Shelf Registration Statement were true, without omissions of any material facts, and were not misleading.  Accordingly, the Securities Act Defendants acted negligently and are therefore liable to Plaintiffs and members of the Class who purchased Lehman securities sold on the Offerings.

250.    Plaintiffs and all members of the Class who acquired Lehman securities sold on the Offerings did not know of the negligent conduct alleged herein or of the facts concerning the untrue statements of material fact and omissions alleged herein, and by the reasonable exercise of care could not have reasonably discovered such facts or conduct.

251.    None of the untrue statements or omissions alleged herein was a forward-looking statement but, rather, concerned existing facts.  Moreover, the Defendants named in this Count did not properly identify any of these untrue statements as forward-looking statements and did not disclose information that undermined the validity of those statements.

252.    Less than one year elapsed from the time that Plaintiffs discovered or reasonably could have discovered the facts upon which this Count is based to the time that this Complaint was filed asserting claims arising out of the falsity of the Shelf Registration Statement.  Less than three years elapsed from the time that the securities upon which this Count is brought were offered in good faith to the public to the time that this Complaint was filed.

253.    Plaintiffs and all members of the Class have sustained damages.  The value of the securities sold pursuant to the Offerings has declined substantially subsequent to and due to the Securities Act Defendants' violations of Section 11 of the Securities Act.

254.    By reason of the foregoing, the Securities Act Defendants named in this Count are liable for violations of Section 11 of the Securities Act to Plaintiffs and all members of the Class who purchased or otherwise acquired Lehman securities pursuant or traceable to the Shelf Registration Statement.

## COUNT II

### Violations Of Section 12(a)(2) Of The Securities
### Act Against The Underwriter Defendants

255.    Plaintiffs repeat and reallege each and every allegation contained above as if set forth fully herein and further allege as follows.

256.    This Count is asserted against the Underwriter Defendants for violations of Section 12(a)(2) of the Securities Act, 15 U.S.C. § 77l(a)(2), on behalf of Plaintiffs and all members of the Class who purchased or otherwise acquired Lehman securities in the Offerings.

257.    The Underwriter Defendants were sellers, offerors, and/or solicitors of sales of Lehman securities offered pursuant to the 2006 Prospectus and the prospectus supplement, pricing supplement, or product supplement issued in connection with each respective Offering.

258.    The Underwriter Defendants are sellers within the meaning of the Securities Act because they (1) transferred title to Plaintiffs and other members of the Class who purchased in the Offerings; and (2) solicited the purchase of Lehman securities by Plaintiffs and other members of the Class, motivated at least in part by the desire to serve the Underwriter Defendants' own financial interest and the interests of their client, Lehman, including but not limited to commissions on their own sales of those securities and separate commissions on the sale of those securities by non-underwriter broker-dealers.  The Underwriter Defendants used means and instrumentalities of interstate commerce and the United States mail.

259.    The 2006 Prospectus contained untrue statements of material fact and omitted other material facts necessary to make the statements not misleading.

260.    The Underwriter Defendants owed to Plaintiffs and all other purchasers or other acquirers of Lehman securities in the Offerings the duty to make a reasonable and diligent investigation of the statements contained in the Offering Materials with respect to each Offering,

74

to ensure that such statements were true and that there was no omission of material fact necessary to prevent the statements contained therein from being misleading.  The Underwriter Defendants did not make a reasonable investigation or possess reasonable grounds to believe that the statements contained and incorporated by reference in the 2006 Prospectus at the time of each Offering in which they participated were true and without omissions of any material facts and were not misleading.  Accordingly, the Underwriter Defendants are liable to Plaintiffs and the other members of the Class who purchased Lehman securities in the Offerings in which each Underwriter Defendant participated.

261.    Plaintiffs and other members of the Class purchased or otherwise acquired Lehman securities in the Offerings pursuant to the materially untrue and misleading 2006 Prospectus and did not know, or in the exercise of reasonable diligence could not have known, of the untruths and omissions contained in the 2006 Prospectus.

262.    Plaintiffs and other members of the Class offer to tender to the Underwriter Defendants those Lehman securities that Plaintiffs and other members of the Class purchased on the Offerings and continue to own in return for the consideration paid for those securities, together with interest thereon.

263.    By virtue of the conduct alleged herein, the Underwriter Defendants violated Section 12(a)(2) of the Securities Act.  Accordingly, Plaintiffs and other members of the Class who purchased Lehman securities in the Offerings pursuant to the 2006 Prospectus, have the right to rescind and recover the consideration paid for their securities, and hereby elect to rescind and tender their securities to the Underwriter Defendants who participated in the respective Offerings in which those securities were purchased.  Plaintiffs and the members of the Class who have sold the securities that they purchased in these Offerings are entitled to rescissory damages.

## COUNT III

### Violations Of Section 15 Of The Securities
### Act Against The Securities Act Individual
### Defendants And Defendants Gregory And Lowitt

264.    Plaintiffs repeat and reallege each and every allegation contained above as if set forth fully herein and further allege as follows.

265.    This Count is asserted against the Securities Act Individual Defendants, as well as Defendants Gregory and Lowitt (collectively, the "Securities Act Control Person Defendants") for violations of Section 15 of the Securities Act, 15 U.S.C. § 77o, on behalf of Plaintiffs and the other members of the Class who purchased or otherwise acquired Lehman securities sold on the Offerings.

266.    At all relevant times, the Securities Act Control Person Defendants were controlling persons of the Company within the meaning of Section 15 of the Securities Act. Each of the Securities Act Control Person Defendants served as an executive officer or director of Lehman prior to and at the time of the Offerings.

267.    The Securities Act Control Person Defendants at all relevant times participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of Lehman's business affairs.  As officers and directors of a publicly owned company, the Securities Act Control Person Defendants had a duty to disseminate accurate and truthful information with respect to Lehman's financial condition and results of operations.  Because of their positions of control and authority as officers or directors of Lehman, the Securities Act Control Person Defendants were able to, and did, control the contents of the Shelf Registration Statement and 2006 Prospectus, which contained materially untrue financial information.

76

268.    By reason of the aforementioned conduct, each of the Securities Act Control Person Defendants is liable under Section 15 of the Securities Act, jointly and severally, to Plaintiffs and the other members of the Class.  As a direct and proximate result of the conduct of Lehman and the Securities Act Control Person Defendants, Plaintiffs and the other members of the Class suffered damages in connection with their purchase or acquisition of Lehman securities.

## VII.   VIOLATIONS OF THE EXCHANGE ACT

269.    The Exchange Act claims below are brought by Plaintiffs individually and on behalf of all persons and entities, except Defendants and their affiliates, who purchased or acquired Lehman common stock, call options, and or who sold put options between June 12, 2007 and September 15, 2008 (the "Exchange Act Period").

### A.    The Insider Defendants' False And Misleading Statements During The Exchange Act Period

270.    Each of the false and misleading statements identified above at ¶¶170-231 that were made between June 12, 2007 and September 15, 2008 are also actionable under the Exchange Act.

#### 1.    2Q07 Financial Results

271.    On June 12, 2007, the Company held a conference call to discuss its financial results for the second quarter of 2007.  During the conference call, Defendant O'Meara reassured investors regarding the impact of the subprime fallout on Lehman's operations, stating that, "[c]onditions in the U.S. subprime mortgage business remain challenging during the quarter, although we did see some signs of improvement by the end of the period.  We continue to believe the subprime market challenges are and will continue to be *reasonably contained to this asset class*."

272.    These statements were false and misleading because, among other things, the market challenges were not contained to subprime assets.  Rather, they expanded to other assets classes, including Alt-A assets.  Additionally, Lehman and the Insider Defendants failed to adequately disclose material facts regarding Lehman's mortgage related losses.  For example, Defendant O'Meara stated that "some amount of marks" had been taken on Lehman's mortgage related positions during the second quarter, but O'Meara provided no further disclosure regarding these write downs, including the gross or net amount of these write downs, whether they related to Lehman's residential or commercial mortgages, or whether they concerned whole loans, mortgage backed securities, or other mortgage related assets.

273.    In addition, when Merrill Lynch analyst Guy Moszkowski pressed O'Meara about the nature of these write downs, asking pointedly whether Lehman's decreased second quarter revenues from its Fixed Income division were the result of "meaningful marks that [Lehman] might have made in residual positions in subprime or Alt A securitizations," O'Meara avoided the issue, stating instead that, "while these positions are moving around and being marked on a day to day basis, *we do have hedging strategies that are in place and have proven to be quite effective*."

274.    Similarly, when asked by Deutsche Bank analyst Mike Mayo to discuss Lehman's subprime and Alt-A mortgage exposure, O'Meara stated only that Lehman "didn't give out what Alt A is or the other businesses inside the securitization business system."

275.    On July 18, 2007, following the collapse of two Bear Stearns hedge funds and an increased call for transparency among investment banks, Lehman and the Insider Defendants denied any exposure to subprime related losses, stating through Lehman spokeswoman Kerrie Cohen, that ". . . *rumors regarding [Lehman's] subprime exposure are totally unfounded*."

276.     The foregoing statements in ¶¶273-275 were materially false and/or misleading because, at the time they were made, Lehman faced a substantial undisclosed risk of loss in its mortgage related assets due to rising default and delinquency rates and a slowing market for subprime and Alt-A mortgages and securities backed by these risky assets, which resulted in declines in the fair value of Lehman's residential and commercial mortgage related assets. Indeed, shortly after these statements were made, in August 2007, Lehman announced that it was shutting down its own subprime mortgage originator, BNC.  In addition, Lehman and the Insider Defendants did not provide any details regarding:   (1) Lehman's massive, high-risk, Alt-A portfolio; (2) the mortgage related write downs Lehman took during the quarter, including the gross or net amount, or a description of which assets Lehman marked; and (3) Lehman's commercial mortgage and real estate related exposures.  Further, while Lehman and the Insider Defendants touted Lehman's hedging abilities as a means of offsetting any mortgage related losses, they materially overstated the effectiveness of these hedging strategies by, among other things, failing to disclose that there was no effective hedge for the Company's undisclosed, multi-billion dollar portfolio of high-risk Alt-A assets.

### 2.     3Q07 Financial Results

277.     On September 18, 2007, Lehman hosted a conference call with analysts and investors to discuss the Company's third quarter financial results.  During the call, despite having just three months earlier characterized rumors about Lehman's subprime exposure as "unfounded," Defendant O'Meara revealed Lehman's $6.3 billion subprime mortgage inventory, and assured investors that these positions, as well as its other mortgage related assets, were being carried at fair value.  O'Meara stated, in relevant part:

> .  .  . *we carry all of our financial instruments, inventory, and lending commitments at fair value.  We have a robust process in place in which employees independent of the businesses review the marks for accuracy or*

*reasonableness, using all information available in the marketplace, including third-party pricing sources where applicable.*

\* \* \*

Given the nature of the asset class, many of our mortgage positions are mark-to-market using valuation models. The underlying inputs of these models are based on market activity, and there have been a significant number of real world trades executed in the market, which are used to validate our marks, and although many of these assets don't appear to be trading at their fundamental values*, we have marked our book to the actual prices being transacted in the market*. Fair value means marking to levels at which the assets will trade, not where we think they should trade.

Said differently, it is important to know that the inputs to our valuation models, such as credit loss assumptions, pre-payment speeds, and investor yield requirements, are calibrated so that the output prices from these models are consistent with real world trades being done in the market. And these are the same models we use to value client collateral that we take in against secured lending*. We feel very good about the marks that are on these positions*, despite the fact this market has come under significant liquidity stress, and activity levels particularly in the junior securities of capital structures have been reduced significantly.

\* \* \*

Barring any unforeseen circumstances, *we feel that the worst of this credit correction is behind us*. We have taken significant negative marks across all asset classes this period . . . .

278.    During the conference call, Defendant O'Meara omitted material information regarding the "hits" Lehman took in its mortgage-backed securities portfolio. Specifically, O'Meara withheld material information on the amount of gross write downs taken during the quarter, stating only that they were "big on both sides," that "the bulk" of the marks were taken on "lower rated instruments" and that the total *net* write downs amounted to $700 million. O'Meara attempted to justify the Company's refusal to disclose these marks, adding that "knowing the gross numbers particularly in that business, I don't think is really a meaningful thing."

279.   O'Meara also omitted material information about the components of Lehman's $700 million net write-down within its mortgage portfolio during the quarter, and did not provide the amount of gross write downs of this portfolio, or specify how much Lehman gained on its hedges to offset greater gross losses, claiming instead "it is just hard when you look at all of the component pieces . . . to break them out individually."

280.   O'Meara also acknowledged that the mortgage market unrest had caused the Company to assume liability for approximately $4 billion in additional mortgage related assets, but did not provide any further detail on these assets and stated that "it's not a real significant amount."

281.   The foregoing statements in ¶¶277-280 were materially false and misleading for the reasons set forth above in Sections V.A.1 - V.A.4.  Specifically, while discussing Lehman's subprime exposure and the net write downs it had taken on its mortgage related assets during the quarter, Lehman and the Insider Defendants (1) omitted any detail regarding Lehman's Alt-A portfolio; (2) did not provide the amount of gross write downs Lehman took on its mortgage related assets or describe which specific mortgage assets Lehman marked; (3) failed to provide sufficient detail regarding the concentration of credit risk in Lehman's mortgage portfolio, including Lehman's exposure to residential and commercial mortgage assets and, within these portfolios, Lehman's exposure to whole loans or securities; and (4) failed to disclose Lehman's full exposure to mortgage related losses by, among other things, failing to (a) adequately write-down Lehman's mortgage related assets and real estate related investments, thereby overstating the value of such assets; (b) disclose significant losses; (c) adequately describe Lehman's "economic hedges" against losses, including the amounts and percentage of assets hedged; and (d) disclose the risk of additional losses associated with the Company's hedging activity.

282.    Lehman and the Insider Defendants failed to write down such assets to adequately reflect their true fair value, despite (1) increasing delinquencies and defaults in its loan pools known from internal reports and tracking software; (2) internal discussions regarding the meltdown in the residential and commercial mortgage markets; (3) risk concerns raised by senior managers Michael Gelband, Lehman's former head of its Fixed Income division, and Madelyn Antoncic, Lehman's former Chief Risk Officer; (4) margin calls made by Lehman on mortgage originators; (5) the rise in loan repurchase requests to and from Lehman's own mortgage originators for non-performing and fraudulent loans; (6) repurchase lawsuits filed by Lehman against mortgage originators in connection with non-performing and fraudulent loans; (7) a reduction in securitization opportunities for mortgages; (8) decreased liquidity in the larger asset-backed securities markets; (9) the lack of an effective hedge for Lehman's Alt-A mortgage related assets; and (10) the Insider Defendants' participation in meetings where these issues were discussed.

283.    As the mortgage crisis broadened in November 2007, Lehman continued to assure the market that it was well-positioned to withstand these pressures.   For example, on November 14, 2007, Lehman management presented at the Merrill Lynch Banking and Financial Services Investor Conference (the "Merrill Conference").

284.    During the Merrill Conference, Defendant Lowitt touted the business and financial conditions of Lehman.   Lowitt represented that Lehman "continu[ed] to show very substantial growth" despite challenging market conditions by, among other things, maintaining an "extremely deep risk culture," being "very conservative around risk," and "operat[ing] an extremely conservative liquidity framework."   Lowitt further represented that Lehman's hedges were very successful, that Lehman's mortgage and mortgage-backed assets were aggressively

marked down, and that there would be no substantial write-downs with respect to its mortgage and mortgage-backed assets, as follows:

> Question:    Page 28 shows that you have 23 billion in Level 3 mortgage and mortgage-backed positions.  Just wondering if you could give us some color on that exposure and the risk of, in the future having to write that down?

> Lowitt:    Yes, I think that we feel very comfortable with the market that we have on those positions.  As I say *we've operated with a very active and effective hedging program*. . . . So the majority of what came into Level 3 was just plain box standard on whole loans, not complicated structures.  *We believe and are sure that we're marking those aggressively.  We've had success in our hedging and so we don't believe that there will be any requirement for substantial markdowns and certainly no requirement for us to announce anything.  We're very comfortable with where we are with regard to that*.

>                          *        *        *

> Lowitt:    . . . *So the hedges have been very effective for us, conservative around where we've marked these positions and very comfortable with where we are.*

285.    Lowitt's statements made in the Merrill Conference were materially false and misleading because Lowitt falsely represented that Lehman was very conservative around risk, which it was not.  Further, Lowitt gave the false impression that Lehman had no major mortgage related losses when, in fact, it had incurred losses in its mortgage portfolio that it concealed from investors.  As a result, the November 15, 2007 report issued by Punk Ziegel & Company analyst Richard Bove discussing Lehman's presentation at the Merrill Conference stated:

> Unlike numbers of its competitors, Lehman suggested that there will not be a meaningful mark down.  In fact, the company suggested that it was short many of the offending securities.  This would mean that Lehman could make money where others are losing.

>                          *   *   *

> However, Lehman went beyond these assertions suggesting that it had no major losses in the impacted areas for the industry.  The company argued that its business is benefiting from the problems surfacing elsewhere.

3.      **4Q07 Financial Results**

286.    On December 13, 2007, Lehman hosted a conference call to discuss the Company's fourth quarter financial results, wherein it announced a $1.5 billion net ($3.5 billion gross) writedown of its residential and commercial mortgage related positions.  Despite this write down, Defendant O'Meara omitted material information about the Company's exposure to losses on its subprime and Alt-A mortgage related assets and instead focused on Lehman's supposedly effective hedging strategies, stating that the fourth quarter results "reflect[] the strength of our risk management culture in terms of managing our overall risk appetite, seeking appropriate risk reward dynamics and exercising diligence around risk mitigation" and "reinforce[] the importance of our disciplined liquidity and capital management framework which sets us up to operate our business through periods of market stress."  During the conference call, O'Meara further stated, in relevant part:

> For the period, we incurred a net revenue reduction from positioned valuation changes of approximately 830 million in our Fixed Income capital markets business.  Most significantly in residential and commercial mortgage related positions.  On a gross basis, these valuation changes reduced revenues by approximately $3.5 billion, including $2.2 billion from our residential mortgage business.  We had gains on hedges of about $2 billion, which reduced the aggregate revenue impact from $3.5 billion negative to $1.5 billion negative.

287.    In addition, when analyst Mike Mayo sought further clarification on Lehman's write downs – namely how much of Lehman's $5.3 billion subprime exposure had been written down, and how much of Lehman's $1 billion CDO portfolio had been written down – Defendant O'Meara omitted material information, disclosing only that "we've had significant writedowns percentage wise" but that it was "a manageable number for us."  Defendant O'Meara also omitted material information regarding the massive undisclosed portion of high-risk Alt-A loans that Lehman was then carrying on its balance sheet.

288.    Defendant O'Meara similarly refused to break out the size of the write downs taken on the Company's commercial mortgage related portfolio.  Instead, O'Meara stated that "the CMBS balance sheet is about as we said about half of the $79 billion of risk assets on the balance sheet that's in the mortgage and related category.  So call it about $40 billion, spread out all over the world. . . .  But that has been written down in a significant way.  That's included in the 3.5."  O'Meara also refused to provide material information on the marks taken on the Company's commercial mortgage related portfolio, stating "[w]e're not giving that" and offering only that "[i]t's a significant difference of the portion between the 2.2 [billion dollar write down on residential mortgages] and the 3.5 [billion dollar total write down]."

289.    When asked what portion of the $3.5 billion gross ($830 million net) revenue reduction Lehman reported for the fourth quarter due to negative valuation adjustments made to its mortgage related portfolio related to Alt-A or prime assets, and what loss assumptions Lehman was using in its models, Defendants O'Meara and Callan responded:

**Chris O'Meara** - Lehman Brothers Holdings Inc. - Global Head of Risk Management

They're certainly in there and significant.  Alt-A across the capital structure. Each of these in terms of how these market values are established, there are at the top of the capital structure, particularly in AAA in both prime and subprime, there is market discovery.  So there are transactions being executed in the AAA space. As you move down the capital structure, there aren't transactions being executed, maybe there are some, but it's not as visible and not as much information on it and so the way to model them out is you have to default to the information that is visible which is the index trading around ABX in the different parts of the capital structure for ABX and so those inputs or that information around the ABX is used to price out the cash products in the bottom parts of the capital structure.  ***But there are some trades being done.  We've got good visibility into them.***  There are many of them that are being done because we're around them.  We're either participating in them or we're having a look at them.  For the most part.  And so we do have intelligence around the pricing information for these instruments.

**Erin Callan** - Lehman Brothers Holdings Inc. – CFO

I think, Glenn, just thinking about that, then, below the AAA part of the cap structure, I mean obviously the ABX is transparent in terms of its inputs and HPA assumptions.  Take a look at that, give you some good guidance as to what the cumulative loss assumptions are.

290.    The foregoing statements in ¶¶286-289 were materially false and misleading for the reasons set forth above in Sections V.A.1 - V.A.4.

291.    On January 10, 2008, after meeting with CFO Erin Callan, Deutsche Bank Global Markets Research analyst Mike Mayo issued a research report maintaining Deutsche Bank's "Buy" rating for Lehman's stock following his meeting with Callan, stating:

> Most importantly for the long-term, Lehman has a stable culture . . . .  The culture showed that ***risk management is effective***, with business managers seeming more integrated than its peers.

*   *   *

> Lehman's culture of risk management starts with the CEO . . . .  The bottom line is that the CEO seems involved in ensuring that potential upside justifies major risks that are taken.

292.    Defendant Callan's statements were materially misleading because they falsely reassured investors that Lehman possessed superior risk management compared to its peers and had ample capital, and that such risk management would continue to be an effective way to offset losses and even increase market share despite the non-performing mortgage assets that Lehman retained.

### 4.    2007 Fiscal Year-End Results

293.    On February 6, 2008, Lehman participated in a Credit Suisse Financial Services Forum.  During the forum, speaking on behalf of the Company, Defendant Callan once again touted the Company's "discipline around liquidity, risk management, capital and expenses" in the second half of 2007.  Further, while failing to disclose Lehman's inability to hedge its multi-billion dollar portfolio of high-risk Alt-A residential mortgage positions, Callan noted that one

component of Lehman's risk management framework "is the active hedging of the residential mortgage book, which [Lehman] started in fiscal 2006."

294.    Defendant Callan also told investors that Lehman was "feeling pretty good about that [mortgage] portfolio," which Callan stated totaled $90 billion, including $37 billion in residential mortgages and $39 billion in commercial mortgages.   Callan also stated that Lehman's subprime exposure was down from the $5.3 billion previously reported.  *As in prior quarters, however, Lehman failed to disclose any information about the amount of Lehman's massive exposure to high-risk Alt-A mortgage related assets.*

295.    In response to Callan's reassurances about Lehman's financial position and ability to navigate through the current mortgage market, Credit Suisse analyst Susan Roth Katzke ("Katzke") reiterated her Outperform rating for the Company, stating, "[m]anagement's comments [at the forum] ought to increase confidence that such outperformance can continue." Notably, Katzke stated that Lehman "differentiated itself" in terms of risk management expertise in 2007.   Katzke also noted that "[w]hile there's clearly risk of near term mark-downs, management is more confident that [Lehman's mortgage] portfolio will prove money good over the long term."

296.    The foregoing statements in ¶¶293-295 were materially false and misleading for the reasons set forth above in Sections V.A.1 - V.A.4.

### 5.    1Q08 Financial Results

297.    On March 18, 2008, Lehman hosted a conference call to discuss its first quarter 2008 financial results.  Despite the Company's inability to hedge a major portion of its high-risk residential mortgage portfolio, Defendant Callan, speaking on behalf of the Company, stated during the conference call that Lehman's "continued diligence around risk management, which

includes the active involvement of [its] senior management team" and "risk management discipline allowed [it] to avoid any single outsize loss" during the quarter.

298.    Callan also stated that "it's been our operating philosophy for a decade . . . that we remain closely focused on our liquidity, our long-term capital position, precisely for the purpose of weathering a difficult market environment that we've seen surfacing in recent weeks" and that "we believe the fed's actions are a strong positive step towards stabilizing the capital markets and certainly enhancing liquidity for quality assets"  Callan further stated that "[*w*]*e had disciplined liquidity and capital management, which we consider to be a core competency, and maintained robust liquidity* to date, and we've executed close to two-thirds of our full-year capital plan at the end of the first quarter" and that "we do believe we have the leadership, the experience, the risk management discipline, the capital strengths, and certainly the liquidity to ride out the cycle."

299.    With regard to the $4.7 billion gross ($1.8 billion net of hedges) mark-to-market write-down Lehman recorded during the quarter, Defendant Callan stated the following:

> Residential mortgage related positions accounted for 800 million, net.  The 800 million net relates to 3 billion gross.  So I think it's fair to say *we continue to do a very, very good job managing the risk on residential mortgages*, an area that I think we're credited with a lot of expertise, a great franchise.

> Non-residential asset backed positions of an additional net 100 million. Commercial mortgages and related real estate up 1 billion.  And 1 billion is net from 1.4 billion, reflecting the fact that it's much more difficult to hedge the commercial asset class.

300.    Callan also continued to overstate the value of Lehman's mortgage and asset-backed portfolio at $74 billion ($85 billion, inclusive of such assets that were accounted for as financings rather than sales), which was purportedly comprised of $32 billion in residential mortgage related assets and $36 billion in commercial mortgage related assets, and represented that the slight decrease in residential mortgage related assets from year-end "doesn't reflect a

static situation" because Lehman "actually sold a fair amount of assets during the quarter and bought opportunistically some very attractive assets that we saw available on the market." Further, Callan stated, "*for residential securities it was a pretty different story for this quarter than last*. We began to see a lot more transparency in the Alt-A sector late in the quarter, allowing us to mark positions based on observable prices, much less use of models."

301.    In addition, Callan stated that Lehman "continue[d] to have significant hedging against [subprime] balance sheet exposure" which decreased from $5.3 billion at year-end to $4 billion. The $4 billion consisted of "$1.3 billion in whole loans, and the remaining amounts are primarily investment grade securities. 82% of which are AAA or AA." Callan also stated that "Prime and Alt-A make up 14.6 billion versus 12.7 at year end . . . reflecting a fair amount of assets sold and bought opportunistically."

302.    Turning to Lehman's commercial mortgage portfolio, Callan stated that $25 billion represented whole loans and $11 billion in securities, of which 85% were AA or AAA-rated. Callan also reiterated that Lehman "look[s] at a number of data points including activity in loans with similar property types and similar regions . . . recent securitizations . . . loan syndications, CMBS spreads and the CMBX index" to value the portfolio. Callan stated that, "as opposed to last quarter, we have seen similar spread experiences in recent securitizations as a CMBX, so what was a divergence in the last quarter has really converged to be pretty identical pricing as securitization and CMBX." Callan stated, however, that "*our valuations reflect how the market is pricing these positions, not the fundamentals of the asset class, regardless of our view on their intrinsic value*." Further, Callan claimed that "[d]elinquencies in commercial mortgages continue to be very low at approximately 40 basis points" and that "[o]ur research expectations that they would not exceed 70 in a difficult environment."

303.    Defendant Callan also stated, "[a]s we look out to the remainder of the year, we certainly will remain vigilant around risk, capital, and liquidity . . . as a Firm we remain very cautious overall."  Callan further claimed that Lehman ***"took care of [its] full year needs" for capital when it raised $1.9 billion through its offering of preferred stock in February***.

304.    Callan also assured analysts and investors that the Company was "***very well hedged,***" so much so that, according to Callan, "***we would consider ourselves at this point net short in the residential asset class***," meaning that the Company was effectively numb to recent price declines because of its hedging strategy.

305.    The foregoing statements in ¶¶297-304 were materially false and misleading for the reasons set forth above in Sections V.A.1 - V.A.5.  In addition, Lehman's and the Insider Defendants' statements touting the Company's risk management and "disciplined capital and liquidity management," as well as statements emphasizing the "temporary" nature of write downs in its mortgage portfolio were particularly misleading in light of (1) the Company's failing hedges and refusal to mark its mortgage portfolio in accordance with applicable fair value standards; and (2) the significant deterioration in value of Lehman's mortgage assets that had already been occurring for months.  Further, Lehman and the Insider Defendants' representations regarding Lehman's liquidity, including Defendant Callan's statement that Lehman's capital needs for 2008 were satisfied, were materially misleading in light of (1) the Company's highly leveraged mortgage portfolio; (2) the decreased liquidity in the larger asset-backed securities markets; and (3) the substantial liquidity issues the Company faced during this time period.

306.    On March 31, 2008, Lehman announced the issuance of 3,000,000 shares of 7.25% Non-Cumulative Perpetual Convertible Preferred Stock, Series P, with a par value of $1.00 per share and a liquidation preference of $1,000 per share supposedly in response to

"investor interest" and to "bolster the Firm's capital and increase financial flexibility." Defendant Callan stated that "[g]iven the challenging environment and our previously stated view that it will likely continue the balance of the year, issuing convertible preferred is appropriate as it optimizes our funding and accelerates our plan to reduce leverage, and at the same time minimizes dilution to our shareholders . . . .  We also felt this was the right time as there was a window of opportunity in the market, as we have received significant interest from several key institutional investors, who have been strong supporters of the Firm over time."

307.    On April 1, 2008, Lehman increased the previously announced preferred offering by one million shares.  Defendant Callan stated that "[t]he significant oversubscription for this deal demonstrates the confidence that investors have in Lehman Brothers.  The success of the transaction is also reflective of the strength of the business model, the capital base and liquidity profile of the Firm as we continue to successfully weather challenging environments."

308.    On April 15, 2008, the Company held its annual shareholder meeting.  Regarding the troubles in the subprime mortgage market, Lehman's CEO, Defendant Fuld, reassured investors during the meeting that, "the worst is behind us."

309.    The foregoing statements in ¶¶306-308 were materially false and misleading because the Series P preferred offering did not demonstrate the strength of Lehman, but was instead designed to provide the Company with much needed capital.  Further, the worst was not behind Lehman, as it had billions of dollars of overstated assets.

### 6.    2Q08 Financial Results

310.    On June 9, 2008, as the U.S. mortgage market declined further, Lehman held a conference call to discuss its preliminary results for the quarter ended May 31, 2008.  During the conference call, speaking on behalf of the Company, Defendant Callan discussed the equity raised by the Company:  "***To be clear, we do not expect to use the proceeds of this equity raise***

*to further decrease leverage, but rather to take advantage of future market opportunities … we stand extremely well capitalized to take advantage of these new opportunities*."

311.   When Merrill Lynch analyst Guy Moszkowski asked whether Lehman's $130 million asset sale during the quarter included "the absolute easiest assets to sell" or the "more difficult asset classes," Defendant Callan stated, "it very much is the latter."  Callan also stated that "the vast majority" of sales from Lehman's "residential book" were "in the form of whole loans, not the securities portion" or "the risk asset classes which did give us a tremendous amount of visibility back into pricing the rest of our inventory," and that "[t]he story on the commercial side is very similar."

312.   In addition, when UBS analyst Glenn Schorr juxtaposed Callan's earlier comments about Lehman's April 2008 capital raise not being overly critical from a corporate finance perspective, and her mid-May comments about Lehman's marks being a lot smaller than in the prior quarter, against what he described as "a bigger loss than I think we all kind of braced for," Callan responded that "the corollary to the write-down number for this quarter . . . of 3.6 gross actually compares apples-to-apples in Q1 of something about $5 billion.  So there definitely was a slowdown in the pace of write-downs on a gross debt basis."  As such, Callan explained, "it is all in the hedging in terms of the outcome," again without disclosing the Company's inability to hedge its Alt-A exposures.  Further, Callan added that "even though [the portfolio] is marked throughout the quarter you do your final marking obviously at the end of the quarter on the more difficult to mark collateral.  So that by nature will be backended in terms of how the losses come through the P&L."

313.   In response to Deutsche Bank analyst Mike Mayo's question, "How do we know that you have taken enough write downs in your real estate book," Defendant Callan claimed that

the write down was sufficient because "the aggregate number is very large that we have taken since Q3 [2007]."  Callan went on to state that the size of Lehman's write downs "gives me confidence in the actual accumulated loss across those portfolios, resi[dential] and commercial." Further, despite suggesting that pricing information was not available for many of its mortgage assets, Callan stated that Lehman was "probably the most active seller of assets in the market this quarter across all these asset classes . . . [and] we weren't selling AAAs.  We were selling the entire capital structure and we were selling risk assets."  Additionally, Callan commented that "unquestionably our price visibility we got from these transactions was tremendous . . . . *So I think the confidence level about the remaining inventory can only be higher than it was given all that sales activity . . . .*"

314.  Fox-Pitt Cochrane Caronia analyst David Trone also questioned Defendant Callan about Lehman's relationship with its creditors and counterparties.  Despite being under significant pressure from its counterparties and from the U.S. government, Callan stated that "*the discussions at this point are not about our viability or the fact that we will be here or the fact that we have sufficient liquidity.*  I think we put that to bed on a number of different levels through our own actions[.]"  Callan also stated that "we are not having any conversation with counterparties or lenders about whether they feel confident extending funds and credit to us."

315.  Although the June 9, 2008 conference call provided somewhat more detail about the nature and composition of Lehman's residential and commercial mortgage portfolio and the write downs that Lehman took in each of these portfolios during the quarter, these statements were still materially false and misleading for the reasons set forth above in Sections V.A.1 – V.A.5, and Lehman's reported write downs for the quarter were still insufficient to reflect the fair value of these mortgage assets at the end of the quarter or during earlier portions of the

Exchange Act Period.   In addition, Defendant Callan continued to mislead investors by suggesting that the Company's write downs were sufficient simply because the "aggregate number" of write downs taken was "very large."   Further, while Lehman and the Insider Defendants suggested that the Company was "extremely well capitalized" and had raised additional capital merely to take advantage of favorable market opportunities, Treasury Secretary Paulson later stated during an October 23, 2008 interview with *The New York Times* that when "Lehman announced bad earnings around the middle of June, [] we told Fuld that if he didn't have a solution by the time he announced his third-quarter earnings, ***there would be a serious problem*** . . . .   We pressed him to get a buyer."

316.   On June 16, 2008, Defendant Fuld admitted that the Company's $2.8 billion quarterly loss was "my responsibility" and stated "I am the one who ultimately signs off."   Fuld explained:

> We made active decisions to deploy our capital.   Some of which in hindsight were poor choices, because ***we really didn't react quickly enough to the eroding environment***. . . .   Together, the accumulation of all these positions ultimately led to our decision this past quarter to aggressively delever.

317.   During the same conference call, however, Defendants Fuld and Lowitt continued to misrepresent that Lehman's capital and liquidity positions had "never been stronger," despite the fact that the Company was under significant pressure from counterparties and the U.S. government either to find a strategic partner or sell the business.   Defendant Lowitt further stated:

> With regard to the rating agencies, I believe that their focus is on the earnings power going forward.   They are very comfortable with the capital and I took you through what the capital ratios were, which I think we'll see when all the Qs come out but our expectation is that pre the capital raise, we were going to be among the strongest and post the capital raise we certainly are confident that will be the case.   So ***we don't believe there will be any issues around capital.   You've got a sense of just how strong our liquidity position is*** . . .

###### 7.    3Q08 Pre-Released Financial
###### Results And Write-down Announcement

318.    On September 10, 2008, Lehman held a conference call to discuss its third quarter 2008 financial results and to address concerns about the Company's mark-to-market write downs, liquidity and capital positions.  During the conference call, Lehman reported a $3.9 billion loss for the quarter, as well as another $7.8 billion in gross write downs on its residential mortgage related assets and commercial mortgage and real estate investments.

319.    The statements made during Lehman's September 10, 2008 conference call partially revealed the truth.  For example, during the call, Lehman and the Insider Defendants gave more detail to investors about the nature and composition of its residential and commercial mortgage portfolio and the write downs that Lehman took in each of these portfolios during the quarter.  Lehman and the Insider Defendants also reported write downs for the third quarter that began approximate to more readily the fair value of these mortgage assets during earlier portions of the Exchange Act Period.

320.    However, these statements were still materially false and misleading for the reasons set forth above in Sections V.A.1 – V.A.5, and because they did not reveal the full truth. Specifically, prior to the September 10, 2008 conference call, Lehman and the Insider Defendants (1) received $10 billion in collateral calls from JP Morgan in the week preceding the conference call (including a $5 billion collateral call on September 9, 2008); (2) faced increased pressure from Treasury Secretary Henry Paulson since mid-June 2008 to find a buyer or strategic partner due to capital concerns; (3) had been actively shopping Lehman and its individual business units to other commercial and investment banks throughout the summer of 2008; and (4) were unable to find a willing purchaser, as potential suitors believed that the Company's ailing commercial mortgage portfolio was overvalued by at least 35%.  Nevertheless, during the

95

September 10, 2008 conference call, Defendants Fuld and Lowitt continued to misrepresent and conceal (1) the true fair value of Lehman's commercial mortgage related assets during the Relevant Period and at the end of the third quarter; and (2) the dire state of Lehman's capital and liquidity position, representing instead, that Lehman's capital position was fine and that Lehman maintained a "very strong liquidity position."

321.    On September 15, 2008, the final day of the Relevant Period, Lehman petitioned for bankruptcy, making it the largest corporate bankruptcy in U.S. history.  Later that day, Lehman issued a press release confirming the filing of its Bankruptcy petition.  As a result of Lehman's bankruptcy filing, investors finally became aware of the truth regarding Lehman's financial position.

      **B.**        **The Insider Defendants' Scienter**

           **1.**       **Insider Defendants' Positions As Lehman's Executive Management And On Its Executive Committee Afforded Them Extensive Knowledge Of Lehman's Core Business Operations**

322.    The Insider Defendants each acted knowingly or recklessly with respect to the materially false and misleading statements alleged herein.  In addition to the facts and circumstances alleged above, the Insider Defendants' scienter stems from their awareness, as top officers of the Company, of important developments in Lehman's core business; pervasive problems discussed internally at Lehman; the deliberate refusal to provide greater transparency into Lehman's mortgage related assets; the Insider Defendants' admissions set forth below; and the Insider Defendants' motive and opportunity to commit the wrongdoing described herein.

323.    Lehman's mortgage related business, including its origination and securitization, were integral to its core business operations, and its mortgage related holdings comprised a material portion of Lehman's revenue and assets.  Lehman originated approximately $60 billion

96

in residential mortgages during 2006 and $47 billion during 2007; it also originated approximately $34 billion in commercial mortgages in 2006 and $60 billion in 2007.  Lehman securitized more than $100 billion in residential mortgages in 2007, and approximately $20 billion in commercial mortgages.

324.    As Lehman's key officers, the Insider Defendants were aware of important transactions and circumstances affecting Lehman's core mortgage related business.    As specifically alleged below, the Insider Defendants directed, were aware of, and/or recklessly disregarded fraudulent conduct within that mortgage related business.

325.    The Insider Defendants were responsible for and oversaw Lehman's mortgage related operations.  As set forth above, the Insider Defendants were Lehman's highest ranking officers: Fuld served as CEO from 1993; O'Meara served as CFO, Controller, and Executive Vice President from 2004 until December 2007, and after that headed Lehman's Worldwide Risk Management; Gregory served as COO and oversaw the day-to-day management of Lehman's operations; Callan was Lehman's CFO and Executive Vice President from December 2007 until June 2008; and Lowitt, who replaced Callan as CFO in June 2008, also served as Co-Chief Administrative Officer and was on Lehman's Executive Committee.

326.    Defendant Fuld chaired, and Defendants Callan and Lowitt were members of, the Company's Executive Committee, which was responsible for assessing Lehman's risk exposure and related disclosures.  Lehman's Executive Committee reviewed "risk exposures, position concentrations and risk-taking activities on a weekly basis, or more frequently as needed." Additionally, the Committee "allocate[d] the usage of capital to each of our businesses and establishes trading and credit limits for counterparties."  According to Callan, the Executive Committee consisted of thirteen people, including herself and Fuld, who met twice a week for

two hours at a time and "devote[d] a significant amount of that time to risk." Callan stated that the Executive Committee addressed "any risk that passes a certain threshold, any risk that we think is a hot topic" and "anything else during the course of the week that's important." Further, Callan stated that the Executive Committee was "intimately familiar with the risk that we take in all the different areas of our business. And [Fuld] in particular . . . keeps very straight lines into the businesses on this topic."

327.    Additionally, as set forth above in ¶¶219-222, Defendants Fuld, O'Meara, Callan and Lowitt signed quarterly and annual Sarbanes-Oxley certifications during the Exchange Act Period attesting to their responsibility for and knowledge of disclosure controls and procedures, as defined in Exchange Act Rules 13a-15(e) and 15d-15(e), as well as Lehman's internal control over financial reporting.

### 2. The Insider Defendants Knew Of And/Or Recklessly Disregarded Fraudulent Conduct Within Lehman's Mortgage Operations

328.    Lehman's mortgage origination and securitization businesses contributed substantially to the Company's Principal Transactions revenue line, and, for fiscal years 2005-2007, Principal Transactions contributed roughly 50% of Lehman's net revenues. From its origination and securitization businesses, during the Exchange Act Period, Lehman amassed nearly $90 billion in mortgage related holdings – more than four times its shareholder equity.

329.    As described above, the collapse of the mortgage and securitization markets did not occur suddenly, and Lehman's competitors took large write downs associated with mortgage related holdings during the decline. During the Exchange Act Period, analysts were focused on Lehman's exposure to mortgage related losses. Thus, throughout the Exchange Act Period, the Insider Defendants publicly addressed the performance of Lehman's mortgage related businesses

and its exposure to loss on mortgage related holdings.  Any fraud affecting this part of Lehman's operations was material to investors.

330.    According to confidential witnesses, high-level Lehman employees directed, or recklessly disregarded the impropriety of, a variety of improper practices related to the Company's mortgage operations and mortgage origination subsidiaries.  These practices were designed both to allow the Company to avoid write downs and to move impaired mortgage and real estate assets off the Company's balance sheet.

331.    According to CW11, a High Risk Specialist/Mortgage Fraud Investigator for Aurora from 2004 to March 2008, in the last six to eight months of CW11's employment with Aurora, Lehman demanded that Aurora purchase a large pool of loans from Lehman.  CW11's department tried to dispute this "shuffling" of loans off Lehman's books to Aurora.  According to CW11, "This was kind of weird because you have a mother company demanding that the smaller company buy these loans back from Lehman."  It seemed to CW11 that Lehman was trying to saddle Aurora with the losses.

332.    Additionally, CW5 explained that Lehman appointed strategic supervisors at Aurora like Lehman employee Mark Golan to spearhead its contract administration, or repurchase, area.  According to CW5, Golan did not want to cut off business despite low loan quality, once even storming out of a meeting and yelling at the vice president of Special Investigations, "Your people find too much fraud!"  Golan accepted indemnification instead of repurchases from strategic partners like Aegis or First Magnus even when they owed $30-$50 million in repurchases but had only $20 million or so in available assets.  CW5 also described how Lehman was aware of mortgages in its securitization transactions that were not performing due to bad loans because if some of the loans in a pool started to experience losses, Lehman had

the option of replacing them – in effect taking one mortgage out and putting another in its place, or just putting money in to buy the loan back from the security so that the security performed as usual.

333.    CW5 recalled that, in March or April of 2006, Lehman put money back into two securities, SASCO and LSX, because the mortgages in these securities were not performing. Around May or June 2006, Lehman sent a group of employees to Aurora to review a number of the loans backing SASCO and LSX, who found that 40-50% of the small number of loans they reviewed contained material misrepresentations in the loan papers.  When Aurora's Special Investigations Unit reviewed the same loans for SASCO and LSX in September 2006, they found that approximately 70% of the pool of loans were fraudulent.  Most of these loans were originated by Aurora's "strategic partners," or correspondents, including First Magnus Financial. These loans were sent back to be repurchased.  The Special Investigation Unit did four or five other bulk reviews for these securities, and they consistently found that approximately 70% of the loans should be repurchased.

334.    This pattern of fraud extended not only to mortgage operations, but also to valuations of the Company's real estate holdings.  CW7, who helped manage a large portion of retained assets called the "Bridge Equity Program" from mid 2007 until his departure from Lehman in early 2008, stated that Lehman employees changed the appraised value of its commercial real estate assets.  According to CW7, Lehman used TriMont Real Estate Advisors in Atlanta to perform regular evaluations on its properties and underlying assets.  The first value that TriMont came up with was always reported verbally, usually to Kenny Cohen, the "lieutenant" of Mark Wash, head of Lehman's Global Real Estate Department, so that Cohen could go back to TriMont and tell them that Lehman needed a specific, higher value, which

TriMont would provide.  CW7, who went down to Atlanta frequently to deal with TriMont, said that changing the appraised value was a common practice while he worked in the "Bridge Equity Program."  CW7 also stated that Lehman maintained no documents, including emails, regarding this sensitive information, and communications about changing the appraised value of the commercial real estate assets were conducted verbally.

335.    Likewise, according to CW25, a Lehman employee from 1998 until early 2008 who handled credit underwriting of individual commercial loans for the CMBS conduit business in the Real Estate Group during his/her last three years with Lehman, Lehman pushed the envelope on risk tolerance and allowed almost all commercial loans to go through, even highly risky ones.  According to CW25, employees were often told by Brett Ersoff and John Herman, the heads of the business line, "that the deal has to be done period, whether or not the value is too excessive," because the more loans and deals Lehman made, the more fees it received.  According to CW25, with respect to CMBS, Lehman did all of the original underwriting on the deal, the loans would be placed in a pool, and the pools would then go to the underwriting agencies.  CW25 stated that the bottom-line was that the deal had to be done, and because the appraisals were "very subjective," many times the value could be "tweaked."  Because Lehman had relationships with numerous third party appraisal companies, including CB Cushman and Joseph Blake, Lehman would suggest that they, for example, adjust the CAP rate (the ratio between the net operating income produced by an asset and its capital cost), the LTV (loan-to-value ratio) or the debt coverage if the appraised value came in too low in order to increase the value.  According to CW25, the whole process was very informal, consisting of phone calls and nothing in writing because Lehman did not want to leave a paper trail.  Anything that was done that was not in compliance with proper protocol generally would not have been documented.

CW25 also stated that most of the borrowers Lehman dealt with were significant, like Tishman. Thus, Lehman was involved in a lot of very large projects and deals.

> **3.    Insider Defendants' Regular Contact With
> Lehman's Mortgage Subsidiaries Made
> Them Aware Of The Deterioration Of The
> Company's Mortgage And Real Estate Related Assets**

336.    Lehman and its subsidiaries prepared numerous internal reports indicating during the Relevant Period that Lehman's mortgage and real estate businesses were deteriorating, and that the deterioration would become more severe.

337.    According to CW7, a senior vice president in Lehman's Global Real Estate Group from 1996 until early 2008, internal Lehman documents from as early as 2006 discussed how a meltdown in the commercial mortgage market would follow a meltdown in the residential market.  Given the subprime mortgage meltdown throughout 2007, a report commissioned by Lehman's senior management confirmed the danger to the commercial mortgage and CMBS markets beginning in mid 2007.  CW7 believes that the report was likely commissioned for Fuld's office.

338.    According to CW3 and CW9, Lehman was in regular communication with Aurora and received numerous performance reports on the loans Aurora serviced for Lehman.  CW3 worked with the Lehman trading desk and provided it with reports on product performance. CW9 prepared detailed spreadsheets of first payment defaults that were sent to Lehman traders before being sent to correspondents.

339.    Additionally, according to various confidential witnesses, including CW1, CW17, CW18, and CW19, Aurora prepared monthly reports on first payment defaults, delinquencies,

and foreclosures to Lehman.[4]   For example, CW19 recalled that these reports were sent to Lehman's Home Loan Finance section.   CW19 noticed that delinquencies and foreclosures began increasing in 2006 on these monthly reports, and recalled that the increased delinquencies were a regular topic of discussion during monthly performance meetings and that staffing increased in the loss mitigation department to address the escalating delinquencies.   Similarly, CW1 said that Aurora prepared a management package monthly with information regarding Aurora's financial and operations and everything "you would need to see how the business was doing" that went to Lehman, including to individuals at its mortgage trading desk.

340.   According to CW20, who worked as a manager in BNC's Due Diligence and Repurchase Department from early 2006 until the fall of 2007, reports were distributed monthly to Lehman regarding all the reasons that BNC's loans were not selling.   The reports broke down the problems by category, including, for example, appraisal and credit issues.   Similarly, CW10, a BNC employee from mid 2005 to October 2007 who dealt with repurchase requests, said that BNC had to report at least monthly to Lehman about repurchases and that, in 2007, Lehman became more actively involved in BNC's repurchase decisions, as someone from Lehman participated by phone for each of the committee meetings and worked on the repurchase decisions with BNC.

---

[4]  CW1 was a Controller of Aurora until August 2006.  CW17 was a vice president of credit risk at Aurora from May 2006 to March 2008.  CW17 was responsible for the quality of loans underwritten on the residential mortgage side, supporting both retail and correspondent lending. CW18 was a High Risk Specialist/fraud analyst at Aurora from the beginning of 2007 to January 2008.  CW18's group audited between 1,000 and 1,300 loans per month that were in either first payment default or early payment default, and would recommend that loans be repurchased by correspondent lenders when they found fraudulent loans.  CW19 was a manager of financial analysis for Aurora's servicing side from 2005 until October 2007.  CW19 handled financial reporting, budgeting, and forecasting.

341.     Internal reporting systems also indicated that loans in Lehman's pools experienced increased deficiencies and defaults.  According to CW21, an associate in Lehman's Securitized Products group from June 2000 to March 2008, Lehman used a Collateral Analysis System to analyze the pools of loans it purchased from various third parties.  The Collateral Analysis System analyzed and compiled information and computed weighted averages regarding components of the pools.  According to CW21, the system categorized loans by product type, and it would consider characteristics of a pool to ascertain potential pricing losses.  CW21 stated that Lehman marketed lower quality loans, and as the securitization market constricted, Lehman was stuck with many lower quality loans.

### 4.     Insider Defendants Were Aware That Lehman Did Not Adequately Manage Risk

342.     The Insider Defendants were aware that high-ranking Lehman employees, including senior risk managers, raised concerns about the Company's risk management and exposure to mortgage related investments, both prior to and during the Exchange Act Period.  In fact, Lehman ousted certain senior risk managers from their positions after they raised concerns regarding Lehman's risk management and mortgage related holdings.

343.     For example, as reported by *Bloomberg Markets*, both Michael Gelband, head of Lehman's Fixed Income division, and Madelyn Antoncic, Lehman's Chief Risk Officer, were "pushed aside" after they "urged caution" with respect to Lehman's mortgage positions.  Indeed, *Bloomberg Markets* reported that Gelband left Lehman's Fixed Income division in May 2007 to become head of Global Markets after he "balked at taking more risk."  In September 2007, Lehman removed Antoncic as Chief Risk Officer and reassigned her to a government relations position within the Company.  Lehman continued its issuance and investment in mortgage-backed securities even after these risk concerns were raised.

**5.     The Insider Defendants Were Aware That Lehman's
Real Estate And Mortgage Related Assets Were
Overvalued And Severely Affected Lehman's Capital And
Liquidity Positions Throughout The Exchange Act Period**

344.     The Insider Defendants recognized that Lehman's real estate and mortgage related assets were overvalued and that the losses in connection with these assets would drain the Company's capital during the Exchange Act Period.

345.     According to CW8, a BNC underwriter from 2003 until October 2007, Lehman held a major conference for employees in Phoenix, Arizona in the spring of 2007, where Lehman reported that the market's appetite for subprime loans had changed and, as a result, Lehman needed to "tighten up guidelines."  The loan underwriters were told:  "We're not going to make the loans we used to, because there's a problem on the horizon."

346.     By August 2007, Lehman's treasury department, under Fuld's direction, began putting together ten to twelve "funding vehicles" containing both senior bank loans and mortgage loans so that Lehman could get cheaper funding from the Federal Reserve Bank and the European Central Bank, according to CW24, an Executive Director in Lehman's Fixed Income Middle Office Loan Operations from April 2007 until Lehman's bankruptcy.

347.     A January 2008 internal presentation made by Eric Felder, a Lehman executive, acknowledged that the mortgage crisis was having a severe impact on the Company's operations and liquidity position.  Slides accompanying Felder's presentation stated that "[v]ery few of the top financial issuers have been able to escape damage from the subprime fallout."   The presentation also warned that, because "a small number of investors account for a large portion of demand [for Lehman issues], liquidity can disappear quite fast."

348.     An internal memorandum from June 2008, produced on behalf of Defendant Fuld to the House of Representatives Committee on Oversight and Government Reform after the

Relevant Period, asked: "Why did we allow ourselves to be so exposed?"  The reasons cited for the Company's exposure included that "[c]onditions clearly [were] not sustainable.  Saw warning signs.  Did not move early, fast enough.  Not enough discipline in our capital allocation."

349.    On June 16, 2008, Defendant Fuld admitted that "we really didn't react quickly enough to the eroding environment" and that the Company's $2.8 billion loss in the second quarter of 2008 was "my responsibility" because "I am the one who ultimately signs off."

350.    Despite these known facts, and even though Lehman raised capital during the Exchange Act Period, including through several multi-billion dollar securities offerings in February, April, and June 2008, Defendants falsely stated that the additional capital raise was not out of necessity.  As Lehman CFO Callan claimed in June 2008, "we do not expect to use proceeds of this equity offering to further decrease leverage, but rather to take advantage of market opportunities, which are abundant.  And overall, we stand extremely well capitalized to take advantage of these new opportunities."

351.    On September 9, and again on September 11, 2008, Steven Black, co-CEO of JPMorgan's investment bank, phoned Defendant Fuld and stated that JPMorgan needed $5 billion in additional collateral to cover lending positions.  According to *The Wall Street Journal*, Jane Buyers Russo, head of JPMorgan's broker-dealer unit, also phoned Lehman's treasurer, Paolo Tonucci, and told him Lehman would have to turn over $5 billion in collateral that JPMorgan had asked for days earlier.  Fulfilling the request temporarily froze Lehman's computerized trading systems and nearly left Lehman with insufficient capital to fund its trading and other operations.

352. On September 10, 2008, Defendant Lowitt contradicted earlier statements by admitting that there was no "direct hedge for Alt-A assets." However, Lowitt continued to represent falsely that Lehman maintained a "very strong liquidity position."

353. Days later, on September 15, 2008, Lehman filed for bankruptcy, which Defendant Lowitt admitted in his bankruptcy affidavit was due to a "liquidity crisis."

354. Against this backdrop, the Insider Defendants failed to provide adequate disclosure concerning Lehman's mortgage related assets or the precarious nature of its liquidity and capital positions during the Relevant Period. Such a lack of transparency can only have been a conscious decision. Defendants Fuld, O'Meara, and Callan refused to provide transparency and basic information about Lehman's holdings even when asked direct questions by analysts and investors regarding exposure to loss from mortgage related assets and real estate related investments and related hedging activities during the Relevant Period. As discussed above, the Insider Defendants failed to disclose: (1) the net or gross write downs Lehman recorded in the first and second quarters of 2007; (2) the amount of gross mortgage related write downs Lehman recorded in the third quarter of 2007; (3) the full extent of Lehman's mortgage related exposure and losses associated with Alt-A mortgage assets; (4) the amount of gross write downs Lehman recorded in its CMBS portfolio in the second, third, and fourth quarters of 2007; and (5) any meaningful information about the Company's "economic hedges" including its inability to hedge Alt-A exposure.

### 6. <u>Motive And Opportunity</u>

355. The Insider Defendants were motivated to commit the fraud alleged herein in order to engage in insider trading and obtain substantial bonuses and other rewards under the Company's compensation plans.

356.     In January 2007, Lehman's Board of Directors authorized stock repurchases of up to 100 million shares.   While this stock purchase program was in place, and as Lehman repurchased approximately 43 million shares of common stock at aggregate costs of $3.2 billion, or $73.83 per share in 2007, Defendant Fuld sold 291,864 shares of stock on June 13, 2007 – the day after Lehman reported that it achieved record quarterly results for second quarter of 2007 – at the average price of $77.56 per share, near the peak of Lehman's stock price during the Exchange Act Period, for proceeds of over $22 million.

357.     Additionally, for 2007, in the midst of record declines in the mortgage and mortgage securitization markets, and the housing and real estate markets, Lehman was somehow able to report its highest earnings ever.   Given Lehman's reported results, its compensation pool reached a record $9.5 billion – 9.5% higher than the previous year − as year-end earnings rose 5% from a year earlier.   The Insider Defendants' compensation was directly tied to the Company's reported short-term performance.

358.     According to Lehman's March 5, 2008 Proxy Statement (the "2008 Proxy Statement"), the Compensation Committee based executive compensation award recommendations upon whether the Company exceeded certain benchmarks during the year, including, among others, percentage increases in Lehman's fiscal 2007 net revenues (10%), pretax income (2%), net income (4%) and earnings per share (7%) over fiscal 2006.   Lehman also awarded additional compensation to executives for purportedly "[s]uccessfully navigating the difficult credit and mortgage market environments and maintaining the Firm's strong risk controls."   For fiscal 2007, Lehman made the following compensation awards to the Insider Defendants:

(a)      Defendant Fuld received an annual salary of $750,000, a cash bonus of $4.250 million and a restricted stock bonus of $35 million, for total compensation of $40 million. According to the 2008 Proxy Statement, the formula that determined Fuld's compensation award for fiscal 2007 was based on declining percentages of Lehman's pre-tax income, with a maximum percentage of 0.75%.  This formula was based on the Company's pre-tax income for fiscal 2007 of $6 billion.  In the 2008 Proxy Statement, Fuld's $40 million compensation award for fiscal 2007 was purportedly justified, in part, by "his role in leading the Company through the challenging market environment, and orchestrating the Company's strategic direction and objectives including the continued diversification of the Company across businesses, regions and products which was important to the Company's financial performance in Fiscal 2007";

(b)      Defendant O'Meara received an annual salary of $200,000, a cash bonus of $2.65 million and a restricted stock award of $6.64 million, for total compensation of $9.49 million;

(c)      Defendant Gregory received an annual salary of $450,000, a cash bonus of $4.5 million and a massive restricted stock award of $29 million, for total compensation of $34 million; and

(d)      Defendant Lowitt received an annual salary of $200,000, a cash bonus of $2.65 million and a restricted stock award of $6.64 million, for total compensation of $9.49 million.

359.   As further evidence of motive to overstate Lehman's financial results and conceal Lehman's exposure to loss from mortgage related assets and real estate related investments, Lehman raised billions of dollars in capital through a combination of common stock, preferred stock and bond offerings, at times when Defendant Callan was representing that the Company

had more than adequate capital and larger-than-ever liquidity pools.  Defendant Callan claimed on June 9, 2008 that Lehman did not intend to use the $6 billion in capital that Lehman had raised that very day to decrease leverage or shore up its mortgage related positions.

360.    The Insider Defendants' also had the opportunity to engage in the alleged fraud by virtue of their positions as Lehman's top officers, their control over Lehman and its public statements, and their superior access to internal information.

### C.    Loss Causation

361.    Plaintiffs and other members of the Class suffered economic losses as the price of Lehman's common stock fell in response to the issuance of partial corrective disclosures and/or the materialization of risks previously concealed by the Insider Defendants from Lehman's investors.

362.    Throughout the period from June 12, 2007 through September 15, 2008, as detailed above, the price of Lehman's securities was artificially inflated as a direct result of Defendants' material misrepresentations and omissions regarding the Company.  As the true financial condition of the Company was revealed and the risks associated with its condition materialized, however, the inflation that had been caused by Defendants' materially false and misleading statements and omissions was eliminated from the price of the Company's common stock, causing significant damages to Plaintiffs and the other members of the Class who had bought or acquired Lehman common stock at inflated prices.  Defendants' misrepresentations and omissions regarding (1) the value of Lehman's residential mortgage related assets, (2) the value of Lehman's commercial mortgage and real estate related assets, (3) Lehman's hedges and ability to hedge against losses, and (4) Lehman's capitalization and liquidity and risks of bankruptcy, concealed the true facts that, when disclosed, negatively affected the value of Lehman's securities and bore on Plaintiffs' loss.

363.    The truth about Lehman's financial condition and illiquid assets materialized in a series of announcements and events that constituted partial disclosures with respect to Lehman's common stock price.   On June 9, 2008, before the markets opened, Lehman issued a press release announcing its financial results for its second quarter of 2008 ending on May 31, 2008. The press release announced a net loss of approximately $2.8 billion, or approximately $5.14 per share, for the second quarter of fiscal 2008, and disclosed that Lehman incurred losses on hedges in the quarter.   Additionally, the press release disclosed that Lehman took $4 billion in mark-to-market write downs, including $2.4 billion in residential mortgage related holdings, $700 million in commercial mortgage related positions, and $300 million in real estate held for sale.   On this news, Lehman's shares declined 8.7% and continued to fall an additional 19.44% over the next two days.   However, the June 9 announcement only partially revealed the truth, and continued to misrepresent Lehman's financial condition, including by representing that Lehman had increased liquidity and capital and reduced its exposure with respect to mortgages and real estate assets.

364.    On September 8, 2008, Lehman announced that it would release its third quarter 2008 results and key strategic initiatives for the Company on September 18.   In this respect, analysts at Bernstein Research and Oppenheimer predicted further write downs in the third quarter of between $4 and $5 billion.   As a result of this news, Lehman's shares finished the trading day down 12.7%.

365.    On September 10, 2008, in an earnings pre-release, Lehman reported a $3.9 billion loss for the third quarter of 2008, as well as $7 billion in gross write downs on its residential and commercial real estate holdings.   In announcing the results during the conference call, Defendant Lowitt, after replacing Callan as CFO, also disclosed that "[t]he majority of our write downs were in Alt-A driven by increase in Alt-A delinquencies and loss expectations

111

which were specific to Alt-A prices and did not affect the performance of our hedges."  Contrary to Defendants' earlier statements, Lowitt admitted that "unfortunately there is no direct hedge for Alt-A assets . . . ."  On this news Lehman's shares declined 7% from the prior day's close to $7.25 per share.

366.    On September 15, 2008, Lehman filed for bankruptcy.  As a result, Lehman's shares declined over 94% on that date.

367.    The declines in the price of Lehman's common stock and the losses as a result thereof are directly attributable to the market's reaction to the disclosure of information that was previously misrepresented or concealed by Defendants, including the truth about Lehman's capital, liquidity, and overall financial condition.  Had Plaintiffs and other members of the Class known of the material adverse information not disclosed by Defendants, or been aware of the truth behind Defendants' material misstatements, they would not have purchased Lehman common stock at artificially inflated prices.

## VIII.   CAUSES OF ACTION UNDER THE EXCHANGE ACT

### COUNT IV

**Violations Of Section 10(b) Of The Exchange Act And
Rule 10b-5 Promulgated Thereunder Against The Insider Defendants**

368.    Plaintiffs repeat and reallege the allegations set forth above as though fully set forth herein, except for those allegations disclaiming any attempt to allege fraud, and further allege as follows:

369.    This claim is asserted against the Insider Defendants, namely, Fuld, O'Meara, Gregory, Callan and Lowitt.

370.    Each of the Insider Defendants, individually and/or in concert, by the use of means or instrumentalities of interstate commerce and/or of the United States mail (1) employed

devices, schemes, and artifices to defraud; (2) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; (3) deceived the investing public, including Plaintiffs and other Class members, as alleged herein; (4) artificially inflated and maintained the market price of Lehman securities; and (5) caused Plaintiffs and other members of the Class to purchase Lehman securities at artificially inflated prices and suffer losses. The Insider Defendants were primary participants in the wrongful and illegal conduct charged herein.

371.    In addition to the duties of full disclosure imposed on the Insider Defendants as a result of their making or participation in the making of affirmative statements and reports to the investing public, they each had a duty to promptly disseminate truthful information that would be material to investors in compliance with the integrated disclosure provisions of the SEC as embodied in SEC Regulations S-X (17 C.F.R. § 210.01 *et seq.*) and S-K (17 C.F.R. § 229.10 *et seq.*) and other SEC regulations, including the duty to provide investors with accurate and truthful information regarding the Company's operations, financial condition and performance so that the market prices of the Company's publicly traded common stock would be based on truthful, complete and accurate information.

372.    Additional facts supporting the Insider Defendants' liability include the following:  (i) each was a high-level executive and/or director at the Company during the Exchange Act Period; (ii) by virtue of his or her responsibilities and activities as a senior executive officer and/or director of the Company, each had contact with other members of the Company's management team, and access to internal reports, and other data and information about the Company's financial condition and performance at all relevant times; and (iii) each was aware of the Company's dissemination of information to the investing public, which they

knew or recklessly disregarded was materially false and misleading the truth of the information they disseminated.

373.     The Insider Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were readily available to them.   The Insider Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Lehman's financial condition and results of operations, business practices and future business prospects from the investing public and supporting the artificially inflated price of its securities.   As demonstrated by their overstatements and misstatements of the Company's financial condition and performance, the Insider Defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

374.     As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of Lehman securities was artificially inflated and caused loss to Plaintiffs when Lehman's stock price fell in response to the issuance of partial corrective disclosures and/or the materialization of risks previously concealed by the Insider Defendants.

375.     By virtue of the foregoing, the Insider Defendants each violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

376.    This claim was brought within two years after the discovery of the fraud and within five years of the making of the statements alleged herein to be materially false and misleading.

377.    As a direct and proximate result of the Insider Defendants' wrongful conduct, Plaintiffs and the other Class members suffered damages in connection with their purchases of the Company's stock and options.

### COUNT V

**Violations Of Section 20(a) Of The
Exchange Act Against The Insider Defendants**

378.    Plaintiffs repeat and reallege each and every allegation contained above as if set forth fully herein, except for those allegations disclaiming any attempt to allege fraud, and further allege as follows:

379.    This claim is asserted against the Insider Defendants, namely, Fuld, O'Meara, Gregory, Callan and Lowitt.

380.    The Insider Defendants were and acted as controlling persons of Lehman within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions with the Company, participation in and/or awareness of the Company's operations and/or intimate knowledge of the Company's actual performance, the Insider Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiffs contend are false and misleading.  Each of the Insider Defendants was provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiffs to be misleading prior to and/or shortly after these statements were

115

issued and had the ability to prevent the issuance of the false statements and material omission or cause such misleading statements and omissions to be corrected.

381.     In addition, each of the Insider Defendants had direct involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

382.     As set forth above, the Insider Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint.  By virtue of their controlling positions, the Insider Defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of the Insider Defendants' wrongful conduct, Plaintiffs and other members of the Class suffered damages in connection with their purchases of the Company's stock and options.

## COUNT VI

### Violations Of Section 20A Of The
### Exchange Act Against Defendant Fuld

383.     Plaintiffs repeat and reallege each of the allegations set forth above as if fully set forth herein.

384.     This Claim is brought pursuant to Section 20A of the Exchange Act against Defendant Fuld on behalf of all members of the Class damaged by Defendant Fuld's insider trading.

385.     As detailed herein, Defendant Fuld was in possession of material, non-public information concerning Lehman.  Defendant Fuld took advantage of his possession of material, non-public information regarding Lehman to make millions of dollars in insider trading profits during the Exchange Act Period.

386.    Defendant Fuld's sale of Lehman securities was made contemporaneously with Plaintiffs' and Class members' purchases of Lehman common stock during the Relevant Period.

387.    For example, on June 13, 2007, Defendant Fuld sold 291,864 shares of stock at average price of $77.83 per share for proceeds of $22,692,426.  On June 14, 2007, Lead Plaintiff NILGOSC purchased 1,300 shares of Lehman at $78.3963 per share, for a total cost of $101,915.19.  On June 15, 2007, NILGOSC purchased 1,800 shares of Lehman at $79.5325 per share, for a total cost of $143,158.50.  Also on June 15, 2007, NILGOSC purchased 100 shares of Lehman at $79.70 per share, for a total cost of $7,970.  On June 19, 2007, Lead Plaintiff Operating Engineers purchased 4,500 shares of Lehman at $80.9702 per share, for a total cost of $364,365.90.  Similarly, on June 20, 2007, Operating Engineers purchased 2,200 shares of Lehman at $81.6462 per share, for a total cost of $179,621.64.

388.    All members of the Class who purchased shares of Lehman securities contemporaneously with sales by Defendant Fuld have suffered damages because: (1) in reliance on the integrity of the market, they paid artificially inflated prices as a result of the violations of Section 10(b) and 20(a) of the Exchange Act as alleged herein; and (2) they would not have purchased the securities at the prices they paid, or at all, if they had been aware that the market prices had been artificially inflated by the Insider Defendants' false and misleading statements and concealment.  At the time of the purchases of the securities by members of the Class, the fair and true market value of the securities was substantially less than the price paid by these Class members.

## IX.    CLASS ACTION ALLEGATIONS APPLICABLE TO ALL CLAIMS

389.    Plaintiffs bring the this Action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of themselves and all other persons and entities, except Defendants and their affiliates, who (1) purchased or acquired Lehman securities identified in

Appendix A between February 13, 2007 and September 15, 2008, inclusive, pursuant or traceable to the Shelf Registration Statement, and (2) all persons and entities who purchased or acquired common stock, call options, and/or who sold put option of Lehman between June 12, 2007 and September 15, 2008.[5]

390.    Excluded from the Class are (i) Defendants, (ii) the officers and directors of each defendant, (iii) any entity in which Defendants have or had a controlling interest; and (iv) members of Defendants' immediate families and the legal representatives, heirs, successors or assigns of any such excluded party.

391.    The members of the Class are so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are thousands of members of the Class located throughout the United States.  Throughout the Relevant Period, Lehman securities at issue traded on an efficient market.  Record owners and other members of the Class may be identified from records maintained by Lehman and/or its transfer agents and may be notified of the pendency of this action by mail, using a form of notice similar to that customarily used in securities class actions.

392.    Plaintiffs' claims are typical of the claims of the other members of the Class as all members of the Class were similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

393.    Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.

---

[5]   This excludes purchasers of CDOs, MBSs, or pass-through securities that are not general obligations of Lehman or its subsidiaries.

394.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)     whether the federal securities laws were violated by Defendants' acts and omissions as alleged herein;

(b)     whether documents, press releases, and other statements disseminated to the investing public and the Company's shareholders during the Relevant Period misrepresented material facts about the business and financial condition of Lehman;

(c)     whether statements made by Defendants to the investing public during the Relevant Period misrepresented and/or omitted material facts about the business and financial condition of Lehman;

(d)     whether the market price of Lehman's securities during the Relevant Period was artificially inflated due to the material misrepresentations and failures to disclose material facts complained of herein; and

(e)     the extent to which the members of the Class have sustained damages and the proper measure of damages.

395.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this suit as a class action.

X.      **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, on their own behalf and on behalf of the Class, pray for

judgment as follows:

(a)     Declaring this action to be a class action pursuant to Rule 23(a) and (b)(3) of the

Federal Rules of Civil Procedure on behalf of the Class defined herein;

(b)     Awarding Plaintiffs and the other members of the Class damages in an amount which

may be proven at trial, together with interest thereon;

(c)     Awarding Plaintiffs and the members of the Class pre-judgment and post-judgment

interest, as well as their reasonable attorneys' and expert witness' fees and other costs;

(d)     An order requiring the Section 20A Defendant Fuld to disgorge the profits of his

insider sales of Lehman common stock during the Relevant Period;

(e)     Awarding Plaintiffs and the members of the Class rescission and/or rescissory

damages; and

(f)     Such other relief as this Court deems appropriate.

///

///

///

///

///

///

///

///

///

///

120

XI.    **DEMAND FOR JURY TRIAL**

Plaintiffs demand a trial by jury.

Dated:  February 23, 2009

BERNSTEIN LITOWITZ BERGER
& GROSSMANN LLP

*/s/ David R. Stickney*
DAVID R. STICKNEY

JOHN P. COFFEY
AVI JOSEFSON
1285 Avenue of the Americas, 38th Floor
New York, NY 10019
Tel:    (212) 554-1400
Fax:    (212) 554-1444
        -and-
DAVID R. STICKNEY
ELIZABETH P. LIN
DAVID A. THORPE
JON F. WORM
12481 High Bluff Drive, Suite 300
San Diego, CA 92130
Tel:    (858) 793-0070
Fax:    (858) 793-0323

*Co-Lead Counsel for Plaintiffs*

BARROWAY TOPAZ KESSLER
MELTZER & CHECK, LLP

*/s/ David Kessler*
DAVID KESSLER

DAVID KESSLER
JOHN A. KEHOE
BENJAMIN J. HINERFELD
MICHELLE M. NEWCOMER
RICHARD A. RUSSO, JR.
NICOLE BROWNING
280 King of Prussia Road
Radnor, PA 19087
Tel:    (610) 667-7706
Fax:    (610) 667-7056

*Co-Lead Counsel for Plaintiffs*

121

GIRARD GIBBS LLP
DANIEL C. GIRARD
JONATHAN K. LEVINE
AARON M. SHEANIN
CHRISTINA H. C. SHARP
601 California Street, 14th Floor
San Francisco, CA 94108
Tel:   (415) 981-4800
Fax:   (415) 981-4846

*Counsel for Plaintiffs Stephen A. Gott, Karim Kano, Ronald Profili and Grace Wang*

GRANT & EISENHOFER P.A.
JAY W. EISENHOFER
485 Lexington Avenue
New York, NY  10017
Tel:   (646) 722-8500
Fax:   (646) 722-8501

LAW OFFICES BERNARD M. GROSS P.C.
DEBORAH R. GROSS
100 Penn Square East, Suite 450
Philadelphia, PA  19107
Tel:   (215) 561-3600
Fax:   (215) 561-3000

*Counsel for Plaintiff Belmont Holdings Corp.*

SPECTOR ROSEMAN KODROFF
     & WILLIS, P.C.
ROBERT M. ROSEMAN (RR-1103)
ANDREW D. ABRAMOWITZ
DAVID FELDERMAN
RACHEL E. KOPP
1818 Market Street, Suite 2500
Philadelphia, PA 19103
Tel:   (215) 496-0300
Fax:   (215) 496-6611

*Counsel for Lead Plaintiff Northern Ireland Local Government Officers' Superannuation Committee*

LABATON SUCHAROW LLP
CHRISTOPHER J. KELLER
THOMAS A. DUBBS
ERIC J. BELFI
JONATHAN GARDNER
140 Broadway
New York, NY 10005
Tel:     (212) 907-0853
Fax:     (212) 818-0477

*Counsel for Lead Plaintiff City of Edinburgh
Council as Administering Authority of the Lothian
Pension Fund*

SAXENA WHITE P.A.
MAYA SAXENA
JOSEPH E. WHITE III
CHRISTOPHER S. JONES
LESTER R. HOOKER
2424 North Federal Highway, Suite 257
Boca Raton, FL 33431
Tel:     (561) 394-3399
Fax:     (561) 394-3382

*Counsel for Lead Plaintiff Operating Engineers
Local 3 Trust Fund, named Plaintiff Brockton
Contributory Retirement System, and named
Plaintiff Teamsters Allied Benefit Funds*

MURRAY, FRANK & SAILER LLP
MARVIN L. FRANK
EVA HROMADKOVA
275 Madison Ave, Suite 801
New York, NY 10016
Tel:     (212) 682-1818
Fax:     (212) 682-1892

*Counsel for Plaintiff Marsha Kosseff*

POMERANTZ HAUDEK BLOCK
  GROSSMAN & GROSS LLP
MARC I. GROSS
100 Park Avenue
New York, NY 10017
Tel:    (212) 661-1100
Fax:    (212) 661-8665

*Counsel for Plaintiff American European Insurance
Company*

COHEN MILSTEIN SELLERS & TOLL PLLC
STEVEN J. TOLL
JULIE G. REISER
1100 New York Avenue NW
Suite 500, West Tower
Washington, D.C. 20005
Tel:    (202) 408-4600
Fax:    (202) 408-4699
        -and-
CATHERINE A. TORRELL
150 East 52nd Street
New York, NY 10022
Tel:    (212) 838-7797
Fax:    (212) 838-7745
*Counsel for Plaintiff Inter-Local Pension Fund
Graphic Communications Conference of the
International Brotherhood of Teamsters*

BONNETT FAIRBOURN FRIEDMAN
  & BALINT, P.C.
ANDREW S. FRIEDMAN
2901 North Central Avenue, Suite 1000
Phoenix, AZ 85012
Tel:    (602) 274-1100
Fax:    (602) 274 1199

*Counsel for Plaintiff Zahniser Trust*

TIFFANY & BOSCO P.A.
RICHARD G. HIMELRICK
2525 East Camelback Road
Phoenix, AZ 85016
Tel:   (602) 255-6000
Fax:   (602) 255-0103

*Counsel for Plaintiff Zahniser Trust*

ZWERLING, SCHACHTER & ZWERLING, LLP
RICHARD A SPEIRS
41 Madison Avenue
New York, NY 10010
Tel:   (212) 223-3900
Fax:   (212) 371-5969

*Counsel for Plaintiffs Rick Fleischman and
Francisco Perez*

LAW OFFICES OF JAMES V. BASHIN, P.C.
JAMES V. BASHIAN
500 Fifth Avenue, Suite 2700
New York, NY 10110
Tel:   (212) 921-4100
Fax:   (212) 921-4229

*Counsel for Plaintiffs Island Medical Group and
Fred Telling*