**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE LEHMAN BROTHERS ERISA LITIGATION | Civil Action No.: 08 Civ. 5598 (LAK) |

**CONSOLIDATED AMENDED COMPLAINT FOR VIOLATIONS**
**OF THE EMPLOYEE RETIREMENT INCOME SECURITY ACT**

Plaintiffs Alex E. Rinehart, Monique Miller Fang, Jo Anne Buzzo, Maria DeSousa, and

Linda Demizio (collectively, the "Plaintiffs") allege the following based upon personal

information as to themselves and the investigation of Plaintiffs' counsel, which includes, among

other things, a review of U.S. Securities and Exchange Commission ("SEC") filings by Lehman

Brothers Holdings Inc. ("Lehman" or the "Company"), including the Company's proxy

statements (Forms DEF-14A), annual reports (Forms 10-K), quarterly reports (Forms 10-Q),

current reports (Forms 8-K), and the annual reports (Forms 11-K) filed on behalf of the Lehman

Brothers Savings Plan (the "Plan"); a review of the Forms 5500 filed by the Plan with the U.S.

Department of Labor ("DOL") and U.S. Department of the Treasury; interviews with former

employees of the Company; and a review of available documents governing the operations of the

Plan.

**I.    NATURE OF THE ACTION**

1.    This action is brought on behalf of the Plan and all Plan participants to recover

losses to the Plan for which Defendants are personally liable pursuant to Sections 409 and

502(a)(2) of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §§ 1109 and

1132(a)(2).  In addition, under ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), Plaintiffs seek other

equitable relief from Defendants, including, without limitation, injunctive relief and, as available under applicable law, constructive trust, restitution, equitable tracing, and other monetary relief.

2.     The Plan is a 401(k) retirement plan sponsored by the Company to provide Plan participants an easy and convenient way to save toward their retirement (LEHMAN-ERISA0000345).

3.     Plaintiffs' claims arise from the failure of Defendants, who were or are fiduciaries of the Plan, to act solely in the interest of the Plan and its participants and beneficiaries and to exercise the required skill, care, prudence, and diligence in administering the Plan and its assets during the period from September 13, 2006, to the present (the "Class Period").

4.     Throughout the Class Period, Defendants allowed the Plan to acquire and hold Lehman common stock ("Company Stock") through the Lehman Brothers Common Stock Fund ("Company Stock Fund"), which invested primarily in Company Stock, even as the Company headed for bankruptcy and even though they knew or should have known that Company Stock was an imprudent means of saving for retirement because, among other things: (i) the Company was exposed to catastrophic losses from trading in subprime mortgage backed derivatives, the nature and extent of which the Company failed to disclose fully; (ii) the Company was exposed to catastrophic losses from collateralized debt obligations, and had failed to timely write down its positions in these securities, the nature and extent of which the Company failed to disclose fully; (iii) the Company was exposed to catastrophic losses from mortgage backed security originations, and had failed to timely write down its positions in these securities, the nature and extent of which the Company failed to disclose fully; (iv) the Company had materially overvalued its positions in commercial and subprime mortgages, and in securities tied to these mortgages; (v) the Company had inadequate reserves for its mortgage and credit related

exposure; (vi) the Company was exposed to catastrophic losses from its investments in commercial real estate, and had failed to timely write down its positions in these securities, the nature and extent of which the Company failed to disclose fully; and (vii) the Company lacked adequate internal and financial controls.

5.    Defendants' breaches of fiduciary duty alleged herein unjustly enriched certain of the Plan's fiduciaries to the detriment of the Plan and its participants.  During the Class Period, while a significant portion of the Plan's assets were used to acquire and hold shares of Company Stock, certain Lehman directors and senior officers (including two Defendants herein) sold nearly $200 million of their own shares of Company Stock.

6.    Accordingly, Plaintiffs allege in Count I that certain Defendants, each having certain responsibilities regarding the management and investment of Plan assets, breached their fiduciary duties to the Plan and Plan participants by failing to prudently and loyally manage the Plan's investment in Company securities by, among other things, (i) continuing to offer Company Stock as a retirement saving option; (ii)  continuing to acquire and hold shares of Company Stock in the Plan when it was imprudent to do so; (iii) failing to provide complete and accurate information to Plan participants regarding the Company's financial condition and the prudence of investing in Company stock; and (iv) maintaining the Plan's pre-existing investment in Company Stock when Company Stock was no longer a prudent investment for the Plan.

7.    Defendants' actions and inactions conflicted with the express purpose of ERISA retirement plans, which is help provide funds for participants' retirement.  *See* ERISA § 2, 29 U.S.C. § 1001 ("Congressional Findings And Declaration Of Policy").

8.      In Count II, Plaintiffs allege that certain Defendants failed to avoid or ameliorate inherent conflicts of interests which crippled their ability to function as independent, "single-minded" fiduciaries with only the Plan's and its participants' best interests in mind.

9.      In Count III, Plaintiffs allege that the Director Defendants (defined below) breached their fiduciary duties by failing to adequately monitor other persons to whom management/administration of Plan assets was delegated, despite the fact that such defendants knew or should have known that such other fiduciaries were imprudently allowing the Plan to continue offering Company Stock as an investment option and investing Plan assets in Company Stock when it was no longer prudent to do so.

10.     As alleged below, Defendants responsible for selecting and monitoring the Plan's retirement savings options imprudently permitted the Plan to offer, acquire, and hold Company Stock during the Class Period despite the Company's serious mismanagement, improper business practices, and dire financial circumstances.  Defendants' breaches have caused the Plan and its participants to suffer millions of dollars in losses of retirement savings.

11.     ERISA §§ 409(a) and 502(a)(2), 29 U.S.C. §§ 1109 and 1132(a)(2), authorize participants, such as Plaintiffs, to sue in a representative capacity for losses suffered by the Plan as a result of breaches of fiduciary duty.  Pursuant to that authority, Plaintiffs bring this action as on behalf of the Plan and as a class action under Fed. R. Civ. P. 23 on behalf of all participants in the Plan whose Plan accounts were invested in the Company Stock Fund during the Class Period.

## II.    <u>JURISDICTION AND VENUE</u>

12.     The Court has subject-matter jurisdiction over this action pursuant to ERISA § 502(e)(1), 29 U.S.C. § 1132(e)(1), and 28 U.S.C. § 1331.

13.     ERISA provides for nationwide service of process.  ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2).  All Defendants are either residents of the United States or subject to service in the

United States. Therefore, the Court has personal jurisdiction over them. The Court also has personal jurisdiction over Defendants pursuant Fed. R. Civ. P. 4(k)(1)(A) because Defendants are all subject to the jurisdiction of a court of general jurisdiction in the State of New York.

14.     Venue is proper in this District pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because the Plan is administered in this District, some or all of the fiduciary breaches for which relief is sought occurred in this District, and Lehman has its principal place of business in this District.

## III.     PARTIES

### A.     Plaintiffs

15.     Plaintiff Alex E. Rinehart is a participant in the Plan, within the meaning of ERISA § 3(7), 29 U.S.C. § 1102(7), and held Company Stock in his individual Plan account during the Class Period.

16.     Plaintiff Monique Miller Fang is a participant in the Plan, within the meaning of ERISA § 3(7), 29 U.S.C. § 1102(7), and held Company Stock in her individual Plan account during the Class Period.

17.     Plaintiff Jo Anne Buzzo is a participant in the Plan, within the meaning of ERISA § 3(7), 29 U.S.C. § 1102(7), and held Company Stock in her individual Plan account during the Class Period.

18.     Plaintiff Maria DeSousa is a participant in the Plan, within the meaning of ERISA § 3(7), 29 U.S.C. § 1102(7), and held Company Stock in her individual Plan account during the Class Period.

19.     Plaintiff Linda Demizio is a participant in the Plan, within the meaning of ERISA § 3(7), 29 U.S.C. § 1102(7), and held Company Stock in her individual Plan account during the Class Period.

B.    **The Company**

20.    The Company, through predecessor entities, was founded in 1850.  For more than a century, Lehman and its predecessor entities served the financial needs of corporations, governments and municipalities, institutional clients, and high-net-worth individuals worldwide. The Company provided a full array of services in equity and fixed income sales, trading and research, investment banking, asset management, private investment management and private equity.  The Company's worldwide headquarters in New York and regional headquarters in London and Tokyo were complemented by a network of offices in North America, Europe, the Middle East, Latin America and the Asia Pacific region.  Through its subsidiaries, the Company was a global market-maker in all major equity and fixed income products.

21.    On September 15, 2008, Lehman filed a voluntary petition for relief under Chapter 11 of Title 11 of the United States Code in the United States Bankruptcy Court for the Southern District of New York captioned *In re Lehman Brothers Holdings Inc., et. al.*, Case Number 08-13555 (JMP).

22.    On September 17, 2008, NYSE Regulation, Inc. ("NYSE Regulation") announced the immediate suspension of trading of Company Stock on the New York Stock Exchange ("NYSE").  Shares of Lehman stock now trade over the counter for less than seven cents a share.

23.    Claims are not asserted against Lehman in this action because of the automatic stay of proceedings against it under Section 362(a) of the Bankruptcy Code, 11 U.S.C. § 362(a).

C.    **Defendants**

24.    All Defendants named below are fiduciaries of the Plan within the meaning of ERISA, and all Defendants breached their fiduciary duties in various ways, as is alleged herein.

(i)    **Director Defendants**

25.    ***Defendant Richard S. Fuld, Jr. ("Fuld")*** served as Chairman of the Board and Chief Executive Officer ("CEO") of Lehman during the Class Period.  Defendant Fuld was a fiduciary of the Plan, within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), in that he exercised discretionary authority with respect to the management and administration of the Plan and management or disposition of the Plan's assets.

26.    ***Defendant Michael L. Ainslie ("Ainslie")*** served as a director of Lehman during the Class Period.  Defendant Ainslie was a fiduciary of the Plan, within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), in that he exercised discretionary authority with respect to the management and administration of the Plan and management or disposition of the Plan's assets.

27.    ***Defendant John F. Akers ("Akers")*** served as a director of Lehman during the Class Period.  Defendant Akers was Chairman of the Compensation and Benefits Committee (the "Compensation Committee") during the Class Period.  Defendant Akers was a fiduciary of the Plan, within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), in that he exercised discretionary authority with respect to the management and administration of the Plan and management or disposition of the Plan's assets.

28.    ***Defendant Roger S. Berlind ("Berlind")*** served as a director of Lehman during the Class Period.  Defendant Berlind was a fiduciary of the Plan, within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), in that he exercised discretionary authority with respect to the management and administration of the Plan and management or disposition of the Plan's assets.

29.    ***Defendant Thomas H. Cruikshank ("Cruikshank")*** served as a director of Lehman during the Class Period.  Defendant Cruikshank was a fiduciary of the Plan, within the

meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), in that he exercised discretionary authority with respect to the management and administration of the Plan and management or disposition of the Plan's assets.

30.    *Defendant Marsha Johnson Evans ("Evans")* served as a director of Lehman. Defendant Evans was a fiduciary of the Plan, within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), in that she exercised discretionary authority with respect to the management and administration of the Plan and management or disposition of the Plan's assets. Defendant Evans is a member of the Compensation Committee.

31.    *Defendant Sir Christopher Gent ("Gent")* served as a director of Lehman during the Class Period.  Defendant Gent was a fiduciary of the Plan, within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), in that he exercised discretionary authority with respect to the management and administration of the Plan and management or disposition of the Plan's assets.  Defendant Gent is a member of the Compensation Committee.

32.    *Defendant Jerry A. Grundhofer ("Grundhofer")* served as a director of Lehman during the Class Period.  Defendant Grundhofer was a fiduciary of the Plan, within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), in that he exercised discretionary authority with respect to the management and administration of the Plan and management or disposition of the Plan's assets.

33.    *Defendant Roland A. Hernandez ("Hernandez")* served as a director of Lehman during the Class Period.  Defendant Hernandez was a fiduciary of the Plan, within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), in that he exercised discretionary authority with respect to the management and administration of the Plan and management or disposition of the Plan's assets.

34.     *Defendant Henry Kaufman ("Kaufman")* served as a director of Lehman during the Class Period.  Defendant Kaufman was a fiduciary of the Plan, within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), in that he exercised discretionary authority with respect to the management and administration of the Plan and management or disposition of the Plan's assets.

35.     *Defendant John D. Macomber ("Macomber")* served as a director of Lehman during the Class Period.  Defendant Macomber was a fiduciary of the Plan, within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), in that he exercised discretionary authority with respect to the management and administration of the Plan and management or disposition of the Plan's assets.  Defendant Macomber is a member of the Compensation Committee.

36.     Defendants Fuld, Ainslie, Akers, Berlind, Cruikshank, Evans, Gent, Grundhofer, Hernandez, Kaufman, and Macomber are collectively referred to herein as the "Director Defendants."

37.     The Director Defendants were fiduciaries of the Plan within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), in that they exercised discretionary authority with respect to the management and administration of the Plan and management or disposition of the Plan's assets.

38.     The Board of Directors of Lehman (the "Board") was ultimately responsible for monitoring and administering the Plan.  Because of their positions as directors of the Company, the Director Defendants had access to material, non-public information concerning Lehman, including the Company's true financial condition and outlook.  The Board had a responsibility to carry out its duties in such a manner as to best serve the interests of the Plan's participants.

39.    Further, as described below, the Board was a named fiduciary of the Plan under the Plan Document and was expressly authorized and empowered to appoint and remove the Benefit Committee members.  *See* Plan Document, Article X, Section 10.1 at LEHMAN-ERISA0000082.

(ii)    **The Compensation Committee Defendants**

40.    ***Defendant Compensation and Benefits Committee***.  The Board delegated Plan administration to the Compensation and Benefits Committee of the Board (the "Compensation Committee").  *See* Lehman Brothers Holdings Inc. Compensation and Benefits Committee of the Board of Directors Charter (the "Charter") at p. 1 ("The purpose of the Compensation and Benefits Committee (the 'Compensation Committee') shall be to:  . . .  [d]ischarge the responsibilities of the Board of Directors with respect to the Corporation's compensation and benefits programs and compensation of the Corporation's executives").

41.    The Compensation Committee and its members were and are fiduciaries of the Plan within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), in that they:  (i) were named fiduciaries of the Plan; and (ii) exercised discretionary authority with respect to the management and administration of the Plan and management or disposition of the Plan's assets.

42.    During the Class Period, the members of the Compensation Committee were as follows: (i) Defendant Akers served as Chair of the Compensation Committee during the Class Period; (ii) Defendant Evans was a member of the Compensation Committee during the Class Period; (iii) Defendant Gent was a member of the Compensation Committee during the Class Period; and (iv) Defendant Macomber was a member of the Compensation Committee during the Class Period.

43.     The Company, acting through the Benefit Committee (with respect to amendments) and the Compensation and Benefits Committee of the Board of Directors (with respect to either amendment or termination), reserves the right to amend, modify, suspend, or terminate the Plan at any time.  *See* Lehman Brothers Savings Plan – Summary Plan Description January 1, 2008 ("SPD") at 20 (LEHMAN-ERISA0000363).

### (iii)    Benefit Committee Defendants

44.     ***Defendant Lehman Brothers Holdings Inc. Employee Benefit Plans Committee***. The Plan is and was administered by the Lehman Brothers Holdings Inc. Employee Benefit Plans Committee ("Benefit Committee"), which is and was appointed by the Compensation Committee.  *See* SPD at 21 (LEHMAN-ERISA0000364).  The Benefit Committee has and had "complete authority and discretion to control and manage the operation and administration of the Plan."  *See* Plan Document, Article X, Section 10.1 (LEHMAN-ERISA0000082); *see also* SPD at 2 (LEHMAN-ERISA00000345).

45.     The Benefit Committee was designated the "Plan Administrator" under the Plan Document.

46.     The members of the Benefit Committee were appointed by, and served at the pleasure of, the Board or the Compensation Committee as its delegate.

47.     Throughout the Class Period, the Benefit Committee consisted of at least three members.  *See* Plan Document, Article X, Section 10.1 (LEHMAN-ERISA0000082).

48.     The Benefit Committee had full discretion and authority to make all decisions in connection with the administration of the Plan, including but not limited to decisions concerning eligibility to participate in the Plan and concerning benefits to which any Participant or

beneficiary is entitled, as well as with regard to Plan interpretation and determination of any fact under the Plan.  *See* SPD at 21 (LEHMAN-ERISA0000364).

49.    The Benefit Committee had all powers and discretion necessary or helpful for the carrying out its responsibilities, including the discretion and exclusive right to determine any question arising in connection with the interpretation, application, or administration of the Plan. *See* Plan Document, Article X, Section 10.2 (LEHMAN-ERISA0000075).

50.    Among other powers, the Benefit Committee had the power and discretion to:

(a)    determine all questions arising out or in connection with the provisions of the Plan or its administration, including, without limitation, the power and discretion to resolve ambiguities, to determine relevant facts, to rectify errors, and to supply omissions;

(b)    make rules and regulations for the administration of the Plan which are not inconsistent with the terms and provisions of the Plan;

(c)    construe all terms, provisions, conditions and limitations of the Plan;

(d)    determine all questions relating to the eligibility of persons to receive benefits hereunder, all other matters upon which the benefits or other rights of a Member or other person shall be based hereunder;

(e)    determine all questions relating to the administration of the Plan (1) when disputes arise between an Employer and a member or his Beneficiary, spouse or legal representatives, and (2) in order to promote the uniform administration of the Plan for the benefit of all parties concerned;

(f)    direct the Trustee as to the method by which and persons to whom benefits will be paid;

(g)    establish procedures for determining whether a domestic relations order is a qualified domestic relations order ("QDRO") as described in Section 7.12 and for complying with any such QDRO;

(h)     determine the method of making corrections necessary or advisable as a result of operating defects in order to preserve qualification of the Plan under Section 401(a) of the Code pursuant to procedures of the Internal Revenue Service applicable in such cases (such as those set forth in Revenue Procedure 2006-27 and similar guidance);

(i)     compromise or settle claims against the Plan and direct the Trustee to pay amounts required in any such settlements or compromise;

(j)     appoint an Administrator and delegate to such Administrator those tasks of recordkeeping, Plan valuation, communication with Members, and other such ministerial and administrative tasks as the Committee deems appropriate; and

(k)     exercise, in its capacity as named fiduciary under the Plan all discretion that the Trust Agreement or any other contract with the Administrator provides shall or may be exercised by the Company.

*See* Plan Document, Article X, Section 10.2 (LEHMAN-ERISA0000075-76).

51.     Further, the Benefit Committee was a named fiduciary with respect to control or management of the assets of the Plan, and had the following authority:

(a)     to appoint an investment manager or managers (within the meaning of Section 3(38) of the Act) to manage (including the power to acquire and dispose of) any assets of the Plan), and

(b)     to direct the Trustee with respect to the management of assets of the Plan not subject to the authority of such an investment manager (including, without limitation, the selection of such mutual funds or other investment options as it may deem appropriate to carry out the investment objectives of each of the respective Investment Funds established by the Committee as provided in Section 9.2).

*See* Plan Document, Article X, Section 10.12 (LEHMAN-ERISA0000085-86).

52.     In addition to the foregoing, under the Plan Document, the Benefit Committee also had exclusive fiduciary responsibility for determining whether Plan provisions requiring the establishment and maintenance of the Company Stock Fund should continue to be given effect in

accordance with their terms as required by ERISA § 401(a)(1)(D), 29 U.S.C. § 1101(a)(1)(D), or whether such provisions were inconsistent with ERISA to any extent, including in particular the fiduciary duty rules of ERISA §§ 404(a)(1) and (a)(2), 29 U.S.C. §§ 1104(a)(1) and (2). *See id.*

53.    As a named fiduciary, the Benefit Committee had full and exclusive responsibility for monitoring, with the requisite prudence, diligence, skill and care required thereby, the suitability of acquiring and holding Company Stock within the meaning of the fiduciary duty rules of section ERISA §§ 404(a)(1) and (a)(2). *See* Trust, RecordKeeping and Administrative Services Agreement between Lehman Brothers Holdings Inc. and Fidelity Management Trust Company – Lehman Brothers Savings Plan Trust (the "Trust Agreement"), Section 5(e)(ii)(A) (LEHMAN-ERISA00000203).

54.    As a named fiduciary, the Benefit Committee also was responsible for filing all reports required under Federal or state securities laws with respect to the Trust's ownership of Company Stock, including, without limitation, any reports required under section 13 or 16 of the Securities Exchange Act of 1934 ("Exchange Act"). *See* Trust Agreement, Section 5(e)(v) (LEHMAN-ERISA00000205).

55.    As a named fiduciary, the Benefit Committee was responsible for notifying the Trustee in writing of any requirement to stop purchases or sales of Company Stock pending the filing of any report required by law or otherwise. *See id*.

56.    ***Defendant Wendy M. Uvino ("Uvino")*** served as the Chair of the Benefit Committee during the Class Period. Defendant Uvino was a Senior Vice President and Global Head of Lehman's employee benefits functions during the Class Period. In her role, defendant Uvino managed all aspects of the benefits programs and oversaw the Human Resources data management functions. Defendant Uvino signed the Plan's 2006 and 2007 Form 11-Ks (filed on

June 29, 2007 and June 26, 2008, respectively) as the Chairperson of the Benefit Committee.

Defendant Uvino also signed the Form 5500 for year ended 2006. Defendant Uvino was a

fiduciary of the Plan, within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), in that

she was a named fiduciary and exercised discretionary authority with respect to the management

and administration of the Plan and management or disposition of the Plan's assets.

(iv)    **Additional "John Doe" Defendants**

57.    Without limitation, unknown *"John Doe" Defendants 1-10* include other

individuals, including members of the Benefit and Compensation committees, directors of

Lehman, as well as other Company officers and employees who are or were fiduciaries of the

Plan, within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), during the Class

Period. The identities of the John Doe Defendants are currently unknown to Plaintiffs; once their

identities are ascertained, Plaintiffs will seek leave to join them to the instant action under their

true names.

## IV.    THE PLAN

58.    The Plan is an employee pension benefit plan, as defined by ERISA § 3(2)(A), 29

U.S.C. § 1002(2)(A). Specifically, the Plan is a defined contribution plan within the meaning of

ERISA § 3(34), 29 U.S.C. § 1002(34). The Plan is a legal entity that can sue and be sued.

ERISA § 502(d)(1), 29 U.S.C. § 1132(d)(1). However, the Plan is not a party in an action for

breach of fiduciary duty such as this. Rather, pursuant to ERISA § 409, 29 U.S.C. § 1109, and

the law interpreting it, the relief requested in this action is for the benefit of the Plan and its

participants and beneficiaries.

59.    The assets of an employee benefit plan, such as the Plan here, must be "held in

trust by one or more trustees." ERISA § 403(a), 29 U.S.C. § 1103(a). During the Class Period,

the assets of the Plan were held in trust by the Plan Trustee, Fidelity Management Trust

15

Company.  *See* SPD at 22 (LEHMAN-ERISA0000365); 2007 Form 11-K at 6; Trust Agreement at 6 (LEHMAN-ERISA0000197).

60.     The Plan, formerly known as the Lehman Brothers Holdings Inc. Tax Deferred Savings Plan, was adopted effective January 1, 1984, as the Shearson Lehman Brothers Holdings Inc. Tax Deferred Savings Plan.

61.     As stated in the Summary Plan Document, the purpose the Plan was and is to help participants plan for retirement.  *See* SPD at 2 (LEHMAN-ERISA00000345) ("The Lehman Brothers Savings Plan ('Plan') is a 401(k) plan that provides you with an easy and convenient way to save toward your retirement.")

62.     Employees were and are eligible to participate in the Plan immediately upon their hire date, if the employee is paid on an hourly, salaried, or commission basis, except if (1) the employee is employed outside of the United States, unless the employee is paid through a U.S. based payroll in U.S. dollars, (2) the employee is employed in a special purpose program (such as student intern), (3) the employee does not have a valid Social Security Number, or (4) the employee is a leased employee, or the employee performs services for an Employer under an arrangement in which the employee is treated as a consultant, an independent contractor or an employee of another entity.   *See* SPD at 3 (LEHMAN-ERISA0000346); *see also* Plan Document, Article II, Section 2.1 (LEHMAN-ERISA0000025).

63.     Plan participants have multiple accounts under the Plan, each containing a specific type of contribution;

- Before-Tax Account and Catch-up Contributions Account ("Before-Tax Accounts");
- Roth 401(k) Account and Roth Catch-up Contributions Account ("Roth Accounts");
- Employer Contributions Account Rollover Account
- After-Tax; and

• Rollover Account.

*See* SPD at 3 (LEHMAN-ERISA0000346).

64.    The Plan has invested in Company Stock through the Company Stock Fund. Investment in the Company Stock Fund consists exclusively of (i) shares of Company Stock and (ii) such cash or short-term fixed income investments.  *See* Trust Agreement, Section 5(e) (LEHMAN-ERISA0000201); Plan Document, Section 8.3(a) ((LEHMAN-ERISA000076).

65.    Throughout the Class Period, Plan participants were permitted to contribute a whole percentage of their pay, up to 50 percent (50%) for investment in the Plan.  *See* Plan Document § 3.1(a) (LEHMAN-ERISA0000027); *see also See* SPD January 1, 2006 at 3 ("You can contribute between 1% and 50% (in 1% increments) of your Pay to the Plan as Regular Before-Tax Contributions.  You must select the percentage of your Pay you wish to contribute in each payroll period and specify the investment fund(s) in which you want your contributions invested").

66.    During the Class Period, Plan participants were permitted to allocate up to 50 percent (50%) of their Plan contributions to the Company Stock Fund in the Plan.  Beginning on January 1, 2008, however, Plan participants were permitted to allocate no more than 20 percent (20%) of their Plan contributions to the Company Stock Fund in the Plan.  Pursuant to the Plan Document, Article VII, § 6.1(c):

> Company Stock Fund Limitations.  A Participant shall not be entitled to direct investment in the Company Stock Fund of (i) more than fifty percent (50%) of his or her Section 401 (k) Contributions prior to such pay date as of which the Committee determines that the procedures necessary to implement the reduced limit set forth in clause (ii) hereof are in place (the "New Limit Effective Date"), or (ii) more than twenty percent (20%) of the total of his or her Section 401(k) Contributions as of any pay date on or after the New Limit Effective Date (or after January 1, 2008, in the case of a Participant's initial election for the investment of

Section 401(k) Contributions). In the event that a Participant's investment election for the allocation of Section 401(k) Contributions exceeded the 20% limit in clause (ii) prior to the New Limit Effective Date and the Participant fails to make a new investment election compliant with such 20% limit by the deadline established by the Committee, the excess of his or her Section 401(k) Contributions for pay dates on and after the New Limit Effective Date shall be invested in such other Investment Fund as the Committee shall direct, until such time as the Participant shall make a new election or new elections compliant with such 20% limit. The limitations of this Section 6.l(c) shall also apply to initial elections for the investment of Rollover Contributions (and the date of such contribution shall be treated as a pay date in applying the New Limit Effective Date).

67.     Throughout the Class Period, the Plan Document expressly authorized the Benefit

Committee to limit, curtail, or eliminate altogether Plan participants' allocation of their Plan

contributions to the Company Stock Fund to permit the Benefit Committee members to comply

with their fiduciary duties under ERISA §§ 404(a)(1) and (a)(2), 29 U.S.C. §§ 1004(a)(1) and

(a)(2).

68.     Pursuant to Section 6.3(a) of the Plan Document, the Company made matching

contributions:

Basic and Matching Contributions. Effective for Plan Years ending on or after December 31, 2007, Basic and Matching Contributions for Plan Years ending after the Spinoff Date and prior to December 31, 2007 shall be invested in the Company Stock Fund, subject to the Member's right thereafter to elect transfers out of the Company Stock Fund in accordance with Section 6.2(a). Basic and Matching Contributions for Plan Years ending December 31, 2007 and thereafter shall be invested in accordance with the Participant's current election on file for the investment of Section 401(k) Contributions or, if no such election shall be on file, in the Investment Fund or Funds designated from time to time by the Committee.

*See* Plan Document, Section 6.3(a) (LEHMAN-ERISA0000054).

69.     Thus, for the 2006 Plan year, Company contributions were made in cash, which

was invested entirely in the Company Stock Fund. For the 2007 Plan year, Company

contributions were made in cash, and were invested in accordance with the participant's elections for their employee contributions. *See* Form 11-K for the year ended December 31, 2007 (LEHMAN-ERISA0000328).

70.     The Company Stock Fund is one of the investment options available for Plan participants. In its 2007 Form 11-K, filed on June 26, 2008, Lehman reported that the Plan had approximately $228,691,000 invested in the Company Stock Fund as of December 31, 2007, when Company Stock was trading at $65.44 per share. Upon information and belief, the Plan does not prohibit or limit the ability of Plan fiduciaries to remove any investment option or divest assets invested in any investment option as prudence dictates.

71.     Plan participants are 100% vested in their own contributions and Company matching contributions upon completion of three (3) years of vesting service. *See* Plan Document, Article VII, § 7.1.1 (LEHMAN-ERISA0000057) ("[a] Member shall have a fully vested and non-forfeitable interest in the portion of his Employer Contributions Account attributable to Basic and Matching Contributions for Plan Years beginning on and after January 1, 2005 upon completion of three Years of Vesting Service, or death while employed by an Employer or Affiliate").

72.     The following documents, previously filed by the Company with the SEC pursuant to the Exchange Act, are incorporated by reference into the SPD:

> The Company's Annual Report on Form 10-K for the fiscal year ended November 30, 2006, filed with the Commission on February 13, 2007 pursuant to Section 13 or 15(d) of the Exchange Act, the Company's Quarterly Report on Form 10-Q for the quarterly period ended August 31, 2006, filed with the Commission on October 10, 2006 pursuant to Section 13 or 15(d) of the Exchange Act; the Company's Quarterly Report on Form 10-Q for the quarterly period ended May 31, 2006, filed with the Commission on July 10, 2006 pursuant to Section 13 or 15(d) of the Exchange Act; the Company's Quarterly Report on Form 10-Q for the

quarterly period ended February 28, 2006, filed with the Commission on April 10, 2006 pursuant to Section 13 or 15(d) of the Exchange Act; the Company's Current Report on Form 8-K, filed with the Commission on February 2, 2007 pursuant to Section 13 or 15(d) of the Exchange Act, the Company's Current Report on Form 8-K, filed with the Commission on February 9, 2007 pursuant to Section 13 or 15(d) of the Exchange Act; the Company's Current Report on Form 8-K, filed with the Commission on February 2, 2007 pursuant to Section 13 or 15(d) of the Exchange Act; the Company's Current Report on Form 8-K, filed with the Commission on January 31, 2007 pursuant to Section 13 or 15(d) of the Exchange Act; the Company's Current Report on Form 8-K, filed with the Commission on January 19, 2007 pursuant to Section 13 or 15(d) of the Exchange Act; the Company's Current Report on Form 8-K, filed with the Commission on December 29, 2006 pursuant to Section 13 or 15(d) of the Exchange Act; the Company's Current Report on Form 8-K, filed with the Commission on December 28, 2006 pursuant to Section 13 or 15(d) of the Exchange Act; the Company's Current Report on Form 8-K, filed with the Commission on December 27, 2006 pursuant to Section 13 or 15(d) of the Exchange Act; the Company's Current Report on Form 8-K, filed with the Commission on December 21 2006 pursuant to Section 13 or 15(d) of the Exchange Act; the Company's Current Report on Form 8-K, filed with the Commission on December 14, 2006 pursuant to Section 13 or 15(d) of the Exchange Act; the Company's Current Report on Form 8-K, filed with the Commission on December 12, 2006 pursuant to Section 13 or 15(d) of the Exchange Act; the Company's Current Report on Form 8-K, filed with the Commission on December 7, 2006 pursuant to Section 13 or 15(d) of the Exchange Act; the Company's Current Report on Form 8-K, filed with the Commission on December 4, 2006 pursuant to Section 13 or 15(d) of the Exchange Act; the Company's Current Report on Form 8-K, filed with the Commission on December I, 2006 pursuant to Section 13 or 15(d) of the Exchange Act; the Company's Current Report on Form 8-K, filed with the Commission on November 22, 2006 pursuant to Section 13 or 15(d) of the Exchange Act; the Company's Current Report on Form 8-K, filed with the Commission on November 13, 2006 pursuant to Section 13 or 15(d) of the Exchange Act; the Company's Current Report on Form 8-K, filed with the Commission on October 30, 2006 pursuant to Section 13 or 15(d) of the Exchange Act; the Company's Current Report on Form 8-K, filed with the Commission on October 27, 2006 pursuant to Section 13 or 15(d) of the Exchange Act; the Company's Current

Report on Form 8-K, filed with the Commission on October 25, 2006 pursuant to Section 13 or 15(d) of the Exchange Act; the Company's Current Report on Form 8-K, filed with the Commission on October 24, 2006 pursuant to Section 13 or 15(d) of the Exchange Act; the Company's Current Report on Form 8-K, filed with the Commission on October 2, 2006 pursuant to Section 13 or 15(d) of the Exchange Act; the Company's Current Report on Form 8-K, filed with the Commission on September 15, 2006 pursuant to Section 13 or 15(d) of the Exchange Act; the Company's Current Report on Form 8-K, filed with the Commission on September 13, 2006 pursuant to Section 13 or 15(d) of the Exchange Act; the Company's Current Report on Form 8-K, filed with the Commission on August 30, 2006 pursuant to Section 13 or 15(d) of the Exchange Act; the Company's Current Report on Form 8-K, filed with the Commission on August 16, 2006 pursuant to Section 13 or 15(d) of the Exchange Act; the Company's Current Report on Form 8-K, filed with the Commission on August 3, 2006 pursuant to Section 13 or 15(d) of the Exchange Act; the Company's Current Report on Form 8-K, filed with the Commission on July 26, 2006 pursuant to Section 13 or 15(d) of the Exchange Act; the Company's Current Report on Form 8-K, filed with the Commission on July 21, 2006 pursuant to Section 13 or 15(d) of the Exchange Act; the Company's Current Report on Form 8-K, filed with the Commission on July 3, 2006 pursuant to Section 13 or 15(d) of the Exchange Act; the Company's Current Report on Form 8-K, filed with the Commission on January 30, 2004 pursuant to Section 13 or 15(d) of the Exchange Act; the Company's Current Report on Form 8-K, filed with the Commission on June 29, 2006 pursuant to Section 13 or 15(d) of the Exchange Act; the Company's Current Report on Form 8-K, filed with the Commission on June 12, 2006 pursuant to Section 13 or 15(d) of the Exchange Act; the Company's Current Report on Form 8-K, filed with the Commission on May 31, 2006 pursuant to Section 13 or 15(d) of the Exchange Act; the Company's Current Report on Form 8-K, filed with the Commission on May 30, 2006 pursuant to Section 13 or 15(d) of the Exchange Act; the Company's Current Report on Form 8-K, filed with the Commission on May 24, 2006 pursuant to Section 13 or 15(d) of the Exchange Act; the Company's Current Report on Form 8-K, filed with the Commission on May 3, 2006 pursuant to Section 13 or 15(d) of the Exchange Act; the Company's Current Report on Form 8-K, filed with the Commission on April 25, 2006 pursuant to Section 13 or 15(d) of the Exchange Act; the Company's Current Report on Form 8-K, filed with the Commission on April 4, 2006 pursuant to Section 13 or 15(d) of the Exchange Act; the Company's Current Report on Form 8-K,

filed with the Commission on March 31, 2006 pursuant to Section 13 or 15(d) of the Exchange Act; the Company's Current Report on Form 8-K, filed with the Commission on March 31, 2006 pursuant to Section 13 or 15(d) of the Exchange Act; the Company's Current Report on Form 8-K, filed with the Commission on March 28, 2006 pursuant to Section 13 or 15(d) of the Exchange Act; the Company's Current Report on Form 8-K, filed with the Commission on March 24, 2006 pursuant to Section 13 or 15(d) of the Exchange Act; the Company's Current Report on Form 8-K, filed with the Commission on March 16, 2006 pursuant to Section 13 or 15(d) of the Exchange Act; the Company's Current Report on Form 8-K, filed with the Commission on March 15, 2006 pursuant to Section 13 or 15(d) of the Exchange Act; the Company's Current Report on Form 8-K, filed with the Commission on March 10, 2006 pursuant to Section 13 or 15(d) of the Exchange Act; the Company's Current Report on Form 8-K, filed with the Commission on March 10, 2006 pursuant to Section 13 or 15(d) of the Exchange Act; the Company's Current Report on Form 8-K, filed with the Commission on March 3, 2006 pursuant to Section 13 or 15(d) of the Exchange Act; the Company's Current Report on Form 8-K, filed with the Commission on February 28, 2006 pursuant to Section 13 or 15(d) of the Exchange Act; the Company's Current Report on Form 8-K, filed with the Commission on February 21, 2006 pursuant to Section 13 or 15(d) of the Exchange Act; the Company's Current Report on Form 8-K, filed with the Commission on February 10, 2006 pursuant to Section 13 or 15(d) of the Exchange Act; the Company's Current Report on Form 8-K, filed with the Commission on January 26, 2006 pursuant to Section 13 or 15(d) of the Exchange Act; the Company's Current Report on Form 8-K, filed with the Commission on January 23, 2006 pursuant to Section 13 or 15(d) of the Exchange Act; the Company's Current Report on Form 8-K, filed with the Commission on January 17, 2006 pursuant to Section 13 or 15(d) of the Exchange Act.

*See* SPD at 22-23 (LEHMAN-ERISA0000365-367).

73.     Certain other documents, filed by the Company with the SEC pursuant to the Exchange Act after publication of the SPD, also were incorporated by reference into the SPD:

In addition, each other document filed by the Company or by the Plan pursuant to Section 13(a), 13(c), 14 or 15(d) of the Exchange Act after the date of this booklet and prior to the termination of the Company's offering of Plan interests and common stock in connection with the Plan shall be automatically incorporated by

> reference into this booklet and constitute part of the aforementioned prospectus from the date of filing of such document. In the event of any inconsistency between any information in this booklet and any document incorporated by reference, the latest information shall prevail and shall be deemed to replace any prior inconsistent information.

*Id*.

## V.     **DEFENDANTS' FIDUCIARY STATUS**

### A.     **The Nature of Fiduciary Status**

74.     **Named Fiduciaries**.  ERISA requires every plan to have one or more "named fiduciaries."  ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1).  The person named as the "administrator" in the plan instrument is automatically a named fiduciary, and in the absence of such a designation, the sponsor is the administrator.  ERISA § 3(16)(A), 29 U.S.C. § 1002(16)(A).

75.     **De Facto Fiduciaries**.  ERISA treats as fiduciaries not only persons explicitly named as fiduciaries under § 402(a)(1), but also any other persons who in fact perform fiduciary functions.  *See* ERISA § 3(21)(A)(i), 29 U.S.C. § 1002(21)(A)(i).  Thus, a person is a fiduciary to the extent "(i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan."  *Id*.

76.     Each Defendant was a fiduciary with respect to the Plan and owed fiduciary duties to the Plan and the participants in the manner and to the extent set forth in the Plan's documents, under ERISA, and through their conduct.

77.    As fiduciaries, Defendants were required by ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1), to manage and administer the Plan and the Plan's investments solely in the interest of the Plan participants and beneficiaries and with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.

78.    Plaintiffs do not allege that each defendant was a fiduciary with respect to all aspects of the Plan's management and administration.  Rather, as set forth below, Defendants were fiduciaries to the extent of the fiduciary discretion and authority assigned to or exercised by each of them, and the claims against each defendant are based on such specific discretion and authority.

79.    Instead of delegating all fiduciary responsibility for the Plan to external service providers, Lehman chose to assign the appointment and removal of fiduciaries to itself and the other Defendants named herein.  These persons and entities in turn selected Lehman employees, officers and agents to perform most fiduciary functions.

80.    ERISA permits fiduciary functions to be delegated to insiders without an automatic violation of the rules against prohibited transactions.  ERISA § 408(c)(3), 29 U.S.C. § 1108(c)(3).  However, insider fiduciaries, like external fiduciaries, must act solely in the interest of participants and beneficiaries, not in the interest of the Plan sponsor.

**B.    Director Defendants' Fiduciary Status**

81.    Lehman, as a corporate entity, cannot act on its own without any human counterpart.  In this regard, during the Class Period, Lehman relied directly on the Director Defendants to carry out their fiduciary responsibilities under the Plan and ERISA.

82.    The Director Defendants were responsible for appointing, and hence monitoring, and removing, the members of the following committees: (1) the Benefit Plans Committee, *see*

SPD at 20 (LEHMAN-ERISA0000364) ("The Plan is administered by the Employee Benefit Plans Committee (called the 'Committee' in this booklet) which is appointed by the Compensation and Benefits Committee of the Board of Directors of Lehman Brothers Holdings Inc."); and (2) the Compensation Committee, *see* Charter at 1-2 ("Members of the Compensation Committee shall be appointed by the Board of Directors, and each member shall serve until a successor is duly elected and qualified or until earlier resignation or removal. The members of the Compensation Committee may be removed, with or without cause, by a majority vote of the Board of Directors"). Thus, according to DOL regulations, the Director Defendants exercised a fiduciary function under ERISA. 29 C.F.R. § 2509.75-8 (D-4).

83. Additionally, the Board had the following discretion:

> The Board of Directors or any other person or persons entitled to act as the representative of the Company exercising the rights of the Company as settlor and plan sponsor. The persons acting as the Committee or, to the extent determined by such persons, any member or members of the Committee designated by such persons, shall be the Company Representative, except to the extent the Board of Directors determines otherwise or designates other person(s) (by name or position) to be Company Representative for any or all of such purposes.

*See* Plan Document § 1.15 - Company Representative (LEHMAN-ERISA0000012).

84. Further, each of the Director Defendants exercised his or her discretionary authority with respect to the Plan by determining or participating in decisions about the substantive content of Lehman's SEC filings, which, on information and belief, were incorporated by reference into the SPD, Prospectus and Form S-8 registration statements. Such filings were intended to communicate to Plan participants information necessary for them to manage their retirement benefits under the Plan.

85. Consequently, in light of the foregoing duties, responsibilities and actions, the Director Defendants were *de facto* fiduciaries of the Plan within the meaning of ERISA § 3(21),

29 U.S.C. § 1002(21), during the Class Period in that they exercised discretionary authority or discretionary control respecting management of the Plan, exercised authority or control respecting management or disposition of the Plan's assets, and had discretionary authority or discretionary responsibility in the administration of the Plan.

### C.    Compensation Committee Defendants' Fiduciary Status

86.    The Compensation Committee has the following powers and duties:

- Oversee evaluation of the Corporation's management;
- Discharge the responsibilities of the Board of Directors with respect to the Corporation's compensation **and benefits programs** and compensation of the Corporation's executives; and
- Produce an annual Compensation Committee report for inclusion in the Corporation's annual proxy statement, in accordance with applicable rules and regulations of the New York Stock Exchange, Inc. ("NYSE"), Securities and Exchange Commission ("SEC") and other regulatory bodies.

*See* Charter at 1 [Emphasis added].

87.    Additionally, the Compensation Committee had the discretion to appoint the members of the Benefit Committee. *See* SPD at 21 (LEHMAN-ERISA0000364).

88.    The Compensation Committee also had the discretion to amend, modify, suspend, or terminate the Plan at any time. *See* SPD at 20 (LEHMAN-ERISA0000363).

89.    Consequently, in light of the foregoing duties, responsibilities, and actions, the Compensation Committee Defendants were named fiduciaries of the Plan pursuant to ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1), or *de facto* fiduciaries within the meaning of ERISA § 3(21), 29 U.S.C. § 1002(21), during the Class Period in that they exercised discretionary authority or discretionary control respecting management of the Plan, exercised authority or control

respecting management or disposition of the Plan's assets, and had discretionary authority or discretionary responsibility in the administration of the Plan.

      **D.**      **The Benefit Committee Defendants' Fiduciary Status**

      90.     The Benefit Committee has the following powers and duties:

> The Committee shall be the "Named Fiduciary" with respect to control or management of the assets of the Plan, and shall have authority (a) to appoint an investment manager or managers (within the meaning of Section 3(38) of the Act) to manage (including the power to acquire and dispose of) any assets of the Plan), and (b) to direct the Trustee with respect to the management of assets of the Plan not subject to the authority of such an investment manager (including, without limitation, the selection of such mutual funds or other investment options as it may deem appropriate to carry out the investment objectives of each of the , respective Investment Funds established by the Committee as provided in Section 9.2). Without limiting the generality of the foregoing, the Committee as such Named Fiduciary shall have exclusive responsibility for determining whether the Plan provisions requiring the establishment and maintenance of the Company Stock Fund (and the American Express Stock Fund until January 31, 2007) may continue to be given effect in accordance with their terms as required by Section 401(a)(1)(D) of the Act, or whether such provisions are to any extent inconsistent with applicable requirements of the Act, including in particular the fiduciary duty rules of Section 404(a)(1) of the Act as modified by Section 404(a)(2) of the Act; and no other fiduciary of the Plan shall have responsibility therefor.

      91.     The Benefit Committee also had the power and discretion to amend the Plan at any time. *See* SPD at 20 (LEHMAN-ERISA0000363).

      92.     Consequently, the Benefit Committee Defendants were named fiduciaries of the Plan pursuant to ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1), or *de facto* fiduciaries within the meaning of ERISA § 3(21), 29 U.S.C. § 1002(21), during the Class Period in that they exercised discretionary authority or discretionary control respecting management of the Plan, exercised authority or control respecting management or disposition of the Plan's assets, and had discretionary authority or discretionary responsibility in the administration of the Plan.

## VI.    FACTUAL BACKGROUND TO BREACHES OF FIDUCIARY DUTY

### A.    Background Of The Subprime Industry

93.    Subprime lending is the practice of making mortgage loans to persons who are generally unable to access credit from traditional financial institutions.  This is because the borrowers do not satisfy income, credit, documentation, or other underwriting standards mandated by traditional mortgage lenders and loan buyers, which typically lend only to more credit-worthy borrowers.

94.    Because subprime borrowers are seen as "higher risk," their loans carry interest rates that are at least two percentage points higher than those offered to borrowers with better credit.  So, for example, while a credit-worthy borrower could obtain a mortgage at 5% interest, the same mortgage would cost a subprime customer 7% interest or more.

95.    Instead of holding mortgage loans themselves, lenders generally sold subprime mortgages bundled with other mortgages into pools of securities.  These mortgage-backed securities were offered for sale to institutional and individual investors.

96.    In *The Impact Of Securitization On The Emergency Economic Stabilization Act Of 2008* (October 2, 2008), Talcott J. Franklin explained the process by which mortgage-backed securities are created:

> The process by which mortgage-backed securities are created begins when a Borrower obtains a loan from a Lender.  The Lender sells that loan to a Purchaser.  The Purchaser generally holds the loan for a period of weeks or months, and then sells the loan to a Depositor, who immediately deposits that loan (and many other loans) into the Trust.  The Trust is administered by a Servicer (who is the face of the Trust with the Borrowers) and a Trustee (who is the face of the Trust with the investors, typically called Certificateholders).  Once the loans are sold into the Trust, Borrowers begin making their payments to the Servicer, who sends those payments to the Trustee.  The Trustee then distributes those payments to the Certificateholders based on a pre-established priority of payment.

28

97.     The following simplified graphic generally depicts how mortgage loans are originated, purchased and sold, in order to create mortgage backed securities:[1]



98.     Often, the cash flow from these mortgage backed securities supported a second investment, called a collateralized debt obligation ("CDO").  *Id.*  A CDO is an investment-grade derivative security backed by a pool of bonds, loans, or other assets, such as mortgages.  Rights to the CDO's cash flow is typically divided into a number of tranches rated by credit risks, with the lower tranches offering higher premiums to compensate for the higher risk assumed, and vice versa.

99.     In essence, issuers like Lehman and others created instruments that appeared to be investment grade out of what was essentially subprime paper.  Ultimately, the purchasers of even

---

[1] Printed with permission from the interactive supplement to Talcott J. Franklin & Thomas F. Nealon III, Mortgage and Asset Backed Securities Litigation Handbook (Thomson West).

these supposedly safe, triple-A-rated CDO tranches found their investments tainted by the poisonous subprime loans, which began to default at alarming rates during the Class Period.

100.    Such a system works best if the underlying asset backed securities held by the CDO are uncorrelated – that is, if they are unlikely to go bad all at once.  CDOs holding only subprime investments (*e.g.*, notes, bonds, or other instruments dependent upon mortgages for their value) were highly correlated because they held only subprime securities and were therefore vulnerable to a rise in defaults on subprime mortgage loans.  However, because of the high yields on subprime mortgages, they were very attractive for investment banks creating CDOs.  *See* FDIC Outlook, A New Plateau for the U.S. Securitization Market, available at http://www.fdic.gov/bank/analytical/regional/ro20063q/na/2006_fall01.html.

101.    One type of CDO is a "cash" CDO.  A cash CDO represents real credit-sensitive assets (*e.g.*, bonds or loans) which are sold.  This can be done for a number of reasons, including to remove assets from the originator's balance sheet, to receive cash by monetizing assets, or to transfer risk.

102.    Another type of CDO is a "synthetic" CDO.  Synthetic CDOs are inherently riskier than cash CDOs, as they do not represent real cash assets like bonds or loans.  Instead, synthetic CDOs add credit exposure to a portfolio of fixed income assets, without owning those assets, through the use of credit derivatives such as credit default swaps.  Mark P. Zimmett, *A Primer on the ABCs of CDO Litigation*, 239 N.Y.L.J. 62 (2008).

103.    In essence, synthetic CDOs are simply ***wagers*** on the performance of other assets, like subprime mortgages.

104.    In the event of default of a cash CDO, there are assets that can be sold to offset any loss.  By contrast, for a synthetic CDO using credit default swaps, credit protection is offered

by the seller of the swap, who receives periodic cash payments, called premiums, in exchange for agreeing to assume the risk of loss on a specific asset in the event that asset experiences a default or other credit event. In the event of a synthetic CDO default, the swap is exercised and the loss is borne by the credit protection seller.

105.    In short, credit default swaps are a form of unregulated insurance. Unlike traditional insurance, however, credit default swaps carry a significant risk factor. In a typical insurance policy, the seller is required to have capital reserves to be able to pay in case the insurance is called upon or triggered. However, in the case of credit default swaps, there is no similar requirement that adequate capital reserves be put to the side. Credit default swaps are privately negotiated contracts that are "traded over the counter," meaning they are not regulated by a public exchange, and they are an investment vehicle in their own right, unrelated to the synthetic CDOs.

106.    Moreover, while credit default swaps give speculators a means of earning large profits from changes in a company's credit quality, sellers of credit default swaps (like Lehman) effectively have an unfunded exposure to the risk of default on the underlying debt instruments.

107.    When a company participates in the credit derivatives market, it increases its exposure to credit and liquidity risk. Credit risk refers to the risk of loss arising from the default by a borrower, counterparty, or other obligor when it is unable or unwilling to meet its obligations. Liquidity and funding risk refers to the risk that the company will be unable to finance its operations due to a loss of access to the capital markets or difficulty in liquidating its assets.

108.    Furthermore, because they were little more than "side bets," the value of many credit derivatives now far exceeds the value of the underlying instruments they protect.

109.    On October 18, 2008, Cristopher Cox, Chairman of the SEC, estimated that there were $55 trillion in credit default swaps outstanding, which is "more than the gross domestic product of all nations on earth combined."  The International Swaps and Derivatives Association, a trade group, recently estimated that there are approximately $62 trillion worth of credit default swaps outstanding, with approximately one-third of the credit default swaps contracts lacking collateral (*i.e.*, that issuers of the swaps had not set aside assets in case the CDOs default).

110.    By comparison, according to data from the New York State Insurance Department, where most credit default swaps are sold, there is only approximately $6 trillion in outstanding corporate debt and $7.5 trillion in mortgage-backed debt in the United States.

111.    The subprime market has grown rapidly in recent years.  According to the Federal Reserve Bulletin, Higher-Priced Home Lending and the 2005 HMDA Data, Summer 2006, in 1994, fewer than 5% of mortgage originations in the United States were subprime.  However, by 2005, subprime mortgages accounted for approximately 26% of all mortgage loans.

112.    Subprime mortgages totaled approximately $600 billion in 2007, and accounted for approximately one-fifth of the total U.S. home loan market.  Approximately $1.3 trillion in subprime mortgages are currently outstanding.

113.    After the dot-com technology bubble burst in 2001, the housing market in the United States began a rapid and sustained increase in perceived value.  With dramatically decreased interest rates and widely available credit, even those who could not afford a down-payment or had checkered credit histories were afforded access to credit to purchase homes. Loan incentives and a long-term trend of rising housing prices encouraged borrowers to grant adjustable-rate mortgages ("ARMs") with lower payment streams in the early years, based on the expectation that refinancing would be available later when the increased payments were

triggered, secured by ever increasing home values.  Speculation fueled rapidly increasing prices, as numerous Americans sought to purchase homes only to "flip" or quickly sell them for a profit.

114.    The rapid growth of the subprime lending industry has been attributed to a number of factors that occurred in 2004 and 2005.  These factors include rising home prices, declining affordability, historically low interest rates, intense lender competition, innovations in the structure and marketing of mortgages, and an abundance of capital from lenders and mortgage securities investors.

115.    The mortgage market was further fueled by significant mortgage-backed securities liquidity, with investors increasingly seeking higher yields through higher-risk securitizations that provided lenders with access to capital markets to fund mortgage operations while simultaneously transferring credit risk away from the lenders to securitization investors.  The share of U.S. mortgage debt held outside the government-sponsored enterprises by private mortgage-backed securitizations doubled between 2003 and 2005, helping to fuel the growth of subprime and non-traditional mortgages.

116.    From 2001 to mid-2004, prime borrowers with a preference for fixed-rate mortgages refinanced in record numbers as long-term interest rates fell to the lowest rates in a generation.  As interest rates began to rise in 2004 and the pool of potential prime borrowers looking to refinance shrank, lenders struggled to maintain or grow market share in a declining origination environment, and did so by extending loans to subprime borrowers with troubled credit histories.

117.    Lenders accommodated these borrowers by diversifying mortgage offerings as they competed to attract borrowers and meet prospective homebuyers' financing needs.  Because of the affordability aspect alleged above, borrowers increasingly sought mortgage loans with

payment option and interest-only structures in 2004 and 2005. Such non-traditional mortgages were designed to minimize initial mortgage payments by eliminating or relaxing the requirement to repay principal during the early years of the loan.

118.    They also turned to Alternative-documentation loans, or "Alt-A" loans, which are flexible instruments primarily credit-score driven, since the candidates for these loans tend to lack proof of income from traditional employment, and, in exchange, pay a higher rate of interest than fully documented loans. Alt-A loans are made to people with better than subprime credit.

119.    Payment option and interest-only loans appear to have made up as much as 40 to 50 percent of all subprime and Alt-A loans securitized by private issuers of mortgage-backed securities during 2004 and 2005, up from 10 percent in 2003.

120.    The majority of subprime originations over the past several years were "2/28" and 3/27" hybrid loan structures. These hybrid loans provide an initial fixed-rate period of two or three years, after which the loan converts to an ARM and the interest rate adjusts to the designated loan index rate for the remaining 28 or 27 years of the loan. These 2/28 and 3/27 loans accounted for almost three-quarters of subprime securitized mortgages in 2004 and 2005.

121.    In late 2004 and early 2005, there was a growing sense of concern regarding the subprime industry, and in particular over eased lending standards. To address those concerns, the Federal Reserve and other banking agencies issued guidance on subprime lending. The Interagency Guidance on Nontraditional Mortgage Product Risks highlighted sound underwriting procedures, portfolio risk management, and consumer protection practices that were recommended to prudently originate and manage non-traditional mortgage loans. A major recommendation was that a lender's analysis of repayment capacity should include an evaluation of the borrower's ability to repay debt by final maturity at the fully indexed interest rate, assuming

a fully amortizing repayment schedule, rather than just under the initial interest rate. The guidance also reminded institutions to communicate clearly the risks and features of these products to consumers in a timely manner, before consumers applied for a loan.

122. In late 2005, however, house prices began to level off and then began to decline. The vast bulk of mortgages that had originated earlier in the decade with adjustable rates began to reset, causing families to experience rapid and significant increases in monthly payments just as home prices were leveling off or declining.

123. Increasing foreclosure rates in 2006 and 2007 led to faster decreases in home prices by mid-2007 and thereafter. Defaults and foreclosure activity increased dramatically as ARM interest rates reset higher. Subprime borrowers with ARMs experienced a large increase in delinquency and foreclosure rates, while prime borrowers experienced almost no increase in delinquencies and foreclosures. Borrowers were not able to avoid sharp payment increases as they could in earlier years. Even borrowers with enough equity to refinance their adjustable rate mortgages faced difficulty finding a loan with affordable payments, as interest rates edged higher than in earlier years.

124. Moreover, an unusually large number of subprime loans defaulted shortly after origination. In many of these "early payment defaults," borrowers stopped making payments before they faced payment shocks, suggesting that in 2006 some lenders may have lowered their underwriting standards in response to reduced borrower demand for credit.

125. In 2006, approximately 80,000 subprime borrowers who took out mortgages that were packaged into securities fell into delinquency. In 2006 and early 2007, dozens of lenders participating in the subprime mortgage business ceased operating as defaults and delinquencies on recent loans skyrocketed. This includes, among others:

(a)     Merit Financial Inc., of Kirkland, Washington, filed for bankruptcy and closes its doors, firing all but 80 of its 410 employees; Merit's marketplace had declined about 40% and sales were not bringing in enough revenue to support overhead. "'Bottom fell out' at Merit Financial," *Seattle Post-Intelligencer* (May 5, 2006).

(b)     On December 28, 2006, Ownit Mortgage Solutions, the 11th largest United States issuer of subprime mortgages, filed for bankruptcy. Earlier in the month, Ownit abruptly shut its doors and told its 800 workers not to return.

(c)     On February 5, 2007, Mortgage Lenders Network USA Inc., a company that catered to borrowers with weak credit, filed for bankruptcy. 880 of its 1,600 employees had been laid off earlier in the year.

(d)     On February 12, 2007, ResMae Mortgage, a subprime lender, filed for bankruptcy. According to *Bloomberg*, in its Chapter 11 filing, ResMae stated that "[t]he subprime mortgage market has recently been crippled and a number of companies stopped originating loans and United States housing sales have slowed and defaults by borrowers have risen." Also in its filing, ResMae stated that it could not cope with the "enormous" surge in loan defaults.

(e)     On February 20, 2007, NovaStar Financial, a company specializing in originating, investing, and servicing non-conforming residential mortgages, reported a substantial loss. Floyd Norris of *The New York Times* noted: "The class of 2006 may live on as a very bad memory in subprime land."

(f)     On March 1, 2007, Fremont General announced it was delaying fourth-quarter results in an annual filing with the SEC, sparking concern about its subprime mortgage business. The next day, Fremont General announced it was going to stop making subprime loans

and put its subprime business up for sale.

(g)    On March 8, 2007, New Century Financial, the second largest subprime lender in 2006, stopped making loans.

(h)    On March 20, 2007, People's Choice Home Loan, Inc., a mortgage lender for people with credit problems, filed for bankruptcy.

(i)    On April 2, 2007, New Century Financial filed for bankruptcy.

(j)    On April 6, 2007, American Home Mortgage Investment Corporation, the tenth largest retail mortgage lender in the United States, wrote down the value of risky mortgages rated one step above subprime.

(k)    On August 6, 2007, American Home Mortgage, one of the United States' largest home lenders, filed for bankruptcy.  According to the *Associated Press* on August 7, 2007, "A weak housing market and a spike in payment defaults scared investors from mortgage debt including bonds and other securities backed by home loans."

(l)    On August 13, 2007, Aegis Mortgage Corp, one of the United States' top 30 mortgage lenders, filed for bankruptcy.  The company also fired 782 out of 1,302 employees.

(m)    On September 21, 2007, HSBC Holdings announced its plans to close its U.S. subprime unit, Decision One Mortgage, and to record an impairment charge of about $880 million.  HSBC stated that it no longer believed the mortgage business was sustainable. Approximately 750 U.S. employees were expected to be affected by the decision.

*See* The Joint Economic Committees' Subprime Mortgage Market Crisis Timeline, July 10, 2008.

126.    During 2007, nearly 1.3 million U.S. housing properties were subject to foreclosure activity, up 79% from 2006.  In a speech at Georgetown University School of Law

on October 16, 2007, Treasury Secretary Henry M. Paulson, Jr., called the bursting housing bubble "the most significant risk to our economy."

      **B.**      **<u>Lehman's Involvement In The Subprime Industry</u>**

127.     Over the past decade, Lehman became a major participant in the mortgage market and in underwriting securities backed by subprime mortgages. The Company was heavily invested in CDOs and purchased several mortgage originators to fuel its securitization of mortgage-backed CDOs.

128.     Despite the staggering risks associated with investments in derivative instruments such as CDOs and credit default swaps, Lehman sought short-term profits at the expense of the Company's long-term viability, all in the face of a growing market consensus that the subprime market was highly risky and would subject those involved to significant losses when the "music stopped."

129.     Lehman established itself as a leader in the market for subprime mortgage backed securities back to the mid-1990s, when the sector was still tiny. "How Wall Street Stoked The Mortgage Meltdown," THE WALL STREET JOURNAL (June 28, 2007).

130.     In 1999, Lehman started operating its own subprime lending unit, called Finance America, in a joint venture with subprime lender Amresco Inc., which was as a minority partner. *Id.* In 2001, Lehman bought out Amresco and another minority investor in 2004. *Id.*

131.     Lehman also took an ownership stake in California-based BNC Mortgage in 2000 after helping management take the company private. *Id.*

132.     In 2004, Lehman purchased management's remaining stake in BNC Mortgage LLC, which was lending more than $1 billion per month by the first quarter of 2006. *Id.*; Yalman Onaran, "Lehman Brothers Fault-Finding Points to the Last Man Fuld as Shares Languish," *Bloomberg News* (July 22, 2008)("Lehman Fault-Finding").

133.    In 2005 and 2006, "Lehman topped other Wall Street firms . . . packaging more than $50 billion in subprime-mortgage-backed securities" "How Wall Street Stoked The Mortgage Meltdown," THE WALL STREET JOURNAL (June 28, 2007).

134.    By 2006, Lehman was the nation's top underwriter for subprime mortgage-backed securities, with approximately 11 percent of the market.  Jenny Anderson and Vikas Bajaj, "Lehman Brothers Closes Subprime Unit and Lays Off 1,200," *New York Times* (Aug. 23, 2007); "Lehman said to be looking for a buyer as pressure builds," *International Herald Tribune* (Sept. 12, 2008). Lehman also bought mortgage lender Aurora Loan Services, LLC, which provides Alt-A Loans, which, as described above, are loans that are not considered subprime, but are made without full documentation of assets.  Aurora originated more than $3 billion per month in loans in the first half of 2007.  Lehman Fault-Finding, *Bloomberg News*, July 22, 2008.

135.    In June 2007, Lehman said it would merge BNC with its Aurora Loan Services unit.  "How Wall Street Stoked The Mortgage Meltdown," THE WALL STREET JOURNAL (June 28, 2007).

136.    Lehman's appetite for accumulating subprime debt continued throughout the market collapse of 2007 and 2008, during which it continued to aggressively underwrite mortgage-backed securities, accumulating an $85 billion portfolio.  *Id.*

137.    In addition, Lehman was one of the ten largest participants in the credit default swaps market, and issued billions of dollars of these contracts in the past several years.  *See* "Derivatives Pose New Wrinkle in Lehman Case," *The New York Sun* (Sept. 25, 2008).

138.    Moreover, Lehman's exposure was not limited just to CDOs, credit default swaps, and other subprime mortgage-backed securities.  The crisis impacting the subprime market was

not limited to the residential sector, but its shock waves affected the commercial real estate market as well, to which, as alleged below, the Company also had considerable exposure.

139.    As the nation's top underwriter for subprime mortgage-backed securities, a leader in the market for subprime mortgage backed-securities, and one of the ten largest participants in the credit default market, Lehman's exposure to the risk of catastrophic loss from a decline in those markets was greater than most (if not all) other investment banks.

140.    Despite the fact that Defendants knew or should have known about the Company's deteriorating mortgage portfolio and serious financial problems, Defendants permitted Plan participants to invest in the Company Stock Fund, and the Company Stock Fund to acquire and hold Company Stock, throughout the Class Period.  Company Stock was not a prudent retirement savings option in light of the following materially adverse facts which seriously impacted the overall health of the Company: (i) the extent of the Company's exposure to losses incurred from trading in subprime mortgage backed derivatives; (ii) the extent of the Company's exposure to losses incurred from mortgage-backed securities, including its failure to timely write-down its positions in these securities; (iii) the nature and extent of its exposure to losses incurred from mortgage-backed security originations, including its failure to timely write-down its positions in these securities; (iv) that the Company had materially overvalued its positions in commercial and subprime mortgages, and in securities tied to these mortgages; (v) that the Company had inadequate reserves for its mortgage and credit related exposure; (vi) the extent of the Company's exposure to losses incurred from its commercial-real-estate holdings, including its failure to timely write-down its positions in these holdings that the Company had grossly overvalued; (vii) that the Company's financial statements were not prepared in accordance with GAAP; and (viii) that the Company lacked adequate internal and financial controls.

141.    Specifically, Defendants knew or should have known that the Plan's heavy investment in Company Stock was imprudent since Lehman was encountering enormous and very serious problems as a result of its significant investments in commercial real estate, CDOs, credit default swaps, and other similar vehicles, as well as internal control and risk management failures. As a consequence of those company-specific problems, which were not adequately or completely disclosed to the market or the participants in the Plan, investment in the Company Stock Fund was exceedingly risky and the Company's stock was artificially inflated.

C.    **Defendants Ignored Lehman's Deteriorating Financial Condition And Prospects, Which Differed Substantially From Public Statements Throughout The Class Period**

142.    Despite what they knew or should have known about Lehman's risky business practices and the artificially inflated prices for Company Stock during the Class Period, Defendants allowed the Plan and its participants to acquire and hold Company Stock through the Company Stock Fund as retirement savings while the Company fostered a falsely positive picture of itself in the public.

143.    For example, on September 13, 2006, the start of the Class Period, the Company issued a press release entitled "Lehman Reports Third Quarter Results; Reports Net Income of $916 Million and Net Reserves of $4.2 Billion," which stated in relevant part:

> Lehman Holdings Inc. (ticker symbol: LEH) today reported net income of $916 million for the third quarter ended August 31, 2006, or $1.57 per common share (diluted), representing increases of 4% and 7% respectively, from net income of $879 million, or $1.47 per common share (diluted), reported for the third quarter of fiscal 2005. Second quarter fiscal 2006 net income was $1.0 billion, or $1.69 per common share (diluted).
>
>     . . .
>
>     Fixed Income Capital Markets net revenues increased 6% to $2.0 billion in the third quarter of fiscal 2006 from $1.9 billion in the third quarter of 2005, reflecting record results in real estate and

strong results in foreign exchange products, partially offset by lower performances within mortgages, high yield and interest rate products.

144.    Commenting on the announced financial results, Defendant Fuld stated:

Market conditions during the third quarter were clearly more challenging than during the first half of the year.  However, despite the market environment and the typically slower activity of the summer months, these results are our best third quarter results ever.  These results also contributed to our best nine months ever, which were driven by record performances across all segments and regions.  This performance demonstrates the Firm's ability to partner with our clients across cycles and to continue to deliver consistent returns to our shareholders.

145.    On October 10, 2006, the Company filed its quarterly report on Form 10-Q for the third quarter of 2006 with the SEC ("Third Quarter 2006 Form 10-Q").  The Third Quarter 2006 Form 10-Q reaffirmed the Company's financial results previously announced on September 13, 2006.

146.    Despite those public statements, Defendants were or should have been aware of warning signs that the Company's mortgage business was in serious trouble.  For example, as *Bloomberg News* reported on July 22, 2008:

Toward the end of 2006, people familiar with Lehman's risk management operations say, ***executives at the firm started seeing trouble in the mortgage market***.  The securitization division raised rates on its bonds to reflect higher risk, which meant higher interest on loans Lehman's mortgage units made to home owners.  When that didn't slow borrowing, lending standards were tightened, a decision that was met with resistance by BNC and Aurora executives whose fees depended on volume, the people say.

Yalman Onaran, Lehman Fault-Finding, *Bloomberg News* (July 22, 2008) [Emphasis added].

147.    By the end of 2006, senior executives at Lehman knew or should have known of serious debt risks stemming from the Company's mortgage portfolio.  Despite those clear warning signs, however, and in breach of their fiduciary duties to the Plan and its participants,

Defendants took no measures to reduce the number of shares of Company Stock in the Plan, to remove the Company Stock Fund as a retirement saving option, to prevent Plan participants from allocating any more of their retirement savings to Company Stock, or to advise Plan participants of the looming danger associated with Company Stock.

148.    Thereafter, on December 14, 2006, the Company issued a press release entitled "Lehman Reports Record Net Revenues, Net Income and Earnings Per Share for Fiscal 2006; Reports Record Quarterly Net Revenues for the Fourth Quarter of 2006," which stated in relevant part:

> Lehman Brothers Holdings Inc. (ticker symbol: LEH) today reported net income of $1.0 billion, or $1.72 per common share (diluted), for the fourth quarter ended November 30, 2006, representing increases of 22% and 25%, respectively, from net income of $ 823 million, or $1.38 per common share (diluted), reported for the fourth quarter of fiscal 2005.  Third quarter fiscal 2006 net income was $916 million, or $1.57 per common share (diluted).
>
> . . .
>
> Capital Markets net revenues increased 28% to $3.0 billion in the fourth quarter of fiscal 2006 from $2.4 billion in the prior year's fourth quarter on strong performances from both Fixed Income and Equities Capital Markets.  ***Fixed Income Capital Markets reported its second highest revenue quarter, an increase of 31% from the fourth quarter of fiscal 2005, reflecting strong levels of client activity, as well as improved results in credit products***.  [Emphasis added].

149.    Defendant Fuld again emphasized the Company's announcement of positive results:

> Once again, we have achieved outstanding results across all our business segments and geographic regions this year.  Our record performance is the result of our client-focused strategy and our continued investment in strategic areas that enable us to deliver the best capabilities, intellectual capital and solutions to our clients. As always, our success is a tribute to how well our people continue

to work together across the Firm to deliver superior value to our
clients and shareholders.

150.    On December 15, 2006, the *International Herald Tribune* reported that "[r]evenue from fixed-income trading rose more than 25 percent at both Lehman and Bear Stearns, faster than in the third quarter.  The banks, based in New York, cited rising sales of so-called credit products, *which include credit-default swaps*, the world's fastest-growing derivative market." *International Herald Tribune*, "Record Profits at Bear Stearns and Lehman Brothers" (Dec. 15, 2006) [Emphasis added].

151.    Notwithstanding these glowing reports, Lehman was already making efforts to reduce its exposure to bad subprime debt that Defendants knew or should have known was on the horizon.  Specifically, in late 2006, on information and belief, Lehman quietly allowed certain traders to "short" – or hedge against – impending mortgage losses.  As *Bloomberg News* reported on July 22, 2008, "By the end of 2006, Lehman started hedging against its mortgage exposure. Some traders were allowed to bet against the prices of home loans by shorting indexes tied to mortgage securities."

152.    Thus, by the end of 2006, there were clear warning signs within the Company that an inevitable subprime collapse loomed on the horizon.  Despite this knowledge, Defendants breached their fiduciary duties to the Plan and its participants by failing to take action to protect them from the subprime collapse and Lehman's subsequent decline into bankruptcy, continuing to allow the Plan and its participants to acquire and hold over-valued Company Stock in the Company Stock Fund and withholding material adverse information about the Company's financial condition and prospects from them.

153.    On February 13, 2007, the Company filed its annual report for fiscal year 2006 on Form 10-K with the SEC ("2006 Form 10-K").  The Company's 2006 Form 10-K reaffirmed the financial results previously announced on December 14, 2006.

154.    The 2006 Form 10-K also discussed, among other things, the Company's commercial real estate investments, stating in relevant part:

> *Real Estate.* In addition to our origination and securitization of commercial mortgages, we also invest in commercial real estate in the form of debt, joint venture equity investments and direct ownership interests. We have interests in properties throughout the world.
>
>    . . .
>
>    Principal transactions revenue improved 25% in 2006 from 2005, driven by broad based strength across fixed income and equity products. ***In Fixed Income Capital Markets, the notable increases in 2006 were in credit products, commercial mortgages and real estate***.  The 2006 increase in net revenues from Equities Capital Markets reflects higher client trading volumes, increases in financing and derivative activities, and higher revenues from proprietary trading strategies. Principal transactions in 2006 also benefited from increased revenues associated with certain structured products meeting the required market observability standard for revenue recognition. Principal transactions revenue improved 37% in 2005 from 2004, driven by improvements across both fixed income and equity products. ***In Fixed Income Capital Markets, businesses with higher revenues over the prior year included commercial mortgages and real estate, residential mortgages and interest rate products***.  Equities Capital Markets in 2005 benefited from higher trading volumes and improved equity valuations, as well as increases in financing and derivative activities from the prior year.  [Emphasis added].

155.    Despite that upbeat description of the Company's results for 2006, Defendants knew or should have known that its risk from subprime lending was not limited to residential housing, but included commercial real estate as well, an area in which the Company also faced considerable exposure.

156.    As the subprime market began to collapse, Defendants continued to assure the market and Plan participants that the Company's financial health was robust.  For example, on March 14, 2007, the Company issued a press release entitled "Lehman Brothers Reports First Quarter Results; Reports Record Net Revenues, Net Income, and Earnings Per Share," which stated, in relevant part:

> Lehman Brothers Holdings Inc. (ticker symbol: LEH) today reported record net income of $1.15 billion, or $1.96 per common share (diluted), for the first quarter ended February 28, 2007, representing increases of 6% and 7%, respectively, from net income of $1.09 billion, or $1.83 per common share (diluted), reported for the first quarter of fiscal 2006. Fourth quarter fiscal 2006 net income was $1.00 billion, or $1.72 per common share (diluted).  The 2006 first quarter results include an after-tax gain of $47 million, or $0.08 per common share (diluted), from the cumulative effect of a change in accounting principle associated with the Firm's adoption of SFAS 123R on December 1, 2005.

> . . .

> Capital Markets reported record net revenues of $3.5 billion in the first quarter of fiscal 2007, an increase of 15% from $3.0 billion in the first quarter of fiscal 2006, *driven by strong performances in both Fixed Income and Equities Capital Markets. Fixed Income Capital Markets reported net revenues of $2.2 billion, its second highest revenue quarter and an increase of 3% from $2.1 billion in the first quarter of fiscal 2006, reflecting record results in credit products as well as a strong performance in real estate*, partially offset by declines in securitized products due to weakness in the U.S. residential mortgage sector and in interest rate products.  [Emphasis added].

157.    At the same time, Defendant Fuld publicly downplayed the "decline" in the U.S. mortgage market and continued to tout the Company's financial status: "[O]ur results clearly demonstrate that we are better positioned than ever to create value for our clients and our shareholders."

158.    On April 9, 2007, the Company filed with the SEC its quarterly report on Form 10-Q for the first quarter of 2007 ("First Quarter 2007 Form 10-Q").  The First Quarter 2007

Form 10-Q reaffirmed the Company's financial results previously announced on March 14, 2007.

159.    Behind the scenes, however, senior Lehman executives were becoming more vocal regarding mounting concerns with Lehman's mortgage portfolio.  For example, on information and belief, Michael Gelband, a senior Lehman executive in charge of fixed income, cautioned the Company against taking more risk in the subprime field.  In response, the Company fired him.  As *Bloomberg News* reported on July 22, 2008, "At least two executive who urged caution were pushed aside . . . Michael Gelband, 49, who ran fixed income . . .was pushed out altogether in May 2007 after he balked at taking more risk."  Lehman Fault-Finding, *Bloomberg News* (July 22, 2008).

160.    While Defendant Fuld publicly stated that Lehman was "better positioned than ever," the Company was terminating senior executives who expressed concern about its risky subprime portfolio.

161.    Despite mounting warning signs, Defendants continued to breach their fiduciary duties to the Plan and its participants by failing to divest the Plan of any accumulated Company Stock, by permitting Plan participants to add to their Company Stock allocations, and by withholding material adverse information about the Company's deteriorating financial condition and prospects from Plan participants.

162.    On June 12, 2007, the Company issued a press release entitled "Lehman Brothers Reports Record Quarterly Results; Reports 25% Increase in Net Revenues, 27% Increase in Net Income and 31% Increase in Earnings Per Share from the Second Quarter of 2006," which stated, in relevant part:

> Lehman Brothers Holdings Inc. (ticker symbol: LEH) today
> reported record net income of $1.3 billion, or $2.21 per common

share (diluted), for the second quarter ended May 31, 2007, representing increases of 27% and 31%, respectively, from net income of $1.0 billion, or $1.69 per common share (diluted), reported for the second quarter of fiscal 2006.  Net income and earnings per common share (diluted) for the second quarter of fiscal 2007 increased 11% and 13%, respectively, from net income of $1.1 billion, or $1.96 per common share (diluted), reported for the first quarter of fiscal 2007.

. . .

Capital Markets reported record net revenues of $3.6 billion in the second quarter of fiscal 2007, an increase of 17% from $3.1 billion in the second quarter of fiscal 2006, driven by a record performance in Equities Capital Markets. ***Fixed Income Capital Markets reported net revenues of $1.9 billion, a decrease of 14% from $2.2 billion in the second quarter of fiscal 2006, as strong client demand across most products and increased real estate and credit product revenues were more than offset by continued weakness in the U.S. residential mortgage business and decreased revenues in the Firm's municipal and interest rate products businesses***. [Emphasis added].

163.    Commenting on this news, Defendant Fuld added, "For the first six months of fiscal 2007, the Firm reported record net revenues of $10.6 billion, an increase of 19% from $8.9 billion for the first half of fiscal 2006."

164.    Yet again, despite acknowledging "continued weakness in the U.S. residential mortgage business," the Company concealed the seriousness of the Company's exposure related to its subprime holdings from the public.

165.    On July 10, 2007, Lehman's subprime portfolio began to unravel.  Specifically, on that date, the Company reported in its Form 10-Q for the quarter ended May 31, 2007 ("Second Quarter 2007 Form 10-Q") that it had "unrealized" losses of $459 million in the quarter from mortgages and mortgage-backed assets in its inventory.

166.    On that same day, *Bloomberg News* published an article entitled "Lehman Brothers Leads Brokerage Stocks Lower After S&P Subprime Warning," which stated in relevant part:

> Lehman Brothers Holdings Inc. led declines in shares of U.S. securities firms after Standard & Poor's said it may cut ratings on $12 billion of bonds backed by subprime mortgages, a move that could shave trading profits.
>
> . . .
>
> Some insurers and pension funds are required to sell bonds when they're downgraded, potentially depressing prices of $800 billion in subprime mortgage bonds and $1 trillion of collateralized debt obligations, which repackage mortgage bonds into new securities. Lehman and other Wall Street firms have seen their revenue from fixed-income trading and sales drop in the second quarter, mostly due to weakness in mortgages.
>
> "Downgrades further hurt the mortgage bond business of the securities firms," said David Hendler, an analyst at CreditSights Inc. "Although they've fallen a lot already and the rating agencies usually are behind the curve, their downgrades bring down prices more."
>
> S&P said today that it's preparing to lower the ratings on 2.1 percent of the $565.3 billion of subprime bonds issued in late 2005 through 2006 because of a worse-than-anticipated U.S. housing slump. The company said it's also reviewing the "global universe" of collateralized debt obligations, or CDOs, that contain subprime mortgages, which are loans to the least creditworthy borrowers.

167.    On that news, Company Stock fell $3.76 per share, or over 5 percent, to close on July 10, 2007, at $71.10 per share on unusually heavy trading volume. Although the news had a negative effect on the price of Company Stock, the price remained inflated as Lehman continued to conceal, among other things, the full nature and extent of its exposure to the mortgage crisis and the credit market downturn.

168.    In response to the news, rather than clearly and unambiguously informing the public and Plan participants fully of the nature and extent of Lehman's exposure to risky

49

subprime investments, Defendants did the exact opposite. On July 18, 2007, *Bloomberg News* published an article entitled "Lehman Brothers Says Subprime Speculation 'Unfounded,'" which stated in relevant part:

> Lehman Brothers Holdings Inc., the largest underwriter of US. mortgage bonds, denied speculation that it may face greater potential losses from subprime mortgages than previously disclosed.
>
> Speculation about a planned announcement from Lehman Brothers related to its subprime holdings spurred investors to demand higher premiums to insure against the risk of owning Wall Street firms' bonds and helped prompt gains in Treasuries, according to traders including Thomas Tucci, head of U.S government bond trading at RBC Capital Markets in New York.
>
> "***The rumors related to subprime exposure are unfounded***," Lehman spokeswoman Kerrie Cohen said today. [Emphasis added].

169. In other words, at the very time Defendants when should have been reducing the number of shares of Company Stock in the Plan, prohibiting Plan participants from allocating any more of their retirement contributions to the Company Stock Fund, and informing Plan participants of the nature and extent of Lehman's exposure to subprime lending, Defendants concealed the truth from them and allowed them to continue saving for retirement with risky Company Stock in their Plan accounts.

170. On July 10, 2007, after credit two rating agencies, Standard & Poor's and Moody's Investors Service, downgraded bonds backed by subprime mortgages, prompting investors to get rid of the securities, a third credit rating agency, Fitch's Investors Service followed suit, and downgraded as well on August 1, 2007.

171. Also on July 10, 2007, *Bloomberg* reported that, according to Christopher Wallen, an analyst from Institutional Risk Analytics, "when ratings agency puts a whole class [*i.e.*, bonds

backed by subprime mortgages] on watch, it will force all the credit officers to get off their butts and reevaluate everything.  This could be one of the triggers we've been waiting for."  *Id.*

172.    Despite the downgrades, Defendants continued to permit Company Stock to be offered as a retirement saving option in the Plan through the Company Stock Fund, and did nothing to reduce the number of shares held by the Plan or preclude Plan participants from allocating more shares to their accounts, leaving the Plan heavily exposed to the growing subprime risk.

173.    On July 26, 2007, contrary to the Company's prior assurances about its exposure, *Bloomberg* reported that the risk of owning Lehman's bonds "soared" and the Company Stock price plunged "as concerns escalated that investment banks will be hurt by losses from subprime mortgages and corporate debt."  As reported by *Bloomberg News*, as the risk mounted, the cost of five-year credit default swaps on $10 million face amount of the Company's bonds jumped by as much as $24,000, to $104,000 a year.

174.    The annual cost of credit default swaps protecting against losses on $10 million of the Company's debt for five years surged to $219,000 at the end of May 2008, and to $800,000 a year by September 11, 2008.  "The Two Faces of Lehman's Fall," THE WALL STREET JOURNAL (Oct. 6, 2008).  Such increases in the cost of credit-default swaps signaled a significant deterioration in investor confidence.

175.    On the July 26, 2007, news, the price of Company Stock fell an additional $3.16 per share, or 4.7 percent, to close on July 26, 2007, at $64.50 per share, again on unusually heavy trading volume.

176.    On July 31, 2007, *Bloomberg News* published an article entitled "Bear, Lehman Brothers, Merrill, Goldman Traded as Junk, Derivatives Show," which stated in relevant part:

On Wall Street, Bear Stearns Cos., Lehman Brothers Holdings Inc., Merrill Lynch & Co. and Goldman Sachs Group Inc., *are as good as junk*.

Bonds of U.S. investment banks lost about $1.5 billion of their face value this month as the risk of owning the securities increased the most since at least October 2004, according to Merrill indexes. Prices of credit-default swaps based on the debt imply that their credit ratings are below investment grade, data compiled by Moody's Investors Service show.

*The highest level of defaults in 10 years on subprime mortgages and a $33 billion pileup of unsold bonds and loans for funding acquisitions are driving investors away from debt of the New York-based securities firms.* Concerns about credit quality may get worse because banks promised to provide $300 billion in debt for leveraged buyouts announced this year.

. . .

Prices of credit-default swaps for Goldman, the biggest investment bank by market value, Merrill, the third largest, and Lehman Brothers, the No. 1 mortgage bond underwriter, also equate to a Ba1 rating, data from Moody's credit strategy group show. Bonds of New York-based Goldman and Merrill are rated Aa3, seven levels higher than swaps suggest. Lehman Brothers is rated A1, the same as Bear Stearns. [Emphasis added].

177.    On this news, the Company's shares fell an additional $2.80 per share, or over 4.3 percent, to close on July 31, 2007 at $62.00 per share, again on heavy trading volume.

178.    Still, Defendants continued to allow Company Stock to be offered as a retirement saving option in the Plan, through the Company Stock Fund, did nothing to reduce the number of shares of Company Stock held by the Plan or preclude Plan participants from allocating more shares to their accounts, and did not disclose the full nature and extent of Lehman's exposure to subprime credit risk to Plan participants.

179.    Instead, as the risk of default continued to grow, Lehman and the other investment banks obfuscated the extent of their total risk. As reported in THE WALL STREET JOURNAL on August 2, 2007:

The mystery of "where are the losses?" has confounded hedge funds searching for opportunities to bet against banks whose day of reckoning has yet to come.

"We've been looking for financials that show losses from these securities on their books, and they've been very difficult to find," says Keith Long, president of Otter Creek Management, a hedge fund in Palm Beach, Fla., with $150 million in assets. "It's very opaque."

Investors have long complained about the lack of transparency when it comes to huge financial firms, whose balance sheets are so big that they can easily mask multimillion-dollar gains or losses. Analysts and investors currently cite several potential factors that could help hide subprime wounds.

180.    On information and belief, Lehman was engaged in such efforts to conceal the extent of its subprime exposure.  For example, *Bloomberg News* later reported that, "Lehman's hedges helped offset losses in the second half of 2007 and the first quarter of 2008.  While the firm wrote down the value of mortgage-related assets *by more than $10 billion*, the net reduction to profit was only $3.3 billion." Lehman Fault-Finding, *Bloomberg News* (July 22, 2008) [Emphasis added].  In short, Lehman used a gain from one area to offset the totality of a loss in another, all the while continuing to assure the Plan's participants that Company Stock was prudent for retirement savings.

181.    On August 10, 2007, *Business Week* published an article entitled "Subprime Woes Wallop Wall Street Firms," which stated in relevant part:

As more news about the looming credit crunch slapped major stock indexes lower on Thursday, the U.S.'s big investment banks got hit even harder. . . . Lehman Brothers (LEH) dropped more than 7%. Market anxiety had already caused financial stocks to drop more than 5% in the last month.

. . .

One problem for big investment banks and hedge funds is they reveal very little to the public or investors about their internal

holdings. "We don't know how many hidden skeletons there are in anybody's closet," Larkin says.

182. On September 18, 2007, the Company issued a press release entitled "Lehman Brothers Reports Third Quarter Results; Reports Net Income of $887 Million and Net Revenues of $4.3 Billion," which stated, in relevant part:

> Lehman Brothers Holdings Inc. (ticker symbol: LEH) today reported net income of $887 million, or $1.54 per common share (diluted), for the third quarter ended August 31, 2007, representing decreases of 3% and 2%, respectively, from net income of $916 million, or $1.57 per common share (diluted), reported for the third quarter of fiscal 2006. Net income and earnings per common share (diluted) for the second quarter of fiscal 2007 were $1.3 billion and $2.21, respectively.
>
> Capital Markets reported net revenues of $2.4 billion for the third quarter of fiscal 2007, a decrease of 14% from $2.8 billion in the third quarter of fiscal 2006. Fixed Income Capital Markets reported net revenues of $1.1 billion, a decrease of 47% from $2.0 billion in the third quarter of fiscal 2006, primarily due to lower performances within Credit and Securitized Products. Within Fixed Income Capital Markets, the Firm recorded very substantial valuation reductions, most significantly on leveraged loan commitments and residential mortgage-related positions. These losses were partially offset by large valuation gains on economic hedges and other liabilities. The result of these valuation items was a net reduction in revenues of approximately $700 million.

183. Commenting on the financial results, Defendant Fuld stated:

> Despite challenging conditions in the markets, our results once again demonstrate the diversity and financial strength of the Lehman Brothers franchise, as well as our ability to perform across cycles. For the quarter, we reported record net revenues in Investment Management, and our second highest net revenues in both Investment Banking and Equities Capital Markets. In addition, more than half of our net revenues for the quarter came from outside the U.S. We remain focused on delivering significant long term value for our clients and shareholders.

184. During a conference call to discuss Lehman's third quarter results on September 18, 2007, Christopher O'Meara, Lehman's Chief Financial Officer, Controller, and Executive

Vice President until December 2007, sought to quell concerns by referring to Lehman's "strong" risk management and liquidity position as a "competitive advantage" separating Lehman from other troubled Wall Street firms.  Mr. O'Meara claimed that Lehman's liquidity position was "stronger than ever":

> We attribute this performance to several factors: Our **strong risk management culture** with regards to the setting of risk limits and the management of market and counterparty credit risks; and our strong liquidity framework . . .
>
> **To reiterate, our liquidity position is stronger than ever**, we consider our liquidity framework to be a competitive advantage which positions us to support our clients and take advantage of market opportunities even in a stress environment.
>
> . . .
>
> Before we move on to outlook, I wanted to make a few comments about fair value and marking to market. As I know it has been the subject of much discussion in the marketplace. First of all, we carry all of our financial instruments, inventory and lending commitments at fair value.  We have a robust process in place in which employees, independent of the businesses, review the marks for accuracy or reasonableness using all the information available in the marketplace including third-party pricing sources where applicable.
>
> . . .
>
> So overall, despite the fact that some amount of judgment has to be used in determining fair values in a distressed environment, we feel very good about our process of marking-to-market and the marks themselves. Historically, our prudent approach to valuing positions has proven out in past distressed environments. [Emphasis added].

185.   Nevertheless, given Lehman's considerable exposure to subprime market risk, Defendants knew or should have known that the Company lacked sufficient liquidity to weather the subprime crisis.

186.    In fact, despite Mr. O'Meara's assurances about Lehman's "fair value" and "marking-to-market" processes, a key factor in Lehman's bankruptcy was its failure to appropriately "mark-to-market" its commercial real estate portfolio, which was considered to be over-valued by approximately $10 billion.

187.    During this same time period, unbeknownst to Plan participants, senior Lehman executives were cautioning against continued hedging against the Company's mortgage positions. Specifically, Madelyn Antoncic, the former head of risk at Lehman, "[w]as moved to a government relations job in September 2007" after warning Company officials "[t]hat hedging mortgage positions had curtailed Lehman's profit." Lehman Fault-Finding, *Bloomberg News*, July 22, 2008.

188.    In short, as alleged above, Lehman squeezed out or reassigned critics of the Company's tactics related to its subprime investments. Worse, during the Class Period, Defendants failed to take appropriate actions to protect the Plan participants, and instead continued to tout the purchase of Company stock as a prudent means of saving for retirement.

189.    On October 4, 2007, Moody's reported that subprime mortgage bonds originated in the first half of 2007 included loans that were going delinquent at the fastest recorded rate. The Moody's report predicted that accelerating delinquencies from 2007 bonds were likely to surpass the number of delinquencies in 2006, which hit a peak not seen since 2000. *See* Joint Economic Committees' Subprime Mortgage Market Crisis Timeline, dated July 10, 2008.

190.    On October 10, 2007, the Company filed with the SEC its quarterly report on Form 10-Q for the third quarter of 2007 ("Third Quarter 2007 Form 10-Q"). The Third Quarter 2007 Form 10-Q reaffirmed the financial results previously released on September 18, 2007.

191.    The Third Quarter 2007 Form 10-Q also discussed, among other things, weaker results in the Company's commercial real estate business:

> Net revenues and volumes in our securitized products business were down compared to the benchmark 2006 three and nine month periods due to continued corrections in the mortgage industry, primarily in the U.S., and sluggish domestic housing markets. Although there was active trading related to certain securitized products, there was also significant credit spread widening across securitizations' capital structures, including highly rated classes of securities, during the three month period.  As a result, negative valuation adjustments, after consideration of hedges, associated with these asset-backed securities were recorded.  Our volumes for residential origination and securitization declined during the 2007 three months.  ***Results in our commercial real estate business were also weaker due to widening in credit spreads and lower asset sale activity during the period***.  [Emphasis added].

192.    Despite the obvious deterioration in Lehman's commercial real estate business as credit risk continued to worsen, Defendants still continued to permit Company Stock to be offered as a retirement saving option in the Plan, did nothing to reduce the number of shares held by the Plan or preclude Plan participants from allocating even more shares to their accounts, and withheld material adverse information about the Company's financial condition and prospects from them, leaving the Plan and its participants heavily exposed to the growing subprime risk.

193.    On October 18, 2007, Standard & Poor's cut the credit ratings on $23.35 billion of securities backed by pools of home loans that were offered to borrowers during the first half of the year.  The downgrades affected even AAA-rated securities, the highest of the 10 investment-grade ratings and the rating of government debt.  *See* Joint Economic Committees' Subprime Mortgage Market Crisis Timeline, dated July 10, 2008.

194.    On December 13, 2007, the Company issued a press release entitled "Lehman Brothers Reports Record Net Revenues, Net Income and Earnings Per Share for Fiscal 2007;

Reports Net Income of $886 Million and Net Revenues of $4.4 Billion for the Fourth Quarter of

Fiscal 2007," which stated in relevant part:

> Lehman Brothers Holdings Inc. (NYSE: <u>LEH</u>) today reported net income of $886 million, or $1.54 per common share (diluted), for the fourth quarter ended November 30, 2007, representing decreases of 12% and 10%, respectively, from net income of $1.0 billion, or $1.72 per common share (diluted), reported for the fourth quarter of fiscal 2006. For the third quarter of fiscal 2007, net income was $887 million; or $1.54 per common share (diluted).
>
> . . .
>
> Net revenues (total revenues less interest expense) for the fourth quarter of fiscal 2007 were $4.4 billion, a decrease of 3% from $4.5 billion reported in the fourth quarter of fiscal 2006 and an increase of 2% from $4.3 billion reported in the third quarter of fiscal 2007. Capital Markets net revenues decreased 10% to $2.7 billion in the fourth quarter of fiscal 2007 from $3.0 billion in the fourth quarter of fiscal 2006. Fixed Income Capital Markets reported net revenues of $860 million, a decrease of 60% from $2.1 billion in the fourth quarter of fiscal 2006, due to the very challenging markets experienced during the period; although strong results from client activity were reported in the Foreign Exchange and Commodities businesses. Fixed Income Capital Markets recorded negative valuation adjustments on trading assets, **principally in the Firm's Securitized Products and Real Estate businesses**. These valuation adjustments were offset, in part, by valuation gains on economic hedges and liabilities, as well as realized gains from the sale of certain leveraged loan positions, resulting in a net revenue reduction in Fixed Income Capital Markets of approximately $830 million. [Emphasis added].

195.    Rather than explain the dire implications of the "negative valuation adjustments,

in the December 13, 2007, press release, Defendant Fuld said, among other things:

> Despite what continues to be a difficult operating environment, the Firm's results for the quarter highlight our **ability to perform across market cycles** and deliver value to our shareholders. Our global franchise and brand have never been stronger, and our record results for the year reflect the continued diversified growth of our businesses. As always, **our people remain committed to managing risk** and providing the best solutions to our clients. [Emphasis added].

196.    Despite the growing concern over credit risk then pervading the markets, and despite the concerns expressed internally by senior Lehman executives, Defendants concealed the risk from the public and from Plan participants.  For example, in the Company's December 13, 2007, Fourth Quarter Earnings call, Erin Callan, Lehman's Chief Financial Officer, said that Lehman had put the risk behind it:

> In general, as we have indicated, **we have come through the current downturn** very well positioned on a competitive basis. We believe we can capitalize on this opportunity for 2008. [Emphasis added].

197.    Thus, in the wake of an uproar of concerns regarding the collapse of the subprime markets, Lehman continued to assure the market and Plan participants of the continued viability of Company Stock and of the fact that the Company would remain virtually unscathed by the subprime crisis, despite the Plan's material investment in Company Stock.

198.    Despite these assurances, Lehman was aware of the risk associated with its subprime and mortgage investment portfolio throughout the Class Period.  As the risk of catastrophic losses on Lehman's subprime mortgage debt continued to grow, Defendants breached their fiduciary duties by continuing to offer Company Stock as a retirement saving option in the Plan through the Company Stock Fund, failing to reduce the number of shares held by the Plan or preventing Plan participants from allocating even more shares in the Company Stock Fund to their accounts, and concealing the full nature and extent of the risk of catastrophic loss from the Plan participants (and, for that matter, from the public market).

199.    As early as January 2008, in a presentation to Lehman's board of directors, from Eric Felder, one of Defendant Fuld's top executives, the Director Defendants were warned that "liquidity can disappear quite fast."  LB 010443, *et seq*., produced in connection with the House Committee on Oversight and Government Reform, Congressional hearing held on October 6,

2008 ("Lehman Congressional Hearing").  As recognized by Rep. Henry A. Waxman, Chairman of the House Committee on Oversight and Government Reform, during the Lehman Congressional Hearing, Lehman ignored the mounting liquidity concerns in 2007, and instead depleted its capital reserves by over $10 billion through year-end bonuses, stock buybacks, and dividend payments.  Preliminary Hearing Transcript, p. 7.

200.    On January 17, 2008, the Company issued a press release announcing that it would substantially reduce its resources and capacity in the U.S. residential mortgage origination space.

201.    On January 29, 2008, Lehman filed its annual report for fiscal year 2007 on Form 10-K with the SEC ("2007 Form 10-K"), which reaffirmed the financial results previously announced on December 13, 2007.

202.    The 2007 Form 10-K also admitted that the deteriorating housing market would likely also stress other components of the capital markets, such as commercial real estate:

> In the U.S., economic growth showed signs of strength at the beginning of our fiscal year, driven by higher net exports and consumption levels, among other indicators, but the pace of growth slowed in the latter half.  Over the twelve-month period, the U.S. housing market weakened, business confidence declined, and, in the last six months of the year, consumer confidence dropped. The labor market followed the same trajectory, showing signs of deterioration in the second half of the period as unemployment levels increased modestly and payroll data showed some signs of weakness. Responding to concerns over liquidity in the financial markets and inflationary pressures, the U.S. Federal Reserve reduced rates three times during the calendar year and made an additional inter-meeting rate cut in January 2008, and most observers anticipate additional reductions will occur in the early part of our 2008 fiscal year. Long-term bond yields declined, with the 10-year Treasury note yield ending our fiscal year down 52 basis points at 3.94%. The S&P 500 Index, Dow Jones Industrial Average and NASDAQ composites were up 5.7%, 9.4%, and 9.4%, respectively, from November 2006 levels. The current high levels of U.S. home inventories suggest that an extended period of

> construction declines and housing price cuts will combine with
> tighter credit conditions and increasing oil prices to slow down
> consumer spending. We believe those conditions will continue to
> strain the capital markets, particularly the securitized products and
> residential housing components. We also believe that those
> conditions will stress other components of the capital markets,
> such as commercial real estate. We believe these impediments will
> decrease the U.S. growth rate in 2008.

203.    Undeniably, by that date, Lehman was well aware of declining economic conditions and the broad risks they posed and that its commercial real estate portfolio was overvalued by billions of dollars. Nonetheless, as Lehman moved closer to bankruptcy, Defendants continued to offer Company Stock as a retirement saving option in the Plan, through the Company Stock Fund, failed to reduce the number of shares of Company Stock held by the Plan or prevent Plan participants from allocating even more shares of the Company Stock Fund to their accounts, and concealed the full nature and extent of the risk of catastrophic loss from the Plan participants, all in breach of their fiduciary duties.

204.    On March 18, 2008, the Company issued a press release announcing its financial results for the first quarter of 2008. The Company reported a profit of $489 million and disclosed that it held $6.5 billion in "other asset-backed securities" – which it did not identify as CDOs – and that it had taken a write-down of just $200 million to reflect the decreased value of those securities. These announcements reassured Plan participants and the investing public, which had become concerned about the impact of the roiling credit market on Lehman, particularly in the wake of the collapse of Bear Stearns just days earlier.

205.    The press release stated, in pertinent part, as follows:

> NEW YORK– March 18, 2008 – Lehman Brothers Holdings Inc.
> (ticker symbol: LEH) today reported net income of $489 million,
> or $0.81 per common share (diluted), for the first quarter ended
> February 29, 2008, representing decreases of 57% and 59%,
> respectively, from net income of $1.15 billion, or $1.96 per
> common share (diluted), reported for the first quarter of fiscal

2007.  Fourth quarter fiscal 2007 net income was $886 million, or $1.54 per common share (diluted).

### First Quarter Business Highlights

• Experienced record client activity across our Capital Markets businesses, which was offset, in part, by the effect of the continued dislocations in the credit markets that significantly impacted the Firm's results

• Maintained strong liquidity position, with the Holding Company having a liquidity pool of $34 billion and unencumbered assets of $64 billion, with an additional $99 billion at our regulated entities, at quarter end

• Reported record net revenues in the Investment Management segment

• Ranked #2 in announced global M&A transactions for the first two months of calendar 2008, according to Thomson Financial.

. . .

### Net Revenues

Net revenues (total revenues less interest expense) for the first quarter of fiscal 2008 were $3.5 billion, representing decreases of 31% and 20%, respectively, from $5.0 billion reported in the first quarter of fiscal 2007 and $4.4 billion reported in the fourth quarter of fiscal 2007. Net revenues for the first quarter of fiscal 2008 reflect negative mark to market adjustments of $1.8 billion, net of gains on certain risk mitigation strategies and certain debt liabilities.

### Business Segments

**Capital Markets** reported net revenues of $1.7 billion in the first quarter of fiscal 2008, a decrease of 52% from $3.5 billion in the first quarter of fiscal 2007.  Fixed Income Capital Markets reported net revenues of $262 million, a decrease of 88% from $2.2 billion in the first quarter of fiscal 2007, as strong performances in liquid products such as high grade corporate debt, foreign exchange and interest rate products were offset, in part, by continued deterioration in the broader credit markets, in particular residential mortgages, commercial mortgages and acquisition finance. Equities Capital Markets reported net revenues of $1.4 billion, an increase of 6% from $1.3 billion in the first quarter of fiscal 2007,

driven by continued growth in prime brokerage and strong activity in execution services.

**Investment Banking** reported net revenues of $867 million, an increase of 2% from $850 million in the first quarter of fiscal 2007. These revenues were driven by strong merger and acquisition advisory revenues, which increased 34% to $330 million from $247 million in the first quarter of fiscal 2007, and higher equity origination revenues, which increased 23% to $215 million from $175 million in the first quarter of fiscal 2007, partially offset by lower revenues in debt origination as compared to the first quarter of fiscal 2007.

**Investment Management** reported record net revenues of $968 million, an increase of 39% from $695 million in the first quarter of fiscal 2007. This performance was driven by record revenues in both Asset Management, which increased 49% to $618 million from $416 million in the first quarter of fiscal 2007, and Private Investment Management, which increased 25% to $350 million from $279 million in the first quarter of fiscal 2007. The Firm reported assets under management of $277 billion, compared to $282 billion at November 30, 2007.

206.    Commenting on the financial results, Defendant Fuld stated:

In what remains a challenging operating environment, our results reflect the value of our continued commitment to building a diversified platform and our *focus on managing risk and maintaining a strong capital and liquidity position*. This strategy has allowed us to support our clients through these difficult and volatile markets, while continuing to build and strengthen our global franchise for our shareholders. [Emphasis added].

207.    Also on March 18, 2008, the Company held a conference call to discuss its financial results. During the conference call, Ms. Callan further reassured the market about the Company's strength and stability in the mortgage and credit markets:

We saw a quarter where *our risk management discipline allowed us to avoid any single outsized loss*. And it's been our operating philosophy for a decade, which many people are very familiar with, that *we remain closely focused on our liquidity, our long-term capital position precisely for the purpose of weathering a difficult market environment that we've seen surfacing in recent weeks. So we're set up for that*.

. . .

So I think it's fair to say we continue to do a ***very, very good job managing the risk on residential mortgages***, an area that I think we are credited with a lot of expertise, a great franchise.

. . .

Let me talk about outlook for a moment, which you've probably gotten message so far, but looking forward, despite the positive developments of Fed actions in the past two days and few weeks, we still don't anticipate the challenging market conditions abating any time soon and we have planned our business accordingly. As we look out to the remainder of the year, we certainly will remain vigilant around risk, capital, and liquidity. As we talked about last quarter, as a firm we remained very cautious overall, but we continue to feel good about our competitive position.

. . .

Now, let me conclude by noting that we don't expect that this extremely challenging period is going to end in the near term. However, ***we do believe we have the leadership, the experience, the risk management discipline, the capital strength, and certainly the liquidity to ride out the cycle***. In addition, we believe that the current markets will continue to present us with a lot of client and trading opportunities which we look forward to that come from market dislocation. And as we successfully meet these challenges, capture these opportunities, ***we certainly believe we are positioning ourselves well for the long-term***. [Emphasis added].

208.   With regard to the Company's capital requirements, Ms. Callan stated:

***We had disciplined liquidity and capital management***, which we consider to be a core competency, and ***maintain robust liquidity*** to date and we have executed close to two thirds of our full-year capital plan at the end of the first quarter.

. . .

The average tenor of our long-term debt has continued to extend and is seven years at this point. We do believe that long-term debt in general will be harder to obtain throughout 2008, we had that strong point of view since late last year and therefore we will continue to pre-fund as we have done so far this year, our liquidity needs, as we see opportunities in the markets. And consistently with that, ***we have already completed two-thirds of our capital***

*plan needs for 2008 as we come out of the first quarter*.
[Emphasis added].

209.    With respect to the Company's Level 3 Assets (assets that have no reliable market price), Ms. Callan stated:

> In terms of level 3 assets, we expect a slight increase for the quarter to 39 billion [dollars]. This represents 5% of total assets. So that's a rather detailed summary of our exposure. I wanted to give you that color, and wanted to give you some sense of why current dislocations in the market did significantly impact us, as we play in all of these asset classes. So our mark-to-market volatility is significant, we believe a significant portion of this is related to the liquidity.

210.    Strikingly, while the First Quarter 2008 Form 10-Q reported a $228 million ***gain*** on its Level 3 assets during the first quarter, Ms. Callan stated during the Company's March 18, 2008, conference call that Lehman had written down the value of its Level 3 assets by $875 million.

211.    Further, in a March 19, 2008 article in *The Irish Times*, Ms. Callan was quoted as saying, "I think we feel better about our liquidity than we ever have." Laura Slattery, Volatile Market Claws Back €1.8bn of Earlier Losses," *The Irish Times* (Mar. 19, 2008).

212.    Nonetheless, as the credit problems continued to mount, Defendants breached their fiduciary duties by continuing to offer Company Stock as a retirement saving option in the Plan, failing to reduce the number of shares held by the Plan or preventing Plan participants from allocating even more shares to their accounts, and concealing the full nature and extent of the risk of catastrophic loss from the Plan participants.

213.    On April 8, 2008, Lehman filed with the SEC its quarterly report on Form 10-Q for the first quarter of 2008 ("First Quarter 2008 Form 10-Q"), which reaffirmed the financial results for the Company previously released on March 18, 2008.

214.   The First Quarter 2008 Form 10-Q also discussed the Company's commercial real estate activities, noting, "Tight credit conditions and high commodity prices are anticipated to place continued strain on the capital markets, *particularly the securitized products and commercial real estate components.*"   [Emphasis added].   The First Quarter 2008 Form 10-Q also stated, in relevant part:

> *In the 2008 three months, credit markets and certain segments of financial asset markets, commercial real estate-related products, for example, declined further from what was observed at the end of the Company's 2007 fiscal year.*   As a result of these market events, the Company recorded negative valuation adjustments on certain components of its financial inventory; substantially all of which are reflected within the results of operations for the Company's Fixed Income component of Capital Markets.   The negative valuation adjustments resulting from the impact of adverse market conditions were partially mitigated by economic risk management strategies employed as well as valuation changes on certain of the Company's debt liabilities.   The net amount of valuation adjustments in the 2008 three months was an approximate $1.8 billion reduction to the Company's net revenues. [Emphasis added].

215.   The First Quarter 2008 Form 10-Q also acknowledged that the $6.5 billion of Lehman's "other asset-backed securities" consisted entirely of CDOs, and revealed for the first time that 25% of those securities were rated BB+ or lower – a junk rating.   The First Quarter 2008 Form 10-Q stated the following regarding the Company's investments in "other asset-backed securities":

> The Company purchases interests in and enters into derivatives with collateralized debt obligation securitization entities ("CDOs"). The CDOs to which the Company has exposure are primarily structured and underwritten by third parties.   The collateralized asset or lending obligations held by the CDOs are generally related to franchise lending, small business finance lending, or consumer lending.   *Approximately 25% of the positions held at February 29, 2008 and November 30, 2007 were rated BB+ or lower (or equivalent ratings) by recognized credit rating agencies*.   In determining the fair value interests in CDOs, the Company considers prices observed for similar transactions

and data for relevant benchmark instruments, such as swap obligations for similar obligations referenced by the instrument. ***In both reference periods, the value in the benchmark instruments as well as market developments caused a decline in the fair value of interests in CDOs, not actual defaults on swap obligations***. [Emphasis added].

216.    The First Quarter 2008 Form 10-Q reported that the Company held $38.8 billion in Level 3 assets for which there was no reliable market and which were valued based only upon management assumptions.  Level 3 assets include CDOs and other derivative securities which were particularly difficult to value since the market for them all but evaporated in 2007 as the subprime mortgage collapsed.

217.    At a conference on May 21, 2008, David Einhorn, President of Greenlight Capital LLC, a hedge fund, analyzed the discrepancies between Lehman's March 18, 2008, announcement of financial results and the Company's First Quarter 2008 Form 10-Q.  During the presentation, Mr. Einhorn discussed the inexplicably small write-down taken on Lehman's CDO portfolio and the more than $1 billion disparity between the reported values of the Company's Level 3 assets between March 18, 2008, and April 8, 2008.

218.    Mr. Einhorn recounted his efforts to obtain an explanation from Lehman, and the constantly changing – and largely implausible – stories that Company management provided in response.  According to Mr. Einhorn, when Ms. Callan was asked to clarify how Lehman could justify writing down just 3% of those securities, she responded only that the Company "would expect to recognize further losses" during the second quarter of 2008.

219.    Mr. Einhorn's presentation revealed potential losses that Lehman had yet to acknowledge, and implied that the Company reported first quarter profit only by overstating the value of its mortgage-backed assets and improperly delayed recognizing the potential losses to a later accounting period.

220.    After Mr. Einhorn's presentation on May 21, 2008, Company Stock closed at $39.56 per share, down $2.44 for the day.  By June 2, 2007, the price of Company Stock had fallen nearly $6 per share, or almost 15%, to $33.83 per share.

221.    On May 26, 2008, David Goldfarb, a senior Lehman executive, sent an email to Defendant Fuld, advising that if the Company could obtain $5 billion in financing from Korea, $2 billion of that should be spent in aggressively buying back shares of Company Stock to hurt Mr. Einhorn, whose hedge fund, Greenlight Capital, had shorted Company Stock, by supporting (or even inflating) the market price of the stock.  *See* LB 008070 (produced in connection with the Lehman Congressional Hearing).

222.    Aside from causing loss to Einhorn, such an action would have burned through even more capital at a time when Lehman's liquidity should have been of primary concern to the Company.  Nevertheless, Defendant Fuld replied, "I agree with all of it."  Though the Company did not obtain the financing from Korea, Defendant Fuld's efforts should have been focused on what was best for the Company, the Plan, and its participants rather than punishing a vocal Lehman critic.

223.    On June 2, 2008, Standard & Poor's lowered its credit rating for Lehman, citing questions about the Company's financing of its operations.  On June 3, 2008, the market price for Company Stock fell nearly $3 per share, or 8%, in response to that downgrade.

224.    The Company faced continuing concerns about its liquidity the following day, as Lehman was forced to deny rumors that it had resorted to borrowing from the Federal Reserve's "discount window."  But on June 3, 2008, THE WALL STREET JOURNAL reported that Lehman intended to raise an estimated additional $3 to $4 billion in capital following other significant fund raising earlier in 2008, including a $4 billion bond offering in January 2008 and the sale of

$1.9 billion of preferred shares in February 2008, which heightened concerns about the Company's ability to access the capital it needed. Company Stock fell another $3 per share on June 3, 2008, in response to those additional concerns.

225.    Despite the Company's rapidly deteriorating financial condition and prospects, Defendants continued to breach their fiduciary duties to the Plan and its participants by failing to divest the Plan of any accumulated Company Stock, by permitting Plan participants to add to their Company Stock allocations through the Company Stock Fund, and by withholding material, adverse information from Plan participants.

226.    In an email exchange on June 3, 2008, some executives from Neuberger Berman, Lehman's money management subsidiary, recommended that Lehman's top management forgo their bonuses in 2008 to reduce expenses and show that management remained accountable for Lehman's recent performance.   (LB 008234-35, produced in connection with the Lehman Congressional Hearing).

227.    George H. Walker, head of Neuberger Berman, responded to that suggestion as follows: "Sorry team.  I'm not sure what's in the water at 605 Third Avenue today . . . . I'm embarrassed and I apologize." *Id.*

228.    Referring to the executives who suggested that Lehman's top management forego their 2008 bonuses, Defendant Fuld responded, "Don't worry – they are only people who think about their own pockets." *Id.*

229.    The exchange of emails demonstrated that Lehman's top management was unwilling to accept responsibility for Lehman's financial woes.  Rather, they mocked and ridiculed the suggestion that they defer any portion of their executive compensation.

230.    According to report by the Mortgage Bankers Association ("MBA") issued on June 5, 2008, for the first time in history, more than one million homes were reported to be in foreclosure, up from 938,000 homes that were in foreclosure at the end of last 2007.  The report included indications that the foreclosure crisis was worsening: 448,000 homes began the foreclosure process during the first quarter of 2008, up from 382,000 that began the process in the last quarter of 2007.  According to the report, loans at subprime rates were to blame for 39% of those foreclosures.

231.    On June 9, 2008, Benoit D'Angelin, a partner at Centaurus Capital Ltd., a hedge fund, and former co-head of European investment banking at Lehman, sent an e-mail to Hugh McGee, the global head of investment banking at Lehman, stating that many bankers had been calling in the last few days, and the mood had become "truly awful."  (LB 008399, produced in connection with the Lehman Congressional Hearing).  The email warned, "all the hard work we have put in could unravel very quickly," and advised that "some senior managers have to be much less arrogant and internally admit that major mistakes have been made.  Can't continue to say 'we are great, and the market doesn't understand.'"  Mr. McGee forwarded this e-mail to Defendant Fuld that same day, and explained it was representative of many others he had received.

232.    Nevertheless, Defendants and Lehman's senior managers made no such admission to Plan participants.

233.    On June 9, 2008, prior to the market opening, Lehman issued a press release announcing its financial results for the second quarter of 2008 one week ahead of schedule. Lehman reported a net loss of $2.8 billion – nearly ten times the loss analysts had anticipated and

the first quarterly loss in the Company's history – following write-downs of $3.7 billion to the

Company's mortgage-backed assets. The press release stated in relevant part:

> NEW YORK, June 9, 2008 – Lehman Brothers Holdings Inc. (ticker symbol: LEH) announced today that continued challenging market conditions will result in an expected net loss of approximately $2.8 billion, or ($5.14) per common share (diluted) for the second quarter ended May 31, 2008, compared to net income of $489 million, or $0.81 per common share (diluted), for the first quarter of fiscal 2008 and $1.3 billion, or $2.21 per common share (diluted), for the second quarter of fiscal 2007.  For the first half of fiscal 2008, the Firm expects to report a net loss of approximately $2.3 billion, or ($4.33) per common share (diluted), compared to net income of $2.4 billion, or $4.17 per common share (diluted), for the first half of fiscal 2007.

> The Firm expects to report net revenues (total revenues less interest expense) for the second quarter of fiscal 2008 of negative ($0.7) billion, compared to $3.5 billion for the first quarter of 2008 and $5.5 billion for the second quarter of fiscal 2007.  Net revenues for the second quarter of fiscal 2008 reflect negative mark to market adjustments and principal trading losses, net of gains on certain debt liabilities.  Additionally, the Firm incurred losses on hedges this quarter, as gains from some hedging activity were more than offset by other hedging losses.  For the first six months of fiscal 2008, the Firm expects to report net revenues of $2.8 billion, compared to $10.6 billion for the first half of fiscal 2007.

> During the fiscal second quarter, the Firm further strengthened its liquidity and capital position (all below amounts estimated as of May 31, 2008):

> - Grew the Holding Company liquidity pool to an estimated $45 billion from $34 billion at the end of the prior quarter

> - Decreased gross assets by approximately $130 billion and net assets by approximately $60 billion

> - Reduced exposure to residential mortgages, commercial mortgages and real estate investments by an estimated 15-20% in each asset class

> - Increased the Firm's long-term capital through the issuance of $4 billion of convertible preferred stock in April and

approximately $5.5 billion of public benchmark long-term debt

. . .

Business Segments

Fixed Income Capital Markets is expected to report net revenues of negative ($3.0) billion, compared to $0.3 billion in the first quarter of 2008 and $1.9 billion in the second quarter of 2007. Excluding mark to market adjustments, related hedges and structured note liability gains, client activity in securitized products, municipals and commodities remained strong, while credit, interest rate and financing were down from last quarter but each up versus the year ago period.

234.     Commenting on the financial results, Defendant Fuld stated:

I am very disappointed in this quarter's results. Notwithstanding the solid underlying performance of our client franchise, we had our first-ever quarterly loss as a public company. However, with our strengthened balance sheet and the improvement in the financial markets since March, we are well-positioned to serve our clients and execute our strategy.

235.     Also on June 9, 2008, Lehman issued a press release announcing that it would be raising $6 billion in capital through the sale of $4 billion in common stock and $2 billion in preferred stock, dwarfing the June 3, 2008 $3 to $4 billion estimate that THE WALL STREET JOURNAL had reported Lehman was likely to raise.

236.     As reported by THE WALL STREET JOURNAL on July 10, 2008, the "Lehman shares tumbled 8.7% [on June 9, 2008], or $2.81 [per share], to $29.48 . . . stem[ming] from investor frustration over the $6 billion in fresh capital raised by the company. That infusion has increased its cushion against potential losses but is diluting the value of Lehman's common-stock by about 30%."

237.    After Lehman's disclosure, Moody's downgraded its rating of Lehman to "negative" from "stable," citing concerns about its exposure to real estate. In addition, the price of the Lehman's shares fell 12%, dropping from $32.29 to close at $28.47 on June 9, 2008.

238.    The extent of the Company's losses and write-downs was staggering. On June 9, 2008, *Bloomberg News* quoted David Hendler, an analyst at CreditSights Inc., as follows: "It's kind of sobering for people who have been listening to the company these last six to nine months that they had everything under control."

239.    On June 12, 2008, the Associated Press published an article entitled "Lehman Brothers Removes Finance, Operating Chiefs," which stated in relevant part:

> NEW YORK (AP) – Lehman Brothers Holdings Inc. shook up its management Thursday, removing two top executives in a concession that attempts to quell Wall Street anger over recent losses have failed.
>
> The nation's fourth-largest investment bank said Chief Financial Officer Erin Callan and Chief Operating Officer Joseph Gregory have been removed from their positions, days after the investment bank announced a $3 billion quarterly loss.
>
> Investors were shaken after the company disclosed Monday it needed $6 billion of fresh capital to offset that loss, its first since going public in 1994. "When you have a stumble of this magnitude, change is not a bad thing," said Lauren Smith, an analyst with Keefe, Bruyette & Woods. "I view the change, on the margin, as a good thing, but this runs a lot deeper than just changing a few high level managers."
>
> Since March, Callan had been taking on an increasingly more prominent profile as the face of Lehman during the credit crisis. She regularly met with analysts and appeared at investor conferences to talk up the company.
>
> On Monday, Callan again waved the flag – telling analysts on a telephone call that Lehman's books were in order and that the fresh dose of capital would allow traders to pursue new opportunities. But her pep talk failed and shares began to plummet toward a record low.

The lack of confidence in Lehman's leadership has been hanging over the company for weeks, and it was unclear if the management upheaval will be enough to satisfy critics.

Shares have lost more than 20 percent this week and were down nearly 2 percent at midday.

240.    A series of talking points were assembled in an internal document prepared in June 2008, addressing why the Company had posted record losses during the prior year.  In response to questions such as "WHY DID WE ALLOW OURSELVES TO BE SO EXPOSED?" the document gave reasons such as "CONDITIONS CLEARLY NOT SUSTAINABLE"; "SAW WARNING SIGNS": "DID NOT MOVE EARLY/FAST ENOUGH"; and "NOT ENOUGH DISCIPLINE ABOUT CAPITAL ALLOCATION."  (LB 011894, produced in connection with the Lehman Congressional Hearing).

241.    When shown the internal document during the October 6, 2008, congressional hearing, Defendant Fuld first claimed ignorance of the document.  After Committee members contended it was either his or was reviewed by him, Defendant Fuld admitted: "if you tell me it is mine, I believe you."  Preliminary Hearing Transcript, p.160.

242.    On June 16, 2008, the Company issued a press release entitled "Lehman Brothers Reports Second Quarter Results – Reports Net Loss of $2.8 Billion, or ($5.14) Per Share," in which the Company reported a net loss of $2.8 billion for the second quarter ended May 31, 2008, compared to net income of $489 million for the first quarter of fiscal 2008 and $1.3 billion for the second quarter of fiscal 2007.  Further, for the six months of fiscal 2008, the Company reported a net loss of approximately $2.3 billion, compared to net income of $2.4 billion, for the first half of fiscal 2007.

243.    Unwilling to acknowledge the Company's steep decline even after reporting staggering losses, during a June 16, 2008, earnings call with investors, Defendant Fuld stated,

"Let me discuss our current asset valuation on those remaining positions. I am the one who ultimately signs off and am comfortable with our valuations at the end of the second quarter, because we have always had rigorous internal process. . . . ***Our capital and liquidity positions have never been stronger***." [Emphasis added].

244.    The Company's Form 10-Q, filed on July 10, 2008, for the period ending May 31, 2008 ("Second Quarter 2008 Form 10-Q"), also noted that Lehman had reduced assets, "inventory positions related to residential mortgages, commercial mortgage and real estate-related investments, and acquisition finance facilities."

245.    On July 11, 2008, an article entitled "Shares of Lehman Take a Beating as Anxiety Builds in the Mortgage Market," appeared in the *New York Times*, which reported that Company Stock had fallen 12%, to $17.30 per share, when regulators said "they would not bail out all financial institutions." The article noted that in 2008, Lehman had lost 70% of its value, while broker-dealer stocks in general were down 33%.

246.    Even after the government announced that it would not bail out other failing financial institutions, significantly increasing the risk that Lehman would collapse under the weight of its subprime mortgage risk, Defendants continued to breach their fiduciary duties by continuing to offer Company Stock as a retirement saving option in the Plan, failing to reduce the number of shares held by the Plan or preventing Plan participants from allocating even more shares to their accounts, and concealing the full nature and extent of the risk of catastrophic loss from the Plan participants.

247.    According to the *New York Times*, on July 28, 2008, Secretary Paulson made a late-afternoon announcement that four major banks were planning to issue a new type of bond to aid the mortgage market. This announcement, however, did not stem Lehman's stock's slide,

which dipped 10.4% by day's end.

248.    On August 18, 2008, THE WALL STREET JOURNAL reported that some analysts expected a loss of $1.8 billion or more in the company's fiscal third quarter, which was less than two weeks away.  If true, Lehman's losses since early March would be at least $4.5 billion, or more than the profit Lehman made in fiscal year 2007.

249.    On August 19, 2008, the *New York Times* reported that Lehman was considering selling all or part of its money management division "to private equity firms to raise billions of dollars of capital and ease the pressure cause by losses related to real estate."  The article explained that:

> Through the mortgage boom, Lehman was a major player in the selling and packaging of residential and commercial mortgages.  That has come back to haunt the firm, whose top management has extolled the virtues of conservative risk management.  In the second quarter, Lehman lost $2.8 billion, mostly caused by write-downs from residential real estate investments, and was forced to raise $6 billion.  Investors who bought into that deal have been burned as Lehman's stock has continued to fall.

250.    The *New York Times* also reported on August 22, 2008, that Company Stock had "plunged more than 10 percent on 11 days of the last quarter," and that despite Lehman's significant exposure on approximately $61 billion in mortgages and asset-backed securities, it was "seeming[ly] reluctant to take drastic steps."

251.    As the price for Company Stock plummeted and as Lehman edged closer to bankruptcy, Defendants continued to breach their fiduciary duties to the Plan and its participants by failing to divest the Plan of any accumulated Company Stock, by permitting Plan participants to add to their Company Stock allocations, and by withholding material adverse information about the Company's growing need for capital to fund continued operations.

252.    On August 30, 2008, THE WALL STREET JOURNAL reported that Lehman was

exploring a structure to permit it to offload billions of dollars in real estate loans from its books, by setting up a "so-called good bank/bad bank structure." The main difficulty, the article explained, was finding financing for such a spinoff or sale of these assets.

253.    On or about September 4, 2008, J.P. Morgan, Lehman's "clearing bank," *i.e.,* the middleman that stood between Lehman and its clients, demanded $5 billion in additional collateral to protect itself and its clients. October 6, 2008, *The Two Faces of Lehman's Fall,* Wall Street Journal. When this went unresolved, five days later, on September 9, 2008, Steven Black, co-CEO of J.P. Morgan's investment bank called Defendant Fuld, demanding an additional $5 billion in collateral. *Id.* Fuld agreed to provide $3 billion right away, and did not reach any agreement regarding the prior $5 billion request.

254.    A September 5, 2008, a *New York Times* article, entitled "Lehman May Split Off Weak Holdings," further discussed the "good bank/bad bank" solution to the Company's problems. The article explained that Lehman was "contemplating placing about $30 billion of troublesome commercial mortgages and real estate that it owns into a new publicly traded company – the 'bad' bank. The rest of Lehman – the 'good' one – would then be able to carry on with the help of a cash infusion from one or more investors."

255.    On September 9, 2008, top Lehman executives discussed the need to raise between $3 and $5 billion to "shore up capital by early 2009." "The Two Faces of Lehman's Fall," THE WALL STREET JOURNAL (October 6, 2008).

256.    On September 10, 2008, the Company issued a press release announcing preliminary results for the third quarter ended August 31, 2008. The Company reported a net loss of $3.9 billion and announced "a comprehensive plan of initiatives to reduce dramatically the firm's commercial real estate and residential mortgage exposure, generate additional capital

through the sale of a majority stake of the Investment Management Division and reduce the annual dividend, in order to maximize value for clients, shareholders and employees."  The press release stated in pertinent part:

> OVERVIEW OF PRELIMINARY THIRD QUARTER RESULTS
>
> Lehman Brothers reported a preliminary net loss of approximately ($3.9) billion, or ($5.92) per common share (diluted), for the third quarter ended August 31, 2008, compared to a net loss of ($2.8) billion, or ($5.14) per common share (diluted), for the second quarter of fiscal 2008 and net income of $887 million, or $1.54 per common share (diluted), for the third quarter of fiscal 2007.  The net loss was driven primarily by gross mark-to-market adjustments stemming from write-downs on commercial and residential mortgage and real estate assets.
>
> Net revenues (total revenues less interest expense) for the third quarter of fiscal 2008 are expected to be negative ($2.9) billion, compared to negative ($0.7) billion for the second quarter of fiscal 2008 and $4.3 billion for the third quarter of fiscal 2007.  Net revenues for the third quarter of fiscal 2008 reflect negative mark-to-market adjustments and principal trading losses, net of gains on certain risk mitigation strategies and certain debt liabilities.
>
> During the fiscal third quarter, the Firm is expected to incur negative gross mark-to-market adjustments on assets of ($7.8) billion, including gross negative mark-to-market adjustments of ($5.3) billion on residential mortgage-related positions, ($1.7) billion on commercial real estate positions, ($600) million on other asset-backed positions and ($200) million on acquisition finance positions.  These mark-to-market adjustments were offset by $800 million of hedging gains during the quarter and $1.4 billion of debt valuation gains.  The Firm is also expected to record losses on principal investments of approximately $760 million.
>
> In order to increase operating efficiency, the Firm has eliminated approximately 1,500 positions since the beginning of the third quarter in discretionary corporate areas and businesses that are in secular decline.

257.    The September 10, 2008, press release explained that Lehman had "reduced its commercial real estate exposure by 18% in the third quarter from $39.8 billion to $32.6 billion"

and was eyeing a spin off of the Company's commercial real estate portfolio into a separate publicly-traded company.

258.    In a conference call for investors that day, Defendant Fuld said that Lehman intended to sell a majority stake in its investment management division and would cut its dividend.  Defendant Fuld told investors the firm was "on the right track to put these last two quarters behind us."  Defendant Fuld did not mention the discussion among top Lehman executives the night before regarding the Company's need to raise between $3 and $5 billion.

259.    Indeed, when asked during the conference call whether the Company needed to raise another $4 billion, Ian Lowitt, Lehman's CFO, denied the Company's need for additional capital: "We don't feel that we need to raise that extra amount."  Earlier in the conference call, Mr. Lowitt stated, "Our capital position at the moment is strong."

260.    On September 10, 2008, *Investors Business Daily* reported that Company Stock had crashed 45% the previous day, to a near decade low.  The article also revealed that Lehman had reportedly ended talks to sell a stake to state-owned Korea Development Bank.

261.    The next day, on September 11, 2008, Jane Buyers Russo, head of J.P. Morgan's broker-dealer unit, called Lehman's treasurer, Paolo Tonucci, demanding the $5 billion in collateral that J.P. Morgan had asked for earlier.  "The Two Faces of Lehman's Fall," THE WALL STREET JOURNAL (October 6, 2008).   In acceding to J.P. Morgan's demand, Lehman's computerized trading systems temporarily froze and the Company was nearly left with insufficient capital to support its trading and other operations.  *Id.*

262.    Also on September 11, 2008, despite Lehman's precarious cash position, a request was submitted to the Compensation Committee of Lehman's Board to give three departing

executives over $20 million in "special payments." (LB 004731, et seq., produced in connection with the Lehman Congressional Hearing).

263.    On Friday, September 12, 2008, credit rating agencies warned the Company that its debt would be further downgraded if Lehman was unable to raise additional capital. "The Two Faces of Lehman's Fall," THE WALL STREET JOURNAL (Oct. 6, 2008).

264.    By then, customers were leaving Lehman in droves, so much so that the Company "couldn't properly process the requests." "The Two Faces of Lehman's Fall," THE WALL STREET JOURNAL (Oct. 6, 2008). Moreover, the firm's cash-management system could not handle the overload and, as a result, Lehman's New York operations were unable to transfer money to its London accounts, leaving Lehman's London operations, or its counterparties, short by an estimated $5 billion by Monday September 15, 2008, as estimated by PricewaterhouseCoopers LLP. *Id.*

265.    After close of business Friday, Lehman's busy weekend began. The New York branch of the Federal Reserve arranged emergency meetings which began that night. Representatives of the Fed asked firms, including Goldman Sachs Group Inc. and Credit Suisse, to value the Company's commercial-real-estate portfolio and to consider buying it.

266.    At the same time, Lehman worked to try and arrange a sale of the Company to potential buyers Barclays PLC or Bank of America, who were not interested. Additionally, counsel for Lehman began preparing Chapter 11 papers in the event they were needed. THE WALL STREET JOURNAL "The Two Faces of Lehman's Fall," October 6, 2008.

267.    Over the course of those weekend meetings, Lehman was grilled as to why it hadn't reduced the value of its $32.6 billion commercial-real-estate holdings, as it was obligated to do. As THE WALL STREET JOURNAL explained, "Securities firms are required to 'mark to

market' their holdings, meaning to value them on their books at the level at which they could sell them right away."  Executives reviewing Lehman's commercial real estate portfolio put the Company's valuation thereof at approximately 35% more than it should have been valued.  *Id.*

268.    By Sunday September 14, 2008, with no bail-out offered by the government and no buyer in sight, the Company finalized its bankruptcy filing, which was filed shortly after midnight, on September 15, 2008.  *Id.*

269.    Even as the Company stood on the doorstep of bankruptcy, Defendants continued to breach their fiduciary duties to the Plan and its participants by failing to divest the Plan of any accumulated Company Stock, by permitting Plan participants to add to their Company Stock Fund allocations, by failing to withdraw the Company Stock Fund as a Plan investment option, and by withholding material adverse information about the Company's then-impending bankruptcy, unreasonably and inexplicably exposing the Plan's participants to near-certain catastrophic loss of their retirement savings.

270.    On September 15, 2008, Lehman filed a voluntary petition to reorganize under Chapter 11 of the Federal Bankruptcy Code in the U.S. Bankruptcy Court for the Southern District of New York.  Lehman's bankruptcy filing listed debts of $613 billion and named banks from Tokyo, Hong Kong, New York, Singapore, Taipei and elsewhere as unsecured creditors of hundreds of millions of dollars.  According to THE WALL STREET JOURNAL, Lehman's bankruptcy is the largest bankruptcy in U.S. history "by a factor of six."

271.    On September 16, 2008, the *New York Times* reported that Barclays had reached a tentative agreement to buy Lehman's core capital markets business for $1.75 billion, which was "far less than Lehman had hoped for."

272.    In describing the Barclays deal, THE WALL STREET JOURNAL reported on September 17, 2008, that "[t]he price tag, for what was roughly half the entire company, appears to value the business at a tiny fraction of what it would have fetched 18 months ago. The acquisition includes Lehman's headquarters, built in 2001 and currently worth $600 to $900 million, according to real-estate brokers. By comparison, the company's entire stock-market value in early 2007 was $45 billion."

273.    According to a report by CNN on September 23, 2008, the FBI is investigating Lehman and other companies as well as their senior executives for potential mortgage fraud. The FBI is seeking to determine whether anyone at Lehman, including its senior executives, had any responsibility for providing "misinformation," CNN reported.

274.    On September 24, 2008, *Datamonitor Wires* reported that Barclays had announced that Lehman had begun to reopen for business under the ownership of Barclays Capital, following the Bankruptcy Court's approval of Barclays' agreement to purchase Lehman's "fixed income and equity sales, trading and research; prime services; investment banking; principal investing; and private investment management businesses in North America."

275.    On October 7, 2008, THE WALL STREET JOURNAL reported that at least three United States Attorneys are investigating whether Lehman misled investors before its bankruptcy filing. The central issue under investigation is whether Lehman's public statements concerning the soundness of its financial condition differed from its own "behind the scenes" internal evaluations, such that a case could be brought that Lehman fraudulently misled shareholders and other parties.

276.    Separately, prosecutors are investigating whether Lehman: (i) valued its commercial real estate assets at artificially high levels; (ii) improperly transferred $8 billion from

its London operations to New York just ahead of its bankruptcy filing; and (iii) misled New Jersey's pension fund concerning the Company's financial health in connection with a $6 billion stock offering in June.  As of October 16, 2008, twelve people had been subpoenaed in connection with those investigations.  Ben James, "Lehman Brothers Targeted in Three Grand Jury Probes," available at http://securities.law360.com/articles/73154.

      **D.**      **The Congressional Hearing Into Causes and Effects Of The Lehman Bankruptcy**

      277.    In his opening statement at the October 6, 2008, congressional hearing, Rep. Waxman charged that Lehman and Defendant Fuld failed to take responsibility for the collapse of Lehman, noting that internal documents "portray a company in which there was no accountability for failure."

      278.    The Committee estimated that Defendant Fuld pocketed roughly $480 million in pay since 2000.  In his defense, Defendant Fuld suggested that his pay was closer to $350 million in that time, and noted that Lehman's compensation system ties executive pay to performance.

      279.    During the congressional hearing, Nell Minow, Editor of the Corporate Library, reviewed the ratings her firm gave to Lehman's Board:

- March, 2002 – Coverage initiated, initial overall D rating assigned;
- June, 2003 – Rating upgraded to overall B;
- October, 2003 – Rating downgraded to overall C;
- June, 2004 – Rating downgraded to overall D;  and
- September, 2008 – Rating downgraded to overall F

      280.    Ms. Minow gave the Committee the following excerpt from one of the Corporate Library's analyst notes on the Company:

> Although [CEO Richard Fuld's] 2007 salary of $750,000 is well below the median for companies of similar size, his non-equity incentive compensation of $4,250,000 exceeded the 85th percentile.  While typical target bonus is two times base salary, Mr.

Fuld's was more than five times his base salary. Additionally, his total annual compensation of $71,924,178 ranks in top 3% for similarly-sized companies. This figure includes $40,278,400 from value realized on the exercise of options and $26,470,870 from value realized on vesting of shares. This raises serious concerns over the alignment of compensation practices with shareholder interests.

281.    Defendant Fuld's compensation over the past five years is was as follows:

| 5-Year Compensation -- Fuld | Amount |
|---|---|
| Base Salary | $3,750,000 |
| Annual Bonus | $41,150,000 |
| Equity Value Realized | $225,068,018 |
| All Other Compensation | $391,012 |
| **5-year total** | **$269,968,018** |

282.    Commenting on Lehman's Board, Ms. Minow stated:

Pay that is out of alignment is one of the causes of poor performance but it is also an important symptom – of an ineffective board.

We have looked at bad boards for several years and we often see patterns other than poorly designed pay packages that recur in the boards later proved to be the most dysfunctional. A number of those patterns are present in the Lehman board. They include inadequate expertise and too-long tenure.

While some of the individual director backgrounds at Lehman reflect more experience in banking and financial services than some of the other recent failed firms, overall it did not have the depth of experience it needed. Notes Dennis K. Berman of the Wall Street Journal:

Nine of them are retired. Four of them are over 75 years old. One is a theater producer, another a former Navy admiral. Only two have direct experience in the financial-services industry . . . . Until the 2008 arrival of former US Bancorp chief Jerry Grundhofer, the group was lacking in current financial-knowledge firepower. A number of the members did have past financial-markets expertise, but most of their working lives were tied to a different era: The one before massive securitization, credit-default swaps, derivatives trading, and all the risks those products created.

Until recently, one director was actress Dina Merrill, daughter of E.F. Hutton. She retired in 2006 at age 83 after 18 years of service. At the time of her retirement Ms. Merrill was a member of Lehman's Nominating & Corporate Governance and Compensation & Benefits Committees.

Currently serving on the board is Broadway producer Roger Berlind, 76, the longest tenured member of the Lehman board, his only public company directorship. While we do not recommend over-boarding, it is usually not a good idea to have people on boards who have no other board or sector experience. Mr. Berlind is a member of Lehman's Audit and Finance & Risk Management Committees. Also on the board is Marsha Johnson Evans, 60, a former Rear Admiral with the US Navy and head of the American Red Cross and Girl Scouts of the USA. Ms. Evans is a member of Lehman's Nominating and Corporate Governance, Compensation & Benefits, and Finance & Risk Management Committees. She is also an active director of three other large US corporations: Weight Watchers International, Office Depot, and Huntsman Corporation; she is a former director of AutoZone. Michael Ainslie, who has been on the board for 12 years, is the former Chief Executive Officer Sotheby's and former President and CEO of the National Trust for Historic Preservation.

With regard to tenure, which can impair independence of judgment, this is a board with very little turnover. Roger Berlind has been on the board for 23 years and six other directors have served for over a decade.

Another point worth noting is that Lehman's Finance & Risk Management Committee, which is chaired by 80 year old director Henry Kaufman, only met twice in 2007, and twice in 2006. Kaufman has served on the Lehman board for 14 years; he was also a member of the Freddie Mac board, from which he retired in 2004 after 13 years of service. A company in this sector should have a risk management committee that is vitally involved and has a great depth of expertise. A company that had $7 billion in losses after becoming embroiled in the global credit crisis had a risk management committee that did not understand or manage its risk.

283.    Ms. Minow took Lehman's Board to task, noting it had "no clue" about the derivative securities and credit default swaps at issue in Lehman's demise.

284.    Luigi Zingales, Professor of Finance at the University of Chicago, also provided testimony before Congress on October 6, 2008. He opined that, *inter alia*, part of Lehman's

downfall, and for the subprime crisis, was the relationship between investment banks and rating agencies: "instead of submitting an issue to the rating agency's judgment, investment banks shopped around for the best ratings and even received handbooks on how to produce the riskiest security that qualified for an AAA rating."

285.    Prof. Zingales also explained that the lack of transparency of these vehicles coupled with their complexity were "such that small differences in the assumed rate of default can cause the value of some tranches to fluctuate from 50 cents on the dollar to zero."

286.    Prof. Zingales also testified that Lehman's situation was aggravated by its very high leverage and "strong reliance on short-term debt financing." Even though commercial banks may not leverage their assets-to-equity ratio by more than 15 to 1, Lehman's leverage ratio was more than double that amount. As Prof. Zingales explained, with such high leverage, "a mere drop of 3.3% in the value of assets wipes out the entire value of equity and makes the company insolvent." Prof. Zingales testified that Lehman's leverage woes were exacerbated by its heavy reliance on short-term debt, which increased the risk of "runs" on its cash like those a bank faces when it is rumored to be insolvent.

287.    Prof. Zingales testified that Lehman's demise was not an accident, but rather the result of an "unlucky draw of a consciously-made gamble."

288.    In response to examination by Rep. John Tierney, Ms. Minow refuted Defendant Fuld's claim that he was a "victim of circumstances." Addressing Defendant Fuld's assertion, Ms. Minow testified emphatically: "No. I think it is horrific. I can't believe that he would have the chutzpah to say something like that. I hold him completely responsible. I hold him responsible and his board responsible for the foreseeable consequences of the decisions they made."

289.    Prof. Zingales echoed that sentiment, testifying that Defendant Fuld was responsible for having, among other things "a too aggressive leverage policy, too much short-term debt that makes the firm sort of at risk of a background that is exactly what happened, and to have not controlled the risk that the firm was taking during this boom period."

## VII.    CONDUCT CONSTITUTING DEFENDANTS' FIDUCIARY BREACHES

290.    ERISA imposes strict fiduciary duties of loyalty and prudence upon the Defendants as fiduciaries of the Plan.  Defendants breached their duties to manage the Plan's assets prudently and loyally because, during the Class Period, Defendants knew or should have known that Company Stock was not a prudent investment for the Plan and knew or should have known that the value of Company Stock was exposed to an unacceptable risk of loss.

291.    Throughout the Class Period, Defendants knew or should have known of the unreasonable risk of subprime debt loss to which the Company was exposed and the enormous risk posed by its leveraged position, as alleged herein.  Nonetheless, Defendants permitted the Company Stock Fund to be offered as a retirement saving option in the Plan, did nothing to reduce the number of shares held by the Plan or preclude Plan participants from allocating even more shares to their accounts, and withheld material adverse information about the Company's deteriorating financial condition and prospects from them, leaving the Plan and its participants heavily exposed to the subprime risk.

292.    Upon information and belief, no Defendant conducted an appropriate investigation into whether Company Stock was a prudent retirement saving option for Plan participants in light of the Company's extreme risk of subprime debt loss, or whether Company Stock was a prudent retirement saving option for Plan participants at the prices it traded during the Class Period in light of the material adverse information concealed from the investing public

during the Class Period, despite the large number of shares of Company Stock held in the Company Stock Fund in the Plan during the Class Period.

293.    Moreover, no Defendant provided Plan participants with adequate information regarding the true nature and extent of Lehman's extraordinary subprime credit risk, such that Plan participants could make informed decisions whether to allocate their Plan contributions to Company Stock as a means of saving for retirement.

294.    Indeed, not one of the Defendants took any meaningful action to protect the Plan against the risk of enormous losses as a result of the Company's very risky and inappropriate corporate misconduct.

295.    On a Plan-wide and Class-wide basis, the risk of an undiversified investment in Company Stock imposes a greater risk than that of other undiversified investments.

296.    The risk associated with allocating Plan contributions to the Company Stock Fund during the Class Period was extraordinary, far above and beyond a prudent level of risk associated with retirement saving.  This abnormal investment risk could not have been known by the Plan's participants, and the Defendants knew or should have known that it was not known by them because the Defendant fiduciaries never disclosed it.  This extraordinary risk made any investment in Company stock inappropriate and imprudent.

297.    Defendants had a heightened duty with regard to both the decision to continue investing in the Company Stock Fund as well as the duty to inform participants concerning the imprudence of investing in the Company Stock Fund.  Ultimately, it was imprudent for Defendants to continue to offer Company Stock in the Company Stock Fund as a Plan investment option, and that it was imprudent for Plan fiduciaries to continue to invest Plan assets in Company Stock through the Company Stock Fund.

298.    Defendants breached their fiduciary duties when they (i) failed to conduct an appropriate investigation into whether Company Stock was a prudent retirement saving option; (ii) failed to develop appropriate guidelines for allocating retirement contributions to the Company Stock Fund; (iii) failed to divest the Plan of Company Stock; (iv) failed to discontinue further allocation of retirement contributions to Company Stock in the Plan; (v) failed to remove Company Stock as a retirement saving option in the Plan; (vi) failed to halt the investment of Plan assets in Company Stock; (vii) failed to consult with or appoint independent fiduciaries regarding the appropriateness of Company Stock as a retirement saving option; (viii) failed to disclose sufficient information about Lehman's financial condition and prospects to permit Plan participants to make informed decisions whether to allocate retirement contributions to the Company Stock Fund in the Plan; and (ix) failed to resign as fiduciaries of the Plan, if as a result of their employment by Lehman, they could not loyally serve the Plan and its participants.

299.    Defendants breached their fiduciary duties by making direct and indirect communications with Plan participants in their fiduciary capacity which contained false or misleading statements that Defendants knew or should have known were untrue or inaccurate. These communications included statements regarding Lehman's lending practices, its earnings, and its profitability as alleged herein that were contained in the documents specifically incorporated into the SPD, including Form 10-K annual reports, Form 10-Q quarterly reports, and Form 8-K periodic reports, Lehman's annual reports, and the Plan's annual reports on Form 11-K.  No Defendant took any action to remedy the breaches set forth in this paragraph.

300.    Moreover, Defendants knew or recklessly disregarded certain well-recognized facts about the characteristics and behavior of retirement plan participants, including:

      (a)    out of loyalty, employees tend to invest in company stock;

(b)    employees tend not to change their retirement saving allocations once made;

(c)    lower income employees tend to invest more heavily in company stock than more affluent workers, though they are at greater risk; and

(d)    many employees do not recognize their exposure to massive loss from failing to diversify their retirement savings.

301.    Any warnings of market and diversification risks that Defendants made to Plan participants regarding Company Stock as a means of saving for retirement did not effectively inform the Plan participants of the past, immediate, and future risk of investing in Company Stock that Defendants knew or should have known, as alleged herein.

302.    Based on their actual or constructive knowledge as set forth herein, Defendants knew about Lehman's risky exposure to the subprime credit market.  Defendants knew or should have known of the affirmative misrepresentations made to Participants in the SEC documents and annual reports incorporated into the SPD.  Defendants knew that the Plan participants lacked the knowledge that Defendants had or should have had concerning the unsound business practices and knew or should have known that the Plan participants would be harmed by this lack of knowledge.  Defendants, on a Plan-wide and Class-wide basis, never accurately disclosed to Plaintiffs or the Plan participants the true nature, extent, and risks of these problems.  Rather, Defendants failed to timely communicate accurate information to the Plan participants concerning Lehman's true financial condition, including its risky exposure to the subprime credit market in prior periods, when they knew or should have known that the Plan participants needed this information.  Defendants or their individual fiduciary delegates, on a Class-wide and Plan-wide basis, failed to provide the Plan participants with complete and accurate information

regarding Company Stock, such that the participants could appreciate the true risks presented by investments in the Company Stock Fund and could make informed decisions, thereby avoiding the unreasonable and entirely predictable losses incurred as a result of the Plan's investment in Company Stock.  No Defendant took any action to remedy the breaches set forth in this paragraph.

303.    The Director Defendants failed in their fiduciary responsibilities in monitoring the Compensation Committee Defendants or the Benefit Committee Defendants (including any additional "John Doe" Defendants).

304.    The Director Defendants breached their fiduciary duties because they did not have procedures in place so that they could review and evaluate on an ongoing basis whether the Compensation Committee Defendants or the Benefit Committee Defendants (including any additional "John Doe" Defendants) were performing their duties adequately and in accordance with ERISA's fiduciary provisions.

305.    The Director Defendants failed adequately to review the performance of the Compensation Committee Defendants or the Benefit Committee Defendants (including any additional "John Doe" Defendants) to: (i) ensure that they were fulfilling their fiduciary duties under the Plan and ERISA; (ii) ensure that they had adequate information to do their job of overseeing the Plan's investments; (iii) ensure that they had adequate access to and use of impartial advisors when needed; and (iv) ensure that they reported regularly to the Board.

306.    The Director Defendants breached their fiduciary duties to remove the Compensation Committee Defendants or the Benefit Committee Defendants (including any additional "John Doe" Defendants) when they knew they had breached their fiduciary duties.

## VIII.    REMEDY FOR BREACHES OF FIDUCIARY DUTY

307.    Defendants breached their fiduciary duties in that they knew or should have known the facts as alleged above, and therefore knew or should have known that the Plan's assets should not have been invested in Company Stock through the Company Stock Fund, during the Class Period.  As a consequence of Defendants' breaches, the Plan suffered significant losses.

308.    ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2), authorizes a plan participant to bring a civil action for appropriate relief under ERISA § 409, 29 U.S.C. § 1109.  Section 409 requires "any person who is a fiduciary . . . who breaches any of the . . . duties imposed upon fiduciaries . . . to make good to such plan any losses to the plan."  Section 409 also authorizes "such other equitable or remedial relief as the court may deem appropriate."

309.    With respect to calculating the losses to the Plan, breaches of fiduciary duty result in a presumption that, but for the breaches of fiduciary duty, the Plan would not have maintained its investments in the challenged investment and, instead, prudent fiduciaries would have invested the Plan's assets in the most profitable alternative investment available to them.  The Court should adopt the measure of loss most advantageous to the Plan.  In this way, the remedy restores the Plan's lost value and puts the participants in the position they would have been in if the Plan had been properly administered.

310.    Plaintiffs and the Class are therefore entitled to relief from Defendants in the form of: (i) a monetary payment to the Plan to make good to the Plan the losses to the Plan resulting from the breaches of fiduciary duties alleged above in an amount to be proven at trial based on the principles described above, as provided by ERISA § 409(a), 29 U.S.C. § 1109(a); (ii) injunctive and other appropriate equitable relief to remedy the breaches alleged above, as provided by ERISA §§ 409(a), 502(a)(2) and (3), 29 U.S.C. §§ 1109(a), 1132(a)(2) and (3);

(iii) injunctive and other appropriate equitable relief pursuant to ERISA § 502(a)(3), 29 U.S.C. 1132(a)(3), for knowing participation by a non-fiduciary in a fiduciary breach; (iv) reasonable attorney fees and expenses, as provided by ERISA § 502(g), 29 U.S.C. § 1132(g), the common fund doctrine, and other applicable law; (v) taxable costs and interest on these amounts, as provided by law; and (vi) such other legal or equitable relief as may be just and proper.

311.    Under ERISA, each defendant is jointly and severally liable for the losses suffered by the Plan in this case.

## IX.    DEFENDANTS SUFFERED FROM CONFLICTS OF INTEREST

312.    As ERISA fiduciaries, Defendants are required to manage the Plan's investments, including the investment in Company Stock, solely in the interest of the participants and beneficiaries, and for the exclusive purpose of providing benefits to participants and their beneficiaries.  This duty of loyalty requires fiduciaries to avoid conflicts of interest and to resolve them promptly when they occur.

313.    Conflicts of interest abound when a company that invests plan assets in company stock founders.  This is because as the situation deteriorates, plan fiduciaries are torn between their duties as officers and directors for the company on the one hand, and to the plan and plan participants on the other.  As courts have made clear "'[w]hen a fiduciary has dual loyalties, the prudent person standard requires that he make a careful and impartial investigation of all investment decisions.'"  *Martin v. Feilen*, 965 F.2d 660, 670 (8th Cir. 1992) (citation omitted). Here, Defendants breached this fundamental fiduciary duty.

314.    *First*, Defendants failed to investigate whether to take appropriate and necessary action to protect the Plan, and instead, chose the interests of the Company over the Plan by continuing to offer Company Stock, through the Company Stock Fund, as a Plan investment option in the Plan.

315.    *Second*, Defendants Fuld and Hernandez and other Company insiders, who knew or should have known of Lehman's artificially inflated stock price during much of the Class Period, benefited directly from this knowledge or neglect by selling their personal holdings of Company Stock for significant gain.  During the Class Period, Defendants Fuld and Hernandez and other Company insiders sold Company Stock for proceeds of over $198,681,719, as summarized below:

| *Date* | *Name* | *Title* | *Shares Sold* | *Price Sold* | *Proceeds* |
|---|---|---|---|---|---|
| 9/18/06 | Richard S. Fuld, Jr. | Chairman of the Board and CEO | 500,000 | $69.60 | $34,800,000 |
| 12/01/06 | Richard S. Fuld, Jr. | Chairman of the Board and CEO | 74,460 | $73.67 | $5,485,468 |
| 06/15/07 | Richard S. Fuld, Jr. | Chairman of the Board and CEO | 800,000 | $77.56 | $62,048,000 |
| 12/04/07 | Richard S. Fuld, Jr. | Chairman of the Board and CEO | 202,587 | $62.63 | $12,688,024 |
| **Total** | | | **1,577,047** | | **$115,021,492** |
| | | | | | |
| 12/01/06 | Joseph M. Gregory | Former President and COO | 72,251 | $73.67 | $5,322,731 |
| 04/25/07 | Joseph M. Gregory | Former President and COO | 495,503 | $77.59 | $38,446,078 |
| 12/04/07 | Joseph M. Gregory | Former President and COO | 126,846 | $62.63 | $7,944,365 |
| **Total** | | | **694,600** | | **$51,713,174** |
| | | | | | |
| 12/01/06 | Christopher M. O'Meara | Former CFO | 5,874 | $73.67 | $432,738 |
| 12/04/06 | Christopher M. O'Meara | Former CFO | 3,225 | $62.63 | $201,982 |
| **Total** | | | **9,099** | | **$634,720** |
| | | | | | |
| 10/26/06 | Thomas A. Russo | Chief Legal Officer | 34,696 | $77.83 | $2,700,390 |
| 12/01/06 | Thomas A. Russo | Chief Legal Officer | 62,700 | $73.67 | $4,619,109 |
| 06/19/07 | Thomas A. Russo | Chief Legal Officer | 220,000 | $78.84 | $17,344,800 |
| 12/04/07 | Thomas A. Russo | Chief Legal Officer | 57,210 | $62.63 | $3,583,062 |
| **Total** | | | **374,606** | | **$28,247,361** |
| | | | | | |
| 12/15/06 | Roland A. Hernandez | Director | 20,000 | $55.86 | $1,117,200 |
| **Total** | | | **20,000** | | **$1,117,200** |
| | | | | | |
| 12/01/06 | Scott J. Freidheim | Co-Chief Administrative Officer | 6,411 | $73.67 | $472,298 |
| 12/04/07 | Scott J. Freidheim | Co-Chief Administrative Officer | 2,798 | $62.63 | $175,239 |
| **Total** | | | **9,209** | | **$647,537** |
| | | | | | |
| 12/01/06 | Ian T. Lowitt | Co-Chief Administrative Officer and CFO from June 2008 to September 22, 2008 | 13,454 | $73.67 | $991,156 |
| 12/04/07 | Ian T. Lowitt | Co-Chief Administrative Officer and CFO from June 2008 to September 22, 2008 | 4,935 | $62.63 | $309,079 |
| **Total** | | | **18,389** | | **$1,300,235** |
| | | | | | |

| Date | Name | Title | Shares Sold | Price Sold | Proceeds |
|------|------|-------|-------------|------------|----------|
| Collective Total | | | 2,702,950 | | $198,681,719 |

## X.    ERISA § 404(C) DEFENSE INAPPLICABLE

316.    ERISA § 404(c), 29 U.S.C. § 1104(c), is an affirmative defense that provides a limited exception to fiduciary liability for losses that result from participants' exercise of control over investment decisions.  In order for Section 404(c) to apply, participants must in fact exercise "independent control" over investment decisions, and the fiduciaries must otherwise satisfy the numerous procedural and substantive requirements of ERISA § 404(c) and the regulations promulgated thereunder.

317.    ERISA § 404(c) does not apply here for, among others, the following reasons:

(a)    ERISA § 404(c) does not and cannot provide any defense to the fiduciaries' imprudent decision to select and continue offering Company Stock as an investment option in the Plan, or to continue making matching contributions in Company Stock, as these are not decisions that were made or controlled by the participants.  *See* Final Reg. Regarding Participant Directed Individual Account Plans (ERISA Section 404(c) Plans) ("Final 404(c) Reg."), 57 Fed. Reg. 46906-01, 1992 WL 277875, at *46924 n.27 (Oct. 13, 1992) (codified at 29 C.F.R. pt. 2550) (noting that "the act of limiting or designating investment options which are intended to constitute all or part of the investment universe of an ERISA § 404(c) plan is a fiduciary function which, whether achieved through fiduciary designation or express plan language, is not a direct or necessary result of any participant direction of such plan");

(b)    As to participant directed investment in Company Stock, ERISA § 404(c) does not apply because Defendants failed to ensure effective participant control by failing to provide complete and accurate material information to participants regarding Company Stock.

*See* 29 C.F.R. § 2550.404c-1(b)(2)(i)(B) (the participant must be provided with "sufficient information to make informed decisions").  As a consequence, participants in the Plan did not have informed control over the portion of the Plan's assets that were invested in Company Stock as a result of their investment directions, and Defendants remain entirely responsible for losses that result from such investment; and

(c)    Upon information and belief, the Plan participants were not informed that the Plan intended to comply as a § 404(c) plan in the manner required by ERISA and applicable regulations.   Therefore, § 404(c) of ERISA does not apply to participants' "investment decisions" regarding Company Stock, and Defendants remain liable for losses suffered by participants during the Class Period as a result of such decisions.

318.    Because ERISA § 404(c), 29 U.S.C. § 1104(c), does not apply here, Defendants' liability to the Plan, Plaintiffs, and the Class for losses caused by the Plan's investment in Company Stock is established upon proof that such investments were or became imprudent and resulted in losses in the value of the assets in the Plan during the Class Period.

## XI.    <u>CAUSATION</u>

319.    The Plan suffered enormous because Defendants imprudently allowed the Plan to acquire and hold Company Stock in the Company Stock Fund during the Class Period in breach of Defendants' fiduciary duties.

320.    Defendants withheld material, non-public facts from Plan participants and provided inaccurate and incomplete information to them regarding the true health and ongoing profitability of Lehman and its soundness as an investment vehicle.  As a consequence, Plan participants did not exercise independent control over their investments in Company Stock through the Company Stock Fund, and Defendants remain liable under ERISA for losses caused by such investment.

321.    Defendants are liable for the Plan's losses in this case because:  (i) a portion of the Plan's investment in Company Stock was the result of Defendants' decisions to invest the Plan's Employer Matching Contributions in Company Stock through the Company Stock Fund, and (ii) as to the portion of Plan's assets invested in Company Stock as a result of participant contributions, Defendants are liable for these losses because they failed to take the necessary and required steps to ensure effective and informed independent participant control over the investment decision-making process, as required by ERISA § 404(c), 29 U.S.C. § 1104(c), and the regulations promulgated thereunder.

322.    Defendants also are liable for losses that resulted from their decision to invest the assets of the Plan in the Company Stock Fund rather than cash or other investment options, which was clearly imprudent under the circumstances presented here.

323.    Had Defendants properly discharged their fiduciary and co-fiduciary duties, including the monitoring and removal of fiduciaries who failed to satisfy their ERISA-mandated duties of prudence and loyalty and eliminating the Company Stock Fund as an investment alternative when it became imprudent, the Plan would have avoided some or all of the losses that it, and indirectly, the participants suffered.

## XII.    CLASS ACTION ALLEGATIONS

324.    ***Class Definition***.  Plaintiffs bring this action as a class action pursuant to Rules 23(a), (b)(1), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure on behalf of Plaintiffs and the following class of persons similarly situated (the "Class"):

> All persons, other than Defendants, who were participants in or beneficiaries of the Plan at any time between September 13, 2006 and the present, and who allocated Plan contributions to the Company Stock Fund.

325. *Numerosity*.  The members of the Class are so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to Plaintiffs at this time, and can only be ascertained through appropriate discovery, based on the Plan's Form 5500 for Plan year 2007, Plaintiffs believe there are or were thousands of present or former Plan participants or beneficiaries across the United States during the Class Period.

326. *Commonality*.  Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class. Among the questions of law and fact common to the Class are:

      (a)    whether Defendants each owed a fiduciary duty to Plaintiffs and members of the Class;

      (b)    whether Defendants breached their fiduciary duties to Plaintiffs and members of the Class by failing to act prudently and solely in the interests of the Plan's participants and beneficiaries;

      (c)    whether Defendants violated ERISA; and

      (d)    whether the Plan has suffered losses and, if so, what measure of damages is proper.

327. *Typicality*.  Plaintiffs' claims are typical of the claims of the members of the Class because:  (i) to the extent Plaintiffs seek relief on behalf of the Plan pursuant to ERISA § 502(a)(2), their claim on behalf of the Plan is not only typical to, but identical to a claim under this section brought by any Class member; and (ii) to the extent Plaintiffs seek relief under ERISA § 502(a)(3) on behalf of themselves for equitable relief, that relief would affect all Class members equally.

328. ***Adequacy***.  Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class action, complex, and ERISA litigation.  Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

329. ***Rule 23(b)(1)(B) Requirements***. Class action status in this ERISA action is warranted under Rule 23(b)(1)(B) because prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to individual members of the Class which would, as a practical matter, be dispositive of the interests of the other members not parties to the actions, or substantially impair or impede their ability to protect their interests.

330. ***Other Rule 23(b) Requirements***. Class action status is also warranted under the other subsections of Rule 23(b) because:  (i) prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendants; (ii) Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole; and (iii) questions of law or fact common to members of the Class predominate over any questions affecting only individual members and a class action is superior to the other available methods for the fair and efficient adjudication of this controversy.

## COUNT I

### FAILURE TO PRUDENTLY AND LOYALLY MANAGE THE PLAN'S ASSETS (BREACHES OF FIDUCIARY DUTIES IN VIOLATION OF ERISA § 404 AND § 405 BY ALL DEFENDANTS)

331.    Plaintiffs incorporate paragraphs 1 through 330 above as if fully set forth herein.

332.    At all relevant times, as alleged above, all Defendants were fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A) in that they exercised discretionary

authority or control over the administration and management of the Plan or disposition of the Plan's assets.

333.    Under ERISA, fiduciaries who exercise discretionary authority or control over management of a plan or disposition of a plan's assets are responsible for ensuring that investment options made available to participants under a plan are prudent.  Furthermore, such fiduciaries are responsible for ensuring that assets within the plan are prudently invested. Defendants were responsible for ensuring that all investments in Company Stock, through the Company Stock Fund, in the Plan were prudent and that such investment was consistent with the purpose of the Plan.  Defendants are liable for losses incurred as a result of such investments being imprudent.

334.    A fiduciary's duty of loyalty and prudence requires it to disregard plan documents or directives that it knows or reasonably should know would lead to an imprudent result or would otherwise harm plan participants or beneficiaries. ERISA § 404(a)(1)(D), 29 U.S.C. § 1104(a)(1)(D).  Thus, a fiduciary may not blindly follow plan documents or directives that would lead to an imprudent result or that would harm plan participants or beneficiaries, nor may it allow others, including those whom they direct or who are directed by the plan, including plan trustees, to do so.

335.    Defendants' duty of loyalty and prudence also obligates them to speak truthfully to participants, not to mislead them regarding the Plan or Plan assets, and to disclose information that participants need in order to exercise their rights and interests under the Plan.  This duty to inform participants includes an obligation to provide participants and beneficiaries of the Plan with complete and accurate information, and to refrain from providing inaccurate or misleading information, or concealing material information, regarding the Plan's investment options such

that participants can make informed decisions with regard to the prudence of investing in such options made available under the Plan. This duty applies to all of the Plan's investment options, including investment in Company Stock.

336.    Defendants breached their duties to prudently and loyally manage the Plan's assets. During the Class Period, Defendants knew or should have known that, as described herein, Company Stock was not a suitable and appropriate investment for the Plan because: (i) the Company had failed to fully disclose the nature and extent of its exposure to losses incurred from trading in subprime mortgage backed derivatives; (ii) the Company had failed to fully disclose the nature and extent of its exposure to losses incurred from CDOs, and had failed to timely write-down its positions in these securities; (iii) the Company had failed to fully disclose the nature and extent of its exposure to losses incurred from mortgage backed security originations, and had failed to timely write-down its positions in these securities; (iv) the Company had materially overvalued its positions in commercial and subprime mortgages, and in securities tied to these mortgages; (v) the Company had inadequate reserves for its mortgage and credit related exposure; (vi) the Company was exposed to catastrophic losses from its investments in commercial real estate, and had failed to timely write down its positions in these securities, the nature and extent of which the Company failed to disclose fully; and (vii) the Company lacked adequate internal and financial controls.

337.    Investment in Company Stock during the Class Period clearly did not serve the Plan's stated purpose of helping participants save for retirement, and in fact caused significant losses/depreciation to participants' retirement savings. During the Class Period, despite their knowledge of the imprudence of the investment, Defendants failed to take any meaningful steps

to protect the Plan from the inevitable losses that they knew would ensue as the non-disclosed material problems, concerns and business slowdowns took hold and became public.

338.    Defendants also breached their duties of loyalty and prudence by failing to provide complete and accurate information regarding the nature and extent of the risk from the Company's positions in subprime and related securities.

339.    During the Class Period, upon information and belief, Defendants fostered a positive attitude toward the Company's Stock, and allowed participants in the Plan to follow their natural bias towards investment in the equities of their employer by not disclosing negative material information concerning investment in the Company's stock.  As such, participants in the Plan could not appreciate the true risks presented by investments in the Company's Stock and therefore could not make informed decisions regarding their investments in the Plan.

340.    Defendants also breached their co-fiduciary obligations by, among their other failures, knowingly participating in, or knowingly undertaking to conceal, the other Defendants' failure to disclose material adverse information regarding the Company's exposure to risk and inflation of the price of the Company Stock.  Defendants had knowledge of such breaches by other Plan fiduciaries, yet made no effort to remedy them.

341.    As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan suffered losses, and indirectly the Plan's participants lost a significant portion of their retirement savings.

342.    Pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a) and ERISA § 409, 29 U.S.C. § 1109(a), Defendants in this Count are liable to restore the losses to the Plan and Plan participants caused by their breaches of fiduciary duties alleged in this Count.

## COUNT II

**BREACH OF DUTY TO AVOID CONFLICTS OF INTEREST
(BREACHES OF FIDUCIARY DUTIES IN VIOLATION OF ERISA §§ 404 AND 405
BY ALL DEFENDANTS)**

343.     Plaintiffs incorporate paragraphs 1 through 330 above as if fully set forth herein.

344.     At all relevant times, as alleged above, Defendants were fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).  Consequently, they were bound by the duties of loyalty, exclusive purpose and prudence.

345.     ERISA § 404(a)(1)(A), 29 U.S.C. § 1104(a)(1)(A), imposes on a plan fiduciary a duty of loyalty, that is, a duty to discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and for the exclusive purpose of providing benefits to participants and beneficiaries.

346.     Defendants breached their duty to avoid conflicts of interest and to promptly resolve them by, *inter alia*, failing to timely engage independent fiduciaries who could make independent judgments concerning the Plan's investments in the Company's own securities; and by otherwise placing their own or the Company's interests above the interests of the participants with respect to the Plan's investment in the Company's securities.

347.     As a consequence of Defendants' breaches of fiduciary duty, the Plan suffered millions of dollars in losses.  If Defendants had discharged their fiduciary duties to prudently manage and invest the Plan's assets, the losses suffered by the Plan would have been minimized or avoided.  Therefore, as a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan suffered losses, and indirectly the Plan's participants, lost a significant portion of their retirement investments.

348. Pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a), and ERISA § 409, 29 U.S.C. § 1109(a), Defendants in this Count are liable to restore the losses to the Plan and to Plan participants caused by their breaches of fiduciary duties alleged herein.

<b><u>COUNT III</u></b>

<b>FAILURE TO ADEQUATELY MONITOR OTHER FIDUCIARIES AND<br>PROVIDE THEM WITH ACCURATE INFORMATION<br>(BREACHES OF FIDUCIARY DUTIES IN VIOLATION OF ERISA § 404<br>BY DIRECTOR DEFENDANTS)</b>

349. Plaintiffs incorporate paragraphs 1 through 330 above as if fully set forth herein.

350. At all relevant times, as alleged above, the Director Defendants were fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

351. At all relevant times, as alleged above, the scope of the fiduciary responsibility of the Director Defendants, included the responsibility to appoint, evaluate, and monitor other fiduciaries, including, without limitation, the members of the Compensation Committee and the Benefit Committee.

352. The duty to monitor entails both giving information to and reviewing the actions of the monitored fiduciaries. In this case, that means that the monitoring fiduciaries, the Director Defendants, had the duty to:

(a) ensure that the monitored fiduciaries possess the needed credentials and experience, or use qualified advisors and service providers to fulfill their duties. They must be knowledgeable about the operations of the Plan, the goals of the Plan, and the behavior of the Plan's participants;

(b) ensure that the monitored fiduciaries are provided with adequate financial resources to do their job;

(c)     ensure that the monitored fiduciaries have adequate information to do their job of overseeing the Plan's investments;

(d)     ensure that the monitored fiduciaries have ready access to outside, impartial advisors when needed;

(e)     ensure that the monitored fiduciaries maintain adequate records of the information on which they base their decisions and analysis with respect to the Plan's investment options; and

(f)     ensure that the monitored fiduciaries report regularly to the Director Defendants.  The Director Defendants must then review, understand, and approve the conduct of the hands-on fiduciaries.

353.    Under ERISA, a monitoring fiduciary must ensure that the monitored fiduciaries are performing their fiduciary obligations, including those with respect to the investment of a plan's assets, and must take prompt and effective action to protect a plan and its participants when they are not.  In addition, a monitoring fiduciary must provide the monitored fiduciaries with complete and accurate information in their possession that they know or reasonably should know that the monitored fiduciaries must have in order to prudently manage a plan and a plan's assets.

354.    The Director Defendants breached their fiduciary monitoring duties by, among other things, (i) failing to ensure that the monitored fiduciaries had access to knowledge about the Company's business problems alleged above, which made Company Stock an imprudent retirement investment, and (ii) failing to ensure that the monitored fiduciaries completely appreciated the huge risk of significant investment of the retirement savings of rank and file

employees in Company Stock, an investment that was imprudent and subject to inevitable and significant depreciation.

355.    The Director Defendants knew or should have known that the fiduciaries they were responsible for monitoring were (i) imprudently allowing the Plan to continue offering Company Stock through the Company Stock Fund, as an investment alternative for the Plan, and (ii) continuing to invest the assets of the Plan in Company Stock when it no longer was prudent to do so. Despite this knowledge, the Director Defendants failed to take action to protect the Plan, and concomitantly the Plan's participants, from the consequences of these fiduciaries' failures.

356.    In addition, the Director Defendants, in connection with their monitoring and oversight duties, were required to disclose to the monitored fiduciaries accurate information about the financial condition of Lehman, including, without limitation, that (i) the Company had failed to fully disclose the nature and extent of its exposure to losses incurred from trading in subprime mortgage backed derivatives; (ii) the Company had failed to fully disclose the nature and extent of its exposure to losses incurred from collateralized debt obligations ("CDOs"), and had failed to timely write-down its positions in these securities; (iii) the Company had failed to fully disclose the nature and extent of its exposure to losses incurred from mortgage backed security originations, and had failed to timely write-down its positions in these securities; (iv) the Company had materially overvalued its positions in commercial and subprime mortgages, and in securities tied to these mortgages; (v) the Company had inadequate reserves for its mortgage and credit related exposure; (vi) the Company was exposed to catastrophic losses from its investments in commercial real estate, and had failed to timely write down its positions in these

securities, the nature and extent of which the Company failed to disclose fully; and (vii) the Company lacked adequate internal and financial controls.

357.    By remaining silent and continuing to withhold such information from the other fiduciaries, the Director Defendants breached their monitoring duties under the Plan and ERISA.

358.    The Director Defendants are liable as co-fiduciaries because they knowingly participated in the each other's fiduciary breaches as well as those by the monitored fiduciaries, they enabled the breaches by these Defendants, and they failed to make any effort to remedy these breaches, despite having knowledge of them.

359.    As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan suffered losses, and the Plan's participants lost a significant portion of their retirement investments.

360.    Pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a) and ERISA § 409, 29 U.S.C. § 1109(a), Defendants in this Count are liable to restore the losses to the Plan and Plan participants caused by their breaches of fiduciary duties alleged herein.

**WHEREFORE**, Plaintiffs pray for:

A.    a declaration that Defendants, and each of them, have breached their ERISA fiduciary duties to the participants;

B.    a declaration that Defendants, and each of them, are not entitled to the protection of ERISA § 404(c)(1)(B), 29 U.S.C. § 1104(c)(1)(B);

C.    an Order compelling Defendants to make good to the Plan all losses to the Plan resulting from Defendants' breaches of their fiduciary duties, including losses to the Plan resulting from imprudent investment of the Plan's assets, and to restore to the Plan all profits

Defendants caused through use of the Plan's assets, and to restore to the Plan all profits which the participants would have made if Defendants had fulfilled their fiduciary obligations;

        D.      imposition of a constructive trust on any amounts by which any defendant was unjustly enriched at the expense of the Plan as the result of breaches of fiduciary duty;

        E.      an Order requiring Defendants to appoint one or more independent fiduciaries to participate in the management of the Plan's investment in Company Stock;

        F.      actual damages in the amount of any losses the Plan suffered;

        G.      an Order awarding costs pursuant to 29 U.S.C. § 1132(g);

        H.      an Order awarding attorneys' fees pursuant to the common fund doctrine, 29 U.S.C. § 1132(g), and other applicable law; and

        I.      an Order for equitable restitution and other appropriate equitable and injunctive relief against Defendants.

Dated:  October 27, 2008

                                **WOLF HALDENSTEIN ADLER FREEMAN & HERZ LLP**

                        By:                                          Mark C. Rifkin (MR 0904)
                                          Scott J. Farrell (SF 5922)
                                          270 Madison Avenue
                                          New York, NY 10016
                                          Tel: (212) 545-4600
                                          Fax:  (212) 545-4653
                                        Email: rifkin@whafh.com
                                                              farrell@whafh.com

Thomas J. McKenna
**GAINEY & MCKENNA**
295 Madison Avenue, 4th Floor
New York, New York 10017
Tel: (212) 983-1300
Fax: (212) 983-0383
Email: tjmckenna@gaineyandmckenna.com

*Interim Co-Lead Counsel for Plaintiffs*

**SARRAF GENTILE LLP**
Ronen Sarraf
Joseph Gentile
11 Hanover Square, 2nd Floor
New York, NY 10005
Tel: (212) 868-3610
Fax: (212) 918-7967

**IZARD NOBEL LLP**
Robert A. Izard
Mark P. Kindall
20 Church Street, Suite 1700
Hartford, CT 06103
Tel: (860) 493-6292
Fax: (860) 493-6290

**MAJOR KHAN LLC**
Major Khan
20 Bellevue Terrace
Weehawken, NJ 07086
Tel: (646) 546-5664
Fax: (646) 546-5755

*Additional Counsel for Plaintiff Buzzo*

**MILBERG LLP**
Lori G. Feldman (LF 3478)
Arvind B. Khurana (AK 3643)
Sara Fuks (SF 6034)
Jennifer Sosa (JS 0324)
One Pennsylvania Plaza
New York, NY 10119-0165
Tel: (212) 594-5300
Fax: (212) 868-1229

**ZIMMERMAN REED**
Carolyn G. Anderson
Kirsten D. Hedberg
651 Nicollet Mall, Suite 501
Minneapolis, MN 55402
Tel: (612) 341-0400
Fax: (612) 341-0844

**LOCKRIDGE GRINDAL
NAUEN P.L.L.P.**
Gregg M. Fishbein
100 Washington Avenue South, Suite 2200
Minneapolis, Minnesota 55401-2197
Tel: (612) 339-6900
Fax: (612) 339-0981

**HARWOOD FEFFER LLP**
Robert I. Harwood
488 Madison Avenue, 8th Floor
New York, New York 10022
Tel: (212) 935-7400
Fax: (212) 753-3630

*Additional Counsel for Plaintiff DeSousa*

**POMERANTZ HAUDEK BLOCK
GROSSMAN & GROSS LLP**
H. Adam Prussin
Fei-Lu Qian
100 Park Avenue – 26th Floor
New York, NY 10017
Tel: (212) 661-1100
Fax: (212) 661-8665

**JAROSLAWICZ & JAROS**
225 Broadway, 24th Floor
New York, NY 10007
Tel: (212) 227-2780
Fax: (212) 227-5090

*Additional Counsel for Plaintiff Demizio*

524323

## CERTIFICATE OF SERVICE

I, Scott J. Farrell, one of Plaintiffs' counsel, hereby certify that on October 27, 2008, I caused a copy of the foregoing *Consolidated Amended Complaint For Violations Of The Employee Retirement Income Security Act*, to be served upon the following counsel, by .pdf email and by Federal Express:

Michael J. Chepiga
Jonathan K. Youngwood
Eric M. Albert
**SIMPSON THACHER & BARTLETT LLP**
425 Lexington Avenue
New York, New York 10017
Tel: (212) 455-2000
Fax: (212) 455-2502

Patricia M. Hynes
Todd Steven Fishman
**ALLEN & OVERY, LLP**
1221 Avenue of the Americas
New York, NY 10020
Tel: (212) 610-6300
Fax: (212) 610-6399

Robert J. Cleary
Dietrich L. Snell
Mark Edward Davidson
Seth David Fier
**PROSKAUER ROSE LLP**
1585 Broadway
New York, NY 10036
Tel: (212) 969-3000
Fax: (212) 969-2900

Scott J. Farrell