(A) Subject to subparagraphs (B) and (C) below, purchases and sales of units in the Stock Funds (other than for exchanges) shall be made on the date on which the Trustee receives from the Administrator, the Recordkeeper, and Participants in good order all information, documentation, and wire transfers of funds (if applicable), necessary to accurately effect such transactions. Exchanges of units in the Stock Funds shall be made in accordance with the Exchange Guidelines attached hereto as Schedule "F".

(B) Aggregate sales of units in the Stock Funds on any day shall be limited to each of the Stock Funds' Available Liquidity for that day. For these purposes, "Available Liquidity" shall mean the amount of short-term investments held in the fund decreased by any outgoing cash for expenses then due, payables for loan principal, and obligations for pending stock purchases, and increased by incoming cash (such as contributions, exchanges in, loan repayments) and to the extent credit is available and allocable to the Stock Fund, receivables for pending stock sales. In the event that the requested sales exceed the Available Liquidity, then transactions shall be processed giving precedence to distributions, loans and withdrawals, and otherwise on a first-in first-out (FIFO) basis, as provided in Schedule "H" (the "Specified Hierarchy"). So long as either of the Stock Funds is open for such transactions, sales of units that are requested but not processed on a given day due to insufficient Available Liquidity shall be suspended until Available Liquidity is sufficient to honor such transactions in accordance with the Specified Hierarchy.

(C) The Trustee shall close the Company Stock Fund to sales or purchases of units, and the American Express Stock Fund to sales of units, as applicable, on any date on which trading in the Company Stock or American Express Stock has been suspended or substantial purchase or sale orders are outstanding and cannot be executed.

(v) Securities Law Reports. The Named Fiduciary shall be responsible for filing all reports required under Federal or state securities laws with respect to the Trust's ownership of Company Stock or American Express Stock, including, without limitation, any reports required under section 13 or 16 of the Securities Exchange Act of 1934, and shall immediately notify the Trustee in writing of any requirement to stop purchases or sales of Company Stock or American Express Stock pending the filing of any report. The Trustee shall provide to the Named Fiduciary such information on the Trust's ownership of Company Stock and American Express Stock as the Named Fiduciary may reasonably request in order to comply with Federal or state securities laws.

14

(vi) Voting and Tender Offers. Notwithstanding any other provision of this Agreement the provisions of this Section shall govern the voting and tendering of Company Stock. The Company shall provide and pay for all printing, mailing, tabulation and other costs associated with the voting and tendering of Company Stock. The Trustee, after consultation with the Company, shall prepare the necessary documents associated with the voting and tendering of Company Stock.

(A) Voting.

(1) When the Company prepares for an annual or special meeting, the Company shall notify the Trustee at least thirty (30) days in advance of the intended record date and shall cause a copy of all proxy solicitation materials to be sent to the Trustee. If requested by the Trustee, the Company shall certify to the Trustee that the aforementioned materials represents the same information that is distributed to shareholders of Company Stock. Based on these materials the Trustee shall prepare a voting instruction form and shall provide a copy of all proxy solicitation materials to be sent to each Participant with an interest in Company Stock held in the Trust, together with the foregoing voting instruction form to be returned to the Trustee or its designee. The form shall show the proportional interest in the number of full and fractional shares of Company Stock credited to the Participant's accounts held in the Company Stock Fund based upon the best information available to the Recordkeeper at the time of the proxy solicitation.

(2) Each Participant with an interest in the Company Stock Fund shall have the right to direct the Trustee as to the manner in which the Trustee is to vote (including not to vote) that number of shares of Company Stock reflecting such Participant's proportional interest in the Company Stock Fund (both vested and unvested). Directions from a Participant to the Trustee concerning the voting of Company Stock shall be communicated in writing, or by such other means as is agreed upon by the Trustee and the Company. These directions shall be held in confidence by the Trustee and shall not be divulged to the Company, or any officer or employee thereof, or any other person except to the extent that the consequences of such directions are reflected in reports regularly communicated to any such persons in the ordinary course of the performance of the Trustee's services hereunder. Upon its receipt of the directions, the Trustee shall vote the shares of Company Stock reflecting the Participant's proportional interest in the Company Stock Fund as directed by the Participant.

15

(3)  Except as otherwise required by law, the Trustee shall vote that number of shares of Company Stock either not credited to Participants' accounts or credited to, Participants' accounts but for which it received no voting directions in the same proportion on each issue as it votes those shares credited to Participants' accounts for which it received voting directions from Participants.

(B)  Tender Offers.

(1)  Upon commencement of a tender offer for any securities held in the Trust that are Company Stock, the Company shall timely notify the Trustee in advance of the intended tender date and shall cause a copy of all materials to be sent to the Trustee. The Company shall certify to the Trustee that the aforementioned materials represent the same information distributed to shareholders of Company Stock. Based on these materials and after consultation with the Company the Trustee shall prepare a tender instruction form and shall provide a copy of all tender materials to be sent to each Participant with an interest in the Company Stock Fund, together with the foregoing tender instruction form, to be returned to the Trustee or its designee. The tender instruction form shall show the number of full and fractional shares of Company Stock that reflect the Participant's proportional interest in the Company Stock Fund (both vested and unvested) upon the best information available to the Recordkeeper at the time of the proxy solicitation.

(2)  Each Participant with an interest in the Company Stock Fund shall have the right to direct the Trustee to tender or not to tender some or all of the shares of Company Stock reflecting such Participant's proportional interest in the Stock Fund (both vested and unvested). Directions from a Participant to the Trustee concerning the tender of Company Stock shall be communicated in writing, or by such other means as is agreed upon by the Trustee and the Company. These directions shall be held in confidence by the Trustee and shall not be divulged to the Company, or any officer or employee thereof, or any other person except to the extent that the consequences of such directions are reflected in reports regularly communicated to any such persons in the ordinary course of the performance of the Trustee's services hereunder. The Trustee shall tender or not tender shares of Company Stock as directed by the Participant. Except as otherwise required by law, the Trustee shall not tender shares of Company Stock reflecting a Participant's proportional interest in the Company Stock Fund for which it has received no direction from the Participant.

16

(3)    Except as otherwise required by law, the
Trustee shall tender that number of shares of Company Stock not credited to Participants'
accounts in the same proportion as the total number of shares of Company Stock credited to
Participants' accounts for which it has received instructions from Participants.

(4)    A Participant who has directed the Trustee
to tender some or all of the shares of Company Stock reflecting the Participant's proportional
interest in the Company Stock Fund may, at any time prior to the tender offer withdrawal date,
direct the Trustee to withdraw some or all of the tendered shares reflecting the Participant's
proportional interest, and the Trustee shall withdraw the directed number of shares from the
tender offer prior to the tender offer withdrawal deadline.  Prior to the withdrawal deadline, if
any shares of Company Stock not credited to Participants' accounts have been tendered, the
Trustee shall redetermine the number of shares of Company Stock that would be tendered under
Section 5(e)(vi)(B)(3) if the date of the foregoing withdrawal were the date of determination, and
withdraw from the tender offer the number of shares of Company Stock not credited to
Participants' accounts necessary to reduce the amount of tendered Company Stock not credited
to Participants' accounts to the amount so redetermined.  A Participant shall not be limited as to
the number of directions to tender or withdraw that the Participant may give to the Trustee.

(5)    A direction by a Participant to the Trustee to
tender shares of Company Stock reflecting the Participant's proportional interest in the Company
Stock Fund shall not be considered a written election under the Plan by the Participant to
withdraw, or have distributed, any or all of his withdrawable shares.  The Trustee shall credit to
each proportional interest of the Participant from which the tendered shares were taken the
proceeds received by the Trustee in exchange for the shares of Company Stock tendered from
that interest.  Pending receipt of directions (through the Recordkeeper) from the Participant or
the Named Fiduciary, as provided in the Plan, as to which of the remaining investment options
the proceeds should be invested in, the Trustee shall invest the proceeds in the investment option
described in Schedule "C".

(vii) General.  Except as required by ERISA, the Trustee shall have
no duty to solicit directions from Participants unless directed to do so by the Named Fiduciary.
With respect to all rights other than the right to vote and the right to tender Company Stock, the
Trustee shall follow the directions, if any, of the Named Fiduciary, except as required by ERISA.

17

(viii) Conversion. All provisions in this Section 5(e) shall also apply to any securities received as a result of a conversion of Company Stock.

(f)     Participant Loans. Loans shall be processed and administered in accordance with the Plan Administrative Manual. The Company shall collect and remit all principal and interest payments to the Trustee. When remitting loan repayments the Company shall distinguish repayments from contributions. To originate a Participant loan, the Participant shall direct the Recordkeeper as to the term and amount of the loan to be made from the Participant's individual account. Such directions shall be made by Participants by use of the telephone exchange system, the internet or in such other manner as may be agreed upon from time to time by the Company, the Recordkeeper and the Trustee or its agent, maintained for such purpose by the Recordkeeper or its agent. The Recordkeeper shall determine, based on the current value of the Participant's account on the date of the request and any guidelines provided by the Company, the amount available for the loan. Based on the interest rate supplied by the Company in accordance with the terms of the Plan, the Recordkeeper shall advise the Participant of such interest rate, as well as the installment payment amounts. The Trustee shall distribute the loan agreement and truth-in-lending disclosure with the proceeds check to the Participant. To facilitate recordkeeping, the Trustee may destroy the original of any proceeds check made in connection with a loan to a Participant under the Plan, provided that the Trustee or its agent first creates a duplicate by a photographic or optical scanning or other process yielding a reasonable facsimile of the promissory note and the Participant's signature thereon, which duplicate may be reduced or enlarged in size from the actual size of the original promissory note.

(g)     Participant Loans for the Purchase of a Primary Residence. The Company shall collect and remit all principal and interest payments to the Trustee. When remitting loan repayments the Company shall distinguish repayments from contributions. To originate a Participant loan, the Participant shall direct the Recordkeeper as to the term and amount of the loan to be made from the Participant's individual account. Such directions shall be made by Participants by use of the telephone exchange system, the internet or in such other manner as may be agreed upon from time to time by the Company, the Recordkeeper and the Trustee or its agent, maintained for such purpose by the Recordkeeper or its agent. The Recordkeeper shall determine, based on the current value of the Participant's account on the date of the request and any guidelines provided by the Company, the amount available for the loan. Based on the interest rate supplied by the Company in accordance with the terms of the Plan, the Recordkeeper shall advise the Participant of such interest rate, as well as the installment payment

18

amounts. The Recordkeeper shall forward the loan document to the Participant for execution and submission for processing to the Trustee. In all cases, processing by the Trustee shall be made within thirty (30) days of the participant's initial request (the origination date).

(h) PRIMCO Stable Value Fund. All transactions involving the PRIMCO Stable Value Fund shall be done in accordance with the Operating Procedures attached hereto as Schedule "D".

(i) Outside Managed Separate Investment Funds.

This Section is intended to authorize appointment of an investment manager as contemplated in section 402(c)(3) of ERISA with respect to outside managed separate investment funds established as described in Section 5(b) hereof. The Named Fiduciary may appoint an investment manager with respect to some or all of the assets of the outside managed separate investment fund. The authority of the investment manager shall not begin until the Trustee receives from the Named Fiduciary notice satisfactory to the Trustee that the investment manager has been appointed and that the investment manager has acknowledged in writing that with respect to the relevant assets of the outside managed separate investment fund that he or she or it is a fiduciary with respect to the Plan within the meaning of ERISA. The investment manager's authority shall continue until the Trustee receives similar notice that the appointment has been rescinded. By notifying the Trustee of the appointment of an investment manager, the Named Fiduciary shall be deemed to warrant that such investment manager meets the requirements of section 3(38) of ERISA, but the Trustee may demand independent evidence that any investment manager meets those requirements.

The assets with respect to which a particular investment manager has been appointed shall be segregated from all other assets held by the Trustee under this Agreement and the investment manager shall have the duty and power to direct the Trustee in every aspect of their investment. The Trustee shall follow the directions of an investment manager regarding the investment and reinvestment of the Trust, or such portion thereof as shall be under management by the investment manager, and shall be under no duty or obligation to review any investment to be acquired, held or disposed of pursuant to such directions nor make any recommendations with respect to the disposition or continued retention of any such investment. The Trustee shall have no liability or responsibility for acting without question on the direction of, or failing to act in the absence of any direction from an investment manager, unless the Trustee has knowledge that by such action or failure to act it will be participating in or undertaking to conceal a breach of

19

fiduciary duty by that investment manager. Upon request, the Trustee shall execute appropriate powers of attorney authorizing an investment manager appointed hereunder to exercise the powers and duties of the trustee.

The Trustee may rely upon any order, certificate, notice, direction or other documentary confirmation purporting to have been issued or given by an investment manager which the Trustee believes to be genuine and to have been issued or given by such investment manager.

An investment manager shall certify in a timely manner, at the request of the Trustee, the value of any securities or other property held in any fund managed by such investment manager, and such certification shall be regarded as a direction with regard to such valuation. The Trustee shall be entitled to conclusively rely upon such valuation.

Any oral direction shall be followed by a written confirmation as soon as practical. Trustee shall follow the procedures established by the Named Fiduciary to validate such oral directions.

(j)     Reliance of Trustee on Directions. It is the intent of the Company and the Trustee that except as expressly set forth herein, the Trustee shall function as a directed trustee and shall not have discretionary authority over the management and investment of Plan assets. It is also the intent of the Company and the Trustee that, subject to the provisions of ERISA, the Trustee not be responsible for any loss resulting from any action taken (or not taken) by the Trustee in accordance with a direction properly given (or properly withheld) by any person (including Participants) authorized to give such direction under the terms of this Agreement.

(k)     Trustee Powers. The Trustee shall have the following powers and authority:

(i)     Subject to paragraphs (b), (c) and (d) of this Section 5, to sell, exchange, convey, transfer, or otherwise dispose of any property held in the Trust, by private contract or at public auction. No person dealing with the Trustee shall be bound to see to the application of the purchase money or other property delivered to the Trustee or to inquire into the validity, expediency, or propriety of any such sale or other disposition.

(ii)     To cause any securities or other property held as part of the Trust to be registered in the Trustee's own name, in the name of one or more of its nominees, or in the Trustee's account with the Depository Trust Company of New York and to hold any

20

investments in bearer form, but the books and records of the Trustee shall at all times show that all such investments are part of the Trust.

(iii)    Subject to guidelines or directions from the Named Fiduciary, to keep a portion of the Trust in cash or cash balances (pending other investment, reinvestment or payment of expenses or benefits), including, but not limited to, savings accounts, certificates of deposit, repurchase agreements (including savings accounts, certificates of deposit and repurchase agreements with the Trustee in its banking capacity or its affiliates so long as such investments bear a reasonable rate of interest), United States Treasury bills, commercial paper and similar types of securities and any collective trust or mutual fund maintained by the Trustee for the management of cash or cash equivalents; and to sell any such cash equivalent instruments.

(iv)    To make, execute, acknowledge, and deliver any and all documents of transfer or conveyance and to carry out the powers herein granted.

(v)    After notice to the Named Fiduciary, to borrow funds from a bank not affiliated with the Trustee in order to provide sufficient liquidity to process Plan transactions in a timely fashion, provided that the cost of borrowing shall be allocated in a reasonable fashion to the investment fund(s) in need of liquidity. The Company acknowledges that it has received the disclosure on the Trustee's line of credit program and credit allocation policy and a copy of the text of Prohibited Transaction Exemption 2002-55 prior to executing this Agreement if applicable.

(vi)    To settle, compromise, or submit to arbitration any claims, debts, or damages due to or arising from the Trust; to commence or defend suits or legal or administrative proceedings; to represent the Trust in all suits and legal and administrative hearings; and to pay all reasonable expenses arising from any such action, from the Trust if not paid by the Company.

(vii)    To employ legal, accounting, clerical, and other assistance as may be required in carrying out the provisions of this Agreement and to pay their reasonable expenses and compensation from the Trust if not paid by the Company.

21

(viii)    To invest all or any part of the assets of the Trust in guaranteed investment contracts and short term investments (including interest bearing accounts with the Trustee or money market mutual funds advised by affiliates of the Trustee) and in any collective investment trust or group trust, including any collective investment trust or group trust maintained by the Trustee, which then provides for the pooling of the assets of plans described in section 401(a) and exempt from tax under section 501(a) of the Code or any comparable provisions of any future legislation that amends, supplements, or supersedes those sections, provided that such collective investment trust or group trust is exempt from tax under the Code or regulations or rulings issued by the Internal Revenue Service. The provisions of the document governing such collective investment trusts or group trusts, as it may be amended from time to time, shall govern any investment therein and are hereby made a part of this Trust Agreement.

(ix)    To do all other acts although not specifically mentioned herein, as the Trustee may deem necessary to carry out any of the foregoing powers and the purposes of the Trust.

(l)    Accounts. The Trustee shall keep accurate accounts of all investments, receipts, disbursements, and other transactions hereunder, and shall report the value of the assets held in the Trust as of each fiscal quarter of the Plan and, if not on the last day of a fiscal quarter, the date on which the Trustee resigns or is removed as provided in Section 9 of this Agreement or is terminated as provided in Section 11 (the "Reporting Date"). Within thirty (30) days following each Reporting Date or within sixty (60) days in the case of a Reporting Date caused by the resignation or removal of the Trustee, or the termination of this Agreement, the Trustee shall file with the Administrator a written account setting forth all investments, receipts, disbursements, and other transactions effected by the Trustee between the Reporting Date and the prior Reporting Date, and setting forth the value of the Trust as of the Reporting Date. Except as otherwise required under ERISA, upon the expiration of twelve (12) months from the date of filing such account, the Trustee shall have no liability or further accountability with respect to the propriety of its acts or transactions shown in such account, except with respect to such acts or transactions as to which a written objection shall have been filed with the Trustee within twelve (12) month period. Notwithstanding the foregoing, the Trustee shall provide financial reporting for each Plan year which is in compliance with Generally Accepted Accounting Principles and ERISA reporting requirements.

22

(m)    Inspection and Audit. All records generated by the Trustee in connection with the Plan shall be open to inspection and audit, during the Trustee's regular business hours prior to the termination of this Agreement and within one year after such termination, by the Company or any person designated by the Company. Upon the resignation or removal of the Trustee or the termination of this Agreement, the Trustee shall provide to the Company, at no expense to the Company, in the format regularly provided to the Company, a statement of each Participant's accounts as of the resignation, removal, or termination, and the Trustee shall provide to the Company or the Plan's new recordkeeper such further records as are reasonable, at the Company's expense.

(n)    Allocation of Plan Interests. All transfers to, withdrawals from, or other transactions regarding the Trust shall be conducted in such a way that the proportionate interest in the Trust of each Plan and the fair market value of that interest may be determined at any time. Whenever the assets of more than one Plan are commingled in the Trust or in any investment option, the undivided interest therein of each such Plan shall be debited or credited (as the case may be) (i) for the entire amount of every contribution received on behalf of such Plan, every benefit payment, or other expense attributable solely to such Plan, and every other transaction relating only to such Plan; and (ii) for its proportionate share of every item of collected or accrued income, gain or loss, and general expense, and of any other transactions attributable to the Trust or that investment option as a whole.

## Section 6.   Recordkeeping and Administrative Services.

(a)    Recordkeeping Services in General. The Recordkeeper shall perform the Recordkeeping Services described in this Section 6 and Schedule A attached hereto and such other services that are mutually agreed upon by the Company and the Recordkeeper. The Recordkeeper shall have the duty and responsibility to perform all functions necessary to provide the Recordkeeping Services in a professional and workmanlike manner through the efforts of its properly trained employees, agents and affiliates in accordance with the terms of the Plan, the Plan Administrative Manual and this Agreement.

(b)    Plan Administrative Manual. The Recordkeeper and Company shall mutually develop and maintain the Plan Administrative Manual, which shall accurately reflect the terms of the Plan as provided by the Company to the Recordkeeper and applicable law as in effect from time to time. Notwithstanding any contrary provision of this Agreement, if the Plan Administrative Manual conflicts with the terms of a Plan (and the terms of the Plan comply with

23

applicable law), the terms of the Plan shall control the Recordkeeping Services provided by the Recordkeeper pursuant to this Agreement provided, however, the Company has provided the Recordkeeper with a copy of the Plan and all amendments in effect.

The Recordkeeper shall provide a copy of the Plan Administrative Manual, and all revisions thereto, to the Company, and employees or agents of the Recordkeeper who provide services to the Plan. The Recordkeeper shall update the Plan Administrative Manual, or portions thereof, whenever the Company provides amendments to the Plan to the Recordkeeper, and to reflect administrative or legal changes or to correct operational or administrative errors.

At the Recordkeeper's request, the Company shall make its personnel available to the Recordkeeper to answer questions regarding Plan interpretations and procedures. The Recordkeeper shall be primarily responsible for ensuring that the contents of the Plan Administrative Manual reflects the terms of the Plan as provided by the Company and applicable law as in effect from time to time. Notwithstanding the foregoing, the Company agrees that it shall be responsible for incorrect or defective information contained in the Plan Administrative Manual to the extent that the Recordkeeper has relied on the Company for information, interpretations, or guidance regarding a Plan provision or practice.

The Company acknowledges that the Plan Administrative Manual will be based on existing templates owned by the Recordkeeper. The Recordkeeper agrees that the customizations to such existing templates which involve information about the Company, including unique information about the Plan, will be owned by the Company. Notwithstanding the Company's ownership of portions of the Plan Administrative Manual, the Company will only use and disseminate the Plan Administrative Manual for purposes directly related to the administration of the Plan.

(c)     Investment Options. The Recordkeeper shall provide Participants with investment options among which to invest their account balances. The authority to determine the investment options made available under the Plan is reserved to the Company through exercise of its prerogative as plan sponsor to determine the terms of the Plan (including the Plan provisions establishing and prescribing the rules for maintaining the Company Stock Fund and American Express Stock Fund) or in the cases of options other than the Company Stock Fund and American Express Stock Fund, the Named Fiduciary. The Recordkeeper shall have no responsibility for the selection of investment options under the Plan.

24

(d)      Compliance. The Recordkeeper represents and warrants that the Recordkeeping Services will be performed in accordance with applicable laws and regulations. The Recordkeeper shall monitor changes in law to the extent applicable to its provision of recordkeeping services.

(e)      Updates. The Recordkeeper shall update the Recordkeeping Services provided to the Plan to take into account changes in technology which the Recordkeeper provides to other clients and both mandatory and discretionary changes in law and regulation as it relates to the Plan. However, the Company acknowledges that the Recordkeeper, from time to time, for pilot testing purposes or otherwise, may offer certain changes to other clients without offering them to the Company. The Recordkeeper shall use its best efforts to maintain its systems so that the Recordkeeping Services are furnished in a manner which complies with all applicable laws and regulations as are in effect from time to time. The Recordkeeper shall be proactive in both communicating legal changes and in making systems and service modifications to accommodate such changes. To the extent that any statutory or regulatory change permits a discretionary response by a plan Company, the Recordkeeper and the Company shall agree as to the manner in which any such change will be implemented with respect to the Plan, and if the Company makes a choice for the Plan that requires customization of the Recordkeeper's system, the Company shall reimburse the Recordkeeper for its reasonable cost in making the requested adaptation; in no event however, shall the Company be billed for any fees pertaining to the development of the base system used by the Recordkeeper to service its customers generally.

(f)      System and Business Recovery. No party shall be deemed in default of this Agreement to the extent that any delay or failure in performance of its obligation results, without its fault or negligence, from any cause beyond its reasonable control, such as acts of God, acts of civil or military authority, embargoes, epidemics, war, riots, insurrections, fires, explosions, earthquakes, floods, unusually severe weather conditions, power outages or strikes. This clause shall not excuse any of the parties to the Agreement from any liability which results from failure to have in place reasonable disaster recovery and safeguarding plans adequate for protecting all data any of the parties are responsible for maintaining for the Plan. The Recordkeeper shall use its best efforts to ensure that the Plan Data and Recordkeeping Services provided by the Recordkeeper pursuant to this Agreement will be operational within 24 hours of such disaster or system failure.

25

(g)      Errors. The Company shall promptly notify the Recordkeeper of any error discovered by the Company and furnish to the Recordkeeper all data in the Company's possession that is reasonably necessary to diagnose and correct such error. The Recordkeeper at its own expense shall correct processing errors caused by the Recordkeeper or errors which result from malfunction of its systems or error by its staff, or are otherwise caused by the acts of its officers, employees, contractors and agents, as soon as reasonably practicable after such errors are discovered by the Company or the Recordkeeper. The Recordkeeper at its own expense shall correct errors in its recordkeeping and administration of the Plan where such errors result from the clarification of existing law and regulations to the extent that the Company relied on the Recordkeeper's prior interpretation. The Recordkeeper shall attempt to correct errors resulting from the Company's error, errors by the Company's staff or otherwise caused by the acts of the Company's officers, employees or agents, as soon as reasonably practicable after such errors are discovered by the Company or the Recordkeeper. The Company shall reimburse the Recordkeeper for the actual cost of such corrections.

(h)      Client Satisfaction.

(i)  Appropriate performance standards shall be established by mutual agreement among the parties hereto, and set forth in a separate document. As soon as practicable, semi-annually, the Recordkeeper shall provide the Company with reports containing quarterly statistics which measure the volume, timeliness and quality of the Recordkeeping Services it provides pursuant to this Agreement.

(ii) The Recordkeeper shall schedule meetings as necessary and mutually agreed upon at alternate locations to be attended by the Recordkeeper and Company personnel to address legislative updates, performance measurements, identification of problems and appropriate solutions and upcoming action items.

(i)      Access to the Company's Auditors. Upon reasonable notice from the Company, the Recordkeeper shall make available such records and personnel as may be necessary for the Company to conduct (or to have conducted) an audit of the Recordkeeper's administrative activities for the Plan or of its charges with respect thereto for fees and/or expenses. Reasonable records and personnel shall be provided without charge, however additional amounts, as mutually agreed upon by the parties, shall be charged to the Company for additional records and personnel. Such audit will be conducted during the Recordkeeper's normal business hours.

(j) On-Site Visits. Upon reasonable notice from the Company, the Company shall be permitted to make on-site inspection visits of the Recordkeeper's service centers. Such inspections will be conducted during the Recordkeeper's normal business hours.

(k) Technology. The Recordkeeper shall invest in new or improved technology while this agreement remains in effect to ensure quality and reliability of the Recordkeeping Services at a competitive price.

(l) Fiduciary Status. It is the intent of the parties that the Recordkeeper serve in a purely ministerial capacity and, therefore that the Recordkeeper not serve in a fiduciary capacity or exercise any discretionary authority which would cause the Recordkeeper to be treated as a fiduciary (within the meaning of section 3(21) of ERISA) with respect to the Plan. If and to the extent that notwithstanding the preceding sentence, the Recordkeeper is deemed to be a fiduciary by a competent authority, it agrees to exercise its fiduciary authority in accordance with the requirements of ERISA, including without limitation, the requirements of sections 404 and 411 thereof.

(m) Insurance. The Recordkeeper shall maintain adequate liability insurance and, upon the Company's request, shall provide the Company documentation describing such insurance. If applicable and upon request, the Recordkeeper also shall provide the Company with satisfactory evidence from its insurer that it has renewed such insurance as soon as practicable after the renewal date. During the course of this Agreement the level of insurance coverage maintained by the Recordkeeper shall not be less than the amount in effect at the time this Agreement is entered into.

(n) Investment Advice. The Recordkeeper's personnel shall not give investment advice to the Company's employees or the Participants.

(o) Retention of Records. The Recordkeeper shall maintain and preserve all records in accordance with its record retention policy and for no less than seven (7) years after the date on which each transaction involving the Plan occurs.

(p) Access to Records. The Recordkeeper shall provide all reasonable information requested by the Plan's or the Company's auditors in a timely manner and, at the Company's request, shall participate in and respond to requests for documentation and

27

information from government agencies such as the Internal Revenue Service and the U.S. Department of Labor in a timely manner.

(q)     Compliance with Applicable Laws. The Recordkeeper shall conduct its business in compliance with all applicable federal, state and local laws and regulations relating to employment and employment practices, terms and conditions of employment, wages and hours, and nondiscrimination in employment.

(r)     Additional Recordkeeping Services. The Company may request and the Recordkeeper may agree to provide additional recordkeeping services to the Plan including, but not limited to, requests for modifications in system or recordkeeping procedures utilized by the Recordkeeper which are not already contemplated by this Section 6 and Schedule A hereof, or requests for special services or data. Any additional recordkeeping services shall be incorporated into this Agreement by amending Section 6 or Schedule A of this Agreement.

(s)     Fees and Expenses.

(i)     In consideration for the Recordkeeping Services, the Recordkeeper will be entitled to receive the fees set forth in Schedule B which relate to the Recordkeeping Services.

(ii)     The Recordkeeper shall have the right to reimbursement for costs and expenses only to the extent specifically provided herein or agreed to from time to time by the parties in writing.

(t)     Plan Data.

(i)     Prior to the commencement of Recordkeeping Services specified in this Agreement, the Company shall furnish or cause to be furnished to the Recordkeeper all information and data in the Company's possession regarding Participant accounts necessary for the Recordkeeper's performance of the Recordkeeping Services.

(ii)     The Company shall be solely responsible for the accuracy and completeness of any Plan Data provided to the Recordkeeper by the Company or its agent. The Company shall promptly furnish or cause to be furnished to Recordkeeper accurate and complete Plan Data to correct any inaccuracies or incompleteness with respect to Plan Data previously provided to the Recordkeeper upon discovery by the Company or request

28

by the Recordkeeper. Upon request of the Company, the Recordkeeper shall assist the Company in correcting or recalculating inaccurate Plan Data that is provided to the Recordkeeper.

(iii)     The Recordkeeper shall process the Plan Data provided by the Company as appropriate for its systems. The Company shall review the processed Plan Data promptly after receipt thereof. The Company shall notify the Recordkeeper in writing of any error with respect to any Plan Data or report promptly after discovery thereof.

(iv)     All Plan Data is and will remain the property of the Company. The Plan Data will not be (A) used by the Recordkeeper for any purpose other than providing the Recordkeeping Services, (B) disclosed, sold, assigned, leased, or otherwise provided to third parties by the Recordkeeper, or (C) commercially exploited by or on behalf of the Recordkeeper or any affiliate of the Recordkeeper, except as authorized by the Company.

(v)     At no cost to the Company and upon the Company's reasonable request, the Recordkeeper shall promptly deliver to the Company, in the format and on the media in use by the Recordkeeper as of the date of the request, a standard extract of all Plan Data. At the Company's request, the Recordkeeper shall prepare ad hoc reports (covering a portion of the Plan Data) or will erase or destroy an identified portion of the Plan Data in the Recordkeeper's possession. The Company shall pay any reasonable fees for such reports.

(u)     Plan Amendments.

(i)     The Company shall promptly notify the Recordkeeper in writing as soon as practicable after any amendment to a Plan is adopted and provide the Recordkeeper with a copy of said amendment. If any amendment (other than amendments conforming to generally applicable changes in law) materially affects any of the recordkeeping, data processing or administration requirements of a Plan, the Recordkeeper and the Company will mutually agree upon appropriate adjustments to the recordkeeping fees.

(ii)     The Company shall assume full responsibility for the contents and effect of Plan amendments. The Company shall be responsible for preparation and submission of the Plan and Plan amendments for Internal Revenue Service determination. The Company shall take all measures required under current federal law and applicable provision of the Internal

29

Revenue Code and Regulations, to assure that the Plan, by design, continues to satisfy the qualification requirements of the Internal Revenue Code. The Recordkeeper, in its normal course of business, provides the plan with quarterly legislative and regulatory updates and will provide the same to the Company. The Recordkeeper's quarterly legislative and regulatory updates provide information regarding changes in law, whether by statute, regulation or administrative interpretation that may effect plan administration. The Recordkeeper shall work with the Company, its outside counsel, and consultants, as requested by the Company, to determine if changes in law, whether by statute, regulation or administrative interpretation could reasonably be expected to have a material effect on a Plan or its administration but, otherwise, will be under no duty to question the measures taken by the Company in response (or lack thereof) to any such change.

(v)  Confidentiality.  Both parties to this Agreement recognize that in the course of implementing and providing the services described herein, each party may disclose to the other Confidential Information. All such Confidential Information, individually and collectively, and other proprietary information disclosed by either party shall remain the sole property of the party disclosing the same, and the receiving party shall have no interest or rights with respect thereto if so designated by the disclosing party to the receiving party. Each party agrees to maintain all such Confidential Information in trust and confidence to the same extent that it protects its own proprietary information, and not to disclose such Confidential Information to any third party without the written consent of the other party. Each party further agrees to take all reasonable precautions to prevent any unauthorized disclosure of Confidential Information. In addition, each party agrees not to disclose or make public to anyone, in any manner, the existence or the terms of this Agreement, except as required by law, without the prior written consent of the other party.

(i)  The Recordkeeper and the Company each agree that all data and information which one party communicates to the other party and designates in writing as confidential during the term of this Agreement will be received in strict confidence, will be used only for the purposes of this Agreement, and, except as permitted by paragraphs (ii) and (iv) below, will not be disclosed to third parties by the recipient party, its officers, employees,

30

consultants, or agents without the prior written consent of the other party. Each party agrees to take reasonable precautions to prevent the disclosure to third parties of the other party's confidential information. The provisions of this Agreement and any incorporated Schedules will be deemed to be confidential information of both parties. The Plan Data, and the Plan Administrative Manual to the extent customized to reflect the Recordkeeping Services, shall be deemed to be confidential information of the Company.

(ii)     Each party shall have the right to disclose the confidential information of the other party to its auditors, attorneys, accountants, consultants, advisors, subsidiaries and affiliates with a need to know in connection with the Plan. Where a party discloses any of the other party's confidential information to a third party, such party will require the third party to execute a confidentiality agreement in which the third party agrees to keep such information confidential.

(iii)     The obligation to treat information as confidential will not apply to information which:

(A)     is in the public domain, other than by any breach of this Agreement;

(B)     is in the possession of a party to this Agreement on the effective date hereof, and if it will not have been obtained from the other party;

(C)     is developed by a party independent of any confidential information received under this Agreement; or

(D)     is obtained rightfully from third parties (except with respect to information received by the Recordkeeper from Participants).

(iv)     Disclosure of confidential information will not be precluded under this Agreement, if such disclosure is: (A) necessary to establish rights under this Agreement; (B) required by any legal, accounting or regulatory authority having jurisdiction over the disclosing party; or (C) in response to a valid subpoena or order of a court or other governmental body or other valid legal process; provided, however, that with respect to any disclosure pursuant to clause (B) or (C) of this sentence, unless prohibited by law, the disclosing party will first give notice to the non-disclosing party and use reasonable efforts to take legally available steps to

31

resist or narrow any applicable request, subpoena or order and obtain an appropriate protective order or other assurance that confidential treatment will be accorded such information.

(v)     The Recordkeeper agrees not to disclose, advertise or otherwise publish this Agreement or include the name of the Company in any marketing or sales material (other than lists, verbal communications, proposals, RFP responses, or similar documents provided by the Recordkeeper to clients or prospective clients) without the prior consent of the Company.

(vi)     The provisions of this subsection (v) on confidentiality shall survive the expiration or termination of this Agreement and continue for so long as either party is in possession of confidential information protected hereunder.

(w) Recordkeeping System.

The Recordkeeper warrants and represents to the Company that:

(i)     The Recordkeeper has all rights and licenses needed to use the recordkeeping system or systems it employs to provide all of the Recordkeeping Services as set forth in this Agreement and to perform its other obligations hereunder without violating any rights of any third party, and there is currently no actual or threatened suit by any such third party based on an alleged violation of such rights by the Recordkeeper;

(ii)     the recordkeeping system used to provide Recordkeeping Services will conform to the Plan, as provided to the Recordkeeper by the Company as of January 1, 2006, the Plan Administrative Manual and the requirements of this Agreement, there after the Recordkeeper with work with the Company to ensure the recordkeeping system conforms to the Plan, provided however, the Company may incur additional costs, which costs will be discussed and agreed upon by the parties hereto prior to any change being made to the recordkeeping system; To the extent that any statutory or regulatory change permits a discretionary response by a plan Company, the Recordkeeper and the Company shall agree as to the manner in which any such change will be implemented with respect to the Plan, and if the Company makes a choice for the Plan that requires customization of the Recordkeeper's system, the Company shall reimburse the Recordkeeper for its reasonable cost in making the requested adaptation; in no event however, shall the Company be billed for any fees pertaining to the development of the base system used by the Recordkeeper to service its customers generally

32

(iii) the Recordkeeper will use its best efforts to ensure that its recordkeeping system will be free of any harmful programs or data incorporated into its recordkeeping system with malicious or mischievous intent to disrupt the proper operation of its recordkeeping system, destroy or corrupt data, prevent proper access and use, or permit improper access and use of the Plan Data, provided that its recordkeeping system may include programs, routines or subroutines to require passwords or codes for continued use, and the Recordkeeper will be responsible for damages to the Company caused by the failure of its recordkeeping system to be free of any such harmful programs or data.

(x) Returns, Reports and Information. Except as set forth on Schedule "A", the Administrator shall be responsible for the preparation and filing of all returns, reports, and information required of the Trust or Plan by law. The Trustee shall provide the Administrator with such information as the Administrator may reasonably request to make these filings. The Administrator shall also be responsible for making any disclosures to Participants required by law, except such disclosure as may be required under federal or state truth-in-lending laws with regard to Participant loans, which shall be provided by the Trustee.

**Section 7.** **Compensation and Expenses.** Fidelity shall be entitled to the fees for Services in accordance with the provisions of Schedule B (collectively, the "Fees"). The Fees are based on all of the assumptions identified therein. Within 30 days of receipt of the Trustee's bill for its fees for Trustee services and Recordkeeping Services in accordance with Schedule "B", the Company shall direct the Trustee to pay out of the Trust the amount of such fees, other than any portion thereof the Company elects to pay itself within such 30-day period (and except for any portion that the Administrator disputes in good faith, in which event the provisions of this Section 7 shall apply upon resolution of such dispute as if the date of such resolutions were the date of receipt of such bill). If there are insufficient assets in the Trust to cover the payment of Trustee's fees for trust and recordkeeping services under this Agreement within 30 days of receipt of Trustee's bill, the Company agrees to be liable for any and all Fees in accordance with Schedule "B". Such fees for services are based on all of the assumptions identified in Schedule "B". In the event that the Plan characteristics referenced in the assumptions outlined in Schedule "B" change significantly by either falling below or exceeding

33

current or projected levels, such fees shall be subject to revision. To reflect increased operating costs, Trustee may once each calendar year amend Schedule B with the Company's consent upon ninety (90) days prior notice to the Company.

All reasonable expenses of plan administration as shown on Schedule "B" attached hereto, as amended from time to time, shall be a charge against and paid from the Trust for allocation among the Participants' accounts as applicable, except to the extent such amounts are paid by the Company in a timely manner. All expenses of the Trustee relating directly to the acquisition and disposition of investments constituting part of the Trust, and all taxes of any kind whatsoever that may be levied or assessed under existing or future laws upon or in respect of the Trust or the income thereof, shall be a charge against and paid from the Trust and allocated the appropriate Participants' accounts.

**Section 8.    Directions and Indemnification.**

(a)    Identity of Administrator and Named Fiduciaries. The Trustee shall be fully protected in relying on the fact that the Administrator and the Named Fiduciary under a Plan are the individuals or persons named as such above or such other individuals or persons as the Company may notify the Trustee in writing.

(b)    Directions from Administrator. Whenever the Administrator provides a proper direction to the Recordkeeper regarding the administration of the Plan, the Recordkeeper may rely on such direction and shall be entitled to indemnification in accordance with subsection (g) below (i) if the direction is contained in a writing (or is oral and immediately confirmed in a writing) provided by any individual whose name has been submitted (and not withdrawn) in writing to the Trustee or Recordkeeper, as the case may be, by the Company and (ii) the direction is proper under ERISA and the actions to be taken under the direction are not contrary to the terms of this Agreement or the PAM as provided by the Company to the Recordkeeper in writing. For purposes of this Section, such direction may also be made via electronic data transfer ("EDT"), facsimile or other secure electronic means in accordance with procedures agreed to by the Company and the Trustee or the Recordkeeper, as the case may be; provided, however, that the Trustee or the Recordkeeper shall be fully protected in relying on such direction as if it were a direction made in writing by the Administrator.

(c)    Directions from Named Fiduciary. Whenever a Named Fiduciary provides a direction to the Trustee with respect to the trust services provided under this

34

Agreement, the Trustee may rely on such direction and shall be entitled to indemnification in accordance with subsection (e) below (i) if the direction is contained in a writing (or is oral and immediately confirmed in a writing) provided by any individual whose name has been submitted (and not withdrawn) in writing to the Trustee by the Named Fiduciary and (ii) the direction is proper under ERISA and is not contrary to the terms of this Agreement. Such direction may also be made via EDT, facsimile or other secure electronic means in accordance with procedures agreed to by the Named Fiduciary and the Trustee, provided, however, that the Trustee shall be fully protected in relying on such direction as if it were a direction made in writing by the Named Fiduciary.

(d)     Co-Fiduciary Liability.  In any other case, the Trustee shall not be liable for any loss or expense arising from any act or omission of another fiduciary under the Plan except as provided in section 405(a) of ERISA.

(e)     Indemnification of Trustee.  To the extent not prohibited by applicable law the Company shall indemnify the Trustee against, and hold the Trustee harmless from, any and all loss, damage, penalty, liability, cost, and expense, including without limitation, reasonable attorneys' fees and disbursements, which the Trustee may sustain by (i) following any proper direction of a Named Fiduciary or the Administrator (whether given directly, or indirectly by and through the Recordkeeper if the Recordkeeper is entitled to indemnification with respect thereto under Section 8(b)) to made in accordance with this Trust or (ii) any failure to act in the absence of proper directions from a Named Fiduciary or the Recordkeeper, provided that the Trustee's action or failure to act is otherwise consistent with its obligations under ERISA, any other applicable law and the Trust, and provided further, that the Trustee shall not be indemnified if such liability or expense results from the Trustee's negligence or the negligence of one of its affiliates (whether acting as a trustee, a recordkeeper, an investment manager or in any other capacity) or if the Trustee or one of its affiliates (in any capacity) knowingly participates in, or knowingly undertakes to conceal an act or omission of a Named Fiduciary, the Recordkeeper or the Company knowing such act or omission to be a breach.

(f)     Indemnification of the Company.  The Recordkeeper agrees to indemnify and hold harmless the Plan and the Company (including any subsidiaries and affiliates of the Company) and their respective directors, officers, employees and agents (each an "indemnitee") against any losses, claims, damages, liabilities or expenses to which an indemnitee may become subject insofar as those losses, claims, damages, liabilities or expenses (or actions in respect

35

thereof), arise out of or are based upon (i) the Recordkeeper's willful misconduct, bad faith or negligence in performing or in failing to perform its duties and obligations as the Recordkeeper under this Agreement; (ii) any material breach by the Recordkeeper of its obligations under this Agreement; (iii) any claim that the system used by the Recordkeeper in providing Recordkeeping Services violates or infringes any copyright, trade secret, patent or other intellectual property right of any third party; or (iv) any breach by the Recordkeeper of a material representation, warranty or covenant contained in this Agreement; and, except as provided in subsection (h) below, shall reimburse the indemnities for any legal fees or other expenses reasonably incurred, as incurred, by them in connection with investigating or defending such loss, claim or action. This indemnity agreement shall be in addition to any liability which the Recordkeeper otherwise may have.

(g)     Indemnification of the Recordkeeper. The Company agrees to indemnify and hold harmless the Recordkeeper and its directors, officers, employees and agents (each an "indemnitee") against any losses, claims, damages, liabilities or expenses to which an indemnitee may become subject insofar as those losses, claims, damages, liabilities or expenses (or actions in respect thereof), arise out of or are based upon (i) the Company's willful misconduct, bad faith or negligence in performing or in failing to perform its duties and obligations under this Agreement or (ii) any breach by the Company of a material representation, warranty or covenant contained in this Agreement; and, except as provided in subsection (h), shall reimburse the indemnitees for any legal fees or other expenses reasonably incurred, as incurred, by them in connection with investigating or defending such loss, claim or action. This indemnity agreement will be in addition to any liability which the Company otherwise may have.

(h)     Option to Defend. If any third party threatens to commence or commences any action for which one party (the "Indemnifying Party") may be required to indemnify another person hereunder (the "Indemnified Party"), the Indemnified Party will promptly give notice thereof to the Indemnifying Party. The Indemnifying Party will be entitled, at its own expense and without limiting its obligations to indemnify the Indemnified Party, to assume control of the defense of such action with counsel selected by the Indemnifying Party which counsel will be reasonably satisfactory to the Indemnified Party. If the Indemnifying Party assumes the control of the defense, the Indemnified Party may participate in the defense of such claim at its own expense. Without the prior written consent of the Indemnified Party, which consent will not be unreasonably withheld, the Indemnifying Party may not settle or compromise the liability of the Indemnified Party in such action or consent to or permit the entry of any judgment in respect

thereof in payment and without unconditional release in favor of each Indemnified Party from all liability in respect of such claim.

(i)     Standard of Care. In performing any of the duties agreed to under this Agreement, the Trustee shall be held to the same standard of care as a fiduciary under ERISA and shall discharge its duties with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims. If the Recordkeeper is deemed to be a fiduciary, the above standard shall apply in the context and to the extent it is so deemed.

(j)     Survival. The provisions of this Section 8 shall survive the termination of this Agreement.


**Section 9.     Resignation or Removal of Trustee.**

(a)     Resignation. The Trustee may resign at any time upon sixty (60) days' notice in writing to the Company, unless a shorter period of notice is agreed upon by the Company.

(b)     Removal. The Company may remove the Trustee at any time upon sixty (60) days' notice in writing to the Trustee, unless a shorter period of notice is agreed upon by the Trustee.

(c)     Duties of Resigning or Removed Trustee. In the event of resignation or removal of the Trustee, the Trustee shall forthwith transfer and deliver to such individual or entity as the Company shall designate, all cash and assets then constituting the Trust. If, by the termination date, the Company has not notified the Trustee in writing as to whom the assets and cash are to be transferred and delivered, the Trustee may bring an appropriate action or proceeding for leave to deposit the assets and cash in a court of competent jurisdiction. The Trustee shall be reimbursed by the Company for all costs and expenses of the action or proceeding including, without limitation, reasonable attorneys' fees and disbursements.

**Section 10.   Successor Trustee**.

(a)   Appointment. If the office of Trustee becomes vacant for any reason, the Company may in writing appoint a successor trustee under this Agreement. The successor trustee shall have all of the rights, powers, privileges, obligations, duties, liabilities, and immunities granted to the Trustee under this Agreement. The successor trustee and predecessor trustee shall not be liable for the acts or omissions of the other with respect to the Trust.

(b)   Acceptance. When the successor trustee accepts its appointment under this Agreement, the predecessor trustee shall execute all instruments and do all acts that reasonably may be necessary or reasonably may be requested in writing by the Company or the successor trustee to vest title to all Trust assets in the successor trustee or to deliver all Trust assets to the successor trustee.

(c)   Corporate Action. Any successor of the Trustee or successor trustee, through sale or transfer of the business or trust department of the Trustee or successor trustee, or through reorganization, consolidation, or merger, or any similar transaction, shall, upon consummation of the transaction, become the successor trustee under this Agreement.

**Section 11.   Termination of Recordkeeping Services**.

(a)   Renewal. The Recordkeeping services under this Agreement may be terminated at any time by the Company upon sixty (60) days' notice in writing to the Recordkeeper. The Recordkeeper may terminate its services under this Agreement upon one hundred eighty (180) days' notice in writing to the Company.

(b)   Breach. If the Company or the Recordkeeper breaches a material obligation related to the Recordkeeping Services contained in this Agreement, and does not cure such breach within thirty (30) days (or such longer period as the parties may otherwise agree) of receiving written notice of such breach from the other party, the non-breaching party will have the right to terminate this Agreement insofar as it pertains to Recordkeeping Services and to any other remedies available to it at law or in equity; provided, however, that no breach of this Agreement by one party (whether or not cured) will excuse or permit a breach of this Agreement by any other party. Any such termination will be effective on the date set forth in the notice of termination, which date will not be less than one hundred eighty (180) days thereafter in the case

38

of a notice given by the Recordkeeper and not be less than sixty (60) days thereafter in the case of a notice given by the Company.

(c)     Post-Notice Quality Maintenance. The Recordkeeper acknowledges that the Recordkeeping Services are critical to the Company in operating the Plan in accordance with its terms and applicable laws and regulations. The Recordkeeper shall continue to provide the Recordkeeping Services during the period from the giving of a notice of termination or nonrenewal to the effective date of the termination of the provisions of this Agreement relating to Recordkeeping Services without any interruption, delay or decline in quality.

(d)     Termination Assistance. During the period from the giving of a notice of termination or nonrenewal to the expiration or earlier termination of the agreement pursuant to this Section 11, the Recordkeeper shall provide to the Company any reasonable termination assistance services requested by the Company in order to effect a smooth transition to internal Company processing or a successor provider without violating any provision of the Plan or any applicable law or regulation. Without limiting the generality of the foregoing, the Recordkeeper shall:

(i)     make key members of the Plan service team available to assist in the transition process;

(ii)     provide Plan Data to the Company or its designee on such media and at such times as the Company may request in the formats then in use by the Recordkeeper, along with all file layouts and related documentation required to fully utilize the Plan Data;

(iii)     permit the Company to extend the effective date of termination by a period of up to six (6) months, which right may be exercised not more than three (3) times and must be exercised by written notice to the Recordkeeper not less than sixty (60) days before the effective date of termination;

(iv)     fully cooperate with any successor provider and provide any successor provider (under customary confidentiality terms, if the Recordkeeper provides its confidential information) in order to effect a smooth transition to the successor provider;

39

    (v) make available to the Company or its designee, pursuant to reasonable terms and conditions, any third party services then being used by the Recordkeeper in performing the Recordkeeping Services.

    To the extent that the Recordkeeper incurs additional costs for providing termination assistance services, the Company shall reimburse the Recordkeeper for its reasonable time and materials for such services. Such fees shall be paid as incurred by the Recordkeeper as soon as reasonably practicable after the Company receipt of an invoice detailing such services.

    (e) Survival. The rights and obligations of the parties set forth in this Section 12, and any payment obligations with respect to Recordkeeping Services actually rendered during the term of the Agreement, shall survive any termination of this Agreement.

**Section 12.**   **Resignation, Removal, and Termination Notices.** All notices of resignation, removal, or termination under this Agreement must be in writing and mailed to the party to which the notice is being given by certified or registered mail, return receipt requested, to the Company c/o Lehman Brothers, Inc., 1301 Avenue of the Americas,, New York, New York 10019, Attention: Employee Benefit Plans Committee, and to the Trustee c/o FESCo Business Compliance, Contracts Administration, 82 Devonshire Street, Boston, Massachusetts 02109, or to such other addresses as the parties have notified each other of in the foregoing manner.

**Section 13.**   **Duration of Trust**. This Trust shall continue in effect without limit as to time, subject, however, to the provisions of this Agreement relating to amendment, modification, and termination thereof.

**Section 14.**   **Amendment or Modification.** This Agreement may be amended or modified at any time and from time to time only by an instrument executed by both the Company and the Trustee.

**Section 15.    Electronic Services.**

(a)    The Trustee may provide communications and services via electronic media (collectively, "Electronic Services"), including, but not limited to NetBenefits, eWorkplace and Fidelity Plan Sponsor WebStation. The Company agrees to use such Electronic Services only in the course of reasonable administration of or participation in the Plan and to keep confidential and not alter, publish, copy, broadcast, retransmit, reproduce, frame-in, link to, commercially exploit or otherwise redisseminate the Electronic Services, any content associated therewith, or any portion thereof (including, without limitation, any trademarks and service marks associated therewith), without the written consent of the Trustee. Notwithstanding the foregoing, the Trustee acknowledges that certain Electronic Services may, by their nature, be intended for non-commercial, personal use by Participants or their beneficiaries, with respect to their participation in the Plan, or for their other retirement or employee benefit planning purposes, and certain content may be intended or permitted to be modified by the Company in connection with the administration of the Plan. In such cases, the Trustee will notify the Company of such fact, and any requirements or guidelines associated with such usage or modification no later than the time of initial delivery of such Electronic Services. To the extent permission is granted to make Electronic Services available to administrative personnel designated by the Company, it shall be the responsibility of the Company to keep the Trustee informed as to which of the Company personnel are authorized to have such access. Except to the extent otherwise specifically agreed by the parties, the Trustee reserves the right, upon notice when reasonably feasible, to modify or discontinue Electronic Services, or any portion thereof, at any time.

(b)    From time to time, upon mutual agreement of the Trustee and the Company, the Trustee may deliver to the Company certain software products ("Electronic Products") not covered by the terms and conditions stated herein for use in connection with the administration of or participation in the Plan. Terms and conditions of use for such Electronic Products shall be provided to the Company, as applicable. The Trustee makes no warranties, express or implied, and specifically disclaims all warranties of merchantability, fitness for a particular purpose, or non-infringement. To the extent that such alternate terms and conditions are not furnished, the use of such Electronic Products shall be governed by the terms of this Agreement as applicable.

41

(c)    Without limiting the responsibilities of the Trustee or the rights of the Company stated elsewhere in this Agreement, Electronic Services shall be provided to the Company without acceptance of legal liability related to or arising out of the electronic nature of the delivery or provision of such Services. To the extent that any Electronic Services utilize Internet services to transport data or communications, the Trustee will take, and the Company agrees to follow, reasonable security precautions. However, the Trustee disclaims any liability for interception of any such data or communications. The Trustee reserves the right not to accept data or communications transmitted electronically or via electronic media by the Company or a third party if it determines that the method of delivery does not provide adequate data security, or if it is not administratively feasible for the Trustee to use the data security provided. The Trustee shall not be responsible for, and makes no warranties regarding access, speed or availability of Internet or network services, or any other service required for electronic communication, nor does the Trustee make any warranties, express or implied, and specifically disclaims all warranties of merchantability, fitness for a particular purpose, or non-infringement. The Trustee shall not be responsible for any loss or damage related to or resulting from any changes or modifications to the Electronic Services made in violation of this Agreement.

(d)    The Company acknowledges that certain web sites through which the Electronic Services are accessed may be protected by passwords or require a login and the Company agrees that neither the Company nor, where applicable, Participants, will obtain or attempt to obtain unauthorized access to such Services or to any other protected materials or information, through any means not intentionally made available by the Trustee for the specific use of the Company. To the extent that a PIN is necessary for access to the Electronic Services, the Company and/or its Participants, as the case may be, are solely responsible for all activities that occur in connection with such PINs.

42

### Section 16.   General.

(a)     Performance by Trustee, its Agents or Affiliates.   The Company acknowledges and authorizes that the services to be provided under this Agreement shall be provided by the Trustee, its agents or affiliates, including but not limited to FIIOC, FBSLLC, . or its successor, and that certain of such services may be provided pursuant to one or more other contractual agreements or relationships.  The Trustee shall notify the Company in writing before either of them subcontracts or otherwise delegates the responsibility to perform any of the services contemplated by this Agreement to a person or entity that is not an affiliate of the Trustee.

(b)     Delegation by Employer.   By authorizing the assets of any Plan as to which it is an Employer to be deposited in the Trust, each Employer, other than the Company, hereby irrevocably delegates and grants to the Company full and exclusive power and authority to exercise all of the powers conferred upon the Company and each Employer by the terms of this Agreement, and to take or refrain from taking any and all action which such Employer might otherwise take or refrain from taking with respect to this Agreement, including the sole and exclusive power to exercise, enforce or waive any rights whatsoever which such Employer might otherwise have with respect to the Trust, and irrevocably appoints the Company as its agent for all purposes under this Agreement.  The Trustee shall have no obligation to account to any such Employer or to follow the instructions of or otherwise deal with any such Employer, the intention being that the Trustee shall deal solely with the Company.

(c)     Entire Agreement.  This Agreement contains all of the terms agreed upon between the parties with respect to the subject matter hereof.

(d)     Waiver.   No waiver by either party of any failure or refusal to comply with an obligation hereunder shall be deemed a waiver of any other or subsequent failure or refusal to so comply.

(e)     Successors and Assigns.  The stipulations in this Agreement shall inure to the benefit of, and shall bind, the successors and assigns of the respective parties.

(f)     Partial Invalidity.  If any term or provision of this Agreement or the application thereof to any person or circumstances shall, to any extent, be invalid or unenforceable, the remainder of this Agreement, or the application of such term or provision to

43

persons or circumstances other than those as to which it is held invalid or unenforceable, shall not be affected thereby, and each term and provision of this Agreement shall be valid and enforceable to the fullest extent permitted by law.

(g)   Section Headings. The headings of the various sections and subsections of this Agreement have been inserted only for the purposes of convenience and are not part of this Agreement and shall not be deemed in any manner to modify, explain, expand or restrict any of the provisions of this Agreement.

(h)   Communications.

(i) General

The Company shall provide all information reasonably requested by Trustee to help it prepare Participant communications necessary to allow the Trustee to meet its obligations under this Agreement. The Trustee shall have no responsibility or liability for any Losses resulting from the use of information provided by or from communications prepared by The Company.

(ii) Section 404(c)

The Company and Named Fiduciary shall cooperate with the Trustee in order for the Plan to meet the requirements of section 404(c) of ERISA and regulations thereunder in the manner described in Schedule "L" and the PAM. The Company and Named Fiduciary shall have ultimate responsibility for the Plan to meet those requirements of section 404(c) of ERISA; provided, however, that nothing in this paragraph (ii) shall relieve the Trustee or Recordkeeper of responsibility or liability for the proper execution of their obligations for the delivery or furnishing of documents or information as described in paragraph (iii) below, or for the preparation of information with respect to Fidelity Mutual Funds or otherwise relating to the Trustee as described in Schedule "L" or such information with respect to Non-Fidelity Mutual Funds or other investment alternatives as the Trustee or Recordkeeper has agreed to furnish as described in Schedule "L".

(iii)   Delivery

44

To the extent that the Company and the Trustee retain or otherwise have any responsibility under this Agreement or the PAM for delivering communications to some or all Participants, the Company or Trustee (as the case may be) agrees to furnish the communications to such Participants in a timely manner as determined under applicable law (including section 404(c) of ERISA and the Sarbanes-Oxley Act requirements for "blackout" notices); provided, however, Trustee will not be responsible for failure to comply with requirements under applicable law (including section 404(c) of ERISA and the Sarbanes-Oxley Act for "blackout" notices) attributable to a failure of the Company to provide timely direction where such direction is required under this Agreement or the PAM, or, to the content of any such information or notices to the extent drafted by the Company. The Company shall not be responsible for materials prepared by the Trustee or its representatives if: (i) Company has not had an opportunity to provide comments to Trustee and/or, (ii) Company's comments have been provided to Trustee and such comments have not been resolved in a mutually agreeable manner; such approval and/or acceptance of comments shall not be unreasonably withheld by either party. The Company and the Trustee, as applicable, also represent that such communications will be delivered to such Participants in a manner permitted by applicable law, including in the case of electronic delivery applicable regulations regarding electronic transmission (for example, DOL Regulation §2520.104b-1). The Trustee and its affiliates shall have no responsibility or liability for any Losses resulting from the failure of the Company to furnish any communications for which it retains distribution responsibility in a manner which is timely and consistent with applicable law.

The provisions of this Agreement shall apply to all information provided and all Participant communications prepared and delivered by the Company or the Trustee during the implementation period prior to the execution date of this Agreement and throughout the term set forth in this Agreement.

**Section 17.    Governing Law.**

(a)    Massachusetts Law Controls. The validity, construction, effect and administration of the Agreement shall be governed by and interpreted in accordance with the banking laws of the Commonwealth of Massachusetts to the extent they govern the activities of the Trustee and otherwise in accordance with the laws of New York, except to the extent those laws are superseded under section 514 of ERISA.

(b)    Trust Agreement Controls. The Trustee is not a party to the Plan, and in the event of any conflict between the provisions of the Plan and the provisions of this Agreement, the provisions of this Agreement shall control with respect to the Trustee's responsibilities and duties.

**Section 18.    Plan Qualification.** The Company hereby represents and warrants that, while any assets of a particular Plan are held in the Trust, the Plan (i) is qualified within the meaning of section 401(a) of the Code; (ii) is permitted by existing or future rulings of the United States Treasury Department to pool its funds in a group trust; and (iii) permits its assets to be commingled for investment purposes with the assets of other such plans by investing such assets in this Trust. A copy of the most recent IRS Determination Letter for each Plan is attached hereto. If any Plan ceases to be qualified within the meaning of section 401(a) of the Code, the Company shall notify the Trustee as promptly as is reasonable. Upon receipt of such notice, the Trustee shall promptly segregate and withdraw from the Trust, the assets which are allocable to such disqualified Plan, and shall dispose of such assets in the manner directed by the Company.

**Section 19.    Data Protection.**

In order to fulfill its obligations under this Agreement, the Trustee or Recordkeeper may receive personal data, including but not limited to, compensation, benefits, tax, marital/family status and other similar information, about Participants ("Personal Data"). With respect to Personal Data it receives, the Trustee or Recordkeeper agrees to (i) safeguard Personal Data in accordance with its privacy policy, and (ii) exercise the same standard of care in safeguarding such Personal Data that it uses to protect the personal data of its own employees. Notwithstanding the foregoing, the

46

Company may monitor the Trustee's and Recordkeeper's interactions with Participants and the Company authorizes the Trustee and Recordkeeper to permit third-party prospects of the Trustee to monitor Participants' interactions for the purpose of evaluating Trustee's services.

The Company hereby authorizes the Trustee to provide the Company's employees with information about comprehensive financial planning services, including but not limited to savings accumulation, financial planning and services, guidance and retirement income management (portions of which may be provided by Fidelity Brokerage Services LLC or another affiliate of Trustee). Such programs may include print communication material, email, employee workshops and/or outbound informational phone calls.

The Company acknowledges that as part of this program employees may provide consent to release their individual Plan data to the Trustee or its affiliates and may also consent to additional Fidelity services.

### Section 20.    Force Majeure

Neither party shall be liable nor deemed to be in default of its obligations hereunder for any delay or failure in performance under the Agreement or other interruption of services to be rendered hereunder resulting, directly or indirectly, from any cause beyond its reasonable control, such as acts of God, acts of civil or military authority, acts of terrorism, whether actual or threatened, quarantines, embargoes, epidemics, war, riots, insurrections, fires, explosions, earthquakes, floods, unusually severe weather conditions, power outages or strikes. However, each party shall utilize its best good faith efforts to avoid or mitigate the effects of any such event and which in the case of the Trustee or Recordkeeper shall include following its disaster recovery procedures and perform its obligations hereunder to the extent of its ability to do so in the event of any such occurrence or circumstances. This clause shall not excuse any of the parties to the Agreement from any liability which results from failure to have in place reasonable disaster recovery and safeguarding plans adequate for protection of all data.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their duly authorized officers as of January 1, 2006.

Attest: _____

**LEHMAN BROTHERS HOLDINGS INC.**

By: _____

Name: Anthony J Colleihon

Title: Managing Director

Date: 1/22/2007

Attest: _____

**FIDELITY MANAGEMENT TRUST COMPANY**

By: _____

Name: Carolyn Redden

Title: Sr. Vice President

Date: 2/17/07

Attest: _____

**FIDELITY INVESTMENTS INSTITUTIONAL OPERATIONS COMPANY, INC.**

By: _____

Name: Carolyn Redden

Title: Sr. Vice President

Date: 2/17/07

## RECORDKEEPING AND ADMINISTRATIVE SERVICES

**Administration**   The Recordkeeper shall provide those recordkeeping and administrative services to the Plan as may be necessary or desirable to assure administration of the Plan in accordance with its terms and applicable law, as set forth on this Schedule A, in the Plan Administration Manual and as otherwise agreed upon by the Company and the Recordkeeper in writing. Without limiting the foregoing, the Recordkeeper shall accurately maintain accounts and keep records of all transactions pertaining thereto for Participants, including but not limited to the following:

(1) Establishment and maintenance of Participant account and election percentages.

*   Maintenance of the Plan investment options set forth on Schedule "C."

*   Maintenance of the money classifications set forth in the Plan Administration Manual.

*   The Recordkeeper will provide the recordkeeping and administrative services set forth on this Schedule "A" or as otherwise agreed to in writing (or by means of a secure electronic medium) between the Company and Recordkeeper. The Recordkeeper may unilaterally add or enhance services, provided there is no impact on the fees set forth in Schedule "B."

(2)   Participant Telephone Services in accordance with the following:

   (i)   Participant service representatives are available each business day from 8:30 a.m. ET - 12:00 Midnight ET to provide toll free telephone service for participant inquiries and transactions.

   (ii)   Through the automated voice response system and on-line account access via the World Wide Web, participants also have virtually 24 hour account inquiry and transaction capabilities.

   (iii)   For security purposes, all calls are recorded. In addition, several levels of security are available including the verification of a Personal Identification Number (PIN) and/or any other indicative data resident on the system.

   (iv)   The following telephone services are available:

## RECORDKEEPING AND ADMINISTRATIVE SERVICES

- Enroll new participants via telephone or such other electronic means as may be agreed upon from time to time by the Company and the Trustee. Confirmation of enrollment will be provided online or if requested, by mail generally within five (5) calendar days of the request.

- Provide Plan investment option information.

- Provide and maintain information and explanations about Plan provisions.

- Respond to requests for literature.

- Maintain and process changes to participants' contribution allocations for all money sources.

- Process exchanges (transfers) between investment options on a daily basis.

- Process in-service and hardship withdrawals due to certain circumstances previously approved by the Company.

- Process loan requests according to written direction provided by the Company in accordance with the Plan Administrative Manual.

- Consult with participants in various loan scenarios and generate all documentation. Participant loans for the purchase of a primary residence shall be processed in accordance with the procedures set forth in Exhibit "K" attached hereto.

(3)     Plan Accounting, including the following:

    (i)     Process consolidated payroll contributions according to the Company's payroll frequency via EDT, consolidated magnetic tape or diskette. The data format will be provided by Trustee.

    (ii)     Maintain and update employee data necessary to support plan administration. The data will be submitted according to payroll frequency.

## RECORDKEEPING AND ADMINISTRATIVE SERVICES

(iii) Provide daily Plan and participant level accounting for all Plan investment options.

(iv) Provide daily Plan and participant level accounting for all money classifications for the Plan.

(v) Audit and reconcile the Plan and participant accounts daily.

(vi) Reconcile and process participant withdrawal requests and distributions as approved and directed by the Company. All requests are paid based on the current market values of participants' accounts, not advanced or estimated values. A distribution report will accompany each check.

(vii) Track individual participant loans; process loan withdrawals; re-invest loan repayments; and prepare and deliver comprehensive reports to the Company to assist in the administration of participant loans.

(viii) Maintain and process changes to participants' deferral percentage and prospective and existing investment mix elections.

(4) Participant Reporting, including the following:

(i) Mail confirmation to participants of all participant initiated transactions within three to five calendar days of the transaction.

(ii) Prepare and mail via first class to each Plan participant a quarterly detailed participant statement reflecting all activity for the period. Statements will be mailed not later than twenty (20) calendar days after the end of each quarter in the absence of unusual circumstances.

(iii) Mail required Code section 402(f) notification for distribution from the Plan. This notice advises participants of the tax consequences of their Plan distributions.

## RECORDKEEPING AND ADMINISTRATIVE SERVICES

(5)     Plan Reporting, including the following:

    (i)     Prepare, reconcile and deliver a monthly Trial Balance Report presenting all money classes and investments. This report is based on the market value as of the last business day of the month. The report will be delivered not later than twenty (20) calendar days after the end of each month in the absence of unusual circumstances.

    (ii)    Prepare, reconcile and deliver a Quarterly Administrative Report presenting both on a participant and a total Plan basis all money classes, investment positions and a summary of all activity of the participant and Plan as of the last business day of the quarter. The report will be delivered not later than twenty (20) calendar days after the end of each quarter in the absence of unusual circumstances.

(h)     Government Reporting, including the following:

    (i)     Process year-end tax reports for Participants – 1099-R as well as preparation of Form 5500 in accordance with the guidelines set forth on Schedule "J".

(i)     Communication & Education Services, including the following:

    (i)     Recordkeeper designs, produces and distributes a customized comprehensive communications program for employees. The program may include multimedia informational materials, investment education and planning materials, access to Recordkeeper's homepage on the Internet and STAGES magazine. Additional fees for such services as mutually agreed upon between Company and Recordkeeper.

    (ii)    Fidelity Portfolio Review is an internet-based educational service for participants that generates target asset allocations and model portfolios customized to investment options in your Plan(s) based upon methodology provided by Strategic Advisers, Inc., an affiliate of the Trustee. The Company acknowledges that it has received the ADV Part II for Strategic Advisers, Inc. more than 48 hours prior to executing the Trust agreement.

## RECORDKEEPING AND ADMINISTRATIVE SERVICES

(6)     Other services, including the following:

   (i)     Perform non-discrimination limitation testing upon request. In order to obtain this service, the Company shall be required to provide the information identified in the Fidelity Discrimination Testing Package Guidelines. Any fees and restrictions associated with this testing service shall be addressed in such Guidelines.

   (ii)    Make the Fidelity Participant Recordkeeping System available on line to the Company via the Plan Sponsor Webstation ("PSW"). PSW is a graphical, Windows-based application that provides current plan and Participant-level information, including indicative data, account balances, activity and history. The Company agrees that PSW access will not be granted to third parties without the prior consent of the Recordkeeper.

   (iii)   Provide a loan coupon book to any Participant that is allowed to repay their outstanding loans in this manner, as outlined in the Plan Administrative Manual.

   (iv)    De Minimis Distributions: After a Participant terminates employment and is eligible for a distribution, the Recordkeeper will determine whether the vested account balance exceeds $1,000 or exceeds $1,000 at the end of the warning period (at least 30 days, but not more than 70 days, from the determination date). If not, the Recordkeeper and Trustee will process a mandatory and immediate cashout, subject only to the requirement to offer a rollover opportunity. The $1,000 threshold will increase or decrease as the IRS may from time to time amend this threshold in Internal Revenue Code section 411(a)(11). Recordkeeper will ensure that the amount actually paid to or for the Participant does not exceed $1,000 (or the current cash-out limit); if, because of daily valuation changes, the final amount processed exceeds the limit, Recordkeeper will not complete the distribution without obtaining the Participant's consent.

   (v)     Roll In Processing. The Recordkeeper shall process the qualification of rollover contributions to the Trust. The procedures for qualifying a rollover are directed by the Company and the Trustee shall accept or deny each rollover based upon the Plan's written criteria and any written guidelines provided by the Company and documented in the Plan Administrative Manual.

## RECORDKEEPING AND ADMINISTRATIVE SERVICES

In the absence of specific direction from the Company, the Recordkeeper shall follow the procedures set forth below:

To process a rollover request the Participant must obtain the signature from the distributing plan, trustee or custodian, on the designated form, certifying that the monies distributed originally came from a qualified plan and have not been commingled with any non eligible money. If a signature cannot be obtained a signed letter from the distributing plan, trustee or custodian on its company letterhead or a copy of the distributing plan's determination letter will also be acceptable.

Requests that do not meet the specified criteria will be returned to the Participant with further explanation as to why the request cannot be processed. If the Recordkeeper or the Company determine that a request is not a valid rollover, the full amount of the requested rollover will be distributed to the Participant.

(vi)   Minimum Required Distribution: monitor and process minimum required distribution ("MRD") amounts as follows: the Recordkeeper shall notify the MRD Participant and, upon notification from the MRD participant, shall use the MRD Participant's information to process their distribution. If the MRD participant has terminated employment and does not respond to the Recordkeeper's notification, the Company hereby directs the Trustee to automatically begin the required distribution for the participant. In the case of any other MRD participant who does not respond to the Recordkeeper's notification, the Trustee shall not proceed with the MRD.

(vii)  The Recordkeeper will determine whether a judgment, decree or order ("Order"), including approval of a property settlement or domestic relations order relating to benefits under the Plan, which provides for child support, alimony payments or marital property rights for the benefit of a spouse, former spouse or other dependent of a Participant is "qualified" under section 414(p) of the Internal Revenue Code and section 206(d) of ERISA. The specific procedures associated with this service are detailed in the Plan's QDRO Approval Guidelines and Procedures ("QDRO Guidelines"). The service will commence only after receipt

## RECORDKEEPING AND ADMINISTRATIVE SERVICES

by the Recordkeeper of written QDRO Guidelines signed by the Company's authorized
representative.

**LEHMAN BROTHERS HOLDINGS INC.**

By: _____

Date: ____1/22/2007_____

**FIDELITY MANAGEMENT TRUST
COMPANY**

By: _____

Date: _____

Schedule "B"

## FEE SCHEDULE

| | |
|---|---|
| Annual Participant Fee: | $0 per Participant. |
| Enrollments by Phone/NetBenefits: | $5.00 per year per non-active employee residing on Fidelity's Participant Recordkeeping System. Fee waived. |
| Loan Fee: | Establishment fee of $35.00 per loan account; annual fee of $15.00 per loan account. |
| Minimum Required Distribution: | $25.00 per Participant per MRD withdrawal. Fee waived. |
| In-Service Withdrawals by Phone: | $20.00 per withdrawal. Fee waived. |
| Plan Sponsor Webstation (PSW): | Two (2) user IDs provided free of charge. Additional user IDs available upon request. |
| Return of Excess Contribution Fee: | $25.00 per Participant, one-time charge per calculation and check generation. Fee waived. |
| Non-Fidelity Mutual Funds: | Fees paid directly to Fidelity Investments Institutional Operations Company, Inc. (FIIOC) or its affiliates by Non-Fidelity Mutual Fund vendors shall be posted and updated quarterly on Plan Sponsor Webstation at http://psw.fidelity.com or a successor site. |
| Neuberger Berman Value Equity Fund: | $30,000 annual fee for daily valuation and reporting |

Schedule "B"

## FEE SCHEDULE

The Trustee fee is a 2.00 basis point fee applied to the total value of the portfolio(s) and a set of transaction fees.

Fees are computed and invoiced quarterly; extraordinary, customized and out of pocket expenses are to be billed separately.

Signature Ready 5500:                    The fee is $5,000 per Plan if all required information is submitted within 5 ½ months following the Plan's year-end. If all required information is not received until after 5 ½ months following the Plan's year-end, there will be an additional $1,000 late processing charge per Plan affected. Any revisions requested by the Company after Recordkeeper has initially prepared and submitted the Form 5500 to the Company will be processed at a rate of $100 per hour.

DRO Qualification:                    $1,200 for a "standard" DRO (a "standard" DRO is an order which references defined contribution plans only); $1,800 for a "complex" DRO (a "complex" DRO is an order which references one or more defined benefit plans whether in conjunction with a defined contribution plan or alone).

- Other Fees: separate charges for optional non-discrimination testing, extraordinary expenses resulting from large numbers of simultaneous manual transactions, from errors not caused by Trustee or Recordkeeper, reports not contemplated in this Agreement, corporate actions, or the provision of communications materials in hard copy which are also accessible to participants via electronic services in the event that the provision of such material in hard copy would result in an additional expense deemed to be material. The Administrator may

## FEE SCHEDULE

direct Trustee to withdraw reasonable administrative fees from the Trust by written direction to
the Trustee.

### Stable Value Investments

·   Stable Value Fund Accounting Fee               .05% on all existing GIC assets

·   Expenses associated with the custody of assets underlying synthetic investment contracts will
    be borne by the portfolio.

### Stock Administration Fee

·   To the extent that assets are invested in Stock, .10% of such assets in the Trust payable pro
    rata quarterly on the basis of such assets as of the calendar quarter's last valuation date, but
    no less than $10,000 nor more than $50,000 per year.

Note: These fees are based on the Plan characteristics, asset configuration, net cash flow, fund
selection and number of Participants existing as of the date of this agreement. In the event that
one or more of these factors changes significantly, fees may be subject to change after discussion
and mutual agreement of the parties. Significant changes in the legal and regulatory
environment would also prompt discussion and potential fee changes.

LEHMAN BROTHERS HOLDINGS INC.               FIDELITY MANAGEMENT TRUST
                                            COMPANY

By: _____                By: _____

Date: ___1/22/2007___                       Date: ___2/17/07___

## INVESTMENT OPTIONS

In accordance with Section 5(b), the Named Fiduciary hereby directs the Trustee that Participants' individual accounts may be invested in the following investment options:

- Fidelity Equity Income Fund
- Fidelity Capital Income Fund
- Fidelity Select Biotech Fund
- Fidelity Select Healthcare Fund
- Fidelity Select Technology Fund
- Fidelity Select Telecomm Fund
- Fidelity Asset Manager Fund
- Fidelity Low Priced Stock Fund
- Fidelity Diversified International Fund
- Fidelity Large Cap Stock Fund
- Fidelity Freedom Fund 2010
- Fidelity Freedom Fund 2020
- Fidelity Freedom Fund 2030
- Fidelity Freedom Fund 2040
- Fidelity US Bond Index Fund
- Primco Stable Value Fund
- NB Partners Investment Fund
- Alliance Z CCM Emerging Companies IS
- PIMCO Total Return Fund
- NB Genesis – Inv Cl
- Templeton Dev Mkts A
- Calamos Growth A
- Vanguard Institutional Index

## INVESTMENT OPTIONS

- LB 10 Uncommon Val

- NB Fasciano Invt

- MFS Value Fund A

- Vanguard Total Stock Market Adm

- Hartford Cap Ap IA

- TRP Mid Cap Value

- NB High Income Bond Inv

- American Cap World G&I R4

- Neuberger Focus Inv

- NB International Inv

- NB Social Response Inv

- Century Small Cap Sel I

- NB Value Equity (frozen to new contributions and exchanges in)

- Lehman Brothers Stock Fund

- American Express Stock Fund (frozen to new contributions and exchanges in and is sunsetting effective 1/31/2007).

## INVESTMENT OPTIONS

The Named Fiduciary hereby directs that the investment option referred to in Section 5(b) and
Section 5(e)(vi)(B)(5) shall be the PRIMCO Stable Value Fund.

**LEHMAN BROTHERS HOLDINGS
INC.**

By: _____

Date: ____1/22/2007____

## OPERATIONAL GUIDELINES FOR THE PRIMCO STABLE VALUE FUND

### I.   Description of Investment Option

The Primco Stable Value Fund (the "Portfolio") will be comprised of existing investment
contracts, including synthetic investment contracts, units in the Colchester Street Trust:
Money Market Portfolio: Class I ("STIF") and additional assets to be purchased by
PRIMCO Capital Management, INVESCO Fixed Income/Stable Value Division (the
"Investment Manager").

### II.   Investment Option Transactions

All accounting transactions for the Portfolio will be coordinated by Fidelity Management
Trust Company (the "Trustee") based on the procedures outlined in this document.

### III.   Valuation

The Trustee will determine the Book Value of all assets on a daily basis and produce a
blended mil rate assuming a net asset value of $1 per share. For purposes of this
agreement, the mil rate is the prior day's interest rate earned on net equity. The
Investment Manager may purchase investments that the Trustee may not be able to value.
The Trustee will identify securities that it is unable to value, and provide the Investment
Manager with a list of such securities prior to settlement date of the securities. In such
cases, the Investment Manager agrees that it will be solely responsible for securing
valuation from an independent third-party broker ("Broker"). The Investment Manager
accepts responsibility for ensuring that accurate and complete valuation information is
forwarded to the Trustee.

The Investment Manager will be responsible for providing the Trustee with a statement
of market value holdings for security backed investments on a quarterly basis. The
Trustee assumes no responsibility for determining said Market Value.

### IV.   Custody

The Investment Manager will arrange for the custody of all assets underlying synthetic
investment contracts. All such assets will be held by custodians selected by the

## OPERATIONAL GUIDELINES FOR THE PRIMCO STABLE VALUE FUND

Investment Manager in the name of Fidelity Management Trust Company as Trustee of the Lehman Brothers Savings Plan Trust.

The Investment Manager shall have the authority and discretion to exercise or abstain from exercising any option, right, or privilege attaching to any asset in the Portfolio, including without limitation the authority to vote in person or by proxy at corporate or other meetings, and to participate in or consent to any voting trust, reorganization, dissolution, merger, or other action affecting any asset in the Portfolio and to direct the Trustee to make payments in connection therewith.

### V.     Money Movement

All money transfers to and from the Portfolio will be made through the STIF.  A STIF transaction summary will be sent monthly by the Trustee to the Investment Manager after month end, typically by the tenth (10th) business day of the subsequent month.

### VI.    Cash Management

For liquidity purposes, a STIF balance of approximately 3% of the Portfolio will be maintained. The Trustee will send a daily facsimile to the Investment Manager indicating prior day STIF balances.  Based on the reported STIF balance the Investment Manager will direct the Trustee, via telephone or facsimile, to either move money into the STIF or take money out of the STIF. The Investment Manager will determine which assets shall be liquidated and direct wiring of such funds to the Trustee.  The Investment Manager may call the Trustee at any time to obtain the daily STIF account balance.   The STIF balance target may be modified in writing as mutually agreed to by the Investment Manager and Trustee.

Alternatively, the Investment Manager may arrange to borrow, for purposes of administrative convenience only, and in such terms and conditions as shall be deemed advisable or proper by the Investment Manager for the purpose of managing the Portfolio and may pledge any securities or other property of the Portfolio for the repayment of any such loan.  Any such borrowings will be evidenced by a promissory note(s) or investment contract provision in form and substance satisfactory to the Trustee.  Furthermore, the Investment Manager, based upon reasonable legal due diligence represents that no such borrowings would result in unrelated business taxable income ("UBTI") to the Trust and

## OPERATIONAL GUIDELINES FOR THE PRIMCO STABLE VALUE FUND

has obtained supportive legal opinions therein. The Company agrees to hold the Trustee harmless in the event that such borrowings did in fact incur UBTI.

To the extent that STIF is insufficient to process Plan transactions, the Trustee may borrow funds from a bank not affiliated with the Trustee in order to provide sufficient liquidity in a timely fashion; provided that the cost of such borrowing shall be allocated to the Portfolio.

### VII.    New Placements

As soon as practicable before funding a new investment, but no later than 2:30 PM ET the day before settlement, the Investment Manager shall provide the Trustee with contract documentation (binder, confirmation, or trade ticket) regarding the respective Book Value investment contract purchases. Such documentation should include a description of the investment and an interest rate illustration.

Where possible, the Investment Manager will execute contract documents, including amendments, on behalf of the Trust. When required, the Investment Manager will send a letter, signed by an authorized representative, directing the Trustee to execute any investment contract documents, including amendments, on behalf of the Trust. In case of investment contracts, the Investment Manager shall notify new contract issuers that the Trustee must receive a monthly issuer statement no later than ten (10) calendar days after the end of the month.

If a new investment purchase does not meet the operational requirements of the Trustee, then the Trustee reserves the right to: (1) request operational changes which conform to the Trustee's valuation requirements, or (2) refuse to value the new investment. In the instance of item (2), the provisions of Section III. Valuation will apply.

The Investment Manager must also notify all new issuers that the Trustee is authorized to make transactions at the direction of the Investment Manager.

### VIII.   Investment Contract Maturities and Payments

The proceeds from investment contracts held in the Portfolio will be transferred to the STIF portion of the Portfolio for subsequent reinvestment. The transfer of proceeds will

## OPERATIONAL GUIDELINES FOR THE PRIMCO STABLE VALUE FUND

be initiated by the issuer or the Investment Manager and processed by the Trustee based upon the payout schedule provided by the Investment Manager in the contract documentation. Should the payout schedule change, the Investment Manager will inform the Trustee as soon as possible. The Trustee will provide wiring instructions to the Investment Manager for use in directing wires from contract issuers to the STIF. Issuer-to-issuer transfers will be allowed only if the transfer is to the same issuer.

### IX.    Reconciliation

The Trustee will reconcile the Fidelity Participant Recordkeeping System ("FPRS") to the Managed Income Portfolio Accounting System ("GUIDE") on a daily and monthly basis. The Book Value investment contracts will be reconciled on GUIDE to the issuer Book Value balances on a monthly basis.

The Trustee will have no responsibility to reconcile the Book Value assets to their respective Market Values either individually or in aggregate.

A copy of the Trust Book Value Asset Statement for the Portfolio will be mailed to the Investment Manager typically by the tenth (10th) business day of the subsequent month.

### X.    Fee Collection for Accounting & Custody Services

Trustee accounting fees for the Portfolio will be accrued daily against the earnings of the Portfolio and deducted monthly from the STIF.

Custody fees for the Portfolio will be borne by the Portfolio, if applicable.

Investment Management fees will be accrued daily against the earnings of the Portfolio and paid to the Investment manager on a monthly basis.

### XI.    Reporting

Investment Manager will provide Trustee with monthly statement of Book Value for investments held in the Portfolio within 5 business days following month end.

## OPERATIONAL GUIDELINES FOR THE PRIMCO STABLE VALUE FUND

Certain investments may periodically experience resets in the Book Value contract crediting rate. Investment Manager will supply Trustee with a report detailing these rate resets on a monthly basis by 1st business day or as made available by the Issuer.

Investment Manager will provide Trustee with statement of market values for security backed investments held in the Portfolio within 30 days following quarter end. Copies of custody statements may also be supplied if greater detail is needed.

Trustee and Recordkeeper (as applicable) will supply the following information and/or reports to the Investment Manager on the basis indicated below.

### Daily

1. Provide via facsimile report indicating prior day's ending STIF balance and if known, current day's participant activity.

### Weekly

1. Provide Transaction Detail report and a Summary of Transactions report every Monday (or next business day if a holiday) for the prior week. These reports will supply data indicating date, amount, and type of participant activity processed (e.g. contributions, exchanges and redemptions as allowed by the Plan).

### Monthly

1. Transaction Detail report and Summary of Transactions report for the entire month by 2nd business day following month end.

2. STIF income posted for each month by 2nd business day following month end.

3. FeeSum report for entire month by 2nd business day following month end.

4. Monthly Trust Statement by the 10th business day of the following month.

5. Option Balances - Trial Balance report from the Fidelity Participant Recordkeeping System by the 15th of the month following month end.

## OPERATIONAL GUIDELINES FOR THE PRIMCO STABLE VALUE FUND

### XII.   Changes to the Operating Procedures

Other than as indicated in Section VI, this Schedule may be amended or modified by a
written instrument executed by the Trustee and Company and as agreed by the
Investment Manager.

**LEHMAN BROTHERS HOLDINGS INC.**

By: _____

Date: ____1/22/2007_____

**FIDELITY MANAGEMENT TRUST
COMPANY**

By: _____

Date: ____8/17/07_____

## EXISTING GICS

## GICs

A.    In accordance with Section 4(b), the Named Fiduciary hereby directs the Trustee to continue to hold the following GICs until such time as the Named Fiduciary directs otherwise. FMTC agrees to act as directed trustee for the following GICs and such other assets or securities as evidenced by the certified trustee statement where FMTC has assumed custodianship:

*This include synthetic GICs  The original list included the synthetics in addition to the traditional GICs.*

Contract Issuer: Bank of America
Contract Number: 05-034
Maturity Date: evergreen

Contract Issuer: ING
Contract Number: 60118
Maturity Date: evergreen

Contract Issuer: IXIS WR
Contract Number: 1921-01
Maturity Date: evergreen

Contract Issuer: JP Morgan Chase
Contract Number: 431429-S
Maturity Date: evergreen

Contract Issuer: State Street
Contract Number: 105019
Maturity Date: evergreen

Contract Issuer: UBS AG
Contract Number: 5206
Maturity Date: evergreen

Contract Issuer: UBS AG
Contract Number: 5186
Maturity Date: evergreen

Contract Issuer: Principal Mutual *
Contract Number: GA-41462
Maturity Date: 11-06

**LEHMAN BROTHERS HOLDINGS INC.**

By: _____

Date: _____1/22/2007_____

**FIDELITY MANAGEMENT TRUST COMPANY**

By: _____
     **Vice President**
Date: _____

\* Added to the fund on February 1, 2006.

# EXCHANGE GUIDELINES

The following exchange guidelines are currently employed by Fidelity Investments Institutional Operations Company, Inc. (FIIOC).

Exchange hours, via a Fidelity participant service representative, are 8:30 a.m. (ET) to 12:00 midnight (ET) on each business day. A "business day" is any day on which the New York Stock Exchange (NYSE) is open.

Exchanges via VRS and the internet may be made virtually 24 hours a day.

FIIOC reserves the right to change these exchange guidelines at its discretion.

Note: The NYSE's normal closing time is 4:00 p.m. (ET); in the event the NYSE alters its closing time, all references below to 4:00 p.m. (ET) shall mean the NYSE closing time as altered.

## Mutual Funds

### Exchanges Between Mutual Funds

Participants may call on any business day to exchange between the mutual funds. If the request is confirmed before 4:00 p.m. (ET), it will receive that day's trade date. Requests confirmed after 4:00 p.m. (ET) will be processed on a next business day basis.

### Company Stock Fund

Provided that the Company Stock Fund is open for purchases and sales of units, the following rules will govern exchanges:

## I.   Exchanges From Mutual Funds to Company Stock Fund

Participants may contact Fidelity on any day to exchange from mutual funds into the Company Stock Fund. If the request is confirmed before the close of the market (generally, 4:00 p.m. ET) on a business day, it will receive that day's trade date. Requests confirmed after the close of the market on a business day (or on any day other than a business day) will be processed on a next business day basis.

## II.   Exchanges From Company Stock Fund to Mutual Funds

Participants may contact Fidelity on any day to exchange the Company Stock Fund to a mutual fund or the GIC Fund [or Managed Income Portfolio]. If Fidelity accepts the

## EXCHANGE GUIDELINES

request conditionally before the close of the market (generally 4:00 p.m. ET) on any business day and Available Liquidity is sufficient to honor the trade after Specified Hierarchy rules are applied, it will receive that day's trade date. Requests accepted conditionally after the close of the market on any business day (or on any day other than a business day) will be processed on a next business day basis, subject to Available Liquidity for such day after application of Specified Hierarchy rules. If Available Liquidity on any day is insufficient to honor the trade after application of Specified Hierarchy rules, it will be suspended until Available Liquidity is sufficient, after application of specified hierarchy rules, to honor such trade, and it will receive the trade date and Closing Price of the date on which it was processed.

## III.   Exchange Restrictions

Exchanges into the American Express Common Stock Fund and into the Neuberger Berman Value Equity Fund are prohibited. Exchanges into and out of the Company Stock Fund may be restricted at times due to a Company or regulatory blackout.

**LEHMAN BROTHERS HOLDINGS INC.**

By: _____

Name: _Anthony J Colletan_

Title: _Managing Director_

Date: _1/22/2007_

## OPERATING PROCEDURES FOR NON-FIDELITY MUTUAL FUNDS

### Pricing

By 7:00 p.m. Eastern Time ("ET") each Business Day, the Non-Fidelity Mutual Fund Vendor
(Fund Vendor) will input the following information ("Price Information") into the Fidelity
Participant Recordkeeping System ("FPRS") via the remote access price screen that Fidelity
Investments Institutional Operations Company, Inc. ("FIIOC"), an affiliate of the Trustee, has
provided to the Fund Vendor: (1) the net asset value for each Fund at the Close of Trading,
(2) the change in each Fund's net asset value from the Close of Trading on the prior Business
Day, and (3) in the case of an income fund or funds, the daily accrual for interest rate factor
("mil rate"). FIIOC must receive Price Information each Business Day (a "Business Day" is
any day the New York Stock Exchange is open). If on any Business Day the Fund Vendor
does not provide such Price Information to FIIOC, FIIOC shall suspend all associated
transaction activity in the Fidelity Participant Recordkeeping System ("FPRS") until the
relevant Price Information is made available by Fund Vendor.

### Trade Activity and Wire Transfers

By 7:00 a.m. ET each Business Day following Trade Date ("Trade Date plus One"), FIIOC
will provide, via facsimile, to the Fund Vendor a consolidated report of net purchase or net
redemption activity that occurred in each of the Funds up to 4:00 p.m. ET on the prior
Business Day. The report will reflect the dollar amount of assets and shares to be invested or
withdrawn for each Fund. FIIOC will transmit this report to the Fund Vendor each Business
Day, regardless of processing activity. In the event that data contained in the 7:00 a.m. ET
facsimile transmission represents estimated trade activity, FIIOC shall provide a final
facsimile to the Fund Vendor by no later than 9:00 a.m. ET. Any resulting adjustments shall
be processed by the Fund Vendor at the net asset value for the prior Business Day.

The Fund Vendor shall send via regular mail to FIIOC transaction confirms for all daily
activity in each of the Funds. The Fund Vendor shall also send via regular mail to FIIOC, by
no later than the fifth Business Day following calendar month close, a monthly statement for
each Fund. FIIOC agrees to notify the Fund Vendor of any balance discrepancies within
twenty (20) Business Days of receipt of the monthly statement.

For purposes of wire transfers, FIIOC shall transmit a daily wire for aggregate purchase
activity and the Fund Vendor shall transmit a daily wire for aggregate  redemption activity, in
each case including all activity across all Funds occurring on the same day.

## OPERATING PROCEDURES FOR NON-FIDELITY MUTUAL FUNDS

### Prospectus Delivery

FIIOC shall be responsible for the timely delivery of Fund prospectuses and periodic Fund
reports ("Required Materials") to Plan participants, and shall retain the services of a third-
party vendor to handle such mailings. The Fund Vendor shall be responsible for all materials
and production costs, and hereby agrees to provide the Required Materials to the third-party
vendor selected by FIIOC. The Fund Vendor shall bear the costs of mailing annual Fund
reports to Plan participants. FIIOC shall bear the costs of mailing prospectuses to Plan
participants.

### Proxies

The Fund Vendor shall be responsible for all costs associated with the production of proxy
materials. FIIOC shall retain the services of a third-party vendor to handle proxy solicitation
mailings and vote tabulation. Expenses associated with such services shall be billed directly
to the Fund Vendor by the third-party vendor.

### Participant Communications

The Fund Vendor shall provide internally-prepared fund descriptive information approved by
the Funds' legal counsel for use by FIIOC in its written Participant communication materials.
FIIOC shall utilize historical performance data obtained from third-party vendors (currently
Morningstar, Inc., FACTSET Research Systems and Lipper Analytical Services) in telephone
conversations with plan Participants and in quarterly Participant statements. The Company
hereby consents to FIIOC's use of such materials and acknowledges that FIIOC is not
responsible for the accuracy of such third-party information. FIIOC shall seek the approval of
the Fund Vendor prior to retaining any other third-party vendor to render such data or
materials under this Agreement.

### Compensation

FIIOC shall be entitled to fees as set forth in a separate agency agreement with the Fund
Vendor.

## OPERATING PROCEDURES FOR NON-FIDELITY MUTUAL FUNDS

### Indemnification

The Fund Vendor shall be responsible for compensating Participants and/or FIIOC in the
event that losses occur as a result of (1) the Fund Vendor's failure to provide FIIOC with
Price Information or (2) providing FIIOC with incorrect Price Information.

**AVAILABLE LIQUIDITY**

    A.    The following procedures shall govern sales in respect of the **Company Stock Fund** requested for a day on which Available Liquidity is insufficient:

1.    Loans, withdrawals and distributions will be aggregated and placed first in the hierarchy. If Available Liquidity is sufficient for the aggregate of such transactions, all such loans, withdrawals and distributions will be honored.

2.    If Available Liquidity has not been exhausted by the aggregate of loans, withdrawals and distributions, then all remaining transactions involving a sale of units in the Company Stock Fund shall be grouped on the basis of when such requests were received, in accordance with standard procedures maintained by the Trustee for such grouping as they may be amended from time to time. To the extent of Available Liquidity, all transactions in a group shall be honored, on a FIFO basis. If Available Liquidity is insufficient to honor all transactions within a group, then none of such transactions in the group shall be honored.

3.    Transactions not honored on a particular day due to insufficient Available Liquidity shall be honored, using the hierarchy specified above, on the next business day on which there is Available Liquidity.

    B.    Available Liquidity procedures for unitized **American Express Company Stock Fund**: The procedures set forth above, applied by treating references therein to the "Company Stock Fund" as references to the "American Express Stock Fund" governed sales of units in the American Express Stock Fund requested for a day on which Available Liquidity is insufficient.

# OPERATING PROCEDURES FOR PARTICIPANT LOANS FOR THE PURCHASE OF A PRIMARY RESIDENCE

1. The participant will call Recordkeeper to request a loan for the purchase of a primary residence.

2. The Participant Services Representative will determine, based on the current value of the participant's account on the date of the request and any additional guidelines provided by the Company, the amount available for the loan.

3. The participants shall direct Recordkeeper to the amount, subject to the Plan's limitations, and term of the loan

4. The Participant Services Representative will inform the participant of the interest rate (which shall be supplied by the Company) and the installment payment amounts for the requested loan.

5. Recordkeeper will forward the loan documentation to the Participant.

6. The Participant adheres to the following procedures in order to execute the transaction:

   - Reviews the loan documentation and notes the expiration date.

   - Completes the loan documentation.

   - Submits the loan documentation as well as a copy of their purchase and sales agreement, signed by both the buyer and seller, or construction contract (aka "Builders Contract for New Construction") to Recordkeeper.

7. Recordkeeper receives the Participant's loan documentation and reviews it for Participant's signature and required documentation.

8. If the documentation submitted by the participant meets the Company's requirements, Recordkeeper will process the transaction and Trustee will mail the check directly to the Participant's home address.

9. If the documentation does not meet the Plan's requirements, Recordkeeper will send a letter to the Participant indicating that the loan cannot be processed and the reason for the rejection.

**OPERATING PROCEDURES FOR PARTICIPANT LOANS FOR THE PURCHASE OF
A PRIMARY RESIDENCE**

10. If it is unclear from the documentation whether the Participant is eligible for a loan from the
Plan, Recordkeeper will forward the loan request to the Company for direction (written
approval or rejection).

**LEHMAN BROTHERS HOLDINGS
INC.**

By: _____

## FORM 5500 SERVICE

Effective for Form 5500, applicable schedules and Summary Annual Report ("SAR") prepared for plan year ending December 31, 2001 and thereafter, Recordkeeper agrees to provide its Signature Ready Form 5500 Service ("Service"), in accordance with the following:

1. The Company hereby agrees to:

    a.  If Recordkeeper 's Non-Discrimination Testing ("NDT") services are used, submit NDT data by one and one half (1 ½) months following the plan's year end, which will be performed pursuant to a separate Non Discrimination Testing Services Agreement;

    b.  If Recordkeeper did not prepare the plan's prior year Form 5500, submit a copy of the most recent Form 5500 filed with the Internal Revenue Service ("IRS");

    c.  If the plan's assets were transferred to Trustee at any time during the plan year, submit a draft or final copy of the audited financial statements from the prior recordkeeper;

    d.  Provide Recordkeeper with complete and accurate Plan data in the required format, including a completed plan questionnaire ("Questionnaire") as soon as possible after the plan's year end but which may be no later than the last day of the 8th month following the plan's year-end (assuming a filing extension has been requested);

    e.  In the event that Recordkeeper has not received all data required to complete a Form 5500 within five and one half (5 1/2) months after the plan year end, the Company hereby authorizes Recordkeeper to prepare and execute IRS Form 5558 (Application for Extension) on behalf of the Plan Administrator and file Form 5558 with the IRS in order to obtain an extension of the filing deadline;

    f.  Review, sign and mail the Form 5500 prepared by Recordkeeper to the IRS in a timely manner;

    g.  Distribute the SAR to Participants and beneficiaries in a timely manner;

## FORM 5500 SERVICE

h.    Elect the Service prior to the last day of the plan year for which the Form 5500 would be required; and

i.    Respond to and provide any other information, requested by Recordkeeper, related to the Form 5500.

2. Recordkeeper hereby agrees to:

a.    Provide the Company with the Questionnaire within one and one-half (1 1/2) months after the plan's year-end. Recordkeeper shall have no responsibility for verifying the authenticity or accuracy of the data submitted by the Company on the Questionnaire;

b.    File Form 5558 to request an extension of time to file Form 5500 if all required data is not received from the Company within five and one half (5 1/2) months after the plan's year end, as specified above;

c.    If all requested information is received later than 8 months after the plan's year-end (assuming a filing extension has been filed), Recordkeeper will not prepare your company's Form 5500. The Company shall be responsible for completing the Form 5500 for filing with the IRS. Recordkeeper shall not be held responsible for any late fees or penalties for incomplete filings caused by the Company's delay, in the event that Recordkeeper does not receive the required information within 8 month's after the plan's year end;

d.    Provide the Company with Form 5500 at least ten (10) days prior to the required filing date and SAR at least ten (10) days prior to the required mailing date assuming the Company has submitted the required documents and has met the filing deadlines as outlined in this agreement, which may be no later than the 8 month following the plan's year end;

e.    Respond to inquiries from the IRS received by the Company, related to any Form 5500 prepared by Recordkeeper.

**Schedule "J"**

**FORM 5500 SERVICE**

3. Fees related to this service are set out on Schedule "B" to the Agreement to which this schedule is attached.

**LEHMAN BROTHERS HOLDINGS INC.**

By: _____

Date: ___ $1/22/2007$ ___

## OPERATIONAL PROCEDURES FOR HARDSHIP WITHDRAWALS BY PHONE

1.  The Participant calls the Recordkeeper to request a hardship withdrawal.

2.  Assuming the Participant has met initial Plan requirement, the Participant Services Representative enters the hardship request.

    Plan requirements are as follows:

    - The individual is an active Participant with an available pre-tax balance;

    - All other non-hardship withdrawals have been made, including from protected sources and age 59 ½ withdrawals;

    - All loanable assets have been exhausted;

    - The Participant declares that the hardship withdrawal meets one of the safe harbor provisions.

3.  The Recordkeeper mails the hardship withdrawal application and procedures to the participant's home.

4.  The Participant adheres to the following procedures in order to execute the transaction:

    - Reviews the application carefully and notes the expiration date.

    - Signs the application and procedures page.

    - Submits the required documentation noted on the second page of the procedures.

    - Submits the signed application, signed procedures and any supporting documentation to:

## OPERATIONAL PROCEDURES FOR HARDSHIP WITHDRAWALS BY PHONE

| | |
|---|---|
| **Regular Mail:** | Fidelity Investments, P.O. Box 770003, Cincinnati, OH  45277 |
| **Overnight Mail:** | Fidelity Investments, Mailzone KC1F-L 100 Crosby Parkway, Covington, KY  41015 |

5.  The Recordkeeper receives the Participant's application and reviews it for Participant signature and required documentation.

    The required documentation includes one of the following:

    *   Purchase (excluding mortgage payments) of primary residence

        A copy of the Purchase and Sale Agreement signed by both the buyer and seller, or a copy of the Construction Contract for new construction and a copy of estimated closing costs.

    *   Payment of tuition for the next year of post-secondary education for the participant, his/her spouse, children or dependents.

        A copy of the bill from the educational institution or a letter from the educational institution (must be on the school's letterhead) attesting to the fact the student is enrolled for the next 12 months and providing the costs for tuition, room and board, and books.

    *   Payment of deductible medical or dental expenses not covered by insurance for the participant, his/her spouse, children or dependents.

        An Explanation of Benefits (EOB) form from the participant's or spouse's or dependent's insurance carrier, or a copy of the letter from the participant's HMO, detailing any out-of pocket deductibles, co-payments or denial of coverage for services rendered.