**Testimony Concerning the Role of Federal Regulators:
Lessons from the Credit Crisis for the Future of Regulation**

**by Chairman Christopher Cox
U.S. Securities and Exchange Commission**

**Before the Committee on Oversight and Government Reform
United States House of Representatives**

**Thursday, October 23, 2008**

Chairman Waxman, Ranking Member Davis, and Members of the Committee, thank you for inviting me to discuss the lessons from the credit crisis and how what we have learned can help the Congress shape the future of federal regulation. I am pleased to appear here today with the distinguished former Chairman of the Federal Reserve and the distinguished former Secretary of the Treasury, who together have given more than 25 years of service to our country. I should say at the outset that my testimony is on my own behalf as Chairman of the SEC, and does not necessarily represent the views of the Commission or individual Commissioners.

**Introduction**

To begin with, it will be helpful to describe the SEC's function in the current regulatory system, to better explain our role in the events we are discussing.

The SEC requires public companies to disclose to the public their financial statements and other information that investors can use to judge for themselves whether to buy, sell, or hold a particular security. Companies do this through annual and quarterly reports, as well as real-time announcements of unusual events. Administering this periodic reporting system has been a fundamental role of the SEC since its founding 74 years ago.

The SEC regulates the securities exchanges on which stocks, bonds, and other securities are traded. The SEC makes rules that govern trading on the exchanges, and also oversees the exchanges' own rules. The primary purpose of this regulation is to maintain fair dealing for the exchanges' customers and to protect against fraud.

The SEC also regulates the securities brokers and dealers who trade on the exchanges. Our authority to do this comes from the Securities Exchange Act, written in 1934. Although the law has been amended several times in the intervening 74 years, it lays out today essentially the same role for the SEC that the agency has always had in this area.

The agency's Investment Management Division regulates investment advisers, and also investment companies such as mutual funds, under statutes written in 1940.

Here, too, the SEC is concerned primarily with promoting the disclosure of important information, and protecting against fraud.

The Office of the Chief Accountant oversees the independent standard setting activities of the Financial Accounting Standards Board, to which the SEC has looked for accounting standards setting since 1973. It also serves as the principal liaison with the Public Company Accounting Oversight Board, established by the Sarbanes-Oxley Act to oversee the auditing profession.

Above all, the SEC is a law enforcement agency. Each year the SEC brings hundreds of civil enforcement actions for violation of the securities laws involving insider trading, accounting fraud, and providing false or misleading information about securities and the companies that issue them.

Some have tried to use the current credit crisis as an argument for replacing the SEC in a new system that relies more on supervision than on regulation and enforcement. That same recommendation was made before the credit crisis a year ago for a very different, and inconsistent, reason: that the U.S. was at risk of losing business to less-regulated markets. But what happened in the mortgage meltdown and the ensuing credit crisis demonstrates that where SEC regulation is strong and backed by statute, it is effective -- and that where it relies on voluntary compliance or simply has no jurisdiction at all, it is not.

The lessons of the credit crisis all point to the need for strong and effective regulation, but without major holes and gaps. They also highlight the need for a strong SEC, which is unique in its arm's-length independence from the institutions and persons it regulates.

If the SEC did not exist, Congress would have to create it. The SEC's mission is more important now than ever.

**Genesis of the Current Crisis**

That brings us to the issue of how the credit crisis came about. The answers are increasingly coming into sharper relief, and this Committee has been looking at several of the contributing causes.

Because the current credit market crisis began with the deterioration of mortgage origination standards, it could have been contained to banking and real estate, were our markets not so interconnected. But the seamlessness which characterizes today's markets saw financial institutions in every regulated sector suffer significant damage -- from investment banks such as Bear Stearns and Lehman Brothers, to commercial banks and thrifts such as Wachovia, Washington Mutual, and IndyMac, to the government-sponsored enterprises Fannie Mae and Freddie Mac, as well as the nation's largest insurance company, AIG. Every sector of the financial services industry has been vulnerable to the effects of this toxic mortgage contagion. And as the bank failures in

Europe and Asia have made clear, regulated enterprises around the world are susceptible as well.

It is abundantly clear, as the SEC's former Chief Accountant testified at this Committee's recent hearing on the failure of AIG, that "if honest lending practices had been followed, much of this crisis quite simply would not have occurred." The nearly complete collapse of lending standards by banks and other mortgage originators led to the creation of so much worthless or near-worthless mortgage paper that as of last month, banks had reported over one-half trillion dollars in losses on U.S. subprime mortgages and related exposure. This was typified by the notorious no down payment loans, and "no-doc" loans in which borrowers not only didn't have to disclose income or assets, but even employment wasn't verified.

Securitization of these bad loans was advertised as a way to diversify and thus reduce the risk. But in reality it spread the problem to the broader markets. When mortgage lending changed from originate-to-hold to originate-to-securitize, an important market discipline was lost. The lenders no longer had to worry about the future losses on the loans, because they had already cashed out. Fannie Mae and Freddie Mac, which got affordable housing credit for buying subprime securitized loans, became a magnet for the creation of enormous volumes of increasingly complex securities that repackaged these mortgages. (Fannie and Freddie together now hold more than half of the approximately $1 trillion in Alt-A mortgages outstanding.)

The credit rating agencies, which until late September 2007 were not regulated by statute, notoriously gave AAA ratings to these structured mortgage-backed securities. But that was not all: the ratings agencies sometimes helped to design these securities so they could qualify for higher ratings. These ratings not only gave false comfort to investors, but also skewed the computer risk models and regulatory capital computations. Both the risk models used by financial institutions and the capital standards used by banking and securities regulators had the credit ratings hard-wired into them.

All of this made financial institutions and the broader economy seriously vulnerable to a decline in housing prices. But the economy has been through real estate boom and bust cycles before. What amplified this crisis, and made it far more virulent and globally contagious, was the parallel market in credit derivatives. If the original cause of the mortgage crisis was too-easy credit and bad lending, the fuel for what has become a global credit crisis was credit default swaps.

Credit default swaps resemble insurance contracts on bonds and other assets that are meant to pay off if those assets default. Lenders who did not sell all of the loans they originated were able to buy relatively inexpensive protection against credit risks through credit default swaps. That further encouraged unsound lending practices and encouraged greater risk-taking. At the same time, credit default swaps became a way for banks, financial firms, hedge funds, and even Fannie Mae and Freddie Mac to hedge their risk – but in the process, to expose themselves to new risk from their often unknown counterparties.

3

By multiplying the risk from the failure of bad mortgages by orders of magnitude, credit default swaps ensured that when the housing market collapsed the effects would be felt throughout the financial system.

For example, as this Committee heard during your hearing on AIG, when mortgage-related securities fell in value, issuers of credit default swaps around the world were forced to post collateral against their positions. This led to increasingly large losses. Credit rating downgrades for such firms would then lead to further requirements for additional collateral, accelerating the downward spiral. Investors concerned about these firms' deepening problems fled from their stocks. In the case of financial institutions, the slumping stock price led to a loss of customer confidence, often precipitating customer withdrawals and "runs on the bank" that have been averted only with central bank guarantees and liquidity.

**Lessons for the Future of Financial Services Regulation**

There are important lessons to be learned from this experience -- for the SEC, and for the Congress. Like each of you, I have asked myself what I would have wanted to do differently, knowing what we all know now. There are several things.

First, I think every regulator wishes that he or she would have been able to predict before March of this year what we have recently seen not just in investment banks and commercial banks but the broader economy: the meltdown of the entire U.S. mortgage market, which was the fundamental cause of this crisis. I would want the agency's economists and experts to have seen in the gathering evidence what we now know was there, but what virtually no one saw clearly. Looking back, it is evident that even as the stock market reached its all-time high in October 2007, the deterioration in housing prices and the rise of credit spreads on mortgage backed securities were early signals of a trend that grew so quickly and so powerfully it would within months wipe out both Fannie Mae and Freddie Mac. But none of the investment banks, commercial banks, or their regulators in the U.S. or around the world in March 2008 used a risk scenario based on a total meltdown of the mortgage market. It clearly would have been prescient for the SEC to have done so.

Second, I would have wanted to question every one of the assumptions behind the Consolidated Supervised Entities program for investment bank holding companies. Although I was not at the SEC when the Commission unanimously approved the program in 2004, when I arrived at the SEC a year later this new program represented the best thinking of the agency's professional staff. Nonetheless, I would have wanted the Division of Trading and Markets to challenge its reliance on the Basel standards and the Federal Reserve's 10% well-capitalized test, for reasons including the fact that unlike commercial banks, investment banks didn't have access to Fed lending. That, as we have seen, can be a crucial distinction.

When the Commission wrote the rules establishing the CSE program in 2004, they chose to rely upon the internationally-accepted Basel standards for computing bank capital. They also adopted the Federal Reserve's standard of what constitutes a "well-capitalized" bank, and required the CSE firms to maintain capital in excess of this 10% ratio. Indeed, the CSE program went beyond the Fed's requirements in several respects, including adding a liquidity requirement, and requiring firms to compute their Basel capital 12 times a year, instead of the four times a year that the Fed requires.

Nonetheless, the rapid collapse of Bear Stearns during the week of March 10, 2008 challenged the fundamental assumptions behind the Basel standards and the other program metrics. At the time of its near-failure, Bear Stearns had a capital cushion well above what is required to meet supervisory standards calculated using the Basel framework and the Federal Reserve's "well-capitalized" standard for bank holding companies.

The fact that these standards did not provide adequate warning of the near-collapse of Bear Stearns, and indeed the fact that the Basel standards did not prevent the failure of many other banks and financial institutions, is now obvious. It was not so apparent before March of this year. Prior to that time, neither the CSE program nor any regulatory approach used by commercial or investment bank regulators in the U.S., or anywhere in the world, was based on the assumption that secured funding, even when backed by high-quality collateral, could become completely unavailable. Nor did regulators or firms use risk scenarios based on a total meltdown of the U.S. mortgage market. That is why, in March of this year, I formally requested that the Basel Committee address the inadequacy of the capital and liquidity standards in light of this experience. The SEC is helping to lead this revision of international standards through our work with the Basel Committee on Banking Supervision, the Senior Supervisors Group, the Financial Stability Forum, and the International Organization of Securities Commissions.

Third, both as SEC Chairman and as a Member of Congress, knowing what I know now, I would have wanted to work even more energetically with all of you to close the most dangerous regulatory gaps. I would have urged Congress to repeal the swaps loophole in the 2000 Commodity Futures Modernization Act. As you know, in this bipartisan law passed by a Republican Congress and signed by President Clinton, Congress specifically prohibited the Commission from regulating swaps in very precise language. Indeed, enacting this loophole eight years ago was a course urged upon us in Congress by no less than the SEC Chairman and the President's Working Group at the time. We now know full well the damage that this regulatory black hole has caused.

The unprecedented $85 billion government rescue of AIG, necessitated in substantial part by others' exposure to risk on its credit default swaps, is but one of several recent alarms. As significant as AIG's $440 billion in credit default swaps were, they represented only 0.8% of the $55 trillion in credit default swap exposure outstanding. That amount of unregulated financial transactions is more than the GDP of

every nation on earth, combined.  Last month, I formally asked the Congress to fill this regulatory gap, and I urge this Committee to join in that effort.

Fourth, I would have worked even more aggressively than I have over the last two years for legislation requiring stronger disclosure to investors in municipal securities.  Now that the credit crisis has reached the state and local level, investors need to know what they own.

This multi-trillion dollar market entails many of the same risks and is subject to the same abuses as other parts of the capital markets.  Individual investors own nearly two-thirds of municipal securities, directly or through funds, and yet neither the SEC nor any federal regulator has the authority to protect investors by insisting on full disclosure.  The problems in Jefferson County, Alabama are only the most recent reminder of what can go wrong.  The multi-billion dollar fraud in the City of San Diego, in which we charged five former City employees this past year, has injured investors and taxpayers alike. The economic slowdown will now make it even harder for many states and localities to meet their obligations.  Many municipalities continue to use interest rate swaps in ways that expose them to the risk that the financial institution on the other side of the derivatives contract may fail.

That is why, repeatedly over the last two years, I have asked Congress to give the SEC the authority to bring municipal finance disclosure at least up to par with corporate disclosure.  Knowing what we now know, I would have begun this campaign on my first day on the job.

Even more important than what I would have wanted to do differently in the past is what we can do together in the future to make sure that this astonishing harm to the economy is not repeated.  The work that you are doing in this hearing and others like it this month is helping to build the foundation for the modernization of financial services regulation.  What was formerly viewed as an opportunity for improvement sometime in the future has become absolutely essential now.

We have learned that voluntary regulation does not work.  Whereas in 1999 the Chairman of the SEC could testify before the House on Gramm-Leach-Bliley that he "strongly supports the ability of U.S. broker-dealers to voluntarily subject their activities to supervision on a holding company basis," experience has taught that regulation must be mandatory, and it must be backed by statutory authority.  It was a fateful mistake in the Gramm-Leach-Bliley Act that neither the SEC nor any regulator was given the statutory authority to regulate investment bank holding companies other than on a voluntary basis.

To fully understand why this is so begins with an appreciation for the enormous difference between an investment bank and an investment bank holding company.  The holding company in the case of Lehman Brothers, for example, consisted of over 200 significant subsidiaries.  The SEC was not the statutory regulator for 193 of them.  There were over-the-counter derivatives businesses, trust companies, mortgage companies, and

6

offshore banks, broker-dealers, and reinsurance companies. Each of these examples I have just described falls far outside of the SEC's regulatory jurisdiction. What Congress did give the SEC authority to regulate was the broker-dealers, investment companies, and investment adviser subsidiaries within these conglomerates.

When I ended the Consolidated Supervised Entities program earlier this year, it was in recognition of the fact that this short-lived experiment in reviewing the consolidated information for these vast global businesses that could opt in and out of the program did not work. Throughout its 74-year history, the SEC has done an outstanding job of regulating registered broker-dealers, and protecting their customers. The SEC's investor protection role has consistently been vindicated when financial institutions fail: for example, following the bankruptcies of Drexel Burnham Lambert and more recently Lehman Brothers, customers' cash and securities have been protected because they were segregated from the firms' other business. They have also been covered by insurance from the Securities Investor Protection Corporation.

But prior to the Federal Reserve's unprecedented decision to provide funding for the acquisition of Bear Stearns, neither the Fed, the SEC, nor any agency had as its mission the protection of the viability or profitability of a particular investment bank holding company. Indeed, it has been a fact of life in Wall Street's history that investment banks can and will fail. Wall Street is littered with the names of distinguished institutions -- E.F. Hutton, Drexel Burnham Lambert, Kidder Peabody, Salomon Brothers, Bankers Trust, to name just a few -- which placed big bets and lost, and as a result ended up either in bankruptcy or being sold to save themselves. Not only is it not a traditional mission of the SEC to regulate the safety and soundness of diversified financial conglomerates whose activities range far beyond the securities realm, but Congress has given this mission to no agency of government.

The lesson in this for legislators is threefold.

First, eliminate the current regulatory gap in which there is no statutory regulator for investment bank holding companies. This problem has been temporarily addressed by changes in the market, with the largest investment banks converting to bank holding companies, but it still needs to be addressed in the law.

Second, recognize each agency's core competencies. The mission of the SEC is investor protection, the maintenance of fair and orderly markets, and the facilitation of capital formation. In strengthening the role of the SEC, build on these traditional strengths -- law enforcement, public company disclosure, accounting and auditing, and the regulation of exchanges, broker-dealers, investment advisers, and other securities entities and products. The vitally important function of securities regulation is best executed by specialists with decades of tradition and experience.

Third, ensure that securities regulation and enforcement remain fiercely independent. This point bears emphasis. Strong securities regulation and enforcement requires an arm's-length relationship, and the SEC's sturdy independence from the firms

and persons it regulates is unique.  For example, banks regulated by the Federal Reserve Bank of New York elect six of the nine seats on the Board of the New York Fed; both the CEOs of J.P. Morgan Chase and Lehman Brothers served on the New York Fed board at the beginning of the credit crisis.  In contrast, the SEC's regulation and enforcement is completely institutionally independent.  Not only the current crisis, but the significant corporate scandals such as Enron and WorldCom earlier this decade, have amply demonstrated the need for such independent, strong securities regulation and enforcement.  That is why an independent SEC will remain as important in the future as ever it has been before.

Communication and coordination among regulators serving distinct but equally important purposes must also be a priority for regulatory reform.  During my Chairmanship, the SEC has initiated Memoranda of Understanding with the CFTC, the Federal Reserve, and the Department of Labor, and we are working on an agreement with the Department of the Treasury.  The fact that these agreements are necessary highlights the importance of better information flows among regulators, to communicate meaningful information sooner.  But instead of ad hoc arrangements, an overarching statutory scheme that anticipates and addresses these needs would represent fundamental improvement.  Through the sharing of market surveillance information, position reporting, and current economic data, federal regulators could get a more comprehensive picture of capital flows, liquidity, and risk throughout the system.

There is another reason that a new, overarching statutory scheme is necessary.  The current regulatory system is a hodge-podge of divided responsibility and regulatory seams.  Coordination among regulators is enormously difficult in this fragmented arrangement, where each of them implements different statutes that treat various financial products and services differently.  Today's balkanized regulatory system undermines the objectives of getting results and ensuring accountability.

The remarkably rapid pace of change in the global capital markets has also placed new importance on international coordination.  American investors simply cannot be protected any longer without help from fellow regulators in other jurisdictions, because so much of the fraud directed at investors today is international in scope.  In recent years the Commission has entered into law enforcement and regulatory cooperation agreements with securities regulators in Europe (including London, Paris, and Brussels), Ottawa, Hong Kong, Tokyo, Beijing, New Delhi, Mexico City, and elsewhere that promote collaboration, information sharing, and cross-border enforcement.

We have all witnessed over the past weeks the connections between financial markets around the world.  The same phenomena affecting our markets are roiling markets abroad.  Regulators in other countries are also under many of the same pressures as those of us here.  While our existing cooperation agreements are helping to protect investors in the current circumstances, the new administration must open negotiations on a new global framework for regulations and standards.

8

Perhaps the most important change to the marketplace in recent years, from the standpoint of investor protection, is the enormous growth in financial products that exist wholly outside the regulatory system.  We simply cannot leave unregulated such products as credit default swaps, which can be used as synthetic substitutes for regulated securities, and which can have profound and even manipulative effects on regulated markets.  The risk is too great.

Across the board, other regulatory anomalies cry out for rationalization:  outdated laws that treat broker-dealers dramatically differently from investment advisers, futures differently from economically equivalent securities, and derivatives as something other than investment vehicles or insurance.  Now is the time to make sense of this confusing landscape.  But doing so will require enormous leadership from the Congress.

There are two main reasons that our regulatory system has grown into the current dysfunctional patchwork, and one of them is traceable to the organization of Congress itself.

The first is that our laws are relatively ancient, at least from the standpoint of today's modern markets.  They were crafted mainly in the 1930s and 40s.  The speed of change in the financial marketplace has only accelerated the divergence of the legal framework and reality.  Regulation has embroidered a semblance of modernity onto this outdated framework, but it has not been enough to keep up.

The second is that legislative jurisdiction in both the House and the Senate is split so that banking, insurance, and securities fall within the province of the Financial Services and Banking Committees, while futures fall within the domain of the Agriculture Committees in each chamber.  This jurisdictional split threatens to forever stand in the way of rationalizing the regulation of these products and markets.

I know from experience how difficult it will be to challenge the jurisdictional status quo.  But the Congress has overcome jurisdictional divides in urgent circumstances before.  Appointing a Select Committee, with representation from each of the existing standing committees with responsibility for financial services regulation, is a model that has worked well.  As you know, I chaired such a Committee for two years after 9-11, following which the House created the permanent Homeland Security Committee with oversight jurisdiction over the new Department of Homeland Security.  A Select Committee on Financial Services Regulatory Reform could cut across the existing jurisdictional boundaries and address these urgent questions from a comprehensive standpoint.

As the Congress undertakes a top-to-bottom review and reassessment of the federal framework for regulation of our financial markets, we must not fall prey to the age-old response of fighting the last war.  If we continue to do what we were doing, and just do more of it, we will undoubtedly repeat history.  I remember working in the White House in 1987, helping to determine how to respond to a 25% drop in the markets in one day.  I see the very real similarities to current events -- institutions borrowing short and

9

lending long, housing bubbles in California and Florida, pressure to change accounting rules to give savings and loans time to right their balance sheets. The nation subsequently spent upwards of $150 billion to clean up the wreckage.

While the nation learned much in 1987, and Congress made some constructive changes in regulation, people and institutions too quickly fell back into old habits in old ways. We read now with disappointment the history of regulatory turf battles and missed opportunities, of old-fashioned greed and misguided economic incentives, of regulations that either failed or had unintended consequences.

It is time to think anew. We should begin with a clear-eyed view of the purpose of our capital markets. The financial system administered by Wall Street institutions exists to raise money for productive enterprise and millions of jobs throughout our economy, and to help put the savings of millions of Americans to work in our economy. It should not be an end in itself − a baroque cathedral of complexity dedicated to limitless compensation for itself in the short-term, paid for with long-term risk capable of threatening the entire nation's sustenance and growth. Transparency has been sorely lacking from enormous swaths of our market. It should by now be abundantly clear that risk in the system which cannot be clearly identified can neither be priced nor effectively disciplined by the market. And it can no longer be tolerated.

In redesigning the regulatory structure, we should also bear in mind the advantages of market forces over government decision-making in allocating scarce resources -- including capital -- throughout an economy as vast as America's, as well as what we can and cannot leave to the market alone. Government intervention, taxpayer assumption of risk, and short-term forestalling of failure must not be a permanent fixture of our financial system.

**Addressing the Current Crisis**

These are some of the regulatory lessons learned during this crisis, and some of the future opportunities. But just as important as reflecting on what could have been done in the past and what should be done in the future is actually dealing with the current emergency. While other federal and state agencies are legally responsible for regulating mortgage lending and the credit markets, the SEC has taken the following decisive actions to address the extraordinary challenges caused by the current credit crisis:

We have worked on a number of fronts to improve transparency, including using our new authority under the Credit Rating Agency Reform Act to expose weaknesses in the ratings process and to develop strong new rules.

We gave guidance on how financial institutions can give fuller disclosure to investors, particularly with respect to hard-to-value assets.

We have worked closely with the Financial Accounting Standards Board to deal with such issues as consolidation of off-balance sheet liabilities, the application of fair

value standards to inactive markets, and the accounting treatment of bank support for money market funds.

We are in the midst of conducting a Congressionally-mandated 90-day study of the impacts of fair value accounting on financial firms in the current crisis.

We have initiated examinations of the effectiveness of broker-dealers' controls on preventing the spread of false information.

We have required disclosures of short positions to the SEC, complementing the existing requirements for reporting of long positions.

We have adopted a package of measures to strengthen investor protections against naked short selling, including rules requiring a hard T+3 close-out, eliminating the options market maker exception of Regulation SHO and expressly targeting fraud in short selling transactions.

We are working with firms in the private sector to speed the development of one or more central counterparties, clearance and settlement systems, and trading platforms for credit default swaps, as an operational step toward bringing this unregulated finance into the sunlight.  This work is being closely coordinated with the CFTC and the Federal Reserve.

Beyond all of this, the SEC is first and foremost a law enforcement agency.  During the market turmoil of the last several months, the professional men and women of the SEC have been working around the clock, seven days a week, to bring accountability to the marketplace and to see to it that the rules against fraud and unfair dealing are rigorously enforced.

In the fiscal year just ended, the SEC's Enforcement Division brought the second-highest number of cases in the agency's history.   For the second year in a row, the Commission returned over $1 billion to injured investors.  In the last few months, our Enforcement Division successfully negotiated agreements in principle to obtain $50 billion in immediate relief for investors in auction rate securities after these markets seized up.  Every one of these cases, when finalized, will set a record for the largest settlements in the history of the SEC, by far.

The agency has been especially aggressive at combating fraud that has contributed to the subprime crisis and the loss of confidence in our markets. We have over 50 pending law enforcement investigations in the subprime area. Most recently, the Commission charged five California stockbrokers with securities fraud for pushing homeowners into risky and unsustainable subprime mortgages, and then fraudulently selling them securities that were paid for with the mortgage proceeds.  We have brought fraud charges against the managers of two Bear Stearns hedge funds in connection with last year's collapse of those funds.  And we have brought the first-ever case against a

trader for spreading knowingly false information designed to drive down the price of stock.

The Division of Enforcement is currently in the midst of a nationwide investigation of potential fraud and manipulation of securities in some of the nation's largest financial institutions through means including abusive short selling and the intentional spreading of false information.

As part of this aggressive law enforcement, the Commission approved orders requiring hedge funds, broker-dealers and institutional investors to file statements under oath regarding trading and market activity in the securities of financial firms. The orders cover not only equities but also credit default swaps. To assist in analyzing this information, the SEC's Office of Information Technology is working with the Enforcement Division to create a common database of trading information, of audit trail data, and of credit default swaps clearing data. Our Office of Economic Analysis is also supporting this effort by helping to analyze the data across markets for possible manipulative patterns in both equity securities and derivatives.

In the days ahead we will continue to work to bring to justice those who have violated the law, and to help mitigate the effects of the credit crisis on investors and our markets.

Mr. Chairman, the role of the SEC has never been more important. The several thousand men and women who have devoted themselves to law enforcement and the protection of investors, markets, and capital formation represent this nation's finest. The last several months have been difficult for the country and for our markets, but this adversity has brought out the best in the people with whom I work. Every day, the staff of the SEC devote themselves with passion to protecting America's investors and ensuring that our capital markets remain strong. I am humbled to work side-by-side with them.

Thank you for the opportunity to discuss the role of the SEC in our financial system, and the lessons from the current crisis for fundamental regulatory reform in the future. I am happy to answer any questions you may have.