If you hold shares of Preferred Stock in certificated form, to convert you must:

- complete and manually sign the conversion notice on the back of the Preferred Stock certificate or a facsimile of the conversion notice;

- deliver the completed conversion notice and the certificated shares of Preferred Stock to be converted to the conversion agent;

- if required, furnish appropriate endorsements and transfer documents;

- if required, pay funds equal to dividend payable on the next dividend payment date to which you are not entitled; and

- if required, pay all transfer or similar taxes, if any.

The conversion date will be the date on which you have satisfied all of the foregoing requirements. You will not be required to pay any taxes or duties relating to the issuance or delivery of our common stock if you exercise your conversion rights, but you will be required to pay any tax or duty that may be payable relating to any transfer involved in the issuance or delivery of the common stock in a name other than your own. Certificates representing common stock will be issued and delivered only after all applicable taxes and duties, if any, payable by you have been paid in full.

The person or persons entitled to receive the shares of common stock issuable upon conversion of the Preferred Stock will be treated as the record holder(s) of such shares as of 5:00 p.m., New York City time, on the applicable conversion date, except to the extent that all or a portion of such common stock is subject to the limitation on beneficial ownership. Prior to 5:00 p.m., New York City time, on the applicable conversion date, the shares of common stock issuable upon conversion of the Preferred Stock will not be deemed to be outstanding for any purpose and you will have no rights with respect to such shares of common stock, including voting rights, rights to respond to tender offers and rights to receive any dividends or other distributions on the common stock, by virtue of holding the Preferred Stock.

**Fractional Shares**

No fractional shares of common stock will be issued to holders of the Preferred Stock upon conversion. In lieu of any fractional shares of common stock otherwise issuable in respect of the aggregate number of shares of the Preferred Stock of any holder that are converted, that holder will be entitled to receive an amount in cash (computed to the nearest cent) equal to the same fraction of:

- in the case of mandatory conversion or conversion in connection with a cash acquisition, the average of the closing prices of our common stock over the five consecutive trading day period preceding the trading day immediately preceding the conversion date; or

- in the case of each early conversion at the option of a holder, the closing price per share of our common stock on the second trading day immediately preceding the conversion date.

If more than one share of the Preferred Stock is surrendered for conversion at one time by or for the same holder, the number of shares or our common stock issuable upon conversion thereof shall be computed on the basis of the aggregate number of shares of the Preferred Stock so surrendered.

S–28

**Reorganization Events**

In the event of:

(a)      any consolidation or merger of us with or into another person in each case pursuant to which our common stock will be converted into cash, securities or other property of us or another person;

(b)      any sale, transfer, lease or conveyance to another person of all or substantially all of the consolidated assets of us and our subsidiaries, taken as a whole, in each case pursuant to which our common stock will be converted into cash, securities or other property;

(c)      any reclassification of our common stock into securities, including securities other than our common stock; or

(d)      any statutory exchange of our securities with another person (other than in connection with a merger or acquisition),

each of which is referred to as a "reorganization event," each share of the Preferred Stock outstanding immediately prior to such reorganization event will, without the consent of the holders of the Preferred Stock, become convertible into the kind of securities, cash and other property receivable in such reorganization event by a holder of the shares of our common stock that was not the counterparty to the reorganization event or an affiliate of such other party (such securities, cash and other property, the "exchange property"). In the event that holders of the shares of our common stock have the opportunity to elect the form of consideration to be received in such transaction, the consideration that the holders of the Preferred Stock are entitled to receive will be deemed to be the types and amounts of consideration received by the majority of the holders of the shares of our common stock that affirmatively make an election. The number of units of exchange property for each share of Preferred Stock converted following the effective date of such reorganization event will be determined by the applicable conversion rate then in effect on the applicable conversion date (without interest thereon and without any right to dividends or distributions thereon which have a record date prior to the date such shares of Preferred Stock are actually converted). The applicable conversion rate, in the case of a mandatory conversion, and the minimum conversion rate, in the case of an early conversion, shall be determined using the applicable market value of the exchange property. Holders have the right to convert their shares of Preferred Stock in the event of certain acquisitions as described under "—Conversion at the Option of the Holder Upon Cash Acquisition; Cash Acquisition Dividend Make−Whole Amount." In connection with certain reorganization events, holders of the Preferred Stock may have the right to vote as a class. See "—Voting Rights."

**Anti−Dilution Adjustments**

We will adjust each fixed conversion rate for the following events:

(1)    issuances of our common stock to all or substantially all holders of our common stock as a dividend or distribution (other than a dividend or distribution in connection with a reorganization event), in which event each fixed conversion rate will be adjusted based on the following formula:

$$CR_1 = CR_0 \times \frac{OS_1}{OS_0}$$

where,

$CR_0 =$      such fixed conversion rate in effect at 5:00 p.m., New York City time, on the trading day immediately preceding the ex−dividend date for such dividend or distribution

$CR_1 =$      such fixed conversion rate in effect on the ex−dividend date for such dividend or distribution

$OS_0 =$      the number of shares of our common stock outstanding at 5:00 p.m., New York City time, on the trading day immediately preceding the ex–dividend date for such dividend or distribution

$OS_1 =$      the number of shares of our common stock that would be outstanding immediately after, and solely as a result of, such dividend or distribution

Any adjustment made pursuant to this clause (1) shall become effective immediately prior to 9:00 a.m., New York City time, on the ex–dividend date for such dividend or distribution. If any dividend or distribution described in this clause (1) is declared but not so paid or made, each fixed conversion rate shall be readjusted, effective as of the date our board of directors publicly announces its decision not to pay or make such dividend or distribution, to such fixed conversion rate that would then be in effect if such dividend or distribution had not been declared;

(2)   subdivisions, splits or combinations of our common stock (other than in connection with a transaction constituting a reorganization event), in which event each fixed conversion rate will be adjusted based on the following formula:

$$CR_1 = CR_0 \times \frac{OS_1}{OS_0}$$

where,

$CR_0 =$      such fixed conversion rate in effect at 5:00 p.m., New York City time, on the trading day immediately preceding the effective date of such subdivision, split or combination

$CR_1 =$      such fixed conversion rate in effect on the effective date of such subdivision, split or combination

$OS_0 =$      the number of shares of our common stock outstanding at 5:00 p.m., New York City time, on the trading day immediately preceding the effective date of such subdivision, split or combination

$OS_1 =$      the number of shares of our common stock that would be outstanding immediately after, and solely as a result of, such subdivision, split or combination

Any adjustment made pursuant to this clause (2) shall become effective on the effective date of such subdivision, split or combination;

(3)   issuances to all or substantially all holders of our common stock of rights (other than rights issued pursuant to a stockholders' rights plan and in connection with a transaction constituting a reorganization event) or warrants to purchase, for a period of 45 calendar days or less from the date of issuance thereof, shares of our common stock at a price less than the current market price (as defined below) of our common stock, in which event each fixed conversion rate will be adjusted based on the following formula:

$$CR_1 = CR_0 \times \frac{OS_0 + X}{OS_0 + Y}$$

where,

$CR_0 =$      such fixed conversion rate in effect at 5:00 p.m., New York City time, on the trading day immediately preceding the ex–dividend date for such issuance

$CR_1 =$      such fixed conversion rate in effect on the ex–dividend date for such issuance

$OS_0 =$      the number of shares of our common stock outstanding at 5:00 p.m., New York City time, on the trading day immediately preceding the ex–dividend date for such issuance

X =    the total number of shares of our common stock issuable pursuant to such rights or warrants

Y =    the number of shares of our common stock equal to the quotient of (x) the aggregate price payable to exercise such rights or warrants divided by (y) the current market price of our common stock

Any adjustment made pursuant to this clause (3) shall become effective immediately prior to 9:00 a.m., New York City time, on the ex–dividend date for such issuance. In the event that such rights or warrants described in this clause (3) are not so issued, each fixed conversion rate shall be readjusted, effective as of the date our board of directors publicly announces its decision not to issue such rights or warrants to such fixed conversion rate that would then be in effect if such issuance had not been declared. To the extent that such rights or warrants are not exercised prior to their expiration or shares of common stock are otherwise not delivered pursuant to such rights or warrants upon the exercise of such rights or warrants, each fixed conversion rate shall be readjusted to such fixed conversion rate that would then be in effect had the adjustments made upon the issuance of such rights or warrants been made on the basis of the delivery of only the number of shares of common stock actually delivered. In determining the aggregate price payable for such shares of common stock, there shall be taken into account any consideration received for such rights or warrants and the value of such consideration (if other than cash, to be determined by our board of directors). If an adjustment to each fixed conversion rate may be required under this clause, delivery of any additional shares of common stock that may be deliverable upon conversion as a result of an adjustment required under this clause shall be delayed to the extent necessary in order to complete the calculations provided for in this clause.

(4)  distributions to all or substantially all holders of our common stock of shares of our capital stock (other than our common stock), evidences of our indebtedness or assets, including securities, but excluding:

- any dividends or distributions referred to in clause (1) above;

- the rights and warrants referred to in clause (3) above;

- any dividends or distributions referred to in clause (5) below;

- any dividends and distributions in connection with a reclassification, change, consolidation, merger, sale, lease, transfer, conveyance or other disposition resulting in a change in the conversion consideration as described under "—Reorganization Events;" and

- any spin–off to which the provisions set forth below in this clause (4) shall apply,

in which event each fixed conversion rate will be adjusted based on the following formula:

$$CR_1 = CR_0 \times \frac{SP_0}{SP_0 - FMV}$$

where,

CR$_0$ =    such fixed conversion rate in effect at 5:00 p.m., New York City time, on the trading day immediately preceding the ex–dividend date for such distribution

CR$_1$ =    such fixed conversion rate in effect on the ex–dividend date for such distribution

SP$_0$ =    the current market price of our common stock

FMV =    the fair market value (as determined by our board of directors), on the ex–dividend date for such distribution, of the shares of capital stock, evidences of indebtedness or assets so distributed applicable to one share of our common stock

S–31

If the transaction that gives rise to an adjustment pursuant to this clause (4) is, however, one pursuant to which the payment of a dividend or other distribution on our common stock consists of shares of capital stock of, or similar equity interests in, a subsidiary or other business unit of ours (i.e., a spin−off) that are, or, when issued, will be, traded or quoted on the New York Stock Exchange, the Nasdaq Stock Market or any other national or regional securities exchange or market, then each fixed conversion rate will instead be adjusted based on the following formula:

$$CR_1 = CR_0 \times \frac{FMV_0 + MP_0}{MP_0}$$

where,

$CR_0 =$    such fixed conversion rate in effect at 5:00 p.m., New York City time, on the trading day immediately preceding the ex−dividend date for such distribution

$CR_1 =$    such fixed conversion rate in effect on the ex−dividend date for such distribution

$FMV_0 =$    the average of the closing prices of the capital stock or similar equity interests distributed to holders of our common stock applicable to one share of our common stock over the 10 consecutive trading day period commencing on and including the effective date of the spin−off or, if not traded on a national or regional securities exchange or over−the−counter market, the fair market value of the capital stock or equity interests representing the portion of the distribution applicable to one share of our common stock on such date as determined by our board of directors

$MP_0 =$    the average of the closing prices of our common stock over the 10 consecutive trading day period commencing on and including the effective date of the spin−off

Any adjustment made pursuant to this clause (4) shall become effective immediately prior to 9:00 a.m., New York City time, on the ex−dividend date for such distribution. In the event that such distribution described in this clause (4) is not so made, each fixed conversion rate shall be readjusted, effective as of the date our board of directors publicly announces its decision not to pay such dividend or distribution, to such fixed conversion rate that would then be in effect if such distribution had not been declared. If an adjustment to each fixed conversion rate may be required under this clause, delivery of any additional shares of common stock that may be deliverable upon conversion as a result of an adjustment required under this clause shall be delayed to the extent necessary in order to complete the calculations provided for in this clause.

(5)  dividends or other distributions consisting exclusively of cash to all or substantially all holders of our common stock (other than dividends or distributions made in connection with our liquidation, dissolution or winding up or upon a merger or consolidation and other than regular cash dividends to the extent that such dividends do not exceed $0.17 per share in any fiscal quarter (the "dividend threshold amount"), in which event each fixed conversion rate will be adjusted based on the following formula:

$$CR_1 = CR_0 \times \frac{SP_0}{SP_0 - DIV}$$

where,

$CR_0 =$    such fixed conversion rate in effect at 5:00 p.m., New York City time, on the trading day immediately preceding the ex−dividend date for such dividend or distribution

$CR_1 =$    such fixed conversion rate in effect on the ex−dividend date for such dividend or distribution

$SP_0 \approx$    the current market price of our common stock

DIV =  the cash amount per share of common stock of the dividend or distribution, as determined pursuant to the following sentences. If an adjustment is required to be made as set forth in this clause (5) as a result of a distribution (1) that is a regularly scheduled quarterly dividend, such adjustment would be based on the amount by which such dividend exceeds the dividend threshold amount or (2) that is not a regularly scheduled quarterly dividend, such adjustment would be based on the full amount of such distribution. The dividend threshold amount is subject to adjustment on an inversely proportional basis whenever each fixed conversion rate is adjusted; *provided* that no adjustment will be made to the dividend threshold amount for any adjustment made to each fixed conversion rate as described under this clause (5).

Any adjustment made pursuant to this clause (5) shall become effective immediately prior to 9:00 a.m., New York City time, on the ex–dividend date for such dividend or distribution. In the event that such dividend or distribution described in this clause (5) is not so made, each fixed conversion rate shall be readjusted, effective as of the date our board of directors publicly announces its decision not to pay such dividend or distribution, to such fixed conversion rate that would then be in effect if such dividend or distribution had not been declared.

(6) purchases of our common stock pursuant to a tender offer or exchange offer made by us or any of our subsidiaries for all or any portion of our common stock to the extent that the fair market value (as determined by our board of directors) of the cash and any other consideration included in the payment per share of common stock exceeds the closing price per share of our common stock on the trading day next succeeding the last date (the "expiration date") on which tenders or exchanges may be made pursuant to such tender or exchange offer (as it may be amended), in which event each fixed conversion rate will be adjusted based on the following formula:

$$CR_1 = CR_0 \times \frac{FMV + (SP_1 \times OS_1)}{OS_0 \times SP_1}$$

where,

CR_0 =  such fixed conversion rate in effect at 5:00 p.m., New York City time, on the expiration date

CR_1 =  such fixed conversion rate in effect immediately after the expiration date

FMV =  the fair market value (as determined by our board of directors), on the expiration date, of the aggregate value of all cash and any other consideration paid or payable for shares validly tendered or exchanged and not withdrawn as of the expiration date

OS_1 =  the number of shares of our common stock outstanding immediately after the last time tenders or exchanges may be made pursuant to such tender or exchange offer (the "expiration time")

OS_0 =  the number of shares of our common stock outstanding immediately before the expiration time

SP_1 =  the average closing price per share of our common stock for the 10 consecutive trading days commencing on the trading day immediately after the expiration date

Any adjustment made pursuant to this clause (6) shall become effective immediately prior to 9:00 a.m., New York City time, on the trading day immediately following the expiration date. In the event that we are, or one of our subsidiaries is, obligated to purchase shares of our common stock pursuant to any such tender offer or exchange offer, but we are, or such subsidiary is, permanently prevented by applicable law from effecting any such purchases, or all such purchases are rescinded, then each fixed conversion rate shall be readjusted to be such fixed conversion rate that would then be in effect if such tender offer or exchange offer had not been made. Except as set forth in the preceding sentence, if the

S–33

application of this clause (6) to any tender offer or exchange offer would result in a decrease in each fixed conversion rate, no adjustment shall be made for such tender offer or exchange offer under this clause (6). If an adjustment to each fixed conversion rate may be required under this clause, delivery of any additional shares of common stock that may be deliverable upon conversion as a result of an adjustment required under this clause shall be delayed to the extent necessary in order to complete the calculations provided for in this clause (6).

For purposes of clause (1), (3), (4) and (5) above, "ex–dividend date" means the first date on which the shares of our common stock trade on the applicable exchange or in the applicable market, regular way, without the right to receive the relevant dividend, distribution or issuance. For purposes of clause (3), (4) and (5) above, "current market price" means the average closing price of our common stock for the 10 consecutive trading days immediately prior to the ex–dividend date for the distribution requiring such computation. Notwithstanding the foregoing, whenever successive anti–dilution adjustments to each fixed conversion rate are called for, such adjustments shall be made to the current market price as may be necessary or appropriate to effectuate the intent of the anti–dilution adjustments and to avoid unjust or inequitable results as determined in good faith by the board of directors.

To the extent that any future stockholders' rights plan adopted by us is in effect upon conversion of the Preferred Stock, you will receive, in addition to our common stock, the rights under the applicable rights agreement unless the rights have separated from our common stock prior to the time of conversion of the Preferred Stock, in which case each fixed conversion rate will be adjusted at the time of separation as if we distributed to all or substantially all holders of our common stock shares of our capital stock, evidences of indebtedness or assets as described above in clause (4), subject to readjustment in the event of the expiration, termination or redemption of such rights.

We will not make any adjustment if holders may participate in the transaction that would otherwise give rise to such adjustment as a result of holding the Preferred Stock without having to convert the Preferred Stock or in certain other cases. For the avoidance of doubt, if a distribution occurs that would generally result in adjustment of the number of shares deliverable to you as a portion of conversion consideration to which you are entitled, instead of making that adjustment, we may instead deem you to be a holder of record for purposes of that distribution so that you would receive the distribution at the time you receive the conversion consideration.

Except as stated above, we will not adjust each fixed conversion rate for the issuance of our common stock or any securities convertible into or exchangeable for our common stock or carrying the right to purchase any of the foregoing.

If an adjustment is made to the fixed conversion rates, an inversely proportional adjustment also will be made to the threshold appreciation price and the initial price solely for the purposes of determining which clauses of the definition of the conversion rate will apply on the mandatory conversion date. Because the applicable market value is an average of the closing prices of our common stock over a 20 consecutive trading day period, we will make appropriate adjustments to the closing prices prior to the relevant ex–dividend date, effective date or expiration date, as the case may be, used to calculate the applicable market value to account for any adjustments to the initial price, the threshold appreciation price and the fixed conversion rates that become effective during the period in which the applicable market value is being calculated.

If a taxable distribution to holders of our common stock or other transaction occurs that results in any adjustment of each fixed conversion rate or an increase in each fixed conversion rate in our discretion (including an adjustment at our option), you may, in certain circumstances, be deemed to have received a distribution subject to U.S. federal income tax as a dividend. In certain other circumstances, the absence of an adjustment may result in a taxable dividend to the holders of our common stock. See "Certain United States Federal Income Tax Considerations."

S–34

We may also make such increases in each fixed conversion rate, in addition to those set forth above, as our board of directors deems advisable to avoid or diminish any income tax to holders of our common stock resulting from any dividend or distribution of stock (or issuance of rights or warrants to acquire stock) or from any event treated as such for income tax purposes or for any other reason. We may only make such a discretionary adjustment if we make the same proportionate adjustment to each fixed conversion rate.

All adjustments to the fixed conversion rates shall be calculated to the nearest 1/10,000th of a share (or, if there is not a nearest 1/10,000th of a share, to the next lower 1/10,000th of a share) of common stock. Prior to the mandatory conversion date, we will not be required to make an adjustment in the fixed conversion rates unless the adjustment would require a change of at least 1% in such fixed conversion rate. However, we will carry forward any adjustment that is less than 1% of such fixed conversion rate, take such carried−forward adjustments into account in any subsequent adjustment, and make such carried forward adjustments regardless of whether the aggregate adjustment is less than 1%, immediately prior to the mandatory conversion date, an early conversion date and the effective date of a cash acquisition.

We will be required, as soon as practicable after the conversion rate is adjusted, to provide or cause to be provided written notice of the adjustment to be sent to the conversion agent and to DTC and make this information available on our website. We will also provide upon request, to the extent not posted on our website, a statement setting forth in reasonable detail the method by which the adjustment to the conversion rate was determined and setting forth the adjusted conversion rate.

If:

- the record date for a dividend or distribution on our common stock occurs after the end of the 20 consecutive trading day period used for calculating the applicable market value and before the mandatory conversion date, and

- that dividend or distribution would have resulted in an adjustment of the number of shares issuable to the holders of Preferred Stock had such record date occurred on or before the last trading day of such 20−trading day period,

then we will deem the holders of Preferred Stock to be holders of record of our common stock for purposes of that dividend or distribution. In this case, the holders of the Preferred Stock would receive the dividend or distribution on our common stock together with the number of shares of common stock issuable upon mandatory conversion of the Preferred Stock.

**Liquidation Rights**

Upon our liquidation, dissolution or winding up, the holders of the Preferred Stock will be entitled to receive out of our assets available for distribution to stockholders, $1,000.00 per share, which is the liquidation preference, plus all declared and unpaid dividends for the dividend period in which liquidation occurs to but not including the date of final distribution. If, upon any liquidation, dissolution or winding up of us, our assets, or proceeds thereof, distributable among the holders of shares of Preferred Stock or any stock ranking equally with the Preferred Stock shall be insufficient to pay in full the preferential amounts to which such stock would be entitled, then such assets, or the proceeds thereof, shall be distributable among such holders ratably in accordance with the respective amounts which would be payable on such shares if all amounts payable thereon were paid in full.

Neither a consolidation nor merger of us, nor a sale, lease, exchange or transfer of all or substantially all of our assets, will be deemed to be a liquidation, dissolution or winding up under the above provisions.

As of the date of this prospectus supplement, the aggregate liquidation preference of the preferred stock we have outstanding (our 5.94% Cumulative Preferred Stock, Series C, 5.67% Cumulative

S−35

Preferred Stock, Series D, 6.50% Cumulative Preferred Stock, Series F and Floating Rate Cumulative Preferred Stock, Series G, 7.95% Non–Cumulative Perpetual Preferred Stock, Series J and 7.25% Non–Cumulative Perpetual Convertible Preferred Stock, Series P) is $6.993 billion.

**Voting Rights**

The Preferred Stock will have no voting rights except as provided below or as otherwise from time to time required by law.

Whenever dividends payable on the shares of Preferred Stock or on any other equally ranked series of preferred stock have not been paid for six or more dividend periods, whether or not consecutive, the authorized number of our directors will automatically be increased by two. The holders of the Preferred Stock will have the right, with holders of any other equally ranked series of preferred stock that have similar voting rights and on which dividends likewise have not been paid, voting together as a class, to elect two directors to fill such newly created directorships at our next annual meeting of stockholders and at each of our subsequent annual meetings until full dividends have been paid on the Preferred Stock for at least four consecutive dividend periods. At that point the right to elect directors terminates, and the terms of office of the two directors so elected will terminate immediately.

Holders of Preferred Stock, together with holders of such other preferred stock entitled to elect preferred directors, voting together as a class, may remove and replace either of the directors they elected. If the office of either such director becomes vacant for any reason other than removal, the remaining director may choose a successor who will hold office for the unexpired term of the vacant office.

So long as any shares of Preferred Stock remain outstanding, Lehman Brothers Holdings will not, without the vote of the holders of at least 66 $^2/_3$% of the shares of the Preferred Stock:

- authorize, create or issue any of our capital stock ranking, as to dividends or upon liquidation, dissolution or winding up, senior to the Preferred Stock, or reclassify any of our authorized capital stock into any such shares of such capital stock, or issue any obligation or security convertible into or evidencing the right to purchase any such shares; or

- amend, alter or repeal the certificate of designation for the Preferred Stock, or our certificate of incorporation, whether by merger, consolidation or otherwise, in a way that adversely affects the powers, preferences or special rights of the Preferred Stock.

Any:

- increase in the amount of authorized common or preferred stock; or

- increase or decrease in the number of shares of any series of preferred stock (including the Preferred Stock); or

- authorization, creation and issuance of other classes or series of stock;

in each case ranking equally with or junior to the Preferred Stock will not be deemed to adversely affect such powers, preferences or special rights.

Each share of Preferred Stock will have four votes whenever it is entitled to voting rights.

Delaware law provides that the holders of preferred stock will have the right to vote separately as a class on any amendment to the rights of that preferred stock that adversely affects the rights, powers and preferences of the preferred stock. This right is in addition to any voting rights that may be provided for in the applicable certificate of designation.

**Miscellaneous**

We will at all times reserve and keep available out of the authorized and unissued shares of our common stock or shares held in the treasury by us, solely for issuance upon the conversion of the Preferred Stock, that number of shares of common stock as shall from time to time be issuable upon the conversion of all the Preferred Stock then outstanding. Any shares of the Preferred Stock converted into shares of our common stock or otherwise reacquired by us shall resume the status of authorized and unissued preferred shares, undesignated as to series, and shall be available for subsequent issuance.

**Transfer Agent, Registrar, Paying Agent and Conversion Agent**

Computershare Trust Company, N.A. and Computershare Inc., collectively, will act as the registrar, transfer agent, dividend disbursing agent and conversion agent for the Preferred Stock.

**Title**

We and the transfer agent, registrar, paying agent and conversion agent may treat the registered holder of the Preferred Stock as the absolute owner of the Preferred Stock for the purpose of making payment and settling the related conversions and for all other purposes.

S-37

## DESCRIPTION OF CAPITAL STOCK

Pursuant to our restated certificate of incorporation, our authorized capital stock consists of 1,224,999,000 shares, of which:

- 1,200,000,000 shares are designated as common stock, 553,646,048 shares of which were outstanding as of March 31, 2008; and

- 24,999,000 shares are designated as preferred stock, $1.00 par value, 5,557,000 shares of which were outstanding as of May 31, 2008.

## Common Stock

### General

Each holder of common stock is entitled to one vote per share for the election of directors and for all other matters to be voted on by stockholders. Except as otherwise provided by law, the holders of common stock vote as one class. Holders of common stock may not cumulate their votes in the election of directors, and are entitled to share equally in the dividends that may be declared by the board of directors, but only after payment of dividends required to be paid on outstanding shares of preferred stock.

Upon our voluntary or involuntary liquidation, dissolution or winding up, holders of common stock share ratably in the assets remaining after payments to creditors and provision for the preference of any preferred stock. There are no preemptive or other subscription rights, conversion rights or redemption or scheduled installment payment provisions relating to shares of common stock. All of the outstanding shares of common stock are fully paid and nonassessable. The transfer agent and registrar for the common stock is The Bank of New York. The common stock is listed on the New York Stock Exchange.

### Delaware Law, Certificate of Incorporation and By-Law Provisions That May Have an Antitakeover Effect

The following discussion concerns certain provisions of Delaware law and our certificate of incorporation and by-laws that may delay, deter or prevent a tender offer or takeover attempt that a stockholder might consider to be in its best interest, including offers or attempts that might result in a premium being paid over the market price for our shares.

*Delaware Law.* We are governed by the provisions of Section 203 of the Delaware General Corporation Law. In general, Section 203 prohibits a public Delaware corporation from engaging in a "business combination" with an "interested stockholder" for a period of three years after the date of the transaction in which the person became an interested stockholder, unless:

- prior to the business combination the corporation's board of directors approved either the business combination or the transaction which resulted in the stockholder becoming an interested stockholder; or

- upon consummation of the transaction which resulted in the stockholder becoming an interested stockholder, the stockholder owned at least 85% of the outstanding voting stock of the corporation at the time the transaction commenced, excluding for the purpose of determining the number of shares outstanding those shares owned by the corporation's officers and directors and by employee stock plans in which employee participants do not have the right to determine confidentially whether shares held subject to the plan will be tendered in a tender or exchange offer; or

at or subsequent to the time, the business combination is approved by the corporation's board of directors and authorized at an annual or special meeting of its stockholders, and not by written consent, by the affirmative vote of at least 66 $^2/_3$% of its outstanding voting stock which is not owned by the interested stockholder.

A "business combination" includes mergers, asset sales or other transactions resulting in a financial benefit to the stockholder. An "interested stockholder" is a person who, together with affiliates and associates, owns (or within three years did own) 15% or more of the corporation's voting stock.

*Certificate of Incorporation and By–Laws.*    Our certificate of incorporation provides that any action required or permitted to be taken by our stockholders must be effected at a duly called annual or special meeting and may not be taken by written consent.

Our by–laws provide that special meetings of stockholders may be called only by the Chairman of the Board, the Chief Executive Officer, the President in the absence or disability of the Chairman of the Board and the Chief Executive Officer, or the Secretary at the request of the board of directors. Notice of a special meeting stating the place, date and hour of the meeting and the purposes for which the meeting is called must be given between 10 and 60 days before the date of the meeting, and only business specified in the notice may come before the meeting. In addition, our by–laws provide that directors be elected by a majority of votes in an uncontested election and a plurality of votes in a contested election at an annual meeting and does not include a provision for cumulative voting for directors. Under cumulative voting, a minority stockholder holding a sufficient percentage of a class of shares may be able to ensure the election of one or more directors.

*Preferred Stock.*    The issuance of preferred stock could adversely affect holders of common stock. The potential issuance of preferred stock may have the effect of discouraging, delaying or preventing a change of control of Lehman Brothers Holdings, may discourage bids for the common stock at a premium over market price of the common stock and may adversely affect the market price of the common stock.

**Preferred Stock**

Under our restated certificate of incorporation, as amended, we have authority to issue up to 24,999,000 shares of preferred stock with $1.00 par value per share (including the Preferred Stock).

Under our restated certificate of incorporation, our board of directors is empowered to authorize the issuance of shares of preferred stock in one or more classes or series. Prior to the issuance of any series of preferred stock, our board of directors will adopt resolutions creating and designating the series as a series of preferred stock, and the resolutions will be filed in a certificate of designation as an amendment to the certificate of incorporation.

S–39

Set forth below is specific information concerning the various series of preferred stock that we have issued and that are currently outstanding or, in the case of our Series H and Series I non–cumulative preferred stock, that we have designated and have agreed issue in the future.

| Title of Series | Number of Shares Outstanding | Annual Dividends per Share | Redemption Price per Share | Date Next Redeemable by Lehman Brothers Holdings | General Voting Rights |
|---|---|---|---|---|---|
| 5.94% Cumulative Preferred Stock, Series C | 500,000 | $ 29.70 | $ 500.00 | 5/31/08 | No |
| 5.67% Cumulative Preferred Stock, Series D | 40,000 | $ 283.50 | $ 5,000.00 | 8/31/08 | No |
| 6.50% Cumulative Preferred Stock, Series F | 138,000 | $ 162.50 | $ 2,500.00 | 8/31/08 | No |
| Floating Rate Cumulative Preferred Stock, Series G | 120,000 | $ Variable(1) | $ 2,500.00 | 2/15/09 | No |
| Non–Cumulative Perpetual Preferred Stock, Series H | 0(2) | Variable(3) | $ 100,000.00 | 5/31/12(2) | No |
| Non–Cumulative Preferred Stock, Series I | 0(4) | Variable(5) | $ 100,000.00 | 5/31/12(4) | No |
| 7.95% Non–Cumulative Preferred Stock, Series J | 759,000 | $ 198.75 | $ 2,500.00 | 2/15/13 | No |
| 7.25% Non–Cumulative Perpetual Convertible Preferred Stock, Series P | 4,000,000 | $ 72.50 | n/a | n/a | No |

*(1)*

Dividends on the Series G preferred stock are payable at a floating rate per annum of one–month LIBOR plus 0.75%, with a floor of 3.0% per annum.

*(2)*

A component of our outstanding 5.857% Mandatory Capital Advantaged Preferred Securities is a stock purchase contract, pursuant to which we have agreed to issue 10,000 shares of Series H preferred stock on a "Stock Purchase Date," which we expect to be May 31, 2012 but may in certain circumstances be an earlier date or be deferred for quarterly periods until as late as May 31, 2013. The Series H preferred stock may be redeemed beginning on the later of May 31, 2012 and the Stock Purchase Date.

*(3)*

Dividends on the Series H Preferred Stock will be payable, if, as and when declared by our board of directors, at a rate per annum of the greater of (i) three–month LIBOR plus 0.84% and (ii) 4.00%, *provided* that if the Series H Preferred Stock is issued prior to May 31, 2012, such rate per annum will be equal to 5.875% until May 31, 2012.

*(4)*

A component of our outstanding Floating Rate Mandatory Capital Advantaged Preferred Securities is a stock purchase contract, pursuant to which we have agreed to issue 5,000 shares of Series I preferred stock on the Stock Purchase Date. The Series I preferred stock may be redeemed beginning on the later of May 31, 2012 and the Stock Purchase Date.

*(5)*

Dividends on the Series I Preferred Stock will be payable, if, as and when declared by our board of directors, at a floating rate per annum of the greater of (i) three–month LIBOR plus 0.83% and (ii) 4.00%, *provided* that if the Series I Preferred Stock is issued prior to May 31, 2012, such floating rate per annum will be equal to three–month LIBOR plus 0.83% until May 31, 2012.

Where the above table indicates that the holders of the specified series of preferred stock have no general voting rights, this means that they do not vote on matters submitted to a vote of the common

stockholders. However, the holders of these series of preferred stock do have other special voting rights:

- that are required by law,

- that apply if dividends are not paid in full for the equivalent of six calendar quarters or six dividend periods, as applicable, and

- when Lehman Brothers Holdings wants to create any class of stock having a preference as to dividends or distributions of assets over such series or alter or change the provisions of the certificate of incorporation so as to adversely affect the powers, preferences or rights of the holders of such series.

Some or all of these special voting rights apply to each series of preferred stock listed above. In the event of a default in paying dividends for the equivalent of six calendar quarters or six dividend periods, as applicable, the holders of any of our preferred stock described above that is then outstanding will have the right collectively to elect two additional directors to Lehman Brothers Holdings' board of directors until such dividends are paid, together with the holders of the Preferred Stock.

## BOOK-ENTRY SYSTEM

The Depository Trust Company, which we refer to along with its successors in this capacity as "DTC," will act as securities depositary for all of the shares of Preferred Stock. The Preferred Stock will be issued only as fully registered securities registered in the name of Cede & Co. (DTC's partnership nominee) or such other name as may be requested by an authorized representative of DTC. One or more fully registered global security certificates, representing the total aggregate number of Preferred Stock, will be issued and will be deposited with DTC and will bear a legend regarding the restrictions on exchanges and registration of transfer referred to below.

DTC is a limited-purpose trust company organized under the New York Banking Law, a "banking organization" within the meaning of the New York Banking Law, a member of the Federal Reserve System, a "clearing corporation" within the meaning of the New York Uniform Commercial Code, and a "clearing agency" registered pursuant to the provisions of Section 17A of the Exchange Act. DTC holds securities that its participants ("participants") deposit with DTC. DTC also facilitates the settlement among participants of securities transactions, such as transfers and pledges, in deposited securities through electronic computerized book-entry changes in participants' accounts, thereby eliminating the need for physical movement of securities certificates. Participants in DTC include securities brokers and dealers, banks, trust companies, clearing corporations and certain other organizations. DTC is owned by a number of its participants and by the New York Stock Exchange, the American Stock Exchange, Inc., and the National Association of Securities Dealers, Inc. Access to the DTC system is also available to others such as securities brokers and dealers, banks and trust companies that clear through or maintain a custodial relationship with a participant, either directly or indirectly ("indirect participants"). The rules applicable to DTC and its participants are on file with the SEC.

Purchases of Preferred Stock within the DTC system must be made by or through participants, which will receive a credit for the Preferred Stock on DTC's records. The ownership interest of each actual purchaser of Preferred Stock ("beneficial owner") is in turn to be recorded on the participants' and indirect participants' records. Beneficial owners will not receive written confirmation from DTC of their purchases, but beneficial owners are expected to receive written confirmations providing details of the transactions, as well as periodic statements of their holdings, from the participants or indirect participants through which the beneficial owners purchased Preferred Stock. Transfers of ownership interests in the Preferred Stock are to be accomplished by entries made on the books of participants and indirect participants acting on behalf of beneficial owners. Beneficial owners will not receive certificates representing their ownership interests in Preferred Stock, except in the event that use of the book-entry system for Preferred Stock is discontinued.

DTC has no knowledge of the actual beneficial owners of the Preferred Stock; DTC's records reflect only the identity of the participants to whose accounts such Preferred Stock are credited, which may or may not be the beneficial owners. The participants and indirect participants will remain responsible for keeping account of their holdings on behalf of their customers.

So long as DTC, or its nominee, is the registered owner or holder of a global security, DTC or such nominee, as the case may be, will be considered the sole owner or holder of the Preferred Stock represented thereby for all purposes under our certificate of incorporation. No beneficial owner of an interest in a global security will be able to transfer that interest except in accordance with DTC's applicable procedures, in addition to those provided for under our certificate of incorporation.

DTC has advised us that it will take any action permitted to be taken by a holder Preferred Stock only at the direction of one or more participants to whose account the DTC interests in the global securities are credited and only in respect of such portion of the aggregate liquidation amount of Preferred Stock as to which such participant or participants has or have given such direction.

S-42

Conveyance of notices and other communications by DTC to participants, by participants to indirect participants, and by participants and indirect participants to beneficial owners will be governed by arrangements among them, subject to any statutory or regulatory requirements as may be in effect from time to time.

Although voting with respect to the Preferred Stock is limited, in those cases where a vote is required, neither DTC nor Cede & Co. will itself consent or vote with respect to Preferred Stock. Under its usual procedures, DTC would mail an omnibus proxy to us as soon as possible after the record date. The omnibus proxy assigns Cede & Co.'s consenting or voting rights to those participants to whose accounts the Preferred Stock are allocated on the record date (identified in a listing attached to the omnibus proxy).

Distributions on the Preferred Stock held in book−entry form will be made to DTC in immediately available funds. DTC's practice is to credit participants' accounts on the relevant payment date in accordance with their respective holdings shown on DTC's records unless DTC has reason to believe that it will not receive payments on such payment date. Payments by participants and indirect participants to beneficial owners will be governed by standing instructions and customary practices and will be the responsibility of such participants and indirect participants and not of DTC or us, subject to any statutory or regulatory requirements as may be in effect from time to time. Payment of any distributions to DTC is the responsibility of us, disbursement of such payments to participants is the responsibility of DTC, and disbursement of such payments to the beneficial owners is the responsibility of participants and indirect participants.

Except as provided in this prospectus supplement, a beneficial owner of an interest in a global security will not be entitled to receive physical delivery of Preferred Stock. Accordingly, each beneficial owner must rely on the procedures of DTC to exercise any rights under the Preferred Stock.

Although DTC has agreed to the foregoing procedures in order to facilitate transfers of interests in the global securities among participants of DTC, DTC is under no obligation to perform or continue to perform such procedures, and such procedures may be discontinued at any time. We will not have any responsibility for the performance by DTC or its participants or indirect participants under the rules and procedures governing DTC. DTC may discontinue providing its services as securities depository with respect to the Preferred Stock at any time by giving notice to us. Under such circumstances, in the event that a successor securities depository is not obtained, certificates of the Preferred Stock are required to be printed and delivered to the preferred stock transfer agent. Additionally, we may decide to discontinue use of the system of book−entry transfers through DTC or any successor transfer agent. In that event, certificates for the Preferred Stock will be printed and delivered to the preferred stock transfer agent. In each of the above circumstances, we will appoint a paying agent with respect to the Preferred Stock.

The laws of some jurisdictions require that certain purchasers of securities take physical delivery of securities in definitive form. Such laws may impair the ability to transfer beneficial interests in the global Preferred Stock as represented by a global security.

**Clearstream and Euroclear**

Links have been established among DTC, Clearstream Banking S.A., Luxembourg ("Clearstream Banking SA") and Euroclear Bank ("Euroclear") (two international clearing systems that perform functions similar to those that DTC performs in the U.S.), to facilitate the initial issuance of book−entry securities and cross−market transfers of book−entry securities associated with secondary market trading.

Although DTC, Clearstream Banking SA and Euroclear have agreed to the procedures provided below in order to facilitate transfers, they are under no obligation to perform such procedures, and the procedures may be modified or discontinued at any time.

Clearstream Banking SA and Euroclear will record the ownership interests of their participants in much the same way as DTC, and DTC will record the aggregate ownership of each of the U.S. agents of Clearstream Banking SA and Euroclear, as participants in DTC.

When book-entry securities are to be transferred from the account of a DTC participant to the account of a Clearstream Banking SA participant or a Euroclear participant, the purchaser must send instructions to Clearstream Banking SA or Euroclear through a participant at least one business day prior to settlement. Clearstream Banking SA or Euroclear, as the case may be, will instruct its U.S. agent to receive book-entry securities against payment. After settlement, Clearstream Banking SA or Euroclear will credit its participant's account. Credit for the book-entry securities will appear on the next day (European time).

Because settlement is taking place during New York business hours, DTC participants can employ their usual procedures for sending book-entry securities to the relevant U.S. agent acting for the benefit of Clearstream Banking SA or Euroclear participants. The sale proceeds will be available to the DTC seller on the settlement date. Thus, to the DTC participant, a cross-market transaction will settle no differently than a trade between two DTC participants.

When a Clearstream Banking SA or Euroclear participant wishes to transfer book-entry securities to a DTC participant, the seller must send instructions to Clearstream Banking SA or Euroclear through a participant at least one business day prior to settlement. In these cases, Clearstream Banking SA or Euroclear will instruct its U.S. agent to transfer the book-entry securities against payment. The payment will then be reflected in the account of the Clearstream Banking SA or Euroclear participant the following day, with the proceeds back-valued to the value date (which would be the preceding day, when settlement occurs in New York). If settlement is not completed on the intended value date (i.e., the trade fails), proceeds credited to the Clearstream Banking SA or Euroclear participant's account would instead be valued as of the actual settlement date.

## Payment

Payments in respect of the Preferred Stock represented by the global securities will be made to DTC, which shall credit the relevant accounts at DTC on the payment dates or, in the case of certificated securities, if any, such payments will be made by check mailed to the address of the holder entitled thereto as such address shall appear on the register. The paying agent is permitted to resign as paying agent upon 30 days' written notice to us. In the event that the preferred stock transfer agent shall no longer be the paying agent, we will appoint a successor to act as paying agent (which must be a bank or trust company).

## CERTAIN UNITED STATES FEDERAL INCOME TAX CONSIDERATIONS

The following is a summary of certain U.S. federal income tax and, for non–U.S. holders (as defined below), estate tax consequences of the purchase, ownership, conversion and disposition of the Preferred Stock and our common stock received in respect thereof as of the date hereof. Except where noted, this summary deals only with the Preferred Stock and our common stock held as capital assets. As used herein, the term "U.S. holder" means a beneficial owner of the Preferred Stock or our common stock that is for U.S. federal income tax purposes:

- an individual citizen or resident of the United States;

- a corporation (or any other entity treated as a corporation for U.S. federal income tax purposes) created or organized in or under the laws of the United States, any state thereof or the District of Columbia;

- an estate the income of which is subject to U.S. federal income taxation regardless of its source; or

- a trust if it (1) is subject to the primary supervision of a court within the United States and one or more United States persons have the authority to control all substantial decisions of the trust or (2) has a valid election in effect under applicable U.S. Treasury regulations to be treated as a United States person.

As used herein, the term "non–U.S. holder" means a beneficial owner of the Preferred Stock or our common stock that is neither a U.S. holder nor a partnership (or other entity treated as a partnership for U.S. federal income tax purposes).

This summary is not a detailed description of the U.S. federal income tax consequences applicable to you if you are subject to special treatment under the U.S. federal income tax laws, including if you are:

- a dealer in securities or currencies;

- a financial institution;

- a regulated investment company;

- a real estate investment trust;

- an insurance company;

- a tax–exempt organization;

- a person holding the Preferred Stock or our common stock as part of a hedging, integrated, conversion or constructive sale transaction or a straddle;

- a trader in securities that has elected the mark–to–market method of accounting for your securities;

- a person liable for alternative minimum tax;

- a partnership or other pass–through entity for U.S. federal income tax purposes;

- a person who is an investor in a pass–through entity;

- a U.S. holder whose "functional currency" is not the U.S. dollar;

- a "controlled foreign corporation";

- a "passive foreign investment company"; or

- a United States expatriate.

This summary is based upon the provisions of the Internal Revenue Code of 1986, as amended (the "Code"), and regulations, rulings and judicial decisions as of the date hereof. Those authorities may be changed, perhaps retroactively, so as to result in U.S. federal income and estate tax consequences different from those summarized below.

If a partnership holds the Preferred Stock or our common stock, the tax treatment of a partner will generally depend upon the status of the partner and the activities of the partnership. If you are a partner of a partnership holding the Preferred Stock or our common stock, you should consult your own tax advisors.

This summary does not contain a detailed description of all the U.S. federal income and estate tax consequences to you in light of your particular circumstances and does not address the effects of any state, local or non–U.S. tax laws. If you are considering the purchase, ownership or disposition of the Preferred Stock, you should consult your own tax advisors concerning the U.S. federal income and estate tax consequences to you in light of your particular situation as well as any consequences arising under the laws of any other taxing jurisdiction.

### U.S. Holders

#### Dividends

Distributions on the Preferred Stock or our common stock will be dividends for U.S. federal income tax purposes to the extent paid out of our current or accumulated earnings and profits, as determined for U.S. federal income tax purposes, and will be taxable as ordinary income, although possibly at reduced rates, as discussed below. Although we expect that our current and accumulated earnings and profits will be such that all distributions paid with respect to the Preferred Stock or our common stock will qualify as dividends for U.S. federal income tax purposes, we cannot guarantee that result. Our accumulated earnings and profits and our current earnings and profits in future years will depend in significant part on our future profits or losses, which we cannot accurately predict. To the extent that the amount of any distribution paid on the Preferred Stock or our common stock exceeds our current and accumulated earnings and profits attributable to that share of the Preferred Stock or our common stock, the distribution will be treated first as a tax–free return of capital and will be applied against and will reduce the U.S. holder's adjusted tax basis (but not below zero) in that share of the Preferred Stock or our common stock. This reduction in basis will increase any gain, or reduce any loss realized by the U.S. holder on the subsequent sale, redemption or other disposition of the Preferred Stock or our common stock. The amount of any such distribution in excess of the U.S. holder's adjusted tax basis will be taxed as capital gain. For purposes of the remainder of the discussion under this heading, it is assumed that distributions paid on the Preferred Stock or our common stock will constitute dividends for U.S. federal income tax purposes.

If a U.S. holder is a corporation, dividends that are received by it will generally be eligible for a 70% dividends received deduction under the Code. However, the Code disallows this dividends received deduction in its entirety if the Preferred Stock or our common stock with respect to which the dividend is paid is held by such U.S. holder for less than 46 days during the 91–day period beginning on the date which is 45 days before the date on which the Preferred Stock or our common stock becomes ex–dividend with respect to such dividend. (A 91–day minimum holding period applies to any dividends on the Preferred Stock that are attributable to periods in excess of 366 days.)

Under current law, if a U.S. holder is an individual or other non–corporate holder, dividends received by such U.S. holder generally will be subject to a reduced maximum tax rate of 15% for taxable years beginning before January 1, 2011, after which the rate applicable to dividends is scheduled to return to the tax rate generally applicable to ordinary income. The rate reduction does not apply to dividends received to the extent that U.S. holders elect to treat the dividends as "investment income," for purposes of the rules relating to the limitation on the deductibility of

investment–related interest, which may be offset by investment expense. Furthermore, the rate reduction will also not apply to dividends that are paid to such holders with respect to the Preferred Stock or our common stock that is held by the holder for less than 61 days during the 121–day period beginning on the date which is 60 days before the date on which the Preferred Stock or our common stock become ex–dividend with respect to such dividend. (A 91–day minimum holding period applies to any dividends on the Preferred Stock that are attributable to periods in excess of 366 days.)

In general, for purposes of meeting the holding period requirements for both the dividends received deduction and the reduced maximum tax rate on dividends described above, U.S. holders may not count towards their holding period any period in which they (a) have the option to sell, are under a contractual obligation to sell, or have made (and not closed) a short sale of the Preferred Stock or our common stock, as the case may be, or substantially identical stock or securities, (b) are the grantor of an option to buy the Preferred Stock or our common stock, as the case may be, or substantially identical stock or securities or (c) otherwise have diminished their risk of loss on the Preferred Stock or our common stock, as the case may be, by holding one or more other positions with respect to substantially similar or related property. The U.S. Treasury regulations provide that a taxpayer has diminished its risk of loss on stock by holding a position in substantially similar or related property if the taxpayer is, including, without limitation, the beneficiary of a guarantee, surety agreement, or similar arrangement that provides for payments that will substantially offset decreases in the fair market value of the stock. In addition, the Code disallows the dividends received deduction as well as the reduced maximum tax rate on dividends if the recipient of a dividend is obligated to make related payments with respect to positions in substantially similar or related property. This disallowance applies even if the minimum holding period has been met. U.S. holders are advised to consult their own tax advisors regarding the implications of these rules in light of their particular circumstances.

U.S. holders that are corporations should consider the effect of Section 246A of the Code, which reduces the dividends received deduction allowed with respect to "debt–financed portfolio stock." The Code also imposes a 20% alternative minimum tax on corporations. In some circumstances, the portion of dividends subject to the dividends received deduction will serve to increase a corporation's minimum tax base for purposes of the determination of the alternative minimum tax. In addition, a corporate shareholder may be required to reduce its basis in stock with respect to certain "extraordinary dividends", as provided under Section 1059 of the Code. U.S. holders should consult their own tax advisors in determining the application of these rules in light of their particular circumstances.

### *Sale or Other Disposition*

A sale, exchange, or other disposition of the Preferred Stock or our common stock (other than a conversion of the Preferred Stock into common stock) will generally result in gain or loss equal to the difference between the amount realized upon the disposition (not including any amount attributable to declared and unpaid dividends, which will be taxable as described above to U.S. holders of record who have not previously included such dividends in income) and a U.S. holder's adjusted tax basis in the Preferred Stock or our common stock, as the case may be. Such gain or loss will be capital gain or loss and will be long–term capital gain or loss if the U.S. holder's holding period for the Preferred Stock or our common stock, as applicable, exceeds one year. Under current law, if a U.S. holder is an individual or other non–corporate holder, net long–term capital gain realized by such U.S. holder is subject to a reduced maximum tax rate of 15%. For taxable years beginning on or after January 1, 2011, the maximum rate is scheduled to return to the previously effective 20% rate. The deduction of capital losses is subject to limitations.

### *Conversion of the Preferred Stock into Common Stock*

As a general rule, a U.S. holder will not recognize any gain or loss in respect of the receipt of common stock upon the conversion of the Preferred Stock. The adjusted tax basis of common stock

S–47

received on conversion will equal the adjusted tax basis of the Preferred Stock converted (reduced by the portion of adjusted tax basis allocated to any fractional common share exchanged for cash, as described below), and the holding period of such common stock received on conversion will generally include the period during which the converted Preferred Stock was held prior to conversion.

Cash received in lieu of a fractional common share will generally be treated as a payment in a taxable exchange for such fractional common share, and capital gain or loss will be recognized on the receipt of cash in an amount equal to the difference between the amount of cash received and the amount of adjusted tax basis allocable to the fractional common share. Any cash received that is attributable to any declared and unpaid dividends on the Preferred Stock will be treated as described above under "—U.S. Holders—Dividends."

In the event U.S. holders elect to convert their Preferred Stock in the case of certain acquisitions and, in respect of any such conversion, we pay a U.S. holder any cash in respect of the net present value of future dividends (see "Description of the Preferred Stock—Conversion at the Option of the Holder Upon Cash Acquisition; Cash Acquisition Dividend Make–Whole Amount"), the receipt of such cash may be taxable to the extent of gain realized by the U.S. holder. For this purpose, a U.S. holder realizes gain on the conversion equal to the excess, if any, of the sum of the fair market value of our common stock received and the cash received attributable to future dividends over the U.S. holder's adjusted tax basis in our Preferred Stock immediately prior to conversion. The character of such gain is uncertain. This gain would be taxable as dividend income, to the extent of our current or accumulated earnings and profits, if the receipt of the cash attributable to future dividends is considered to have the effect of a dividend. Alternatively, such gain would be capital gain. To the extent the amount of cash received in respect of the net present value of future dividends exceeds the gain realized, the excess amount will not be taxable to such U.S. holder but will reduce its adjusted tax basis in our common stock. A U.S. holder will not be permitted to recognize any loss realized by it upon conversion of Preferred Stock into common stock.

U.S. holders should be aware that the tax treatment described above in respect of the payments made in respect of future dividends is not certain and may be challenged by the Internal Revenue Service ("IRS") on grounds that the amount received attributable to future dividends represents a taxable dividend to the extent we have earnings and profits at the time of conversion, as described above under "—U.S. Holders—Dividends." Under this characterization, the U.S. holder would be taxable on cash received on account of future dividends even if it realized a loss on its conversion of our Preferred Stock into our common stock.

In the event a U.S. holder's Preferred Stock is converted pursuant to certain other transactions, including our consolidation or merger into another person (see "Description of the Preferred Stock—Reorganization Events") the tax treatment of such a conversion will depend upon the facts underlying the particular transaction triggering such a conversion. Each U.S. holder should consult its tax adviser to determine the specific tax treatment of a conversion under such circumstances.

### Adjustment of Fixed Conversion Rate

Each fixed conversion rate of the Preferred Stock is subject to adjustment under certain circumstances. U.S. Treasury regulations promulgated under Section 305 of the Code would treat a U.S. holder of the Preferred Stock as having received a constructive distribution includable in such U.S. holder's income in the manner as described above under "—U.S. Holders—Dividends," above, if and to the extent that certain adjustments in each fixed conversion rate increase the proportionate interest of a U.S. holder in our earnings and profits. For example, an increase in each fixed conversion rate to reflect a taxable dividend to holders of common stock or in connection with certain acquisitions (see "Description of the Preferred Stock—Conversion at the Option of the Holder Upon Cash Acquisition; Cash Acquisition Dividend Make–Whole Amount") will generally give rise to a deemed taxable

dividend to the holders of the Preferred Stock to the extent of our current and accumulated earnings and profits. In addition, an adjustment to each fixed conversion rate of the Preferred Stock or a failure to make such an adjustment could potentially give rise to constructive distributions to U.S. holders of our common stock. Thus, under certain circumstances, U.S. holders may recognize income in the event of a constructive distribution even though they may not receive any cash or property. Adjustments to each fixed conversion rate made pursuant to a bona fide reasonable adjustment formula which has the effect of preventing dilution in the interest of the U.S. holders of the Preferred Stock, however, will generally not be considered to result in a constructive dividend distribution.

### Information Reporting and Backup Withholding

In general, information reporting will apply to dividends in respect of the Preferred Stock or our common stock and the proceeds from the sale, exchange or other disposition of the Preferred Stock or our common stock that are paid to a U.S. holder within the United States (and in certain cases, outside the United States), unless a U.S. holder is an exempt recipient such as a corporation. Backup withholding may apply to such payments if a U.S. holder fails to provide a taxpayer identification number or certification of other exempt status or fails to report in full dividend and interest income.

Any amounts withheld under the backup withholding rules will be allowed as a refund or a credit against a U.S. holder's U.S. federal income tax liability provided the required information is furnished to the IRS.

### Non–U.S. Holders

#### Dividends

Dividends (including any constructive distributions taxable as dividends) paid to a non–U.S. holder of the Preferred Stock or our common stock generally will be subject to withholding of United States federal income tax at a 30% rate or such lower rate as may be specified by an applicable income tax treaty. However, dividends that are effectively connected with the conduct of a trade or business within the United States by the non–U.S. holder (and, if required by an applicable income tax treaty, are attributable to a United States permanent establishment) are not subject to the withholding tax, provided certain certification and disclosure requirements are satisfied. Instead, such dividends are subject to United States federal income tax on a net income basis in the same manner as if the non–U.S. holder were a United States person as defined under the Code. Any such effectively connected dividends received by a foreign corporation may be subject to an additional "branch profits tax" at a 30% rate or such lower rate as may be specified by an applicable income tax treaty.

A non–U.S. holder of the Preferred Stock or our common stock who wishes to claim the benefit of an applicable treaty rate and avoid backup withholding, as discussed below, for dividends will be required (a) to complete Internal Revenue Service Form W–8BEN (or other applicable form) and certify under penalty of perjury that such holder is not a United States person as defined under the Code and is eligible for treaty benefits or (b) if the Preferred Stock or our common stock is held through certain foreign intermediaries, to satisfy the relevant certification requirements of applicable United States Treasury regulations. Special certification and other requirements apply to certain non–U.S. holders that are pass–through entities rather than corporations or individuals.

A non–U.S. holder of the Preferred Stock or our common stock eligible for a reduced rate of United States withholding tax pursuant to an income tax treaty may obtain a refund of any excess amounts withheld by filing an appropriate claim for refund with the Internal Revenue Service.

### Sale or Other Disposition

Any gain realized on the disposition of the Preferred Stock or our common stock (including, in the case of conversion, the deemed exchange that gives rise to a payment of cash in lieu of a fractional common share) generally will not be subject to United States federal income tax unless:

- the gain is effectively connected with a trade or business of the non–U.S. holder in the United States (and, if required by an applicable income tax treaty, is attributable to a United States permanent establishment of the non–U.S. holder);

- the non–U.S. holder is an individual who is present in the United States for 183 days or more in the taxable year of that disposition, and certain other conditions are met; or

- we are or have been a "United States real property holding corporation" for United States federal income tax purposes.

An individual non–U.S. holder described in the first bullet point immediately above will be subject to tax on the net gain derived from the sale under regular graduated United States federal income tax rates. An individual non–U.S. holder described in the second bullet point immediately above will be subject to a flat 30% tax on the gain derived from the sale, which may be offset by United States source capital losses, even though the individual is not considered a resident of the United States. If a non–U.S. holder that is a foreign corporation falls under the first bullet point immediately above, it will be subject to tax on its net gain in the same manner as if it were a United States person as defined under the Code and, in addition, may be subject to the branch profits tax equal to 30% of its effectively connected earnings and profits or at such lower rate as may be specified by an applicable income tax treaty.

We believe we are not and do not anticipate becoming a "United States real property holding corporation" for U.S. federal income tax purposes.

### Conversion into Common Stock

Non–U.S. holders will generally not recognize any gain or loss in respect of the receipt of common stock upon the conversion of the Preferred Stock, except with respect to any cash received in lieu of a fractional share that is taxable as described above under "—Non–U.S. Holders—Sale or Other Disposition."

Additionally, non–U.S. holders that receive cash in respect of declared and unpaid dividends on our Preferred Stock will be treated as described above under "—Tax Consequences to Non–U.S. Holders—Distributions." A non–U.S. holder may recognize capital gain or dividend income when the holder receives an additional amount attributable to future dividends, as described above under "—Tax Consequences to U.S. Holders—Conversion of Mandatory Convertible Preferred Stock into Common Stock". The tax treatment of such amount is uncertain and we may withhold 30% of such amount as described above under "—Tax Consequences to Non–U.S. Holders—Distributions."

### Adjustment of Conversion Rate

As described above under "—U.S. Holders—Adjustment of Conversion Rate," adjustments in each fixed conversion rate (or failures to adjust each fixed conversion rate) that increase the proportionate interest of a non–U.S. holder in our earning and profits could result in deemed distributions to the non–U.S. holder that are taxed as described under "—Non–U.S. Holders—Dividends."

### Federal Estate Tax

The Preferred Stock and common stock owned or treated as owned by an individual who is not a citizen or resident of the United States (as specially defined for U.S. federal estate tax purposes) at the

time of death will be included in the individual's gross estate for U.S. federal estate tax purposes, unless an applicable estate tax or other treaty provides otherwise and, therefore, may be subject to U.S. federal estate tax.

### Information Reporting and Backup Withholding

We must report annually to the Internal Revenue Service and to each non−U.S. holder the amount of dividends paid to such holder and the tax withheld with respect to such dividends, regardless of whether withholding was required. Copies of the information returns reporting such dividends and withholding may also be made available to the tax authorities in the country in which the non−U.S. holder resides under the provisions of an applicable income tax treaty.

A non−U.S. holder will be subject to backup withholding for dividends paid to such holder unless such holder certifies under penalty of perjury that it is a non−U.S. holder (and the payor does not have actual knowledge or reason to know that such holder is a United States person as defined under the Code), or such holder otherwise establishes an exemption.

Information reporting and, depending on the circumstances, backup withholding will apply to the proceeds of a sale of the Preferred Stock or our common stock within the United States or conducted through certain United States−related financial intermediaries, unless the beneficial owner certifies under penalty of perjury that it is a non−U.S. holder (and the payor does not have actual knowledge or reason to know that the beneficial owner is a United States person as defined under the Code), or such owner otherwise establishes an exemption.

Any amounts withheld under the backup withholding rules may be allowed as a refund or a credit against a non−U.S. holder's United States federal income tax liability provided the required information is furnished to the Internal Revenue Service.

S−51

## CERTAIN ERISA CONSIDERATIONS

Each person considering the use of plan assets of a pension, profit-sharing or other employee benefit plan, individual retirement account, Keogh plan or other retirement plan, account or arrangement (a "plan") to acquire or hold the Preferred Stock should consider whether an investment in the Preferred Stock (and the common stock issuable upon conversion of the Preferred Stock) would be consistent with the documents and instruments governing the plan, and whether the investment would involve a prohibited transaction under Section 406 of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), or Section 4975 of the Code.

Section 406 of ERISA and Section 4975 of the Code prohibit plans subject to Title I of ERISA and/or Section 4975 of the Code including entities such as collective investment funds, partnerships and separate accounts or insurance company pooled separate accounts or insurance company general accounts whose underlying assets include the assets of such plans (collectively, "Plans") from engaging in certain transactions involving "plan assets" with persons who are "parties in interest" under ERISA or "disqualified persons" under the Code ("parties in interest") with respect to the Plan. A violation of these prohibited transaction rules may result in civil penalties or other liabilities under ERISA and/or an excise tax under Section 4975 of the Code for those persons, unless exemptive relief is available under an applicable statutory, regulatory or administrative exemption. Certain plans including those that are governmental plans (as defined in Section 3(32) of ERISA), certain church plans (as defined in Section 3 (33) of ERISA) and foreign plans (as described in Section 4(b)(4) of ERISA) are not subject to the requirements of ERISA or Section 4975 of the Code but may be subject to similar provisions under applicable federal, state, local, foreign or other regulations, rules or laws ("Similar Laws").

The acquisition or holding of the Preferred Stock (and the common stock issuable upon conversion of the Preferred Stock) by a Plan with respect to which we, Lehman Brothers Inc. or certain of our affiliates is or becomes a party in interest may constitute or result in prohibited transactions under ERISA or Section 4975 of the Code, unless the Preferred Stock (or such common stock) is acquired or held pursuant to and in accordance with an applicable exemption.

Accordingly, the Preferred Stock (and the common stock issuable upon conversion of the Preferred Stock) may not be purchased or held by any Plan or any person investing "plan assets" of any Plan, unless such purchase or holding is eligible for the exemptive relief available under Prohibited Transaction Class Exemption ("PTCE"), such as PTCE 96-23, PTCE 95-60, PTCE 91-38, PTCE 90-1 or PTCE 84-14 issued by the U.S. Department of Labor or there is some other basis on which the purchase and holding of the Preferred Stock is not prohibited, such as the exemption under Section 408(b)(17) of ERISA and Section 4975(d)(20) of the Code (the "Service Provider Exemption") for certain transactions with non-fiduciary service providers for transactions that are for adequate consideration. Each purchaser or holder of the Preferred Stock (and the common stock issuable upon conversion of the Preferred Stock) or any interest therein, and each person making the decision to purchase or hold the Preferred Stock (or such common stock) on behalf of any such purchaser or holder will be deemed to have represented and warranted in both its individual capacity and its representative capacity (if any), that on each day from the date on which the purchaser or holder acquires its interest in the Preferred Stock (and the common stock issuable upon conversion of the Preferred Stock) to the date on which the purchaser disposes of its interest in the Preferred Stock (or such common stock), that such purchaser and holder, by its purchase or holding of the Preferred Stock (or such common stock) or any interest therein that (a) its purchase and holding of the Preferred Stock (and the common stock issuable upon conversion of the Preferred Stock) is not made on behalf of or with "plan assets" of any Plan or (b) its purchase and holding of the Preferred Stock (and the common stock issuable upon conversion of the Preferred Stock) is made on behalf of or with "plan assets" of a Plan and (i) its purchase and holding of the Preferred Stock (and the common stock issuable upon conversion of the Preferred Stock) will not result in a non-exempt prohibited transaction under Section 406 of ERISA or Section 4975 of the Code. and (ii) neither Lehman Brothers Inc. nor any of

our affiliates is acting as a fiduciary (within the meaning of Section 3(21)) of ERISA in connection with the purchase or holding of the Preferred Stock (and the common stock issuable upon conversion of the Preferred Stock) and has not provided any advice that has formed or may form a primary basis for any investment decision concerning the purchase or holding of the Preferred Stock. Each purchaser and holder of the Preferred Stock (and the common stock issuable upon conversion of the Preferred Stock) or any interest therein on behalf of any governmental plan will be deemed to have represented and warranted by its purchase or holding of the Preferred Stock or any interest therein that such purchase and holding does not violate any applicable Similar Laws or rules.

Due to the complexity of these rules and the penalties that may be imposed upon persons involved in nonexempt prohibited transactions, it is important that fiduciaries or other persons considering purchasing the Preferred Stock on behalf of or with "plan assets" of any plan or plan asset entity consult with their counsel regarding the availability of exemptive relief under any of the PTCEs listed above or any other applicable exemption, or the potential consequences of any purchase or holding under Similar Laws, as applicable.

## UNDERWRITING

Subject to the terms and conditions of the underwriting agreement under which the Preferred Stock is being offered and sold, we have agreed to sell to the underwriter, Lehman Brothers Inc., and the underwriter has agreed to purchase from us, all of the Preferred Stock being offered, if any is purchased.

The conditions contained in the underwriting agreement include requirements that:

- the representations and warranties made by us to the underwriter are true;

- there has been no material adverse change in our financial condition or in the financial markets; and

- we deliver the customary closing documents to the underwriter.

The underwriter proposes to offer the Preferred Stock initially at a public offering price equal to the initial public offering price set forth on the cover of this prospectus supplement. After the initial public offering, the offering price and other selling terms may from time to time be varied by the underwriter.

### Discounts and Commissions

The following table summarizes the underwriting discounts and commissions we will pay to the underwriter. The underwriting fee is the difference between the initial public offering price and the amount the underwriter will pay to us for the Preferred Stock.

| | | |
|---|---|---|
| Per Share of Preferred Stock | $ | 30.00 |
| Total | $ | 1,940,000,000.00 |

We estimate that our total expenses associated with the offer and sale of the Preferred Stock, excluding underwriting discounts, will be approximately $475,000.

### Indemnification and Expenses

We have agreed to indemnify the underwriter against liabilities relating to any offering of the Preferred Stock, including liabilities under the Securities Act, or to contribute to payments that the underwriter may be required to make relating to these liabilities.

### Listing

The Preferred Stock will not be listed on any securities exchange or included in any automated quotation system.

### Market−Making

The Preferred Stock will not have an established trading market when issued. The Preferred Stock will not be listed on any securities exchange or included in any automated quotation system. Due to certain regulatory restrictions arising from its affiliation with Lehman Brothers Holdings, Lehman Brothers Inc. will be unable to make a market in the Preferred Stock. In addition, Lehman Brothers Inc. will not be able to effect any transactions in the Preferred Stock for the account of any customers except on a limited unsolicited basis. We cannot assure you of the liquidity of, or trading market for, the Preferred Stock.

If an active trading market for the Preferred Stock does not develop, the market price and liquidity of the Preferred Stock may be adversely affected.

### Lock−Up Agreements

We and certain of our executive officers have agreed, subject to certain exceptions (including, in the case of Lehman Brothers Holdings Inc., the concurrent offering of common stock pursuant to the prospectus supplement dated June 9, 2008), that we will not offer for sale, sell, pledge or otherwise

S−54

dispose of (or enter into any transaction or device that is designed to, or could be expected to, result in the disposition by any person at any time in the future of), directly or indirectly, sell or grant options, warrants or rights with respect to, or file with the SEC a registration statement or prospectus supplement under the Securities Act relating to, any shares of our common stock or securities convertible into or exchangeable or exercisable for any shares of our common stock, or, with respect to any person other than us, enter into any swap or other derivative transactions or engagement that transfers to another, in whole or in part, any of the economic benefits or risks of ownership of shares of common stock, whether any such transaction is to be settled by delivery of common stock or other securities, in cash or otherwise, or publicly disclose the intention to make any such offer, sale, pledge, disposition or filing, without the prior written consent of Lehman Brothers Inc. for a period of 90 days after the date of this prospectus supplement.

**Stabilization, Short Positions and Penalty Bids**

The underwriter may engage in stabilizing transactions, short sales and purchases to cover positions created by short sales, and penalty bids or purchases for the purpose of pegging, fixing or maintaining the price of the Preferred Stock, in accordance with Regulation M under the Exchange Act:

- Stabilizing transactions permit bids to purchase the underlying security so long as the stabilizing bids do not exceed a specified maximum.

- A short position involves a sale by the underwriter of Preferred Stock in excess of the number of shares of Preferred Stock the underwriter is obligated to purchase in the offering, which creates the syndicate short position. The underwriter will close out any short position by purchasing Preferred Stock in the open market. A short position is more likely to be created if the underwriter is concerned that there could be downward pressure on the price of Preferred Stock in the open market after pricing that could adversely affect investors who purchase in the offering.

These stabilizing transactions may have the effect of raising or maintaining the market price of the Preferred Stock or preventing or retarding a decline in the market price of the Preferred Stock. As a result, the price of the Preferred Stock may be higher than the price that might otherwise exist in the open market. These transactions, if commenced, may be discontinued at any time.

Neither we nor the underwriter makes any representation or prediction as to the direction or magnitude of any effect that the transactions described above may have on the price of the Preferred Stock.

In addition, neither we nor the underwriter makes representation that the underwriter will engage in these stabilizing transactions or that any transaction, once commenced, will not be discontinued without notice.

**Other Relationships With the Underwriter**

Lehman Brothers Inc., our principal U.S. broker–dealer subsidiary, is a member of the Financial Industry Regulatory Authority ("FINRA") and may participate in distributions of the Preferred Stock. Accordingly, offerings of the Preferred Stock in which Lehman Brothers Inc. or any other U.S. broker–dealer subsidiary participates will conform to the requirements set forth in Rule 2720 of the Conduct Rules of the FINRA. Under Rule 2720, the underwriter is not permitted to sell Preferred Stock in this offering to an account over which it exercises discretionary authority without the prior written approval of the customer to which the account relates.

Certain of the underwriter's affiliates have in the past provided, and may in the future from time to time provide, investment banking and/or general financing and/or banking services to us and our affiliates, for which they have in the past received, and may in the future receive, customary fees and reimbursement of expenses.

**Selling Restrictions**

### *European Economic Area*

In relation to each Member State of the European Economic Area that has implemented the Prospectus Directive (each, a Relevant Member State), with effect from and including the date on which the Prospectus Directive is implemented in that Relevant Member State (the relevant implementation date), an offer of Preferred Stock described in this prospectus supplement may not be made to the public in that Relevant Member State other than:

- to any legal entity that is authorized or regulated to operate in the financial markets or, if not so authorized or regulated, whose corporate purpose is solely to invest in securities;

- to any legal entity that has two or more of (1) an average of at least 250 employees during the last financial year; (2) a total balance sheet of more than €43,000,000 and (3) an annual net turnover of more than €50,000,000, as shown in its last annual or consolidated accounts;

- to fewer than 100 natural or legal persons (other than qualified investors as defined in the Prospectus Directive) subject to obtaining the prior consent of the underwriter; or

- in any other circumstances that do not require the publication of a prospectus pursuant to Article 3 of the Prospectus Directive,

provided that no such offer of Preferred Stock shall require us or the underwriter to publish a prospectus pursuant to Article 3 of the Prospectus Directive.

For purposes of this provision, the expression an "offer of Preferred Stock to the public" in any Relevant Member State means the communication in any form and by any means of sufficient information on the terms of the offer and the Preferred Stock to be offered so as to enable an investor to decide to purchase or subscribe the Preferred Stock, as the expression may be varied in that Member State by any measure implementing the Prospectus Directive in that Member State, and the expression "Prospectus Directive" means Directive 2003/71/EC and includes any relevant implementing measure in each Relevant Member State.

We have not authorized and do not authorize the making of any offer of Preferred Stock through any financial intermediary on their behalf, other than offers made by the underwriter with a view to the final placement of the Preferred Stock as contemplated in this prospectus supplement. Accordingly, no purchaser of the Preferred Stock, other than the underwriter, is authorized to make any further offer of the Preferred Stock on behalf of us or the underwriter.

### *Hong Kong*

Shares of the Preferred Stock may not be offered or sold in Hong Kong, by means of any document, other than (a) to "professional investors" as defined in the Securities and Futures Ordinance (Cap. 571, Laws of Hong Kong) and any rules made under that Ordinance or (b) in other circumstances which do not result in the document being a "prospectus" as defined in the Companies Ordinance (Cap. 32, Laws of Hong Kong) or which do not constitute an offer to the public within the meaning of that Ordinance. No advertisement, invitation or document relating to our securities may be issued, whether in Hong Kong or elsewhere, which is directed at, or the contents of which are likely to be read by, the public in Hong Kong (except if permitted to do so under the laws of Hong Kong) other than with respect to our securities which are intended to be disposed of only to persons outside Hong Kong or only to "professional investors" as defined in the Securities and Futures Ordinance (Cap. 571, Laws of Hong Kong) or any rules made under that Ordinance. The contents of this document have not been reviewed by any regulatory authority in Hong Kong. You are advised to exercise caution in relation to the offer. If you are in any doubt about any of the contents of this prospectus supplement and the accompanying prospectus, you should obtain independent professional advice.

*Israel*

No action has been or will be taken in Israel that would permit an offering of the Preferred Stock or a distribution of this prospectus supplement or the accompanying prospectus to the public in Israel.

Accordingly, the Preferred Stock will not be offered, directly or indirectly, in Israel or to others for re–offering or resale, directly or indirectly, in Israel except to investors of the type listed in the First Schedule to Israel's Securities Law 5728–1968.

*Japan*

Shares of the Preferred Stock have not been and will not be registered under the Financial Instruments and Exchange Law of Japan (Law No. 25 of 1948 as amended, the FIEL), and we will not offer or sell any of the Preferred Stock, directly or indirectly, in Japan or to, or for the benefit of, any resident of Japan (which term as used herein means any person resident in Japan, including any corporation or other entity organized under the laws of Japan), or to others for re–offering or resale, directly or indirectly, in Japan or to a resident of Japan, except pursuant to an exemption from the registration requirements of, and otherwise in compliance with, the FIEL and any other applicable laws, regulations and ministerial guidelines of Japan.

*Korea*

The Preferred Stock may not be offered, sold and delivered directly or indirectly, or offered or sold to any person for reoffering or resale, directly or indirectly, in Korea or to any resident of Korea except pursuant to the applicable laws and regulations of Korea, including the Korea Securities and Exchange Act and the Foreign Exchange Transaction Law and the decrees and regulations thereunder. The Preferred Stock has not been registered with the Financial Services Commission of Korea for public offering in Korea. Furthermore, the Preferred Stock may not be resold to Korean residents unless the purchaser of the Preferred Stock complies with all applicable regulatory requirements (including but not limited to government approval requirements under the Foreign Exchange Transaction Law and its subordinate decrees and regulations) in connection with the purchase of the Preferred Stock.

*Singapore*

This prospectus supplement and the accompanying prospectus have not been registered as a prospectus with the Monetary Authority of Singapore. Accordingly, this prospectus supplement and the accompanying prospectus and any other document or material in connection with the offer or sale, or invitation for subscription or purchase, of our securities may not be circulated or distributed, nor may our securities be offered or sold, or be made the subject of an invitation for subscription or purchase, whether directly or indirectly, to persons in Singapore other than (i) to an institutional investor under Section 274 of the Securities and Future Act, Chapter 289 of Singapore (the "SFA"), (ii) to a relevant person, or any person pursuant to Section 275 (1A), and in accordance with the conditions, specified in Section 275 of the SFA or (iii) otherwise pursuant to, and in accordance with the conditions of, any other applicable provision of the SFA.

Where our securities are subscribed and purchased under Section 275 by a relevant person which is (a) a corporation (which is not an accredited investor) the sole business of which is to hold investments and the entire share capital of which is owned by one or more individuals, each of whom is an accredited investor; or (b) a trust (where the trustee is not an accredited investor) whose sole whole purpose is to hold investments and each beneficiary is an accredited investor, shares, debentures and units of shares and debentures of that corporation or the beneficiaries' rights and interest in that trust shall not be transferable in six months after that corporation or that trust has acquired our securities under Section 275 except (i) to an institutional investor under Section 274 of the SFA or to a relevant person, or any person pursuant to Section 275 (1A), and in accordance with the conditions, specified in Section 275 of the SFA; (ii) where no consideration is given for transfer; or (iii) by operation of law.

S–57

*United Kingdom*

This prospectus supplement and the accompanying prospectus are only being distributed to, and are only directed at, persons in the United Kingdom that are qualified investors within the meaning of Article 2(1)(e) of the Prospectus Directive ("Qualified Investors") that are also (i) investment professionals falling within Article 19(5) of the Financial Services and Markets Act 2000 (Financial Promotion) Order 2005 (the "Order") or (ii) high net worth entities, and other persons to whom it may lawfully be communicated, falling within Article 49(2)(a) to (d) of the Order (all such persons together being referred to as "relevant persons"). This prospectus supplement and its contents are confidential and should not be distributed, published or reproduced (in whole or in part) or disclosed by recipients to any other persons in the United Kingdom. Any person in the United Kingdom that is not a relevant person should not act or rely on this document or any of its contents.

*United Arab Emirates*

This prospectus supplement and the accompanying prospectus are not intended to constitute an offer, sale or delivery of shares or other securities under the laws of the United Arab Emirates ("UAE"). The Preferred Stock has not been and will not be registered under Federal Law No. 4 of 2000 Concerning the Emirates Securities and Commodities Authority and the Emirates Security and Commodity Exchange, or with the UAE Central Bank, the Dubai Financial Market, the Abu Dhabi Securities market or with any other UAE exchange.

The offering, the Preferred Stock and interests therein have not been approved or licensed by the UAE Central Bank or any other relevant licensing authorities in the UAE, and do not constitute a public offer of securities in the UAE in accordance with the Commercial Companies Law, Federal Law No. 8 of 1984 (as amended) or otherwise.

This prospectus supplement is strictly private and confidential and is being distributed to a limited number of investors and must not be provided to any person other than the original recipient, and may not be reproduced or used for any other purpose. The interests in the Preferred Stock may not be offered or sold directly or indirectly to the public in the UAE.

**Electronic Distribution**

This prospectus supplement and the accompanying prospectus may be made available in electronic format on Internet websites or through other online services maintained by the underwriter participating in this offering, or by its affiliates. In those cases, prospective investors may view offering terms online and, depending upon the particular affiliates or the underwriter, prospective investors may be allowed to place orders online. The underwriter may agree with us to allocate a specific number of Preferred Stock for sale to online brokerage account holders. Any such allocation for online distributions will be made by the underwriter on the same basis as other allocations.

Other than the prospectus in electronic format, the information on the underwriter's website and any information contained in any other website maintained by the underwriter is not part of the prospectus or the registration statement of which this prospectus supplement forms a part, has not been approved and/or endorsed by us or the underwriter in its capacity as an underwriter and should not be relied upon by investors.

**Stamp Taxes**

Purchasers of the Preferred Stock offered by this prospectus supplement may be required to pay stamp taxes and other charges under the laws and practices of the country of purchase, in addition to the offering price listed on the cover page of this prospectus supplement. Accordingly, we urge you to consult a tax advisor with respect to whether you may be required to pay those taxes or charges, as well as any other tax consequences that may arise under the laws of the country of purchase.

## WHERE YOU CAN FIND MORE INFORMATION

As required by the Securities Act, we filed a registration statement relating to the securities offered by this prospectus supplement with the SEC. This prospectus supplement and the accompanying prospectus are a part of that registration statement, which includes additional information.

We file annual, quarterly and current reports, proxy statements and other information with the SEC. You may read and copy any document we file at the SEC's public reference room at 100 F Street, N.E., Washington, D.C. 20549. You can also request copies of the documents, upon payment of a duplicating fee, by writing the Public Reference Section of the SEC. Please call the SEC at 1–800–SEC–0330 for further information on the public reference rooms. These SEC filings are also available to the public from the SEC's website at *http://www.sec.gov.*

Our common stock, par value $0.10 per share, is listed on the New York Stock Exchange under the symbol "LEH." You may inspect reports, proxy statements and other information concerning us and our consolidated subsidiaries at the offices of the New York Stock Exchange, Inc., 20 Broad Street, New York, New York 10005. For further information in obtaining copies of our public filings at the New York Stock Exchange, Inc., you should call 212–656–5060.

The SEC allows us to "incorporate by reference" the information we file with the SEC, which means that we can disclose important information to you by referring you to those documents. The information incorporated by reference is considered to be part of this prospectus supplement, and later information that we file with the SEC will automatically update and supersede this information. We incorporate by reference the documents listed below and any future filings made with the SEC under Section 13(a), 13(c), 14, or 15(d) of the Exchange Act (other than information in the documents or filings that is deemed to have been furnished and not filed), until the completion of the distribution of the Preferred Stock:

- Annual Report on Form 10–K for the year ended November 30, 2007;

- Quarterly Report on Form 10–Q for the quarter ended February 29, 2008;

- Current Reports on Form 8–K filed with the SEC on December 3, December 4 (three Form 8–K filings), December 5, December 6, December 7, December 10, December 11, December 13 (three Form 8–K filings), December 17 (two Form 8–K filings), December 20, December 21 and December 28, 2007 and January 4, January 15, January 16, January 17, January 23, January 29, February 4 (two Form 8–K filings), February 5, February 6 (two Form 8–K filings), February 8, February 11, February 12 (three Form 8–K filings), February 13, February 15, February 19 (two Form 8–K filings), February 20, February 22 (two Form 8–K filings), February 25, February 26, February 27, February 28, March 3, March 4, March 5, March 11 (two Form 8–K filings), March 12, March 13, March 18, March 21, March 24, March 26 (two Form 8–K filings), April 1, April 2, April 3, April 4, April 8, April 11 (two Form 8–K filings), April 18, April 22, April 25, April 28, May 1, May 2, May 5, May 6, May 7, May 12, May 13, May 19, May 20, May 23 (two Form 8–K filings), May 30, June 3, June 4 and June 9, 2008; and

- Registration Statement on Form 8–A, filed on April 29, 1994.

You may request a copy of these filings, at no cost, by writing or telephoning us at the following address:

Controller's Office
Lehman Brothers Holdings Inc.
745 Seventh Avenue
New York, New York 10019
(212) 526–7000

S–59

## LEGAL MATTERS

The validity of the Preferred Stock will be passed upon for us by Andrew M.W. Yeung, Associate General Counsel and Vice President of Lehman Brothers Holdings Inc. Mr. Yeung beneficially owns, or has rights to acquire under Lehman Brothers Holdings' employee benefit plans, an aggregate of less than 1% of Lehman Brothers Holdings' common stock. We were represented by Simpson Thacher & Bartlett LLP, New York, New York and the underwriter was represented by Sullivan & Cromwell LLP, New York, New York.

## EXPERTS

The consolidated financial statements and financial statement schedule of Lehman Brothers Holdings Inc. appearing in Lehman Brothers Holdings Inc.'s Annual Report (Form 10-K) for the year ended November 30, 2007, and of the effectiveness of internal control over financial reporting as of November 30, 2007 included therein have been audited by Ernst & Young LLP, independent registered public accounting firm, as set forth in their reports thereon, included therein, and incorporated by reference herein. Such consolidated financial statements are incorporated herein by reference in reliance upon the reports of Ernst & Young LLP pertaining to such consolidated financial statements given on the authority of such firm as experts in accounting and auditing.