1

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK

Case No. 08-13555

- - - - - - - - - - - - - - - - - - - -x

In the Matter of:


LEHMAN BROTHERS HOLDINGS, INC., et al.


        Debtors.


- - - - - - - - - - - - - - - - - - - -x


                United States Bankruptcy Court

                One Bowling Green

                New York, New York


                September 19, 2008

                4:36 PM


B E F O R E:

HON. JAMES M. PECK

U.S. BANKRUPTCY JUDGE

2

1

2    HEARING re Debtor's Motion for an Order Pursuant to Section 105

3    of the Bankruptcy Code Confirming Status of Citibank Clearing

4    Advances

5

6    HEARING re Debtor's Motion to (a) Schedule a Sale Hearing; (b)

7    Establish Sales Procedures; (c) Approve a Breakup Fee; and (d)

8    Approve the Sale of the Purchased Assets and the Assumption and

9    Assignment of Contracts Relating to the Purchased Assets

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25    Transcribed by:  Lisa Bar-Leib

3

```
 1
 2   A P P E A R A N C E S :
 3   WEIL, GOTSHAL & MANGES LLP
 4         Attorneys for Debtor
 5         767 Fifth Avenue
 6         New York, NY 10153
 7
 8   BY:   HARVEY R. MILLER, ESQ.
 9         RICHARD P. KRASNOW, ESQ.
10         SHAI WAISMAN, ESQ.
11         LORI R. FIFE, ESQ.
12         MICHELE J. MEISES, ESQ.
13         GARRETT A. FAIL, ESQ.
14
15   WEIL, GOTSHAL & MANGES LLP
16         Attorneys for Debtor
17         1395 Brickell Avenue
18         Suite 1200
19         Miami, FL 33131
20
21         NELLIE P. CAMERIK, ESQ.
22         (TELEPHONICALLY)
23
24
25
```

4

1

2    MILBANK, TWEED, HADLEY & MCCLOY LLP

3          Proposed counsel to the Official Committee of Unsecured

4           Creditors

5          One Chase Manhattan Plaza

6          New York, NY 10005

7

8    BY:   LUC A. DESPINS, ESQ.

9          DENNIS C. O'DONNELL, JR.

10         DENNIS F. DUNNE, ESQ.

11         PAUL ARONSON, ESQ.

12         EVAN R. FLECK, ESQ.

13         WILBUR F. FOSTER, ESQ.

14

15   CLEARY GOTTLIEB STEEN & HAMILTON LLP

16         Attorneys for Barclays Capital Inc.

17         One Liberty Plaza

18         New York, NY 10006

19

20   BY:   LISA M. SCHJWEITZER, ESQ.

21         LINDSEE P. GRANFIELD, ESQ.

22         JAMES L. BROMLEY, ESQ.

23

24

25

5

1

2    UNITED STATES DEPARTMENT OF JUSTICE

3         Office of the United States Trustee

4         33 Whitehall Street

5         Suite 2100

6         New York, NY 10004

7

8    BY:   LINDA A. RIFFKIN, ESQ.

9          ANDREW D. VELEZ-RIVERA, ESQ.

10         TRACY HOPE DAVIS, ESQ.

11         DIANA G. ADAMS, TRUSTEE

12

13   DEWEY & LEBOEUF, LLP

14         Attorneys for CAPCO Holdings Inc. and Customer Asset

15          Protection Company

16         125 West 55th Street

17         New York, NY 10019

18

19   BY:   ELIZABETH P. SMITH, ESQ.

20         SAMUEL S. KOHN, ESQ.

21

22

23

24

25

6

1

2    DEWEY & LEBOEUF, LLP

3            Attorneys for The Royal Bank of Scotland PLC; ABN AMRO

4             NV; and The Walt Disney Company

5            1301 Avenue of the Americas

6            New York, NY 10019

7

8    BY:    MARTIN J. BIENENSTOCK, ESQ.

9            IRENA GOLDSTEIN, ESQ.

10            TIMOTHY Q. KARCHER, ESQ.

11            WILLIAM C. HEUER, ESQ.

12

13    MAYER BROWN LLP

14            Attorneys for SP4 190 S. LaSalle, L.P.

15            1675 Broadway

16            New York, NY 10019

17

18    BY:    BRIAN TRUST, ESQ.

19            ANTONIA GOLIANOPOULOS, ESQ.

20

21

22

23

24

25

7

1

2    MAYER BROWN LLP

3          Attorneys for SP4 190 S. LaSalle, L.P.

4          71 South Wacker Drive

5          Chicago, IL 60606

6

7    BY:   THOMAS S. KIRIAKOS, ESQ.

8          MELISSA A. MICKEY, ESQ.

9

10   DESHAW & CO.

11         39th Floor

12         Tower 45

13         120 West Forty-Fifth Street

14         New York, NY 10036

15

16   BY:   JO ERN CHEN, ESQ.

17

18   AKIN GUMP STRAUSS HAUER & FELD LLP

19         Attorneys for the Ad Hoc Committee of Bondholders

20         590 Madison Avenue

21         New York, NY 10022

22

23   BY:   DANIEL H. GOLDEN, ESQ.

24         ABID QURESHI, ESQ.

25

8

NIXON PEABODY LLP

    Attorneys for Intuition Publishing Inc.

    437 Madison Avenue

    New York, NY 10022


BY:   ROBERT N.H. CHRISTMAS, ESQ.


UNITED STATES SECURITIES AND EXCHANGE COMMISSION

    3 World Financial Center

    New York, NY 10279


BY:   ALISTAIRE BAMBACH, ESQ.

    DAN GALLAGHER, ESQ.

    NEAL JACOBSON, ESQ.


POLSINELLI SHALTON FLANIGAN SUELTHAUS PC

    Attorneys for BATS Holdings, Inc.

    7 Penn Plaza

    Suite 600

    New York, NY 10001


BY:   DANIEL J. FLANIGAN, ESQ.

    JAMES E. BIRD, ESQ.

9

1

2   ELROD, PLLC

3         Attorneys for TransCanada PipeLines Limited & Affiliates

4         500 North Akard Street

5         Suite 3000

6         Dallas, TX 75201

7

8   BY:   DAVID W. ELROD, ESQ.

9

10  GIBBONS P.C.

11        Attorneys for

12        One Gateway Center

13        Newark, NJ 07102

14

15  BY:   DAVID N. CRAPO, ESQ.

16

17  KAYE SCHOLER LLP

18        Attorneys for Wells Fargo

19        425 Park Avenue

20        New York, NY 10022

21

22  BY:   SCOTT D. TALMADGE, ESQ.

23

24

25

10

1

2    MICHAEL N. DAVID, ATTORNEY AT LAW

3          Attorney for M&M Technology; M&M Sentinel

4          82 Wall Street

5          New York, NY 10005

6

7    BY:   MICHAEL N. DAVID, ESQ.

8

9    DEBEVOISE & PLIMPTON LLP

10          Attorneys for Rock-Forty-Ninth LLC; Rockefeller Center

11           Management Corp.; Rockefeller Group Development Corp.;

12           Rockefeller Center North, Inc.

13          919 Third Avenue

14          New York, NY 10022

15

16    BY:   MAUREEN CRONIN, ESQ.

17          MY CHI TO, ESQ.

18

19    SATTERLEE STEPHENS BURKE & BURKE LLP

20          Attorneys for Moody's Investors Service; International

21           Business Machines Corp.

22          230 Park Avenue

23          New York, NY 10169

24

25    BY:   ABIGAIL SNOW, ESQ.

11

1

2    LAW OFFICES OF DAVID C. MCGRAIL

3         Attorney for Iron Mountain Information Management, Inc.

4         676 A. Ninth Avenue

5         Suite 211

6         New York, NY 10036

7

8    BY:   DAVID C. MCGRAIL, ESQ.

9

10   SIDLEY AUSTIN LLP

11        Attorneys for

12        787 Seventh Avenue

13        New York, NY 10019

14

15   BY:   ALEX R. ROVIRA, ESQ.

16

17   MORGENSTERN & BLUE, LLC

18        Attorneys for Options Clearing Corporation

19        885 Third Avenue

20        New York, NY 10022

21

22   BY:   GREGORY A. BLUE, ESQ.

23

24

25

12

1

2    ARENT FOX LLP

3         Attorneys for The Vanguard Group

4         1675 Broadway

5         New York, NY 10019

6

7    BY:   ROBERT M. HIRSH, ESQ.

8

9    FULBRIGHT & JAWORSKI, L.L.P.

10        Attorneys for AT&T Inc.

11        666 Fifth Avenue

12        New York, NY 10103

13

14   BY:   DAVID A. ROSENZWEIG, ESQ.

15         MARK C. HAUT, ESQ.

16

17   FULBRIGHT & JAWORSKI, L.L.P.

18        Attorneys for AT&T Inc.

19

20

21   BY:   ANDY BLACK, ESQ.

22

23

24

25

13

1

2    GIBSON, DUNN & CRUTCHER LLP

3          Attorneys for Lehman Brothers Private Equity Funds

4          200 Park Avenue

5          New York, NY 10016

6

7    BY:   MICHAEL A. ROSENTHAL, ESQ.

8          JANET M. WEISS, ESQ.

9

10   GIBSON, DUNN & CRUTCHER LLP

11         Attorneys for Lehman Brothers Private Equity Funds

12

13   BY:   OSCAR GARZA, ESQ.

14         (TELEPHONICALLY)

15

16   WILKIE FARR & GALLAGHER LLP

17         Attorneys for IntraLinks, Inc.; Bloomberg L.P.;

18          Bloomberg Finance L.P.; AIG Global Investment; AIG

19          Financial Products

20         787 Seventh Avenue

21         New York, NY 10019

22

23   BY:   THOMAS H. GOLDEN, ESQ.

24         SHAUNNA D. JONES, ESQ.

25

14

1

2    ARNALL GOLDEN GREGORY LLP

3           Attorneys for the Wholly Owned Subsidiaries of

4            Verizon Communications

5           171 17th Street, N.W.

6           Suite 2100

7           Atlanta, GA 30363

8

9    BY:   DARRYL S. LADDIN, ESQ.

10

11   LOWEY DANNENBERG COHEN & HART, P.C.

12          Attorneys for Unofficial Committee of Participants in

13           Deferred Compensation Plan

14          One North Broadway

15          White Plains, NY 10601

16

17   BY:   ANNE PENACHIO, ESQ.

18

19   PROSKAUER ROSE LLP

20          Attorneys for DTCC

21          1585 Broadway

22          New York, NY 10036

23

24   BY:   ADAM T. BERKOWITZ, ESQ.

25          SHELDON I. HIRSHON, ESQ.

15

1

2    QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP

3         Conflicts Counsel for Committee

4         51 Madison Avenue

5         22nd Floor

6         New York, NY 10010

7

8    BY:   SUSHEEL KIRPALANI, ESQ.

9

10   KLEINBERG, KAPLAN, WOLFF & COHEN, P.C.

11        Attorneys for Elliott Associates, L.P., Elliott

12         International, L.P. and the Liverpool Limited

13         Partnership

14        551 Fifth Avenue

15        18th Floor

16        New York, NY 10176

17

18   BY:   MATTHEW J. GOLD, ESQ.

19

20

21

22

23

24

25

16

1

2    MEYER, SUOZZI, ENGLISH & KLEIN, P.C.

3        Attorneys for SunGard Creditors; Constellation Place

4        990 Stewart Avenue

5        Suite 300

6        Garden City, NY 11530

7

8    BY:   ALAN MARDER, ESQ.

9          JIL MAZER-MARINO, ESQ.

10

11   ALLEN MATAKINS LECK GAMBLE & MALLORY LLP

12        Attorneys for SunGard Creditors; Constellation Place, LLC

13        1900 Main Street

14        Fifth Floor

15        Irvine, CA 92614

16

17   BY:   MICHAEL S. GREGOR, ESQ.

18         JAMES A. TIMKO, ESQ.

19

20

21

22

23

24

25

17

1

2    DIAMOND MCCARTHY LLP

3         Attorneys for DCI Umbrella Fund PLC, Diversified Credit

4          Investments LLC

5         620 Eighth Avenue

6         39th Floor

7         New York, NY 10018

8

9    BY:   HOWARD D. RESSLER, ESQ.

10         MARIA M. PATTERSON, ESQ.

11

12   COVINGTON & BURLING LLP

13         Attorneys for Wilmington Trust Company as Indenture

14          Trustee

15         The New York Times Building

16         620 Eight Avenue

17         New York, NY 10016

18

19   BY:   SUSAN P. JOHNSTON, ESQ.

20

21

22

23

24

25

18

1

2    SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

3         Attorneys for

4         Four Times Square

5         New York, NY 10036

6

7    BY:   DENISE KALOUDIS, ESQ.

8

9    WACHTELL, LIPTON, ROSEN & KATZ

10        Attorneys for JPMorgan Chase Bank, N.A.

11        51 West 52nd Street

12        New York, NY 10019

13

14   BY:   HAROLD S. NOVIKOFF, ESQ.

15        PHILIP MINDLIN, ESQ.

16

17   SHEARMAN & STERLING LLP

18        Attorneys for Bank of America Securities

19        599 Lexington Avenue

20        New York, NY 10022

21

22   BY:   JAMES L. GARRITY, ESQ.

23

24

25

19

1

2    HOLLAND & KNIGHT LLP

3         Attorneys for Lehman Executives

4         195 Broadway

5         New York, NY 10007

6

7    BY:   SANDRA E. MAYERSON, ESQ.

8

9    FEDERAL RESERVE BANK OF NEW YORK

10        Assistant General Counsel and Senior Vice President

11        33 Liberty Street

12        New York, NY 10045

13

14   BY:   SHARI LEVENTHAL, ESQ.

15

16   LINKLATERS LLP

17        Attorneys for Joint Administrators of Lehman Brothers

18         International Europe

19        1345 Avenue of the Americas

20        New York, NY 10105

21

22   BY:   LAWRENCE BYRNE, ESQ.

23        MARTIN N. FLICS, ESQ.

24

25

20

```
 1

 2    SHEPPARD MULLIN RICHTER & HAMPTON, LLP

 3          Attorneys for Bank of New York Mellon

 4          30 Rockefeller Plaza

 5          24th Floor

 6          New York, NY 10112

 7

 8    BY:   CAREN SHULMAN, ESQ.

 9          RUSSELL REID, ESQ.

10

11    SHEPPARD MULLIN RICHTER & HAMPTON, LLP

12          Attorneys for Bank of New York Mellon

13          333 South Hope Street

14          Los Angeles, CA 90071

15

16    BY:   KYLE MATHEWS, ESQ.

17

18    K & L GATES LLP

19          Attorneys for Structure Tone Inc.

20          599 Lexington Avenue

21          New York, NY 10022

22

23    BY:   JEFFREY N. RICH, ESQ.

24          KRISTIN S. ELLIOT, ESQ.

25
```

21

1

2    SALANS

3          Attorneys for Svenska; Handel S. Banken

4          Rockefeller Center

5          620 Fifth Avenue

6          New York, NY 10020

7

8    BY:   CLAUDE D. MONTGOMERY, ESQ.

9

10   REED SMITH LLP

11         Attorneys for Galleon Buccaneer's Offshore, Ltd.

12         599 Lexington Avenue

13         New York, NY 10022

14

15   BY:   LUMA S. AL-SHIBIB, ESQ.

16

17   CADWALADER, WICKERSHAM & TAFT LLP

18         Attorneys for Citigroup, N.A., Citigroup Inc.,

19         FXCM Holdings, LLC and Morgan Stanley

20         One World Financial Center

21         New York, NY 10261

22

23   BY:   DERYCK A. PALMER, ESQ.

24         HOWARD R. HAWKINS, ESQ.

25         ELLEN M. HALSTEAD, ESQ.

22

1

2      MCGUIREWOODS LLP

3             Attorneys for Meridian Comp of New York d/b/a CHD

4              Meridian Healthcare; Toronto-Dominion Bank

5             1345 Avenue of the Americas

6             Seventh Floor

7             New York, NY 10105

8

9      BY:    SHAWN R. FOX, ESQ.

10

11     MCGUIREWOODS LLP

12            Attorneys for Meridian Comp of New York d/b/a CHD

13             Meridian Healthcare; Toronto-Dominion Bank

14            One James Center

15            901 East Cary Street

16            Richmond, VA 23219

17

18     BY:    DION W. HAYES, ESQ.

19

20

21

22

23

24

25

23

1

2    MCGUIREWOODS LLP

3          Attorneys for Meridian Comp of New York d/b/a CHD

4           Meridian Healthcare; Toronto-Dominion Bank

5          625 Liberty Avenue

6          23rd Floor

7          Pittsburgh, PA 15222

8

9    BY:    MICHAEL J. ROESCHENTHALER, ESQ.

10

11    CHADBOURNE & PARKE LLP

12          Attorneys for Amber Capital Investment Management

13          30 Rockefeller Plaza

14          New York, NY 10012

15

16    BY:    HOWARD SEIFE, ESQ.

17          DAVID M. LEMAY, ESQ.

18          ANDREW ROSENBLATT, ESQ.

19

20

21

22

23

24

25

24

1

2    CROWELL MORING

3          Attorneys for ICAP North America, Inc. and Affiliates

4          153 East 53rd Street

5          31st Floor

6          New York, NY 10022

7

8    BY:   MICHAEL V. BLUMENTHAL, ESQ.

9

10   HUGHES HUBBARD & REED LLP

11         Attorneys for James Giddens, SIDC Trustee

12         One Battery Park Plaza

13         New York, NY 10004

14

15   BY:   JAMES B. KOBAK, JR.

16

17   CURTIS, MALLET-PREVOST, COLT & MOSLE LLP

18         Attorneys for NYSE Euronext

19         101 Park Avenue

20         New York, NY 10178

21

22   BY:   JERROLD L. BREGMAN, ESQ.

23

24

25

25

1

2   LOWENSTEIN SANDLER P.C.

3        Attorneys for Avaya Inc.

4        65 Livingston Avenue

5        Roseland, NJ 07068

6

7   BY:   PAUL KIZEL, ESQ.

8

9   KASOWITZ, BENSON, TORRES & FRIEDMAN LLP

10        Attorneys for Bay Harbour Management L.C.; Bay Harbour

11         Master Ltd.; Trophy Hunter Investments, Ltd., BHCO

12         Master, Ltd.; MSS Distressed & Opportunities 2 and

13         Institutional Benchmarks

14        1633 Broadway

15        New York, NY 10019

16

17  BY:   DAVID M. FRIEDMAN, ESQ.

18        DAVID S. ROSNER, ESQ.

19        ANDREW K. GLENN, ESQ.

20

21

22

23

24

25

26

1

2      BINGHAM MCCUTCHEN LLP

3            Attorneys for Harbinger Capital Partners Special

4             Situations Fund, L.P. and Harbinger Capital Master

5             Fund I, Ltd.

6            399 Park Avenue

7            New York, NY 10022

8

9      BY:   JEFFREY S. SABIN, ESQ.

10           RONALD J. SILVERMAN, ESQ.

11           STEVEN WILAMOWSKY, ESQ.

12

13     BINGHAM MCCUTCHEN LLP

14           Attorneys for Harbinger Capital Partners Special

15            Situations Fund, L.P. and Harbinger Capital Master

16            Fund I, Ltd.

17           150 Federal Street

18           Boston, MA 02110

19

20     BY:   SABIN WILLETT, ESQ.

21

22

23

24

25

27

1

2    STEVENS & LEE, P.C.

3         Attorneys for 1301 Property Owner, LP

4         485 Madison Avenue

5         20th Floor

6         New York, NY 10022

7

8    BY:   CHESTER B. SALOMON, ESQ.

9          CONSTANTINE D. POURAKIS, ESQ.

10

11   COMMODITY FUTURE TRADING COMMISSION

12        Office of General Counsel

13        1155 21st Street, N.W.

14        Washington, DC 20581

15

16   BY:   BRADFORD M. BERRY, ESQ.

17         ROBERT B. WASSERMAN, ESQ.

18

19

20

21

22

23

24

25

28

1

2    THOMPSON & KNIGHT LLP

3         Attorneys for Chevron Natural Gas and Direct Energy

4          Business, LLC

5         919 Third Avenue

6         39th Floor

7         New York, NY 10022

8

9    BY:   IRA L. HERMAN, ESQ.

10         DEMETRA L. LIGGINS, ESQ.

11

12   THOMPSON & KNIGHT LLP

13        Attorneys for Chevron Natural Gas and Direct Energy

14         Business, LLC

15        33 Clay Street

16        Suite 3300

17        Houston, TX 77002

18

19   BY:   RHETT G. CAMPBELL, ESQ.

20        MITCHELL E. AYER, ESQ.

21

22

23

24

25

29

1

2    PATTERSON BELKNAP WEBB & TYLER LLP

3         Attorneys for Hilliard Farber & Co., Inc.; Training the

4          Street, Inc.

5         1133 Avenue of the Americas

6         New York, NY 10036

7

8    BY:   DAVID W. DYKHOUSE, ESQ.

9          DANIEL A. LOWENTHAL, ESQ.

10         BRIAN P. GUINEY, ESQ.

11

12   MCCARTER & ENGLISH, LLP

13         Attorneys for Occidental Energy Marketing, Inc.

14         Four Gateway Center

15         100 Mulberry Street

16         Newark, NJ 07101

17

18   BY:   EDUARDO J. GLAS, ESQ.

19

20

21

22

23

24

25

30

1

2    MCCARTER & ENGLISH, LLP

3        Attorneys for Occidental Energy Marketing, Inc.

4        Renaissance Centre

5        405 North King Street

6        8th Floor

7        Wilmington, DE 19801

8

9    BY:    KATHARINE L. MAYER, ESQ.

10

11   KLESTADT & WINTERS LLP

12       Attorneys for Overstock.com, Inc.

13       292 Madison Avenue

14       17th Floor

15       New York, NY 10017

16

17   BY:    TRACE L. KLESTADT, ESQ.

18          JOHN E. JURELLER, JR.

19          SEAN C. SOUTHARD, ESQ.

20

21

22

23

24

25

31

1

2    BARTLETT HACKETT FEINBERG P.C.

3        Attorneys for Iron Mountain Information Management, Inc.

4        155 Federal Street

5        Boston, MA 02110

6

7    BY:   FRANK F. MCGINN, ESQ.

8

9    HALPERIN BATTAGLIA RAICHT, LLP

10        Attorneys for Henegan Construction Co., Inc.

11        555 Madison Avenue

12        9th Floor

13        New York, NY 10022

14

15    BY:   WALTER BENZIJA, ESQ.

16        JULIE D. DYAS, ESQ.

17        ALAN D. HALPERIN, ESQ.

18

19

20

21

22

23

24

25

32

```
 1
 2    KOBRE & KIM LLP
 3          Attorneys for Essex Holdings USA, LLC, 4Kids
 4           Entertainment, Northgate Minerals Corporation
 5          800 Third Avenue
 6          New York, NY 10022
 7
 8    BY:   MICHAEL S. KIM, ESQ.
 9          ROBERT W. HENOCH, ESQ.
10          ANDREW C. LOURIE, ESQ.
11          STEVEN W. PERLSTEIN, ESQ.
12          IAN N. LEVY, ESQ.
13
14    GOULSTON & STORRS P.C.
15          Attorneys for 125 High Street, L.P.; Interactive Data
16           Corporation
17          400 Atlantic Avenue
18          Boston, MA 02110
19
20    BY:   DOUGLAS B. ROSNER, ESQ.
21          JAMES F. WALLACK, ESQ.
22          GREGORY O. KADEN, ESQ.
23
24
25
```

33

1

2    MUNSCH HARDT KOPF & HARR, P.C.

3         Attorneys for Ad Hoc Committee of Bondholders

4         3800 Lincoln Plaza

5         500 North Akard Street

6         Dallas, TX 75201

7

8    BY:   KEVIN M. LIPPMAN, ESQ.

9          RAYMOND J. URBANIK, ESQ.

10

11   MUNSCH HARDT KOPF & HARR, P.C.

12        Attorneys for Ad Hoc Committee of Bondholders

13        One American Center

14        600 Congress Avenue

15        Suite 2900

16        Austin, TX 78701

17

18   BY:   RUSSELL L. MUNSCH, ESQ.

19

20

21

22

23

24

25

34

1

2    LATHAM & WATKINS LLP

3         Attorneys for Fannie Mae

4         885 Third Avenue

5         New York, NY 10022

6

7    BY:    KEITH A. SIMON, ESQ.

8           MITCHELL SEIDER, ESQ.

9

10   LATHAM & WATKINS LLP

11        Attorneys for Fannie Mae

12        Sears Tower

13        Suite 5800

14        233 South Wacker Drive

15        Chicago, IL 60606

16

17   BY:    DAVID S. HELLER, ESQ.

18           J. DOUGLAS BACON, ESQ.

19

20

21

22

23

24

25

35

```
 1
 2    BLANK ROME LLP
 3          Attorneys for FX Alliance, LLC and its Affiliates and
 4           Subsidiaries
 5          THE CHRYSLER BUILDING
 6          405 Lexington Avenue
 7          New York, NY 10174
 8
 9    BY:   MARC E. RICHARDS, ESQ.
10
11    VEDDER PRICE P.C.
12          Attorneys for Pursuit Capital Partners Master (Cayman)
13           Ltd. and Pursuit Opportunity Fund I Master Ltd.
14          1633 Broadway
15          New York, NY 10019
16
17    BY:   MICHAEL J. EDELMAN, ESQ.
18          ERIN ZAVALKOFF-BABEJ, ESQ.
19
20
21
22
23
24
25
```

36

1

2    RUSSIN, VECCHI, BERG & BERNSTEIN LLP

3         Attorneys for Dresdner Kleinwort Group Holdings, LLC

4         380 Lexington Avenue

5         Suite 1518

6         New York, NY 10168

7

8    BY:   J. FRED BERG, JR., ESQ..

9

10    STROOCK & STROOCK & LAVAN LLP

11         Attorneys for Mizuho Corporate Bank, Ltd.

12         180 Maiden Lane

13         New York, NY 10038

14

15    BY:   MARK A. SPEISER, ESQ.

16         SHERRY J. MILLMAN, ESQ.

17

18    SHENWICK & ASSOCIATES

19         Attorneys for Collins Building Services

20         655 Third Avenue

21         20th Floor

22         New York, NY 10017

23

24    BY:   JAMES H. SHENWICK, ESQ.

25

37

1

2    TROUTMAN SANDERS LLP

3         Attorneys for Bank of China, New York Branch

4         The Chrysler Building

5         405 Lexington Avenue

6         New York, NY 10174

7

8    BY:   HOLLACE T. COHEN, ESQ.

9          PAUL H. DEUTCH, ESQ.

10

11   LANE POWELL PC

12        Attorneys for Fred Hutchinson Cancer Research Center

13        1420 Fifth Avenue

14        Suite 4100

15        Seattle, WA 98101

16

17   BY:   CHARLES R. EKBERG, ESQ.

18

19   LAW OFFICES OF ROBERT E. LUNA, P.C.

20        Attorney for Carrollton-Farmers Branch Independent School

21         District

22        4411 North Central Expressway

23        Dallas, TX 75205

24

25   BY:   ANDREA SHEEHAN, ESQ.

38

1

2    KELLEY DRYE & WARREN LLP

3          Attorneys for BP Corp North America Inc., BP Energy

4          Company, BP Canada Energy Company, IGI Resources, Inc.

5          101 Park Avenue

6          New York, NY 10178

7

8    BY:    JAMES S. CARR, ESQ.

9

10   PLATZER, SWERGOLD, KARLIN, LEVINE, GOLDBERG & JASLOW LLP

11         Attorneys for Hale Avenue Borrower LLC, East 46th

12         Borrower, LLC, 250 East Borrower, LLC

13         1065 Avenue of the Americas

14         18th Floor

15         New York, NY 10018

16

17   BY:    SYDNEY G. PLATZER, ESQ.

18

19   LINEBARGER GOGGAN BLAIR & SAMPSON, LLP

20         Attorneys for Dallas County, Tarrant County

21         2323 Bryan Street

22         Suite 1600

23         Dallas, TX 75201

24

25   BY:    ELIZABETH WELLER, ESQ.

39

1

2     CRAVATH SWAINE & MOORE, LLP

3           Attorneys for Credit Suisse

4           Worldwide Plaza

5           825 Eighth Avenue

6           New York, NY 10019

7

8     BY:   RICHARD LEVIN, ESQ.

9           ROBERT H. TRUST, ESQ.

10

11    PAUL, HASTINGS, JANOFSKY & WALKER LLP

12          Attorneys for General Electric Capital Corporation

13          75 East 55th Street

14          New York, NY 10022

15

16    BY:   HARVEY A. STRICKEN, ESQ.

17

18    FILARDI LAW OFFICES

19          Attorneys for Federal Express Corporation

20          65 Trumbull Street

21          Second Floor

22          New Haven, CT

23

24    BY:   CHARLES J. FILARDI, JR.

25

40

1

2    BIALSON, BERGEN & SCHWAB

3        Attorneys for NetApp, Inc. and Network Appliance Limited

4        2600 El Camino Real

5        Suite 300

6        Palo Alto, CA 94306

7

8    HENNIGAN BENNETT & DORMAN

9        865 South Figueroa Street

10       Suite 2900

11       Los Angeles, CA 90017

12

13   BY:   JOSHUA D. MORSE, ESQ.

14       (TELEPHONICALLY)

15

16   DUANE MORRIS LLP

17       30 South 17th Street

18       Philadelphia, PA 19103

19

20   BY:   MATTHEW E. HOFFMAN, ESQ.

21       (TELEPHONICALLY)

22

23

24

25

41

1              P R O C E E D I N G S

2         THE COURT:  Be seated, please.  Do we really have

3    standing room only at that spot?  Okay.

4         MR. KRASNOW:  Good afternoon, Your Honor.  Richard

5    Krasnow from Weil Gotshal & Manges on behalf of the debtors.

6    Your Honor, I believe that there is no one in this crowded

7    courtroom or the overflow courtrooms who has any interest with

8    respect to the motion that is currently before the Court and

9    that I will be addressing.  Your Honor will recall that on

10   Wednesday we sought a comfort order with respect to the

11   functions that Morgan Guaranty -- Chase was providing as

12   clearing agent.  It provided them with comfort that the

13   collateral that they then had would cover not only the pre-

14   petition advances that they made as clearing agent but also

15   those that occurred during the course of the case.  What is

16   before Your Honor this morning (sic) is essentially an

17   identical motion but as to Citibank.

18        THE COURT:  You've lost track of time.  It's this

19   afternoon.

20        MR. KRASNOW:  This afternoon, Your Honor.  Yes, I

21   have.  Your Honor, as I was saying, essentially the same as

22   that particular motion.  The order is essentially the same.

23   The differences only result from the changes in facts:  the

24   numbers, the amount of collateral, the level of transactions

25   that take place.  The collateral is cash.  There is no

42

1    determination being made in the order with respect to the

2    validity of the guaranties.  There is no provision in the order

3    with respect to setoffs.  Your Honor, we would rest on the

4    motion and request that the relief be granted.

5           THE COURT:  There are no objections that have been

6    filed but this was an emergency motion.  The courtroom is

7    packed.  This is, for all practical purposes, a clone of the

8    very same relief that was granted the other day in favor of

9    JPMorgan Chase.  Let me just verify that there are no

10   objections.  Mr. Despins?

11          MR. DESPINS:  Good afternoon, Your Honor.  Luc

12   Despins with Milbank Tweed with my partner Dennis Dunne and

13   also Paul Aronson.  Could we have -- not to indispose counsel

14   but could we have until the -- just an hour while the other

15   matter is proceeding so that we can confer with counsel just to

16   make sure that everything is not problematic?  We don't think

17   there will be a problem, Your Honor, but we just would like a

18   little bit of time to --

19          THE COURT:  Well, candidly, the reason that we're

20   doing this now is to dispose of something that was presumed to

21   be noncontroversial.

22          MR. DESPINS:  And I think --

23          THE COURT:   There's nothing that you've said that

24   tells me that it is controversial.  But what I'm going to do is

25   approve it subject to your review of the form of order to

43

1    satisfy yourself that the relief being granted to Citibank is

2    as represented of like type to the relief that was granted to

3    JPMorgan Chase.  Is that fair?

4              MR. DESPINS:  That's fine, Your Honor.

5              THE COURT:  Fine.  That's what we'll do.

6              MR. KRASNOW:  Thank you, Your Honor.

7              THE COURT:  You may approach, if that's what you're

8    doing.  I can't really tell.  Frankly, with so many people in

9    the courtroom, whenever I see the movement this way, I get a

10   little concerned.  Mr. Miller?

11             MR. MILLER:  Good afternoon, Your Honor.  It's sort

12   of difficult to believe, Your Honor, this is the fifth day of

13   this case.  In terms of hours, I think we're in the sixth

14   month.  In any event, Your Honor, as we described last

15   Wednesday, there are a lot of moving parts to this transaction.

16   And they've been moving with great velocity over the last days

17   since Wednesday.  And as a consequence, Your Honor, there has

18   had to be some major changes in the transaction.  And

19   unfortunately, they weren't finalized until about a half hour

20   ago.  What I would propose, Your Honor, is that if Your Honor

21   will give us a recess for approximately a half hour so we can

22   explain orally to this audience --

23             THE COURT:  Excuse me for one moment.  Excuse me.

24             MR. MILLER:  Going back, Your Honor, a recess for a

25   half hour so that we can orally explain to this audience the

44

1    nature of those changes and the significance.  We think that

2    will expedite the hearing.  One other thing, Your Honor, if I

3    might add, a large number of objections, Your Honor, relate to

4    cure amounts on the assumption and assignment of the executory

5    contracts, etcetera.  The way it was set up, Your Honor, is

6    that if you did not object to the cure amount today, you were

7    bound by the cure amount.  We're making a change in that, Your

8    Honor.  All rights to object to the cure amounts and to

9    whatever resolution comes out of that, Your Honor, we are

10   extending to October 3 so that there's no -- if you have a

11   motion or an objection based on the cure amounts, you need not

12   be concerned about it today.

13          THE COURT:  Does that mean that if there is a cure

14   objection that hasn't been filed prior to the commencement of

15   today's hearing that there's effectively a broad-based

16   extension for all such parties to file objections --

17          MR. MILLER:  That is my impression, Your Honor.

18          THE COURT:  -- on or before the 3rd of October?

19          MR. MILLER:  That's my impression, Your Honor.

20          THE COURT:  And is there any provision for a hearing

21   in connection with disputes regarding cure amounts?

22          MR. MILLER:  Only if the parties don't come to an

23   agreement.

24          THE COURT:  Fine.

25          MR. MILLER:  Thank you, Your Honor.  So I think that

45

1   if people have objections based upon that, they should be

2   somewhat relieved.

3           THE COURT:  All right.  And I'm sure if there are

4   questions during the break, they'll approach you or your

5   partners.

6           MR. MILLER:  Thank you, Your Honor.

7           THE COURT:  I think if a half hour is what you think

8   you need --

9           MR. MILLER:  Yes.

10          THE COURT:  -- why don't we say 5:15 with the

11  understanding that time has proven to be very flexible here in

12  the past this week.  And it may turn out that we'll need a

13  little bit more time.  But let's make that the holding time and

14  if there's a need for more, somebody should just knock on my

15  chambers door and let me know what's required.

16          MR. MILLER:  Thank you, Your Honor.

17          THE COURT:  Okay.  We're adjourned until 5:15

18  provisionally.

19      (Recess from 4:43 p.m. until 5:41 p.m.)

20          THE COURT:  Please be seated.  I find myself in the

21  unusual position of being perhaps the only person in the

22  courtroom who doesn't know what everybody else knows because I

23  didn't hear what you told everybody.  Do you want to tell me

24  anything?

25          MR. MILLER:  Somehow, Your Honor, we knew you were

46

1    going to ask that question.  So --

2         THE COURT:  I hate to be that predictable.

3         MR. MILLER:  There is a document -- maybe it'd be

4    better, Your Honor, if we do it orally.

5         THE COURT:  Fine.

6         MR. MILLER:  My partner, Ms. Fife, will do that.  And

7    with some assistance from Ms. --

8         THE COURT:  Let me just check on something because --

9    and this is purely technical.  During the first phase of the

10   hearing, I was told that those people who are listening in

11   spillover courtrooms had a very hard time hearing me.  I'm

12   having some difficulty as compared with our last hearing with

13   the amplification coming out of the podium.  And I just want to

14   make sure that we're not suffering system overload.  Okay.

15   That's on.  And let me also make the announcement, whenever

16   anyone speaks for the record, this is always true here, but

17   given the number of people, please identify yourself before

18   speaking.

19        MS. FIFE:  Thank you, Your Honor.  Lori Fife from

20   Weil Gotshal & Manges on behalf of the debtors.  Let me try to

21   summarize the changes that were made to the transaction.  In

22   terms of the economic changes, they result largely because of

23   the markets, unfortunately.  And from the time that the

24   transaction was actually entered into till now, the markets

25   dropped and the value of the securities dropped as well.

47

1          So, originally, we were selling assets that had a

2   value of seventy -- approximately seventy billion dollars.  And

3   today, Your Honor, we're only selling assets that have a value

4   of 47.4 billion dollars.

5          Barclays is assuming liabilities, however, of 45.5

6   billion dollars in connection with those assets.  So that has

7   not changed from the original transaction.  There was an upside

8   sharing in the original transaction.  There was going to be a

9   true-up twelve months later on and that has been eliminated

10  from this transaction.

11         Barclays is still agreeing to pay the cure amounts on

12  any leases that it assumes or that we assume and assign to it.

13  Barclays is also agreeing to the same employee compensation

14  arrangements.  And it is also agreeing to pay the 250 million

15  dollars of goodwill to LBI.

16         With respect to the real estate assets, Your Honor,

17  that was -- we had said at the last hearing, I believe, it was

18  approximately a billion dollars.  Since that time, an appraisal

19  has come in and it is below that amount.  The contact had a

20  provision which allowed the purchaser really to purchase the

21  building at the appraised amount.  So we have some negotiations

22  to go, but I believe that the purchase price will come down by

23  approximately a hundred million dollars.

24         There were two other real estate properties also

25  which we received appraisals for which, similarly, were lower

48

1    than we had anticipated, unfortunately.  So I think,

2    cumulatively, we're expecting that the purchase price will come

3    down by a hundred to maybe 200 million dollars for the real

4    estate.

5         Some other changes that were made to the contracts

6    affect what are called purchase assets and what are excluded

7    assets.  There was some confusion as to which subsidiaries, if

8    any, were being sold.  And we've clarified in a clarification

9    letter which we're hoping to finalize and actually present to

10   Your Honor whenever it comes down here.  But in that letter,

11   we're going to clarify that the only subsidiaries that are

12   being purchased by Barclays are Lehman Brothers Canada Inc.,

13   Lehman Brothers Sudamerica SA and Lehman Brothers Uruguay SA.

14   The latter two subsidiaries that I just referred to relate to a

15   business that is called PIM, or Private Investment Management

16   Business, which is a business that was not part of the original

17   deal but is now being purchased by Barclays.

18        THE COURT:  For no additional consideration?

19        MS. FIFE:  That's correct, Your Honor.

20        THE COURT:  And what's that business worth?

21        MS. FIFE:  It's essentially just people, Your Honor.

22   It's the high net worth individual brokerage business.  And

23   it's really just the people who are in those offices.

24        THE COURT:  And their rolodexes.

25        MS. FIFE:  And their rolodexes, exactly.  The

49

1    customer accounts were being transferred anyway.

2            There was a change that was made to the license of

3    the Lehman Brothers' name.  It was perpetual.  It is now two

4    years but we don't really believe that that's a problem.  The

5    IMD business, which is essentially Neuberger Berman and some

6    other related entities, will have a perpetual license to use

7    the name.

8            There was a provision in the old agreement pursuant

9    to which the parties were sharing the residential real estate

10   mortgages.  There is no longer that provision.  Barclays was

11   required to post collateral, actually this morning, in order to

12   get DTC to open up trading.  And that collateral was posted --

13   the residential real estate mortgages was posted to DTC.

14   Pursuant to this transaction, Barclays is taking over and

15   guaranteeing all of those transactions.  And they are assuming

16   the risk related to those transactions so that collateral will

17   remain with Barclays.

18            THE COURT:  What's the aggregate value of the posted

19   collateral?

20            MS. FIFE:  One second, Your Honor.

21        (Pause)

22            MS. FIFE:  Your Honor, I'm not -- excuse me?  There

23   are 300,000 trades but we're not sure the value of the

24   collateral.  Perhaps during the rest of the hearing we can find

25   that amount out for Your Honor.

50

1          THE COURT:  Okay.  I'm not entirely sure I'm

2    understanding the overall impact of the change in the sharing

3    of the residential mortgage collateral and whether or not that

4    constitutes a benefit to the estate or a detriment to the

5    estate.  Which do you think it is?

6          MS. FIFE:  It's hard to tell.  It depends on which

7    way those trades come out.  But we believe it's a benefit to

8    the estate because it allowed trading to continue this morning

9    because DTC and NASDAQ were unwilling to allow Lehman to

10   continue trading without this posting of collateral which was

11   very important to the company, obviously.  So we were able to

12   work out this arrangement whereby Barclays would stand behind

13   the trades.  It is the debtors' belief that it's a necessary

14   part of the transaction.

15         THE COURT:  Okay.  And I realize I'm asking a lot of

16   questions about things that may have been fully explained when

17   I was in chambers, but Barclays' undertaking to stand behind,

18   as you put it, this posted collateral, how is that documented?

19   And what happens in the event that the transaction that we're

20   now talking about is not approved or is delayed?

21         MS. FIFE:  It was documented in the First Amendment

22   to the asset purchase agreement, which we actually do have and

23   if the transaction is not consummated -- I'm actually not sure

24   of the answer, Your Honor.  I'm sorry.  I believe Barclays is

25   liable.  Oh, okay.  So, I'm advised by my partner that if the

51

1  transaction's not consummated then the transactions -- all the

2  trades come back to Lehman, and Lehman is then responsible for

3  them.  Excuse me for one second, Your Honor.

4      (Pause)

5          MS. FIFE:  I'm being told that if the liabilities are

6  less than the collateral then the excess collateral comes back

7  to Lehman.

8          THE COURT:  And if the liabilities are greater?

9          MS. FIFE:  We have no further obligation.

10         THE COURT:  Okay.

11         MS. FIFE:  We also modified the agreement -- would

12 you like the representative from DTC to explain that in more

13 detail, Your Honor?

14         THE COURT:  Mr. Hirshon, I'd be happy to hear from

15 you.

16         MR. HIRSHON:  Good afternoon, Your Honor.  Nice to be

17 before you.  Sheldon Hirshon, Proskauer Rose, representing the

18 composite -- the trust clearing corporations.  Your Honor, the

19 essence of the transaction is to move all of the accounts

20 seamlessly from Lehman to Barclays.  What DTC does is the

21 plumbing of that and handles all of the details in the settling

22 of the trades.

23         THE COURT:  Is that how they describe themselves?

24         MR. HIRSHON:  That's how I describe them because

25 until Sunday, I didn't understand any of this.  But it is what

52

1   spigots get turned on and off and how the pipeline is filled

2   and then emptied.  So each day -- there are several different

3   clearinghouses.  And each day the trades are matches and then

4   either a net number goes to Lehman or from Lehman to DTC or any

5   of its clearing companies.  There was a depository that holds

6   all of the securities.  The residential mortgages that you've

7   heard about that were going to be split fifty/fifty are in the

8   DTC registry.  We hold them now.  They are there.  Originally,

9   the idea for the original transaction was to split those

10  fifty/fifty between Barclays and the estate.  But in order to

11  facilitate the settlement of these accounts, the additional

12  fifty percent was needed so that DTC would not be at risk for

13  the settlement.  So the --

14          THE COURT:  So this modification principally is for

15  the benefit of your client?

16          MR. HIRSHON:  Correct.  And for the transaction,

17  because without it trading would have stopped.  There would be

18  no business to sell because there would have been no -- no

19  trades cleared today.  So it was to facilitate the transaction

20  as a friend to the transaction that this was done so that the

21  business continues to operate today.  Now, the arrangement is

22  that the whole six billion dollars of residential mortgages

23  will be there and subject to settlement.  But the anticipation

24  is that once all these claims settle, the trades that are from

25  Wednesday through Monday settle, there will not be a need for

53

1    all of that collateral.  So what the amendment to the APA says

2    is that the fifty percent will be returned, as long as it's

3    there.  If something really terrible happens in the world and

4    the settlements don't work and we have to use that collateral,

5    then there will be nothing to return.  But the anticipation is

6    that if the world remains somewhat stable that the fifty

7    percent that was now transferred to Barclays will be

8    transferred back to Lehman.  That is the expectation.

9          THE COURT:  All right.  I appreciate that

10   explanation.

11         One comment before you continue, Ms. Fife.  I'm just

12   once again hearing the Geiger counter.  And we are connected to

13   two extra courtrooms and I know that there are people

14   participating at various occasions by telephone through

15   CourtCall.  And I'm hearing increased static on the line.  So,

16   I'm just going to request everybody who is participating in

17   this hearing, whether by telephone or in person, who has an

18   electronic device to shut it off.  And if you're on the phone,

19   since you're just listening, please mute your phone.

20         MS. FIFE:  Thank you, Your Honor.  I'll continue

21   going through some of the changes, if that's okay.  There was a

22   provision in a deal originally which required the debtors to

23   transfer 700 million dollars in cash to Barclays.  And that is

24   no longer the case.  There's no cash that's being transferred

25   to Barclays.

54

1          In addition, there was a provision in the contract

2     where Barclays was going to purchase a company called Eagle

3     Energy Management and they are no longer going to purchase that

4     entity.

5          We clarified, because a number of creditors had some

6     concerns during the -- yesterday we had a meeting with the

7     creditors and they were asked some questions regarding

8     intercompany claims.  We made it very clear in this

9     clarification that we are not transferring any intercompany

10    payables or receivables.  Those remain with the particular

11    entities.

12         There was a reference in the agreement to a mortgage

13    that was on the 745 Seventh Avenue property.  And as it turned

14    out, Your Honor, there is no mortgage on that property.  So we

15    deleted that reference.  There was a 500 million dollar

16    promissory note made by 745 in favor of an affiliate which will

17    be repaid and extinguished.

18         Those are the major changes to the transaction.

19    There were some other clarifications that we made but I don't

20    consider them material, Your Honor.

21         THE COURT:  I still consider 500 million dollars

22    material, though.

23         MS. FIFE:  Yes.

24         THE COURT:  So, the money that's due an affiliate,

25    what affiliate is that?  And as a result of the payment, how

55

1   does that impact the overall realization to the estate?

2          MS. FIFE:  Umm --

3          THE COURT:  Maybe it doesn't.

4          MS. FIFE:  Yeah.  I don't think it does, Your Honor.

5   We still anticipate that the full purchase price will be paid

6   to 745 and then transferred up to the holding company and the

7   note will be extinguished -- I'm sorry?  Yeah.  It already has

8   been extinguished.

9          THE COURT:  Okay.

10         MS. FIFE:  Do you have any further questions, Your

11  Honor?

12         THE COURT:  I may have some as we proceed.  It's hard

13  for me to tell, based upon this helpful oral presentation, how

14  the deal has moved in terms of material changes and whether or

15  not those changes affect, in any way, the objectors and whether

16  or not these are changes that make the objectors happy or sad.

17         MS. FIFE:  Right.

18         THE COURT:  It's unclear to me at the moment because

19  I haven't had a chance to reflect on it and I don't know what

20  documents have been prepared that will clarify this.  But I'm

21  confident that as the evening progresses, I'll learn more.

22         MS. FIFE:  Yes.  We're hopeful that we'll have the

23  documents so that everyone can look at them.  And just one

24  other thing I wanted to point out to Your Honor, we are keeping

25  approximately twenty million dollars -- twenty billion dollars

56

1    of assets in LBI that are not being transferred.  So those

2    assets will have value and inure to the benefit to the SIPC

3    estate.  Okay?

4             THE COURT:  Thank you for that.

5             MS. FIFE:  I'm now going to turn it over to Mr.

6    Miller.

7             MR. MILLER:  Your Honor, I don't think it's necessary

8    to repeat that we did make another change in connection with

9    the time to object to cure amounts which was in --

10            THE COURT:  I remember you said that before.  One

11   thing I do want to take care of as a piece of unfinished

12   business from before the break.  And that's the creditors'

13   committee's position with regard to the Citibank comfort order.

14            MR. DESPINS:  Your Honor, there was a reason why

15   there was some -- we couldn't address it is 'cause our

16   conflicts counsel was going to look at those issues.  Susheel

17   Kirpalani is here and he will address that, Your Honor.

18            MR. KIRPALANI:  Good evening, Your Honor.  Susheel

19   Kirpalani of Quinn Emanuel for the creditors' committee.  Your

20   Honor, it's been represented to us that this is the same type

21   of relief that was requested with respect to the Chase motion.

22            THE COURT:  It was represented to me as well.

23            MR. KIRPALANI:  Yes, Your Honor.  It appears that the

24   language is the same.  The Chase motion -- or the Chase order

25   dealt with securities and cash.  And so the language is a

57

1    little bit different.  It talks about how the pre-petition

2    amounts are -- or the post-petition amounts are secured by as

3    opposed to have an allowable setoff right.  And while I agree

4    that's not a distinction with a difference, the one thing

5    that's not clear to me from the Chase motion is the mutuality

6    issue.  I apologize, but the timing is such that I've been

7    getting e-mails from my office.  If I could just ask the

8    debtors, was there no mutuality issue in the Chase motion and

9    the same issue here?  Meaning that in the Chase motion, was it

10   clear that the accounts and the obligations were both owed by

11   the same entity and the same thing is true here?  Or are we

12   relying on a contract exception to mutuality?

13        MR. KRASNOW:  Your Honor, both as to the JPMorgan

14   Chase agreements, so too as with respect to the Citibank

15   agreements, Holdings is the guarantor.  And it is Holdings'

16   collateral which was at issue in both instances.  So, other

17   than JPMorgan Chase dealing with securities and cash, although

18   as to the Holdings company, it was just cash, as I recall, with

19   respect to Citibank, it is just cash.  So in all material

20   respects, the orders are identical, Your Honor.

21        THE COURT:  I'm satisfied.  Are you?

22        MR. KIRPALANI:  Yes, Your Honor.

23        THE COURT:  Good.

24        MR. KRASNOW:  Thank you.

25        MR. KIRPALANI:  Thank you, Your Honor.

VERITEXT REPORTING COMPANY

212-267-6868                                           516-608-2400

58

1          THE COURT:  The order will be entered.

2          MR. KRASNOW:  Your Honor, may I be excused?  I think

3    that was my only --

4          THE COURT:  I'm sorry?

5          MR. KRASNOW:  I think that was my only business here.

6    Should I be excused?

7          THE COURT:  You mean, you don't want to stay?  Sure,

8    you may be excused.

9          MR. KRASNOW:  Thank you, Your Honor.

10          MR. MILLER:  Good evening, Your Honor.

11          THE COURT:  Good evening.

12          MR. MILLER:  You know, Your Honor, as I was sitting

13    here listening to what was going on, it occurred to me that the

14    way we do business today is so different from the way we used

15    to do business.

16          THE COURT:  It could be you.

17          MR. MILLER:  It could be me.  I had trouble getting

18    through security today.

19          THE COURT:  Do you have anything on in your pocket?

20          UNIDENTIFIED SPEAKER:  Are you radioactive?

21          MR. MILLER:  I think my flak jacket, Your Honor.  I

22    think that's it.  These decisions, Your Honor, are being made

23    almost in split second timing.  One has to think about the

24    decisions that were made in connection with the bailout at Bear

25    Stearns.  How much time was devoted to that?  The decision to

59

1    open access to the Primary Dealer Credit Facility at the

2    Federal Bank to support the banking industry, to commit the

3    federal government to what might be hundreds of billions of

4    dollars to save Fannie Mae and Freddie Mac and to have the

5    government advance eighty-five billion dollars to save AIG.

6    And now, Your Honor, within the space of maybe a few days for

7    the government to adopt a variation of the Resolution Trust

8    Company or the Reconstruction Finance Corporation to save the

9    economy and the welfare of the people who are dependent upon a

10   stable economy.

11         The tragedy of Lehman, Your Honor, is part and parcel

12   of the design to preserve and stabilize financial markets.

13   Access to federal funding to maintain the business of Lehman

14   Brothers incorporated the need to put Lehman Brothers Holdings

15   Inc. into Chapter 11 as part of a plan to move that sensitive

16   business of LBI to a qualified buyer as soon as possible.  A

17   buyer who meets the qualifications necessary to operate such a

18   business -- which is a universe, I might add, Your Honor, that

19   is only limited to a few possible candidates.  In making those

20   decisions that the government or parties involved wait for

21   ordered reports, appraisals, physical inventories, a review of

22   each and every document relating to the transaction, I think,

23   Your Honor, the answer is no.  They had to do what was

24   necessary to protect the greater good and not to lose the

25   forest for the trees.

1        Clearly, our economy was and is dependent upon those

2    decisions and sole decisions which would come in the future few

3    weeks.  The decisions affected and would affect millions of

4    people.  In the case of Lehman, it affects directly the 25,000

5    employees whose futures became extremely clouded because of the

6    events of last weekend.

7        The future of many of those people hangs in the

8    balance in connection with the transaction before the Court.

9    If it's not approved, no one can predict with any certainty the

10   consequences other than to note that there will be additional

11   turmoil and thousands of transactions will be suspended.  The

12   volatility and distress of the liquidation of collateral

13   positions will be unmatched in history.  The unemployment rolls

14   for the metropolitan area will increase dramatically, not to

15   mention the financial losses incurred by ordinary people who

16   would be prejudiced by their inability to reach their accounts.

17       Expedition, Your Honor, is mandatory.  Events move

18   with the velocity that almost defies comprehension.  In this

19   kind of world, form cannot be exalted over substance.  The

20   substance of this transaction is to continue a business for the

21   benefit of the general economy, the employees whose lives are

22   at stake and to fit a small piece into the jigsaw puzzle of

23   maintaining a stable economy.  We cannot take the risk of

24   rejecting this transaction because of ambiguities, the lack of

25   a piece of paper to support every element of the assets to be

61

1    transferred, the lack of definition as to particular items.  We

2    have to think and we have to act in the same manner that the

3    decisions were made by the government and others over the past

4    week to expend billions and billions of dollars to shore up the

5    economy.  Lehman is here because it was necessary to assure

6    LBI's access to the support of the Federal Reserve Bank and the

7    SEC support and to allow LBI access to the window to support

8    the transactions that were pending before there was a run on

9    the bank.  To dissipate that effort, by rejecting a transaction

10   that is intended to save jobs, protect customers and enable a

11   relatively smooth transition of the LBI business and bring

12   value to all involved, would be a miscarriage of justice and

13   detrimental to the national interest.

14           Since the hearing last Wednesday, and in the space of

15   roughly twenty-four hours, Your Honor, there have been a number

16   of significant events.  Yesterday, the Chicago Mercantile

17   Exchange unilaterally decided to close out all of Lehman's

18   positions on that exchange.  That closeout resulted in a loss

19   to Lehman of approximately 1.6 billion dollars.  Earlier this

20   afternoon, Your Honor, the Securities Investor Protection

21   Corporation initiated a proceeding under the Securities

22   Investor Protection Act in the United States District Court for

23   the Southern District of New York.

24           THE COURT:  Excuse me, Mr. Miller.  You're being

25   interrupted, as is this entire proceeding, by someone who's on

62

1    the telephone who's whispering into the courtroom.  As I said

2    at the outset, everybody who is listening on the phone, mute

3    your phone.  Everybody who has an electronic device, find it

4    and shut it off or throw it away.

5         MR. MILLER:  Your Honor, as I was saying, this

6    afternoon the Securities Investor Protection Corporation

7    initiated a proceeding under the Securities Investor Protection

8    Act in the United States District Court for the Southern

9    District of New York.  Mr. James Giddens, an attorney and

10   experienced SIPC trustee, has been appointed as trustee in the

11   SIPC proceeding.  LBI consented to the commencement of the SIPC

12   proceeding.  And during the past few days, Mr. Giddens was

13   provided with information concerning the state of affairs at

14   LBI and the need for expedition and support of the sale

15   transaction.  Mr. Giddens is a recognized SIPC trustee and a

16   man of great talent, Your Honor.  He recognized the

17   extraordinary nature of what is occurring and, unusual for a

18   SIPC proceeding, SIPC and the trustee have agreed that trading

19   in customer accounts --

20        THE COURT:  Sorry.  Technical difficulties.

21        MR. MILLER:  In that SIPC proceeding, Your Honor, the

22   trustee and SIPC have agreed that trading in customer accounts

23   may continue in the ordinary course of business rather than be

24   suspended as is usual in a SIPC proceeding.  SIPC and the

25   trustee have expended extraordinary efforts in an extraordinary

63

1    case to protect the public customers and ensure stability and

2    preservation of customer interests.  Their actions are to be

3    commended, Your Honor.  And I believe, Your Honor, that the

4    SIPC proceeding has been referred, I hope, to Your Honor.

5            THE COURT:  I've seen Judge Lynch's order.  I have a

6    certified copy of it and the order includes a decretal

7    paragraph removing those proceedings to this court.  I'm

8    satisfied that the seal is in fact genuine and I'm prepared to

9    proceed with full authority.

10           MR. MILLER:  And, Your Honor, Mr. Giddens is here

11   with Mr. Kevin (sic) Caputo from SIPC and the president of

12   SIPC, Your Honor, Mr. Stephen Harbeck who's sitting in the jury

13   box.

14           THE COURT:  Gentlemen, welcome.

15           MR. GIDDENS:  Thank you, Your Honor.

16           MR. MILLER:  Barclays, Your Honor, has extended the

17   sale to enable this extraordinary transaction and hopefully to

18   be consummated.  Yesterday, as Your Honor has heard, Barclays

19   basically stepped into the shoes of the Federal Reserve in

20   connection with the Primary Dealer Credit Facility as to the

21   45.5 billion dollars Lehman borrowed last Monday and received

22   the collateral that Lehman had posted in connection therewith.

23           Because of the circumstances this week, Your Honor,

24   the operations of LBI have resulted in approximately 300,000

25   sales, which is very significant.  In addition, Your Honor,

64

1    because of the administration proceeding in the United Kingdom

2    for LBIE and the freezing of all of the assets of LBI that were

3    in the possession of LBIE, which I believe, Your Honor, stands

4    for Lehman Brothers England, relating to repo financings, the

5    result is that we were unable -- or LBI is unable to deliver to

6    Barclays the assets that were originally intended under the

7    APA.  That's one of the reasons, Your Honor, for the amendments

8    that we heard about earlier today.

9           There are many moving parts in what we are trying to

10   do, many of which are beyond the control of Lehman or Barclays

11   as market forces operate to affect the value of the transaction

12   and the assets.  Enormous problems did arise in connection with

13   clearing transactions that have caused a number of

14   modifications to the transaction.  The necessity of assuring

15   DTC and other clearing institutions who will not expose

16   themselves to additional liability of some kind has been

17   enormously time consuming.

18          It's because of that, Your Honor, that we have heard

19   about these changes.  But if Your Honor will look at the basic

20   agreement, the amount of cash consideration will be relatively

21   the same except for the issues with respect to the value of the

22   real estate.  The 250 million dollars being paid for the

23   goodwill of LBI will go to LBI.  The real estate, 745 Seventh

24   Avenue, and the two data centers in New Jersey, that's with a

25   variation, Your Honor, and there's some negotiation to be done

65

1      with Barclays in connection with that.  And so there might be a

2      decrease of that one billion four fifty that we talked about on

3      Wednesday to something in the area of a billion three to a

4      billion three fifty, in that area.

5              THE COURT:  Let me break in with respect to that

6      issue --

7              MR. MILLER:  Sure.

8              THE COURT:  -- because it's something that concerns

9      me.  I read most of the objections --

10             MR. MILLER:  Yes, sir.

11             THE COURT:  -- and there were a lot of them.  And I

12     may have missed some that came in late.  But none of them

13     picked up the issue that concerned me.  As I view the

14     transaction, and I need your help in telling me if I'm seeing

15     it incorrectly, most of the value is attributed to the real

16     estate.  But there has been no traditional marketing effort for

17     the real estate.  Instead, the real estate represents a tie-in

18     to the sale of the broker dealer assets and the preservation of

19     markets and employment.  One of the things that I think you may

20     need to get over for purposes of today's evidentiary hearing,

21     in terms of the showing you need to make, is that the

22     transaction as it relates to the real estate in particular is

23     fair value.

24             I know nothing about this appraisal.  I don't know

25     who commissioned it.  I don't know who the appraiser is.  I

66

1    don't know if he or she is in court.  But I am, frankly,

2    concerned that we're all hearing -- and maybe others heard it

3    earlier but I'm hearing it only now -- that there is this

4    negative variance in the assumed value of the real estate.  And

5    I find that troublesome.

6         MR. MILLER:  Yes, sir.  We will try to deal with

7    that, Your Honor.  Now, Your Honor, in connection with going

8    forward in the transaction, I don't know what order Your Honor

9    wants to go in, whether you want to hear oral statements of

10    objections or should we move right to the evidentiary hearing?

11         THE COURT:  Well, one of the things I'd like to do,

12    and it's really to verify something, I don't recall seeing an

13    objection from the official creditors' committee.  And I don't

14    know, as a result of that, whether the committee supports the

15    transaction, has issues with respect to the transaction or has

16    given you notice of whatever objections they might have.  So it

17    seems to me that because of the expedited nature of today's

18    proceeding, we agreed Wednesday that written objections were

19    not necessary and, particularly, not necessary in the case of

20    the committee which had just been formed.  I'd like to know

21    what the status is as it relates to that important

22    constituency.

23         MR. MILLER:  Mr. Despins informed me, Your Honor,

24    before the hearing -- I'm losing my voice -- that the committee

25    will not object to the transaction but does not support it.  So

67

1    they're not affirmatively -- I think not affirmatively going to

2    stand up and say --

3              MR. DESPINS:  Why don't I address that, Your Honor?

4              MR. MILLER:  Sure.

5              THE COURT:  I think that would be helpful.

6              MR. MILLER:  Don't change your position.

7              MR. DESPINS:  Good afternoon, Your Honor.  Luc

8    Despins with Milbank Tweed, proposed counsel for the committee.

9    I'm here with my partners, Paul Aronson and Dennis Dunne.  The

10   headline is we are not objecting, Your Honor, but although

11   we'll have some minor comments to the form of order, which we

12   don't need to detain the court order at this point.  And the

13   reason we're not objecting is really based on the lack of a

14   viable alternative.  And, Your Honor, we're still a little bit

15   puzzled by the statement by Mr. Miller that we're not

16   affirmatively supporting.  And that's correct.  We're not

17   affirmatively supporting the transaction, Your Honor, because

18   there has been insufficient time for us to really do all the

19   due diligence that we would feel should be done to take that

20   next step of saying yes, this is the best deal and we're

21   supportive actively.  We've met with the debtor.  They've been

22   very cooperative.  I don't want to imply that they have not

23   been but we have not had time to test the assumptions and do

24   all the due diligence we would normally do.  So that is, Your

25   Honor, the distinction.

68

1           The second message, Your Honor, which is not directed

2    at Your Honor but really at the debtor and, generally, at also

3    regulators, is that the committee, although we're not objecting

4    to this transaction, we understand we're dealing with

5    extraordinary circumstances, as Your Honor has described.  The

6    committee fully expects that after this, we're going to go back

7    to what I would call --

8           THE COURT:  A more conventional model?

9           MR. DESPINS:  Yes.  Business as usual for Chapter 11,

10   if you will, Your Honor.  The committee feels very strongly and

11   wanted me to say that they recognize the extraordinary nature

12   of what's going on here but they feel their duties are to pre-

13   petition creditors, not to the market participants, not to the

14   economy at large or other participants in those markets.  And I

15   think that that's very important and it's very important to the

16   committee that I convey that message, again, not to Your Honor,

17   but really to the debtor and other parties in this case.  So

18   that is where we stand, Your Honor.

19          THE COURT:  I appreciate that.  And it lifts the fog

20   over at least that aspect of the case.  And I'm grateful for

21   the comment.  Has there been any --

22          MR. MILLER:  Your Honor, we --

23          THE COURT:  Has there been any resolution by

24   agreement of any of the other objections?  Or are they all live

25   at this point --

69

1          MR. MILLER:  As far as --

2          THE COURT:  -- except for the cure amounts perhaps?

3          MR. MILLER:  As far as I know, Your Honor, I have to

4    say, Your Honor, there wasn't really time.  They were cascading

5    through the electronic filing at such a rate, it was almost

6    impossible to keep up with them.

7          THE COURT:  I know.

8          MR. MILLER:  And so, with people dedicated to doing

9    the clarification of the APA -- of the asset purchase

10   agreement, there really wasn't an adequate amount of time.  As

11   Mr. Despins says, Your Honor, this is such an exceptional

12   circumstance, I would feel relieved to get back to the ordinary

13   Chapter 11 process.  It would be good for everybody's health.

14   But this is just an unusual situation.  And while I understand

15   the committee's views and the parochial views as to general

16   unsecured creditors, we are facing a bigger picture and a very

17   difficult severe picture for everybody involved.  And in

18   addition to the people in this courtroom, Your Honor, the

19   telephone is going -- just I can't tell you the rapidity of

20   calls from people, where's -- how can I get my securities?

21   This is my pension fund.  And so on.  This is a tragedy, Your

22   Honor.  And maybe we missed the RTC by a week.  That's the real

23   tragedy, Your Honor.

24         THE COURT:  That occurred to me as well.

25         MR. MILLER:  So I defer to Your Honor as to the

70

1    procedure for going forward.  Should we have -- I would waive

2    opening statements at this point, Your Honor, since I've

3    already made mine.

4        THE COURT:  Well, I propose the following.  And I

5    think you've made your opening statement.  I would propose the

6    following.  I would like to hear -- I'm not sure what the right

7    time for that is -- from counsel for the SIPC trustee or the

8    SIPC trustee, beyond the fact that we've commenced a case, and

9    understand a little bit more about how that parallel proceeding

10   that is happening as we speak, in conjunction with the sale

11   process, truly does tie together with what we're now doing.

12   And I think that it would be useful for me to have an

13   evidentiary record that supports the sale motion.  Once that

14   record is made, either through proffer or live testimony, based

15   upon the willingness of objectors to do it through proffer --

16   and if they object, that's fine.  We can have witnesses.  I

17   think it would be useful then to move on to the merits of the

18   objections and deal with the legal issues that confront us.

19       MR. MILLER:  Yes, Your Honor.  Mr. Caputo from SIPC

20   is here with us today.

21       THE COURT:  Fine.  Before he gets up, let me just

22   confirm that what I have -- often what I say is acceptable to

23   people when they hear it.  But -- at least when I'm sitting

24   here.  But is what I have outlined consistent with your views?

25       MR. MILLER:  Whatever you say, Your Honor, is

1    acceptable to me.

2         THE COURT:  Fine.  I figured you'd say that.  Let's

3    hear from the SIPC trustee.

4         MR. CAPUTO:  Your Honor, my name is Kenneth Caputo.

5    I am counsel for the Securities Investor Protection Corporation

6    and I will be brief in my remarks and let counsel for the

7    trustee step in.

8         We did commence a case earlier today before Judge

9    Lynch intended to protect public customers of LBI.  That has

10   commenced the SIPA liquidation which brings into there all of a

11   different proceeding but for the most part, it is essentially a

12   bankruptcy proceeding, Chapters 1, 3, 5 and subchapters 1 and 2

13   of Chapter 7 all apply in a SIPA case specifically.  The unique

14   nature of what we have done in this case -- there are a few,

15   but first I have to mention the collaborative nature of the

16   proceeding that we had with all of the different regulatory

17   agencies.  We had tremendous cooperation from the SEC, from the

18   Federal Reserve Bank of New York, from the CFTC, from private

19   parties, if you will, JPMorgan Chase, DTC.

20        I'm apologizing if I leave anybody out.  But we came

21   together with a collaborative approach to deal with these

22   exigent circumstances, these truly unique circumstances.  And

23   the other thing we've done is permitting the trustee to operate

24   the business of the debtor under 721 of the Code for a limited

25   period of time.  That period of time to allow for transactions

72

1    to be affected expired at 6 p.m. this evening.  And that was at

2    the urging of regulatory agencies and DTC to permit many more

3    contracts to be settled and then moved out of the entity so

4    that these individual customers can gain access to their

5    property in a quicker fashion.

6           The trustee also has the ability here to complete

7    settlement of transactions through next Tuesday, which is a 6

8    p.m. date on that regard, and to take other actions as

9    necessary to allow for the orderly transfer of customer

10   accounts.  It is SIPC's goal here to get out of the way of the

11   normal and ordinary course of business and the fair and orderly

12   market transactions that can be affected so that not only the

13   institutional but the public customers of LBI have access to

14   their account in as quick a fashion as possible.  It is my

15   understanding, based on representations from LBHI and their

16   participants, that we're talking about more than 600,000

17   accounts.  Many of them are institutional.  I believe the

18   number is somewhere in the range of 130,000 customer accounts

19   non-institutional.  There was some allusion today to the PIM

20   aspect of the transaction which was affected and performs a new

21   part of the deal.  Your Honor had a question about it.  We

22   support it.  It allows these customers, these high net worth

23   customers, essentially, to be moved and Barclays is assuming

24   those customers on the same platform at DTC, is my

25   understanding, that existed.  So this is also going to permit

73

1    the effective administration of that estate of the trustee and

2    have less to do, essentially, Monday morning.  And we stand

3    back from the proceeding at first but we have committed all of

4    the energy and all of the resources of SIPC to enable the SIPC

5    trustee to get his work done, to enable Barclays to step in,

6    take over the accounts that they are willing to take over and

7    then to deal with the other transactions in the ordinary course

8    of business as necessary.

9            THE COURT:  Let me ask you a question about the

10   timing imperative as it relates to the undertakings of your

11   client.  You mentioned a 6 p.m. cutoff date, I think, on

12   Tuesday.

13           MR. CAPUTO:  Yeah.

14           THE COURT:  In order for this transaction to be

15   optimally closed from the perspective of SIPC, when should it

16   close?  Does it need to close this weekend before the markets

17   open on Monday?

18           MR. CAPUTO:  The sale transaction?

19           THE COURT:  Yes.

20           MR. CAPUTO:  As soon as possible it needs to close.

21   The sooner the better.  That's going to provide certainty to

22   parties and counterparties so that they can take the actions

23   that they deem necessary to protect their clients but it also

24   provides certainty to the hundreds of thousands of customers.

25   And that provides comfort to the markets and I think comfort on

74

1    a national scale as Mr. Miller alluded.

2        THE COURT:  So without putting any more words in your

3    mouth, would it be your position on behalf of your client that,

4    assuming the sale transaction that has been proposed to me

5    today is approved, that the approval should happen before the

6    close of today's hearing?  In other words, we should stay here

7    as late as we need to in order to get this done?

8        MR. CAPUTO:  Yes, Your Honor.  That would be our

9    recommendation.

10        THE COURT:  Fine.

11        MR. CAPUTO:  And if I may, Your Honor, I'd defer to

12    Mr. James Kobak, counsel for Hughes Hubbard who is counsel to

13    the trustee, to fill you in on some of the particulars

14    involving the actions that the trustee will take.

15        THE COURT:  All right.  Thank you.

16        MR. KOBAK:  Good afternoon, Your Honor.  Actually,

17    Mr. Caputo has done a lot of my job for me.  So I would just

18    like to echo everything he said, especially the extraordinary

19    cooperation of everybody involved.  Mr. Giddens is here and

20    he's prepared, and I think, in fact, he would probably like to

21    address you and some of the other counsel if you think that's

22    appropriate.  I do have a couple of housekeeping items or maybe

23    a little more than housekeeping.  This case has now been

24    officially assigned to you.  It's on the docket and so forth.

25    We have an administrative order which would do things like

75

1   change the caption, approve the form of notice and so forth.

2   So we'll be filing that either over the weekend or sometime

3   early next week and probably put it on before Your Honor,

4   subject to Your Honor's calendar, later in the week.

5        We also have -- I have with me today an order because

6   the trustee has made an investigation and is prepared to

7   approve the transaction, thinks that the transaction is in the

8   best interest of customers and creditors of the SIPC estate

9   including some of the -- or all the changes that have been

10  discussed today.  It's a condition of the deal that an order be

11  entered in the SIPC case that essentially adopts the order in

12  the Chapter 11.  And we have such an order.  And, in fact, we

13  made copies -- we haven't had time to serve it because we've

14  only been appointed, I think, maybe for a matter of two hours.

15  But we did make it -- maybe three hours by now, Your Honor.

16  But we did make it available to as many people as possible here

17  today.

18       And I think with that, if you would entertain hearing

19  briefly from Mr. Giddens --

20       THE COURT:  I'd be delighted to hear from him.

21       MR. KOBAK:  Good.  Thank you, Your Honor.

22       THE COURT:  In fact, I invited this presentation so

23  I'm pleased to have him come to the podium.

24       MR. GIDDENS:  Thank you, Your Honor.  SIPC and others

25  have been working equally so for a week and I should also say

1    it's been extraordinary -- there's been extraordinary

2    cooperation, 3 a.m. telephone calls, reviewing financial

3    statements with others.  The staff of Lehman has been always

4    available.  The law firm of Weil Gotshal has been

5    extraordinarily cooperative.  And I think again, the response

6    of this extraordinary transaction by the team under Harvey

7    Miller is truly something we're all benefiting from.

8            The SIPC -- looking at this proceeding, I think

9    setting some things in context, when I looked at the balance

10   sheet of the broker dealer a few months ago, the assets were, I

11   think, approximately 497 billion dollars -- or the assets,

12   excuse me, were about 500 billion dollars and the liabilities

13   were 497 billion, which is not unusual for a brokerage firm.

14   Nevertheless, with a pro forma balance sheet which I reviewed

15   with members of the SEC, accountants, people from Lehman,

16   lawyers and others, those assets had decreased because of

17   changes in market from 500 billion to less than a hundred

18   billion.  And part of the exercise, of course, with the broker-

19   dealer after -- the first role of a SIPC proceeding is to

20   maintain orderly markets and to try to preserve normalcy for

21   customer accounts.  That, I think, has been done here in large

22   measure.  There are 629,000 accounts.  Through extraordinary

23   efforts a substantial number of those will be transferred.

24   There will remain, by estimate, several thousand, which may

25   take considerable amount of time to resolve disputes,

77

1    controversies, monies owed to Lehman and the like, which will

2    take some time to deal with.  All of those will be dealt with

3    in the context of the SIPC liquidation.

4        Congress created and provided that any -- when a

5    broker-dealer such as SIPC or Merrill Lynch was in financial

6    difficulty it had to be liquidated, it could not be

7    reorganized.  And it had to be done so under the specific

8    provisions of the Securities Investor Protection Act, which, in

9    effect, can create certain priorities and preferences for

10   customers.  And so that's the first job of a trustee.  I think

11   that we have focused on that and spent considerable resources

12   in trying to accomplish that.

13       Nevertheless, as the Federal Reserve, the SEC and

14   other regulators involved in this, there will be considerable

15   assets.  Of course, in this proceeding, 500 million, three

16   billion are really deemed to be de minimis numbers.  But there

17   are complicated transactions which are in securities and

18   derivatives, private equity investments, all of which will have

19   to be analyzed and resolved in the course of our marshalling

20   the assets of the broker-dealer.  The broker-dealer is out of

21   business.  They could not conduct additional business after 6

22   p.m.  Most of the personnel and typical brokerage assets have

23   been transferred to Barclays or will go to other places.

24   Nevertheless, we will be left with substantial -- there are

25   subsidiaries which have to be, again, mostly dealing with

78

1    securities and derivatives and the like, whose assets and

2    issues will have to be sorted.

3             It's, I think, the intent of the statute that those

4    kinds of things are dealt with in this proceeding, and we

5    would, of course, intend to work closely with DTC, with

6    regulators, of the SEC in particular, the Federal Reserve,

7    foreign regulators dealing with resolutions to these kinds of

8    issues.

9             So we have many challenges and much work ahead of us.

10   There's no indication we'll have a small amount of money, cash.

11   The liabilities, as best I can determine them, are in the

12   billions.  And there are potential assets which are also valued

13   highly on the balance sheet.  As to what those assets will be,

14   many of which appear to be -- have decreased, because of market

15   conditions, substantially in value just in a matter of days, I

16   really cannot tell.

17            As I say, we intend to work cooperatively with

18   everyone, try to work quickly and efficiently.  Again, we have

19   all the kinds of issues you would have if you -- the residue of

20   any major financial institution.  And, again, it's challenging

21   because Lehman was certainly one of the most complex, versatile

22   and finest of the financial institutions globally.  And I must

23   say that all early indications are -- the good thing is, unlike

24   other liquidations we've been involved in, there's no

25   indication of sloppy record keeping, missing customer funds and

79

1    the like.  Now, that is not to say, as Mr. Miller indicated,

2    there have already been 300,000 failed transactions just in a

3    matter of days.  So it's a complex undertaking that, as I say,

4    we have been working around the clock and will continue to do

5    so to try to resolve those issues, taking care of customers,

6    which is a priority, promoting the orderly transfer of

7    accounts, but also trying to fairly resolve many, many open

8    issues relating to complex securities transactions.

9         So, thank you.

10        THE COURT:  Thank you.  Mr. Miller?

11        MR. MILLER:  Your Honor, I think there may be some

12   other regulators that want to --

13        THE COURT:  I didn't realize there were others who

14   wanted to speak in connection with the SIPC proceeding.

15        MR. HIRSHON:  Yes, Your Honor.  Sheldon Hirshon,

16   Proskauer Rose, representing Depository Trust & Clearing

17   Corporation.

18        I too rise to urge the Court to act on this matter as

19   quickly as possible.  And I wanted to explain a little bit more

20   about the plumbing, if you will.

21        The Depository Trust & Clearing Corporation is

22   actually the holding company for three separate clearing

23   corporations, DTC, NSCC, and FICC.  And the reason that they're

24   somewhat different is because they clear different kinds of

25   securities.

80

1          You heard that there are roughly 600,000 institution

2     clients and 170,000 retail clients of Lehman.  Lehman has an

3     account at DTC and I'll use that globally to refer to each of

4     these clearing corporations.  And many, if not all, of the

5     transactions that those customers process come through the DTC.

6     So all of those people are trading through a Lehman account at

7     DTC.  DTC, itself, is a securities agency; it's registered

8     under 17A of the 1934 Act.  It is supervised by both, the

9     Federal Reserve and the SEC.

10          We have participated along with the other regulatory

11     agencies to facilitate this transaction.  The magnitude of the

12     transaction as you've now heard, the number of trades that come

13     through, the 300,000 failed trades, meaning that there hasn't

14     been a delivery either on one side that is a sale or buy.  All

15     of those have to be worked out and we need to really focus on

16     that and hopefully understand what that is and maybe even clear

17     most, if not all of them, by Monday when the market reopens.

18     And we hope to have transferred the accounts from Lehman to

19     Barclays so that it would be seamless.  So that when the

20     customer calls up on Monday to place an order it will be

21     prosecuted and then cleared.

22          So that's why we've risen to urge the Court to

23     consider this.  It is an extraordinary moment.  And in order to

24     keep the market stabilized and have an opening on Monday where

25     Barclays can trade as if it were Lehman, we need to have this

81

1    transaction approved today and as early in the evening as

2    possible so then we can go back to our offices and do the work

3    we need to do, sign the various documents to transfer, and get

4    all the regulatory approvals that are required.

5              Thank you, Your Honor.

6              THE COURT:  Thank you.

7              MR. MILLER:  Your Honor, taking Mr. Hirshon's cue

8    from what he just said, I would propose, Your Honor, as direct

9    testimony, that we would offer a proffer at this time.

10              THE COURT:  That's fine.  But Mr. Bienenstock is

11   raising his hand, however, and may have an issue.

12              MR. BIENENSTOCK:  Your Honor, as I think Your Honor

13   anticipated, the issues here are mostly legal rights with the

14   relief they're going to be requesting.  I've asked three times

15   for the proposed order, which at the recess they said has

16   changed.  It's in the courtroom, I'm told.

17              Before I agree to a proffer, as opposed to the

18   witnesses, I'd like to see -- and for due process, I'd like to

19   see the relief being requested in writing, that's what this

20   hearing is all about at this point, I think.

21              THE COURT:  All right. Well, let's deal with that.

22   And maybe in light of the fact that you're actively

23   participating at this moment, and given the awkwardness of the

24   distance from the bench and microphones, we can have Mr.

25   Bienenstock walk through the gauntlet and come to the front of

82

1    the courtroom.

2            Apparently, there will be others joining him and --

3            MR. GOLDEN:  Your Honor, I just want to make sure --

4    we don't have an objection --

5            THE COURT:  You have to identify yourself by name,

6    even though I know you.

7            MR. GOLDEN:  Daniel Golden Akin Gump Strauss Hauer &

8    Feld, counsel for an ad hoc bondholders group.

9            We have no objection to proceeding by proffer as long

10   as the proffered witness will be available for cross-

11   examination.

12           THE COURT:  That's fine.

13           MR. MILLER:  I was only offering direct testimony,

14   Your Honor, as a proffer.

15           THE COURT:  Mr. Bienenstock, do you wish to

16   comment -- I view what you said as an objection to proceeding

17   by means of proffer until such time as there is a writing that

18   clarifies the relief being sought in the pending motion at this

19   moment.  Do I understand your position correctly?

20           MR. BIENENSTOCK:  Yes, Your Honor, with one step

21   further.  I really think, based on all of the circumstances,

22   it's enough that everyone showed up at 4 p.m. without knowing

23   what deal was being proposed.  Not pointing fingers, again,

24   Your Honor, but these are just how the facts unfolded.

25           We not only knew -- didn't know the deal being

83

1    proposed, we didn't know and do not know at this instant the

2    relief being requested, and yet this hearing is going forward.

3    It's really -- I don't think I've ever had occasion in my

4    career to make such a due process argument, but the facts

5    compel it.  I'd like to see the relief being requested before

6    this proceeds.  Whether by proffer or by live witness.  And I

7    think everybody, including the Court, should know what's the

8    relief being requested.

9            THE COURT:  Well, I'll let Mr. Miller respond to

10   that, but I'm going to give you a reaction to what you just

11   said, too.

12           I've attempted to distill and digest from my own

13   understanding the various objections that have been filed,

14   including the objection that you filed.  And many of the

15   objections, but not all of them, raise questions as to

16   vagueness in the asset purchase agreement, ambiguous provisions

17   in the asset purchase agreement, concerns with respect to the

18   sale of nondebtor assets, and confusion associated with the

19   speed with which the transaction is proceeding that makes it

20   more difficult for parties-in-interest to comprehend precisely

21   how they're affected by the transaction.  In fact, you said

22   much the same thing differently on Wednesday on behalf of your

23   clients.

24           But I also understand that since Wednesday, in a

25   process of a cooperative information sharing, as opposed to

84

1    coercive discovery, there have been many opportunities offered

2    to parties such as your client and you.  I have no idea what

3    happened and I don't need to know that right now.  But my

4    working premise is that in a manner somewhat comparable to the

5    level of cooperation described by the SIPC trustee that has

6    existed between the regulators and the SIPC trustee and Mr.

7    Miller's firm in making this dramatically emergent transaction

8    happen, that through discovery -- informal discovery, parties-

9    in-interest, including the creditors' committee, has gotten to

10   the point of at least acquiescing because the transaction is so

11   significant to the markets, to the employees, to the U.S.

12   economy, to the world economy.

13          I think I know what's going on here, and I'm not

14   saying that you necessarily know how your client's rights are

15   affected.  But I have a pretty good idea, even with the

16   modifications that I've only heard about as recently as when I

17   took the bench an hour or two ago, I can't remember what time

18   it was.  I understand this deal, not in every aspect but

19   certainly in broad outline.  I have notice.  This is a

20   hearing.  I believe that for due process purposes we are all

21   here with, perhaps cobbled together notice, but it's notice.

22   The form of order undoubtedly is something that parties will be

23   arguing about.  But I believe that it is not a necessary

24   precondition to proceeding with the hearing that parties know

25   more in terms of what's before me.  Because unless you have

85

1    another argument to make, I'm satisfied that I know the relief

2    that's being sought.

3         In conjunction with the SIPC proceeding,

4    substantially all of the going concern value that exists within

5    these assets is to be preserved.  Assets, principally the real

6    estate, will be sold for a value that I've already questioned.

7    The essential terms of the transaction, with modifications,

8    have been understood at least for the last few days.

9         What I think you're addressing, and I don't want to

10   speak for you, is that there are particulars of the transaction

11   as it affects your client that you're still uncertain about.  I

12   believe that we should proceed with proof.  Everybody's rights

13   are reserved.  If there's a need for a witness to testify live

14   on cross-examination after a proffer, the witness is available

15   and will be exposed to cross-examination.  If there's an

16   objection to proceeding by means of proffer, this is the time

17   to make that objection.  So question one is do we or don't we

18   at least offer the direct by means of a proffer?

19        MR. BIENENSTOCK:  If you're asking for my response

20   first, it's --

21        THE COURT:  It might as well be because you're right

22   there.

23        MR. BIENENSTOCK:  If the debtor will demonstrate its

24   cooperation and give us the proposed order so we can read it, I

25   would have no objection proceeding by proffer.  Otherwise, I do

86

1  object.

2          MR. MILLER:  Here's the order.

3          MR. BIENENSTOCK:  Thank you.

4          THE COURT:  Okay.

5          MR. BIENENSTOCK:  I have no objection to proceeding

6  by proffer.

7          THE COURT:  All right.  That must be the most

8  difficult request for a form of order I have ever seen.  Mr.

9  Sabin?

10         MR. SABIN:  Good afternoon, Your Honor.  Jeffrey

11 Sabin from Bingham McCutchen on behalf of Harbinger Capital

12 Special Situations and Harbinger Capital Partners Master Fund.

13         I rise not to object to the proposed proffer.  And we

14 did file a limited objection.  And based upon what we have

15 heard before you took the bench in the interim, and based upon

16 what you heard from Ms. Fife when we presumed this hearing, we

17 have two other clarifications that perhaps could be part of the

18 proffer that I think we heard.  And assuming that these two

19 representations are indeed part of the proffer and the process

20 is otherwise as you described with respective parties-in-

21 interest participating in getting to a fully consensual order,

22 our objection would be resolved.

23         So let me first talk about those two additional

24 things that I understood are material, enough at least to my

25 client, to put it on the record at this point.  First, that no

87

1    assets of any of the nondebtors, whether in this Chapter 11

2    cases or in the SIPC proceeding are being sold as part of this

3    transaction.  And we would seek that representation, not only

4    from the debtors, but from the purchaser and from the SIPC

5    trustee.

6              THE COURT:  I hate to break in on that.  But if I

7    heard what Ms. Fife had to say, there are some nondebtor assets

8    that I believe are being sold.  Lehman Canada, Lehman

9    Sudamerica and Lehman Uruguay S.A.

10             MR. SABIN:  I believe, Your Honor, that would be an

11   asset of LBHI, the parent.  And the asset being sold is stock

12   so that you would have jurisdiction.  Just to clarify for the

13   record.

14             MR. DESPINS:  Your Honor, I apologize, but I believe

15   their real estate is owned by -- is it all owned by the

16   debtors?  The New Jersey real estate as well?

17             UNIDENTIFIED FEMALE SPEAKER:  Yes.

18             MR. DESPINS:  I apologize, Your Honor.  It's a

19   limited liability company which the debtor owes ninety-nine

20   percent.

21             THE COURT:  Mr. Sabin, before you proceed with your

22   remarks, just because I think for good order you should have

23   the full attention of the bench and the full attention of those

24   who are in the room, pause for a minute,  because there's some

25   movement that I'm finding distracting.  Mostly having to do

88

1    with the passing out of the form of order so that Mr.

2    Bienenstock's ability to review it is not an exclusive

3    privilege.

4            Why don't you proceed?

5            MR. SABIN:  Thank you, Your Honor.  So to be precise,

6    after the various comments I'll go back to what I believe to be

7    the understanding of an additional material term, if you will,

8    that will be set forth in a so-called six-page clarification

9    letter that will constitute an amendment to the as-filed

10   version of the APA.  And that is a representation, or as part

11   of the proffer, which is supported also not only by the debtors

12   but by the purchaser and by the SIPC trustee, that no assets of

13   any nondebtors, whether in the Chapter 11 cases or in the SIPC

14   proceeding are being sold as part of this transaction.

15           And for clarity, I understand from the remarks of Ms.

16   Fife, that there are certain equity interests that constitute

17   property of the estate of one or more of these debtors that

18   will now be part of this transaction.

19           MS. FIFE:  Your Honor, if I may?

20           THE COURT:  Sure.

21           MS. FIFE:  During the break that issue came up.  And

22   I responded that there were no nondebtor assets being sold.

23   However, I was incorrect in one very small way.  There is some

24   intellectual property that is held by nondebtors that is

25   primarily used and necessary for the LBI business, and that is

89

1    being sold pursuant to this transaction.  Other than that, no

2    other nondebtor assets are being sold.

3           THE COURT:  Is this intellectual property held in a

4    special purpose entity?

5           MS. FIFE:  We're not exactly sure what entity it's

6    held in.  I wouldn't say, though, it's a special purpose.  It's

7    perhaps spread out through other subsidiaries.

8           THE COURT:  Okay.  It sounds like there's some

9    nondebtor property, but it's IPR.

10          MR. SABIN:  I'm just going to reserve for that part

11   of our objection related to this issue.  But it doesn't sound

12   like it's a material asset that is part of the transaction

13   itself.

14          Number two, in that same session where Your Honor was

15   not in participation, we understand that so-called master

16   netting agreements and securities contracts, other than those

17   already owned as of today by Barclays, will not be part of the

18   sale by LBI in this transaction.

19          THE COURT:  In making that statement, are you seeking

20   a clarification that what you had just said is true?

21          MR. SABIN:  I am, Your Honor.

22          THE COURT:  Who's going to confirm that, if it's, in

23   fact, true?

24          Maybe that will have to be confirmed at some other

25   time.

90

1                For record purposes, it's unclear what just happened.

2                MR. SABIN:  I think, let the record reflect that the

3  parties with knowledge will confer and hopefully we will

4  resolve it and get an answer on the record.

5                THE COURT:  Fine.

6                MR. SABIN:  The additional matters, Your Honor, that

7  we have a concern with, which of course, were not facts known

8  when we filed our objection, deal with the intent and maybe

9  it's already an act of the SIPC trustee.  With respect to the

10  existing five corporate entities that are subsidiaries, as we

11  understand it, of LBI, which is now subject to the SIPC

12  proceeding.  And whether or not any or all of those entities

13  will indeed become, or have become, as we sit here, debtors,

14  whether in Chapter 11 or Chapter 7, especially given our

15  understanding that the proceeds going to LBI are just 250

16  million dollars.  And given our understanding that many of the

17  employees who may have otherwise supported the services of some

18  or all of those entities will no longer be supporting those

19  entities.

20                Other than that, Your Honor, no longer delay.  And I

21  will turn the podium to Mr. Miller to go forward with the

22  proffer.

23                THE COURT:  I don't think you received a

24  clarification on that last point.  Is that something that can

25  be clarified now or should it be clarified later?

91

1         My suggestion is for good order that we, at some

2    point, have a break.  You and others will have an opportunity

3    to meet and confer and gain some additional information.  And

4    that we proceed by way of proffer unless there's someone else

5    who has something to say on that subject.

6         MR. SABIN:  Thank you, Your Honor.

7         THE COURT:  Thank you.

8         MR. MILLER:  Harvey Miller, Your Honor, for the

9    debtors, again.

10        If Your Honor please, I would offer proffer, the

11   testimony of Herbert H. McDade.  If Mr. McDade, Your Honor,

12   were called to the stand to testify, he would testify to the

13   following effect:

14        Mr. McDade received a Bachelor of Arts degree from

15   Duke University and a Masters of Business Administration from

16   the University of Michigan.

17        After joining Lehman Holdings in 1983, Mr. McDade was

18   named head of Corporate Bond Department in 1991.  In 1998 he

19   was named global head of Debt Capital Markets.  In 2002 Mr.

20   McDade was named to Lehman Holdings Operating Committee.  He

21   has served as global head of the Fixed Income Division for the

22   period June 2002 through 2005.  In June of 2005 Mr. McDade

23   assumed the responsibilities of the global head of Equities

24   Division.  Mr. McDade has over twenty-five years of experience

25   in managing a company's financial operations.

92

1          Mr. McDade would testify that Lehman Holdings'

2     predecessor was founded in 1850.  Since that time Lehman

3     Holdings grew into the fourth largest investment bank in the

4     world.  He would testify that through Lehman Holdings'

5     subsidiaries, it is a global market maker in all major equity

6     and fixed income products.  Lehman Holdings' subsidiaries are

7     members of all principal securities and commodities exchanges

8     in the United States, including FINRA and the NYSE.  And

9     memberships on several principal international securities and

10    commodities exchanges, including London, Tokyo, Hong Kong,

11    Frankfurt, Paris, Milan, Singapore and Australia.

12          Lehman is a global leader -- was a global leader in

13    equity and fixed income sales, trading and research, investment

14    banking, private investment management, asset management and

15    private equity.

16          Mr. McDade would testify that the tightening of the

17    U.S. and international markets caused Lehman Brothers to

18    experience a severe liquidity crisis.

19          Now Lehman Holdings' broker-dealer subsidiary, Lehman

20    Brothers Inc., relies to a large extent upon funding from

21    Lehman Holdings, which is the public company and the issuer of

22    debt -- unsecured debt that provides funds for the entire

23    organization.  And that such funding is no longer available to

24    provide to Lehman and LBI.

25          And as each hour has passed and uncertainty is

93

1    prolonged, investor's faith in the market has weakened the

2    value of Lehman's business and it has rapidly deteriorated.

3            The state of affairs at Lehman Brothers Holding Inc.

4    and LBI is critical and their fate just jeopardizes their

5    affiliates' ability to conduct business.

6            Absent approval of the Barclays' transaction, the

7    broker-dealer business would discontinue as a going concern and

8    adversely impact the credit markets on a global scale in ways

9    that are immeasurable.

10           He would testify that Lehman Brothers and its

11   advisors have literally spent every hour attempting to preserve

12   Lehman Holdings' estate and LBI's broker-dealer business.

13           Other than the liquidity crisis, Lehman has been

14   facing pressure and constraints from regulators and agencies.

15   The Federal Reserve, the SEC, the CFTC and other governmental

16   entities have been putting constant pressure on Lehman to

17   engage a prospective buyer and consummate a sale of the broker-

18   dealer business, no later than today, so that there is a

19   seamless transition to preserve the business.

20           Other than the pressures from regulators, Mr. McDade

21   would testify that the broker-dealer's customers are in a state

22   of panic.  Vendors are threatening to stop providing services.

23   Lehman is experiencing severe internal pressures.  He would

24   testify that it would be an understatement to state that the

25   morale of the employees is low.  Employees have and will

94

1    continue to defect.  And the images on television of employees

2    streaming out of the Seventh Avenue headquarters with boxes and

3    suitcases with their possessions is self-evident proof of what

4    is happening.

5         He would testify that the broker-dealer business

6    services over 600,000 customer accounts, and that it could take

7    several months to transfer all of the accounts in the ordinary

8    course of business.  In its current state the broker-dealer

9    does not have sufficient capital to service its customer

10   accounts while transferring them to another broker-dealer in

11   the ordinary course of business.  The market value of customer

12   accounts is in the hundreds of billions.

13        Mr. McDade would testify that the broker-dealer is

14   dependent upon financing from Lehman Holdings Inc., the holding

15   company during the period prior to the Chapter 11 case.

16   Without access to financing, the broker-dealer is incapable of

17   servicing its customer accounts.  As a result, the broker-

18   dealer would have no choice but to close its customer accounts

19   and that would result in billions of dollars of losses and

20   damages.

21        If the broker-dealer is not able to settle trades, a

22   SIPC trustee will commence a proceeding and there has been a

23   proceeding commenced consistent with the transaction that is

24   being proposed.

25        Mr. McDade would testify that during the past ten

1    days, he and Lehman's senior management, have been in constant

2    communications with Lehman's regulators.  The regulators are,

3    for now, very supportive of the current transaction.  In an

4    effort to facilitate the transaction, the SIPC trustee agreed

5    not to freeze customer accounts when the broker-dealer was

6    placed into a SIPC proceeding.

7         The regulators and agencies support the Barclays'

8    transaction.  But they have made clear to Lehman that their

9    patience is limited and they are placing tremendous pressure on

10   all parties to close a transaction no later than today.  The

11   state of Lehman's affairs have been widely publicized the world

12   over.

13        It has been widely reported in the media that Lehman,

14   its senior management and advisors have participated in

15   numerous meetings conducted by the Federal Reserve Bank.  At

16   these meetings, the Federal Reserve Bank and Lehman met with

17   numerous financial institutions to attempt to find the solution

18   to the problem of Lehman's financial condition.

19        Also, as widely reported in the media, the financial

20   institutions that participated in those meetings included some

21   of the largest banks in the country.

22        Notwithstanding the help from regulators and other

23   governmental agencies, Lehman was not successful in reaching an

24   agreement with any of these parties as to a support for

25   continued operations.

96

1          Mr. McDade would testify that he first became

2     involved with this particular transaction Monday morning --

3     last Monday morning, I guess that was September 15, at 7 a.m.

4     in the morning.  Since that time, he has been in constant

5     contact with senior management and Lehman's outside advisors

6     regarding the status and progression of the negotiations.  The

7     negotiations leading up to the Barclays' transaction have been

8     at arm's length, objective, aggressively pursued by Barclays

9     and difficult, to say the least, Your Honor.

10          He would testify that since the collapse of Bear

11     Stearns and a subsequent takeover by JPMorgan, the Federal

12     Reserve Bank has made financing available to broker-dealers in

13     what is colloquially referred to as the window.

14          After the broker-dealer settles its trade at the

15     close of business, the clearing bank returns the collateral,

16     which Lehman then transfers to the Federal Reserve in exchange

17     for financing until the opening of business the next day.  That

18     process, as the liquidity of Lehman's deteriorated, no longer

19     became possible.

20          He would testify that in the climate of today's

21     market, a potential buyer of the broker-dealer business could

22     not operate without having access to the PDCF, the Primary

23     Dealer Credit Facility.  That facility is not available to all

24     broker-dealers.  Rather, it is available only to a limited

25     number of financial institutions who could meet the rules and

97

1    regulations of the Federal Reserve in respect thereof.  And

2    that, Your Honor, is probably less than a dozen institutions.

3           He would testify that during the period of stress and

4    strain, the week before this week, Lehman attempted to interest

5    the Bank of America in an acquisition of Lehman's, and that,

6    unfortunately, did not come to fruition.  At the same time, it

7    was negotiating an acquisition by Barclays of the Lehman

8    business.  And that negotiation led to what I might call an

9    agreement that was subject to the -- he would testify it was

10   subject to the regulators throughout the world, and,

11   unfortunately, it became clear that that agreement could not be

12   consummated.

13          And immediately after that announcement was made, he

14   would testify that he and other officers of Lehman were called

15   to the Federal Reserve Bank in New York to meet with the

16   Federal Reserve Bank representatives, the SEC, and the United

17   States Treasury to deal with the problem confronting Lehmans.

18   And those meetings, he would testify, took place, Your Honor,

19   Sunday morning and ran into the late evening of that day.  In

20   which it was made perfectly clear that it was necessary for the

21   protection of the public and the financial markets in an effort

22   to placate the public markets, or at least stabilize the

23   situation, that it is in the best interest of all parties that

24   Lehman Brothers Holdings Inc. commence a Chapter 11 proceeding.

25   And that it maintain, for LBI, access to the so-called window.

1    And it was in that context, he would testify, that LBI was

2    enabled to go forward, at least for the past week.

3           He would also testify, Your Honor, Barclays, unlike

4    some of the larger and healthier financial institutions that

5    might qualify for access to the PDCF, does not have a North

6    American broker-dealer operation of this scale.  Therefore, the

7    sale is a national extension of Barclays' business.  Barclays

8    would have access to the PDCF and also will assume Lehman's

9    broad spectrum broker-dealer license.

10           Not only is this sale a good match economically but

11    it saves the jobs of thousands of employees and avoids losses

12    that could total in the hundreds of billions of dollars.

13           He would further testify, Your Honor, that he is

14    familiar with the asset purchase agreement, that he

15    participated in all of the negotiations involved in the asset

16    purchase agreement.  And that those negotiations from time to

17    time broke out into different teams, but he was the team leader

18    for Lehman.

19           He would testify that the asset purchase agreement

20    provides for the sale of the North American broker-dealer

21    business of LBI, which includes banking and capital markets

22    business in addition to numerous other divisions.

23           The Seventh Avenue headquarters is being transferred

24    to Barclays, in addition to the various offices located

25    throughout the United States, that are integral to the broker-

99

1    dealer business.  The value of the real estate being

2    transferred to  Barclays pursuant to the transaction is subject

3    to negotiation with respect of the appraised values.  That the

4    building on Seventh Avenue is subject to an appraisal which has

5    been provided to Barclays.  And that appraisal is in the area

6    of 900 million dollars to 100 million dollars.  And that the

7    appraisal was done by CB Richard Ellis.  And it was prepared

8    for the other debtor in this case, LB 745 LLC and Barclays

9    Capital Inc.  And it is a voluminous appraisal of the

10   properties which we will offer into evidence at the appropriate

11   time, Your Honor.

12         And that he would also testify that an appraisal of

13   the two data centers was also directed and that CB Richard

14   Ellis was also engaged to undertake that appraisal.  And that

15   appraisal has established the value for the purpose of the

16   negotiations, Your Honor.  And as pointed out earlier in the

17   proceeding, those values have come in at slightly less -- I

18   shouldn't say slightly, less than was originally projected.

19         So that was a very negotiated term, and the reason

20   for the transfer of these properties, Your Honor, is that they

21   are integral to the smooth transition of the businesses.

22         Barclays will also assume exposure for the employees

23   that accept offers of employment, which is estimated to have a

24   value of approximately -- an exposure of approximately two

25   billion dollars.

1          Barclays is also assuming the cure amounts relating

2     to contracts and leases that will be assumed pursuant to the

3     asset purchase agreement.  And that has a potential exposure,

4     Your Honor, of 1.5 billion dollars that he would testify to.

5          Barclays is also paying the real estate transfer

6     taxes, which are estimated to be approximately thirty million

7     dollars.

8          Mr. McDade would testify that the financial community

9     has known that Lehman has been under stress for some time.

10    Certainly, going back to the time that Bear Sterns was bailed

11    out.  Potential purchasers have known that Lehman has been

12    searching for a buyer since well before the Chapter 11 case

13    commenced.  And that those ethics, those strategic alternatives

14    that were being pursued involved parts of Lehman as well as the

15    whole of Lehman.  And that the notoriety attached to that did

16    not produce any interested parties other than the ones I

17    mentioned -- he mentioned.

18         During the meeting at the Federal Reserve Bank last

19    week, Bank of America, JPMorgan, Merrill Lynch and Barclays

20    were all present, showing interest in the broker-dealer assets.

21    It was clear to each party that if Lehman was unable to reach a

22    deal it would most likely have to commence cases under Chapter

23    11 of the Bankruptcy Code.  That would not only have an adverse

24    impact upon their businesses but also upon the international

25    markets.

1          He would testify that since the commencement of the

2     Chapter 11 case, Lehman's senior management and its advisors

3     have not undertaken an intensive marketing of the business and

4     the assets to be sold.  But instead focused on reaching an

5     agreement with the most eligible interested buyer for these

6     assets.

7          That notwithstanding the lack of a specific program

8     for marketing, the sale of Lehman's broker-dealer business has

9     been known worldwide.  And, yet, he would say nobody has

10    expressed an interest to step into the shoes of -- excuse me,

11    step into the shoes of Barclays, Your Honor.

12         Lehman has not received any other interest since the

13    commencement of the Chapter 11 cases.  If Lehman was approached

14    by another potential buyer that he would consider the offer,

15    provided that the company had sufficient liquidity to operate

16    the business without jeopardizing customer accounts.  That has

17    not happened, Your Honor.  So it is almost academic.

18         Mr. McDade would testify, Your Honor, that if the

19    sale with Barclays is consummated, customer accounts would

20    continue on a seamless, uninterrupted basis and trading would

21    continue on a normal basis, thereby maintaining the billions of

22    dollars in value.

23         At the same time, the jobs of thousands of employees

24    would be saved and will be entitled to substantial benefits

25    from Barclays in the form of compensation, bonuses and

1    severance payments that are based upon the employee's prior

2    performance while with Lehman.

3            He would testify to the consummation of the

4    transactions makes available a greater pool of assets to the

5    debtors' estates, because the exposure under Lehman Holdings

6    guarantee to the broker-dealer will be substantially less.  If

7    the transaction does not close today or over this weekend, Your

8    Honor, Mr. McDade would testify that the effect on the broker-

9    dealers business and on Lehman Holdings would be devastating.

10   First, the failure to consummate the transaction would cause

11   default under the DIP facility and require Lehman Holdings to

12   repay the outstanding amounts under that facility.

13           He would testify that the liabilities in the hundreds

14   of billions of dollars would be triggered against Lehman

15   Holdings which would in turn deplete the property available to

16   distribution to creditors.  It would adversely affect the

17   debtors other nondebtor subsidiaries to the extent they have

18   any value.

19           He would testify, Your Honor, that if the transaction

20   is not consummated, it will result in the largest failure of a

21   broker-dealer in the history of the United States and will

22   cripple the credit markets for some time to come.

23           He would further testify, Your Honor, that the shock

24   of this transaction not being consummated in the public markets

25   could be immeasurable and could ignite a panic in the financial

103

1    condition that we now face in the United States.

2         He would testify that it is essential to an orderly

3    financial market that this transaction be consummated as early

4    as possible in the interest of all stakeholders of these two

5    cases.  And in the interest of the public in general and the

6    economy in general, and to avoid a dislocation in the market,

7    Your Honor.

8         Thank you, Your Honor.

9         THE COURT:  And that concludes the proffer?

10        MR. MILLER:  Yes, Your Honor.

11        THE COURT:  Is there anyone who wishes to cross-

12   examine Mr. McDade with respect to the proffer or may I simply

13   accept the proffer in the form it has been offered by Mr.

14   Miller without further examination?

15        MR. QURESHI:  Your Honor, Abid Qureshi, Akin, Gump,

16   Strauss, Hauer & Feld on behalf of an ad hoc group of

17   noteholders of LBHI.  We would like to cross-examine the

18   witness.

19        THE COURT:  All right.  Mr. McDade should come to the

20   stand then.

21        (Witness is sworn)

22   CROSS-EXAMINATION

23   BY MR. QURESHI:

24   **Q.   Good evening, Mr. McDade.  You testified through the**

25   **proffer that you were involved in the negotiations concerning**

104

1    the asset purchase agreement, correct?

2    A.   That's correct.

3    Q.   And, sir, did you also attend a meeting that was held with

4    creditors this past Wednesday at Weil Gotshal?

5    A.   Yes, I did.

6    Q.   I'd like to talk first, if we could, about the real estate

7    assets.  What was the expectation of the debtors with respect

8    to the headquarter's building at 745 Seventh Avenue at the time

9    the original asset purchase agreement was signed up with

10   Barclays in terms of the value of that building?

11   A.   The headquarters building, approximately a billion

12   dollars.

13   Q.   So that was the expectation at the time that you first

14   entered into the asset purchase agreement with Barclays?

15   A.   That's correct.

16   Q.   And at that time, sir, what was the debtors' expectation

17   concerning the value of the two other real estate assets

18   located in New Jersey?

19   A.   The two data centers totaled 450 million.

20   Q.   And is it your testimony today, sir, that the appraisal

21   with respect to the headquarters building performed by CBRE

22   appraised the value at 900 million, is that correct?

23   A.   I don't know.

24   Q.   You don't know what the appraised value is?  Do you

25   know -- were you involved with discussions with Barclays

105

1    concerning the appraised value of the headquarters building?

2    A.   I was involved with the negotiations in terms of the

3    process with respect to the purchase of the building and the

4    process with respect to getting the appraised value.  I have

5    not been involved since, directly.  The team has.

6    Q.   Do you know if the appraised value, whatever it is, of the

7    headquarters building, is something that has been agreed upon

8    between Lehman and Barclays?

9    A.   The appraised value of the building is still to be

10   negotiated, as Mr. Miller suggested earlier.

11   Q.   So you do not know what CBRE concluded the appraised value

12   was in their review of the headquarters building?

13   A.   The team has been involved in that, I have not been

14   directly involved.

15   Q.   Okay.  Sir, with respect to the two buildings located in

16   New Jersey, are you aware of what the appraised value is of

17   those buildings?

18   A.   I would answer in the same way, the team has been

19   involved.

20   Q.   You personally have not?

21   A.   Correct.

22   Q.   And, again, Lehman's expectation going in was that the

23   approximate value of those two building was 450 million?

24   A.   That's correct.

25   Q.   And is it your understanding that it's materially less

106

1   than that today?

2   A.   Materially less -- again, I have not seen the final

3   documents in terms of the appraisal.

4   Q.   Okay.  With respect to the appraisals of those two

5   buildings in New Jersey, again, has that appraised value,

6   although it's an unknown to you, do you know whether that

7   appraised value has been agreed upon between Barclays and --

8   A.   No, it has not, to be negotiated.

9   Q.   Okay.  Is it your understanding, sir, that with respect to

10  the transfer of these real estate assets to Barclays that there

11  is any broker fee involved?

12  A.   My understanding is from the negotiation, again, that a

13  suggested broker fee was part of the negotiation to take place,

14  yes.

15  Q.   And do you know what the magnitude of that suggested

16  broker fee is?

17  A.   I do not.

18  Q.   Okay.  Do you have any approximate idea of what it might

19  be?  Are we talking tens of millions, fifty million or do we

20  not know?

21  A.   I do not know.

22  Q.   Okay.  Is it your understanding, sir, that there actually

23  will be a broker fee payable to a broker as a result of the

24  transfer of these assets?

25  A.   There is not an individual broker involved.

107

1    Q.   So there is no actual broker fee that will be paid, but

2    value will be deducted from the appraised value for the benefit

3    of Barclays, is that correct?

4    A.   That's correct.

5    Q.   Sir, just to switch gears and to talk about the businesses

6    that are being sold from LBI to Barclays, are there any

7    businesses remaining at LBI that are not being transferred to

8    Barclays?

9    A.   No.

10   Q.   And with respect to the contracts that are associated with

11   each of the various businesses that are being acquired by

12   Barclays, do each of those contracts also reside at LBI?

13   A.   The contracts with respect to the underlying products?

14   Q.   Let's start more broadly, the contracts with respect to

15   the running of each of those businesses, generally?

16   A.   I'm not quite certain I understand the specifics of the

17   question.  The assets of those business units, the people of

18   the business units will be moving to Barclays.  The individual

19   businesses have different assets and securities and

20   derivatives, obviously, that they're responsible for trading.

21   The contracts, themselves, in terms of the business units, I'm

22   not certain I understand the question.

23   Q.   Okay.  Are the trading contracts with respect to the

24   various products that each of those businesses operates in, are

25   those contracts going to the purchaser?

108

1   A.    The specific question has yet to be determined, given the

2   dynamic nature and speed of which we're operating.  Each of the

3   individual businesses will enter into a series of very quick

4   next steps to determine how we actually transact in each of

5   those business units going forward.

6   Q.    And who will determine which of those contracts go to the

7   purchaser and which of those contracts stay behind?  Will that

8   be something in Barclays' discretion, or is that Lehman's

9   decision?

10  A.    That will be a mutual process.

11  Q.    And is it your understanding, sir, that all of the

12  contracts that are to be negotiated, in terms of whether they

13  stay or whether they go, are contracts that reside at LBI?  Or

14  are any of those contracts that reside at other Lehman

15  entities?

16  A.    LBI.

17  Q.    And, sir, can you also please confirm if it is your

18  understanding that the purchased assets do not include

19  Neuberger Berman or any of its assets?

20  A.    Yes, I affirm that.

21  Q.    Okay.  Sir, are you aware of whether -- do you know what a

22  closing balance sheet is?

23  A.    Yes, I do.

24  Q.    Okay.  And do you know whether a closing balance sheet was

25  prepared in connection with this transaction?

109

1   A.    I am not aware of that.

2   Q.    Okay.  Assuming that one was not, do you have any

3   understanding of why one was not?

4   A.    The speed of which we're operating.

5   Q.    Well, in the absence of a closing balance sheet having

6   been prepared, can you please describe for the Court how it is

7   that the debtor determined that fair value was being realized

8   for the sale of these assets?

9   A.    For the assets?

10  Q.    Yes.

11  A.    The individual assets on the balance sheet, the trading

12  inventory was bottoms up, meaning individual line item detail

13  processed through all of our individual risk business units in

14  coordination with the normal finance professionals who are

15  incorporated into the valuation process.

16  Q.    Did the debtors have any form of valuations of any of the

17  assets that are being transferred?

18  A.    Sorry?

19  Q.    Does Lehman have any valuations -- internal valuations of

20  any of the assets that are being transferred to Barclays?

21  A.    Absolutely.  There are many complex securities involved.

22  Many different models that we use to evaluate those securities.

23  Q.    And so, sir, is it your testimony then that a valuation

24  was conducted within Lehman of all of the assets that are being

25  transferred to Barclays?  When was that conducted?

110

1   A.   Portfolio moved during the week, but that was conducted

2   all last evening.  All through and up to the arrangement -- the

3   agreement today.

4   Q.   And, sir, was it the case that at the time of the meeting

5   that took place with creditors this past Wednesday, LBI had

6   approximately --

7             MR. MILLER:  Excuse me, Your Honor, Thursday.

8             MR. QURESHI:  I apologize, it was Thursday.

9             THE COURT:  I'll take that as an objection to the

10  question, and it's sustained.

11  Q.   Am I correct, sir, in understanding that at that time

12  creditors were told that LBI had approximately 1.3 billion

13  dollars in cash?

14  A.   That's correct.

15  Q.   Okay.  And at that time, the deal was that 700 million of

16  those funds would go to Barclays, and the remaining 600 million

17  would stay at LBI?

18  A.   That's correct.

19  Q.   And what is the cash balance at LBI today?

20  A.   It's virtually nil.

21  Q.   Where did it go?

22  A.   To the CME.  Liquidation of the CME trades.  And to all

23  the other clearing banks involved in processing of the

24  transactions this week.

25  Q.   Sir, since the time that the agreement was first entered

111

1    into with Barclays early in the week, are you aware of any

2    affirmative efforts of having been undertaken on behalf of

3    Lehman to shop these assets to any other potential purchasers?

4    A.   The assets, specifically, the inventory assets?

5    Q.   The assets being acquired by Barclays or any subset of

6    those?

7    A.   No.  Nor -- no.

8            MR. QURESHI:  Your Honor, may I have one moment,

9    please?

10           THE COURT:  Sure.

11   Q.   Sir, are you familiar, generally, with the terms of the

12   DIP financing agreement?

13   A.   Generally.

14   Q.   Okay.  Is it your understanding that if the transaction

15   with Barclays does not close, that that would constitute a

16   default under the DIP?

17   A.   Thirty days to repay.  It's thirty days to repay.

18   Q.   So it would trigger a thirty-day repayment of it?

19   A.   Yes.

20   Q.   Okay.

21           MR. QURESHI:  Thank you, Your Honor, that's all I

22   have.

23           THE COURT:  Is there anyone else who wishes to

24   examine the witness?

25           MR. ROSNER:  Your Honor, if you can see me, I'm right

112

1   here.  I'd like to --

2            THE COURT:  Well, Mr. Bienenstock is ahead of you.

3   So you're going to have to move to a position where you can

4   both be seen and heard.

5            Mr. Bienenstock, it's your turn.

6            MR. BIENENSTOCK:  Thank you, Your Honor.

7   CROSS-EXAMINATION

8   BY MR. BIENENSTOCK:

9   Q.   Good evening, Mr. McDade.

10  A.   Good evening.

11  Q.   My name is Martin Bienenstock, representing the Walt

12  Disney Company.  Yesterday, I understand that you were at the

13  information session at Weil Gotshal?

14  A.   That's correct.

15  Q.   And I want to confirm some information given there.

16  Pursuant to the proposed asset purchase agreement here, the

17  businesses that are being -- the Lehman businesses being

18  transferred to Barclays are as follows:  Tell me if I'm

19  incorrect, I'll read one at a time.  Investment Banking?

20  A.   Correct.

21  Q.   Fixed Income?

22  A.   Correct.

23  Q.   North American Operations?

24  A.   Correct.

25  Q.   Credit?

113

1    A.    Correct.

2    Q.    Lending?

3    A.    Correct.

4    Q.    Municipal Bonds?

5    A.    Yes.

6    Q.    Commodities?

7    A.    Correct.

8    Q.    High Yield?

9    A.    Yes.

10   Q.    Derivatives?

11   A.    Yes.

12   Q.    Government Bonds?

13   A.    Yes.

14   Q.    Interest rates derivatives?

15   A.    Yes.

16   Q.    High grade credit?

17   A.    Yes.

18   Q.    Cash and credit derivatives?

19   A.    Yes.

20   Q.    Money market?

21   A.    Yes.

22   Q.    Commercial paper?

23   A.    That's the same.

24   Q.    Commercial lending?

25   A.    Commercial lending, if you mean the leverage finance

114

1    business, yes.

2    Q.    Foreign exchange trading?

3    A.    Yes.

4    Q.    Prime brokerage?

5    A.    Yes.

6    Q.    Prime services?

7    A.    That's the same business.

8    Q.    Sorry, I'm not familiar.

9    A.    No problem.

10   Q.    Cash equities?

11   A.    Correct.

12   Q.    Convertible bonds?

13   A.    Yes.

14   Q.    Long/short proprietary trading?

15   A.    Yes.

16   Q.    Customer options and futures?

17   A.    Yes.

18   Q.    Equity prime brokerage?

19   A.    Yes.

20   Q.    And to transfer those businesses, I take it, the one

21   necessary component is the transfer of employees to Barclay?

22   A.    Absolutely.

23   Q.    And how many employees did you say will be going over to

24   Barclays?

25   A.    Approximately 9,000.

115

1    Q.    And at Lehman Brothers and its subsidiary entities, do

2    employees work across legal entities in business lines or is

3    there a different employee for each legal entity?

4    A.    Most of the employees in the U.S. work for the U.S.

5    broker-dealer, LBI.  Most of the LBH employees were actually

6    corporate functions, operations financed technology which

7    supported the capital markets units in particular.

8    Q.    So the employees then who worked for Lehman Brothers

9    Commercial Corp. are technically employees of LBI, is that

10   correct?

11   A.    Lehman Brothers Commercial Corp.?

12   Q.    Yes.

13   A.    I'm not familiar with that legal entity.

14   Q.    Foreign exchange trading?

15   A.    Foreign exchange trading, yes.

16   Q.    Okay.  And Lehman Brothers Finance, are those employees

17   employees of -- are the employees who operate Lehman Brothers

18   Finance, are they employees of LBI?

19   A.    Lehman Brothers Finance, you mean the finance professional

20   staff?

21   Q.    I think the technical name is Lehman Brothers Finance S.A.

22   A.    Lehman Brothers Finance S.A. is one of our derivative

23   subsidiaries.

24   Q.    Okay.  And the employees who work that business are

25   employees of LBI?

116

1    A.    Correct.

2    Q.    And the same goes for Lehman Brothers Equity Finance

3    (Cayman) Ltd.?

4    A.    Correct.

5    Q.    And for Lehman Brothers Commercial Corporation Asia Ltd.?

6    A.    Correct.

7    Q.    And for Lehman Brothers Bankhaus A.G. Seoul branch?

8    A.    That's a funding vehicle, it's a bank.

9    Q.    Okay.  And for Lehman Brothers Commodity Services, Inc.?

10    A.    That's correct.

11    Q.    Are you sure you have no recollection of Lehman Brothers

12    Commercial Corp., LBCC?

13    A.    No, I do not.

14    Q.    Okay.  But, in general, the subsidiaries of Lehman

15    Brothers Inc. and Lehman Brothers Holdings Inc. use employees

16    of those two entities?

17    A.    That's correct.

18    Q.    So as a consequence of this asset purchase agreement if

19    it's closed, the businesses and those subsidiaries will have to

20    be wound down, is that fair?

21    A.    The businesses in the subsidiaries?

22    Q.    Yes.

23    A.    The vehicles themselves?

24    Q.    Well, let me ask it this way.  Those subsidiaries will

25    stop transacting new business, I take it?

117

1    A.    If Barclays so chooses, yes, that's correct.  In terms of

2    the process.

3    Q.    Okay.

4    A.    We're still in a period, obviously, of working through the

5    dynamic of how the Barclays/Lehman integration, if it were to

6    happen, would take place.

7    Q.    And along with the sale, what was referred to, I think at

8    the information session, as the infrastructure, which I take it

9    are the data processing and other items that enable the

10   businesses to work, that's being transferred over to Barclays?

11   A.    That's correct.

12   Q.    And that would apply -- and that's the same infrastructure

13   that enables the subsidiary's businesses to work, is that

14   correct?

15   A.    Very different infrastructure, it's trading infrastructure

16   in particular.  So trading platforms.  The reason the data

17   centers are so important is the volume of electronic trading

18   taking place, for example, in equities.  So it's a very

19   different infrastructure.

20   Q.    Okay.  Let me clarify that.  Are you saying that the

21   infrastructure that's moving over to Barclays to cover all the

22   list of businesses that you agreed were being transferred, is

23   different than the infrastructure that helps run the

24   subsidiaries?

25   A.    I'm sorry.  There are different forms of infrastructure,

118

1    it's a broad term covering a lot of different aspects of

2    responsibilities for running these businesses.

3    Q.   But the infrastructure for running all of the businesses

4    we went through at the outset is moving over to Barclays?

5    A.   That's correct.

6    Q.   At I think it's LH 745, the owner of the headquarter

7    building, who was that note payable to?

8    A.   The intercompany?

9    Q.   Yes.

10   A.   I don't know the specifics.

11   Q.   Do you know whether the money will be -- do you know

12   whether that note payable will be satisfied at closing?

13   A.   I believe it's already been -- I believe it was already

14   answered earlier that it was satisfied previously at this

15   point.  I don't know specifically.

16   Q.   There was lawyer's colloquy, but I just want to -- this is

17   the evidence part.

18   A.   I do not know specifically.

19   Q.   Okay.  In running the businesses that we spoke about

20   earlier, would you agree that it's the employees that are

21   critically important?

22   A.   Absolutely.

23   Q.   When you negotiated this deal with Barclays, tell me, were

24   you at the table?

25   A.   Absolutely.

119

1    Q.    Okay.  And who were you negotiating on behalf of?

2    A.    I was negotiating on behalf of the estate.

3    Q.    The estate of LBHI?

4    A.    There were two phases of the negotiation.  The weekend

5    conversations, which obviously did not transpire.  And then

6    this phase of the negotiations.

7    Q.    When you refer to estate, is it fair to say you meant

8    Lehman Brothers Holdings Inc. --

9    A.    Correct.

10   Q.    -- and Lehman Brothers Inc., and Lehman Brothers 745?

11   A.    Correct.

12            MR. BIENENSTOCK:  No further questions, Your Honor.

13            THE COURT:  Thank you.  Mr. Sabin, are you going to

14   question?

15            MR. SABIN:  I do, Your Honor.

16            THE COURT:  What happened to that gentleman that

17   raised his hand and sat down --

18            MR. ROSNER:  I'm sorry.  I think Mr. Sabin was

19   prepared to go next.  So if that's okay with Your Honor, it's

20   certainly okay --

21            THE COURT:  It's perfectly fine.  You just seemed

22   very interested to be the one who was going to take Mr.

23   Bienenstock's spot.

24            MR. ROSNER:  No, it's just sometimes I'm hard to be

25   seen.

120

1          THE COURT:  Okay.  Well, you'll be next if you want

2     to be.

3          MR. ROSNER:  Thank you, Your Honor.

4     CROSS-EXAMINATION

5     BY MR. SABIN:

6     Q.   Mr. McDade, good evening.  I'll try to be brief.  Are you

7     familiar with the conditions to closing of this proposed

8     transaction?

9     A.   (No verbal response)

10    Q.   And is it fair to say that one of those conditions require

11    a certain level of employees to be identified and to be

12    anticipated to go to becoming employed by Barclays?

13    A.   That's correct.

14    Q.   In your view as of today, is that condition satisfied or

15    capable of being satisfied?

16    A.   That condition is still being worked through.  You'd have

17    to speak to Barclays in terms of the specifics of their

18    satisfaction.

19    Q.   Let's just assume for the moment that that condition could

20    be satisfied, are the employees who that condition speaks of

21    and identifies in any way, shape or form necessary to the

22    continued operation of any of the existing subsidiaries of LBI

23    today?

24    A.   No.

25    Q.   Lastly, Mr. McDade, there is a condition that was

121

1    negotiated that otherwise requires before Barclays funds, that

2    this Court had entered a final order with respect to certain

3    aspects of the sale.  Has Barclays indicated to you that if

4    there were an appeal that they would close in the face of an

5    appeal if it were not safe?

6    A.   I have not been part of that type of discussion.

7         MR. SABIN:  I have no further questions.  Thank you.

8         THE COURT:  Please state your name?

9         MR. ROSNER:  Sure.  Good evening, Your Honor.  David

10   Rosner from Kasowitz, Benson, Torres & Friedman.

11        MR. MILLER:  Your Honor, do we know who Mr. Rosner

12   represents?

13        THE COURT:  He filed an objection which I saw and

14   read.  But who do you represent?

15        MR. ROSNER:  Apparently, Mr. Miller didn't get a

16   chance to read it.

17        THE COURT:  He's been busier than I have been.  I've

18   been preparing for this hearing and he's been doing other

19   things as well.

20        MR. ROSNER:  Bay Harbour, there's four Bay Harbour

21   entities that are identified.  And actually I just have a few

22   questions.

23   CROSS-EXAMINATION

24   BY MR. ROSNER:

25   Q.   At what point did Barclays express interest in any part of

122

1    Lehmans?

2    A.    In any part of Lehman, the discussion started last Friday

3    evening.

4    Q.    Did Barclay sign a confidentiality agreement?

5    A.    Yes, it did.

6    Q.    Did you see that confidentiality agreement?

7    A.    No, I did not.

8    Q.    Do you know when it was signed?

9    A.    No, I do not.  I assume Friday.

10    Q.    Do you know if it was signed before they got access to any

11    information from Lehmans?

12    A.    I do not know.

13    Q.    When did they actually get access to Lehman confidential

14    information?

15    A.    I do not know.

16    Q.    You weren't involved in the process at all of providing

17    confidential information to --

18    A.    When that process started I was negotiating with another

19    party.

20    Q.    Do you know what Lehman did in -- I'm sorry, do you know

21    what Barclays did in terms of seeking information from Lehmans?

22    A.    Do I know the specifics --

23              MR. MILLER:  Your Honor, please, can we identify in

24    connection to what transaction?

25              MR. ROSNER:  I'm sorry?

123

1       MR. MILLER:  In connection with which transaction?

2       MR. ROSNER:  In connection with the transaction that

3   we have here today.

4       THE COURT:  Okay.  It's an objection.  The question

5   has been clarified.  Is the objection withdrawn as a result of

6   that?

7       MR. MILLER:  Yes, sir.

8       MR. ROSNER:  Okay.

9   Q.   I'm sorry, was I not clear in the question?  I want to be

10  clear, so if I'm not clear please feel free to interrupt.

11  A.   I think it's important to note there were two sets of

12  discussions.  The first over the weekend, organized

13  specifically on behalf of the markets and energized by the

14  Federal Reserve and other regulatory bodies.  Those discussions

15  ended without a transaction, new discussions began the next

16  morning.

17  Q.   Okay.

18  A.   The information used in both of those processes were

19  reasonably similar, obviously with any updates that might have

20  been appropriate.

21  Q.   Got you.  Was there an amendment to a confidentiality

22  agreement, or was there --

23  A.   Again, I was not directly part of those conversations.

24  Q.   Are you aware of anything that Barclays asked for from

25  Lehman that Lehman did not provide in terms of information in

124

1    order to make an assessment as to whether to go forward with a

2    transaction?

3    A.   I'm not specifically aware of anything that they asked for

4    that we could not provide.

5    Q.   Are you aware of whether they asked for or were given

6    information regarding intercompany transactions?

7    A.   I'm not aware specifically.

8    Q.   Does that include intercompany payables?

9    A.   Again, not aware specifically.

10   Q.   And intercompany receivables as well?

11   A.   Yes, sir.

12   Q.   Okay.  Are you aware today if there's an intercompany

13   payable to what I'll call LB -- do you know what I mean by

14   LBIE?

15   A.   Yes.

16   Q.   Are you aware today whether there's an intercompany

17   payable to LBIE by either of the debtor entities?

18   A.   Yes.

19   Q.   How much is it?

20   A.   Approximately five billion.

21   Q.   And where did that one arise?

22   A.   I'm sorry?

23   Q.   Where did that -- I'm sorry.  Where did that intercompany

24   payable arise?  From where did that intercompany payable arise?

25   A.   I think it's a series of transactions.  I'm not aware of

125

1   the specifics.

2   Q.   Are you aware of any of the specifics?

3   A.   No.

4   Q.   Not a single one?

5   A.   With respect to the intercompany?

6   Q.   With respect to the intercompany payable from these

7   debtors to LBIE?

8   A.   I know the notional amount.

9   Q.   Okay.

10  A.   Five billion.

11  Q.   Do you know if money was transferred from LBIE to the

12  debtor entities on Friday, the last week?

13  A.   I'm not involved in the day-to-day process of financing

14  the firm.

15  Q.   But my question was whether you were aware of that?

16  A.   No, I'm not specifically aware.

17  Q.   Have you read anything about that?

18  A.   Absolutely.

19  Q.   You have read something about that?

20  A.   Have I read it in the media, is that what you're referring

21  to?

22  Q.   Yes.

23  A.   Yes.

24  Q.   And you did testify that you were at the meeting yesterday

25  at Weil Gotshal?

126

1   A.   I was at an afternoon session.  My understanding is there

2   was more than one session.

3   Q.   And these questions were asked as to the intercompany

4   payable, correct?

5   A.   Uh-huh.

6   Q.   And do you recall whether --

7          THE COURT:  You have to answer with more than a nod

8   of the head.  Thanks.

9          THE WITNESS:  Sorry.

10  Q.   And do you recall whether this information that I'm asking

11  now was given yesterday at the information center?

12  A.   It was not given yesterday.

13  Q.   Which debtor entity owes that money to LBIE?

14  A.   LBI is a payable to LBIE.

15  Q.   And what about Holdings?

16  A.   LBIE is a payable to LB Holdings.

17  Q.   And how much is that?

18  A.   Eight billion.

19  Q.   And do you know what that's derived from?

20  A.   No.

21  Q.   Did you do an audit of the -- I'm sorry.  Has an audit

22  been accomplished of the securities that are to be transferred

23  to Barclays under the proposed transactions?

24  A.   If you mean an audit by external valuation process?

25  Q.   By identification of the securities?

127

1    A.    Absolutely, line by line.

2    Q.    I think during your proffer it was stated that you are

3    familiar with the contract.  I assume that means you don't know

4    every line but you are generally familiar with the contract

5    that's before the Court today, is that a fair statement?

6    A.    Yes.

7    Q.    Are you aware of the closing conditions under the

8    contract?

9    A.    I believe so.

10   Q.    Are they all satisfied as of today, subject to the entry

11   of an order by this Court?

12   A.    With respect to all those that I have knowledge of, yes.

13   Q.    And I think there was a question, but I just want to be

14   clear.  There is a closing condition regarding eight employees

15   signing up agreements, is that correct?

16   A.    That is correct.

17   Q.    And I might have missed this before, and have all of those

18   eight employees been signed up?

19   A.    We expect no issues with respect to the employment

20   services needs to close.

21   Q.    Okay.  So as of sitting here right now, that condition has

22   not been met?

23   A.    We expect no issues.

24   Q.    For the record, it's a yes or no and I just want to make

25   it clear on the record?

128

1    A.   I do not have the specific information with respect to

2    either the exact number of those participants or with respect

3    to Barclays' view as to whether that would be waived if,

4    indeed, that became an issue.

5         MR. ROSNER:  Okay.  I have nothing further, Your

6    Honor.  Thank you.

7         THE COURT:  Okay, thank you.  Is there anyone else

8    that wishes to examine Mr. McDade?  Come forward.  Please state

9    your name and identity of the client that you're here to

10   represent.

11        MR. BYRNE:  Yes, Your Honor, good afternoon.  Larry

12   Byrne from Linklaters.  Linklaters, Your Honor, represents the

13   administrators who have been appointed to supervise the

14   insolvency of four Lehman Brothers entities in the U.K. and in

15   Europe.

16        THE COURT:  These are the Pricewaterhouse people?

17        MR. BYRNE:  Yes, Your Honor.

18        THE COURT:  Okay.

19        MR. BYRNE:  So we act for Pricewaterhouse who are now

20   the insolvency administrators in the U.K. for these four Lehman

21   Brothers entities who are affiliates of subsidiaries of the

22   debtors.

23        THE COURT:  Okay.  You may proceed with your

24   questions.

25   CROSS-EXAMINATION

1  BY MR. BYRNE:

2  Q.    Good evening, Mr. McDade.  The hour's late, so I have just

3  a few questions for you following up on the previous questions.

4        You referred to an intercompany payable in the amount of

5  five billion and an intercompany payable in the amount of eight

6  billion.  Do you know when those payables first arose or came

7  into existence?

8  A.    No, I do not.

9  Q.    When did you first become aware of them?

10       MR. MILLER:  Excuse me, Your Honor.  I'm not quite

11  sure I understand how that relates to whether the sale should

12  be approved or not.  It seems to be the administrator in London

13  is trying to find out information concerning whether it has a

14  claim against this estate, what's going to happen to that

15  claim.  It doesn't go to this transaction.

16       THE COURT:  Well, let me observe that I have read a

17  number of objections that have raised questions concerning

18  whether this transaction, if approved, would affect the ability

19  of parties-in-interest, including the Pricewaterhouse foreign

20  representatives, I'll call them for these purposes, in being

21  able to pursue a claim for recovery in this estate of the eight

22  billion dollars that, according to the objection that I read,

23  was allegedly swept from LBIE on Friday, a week ago, to the

24  accounts of LBH.  And that didn't come back to LBIE on Monday

25  presumably as a consequence of the bankruptcy filing.  And so I

1  don't know that this goes to the reasonableness of the debtors'

2  business judgment in proposing that this transaction be

3  approved this evening, as much as it goes to the legal affect

4  of such approval in light of the ambiguities -- alleged

5  ambiguities and vagueness -- the alleged vagueness of the asset

6  purchase agreement and the various documents that have been

7  offered up to parties-in-interest.

8          So with that, I overrule your comment and will permit

9  the examination.

10         MR. BYRNE:  Thank you, Your Honor.  May I proceed?

11         THE COURT:  Yes.

12  BY MR. BYRNE:

13  Q.  When did you first become aware of these two intercompany

14  payables, the eight billion, the five billion, apart from press

15  reports?

16  A.  I followed up post the session that we had yesterday to

17  make sure I had the information.

18  Q.  And what information did you learn as a result of that

19  follow-up?

20  A.  The previous statements that I made with respect to the

21  nominal amounts.

22  Q.  I'm not sure I understand what you're saying.

23  A.  LBI has a payable to LBIE.  LBIE has a payable to LBH.

24  Those are the figures and data that I researched.

25  Q.  And following up to confirm those figures and data, what

131

1    is it that you looked at?

2    A.    I looked at a summary finance document from one of our

3    senior finance officers.

4    Q.    That's an internal document at Lehman?

5    A.    That's correct.

6    Q.    And who is the senior finance officer that had prepared

7    that?

8    A.    I don't know who prepared the document.  The interaction I

9    had was with a gentleman named Chris O'Meara.

10    Q.    I'm sorry, I couldn't hear you.

11    A.    Chris O'Meara.

12         MR. BYRNE:  Your Honor, I don't think I have any

13    further questions at this time.  I would like an opportunity

14    either now or later just to clarify a couple of things you said

15    with respect to the PWC administrator's position.  Because

16    they're actually not objecting to this transaction.

17         THE COURT:  Oh, great.  I assumed because you were

18    asking questions that you were getting in the way of it.

19         MR. BYRNE:  No, not at all, Your Honor, we just

20    wanted clarification based on the questions that were asked

21    earlier.  You may not have seen, because it did not get

22    electronically filed until shortly before the hearing, what the

23    administrators have filed, which is a response to the proposed

24    settlement, not an objection.  And we say in the first line of

25    that response that the administrators have no objections to the

132

1   approval of this transaction this evening.

2          There are some clarifications we're going to seek,

3   but we can do that later in the proceeding with the Court's

4   permission.

5          THE COURT:  Fine.  The only thing I read was the

6   declaration that was filed.  In order to triage the preparation

7   for this hearing, I read things that I thought would be

8   helpful.

9          MR. BYRNE:  Right.  We have a declaration from the

10  PWC administrator --

11         THE COURT:  That's what I read.

12         MR. BYRNE:  Okay.  I think the transaction details

13  you're describing might have been in someone else's objection,

14  not in ours.

15         THE COURT:  If I misstated the facts it's because I

16  didn't understand --

17         MR. BYRNE:  Understood, Your Honor.  I have nothing

18  further at this time, Your Honor.

19         THE COURT:  Okay.  Is there anyone else that would --

20  Ms. Granfield?

21         MS. GRANFIELD:  Good evening, Your Honor.  Lindsay

22  Granfield, Cleary Gottlieb Steen & Hamilton, LLP on behalf of

23  Barclays Capital.

24         Odd procedural posture.  I think that there's going

25  to be very able -- probably not too long an able redirect by

133

1    the debtor.  And that might make it unnecessary for me to ask

2    any questions.  And, in fact, if there was a short recess, I

3    might be able to confer with Mr. Miller on what he planned to

4    cover and not make it necessary for me to ask any questions.

5            THE COURT:  Well, before taking that welcomed recess,

6    because I think people are probably ready for one, let me just

7    confirm that there is no one else, other than yourself, at this

8    moment, has an interest in asking any further questions of Mr.

9    McDade?

10           MS. GRANFIELD:  Very good, Your Honor.

11           THE COURT:  I see no one moving in the direction of

12   the podium, and I see no one indicating an interest in asking

13   questions.  So I'm going to assume that you are the last

14   possible questioner on cross.  And since its now about ten

15   minutes to 8 in the evening and it is warm, and many people are

16   standing, I'm going to propose that we take a break until 8:15.

17   And we'll resume at that time.

18           MS. GRANFIELD:  Thank you, Your Honor.

19       (Recess from 7:48 p.m. until 8:45 p.m.)

20           THE COURT:  Be seated, please.

21           MR. MILLER:  Once again, good evening, Your Honor.

22   Harvey Miller for the debtors.

23           Your Honor, in the interest of expedition, I would

24   offer into evidence the asset purchase agreement among Lehman

25   Brothers Holdings Inc., Lehman Brothers Inc., LB 745 LLC and

134

1    Barclays Capital, Inc. dated as of September 16, 2008 and the

2    first amendment to the asset purchase agreement among the same

3    parties, Your Honor, dated September 19, 2008.

4         THE COURT:  Is there any objection to the admission

5    of the evidence of those two documents?

6         UNIDENTIFIED SPEAKER:  Yeah.  No, I haven't seen it.

7         UNIDENTIFIED SPEAKER:  We haven't been given a copy

8    even.

9         UNIDENTIFIED SPEAKER:  Same, Your Honor.

10        UNIDENTIFIED SPEAKER:  Your Honor, we would have the

11   additional objection of it's unclear whether this even

12   represents the final asset purchase agreement or whether terms

13   are made to be negotiated.

14        THE COURT:  I don't think it needs to represent the

15   final.  It's a document that -- assuming the first one is a

16   document everybody's seen, the second one is the only document

17   that may be subject to reasonable objection.  And whether or

18   not it is, in fact, the document that would govern the closing

19   is irrelevant to its admissibility.  That objection is

20   overruled.

21        As far as the amendment, I'm certainly interested in

22   seeing it.  I'm sure others are as well.  How many copies are

23   there?  Or are there copies?

24        MR. MILLER:  As I said last time, Your Honor, modern

25   technology is not what it's all cracked up to be.  Your Honor,

135

1    I have --

2            THE COURT:  I would also note that copies of a

3    document, while a courtesy of counsel, are not a condition to

4    admissibility.  And if an offer of proof is made as to the

5    authenticity of the document, the fact that it is what it

6    purports to be, which is the second amendment, I'm prepared to

7    admit it notwithstanding the fact that copies are not

8    available, recognizing that there is an objection that is a

9    reasonable one that all other parties to the transaction need

10    to see a copy at some point so they have reasonable notice.

11            MR. MILLER:  Your Honor, I would make an offer of

12    proof that this is a document.  This represents the asset

13    purchase agreement that's dated as of September 16, 2008, which

14    was attached or filed at 6 a.m., or whatever it was, in the

15    morning, a couple of days ago with a lot of interlineations.

16    This is a clean draft -- a clean copy, Your Honor.  This is the

17    execution -- a copy of the execution copy.

18            THE COURT:  It is the hand-marked copy typed so that

19    the edits that we saw in handwriting are now incorporated in

20    full font?

21            MR. MILLER:  That is correct, Your Honor.

22            THE COURT:  Okay.

23            MR. MILLER:  I would represent, Your Honor, that the

24    first amendment to the asset purchase agreement, which consists

25    of exactly four pages, dated September 19 -- and this is a copy

136

1    of the execution copy of that document, Your Honor, which

2    clarifies certain provisions in the asset purchase agreement,

3    and, Your Honor, is part of -- an integral part of the

4    agreement and is signed on behalf of Lehman Brothers Holdings,

5    Lehman Brothers Inc., LB 745 and Barclays Capital.

6            THE COURT:  May I simply ask if the witness who's on

7    the witness stand is familiar with that document or had

8    anything to do with its execution, it might be in a position to

9    further authenticate it?

10           MR. MILLER:  May I approach, Your Honor?

11           THE COURT:  Yes.

12   REDIRECT EXAMINATION

13   BY MR. MILLER:

14   **Q.   Mr. McDade, are you familiar with the fact that a first**

15   **amendment was made to the asset purchase agreement?**

16   **A.   Yes, I am.**

17   **Q.   The document which I have shown you, have you seen that**

18   **document before?**

19   **A.   Yes, I have.**

20   **Q.   Are you familiar with that document?**

21   **A.   Yes, I am.**

22   **Q.   Is that the first amendment to the asset purchase**

23   **agreement?**

24   **A.   Yes, it is.**

25   **Q.   That was executed on behalf of the debtors?**

137

1   A.   Yes.

2        MR. MILLER:  I offer it, Your Honor.

3        THE COURT:  Notwithstanding the objection that copies

4   are not available, it's admitted.  So it's in evidence along

5   with that first one.

6   (Copy of execution copy of asset purchase agreement among LBHI,

7   LBI, LB 745 LLC and Barclays Capital, Inc. dated 9/16/08 and

8   first amendment thereto dated 9/19/08 were hereby received as

9   Debtor's Exhibit into evidence, as of this date.)

10       MR. MILLER:  Thank you, Your Honor.  If I might, Your

11  Honor, I would like to hand up copies to you on -- so that'd be

12  marked, Your Honor?

13       THE COURT:  If you wish to have them marked they can

14  be marked.  Thank you.

15  BY MR. MILLER:

16  Q.   Mr. McDade, in your cross-examination concerning LBIE, you

17  made reference to the notional value of the payables and the

18  receivable.  What did you mean by "notional value"?

19  A.   The -- the notional of eight billion was the -- the

20  figure, the gross figure at the bottom of the calculation.

21  Q.   Does the transaction contemplate a transition services

22  agreement?

23  A.   Yes, it does.

24  Q.   And what would that agreement provide?

25  A.   Those would provide services to Barclays and back with

138

1   respect to all of the associated business responsibilities that

2   would be necessary to continue the business as it moves  on --

3   the businesses as they move on.

4   Q.   And is that agreement in the process of being negotiated

5   right now?

6   A.   Yes, it is.

7   Q.   Have you formed an opinion as to whether that will come to

8   fruition?

9   A.   Yes, I did.

10  Q.   And what is your opinion?

11  A.   Yes, it will.

12          MR. MILLER:  I have no further questions of this

13  witness, Your Honor.

14          THE COURT:  Given that very limited redirect, I would

15  hope that further examination would be held to a limited period

16  given the hour.  But I don't wish to restrict the examination

17  of any party-in-interest who wishes to further examine only

18  with respect to the subject of the redirect.

19          I see no interest in further questioning.  I believe

20  it's now timely to excuse the witness.  Mr. McDade, thank you.

21  You're excused.

22          THE WITNESS:  Thank you, Your Honor.

23          MR. MILLER:  Your Honor, I am pleased to announce

24  that we have reached agreement in respect of the value of the

25  real estate.  As Your Honor may recall, there was a difference

139

1    of opinion between Barclays and Lehman.  The Barclays

2    appraisal, Your Honor, which I referred to, that was made by CB

3    Richard Ellis, was an appraisal for the building and states

4    specifically in the appraisal, Your Honor, the appraisal

5    premise is as is, assuming market tenant in place.

6          I told Your Honor if there is no tenant in place the

7    value of the buildings really depreciates.  That appraisal,

8    Your Honor, was one billion twenty million dollars.  Barclays

9    obtained an appraisal for the building at 900 million dollars,

10   Your Honor.  The parties have agreed to split the difference.

11   That's so that the value that would go to the estate, Your

12   Honor, is 960 million dollars.

13         As to the two data centers, Your Honor, Barclays has

14   agreed that the appraisal values obtained by Lehman for those

15   two properties, which total 330 thousand dollars --

16         THE COURT:  Three hundred thirty million, perhaps?

17         MR. MILLER:  Three hundred thirty million dollars,

18   Your Honor.  It's getting late.  So that there would be a

19   billion 290 -- I'm sorry, a billion 290 million dollars as the

20   purchase price, and there will be no brokers' commissions, Your

21   Honor.  So that will be the amount received if this

22   transaction's consummated.

23         THE COURT:  All right.  So, notwithstanding some of

24   the things that came up during the opening remarks and the

25   examination of the witness, there is, at this moment, a

140

1    stipulation which you have put on the record that the real

2    estate component of the transaction, in the aggregate, and I

3    just want to be sure, that the number will be valued at one

4    billion 290 million dollars and there will be no commission

5    payable.

6              MR. MILLER:  That is correct, Your Honor.

7              THE COURT:  Fine.  Thank you.

8              MR. MILLER:  Okay.  Your Honor, just one observation.

9    We told Your Honor that if this transaction were to be approved

10   in a relatively short period of time that, if we can, we could

11   transfer the accounts before 10:45 p.m.

12             THE COURT:  Let's get to work.

13             MR. MILLER:  Okay.  Your Honor, our next witness

14   would be Mr. Barry W. Ridings of Lazard.  And I would also,

15   Your Honor, do a fast proffer.

16             THE COURT:  Is there any objection to proceeding by

17   means of a proffer with respect to Mr. Ridings' direct

18   examination?

19             There's no objection.  Please proceed.

20             MR. MILLER:  Your Honor, if Mr. Ridings were called

21   to testify in support of the sale motion, his direct testimony

22   would be as follows:

23             Mr. Ridings joined Lazard in July 1999; is co-head of

24   the restructuring group.  He has a BA from Colgate University

25   and an MBA in finance from Cornell University.

141

1          From 1990 to 1999, Mr. Ridings was the managing

2     director of BT Alex. Brown and this restructuring group.

3          Before that, Mr. Ridings served as a managing

4     director in the restructuring group at Drexel Burnham and

5     Lambert.  Interesting.  As a result of his experiences --

6          THE COURT:  At least we have somebody to point the

7     finger at.

8          MR. MILLER:  As a result of the experiences at

9     Drexel, Mr. Ridings knows of the consequences of failure of a

10    major investment bank and the costs in dislocation that occur.

11         Since 1990, Lazard's professionals have been involved

12    in over 250 restructurings, representing 350 billion dollars in

13    debtors' assets.

14         Mr. Ridings is the head of Lazard's capital markets

15    group, which is the Lazard unit responsible for equity and bond

16    sales, trading and research business, which is the same

17    business being sold by LBI to Barclays.

18         Mr. Ridings has testified in many reorganization

19    cases, including Macy's, Western Union, Owens Corning, Marble

20    Entertainment, Fruit of the Loom, Sun Healthcare, Wang

21    Laboratories and Vlasic Foods.

22         He is also a former member of the board of directors

23    of the American Stock Exchange and serves on corporate boards,

24    including New Valley Corp. and other corporations.

25         Mr. Ridings has been the principal investment banker

142

1    on over twenty-five public offerings of high-yield debt.  He

2    also has extensive experience with IPOs, opinion letters and

3    M&A transactions.

4           Lehman retained Lazard and Mr. Ridings to offer

5    investment banking and financial advice.  Mr. Ridings' work in

6    this matter also involved assisting in the sale of the various

7    assets.

8           He was intimately involved in the negotiations

9    between Lehman and Barclays that resulted in the asset purchase

10   agreement.  He would testify that he has become reasonably

11   familiar with Lehman's business and has reviewed the terms and

12   provisions of the asset purchase agreement with Barclays.

13          Mr. Ridings would testify that over the past year the

14   financial markets have been extremely volatile with negative

15   consequences to Lehman and other similar firms.

16          He would testify that Lehman has faced a continued

17   lack of liquidity in the credit markets, significantly

18   depressed volumes in most equity markets, a widening in fixed

19   income credit spreads compared to the end of 2007 fiscal year

20   as well as declining asset values.  As a leading firm in the

21   financial markets, these factors have had a materially negative

22   impact on Lehman.

23          He would testify that there was downward pressure on

24   financial asset prices, and Lehman's inventory positions

25   diminished in value and its liquidity began to contract.

143

1          In addition, Lehman's transactional volumes and

2     market activity for Lehman's capital markets and investment

3     banking business segments also contracted.

4          Lehman's portfolio was particularly vulnerable

5     because it held significant volumes of illiquid residential

6     mortgages and structured credit products.

7          At the time of Lazard's engagement, he was aware that

8     Lehman's management was exploring several different options to

9     deal with the crisis.  Specifically, he is aware that Lehman

10    explored selling its investment management division to raise

11    much needed liquidity, and it also considered spinning off some

12    of its illiquid real estate assets.

13         Before any of these strategic maneuvers came to

14    fruition, the company was forced to file the Chapter 11 cases

15    because its assets were rapidly depreciating and they could not

16    raise additional liquidity.

17         Mr. Ridings would also testify that the sale of LBI

18    must be immediately consummated or there will be little or

19    nothing to sell.

20         There are few potential purchasers for this business

21    because any buyer must meet regulatory requirements, have

22    sufficient capital and have the strategic capability to operate

23    the business from day one.

24         He would testify that he and other members of the

25    Lazard team were involved in the discussions and negotiations

144

1    with Barclays.

2          Mr. Ridings would testify that the negotiations were

3    at arm's length, difficult and aggressively negotiated by the

4    parties, that the asset purchase agreement is the result of

5    good faith negotiations.

6          He would testify that the parties worked around the

7    clock to finalize the purchase agreement because they realize

8    that time was of the essence and that the business would not

9    survive without an immediate infusion of new liquidity.

10          Between Monday and Wednesday of this week, he would

11   testify the parties exchanged numerous bids and asks and turned

12   drafts of the agreement countless times.

13          He would also testify that since executing the asset

14   purchase agreement the parties have continued to work nonstop

15   in order to prepare for closing, contracts have been identified

16   for assumption or assignment and, with the authority from the

17   Court, debtor-in-possession financing was obtained for LBHI.

18          He would testify that these assets have substantially

19   greater value if they are sold as a going concern.  Despite the

20   tremendous publicity associated with this case, not one firm,

21   other than Barclays, showed up with an interest in the assets

22   as a whole.  Without Barclays, Lehman would be forced to sell

23   discreet assets for a fraction of the value that will be

24   realized from this transaction.

25          By selling the business as a going concern, Lehman

145

1    has preserved approximately nine to ten thousand jobs for its

2    employees and avoided significant costs and claims that would

3    have resulted if there were mass layoffs and a cessation of

4    operations.

5         He would also testify that calls were placed to a

6    number of prospective bidders over this week.  He would testify

7    that Lehman's situation was widely known in the financial

8    services industry and yet no one really appeared to show an

9    interest.

10         He will testify that Lazard had twenty-one contacts

11    with entities that expressed an interest but not one of them,

12    nor any other entity, had expressed the desire or ability to

13    step into Barclays' shoes.

14         Practically, he would testify there were few

15    potential purchasers for these assets.  Of this universe, most

16    of the funds that could purchase these assets have their own

17    cash flow problems to contend with and are not looking to

18    expand.

19         Any prospective purchaser would need access to the

20    Federal Reserve Funds to operate Lehman's business.  The list

21    of firms authorized to trade directly with the Federal Reserve

22    System and borrow from the so-called "window" is limited.  Each

23    entity must meet stringent capital and regulatory requirements.

24         He would testify that, in his opinion, Barclays'

25    offer is the highest and best offer for these assets.

146

1          Lehman is selling its North American investment

2    banking and capital markets business.  This business focuses on

3    fixed income, equities, trading, advisory services, futures and

4    investment banking.  The costs to Lehman and counterparties, as

5    pending transactions unwind, if this transaction is not

6    approved, will run into the many billions of dollars.

7    Counterparties will be required to liquidate their collateral

8    positions, which may entail a wholesale dumping of the

9    collateral into the marketplace with the attendant erosion of

10   values.  The deficiencies that counterparties may incur will

11   result in massive claims against the assets of the Lehman

12   estates.  Ten to twelve thousand employees may not find any

13   employment.  Any failure to consummate may potentially cause a

14   major shock to the financial system.

15          Although the potential sale of Lehman assets has

16   generally been known to the financial community for many months

17   and that the current transaction has gotten enormous and wide

18   media attention, as previously stated, only twenty very limited

19   inquiries were made from outside parties.

20          Again, he would testify, Your Honor, the universe of

21   potentially qualified and capable purchases is extremely

22   limited by the huge financial commitment that would have to be

23   made and the ability to access federal funds.  At most, there

24   are less than a half dozen possible entities that might

25   qualify, and most of them have their own financial needs.

147

1          In conclusion, it is Mr. Ridings' opinion, he would

2    testify, that this sale transaction should be approved because

3    it serves the best interests of the creditors, the public and

4    the nation and that it was negotiated in good faith and at

5    arm's length by both parties.

6          That concludes the proffer, Your Honor.

7          THE COURT:  Is there anyone who objects to my receipt

8    of the proffer in evidence or who wishes to examine Mr. Ridings

9    on cross-examination?

10          MR. QURESHI:  Your Honor, again, Abid Qureshi, Akin

11   Gump Strauss Hauer & Feld, on behalf of the informal committee

12   of note holders -- the informal group of note holders.  We

13   would like to cross-examine Mr. Ridings briefly.

14          THE COURT:  All right, Mr. Ridings, would you please

15   come to the stand?  Mr. Ridings, please, before sitting down,

16   just raise your right hand.  I'm going to swear you as a

17   witness.

18       (Witness duly sworn)

19          THE COURT:  Please be seated.

20   CROSS-EXAMINATION

21   BY MR. QURESHI:

22   Q.   Good evening, Mr. Ridings.  Sir, when was Lazard first

23   retained in connection with this engagement?

24   A.   Lazard had been working with Lehman since July.  We had an

25   engagement letter signed last Friday, before the filing, in

148

1    connection with the transactions that did not happen.  And then

2    we were re-retained on, I guess, Monday afternoon, after the

3    filing.

4    Q.    Okay.  And, sir, is it correct that you are, again,

5    generally familiar with the terms and the provisions contained

6    in the asset purchase agreement?

7    A.    Yes.

8    Q.    And in your proffer the preservation of nine to ten

9    thousand jobs was discussed, correct?

10   A.    Yes.

11   Q.    And is it your understanding that Barclays' obligation,

12   under the terms of the asset purchase agreement, is to only

13   keep those employees for ninety days?

14   A.    I think, under the terms of the agreement, all nine to ten

15   thousand people will be offered a job for ninety days, and at

16   the end of that period Barclays will decide if they want to

17   offer them full-time employment or not and, if not, they will

18   be given severance according to Lehman's normal severance

19   policy.

20   Q.    Okay.  With the severance to be paid by whom?

21   A.    Barclays.

22   Q.    Okay.  So the obligation to employ runs only for ninety

23   days?

24   A.    I don't know that there's a commitment only for ninety

25   days.  It's unimaginable to me that they can run the business

149

1    without people.

2    Q.   Sir, are you generally familiar with the closing

3    conditions contained in the APA?

4    A.   Generally.

5    Q.   Okay.  And, according to your understanding, as you sit

6    here today, have all of the closing conditions been satisfied?

7    A.   I don't know.

8    Q.   Okay.  Are you aware of any specific closing conditions

9    that have not been satisfied?

10   A.   I don't know.

11   Q.   Okay.  Are you aware, sir, of the provision in the asset

12   purchase agreement that requires contracts to be negotiated

13   with eight key employees?

14   A.   Yes.

15   Q.   Is it your understanding that that is a closing condition?

16   A.   Yes.

17   Q.   Is it your understanding that that closing condition has

18   been satisfied?

19   A.   I don't know.

20   Q.   Okay.  Is it your understanding that that closing

21   condition has been waived by Barclays?

22   A.   Not that I know of.

23   Q.   Okay.  Sir, is it also your understanding that one of the

24   closing conditions is that, I believe, a prior version of the

25   APA used the term "substantial majority" of so-called "critical

150

1    employees" agreed to go with Barclays upon the closing of the

2    transaction?

3    A.    My understanding:  that it's that they don't leave.  I

4    don't know that there's an agreement that they go.

5    Q.    That they are acquired by Barclays, in other words?

6    A.    In other words, they haven't left before the closing.

7    Q.    Right.  And is it your understanding --

8             MR. QURESHI:  Or, strike that.

9    Q.    Do you know if that closing condition has been complied

10   with?

11   A.    We're closing tonight or we're not closing?

12   Q.    Do you have an understanding of whether the substantial

13   majority of the employees on that list have agreed to stay upon

14   the closing?

15   A.    That's not the -- they don't leave.  It's not that they

16   agreed to stay.  And at close of business I saw people working,

17   albeit not everybody was at their desk.

18   Q.    Sir, in your proffer -- through your proffer you testified

19   that Lazard has contacted a number of entities in connection

20   with attempting to find buyers for these assets.  Is that

21   correct?

22   A.    Can you clarify when?

23   Q.    Well, that is going to be my question.  Since the

24   transaction with Barclays was signed up, has any effort been

25   made by Lazard to try to find an alternative buyer for the same

151

1   assets being acquired by Barclays?

2   A.   Okay.  There's a two-part answer:  Number one, we

3   responded to inquiries coming in in the form of phone calls,

4   fax and letters.  We spoke with all of those people.  And as

5   mentioned in the proffer, not one of those people offered to

6   buy the assets that Barclays is buying.  Those inquiries ranged

7   from someone who wanted to buy the phone system to people who

8   wanted usually to buy real estate.

9        In terms of reaching out to other parties, as Mr. Miller

10  suggested, there's a very limited number of people who would be

11  qualified.  Almost every single one of those limited people

12  have either just completed an acquisition or are in the midst

13  of an acquisition or a merger.

14       It was my belief that it would not serve a purpose for me

15  or Lazard to reach out to those parties and say would you like

16  to bid for fear of throwing more panic on this offering.

17       Based on what's been reported in the papers, if those

18  people were interested they would have called.

19  Q.   So am I to understand, sir, that your testimony is then

20  that Lazard, on behalf of the company, made no affirmative

21  effort to reach out to potential buyers for these assets but

22  responded only to inquiries that were received?

23  A.   Based on what I said, yes.

24  Q.   Okay.  And, sir, in terms of the inquiries that were

25  received, were those people that inquired told that subsets of

152

1    the assets being acquired by Barclays were available?  Or were

2    those people told that they would only be considered if they

3    wanted to buy everything?

4    A.    The latter.

5    Q.    Okay.  And why is that, sir?

6    A.    Because Barclays wasn't willing to close if they could --

7    people could cherry-pick assets.

8    Q.    Okay.  So do you know, for example, if any offers were

9    received through inquiries coming in to Lazard for the real

10   estate assets that exceed what Barclays is prepared to pay for

11   the real estate assets?

12   A.    The real estate inquiries we got are for things that we

13   call CRE, commercial real estate, and they are not the assets

14   that are being sold to Barclays.

15   Q.    So your testimony is that none of the inquiries that

16   Lazard received for any of the assets going to Barclays were

17   specific offers with respect to the same real estate being

18   acquired by Barclays?

19   A.    Well, my understanding was that the inquiries for the real

20   estate were for the commercial real estate, not the securities

21   that Barclays is buying.  Yes, that's my understanding.

22   Q.    Sir, I'd like to ask you a question about the amendment to

23   the purchase agreement that we just received.  If Mr. Miller

24   has a copy that I could hand up to the witness, that would

25   help.

153

1           MR. MILLER:  Here.

2           MR. QURESHI:  Thank you.  May I approach, Your Honor?

3           THE COURT:  You may.

4    Q.   Mr. Ridings, first, were you involved in the negotiations

5    concerning this amendment?

6    A.   Concerning the amendment, generally.  The words on the

7    page, no.

8    Q.   Okay.  Let me direct your attention to paragraph 4.

9    That's the holdback and adjustment provision.  And, again, my

10   apologies; I barely had time to read it.  Can you please

11   explain, if you can, what your understanding is of that

12   provision and how it's to work?

13   A.   I haven't read this either, so I can't explain it.

14   Q.   So you were not involved in the negotiation of that

15   particular provision?

16   A.   Not of that paragraph.

17   Q.   Okay.

18           MR. QURESHI:  Your Honor, may I have a brief moment?

19           THE COURT:  Yes.

20   Q.   Sir, is it your understanding that Barclays is now

21   demanding the holdback of 250 million dollars subject to

22   certain offsets?

23   A.   I mean, the paragraph says what it says.  And I can read

24   it for you, if you'd like.

25   Q.   No, that's okay.

154

1    A.    Okay.

2    Q.    Sir, in your negotiations with Barclays, right, related to

3    this amendment, did they make the demand to you that they

4    wanted the holdback of 250 million dollars?

5    A.    They did not make that demand to me, no.

6    Q.    Okay.  Are you aware of that demand having been made --

7    A.    Yes.

8    Q.    -- in the negotiations?  Are you aware of Lehman having

9    agreed to it?

10    A.    I believe they've agreed to this.

11    Q.    Thank you.

12            MR. QURESHI:  Nothing further.

13            THE COURT:  Is there anyone else who wishes to cross-

14    examine Mr. Ridings?

15            Is there any redirect?

16            MR. MILLER:  Just one question, Your Honor.

17    REDIRECT EXAMINATION

18    BY MR. MILLER:

19    Q.    Mr. Ridings, you're aware of the additional amendments

20    that have been made to the asset purchase agreement which were

21    discussed earlier today?

22    A.    Yes.

23    Q.    And isn't it a fact that under those additional amendments

24    and clarifications that the 250 million dollars, to the

25    goodwill of LBI, is going to be paid to LBI?

155

1  A.    That's my understanding.   Yes, sir.

2  Q.    So that that holdback provision has since been amended,

3  and in the clarified agreement there will be 250 million

4  dollars, if this transaction is consummated, that will go to

5  LBI?

6  A.    Yes.

7  Q.    Thank you.

8            THE COURT:  Mr. Ridings, you're excused.  Thank you.

9            THE WITNESS:  Thank you.

10           MR. BIENENSTOCK:  Your Honor, I have one

11  clarification on the record.  We had submitted -- it doesn't

12  affect your BNC.  We had submitted, I think as Your Honor might

13  have noted, two responses to the pending motion.  When I cross-

14  examined, I only cross-examined on behalf of the Walt Disney

15  Company because, based on clarifications given to the Royal

16  Bank of Scotland, they are satisfied and withdraw their

17  response.

18           THE COURT:  Thank you.  Mr. Miller, do you have any

19  more witnesses?

20           MR. MILLER:  No, Your Honor.

21           THE COURT:  We're relieved.  Does that conclude the

22  evidentiary portion of your case?

23           MR. MILLER:  Concludes the debtors' case, Your Honor.

24  I assume my friend, Mr. Sabin, has to have the last word.

25           MR. SABIN:  Not the last.  I'm just asking whether,

156

1    on the record, we can include the debtors' affirmative case

2    with a clarification that was still left open, and that was as

3    to whether master ISDA agreements and master securities

4    contracts, other than those owned by Barclays, will not be sold

5    as part of this transaction.

6              UNIDENTIFIED SPEAKER:  Right.  They will not.

7              UNIDENTIFIED SPEAKER:  Correct.

8              MR. SABIN:  Thank you.

9              THE COURT:  Okay.  We've got clarification, which I

10   don't treat as part of the evidentiary record but rather as

11   stipulation of counsel or a response to counsel's question.

12             I'll repeat my question to Mr. Miller:  Do you have

13   any other evidence that you wish to offer?

14             MR. MILLER:  No, Your Honor.

15             THE COURT:  Fine.  Then the debtors' case, at least

16   evidentiary case, in support of the proposed relief is

17   concluded.

18             I'll simply ask if any of the objectors are intending

19   to submit any evidence of their own in opposition to the

20   pending motion.

21             Someone on the phone is rustling papers that we are

22   all hearing, and you are disturbing hundreds of people.  Stop

23   it, please.  And if there's anyone on the telephone who doesn't

24   have their mute button pushed to mute, do so now.

25             Mr. Golden, do you have something you want to say?

157

1          MR. GOLDEN:  No, I was just going to say that we did

2     not intend to call a witness, Your Honor.  We do not intend to

3     call a witness.

4          THE COURT:  I assume because nobody spoke that that

5     was the -- but now we know, and I'm even happier to know that

6     you do not intend to call witnesses.

7          It seems to me that, at this point, then, this comes

8     down to either arguments in support of those objections that

9     have not been either withdrawn, as in the case of Mr.

10    Bienenstock's other client, or deferred, as in the case of any

11    disputes with respect to cure amounts.

12         And so I'm going to ask, so we can do this

13    expeditiously, who wishes to press argument?  Unless Mr.

14    Miller, as proponent of the transaction, wishes to say anything

15    before he hears the objectors.

16         MR. MILLER:  No, Your Honor.  I think time is of the

17    essence right now.  I would just like to say, Your Honor, that

18    because time is of the essence I've been informed by Ms.

19    Bambach of the SEC that the regulators strongly support this

20    transaction.

21         THE COURT:  I will incorporate into the record of

22    this proceeding statements made by counsel for the various

23    regulators on Wednesday at the time of bid procedures being

24    approved in which I heard and considered the various statements

25    of counsel for the regulators in support of the transaction.

158

1          MR. MILLER:  I would just add to that, Your Honor,

2     when Mr. Gallagher spoke he said he didn't really have

3     authority from the commission.  But since that time, the SEC --

4     I mean, the commission has met, and he's been duly authorized

5     and has the same position, Your Honor.

6          THE COURT:  That's good to hear.  Thank you.  Mr.

7     Despins?

8          MR. DESPINS:  Your Honor, may I be heard very

9     briefly?  And I apologize for this but we're moving really

10    quickly.  And the first amendment -- Your Honor, we received

11    that about an hour ago, and there may be an issue here.  And I

12    apologize but we just got it an hour ago.  And, basically, this

13    is an amendment that protects DTC against potential claims that

14    may be made, and they're given collateral.  I'm told that that

15    collateral could be as much as six billion dollars.

16          And that's fine, Your Honor.  We're okay with that.

17    But the way this is drafted, they can keep this collateral

18    until all guaranteed obligations have been satisfied,

19    literally, one dollar left, they can keep six billion.  I'm

20    exaggerating but that's the way -- I raised this with counsel

21    for DTC saying why don't we put in a provision in saying that

22    the Court, Your Honor, retains jurisdiction to make sure that

23    that situation does not present itself?  And I don't believe

24    that they're agreeable to that.  It puts us in a bizarre

25    position where -- we did not know about this provision.  I

159

1    don't think it's intended that way but the way it's drafted

2    they can hold six billion if there's a hundred thousand dollars

3    of potential claims.  We're not asking them to concede the

4    point.  We're asking them to make that subject to Your Honor's

5    jurisdiction and further order.

6            THE COURT:  Mr. Hirshon, do you want to comment with

7    respect to that?  If you don't want to be here I can understand

8    why, but where do you want to be?

9            MR. HIRSHON:  Right here, Your Honor.

10            THE COURT:  Okay.

11            MR. HIRSHON:  I'm having a good time.  Your Honor,

12    let me explain the situation because it's not quite right, what

13    you've heard.  It is true that the first amendment, as a

14    contractual term, between the purchaser and the seller calls

15    for an amendment under which instead of fifty percent of the

16    residential mortgages a hundred percent of the residential

17    mortgages are being sold to the purchaser.  There is a separate

18    agreement between the purchaser and DTC under which those

19    mortgages are going to be used as collateral for the clearing

20    corporations.  So the collateral arrangements are part of the

21    APA, and they're not subject to the APA and not subject,

22    practically, to Your Honor's control.

23            So in order to make that possible, the APA had to be

24    amended so that the other half of the residential mortgages are

25    now owned by -- will be owned by the purchaser and therefore

160

1    pledged.

2         However, in order -- the parties themselves then

3    said, well, we want to restore where we were before where you

4    had fifty percent and fifty percent.  So the APA then has in

5    its amendment that, after the guaranteed obligations are

6    satisfied, if there is anything left over, and as I said

7    before, it's expected that there will be, then the purchaser

8    will return the fifty percent to the seller.  And that's what

9    the APA says.

10        So it's in two pieces.  The APA itself is simply a --

11   is amended simply to transfer the one-half that wasn't being

12   originally acquired to the purchaser.  There's a separate

13   arrangement between DTC and the purchaser.  And the APA then

14   says and when you're done settling, if there's anything left,

15   the purchaser has an obligation to return the fifty percent.

16        Now, this was --

17        THE COURT:  May I understand something, and I

18   apologize if I'm intruding on your argument, just to clarify

19   something?

20        MR. HIRSHON:  Please.

21        THE COURT:  Who's the custodian of this?  Isn't it

22   DTC?

23        MR. HIRSHON:  It is.  That's where all these reside.

24        THE COURT:  So aren't we just talking about

25   accounting entries?

161

1          MR. HIRSHON:  Yes, we are.

2          THE COURT:  The mortgages aren't moving?

3          MR. HIRSHON:  They are not.

4          THE COURT:  And you hold these as a fiduciary for

5     whoever has an interest in them?

6          MR. HIRSHON:  Exactly.  Mr. Despins, doesn't that

7     cure the problem?  Or what is the problem?  It's not as if

8     there's any risk that the assets are going to move.

9          MR. DESPINS:  No, no.  I'm not concerned that they're

10    going to dissipate the assets; that's not the concern at all.

11    I'm telling you my experience with depository companies, not

12    this one, of course, but others, is that --

13         THE COURT:  This sounds like a swipe at other

14    companies to me, but go ahead.

15         MR. DESPINS:  Yeah, is that they are not incentivized

16    to release collateral.  And, in fact, they will hold it four

17    years unless there's a clear way to force them to release the

18    collateral.  We don't want the estate to be in a position where

19    we're waiting for two or three years to receive potentially six

20    billion dollars back, or a portion of six billion dollars back.

21    That's my only concern.

22         They should be protected.  I want to be clear about

23    that.  I am not saying they shouldn't be protected.  I'm saying

24    that Your Honor should be able to intervene in case of -- in

25    the event that something is not returned because it is a

162

1    hundred thousand dollars of unsatisfied obligations.  They're

2    holding three billion.  If that's not the case, we won't be

3    here.  We won't be here.  But we --

4              THE COURT:  Well, I --

5              MR. DESPINS:  -- we don't want to be without

6    recourse.  That's all.

7              THE COURT:  -- I understand the point, although --

8    and I don't diminish the point by saying that it seems a highly

9    theoretical one to be pressing at this point in the hearing,

10   given that the estate's interest, whatever it may be, is, I'll

11   use the term, adequately protected, but I do understand this to

12   be an issue of whether or not DTC will, this evening, consent

13   to jurisdiction here for purposes of, in effect, being forced

14   to make an accounting entry for the benefit of the estate when

15   they are disproportionately oversecured by a gargantuan pool of

16   mortgages in respect of a de minimis claim.

17             My sense is that if they are in that position and are

18   resistant, that they would find themselves at the wrong end of

19   some litigation somewhere.

20             MR. DESPINS:  That is correct, Your Honor.

21             THE COURT:  And I don't know that this is a

22   particularly good time to force the issue, but I hear your

23   argument and I understand that you're looking to have DTC blink

24   on it.  And I don't know if they're willing to do that this

25   evening.

163

1          MR. DESPINS:  No, Your Honor.

2          THE COURT:  Okay.  So --

3          MR. DESPINS:  But is it clear that Your Honor will

4   have -- will retain jurisdiction over that issue?

5          THE COURT:  Well, it's not clear at all if we're

6   talking about nondebtors arguing about relative rights in

7   collateral posted to secured DTC's claims.

8          So I think that whatever I said tonight wouldn't

9   create jurisdiction, and I'm not prepared to reach that

10  question now.  If the parties are willing to stipulate to

11  jurisdiction, I'm not even sure that solves the problem.  There

12  either is or there isn't jurisdiction.

13         MR. DESPINS:  And I'm not authorized to stipulate --

14         THE COURT:  Fine.

15         MR. DESPINS:  -- to jurisdiction.

16         THE COURT:  So I think at this point the argument --

17  I understand the argument.  We have a record on it.  I trust

18  that DTC will not act in a commercially unreasonable manner and

19  that, whether or not this Court has jurisdiction, there are

20  clearly courts of competent jurisdiction in a position to

21  adjudicate future disputes.

22         MR. DESPINS:  Thank you, Your Honor.  And, Your

23  Honor, just to be clear, we would have raised this a long time

24  ago if we had seen the provision.  We apologize but we just saw

25  it an hour ago.  Thank you.

164

1          THE COURT:  Okay.  Now what?

2          MR. GOLDEN:  Is it time for the objections, Your

3     Honor?

4          THE COURT:  Yes.

5          MR. GOLDEN:  Thank you.  Daniel Golden, Akin Gump

6     Strauss Hauer & Feld, on behalf of an ad hoc group of LBHI

7     senior, sub and junior sub-bondholders, holding in excess of

8     nine billion dollars of such bonds.

9          Your Honor, as I walk to the lectern tonight, mindful

10    of Wednesday's hearings and tonight's proceedings, it reminds

11    me of a fable, one involving my namesake:  Daniel walking into

12    the lion's den.

13         The bondholders recognize the seriousness of the

14    circumstances that brings the debtor and the CIPC trustee

15    before this Court.  We recognize and they recognize, as

16    economic animals, and fully appreciate the extraordinary

17    circumstances that we all find ourselves in.  And, yes, the ad

18    hoc bondholder group can hear and it can count and it can see

19    that the Federal Reserve Board, the Treasury, the various

20    commodity exchanges, the SEC, the Department of Justice and the

21    debtors all are desperate for this proposed transaction to be

22    approved.

23         And we've heard many motivations for that, but two of

24    them are what we've heard specifically:  the need to stabilize

25    the financial markets and the preservation of up to 10,000 jobs

165

1   of Lehman employees.  And those are all worthy goals, and my

2   clients recognize those goals.

3          But what we don't hear is at what cost and at whose

4   expense this transaction should be approved.  What we don't

5   hear is why the Fed chose to bail out Bear Stearns and AIG and

6   just announced a potential rescue plan, like an RTC-type

7   bailout for all major financial institutions and yet somehow

8   Lehman Brothers gets left on the sidelines.  We don't hear why

9   the Fed, despite choosing to ignore Lehman in connection with

10  the bailout, is, frankly, directing and mandating that this

11  sale to Barclays occur whether or not such sale is in the best

12  interests of creditors and maximizes value for creditors.

13         And, yet, the debtors and the CIPC trustee are asking

14  this Court to approve such sale, a sale whose terms, very

15  material terms, are still not resolved.  And yet Mr. Miller

16  suggests that we should have a closing by 10:45 this evening.

17         And we've heard testimony, and I'll discuss that

18  further, that the marketing process with respect to these

19  assets, these assets which are the subject of this proposed

20  sale, was basically nonexistent.  We don't believe that this is

21  a proper exercise of the debtors' fiduciary obligations.

22         Mr. Miller suggests when the committee initially

23  indicated its position of not either supporting or opposing the

24  transaction -- well, that's just a parochial interest of

25  creditors as if to diminish the interests of creditors, but if

166

1    the debtors aren't prepared to look out for the interests of

2    creditors, the creditors and the creditors' committee have no

3    choice but to do so for themselves.

4         Your Honor may recall at the conclusion of

5    Wednesday's hearing and at the urging of this Court and other

6    parties in attendance at the court, the debtors and their

7    professionals offered to hold a meeting -- or host a meeting at

8    Weil, Gotshal to answer questions about the transaction.  And

9    certain important facts came out at that meeting, and they were

10   reiterated during the proffered testimony this evening.

11        For several months prior to the Chapter 11

12   proceedings, the debtors and their professionals engaged in a

13   substantial marketing process not to sell these assets but to

14   sell the entirety of the Lehman businesses.  When these efforts

15   failed, Lehman sought financial and funding relief from the

16   government, which apparently was denied.

17        Days prior to the Chapter 11 proceeding, the Federal

18   Reserve took over those negotiations in an attempt to sell

19   Lehman's businesses as a whole, and only two potential

20   acquirers were identified:  Bank of America and Barclays.  And,

21   unfortunately, for reasons that are not altogether apparent,

22   neither of those institutions were prepared to go forward on a

23   sale for all of Lehman's businesses.

24        Left with no alternatives and left in a situation

25   where they were desperate for liquidity, the holding company

167

1    filed Chapter 11, and so we find ourselves here tonight.

2            Within two days of that Chapter 11 filing, the

3    debtors filed this approval motion seeking approval of the

4    proposed assets of certain businesses and certain assets of

5    Barclays belonging principally to LBI.  And based upon the

6    facts and the testimonies adduced at this hearing, certain

7    things, we believe, are crystal clear.  It is undisputed that

8    neither the debtors nor their advisers nor any governmental

9    agency involved attempted to specifically market the assets

10   which are the subject of the approval motion.  In fact, when

11   the debtors originally entered into their agreement with

12   Barclays, they contracted away their rights to seek an

13   alternative buyer.

14           Now, I'm assuming, Your Honor, that it was the

15   determination of the debtors that that fact would not sit well

16   with the Court, that at Wednesday's hearing the Court was

17   advised that, through a negotiation between Barclays and the

18   debtors, that Barclays agreed to drop -- or allowed the debtor

19   to drop that no-shop provision.

20           But, in our opinion, it references a viewpoint, an

21   indication, a motivation that this transaction that the debtors

22   were trying to accomplish was not necessarily to get the most

23   value, the most appropriate value, to maximize value for

24   creditors, but it was to get this transaction done with

25   Barclays.

168

1          Since Wednesday, when the debtors were freed to go

2     out and shop these particular assets -- you've heard Mr.

3     Ridings testify that he took no affirmative steps to do so.

4          We believe this was a flawed sale process with

5     respect to these assets, a process that appears only to benefit

6     Barclays and the federal government but not the creditors of

7     this estate.

8          Perhaps as importantly, Your Honor, as I'm sure the

9     Court is aware, the economic landscape seems to have changed

10    over the last two days.  Yesterday, the U.S. Treasury and the

11    Federal Reserve Board have begun discussions about a potential

12    bailout of financial institutions by the government agreeing to

13    buy distressed mortgages and distressed real estate assets of

14    these financial institutions.  Just the hint of that potential

15    bailout has sent the equity of those financial institutions who

16    would be the beneficiary of that bailout soaring.

17         And, yet, the debtors and the Fed seem content or

18    determined that nothing get in the way of this transaction.

19    There is no attempt to determine, based upon the latest events,

20    whether Lehman can be a beneficiary of that potential bailout

21    or whether, in fact, as a result of that potential bailout, the

22    assets to be purchased under this transaction haven't increased

23    significantly in value.

24         And, yet, there has been no renegotiation of a sales

25    price.  In fact, there has been a renegotiation of the sales

169

1    price.  It's been a downward renegotiation, as Mr. Ridings

2    testified with respect to the real estate assets.

3           There is no final form of agreement to be approved by

4    this Court.  We had a forty-minute session with counsel for the

5    debtors where they outlined to the parties in the courtroom

6    suggested changes.  There's no writing.  There's no opportunity

7    for parties-in-interest to review that.  The first amendment,

8    frankly, was just handed out, and that's been around for a

9    couple of days, I'm told.

10          And, yet -- I'm sorry, since this morning?

11   Apparently they don't know how long it's been around.

12          THE COURT:  Mr. Golden, given the pace of this

13   transaction, days merge for all of us and I don't think that's

14   a fair comment.

15          MR. GOLDEN:  I'm sorry, Your Honor.  You know,

16   everybody's frustrated:  the parties, the debtors, the

17   governmental agencies, but so, too, are the creditors.

18          Going forward with this transaction this evening will

19   not allow anybody to assess whether this proposed bailout

20   legislation or any other restructuring alternatives,

21   restructuring alternatives that are very familiar to this

22   Court, such as a debt-for-equity swap of the 150 billion

23   dollars of securities at the holding company, could be a better

24   alternative for the creditors of the holding company.

25          There has simply been no credible evidence adduced at

170

1    this hearing that the price that Barclays is paying for these

2    assets represents fair value.  The appraisals are not in

3    evidence.  All you've heard is Mr. Miller discuss the contents

4    of the appraisals.  There's no other testimony or evidence that

5    suggests the other assets being purchased by Barclays

6    represents fair value or an attempt to maximize value for

7    creditors.

8          I simply think, Your Honor, for whatever reason, the

9    debtor has failed to meet its burden with respect to the

10   appropriateness of the sale.  We have heard the dire

11   consequences as to what will occur or may occur if this

12   transaction is not approved, but we have not heard credible,

13   cogent testimony as to whether the proposed purchase price

14   represents a fair value for these assets.

15         THE COURT:  Mr. Golden, in effect, you're asking me

16   to weigh your speculation against their speculation.  What

17   you're asking me to do is to weigh the fact that the markets

18   have turned because of the RTC-type announcement made last

19   night against the palpable, potential, devastating damage to

20   the markets to be caused if this transaction is not approved.

21   You've offered no affirmative evidence.  Why should I give any

22   weight whatsoever to your argument?

23         MR. GOLDEN:  Your Honor, I'm not asking you to allow

24   me to superimpose my business judgment versus the debtors'

25   business judgment.  But it is not my burden, it is not the

171

1    burden of the ad hoc noteholders with respect to this

2    transaction, it is the debtors' burden.  And they have not,

3    likewise, adduced any credible evidence as to what will happen

4    if this transaction is not approved this evening.

5              And, Your Honor, what we think, based upon the facts

6    and circumstances as we understand them, that this situation --

7              THE COURT:  You weren't listening to Mr. Ridings'

8    proffer, apparently.  Because in unrebutted testimony he

9    indicated through the proffer that the markets, in effect,

10   would tank.  Your cross-examination didn't even touch that

11   subject.

12             MR. GOLDEN:  Your Honor, you're right.  We did not

13   cross-examine that.  Frankly, I don't believe that Mr. Ridings

14   could credibly testify as to what would happen if these -- if

15   this particular transaction was not consummated this evening.

16             We think, Your Honor, that what this situation cries

17   out for is a denial without prejudice, but really a brief

18   delay.  Not a delay for weeks or months, but a delay so as to

19   determine once and for all, has, in fact, every viable

20   alternative been considered in order to maximize the value for

21   assets.

22             I said to the Court on Wednesday -- as we sat here on

23   Wednesday and as I sit here this evening, we don't know whether

24   this transaction represents the best viable option for these

25   assets.  And we can't know this because we believe there was an

172

1    inappropriate and flawed marketing process with respect to

2    these assets.

3           A brief delay would have several beneficial effects

4    in our view.  We'd allow the parties to finally negotiate a

5    final asset purchase agreement --

6           MR. MILLER:  Excuse me, Your Honor.  Is Mr. Golden

7    testifying?

8           THE COURT:  I think what Mr. Golden is doing is

9    converting his argument into what amounts to a request that I

10   not approve the transaction this evening so that more time can

11   be spent to evaluate transactional alternatives, or

12   alternatively, to evaluate whether or not this transaction, as

13   it has evolved at the last minute, may, in fact, be the best

14   transaction.  That's my interpretation.  I don't consider this

15   to be testimony, I consider it to be an argument.

16          MR. GOLDEN:  Thank you, Your Honor.

17          THE COURT:  Have I understood your argument?

18          MR. GOLDEN:  You have, perfectly.

19          THE COURT:  Thank you.

20          MR. GOLDEN:  If we were to have a brief delay, Your

21   Honor, as I said, there would be several benefits that could be

22   achieved.  A final form of agreement could be finally agreed to

23   and produced and put into evidence.  What's been put into

24   evidence to date is an agreement that's not final with material

25   terms left to be negotiated.  So, frankly, I don't know exactly

173

1        what the debtors are asking this Court to approve this evening.

2               We can determine once and for all, is there anybody

3        else prepared to pay more consideration either in dollars or

4        assumption of liabilities with respect to these assets.  We can

5        determine whether the federal government is prepared to allow

6        Lehman to be a beneficiary of any proposed bailout legislation.

7               As I said, Your Honor, it's almost, in our view,

8        impossible for the debtors to have carried a burden with

9        respect to a contract that's not complete.

10              THE COURT:  I'm sorry, Mr. Golden, it's my

11       determination as to whether they've carried the burden.  And

12       you're not in the position to say it's almost impossible.  So I

13       know it's argument, but don't go there.

14              MR. GOLDEN:  Okay, Your Honor.  It's our view that

15       they haven't sustained that burden.  I fully well appreciate

16       that that ultimate decision is made by the Court.

17              Your Honor, it's not a secret here that the

18       bondholders are frustrated by the process.  They're frustrated

19       with the lack of clarity with respect to the agreement.

20       They're frustrated by the fact that it changes every few hours.

21       They understand it but they're frustrated by that fact.

22       They're frustrated that they're asking to weigh in on a

23       contract that's not final.

24              And what the bondholders can't really tolerate is

25       that to the extent that this transaction is approved, the

174

1    debtors may believe that they have free license to treat the

2    balance of the assets of this estate in the same cavalier

3    manner.  It's not that the bondholders don't understand the

4    pressures, the crushing economic time pressures that the

5    debtors were operating under.  But nobody ever reached out to

6    the major creditor constituents.  Nobody ever suggested maybe

7    there's an alternative here that is something less than selling

8    assets on what we perceive to be a discount value.

9              Your Honor, you said on Wednesday that the

10   transaction would be considered up or down this evening.  It

11   leaves the bondholders very little choice.  They don't like the

12   transaction in its current form, so the natural inclination is

13   to say, as our written objection was styled, that they object

14   to the approval of the transaction.  But what the bondholders

15   are really seeking is an opportunity, a very brief opportunity,

16   to vet this process and to ensure that all the alternatives

17   were actually considered, to find out whether there were other

18   possibilities.  We have more faith in the Federal Reserve and

19   the Treasury.  We don't believe, this is my view, that should

20   this transaction not be approved that the parade of horribles

21   will not fall down on these assets.

22             So short of asking for an adjournment, which I know

23   that Your Honor was not disposed to consider when we considered

24   the DIP proceeding --

25             THE COURT:  It wasn't that I wasn't disposed to

175

1    consider it, I denied it.

2         MR. GOLDEN:  We think the appropriate course of

3    action, Your Honor, is to issue a denial of the motion without

4    prejudice so as to allow the process to unfold in a way that's

5    a little bit more transparent, a little bit more conducive to

6    allow parties -- all parties-in-interest to understand once and

7    for all whether this represents the highest and best value with

8    respect to these transactions.  Thank you.

9         THE COURT:  Thank you, Mr. Golden.

10        MR. NOVIKOFF:  Good evening, Your Honor.  Howard

11   Novikoff, Wachtell, Lipton, Rosen & Katz on behalf of JPMorgan

12   Chase Bank N.A.

13        Your Honor, we are not here to urge the Court not to

14   act tonight.  We think Your Honor should act tonight.  And we

15   appreciate the speed with which the parties have been moving.

16        We are here and we filed a limited objection because

17   we are concerned that there's a lack of clarity in at least two

18   significant respects and the way that the order affects

19   JPMorgan.  And there is one matter not requiring relief of the

20   Court but a matter we do want to bring to the Court's

21   attention.

22        First, as Your Honor may recall from argument on

23   Tuesday, JPMorgan is Lehman's major clearing bank.  In that

24   role, it maintains literally hundreds of clearing, operating,

25   settlement and other accounts.  And in that role it makes

176

1    advances against securities collateral on a daily basis.

2         As of this morning, the amount of the advances, Your

3    Honor, was approximately 23.2 billion dollars.  Against which,

4    JPMorgan is holding collateral.

5         In addition, Your Honor, JPMorgan is a major

6    counterparty with Lehman and various types of what we refer to

7    as Safe Harbor transactions, such as security lending

8    arrangements, repurchase agreements, ex-contracts and other

9    similar agreements.  And with respect to many of those it also

10   holds collateral and holds setoff rights.  And, as Your Honor

11   heard in detail on Tuesday, we have a guarantee from LBHI,

12   which is secured by collateral, which LBHI values at

13   approximately 17.9 billion dollars.

14        We have heard that as part of the purchased assets,

15   the debtor -- excuse me, Barclays is seeking to purchase 47.4

16   billion of securities.  While we've been given that as a

17   number, we don't know, there's simply a lack of clarity as to

18   whether any of those securities are securities that are held by

19   JPMorgan as collateral as I just described.

20        A difficulty with the order, Your Honor, if that was

21   the intent, is it does not provide for any payment to JPMorgan

22   for that collateral.  And in view of the fact I described

23   collateral -- collateral securing obligations of over forty

24   billion dollars, saying we would have access to a pool of 1.7

25   billion, along with everybody else chasing that pool, would not

1  be very satisfactory.

2      I have sought clarification and I believe obtained

3  clarification from Barclays.  That, in fact, they are not

4  seeking or are not treating as purchased assets any of those --

5  any of the collateral that JPMorgan is holding for that.  And I

6  would like that stated on the record, otherwise we need to

7  correct the order.

8      THE COURT:  You're going to have to move to a

9  microphone, and state your name.

10      MS. GRANFIELD:  Good evening.  Lindsee Granfield from

11  Cleary, Gottlieb, Steen & Hamilton LLP for Barclays Capital.

12      It's our understanding that with respect to the

13  purchase assets in this transaction that they do not include

14  the assets that JPMorgan is holding as its collateral.

15      THE COURT:  Is that satisfactory?

16      MR. NOVIKOFF:  I believe she stated it's Cleary

17  Gottlieb's understanding.  I'd like to know if that is after

18  consultation with the client.

19      MS. GRANFIELD:  That is.

20      MR. NOVIKOFF:  The second, as I mentioned, Your

21  Honor, that JPMorgan is a major counterparty in various Safe

22  Harbor contracts.  The proposed order contains an injunctive

23  provision which affects the debtors' rights in property of the

24  estate.  It involves an ability on the part of Barclays to

25  choose contracts in the future for assignment and assumption.

178

1    And in the latest version it contains an incomplete protection

2    for Safe Harbor contracts.  I would just like a clarification

3    to the effect that -- and I suspect there may be other parties

4    looking for this, that nothing in the proposed sale order

5    affects any right of JPMorgan under or with respect to any

6    securities contract, commodities contract, forward contract,

7    repurchase agreement, swap agreement or master netting

8    agreement, and I use each of those terms as defined in the

9    Bankruptcy Code, Your Honor, to exercise any contractual right.

10   And I use that term as well.  Contractual right is defined in

11   the relevant sections of the Bankruptcy Code.  Of a kind

12   described in Sections 362(b)(6),(7),(17) or (27), 362(o) and

13   Sections 555, 556, 559, 560, or 561 of the Bankruptcy Code.

14   I've intentionally done it, Your Honor, in that way by making

15   direct reference to the Bankruptcy Code terms.  And we were

16   looking just for a clarification and understanding.  But that

17   is the effect of the order so as not to affect the Safe Harbor

18   contracts.

19            THE COURT:  We need a clarification, confirmation?

20            MR. NOVIKOFF:  I need confirmation.  And that one, I

21   believe I need from both, the debtor and Barclays, Your Honor.

22            MR. MILLER:  Debtor has no objections.

23            MR. NOVIKOFF:  Okay.  Now --

24            THE COURT:  Do we have it, I don't think so.

25            MR. NOVIKOFF:  And just to be clear I'm looking for

179

1    that as it relates to the proposed sale order.  There was an

2    order entered today commencing the SIPC liquidation which had

3    limited effects, and I'm not challenging that.  I'm just

4    talking in terms of anything added by the proposed sale order.

5    That does not deal with secured party rights, secured netting

6    rights.

7         MS. GRANFIELD:  Mr. Novikoff had pointed out that the

8    section that had been added to the sale order went through a

9    lot of the Safe Harbor terms.  That may be just a mistake,

10   didn't add in every single section of the code that people

11   usually colloquially refer to as the Safe Harbors.  So with

12   respect to those few things that weren't added to the order, we

13   recognize that the Safe Harbors exist.  And we understand that

14   we are not purchasing the things that are either his collateral

15   or that we can stop the Safe Harbors from being affected.

16        THE COURT:  Let me clarify what you just said because

17   we're talking about the form of order and the impact of the

18   order, if any, on what we were globally talking about the

19   universe at Safe Harbor provisions, as those terms are

20   generally understood in the Bankruptcy Code to deal with repo

21   swaps, forward contracts, securities contracts and the like.

22   And by making the statement that I just made, I am not

23   intending to leave anything out.

24        I simply want to confirm, as Mr. Novikoff has sought

25   to confirm, that it is intended that those provisions, to the

180

1    extent applicable outside of bankruptcy are, in fact, all

2    governing.  And that nothing in the sale order is intended to

3    impair, in any respect, those contractual rights.

4                MS. GRANFIELD:  Yes, Your Honor.

5                THE COURT:  Thank you.

6                MR. NOVIKOFF:  Thank you, Your Honor.  And then the

7    one point I needed to inform Your Honor concerning -- as I've

8    mentioned, JPMorgan maintains literally hundreds of accounts

9    for Lehman Brothers Inc.  And they continue, through the day

10   today, to continue operating those accounts.  During the course

11   of the day, it was either Lehman Brothers or the SIPC trustee

12   that, during the course of the day, was the owner of those

13   accounts.

14               At this point, we are not sure whether Barclays

15   intends to use those accounts on Monday or not.  We believe

16   that they will, in fact, need to use those accounts in order to

17   continue their operations.  There will be a complication in

18   that when securities and cash hit those accounts on Monday, we

19   are not going to know, unless somebody tells us, whether those

20   securities and cash belong either to Barclays or to the SIPC

21   trustee; that is, are they attributable to assets that have

22   been purchased by Barclay or they have not.

23               So between now and then we are perfectly willing to

24   work with the SIPC trustee and Barclays to create a protocol so

25   that we can get instructions in how to deal with that, but we

181

1    have to get that resolved or we will not be in a position to

2    operate those accounts.  Also, Your Honor heard that DTC, the

3    clearing organization, insisted and negotiated heavily during

4    the day and received potentially billions of dollars of

5    collateral to protect it against the possibility of liability,

6    overdrafts, etcetera, with respect to its clearing operations.

7            In the ordinary course, JPMorgan also picks up those

8    type of obligations.  Indeed, last night, picked up -- they had

9    to make a fail advance to allow clearing to go forward of over

10   seven billion dollars.  If our accounts are going to be used to

11   effect a smooth transition until Barclays has its accounts set

12   up with another institution, we're going to have to work with

13   them and with SIPC to make sure that -- whether it's a

14   guarantee, an indemnity, or some other procedures are put in

15   place so that JPMorgan is not at risk for providing that

16   transition.  Again, we are willing to work with them over the

17   weekend to make sure that works.  If, in fact, they have other

18   accounts that they can use on Monday other than ours, we're

19   delighted to do that.  But we did want Your Honor to know that

20   that's something that has to be resolved from our perspective,

21   and it is not resolved yet.

22           THE COURT:  Thank you for that.  And let me clarify

23   that the statements you've just made with regard to transition

24   issues that are quite significant from the perspective of

25   JPMorgan Chase are not issues that affect the Court, but they

182

1    are rather closing issues that must be addressed in order to

2    effect an orderly transition.  Correct?

3                MR. NOVIKOFF:  That's correct, Your Honor.  We are

4    not seeking relief from the Court on those issues, but if we

5    fail to reach agreement I did not want JPMorgan's credibility,

6    or, frankly, my firm's credibility, to be affected because we

7    didn't let you know that those issues existed.

8                THE COURT:  Thank you.

9                MR. NOVIKOFF:  Thank you.

10               THE COURT:  Mr. Sabin?

11               MR. SABIN:  Your Honor, I know the hour is late.

12   I'll be very brief.  There is but one issue remaining, I

13   believe, that is not yet resolved and it arises in connection

14   with that part of this transcript, if you will, when it becomes

15   a transcript, that otherwise was raised in ours, and that is

16   related to the small amount, allegedly, of IP assets that do

17   not belong to any of the debtors that we do not believe this

18   Court has jurisdiction to sell free and clear.  So assuming we

19   can solve it by drafting in the order, and assuming that's

20   acceptable to the debtors and purchaser, hopefully we could

21   schedule those assets, we could define them in the appropriate

22   places, carve them out from the relief otherwise with respect

23   to the balance of the purchase assets, which are assets of the

24   debtors.  If that can be done then the entirety of our concerns

25   and our limited objection of the Harbinger funds would be

183

1      resolved.

2              THE COURT:  All right.  I hear that argument, and I

3      don't know if anybody on the debtors' side, as a matter of law

4      or as a matter of structure, would argue that notwithstanding

5      what Mr. Sabin has said it may be possible for those IP assets

6      to be transferred free and clear.  I'll be the first to admit

7      that I don't know, based on this record, anything about where

8      the IP resides.  And my best recollection of the statements

9      made by Lori Fife is that she wasn't so sure where, within the

10     corporate structure, those assets reside.  So based on the

11     record, I think it would be hard to override Mr. Sabin's

12     concern, but I'm not eliminating the possibility that the

13     debtor could make such an argument, and it sounds like it's a

14     drafting issue.

15             MS. GRANFIELD:  Your Honor, it's not a drafting

16     issue, quite.

17             THE COURT:  You're going to have to talk by a

18     microphone.

19             MS. GRANFIELD:  I'm sorry.

20             THE COURT:  Then you're going to have to make an

21     argument --

22             MS. GRANFIELD:  No, I understand, Your Honor.

23             THE COURT:  -- as to how, as a matter of bankruptcy

24     law, assets that are not residing within this debtor or its

25     property-owning affiliate can be the subject of a free and

184

1    clear order.

2         MS. GRANFIELD:  No, I understand.  I understand the

3    argument and Your Honor's view.  Obviously, a few things in

4    terms of our ability to schedule those assets -- it may be

5    drafting and you're right.  We can see on a recess or as we're

6    trying to do an order, whether we can come to agreement or not.

7    But to say that we don't want to be put into a position of the

8    proverbial death by a thousand cuts, where Barclays --

9         THE COURT:  I think I'm in that position right now.

10        MS. GRANFIELD:  -- you know, where Barclays obviously

11   has made a tremendous effort in trying to get to a position to

12   be able to close this transaction, so we'll see, Your Honor.

13   But I just wanted to not be too quick, and I understand the

14   legal argument and Your Honor's view -- but too quick that it's

15   just a drafting --

16        THE COURT:  If you want to think about an argument

17   that would permit this Court to convey nondebtor property free

18   and clear, I'm certainly receptive to creativity.  But I think

19   that at this hour, it may really be a drafting issue or an

20   issue of risk assessment.

21        MS. GRANFIELD:  No, I think it's the latter.  So we'd

22   have to -- it's really just having the ability to talk to the

23   client.  And we'll have to make a decision in terms of,

24   obviously, the deal was we're buying the assets free and clear.

25   But we'll leave that to the recess.

185

1    THE COURT:  Well, I think it was Mr. Miller who

2    mentioned that 10:45 was a witching hour.  And I haven't heard

3    all the objectors.  So absent a miracle, I think it's going to

4    be hard to make that deadline.

5    MR. MILLER:  I didn't understand that PWC was

6    objecting, Your Honor.  I thought we went through that earlier

7    today.

8    MR. FLICS:  Your Honor, Martin Flics of Linklaters

9    for the administrators.  Just as Mr. Novikoff and some others

10    have had some important clarifying points, we do as well.  And,

11    in fact, the first point may relate to the very last point that

12    was just addressed.  These businesses have, for many years,

13    operated as one.  And what is being proposed tonight is

14    something very ambitious.  And as we've indicated, we do not

15    oppose it.  But it is very ambitious.  It is the complete

16    separation of these businesses that have operated as one.

17    The asset purchase documents, as we have pointed out

18    in our response and in the declaration, do not do a perfect job

19    of effecting that separation.  There are a number of issues

20    that need to be addressed.  Those issues are important not only

21    to the European entities, but as we've heard in the last round

22    of discussion, they're probably important to the debtors as

23    well, in effecting the sale.  For example, there is

24    intellectual property and IT all over the enterprise that is

25    shared.  Some of that intellectual property is owned by

186

1    European entities and is used by the American entities.

2         That intellectual property surely cannot be

3    transferred tonight.  Those entities and administration surely

4    cannot have their property compelled to be transferred.  I

5    assume no one would dispute that.  On the other hand, equally,

6    there are assets owned by the U.S. entities that are used in

7    the European business.  There are client contracts that are

8    shared.  There are source codes that are shared.  There are

9    issues of confidentiality and access to source code.  There's

10   various ownership rights in the IT and in the process.

11        There are a lot of issues that are very important to

12   both sides.  These issues have not yet been addressed.  And

13   they need to be addressed.  During the course of the last

14   couple of days, we have communicated a number of the points to

15   Weil Gotshal and to the debtor.  We have made our points in our

16   responsive pleading.  We understand that some of them may have

17   been addressed in the proposed amendment, but we don't know.

18   We understand that others have not, but we don't know which

19   have been and which have not been.

20        We are prepared to accept a representation and

21   confirmation that all of the issues that we have set forth in

22   our response and in our declaration will be negotiated in good

23   faith, expeditiously.  As I said, they're very important to the

24   administrators, and we think they're also important to the

25   estate.  There are issues of our access to books and records

187

1    that we think we have a reasonable right, not to mention a

2    statutory obligation, to review, and all of the proprietary

3    information that is shared across the IT and intellectual

4    platforms.  So as to the first of the two issues that I wanted

5    to address this evening, I would like to know -- we're not

6    going to negotiate those standing here, for sure.

7            THE COURT:  Certainly not in my presence.

8            MR. FLICS:  And I'm certainly not capable of doing

9    so.  But we have had representations informally from people in

10   the course of this evening that they are prepared to do so.  We

11   will accept that representation as a means of going forward

12   with the --

13           THE COURT:  Are you also reserving rights in respect

14   to that representation?

15           MR. FLICS:  -- we are absolutely reserving rights in

16   the event that we are not able to achieve a satisfactory

17   resolution on the issues that we have put of record.

18           THE COURT:  Do I understand that your principal

19   concern relates to the very same intellectual property rights

20   that we were talking about moments ago, or is it different?

21           MR. FLICS:  Actually, I have no idea.  All I know is

22   that they have mentioned cryptically intellectual property of

23   nondebtor, and there is some issue about its ability to be

24   transferred.  That happens to be an issue because I know that

25   the European entities hold some intellectual property that is

188

1    used by the American entities.  I have no idea if that's the

2    particular point they were raising.  Perhaps it's some other

3    nondebtor entity.  I can only speak to the administrators and

4    their estates.  I would like to get that confirmation on the

5    record so that we could proceed.

6              MR. MILLER:  We'll negotiate in good faith.

7              MR. FLICS:  Okay.  And we reserve our rights in the

8    event that we cannot reach a satisfactory resolution.  The

9    second issue is an issue that you have heard something about

10   this evening and in the course of the press, which is the so-

11   called eight billion dollars that is owed to Lehman Brothers

12   International Europe.  I will not spend more than a minute on

13   the substance of that issue.

14             For parties that care to understand what the

15   administrators' current state of knowledge is on that, they can

16   refer to our pleadings.  As I said, we have a declaration of

17   one of the administrators which describes their understanding

18   of the state of affairs at this time.  I think I should

19   emphasize what should be obvious to all, which is that it is a

20   point of substantial interest and concern to the

21   administrators.  This is not the only forum in which people

22   have been working day and night.  In fact, the administrators

23   were strangers to Lehman Brothers until Monday morning and they

24   have, in the course of just the last few days with a team of

25   literally hundreds of people, tried to understand this business

189

1    in the very course of the business being split and to fulfill

2    their obligations as administrators.

3            One of those obligations is clearly to determine

4    their rights in respect of these claims.  We want to be certain

5    that the entry of this order in no way prejudices the rights of

6    the administrators to pursue their rights and claims against

7    the debtors or third parties.  We recognize, before people jump

8    up, that it does limit our rights against the purchaser.  But

9    as to everyone else in the world, it should not be impairing

10   our rights in any way to seek and pursue our rights and claims

11   against those parties.

12           I did note earlier in the evening, a matter that

13   makes the issue easier for us with respect to the purchaser,

14   and I know that this is good news/bad news, which is that no

15   cash was being transferred to the purchaser.  To the extent

16   that there were substantial amounts, that might have raised

17   some issue as to what the source of it was.  But since there is

18   not, that is probably not an issue for the purchaser.  But we

19   just want to be very clear that if anyone believes that in the

20   course of this sale, this sale order, that somehow there's an

21   intention to limit our ability to pursue, investigate and

22   assert these claims, I'd ask them to say so, because I do not

23   believe that they do.

24           THE COURT:  You seem to be asking for somebody to

25   speak up.  It's almost like a wedding.

190

1        MR. MILLER:  Well, I guess sales are like weddings.

2        MR. MILLER:  If there's somebody that represents the

3   rest of the world, Your Honor, I wish he would speak up.

4        MR. FLICS:  Okay.  Well, hearing nothing --

5        THE COURT:  I hear no one disagreeing with your

6   assertion, and I trust that the order is not intended to cut

7   off rights against any parties other than Barclays.

8        MR. FLICS:  Thank you, Your Honor.

9        MR. BIENENSTOCK:  Good evening, Your Honor.  Martin

10  Bienenstock, Dewey LeBoeuf, for the Walt Disney Company.  Due

11  to the hour, etcetera, I can say that the issues I'm about to

12  address briefly boil down to two provisions in this order,

13  which can be dealt with either by -- if the Court cares to

14  interpret them in a way that I'll submit makes them legal or by

15  interlineation.

16        The premise of the remarks is basically that even

17  when parties get together to do God's work and do God's work,

18  when it's human beings doing it, they may also do some other

19  things that are illegal.  And it's not at all surprising, based

20  on Mr. McDade's testimony, that when he sat at the table he was

21  sitting there as the representative of LBHI and LBI.  It's not

22  at all surprising that the interests of subsidiaries of those

23  and those creditors of those subsidiaries were not represented.

24  And as we all know, in a commercial sense, the easiest thing to

25  do when two parties are negotiating what seems like a zero-sum

191

1    game, is to say the third party will pay extra money or incur

2    extra liability.  And that's what we think has happened here.

3              And Your Honor, I hope, will note I'm not asking for

4    the Court to agree to some argument of exercising discretion in

5    one way or another.  I'm only bringing to the Court's attention

6    that which I think the Court is compelled to do based on

7    whether something is legal or illegal.  And we just have to

8    rely on the Court that even when parties are doing God's work,

9    the law is the law and it needs to be carried out.  So what am

10   I referring to specifically?

11             You can tell that none of the subsidiaries or their

12   creditors were represented here by the very fact that the

13   entire purchase price is payable to the three entities, the

14   LBI, LBHI and the LB 745 LLC.  We have testimony, as Mr. McDade

15   admitted on cross, that that long list of businesses,

16   everything in North America, foreign exchange, etcetera, is

17   being transferred.  The asset purchase agreement says it's

18   being transferred.  Those are the businesses that the

19   subsidiaries conduct.  What the asset purchase agreement does,

20   in our view, and Your Honor doesn't have to decide this, is sub

21   silentio.  It transfers the business of the subsidiaries:  the

22   foreign exchange business, the Walt Disney Company, trades with

23   and Lehman Brothers Commercial Corp.  But it doesn't get part

24   of the purchase price here.

25             Its employees are leaving, the infrastructure is

192

1    leaving.  Everything important is leaving.  He admitted it is

2    being wound down.  It'll have to be.  No one's left to really

3    run it for a profit.  But they don't get part of the purchase

4    price.  Now this, frankly, I don't think should even be

5    objectionable to the debtors or doesn't affect Barclays.  I

6    don't know how the committee will come out.  But if paragraph 4

7    on page 12 of the proposed order, which is the free and clear

8    paragraph --

9            THE COURT:  Well, you know, the only person in this

10   room who seems not to have the proposed order is me, Harvey.

11           MR. BIENENSTOCK:  The judge needs an order.

12           THE COURT:  Where are we looking?

13           MR. BIENENSTOCK:  Paragraph 12 -- I'm sorry,

14   paragraph 4 on page 12, carrying on to page 13.  It's a

15   somewhat boilerplate provision providing that interest, which

16   is broadly defined to include claims interest and a thousand

17   other things in the assets transferred, will attach to the

18   proceeds.  Now, what's happening here is in the asset purchase

19   agreement they're transferring the employees, the

20   infrastructure, ultimately the business of the subsidiaries,

21   without having the subsidiaries a party, simply by virtue of

22   the fact that technically the employees work for LBI or LBHI,

23   etcetera.

24           To give the subsidiaries a fair shake here, all

25   really that needs to happen is the Court can say the

193

1    subsidiaries can submit their claims to their share of the sale

2    proceeds to the extent they show that they had value, they in

3    essence were being sold, and they'll get whatever the Court

4    determines they're supposed to get when it allocates a purchase

5    price someday.  And since the estate has billions of dollars of

6    real estate, it will be selling later, which we'll part see at

7    this purchase price, it shouldn't be hard to accommodate that.

8    That's one thing.  It's both required -- otherwise, you have

9    subsidiaries losing all value with no compensation, and it also

10   shows the mental -- the dynamics at work, which as I said

11   before was two parties get together; the easiest thing to make

12   a deal is to take from a third party.  The other provision --

13            THE COURT:  It may be that they're not being --

14   nobody's taking any -- it might be that it's not taking as much

15   as collateral damage; that the consequence of selling the

16   platform is to indirectly erode value within the subsidiaries

17   that you're talking about.  You have the advantage of perhaps

18   having some understanding of the corporate structure of Lehman.

19   There is nothing that has been presented to me since Monday of

20   this week, when I first became actively acquainted with this

21   case, that has instructed me on a corporate structure of the

22   various entities that you are referencing.  I know about LBHI.

23   I know about LBI.  I now know about the European entity.  And

24   this is a learning process for probably all of us.  And it's

25   happening in a hurry.

194

1    If what we're talking about is crafting consensual

2    language that's acceptable to the debtor and also acceptable to

3    the purchaser, that modifies the free and clear paragraph to

4    give you what amounts to a reserved right to make a claim on

5    behalf of your client -- I don't know how you do that,

6    actually -- to an allocated portion of an unallocated purchase

7    price.  I think it may be an invitation to future disaster.

8    But that's just me, late in the evening, processing what you

9    said.

10    MR. BIENENSTOCK:  No, Your Honor, I might have been

11    misunderstood because I submit it's simpler than that.  This

12    paragraph 4 already allows everyone with any type of interest

13    in the proceeds to -- it automatically attaches the interest in

14    the assets to the sale proceeds.  All I'm saying is the Court

15    can solve this problem by saying the subsidiaries can assert

16    their interest in this -- that this paragraph, as drafted, will

17    also allow the subsidiaries to assert whatever interest they

18    have.  If Your Honor's theory is right, they may have zero

19    interest.  But they can assert their interest --

20    THE COURT:  It wasn't a theory.  It was just a

21    musing.

22    MR. BIENENSTOCK:  Pardon me?

23    THE COURT:  I was just thinking about the

24    consequences of what you said in light of what was in the

25    order.  And I may have unduly complicated it.  But I think the

195

1    only thing, then, that's being requested by Mr. Bienenstock as

2    to this paragraph is that the debtor agree, if willing to do

3    so, that certain unnamed subsidiaries -- or maybe we need to

4    name them -- will have at least the ability to assert an

5    interest in proceeds, whatever that might be.

6            MR. BIENENSTOCK:  That's right.

7            THE COURT:  Mr. Miller?

8            MR. MILLER:  As I understand Mr. Bienenstock, Your

9    Honor, all he wants to do is have a right to file a claim

10   against the proceeds.  Is that correct?

11           MR. BIENENSTOCK:  Well, for the subsidiaries to have

12   the right -- it's their proceeds.

13           MR. MILLER:  Without conceding that there's any claim

14   whatsoever, or that his theory on businesses being sold has any

15   validity whatsoever, I don't see that there's any restriction

16   in this order against anybody filing a claim against those

17   proceeds.

18           THE COURT:  Is that a yes or a no, Mr. Miller?

19           MR. MILLER:  That's a yes, Your Honor.

20           THE COURT:  Okay.

21           MR. MILLER:  But it doesn't affect the purchaser,

22   Your Honor.  It's just the proceeds of the sale.  And the

23   subsidiaries he's talking about, Your Honor, are subsidiaries

24   of LBI.  And, therefore, he's really talking about the

25   allocated 250 million dollars that goes to LBI, which is in a

196

1    SIPC proceeding.

2         MR. BIENENSTOCK:  Your Honor, the answer was yes, and

3    I can move on.

4         THE COURT:  I'm glad I asked that question.

5         MR. MILLER:  I just hope that Mr. Bienenstock and his

6    client understand that.

7         MR. BIENENSTOCK:  Your Honor, the other provision

8    which is -- well, at least as important, if not more so, is in

9    paragraph 10 on page 15 of the proposed order.  There's

10   language about free and clear and successor liability all

11   through this order.  Except in paragraph 10, the language is

12   fairly good at saying that -- at protecting Barclays from

13   successor liability for any claims against the debtors, which

14   is conventional, and that's what we're all accustomed to.  Now,

15   whether you can have a free and clear order that applies to

16   successor liability is an issue in itself.  Only one or two

17   circuits have spoken on it.  But that's not for tonight.

18        But generally, in the order, the successor liability

19   is spoken about as successor liability for claims against the

20   debtors.  In this paragraph, in paragraph 10 -- page 15,

21   paragraph 10, section C -- the order, or the proposed order,

22   provides that the purchaser and its affiliates, etcetera, shall

23   not have successor liability as a continuation of substantial

24   continuation of the debtors -- fair enough -- or any enterprise

25   of the debtors.  If that is interpreted to mean divisions of

197

1    the debtors but not subsidiaries, I don't have a problem.  And

2    then my client would not be enjoined pursuant to the paragraph

3    on -- there is a paragraph in here enjoining parties against

4    bringing claims that you're not supposed to bring or that are

5    sold free and clear.

6         But if "or any enterprise of the debtors" is

7    interpreted as subsidiaries of the debtors, then we run into

8    the issue that Your Honor started to discuss earlier.  What is

9    the authority for a creditor of a nondebtor to be told that its

10   business was transferred free and clear of liens, claims,

11   interest, successor liability?  Now, if Mr. Miller is right, or

12   his suggestion turns out to be true of a possibility that the

13   businesses of the subsidiaries were not transferred, fine, then

14   presumably the action may not be meritorious unless there's

15   another good theory.  And there are other theories besides

16   successor liability.

17        But, again, we're not asking Your Honor, and it's not

18   before Your Honor tonight to decide whether creditors of the

19   nondebtor subsidiaries who have causes of action as a result of

20   this have meritorious ones or not.  I'm here on the black-

21   letter law, for all the reasons in our objection, which I will

22   spare Your Honor and not repeat, because I know you read them,

23   however quickly.  I know Your Honor understood them.  We think

24   they're compelling and ironclad.  But I'm not going to repeat

25   them.  For all those reasons, we don't think this language, "or

198

1   any enterprise of the debtors", can be interpreted to mean

2   subsidiaries of the debtors within the contours of the law.

3   Cannot do, this was overreaching, if that's what this means.

4   And this can be fixed either by striking the words "or any

5   enterprise of the debtors", or simply Your Honor saying -- Your

6   Honor issues this order, even though the drafting was proposed

7   by others, saying when you sign this you don't intend that

8   enterprise means subsidiaries of the debtors.  It's as simple

9   as that.

10          THE COURT:  I'm going to give others an opportunity

11   to comment on this point, because I know from experience that

12   the no successor liability provision is more often than not of

13   extraordinary importance to the purchaser.  And if the

14   purchaser is willing, through counsel, to confirm that "or any

15   enterprise of the debtor" is as that term is used in paragraph

16   10(c) of the order, is not intended to extend to any subsidiary

17   of the debtors, that confirmation or an edit that's consistent

18   with that confirmation would seem to satisfy you.  Correct?

19          MR. BIENENSTOCK:  Yes.  I just have to say, and I

20   apologize for the repetition, that this is where we just have

21   to rely on the Court.  Of course, a purchaser will want all the

22   protection it can get.  This -- regardless of its desire -- I

23   mean, if I'm the purchaser, why wouldn't I say no, I want that

24   to mean subsidiary.  Of course I would say that.

25          THE COURT:  No, the problem with --

199

1          MR. BIENENSTOCK:  But it's illegal.

2          THE COURT:  -- I don't want, at the moment, without

3    hearing from purchasers' counsel, to start to comment on my

4    interpretation of this language at this hour.  But I could do

5    so.  And I don't want to do that without knowing what position

6    the purchaser takes with respect to it.  I'm offering that up

7    as an opportunity.  Otherwise, I may say some things that you

8    might not want to hear.

9          MR. BIENENSTOCK:  Thank you.

10          MS. GRANFIELD:  Good evening, again, Your Honor.

11    Lindsee Granfield, Cleary, Gottlieb, Steen & Hamilton, LLP, on

12    behalf of Barclays Capital.  The problem -- I have no problem

13    with Mr. Bienenstock's first point, but the coupling of the two

14    do cause a problem because, essentially, I see the parties to

15    the asset purchase agreement are the debtors.  Those parties,

16    up until the time that the trustee came in, controlled their

17    subsidiaries.  These are, I think, all wholly owned

18    subsidiaries or for the most part wholly owned subsidiaries.

19    The trustee came in, exercising his control in terms of his

20    business judgment to exercise his control here.

21          With respect to claims that in their exercising their

22    control over the subsidiaries that there should be an

23    allocation of the purchase price with respect to what's

24    happening here, you know, obviously, I agree with Mr.

25    Bienenstock, that doesn't affect the purchaser, and so we have

200

1    no objection to it.  But if he's saying he wants his cake and

2    he wants to eat it too, which is he wants to make claims

3    against the proceeds, like everyone's just agreed, and now he

4    wants to keep open the ability not just to question the

5    business judgment of the controlling parties of the

6    subsidiaries in entering into the transaction, but he wants to

7    leave Barclays open.  Barclays is making this transaction

8    possible to claims by subsidiary creditors that Barclays is a

9    successor and Barclays, after having had to renegotiate this

10   deal many times over the last few days, lost the 700 million

11   dollars in cash it was originally going to receive, lost other

12   benefits under the deal.  No, we can't agree to that.  And I

13   would have to go talk to my clients about how strongly we feel

14   about that.  But if it were up to me, that would be it.  That

15   would be the final cut.

16           THE COURT:  Okay.  Now, I know what you think.

17           UNIDENTIFIED SPEAKER:  Your Honor, you ready for the

18   next objector or --

19           THE COURT:  Well, we sort of have a pregnant pause

20   here.  This is an unresolved issue, and I don't mean to

21   diminish the significance of it by describing it as a drafting

22   point because it's not.  The problem with the language as it's

23   presently drafted is that it's wildly ambiguous.  The term

24   enterprise is not defined.  And in common parlance it could

25   include joint ventures, other business activities.  It's not

201

1    limited to nor does it address subsidiaries, it's actually far

2    broader.  And I suppose it was made as broad as it was made

3    deliberately.

4            I don't know what the term is intended to convey in

5    terms of its meaning.  Nor do I believe, based upon my looking

6    at it for the first time and not hearing any discussion as to

7    what was the intent in the drafting of it, that I'm in a

8    position now to do what Mr. Bienenstock has asked me to do,

9    which is to do God's work.

10           I believe that if it's left as it is, without further

11   definition, that we'll be revisiting this another day.  And I

12   certainly don't want to invite further potentially burdensome

13   litigation over the point.  Nor do I have any idea as to

14   whether or not what we're talking about is a theoretical

15   discussion, which I'm happy to engage in at any hour, or a

16   practical discussion involving meaningful rights of Walt Disney

17   Company.  Based upon the pleadings filed by Mr. Bienenstock on

18   behalf of his client who is still objecting and the questioning

19   that he has presented of witnesses this evening, it's apparent

20   that he is doing what he can do to protect claims against an

21   identified counterparty.  I don't know what those claims are at

22   the moment in terms of their net value, and I don't need to

23   know.

24           For purposes of this order, however, I'm going to

25   need to look at it very carefully because this is one

202

1    highlighted example of provisions in a sale order that I had

2    not had a chance to review, partly because it's now 10:33 and

3    because I haven't had a chance yet to review the order although

4    I promise I will do so as expeditiously as I can and given the

5    fact that there is an objector waiting in the wings --

6    actually, it is a wing over there, we're not getting this done

7    before 10:45.  That's apparent.  I'm going to make the

8    following suggestion, and I'm not trying to delay anything.

9    I'm going to hear all the objections this evening.  I'm going

10   to hear the debtors' response to those objections, and I think

11   that Mr. Miller, or any other member of his team that he

12   designates, is entitled to speak to the Court while all of this

13   is fresh.  But it's also clear to me that assuming I rule, and

14   I'm going to rule one way or the other this evening, in favor

15   of the transaction and an order needs to be entered, I think

16   that everybody should be spending a little bit more time than

17   we have this evening since it's no longer critical in terms of

18   timing to make sure that language issues, such as the issue

19   identified by Mr. Bienenstock, are addressed to the

20   satisfaction of everyone involved in the transaction.

21          I have reserved, just in case it might be needed,

22   this courtroom for tomorrow morning at 10 a.m.  I'm not

23   suggesting that it's going to be necessary for anybody to come

24   back.  But in the same way that parties mentioned to me that

25   10:45 this evening was a time that I might take into

203

1    consideration, I wanted you to know that I didn't have any idea

2    one way or the other as to how long this hearing would last or

3    how much time would be required to address the many objections

4    that float in, particularly at the last minute.  So to the

5    extent that it's not critically important to the transaction

6    that an order be entered this evening, I'm going to suggest

7    that time be spent to make sure that it's right and that I've

8    had a chance to consider it fully so it can be entered tomorrow

9    morning, assuming that I approve the transaction.  That's my

10   comment with respect to this language point.  Mr. Rosner?

11            MR. ROSNER:  Thank you, Your Honor.

12            MS. GRANFIELD:  I apologize, Your Honor.  I apologize

13   to Mr. Rosner.

14            THE COURT:  Once again, for record purposes, I just

15   think you're too far away from the mike unless you speak at the

16   podium.

17            MS. GRANFIELD:  I apologize, Your Honor, and I

18   apologize to counsel.  Just --

19            THE COURT:  This is Lindsee Granfield speaking on

20   behalf of Barclays.

21            MS. GRANFIELD:  Lindsee Granfield speaking on behalf

22   of Barclays.  I wanted to -- just because obviously we did not

23   have an opportunity to respond in writing to the different

24   arguments or Mr. Bienenstock's writing just if I may, or if

25   it's all right with Your Honor, I'd like to cite and I'd like

204

1    to hand up to Your Honor the order authorizing a similar

2    transaction in the Refco Chapter 7 case where exactly the same

3    language on successor liability was used, if that is

4    permissible?

5            THE COURT:  It's permissible but it's completely

6    unnecessary.

7            MS. GRANFIELD:  Okay.

8            THE COURT:  And I suggest that whatever language

9    appears in any other order is of no significance to me.  Just

10   because something was entered in another case because it wasn't

11   picked up by a parting interest who was concerned about it does

12   not, to me, influence this outcome.

13           MS. GRANFIELD:  Very well, Your Honor.

14           MR. ROSNER:  Thank you, Your Honor.  David Rosner,

15   Kasowitz, Benson, Torres & Friedman on behalf of the Bay Harbor

16   Entities.  And to state something obvious, there's clearly some

17   momentum behind this takeover of this company and we recognize

18   that.  And we recognize that in making our objection, and we

19   recognize that there are some very important human elements to

20   the transaction that I know in the dollars and cents world of

21   bankruptcy sometimes people do lose sight of and I think that

22   on all sides here nobody has lost sight of them and I think

23   that they are important.

24           One of the main arguments, and I understood

25   Mr. Golden when he said it and I thought it was right even

1    though it may not be the most appealing thing to say but it is

2    right that this global markets argument is not really directly

3    on point as to what is being done in front of Your Honor in

4    terms of this estate and what is happening to creditors.

5    Though I understand that the Court does take a macro view of

6    certain things, but one of the arguments in favor is that

7    getting this deal done will build confidence in the market and

8    that's kind of just been taken as a given, almost, by many of

9    the parties here.  People can look at the way this transaction

10   actually got created and determine whether Barclays' behavior,

11   whether the position that Lehman found itself in, whether that

12   is market confidence building or if that is detrimental to the

13   market, nobody really knows.  And as I think we've seen over

14   the last couple of weeks, nobody really knows a lot about when

15   people make moves -- people in positions of power make moves

16   that they think are going to stabilize.  Perhaps they are

17   really unstabilizing.  But what you're being asked for here to

18   do today is to be a federal court granting its imprimatur on a

19   transaction where we know -- and the PWC as the administration

20   of a U.K. entity has submitted a declaration that eight billion

21   dollars was transferred from the U.K. entity into the United

22   States rendering that entity unable to trade, delisted,

23   insolvent and that money disappeared and that money is gone.

24   And by money, I mean money and securities.  Now, I will

25   respectfully disagree with you, Your Honor, on some things that

206

1    you have said and we have heard tonight.  Unquestionably, you

2    wear the robe and this is your courtroom and you make the call.

3              THE COURT:  No, this is our courtroom.  It's not my

4    courtroom.  This is the people's courtroom, but I'm not

5    Judge Wapner.

6              MR. ROSNER:  Clearly, Your Honor.  Clearly.

7              THE COURT:  This is -- I'm serious about this.  I

8    feel very strongly that we're here for a public purpose and my

9    name just happens to be on the door.

10             MR. ROSNER:  I appreciate that, Your Honor, very

11   much.  And what I will say is that I do respectfully disagree

12   with Your Honor as to whether this process comports with due

13   process as it's understood under the Bankruptcy Code and as

14   it's understood under the Constitution.  It's an important

15   point.  It is one that has been discussed tonight to some

16   degree but it is one that Your Honor did speak to quite

17   directly earlier, and I took those points and I just want to

18   state for the record that our view is that the eight billion

19   dollars has not been investigated.  Nobody knows how that

20   happened.  Nobody knows who knew about that transfer.  Nobody

21   knows whether -- and by nobody here in our people's court, I'm

22   including Your Honor as saying nobody knows that, because Your

23   Honor certainly doesn't know because no one has been able to

24   present evidence to Your Honor as to who was involved in the

25   transfer and --

207

1        THE COURT:  I'm having a problem with this argument

2    right now, so you might as well know it rather than continue

3    it.  I don't understand the relevance of this.  I understand

4    that it's a big number, it's a huge number.  And I understand

5    that you've asked questions of Mr. McDade about his knowledge

6    of the transaction, and he didn't provide a lot of information.

7    And I paid attention to the fact that he didn't provide a lot

8    of information.  But it made no impact on me because I'm

9    confident I'm going to learn a lot about this in the course of

10    this case.  The question that I have for you, and you're

11    pressing this point now, is what does this have to do with

12    whether or not it is in the best interest of this estate to

13    approve this particular transaction which is the only available

14    transaction tonight?  What does this have to do with what we're

15    here to consider?

16        MR. ROSNER:  What it has to do with, Your Honor, is

17    akin to what you were talking about, about the terms of the

18    order, is that if you approve this sale and if you permit an

19    order to be entered like this sale order then all those

20    securities that were transferred from the U.K. to the U.S. are

21    now going to be transferred to Barclays and that will be it.

22    And anybody's rights --

23        THE COURT:  I thought this was a cash sweep.  Is this

24    a securities sweep?

25        MR. ROSNER:  As I understood, there are going to be

208

1  securities.  I heard tens of -- millions of -- billions of

2  dollars of securities that are going to be transferred pursuant

3  to this transaction.

4         THE COURT:  Well, there's actually --

5         MR. ROSNER:  And cash, but --

6         THE COURT:  -- there's absolutely nothing in the

7  record, Mr. Rosner, about even what we're talking about.  This

8  is a reference to news articles that appeared, speculation in

9  the press.  Having read some articles about myself lately, I

10 know that there are a lot of things in the press that are just

11 plain wrong.  And I've always known that.

12        MR. ROSNER:  You have a declaration --

13        THE COURT:  My apologies to any members of the press

14 who may be watching this or listening in.  The reason I make

15 this point is that just because there is scuttlebutt about

16 something doesn't mean it's properly before me.  And it's a

17 huge amount of money, and it's a matter of great significance

18 and I'm confident that it will be addressed.  But I thought I

19 heard someone say earlier that there's no intention, as a

20 result of this transaction, to affect what rights may exist

21 with respect to that transfer.

22        MR. ROSNER:  Well, except -- and if that's the case

23 Your Honor, and if --

24        THE COURT:  Did I mishear that?

25        MR. ROSNER:  Well --

209

1          THE COURT:  I may have.

2          MR. ROSNER:  Except, I think, that the purchaser is

3   seeking to cut off any rights for people to trace their

4   property to the purchaser.  That's the whole point of tonight's

5   proceeding is for the purchaser to be able to say it is taking

6   assets that were in our view and in the view of PWC, who did

7   submit a declaration to Your Honor.  This is not a newspaper

8   story; it is a declaration that states that in just a few days

9   the joint administrators have identified more than eight

10  billion such funds that are due to LBIE but that LBIE does not

11  hold.  It's not a newspaper article.  The administrators know

12  what they're -- excuse me.

13         MR. MILLER:  Your Honor, it's pure speculation as to

14  what was transferred, if there was a transfer.  There's nothing

15  in the record on this at all.

16         MR. ROSNER:  That's the point.  There's nothing in

17  the record --

18         THE COURT:  I think we all agree.  There's nothing on

19  the record on this point.

20         MR. ROSNER:  But that's a critical omission on the

21  debtors' part because what the debtor is seeking to do is if

22  you look at the sale order what the debtor is seeking to do is

23  to have Your Honor find that the debtors had good title to

24  these assets.  Not they have the right, title and interest to

25  these assets, that they have good title to these assets and

210

1    that upon the sale to Barclays, Barclays will have good title

2    to these assets.  And those are findings that this Court can't

3    make because there has been no evidence that has been

4    introduced by the debtors.  There's been no record made by the

5    debtors that these assets that are being transferred are not

6    the assets that were transferred by LBIE.  The debtor has

7    chosen not to put on that case and has not put on any evidence

8    to demonstrate that it has title to the purchased assets.

9            Now, you did say just a moment ago, Your Honor, and I

10   listened to you out in the wing, that the order's going to need

11   some study?  And everybody's going to need to take a look and

12   study?  But that is a critical point of this order because to

13   say that the debtor has to have this Court make a finding that

14   the debtor has good title in the face of the knowledge that

15   there was a transaction of this magnitude, and what we're

16   talking about is customer property.  Customer property, the

17   people who broker dealt -- who prime broker dealt with LBI and

18   whose property was then moved to the U.K. and then that

19   property disappeared and it disappeared, we believe, through a

20   transfer on Friday and no replenishment.  And that, we believe,

21   is the very same property that is being sold.  But the order

22   that you're being asked to enter is to say they have good title

23   today.  Well, they don't have good title today.  They can't

24   prove that they have good title today and they certainly

25   haven't tried to prove that they have good title today.  And

1    what we've said, Your Honor, is that we have -- we own our

2    property.  It is -- I think Mr. Bienenstock made this point

3    when we were dealing with subsidiaries and I believe counsel

4    for Barclays said at some point it was going to come up with an

5    argument and Your Honor said it better be a pretty darn good

6    argument but that a debtor can't sell what it doesn't own.  We

7    own our property.  If our property was transferred without our

8    consent into LBI, even with our consent, it's still our

9    property and they don't have good title and they can't sell it.

10   So our liability -- Barclays has to remain liable to return our

11   property or to honor our constructive trust.  And that's why

12   it's highly relevant to these proceedings, Your Honor.

13        THE COURT:  Has there been any attempt, prior to your

14   articulation of this argument this evening, to determine the

15   willingness of the parties to this transaction to reserve with

16   respect to this claim for repatriation of the funds that were

17   transferred on the Friday before the Monday of the filing?

18        MR. ROSNER:  We put that in our papers as the

19   alternative to denial of the sale because it's always good to

20   have a second option on the denial that we sought.  But in

21   fairness, I think that we have not had that discussion.  There

22   was a meeting at Weil, I spoke with Ms. Fife yesterday; I had

23   actually sent her an e-mail and sent an e-mail to another

24   person.  I wasn't here on Wednesday, but I understood that they

25   had said partners would be available 24/7.  I reached out to

212

1    say can we have a discussion.  I was advised to come to Weil at

2    3:00, which I did.  And I listened to the presentation and I

3    asked my questions.  And the answers I got were I don't know.

4    And I don't mean that disrespectfully or disparagingly but no,

5    the answer is no.  We would reserve for our property.  I will

6    tell you that, Your Honor.  We would take our property and we

7    would reserve for it and say let's make sure that we have a

8    full and good claim to the ability to recover our property

9    since it was taken from LBIE and transferred into this estate

10   and is now being sold.

11        I get back to your point, Your Honor, and not to beat

12   it again, there's a lot of things -- the Bankruptcy Code is a

13   very powerful document.  It gives us the ability to come into

14   court just a few days after a filing of Lehman's size and seek

15   to sell pieces of the company that Mr. Flics says it doesn't

16   even own pieces of the company.  The Bankruptcy Code gives us

17   that but it doesn't give us the right to sell what it doesn't

18   own.  A debtor cannot do that.  363 says property of the

19   estate.  It doesn't say whatever property it wants to.  It

20   can't sell my -- well, it can't sell my client's property, it

21   can't sell my property either but it can't sell my client's

22   property.

23        THE COURT:  I guess I'm having a problem with what

24   you're saying.  I've heard you say it, and I think you've

25   almost said it enough because I know your argument.  But

213

1    because this isn't in the record, this is just argument, and

2    because the Lehman Enterprise transferred routinely cash and

3    other securities in staggering amounts clearing from one

4    continent to another all the time, and we're dealing with

5    issues relating to separate estates, one in the U.K. and this

6    one here, and including SIPC estate we have two, I don't know

7    whose property this is.

8            MR. ROSNER:  Exactly.

9            THE COURT:  And it may not be the estate that you're

10   asserting it belongs to.  It may not belong to the

11   administrators.  All you're doing is asserting on behalf of

12   your client a claim derivative of the claim that the

13   administrators would make.  And you know what?  I don't know if

14   it's right.  So because we are approaching 11:00 at night and

15   dealing with no evidence with respect to the underlying premise

16   of your argument I think it's time to move on.

17           MR. ROSNER:  Fair enough, Your Honor.  I'll just

18   close off that piece and I will move on to the next argument is

19   that your last statement that we don't know is the statement

20   that I believe is correct.  And when you talked about the

21   transfers around Lehman, which I don't think was actually

22   testified to but when you spoke of that, I'm still talking

23   about customer property.  I'm talking about our property.  No

24   matter how many times it gets moved, it's still our property

25   and it can't be sold.

214

1          THE COURT:  Excuse me a second.  If you're talking

2     about customer property you represent a particular fund or a

3     family of funds --

4          MR. ROSNER:  Yes.

5          THE COURT:  -- and segregate accounts and that kind

6     of thing.  Yes?

7          MR. ROSNER:  Well, yes, except that the property was

8     moved out, yes.

9          THE COURT:  And how much are we talking about in the

10    case of your client?  It's not eight billion dollars.

11         MR. ROSNER:  No, unfortunately for them it's not --

12    fortunately, it's not eight billion dollars but it's a very

13    sizable figure that I'm --

14         THE COURT:  What are we talking about?

15         MR. ROSNER:  It's actually something I'd prefer to

16    tell Your Honor in chambers as opposed to make a public

17    statement on the number.  But I would say --

18         THE COURT:  Here we go again with hedge funds not

19    wanting to talk out loud.

20         MR. ROSNER:  I didn't say they were hedge funds, you

21    said funds.

22         THE COURT:  I don't know if they're hedge funds or

23    not.

24         MR. ROSNER:  Thank you.

25         THE COURT:  I'm just reminded of the old 2019 issues.

215

1          MR. ROSNER:  Me too.

2          THE COURT:  I understand your argument.  And your

3    argument is fundamentally we need to look more closely at the

4    order so that you can protect the interest of your clients, and

5    I agree you should.

6          MR. ROSNER:  There's another part of this record that

7    hasn't been made.  In the overall point here that I think we

8    kind of talked about in somewhat of a generality is that they

9    have the burden of proof here.  The burden of proof on each

10   element.  You did talk about evidence that was given, evidence

11   that wasn't and there was some cross-examination.  But the

12   debtors have the burden of proof of demonstrating each of the

13   elements that they need to demonstrate.  And they didn't put a

14   record on regarding the good faith purchaser findings that they

15   are seeking to have found by Your Honor.

16         THE COURT:  Oh, I totally disagree.

17         MR. ROSNER:  Well --

18         THE COURT:  I totally disagree.  One of the things

19   that I try to do, I may not succeed perfectly, but I try to

20   listen with great care to the evidence that's being put into

21   the record to support findings, and I heard ample evidence both

22   in the McDade and in the Ridings proffer that would support

23   good faith findings here.  This was an arm's length

24   transaction, negotiated aggressively' it arose in two stages

25   after the deal fell apart.  At the end of the weekend they

216

1    restarted it, it was brisk, everybody was concerned about the

2    markets, this is all going at a breakneck speed but in terms of

3    good faith, everything that I heard was indicative of arm's

4    length, good faith, aggressive negotiations.  And, in fact,

5    what occurred this evening in court with respect to the fair

6    value of the real estate is a further concrete example of that

7    negotiation.  So I reject completely the assertion you've just

8    made.

9            MR. ROSNER:  Then I'm going to leave that one alone,

10   Your Honor.

11           THE COURT:  I think that's a good idea.

12           MR. ROSNER:  There are some other problems in the

13   order and I appreciate that you said that we have to look

14   carefully at it.  But there is one that I want to point out to

15   Your Honor and then talk about the alternative that we were

16   talking about just a moment ago.  And I don't know if this was

17   simply a drafting point, but it does seem -- didn't write the

18   paragraph number, the word "interest" -- Mr. Bienenstock

19   mentioned that the word "interest" is a defined term in here

20   and it includes all claims.  But then the order itself actually

21   releases the debtor from all interests and I don't know if that

22   was the intention of the order.  I'll get to it in a minute.

23   It's in paragraph -- it was in paragraph 24 --

24        (Off the record)

25           MR. ROSNER:  Okay.  I'm sorry.  It's actually

1    paragraph 8.  Thank you.  Is this something revised or -- this

2    is the revised one?

3                UNIDENTIFIED SPEAKER:  That's the one I handed up

4    this evening.  I need that back.

5                MR. ROSNER:  Okay.  It's in paragraph 8 called

6    Release of Interests.  And it said "that the order shall be

7    effective as a determination on the closing date all interests

8    of any kind or nature whatsoever existing as to the debtors for

9    the purchased assets have been unconditionally released,

10   discharged, and terminated".  And since interest includes all

11   claims and, as we said earlier, includes everything under the

12   world, this would actually constitute a general release to the

13   debtors.  And I don't think -- I'm hoping that that's not what

14   was intended, but it is what it says.

15               THE COURT:  Well, here's what I think, and I

16   understand the point and you've made it and I think it needs to

17   be addressed.

18               MR. ROSNER:  Thank you, Your Honor.

19               THE COURT:  But I'm not ruling on it at this moment.

20   I believe that what this is about is a drafting point.  And I

21   don't think that this courtroom should be converted into a late

22   night session in somebody's law firm.  This is a hearing to

23   approve a sale or deny approval of a sale.  We've already

24   reserved on the question of the form of the order and I've made

25   it clear that I have as a fallback, if people can't agree, that

218

1   we can have a further hearing to flush out ongoing issues

2   concerning the form of the order tomorrow morning at 10 a.m.  I

3   intend to be here.  And anybody's who's interested can show up.

4          MR. ROSNER:  Got it, Your Honor.  I'll close with

5   just saying, and maybe I'm stating the obvious, I hope not, but

6   I recognize that it's a lot to do.  It's a lot to ask this

7   Court to do that which is in the face of the massive pressure

8   that is being brought to bear on this transaction to say no,

9   I'm not going to approve it or no, I'm actually going to

10  adjourn it to allow people to take some reasonable amounts of

11  discovery investigation to learn if there are facts that should

12  be presented to the Court which we haven't been able to present

13  to the Court because there hasn't been an ability to do that.

14  I recognize that that's a huge burden to be placed on the Court

15  and that's why you wear the robe in the people's court and we

16  don't and we don't have to make that tough call.  And people

17  have said that this transaction is unprecedential and I think

18  that's right.  But unprecedential transactions lead to bad

19  precedence as well.  And I would just ask -- urge Your Honor to

20  consider what's before you, consider the interests of the

21  creditors, all the arguments that have been made and I hope

22  that you will either deny approval of the sale, adjourn it for

23  some brief period of time or in our case, allow for a set aside

24  so that we can preserve our interests as to specific property.

25  Thank you, Your Honor.

219

1        THE COURT:  Thanks, Mr. Rosner.  Is there someone

2    else who wishes to be heard?

3        MR. LEMAY:  Your Honor, my name is David Lemay from

4    Chadbourne & Parke and I won't consume more than about three

5    minutes of the Court's time.  I, too, am part of the LBIE posse

6    and I rise only to suggest what I think could be a very modest

7    change.  My client, Amber Capital Management, does not seek to

8    have liabilities foisted on the transferee.  We know that's not

9    really something that's ever going to happen.  We don't seek to

10   stop the sale.  Indeed, our client thinks that it's fine that

11   the sale goes ahead.  We have a couple of drafting issues on

12   the order.  I think what I've heard is I should stow those for

13   now and talk about them with counsel.

14        THE COURT:  Yes.

15        MR. LEMAY:  I'll do that, of course.  One thought

16   that I had, though, Your Honor, that would go a long way to

17   placating the LBIE constituency, would be since there are these

18   arguments and yes, at this point there's no record to support

19   them one way or the other about who owns the assets that are

20   being transferred, one classic way that courts deal with that,

21   of course, is to just make sure that the proceeds -- the

22   proceeds that the debtors receive, both the SIPA debtor and the

23   Chapter 11 debtor, are put in a safe place where you can make

24   those decisions later on.  So I am going to simply suggest to

25   Your Honor that I think the LBIE constituency would be very

220

1    well served, and no one else would be prejudiced, by adding a

2    minor substantive in the future and that's simply if the sale

3    price is effectively the escrow subject to further order of

4    this Court.  As I say, I've got drafting issues; I'll take

5    those up later and that's really it for me, Your Honor.  Thank

6    you very much.

7            THE COURT:  Thank you, Mr. Lemay.  Just so I get a

8    sense of how many people who are standing are standing waiting

9    to speak?  One, two, three, four?  Okay.

10            MR. TALMADGE:  Your Honor, I'll be extremely brief.

11    Scott Talmadge from Kaye Scholer for Wells Fargo.  We had filed

12    a brief objection.  It raises the same points that Mr. Sabin

13    had raised with respect to the nondebtor subsidiary's assets.

14    And we believe that that can be resolved by a drafting in the

15    order, but we'll have to see what happens with respect to that.

16    That's all I'm going to say because we might be here a while.

17            THE COURT:  Thank you.

18            MR. FLANIGAN:  Your Honor, my name is Dan Flanigan

19    and I represent BATS Holding, Inc.  I'll not only be brief but

20    I'll talk as fast as I can.

21            THE COURT:  Don't do that because we won't understand

22    you.

23            MR. FLANIGAN:  All I'm seeking, Your Honor, is

24    confirmation on the record of what I think I heard off the

25    record at the earlier presentation and that is that none of the

221

1    stock owned by the debtor in BATS Holding, Inc. is going to be

2    sold to Barclays in this transaction.  Thank you.

3            THE COURT:  That has been confirmed.   Okay.  Next.

4            MR. GREGOR:  Good evening, Your Honor.  Michael

5    Gregor of Allen Matkins Leck Gamble Mallory & Natsis on behalf

6    of Constellation Place, LLC as well as SunGard Expert

7    Solutions, LLC and certain affiliated entities that are

8    affiliated with SunGard as reflected in the opposition that we

9    filed today.  Your Honor, initially, I have not yet filed a

10   property application.  I request authority to --

11           THE COURT:  I'm hearing you now.  It's fine.

12           MR. GREGOR:  Thank your, Your Honor.  Very quickly,

13   with respect to Constellation, Your Honor, my client is a

14   landlord of the Los Angeles premises that are going to be

15   assumed.  Section 8.14 of the APA provides that immediately

16   upon assumption there will be a sublease back and the point

17   that we have is simply that while the code allows for an

18   assumption and an assignment, there's no right to compel a

19   sublease back once the assignment occurs.  And any -- our point

20   is simply that any subleasing should occur in certain forms

21   with the terms and conditions of the lease, whatever those

22   terms are.

23           The second point, Your Honor, is with respect to the

24   terms of the assumption.  The APA provides that Barclays will

25   only be responsible for post-closing obligations under the

222

1    leases, not pre-closing, and while normally defaults are taken

2    care of with a cure, and it shouldn't be an issue with

3    landlords in particular, it does create an issue because there

4    are obligations relating the pre-closing period such as CAM

5    reconciliations, indemnity obligations and otherwise that may

6    arise post-closing but relate to pre-closing activities that no

7    one knew about prior to the closing.  And our position, Your

8    Honor, is simply that in connection with the lease assumption,

9    Barclays should be required to assume the obligations as -- all

10   the benefits and burdens of the lease, not pick and choose,

11   just the post-closing liabilities with respect to our

12   leaseholds.

13       Moving on, Your Honor, with respect to SunGard,

14   SunGard has approximately forty agreements with some of these

15   debtors.  It has not had the opportunity to review which

16   agreements are being proposed to be assumed and assigned.

17       THE COURT:  I'm confused about something.  As to

18   these agreements, are these agreements that are closing date

19   agreements or designated agreements to be --

20       MR. GREGOR:  The debtors --

21       THE COURT:  -- selected within the next sixty days?

22       MR. GREGOR:  The debtors' notice of assumption

23   designated approximately forty-two of the SunGard agreements

24   for closing date contracts.

25       THE COURT:  Okay.

223

1        MR. GREGOR:  And the point here is simply that we

2   haven't had a chance to review our objections with respect to

3   those.  There may be issues pertaining to whether or not the

4   debtor entities are the parties to this contract.  It may be

5   nondebtor affiliates that are the parties to the contracts as

6   well because the contracts relate to IP; they may be

7   nonassignable under nonapplicable bankruptcy -- under

8   applicable nonbankruptcy law.  And we reserve our rights to

9   raise any of those objections.

10        THE COURT:  All right.  Your rights are reserved.

11        MR. POURAKIS:  Constantine Pourakis of Stevens & Lee

12   on behalf of 1301 Properties, LLP, the owners of the 1301

13   Avenue of the Americas building.  Just a couple of questions.

14   Our understanding is that the assignment will not be taking

15   place tonight but the assumption will.  We just want to know if

16   the order will provide -- there will be a provision saying that

17   the assumption of the contracts is effective as of today.

18        MR. MILLER:  The transaction is approved by the

19   board.

20        MR. POURAKIS:  Okay.  Second, in our objection we

21   just stated that the debtor failed to provide any proof of

22   adequate insurance due to performance.  Is there going to be

23   any kind of reserve for unpaid rent obligations?

24        THE COURT:  I'm sorry, what did you say?

25        MR. MILLER:  Adequate assurance, Your Honor.

224

1          THE COURT:  Adequate assurance of future performance?

2          MR. POURAKIS:  Yes, Your Honor.

3          THE COURT:  Is the Barclays?

4          MR. POURAKIS:  Well, we understand this is not

5     Barclays PLC.  We understand it's a subsidiary.  We're not sure

6     who the actual entity is who's buying this asset.

7          THE COURT:  Well, this is the first challenge I've

8     heard to the financial wherewithal of Barclays, and I'm

9     intrigued by your position.  I'm not sure what you're looking

10    for.

11         MR. POURAKIS:  When we filed the papers we still

12    weren't clear as to who was the proper entity.  How these --

13    our client was; it was not so that's why we raised that

14    objection -- our objection.  We just wanted to make sure.

15         THE COURT:  Well, my suggestion is that at some point

16    we're going to take a break and that you have a conversation to

17    adequately assure yourself that things are fine.  And if you're

18    not, we can revisit it.

19         MR. POURAKIS:  We're fine with that, Your Honor.

20         THE COURT:  Okay.

21         MR. POURAKIS:  Thank you.

22         MR. KADEN:  Excuse me, Your Honor.

23         THE COURT:  Who are you?

24         MR. KADEN:  I'm a disembodied voice.  Greg Kaden of

25    Goulston & Storrs.  I understand from the debtor that the

225

1    objectors who are on the phone were muted for a while and I

2    just wanted to make sure that we weren't forgotten about; that

3    at least one objector, myself, on behalf of two clients, has

4    objections to raise as well.  And I don't mean to take my turn

5    out of order, but I can't see what's going on in the courtroom

6    and I just wanted to make sure that in the late hour people

7    didn't start filing out of the courtroom and have us be left on

8    mute on the --

9          THE COURT:  Well, you did a very graceful job of

10   jumping the line.  We're not going to let you --

11         MR. KADEN:  I apologize, again, for the interruption,

12   Your Honor.

13         THE COURT:  Okay.  What I'll do is when people in the

14   courtroom have finished their presentations I'll give you a

15   signal and you can express your position for your clients.

16         MR. KADEN:  I appreciate that, Your Honor.  If I

17   could indulge one further request relating to my handicap of

18   being outside the courtroom.  Is there some way that the

19   debtors could either have their claims agent call us or e-mail

20   to the service list the proposed form of order that's being

21   discussed?

22         THE COURT:  It's a reasonable request for those who

23   are actively engaged in this hearing remotely and judging from

24   the nods that I see at counsel table for the debtors, that will

25   be done.  I just don't know when it will be done but it will be

226

1    done.

2            MR. KADEN:  Okay.  Thank you, Your Honor.

3            MR. ELROD:  Thank you, Your Honor.  David Elrod on

4    behalf of TransCanada Pipelines and its affiliates.  We filed a

5    limited objection and I think that it has been essentially in

6    part resolved by statements that occurred when the Court left

7    the courtroom and we had an update by counsel for the debtor on

8    what's not included in the sale.  And I just wanted to make

9    that clarified on the record, Your Honor, because it hasn't

10   been confirmed yet.  It's our understanding that Lehman

11   Brothers Commodity Services, Inc., Eagle Energy Partners, ULC

12   and Eagle Energy Partners I, L.P. assets are not part of this

13   transaction, this purchase agreement, and that the transaction

14   will not affect their ability to operate as an entity.

15           THE COURT:  It was hours ago that I heard that but I

16   believe that to be true.  Ms. Fife, is that true?

17           MS. FIFE:  Yes it is, Your Honor.

18           MR. ELROD:  Thank you, Your Honor.

19           THE COURT:  Okay.

20           MR. ANGELICH:  Good evening, Your Honor.  George

21   Angelich of Arent Fox, counsel to the Vanguard Group, Inc.  The

22   mutual fund so many Americans, millions of them, indeed, trust

23   their money with Vanguard.  And, Your Honor, people are in a

24   panic mode in America and not acting rationally on many fronts

25   in the economy.  And I think, Your Honor, the global economy

227

1    argument that you've heard tonight as a rationale for speeding

2    this process up and taking the expedited approach that's been

3    taken and utilized by this Court, it needs to be responded to

4    one more time.

5         Your Honor's discretion in judgment is really the

6    only counterbalance at the moment and waiting and giving a

7    little additional time to this process and allowing the debtor

8    the opportunity to go out and market these assets for perhaps

9    an additional period of time, just two weeks, might engage a

10   competitive process because Barclays is probably not going

11   away.  They're getting a fire-sale deal here for these assets

12   and I think that approving a deal in the middle of the night

13   will not do much to assure the markets of an improvement to the

14   economy, it may actually have the opposite effect.  So, Your

15   Honor, we would ask that you --

16        THE COURT:  Could you explain how approving this

17   transaction could possibly have a negative effect on the

18   markets?

19        MR. ANGELICH:  Well, Your Honor, there could be a

20   negative impact because there could, in fact, be additional

21   value that could be realized through a competitive fitting

22   process.  If there are indeed -- if there's no one else out

23   there --

24        THE COURT:  I don't think you've answered my

25   question.  You've made the assertion that you thought that my

228

1    putting this off is somehow a plus for the markets?  Was that

2    your assertion?

3              MR. ANGELICH:  Indeed, Your Honor.  It may very well

4    be.  This week we've seen an improvement in the markets.  There

5    has been an opportunity for stabilization for --

6              THE COURT:  I'm sorry, but I've been down this road

7    with other arguments in terms of relative speculation and I

8    think I addressed it with Mr. Golden when he was pressing me

9    hard on that very same point.  So I've heard it, and I will

10   consider it.

11             MR. ANGELICH:  Thank you, Your Honor.

12             THE COURT:  Is there anyone else in the courtroom who

13   wishes to be heard?  All right.  We go to the telephone list

14   and I'm not sure how many people who are participating by phone

15   are objectors.  Please identify yourself and speak up.

16             MR. KADEN:  Good evening, Your Honor.  It's Greg

17   Kaden at Goulston & Storrs on behalf of two clients,

18   Interactive Data Corporation and 125 High Street, L.P., each of

19   which filed an objection.  I'll start with Interactive Data

20   Corporation.

21             Some of my objections have been -- or reservations of

22   rights, so to speak, have been raised already so I'll try to

23   make it brief and hopefully incorporate the concessions that

24   have been made in response to those similar objections.

25             Interactive Data Corporation, to begin with, along

229

1    with its affiliates, provide data and related services to the

2    debtors and their affiliates, pursuant to a global services

3    agreement.  The global services agreement sets forth universal

4    terms and conditions for the specific projects that Interactive

5    undertakes for the debtors and affiliates.  Now, those specific

6    projects are governed by other agreements called schedules.

7    But the schedule is subject to all of the terms and conditions

8    of the global services agreement.

9            Now Interactive compared -- in the limited time that

10    we have, compared the agreements that the debtors proposed to

11    assume and assign against its own books and records but simply

12    has not been able to determine, with any certainty, which

13    agreements the debtors intend to assume and assign.

14            With that said, we would first ask that the debtors

15    and Barclay work with Interactive to determine which contracts

16    are being assumed and assigned.  I believe that the parties

17    have already undertaken to do that, but given that I've been a

18    little bit handicapped on the phone, I just want to make sure

19    that we have confirmation of that for the record.

20            MR. MILLER:  Yes, sir.

21            THE COURT:  I don't know if you heard Mr. Miller but

22    I believe he confirmed it.

23            MR. KADEN:  Okay.  Is that the case?

24            THE COURT:  Yes, that is the case.

25            MR. KADEN:  All right.  Moving on then, Interactive

230

1    believes that the global services agreement must be assumed and

2    assigned together with any schedule that Barclay is purchasing.

3    That's because they're interrelated and we think that the

4    global services agreement provides the master terms and

5    conditions for the schedules.  It actually got intertwined with

6    the schedules.  So we respectfully request either that the

7    parties agree to that proposition on the record, namely that

8    the schedules can't be assumed without the global services

9    agreement also being assumed.  Or if we can't get that granular

10   at this point, simply confirmation of the issue can be tabled

11   for purposes of today's hearing, without prejudice to

12   Interactive's right to raise the issue post-closing.

13            THE COURT:  Is there anybody here in a position to

14   comment with regard to that statement?

15            MR. MILLER:  Not the debtors, Your Honor.

16            MS. GRANFIELD:  Lindsee Granfield, Cleary Gottlieb

17   Steen & Hamilton, LLP on behalf of Barclays Capital.  I think

18   we indicated to the Courtroom, when Your Honor was out of the

19   courtroom, that in working through the issues of the assumed

20   contracts, that we would seek to resolve those issues.  The

21   contracts that are the closing contracts, we are asking Your

22   Honor to find are assumed because with respect to many of them

23   they are needed to operate.  For instance, the Lehman space on

24   Seventh Avenue and the trading floors there, and other

25   infrastructure in many, many different places.  And therefore

231

1    not to have -- or to have some cloud would be a problem.

2           But having said that, in terms of trying to work out

3    with the counterparties to assume contracts, are there issues

4    about identification?  Is there an issue that -- what's the

5    full contract?  We obviously realize we have to live within the

6    bounds of 365 in terms of assuming a full contract, can't break

7    up the contract, have to pay the cure cost.  Plus, in terms of

8    any accrued amounts, when we assume the contract, even if

9    accrued amounts aren't due yet but then the due date comes up,

10   that's going to be for our account.  So that's pretty much the

11   comfort I can give at this time.

12          THE COURT:  You don't have to agree that's sufficient

13   but that's all you're getting.

14          MR. KADEN:  Pardon me, Your Honor.

15          THE COURT:  I said, you don't have to agree right now

16   that that's sufficient but I've heard what she said and I think

17   that's all you're getting in court this evening.  Is that

18   satisfactory?

19          MR. KADEN:  I guess it's not satisfactory to the

20   extent that these documents are -- the two agreements are

21   physically separate documents.  So, to the extent we're talking

22   about assuming all the benefits of one contract, if we can

23   agree that it's one contract, then of course we have no

24   objection.  But we just don't know whether the debtors or the

25   Barclays will have an issue that these are, in fact, separate

232

1    contracts and they don't actually go hand in glove together as

2    part of the assumption and the assignment.

3            So I guess it could be a moot point that we can't

4    even tell whether it's in on the list.  For all we know the

5    master agreement already is on the list.  But I guess, to the

6    extent I popped a hole into the current circumstances, I would

7    like to reserve the right to raise the argument, with respect

8    to the global services agreement, that that also must come

9    along with any assumption and assignment of the schedules.

10           To the extent that we can't consensually agree or

11   indeed to the extent that the global services agreement isn't

12   already sitting on the schedules to be assumed and assigned or

13   a different name that we simply just can't identify for our

14   books and records.

15           THE COURT:  I'm not sure how to say goodbye but I

16   think we're done with what you had to say.  I didn't mean to

17   make light of what you said, it's just that you're on the phone

18   and nobody said anything and I think we're done with what you

19   had to say.  Anything more?

20           MR. KADEN:  I'll move on, then.  Finally, although

21   Interactive has determined the cure amount under its contract

22   to, at least the amount scheduled by the debtors, which is

23   596,792 dollars and, I guess, six cents.  We think it may be

24   more.  However, since the debtors have already scheduled 596K

25   as an undisputed cure amount, we'd have to immediately pay this

233

1   as an undisputed cure without prejudice to Interactive's right

2   to argue after discussion.  Hopefully we can reach a consensual

3   resolution but they will argue, post-closing, that additional

4   cure is required.  And I want to make sure that that argument

5   is reserved under Mr. Miller's general postponement of cure

6   objections but also to clarify that any undisputed cure amount,

7   if we agree, as we believed in the 596,000 dollars will be

8   immediately paid as part of the closing.

9        THE COURT:  I'm not going to say anything in response

10  to that.  Whoever wants to respond, please do?

11       MS. GRANFIELD:  Lindsee Granfield, Cleary Gottlieb

12  for Barclays Capital.  The proposed order is providing that to

13  the extent -- well, that the cure amounts will be paid as soon

14  as practicable on the earlier of the consent of the party to

15  the cure amount on the schedule, the deemed consent of the

16  party because they don't object on October 3rd or after your

17  Court's determination of the cure amount after dispute.

18       So no, we can't agree that again another party wants

19  to have its cake and eat it too, that if there's a dispute

20  about the amount we either reach agreement, get paid as soon as

21  practicable or Your Honor will determine it.

22       THE COURT:  That sounds perfectly consistent with due

23  process and I think everybody can agree that that's so, even

24  this briefly into the case.  There'll be an opportunity to be

25  paid an amount that you agree.  If you don't object you'll get

234

1   the deemed amount and if there's a problem there'll be a

2   hearing.

3           MR. KADEN:  Fair enough, Your Honor.  Thank you.

4           If I can move on now to my second client, which is

5   125 High Street.

6           THE COURT:  What time zone are you in?

7           MR. KADEN:  What time zone?

8           THE COURT:  Yes.

9           MR. KADEN:  I'm in the Eastern Time Zone.

10          THE COURT:  Okay.  Well, then you know how late it

11  is.  I wish you'd expedite -- I don't mean anything by this but

12  we've really been going for a long time.  It's a very, very hot

13  courtroom and we have a tremendous amount of work to do before

14  we can all go to sleep.  So I really ask you to limit your

15  remarks if you can.

16          MR. KADEN:  Okay, I will.  I'll get to the main

17  issues and many of them have already been raised.  So I will

18  try to be as brief as possible and I apologize and I appreciate

19  the Court's indulgence.

20          I would like the same confirmation that the prior

21  landlord has asked for, that the rights of my landlord at 125

22  High, under the lease, with respect to any sublease back to the

23  debtors are preserved consistent with the terms of the lease.

24          I think it was already confirmed on the record for

25  the other landlord but I want to make sure that that same

235

1    confirmation as to that the lease says what it says with

2    respect to treatment of subleases and that there's no attempt

3    here being made to overrun the provisions of the lease with

4    respect to subleasing, if there is a sublease contemplated on

5    this matter.

6            MS. GRANFIELD:  With all due respect to counsel, I

7    have no idea what your lease says or what its terms are.  And

8    so I can't confirm to you anything at this moment.  But I can

9    confirm that we'll have to live with what 365 gives us in terms

10   of rights.  That's all I can give you at this moment.

11           MR. KADEN:  Fair enough.

12           THE COURT:  Does that do it?

13           MR. KADEN:  The same confirmation as to year-end

14   reconciliations with respect to 125 High, if the year

15   interrupts, to the extent that they're payable under the lease,

16   that those provisions will be honored as well?

17           THE COURT:  Counsel, let me tell you what I think is

18   happening here, and you can't see what's going on in the

19   courtroom, which puts you at a disadvantage.  You're doing a

20   really effective job of being tenacious and pressing your

21   points but I don't think you're winning them.  I think that all

22   you're doing is getting reservations of rights, which is about

23   as much as you can expect at this hour.

24           And I'm also going to acknowledge, both to you and to

25   everybody in the courtroom that I'm getting tired.  I've been

236

1   on the bench for a long time and I've been trying to

2   concentrate in a very important hearing and I think we have to

3   stop talking about these issues.

4           MR. KADEN:  Fair enough, Your Honor.  I apologize.

5           THE COURT:  There's no reason to apologize.  This is

6   an important hearing and you have clients to represent.  I'm

7   just telling you that if you were watching what's going on you

8   would realize that you're losing me.  I can't pay attention to

9   what you're saying and I'm trying to.

10          MR. KADEN:  Okay.  So then with that I will take your

11  cue and close my arguments there.

12          THE COURT:  Thank you.

13          MR. HAYES:  Your Honor, one more telephone objection

14  that'll take about thirty seconds.

15          THE COURT:  Where are you?

16          MR. HAYES:  My name is Dion Hayes, I'm with

17  McGuireWoods.  I represent Toronto Dominion Bank, also Eastern

18  Time Zone.

19          THE COURT:  Are you in New York City?

20          MR. HAYES:  No, sir.

21          THE COURT:  Okay, then I'll listen to you.

22          MR. HAYES:  We have significant claims, Your Honor,

23  against Holdings LBI and certain LBI subsidiaries.  We filed,

24  essentially, a joinder in Mr. Bienenstock's objection that he

25  filed on behalf of RBS.  We join in his comments that he

237

1    articulated earlier with respect to paragraphs 4 and 10 of the

2    order.  I haven't seen the order unfortunately but as it was

3    described in the hearing earlier, we share his objections to

4    those provisions.  Thank you, Judge.

5         THE COURT:  Okay.  Thank you.

6         MR. ROESCHENTHALER:  Your Honor, this is Mike

7    Roeschenthaler, also for McGuireWoods in the Eastern Time Zone.

8    I represent Access Data Corp and CNX Gas Company.  Briefly,

9    Your Honor, Access Data Corp, based on the representations made

10   by counsel for the debtor about asserting late claims or

11   rejection of claims, at this point we're fine with that,

12   subject to our right to assert those claims because we -- the

13   claim of Access Data is about ten times what has been listed by

14   the debtor.

15        And for CNX Gas Company, our claim related to EU

16   Energy and based on representations by the debtor earlier, that

17   is no longer part of the sale.  If that's the case, then we

18   have no objection to the sale going forward.

19        THE COURT:  Thank you.

20        MR. ROESCHENTHALER:  Thank you, Your Honor.

21        THE COURT:  Is there anyone else on the phone?  Okay.

22   Then you can mute your lines.

23        It's now 11:30 and what I said I meant, I'm kind of

24   exhausted.  But I think that it's also important for us to get

25   through this.  I recognize that many of the people who are

238

1    sitting out there have not eaten and haven't had a break in a

2    while and I think due process also includes no cruel and

3    inhuman punishment.  And so I think that it may be timely,

4    before I hear from the debtors and/or also from the purchaser,

5    to take a fifteen minute break so everybody can refresh

6    themselves a little bit.

7              So since it's already as late as it is, it might as

8    well be a little bit later and let's take a fifteen minute

9    break and I'll see you at 11:45.

10         (Recess from 11:30 till 11:45 p.m.)

11              THE COURT:  Be seated, please.  Mr. Miller?

12              MR. MILLER:  Good evening again, Your Honor.  And

13    given the lateness of the hour, Your Honor, I expect to be

14    exceedingly brief, Your Honor.  There have been an awful lot of

15    objectors who have stood at the lectern and it's, sort of, hard

16    after listening to twenty odd people, to remember all of the

17    comments that were made and objections that were made.  But

18    there's one basic theme, Your Honor, that has gone through the

19    statements by Mr. Golden, Mr. Rosner and some others.  That

20    apparently there is the ability to stop everything, take two or

21    three weeks or maybe two or three months, while we explore

22    every possible alternative.  And there is no recognition, Your

23    Honor, that we have a patient that is hemorrhaging on the

24    operating table and there is no intensive care ward for this

25    patient.

239

1          Things have happened, Your Honor, in the last two

2     days.  First of all, we have a SIPC proceeding, Your Honor.  A

3     trustee has been appointed for SIPC and the assets of LBI are

4     under the jurisdiction of that proceeding.  They're gone, Your

5     Honor.  And as it was pointed out in the testimony today, there

6     are 639,000 accounts with a value of something like 138 billion

7     dollars that are sitting now waiting transfer.  And if this

8     sale doesn't go through, Your Honor, those accounts are going

9     to be stuck.  And they're going to be stuck for months and

10    months.

11         Mr. Golden says that he protects the interest of

12    creditors.  I would say, Your Honor, the debtor is protecting

13    the interest of creditors.  If this transaction doesn't go

14    through, Your Honor, LBI is out of business.  It already is --

15    will be in a SIPC liquidation proceeding.

16         There is no money at LBHI.  The DIP loan will become

17    due, 200 million dollars, as payable.  Look what happened

18    yesterday, Your Honor.  The CME closed us out and we took a

19    loss of one billion, six hundred million dollars.  This

20    administration is finished if this transaction is not

21    completed, Your Honor.

22         It's a shame, Your Honor, that the 7,000 people who

23    are waiting for transfers today in various computer points

24    throughout the country, did not get what they expected to.  And

25    I'm not being critical of anybody, Your Honor; everybody has a

240

1    right to express their views.  But we are in a situation in

2    which we have a fragile asset that can't.  This is not a case

3    where you can sit and go out and explore every single

4    opportunity.  And in that connection I might say, Your Honor,

5    that for months, certainly going back to the collapse of Bear

6    Sterns and before that, Lehman has been deleveraging.  It has

7    been participating in every effort to deleverage its balance

8    sheet.

9            It got down to -- let me call it the final round,

10   where there only were two possibilities:  the Bank of America

11   and Barclays.  And the Bank of America went off and did

12   something else.  Barclays -- that transaction was unable to be

13   consummated.  So in the exercise of good business judgment,

14   management and the board of directors turned to get the best

15   transactions they could get in the limited time.

16           And, Your Honor, there aren't many candidates that

17   could do this.  You needed somebody with the kind of capital,

18   credit standing of Barclays.  There aren't that many people out

19   there.  And you can't go around and cherry pick these assets,

20   Your Honor.  This is an integrated operation.

21           So what is happening, Your Honor, we are protecting

22   the customers.  There's testimony on the record, Your Honor, as

23   to what the consequences would be if this transaction doesn't

24   go forward.  Both Mr. Ridings and Mr. McDade have indicated

25   there won't be anybody in the building.  If there's no

241

```
 1    assurance of an ongoing operation for the LBI employees, which
 2    are most of the employees in 745 Seventh Avenue, they're not
 3    going to stay there, Your Honor.  These are people who have
 4    bills that they have to meet, they need employment.  They need
 5    some element of certainty.  They're all expecting, and I'm not
 6    putting any pressure on Your Honor, they're all expecting that
 7    Your Honor will rule --
 8              THE COURT:  The pressure is already there, Mr.
 9    Miller.
10              MR. MILLER:  I'm sorry?
11              THE COURT:  The pressure is already there.
12              MR. MILLER:  Thank you, Your Honor.
13              THE COURT:  Not from you.
14              MR. MILLER:  No, no.  I was looking for that woman.
15    There is pressure on everybody, Your Honor.  I mean, I was just
16    saying to somebody, here we are sitting in a courtroom at 5
17    minutes after 12, and we've been here for a long time, and that
18    is evidence of the concern that everybody has.  And I
19    understand the issues, Your Honor.  As we said on the very
20    first day, this is an extraordinarily exceptional case.  There
21    is so much at stake here.  And if we miss this opportunity we
22    are talking about a wholesale liquidation with all of the
23    consequences that come out of that liquidation.  And people can
24    speculate as to what's going to happen.
25              I mean, I was a little shocked at Vanguard, who
```

242

1    happens to be a competitor of Neuberger, saying don't close

2    this.  It'll be a good thing for the marketplace, for somebody

3    maybe.  So I think that argument, Your Honor, just doesn't

4    carry water.

5            Now I would turn, just for a minute, Your Honor, to

6    the LBIE thing, which is confusing this whole matter.  I point

7    out, Your Honor, LBIE went into administration before the

8    Chapter 11 case was filed.  And PWC froze all transactions

9    immediately and it became the administrator.  So those

10   transactions were frozen.

11           Now, what we're talking about, Your Honor, is eight

12   billion or five billion, whatever it might be, Your Honor, that

13   was a cash sweep.  Cash, we're not transferring any cash to

14   Barclays, that's out of the agreement.  So if Mr. Rosner or

15   somebody else has a claim, they can assert a claim.  It has

16   nothing to do with this transaction.

17           And I would also point out, Your Honor, that PWC as

18   the administrator is not opposing the sale.  In fact, they're

19   supporting the sale.  They're just reserving their rights and

20   they should reserve their rights.  If they have a claim, this

21   is all going to be investigated.  But we have to look at the

22   bigger picture, Your Honor, what happens if we don't close this

23   transaction.  And Mr. Ridings testified, Mr. McDade testified

24   as to the consequences that will affect these estates.  We

25   cannot reverse what has already happened.

243

1        And in the short period from Wednesday to Friday,

2    notwithstanding that Your Honor approved the sale procedures,

3    we lost the confidence of the market.  And if you don't approve

4    this transaction, Your Honor, LBI is finished as an operating

5    business.  It will not add any value to anybody.  And all we

6    will have left, Your Honor, is a winding down estate and

7    holdings.  And if that building is empty, Your Honor, it won't

8    be worth 900 million dollars because that's the nature -- that

9    appraisal that we got assumed a value with the building in use.

10        So the dangers here, Your Honor, are extraordinary.

11   This is a good transaction, Your Honor.  We spent a lot of time

12   listening to landlords.  All of those issues, Your Honor, are

13   minor and will be resolved in one way or the other.  Either

14   Your honor will decide them or there will be mutual

15   arrangements and agreements among the parties.

16        The drafting of the order, I think, Your Honor, if we

17   all sit down in good faith we will come up with an order.  I

18   think we will come up with an order tonight if Your Honor were

19   to approve this transaction.

20        THE COURT:  I'm prepared to stay here for as long as

21   it takes if you're prepared to stay here for as long as it

22   takes.

23        MR. MILLER:  Your Honor, I can't think of a better

24   place to be.

25        THE COURT:  Do you want to order pizza?  How do you

244

1    want to nourish yourself between now and the entry of the

2    order?

3              MR. MILLER:  With pepperoni?

4              THE COURT:  Whatever you want.

5              MR. MILLER:  I agree with Mr. Bienenstock -- maybe

6    let me rethink that.  Your Honor, I would stay without food.  I

7    think that's a good thing.  And I would lock all of the

8    latrines.  I'm sorry; I withdraw that remark, Your Honor.

9              THE COURT:  Unfortunately, it's on the record of this

10   proceeding.

11             MR. MILLER:  And, Your Honor, the proceeds of the

12   sale, the 250 million dollars, is going to the SIPC trustee,

13   the one billion 290 million dollars is going to the estate.

14   There is a creditors' committee.  Those proceeds are safe.

15   Hopefully, we're going to go into the more conventional

16   procedures of Chapter 11.

17             I don't want to use the melting ice cube.  It's

18   already half melted, Your Honor.  The steps have had happened,

19   the things that have happened since Wednesday, make it

20   imperative that this sale be approved.  In the interest of all

21   of the stakeholders, including Mr. Golden's clients, they will

22   benefit by this, Your Honor, because if the alternative

23   happens, there will be very little to distribute to creditors,

24   if anything.

25             So we submit to Your Honor that this sale should be

245

1    approved and should be approved tonight.  And we should get the

2    orders entered and get the transfers done before there's any

3    other prejudice and harm.  Thank you, Your Honor.

4         THE COURT:  Thank you, Mr. Miller.

5         MS. GRANFIELD:  Really brief, Your Honor, because I

6    won't tread over any ground that Mr. Miller just went over.

7    The importance, if Your Honor is so disposed to approve the

8    transaction of staying here, getting the order done and getting

9    it entered tonight, my client wanted me to express to you the

10   importance is really not only in terms of the operations, the

11   moving of the money, the preserving of the value for this

12   estate, but the importance in terms of staying here and get it

13   done tonight is really with respect to the employees who we've

14   already heard many times have really had a horrible week.  They

15   have had a bit of hope in terms of being able to return to a

16   more business as usual.  And we're really concerned if they

17   don't wake up tomorrow and see that not only has it been

18   approved but the order's been entered and we're moving forward

19   towards closing.

20        Just generally, with respect to the objections,

21   Barclays Capital cannot pay out the sums that have been put on

22   the record tonight and subject itself to collateral attack.

23   It's not doing this transaction to paint a bullseye on its back

24   for every subsidiary creditor, landlord, fund that wants to

25   figure out who's a deep pocket, oh, Barclays is doing this deal

246

1    so it's one of the three or four deep pockets that could have

2    and so we're going to reward by miring it in collateral

3    litigation.  If there's really any chance of that, it won't

4    happen.  And this will all be for naught.  So we do have to

5    keep our eye on that ball.

6            And then finally, Your Honor, in the proffer of some

7    of the testimony tonight, and this had been said before, and it

8    may have been the belief of the parties who had said it, but

9    it's important with respect to Barclays and its relationship

10   with regulators in the U.K. that we wanted to make a pointed

11   statement that it has not only been the U.S. regulators that

12   have really gone above and beyond to try and facilitate this

13   transaction.  But the regulators in the United Kingdom have

14   done so as well.  And there was speculation, really, that maybe

15   the U.K. regulators had some to do with not having the prior

16   transaction that was worked on last week come to fruition.  And

17   it turns out that's not the case.  It really was not a

18   regulatory issue but just a question of the structure of the

19   transaction would have required Barclays to have a

20   shareholder's vote in order to do the transaction and that just

21   was not going to happen with the precipitous terrible things

22   that were happening at the time.  And so, we just wanted to

23   correct the record with respect to that.  And with that, I'll

24   turn it over to others.

25            MR. BIENENSTOCK:  May I respond for a moment, Your

247

1    Honor?

2            THE COURT:  Yes, you may.

3            MR. BIENENSTOCK:  I just want to point out that,

4    number one, we all understand the importance of the

5    transaction.  And it's very easy for a party sponsoring it to

6    say, and I won't do it unless you give me something illegal, so

7    give it to me, Judge.  I'd like to point Your Honor to some

8    evidence Your Honor admitted, the contract.  Nowhere in that

9    contract does it say they need an order that's free and clear

10   of successor liability from creditors of non-debtor

11   subsidiaries.  Nowhere.  This is just overreaching and gambling

12   that Your Honor feels this is so important that you'll do

13   something illegal so they'll close tonight.  Thanks.

14           THE COURT:  It's my job to do what the law permits in

15   the exercise of my discretion.  This week, more than any other

16   week since I was appointed to the bench, I have felt the

17   awesome power of this job.  And it's now Saturday morning.

18   I've given a lot of thought the objections.  I reviewed each

19   one that I could get.  They were flying in this afternoon one

20   after another.  And I categorized them in my mind and

21   considered carefully whether it was permissible for me as a

22   judge in this district to approve a transaction this momentous

23   on such an extraordinarily fast schedule.  And I gave

24   consideration to the due process considerations that have been

25   articulated in objections both orally and in writing.  And I

248

1    have concluded that this is really not a question of due

2    process being denied.  This is a question of due process being

3    pursued in good faith by all parties to the transaction, even

4    the objectors.  It is a testament to the importance of this

5    transaction that this courtroom is still packed.  I have no

6    idea what's going on in the overflow rooms.  This is not an

7    ordinary Chapter 11 case.

8            This is not simply approving the transaction because

9    Mr. Miller is putting pressure on me to do so.  This is not

10   approving the transaction because I know it's the best

11   available transaction.  I have to approve this transaction

12   because it's the only available transaction.

13           I believe that one of the remarkable aspects of our

14   Bankruptcy Code, as it has evolved, is its remarkable

15   flexibility to different circumstances.  The lawyers who are

16   appearing before me this evening are truly among the best and

17   the brightest in the field.  And some have participated in the

18   evolution of bankruptcy as a field, nationally and

19   internationally.  We must close this deal this weekend not

20   because the markets demand it, although that's certainly a part

21   of it.  Lehman Brothers became a victim.  In effect, the only

22   true icon to fall in the tsunami that has befallen the credit

23   markets.  And it saddens me.  I feel that I have a

24   responsibility to all the creditors, to all of the employees,

25   to all of the customers and to all of you.  Arguments have been

1    made this evening by objectors, some questioning whether or not

2    if I were to delay approval another better transaction might be

3    realized or discovered.  And that's a preposterous notion.  As

4    I said on Wednesday, it's very apparent to me that for a

5    transaction of this sort to happen, only Barclays can do it.

6    Only Barclays has the support of the regulators.  Only Barclays

7    is prepared to close.  Only Barclays can deliver the customer

8    accounts to safe harbors.  And the customer property, which is

9    the principal concern of the SIPC trustee, a case which is also

10   pending before me now, will be best protected by virtue of

11   approving the sale.

12          The objectors, and I'm not putting them all in the

13   same basket, principally, Mr. Golden and Mr. Rosner's clients,

14   argue passionately that I should not be unduly influenced by

15   the arguments made by the debtors that the markets will, in

16   fact, tank if this deal is not approved and that more time

17   should be afforded to searching for an alternative.  I am

18   persuaded that to do so would be reckless.  I believe that the

19   debtors have acted in the utmost of good faith in trying to

20   make the best out of a terrible situation.  The comments made

21   by the SIPC trustee so many hours ago in reference to the

22   cooperation, the unusual cooperation that has characterized the

23   commencement of the SIPC proceeding and the coordination of

24   that proceeding with this bankruptcy case demonstrate not just

25   that New York lawyers and consultants can be good citizens but

250

1    that we all recognize that we're engaged in something here

2    that's very special.  This is the most momentous bankruptcy

3    hearing I've ever sat through either as a lawyer or as a judge.

4    And I'm guessing I'm not alone in that sense.

5            One could be a theoretical bankruptcy jurist and say

6    transactions such as this should always be subject to more time

7    so that parties can better assess the consequences of the

8    transactions.  Bankruptcy Rule 6003 which was enacted recently

9    was designed among other things to slow down activities in the

10   first twenty days of big bankruptcy cases.  This is Friday.

11   This case was filed on Monday.  What we're doing is unheard of

12   but imperative.

13           I am completely satisfied that I am fulfilling my

14   duty as a United States bankruptcy judge in approving this

15   transaction and in finding that there is no better or

16   alternative transaction for these assets, that the consequences

17   of not approving a transaction could prove to be truly

18   disastrous.  And those adverse consequences are meaningful to

19   me as I exercise this discretion.  The harm to the debtor, its

20   estates, the customers, creditors, generally, the national

21   economy and the global economy could prove to be incalculable.

22           Moreover, it's not just about avoiding harm.

23   Approving the transaction secures whether for ninety days or

24   for a lifelong career employment for 9,000 employees at Lehman,

25   and holds together an operation the value of which is really

251

1    embedded in the talent of the employees, their knowledge, their

2    relationship, their expertise and their ability to create value

3    to the economy.

4            Earlier today, I guess it was yesterday, I said that

5    I was concerned about the real estate value in this

6    transaction.  I still am but I'm getting over it.  I believe

7    that sophisticated negotiations cannot be parsed neatly into

8    the constituent parts because they're integrated and

9    interrelated in the result of give and take.  I'm unable to

10   value a piece of New York City real estate and there's been no

11   real evidence presented although the appraisal has been alluded

12   to.  I suppose it is theoretically possible that if the office

13   building at 745 Seventh Avenue were subject to marketing and

14   auction procedures over a lengthy period of time and were

15   somehow viewed as a quasi trophy property that perhaps it might

16   bring more value.  But that's speculation.  As to the data

17   centers, I have no idea.  I'm not even sure I know what a data

18   center.  I expect it's a place that has servers and deals with

19   the back office needs of a large operation such as this.  And

20   that, in a sense, describes part of the problem for me as a

21   judge here.  I know that I need to approve this transaction.  I

22   am absolutely confident in my judgment.  But I also know that

23   this is so exceptional relative to the experience that I have

24   had both as bankruptcy lawyer and as judge to know that it

25   could never be deemed a precedent for future cases unless

252

1    someone could argue that there is a similar emergency.  It's

2    hard for me to imagine a similar emergency.

3            And so, as to those objectors who say it would be

4    establishing bad precedent to approve this transaction, I say

5    no.  This is not a bad precedent.  To the contrary.  It's an

6    extraordinary example of the flexibility that bankruptcy

7    affords under circumstances such as this.  It's an example that

8    creative minds working diligently day and night even under the

9    worst of circumstances can create remarkably complicated

10   transactions that preserve value.  I am proud to have been part

11   of this process.

12           I'm also satisfied that if everybody stays who needs

13   to comment on the order that some of the legal issues that have

14   been raised during the objection phase of this hearing can be

15   addressed.  I note the arguments made by Mr. Bienenstock on

16   behalf of the Walt Disney Company, that I can't do anything

17   that's illegal.  And he's right.  However, it's not illegal to

18   enter orders that include from time to time language that

19   people dispute or language that may be ambiguous or language

20   that might have been better drafted.  I regret to say that I

21   think I do it every day.  And most of it's because I enter

22   orders that you draft.  So, I don't think it's illegal for me

23   to do something that may lead to an argument in the future as

24   to what the language of the order means.

25           As far as Mr. Rosner's arguments are concerned and

253

1    those of others who have talked about the sweeping of cash out

2    of the European operations on the Friday before the filing

3    here, I'll repeat what I referred to earlier.  There's no

4    evidence with respect to that although there's been a lot of

5    discussion about it.  I'm satisfied that given the fact that

6    Barclays is not taking cash and the only thing that came in to

7    the debtor from Europe was cash that in practical terms we

8    should be safe.  The cure objections will be dealt with in

9    accordance with the understandings and representations made by

10   Mr. Miller on behalf of the debtors.  And I presume that unless

11   that's worked out consensually that at some point I'll have an

12   opportunity to hear evidence with regard to proper cures.

13        I believe I dealt with the matters that are before me

14   and that the remainder of the evening should be spent with

15   those lawyers who need to address the substance of the order to

16   work together to develop that in a form that's either purely

17   consensual, or to the extent it's not, can be entered by me

18   provided that the areas of disagreement are highlighted.  I

19   will remain available for as long as it's necessary so that to

20   the extent there is a need to put anything on the record or to

21   confer with me that you'll be able to do so.  I would note,

22   however, just in the interest of avoiding an all-nighter that

23   to the extent it would be feasible for the order to be

24   completed given the fact that it is mostly done within the

25   next, say, forty-five minutes, that would be desirable.

254

1           Would you like to be heard, sir?

2           MR. KOBAK:  Yes.  James Kobak, Hughes, Hubbard & Reed

3   for the SIPC trustee.  There's also an order in the SIPC case

4   which -- a proposed order which we presented to Your Honor

5   which, essentially -- in fact, what it does is adopts and

6   incorporates by reference the order approving the sale in the

7   Chapter 11 case and to our proceeding.

8           THE COURT:  Whatever that order might end up saying,

9   I take it.  So that in effect --

10          MR. KOBAK:  Yes, that's correct.  But when that order

11  is entered, if Your Honor would entertain the other order

12  because it is a condition to approval of the contract.

13          THE COURT:  I certainly will.

14          MR. KOBAK:  I have a copy with me.

15          THE COURT:  Do you have a copy of that order?

16          MR. KOBAK:  Yes.  If I may?

17          THE COURT:  You may.  Does it also have an electronic

18  disk that goes with it?

19          MR. KOBAK:  Yes, it does.

20          THE COURT:  Okay.

21          MR. KOBAK:  Thank you, Your Honor.

22          THE COURT:  Thank you.

23          MR. BIENENSTOCK:  Your Honor, may I be heard?

24          THE COURT:  Mr. Bienenstock?

25          MR. BIENENSTOCK:  Yeah.  I'm trying to take Your

255

1   Honor's cue.  I think Your Honor came up with a solution to the

2   issue I had raised in terms of ambiguous language which might

3   obviate any change in that regard depending on whether Your

4   Honor feels inclined to comment on the following question.  Is

5   it fair for us to infer from Your Honor's remarks that if we

6   leave the language alone and one day we'll come back to Your

7   Honor, if necessary, to resolve its ambiguity that Your Honor

8   would be inclined based on your first comments that you'll

9   interpret it based on what was legal?

10          THE COURT:  I'm obligated as a matter of my oath to

11   interpret everything in a manner that I consider legal.

12   Occasionally, however, I'm told I've made mistakes.

13          MR. BIENENSTOCK:  Well, we all do.  But I asked the

14   question for this reason.  There is bankruptcy jurisprudence

15   that if a bankruptcy judge, like, discharges a third party

16   claim and you don't object, you're stuck with it even though it

17   was illegal.  And I just want to be clear here that if we leave

18   the language alone, make the evening shorter, but come back to

19   Your Honor, Your Honor's intent is to interpret it as to what

20   would have been legal.

21          THE COURT:  I'm disinclined to ever state from the

22   bench, even when there are only a couple of people in the room,

23   what my intent is.  I'm prepared to say, however, that in the

24   event that parties were to return to this court at some time in

25   the future to seek an interpretation of what I meant in one of

256

1    my orders that I will look at the language probably with a

2    clearer head than I have right now and attempt to reasonably

3    parse the words and, in doing so, make a judgment as to not

4    only what the language means but how it should be applied as a

5    legal matter.

6             MR. BIENENSTOCK:  Thank you, Your Honor.

7             MR. LEMAY:  Your Honor, very brief?

8             THE COURT:  Mr. LeMay?  This is sort of remarkable

9    because I thought that I had ruled and that I was going to

10   leave and that everybody was going to do some work.  But here

11   you go.

12            MR. LEMAY:  Your Honor --

13            THE COURT:  And you were so good about saying that

14   you're going to be brief when you spoke earlier.

15            MR. LEMAY:  And I'll be even briefer now, Your Honor.

16   David LeMay from Chadbourne & Parke.  I had raised in my

17   argument the concept of an escrow of the purchase price.  Mr.

18   Miller, I think, basically took issue with that.  I didn't hear

19   Your Honor's ruling encompass that issue and I simply ask that

20   Your Honor --

21            THE COURT:  It does not encompass that issue.  You've

22   confirmed that I did not address that issue at all.  So it

23   would have been probably even better had you said nothing.

24            MR. LEMAY:  Thank you, Your Honor.

25            THE COURT:  We're adjourned as far as this hearing is

257

1    concerned.

2              ALL:  Thank you, Your Honor.

3         (Applause)

4         (Whereupon these proceedings were concluded at 12:41 a.m.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

258

1

2                              I N D E X

3

4                           T E S T I M O N Y

5

6    WITNESS                    EXAM BY                      PAGE

7    Herbert H. McDade          Mr. Qureshi                 102

8    Herbert H. McDade          Mr. Bienenstock             111

9    Herbert H. McDade          Mr. Sabin                   118

10   Herbert H. McDade          Mr. Rosner                  120

11   Herbert H. McDade          Mr. Byrne                   127

12   Herbert H. McDade          Mr. Miller                  135

13   Barry W. Ridings           Mr. Qureshi                 146

14   Barry W. Ridings           Mr. Miller                  153

15

16   EXHIBITS

17   PARTY    NO.  DESCRIPTION                    PAGE     LINE

18   Debtor        Copy of execution copy of asset   133      23

19                 purchase agreement among LBHI, LBI,

20                 LB 745 LLC and Barclays Capital, Inc.

21                 dated 9/16/08 and first amendment

22                 thereto dated 9/19/08

23

24

25

259

1

2                    I N D E X, cont'd

3

4                   R U L I N G S

5  DESCRIPTION                                    PAGE    LINE

6  Debtor's motion for an order confirming status    57      1

7  of Citibank clearing advances approved

8

9  Sale transaction approved                      245     25

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

260

1

2                C E R T I F I C A T I O N

3

4     I, Lisa Bar-Leib, certify that the foregoing transcript is a

5     true and accurate record of the proceedings.

6

7     _____

8     LISA BAR-LEIB

9

10    Veritext LLC

11    200 Old Country Road

12    Suite 580

13    Mineola, NY 11501

14

15    Date:  September 22, 2008

16

17

18

19

20

21

22

23

24

25