**STENOGRAPHIC MINUTES**
**Unrevised and Unedited**
**Not for Quotation or**
**Duplication**

## **Preliminary Transcript**

THE CAUSES AND EFFECTS OF THE LEHMAN

BROTHERS BANKRUPTCY

Monday, October 6, 2008

House of Representatives,

Committee on Oversight and

Government Reform,

Washington, D.C.

"This is a preliminary transcript of a Committee Hearing.  It has
not yet been subject to a review process to ensure that the statements
within are appropriately attributed to the witness or member of
Congress who made them, to determine whether there are any
inconsistencies between the statements within and what was actually
said at the proceeding, or to make any other corrections to ensure the
accuracy of the record."

## **Committee Hearings**

### of the

# **U.S. HOUSE OF REPRESENTATIVES**



**OFFICE OF THE CLERK**
**Office of Official Reporters**

1 | RPTS KESTERSON

2 | DCMN HERZFELD


3 | THE CAUSES AND EFFECTS OF THE LEHMAN

4 | BROTHERS BANKRUPTCY

5 | Monday, October 6, 2008

6 | House of Representatives,

7 | Committee on Oversight and

8 | Government Reform,

9 | Washington, D.C.


10 | The committee met, pursuant to call, at 10:09 a.m., in

11 | Room 2154, Rayburn House Office Building, Hon. Henry A.

12 | Waxman [chairman of the committee] presiding.

13 | Present: Representatives Waxman, Maloney, Cummings,

14 | Kucinich, Tierney, Watson, Higgins, Yarmuth, Braley, Norton,

15 | McCollum, Cooper, Van Hollen, Sarbanes, Welch, Davis of

16 | Virginia, Shays, Mica and Turner.

17 | Staff Present: Kristin Amerling, General Counsel; Caren

18 | Auchman, Press Assistant; Phil Barnett, Staff Director and

19 | Chief Counsel; Jen Berenholz, Deputy Clerk; Alison Cassady,

20 | Professional Staff Member; Brian Cohen, Senior Investigator

21  and Policy Advisor; Zhongrui "JR" Deng, Chief Information

22  Officer; Greg Dotson, Chief Environmental Counsel; Miriam

23  Edelman, Special Assistant; Earley Green, Chief Clerk; David

24  Leviss, Senior Investigative Counsel; Karen Lightfoot,

25  Communications Director and Senior Policy Advisor; Jennifer

26  Owens, Special Assistant; Leneal Scott, Information Systems

27  Manager; Roger Sherman, Deputy Chief Counsel; Mitch Smiley,

28  Special Assistant; Lawrence Halloran, Minority Staff

29  Director; Jennifer Safavian, Minority Chief Counsel for

30  Oversight and Investigations; A. Brooke Bennett, Minority

31  Counsel; Brien Beattie, Minority Professional Staff Member;

32  Molly Boyl, Minority Professional Staff Member; Larry Brady,

33  Minority Senior Investigator and Policy Advisor; Alex Cooper,

34  Minority Professional Staff Member; John Cuaderes, Minority

35  Senior Investigator and Policy Advisor; Adam Fromm, Minority

36  Professional Staff Member; Todd Greenwood, Minority

37  Professional Staff Member; Patrick Lyden, Minority

38  Parliamentarian and Member Services Coordinator; Brian

39  McNicoll, Minority Communications Director; Nick Palarino,

40  Minority Senior Investigator and Policy Advisor; and Mark

41  Marin, Minority Professional Staff Member.

42      Chairman WAXMAN.  The meeting of the committee will

43  please come to order.

44      On Friday, Congress passed a $700 billion rescue package

45  for Wall Street.  This was something no Member wanted to do.

46  If Wall Street had been less reckless, or thorough regulators

47  had been more tentative, the financial crisis could have been

48  prevented.  But we voted for the $700 billion rescue because

49  the consequences of doing nothing were even worse.

50      The excesses on Wall Street have caused a credit freeze

51  that threatened our entire economy.  The $700 billion rescue

52  plan is a life-support measure.  It may keep our economy from

53  collapsing, but it won't make it healthy again.  To restore

54  our economy to health, two steps are necessary.  First we

55  must identify what went wrong, then we must enact real

56  reforms for our financial markets.

57      Over the next 3 weeks, we will start this process in

58  this committee.  We will be holding a series of five hearings

59  on the financial meltdown on Wall Street.  We'll examine how

60  the system broke down, what could have been done to prevent

61  it, and what lessons we need to learn so this won't happen

62  again.

63      Today's hearing examines the collapse of Lehman

64  Brothers, which, on September 15th, filed for bankruptcy, the

65  largest bankruptcy filing in American history.  Before the

66  Lehman Brothers bankruptcy, Treasury Secretary Paulson and

67 | Federal Reserve Chairman Bernanke told us our financial

68 | system could handle the collapse of Lehman.  It now appears

69 | they were wrong.  The repercussions of this collapse have

70 | reverberated across our economy.  Many experts think Lehman's

71 | fall triggered the credit freeze that is choking our economy,

72 | and that made the $700 billion rescue necessary.

73 | Lehman's collapse caused a big money market fund to

74 | break the buck, which caused investors to flee to Treasury

75 | bills and dried up a key source of short-term commercial

76 | paper.  It also spread fear throughout the credit markets,

77 | driving up the costs of borrowing.

78 | Over the weekend we received the testimony, the written

79 | testimony, of Richard Fuld, the CEO of Lehman Brothers.  Mr.

80 | Fuld takes no responsibility for the collapse of Lehman.

81 | Instead he cites a, quote, litany of destabilizing factors,

82 | end quote, and says, quote, in the end, despite all our

83 | effort, we were overwhelmed, end quote.

84 | In preparation for today's hearing, the committee

85 | received thousands of pages of internal documents from Lehman

86 | Brothers.  Like Mr. Fuld's testimony, these documents portray

87 | a company in which there was no accountability for failure.

88 | In one e-mail exchange from early June, some executives from

89 | Lehman's money management subsidiary Neuberger Berman made

90 | this recommendation:  Top management should forego bonuses

91 | this year.  This would serve a dual purpose.  Firstly, it

92  would represent a significant expense reduction; secondly, it

93  would send a strong message to both employees and investors

94  that management is not shirking accountability for recent

95  performance.

96      The e-mail was sent to Lehman's executive committee.

97  One of its members is George H.--George H. Walker, President

98  Bush's cousin, who is responsible for overseeing Neuberger

99  Berman.  And here is what he wrote the executive committee.

100  Quote, sorry, team.  I'm not sure what is in the water at 605

101  Third Avenue today.  I'm embarrassed, and I apologize, end

102  quote.

103      Mr. Fuld also mocked the Neuberger suggestion that top

104  management should accept responsibility by giving up their

105  bonuses.  His response was, quote, don't worry, they are only

106  people who think about their own pockets, end quote.

107      Another remarkable document is a request submitted to

108  the compensation committee of the board on September 11th, 4

109  days before Lehman filed for bankruptcy.  It recommends that

110  the board give three departing executives over $20 million

111  in, quote, special payments.  In other words, even as Mr.

112  Fuld was pleading with Secretary Paulson for a full rescue,

113  Lehman continued to squander millions on executive

114  compensation.

115      Other documents obtained by the committee undermine Mr.

116  Fuld's contention that Lehman was overwhelmed by forces

117 outside of its control.  One internal analysis reveals that

118 Lehman saw warning signs, but did not move early/fast enough,

119 and lacked discipline about capital allocation.

120      In 2004, the Securities and Exchange Commission relaxed

121 a rule limiting the amount of leverage that Lehman and other

122 investment banks could use.  As this chart--Lehman chart

123 shows--and if we could have that posted, I would appreciate

124 it--that proved to be a temptation the firm could not resist.

125  So in 2004, the SEC allowed greater leverage, and Lehman and

126 other banks couldn't resist that and took on more leverage.

127      At first Lehman's bets paid out.  As Mr. Fuld's

128 testimony recounts, Lehman achieved 4 consecutive years of

129 record-breaking financial results between 2004 and 2007.

130 These were lucrative years for Lehman's executives and Mr.

131 Fuld.  Lehman paid out over $16 billion in bonuses.  And we

132 do have the chart now on the screen.  Lehman paid out over

133 $16 billion in bonuses.  Mr. Fuld himself received over $40

134 million in cash bonuses.  His total compensation during these

135 4 years exceeded $260 million.

136      But while Mr. Fuld and other Lehman executives were

137 getting rich, they were steering Lehman Brothers and our

138 economy toward a precipice.  Leverage is a double-edged

139 sword.  When it works as it did in 2004 to 2007, it magnifies

140 investment gains.  But when asset failures decline as the

141 subprime market did, leverage rapidly consumes a company's

142  capital and jeopardizes its survival.

143      Mr. Fuld's actions during this crisis were questionable.

144  In a January 2008 presentation, he and the Lehman board were

145  warned that the company's liquidity can disappear quite fast.

146  Yet despite this warning, Mr. Fuld depleted Lehman's capital

147  reserves by over $10 billion through year-end bonuses, and

148  stock buybacks and dividend payments.  In one document a

149  senior executive tells Mr. Fuld that if the company can

150  secure $5 billion in financing from Korea, quote, I like the

151  idea of aggressively going into the market and spending 2- of

152  the 5- in buying back lots of stock and hurting Einhorn bad.

153  This action might have inflicted short-term losses on a short

154  seller Lehman despised, but it would have burned through even

155  more capital.  Mr. Fuld's response:  I agree with all of it.

156      What is fundamentally unfair about the collapse of

157  Lehman is its impact on the economy and taxpayers.  Mr. Fuld

158  will do fine.  He can walk away from Lehman a wealthy man who

159  earned over $500 million, but taxpayers are left with a $700

160  billion bill to rescue Wall Street and an economy in crisis.

161      Risk taking has an important role in our economy, but

162  Federal regulators are supposed to ensure that these risks

163  don't become so large that they can imperil our entire

164  economy.  They failed miserably.  The regulators had a blind

165  faith in the market and a belief that what was good for Mr.

166  Fuld and other executives on Wall Street was good for

167  America, and we are now all paying a terrible price.

168      We can't undo the damage of the past 8 years.  That is

169  why I reluctantly voted for the $700 billion rescue plan.

170  But we can start the process of holding those responsible to

171  public account and identifying the reforms we need for the

172  future.  These are the goals of today's hearing and the other

173  hearings we will be holding this month.

174      [Prepared statement of Mr. Waxman follows:]


175  ******** INSERT 1-1 ********

176         Chairman WAXMAN.  I would now like to recognize Mr.

177   Davis for his opening statement.

178         Mr. DAVIS OF VIRGINIA.  Thank you, Mr. Chairman.  We

179   have Members on this side who would like to make opening

180   statements.  What is the position to be today?

181         Chairman WAXMAN.  The rules of the committee provide

182   that the Chairman and the Ranking Member may make opening

183   statements.  We have many Members here.  We have many

184   witnesses that will also be here to--also here to make their

185   presentations.  So the Chair will stick by the rules.

186   Opening statements only by the Chairman and the Ranking

187   Member.

188         Mr. DAVIS OF VIRGINIA.  Thank you, Mr. Chairman.

189         Mr. SHAYS.  I'd just like to ask unanimous consent that

190   Members be allowed to make an opening statement.  This is a

191   hugely important hearing.  It is the beginning of five

192   hearings, and frankly there is some--

193         Chairman WAXMAN.  There is objection to that.  The rules

194   don't provide for it, and the committee will not give

195   unanimous consent for it.

196         Mr. SHAYS.  I haven't finished my motion.

197         Chairman WAXMAN.  The Chair has recognized Mr. Davis for

198   an opening statement.

199         Do you wish to make a motion, Mr. Shays?

200         Mr. SHAYS.  I wish to make a unanimous consent motion

201 that we be allowed to--because I believe there is a cover-up

202 going on, and I'd like to make a statement.

203     Chairman WAXMAN.  We'll follow the rules.  Mr. Davis is

204 recognized for his opening statement.

205     Mr. DAVIS OF VIRGINIA.  Thank you, Mr. Chairman, for

206 convening a series of hearings to examine the many complex

207 and interlocking causes and effects of the economic paralysis

208 gripping our Nation and most of the industrialized world.

209 Today, tomorrow and in the coming weeks we'll ask some tough

210 questions about the role of investment firms like Lehman

211 Brothers Holding, insurers like AIG, hedge funds,

212 credit-rating agencies, regulators and Congress in feeding

213 the boom that has now gone so painfully bust.

214     I particularly appreciate you calling Lehman Brothers up

215 today before us.  Mr. Fuld, a very active contributor to

216 Democratic causes, along with Mr. Janulis, Mr. Demura, Mr.

217 Collerton and others, have been bypassed by other committees,

218 and I appreciate your having the courage to call him up here

219 today.

220     The scope of these hearings effectively rebuts the

221 simplistic premise peddled by some that laissez-faire

222 Republicanism and mindless deregulations alone caused the

223 collapse of global capital markets.  That's the political

224 cartoon version of a very complicated life-and-death reality.

225  Partisan fingerpointing adds nothing to serious oversight of

226  the intricate web of individuals, institutions, market

227  incentives and cyclical trends that have brought us to the

228  brink of economic abyss.

229       For more than a decade, all the Wall Street and

230  Washington players engaged in an increasingly elaborate game

231  of high-takes musical chairs driven by the mesmerizing siren

232  song of perpetually rising housing costs.  But when the music

233  stopped, as it always does, many formally upstanding

234  financial giants found themselves without a safe or a sound

235  place to sit.  Suddenly the phrase "too big to fail" measured

236  only the limits of our foresight, not the size of the all too

237  foreseeable failure.

238       So today we start with the case of Lehman Brothers, a

239  venerable investment house that sank into insolvency while

240  others were being thrown Federal lifelines.  One lesson from

241  Lehman's demise:  Words matter.  Rumors and speculative leaks

242  fed the panic and accelerated a flight of confidence in

243  capital from that company.

244       Words matter here as well.  Look at the TV monitors.  As

245  we watch them, the markets are watching us.  In this volatile

246  environment, unsupported allegations, irresponsible

247  disclosures can inflame fears and trigger market stampedes.

248  As these hearings proceed, we should watch the pulse of Wall

249  Street and choose our words with great care.

250       But it must be said the driving factor in the loss of

251  value and confidence in Lehman was the financial undertow

252  created by falling home prices and resulting losses on

253  mortgage-backed assets of all kinds.  And central to that

254  crisis in the $12 trillion mortgage securities market were

255  imprudent policies and cozy practices of the two

256  government-sponsored housing finance giants, Fannie Mae and

257  Freddie Mac.  We have asked that former Fannie Mae CEO

258  Franklin Raines be invited to testify at a future hearing

259  because that company's failure offers Congress lessons that

260  we dare not overlook.  You can't have a complete analysis

261  without looking at Freddie and Fannie.

262       Many in Congress did turn a blind eye to clear warnings

263  of impending danger sounded as early as 1998.  They missed

264  golden opportunities to treat localized problems before they

265  metastasized throughout the economic system.  Out of

266  well-intentioned zeal to promote homeownership, Members from

267  both parties and both Chambers not only tolerated, but

268  encouraged the steady erosion of mortgage-lending standards.

269  When an alarm sounded, Fannie and Freddie, holding low-income

270  borrowers as political hostages, mobilized armies of

271  expensive lobbyists to block calls for greater accountability

272  and transparency.  Using lobbying fees and campaign

273  contributions, the mortgage giants bought their way around

274  attempts by Senate and House Banking Committees to pierce

275  their profitable pyramid scheme.  The Clinton administration

276  was rebuffed by a Republican Congress, and this

277  administration had no more success with the Democratic

278  Congress in advancing needed reforms.

279      This committee cannot ignore that sad history in our

280  inquiries into the causes and effects of the current economic

281  crisis.  But now that the $700 billion economic rescue bill

282  has been enacted, the debate is no longer whether the Federal

283  Government should intervene in the credit markets, but how

284  that intervention should be managed to stabilize capital

285  flows and protect taxpayers.  Although it comes too late to

286  help Lehman Brothers, the so-called bailout program will have

287  to make wrenching choices, picking winners and losers from a

288  shattered and fragile economic landscape.

289      These hearings should help mark the land mines and

290  potholes on the path to a restoration of trust and economic

291  vitality.  Trust.  There is a moral dimension to economics we

292  don't often want to confront.  Economics is not an objective

293  discipline, but a political art grounded in certain

294  assumptions about human nature and civilized behavior.  As

295  the process of deleveraging unfolds, breaking the economy's

296  delusional addiction to debt beyond our reasonable means to

297  repay, the goal has to be a restoration of the moral bond

298  between labor and capital.  We need to restore faith in

299  production, savings and investment over consumption, spending

300  and speculation.  Our witnesses today can help us do that.

301  We appreciate their being there.

302      Thank you, Mr. Chairman.

303      Chairman WAXMAN.  Thank you very much, Mr. Davis.

304      [The information follows:]


305  ******** COMMITTEE INSERT ********

306      Mr. DAVIS OF VIRGINIA.  I also ask unanimous consent for

307  our staff analysis to be included in the hearing record.

308      Chairman WAXMAN.  Without objection, that will be the

309  order.

310      [The information follows:]


311  ******** COMMITTEE INSERT ********

312        Mr. SHAYS.   Mr. Chairman, a parliamentary inquiry.

313        Chairman WAXMAN.   The gentleman will state his

314  parliamentary inquiry.

315        Mr. SHAYS.   Thank you.

316        In my request for permission to have the Members give an

317  opening statement, I'd like the Chair to please cite the

318  provision of committee rules or House rules on which he

319  relies for the proposition that only the Chair and Ranking

320  Member may make opening statements.

321        Chairman WAXMAN.   The rule provides--in general the

322  House and committee rules do not address the common practice

323  of opening statements by Members at hearings and meetings.

324  The only exception is House Rule 11, clause (2)(k)(1), which

325  provides that the Chairman at a hearing shall announce in an

326  opening statement the subject of an investigation.  Because

327  there is no limitation on opening statements in the rule,

328  every member of the committee has the right to--has a right

329  to seek recognition, but that as a matter of House rules, the

330  refusal of the Chair to recognize a Member for an opening

331  statement is not appealable.  As a practical matter,

332  controversy relating to handling of opening statements are

333  normally dealt with by consensus within the committee.  The

334  committee has always operated on the basis of the Chairman

335  and the Ranking Member, and that is the way we'll continue to

336  do so.

337    Mr. MICA.  Mr. Chairman, parliamentary inquiry.

338    Chairman WAXMAN.  The gentleman will state his

339 parliamentary inquiry.

340    Mr. MICA.  Mr. Chairman, I have been on the committee

341 with you for 16 years.  I had the opportunity to chair two

342 subcommittees.

343    Chairman WAXMAN.  The gentleman will state his

344 parliamentary inquiry.

345    Mr. MICA.  I am stating, but I have to have a preface

346 for my--

347    Chairman WAXMAN.  The gentleman will state his

348 parliamentary inquiry.

349    Mr. MICA.  During the entire tenure of my chairmanship,

350 I afforded as a courtesy every Member on either side in every

351 hearing the opportunity for an opening statement.  Now, it

352 may not be in the rules, Mr. Chairman, and you have the

353 ability to now reject my request for an opening statement.

354    Chairman WAXMAN.  The Chairman--

355    Mr. MICA.  I would ask you in fairness an opportunity

356 for all sides to be heard on this important hearing, the

357 opportunity--I'm asking you honor the ability of my--of the

358 rules just stated to allow me to present a 5-minute opening

359 statement.

360    Chairman WAXMAN.  Well, the Chairman notes the presence

361 of many, many Members.  To allow you to make an opening

362  statement and not others would be unfair.  The rules do not

363  provide for all Members to have the right to an opening

364  statement.  There are occasions when Members have been given

365  that opportunity, especially when it is a small subcommittee,

366  as you chaired.  But we have too many Members here and too

367  many witnesses to be heard.  So the Chair did not hear a

368  parliamentary inquiry, but a personal appeal, which the Chair

369  denies.

370       We have with us the following witnesses:  Nell Minow,

371  chairman of the board and editor of The Corporate Library;

372  Gregory W. Smith, general counsel, Colorado Public Employees'

373  Retirement Association; Robert F. Wescott, Ph.D., president

374  of Keybridge Research LLC; Luigi Zingales, Ph.D., professor

375  at the University of Chicago Graduate School of Business; and

376  Peter J. Wallison, Arthur F. Burns Fellow in Financial Policy

377  Studies, American Enterprise Institute.

378       And it is the policy of this committee that all

379  witnesses that testify before us do so under oath, so I'd

380  like to ask each of you to please stand and raise your right

381  hand.

382       [Witnesses sworn.]

383       Chairman WAXMAN.  The record will indicate that each of

384  the witnesses answered in the affirmative.

385       Your prepared statements will be in the record in full.

386  We would like to ask each of you to be mindful that we have a

387 | clock that will indicate when 5 minutes is up.  We'd like you

388 | to stay as close to the 5 minutes as possible.  There will be

389 | a green light for 4 minutes, a yellow light for the last

390 | minute.  And then when it turns red, the 5 minutes has

391 | expired.

392 |     Dr. Zingales, am I pronouncing your name correctly?

393 | Okay.  There is a button on the base of your mic.  Be sure it

394 | is in, and we'd like to hear from you first.

395  STATEMENTS OF LUIGI ZINGALES, PROFESSOR OF FINANCE,

396  UNIVERSITY OF CHICAGO; ROBERT F. WESCOTT, PRESIDENT,

397  KEYBRIDGE RESEARCH LLC; NELL MINOW, CHAIRMAN OF THE BOARD AND

398  EDITOR, THE CORPORATE LIBRARY; GREGORY W. SMITH, GENERAL

399  COUNSEL, COLORADO PUBLIC EMPLOYEES' RETIREMENT ASSOCIATION;

400  AND PETER J. WALLISON, ARTHUR F. BURNS FELLOW IN FINANCIAL

401  POLICY STUDIES, AMERICAN ENTERPRISE INSTITUTE


402  STATEMENT OF LUIGI ZINGALES


403       Mr. ZINGALES.  Okay.  Thank you.  Chairman Waxman,

404  Ranking Minority Davis, members of the committee, thank you

405  for inviting me.

406       The demise of Lehman Brothers is the result of a very

407  aggressive leverage policy in the context of a major

408  financial crisis.  The roots of this crisis have to be found

409  in bad regulation, lack of transparency, and market

410  complacency brought about by several years of positive

411  returns.

412       A prolonged period of real estate price increases and

413  the boom of securitization relaxed lending standards.  The

414  quality of these mortgages should have been checked by the

415  capital market that bought them, but several problems made

416 this monitoring less than perfect.  First, these mortgages

417 were priced based on historical records, which did not factor

418 in the probability of a significant drop in real estate

419 prices at the national level.  Nor did they factor the effect

420 of the changes in the lending standards on the probability of

421 default.

422      Second, the massive amount of issuance by a limited

423 number of players, which Lehman was one, changed the

424 fundamental nature of the relationship between credit-rating

425 agencies and the investment banks issuing the securities.  As

426 a result, instead of submitting an issue to the rating

427 agency's judgment, investment banks shopped around for the

428 best ratings and even received handbooks on how to produce

429 the riskiest security that qualified for a AAA rating.

430      The market was not completely fooled by this process.

431 AAA-rated asset-backed securities had a higher yield than

432 corporate AAA, a clear indication of the higher risk.

433      Unfortunately, regulatory constraints created inflated

434 demand for these products.  Fannie Mae and Freddie were

435 allowed, even induced, to invest their funds in these

436 securities, creating an easy arbitrage.  They issued

437 AAA-rated debt and invested in higher-yield AAA-rated debt.

438      Another source of captive demand were money market

439 funds.  Being required to hold only highly rated securities,

440 money market funds loved these instruments and satisfied the

441  regulatory requirements and boosted their yields.

442      Most managers of these firms were aware of the gamble

443  they were taking, but could not resist taking it under an

444  intense competition for yield-hungry customers.  These

445  managers were also hoping that if a shock occurred, all their

446  competitors would face the same problem, thereby reducing the

447  reputational costs and possibly triggering a government

448  support.  The September 19 decision to insure all money

449  market funds validated this gamble, forever destroying money

450  market managers' incentives to be careful in regard to the

451  risks they take.

452      The pooling of mortgages, while beneficial for

453  diversification purposes, became a curse as the downturn

454  worsened.  The lack of transparency in the issuing process

455  made it difficult to determine who owned what.  Furthermore,

456  the complexity of these repackaged mortgages is such that

457  small differences in the assumed rate of default can cause

458  the value of some tranches to fluctuate from 50 cents on the

459  dollar to zero.  Lacking information on the quality and hence

460  the value of banks' assets, the market grew reluctant to lend

461  to them for fear of losing out in case of default.

462      In the case of Lehman and other investment banks, this

463  problem was aggravated by two factors, the extremely high

464  level of leverage and the strong reliance on short-term debt

465  financing.  While commercial banks cannot leverage their

466   equity more than 15 to 1, Lehman had a leverage of more than

467   30 to 1.  With this leverage, a mere 3.3 percent drop in the

468   value of assets wipes out the entire value of equity and

469   makes the company insolvent.

470       In turn, the instability created by a leverage problem

471   was exacerbated by Lehman's large use of short-term debt.

472   Reliance on short-term debt increases the risk of runs

473   similar to the ones bank face when they are rumored to be

474   insolvent.  The Lehman CEO will likely tell you that his

475   company was solvent, and it was brought down by a run.  This

476   is a distinct possibility.  The problem is that nobody knows

477   for sure.  When Lehman went down, it had $26 billion in book

478   equity, but the doubts about the value of its assets combined

479   with the high degree of leverage created a huge uncertainty

480   about the true value of this equity.  It could have been

481   worth $40 billion or negative 20-.

482       It is important to note that Lehman did not find itself

483   in that situation by accident.  It was the unlucky draw of a

484   consciously made gamble.

485       Lehman Brothers' bankruptcy forced the market to assess

486   risk.  As after a major flood, people start to buy flood

487   insurance.  After the demise of Lehman, the market started to

488   worry about several risks previously overlooked.  This risk

489   reassessment is crucial to support a market discipline.  The

490   downside is that it can degenerate into a panic.

491        Chairman WAXMAN.  Thank you very much, Dr. Zingales.

HGO280.000                                        PAGE        25

492        [Prepared statement of Mr. Zingales follows:]


493  ******** INSERT 1-2 ********

494        Chairman WAXMAN.   Dr. Wescott.


495   STATEMENT OF ROBERT F. WESCOTT


496      Mr. WESCOTT.   Chairman Waxman and members of the

497   committee, thank you for inviting me to testify today about

498   the financial meltdown on Wall Street.   I'll focus my

499   comments on the main causes of the financial crisis.   During

500   questions, I'm also happy to discuss its economic effects and

501   also the lessons we might draw about it for public policy.

502   I'll give you an economist's perspective, drawing on my

503   experiences in forecasting the U.S. economy, in participating

504   in the national economic policymaking process at the National

505   Economic Council of the White House, and in researching

506   global and economic financial risks.

507      In my opinion, there were three main contributors to the

508   financial meltdown.   The first was an environment of easy

509   credit that existed in the first half of this decade.   We

510   simply left the monetary floodgates open too far and too long

511   in the period 2002 to 2005.   During this period, mortgage

512   rates got as low as 2-1/2 percent, and families got an

513   inflated sense of their capacity to afford housing.   This

514   cheap credit quickly got capitalized in housing prices, and

515   housing prices doubled and even tripled in some neighborhoods

516    in the span of just a few years.  This caused a housing

517    frenzy, and many Americans developed unrealistic expectations

518    and assumed that housing prices could only go up.

519        The second key development was mortgage securitization,

520    the bundling of pools of mortgages, their underwriting and

521    their sale to institutional investors.  This increased

522    liquidity and made mortgage money cheaper than--because we

523    could tap the savings of global savers.  On the downside,

524    however, it also meant that the mortgage originator was no

525    longer going to hold the mortgage to maturity.  So it did not

526    have a strong incentive to perform due diligence on the loan.

527        In this environment of easy credit, there was lots of

528    competition.  Lenders began loosening standards to win

529    business and increase market share.  This led to an easing of

530    down payment requirements and a proliferation of

531    unconventional mortgages, including teaser rate mortgages, no

532    doc mortgages, option payment mortgages and so on.

533    Eventually homebuyers were receiving 100 percent

534    loan-to-value mortgages, a very dangerous predictor of

535    default risk.

536        The third key development was an increase in leverage by

537    investment banks, as has just been stated.  Whereas a

538    traditional bank might have a leverage ratio of, say, four,

539    meaning that the value of its obligations was four times the

540    value of its shareholders' equity, investment banks increased

541  their leverage ratios to 30 or 35 times in the past few

542  years.  Such high leverage ratios meant that there was much

543  less cushion in hard times.

544       Well, how did these ingredients mix?  As long as house

545  prices kept appreciating steadily, all players in the system

546  had a strong incentive to keep going and keep doing what they

547  were doing.  It was good for existing homeowners because they

548  had asset appreciation, and they had great opportunities for

549  extracting equity out of their houses through cash-out

550  refinancings and home equity loans.  Basically families

551  started using their houses as ATM machines.  It was good for

552  new homebuyers, including speculators, because they saw

553  almost immediate price gains.  It was good for mortgage

554  brokers.  They earned hefty origination fees.  It was good

555  for rating agencies.  They had great business.  And it was

556  good for investment banks because they were earning large

557  securitization fees.

558       The system boomed this way for many years.  The problem

559  came when the U.S. housing sector simply reached saturation.

560  By early 2006, almost every American who wanted a home was in

561  one.  The Fed started raising interest rates to fight

562  inflation, and suddenly housing prices leveled off and then

563  began to fall.  Some borrowers, especially subprime

564  borrowers, began to miss their monthly mortgage payments, and

565  the value of subprime mortgage portfolios began to decline.

566  Now, because of the high leverage in the investment banks,

567  many simply did not have the cushion to fall back on.

568      The problems were compounded by a rapidly weakening U.S.

569  economy.  As the housing sector weakened, overall U.S.

570  economic growth was cut roughly in half, and the drying up of

571  home equity loans and cash-out refinancings hurt consumption.

572   By early 2008, 10 percent of all U.S. households were

573  underwater with their mortgages, meaning that they owed more

574  on their house than their house was worth.  These events set

575  the stage for the financial and liquidity crisis we have

576  today.

577      The cause of Lehman Brothers--basically the collapse of

578  Lehman Brothers in September was effectively the pinprick

579  that burst the bubble.  Mr. Chairman, the collapse of Lehman

580  shook the market's financial confidence and set off the

581  liquidity crisis that has thrown sand into the gears of the

582  U.S. economic engine.

583      What lessons should we draw?  Any time the price of a

584  major asset class or commodity increases 200 percent or 300

585  percent in a matter of just a few weeks--in a matter of just

586  a few years, whether it is home prices, timber, Dutch tulips,

587  oil, gold, technology, stocks, we need to ask questions.

588  Prudent regulators need--needed to ask whether the system

589  they regulate could tolerate a rapid return of asset prices

590  to the historical trading range, and private executives

591 | running investment banks who wanted to maximize their
592 | shareholders' value in the long term needed to ask whether
593 | their business model could tolerate a rapid return of asset
594 | prices to their historical range.
595 |         Thank you.
596 |         Chairman WAXMAN.  Thank you very much, Dr. Wescott.
597 |         [Prepared statement of Mr. Wescott follows:]


598 | ******** INSERT 1-3 ********

599        Chairman WAXMAN.  Ms. Minow.


600  STATEMENT OF NELL MINOW



601        Ms. MINOW.  Thank you very much, Mr. Chairman and

602  Members.  It is an honor to participate in this hearing.  I

603  appreciate it very much.  And I would give anything if what I

604  wasn't here to say was, "I told you so."

605        I have testified before this committee before, and what

606  I said then was that there is no more reliable indicator of

607  investment--litigation and liability risk than excessive CEO

608  compensation.  CEO compensation is not just the symptom, it

609  is actually a cause.  It pours gasoline on the fire.

610        With that in mind, I'd like to tell you what our ratings

611  have been.  My company, The Corporate Library, rates boards

612  of directors, and in part we look at decisions they make,

613  like CEO pay.  We have given this company a C or a D since we

614  started rating them, with one very brief exception of a

615  couple of months where we gave them a B.

616        Here is a quote from our analyst's note on the company:

617  Although the CEO's 2007 salary is well below the median for

618  companies of similar size, his nonequity incentive

619  compensation of $4,250,000 exceeded the 85th percentile.

620  While typical target bonus is two times base salary, Mr.

621 | Fuld's was more than five times his base salary.

622 | Additionally, his total annual compensation of $71,924,178

623 | ranks in the top 3 percent for similarly sized companies.

624 | As I've mentioned before, this is the problem.  When we

625 | pay people based on the volume of business rather than the

626 | quality of business, eventually it is like a game of musical

627 | chairs.  And when the music stops, the people that don't have

628 | a place to sit are the investors.

629 | Pay that is out of alignment is one of the causes of

630 | poor performance, but it is also an important symptom of an

631 | ineffective board.  Let's talk about this board for just a

632 | minute.  They had a finance and risk management committee.  I

633 | think that my economist colleagues here would agree, and my

634 | investor colleague, that the--in a company like this, the

635 | finance and risk management committee is a very important

636 | committee, and yet it only met twice in 2007 and twice in

637 | 2006.  The crystal-clear explanations of Dr. Zingales and Dr.

638 | Wescott were--as brilliant as they are, were not unknown at

639 | the time.  These were things that the risk committee should

640 | have been looking at.

641 | An additional indicator is the meaningful stock

642 | ownership by the board.  It is a public statement of their

643 | confidence in a company and a powerful reminder and motivator

644 | for them as they deliberate issues like executive

645 | compensation and risk management.  With the exception of the

646  CEO who sold the significant percentage of his stock, and the

647  lead director, and the 23-year veteran on the committee,

648  given their tenure, these directors did not put their money

649  where their mouths were.

650      I'm really horrified by the effort by Mr. Fuld and other

651  executives in these failing companies to absolve themselves

652  of blame.  It infuriates me when they talk about how

653  efficient the markets are except when they are not efficient.

654   All of a sudden, it is not their fault anymore.  These are

655  people who fight for deregulation, and now they're blaming

656  the regulators.

657      They talk about a litany of destabilizing factors.  Let

658  me tell you that the most important destabilizing factor was:

659   an inefficient and ineffective board of directors and bad

660  judgment by the executives.  People make mistakes, but what

661  we like to see is people accepting responsibility and

662  participating in mitigating damages and preventing the

663  recurrence.  It is indispensable for the credibility of our

664  capital markets to align the interests of executives with the

665  investors, and we'll have an enormously increased cost of

666  capital if we do not make that clear throughout the world.

667      What we had was an executive compensation system that

668  created an incentive for imagining derivative securities that

669  exploited regulatory and accounting loopholes.  I had a

670  presentation at the Public Company Accounting Oversight Board

671 | where they told us that Paul Volker said he didn't understand
672 | these derivatives.  I hereby propose the Paul Volker rule,
673 | that if he doesn't understand it, we shouldn't put it out on
674 | the markets.  Even if executives are overwhelmed by forces
675 | beyond their control, I believe you've heard this expression
676 | before, that is why we pay them the big bucks.
677 |      Thank you.
678 |      Chairman WAXMAN.  Thank you.  No demonstrations.  Thank
679 | you, Ms. Minow.
680 |      [Prepared statement of Ms. Minow follows:]

681 | ******** INSERT 1-4 ********

682      Chairman WAXMAN.  Mr. Smith.


683  STATEMENT OF GREGORY W. SMITH



684      Mr. SMITH.  Thank you, Mr. Chairman.  Thank you,

685  Members, for having me here today to express the perceptions

686  and perspective of a major institutional investor.  One of

687  the things that I want to address--you certainly heard some

688  good diagnosis and comments from people much more qualified

689  than I to assess why this has happened.  I'd like to put a

690  little bit of a face to this.

691      We hear a lot in the media about the savior of Wall

692  Street, and we hear a lot about major institutions

693  and--throughout the country, Wall Street being saved.  We

694  think this is about every working American in the United

695  States.  It is about people that I work for every day.  I

696  work for a pension fund that represents 420,000 current and

697  former public employees, public servants in the State of

698  Colorado.  We represent every State trooper, every teacher in

699  the State of Colorado, every State employee, every judge and

700  over 400 employers, including all of our local divisions of

701  government.  These--the individuals are the ones that are

702  being impacted in this crisis.  It is the individuals who are

703  having to face the questions of whether their college fund

704 for their children is going to still be around when this is

705 over.  It is these individuals who are wondering how long is

706 it until retirement now, how long do I have to go before I

707 can recover from what Wall Street has done to me this time.

708     And what it really has boiled down to is a complete

709 collapse in investor confidence.  And it is a complete

710 collapse in investor confidence because they no longer

711 believe in management, they no longer believe in the numbers,

712 and they no longer believe in the regulatory framework for

713 good reason.

714     We don't claim to know, I certainly don't claim to be

715 able to articulate, why this happened, and I certainly would

716 not predict what the result of the blame game is going to be.

717  There is certainly going to be one, and the lawyers are

718 going to spend a lot of time on it.  What we would like to

719 urge you to consider is what the future needs to hold to

720 regain confidence, and what it needs to consist of is an

721 opportunity for shareholders to be heard in a meaningful way

722 at a meaningful time in the process of running corporate

723 America.  We need access to the proxy.  We need to be able to

724 hold the directors accountable.  If they're not doing a good

725 job, we need to be able to get them out of the boardroom and

726 get somebody else in that will represent shareholders.

727     We need a regulatory framework that is aligned with the

728 shareholder, not with corporate America, but with the

729  shareholders, and a regulatory framework that is prepared to

730  hold people accountable that breach their duty to the

731  shareholder.

732      That's where we need to go.  We need to have say on pay,

733  and we need to be able to regain confidence that this market

734  is about the shareholder, it is about mom and pop, it is

735  about small businesses, and it is about the individuals that

736  I represent all over this country.

737      One of the things that doesn't get talked about very

738  much and that is really impacting the people that I work with

739  is the credit crisis and the freezing of their accounts.

740  People who have been the most conservative investors and who

741  have thought, well, I don't want to get involved in these

742  speculative things, I'm going to put my money in a money

743  market, I'm going to fall behind inflation, I don't really

744  worry about inflation, I want to make sure I have my money,

745  those people don't have their money now.

746      We manage our cash through those types of accounts.

747  There were times last week and 2 weeks ago that our money was

748  on the brink of being frozen.  People in this country are not

749  going to be able to make payroll.  Small businesses are not

750  going to make payroll because they are not going to be able

751  to access their cash.

752      These are the problems that we believe are yet to come.

753  Some of them you've begun to see.  But there is many more to

754 | come, and it is the working people of America that are
755 | suffering this crisis.  It is not about Wall Street, it is
756 | about investor confidence, And that is what needs to be
757 | restored.
758 |      Thank you.
759 |      Chairman WAXMAN.  Thank you very much, Mr. Smith.
760 |      [Prepared statement of Mr. Smith follows:]


761 | ******** INSERT 1-5 ********

762        Chairman WAXMAN.  Mr. Wallison.


763   STATEMENT OF PETER J. WALLISON



764        Mr. WALLISON.  Thank you, Mr. Chairman and members of

765   this committee.  I'm really pleased to have this opportunity

766   to address the question of regulation and its role in the

767   current financial crisis.

768        There are cases where regulation is necessary and cases

769   where it is harmful.  It was necessary in the case of Fannie

770   Mae and Freddie Mac.  These two companies were seen in the

771   market as backed by the Federal Government.  As a result,

772   investors did not worry about the risks of lending to them

773   since Uncle Sam would bail them out if the companies got into

774   financial trouble.  Investors have been proved right.  In

775   cases where investors see themselves as bearing no risks

776   lending to a private, shareholder-owned company, strong

777   regulation is essential.  That is the only way that

778   government can protect itself against loss.  Yet Congress

779   resisted--

780        Chairman WAXMAN.  Mr. Wallison, could you pull the mic a

781   little closer?  Some Members are having--

782        Mr. WALLISON.  Oh, I'm sorry.

783        Yet Congress resisted reforming regulation of Fannie Mae

784  and Freddie Freddie until it was too late.  And even then the

785  reform legislation wouldn't have been passed unless it had

786  been attached to a housing bill that Congress wanted to adopt

787  before going home for the August recess.

788      The failure by Congress had serious consequences.  An

789  article in yesterday's New York Times makes clear that

790  reckless buying of junk loans by Fannie Mae and Freddie Mac

791  bears a large part of the responsibility for the financial

792  crisis we are now in.  Voters, justifiably angry about the

793  $700 billion rescue plan just adopted by Congress, should

794  recognize who is responsible and act accordingly.

795      Incidentally, since some issues of compensation have

796  come up, I ought to mention that Fannie was very generous in

797  its own compensation.  Franklin Raines, who was its Chairman

798  for several years, 4 or 5, made $90 million during the time

799  he was there, and there was little outrage expressed in

800  Congress at that time.

801      Bad or weak regulation is often worse than no regulation

802  at all.  Another article in the New York Times on Friday of

803  last week recounted the SEC's failure to devote sufficient

804  resources to the regulation of the major investment banking

805  firms that have now all collapsed, been taken over, sold

806  themselves to big banks or sought shelter under the Federal

807  Reserve's wings as financial holding companies.  According to

808  the article, the SEC assigned a pitifully small staff to

809 | regulating these huge investment banks, and as a result they
810 | took imprudent financial risks that ultimately led to their
811 | losses.
812 | A chart accompanying the article shows that these
813 | institutions took increasing risks every year from the time
814 | they entered the SEC's supervisory regime.  This is
815 | important.  It demonstrates the effect of regulation in
816 | creating moral hazard.  Immediately after the SEC took over
817 | the supervision of their safety and soundness, the market
818 | discipline to which they had previously been subject began to
819 | relax.  Investors thought the SEC was minding the store, but
820 | it wasn't.  That is why weak regulation can be worse than
821 | none.
822 | Regulation itself is no panacea.  Even strong regulation
823 | may not be effective.  Regulation of commercial banks in the
824 | United States is a case of strong regulation failing.
825 | Congress imposed a strong regulatory regime on commercial
826 | banks when it adopted FDICIA in 1991.  Still, even though
827 | IndyMac, WAMU, Wachovia and dozens of smaller commercial
828 | banks were regulated by one or another agency of the Federal
829 | Government under strict FDICIA requirements, they all failed
830 | or had to be taken over just like the weakly regulated
831 | investment banks.
832 | Calling for more regulation as a solution to the
833 | financial crisis is, therefore, somewhat simplistic.

834  Regulation's track record is ambiguous.  There is no question
835  that it is the only protection we have when the government is
836  exposed to risks created by companies it backs, like
837  commercial banks, which have deposits insured by the FDIC,
838  and like Fannie Mae and Freddie Mac, which were seen as
839  backed by the Federal Government without any limit.
840       But the regulation of the investment banks by the SEC
841  was a mistake.  They were not seen as backed by the
842  government in any way until the SEC was given authority to
843  supervise their safety and soundness.  Then their risk-taking
844  took off.  If they had been left free of government
845  oversight, they would not, in my view, have been able to
846  borrow the funds that created their extraordinary leverage.
847       If our solution to today's crisis is to regulate hedge
848  funds, private equity funds, finance companies, institutional
849  lenders, pension funds, leasing companies and insurance
850  companies and anyone else who participates in the capital
851  markets without any government backing, we will simply be
852  assuring ourselves of many more financial crises in the
853  future.
854       Many thanks, Mr. Chairman.
855       Chairman WAXMAN.  Thank you, Mr. Wallison.
856       [Prepared statement of Mr. Wallison follows:]


857  ******* INSERT 1-6 *******

858        Chairman WAXMAN.  I want to thank all of the members of

859   the panel for your presentation.  We'll now recognize Members

860   to ask questions for a 5-minute period.  We'll start with

861   Mrs. Maloney.

862        Mrs. MALONEY.  Thank you, Mr. Chairman and Ranking

863   Member Davis and all of the panelists.

864        We are facing what has been called the most serious

865   financial crisis since the 1930s.  And the potential cost to

866   taxpayer is staggering:  $29 billion to J.P. Morgan to buy

867   Bear Stearns; $85 billion to AIG; $200 billion to Fannie and

868   Freddie; $700 billion rescue package; $300 billion to the Fed

869   window opening it up to investment banks; $50 billion to

870   stabilize the money market funds.  A staggering $1.7 billion

871   potential cost to taxpayers.

872        Now, Professor Zingales, you seem to believe that this

873   may have been caused by the staggering leverage that was put

874   in these firms, but others see it as the deregulation that

875   has taken place in Congress over the past decade.  In 1990,

876   Congress passed the Financial Stabilization Act, which took

877   away the protections of the Glass-Steagall Act that had

878   served and protected our economy for 80 years.  This allowed

879   the banking a safety and soundness standard to be able to

880   merge and be lowered, with risky speculative activities.  And

881   then during this period, Congress prohibited the regulation

882   of risky derivatives.  The SEC loosened rules governing the

883  amount of leverage that investment banks could use, and

884  Federal regulators were defunded and defanged, and they were

885  reluctant to use the authority they had to protect taxpayers

886  and investors.

887       Some believe that the root cause of the credit cost of

888  this crisis was not only the leverage, but the excessive

889  deregulation.  And I would like to ask first, Dr. Wescott,

890  and then others, if you'd like to comment.  What do you think

891  were the biggest mistakes or missed opportunities for

892  regulators?  And going forward, what do you think we should

893  regulate?  Do you think all of this deregulation that I

894  listed was a mistake for protection for our taxpayers and our

895  economy?

896       Mr. WESCOTT.  Regulation is a--as Mr. Wallison said, is

897  an extremely complicated matter, and it is very important

898  that it be handled and that we get the incentives properly

899  lined up here.

900       There is no question that the regulators did make a

901  decision.  The SEC made a decision in 2004, in April of 2004,

902  to relax the leverage standards that the large $5

903  billion-plus investment banks would be allowed to operate

904  under.  And in my opinion, this decision did end up making

905  the situation worse.  And so I do--

906       Mrs. MALONEY.  What about Glass-Steagall, Dr. Wescott?

907  That is not complicated.  It merely says financial

908  institutions, bank safety and soundness should not mingle

909  with risky activities.  That is not complicated at all.  It

910  is very clear.  Was that a mistake to roll that back, do you

911  believe?  Or I'd ask any other panelist to talk.

912      Mr. WESCOTT.  I don't have a strong opinion on

913  Glass-Steagall.  I do think that there were risks involved in

914  the mortgage-lending business that were greater than were

915  appreciated by regulators and obviously by many of the

916  investment banks themselves.  The key thing was that they

917  assumed there was going to be plenty of business, and that

918  they could keep getting additional borrowers, and that they

919  would not suffer credit quality loss as we went further and

920  further down the list of applicants for mortgages.

921      Mrs. MALONEY.  Thank you very much.  My time is very

922  limited.  I'd just like to go down the line, starting with

923  Dr. Zingales.

924      Do you think repealing Glass-Steagall, allowing banks to

925  mix with risky investment banks that were leveraged in hedge

926  funds, in some cases 1 to 30, 10 to 60, do you think rolling

927  it back was a mistake, yes or no?

928      Mr. ZINGALES.  No.  I don't think it was a mistake.

929      Mrs. MALONEY.  Yes or no.  Mr. Wescott, you don't think

930  it was a mistake?

931      Mr. WESCOTT.  No at this point.

932      Mrs. MALONEY.  Ms. Minow?

933    Ms. MINOW.  I do think it was a mistake.

934    Mrs. MALONEY.  You do.

935    Mr. Smith.

936    Mr. SMITH.  It appears to be from this angle.  I'm

937    sorry.  It appears to be from this angle.

938    Mrs. MALONEY.  Mr. Wallison?

939    Mr. WALLISON.  Not a mistake.

940    Mrs. MALONEY.  Okay.  So we're divided on that.

941    If the Fed and Treasury had not allowed Lehman to fail

942    in default on its obligations, would this have prevented runs

943    on other firms, and especially the money market funds, the

944    run that began on that?  Again, down the panel quickly.  My

945    time has expired.  Quickly now.

946    Mr. ZINGALES.  I think no.  The proof is if we look at

947    what happened when Bear Stearns was bailed out, I think that,

948    for example, the price of the credit default swap was--an

949    insurance on default as a measure of how risky borrowers are

950    considered--went up the same amount it went up after the

951    Lehman default.  So I don't think that bailing out sort of

952    Lehman would have--would solve the situation.

953    Mr. WESCOTT.  I think that regulators in retrospect

954    would now understand that there was more Lehman paper out

955    there in money market accounts, and they might have made a

956    different decision on that account.

957    Ms. MINOW.  I think it would not have made an enormous

958 | difference.

959 |     Mr. SMITH.  I think it was one piece of a much bigger

960 | puzzle.

961 |     Mr. WALLISON.  It has no significant difference, I

962 | think.

963 |     Chairman WAXMAN.  Thank you, Mrs. Maloney.

964 |     Mr. Davis.

965 |     Mr. DAVIS OF VIRGINIA.  Thank you.

966 |     This concerns the SEC.  Both the Chairman and I were

967 | instrumental in shepherding through legislation that removed

968 | the Civil Service pay ceilings on the SEC employees because

969 | they were losing employees like crazy.  They lost a third of

970 | their senior management because of the pay.  We raised that,

971 | but we also held hearings on IT and their IT capacity.  What

972 | were the limitations if SEC had wanted to do something?  Were

973 | their systems up?  Could they have done the appropriate job?

974 | Or are there limitations on their IT and personnel that

975 | probably limited their abilities?  Does anybody have any

976 | thoughts on that?

977 |     No.  Okay.

978 |     Ms. Minow, let me just ask you.  You rated the corporate

979 | boards at Lehman.  Did you ever rate the board in salaries at

980 | Freddie and Fannie?

981 |     Ms. MINOW.  I'm sorry.  Freddie and Fannie?  Yes.  We

982 | did give a high grade to Fannie Mae after they were--in 2002,

983   when we began rating after they were cleared by the SEC and

984   OFHEO.  We, however, from the beginning gave poor ratings to

985   Freddie.

986        Mr. DAVIS OF VIRGINIA.  We should have seen this coming;

987   don't you agree?  I mean, I don't know if any of you are

988   familiar with the Superior Bank.  I just was looking at

989   one--Superior Bank, the inspector general report.  This was a

990   Chicago bank owned by--the chief owner was Penny Pritzker,

991   who happens to be, as I think many of us know, Senator

992   Obama's finance chairman.  But more importantly, when you

993   look at the inspector general's report, it says that the bank

994   became associated with the subprime lending business in '92.

995   Beginning in 1993, Superior embarked on a business strategy

996   marked by rapid and aggressive growth into subprime home

997   mortgages.  Federal bank regulators warned them in '93, '94,

998   '95, '97 and 2000 to rein in their risky subprime lending

999   businesses.

1000       According to an independent investigation by the

1001   Department of Justice, the bank used improper accounting

1002   procedures to cover up their bad debts.  Fifteen hundred of

1003   the bank customers lost large sums of money.  But this was

1004   years ago.  I mean, didn't--all the warning signs were there

1005   that these subprimes were a mess, wasn't there?

1006       Ms. MINOW.  Yes, there were.  That's why one of my

1007   primary concerns is the obstacles to what I would consider

1008 the essential market oversight from institutional investors

1009 like the Colorado pension fund, if they could have responded

1010 as I think they would like to have.  If the corporate

1011 community hadn't lobbied for so many restrictions on the

1012 ability of shareholders to respond to these indicators, then

1013 I think we would not need a lot of new regulation.

1014      Mr. DAVIS OF VIRGINIA.  Mr. Wallison.

1015      Mr. WALLISON.  Well, I would say that this is a very

1016 good example of the faith in regulation that is often

1017 misplaced.  The regulators had the responsibility for looking

1018 at the risks that were being taken by these institutions, and

1019 they did not effectively do that.  And I think that that is

1020 an important lesson for our Congress to understand, because

1021 regulation is not a solution to many of these problems,

1022 especially when the regulators have a great deal of

1023 difficulty understanding what is happening in these

1024 institutions.

1025      The Superior Bank case is a perfect example of something

1026 that was starting in 2001 and beginning to build at that

1027 point with subprime loans.  But I'm afraid that if a

1028 congressional committee or a regulator--let's put it this

1029 way:  If a congressional committee had looked over the

1030 shoulder of the regulators and said, will you stop that from

1031 happening, I think the regulator would have been reluctant to

1032 do it.  The institutions were making money from this.  And

1033  once more, they were afraid of some of the political backlash

1034  that would come if they did try to stop this kind of lending.

1035     There is a strong feeling in the United States that many

1036  people should have access to housing. And the question is,

1037  do you allow the regulators to interfere with a strong

1038  housing market, especially involving--

1039     Mr. DAVIS OF VIRGINIA. Lower-income people were getting

1040  housing, so nobody wanted to stop that.

1041     Mr. ZINGALES. I think that the problem is not subprime

1042  per se, it is a risky lending. But as Mr. Wallison said, it

1043  has beneficial effects.

1044     Second, in some situations, a risky--might be

1045  profitable. I think that the problem is that the level of

1046  securitization this took place was not probably monitored.

1047  We have sort of an enormous market that has got completely

1048  sort of unregulating type of disclosure. I think we should

1049  have more disclosure, because today we don't know who owns

1050  what. And out of that, a lot of the problems we observe in

1051  the credit market is because banks don't know the losses of

1052  other banks. If they don't know the losses, it is because

1053  they don't know what is in their portfolio. And if they

1054  don't know what is in the portfolio--because if you look at

1055  the issuances, you cannot trace back easily what is in that

1056  package of loans. We don't know whether they are loans from

1057  California, we don't know whether they are from Florida. We

1058 | don't know who has these loans.  And this lack of

1059 | transparency is one of the roots of the problem.  It is not

1060 | subprime, It is the lack of transparency.

1061  RPTS JOHNSON

1062  DCMN BURRELL

1063  [11:04 a.m.]

1064      Mr. WESCOTT.  Just on the question of whether we should

1065  have known or did we know, I will just say that in looking at

1066  a full range of economic statistics in the summer of 2005,

1067  looking at the value of houses divided by median income and

1068  by many other measures, we knew that the housing prices were

1069  set for a fall.  We were beginning to tell our clients in the

1070  autumn of 2005 that housing prices were set for a fall and

1071  the housing sector was ready for a decline.  We were not

1072  alone.  Many other economists were also giving similar

1073  warnings.

1074      Chairman WAXMAN.  Thank you, Mr. Davis.  Mr. Cummings.

1075      Mr. CUMMINGS.  Thank you very much.  Ms. Minow, when I

1076  went to church yesterday, it is interesting that almost

1077  everybody who came up to me afterwards was very upset.  And

1078  it seemed like the thing they were most upset about was the

1079  compensation for these executives.  As part of the

1080  committee's investigation the committee asked for copies of

1081  the e-mails that Mr. Fuld sent and received over the last 6

1082  months.  I want to read to you from an e-mail an exchange

1083  that involves Mr. Fuld, his executive committee, and senior

1084  executives at Neuberger Berman, a money management subsidiary

1085  of Lehman Brothers.

1086        The first e-mail is sent in early June of this year.  It

1087   is sent from Neuberger Berman executives to Mr. Fuld's

1088   executive committee.  The e-mail begins, and I quote, as

1089   long-term employees and former partners of Neuberger Berman,

1090   we feel compelled to express our views on several matters to

1091   members of Lehman's executive committee, end of quote.  In

1092   the e-mail, the Neuberger Berman executives write that Lehman

1093   had made, quote, management mistakes, and that, quote, a

1094   substantial portion of the problems at Lehman are structural

1095   rather than merely cyclical in nature, end of quote.

1096        The e-mail then recommended two actions.  And let me

1097   read from the e-mail.  It says top management should forego

1098   bonuses this year.  This would serve a dual purpose.

1099   Firstly, it would represent a significant expense reduction.

1100   Secondly, it would send a strong message to both employees

1101   and investors that management is not shirking accountability

1102   for recent performance.  And then it goes on to say, too, and

1103   this is a direct quote, do a partial spinout of NB.  A

1104   partial spinout could be an attractive source of capital for

1105   Lehman at a time when the company needs capital.  The

1106   officials also suggested that a partial spinout of Neuberger

1107   Berman would allow some employees to receive their equity

1108   compensation in the new Neuberger Berman shares instead of

1109   Lehman shares, which would reassure the Neuberger employees

1110   of their funds.

1111        Question:  Ms. Minow, what do you think of the

1112   recommendations made in this e-mail?  And was the

1113   recommendations that senior management forego bonuses a sound

1114   one?

1115        Ms. MINOW.  Yes, it was.

1116        Mr. CUMMINGS.  And why is that?

1117        Ms. MINOW.  Because in my opinion, management gets paid

1118   last.  You know, you pay the shareholders, you pay the

1119   employees, and then if there is any money left over you take

1120   it.  But when the company is doing poorly, management

1121   should--management compensation should reflect that.

1122        Mr. CUMMINGS.  Yeah, because when I talk to the people

1123   in my block, they tell me--you said something that was very

1124   interesting.  You said paying people based on volume as

1125   opposed to quality is just the wrong way to go.  And the

1126   people in my block in Baltimore, if they perform poorly, they

1127   get fired.

1128        Ms. MINOW.  Yeah.

1129        Mr. CUMMINGS.  They certainly don't get a bonus.

1130        Ms. MINOW.  That is how it works in my company.

1131        Mr. CUMMINGS.  And Mr. Fuld is going to come in here in

1132   about an hour, and you know what he is going to say?  He is

1133   going to say it is everybody's fault but mine, but he was the

1134   chief guy, is that right?

1135        Ms. MINOW.  He was.  He was the captain of the ship.

1136   And you are familiar with the expression "the buck stops

1137   here." You know, unfortunately it did stop with him.  He

1138   took all the bucks.

1139       Mr. CUMMINGS.  One of the recipients of that e-mail was

1140   George W. Walker.  Mr. Walker was Lehman's global head of

1141   investment management at the time.  And if the name sounds

1142   familiar, that is because Mr. Walker also happens to be

1143   President Bush's cousin.  Within 15 minutes, Mr. Walker

1144   writes a follow-up e-mail to the other members of the

1145   executive committee.  And let me read that to you, because it

1146   is extremely interesting.  He said sorry, team.  I am not

1147   sure of what is in the water at 605 Third Avenue today.  The

1148   compensation issue she raises is hardly worth the

1149   EC's--executive committee's that is--time now.  I am

1150   embarrassed and I apologize.  Mr. Fuld also mocked the

1151   Neuberger executives.  And his response was don't worry.

1152   They are only people who think--listen to this--they are only

1153   people who think about their own pockets.

1154       Ms. Minow, I see you shaking your head.  What do you

1155   think of Mr. Fuld's response?  I can imagine what you are

1156   going to say, because it is clear that he was thinking about

1157   his own pockets as he made millions upon millions.

1158       Ms. MINOW.  You are exactly right, Congressman.  I am

1159   horrified by that.  I am absolutely horrified.  And I am

1160   thinking about--I am thinking about what you could possibly

1161  say to him when he arrives here to make him understand his

1162  responsibility.

1163      Mr. CUMMINGS.  I wonder how he sleeps at night.  Mr.

1164  Smith, do you have a comment on that?  I see you shaking your

1165  head, too.  You talked about all the employees you represent.

1166      Mr. SMITH.  Well, it is of interest to me that nowhere

1167  in that conversation, nowhere even in their way of thinking

1168  does the shareholder have any role whatsoever.  And that is

1169  who their duty is to.

1170      Mr. CUMMINGS.  Thank you very much.  I see my time is

1171  up.

1172      Chairman WAXMAN.  Thank you, Mr. Cummings.

1173      Mr. Mica.

1174      Mr. MICA.  First of all, I think it is very important

1175  that our committee investigate how we got into this financial

1176  mess.  I believe Americans want to know who caused this

1177  outrage, how it happened, and who will be held accountable.

1178  If it is wrongdoing by AIG or Lehman, in fact I saw one of

1179  these signs out here with Code Pink, and they said no bail,

1180  jail.  And which I agree with.  In fact, at the conclusion of

1181  these hearings I intend to consult with my colleagues to ask

1182  for a special counsel to investigate this matter.  The

1183  announced hearings, however, today and the ones that we have

1184  before us selected by the chairman only cover Lehman, AIG,

1185  and several regulators.  Unfortunately, I think this is a

1186    clever sequencing of these hearings, which is obviously

1187    organized to deflect attention from government-backed

1188    financial institutions, and also deflect from Congress any

1189    blame, and put it on Wall Street, or blame it on executive

1190    compensation.

1191        Any hearing or real oversight that does not start with

1192    Fannie Mae, Franklin Raines, who walked away with over a

1193    hundred million dollars in executive compensation and

1194    bonuses, and also hearing from his accomplices, any hearing

1195    will be a sham.  This is like investigating the Great Train

1196    Robbery and only talking to the dining car stewards.  Instead

1197    of a balanced panel today, we will take testimony from

1198    academics, and no one from Fannie Mae or Freddie Mac.  Rather

1199    clever.

1200        The fact is that our Nation's current financial crisis

1201    began back in 1992, with the concerted effort to expand

1202    government-sponsored enterprises Fannie Mae and Freddie Mac

1203    to include loans to marginally qualified borrowers and get

1204    into a whole host of speculative investments.  Last week

1205    Speaker Pelosi incorrectly and partisanly attributed the

1206    responsibility to the Bush administration's failed economic

1207    policies.  Chairman Waxman in his opening statement is trying

1208    today to direct focus on Wall Street and regulators.  Last

1209    time I checked, none of those folks had a vote in Congress.

1210        In fact, it was in 1999, and we heard some reference to

1211  this already, I have a copy of the vote here which we will

1212  put in the record later, the Congress voted to repeal the

1213  Glass-Steagall Act, allowing banks to engage in speculative

1214  ventures.  And Wall Street followed.  In fact, long before

1215  Bush took office, the stage was set for the current financial

1216  meltdown of the housing and finance industry.  In fact, in

1217  1999 the Clinton administration and Fannie Mae Director

1218  Raines lowered policy standards and increased subprime loans

1219  to new, more dangerous levels.

1220      As quoted in the New York Times that year, Raines said,

1221  and I quote from Raines, Fannie Mae has expanded home

1222  ownership for millions of families in the '90s by reducing

1223  down payment requirements, yet there remain too many

1224  borrowers whose credit is just a notch below what our

1225  underwriting has required who have been regulated to paying

1226  significantly higher mortgages in the so-called subprime

1227  market.  Wall Street followed.

1228      The New York Times article continued, in moving even

1229  tentatively into this new era of lending, Fannie Mae is

1230  taking on significantly more risk, which may not pose any

1231  difficulty during flush economic times, as we saw, but the

1232  government-subsidized corporation may run into trouble in an

1233  economic downturn, prompting a government rescue similar to

1234  that of the savings and loan associations, end quote.

1235      In fact, in 2004, Raines and Freddie Mac CEO Richard

1236  Syron told an ABA meeting, and quote, we push products and

1237  opportunities to people who have lesser credit.  In fact,

1238  testimony before the House Financial Services Committee on

1239  Capital Markets and Insurance and Government Sponsored

1240  Enterprises on October 6, 2004, Raines termed some of these

1241  loans riskless.  That is his quote.

1242      In fact, Raines by rule change lowered Fannie Mae's cash

1243  reserve requirements from 10 to 2.5 percent.  In fact, after

1244  fraudulently cooking Fannie Mae's books so Raines and Jamie

1245  Gorelick and others could boost earnings to rob millions in

1246  bonuses, congressional Democrats chose to ignore the

1247  findings.  During a House Financial Services hearing on

1248  September 10th, 2003, the top Democrat at the time, Barney

1249  Frank, said the more people in my judgment exaggerate a

1250  threat of safety and soundness, the more people conjure up

1251  the possibility of serious financial losses to the Treasury,

1252  which I do not see.  I think we see entities that are

1253  fundamentally sound and withstand some of the debt disaster

1254  scenarios.  Representative Maxine Waters demanded to know why

1255  if it ain't broke, why anybody would want to fix Fannie Mae.

1256  More incredibly--

1257      Chairman WAXMAN.  Thank you, Mr. Mica.

1258      Mr. MICA.  --Frank said a few days later, I want to roll

1259  the dice a little bit more in this situation.

1260      Chairman WAXMAN.  Mr. Mica, you can put the rest of the

1261  statement in the record, but your time has expired.

1262      Mr. MICA.  Well, since our side is gagged from either

1263  giving a statement or--

1264      Chairman WAXMAN.  Mr. Kucinich, it is your turn to ask

1265  the questions.

1266      Mr. MICA.  --having the opportunity to not ask questions,

1267  I won't get to ask my questions.

1268      Chairman WAXMAN.  I thought you asked a lot of brilliant

1269  questions here.  Mr. Kucinich, your turn to ask questions.

1270      Mr. KUCINICH.  I thank the gentleman.  Mr. Wallison, in

1271  your testimony you said voters are justifiably angry about

1272  the $700 billion rescue plan just adopted by Congress.  Why?

1273      Mr. WALLISON.  Because much of the problem that--

1274      Mr. KUCINICH.  You want to speak closely to the mike?

1275      Mr. WALLISON.  Because much of the problem that this

1276  plan is intended to address was caused by a lack of

1277  regulation of Fannie Mae and Freddie Mac.

1278      Mr. KUCINICH.  Okay.  Thank you, sir.

1279      Mr. WALLISON.  The bad assets that are now on the books

1280  of banks and securities firms all over the world came from a

1281  market that they stimulated between 2005 and 2007.

1282      Mr. KUCINICH.  Thank you, sir.  Thank you for your

1283  answer.  I am going to go on with the rest of my questions.

1284      I want to say that I agree with you that the American

1285  people are angry.  I voted against this bailout.  And I think

1286  that I have to say that, with all due respect to our Chair,

1287  who really was given a mandate to hold hearings after the

1288  fact, I am sorry that these hearings are taking place after

1289  we voted on the bailout.  I mean how much better we would

1290  have been, how much better informed we would have been if we

1291  had had these hearings before the bailout.  And I think that

1292  it would have--that takes nothing away from Mr. Chairman, who

1293  I have the greatest admiration for, but this is a decision

1294  that was made by our congressional leaders.  We should have

1295  had these hearings first and then taken a vote on a bailout

1296  later.

1297       Now I want to get into the questions of why didn't

1298  Secretary Paulson save Lehman.  We all know about the

1299  implications of the collapse.  That is what we are here to

1300  discuss.  But you know, my question is why Secretary Paulson

1301  decided to bail out AIG and other companies but not Lehman.

1302       Gretchen Morgenson in the New York Times wrote a column

1303  about the decision to rescue AIG.  She said that Secretary

1304  Paulson, a former CEO of Goldman Sachs, made this decision

1305  after consulting with Lloyd Blankfein, the current CEO of

1306  Goldman Sachs.  She also wrote that Goldman Sachs could have

1307  been imperiled by the collapse of AIG because Goldman was

1308  AIG's largest trading partner.  She said Goldman had a $20

1309  billion exposure to AIG.

1310       Now I would like Professor Zingales, when you hear about

1311 that, you know, a decision was made to let Lehman go down.

1312 Goldman Sachs is still standing for sure.  Are you concerned,

1313 given these facts, that there is an apparent conflict of

1314 interest by the Treasury Secretary in permitting a principal

1315 of a firm that he was a CEO with to be involved in these

1316 discussions about the survival of Lehman?

1317     Mr. ZINGALES.  Yes.  I am certainly concerned by that.

1318 But I have to say that I think that the reason--and I am not

1319 saying it wasn't the right decision--I think the reason to go

1320 to the AIG bailout is that AIG was a major player in the

1321 credit default swap market.  And I think that not only

1322 Goldman was very heavily involved with that, J.P. Morgan, to

1323 the best of our ability, J.P. Morgan has a notional amount of

1324 $7 trillion in the credit default swap market.  Most of that

1325 is hedged.  And since they buy and sell insurance at the same

1326 time, so if everybody is holding up, there is no risk.  But

1327 if AIG went under, all of a sudden J.P. Morgan would have

1328 found itself probably on edge for a significant fraction of

1329 that sort of a $7.1 trillion.  Now--

1330     Mr. KUCINICH.  Let me ask you this.  You throw Lehman

1331 Brothers overboard.  Does that help what competitive position

1332 may remain with respect to Goldman Sachs?

1333     Mr. ZINGALES.  I think it is clear that Goldman Sachs

1334 benefits from Lehman Brothers going under, yes.

1335     Mr. KUCINICH.  I want to ask Ms. Minow to answer the

1336 | question that I asked.  Is there an apparent conflict of
1337 | interest here?
1338 |      Ms. MINOW.  Yes, there was.
1339 |      Mr. KUCINICH.  You want to elaborate on that?
1340 |      Ms. MINOW.  You know, that is part of the problem of
1341 | regulating and deal making and bailing out in the financial
1342 | sector.  You know, we do regressions about the relationships
1343 | between the various boards of directors.  And overwhelmingly,
1344 | that is the most tightly knit.
1345 |      Mr. KUCINICH.  I want to thank you for that.  Because
1346 | see, what we are confronted with is that bailout legislation
1347 | gives Secretary Paulson the ability to direct assets over the
1348 | entire economy, changing forever the idea of a free market
1349 | and putting him in a direct position where he can benefit the
1350 | people that he worked with while he was CEO of Goldman Sachs.
1351 |  Does that concern you?
1352 |      Ms. MINOW.  It concerns me greatly, Congressman.  And
1353 | that is why I think it is very important, even though the
1354 | legislation was already passed, to have these hearings right
1355 | now, because as you well know, the implementation is going to
1356 | tell the story here.  And even though the legislation is now
1357 | significantly longer than the original proposal sent over by
1358 | the administration, there is still a lot of room to make it
1359 | right or make it wrong.  And I think it is going to need a
1360 | lot of oversight.

1361        Mr. KUCINICH.  Thank you very much.

1362        Chairman WAXMAN.  Thank you, Mr. Kucinich.

1363        Mr. Turner.

1364        Mr. MICA.  Mr. Chairman, I have a unanimous consent

1365   request.

1366        Chairman WAXMAN.  The gentleman will state his unanimous

1367   consent request.

1368        Mr. MICA.  I would like to ask unanimous consent to

1369   submit for the record the final vote results of roll call

1370   570, which is the Glass-Steagall repeal, which you actually

1371   and I voted no on.

1372        I would like unanimous consent to insert in the record

1373   H.R. 4071, which Mr. Shays asked me to cosponsor as a

1374   cosponsor, to register and regulate the Federal securities

1375   laws to include housing-related government-sponsored

1376   enterprises in March 20th, 2002.

1377        And I would like unanimous consent to submit into the

1378   record the legislation entitled Federal Housing Finance

1379   Reform Act of 2005, sponsored by Richard Baker, voted for by

1380   myself and others--you weren't with me on that one--that

1381   would have resolved this.  And also the vote of that I think

1382   are important to include in the record.

1383        Chairman WAXMAN.  Without objection, that will be the

1384   order.

1385        Mr. MICA.  Thank you.

1386          [The information follows:]


1387   ******** COMMITTEE INSERT ********

1388        Chairman WAXMAN.  Mr. Turner?

1389        Mr. TURNER.  Thank you, Mr. Chairman.  I also voted

1390  against the bailout package.  And I voted against the bailout

1391  package because I believe that it did nothing to prohibit the

1392  types of practices we are going to discuss today.  It

1393  provided no real relief to communities or homeowners who are

1394  impacted as a result of these practices.  And I believe it

1395  does no real understanding of what the requirements will be

1396  for administering such a program as we look to the underlying

1397  mortgages and the number of housing and house units that is

1398  there.  And I also don't believe that the value is ultimately

1399  going to be there when they take a look at the mortgages and

1400  the mortgage-backed securities that they are going to be

1401  acquiring.

1402        Dr. Wescott, you said that--you gave us about four or

1403  five points as to how this happened.  Easy credit, housing

1404  prices escalating, securitization of mortgages, houses

1405  becoming ATMs.  And Ms. Minow, you indicated also excessive

1406  CEO compensation.  Well, I am from Ohio, and we are one of

1407  the leaders, unfortunately, in the area of foreclosures.  And

1408  I want to tell you a little bit about what our experience is.

1409   And I would like to get your thoughts on this.

1410        In 2001, I was serving as mayor for my community.  And

1411  then city commissioner Dean Lovelace, who was a leader in our

1412  community of trying to advocate for people who were victims

1413  of predatory lending, brought to the attention of the city

1414  commission and ultimately legislation, which we passed but

1415  were not able to enforce, attempting to prohibit predatory

1416  lending practices in our community. We then began working

1417  with the Miami Valley Fair Housing Center in our community to

1418  work directly with people who were impacted. And our

1419  community in the past 2 years has had 5,000 foreclosures on

1420  an annual basis in a county of about 500,000 people. The

1421  State of Ohio I believe is clipping along at about

1422  80,000-plus foreclosures.

1423      And Dr. Wescott, we are not seeing the housing price

1424  escalation as the problem. Ohio is not a State that saw wild

1425  fluctuations in housing values. In fact, the Miami Valley

1426  Fair Housing Center, Tim McCarthy, the director there, tells

1427  me that this is what we experienced. Houses that are

1428  probably valued between 75, $80,000, people who found the

1429  American dream, who got a traditional lending product, were

1430  convinced to refinance their house by unscrupulous lenders,

1431  predatory lenders, subprime lenders, convinced that the

1432  property value was worth a hundred thousand, many times

1433  capitalizing the fees, giving the ultimate homeowner a small

1434  portion of the cash in the refinancing, the homeowner then

1435  facing many times interest rates or payment schedules that

1436  they are either not familiar with or not prepared to make; in

1437  any event, finding perhaps hard economic times or other

1438  circumstances where they realized that the value of the

1439  property is below the actual mortgage value.  And ultimately,

1440  this property going through foreclosure becomes abandoned in

1441  my community.  Sitting with a leaking roof, broken windows

1442  and many times is now worth $20,000, requiring tens of

1443  thousands of dollars for it even to be habitable.  We are

1444  seeing that scourge around our community.  And when I see

1445  that, I don't see bad loan choices, I don't see people who

1446  just were stretching for the American dream but could not

1447  afford it.  I see someone having stolen the American dream,

1448  where there was a homeowner and a family that were sitting

1449  there that were convinced to them what they thought was the

1450  most regulated transaction in our country, protected by the

1451  Federal Government and rules and regulations, caught in a

1452  cycle of refinancing.

1453      But there is someone who knew.  The person who

1454  originated this loan knows that the value of the property

1455  isn't there.  They know that this homeowner is not going to

1456  be able to make it.  And ultimately, as we now know, they

1457  take that loan, securitize it, and sell it back likely to the

1458  bank that had the first mortgage to begin with that wouldn't

1459  have given them a loan like that.  Again, I believe these

1460  people stole.  And I believe it was systematic stealing at

1461  such an unbelievable and grand scale that it is going to be

1462  very difficult for us to unwind this.

1463      In those circumstances, I would like your thoughts on

1464   that very process.

1465      Mr. WESCOTT.  Mr. Turner, you described very eloquently

1466   a second type of housing problem that we are having in this

1467   country.  We really have two housing problems.  We have the

1468   credit-oriented problem that is heavily focused in Florida,

1469   California, Las Vegas, and so on.  And because this part of

1470   the economy, because the housing sector of the economy

1471   started weakening, we have actually eaten into real

1472   disposable income.  We have hurt consumer spending across the

1473   country.  And what that has done is that has lowered demand

1474   for automobiles, for industrial goods, and so on.  And that

1475   is the core part of the problem in the State of Ohio.  It is

1476   the same in Michigan.  These are regions that have lost

1477   hundreds of thousands of industrial jobs, as you well know.

1478   And so the fundamental problem in Ohio is the loss of jobs

1479   and the fact that many people just don't have the income they

1480   did 2 years ago or 4 years ago.

1481      Ms. MINOW.  Mr. Turner, I want to repeat that one of the

1482   most important factors in creating this problem was pay plans

1483   that rewarded the executives on the basis of the number of

1484   transactions rather than the quality of transactions.  And as

1485   I said the last time I spoke to this committee, of course we

1486   could never pay Congress what you are worth, but if we were

1487   paying you based upon the number of laws rather than the

1488   quality of the laws, I think you see what the result would

1489   be.  And when we created these pay packages so that they were

1490   benefited by just generating as many transactions as

1491   possible, chopping them up, sending them all over the place

1492   in a form that could no longer be valued accurately, to me

1493   that is one of the key sources of this problem.

1494       Mr. TURNER.  As we talk many times about falling housing

1495   prices, it is going to be interesting when we actually get

1496   into these mortgage-backed securities and look at these

1497   mortgage transactions, because I think we will find that many

1498   of these loans were given on housing prices where the value

1499   wasn't there to begin with.

1500       Ms. MINOW.  I agree.  And I understand that in some

1501   cases even the title searches were not completed.

1502       Mr. TURNER.  Thank you, Mr. Chairman.

1503       Chairman WAXMAN.  Thank you, Mr. Turner.

1504       Mr. Tierney.

1505       Mr. TIERNEY.  Thank you, Mr. Chairman.  I want to thank

1506   all of our panel for testifying today.  I know we are going

1507   to have this hearing and about four other hearings trying to

1508   understand the process that got us into this situation.  And

1509   today we are focusing on Lehman Brothers.  Over the weekend

1510   we all got a chance to look at Mr. Fuld's proposed testimony

1511   for today.  And in looking at that, it appears that he blames

1512   just about everyone and everything except himself and the

1513  other executives for the downfall of Lehman.

1514      So I wanted to begin by asking this panel for a full

1515  diagnosis of just what went on.  What were the factors that

1516  went into this?  Mr. Fuld said it was a litany of

1517  destabilizing factors:  Rumors, credit agency downgrades,

1518  naked short attacks.  He says ultimately lack of confidence,

1519  and in the end he was overwhelmed.  So I want to ask each of

1520  you whether or not you agree with that, that Mr. Fuld was a

1521  victim of the circumstances or whether or not he and his

1522  fellow executives made mistakes, causing the collapse of the

1523  company and eventually putting all of us in jeopardy.

1524      Ms. Minow, if I could begin with you.  Do you agree with

1525  Mr. Fuld's diagnosis?

1526      Ms. MINOW.  No.  I think it is horrific.  I can't

1527  believe that he would have the chutzpah to say something like

1528  that.  I hold him completely responsible.  I hold him

1529  responsible and his board responsible for the foreseeable

1530  consequences of the decisions they made.

1531      Mr. TIERNEY.  Professor Zingales, what are your views on

1532  that?

1533      Mr. ZINGALES.  I think he is definitely responsible for

1534  having a too aggressive leverage policy, too much short-term

1535  debt that makes the firm sort of at risk of a background that

1536  is exactly what happened, and to have not controlled the risk

1537  that the firm was taking during this boom period.

1538       All this said, it is also true that we are in

1539   exceptional circumstances, and I think that the system is

1540   suffering of lack of liquidity.  And so it is possible that a

1541   lot of banks and firms that in normal times would not be

1542   insolvent today find themselves insolvent.  The example is

1543   suppose that we had no mortgages, what would be the price of

1544   your house?  And we are in the situation right now.  The

1545   banks are not lending.  And if the banks are not lending, we

1546   don't know what the prices of anything is.  And at those

1547   prices it is very easy that a lot of firms, a lot of banks

1548   are insolvent.

1549       Mr. TIERNEY.  Thank you.  Mr. Smith, you are the only

1550   investor on the panel.  What are your views?

1551       Mr. SMITH.  Well, certainly I hold him responsible, but

1552   I think it goes beyond that.

1553       Chairman WAXMAN.  Is your mike on?

1554       Mr. SMITH.  I am sorry.  I certainly hold him

1555   responsible.  I certainly think they made conscious decisions

1556   to take risks that went far beyond the interests of the

1557   shareholder.  But I also look at the directors, and I look at

1558   their responsibility for overseeing management.  And I look

1559   at the regulatory system that denies investors the

1560   opportunity to hold directors accountable.  So there are

1561   multiple pieces to the puzzle.  But I don't believe that he

1562   has any safe ground to stand on.

1563      Mr. TIERNEY.  Thank you.  Professor Zingales and Ms.

1564  Minow, if I were to put you or you were to put yourself in

1565  Mr. Fuld's position, in 2007 Lehman Brothers paid out nearly

1566  $5 billion in bonuses.  He himself got a 4 million cash

1567  bonus.  But at the same time they did that, they spent over

1568  $4 billion buying back shares of stock.  They paid out $750

1569  million in dividends.  Were those actions, almost $10 billion

1570  of capital dissipated in that sense, were those wise decision

1571  under the circumstances?

1572      Ms. MINOW.  No.  I don't think they were.  And I will

1573  say that I am a real radical on the subject of CEO stock

1574  sales.  He was also selling a lot of his stock at that time.

1575  And I don't believe that CEOs should be allowed to sell stock

1576  while they are still with the company.

1577      Mr. TIERNEY.  Dr. Zingales.

1578      Mr. ZINGALES.  No, it was not a wise decision.  He

1579  should have increased the equity base, not reduce it at that

1580  moment.

1581      Mr. TIERNEY.  I noticed that in June of 2008 the Lehman

1582  Brothers had a $2.8 billion loss on their books, and that

1583  sent everything--stunning the markets, sent everything

1584  spinning.  If they had that $10 billion that had gone to

1585  bonuses and to dividends and buybacks, it certainly seems

1586  that they might have avoided that situation as well.

1587      Do you know, Dr. Zingales, what the amount of money that

1588 | Mr. Fuld was seeking from the Korean Development Bank toward

1589 | the end?

1590 |     Mr. ZINGALES.  No, I don't know the exact amount.

1591 |     Mr. TIERNEY.  Do you, Ms. Minow?

1592 |     Ms. MINOW.  No, I do not.

1593 |     Mr. TIERNEY.  I believe it was probably $6 billion or

1594 | less.  And my point was again, if you take that $10 billion

1595 | off the books, you lost that opportunity to do something

1596 | substantial in terms of saving that company and saving our

1597 | economy on that.  But we can explore that further with Mr.

1598 | Fuld.

1599 |     But I do want to just cover an e-mail exchange between

1600 | Mr. Fuld and one of his top executives, David Goldfarb, that

1601 | was dated May 26th of 2008.  In that, Mr. Goldfarb reports

1602 | that a possible deal with the Korean Development Bank would

1603 | provide several billion dollars worth of new capital to

1604 | Lehman.  Mr. Goldfarb describes what he would like to do with

1605 | the money, and he writes as follows.  It feels like this

1606 | could become real.  If we did raise $5 billion, I like the

1607 | idea of aggressively going into the market and spending two

1608 | of the five and buying back lots of stock and hurting Einhorn

1609 | bad.  Now, in the e-mail Mr. Goldfarb was referring

1610 | apparently to David Einhorn, who at the time was publicly

1611 | critical of Lehman and was shorting its stock.  Mr. Fuld

1612 | wrote in a short response, I agree with all of it.

1613     So here is how I read this e-mail.  Lehman was

1614  dangerously low on capital, and possibly found an investor

1615  willing to give them billions of dollars.  And what they

1616  wanted to do with it, however, was buy back stock and punish

1617  a short seller.  Mr. Smith, what are your views about that

1618  e-mail exchange, being an investor?

1619     Mr. SMITH.  Well, horrified.  When you know that you are

1620  low on cash, when you know that you have exposed your company

1621  to what I have heard as ranging from 35 to 70 times leverage,

1622  and you are giving away your cash with a motive of punishing

1623  someone rather than benefiting your shareholders, that is the

1624  ultimate breach.

1625     Mr. TIERNEY.  Thank you.

1626     Chairman WAXMAN.  Thank you, Mr. Tierney.

1627     Ms. Watson?

1628     Ms. WATSON.  I really think this is the most important

1629  hearing we have had in this particular Congress.  I thank the

1630  experts for coming out this morning.  I just returned from

1631  California, the largest State in the Union, 38 million

1632  people.  It was a turnaround for me.  And I tell you, they

1633  followed me out of church, they followed me at several

1634  dinners, political dinners.  Everyone was outraged over the

1635  $850 billion of their moneys to bail out people who have

1636  shown nothing but corporate greed.  And I am hoping that as a

1637  result of the six hearings we are going to have that we can

1638 come out with a policy that will really curtail this greed

1639 out of control.

1640     Now, looking at Lehman Brothers and trying to get to the

1641 bottom of what caused this economic crisis that we are in,

1642 the makeup of the board may provide some insight with what

1643 went wrong.  Seven of the 10 board members were retired.

1644 Many of them lacked Wall Street experience.  And the Lehman

1645 board members included the former head of Telemundo, who was

1646 a retired Navy Admiral, and a theater producer.

1647     And so I am directing this to Ms. Minow.  You are an

1648 expert on corporate governance.  Do you have concerns about

1649 the effectiveness of the Lehman board?  And let me just

1650 mention one board member, Mr. Roger Berlind, the theater

1651 producer.  He has been on the board for 20 years, and sits on

1652 the audit and the finance and risk committees.  What are your

1653 concerns about having a board full of people like Mr.

1654 Berlind?

1655     Ms. MINOW.  Thank you, Ms. Watson.  As I said in my

1656 testimony, we rank boards based on the decisions they make,

1657 and not on their resumes.  And I will say in fairness to Mr.

1658 Berlind that yes, he is a theatrical producer, he does have a

1659 background in finance, and was the co-founder of a Wall

1660 Street firm at one time.  However, I think it is clear that

1661 the members of this board had no clue about the kinds of

1662 securities and other issues, the derivative securities and

1663 the credit default swaps that we have heard about today.  And

1664 the fact that the risk committee met only twice 2 years in a

1665 row I think tells you everything you need to know.

1666      So I rank this board very, very poorly.  They currently

1667 get an F from us.

1668      Ms. WATSON.  I see one of the biggest problems in

1669 corporate governance is how entrenched the board can become.

1670 And under current law, there is no effective way for

1671 shareholders to challenge an incompetent or negligent board.

1672 And in the bailout bill, Chairman Barney Frank tried to

1673 address the problem of these entrenched boards.  And he said

1674 that shareholders should be able to propose their own

1675 candidates for the board.  The theory behind this reform is

1676 that if the board gets too close to management, as the Lehman

1677 board did, the shareholders can vote in a new board with more

1678 independence and oversight.  Unfortunately, Secretary Paulson

1679 insisted that this corporate governance reform be dropped

1680 from the bill.

1681      So I would like to ask you first, Ms. Minow, was this an

1682 important reform?  And then Mr. Smith, do you have a view on

1683 this?  And Mr. Zingales, what you think.  In that order,

1684 please.

1685      Ms. MINOW.  This is a crucial reform.  Mr. Smith

1686 mentioned it in his testimony.  I have got it in my written

1687 remarks.  At this point, you know, I always love bringing

1688  this up when I am speaking to the committee because one thing

1689  that you all understand very, very well here, very intimately

1690  is the concept of an election.  And yet we call it an

1691  election for a corporate board, and only one person runs, no

1692  one runs against them, and management counts the votes.  It

1693  is a pretty good system.  We have got to have some way--this

1694  is exactly what I am talking about when I say we need to

1695  remove the impediments to oversight from investors so that we

1696  can remove directors.  There are currently more than 20

1697  directors serving on boards today who did not receive a

1698  majority vote from their shareholders.  Shareholders did

1699  everything they could to say we don't want you and they are

1700  still serving.  So we definitely need to improve that system.

1701       Thank you.

1702       Mr. SMITH.  Yes, that certainly is one of the biggest

1703  reforms I would like to see.  It is the only place I have

1704  ever seen where--

1705       Chairman WAXMAN.  Is your mike on?

1706       Mr. SMITH.  Pardon me?

1707       Chairman WAXMAN.  Is your mike on?

1708       Mr. SMITH.  Yes, it is.  Who are our representatives,

1709  the shareholders' representative is not picked by the

1710  shareholders and the shareholders have nothing to say about

1711  who they are, and they are not accountable to the

1712  shareholders.  Their presence in the board room is dependent

1713  upon management and whether or not management puts them on

1714  the slate.  That is not a good connection for the

1715  shareholders to have their voice heard in a board room, and

1716  it has failed us.

1717      Mr. ZINGALES.  I completely agree with you.  In fact,

1718  there are very few things that the United States can learn

1719  from Italy, but Italy has a law that allows representatives

1720  of institutional investors to be elected on board.  And I

1721  happen to be one of those.  I sit on the board of one of the

1722  largest companies in Italy, Telecom Italia, as representative

1723  of institutional investors.  And I sit on their compensation

1724  committee, and I can actually argue about their compensation.

1725   And I can tell you that last year I wasn't particularly

1726  polite in some of the conversation.  And if I was appointed

1727  by management, I would not have been renewed.  But I was

1728  renewed because I am appointed by institutional investors and

1729  I represent shareholders on that board.

1730      So I think that would be a very important reform that we

1731  could pass.

1732      Chairman WAXMAN.  Thank you, Ms. Watson.

1733      Ms. WATSON.  Thank you so much.

1734      Chairman WAXMAN.  Mr. Higgins.

1735      Mr. HIGGINS.  Thank you, Mr. Chairman.  Just a couple of

1736  thoughts.  Virtually every recession or severe economic

1737  downturn originates in excesses in the financial economy.

1738  And then they go on to ruin the real economy.  I think the

1739  recent financial crisis is consistent with that.  And I find

1740  in my review of the facts four basic abuses:  A lack of

1741  transparency, excessive leveraging, conflicts of interest,

1742  and most egregious, the probability of dishonesty and deceit.

1743       Lehman Brothers didn't just collapse on September 15th.

1744  Its financial situation has been getting increasingly dire

1745  with each passing quarter.  But Lehman's executives kept

1746  telling shareholders and public investors that its finances

1747  were in great shape.  In September 2007, Lehman's chief

1748  financial officer told investors, quote, our liquidity

1749  position is stronger than ever.  In December 2007, CEO

1750  Richard Fuld said, quote, our global franchise and brand have

1751  never been stronger.  In March 2008, Lehman fired its chief

1752  executive officer and hired a new one.  The new chief

1753  financial officer told investors, quote, I think we feel

1754  better about our liquidity than we ever have.  In June 2008,

1755  CEO Richard Fuld told shareholders, quote, our capital and

1756  liquidity positions have never been stronger.  And on

1757  September 10th, 5 days before Lehman filed for bankruptcy

1758  protection, Lehman made upbeat comments to investors and

1759  research analysts.

1760       Mr. Smith, you represent a state pension fund.  Your

1761  fund manages retirement assets of public employees in the

1762  State of Colorado.  What do you think about these statements

1763  by Mr. Fuld and others at Lehman?  Were they giving you an

1764  honest assessment of what was going on inside the company?

1765      Mr. SMITH.  Well, clearly, they were not giving us an

1766  honest assessment of it.  And unfortunately, neither were the

1767  books, neither were the auditors.  There was no piece of the

1768  puzzle that allowed us--we are big boys and girls.  We invest

1769  billions of dollars.  We understand how to invest.  We

1770  understand how to do due diligence.  But you have to have the

1771  tools to do that.  And you have to have people who are going

1772  to be honest enough to tell you the facts, or at least have

1773  you have the ability to go mine the facts yourself.  And in

1774  today's situation, and for many years now we have been

1775  unable, we have been impaired in our ability to do that.

1776      Mr. HIGGINS.  Professor Zingales, what is your view?

1777  Could Mr. Fuld have been truthful when he said in June of

1778  2008 that our capital and liquidity positions have never been

1779  stronger?

1780      Mr. ZINGALES.  It is hard to imagine that it was never

1781  stronger than that.  I think that it is clear that was a

1782  moment of crisis, and it is clear that he didn't have a good

1783  understanding of what the situation was.  If it is true, as

1784  was said, that he was indicating that they would buy back

1785  stocks in order to punish the analysts, I think--I am sorry,

1786  the short sellers, this is a typical situation of

1787  overconfidence by a CEO that doesn't see the problems as they

1788   should be.  And he thinks that the responsibility is all on

1789   the market that gets it wrong.  It is all on the short

1790   sellers, the short sellers of stocks, and they don't see the

1791   problem coming.

1792        Mr. HIGGINS.  Mr. Fuld had a vested interest in painting

1793   a rosy picture at Lehman.  If he had disclosed its precarious

1794   situation it could have put more pressure on the company.

1795   That is why I believe the disclosure rules are so important.

1796   Investors shouldn't have to rely on the rosy assessment of

1797   corporate executives.  They should be able to verify those

1798   statements in reviewing public filings of the company.  Mr.

1799   Smith or Dr. Wescott, what are your views about disclosure

1800   rules?

1801        Mr. SMITH.  Well, I was just mentioning I should have

1802   hit transparency a little harder in my answer.  I appreciate

1803   the loop back, because that is what we believe was lacking

1804   with the off balance sheet opportunities, with the loosened

1805   accounting rules, with the obfuscation of the leverage that

1806   they were actually imposing on the assets of the organization

1807   that were in large part undetectable by an investor.  Didn't

1808   have much of a fair shot at assessing our risk when we got

1809   into that.

1810        Mr. WESCOTT.  A quick comment.  Basically, there are two

1811   ways you can go if you are going to regulate an industry.

1812   You can have very, very tight regulation.  At the limit, you

1813 can imagine a regulator basically working full-time in the
1814 institution looking at every number every day.  And that is
1815 one way you could go.  The other way is to back off and to
1816 allow--to have less day to day, minute to minute regulation.
1817 If you are going to go that way, though, you have to--the key
1818 building block is disclosure and transparency.  And that
1819 is--if you don't have this very minute level of regulation,
1820 you have to have disclosure and transparency.

1821      Chairman WAXMAN.  Thank you, Mr. Higgins.

1822      Mr. HIGGINS.  Thank you, Mr. Chair.

1823      Chairman WAXMAN.  Ms. McCollum.

1824      Ms. MCCOLLUM.  Thank you, Mr. Chairman.  I want to go
1825 back to September 10th, because that is 5 days before the
1826 bankruptcy filing.  It is my understanding that the chief
1827 financial officer held a conference call for investors.  And
1828 that was reported in the Wall Street Journal.  And in fact,
1829 some of the bankers even advised them not to hold this call
1830 because there were going to be too many open questions.  And
1831 I would like to know from the panel, to your understanding is
1832 this accurate?

1833      Ms. MINOW.  I don't have any information about that,
1834 sorry.

1835      Ms. MCCOLLUM.  My understanding is at the time that they
1836 were making this call they were trying to raise capital
1837 through new investors or by off selling assets.  Dr. Wescott,

1838  Dr. Zingales, any comment on that?

1839       Mr. WESCOTT.   Unfortunately, I don't know the details of

1840  what was going on.

1841       Mr. ZINGALES.   Neither do I.

1842       Ms. MCCOLLUM.   One of the concerns that I had, Dr.

1843  Zingales, from your testimony, you talked about how there

1844  were three issues kind of involved to Lehman's collapse.   One

1845  of them that we haven't spoken about very much was the whole

1846  idea of the credit market swap that was involved in here.   So

1847  irrespective of whether or not they were making good

1848  investments, and they definitely were not in the home

1849  mortgage securities, could you elaborate on Lehman Brothers'

1850  role in the credit swap?

1851       Mr. ZINGALES.   Actually, the role of Lehman in the

1852  credit default swap market is relatively limited.   There is a

1853  table in my long testimony, I think it is table 5, that

1854  reports the best numbers we have regarding sort of the amount

1855  of credit default swaps in place.   And Lehman is 25th in the

1856  list.   So they definitely had some sort of play in the

1857  market, but not a huge play in that market.

1858       Ms. MCCOLLUM.   But when there is lack of confidence in

1859  the market, to what degree did these--I mean they were out

1860  there hustling for cash, looking for something.   They knew

1861  that they had problems with the loans that they had accrued.

1862  The fact that they got even involved in doing this credit

1863  swap, does that bring any--from my research, that does not

1864  bring any stability to a company.  In fact, it adds to

1865  destability.

1866      Mr. ZINGALES.  It depends what position they take,

1867  because if they were hedging their risk by taking insurance

1868  along the way, this should in principal have reduced their

1869  risk.  Of course if they were selling insurance, that would

1870  have been crazy, but I don't think at that time people would

1871  have bought the insurance because they were sort of rumored

1872  to be in difficulty.  So you don't want to buy insurance from

1873  an insurance company that you are not sure is going to be

1874  around to pay when your house is in trouble, for example.

1875      Ms. MCCOLLUM.  Could I ask each one of the panelists,

1876  there was great discussion about privatizing Social Security.

1877   And as we have heard from the gentleman from Colorado, a lot

1878  of pensions had their security assets in fact involved in

1879  these types of products.  Could you tell me what, in your

1880  opinion, privatizing Social Security would have meant for

1881  Americans today had that plan gone through?

1882      Mr. SMITH.  Well, the beauty in our view as a pension

1883  system, and particularly a hybrid defined benefit pension

1884  system is that we are able to pool at least some of these

1885  market risks for our members.  The members in our system who

1886  were within a year or so of retiring and faced this crisis

1887  probably still have the ability to retire, because we have a

1888 long-term ability to provide those benefits.  If they were on

1889 their own and they were in individual accounts that were

1890 under their control and their responsibility, they would be

1891 left with only that, and that would be inadequate to provide

1892 for them in these times.  And this cycle would have caused

1893 them to go back to work for years into the future.  So it

1894 would be devastating to have individuals--in my view, to have

1895 individuals and individual accounts out there trying to

1896 survive in what is a market that lacks transparency.

1897       Mr. WESCOTT.  Just there are many different proposals of

1898 how to do a privatization of Social Security.  There is carve

1899 out, there is add on, and so on.  So it is difficult to know

1900 exactly which type of plan we would be talking about.  The

1901 key for insuring safe retirements for Americans is

1902 diversification, a blend of income, some coming from Social

1903 Security, some coming from company plans, some coming from

1904 private 401(k) plans or individual plans.  What we really

1905 want is to have a blend of money so that you have multiple

1906 sources, each of them subject to different risks.

1907       Chairman WAXMAN.  Thank you very much.  Did anyone else

1908 wish to respond to the question?  Thank you, Ms. McCollum.

1909 Mr. Van Hollen?

1910       Mr. VAN HOLLEN.  Thank you, Mr. Chairman.  I thank all

1911 of the witnesses for being here today.  I just want to pick

1912 up on a point that Ms. Minow raised in her testimony

1913 regarding the link between executive compensation and overall

1914 performance.  We are looking at Lehman Brothers as a case

1915 study today.  We have AIG tomorrow.  And then we will go on

1916 to some of the more systemic issues.  But I think what we are

1917 seeing today, just looking at Lehman Brothers, is a good case

1918 study of the fact that you don't have this alignment between

1919 pay and performance.  In fact, as my colleague Mr. Cummings

1920 was saying, unlike the rest of America, where pay for

1921 performance means you get rewarded when you do well, but you

1922 actually get--there are disincentives, you get cut in pay

1923 when you do poorly, the fact of the matter is on Wall Street

1924 you do well when they do well, and you do well when they are

1925 doing poorly.  And that clearly is a mismatch.  And I think

1926 it is important to look at this to make the recommendations

1927 you have talked about in terms of what we can do

1928 legislatively to better align stockholders' interests with

1929 those of the executives who are making decisions.  And one

1930 problem I think is the fact that people are urged to take big

1931 risks to maximize short-term pay and bonuses at the expense

1932 of longer term well-being of the company and the

1933 stockholders.  And I think one of the reasons that happens is

1934 because people think that when they make bad decisions they

1935 are going to still get bailed out.

1936       I want to talk to you briefly about a memo that was

1937 written at Lehman Brothers by the compensation committee on

1938   September 11th.  That is 4 days before Lehman Brothers

1939   declared bankruptcy.  And it is a recommendation from Lehman

1940   Brothers to the compensation committee of the board.  It

1941   discusses a number of the separation payments, including one

1942   of them to Andy Morton.  Mr. Morton was the head of Lehman's

1943   global head of fixed income.  He was the person who was

1944   responsible for the leveraged investments that were a good

1945   part of what drove Lehman into bankruptcy.  Another was Mr.

1946   Benoit Savoret, a member of Lehman's executive committee.  It

1947   says that they both had been involuntarily terminated.  They

1948   have been fired.  And so you would think, you know, when you

1949   get fired, bad performance, no pay.  But it goes on to

1950   recommend giving them cash separation payments combined of

1951   $20 million, 16.2 million for Mr. Savoret, and 2 million for

1952   Mr. Morton.  And it calls--in the memo they describe these as

1953   special payments.  And they come up with a rationale for

1954   providing these kind of last minute bailouts to these guys.

1955   Is this part of the mentality of sort of an insatiable, you

1956   know, insatiable sense of entitlement on Wall Street that

1957   suggests that even when you do badly someone is going to be

1958   there to bail you out?

1959        Ms. MINOW.  I couldn't possibly have put it as well as

1960   you did, Congressman.  That was perfect.  I had to laugh,

1961   though, when you said this was a good case study.  I wish it

1962   was the only case study.  It is just replicated over and over

1963  and over and over again.  And you are right, they are so

1964  completely out of touch, that on the upside they always say I

1965  am responsible, it is a market test, I am Michael Jordan, I

1966  am A-Rod, I deserve this.  But on the downside, it is never

1967  their fault.  And if we don't have better shareholder

1968  oversight, if we don't have better market response to them,

1969  then they are never going to get the message.

1970       Mr. VAN HOLLEN.  Let me just read to you their

1971  description of why these are apparently justified in their

1972  view.  They say these executives are, quote, very experienced

1973  senior executives with valuable business skills and

1974  experience that the corporation may wish to leverage.  Again,

1975  these are the guys who helped obviously contribute to the

1976  downfall.  It also says, and I quote, the corporation would

1977  face significant impacts if the terminating executives should

1978  fail to provide appropriate transition assistance, solicit

1979  clients, or engage in other behavior that may be detrimental

1980  to the corporation.

1981       Now that you have heard the rationale, does that pass

1982  the common sense smell test?

1983       Ms. MINOW.  Not at all.  But this goes back to a point

1984  that I made earlier where I said I take a very hard line.  I

1985  don't believe they should be allowed to sell their stock

1986  until after they leave their company.  And if that doesn't

1987  motivate them adequately, then they are not paying attention.

1988  But I think it is hilarious that they use the term

1989  "leverage." Because one thing we have learned about this

1990  company is they didn't understand leverage at all.

1991      Mr. VAN HOLLEN. Mr. Smith, as somebody who entrusts

1992  these individuals with lots of decisions, is that the kind of

1993  pay for performance that you would want to see?

1994      Mr. SMITH. Certainly not, and certainly highlights our

1995  desire to have say on pay as a shareholder, to be able to be

1996  in the board room or have a representative in the board room

1997  that actually is looking at those payments and saying how is

1998  this going to bring value to my shareholders? And I would

1999  contend that there is categorically no way those payments

2000  could bring value to the shareholders.

2001      Mr. VAN HOLLEN. Thank you. Thank you, Mr. Chairman.

2002      Chairman WAXMAN. Thank you, Mr. Van Hollen.

2003      Mr. Cooper?

2004      Mr. COOPER. Thank you, Mr. Chairman. I would like to

2005  explore the role of excessive leverage in the downfall of

2006  Lehman Brothers. Professor Zingales starts his whole

2007  testimony by saying the downfall of Lehman Brothers is the

2008  result of its very aggressive leveraging policy. Could you

2009  help the public understand how leverage magnifies gains or

2010  losses?

2011      Mr. ZINGALES. Sure. Let me make sure that you all

2012  understand what we are talking about. When you buy a house

2013  and you put a 10 percent down, you are basically buying

2014  something that is worth 10 times what you put down.  So your

2015  ratio is 10 to 1.  That is the leverage.  What Lehman was

2016  doing was 30 to 1.  So it was much more than what most people

2017  do in buying their house.  And this exposes you enormously to

2018  fluctuations in the value of the underlying assets.

2019      As I said in my testimony, if you have a drop of only

2020  3.3 percent in the value of your assets, your entire value of

2021  the equity is wiped out, and so you are insolvent.  And this

2022  system, as was mentioned by the chairman, is very rewarding

2023  on the upside, so that when things go well you have very high

2024  sort of earnings, you have very high return on capital, and

2025  this allows you to pay very large bonuses.  On the downside,

2026  this is very dramatic.  And so especially given sort of the

2027  situation in which we were, the risk on their assets and the

2028  risk of a downturn in the housing market, it was not sort of

2029  not foreseeable, I think their leverage policies should be

2030  much more cautious.  But also it is not only the leverage, it

2031  is also how much of that leverage is short term.  Because

2032  when you have a problem, the short term lenders can leave you

2033  and create a situation of insolvency, which is exactly where

2034  Lehman was.  And before the beginning of the crisis, 50

2035  percent of that leverage was made of short-term debt, which

2036  is very profitable in the short term because short-term debt,

2037  especially in the current environment, is much cheaper than

2038  long-term debt but exposes more to a risk of a run, and that

2039  is exactly what happened.

2040      Mr. COOPER.  So Lehman was levered I think at the start

2041  of Dick Fuld's tenure at 27 times, and then it went to 37

2042  times.  And now that there are no major investment banks left

2043  on Wall Street, even Goldman Sachs and Morgan as I understand

2044  are down to about 10 times leverage.  So it has been a

2045  substantial contraction of the leverage ratios.

2046      Dr. Wallison, could you tell us what you think an

2047  appropriate leverage ratio would be for investment banks,

2048  assuming we have major investment banks return to America one

2049  day?

2050      Mr. WALLISON.  I don't think, Congressman, that you can

2051  give a number.  It depends very much on the risks that they

2052  are encountering in the market at a given time.  It is

2053  obvious, it should have been obvious to the management of

2054  Lehman and any other management that when things can't

2055  continue, as Herb Stein once said, they will stop.  And as a

2056  result, a provision should have been made for a downturn.

2057  But there isn't a number that is the right number under any

2058  circumstances.

2059      Mr. COOPER.  But it is sounding today, since no firm,

2060  major firm left in the country is leveraged at 30 to 40 to 1,

2061  that that must be too much, right?  Another point about

2062  leverage is the fulcrum on which the lever rests, the

HGO280.000                                          PAGE       93

2063  capital, the equity that Lehman thought it had on its balance

2064  sheet.  And Professor Zingales, didn't you say in your

2065  testimony on the day they went bankrupt it supposedly had $26

2066  billion on its balance sheet?

2067 | RPTS KESTERSON

2068 | DCMN MAGMER

2069 | [12:02 p.m.]

2070 |     Mr. ZINGALES.  Yes, $26 billion in book value of equity.

2071 | The problem is the market value of the equity depends

2072 | crucially on the value of its assets; and the uncertainty

2073 | that was created in the value of the assets in part by lack

2074 | of transparency, in part by the liquidity crisis made it

2075 | impossible to know exactly what it was.  And when the market

2076 | becomes nervous, that is the moment they pull out their

2077 | money.  That is the reason why adding a lot of short-term

2078 | debt is not wise, because in that situation you can have

2079 | literally a bank run, and that is what happened.

2080 |     Mr. COOPER.  So a contraction in credit because of

2081 | excessive leverage crushed $26 billion in capital, which we

2082 | question the value of anyway, because, apparently,

2083 | mark-to-market rules didn't necessarily apply quickly enough

2084 | in this case.  And I think that leaves a lot of folks back

2085 | home wondering whether this is Wall Street or a casino.

2086 |     Because, as you conclude your testimony, Professor

2087 | Zingales, you say Lehman did not find itself in this

2088 | situation by accident.  It was the unlucky draw of a

2089 | consciously made gamble.  That doesn't sound like an

2090 | investment.  That sounds like gambling.

2091 |     Mr. ZINGALES.  I think, as I said in my testimony, they

2092  were too aggressive in their leverage; and that is the reason

2093  why I think they should not have been bought out.  My major

2094  concern is that if we bail out everybody who took those

2095  gambles, we are going to create incentives to have more

2096  gambles down the line.  And I think that there is a strategy

2097  on Wall Street to sort of take a lot of gambles on the

2098  outside and then walk away when things don't work out.  And

2099  if you don't get punished when things don't work out,

2100  everybody will play that gamble over and over again.  So I

2101  think we have to be very careful on what we do now, because I

2102  think that what we are doing now will define incentives for a

2103  generation to come.

2104       Chairman WAXMAN.  Will the gentleman yield?  Just for me

2105  to point out that the regulation of commercial banks is that

2106  the leverage is no more than four to one.  So I guess

2107  every--all the banks are now commercial banks.  But there is

2108  a spelling out of it--of a leverage number.

2109       The next person to question would be Mr. Sarbanes.

2110       Mr. SARBANES.  Thank you, Mr. Chairman.

2111       Of course, we have all alluded to the fact that there is

2112  a lot of people who are angry out here in the country.  I

2113  expect that when we are done with these five hearings they

2114  are going to be a lot angrier, because they had deep

2115  suspicion about this culture of greed and recklessness on

2116  Wall Street.  Now they are going to have plenty of proof

2117 positive of it once we are done with these hearings.

2118     I don't think there is any surprise to be found in the

2119 huge either golden parachute packages or compensation or

2120 salaries that these folks got used to thinking they should

2121 have.  When you look at the amount of money they are playing

2122 with--and I use the phrase "play with" rather than "manage"

2123 because that's where it seems things seemed to get.  So you

2124 put it in that context, and they lose all perspective.  They

2125 are not living really in the same world that everybody else

2126 is living when they are dealing with these kinds of dollars

2127 under these sorts of conditions.

2128     And I have got to go back to what Congressman Higgins

2129 was asking about before.  Because if you're Richard Fuld, I

2130 mean, how do you lose all commonsense?  I'm looking at these

2131 statements that he made.  Late in the game, like right before

2132 this thing falls apart, our global franchise and brand

2133 name--our brand have never been stronger.  In June of 2008,

2134 still in this year, our capital liquidity positions have

2135 never been stronger.  This is a no-win statement from him.

2136 Because either he has lost all perspective and is completely

2137 clueless in a statement like that or he is quite savvy but he

2138 is deceiving people affirmatively.

2139     You could pull anybody out of any coffeehouse anywhere

2140 in this country who are small businessmen and you could lay

2141 out for them the basic metrics of what was happening to this

2142    company at that moment in time and they would say, are you

2143    kidding me?  Are you kidding me that this was a strong

2144    position?  I mean, anyone would recognize that.

2145        So here is my question.  How does this happen?  Talk to

2146    me a little bit about the culture, the external culture--in

2147    other words, if you're Richard Fuld, you've got your

2148    company's culture that you're dealing with, and then you have

2149    got the larger culture.  So what happens that makes him lose

2150    such perspective?  Or, if you want to look at it another way,

2151    think he can get away with this kind of public pronouncement.

2152     Is it the parties you're going to?  Is it the fact that the

2153    analyst division of your own company suddenly evaporates and

2154    stops doing its job?  I mean, what is happening to get you to

2155    this point?  Anybody.  Yes.

2156        Mr. WESCOTT.  Let me take the first cut at this.

2157        Think of the--you're having a monthly management meeting

2158    of your management team, you have the heads of your profit

2159    units there, and you're giving--if you're the CEO, you're

2160    giving them their profit targets, let's say, for the quarter.

2161     This trading desk, you're expected to have $100 million of

2162    profit; that trading desk, $50 million; and so on.  In the

2163    room, you have the corporate risk officer; and these

2164    companies--all of the investment banks have risk officers.

2165    Their job is to be looking at the financial developments, at

2166    the trends of housing prices, subprime loans and so on.  And

2167   when you're sitting around the table, the profit managers are

2168   explaining what their prospects are for hitting that profit

2169   target.

2170       Presumably, the risk officers there are saying, we are

2171   getting kind of nervous here, because we're now pushing the

2172   envelope in this area.  I think maybe we need to cut back the

2173   profit target for that--let's say, that trading activity or

2174   whatever activity, because it is starting to feel risky.

2175       Ultimately, that is what the CEO is being paid for.  He

2176   is being paid for that judgment, hearing the debate that is

2177   going on.  And probably in many of these cases, the risk

2178   officers were not speaking up quite loudly enough.

2179       Ms. MINOW.  Mr. Sarbanes, I always say when I look at

2180   boards of directors, more than being a financial analyst,

2181   more than being a lawyer, I'm an anthropologist.  Because I

2182   think you have to look at kind of the anthropology of the

2183   board room.  And when you have got a CEO who picks his board

2184   to make sure that it is a bunch of retirees who barely know

2185   what a derivative is and have a risk committee that meets

2186   only twice in a year, you have kind of an emperor's new

2187   clothes problem.  Nobody wants to tell him the truth, and he

2188   intentionally surrounds himself with people who are

2189   complicit.

2190       If you look at the part of my testimony where I talk

2191   about the related party transactions, these are people who