**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
--------------------------------------------------------------- x
In re:                           :
                               :
LEHMAN BROTHERS SECURITIES   :     09 MD 2017 (LAK)
AND ERISA LITIGATION         :
                               :
This document applies to:        :
                               :
*In re Lehman Brothers Mortgage-Backed Securities*  :
*Litigation*, No. 08-CV-6762 (LAK)      :
--------------------------------------------------------------- x

## MEMORANDUM OF LAW IN SUPPORT OF THE INDIVIDUAL DEFENDANTS' MOTION TO DISMISS

SIMPSON THACHER & BARTLETT LLP
425 Lexington Avenue
New York, New York  10017
(212) 455-2000
*Attorneys for Defendants Lana Franks,*
*Edward Grieb, Richard McKinney, Kristine*
*Smith, James J. Sullivan, Samir Tabet and*
*Mark L. Zusy*

## TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................. 1

BACKGROUND .................................................................................................... 3

    A.    The Certificates And The Offering Documents ....................................... 3

    B.    The Allegations .................................................................................. 6

    C.    Risk Disclosures In The Offering Documents ........................................ 8

ARGUMENT ...................................................................................................... 11

I.      THE LEGAL STANDARD ............................................................................ 11

II.     PLAINTIFFS LACK STANDING WITH RESPECT TO 85 OF THE 94
       OFFERINGS CHALLENGED IN THE COMPLAINT BECAUSE THEY DID
       NOT PURCHASE CERTIFICATES SOLD IN THOSE OFFERINGS ....................... 12

III.    THE COMPLAINT FAILS TO ALLEGE MATERIAL OMISSIONS
       RELATING TO THE MORTGAGE LOAN UNDERWRITING GUIDELINES ........ 16

    A.    The Offering Documents Were Not Materially Misleading Because The
         Allegedly Undisclosed Information Concerning Underwriting Practices Was
         Disclosed ......................................................................................... 17

    B.    Plaintiffs Fail To Allege That Individual Defendants Had Actual Knowledge
         Of Exceptions To Underwriting Guidelines .......................................... 20

    C.    The Complaint Fails To Allege Facts Showing That Any Material
         Information Was Omitted ................................................................... 22

IV.   THE ALLEGATIONS ABOUT OMISSIONS CONCERNING THE RATINGS
       AGENCIES' ALLEGED ROLE IN STRUCTURING THE LOAN POOLS
       UNDERLYING THE CERTIFICATES FAIL TO STATE A CLAIM ....................... 26

V.    THERE WAS NO DUTY TO DISCLOSE POTENTIAL CONFLICTS OF
       INTEREST BETWEEN RATINGS AGENCIES AND ISSUERS, WHICH
       WERE PUBLICLY KNOWN LONG BEFORE THE CERTIFICATES WERE
       ISSUED ..................................................................................................... 28

VI.   PLAINTIFFS' HINDSIGHT ALLEGATION CONCERNING THE RATINGS
       AGENCIES' JUDGMENTS ABOUT FUTURE DEFAULTS AND LOSSES
       FAILS TO STATE A CLAIM........................................................................ 30

VII.    PLAINTIFFS' CLAIMS ARE BARRED BY THE STATUTE OF LIMITATIONS.................................................................................................. 34

    A.    Plaintiffs Were On Notice Of Originator Lending Practices That Allegedly Violated The Underwriting Guidelines Prior To June 19, 2007............................. 35

        1.    The Complaint Itself Relies on Material Published Prior to June 19, 2007 ........................................................................................................ 35

        2.    Congressional Hearings Predating June 19, 2007 Put Plaintiffs on Notice of the Originators' Alleged Lending Practices ................................ 36

        3.    Major Newspaper Reports Predating June 19, 2007 Put Plaintiffs on Notice of the Originators' Alleged Lending Practices ................................ 38

    B.    Plaintiffs Were On Notice Of Storm Warnings That The Ratings Agency Models Were Allegedly Deficient Prior To June 19, 2007 .................................... 39

    C.    Plaintiffs Were On Notice Of The Ratings Agencies' Role In Structuring The Mortgage Pools Underlying The Certificates Prior To June 19, 2007............. 40

    D.    Plaintiffs Were On Notice Of Alleged Ratings Agency Conflicts Of Interest Prior To June 19, 2007 ......................................................................................... 41

VIII.    PLAINTIFFS' SECTION 15 CLAIMS SHOULD BE DISMISSED ............................. 42

CONCLUSION .................................................................................................................. 45

# TABLE OF AUTHORITIES

## Cases

*Alaska Electrical Pension Fund v. Lehman Brothers Holdings Inc., et. al.,* No. 08-CV-10686 (S.D.N.Y. June 19, 2008)............................................................................ 34

*Allen v. Wright*, 468 U.S. 737, 104 S.Ct. 3315 (1984) ............................................... 12

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87 (2d Cir. 2007)................................ 12, 22

*Barnes v. Osofsky*, 373 F.2d 269 (2d Cir. 1967) ....................................................... 13, 15

*Basic, Inc v. Levinson*, 485 U.S. 224, 108 S.Ct. 978 (1988) ........................................... 28

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 127 S.Ct. 1955 (2007).............................11, 22, 26

*Compuware Corp. v. Moody's Investors Servs., Inc.,* 499 F.3d 520 (6th Cir. 2007) ................... 31

*Coronel v. Quanta Capital Holdings Ltd.*, No. 07 CIV 1405 (RPP), 2009 WL 174656 (S.D.N.Y. Jan. 26, 2009)............................................................................ 33

*DeMaria v. Andersen,* 318 F.3d 170 (2d Cir. 2003) ........................................................13, 23, 26

*Dodds v. Cigna Sec., Inc.*, 12 F.3d 346 (2d Cir. 1993) .............................................34, 36, 39, 42

*ECA, Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187 (2d Cir. 2009)........................................................................... 44

*Finkel v. Stratton Corp.*, 962 F. 2d 169 (2d Cir. 1992) ............................................... 14

*Garber v. Legg Mason, Inc.*, 537 F. Supp. 2d 597 (S.D.N.Y. 2008) ...................20, 21, 23, 24, 26

*Grand Lodge of Pa. v. Peters*, 550 F. Supp. 2d 1363 (M.D. Fla. 2008) ................................. 15

*Greebel v. FTP Software, Inc.*, 939 F. Supp. 57 (D. Mass. 1996) ...................................... 13

*Guenther v. Cooper Life Sciences, Inc.*, 759 F. Supp. 1437 (N.D. Cal. 1990) .......................... 15

*Hoffman v. UBS-AG*, 591 F. Supp. 2d 522 (S.D.N.Y. 2008)...........................................12, 15, 16

*I. Meyer Pincus & Assocs., P.C. v. Oppenheimer & Co. Inc.*, 936 F.2d 759 (2d Cir. 1991) ........................................................................................ 23

*In re Duke Energy Corp., Sec. Litig.*, 282 F. Supp. 2d 158 (S.D.N.Y. 2003) ........................... 23

*In re First Union Corp. Sec. Litig.*, 128 F. Supp. 2d 871 (W.D.N.C. 2001) ................................. 4

*In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 352 F. Supp. 2d 429 (S.D.N.Y. 2005) .....27, 32, 33

*In re Global Crossing, Ltd. Sec. Litig.*, 313 F. Supp. 2d 189 (S.D.N.Y. 2003)................13, 15, 32

*In re JP Morgan Chase Sec. Litig.*, 363 F. Supp. 2d 595 (S.D.N.Y. 2005) ......................... 21, 32

*In re Merrill Lynch & Co.,* 273 F. Supp. 2d 351 (S.D.N.Y. 2003) ..................................12, 34, 36

*In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.*, 272 F. Supp. 2d 243
    (S.D.N.Y. 2003)...................................................................................... 30, 42

*In re Merrill Lynch & Co., Inc. Sec., Derivative and Erisa Litig.*, 597 F. Supp. 2d 427
    (S.D.N.Y. 2009)............................................................................................ 12

*In re N2K Inc. Sec. Litig.*, 82 F. Supp. 2d 204 (S.D.N.Y. 2000), *aff'd*, 202 F.3d 81 (2d
    Cir. 2000) ..................................................................................................... 20

*In re Progress Energy, Inc. Sec. Litig.,* 371 F. Supp. 2d 548 (S.D.N.Y. 2005)........................... 28

*In re Turkcell Iletisim Hizmetler, A.S. Sec. Litig.,* 202 F. Supp. 2d 8 (S.D.N.Y. 2001)............... 22

*In re Twinlab Corp. Sec. Litig.*, 103 F. Supp. 2d 193 (E.D.N.Y. 2000)..................................... 43

*In re Ultrafem Inc. Sec. Litig.,* 91 F. Supp. 2d 678 (S.D.N.Y. 2000).......................................... 39

*Iqbal v. Hasty*, 490 F.3d 143 (2d Cir. 2007) .............................................................................. 12

*La. Mun. Police Employees Ret. Sys. v. Merrill Lynch & Co.*, No. 08 Civ. 9063 (JSR)
    (S.D.N.Y. Feb. 19, 2009) ......................................................................... 14, 15

*McMahan & Co. v. Wherehouse Entertainment, Inc.*, 900 F.2d 576 (2d Cir. 1990) ................... 23

*Olkey v. Hyperion 1999 Term Trust, Inc.*, 98 F.3d 2 (2d Cir. 1996)...............................20, 32, 33

*Panther Partners, Inc. v. Ikanos Commc'ns, Inc.*, 538 F. Supp. 2d 662 (S.D.N.Y.
    2008) .............................................................................................20, 22, 33

*Patane v. Clark*, 508 F.3d 106 (2d Cir. 2007) .............................................................12, 26, 43

*Pinter v. Dahl*, 486 U.S. 622, 108 S.Ct. 2063 (1988) ............................................................... 44

*Rombach v. Chang*, 355 F.3d 164 (2d Cir. 2004) ..................................................................... 20

*Schoenhaut v. Am. Sensors, Inc.*, 986 F. Supp. 785 (S.D.N.Y. 1997).......................................... 23

*Staehr v. Hartford Fin. Servs. Group, Inc.,* 547 F.3d 406 (2d Cir. 2008) ........................34, 36, 41

*TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 96 S.Ct. 2126 (1976)............................... 23, 27

*Warth v. Seldin*, 422 U.S. 490, 95 S.Ct. 2197 (1975) ............................................................... 12

*Wilson v. Saintine Exploration and Drilling Corp.*, 872 F.2d 1124 (2d Cir. 1989)..................... 44

*Zirkin v. Quanta Capital Holdings Ltd. Inc.*, No. 07 Civ. 851 (RPP), 2009 WL
   185940 (S.D.N.Y. Jan. 23, 2009) ................................................................ 33

*Zucker v. Quasha*, 891 F. Supp. 1010 (D.N.J. 1995), *aff'd*, 82 F.3d 408 (3d Cir. 1996)............. 33

## Statutes

15 U.S.C. § 77m ................................................................................................... 34

15 U.S.C. § 77z-1(a)(2)(A) ................................................................................... 13

17 C.F.R. § 229.512............................................................................................... 14

17 C.F.R. §§ 229.1100 – 229.1123 ....................................................................... 20

17 C.F.R. § 229.1101.......................................................................................... 3, 4

17 C.F.R. § 229.1111...................................................................................... 20, 25

17 C.F.R. § 230.415............................................................................................... 14

17 C.F.R. § 240.12b-2 ........................................................................................... 43

42 Fed. Reg. 42024................................................................................................ 31

Sarbanes-Oxley Act, Pub. L. No. 107-204, § 702(b), 116 Stat. 745 (2002)........... 28

Section 11 of the Securities Act of 1933 (15 U.S.C. § 77k)................................. passim

Section 12(a)(2) of the Securities Act of 1933 .................................................... 6, 44

Section 15 of the Act Securities Act of 1933....................................................... 6, 44

## Other Authorities

Strauss, Rakoff, et al., *Administrative Law* (9th ed. 1995)....................................... 12

## PRELIMINARY STATEMENT

As the world now knows, the bursting of the housing bubble and subsequent collapse of the mortgage industry triggered an unprecedented financial crisis resulting in billions of dollars in losses for all segments of the financial markets.  The market for mortgage-backed securities, such as those allegedly purchased by Plaintiffs, has been one of the hardest hit.  In response to this historic market collapse, Plaintiffs and other purchasers of mortgage-backed securities have filed suit against any and all firms that participated in the mortgage origination and securitization businesses, together with their officers and directors.

The Complaint in this action asserts claims under the Securities Act against the Individual Defendants, who are former officers and directors of Structured Asset Securities Corporation ("SASCo"), a Lehman-affiliated special purpose entity that filed the offering documents at issue; the trusts holding the loans underlying the securities (the "Issuing Trusts"); and two ratings agencies that assigned credit ratings to the securities.  Plaintiffs allege that the offering documents were materially misleading because they omitted to disclose (i) mortgage originators' alleged non-compliance with the mortgage underwriting guidelines described in the offering documents; (ii) the role of the ratings agencies in allegedly "structuring" securities by using their models to determine the pools of loans and credit enhancements; (iii) that the models failed to adequately assess the risks associated with the securities; and (iv) that the ratings agencies were allegedly conflicted because they were paid by the issuer to rate the securities.

Defendants Lana Franks, Edward Grieb, Richard McKinney, Kristine Smith, James J. Sullivan, Samir Tabet and Mark L. Zusy respectfully submit this memorandum of law, together with the Declaration of Mary Elizabeth McGarry, sworn to on April 27, 2009, in support of their motion to dismiss the Consolidated Securities Class Action Complaint (the "Complaint").  The Complaint should be dismissed for three independent reasons:

1

First, Plaintiffs lack standing to assert the overwhelming majority of claims in the Complaint.  Plaintiffs purport to bring this action on behalf of purchasers of securities in 94 different offerings over the course of two years, but themselves allegedly purchased securities in only nine of those offerings.

Second, none of the alleged omissions is actionable.  Much of the information that Plaintiffs allege was omitted from the offering documents was, in fact, explicitly disclosed, including that the loan originators had discretion to depart from their underwriting guidelines "in the ordinary course of business" and that a "significant number" of loans may have been extended with such exceptions.  Moreover, under applicable SEC regulations, the Individual Defendants had no duty to disclose departures from the underwriting guidelines unless they had actual knowledge of them, which Plaintiffs do not allege.  Plaintiffs also have not alleged facts showing that any departures from underwriting guidelines were material, particularly in light of the credit enhancements that provided protection against mortgage defaults to purchasers such as Plaintiffs, and that are responsible for these Plaintiffs continuing to this day to receive the expected income stream from their investments.  Finally, the other allegedly omitted information was immaterial and/or was well known to the public and therefore did not need to be disclosed – for example, the potential conflicts of interest to which ratings agencies are subject.

Third, the Complaint asserts claims that are barred by the statute of limitations applicable to Securities Act claims, which requires a plaintiff to sue within one year after the untrue statement or the omission was discovered or should have been discovered by the exercise of reasonable diligence.  Voluminous public materials of which the Court may take judicial notice – including materials quoted in the Complaint – demonstrate that Plaintiffs knew or should have

known of the allegedly omitted information on which they base their claims more than a year

before the first suit in this consolidated action was filed.

For all of these reasons, as well as those set forth in the motions filed by defendants

The McGraw-Hill Companies and Moody's Investors Service, Inc. the Complaint should be

dismissed.

## BACKGROUND

### A.    The Certificates And The Offering Documents

Plaintiffs allege that they purchased certain mortgage-backed pass-through

certificates (the "Certificates") securitized and sold by Lehman Brothers Holdings Inc. ("LBHI")

and its affiliates.  Ex. 1 (hereinafter "Compl.") ¶¶ 4-6.[1]  The Certificates are a type of asset-backed

security, and therefore their value – unlike the value of corporate equity or debt securities – does

not depend on the future profitability of the issuer.  Rather, returns on an asset-backed security

depend on the cash produced by the security's underlying assets and the "credit enhancements"

written into the terms of the security, as explained by the SEC's definition:

> Asset-backed security means a security that is primarily serviced by [i] the cash
> flows of a discrete pool of receivables or other financial assets, either fixed or
> revolving, that by their terms convert into cash within a finite time period, plus [ii]
> any rights or other assets designed to assure the servicing or timely distributions of
> proceeds to the security holders . . . .

17 C.F.R. § 229.1101(c)(1).

In the case of mortgage-backed securities, the underlying asset, *i.e.*, the "discrete

pool of receivables," is a pool of mortgage loans or other asset-backed securities for which the

underlying assets are mortgage loans.  Investors who purchase mortgage-backed securities buy the

right to receive periodic distributions of principal and interest collected on the underlying pools of

---

[1]    All citations to "Ex. __" refer to exhibits to the Declaration of Mary Elizabeth McGarry.

mortgage loans. *See* Compl. ¶ 9. The value of the securities is derived in part from the future cash flows generated by those pools of mortgage loans. *See, e.g., In re First Union Corp. Sec. Litig.*, 128 F. Supp. 2d 871, 894 n.22 (W.D.N.C. 2001) ("Valuation of mortgage-backed securities . . . is an exercise in estimating expected future cash flows.").

The other component of the Certificates' value – the "rights . . . designed to assure the . . . timely distributions of proceeds" to holders of the Certificates, 17 C.F.R. § 229.1101(c)(1) – were various forms of "credit enhancement" described in the Prospectus Supplement for each offering. Compl. ¶ 15, n.3. One form of credit enhancement described in every Prospectus Supplement is "over-collateralization." Compl. ¶ 15, n.3. Over-collateralization means that the underlying pool of loans will be sufficiently large so that the expected cash flows from the loans exceed the expected monthly distributions to Certificate holders. *Id.* Another form of credit enhancement is the subordination of some Certificates to others secured by the same asset pool. *Id.* If there is a shortfall in the cash flows from the pool of loans, losses will be allocated to more junior, subordinated Certificates (which are generally assigned lower credit ratings), while more senior Certificates may continue to receive full distributions. *Id.* Certificate holders may also benefit from third-party insurance policies that guarantee the monthly distributions despite any potential defaults on the underlying loans and interest rate swap agreements that protect the Certificate holders against the risk of fluctuations in interest rates. *See, e.g.,* Ex. 2 (SASCo, Prospectus Supplement Lehman XS Trust, Series 2005-7N (Form 424B5) (Dec. 1, 2005)), at S-56, S-107-10.

The mortgage loans underlying the Certificates were made by a number of different banks, mortgage companies and brokers (the "Originators"). Compl. ¶¶ 5-6. After origination, the loans were purchased by LBHI, the "Sponsor" of the Certificates. Compl. ¶¶ 6, 28. LBHI

4

aggregated the loans into specific pools that would underlie each series of Certificates and then

transferred the pools of loans to a special purpose entity, SASCo, the "Depositor" of the loans.

Compl. ¶ 26.  The Individual Defendants were directors and officers of SASCo.  Compl. ¶¶ 4, 37-

43.  SASCo then conveyed each pool to the ultimate holder of the assets, the "issuing entity," here

a common law trust of which the purchasers of the Certificates are the beneficiaries and a financial

institution is the trustee.[2]  Compl. ¶¶ 26, 32.

        The Complaint is addressed to over $93 billion of Certificates in 94 separate

offerings from 2005 through July 2007.  Compl. ¶¶ 30-31.  Although the Complaint attempts to

create the misimpression that most of the loans securitized in the 94 offerings were subprime, only

*three* of the 94 offerings (and none of the offerings in which Plaintiffs participated) were subprime

offerings.  Compl. ¶¶  3, 68.

        The Certificates were registered with the SEC under two shelf registration

statements with base prospectuses filed by SASCo in August 2005 (amended in September 2005)

and August 2006, pursuant to Rule 415 of the Securities Act.  Ex. 5 (SASCo, Registration

Statement (Form S-3/A) (Sept. 16, 2005)) (the "2005 Shelf Registration Statement"); Ex. 6

(SASCo, Registration Statement (Form S-3/A) (Aug. 8, 2006)) (the "2006 Shelf Registration

Statement").  For each offering, SASCo also filed a pricing supplement to the relevant base

prospectus (the "Prospectus Supplements").  Each Prospectus Supplement amended or updated

both the original Shelf Registration Statement to which it was traceable and provided detailed

information about the particular pools of mortgages underlying the series of Certificates offered

---

[2]    The issuing entity also became the assignee of representations and warranties made by the Originator,
including, for example, a representation and warranty that "[t]he origination and collection practices
used with respect to each mortgage note and mortgage have been in all material respects legal, proper
and prudent, and all escrow amounts have been collected in compliance with state and federal law."
Ex. 3 (SASCo, Prospectus Supplement Lehman XS Trust Mortgage Pass-Through Certificates, Series
2006-2N (Form 424B5) (Feb. 1, 2006)) at S-96.

pursuant to that Prospectus Supplement, including the types of loans and the descriptions of underwriting guidelines for those loans that were provided by the Originators. The Shelf Registration Statements and Prospectus Supplements are hereinafter collectively referred to as the "Offering Documents."

Significantly, in part due to the various forms of credit enhancement built into the Certificates, ***Plaintiffs are unable to allege any reduction or interruption in their distribution payments, because there have been none,*** even though delinquencies and defaults on the underlying loans have risen sharply. Ex. 4 (Screen Captures from Bloomberg showing distributions on Certificates to date); Compl. ¶¶ 8, 22-24. In fact, Plaintiffs may never suffer any ***actual losses***.

### B.    The Allegations

The Complaint asserts claims against all defendants under Section 11 of the Securities Act of 1933 (the "Securities Act" or "Act"). The Complaint also asserts claims under Section 12(a)(2) of the Act against the Issuing Trusts and two ratings agencies, Moody's Investors Service, Inc. ("Moody's") and Standard & Poor's ("S&P") (together, "Ratings Agencies" or "Agencies"), that assigned credit ratings to the Certificates and under Section 15 of the Act against the Individual Defendants and Ratings Agencies. All of the claims are based on allegations that the Offering Documents contained the following omissions:

- "the Originators of the underlying Certificate loans failed to comply with the general loan underwriting guidelines in the Registration Statements, including an examination of borrower creditworthiness and performance and review of standardized appraisals of the mortgaged properties," Compl. ¶ 18; *see also id.* ¶¶ 69-150, 185-266;

- "the Ratings Agencies – and not [Lehman Brothers Holdings Inc.] as stated in the Offering Documents – largely determined the composition of the securitized pool of loans, the amount and form of the Certificates' levels of credit enhancement before the Certificates were created and the Ratings Agencies were 'engaged' to rate the securities," *id.* ¶ 18; *see also id.* ¶¶ 172-78, 272-73;

- "there were material undisclosed conflicts of interest between Lehman and the Ratings Agencies, including as reflected in the undisclosed rating shopping practices, which incentivized the Ratings Agencies to understate the appropriate Certificate credit enhancement and inflate the Certificate ratings," *id.* ¶ 18; *see also id.* ¶¶ 17, 168-171, 272-273; and

- "the amount of credit enhancement provided to the Certificates was inadequate to support the AAA and investment grade ratings because those amounts were determined primarily by Ratings Agencies' models which had not been updated in a timely manner," *id.* ¶ 18; *see also id.* ¶¶ 16, 53, 58, 159-167, 268-71.[3]

The majority of the Complaint is devoted to allegations concerning the Originators' purported violations of their respective underwriting guidelines. The Complaint alleges that the Originators – which Plaintiffs have not sued here – were incentivized to ignore bad loans to maintain volume because, "[i]n securitizations where the originator immediately sells the loan to an investment bank, it does not have the same economic interest in establishing borrower creditworthiness or a fair appraisal value of the property in the loan origination process." Compl. ¶ 47. As a result, the Complaint alleges, the Originators "systematically disregarded the mortgage loan underwriting guidelines described in the Offering Documents." Compl. ¶ 11. The Complaint contains pages of allegations concerning lending practices of individual Originators, but the specific conduct alleged to be in violation of the Originators' respective underwriting guidelines falls into four categories:

1) **Appraisal Standards.** "[A]ppraisal standards were largely disregarded," ¶ 188, and appraisers were "pressured to appraise to certain levels." ¶ 207. *See also* ¶¶ 202, 207, 209, 217, 252.

---

[3]    The Complaint also alleges that the defendants cannot establish a "due diligence" affirmative defense to the Securities Act claims because they "failed to conduct adequate due diligence with respect to the Originators' compliance with the stated underwriting guidelines." Compl. ¶ 18; *see also id.* ¶¶ 152-58; *see generally* 15 U.S.C. § 77k(b), (c). Because the Complaint fails to state a claim that any material information was omitted from the Offering Documents, Plaintiffs' allegations concerning a potential due diligence affirmative defense are moot, and this memorandum therefore does not address the due diligence-related allegations.

2) **Disregard of Credit History.**  "[I]ssues of borrower creditworthiness were largely disregarded" and Originators "routinely disregarded their own guidelines for these no-doc loans and offered them to many loan applicants with little or no inquiry into their credit history."  ¶¶ 186, 197.  *See also* ¶¶ 191, 200, 211, 214, 219, 221, 233, 244, 248, 250, 264, 266.

3) **Failure to Monitor Brokers.**  "[The originators'] background check of correspondents was extremely limited and opened the door for the acquisition of mortgage loans from brokers who did very little, if any, verification of the borrower's ability to repay the loans." ¶ 193.  *See also* ¶¶ 195, 205, 219, 236, 246, 254, 259, 261.

4) **Predatory Lending.**  Certain originators' lending practices "were used to exploit lower income borrowers by charging excessive fees and higher rates."  ¶ 241.  *See also* ¶ 239.

C.    **Risk Disclosures in the Offering Documents**

The Offering Documents contain robust risk disclosures that describe with specificity numerous facts and circumstances that could result in losses for purchasers of the Certificates, including housing market conditions that have subsequently occurred and triggered both the current economic crisis and the alleged decline in the market value of the Certificates. Each Base Prospectus contains over 30 pages of discussion of the "Risk Factors" applicable to all Certificates issued thereunder.  *See* Ex. 5 at 3-33; Ex. 6 at 15-46.  In addition, the Prospectus Supplement for each of the offerings also includes a detailed discussion of the specific "Risk Factors" for the Certificates offered pursuant thereto, as well as a detailed description of the particular mortgage pools underlying each tranche of the securities and their credit enhancements for that tranche.  *See, e.g.,* Ex. 3 at S-21-39, S-B-1-18.

As a result of the complexity of the Certificates and the significant risks associated with them, each of the Offering Documents contained a warning that only sophisticated investors with a thorough understanding of the securities and their risks should invest:

> An investment in these types of securities involves *significant risks and uncertainties* and *should only be considered by sophisticated investors* who, either alone or with their financial, tax and legal advisors, have *carefully analyzed the mortgage loans and the securities and understand the risks*.  In addition, investors should not purchase classes of securities that are susceptible to special risks, . . .

8

unless the investors have the financial ability to absorb a substantial loss on their investment. Ex. 5 at 33 (emphasis added).

These Risk Factor disclosures, about which the Complaint is silent, provide most, if not all, of the information that Plaintiffs allege was omitted from the Offering Documents. For example, Plaintiffs' principal allegation is that the Offering Documents failed to disclose that Originators frequently deviated from the underwriting guidelines described therein. However, the 2006 Shelf Registration Statement discloses that Originators had discretion to depart from their general guidelines:

> Although mortgage originators generally underwrite mortgage loans in accordance with their pre-determined loan underwriting guidelines, *from time to time and in the ordinary course of business, originators will make exceptions to these guidelines*. Loans originated with exceptions may result in *a higher number of delinquencies and loss severities* than loans originated in strict compliance with the designated underwriting guidelines.

Ex. 6 at 17 (emphasis added). And individual Prospectus Supplements disclosed that a "significant number" of loans may be made with underwriting exceptions. *See, e.g.,* Ex. 7 (SASCo, Prospectus Supplement Structured Adjustable Rate Mortgage Loan Trust Mortgage Pass-Through Certificates, Series 2006-1(Form 424B5) (Feb. 1, 2006)), at S-60.

Among the other risk disclosures that go unmentioned in the Complaint are the following (with emphasis added):

- **Liberal Underwriting Guidelines.** "[T]he mortgage loans may have been originated according to underwriting guidelines that do not comply with Fannie Mae or Freddie Mac guidelines . . . [and such loans] may be likely to experience rates of delinquency, foreclosure and bankruptcy that are higher, and that may be substantially higher, than those experienced by mortgage loans underwritten in accordance with higher standards." Ex. 5 at 3-4.

- **Decline in Housing Prices.** "We cannot assure you that the values of the mortgaged properties have remained or will remain at levels in effect on the dates of origination of the related mortgage loans. These risks are magnified with respect to adjustable rate mortgage loans, interest-only mortgage loans, loans with balloon payments and loans which provide for negative amortization. . . ." If the "rapid increase in house prices ceases or housing prices decline," borrowers may not be able to sell their properties "for an amount equal to or

9

greater than the unpaid principal balance of their loans, especially in the case of negative amortization mortgage loans," and these events "*could cause borrowers to default on their mortgage loans*." This eventuality "*could adversely affect the yield on your securities*. Depending upon the type of security purchased and the price paid, *the adverse yield effect could be substantial*." Ex. 5 at 4, 9.

- **Appraisal Standards.** The quality of the appraisals obtained on each prospective mortgaged property may "vary widely in accuracy and consistency," and, because the appraiser is often selected by the mortgage loan broker or lender, the appraiser "*may feel pressure from that broker or lender to provide an appraisal in the amount necessary to enable the originator to make the loan whether or not the value of the property justifies such an appraised value*." As a result, "[i]naccurate or inflated appraisals may result in an increase in the number and severity of losses on the mortgage loans." Ex. 5 at 5.

- **"No Doc" Loans.** "There has recently been an increasing number of mortgage loans originated under 'stated income' programs, which permit an applicant to qualify for a mortgage loan based upon monthly income as stated on the mortgage loan application, if the applicant meets certain criteria. *Typically no verification of monthly income is required* under stated income programs, which *increases the risk that these borrowers have overstated their income and may not have sufficient income to make their monthly mortgage loan payments*." Ex. 5 at 5.

- **Failure to Monitor Brokers.** Mortgage loans originated by "*unaffiliated brokers or correspondents* rather than directly by the originators themselves," including "a substantial number of subprime mortgage loans . . . *may experience a higher rate of delinquency and default*." Ex. 5 at 5.

- **Fraud by Borrowers.** "Fraud committed in the origination process may *increase delinquencies and defaults* on the mortgage loans." Ex. 5 at 5.

- **Adjustable Rate Mortgages.** The pool of mortgage loans may include "significant concentrations of [adjustable rate mortgage loans], which present *special default and prepayment risks*." Ex. 5 at 7.

- **Limits on Historical Performance Data.** Adjustable rate mortgage loans and interest only mortgage loans "have only been originated in any significant numbers in relatively recent years", so "there is *no material statistical information* showing payment and default trends under a variety of macroeconomic conditions," and it is therefore "*unclear how these mortgage loan products will perform in a declining housing market*." Ex. 5 at 10.

- **Credit Enhancement May Be Insufficient.** Credit enhancement is "*limited in nature* and *may be insufficient* to cover all losses" on the mortgage loans and, if that occurs, "security *holders will likely incur losses* and may never receive all of their principal payments." Ex. 5 at 19.

10

- **Predatory Lending.** If certain loans were originated "in violation of predatory or abusive lending laws and the seller does not repurchase the affected loans and pay any related liabilities, *securityholders could incur losses*." Ex. 5 at 31.

The Offering Documents stated that Certificates would not be issued unless the applicable Rating Agency gave the credit rating specified for a particular class of Certificate. Ex. 5 at 37. Far from suggesting that a rating constituted a guarantee of payments, the Offering Documents explained:

- **Nature of Ratings as Expressions of Judgment.** The ratings on the securities "depend primarily on an assessment by the rating agencies of the mortgage loans and other assets of the trust fund, any credit enhancement and the ability of the servicers and the master servicer to service the loans." Ex. 5 at 32.

- **Nature of Ratings as Predictions.** "The ratings of the securities by the rating agencies . . . address the *likelihood* of receipt by holders of securities of distributions in the amount of scheduled payments on the mortgage loans . . . . Ratings are not recommendations to buy, sell or hold the securities." Ex. 5 at 32 (emphasis added).

- **Certificates May Be Downgraded.** A rating may be "changed or withdrawn at any time by the assigning rating agency." Ex. 5 at 32.

These robust, detailed disclosures fully informed investors of the potential risks associated with the Certificates and rebut any claim that the Offering Documents were materially misleading.

## ARGUMENT

### I.    THE LEGAL STANDARD

On a Rule 12(b)(6) motion to dismiss, the Court determines whether Plaintiffs have met their "obligation to provide the grounds of [their] entitlement to relief." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555, 127 S.Ct. 1955, 1964-65 (2007) (internal quotes omitted). To meet that obligation, the Complaint must allege "enough factual matter (taken as true) to suggest" facts that would entitle Plaintiffs to relief. *Id.* at 556, 1965. Under the "plausibility standard" of *Twombly*, "a pleader [is obligated] to amplify a claim with some factual allegations in those

contexts where such amplification is needed to render the claim *plausible*." *Iqbal v. Hasty*, 490

F.3d 143, 157-58 (2d Cir. 2007); *see also Patane v. Clark*, 508 F.3d 106, 111-12 (2d Cir. 2007)

(plaintiffs must allege "enough facts to state a claim for relief that is plausible on its face")

(internal quotes omitted). Conclusory allegations do not suffice – rather, Plaintiffs must "raise a

right to relief above the speculative level." *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d

87, 98 (2d Cir. 2007). In ruling on a motion to dismiss, the Court is not limited solely to the

allegations of the Complaint. The Court

> may consider any written instrument attached to the complaint, statements or
> documents incorporated into the complaint by reference, legally required public
> disclosure documents filed with the SEC, and documents possessed by or known to
> the plaintiff and upon which it relied in bringing the suit, and matters subject to
> judicial notice.

*ATSI Commc'ns*, 493 F.3d at 98 (internal citations omitted).

## II.    PLAINTIFFS LACK STANDING WITH RESPECT TO 85 OF THE 94 OFFERINGS CHALLENGED IN THE COMPLAINT BECAUSE THEY DID NOT PURCHASE CERTIFICATES SOLD IN THOSE OFFERINGS

"Standing is the key to the courthouse door." *In re Merrill Lynch & Co., Inc. Sec.,*

*Derivative and Erisa Litig.*, 597 F. Supp. 2d 427, 431 (S.D.N.Y. 2009) (citing Strauss, Rakoff, et

al., *Administrative Law* 1121 (9th ed. 1995)). "In essence the question of standing is whether the

litigant is entitled to have the court decide the merits of the dispute or of particular issues."

*Hoffman v. UBS-AG*, 591 F. Supp. 2d 522, 530 (S.D.N.Y. 2008) (quoting *Warth v. Seldin,* 422

U.S. 490, 498, 95 S.Ct. 2197, 2205 (1975)). Thus, standing is a constitutional requirement. *Id.* In

order to satisfy Article III of the Constitution, a plaintiff must allege "(1) a personal injury, (2) that

is fairly traceable to alleged unlawful conduct, and (3) that is likely to be redressed by the

requested relief." *Id.* at 530 (citing *Allen v. Wright*, 468 U.S. 737, 757, 104 S.Ct. 3315, 3327

(1984)).

Under Section 11 of the Securities Act, a purchaser of securities offered under a

registration statement may sue if "any part of the registration statement . . . contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading." 15 U.S.C. § 77k. The Complaint alleges that "Plaintiffs **and other Class members** acquired the Certificates pursuant and/or traceable to the Registration Statements." Compl. ¶ 292 (emphasis added). This allegation is insufficient. To have standing to assert a claim on behalf of a class of purchasers under Section 11 of the Securities Act, "at least one **named plaintiff** . . . must have purchased shares traceable to the challenged offering." *In re Global Crossing, Ltd. Sec. Litig.*, 313 F. Supp. 2d 189, 207 (S.D.N.Y. 2003) (emphasis added); *see also Barnes v. Osofsky*, 373 F.2d 269, 273 (2d Cir. 1967). Here, the allegations do not establish that Plaintiffs have standing with respect to the overwhelming majority of the challenged offerings. Plaintiffs purport to bring their claims on behalf of all persons who purchased 94 separate series of Certificates in 94 separate offerings covering 94 different investment pools pursuant to 94 separate Prospectus Supplements. Compl. ¶¶ 2, 30-31. The Complaint, however, alleges that Plaintiffs collectively have purchased Certificates in only **nine** of these 94 offerings. Compl. ¶¶ 22-24.[4]

---

[4]    In fact, Plaintiffs have only filed valid PSLRA certifications with respect to **six** offerings. Local 302 and 612 of the International Union of Operating Engineers – Employers Construction Industry Retirement Trust ("Operating Engineers") filed two certifications: one signed and stating that the Operating Engineers purchased Certificates in three offerings and an **unsigned** amended certification stating that the Operating Engineers purchased Certificates in six offerings. The amended certification does not comply with the PSLRA, which expressly requires "a sworn certification, which shall be personally signed by such plaintiff and filed with the complaint." 15 U.S.C. § 77z-1(a)(2)(A). Accordingly, Plaintiffs lack standing with respect to the three offerings that are only identified on the invalid amended certification. *See, e.g., Greebel v. FTP Software, Inc.*, 939 F. Supp. 57, 60 (D. Mass. 1996) (failure of named plaintiff to file certification is "fatal to maintenance of the putative class action"). Moreover, it is evident from the PSLRA certifications that Plaintiffs purchased certain of their Certificates in the secondary market many months after the relevant offering. Claims with respect to those Certificates should be dismissed because only purchasers in an offering made pursuant to an allegedly misleading registration statement have standing to sue under Section 11. Individual Defendants recognize that the Second Circuit has held that secondary market purchasers have standing under Section 11, *see DeMaria v. Andersen,* 318 F.3d 170 (2d Cir. 2003), and respectfully preserve this issue for appeal.

The fact that Plaintiffs purchased Certificates pursuant to Prospectus Supplements that incorporated the Shelf Registration Statements does not give them standing to assert claims on behalf of the purchasers of securities issued pursuant to different Prospectus Supplements that also incorporated those Shelf Registration Statements, as Judge Rakoff recently held in dismissing a complaint for lack of standing.  *See* Ex. 8 (Transcript of Oral Argument at 62, *La. Mun. Police Employees Ret. Sys. v. Merrill Lynch & Co.*, No. 08 Civ. 9063 (JSR) (S.D.N.Y. Feb. 19, 2009)). The Complaint alleges that each series of Certificates was issued "[p]ursuant to the Registration Statements, accompanying Prospectuses and later-filed Prospectus Supplements . . . incorporated into the Registration Statements."  Compl. ¶ 2.  However it is the Registration Statements that are incorporated into the later-filed Prospectus Supplements, and the Certificates are issued pursuant to those Prospectus Supplements.[5]  Each Prospectus Supplement constituted a post-effective amendment to the original Shelf Registration Statement.  17 C.F.R. § 229.512(a)(1); *see Finkel*, 962 F.2d at 174.  Critically, SEC regulations provide that "for the purpose of determining any liability under the Securities Act of 1933, each . . . post-effective amendment [to a shelf registration statement] shall be deemed to be ***a new registration statement*** relating to the securities offered therein."  17 C.F.R. § 229.512(a)(2) (emphasis added).  Thus, for purposes of claims under the Securities Act, each of the 94 offerings is subject to a separate "registration statement" consisting of the original Shelf Registration and Prospectus and the applicable

---

[5]    The Shelf Registration Statements were filed pursuant to Rule 415 of the Securities Act for registration of securities to be offered to the public "on a continuous or delayed basis."  17 C.F.R. 230.415.  As described by the Second Circuit, an issuer of securities under a "shelf registration" is required to file an amendment to the original prospectus to include additional material information about the offered securities that was not available at the time the shelf registration and prospectus were filed.  *See Finkel v. Stratton Corp.*, 962 F.2d 169, 174 (2d Cir. 1992); *see also* 17 C.F.R. § 229.512(a)(1).  Accordingly, in connection with each offering of Certificates at issue, the Depositor filed a Prospectus Supplement that provided information unique to that offering, including "the underwriting guidelines used by the principal originators of the loan pool securitized in that offering." Compl. ¶ 10.

Prospectus Supplement.

Accordingly, Plaintiffs can only assert claims with respect to the "registration statements" applicable to the nine offerings in which they allegedly purchased Certificates. *See* Ex. 8 at 62; *Barnes*, 373 F.2d at 273 ("[A]n action under § 11 may be maintained 'only by one who comes within a narrow class of persons, *i.e.*, those who purchased securities that are the direct subject of the prospectus and registration statement.'") (internal citation omitted); *In re Global Crossing*, 313 F. Supp. 2d 189 at 207 ("at least one named plaintiff . . . must have purchased shares traceable to the challenged offering"); *Grand Lodge of Pa. v. Peters*, 550 F. Supp. 2d 1363, 1376 (M.D. Fla. 2008); *Hoffman*, 591 F. Supp. 2d at 530-31; *Guenther v. Cooper Life Sciences, Inc.*, 759 F. Supp. 1437, 1441 (N.D. Cal. 1990) ("a cause of action under section 11 is available only to purchasers of 'stock actually issued in the offering for which the plaintiff claims there was a false or otherwise misleading registration statement'") (internal citation omitted).

More fundamentally, Plaintiffs cannot satisfy the constitutional injury requirement with respect to offerings in which they did not participate. The series of Certificates issued in the 94 offerings were all different securities, backed by different pools of loans that, in many cases, were underwritten by different Originators. Compl. ¶¶ 5, 189-267. The vast majority of Plaintiffs' allegations relate to disclosures in the Prospectus Supplements about the specific loans underlying the Certificates that are the subject of those specific Prospectus Supplements, including the underwriting practices of the various Originators. *See* Compl. ¶¶ 189-267. Importantly, four of the nine originators discussed in the Complaint – BNC, First Franklin, EquiFirst and Aegis – did not originate any of the loans underlying any of the Certificates allegedly purchased by Plaintiffs.[6] Plaintiffs have failed to plead, and cannot plead, that they "personally [ ] suffered

---

[6]    *Compare* Compl. ¶¶ 22-25 *with* Ex. 2 at S-3; Ex. 3 at S-3; Ex. 7 at S-4, S-59; Ex. 9 at S-3; Ex. 10 at S-3; Ex. 11 at S-4; Ex. 12 at S-4; Ex. 13 at S-4; Ex. 14 at S-4.

some actual or threatened injury" in connection with the 85 offerings in which they did not

purchase Certificates.  *See Hoffman*, 591 F. Supp. 2d at 530 (internal quotations omitted).

## III.    THE COMPLAINT FAILS TO ALLEGE MATERIAL OMISSIONS RELATING TO THE MORTGAGE LOAN UNDERWRITING GUIDELINES

The central allegation of the Complaint is that the Offering Documents

> fail[ed] to disclose that . . . the Originators of the underlying Certificate loans failed to comply with the general loan underwriting guidelines in the Registration Statements, including an examination of borrower creditworthiness and performance and review of standardized appraisals of the mortgaged properties.

Compl. ¶ 18.  Plaintiffs devote 44 pages of the Complaint to various news articles and other public

sources that purportedly show various ways in which the Originators' lending practices deviated

from their underwriting guidelines.  Compl. ¶¶ 69-184.  Despite this prolixity, the Complaint fails

to state a claim under Section 11 with respect to alleged violations of the underwriting guidelines

for at least three reasons:

- **First,** the Originators' underwriting guidelines were just that: guidelines, not rigid rules. The Offering Documents state that the Originators had discretion to make exceptions to their general guidelines "in the ordinary course of business" and might do so with respect to a "significant number" of the loans, which could result in higher levels of delinquencies. Indeed, there was also specific disclosure of the nature of the mortgages, documentation practices, borrowers' credit histories, appraisals and attendant risks allegedly omitted from the Offering Documents.  Given these clear disclosures, the Offering Documents were not materially misleading.

- **Second,** under the applicable SEC regulation, issuers only had a duty to disclose exceptions from the Originators' underwriting guidelines "to the extent known" and Plaintiffs do not allege that the Individual Defendants had actual knowledge of exceptions that they failed to disclose.

- **Third,** even if the Individual Defendants had a duty to disclose unknown exceptions from the underwriting guidelines, the Complaint fails to allege facts showing that any loans issued as underwriting exceptions were actually included in the mortgage pools underlying the Certificates or, if they were, that the disclosure of such loans would have altered the "total mix" of information available to investors, which included substantial quantitative detail about the loans underlying the Certificates and the clear statements noted above that underwriting exceptions frequently occurred, as well as other robust risk disclosures.

A.      **The Offering Documents Were Not Materially Misleading Because The Allegedly Undisclosed Information Concerning Underwriting Practices Was Disclosed**

The Offering Documents repeatedly disclosed – both as "Risk Factors" **and** in discussing the Originators' underwriting guidelines – that the Originators had discretion to depart from those general guidelines.  For example, the base prospectus accompanying the 2006 Shelf Registration Statement identifies Originator underwriting discretion as a specific "Risk Factor" for the Certificates:

> Although mortgage originators generally underwrite mortgage loans in accordance with their pre-determined loan underwriting guidelines, *from time to time and in the ordinary course of business, originators will make exceptions to these guidelines*.  Loans originated with exceptions may result in *a higher number of delinquencies and loss severities* than loans originated in strict compliance with the designated underwriting guidelines.

Ex. 6 at 17 (emphasis added).  The base prospectus accompanying the 2005 Shelf Registration Statement includes a similar "Risk Factor":

> A significant portion of the mortgage loans in the trust fund may have been classified in these relatively low (*i.e.*, relatively higher risk) credit categories.  In addition, if specified in the related prospectus supplement**, *some of the mortgage loans may also represent either one or more exceptions to the applicable underwriting guidelines.***

Ex. 5 at 3, "Risk Factors" (emphasis added).  Consistent with this disclosure, each of the Prospectus Supplements issued under the 2005 Shelf Registration Statement disclosed that the Originators may make exceptions to their general underwriting guidelines.  For example:

> On a case-by-case basis, the underwriter may determine that, based upon compensating factors, a prospective borrower not strictly qualifying under the applicable underwriting guidelines warrants an underwriting exception. . . . **A *significant number* of the Mortgage Loans may represent underwriting exceptions.**

Ex. 7 at S-60 (emphasis added).[7]

---

[7]    The relevant disclosure language in the Prospectus Supplements for the nine offerings in which Plaintiffs allegedly purchased Certificates is excerpted in Annex A attached hereto.

In particular, one of the Offering Documents disclosed that the Originators were becoming "more aggressive[]" in exercising discretion to deviate from underwriting guidelines, which could result in a higher rate of delinquencies and disclosures than past practices:

> Underwriter Discretion. During the second calendar quarter of 2005, [the Originator] initiated a program designed to encourage its mortgage loan underwriting staff to prudently, but ***more aggressively, utilize the underwriting discretion already granted to them*** under [the Originator's] underwriting guidelines and policies . . . . ***There can be no assurance that the successful implementation of this initiative will not result in an increase in the incidence of delinquencies and foreclosures, or the severity of losses, among mortgage loans underwritten in accordance with the updated philosophy,*** as compared to mortgage loans underwritten prior to the commencement of the initiative.

Ex. 7 at S-75 (emphasis added).

With respect to specific practices of Originators, a comparison of the Offering Documents to the Complaint reveals that the allegedly omitted information was, in fact, disclosed:

| Alleged Omission | Actual Disclosures |
|---|---|
| Appraisals:<br><br>"[A]ppraisal standards were largely disregarded and the values of the underlying mortgage properties were in many instances inflated in the loan underwriting process." ¶ 188. The appraisals "were not performed and reviewed in line with the standards implied, but instead, were cursory in nature," ¶ 252, because "brokers had no incentive to obtain legitimate appraisals . . . ." ¶ 261. *See also* ¶¶ 202, 209, 217, 246.<br><br>In addition, appraisers were "pressured to appraise to certain levels" and "if they appraised under certain levels they would not be hired again." ¶ 207. | "During the mortgage loan underwriting process, appraisals are generally obtained on each prospective mortgaged property. The quality of these appraisals may vary widely in accuracy and consistency. Because in most cases the appraiser is selected by the mortgage loan broker or lender, the appraiser may feel pressure from that broker or lender to provide an appraisal in the amount necessary to enable the originator to make the loan whether or not the value of the property justifies such an appraised value. Inaccurate or inflated appraisals may result in an increase in the number and severity of losses on the mortgage loans." Ex. 5 at 5. |

18

| | |
|---|---|
| <u>Failure to Monitor Brokers/Correspondents</u>:<br><br>"[The originators'] background check of correspondents was extremely limited and opened the door for the acquisition of mortgage loans from brokers who did very little, if any, verification of the borrower's ability to repay the loans." ¶ 193.  *See also* ¶¶ 195, 259. | Mortgage loans originated by "unaffiliated brokers or correspondents rather than directly by the originators themselves," including subprime loans, might experience increased rates of delinquency and default on the mortgage loans.  Ex. 5 at 5. |
| <u>Stated Income/No Doc Loans</u>:<br><br>"[S]tated income amounts far in excess of those reasonable for the borrowers' employment were regularly ignored in order to approve loans under the stated income and stated asset documentation programs." ¶ 221.  *See also* ¶¶ 200, 211, 219, 233, 236, 244, 250, 266. | Under stated income programs, monthly income is typically not verified, so borrowers "may not have sufficient income to make their monthly . . . payments," thus causing "increased delinquencies and defaults on the mortgage loans."  Ex. 5 at 5. |
| <u>Disregard of Credit History</u>:<br><br>"[The originators] and independent third-party underwriters were not nearly as thorough in getting documentation from or about borrowers as the [registration] statement[s] implied." ¶ 191. The originators "routinely disregarded their own guidelines for these no-doc loans and offered them to many loan applicants with little or no inquiry into their credit history." ¶ 197.  *See also* ¶¶ 186, 248, 264. | "Loans may be underwritten under a 'limited documentation' or 'no documentation' program. With respect to those Loans, minimal investigation into the borrowers' credit history and income profile is undertaken by the originator and the Loans may be underwritten primarily on the basis of an appraisal of the Mortgaged Property and Loan-to-Value Ratio on origination."  Ex. 5 at 71. |
| <u>Predatory Lending</u>:<br><br>Certain originators' lending practices "were used to exploit lower income borrowers by charging excessive fees and higher rates." ¶ 241. | Certain loans may be originated "in violation of predatory or abusive lending laws and [if] the seller does not repurchase the affected loans and pay any related liabilities, securityholders could incur losses."  Ex. 5 at 31. |

Because the Offering Documents disclosed the allegedly omitted information, *i.e.*, the fact that Originators had discretion to depart from their general underwriting guidelines, the frequency with which they might do so, and the specific Originator practices to which Plaintiffs

attribute the loss in value of their Certificates, Plaintiffs cannot state a claim under Section 11 of the Securities Act.  *See, e.g., Rombach v. Chang*, 355 F.3d 164, 175 (2d Cir. 2004) (plaintiffs' "allegations . . . are undercut by the fact that the offering documents . . . did not omit such information . . .");  *cf. Olkey v. Hyperion 1999 Term Trust, Inc.*, 98 F.3d 2, 7 (2d Cir. 1996).

### B.    Plaintiffs Fail To Allege That Individual Defendants Had Actual Knowledge Of Exceptions To Underwriting Guidelines

With respect to a claim under the Securities Act, "[t]he relevant SEC regulations answer the question as to what material facts are required to be stated in an issuer's registration statement and prospectus."  *In re N2K Inc. Sec. Litig.*, 82 F. Supp. 2d 204, 207 (S.D.N.Y. 2000), *aff'd,* 202 F.3d 81 (2d Cir. 2000); *see also Panther Partners, Inc. v. Ikanos Commc'ns, Inc.*, 538 F. Supp. 2d 662 (S.D.N.Y. 2008) ("Whether a duty to disclose exists [under Section 11] depends largely on the itemized disclosures required by the securities laws and the regulations promulgated thereunder.").  Here, the SEC has issued regulations that provide a comprehensive guide to drafters of registration statements for mortgage-backed securities.  Codified as "Regulation AB" at 17 C.F.R. §§ 229.1100 – 229.1123, these regulations instruct issuers as to what information must be included in a registration statement for mortgage-backed securities.

Section 1111 of Regulation AB addresses underwriting guidelines and requires disclosure of the following:

> A description of the solicitation, credit-granting or underwriting criteria used to originate or purchase the pool assets, including, ***to the extent known**, any changes in such criteria and the extent to which such policies and criteria are or could be overridden.*

17 C.F.R. § 229.1111(a)(3) (emphasis added).  Thus, the Individual Defendants only had a duty to disclose the Originators' departures from their general underwriting criteria to the extent they had actual knowledge of them.  *See Garber v. Legg Mason, Inc.*, 537 F. Supp. 2d 597, 614 (S.D.N.Y. 2008) (applying comparable SEC regulation).  Although defendants knew (and disclosed) that

underwriting exceptions *may* occur, the Complaint does not allege that the Individual Defendants, SASCo or Lehman had actual knowledge of departures from the general underwriting guidelines that they failed to disclose.

On the contrary, the Complaint affirmatively pleads that the individual defendants did *not* have such knowledge:  it scrupulously disclaims any intent to plead fraud.  Compl. ¶ 3.  As the Court has recognized, if a complaint alleges that the defendants knew of material information that they failed to disclose, it "sounds in fraud" and is subject to the heightened pleading standards of Rule 9(b).  Ex. 15 (Transcript of Oral Argument at 24-25, *In re Lehman Brothers Sec. and ERISA Litig.*, No. 09-MD-2017 (Jan. 8, 2009))  ("[A complaint] sounds in fraud if there is an allegation that it was false and misleading, and that the proponent of it knew it at the time or acted in reckless disregard of its truth.  That's where the line is between 9(b) and not 9(b).").  And if the Complaint here were to allege that the actual knowledge standard necessary to escape the safe harbor of Section 1111 of Regulation AB, Rule 9(b) would both apply and necessitate dismissal because the Complaint does not allege with particularity the existence, extent or nature of any underwriting exceptions actually included in the loan pools underlying the Certificates.  *See In re JP Morgan Chase Sec. Litig.*, 363 F. Supp. 2d 595, 626, 631 (S.D.N.Y. 2005) (dismissing complaint pursuant to Rule 9(b) because it provided "no particular factual allegations demonstrating the materiality" of any omitted information).

In all events, because Plaintiffs have not pleaded the requisite knowledge, the claim that the Offering Documents were materially misleading by allegedly failing to disclose Originator departures from their underwriting guidelines must be dismissed.  *See Garber*, 537 F. Supp. 2d at 614 (S.D.N.Y. 2008) (dismissing Section 11 claim where regulation required disclosure of "known trends" and plaintiff did not allege that defendants had knowledge of omitted

information); *Panther Partners*, 538 F. Supp. 2d at 673 (same); *In re Turkcell Iletisim Hizmetler, A.S. Sec. Litig.,* 202 F. Supp. 2d 8, 13 (S.D.N.Y. 2001) (same).

      **C.**      **The Complaint Fails To Allege Facts Showing That Any Material Information Was Omitted**

      Even if there were a duty to disclose exceptions to the Originators' underwriting guidelines absent actual knowledge thereof, Plaintiffs have not alleged facts showing that any undisclosed departures from the Originators' general underwriting guidelines were material to a reasonable investor's decision to purchase the Certificates.

      The Complaint contains numerous allegations quoting news reports and other information purporting to describe *general* lending practices of the various Originators.  *See, e.g.,* Compl. ¶¶ 132-33, 141.  Nowhere, however, do Plaintiffs allege that the Originators engaged in those practices in connection with any loans securitized in the Certificates underlying any of the 94 offerings referred to in the Complaint, let alone in any of the nine offerings which Plaintiffs allegedly purchased.  It is *possible*, as disclosed in the Offering Documents, that some loans securitized in the nine offerings in which Plaintiffs purportedly participated were exceptions to the Originators' underwriting guidelines.  But a complaint cannot rest on an assumption or speculation particularly where, as here, some of the Originators whose alleged practices are described in the Complaint did not provide *any* of the mortgage loans for *any* of the pools underlying the Certificates purchased by these Plaintiffs.  Under the standard set forth by the Supreme Court in *Twombly*, Plaintiffs must allege sufficient facts "to raise their right to relief above the speculative level."  *ATSI Commc'ns*, 493 F.3d at 98 (quoting *Twombly*, 550 U.S. at 555, 127 S.Ct. at 1965).  Under *Twombly*, a conclusory allegation that Originators violated their underwriting guidelines with respect to loans underlying the Certificates is insufficient to state a claim.  *Twombly*, 550 U.S. at 555, 127 S.Ct at 1965; *see also ATSI Commc'ns,* 493 F.3d at 98.

Moreover, Plaintiffs have not alleged facts to show that the extent or volume of departures from the underwriting exceptions was material, particularly in the context of all the other information disclosed in the Offering Documents.  In determining whether a registration statement contains a misleading omission, "[t]he central issue . . . is . . . whether defendants' representations, taken together and in context, would have misled a reasonable investor about the nature of the [securities]."  *McMahan & Co. v. Wherehouse Entertainment, Inc.*, 900 F.2d 576, 579 (2d Cir. 1990); *see also I. Meyer Pincus & Assocs., P.C. v. Oppenheimer & Co. Inc.*, 936 F.2d 759, 761 (2d Cir. 1991).  The omitted information is material only if it would alter "the 'total mix' of information made available" to plaintiffs.  *DeMaria*, 318 F.3d at 180 (quoting *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449, 96 S.Ct. 2126, 2132 (1976)).  Absent allegations of facts showing the extent of allegedly improper loans included in the mortgage pools underlying the Certificates, it is impossible for the Court to conclude that any omitted information was material, particularly in light of the clear disclosures that exceptions to the underwriting guidelines might occur in a "significant number" of the underlying loans.  *See Garber*, 537 F. Supp. 2d at 613 (granting motion to dismiss for failure to adequately allege materiality); *In re Duke Energy Corp., Sec. Litig.*, 282 F. Supp. 2d 158, 160 (S.D.N.Y. 2003) (same); *Schoenhaut v. Am. Sensors, Inc.*, 986 F. Supp. 785, 793 (S.D.N.Y. 1997) (same).

The *Garber* case is instructive.  In *Garber*, shareholders of an asset management company sued the company under Section 11, claiming that its registration statements, which disclosed that "key personnel" may leave the firm and that customers may withdraw their funds, should have disclosed that the company was "'experiencing an increase' in broker attrition and customer withdrawals."  537 F. Supp. 2d at 613.  The court dismissed the claims, holding under *Twombly* that the conclusory allegation of a failure to disclose an unquantified increase in lost

personnel and customer withdrawals was insufficient to allege a material omission. *Id.* Like the registration statement in *Garber*, the Offering Documents disclosed the existence of a particular risk (*i.e.*, a "significant number" of underwriting exceptions). Like the plaintiffs in *Garber*, Plaintiffs fail to allege facts showing the extent to which the disclosed risk occurred. In the absence of alleged facts showing the extent to which the Originators' alleged exceptions from their underwriting guidelines impacted the mortgage pools underlying the Certificates, this Court cannot possibly determine whether the alleged underwriting exceptions, in the context of the "total mix" of information disclosed in the Offering Documents, were material to investors.[8]

In addition, the Offering Documents contain an ocean's worth of specific, quantitative information about each asset pool. This detailed data would enable sophisticated investors to analyze the underlying mortgage pools. For example, each Prospectus Supplement has an annex of tables that provides quantitative breakdowns of the mortgage pools in terms of the kinds of loan (fully amortizing, interest-only, etc.), the length of the loans, the interest rates of the loans (with specific descriptions of the terms of variable rates), the loans that have been delinquent in the past, and the geographic distribution of the loans. *See, e.g.,* Ex. 9 (SASCo, Prospectus Lehman XS Trust Mortgage Pass-Through Certificates, Series 2005-5N (Form 424B5) (Nov. 1, 2005)) at S-B-1-27. For example, each Prospectus Supplement contains a table showing how many of the loans were originated based on full documentation from the borrower, how many were originated based on no documentation, and how many were based on something in between.

---

[8]    The *Garber* court also dismissed plaintiffs' allegation that the company failed to disclose that the costs of integrating a newly acquired business had "dramatic[ally] increase[d]." *Id.* According to the Court, the allegations failed "to describe in any way the magnitude of the increase [in costs], the initial projections, or by how much the actual costs exceeded the internal budget" and, thus, "they offer no possibility at all of assessing materiality as a matter of law." *Id.*

The following illustrative table is taken from page S-A-6 of the Lehman XS Trust Series 2006-GP2 Prospectus Supplement (Ex. 11):

```
                           LOAN DOCUMENTATION -- POOL 1

                                                             PERCENTAGE OF
                                                            MORTGAGE LOANS BY
                                     NUMBER OF      TOTAL SCHEDULED   TOTAL SCHEDULED
        LOAN DOCUMENTATION         MORTGAGE LOANS  PRINCIPAL BALANCE  PRINCIPAL BALANCE
------------------------------     --------------  -----------------  -----------------
<S>                                     <C>             <C>                <C>
Full Documentation ...........          103        $ 39,936,148.47        6.37%
Stated Documentation .........        1,188          582,521,590.18       92.91
Stated Income/Stated Assets ..            5            1,862,706.04        0.30
No Income Verification .......            6            2,666,112.68        0.43
                                      -----        ---------------       ------
     Total ....................       1,302        $626,986,557.37       100.00%
                                      =====        ===============       ======
```

The Prospectus Supplements also contain detailed information concerning the "[s]tandardized credit scores of [borrowers] and other information regarding obligor credit quality." 17 C.F.R. § 229.1111(b)(11).  For example, the Lehman XS Trust Series 2006-GP2 Prospectus Supplement contains the following table at S-A-10 (Ex. 11):

```
                           FICO SCORES -- POOL 1

                                                             PERCENTAGE OF
                                     NUMBER OF      TOTAL SCHEDULED   MORTGAGE LOANS BY
                                     MORTGAGE          PRINCIPAL       TOTAL SCHEDULED
      RANGE OF FICO SCORES            LOANS            BALANCE        PRINCIPAL BALANCE
------------------------------       ---------      ---------------  -----------------
621 to 640 ...................           3        $  1,504,837.50          0.24%
641 to 660 ...................          72           36,720,562.89         5.86
661 to 680 ...................         186           94,172,651.56        15.02
681 to 700 ...................         230          116,006,597.48        18.50
701 to 720 ...................         234          115,266,515.87        18.38
721 to 740 ...................         186           85,037,644.80        13.56
741 to 760 ...................         177           82,478,202.20        13.15
761 to 780 ...................         125           60,227,573.93         9.61
781 to 800 ...................          62           23,302,244.83         3.72
801 to 820 ...................          27           12,269,726.31         1.96
                                     -----          ---------------       ------
     Total ...................       1,302        $626,986,557.37        100.00%
                                     =====          ===============       ======

     The weighted average FICO Score is approximately 716.
```

These examples illustrate the wealth of detailed information in the Offering Documents that would allow Plaintiffs and all other purchasers of the Certificates to assess the quality of the underlying mortgage pools.

25

Given the extensive risk disclosures and detailed qualitative **and quantitative** information about the underlying mortgage pools in the Offering Documents, it is hard to imagine that further disclosures about exceptions to the Originators' underwriting guidelines would have altered the "total mix" of information or that omission of such disclosures could have "caused a reasonable investor to overestimate" the security's "future performance potential." *See DeMaria*, 318 F.3d at 181. Rather, "[a] reasonable investor would have . . . relied upon the detailed . . . data included" in the Offering Documents. *Id.* Under *Twombly*, Plaintiffs are not permitted to leave it to the imagination. Plaintiffs must instead plead "enough facts" that the allegation of materiality "is plausible on its face." *Patane*, 508 F.3d at 111-12 (quoting *Twombly*, 550 U.S. at 570, 127 S.Ct at 1974). In this context, that means Plaintiffs must at a minimum plead facts showing that undisclosed underwriting exceptions underlying the Certificates materially increased the risk that the cash flows from the loans would be insufficient to pay distributions to Certificate holders. Because the allegations in the Complaint "offer no possibility at all of assessing materiality as a matter of law," they fail to state a claim. *Garber*, 537 F. Supp at 613.

## IV.    THE ALLEGATIONS ABOUT OMISSIONS CONCERNING THE RATINGS AGENCIES' ALLEGED ROLE IN STRUCTURING THE LOAN POOLS UNDERLYING THE CERTIFICATES FAIL TO STATE A CLAIM

Plaintiffs allege that the Offering Documents made misleading statements about the role of the Ratings Agencies in structuring the loan pools underlying the Certificates and determining the amount of credit enhancement. This fails to state a claim because (i) the allegedly misleading disclosures quoted in the Complaint were accurate and (ii) the allegation is not well-pled. At paragraph 172, the Complaint misleadingly pieces together excerpts from passages in separate sections of the Shelf Registration Statements:

> In the normal course of its securitization program, Lehman Holdings acquires
> Primary Assets from third party originators and through its affiliates. Employees of

26

> Lehman Holdings or its affiliates structure securitization transactions in which the Primary Assets are sold to the depositor.
>
> The ratings on the securities depend primarily on an assessment by the rating agencies of the mortgage loans and other assets of the trust fund, any credit enhancement and the ability of the servicers and the master servicer to service the loans.

Compl. ¶ 172; Ex. 6 at 83, 45.

The first quoted excerpt is taken from a section titled "The Sponsor" on page 83 of the Shelf Registration Statement. *Id.* at 83. The second quoted excerpt is taken from a Risk Factor on credit ratings on page 45. *Id.* at 45. Although the excerpts appear 38 pages apart, the Complaint alleges that they "created the false impression" that the ratings agencies "were only brought in after the Certificates were 'structured' by LBHI." Compl. ¶ 173. However, neither of the quoted excerpts from the Shelf Registration Statements purports to describe the Ratings Agencies' level of involvement in structuring the Certificates, let alone disclaim that they had any role. *Id.* ¶ 172; *see also* Ex. 5 at 32. The alleged "false impression" of the Ratings Agencies' role is an unwarranted inference that the Court is not required to accept. *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 352 F. Supp. 2d 429, 448 (S.D.N.Y. 2005) (on a motion to dismiss, "we are not required to take every inferential leap suggested by plaintiff").

Moreover, Plaintiffs fail to allege any facts that would explain why a reasonable investor would consider it important that LBHI allegedly consulted the Ratings Agencies during the structuring process and received "preliminary rating indications," Compl. ¶ 171, rather than waiting until it had structured the loan pools to obtain Ratings Agency feedback as to the level of credit enhancement that would support the specific ratings desired by investors. *See generally TSC Indus., Inc.*, 426 U.S. at 449, 98 S.Ct. at 2132. The Complaint asserts that the relevant fact for investors and Lehman was the existence of an investment grade rating for the Certificates. Compl. ¶ 14 ("Without the AAA rating, the Certificates had no market . . ."). The Prospectuses

disclosed that issuance of the Certificates was conditioned on receipt of specific ratings from the

Ratings Agencies.  *See, e.g.,* Ex. 2 at 27.  Those ratings could have been achieved, albeit much less

efficiently, by presenting the Certificates to the Ratings Agencies after the loan pools and credit

enhancement were determined and going back to the drawing board if the Ratings Agencies did

not believe the Certificates, as structured, supported the specified rating.  But whether the ratings

resulted from such an inefficient process or a dialogue with the Ratings Agencies while structuring

the pools and credit enhancement is immaterial because the end result – the rating – is the same.

*See generally Basic, Inc v. Levinson*, 485 U.S. 224, 231, 108 S.Ct. 978, 983 (1988).

## V.    THERE WAS NO DUTY TO DISCLOSE POTENTIAL CONFLICTS OF INTEREST BETWEEN RATINGS AGENCIES AND ISSUERS, WHICH WERE PUBLICLY KNOWN LONG BEFORE THE CERTIFICATES WERE ISSUED

''It is well-established law that the securities laws do not require disclosure of

information that is publicly known.''  *In re Progress Energy, Inc. Sec. Litig.,* 371 F. Supp. 2d 548,

552–53 (S.D.N.Y. 2005).  That the Ratings Agencies are paid by issuers to rate securities and,

therefore, there exists the potential for conflicts of interest was publicly known for many years

prior to the issuance of the Certificates.  As reported by *Bloomberg* in May 2007, the Ratings

Agencies "are ***always*** paid by the issuers of the debt they're rating."[9]

Notably, in 2002, the Sarbanes-Oxley Act specifically directed the SEC to study

the Ratings Agencies, including "any conflicts of interest" in their operations.  Pub. L. No. 107-

204, § 702(b), 116 Stat. 745 (2002).  In January 2003, the SEC issued its resulting "Report on the

Role and Function of Credit Rating Agencies in the Operation of the Securities Markets," which

included a section entitled "Conflicts of Interest in the Operation of Credit Rating Agencies."  Ex.

---

[9]    Ex. 32 (Richard Tomlinson & David Evans, *CDO Boom Masks Subprime Losses, Abetted by S&P, Moody's, Fitch*, Bloomberg, May 31, 2007) at 6 (emphasis added).

17 (SEC Report on the Role and Function of Credit Rating Agencies in the Operation of the

Securities Markets (2003)).  The report identified several major problem areas:

> Potential ***conflicts of interest have existed in the credit rating business for many years*** and . . . the Commission has reviewed the impact of certain of these potential conflicts in the past.  Many are of the view, however, that ***the potential conflicts of interest faced by credit rating agencies have increased in recent years*** . . .  *Id.* at 40 (emphasis added).

> In both [1994 and 1997], for example, the Commission solicited comment on the practice of [ratings agencies] charging issuers for ratings, and basing their fees on the size of the transaction.  Among other things, ***concerns had been expressed that a rating agency might be tempted to give a more favorable rating to a large issue because of the large fee, and to encourage the issuer to submit future large issues to the rating agency.*** *Id.* at 40, n.109.

> Concerns have been expressed for a number of years about the potential conflict of interest that arises from the fact that the largest credit rating agencies rely on issuer fees for the vast majority of their revenues. *Id.* at 41 (noting that "[a]bout 90 percent [of Moody's research service revenues] comes from issuers who pay fees for ratings, and about 10 percent comes from [Moody's] research and data services" and "90 percent [of Fitch's revenues] come from issuer fees, and around 10 percent come from subscription services.").

> [T]he dependence of rating agencies on revenues from the companies they rate could induce them to rate issuers more liberally, and temper their diligence in probing for negative information. This potential conflict could be exacerbated by the rating agencies' practice of charging fees based on the size of the issuance, as large issuers could be given inordinate influence with the rating agencies. *Id.* at 41.

   Underscoring the importance of this January 2003 SEC Report, in April 2003, then-

SEC Director and later SEC Commissioner Annette L. Nazareth testified before a House

Subcommittee about the SEC's review of the "conflicts of interest . . . when issuers pay for

ratings," noting that "[a]rguably, the dependence of ratings agencies on revenues from the

companies they rate could induce them to rate issuers more liberally, and temper their diligence in

probing for negative information."[10]

---

[10]  Ex. 18 (*Testimony Concerning Rating the Rating Agencies: The State of Transparency and Competition* by Annette L. Nazareth Director, Division of Market Regulation, U.S. Securities and Exchange Commission, Before the House Subcommittee on Capital Markets, Insurance, and Government

That the Offering Documents do not repeat what was common knowledge in the market is immaterial and fails to state a claim. *See In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.*, 272 F. Supp. 2d 243, 246 (S.D.N.Y. 2003) (dismissing Section 11 claims because the "alleged conflict of interest between brokerage firms, investment bankers and research analysts that underlies the entire complaint was a matter of public knowledge for years before the amazing boom of the market initially rewarded those who disregarded such caveats").

## VI. PLAINTIFFS' HINDSIGHT ALLEGATION CONCERNING THE RATINGS AGENCIES' JUDGMENTS ABOUT FUTURE DEFAULTS AND LOSSES FAILS TO STATE A CLAIM

Plaintiffs allege that the Offering Documents failed to disclose that the Certificates were insufficiently "credit enhance[d]" because there had been a sharp growth in the market for non-traditional adjustable rate mortgages ("ARMs") from 2004-2006 and "the models the Ratings Agencies used to determine the requisite credit enhancement required for the Certificates to be substantially rated AAA had not been sufficiently updated by S&P since 1999 or by Moody's since 2002." Compl. ¶¶ 52-53. This allegation fails to state a claim for four reasons.

First, the Prospectus Supplements recite a simple fact:

It is a condition to the issuance of the Offered Certificates that they have the applicable rating or ratings by [the Ratings Agencies] indicated under "Initial Certificate Ratings" in the table on page S-1.

*See, e.g.,* Ex. 9 at S-95. It is undisputed that each class of Certificates in each offering did, in fact, receive the listed initial rating by the respective Ratings Agency. Thus, there was no misstatement. The Individual Defendants (and the non-party Lehman entities) did not themselves assign a rating to any Certificates, nor are they alleged to have. Rather, they included the ratings to provide investors with the *Ratings Agencies'* opinion, consistent with the public policy

---

Sponsored Enterprises, Committee on Financial Services, April 2, 2003, *available at* http://www.sec.gov/news/testimony/ts040203aln.htm) at 5.

expressed by the SEC favoring disclosure of ratings in registration statements. *See* 42 Fed. Reg.

42024. The disclosure of the rating in the Offering Documents is not actionable.

Second, the Offering Documents contained risk disclosures about "Potential

Inadequacy of Credit Enhancement and Other Support" that detail specific ways in which the

various forms of credit enhancement were "limited in nature and may be insufficient to cover all

losses on the mortgage loans." *See, e.g.,* Ex. 11 at S-22-27. Moreover, the Offering Documents

***specifically identified the lack of historical data on the performance of non-traditional ARMs*** as

a Risk Factor that investors should consider before purchasing Certificates:

> Several types of adjustable payment mortgage loans discussed above, in particular
> "option ARMs" and interest-only mortgage loans, ***have only been originated in***
> ***any significant numbers in relatively recent years***. Consequently, ***there is no***
> ***material statistical information showing payment and default trends under a***
> ***variety of macroeconomic conditions***. In particular, it is unclear how these
> mortgage loan products will perform in a declining housing market or under other
> negative macroeconomic conditions.

Ex. 6 at 22 (emphasis added).

Third, Plaintiffs' allegation is classic fraud by hindsight: an assertion that the

Ratings Agencies' expression of judgment and opinion concerning the likelihood that the holders

would receive all distributions to which they were entitled must have been materially misleading

when made merely because those expressions of judgment and opinion may have turned out to be

less than completely prescient.[11] The Complaint alleges that the Ratings Agencies used their

---

[11]    The Offering Documents state that credit ratings were based on "an assessment by the rating agencies
of the mortgage loans and other assets of the trust fund, any credit enhancement and the ability of the
servicers and the master servicer to service the loans." Ex. 5 at 32. The SEC has stated that "a credit
rating reflects a rating agency's *opinion*, as of a specific date, of the creditworthiness of a particular
company, security, or obligation." Ex. 17 at 5 (emphasis added); *see also Compuware Corp. v.
Moody's Investors Servs., Inc.,* 499 F.3d 520, 528 (6th Cir. 2007) (describing credit rating as "a
predictive opinion, dependent on a subjective and discretionary weighing of complex factors").
Notably, investors such as Plaintiffs who purchased securities in highly rated tranches – and indeed
purchasers of all but the most junior tranches – have not experienced any losses and are still receiving
principal and interest payments, suggesting that the Ratings Agencies' judgments were not so
inaccurate after all. *See* Ex. 4.

models to determine "the *(1) expected default probability* of a loan and *(2) loss that would occur in the event of a default* which, in turn was used to establish the amount of AAA bonds that could be issued against the pool and amount of equity or 'credit enhancement' needed to protect the AAA bonds from experiencing losses . . . ."  Compl. ¶ 164 (emphasis in original).  In other words, the credit ratings given to Certificates based upon the combination of their underlying mortgage pools and various credit enhancements reflected the Agencies' judgments as to how the mortgages would perform in the future, judgments that necessarily incorporated predictions about strength of the housing market and the economy more broadly.  Under the standard applicable to Section 11 claims arising out of forward-looking statements and expressions of judgment or opinion, Plaintiffs have failed to state a claim with respect to the ratings given to the Certificates or the models underlying those ratings.

In order to state a claim under Section 11 of the Securities Act, "the complaint must offer more than allegations that the [loans] failed to perform as predicted . . . . It is in the very nature of securities markets that even the most exhaustively researched predictions are fallible." *Olkey*, 98 F.3d at 8 (internal quotations and citations omitted).  Thus, to allege an actionable omission with respect to a forward-looking statement, a complaint must allege facts "demonstrating the defendant possessed the omitted information *at the time the registration statement became effective* and that the defendant had a duty to disclose that information." *In re JP Morgan Chase Sec. Litig.*, 363 F. Supp. 2d at 635 (emphasis added) (internal quotations and citations omitted); *see also In re Flag Telecom Holdings, Ltd. Sec. Litig.,* 308 F. Supp. 2d 249, 254 (S.D.N.Y. 2004).  A credit rating is an expression of the rating agency's judgment or opinion and cannot be a basis for liability unless that judgment or opinion was not "truly held."  *In re Global Crossing*, 313 F. Supp. 2d at 210 (dismissing Section 11 claim where plaintiff did not allege

adequately that "opinion or belief" was not "truly held").  There is no allegation that the Ratings

Agency defendants did not believe that the Certificates were deserving of the ratings given them,

let alone that the Individual Defendants were aware of any such belief.

Plaintiffs rely on Moody's subsequent announcement that it was revising its model,

as well as recent downgrades in the ratings for the Certificates and increases in mortgage

delinquencies and defaults, as evidence that the models were defective.  But that is precisely the

type of "pleading by hindsight" that courts have routinely rejected.  *See, e.g., Panther Partners*,

538 F. Supp. 2d at 672; *see also Olkey*, 98 F.3d at 8; *Zirkin v. Quanta Capital Holdings Ltd. Inc.*,

No. 07 Civ. 851 (RPP), 2009 WL 185940, at *10 (S.D.N.Y. Jan. 23, 2009); *In re Flag Telecom,*

352 F. Supp. 2d at 447 ("The truth of a statement made in the prospectus is adjudged by the facts

as they existed when the registration statement became effective." (internal citation omitted));

*Zucker v. Quasha*, 891 F. Supp. 1010, 1018 (D.N.J. 1995) (dismissing claims "based entirely on

hindsight"), *aff'd*, 82 F.3d 408 (3d Cir. 1996).

Fourth, the Offering Documents included robust risk disclosures warning that there

was a lack of historical data on the performance of ARMs and that the level of credit enhancement

for the Certificates may be inadequate, as well as numerous other risks that could result in higher

levels of delinquencies, defaults and losses for investors.  *See supra*, at 9-11; *see, e.g.*, Ex. 5 at 3-

33.  Thus, the risk disclosures in the Offering Documents reflect sufficient cautionary language to

protect the Individual Defendants from liability under the "bespeaks caution" doctrine.  *See Olkey*,

98 F.3d at 5 (internal quotations and citation omitted); *Coronel v. Quanta Capital Holdings Ltd.*,

No. 07 CIV 1405 (RPP), 2009 WL 174656, at *18 (S.D.N.Y. Jan. 26, 2009).

## VII.    PLAINTIFFS' CLAIMS ARE BARRED BY THE STATUTE OF LIMITATIONS

Pursuant to 15 U.S.C. § 77m, Plaintiffs' claims must be brought "within one year after the discovery of the untrue statement or the omission, or after such discovery should have been made by the exercise of reasonable diligence." Actual, constructive or inquiry notice of facts giving rise to an action triggers the statute of limitations. *See Dodds v. Cigna Sec., Inc.*, 12 F.3d 346, 350 (2d Cir. 1993).

"Courts in this district routinely dismiss securities fraud claims on statute of limitations grounds at the pleading stage where, as here, the facts necessary to trigger inquiry notice are apparent from the face of the complaint, the documents cited therein and other public documents." *In re Merrill Lynch & Co.,* 273 F. Supp. 2d 351, 378-79 (S.D.N.Y. 2003). The Court may "take judicial notice of the *fact* that press coverage, prior lawsuits, or regulatory filings contained certain information, without regard to the truth of their contents, in deciding whether so-called 'storm warnings' were adequate to trigger inquiry notice as well as other matters." *Staehr v. Hartford Fin. Servs. Group, Inc.,* 547 F.3d 406, 425 (2d Cir. 2008). "Storm warnings" are "circumstances [that] would suggest to an investor of ordinary intelligence the probability that she has been defrauded" and themselves trigger the statute of limitations. *See Dodds*, 12 F.3d at 350. "'Storm warnings' need not detail every aspect of the alleged fraudulent scheme . . . [r]ather a totality-of-the-circumstances analysis applies." *Staehr*, 547 F.3d at 427.

The earliest suit in this consolidated mortgage-backed securities action, *Alaska Electrical Pension Fund v. Lehman Brothers Holdings Inc., et. al.,* No. 08-CV-10686 (S.D.N.Y. June 19, 2008) (the "Alaska Electrical Action"), was filed on June 19, 2008. Thus, the date for determining whether Plaintiffs had notice of their claims is June 19, 2007. As discussed below, a wealth of information publicly available well before June 19, 2007 put Plaintiffs on notice of the lending practices and other facts and circumstances on which they base their claims. Indeed,

34

many of the sources relied upon in the Complaint to plead Defendants' allegedly wrongful

conduct *pre-date* June 19, 2007.  Other pre-June 19, 2007 sources are not cited directly in the

Complaint, but the Complaint relies on comparable information.  Accordingly, even if the

allegations stated actionable claims, those claims would be time barred.

> **A.    Plaintiffs Were On Notice Of Originator Lending Practices That Allegedly Violated The Underwriting Guidelines Prior To June 19, 2007**

Congressional hearings and prominent press reports predating June 19, 2007 –

some of which are quoted in the Complaint – discuss the same lending practices of the Originators

that allegedly violated the underwriting guidelines disclosed in the Offering Documents on which

the Plaintiffs base their allegations.  *See* Compl. ¶¶ 69-158, 185-267.

> **1.    The Complaint Itself Relies on Material Published Prior to June 19, 2007**

The Complaint itself relies on materials predating June 19, 2007 that describe

lending practices that Plaintiffs allege violate the Originators' underwriting guidelines.  For

example:

> In support of the allegation that IndyMac violated its underwriting guidelines in issuing "Alt-A" loans, the Complaint quotes a **March 21, 2007** *MarketOracle* article reporting that "Applicants for [Alt-A] lack proof of income from traditional employment. . . . IndyMac is the king-pin of Alt-A loans . . . . Alt-A loans are also known as 'Stated Income' or 'Liar Loans' since income is taken as fact. No further documentation is required . . . . The problem lies in the type of loans that have been originated. Creative loans using teaser rates, negative amortization and interest-only are causing the chaos . . . . [L]ike all good things - it must end at some point. . . . Resetting of such loans is causing the subprime sector to explode."[12]  Compl. ¶ 231.

> In support of the allegation that First Franklin violated its underwriting guidelines, the Complaint discusses a **March 23, 2007** *New York Times* article that "**reported that First Franklin had lowered its lending standards and applied lax controls in its underwriting practice by customizing underwriting software in order to approve the wrong borrowers** . . . . The article stated in part that 'the push for

---

[12]    Ex. 19 (Michael K. Dawson, *US Housing Market - IndyMac - We are Not a Subprime Lender!*, MarketOracle, Mar. 21, 2007) at 5.

speed influenced some lenders to take shortcuts, ignore the warning signs or focus entirely on credit scores.' First Franklin's proprietary computer system was just one of the methods the article cited as an example of the shortcuts that lenders like them had used to undermine the underwriting process."[13] Compl. ¶ 133 (emphasis added).

In support of the allegation that IndyMac improperly applied its underwriting guidelines for Alt-A loans (which required minimal documentation) to subprime loans, the Complaint quotes a **March 19, 2007** CNNMoney.com article that reported that "*Inside Mortgage Finance*'s Cecala [the publisher of a trade publication] said **he believes underwriting of the loans had grown too loose by the end of last year,** and that even some subprime borrowers were getting so-called low-doc or no-doc loans. **He believes as much as a quarter of Alt.-A loans were going to subprime borrowers**."[14] Compl. ¶ 109 (emphasis added).

In support of the allegation that Wells Fargo violated its underwriting guidelines by engaging in predatory lending, the Complaint refers to an **April 2004** report from the Center for Response Lending entitled "A Review of Wells Fargo's Subprime Lending." *See* Compl. ¶ 141. The report stated that Wells Fargo "evade[d] reporting requirement" on loans and accused it of having "a pattern of under-reporting loans." It further stated that "we have seen Wells Fargo Financial embrace a host of practices that victimize low-wealth consumers."[15]

Obviously, allegations based upon a quotation from or citation to information published prior to June 19, 2007 cannot state a claim. *See Dodds*, 12 F.3d at 350.

### 2. Congressional Hearings Predating June 19, 2007 Put Plaintiffs on Notice of the Originators' Alleged Lending Practices

The Court may take judicial notice of publicly available information, without regard to its truth, in determining whether Plaintiffs had notice of the Originators' alleged lending practices even if that information is outside the four corners of the Complaint. *See Staehr*, 547 F.3d at 425; *In re Merrill Lynch & Co.,* 273 F. Supp. 2d at 351. Here, the alleged lending

---

[13]    Ex. 20 (Lynnley Browning, *The Subprime Loan Machine; Automated Underwriting Software*, N.Y. Times, Mar. 23, 2007) at 2 (emphasis added).

[14]    Ex. 21 (Chris Isidore, '*Liar Loans': Mortgage Woes Beyond Subprime*, CNNMoney.com, Mar. 19, 2007) at 2.

[15]    Ex. 22 (Center for Responsible Lending, *A Review of Wells Fargo's Subprime Lending*, April 2004) at 7, 9.

practices on which Plaintiffs base their claims were discussed at length in public Congressional

hearings during the first five months of 2007.  For example:

On **March 27, 2007**, the House Subcommittee on Financial Institutions and
Consumer Credit convened a hearing on the issue of "Subprime and Predatory
Mortgage Lending."  Experts addressed the "situation" resulting from "the
abandonment of traditional underwriting guidelines."[16]

*Congressman Paul E. Gillmor*:  "In the subprime area, there is no doubt that the
past several years have seen a general loosening of underwriting standards."  Ex. 23
at 3.

*The Honorable Sheila Bair, Chairwoman, Federal Deposit Insurance Corporation*:
"[N]o doubt that securitization has had an impact on the loosened underwriting
standards we've seen by lenders. There's no doubt about it."  Ex. 23 at 45.

*Mr. Michael Calhoun, President, Center for Responsible Lending*:  "[T]he
abandonment of traditional underwriting standards . . . . was the essence of
predatory lending . . . . That's what's developed over the last 4 years . . . It got
worse and worse each quarter."  Ex. 23 at 64.

*Mr. Steven Antonakes, Commissioner of Banks, Massachusetts Division of Banks &
Voting Member, FDIC*: "I would also add however that certainly the securitization
of loans has created incentives for prudent underwriting standards to become lax
and for brokers to push through loans."  Ex. 23 at 46.

On **May 8, 2007**, the House Subcommittee on Financial Institutions and Consumer
Credit held another hearing to gather testimony regarding the risk created by the
mortgage market's "dangerous loan products."[17]  Once again, testimony focused
on "abuses that occurred in underwriting in 2005 and 2006 [that] are now
abundantly clear":

*Mr. Michael Calhoun, President, Center for Responsible Lending*:  "We have
widespread loans with built-in payment shocks, undocumented income, unreliable
appraisals, and underwriting that not only fails to determine the borrower's ability
to repay, but actually ensures the borrowers must continually refinance to keep up
their payments, thereby deleting their home equity, and often facing foreclosure."[18]

---

[16]   Ex. 23 (*Subprime and Predatory Mortgage Lending: New Regulatory Guidance, Current Market
Conditions and Effects on Regulated Financial Institutions Before the H. Subcomm. on Financial
Institutions and Consumer Credit*, 110th Cong. (Mar. 27, 2007)) at 64.

[17]   Ex. 24 (*The Role of the Secondary Market in Subprime Mortgage Lending Before the H. Subcomm. on
Financial Institutions and Consumer Credit Hearing*, 110th Cong. (May 8, 2007) (hereinafter
"*Secondary Market in Subprime Mortgage Lending*") (written statement of Michael Calhoun) at 2.

[18]   Ex. 25 (*Secondary Market in Subprime Mortgage Lending*) (hearing testimony) at 18, 41.

In addition to the two House Subcommittee hearings, the Senate Committee on Banking, Housing and Urban Affairs also held three of its own hearings in early 2007 to address the "minimal underwriting standards" that are "driving and will continue to drive homeowners into foreclosure."[19]  The testimony included the following:

> Professor Kurt Eggert, Professor of Law & Member, Federal Reserve Board Consumer Advisory Council (**Apr. 17, 2007**): "Securitization has encouraged the decline of stringent underwriting . . . This reduction of effective underwriting has been widely blamed for the current turmoil in the subprime markets. . . . *the last two years have witnessed a dramatic shift in loan underwriting*, first a *loosening of standards so that more loans could be made*, and then a recent tightening of underwriting standards."[20]

### 3.  Major Newspaper Reports Predating June 19, 2007 Put Plaintiffs on Notice of the Originators' Alleged Lending Practices

In addition, pre-June 19, 2007 news articles published in prominent periodicals, including the *Washington Post* and the *New York Times*[21] discussed the industry-wide decline in lending standards.  The *Washington Post* reported on **May 17, 2007** that:

> And a detailed inquiry into the situation at . . . subprime lenders suggests that in the feeding frenzy for housing loans, basic quality controls were ignored in the mortgage business . . . . *negotiating with banks to reduce both their due diligence and the number of loans they returned was a "generally accepted practice" that was "always a matter of discussion."*

> "The entire industry, over time, became more lax," [the head of a large Wall Street Bank's mortgage group] said . . . . *The name of the game was definitely volume*."

---

[19]   Ex. 26 (*Preserving the American Dream: Predatory Lending Practices and Home Foreclosures Before the U.S. Senate Committee on Banking, Housing and Urban Affairs,* 110th Cong. (Feb. 7, 2007)) at 2 (written statement of Jean Constantine-Davis, Senior Attorney AARP Foundation) (hereinafter "Preserving the American Dream"); *see also* Ex. 27 (schedule of *Mortgage Market Turmoil: Causes and Consequences Before the U.S. Senate Committee on Banking, Housing and Urban Affairs,* 110th Cong. (Mar. 22, 2007)); Ex. 28 (schedule of *Subprime Mortgage Market Turmoil:  Examining the Role of Securitization Hearing Before the S. Banking, Housing and Urban Affairs Comm.'s Subcomm. on Securities, Insurance and Investments,* 110th Cong. (April 17, 2007)) (hereinafter "*Subprime Mortgage Market Turmoil*").

[20]   Ex. 29 (*Subprime Mortgage Market Turmoil,* (written statement of Prof. Kurt Eggert)) at 15-16. (emphasis added).

[21]   Ex. 20; *see supra* at 36.

Salespeople were supposed to be the "first line of defense" against fraud and bad loans, said Steve Krystofiak, president of the Mortgage Broker Association for Responsible Lending, a group that is trying to retool practices in the industry. But salespeople worked on commission – meaning the more loans they sold, the more bonus money they received. "That's a bad business model. It's absolutely contradictory," Krystofiak said, adding that *he has witnessed salespeople tweak numbers in mortgage applications to ensure that the loans would be approved*. Automated underwriting software that searches for irregularities and possible fraud was also supposed to stop bad loans. But industry professionals say such *programs were easily manipulated*. Meanwhile, some appraisers and underwriters, who examine housing values and other claims made on loan applications, say they *felt pressure from bosses to let questionable loans through*.[22]

*          *          *

These "storm warnings" are qualitatively the same as the press reports and other public sources on which Plaintiffs rely in the Complaint. If the allegations in the Complaint state a claim, the "storm warnings" were more than sufficient to put Plaintiffs on notice of the claim, and, therefore, it must be dismissed as time-barred. *See, e.g., Dodds*, 12 F.3d at 350; *In re Ultrafem Inc. Sec. Litig.*, 91 F. Supp. 2d 678, 692 (S.D.N.Y. 2000).

**B.      Plaintiffs Were On Notice Of Storm Warnings That The Ratings Agency Models Were Allegedly Deficient Prior To June 19, 2007**

Plaintiffs' allegation that the Offering Documents failed to disclose that the Ratings Agencies' models were "deficient," Compl. ¶¶ 159-167, is also time-barred because storm warnings about the Ratings Agencies' models were published prior to June 19, 2007. The Complaint, itself, cites the alleged "stunning admission" by Moody's in *April 2007* that it had not updated its model since 2002. Compl. ¶ 162.

In addition, on *May 31, 2007*, *The Economist* reported that:

Janet Tavakoli, a consultant, believes that [the Ratings Agencies'] standards have slipped as business has boomed. In subprime lending, she says, the *models misread the level of correlation between different types of assets*—a crucial

---

[22]    Ex. 30 (David Cho, *Pressure at Mortgage Firm Led to Mass Approval of Bad Loans*, Wash. Post, May 7, 2007) at 2 (emphasis added); *see also* Ex. 20.

variable—and *ignored signs that risks were greater than historical data suggested.* Securitised assets using this flawed methodology were used as collateral in other deals, compounding the error. It is *hardly a good sign that most hedge funds pay little attention to ratings, assuming their own models to be better.* Even Mr. [Warren] Buffett, as happy as he must be with his investment in Moody's, crunches his own numbers when using derivatives.[23]

In addition to public information about potential flaws in the Ratings Agencies' models, the Offering Documents specifically disclosed with respect to non-traditional adjustable rate mortgages that were becoming increasingly more common that there was "no material statistical information showing payment and default trends under a variety of macroeconomic conditions." Ex. 6 at 22. Any prediction model can only be as good as the data on which it is based. Accordingly, if hindsight-based allegations about the failure of the Ratings Agencies' models to accurately predict the performance of the loans stated an actionable claim – and they do not – Plaintiffs had notice of the grounds for the claim well before June 19, 2007.

C.    **Plaintiffs Were On Notice Of The Ratings Agencies' Role In Structuring The Mortgage Pools Underlying The Certificates Prior To June 19, 2007**

Plaintiffs allege that it was not until April 2008 that "critics began to note the role of the Ratings Agencies in providing 'structuring advice.'" *See* Compl. ¶ 174. But the reality is that the alleged role of the Ratings Agencies was well-known in the market prior to June 19, 2007. The Complaint itself cites a *June 1, 2007* article in the *International Herald Tribune* in alleging that "the Ratings Agencies did 'much more than evaluate [MBS instruments] and give them letter grades,' they played an 'integral role' in structuring the transactions and instructing the assemblers 'how to squeeze the most profit out' of the MBS by maximizing the tranches with the highest ratings." Compl. ¶ 175. The article explained in detail the process by which the Ratings Agencies purportedly worked closely with banks in structuring mortgage-related securities:

---

[23]    Ex. 31 (*Measuring the Measurers,* The Economist, May 31, 2007) at 2 (emphasis added).

> ***Credit rating companies help the financial firms divide the CDOs into sections
> known as tranches,*** each of which gets a separate grade, said Charles Calomiris, a
> professor of financial institutions at Columbia University in New York. ***Credit
> raters participate in every level of packaging a CDO***, said Calomiris, who has
> worked as a consultant for Bank of America, Citigroup, UBS and other major
> banks. ***The rating companies tell CDO assemblers how to squeeze the most profit
> out of the CDO by maximizing the size of the tranches with the highest ratings***,
> he said. "It's important to understand that . . . ***in the securitization market, the
> rating agencies run the show***," he said. "***This is not a passive process of rating
> corporate debt.*** This is a financial engineering business."[24]

In addition, *The Economist* and the *Financial Times* published articles in ***May 2007***
discussing the "integral role" the Ratings Agencies allegedly played in packaging structured debt
securities. The *Financial Times* quoted the head of S&P's European structured finance unit
describing the ratings process: "Banks come to us with a proposed transaction and we explain
how it might be rated under our criteria. ***In many cases, the transaction is then restructured by
the bank in order to meet our criteria.***"[25] To the extent details about the process used to rate the
Certificates was material, these articles were sufficient to put Plaintiffs on notice of those details.
*Staehr*, 547 F.3d at 425.

> **D.    Plaintiffs Were On Notice Of Alleged Ratings Agency Conflicts Of Interest
> Prior To June 19, 2007**

Plaintiffs allege that the Offering Documents failed to disclose "the material
financial conflicts of interest between Lehman and the Ratings Agencies" and claim that these
"undisclosed conflicts of interest which incented ratings agencies to issue inflated ratings" were
first disclosed in a July 2008 report. Compl. ¶¶ 179, 181. However, the potential conflicts of
interest inherent in the Ratings Agencies' issuer-pays business model were recognized and widely
discussed for more than a decade prior to June 19, 2007. *See supra* at 28-30.

---

[24]    Ex. 32 at 2 (emphasis added).

[25]    Ex. 16 (Richard Beales, Saskia Scholtes & Gillian Tett, *Failing Grades?,* Financial Times, May 16,
2007) at 2 (emphasis added); *see also* Ex. 31 (*Economist* article).

Moreover, in early 2007, major publications provided Plaintiffs further notice of the potential conflicts of interest. For example, on ***May 17, 2007***, Wall Street veteran John Succo warned that the issuer/ratings agency relationship "raises a huge conflict of interest: the credit agency's customers are the very issuers of the tranches they rate. The credit agencies, therefore, need to compete for business based at least in part on the ratings they are willing to give these tranches."[26] In addition, on ***May 31, 2007***, *The Economist* reported: "The big agencies bill the issuer, not the investor. This leaves them conflicted, say critics, as they have an incentive to give the issuer-client the rating it wants so as to win repeat business." Ex. 31 at 2. In short, that the Ratings Agencies were paid by issuers and were subject to potential conflicts of interest was common knowledge in market before June 19, 2007 and, indeed, well before the Certificates were issued. Thus, Plaintiffs' claim that the non-disclosure of these facts was materially misleading is both meritless and time-barred. *See Dodds*, 12 F.3d at 350; *In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.*, 289 F. Supp. 2d 429, 432-33 (S.D.N.Y. 2003) (holding that investors were on inquiry notice of alleged conflicts of interest, commencing statute of limitations).

## VIII.   PLAINTIFFS' SECTION 15 CLAIMS SHOULD BE DISMISSED

Plaintiffs assert claims against the Individual Defendants under Section 15 of the Securities Act, making the conclusory allegation that "[e]ach of the Individual Defendants . . . was . . . a controlling person of SASCo, LBI [*i.e.*, Lehman Brothers Inc.] and the Issuing Trusts." Compl. ¶ 306. The Section 15 claims must be dismissed for two reasons.

First, the Complaint fails to allege facts showing that the Individual Defendants controlled LBI or the Issuing Trusts. A controlling person is one who, "direct[ly] or indirect[ly],"

---

[26] Ex. 33 (John Succo, *I Knew it Was Bad, But...,* Minyanville, May 17, 2007, available at http://www.minyanville.com/articles/index.php?a=12869) at 1; *see also* Ex. 34 (John Succo Bio, available at http://www.minyanville.com/gazette/bios.htm#) (detailing Succo's 25 year career on Wall Street).

has "the power to direct or cause the direction of the management and policies of [the controlled] person, whether through the ownership of voting securities, by contract, or otherwise." 17 C.F.R. § 240.12b-2; *see also In re Twinlab Corp., Sec. Litig.*, 103 F. Supp. 2d 193, 208-09 (E.D.N.Y. 2000). The Complaint asserts in conclusory fashion that the Individual Defendants were "at the time of the wrongs alleged herein, a controlling person of . . . LBI . . . within the meaning of Section 15 of the Securities Act." Compl. ¶ 306. The Individual Defendants, however, are or were officers and directors of SASCo. SASCo is a wholly owned subsidiary of Lehman Commercial Paper Inc., which in turn is a wholly owned subsidiary of LBI. *See* Ex. 35 (Lehman Brothers Holdings Inc, Annual Report (Form 10-K) at Exhibit 21.01 (Feb. 14, 2005)). It is not "plausible on its face" that the officers and directors of a special purpose entity control the parent company of its parent company. *Patane*, 508 F.3d at 111-12.

    With respect to the Issuing Trusts, the Complaint alleges generally that "[t]he Defendants herein were responsible for overseeing the formation and operation of the Issuing Trusts, including routing payments from the borrowers to investors." Compl. ¶ 309. However, as the Complaint concedes, SASCo's role as the Depositor with respect to the Trusts was to acquire the loan pools from LBHI and transfer them to the Trusts together with certain representations and warranties. Compl. ¶ 26. The Offering Documents state that "the Depositor . . . may only perform those actions on behalf of the Issuing Entity that are specified in the Trust Agreement [and] the Sale and Assignment Agreement," both of which were publicly filed and were incorporated into the Prospectus Supplements by reference. *See* Ex. 6 at 717. Neither the Trust Agreements nor the Sale and Assignment Agreements give SASCo anything resembling "the power to direct or cause the direction of the management and policies" of the Issuing Trusts. Pursuant to each of the Trust Agreements, SASCo conveyed to the trustee of the Trust "all the right, title and interest of the

Depositor in and to the Mortgage Loans [*i.e.*, the trust res]." *See e.g.,* Ex. 36 (Lehman XS Trust, Series 2006-14N, Current Report (Form 8-K) (Sep. 15, 2006)), at Ex. 4.1, §2.01(a).  These operative documents definitively rebut Plaintiffs' allegation that SASCo or the Individual Defendants controlled the Issuing Trusts.

        Second, because Plaintiffs "fail to state a claim under . . . [S]ection 11 of the Securities Act," or, for that matter, Section 12, "their control person liability claim pursuant to [S]ection 15 of the Securities Act . . . must fail for want of a primary violation." *ECA, Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 207 (2d Cir. 2009). For the reasons set forth above with respect to the Individual Defendants, the Complaint fails to state a claim for a primary violation of Section 11 by SASCo, LBI or the Issuing Trusts.  In addition, the allegations of the Complaint are insufficient to show a Section 12 violation by any entity because the Complaint fails to allege facts showing either that any of these entities "passed title, or other interest in the securit[ies], to the buyer for value," or that any of these entities, "motivated at least in part by a desire to serve [its] own financial interests or those of the" entity passing title, "urged [Plaintiffs] to purchase" the securities.  *Pinter v. Dahl*, 486 U.S. 622, 642-47, 108 S.Ct. 2063, 2076-79 (1988); *see also Wilson v. Saintine Exploration and Drilling Corp.*, 872, F.2d 1124, 1126 (2d Cir. 1989) (holding that "*Pinter* applies to Section 12[a](2)" as well as 12(a)(1)).  Because the Complaint does not state a claim for a primary violation of the Securities Act, the Section 15 claim must be dismissed.

## CONCLUSION

For all the foregoing reasons, the Consolidated Securities Class Action Complaint should be dismissed pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.

Dated:   New York, New York
         April 27, 2009

SIMPSON THACHER & BARTLETT LLP

By   s/: Michael J. Chepiga

Michael J. Chepiga (mchepiga@stblaw.com)
Mary Elizabeth McGarry (mmcgarry@stblaw.com)
Michael C. Ledley (mledley@stblaw.com)

425 Lexington Avenue
New York, New York  10017-3954
Telephone: (212) 455-2000
Facsimile: (212) 455-2502

*Attorneys for Defendants Lana Franks, Edward Grieb, Richard McKinney, Kristine Smith, James J. Sullivan, Samir Tabet and Mark L. Zusy*

# ANNEX A

# ANNEX A

## Disclosures Relating to Underwriting Exceptions
## In Prospectus Supplements

| Prospectus Supplement | Disclosures |
|---|---|
| Lehman XS Trust Mortgage Pass-Through Certificates, Series 2005-6 | The Aurora Underwriting Guidelines are generally not as strict as Fannie Mae or Freddie Mac guidelines. The Aurora Underwriting Guidelines are intended to evaluate the value and adequacy of the mortgaged property as collateral and to consider the borrower's credit standing and repayment ability. On a case-by-case basis, *Aurora may determine that, based upon compensating factors, a prospective borrower not strictly qualifying under the applicable underwriting guidelines warrants an underwriting exception.* Compensating factors may include, ***but are not limited to***, low loan-to-value ratios, low debt-to-income ratios, good credit history, stable employment, financial reserves, and time in residence at the applicant's current address. ***A significant number of the Mortgage Loans may represent underwriting exceptions.*** S-47 (emphasis added).<br><br>The General Underwriting Guidelines used by Originators other than Aurora are generally intended to evaluate the credit risk of mortgage loans made to borrowers with imperfect credit histories, ranging from minor delinquencies to bankruptcy, or borrowers with relatively high ratio of monthly mortgage payments to income or relatively high ratios of total monthly credit payments to income.  In addition, such guidelines also evaluate the value and adequacy of the Mortgaged Property as collateral. *On a case by case basis, the Originators may determine that, based upon compensating factors, a prospective mortgagor not strictly qualifying under the applicable underwriting guidelines warrants an underwriting exception.* Compensating factors may include, ***but are not limited to***, relatively low ratio, relatively low debt-to-income ratio, good credit history, stable employment, financial reserves, and time in residence at the applicant's current address. ***A significant number of the Mortgage Loans may represent such underwriting exceptions.*** S-48 (emphasis added). |

| | |
|---|---|
| | A substantial portion of the Mortgage Loans were classified by the related Originators in relatively low (i.e., relatively higher risk) credit categories.  The incidence of delinquency, default and bankruptcy with respect to such Mortgage Loans is expected to be greater than if such Mortgage Loans had been classified in relatively higher categories.  S-50. |
| Structured Adjustable Rate Mortgage Loan Trust Mortgage Pass-Through Certificates, Series 2006-1 | The Bank [Lehman] Underwriting Guidelines are generally not as strict as Fannie Mae or Freddie Mac guidelines. The Bank Underwriting Guidelines are intended to evaluate the value and adequacy of the mortgaged property as collateral and to consider the borrower's credit standing and repayment ability.  *On a case-by-case basis, the underwriter may determine that, based upon compensating factors, a prospective borrower not strictly qualifying under the applicable underwriting guidelines warrants an underwriting exception. Compensating factors may include**, but are not limited to***, low loan-to-value ratios, low debt-to-income ratios, good credit history, stable employment, financial reserves, and time in residence at the applicant's current address. **A significant number of the Mortgage Loans may represent underwriting exceptions.***  S-60 (emphasis added).

*Exceptions to Countrywide Home Loans' underwriting guidelines may be made if compensating factors are demonstrated by a prospective borrower.*  S-63 (emphasis added).

In addition to Countrywide Home Loans' standard underwriting guidelines (the "Standard Underwriting Guidelines"), which are consistent in many respects with the guidelines applied to mortgage loans purchased by Fannie Mae and Freddie Mac, Countrywide Home Loans uses underwriting guidelines featuring expanded criteria (the "Expanded Underwriting Guidelines").  S-64.

Mortgage loans which are underwritten pursuant to the Expanded Underwriting Guidelines may have higher Loan-to-Value Ratios, higher loan amounts and different documentation requirements than those associated with the Standard Underwriting Guidelines.  The Expanded Underwriting Guidelines also permit higher debt-to-income ratios than mortgage loans underwritten pursuant |

<table>
<tr><td></td><td>to the Standard Underwriting Guidelines. S-65-66.<br><br>Wells Fargo Bank's guidelines for underwriting may vary according to the nature of the borrower or the type of loan, since differing characteristics may be perceived as presenting different levels of risk. S-71<br><br>***Underwriter Discretion.*** During the second calendar quarter of 2005, Wells Fargo Bank initiated a program designed to encourage its mortgage loan underwriting staff to prudently, but *more aggressively, utilize the underwriting discretion already granted to them under Wells Fargo Bank's underwriting guidelines and policies.* This initiative was viewed by management as necessary and desirable to make prudent loans available to customers where such loans may have been denied in the past because of underwriter hesitancy to maximize the use of their ability to consider compensating factors as permitted by the underwriting guidelines. There can be no assurance that the successful implementation of this initiative will not result in an increase in the incidence of delinquencies and foreclosures, or the severity of losses, among mortgage loans underwritten in accordance with the updated philosophy, as compared to mortgage loans underwritten prior to the commencement of the initiative. S-75 (emphasis added).</td></tr>
<tr><td>Lehman XS Trust Mortgage Pass-Through Certificates, Series 2006-14N</td><td>Mortgage loans that are acquired by IndyMac Bank are underwritten by IndyMac Bank according to IndyMac Bank's underwriting guidelines, which also accept mortgage loans meeting Fannie Mae or Freddie Mac guidelines regardless of whether such mortgage loans would otherwise meet IndyMac Bank's guidelines, or *pursuant to an exception to those guidelines based on IndyMac Bank's procedures for approving such exceptions.* S-76 (emphasis added).<br><br>*Exceptions to underwriting standards are permitted in situations in which compensating factors exist. **Examples of these factors** are significant financial reserves, a low loan-to-value ratio, significant decrease in the borrower's monthly payment and long-term employment with the same employer.* S-79 (emphasis added).<br><br>The automated underwriting decision engine and/or the underwriter may utilize compensating factors to offset *one*</td></tr>
</table>

| | |
|---|---|
| | *or more features of the loan transaction that may not specifically comply with the product guidelines. Therefore, the application of the underwriting guidelines for a product type by either an underwriter or an automated decision engine does not imply that each specific standard was satisfied individually.* A loan is considered to be underwritten in accordance with a given set of guidelines if, based on an overall qualitative evaluation, the loan is in substantial compliance with such underwriting guidelines. S-80 (emphasis added).<br><br>In addition to the general underwriting standards described above, Bank of America provides for certain *alternative underwriting programs* for qualified borrowers, some of which enable the applicant to request reductions in the verification documentation required for the mortgage loan.  S-85 (emphasis added). |
| Lehman XS Trust Mortgage Pass-Through Certificates, Series 2006-2N | IndyMac's underwriting criteria for traditionally underwritten mortgage loans includes an analysis of the borrower's credit history, ability to repay the mortgage loan and the adequacy of the mortgaged property as collateral.  *Traditional underwriting decisions are made by individuals authorized to consider compensating factors that would allow mortgage loans not otherwise meeting IndyMac's guidelines.*  S-67 (emphasis added).<br><br>Underwriting procedures vary by channel of origination. Generally, mortgage loans originated through the mortgage professional channel will be submitted to e-MITS for assessment and subjected to a full credit review and analysis. *Mortgage loans that do not meet IndyMac's guidelines may be manually re-underwritten and approved under an exception to those underwriting guidelines.*  Mortgage loans originated through the consumer direct channel are subjected to essentially the same procedures, modified as necessary to reflect the fact that no third-party contributes to the preparation of the credit file.  S-69 (emphasis added).<br><br>*Exceptions to underwriting standards are permitted in situations in which compensating factors exist.* **Examples of these factors** *are significant financial reserves, a low loan-to-value ratio, significant decrease in the borrower's monthly payment and long-term employment with the same employer.*  S-70 (emphasis added). |

| | |
|---|---|
| | *Exceptions to Countrywide Home Loans' underwriting guidelines may be made if compensating factors are demonstrated by a prospective borrower.* Additionally, Countrywide Home Loans does permit its adjustable rate mortgage loans, hybrid adjustable rate mortgage loans and negative amortization mortgage loans to be assumed by a purchaser of the related mortgaged property, so long as the mortgage loan is in its adjustable rate period (except for a 3/1 Mortgage Loan, which may be assumed during the fixed rate period) and the related purchaser meets Countrywide Home Loans' underwriting standards that are then in effect. S-72 (emphasis added). |
| Lehman XS Trust Mortgage Pass-Through Certificates, Series 2005-5N | IndyMac's underwriting standards for conventionally underwritten mortgage loans are based on traditional underwriting factors, including the creditworthiness of the mortgagor, the capacity of the mortgagor to repay the mortgage loan according to its terms, and the value of the related mortgaged property. Among other factors, IndyMac will consider such factors as loan-to-value ratios, debt-to-income ratio, FICO Credit Score, loan amount, and the extent to which IndyMac can verify the mortgagor's application and supporting documentation. These standards are applied in accordance with applicable federal and state laws and regulations. *Exceptions to these underwriting standards are permitted where compensating factors are present or in the context of negotiated bulk purchases.* S-57 (emphasis added). |
| | *Exceptions to Countrywide Home Loans' underwriting guidelines may be made if compensating factors are demonstrated by a prospective borrower.* S-59 (emphasis added). |
| | In addition to Countrywide Home Loans' standard underwriting guidelines (the "Standard Underwriting Guidelines"), which are consistent in many respects with the guidelines applied to mortgage loans purchased by Fannie Mae and Freddie Mac, Countrywide Home Loans uses underwriting guidelines featuring expanded criteria (the "Expanded Underwriting Guidelines"). S-60. |
| | Mortgage loans which are underwritten pursuant to the Expanded Underwriting Guidelines may have higher Loan-to-Value Ratios, higher loan amounts and different |

| | |
|---|---|
| | documentation requirements than those associated with the Standard Underwriting Guidelines. The Expanded Underwriting Guidelines also permit higher debt-to-income ratios than mortgage loans underwritten pursuant to the Standard Underwriting Guidelines. S-62 (emphasis added). |
| Lehman XS Trust Mortgage Pass-Through Certificates, Series 2005-7N | IndyMac's underwriting standards for conventionally underwritten mortgage loans are based on traditional underwriting factors, including the creditworthiness of the mortgagor, the capacity of the mortgagor to repay the mortgage loan according to its terms, and the value of the related mortgaged property.  Among other factors, IndyMac will consider such factors as loan-to value ratios, debt-to-income ratio, FICO Credit Score, loan amount, and the extent to which IndyMac can verify the mortgagor's application and supporting documentation. These standards are applied in accordance with applicable federal and state laws and regulations. *Exceptions to these underwriting standards are permitted where compensating factors are present or in the context of negotiated bulk purchases.*  S-71 (emphasis added).<br><br>*Exceptions to Countrywide Home Loans' underwriting guidelines may be made if compensating factors are demonstrated by a prospective borrower.*  S-73 (emphasis added).<br><br>In addition to Countrywide Home Loans' standard underwriting guidelines (the "Standard Underwriting Guidelines"), which are consistent in many respects with the guidelines applied to mortgage loans purchased by Fannie Mae and Freddie Mac, Countrywide Home Loans uses *underwriting guidelines featuring expanded criteria* (the "Expanded Underwriting Guidelines").  S-74 (emphasis added)<br><br>Mortgage loans which are underwritten pursuant to the Expanded Underwriting Guidelines may have higher Loan-to-Value Ratios, higher loan amounts and different documentation requirements than those associated with the Standard Underwriting Guidelines. The Expanded Underwriting Guidelines also permit higher debt-to-income ratios than mortgage loans underwritten pursuant to the Standard Underwriting Guidelines. S-76. |

| | |
|---|---|
| Lehman XS Trust Mortgage Pass-Through Certificates, Series 2006-GP2 | Generally, the GreenPoint underwriting guidelines are applied to evaluate the prospective borrower's credit standing and repayment ability and the value and adequacy of the mortgaged property as collateral. *Exceptions to the guidelines are permitted where compensating factors are present.* The GreenPoint underwriting guidelines are generally not as strict as Fannie Mae or Freddie Mac guidelines. GreenPoint's underwriting guidelines are applied in accordance with applicable federal and state laws and regulations. S-62 (emphasis added). |
| GreenPoint Mortgage Funding Trust, Mortgage Pass-Through Certificate, Series 2006-AR4 | Generally, the GreenPoint underwriting guidelines are applied to evaluate the prospective borrower's credit standing and repayment ability and the value and adequacy of the mortgaged property as collateral. *Exceptions to the guidelines are permitted where compensating factors are present.* The GreenPoint underwriting guidelines are generally not as strict as Fannie Mae or Freddie Mac guidelines. S-51 (emphasis added). |
| GreenPoint Mortgage Funding Trust, Mortgage Pass-Through Certificate, Series 2006-AR5 | Generally, the GreenPoint underwriting guidelines are applied to evaluate the prospective borrower's credit standing and repayment ability and the value and adequacy of the mortgaged property as collateral. *Exceptions to the guidelines are permitted where compensating factors are present.* The GreenPoint underwriting guidelines are generally not as strict as Fannie Mae or Freddie Mac guidelines. S-64 (emphasis added). |