UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

– – – – – – – – – – – – – – – – – – – – – – – – – – – – – – – x

In re:                                                   :
                                                         :
LEHMAN BROTHERS SECURITIES                               :
AND ERISA LITIGATION                                     :        09 MD 2017 (LAK)
                                                         :
This document applies to:                                :
                                                         :
*In re Lehman Brothers Mortgage-Backed Securities*       :
*Litigation*, No. 08-CV-6762 (LAK)                       :

– – – – – – – – – – – – – – – – – – – – – – – – – – – – – – – x

# MEMORANDUM OF LAW IN SUPPORT OF
## MOODY'S INVESTORS SERVICE, INC. 'S MOTION TO DISMISS

SATTERLEE STEPHENS BURKE &
BURKE LLP
230 Park Avenue
New York, New York  10169
(212) 818-92009
*Attorneys for Moody's Investors Service, Inc.*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ...........................................................................................ii

PRELIMINARY STATEMENT.....................................................................................1

STATEMENT OF FACTS ............................................................................................4

ARGUMENT...............................................................................................................10

 I. THE COMPLAINT FAILS TO ADEQUATELY PLEAD THAT MOODY'S IS AN "UNDERWRITER" WITHIN THE MEANING OF SECTION 11 .....................................................................................11

  A. SEC Regulations Preclude Section 11 Liability for Moody's Credit Ratings...........................................................12

  B. Moody's Did Not Participate in the Distribution of the Certificates and Was Therefore Not an "Underwriter" Under Section 11 .....................................................................14

 II. THE COMPLAINT FAILS TO ADEQUATELY PLEAD THAT MOODY'S IS A "SELLER" WITHIN THE MEANING OF SECTION 12(a)(2) ..........................................................................18

 III. THE COMPLAINT FAILS TO ADEQUATELY PLEAD THAT MOODY'S IS A "CONTROL PERSON" WITHIN THE MEANING OF SECTION 15 .....................................................................................22

 IV. PLAINTIFFS' CLAIMS ARE BARRED BY THE STATUTE OF LIMITATIONS.............................................................................25

  A. The Applicable Law ..............................................................26

  B. Plaintiffs Were on Inquiry Notice as of February 23, 2008 .....................27

   1. Allegations Regarding Origination and Due Diligence.....................28

   2. Allegations Regarding the Rating Agencies.......................................30

 V. PLAINTIFFS FAIL, AS REQUIRED, TO PLEAD RECOVERABLE DAMAGES ............................................................32

CONCLUSION............................................................................................................35

# TABLE OF AUTHORITIES

**Page**

*Ackerberg v. Johnson*,
892 F.2d 1328 (8th Cir. 1989) ............................................................................. 15

*Alaska Elec. Pension Fund v. Pharmacia Corp.*,
554 F.3d 342 (3d Cir. 2009) ................................................................................. 27

*In re Alcatel Sec. Litig.*,
382 F. Supp. 2d 513 (S.D.N.Y. 2005) ................................................................. 25

*In re Alstom SA Sec. Litig.*,
406 F. Supp. 2d 433 (S.D.N.Y. 2005) ...................................................... 23, 24, 25

*Bass v. World Wrestling Federation Entm't, Inc.*,
129 F. Supp. 2d 491 (E.D.N.Y. 2001) ................................................................. 26

*Bell Atl. v. Twombly*,
550 U.S. 544, 127 S. Ct. 1955 (2007) ............................................................ 10, 21

*Berckeley Inv. Group, Ltd. v. Colkitt*,
455 F.3d 195 (3d Cir. 2006) ................................................................................. 14

*In re Blech Sec. Litig.*,
961 F. Supp. 569 (S.D.N.Y. 1997) ....................................................................... 24

*Burch v. Pioneer Credit Recovery, Inc.*,
551 F.3d 122 (2d Cir. 2009) ................................................................................. 10

*Carmona v. Spanish Broad. Sys., Inc.*,
No. 08 Civ. 4475, 2009 WL 890054 (S.D.N.Y. Mar. 30, 2009) ....................... 10

*Central Bank v. First Interstate Bank*,
511 U.S. 164, 114 S. Ct. 1439 (1994) ................................................................. 12

*Compuware Corp. v. Moody's Investors Serv., Inc.*,
499 F.3d 520 (6th Cir. 2007) ............................................................................... 12

*In re Crazy Eddie Sec. Litig.*,
747 F. Supp. 850 (E.D.N.Y. 1984) ...................................................................... 24

*Credit Suisse First Boston Corp. v. ARM Fin. Group, Inc.*,
No. 99 Civ. 2046, 2001 WL 300733 (S.D.N.Y. Mar. 28, 2001) ....................... 22

*In re Deutsche Telekom AG Sec. Litig.*,
No. 00 Civ. 9475, 2002 WL 244597 (S.D.N.Y. Feb. 20, 2002) ............. 20, 22, 23, 25

*Dietrich v. Bauer,*
    76 F. Supp. 2d 312 (S.D.N.Y. 1999) ........................................................20

*Dodds v Cigna Sec., Inc.,*
    12 F.3d 346 (2d Cir. 1993) ......................................................................26

*Dorchester Investors v. Peak Int'l Ltd.,*
    134 F. Supp. 2d 569 (S.D.N.Y. 2001) .....................................................19

*Dura Pharm., Inc. v. Broudo,*
    544 U.S. 336, 125 S. Ct. 1627 (2005).....................................................33

*In re Enron Corp. Sec., Derivative & "ERISA" Litig.,*
    511 F. Supp. 2d 742 (S.D. Tex. 2005) ..............................................12, 13

*Enterprise Mortg. Acceptance Co., Sec. Litig. v. Enterprise Mortg. Acceptance Co.,*
    391 F.3d 401 (2d Cir. 2004) ....................................................................26

*In re First Union Corp. Sec. Litig.,*
    128 F. Supp. 2d 871 (W.D.N.C. 2001) ....................................................33

*In re Flag Telecom Holdings, Ltd. Sec. Litig.,*
    352 F. Supp. 2d 429 (S.D.N.Y. 2005) ...............................................23, 24

*Forseberg v. Always Consulting, Inc.,*
    No. 06 Civ. 13488, 2008 WL 5449003 (S.D.N.Y. Dec. 31, 2008) .....................16, 17, 20

*In re Gas Reclamation, Inc. Sec. Litig.,*
    733 F. Supp. 713 (S.D.N.Y. 1990) ..........................................................22

*In re Global Crossing, Ltd. Sec. Litig.,*
    313 F. Supp. 2d 189 (S.D.N.Y. 2003) ......................................................26

*In re Global Crossing, Ltd. Sec. Litig.,*
    No. 02 Civ. 0910, 2005 WL 2990646 (S.D.N.Y. Nov. 7, 2005)...............................18, 20

*HB Holdings Corp. v. Scovill, Inc.,*
    No. 88 Civ. 7983, 1990 WL 37869 (S.D.N.Y. Mar. 26, 1990) ........................................20

*Ingenito v. Bermec Corp.,*
    441 F. Supp. 525 (S.D.N.Y. 1977) ..........................................................15

*Iqbal v. Hasty,*
    490 F.3d 143 (2d Cir. 2007) ....................................................................10

*Jackson  Nat. Life Ins. Co. v. Ligator,*
    949 F. Supp. 200 (S.D.N.Y. 1996) ..........................................................33

*Jefferson County Sch. Dist. No. R-1 v. Moody's Investor's Services, Inc.*,
    175 F.3d 848 (10th Cir. 1999) ...................................................................................7, 12

*In re Jenny Craig Sec. Litig.*,
    No. 92 Civ. 0845, 1994 WL 750662 (S.D. Cal. Nov. 22, 1994) ......................................12

*LC Capital Partners, LP v. Frontier Ins. Group, Inc.*,
    318 F.3d 148 (2d Cir. 2003) ....................................................................................27, 32

*McFarland v. Memorex Corp.*,
    493 F. Supp. 631 (N.D. Cal. 1980) .................................................................................15

*McMahan & Co. v. Wherehouse Entm't, Inc.*,
    65 F.3d 1044 (2d Cir. 1995) ..........................................................................................34

*In re Morgan Stanley Tech. Fund Sec. Litig.*,
    No. 02 Civ. 6153, 2009 WL 256005 (S.D.N.Y. Feb. 2, 2009) ........................................22

*In re Mutual Funds Inv. Litig.*,
    384 F. Supp. 2d 845 (D. Md. 2005) ................................................................................32

*Pierce v. Morris*,
    No. 03 Civ. 026, 2006 WL 2370343 (N.D. Tex. Aug. 16, 2006) .....................................33

*Pinter v. Dahl*,
    486 U.S. 622, 108 S. Ct. 2063 (1988) .....................................................18, 19, 20, 21, 22

*In re Refco, Inc. Sec. Litig.*,
    503 F. Supp. 2d 611 (S.D.N.Y. 2007) .......................................................................15, 17

*In re Refco, Inc. Sec. Litig.*,
    No. 05 Civ. 8626, 2008 WL 3843343 (S.D.N.Y. Aug. 14, 2008)....................................15

*Schuh v. Druckman & Sinel, L.L.P.*,
    __ F. Supp. 2d __, 07 Civ. 0366, 2009 WL 129851 (S.D.N.Y. Feb. 2, 2009) .................17

*Shah v. Meeker*,
    435 F.3d 244 (2d Cir. 2006) ....................................................................................27, 32

*Shain v. Duff & Phelps Credit Rating Co.*,
    915 F. Supp. 575 (S.D.N.Y. 1996) .......................................................................20, 21, 22

*Staehr v. Hartford Fin. Servs. Group, Inc.*,
    547 F.3d 406 (2d Cir. 2008) ..........................................................................................26

*Steed Fin. LDC v. Nomura Sec. Int'l, Inc.*,
    No. 00 Civ. 8058, 2001 WL 1111508 (S.D.N.Y. Sept. 20, 2001) ....................................21

*In re Ultrafem Inc. Sec. Litig.*,
    91 F. Supp. 2d 678 (S.D.N.Y. 2000) ...............................................................................27

*Wilson v. Saintine Exploration and Drilling Corp.*,
    872 F.2d 1124 (2d Cir. 1989) ...............................................................................18, 19

*White v. H&R Block, Inc.*,
    No. 02 Civ. 8965, 2004 WL 1698628 (S.D.N.Y. July 28, 2004) ......................................27

*In re WorldCom Sec. Litig.*,
    496 F.3d 245 (2d Cir. 2007) ...............................................................................25

## DOCKETED CASES

*New Jersey Carpenters Vacation Fund v Harborview Mortgage Loan Trust 2006-4,*
    *New York Sup.*, Index No. 0601451/08...............................................................................26

*New Jersey Carpenters Health Fund v. Lehman XS Trust Series 2005-5N*,
    No. 08-CV-6762 (S.D.N.Y.).............................................................................28

*New Jersey Carpenters Health Fund v Home Equity Mortgage Trust 2006-5,*
    *New York Sup.*, Index No. 0601670/08...............................................................................26

*New Jersey Carpenters Health Fund v NovaStar Mortgage Funding Trust,*
    *Series 2006-3, New York Sup.*, Index No. 061563/08 ......................................26

## STATUTES AND RULES

17 C.F.R. § 230.436(g) ...............................................................................12, 13, 14

15 U.S.C. § 77b(a)(11) ...............................................................................16

46 Federal Register 42024 ...............................................................................13

47 Federal Register 11380 ...............................................................................13.

Fed. R. Civ. P. 8...............................................................................21

Fed. R. Civ. P. 15(c)(3)...............................................................................26

Fed. R. Civ. P. 12(b)(6) ...............................................................................1, 10

15 U.S.C. § 77m...............................................................................25

28 U.S.C. § 1658(b)...............................................................................25

Sarbanes-Oxley Act of 2002, Pub. L. No. 107-204, § 702(b), 116 Stat. 745 (2002) ..................... 7

Securities Act of 1933 § 7 ................................................................................................ 13

Securities Act of 1933 § 2(11) ..................................................................................... 14, 15

Securities Act of 1933 § 11 ........................................................................................ passim

Securities Act of 1933, § 12 ....................................................................................... passim

Securities Act of 1933, § 15 ....................................................................................... passim

Securities Act of 1933, § 20 ............................................................................................. 23

Securities Act of 1933, Rule 144A .................................................................................... 15

**COMMITTEE HEARINGS**

Subprime and Predatory Mortgage Lending: New Regulatory Guidance, Current
    Market Conditions and Effects on Regulated Financial Institutions Before the
    H. Subcomm. on Financial Institutions and Consumer Credit, 110th Cong. 3
    (Mar. 27, 2007) ..................................................................................................... 29

The Role of the Secondary Market in Subprime Mortgage Lending Before the H.
    Subcomm. on Financial Institutions and Consumer Credit Hearing, 110th Cong. 3
    (May 7, 2007) ........................................................................................................ 29

Preserving the American Dream: Predatory Lending Practices and Home Foreclosures
    Before the U.S. Senate Committee on Banking, Housing and Urban Affairs,
    110th Cong. (Feb. 7, 2007) ................................................................................... 29

Mortgage Market Turmoil: Causes and Consequences Before the U.S. Senate
    Committee on Banking, Housing and Urban Affairs, 110th Cong.
    (Mar. 22, 2007) ..................................................................................................... 29

Subprime Mortgage Market Turmoil:  Examining the Role of Securitization Hearing
    Before the S. Banking, Housing and Urban Affairs Comm.'s Subcomm. on
    Securities, Insurance and Investments, 110th Cong. (April 17, 2007) .............................. 29

**MISCELLANEOUS**

1 Thomas Lee Hazen, *The Law of Securities Regulation* 476 (2005) ........................................... 14

Amir Efrati and Ruth Simon, *Due-Diligence Firm to Aid New York Subprime Probe*,
   Wall St. J., Jan. 28, 2008 ..................................................................30

David Cho, *Pressure at Mortgage Firm Led to Mass Approval of Bad Loans*,
   Wash. Post, May 7, 2007 ..................................................................29

Dawn Kopecki, *The Credit Ratings Blame Game: Congressional Hearings Raise
   Questions About How Credit Ratings Agencies Evaluated Mortgage Securities
   and Managed Potential Conflicts*, Business Week Online, Oct. 1, 2007 ........................32

*Editorial:  Conflicts and Interests*, St. Louis Post-Dispatch, Oct. 31, 2007..................................32

Matthew Valencia, *Measuring the Measurers*, The Economist, May 31, 2007 ...........................30

Richard Beales, Saskia Scholtes & Gillian Tett, *Failing Grades?*,
   Financial Times, May 16, 2007 ..................................................................32

Stephen Labaton, *U.S. Investigates Credit-Rating Firms: Impartiality is Questioned on
   Mortgage-Backed Securities*, International Herald Tribune, Sept. 28, 2007...................32

Dec. 12, 2007 Congressional Daily, 2007 WLNR 24387841 ........................................32

Defendant Moody's Investors Service, Inc., incorrectly sued herein as Moody's Corp. ("Moody's"),[1] submits this memorandum of law in support of its motion, pursuant to Fed. R. Civ. P. Rule 12(b)(6), to dismiss the Consolidated Securities Class Action Complaint filed February 23, 2009 (the "Complaint" or "CAC") by named plaintiffs Locals 203 and 612 of the International Union of Operating Engineers ("Operating Engineers" or "Lead Plaintiff"), New Jersey Carpenters Health Fund ("New Jersey Carpenters"), and Boilermakers-Blacksmith National Pension Trust ("Boilermakers") (collectively, "Plaintiffs").

## PRELIMINARY STATEMENT

The Complaint in this putative class action concerns the issuance, distribution, and sale, by affiliates and subsidiaries of Lehman Brothers Holdings, Inc. (collectively, "Lehman"), of over 90 separate offerings of mortgage pass-through certificates issued between September 2005 and July 2007 (the "Certificates"). The Complaint names as defendants the trusts that issued the Certificates as well as individual directors and officers of the Lehman subsidiary that allegedly filed the registration statements (the "Individual Defendants"). The Individual Defendants, as well as other Lehman entities, were named in the original state court complaints, filed in mid-2008, that were subsequently removed and eventually consolidated in this Court.

Moody's, however, was named in none of the prior actions or proceedings. The Complaint now before the Court, filed on February 23, 2009, for the first time asserts claims against Moody's, alleging that Moody's is "strictly liable" under Sections 11, 12(a)(2), and 15 of the Securities Act of 1933 (the "1933 Act" or "Securities Act") for any and all purported "material misstatements and omissions" in the offering documents for the Certificates. CAC ¶ 3.

---

[1]  Moody's Investors Service, Inc., a wholly owned subsidiary of Moody's Corporation, is the only Moody's entity that issued the credit ratings that are a subject of this action.

All of these claims are legally deficient and should be dismissed by this Court forthwith. As an initial matter, the Complaint represents a blatant attempt to circumvent the carefully defined scope of the 1933 Act and to expand its strict liability scheme in an unprecedented manner. As consistently interpreted by the courts, the Act sets forth stringently limited categories of defendants who are potentially subject to liability under Sections 11, 12(a)(2), and 15. The Complaint simply fails to allege any factual basis for claiming that Moody's, which provided credit ratings for some of the Certificates at issue, falls within any category of potentially liable defendants. Instead, as to the essential threshold requirements for each of the claims, the Complaint merely parrots the statutory language and offers nothing more than bare, conclusory, and fundamentally implausible assertions. Specifically:

- Plaintiffs assert that Moody's is an "underwriter" for purposes of Section 11, but do not – because they cannot – allege facts regarding any purported participation by Moody's in the distribution of the securities to the public. On the contrary, the *factual* allegations in the Complaint confirm that Moody's only involvement with the Certificates was in connection with the credit rating process. This renders Plaintiffs' Section 11 claim defective since Plaintiffs acknowledge, as they must, that Moody's is expressly exempted from liability under Section 11 for its role in evaluating the securities and providing credit ratings. *See* Point I, *infra*.

- Plaintiffs assert that Moody's is a "seller" for purposes of Section 12(a)(2), but do not – because they cannot – allege facts regarding any purported acts of selling or solicitation by Moody's. Indeed, there are no allegations in the Complaint that Moody's had contact of any kind with Plaintiffs, or other alleged purchasers of the Certificates, or that its involvement extended beyond the credit rating process. *See* Point II, *infra*.

- Plaintiffs assert that Moody's is a "control person" for purposes of Section 15, but do not – because they cannot – allege any facts sufficient to establish that Moody's exerted "actual

control" over Lehman.  The notion of such control by Moody's is not only absurd on its face but inconsistent with the factual allegations in the Complaint.[2]  *See* Point III, *infra*.

Separate and apart from these plainly fatal deficiencies on the face of the Complaint, dismissal of all three claims is compelled on several other grounds as well:

■    Even if, *arguendo* and contrary to law, Moody's could be subject to liability under the 1933 Act for the content of Lehman's offering documents, the Complaint must in any event be dismissed because Plaintiffs fail to adequately allege that those documents contained material misrepresentations or omissions.[3]

■    All claims against Moody's are in any event barred by the applicable statute of limitations, which requires that claims under the Act be brought within (a) a year of the date when Plaintiffs were on actual or inquiry notice of the alleged violation, *and* (b) three years of the date that the security was offered (as to Section 11) or purchased (as to Section 12).  Here, according to the allegations in the Complaint itself, as well as additional materials of which the Court may take notice, Plaintiffs were clearly on inquiry notice of any arguable violations *at least* one year prior to February 23, 2009, the date the Complaint was filed.  Moreover, all claims relating to those Certificates that were offered or purchased prior to February 23, 2006 (*i.e.*, three years before filing) are time-barred on this additional ground as well.  *See* Point IV, *infra*.

■    Plaintiffs' claims must also be dismissed on the separate ground that the Complaint contains no allegation of any actual and cognizable economic loss.  The Complaint fails to allege that Plaintiffs have been deprived of *any* of the payments that constitute the only expected value

---

[2]  Moreover, if plaintiffs' Section 11 and 12 claims are found to be deficient as against all parties, as they should be for the reasons outlined below, no claim of any kind can be made under Section 15, which requires the existence of a viable claim under the 1933 Act against a "primary violator."

[3]  Moody's respectfully refers the Court to, and incorporates by reference, the points and authorities regarding this ground for dismissal contained in the Memoranda of Law submitted by the Individual Defendants (the "I.D.") and The McGraw-Hill Companies, Inc. ("McGraw") in support of their motions to dismiss the Complaint.

of the Certificates.  Plaintiffs' claims are therefore fundamentally deficient or, at best, premature.
*See* Point V, *infra*.

■   Finally, even assuming, *arguendo*, that the claims against Moody's could survive all
of the deficiencies outlined above, Plaintiffs' claims as to 85 of the alleged 94 securities at issue
are subject to dismissal for lack of standing.  Plaintiffs allege that they purchased, *in toto*, only
*nine* of the Certificate offerings, each of which was issued by a separate and distinct entity,
represents an interest in payment streams from entirely different and distinct pools of mortgages,
and/or involves different credit enhancements and other critical features.[4]

For all of these reasons, the Complaint should be dismissed as against Moody's.

## STATEMENT OF FACTS

### Procedural Background

On June 19, 2008, plaintiff Alaska Electrical Pension Fund filed a putative state court
class action, Index No. 011341/08, in the Supreme Court of the State of New York, County of
Nassau.  On July 23, 2008, plaintiff New Jersey Carpenters Health Fund filed a putative state
court class action, Index No. 602158/08, in the Supreme Court of New York, County of New
York.  Both state court actions were allegedly brought on behalf of purchasers of Lehman-related
mortgage pass-through certificates, and both named certain Lehman entities, the Individual
Defendants, and certain issuing trusts as defendants.  Neither complaint named Moody's.

These state court actions were subsequently removed and/or transferred to this Court and
assigned Civil Action numbers 08-CV-10686 and 08-CV-6762, respectively.  On January 9,
2009, this Court, in Pre-Trial Order No. 1, ordered that Civil Action Nos. 08-CV-10686 and 08-
CV-6762 be consolidated for all purposes and amended the caption of the action to be *In re*

---

[4]   Moody's respectfully refers the Court to, and incorporates by reference, the points and authorities
regarding this ground for dismissal contained in the Memorandum of Law of the I.D.

*Lehman Brothers Mortgage-Backed Sec. Litig., Civil Action No. 08-CV-6762*.  The Court

ordered that a single amended complaint be served and filed in the consolidated action.  On

February 23, 2009, this Complaint[5] was filed, naming Moody's as a defendant for the first time.

**The Securities at Issue and Plaintiffs' Alleged Investments**

This action involves mortgage-backed securities.  In a mortgage securitization, mortgage

loans are "acquired, pooled together, and then sold to investors, who acquire rights in the income

flowing from the mortgage pools."  CAC ¶ 46.  In contrast to an investment in stock, when an

investor purchases mortgage pass-through certificates, the expected return lies in the "principal

and interest payments due to investors . . . derived from cash flows from underlying mortgage

loans."  *Id*. ¶ 9.  According to the Complaint, between 2005 and 2007 Lehman became "one of

the largest producers of mortgage-backed securities."  *Id*. ¶ 46.

The Complaint states that Plaintiffs are asserting all claims on behalf of "all persons and

entities who purchased or otherwise acquired interests in" 94 different Lehman-related issuing

trusts (the "Issuing Trusts"). CAC ¶¶ 1, 32.  Lehman Brothers Holdings, Inc. was the sponsor for

all 94 offerings of the Certificates (the "Offerings") issued between September 2005 and July

2007, and Lehman Brothers, Inc. was the underwriter for all the Offerings.  *Id*. ¶¶ 28-31.  In

short, "Lehman controlled every aspect of the securitization and underwriting process."  *Id*. ¶ 6.

The three named Plaintiffs invested in only nine[6] of the 94 Offerings alleged to be at issue

in this class action. CAC ¶¶ 2, 22-24, 30-31.  According to the Complaint, the offering date for

---

[5]  The Complaint is annexed as Exhibit A to the Affidavit of Joshua M. Rubins ("Rubins Aff."), submitted herewith.  All Exhibits thereto will be referenced herein as "Ex."

[6]  Operating Engineers allegedly invested in: Lehman XS Trust, Mortgage Pass-Through Certificates, Series 2005-5N, Class 1A1; Lehman XS Trust, Mortgage Pass-Through Certificates, Series 2005-7N, Class 1A1B; Lehman XS Trust, Mortgage Pass-Through Certificates, Series 2006-2N, Class 1A1; Lehman XS Trust, Mortgage Pass-Through Certificates, Series 2006-GP2, Class 1A1A; GreenPoint Mortgage Funding Trust, Mortgage Pass-Through Certificates, Series 2006-AR4, Class A1A; and GreenPoint Mortgage Funding Trust, Mortgage Pass-Through Certificates, Series 2006-AR5, Class A1A. CAC ¶ 22.  New Jersey Carpenters allegedly also invested in the Lehman XS Trust 2005-5N, as well as Lehman XS Trust, Mortgage Pass-Through Certificates, Series 2005-6, Class

five of the nine Offerings in which the Plaintiffs allegedly invested was more than three years

prior to the filing of the Complaint on February 23, 2009.[7]  Five other Offerings also had an

offering date of more than three years prior to the filing of the Complaint. CAC ¶ 30.[8]  Plaintiffs

further allege purchases, involving five of the Offerings, that occurred more than three years

prior to the filing of the Complaint.[9]

**The Alleged Misrepresentations and Omissions**

The Complaint alleges that all of the Offerings were made pursuant, or are traceable, to

two Registration Statements with accompanying Prospectuses filed with the Securities and

Exchange Commission (the "SEC") in September 2005 and August 2006 by Structured Asset

Securities Corporation, a Lehman subsidiary and Delaware "special purpose" corporation.  CAC

¶¶ 1, 25.  The Complaint further alleges that Lehman underwrote the issuance of the Certificates

pursuant to the Registration Statements, the accompanying Prospectuses, and the individual

Prospectus Supplements (collectively, the "Offering Documents").  *Id*. ¶ 2.

According to the Complaint, the Offering Documents contained alleged material

misstatements and omissions regarding mortgage loan underwriting guidelines (CAC ¶¶ 185-

267), Lehman's due diligence (*id*. ¶¶ 151-158), and the alleged "true role," and "undisclosed

conflicts of interest," of the credit rating agencies, Moody's and Standard & Poor's ("S&P"), in

---

1A1. CAC ¶ 23. Boilermakers allegedly also invested in Lehman XS Trust 2005-7N, as well as Lehman XS Trust, Mortgage Pass-Through Certificates, Series 2006-14N, Class 1A1B, and Structured Adjustable Rate Mortgage Loan, Mortgage Pass-Through Certificates, Series 2006-1, Class 7A4. CAC ¶ 24.

[7]  The offering dates for Lehman XS 2005-5N, Lehman XS 2005-7N, Lehman XS 2006-2N, and Lehman XS 2005-6 were October 28, 2005, November 29, 2005, January 30, 2006, and October 28, 2005, respectively. CAC ¶¶ 22-24.  While the Complaint omits the offering date for Structured Adjustable 2006-1 in paragraph 30, Schedule A to the Certifications of the Complaint indicates that the transaction date was January 18, 2006.

[8]  The offering dates for Lehman XS Trust, Series 2005-4, Lehman XS Trust, Series 2005-8, Lehman XS Trust, Series 2005-9N, Lehman XS Trust, Series 2005-10, and Lehman XS Trust, Series 2006-1 were September 29, 2005, November 29, 2005, December 29, 2005, December 28, 2005, and January 30, 2006, respectively.  CAC ¶ 30.

[9]  Plaintiffs allege purchases on October 1, 2005 (Lehman XS, Series 2005-5N), November 21, 2005 (Lehman XS, Series 2005-7N), January 13, 2006 (Lehman XS, Series 2006-2N), January 18, 2006 (Structured Adjustable 2006-1), and February 3, 2006 (Lehman XS, Series 2005-6).  CAC Certifications , Schedules A.

the credit rating process (*id.* ¶¶ 268-273).  As set forth in detail *infra* at Point IV, the Complaint contains numerous allegations demonstrating that, long prior to February 23, 2008 (one year before filing of the Complaint), there was available to Plaintiffs extensive public information – including widely publicized articles in the mainstream press and public announcements by governmental agencies and market participants – that was more than sufficient to put them on "inquiry notice" of the alleged misrepresentations and omissions.  *See, e.g.*, CAC ¶¶ 70-72, 88, 89, 92, 94, 109, 110, 113, 115, 132, 133, 142, 150, 155, 156, 162, 175, 177.[10]

**The Allegations Concerning Moody's**

The Complaint alleges that Moody's "provides credit ratings, risk evaluation, investment research and data to investors." CAC ¶ 34.  As recognized by the courts and the SEC, Moody's has been a leading publisher of credit ratings – which are predictive opinions on creditworthiness – for nearly a century.  *See, e.g., Jefferson County Sch. Dist. No. R-1 v. Moody's Investor's Services, Inc.*, 175 F.3d 848 (10th Cir. 1999); "Report on the Role and Function of Credit Rating Agencies in the Operation of Securities Markets" ("SEC Report") (January 2003), available at www.sec.gov/news/studies/credratingreport0103.pdf.[11]  For over 30 years Moody's has been recognized by the SEC as a "nationally recognized statistical rating organization" ("NRSRO"). SEC Report at 5.

The Complaint contains no factual allegations concerning Moody's having participated in the distribution, marketing, or sale of the Certificates, and there would be no good-faith basis

---

[10]  As discussed *infra*, the Court may also take notice of numerous additional publications and announcements issued prior to February 23, 2008, not for the truth of their contents but for the fact of their public availability.  In addition to the exhibits attached to the Rubins Aff., Moody's also respectfully refers the Court to, and incorporates by reference, exhibits submitted in connection with the motions to dismiss of McGraw and the I.D.

[11]  "In essence, a credit rating reflects a rating agency's opinion, as of a specific date, of the creditworthiness of a particular company, security, or obligation.  For almost a century, credit rating agencies have been providing opinions on the creditworthiness of issuers of securities and their financial obligations."  SEC Report at 5.  The Court may take judicial notice of the SEC Report, which was issued in compliance with a Congressional directive.  Sarbanes-Oxley Act of 2002, Pub. L. No. 107-204, § 702(b), 116 Stat. 745 (2002).

for any such allegation.  Moody's simply has no role in the distribution or sale of any securities, including those at issue in this action, and there is nothing to the contrary in either the Complaint itself or in any of the numerous publications concerning Moody's and other credit rating agencies cited in the Complaint.  Indeed, all the relevant Prospectus Supplements, in referring to Moody's credit ratings of the Certificates, contain identical language stating that "These ratings are not recommendations to buy, sell or hold these certificates." *See e.g.*, Ex. B, Prospectus Supplement Lehman 2005-5N, at S-15, S-94.  Moreover, Plaintiffs do not allege that Moody's signed any Offering Documents, solicited Plaintiffs to purchase any Certificates, or, indeed, communicated at all, whether directly or indirectly, with any Plaintiff or other alleged purchaser.

Instead, the Complaint contains numerous allegations regarding the purported nature of Moody's involvement in the process – *prior* to the distribution, marketing, and sale of the Certificates – whereby the securities were structured by Lehman and credit ratings were assigned and maintained by Moody's and S&P.  *See, e.g.*, CAC ¶¶ 56-62, 66-67, 159-184.  These allegations are irrelevant to liability under Sections 11, 12, or 15, and merely confirm that Moody's involvement did not extend beyond the credit rating process.

Nor does the Complaint contain any factual allegations that support Plaintiffs' bare assertion that Moody's was a "controlling person" of the Lehman entities that underwrote or sold the Certificates.  CAC ¶ 307.  Indeed, Plaintiffs do not even *conclusorily* allege that Moody's actually controlled Lehman but merely that Moody's had the "power to influence" Lehman.  *Id*. Moreover, the facially implausible notion that Moody's "controlled" Lehman is contradicted by, and flatly inconsistent with, factual allegations in the Complaint that depict, *e.g.*, (i) Moody's as providing free services to Lehman "to engender goodwill so that Lehman would ultimately engage" Moody's to provide credit ratings (CAC ¶ 61); (ii) Moody's and Lehman as independent business entities in a "constant" process of "negotiation," with "Lehman pressing the Rating

Agencies for more AAA rated classes and less credit enhancement" (*id.* ¶ 57); and (iii) Lehman allegedly engaging in "ratings shopping," whereby Lehman purportedly "pressured" Moody's and other rating agencies to issue the ratings Lehman desired (*id.* ¶ 168).

**The Allegations Regarding Plaintiffs' Return on Investment and Purported "Losses"**

The Complaint confirms that the Plaintiffs' return on investment was through "distributions" tied to the loan payments underlying the Certificates held by investors: "[P]rincipal and interest payments due to investors were secured and derived from cash flows from underlying mortgage loans. As the original borrowers on each of the underlying loans paid their mortgages, distributions were made to investors through the Issuing Trusts in accordance with the terms of the Offering Documents governing the issuance of the Certificates." CAC ¶ 9.

Nowhere in the Complaint do Plaintiffs allege that there have been any disruptions in the distributions due them under the Certificates. Moreover, Plaintiffs are in the most "senior" classes of investors in all but one of the Offerings in which they invested, and benefit from credit enhancements, such as subordination, designed to extend extra protection to purchasers of senior Certificates.[12] Thus, the possibility of future disruption in distributions due to these Plaintiffs is, at best, wholly speculative.

Plaintiffs contend their holdings have lost "44% of their total initial value" based on the difference in price per unit when purchased and the alleged "market" price on the date the Complaint was filed. CAC ¶¶ 8, 22-24. Significantly, however, the Prospectus Supplements for the Offerings expressly warn investors: "A secondary market for any class of offered certificates may not develop. If a secondary market does develop, it might not continue or it might not be

---

[12] Of the Offerings in which the Named Plaintiffs invested, they are in the most senior class in every instance except for Structured Adjustable 2006-1. CAC ¶ 22-24.

sufficiently liquid to allow you to resell any of your certificates."[13]  Moreover, Plaintiffs do not allege that they have in fact sold any of the Certificates at issue.

## ARGUMENT

On a motion to dismiss under Rule 12(b)(6), the court must determine whether the plaintiff has pleaded "'enough facts to state a claim to relief that is plausible on its face.'" *Carmona v. Spanish Broad. Sys., Inc.*, No. 08 Civ. 4475, 2009 WL 890054, at *2 (S.D.N.Y. Mar. 30, 2009) (quoting *Bell Atl. v. Twombly*, 550 U.S. 544, 570, 127 S. Ct. 1955, 1974 (2007)). While "a court must accept as true the facts alleged in the complaint and draw all reasonable inferences in favor of the nonmoving party," *id.*, "'[c]onclusory allegations or legal conclusions masquerading as factual conclusions will not suffice to [defeat] a motion to dismiss,'" *id.* (quoting *Achtman v. Kirby, McInerney & Squire LLP*, 464 F.3d 328, 337 (2d Cir. 2006)); *see Burch v. Pioneer Credit Recovery, Inc.*, 551 F.3d 122, 124 (2d Cir. 2009) ("[A] plaintiff's pleading obligation still 'requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do.'") (quoting *Twombly*, 550 U.S. at 555).  "A court must apply a 'flexible "plausibility standard," which obliges a pleader to amplify a claim with some factual allegations in those contexts where such amplification is needed to render the claim plausible.'" *Carmona*, at *2. (quoting *Iqbal v. Hasty*, 490 F.3d 143, 157-58 (2d Cir. 2007)). "While the plausibility standard does 'not require heightened fact pleading of specifics,' it does require 'factual allegations sufficient "to raise a right to relief above the speculative level.'" *Id.* (quoting *Boykin v. KeyCorp*, 521 F.3d 202, 213 (2d Cir. 2008) (quoting *Twombly*, 550 U.S. at 555)).

---

[13]  *See e.g.*, Ex. B, Prospectus Supplement Lehman 2005-5N at S-26.  Of the nine Prospectus Supplements for the Offerings in which the Named Plaintiffs invested, all but the Structured Adjustable 2006-1 contains this language.

As demonstrated below, the Complaint abjectly fails to meet these standards with respect to the required threshold pleading of facts showing that Moody's is an "underwriter," a "seller," or a "control person" for purposes of Sections 11, 12(a)(2), and 15, respectively.  On this ground alone, all claims against Moody's should be dismissed.  Moreover, the Complaint also fails to plead adequately either the existence of material misrepresentations and omissions in the Offering Documents or a cognizable economic loss; each of these failures, too, independently compels dismissal.  Finally, all of Plaintiffs' claims are time-barred, and Plaintiffs' claims as to all but a few of the Certificates at issue also fail, and should be dismissed, for lack of standing.

## I.    THE COMPLAINT FAILS TO ADEQUATELY PLEAD THAT MOODY'S IS AN "UNDERWRITER" WITHIN THE MEANING OF SECTION 11

In their Complaint, Plaintiffs attempt to chart a radical new course of liability for credit rating agencies under Section 11 – *i.e.*, by asserting that these agencies are actually "underwriters" who are liable for all alleged misstatements in the Offering Documents.  This expansive reading of Section 11 – a reading utterly lacking in any support in case law – would completely unmoor the statutory term "underwriter" from its historical meaning, namely, as one who serves as a conduit for the distribution of securities from issuers to the public.  There are no allegations in the Complaint that Moody's played such a role.  Indeed, the only allegations pertaining to Moody's conduct relate to the process through which Moody's provided credit ratings for the Certificates – an activity for which, in recognition of the value inherent in the dissemination of such ratings, credit rating agencies have been provided regulatory protection.  In light of this protection, but more importantly in light of the plain text of the 1933 Act itself and the consistent interpretation of that text in case law, the Court should reject Plaintiffs' novel theory of liability.

A.    **SEC Regulations Preclude Section 11 Liability for Moody's Credit Ratings**

As an initial matter, it is important to understand that Plaintiffs' expansive and unprecedented theory of underwriter liability is not written on a blank slate.  The liability of credit rating agencies under Section 11 has already been considered by the SEC and, for important policy reasons, was sharply circumscribed by the promulgation of Rule 436(g) of Regulation C, 17 C.F.R. § 230.436(g).  As recognized in the Complaint (CAC ¶ 36), this provision precludes liability insofar as it is based upon any Moody's rating included in a registration statement.  Indeed, as discussed below, it is clear that Section 11 was never intended to impose securities liability for the rating process, and Plaintiffs' claim represents an attempt to circumvent the existing regulatory framework and distort the statutory language.[14]  *See also In re Jenny Craig Sec. Litig.*, No. 92 Civ. 0845, 1994 WL 750662 (S.D. Cal. Nov. 22, 1994) (holding, in reliance on *Central Bank v. First Interstate Bank*, 511 U.S. 164, 114 S. Ct. 1439 (1994), that "*Central Bank* . . . generally approve[s] of a restrictive drawing of the categories of persons who may be liable under the federal securities laws" and rejecting a broad construction of § 11's underwriter liability provision).

In 1982, the SEC amended Rule 436, which governs when the consents of certain professionals are required to be included in a registration statement, to address the use of credit ratings in such statements and the liability of the agencies for such ratings:

> Notwithstanding the provisions of paragraphs (a) and (b) of this section, the security rating assigned to a class of debt securities, a class of convertible debt securities, or a class of preferred stock by a nationally recognized statistical rating organization [NRSRO] . . . shall not be considered a part of the registration

---

[14]  In addition to the exemption provided by Rule 436(g) – and motivated in part by similar concerns – courts have held that ratings issued by Moody's and other agencies are opinions that cannot, under the First Amendment, form the basis for liability.  *See, e.g., Compuware Corp. v. Moody's Investors Serv., Inc.*, 499 F.3d 520 (6th Cir. 2007); *Jefferson County Sch. Dist. No. R-1*, 175 F.3d at 855-56, or that, at least, are subject to an "actual malice" standard, *see, e.g., In re Enron Corp. Sec., Derivative & "ERISA" Litig.*, 511 F. Supp. 2d 742, 825 (S.D. Tex. 2005).  As with Rule 436(g), the First Amendment protection afforded to credit ratings recognizes that their dissemination serves a valuable function that will be chilled if liability is too easily imposed.

statement prepared or certified by a person within the meaning of sections 7 and 11 of the Act.

SEC Regulation C, Rule 436(g)(1), 17 C.F.R. § 230.436(g)(1).  This provision was added as part of SEC regulatory changes designed to encourage the disclosure of ratings in registration statements.  *See* 47 Fed. Reg. 11380; 46 Fed. Reg. 42024.

Rule 436(g) eliminates the requirement, otherwise applicable under Section 7 of the Securities Act, that the consent of an NRSRO such as Moody's be obtained in order to use its ratings in a registration statement – and thus, by eliminating such consent, precludes any claims against the NRSRO for such ratings under Section 11.  The SEC promulgated this change, in part, in recognition of the fact that, given the attendant liability, ratings agencies would be highly unlikely to consent to the inclusion of their ratings in registration statements.  This understandable reluctance was seen as a significant obstacle to SEC's goal of encouraging the voluntary disclosure of such ratings.  *See* 46 Fed. Reg. at 42027-28.

Accordingly – as Plaintiffs fully recognize (CAC ¶ 36) – Moody's cannot be held liable under Section 11 for any alleged inaccuracies in the credit ratings given to the Certificates.[15] (Indeed, as stated by the *Enron* court, "NRSROs are also shielded from liability under the securities laws for all conduct except fraud."  *In re Enron*, 511 F. Supp. 2d at 817 n.77.)  Nor can this exemption be circumvented, as Plaintiffs attempt to do, by alleging that supposed errors in the credit rating *process* – e.g., that Moody's models were inaccurate, or that Moody's had a conflict of interest due to "ratings shopping" – were not disclosed.  Such allegations, even if true, are material only to the extent that they suggest that the ratings were inaccurate.  Accordingly, they cannot form the basis for liability under Section 11.

---

[15] Rule 436(g)'s exemption aside, there can be no Section 11 liability in any case because Plaintiffs do not and cannot allege that the Registration Statements contain any information identified as having been prepared by Moody's.  There is, in other words, simply no "statement in [the] registration statement, report or valuation [used in connection with the registration statement]" which purports to have been prepared by Moody's so as to support liability under Section 11(a)(4).

### B.    Moody's Did Not Participate in the Distribution of the Certificates and Was Therefore Not an "Underwriter" Under Section 11

Section 11(a) of the 1993 Act imposes liability for misrepresentations and omissions in a registration statement upon (1) signatories; (2) directors of the issuer; (3) directors-to-be of the issuer; (4) experts who consent to inclusion of their evaluations; and (5) underwriters. The first three of these categories plainly have no application to Moody's, and, as already discussed, Section 11a(4) expert liability is specifically negated by Rule 436(g) and Plaintiffs disclaim any reliance upon that provision. As for underwriter liability under Section 11(a)(5), the term "underwriter" is defined as

> any person who has purchased from an issuer with a view to, or offers or sells for an issuer in connection with, the distribution of any security, or participates or has a direct or indirect participation in any such undertaking, or participates or has a participation in the direct or indirect underwriting of any such undertaking; but such term shall not include a person whose interest is limited to a commission from an underwriter or dealer not in excess of the usual and customary distributors' or sellers' commission. As used in this paragraph the term "issuer" shall include, in addition to an issuer, any person directly or indirectly controlling or controlled by the issuer, or any person under direct or indirect common control with the issuer.

Securities Act § 2(11).

Courts interpreting this definition have consistently and repeatedly emphasized that it remains tethered to the traditional understanding of "underwriting" as the *distribution* of securities from an issuer to the investing public. "The legislative history of the term 'underwriter' reveals 'that the congressional intent was to include as underwriters all persons who might operate as conduits for securities being placed into the hands of the investing public.' As a result, the focus of the term 'underwriter' is on the concept of 'distribution.'" *Berckeley Inv. Group, Ltd. v. Colkitt*, 455 F.3d 195, 214-15 (3d Cir. 2006) (quoting 1 Thomas Lee Hazen, *The Law of Securities Regulation* 476 (2005)); *see also Ackerberg v. Johnson*, 892 F.2d 1328, 1335-36 (8th Cir. 1989) ("'[U]nderwriter' is generally defined in close connection with the

definition and meaning of 'distribution.'"); *McFarland v. Memorex Corp.*, 493 F. Supp. 631, 644 (N.D. Cal. 1980) ("It is crucial to the definition of 'underwriter' that any underwriter must participate in the distribution of a security.")[16]; *Ingenito v. Bermec Corp.*, 441 F. Supp. 525, 535-36 (S.D.N.Y. 1977) ("It is apparent that to be an underwriter within the meaning of the '33 Act, one must participate, in some manner, in the distribution of securities to the public. . . . [An underwriter] participates in the transmission process between the issuer and the public.").

The proper scope of § 11(a)(5) underwriter liability was recently examined in detail by Judge Lynch in a pair of opinions rejecting an expansive reading of the term. *See In re Refco, Inc. Sec. Litig.*, 503 F. Supp. 2d 611 (S.D.N.Y. 2007) ("*Refco I*"); *In re Refco, Inc. Sec. Litig.*, No. 05 Civ. 8626, 2008 WL 3843343 (S.D.N.Y. Aug. 14, 2008) ("*Refco II*"). Plaintiffs in *Refco* had obtained unregistered Refco bonds through an initial private (Rule 144A) offering, then exchanged those bonds for registered Refco bonds in a subsequent "Exxon Capital exchange." 503 F. Supp. 2d at 620. Plaintiffs alleged that certain underwriters of the first, private offering could be held liable under Section 11 for misrepresentations in the registration statement for the second offering because the defendants had "participated" in the creation of the second registration statement. *Id.* at 629.

Judge Lynch rejected this expansive reading of Section 11. In *Refco I*, the court noted that "'[u]nderwriter' is not . . . a term of unlimited applicability that includes anyone associated with a given transaction. 'It is crucial to the definition of "underwriter" that any underwriter must participate in the distribution of a security.'" *Id.* (quoting *McFarland*, 493 F. Supp. at 644.) The court further noted that the defendants there had neither purchased the registered securities for resale to the public, nor had they taken on any risk with respect to that transaction. *Id.*

---

[16] Judge Ingram's opinion in McFarland followed a review and recounting of the legislative history behind § 2(11). *See* 493 F. Supp. at 645.

Finally, the court held that the mere conclusory allegation of "participation" in the creation of the registration statement, absent specific allegations that would support such a conclusion, was insufficient to withstand a motion to dismiss, although the court did afford plaintiffs an opportunity to seek leave to replead.  *Id.* at 629-30 & n. 15.

Plaintiffs then filed an amended complaint, alleging in more detail that defendants and their lawyers had played a substantial role in drafting and editing the registration statement.  In *Refco II*, however, Judge Lynch again dismissed the Section 11 claims, in reasoning that bears repeating at length:

> While the definition of "underwriter" is indeed broad and is to be interpreted broadly, it must be read in relation to the underwriting function that the definition is intended to capture. Thus, a careful reading of the definition refutes plaintiffs' mistaken contention that a literal reading of the statute favors their interpretation. The definition primarily references those who "purchase[ ] from an issuer with a view to ... the distribution of any security."15 U.S.C. § 77b(a)(11). The language on which plaintiffs rely then adds to this definition anyone who "participates ... direct[ly] or indirect[ly] ... in any *such undertaking*." *Id.* (emphasis added). The "participation" in question is participation in the "undertaking" referred to immediately before: that of purchasing securities from an issuer with a view to their resale-that is, the underwriting of a securities offering as commonly understood. Whatever conduct may be covered by this language, it cannot easily be read to include the 144A Defendants' merely commenting on a draft of a registration statement for a bond offering in which they took no part in the distribution of the bonds.
>
> The general judicial understanding of the statute has been in accord with this Court's interpretation, as courts have emphasized that the breadth of the definition of "underwriter" is intended to sweep up all-but only-those who play a role in the distribution of the securities.

2008 WL 3843343, at *4.  The court went on to note that efforts to "identify[] actions taken behind the scenes merely emphasizes the critical defect" in the complaint, namely, that "defendants did not in any way hold themselves out as evaluating the registered bonds or endorsing the registration statement."  *Id.* at *4-5.

16

Here, the only actions alleged by the Plaintiffs with respect to Moody's participation in the offerings at issue are that (1) Moody's allegedly ran the loan-level files through their ratings models in order to advise Lehman regarding the potential value of the loans; and (generously read) (2) Moody's advised Lehman on how to structure individual certificates so as to obtain certain ratings. CAC ¶¶ 56-60, 172-78. *All* of the factual allegations regarding Moody's refer to the ratings and "structuring" process, *none* to the process that begins once the securities are ready to be offered, sold, or distributed. Indeed, there are no specific allegations at all that Moody's participated in *the undertaking* – *i.e*., played any "role in the distribution of the securities." There is not even any allegation, such as in *Refco*, that Moody's participated or advised in the drafting of the registration statement. Moreover, the only sense in which Moody's could possibly be found to have "h[eld] [itself] out as evaluating" the Certificates is through the issuance of its credit ratings – for which, as previously discussed, Moody's is specifically exempted from liability – and Plaintiffs explicitly disavow any such claim.

Nor can the complaint be salvaged by Plaintiffs' conclusory allegations that Moody's "disseminated" or "participated in the issuance and dissemination" of the Offering Documents. CAC ¶ 290. As Judge Lynch held in *Refco I*, such conclusory allegations – bereft of any specific factual allegations to support those conclusions – are inadequate to withstand a motion to dismiss. *See Refco I*, 503 F. Supp. 2d at 629-31; *see also Schuh v. Druckman & Sinel, L.L.P.*, __ F. Supp. 2d __, No. 07 Civ. 0366, 2009 WL 129851, at **6-7 (S.D.N.Y. Feb. 2, 2009) (dismissing claim based on allegation that defendant was a "debt collector" under the FDCPA, but failing to make any factual allegations to support that conclusion).

In sum, while the Securities Act definition of "underwriter" is written broadly, it is nevertheless still firmly tethered to the traditional understanding of the term – *i.e.*, that to sustain underwriter liability requires some participation as a conduit to the investing public. No such

17

allegations are present here.  To uphold Plaintiffs' Section 11 claim against Moody's would require a radically expansive interpretation of the statutory text, far beyond, and fundamentally different from, what any court has previously sustained.  There is no basis in law for such an interpretation, and Plaintiffs' baldly deficient pleading compels dismissal.

## II.      THE COMPLAINT FAILS TO ADEQUATELY PLEAD THAT MOODY'S IS A "SELLER" WITHIN THE MEANING OF SECTION 12(a)(2)

Plaintiffs' attempt to impose Section 12(a)(2) liability on Moody's is no more colorable than their assertion of a Section 11 claim and, again, is directly at odds with well-settled law as to the limited group of persons potentially subject to the statute's strict liability scheme.

A Section 12(a)(2) claim cannot survive a motion to dismiss unless the complaint contains factual allegations from which it can be concluded that the party to be held liable was an actual "seller" of the securities at issue.  *See, e.g.*, *Wilson v. Saintine Exploration and Drilling Corp.*, 872 F.2d 1124 (2d Cir. 1989) (defendant's status as a "seller" is threshold requirement for Section 12 claim); *In re Global Crossing, Ltd. Sec. Litig.*, No. 02 Civ. 0910, 2005 WL 2990646, at *11 (S.D.N.Y. Nov. 7, 2005) (dismissing Section 12(a)(2) claim where plaintiff could not "adequately allege a 'buyer-seller' relationship between himself and the defendant").

As confirmed in the seminal case of *Pinter v. Dahl*, 486 U.S. 622, 108 S. Ct. 2063 (1988), the definition of "seller" for Section 12 purposes is narrowly limited to the following: (i) the actual seller, *i.e.*, the entity or person which passed title to the plaintiff purchaser; or (ii) those who directly solicit the plaintiff purchaser on the seller's behalf for financial gain.  486 U.S. at 643.  All other parties – including those who are alleged to have extensively participated in the transaction at issue – are not statutory "sellers" and accordingly cannot be subject to Section 12 liability.  *Id.*; *see also Dorchester Investors v. Peak Int'l Ltd.*, 134 F. Supp. 2d 569 (S.D.N.Y. 2001) (party whose name appeared frequently in Prospectus and who was allegedly key to

success of securities transaction at issue not subject to Section 12(a)(2) liability in the absence of allegations which satisfied statutory definition of seller).

Indeed, in *Pinter*, the Supreme Court squarely rejected the so-called "substantial factor test," a theory advanced by plaintiffs seeking to expand Section 12 liability to encompass not just sellers, but various other third parties who had assisted with, provided advice to, or otherwise participated in the securities transaction at issue.  486 U.S. at 649-54.  By decisively spurning this all-encompassing approach, the *Pinter* case made crystal clear that Section 12 liability only reaches as far as those directly involved in the actual sales transaction – either the seller itself or those who solicit on the seller's behalf.  *Id*.  The Court confirmed that Section 12 was never meant to apply to service providers or other participants in the transaction given that the "buyer does not, in any meaningful sense, purchase the securities from such . . . person[s]."  *Id*. at 651.

The courts of this Circuit have scrupulously hewed to the *Pinter* holding, thereby effectively eliminating Section 12 liability for all parties who are not in direct sales contact with plaintiff purchasers as sellers or solicitors.[17]  In *Wilson*, *supra*, the Court of Appeals noted that the *Pinter* Court "expressly cautioned" against extending the "draconian provisions of Section 12" to those not directly involved in sales and solicitation. 872 F.2d at 1126-27 (collateral participants in a transaction who do not directly participate in sale are not statutory sellers).

In particular, courts have consistently required that when a plaintiff seeks to base a Section 12 claim on an allegation of "solicitation," the complaint must include specific factual allegations averring that the defendant engaged in the actual, direct, personal solicitation of the plaintiff.  *See*, *e.g.*, *In re Global Crossing*, 2005 WL 2990646 (failure to allege facts showing active solicitation warranted dismissal); *Forseberg v. Always Consulting, Inc.*, No. 06 Civ.

---

[17]  Although the *Pinter* holding as to the meaning of "seller" arose in the context of a Section 12(1) claim, it is well-settled that the holding applies with equal force to Section 12(a)(2) claims.  *See*, *e.g.*, *Wilson*, 872 F.2d at 1125.

19

13488, 2008 WL 5449003, at *12 (S.D.N.Y. Dec. 31, 2008) (no Section 12 claim against banker and surety defendants where complaint simply alleged that parties "facilitated" transaction through alleged corrupt banking and insurance practices); *Dietrich v. Bauer*, 76 F. Supp. 2d 312, 330 (S.D.N.Y. 1999) (allegation that "defendant made sale of securities possible" insufficient to sustain Section 12 claim); *In re Deutsche Telekom AG Sec. Litig.*, No. 00 Civ. 9475, 2002 WL 244597 (S.D.N.Y. Feb. 20, 2002) (dismissing Section 12 claim where pleadings contained no factual allegation of specific solicitation conduct); *HB Holdings Corp. v. Scovill, Inc.*, No. 88 Civ. 7983, 1990 WL 37869 (S.D.N.Y. Mar. 26, 1990) (defendants not statutory seller absent allegations of actual involvement in sales transaction).

*Shain v. Duff & Phelps Credit Rating Co.*, 915 F. Supp. 575 (S.D.N.Y. 1996), is particularly instructive.  In *Shain*, the class action plaintiff claimed that Duff & Phelps, a credit rating agency, was liable as one who "solicited" the sale of the securities at issue.  The plaintiff made allegations – like those made by Plaintiffs here – concerning the relationship between the rating agency and the issuer and claimed that conflicts of interest impacted the credit rating process. *Id*. at 578.  Unlike Plaintiffs here, however, the plaintiff in *Shain* also made specific allegations about Duff & Phelps' involvement in the *solicitation* process, alleging that, at the issuer's request, the rating agency met with broker-dealers, made numerous representations about the securities, and shared non-public information, knowing that this information would be passed on to potential investors.  *Id*. at 578-79.  Even with such allegations present, this Court dismissed the claim against Duff & Phelps. Citing the holding in *Pinter* that Section 12 liability cannot be imposed on "those who merely assist in another's solicitation efforts," 486 U.S. at 651 n.27, and emphasizing the absence of allegations that the defendant directly or personally solicited the plaintiff, the Court found that Duff & Phelps could not be liable as a "seller." 915 F. Supp. at 581-82.

*Shain* and the other above-cited cases are applicable here *a fortiori*, and dismissal is clearly compelled by *Pinter* and its Second Circuit progeny.[18]  As an initial matter, Plaintiffs do not and cannot allege that Moody's even held title to the Certificates, much less transferred title of them to Plaintiffs.  Accordingly, Plaintiffs cannot rely on any direct transfer of title as a basis for establishing liability against Moody's under Section 12.

Equally plain is Plaintiffs' complete failure – to a greater degree than that of the plaintiff in *Shain* – to allege *any* involvement by Moody's in the solicitation process, let alone the kind of actual, direct, or personal solicitation required to meet the *Pinter* standard.  There is no allegation that Moody's ever acted as a broker or sales agent on Lehman's behalf in order to obtain purchasers, or even that Moody's provided assistance to such a broker or sales agent.  There is certainly no allegation that Moody's ever had any direct contact, or communicated at all, with any Plaintiff or other purchaser in connection with the sales transaction.  Plaintiffs are likewise unable to allege that Moody's signed the registration statement circulated to purchasers, or participated in any other event designed to elicit sales interest from purchasers.  *See Steed Fin. LDC v. Nomura Sec. Int'l, Inc.*, No. 00 Civ. 8058, 2001 WL 1111508, at *7 (S.D.N.Y. Sept. 20, 2001) (Section 12 claim dismissed where plaintiff failed to allege that defendant signed registration statement or engaged in "specific acts" to "directly solicit" sale of securities).

Moreover, as the decision in *Shain* confirms, Plaintiffs' allegations concerning Moody's purported involvement in "structuring" the securities, or potential conflicts of interest in its relationship with Lehman, are wholly irrelevant to Section 12.  As the *Pinter* Court emphasized, the focus in Section 12 analysis must be on the defendant's relationship with the plaintiff-

---

[18]  Significantly, nearly all of the cited decisions predate the U.S. Supreme Court's decision in *Bell Atlantic v. Twombly*, *supra*, which made clear that pleading a cause of action under Rule 8 requires sufficient *factual* allegations to render the claim "plausible."  Under *Twombly*, the deficiencies of the pleadings here are even more inescapable, particularly given the inherently implausible nature of Plaintiffs' claims.

purchaser rather than the defendant's "degree of involvement in the security transaction and its surrounding circumstances." 486 U.S. at 651; *see also In re Gas Reclamation, Inc. Sec. Litig.*, 733 F. Supp. 713, 723-24 (S.D.N.Y. 1990).

Finally, Plaintiffs cannot rely on fleeting, vague, and wholly conclusory allegations (CAC ¶¶ 298, 307) that do no more than mechanically invoke the words "sold" and "solicitation." Such conclusory allegations are patently insufficient and render a Section 12 claim subject to dismissal. *See*, *e.g.*, *Credit Suisse First Boston Corp. v. ARM Fin. Group, Inc.*, No. 99 Civ. 2046, 2001 WL 300733, at *10 (S.D.N.Y. Mar. 28, 2001) (bald allegation of solicitation, standing alone, does not suffice for pleading purposes); *In re Deutsche Telekom*, 2002 WL 244597, at *5 ("bald allegations of solicitation insufficient to sustain . . . section 12(a)(2) liability").

In short, the Complaint does not come close to adequately pleading that Moody's is a "seller" for purposes of Section 12(a)(2), and this claim accordingly should be dismissed.

## III.   THE COMPLAINT FAILS TO ADEQUATELY PLEAD THAT MOODY'S IS A "CONTROL PERSON" WITHIN THE MEANING OF SECTION 15

Plaintiffs' assertion of a Section 15 claim against Moody's is as misguided and fundamentally deficient as their other attempts to sidestep the statutory and judicial restrictions on potential liability under the 1933 Act.

First, a Section 15 claim must be dismissed when there is no viable allegation of a primary violation of the Act.  *See*, *e.g.*, *In re Morgan Stanley Tech. Fund Sec. Litig.*, No. 02 Civ. 6153, 2009 WL 256005 (S.D.N.Y. Feb. 2, 2009).  Here, as demonstrated in the briefs of the moving defendants, all Section 11 and 12 claims asserted by Plaintiffs should be dismissed on numerous grounds.  Accordingly, in the absence of an underlying primary violation, the Section 15 claim against Moody's cannot stand.

Moreover, under Section 15, liability may only be imposed on parties that *actually controlled* the conduct of a primary violator of the Act, and claims under "control person" provisions will be dismissed unless the complaint contains, at minimum, factual allegations sufficient to show that the defendant "possessed the power to direct or cause the direction of the management and policies" of the primary violator. *In re Alstom SA Sec. Litig.*, 406 F. Supp. 2d 433, 486 (S.D.N.Y. 2005) (citations and quotation marks omitted).[19]  This case law is consistent with the purpose of Section 15, which was not to expand the Act's liability scheme but rather "to prevent people and entities from using 'dummies' to do the things that they were forbidden to do by the securities laws."  *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 352 F. Supp. 2d 429, 459 (S.D.N.Y. 2005) (internal citations and quotation marks omitted).

Here, Plaintiffs do not come remotely close to alleging "actual control" of Lehman by Moody's.  Moody's is not alleged to have any ownership interest in Lehman, any board positions at Lehman, any signing power for Lehman, or any contractual power to exercise authority over Lehman's actions.  Instead, Plaintiffs merely allege that Moody's provided information concerning what "credit enhancement" was needed to secure certain credit ratings, and thus influenced Lehman's decisions in purchasing loan pools and structuring the transaction.  *See* CAC ¶¶ 56-60.  Even assuming that Plaintiffs' description of the credit rating process is factually accurate (which it is not), they in no way allege that Moody's had the power or authority to "control" Lehman's management, policies, or decisions.

On the contrary, Plaintiffs allege, at best, that Moody's purportedly exercised some business influence over Lehman. Such allegations, however, have uniformly been found to be

---

[19]  For purposes of analyzing whether plaintiff has sufficiently pled the element of control, courts in this District apply the identical standard irrespective of whether the claim arises under Section 15 of the Securities Act or Section 20 of the Exchange Act , interchangeably citing cases arising under both provisions. *See*, *e.g.*, *In re Deutsche Telkom AG Sec. Litig.*, *supra* (applying same analysis to control element for claims arising under Section 15 and Section 20).

deficient.  *See, e.g., In re Flagg*, 352 F. Supp. 2d at 458-59 (allegations that party had strong business influence over primary violator and was directly involved in creating securities transaction insufficient); *In re Blech Sec. Litig.*, 961 F. Supp. 569, 586-87 (S.D.N.Y. 1997) (allegations describing broker's "exercise of influence" over transaction insufficient); *In re Alstom SA*, 406 F. Supp. 2d at 487  ("exercise of influence, without power to direct or cause the direction of management and policies through ownership of voting securities, by contract, or in any other direct way, is not sufficient to establish control"); *In re Crazy Eddie Sec. Litig.*, 747 F. Supp. 850 (E.D.N.Y. 1984) (allegations of participation in wrongful conduct insufficient). Plainly, whatever guidance Moody's allegedly gave to Lehman, Lehman was always free to make any choice it wanted – including but not limited to deciding not to issue the Certificates. Plaintiffs allege nothing to the contrary.

Furthermore, Plaintiffs' own allegations in the Complaint flatly contradict, and indeed render absurd, the notion that Moody's had "actual control" of Lehman.  For example, Plaintiffs allege that Moody's provided free services to Lehman "engender goodwill so that Lehman would ultimately engage" Moody's to provide ratings; that the credit rating process involved a "constant" process of "negotiation," with Lehman "pressing" for higher ratings and less credit enhancement; and that Lehman engaged in "ratings shopping."  CAC ¶ 57, 61, 168.  The nature of the purported relationship between Moody's and Lehman alleged by Plaintiffs – Moody's currying favor in hopes of obtaining business while Lehman pushes Moody's for accommodations, effectively threatening to take its business elsewhere if not satisfied – is not merely inconsistent with, but antithetical to, the claim that Moody's "controlled" Lehman.

In sum, the Complaint contains no factual allegations supportive of "actual control." Even Plaintiffs' purely conclusory allegations, which would be deficient even if they echoed the legal standard, s*ee In re Deutsche Telkom AG*, 2002 WL 244597, at **6-7, conspicuously fail to

24

allege that Moody's had the power to "control" but merely allege, instead, the "power to influence." CAC ¶ 307.   The Section 15 claim against Moody's should also therefore be dismissed for failure to allege that Moody's is a "control person."

## IV.   PLAINTIFFS' CLAIMS ARE BARRED BY THE STATUTE OF LIMITATIONS

Plaintiffs' claims against Moody's are governed by the statute of limitations set forth in 15 U.S.C. § 77m. *See In re Alcatel Sec. Litig.*, 382 F. Supp. 2d 513, 522 (S.D.N.Y. 2005). Claims under Sections 11, 12, and 15 must be filed "within one year of the date that the plaintiff was on actual notice or inquiry notice of the violation." *In re WorldCom Sec. Litig.*, 496 F.3d 245, 249 (2d Cir. 2007). They must also be brought within three years of the offering date (Section 11) or the sale date (Section 12). *Id.*; 15 U.S.C. § 77m. [20]

While the original complaints underlying this consolidated class action were filed in June and July of 2008, those complaints did not name Moody's as a defendant.  The first time Moody's (or any rating agency) was named was when Plaintiffs filed the Complaint on February 23, 2009.  Thus, Plaintiffs' claims are barred by the statute of limitations to the extent they are based on Offerings with offering or purchase dates preceding February 23, 2006.  Further, their claims are completely barred because – given the massive media disclosures in 2007 and early 2008 concerning the mortgage originators and rating agencies discussed in the Complaint – Plaintiffs were on inquiry notice of the alleged violations prior to February 23, 2008. [21]

---

[20]  The two and five year statute of limitations set forth in the Sarbanes-Oxley Act, 28 U.S.C. § 1658(b), governing claims "that involve . . . fraud, deceit, manipulation, or contrivance . . ." is not applicable here, as Plaintiffs expressly disavow any claims based on fraud. CAC ¶ 3.  *See In re WorldCom*, 496 F.3d at  250 (2d Cir. 2007); *In re Alstom SA*, 406 F. Supp. 2d at 413.

[21]  Given that Plaintiffs cannot possibly contend that Moody's was omitted from the original complaints because they were "mistaken" as to Moody's identity, they cannot take advantage of Fed. R. Civ. P. 15(c)(3) and claim, for purposes of the statute of limitations, that the Complaint as to Moody's "relates back" to an earlier filing date.  *See Enterprise Mortg. Acceptance Co., Sec. Litig. v. Enterprise Mortg. Acceptance Co.*, 391 F.3d 401, 405 n.2 (2d Cir. 2004) (Rule 15(c) relation back doctrine inapplicable where plaintiff "did not sue another accountant by mistake, but rather chose not to name E & Y in their original complaint"); *Bass v. World Wrestling Federation Entm't, Inc.*, 129 F. Supp. 2d 491, 508 (E.D.N.Y. 2001) (plaintiff bears burden of proving that failure to name  new defendant in original pleading was a "mistake," and "not due to strategy, lack of knowledge, or some other reason")

A.      **The Applicable Law**

Courts can "readily resolve the issue of inquiry notice as a matter of law on a motion to

dismiss – as has been done in a vast number of cases in this circuit – where the facts needed for

determination of when a reasonable investor of ordinary intelligence would have been aware of

the existence of [the violations alleged] can be gleaned from the complaint and papers ... integral

to the complaint." *Staehr v. Hartford Fin. Servs. Group, Inc.*, 547 F.3d 406, 412 (2d Cir. 2008)

(citations and quotation marks omitted).  Inquiry notice does not require that a plaintiff learn the

full story, or every detail underlying his claims. *See Dodds v Cigna Sec., Inc.*, 12 F. 3d 346, 351-

52 (2d Cir. 1993); *In re Global Crossing, Ltd. Sec. Litig.*, 313 F. Supp. 2d 189, 201 (S.D.N.Y.

2003) (statute is not tolled for plaintiff's "leisurely discovery of the full details").

To determine whether the "mix of information" available to investors was sufficient to

trigger inquiry notice, the courts consider media reports as well as regulatory filings, lawsuits,

and other public information.  In each instance, the court can take judicial notice of the

availability of these materials, "without regard to the truth of their contents."  *Staehr*, 547 F.3d at

425.  Numerous cases in this circuit have recognized that media reports may trigger inquiry

notice. *See, e.g.*, *Shah v. Meeker*, 435 F.3d 244, 250-51 (2d Cir. 2006); *LC Capital Partners, LP

v. Frontier Ins. Group, Inc.*, 318 F.3d 148, 155 (2d Cir. 2003); *White v. H&R Block, Inc.*, No. 02

Civ. 8965, 2004 WL 1698628, at *6 (S.D.N.Y. July 28, 2004) (public information, including

press reports, "more than sufficient"); *In re Ultrafem Inc. Sec. Litig.*, 91 F. Supp. 2d 678, 692-93

(S.D.N.Y. 2000) (single press article triggered inquiry notice).  While generic articles revealing

information about a particular industry sector, standing alone, are unlikely to trigger the duty of

---

(citations omitted).  Indeed, any claimed mistake as to Moody's identity is particularly undercut by the fact that one of the Plaintiffs, represented by the lead counsel for Plaintiffs, did in fact file suit against Moody's in other class actions alleging similar claims filed in May and early June 2008. *See New Jersey Carpenters Vacation Fund v Harborview Mortgage Loan Trust 2006-4*, New York Sup., Index No. 0601451/08; *New Jersey Carpenters Health Fund v NovaStar Mortgage Funding Trust, Series 2006-3*, New York Sup., Index No. 061563/08; *New Jersey Carpenters Health Fund v Home Equity Mortgage Trust 2006-5*, New York Sup., Index No. 0601670/08.

inquiry, it may be triggered by a mixture of media reports containing company-specific information and more general information.  *See*, *e.g.*, *Shah*, 435 F.3d at 249-50.

Finally, in a case such as this, where a plaintiff has disavowed claims of fraud, inquiry notice may be demonstrated by less information than would be required in a securities fraud case.  Whereas "inquiry notice, in securities fraud suits, requires storm warnings indicating that defendants acted with scienter," *Alaska Elec. Pension Fund v. Pharmacia Corp.*, 554 F.3d 342, 348 & n.4 (3d Cir. 2009), in a Section 11 or 12 case the available information need only constitute "storm warnings" regarding the existence of possible misstatements and omissions. "This is a distinction with a difference . . . in terms of what information must be available for inquiry notice to take hold. . . . Were this is a § 11 case, which it is not, the evidence in the public realm . . . might well have given rise to storm warnings of misstatements" much earlier. *Id*. at 348 n.4.

### B.  Plaintiffs Were on Inquiry Notice as of February 23, 2008

The Complaint alleges that the Offering Statements contained material misrepresentations or omissions concerning the origination of the loans, Lehman's due diligence, the purported involvement of Moody's and S&P (the "Rating Agencies") in the "structuring" of the transactions, and potential conflicts of interest in the Rating Agencies' relationship with Lehman.  It is clear from the record – which shows that these very issues were the subject of a steady stream of disclosures in company-specific media reports and public announcements – that Plaintiffs were on inquiry notice of these alleged misrepresentations and omissions by mid-2007 and certainly by February 23, 2008.  Indeed, these "storm warnings" are in large part alleged by Plaintiffs themselves in the Complaint.

### 1.    <u>Allegations Regarding Origination and Due Diligence</u>

Plaintiffs' principal allegations of misrepresentations and omissions concern the originators' alleged failure to comply with general loan underwriting guidelines set forth in the Offering Documents. CAC ¶¶ 157-246. As an initial matter, the Complaint alleges that "relatively soon after issuance" delinquency and foreclosure rates of the Certificate collateral began increasing, leading S&P to announce, on **July 10, 2007**, a revision in methodologies to reflect indications of "pervasive failures in the origination of collateral" and concerns about "the accuracy of the loan data." According to the Complaint, Moody's made a similar announcement on **July 11, 2007**, and downgrades of the Certificates soon followed. CAC ¶¶ 70-72.

Moreover, alleged improper practices in loan underwriting by the specific originators named in the Complaint were widely publicized beginning *nearly two years* before the Complaint was filed. The "improper tactics" of Lehman's in-house lending outlets – Aurora and BNC – were detailed in a **June 27, 2007** *Wall Street Journal* ("WSJ") article, which included interviews with 25 former employees. CAC ¶ 88. The alleged predatory lending practices of Countrywide – according to this Complaint and one of the earlier-filed complaints herein – were: (i) at the center of disclosures beginning "in or around **early 2007**," which revealed that billions in mortgage-backed securities were "collateralized with home loans which were made to uncreditworthy borrowers, significantly inflating the value of those securities";[22] (ii) the subject of Senate Panel investigation as reported by WSJ on **August 29, 2007** (CAC ¶ 92); and (iii) acknowledged in **December 2007** by Countrywide itself, which reported that over $130 billion in loans originated in 2005-06 would not have been approved under its original underwriting guidelines. CAC ¶ 94. With respect to IndyMac, its alleged use of no-documentation-required

---

[22]  *See* Complaint in *New Jersey Carpenters Health Fund v. Lehman XS Trust Series 2005-5N*, No. 08-CV-6762 (S.D.N.Y.), at ¶ 43.

"liar loans" was reported in **March 2007** (CAC ¶ 110), and an **August 20, 2007** *Business Week* article "provided glaring examples of IndyMac's loose underwriting and aggressive mortgage lending practices." CAC ¶ 113.  A suit filed against Greenpoint in **2005** alleged that "if underwriters denied an application for creditworthiness, managers would override their decisions and approve the loans anyway." CAC ¶ 122.  First Franklin's "lowered" lending standards and "lax controls" were cited in a *New York Times* ("NYT") article published on **March 23, 2007**. CAC ¶ 133.  As early as **April 2004**, Wells Fargo was publicly accused of "widespread predatory lending practices" by a watchdog group. CAC ¶ 141.[23]  Indeed, by the end of **May 2007**, several government hearings[24] and major news publications[25] were focusing on the failure of underwriters to follow proper lending guidelines in issuing subprime loans.

As for Lehman's allegedly inadequate review of the loan documentation (CAC ¶¶ 151-58), the firms it allegedly contracted with to conduct its due diligence, Clayton and Bohan (CAC ¶ 13), were subpoenaed by the New York Attorney General in **June 2007** during an investigation into whether "investment banks held back information they should have provided in the disclosure documents related to the sale of mortgage backed securities to investors." CAC ¶ 154.  In **January 2008**, both the NYT and WSJ reported in detail on the testimony of Clayton before

---

[23]  In January 2008 (*see* No. 08-CV-062 (D. Md.)), still more than a year before the Complaint was filed, the City of Baltimore sued Wells Fargo, "accusing the company of issuing loans without regard for whether the borrower could repay them." CAC ¶ 141.

[24]  *See* Subprime and Predatory Mortgage Lending: New Regulatory Guidance, Current Market Conditions and Effects on Regulated Financial Institutions Before the H. Subcomm. on Financial Institutions and Consumer Credit, 110th Cong. 3 (**Mar. 27, 2007**); The Role of the Secondary Market in Subprime Mortgage Lending Before the H. Subcomm. on Financial Institutions and Consumer Credit Hearing, 110th Cong. 3 (**May 7, 2007**); Preserving the American Dream: Predatory Lending Practices and Home Foreclosures Before the U.S. Senate Committee on Banking, Housing and Urban Affairs, 110th Cong. (**Feb. 7, 2007**); Mortgage Market Turmoil: Causes and Consequences Before the U.S. Senate Committee on Banking, Housing and Urban Affairs, 110th Cong. (**Mar. 22, 2007**); Subprime Mortgage Market Turmoil:  Examining the Role of Securitization Hearing Before the S. Banking, Housing and Urban Affairs Comm.'s Subcomm. on Securities, Insurance and Investments, 110th Cong. (**April 17, 2007**).

[25]  *See e.g.* Ex. C, David Cho, *Pressure at Mortgage Firm Led to Mass Approval of Bad Loans*, Wash. Post, May 7, 2007, at A01.

regulators and detailed the investment banks' acceptance of lower lending standards. CAC ¶ 156. The WSJ specifically identified Lehman as a "large" ex-client of Clayton.[26]

In sum, the company-specific "storm warnings" around the alleged failure of Lehman's originators to adhere to loan underwriting guidelines and Lehman's allegedly deficient due diligence were unmistakable by mid-2007 and nothing short of overwhelming by February 2008.

## 2.    Allegations Regarding the Rating Agencies

Similarly, Plaintiffs' allegations concerning purported misrepresentations or omissions about the Rating Agencies' role in the securitization process all involve concerns that were the subject, beginning in early 2007, of public announcements, government inquiries, and a flood of mainstream media articles that focused specifically on Moody's and S&P.

For example, with respect to Plaintiffs' allegations concerning "outdated" models or methodologies (CAC ¶¶ 16, 53, 159-67), the Rating Agencies – according to the Complaint – acknowledged publicly in **April and July 2007** that their models or methodologies were several years old and/or requiring revision.  CAC ¶¶ 72, 162 (Moody's alleged "stunning admission" in **April 2007** that its model, introduced in 2002, would be revised because "the mortgage market has evolved considerably" and announcement in **July 2007** that methodologies were being revised and downgrades would follow); CAC ¶ 70 (S&P's alleged **July 2007** announcement that it was revising RMBS methodologies because "performance of the underlying collateral 'called into question' the accuracy of the loan data").  A **May 31, 2007** article in *The Economist* also publicly discussed the alleged shortcomings of the Ratings Agencies' models for evaluating mortgage backed securities.[27]  Similarly, an article that appeared on page A1 of the **August 15,**

---

[26] *See* Ex. D, Amir Efrati and Ruth Simon, *Due-Diligence Firm to Aid New York Subprime Probe*, Wall St. J., Jan. 28, 2008, at A2.

[27] Ex. F, Matthew Valencia, *Measuring the Measurers*, The Economist, May 31, 2007 (stating that the Ratings Agencies' models "misread the level of correlation between different types of assets – a crucial variable – and ignored signs that risks were greater than historical data suggested").

**2007** WSJ, entitled "How Rating Firms' Calls Fueled Subprime Mess" (the "WSJ 'Subprime Mess' Article") reported that the Rating Agencies had recently announced that the changes in the market "had reduced the relevance of their statistical models and historical data." Ex. E.

As for Plaintiffs' claim that the Offering Documents failed to disclose the alleged "true" role of the Rating Agencies in the structuring of the Offerings (CAC ¶¶ 56-62, 172-78), the Complaint alleges that a **June 1, 2007** article in the *International Herald Tribune* reported that Ratings Agencies "did much more than evaluate [MBS instruments] and give them letter grades," but, rather, played an "integral role" in structuring the transactions and instructed the assemblers "how to squeeze the most profit out" of the MBS by maximizing the tranches with the highest ratings." CAC ¶ 175.  Similarly, according to Plaintiffs, the "actual role" played by the Rating Agencies was further exposed in a **September 2007** *Conde Naste Portfolio* article describing how Moody's "revealed" the "significant, and ultimately more dangerous, role that the agencies play in financial markets" – with "Moody's and its peers" helping their clients "put together complicated mortgage securities before they receive an official ratings stamp." CAC ¶ 177. The WSJ "Subprime Mess" Article from **August 2007** about Moody's and S&P also trumpeted "a less-recognized role of the rating companies: their collaboration, behind the scenes, with the underwriters that were pulling those securities together."

Finally, allegations concerning the Rating Agencies' "conflicts of interest" and so-called "ratings shopping" (CAC ¶¶ 66-67, 168-171) were widely publicized during the same period.  In **August 2007**, the front-page WSJ "Subprime Mess" Article reported claims that underwriters took their business to "another rating company if they couldn't get the rating they needed" and quoted a former Rating Agency employee as saying, "It was always about shopping around."

Indeed, throughout 2007 there were countless mainstream press reports and public statements making the very same conflict-of-interest allegations contained in the Complaint.[28]

Given this broad, dense, voluminous mix of prominently placed, strongly worded mainstream press reports and public announcements, virtually all of which specifically reference Moody's and S&P, any reasonable investor of ordinary intelligence would certainly have had sufficient information in 2007, and undoubtedly by February 2008, to be on inquiry notice of any alleged misrepresentations or omissions concerning the Rating Agencies. *See Shah*, 435 F.3d at 249, 251 (some "degree of specificity" required to trigger inquiry notice); *LC Capital Partners*, 318 F.3d at 154.

Thus, all of Plaintiffs' claims against Moody's are time-barred (claims concerning Certificates offered or sold prior to February 23, 2006 are *doubly* time-barred), and, on this ground as well, the Complaint should be dismissed.

## V.       PLAINTIFFS FAIL, AS REQUIRED, TO PLEAD RECOVERABLE DAMAGES

Plaintiffs must plead "the existence of recoverable damages" in order to survive a motion to dismiss on Securities Act claims. *See In re Mutual Funds Inv. Litig.*, 384 F. Supp. 2d 845, 866 (D. Md. 2005); *see also Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 345, 125 S. Ct. 1627, 1633 (2005) ("The securities statutes seek to maintain public confidence in the marketplace," . . . "not to provide investors with broad insurance against market losses, but to protect them against those

---

[28] *See, e.g.*, Ex. G, Richard Beales, Saskia Scholtes & Gillian Tett, *Failing Grades?*, Financial Times, **May 16, 2007** (rating agencies' "dependence on investment banks for structured finance business gives them a significant incentive to look kindly on the products they are rating, critics say."); Ex. H, Stephen Labaton, *U.S. Investigates Credit-Rating Firms: Impartiality is Questioned on Mortgage-Backed Securities*, International Herald Tribune, **Sept. 28, 2007**, at 14 (SEC inquiry into whether rating agencies "compromised their impartiality" when they "provided advice to Wall Street investment firms about how to package [RMBS securities] so as to gain higher credit ratings."); Ex. I, Dawn Kopecki, *The Credit Ratings Blame Game: Congressional Hearings Raise Questions About How Credit Ratings Agencies Evaluated Mortgage Securities and Managed Potential Conflicts*, Business Week Online, **Oct. 1, 2007** (SEC focusing on whether fees paid to Moody's and S&P "unduly influenced" ratings); Ex. J, *Editorial: Conflicts and Interests*, St. Louis Post-Dispatch, **Oct. 31, 2007** (discussing rating shopping and "obvious" problem that "it's in a ratings agency's financial interest to rate mortgage bonds favorably"); **Dec. 12, 2007** Congressional Daily, 2007 WLNR 24387841 (Senator Schumer announcement concerning rating agencies' "inherent conflict of interest" and "incentive to be optimistic").

economic losses that misrepresentations actually cause."); *Pierce v. Morris*, No. 03 Civ. 026, 2006 WL 2370343, at *4 (N.D. Tex. Aug. 16, 2006) ("Where a plaintiff fails to allege any conceivable damages for violation of the Securities Act his claims must be dismissed.").

Here, Plaintiffs have alleged no facts which indicate they have suffered recoverable losses on their investments in the Certificates. The Complaint confirms that the Plaintiffs' expected return on investment was through "distributions" tied to the loan payments underlying the Certificates held by investors. CAC ¶ 9. In such situations, the only appropriate measure of the Certificates' value, or any loss in value, is clearly derived from the future cash flows generated by the underlying pools of securitized mortgages, discounted to the present. *See, e.g., In re First Union Corp. Sec. Litig.*, 128 F. Supp. 2d 871, 894 n.22 (W.D.N.C. 2001) ("Valuation of mortgage-backed securities such as those at issue here essentially is an exercise in estimating expected future cash flows.").

Yet, although the Complaint refers to delinquencies and defaults as to the underlying loans, it conspicuously fails to allege that Plaintiffs have suffered any cessation or reduction in the cash flow to which they are entitled under the Certificates.[29] Thus, Plaintiffs have alleged no losses at all, and no recoverable damages, and their claims are at best premature. Indeed, even if, *arguendo*, the Complaint could be read to imply that disruptions in future expected cash flows are likely, such speculative future injury is not sufficient to support this Complaint. *See Jackson Nat. Life Ins. Co. v. Ligator*, 949 F. Supp. 200, 207-208 (S.D.N.Y. 1996) (where plaintiffs alleged their $34 million investment in securities "has been rendered valueless, or has substantially lost its value, due to the unlikelihood of full repayment," court held "a mere

---

[29] As the Prospectus Supplements make clear, significant delinquency and default rates on the loans tied to a particular Offering are an expected occurrence – and in no way indicative of actual losses suffered by investors. *See e.g.* Ex. B, Prospectus Supplement Lehman 2005-5N, at S-16 ("the mortgage loans are likely to experience rates of delinquency, foreclosure and bankruptcy that are higher, and that may be substantially higher, than those experienced by mortgage loans underwritten in accordance with higher standards").

'unlikelihood' is simply not sufficient to support an action at this time," and dismissed in light of, *inter alia*, "the speculative, unprovable nature of damages at this time").

Moreover, any future disruptions in the distributions due to Plaintiffs are particularly speculative here, given Plaintiffs' status as "senior" Certificate holders.  Senior holders are exposed to losses only *after* losses are absorbed by "subordinate" classes of investors, and this subordination mechanism is only one of several "credit enhancements" built into the Offerings to extend extra protection to purchasers of senior Certificates.  CAC ¶ 15.

Evidently aware of their inability to establish recoverable damages through losses of their expected return, Plaintiffs assert that their losses consist of alleged declines in the "market price" for the Certificates. CAC ¶¶ 8, 22-24. Plaintiffs' attempt to base a damage claim on a loss in market value, as if they had purchased stock in a publicly traded corporation, ignores the fundamental nature of the Certificates and explicit warnings in the Prospectuses.  The Certificates could not have reasonably been purchased with the expectation that they could be sold on a secondary market for a profit. As the Prospectus Supplements caution, "[a] secondary market for any class of offered certificates may not develop. . . [and] it might not continue or it might not be sufficiently liquid to allow you to resell any of your certificates." *See e.g.* Ex. B, Prospectus Supplement Lehman 2005-5N, at S-16.  Thus, there is no open and efficient trading market for the Certificates which can provide the appropriate measure of their "value." *See McMahan & Co. v. Wherehouse Entm't, Inc.*, 65 F.3d 1044, 1049 (2d Cir. 1995) ("The value of a security may not be equivalent to its market price. Congress' use of the term 'value,' as distinguished from the terms 'amount paid' and 'price' indicates that, under certain

circumstances, the market price may not adequately reflect the security's value.").[30]  Moreover,

Plaintiffs do not allege that they have in fact sold any of the Certificates at issue.

Indeed, were Plaintiffs allowed to proceed with their theory of damages and prevail, they

would receive a potential windfall, possibly receiving both the future expected cash flow from

the Certificates as well as the alleged diminution in the "market price."

In sum, because Plaintiffs have failed to allege any recoverable losses, their claims

should be dismissed on this ground as well.

## CONCLUSION

For the foregoing reasons, and those set forth in the Memoranda of Law of The McGraw-

Hill Companies, Inc. and the Individual Defendants, the Complaint against Moody's should be

dismissed in its entirety.


Dated:    New York, New York
          April 27, 2009


                              **SATTERLEE STEPHENS BURKE & BURKE LLP**

                              By:  /s/ Joshua M. Rubins
                                      Joshua M. Rubins (jrubins@ssbb.com)
                                      James J. Coster (jcoster@ssbb.com)
                              230 Park Avenue
                              New York, New York  10169
                              Telephone:  (212) 818-9200
                              Facsimile:  (212) 818-9606
                              *Attorneys for Defendant Moody's Investors Service, Inc.*

---

[30]  Significantly, Sections 11(e) and 12(b), in authorizing certain damage recoveries based on "value"
determinations, do not equate, and, indeed, clearly make a distinction between "value" and "price."