UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
In re:

LEHMAN BROTHERS SECURITIES AND
ERISA LITIGATION                          Civil Action No. 09-MD-2017 (LAK)

This document applies to:

*In re Lehman Brothers Mortgage-Backed Securities
Litigation, No. 08-CV-6762*
-------------------------------------------------------------X


**DEFENDANT THE MCGRAW-HILL COMPANIES, INC.'S
MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION TO
<u>DISMISS THE CONSOLIDATED AMENDED COMPLAINT</u>**


Floyd Abrams
S. Penny Windle
Adam Zurofsky
Tammy L. Roy
CAHILL GORDON & REINDEL LLP
80 Pine Street
New York, New York  10005
(212) 701-3000

*Attorneys for Defendant The
McGraw-Hill Companies, Inc.*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ ii

PRELIMINARY STATEMENT ......................................................................................... 1

STATEMENT OF THE CASE ............................................................................................ 2

      A.     Procedural Background ................................................................................ 2

      B.     McGraw-Hill and Standard & Poor's Ratings Services ......................................... 4

ARGUMENT .................................................................................................................... 5

I.      PLAINTIFFS' SECTION 11 CLAIM AGAINST S&P SHOULD BE
      DISMISSED ............................................................................................................ 5

      A.     No Section 11 Liability Can Be Imposed Based on S&P's Ratings ....................... 6

      B.     Plaintiffs Cannot Meet The Elements for Establishing "Expert"
              Liability ...................................................................................................... 8

      C.     S&P Is Not An "Underwriter" of the Securities It Rated ................................... 11

II.     S&P IS NOT A "SELLER" UNDER 12(a)(2) ............................................................... 18

      A.     S&P Is Not A Direct Seller of the Securities ...................................................... 18

      B.     S&P Is Not A Solicitation Seller of the Securities ............................................. 19

III.    PLAINTIFFS' SECTION 11 AND 12 CLAIMS ARE TIME-BARRED ....................... 22

IV.   THE ASSERTED RATINGS-RELATED "MISSTATEMENTS" AND
      "OMISSIONS" ARE NOT ACTIONABLE IN ANY EVENT ..................................... 27

      A.     No Actionable "Omissions" Are Alleged .......................................................... 28

      B.     The Ratings-Related Statements In The Offering Documents Are
              Entitled To Protection Under The "Bespeaks Caution" Doctrine ....................... 31

V.     PLAINTIFFS' SECTION 15 CLAIM SHOULD BE DISMISSED ............................... 33

CONCLUSION ................................................................................................................ 35

## **TABLE OF AUTHORITIES**

### **Cases**

*Ackerberg* v. *Johnson*, 892 F.2d 1328 (8th Cir. 1989) ............................................. 12

*Addeo* v. *Braver*, 956 F. Supp. 443 (S.D.N.Y. 1997) ................................................. 23

*In re Adelphia Communications Corp. Securities and Derivative Litigation*, 2007 WL 2615928 (S.D.N.Y. Sept. 10, 2007) ................................... 16-17

*Alaska Electrical Pension Fund* v. *Pharmacia Corp.*, 554 F.3d 342 (3d Cir. 2009) .............................................................................................................. 23

*In re Alstom SA Securities Litigation*, 406 F. Supp. 2d 402 (S.D.N.Y. 2005) .................................................................................................................... 23

*Capri* v. *Murphy*, 856 F.2d 473 (2d Cir. 1988)........................................................ 19-20

*In re Citigroup, Inc. Securities Litigation*, 330 F. Supp. 2d 367 (S.D.N.Y. 2004) .................................................................................................................... 30n

*Cortec Industries, Inc*. v. *Sum Holding L.P.*, 949 F.2d 42 (2d Cir. 1991)................ 18-19

*Cross* v. *21st Century Holding Co.*, 2001 WL 34808272 (S.D.N.Y. Aug. 6, 2001) ......................................................................................................... 23-24

*In re Daou Systems, Inc. Securities Litigation*, 411 F.3d 1006 (9th Cir. 2005) .................................................................................................................... 20

*In re Deutsche Telekom AG Securities Litigation*, 2002 WL 244597 (S.D.N.Y. Feb. 20, 2002) ..................................................................................... 21

*Endo* v. *Arthur Andersen & Co.*, 163 F.3d 463 (7th Cir. 1999) ............................... 10n

*In re Enron Corp. Securities, Derivative and "ERISA" Litigation*, 511 F. Supp. 2d 742 (S.D. Tex. 2005) ....................................................................... 7

*In re Enterprise Mortgage Acceptance Co., LLC Securities Litigation*, 391 F.3d 401 (2d Cir. 2004).................................................................................. 22n

*In re Flag Telecom Holdings, Ltd. Securities Litigation*, 352 F. Supp. 2d 429 (S.D.N.Y. 2005) .......................................................................................... 34-35

*In re Gas Reclamation, Inc. Securities Litigation*, 733 F. Supp. 713 (S.D.N.Y. 1990) ................................................................................................... 19

*In re Global Crossing, Ltd. Securities Litigation*, 313 F. Supp. 2d 189 (S.D.N.Y. 2003) ........................................... 26

*In re Global Crossing, Ltd. Securities Litigation,* 322 F. Supp. 2d 319 (S.D.N.Y. Aug. 5, 2005) ........................................... 10n

*In re Global Crossing, Ltd. Securities Litigation*, 2005 WL 1875445 (S.D.N.Y. Aug. 5, 2005) ........................................... 34

*Halperin* v. *eBanker USA.com, Inc.*, 295 F.3d 352 (2d Cir. 2002) ...................... 31, 33

*Herman & MacLean* v. *Huddleston*, 459 U.S. 375, 103 S. Ct. 683 (1983) .............. 5, 8, 9n

*Hinerfeld* v. *United Auto Group*, 1998 WL 397852 (S.D.N.Y. July 15, 1998) ........................................... 32

*Ingenito* v. *Bermec Corp.*, 441 F. Supp. 525 (S.D.N.Y. 1997) ................................ 12-13

*Jackson National Life Insurance Co.* v. *Merrill Lynch & Co.*, 32 F.3d 697 (2d Cir. 1994) ........................................... 24

*Lin* v. *Interactive Brokers Group, Inc.*, 574 F. Supp. 2d 408 (S.D.N.Y. 2008) ........................................... 30

*Luce* v. *Edelstein*, 802 F.2d 49 (2d Cir. 1986) ........................................... 33

*Maywalt* v. *Parker & Parsley Petroleum Co.*, 808 F. Supp. 1037 (S.D.N.Y. 1992) ........................................... 27

*McFarland* v. *Memorex Corp.*, 493 F. Supp. 631 (N.D. Cal. 1980) ........................ 9-10, 13, 17, 17n-18n

*In re Merrill Lynch & Co., Research Reports Securities Litigation*, 272 F. Supp. 2d 243 (S.D.N.Y. 2003) ........................................... 29

*Miller* v. *Lazard, Ltd.*, 473 F. Supp. 2d 571 (S.D.N.Y. 2007) ................................ 32

*In re Morgan Stanley Technology Fund Securities Litigation,* 2009 WL 256005 (S.D.N.Y. Feb. 2, 2009) ........................................... 28-29

*Olkey* v. *Hyperion 1999 Term Trust, Inc.*, 98 F.3d 2 (2d Cir. 1996) ........................ 31

*In re Openwave Systems Securities Litigation*, 528 F. Supp. 2d 236 (S.D.N.Y. 2007) ........................................... 22-23

*Pinter* v. *Dahl*, 486 U.S. 622, 108 S. Ct. 2063 (1988) ........................................... 18, 18n, 19-20

*PPM America, Inc*. v. *Marriott Corp*., 853 F. Supp. 860 (D. Md. 1994) .................. 20

*In re Prestige Brands Holding, Inc*., 2006 WL 2147719 (S.D.N.Y. Sept. 20, 2001) ............................................................................... 21

*In re Refco, Inc. Securities Litigation*, 503 F. Supp. 2d 611 (S.D.N.Y. 2007) ......................................................................... 6, 15-16, 33

*In re Refco, Inc. Securities Litigation*, 2008 WL 3843343 (S.D.N.Y. Aug. 14, 2008) ..................................................................... 8-10, 13, 17

*Resnik* v. *Swartz*, 303 F.3d 147 (2d Cir. 2002) ........................................ 29

*Rogers* v. *Sterling Foster & Co*., 222 F. Supp. 2d 216 (E.D.N.Y. 2002) .................. 22n

*Rombach* v. *Chang*, 355 F.3d 164 (2d Cir. 2004) ..................................... 31, 34

*Roth ex rel. Beacon Power Corp.* v. *Perseus, L.L.C.*, 522 F.3d 242 (2d Cir. 2008) ................................................................................ 7n

*SEC* v. *First Jersey Securities, Inc*., 101 F.3d 1450 (2d Cir. 1996).......................... 34-35

*SEC* v. *Lybrand*, 200 F. Supp. 2d 384 (S.D.N.Y. 2002)............................. 12

*Shain* v. *Duff & Phelps Credit Rating Co*., 915 F. Supp. 575 (S.D.N.Y. 1996) ....................................................................... 20-21, 21n

*Sloane Overseas Fund, Ltd.* v. *Sapiens International Corp., N.V.*, 941 F. Supp. 1369 (S.D.N.Y. 1996).................................................... 34

*Starr ex rel. Estate of Sampson* v. *Georgeson Shareholder, Inc*., 412 F.3d 103 (2d Cir. 2005) ............................................................. 31

*Steed Finance LDC* v. *Nomura Securities International, Inc*., 2001 WL 1111508 (S.D.N.Y. Sept. 20, 2001)........................................ 21

*TSC Industries* v. *Northway, Inc*., 426 U.S. 438, 96 S. Ct. 2126 (1976).................. 30

*In re Tseng Labs, Inc. Securities Litigation*, 954 F. Supp. 1024 (E.D. Pa. 1996), *aff'd*, 107 F.3d 8 (3d Cir. 1997)........................................ 31

*VTech Holdings, Ltd.* v. *Pricewaterhouse Coopers, LLP*, 348 F. Supp. 2d 255 (S.D.N.Y. 2004) ............................................... 11

*Wilson* v. *Saintine Exploration and Drilling Corp.*, 872 F.2d 1124 (2d Cir. 1989) ................................................................. 18n

*In re Worldcom Securities Litigation*, 308 F. Supp. 2d 338 (S.D.N.Y. 2004) ............................................................................................................ 13

*In re WorldCom, Inc. Securities Litigation*, 294 F. Supp. 2d 431 (S.D.N.Y. 2003) ..................................................................................................... 22n

## SEC Decisions

*In re Lorsin, Inc.*, 82 S.E.C. Docket 3044, Release No. 250 (May 11, 2004) ................................................................................................................ 12

*In re Reiter-Foster Oil Corp.*, 6 S.E.C. 1028, Release No. 33-2201 (Mar. 11, 1940) ................................................................................................. 13n

## Congressional Reports

H.R. Rep. No. 73-85 (1933) .................................................................................. 12n

## Regulations

SEC Regulations

    17 C.F.R. § 229.512(a)(2) (2009) ........................................................ 26
    17 C.F.R. § 229.1120 (2009) ............................................................... 15n
    17 C.F.R. § 230.436(g) (2009) ........................................................ 7-8, 11, 29
    17 C.F.R. § 230.436(g)(1) (2009) ....................................................... 6

## Rules

Fed. R. Civ. P.

    8 ........................................................................................................ 1
    12(b)(6) .............................................................................................. 1
    15(c)(ii) ............................................................................................. 22n

## Statutes

Securities Act of 1933

    § 2(11), 15 U.S.C. § 77b(a)(11) (2006) ............................................ 12

    § 11, 15 U.S.C. § 77k (2006) ........................................................ passim

    § 12(a)(1), 15 U.S.C. § 77l(a)(1) (2006) ....................................... passim

    § 12(a)(2), 15 U.S.C. § 77l(a)(2) (2006) ..................................... 18, 18n, 31

§ 13, 15 U.S.C. § 77m (2006)..........................................................................22, 27

§ 15, 15 U.S.C. § 77o (2006)........................................................................2, 33-35

Securities Exchange Act of 1934

§ 10b, 15 U.S.C. § 78j(b) (2006) ....................................................................7-8, 23

**<u>Treatises</u>**

1 Thomas Lee Hazen, *Law of Securities Regulation* (4th ed. 2002)..........................12

**<u>Other Authorities</u>**

SEC Release No. 33-6383, *Adoption of Integrated Disclosure System,*
1982 WL 90370 (Mar. 3, 1982)..............................................................................7

SEC Release No. 33-6336, 46 F.R. 42024 (Aug. 18, 1981) ...................................7, 7n, 8

Jennifer E. Bethel, Allen Ferrell and Gary Hu, *Law and Economic Issues
in Subprime Litigation*, Harvard, John M. Olin Center for Law,  Econom-
ics and Business, Discussion Paper No. 612 (Mar. 2008) ........................................18n

Defendant The McGraw-Hill Companies, Inc. ("McGraw-Hill") respectfully submits this memorandum of law in support of its motion to dismiss the Consolidated Securities Class Action Complaint ("AC") pursuant to Fed. R. Civ. P. 8 and 12(b)(6). McGraw-Hill has been sued in this case on the basis of the alleged actions of Standard & Poor's Rating Services ("S&P"), a unit of McGraw-Hill. Accordingly, in this memorandum, we refer to the defendant as "S&P."

## PRELIMINARY STATEMENT

Sections 11 and 12(a)(2) of the Securities Act of 1933 (the "1933 Act") offer potential plaintiffs a tradeoff. Strict liability may be imposed if an entity subject to these provisions makes a false or misleading statement in a registered securities offering. But the categories of persons that may be sued are carefully limited and defined to include only those persons that had a direct role in the registered offering. In the long history of the 1933 Act, that group has never included a nationally recognized statistical rating organization ("NRSRO"). By bringing this case against S&P and another NRSRO, Moody's Investors Service ("Moody's"), Plaintiffs seek an unprecedented — indeed, radical — expansion of the well-settled terms of the 1933 Act.

Following the bankruptcy of the underwriter and depositor of the securities at issue here, Plaintiffs amended the complaint to replace those parties with S&P and Moody's, two NRSROs that provided credit ratings on those securities. Plaintiffs did so notwithstanding that the ratings of an NRSRO, such as S&P, are explicitly exempt from liability under Section 11 of the 1933 Act. They did so, as well, notwithstanding that clearly articulated provisions of Section 11 establish that entities such as S&P may only be held liable under Section 11, if at all, if they are named in the registration statement as having prepared or certified it; S&P is indisputably not so named.

Plaintiffs seek to elude these explicit bars on Section 11 liability with a sleight of hand: they have simply relabeled S&P's alleged conduct as "underwriting." At the same time, Plaintiffs also attempt to impose liability on S&P under Section 12 of the 1933 Act by recasting S&P's conduct as that of a "seller." That S&P underwrote nothing and sold nothing appears to be of no moment. Nor is the bizarre nature of the new 1933 Act Plaintiffs' rewriting would oc-

casion — S&P would remain exempt from liability for its own ratings, but newly subject to potential liability as an "underwriter" for every other word in the registration statement made by other parties. This result is all the more perverse since there has never been any doubt as to the identity of the actual underwriter of the transactions at issue in this case. The AC itself could hardly be clearer in asserting that "Lehman," as the "underwriter" of the securities "controlled every aspect of the securitization and underwriting process." (AC ¶ 6).

Under the 1933 Act, the roles of both "underwriters" and "sellers" — and the increased responsibilities and potential liability associated with both — have long been confined to those persons or entities that have a direct role in the distribution process between the issuer and the investor. S&P played no such role. For this reason alone, S&P cannot be held liable under the Act. *See* Sections I & II. But as demonstrated below, additional — and entirely distinct — bases for dismissal of this action exist. Plaintiffs' Section 11 and 12 claims against S&P are, for one thing, time-barred. *See* Section III. In addition, the alleged "misstatements" and "omissions" asserted by Plaintiffs relating to S&P and its rating opinions cannot as a matter of law serve as the basis for a 1933 Act claim both because they are not material misstatements or actionable omissions and because these inherently forward-looking statements were accompanied by meaningful cautionary language. *See* Section IV. Finally, Plaintiffs have failed to plead a viable claim for control person liability under Section 15 against S&P. *See* Section V.[1]

## STATEMENT OF THE CASE

### A.    Procedural Background

On or about June 19, 2008, plaintiff Alaska Electrical Pension Fund filed a putative state court class action in the Supreme Court of the State of New York, County of Nassau, on behalf of purchasers of certain residential mortgage-backed securities ("RMBS"). The complaint as-

---

[1] McGraw-Hill also joins in Section V of the memorandum of law filed by Defendant Moody's and Section II of the memorandum of law filed by the Individual Defendants, which seek dismissal of Plaintiffs' claims for the additional reasons that 1) Plaintiffs continue to receive the interest and principal payments required to be paid pursuant to the terms of the securities they purchased and thus, have suffered no actual loss; and 2) with respect to the 85 offerings from which none of the named Plaintiffs purchased securities, Plaintiffs lack standing to assert any claims.

serted 1933 Act claims against Lehman Brothers Holdings Inc. ("LBHI") and Structured Asset Securities Corporation ("SASCO"), as well as certain issuing trusts and individuals. The action was removed to the United States District Court for the Eastern District of New York.  On July 23, 2008, plaintiff New Jersey Carpenters Health Fund filed a putative state court class action in the Supreme Court of New York, County of New York, on behalf of purchasers of certain RMBS.  This second complaint asserted 1933 Act claims against Lehman Brothers Inc. ("LBI") and SASCO, as well as certain issuing trusts and individuals.  The action was removed to the United States District Court for the Southern District of New York.

On September 15, 2008, LBHI, the parent company of SASCO and LBI, filed a voluntary petition under Chapter 11 of the Bankruptcy Code in the Bankruptcy Court for the Southern District of New York.  On September 19, 2008, the S.D.N.Y. issued an order commencing liquidation against LBI.  On February 9, 2009, SASCO filed a voluntary petition under Chapter 11 of the Bankruptcy Code in the Bankruptcy Court for the Southern District of New York.

On January 9, 2009, this Court entered an order consolidating the E.D.N.Y. and S.D.N.Y. cases, appointing The Local 302 and 612 of the International Union of Operating Engineers-Employers Construction Industry Retirement Trust as "Lead Plaintiff," and ordering Lead Plaintiff to file a consolidated amended complaint.  On February 23, 2009, Lead Plaintiff filed the AC.  As with the earlier complaints, the AC asserts that the Registration Statements, Prospectuses, and Prospectus Supplements (the "Offering Documents") pursuant to which Plaintiffs allegedly purchased certain mortgage pass-through certificates (the "Certificates") "contained material misstatements and omitted material information" in violation of the 1933 Act. (AC ¶¶ 2-3). Unlike its predecessor pleadings, however, the AC dropped its claims against the sponsor and underwriters of the offerings at issue, *i.e.*, LBHI, SASCO and LBI, because of their respective bankruptcies (AC ¶ 4) and offered the new theory that Defendants S&P and Moody's (collectively, the "Rating Agencies") must be deemed "underwriters" and "sellers" of the securities at issue.  The AC, filed on behalf of Lead Plaintiff and two other plaintiffs (collectively, "Plaintiffs"), also names the trusts that issued the securities (the "Issuing Trusts") and the individuals

that signed the allegedly misleading offering documents (the "Individual Defendants").

Although Plaintiffs allege that they collectively purchased securities from senior classes of only 9 RMBS offerings, the AC purports to bring a class action on behalf of purchasers of 94 separate issuances of RMBS, totaling $93.24 billion, each sold by a separate allegedly misleading prospectus supplement and collateralized by a separate pool of residential mortgage loans originated by any one of approximately nine different mortgage-loan originators. On behalf of these purchasers — many of whom own performing securities and none of whom appears to have filed suit on its own behalf or applied to be lead plaintiff here — the AC asserts claims under Sections 11, 12 and 15 of the 1933 Act. (AC ¶¶ 2, 32-45).

**B.      McGraw-Hill and Standard & Poor's Ratings Services**

Defendant McGraw-Hill is a leading global information services provider serving the financial services, education and business information markets with a wide range of information products and services. (2008 SEC Form 10-K, excerpt attached to the Affidavit of Floyd Abrams ("Abrams Aff't") as Ex. 2). The Company has three principal areas of operation: Education, Financial Services and Information & Media. McGraw-Hill's Financial Services division provides independent credit ratings, indices, risk evaluation, investment research and data. Standard & Poor's Ratings Services ("S&P") is commonly referred to as a credit rating agency and is registered with the SEC as an NRSRO.[2] S&P assigns credit ratings to securities issued by, *inter alia*, corporations, financial institutions, municipalities, and structured finance vehicles, including RMBS. S&P's credit ratings speak only to the creditworthiness of the rated securities, not to their suitability for investment. As expressly set forth in the Offering Documents:

> A securities rating is not a recommendation to buy, sell or hold securities and may be subject to revision or withdrawal at any time by the assigning rating agency. A securities rating addresses the likelihood of receipt by holders of Offered Certificates of distributions in the amount of scheduled payments on the Mortgage Loans.

---

[2]  Standard & Poor's Ratings Services has changed its legal structure so that, as of January 1, 2009, its U.S. business operates as part of "Standard & Poor's Financial Services LLC," a wholly-owned subsidiary of McGraw-Hill.

*See, e.g.,* Lehman XS Trust 2005-5N Prospectus Supplement S-95, Section "Ratings."

## ARGUMENT

## I.   PLAINTIFFS' SECTION 11 CLAIM AGAINST S&P SHOULD BE DISMISSED

Section 11 "allows purchasers of a registered security to sue certain *enumerated* parties in a registered offering when false or misleading information is included in a registration statement. [It] was designed to assure compliance with the disclosure provisions of the Act by imposing a stringent standard of liability on the parties who play a *direct role* in a registered offering." *Herman & MacLean* v. *Huddleston*, 459 U.S. 375, 381-82, 103 S. Ct. 683, 684 (1983) (emphasis added). The only parties that can be held liable are listed in the statute and are the following:

> (1) every person who signed the registration statement; (2) every person who was a director . . . or partner in the issuer at the time of [filing] . . .; (3) every person who, with his consent, is named in the registration statement as being or about to become a director, person performing similar functions, or partner; (4) every accountant, engineer, or appraiser, or any person whose profession gives authority to a statement made by him, who has with his consent been named as having prepared or certified any part of the registration statement, or as having prepared or certified any report or valuation which is used in connection with the registration statement, with respect to the statement in such registration statement, report, or valuation, which purports to have been prepared or certified by him; and (5) every underwriter with respect to such security. 15 U.S.C. §77(k)(a).

As demonstrated in Section I.A, *infra*, for compelling public policy reasons ratings issued by NRSROs are expressly and absolutely exempted from Section 11 liability by SEC rule. Thus, a plaintiff asserting a Section 11 claim against an NRSRO must allege and prove that actions of the NRSRO, *other than actions it took as part of generating and issuing its ratings*, somehow fall into the five enumerated categories. Since NRSROs are as a matter of course only involved in securities offerings for the purpose of providing ratings, the exemption essentially precludes Section 11 liability against an NRSRO in all but the rarest of circumstances.

Here, Plaintiffs try to get around the unambiguous exemption by alleging that the Rating Agencies were involved in the creation of the securities. For example, Plaintiffs allege that S&P was involved in the drafting of the Offering Documents and the "structuring" of the securities. Leaving aside the merits of these assertions, these activities do not provide a basis for Section 11 liability. Indeed, even where such activities are performed by "profession[als]," they can give

rise to Section 11 liability only under Section 11(a)(4) (*i.e.*, "expert" liability).  Yet, "expert" liability can only attach when the "expert" expressly consents to be named in the registration statement as having prepared or certified a portion thereof, which S&P indisputably did not do.

Faced with these insurmountable hurdles, Plaintiffs resort to an old ruse — they attempt to change the subject.  Rather than seeking to take on S&P's ratings directly or somehow arguing for "expert" liability, Plaintiffs seek to recast S&P as an "underwriter" under Section 11(a)(5).  But the term "underwriter" is not "a term of unlimited applicability that includes anyone associated with a given transaction."  *In re Refco, Inc. Securities Litigation*, 503 F. Supp. 2d 611, 629 (S.D.N.Y. 2007) (Lynch, J.).  Plaintiffs' strained attempt to fit the square peg of S&P's ratings activities into the round hole of an "underwriter" simply cannot be credited for two reasons.  First, this Court has made plain that Section 11(a)(5) cannot be used to avoid the consent requirements of Section 11(a)(4).  (Section I.B, *infra*).  Second, the key element required for underwriter liability — an active role in the distribution process — is unquestionably absent here.  (Section I.C, *infra*).

### A.     No Section 11 Liability Can Be Imposed Based on S&P's Ratings

We start with a proposition that should not be in doubt: S&P's ratings, much and repeatedly denounced throughout the AC, cannot give rise to Section 11 liability.  Plaintiffs themselves appear to recognize this since, for all their references to "faulty AAA ratings," "inflated and unjustifiably high" ratings, *etc.* (*see, e.g.,* AC ¶ 160, 269), Plaintiffs affirm that that they are not suing the Rating Agencies on the basis of their ratings (AC ¶ 36).  It is understandable why Plaintiffs make such a concession since the credit ratings of an NRSRO such as S&P are absolutely immune from liability under Section 11 of the 1933 Act.

Specifically, Rule 436(g)(1), 17 C.F.R. §230.436(g)(1), provides that:

the security rating assigned to a class of debt securities, a class of convertible debt securities, or a class of preferred stock by a nationally recognized statistical rating organization . . . shall not be considered a part of the registration statement prepared or certified by a person within the meaning of sections 7 and 11 of the [Securities] Act.

The purpose of the rule is unambiguous.  It is to "exclude any [NRSRO] whose security rating is disclosed in a registration statement from civil liability under Section 11."[3]  SEC Release No. 33-6336, 46 F.R. 42024, 42024, 42026 (Aug. 18, 1981) (the "Proposal Release").  *See also* SEC Release 33-6383, Adoption of Integrated Disclosure System, 1982 WL 90370 (Mar. 3, 1982) ("The Commission continues to believe that ratings should be permitted to be disclosed in Commission filings . . . and that it is appropriate to exempt NRSROs from Section 11 liability if their ratings are included in Securities Act registration statements.").  Rule 436(g) thus provides a "statutory exemption" under the 1933 Act "for Section 11 claims against credit rating agencies" designated as NRSROs.  *In re Enron Corp. Securities, Derivative and "ERISA" Litigation*, 511 F. Supp. 2d 742, 817 (S.D. Tex. 2005).

This exemption was adopted in full recognition of the concerns raised by some commentators that NRSROs might not give "due attention" to their ratings unless they were subject to potential liability, and with full appreciation of the "significance" of ratings for, *inter alia*, institutions statutorily barred from investing in securities below a certain rating.  Proposed Release, 46 F.R. at  42026-27 & n.16.  In other words, the exemption reflects a deliberate and important statement of public policy — because of their value to investors, the SEC has encouraged the inclusion of ratings in registration statements, but has also recognized that but for the exemption no NRSRO would allow such inclusion.[4]

In proposed Rule 436(g), the SEC emphasized that despite the exemption, NRSROs remained subject to liability under the antifraud provisions of the securities laws, *e.g.,* Section

---

[3]  Courts defer to the SEC's interpretation of its own rules provided "the interpretation is not plainly erroneous or inconsistent with the law."  *Roth ex rel. Beacon Power Corp.* v. *Perseus, L.L.C.*, 522 F.3d 242, 247 (2d Cir. 2008).

[4]  In proposing Rule 436(g), the SEC cited several consequences that could follow if NRSROs were not granted the exemption.  Among these concerns, the SEC noted that without the exemption, an NRSRO "might not be willing to furnish a consent until it had reviewed all information in the registration statement, in order to ensure that its rating was based on the same data."  Proposed Release, 46 F.R. at 42027. Yet here, what the SEC sought to avoid — the Rating Agencies becoming so involved that, for the purpose of avoiding potential liability, they felt obliged to verify all information relied on by the issuer — is precisely the task that Plaintiffs assert S&P should be held strictly liable for allegedly failing to perform.

10(b) of the Securities Exchange Act of 1934.  *Id.* at 42028.  But, as Plaintiffs themselves appear to acknowledge, liability under Section 11 on the basis of an NRSRO's ratings is barred.

### B.    Plaintiffs Cannot Meet The Elements for Establishing "Expert" Liability

While it is clear that, at their core, Plaintiffs' claims are rooted in S&P's supposedly "faulty" ratings, Plaintiffs plainly understand that they cannot assert such a claim in so many words.  Accordingly, they attempt to sidestep the compelling public policies underlying Rule 436(g) by alleging that the Rating Agencies can be held liable for activities beyond their ratings. The AC thus alleges that the Rating Agencies played a role in the creation of the securities and the Registration Statements.  For example, the AC alleges that the Rating Agencies "participated in the drafting and disseminating of the Offering Documents."  (AC ¶¶ 33-34, 286).

Leaving aside the transparency of this strained effort to simultaneously denounce the ratings while not quite suing on them, it is well-established that "certain individuals who play a part in preparing the registration statement generally cannot be reached by a Section 11 action."  *Herman & MacLean*, 459 U.S. at 386 n.22, 103 S. Ct. at 689 n. 22.  In certain narrow circumstances, "experts" (such as an "accountant, engineer, or appraiser, or any person whose profession gives authority to a statement made by him") may be held liable under Section 11 *but only to the extent* the expert has been named to investors — and has consented to being named — as someone who has certified or prepared a portion of the registration statement.  15 U.S.C. §77(k)(a)(4).  Here, the Offering Documents themselves make abundantly clear that S&P was not named to investors as having prepared or certified any part of the Registration Statements at issue.

That fact is dispositive of the whole of Plaintiffs' Section 11 claim against S&P.  *See In re Refco, Inc. Securities Litigation*, 2008 WL 3843343 (S.D.N.Y. Aug. 14, 2008).  In *Refco*, Judge Lynch, in the course of dismissing a Section 11 claim, rejected plaintiffs' allegation that drafting and editing registration statements was sufficient to trigger Section 11 liability.  In so holding, Judge Lynch observed that "Plaintiffs do not cite any case in which a court has held that a party that participated in the drafting of a registration statement, *but who was not identified to the public as endorsing the truth of representations contained therein*, has been held liable under

§11 as an underwriter." *Id.* at *3 (emphasis added).  In fact, "courts have generally refused to extend §11 liability to those professionals most directly involved in the drafting of registration statements: lawyers." *Id.* at *3.  Plaintiffs attempted to distinguish the myriad cases holding that lawyers are not subject to Section 11 liability, arguing that these cases were decided under the Section 11(a)(4) "expert" provision — not the Section 11(a)(5) "underwriter" provision.  Judge Lynch rejected this distinction, noting "it would seem even stranger to classify attorneys who draft the documents on which the public rely as 'underwriters' — a term generally understood to refer to those who undertake actively to sell the securities — than to consider them 'profession[als] . . .  named as having prepared . . .any part of the registration statement.'" *Id.* at *3 n.5. In fact, Judge Lynch reasoned, these cases make clear that historically both "plaintiffs attempting to extend §11 liability to lawyers and courts rejecting those efforts have looked primarily to the subsection (4) category . . . rather than to the subsection (5) category" — this, he explained, "speaks volumes" against the plaintiffs' argument that applying the "underwriter" prong there would be "a straightforward application of broad and literal language" of Section 11(a)(5).  *Id.*

Accordingly, to the extent a party is alleged to have had some role — even an extensive role — in preparing the registered offering (as Plaintiffs assert here against S&P), if it has not consented to being named to investors as having prepared or certified the registration statement, it cannot be subject to liability under Section 11.[5]  Indeed, whatever actions or role a plaintiff may assert the expert performed are simply "irrelevant" to Section 11 liability.  In *McFarland* v. *Memorex Corp.*, 493 F. Supp. 631, 643 (N.D. Cal. 1980), the court dismissed Section 11 claims against an accountant, where the accountant had not been named in the registration statement as having prepared the specific financial data that was alleged to be misleading.  *Id.*  The court explained:  "The language of [Section 11] plainly states that an accountant may be sued *only with*

---

[5]  To the extent an expert does not meet the requirements for Section 11 liability, a plaintiff is not without remedy for that expert's alleged wrongdoing; it is merely without a strict liability claim.  *See Herman & MacLean*, 459 U.S. at 382, 103 S. Ct. at 687 ("While a Section 11 action . . . can only be brought against certain parties, a Section 10(b) action can be brought . . . against '*any* person'[.]") (emphasis in original).

*respect to* that part of a registration statement 'which purports to have been prepared or certified by him.' Thus, even if part of a registration statement is misleading, there is no accountant liability unless the misleading data can be expressly attributed to the accountant." *Id*. at 643 (emphasis added). Plaintiffs in *McFarland* argued that even though the accountant had not been named as an expert in connection with the allegedly misleading materials, it had prepared and reviewed the unaudited financial statements and other reports and valuations that were used in connection with the registered offering and thus, should still be liable under Section 11. The court rejected plaintiffs' argument, stating: "This argument is flawed because section 11(a)(4) limits liability. Because the accountants are not '*named* as' having prepared the allegedly misleading portions of the registration statement, *their participation in the preparation of the misleading figures is irrelevant to section 11*." *Id*. (emphasis added).[6]

Here, where S&P was not named, and did not consent to be named, to investors as endorsing the truth of the representations in the Offering Documents, Plaintiffs cannot satisfy the elements for Section 11 liability and its claims against S&P should be dismissed outright. Yet, Plaintiffs urge that notwithstanding that they cannot meet the requirements of Section 11(a)(4), the Court may nonetheless hold S&P liable under Section 11(a)(5). In substance, Plaintiffs seek to erase the consent requirements of Section 11. But, in the face of rulings such as *Refco* and *McFarland*, Plaintiffs cannot be permitted to effectuate so gross an expansion of the 1933 Act.

Indeed, if successful, Plaintiffs' attempt to ignore the limitations on Section 11 liability contained in Section 11(a)(4) would lead to senseless results. An NRSRO, whose ratings are ex-

---

[6] *See also Endo* v. *Arthur Andersen & Co., S.C.*, 163 F.3d 463, 464, 466 (7th Cir. 1999) (Posner, J.) (stating that "[a]lthough the plaintiffs seek to ground this duty in various provisions of federal and state law, we shall not have to discuss any provision other than section 11(a)(4)" because one must "remember that an accountant's liability for misleading representations in a registration statement is limited to the portion of any financial statements 'which purports to have been prepared or certified by him'"); *In re Global Crossing, Ltd. Securities Litigation*, 322 F. Supp. 2d 319, 327, 348-49 (S.D.N.Y. 2004) (Lynch, J.) (citation omitted) (dismissing in part a Section 11 claim against a company's outside auditor because "Andersen cannot be held liable for reports it was not named as having certified or prepared" even though plaintiff alleged that Andersen "played a central role in devising and implementing the accounting schemes in question" and "had direct knowledge of the Companies' unaudited pro forma reports").

empted from Section 11 liability, would (a) nonetheless be subjected to potential liability for the work product of all others reflected in a registration statement; and (b) be therefore subjected to *greater* potential liability than that of lawyers, accountants, and other professionals who regularly play a significant role in securities offerings. That is because an "expert" is subject to Section 11 liability only with respect to misstatements, if any, made in the portion of the registration statement that it prepared or certified. 15 U.S.C. §77(k)(a)(4). The expert is not subject to blanket liability for all statements made in the offering documents as an "underwriter" would be.

While we address the deficiencies of Plaintiffs' "underwriter" claim directly in Section I.C, *infra*, it is worth emphasizing here that, in citing Section 11(a)(5), Plaintiffs seek to hold S&P liable for statements made in the Registration Statements by other Defendants and non-parties. Yet, holding S&P liable for statements it did not make would be akin to subjecting it to liability for "aiding and abetting" a securities law violation — a claim that the Supreme Court has unequivocally rejected. *Cf. VTech Holdings, Ltd.* v. *Pricewaterhouse Coopers, LLP*, 348 F. Supp. 2d 255, 263 n.58 (S.D.N.Y. 2004) (Kaplan, J.) ("[A]n accountant cannot be held liable as a primary violator [under Section 10(b)] for a misstatement or omission in a statement made by someone else, even if it 'substantially participated' in the alleged fraud, unless the accountant 'certified, audited, prepared or reported' the statement"; "[t]o rule otherwise . . . would run afoul of the Supreme Court's rejection of aiding and abetting liability in [*Central Bank*].") (citation omitted).

In short, Plaintiffs' attempt to avoid the limitations on liability contained in Section 11(a)(4) should not be permitted. Based on the role and activities allegedly performed by S&P, it is a prerequisite to Section 11 liability that S&P have been named to investors as having prepared or certified the Registrations Statements and consented to being so named. This was indisputably not the case here and Plaintiffs' Section 11 claims against S&P should be dismissed.

## C.   S&P Is Not An "Underwriter" of the Securities It Rated

In any event, even if neither the NRSRO exemption in Rule 436(g) nor the restrictive language in Section 11(a)(4) existed, the activities S&P allegedly performed simply cannot as a

matter of law be deemed as "underwriting" under the 1933 Act.

We begin by focusing on the nature of the entity at issue.  An "underwriter" acts as a conduit between the issuer and the investor. "He participates in the transmission process between the issuer and the public."  *Ingenito* v. *Bermec Corp.*, 441 F. Supp. 525, 536 (S.D.N.Y. 1977) (Lasker, J.).  In enacting the 1933 Act, Congress thus defined "underwriter" "to encompass 'all persons who might operate as conduits for securities being placed into the hands of the investing public.'"  *In re Lorsin, Inc.*, 82 S.E.C. Docket 3044, Release No. 250 (May 11, 2004) (quoting Thomas Lee Hazen, *The Law of Securities Regulation* 431 (4th ed. 2002)); *SEC* v. *Lybrand*, 200 F. Supp. 2d 384, 393 (S.D.N.Y. 2002) (Stein, J.) (same); *Ackerberg* v. *Johnson*, 892 F.2d 1328, 1336-37 (8th Cir. 1989) ("The congressional intent in defining 'underwriter' was to cover all persons who might operate as conduits for the transfer of securities to the public.  Thus, 'underwriter' is generally defined in close connection with the definition and meaning of 'distribution.'").[7]

Specifically, the 1933 Act provides as follows:

The term "underwriter" means any person who has purchased from an issuer with a view to, or offers or sells for an issuer in connection with, the distribution of any security, or participates or has a direct or indirect participation in any such undertaking, or participates or has a participation in the direct or indirect underwriting of any such undertaking . . .

15 U.S.C. §77b(a)(11).  Plaintiffs do not allege (nor could they) that S&P meets the first clause of the definition (*i.e.,* "any person who has purchased from an issuer with a view to, or offers or sells for an issuer in connection with, the distribution of any security").  Rather, it appears, that

---

[7]  The 1933 Act's legislative history confirms this:  "The term ['underwriter'] is defined broadly enough to include not only *the ordinary underwriter, who for a commission promises to see that an issue is disposed of at a certain price, but also includes as an underwriter the person who purchases an issue outright with the idea of then selling that issue to the public.* The definition of underwriter is also broad enough to include two other groups of persons who perform functions, similar in character, *in the distribution of a large issue*. The first of these groups may be designated as the underwriters of the underwriter, a group who, for a commission, agree to take over pro rata the underwriting risk assumed by the first underwriter.  *The second group may be termed participants in the underwriting or outright purchase, who may or may not be formal parties to the underwriting contract, but who are given a certain share or interest therein*."  H.R. Rep. No. 73-85, at 13 (1933) (emphasis added).

Plaintiffs base their unprecedented "underwriter" claim against S&P on a tortured reading of the second clause of the definition, *i.e.*, someone who "participates or has a participation in the direct or indirect underwriting of any such undertaking."

Like the rest of the definition, however, the "participation" necessary to qualify one as a statutory underwriter must relate to the actual *distribution* of the security. *Refco*, 2008 WL 3843343, at *4 ("The breadth of the definition of 'underwriter' is intended to sweep up all — but only — those who play a role in the distribution of the securities."); *McFarland*, 493 F. Supp. at 644 ("It is crucial to the definition of 'underwriter' that any underwriter must participate in the distribution of a security.  There is no allegation here, however, that [the alleged underwriters] purchased any . . . securities with a view to distribution or that they offered or sold any security[.]"); *In re Worldcom Securities Litigation*, 308 F. Supp. 2d 338, 344 (S.D.N.Y. 2004) (Cote, J.) ("According to the statutory definition," underwriter liability "extends to any person who has purchased securities from an issuer for distribution, or who offers or sells securities for an issuer for that purpose, or who participates directly or indirectly in those tasks.").

Thus, "participation" in the Section 11 context equates to involvement in the "transmission process between the issuer and the public." *Ingenito*, 441 F. Supp. at 536.[8]  Even assuming that S&P had been involved in the actions alleged by Plaintiffs with respect to the *creation* of the securities, Plaintiffs allege no factual basis whatsoever — and there is none — to support any assertion that S&P had a role in the "distribution process."  Significantly, the AC does not (and

---

[8] This is consistent with the S.E.C.'s interpretation of the term "underwriter."  Shortly after the passage of the 1933 Act, the S.E.C. in *In re Reiter-Foster Oil Corp.* evaluated the question of what constitutes an "underwriter." 6 S.E.C. 1028, Release No. 33-2201, at *4, *8 (Mar. 11, 1940).  The S.E.C. found that each of 5 individuals had in fact served as an "underwriter" for the transaction.  The Commission pointed to a series of activities by the individuals which evidenced that they had "actively participated in the distribution of the underwritten securities," including that some or all of the individuals had "touted [the] securities in an effort to induce purchases," "contacted security holders," "suggested" names of purchasers and "dealers who might participate in the distribution," attended conferences "relative to arranging the terms of the underwriting," "induced" and/or "was responsible" for the purchase of shares by specific individuals, and "urged" stock sales.  In each instance, the focus of the Commission in determining whether an individual had "participated" sufficiently to meet the underwriter definition was on the distribution process and specifically the defendants' roles vis-a-vis the investing public.

could not) allege that S&P acted as a conduit in the distribution process between the issuer and the investors.  The AC does not (and could not) allege that S&P was named to the investors or in the Offering Documents as an underwriter.  The AC does not (and could not) allege that S&P purchased securities from anyone with a view to their distribution.  The AC does not (and could not) allege that S&P had a financial stake in the success of the securities offering,  And the AC does not (and could not) allege that S&P offered or sold any of the securities at issue to the Plaintiffs or had any contact whatsoever with them.  S&P's only "contact" with the public (for lack of a better term) was through the publication of its ratings on the securities, but that, of course, cannot form the basis for Section 11 liability.

In fact, in the AC as well as the Offering Documents themselves, it is Lehman that is de-scribed to have served as the underwriter for the Certificates and to have performed all of the typical functions of an underwriter.  For example, the Registration Statement filed by SASCO on May 10, 2006 provides for the following "Plan of Distribution":

> Each series of Securities offered hereby and by means of the prospectus supplements may be offered through any one or more of the following: Lehman Brothers Inc., an affiliate of the depositor; underwriting syndicates represented by Lehman Brothers Inc.; any originator of Loans underlying a series; or underwriters, agents or dealers se-lected by the originator (collectively, the "Underwriters") . . . The prospectus supple-ment with respect to each series of Securities will set forth the terms of the offering of the series of Securities . . . including the name or names of the Underwriters (if known) . . . the discounts and commissions to the Underwriters and any discounts or commissions allowed or reallowed to certain dealers, or the method by which the prices at which the Underwriters will sell the Securities will be determined.

*See also* Prospectus Supplement for Lehman XS Trust Mortgage Pass-Through Certificates, Se-ries 2006-14N, dated August 30, 2006 (listing "Lehman Brothers" as "Underwriter" and disclos-ing that "[t]he certificates offered by this prospectus supplement will be purchased by Lehman Brothers Inc., as underwriter, from [SASCO], and are being offered from time to time for sale to the public in negotiated transactions or otherwise at varying prices to be determined at the time of sale.").  The Offering Documents never name S&P as an "Underwriter."  Rather, as the AC recognizes, it was "Lehman Brothers, Inc. ('LBI' or the 'Underwriter')" that "underwrote the issuance of $93.23 billion of [Certificates] sold to the Plaintiffs and the Class in . . . 94 separate

offerings between September 29, 2005 and July 28, 2007." (AC ¶ 2). The AC further asserts that "Lehman controlled every aspect of the securitization and underwriting process," acquired the mortgage loans, conveyed them to the Issuing Trusts, securitized the cashflows, and conducted the due diligence on the loans for the transaction. (AC ¶¶ 6, 12-13).

By contrast, beyond conclusory allegations that the Rating Agencies "indirectly and directly participated in and took steps necessary to the distribution of" the Certificates (AC ¶ 175), Plaintiffs cite only the following alleged "underwriting" activities:

- The Rating Agencies "directly and indirectly participated in the drafting and disseminating of the Offering Document." (AC ¶¶ 33-34, 286).
- The Rating Agencies "worked with" Lehman, as well as the "loan sellers and servicers," in "forming and structuring the securitization transactions related to the Certificates." (AC ¶¶ 15, 18, 36, 173-75, 178, 273).[9]
- The Rating Agencies determined "which loans [were] to be included in the securitization, the amount and form of credit enhancement . . and the Certificate structure were largely determined by the Rating Agencies." (AC ¶ 15).[10]

These allegations are facially insufficient to classify S&P as a Section 11 "underwriter."

First, Plaintiffs' conclusory allegations of general "participation" in the offerings are entitled to no weight. Judge Lynch's decision in *In re Refco, Inc. Securities Litigation*, 503 F. Supp.

---

[9]  Plaintiffs allege elsewhere in the AC that they were aware of such activities in September 2007 — *i.e.,* well over a year before filing claims against the Rating Agencies. *See* AC ¶ 177 ("The actual role of the Rating Agencies in structuring the securitizations first began to emerge in an article appearing on *Conde Naste*'s Portfolio.com in September 2007."). As a result, Plaintiffs' claims are time barred by the one-year statute of limitations that governs such claims. *See* Section III, *infra*.

[10]  Plaintiffs also assert that "[a]s a condition to the issuance of the Certificates, [S&P] rated the investment quality of the Certificates with predetermined ratings." *See, e.g.,* AC ¶ 9. Plaintiffs are referring to the fact that Lehman stated in the Offering Documents that the Certificates' achieving an investment grade rating would be a condition for their issuance. *See, e.g.,* Form S-3 Registration Statement filed by Structured Asset Securities Corporation (May 10, 2006). To the extent that an issuer opts to structure an offering of asset-backed securities in this manner, it is required to state this in the registration statement. The Standard Instructions for Filing Forms Under Securities Act of 1933 with respect to "Asset-Backed Securities" requires a filer to "[d]isclose whether the issuance or sale of any class of offered securities is conditioned on the assignment of a rating by one or more rating agencies, whether or not NRSROs. If so, identify each rating agency and the minimum rating that must be assigned." 17 C.F.R. §229.1120. The fact that Lehman structured the transaction to operate in this matter does not confer liability on S&P. As discussed in Section I.A, *supra*, S&P's ratings are exempt from Section 11 liability. That Lehman represented that it would not issue the Certificates without achieving a certain rating level does not void the protection afforded to S&P under the exemption.

15

2d 611, 629 (S.D.N.Y. 2007) is particularly instructive on this point.  In *Refco*, the alleged "underwriters," referred to as the "144A Defendants," had purchased unregistered bonds issued by Refco as part of a 144A private placement offering.  The 144A Defendants "then immediately resold the bonds to institutional buyers, including some of the plaintiffs."  *Id.* at 620.  Later, Refco issued registered bonds and permitted the holders of the Rule 144A unregistered bonds to exchange their holdings for registered bonds.  Plaintiffs did so and filed suit thereafter asserting that the offering documents that were used in connection with the private offering and the registered bond offering contained misstatements.  In attempting to argue that the 144A Defendants were "underwriters" of the registered bonds, plaintiffs alleged that the 144A Defendants "participated in the preparation of the Bond Registration Statement."  *Id.* at 629.  The court, however, noting that the term "underwriter" is not "a term of unlimited applicability that includes anyone associated with a given transaction," granted the Defendants' motion to dismiss the Section 11 claim.  *Id.*  The court found that plaintiffs' allegations were insufficient to plead adequately that the 144A Defendants had acted as underwriters, reasoning that plaintiffs' "conclusory allegation of participation in the preparation of the statement includes no detail whatsoever" and plaintiffs made "no specific allegations as to the extent of the participation or what actual actions the defendants took."  *Id.* at 629.  The court continued:

> [T]he single sentence alleging that [the defendants] participated in the public offering presents a legal conclusion, not a factual allegation. . . .  Plaintiffs have in fact failed to allege any specific role whatsoever in the underwriting of the public offering; their only relevant allegation is simply a reproduction of the statutory requirement of "direct or indirect participation."  *Id.*  at 630-31.

Here too, the vast majority of Plaintiffs' allegations against S&P are mere legal conclusions parroting the statutory requirements.  *See, e.g.,* AC ¶ 175 (alleging that the Rating Agencies "indirectly and directly participated in and took steps necessary to the distribution of mortgage pass-through certificates and other MBS").  Accordingly, these allegations are insufficient to state a claim.  *See Refco*, 503 F. Supp. 2d at 629.  *See also In re Adelphia Communications Corp. Securities and Derivative Litigation*, 2007 WL 2615928, at *8 (S.D.N.Y. Sept. 10, 2007) (McKenna, J.) (a "bare pleading" that banks had "extended loans" to the issuer, "induced and

structured numerous public offerings" through their affiliates and had "'direct or indirect partici-

pation in the distribution of" securities was insufficient "to turn lenders into underwriters").

Plaintiffs' other allegations regarding the actions purportedly performed by S&P fare no

better as none relate in any way to the *distribution* of the securities.  A subsequent decision by

Judge Lynch in the *Refco* litigation again proves instructive.  After their first pleading was de-

termined to be deficient, on an amended complaint, the plaintiffs added to their underwriter alle-

gations that the alleged underwriters "played a substantial role in drafting and editing the Bond

Registration Statement on the basis of which the registered bonds were sold to the public."

*Refco*, 2008 WL 3843343, at *2.  In dismissing the Section 11 claims yet again, Judge Lynch

rejected "Plaintiffs' effort to redeem their complaint by identifying actions taken by defendants

behind the scenes."  *Id*. at 4.  Judge Lynch cautioned that the definition of the term "underwriter"

"must be read in relation to the underwriting function that the definition is intended to capture"

— a definition which "primarily references those who 'purchase[ ] from an issuer with a view to

. . . the distribution of any security.'"  *Id*.  The alleged "participation" in the offering must relate

to the specific undertaking of "purchasing securities from an issuer with a view to their resale —

that is, the underwriting of a securities offering as commonly understood."  *Id*.; *see also*

*McFarland*, 493 F. Supp. at 645-46 (where warrantholders "had no interest, direct or indirect" in

underwriting, "this Court will not strain the definition of a statutory term in order to classify

[them] as underwriters" even where they had "structured the transaction . . .to avoid the risks of

an underwriter").

Here, S&P is not alleged to have purchased any of the Certificates, let alone "with a view

to their resale."  It is not alleged to have sold the Certificates or to have offered them for sale.  It

is not alleged to have been identified to the public as "endorsing the truth of the representations"

in the Registration Statements.[11]  Every allegation against it constitutes nothing more than an al-

---

[11] Similarly, S&P is not alleged to have had any financial stake in the offering or to have taken on any risk
with respect to the offering.  These factors also counsel against any "underwriter" characterization.  *See*
*McFarland*, 493 F. Supp. at 645 ("If the underwriters had been unable to sell the stock to the public, they

Footnote continued on next page.

leged "behind the scenes" (to use Judge Lynch's phrase) action relating to the creation of the securities, not their distribution.   The AC thus fails to state a claim that S&P was an "underwriter."[12]

## II.   S&P IS NOT A "SELLER" UNDER 12(a)(2)

Plaintiffs' Section 12 claim against S&P is a similar, if not more, far-fetched attempt to stretch the securities laws beyond recognition.   Section 12(a)(2) extends liability to any person who "offers or sells a security . . . by means of a prospectus or oral communication, which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements . . . not misleading."   15 U.S.C. §77l(a)(2).   In *Pinter* v. *Dahl*, 486 U.S. 622, 642-43, 108 S. Ct. 2063, 2076 (1988), the Supreme Court held that the phrase "offers or sells a security" extends to two groups: 1) direct sellers; and 2) solicitation sellers.[13]   The AC sets forth no basis for asserting that S&P was either a "direct seller" or a "solicitation seller" of the Certificates.   Plaintiffs' Section 12(a)(2) claims against S&P should thus be dismissed.

### A.   S&P Is Not A Direct Seller of the Securities

As the Supreme Court recognized in *Pinter*, the language of Section 12 "contemplates a buyer-seller relationship not unlike traditional contractual privity" and accordingly imposes liability on direct sellers, *i.e.,* "the owner who passed title, or other interest in the security, to the buyer for value."   *Pinter*, 486 U.S. at 642, 108 S. Ct. at 2076.   *See also Cortec Industries, Inc.* v.

---

Footnote continued from previous page.

would have had no recourse against the selling warrantholders.   The Court must consider whether the warrantholders 'participated' in the underwriting from this risk-bearing perspective . . . .   Because the warrantholders took no similar risk and received no corresponding reward, it would be anomalous to include them within the definition of underwriter along with those who engaged in the selling effort.").

[12]   A scholarly article assessing recent claims against rating agencies reached the same conclusion.   Since the agencies did not "purchase rated tranches with a view to resale," "the rating agencies are not 'underwriters,' at least as that term has long been understood in the context of the Securities Act of 1933." Jennifer E. Bethel, Allen Ferrell and Gary Hu, "*Law and Economic Issues in Subprime Litigation*," Harvard, John M. Olin Center for Law, Economics and Business, Discussion Paper No. 612, 03/2008.

[13]   *Pinter* directly addressed the definition of a "statutory seller" in the context of Section 12(a)(1).   Subsequently, courts have applied the *Pinter* holding to §12(a)(2) claims as well.   *See, e.g.*, *Wilson* v. *Saintine Exploration and Drilling Corp.*, 872 F.2d 1124, 1126 (2d Cir. 1989).

*Sum Holding L.P.*, 949 F.2d 42, 49 (2d Cir. 1991) (quoting *Pinter* and holding that a direct seller is "the owner who passed title, or other interest in security, to the buyer for value").  Plaintiffs have not made — and could not make — any allegation that S&P acted as a "direct seller" of the Certificates at issue, passing title or other interest to the Plaintiffs or the class they seek to represent.  As such, the AC asserts no basis for holding S&P liable as a direct seller.

### B.  S&P Is Not A Solicitation Seller of the Securities

Nor does the AC provide a basis on which to find that S&P acted as a "solicitation seller."  The term "solicitation" has been construed narrowly by the Supreme Court and liability under Section 12 for "solicitation" is strictly limited to "the person who successfully solicits the purchase, motivated at least in part by a desire to serve his own financial interests or those of the securities owner."  *Pinter*, 486 U.S. at 647, 108 S. Ct. at 2078.  The Court has made clear that Section 12 liability does *not* extend to those whose mere "participation in the buy-sell transaction is a substantial factor in causing the transaction to take place."  *Id.* at 649, 108 S. Ct. at 2080 (citation and internal quotation marks omitted).  In fact, in rejecting the so-called "substantial factor" test, the Court noted that such a test would extend Section 12 liability "to participants only remotely related to the relevant aspects of the sales transaction.  Indeed, it might expose securities professionals, such as accountants and lawyers, whose involvement is only the performance of their professional services. . . .  *The buyer does not, in any meaningful sense, 'purchas[e] the security from' such a person*."  *Id.* at 651, 108 S. Ct. at 2081 (emphasis added).  Plaintiffs' allegations here against S&P, at best, assert that its ratings were a "substantial factor" in the sale of the Certificates.  This is insufficient as a matter of law to trigger §12 liability.

Under *Pinter* and its progeny, in evaluating claims that a defendant is a "solicitation seller," courts focus on "'the defendant's relationship with the plaintiff-purchaser' rather than the 'defendant's degree of involvement in the securities transaction and its surrounding circumstances.'"  *In re Gas Reclamation, Inc. Securities Litigation*, 733 F. Supp. 713, 723-24 (S.D.N.Y. 1990) (Sand, J.) (quoting *Pinter*, 486 U.S. at 651, 108 S. Ct. at 2080); *Capri* v. *Murphy*, 856 F.2d 473, 478-79 (2d Cir. 1988) ("[w]hile there is no doubt that [defendant] played a major role in

setting up the . . . venture . . . . plaintiffs must show that [defendant] actually solicited their investment" in order to cast the defendant as a "seller" under §12); *PPM America, Inc.* v. *Marriott Corp.*, 853 F. Supp. 860, 875 (D. Md. 1994) (company that made public statements "not directed at any particular investor" was not a "seller" under §12). Plaintiffs must show that a defendant actively solicited the sale. *Pinter*, 486 U.S. at 646-48, 108 S. Ct. at 2076-77; *Capri*, 856 F. 2d. at 479; *In re Daou Systems*, *Inc. Securities Litigation*, 411 F.3d 1006, 1029 (9th Cir. 2005) (to establish liability under §12(a)(2), "a plaintiff must allege that the defendants did more than simply urge another to purchase a security; rather, the plaintiff must show that the defendants solicited purchase of the securities for their own financial gain").

Where, as here, the defendant is not alleged to have any contact with the purchaser of the security, the defendant is not a "solicitation seller." This was precisely the holding in *Shain* v. *Duff & Phelps Credit Rating Co.*, 915 F. Supp. 575 (S.D.N.Y. 1996) (Knapp, J.), an opinion of particular relevance here, where the court dismissed a Section 12 claim against a rating agency because there was no allegation that it had had "direct contact" with the plaintiff. *Id.* at 577. At issue in *Shain* was an alleged Ponzi scheme involving securities of Towers Financial Corporation ("Towers"). *Id.* The plaintiff had alleged that "in an effort to lend additional credibility and respectability to its operations, Towers hired [the rating agency] to rate the Towers Bonds" and that Towers paid "substantial sums" to the rating agency "ostensibly for the investigatory and other 'due diligence' activities . . . that were a supposed precondition of [the] bond rating." *Id.* at 578. The plaintiff described the relationship between Towers and the rating agency as "symbiotic" and alleged that the rating agency, through a "uniform and consistent set of misrepresentations and omissions . . . . caused and induced" the plaintiff to buy the securities at issue. *Id.* at 578-79. The plaintiff did not allege, however, that the rating agency itself sold the securities; rather, plaintiff argued, it solicited their sale. *Id.* at 581. The court found these allegations insufficient to plead adequately that the rating agency was a "seller" under §12(a)(2). The court explained: "Plaintiff Shain has failed to plead any instance of direct contact between himself and [the rating agency] (a fact that plaintiff clearly would know), and in fact concedes that [the rating

agency's] only contact with plaintiff (or the purported class) was indirect, through the Class Brokers. Therefore, as a matter of law [the rating agency] is not a 'statutory seller.'" *Id.* at 583. "[P]ersons are not liable under §12 for solicitation unless they directly or personally solicit the buyer." *Id.* The court thus dismissed the Section 12(a)(2) claim with prejudice.[14]

Similarly, in *In re Deutsche Telekom AG Securities Litigation*, 2002 WL 244597, at *5 (S.D.N.Y. Feb. 20, 2002) (Stein, J.), the lack of any alleged "direct contact" between the defendant and the plaintiffs precluded a claim under Section 12. The court explained:

> Plaintiffs' bald allegations of solicitation are insufficient to sustain . . .section 12(a)(2) liability . . . . First, there is no factual allegation that [the underwriters] had direct contact with any plaintiff. Second, there is no factual allegation of specific conduct on the part of [the underwriters] to solicit purchases . . . other than the fact that [their] name appears in the prospectus. Third, while the nature of a prospectus itself is to solicit the purchase of securities, it is those who sign the registration statement that accompanies the prospectus who are deemed solicitors. *Id.* at *5.

Other courts have similarly dismissed Section 12(a)(2) claims where, as here, the complaint fails to set forth sufficient allegations that a defendant directly and actively participated in an actual sale. *See, e.g., In re Prestige Brands Holding, Inc.*, 2006 WL 2147719, at *10 (S.D.N.Y. July 10, 2006) (dismissing Section 12(a)(2) claim where alleged underwriter "did not pass title to the Plaintiffs" and complaint lacked "even one averment claiming that [alleged underwriter] directly or personally solicited any sale"); *Steed Finance LDC* v. *Nomura Securities International, Inc.*, 2001 WL 1111508, at *7 (S.D.N.Y. Sept. 20, 2001) (Buchwald, J.) (plaintiff failed to satisfy *Pinter* where defendant's name appeared in the registration statement but it was not alleged to have signed it or to have performed any "specific acts" "to directly solicit" a sale — facts that "presumably plaintiff would have known").

Here, Plaintiffs have not alleged one instance of direct contact between themselves — or any other purchaser — and S&P. The AC offers nothing but a bald allegation of solicitation (*see* AC ¶ 286 ("The Ratings Agenc[ies] directly and indirectly solicited offers to purchase the Cer-

---

[14] The court reached this conclusion though it recognized that the rating agency knew that its "statements . . . would be passed directly to [investors] and would influence their decision to purchase." *Id.* at 581.

tificates"), with no factual allegations whatsoever to support this legal conclusion.  Accordingly, Plaintiffs' Section 12 claims against S&P must be dismissed as a matter of law.

## III.   PLAINTIFFS' SECTION 11 AND 12 CLAIMS ARE TIME-BARRED

Plaintiffs' Section 11 and 12(a)(2) claims against S&P should also be dismissed for the independent reason that they are time-barred.  Section 13 of the 1933 Act provides as follow:

> No action shall be maintained . . . under [Section 11 or 12(a)(2)] unless brought within one year after the discovery of the untrue statement or the omission, or after such discovery should have been made by the exercise of reasonable diligence . . . . In no event shall any such action be brought to enforce a liability created under [Section 11] more than three years after the security was bona fide offered to the public, or under [Section 12(a)(2)] of this title more than three years after the sale.  15 U.S.C. §77m.

Plaintiffs filed their claims against S&P on February 23, 2009 — well past the expiration of the one-year statute of limitations for all claims and, with respect to several of the offerings listed in the AC, well past the expiration of the three-year statute of repose as well.[15]

### *Plaintiffs' Claims Against S&P Are Barred By The One-Year Statute of Limitations*

Plaintiffs' Section 11 and 12(a)(2) claims against S&P are barred by Section 13's one-year statute of limitations period.  This period "begins to run when the plaintiff obtains actual knowledge of the facts giving rise to the action" or upon "inquiry notice," *i.e.,* "notice of the

---

[15] Plaintiffs' claims against S&P do not relate back to the initial filing of their complaints.  Under Fed. R. Civ. P. 15(c)(II), claims against a new defendant do not relate back unless the plaintiff can establish that the defendant was omitted from the original complaint due to a "mistake concerning the proper party's identity."  In asserting an alleged "mistake," a plaintiff must "show either a factual mistake as to the name of the party to be sued . . . or a legal mistake concerning the requirements of the cause of action."  *Rogers* v. *Sterling Foster & Co*, 222 F. Supp. 2d 216, 261 (E.D.N.Y. 2002).  Here, where S&P's ratings were a part of the Registration Statements — and thus, its identity known — there clearly was no "mistake" and the claims against it cannot relate back.  *See, e.g., In re Enterprise Mortgage Acceptance Co. Securities Litigation*, 391 F.3d 401, 405 n.2 (2d Cir. 2004) (where plaintiff "chose not to name E&Y in their original complaint, Rule 15(c)'s relation back doctrine was inapplicable"); *In re WorldCom, Inc. Securities Litigation*, 294 F. Supp. 2d 431, 449 (S.D.N.Y. 2003) (Cote, J.) (where new defendants had been "identified by name in the Offering documents giving rise to the claims alleged" and "had been named in other, earlier complaints asserting similar claims," the plaintiffs "are assumed to have omitted the defendants intentionally" and the claims against them "do not relate back").  In fact, there can be no doubt that Lead Counsel was aware of S&P's identity as it had already sued S&P in three other cases alleging 1933 Act violations in connection with RMBS offerings by the time it filed its initial complaint in this matter.  Nonetheless, for the reasons set forth in the brief filed by the Individual Defendants, Plaintiffs' claims were, in any event, time-barred by the date the original complaints were filed.

facts, which in the exercise of reasonable diligence, would have led to actual knowledge." *In re Openwave Systems Sec. Litig.*, 528 F. Supp. 236, 245 (S.D.N.Y. 2007) (Cote, J.).  Here, Plaintiffs should have been on notice of the claims they assert well before February 23, 2008 (*i.e.,* one year prior to filing its claims against S&P).

Inquiry notice is triggered "'when the circumstances would suggest to an investor of ordinary intelligence the probability' that she has a cause of action." *Id.* at 245 (citation omitted).  For a Section 10(b) claim, this would require notice of a probable fraud; for the Section 11 or 12(a)(2) claims asserted here — which are not "fraud" claims, but strict liability claims — this requires notice of a probable misstatement.  *See*, *e.g., Alaska Electrical Pension Fund* v. *Pharmacia Corp*., 554 F.3d 342, 348 n.4 (3d Cir. 2009) ("Thus, as defamation is not assault, so is §10(b) not §11.  Section 11 does not require a plaintiff to plead or to prove scienter; §10(b) does.  This is a distinction with a difference, both in terms of what a plaintiff must show for recovery *and* in terms of what information must be available for inquiry notice to take hold . . . .  Were this a §11 case, which it is not, the evidence in the public realm as of February 2001 might well have given rise to storm warnings of misstatements, and thus triggered the second step of the inquiry notice analysis — the duty to investigate potential claims."); *Openwave*, 528 F. Supp. 2d at 246 ("[B]ecause plaintiff's Securities act claims are not fraud-related, but rather concern strict liability . . . for misrepresentations or misstatements by the defendants, the disclosures gave plaintiff more than adequate prompting to inquire into Openwave's alleged wrongdoing.").

"Information that may be held to constitute inquiry notice includes any financial, legal, or other data, such as public disclosures in the media . . . , that provide the plaintiff with sufficient storm warnings to alert a reasonable person to the probability that there may have been either misleading statements or material omissions involved in the sale of the securities at issue." *In re Alstom SA Securities Litigation*, 406 F. Supp. 2d 402, 421 (S.D.N.Y. 2005) (Marrero, J.).  Once an investor is on inquiry notice, he or she must "exercise reasonable diligence in investigating the potential" of a claim under the securities laws.  *Addeo* v. *Braver*, 956 F. Supp. 443, 449 (S.D.N.Y. 1997) (Sotomayor, J.).  If the investor fails to meet this obligation, plaintiffs will be

held to have had "constructive knowledge" of their claims.  *Cross* v. *21st Century Holding Co.*, 2001 WL 34808272, at *6 (S.D.N.Y. Aug. 6, 2001) (Schwartz, J.).

Thus, in *Jackson National Life Insurance Co.* v. *Merrill Lynch & Co.,* 32 F.3d 697 (2d Cir. 1994), the Second Circuit affirmed the dismissal of 1933 Act claims where plaintiffs were "on notice" of the alleged misstatements more than one year before filing its claims.  The Second Circuit concluded that on the face of the prospectus itself, as well as a subsequent offering memorandum, plaintiffs were on notice of facts that "would . . . raise major questions in the mind of a reasonable investor, and therefore to trigger the duty of inquiry." *Id*. at 702.  The court also found that certain disclosures in the offering documents warned investors of the very risk that plaintiffs asserted came to pass.  In dismissing plaintiffs' claims, the court held that these disclosures and others "provided actual notice of potential insolvency, much less the inquiry notice sufficient to trigger the duty to timely investigate and file the complaint." *Id*. at 703.

Here, beyond the fact that the Offering Documents themselves contain sufficient cautionary language regarding the risks of which Plaintiffs now complain (*see, e.g.,* Section IV.B), both the original complaints and the AC rely heavily on news reports and public events <u>occurring before February 23, 2008</u> that should have put Plaintiffs on notice of the very claims they assert here, *e.g.,* alleged inconsistencies between disclosures in the Offering Documents regarding how the underlying loans would be originated and the manner in which such loans were actually originated.  For example, as Plaintiffs repeatedly note, the national media extensively and continuously reported on loosened underwriting and origination standards by the very originators at issue here, as well as escalating delinquencies and defaults of subprime mortgage loans, throughout 2007.  A sampling of these events — as trumpeted in the AC itself — include:[16]

- On March 19, 2007, *CNNMoney.com* published an article entitled "Liar's Loans: Mortgage Woes Beyond Subprime," which the AC describes as "disclos[ing] that there was a growing indication that Alt-A mortgages issued by lenders, such as IndyMac" — *i.e.,* one of the originators of the loans at issue here (AC ¶ 6) — "'could be the next threat to the troubled real es-

---

[16]  A complete timeline of events is included in the Abrams Aff't submitted herewith along with copies of public articles reporting relevant events in addition to those set forth in the AC itself.

tate market" and quotes "Inside Mortgage Finance's Cecala" as stating that "he believes underwriting of the loans had grown too loose by the end of last year."  (AC ¶109).

- On March 23, 2007, a *New York Times* article "reported that First Franklin" — another of the loan originators at issue here (AC ¶ 6) — "had lowered its lending standards and applied lax controls in its underwriting practice by customizing underwriting software in order to approve the wrong borrowers."  (AC ¶ 133).

- In June 2007, the New York Attorney General "subpoenaed documents from Bohan and Clayton related to their due diligence efforts on behalf of the investment banks . . . that underwrote mortgage backed securities."  The AC describes this event as follows: "The NYAG, along with Massachusetts, Connecticut and the SEC (all of which also subpoenaed documents) are investigating whether investment banks held back information they should have provided in disclosure documents related to the sale of mortgage backed securities to investors."  (AC ¶ 154)  The subpoena was first publicly reported no later than July 16, 2007.  *See* "Clayton Holdings subpoenaed in subprime probe," *Reuters* (Jul. 16, 2007).

- On June 27, 2007, the AC notes that the "*The Wall Street Journal* reported that borrowers and former employees alike had made several claims that [Lehman's] in-house lending outlets used improper tactics during the mortgage boom to put borrowers into loans they could not afford" including "by falsifying tax forms, pay stubs and other information, or by ignoring inaccurate data submitted by independent mortgage brokers."  (AC ¶ 88).

- On July 10, 2007, S&P announced that it was placing its credit ratings on 612 classes of RMBS backed by U.S. subprime collateral on CreditWatch with negative implications due to "poor collateral performance, our expectation of increasing losses on the underlying collateral pools, the consequent reduction of credit support, and changes that will be implemented with respect to the methodology for rating new transactions."  *See* Abrams Aff't Ex. 17.

- On August 20, 2007, the AC notes that BusinessWeek (a McGraw-Hill publication) published an article entitled, "Did Big Lenders Cross the Line? Law Suits Assert Some Firms Doctored Loan Documents," which the AC describes as having "provided glaring examples of IndyMac's loose underwriting and aggressive mortgage lending practices."  (AC ¶ 113).

- On August 29, 2007, *The Wall Street Journal* reported on a press conference during which, as the AC describes it, "Senator Charles Schumer, chairman of the Senate panel investigating Countrywide's predatory lending practices, stated: Countrywide's most lucrative brokers are those that make bad loans that are largely designed to fail the borrower . . ." (AC ¶ 92).  Countrywide is another of the loan originators at issue here.  (AC ¶ 6).

- In September 2007, *Portfolio* published an article entitled "Overrated," which the AC describes as reporting on "a presentation that Moody's gave to a group of Russian investors in 2006 where Moody's explained the 'iterative' process of MBS securitization where Moody's gave 'feedback' to underwriters before the bonds were issued as follows . . . ." (AC ¶ 177).

- On January 27, 2008, the AC reports that Clayton revealed that it had entered into an agreement with the NYAG and "[o]n the same day, both the *New York Times* . . . and the *Wall Street Journal* ran articles describing the nature of the NYAG's investigation and Clayton's testimony.  The *Wall Street Journal* reported that the NYAG's investigation is focused on 'the broad language written in prospectuses about the risky nature of these securities changed little in recent years, even as due diligence reports noted that the number of exception loans backing the securities was rising.'" The AC further explains that Lehman, "a noted client of

Clayton," had hired it "to review whether the loans included in MBS that they underwrote were in compliance with the loan originators' represented standards." (AC ¶¶ 153, 156).

Putting aside the merits, if any, of these pre-February 2008 public reports, each of these events as reported in the AC, as well as many additional public events described in ¶¶ 6-54 of the Abrams Aff't, triggered a duty of inquiry which Plaintiffs simply ignored, filing its claims against S&P for the first time on February 23, 2009. As such, these claims are now time-barred.

### Section 11 Claims Barred By The Three-Year Statute of Repose

Several of Plaintiffs' claims are also barred under Section 13's three-year statute of repose. The statute of repose is absolute, and applies whether or not the investor could have discovered the violation. *In Re Global Crossing, Ltd. Securities Litigation*, 313 F. Supp. 2d 189, 196 (S.D.N.Y 2003) (Lynch, J.). For Section 11 claims, the three years begins to run on the date the securities are first offered, *i.e.*, the effective date of the registration statement. *See id.* at 198. When the registration is a "shelf registration," as here, the period of repose commences on the effective date of the Prospectus Supplements. *See* 17 C.F.R. §229.512(a)(2).

Of the nine offerings from which Plaintiffs certify they purchased securities, *five* were offered pursuant to a Registration Statement that became effective more than three years prior to the filing of Plaintiffs' claims against S&P on February 23, 2009.[17] Of the additional 85 offerings referenced in the AC, but from which none of the named Plaintiffs is alleged to have purchased, five occurred more than three years prior to the filing of Plaintiffs' claims against S&P.[18] Any Section 11 claims based on these ten offerings are barred by Section 13's statute of repose.

### Section 12(a)(2) Claims Barred By The Three-Year Statute of Repose

Claims under Section 12 must be brought within "three years after the sale" of the secu-

---

[17] The five offerings are:  Lehman XS Trust, Mortgage Pass-Through Certificates Series 2005-5N (prospectus supplement ("pro. supp.") filed with the SEC on Nov. 1, 2005); Series 2005-7N (pro. supp. filed on Dec. 1, 2005); Series 2006-2N (pro. supp. filed on Feb. 1, 2006); Series 2005-6 (pro. supp. filed on Nov. 1, 2005); and Structured Adjustable Rate Mortgage Loan, Mortgage Pass-Through Certificates, Series 2006-1 (pro. supp. filed on Feb. 1, 2006).  *See* Abrams Aff't Exs. 46-48, 52-53.

[18] The additional offerings are:  Lehman XS Trust, Series 2005-4 (pro. supp. filed on Oct. 4, 2005); Series 2005-8 (pro. supp. filed on Dec. 2, 2005); Series 2005-9N (pro. supp. filed on Jan. 4, 2006); Series 2005-10 (pro. supp. filed on Dec. 30, 2005); Series 2006-1 (pro. supp. filed on Feb. 1, 2006).  *See* Abrams Aff't Exs. 45, 49-51, 54.

rity in question. 15 U.S.C. §77m.  Plaintiffs have certified that their securities purchases from three offerings occurred more than three years before the filing of their claims against S&P.[19] Plaintiffs' Section 12(a)(2) claims on the basis of these purchases are thus time-barred.  With respect to the 85 other offerings listed in the AC, Plaintiffs do not allege they made any purchases, rendering it impossible for them to ever establish a necessary element of any Section 12(a)(2) claim, *i.e.,* compliance with the statute of repose.  *See Maywalt* v. *Parker & Parsley Petroleum Co.*, 808 F. Supp. 1037, 1052 (S.D.N.Y. 1992) (Sweet, J.) ("[B]ecause compliance with §13 is an essential element of a §12(2) claim, a complaint . . . must explicitly aver such compliance.").  Plaintiffs' Section 12 claims based on these offerings are also time-barred.

## IV.   THE ASSERTED RATINGS-RELATED "MISSTATEMENTS" AND "OMISSIONS" ARE NOT ACTIONABLE IN ANY EVENT

Plaintiffs' claims based on alleged ratings-related misstatements must also be dismissed because such statements are not actionable.  Plaintiffs identify the allegedly misleading portions of the Offering Documents on pages 81-116 of the AC; with respect to each, Plaintiffs assert that these statements were misleading because of purportedly omitted information.[20]  With respect to those alleged misstatements related in some way to the ratings issued on the Certificates and/or the Rating Agencies, the AC asserts the following:

First, Plaintiffs allege that the descriptions in the Offering Documents "defining the specific kind and amount of . . . Credit Enhancement provided for that Series of Certificates as well as the ratings for the Certificate Classes" were misleading because they failed to disclose that 1) "the Ratings Agencies largely determined the amount and kind of . . . Credit Enhancement to be provided for each Certificate . . . in order for the Certificates to be assigned predetermined rat-

---

[19]  According to Plaintiffs' certifications, the purchases occurring more than three years before the filing of the AC are:  Lehman XS Trust Mortgage Pass-Through Certificates 2006-2N (purchased on Jan. 13, 2006); Lehman XS Trust, Series 2005-6 (purchased on Feb. 3, 2006); and Structured Adjustable Rate Mortgage Loan, Mortgage Pass-Through Certificates, Series 2006-1 (purchased on Jan. 18, 2006).

[20]  The vast majority of these "misleading" statements relate to the descriptions of the mortgage underwriting guidelines to be used.  McGraw-Hill joins in Section III of the memorandum of law filed by the Individual Defendants with respect to the arguments made regarding these alleged omissions.

ings";[21] 2) "the amounts and kind of Credit Support the Ratings Agencies determined . . . were faulty, erroneous and inaccurate"; 3) "as a result of the material undisclosed conflicts of interest, the Ratings Agencies were incentivized to understate the required amount of credit enhancement needed to appropriately rate the Certificates AAA or investment grade"; and 4) "the amount of credit enhancement was, in fact, understated."  (AC ¶ 268-271).

Second, Plaintiffs cite the following statement from the Registration Statements:

> The ratings on the securities depend primarily on an assessment by the rating agencies of the mortgage loans and other assets of the trust fund, any credit enhancement and the ability of the servicers and the master servicer to service the loans.  (AC ¶ 272).

Plaintiffs assert that this statement was misleading because it omitted "the Ratings Agencies true role in structuring the Certificates," *i.e.,* "that it was the Ratings Agencies that largely determined . . . the amount and kind of credit enhancement necessary to support the credit rating to be assigned to the Certificates." (AC ¶ 273).  Plaintiffs' Section 11 and 12(a)(2) claims based on such statements should be dismissed both because the alleged omissions are not actionable (*see* Section IV.A) and because no reasonable investor could have been misled by the Offering Documents when read in context and in their entirety (*see* Section IV.B).

## A.    No Actionable "Omissions" Are Alleged

"[I]t is well established that there is no liability in the absence of a duty to disclose, even if the information would have been material."  *In re Morgan Stanley Technology Fund Securities Litigation*, 2009 WL 256005, at *7, *12 (S.D.N.Y. Feb. 2, 2009) (Jones, J.) (dismissing Section 11 and 12(a)(2) claims arising out of failure to disclose alleged "economic incentives" and conflicts of interest between Morgan Stanley's research and investment banking departments where

---

[21]  Pursuant to the terms of the Certificates, investors receive principal and interest payments "derived from cash flows from underlying mortgage loans."  (AC ¶ 9).  "[T]o enhance the likelihood that holders of more senior classes of certificates will receive regular distributions of interest and principal," the payment structure for the Certificates includes various forms of "credit enhancement," *e.g.,* "excess interest, overcollateralization, subordination, loss allocation features," *etc.  See, e.g.,* Lehman XS Trust Mortgage Pass-Through Certificates, Series 2006-14N  Prospectus Supplement dated August 30, 2006 at S-11.  This credit enhancement, along with other elements of the transaction listed in the Offering Documents, are evaluated by the Rating Agencies in assessing the creditworthiness of the Certificates.  *Id.* at 34.

"Plaintiffs do not plead facts sufficient to show that Defendants had a duty to disclose this information"); *In re Merrill Lynch & Co. Research Reports Securities Litigation*, 272 F. Supp. 2d 243, 247-48 (S.D.N.Y. 2003) (Pollack, J.) (dismissing Section 11 and 12 claims with prejudice where Plaintiff "failed to plead facts sufficient to show that the Defendants had a duty to disclose the information allegedly omitted," including information regarding asserted conflicts of interest between the Fund's investment advisor and the companies in which the Fund invested). "Disclosure of an item of information is not required . . .simply because it may be relevant or of interest to a reasonable investor. For an omission to be actionable, the securities laws must impose a duty to disclose the omitted information." *Resnik* v. *Swartz*, 303 F.3d 147, 154 (2d Cir. 2002). Here, Plaintiffs have set forth no facts that would demonstrate that any of the Defendants had a duty to disclose any of the allegedly omitted information regarding the Rating Agencies.

Moreover, the alleged omissions regarding the relationship between credit enhancement and the purported propriety of the ratings are, at their core, an attempt to sidestep Rule 436(g). Aware of the exemption, Plaintiffs avoid attacking S&P's ratings directly and instead assert that it is the credit support levels in the transaction that were "faulty, erroneous and inaccurate," *i.e.,* allegedly insufficient to support the ratings issued. But there is no meaningful distinction between asserting that the credit enhancement levels were insufficient to support the ratings and a claim that the ratings themselves were "wrong" or, more to the point, "unsupportable." To hold otherwise would render Rule 436(g) meaningless. In short, to the extent any of the alleged omissions are based on the notion that S&P's ratings, including its analysis of credit enhancement, or its rating models were in any way "faulty," such claims are preempted by Rule 436(g).

In any event, Plaintiffs fail to provide facts sufficient to show that the alleged "inaccuracy" of the credit support levels produced by allegedly "outdated" ratings models (AC, p. 69) was known to S&P at the time the Offering Documents became effective. In characterizing S&P's models as "outdated," Plaintiffs rely solely on an 2008 article that stated that S&P's historical assumptions based on past data "provided to be much less of a guide to future performance" and the 2008 testimony of a former S&P employee — that the AC recognizes left S&P in

"April 2005" before the offerings at issue here — that stated his "opinion" that S&P should have implemented a different rating model.  (AC ¶¶ 161, 164-67).  These allegations do not come close to demonstrating that the alleged "facts" regarding S&P's models were known at the time the Offering Documents became effective.  Even at the pleading stage, a "cognizable claim" under the 1933 Act "requires plaintiffs to, 'at a minimum, plead facts to demonstrate that allegedly omitted facts both existed, and were known or knowable, at the time of the offering."  *Lin* v. *Interactive Brokers Group, Inc.*, 574 F. Supp. 2d 408, 421 (S.D.N.Y. 2008) (McMahon, J.).

Finally, several of the underlying facts on which Plaintiffs base their claims of "omissions" were publicly known to the market.  For example, while Plaintiffs may now characterize them as producing "faulty" credit enhancement levels, S&P's U.S. RMBS ratings models have long been publicly-available via its website (www.sandp.com) and thus, subject to inspection and scrutiny by investors and issuers alike.[22]  Similarly, the fact that S&P was engaged and paid by the issuers of the securities it rates is something S&P has repeatedly and publicly stated and includes in its public announcements of its ratings.  *See, e.g., New Issue: Lehman XS Trust Series 2006-14N*, RatingsDirect (Sept. 25, 2006) ("Ratings Services receives compensation for its ratings.  Such compensation is normally paid either by the issuers of such securities or third parties participating in the marketing the securities.").  In addition, the alleged role that the Rating Agencies played in these transactions was a fact that Plaintiffs concede they knew through public articles.  (AC ¶ 177).  Plaintiffs' claims require a showing that there is "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of the information made available."  *TSC Industries* v. *Northway, Inc.*, 426 U.S. 438, 449 (1976).  By definition, public information is part of the "total mix" of information available, and a failure to disclose publicly known information cannot be the

---

[22]  While S&P disputes Plaintiffs' characterization of its ratings models, to the extent that Plaintiffs are asserting that the Offering Documents should have characterized these models as "outdated," they have also failed to state a claim because such a characterization is not an actionable omission. "[T]he federal securities laws do not require a company to accuse itself of wrongdoing."  *In re Citigroup, Inc. Securities Litigation*, 330 F. Supp. 2d 367, 377 (S.D.N.Y. 2004) (Swain, J.).

basis for a claim under the securities laws.  *See In re Tseng Labs, Inc. Securities Litigation*, 954 F. Supp. 1024, 1029 (E.D. Pa. 1996) ("There can be no liability under the securities laws because of an alleged failure to disclose information that is already available to the public.'"), *aff'd*, 107 F.3d 8 (3d Cir. 1997).  *See also Starr ex rel. Estate of Sampson* v. *Georgeson Shareholder, Inc.*, 412 F.3d 103, 110 (2d Cir. 2005) ("The 'total mix' of information includes all information reasonably available to the shareholders . . . .") (citations and internal quotation marks omitted).

### B.     The Ratings-Related Statements In The Offering Documents Are Entitled To Protection Under The "Bespeaks Caution" Doctrine

Plaintiffs' claims of alleged misstatements relating to S&P and its forward-looking rating opinions also fail for another reason: S&P's ratings were disclosed to investors in the Offering Documents along with cautionary language warning investors about the purpose and limitation of ratings and the risk that the credit enhancement incorporated into the offering could be insufficient to insulate investors from losses.  The Offering Documents thus "bespoke caution."

Materiality is an essential element of Section 11 and 12(a)(2) claims.  *See* 15 U.S.C. §§77k(a), 77l(a)(2).  "The touchstone of [this materiality] inquiry is . . . whether defendants' representations or omissions, considered together and in context, would affect the total mix of information and thereby mislead a reasonable investor regarding the nature of the securities offered."  *Halperin* v. *eBanker USA.com, Inc.*, 295 F.3d 352, 357 (2d Cir. 2002) (holding that alleged misstatements will be deemed "immaterial as a matter of law" where "it cannot be said that any reasonable investor could consider them important in light of adequate cautionary language set out in the same offering"); *Rombach* v. *Chang*, 355 F.3d 164, 176 (2d Cir. 2004) (affirming dismissal of Section 11 claim where the registration statement's cautionary language "provided a sobering picture of [the company's] financial condition and future plans," and was thus sufficient to trigger the protection of the "bespeaks caution" doctrine).  Accordingly, the relevant offering documents must be read as a whole, with the alleged misstatements considered in context.  *Olkey* v. *Hyperion 1999 Term Trust, Inc.*, 98 F.3d 2, 5 (2d Cir. 1996).

Under this doctrine, courts in this district have regularly dismissed Section 11 and 12(a)(2) claims where the relevant offering documents acknowledge the pertinent risk and set

forth warnings specifically addressing the nature of that risk.  *See Miller* v. *Lazard, Ltd.*, 473 F. Supp. 2d 571, 583-84 (S.D.N.Y. 2007) (Marrero, J.) (dismissing Section 11 and 12(a)(2) claims premised on allegations that defendants knew from roadshows that the market could only support offering price of $21 to $22 per share, because prospectus explicitly recognized that there was no prior market for the shares and that the price could be subject to significant fluctuations); *Hiner-feld* v. *United Auto Group*, 1998 WL 397852, *5, *6, *8 (S.D.N.Y. July 15, 1998) (Patterson, J.) (dismissing Section 11 and 12(a)(2) claims premised on allegations that company was experiencing delays in acquiring new dealerships, because prospectus adequately conveyed risk of delays associated with dealership acquisition and subsequent revenue losses).

Here, the Offering Documents contained meaningful cautionary language regarding the nature of ratings and the possibility that, notwithstanding the use of credit enhancements, purchasers could suffer losses on the Certificates.[23]  For example, the Offering Documents stated:

- "These ratings are not recommendations to buy, sell or hold these certificates. A rating may be changed or withdrawn at any time by the assigning rating agency." *See, e.g.,* Lehman XS Trust, Mortgage Pass-Through Certificates, Series 2005-5N Prospectus Supplement S-16, Section "Summary of Terms," Subsection "Ratings of the Certificates."

- "A securities rating is not a recommendation to buy, sell or hold securities and may be subject to revision or withdrawal at any time by the assigning rating agency.  A securities rating addresses the likelihood of receipt by holders of Offered Certificates of distributions in the amount of scheduled payments on the Mortgage Loans.  The rating takes into consideration the characteristics of the Mortgage Loans and the structural and legal aspects associated with the Offered Certificates . . .  The security ratings assigned to the Offered Certificates should be evaluated independently from similar ratings on other types of securities." *See, e.g.,* Lehman XS Trust 2005-5N Prospectus Supplement S-95, Section "Ratings."

- "If the applicable subordination . . . is insufficient to absorb losses, then certificate holders will likely incur losses and may never receive all of their principal payments." *See, e.g.,* Lehman XS Trust 2005-5N, Prospectus Supplement S-20, Section "Risk Factors," Subsection "Potential Inadequacy Of Credit Enhancement And Other Support."

- "This excess is referred to . . . as 'overcollateralization,' and will be available to absorb losses.  We cannot assure you, however, that the mortgage loans, together with payments

---

[23]  Plaintiffs here have not alleged that the Issuing Trusts have failed to pay interest and principal on the Certificates Plaintiffs purchased in accordance with the terms of the Certificates.  As such, Plaintiffs have not alleged that they have suffered any actual losses.  For this reason as well, Plaintiffs have stated no claim.  *See* Section V of the memorandum of law filed by Defendant Moody's.

from the interest rate swap agreement, will generate enough excess interest to create or main-
tain the applicable overcollateralization level as set by the rating agencies." *See, e.g.,* Leh-
man XS Trust 2005-5N Prospectus Supplement S-19, Section "Risk Factors," Subsection
"Potential Inadequacy Of Credit Enhancement And Other Support."

- "We cannot assure you that any amounts will be received under the interest rate swap agree-
ment, or that any such amounts that are received will be sufficient to maintain required over-
collateralization, pay interest shortfalls or repay losses on the mortgage loans." *See, e.g.,*
Lehman XS Trust 2005-5N, Prospectus Supplement S-20, Section "Risk Factors," Subsec-
tion "Potential Inadequacy Of Credit Enhancement And Other Support."

Each of these statements, as well as similar statements in each of the Offering Documents

at issue, specifically warned investors of the very risk that Plaintiffs assert occurred, namely that

"the credit enhancement provided to the Certificates was inadequate to support the AAA and in-

vestment grade ratings."  (AC ¶ 18).[24]  This cautionary language renders any alleged misstate-

ment on these topics immaterial.  *See Halperin*, 295 F.3d at 360 (holding that where offering

memoranda contained "numerous warnings that the securities were not presently registered for

resale and there could be no assurance that they ever would be registered," the "cautionary lan-

guage addresses the relevant risk directly" and was "not misleading"); *Luce* v. *Edelstein*, 802

F.2d 49, 56 (2d Cir. 1986) (offering memorandum's warnings that actual results could vary from

projections bespoke caution).  For this reason as well, Plaintiffs' Section 11 and 12(a)(2) claims

based on alleged misstatements relating to S&P and its ratings should be dismissed.

## V.    PLAINTIFFS' SECTION 15 CLAIM SHOULD BE DISMISSED

Plaintiffs also allege a claim against S&P under Section 15 of the 1933 Act.  (AC ¶¶ 304-

312).  To survive a motion to dismiss, Plaintiffs were required to "allege '(a) a primary violation

by a controlled person, and (b) control by the defendant of the primary violator.'" *Refco*, 503 F.

Supp. 2d at 637 (citation omitted).  Plaintiffs have failed to plead either.

First, for all of the reasons set forth above and in the motions to dismiss filed by the other

---

[24]  In addition, to the extent Plaintiffs seek to argue that the "damage" they allegedly suffered was a drop
in the current market value of the Certificates, this was also a risk that was clearly disclosed in the offer-
ing documents.  *See, e.g.,* Lehman XS Trust Mortgage Pass-Through Certificates, Series 2006-14N Pro-
spectus Supplement dated Aug. 30, 2006 at S-41 ("Limited Ability to Resell Certificates": "A secondary
market for any class of offered certificates may not develop. If a secondary market does develop, it might
not continue or it might not be sufficiently liquid to allow you to resell any of your certificates.").

Defendants, Plaintiffs' Section 11 and 12 claims must fail and, with them, Plaintiffs' claim for control liability under Section 15. *See, e.g.*, *Rombach*, 355 F.3d at 177-78 (2d Cir. 2004) (citing *SEC* v. *First Jersey Securities, Inc.*, 101 F.3d 1450, 1472-73 (2d Cir. 1996)).

Second, Plaintiffs' Section 15 claim against S&P fails because Plaintiffs have not adequately pled that S&P "controlled" the alleged primary violators. Control is "the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise." *First Jersey*, 101 F.3d at 1472-73 (citation and internal quotation marks omitted); *see also In re Global Crossing, Ltd. Securities Litigation*, 2005 WL 1875445, at *3 (S.D.N.Y. Aug. 5, 2005) (Lynch, J.) ("To be liable as a control person, the defendant must actually possess in fact, rather than in theory, the ability to direct the actions of the controlled person.") (citation and internal quotation marks omitted). "Conclusory allegations of control are insufficient as a matter of law." *Id.* at *3. In fact, where, as here, "plaintiff seeks to attribute control status to a third party . . . who is not in a control position nor an outside party such as an attorney, auditor or underwriter, then further factual allegations must be made to show that in fact such control can be inferred." *See Sloane Overseas Fund, Ltd.* v. *Sapiens International Corp., N.V.*, 941 F. Supp. 1369, 1378 (S.D.N.Y. 1996) (Patterson, J.).

In support of its Section 15 claims, Plaintiffs summarily assert that S&P:

- "had the power to influence" the primary violators, *i.e.,* "SASCo, LBI and the Issuing Trusts," and "exercised that power and influence" (AC ¶ 307); and

- "controlled the ultimate decision" of which loans would be included in the transaction and the "credit enhancement required [for a] AAA [rating]," S&P "controlled all material aspects relating to the acquisition, structure and sale of the Certificates and, thus, the activities of the" primary violators. (*Id.* ¶ 311).

Plaintiffs' bald allegations are facially deficient. First, conclusory allegations that S&P had the "power to influence" the alleged primary violators, even assuming this were the case, are insufficient to state a claim under Section 15. *See, e.g., In re Flag Telecom Holdings, Ltd. Securities Litigation*, 352 F. Supp. 2d 429, 458 (S.D.N.Y. 2005) (Conner, J.) ("Control in this context is not the mere ability to persuade, but almost always means the practical ability to *direct* the actions of people who issue or sell securities.") (citation and internal quotation marks omitted).

Second, Plaintiffs' mere conclusory statements lack any of the hallmarks generally considered adequate to plead "control."  For example, S&P is not alleged to have been involved in the day-to-day affairs of the alleged primary violators, to have controlled any of the alleged primary violators through stock ownership, or to have signed the actual offering documents.  *See First Jersey*, 101 F.3d at 1472-73 ("Control over a primary violator may be established by showing that the defendant possessed the power to direct or cause the direction of management and policies of a person, whether through the ownership of voting securities, by contract or otherwise") (citation and internal quotation marks omitted); *Flag Telecom*, 352 F. Supp. 2d at 459 (dismissing claim where plaintiff did not plead facts "creating the inference" that the defendant "could have directed [the primary violator] to enter into the allegedly improper" contract).

Finally, the notion that because S&P allegedly "controlled" two aspects of the securitization process by setting forth its criteria for a "AAA" rating, it therefore "controlled" the activities of Lehman, SASCO and the Issuing Trusts is absurd on its face and, in any event, contradicted by every other allegation contained in the AC that make clear that it was Lehman that "*controlled every aspect of the securitization and underwriting process*." (AC ¶ 6; emphasis added). For each of these reasons, Plaintiffs' Section 15 claim should be dismissed.

## <u>CONCLUSION</u>

The claims asserted against McGraw-Hill in the AC should be dismissed in their entirety.

Dated: April 27, 2009

Respectfully submitted,

   /s/ Floyd Abrams
Floyd Abrams
S. Penny Windle
Adam Zurofsky
Tammy L. Roy
CAHILL GORDON & REINDEL LLP
80 Pine Street
New York, New York  10005
(212) 701-3000
*Attorneys for Defendant McGraw-Hill*