**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------X
                                                    :

In re:                                    :      09 MD 2017 (LAK)
                                                    :

LEHMAN BROTHERS SECURITIES AND    :
ERISA LITIGATION                    :      **ECF CASE**
                                                      :

This Document Applies to:                 :
                                                    :

*In re Lehman Brothers Mortgage-Backed*    :
*Securities Litigation,* No 08-CV-6762.    :
                                                    :
------------------------------------------------------------X

## MEMORANDUM OF LAW IN OPPOSITION TO THE INDIVIDUAL DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' CONSOLIDATED <u>AMENDED SECURITIES CLASS ACTION COMPLAINT</u>

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ............................................................................1

SUMMARY OF THE FACTS ............................................................................3

SUMMARY OF THE ARGUMENT ....................................................................7

ARGUMENT .......................................................................................................9

I.      PLAINTIFFS ADEQUATELY ALLEGE
STANDING TO ASSERT THEIR CLAIMS ..................................................9

      A.      Any Challenge to Lead Plaintiff's Standing Is Premature ......................9

      B.      Plaintiffs Have Adequately Alleged Standing ......................................11

      C.      Plaintiffs Have Adequately Alleged Article III Standing ......................15

II.     THE COMPLAINT SATISFIES THE PLEADING STANDARDS OF
RULES 8(a) AND 12 OF THE FEDERAL RULES OF CIVIL PROCEDURE...............16

      A.      The Legal Standards ...........................................................................16

            1.      Factual Allegations Supporting the Inference that
the Guidelines Were Systematically Disregarded.....................................17

            2.      Factual Allegations Supporting the Inference of
Credit Support Misstatements and Omissions ..........................................20

            3.      Factual Allegations Supporting Conflicts of Interest
and Ratings Shopping Misstatements and Omissions ..............................20

      B.      Plaintiffs State Claims under Section 15 of
the 1933 Act Against the Individual Defendants...................................21

III.    RISK DISCLOSURES DO NOT CURE UNDERWRITING
GUIDELINE MISSTATEMENTS AND OMISSIONS....................................22

IV.    FAILURE TO QUANTIFY EXCEPTIONS DOES NOT MANDATE
DISMISSAL AND "OCEANS" OF LOAN DATA IN THE
OFFERING DOCUMENTS DO NOT CURE MISSTATEMENTS ................30

V.     ALLEGED MISSTATEMENTS AND OMISSIONS REGARDING RATINGS
AGENCIES PRE-ENGAGEMENT STRUCTURING ARE ACTIONABLE.................31

VI.    THE INDIVIDUAL DEFENDANTS ARE NOT CORRECT
       THAT CREDIT SUPPORT ISSUES WERE SUFFICIENTLY
       DISCLOSED IN THE OFFERING DOCUMENTS ..........................................................32

VII.   PLAINTIFFS' CLAIMS ARE NOT TIME BARRED......................................................34

       A.    The Standard for Inquiry Notice .............................................................34

       B.    Defendants Do Not Establish Inquiry Notice ........................................37

             1.    None of the News Articles Reference the Effect on the Certificates.........37

             2.    General News Articles on the Subprime Originators Do
                   Not Demonstrate a Probable Claim on the Certificates ............................37

             3.    None of the News Articles Reference
                   Either the Certificates or Lehman MBS......................................................38

             4.    None of the News Articles Reference Ratings Shopping .........................38

             5.    The News Articles Themselves Are Controverted ...................................39

             6.    News Articles Relating to the Ratings Agencies'
                   Outdated Models Do Not Satisfy Inquire Notice......................................40

             7.    News Articles on the Ratings Agencies' Role
                   in Structuring Do Not Satisfy Inquiry Notice ..........................................41

VIII.  THE INDIVIDUAL DEFENDANTS' INCORRECTLY ASSERT
       THAT PLAINTIFFS' SECTION 15 CLAIM FAILS TO STATE
       A CLAIM UPON WHICH RELIEF CAN BE GRANTED ............................................42

       **CONCLUSION** ....................................................................................................45

# TABLE OF AUTHORITIES

**FEDERAL & STATE CASES**

*Alameda v. Nuveen Municipal High Income Opportunity Fund,*
Civ. No. 08-4575, 2009 U.S. Dist. LEXIS 42637 (N.D. Cal. May 20, 2009) ..................35

*Alaska Electrical Pension Fund v. Lehman Brothers Holdings Inc.,*
Civ. No. 08-10686 (S.D.N.Y. June 19, 2008) ...................34

*Allen v. Wright,*
468 U.S. 737 (1984)...................15

*Aschcroft v. Iqbal,*
556 U.S. __, 129 S. Ct. 1937 (2009)...................16

*Barnes v. Osofsky,*
373 F.2d 269 (2d Cir. 1967)...................13

*Basic, Inc. v. Levinson,*
485 U.S. 224 (1988)...................17

*Bell Atl. Corp. v. Twombly,*
550 U.S. 544 (2007)...................16

*Caiola v. Citibank, N.A.,*
295 F.3d 312 (2d Cir. 2002)...................17

*Feinman v. Dean Witter Reynolds, Inc.,*
84 F.3d 539 (2d Cir. 1996)...................32

*Fogarazzo v. Lehman Brothers, Inc.,*
341 F. Supp. 2d 274 (S.D.N.Y. 2004)...................36

*Garber v. Legg Mason, Inc.,*
537 F. Supp. 2d 597 (S.D.N.Y. 2008)...................29

*Giarraputo v. Unumprovident Corp.,*
Civ. No. 99-301, 2000 U.S. Dist. LEXIS 19138 (D. Me. Nov. 8, 2000)...................33

*Glazer v. Formica Corp.,*
964 F.2d 149 (2d. Cir. 1992)...................31

*Goldman v. Belden,*
754 F.2d 1059 (2d Cir. 1985)...................32

*Grand Lodge of Pa. v. Peters,*
    550 F. Supp. 2d 1363 (M.D. Fla. 2008)............................................................13

*Guenther v. Cooper Life Sciences, Inc.,*
    759 F. Supp. 1437 (N.D. Cal. 1990) ...............................................................13

*Herman & MacLean v. Huddleston,*
    459 U.S. 375 (1983)..........................................................................................2

*Hevesi v. Citigroup Inc.,*
    366 F.3d 70 (2d Cir. 2004)..............................................................................10

*Hoffman v. UBS-AG,*
    591 F. Supp. 2d 522 (S.D.N.Y. 2008).............................................................13

*I. Meyer Pincus & Assocs., P.C. v. Oppenheimer & Co.,*
    936 F.2d 759 (2d Cir. 1991)............................................................................17

*In re Adelphia Commc'ns Corp. Sec. & Derivative Litig.,*
    Civ. No. 03-MD-1529 (LMM), 2007 U.S. Dist. LEXIS 66911
    (S.D.N.Y. Sept. 10. 2007)...............................................................................42

*In re Alstom SA Sec. Litig.,*
    406 F. Supp. 2d 402, 421 (S.D.N.Y. 2005).....................................................36

*In re Ames Dep't Stores, Inc.,*
    991 F.2d 968 (2d Cir. 1993)............................................................................36

*In re AMF Bowling Sec. Litig.,*
    Civ. No. 99-3023 (DC), 2003 U.S. Dist. LEXIS 7389 (S.D.N.Y. May 2, 2003) ..............45

*In re Brooks Automation Inc. Sec. Litig.,*
    Civ. No. 06-11068 (RWZ), 2007 U.S. Dist. LEXIS 88045 (D. Mass. Nov. 6, 2007).......43

*In re Cabletron Sys.,*
    311 F.3d 11 (1st Cir. 2002).............................................................................43

*In re Countrywide Fin. Corp. Sec. Litig.,*
    588 F. Supp. 2d 1132 (C.D. Cal. 2008) ............................................... *passim*

*In re Dreyfus Aggressive Growth Mut. Fund Litig.,*
    Civ. No. 98-4318 (HB), 2000 U.S. Dist. LEXIS 13469 (S.D.N.Y. Sept. 20, 2000).........11

*In re Flag Telecom Holdings Ltd. Sec. Litig,*
    Civ. No. 02-3400, 2009 U.S. Dist. LEXIS 37090 (S.D.N.Y. May 1, 2009)...............17, 33

*In re Fleming Cos. Sec. & Derivative Litig.,*
    Civ. No. 03-MD-1530, 2004 U.S. Dist. LEXIS 26488 (E.D. Tex. Jun. 10, 2004)............13

*In re Global Crossing, Ltd. Sec. Litig.,*
    313 F. Supp. 2d 189 (S.D.N.Y. 2003).................................................................10, 13, 42

*In re Initial Pub. Offering Sec. Litig.,*
    214 F.R.D. 117 (S.D.N.Y. 2002) ...........................................................................10, 11

*In re Moody's Corp. Sec. Litig.,*
    599 F. Supp. 2d 493 (S.D.N.Y. 2009).................................................................35, 36, 39

*In re Number Nine Visual Tech. Corp. Sec. Litig.,*
    51 F. Supp. 2d 1 (D. Mass. 1999) .............................................................................33

*In re Refco, Inc. Sec. Litig.,*
    503 F. Supp. 2d 611 (S.D.N.Y. 2007)........................................................................43

*In re Sumotomo Copper Litig.,*
    120 F. Supp. 2d 328 (S.D.N.Y. 2000).......................................................................36

*In re Turkcell Iletisim Hizmetler, A.S. Sec. Litig.,*
    202 F. Supp. 2d 8 (S.D.N.Y. 2001) ...........................................................................29

*In re Westinghouse Sec. Litig.,*
    90 F.3d 696 (3d Cir. 1996).........................................................................................11

*In re Worldcom, Inc. Sec. Litig.,*
    Civ. No. 02-3288 (DLC), 2004 U.S. Dist. LEXIS 4240 (S.D.N.Y. Mar. 19, 2004)..........13

*In re Worldspace Sec. Litig.,*
    Civ. No. 07-2252 (RMB), 2008 U.S. Dist. LEXIS 56224 (S.D.N.Y. Jul. 21, 2008).........44

*La. Mun. Police Employees Ret. Sys. v. Merrill Lynch & Co.,*
    Civ. No. 08-9063 (JSR) (S.D.N.Y. Feb. 19, 2009).........................................................12

*Lapin v. Goldman Sachs Group, Inc.,*
    506 F. Supp. 2d 221(S.D.N.Y. 2006)...........................................................................35

*Luce v. Edelstein,*
    802 F.2d 49 (2d Cir. 1986)...........................................................................................33

*Milman v. Box Hill Sys. Corp.,*
    72 F. Supp. 2d 220 (S.D.N.Y. 1999).......................................................................32, 39

*Nanopierce Tech., Inc. v. Southridge Capital Mgmt, LLC,*
    Civ. No. 02-0767(LBS), 2003 U.S. Dist. LEXIS 21858 (S.D.N.Y. Dec. 4, 2003) ..........31

*Newman v. Warnaco Group, Inc.,*
    335 F.3d 187 (2d Cir. 2003)............................................................................35

*Nivram Corp. v. Harcourt Brace Jovanovich, Inc.,*
    840 F. Supp. 243 (S.D.N.Y. 1993) .................................................................35

*Olkey v. Hyperion 1999 Term Trust, Inc.,*
    98 F.3d 2 (2d Cir. 1996)................................................................................17

*Panther Partners, Inc., v. Ikanos Comms, Inc.,*
    538 F. Supp. 2d 662 (S.D.N.Y. 2008).............................................................29

*Randall v. Loftsgaarden,*
    478 U.S. 647 (1986)........................................................................................2

*Rombach v. Chang,*
    355 F.3d 164 (2d Cir. 2004)............................................................................17

*Shah v. Meeker,*
    435 F.3d 244 (2d Cir. 2006)............................................................................35

*Staehr v. The Hartford Fin. Servs. Group, Inc.,*
    547 F.3d 406 (2d Cir. 2008)............................................................................34

*Teamsters Local 445 Freight Division Pension Fund v. Bombardier Inc.,*
    Civ. No. 05-1898 (SAS), 2005 U.S. Dist. LEXIS 19506 (S.D.N.Y. Sept. 6. 2005)..........36

*TSC Indus., Inc. v. Northway, Inc.,*
    426 U.S. 438 (1976)......................................................................................32

## STATUTES & RULES

U.S. Const. Art. III, § 2 ...........................................................................................15

15 U.S.C. §§ 77a *et seq.* ................................................................................ *passim*

Fed. R. Civ. P. 8(a) ...............................................................................................16

Fed. R. Civ. P. 12(b)(6) .........................................................................................16

Fed. R. Civ. P. 15(a) .............................................................................................45

17 C.F.R. § 229.303(a) ..........................................................................................29

## SECONDARY AUTHORITY

S. Rep. No. 476-73 (1st Sess. 1933) .......................................................................2

Report on the Role and Function of Credit Rating Agencies in
the Operation of the Securities Markets,
(U.S. Securities and Exchange Commission), January 2003 ......................................32

2 T.L. Hazen, Treatise on the Law of Securities Regulation § 12.24(1) (4th ed. 2002)...............43

## PRELIMINARY STATEMENT

Plaintiffs respectfully submit this memorandum of law in opposition to the motion made by defendants Mark L. Zusy, Samir Tabat, James J. Sullivan, Lana Franks, Edward Grieb, Kristine Smith and Richard McKinney (collectively, the "Individual Defendants" or the "Individuals") pursuant to Fed. R. Civ. P. 12(b)(6) to dismiss Plaintiffs' Consolidated Securities Class Action Complaint (the "Complaint").

This is an action brought pursuant to the Securities Act of 1933, 15 U.S.C. §§ 77k, 77l, (the "1933 Act" or "Securities Act") by Court-appointed Lead Plaintiff Locals 302 and 612 of the International Union of Operating Engineers – Employers Construction Industry Retirement Trust (the "Operating Engineers" or the "Lead Plaintiff"), Plaintiff New Jersey Carpenters Health Fund (the "New Jersey Carpenters") and Plaintiff Boilermakers-Blacksmith National Pension Trust (the "Boilermakers") (collectively, "Plaintiffs"), on their own behalf and as a class action on behalf of all persons and entities who purchased or otherwise acquired mortgage-backed securities ("MBS" or "Certificates") underwritten by Lehman Brothers Inc. ("LBI") and issued by Issuing Trusts pursuant or traceable to two Registration Statements and accompanying Prospectuses (the "Registration Statements") and later-filed Prospectus Supplements incorporated into the Registration Statements (the "Offering Documents").

Defendants registered the securities at issue with the Securities and Exchange Commission (the "SEC"), received the benefits of an SEC-registered offering and also were obliged to comply with the strict liability provisions of the federal securities laws, including the private rights of action provided in Section 11 of the 1933 Act.[1]

---

[1]    In addition to the Individuals, Plaintiffs seek redress against the Defendant Issuing Trusts, which issued the Certificates purchased by Plaintiffs and the Class, and Defendants Moody's Corp. and The McGraw-Hill Companies, Inc., as a result of the activities of their respective divisions, Moody's and S&P (together, the "Ratings Agencies" or "Ratings Agency Defendants"). LBHI, Lehman Brothers Inc. ("LBI"), as Underwriter for each of the

The Complaint asserts claims pursuant to the 1933 Act against each of the Individual Defendants under Section 11, as signatories of either one or both of the Registration Statements, and Section 15, as control persons of a primary violator under Section 11. These claims under the 1933 Act impose "a harsh, nearly strict-liability rule designed to make sure those involved in securities offerings meticulously prepare the registration statement." *In re Countrywide Fin. Corp. Sec. Litig.*, 588 F. Supp. 2d 1132, 1170 n.47 (C.D. Cal. 2008); *see also Herman & MacLean v. Huddleston*, 459 U.S. 375, 381-82 (1983). As the Supreme Court has noted, liability under the 1933 Act is "virtually absolute, even for innocent misstatements." *Herman & MacLean*, 459 U.S. at 382 (citing 15 U.S.C. § 77k(b)). The 1933 Act imposes such high standards on signatories to the Registration Statement because it seeks "'to prevent further exploitation of the public by the sale of unsound, fraudulent, and worthless securities through misrepresentation [and] to place adequate and true information before the investor." *Randall v. Loftsgaarden*, 478 U.S. 647 (1986) (quoting S. Rep. No. 476-73, at 1 (1st Sess. 1933)).

As set forth in the Complaint, Lehman, its affiliates, the Individual Defendants and the Ratings Agency Defendants violated the high standards of the 1933 Act. These Defendants inundated the financial markets with nearly $100 billion of MBS through an "assembly line" of nearly 100 public offerings over a 21-month period. The Offerings Documents used to effectuate these Offerings violated the core disclosure provisions of the Securities Act. They failed to disclose, *inter alia*, that the stated guidelines for originating the mortgage collateral (the "Guidelines") were systematically disregarded; that the Ratings Agencies served conflicting roles as undisclosed "coach" and "referee" – not merely rating the Certificates, but creating and structuring them as well; and that Lehman engaged the Ratings Agencies through undisclosed

Offerings, and the Structured Asset Securities Corporation ("SASCo"), a special purpose corporation formed by Lehman to securitize assets and file the Registration Statements with the SEC, are not named as defendants because they have filed for bankruptcy protection under Chapter 11 of the U.S. Bankruptcy Code, 11 U.S.C. § 1101 *et seq.*

"ratings shopping" practices which compromised their independence and incentivized the assignment of inflated investment-grade ratings to the Certificates. The result of these disclosure violations was the production and sale, on a mass scale, of the largely "worthless" and "unsound" securities the 1933 Act was enacted to both guard against and remedy.

## SUMMARY OF FACTS

Pursuant to the Registration Statements signed by the Individual Defendants, Lehman Brothers Inc., acting in continuous coordination with the Ratings Agency Defendants, Moody's and S&P, inundated the financial markets with an unprecedented volume of purportedly investment-grade MBS. Over $96 billion of Certificates were sold to investors in a rapid succession of 94 public offerings over a concentrated 21-month period ending in early 2007. (¶¶ 2, 5, 30-31). The Certificates were sold primarily to conservative institutional investors such as pension funds who were required to purchase only the highest investment-grade securities. (¶ 14).

The Certificates were collateralized by residential mortgages, meaning the investors' interest and principal payments were derived from payments made by borrowers on the underlying mortgages. (¶¶ 9, 12). The Registration Statements and Prospectus Supplements each contained specific sections describing the purported "Underwriting Guidelines" used to originate the mortgage collateral (the "Guidelines"). (¶¶ 10-14, 18, 185-267). The Guidelines provided that the originator was required to assess borrower creditworthiness through an examination and verification of borrower assets, credit history and employment (¶¶ 185, 190, 182, 199, 201, 204, 210, 213, 218, 224, 229, 238, 240, 243, 247, 249, 256, 263) and the valuation of the mortgaged property through standard appraisals. (¶¶ 185, 187, 190, 199, 201, 204, 208, 216, 238, 240, 243, 247, 250, 256, 260). The Guidelines also provided that mortgage loans could

be originated pursuant to limited or no supporting borrower documentation where there were countervailing or compensating factors justifying issuance of the loan, *e.g.*, strong credit profile or high appraisal value in relation to loan amount. (¶¶ 192, 195, 196, 206, 216, 220, 226, 229, 232, 249, 253, 265). It is alleged that these Guidelines contained material misstatements and omissions since, in fact, the Guidelines were systematically disregarded. (¶¶ 11, 69-150, 186, 188, 196).

Relatively soon after issuance and in the face of mounting delinquencies in the mortgage collateral, the Ratings Agencies in July 2007 announced the need to not merely potentially downgrade the Certificates and all similar MBS, but to revise the underlying ratings methodologies use to rate them, incorporating significantly higher anticipated default rates. (¶¶ 159-67). When these methodology changes were finally implemented, they resulted in downgrades in late 2007 and 2008, of not merely one or two levels within the rating system – *i.e.,* from "AAA" to "AA" or "AA-" – but as much as 17 levels – *i.e.,* from "AAA" to "CCC." Although initially 89% and 76% of the Certificates were assigned the highest "AAA" and "Aaa" ratings by S&P and Moody's, respectively, over 71% and 79%, respectively, of those Certificates were subsequently downgraded, with 58% and 65%, respectively, downgraded to speculative "junk bond" investments.[2] (¶ 8). Further, delinquency and foreclosure rates on the collateral underlying the Certificates continued to dramatically increase, with delinquencies and foreclosures impairing as much as 50% of the underlying Certificate mortgage loans. (¶¶ 8, 75, 83, 90, 105, 119, 128, 139, 143, 146). Attendant to these significant downgrades and delinquencies was a commensurate collapse in the value of the bonds, with Plaintiffs' Certificates having lost on average 44% of their value. (¶¶ 8, 22-24).

---

[2]    As set forth in the Plaintiffs' Memorandum of Law in Opposition to the Ratings Agency Defendants' Motions to Dismiss at 7, 100% of the downgrades of the Certificates by the Ratings Agencies to below investment grade occurred after June 17, 2007.

In announcing the methodology changes, and in the subsequent Certificate downgrades, the Ratings Agency Defendants attributed, as a material cause, the aggressive underwriting practices and mortgage fraud which had infected the underlying mortgage collateral. (¶¶ 72, 75, 83, 90, 105, 119, 128, 139, 143, 146). The Ratings Agencies' actions in July 2007 triggered a number of governmental and other investigations. (¶¶ 169, 177). The findings of these investigations, which only emerged in 2008, also supported the strong inference that the mortgage collateral had been impaired from the outset; and the AAA ratings consistently assigned to the Certificates had been inflated and were the product of undisclosed material conflicts of interest.

In March 2008, the Presidential Working Group (the "PWG") composed of the CFTC, the SEC, the Secretary of the Treasury and the Chairman of the Board of Governors of the Federal Reserve System determined that there had been an "erosion of market discipline" in the underlying mortgage origination and rating of MBS. (¶ 72). In July 2008, the SEC reported the results of its year-long investigation into the activities of Defendants S&P and Moody's in rating residential MBS in the precise period during which the Certificates had been issued (the "2008 SEC Report"). (¶¶ 17, 67, 154, 168, 179-81). The 2008 SEC Report concluded that there were material undisclosed conflicts of interest in the Ratings Agency Defendants' rating of MBS including, most notably, the Ratings Agency Defendants' role in structuring the MBS. (¶¶ 56-62, 172-84, 273). The Ratings Agency Defendants, in seeking the highly profitable MBS ratings engagements from the same few investment banking firms, were incentivized not to update their models to reflect more aggressive mortgage loan products (*i.e.,* adjustable and negative amortization loans) lest the models not yield the highest investment grade ratings which would result in the greatest profit for the investment banks. (¶¶ 178-81). In October 2008, in testimony

given before the United States House of Representatives Committee on Oversight and Governmental Reform (the "House Oversight Committee"), a former S&P managing director testified about the failure of the Ratings Agency Defendants to update their models to reflect the default rate of the loans being issued (¶¶ 164-71), as well as the "ratings shopping" practice employed by investment banks to engage the Ratings Agency Defendants wherein the Ratings Agencies provided ratings as part of their competitive bid for the ultimate engagement, further incenting the assignment of inflated ratings to the MBS. (¶¶ 17, 66-67, 168-78).

In early 2008, facts regarding an investigation by the New York State Attorney General ("NYAG") relating to the due diligence of investment banks, including Lehman, with respect to MBS, began to emerge. (¶¶ 155-57). The investigation revealed that investment banks may have disregarded data presented to them by their outside "due diligence firms" the Bohan Group ("Bohan") and Clayton Holdings, Inc. ("Clayton"), showing that the underlying mortgage loans did not comply with the mortgage loan underwriting guidelines stated in MBS offering documents. (¶¶ 13, 155-58). In March 2008, the President of Bohan stated publicly that the investment banks which engaged his firm had significantly reduced, in the 2005-2007 time frame, the percentage of loans the investment firms wanted examined to determine whether the mortgage loans to be securitized complied with the stated underwriting guidelines in the applicable offering documents. (¶ 158). Further, in 2008 and 2009, securities fraud complaints were filed detailing the reckless mortgage underwriting practices employed by four of the nine principal mortgage loan originators of the Certificates. (¶¶ 86-87, 93-96, 116-17, 137-38).

The Complaint alleges violations of Sections 11 and 15 of the Securities Act arising from three categories of material omissions that had not been disclosed in the Offering Documents: (1) the mortgage underwriting guidelines set forth in the Offering Documents were

systematically disregarded (¶¶ 185-267); (2) the credit support or investor protections built into the structure of the Certificates were inadequate and based on outdated models employed by the Ratings Agencies who had the incentive to inflate credit support and Certificate ratings (¶¶ 17-18, 53-57, 67, 159-67, 172-78, 268-71); and (3) the Ratings Agencies' activities in connection with the Certificates were infected by undisclosed conflicts of interest, including the Ratings Agency Defendants' provision of *unpaid* services in creating and structuring the Certificates as an inducement for Lehman to hire them to rate the Certificates (¶¶ 51-62), and Lehman's requirement that the Ratings Agency Defendants submit to the "ratings shopping" process as a prerequisite for being engaged to rate the Certificates. (¶¶ 17, 66-67, 168-73).

These material omissions resulted in material misstatements in the specific portions of the Offering Documents that described: (1) the Guidelines purportedly used to originate mortgages, because, in fact, those Guidelines were systematically disregarded (¶¶ 185-267); (2) the various forms of stated credit support or investor protections because, having been derived from outdated models employed by the conflicted Ratings Agency Defendants, they were wholly inadequate (¶¶ 268-271); and (3) Lehman as the sole "structurer" of the Certificates because, in fact, the Ratings Agencies were critical to both the formation and structuring of the Certificates (¶¶ 272-73).

## SUMMARY OF ARGUMENT

The Individuals argue that all the claims must be dismissed because: (1) Plaintiffs do not have standing to represent purchasers of all of the Offerings; (2) there are no actionable misstatements or omissions in the stated mortgage underwriting guidelines both because of certain risk disclosures and an "ocean" of loan data provided to investors in the Offering Documents; (3) the statements regarding the stated credit support are not actionable because the

potential inadequacy was disclosed and no facts are alleged that the Ratings Agencies models used to determine Credit Support were known to be outdated at the time of the Offerings; (4) the non-disclosure of the conflicting roles of the Ratings Agencies in creating and rating the Certificates are not actionable because no reasonable investor would deem them important; (5) the non-disclosure of the ratings shopping practices used to engage the Ratings Agencies and the Ratings Agencies' role in structuring the Certificates without compensation as an inducement to be hired are all not actionable because these practices are merely the by-products of the well known practice of having securities issuers pay the Ratings Agencies so no separate disclosures were required; and, (6) all of Plaintiffs' claims are time-barred because disclosures made before June 19, 2007 provided notice to Certificate purchasers of their probable legal claims and the alleged wrongdoing.

All of the Individuals' arguments fail. First, once it has been pled that Plaintiffs purchased Certificates pursuant to the Registration Statements, their standing is sufficiently stated and the issue of whether Plaintiffs may represent purchasers on all the Offerings is a matter resolved at the class certification stage. In any event, however, Plaintiffs have standing to represent investors in all the Certificate Offerings because the claims arise from common alleged omissions and misstatements. Further, the Risk Disclosures and other disclosures do not sufficiently "match" the alleged misstatements and omissions relating to the Guidelines to render them not actionable as a matter of law; the misstatements and omissions regarding Certificate credit support also are not cured by risk disclosures, nor are they based on merely "hindsight" allegations regarding the use of outdated models; and the undisclosed conflicted roles of the Ratings Agencies and undisclosed ratings shopping practices used to engage them both constitute clear material non-disclosure since they are facts which undermine the purported independence

of the Ratings Agencies and their Certificate ratings. Finally, none of the claims are time barred because the disclosures prior to June 19, 2007 upon which the Individuals rely fail to demonstrate probable wrong-doing and legal claims as a matter of law because by that date no Certificate downgrades had occurred or been announced and none of the pertinent governmental investigations had even begun.

## ARGUMENT

### I. PLAINTIFFS ADEQUATELY ALLEGE STANDING TO ASSERT THEIR CLAIMS.

The Individuals argue that, even though Plaintiffs purchased Certificates pursuant to both Registration Statements, they do not have standing to bring suit on behalf of purchasers of all the Certificate Offerings issued pursuant to those Registration Statements because: (1) each post-effective amendment to a shelf registration statement is deemed to be a new registration statement which makes each of the 94 Offerings subject to a separate registration statement; (2) the individually-named Plaintiffs purchased Certificates in nine of the 94 Offerings and, accordingly, can only assert claims regarding nine of the 94 Offerings; and (3) as a matter of constitutional law, Plaintiffs lack standing to assert claims with respect to those series of Certificates which Plaintiffs did not purchase. (Memorandum of Law in Support of the Individual Defendants' Motion to Dismiss Plaintiffs' Consolidated Amended Securities Class Action Complaint ("IDM") at 12-16). The Individuals are wrong.

#### A. Any Challenge to Lead Plaintiff's Standing Is Premature

As an initial matter, on December 31, 2008, Operating Engineers moved the District Court, pursuant to the Private Securities Litigation Reform Act of 1995, 15 U.S.C. § 77z (the "PSLRA"), for an order appointing it Lead Plaintiff of this putative securities class action on behalf of all persons or entities who acquired the Certificates pursuant and/or traceable to the

2005 and 2006 Registration Statements and Prospectus Supplements at issue. None of the Defendants, including the Individual Defendants, opposed that motion, and the Court issued its order appointing the Operating Engineers as Lead Plaintiff on January 9, 2009.

A Lead Plaintiff is responsible for managing and directing the litigation. 15 U.S.C. § 78u-4(a)(3)(B). "Nothing in the PSLRA indicates that district courts must choose a lead plaintiff with standing to sue on every available cause of action." *Hevesi v. Citigroup Inc.*, 366 F.3d 70, 82 (2d Cir. 2004). "Because the PSLRA mandates that courts must choose a party who has, among other things, the largest financial stake in the outcome of the case, it is inevitable that, in some cases, the lead plaintiff will not have standing to sue on every claim." *Id.*

As the district court in *In re Global Crossing, Ltd. Sec. Litig.*, 313 F. Supp. 2d 189 (S.D.N.Y. 2003), held:

> [N]othing in the PSLRA requires that the lead plaintiffs have standing to assert all of the claims that may be made on behalf of all of the potential classes and subclasses of holders of different categories of security at issue in the case. Indeed, the imposition of any such requirement would be at odds with the purposes of the statute, since in the case of large alleged frauds involving issuers of many classes of securities, the consequence would be either the appointment of a large number of lead plaintiffs (undermining the goal of a cohesive leadership and management group) or the premature breakdown of the action into an unmanageable number of separate cases brought by different lead plaintiffs on behalf of each potential subclass of securities holders.

*Id.* at 204-05.[3]

As a result, additional named plaintiffs are entitled to intervene prior to class certification in order to cure any potential deficiencies in class representation. *See, e.g., Hevesi*, 366 F.3d at 82-83 (affirming lead plaintiff's ability to add named plaintiffs to aid in representing the class

---

[3]    *Accord Hevesi*, 366 F.3d at 82 n.13 ("any requirement that a different lead plaintiff be appointed to bring every single available claim would contravene the main purpose of having a lead plaintiff – namely, to empower one or several investors with a major stake in the litigation to exercise control over the litigation as a whole"); *In re Initial Pub. Offering Sec. Litig.*, 214 F.R.D. 117, 123 (S.D.N.Y. 2002) ("The only other possibility – that the court should cobble together a lead plaintiff group that has standing to sue on all possible causes of action – has been rejected repeatedly by courts in this Circuit and undermines the purpose of the PSLRA.").

where lead plaintiff did not have standing to bring every available claim); *Initial Pub. Offering*, 214 F.R.D. at 122-23 (granting leave to add new named plaintiffs for purpose of conferring standing prior to class certification).

The Individuals' assertions regarding Lead Plaintiff's ability to represent a class of Certificate purchasers are premature at this point and more appropriately addressed at the class certification stage of the litigation. *See, e.g., Countrywide*, 588 F. Supp. 2d at 1167 ("The well-developed class certification framework will better guide this inquiry and lead to more efficient resolution of class claims than standing's sometimes-arbitrary distinctions."); *In re Dreyfus Aggressive Growth Mut. Fund Litig.*, Civ. No. 98-4318 (HB), 2000 U.S. Dist. LEXIS 13469, at *8 (S.D.N.Y. Sept. 20, 2000) ("Courts have not addressed this concern vis-à-vis the doctrine of standing, but rather have examined such concerns pursuant to Rule 23(a)(3)'s typicality requirement."); *In re Westinghouse Sec. Litig.*, 90 F.3d 696, 718 n.22 (3d Cir. 1996) ("While these concerns might be relevant on a motion for class certification, they do not address whether, as a threshold matter, plaintiffs properly stated a [Section 12(a)(2)] claim under Rule 12(b)(6)."). Therefore, the Individuals' assertions should be rejected.

B.     **Plaintiffs Have Adequately Alleged Standing**

The Individuals assert that, in order to have standing pursuant to Section 11 of the 1933 Act in connection with the 94 series of Certificates at issue, Plaintiffs must have purchased Certificates traceable to each of the 94 Offerings, because each of the Offerings is subject to a separate registration statement that consisted of the original Registration Statement and the applicable Prospectus Supplement. (IDM at 12-14). However, Section 11, by its terms, confers standing on any person acquiring a security where "any part of the ***registration statement***, when such part became effective, contained an untrue statement of a material fact or omitted to state a

material fact required to be stated therein or necessary to make the statements therein not misleading." 15 U.S.C. § 77k (emphasis added). It is undisputed that Plaintiffs purchased Certificates pursuant and/or traceable to the 2005 and the 2006 Registration Statements (¶¶ 22-24) – the only Registration Statements at issue (¶ 25). It also is undisputed that every Certificate at issue was issued pursuant to either the 2005 or the 2006 Registration Statement. (¶¶ 25, 30-31). As such, Plaintiffs have standing to assert Section 11 claims based on the material misrepresentations and omissions contained in these Registration Statements.[4]

In *Countrywide,* 588 F. Supp. 2d 1132, the district court analyzed the identical standing issue presented here and determined that the plaintiffs had alleged sufficient Section 11 standing to survive a motion to dismiss:

> The statute contemplates the possibility that the "registration statement" in the first clause of § 11 is not the same in every respect as the "registration statement" for a particular security because "parts" of the "registration statement" may "bec[o]me effective" at different times. 15 U.S.C. § 77k(a) ("[A]ny part of the registration statement, when such part became effective . . . ."). To require that "registration statement" of § 11's first clause be absolutely identical for each security traceable to the same initial registration and prospectus would rewrite "such part" to read "registration statement." *See also* 15 U.S.C. § 77b (defining registration statement "unless the context otherwise requires"). ***The statute grants standing to anyone who buys "such security" – one traceable to a defective***

---

[4]     The Individuals purport to rely upon a ruling by Judge Jed S. Rakoff at a hearing in *La. Mun. Police Employees Ret. Sys. v. Merrill Lynch & Co.,* Civ. No. 08-9063 (JSR) (S.D.N.Y. Feb. 19, 2009). Defendants cite to page 62 of the hearing transcript. (Declaration of Mary Elizabeth McGarry ("McGarry Decl."), Ex. 8 at 62). However, the ruling, to the extent that it is supportive of the Individuals' argument, is less than clear as to either the parameters of or grounds for its determination, providing on page 62 only as follows:

> But I hope what you are about to suggest is what I was thinking is this. I'm going to give leave to plaintiffs to amend their complaint as I have already strongly hinted previously. I am going to require … that they put in all the kinds of specification for standing that had been suggested and which I believe defense counsel has convinced the Court are required but which it appears they will be able to satisfy.

In all events, the complaint in that case had unique factual circumstances inapplicable here. Because the Offerings sued upon were underwritten by different investment banks, Plaintiffs sued investment banks that were not implicated in the Offering pursuant to which the Plaintiffs had purchased. Here, the same investment bank – Lehman – underwrote all the Offerings. Further, in that case the Offerings issued different types of securities including both debt securities and preferred stock offerings. Here, all of the Offerings issued debt securities collateralized with residential mortgage loans.

***registration statement.*** *Hertzberg*, 191 F.3d 1076. ***If the initial shelf registration statement contained an actionable statement or omission that is common to more than one issuance under the shelf registration, then purchasers in those issuances may be able to trace the same injury to the same "registration statement."***

*Id.* at 1166 (emphasis added).

The district court then held that "[s]o long as (1) the securities are traceable to the same initial shelf registration and (2) the registration statements share common 'parts' that (3) were false and misleading at each effective date, there is § 11 standing." *Id.* at 1166. *Accord In re Worldcom, Inc. Sec. Litig.*, Civ. No. 02-3288 (DLC), 2004 U.S. Dist. LEXIS 4240, at *6-7 (S.D.N.Y. Mar. 19, 2004) (purchasers of one type of debt security had standing to pursue claims of purchasers of a second type of debt security issued pursuant to the same registration statement); *In re Fleming Cos. Sec. & Derivative Litig.*, Civ. No. 03-MD-1530, 2004 U.S. Dist. LEXIS 26488, at *153 (E.D. Tex. Jun. 10, 2004) ("case law holds that purchasers of one type of security have standing to sue on behalf of purchasers of other types of security issued pursuant to a single registration statement").[5]

Plaintiffs here have met the applicable standard. The Complaint details that the Registration Statements and Prospectus reiterate the same basic set of Underwriting Guidelines:

---

[5]     The cases upon which the Individual Defendants rely do not address the issue that was decided in *Countrywide* and that is at issue here. For example, in *Barnes v. Osofsky*, 373 F.2d 269 (2d Cir. 1967), the issue was simply whether class members participating in a settlement fund needed to prove that their share were traceable to the flawed registration statement. The Second Circuit answered that question in the affirmative. In *Global Crossing,* 313 F. Supp. 2d at 206-07, plaintiffs' Section 11 claims were dismissed because plaintiffs did not allege and were not able to trace their shares to the flawed registration statement in one challenged offering and therefore were not members of the class they purported to represent. In *Guenther v. Cooper Life Sciences, Inc.*, 759 F. Supp. 1437, 1440 (N.D. Cal. 1990), the district court held that the "non-defective 1985 registration statement" could not be "rendered retroactively blemished by the defective 1986 amendment" because this reading of [Section 11] would enable investors … to bring a section 11 action even though at the time they purchased their shares they could not possibly have relied on misleading registration statements, since none had been filed." *Grand Lodge of Pa. v. Peters*, 550 F. Supp. 2d 1363, 1376 (M.D. Fla. 2008), held only that lead plaintiffs had not sufficiently alleged that the stocks purchased in that litigation were traceable to the second offering. Furthermore, *Hoffman v. UBS-AG*, 591 F. Supp. 2d 522 (S.D.N.Y. 2008), involved two different mutual funds which were governed by the Investment Company Act of 1940.

(1)     the originator of a Loan will have applied underwriting procedures intended to evaluate the borrower's credit standing and repayment ability (Registration Statements at ¶ 185; *see also* SASCo Registration Statement, Form S-3/A, dated August 8, 2006, at 79; Prospectus Supplements at ¶¶ 190, 199, 204, 213, 226, 240, 243, 247, 256, 263);

(2)     standard guidelines require assessment of borrower assets and employment (Registration Statements at ¶ 185; *see also* SASCo Registration Statement, Form S-3/A, dated August 8, 2006, at 79; Prospectus Supplements at ¶¶ 190, 206, 210, 213, 218, 229, 238, 240, 243, 245, 253, 256, 263);

(3)     the adequacy of the property financed by the related Loan as security for repayment of the Loan will generally have been determined by appraisal in accordance with pre-established appraisal procedure guidelines for appraisals established by or acceptable to the originator (Registration Statements at ¶¶ 185, 187; *see also* SASCo Registration Statement, Form S-3/A, dated August 8, 2006, at 79; Prospectus Supplements at ¶¶ 190, 199, 201, 208, 216, 224, 240, 251, 260);

(4)     deviations or exceptions to the standard guidelines are permitted including for origination of limited documentation loans where there are countervailing facts such as strong credit profile or high appraised value of mortgaged property supporting underwriting of the mortgage (Registration Statements at ¶¶ 185, 187, *see also* SASCo Registration Statement, Form S-3/A, dated August 8, 2006, at 80; Prospective Supplements at ¶¶ 190, 196, 199, 201, 206, 220, 229, 229, 232, 253, 265); and

(5)     Credit Enhancement is said to include the same elements of subordination, overcollateralization and excess spread set forth in the Registration Statements (¶ 268, *see also* SASCo Registration Statement, Form S-3/A, dated August 8, 2006, at 79; Prospectus Supplements (¶ 270); *see generally* Structured Adjustable Rate Mortgage Loan Trust 2006-9 Prospectus Supplement, September 28, 2006, at 100).[6]

(6)     Finally, Lehman – *not* the Ratings Agencies – is identified as the structurer of the Certificates in both Registration Statements (¶ 272) and the Prospectus Supplements (*see* Structured Adjustable Rate Mortgage Loan Trust 2006-9 Prospectus Supplement, September 28, 2006, at 70).[7]

---

[6]     *See also* Structured Adjustable Rate Mortgage Loan Trust 2007-1 Prospectus Supplement, January 30, 2007, at S-12-13; Structured Asset Securities Corporation Mortgage Loan Trust 2006-BC3 Prospectus Supplement, October 26, 2006, at S-40; Lehman XS Trust 2006-14N Prospectus Supplement, August 30, 2006, at S-59; Lehman Mortgage Trust 2007-1 Prospectus Supplement, January 26, 2007, at S-11-12.

[7]     *See also* Structured Adjustable Rate Mortgage Loan Trust 2007-1 Prospectus Supplement, January 30, 2007, at 71; Structured Asset Securities Corporation Mortgage Loan Trust 2006-BC3 Prospectus Supplement, October 26, 2006, at 70; Lehman XS Trust 2006-14N Prospectus Supplement, August 30, 2006, at 70; Lehman Mortgage Trust 2007-1 Prospectus Supplement, January 26, 2007, at 71.

Because Plaintiffs purchased Certificates pursuant and/or traceable to both of the false and misleading Registration Statements at issue, Plaintiffs have standing to assert Section 11 claims on behalf of all Class members who similarly purchased Certificates pursuant and/or traceable to those same false and misleading Registration Statements.

## C.    Plaintiffs Have Adequately Alleged Article III Standing

The Individuals assert that Plaintiffs cannot satisfy the constitutional injury requirement with respect to offerings in which they did not participate because they did not and cannot plead that they personally suffered some actual or threatened injury in connection with the 85 offerings in which they did not purchase Certificates. (IDM at 15-16). However, as discussed in Points I.A. and B., *supra*, the Complaint clearly alleges that Plaintiffs have standing to assert claims under Section 11 of the 1933 Act against the Individuals.[8] As a result, the Complaint also adequately alleges Plaintiffs' standing under Article III of the United States Constitution, which expressly refers to federal statutes as one basis for conferring subject matter jurisdiction on federal courts. *See* U.S. Const. Art. III, § 2 ("The judicial power shall extend to all cases, in Law and Equity, arising under this Constitution, the Laws of the United States, and Treaties…"). Because Plaintiffs' allegations satisfy the specific standing requirements of Section 11 of the 1933 Act, there is no need for the Court to undertake the more abstract and generalized Article III standing analysis.

Nonetheless, Plaintiffs' claims satisfy the elements of Article III standing, pursuant to which Plaintiffs "must allege personal injury fairly traceable to the defendant's allegedly wrongful conduct and likely to be redressed by the requested relief." *Allen v. Wright*, 468 U.S. 737, 751 (1984). The Complaint alleges that each of the Individuals signed one or both of the

---

[8] Standing under Section 11 of the Securities Act clearly also gives Plaintiffs standing under Section 15 of the Act.

materially false and misleading Registration Statements at issue. (¶¶ 37-42). The Complaint further alleges that Plaintiffs and members of the Class were injured when their Certificates declined in value after the truth about the misrepresentations and omissions in the Registration Statements was revealed. (¶¶ 69-150). These injuries can unquestionably be redressed by the relief sought in the Complaint. *See Countrywide*, 588 F. Supp. 2d at 1167 n.39 (rejecting defendants' Article III standing argument relating to Section 11 claims on the basis of the court's finding that the "actual injuries Plaintiffs allegedly suffered arose from the same harmful conduct and [are] of the same type as the injuries to those they propose to represent"). Plaintiffs have adequately alleged Article III standing herein.

## II. THE COMPLAINT SATISFIES THE PLEADING STANDARDS OF RULES 8(a) AND 12 OF THE FEDERAL RULES OF CIVIL PROCEDURE

### A. The Legal Standards

Rule 8(a) of the Federal Rules of Civil Procedure requires that the pleading contain "a short and plain statement of the claim showing that the pleader is entitled to relief." As the Supreme Court recently reaffirmed in *Aschcroft v. Iqbal,* 556 U.S. __, 129 S. Ct. 1937, 1949 (2009), "the pleading standard that Rule 8 announces 'does not require detailed factual allegations,'" though the pleading must offer more than just "a formulaic recitation of the elements of the causes of action."[9] The *Iqbal* decision reaffirmed that "in order to survive a motion to dismiss [pursuant to Fed. R. Civ. P. 12(b)(6)], a complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face.'" *Id*. (citing *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 566, 570 (2007)). The Supreme Court made

---

[9]     The *Iqbal* complaint was dismissed because it "amount[ed] to nothing more than a formulaic recitation of the elements of a constitutional discrimination claim" against two high-level government officials. *Id.* at 1951. The complaint failed to provide any fact content in support the allegation that the two defendants engaged in the "purposeful discrimination" required for the asserted claim. Here, as set forth below, since Section 11 and 15 require no pleading of fraud (including the elements of intent and reliance), the sufficiency of the pleading is based simply on whether the factual allegations support a reasonable inference that there were material misstatements and omissions in the Offering Documents.

clear that "a claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct." To satisfy this plausibility standard, a *probability* of entitlement to relief need *not* be shown; rather a plaintiff must only show that more than the mere possibility of entitlement to relief has been pled. The application of this plausibility standard under Rule 12(b)(6) requires a "two prong" analysis: first, isolating the factual allegations in the pleading and then determining whether, after accepting all these factual allegations as true, the complaint gives rise to a *reasonable inference* that defendants are liable for the alleged misconduct. All that is required to give rise to a *reasonable inference* the Individual Defendants are liable under Sections 11 and 15 are factual allegations that indicate that the Offering Documents "contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading." 15 U.S.C. § 77k(a).[10] As set forth below, the Complaint contains several categories of precisely such factual allegations.

### 1. Factual Allegations Supporting the Inference that the Guidelines Were Systematically Disregarded

**Certificate Delinquencies Linked to Underwriting:** The Complaint details that the Ratings Agencies not only downgraded the Certificates soon after issuance from predominately

---

[10] The Second Circuit has acknowledged that "fraud is not an element or a requisite to a claim under Section 11," and that "a plaintiff need allege no more than negligence to proceed under Section 11." *Rombach v. Chang*, 355 F.3d 164, 171 (2d Cir. 2004). Further, "a violation of Section 11 will be found when material facts have been omitted or presented in such a way as to obscure or distort their significance." *I. Meyer Pincus & Assocs., P.C. v. Oppenheimer & Co.*, 936 F.2d 759, 761 (2d Cir. 1991); *In re Flag Telecom Holdings Ltd. Sec. Litig.*, Civ. No. 02-3400, 2009 U.S. Dist. LEXIS 37090, *24 (S.D.N.Y. May 1, 2009).

The test for determining whether the prospectus contains a material misstatement or omission is "whether the defendants' representations [in the prospectus], taken together and in context, would have misled a reasonable investor," *Olkey v. Hyperion 1999 Term Trust, Inc.*, 98 F.3d 2, 5 (2d Cir. 1996); *In re Flag Telecom*, 2009 U.S. Dist. LEXIS 37090, at *25, or whether the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information made available. *In re Flag Telecom*, 2009 U.S. Dist. LEXIS 37090, at *25 (citing *Caiola v. Citibank, N.A.*, 295 F.3d 312, 329 (2d Cir. 2002), quoting *Basic, Inc. v. Levinson*, 485 U.S. 224 (1988)) (internal quotation marks omitted).

AAA bonds to predominately junk bonds (¶¶ 8, 75, 83, 90, 105, 119, 128, 139), but in doing so attributed the cause, in material part, to defective mortgage origination practices including questionable or misrepresented loan data and wide scale loosened or "aggressive [mortgage loan] underwriting." (¶¶ 70-72). The Ratings Agencies eventually were forced to revamp their entire "methodologies" for rating the Certificates and all other MBS – increasing the default assumptions used for assigning ratings to the Certificate mortgage collateral. (¶¶ 69-73).[11] The Ratings Agencies reiterated the link between defective underwriting and the Certificates when they downgraded the Certificates dramatically beginning in late 2007 and continuing through 2008. These origination practices only began to come to light in the MBS context in July 2007 when the Ratings Agencies sought to comprehend the basis for astronomical delinquency and foreclosure rates in Certificate and other similar MBS collateral. (¶¶ 70-72). Clearly, had the true defective underwriting practices been disclosed in the Offering Documents – which, of course, the Ratings Agencies necessarily reviewed – the Ratings Agencies would not have been required to make these announcements in July 2007 and the attendant fundamental methodology changes and Certificate downgrades in late 2007 and 2008.

**Post-Issuance Delinquency and Foreclosure Data**: The Complaint provides data reflecting that Certificate delinquency and foreclosure rates skyrocketed to levels which, on their face, support an inference that the collateral was impaired from the outset. The Complaint details that Certificate delinquencies ranged from 24.3% to 48.8% and foreclosure rates from 4% to 24.57%. (¶ 8). These statistics are then further broken out by principal mortgage loan originator: Aurora – 24.46% delinquent and 12.45% in foreclosure (¶ 75); LBB – 24.93%

---

[11] In rating the Certificates, S&P and Moody's each used its own 21-level rating system (ranging from "AAA" to "D" for S&P and ranging from "Aaa " to "C" for Moody's) in all of the Offering Documents. As alleged the downgrades to the Certificates across all Offerings was not merely by one or two levels (*e.g.,* from "AAA" to "AA" for S&P or "Aaa" to "Aa2" for Moody's, but, rather, by over ten levels – from "AAA" to "Ba1" or lower. (¶ 7).

delinquent and 11.38% in foreclosure (¶ 75); BNC – 41.13% delinquent and 19.36% in foreclosure (¶ 83); Countrywide – 26.72% delinquent and 12.11% in foreclosure (¶ 90); IndyMac – 30.86% delinquent and 15.59% in foreclosure (¶ 105); GreenPoint – 28.28% delinquent and 12.27% in foreclosure (¶ 119); First Franklin – 30.19% delinquent (¶ 128); and Wells Fargo – 27.13% delinquent and 12.32% in foreclosure (¶ 139). Collateral failure in the range of one quarter to one half of the total mortgage pool is quantitative evidence supporting the conclusion that the collateral was impaired from the outset.

**Originators' Reckless Underwriting Practices:** The Complaint details that, following the issuance of the Certificates, disclosures emerged principally in the form of news articles and civil fraud actions alleging that the principal Certificate Originators engaged in reckless mortgage origination practices: Aurora (¶¶ 77-78, 81); BNC (¶¶ 84, 86, 88); Countrywide (¶¶ 94, 96); IndyMac (¶¶ 116, 117, 121, 122, 126); First Franklin (¶¶ 132, 138); Wells Fargo (¶¶ 140-42); EquiFirst (¶ 143-44); Aegis (¶¶ 147-49).

**NYAG Investigation and PWG Report:** As Plaintiffs allege, Lehman contracted with primarily two firms – Clayton and Bohan – to determine whether in fact the Underwriting Guidelines set forth in the Offering Documents were applied with respect to the Certificate collateral. (¶¶ 13, 63). However, as the President of Bohan stated, firms such as Lehman directed that fewer loans be examined and disregarded evidence of non-compliant loans. (*Id.*) Indeed, in 2008 the NYAG announced an investigation of Lehman and other investment banks which included their rejection of evidence of non-compliant loans brought to their attention. (¶¶ 151-58). As Plaintiffs allege, Lehman was incentivized not to reject any loans for fear it would be cut out of future auctions. (¶¶ 12, 63).

Also as described above, the PWG found rampant mortgage underwriting deficiencies or "erosion of market discipline" in connection with origination of MBS during the precise time when the Certificates were originated. (¶ 69).

### 2. Factual Allegations Supporting the Inference of Credit Support Misstatements and Omissions

The Complaint details that it was disclosed, after the Certificate issuances, that S&P had not materially updated its models for determining credit support since 1999 and Moody's had not done so since 2002. (¶¶ 16, 159). It is further alleged, as a result, that the models failed to properly assess default rates for subprime, Alt-A, ARM and Neg Am loans which only became widely used in or about 2004. (¶¶ 16, 159-63). Further, S&P former executive Frank Raiter testified that S&P developed updated models but failed to implement them until 2007, which resulted in faulty and inflated MBS ratings by S&P during the period the Certificates were consistently rated AAA by S&P. (¶¶ 164-167). Finally, the 2008 SEC Report found that the Ratings Agency Defendants were incentivized not to update their models so as to provide MBS investment banks with inflated and more profitable ratings. (¶¶ 17, 67, 168, 178-81). These facts support the reasonable inference that the stated credit support was inadequate and contained material misstatements and omissions.

### 3. Factual Allegations Supporting Conflicts of Interest and Ratings Shopping Misstatements and Omissions[12]

The Complaint specifically details that the House Oversight Committee Report and the October 2008 testimony before the House Oversight Committee described that S&P and

---

[12] Defendants argue the failure to disclose conflicts of interest and rating shopping is not actionable because the market was made aware of them in a 2003 SEC Report. (IDM at 28-29). As discussed below, that report discusses only "potential conflicts interest" and never mentions ratings shopping or even generally the role that the Ratings Agencies had in rating MBS. It was only the 2008 SEC Report – issued well after all the Certificate issuances – that partially discussed the potential actual conflicts which existed in the ratings of MBS and House Oversight Committee hearing testimony in October 2008 which identified adverse effects of ratings shopping.

Moody's engaged in ratings shopping as part of the ratings process and that this is one of the practices that incentivized the Ratings Agencies to inflate their ratings in order to obtain the lucrative MBS ratings engagements. (¶¶ 178-81). Further, the Complaint details that former S&P executive Jerome Fons testified before the House Oversight Committee in October 2008 that ratings shopping was a material cause of faulty MBS ratings by S&P at precisely the time S&P consistently assigned AAA ratings to the Certificates. (¶¶ 164-67, 170).

## B. Plaintiffs State Claims Under Section 15 of the 1933 Act Against the Individual Defendants

Plaintiffs state claims against the Individual Defendants under Section 15 (Third Cause of Action) of the 1933 Act, 15 U.S.C. § 77o. Section 15 extends liability created under Section 11 to "[e]very person who, by or through stock ownership, agency, or otherwise … controls any person liable under" Section 11. 15 U.S.C. § 77o. As set forth above at Point II, *supra*, the Complaint adequately alleges primary violations of Section 11 against the Individuals.

Plaintiffs specifically allege that each of the Individuals was an officer and/or director of SASCo, who therefore functioned as a director of the Issuing Trusts, during the relevant time period and that each signed the 2005 Registration Statement and/or the 2006 Registration Statement. (¶¶ 37-44). Plaintiffs also allege that each of the Individuals (1) participated with and/or conspired with the remaining Defendants in the wrongful acts and course of conduct or otherwise caused the damages and injuries claimed in the Complaint and are responsible in some manner for the acts, occurrences and events alleged in the Complaint (¶ 45); (2) had the power to influence, and exercised that power and influence, to cause SASCo, LBI and the Issuing Trusts to engage in violations of the Securities Act described in the Complaint (¶ 306); (3) had the control, position and influence which made them privy to, and provided them with actual knowledge of, the material facts and omissions concealed from Plaintiffs and the other Class

members (¶ 308); (4) was a participant in the violations alleged in the Complaint, based on their having prepared, signed or authorized the signing of the Registration Statements and having otherwise participated in the consummation of the Offerings (¶ 309); (5) was responsible for overseeing the formation and operation of the Issuing Trusts, including routing payments from borrowers to investors (¶ 309); and (6) prepared, reviewed and/or caused the Registration Statements and Prospectus Supplements to be filed and disseminated. (¶ 310). These facts are more than sufficient to establish a claim under Section 15 of the 1933 Act. *See In re Worldspace Sec. Litig.*, Civ. No. 07-2252 (RMB), 2008 U.S. Dist. LEXIS 56224, at *20-21 (S.D.N.Y. Jul. 21, 2008).

## III.  RISK DISCLOSURES DO NOT CURE UNDERWRITING GUIDELINE MISSTATEMENTS AND OMISSIONS

The Individual Defendants assert that there were no material omissions relating to the mortgage loan underwriting guidelines because the alleged omissions and misstatements, including presumably the core omission that the stated Guidelines were systematically disregarded, were disclosed in the "risk disclosures" contained in the Offering Documents. (IDM at 16-26). This argument fails. As an initial matter, the Individual Defendants must satisfy a high burden to demonstrate that the misstatements are immaterial as a matter of law. As Judge Conner recently wrote, it is because "risk factors" have become ubiquitous in securities offering documents that:

> The cautionary language must be specific, prominent and must directly address the risk that plaintiffs claim was not disclosed**.** *Olkey*, 98 F.3d at 5-6. ***The requirement that the cautionary language match the specific risk is particularly important, considering that most, if not all, security offerings contain cautionary language***. *Miller,* 473 F. Supp. 2d at 579.

The Individual Defendants point to risk disclosures in the Offering Documents stating that "from time to time and in the ordinary course of business originators will make *exceptions* to

the guidelines [that] may result in a higher number of delinquencies and loss severities" and that "some of the loans may also represent either one or more *exceptions*" and that "a significant number of the Mortgage Loans may represent a significant number of underwriting *exceptions.*" However, the references to these "exceptions" do not even remotely "match" the alleged systematic disregard for the stated underwriting Guidelines set forth in the Complaint because, as the Offering Documents made absolutely clear (in the portions of the risk disclosures that the Individual Defendants choose to excise) – "exceptions" are defined as exceptions to the standard full underwriting process. As set forth in both the Registration Statements and the Prospectus Supplements, "*exceptions*" were only to be made where there were "*compensating factors*" such as "low loan-to-value ratios, low debt-to-income ratios, good credit history, [and] stable employment" as follows:

> The LBB Underwriting Guidelines are intended to evaluate the value and adequacy of the mortgaged property as collateral and to consider the applicant's credit standing and repayment ability. ***On a case-by-case basis, the underwriter may determine that, based upon compensating factors, an applicant not strictly qualifying under the applicable underwriting guidelines warrants an underwriting exception. Compensating factors may include, but are not limited to, low loan-to value ratios, low debt-to-income ratios, good credit history, stable employment, financial reserves, and time in residence at the applicant's current address.*** A significant number of the Mortgage Loans may contain underwriting exceptions.

> In addition, the depositor may purchase Loans for inclusion in a trust fund which vary from, or do not comply with, the applicable originator's underwriting guidelines. In some cases, the divergence from a strict application of the applicable underwriting guidelines was the result of ***a permitted exception under such underwriting guidelines (i.e., a case by case permitted exception based upon other compensating factors such as relatively low debt to income ratio, good credit history, stable employment or financial reserves of the borrower).***

McGarry Decl., Ex. 6 at STB-78 (emphasis added); *see also* SASCo Form S-3/A Registration Statement, August 8, 2006, at 80.

> Certain of the Mortgage Loans originated by the Bank were originated or acquired under "no documentation" program guidelines, pursuant to which no information

was obtained regarding the borrowers' income or employment and there was no verification of the borrowers' assets. ***The no documentation program guidelines require stronger credit profiles than the other loan programs, and have substantially more restrictive requirements for loan amounts, loan-to-value ratios and occupancy.***

McGarry Decl., Ex. 7 at S-61 (emphasis added); *see also* Structured Adjustable Rate Mortgage Loan Trust 2006-1, January 30, 2006 at S-61.

As a result, disclosure of the existence of "exceptions" does not cure the alleged omissions because the standard for "exceptions" is part of the stated Guidelines that, as the Complaint alleges, were disregarded. (¶ 191).

The Individual Defendants also assert that the following excerpted statement from one of the 94 Prospectus Supplements cures and renders the alleged Guideline omissions and misstatements inactionable:

> One of the Offering Documents disclosed that the Originators were becoming "more aggressive[]" in exercising discretion to deviate from underwriting guidelines, which could result in a higher rate of delinquencies and disclosures than past practices:
>
> Underwriter Discretion. During the second calendar quarter of 2005, [the Originator] initiated a program designed to encourage its mortgage loan underwriting staff to ***prudently***, but more aggressively utilize the underwriting discretion already granted to them under [the Originator's] underwriting guidelines and policies… There can be no assurance that the successful implementation of this initiative will not result in an increase in the incidence of delinquencies and foreclosures, or the severity of losses among mortgage loans underwritten in accordance with the updated philosophy, as compared to mortgage loans underwritten prior to the commencement of the initiative.

IDM at 18 (emphasis in original).

The Individual Defendants carefully omit from the middle of their selective quote the following critical sentence: *"This initiative was viewed by management as necessary and desirable to make **prudent** loans available to customers where such loans may have been denied in the past because of underwriter hesitancy to maximize the underwriting guidelines."* Once

again, Plaintiffs are not contesting that Wells Fargo's Underwriting Guidelines provided for exceptions so that Wells Fargo could "make ***prudent*** loans available." However, as alleged in the Complaint (¶¶ 139-42), and contrary to its guidelines, Wells Fargo employed an illegal, predatory lending program that put quantity ahead of quality. Plaintiffs have stated a claim under Section 11 of the 1933 Act.

The Individual Defendants next submit a chart that purports to compare Plaintiffs' "alleged omissions" in the Complaint to "actual disclosures" in the Offering Documents with respect to (1) appraisals; (2) failure to monitor brokers and correspondents; (3) stated income/no doc loans; (4) disregard of credit history; and (5) predatory lending. (IDM at 18-19). This "analysis" is critically flawed because the "alleged omissions" are composed of only certain excised phrases from the Complaint, and, even more significantly, the specific Prospectus Supplement statements challenged in the Complaint and to which the "omissions" relate are omitted entirely. When the actual portions of the Offering Documents to which the "omissions" refer are examined, it is readily apparent that the general risk disclosures the Individuals purport to rely from the Registration Statements do not remotely "match" the specific Prospectus Supplement statement challenged in the Complaint.

For example, the Individuals cite as "Alleged Omissions" excised portions of paragraphs from the Complaint that describe omissions in the Offering Documents relating to standards for appraisal as follows:

> "[A]ppraisal standards were largely disregarded and the values of the underlying mortgage properties were in many instances inflated in the loan underwriting process." ¶ 188. The appraisals "were not performed and reviewed in line with the standards implied, but instead, were cursory in nature," (¶ 252), because "brokers had no incentive to obtain legitimate appraisals . . . ." (¶ 261).

> In addition, appraisers were "pressured to appraise to certain levels" and "if they appraised under certain levels they would not be hired again." (¶ 207).

IDM at 18.  The Individuals then argue the Alleged Omissions relating to appraisals are cured by

the following general risk disclosure contained in the 2005 Registration Statement as follows:

> During the mortgage loan underwriting process, appraisals are generally obtained
> on each prospective mortgaged property.  The quality of these appraisals may
> vary widely in accuracy and consistency.  Because in most cases the appraiser is
> selected by the mortgage loan broker or lender, the appraiser may feel pressure
> from that broker or lender to provide an appraisal in the amount necessary to
> enable the originator to make the loan whether or not the value of the property.

*Id.*

However, omitted from the Chart are the specific portions of the Prospectus Supplement

relating to Appraisals which are challenged in the Complaint – *i.e.*, ¶¶ 201, 206, 208, 216, 245,

251, 260 – and to which each of the above "Alleged Omission" paragraphs specifically relates. [13]

When the specific challenged Prospectus Supplement statements are examined it is

immediately apparent that the generalized risk factor from the 2005 Registration Statement does

not remotely "match."    Specifically, ¶ 251, to which ¶ 252 (one of the Alleged Omission

paragraphs in the Chart) refers, contains the following rigorous statement of appraisal standards:

> In accordance with the Mortgage Loan Seller's guidelines for acquisition, the
> mortgage loans are required to comply with applicable federal and state laws and
> regulations and generally require an appraisal of the mortgaged property prepared

---

[13]    The Chart's failure to refer or cite to the specific Prospectus Supplement statements  to which the
omissions refer, is particularly misleading since the Registration Statement expressly provides that the Guideline
provisions in the Prospectus Supplements govern and supercede the more general statements in the Registration
Statement as follows:

> The depositor expects that Loans comprising the Primary Assets for a Series of Securities will
> have been originated in accordance with underwriting procedures and standards similar to those
> described in this prospectus, ***except as otherwise described in the prospectus supplement***.

*        *        *

> The prospectus supplement will specify the underwriting standards applicable to the Mortgage
> Loans.

McGarry Decl., Ex. 5 at STB-70-72 (citing Structured Asset Securities Corporation Form S-3/A Registration
Statement, September 16, 2005) (emphasis added).

in accordance with applicable law and regulation; and if appropriate, a review appraisal. Generally, appraisals are provided by appraisers approved by NC Bank or third party lenders, as applicable. Review appraisals may only be provided by appraisers approved by NC Bank or the third party lender. In some cases, NC Bank or a third party lender may rely on a statistical appraisal methodology provided by a third party.

Qualified independent appraisers must meet minimum standards of licensing and provide errors and omissions insurance in states where it is required to become approved to do business with NC Bank or a third party lender. Each Uniform Residential Appraisal Report includes a market data analysis based on recent sales of comparable homes in the area and, where deemed appropriate, replacement cost analysis. The review appraisal may be an enhanced desk, field review or an automated valuation report that confirms or supports the original appraiser's value of the mortgaged premises.

*     *     *

The Mortgage Loan Seller conducts a number of quality control procedures, with respect to NC Bank and third party lenders, including post funding compliance audits as well as a full re-underwriting of a random selection of loans to assure asset quality. Under the post-funding audits, a random sample of loans are required to be reviewed to verify credit grading, documentation compliance and data accuracy.

First Franklin Mortgage Loan Trust 2006-FF12 Prospectus Supplement, August 18, 2006, at S-55.

The generalized appraisal risk disclosure statement from the Registration Statement upon which the Individuals purport to rely does not even begin to meaningfully address these detailed appraisal standards articulated in the Prospectus Supplement. It does not address, for example, the statement (¶ 260) that all appraisals are performed by *"qualified independent appraisers in their respective states;"* that appraisals are generally required to *"conform to Freddie and Fannie Mae standards;"* and that all loans are subject to the *"appraisal review process"* which includes *"steps that may require (but are not limited to) an automated valuation report, or a manual review from one of our internal staff appraisers to conform or support the original*

*appraisers' value of the mortgage property."*[14]   Indeed, the Registration Statement makes no mention of the appraisal review process – much less that the review process was in any way ineffective.

Similarly, with respect to the Originators' failure to monitor brokers and correspondents, the Individuals derive as an "Alleged Omission," a *partial* quote from ¶ 193 of the Complaint:

> "[The originators'] background check of correspondents was extremely limited and opened the door for the acquisition of mortgage loans from brokers who did very little, if any, verification of the borrower's ability to repay the loans."  ¶ 193. *See also* ¶¶ 195, 259.

IDM at 19.  Omitted, of course, is the portion from the Prospectus Supplement contained in ¶ 192 to which the contents of ¶ 193 relates.  Paragraph 192 quotes the affirmative statements from the Prospectus Supplement for the Lehman XS Trust, Series 2007-9 Certificate Offering which describes rigorous background checks of correspondent lenders, as follows:

> Certain correspondents are given delegated underwriting authority.  Full delegated underwriting authority is granted only to correspondents who meet a minimum net worth requirement and have a satisfactory quality control system in place; if Aurora has prior experience with the correspondent, such prior experience is reviewed to ensure satisfactory quality of production.[15]

---

[14]      Similarly, as cited in ¶¶ 201, 208, 216, 251 and 260 of the Complaint, the Prospectus Supplement sets forth heightened appraisal standards untouched, much less rendered immaterial as a matter of law, by the general risk disclosure Defendants purport to rely upon: ¶ 201 ("The BNC Underwriting Guidelines are applied in accordance with a procedure that generally requires (1) an appraisal of the mortgaged property that conforms generally to Fannie Mae and Freddie Mac standards and (2) a review of the appraisal…"); ¶ 208 ("In determining the adequacy of the property as collateral, an independent appraisal is generally made of each property considered for financing. All appraisals are required to conform to the Uniform Standards of Professional Appraisal Practice adopted by the Appraisal Standard Board of the Appraisal Foundation.  Each appraisal must meet the requirements of Fannie Mae and Freddie Mac. "); ¶ 216 ("Countrywide Home Loans obtains appraisals from independent appraisers or appraisal services for properties that are to secure mortgage loans… All appraisals are required to conform to Fannie Mae or Freddie Mac appraisal standards then in effect."); ¶ 251 ("In accordance with the Mortgage Loan Seller's guidelines for acquisition, the mortgage loans … generally require an appraisal of the mortgaged property prepared in accordance with applicable law and regulation; and if appropriate, a review appraisal"); and ¶ 260 ("EquiFirst's guidelines … generally require an appraisal of the mortgaged property which conforms to Freddie Mac and/or Fannie Mae standards.  All loans are subject to EquiFirst's appraisal review process.")

[15]      The heading of this Section in the Prospectus Supplement is: "Aurora's background check of correspondents," and not, as the Individuals state, "[The originators'] background check of correspondents."

*Id.* at S-82.  When viewed against the actual challenged contents of the Prospectus Supplement, it is immediately apparent that it is not remotely cured or matched by the general risk disclosure in the 2005 Registration Statement upon which the Individuals purport to rely and which merely provides:

> Mortgage loans originated by "unaffiliated brokers or correspondents rather than directly by the originators themselves," including subprime loans, might experience increased rates of delinquency and default on the mortgage loans. McGarry Decl., Ex. 5 at 5.

IDM at 19.  There is no effort in this risk disclosure to address, for example, the fact that the Prospectus Supplement requires correspondent lenders to maintain a "minimum quality control system.  As a result, there is no match between the alleged misstatements and purported curative disclosures.[16]

The Individuals also argue that, because Section 1111 of Regulation AB requires Defendants to disclose underwriting exceptions "to the extent known," the Individual Defendants may only be held liable if the Complaint pleads the Individual Defendants had *actual knowledge* of the specific exceptions to the Guidelines.[17]   (IDM at 22-23).  This argument fails, however, because Section 1111 imposes a duty to describe the *"underwriting criteria"* including circumstances where they may be overridden and the Complaint challenges not merely the failure to disclose particular exceptions, but the entire affirmative description of the Guidelines,

---

[16]     The Individuals' remaining "comparisons" of "Alleged Omissions" and "Actual Disclosures" in the Chart deploy the same sleight of hand of failing to present the actual Offering Document statements challenged in the Complaint.

[17]     The Individuals argue that Section 1111 is analogous to Section 303(a) of SEC Regulation S-K, 17 C.F.R. § 229.303(a), which imposes an affirmative duty to disclose certain financial trends not included in reported financial statements.  As a result, each of the cases Defendants purport to rely upon involves the alleged failure to disclose a discrete transaction deemed not to be required under Rule 303(a).  *Garber v. Legg Mason, Inc.,* 537 F. Supp. 2d 597 (S.D.N.Y. 2008) (alleged failure to disclose $12 million in fees owed by the corporate defendant to mutual funds); *Panther Partners, Inc. v. Ikanos Comms, Inc.,* 538 F. Supp. 2d 662 (S.D.N.Y. 2008) (failure to disclose $700,000 in non-saleable inventory); *In re Turkcell Iletisim Hizmetler, A.S. Sec. Litig.,* 202 F. Supp. 2d 8 (S.D.N.Y. 2001) (failure to disclose post-offering financial results showing a 9% drop in operating income).

including the description of the exception process itself – *i.e.,* that exceptions to standard underwriting would only occur where there were "compensating factors" such as strong borrower credit history. The Complaint alleges not merely the failure to disclose certain exceptions, but that all of the stated Guidelines were systematically disregarded as reflected by the massive rating downgrades, delinquencies and foreclosures, and subsequent disclosures regarding the reckless practices of the principal originators.

## IV.  FAILURE TO QUANTIFY EXCEPTIONS DOES NOT MANDATE DISMISSAL AND "OCEANS" OF LOAN DATA IN THE OFFERING DOCUMENTS DO NOT CURE MISSTATEMENTS

The Individual Defendants argue that the alleged material omission that the Guidelines were systematically disregarded is not actionable because there is no quantification of the number of loans that were "exceptions" to the Guidelines to demonstrate the impact and materiality of the omission. (IDM at 22-24). This argument fails for a number of reasons. First, as discussed above, it is not alleged that there were too many exceptions; but rather, that the system of exceptions was not followed; that the entire process of exceptions based on prudent lending criteria was disregarded and that, as a result, loans were routinely made where the requisite lending justification did not exist. As a result, quantification of exceptions would not demonstrate the alleged systematic disregard of the stated Guidelines in any event.

Further, as set forth below, the Complaint amasses several categories of facts supporting a reasonable inference that the Guidelines were systematically disregarded. These facts include the Ratings Agencies' statements of potential and actual downgrades due, in part, to deficient underwriting, including statements of the need to downgrade Certificates because of impaired underwriting; the uniform statistical data demonstrating massive delinquencies after issuance;

and disclosures evidencing that the nine principal Certificate originators engaged in reckless underwriting practices. (*See* Point II.A.1-3, *supra*).

Defendants also argue there can be no actionable omissions with regard to the Guidelines because the Offering Documents provided an "ocean's worth" of information as to, for example, the number of no documentation and limited documentation loans and the FICO scores of the borrowers. (IDM at 24-26). However, as discussed above, the mere fact that there were numerous "no documentation" loans, or loans issued to borrowers with low FICO scores, provides no information to investors that the Guidelines were disregarded. Such loans were fully permitted under the Guidelines as long as there were prudent countervailing circumstances supporting the origination of the loan. As a result, the "ocean's worth" of data provided does not and cannot cure the material omissions that Plaintiffs allege in the Complaint.

## V. ALLEGED MISSTATEMENTS AND OMISSIONS REGARDING RATINGS AGENCIES PRE-ENGAGEMENT STRUCTURING ARE ACTIONABLE

As the Complaint alleges (¶¶ 272-73), the Registration Statements stated that Lehman structured the Certificates. This statement is materially false and misleading because, in fact, the Ratings Agency Defendants chose the Certificate collateral and structured the Certificates. They thus played an equally critical role in determining the mortgages to be purchased at auction.[18]

The Individuals argue that the Ratings Agencies' pre-engagement activities in rating the Certificates were simply a matter of non-actionable "efficiency" because no investor would deem

---

[18] The Registration Statements disclosures violate the settled principal that when a disclosure is made … there is a duty to make it complete and accurate." *Nanopierce Tech., Inc. v. Southridge Capital Mgmt., LLC*, Civ. No. 02-0767(LBS), 2003 U.S. Dist. LEXIS 21858, at *13 (S.D.N.Y. Dec. 4, 2003) (citing *Glazer v. Formica Corp.*, 964 F.2d 149, 157 (2d. Cir. 1992)) (refusing to dismiss a section 11 claim where the corporation, having chosen to disclose the CEO's professional background in the prospectus, could not omit disclosure of the fact that his former company declared bankruptcy during his tenure).

them important.  (IDM at 26-28).[19]  This argument fails because the omissions related directly to the Ratings Agencies' independence.  A reasonable investor clearly would want to know that the Ratings Agencies were providing critical services instrumental to the creation of the Certificates *for no compensation* as an inducement to ultimately becoming engaged by Lehman because this evidences an incentive to structure the Certificates in a manner that satisfied Lehman and not in accordance with their independent professional judgment.

The Individuals argue that failure to disclose the Ratings Agencies' conflicts of interest and ratings shopping practices are not actionable because these facts were well known to investors as a result of a 2003 SEC report entitled *Report on the Role and Function of Credit Rating Agencies in the Operation of the Securities Markets* (U.S. Securities and Exchange Commission), January 2003 (the "2003 SEC Report").  However, Defendants' reference to the 2003 SEC Report is misplaced.  The 2003 SEC Report described only *potential* conflicts of interest and did not focus at all on the actual activities and conflicts of interest that existed in MBS ratings.  Further, this Report not once mentions ratings shopping; nor does it discuss the practice of providing free structuring direction as a further inducement to investment banks to engage ratings agencies to rate the securities.

## VI. THE INDIVIDUAL DEFENDANTS ARE NOT CORRECT THAT CREDIT SUPPORT ISSUES WERE SUFFICIENTLY DISCLOSED IN THE OFFERING DOCUMENTS

The Individuals assert that Plaintiffs' allegations about inadequate credit support that was based on outdated models fail to state a claim because (1) risk disclosures in the Offering

---

[19] "Ordinarily, materiality is a mixed question of law and fact left to the finder of fact to determine.  *TSC Indus., Inc.* v. *Northway, Inc.,* 426 U.S. 438, 450 (1976).  Therefore, the standard for [dismissing] is high: [A] complaint may not properly be dismissed pursuant to 12(b)(6) … on the ground that the alleged misstatements or omissions are not material unless they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance."  *Milman v. Box Hill Sys. Corp.*, 72 F. Supp. 2d 220, 228 (S.D.N.Y. 1999) (quoting *Goldman v. Belden*, 754 F.2d 1059, 1067 (2d Cir. 1985) (internal quotations omitted; alterations in original); *see also Feinman v. Dean Witter Reynolds, Inc.*, 84 F.3d 539, 540-41 (2d Cir. 1996).

Documents about the *potential* inadequacy of credit enhancements protect the Individual Defendants under the bespeaks caution doctrine and (2) the credit support statements are essentially forward-looking and there is no duty to disclose them absent allegations that there were known facts that the Individual Defendants had a duty to disclose, and Plaintiffs do not allege such facts. (IDM at 30-33).

Both of the Individual Defendants' arguments fail. First, the risk disclosures only warn of potential inadequacy, not actual inadequacy. (IDM at 32). While liability may be avoided when a document states that "'actual results may vary'" on **future events**, *Luce v. Edelstein*, 802 F.2d 49, 56 (2d Cir. 1986) (emphasis added), such "[c]autionary words about future risk cannot insulate from liability the failure to disclose that the risk has transpired." *Rombach*, 355 F.3d at 173 ("'The doctrine of bespeaks caution provides no protection to someone who warns his hiking companion to walk slowly because there might be a ditch ahead when he knows with near certainty that the Grand Canyon lies one foot away.'").[20] "The cautionary language must be specific, prominent and must directly address the risk that plaintiffs claim was not disclosed. *In re Flag Telecom*, 2009 U.S. Dist. LEXIS 27090, at *29 (quoting *Olkey*, 98 F.3d at 5-6). Because all of the statements at issue were historical in nature, they impacted the securities beginning when they were issued, artificially minimizing their risk of failure.

Further, the Complaint *does* specifically allege facts known to Defendants that Defendants had a duty to disclose. With respect to the adequacy of credit support, it is alleged that Moody's had not updated its model since 2002 and that S&P had not updated its model since 1999. (¶¶ 16-18, 53, 58, 159-67, 271). These are not "hindsight" allegations because Lehman

---

[20]     *See also, Giarraputo v. Unumprovident Corp.*, Civ. No. 99-301, 2000 U.S. Dist. LEXIS 19138, at *55-56 (D. Me. Nov. 8, 2000) ("the statement in question must be a 'forward-looking statement' such as a financial projection, future management plans or objectives, statements of future economic performance or other statements of prediction"); *In re Number Nine Visual Tech. Corp. Sec. Litig.*, 51 F. Supp. 2d 1, 23 (D. Mass. 1999) ("bespeaks caution" doctrine may not be invoked to protect defendants' misrepresentations regarding present facts).

worked with the models on a daily basis and thus was clearly aware that they had not been updated to reflect the increased origination of adjustable, negative amortization and other more aggressive mortgage loan collateral which had become more prevalent since 2002 as alleged. (¶¶ 52, 58, 162). Further, the Raiter Testimony before the House Oversight Committee made clear that models that tracked subprime and adjustable mortgages did exist – and were developed by S&P – but S&P simply chose not to use them. (¶¶ 165-67). Also, the risk disclosures upon which the Individual Defendants attempt to rely, *i.e.,* that there is no data on option-ARM and interest-only loans, is not only *not* curative but, based on the allegations of the Complaint, it also is misleading because, in fact, as testified to by S&P's former managing director, the data was available and had been assembled but was not integrated into the models for fear it would result in the loss of business. (¶¶ 165-167).

## VII.   PLAINTIFFS' CLAIMS ARE NOT TIME BARRED

### A.   The Standard for Inquiry Notice

The Individuals argue that all of Plaintiffs' claims are time barred under Section 13 of the Securities Act because Plaintiffs had been on inquiry notice of the causes of action before June 19, 2007 – more the one year prior to the first filed complaint.[21] (IDM at 34). In order to demonstrate that Plaintiffs had such inquiry or constructive notice, Defendants are required to present evidence of so called "storm warnings." *Staehr v. The Hartford Fin. Servs. Group, Inc.*, 547 F.3d 406, 427 (2d Cir. 2008). These storm warnings must be *directly* related to the legal claims such that they would apprise a person of reasonable intelligence of *probable* wrongdoing

---

[21]    Section 13 of the 1933 Act governs the timeliness of claims brought pursuant to Sections 11 and 12(a)(2) and provides, in relevant part, that "[n]o action shall be maintained…under [Section 11 or 12(a)(2)] unless brought within one year after the discovery of the untrue statement or omission, or after such discovery should have been made by the exercise of reasonable diligence…" 15 U.S.C. § 77m. Because the first related action, *Alaska Electrical Pension Fund v. Lehman Brothers Holdings Inc.*, Civ. No. 08-10686 (S.D.N.Y. June 19, 2008), was filed on June 19, 2008, inquiry notice of probable wrongdoing and legal claims must be demonstrated to have occurred before June 19, 2007.

and legal claims. *Shah v. Meeker*, 435 F.3d 244, 249 (2d Cir. 2006) (storm warnings exist only when the available information makes wrongdoing "probable, not merely possible").[22]

In order for courts to demonstrate inquiry notice as a matter of law at the motion to dismiss stage, defendants must present *uncontroverted* evidence that the plaintiff should have discovered the wrongdoing and legal claims. *See In re Initial Pub. Offering*, 341 F. Supp. 2d at 347 ("Unless Defendants can produce 'uncontroverted evidence [that] irrefutably demonstrates when Plaintiff discovered or should have discovered the fraudulent scheme,' they cannot satisfy the heavy burden of establishing inquiry notice as a matter of law.'") (citation omitted).[23]

Where the defendants offer reasonable words of comfort or otherwise controvert the basis for any claim, the storm warnings become "controverted" and inquiry notice is defeated. *In re Moody's Corp. Sec. Litig.*, 599 F. Supp. 2d 493, 506 (S.D.N.Y. 2009) (Plaintiffs are not put on inquiry notice when they "reasonably rely" on "reliable words of comfort from management"); *see also Lapin v. Goldman Sachs Group, Inc.*, 506 F. Supp. 2d 221, 234 (S.D.N.Y. 2006) ("A plaintiff may not be considered to have been placed on inquiry notice, 'despite the presence of some ominous indicators,' when 'the warning signs are accompanied by reliable words of

---

[22] To trigger the duty of inquiry, the storm warnings must "relate directly" to the misrepresentations and omissions on which the plaintiffs base their claims, but they "need not detail every aspect" of the alleged scheme. *Id.* (citations omitted).

[23] *Accord Nivram Corp. v. Harcourt Brace Jovanovich, Inc.*, 840 F. Supp. 243, 249 (S.D.N.Y. 1993) ("[D]efendants bear a heavy burden in establishing that the plaintiff was on inquiry notice as a matter of law. Inquiry notice exists only when *uncontroverted evidence* irrefutably demonstrates when a plaintiff discovered or should have discovered the fraudulent conduct."); *Newman v. Warnaco Group, Inc.*, 335 F.3d 187, 193-95 (2d Cir. 2003) (defendants "bear a heavy burden in establishing that plaintiff was on inquiry notice as a matter of law"); *Alameda v. Nuveen Municipal High Income Opportunity Fund*, Civ. No. 08-4575, 2009 U.S. Dist. LEXIS 42637, at *8 (N.D. Cal. May 20, 2009) (statute of limitations arguments were premature and could not be resolved on the pleadings because "[t]he question of whether the plaintiff exercised reasonable diligence in investigating the facts underlying the alleged fraud … necessarily entails an assessment of the plaintiff's particular circumstances from the perspective of a reasonable investor") (citation omitted).

comfort from management.'" (quoting *In re Alstom SA Sec. Litig.*, 406 F. Supp. 2d 402, 421 (S.D.N.Y. 2005)).[24]

It is because issues of inquiry notice are so fact intensive that they are typically not decided on a motion to dismiss absent extreme circumstances.[25] Indeed, the issue of whether media coverage apprised investors of claims arising from alleged conflicts of interest between analysts and their financial institutions and from the alleged non-independence of Moody's have been determined to be factual issues which could not be resolved on a motion to dismiss. For example, in *In re Moody's Corp.,* 599 F. Supp. 2d at 506-07, Judge Kram examined an extensive record of public statements concerning potential conflicts of interest in the credit-ratings industry and held that plaintiffs were not put on inquiry notice. There, the statements cited by defendants either referred to the credit ratings industry in general without specific reference to Moody's, or else only identified "possible mismanagement of conflicts of interest," which Judge Kram held to be insufficient to raise the *probability* of fraud necessary to trigger inquiry notice. *Id.* at 506.[26]

---

[25] *In re Sumotomo Copper Litig.*, 120 F. Supp. 2d 328, 347 (S.D.N.Y. 2000) ("In fact, Southern District courts have variously described defendants' burden in this regard as 'extraordinary' and appropriate only in 'extreme circumstances.'"); *see also In re Ames Dep't Stores, Inc.*, 991 F.2d 968 (2d Cir. 1993) (reversing grant of summary judgment on statute of limitations grounds despite approximately fifteen news reports or articles presenting facts relevant, but more simplistic, than the facts forming the basis of the complaint).

[26] Indeed, the widespread reporting on conflicts of interest amongst various financial and ratings institutions has seldom formed the basis for inquiry notice at the motion to dismiss stage. In *Fogarazzo v. Lehman Brothers, Inc.*, 341 F. Supp. 2d 274 (S.D.N.Y. 2004), at issue were allegations of fraudulently optimistic ratings reports due to conflicts between the defendants' research and investment banking departments. Lehman Brothers and the other defendants there argued that the claims were barred as untimely because of widespread media reports detailing analysts' conflicts of interest. *Id.* at 297. The Court denied the motion, holding that "[w]hile such reports indicate a tension created by analysts' placement within firms that derive a large proportion of their revenue from investment banking business, they do not suggest the widespread fraud alleged here – they only provide the background." *Id.* at 300. "At most," Judge Scheindlin stated, "those reports should have instilled in plaintiffs a healthy skepticism towards research reports; they did not reveal a 'probability' of fraud." *Id.; Teamsters Local 445 Freight Division Pension Fund v. Bombardier Inc.*, Civ. No. 05-1898 (SAS), 2005 U.S. Dist. LEXIS 19506 (S.D.N.Y. Sept. 6, 2005), Judge Scheindlin denied the motion to dismiss, finding that Defendants had not met their burden of showing inquiry notice as a matter of law, and finding that poor Certificate performance "alone is not an indication of securities fraud" and notice of "aggressive underwriting practices" and "combination of underwriting and servicing problems" does not amount to "routine disregard [for] all underwriting guidelines … at the direction of senior management." Notification of a problem is not necessarily notification of fraud. *Id.* at *9.

B.    **Defendants Do Not Establish Inquiry Notice**

1.    **None of the News Articles Reference the Effect on the Certificates**

Despite a valiant effort to cobble together disparate news articles, none of these articles either individually or collectively, can fill the void arising from the fact that no possible, much less "probable" 1933 Act claims on behalf of Certificate purchasers can be demonstrated to have been reasonably known prior to June 19, 2007 because the first indication of possible Certificate downgrades did not occur until July 2007 (¶¶ 159-67),[27] and the actual downgrades of a substantial portion of the Certificates occurred beginning in December 2007 and continuing until February 2009.

2.    **General News Articles on the Subprime Originators Do Not Demonstrate a Probable Claim on the Certificates**

The Individuals repeatedly cite to Plaintiffs' citation to articles about reckless underwriting by the principal Originators. (IDM at 35-39). However, Complaint references to those articles are only after citation to Certificate delinquencies and downgrade data. These articles do not, either in the Complaint or otherwise, constitute independent grounds for a Securities Act claim as the Individuals essentially argue here.[28]

Even the most explicit news articles about lax subprime originator lending practices or even Lehman's MBS procedures are incapable of giving rise to a "probable" Securities Act claim on behalf of Certificate purchasers absent some clear evidence that those practices impacted the

---

[27]    As set forth in the Plaintiff' Memorandum of Law in Opposition to the Ratings Agency Defendants' Motions to Dismiss at 35, the Individuals' argument that Plaintiffs were on inquiry notice prior to June 19, 2007 fails due to the fact that almost 100% of the Certificates were downgraded after June 19, 2007, with over 75% of the Certificate downgrades occurring after February 2008.

[28]    Indeed, the May 17, 2007 *Washington Post* article (IDM at 38-39) is specifically about New Century Financial – a mortgage company that was not a principal Originator for any of the 94 Offerings at issue in this action – that had filed for bankruptcy protection in April 2007. Again, this article does not trigger inquiry notice of a claim against Lehman with respect to the Certificates at issue in this litigation.

Certificates prior to June 19, 2007. This, the Individuals simply cannot and, of course, do not demonstrate because the critical impact on the Certificates occurred only well after June 19, 2007 and well into 2008.[29]

### 3. None of the News Articles Reference Either the Certificates or Lehman MBS

It is fatal to the Individuals' inquiry notice showing that ***none*** of the eleven articles or five congressional hearing testimony transcripts upon which the Individuals purport to rely to demonstrate inquiry notice ever mention or refer to the Certificates. Nor do they ever mention or refer to Lehman MBS. In fact, only two of the articles mention Lehman at all, and both do so in ways entirely unrelated to the legal claims at issue.[30] The articles instead, as Defendants apparently intend, refer solely to various originators. This is particularly significant because the legal claims at issue are not against the subprime Originators.

### 4. None of the News Articles Reference Ratings Shopping

Further, none of the news articles ever mention or refer to one of the core undisclosed conflict of interest practices engaged in and publicly disclosed in the October 2008 House Oversight Hearing (¶¶ 164-71). The sole article to which the Individuals cite as purportedly

---

[29]     Defendants elsewhere argue that Plaintiffs to this day have sustained no actionable damages. (IDM at 6, 31). If that is true – which it is not given the well pled massive decline in the value of the Certificates – no Securities Act claim was ever "probable" since no cognizable damages ever have existed.

[30]     The McGarry Decl. Exhibit 28, *Schedule of Subprime Mortgage Market Turmoil: Examining the Role of Securitization Hearing before the Senate Banking Subcommittee on Securities, Insurance and Investments*, also provided that Lehman's Managing Director and Head of Securitized Products, David Sherr, would provide written testimony. However, going beyond Defendants' citation, rather than relating Kurt Eggert's testimony to Lehman MBS, Sherr's testimony directly controverts it.

        The only other reference to Lehman in Defendants exhibits is a May 31, 2007 article appearing in Bloomberg.com entitled "CDO Boom Masks Subprime Losses, Abetted by S&P, Moody's and Fitch." (IDM at 41, Ex. 32.) This article refers only to the birth and growth of the CDO market and never mentions the Certificates or the MBS market. The article simply cites LBHI for the generalized quote that "CDO holdings have already declined in value between $18 billion and $25 billion because of falling repayment rates by subprime U.S. mortgage holders." As a result, this article, like the others, fails to establish inquiry notice.

providing inquiry notice of undisclosed conflicts, provides only generalized information about the conflicts associated with rating **CDOs** and does not relate to the MBS market, Lehman, or the Certificates.[31] Thus, it cannot give rise to inquiry notice of the legal claims here.

### 5. The News Articles Themselves Are Controverted

The Individuals cannot demonstrate inquiry notice as a matter of law because the disclosures upon which they purport to rely were controverted.[32]

Further, even if there were reports of problems – which do not trigger inquiry notice – Lehman, as underwriter of the Offerings, was obligated to conduct due diligence with respect to Originator compliance with loan underwriting guidelines which would have filtered out bad loans. A reasonable investor would have had no reason to know at that time that Lehman was not conducting adequate due diligence and was allowing bad loans into the securitizations.[33] (¶¶ 151-58).

---

[31] The Individuals cite a May 17, 2007 article by John Succo published on *Minyanville.com*, which the Individuals refer to as a "major publication." (IDM at 42; McGarry Decl., Ex. 33). The article does not mention anything about Lehman, the Certificates or the MBS market, and instead discusses generally, the reasons for realized losses in the CDO markets ("They [Rating Agencies] will only downgrade [CDOs] when forced to by experienced losses, not rising default rates, not a worsening economy").

[32] For example, the contemporaneous testimony of First Franklin's President and CEO during a Senate Committee Hearing on March 22, 2007 – one day before publication of *The New York Times* article – that First Franklin "does not intake the loans based solely on collateral value; specifically all loans are underwritten based on the applicant's credit history and the ability to repay the debt" (¶ 132), *i.e.*, that First Franklin in fact adhered to its underwriting guidelines, is precisely the kind of "reliable words of comfort from management" that deprives an investor of inquiry notice. *In re Moody's Corp.*, 599 F. Supp. 2d at 506; *see also*, *Milman*, 72 F. Supp. 2d at 229.

Similarly, the testimony of Kurt Eggert during a Senate Banking Subcommittee on Securities, Insurance and Investment Hearing on April 17, 2007 (IDM at 38; McGarry Decl., Ex. 29 ("securitization has encouraged the decline of stringent underwriting…") is directly controverted by the testimony of David Sherr, Managing Director and Global Head of Securitized Products for Lehman Brothers, Inc. at the same April 17, 2007 Banking Subcommittee Hearing which included, "It should be said that sponsors of Mortgage-backed securitizations, such as Lehman, are careful about choosing the lenders with whom they do business… Prior to establishing a business relationship with a particular ender, Lehman spends time learning about that lender, its past conduct and its lending standards. Further, Lehman, like other securitization sponsors, performs a quality check on the mortgage loans before purchasing them." (Sherr Testimony, at 2-3.)

[33] In addition, the Individuals quote from March 27 and May 8, 2007 House Subcommittee hearings (*e.g.*, statements regarding "a general loosening of underwriting standards," the "abandonment of traditional underwriting standards," and the creation of "incentives for prudent underwriting standards to become lax") and testimony from

The Individuals assert that Plaintiffs were on notice that the Ratings Agencies' models were deficient prior to June 19, 2007 because (1) as alleged in the Complaint (¶ 162), Moody's admitted in April 2007 that it had not updated its model since 2002; and (2) in a May 31, 2007 article in *The Economist*, a consultant was reported to believe that the Ratings Agencies' "standards have slipped as business has boomed," that in "subprime lending … the models misread the level of correlation between different types of assets – a crucial variable – and ignored signs that risks were greater than historical data suggested," and that "[s]ecuritised assets using this flawed methodology were used as collateral in other deals, compounding the error." (IDM at 39-40).

Complaint ¶ 162 quotes a passage from an ***April 8, 2008*** article appearing in *The New York Times* stating that, ***one year earlier***:

> [i]n April 2007, Moody's announced it was revising the model it used to evaluate subprime mortgages. It noted that the model "was first introduced in 2002. Since then, the mortgage market has evolved considerably." This was a rather stunning admission; its model had been based on a world that no longer existed.

*The New York Times'* hindsight observation one year later that "[t]his was a rather stunning admission," does not change the fact that Moody's April 2007 announcement would not have been a "storm warning" to a reasonable investor because Moody's did not announce that the use of these models would have an impact on the initial ratings given to the Certificates and there

---

Professor Kurt Eggert during an April 17, 2007 Senate Subcommittee hearing (that "[s]ecuritization has encouraged the decline of stringent underwriting" that "has been widely blamed for the current turmoil in the subprime markets" and that "the last two years have witnessed a dramatic shift in loan underwriting, first a loosening of standards so that more loans could be made, and then a recent tightening of underwriting standards") and assert that these statements provide inquiry notice that the Originators systematically disregarded their Underwriting Guidelines. (IDM at 36-38). They do not. General statements regarding a general loosening of underwriting standards clearly do not even come close to alerting a reasonable investor that the Originators were systematically ***disregarding*** their own Underwriting Guidelines contained in the Offering Documents or that Lehman was not conducting adequate due diligence with the respect to the Originators and was allowing bad loans into the securitizations.

was no indication that the Certificates would eventually have to be significantly downgraded. Similarly, the May 31, 2007 article in *The Economist* raises no such "storm warnings" either.[34]

### 7.    News Articles on the Ratings Agencies' Role in Structuring Do Not Satisfy Inquiry Notice

The Individuals also assert that Plaintiffs were on inquiry notice of the true roles of the Ratings Agencies in forming and structuring the Certificates for sale as Primarily AAA securities prior to June 19, 2007 based on a June 1, 2007 article in the *International Herald Tribune* referred to in ¶ 174 of the Complaint and May 2007 articles in *The Economist* and the *Financial Times*. However, the articles cited by the Individuals do not warn of the specific risks, as alleged in the Complaint (¶ 173), that the Ratings Agencies were critically involved in creating and structuring the Certificates, that investors were given the false impression that the Ratings Agencies were independent and were brought in only after the Certificates had been structured by Lehman, and that the Ratings Agencies largely determined the amount and kind of credit enhancement rather than merely evaluating it after the fact.

The Individual Defendants' selective quotes omit reassuring statements. For example, in the May 16, 2007 *Financial Times* article about ratings agencies, the head of S&P's European structured finance group said: "Banks come to us with a proposed transaction and we explain how it might be rated under our criteria. In many cases, the transaction is then restructured by the bank in order to meet our criteria. *There's nothing sinister about this process – we don't advise on how deals should be structured or arbitrate on which deals can proceed or not.*"[35]

---

[34]    The Individuals also note that the Offering Documents disclosed that non-traditional ARMs were becoming increasingly more common and that there was "no material statistical information showing payment and default trends under a variety of macroeconomic conditions." (IDM at 40). This disclosure is contained in a 35-page list of general risk factors in the 2006 Registration Statement. This disclosure, however, discloses nothing about the Ratings Agencies' models and clearly does not provide inquiry notice to Plaintiffs.

[35]    Other examples of contemporaneous "reliable words of comfort" from S&P and Moody's include, for example, on September 17, 2007, the *Wall Street Journal's* publication of a self-serving letter submitted by S&P

## VIII. THE INDIVIDUAL DEFENDANTS' INCORRECTLY ASSERT THAT PLAINTIFFS' SECTION 15 CLAIM FAILS TO STATE A CLAIM UPON WHICH RELIEF CAN BE GRANTED

The Individual Defendants argue that Plaintiffs' Section 15 claims against them should be dismissed because the Complaint fails to allege facts showing that the Individuals – officers and directors of SASCo – controlled either LBI, the parent company of SASCo's parent company, or the Issuing Trusts, and the Individual Defendants therefore cannot be control persons within the meaning of Section 15 of the 1933 Act.  (IDM at 42-44).  The argument is misplaced.

Section 15 of the 1933 Act provides that:

> Every person who, by or through stock ownership, agency, or otherwise, or who, pursuant to or in connection with an agreement or understanding with one or more other persons by or through stock ownership, agency, or otherwise, controls any person liable under section 11 or 12, shall also be liable jointly and severally with and to the same extent as such controlled person to any persons to whom such controlled person is liable …

15 U.S.C. § 77o.  To plead a claim under Section 15, "a plaintiff must allege (1) a primary violation by a controlled person and (2) direct or indirect control by the defendant of the primary violator."  *E.g., In re Adelphia Commc'ns Corp. Sec. & Derivative Litig.*, Civ. No. 03-MD-1529 (LMM), 2007 U.S. Dist. LEXIS 66911, at *30 (S.D.N.Y. Sept. 10, 2007); *In re Global Crossing*, 322 F. Supp. 2d at 349.  "Culpable participation" by the controlling person is not an element of a Section 15 claim.  *E.g., In re Adelphia*, 2007 U.S. Dist LEXIS 66911, at *31; *Global Crossing*,

---

called "How S&P Protects Integrity of Credit Ratings."  Countering claims of conflicts of interest, S&P categorically stated that they "do not structure transactions, nor do [they] determine which deals can proceed and which cannot."  They further heralded their provision of objective, impartial opinions on the quality of bonds, and their institutional safeguards in place to ensure the independence and integrity of those opinions.  A September 27, 2007 article in *The New York Times* provided that, concerning the ratings agencies' role in the wave of mortgage defaults in mortgage-backed securities, an executive vice president at S&P remarked that "[s]ome have questioned whether the 'issuer pays' model has led S&P and others to issue higher, or less rigorously analyzed, ratings so as to garner more business.  There is no evidence – none at all – to support this contention with respect to S&P."  The head of the asset-backed finance rating group at Moody's similarly said there were no conflicts of interest that led to inflated ratings.  (*See* Rubin Aff., Ex. H.; Abrams Aff., Ex. 36).

322 F. Supp. 2d at 349. In *In re Refco, Inc. Sec. Litig.*, 503 F. Supp. 2d 611 (S.D.N.Y. 2007), the

court stated:

> Defendant…argues that the mere signing of the Bond Registration Statement is insufficient to support control liability … However, "[t]he very fact that a director is required to sign these critical documents charges the director with power over the documents and represents to the corporation, its shareholders, and the public that the corporation's director has performed her role with sufficient diligence that she is willing and able to stand behind the information contained in those documents," *Worldcom I*, 294 F. Supp. 2d at 420. "It does comport with common sense to presume that a person who signs his name to a report has done some measure of control over those who write the report." *Jacobs v. Coopers & Lybrand, L.L.P.,* No. 97 Civ. 3374, 1999 U.S. Dist. LEXIS 2102, 1999 WL 101772, at *18 (S.D.N.Y. Mar. 1, 1999). Thus, signature on an SEC filing containing the misrepresentations that are the subject of a claim is suggestive of control. In any event, the complaint goes on to allege that [defendant's] position as Executive Vice President and General Counsel gave him some degree of control over Refco, and that he was directly involved in its day-to-day operations, including financial reporting and accounting. That suffices as an allegation of control.

*Id.* at 638.[36]

Plaintiffs here similarly allege that each of the Individual Defendants signed the 2005

Registration Statement and/or the 2006 Registration Statement, was an officer and/or director of

SASCo and was directly involved in Lehman's day-to-day RMBS operations. (¶¶ 37-45, 54,

306, 308-10). These allegations are sufficient to allege Section 15 control person liability.

Further, "[c]ontrol is a question of fact that 'will not ordinarily be resolved summarily at

the pleading stage'" because the control issue "raises a number of complexities that should not

be resolved on such an underdeveloped record." *In re Cabletron Sys.*, 311 F.3d 11, 41 (1st Cir.

2002) (citing 2 T.L. Hazen, *Treatise on the Law of Securities Regulation* § 12.24(1) (4th ed.

2002). As set forth in the Complaint (¶¶ 26, 27, 54), the MBS at issue in this litigation were

---

[36]     *Accord In re Brooks Automation Inc. Sec. Litig.*, Civ. No. 06-11068 (RWZ), 2007 U.S. Dist. LEXIS 88045, at *43 (D. Mass. Nov. 6, 2007) ("Plaintiffs have alleged that [defendant] participated in the day-to-day management of the company and signed some of the allegedly misleading SEC filings. These allegations, combined with [defendant's] position as an executive officer, are sufficient to allege control at this stage.").

securitized by multiple layers of special purpose entities controlled by LBI and operated out of the same address as LBI.  Clearly, dismissal of the claims against the Individual Defendants at the pleading stage would be premature here.

Second, the Individuals summarily argue that Plaintiffs fail to state a claim under Section 11 and, as a result, their Section 15 claim must fail for want of a primary violation.  (IDM at 44). As set forth above, Plaintiffs have adequately pled claims for violations of Section 11 of the 1933 Act.  Accordingly, the Individual Defendants' Motion to Dismiss on this basis should be denied.  *Worldspace*, 2008 U.S. Dist. LEXIS 56224, at *20-21.

## CONCLUSION

For all of the foregoing reasons, the Individual Defendants' Motion to Dismiss Plaintiffs' Consolidated Amended Securities Class Action Complaint should be denied in its entirety.[37]

Dated: New York, New York
June 29, 2009

COHEN MILSTEIN SELLERS & TOLL PLLC

By: _____
    Joel P. Laitman (JL-8177)
    Christopher Lometti (CL-9124)
    Daniel B. Rehns (DR-5506)
    Kenneth M. Rehns (KR-9822)
150 East 52nd Street, Thirtieth Floor
New York, New York 10022
Telephone: (212) 828-7797
Facsimile: (212) 828-7745
*jlaitman@cohenmilstein.com*
*clometti@cohenmilstein.com*
*drehns@cohenmilstein.com*
*krehns@cohenmilstein.com*

    Steven J. Toll (*admitted pro hac vice*)
    Avi Garbow (*admitted pro hac vice*)
    S. Douglas Bunch (*admission pending*)
1100 New York Avenue NW
Suite 500 West
Washington, D.C. 20005
Telephone: (202) 408-4600
Facsimile: (202) 408-4699
*stoll@cohenmilstein.com*
*agarbow@cohenmilstein.com*
*dbunch@cohenmilstein.com*

---

[37] In the event the Court decides to dismiss all or part of plaintiffs' allegations, Plaintiffs respectfully request leave to replead. *See* Fed. R. Civ. P. 15(a) (providing that leave to amend shall be granted freely); *see also Foman v. Davis*, 371 U.S. 178, 182 (1962); *In re AMF Bowling Sec. Litig.*, Civ. No. 99-3023 (DC), 2003 U.S. Dist. LEXIS 7389 (S.D.N.Y. May 2, 2003) ("the only possible reasons to reject amendment would be prejudice to the defendant or misconduct by plaintiffs…").

## <u>CERTIFICATE OF SERVICE</u>

I, Daniel B. Rehns, hereby certify that on June 29, 2009, I caused the foregoing document to be filed electronically with the United States District Court for the Southern District of New York through the Court's mandated ECF service.  Counsel of record are required by the Court to be registered e-filers, and as such are automatically e-served with a copy of the document(s) upon confirmation of e-filing.

/s//  Daniel B. Rehns
       Daniel B. Rehns