**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------X
                                                        :
In re:                                                  :          09 MD 2017 (LAK)
                                                        :
LEHMAN BROTHERS SECURITIES AND                          :
ERISA LITIGATION                                        :          **ECF CASE**
                                                        :
This Document Applies to:                               :
                                                        :
*In re Lehman Brothers Mortgage-Backed*                 :
*Securities Litigation,* No. 08-CV-6762.                :
                                                        :
------------------------------------------------------------X


# MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT MOODY'S INVESTORS SERVICE, INC. AND DEFENDANT THE MCGRAW-HILL COMPANIES, INC.'S MOTIONS TO DISMISS PLAINTIFFS' <u>CONSOLIDATED AMENDED SECURITIES CLASS ACTION COMPLAINT</u>

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ...................................................................................1

SUMMARY OF THE FACTS ....................................................................................3

SUMMARY OF THE ARGUMENT .............................................................................6

ARGUMENT ...........................................................................................................7

I.  THE RATINGS AGENCY DEFENDANTS ARE LIABLE AS
    "UNDERWRITERS" WITHIN THE MEANING OF SECTION 11 .................................7

    A.  Plaintiffs' Claims Against the Ratings Agency
        Defendants Are Not Precluded by Rule 436(g) ......................................8

    B.  Plaintiffs Adequately Allege that the RA Defendants
        Were Engaged in the Distribution Process and
        Are Therefore "Underwriters" Under Section 11 ..................................11

        1.  The RA Defendants Were Engaged in Steps
            Necessary to the Distribution of the Certificates ......................11

        2.  Plaintiffs' Comprehensive Factual Allegations
            of Underwriter Status are "Facially Plausible" .........................16

II.  THE RA DEFENDANTS ARE "SELLERS"
     WITHIN THE MEANING OF SECTION 12(a)(2) ........................................18

    A.  The RA Defendants Solicited the Sale of the Certificates .....................19

    B.  The RA Defendants' Solicitation Was Motivated by Financial Interests .............22

    C.  Plaintiffs' Factual Allegations of Seller Status Are "Facially Plausible" ..............23

III.  PLAINTIFFS' CLAIMS ARE NOT TIME BARRED .......................................25

    A.  The Standard for Inquiry Notice ........................................................26

    B.  Plaintiffs Did Not Have Inquiry Notice of a Probable Legal
        Claim against the RA Defendants Prior to February 23, 2008 ...............29

        1.  No "Probable" Legal Claim Existed against the RA
            Defendants Until After Issuance of the July 2008 SEC
            Report and Completion of October 2008 Oversight Testimony ................29

2. General News Articles on the Subprime Originators Do
Not Demonstrate a Probable Claim on the Certificates ............................ 30

3. The News Articles Themselves Are Controverted ................................. 32

C. The Statute of Repose Does Not Bar Plaintiffs' Claims ......................................... 34

1. The Statute of Repose Does Not Bar Plaintiffs'
Section 11 Claims against the RA Defendants .......................................... 34

2. The Statute of Repose Does Not Bar Plaintiffs'
Section 12(a)(2) Claims against the RA Defendants ................................. 34

IV. THE COMPLAINT ASSERTS ACTIONABLE
MISSTATEMENTS AND OMISSIONS ........................................................................ 36

A. The Defendants Had a Duty to Disclose ................................................................. 36

B. The Truth-On-The-Market Defense Does Not Apply ........................................... 38

C. The "Bespeaks Caution" Doctrine Does Not Shield
The RA Defendants from Alleged Misstatements and
Omissions Relating to Present and Historical Facts ............................................... 39

V. THE COMPLAINT ADEQUATELY ALLEGES DAMAGES ...................................... 41

VI. PLAINTIFFS STATE CLAIMS UNDER SECTION 15
OF THE 1933 ACT AGAINST THE RA DEFENDANTS ............................................ 44

**CONCLUSION** ..................................................................................................................... 50

**FEDERAL & STATE CASES**

*Ackerberg v. Johnson,*
        892 F.2d 1328 (8th Cir. 1989) .................................................................................11, 12

*Alameda v. Nuveen Municipal High Income Opportunity Fund,*
        Civ. No. 08-4575, 2009 U.S. Dist. LEXIS 42637 (N.D. Cal. May 20, 2009) .............27, 40

*Ashcroft v. Iqbal,*
        556 U.S. __, 129 S. Ct. 1937 (2009).........................................................................7, 16

*Bell Atl. Corp. v. Twombly,*
        550 U.S. 544 (2007) ....................................................................................... *passim*

*Berckeley Inv. Group, Ltd. v. Colkitt,*
        455 F.3d 195 (3d Cir. 2006).....................................................................................11, 12

*Caiola v. Citibank, N.A., New York,*
        295 F.3d 312 (2d Cir. 2002)..........................................................................................36

*Capri v. Murphy,*
        856 F.2d 473 (2d Cir. 1998)............................................................................. *passim*

*Credit Suisse First Boston Corp. v. Arm Fin. Group, Inc.,*
        Civ. No. 99-2046, 2001 U.S. Dist. LEXIS 3332 (S.D.N.Y. Mar. 28, 2001) ....................24

*Cremeen v. Schaefer,*
        Civ. No. 04-2519 (CM), 2005 U.S. Dist. LEXIS 18944 (D. Kan. Aug. 10, 2005) ..........42

*Demaria v. Andersen,*
        318 F.3d 170 (2d Cir. 2003)...........................................................................................37

*Dietrich v. Bauer,*
        76 F. Supp. 2d 312 (S.D.N.Y. 1999)..............................................................................25

*Dorchester Investors v. Peak Int'l Ltd.,*
        134 F. Supp. 569 (S.D.N.Y. 2001) ..........................................................................21, 22

*Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.,*
        472 U.S. 749 (1985).......................................................................................................10

*Edison Fund v. Cogent Inv. Strategies Fund, Ltd.,*
        551 F. Supp. 2d 210 (S.D.N.Y. 2008)............................................................................41

*Ellison v. Am. Image Motor Co., Inc.*,
    36 F. Supp. 2d 628 (S.D.N.Y. 1999)......................................................................48

*Enron Corp. Sec., Derivative and ERISA Litig.*,
    511 F. Supp. 2d 742 (S.D. Tex. 2005) ...........................................................9, 10

*Fogarazzo v. Lehman Brothers, Inc.*,
    341 F. Supp. 2d 274 (S.D.N.Y. 2004)...................................................................28

*Foman v. Davis*,
    371 U.S. 178 (1962)...............................................................................................50

*Forsberg v. Always Consulting, Inc.*,
    Civ. No. 06-1348, 2008 U.S. Dist. LEXIS 105779 (S.D.N.Y. Dec. 31, 2008) .................25

*Gabriel Capital L.P. v. NatWest Fin., Inc.*,
    122 F. Supp. 2d 407 (S.D.N.Y. 2000)...................................................................41

Ganino v. Citizens Utility Co.,
    228 F.3d 154 (2d Cir. 2000)...........................................................................37, 38

*Goldman v. Belden*,
    754 F.2d 1059 (2d Cir. 1985).................................................................................37

*Grossman v. Waste Mgmt., Inc.*,
    Civ. No. 83-2167, 1983 WL 1370 (N.D. Ill. Sept. 9, 1983) ...............................43

*Hall v. The Children's Place Retail Stores, Inc.*,
    580 F. Supp. 2d 212 (S.D.N.Y. 2008)...................................................................38

*Harden v. Raffensperger*,
    65 F.3d 1392 (7th Cir. 1995) ................................................................................13

*Harrison v. Eventure Capital Group, Inc.*,
    666 F. Supp. 473 (W.D.N.Y. 1987)......................................................................48

*HB Holdings Corp. v. Scovill, Inc.*,
    Civ. No. 88-7983, 1990 U.S. Dist. LEXIS 3341 (S.D.N.Y. Mar. 26, 1990) ...................25

*Heller v. Goldin Restructuring Fund, L.P.*,
    590 F. Supp. 2d 603 (S.D.N.Y. 2008)...................................................................39

*Hevesi v. Citigroup Inc.*,
    366 F.3d 70 (2d Cir. 2004)....................................................................................35

*Hunt v. Alliance N. Am. Gov't Income Tr. Inc.,*
  159 F.3d 723 (2d Cir. 1998)................................................................40

*In re Adelphia Commc'ns Corp. Sec. & Derivative Litig.,*
  Civ. No. 03-MD-1529 (LMM), 2007 U.S. Dist.
  LEXIS 66911 (S.D.N.Y. Sept. 10. 2007).............................................17, 18, 47

*In re Alliance Pharm. Corp. Sec. Litig.,*
  279 F. Supp. 2d 171 (S.D.N.Y. 2003)..................................................37

*In re Alstom SA Sec. Litig.,*
  406 F. Supp. 2d 402 (S.D.N.Y. 2005)..................................................27

*In re Am. Bank Note Holographics Securities Litigation,*
  93 F. Supp. 2d 424 (S.D.N.Y. 2000)......................................... *passim*

*In re Ames Dep't Stores, Inc.,*
  991 F.2d 968 (2d Cir. 1993)...............................................................27

*In re AMF Bowling Sec. Litig.,*
  Civ. No. 99-3023 (DC), 2003 U.S. Dist. LEXIS 7389 (S.D.N.Y. May 2, 2003) .............50

*In re AOL Time Warner Sec. & ERISA Litig.,*
  381 F. Supp. 2d 192 (S.D.N.Y. 2004)..................................................40

*In re BankAmerica Corp. Sec. Litig.,*
  210 F.R.D. 694 (E.D. Mo. 2002) .........................................................42

*In re Cabletron Sys., Inc.,*
  311 F.3d 11 (1st Cir. 2002)..................................................................49

*In re Columbia Sec. Litig.,*
  155 F.R.D. 466 (S.D.N.Y. 1994) .........................................................38

*In re Countrywide Fin. Corp. Sec. Litig.,*
  588 F. Supp. 2d 1132 (C.D. Cal. 2008) ..........................................42, 43

*In re Crazy Eddie Sec. Litig.,*
  747 F. Supp. 850 (E.D.N.Y. 1990) .....................................................48

*In re Deutsche Telekom AG Sec. Litig.,*
  Civ. No. 00-9475, 2002 U.S. Dist. LEXIS 2627 (S.D.N.Y. Feb. 20, 2002)....................24

*In re Donald J. Trump Casino Sec. Litig.,*
  7 F.3d 357 (3d Cir. 1993)....................................................................40

v

*In re Exec. Telecard, Ltd. Sec Litig.,*
    913 F. Supp. 280 (S.D.N.Y. 1996) .................................................................49

*In re Falstaff Brewing Corp. Antitrust Litig.,*
    441 F. Supp. 62 (E.D. Mo. 1977).................................................................49

*In re Fitch, Inc.,*
    330 F.3d 104 (2d Cir. 2003).......................................................................10

*In re Flag Telecom Holdings, Ltd., Sec. Litig.,*
    Civ. No. 02-3400, 2009 U.S. Dist. LEXIS 37090 (S.D.N.Y. May 1, 2009).....................40

*In re Global Crossing Ltd. Sec. Litig.,*
    322 F. Supp. 2d 319 (S.D.N.Y. 2004).......................................................47

*In re Initial Pub. Offering Sec. Litig.,*
    214 F.R.D. 117 (S.D.N.Y. 2002) ...............................................................35

*In re Initial Pub. Offering Sec. Litig.,*
    341 F. Supp. 2d 328 (S.D.N.Y. 2004).................................................26, 42

*In re Jenny Craig Sec. Litig.,*
    Civ. No. 92-0845, 1994 U.S. Dist. LEXIS 19781 (S.D. Cal. Nov. 22, 1994) ..................10

*In re JTS Corp.,*
    305 B.R. 529 (Bankr. N.D. Cal. 2003) .....................................................43

*In re McKesson HBOC, Inc. Sec. Litig.,*
    126 F. Supp. 2d 1248 (N.D. Cal. 2000) ...................................................43

*In re Moody's Corp. Sec. Litig.,*
    599 F. Supp. 2d 493 (S.D.N.Y. 2009).................................................27, 28

*In re Oxford Health Plans, Inc., Sec. Litig.,*
    913 F. Supp. 280 (S.D.N.Y. 1996) ...........................................................49

*In re Prestige Brands Holding, Inc.,*
    Civ. No. 05-06924, 2006 U.S. Dist. LEXIS 46667 (S.D.N.Y. July 10, 2006) .................24

*In re Priceline.com Inc.,*
    342 F. Supp. 2d 33 (D. Conn. 2004)..........................................................40

*In re Refco, Inc. Sec. Litig.,*
    503 F. Supp. 2d 611 (S.D.N.Y. 2007)...............................................10, 16, 17

*In re Refco, Inc. Sec. Litig.*,
　　Civ. No. 05-8626, 2008 U.S. Dist. LEXIS 62543 (S.D.N.Y. Aug. 14, 2008) ......12, 13, 14

*In re Stac Elecs. Sec. Litig.*,
　　89 F.3d 1399 (9th Cir. 1996) .........................................................................43

*In re Sumotomo Copper Litig.*,
　　120 F. Supp. 2d 328 (S.D.N.Y. 2000)..............................................................27

*In re Taxable Municipal Bond Sec. Litig.*,
　　Civ. No. MDL 863, 1993 U.S. Dist. LEXIS 18592 (E.D. La. Dec. 29, 1993) .................10

*In re Time Warner Inc. Sec. Litig.*,
　　9 F.3d 259 (2d Cir. 1993)...............................................................................36

*In re Worldspace Sec. Litig.*,
　　Civ. No. 07-2252 (RMB), 2008 U.S. Dist. LEXIS 56224 (S.D.N.Y. Jul. 21, 2008).........44

*Ingenito v. Bermec Corp.*,
　　441 F. Supp. 525 (S.D.N.Y. 1977) ...................................................................12

*Lapin v. Goldman Sachs Group, Inc.*,
　　506 F. Supp. 2d 221 (S.D.N.Y. 2006).................................................27, 36, 38

*LaSalle Nat'l Bank v. Duff & Phelps Credit Rating Co.*,
　　951 F. Supp. 1071 (S.D.N.Y. 1996)..................................................................10

*Lucia v. Prospect St. High Income Portfolio*,
　　36 F.3d 170 (1st Cir. 1994).............................................................................36

*Maywalt v. Parker & Parsley Petroleum Co.*,
　　808 F. Supp. 1037 (S.D.N.Y. 1992)..................................................................35

*McFarland v. Memorex Corp.*,
　　493 F. Supp. 631 (N.D. Cal. 1980) ..................................................................15

*McMahan & Co. v. Wherehouse Entertainment, Inc.*,
　　859 F. Supp. 743 (S.D.N.Y. 1994) ..................................................................21

*Newman v. Warnaco Group, Inc.*,
　　335 F.3d 187 (2d Cir. 2003).............................................................................27

*Nivram Corp. v. Harcourt Brace Jovanovich, Inc.*,
　　840 F. Supp. 243 (S.D.N.Y. 1993) ..................................................................27

*Olkey v. Hyperion 1999 Term Trust, Inc.,*
    98 F.3d 2 (2d Cir. 1996)............................................................................40

*P. Stolz Family P'ship v. Daum,*
    355 F.3d. 92 (2d Cir. 2004).....................................................................40

*Pinter v. Dahl,*
    486 U.S. 622 (1988)..................................................................... *passim*

*Robbins v. Wilkie,*
    300 F.3d 1208 (10th Cir. 2002) ..............................................................42

*Rodriguez v. Countrywide Homes,*
    Civ. No. 08-0869 (DLB), 2008 U.S. Dist. LEXIS 82874 (E.D. Cal. Sept. 22, 2008) .......43

*Rombach v. Chang,*
    355 F.3d 164 (2d Cir. 2004)....................................................................40

*SEC v. Chinese Consol. Benevolent Ass'n, Inc.,*
    120 F.2d 738 (2d Cir. 1941)....................................................................12

*SEC v. Holschuh,*
    694 F.2d 130 (7th Cir. 1982) ..................................................................13

*SEC v. Kern,*
    425 F.3d 143 (2d Cir. 2005)........................................................8, 12, 13

*SEC v. Lybrand,*
    200 F. Supp. 2d 384 (S.D.N.Y. 2002)......................................................11

*SEC v. Mayhew,*
    121 F.3d 44 (2d Cir. 1997).......................................................................37

*SEC v. N. Am. Research & Dev. Corp.,*
    424 F.2d 63 (2d Cir. 1970).......................................................................10

*SEC v. Universal Express, Inc.,*
    475 F. Supp. 2d 412 (S.D.N.Y. 2007)......................................................10

*Schuh v. Druckman & Sinel, L.L.P,*
    Civ. No. 07-0366, 2009 U.S. Dist. LEXIS 47185 (S.D.N.Y. Feb 3, 2009) ......................18

*Shah v. Meeker,*
    435 F.3d 244 (2d Cir. 2006).............................................................26, 36

*Shain v. Duff & Phelps,*
    915 F. Supp. 575 (S.D.N.Y. 1996) ...........................................................................23, 24

*Sloane Overseas Fund, Ltd. v. Sapiens Int'l Corp., N.V.,*
    941 F. Supp. 1369 (S.D.N.Y. 1996).................................................................................48

*Special Situations Fund, III, L.P. v. Cocchiola,*
    Civ. No. 02-3099, 2007 U.S. Dist. LEXIS 56627 (D.N.J. Aug. 3, 2007).........................13

*Staehr v. The Hartford Fin. Servs Group, Inc.,*
    547 F.3d 406 (2d Cir. 2008).............................................................................................26

*Steed Fin. LDC v. Nomura Sec. Int'l, Inc.,*
    Civ. No. 00-8058, 2001 U.S. Dist. LEXIS 14761 (S.D.N.Y. Sept. 20, 2001).............24, 25

*Teamsters Local 445 Freight Division Pension Fund v. Bombardier Inc.,*
    Civ. No. 05-1898 (SAS), 2005 U.S. Dist. LEXIS 19506 (S.D.N.Y. Sept. 6. 2005).........28

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.,*
    551 U.S. 308 (2007)..........................................................................................................7

*Tregenza v. Great Am. Commc'ns Co.,*
    12 F.3d 717 (7th Cir. 1993) .............................................................................................43

*TSC Indus., Inc. v. Northway, Inc.,*
    426 U.S. 438 (1976).........................................................................................................37

*United States v. Honeywell Int'l, Inc.,*
    542 F. Supp. 2d 1188 (E.D. Cal. 2008)............................................................................43

*Wilson v. Saintine,*
    72 F.2d 1124 (2d Cir. 1989).............................................................................................21

## STATUTES & RULES

15 U.S.C. § 77a *et seq.*................................................................................ *passim*

Fed. R. Civ. P. 12(b)(6)............................................................................... *passim*

Fed. R. Civ. P. 15(a) .........................................................................................45

17 C.F.R. § 230.436(g) (2008)........................................................................7, 9

## SECONDARY AUTHORITY

H.R. Rep. No. 73-85, (1933)...............................................................................8

Disclosure of Security Ratings in Registration Statements,
    SEC Release Nos. 33-6336, 34-18012, 46 Fed. Reg. 42024-01 (Aug. 18, 1981) ...............9

2 T.L. Hazen, Treatise on the Law of Securities Regulation § 12.24(1) (4th ed. 2002)................49

*In re Lorsin, Inc.,*
    82 S.E.C. Docket 3044, Release No. 250 (May 11, 2004) ................................................11

## PRELIMINARY STATEMENT

This memorandum of law is submitted by Court-appointed Lead Plaintiff Locals 302 and 612 of the International Union of Operating Engineers – Employers Construction Industry Retirement Trust (the "Operating Engineers" or "Lead Plaintiff"), Plaintiff New Jersey Carpenters Health Fund (the "New Jersey Carpenters") and Plaintiff Boilermakers-Blacksmith National Pension Trust (the "Boilermakers") (collectively, the "Plaintiffs") in opposition to Defendants', The McGraw-Hill Companies, Inc. ("McGraw-Hill")[1] and Moody's Investors Service, Inc. ("Moody's") (collectively, the "RA Defendants") motions to dismiss the Consolidated Securities Class Action Complaint filed on February 23, 2009 (the "Complaint").

This action asserts claims under Sections 11, 12 and 15 of the Securities Act of 1933, 15 U.S.C. § 77 *et seq.* (the "Securities Act" or "1933 Act" ), arising from the actions of Lehman Brothers Holding Inc., its affiliates and subsidiaries (collectively "Lehman") and the RA Defendants in inundating the financial markets with nearly $100 billion of purportedly investment grade mortgage-backed securities ("MBS"), referred to as Certificates, through an "assembly line" of nearly 100 public offerings (the "Offerings"). The Offerings were completed over a 21-month time frame ending in early 2007. It is alleged that the Offerings Documents used to effectuate these Offerings violated the core disclosure provisions of the Securities Act. They failed to disclose, *inter alia*, that the stated guidelines for originating the mortgage collateral (the "Guidelines") were systematically disregarded; that the RA Defendants served conflicting roles as undisclosed "coach" and "referee" – not merely rating the Certificates, but creating and structuring them as well; and that Lehman engaged the RA Defendants through

---

[1] Standards & Poor's ("S&P"), a division of Defendant McGraw-Hill Companies, Inc., provides credit ratings, risk evaluation, investment research and data to investors.

undisclosed "ratings shopping" practices which compromised their independence and incentivized the assignment of inflated investment-grade ratings to the Certificates.

The role of the RA Defendants, in connection with the mass production and sale of the Certificates, marked a fundamental shift away from the traditional role of rating agencies in the financial markets. Historically, Nationally Recognized Statistical Ratings Organizations ("NRSRO"), or ratings agencies, functioned strictly as expert consultants, engaged for their *independent* financial assessment of public and private debt securities.[2] Their role was decidedly *not* to create financial products. Nor was it to design financial products to be sold to a particular market of institutional investors. Nevertheless, faced with the prospect of unprecedented profits, those are precisely the roles the RA Defendants assumed with respect to the Certificates. In order to construct MBS which would be marketable to pension funds and insurance companies required to purchase only the highest rated debt securities, the RA Defendants controlled which mortgages were purchased and securitized and at what price. Once the mortgages were acquired, the RA Defendants then directed the structure of the Certificates, including the number of classes and the nature and amount credit support and investor protections. In performing these non-rating tasks the RA Defendants were clearly not independent. Much of the structuring direction given was provided *gratis* – as an inducement to be hired by Lehman. Further, in submitting competitive bids for the Certificate ratings engagements, the RA Defendants included their proposed Certificate ratings – so the ratings became part of the economic competition for the job; rather than the result of independent professional judgment after the firms were engaged.

Having chosen to act well within the domain of underwriters and sellers of registered securities, the RA Defendants are subject to the disclosure obligations imposed on such actors by

---

[2]     As part of that independent assessment the rating agencies assigned ratings to the securities according to their well-known rating systems (encompassing 21-levels ranging from "AAA" to "D" for S&P and "Aaa" to "C" for Moody's).

the Securities Act. As a result of their substantial participation in the Offerings, as sellers under Section 12 and as control persons under Section 15 of the 1933 Act, the RA Defendants are liable for alleged misstatements and omissions in the Offering Documents as underwriters under Section 11.

## SUMMARY OF FACTS

As set forth in the Complaint, the RA Defendants were engaged by Lehman in connection with each of the 94 Offerings of Certificates or MBS, totaling over $93 billion, underwritten by Lehman. (¶¶ 2, 5, 31-32, 66-67). The Certificates were MBS designed to be AAA investment products which would be sold to pension funds and insurance companies who were only permitted to purchase such high-rated investment-grade securities. (¶ 14). To that end, and since it was ultimately only the ratings agencies who could assign the necessary AAA ratings, the RA Defendants wielded significant power and control in connection with each of the Certificate Offerings, determining: (1) the underlying mortgages Lehman would purchase at auction (and at what price) (¶¶ 15, 17-18, 172-78); (2) the number of senior and junior, or subordinate, Certificate classes in each Offering and the attendant rights of those classes in the event of loss or borrower default (*i.e.,* the "subordination structure") (¶¶ 15, 17-18, 56-58, 67, 172-78); (3) the principal amount of mortgages (in excess of the principal bond amount) to be securitized (*i.e.,* the "overcollateralization amount") in each Certificate Offering (*id.*); (4) the Certificate classes in each Offering that would receive excess funds from borrower payments on mortgage obligations in the event of losses (*i.e.,* the "excess spread") (*id.*); and (5) the amount and type of insurance, if any, built into each Certificate Offering structure (*id.*).

While "on the ground" the roles of the RA Defendants had fundamentally changed, the Offering Documents gave no hint of it. Both the Certificate Registration Statements and

Prospectus Supplements affirmatively described only Lehman as the "structurer" of the Certificates. (¶¶ 15, 272). The RA Defendants' true roles in creating and structuring the Certificates and Certificate Offerings only began to partially emerge in a July 2008 Report issued by the Securities and Exchange Commission ("SEC") (the "2008 SEC Report") (¶ 178), and thereafter in articles published in the *Financial Times* in October 2008. (¶ 176).

Also not disclosed was the fact that at the point in time when the RA Defendants were providing pivotal direction in the formation of the Certificate collateral by advising Lehman which mortgages should be purchased at auction and at what price, the RA Defendants still had not been formally engaged and were *not* being compensated by Lehman. (¶ 61). The RA Defendants were thus providing these services as an inducement to Lehman to ultimately hire them to rate the Certificates. These undisclosed circumstances clearly compromised the RA Defendants' independence. Further, as the July 2008 SEC Report found, the unique circumstances of the MBS Offerings presented other undisclosed and material conflicts of interest, including that the RA Defendants' personnel engaged to rate the MBS were not prevented from taking into account "market share" and "business" considerations, that ratings engagements were concentrated in the hands of a few investment banks., and that ratings agencies "may" be pressured to reduce "Credit Support" and to avoid updating models so as to inflate ratings. (¶¶ 179-81).

Further, the undisclosed rating shopping practices was definitively disclosed in the testimony of Jerome Fons ("Fons"), a former Moody's managing director, before the United States House of Representatives Committee on Oversight and Governmental Reform ("House Oversight Committee") in October 2008. (¶¶ 17, 66-67, 168-78). Through the process of ratings shopping, Lehman exercised its economic leverage to obtain the artificially inflated ratings.

The ratings shopping practices produced the intended results – namely, the RA Defendants deployed outdated models to determine not only the Certificate ratings, but also the appropriate level of investor protection or credit support in the Certificates' structure (*e.g.,* appropriate subordination structure, overcollateralization or excess spread in each Certificate Offering) which justified the AAA rating of the Certificates. (¶¶ 16-17, 57-58, 159-67, 271). The use of outdated models by Moody's first began to emerge in an article published by the *New York Times* in April 2008 (¶¶ 162-63), while S&P's use of such outdated models was only first partially disclosed in the testimony of a former S&P Managing Director, Frank Raiter, before the House Oversight Committee in October 2008.[3] (¶¶ 164-67).

The use of outdated models permitted Certificate Offerings composed substantially of aggressive loan products (such as adjustable mortgages with low initial teaser rates and negative amortization loans with high potential for payment shock and borrower default) to receive the highest AAA ratings from the RA Defendants based on wholly inadequate credit support and investor protection. (¶¶ 36, 53, 56-57, 66, 159-67, 269-70). Relatively soon after issuance, the ratings of the Certificates dramatically collapsed, with Moody's and S&P downgrading 71% and 79%, respectively, of the Certificate classes; and with 58% and 65%, respectively, of the Certificates becoming downgraded to speculative junk bond investments. (¶ 8). Attendant to these massive downgrades was the collapse in Certificate values. *Id.*

---

[3]     The July 2008 SEC Report also noted the fact that the MBS issuance market was controlled by a limited number of major investment banks and that these banks paid the RA Defendants, created incentives for RA Defendants not to update the models since to do so would result in their inability to generate both the desired "AAA" ratings necessary for the MBS' marketability, and the investment banks' profit. (¶ 181 ("When the arranger sponsors the MBS … pressure can influence an agency's decision to update a model when the update would lead to a less favorable outcome."))

## SUMMARY OF THE ARGUMENT

The RA Defendants argue that Plaintiffs' claims must all be dismissed because: (1) SEC Rule 436(g), 17 C.F.R. § 230.436(g) (2008), grants them absolute immunity from any Securities Act claim (Memorandum of Law in Support of Defendant Moody's Corporation's Motion to Dismiss ("Moody's Mem.") at 12-13; Memorandum of Law in Support of Defendant McGraw-Hill Companies, Inc.'s Motion to Dismiss ("McGraw Mem.") at 6-8); (2) there are insufficient allegations to state a claim against them as underwriters under Section 11(a)(5) because they did not participate in the distribution of the Certificates (Moody's Mem. at 14-18; McGraw Mem. at 8-18); (3) there are insufficient allegations to support a claim against them as sellers under Section 12(a)(2) because they did not participate in the solicitation or sale of the Certificates (Moody's Mem. at 18-22; McGraw Mem. at 18-22); (4) all of the claims are time-barred because Plaintiffs had notice of the probable legal claims against the RA Defendants prior to February 23, 2008 (Moody's Mem. at 25-32; McGraw Mem. at 22-27); and (5) there are insufficient allegations to state a claim under Section 15 that the RA Defendants were "control persons." (Moody's Mem. at 22-25; McGraw Mem. at 33-35).

These arguments fail because the Complaint sufficiently details the RA Defendants' "substantial participation" in the Offerings so as to state a claim against them as underwriters under Section 11(a)(5) and further details their direct role in the solicitation process so as to state a claim against them as sellers under Section 12(a)(2). Further, the claims are not time-barred because there was insufficient notice of probable claims arising from the RA Defendants' role in structuring the MBS until after the issuance of the July 2008 SEC Report and there were no probable claims from ratings shopping or issuance of inadequate credit support based on outdated models until after the testimony at the House Oversight Committee Hearing in October

2008. Also, the impact of the defective underwriting did not substantially impact the Certificates until after February 23, 2008, when a substantial portion of the Certificates was downgraded below investment grade. Of those classes downgraded, 78% were downgraded *after* February 23, 2008, with approximately 100% of the highest-rated AAA Certificates materially downgraded only after that date. *See*, Declaration of Joel P. Laitman in Opposition to Defendants Moody's Corporation's and McGraw-Hill Companies, Inc.'s Motions to Dismiss ("Laitman Decl."),Exhibits ("Exs.") A-F. Finally, the particularized facts regarding the RA Defendants' role in forming and structuring the Certificates are sufficient to state a claim for control-person liability under Section 15 of the 1933 Act.

## ARGUMENT

A motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6) is governed by certain well-settled legal principles. The court accepts as true all factual allegations in the complaint and must draw all reasonable inferences in the plaintiff's favor. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 323 (2007). Further, a claim should only be dismissed if the plaintiff's factual allegations are insufficient "to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544 562 (2007). *See Ashcroft v. Iqbal*, 556 U.S. __, 129 S. Ct. 1937, 1949 (2009). Moreover, a complaint's factual allegations must be sufficient enough as to "raise a right to relief above the speculative level." *Id.* at 1965.

## I. THE RATINGS AGENCY DEFENDANTS ARE LIABLE AS "UNDERWRITERS" WITHIN THE MEANING OF SECTION 11

The RA Defendants argue for the dismissal of Plaintiffs' Section 11 claims against them by asserting that they are exempt from liability under SEC Rule 436(g), 17 C.F.R. § 230.436(g), promulgated pursuant to the Securities Act of 1933 and, in any event, that they do not fall within the Securities Act's definition of "underwriter." Both arguments are unavailing.

S&P, in particular, suggests that Plaintiffs are resorting "to an old ruse" in arguing that the RA Defendants are liable as underwriters. (McGraw Mem. at 6). It is the RA Defendants themselves, however, that are attempting to circumvent their liability under Section 11 by arguing that Rule 436(g) somehow operates as a catch-all, absolving them of any liability for the misstatements and omissions in the registration statement for which they are responsible. The RA Defendants' conduct as underwriters should not be excused because they happen to issue ratings.

In addition, Moody's argues that holding it liable as an underwriter would "unmoor the statutory term 'underwriter' from its historical meaning" (Moody's Mem. at 11), but, in fact, quite the opposite is true. The purpose of Section 11 is to hold liable those who make misrepresentations in marketing securities to the public. Civil liability in the Securities Act is premised on "a requirement that all those responsible for statements upon the face of which the public is solicited to invest its money shall be held to standards like those imposed by law upon a fiduciary." H.R. Rep. No. 73-85, at 5 (1933). The RA Defendants' actions, in collaborating with Lehman to package the loans underlying the Certificates and in helping to draft the Prospectus Supplements, are exactly the kind typically performed by underwriters and are "necessary to the distribution of securities." *See SEC v. Kern*, 425 F.3d 143 (2d Cir. 2005). Accordingly, the RA Defendants are liable for the misrepresentations made in the Certificates and Prospectus Supplements.

**A.    Plaintiffs' Claims against the Ratings Agency
      Defendants Are Not Precluded by Rule 436(g)**

Both of the RA Defendants claim that SEC Rule 436(g) absolves them of all liability for any misstatements or omissions in the Offering Documents for which they are responsible. (Moody's Mem. at 12-13; McGraw Mem. at 7-8). Moody's further argues that the RA

Defendants are "shielded" from all liability under the securities laws except for fraud. (Moody's Mem. at 13 (quoting *Enron Corp. Sec., Derivative and ERISA Litig.*, 511 F. Supp. 2d 742, 817 n. 77 (S.D. Tex. 2005))). As the statute itself explicitly provides, however, the exemption that Rule 436(g) grants NRSROs, including the RA Defendants, is not a blanket protection for all NRSRO activities; rather, the exemption relates solely to "the *security rating* assigned … by a nationally recognized rating organization." 17 C.F.R. § 230.436(g) (2008) (emphasis added). Rule 436(g) is intended only to "exempt the rating organization from liability *as an expert* under Section 11 of the Securities Act for security ratings included in registration statements." Disclosure of Security Ratings in Registration Statements, SEC Release Nos. 33-6336, 34-18012, 46 Fed. Reg. 42024-01, 42025 (Aug. 18, 1981) (emphasis added).[4]

In spite of this clear statutory language, Moody's and S&P both attempt to use the ratings exemption of Rule 436(g) to shield themselves from liability for their actions. Although Rule 436(g) may protect the RA Defendants from liability for the actual ratings included in registration statements, this exemption does not provide "absolute[] immun[ity]" for all of the RA Defendants' actions. (McGraw Mem. at 6). The RA Defendants are not being sued as persons who prepared or certified the ratings pursuant to Section 11(a)(4), but rather for, *inter alia*, their activities "in determining which mortgage loans to be included and excluded from the underlying collateral and composition of the Certificate credit enhancement needed in order to

---

[4]     S&P argues in its brief that Plaintiffs cannot establish S&P's liability as an expert under Section 11(a)(4) of the 1933 Act. (McGraw Mem. at 8-11). S&P appears to circuitously claim that it was not an expert, while at the same time arguing that it could only have been an expert and not an underwriter under Section 11. (*Compare* McGraw Mem. at 5-6 *with* McGraw Mem. at 10-11). Without reaching the merits of these arguments, Plaintiffs note that they have explicitly disavowed any claim that S&P is liable as an expert. As stated in the Complaint, "[t]he Ratings Agency Underwriters are not being sued herein pursuant to Section 11(a)(4) as persons who prepared or certified the ratings portion of the Registration Statements." (¶ 36).

sell the Certificates with AAA ratings," (¶ 36), and the failure to disclose this role in registration statements[5] (¶ 173).

To further bolster its argument that it is exempted from Section 11, Moody's cites a one-page, unreported opinion from California, which suggests that underwriter liability should be construed narrowly. (Moody's Mem. at 12 (citing *In re Jenny Craig Sec. Litig.*, Civ. No. 92-0845, 1994 U.S. Dist. LEXIS 19781, at *1 (S.D. Cal. Nov. 22, 1994)). This interpretation sharply contrasts with cases in this jurisdiction holding that Section 11 underwriter liability is, in fact, broad in scope. *See, e.g., SEC v. Universal Express, Inc.*, 475 F. Supp. 2d 412, 431 (S.D.N.Y. 2007) (stating that "[t]he term [underwriter] should be 'broadly defined to include anyone who directly or indirectly participates in a distribution of securities from an 'issuer' to the public'" (quoting *SEC v. N. Am. Research & Dev. Corp.*, 424 F.2d 63, 72 (2d Cir. 1970))); *In re Refco, Inc. Sec. Litig. ("Refco I")*, 503 F. Supp. 2d 611, 629 (S.D.N.Y. 2007) (noting that "[t]he term 'underwriter' in the Securities Act has been broadly interpreted"). As discussed in Section I.B below, the RA Defendants fall squarely within the definition of underwriters in

---

[5]     Moody's also asserts that in addition to being protected under Rule 436(g), its ratings "are opinions that cannot, under the First Amendment, form the basis for liability." (Moody's Mem. at 12 n. 14). Again, Plaintiffs' allegations address the RA Defendants' liability for their collaboration with Lehman in structuring the securitized transaction and not as experts for the ratings included in registration statements. (¶¶ 33, 34, 36). Moreover, the authorities Moody's relies upon for its First Amendment argument ***do not*** unequivocally state that ratings cannot form a basis for liability. *In re Enron Corporation Securities, Derivative & ERISA Litig.*, for example, cited by Moody's, states that, although "courts generally have shielded [credit rating agencies] from liability for allegedly negligent ratings for various reasons," "there is no automatic, blanket, absolute First Amendment protection for reports from the credit rating agencies based on their status as credit rating agencies." 511 F. Supp. 2d 742, 817 (S.D. Tex. 2005).

Additionally, in *LaSalle Nat'l Bank v. Duff & Phelps Credit Rating Co.*, 951 F. Supp. 1071 (S.D.N.Y. 1996), the court rejected the "actual malice" standard, which Moody's argues for here, finding it inapplicable to a credit reporting agency. *Id.* at 1097 (citing *Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*, 472 U.S. 749, 762 (1985)). Indeed, the *LaSalle* court endorsed the court's opinion in *In re Taxable Municipal Bond Sec. Litig.*, Civ. No. MDL 863, 1993 U.S. Dist. LEXIS 18592 (E.D. La. Dec. 29, 1993). In *In re Taxable Municipal Bond*, the court rejected an argument by S&P that its ratings, which were incorporated into public offering materials, were protected by the First Amendment. 1993 U.S. Dist. LEXIS 18592, at *4-5 (stating that "the Fifth Circuit has held that statements about creditworthiness and even predictions may be actionable under the federal securities laws"); *see also In re Fitch, Inc.,* 330 F.3d 104, 108-09 (2d Cir. 2003) (affirming order requiring rating agency Fitch to respond to subpoena on basis that journalist privilege under First Amendment did not apply to Fitch where it was paid to provide rating and was motivated by "client needs" rather than "newsworthiness").

Section 2(a)(11) of the Securities Act.  *See* 15 U.S.C. § 77(b)(a)(11).  The RA Defendants cannot couple Rule 436(g) with definitions of 'underwriter' that conflict with this Court's precedent in order to avoid liability.

       **B.**     **Plaintiffs Adequately Allege that the RA Defendants
Were Engaged in the Distribution Process and
<u>Are Therefore "Underwriters" Under Section 11</u>**

              **1.**     **The RA Defendants Were Engaged in Steps
<u>Necessary to the Distribution of the Certificates</u>**

The RA Defendants present several arguments in an attempt to demonstrate that, contrary to Plaintiffs' assertions, they are not underwriters.  Despite the RA Defendants' insistence that underwriters must actually buy and sell the securities involved (Moody's Mem. at 17; McGraw Mem. at 13-14), their definition of "underwriter" is far more narrow than that of the Second Circuit.  Although the RA Defendants attempt to restrict the definition of 'underwriter' in order to exclude themselves from liability, they were clearly engaged in activities traditionally associated with underwriters.  Moreover, Plaintiffs present more than enough factual allegations in their Complaint to demonstrate that their claims are "plausible on [their] face," which is all they are required to do.  *Twombly*, 550 U.S. at 570.  Accordingly, the RA Defendants' motions to dismiss the Section 11 underwriter claims should be denied.

The RA Defendants first argue that in order to be an underwriter, one must be engaged in "distribution," and that underwriters are mere "conduits" for the securities being offered.  (*See* Moody's Mem. at 14-15 (citing *Berckeley Inv. Group, Ltd. v. Colkitt*, 455 F.3d 195, 214-15 (3d Cir. 2006); *Ackerberg v. Johnson*, 892 F.2d 1328, 1335-36 (8th Cir. 1989)); McGraw Mem. at 12 (citing *In re Lorsin, Inc.*, 82 S.E.C. Docket 3044, Release No. 250 (May 11, 2004); *SEC v. Lybrand*, 200 F. Supp. 2d 384, 393 (S.D.N.Y. 2002); *Ackerberg*, 892 F.2d at 1336-37))).  These decisions emphasize the necessity of a "distribution," however, only to distinguish public

offerings, to which Section 11 liability may attach, from private offerings exempt from Section 11 under Section 4(1) of the Securities Act. These decisions do *not* hold that, within the context of a public offering, Section 11 liability may only attach to those who are involved in the "distribution" of the subject securities. *See*, *e.g.*, *Ackerberg*, 892 F.2d at 1335-36 (asserting that defendant's possible underwriter status depends on whether transaction was a private offering or a public "distribution"); *Berckeley Inv. Group*, 455 F.3d at 212-15 (explaining that plaintiff's possible underwriter status depends on whether there was a "distribution," *i.e.*, "public offering"). Where, as here, a public offering or "distribution" has unquestionably taken place, the RA Defendants may not claim immunity by asserting that they were not part of that "distribution."

Moreover, although the definition of 'underwriter' may be linked to distribution, it does not include only those who "purchas[e] securities from an issuer with a view to their resale," as defendants argue. (Moody's Mem. at 16; McGraw Mem. at 17 (citing *In re Refco, Inc. Sec. Litig.,* Civ. No. 05-8626, 2008 U.S. Dist. LEXIS 62543, at *4 (S.D.N.Y. Aug. 14, 2008) ("*Refco II*"))). Rather, the term 'underwriter' has been defined by the Second Circuit to encompass a person "who is 'engaged in steps necessary to the distribution of securities.'" *Kern*, 425 F.3d at 152 (quoting *SEC v. Chinese Consol. Benevolent Ass'n, Inc.*, 120 F.2d 738, 741 (2d Cir. 1941)). As the Complaint alleges in detail, the RA Defendants were integrally involved in "steps necessary" in order to bring the securities to market. (¶¶ 15, 173). In the words of one of the decisions cited by the RA Defendants themselves, the RA Defendants "perform[ed] some act (or acts) that facilitate[d] the issuer's distribution." *Ingenito v. Bermec Corp.*, 441 F. Supp. 525, 536 (S.D.N.Y. 1977).

Courts have also held that a person need not actually buy or sell securities in order to qualify as an underwriter, so long as the person played a "necessary" role in the distribution. *See Harden v. Raffensperger*, 65 F.3d 1392, 1400-01 (7th Cir. 1995); *Special Situations Fund, III, L.P. v. Cocchiola*, Civ. No. 02-3099, 2007 U.S. Dist. LEXIS 56627, at *5 (D.N.J. Aug. 3, 2007) (citing same). In *Harden v. Raffensberger*, the defendant Raffensberger was retained as a "qualified independent underwriter" pursuant to National Association of Securities Dealers rules to perform due diligence on the registration statement and recommend a minimum yield. At no point did Raffensperger purchase, offer, or sell any of the securities involved. *Harden*, 65 F.2d at 1395. Nonetheless, the Seventh Circuit found that Raffensperger qualified as an underwriter because "its role … was 'necessary to the distribution of [the Firstmark] securities.'" *Id.* at 1401 (quoting *SEC v. Holschuh*, 694 F.2d 130, 139 n. 13 (7th Cir. 1982)). Although the RA Defendants might not have purchased securities, as in *Harden* they were pivotally engaged in "steps necessary to the distribution" of the Certificates. Indeed, without their collaboration with Lehman to rate the Certificates, Lehman would not have been able to offer the Certificates for sale. (¶¶ 14, 57, 66). The RA Defendants fall squarely within the definition of 'underwriter,' as endorsed by the Second Circuit, as one who is engaged in "steps necessary to the distribution." *See Kern*, 425 F.3d at 152.

In further support of the argument that they are not underwriters, the RA Defendants attempt to draw parallels between the instant case and the decision in *Refco II*. First, the RA Defendants suggest that *Refco II* is so factually similar to the present case that this Court should reach the same conclusion as Judge Lynch and dismiss Plaintiffs' claims altogether. (Moody's Mem. at 15, 17; McGraw Mem. at 15-16). The facts of *Refco II*, however, are clearly distinguishable from this case. There, plaintiffs alleged that the defendants were liable as

13

underwriters for "merely commenting on a draft of a registration statement for a bond offering in which they took no part in the distribution of the bonds." *Refco II,* 2008 U.S. Dist. LEXIS 62543, at *4. Judge Lynch did not conclude that Section 11 should be read so narrowly as to only include those who purchase securities from the issuer with a view to distribution; his decision only went so far as to say that "[w]hatever conduct may be covered by this language, it cannot easily be read to include … merely commenting on a draft of a registration statement." *Id*. The RA Defendants' involvement in the distribution, by contrast, went far beyond "merely commenting on a draft;" indeed, not only did they participate in producing the Prospectus Supplements, but they were also largely responsible for structuring the securities that were the subject of the registration statement and the distribution. (¶¶ 33, 34, 57, 66, 173-74). The RA Defendants' actions were "necessary steps" to the distribution of the securities.

Moody's also argues that it should not be considered an underwriter because, like the defendants in *Refco II*, it did not "in any way hold [itself] out as evaluating" the Certificates. (Moody's Mem. at 16-17 (quoting *Refco II,* 2008 U.S. Dist. LEXIS 62543, at *5)). Contrary to Moody's assertion, the credit ratings that it ultimately gave to the Certificates were not the only actions by which Moody's held itself out as evaluating the Certificates. Rather, "it was the RA Defendants that largely determined the amount and kind of credit enhancement – rather than merely evaluat[ing] the credit enhancement after the fact." (¶¶ 15, 173). As alleged in the Complaint, Moody's worked with Lehman to form and structure the securitized transactions related to the Certificates. (¶¶ 15, 34). In particular, Moody's "played an 'integral role' in structuring the transactions and instructing the assemblers 'how to squeeze the most profit out' of the MBS by maximizing the tranches with the highest ratings." (¶ 175). Lehman relied on the RA Defendants for their ability to advise Lehman on how to package loans. (¶¶ 168-78).

Moody's assumed the role not just of an assigner of ratings, but of an adviser to issuers on how to structure transactions in order to achieve inflated ratings.

The RA Defendants present several additional arguments in an attempt to undermine Plaintiffs' claims that they were underwriters; these arguments are similarly unpersuasive, and again attempt to analogize the present case to other cases that are simply not comparable. For instance, both RA Defendants attempt to draw parallels between the present case and *McFarland v. Memorex Corp.*, 493 F. Supp. 631 (N.D. Cal. 1980). (Moody's Mem. at 15; McGraw Mem. at 17). In *McFarland*, the plaintiffs attempted to argue that warrant holders who held the right to purchase certain amounts of defendant Memorex's stock prior to a public offering were liable as underwriters. The warrant holders sold these warrants to underwriters, who in turn exercised the warrants and sold the stock through a public offering. *McFarland*, 493 F. Supp. at 644. The warrant holders in *McFarland* were deemed by the court to have "no interest, direct or indirect," in underwriting, and did not play an active role in the underwriting as the RA Defendants have in this case. *Id*. at 646.

Here, unlike in *McFarland*, the RA Defendants not only played a pivotal role in structuring the securitized loans and creating and disseminating the Prospectus Supplements, but also had a strong financial interest in the offering. Unlike the defendants in *McFarland*, the RA Defendants should be subject to Section 11 liability as underwriters because they "h[e]ld themselves out as professionals who are able to evaluate the financial condition of the issuer," and because they "exercised control over the content of the registration statement." *Id.* The RA Defendants were relied on for their ability to advise Lehman on how to compose and structure the securitized transactions in order to obtain optimal ratings with the least amount of loss

15

coverage and credit enhancement, and their compensation was conditioned on providing this assistance. (¶¶ 33, 34, 36, 172-81).

Finally, S&P argues that Lehman was the underwriter and was identified as such in the registration statement, and that S&P was not because it had no "contact" with the public. (McGraw Mem. at 14-15). As a threshold matter, underwriters do not cease being underwriters merely because they are not identified as such. Additionally, however, Plaintiffs allege that although Lehman might have been the party identified in the Offering Documents as the underwriter, the Offering Documents failed to disclose the fact that the RA Defendants actually performed many of the traditional underwriting functions. (¶¶ 15, 33, 34, 36, 172-78). Those functions included "contact" with the public, not just through their ratings, but through their participation in producing the Offering Documents. *Id.* For this participation and for their work in structuring the Certificates, the RA Defendants are liable under Section 11 as underwriters.

### 2. Plaintiffs' Comprehensive Factual Allegations of Underwriter Status are "Facially Plausible"

In *Twombly*, the Supreme Court held that in order to survive a motion dismiss, a plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." 550 U.S. at 570. *Twombly*'s requirement of "facial plausibility" is satisfied "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. __, 129 S. Ct. 1937. Plaintiffs have more than satisfied this requirement as to allegations that the RA Defendants are 'underwriters' as defined by the Securities Act.

Nonetheless, the RA Defendants attempt to undermine Plaintiffs' claims by arguing that they are "conclusory." (Moody's Mem. at 17; McGraw Mem. at 15-16). Both RA Defendants compare Plaintiffs' claims to the claims of the plaintiffs in *Refco I* which were initially

dismissed. (Moody's Mem. at 17; McGraw Mem. at 15-17). Here, however, Plaintiffs' claims are clearly distinguishable from those that were found inadequate by the court in *Refco I*.

In contrast to *Refco I*, where the court found that a "single sentence" alleging that the defendants had participated in preparing the registration statement was insufficient to plead that defendants acted as underwriters, 503 F. Supp. 2d at 629-30, Plaintiffs have presented numerous factual allegations in support of their claim that the RA Defendants acted as underwriters. Plaintiffs here have alleged, *inter alia*, that the RA Defendants were largely responsible for determining "the composition of the securitized pool of loans, the amount and form of the Certificates' level of credit enhancement," (¶ 18); that they "participated in the drafting and dissemination of the Prospectus Supplements" and took part in "forming and structuring the securitization transactions related to the Certificates, and then provided pre-determined credit ratings for the Certificates," (¶¶ 33-34); and that they were instrumental "in determining which mortgage loans to be included and excluded from the underlying collateral and composition of the Certificate credit enhancement needed in order to sell the Certificates with AAA ratings" (¶ 36). These factual allegations bear no resemblance to the "single sentence" alleging participation in preparation of the registration statement that the court found inadequate in *Refco I. See Refco I*, 503 F. Supp. 2d at 629-30.

McGraw also attempts to equate Plaintiff's factual allegations with the "bare pleadings" that were found inadequate in *In re Adelphia Commc'ns Corp. Sec. & Derivative Litig.*, Civ. No. 03-MD-1529 (LMM), 2007 U.S. Dist. LEXIS 66911 (S.D.N.Y. Sept. 10. 2007). (McGraw Mem. at 16-17). As in *Refco I*, Plaintiff's allegations are clearly distinguishable from those that the court found inadequate in *Adelphia*. Plaintiffs in that case broadly alleged that the defendants extended loans to their affiliated underwriting banks, "induced and structured" public offerings,

and had "direct or indirect participation" in the distribution of securities. *In re Adelphia Commc'ns*, 2007 U.S. Dist. LEXIS 66911, at *8. These claims, devoid of any additional factual detail, are simply not comparable to the specific factual allegations that Plaintiffs have included in their Complaint here.

Finally, Moody's reliance on *Schuh v. Druckman & Sinel, L.L.P,* Civ. No. 07-0366, 2009 U.S. Dist. LEXIS 47185 (S.D.N.Y. Feb 3, 2009), to argue that Plaintiffs' claims are "conclusory" is similarly misplaced. (Moody's Mem. at 17). In *Schuh*, plaintiffs alleged that defendants were statutory "debt collectors," but the complaint was devoid of any facts supporting this allegation. *See Schuh*, 2009 U.S. Dist. LEXIS 47185, at *6-7 (S.D.N.Y. Feb 2, 2009). As discussed above, Plaintiffs' Complaint contains numerous factual allegations in support of its claim that Moody's was an underwriter. (¶¶ 34, 36, 56, 57, 168-78). Accepting these allegations as true, which the Court is obliged to do at the motion to dismiss phase, Plaintiffs have stated a claim, "plausible on its face," that the RA Defendants acted as underwriters. *Twombly*, 550 U.S. at 570.

## II. THE RA DEFENDANTS ARE "SELLERS" WITHIN THE MEANING OF SECTION 12(a)(2)

The RA Defendants' arguments that they are not sellers under Section 12(a)(2) of the Securities Act are as unconvincing as their Section 11 arguments. In *Pinter v. Dahl*, 486 U.S. 622, 644 (1988), the Supreme Court identified two categories of sellers: direct sellers and solicitation sellers. Although the RA Defendants argue that *Pinter* foreclosed the possibility that they can be liable as sellers, Plaintiffs' factual allegations demonstrate that the RA Defendants *do* fit within the definition of *solicitation seller* as interpreted by courts in this jurisdiction.

## A.    The RA Defendants Solicited the Sale of the Certificates

The RA Defendants assert that in *Pinter*, the Supreme Court unequivocally rejected the notion that those who are a "substantial factor" in a transaction can be liable as sellers under Section 12(a)(2).  (Moody's Mem. at 19-21; McGraw Mem. at 19-22 (citing *Pinter*, 486 U.S. at 649-50)).  Both RA Defendants also insist that one must directly or personally solicit a sale of securities in order to qualify as a solicitation seller.  *Id.*   In making these arguments, the RA Defendants inaccurately characterize Supreme Court precedent and this jurisdiction's interpretation of that precedent.  Although *Pinter* rejected the "substantial factor" test for seller liability under Section 12(a)(1), *see* 486 U.S. at 654, courts post-*Pinter* have imposed liability under Section 12(a)(2) in instances where parties do not directly sell or solicit a sale, but are a "substantial factor" in a sale.

The Second Circuit's decision in *Capri v. Murphy*, 856 F.2d 473, 478-79 (2d Cir. 1988), for example – the very same case that S&P cites for the argument that a party must "actually" solicit a plaintiff's investment (McGraw Mem. at 19-20), supports the proposition that a party need not directly solicit a sale in order to be a seller under Section 12(a)(2).  In that case, the court imposed liability on two defendants, Murphy and Greenwich Coal Company ("GCC"), general partners of Greenwich Coal Associates, who participated in preparing and circulating a prospectus but did not have any direct contact with plaintiffs.  *Id.* at 478.  Although Murphy and GCC argued that they should not be liable as sellers because a third party was the only person who "was in direct communication with plaintiffs," the court nonetheless found Murphy and GCC liable as sellers.  *Id.*

Similarly, although the RA Defendants here might not have had direct contact with Plaintiffs, the RA Defendants, like Murphy and GCC, "participated in the drafting and

dissemination of the Prospectus Supplements." (¶¶ 33-34). They continually collaborated with Lehman to determine, *inter alia*, the loss coverage and credit enhancement that were ultimately included in the Offering Documents. (¶¶ 57, 66). The descriptions of credit enhancements in the Offering Documents contained material misstatements and omissions and were based upon models that had not been updated by the RA Defendants for several years. (¶¶ 58, 159-60). Like the defendants in *Capri*, the RA Defendants here are responsible for material misstatements and omissions in the Prospectuses that "significantly affected the risk undertaken by the investors." 856 F.2d at 478; *see also,* ¶ 298 (alleging that the "Ratings Agency Underwriters promoted and sold the Certificates pursuant to the defective Prospectuses…. The Prospectuses contained untrue statements of material fact, omitted to state facts necessary to make statements not misleading, and concealed and failed to disclose material facts"). Through these actions, the RA Defendants did "actually solicit[]" Plaintiffs' investment. 856 F.2d at 479. Therefore, they are liable as sellers under Section 12(a)(2).

In addition, in *In re Am. Bank Note Holographics Sec. Litig.*, 93 F. Supp. 2d 424 (S.D.N.Y. 2000), the court held that a defendant does not have to directly solicit a sale to be considered a seller under Section 12(a)(2) "where significant involvement in the solicitation is found." 93 F. Supp. 2d at 439 n.4. There, the court reasoned that even though the defendant could not and did not itself transfer title to the securities, it "nonetheless actively solicited the sale of the shares through participation in preparation of the registration statement and prospectus and road shows." *Id.* at 439. The court further commented that it is not an "absolute" requirement that a defendant must personally solicit a sale from a plaintiff in order to qualify as a

"solicitor" under Section 12(a)(2); rather, "where significant involvement in the solicitation is found, a defendant may be liable under Section 12(a)(2)." *Id.* at 439 n.4.[6]

Through their roles as underwriters, the RA Defendants were "significantly involved" in the solicitation of sales. As discussed above, the RA Defendants participated in the drafting of the Prospectus Supplements, and worked with Lehman to determine how the loan packages would be structured. (¶¶ 33, 34, 57, 66). They were instrumental in determining the loss coverage and credit enhancements, both of which were critical to the Offering Documents and necessary for the ultimate sale of the Certificates. (¶ 57 (alleging that "[i]t was the level of credit enhancement described in the Offering Documents which provided the justification to investors of an award of an AAA rating")). Accordingly, the RA Defendants satisfy the solicitation requirement of Section 12(a)(2).

The RA Defendants' activities in soliciting the sale of securities bear a strong resemblance to the activities found to satisfy the seller requirement in *Capri* and *Am. Bank Note Holographics*. By contrast, the cases cited by the RA Defendants for the proposition that a party must participate directly in a sale in order to be liable are easily distinguishable from this case. For example, in *Wilson v. Saintine*, 72 F.2d 1124, 1126 (2d Cir. 1989), cited by Moody's, the defendant's "participation in the sale consisted solely of the ministerial act of mailing a copy of the private placement memorandum." (Moody's Mem. at 18-19). In contrast, the RA Defendants' involvement here, in collaborating with Lehman to structure the securitized transactions, far exceeds what could be considered "ministerial." Moody's also cites *Dorchester Investors v. Peak Int'l Ltd.*, 134 F. Supp. 569 (S.D.N.Y. 2001), for the proposition that even

---

[6]     In *McMahan & Co. v. Wherehouse Entertainment, Inc.*, 859 F. Supp. 743 (S.D.N.Y. 1994), *rev'd in part on other grounds*, 65 F.3d 1044 (2d Cir. 1995), the court also held that direct contact was not necessary in order to be liable as a solicitation seller. In that case, which also post-dates *Pinter*, the court opined: "[t]here need be no direct contact between a plaintiff and defendant, provided that the defendant, with scienter, participated in the sale of securities." 859 F. Supp. at 755.

those who have extensive involvement in a transaction are not "statutory sellers" under Section 12(a)(2). (Moody's Mem. at 18-19). As Moody's itself concedes, however, it appears that the plaintiffs' sole allegations supporting the claim of Section 12(a)(2) liability in *Dorchester Investors* were that the defendant's name appeared frequently in the Prospectus and that the defendant was identified as a person upon whom the success of the defendant company depended. *Id.* at 580. Again, the lengthy factual allegations detailed in Plaintiffs' Complaint much more closely mirror the facts of *Capri* and *Am. Bank Note Holographics*, where courts found seller liability.

Finally, the RA Defendants argue that Plaintiffs' allegations of their actions in soliciting the sale of securities disregard *Pinter*'s requirement that the focus be on "the defendant's relationship with the plaintiff-purchaser," and not merely the "defendant's degree of involvement in the securities transaction." (Moody's Mem. at 21-22; McGraw Mem. at 19-20 (citing *Pinter*, 486 U.S. at 651)). As discussed above, however, Plaintiffs' Complaint contains detailed allegations of the RA Defendants' involvement in the creation of the Offering Documents, including the Prospectus Supplements. These documents were directed at purchasers and were the indispensable means by which sales were solicited. Through its integral involvement in composing these documents, the RA Defendants did "actually" and "actively" solicit the sale of securities. (McGraw Mem. at 19-20 (citing *Capri*, 856 F.2d at 479; *Pinter*, 486 U.S. at 646-48)).

**B.      The RA Defendants' Solicitation was Motivated by Financial Interests**

The RA Defendants also satisfy the second requirement for being a solicitation seller: they "successfully solicit[ed] the purchase [of the Certificates], motivated … by a desire to serve [their] own financial interests" and those of Lehman, "the securities owner." *Pinter*, 486 U.S. at 647. As detailed in Plaintiffs' Complaint, packaging the loans in order to obtain an optimal

credit enhancement was crucial to Lehman's ability to sell the Certificates. (¶ 57). In order to obtain this optimal rating, Lehman "shopped" around among the credit ratings agencies, ultimately engaging only those agencies that would require the least amount of loss coverage and credit enhancement and offer the highest number of AAA-designated Certificates. (¶ 66). The RA Defendants had a direct financial interest in "successfully soliciting" the purchase of securities through the Offering Documents; if the information provided by the RA Defendants was not incorporated into these documents, the RA Defendants would not be compensated. (¶¶ 61, 66). In addition, they were motivated to serve Lehman's financial interests, because the RA Defendants' own financial success was bound up with Lehman's ability to offer the Certificates. (¶¶ 57, 179-83). The RA Defendants' sale of the Certificates, motivated by a desire to serve their own financial interests and those of Lehman, qualifies them as solicitation sellers under *Pinter*.

**C.      Plaintiffs' Factual Allegations of Seller Status Are "Facially Plausible"**

Both RA Defendants also suggest that Plaintiffs' Section 12(a)(2) claims are nothing more than conclusory allegations. As with their Section 11 claims, however, Plaintiffs more than satisfy *Twombly*'s requirement that they "state a claim to relief that is plausible on its face." 550 U.S. at 570. The detailed factual allegations contained in Plaintiffs' Complaint simply cannot be compared to the sparse allegations contained in the cases that the RA Defendants cite.

First, the RA Defendants argue that *Shain v. Duff & Phelps*, 915 F. Supp. 575 (S.D.N.Y. 1996), is dispositive of this case, because it, too, involved claims that a credit ratings agency was a solicitation seller. (Moody's Mem. at 20-21; McGraw Mem. at 20-21). In *Shain*, the plaintiffs' allegations of solicitation amounted to claims that the credit ratings agency had provided information to two brokers, who in turn provided this information to the plaintiff

purchasers. *Shain*, 915 F. Supp. at 581. As discussed in section II(A) *supra*, however, direct or personal contact with a plaintiff is not an "absolute" requirement for solicitation liability. *Am. Bank Note Holographics,* 93 F. Supp. 2d at 439 n. 4. Moreover, although plaintiffs in *Shain, supra,* sought to hold a credit rating agency liable as a seller under Section 12(a)(2), the factual allegations upon which the court declined to extend seller liability in that case are markedly lacking in substance compared to Plaintiffs' allegations here. Unlike in this case, the plaintiffs in *Shain* did "not allege[] that Duff & Phelps created, drafted, distributed or had anything to do with Tower's Offering Memoranda." *Shain*, 915 F. Supp. at 582. Plaintiffs' Complaint contains numerous factual allegations of the RA Defendants' involvement in the creation and drafting of the Offering Documents. (¶¶ 33, 34, 57, 66, 159). Accepting Plaintiffs' factual allegations as true, as the Court is bound to do, Plaintiffs have sufficiently pled facts alleging solicitation.

The RA Defendants' remaining cases are similarly distinguishable, as they contain minimal, if any, factual allegations that defendants were solicitation sellers. *See Credit Suisse First Boston Corp. v. Arm Fin. Group, Inc.*, Civ. No. 99-2046, 2001 U.S. Dist. LEXIS 3332, at *10 (S.D.N.Y. Mar. 28, 2001) (stating that where plaintiffs failed to show defendant ARM was a direct seller, "[t]he complaint's bald allegation of solicitation, standing alone, does not suffice for pleading purposes"); *In re Deutsche Telekom AG Sec. Litig.*, Civ. No. 00-9475, 2002 U.S. Dist. LEXIS 2627, at *4 (S.D.N.Y. Feb. 20, 2002) (stating that complaint contained no factual allegations of specific conduct to solicit purchases, but, rather, unsupported statements that the parties were sellers within the meaning of Section 12(a)(2)), *In re Prestige Brands Holding, Inc.*, Civ. No. 05-06924, 2006 U.S. Dist. LEXIS 46667, at *10 (S.D.N.Y. July 10, 2006) (finding plaintiff not liable as direct seller because he did not pass title and not liable as solicitation seller because complaint contained no "averment" of solicitation); *Steed Fin. LDC v. Nomura Sec.*

*Int'l, Inc.*, Civ. No. 00-8058, 2001 U.S. Dist. LEXIS 14761, at *7 (S.D.N.Y. Sept. 20, 2001) (finding complaint inadequately alleged solicitation seller status where no "specific facts" to directly solicit sales were alleged). Plaintiffs' Complaint, by contrast, contains numerous factual allegations to support their claims that the RA Defendants were solicitation sellers. (¶¶ 33, 34, 57, 66, 159, 298). Plaintiffs' claims are not the "bald allegations" defendants say they are. (Moody's Mem. at 21-22; McGraw Mem. at 22).[7]

### III.    PLAINTIFFS' CLAIMS ARE NOT TIME BARRED.

The RA Defendants argue that Plaintiffs' claims are barred by the inquiry notice portion of Section 13 of the Securities Act, 15 U.S.C. § 77m. (Moody's Mem. at 25-32; McGraw Mem. at 22-27). As discussed below, the RA Defendants' reliance on sheer volume of general mortgage industry reports yields no secure footing for a finding of inquiry notice as a matter of law. Common principles of law, coupled with a fair reading of the RA Defendants' exhibits, and others submitted herewith, demonstrate the timeliness of Plaintiffs' claims.

The RA Defendants also argue that Plaintiffs' claims are barred by the statute of repose portion of Section 13 of the Securities Act, 15 U.S.C. § 77m. (Moody's Mem. at 25-32; McGraw Mem. at 22-27). The RA Defendants' statute of repose argument for Plaintiffs' Section 11 claims against them is limited to only nine of the 94 Offerings at issue. The RA Defendants do not dispute that Section 11 claims brought in connection with the remaining 85 Offerings are timely. The RA Defendants' statute of repose argument for Plaintiffs' Section 12 claims against

---

[7]      Moody's also cites a string of cases as instances in which a court dismissed plaintiffs' claims for lack of "specific factual allegations averring that the defendant engaged in the actual, direct, personal solicitation of the plaintiff." (Moody's Mem. at 19). However, the allegations in these cases were almost entirely devoid of facts altogether. At best, these complaints included conclusory allegations that parties "assisted" in a sale, *HB Holdings Corp. v. Scovill, Inc.*, Civ. No. 88-7983, 1990 U.S. Dist. LEXIS 3341, at *5 (S.D.N.Y. Mar. 26, 1990); "made [the] sale of securities possible," *Dietrich v. Bauer*, 76 F. Supp. 2d 312, 330 (S.D.N.Y. 1999); or "facilitated" a transaction, *Forsberg v. Always Consulting, Inc.*, Civ. No. 06-1348, 2008 U.S. Dist. LEXIS 105779, at *12 (S.D.N.Y. Dec. 31, 2008). In comparison, Plaintiffs adequately allege detailed factual allegations supporting their claim that Moody's and S&P were solicitation sellers under Section 12(a)(2). (¶¶ 33, 34, 57, 66, 298).

them similarly is limited to only eight of the 94 Offerings at issue, and Plaintiffs' claims regarding the remaining 86 Offerings are timely.

A.      **The Standard for Inquiry Notice**

Section 13 of the 1933 Act governs the timeliness of claims brought pursuant to Sections 11 and 12(a)(2) and provides, in relevant part, that "[n]o action shall be maintained … under [Section 11 or 12(a)(2)] unless brought within one-year after the discovery of the untrue statement or omission, or after such discovery should have been made by the exercise of reasonable diligence …." 15 U.S.C. § 77m. The date for the purpose of determining whether inquiry notice was triggered is February 23, 2008 – one-year before Plaintiffs first filed their claims against the RA Defendants.

To demonstrate that Plaintiffs had such inquiry or constructive notice, the RA Defendants are required to present evidence of so called "storm warnings." *Staehr v. The Hartford Fin. Servs. Group, Inc.*, 547 F.3d 406, 427 (2d Cir. 2008). These storm warnings must be *directly* related to the legal claims such that they would apprise a person of reasonable intelligence of *probable* wrongdoing and legal claims. *Shah v. Meeker*, 435 F.3d 244, 249 (2d Cir. 2006) (storm warnings exist only when the available information makes wrongdoing "probable, not merely possible").[8]

In order for courts to find inquiry notice as a matter of law at the motion to dismiss stage, defendants must present *uncontroverted* evidence the plaintiff should have discovered the wrongdoing and legal claims. *See In re Initial Pub. Offering Sec. Litig.*, 341 F. Supp. 2d 328, 347 (S.D.N.Y. 2004) ("Unless Defendants can produce 'uncontroverted evidence [that]

---

[8]      To trigger the duty of inquiry, the storm warnings must "relate directly" to the misrepresentations and omissions on which the plaintiffs base their claims, but they "need not detail every aspect" of the alleged scheme. *Id*. (citations omitted).

irrefutably demonstrates when Plaintiff discovered or should have discovered the fraudulent scheme,' they cannot satisfy the heavy burden of establishing inquiry notice as a matter of law.'") (citation omitted).[9]

Where defendants offer reasonable words of comfort or otherwise controvert the basis for any claim, the storm warnings become "controverted" and inquiry notice is defeated. *See In re Moody's Corp. Sec. Litig.*, 599 F. Supp. 2d 493, 506 (S.D.N.Y. 2009) (plaintiffs are not put on inquiry notice when they "reasonably rely" on "reliable words of comfort from management"); *see also Lapin v. Goldman Sachs Group, Inc.*, 506 F. Supp. 2d 221, 234 (S.D.N.Y. 2006) ("A plaintiff may not be considered to have been placed on inquiry notice, 'despite the presence of some ominous indicators,' when 'the warning signs are accompanied by reliable words of comfort from management.'" (quoting *In re Alstom SA Sec. Litig.*, 406 F. Supp. 2d 402, 421 (S.D.N.Y. 2005))).[10]

It is because issues of inquiry notice are so fact intensive that they are typically not decided on a motion to dismiss absent extreme circumstances. *See, e.g., In re Sumotomo Copper Litig.*, 120 F. Supp. 2d 328, 347 (S.D.N.Y. 2000) ("Southern District courts have variously described defendants' burden in this regard as 'extraordinary' and appropriate only in 'extreme circumstances'").[11] Indeed, the issues of whether media coverage apprised investors of claims

---

[9]    *Accord Nivram Corp. v. Harcourt Brace Jovanovich, Inc.*, 840 F. Supp. 243, 249 (S.D.N.Y. 1993) ("defendants bear a heavy burden in establishing that the plaintiff was on inquiry notice as a matter of law. Inquiry notice exists only when *uncontroverted evidence* irrefutably demonstrates when a plaintiff discovered or should have discovered the fraudulent conduct."); *Newman v. Warnaco Group, Inc.*, 335 F.3d 187, 193-95 (2d Cir. 2003) (defendants "bear a heavy burden in establishing that plaintiff was on inquiry notice as a matter of law."); *Alameda v. Nuveen Municipal High Income Opportunity Fund*, Civ. No. 08-4575, 2009 U.S. Dist. LEXIS 42637, at *25-26 (N.D. Cal. May 20, 2009) (statute of limitations arguments were premature and could not be resolved on the pleadings because "[t]he question of whether the plaintiff exercised reasonable diligence in investigating the facts underlying the alleged fraud ... necessarily entails an assessment of the plaintiff's particular circumstances from the perspective of a reasonable investor") (citation omitted).

[11]    *See also In re Ames Dep't Stores, Inc.*, 991 F.2d 968 (2d Cir. 1993) (reversing grant of summary judgment on statute of limitations grounds despite approximately fifteen news reports or articles presenting facts relevant, but more simplistic, than the facts forming the basis of the complaint).

arising from alleged conflicts of interest between analysts and their financial institutions and from the alleged non-independence of Moody's have been determined to be factual issues which could not be resolved on a motion to dismiss. For example, in *In re Moody's Corp*, 599 F. Supp. 2d at 506-07, Judge Kram examined an extensive record of public statements concerning potential conflicts of interest in the credit-ratings industry and held that plaintiffs were not put on inquiry notice. There, the statements cited by defendants either referred to the credit ratings industry in general without specific reference to Moody's, or else only identified "possible mismanagement of conflicts of interest," which Judge Kram held to be insufficient to raise the *probability* of fraud necessary to trigger inquiry notice. *Id.* at 506.[12]

In sum, the RA Defendants face a heavy burden when seeking dismissal of claims at the motion to dismiss stage based upon the triggering of inquiry notice. Whereas reports of industry-wide, or even company-specific, problems or conflicts of interest may give rise to a *possibility* of wrongdoing, courts routinely deny statute of limitations claims when the available information is not so directly related to the heart of the omissions or misstatements as to give rise to the requisite *probability* of wrongdoing.

---

[12] Indeed, the widespread reporting on conflicts of interest amongst various financial and ratings institutions has seldom formed the basis for inquiry notice at the motion to dismiss stage. In *Fogarazzo v. Lehman Brothers, Inc.*, 341 F. Supp. 2d 274 (S.D.N.Y. 2004), at issue were allegations of fraudulently optimistic ratings reports due to conflicts between the defendants' research and investment banking departments. Lehman Brothers and the other defendants there argued that the claims were barred as untimely because of widespread media reports detailing analysts' conflicts of interest. *Id.* at 297. The Court denied the motion, holding that "[w]hile such reports indicate a tension created by analysts' placement within firms that derive a large proportion of their revenue from investment banking business, they do not suggest the widespread fraud alleged here – they only provide the background." *Id.* at 300. "At most," Judge Scheindlin stated, "those reports should have instilled in plaintiffs a healthy skepticism towards research reports; they did not reveal a 'probability' of fraud." *Id.* In *Teamsters Local 445 Freight Division Pension Fund v. Bombardier Inc.*, Civ. No. 05-1898 (SAS), 2005 U.S. Dist. LEXIS 19506 (S.D.N.Y. Sept. 6, 2005), Judge Scheindlin denied the motion to dismiss, finding that defendants had not met their burden of showing inquiry notice as a matter of law, and finding that poor Certificate performance "alone is not an indication of securities fraud" and notice of 'aggressive underwriting practices' and 'combination of underwriting and servicing problems' does not amount to 'routine disregard [for] all underwriting guidelines ... at the direction of senior management.' Notification of a problem is not necessarily notification of fraud. *Id.* at *9.

**B.** **Plaintiffs Did Not Have Inquiry Notice of a Probable Legal Claim against the RA Defendants Prior to February 23, 2008**

**1.** **No "Probable" Legal Claim Existed against the RA Defendants Until After Issuance of the July 2008 SEC Report *and* Completion of October 2008 Oversight Testimony**

For Plaintiffs to have had notice of "probable" Securities Act claims against the RA Defendants, two distinct kinds of detailed factual information would have had to emerge. First, detailed facts evidencing that the RA Defendants acted not merely as ratings agencies but rather as underwriters and sellers in creating and structuring the Certificates would have been required. This highly unusual factual predicate only began to emerge credibly in the July 2008 SEC Report. This Report followed a year-long investigation by the SEC of the two RA Defendants in particular and involved "extensive on-site interviews with the ratings agencies' staff, including … managers, initial ratings analysts and surveillance analysts…" and review of more than two million pages of internal documents.[13]

Second, in order to have notice of "probable" Securities Act claims against the RA Defendants, detailed facts supporting (1) the existence of material undisclosed conflicts of interest including, most prominently, the ratings shopping practices used to engage the RA Defendants; (2) their use of outdated models to determine RMBS credit support; and (3) the systematic disregard for stated Guidelines which adversely impacted the Certificates would have had to emerge. These critical facts did not emerge until the completion of the testimony at the Oversight Committee in October 2008. It was in this testimony that the detrimental effects of

---

[13] The news articles upon which the RA Defendants purport to rely to demonstrate the RA Defendants' "probable" structuring activities prior to February 23, 2008 do not specifically identify the RA Defendants in each case or explain the manner in which they participated in so-called creating or structuring of RMBS. For example, both S&P and Moody's point to a September 2007 Conde Naste article. (Moody's Mem. at 31; McGraw Mem. at 15 n.9). The article never mentions S&P and only speaks of the RA Defendants' "bigger role" in the subprime mortgage meltdown in generalities. Further, this article merely discusses a Moody's presentation to an anonymous group of Russian investors regarding unidentified securities – which clearly is insufficient to demonstrate Moody's probable structuring role with respect to the Certificates.

ratings shopping was confirmed for the first time by a former Moody's managing director (among other witnesses)[14] (¶ 170) and a former S&P managing director confirmed for the first time that S&P had used outdated models in MBS issuances.[15] (¶¶ 164-67). Finally, the detrimental impact of the defective underwriting on the Certificates in particular only emerges with the downgrades and these downgrades occurred substantially *after* February 2008.

### 2. General News Articles on the Subprime Originators Do Not Demonstrate a Probable Claim on the Certificates

As to the loan originator omissions, absent from the RA Defendants' briefs and the articles cited therein is the recognition that reports about general loan underwriting standards of even the very originators identified in the Complaint are divorced from the asset-backed securitization context so integral to Plaintiffs' claims. Articles generally about the subprime industry's woes do not lead to the *probability* that the misstatements and omissions alleged in the Complaint likely occurred. *See, e.g.,* Affidavit of Joshua M. Rubins in Support of Defendant Moody's Corporation's Motion to Dismiss ("Rubin Aff."), Ex. C (regarding approvals of bad loans, with no mention of either a Defendant in this action or MBS).

The fact is that Plaintiffs and the Class were purchasers of asset-backed securities – bonds that were purportedly the result of several layers of due diligence above and beyond

---

[14]    McGraw-Hill, in fact, offers no argument or evidence in their motion to dismiss that Plaintiffs were on inquiry notice regarding the RA Defendants' ratings shopping practices before February 23, 2008. On the other hand, Moody's' evidence demonstrating "probable" ratings shopping prior to February 23, 2008 is clearly inadequate. Moody's relies on an August 2007 article in *The Wall Street Journal* which merely stated that "claims" were made that underwriters took their business to "another rating company if they couldn't get the rating they needed," and quoted a former ratings agency employee as saying "It was always about shopping around." Moody's Mem. at 31. Even the most generous reading of this article falls far short of disclosing a practice systematically deployed by both firms whereby proposed ratings were submitted as part of the competitive bid for the engagement. (¶¶ 66-67).

[15]    An April 2008 article in *The New York Times* revealed for the first time that Moody's had used outdated models in its work on MBS. (¶¶ 162-63). The RA Defendants argue that Plaintiffs were on notice of a probable claim when new methodologies were announced in April and July 2007 (Moody's Mem. at 30) – but obviously the announcement of new models is not an indication that the old models were deficient so as to put the public on notice of the latter. As reflected in *The New York Times* article that emerged one year later, the inadequacy of the old Moody's model was a far different matter requiring separate disclosure.

compliance with the originator's underwriting standards. Each level of due diligence offered to the MBS investor, by design, was comfort that the specific loans that comprised the security were in accordance with the stated underwriting guidelines. In that regard, general articles about the underwriting standards of Countrywide, IndyMac, or any other originator must be viewed through the lens of the Plaintiffs who were purchasing specific loan pools that had supposedly been vetted multiple times, and by multiple parties to the transaction.

The various Prospectus Supplements not only identified the Originators and first tier servicers of the loans, they also identified a Master Servicer who was supposed to monitor the performance of the servicers of the mortgage loans (who were usually the same entities as the originators). Moreover, the Prospectus Supplements touted the fact that "under each servicing agreement, the Master Servicer was obligated to terminate a servicer for certain events of default which indicate that the servicer was not performing, or was unable to perform, its duties under the applicable servicing agreement." Rubin Aff., Ex. B at S-65. LBHI, through its affiliates, also offered the built-in assurances of its due diligence activities.

Finally, though, the best assurance that the specific pool of loans making up a particular issuance was unlikely to suffer surprising default rates was the fact that the supposedly-independent RA Defendants had thoroughly examined the portfolios and offered the imprimatur of their stellar ratings. This is very important, because whatever problems Countrywide, for example, may have reportedly been experiencing with some of its subprime loans, ultimately the RA Defendants' highest ratings provided the kind of reassurance to investors that absolutely disquieted any concerns about the underlying collateral. In an article appearing in the *Wall Street Journal* on August 31, 2007 called "Don't Blame the Ratings Agencies," an S&P executive stated that "in the MBS market, [S&P's] process involves an analysis of individual

loans, a simulation of the cash flow generated by the deal, a review of both originator and

servicer operational procedures, and a surveillance process that enables [them] to monitor

performance." (*See* Laitman Decl., Ex. G). This is the critical overlay that must be considered

in determining the relative strength of purported storm warnings about originator underwriting

guidelines in this case.[16]

### 3. The News Articles Themselves Are Controverted

The overwhelming majority of articles and other publicly-available sources cited by the

RA Defendants fail to mention even a single Defendant in this case, or else make no reference to

MBS – and clearly are insufficient for inquiry notice. Further, the RA Defendants' surgical

citations oftentimes omit clearly reassuring statements. In those articles that actually do name a

Defendant – more often than not one of the RA Defendants themselves – the majority of those

contain reassuring statements from S&P and/or Moody's that disputes the premise of the article

to which the RA Defendants refer. For example:

- In a May 16, 2007 article about ratings agencies in the *Financial Times*, the head of S&P's European structured finance group said: "Banks come to us with a proposed transaction and we explain how it might be rated under our criteria. In many cases, the transaction is then restructured by the bank in order to meet our criteria. ***There's nothing sinister about this process – we don't advise on how deals should be structured or arbitrate on which deals can proceed or not.***" *See* Rubin Aff., Ex. G.

- Concerning the ratings agencies' role in the wave of mortgage defaults and MBS, an executive vice president at S&P remarked that "[s]ome have questioned whether the 'issuer pays' model has led S&P and others to issue higher, or less rigorously analyzed, ratings so as to garner more business. There is no evidence – none at all – to support this contention with respect to S&P." The head of the asset-backed finance rating group

---

[16] Also important is the fact that for dozens of Certificate issuances, the "principal originators" (referenced in the Complaint, and in many of the articles Defendants submit as exhibits) are responsible for originating only a small fraction of the composite loans. In some cases, for example, Countrywide and IndyMac are designated "Principal Originators" in the Offering Documents but only originated ten percent or less of the pool of loans underlying a particular issuance. (*See* Laitman Decl., Ex. H). A "storm warning" about Countrywide's compliance or non-compliance with its own underwriting guidelines would thus not necessarily provide notice to a Certificate investor that their investment would be at all materially affected.

at Moody's similarly said there were no conflicts of interest that led to inflated ratings. *See* Rubin Aff., Ex. H.; Affidavit of Floyd Abrams in Support of Defendant McGraw-Hill Companies, Inc.'s Motion to Dismiss ("Abrams Aff."), Ex. 36 (September 27 and 28, 2007).

- Michael Kanef, group managing director at Moody's, stated that Moody's has "successfully managed related conflicts of interest and provided the market with objective, independent, and unbiased credit opinions." *See* Rubin Aff, Ex. I (October 1, 2007).

- According to a December 5, 2006 *Wall Street Journal* article, "[b]ecause the underlying loans have gotten riskier, credit-rating agencies are telling issuers of mortgage-backed bonds to set aside more money to cover losses than they did three years ago in order to get an AAA rating for their bonds." The head of RMBS Surveillance at S&P is quoted as saying, "we are really monitoring very, very closely the portfolios of all the subprime issuers." *See* Abrams Aff., Ex. 4.

- In a September 17, 2007, the *Wall Street Journal* published a self-serving letter submitted by S&P called "How S&P Protects Integrity of Credit Ratings." Countering claims of conflicts of interest, S&P categorically stated that they "do not structure transactions, nor do [they] determine which deals can proceed and which cannot." They further heralded their provision of objective, impartial opinions on the quality of bonds, and their institutional safeguards in pace to ensure the independence and integrity of those opinions. *See* Laitman Decl., Ex. I.

Moreover, reassuring statements abound in the press reports addressing the subprime industry and their underwriting guidelines. For example:

- In a May 8, 2007 article in *The New York Times* regarding pressure to loosen underwriting standards, the head of Bear Stearns mortgage business group disputed the contention that Wall Street pressure led to the loosening of credit standards. *See* Abrams Aff., Ex. 12.

- In a June 27, 2007 *Wall Street Journal* article concerning Lehman Brothers and various claims and lawsuits brought by former employees regarding their in-house lending standards, Lehman said "it has gone to great lengths to screen loans for fraud and vet the lenders it works with." Moreover, specifically directed at the claims of former employees, "Lehman officials say there's no evidence to support such claims.... Lehman says company records clearly refute specific details of the accounts given by these former employees.... Lehman officials say they have procedures in place to prevent mortgage brokers and others in the loan process from bending rule." *See* Abrams Aff., Ex. 16.

These "reliable words of comfort from management" can reasonably be found to have allayed the concerns of Plaintiffs and other investors, so as not to give rise to inquiry notice.

### C.    The Statute of Repose Does Not Bar Plaintiffs' Claims

The RA Defendants assert that Plaintiffs' claims are barred by the statute of repose portion of Section 13 of the Securities Act, which provides, in relevant part, that "[i]n no event shall any such action be brought to enforce a liability created under [Section 11] more than three years after the security was bona fide offered to the public, or under [Section 12(a)(2)] more than three years after the sale." 15 U.S.C. § 77m. (Moody's Mem. at 25; McGraw Mem. at 26-27).

#### 1.    The Statute of Repose Does Not Bar Plaintiffs' Section 11 Claims against the RA Defendants

Plaintiffs do not dispute that nine of the 94 Offerings at issue were offered pursuant to a Registration Statement that became effective more than three years prior to the filing of Plaintiffs' claims against the RA Defendants on February 23, 2009 and that Plaintiffs' Section 11 claims as to these nine offerings are therefore time-barred by Section 13's three-year statute of repose.[17] Plaintiffs' Section 11 claims against the RA Defendants brought in connection with the remaining 86 Offerings are timely – and the RA Defendants do not dispute this fact.

#### 2.    The Statute of Repose Does Not Bar Plaintiffs' Section 12(a)(2) Claims against the RA Defendants

Defendant S&P specifically asserts that, in three of the nine Offerings pursuant to which Plaintiffs purchased Certificates, Plaintiffs' purchases were made before February 23, 2006, more than three years before Plaintiffs asserted their claims against the RA Defendants, and that

---

[17]    This is because only eight of the nine offerings pursuant to which Plaintiffs purchased certificates are included in the 94 Offerings at issue in this action. The ninth offering, Structured Adjustable Rate Mortgage Pass-Through Certificates, Series 2006-1, was included as an offering pursuant to which Plaintiffs purchased certificates, for the purpose of full disclosure of Plaintiffs' certificate purchases. However, it is not one of the offerings at issue in this action (¶¶ 30-31) because it was time-barred as of the date of the filing of the initial complaint.

Plaintiffs' Section 12(a)(2) claims against the RA Defendants are therefore barred by the statute of repose. Plaintiffs' purchases of Certificates in the other six Offerings pursuant to which Plaintiffs purchased Certificates were made after February 23, 2006 and are therefore timely – and the RA Defendants do not dispute this fact.

Defendant S&P also asserts that Plaintiffs' claims against the RA Defendants in connection with the remaining 86 Offerings at issue are time-barred because Plaintiffs did not make any purchases of Certificates in connection with those Offerings, "making it impossible for them to ever establish a necessary element of any Section 12(a)(2) claim, *i.e.*, compliance with the statute of repose." (McGraw Mem. at 27).

Defendant's assertion is illogical and should be rejected.[18] A total of 85 of the 94 Offerings at issue in this litigation were first offered on or after February 23, 2006. As a result, no member of the Class could have purchased Certificates pursuant to these Offerings prior to February 23, 2006. Plaintiffs' Section 12(a)(2) claims regarding these 85 Offerings against the RA Defendants are timely and have adequately been pled in the Complaint.[19] (¶¶ 30-31).

---

[18] Defendant McGraw-Hill's citation to *Maywalt v. Parker & Parsley Petroleum Co.*, 808 F. Supp. 1037 (S.D.N.Y. 1992) is perplexing. In holding that Plaintiff's allegations specifically averred compliance with section 12(a)(2) of the Securities Act, and in doing so satisfied Section 13's statute of limitations requirements, the Court denied defendants' motion to dismiss, finding plaintiff's Section 12(a)(2) claims timely.

Similarly, here Plaintiff has explicitly averred compliance with the elements of Section 12(a)(2) of the Securities Act (¶¶ 296-303), specifically with respect to Section 13. (¶ 303 ("This action is brought within one year after the discovery of the untrue statements and omissions contained in the Offering Documents, within one year after reasonable discovery of the untrue statements and material omissions and within three years of when the Certificates were sold to the public")).

[19] Further, to the extent necessary, additional named plaintiffs are entitled to be added prior to class certification in order to cure any potential deficiencies in class representation. *See, e.g., Hevesi v. Citigroup Inc.*, 366 F.3d 70, 82-83 (2d Cir. 2004) (affirming lead plaintiff's ability to add named plaintiffs to aid in representing the class where lead plaintiff did not have standing to bring every available claim); *In re Initial Pub. Offering Sec. Litig.*, 214 F.R.D. 117, 122-23 (S.D.N.Y. 2002) (granting leave to add new named plaintiffs for purpose of conferring standing prior to class certification). (*See* Plaintiffs' Memorandum of Law in Opposition to the Individual Defendants' Motion to Dismiss at Point I).

## IV. THE COMPLAINT ASSERTS ACTIONABLE MISSTATEMENTS AND OMISSIONS

### A. The Defendants Had a Duty to Disclose

Plaintiffs allege that the RA Defendants actively participated in the drafting and dissemination of the Offering Documents pursuant to which the Certificates were sold to Plaintiffs and other Class members, and that they further worked with LBHI, loan sellers and servicers in forming and structuring the securitized transactions related to the Certificates, and then provided predetermined credit ratings for them. (¶¶ 33-34). These facts were omitted from the Offering Documents, which also contained materially misleading statements concerning the expansive and conflicted roles of the RA Defendants. The RA Defendants now disclaim any liability based upon these alleged misstatements and omissions because, they say, they were under no duty to disclose the omitted information. (McGraw Mem. at 28-29). They are wrong.

"When a defendant speaks on a subject, there is a duty to disclose all material information that would bear on the accuracy of the statement." *Shah,* 435 F.3d at 249 (2d Cir. 2006) (citations omitted); *see also Lucia v. Prospect St. High Income Portfolio*, 36 F.3d 170, 175 (1st Cir. 1994) ("when a corporation does make a disclosure – whether it be voluntary or required – there is a duty to make it complete and accurate"); *In re Time Warner Inc. Sec. Litig.*, 9 F.3d 259, 268 (2d Cir. 1993) ("A duty to disclose 'arises whenever secret information renders prior public statements materially misleading, not merely when that information completely negates the public statements.'"); *Caiola v. Citibank, N.A., New York*, 295 F.3d 312, 331 (2d Cir. 2002); *Lapin* 506 F. Supp. 2d at 237 ("The lack of an independent duty to speak in the first instance becomes irrelevant once a party chooses to discuss material issues, because upon choosing to speak, one 'has a duty to be both accurate and complete.'").

Defendants ignore, for obvious reasons, the fact that a complaint may not be dismissed on a Rule 12(b)(6) motion unless the alleged omissions "are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance." *Ganino v. Citizens Utility Co.*, 228 F.3d 154, 162 (2d Cir. 2000) (quoting *Goldman v. Belden*, 754 F.2d 1059, 1067 (2d Cir. 1985)). "'Materiality is a mixed question of law and fact,' and only if an omission or misstatement is 'so obviously important or unimportant to a reasonable investor that reasonable minds cannot differ on the question of materiality is the issue appropriately resolved as a matter of law by summary judgment.'" *In re Alliance Pharm. Corp. Sec. Litig.*, 279 F. Supp. 2d 171, 188 (S.D.N.Y. 2003) (quoting *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 450 (1976)).

"To be material, the information need not be such that a reasonable investor would necessarily change his investment decision based on the information, as long as a reasonable investor would have viewed it as significantly altering the 'total mix' of information available." *SEC v. Mayhew*, 121 F.3d 44, 52 (2d Cir. 1997); *see also Demaria v. Andersen*, 318 F.3d 170, 180 (2d Cir. 2003) ("A prospectus will violate federal securities laws if it does not disclose 'material objective factual matters,' or buries those matters beneath other information, or treats them cavalierly." *Id.* at 180 (quoting and citing cases).

Furthermore, the Complaint adequately alleges that the RA Defendants knew, or reasonably should have known, of the misleading nature of their statements and omissions. For example, S&P used its "LEVELS" Model, last updated in 1999, for purposes of rating the underlying collateral loans. (¶ 166). Notwithstanding that it had developed an updated and better model in 2001 which, according to S&P's former Managing Director and head of Residential Mortgage-Backed Securities, Frank Raiter, "could have ... caused some of these

products to be withdrawn from the market as they would have been too expensive to put into bonds," S&P continued to use its outdated LEVELS Model. (¶¶ 166-67).

The materiality of the alleged omissions cannot reasonably be questioned – particularly at the motion to dismiss stage. Having chosen to speak in and through the Offering Documents, Defendants cannot evade their duty to make such statements complete and accurate.

### B. The Truth-On-The-Market Defense Does Not Apply

The RA Defendants contend that "several of the underlying facts on which Plaintiffs base their claims of 'omissions' were publicly known to the market," thereby rendering those omissions immaterial. (McGraw Mem. at 30-31). This "truth-on-the-market" defense "is intensely fact-specific and is rarely an appropriate basis for dismissing a § 10(b) complaint for failure to plead materiality." *Ganino*, 228 F.3d at 167 (citation omitted); *see also In re Columbia Sec. Litig.*, 155 F.R.D. 466, 482-83 (S.D.N.Y. 1994) ("[D]efendants' burden [of establishing the truth-on-the-market defense is] extremely difficult, perhaps impossible, to meet at the summary judgment stage."); *Hall v. The Children's Place Retail Stores, Inc.*, 580 F. Supp. 2d 212, 229 (S.D.N.Y. 2008) (holding that whether problems were adequately disclosed to the market, giving rise to a possible "truth-on-the-market" defense, is a fact-intensive query that cannot be disposed of on a motion to dismiss).

It is axiomatic that before a "known" fact can make an alleged omission immaterial as a matter of law there must be a meaningfully direct and substantial correlation between the two. Indeed, the "Second Circuit has stressed that such 'corrective information must be conveyed to the public with a degree of intensity and credibility sufficient to counter-balance effectively any misleading information created by the alleged statements.'" *Lapin* 506 F. Supp. 2d at 238 (quoting *Ganino*, 228 F.3d at 167).

The RA Defendants do not come close to meeting this standard. They point to only three "facts" allegedly known to the market: (1) that S&P's RMBS ratings models have been publicly available via its website and thus subject to inspection by investors; (2) that S&P was engaged and paid by the issuers of the securities it rates; and (3) the "alleged role that the Ratings Agencies played in these transactions." (McGraw Mem. at 30). It is difficult to conceive of a thinner record of "facts" somehow known to the market or a more attenuated connection to the actual material misstatements and omissions that form the basis for the claims.

### C.    The "Bespeaks Caution" Doctrine Does Not Shield The RA Defendants from Alleged Misstatements and Omissions Relating to Present and Historical Facts

The RA Defendants also seize upon certain generic statements in the Offering Documents about the nature of ratings, and claim protection under the "bespeaks caution" doctrine. (McGraw Mem. at 31-33). The five particular statements referenced can fairly be distilled as making two general points: *first*, that the ratings are not recommendations to buy, sell or hold the Certifications; and *second*, that the rating is not a guarantee of payment. *Id.* at 32-33.[20] These statements, taken individually and together, are forward-looking statements that steer totally clear of the material misstatements and omissions at the heart of Plaintiffs' claims, and the "bespeaks caution" doctrine does not apply under these circumstances.

Three principles are of particular importance here. First, the "bespeaks caution" doctrine applies solely to forward-looking statements, and not to misrepresentations of present or historical fact. *Heller v. Goldin Restructuring Fund, L.P.*, 590 F. Supp. 2d 603, 617 (S.D.N.Y. 2008). "[C]autionary words about future risk cannot insulate from liability the failure to disclose

---

[20]    McGraw identifies only five specific statements in the Offering Documents as grounds for invoking the "bespeaks caution" doctrine, yet refers to "similar statements in each of the Offering Documents at issue." (McGraw Mem. at 33). This vague reference gives no guidance to this Court, nor to Plaintiffs, about what other statements (if any) the RA Defendants might contend are sufficiently cautionary so as to render any alleged misstatements or omissions immaterial as a matter of law.

that the risk has transpired." *In re AOL Time Warner Sec. & ERISA Litig.*, 381 F. Supp. 2d 192, 223 (S.D.N.Y. 2004) (citing *Rombach v. Chang*, 355 F.3d 164, 173 (2d Cir. 2004)). *Accord P. Stolz Family P'ship v. Daum*, 355 F.3d. 92, 97 (2d Cir. 2004) ("It would be perverse indeed if an offeror could knowingly misrepresent historical facts but at the same time disclaim those misrepresented facts with cautionary language."); *In re Priceline.com Inc.*, 342 F. Supp. 2d 33, 53-54 (D. Conn. 2004) ("because plaintiffs allege that defendants misrepresented historical facts, the existence of cautionary language does not affect the materiality of the statements set forth in the complaint.").

Second, "[t]he cautionary language must be specific, prominent and must directly address the risk that plaintiffs' claim was not disclosed." *In re Flag Telecom Holdings, Ltd., Sec. Litig.*, Civ. No. 02-3400, 2009 U.S. Dist. LEXIS 37090, *28 (S.D.N.Y. May 1, 2009) (citing *Olkey v. Hyperion 1999 Term Trust, Inc.*, 98 F.3d 2, 5-6 (2d Cir. 1996)). "The requirement that the cautionary language match the specific risk is particularly important, considering that most, if not all security offerings contain cautionary language." *In re Flag Telecom Holdings,* 2009 U.S. Dist. LEXIS 37090*, at* 28; *see also In re Donald J. Trump Casino Sec. Litig.*, 7 F.3d 357, 371-72 (3d Cir. 1993) ("To suffice, the cautionary statements must be substantive and tailored to the specific future projections, estimates or opinions in the prospectus which the plaintiffs challenge."); *Hunt v. Alliance N. Am. Gov't Income Tr. Inc.*, 159 F.3d 723, 729 (2d Cir. 1998) ("The cautionary language contained in the prospectus does not necessarily foreclose liability because it warned investors of a different contingency than that which plaintiffs allege was misrepresented."); *Alameda,* 2009 U.S. Dist. LEXIS 42637, at *23 (Disclosures and warnings do not insulate defendant because the statements "create an impression of a state of affairs that differs in a material way from the one that actually exists.") (Citation omitted).

Third, "[i]f a party is aware of an actual danger or cause for concern, the party may not rely on a generic disclaimer in order to avoid liability." *Edison Fund v. Cogent Inv. Strategies Fund, Ltd.*, 551 F. Supp. 2d 210, 226 (S.D.N.Y. 2008) (citing cases); *see also Gabriel Capital L.P. v. NatWest Fin., Inc.*, 122 F. Supp. 2d 407, 419 (S.D.N.Y. 2000) (observing that the bespeaks caution doctrine "does not apply where a defendant knew that its statement was false when made").

Each of these well-established principles acts to bar the application of the "bespeaks caution" doctrine here, where the Complaint alleges material misstatements and omissions relating to then-present facts concerning the RA Defendants' undisclosed and integral role in structuring marketable MBS.

## V. THE COMPLAINT ADEQUATELY ALLEGES DAMAGES

The Complaint alleges that Plaintiffs and the Class have suffered damages as a result of Defendants' Sections 11 and 12(a)(2) violations. (¶¶ 293, 302). The value of the Certificates purchased by Plaintiffs and the Class has dramatically plummeted since their offerings. (¶¶ 8, 22-24). At this stage, the Complaint need not allege more. The RA Defendants attempt to brush aside these allegations by arguing that this Court should dismiss the case based upon their premature assessment of speculative damages theories. (Moody's Mem. at 32-35). These arguments, faulty as they are, are simply premature and provide no basis for dismissal of the Complaint.

Section 11 of the 1933 Act states that a plaintiff who purchases a security may "recover such damages as shall represent the difference between the amount paid for the security ... and ... the value thereof as of the time such suit was brought." 15 U.S.C. § 77k(e). A plaintiff pleading a Section 11 claims is required to (1) allege the purchase of relevant securities and (2) allege

41

facts creating the reasonable inference that the value of the securities at the presumptive damages date is *less* than the purchase price. *In re Countrywide Fin. Corp. Sec. Litig.*, 588 F. Supp. 2d 1132, 1169-70 (C.D. Cal. 2008). Accordingly, the statute permits recovery of a certain type of economic injury. So long as the allegations in the complaint, and other matters of which the Court may take judicial notice, do not conclusively demonstrate that plaintiffs cannot prove a loss, the complaint survives a motion to dismiss. *Id.*

It cannot be disputed that Plaintiffs allege a diminution in value of the securities they purchased. (¶¶ 22-24). There are no loss causation issues raised on the face of the Complaint, nor do the Defendants suggest that the Plaintiffs cannot, as a matter of law, prove that the alleged diminution of value of the securities is unrelated to the alleged material misstatements and omissions. At this stage, nothing more is required. *See Robbins v. Wilkie*, 300 F.3d 1208, 1211 (10th Cir. 2002) ("at the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice"); *Cremeen v. Schaefer*, Civ. No. 04-2519 (CM), 2005 U.S. Dist. LEXIS 18944, at *12 (D. Kan. Aug. 10, 2005) ("damages must be alleged in accordance with the Rule 8 'short and plain statement' standard.") (Emphasis omitted).

Instead, based only upon conjecture, the RA Defendants argue that the Complaint alleges absolutely no facts under which recoverable damages may be found. (Moody's Mem. at 33). But the determination of a particular security's "value" is an issue that is "inappropriate to resolve" on the pleadings. *In re Initial Pub. Offering,* 241 F. Supp. 2d at 351 n. 80. While "[§] 11(e) sets the measure of damages for a plaintiff still holding her securities at the 'value' of those securities at the time of suit ... the determination of value is a fact-intensive inquiry.'" *Id.*; *see also In re BankAmerica Corp. Sec. Litig.*, 210 F.R.D. 694, 702 (E.D. Mo. 2002) (describing trials in securities actions under federal law as "lengthy, costly and complex and would involve a

veritable 'battle of the experts' on the penultimate issues of causation and damages"). Federal courts in other contexts have also espoused this same rule. *See, e.g., United States v. Honeywell Int'l, Inc.*, 542 F. Supp. 2d 1188, 1201 (E.D. Cal. 2008) ("The calculation of damages is not ordinarily amenable to resolution at the summary judgment stage."); *In re JTS Corp.*, 305 B.R. 529, 542 (Bankr. N.D. Cal. 2003) ("valuation considerations are inherently fact-laden, turning on the case-specific circumstances").

Defendants ignore the fact that damages are not an element of a Section 11 claim that needs to be pled in the Complaint. The statute at issue here expressly makes lack of damages an affirmative defense. 15 U.S.C. 77k(e) (2006); *see also In re Countrywide*, 588 F. Supp. 2d at 1168 (citing *Huddleston*, 459 U.S. at 382); *In re Stac Elecs. Sec. Litig.*, 89 F.3d 1399, 1403-04 (9th Cir. 1996); *In re McKesson HBOC, Inc. Sec. Litig.*, 126 F. Supp. 2d 1248, 1258, 1261 (N.D. Cal. 2000); *Grossman v. Waste Mgmt., Inc.*, No. Civ. No. 83-2167, 1983 WL 1370, at *8 (N.D. Ill. Sept. 9, 1983) ("A cause of action under section 11 requires only a material misrepresentation or omission in a prospectus. Damages need not be alleged."). "[A] plaintiff is not required to negate an affirmative defense in his complaint." *Tregenza v. Great Am. Commc'ns Co.*, 12 F.3d 717, 718 (7th Cir. 1993). *See also Rodriguez v. Countrywide Homes*, Civ. No. 08-0869 (DLB), 2008 U.S. Dist. LEXIS 82874, at *7 (E.D. Cal. Sept. 22, 2008) ("At the pleading stage, plaintiffs are not required to plead facts to negate anticipated affirmative defenses … While defendants' argument may ultimately provide a defense in this action, it would be better suited in a motion for summary judgment after discovery is complete.").

The RA Defendants will have the opportunity in this case to offer evidence in support of their argument that the type of economic injury Plaintiffs' allege – the drastic diminution in value of the Certificates they purchased – is somehow not recoverable. They will also have

ample opportunity to contest the appropriate measure of such damages. But at this stage, with all inferences properly made in Plaintiffs' favor, the Complaints' allegations concerning damages are more than sufficient to withstand a motion to dismiss.

## VI. PLAINTIFFS STATE CLAIMS UNDER SECTION 15 OF THE 1933 ACT AGAINST THE RA DEFENDANTS

In their respective memoranda of law, S&P and Moody's each assert that Plaintiffs' Section 15 control person claims fail because (1) Plaintiffs' Sections 11 and 12 claims fail and, in the absence of an underlying primary violation of the 1933 Act, Plaintiffs' Section 15 claim cannot stand; and (2) Plaintiffs have failed to allege that the RA Defendants controlled the primary violators. (Moody's Mem. at 22-25; McGraw Mem. at 33-35). The RA Defendants are wrong on both counts.

First, the RA Defendants summarily assert that Plaintiffs fail to state claims under Sections 11 and 12 of the 1933 Act and their Section 15 claim fails for want of a primary violation. However, as set forth in Points I and II, above, Plaintiffs have adequately pled claims against the RA Defendants, the Individual Defendants and the Issuing Trusts for violations of Section 11 of the 1933 Act and against the RA Defendants and the Issuing Trusts for violations of Section 12 of the 1933 Act. Accordingly, the RA Defendants' motions to dismiss on this basis should be denied. *See In re Worldspace Sec. Litig.*, Civ. No. 07-2252 (RMB), 2008 U.S. Dist. LEXIS 56224, at *20-21 (S.D.N.Y. Jul. 21, 2008).

Second, Plaintiffs adequately allege the RA Defendants' control. Plaintiffs specifically allege that the Offering Documents contained material misstatements and omissions because they did not disclose that the RA Defendants largely determined which loans were to be included in the securitization, the amount and form of credit enhancement for each Certificate and the Certificate structure before they were actually "engaged" by Lehman and before the

securitization was completed so that Lehman would be assured that substantially all the Certificates could be sold to investors as AAA-rated securities. (¶ 15). Plaintiffs allege that without the AAA rating, the Certificates had no market because they could not be sold to either pension funds or insurance companies, who were required to purchase only such highly rated investment grade securities. (¶¶ 14, 172-73).

With respect to credit enhancement, Plaintiffs allege (1) that the Offering Documents failed to disclose that the amount of credit enhancement provided was insufficient for the Certificates to be assigned AAA and investment grade ratings, (2) that the RA Defendants caused this understatement by failing to timely and adequately update the models employed to make those assessments; (3) that, as was only disclosed well after the issuance of the Certificates, S&P's and Moody's models had not been materially updated since 1999 and 2002, respectively; and (4) that, as a result, they failed to accurately reflect the performance of the Certificate collateral which included substantial portions of the type of loans which only began to be originated *en masse* after 2002, *i.e.*, subprime, Alt-A, no documentation, non-traditional ARMs, interest only and negative amortization loans. (¶¶ 16, 17, 56-62, 269, 271).

Plaintiffs also allege that the Offering Documents failed to disclose material financial conflicts of interest between the RA Defendants and Lehman, including Lehman's engagement of the RA Defendants through "ratings shopping," as was detailed in the July 2008 SEC Report which disclosed (1) that the RA Defendants were typically engaged by way of "ratings shopping" whereby the Ratings Agency that was ultimately engaged was the one which provided the most profitable rating to the investment bank in "bidding" for the engagement and (2) that the RA Defendants were incentivized, due to the highly profitable nature of these MBS engagements and the concentration of business in the hands of a relatively small group of investment banks, to

not update their models lest they become unable to provide to the investment bank the most profitable credit enhancement and rating structure for the MBS transaction. (¶¶ 17, 66-67, 168, 178-81).

Specifically, Plaintiffs allege (1) that Lehman sent the detailed Loan Level File of the pool of loans to be securitized and the RA Defendants ran the data through their models and provided the results as part of the bidding process for the engagement; (2) that, for example, S&P ran the loan tape through both its LEVELS and SPIRE Models again and provide Lehman with the results in an effort to obtain the ratings engagement and advise Lehman, *e.g.*, that 94.25% of the Certificates would be rated AAA as long as 5.75% of the total collateral balance supporting those Certificates were subordinate and that this 5.75% was the amount of loss coverage required; (3) that Lehman would then again "negotiate" with the RA Defendants before they were hired in order to get them to agree to the least amount of loss coverage and credit enhancement and the highest percentage of AAA-designated Certificates; and (4) that, for example, S&P) would also again run the loan tape through its SPIRE Model in order to provide a projected subordination or over-collateralization structure.[21] (¶¶ 66-67).

Plaintiffs allege that the RA Defendants acted as underwriters for the Issuing Trusts in the sale on the Certificates, directly and indirectly participated in the distribution of the Certificates, directly and indirectly solicited offers to purchase the Certificates, and directly and indirectly participated in drafting and disseminating the Offering Documents and in the promotion and sale of the Certificates pursuant to the defective Offering Documents. (¶¶ 286, 298).

Further, Plaintiffs allege that the RA Defendants controlled the ultimate decision of which mortgage loans would be included and excluded from the securitized pools of loans, as

---

[21]     These practices were disclosed in detail in the July 2008 SEC Report and in testimony by former Moody's and S&P managers in October 2008, and these practices were effectively ended by agreement between the RA Defendants and the New York Attorney General in 2008. (¶¶ 17, 164-67, 169, 170).

well as the ultimate amount of credit enhancement required in order for the Certificates to be sold to investors as AAA and investment grade investments.  (¶¶ 15, 18, 158-68).  Plaintiffs further allege that the RA Defendants controlled all material aspects relating to the acquisition, structure and sale of the Certificates and, as a result, they also controlled the activities of the Defendant Issuing Trusts, the Individual Defendants and LBI within the meaning of Section 15 of the Securities Act.  (¶ 311).

Plaintiffs' allegations demonstrate that the RA Defendants were not merely interested in one offering.  Rather, they had an ongoing financial interest in Lehman's "MBS machine" – like having a share in the operations.  It was in the RA Defendants' best interests when satisfying the requirements of one deal to inflate the ratings because they would obtain many more transactions down the road.  This was a highly exceptional situation where the financial incentive was so significant that the RA Defendants assumed control person status as a result.

Section 15 of the 1933 Act provides that:

Every person who, by or through stock ownership, agency, or otherwise, or who, pursuant to or in connection with an agreement or understanding with one or more other persons by or through stock ownership, agency, or otherwise, controls any person liable under section 11 or 12, shall also be liable jointly and severally with and to the same extent as such controlled person to any persons to whom such controlled person is liable

15 U.S.C. § 77o.

To plead a claim under Section 15, "a plaintiff must allege (1) a primary violation by a controlled person and (2) direct or indirect control by the defendant of the primary violator." *E.g., In re Adelphia Commc'ns,* 2007 U.S. Dist. LEXIS 66911, at *30; *In re Global Crossing Ltd. Sec. Litig.*, 322 F. Supp. 2d 319, 349 (S.D.N.Y. 2004).  "Culpable participation" by the controlling person is not an element of a Section 15 claim.  *E.g., In re Adelphia Commc'ns,* 2007 U.S. Dist LEXIS 66911, at *31; *In re Global Crossing*, 322 F. Supp. 2d at 349.

Control can be established by demonstrating that a defendant possessed the power to direct or cause the direction of the management and policies of a person or entity through ownership of voting securities or by contract, business relationships, interlocking directors, family relations, or the power to influence and control the activities of another. *Ellison v. Am. Image Motor Co., Inc.*, 36 F. Supp. 2d 628, 638 (S.D.N.Y. 1999) (analyzing control person liability under Section 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act)). The same considerations that apply to control person liability under the Exchange Act apply to control person liability under the Securities Act. *Ellison*, 36 F. Supp. at 638-39 (citing *Sloane Overseas Fund, Ltd. v. Sapiens Int'l Corp., N.V.*, 941 F. Supp. 1369, 1377-78 (S.D.N.Y. 1996); *In re Crazy Eddie Sec. Litig.*, 747 F. Supp. 850, 860-61 (E.D.N.Y. 1990); *Harrison v. Eventure Capital Group, Inc.*, 666 F. Supp. 473, 479 (W.D.N.Y. 1987)).

Plaintiffs here meet this standard and state valid claims under Section 15 of the 1933 Act against the RA Defendants. Plaintiffs clearly allege primary violations of Sections 11 and 12 of the 1933 Act by the Defendant Issuing Trusts and the Individual Defendants. *See* Points I.A-I.B, *supra*. Plaintiffs clearly allege that the RA Defendants possessed the power to direct or cause the direction of the management and policies of the Defendant Issuing Trusts and the Individual Defendants because the RA Defendants controlled the ultimate decision on which mortgage loans would be included and excluded from the securitized pools of loans, as well as the ultimate amount of credit enhancement required in order for the Certificates to be sold to investors as AAA and investment grade investments. As a result, the RA Defendants controlled all material aspects relating to the acquisition, structure and sale of the Certificates, as well as the activities of the Defendant Issuing Trusts and the Individual Defendants within the meaning of Section 15

of the Securities Act.  (¶ 311). These allegations are sufficient to establish a control person claim under Section 15 of the 1933 Act.[22]

Further, "[c]ontrol is a question of fact that 'will not ordinarily be resolved summarily at the pleading stage'" because the control issue "raises a number of complexities that should not be resolved on such an underdeveloped record." *In re Cabletron Sys., Inc.,* 311 F.3d 11, 41 (1st Cir. 2002) (citing 2 T.L. Hazen, *Treatise on the Law of Securities Regulation* § 12.24(1) (4th ed. 2002)).  *Accord In re Oxford Health Plans, Inc., Sec. Litig.*, 913 F. Supp. 280, 286 (S.D.N.Y. 1996) (denying defendants' motion to dismiss Section 20 claim, finding the determination of control to be a "fact-intensive inquiry" and not capable of resolution on such motion) (citing *In re Exec. Telecard, Ltd. Sec Litig.*, 913 F. Supp. 280, 286 (S.D.N.Y. 1996)).

As a result, dismissal of the Section 15 control person claims against the RA Defendants at the pleading stage would be premature.

---

[22]        In *In re Falstaff Brewing Corp. Antitrust Litig.,* 441 F. Supp. 62, 68 (E.D. Mo. 1977), the court refused to dismiss claims that lender defendants controlled the daily affairs of a brewing corporation.  Clearly, the RA Defendants' role in controlling all material aspects of the acquisition, structure and sale of the Certificates, as well as the activities of the Defendant Issuing Trusts and the Individual Defendants, is at least as significant as the role of the *Falstaff* lender.

## CONCLUSION

For all of the foregoing reasons, the RA Defendants' Motions to Dismiss Plaintiffs' Consolidated Amended Securities Class Action Complaint should be denied in their entirety.[23]

Dated: New York, New York
June 29, 2009

> COHEN MILSTEIN SELLERS & TOLL PLLC
>
> By: _____
>
> Joel P. Laitman (JL-8177)
> Christopher Lometti (CL-9124)
> Daniel B. Rehns (DR-5506)
> Kenneth M. Rehns (KR-9822)
> 150 East 52nd Street, Thirtieth Floor
> New York, New York 10022
> Telephone: (212) 828-7797
> Facsimile: (212) 828-7745
> *jlaitman@cohenmilstein.com*
> *clometti@cohenmilstein.com*
> *drehns@cohenmilstein.com*
> *krehns@cohenmilstein.com*
>
> Steven J. Toll (*admitted pro hac vice*)
> Avi Garbow (*admitted pro hac vice*)
> Douglas Bunch (*admission pending*)
> 1100 New York Avenue NW
> Suite 500 West
> Washington, D.C. 20005
> Telephone: (202) 408-4600
> Facsimile: (202) 408-4699
> *stoll@cohenmilstein.com*
> *agarbow@cohenmilstein.com*
> *dbunch@cohenmilstein.com*

---

[23] In the event the Court decides to dismiss all or part of plaintiffs' allegations, Plaintiffs respectfully request leave to replead. See Fed. R. Civ. P. 15(a) (providing that leave to amend shall be granted freely); *see also Foman v. Davis*, 371 U.S. 178, 182 (1962); *In re AMF Bowling Sec. Litig.*, Civ. No. 99-3023 (DC), 2003 U.S. Dist. LEXIS 7389 (S.D.N.Y. May 2, 2003) ("the only possible reasons to reject amendment would be prejudice to the defendant or misconduct by plaintiffs...").

## CERTIFICATE OF SERVICE

I, Daniel B. Rehns, hereby certify that on June 29, 2009, I caused the foregoing document to be filed electronically with the United States District Court for the Southern District of New York through the Court's mandated ECF service. Counsel of record are required by the Court to be registered e-filers, and as such are automatically e-served with a copy of the document(s) upon confirmation of e-filing.

/s// Daniel B. Rehns
Daniel B. Rehns