**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------- x
In re: :
 :
LEHMAN BROTHERS SECURITIES : 09 MD 2017 (LAK)
AND ERISA LITIGATION :
 :
This document applies to: :
 :
*In re Lehman Brothers Mortgage-Backed Securities* :
*Litigation*, No. 08-CV-6762 (LAK) :
---------------------------------------------------------------- x


# REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF THE INDIVIDUAL DEFENDANTS' MOTION TO DISMISS


SIMPSON THACHER & BARTLETT LLP
425 Lexington Avenue
New York, New York  10017
(212) 455-2000

*Attorneys for Defendants Lana Franks, Edward*
*Grieb, Richard McKinney, Kristine Smith, James J.*
*Sullivan, Samir Tabet and Mark L. Zusy*

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................................1

ARGUMENT...........................................................................................................................3

I.    PLAINTIFFS DO NOT HAVE STANDING TO CHALLENGE THE 85
OFFERINGS IN WHICH THEY DID NOT PURCHASE SECURITIES .......................3

    A.    Plaintiffs Must Have Purchased The Securities At Issue To Have Standing .........4

    B.    Plaintiffs Do Not Have Standing Based On Allegedly "Common"
Misrepresentations In The Shelf Registration Statements ......................................6

II.    ALLEGATIONS REGARDING DEPARTURES FROM UNDERWRITING
GUIDELINES FAIL TO STATE A CLAIM ......................................................................9

    A.    The Conclusory, Implausible Allegation That Originators "Systematically
Disregarded" Underwriting Guidelines Does Not State A Claim ........................10

    B.    Plaintiffs Have Not Alleged Facts Suggesting Disclosure Of Deviations
From The Underwriting Guidelines Would Have Altered The Total Mix
Of Information .......................................................................................................13

    C.    Alleged Omissions Regarding Underwriting Practices Were In Fact
Disclosed...............................................................................................................14

III.    ALLEGATIONS ABOUT RATINGS AGENCIES' RELATIONSHIPS WITH
THE ISSUER FAIL TO STATE A CLAIM....................................................................15

IV.    HINDSIGHT ALLEGATIONS ABOUT THE RATINGS AGENCIES'
JUDGMENTS FAIL TO STATE A CLAIM ...................................................................19

V.    SPECIFIC INFORMATION PUBLICLY AVAILABLE PRIOR TO JUNE 19,
2007 BARS PLAINTIFFS' CLAIMS .............................................................................20

CONCLUSION.....................................................................................................................24

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ashcroft v. Iqbal*, 556 U.S. ---, 129 S. Ct. 1937 (2009) ................................................ 2, 12, 13, 18

*Barnes v. Osofsky*, 373 F.2d 269 (2d Cir. 1967) ........................................................................ 6, 9

*Basic Inc. v. Levinson*, 485 U.S. 224, 108 S. Ct. 978 (1988) ....................................................... 17

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 127 S. Ct. 1955 (2007) ........................... 12, 13, 18

*Benedict v. Amaducci*, No. 92 CIV 5239 (KMW), 1995 WL 702444
 (S.D.N.Y. Nov. 28, 1995) ...................................................................................................... 7

*Congregation of Ezra Sholom v. Blockbuster, Inc.*, 504 F. Supp. 2d 151
 (N.D. Tex. 2007) ...................................................................................................................... 5

*De la Fuente v. DCI Telecomms., Inc.*, 206 F.R.D. 369 (S.D.N.Y. 2002) ................................... 21

*DeMaria v. Anderson*, 318 F.3d 170 (2d Cir. 2003) ............................................................ 14, 15

*Dietrich v. Bauer*, 76 F. Supp. 2d 312 (S.D.N.Y. 1999) ......................................................... 7, 20

*Dodds v. Cigna Sec., Ins.*, 12 F.3d 346 (2d Cir. 1993) ............................................................... 23

*Faggionato v. Lerner*, 500 F. Supp. 2d 237 (S.D.N.Y. 2007) ...................................................... 7

*Flast v. Cohen*, 392 U.S. 83, 88 S. Ct. 1942 (1968) ...................................................................... 4

*German v. Fed. Home Loan Mortgage Corp.*, 885 F. Supp. 537
 (S.D.N.Y. 1995) ..................................................................................................................... 4, 5

*Hoffman v. UBS-AG*, 591 F. Supp. 2d 522 (S.D.N.Y. 2008) ........................................................ 4

*I. Meyer Pincus & Assocs., P.C. v. Oppenheimer & Co.*, 936 F.2d 759
 (2d Cir. 1991) ........................................................................................................................ 15

*In re Countrywide Fin. Corp. Sec. Litig.*, 588 F. Supp. 2d 1132
 (C.D. Cal. 2008) ................................................................................................................. 6, 7, 8

*In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 352 F. Supp. 2d 429
 (S.D.N.Y. 2005) ..................................................................................................................... 20

*In re Global Crossing Ltd. Sec. Litig.*, 313 F. Supp. 2d 189
 (S.D.N.Y. 2003) ............................................................................................................... passim

*In re JP Morgan Chase Sec. Litig.*, 363 F. Supp. 2d 595 (S.D.N.Y. 2005)................................. 20

*In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.*,
    272 F. Supp. 2d 243 (S.D.N.Y. 2003)................................................................ 17

*In re Progress Energy, Inc. Sec. Litig.*, 371 F. Supp. 2d 548
    (S.D.N.Y. 2005) ........................................................................................ 16

*La. Mun. Police Employees Ret. Sys. v. Merrill Lynch & Co.*,
    Civ. No. 08-9063 (JSR) (S.D.N.Y. Feb. 17 & 19, 2009)........................ 4, 8, 9

*LC Capital Partners, LP v. Frontier Ins. Group., Inc.*, 318 F.3d 148
    (2d Cir. 2003)..................................................................................... 22, 23

*Lewis v. Casey*, 518 U.S. 343, 116 S. Ct. 2174 (1996) .................................................... 5

*Olkey v. Hyperion 1999 Term Trust, Inc.*, 98 F.3d 2 (2d Cir. 1996) ........................... 15

*Panther Partners, Inc. v. Ikanos Commc'ns., Inc.*, 538 F. Supp. 2d 662
    (S.D.N.Y. 2008).............................................................................. 16, 20

*Staehr v. Hartford Fin. Servs. Group, Inc.*, 547 F.3d 406 (2d Cir. 2008) .................... 21

*W.R. Huff Asset Mgmt. Co. LLC v. Deloitte & Touche LLP*, 549 F.3d 100
    (2d Cir. 2008)............................................................................................. 5

*Warth v. Seldin*, 422 U.S. 490, 95 S. Ct 2197 (1975) ................................................... 5

**Statutes and Regulations**

15 U.S.C. § 77m.............................................................................................................. 20

17 C.F.R. § 229.1111(a)(3)............................................................................................. 10

17 C.F.R. § 229.1120....................................................................................................... 15

17 C.F.R. § 229.512(a)(2)................................................................................................. 7

SEC Proposed Rules, 57 S.E.C. Docket 1244, 1994 WL 469347 ................................. 16

# PRELIMINARY STATEMENT

Plaintiffs fail to rebut any of the alternative grounds for dismissal of this case.

As a threshold matter, Plaintiffs fail to show why they are properly before the Court to pursue claims concerning 85 securities offerings in which they did not purchase securities. Contrary to Plaintiffs' arguments, the constitutional and jurisdictional requirements of standing are neither relieved nor deferred because this is a putative class action. Plaintiffs also cannot establish standing by pointing to alleged common misstatements in the Shelf Registration Statements when their allegations focus on the Prospectus Supplements themselves. Each Prospectus Supplement was a unique part of the Offering Documents accompanying each security, disclosing the different combination of originators and the different set of underwriting guidelines they used to originate the pool of loans backing each certificate. Moreover, these 94 offerings were comprised of an estimated half-million loans, originated by nine different originators, and issued between October 2005 and June 2007, a 21 month period characterized by highly volatile credit, commercial and real estate markets. The diversity of the loan pools, their timing, and the different guidelines employed by the different originators underwriting them, as described in the Prospectus Supplement for each of the offerings, preclude Plaintiffs from asserting standing based on the Shelf Registrations.

Plaintiffs' claims fare no better on the merits. The principal allegation in the Complaint is that the Offering Documents did not disclose that loans underlying the mortgage-backed Certificates at issue here were originated in violation of the originators' stated underwriting guidelines. Plaintiffs **acknowledge** that the Offering Documents disclosed that the originators had discretion to make exceptions to their underwriting guidelines. They **concede** that the Individual Defendants lacked actual knowledge of undisclosed deviations from the

underwriting guidelines. And they **do not dispute** that, under SEC regulations, actual knowledge of underwriting deviations is required before there is a duty to disclose. These three concessions are sufficient to dismiss Plaintiffs' claims.

Plaintiffs argue that it was misleading for the Offering Documents to disclose any underwriting guidelines at all because the guidelines were in practice "disregarded" – that they were, in effect, a sham. Under the Supreme Court's decision in *Iqbal*, such a conclusory (and extraordinary) claim requires additional factual allegations to "nudge[]" the conclusions "across the line from conceivable to plausible" and to render them more likely than alternative explanations of the alleged facts. *See Ashcroft v. Iqbal*, 556 U.S. ---, 129 S. Ct. 1937, 1951 (2009) (internal quotes omitted). The Complaint contains no such allegations. Plaintiffs argue that systematic disregard of underwriting guidelines is the only possible explanation for increased foreclosures and the resulting downgrades in the ratings of the Certificates. The more likely explanation, however, with the benefit of hindsight, is that underwriting guidelines had been liberalized and loan underwriters simply made poor decisions in exercising their fully disclosed discretion to make exceptions to the guidelines. Moreover, Plaintiffs have not shown why any failure to disclose alleged departures from underwriting guidelines was material given the extensive quantitative, loan-level disclosures in each Prospectus Supplement. Further, Plaintiffs try, but fail, to explain away the Offering Documents' explicit disclosure of the very risks associated with the Certificates that Plaintiffs allege were omitted.

Plaintiffs have also failed to show why the other information they allege should have been disclosed – Ratings Agencies' alleged conflicts of interest and the Agencies' alleged role in providing structuring advice – was material. Potential conflicts of interest arising out of the "issuer pays" model have been common knowledge for a decade. And Plaintiffs offer no

credible explanation why the alleged fact that the Ratings Agencies helped LBHI structure Certificates that complied with their requirements for AAA ratings would make any difference to a potential investor. The Complaint also contains no specific factual allegations to support the conclusory assertion that Lehman-affiliated entities engaged in so-called "ratings shopping." In fact, the Prospectus Supplement for each offering indicates that LBHI simultaneously engaged both S&P and Moody's to rate the Certificates, rebutting any suggestion that LBHI attempted to play the two Agencies off each other to obtain more favorable ratings.

Finally, even if the Complaint otherwise stated actionable claims, they would be barred by the statute of limitations. Voluminous publicly available information placed Plaintiffs on inquiry notice of the allegedly omitted information on which they base their claims more than a year before the filing of the first suit in this consolidated action. This public material – some of which is cited in the Complaint – is indistinguishable from the collection of public material on which Plaintiffs base their allegations. If the public material cited in the Complaint is sufficient to state a claim, then the material available a year before commencement of the action was sufficient to put Plaintiffs on inquiry notice of that claim.

For these reasons, as well as those set forth in the memoranda filed by The McGraw-Hill Companies and Moody's Investors Service, Inc., the Complaint should be dismissed.

**ARGUMENT**

## I. PLAINTIFFS DO NOT HAVE STANDING TO CHALLENGE THE 85 OFFERINGS IN WHICH THEY DID NOT PURCHASE SECURITIES

Plaintiffs concede they did not purchase securities in 85 of the 94 offerings that are at issue in this action. Yet Plaintiffs argue that their claims related to those 85 offerings should not be dismissed for lack of standing for two reasons. First, Plaintiffs argue that a

challenge to their standing is somehow "premature" and should be addressed in the context of class certification. Second, Plaintiffs argue that they have standing based on certain allegedly "common" misrepresentations and omissions in the Shelf Registration Statements, even though the Complaint is premised almost entirely on alleged omissions from the different Prospectus Supplements filed in connection with the 94 very different offerings, which were backed by loans from some combination of the nine different originators named in the Complaint. Plaintiffs are wrong on both counts.

### A. Plaintiffs Must Have Purchased The Securities At Issue To Have Standing

Standing is a constitutional requirement that asks "whether the person whose standing is challenged is a proper party to request an adjudication of a particular issue." *Flast v. Cohen*, 392 U.S. 83, 99-100, 88 S. Ct. 1942, 1952 (1968). To have standing here, at least one of the named Plaintiffs must allege that it personally "suffered some actual or threatened injury" as a result of the alleged misrepresentations and omissions contained in the Offering Documents for each of the 94 challenged offerings. *See Hoffman v. UBS-AG*, 591 F. Supp. 2d 522, 530 (S.D.N.Y. 2008) (citing cases). Because the Complaint alleges purchases in only nine of those offerings, Compl. ¶¶ 22-24, Plaintiffs have suffered no actual or threatened injury with respect to the other 85 offerings and, accordingly, lack standing under Section 11 and Article III to sue with respect to those offerings. *See La. Mun. Police Employees Ret. Sys. v. Merrill Lynch & Co.,* Civ. No. 08-9063 (JSR) (S.D.N.Y. Feb. 19, 2009) (Ex. 8 to April 27, 2009 Declaration of Mary Elizabeth McGarry ("McGarry Decl.") at 62).

Plaintiffs' argument that the standing inquiry should be deferred until the class certification stage is at odds with the law. "[T]he question of standing is totally separate and distinct from the question of plaintiff's right to represent a purported class under Rule 23." *German v. Fed. Home Loan Mortgage Corp.*, 885 F. Supp. 537, 548 (S.D.N.Y. 1995). The class

certification stage under Rule 23 determines whether the named plaintiffs' claims are typical of others who bought the same securities, not whether absent parties who bought different securities issued pursuant to different prospectuses have similar claims. *See Lewis v. Casey*, 518 U.S. 343, 357, 116 S. Ct. 2174, 2183 (1996) ("That a suit may be a class action . . . adds nothing to the question of standing, for even named plaintiffs who represent the class must allege and show that they personally have been injured, not that injury has been suffered by other, unidentified members of a class to which they belong and which they purport to represent."). Plaintiffs "may not use the procedural device of a class action to bootstrap [themselves] into standing [they] lack[] under the express terms of the substantive law." *German*, 885 F. Supp. at 548 (citation omitted); *see also Congregation of Ezra Sholom v. Blockbuster, Inc.*, 504 F. Supp. 2d 151, 160 (N.D. Tex. 2007) (holding "a plaintiff who lacks standing to sue a defendant may not acquire such status through class representation" and dismissing Section 11 claims).

As Plaintiffs concede, a party's status as Lead Plaintiff does not mean the party has standing to sue on behalf of all members of the putative class. *See In re Global Crossing Ltd. Sec. Litig.*, 313 F. Supp. 2d 189 (S.D.N.Y. 2003). *Global Crossing* makes clear that even when a Lead Plaintiff has been designated, the Complaint must still name plaintiffs who, collectively, have standing to sue on every claim. *See id.* at 206-208; *see also W.R. Huff Asset Mgmt. Co. LLC v. Deloitte & Touche LLP*, 549 F.3d 100, 106 n.5 (2d Cir. 2008) ("named plaintiffs in a class action 'must allege and show that they personally have been injured…'") (quoting *Warth v. Seldin*, 422 U.S. 490, 502, 95 S. Ct 2197, 2206 (1975)). Finally, *Global Crossing* also makes clear that, regardless of the existence of a putative class action, a court ***must*** dismiss claims for which the named plaintiffs lack standing. *See In re Global Crossing*, 313 F.

Supp. 2d at 206-208 (stating that class claim with respect to offering in which no named plaintiffs purchased shares "must be dismissed").

**B.      Plaintiffs Do Not Have Standing Based On Allegedly "Common" Misrepresentations In The Shelf Registration Statements**

Plaintiffs' reliance on the *Countrywide* decision in the Central District of California is misplaced. *In re Countrywide Fin. Corp. Sec. Litig.*, 588 F. Supp. 2d 1132 (C.D. Cal. 2008). First, *Countrywide* is not the law in this Circuit. In the Second Circuit, in order to have standing, "at least one named plaintiff . . . must have purchased [securities] traceable to the challenged offering." *Global Crossing*, 313 F. Supp. 2d at 207; *Barnes v. Osofsky*, 373 F.2d 269, 273 (2d Cir. 1967) ("[A]n action under § 11 may be maintained only by one who comes within a narrow class of persons, *i.e.*, those who purchase securities that are the direct subject of the prospectus and registration statement.") (internal citations omitted).

Second, *Countrywide* was a consciously "narrow" decision based on specific facts that are not present here. In *Countrywide*, the court found standing because the misrepresentations and omissions alleged by the plaintiffs were contained ***in the shelf registration statement*** pursuant to which all of the challenged offerings were issued. *In re Countrywide*, 588 F. Supp. 2d at 1165. Here, in contrast, Plaintiffs' claims are premised on alleged omissions from the unique ***Prospectus Supplements*** filed in connection with each offering that describe the unique security issued in that offering. *See* Compl. ¶¶ 189-271. The 94 Prospectus Supplements were separately issued over the span of a nearly two year period, each with different pools of mortgages, totaling an estimated half million loans. *See id.* at ¶ 5. As the Prospectus Supplements clearly explained, the loans backing each separate offering were underwritten by various combinations of originators, each with their own separate underwriting guidelines and procedures. *See, e.g.,* McGarry Decl. Ex. 2 at S-70-77 (describing in detail the

originators' respective guidelines and practices). In short, no two offerings were the same – each was a *different security* backed by *different mortgages* underwritten at *different times* by *different originators* employing *different guidelines*. And each Prospectus Supplement constitutes a post-effective amendment, which is deemed by regulation "to be *a new registration statement* relating to the securities offered therein." 17 C.F.R. § 229.512(a)(2) (emphasis added).

In apparent recognition that *Countrywide* is inapplicable to the actual allegations in the Complaint, Plaintiffs attempt to transform their dozens of allegations about specific underwriting guidelines described in specific Prospectus Supplements into allegations about "common" misrepresentations and omissions in the Shelf Registrations. Opp'n Br. at 13-14. This attempted alchemy fails because the Court must consider the actual allegations contained in the Complaint and must disregard arguments "that interpret allegations in the Amended Complaint broadly or facts that are offered but that do not appear in the Amended Complaint. . ." *Dietrich v. Bauer*, 76 F. Supp. 2d 312, 328 (S.D.N.Y. 1999); *see also Faggionato v. Lerner*, 500 F. Supp. 2d 237, 248 (S.D.N.Y. 2007) ("This new theory, however, was not pled in the Complaint, and, of course, the Court need not accept assertions contained in briefs."); *Benedict v. Amaducci*, No. 92 CIV 5239 (KMW), 1995 WL 702444, at *3 (S.D.N.Y. Nov. 28, 1995) ("factual assertions in plaintiffs' brief cannot be used to rescue a deficient complaint.").

A cursory review of the Complaint reveals that Plaintiffs are not really complaining about the Shelf Registration Statements. The Shelf Registration Statements are quoted precisely four times in the 123-page, 312-paragraph Complaint. *See* Compl. ¶¶ 185, 187, 268, 272. In contrast, the Prospectus Supplements are quoted several dozen times and allegations about specific omissions from the Prospectus Supplements extend over 80 paragraphs

in the Complaint.  *Id.* at ¶¶ 189-271.  Even *Countrywide* acknowledges that its "narrow" holding would not necessarily apply when the allegedly common misrepresentation or omission contained in the shelf registration is "minor."  *In re Countrywide*, 588 F. Supp. 2d at 1167.  This is precisely a case in which the allegations regarding the Shelf Registration Statements are exceedingly minor compared to the far more voluminous allegations regarding the Prospectus Supplements.  Thus, even under *Countrywide*, Plaintiffs cannot acquire standing for their claims relating to the Prospectus Supplements for offerings in which none of them purchased a security by bootstrapping them to the tiny handful of allegations relating to the Shelf Registration Statements.

Moreover, the only discussion of underwriting guidelines in the Shelf Registration Statements is a brief (less than two pages), general description in each Shelf Registration Statement of certain procedures the "depositor expects" "will" be used in underwriting future loans to be issued under the Shelf Registration.  *See* McGarry Decl. Ex. 5 at STB-70; Ex. 6 at STB-77.  Because the information about underwriting practices in the Shelf Registration Statements is so limited and so general, the Shelf Registration Statements expressly refer the reader to the specific underwriting guidelines applicable to each offering that are set forth in the Prospectus Supplements.  *Id.*  Ultimately, each offering was based on a separate pool of loans, underwritten by various combinations of originators, each with its own underwriting guidelines.  Plaintiffs therefore have not and cannot allege material misstatements or omissions in the Shelf Registration Statements that are "common" to all the offerings.

Finally, Plaintiffs' attempt to distinguish Judge Rakoff's bench ruling in *La. Mun. Police Employees Ret. Sys. v. Merrill Lynch & Co.*, is without merit.  Civ. No. 08-9063 (JSR) (S.D.N.Y. Feb. 19, 2009) (McGarry Decl. Ex. 8 at 62).  The transcript of the proceedings

suggests that neither the number of underwriters nor the different types of security involved – distinctions raised by Plaintiffs – were decisive issues. Rather, Judge Rakoff was persuaded by the general proposition set forth in *Global Crossing* and in Judge Friendly's decision in *Osofsky* that in order to have standing, a plaintiff must have purchased securities sold in the challenged offering. *See* Civ. No. 08-9063 (JSR) (S.D.N.Y. Feb. 17, 2009) (Ex. 1 to July 31, 2009 Declaration of Michael C. Ledley at 15-19, 60-61). Plaintiffs have not offered any argument why the holder of one security would have standing to sue on behalf of holders of 85 entirely different securities issued under different Prospectus Supplements that contain different alleged misstatements and omissions.

## II.   ALLEGATIONS REGARDING DEPARTURES FROM UNDERWRITING GUIDELINES FAIL TO STATE A CLAIM

The Complaint fails to state a claim with respect to alleged violations of the loan originators' underwriting guidelines for at least three reasons. First, the Complaint does not allege that the Individual Defendants had actual knowledge of exceptions to the underwriting guidelines, without which these Defendants could have no duty to disclose. *See* Defs.' Opening Br. at 20-22. Second, even if there were a duty to disclose unknown exceptions to the underwriting guidelines, the Complaint fails to allege facts showing that any allegedly undisclosed exceptions were material to a reasonable investor's decision to purchase Certificates given the volume of quantitative and qualitative data about the underlying mortgages disclosed in the Offering Documents. *Id.* at 22-26. Lastly, the Offering Documents contained specific and detailed disclosure of the same risks Plaintiffs allege were never disclosed, including that the originators had discretion to depart from their general underwriting guidelines. *Id.* at 17-20. Plaintiffs' opposition fails to rebut any of these arguments.

### A. The Conclusory, Implausible Allegation That Originators "Systematically Disregarded" Underwriting Guidelines Does Not State A Claim

The Offering Documents disclosed that loan underwriters had discretion to make exceptions to their general underwriting guidelines. Opp'n Br. at 22-23. These disclosures were clear and unambiguous and foreclose any claim that the Offering Documents omitted information about so-called "violations" of underwriting guidelines:

> Although mortgage originators generally underwrite mortgage loans in accordance with their pre-determined loan underwriting guidelines, from time to time, and *in the ordinary course of business, originators will make exceptions to these guidelines*. Loans originated with exceptions may result in *a higher number of delinquencies and loss severities* than loans originated in strict compliance with the designated underwriting guidelines.

McGarry Decl. Ex. 6 at 17 (emphasis added); *see also* Defs.' Opening Br., Annex A.

Moreover, the SEC Regulation that addresses underwriting guidelines specifies that issuers only have a duty to disclose originators' departures from their general underwriting criteria to the extent the issuers had actual knowledge of them. *See* 17 C.F.R. § 229.1111(a)(3). The Complaint does not allege that the Individual Defendants had actual knowledge of the originators' alleged underwriting practices for the hundreds of thousands of mortgage applications from the nine different originators named in the Complaint. To the contrary, Plaintiffs disclaim any intent to allege fraud. *See* Compl. ¶ 3.

Plaintiffs acknowledge both that the Offering Documents disclosed the originators' discretion to make exceptions to the underwriting guidelines and the law that requires disclosure of only "known" exceptions. Plaintiffs respond, however, that "[t]he Complaint alleges not merely the failure to disclose certain exceptions, but that all of the stated Guidelines were systematically disregarded…." Opp'n Br. at 30. In essence, Plaintiffs' opposition argues that the Offering Documents, rather than describe the underwriting guidelines and disclose that originators had discretion to depart from them, should not have discussed the

underwriting guidelines at all because they were never followed. Too much disclosure cannot support a Section 11 claim, however.

        The Complaint lacks any specific factual allegations that would render plausible the claim that the loan originators completely disregarded their underwriting guidelines in issuing the mortgage loans underlying the Certificates. The allegations on this point are particularly conclusory and nowhere close to well-pled. Plaintiffs argue that their inferential leap is supported by (i) subsequent downgrades in the ratings for the Certificates, (ii) delinquency and foreclosure rates following the real estate crisis, (iii) general reports of allegedly "reckless" underwriting by certain loan originators, none of which mentions or discusses the mortgages underlying the Certificates purchased by Plaintiffs, and (iv) the existence of government investigations of Clayton Holdings and The Bohan Group, due diligence firms retained by LBHI as well as many other investment banks. Opp'n Br. at 18-20. The first three circumstances, however, are perfectly compatible with the alternative explanation that the ***fully disclosed*** underwriting guidelines were overly liberal and that loan underwriters made poor decisions to exercise their ***fully disclosed*** discretion to make exceptions to the guidelines. Plaintiffs' hindsight claims based on a market collapse are not sufficient to show that the underwriting guidelines were a sham. Moreover, even if the Complaint's conclusory allegations about the originators' violations of the underwriting guidelines were credited, the Plaintiffs still fail to allege that any of the particular loans underlying the Certificates were underwritten in violation of the guidelines. Generalized allegations about misconduct by originators are irrelevant absent some well-pled allegations connecting the alleged misconduct to loans underlying the Certificates. The Complaint contains no such allegations.

As for the fourth point, allegations about an investigation of Clayton Holdings and The Bohan Group show absolutely nothing except that there is an investigation. The alleged investigations of two firms who happened to do work for LBHI (among other investment banks) do not implicate any Lehman-affiliated entity in any wrongdoing. This cannot support *any* inference that the originators issuing the loans underlying the Certificates purchased by Plaintiffs disregarded their underwriting guidelines.

The conclusory allegation that the loan underwriters "systematically disregarded" the guidelines, as opposed to simply exercising their fully disclosed discretion unwisely, is insufficient. Such a claim requires additional factual allegations to "nudge[]" the allegation "across the line from conceivable to plausible." *Iqbal*, 556 U.S. at ---, 129 S. Ct. at 1951 (internal quotations omitted). As the Supreme Court explained in *Iqbal,* where there were "more likely explanations" than those provided by plaintiffs' conclusory allegations, the claim fails. *Id.*; *see also Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555, 127 S.Ct. 1955, 1964-65 (2007). Here, assuming Plaintiffs' factual allegations are true (and disregarding, as the Court must, Plaintiffs' conclusory and tendentious characterization of the alleged facts), the far more likely inferences to be drawn are that the underwriting guidelines were insufficiently stringent and loan underwriters exercised their discretion to deviate from the guidelines more often than proved prudent with the hindsight of the mortgage crisis. In other words, a market collapse does not give rise to a Section 11 claim. A Section 11 claim must instead be based upon nondisclosure of material facts, not the alleged failure of disclosed practices, the materialization of disclosed risks, or the bursting of a real estate bubble. Just as in *Twombly*, Plaintiffs' conclusory allegation

cannot pass the plausibility test because there is a far more likely explanation for Plaintiffs'
factual allegation.[1]

**B.  Plaintiffs Have Not Alleged Facts Suggesting Disclosure Of Deviations From The Underwriting Guidelines Would Have Altered The Total Mix Of Information**

The Complaint fails to plead facts showing that the alleged total, systematic undisclosed departure from the originators' underwriting guidelines constituted a material omission.  The Offering Documents provided extensive, specific and quantitative information about the loans underlying each tranche of securities in an offering – information on which a reasonable investor would have relied in deciding to purchase the securities in a particular tranche.  Quantitative tables at the back of every Prospectus Supplement informed prospective investors about, for example, the FICO scores of the borrowers, the precise number of "no documentation" loans, and numerous other quantitative aspects of the loans underlying the securities.  *See* Defs.' Opening Br. at 22-26.

Plaintiffs argue that "[t]he mere fact that there were numerous 'no documentation' loans, or loans issued to borrowers with low FICO scores, provides no information to investors that the Guidelines were disregarded."  Opp'n Br. at 31.  This is nonsensical.  Whatever impact the alleged departure from guidelines had on determining to which borrowers and under what conditions mortgage loans were extended was made plain to investors by the detailed descriptions of the mortgages that backed the securities offered.  What matters is that Plaintiffs' factual allegations make no showing that further disclosures about exceptions to the originators'

---

[1]     Indeed, in this case, unlike in *Twombly* and in *Iqbal*, the conclusory allegation is not only implausible, it is "extravagantly fanciful."  *Iqbal*, 556 U.S. ---, 129 S. Ct. at 1951.  Plaintiffs repeatedly represent that they are not alleging fraud.  Thus, their "systematic disregard" claim requires the Court to accept both that the underlying guidelines were a complete sham **and** that the Individual Defendants were unaware of it.

underwriting guidelines would have altered the "total mix" of information or would have "caused a reasonable investor to overestimate" the security's "future performance potential." *DeMaria v. Anderson*, 318 F.3d 170, 181 (2d Cir. 2003); *see also* Defs.' Opening Br. at 26. The detailed quantitative information about the characteristics of loans included in the pools underlying the Certificates fully equipped the investors to whom the Certificates were marketed to assess the risks. Apparently, the only disclosures that would be acceptable to Plaintiffs would be to attach the millions of pages of mortgage files and applications to the 94 different Prospectus Supplements.

      **C.**      **Alleged Omissions Regarding Underwriting Practices Were In Fact Disclosed**

      Plaintiffs cannot state a claim that the Offering Documents were materially misleading where the allegedly undisclosed information concerning underwriting practices was disclosed. *See* Defs.' Opening Br. at 17-20. The Individual Defendants' opening brief demonstrates that the exact information Plaintiffs allege to have been omitted was, in fact, set forth in the Offering Documents.

      For example, the Complaint alleges that the Offering Documents failed to disclose that appraisals of the mortgaged properties were often inflated because appraisers were "pressured to appraise to certain levels" and "if they appraised under certain levels they would not be hired again." Compl. ¶ 207. The Offering Documents, however, explicitly state:

> During the mortgage loan underwriting process, appraisals are generally obtained on each prospective mortgage property. The quality of these appraisals may vary widely in accuracy and consistency. Because in most cases the appraiser is selected by the mortgage loan broker or lender, **the appraiser may feel pressure** from that broker or lender to provide an appraisal in the amount necessary to enable the originator to make the loan whether or not the value of the property justifies such an appraised value. **Inaccurate or inflated appraisals** may result in an increase in the number and severity of losses on the mortgage loans.

McGarry Decl. Ex. 5 at STB-5 (emphasis added); *see also* Ex. 7 at 74. The Offering Documents disclose precisely the omission alleged.

Plaintiffs' response is that this information should have been disclosed in "specific portions of the Prospectus Supplement[s]." Opp'n Br. at 26. But it is black letter law that "the prospectus[] must be read as a whole." *Olkey v. Hyperion 1999 Term Trust, Inc.*, 98 F.3d 2, 5 (2d Cir. 1996); *see also DeMaria*, 318 F.3d at 181; *I. Meyer Pincus & Assocs., P.C. v. Oppenheimer & Co.*, 936 F.2d 759, 761 (2d Cir. 1991). Issuers are not required to repeat risk factors and cautionary language in each and every section of offering documents. As set forth in the Individual Defendants' moving brief, the Offering Documents fully and adequately disclosed all of the risks that Plaintiffs claim were omitted.

## III. ALLEGATIONS ABOUT RATINGS AGENCIES' RELATIONSHIPS WITH THE ISSUER FAIL TO STATE A CLAIM

Plaintiffs contend that they have sufficiently alleged Section 11 claims because the Offering Documents did not disclose certain alleged facts about the relationship between the Ratings Agencies and LBHI: alleged conflicts of interests, "ratings shopping" by LBHI, and the Ratings Agencies' roles in providing structuring advice. As a preliminary matter, the SEC regulation governing disclosure for asset backed securities offerings requires only (1) the disclosure of whether the issuance or sale of any class of offered securities is conditioned on the assignment of a rating by a rating agency, and (2) the actual rating, as was done here. *See* 17 C.F.R. § 229.1120. Moreover, the SEC has previously considered whether "to require disclosure in the prospectus supplement on the method of compensating the rating organization," "whether the extent of the rating organization involvement in the structuring of the security should be disclosed," and "whether issuers should be required to disclose activities that could be viewed as 'ratings shopping.'" *See* SEC Proposed Rules, 57 S.E.C. Docket 1244, 1994 WL 469347 at *9-

10.  The SEC *declined* to adopt these proposed additional disclosure requirements.  The Offering

Documents therefore disclosed what was legally required, and there was no duty to include

further disclosures about the role of Ratings Agencies.  *See Panther Partners, Inc. v. Ikanos*

*Commc'ns., Inc.*, 538 F. Supp. 2d 662, 668 (S.D.N.Y. 2008) ("Whether a duty to disclose exists

depends largely on the itemized disclosures required by the securities laws and the regulations

promulgated thereunder.").

        These allegations fail to state a claim for additional reasons.  First, the alleged

conflicts of interest between LBHI and the Ratings Agencies do not give rise to a claim because

the securities laws do not require the disclosure of publicly known information.  *See In re*

*Progress Energy, Inc. Sec. Litig.*, 371 F. Supp. 2d 548, 552-53 (S.D.N.Y. 2005).  Plaintiffs do

not dispute this legal principal but instead argue that the sources cited in the opening brief "did

not focus at all on the actual activities and conflicts of interest that existed in MBS ratings."

Opp'n Br. at 32.  Yet these sources include a January 2003 SEC report entitled "Report on the

Role and Function of Credit Ratings Agencies in the Operation of the Securities Markets."  This

report featured a section discussing "Conflicts of Interest in the Operation of Credit Rating

Agencies."  It specifically highlighted the very problem areas alleged in the Complaint.  *See*

McGarry Decl. Ex. 17 at 40; *see also* Ex. 32 at 6 (May 2007 *Bloomberg* article stating that

Ratings Agencies' "[p]otential conflicts of interest in the ratings game aren't new . . . . [the

Ratings Agencies] are always paid by the issuers of the debt they're rating").  The 2003 SEC

report and ensuing Congressional testimony from an SEC Director specifically detailed long-

held "***concerns . . . that a rating agency might be tempted to give a more favorable rating to a***

***large issuer because of the large fee***" and noted that "***the dependence of ratings agencies on***

***revenues from the companies they rate could induce them to rate issuers more liberally, and***

*temper their diligence in probing for negative information*."  *See* McGarry Decl. Ex. 17 at 40 n.109; Ex. 18 at 5.  Clearly, the "issuer pays for ratings" model was publicly known long before the challenged offerings were issued.

Plaintiffs and the rest of the market well knew that issuers paid the Ratings Agencies to rate their bonds and the potential conflict posed by this arrangement.  The underlying facts as reported by the SEC report and other sources made it clear to the investing public that the "issuer pays for ratings" model was the industry standard.  Plaintiffs claim that because the 2003 SEC Report described only "potential" conflicts of interest, it somehow did not inform the market about this industry standard.  This argument misses the point – whether or not the language in the report characterized the conflicts as "potential" rather than "actual," the market knew how Ratings Agencies were paid.  Accordingly, allegations about alleged conflicts of interest between the Ratings Agencies and LBHI do not state a claim.  *See In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.*, 272 F. Supp. 2d 243, 246 (S.D.N.Y. 2003) (dismissing Section 11 claims due to public knowledge of alleged conflicts of interest on Wall Street).

Second, with respect to contacts between the Ratings Agencies and LBHI prior to the issuance of a rating, such allegations fail to state a claim because this information is either not material or not sufficiently alleged.  The Complaint alleges that the relevant fact for investors and LBHI was the Certificates' investment grade rating.  *See* Compl. ¶ 14.  But the Complaint does not explain why a reasonable investor would consider consultation with the Ratings Agencies during the structuring process material.  *See generally Basic Inc. v. Levinson*, 485 U.S. 224, 231, 108 S. Ct. 978, 983 (1988).  Whether or not LBHI engaged in a dialogue with the Ratings Agencies during the rating process or instead engaged in an "iterative process" with the Ratings Agencies to determine the appropriate structure of a certificate is immaterial.  Either

process would give the exact same result – the rating. Furthermore, Plaintiffs' argument that the Offering Documents should have disclosed that this structuring advice was provided for free because that fact allegedly motivated the Ratings Agencies to inflate their ratings is undermined by allegations in the Complaint that the Rating Agencies required sponsors and issuers to comply with their criteria before issuing a rating. *See, e.g.,* Compl. ¶ 177-178 (describing "iterative process" whereby Ratings Agencies provided feedback to issuers before issuance of certificates). The Complaint alleges that the Ratings Agencies advised sponsors about how to structure the Certificates "to get a triple-A credit rating for their deals," *id.* at ¶ 174, not that the Ratings Agencies modified or changed their ratings criteria to accommodate the sponsors. The inference the Plaintiffs seek to draw – that the allegedly free structuring advice offered by the Ratings Agencies resulted in relaxed standards – is contradicted by the allegations themselves.

Finally, with respect to omissions regarding alleged "ratings shopping," the Complaint fails to state a claim because it provides only conclusory allegations about LBHI engaging in such practices. *See, e.g.*, *id.* at ¶¶ 66-67. Such conclusory allegations require some supporting facts to render the allegation plausible. *Iqbal*, 556 U.S. ---, 129 S. Ct. at 1950; *see also Twombly*, 550 U.S. at 554-555, 127 S. Ct. at 1955. The specific allegations about ratings shopping in the Complaint, however, do not name LBHI or any Lehman-affiliated entity. Compl. ¶¶ 168-171. The alleged fact that some firms may have engaged in ratings shopping does not suggest that all firms, and particularly LBHI, did so. In addition, the logical inference from Plaintiffs' allegations that the Rating Agencies refused to give LBHI its desired rating unless LBHI made changes to the underlying pool of mortgages is that the Agencies were ***not*** willing to give LBHI whatever rating it wanted for fear of losing business. *See id.* at ¶¶ 177-178 (alleging Ratings Agencies provided feedback to issuers in order to maximize the rating for a

mortgage-backed security).  More fundamentally, the suggestion that LBHI "played the Ratings Agencies off" against each other to obtain the most favorable rating is contradicted by the Prospectus Supplements.  The Prospectus Supplements for each of the nine offerings in which Plaintiffs allegedly purchased securities indicate that the Certificates were required to receive ratings from **both** S&P and Moody's. [2]  *See* McGarry Decl. Ex. 2 at S-115; Ex. 3 at S-117; Ex. 9 at S-95; Ex. 10 at S-76; Ex. 11 at S-102; Ex. 12 at S-121; Ex. 13 at S-86; Ex. 14 at S-100.  LBHI's employment of both Ratings Agencies to rate each Certificate is inconsistent with the conclusory allegation that LBHI "shopped for ratings" with respect to the Certificates.

## IV.  HINDSIGHT ALLEGATIONS ABOUT THE RATINGS AGENCIES' JUDGMENTS FAIL TO STATE A CLAIM

Plaintiffs' reliance on subsequent events – such as recent ratings downgrades for the Certificates and Moody's announcement of revisions to its model – to show flaws in the Ratings Agencies' models does not state a claim under Section 11.  The ratings awarded to the Certificates, as well as the determination of the appropriate level of credit enhancement, were forward-looking statements consisting of judgments and opinions about how the mortgages backing the certificates were likely to perform in the future.  To state a claim arising out of such opinions, Plaintiffs must allege facts demonstrating that the Individual Defendants knew that the Ratings Agencies' opinions were not "truly held," *In re Global Crossing*, 313 F. Supp. 2d at 210, and that the Individual Defendants possessed the allegedly omitted information about these opinions at the time the Prospectus Supplements were issued.  *In re JP Morgan Chase Sec. Litig.*, 363 F. Supp. 2d 595, 635 (S.D.N.Y. 2005).  Reliance on later events to show that the

---

[2]    All nine of the offerings in which the Plaintiffs allegedly purchased securities required ratings from two different ratings agencies.  Eight of the nine offerings received ratings from both S&P and Moody, while one offering received ratings from S&P and Fitch.  *See* McGarry Decl. Ex. 7 at S-1, S-119.

models were defective is the type of "pleading by hindsight" that courts regularly reject. *See, e.g., Panther Partners*, 538 F. Supp. 2d at 672.

Plaintiffs argue that their allegations are not made in hindsight based on statements made in 2008 that S&P had previously developed superior models that would have better predicted loan performance. But Plaintiffs' failure to allege that the Individual Defendants knew of the existence of such models when the Certificates were issued defeats their claims. In addition, their contention that LBHI was "clearly aware" that the Rating Agencies' models had allegedly not been updated because they worked with the models on a "daily basis" fails for at least three reasons. *See* Opp'n Br. at 33-34. First, LBHI's "awareness" is an inference that the Court is not required to accept. *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 352 F. Supp. 2d 429, 448 (S.D.N.Y. 2005). Second, because there are no allegations concerning LBHI's "awareness" pleaded in the Complaint, the Court need not consider it. *See Dietrich*, 76 F. Supp. 2d at 328. Third, even if the Complaint did allege that LBHI was aware that the models had not been updated, such an allegation would not establish that it knew at the time the Registration Statements were issued that the Ratings Agency predictions were not truly held. *See In re Global Crossing*, 313 F. Supp. 2d at 210.

## V. SPECIFIC INFORMATION PUBLICLY AVAILABLE PRIOR TO JUNE 19, 2007 BARS PLAINTIFFS' CLAIMS

Even if the allegations in the Complaint were sufficient to state actionable claims (and, for the reasons discussed above, they are not), the claims would be time-barred. A plaintiff must bring a Section 11 action within one year of actual, constructive or inquiry notice of facts giving rise to that action. *See* 15 U.S.C. § 77m; Defs.' Opening Br. at 34-35. There was a wealth of information publicly available more than a year before commencement of this action (June 19, 2007) about alleged violations of underwriting guidelines by originators, as well as the

allegations about the Ratings Agency models and relationships with issuers. This publicly available information is ***indistinguishable*** from the types of public information on which Plaintiffs rely in the Complaint and, accordingly, put Plaintiffs on notice of the facts and circumstances on which they base their claims.

Congressional hearings held in the spring of 2007 warned about the "abandonment of traditional underwriting guidelines" and "abuses that occurred in underwriting in 2005 and 2006" that had become "abundantly clear." *See* Defs.' Opening Br. at 37-38; *see generally* McGarry Decl. Exs. 23-25. Similarly, newspapers reports dating from the pre-June 19, 2007 timeframe also warned about the industry-wide decline in lending standards. *See* Defs.' Opening Br. at 39-40; *see generally* McGarry Decl. Ex. 31 (May 2007 article from *The Economist*). Combined, these reports were sufficient to provide "storm warnings" before June 19, 2007 of alleged deviations by mortgage originators from their underwriting guidelines. *See, e.g., Staehr v. Hartford Fin. Servs. Group, Inc.*, 547 F.3d 406, 427 (2d Cir. 2008) ("'Storm warnings' need not detail every aspect of the alleged fraudulent scheme."); *De la Fuente v. DCI Telecomms., Inc.*, 206 F.R.D. 369, 383 (S.D.N.Y. 2002) ("The issue . . . is whether the objective facts and circumstances, taken as a whole, provided inquiry notice.").

Ironically, Plaintiffs argue that the publicly available information was too general to have provided them with inquiry notice of the "storm warnings" because none of the articles specifically refer to LBHI or the Certificates. Opp'n Br. at 37-38. However, the Complaint relies on comparable articles that similarly fail to mention LBHI or SASCo. *See* Compl. ¶¶ 103, 109, 110, 156, 157, 161, 164, 170, 171, 174, 182, 228, 231. And none of the small number of articles or other sources cited in the Complaint that do mention LBHI specifically discuss the

Certificates.  *See, e.g.*, Compl. ¶¶ 81, 88, 155.[3]  Plaintiffs thus ask this Court to infer misconduct by Lehman-affiliated entities and the Individual Defendants from general reporting about the securitization market that neither describes nor suggests wrongdoing by LBHI.  Such inferences are unwarranted, and Plaintiffs cannot on the one hand trumpet certain articles discussing improper conduct by other firms as a basis for suing the Individual Defendants, and on the other hand dismiss earlier articles that do the same as being too general to put them on notice.

Moreover, the Complaint specifically relies on material published prior to June 19, 2007 concerning the alleged practices of originators of the mortgages underlying the Certificates.  *See, e.g.,* Compl. ¶ 109 (March 2007 CNNMoney.com describing risky lending by originators including IndyMac) (McGarry Decl. Ex. 21); *id.* at ¶ 231 (quoting March 2007 *MarketOracle* article labeling IndyMac the "king-pin of Alt-A loans," for which applicants' "income is taken as fact") (McGarry Decl. Ex. 19); *id.* at ¶ 133 (discussing March 2007 *New York Times* article describing First Franklin's use of shortcuts to "ignore warning signs" about borrowers) (McGarry Decl. Ex. 20).  Having themselves relied on these same articles to draft their complaint, Plaintiffs cannot claim that the articles were too vague to put them on notice that they had claims.

Plaintiffs also had notice of their claims regarding the Ratings Agencies' models, their roles in structuring the Certificates, and any conflicts of interest more than one year before

---

[3]    The only source in the Complaint that specifically mentions the Certificates are the announcements of rating downgrades.  Plaintiffs contend that they had no inquiry notice because the downgrades were not announced until after June 19, 2007.  Significantly, they cite no law to support their argument that "storm warnings" cannot arise until the market reacts.  In one illustrative case, *LC Capital Partners*, the Second Circuit found a complaint time-barred, holding that reserves taken by the defendant company provided inquiry notice. *LC Capital Partners, LP v. Frontier Ins. Group., Inc.*, 318 F.3d 148, 154-55 (2d Cir. 2003). These reserves – and not their impact on the company's stock price or debt rating – were sufficient to provide inquiry notice.

the first suit was filed. The Complaint cites articles predating the statute of limitations which discuss Moody's "stunning admission" in *April 2007* that it had not updated its models since 2002, Compl. ¶ 162, and a *June 1, 2007* article that quoted a Columbia University professor's description of how "[c]redit raters participate in every level of packaging a CDO." *Id.* at ¶ 175. With respect to the conflicts of interest Plaintiffs allege, the SEC identified the potential conflicts of interest inherent in the issuer-pays model going back to the late 1990's – a decade prior to the June 19, 2007 statute of limitations deadline here. *See* Defs.' Opening Br. at 28-29.

Faced with this array of publicly available information providing them inquiry notice of their claims here, Plaintiffs contend that certain statements made by both LBHI and the Ratings Agencies made the storm warnings "controverted," thereby defeating inquiry notice. However, as the Second Circuit explained, "reassuring statements will prevent the emergence of a duty to inquire or dissipate such a duty only if an investor of ordinary intelligence would reasonably rely on the statements to allay the investor's concern." *LC Capital Partners,* 318 F.3d at 155. In light of the overwhelming volume of news about (1) the originators' alleged lending practices, (2) the alleged flaws in the Ratings Agency models, (3) potential conflicts of interest between the Ratings Agencies and issuers, and (4) reports about how the Ratings Agencies provided structuring advice to issuers, Plaintiffs cannot reasonably contend that a general statement by one Lehman executive or representatives from the Ratings Agencies excused them from their duty to inquire. Because Plaintiffs had available prior to June 19, 2007, the same quality of information concerning alleged lending practices and Ratings Agencies on which they rely in the Complaint, their claims should be dismissed as time barred. *See Dodds v. Cigna Sec., Ins.,* 12 F.3d 346, 350 (2d Cir. 1993).

## CONCLUSION

For all the reasons stated above and in the Individual Defendants' moving papers, the Consolidated Securities Class Action Complaint should be dismissed without leave to replead pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.

Dated:   New York, New York
         July 31, 2009

**SIMPSON THACHER & BARTLETT LLP**

By   s/: Michael J. Chepiga

Michael J. Chepiga (mchepiga@stblaw.com)
Mary Elizabeth McGarry (mmcgarry@stblaw.com)
Michael C. Ledley (mledley@stblaw.com)

425 Lexington Avenue
New York, New York  10017-3954
Telephone: (212) 455-2000
Facsimile: (212) 455-2502

*Attorneys for Defendants Lana Franks, Edward Grieb, Richard McKinney, Kristine Smith, James J. Sullivan, Samir Tabet and Mark L. Zusy*
