**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
:
In re: :
:
LEHMAN BROTHERS SECURITIES :
AND ERISA LITIGATION :
:
This Document Applies To: :
:
*In re Lehman Brothers Equity/ Debt Securities* :
*Litigation*, 08 Civ. 5523 (LAK) : Civil Action 09 MD 2017 (LAK)
:
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

### MEMORANDUM OF LAW IN FURTHER SUPPORT OF THE EXECUTIVE DEFENDANTS' MOTION TO DISMISS THE EXCHANGE ACT CLAIMS OF THE SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

SIMPSON THACHER & BARTLETT LLP
425 Lexington Avenue
New York, New York 10017
(212) 455-2000
*Attorneys for Defendants Joseph M. Gregory,*
*Ian Lowitt and Christopher M. O'Meara*

ALLEN & OVERY LLP
1221 Avenue of the Americas
New York, NY 10010
(212) 610-6323
*Attorneys for Defendant Richard S. Fuld, Jr.*

FRIED, FRANK, HARRIS, SHRIVER &
JACOBSON LLP
One New York Plaza
New York, New York 10004
(212) 859-8218
*Co-Counsel for Defendant Joseph M. Gregory*

PROSKAUER ROSE LLP
1585 Broadway
New York, NY 10036
(212) 610-6323
*Attorneys for Defendant Erin Callan*

Dated: July 31, 2009

## TABLE OF CONTENTS

**Page**

I.    PLAINTIFFS FAIL TO ALLEGE ANY MATERIAL MISSTATEMENT OR OMISSION ........................................................................................3

II.    PLAINTIFFS' INFERENCES OF SCIENTER DO NOT MAKE SENSE ......................3

     A.     Plaintiffs' Theory Assumes Irrational Conduct .....................................................4

     B.     Plaintiffs' "Red Flags" Are Nothing More Than Fraud By Hindsight ..................6

     C.     Plaintiffs' Temporal Proximity And Magnitude Arguments Do Not Lead To A Strong Inference Of Scienter ..................................................................10

     D.     Plaintiffs Fail To Establish Through Individualized Pleadings That Each Of The Executive Defendants Acted With Scienter .............................................12

III.    PLAINTIFFS IGNORE THE INTERVENING FACTOR THAT PLAINTIFFS' LOSS COINCIDED WITH THE WORST FINANCIAL CRISIS SINCE THE GREAT DEPRESSION ...............................................................................14

IV.    PLAINTIFFS' REQUEST TO IGNORE CERTAIN DOCUMENTS SHOULD BE REJECTED ....................................................................................16

CONCLUSION...........................................................................................17

# TABLE OF AUTHORITIES

<u>Page(s)</u>

## Cases

*Ashcroft v. Iqbal*, 129 S. Ct. 1937 (2009)...................................................................................14

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87 (2d Cir. 2007) ...............................12, 13

*Campo v. Sears Holding Corp.*, -- F. Supp. 2d --, 2009 WL 2151289
    (S.D.N.Y. July 21, 2009) ....................................................................................... 9, 10, 16

*Chambers v. Time Warner, Inc.*, 282 F.3d 147 (2d Cir. 2002)....................................................16

*Denny v. Barber*, 576 F.2d 465 (2d Cir. 1978)...........................................................................11

*Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336, 125 S. Ct. 1627
    (2005)..................................................................................................................................14

*ECA and Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan
    Chase Co.*, 553 F.3d 187 (2d Cir. 2009)..............................................................................4

*Edison Fund v. Cogent Inv. Strategies Fund, Ltd.*, 551 F. Supp. 2d 210
    (S.D.N.Y. 2008) ............................................................................................................13, 14

*First Nationwide Bank v. Gelt Funding Corp.*, 27 F.3d 763 (2d Cir. 1994) .........................14, 15

*In re Acterna Corp. Sec. Litig.*, 378 F. Supp. 2d 561, 581-82 (D. Md 2005)..............................11

*In re Amaranth Natural Gas Commodities Litig.*, 587 F. Supp. 2d 513 (S.D.N.Y. 2008)..........12

*In re AOL Time Warner, Inc. Sec. & "ERISA" Litig.*, 381 F. Supp. 2d 192
    (S.D.N.Y. 2004) ....................................................................................................................7

*In re Bisys Sec. Litig.*, 397 F. Supp. 2d 430 (S.D.N.Y. 2005)..........................................9, 13, 14

*In re Elan Corp. Sec. Litig.*, 543 F. Supp. 2d 187 (S.D.N.Y. 2008)..............................................1

*In re Gildan Activewear, Inc. Sec. Litig.*, No. 08 Civ. 5048 (HB), 2009
    WL 1919618 (S.D.N.Y. July 1, 2009)..................................................................................7

*In re Keyspan Corp. Sec. Litig.*, 383 F. Supp. 2d 358 (E.D.N.Y. 2003)......................................5

*In re Pixar Sec. Litig.,* 450 F. Supp. 2d 1096 (N.D. Cal. 2006) ..................................................5

*In re Sina Corp. Sec. Litig.*, No. 05 Civ. 2154, 2006 WL 2742048
    (S.D.N.Y. Sept. 25, 2006)....................................................................................................5

**Page(s)**

*In re Worlds of Wonder Sec. Litig.*, 35 F.3d 1407 (9th Cir. 1994) ................................................5

*In re Zyprexa Prods. Liab. Litig.*, 549 F. Supp. 2d 496 (E.D.N.Y. 2008) ...................................16

*Int'l Star Class Yacht Racing Ass'n. v. Tommy Hilfiger U.S.A., Inc.*, 146 F.3d 66 (2d Cir. 1998) ........................................................................................16

*Lentell v. Merrill Lynch & Co.*, 396 F.3d 161 (2d Cir. 2005) ....................................................15

*Leykin v. AT&T Corp.*, 423 F. Supp. 2d 229 (S.D.N.Y. 2006) ...................................................14

*Makor Issues & Rights, Ltd. v. Tellabs, Inc.*, 437 F.3d 588 (7th Cir. 2006) ..............................13

*Malin v. XL Capital Ltd.*, 499 F. Supp. 2d 117 (D. Conn. 2007) ...............................................16

*Merrill Lynch & Co. Research Reports Secs. Litig.*, Nos. 02 MDL 1484, 02 CIV 9690 (JFK), 2008 WL 2324111 (S.D.N.Y. June 4, 2008)...................................14

*Metzler Inv. GMBH v. Corinthian Colleges, Inc.*, 540 F.3d 1049 (9th Cir. 2008)...........................................................................................................................5

*Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124 (2d Cir. 1994) ..................................................4

*South Cherry Street, LLC v. Hennessee Group LLC*, 07-3658-cv, 2009 WL 2032133 (2d Cir. July 14, 2009) ..........................................................................1, 6, 7

*Southland Sec. Corp. v. INSpire Ins. Solutions, Inc.*, 365 F.3d 353 (5th Cir. 2004)..........................................................................................................................13

*Staehr v. Hartford Fin. Servs. Group, Inc.*, 547 F.3d 406 (2d Cir. 2008)...................................16

*Stair v. Calhoun*, No. 07-CV-03906 (JFB)(ETB), 2009 WL 792189 (E.D.N.Y. Mar. 23, 2009) .............................................................................................13

*Stevelman v. Alias Research, Inc.*, 174 F.3d 79 (2d Cir. 1999)....................................................9

*Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*, 531 F.3d 190 (2d Cir. 2008)................................................................................................8

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 127 S. Ct. 2499 (2007)........................................................................................................ 1, 3, 12, 16

*Winer Family Trust v. Queen*, 503 F.3d 319 (3d Cir. 2007) ......................................................13

The Opposition argues that the Executive Defendants were motivated by a desire to "postpone Lehman's demise, in the hopes of avoiding it."  Op. at 55.  The Executive Defendants agree.  Officers and directors are always motivated to further their company's success and to avoid bad results.  But such motive cannot support the inference of scienter necessary to salvage a complaint, particularly under the standards recently set down by the Supreme Court.  Nor can scienter be supported by implausible assumptions, such as that of Plaintiffs here, namely, that the full extent of the real estate and financial crisis was known and appreciated early by each Executive Defendant.  The far more plausible inference is that the Executive Defendants believed – like almost all the world's most sophisticated financial leaders – that the problems in the real estate and financial sectors were limited and containable in breadth, depth, and duration.

Plaintiffs argue that this Court must draw all inferences in their favor.  Op. at 14. That is a misstatement of the law.  The Supreme Court said in *Tellabs* that courts must undertake an "inherently comparative inquiry" and ask "[h]ow likely is it that one conclusion, as compared to others, follows from the underlying facts?"  *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 127 S. Ct. 2499, 2510 (2007).  The inference of scienter "must be cogent and compelling" and "at least as compelling as any opposing inference of nonfraudulent intent."  *Id*.  Specific, concrete allegations – not generalized allegations of a profit motive that any corporate officer possesses – are necessary to plead scienter.  *South Cherry Street, LLC v. Hennessee Group LLC*, 07-3658-cv, 2009 WL 2032133 at *9 (2d Cir. July 14, 2009); *see also In re Elan Corp. Sec. Litig.*, 543 F. Supp. 2d 187, 216 (S.D.N.Y. 2008) ("Any corporation would be motivated to make a profit [or] to avoid bankruptcy").

Far from being cogent and compelling, Plaintiffs' inferences do not make sense. Plaintiffs assert that the Executive Defendants knew that the deterioration of the subprime mortgage markets would infect and cripple the broader real-estate markets as well as the

1

financial markets generally, and that Executive Defendants wilfully ignored these problems at first, then fraudulently concealed them.  But if they knew what Plaintiffs say they did, why would the Executive Defendants have failed to take the obvious steps to save their own jobs?  Why in the 15 months prior to the Company seeking bankruptcy protection would all Executive Defendants have held or increased their holdings rather than sold any of their unrestricted shares?  Why would the Executive Defendants have increased Lehman's investments in real-estate and mortgage-backed assets knowing that the market was going to collapse?  Why would they have maintained the same hedging strategies rather than just shorted the mortgage markets?

The answer is simple: they **would not have**.  The more compelling inference – indeed the only cogent and compelling inference – from the Executive Defendants **increasing** Lehman's investments in real-estate and **holding or increasing** their personal holdings is that they had an honest belief that the problems of the real estate markets were containable and short-lived.  Viewed through this more discerning lens, the public statements made about Lehman's financial condition were the product of rational, real-time reactions to what Plaintiffs themselves describe as an "unprecedented meltdown" (SAC ¶ 2), not the product of a deceptive effort to shield investors from a known or even foreseen probability of failure. Indeed, it simply is implausible that Lehman officers independently conceived and perpetrated the same "fraudulent" scheme as the hundreds of other financial institutions and their officers and directors who have been sued in over **520** securities actions commenced prior to the filing of this motion to dismiss.  *See* MTD Chepiga Decl., Ex. 1.  The actions of the Executive Defendants show they believed what they said and were caught unaware by the same economic firestorm that swallowed many other financial institutions and would have destroyed more without previously unimagined governmental intervention.

## I.    PLAINTIFFS FAIL TO ALLEGE ANY MATERIAL MISSTATEMENT OR OMISSION

As detailed in the Securities Act Moving and Reply briefs, which are incorporated by reference here, the SAC does not allege any actionable misstatement or omission by the Executive Defendants.  The SAC fails to satisfy the stringent pleading standard that requires it to identify the speaker, where and when the statements were made and why they were fraudulent.  Moreover, the truth of the alleged misstatements or omissions must be evaluated by the facts and disclosures as they existed at the time of the alleged misstatements. Plaintiffs' blanket assertions cover five different Lehman officers who served at various points of time over a 15 month time span characterized by the most highly volatile credit, securities, and real estate markets in recent history.  Yet Plaintiffs treat the alleged misstatements and omissions as if then existing market conditions and information did not matter and instead advance one-size fit all allegations.  This cannot state a claim for securities fraud.

## II.    PLAINTIFFS' INFERENCES OF SCIENTER DO NOT MAKE SENSE

Plaintiffs' failure to plead any material misstatement or omission under the Securities Act is even more acute with the Exchange Act allegations, which necessarily require pleading "a mental state embracing intent to deceive, manipulate or defraud" under not only the strict standards of Rule 9(b), but also the Reform Act.  *Tellabs,* 551 U.S. at 319, 127 S. Ct. at 2507 (internal citation omitted).  Plaintiffs fail to plead cogent and compelling inferences of scienter because, among other things: (a) their theory assumes irrational conduct and that the Executive Defendants acted contrary to their own self-interest; (b) Plaintiffs' attempts to identify "red flags" are simply fraud by hindsight; (c) Plaintiffs' temporal proximity and magnitude arguments ignore the requirement that scienter must exist at the time a

3

misstatement is made; and (d) Plaintiffs have not met their burden of establishing through individualized pleadings that each of the Executive Defendants acted with scienter.

### A.    Plaintiffs' Theory Assumes Irrational Conduct

The inferences that Plaintiffs ask this Court to draw require assumptions that the Executive Defendants acted contrary to their own self-interest.  This does not make sense and is not the law.  *See, e.g.*, *ECA and Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co*., 553 F.3d 187, 203 (2d Cir. 2009) (affirming dismissal of securities fraud case because the theory that the defendant acted contrary to its economic well being was "implausible"); *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1130 (2d Cir. 1994) ("In looking for a sufficient allegation of motive, we assume that the defendant is acting in his or her informed economic self-interest.").

The SAC alleges that the Executive Defendants knew since 2006 that "a meltdown in commercial mortgage market would follow a meltdown in the residential market" with "the danger to the commercial mortgage and CMBS markets beginning in mid 2007."  SAC ¶ 337.  But there is no sign the Executive Defendants had such foresight.[1]  Instead, Lehman invested billions of dollars in "direct investment in real estate, committing financing and direct equity to several deals in mid-2007."  Op. at 37-38 (citing SAC ¶ 129).  "By the end of 2007, Lehman had amassed roughly $89 billion of [mortgage and real estate-related assets], up more than 50% from 2006."  *Id.* at 38 (citing SAC ¶ 94).  This course of conduct makes no sense if, as Plaintiffs assert, at that very time the Executive Defendants knew a major crisis in the mortgage and real estate-related markets was brewing.

---

[1]    After a highly successful career as an investment banker in an area having nothing to do with the alleged fraud, Defendant Erin Callan assumed the role of Lehman CFO on December 1, 2007.  It defies common sense that if she were aware of an ongoing fraud relating to Lehman's mortgage business, she would have voluntarily elected to leave her investment banking job, join such illicit activity and become a spokesperson for Lehman with respect to the alleged fraud, only to resign from the position seven months later.

Likewise, the Executive Defendants managed their personal finances in a manner inconsistent with knowledge of an impending market collapse. An inference of scienter may be supported by evidence that defendants reduced their interest in an issuer prior to disclosure of an alleged misrepresentation. But it is indisputable that the opposite occurred here. Plaintiffs concede that *each* of the Executive Defendants either retained or increased his or her holdings. Plaintiffs argue instead that because the increased holdings were not due to purchases on the open market, those purchases (as well as the absence of widespread selling) should be disregarded.[2] Op. at 57. This misses the point – and the law. The fact that all but one of the Executive Defendants did not sell a single share,[3] and that all increased or held their overall holdings, negates an inference of scienter, regardless of how those shares were acquired. *In re Keyspan Corp. Sec. Litig.*, 383 F. Supp. 2d 358, 383 (E.D.N.Y. 2003); *In re Sina Corp. Sec. Litig.*, No. 05 Civ. 2154, 2006 WL 2742048, at *12 (S.D.N.Y. Sept. 25, 2006).

---

[2]  Plaintiffs cite a Ninth Circuit case for the proposition that the lack of trading does not negate an inference of scienter. Op. at 57, n.28 (citing *In re Worlds of Wonder Sec. Litig.*, 35 F.3d 1407, 1427 (9th Cir. 1994)). This case and others say the exact opposite of what Plaintiffs claim. The Ninth Circuit found where "most of the defendants sold only a miniscule fraction of their holdings . . . the defendants' actual trading would conclusively rebut an inference of scienter." 35 F.3d at 1427; *see also Metzler Inv. GMBH v. Corinthian Colleges, Inc.*, 540 F.3d 1049, 1067 (9th Cir. 2008) (collecting cases); *In re Pixar Sec. Litig.,* 450 F. Supp. 2d 1096, 1106-1107 (N.D. Cal. 2006).

[3]  Plaintiffs characterize Fuld's sale of less than 3% of his holdings *almost a year before* the first alleged corrective disclosure as "unusual and suspicious" because it was made when Lehman's stock price was near its peak and the Company was repurchasing shares. Op. at 57. Plaintiffs ignore the precedent holding there is no inference of scienter where a sale was a small percentage of the individual's total holdings, and the facts that the June 2007 sale was consistent with Fuld's previous trading history, and he subsequently **added** to his holdings, continuing to hold 10 million shares when Lehman filed for bankruptcy. MTD at 32-33. Regardless, Plaintiffs' theory begs the question: Why wouldn't Fuld have sold more of his shares – or any of his shares at some point in the 15 months prior to their becoming worthless – if he believed the share price was at a peak and the market was going to collapse?

Desperate, and implicitly acknowledging the lack of a coherent and compelling inference of scienter based on the Executive Defendants' own self-interest, Plaintiffs argue that this Court should not assume that the Defendants acted rationally.  Op. at 58-59.  Courts regularly hold otherwise.  MTD at 29-30 (collecting over a half dozen opinions by the Second Circuit and Southern District of New York courts).  In assessing scienter, the Court is to assume that Defendants act in their rational self-interest.

**B.    Plaintiffs' "Red Flags" Are Nothing More Than Fraud By Hindsight**

The "red flags" identified by Plaintiffs are simply fraud by hindsight and do not plead scienter.  Plaintiffs ignore that Lehman was a global investment bank with 28,000 employees. Within the walls of the Company, these employees studied, analyzed, crunched and debated in real-time a virtually infinite amount of economic data to make their best informed predictions about numerous future economic trends.  After the fact, one can find isolated data points that seemingly "predicted" a future economic event.  This exercise in cherry-picking is insufficient to plead scienter, however.  Plaintiffs do not even purport to connect any of the "red flags" to a particular misstatement or show that the flags lead to a strong inference that an alleged misstatement was known to be false when made.

The Second Circuit's recent decision in *South Cherry Street* is instructive.  *South Cherry Street,* 2009 WL 2032133.  There, the Second Circuit affirmed the dismissal of securities fraud claims against investment advisors for failure to disclose that a recommended hedge fund was a Ponzi scheme.  *Id.* at *16.  Plaintiffs alleged that defendants were aware that representations about performance of the hedge fund were false, but failed to allege facts supporting that allegation.  The Court found such boilerplate allegations to be insufficient to plead scienter.  *Id*. at *12-15.  It rejected arguments that scienter was pled by alleging that defendants "failed to take obvious investigative steps and ignored clear red flags" when the complaint did not allege any facts that "there were obvious signs of fraud, or that the danger

6

of fraud was so obvious that [defendants] must have been aware of it." *Id.* at *13. Similarly, here, none of the red flags asserted by Plaintiffs adds up to an inference of scienter.

Citing 1989 authority, Plaintiffs advance boilerplate arguments that scienter can be inferred from Executive Defendants' positions with Lehman. They assert that since the alleged misstatements generally concerned core parts of Lehman's business, the Executive Defendants must have known those alleged misstatements were false. Op. at 34-39. This does not follow, and certainly does not lead to a strong inference of scienter. MTD at 42; *see also In re Gildan Activewear, Inc. Sec. Litig.*, No. 08 Civ. 5048 (HB), 2009 WL 1919618, at *8 (S.D.N.Y. July 1, 2009). Conclusory allegations regarding Executive Defendants' positions and responsibilities at the Company do not plead scienter. *See, e.g., In re AOL Time Warner, Inc. Sec. & "ERISA" Litig.*, 381 F. Supp. 2d 192, 230 (S.D.N.Y. 2004).

In lieu of direct evidence of scienter, Plaintiffs posit a litany of circumstantial evidence such as internal reports discussing the real estate crisis, data from Lehman subsidiaries concerning loan performance, and information to which the Executive Defendants would have had "access" that Lehman had made margin calls to two mortgage originators. Notably, Plaintiffs merely cite this "evidence" but do not connect it to any specific alleged misstatement or omission or allege that any particular Executive Defendant had actual knowledge of such "evidence." At best, Plaintiffs are – with the benefit of hindsight – second-guessing the wisdom of subprime mortgage lending.

The "reports" and "presentations" that "discussed" the developing economic crisis do not contradict any public statement by an Executive Defendant. MTD at 43. These reports are at best "red flags" that markets were deteriorating but not that a particular statement was false and certainly not that Lehman's valuations of its own mortgage and real estate assets were intentionally misstated. It is not sufficient to plead that the Executive Defendants were

7

reckless in not foreseeing an economic crisis that neither any major financial institution nor the Government foresaw.

Theoretically, even if corporate executives had access to raw data concerning performance of loans originated by subsidiaries, repurchases of loans originated by others, and individuals' margin calls that reflected a deterioration of a customer's subprime mortgage assets, this would be wholly insufficient to plead scienter. *See Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*, 531 F.3d 190, 196 (2d Cir. 2008) ("[Plaintiffs'] broad reference to raw data lacks even an allegation that these data had been collected into reports that demonstrated that loan origination practices were undermining the collateral's performance. Accordingly, they have not raised an inference of scienter . . . ."). The issue is not whether the mortgage markets and mortgage-related assets were deteriorating (as Lehman disclosed), but whether Lehman's failure to take writedowns earlier than it did was a product of fraud on the part of the Executive Defendants. Merely pointing to the unremarkable fact that Executive Defendants were aware that these asset classes were declining in value during the time in which the Plaintiffs admit Lehman was taking writedowns on such assets is insufficient to allege scienter.[4] For example, the very January 2008 Lehman internal presentation on which Plaintiffs rely to show that Lehman's writedowns were allegedly inadequate, Op. at 40, illustrates that firms with even greater debt exposure than Lehman took *smaller* writedowns than did Lehman, evidencing that each of these institutions analyzed its

---

[4] Plaintiffs allege as so-called evidence of the Executive Defendants' fraud that other companies such as Bear Stearns, Merrill Lynch, Citigroup and UBS took writedowns of mortgage-related holdings sooner and "more adequately" than Lehman did. Leaving aside that they do not allege that these firms' assets and reporting periods were the same as Lehman's, Plaintiffs further ignore the fact that each of these financial firms has also been sued for overvaluing its assets or not taking writedowns earlier than it did. MTD at 50 n.66.

mortgage portfolio differently, based on its own unique portfolio composition and loss experiences.[5]

Moreover, the valuation of illiquid assets necessarily involves nuanced business judgment.  To plead scienter, the SAC would need to allege both that Lehman believed that the actual value of the assets was different from their valuations at the time they were made, and that the Executive Defendants had affirmative knowledge of this discrepancy.  *Stevelman v. Alias Research, Inc.*, 174 F.3d 79, 84 (2d Cir. 1999); *In re Bisys Sec. Litig.*, 397 F. Supp. 2d 430, 448 (S.D.N.Y. 2005) (Kaplan, J.).  There are no such allegations here.  MTD at 50-54.

That Lehman explored a strategic sale of the company was not a "red flag" to the Company's executives and is not evidence of scienter.  These efforts were publicly known, and Plaintiffs do not even claim there was any misstatement concerning them.  Taking such exploratory steps in the shifting economic climate of the summer of 2008 indicates rational business judgment – not fraudulent intent.[6]  Even if this constituted a "red flag" of troubles at Lehman, the events were known to the public, putting it on equal footing with the Executive Defendants with respect to these facts.

_____

[5]   Moreover, scienter cannot be inferred from the mere fact that the size of Lehman's writedowns was different than the size of other banks' writedowns.  The SAC presupposes that Lehman's portfolio was comparable to that of other banks, but scienter cannot be based upon an unsubstantiated assumption.  *See Campo v. Sears Holding Corp.*, -- F. Supp. 2d --, 2009 WL 2151289, at *5 (S.D.N.Y. July 21, 2009).

[6]   Plaintiffs also half-heartedly point to certain personnel changes as evidence of scienter.  The SAC does not allege that these changes were due in any way to concerns over the accuracy of public statements including those about valuations, however.  The SAC only alleges that two executives were moved to other positions because they "urged caution" with respect to mortgage positions or "balked at taking more risks," and does not allege the executives were "pushed aside" for objecting to Lehman's asset valuations or disclosures.  SAC ¶ 343.  This case is not about whether Lehman took on too much risk, but whether the Executive Defendants each believed that the Company had taken on too much risk and contemporaneously said otherwise.

Similarly, that prospective suitors, based on a whirlwind review over the weekend before Lehman filed for bankruptcy, asserted that Lehman's mortgage and real estate portfolio were overvalued says nothing about any Executive Defendants' fraudulent intent. Potential buyers' speculative valuations could only have been based on experience with their own unique assets and would have been colored by their motive to acquire Lehman assets at fire sale prices.

Finally, Plaintiffs argue that scienter is established by their allegations that confidential witnesses "presaged the causes for Lehman's bankruptcy." Op. at 52. However, the SAC never alleges these witnesses actually interacted with or communicated to any Executive Defendant facts contrary to Lehman's public statements, or that they had (or were in a position to have) personal knowledge of the facts relevant to their post-hoc opinions. *See Campo*, 2009 WL 2151289, at *8 (finding no scienter and dismissing securities fraud complaint where, *inter alia*, none of the confidential witnesses had contact with the individual defendants and two of them had left the company prior to the class period). Moreover, the confidential witness accounts were not contemporaneously made but instead were compiled for purposes of this litigation. *See* MTD at 44-50.

### C. Plaintiffs' Temporal Proximity And Magnitude Arguments Do Not Lead To A Strong Inference Of Scienter

Plaintiffs argue that the "temporal proximity" between alleged misstatements regarding risk management, hedging, capitalization and liquidity and Lehman's bankruptcy supports an inference of scienter. This argument begs the question. Plaintiffs must plead scienter at the time a misstatement was made. For example, Plaintiffs point to eventual poor results with Lehman's hedging strategy as evidence that Defendants Lowitt and Callan's earlier comments that the hedges were effective were both false and made with scienter. But this does not follow. At the time the statements were made, Lehman's hedging strategy *was*

working. Because that strategy later stopped working does not mean that the statements were either false or made with scienter at the time they were made.

Plaintiffs allege that because Defendant Lowitt stated (in part) during a September 10, 2008 conference call that "there is no *direct* hedge for Alt-A assets," this was an admission that there had never been an *effective* hedge for such assets and that Lehman should have disclosed this fact. However, a reading of the entire transcript makes clear that Lowitt was not stating there was no effective hedge for Alt-A assets. Rather, he was explaining that the risk of those assets was managed by a series of indirect hedges, including trades on ABX indices for other asset classes, and that during the specific reporting period prices for those other asset classes dropped far less than the price of Alt-A assets fell. This resulted in an ineffective hedge for the quarter. MTD Chepiga Decl., Ex. 50 at 8-9.

Plaintiffs similarly argue that Defendant Fuld's comments were knowingly false because Lehman's efforts to prevent a "run on the bank" ultimately were unsuccessful and the Company was forced into bankruptcy five days later. It is an inferential leap that because Lehman did fail that therefore Fuld's statement that he believed **at that time** that Lehman had a strong liquidity position was made with scienter. It is unsurprising that with unprecedented market dislocation liquidity dries up quickly, particularly for trading firms that cannot survive unless other entities have sufficient confidence to continue trading with them. This is by definition what occurs in a run on the bank. MTD at 10. It is not the law that the fact a company failed establishes fraud on the part of managers who did not predict that failure. *See Denny v. Barber*, 576 F.2d 465, 470 (2d Cir. 1978).

Plaintiffs' attempt to infer scienter from the scope and magnitude of Lehman's collapse relies on cases with facts different from those here and is also unavailing. *See In re Acterna Corp. Sec. Litig.*, 378 F. Supp. 2d 561, 581-82 (D. Md. 2005) (rejecting that magnitude of a writedown, as opposed to a restatement or corrective disclosure, gives rise to

11

an inference of scienter).  Plaintiffs argue in their brief that Lehman's writedowns were so big

that they can infer scienter from their magnitude.  Op. at 50.  But Plaintiffs alleged in the

SAC that the writedowns "were too late and too little." SAC ¶ 135.  Plaintiffs' writedown

arguments are mutually inconsistent.  The more compelling inference from the writedowns is

that Lehman suffered the increasing but unanticipated effects of a collapsing market that

wiped out trillions of dollars of wealth across the global economy.

> **D.    Plaintiffs Fail To Establish Through Individualized Pleadings That Each
> Of The Executive Defendants Acted With Scienter**

Plaintiffs often do not differentiate which alleged misstatements or omissions are

attributable to which Executive Defendant, even though three of the Executive Defendants

served in the CFO position for only a portion of the relevant time period.  Instead, Plaintiffs

argue that "only one of Plaintiffs' allegations must satisfy the pleading standard in order to

survive dismissal of the Complaint."  Op. at 17.

If Plaintiffs are arguing that each allegation should be scrutinized in isolation, they are

wrong.  "The inquiry . . . is whether *all* of the facts alleged, taken collectively, give rise to a

strong inference of scienter, not whether any individual allegation, scrutinized in isolation,

meets that standard."  *Tellabs*, 551 U.S at 322-23, 326, 127 S. Ct. at 2509, 2511 (emphasis in

original) (stating also that "the court's job is not to scrutinize each allegation in isolation but

to assess all the allegations holistically"); *see also In re Amaranth Natural Gas Commodities

Litig.*, 587 F. Supp. 2d 513, 529 (S.D.N.Y. 2008) (same).  Alternatively, if Plaintiffs are

arguing that the Motion to Dismiss the Executive Defendants should be denied if they can

satisfy the pleading standard for one set of allegations against one defendant, Plaintiffs are

wrong again.  Rule 9(b) and the Reform Act mandate that a complaint must "(1) specify the

statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where

and when the statements were made, and (4) explain why the statements were fraudulent."

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007). "Where multiple defendants are asked to respond to allegations of fraud, the complaint should inform each defendant of the nature of his alleged participation in the fraud. . . . Because the allegations must be analyzed with respect to each defendant, the Court examines each in turn." *Stair v. Calhoun*, No. 07-CV-03906 (JFB)(ETB), 2009 WL 792189, at *13 (E.D.N.Y. Mar. 23, 2009) (granting motion to dismiss with respect to some defendants and denying it with respect to others). Allegations against one Defendant do not give Plaintiffs a free pass on satisfying their burden with respect to all Defendants.

Plaintiffs concede that the SAC does not attribute even a single statement to one Executive Defendant, Gregory, and fall back on the "group pleading" doctrine. The continued viability of this doctrine to attribute the statement of one officer to corporate statements is doubtful given the Reform Act's particularity requirements.[7] Even if it remains viable as to the attribution of corporate statements, however, courts are in agreement that the group pleading doctrine has no applicability to the Reform Act's scienter requirement. It cannot substitute for pleading each defendant's basis for knowledge. Plaintiffs cannot avoid – and have not met – their burden to establish through individualized pleadings that Gregory and each and every other Executive Defendant acted with scienter.[8] *Bisys*, 397 F. Supp. 2d at

---

[7] Plaintiffs ignore the fact that, since the passage of the Reform Act, every Court of Appeals that has directly addressed the issue has held that the Reform Act's particularity requirements eliminated the group pleading doctrine. *See Winer Family Trust v. Queen*, 503 F.3d 319, 336-37 (3d Cir. 2007); *Makor Issues & Rights, Ltd. v. Tellabs, Inc.*, 437 F.3d 588, 602-03 (7th Cir. 2006); *Southland Sec. Corp. v. INSpire Ins. Solutions, Inc.*, 365 F.3d 353, 365-66 (5th Cir. 2004). This Court should likewise reject Plaintiffs' attempt to rely on group pleading here.

[8] Because Plaintiffs do not adequately allege a primary violation of § 10(b) and Rule 10b-5, their § 20(a) claim against the Executive Defendants fails as a matter of law. Moreover, § 20(a) requires allegations that the defendant was in some meaningful sense a culpable participant in the fraud. This requires particularized allegations supporting an inference that the defendant acted with scienter. Where courts have not found scienter, they have not found a violation of § 20(a). *See, e.g., Edison Fund v. Cogent Inv. Strategies Fund*,

13

440 (Kaplan, J.) ("[The group pleading doctrine] does not permit plaintiffs to presume the state of mind of those defendants at the time the alleged misstatements were made.").

## III.    PLAINTIFFS IGNORE THE INTERVENING FACTOR THAT PLAINTIFFS' LOSS COINCIDED WITH THE WORST FINANCIAL CRISIS SINCE THE GREAT DEPRESSION

The Supreme Court recently stated that even under Rule 8, a reviewing court should "draw on its judicial experience and common sense" to determine whether a claim is sufficiently "plausible" to state a claim for relief. *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1950-52 (2009). Yet Plaintiffs want this Court to ignore the largest financial crisis in decades when assessing their loss causation allegations. That defies reason and precedent. Courts regularly take into account such intervening factors when there is a market phenomenon even approaching the magnitude of this financial crisis.[9]

First, Plaintiffs' reliance upon the Restatement (Second) of Torts to fill the gaps in their loss causation theory is misplaced and revealing. To plead an Exchange Act claim a plaintiff must allege that the misstatements – not a broad market collapse – caused its loss.[10]

---

*Ltd.*, 551 F. Supp. 2d 210, 231 (S.D.N.Y. 2008). Even if Plaintiffs were to have pleaded a primary violation against one of the Defendants (and they have not), Plaintiffs' failure to plead that the other Defendants acted with scienter would be an additional reason to dismiss the § 20(a) claims as against those Defendants.

[9]  *See, e.g.*, *Merrill Lynch & Co. Research Reports Secs. Litig.*, Nos. 02 MDL 1484, 02 CIV 9690 (JFK), 2008 WL 2324111, at *7 (S.D.N.Y. June 4, 2008) (dismissing complaint in context of market-wide collapse of the Internet sector and stating that to prove loss causation "plaintiffs must distinguish the alleged fraud from the 'tangle of [other] factors' that affect a stock's price" (citing *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336, 343, 125 S. Ct. 1627 (2005)); *Leykin v. AT&T Corp.*, 423 F. Supp. 2d 229, 246 (S.D.N.Y. 2006) (finding complaint did not plead loss causation where it "does not allege facts showing that it was the claimed concealment which caused plaintiffs' losses, rather than the market-wide Internet stock collapse, nor any way to separate the effect of the misstatements (if there were any) from the general collapse or other causes); *see also* MTD at 59 (collecting cases).

[10]  *See First Nationwide Bank v. Gelt Funding Corp.*, 27 F.3d 763, 769, 772 (2d Cir. 1994) (stating "when the plaintiff's loss coincides with a marketwide phenomenon causing comparable losses to other investors, the prospect that the plaintiff's loss was caused by

14

Plaintiffs do not even attempt to separate the loss caused by alleged misstatements or omissions from loss caused by these other events.

Second, Plaintiffs make no effort to refute the obvious connection between news reports of other banks collapsing and Lehman's sudden stock price drops. Plaintiffs simply ignore the facts that Lehman's stock price plummeted 35% after Bear Stearns collapsed, and then again 45% when news broke about the troubles of Fannie Mae and Freddie Mac. *See* MTD at 61. These stock drops are much greater than those on the days of alleged "corrective disclosures" on June 9, 2008 (8.7%; with fall over two days of 19.44%), September 8, 2008 (12.7%), and September 10, 2008 (7%). *See* SAC ¶¶ 363-65.

Ironically, Plaintiffs acknowledge that Lehman was only one part of a broader industry collapse, characterizing the real estate and mortgage markets as "in the midst of an unprecedented meltdown." SAC ¶ 2; *see also id.* ¶¶ 4, 129(d), 271. Plaintiffs also repeatedly refer to the business decisions and practices of other banks affected by the financial crisis to allege that Lehman's response to developments was insufficient. *See* Op. at 8-9, 42, 46-47. At the same time, Plaintiffs do not acknowledge that there were other intervening factors that were the real cause of these other institutions' massive problems, as well as Lehman's, and of Plaintiffs' resulting losses. Plaintiffs cannot have it both ways.

---

the fraud decreases. . . . [A plaintiff's claim fails when] it has not adequately plead facts which, if proven, would show that its loss was caused by the alleged misstatements as opposed to intervening events," and holding a real estate market crash lent support for the conclusion that fraud was *not* a substantial cause of the plaintiff's injury); *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 174 (2d Cir. 2005) (same) (quoting *First Nationwide*).

## IV.  PLAINTIFFS' REQUEST TO IGNORE CERTAIN DOCUMENTS SHOULD BE REJECTED

The documents that Plaintiffs dispute are referred to in the Complaint and/or otherwise appropriate for judicial notice.[11]  Moreover, they are appropriate for consideration as the Court evaluates "how likely it is that [Plaintiffs'] conclusion, as compared to others, follows from the underlying facts."  *Tellabs*, 551 U.S. at 323, 127 S. Ct. at 2510.

Plaintiffs argue that the Court should ignore as "unauthenticated" Lehman conference call transcripts when deciding the Motion to Dismiss and object, in particular, to the September 10, 2008 Transcript.  Op. at 74-75.  But Plaintiffs extensively quote in the SAC from the September 10 transcript – indeed from 7 of the 8 transcripts at issue here.  *See* SAC ¶¶ 6, 8, 9, 135, 147, 151, 157, 271-274, 277-280, 286-289, 297-304, 310-320, 365 (quoting transcripts).  It is black letter law that judicial notice may be taken of documents that Plaintiffs "had either in [their] possession or had knowledge of and upon which they relied in bringing suit."  *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152-53 (2d Cir. 2002) (internal quotations omitted).  Moreover, Plaintiffs can hardly object to the authenticity of a document that they have submitted with their opposition papers.  *See* Securities Act Op. Kessler Decl., Ex. C (attaching September 10, 2008 Transcript).[12]

---

[11]  *Campo*, 2009 WL 2151289, at *3; *see* MTD at 2 n.8; *see also Staehr v. Hartford Fin. Servs. Group, Inc.*, 547 F.3d 406, 425 (2d Cir. 2008) (Courts may take judicial notice on a motion to dismiss of "the fact that press coverage, prior lawsuits, or regulatory filings contained certain information, without regard to the truth of their contents . . . ."); *Int'l Star Class Yacht Racing Ass'n. v. Tommy Hilfiger U.S.A., Inc.*, 146 F.3d 66, 70 (2d Cir. 1998) ("A court may take judicial notice of a document filed in another court to establish the fact of such litigation and related filings."); *In re Zyprexa Prods. Liab. Litig.*, 549 F. Supp. 2d 496, 501 (E.D.N.Y. 2008) (taking judicial notice of documents issued by a government agency).

[12]  In addition, this transcript (and others) are permissible on a motion to dismiss where, as here, Plaintiffs have quoted from the document only in part and omitted critical portions. *See* page 11 above (discussing Plaintiffs' mischaracterization of Defendant Lowitt's statement regarding Alt-A hedging); *Malin v. XL Capital Ltd.*, 499 F. Supp. 2d 117, 131 n.10 (D. Conn. 2007).

16

**CONCLUSION**

Plaintiffs fail to plead cogent and compelling inferences of scienter and cannot meet

the test of *Tellabs*. The Exchange Act claims should be dismissed without leave to replead.

Respectfully submitted,

**ALLEN & OVERY LLP**

By: /s/ _____
Patricia M. Hynes
(patricia.hynes@newyork.allenovery.com)
Todd S. Fishman
(todd.fishman@newyork.allenovery.com)
1221 Avenue of the Americas
New York, New York 10020
Telephone: (212) 610-6300
Facsimile: (212) 610-6399

*Attorneys for Defendant Richard S. Fuld, Jr.*

**SIMPSON THACHER &
BARTLETT LLP**

By: /s/ _____
Michael J. Chepiga
(mchepiga@stblaw.com)
Mary Elizabeth McGarry
(mmcgarry@stblaw.com)
Erika H. Burk (eburk@stblaw.com)
Bryce Pashler (bpashler@stblaw.com)
425 Lexington Avenue
New York, New York 10017
Telephone: (212) 455-2000
Facsimile: (212) 455 2502

*Attorneys for Defendants Joseph M.
Gregory, Ian Lowitt and Christopher M.
O'Meara*

**FRIED, FRANK, HARRIS, SHRIVER &
JACOBSON LLP**

By /s/_____
Audrey Strauss
(audrey.strauss@friedfrank.com)
Israel David
(israel.david@friedfrank.com)
One New York Plaza
New York, New York 10004
Telephone: (212) 859-8218
Facsimile: (212) 859-4000

*Co-Counsel for Joseph M. Gregory*

**PROSKAUER ROSE LLP**

By  /s/_____
Robert J. Cleary (rjcleary@proskauer.com)
Dietrich L. Snell (dsnell@proskauer.com)
Mark E. Davidson
(mdavidson@proskauer.com)
Seth D. Fier
(sfier@proskauer.com)
1585 Broadway
New York, NY 10036
Telephone: (212) 969-3000
Facsimile: (212) 969-2900

*Attorneys for Defendant Erin Callan*

July 31, 2009

17