UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

In re LEHMAN BROTHERS SECURITIES
AND ERISA LITIGATION

This Document Applies To:

> *In re Lehman Brothers Equity/Debt*
> *Securities Litigation*, 08-CV-5523-LAK

Case No. 09-MD-2017 (LAK)

<u>ECF CASE</u>

**LEAD PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF THEIR
<u>MOTION FOR LIMITED RELIEF FROM THE PSLRA DISCOVERY STAY</u>**

# TABLE OF CONTENTS

Page

I.     INTRODUCTION ............................................................................................ 1

II.    FACTUAL BACKGROUND ......................................................................... 2

III.   SUMMARY OF PARALLEL PROCEEDINGS AND PRODUCTION OF
       DOCUMENTS AND DEPOSITIONS IN THOSE PROCEEDINGS ............................. 5

IV.    ARGUMENT .................................................................................................. 12

       A.    The Limited Relief Requested Here Is Consistent With The
             Purposes Of The PSLRA ...................................................................... 13

       B.    Lead Plaintiffs' Requested Discovery Is Sufficiently Particularized
             And Places No Added Burden On The Producing Parties .................... 16

       C.    Lead Plaintiffs Will Suffer Undue Prejudice Absent Limited Relief ................... 18

       D.    Granting Lead Plaintiffs Access To Discovery Produced To Other
             Parties Would Minimize Any Danger Of Loss Of Evidence ................ 21

V.     CONCLUSION ............................................................................................... 23

# TABLE OF AUTHORITIES

CASES                                                                                    PAGE(S)

*In re Delphi Corp. Sec., Deriv. & "Erisa" Litig.*,
    2007 WL 518626 (E.D. Mich. Feb. 15, 2007)................................................................ passim

*In re Enron Corp. Sec., Deriv. & ERISA Litig.*,
    2002 WL 31845114 (S.D. Tex. Aug. 16, 2002) ..................................................16, 17, 18, 21

*Faulkner v. Verizon Commc'ns, Inc.*,
    156 F. Supp. 2d 384, 404 (S.D.N.Y. 2001).............................................................................22

*In re FirstEnergy Corp. Sec. Litig.*,
    229 F.R.D. 541 (N.D. Ohio 2004) ......................................................................15, 16, 17, 18

*In re Labranche Sec. Litig.*,
    333 F. Supp. 2d 178 (S.D.N.Y. 2004).........................................................................17, 18, 19

*In re Lehman Brothers Holdings Inc.*,
    Case No. 08-13555 (JMP) (Bankr. S.D.N.Y.) .............................................................6, 7, 8, 9

*In re Lernout & Hauspie Sec. Litig.*,
    214 F. Supp. 2d 100 (D. Mass. 2002) .......................................................................16, 18, 21, 23

*Mishkin v. Ageloff*,
    220 B.R. 784 (S.D.N.Y. 1998)................................................................................................16

*In re Optionable Inc. Sec. Litig.*,
    2008 WL 4629985 (S.D.N.Y. Oct. 20, 2008) .........................................................................15

*In re Royal Ahold N.V. Sec. & ERISA Litig.*,
    220 F.R.D. 246 (D. Md. 2004)........................................................................................ passim

*Seippel v. Sidley, Austin, Brown & Wood LLP*,
    2005 WL 388561 (S.D.N.Y. Feb. 17, 2005)...........................................................................18

*Singer v. Nicor*,
    2003 WL 22013905 (N.D. Ill. Aug. 23, 2003) ..................................................................18, 21

*In re Tyco Int'l, Ltd. Multidistrict Litig.*,
    2003 WL 23830479 (D.N.H. Jan. 29, 2003)...........................................................................17

*In re WorldCom, Inc. Sec. Litig.*,
    234 F. Supp. 2d 301 (S.D.N.Y. 2002)................................................................................ passim

**STATUTES**

11 U.S.C. § 362(a) ....................................................................................................................1

15 U.S.C.
    § 77z-1(b)(1) ...........................................................................................12, 13, 21
    § 78fff-1(d)(3) ......................................................................................................7
    § 78u-4(b)(3)(B) ...............................................................................12, 13, 16, 21, 22

**LEGISLATIVE MATERIALS**

H.R. Conf. Rep. No. 104-369 (1995), *reprinted in* 1995 U.S.C.C.A.N. 730 ................................13

S. Rep. No. 104-98 (1995), *reprinted in* 1995 U.S.C.C.A.N. 679..................................................13

I.    INTRODUCTION

Lead Plaintiffs respectfully submit this memorandum in support of their motion for partial modification of the discovery stay imposed by the Private Securities Litigation Reform Act of 1995 ("PSLRA").[1]  Lead Plaintiffs seek only limited relief from the stay:  Permission to obtain copies of documents, deposition transcripts, and other information that Defendants, Lehman Brothers Holdings Inc. ("Lehman" or the "Company"), Lehman-affiliated debtors, and third parties[2] have produced, or will soon produce, to governmental authorities and other litigants concerning investigations or litigation related to Lehman's bankruptcy.[3]

While numerous government entities and other litigants already have access to this evidence, the PSLRA stay currently precludes Lead Plaintiffs from obtaining any of the same materials.  Thus, Lead Plaintiffs are at an increasing information disadvantage in relation to other interested parties and are being hampered in forming their litigation – and settlement – strategy.  The PSLRA provides that a court may grant relief under the circumstances here, however, and permitting Lead Plaintiffs to obtain from the Producing Parties copies of materials already collected and produced to other interested parties would not frustrate any of the purposes

---

[1] "Lead Plaintiffs" refers to the Alameda County Employees' Retirement Association, the Government of Guam Retirement Fund, the Northern Ireland Local Government Officers' Superannuation Committee, the City of Edinburgh Council as Administering Authority of the Lothian Pension Fund, and Operating Engineers Local 3 Trust Fund.  *See* Lead Plaintiffs' Second Amended Consolidated Class Action Complaint ("SAC"), ¶¶17-21 (Ex. A).  All exhibit references herein are to exhibits accompanying the Declaration of David R. Stickney in Support of Lead Plaintiffs' Motion for Limited Relief From the PSLRA Discovery Stay.

[2] Defendants, Lehman, Lehman-affiliated debtors, and third parties are referred to collectively as the "Producing Parties."

[3] In light of Lehman's pending bankruptcy proceeding, litigation against Lehman (and affiliated debtors) is subject to the automatic stay set forth in 11 U.S.C. § 362(a).  Accordingly, Lead Plaintiffs will move the bankruptcy court for a limited modification of the automatic bankruptcy stay for access to materials that Lehman and affiliated debtors have produced or will produce to other parties.

underlying the PSLRA stay provision.  Rather, as courts have recognized in similar situations,

Lead Plaintiffs merely seek to ensure that they (and the prospective class[4] they represent) are not

as disadvantaged vis-à-vis other litigants in related proceedings as is currently – and

unnecessarily – the case.  *See, e.g.*, *In re WorldCom, Inc. Sec. Litig.*, 234 F. Supp. 2d 301, 305

(S.D.N.Y. 2002) (noting prejudice to securities plaintiffs as a result of PSLRA stay and lifting

stay as to materials produced in related proceedings so that securities plaintiffs could make

informed litigation decisions).

Lead Plaintiffs' claims are meritorious, the requested discovery is sufficiently

particularized, and the request for copies of materials already gathered and produced to

government entities and other litigants would place at most a negligible burden on the Producing

Parties.  Absent relief, this case will lag even further behind parallel criminal, civil, and

regulatory investigations and legal proceedings, and Lead Plaintiffs and the prospective class

will suffer undue prejudice as a result.  The prejudice is particularly acute here, where Lehman

and affiliated debtors are in bankruptcy and other persons in the United States and abroad seek to

hold Lehman and certain of its officers and directors accountable for their actions, thus creating

substantial uncertainty regarding sources of recovery.  Under these circumstances, courts have

granted the limited relief that Lead Plaintiffs request here.

II.    FACTUAL BACKGROUND

Before its bankruptcy filing, Lehman was one of the nation's most prominent financial

institutions.  It was a major participant in all aspects of the mortgage and real estate markets,

including originating residential and commercial mortgages, securitizing loans, marketing asset-

backed instruments, and investing directly in real estate.  SAC ¶¶2, 93.  Lehman's real estate and

---

[4] The prospective class is described on page 1 of the SAC.

mortgage exposure was substantial and increased over time.  SAC ¶94.  While Lehman amassed its real estate- and mortgage-related portfolio, the markets were in the midst of an unprecedented meltdown that adversely affected the market value of such assets.  SAC ¶¶2-3, 94.  Other companies with mortgage and real estate exposure booked massive write downs, ceased operations, or petitioned for bankruptcy protection, including firms such as Citigroup, Merrill Lynch, Morgan Stanley, Bear Stearns, and UBS.  SAC ¶¶2-3, 145, 147-48.  In contrast, Lehman and its insiders indicated publicly that the Company was different from its peers and able to perform better in the economic downturn.  *See, e.g.*, SAC ¶385.  It was not.

Lead Plaintiffs' action arises out of Lehman's hundreds of offerings of debt and equity securities, for collective proceeds of more than $47 billion, pursuant to offering materials that contained untrue statements and omitted material information.  Lehman's offering documents contained untrue statements and omitted material information regarding Lehman's: (1) significant and increasing concentration of mortgage-related risks; (2) failure to record write downs of its mortgage- and real estate-related investments in a timely or adequate fashion; (3) high-risk residential mortgage lending practices; (4) risk mitigation and inability to hedge against losses in its mortgage-related portfolio; and (5) capitalization, liquidity, and risks of bankruptcy.  *See, e.g.*, SAC ¶1.  Based on the false statements and omissions in Lehman's offering documents, the SAC asserts claims arising under the Securities Act of 1933 on behalf of purchasers of Lehman securities.  SAC ¶12.

Separately, based on certain Lehman insiders' numerous false and misleading statements and omissions, Lead Plaintiffs assert fraud-based claims under the Securities Exchange Act of

1934 against the Insider Defendants.[5]  For example, the Insider Defendants portrayed Lehman as being different from its competitors because Lehman supposedly had superior risk management and hedging strategies and was able to weather tough economic times due to its purportedly strong capital and liquidity positions.  *See, e.g.*, SAC ¶¶273, 284-85, 291, 298-99, 304.  As one analyst wrote following Defendant Lowitt's presentation on November 14, 2007, "Lehman suggested that there will not be a meaningful mark down . . . .  Lehman went beyond these assertions suggesting that it had no major losses in the impacted areas for the industry.  The company argued that its business is benefiting from the problems surfacing elsewhere."  SAC ¶285.  Internally, however, the Insider Defendants saw the adverse effects of the ongoing financial deterioration on Lehman's liquidity and capital.  For example, an internal June 2008 memorandum asked of Lehman executives: "Why did we allow ourselves to be so exposed?"  According to the memorandum, "[c]onditions clearly [were] not sustainable.  Saw warning signs.  Did not move early, fast enough.  Not enough discipline in our capital allocation."  SAC ¶348.

On September 9, 2008, during the week leading up to Lehman's bankruptcy, Lehman executives internally calculated that the Company required at least $3 billion in additional capital.  SAC ¶7.  Lehman also received demands from JPMorgan for $10 billion to cover lending positions.  *Id.*  Nevertheless, Lehman's Chief Executive Officer, Fuld, and Lehman's new Chief Financial Officer, Lowitt, held a conference call to assure investors that the Company did not need additional capital.  SAC ¶¶8-9.  During the September 10, 2008 conference call,

---

[5] SAC ¶13.  The "Insider Defendants" include Richard S. Fuld, Jr. (Lehman's Chief Executive Officer and Chairman of the Board of Directors); Christopher M. O'Meara (Lehman's head of Worldwide Risk Management and former Chief Financial Officer); Joseph M. Gregory (Lehman's President and Chief Operating Officer until June 2008); Erin Callan (Lehman's Chief Financial Officer and Vice President until June 2008); and Ian Lowitt (Lehman's Co-Chief Administrative Officer and Chief Financial Officer following Callan).  *See* SAC ¶¶25-30.

Lowitt stated: "Our liquidity position . . . remains very strong," "we have maintained our strong liquidity and capital profiles even in this difficult environment," and "we think that clearly with our capital position at the moment is, it's strong." SAC ¶9. Five days later, Lehman filed for bankruptcy protection.

Moreover, the Insider Defendants failed to disclose to investors adequate information concerning Lehman's mortgage-related assets or the precarious nature of Lehman's liquidity and capital positions. *See, e.g.*, SAC ¶11. Indeed, Insider Defendants refused to provide transparency and basic information about Lehman's holdings even when asked direct questions by analysts and investors regarding exposure to loss from mortgage-related assets and real estate-related investments and related hedging activities. *See, e.g.*, SAC ¶¶272-74, 276.

While Lehman executives publicly promoted Lehman's supposedly sound financial condition, Fuld was privately trying to sell Lehman's commercial real estate assets to various banks. When experts from the prospective purchasers analyzed Lehman's $32.6 billion portfolio, however, they determined that it was overvalued by as much as 35%. SAC ¶10. Additionally, the federal government refused to provide Lehman with a bailout. As Treasury Secretary Paulson later explained, "[T]he Federal Reserve could bailout Lehman with a loan only if the bank had enough good assets to serve as collateral, which it did not." *Id.* Ultimately, Lehman filed its voluntary petition for bankruptcy on September 15, 2008.

III.    SUMMARY OF PARALLEL PROCEEDINGS AND PRODUCTION
        OF DOCUMENTS AND DEPOSITIONS IN THOSE PROCEEDINGS

In the wake of Lehman's rapid decline and bankruptcy filing, and given serious questions regarding the value of Lehman's assets and the content of its public disclosures, Congress and numerous additional authorities launched civil or criminal investigations into potential wrongdoing at Lehman prior to the bankruptcy. Further, litigation over these issues continues in

different courts.  Many of these proceedings have involved large-scale document productions, depositions, and interviews.  To date, Lead Plaintiffs are aware of the following investigations and legal proceedings related to the allegations in the SAC, none of which is limited by the PSLRA's stay of discovery:

1.      In Lehman's Chapter 11 proceeding, *In re Lehman Brothers Holdings Inc.*, Case No. 08-13555 (JMP) (Bankr. S.D.N.Y.), several parties moved the court to appoint a bankruptcy examiner to examine the pre-petition conduct of Lehman and its managers.  Lead Plaintiffs joined in that request.  On January 16, 2009, the Honorable James M. Peck entered an Order Directing Appointment of an Examiner ("Examiner Order"), and on January 19, 2009, the court approved the appointment of Anton R. Valukas as Examiner.[6]  Among other duties, the Examiner is tasked with investigating:  (1) whether there are any colorable claims for breach of fiduciary duty against officers and directors of the debtors prior to the bankruptcy filing; and (2) the events that occurred between September 2, 2008 and September 15, 2008 or prior that may have resulted in commencement of the Chapter 11 case.  *See* Examiner Order ¶2.  As expressed recently by the Examiner in the bankruptcy court, his role is to resolve "individual liability and the liability of various institutions as it may or may not exist in connection with" the bankruptcy case.  *See* Aug. 26, 2009 Hr'g Tr. at 25:16-24 ("Aug. 26 Tr."), Docket No. 4999, *In re Lehman Brothers Holdings Inc.*, Case No. 08-13555 (JMP) (Bankr. S.D.N.Y.) (Ex. D).

On February 11, 2009, the bankruptcy court granted the Examiner's motion directing the production of documents and authorizing examination of the debtors' current and former

---

[6] *See* Order Directing Appointment of an Examiner Pursuant to Section 1104(c)(2) of the Bankruptcy Code, Docket No. 2569, *In re Lehman Brothers Holdings Inc.*, Case No. 08-13555 (JMP) (Ex. B) and Order Approving Appointment of Examiner, Docket No. 2583, *In re Lehman Brothers Holdings Inc.*, Case No. 08-13555 (JMP) (Ex. C).

officers, directors, employees, and other persons. Docket No. 2804, *In re Lehman Brothers Holdings Inc.*, Case No. 08-13555 (JMP) (Bankr. S.D.N.Y.) (Ex. E). Further, that order and the Examiner Order require the Examiner to cooperate and share information with other government agencies investigating the debtors, their management, or their financial condition. Aside from the issuance of multiple subpoenas under Bankruptcy Rule 2004, the Examiner has also obtained documents and information through informal information requests to third parties. In a recent filing, the Examiner indicated that his team had already collected over twenty-eight million pages of relevant documents and conducted more than 110 interviews. *See* Examiner's Motion to Compel ABN AMRO Inc. to Respond to Examiner's Subpoena for Rule 2004 Examination, filed Sept. 30, 2009, Docket No. 5306, *In re Lehman Brothers Holdings Inc.*, Case No. 08-13555 (JMP) (Bankr. S.D.N.Y.) (Ex. F).

2.       In the liquidation proceedings of Lehman's broker-dealer subsidiary, Lehman Brothers Inc. ("LBI"), the trustee appointed under the Securities Investor Protection Act to oversee the liquidation ("SIPA Trustee") is conducting an investigation into the events leading to LBI's liquidation and must report to the court any facts concerning "fraud, misconduct, mismanagement, and irregularities." *See* SIPA Trustee's Motion for an Order Granting Authority to Issue Subpoenas for the Production of Documents and the Examination of the Debtor's Current and Former Officers, Directors and Employees, and Other Persons at 2 (quoting 15 U.S.C. § 78fff-1(d)(3)), filed December 11, 2008, Docket No. 417, *In re Lehman Brothers Holdings Inc.*, Case No. 08-1420 (JMP) SIPA (Bankr. S.D.N.Y.) (Ex. G). According to the SIPA Trustee, he intends to investigate potential claims of LBI against officers, directors, and employees. *Id.* at 7. The bankruptcy court has authorized the SIPA Trustee to subpoena documents and to examine LBI's current and former officers, directors, and employees, as well

as any other persons having relevant information.  *See* Order Granting Authority to Issue Subpoenas for the Production of Documents and the Examination of the Debtor's Current and Former Officers, Directors and Employees, and Other Persons, filed January 15, 2009, Docket No. 561, *In re Lehman Brothers Holdings Inc.*, Case No. 08-01420 (JMP) SIPA (Bankr. S.D.N.Y.) (Ex. H).

In fact, the SIPA Trustee has already made document requests to numerous financial institutions that may have information relating to the events leading to LBI's collapse.  The SIPA Trustee has received and reviewed thousands of documents from these institutions and has interviewed their employees.  In addition, the SIPA Trustee has also reviewed hundreds of thousands of pages of internal LBI e-mails, including those of numerous high-level officers during the critical months leading up to Lehman's collapse, as well as account records, contractual agreements, and electronic data from LBI's records and information systems.    The SIPA Trustee is reviewing these materials "with an eye toward both investigating currently-known causes of action against third parties as well as uncovering presently-known causes of LBI's decline, matters concerning the financial condition of LBI, and events impacting the liquidation process."  *See* Trustee's First Interim Report for the Period September 19, 2008 Through May 29, 2009 at 15-16, filed May 29, 2009, Docket No 1151, *In re Lehman Brothers Holdings Inc.*, Case No. 08-1420 (JMP) SIPA (Bankr. S.D.N.Y) (Ex. I).

Among other things, the Trustee's report is expected to analyze: (1) the causes of LBI's collapse and the events and transactions that preceded it; (2) potential causes of action on behalf of LBI against third parties; (3) the status of the liquidation; and (4) lessons learned from the LBI liquidation and legislative, regulatory, and other policy recommendations for the future.  *Id.* at 16.

Moreover, in response to requests from government agencies, the SIPA Trustee has produced over a half-million pages of documents, as well as hundreds of gigabytes of electronic data.  Additionally, the SIPA Trustee is responding to non-party subpoenas issued in connection with various litigations and arbitrations around the United States, and he has made over one hundred document productions in response to these governmental and non-party requests.  *Id.* at 24.

At a recent hearing, the Examiner stated that he meets with the SIPA Trustee and that they exchange information.  For example, the Examiner noted that he shared documents and interviews with the SIPA Trustee and, similarly, that the SIPA Trustee has provided the Examiner with materials and access to a database.  Aug. 26 Tr. at 25:1-9 (Ex. D).

3.    The United States Trustee appointed the Official Committee of Unsecured Creditors ("UCC") to represent the interests of the unsecured creditors of Lehman and affiliated debtors.  The UCC is conducting an investigation into the acts, transactions, and conduct relating to Lehman's collapse.  In connection with its investigation, the UCC has received and is reviewing thousands of pages of documents.  *See* Response of Official Committee of Unsecured Creditors to Motion of The Walt Disney Company for Appointment of an Examiner Pursuant to Section 1104(c)(2) of Bankruptcy Code and Joinders Thereto, filed January 9, 2009, Docket No. 2477, *In re Lehman Brothers Holdings Inc.*, Case No. 08-13555 (JMP) (Bankr. S.D.N.Y.) (Ex. J).  It is likely, as in other bankruptcy cases, that the UCC ultimately will be tasked with prosecuting claims, such as derivative claims, on behalf of the debtors.

4.    On September 15 and 16, 2009, Lehman, the UCC, and the SIPA Trustee all moved for relief from the bankruptcy court's September 20, 2008 order approving the sale of Lehman's assets to Barclays.  According to the motions, extensive structural changes to the

transaction were implemented after Judge Peck entered his order approving the sale, and Barclays extracted billions in additional assets from the estate. *See, e.g.*, Debtor's Motion for an Order, Pursuant to Fed. R. Civ. P. 60 and Fed. R. Bankr. P. 9024, Modifying the September 20, 2008 Sale Order and Granting Other Relief, Docket No. 5148, *In re Lehman Brothers Holdings Inc.*, Case No. 08-13555 (JMP) (Bankr. S.D.N.Y.) (Ex. K). The motions indicate that the parties have engaged in extensive discovery related to the transaction and the composition and value of the assets transferred, including both document productions and depositions. *See id.* Indeed, Lehman – joined by the UCC and the SIPA Trustee – requested further discovery. *See id.* at ¶¶167-70.

5.      The Securities and Exchange Commission ("SEC") continues to investigate Lehman. The Examiner recently stated that he meets or speaks with the SEC on a weekly basis and shares information. Aug. 26 Tr. at 24:22-25:1 (Ex. D). According to *The Wall Street Journal*, the Examiner has been sharing information with the SEC related to the valuation of Lehman's real estate and other assets and its finances heading into bankruptcy. *See* Amir Efrati & Susan Pulliam, *Prosecutors are Poised to Impanel AIG Grand Jury*, Wall St. J., Sept. 11, 2009, at C1 (Ex. L).

6.      As first reported in September 2008, the Federal Bureau of Investigation ("FBI") continues to investigate potential corporate fraud at Lehman. *See, e.g.*, James Vicini, *FBI Said to Probe Fannie, Freddie, Lehman, AIG*, Reuters, Sept. 24, 2008 (Ex. M).

7.      As confirmed by Lehman's bankruptcy counsel in open court on October 16, 2008, the United States Attorneys' Offices in Manhattan, Brooklyn, and Newark are investigating Lehman and have subpoenaed various Lehman executives to testify before grand juries. Oct. 16, 2008 Hr'g Tr. at 52:18-22, Docket No. 1187, *In re Lehman Brothers Holdings*

*Inc.,* Case No. 08-13555 (JMP) (Bankr. S.D.N.Y.) (Ex. N). According to *The Wall Street Journal*, the U.S. Attorney's Office for this District is investigating whether Lehman valued its assets at artificially high levels, including its commercial real estate portfolio. Amir Efrati & Susan Pulliam, *Three U.S. Attorneys Probe If Lehman Misled Investors*, Wall St. J., October 7, 2008, at A3 (Ex. O). The U.S. Attorney's Office in Brooklyn is investigating whether officials misrepresented Lehman's true condition when making upbeat comments to the public, while federal prosecutors in New Jersey are reportedly investigating whether Lehman misled a New Jersey pension fund regarding its financial health prior to a stock offering in June 2008. *Id.*

The U.S. Attorneys and the Examiner have been meeting and exchanging information. According to the Examiner, he meets or speaks with the U.S. Attorneys on a weekly basis and shares information. Aug. 26 Tr. at 24:22-25:1 (Ex. D).

8.     Other state agencies are reportedly investigating Lehman and its business dealings. For example, immediately following Lehman's bankruptcy, Bloomberg reported that New Jersey Attorney General Anne Milgram was already "actively looking at Lehman." David Voreacos & Linda Sandler, *U.S. Subpoenas Lehman Over Investor Data, People Say*, Bloomberg.com, Oct. 7, 2008 (Ex. P).

9.     The House of Representatives Committee on Oversight and Government Reform launched an investigation into the causes and effects of Lehman's bankruptcy. Particularly relevant to this present motion, according to Chairman Henry Waxman's opening statement before the October 6, 2008 hearing, the Committee received "thousands of pages of internal documents from Lehman" in response to its requests. *See* Opening Statements of Rep. Henry Waxman, Chairman, Committee on Oversight and Government Reform, Causes and Effects of

the Lehman Brothers Bankruptcy, October 6, 2008, available at http://oversight.house.gov/documents/20081006101958.pdf  (Ex. Q).

10.     In Australia, a court has authorized local governments that invested in Lehman collateralized debt obligations (based on mortgage-backed securities linked to the U.S. subprime market) to bring suit against Lehman in Australia and elsewhere.  *See* Denny Thomas, et al., *Australia Court Allows Claims Against Lehman – Firm*, Reuters, Sept. 28, 2009 (Ex. R). According to news reports, the court determined that an agreement preventing the towns from filing claims against Lehman entities or pursuing payment from insurance policies was invalid. *Id.*

11.     Finally, suits brought pursuant to the Employee Retirement Income Security Act of 1974 ("ERISA") and additional actions are not foreclosed from discovery by the PSLRA's discovery stay.  Lead Plaintiffs understand that discovery has begun in the ERISA action, at least with respect to ERISA plan materials.

As this short summary of parallel proceedings demonstrates, Lehman, Defendants, and third parties have already gathered and produced millions of pages of documents and participated in depositions and interviews, many related to the claims at issue in the SAC.  Lead Plaintiffs, however, are the only parties that are currently denied access to this evidence.  As explained below, in similar circumstances, courts have granted partial relief from the PSLRA discovery stay to allow plaintiffs to obtain materials produced to governmental authorities and other litigants, and Lead Plaintiffs seek a similar order here.

IV.    ARGUMENT

Under the PSLRA, discovery is generally stayed "during the pendency of any motion to dismiss."   15 U.S.C. §§ 77z-1(b)(1) & 78u-4(b)(3)(B).  As courts have explained, "Congress enacted the discovery stay in order to minimize the incentives for plaintiffs to file frivolous

securities class actions in the hope either that corporate defendants will settle those actions rather than bear the high cost of discovery, or that the plaintiff will find during discovery some sustainable claim not alleged in the complaint." *In re WorldCom, Inc. Sec. Litig.*, 234 F. Supp. 2d 301, 305 (S.D.N.Y. 2002) (internal citations omitted).

The PSLRA's discovery stay is not absolute. Rather, upon the motion of a party, a court may lift the stay where it concludes "that particularized discovery is necessary to preserve evidence or to prevent undue prejudice to that party." 15 U.S.C. §§ 77z-1(b)(1) & 78u-4(b)(3)(B). Thus, in conducting this inquiry, courts typically examine whether: (1) the relief is consistent with the purposes of the PSLRA; (2) the request is sufficiently particularized (and, relatedly, the extent of any burden on the producing parties); and (3) the relief will prevent undue prejudice or preserve evidence. *See, e.g.*, *WorldCom*, 234 F. Supp. 2d at 305-06; *In re Royal Ahold N.V. Sec. & ERISA Litig.*, 220 F.R.D. 246, 249-52 (D. Md. 2004). As explained below, Lead Plaintiffs' suit is meritorious, and all of the relevant factors favor granting Lead Plaintiffs' limited request for relief, as other courts have done under similar circumstances.

A. The Limited Relief Requested Here Is
   Consistent With The Purposes Of The PSLRA

The PSLRA discovery stay seeks to prevent the filing of "strike suits" – frivolous suits filed in the hope that the high cost of discovery will coerce otherwise innocent defendants to settle. *See, e.g.*, H.R. Conf. Rep. No. 104-369, at 37 (1995), *reprinted in* 1995 U.S.C.C.A.N. 730, 736; *WorldCom*, 234 F. Supp. 2d at 305. Further, the stay seeks to prevent "fishing expeditions," where a plaintiff files a frivolous suit and seeks to use discovery to search for a viable claim not alleged in the complaint. *See, e.g.*, S. Rep. No. 104-98, at 14 (1995), *reprinted in* 1995 U.S.C.C.A.N. 679, 693; *WorldCom*, 234 F. Supp. 2d at 305. Lead Plaintiffs' suit is not

the type of lawsuit targeted by the PSLRA, and allowing the limited relief sought by Lead Plaintiffs is consistent with the statute's goals.

First, even a cursory examination of the detailed allegations in the SAC reveals that Lead Plaintiffs' suit is meritorious. As summarized above, the SAC contains detailed allegations describing how Lehman issued hundreds of public offerings of debt and equity securities – for proceeds of more than $47 billion – pursuant to offering materials that contained untrue statements and omitted material information. Further, Lehman insiders made numerous false and misleading statements and omitted crucial information regarding Lehman's assets, capitalization, liquidity, and risks of bankruptcy – right up until the days before Lehman filed for bankruptcy. These statements and omissions harmed investors in Lehman securities.

Lead Plaintiffs' allegations are supported by, among other things, comparisons with applicable market indices and observable market data, internal documents, and accounts from former employees with first-hand knowledge about Lehman's undisclosed high-risk lending practices and the overstated value of its real estate-related assets. Moreover, the numerous investigations and parallel proceedings initiated by government agencies and other litigants related to the allegations in the SAC reinforce the strength of Lead Plaintiffs' claims.

Second, granting Lead Plaintiffs' request will place a minimal burden, if any, on the Producing Parties. Lead Plaintiffs seek copies of materials that have already been produced, or will soon be produced, to various government investigators, other litigants, the Examiner, the SIPA Trustee, and the UCC. The Producing Parties have already searched and collected the materials and could, for example, simply provide copies of the materials to Lead Plaintiffs. Absent any meaningful burden, permitting Lead Plaintiffs to have access to the materials already available to government agencies and other litigants would certainly not involve any coercion.

Under these circumstances, there is no concern that innocent parties would be forced to settle simply because of the high cost of discovery.  Thus, courts recognize that "maintaining the discovery stay as to materials already provided to government entities does not further the policies behind the PSLRA."  *In re FirstEnergy Corp. Sec. Litig.*, 229 F.R.D. 541, 545 (N.D. Ohio 2004); *see also In re Delphi Corp. Sec., Deriv. & "Erisa" Litig.*, No. 05-MD-1725 (GER), 2007 WL 518626, at *8 (E.D. Mich. Feb. 15, 2007) ("[M]aintaining the discovery stay as to materials already provided to the federal authorities and to the Unsecured Creditors Committee does not further the policies behind the PLSRA.").

Third, Lead Plaintiffs are not on a "fishing expedition" to locate a claim not alleged in their SAC.  Lead Plaintiffs seek only limited relief – access to the materials already produced to government agencies and other litigants.  Further, Lead Plaintiffs have already conducted an extensive investigation and filed a pleading setting forth their claims in detail.  *Cf. In re Optionable Inc. Sec. Litig.*, No. 07-Civ-3753 (LAK), 2008 WL 4629985, at *1 (S.D.N.Y. Oct. 20, 2008) (denying motion to lift PSLRA stay because plaintiffs had failed to seek leave to amend in the allotted time and because plaintiffs sought to lift the stay merely to uncover facts sufficient to state a claim).  In sum, under the circumstances here, granting Lead Plaintiffs' motion would contravene neither rationale underlying the PSLRA's discovery stay.[7]

---

[7] Additionally, as at least one court has noted, allowing limited relief from the PSLRA stay may facilitate early resolution of this matter, and thus support important goals of efficiency and judicial economy.  *See Royal Ahold*, 220 F.R.D. at 254 ("[F]or judicial economy, the court has a not insubstantial interest in facilitating early settlement of this case, and discovery could advance the parties toward that goal.").

B.    Lead Plaintiffs' Requested Discovery
Is Sufficiently Particularized And Places
No Added Burden On The Producing Parties

To satisfy the PSLRA's particularity requirement, "the party seeking discovery under the exception must adequately specify the target of the requested discovery and the types of information needed."  *In re Lernout & Hauspie Sec. Litig.*, 214 F. Supp. 2d 100, 108 (D. Mass. 2002) (citing *Mishkin v. Ageloff*, 220 B.R. 784, 792-95 (S.D.N.Y. 1998)).  As here, courts routinely hold that a request to lift the stay is sufficiently particularized where it is limited to a closed universe of materials that either has been produced, or will be produced, to government investigators or other parties in related matters.  *See, e.g.*, *WorldCom*, 234 F. Supp. 2d at 306 (lifting stay as to materials produced to public agencies in related proceedings); *FirstEnergy*, 229 F.R.D. 541 (lifting stay as to documents produced to governmental entities); *In re Enron Corp. Sec., Deriv. & ERISA Litig.*, Nos. MDL-1446, Civ. A. H-01-3624, 2002 WL 31845114 (S.D. Tex. 2002) (lifting stay as to materials already made available to numerous governmental entities and others); *Delphi*, 2007 WL 518626 (lifting stay as to materials produced during the course of investigations).

In *WorldCom*, for example, where plaintiffs sought access to documents produced in the course of governmental investigations and other parallel proceedings, the court rejected defendants' claims that the requests were not sufficiently "particularized."  234 F. Supp. 2d at 306.  According to Judge Cote, where the plaintiffs were not engaged in a "fishing expedition" or an abusive strike suit, but only sought documents "already produced in connection with other identified proceedings," "defendants cannot call upon the ambiguous notion of 'particularized' discovery to bend Section 78u-4(b)(3)(B) to a purpose for which it was not intended."  *Id.*

Moreover, courts have acknowledged the need to lift the PSLRA's stay not only for documents already produced but also for documents that will be produced in the future.  *See,*

*e.g.*, *WorldCom*, 234 F. Supp. 2d at 305 (lifting stay as to documents likely to be produced to plaintiffs in related ERISA action); *Royal Ahold*, 220 F.R.D. at 252 (requiring production of documents to be produced in other litigation); *In re Tyco Int'l, Ltd. Multidistrict Litig.*, No. MDL 02-1335-B, 2003 WL 23830479, at *4 (D.N.H. Jan. 29, 2003) (lifting stay as to documents to be produced in related ERISA and derivative lawsuits); *Enron*, 2002 WL 31845114, at *1 (noting that court had already lifted stay in a scheduling order for documents to be produced in related ERISA and derivative lawsuits).

Additionally, the volume of material encompassed in the request does not determine whether a request is particularized. For example, in *Royal Ahold*, even though the plaintiffs sought access to an estimated one million pages, the court rejected the defendants' argument that the plaintiffs' request was not particularized, explaining that particularized did not "necessarily mean 'small.'" 220 F.R.D. at 250.

Here, as in the cases above, Lead Plaintiffs only seek access to a specific and circumscribed universe – materials that have been, or will soon be, produced in parallel proceedings. As explained in *WorldCom*, *FirstEnergy*, *Delphi*, and other cases, Lead Plaintiffs' request for access to these limited materials is sufficiently particularized.

Finally, in "deciding whether or not to lift the PSLRA's discovery stay, 'it is customary to consider whether a production places an undue burden on the party from which it is requested.'" *In re Labranche Sec. Litig.*, 333 F. Supp. 2d 178, 183 (S.D.N.Y. 2004) (quoting *WorldCom*, 234 F. Supp. 2d at 306). As noted above, and as various courts have explained, granting securities plaintiffs access to materials already collected and produced to other parties imposes virtually no additional burden on any producing parties. *See, e.g.*, *id.* (no burden where materials already gathered and produced); *FirstEnergy*, 229 F.R.D. at 545 (same); *Enron*, 2002

WL 31845114, at *3 (same).  As the *Enron* court summarized:  "In a sense, this discovery has already been made, and it is merely a question of keeping it from a party because of the strictures of a statute designed to prevent discovery abuse."  2002 WL 31845114, at *3; *see also FirstEnergy*, 229 F.R.D. at 545; *WorldCom*, 234 F. Supp. 2d at 306.  Accordingly, allowing Lead Plaintiffs to have access to materials already (or soon to be) gathered and produced in other proceedings imposes virtually no additional burden on the Producing Parties, and this factor weighs in favor of granting Lead Plaintiffs' requested relief.

       C.       **Lead Plaintiffs Will Suffer**
                     **Undue Prejudice Absent Limited Relief**

Undue prejudice in the context of the PSLRA stay means "improper or unfair detriment that need not reach the level of irreparable harm."  *Lernout*, 214 F. Supp. at 107.  Courts, including several within this District, have repeatedly found that securities plaintiffs would suffer undue prejudice if they were denied access to materials provided to government investigators and other litigants, as the lack of access would prejudice their ability to make informed strategy decisions in a rapidly shifting landscape.[8]  The court's analysis in *WorldCom* under similar circumstances is particularly instructive here:

> All of the investigations and proceedings concerning WorldCom are moving apace.  Without access to documents already made available to the U.S. Attorney, the SEC, and in whole or in part to the WorldCom's Creditors Committee and the documents that will in all likelihood soon be in the hands of the ERISA plaintiffs,

---

[8] *See, e.g.*, *LaBranche*, 333 F. Supp. 2d at 182; *WorldCom*, 234 F. Supp. 2d at 305; *FirstEnergy*, 229 F.R.D. at 545; *Delphi*, 2007 WL 518626, at *6-8; *Seippel v. Sidley, Austin, Brown & Wood LLP*, No. 03-Civ-6942 (SAS), 2005 WL 388561, at *1-2 (S.D.N.Y. Feb. 17, 2005); *Singer v. Nicor*, No. 02-C-5168, 2003 WL 22013905, at *2 (N.D. Ill. Aug. 23, 2003); *Enron*, 2002 WL 31845114, at *1; Order Granting Lead Plaintiff's Motion to Modify the PSLRA Stay of Discovery, filed February 5, 2009, Docket No. 30, *In re SemGroup Energy Partners, L.P., Sec. Litig.*, No. 08-MD-1989-GKF-FHM (N.D. Okla.) (Ex. S); Order, filed February 18, 2009, Docket No. 64, *In re SemGroup Energy Partners, L.P., Sec. Litig.*, No. 08-MD-1989-GKF-FHM (N.D. Okla.) (Ex. T).

> [the lead securities plaintiff] would be prejudiced by its inability to make informed decisions about its litigation strategy in a rapidly shifting landscape. It would essentially be the only major interested party in the criminal and civil proceedings against WorldCom without access to documents that currently form the core of those proceedings.

234 F. Supp. 2d at 305.

As in *WorldCom* and the other cases cited above, governmental investigators and litigants have access to, or will soon have access to, materials produced by Lehman, its affiliated debtors, Defendants, and third parties. Lead Plaintiffs, however, are currently precluded by the PSLRA's discovery stay from accessing the same materials. Undoubtedly, some of the other interested parties have already engaged in settlement discussions. Without access to these materials, Lead Plaintiffs will be at an unfair disadvantage in relation to other interested parties when forming litigation and settlement strategies. The court in *LaBranche* explained the prejudice facing securities plaintiffs under these circumstances:

> Lead Plaintiffs must now determine their litigation strategy, principally whether or not to seek an early settlement to benefit the class without further expense. The requested discovery is essential to determine that strategy and to assist in formulating an appropriate settlement demand. The Lead Plaintiffs will suffer undue prejudice in having to defer such decisions.

333 F. Supp. 2d at 184.

This threatened prejudice is even greater here, where Lehman and affiliated debtors are in the midst of bankruptcy proceedings. Investigators and bankruptcy litigants are able to pursue potential remedies against the defendants who are common to this action and identify and assess sources of recovery from these defendants. Lead Plaintiffs and the class, on the other hand, face the danger that as these other proceedings advance, defendants may distribute finite sources of recovery to other parties to the exclusion of the class. Absent modification of the PSLRA discovery stay to put Lead Plaintiffs on the same informational footing as other parties seeking

19

recovery from common defendants to this action, the securities plaintiffs will be the only major

interested party in an information vacuum, a prejudice that other courts have concluded is

sufficient to warrant the modification of the PSLRA stay.  *See Delphi*, 2007 WL 518626, at *6-8.

As noted by the court in *Delphi*:

> Lead Plaintiffs here, too, face "being left with nothing" if this litigation does not
> keep pace with the bankruptcy and the SEC action. Given that several of the
> Defendants in this case have already consented to substantial money judgments in
> the SEC case, Lead Plaintiffs here already face the prospect that they may not be
> able to recover from those Defendants in this action because of the substantial
> consent judgments they have taken in the SEC case. Furthermore, in the
> bankruptcy action, the Unsecured Creditors Committee and Delphi's Equity
> Committee -- two groups of claimants who are vying for substantially the same
> pool of funds as our Lead Plaintiffs and the Class they represent -- have already
> been given copies of the same records which Lead Plaintiffs seek in this action.
> Armed with those documents, the UCC intends to press for participation in the
> settlement negotiations which have already begun between Delphi and GM. Lead
> Plaintiffs, however, are not being given the same opportunity in this case. As the
> court found in *WorldCom*, under these circumstances, the Class that Lead
> Plaintiffs represent "faces the very real risk that it will be left to pursue its action
> against defendants who no longer have anything or at least as much to offer."

*Id.* at *7 (citations omitted).

Moreover, Lehman's bankruptcy is not only massive, but involves authorities in several

countries and is complicated by disputes among numerous Lehman entities regarding assets.

*See, e.g.*, Lindsay Fortado, *Lehman European Entities Seeking Around $150 Billion from Parent*,

Bloomberg.com, Sept. 24, 2009 (Ex. U).  With limited assets available to aggrieved parties, Lead

Plaintiffs and the prospective class are at a pronounced disadvantage in relation to other parties

with regard to strategy and settlement discussions.  If a "[securities lead plaintiff] must wait until

resolution of a motion to dismiss to obtain discovery and formulate its settlement or litigation

strategy, it faces the very real risk that it will be left to pursue its action against defendants who

no longer have anything or at least as much to offer."  *WorldCom*, 234 F. Supp. 2d at 306.  Thus,

in cases involving corporate bankruptcies, courts regularly grant limited relief from the PSLRA

stay. *See, e.g.*, *WorldCom*, 234 F. Supp. 2d at 306; *Delphi*, 2007 WL 518626, at *6-8; *Enron*, 2002 WL 31845114, at *1-2.

As the court noted in *Delphi*: "It was precisely because the defendants in *Enron* and *WorldCom* were bankrupt and subject to other civil lawsuits that a partial lifting of the PSLRA stay was necessary 'to prevent the securities plaintiffs from being left with nothing if their litigation did not keep pace with the bankruptcy and other proceedings.'" *Delphi*, 2007 WL 518626, at *7 (quoting *Nicor*, 2003 WL 22013905, at *2).

In sum, partial relief from the PSLRA's stay of discovery will protect Lead Plaintiffs and the prospective class they represent from undue prejudice. With access to the same materials available to other interested parties, Lead Plaintiffs will be able to plan their litigation strategy and knowledgeably investigate the merits of early settlement discussions that include competing interests of parties that, unlike Lead Plaintiffs, have access to the materials at issue. Accordingly, this factor strongly supports granting Lead Plaintiffs' request for limited relief.

> D.    Granting Lead Plaintiffs Access
>       To Discovery Produced To Other Parties
>       <u>Would Minimize Any Danger Of Loss Of Evidence</u>

In addition to preventing undue prejudice, the PSLRA also provides that a court may lift the discovery stay to "preserve evidence." 15 U.S.C. §§ 77z-1(b)(1) & 78u-4(b)(3)(B). Noting the inherent dangers of loss of evidence in bankruptcies and reorganizations, courts have lifted the discovery stay under circumstances similar to those here. *See, e.g.*, *Lernout*, 214 F. Supp. 2d at 108 (company's bankruptcy "raises the added dangers of poorly maintained records and dispersal of key witnesses").

While the risk of loss is reduced as to documents already produced to regulators, granting Lead Plaintiffs' request would minimize any concern in light of the frantic nature of Lehman's massive bankruptcy. Lehman's bankruptcy, initiated shortly after midnight on September 15,

2008, is the largest in history, involving more than $650 billion in liabilities.  Further, numerous Lehman affiliates have now been placed into bankruptcy in various countries.  At the time of its bankruptcy filing, Lehman had over 20,000 employees.  Moreover, as described by Lehman's bankruptcy counsel and various news reports, the bankruptcy was filed "without any preplanning," and the case had "a high level of chaos in the first weeks."  Emily Chasan, *Lehman clears early hurdle for Neuberger sale*, Reuters, Oct. 16, 2008 (Ex. V).  This reorganization, coupled with the departure of key executives of Lehman, creates a reasonable concern that documents may be lost, despite best efforts to preserve them.  *See Royal Ahold*, 220 F.R.D. at 251.  Importantly, Lehman is not a party to this action.  The PSLRA discovery stay applies to discovery sought from non-parties.  *Faulkner v. Verizon Commc'ns, Inc.*, 156 F. Supp. 2d 384, 404 (S.D.N.Y. 2001) ("the PSLRA does not distinguish between discovery of non-parties and parties").  But the PSLRA document preservation provision does not apply to non-parties.[9] Therefore, especially in light of Lehman's ongoing liquidation proceedings, Lead Plaintiffs' request to obtain documents already assembled and produced by Defendants and third parties is eminently reasonable.

Although documents produced to the Examiner, government agencies, and others presumably will be preserved, those documents – which likely comprise the most critical evidence in this case – will assist Lead Plaintiffs to identify specific material that may be at risk of loss.  Faced with Lehman's shifting corporate landscape and concerns about evidentiary loss

---

[9] *See* 15 U.S.C. § 78u-4(b)(3)(C)(i) ("During the pendency of any stay of discovery pursuant to [the PSLRA]. . . any party to the action with actual notice of the allegations contained in the complaint shall treat all documents, data compilations (including electronically recorded or stored data), and tangible objects that are in the custody or control of such person and that are relevant to the allegations, as if they were the subject of a continuing request for production of documents from an opposing party under the Federal Rules of Civil Procedure." (emphasis added)).

that are by no means speculative, Lead Plaintiffs should not be required to rely "on the assurances of counsel that relevant evidence will be preserved." *Royal Ahold*, 220 F.R.D. at 251. The early production of core documents is the preferred method to ensure that such materials are available for the prosecution of the action. *See Lernout*, 214 F. Supp. 2d at 109. Simply put, no statutory provision or preservation order can preserve documents after they have been destroyed or lost. Accordingly, in addition to preventing prejudice to Lead Plaintiffs, partial relief from the PSLRA stay would ensure that evidence is preserved and is consistent with the statute's goals.

V.    <u>CONCLUSION</u>

For the reasons stated above, partially lifting the PSLRA's discovery stay is necessary to prevent undue prejudice to Lead Plaintiffs and the prospective class. Further, such relief would ensure that relevant evidence is preserved during Lehman's complicated bankruptcy and related proceedings. Given that Lead Plaintiffs only seek materials gathered and produced in other proceedings, the requested relief would impose minimal burden on the Producing Parties. Finally, granting limited relief from the stay does not contravene any purposes behind the PSLRA. Accordingly, Lead Plaintiffs respectfully request that the Court grant their motion and partially lift the PSLRA's stay of discovery as to materials produced (or to be produced) to government agencies and parties in parallel proceedings.

Dated: October 13, 2009          **BERNSTEIN LITOWITZ BERGER**
                                          **& GROSSMANN LLP**

                         *  /s/ David R. Stickney*
                         DAVID R. STICKNEY
                         ELIZABETH P. LIN
                         JON F. WORM
                         12481 High Bluff Drive, Suite 300
                         San Diego, California 92130
                         Tel: (858) 793-0070
                         Fax: (858) 793-0323

-and-

JOHN P. COFFEY
ANN LIPTON
1285 Avenue of the Americas, 38th Floor
New York, New York 10019
Tel: (212) 554-1400
Fax: (212) 554-1444

*Co-Lead Counsel for Plaintiffs*


**BARROWAY TOPAZ KESSLER MELTZER
    & CHECK, LLP**
DAVID KESSLER
JOHN A. KEHOE
BENJAMIN J. HINERFELD
MICHELLE M. NEWCOMER
RICHARD A. RUSSO, JR.
280 King of Prussia Road
Radnor, Pennsylvania 19087
Tel: (610) 667-7706
Fax: (610) 667-7056


        -and-

NICHOLE BROWNING
580 California Street, Suite 1750
San Francisco, California 94104
Tel: (415) 400-3000
Fax: (415) 400-3001

*Co-Lead Counsel for Plaintiffs*

**GIRARD GIBBS LLP**
DANIEL C. GIRARD
JONATHAN K. LEVINE
AARON M. SHEANIN
CHRISTINA H. C. SHARP
601 California Street, 14th Floor
San Francisco, California 94108
Tel: (415) 981-4800
Fax: (415) 981-4846

*Counsel for Plaintiffs Stephen A. Gott, Karim Kano,*
*Ronald Profili and Grace Wang*


**GRANT & EISENHOFER, P.A.**
JAY W. EISENHOFER
JAMES J. SABELLA
KEITH A. FLEISCHMAN
485 Lexington Avenue
New York, New York 10017
Tel: (646) 722-8500
Fax: (646) 722-8501

**LAW OFFICES OF BERNARD M. GROSS P.C.**
DEBORAH R. GROSS
100 Penn Square East, Suite 450
Philadelphia, Pennsylvania 19107
Tel: (215) 561-3600
Fax: (215) 561-3000

*Counsel for Plaintiff Belmont Holdings Corp.*


**SPECTOR ROSEMAN KODROFF**
   **& WILLIS, P.C.**
ROBERT M. ROSEMAN
ANDREW D. ABRAMOWITZ
DAVID FELDERMAN
RACHEL E. KOPP
1818 Market Street, Suite 2500
Philadelphia, Pennsylvania 19103
Tel: (215) 496-0300
Fax: (215) 496-6611

*Counsel for Lead Plaintiff Northern Ireland Local*
*Government Officers' Superannuation Committee*

25

**LABATON SUCHAROW LLP**
CHRISTOPHER J. KELLER
THOMAS A. DUBBS
ERIC J. BELFI
JONATHAN GARDNER
140 Broadway
New York, New York 10005
Tel: (212) 907-0853
Fax: (212) 818-0477

*Counsel for Lead Plaintiff City of Edinburgh Council as Administering Authority of the Lothian Pension Fund*

**SAXENA WHITE P.A.**
MAYA SAXENA
JOSEPH E. WHITE III
CHRISTOPHER S. JONES
LESTER R. HOOKER
2424 North Federal Highway, Suite 257
Boca Raton, Florida 33431
Tel: (561) 394-3399
Fax: (561) 394-3382

*Counsel for Lead Plaintiff Operating Engineers Local 3 Trust Fund, named Plaintiff Brockton Contributory Retirement System, and named Plaintiff Teamsters Allied Benefit Funds*

**MURRAY, FRANK & SAILER LLP**
MARVIN L. FRANK
EVA HROMADKOVA
275 Madison Avenue, Suite 801
New York, New York 10016
Tel: (212) 682-1818
Fax: (212) 682-1892

*Counsel for Plaintiff Marsha Kosseff*

**POMERANTZ HAUDEK GROSSMAN
    & GROSS LLP**
MARC I. GROSS
100 Park Avenue
New York, New York 10017
Tel: (212) 661-1100
Fax: (212) 661-8665

*Counsel for Plaintiff American European Insurance
Company*

**COHEN MILSTEIN SELLERS & TOLL PLLC**
STEVEN J. TOLL
JULIE G. REISER
1100 New York Avenue NW
Suite 500, West Tower
Washington, D.C. 20005
Tel: (202) 408-4600
Fax: (202) 408-4699

        -and-

CATHERINE A. TORRELL
150 East 52nd Street
New York, New York 10022
Tel: (212) 838-7797
Fax: (212) 838-7745

*Counsel for Plaintiff Inter-Local Pension Fund
Graphic Communications Conference of the
International Brotherhood of Teamsters*

**BONNETT FAIRBOURN FRIEDMAN
    & BALINT, P.C.**
ANDREW FRIEDMAN
2901 North Central Avenue, Suite 1000
Phoenix, Arizona 85012
Tel: (602) 274-1100
Fax: (602) 274-1199

*Counsel for Plaintiffs MJB Living Trust dated
February 12, 2002 and the Shea-Edwards Limited
Partnership*

27

**TIFFANY & BOSCO P.A.**
RICHARD G. HIMELRICK
2525 East Camelback Road
Phoenix, Arizona 85016
Tel: (602) 255-6000
Fax: (602) 255-0103

*Counsel for Plaintiffs MJB Living Trust dated
February 12, 2002 and the Shea-Edwards Limited
Partnership*


**ZWERLING, SCHACHTER
    & ZWERLING, LLP**
STEPHEN BRODSKY
SUSAN SALVETTI
41 Madison Avenue
New York, New York 10010
Tel: (212) 223-3900
Fax: (212) 371-5969

*Counsel for Plaintiffs Rick Fleischman and
Francisco Perez*


**LAW OFFICES OF JAMES V. BASHIAN, P.C.**
JAMES V. BASHIAN
500 Fifth Avenue, Suite 2700
New York, New York 10110
Tel: (212) 921-4100
Fax: (212) 921-4229

*Counsel for Plaintiffs Island Medical Group and
Fred Telling*


**KIRBY McINERNEY LLP**
MARK A. STRAUSS
RICHARD L. STONE
825 Third Avenue
New York, New York 10022
Tel: (212) 371-6600
Fax: (212) 751-2540

*Counsel for Plaintiff Michael Karfunkel*