UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
In re:

LEHMAN BROTHERS SECURITIES AND ERISA
LITIGATION

This document applies to:   09 MD 2017 (LAK)
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
In the Matter of the Application of

RICHARD S. FULD, JR.,

                Petitioner,

    -against-

BOOTH FOUNDATION, INC.

                Respondent.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

09 MD 2017 (LAK)
and
No. M-82

## MEMORANDUM OPINION

Appearances:

        Todd S. Fishman
        Patricia Hynes
        ALLEN & OVERY
        *Attorneys for Petitioner Richard S. Fuld, Jr.*

        Leo Kayser, III

        J. Michael Rediker
        Page A. Poerschke
        Meredith Jowers Lees
        Laura S. Dunning
        HASKELL SLAUGHTER YOUNG & REDIKER, LLC
        *Attorneys for Respondent Booth Foundation, Inc.*

LEWIS A. KAPLAN, *District Judge.*

Richard S. Fuld, Jr., the former chairman and chief executive officer of Lehman Brothers Holdings, Inc. ("LBHI") is the sole remaining respondent in an arbitration entitled *Booth Foundation, Inc. v. Martin D. Shafiroff, et al.,* No. 09-01844, now pending before the Financial Industry Regulatory Authority ("FINRA")[1] (the "Arbitration"). On March 24, 2010, Fuld moved to enjoin the arbitration, which was scheduled to begin on April 5, 2010, under the All Writs Act[2] and Section 4 of the Federal Arbitration Act ("FAA"),[3] on the grounds that (1) the claims are not within the scope of any agreement to arbitrate binding on him and (2) the arbitration would impair this Court's flexibility in *In re Lehman Brothers Securities & ERISA Litigation.*[4] The Booth Foundation, Inc. ("Foundation"), opposes the application.

*Facts*

*Parties*

Fuld formerly was the chairman and chief executive officer not only of LBHI, but also its subsidiary, Lehman Brothers, Inc. ("LBI"), which at all relevant times was a registered

---

[1] FINRA was formed in 2007 by the consolidation of the National Association of Securities Dealers, Inc. and certain functions of the New York Stock Exchange. http://www.finra.org/AboutFINRA/ (last visited Apr. 10, 2010). Where appropriate, references to FINRA include references to its predecessor entities.

[2] 28 U.S.C. § 1651.

[3] 9 U.S.C. § 4.

[4] No. 09 MD 2017 (LAK).

broker-dealer.[5]  LBHI is in bankruptcy.  LBI is in liquidation under the Securities Investor Protection Act.[6]

The Foundation is a Florida charitable organization created by Alex Booth.[7]  In September 2006, the Foundation, through Booth, purchased a $22 million LBHI 5.540% medium term note due December 15, 2028 (the "Note") through Martin D. Shafiroff and Morgan C. McLanahan (the "Brokers"), two brokers in LBI's Private Investment Management unit.[8]  Shafiroff allegedly was a "trusted investment advisor and broker" to both Booth and the Foundation.[9]  McLanahan, operating under Shafiroff's direction and supervision, also was a broker for Booth and the Foundation.[10]

The Note was issued by LBHI pursuant to a May 30, 2006 shelf registration statement, prospectus, prospectus supplement and an August 21, 2006 free writing prospectus (the "Offering Documents").[11]  Fuld signed the shelf registration statement as well as the financial reports incorporated by reference into the other Offering Documents as chief executive officer of

---

[5] BrokerCheck Report: Lehman Brothers, Inc. at 10, available at http://brokercheck.finra.org/Support/ReportViewer.aspx?FirmCRD=7506.

[6] 15 U.S.C. § 78fff.

[7] Petition [09 MD 2017, docket item 269] ¶ 9.

[8] Id. ¶ 10; see also SC ¶¶ 4-5.

[9] SC ¶ 13.

[10] Id. ¶ 14.

[11] Petition ¶ 10.

4

LBHI.[12]  LBI was the underwriter.[13]   The Foundation received its payments under the Note until June 2008, but has received none since due to LBHI's bankruptcy petition.[14]

*The Arbitration*

    *The Statement of Claim*

On April 3, 2009, the Foundation filed a statement of claim and demand for arbitration with FINRA against Fuld and the Brokers.[15]  It asserted claims for breach of fiduciary duty, breach of contract, common law fraud, fraudulent inducement as well as for alleged violations of Sections 11, 12 and 15 of the Securities Act of 1933[16] and the Florida Securities and Investor Protection Act.[17] It seeks recision and damages.

The Foundation's claims relate to two distinct time periods – before and after the

---

[12] Statement of Claim ("SC") (Fishman Decl. Ex. 3) ¶ 15.

The paragraphs of the statement of claim are numbered consecutively from 1 through 88 following which the next paragraph, rather than being numbered 89, instead is number 81. The paragraphs following the second paragraph 81 then are numbered consecutively from 81 through 86.  Thus, there are two paragraphs numbered with each numeral from 81 through 86.  Unless otherwise indicated, all references to paragraphs 81 through 86 are to the first of those to appear.  References to the second paragraph 81 and following are cited "81(2d)" and so on.

[13] SC Ex. A.

[14] Petition ¶ 10.

[15] Fishman Decl. Ex. 3.

[16] 15 U.S.C. § 77k, *l*, *o*.

[17] FLA. STAT. § 517.301.

5

Foundation purchased the Note on September 15, 2006. Five claims – for common law fraud, breach of contract, and securities law violations – are based exclusively on events culminating in the Note's purchase. The essence of these claims is that (1) the Brokers and/or (2) the Offering Documents misled or failed adequately to inform the Foundation of the risks of investment in the Note and that the Foundation would not have bought it had full disclosure been made.[18] Count two alleges that FINRA's rules created a contract between it on the one hand and the Brokers and Fuld on the other, which they breached by recommending an unsuitable investment in the Note.[19] The common law fraud claim (count three) alleges that Foundation purchased the Note in reliance on the Brokers' false and misleading statements about, *inter alia*, LBHI's financial health.[20] The securities law claims (counts four, five, and six) are predicated on allegations that the Offering Documents contained similar false and misleading statements.[21]

One claim is based exclusively on post-sale allegations. Count seven alleges that the Brokers fraudulently caused it to hold its investment in the Note by, among other things, failing to reveal LBHI's true financial condition.[22]

The remaining claim, count one, is based on allegations that occurred both before and after the Note's sale. The Brokers and Fuld allegedly owed fiduciary duties to the Foundation at all

---

[18] SC ¶¶ 33, 44, 52-53, 55, 67, 78, 88.

[19] *Id.* ¶¶ 47-54.

[20] *Id.* ¶¶ 33, 55.

[21] *Id.* ¶¶ 33, 62-85.

[22] *Id.* ¶¶ 33, 88, 81(2d)-84(2d).

6

relevant times. They allegedly breached these duties before the sale by failing to investigate the Note adequately and by subordinating the Foundation's interests to LBHI's and their own.[23] They allegedly breached them after the sale by failing to inform the Foundation about LBHI's finances.[24]

The statement of claim, except in two respects, is nearly silent as to any alleged actions by Fuld directly with respect to the Foundation. Rather, it principally seeks to hold Fuld responsible for the Brokers's conduct under various theories, including *respondeat superior* and as a supervisor or control person.[25] The first respect in which it makes direct allegations against Fuld is a contention that he breached a fiduciary duty he owed the Foundation, although it is silent as to the bases for the assumption that he owed such a duty.[26] The second respect, and the only one supported by any significant factual allegations, relates to Fuld's actions in his capacity as the chairman and chief executive officer of LBHI. Count six alleges that Fuld signed the LBHI's SEC filings, including the registration statement pursuant to which the Note was issued.[27] It seeks to hold Fuld liable as a principal for alleged misstatements in the Offering Documents under Section 11 of the Securities Act of 1933 and as a control person of LBHI under Section 15.[28]

On November 18, 2009, Fuld moved to dismiss the statement of claim. The

---

[23] *Id.* ¶¶ 35-41, 44.

[24] *Id.* ¶ 45.

[25] 15 U.S.C. § 77*o*.

[26] *E.g.*, SC ¶¶ 36, 37, 40, 44-45.

[27] SC ¶¶ 15, 73-76.

[28] 15 U.S.C. § 77k, *o*.

7

arbitrators denied that motion on January 15, 2010, and scheduled the arbitration hearing for April 5-6 and June 21-24, 2010.[29]

*The LBHI Examiner's Report*

On March 11, 2010, an examiner appointed in the LBHI bankruptcy[30] issued an extensive report addressing various questions including, among others, why LBHI failed and whether there are colorable claims against its former senior executives and directors. While the report concluded that there are not such claims in many areas, it was not uniformly favorable to Fuld and others. Among other things, it expressed the view that there was "sufficient evidence to support a colorable claim that" Fuld and certain others "breached their fiduciary duties [to LBHI] by engaging in one or more of the following: (1) allowing and certifying the filing of financial statements that omitted or misrepresented material information regarding [LBHI]'s use of Repo 105 transactions and their accounting treatment, thus exposing the firm to potential liability; and/or (2) failing to disclose to [LBHI] Directors information about the firm's Repo 105 program."[31] This aspect of the report, which is based on transactions and accounting that occurred in late 2007 and 2008,[32] has received widespread public attention.

---

[29] Fishman Decl. Exs. 7-8.

[30] Chapter 11 Case No. 08-13555 (JMP).

[31] Report of Anton R. Valukas, Examiner, *In re Lehman Brothers Holdings, Inc., et al., Debtors,* Chap. 11 Case No. 08 B 13555 (JMP) (Bankr. S.D.N.Y. filed Mar. 11, 2010) ("Examiner's Report") at 992.

[32] *Id.* at 732.

*The Foundation's Shift*

Within days, the Foundation pivoted sharply. On March 16, 2010, it voluntarily dismissed the Arbitration as against the Brokers.[33] That day it filed a pre-trial brief that focused almost exclusively on Fuld, including his alleged decisions to increase LBHI's risk profile, his public statements about LBHI's financial health, internal memoranda to employees, and LBHI's use of "Repo 105-108" transactions and related accounting.[34] In light of this change, Fuld sought to have the hearing adjourned. The arbitration panel denied his request on March 23, 2010.[35]

*Prior Proceedings*

On March 24, 2010 Fuld obtained from the Part I judge an order to show cause why

---

[33] Pet. Br. at 7.

[34] *See* Resp. Pre-Trial Br. (Fishman Decl. Ex. 9) at 21-41 (section entitled "Respondent Fuld's Actions and Motivations").

The Foundation purchased the Note on September 15, 2006. SC Ex. A. Five of its claims are based on a theory that it purchased the Note because the Brokers and the Offering Documents misled or failed adequately to inform it about the risks of investing in the Note including, specifically, risks related to LBHI's financial health and risk of failure. *Id.* ¶¶ 33, 44, 52-53, 55, 67, 78, 88. The pre-trial brief relies heavily on the Repo 105-108 transactions of evidence of this claim.

While Lehman used reportedly engaged in its first Repo 105 transaction in 2001, the bankruptcy examiner's report concluded in this respect only that a trier of fact could find that they were used to create a materially misleading picture of its financial condition only beginning in late 2007. *See* Examiner's Report at 732-34, 740. Assuming that to be so, it is difficult to see how Repo 105 transactions and the accounting therefore beginning in late 2007 could have affected the Foundation's decision to purchase the Note in September 2006.

The Foundation's attempts to base pre-purchase claims on alleged post-purchase conduct is not limited to the Repo 105-108 transactions. Its pre-trial brief is replete with (usually conclusory) references to alleged actions by Fuld and LBHI in 2007 and 2008. *See*, *e.g.*, Pre-trial Br. at 19-26.

[35] Petition ¶ 17.

the Arbitration should not be enjoined.[36] The motion seeks to enjoin it on the grounds that (1) the Foundation's claims against him are not subject to an arbitration agreement by which he is bound and, (2) the arbitration would interfere with this Court's administration of *In re Lehman Brothers Secur. & ERISA Litig.*[37] After receiving papers in opposition to the application and hearing argument, the Court issued a temporary restraining order staying the arbitration[38] in order to afford sufficient time within which to deal with the issues presented.

*Discussion*

A.  Arbitrability

Fuld argues first that the Court should enjoin the Arbitration because the Foundation's claims against him are not within the scope of any arbitration agreement binding upon

---

[36] It is questionable whether this was an appropriate or effective manner in which to proceed. While Fuld is a defendant in all or most of the cases consolidated for pretrial purposes into *In re Lehman Brothers Secur. & ERISA Litig.*, he did not initially seek relief in any of those cases. Nor did the order to show cause in Part I commence a civil action, as "[a] civil action is commenced by filing a complaint with the court." FED. R. CIV. P. 3. Moreover, this Court's Rules for the Division of Business Among District Judges ("RDB") designates Part I for the determination of emergency and miscellaneous matters and provides that the Part I judge "shall hear and determine all miscellaneous proceedings in civil matters, such as application for naturalization, for admission to the bar, for relief relating to orders and subpoenas of administrative agencies." RDB 3, 5(a). As the application was not filed in a civil matter, was not a response to process issued by an administrative agency or by the Court in a matter extrinsic to any pending action, and did not concern a matter within the Court's inherent or statutory authority, such as admission to the Bar or naturalization, it perhaps should not have been made in Part I. Any irregularity in the manner in which this application was brought on, however, ultimately is immaterial because Fuld subsequently filed a petition in *In re Lehman Brothers Secur. & ERISA Litig.*

[37] No. 09 MD 2017 (LAK).

[38] No. 09 MD 2017, docket item 252. The order permitted the Foundation to conduct a deposition of Mr. Booth *de bene esse* on the date on which he had been scheduled to testify before the arbitrators in view of the fact that he is 84 years of age and reportedly failing.

10

him.

The FAA[39] established an "emphatic federal policy in favor of arbitral dispute resolution."[40]  Nevertheless, "arbitration is simply a matter of contract between the parties; it is a way to resolve those disputes – but only those disputes – that the parties have agreed to submit to arbitration."[41]  Hence, issues as to the existence and validity of an agreement to arbitrate always are for courts, not for arbitrators.[42]  Moreover, notwithstanding the federal policy in favor of arbitration, the FAA places contracts requiring arbitration "on equal footing with all other contracts."[43]

Assuming the existence of an agreement to arbitrate, the question whether a particular dispute is to be resolved by litigation or arbitration also is for the court "unless there is clear and unmistakable evidence from the arbitration agreement, as construed by the relevant state law, that the parties intended that the question of arbitrability shall be decided by the arbitrator."[44]  This presumption, however, is reversed where the question is the scope of issues intended to be resolved by arbitration.  In such cases, ambiguity concerning the scope of the arbitrable issues is decided in

---

[39] 9 U.S.C. § 1 *et seq.*

[40] *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.,* 473 U.S. 614, 631 (1985); *see also, e.g., Buckeye Check Cashing v. Cardegna,* 546 U.S. 440, 443 (2006); *Circuit City Stores, Inc. v. Adams,* 532 U.S. 105, 111 (2001); *Shearson/Am. Exp,. Inc. v. McMahon*, 482 U.S. 220, 225-26 (1987).

[41] *First Options of Chicago, Inc. v. Kaplan,* 514 U.S. 938, 943 (1995).

[42] *E.g., LAIF X SPRL v. Axtel, S.A. de C.V.,* 390 F.3d 194, 198 (2d Cir. 2004).

[43] *EEOC v. Waffle House, Inc.,* 534 U.S. 279, 293 (2002).

[44] *E.g., PaineWebber Inc. v. Bybyk,* 81 F.3d 1193, 1198 (2d Cir. 1996).

favor of arbitration.[45]  But this principle is not boundless.  Arbitration of a particular grievance will not be ordered where "it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute."[46]

Where a dispute is covered by an arbitration agreement, the court must compel the parties to arbitrate.[47]  The FAA is silent, however, as to whether district courts may enjoin the arbitration of issues not subject to a binding agreement to arbitrate.  While the Second Circuit has not addressed the issue explicitly,[48] it recently considered and upheld a district court's order preliminarily enjoining a FINRA arbitration.[49]

---

[45] *Id.*

[46] *Id. Accord, e.g., Katz v. Feinberg,* 290 F.3d 95, 97 (2d Cir. 2002).

[47] 9 U.S.C. § 4.

[48] *See Westmoreland Capital Corp. v. Findlay*, 100 F.3d 263, 266 n.3 (2d Cir. 1996).

[49] *Citigroup Global Markets, Inc. v. VCG Special Opportunities Master Fund Limited*, 590 F.3d 30, 40 (2d Cir. 2010); *see also Tai Ping Ins. Co., Ltd. v. M/V Warschau*, 731 F.2d 1141, 1143-44 (5th Cir. 1984); *Societe Generale de Surveillance, S.A. v. Ratheon European Mgmt. & Sys. Co.*, 643 F.2d 863, 868 (1st Cir. 1981) ("[T]o enjoin a party from arbitrating where an agreement to arbitrate is absent is the concomitant of the power to compel arbitration where it is present."); *SATCOM Int'l Group PLC v. ORBCOMM Int'l Partners, L.P.*, 49 F. Supp. 2d 331, 342 (S.D.N.Y. 1999); *L.F. Rothschild & Co. v. Katz*, 702 F. Supp. 464, 467-68 (S.D.N.Y. 1988).

The FAA provision on interlocutory appeals supports the proposition that district courts may enjoin improper arbitrations.  Section 16, 9 U.S.C. § 16, prohibits appeals from interlocutory orders "refusing to enjoin an arbitration . . . ."  This presupposes that the district court could enjoin an arbitration in appropriate circumstances.

Fuld relies also on diversity of citizenship as a basis for jurisdiction.  An additional basis for an injunction in this case therefore may be N.Y. CPLR § 7503, which expressly authorizes stays of arbitration. Tr. 17-18; *see also Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938); *Gasperini v. Ctr. for Humanities*, 518 U.S. 415, 437-38 (1996) (applying provision of N.Y. CPLR in diversity case).

12

With these principles in mind, we turn to the present controversy.

1.  *Fuld's agreement to arbitrate*

The Foundation argues that the FINRA rules make these claims arbitrable.[50] Those rules provide that an "associated person of a member" is obliged to arbitrate a claim if:

(i) "[a]rbitration under the code is . . . [r]equested by the customer,"

(ii) "[t]he dispute is between a customer and a member or associated person of a member," and

(iii) "[t]he dispute arises in connection with the business activities of the member or the associated person . . . ."[51]

Here, LBI was a member of FINRA[52] and the Foundation was its customer.[53] The

---

[50] The Foundation puts forth two other bases for Fuld's obligation to arbitrate these disputes. First, it argues that Fuld is bound to arbitrate by his Form U-4, which contains a provision stating that he "agree[d] to arbitrate any dispute, claim or controversy that may arise between me and my firm, or a customer, or any other person, that is required to be arbitrated under the rules, constitutions, or by-laws of the SROs indicated in Item 11 as may be amended from time to time . . . ." The version of the U-4 submitted to the Court, however, does not contain an Item 11. *See id.* In consequence, the Court can not rely on the U-4's arbitration provision to determine whether the dispute at issue in this case is arbitrable.

Second, the Foundation argues that its Client Agreement with LBI also contains an agreement to arbitrate. Redicker Decl. Ex. 2 at 3. While the Client Agreement does contain an arbitration agreement, there is no evidence that Fuld ever agreed to or is bound by it on any theory of agency or estoppel. Accordingly, there is no basis for concluding that the Client Agreement binds Fuld to arbitrate these disputes.

[51] FINRA R. 12200.

[52] BrokerCheck Report: Lehman Brothers Inc., available at http://brokercheck.finra.org/ using CRD # 7506.

There is no suggestion that LBHI was a member of FINRA or any predecessor organization.

questions therefore are (1) whether Fuld was an "associated person of a member," LBI, and, if so, (2) whether the claims arose in connection with LBI's business activities.

An "associated person of a member" is

"(1) [a] natural person who is registered or has applied for registration under the Rules of FINRA; or"

"(2) [an] officer [or] director of a member, or other natural person occupying a similar status or performing similar functions, or a natural person engaged in the investment banking or securities business who is directly or indirectly controlling or controlled by a member, whether or not any such person is registered . . . ."[54]

Fuld was LBI's chairman and chief executive officer.[55]  Consequently, he was an associated person of a member and is bound by the FINRA arbitration rules if the dispute "arises in connection with" LBI's business activities.[56]

---

[53] Fuld's status as an LBHI officer or director therefore could not subject him to any of the FINRA rules, including the arbitration provisions.

FINRA R. 12100(i) ("A customer shall not include a broker or dealer.").

[54] FINRA R. 12100(r).  FINRA's rules provide also that "a person formerly associated with a member is a person associated with a member."*Id.*

[55] *See*, *e.g.*, Redicker Decl. Ex. 1, at 4.

[56] *See Spear, Leeds & Kellogg v. Cent. Life Assur. Co.*, 85 F.3d 21, 26 (2d Cir. 1996) ("[T]he arbitration rules of an exchange are sufficient to compel arbitration of exchange-related disputes in the absence of a specific written arbitration agreement."); *Kidder, Peabody & Co., Inc. v. Zinsmeyer Trusts P'ship*, 41 F.3d 861, 863 (2d Cir. 1994) (SRO rules are "contractual in nature" and bind members); *Paine, Webber, Jackson & Curtis, Inc. v. Chase Manhattan Bank, N.A.*, 728 F.2d 577, 580 (2d Cir. 1984) ("[W]e believe that the arbitration provisions of the NYSE Constitution and Rules are sufficient in and of themselves to compel arbitration of covered disputes[.]").

14

  2. *Six of the Foundation's claims arise in connection with LBI's business activities*

In order to determine whether the Foundation's claims are in connection with LBI's business activities it is necessary to examine its allegations.

The Foundation asserts seven claims against Fuld. With two exceptions, the essence of each of those claims is that the Brokers, who were LBI employees, sold the Note to the Foundation based on false and misleading information and that Fuld is indirectly liable on theories of *respondeat superior* and supervisory or control person liability.[57]

    a. *Counts one, two, three, four, five, and seven are arbitrable*

The Foundation's breach of fiduciary duty claim (count one) alleges that the Brokers intentionally or recklessly misled the Foundation about the Note's risks in light of LBHI's financial health.[58] Its breach of contract claim (count two), alleges that the Brokers sold the Foundation the Note in violation of various NYSE and FINRA rules because it was an unsuitable investment.[59] The common law fraud claim (count three) alleges that the Brokers made material misstatements and omissions during the Note's sale.[60] The state securities law claim and the claim under Sections 12

---

[57] It is difficult to understand the Foundation's claim that Fuld is liable on a *respondeat superior* theory. Under that doctrine, a principal is vicariously liable for the torts of an agent when the agent acts within the scope of the agent's authority. *See* RESTATEMENT OF AGENCY 3D § 7.03 (2006). There is no suggestion here that the Brokers were agents of Fuld personally.

[58] SC ¶¶ 33, 44.

[59] *Id.* ¶¶ 52-53.

[60] *Id.* ¶¶ 33, 55.

15

and 15 of the Securities Act of 1933 (counts four and five) allege that the Brokers sold the Note using a prospectus that contained material misstatements and omissions.[61] The fraudulent inducement and hold claim (count seven) likewise is predicated on the Brokers' and Fuld's failure to disclose the Note's allegedly known and growing risks by reason of the issuer's – LBHI's – activities.[62]

These six claims all arise from the structuring and sale of the Note by LBI employees to an LBI customer or, in the case of count seven, the Broker's alleged persuasion of the Foundation to continue to hold the Note. Fuld is sued on a control person or supervisory liability theory based on his role as chief executive officer of LBI. All therefore arose "in connection with [LBI's] business activities." In consequence, these six of the Foundation's seven claims against Fuld – counts one, two, three, four, five, and seven – appear to be subject to the arbitration agreement.

Fuld responds that all of the claims "are founded on the general proposition that LBHI, not LBI, increased its risk thresholds over a stated period of time, starting in 2006" and that the allegations against Fuld concern primarily his role as chairman and chief executive officer of LBHI, not LBI.[63] This is true to the extent that the claims are based almost entirely on undisclosed risks about LBHI's financial health, and the statement of claim contains almost no non–conclusory allegations regarding Fuld or his role at LBI. Nevertheless, the fact that the claims derived from LBHI's activities does not alter the fact that allegedly fraudulent information was provided to the Foundation by LBI employees while making a sale or inducing the retention of the Note. Fuld

---

[61] *Id.* ¶¶ 33, 55, 62, 63, 67, 69.

[62] *Id.* ¶¶ 33, 87, 88.

[63] Pet. Br. at 11-12.

16

allegedly is liable under theories of *respondeat superior* and as a supervisor or control person for those LBI activities. This manifestly is "in connection with [LBI's] business activities." In consequence, Fuld is obliged to arbitrate these claims.

        b.      *Count six is not arbitrable*

Count six, which contains claims under Sections 11 and 15 of the Securities Act of 1933, is different. Even before the Foundation's examiner report-induced change in strategy, these allegations were based purely on Fuld's actions as chairman, chief executive officer, and a director of LBHI.[64] The Foundation alleges that Fuld is liable under Section 11 for alleged violations in two ways. First, he signed LBHI's May 30, 2006 shelf registration statement, amendments, and other Offering Documents, which allegedly contained misstatements and omissions concerning LBHI's financial health, including its investments in mortgage-related securities, liquidity, asset valuations, and accounting.[65] Second, he was a director of LBHI at the time the allegedly false or misleading shelf registration statement became effective.[66] In addition, it alleges that Fuld is liable as a control person of LBHI, the Note's issuer.[67] The pre-trial brief, incorporating the examiner's report, underscored this theory of recovery.[68]

---

[64] *See* SC ¶¶ 73-77.

[65] *Id.* ¶¶ 33, 55, 75, 78.

[66] *Id.* ¶ 76. *See* 15 U.S.C. § 77k(a)(1).

[67] *Id.* ¶ 77. *See* 15 U.S.C. § 77k(a)(2).

[68] Pre-trial Br. 22-23 ("Fuld is liable [as a] [d]irector and signed of the Registration Statement, under 1933 Act §11[.]").

These allegations purely relate to Fuld's role as an officer or director of LBHI. That entity, unlike LBI, was not a member of FINRA or its predecessor entity. Signing LBHI's registration statement and acting as LBHI's director were not, in any relevant sense, "in connection with" the business of a FINRA member, including LBI. Consequently, the Foundation's claim against Fuld under Section 11 and 15 of the Securities Act are not subject to the FINRA rules' arbitration provisions.[69]

B.   *Interference with the multidistrict litigation*

Fuld argues also that all seven counts in the Arbitration should be enjoined under the All Writs Act[70] in aid of the Court's jurisdiction over *In re Lehman Brothers Securities & ERISA Litigation*.[71] Should the Arbitration continue, Fuld anticipates a personal parade of horribles, including uncoordinated and costly discovery circumventing the PSLRA's automatic stay,

---

[69] *See Oppenheimer & Co. Inc. v. Deutsche Bank AG*, No. 09 Civ. 8154 (LAP), 2010 WL 743915, at * 2 (S.D.N.Y. Mar. 2, 2010) (holding parent company not bound to arbitrate disputes by subsidiary's membership in FINRA).

It is unclear whether the petitioner must show irreparable injury before an arbitration is enjoined. *Compare SATCOM Int'l Group PLC*, 49 F. Supp. 2d at 342 (enjoining arbitration after noting existence of irreparable injury) *with L.F. Rothschild & Co.*, 702 F. Supp. at 467-68 (enjoining arbitration without discussion of irreparable injury). If a showing of irreparable injury is required, Fuld has demonstrated it here. Since the FINRA arbitrators here are not required to justify their decisions, Tr. at 8-9, there would be no way to determine whether the claim not subject to the arbitration agreement "poisoned" any arbitral award. Fuld therefore would have no material opportunity to challenge whether the arbitrators were swayed by matters over which they had no jurisdiction in rendering any award.

[70] 28 U.S.C. § 1651(a).

[71] Pet. Br. at 12.

duplicative litigation, inconsistent rulings, and limited rights to appeal.[72] Other potential difficulties include the possibility that Fuld could be forced to arbitrate claims in uncoordinated arbitral tribunals across the country or be subjected to collateral estoppel in subsequent litigation.

The All Writs Act authorizes federal courts to "issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law."[73] The Act "fills the interstices of federal judicial power," authorizing courts to "issue such commands . . . as may be necessary or appropriate to effectuate and prevent the frustration of orders it has previously issued in its exercise of jurisdiction otherwise obtained."[74]

While Fuld describes a litany of difficulties that he might face personally should the Arbitration continue, he makes few non-conclusory arguments[75] explaining how the Arbitration would interfere with this Court's jurisdiction or orders in *In re Lehman Brothers Secur. & ERISA Litig.* The strongest argument is that collateral estoppel possibly could apply to issues decided in the arbitration.[76] Although the Arbitration could preclude some aspects of the multidistrict

---

[72] *Id.* at 14; Fishman Decl. Ex. 4, at 4.

[73] 28 U.S.C. § 1651(a).

[74] *Syngenta Crop Prot., Inc. v. Henson*, 537 U.S. 28, 31-32 (2002) (quoting *United States v. N. Y. Tel. Co.*, 434 U.S. 159, 172 (1977) and *Penn. Bureau of Corr. v. U.S. Marshals Serv.*, 474 U.S. 34, 41 (1985)).

[75] *E.g.*, Pet. Br. at 12 ("To have [securities law] issues decided in FINRA arbitral forum would impair Judge Kaplan's jurisdiction and authority over the MDL Action, limit Judge Kaplan's flexibility to adjudicate the securities law questions raised in the civil complaints before him and expose Mr. Fuld to the real risk of inconsistent judgments.").

[76] Pet. Rep. Br. at 7.

litigation,[77] this Court ultimately would decide whether collateral estoppel applied and, if so, its scope.[78] In any event, most of the multidistrict parties would not be bound.

There is some merit also to the argument that arbitrations such as this one should be funneled into the federal courts and consolidated into a single multidistrict proceeding as occurs with state court securities class actions under the Securities Litigation Uniform Standards Act ("SLUSA").[79] This, however, is a matter for Congress. In the absence of some showing that this arbitration would interfere with the multidistrict litigation pending before the Court – and petitioner has made none here – resort to the All Writs Act would be inappropriate.

*Conclusion*

For the foregoing reasons, Fuld's petition [09 MD 2017, docket item 269] and motion [M-82] are granted to the extent that the parties are enjoined from arbitrating count six in the statement of claim. They are denied in all other respects. The temporary restraining order previously entered and extended [09 MD 2017, docket items 252 and 265] are dissolved.

SO ORDERED.

Dated:    April 20, 2010

_____
Lewis A. Kaplan
United States District Judge

(The manuscript signature above is not an image of the signature on the original document in the Court file.)

---

[77] *See Boguslavsky v. Kaplan*, 159 F.3d 715, 720 (2d Cir. 1998) (finding plaintiff's claims collaterally estopped after dismissal of identical claims in arbitration).

[78] *Dean Witter Reynolds Inc. v. Byrd*, 470 U.S. 213, 223 (1985).

[79] 15 U.S.C. § 78bb(f).