UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK



RECEIVED
APR 23 2010
U.S.D.C. S.D.N.Y.
CASHIERS

In re:

LEHMAN BROTHERS SECURITIES AND
ERISA LITIGATION

This Document Applies to:

*In re Lehman Brothers Equity/Debt Securities
Litigation*, 08 Civ. 5523 (LAK)

Civil Action 09 MD 2017

ECF CASE

<u>JURY TRIAL DEMANDED</u>

## THIRD AMENDED CLASS ACTION COMPLAINT
## FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

## TABLE OF CONTENTS

Page

I.      NATURE OF ACTION ................................................................................ 1

II.     JURISDICTION AND VENUE................................................................... 2

III.    PARTIES AND RELEVANT NON-PARTIES......................................... 3

        A.   Plaintiffs ........................................................................................ 3

        B.   Relevant Non-Parties..................................................................... 3

        C.   Defendants...................................................................................... 4

IV.     CLASS ACTION ALLEGATIONS APPLICABLE TO ALL CLAIMS ......................... 5

V.      VIOLATIONS OF THE SECURITIES ACT ........................................... 7

        A.   The Offering Materials Were Materially False And Misleading .......................... 8

             1.   The Offering Materials Failed To Disclose Lehman's Repo
                  105 Transactions .................................................................. 8

                  a.   Additional Material Misstatements And
                       Omissions Relating To Repo 105.................................. 15

                  b.   GAAP Violations Relating To Repo 105 ...................... 18

             2.   The Offering Materials Misrepresented Lehman's Risk
                  Management Practices........................................................... 20

             3.   The Offering Materials Contained Untrue Statements
                  Regarding Lehman's Liquidity Risk And Risk Of Bankruptcy ............... 27

             4.   The Offering Materials Overstated The Value Of Lehman's
                  Commercial Real Estate Holdings ....................................... 28

                  a.   Archstone Valuations ................................................... 29

                  b.   PTG Asset Valuations .................................................. 30

                  c.   Additional Facts Showing That Lehman's
                       Commercial Real Estate Holdings Were
                       Overvalued ................................................................... 32

             5.   The Offering Materials Failed To Disclose Lehman's Risk
                  Concentrations...................................................................... 33

        B.   The Lehman/UBS Structured Product Offerings ................................. 36

VI.     CAUSES OF ACTION UNDER THE SECURITIES ACT ........................... 41

COUNT I  Violations Of Section 11 Of The Securities Act Against The Securities Act Defendants ............................................................................. 41

COUNT II  Violations Of Section 12(a)(2) Of The Securities Act Against Defendant UBS ................................................................................. 44

COUNT III  Violations Of Section 15 Of The Securities Act Against Defendants Fuld, O'Meara, Callan, Gregory And Lowitt .................................... 45

VII.  VIOLATIONS OF THE EXCHANGE ACT ............................................. 46

    A.  Repo 105 Transactions ............................................................. 47

        1.  Lehman Utilized Repo 105 For A Fraudulent Purpose ............................ 47

        2.  Lehman Utilized Repo 105 To Avoid Recording Losses On Illiquid Or "Sticky" Assets While Creating The False Appearance Of Deleveraging ............................................. 50

    B.  Liquidity Risk And Overstated Liquidity Pool .................................... 52

    C.  Risk Management ................................................................... 52

    D.  The Insider Defendants' False And Misleading Statements During The Class Period ................................................................. 55

    E.  Additional Evidence Of Scienter .................................................. 67

        1.  The Insider Defendants Knew Of Repo 105 And The Artificial Balance Sheet Manipulation ............................................. 67

        2.  Insider Defendants Knew Of Lehman's Disregard Of Risks And Its Liquidity Problems ................................................ 71

    F.  Section 10(b) Allegations Against E&Y ........................................... 76

        1.  Material Misstatements By E&Y .............................................. 76

        2.  E&Y's Scienter ............................................................. 77

        3.  E&Y's Violation Of Auditing Standards ..................................... 80

    G.  Loss Causation ..................................................................... 83

VIII.  CAUSES OF ACTION UNDER THE EXCHANGE ACT ............................. 86

COUNT IV  Violations Of Section 10(b) Of The Exchange Act And Rule 10b-5 Promulgated Thereunder Against The Insider Defendants And E&Y ..................................................................................... 86

COUNT V  Violations Of Section 20(a) Of The Exchange Act Against The Insider Defendants............................................................... 88

COUNT VI  Violations Of Section 20A Of The Exchange Act Against
Defendant Fuld ................................................................................................ 90

PRAYER FOR RELIEF .......................................................................................... 91

## GLOSSARY OF TERMS

| | |
|---|---|
| AICPA: | American Institute of Certified Public Accountants. |
| ALCO: | Asset Liability Committee. |
| Alt-A: | Alternative A-paper. |
| Aurora: | Aurora Loan Services LLC. |
| ASB: | Auditing Standards Board. |
| AU: | Statements on Auditing Standards issued by the ASB. |
| AU § 110: | Responsibilities and Functions of the Independent Auditor. |
| AU § 230: | Due Professional Care in the Performance of Work. |
| AU § 311: | Planning and Supervision. |
| AU § 312: | Audit Risk and Materiality in Conducting an Audit. |
| AU § 316: | Consideration of Fraud in a Financial Statement Audit. |
| AU § 336: | Using the Work of a Specialist. |
| AU § 411: | The Meaning of Present Fairly in Conformity with Generally Accepted Accounting Principles. |
| AU § 561: | Subsequent Discovery of Facts Existing at the Date of the Auditor's Report. |
| AU § 722: | Interim Financial Information. |
| AU § 9336: | Interpretation of AU Section 336, *Using the Work of a Specialist*. |
| BNC: | BNC Mortgage LLC. |
| Cap * 105: | A method Lehman used to assign value to the collateral underlying its PTG assets. |
| Cash Capital Surplus: | A measure of the excess of long-term funding sources over long-term funding requirements. |
| CDO: | Collateralized Debt Obligation. |

| | |
|---|---|
| CEO: | Chief Executive Officer. |
| CFO: | Chief Financial Officer. |
| CLO: | Collateralized Loan Obligation. |
| CMBS: | Commercial Mortgage-Backed Securities. |
| Commercial Portfolio: | Comprised of debt instruments, such as commercial mortgage loans and CMBSs. |
| COO: | Chief Operating Officer. |
| Concentration Limits: | Exposure limits in a single, undiversified business or area. |
| CRE: | Commercial Real Estate. |
| CW: | Confidential Witness. |
| Examiner: | Anton R. Valukas, the examiner appointed by the court in Lehman's bankruptcy proceedings, *In re Lehman Brothers Holdings Inc.*, 08-13555 (JMP) (Bankr. S.D.N.Y.). |
| Exchange Act: | Securities Exchange Act of 1934. |
| FASB: | Financial Accounting Standards Board. |
| FASCON 1: | Financial Accounting Standards Board – Statement of Financial Accounting Concepts No. 1, *Objectives of Financial Reporting by Business Enterprises*. |
| FASCON 2: | Financial Accounting Standards Board – Statement of Financial Accounting Concepts No. 2, *Qualitative Characteristics of Accounting Information*. |
| FASCON 5: | Financial Accounting Standards Board – Statement of Financial Accounting Concepts No. 5, *Recognition and Measurement in Financial Statements of Business Enterprises*. |
| FID: | Lehman's Fixed Income Division. |
| GAAP: | Generally Accepted Accounting Principles. |
| GAAS: | Generally Accepted Auditing Standards. |
| GREG: | Lehman's Global Real Estate Group. |

| | |
|---|---|
| GRMG: | Lehman's Global Risk Management Group. |
| IRR: | Internal Rate of Return. |
| Leveraged Loans: | Loans extended to companies or individuals that already have high levels of debt. |
| Liquidity: | A measure of the extent to which a firm has cash (or has the ability to convert current assets to cash) to meet immediate and short-term obligations. |
| MBS: | Mortgage-Backed Securities. |
| MD&A: | Management Discussion and Analysis. |
| PCAOB: | Public Company Accounting Oversight Board. |
| PTG: | Principal Transactions Group. |
| REIT: | Real Estate Investment Trust. |
| Repo: | Secured financing transaction allowing a borrower to use securities as collateral for a short-term loan sold for cash to a counterparty with a simultaneous agreement to repurchase the same or equivalent securities at a specific price at a later date. |
| Repo 105: | Repo financing transactions accounted for as "sales" as opposed to financing transactions based upon their larger haircuts (or overcollateralization), which ranged from approximately 5% to 8%. |
| Risk Appetite: | A measure Lehman used to aggregate the market risk, credit risk, and event risk it faced and to represent the amount the firm was prepared to lose in one year. |
| SEC: | United States Securities and Exchange Commission. |
| Securities Act: | Securities Act of 1933. |
| SFAS 5: | Financial Accounting Standards Board – Statement of Financial Accounting Standards No. 5, *Accounting for Contingencies*. |
| SFAS 107: | Financial Accounting Standards Board – Statement of Financial Accounting Standards No. 107, *Disclosures about Fair Value of Financial Instruments*. |

SFAS 133:                    Financial Accounting Standards Board – Statement of Financial Accounting Standards No. 133, *Accounting for Derivative Instruments and Hedging Activities*.

SFAS 140:                    Financial Accounting Standards Board – Statement of Financial Accounting Standards No. 140, *Accounting for Transfers and Servicing of Financial Assets and Extinguishments of Liabilities*.

SFAS 157:                    Financial Accounting Standards Board – Statement of Financial Accounting Standards No. 157, *Fair Value Measurement*.

Single Transaction Limit:   A limit designed to ensure that Lehman did not commit too much risk in a single transaction.

SOP 94-06:                   AICPA Statement of Position No. 94-6, *Disclosure of Certain Significant Risks and Uncertainties*.

Stress tests:                Analyses employed to evaluate how various market scenarios would affect its portfolio.

VaR:                         Value at Risk, which measures the potential loss in the fair value of a portfolio.

Plaintiffs bring claims arising under the Securities Act individually and on behalf of all persons and entities, except Defendants and their affiliates, who purchased or otherwise acquired the Lehman Brothers Holdings Inc. ("Lehman" or the "Company") securities identified in Appendices A and B attached hereto and who were damaged thereby.[1]  Separately, Plaintiffs bring claims arising under the Exchange Act individually and on behalf of all persons and entities, except Defendants and their affiliates, who purchased or otherwise acquired Lehman common stock, call options, and/or who sold put options between June 12, 2007 and September 15, 2008, inclusive (the "Class Period"), and who were damaged thereby.

Plaintiffs' allegations are based upon personal knowledge as to themselves and their actions, and upon lead counsel's investigation as to all other matters.  Such investigation included interviews of Confidential Witnesses ("CWs"), review of press releases, analyst reports, media reports, conference call transcripts, documents and testimony provided to Congress, SEC filings, books, and the March 11, 2010 report and documents collected by the Bankruptcy Court-appointed examiner, Anton R. Valukas (the "Examiner").

## I.    NATURE OF ACTION

1.    As alleged herein, the Offering Materials contained untrue statements and omitted materials facts concerning the following aspects of Lehman's financial results and operation, which allowed Lehman to raise over $31 billion through the Offerings set forth on Appendices A and B:

- **Repo 105**:  Lehman used undisclosed repurchase and resale ("repo") transactions, known as "Repo 105" and "Repo 108" transactions (together, "Repo 105"), to temporarily remove tens of billions of dollars from its balance sheet at the end of financial reporting periods, usually for a period of seven to ten days.  These transactions lacked any economic substance.  While Lehman affirmatively represented throughout the Class Period that it used ordinary repo agreements and recorded these repos as short-term financings, *i.e.*, borrowings, Lehman failed to

---

[1]  "Offerings" refers to the offerings set forth on Appendices A and B that occurred pursuant to a shelf registration statement dated May 30, 2006, filed with the SEC on Form S-3 (the "Shelf Registration Statement").  The Shelf Registration Statement, together with the prospectuses, prospectus supplements, product supplements and pricing supplements, as well as all SEC filings incorporated therein, are collectively referred to herein as the "Offering Materials."

disclose that (i) it simultaneously engaged in Repo 105 transactions for tens of billions of dollars in assets; (ii) it was recording the Repo 105 transactions as if the underlying assets had been permanently sold and removed from the books; and (iii) it had an obligation to repurchase these assets just days after the end of each quarter. This undisclosed practice had the effect of artificially and temporarily reducing Lehman's net leverage ratio each quarter during the Class Period – an important metric to securities analysts, credit agencies and investors – rendering Lehman's statements concerning net leverage and financial condition materially false and misleading when made and in violation of GAAP.

- **Risk Management**:  Lehman publicly and consistently promoted its robust and sophisticated risk management system.   In truth, however, Lehman regularly disregarded and exceeded its risk limits, or simply raised the limits, as Lehman accumulated illiquid assets, including the largest in its history – the $5.4 billion Archstone project discussed below.

- **Liquidity**:  Defendants' statements concerning Lehman's liquidity failed to disclose that Repo 105 transactions had the effect of materially understating Lehman's liquidity risk as Lehman had tens of billions of dollars in immediate short term obligations that were unreported, and as the Class Period continued, Lehman's reported liquidity pool included large amounts of encumbered assets.

- **Commercial Real Estate Assets**:  Defendants represented that all of Lehman's assets were presented at "fair value."  Lehman, however, failed to consider market information when valuing certain of its commercial real estate assets, thereby materially overstating their value.

- **Concentration of Credit Risk**:   GAAP requires disclosure of significant concentrations of credit risk.   Lehman, however, failed to disclose material facts concerning its concentration of mortgage and real estate related assets, preventing investors from meaningfully assessing the Company's exposure to these risky assets.

2.     In short, as the Examiner recently testified before the House Committee on Financial Services, "the public did not know there were holes in the reported liquidity pool, nor did it know that Lehman's risk controls were being ignored, or that reported leverage numbers were artificially deflated.  Billions of Lehman shares traded on misinformation."

## II.     JURISDICTION AND VENUE

3.     This Court has jurisdiction over the subject matter of this action pursuant to Section 22 of the Securities Act, 15 U.S.C. § 77v; Section 27 of the Exchange Act, 15 U.S.C. § 78aa; and 28 U.S.C. § 1331.

4.      Venue is proper in this District pursuant to Section 22 of the Securities Act, 15 U.S.C. § 77v; Section 27 of the Exchange Act, 15 U.S.C. § 78aa; and 28 U.S.C. § 1391(b), (c), and (d).   Many of the acts and transactions described herein, including the preparation and dissemination of materially false and misleading public filings, occurred in this District.   At all times relevant, Lehman's headquarters and principal offices were located in this District.

5.      In connection with the acts alleged herein, Defendants used the means and instrumentalities of interstate commerce, including, but not limited to, the United States mails, interstate telephone communications, and the facilities of national securities exchanges.

## III.   PARTIES AND RELEVANT NON-PARTIES

### A.      Plaintiffs

6.      Court-appointed Lead Plaintiffs Alameda County Employees' Retirement Association ("ACERA"), Government of Guam Retirement Fund ("GGRF"), Northern Ireland Local Government Officers' Superannuation Committee ("NILGOSC"), City of Edinburgh Council as Administering Authority of the Lothian Pension Fund ("Lothian"), and Operating Engineers Local 3 Trust Fund ("Operating Engineers"), along with the additional plaintiffs identified in Appendices A and B, purchased or otherwise acquired Lehman common stock during the Class Period, and/or various Lehman securities set forth in Appendices A and B, and were damaged thereby.

### B.      Relevant Non-Parties

7.      Lehman, headquartered in New York, was a global investment bank.   Lehman's common stock traded on the New York Stock Exchange.   On September 15, 2008, Lehman filed for bankruptcy protection under Chapter 11 of the Bankruptcy Code.   For this reason, Lehman is not named as a defendant in this action.

C.    **Defendants**

8.      At all relevant times, Defendant Richard S. Fuld, Jr. ("Fuld") served as Lehman's Chairman and CEO, and chair of Lehman's Executive Committee and Lehman's Risk Committee. Fuld signed the Shelf Registration Statement.

9.      Defendant Christopher M. O'Meara ("O'Meara") served as the Company's CFO, Controller, and Executive Vice President from 2004 until December 1, 2007, when he became Global Head of Risk Management.  O'Meara was also a member of Lehman's Risk Committee at all relevant times.  O'Meara signed the Shelf Registration Statement.

10.     Defendant Joseph M. Gregory ("Gregory") was, at all relevant times, the Company's President and COO and a member of Lehman's Executive Committee, until he resigned on or about June 12, 2008.

11.     Defendant Erin Callan ("Callan") became the Company's CFO and Executive Vice President on December 1, 2007, and served in that position and as a member of Lehman's Executive Committee and Lehman's Risk Committee until she resigned on or about June 12, 2008.

12.     Defendant Ian Lowitt ("Lowitt") replaced Callan as CFO in June 2008.  He also served as the Co-Chief Administrative Officer and was a member of Lehman's Executive Committee and Lehman's Risk Committee from June 2008 through the date of Lehman's bankruptcy filing.

13.     Defendants Fuld, O'Meara, Gregory, Callan and Lowitt are referred to collectively as the "Insider Defendants."

14.     Director Defendants Michael L. Ainslie ("Ainslie"), John F. Akers ("Akers"), Roger S. Berlind ("Berlind"), Thomas H. Cruikshank ("Cruikshank"), Marsha Johnson Evans ("Evans"), Sir Christopher Gent ("Gent"), Roland A. Hernandez ("Hernandez"), Henry Kaufman ("Kaufman"), and John D. Macomber ("Macomber") (collectively, the "Director Defendants") were at all relevant times members of Lehman's Board of Directors.  Each director signed the Shelf Registration Statement in his or her capacity as a director of Lehman.

-4-

15.     Auditor Defendant Ernst & Young LLP ("E&Y") served as the Company's purportedly independent auditor at all times relevant to the Class Period.  E&Y audited Lehman's fiscal 2007 financial statements, falsely certified that those financial statements were prepared in accordance with GAAP, and falsely represented that it conducted its audits or reviews in accordance with GAAS, set forth by the PCAOB.  E&Y also reviewed Lehman's interim financial statements during the Class Period and falsely represented that no material modifications needed to be made for them to conform with GAAP.

16.     The Underwriter Defendants, who underwrote the Offerings which were sold pursuant to materially false and misleading Offering Materials, are being charged with violations of Section 11 of the Securities Act, as set forth in Appendix A (identifying the underwriters, the offerings and amounts underwritten).  UBS, which underwrote certain offerings in Appendix A and all of the offerings in Appendix B, is being charged with violations of Section 11 and 12(a)(2) of the Securities Act.

## IV.     CLASS ACTION ALLEGATIONS APPLICABLE TO ALL CLAIMS

17.     Plaintiffs bring this Action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of themselves and all other persons and entities, except Defendants and their affiliates, who (1) purchased or acquired Lehman securities identified in Appendix A pursuant or traceable to the Shelf Registration Statement, (2) purchased or acquired any Lehman Structured Notes identified in Appendix B pursuant or traceable to the Shelf Registration Statement, and (3) purchased or acquired Lehman common stock, call options, and/or who sold Lehman put options between June 12, 2007 and September 15, 2008.  Excluded from the Class are (i) Defendants, (ii) the officers and directors of each Defendant, (iii) any entity in which Defendants have or had a controlling interest, and (iv) members of Defendants' immediate families and the legal representatives, heirs, successors or assigns of any such excluded party.

18.     The members of the Class are so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to Plaintiffs at this time and

can only be ascertained through appropriate discovery, Plaintiffs believe that there are thousands of members of the Class located throughout the United States.  Throughout the Class Period, the Lehman securities at issue traded on an efficient market.  Record owners and other members of the Class may be identified from records maintained by Lehman and/or its transfer agents and may be notified of the pendency of this action by mail, using a form of notice similar to that customarily used in securities class actions.

19.     Plaintiffs' claims are typical of the claims of the other members of the Class as all members of the Class were similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

20.     Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.

21.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:  (a) whether the federal securities laws were violated by Defendants' acts and omissions as alleged herein; (b) whether documents, press releases, and other statements disseminated to the investing public and the Company's shareholders misrepresented material facts about the business and financial condition of Lehman; (c) whether statements made by Defendants to the investing public misrepresented and/or omitted material facts about the business and financial condition of Lehman; (d) whether the market price of Lehman's securities was artificially inflated due to the material misrepresentations and failures to disclose material facts complained of herein; and (e) the extent to which the members of the Class have sustained damages and the proper measure of damages.

22.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of

individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this suit as a class action.

## V.      VIOLATIONS OF THE SECURITIES ACT

23.      The Securities Act claims are based on strict liability and negligence.  The Securities Act claims are not based on any allegation that any Defendant engaged in fraud or any other deliberate and intentional misconduct, and Plaintiffs specifically disclaim any reference to or reliance upon fraud allegations.

24.      The Securities Act claims are brought on behalf of investors who purchased or otherwise acquired Lehman securities in or traceable to the Offering Materials issued in connection with the Offerings set forth in Appendices A and B.[2]  Each of the Offerings was conducted pursuant to the Shelf Registration Statement, a prospectus dated May 30, 2006 (the "2006 Prospectus"), and either a prospectus supplement or pricing supplement issued in connection with that Offering.  The 2006 Prospectus stated that it was part of the Shelf Registration Statement.  The date of each offering – and not the prior date of the Shelf Registration Statement – was the "effective date" of the Shelf Registration Statement for purposes of Section 11 liability under 17 C.F.R. § 230.415 and 17 C.F.R. § 229.512(a)(2).

25.      The 2006 Prospectus expressly incorporated by reference Lehman's Forms 10-K, 10-Q and 8-K that were filed with the SEC subsequent to the 2006 Prospectus and prior to the date of each Offering conducted pursuant to the 2006 Prospectus.  As to each Offering, certain documents contained untrue statements and material omissions that were incorporated in the Shelf Registration Statement and 2006 Prospectus, as set forth in Appendices A and B.

---

[2]  Lead Plaintiffs reserve the right to assert claims for additional offerings that occurred pursuant to Lehman's May 30, 2006 Shelf Registration Statement, should investors who purchased such additional securities indicate their willingness to serve as named plaintiffs.

A.      **The Offering Materials Were Materially False And Misleading**

1.      **The Offering Materials Failed To
         Disclose Lehman's Repo 105 Transactions**

26.     Throughout the Class Period, Lehman consistently described the importance of net leverage to its business as follows:   "The relationship of assets to equity is one measure of a company's capital adequacy.   Generally, this leverage ratio is computed by dividing assets by stockholders' equity.   We believe that a more meaningful, comparative ratio for companies in the securities industry is net leverage, which is the result of net assets divided by tangible equity capital."   *See, e.g.*, 2007 10-K at 63.

27.     In calculating the numerator for its net leverage ratio, Lehman defined "net assets" in its 2007 10-K as total assets less:   (i) cash and securities segregated and on deposit for regulatory and other purposes; (ii) collateralized lending agreements; and (iii) identifiable intangible assets and goodwill.   For the denominator, Lehman included stockholders' equity and junior subordinated notes in "tangible equity capital," but excluded identifiable intangible assets and goodwill.   Lehman's publicly reported net leverage ratio, therefore, supposedly compared the Company's riskiest assets to its available stockholders equity to absorb losses sustained by such assets.

28.     In fact, net leverage was so meaningful that E&Y's audit workpapers stated that "Materiality is usually defined as any item individually, or in the aggregate, that moves net leverage by 0.1 or more (typically $1.8 billion)." According to E&Y's engagement partner, William Schlich, this was Lehman's own definition for materiality with respect to net leverage.   Accordingly, a "one-tenth" of a point adjustment in net leverage, which during the Class Period meant either an increase or decrease in net assets or tangible equity capital of $1.8 billion, was material to Lehman.

29.     Lehman, along with the majority of investment banking firms on Wall Street, routinely entered ordinary sale and repurchase agreements to satisfy short-term cash needs, borrowing cash from counterparties at fixed interest rates and putting up collateral, typically in the form of financial instruments, to secure financing (referred to herein as "Ordinary Repo"

transactions).  Upon maturity of the Ordinary Repo transactions, Lehman would repay the cash to the counterparty, plus interest, and reclaim its collateral, ending the arrangement.

30.    Lehman accounted for Ordinary Repos as financings – *i.e.*, debt – recording both an asset (the cash proceeds of the Ordinary Repo loan) and a liability (an obligation to repay the Ordinary Repo loan).  Significantly, the collateral that securitized the Ordinary Repo remained on Lehman's balance sheet, and the incoming cash and corresponding liability had the effect of ***increasing*** Lehman's net leverage ratio as the numerator (net assets) increased, while the denominator (tangible equity capital) remained the same.

31.    Unbeknownst to investors, however, Lehman entered into tens of billions of dollars worth of undisclosed Repo 105 transactions, which resembled Ordinary Repo transactions in all material respects, but Lehman recorded the transaction on its books as though the asset collateralizing the loan had actually been ***sold*** and removed from its balance sheet.  Lehman would then use the cash received from the Repo 105 loan to pay down other existing liabilities, which had the effect of ***reducing*** Lehman's net leverage ratio, because it reduced the numerator in the net leverage ratio (net assets) (through the "sale" of the collateralizing asset and the use of cash to pay down other short-term debt), while having no impact on the denominator in the net leverage ratio (tangible equity ratio).  As a result, the Repo 105 accounting treatment had the effect of reducing Lehman's reported net leverage ratio as of the end of each reporting period during the Class Period.

32.    Significantly, the "reduction" in the net leverage ratio was only temporary, and wholly illusory.  Pursuant to the terms of these Repo 105 transactions, just days after the Company's quarter ended, Lehman would repay the Repo 105 counterparty, and the collateralized assets would return to Lehman's balance sheet, thereby immediately and materially increasing the net leverage ratio by highly material amounts shortly after the quarter had closed.

33.    In his prepared testimony before Congress, the Examiner explained that Lehman's public disclosures were misleading by its failure to disclose its use of Repo 105 transactions: Lehman did not disclose that it had only temporarily reduced its net leverage ratio through Repo

105 transactions, "[c]onsequently, Lehman's statement that the net leverage ratio was a 'more meaningful' measurement of leverage was rendered misleading because that ratio – as reported by Lehman – was not an accurate indicator of Lehman's actual leverage, and in fact, understated Lehman's leverage significantly."

34.     In addition, Lehman's public statements regarding its liquidity (the immediate ability to access funds to pay down short-term obligations) was rendered materially misleading because its financial statements and related footnote disclosures failed to disclose Lehman's immediate obligation to repay tens of billions of dollars in Repo 105 transactions just days after the end of each fiscal quarter.   Thus, Lehman's reported that short-term or current liabilities were similarly understated by a material amount.   As a result, Lehman did not have nearly as much in available liquidity or in its liquidity pool as it represented.

35.     Lehman also issued materially false and misleading explanations in the Management's Discussion and Analysis ("MD&A") section of its periodic reports relating to the rationale behind the reported decreases to its net leverage ratio (either quarter-on-quarter or comparing to the prior year's same quarter to the reported quarter).   Regardless of the appropriateness of Lehman's accounting for its Repo 105 transactions under GAAP, these representations were materially false and misleading because Lehman was contractually obligated to repurchase the Repo 105 assets.

36.     Significantly, a Repo 105 transaction was a more expensive form of short-term financing than an Ordinary Repo.  Lehman had the ability to conduct an Ordinary Repo transaction using the same securities and with substantially the same counterparties, at a lower cost, but instead engaged in Repo 105 transactions that had the effect of temporarily "removing" tens of billions of dollars of assets off Lehman's balance sheet at the end of each quarter.

37.     At bottom, Lehman's Repo 105 transactions lacked economic substance, and Lehman's reported de-leveraging failed to reflect its true financial condition.  The quarterly cycle of temporarily "removing" as much as $50 billion of assets off its balance sheet (as reflected in Table 1

below) for only days at quarter-end created the false impression that Lehman had reduced its balance sheet exposure and net leverage, and fostered the appearance of increased liquidity, and thereby made Lehman's financial health appear significantly more sound than it actually was.

**Table 1 – Undisclosed Repo 105/108 Usage *(in billions)***

|          | 2Q07  | 3Q07  | 4Q07  | 1Q08  | 2Q08  |
|----------|-------|-------|-------|-------|-------|
| **Repo 105** | $23.1 | $29.1 | $29.7 | $42.2 | $44.5 |
| **Repo 108** | $8.6  | $6.9  | $8.9  | $6.9  | $5.8  |
| ***Total*** | **$31.9** | **$36.4** | **$38.6** | **$49.1** | **$50.3** |

38.     Notably, throughout the Class Period, Repo 105 transactions decreased Lehman's net leverage between 15 and 19 times its own materiality threshold (0.1), as set forth in Table 2 below.

**Table 2 – Repo 105 and 108 Transactions and Reported Net Leverage**

| Reporting Period | Repo 105 *(billions)* | Reported Net Leverage Ratio | Actual Net Leverage Ratio | Difference As Multiple of Lehman's 0.1 Materiality Threshold |
|------------------|-----------------------|-----------------------------|---------------------------|-------------------------------------------------------------|
| 2Q07 | $31.9 | 15.4x | 16.9x | 15 times |
| 3Q07 | $36.4 | 16.1x | 17.8x | 17 times |
| 4Q07 | $38.6 | 16.1x | 17.8x | 17 times |
| 1Q08 | $49.1 | 15.4x | 17.3x | 19 times |
| 2Q08 | $50.4 | 12.1x | 13.9x | 18 times |

39.     In addition, throughout the Class Period, the Repo 105 transactions also caused Lehman's short term and total liabilities to be materially understated, as reflected in Table 3 below:

**Table 3 – Repo 105 Transactions and Total and Short Term Liabilities** *(in billions)*

|  | 2Q07 | 3Q07 | 2007 Year End | 1Q08 | 2Q08 |
|---|---|---|---|---|---|
| Total Reported Liabilities | $584.73 | $637.48 | $668.57 | $761.20 | $613.16 |
| Reported Short Term Liabilities | $483.91 | $517.15 | $545.42 | $632.92 | $484.97 |
| Repo 105's | $31.90 | $36.40 | $38.60 | $49.10 | $50.40 |
| % of Repo 105's to Total Liabilities | 5.45% | 5.71% | 5.77% | 6.45% | 8.22% |
| % of Repo 105's to Short-Term Liabilities | 6.59% | 7.04% | 7.08% | 7.76% | 10.39% |

40.    The failure to disclose the tens of billions of dollars in Repo 105 transactions consistently rendered statements in Lehman's quarterly and annual filings throughout the Class Period materially false and misleading, including the following:

(a)    Each Form 10-Q and Lehman's 2007 10-K represented that securities sold under agreements to repurchase, are "treated as collateralized agreements and financings for financial reporting purposes."  This statement was untrue and materially misleading because it failed to disclose that, through Lehman's Repo 105 program, tens of billions of dollars in securities sold each quarter pursuant to agreements to repurchase were not treated as "financings for financial reporting purposes" but were treated as sales by Lehman;

(b)    Each Form 10-Q and the 2007 10-K purported to describe all of Lehman's material off-balance sheet arrangements.  In fact, each filing expressly included a discussion and table purportedly summarizing all "Off-Balance Sheet Arrangements" in the MD&A section.  Such descriptions were materially false and misleading because they failed to list or discuss the material fact that Lehman had agreed to tens of billions of dollars in off-balance sheet commitments that were not included in these descriptions;

(c)    Each Form 10-Q contained a statement that the "Consolidated Financial Statements are prepared in conformity with U.S. generally accepted accounting principles," and included

certifications from Fuld and either Callan or O'Meara stating that "this report does not contain any untrue statements of a material fact or omit to state a material fact" and that "the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flow of the registrant."  These statements were materially false and misleading for, among other reasons described herein, failing to disclose the Repo 105 transactions, which falsely reduced net leverage and understated liabilities and violated GAAP.

(d)     Each Form 10-Q contained a "Report of Independent Registered Public Accounting Firm" signed by E&Y (the "Interim Reports"), stating that, based on its review of Lehman's consolidated financial statements and in accordance with the standards of the PCAOB, "we are not aware of any material modifications that should be made to the consolidated financial statements referred to above for them to be in conformity with U.S. generally accepted accounting principles." This statement was materially false for, among other reasons described herein, failing to disclose the Repo 105 transactions, which falsely reduced net leverage and understated liabilities, and violated GAAP.

(e)     The 2007 10-K represented that Lehman's "Consolidated Financial Statements are prepared in conformity with U.S. generally accepted accounting principles," and included certifications from Defendants Fuld and Callan stating that "this report does not contain any untrue statements of a material fact or omit to state a material fact" and that "the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant."  These statements were false and misleading for, among other reasons described herein, failing to disclose the Repo 105 transactions, which falsely reduced net leverage and understated liabilities, and violated GAAP.

(f)     The 2007 10-K included E&Y's "Report of Independent Registered Public Accounting Firm," signed January 28, 2008, certifying that: (1) Lehman's FY07 financial results: (a) were prepared in accordance with GAAP; and (b) in all material respects, fairly presented the

financial condition and operations of Lehman as of November 30, 2007; and (2) E&Y conducted its audit of Lehman's FY07 financial results in accordance with GAAS (the "2007 Audit Report"). E&Y consented to the inclusion of its 2007 Audit Report in Lehman's 2007 Form 10-K, and consented to the incorporation of the 2007 Audit Report by reference in registration statements, including Lehman's May 30, 2006 S-3 Shelf Registration Statement (No. 333−134553), and post effective amendments.  These statements in E&Y's 2007 Audit Report were false and misleading because, contrary to E&Y's representation, Lehman's FY07 financial results were not prepared in accordance with GAAP because the Company's net leverage was understated through the use of Repo 105 transactions, and E&Y's audit of Lehman's FY07 financial results was not performed in accordance with GAAS.

41.    As further discussed in ¶¶61-69, the failure to disclose Lehman's use and accounting treatment of Repo 105 transactions in its financial statements and related footnotes incorporated into the Offering Materials violated numerous GAAP provisions and SEC regulations.  This material omission caused Lehman's financial reports to present an unrealistic and unreliable picture of the Company's business realities by misrepresenting its net leverage and liquidity, in violation of, *inter alia*, Accounting Release 173 ("[I]t is important that the overall impression created by the financial statements be consistent with the business realities of the company's financial position and operations") and FASCON 1 (specifically ¶¶32, 34 & 42) and FASCON 2 (specifically ¶¶15, 33, Figure 1, ¶¶58, 79-80, 91-97, 160).

42.    Moreover, the SEC requires that certain information be disclosed in the MD&A section of periodic reports.  Specifically, Item 303 of SEC Regulation S-K states that the registrant's MD&A section of its SEC filings should provide users of financial statements with relevant information in assessing the registrant's financial condition and results of operations, including trends and uncertainties that would cause reported financial information to not be indicative of its future financial condition or future operating results.  By omitting any mention of Repo 105, the Offering Materials violated Item 303's disclosure requirements.  Nowhere did the Offering

Materials report, *inter alia*, the material effect Repo 105 transactions had on the Company's balance sheet, net leverage, liquidity and capital resources, and their nature or business purpose.

43.     In addition to the false and misleading statements referenced above at ¶¶26-40, which appear in the Forms 10-Q and 10-K filed by Lehman during the Class Period and which were incorporated by reference into the Offerings Materials issued in connection with the challenged Offerings, additional false and misleading statements regarding Repo 105 are set forth below in chronological order.

a.     **Additional Material Misstatements
And Omissions Relating To Repo 105**

44.     **2Q07:**  On July 10, 2007, Lehman filed with the SEC its quarterly report on Form 10-Q for the quarter ended May 31, 2007 ("2Q07 10-Q") (which largely repeated information in its June 12, 2007 Form 8-K) signed by O'Meara.

45.     The 2Q07 10-Q reported that Lehman's net leverage ratio was 15.4, which was materially false and misleading because it failed to take into account $31.943 billion in Repo 105 assets that were temporarily removed from Lehman's financial statements.  Had the assets that were subject to the Repo 105 transactions been included, Lehman's net leverage ratio would have been 16.9, representing an increase 15 times greater than Lehman's own materiality threshold of a change in net leverage of 0.1.

46.     In addition, the 2Q07 10-Q reported $137.948 billion in securities sold under agreements to repurchase.  This statement was materially false and misleading because it excluded almost $32 billion in Repo 105 assets that Lehman had temporarily removed from its balance sheet, which Lehman had agreed to repurchase days after the end of the quarter.

47.     **3Q07:**  On October 10, 2007, Lehman filed with the SEC its quarterly report on Form 10-Q for the quarter ended August 31, 2007 ("3Q07 10-Q") (which largely repeated information in its September 18, 2007 Form 8-K), signed by O'Meara.

48.     The 3Q07 10-Q reported that Lehman's net leverage ratio was 16.1, which was materially misleading because it failed to take into account $36.407 billion in Repo 105 assets that

were temporarily removed from Lehman's financial statements. Had the Repo 105 transactions been included, Lehman's net leverage ratio would have been 17.8, representing an increase 17 times greater than Lehman's own materiality threshold of a change in net leverage of 0.1.

49. In addition, the 3Q07 10-Q reported $169.302 billion in securities sold under agreements to repurchase. This statement was materially false and misleading because it excluded over $36 billion in Repo 105 assets that Lehman had temporarily removed from its balance sheet, which Lehman had agreed to repurchase days after the end of the quarter.

50. **FY2007:** On January 29, 2008, Lehman filed with the SEC its annual report on Form 10-K for the fiscal year ended November 30, 2007 ("2007 10-K") (which largely repeated information in its December 13, 2007 Form 8-K), signed by Fuld, Callan, Ainslie, Akers, Berlind, Cruikshank, Evans, Gent, Hernandez, Kaufman, and Macomber.

51. The 2007 10-K reported that Lehman's net leverage ratio was 16.1, which was materially misleading because it failed to take into account $38.634 billion in Repo 105 assets that were temporarily removed from Lehman's financial statements. Had the Repo 105 transactions been included, Lehman's net leverage ratio would have been 17.8, representing an increase 17 times greater than Lehman's own materiality threshold of a change in net leverage of 0.1.

52. In addition, the 2007 10-K reported $181.732 billion in securities sold under agreements to repurchase. This statement was materially false and misleading because it excluded almost $39 billion in Repo 105 assets that Lehman had temporarily removed from its balance sheet, which Lehman had agreed to repurchase days after the end of the quarter.

53. **1Q08:** On April 8, 2008, Lehman filed with the SEC its quarterly report on Form 10-Q for the first quarter ended February 29, 2008 ("1Q08 10-Q") (which largely repeated information in its March 18, 2008 Form 8-K), signed by Callan and incorporated by reference into the offerings, as set forth in Appendix A.

54. The 1Q08 10-Q reported that Lehman's net leverage ratio was 15.4, which was materially misleading because it failed to take into account $49.102 billion in Repo 105 assets that

were temporarily removed from Lehman's financial statements.  Had the Repo 105 transactions been included, Lehman's net leverage ratio would have been 17.3, representing an increase 19 times greater than Lehman's own materiality threshold of a change in net leverage of 0.1.

55.     In addition, the 1Q08 10-Q reported $197.128 billion in securities sold under agreements to repurchase.  This statement was materially false and misleading because it excluded over $49 billion in Repo 105 assets that Lehman had temporarily removed from its balance sheet, which Lehman had agreed to repurchase days after the end of the quarter.

56.     **2Q08:**  On June 9, 2008, Lehman issued a press release, filed with the SEC on Form 8-K, pre-announcing its financial results for the second quarter ended May 31, 2008 ("6/9/08 8-K").

57.     The 6/9/08 8-K claimed that Lehman had reduced its net leverage ratio to below 12.5.  This statement was materially misleading because the 6/9/08 8-K failed to take into account $50.383 billion in Repo 105 assets that were temporarily removed from Lehman's financial statements.  The 6/9/08 8-K was incorporated by reference into the offerings, as set forth in Appendix A.

58.     The 6/9/08 8-K also stated that the Company "further strengthened its liquidity and capital position" by growing its "liquidity pool to an estimated $45 billion" and decreasing gross assets and net assets by approximately $130 billion and $60 billion, respectively.  This statement was false and misleading for reasons set forth below in ¶¶85-88.

59.     On June 16, 2008, the Company issued another press release, filed with the SEC on Form 8-K, announcing its results for the second quarter of 2008 (the "6/16/08 8-K").

60.     The 6/16/08 8-K reported a net leverage ratio of 12.0, and also announced that the firm reduced its gross assets and net assets by $147 billion and $70 billion, respectively, during the second quarter.  These statements were materially misleading because the 6/16/08 8-K failed to disclose $50.383 billion in Repo 105 assets that had been removed only temporarily from Lehman's balance sheet at quarter end.  Had the assets been included, Lehman's net leverage ratio would have been 13.9, representing an increase of 18 times Lehman's own materiality threshold of a change in

net leverage of 0.1.  The 6/16/08 8-K was incorporated by reference into the offerings, as set forth in Appendix A.

### b.   GAAP Violations Relating To Repo 105

61.   Lehman's financial statements for fiscal year 2007, as well as its quarterly financial statements from the second quarter of 2007 through its bankruptcy filing, violated GAAP and SEC disclosure requirements.  Lehman represented in its public filings that all transactions containing short-term repurchase commitments were recorded as "secured financing transactions," which effectively had no net impact on Lehman's balance sheet.  In truth, however, Lehman accounted for its Repo 105 transactions as "sales" under FAS 140, which had a profound impact on Lehman's balance sheet.  By categorizing its Repo 105 transactions as "sales," the transferred securities were removed from the balance sheet, replaced by cash, and a liability was never recorded.  Lehman then used this cash to pay down existing, short-term liabilities, effectively reducing its balance sheet.

62.   Guidance in FAS 140 itself states that categorizing a repurchase agreement as a sale is unusual.  Indeed, unlike Lehman, similar investment banks did not record such repurchase transactions as "sales."  To qualify as a sale under FAS 140, the company transferring the asset must divest itself of the asset and relinquish all control over the assets.  The retention of any portion of control over the assets precludes treatment of a transfer of financial assets as a "sale."  Only when the transferor has divested itself of the assets from a control perspective, such that the asset is effectively "isolated from the transferor – put presumptively beyond the reach of the transferor and its creditors, even in bankruptcy or other receivership," and "the transferor does not maintain effective control over the transferred assets through" for example "an agreement that both entitles and obligates the transferor to repurchase or redeem them before their maturity" can the transaction be deemed a "sale."

63.   Lehman's Repo 105 transactions were not "sales" for a number of reasons, not least of which was that they lacked the necessary business purpose and economic substance to be recorded as legitimate sales under GAAP.  Unlike a true sale, there was no legitimate business

purpose to the transactions.  Indeed, as explained above, the Repo 105 transactions were a more expensive, form of short-term financing for Lehman than an Ordinary Repo transaction.

64.    Moreover, unlike an actual sale, Lehman's repurchase agreements **required** Lehman to repurchase the collateral after a fixed period of time; they did not merely grant Lehman the right to do so.  While characterizing the short-term financing as a "sale" on its financials, Lehman in fact was obligated to repurchase these assets within days after the close of the reporting period.

65.    Furthermore, FAS 140 specifically notes that the determination of whether a transfer of assets qualifies as a sale might depend upon a legal determination of whether such arrangement represents a "true sale at law."  Lehman, however, was unable to obtain a true sale opinion from any United States law firm.  Lehman did not disclose its inability to obtain such an opinion or its decision to nevertheless treat its Repo 105 transactions as sales.  That Lehman attempted to satisfy the requirements of FAS 140 through an opinion from Linklaters, a law firm, in the United Kingdom within the context of English Law (and then channel Repo 105 transactions through a Lehman subsidiary in the United Kingdom) cannot justify the accounting treatment.  Because no U.S. firm would provide the opinion under U.S. law, there was no basis in FAS 140 for recording the transactions as sales, nor was there legitimate business or economic substance behind channeling the Repo 105 transactions through the United Kingdom.

66.    Lehman's accounting for its Repo 105 transactions also failed fundamental tenets of financial reporting under GAAP.  GAAP requires that the overall impression created by financial statements be consistent with the business realities of the company's financial position and operations, such that the financial statements are **useful** and comprehensible to users in making rational business and investment decisions.  *See, e.g.,* FASCON 1, ¶¶9, 16, 33-34; FASCON 5, ¶5. FASCON 1 states that "Financial reporting should include explanations and interpretations to help users understand financial information."  ¶54.  Under GAAP, "**nothing material is left out of the information** that may be necessary to [ensure] that [the report] validly represents the underlying events and conditions."  FASCON 2, ¶¶79-80.  FASCON 5 explains that footnotes are an integral

part of financial statements and are read in conjunction with the notes to the financial statements. Here, Lehman's accounting treatment for its Repo 105 transactions, and the total absence of any disclosures about Repo 105 in footnotes, the MD&A section of the SEC filings or elsewhere created a false impression of Lehman's business condition, violating GAAP. An analyst or a member of the investing public reading Lehman's SEC filings from cover to cover, with unlimited time, would not have learned about the Repo 105 program or Lehman's true net leverage. To the contrary, Lehman affirmatively told readers that its repurchase agreements were treated as financial arrangements, not sales, under FAS 140.

67.     In addition, GAAP requires that financial statements place substance over form. FASCON 2, for example, states in relevant part:

> . . . The quality of reliability and, in particular, of representational faithfulness leaves no room for accounting representations that subordinate substance to form . . . (FASCON 2, ¶59)

68.     Additionally, AU § 411 states, in relevant part:

> Generally accepted accounting principles recognize the importance of reporting transactions and events in accordance with their substance.  (AU § 411.06)

69.     Lehman's Repo 105 transactions lacked substance as "sales."  Whereas ordinary repo transactions provide financing but do not impact the balance sheet, Lehman's Repo 105 transactions did.  Elevating form over substance, Lehman engaged in tens of billions of Repo 105 transactions at the end of its quarters for the purpose of improving the appearance of its balance sheet and net leverage ratio.

### 2.     The Offering Materials Misrepresented Lehman's Risk Management Practices

70.     Throughout the Class Period, the Offering Materials included false and misleading statements concerning Lehman's risk management, including, *inter alia*, statements about Lehman's adherence to risk policies, compliance with risk limits, stress testing, risk appetite, and use of risk mitigants.  Lehman's statements were highly material to investors because, as an investment bank, risk management was critical to loss prevention.  In particular, Lehman's overriding of its risk

management policies and systems enabled Lehman to amass billions of dollars of illiquid, risky assets that it could not monetize to maintain its reported liquidity and net leverage ratio.

71.     Prior to 2006, Lehman focused primarily on the "moving business" – a business strategy of originating assets for securitization or syndication and distribution to others.  In this regard, Lehman's wholly-owned subsidiaries, BNC, a California-based subprime mortgage originator, and Aurora, a leading Alt-A mortgage originator based in Colorado, originated subprime and other non-prime mortgages for Lehman's securitization business, which were then sold to investors.

72.     However, in 2006 and the outset of 2007, Lehman's management began to pursue an aggressive growth strategy that caused the Company to assume significantly greater risk.  This growth strategy depended on Lehman's ability to increase substantially the leverage on its capital. As a result, Lehman shifted from the "moving business" to the "storage" business, making longer-term investments using Lehman's own balance sheet.  This expansion strategy focused heavily on acquiring and holding commercial real estate, leveraged loans and private equity assets – areas that entailed far greater risk and less liquidity than Lehman's traditional lines of business.  From 2007 through the first quarter of 2008, as the real estate markets were collapsing, Lehman continued this strategy, which was considered "counter-cyclical" in that Lehman sought to acquire assets priced at the bottom of the economic cycle.  Thus, as other institutions reduced their risk exposure, Lehman increased its exposure to commercial and residential real estate.

73.     Although Lehman increased its net assets through this growth strategy (by almost $128 billion, or 48%, from the fourth quarter of 2006 through the first quarter of 2008), the market was unaware that the Company had become saddled with an enormous volume of illiquid assets that it could not readily sell in a downturn.  For example, BNC and Aurora continued to originate subprime and other non-prime mortgages to a greater extent than other mortgage originators, many of whom had gone out of business, that could not be securitized and sold off to investors, but rather remained on Lehman's books.  At the same time, during the first two quarters of 2007, Lehman

-21-

continued to grow its leveraged loans, commercial real estate and principal investment business, culminating with the acquisition of the Archstone REIT in May 2007, the largest transaction in Lehman's history.

74.     In its SEC filings during the Class Period, Lehman repeatedly assured investors that it had appropriate risk management policies in place and, significantly, that Lehman monitored and enforced strict adherence to those policies.  Lehman stated that it "monitor[ed] and enforce[ed] adherence to [its] risk policies" (included in the 2007 10-K and 1Q08 10-Q) and that "[m]anagement's Finance Committee oversees compliance with policies and limits" (included in the 2Q07 10-Q, 3Q07 10-Q, 2007 10-K, and 1Q08 10-Q).  Lehman also stated that "[w]e . . . ensure that appropriate risk mitigants are in place" (included in the 2Q07 10-Q and 3Q07 10-Q), and that "[d]ecisions on approving transactions . . . take into account . . . importantly, the impact any particular transaction under consideration would have on our overall risk appetite" (included in the 2Q07 10-Q and 3Q07 10-Q).  These statements were materially false and misleading because Lehman's risk management framework and risk mitigants, including its risk appetite limits, were routinely overruled, disregarded and violated throughout the Class Period.

75.     Lehman's "risk appetite" was a measure that aggregated market risk, credit risk and event risk faced by Lehman.  According to Lehman's risk management policies, the firm-wide risk appetite limit was supposed to be the "hardest" of all Lehman's risk limits such that a breach of this limit required a determination by the Risk Committee – comprised of the Executive Committee (which included Defendants Fuld, Gregory, Callan and Lowitt), the Chief Risk Officer, and the Chief Financial Officer – of the proper action to take.  In reality, however, risk appetite was treated as a "soft" limit that was routinely exceeded during the Class Period.  As the Examiner testified to Congress, "Lehman was in breach of its established risk appetite limits on a persistent basis during the second half of 2007."  All of the Insider Defendants served on the Risk Committee at varying times during the Class Period.

-22-

76.     Indeed, in order to engage in riskier transactions, Lehman raised its risk appetite limit four times between December 2006 and December 2007, from $2.3 to $3.3 billion, then to $3.5 billion, then to $4.0 billion, and then regularly exceeded even these increased limits by hundreds of millions of dollars.  Furthermore, between May and August 2007, Lehman excluded its $2.3 billion bridge equity position in Archstone (as well as other large bridge equity positions) from its risk appetite usage calculations which, if included, would have caused Lehman to further exceed its risk limits.  In May 2007, when Lehman committed to Archstone, "[i]t was clear," according to the Examiner, "that the Archstone transaction would put Lehman over its then existing risk limits, but the deal was committed anyway."  Lehman exceeded its risk appetite limit by $41 million in July 2007 and $62 million in August 2007, and after the Archstone and other bridge equity positions were added, Lehman exceeded its risk appetite limits by $608 million in September 2007, $670 million in October 2007, $508 million in November 2007, $562 million in December 2007, $708 million in January 2008, and $578 million in February 2008.  As the Examiner found, Lehman's disregard for this "hard" limit facilitated a dramatic expansion of the firm's risk profile between 2006 and 2007.

77.     Lehman also had "concentration limits," which were designed to ensure that the Company did not take too much risk in a single, undiversified business or area.  However, Lehman routinely and consistently disregarded the concentration limits with respect to its leveraged loan and commercial real estate business, including by failing to enforce the Company's "single transaction limits," which were meant to ensure that its investments were properly limited and diversified by business line and by counterparty.  The single transaction limit was composed of two limits:  (1) a limit applicable to the notional amount of the expected leveraged loan (*i.e.*, the total value of a leveraged position's assets); and (2) a limit applicable to the amount that Lehman was at risk of losing on the leveraged loan.  The Examiner testified that, in late 2006, Lehman decided "to disregard the single transaction limit."  By July 2007, Lehman had committed to approximately 30 deals that exceeded its $250 million loss threshold, and five deals that violated the notional limit of

$3.6 billion.  Lehman also committed approximately $10 billion more than the single transaction limit allowed with respect to 24 of its largest high yield deals.  Moreover, the Company did not impose a limit on its leveraged loan bridge equity commitments, in which Lehman took on riskier equity pieces of real estate investments and which could directly affect its balance sheet and liquidity position if not sold.  Lehman ultimately exceeded its risk limits by margins of 70% for commercial real estate and by 100% for its leveraged loans.

78.     Lehman also exceeded its balance sheet limits which were designed to contain its overall risk and maintain net leverage ratio within the range required by ratings agencies.  For example, Lehman's Fixed Income Division ("FID") exceeded its balance sheet limit by almost $20 billion at the end of 2Q07; by $11.17 billion at the end of 4Q07; and by $18 billion at the end of 1Q08; with overages concentrated in securitized products and real estate.  Furthermore, despite the fact that Lehman almost doubled its Global Real Estate Group's ("GREG") balance sheet limit for commercial real estate transactions from $36.5 billion in 1Q07 to $60.5 billion in 1Q08, GREG still exceeded its balance sheet limit by approximately $600 million in 3Q07; by approximately $3.8 billion in 4Q07; and by approximately $5.2 billion in 1Q08.

79.     During the Class Period, Lehman's Offering Materials also included false and misleading statements concerning its "stress tests," one of Lehman's publicized risk controls.  Lehman's stress tests were supposed to be used to determine the potential financial consequences of an economic shock to its portfolio of real estate assets and investments, and Lehman was required by the SEC to conduct some form of regular stress testing.  Indeed, in its Class Period SEC filings, Lehman publicly represented that "[w]e use stress testing to evaluate risks associated with our real estate portfolios . . . ."  Contrary to this statement, however, Lehman excluded some of its most risky principal investments – including commercial real estate investments, private equity investments, and leveraged loan commitments – from its stress tests.

80.     Lehman's failure to conduct stress testing of its real estate investments had a material adverse effect on the Company.  Indeed, as the Examiner found, the failure to do so rendered

Lehman's stress tests "meaningless," and "Lehman's management did not have a regular and systematic means of analyzing the amount of catastrophic loss that the firm could suffer from those increasingly large and illiquid investments."  In fact, experimental stress tests conducted in 2008 indicated that a large proportion of Lehman's risk lay with real estate and private equity positions that had not been included in the stress tests.  For example, one stress test showed maximum potential losses of $9.4 billion, which included $7.4 billion in losses on real estate and private equity positions excluded from the stress tests.  Another stress test showed potential total losses of $13.4 billion, of which $10.9 billion was attributable to the previously excluded real estate and private equity positions, and only $2.5 billion to previously included trading positions.

81.     Lehman's Offering Materials, by incorporating the 2Q07 10-Q and 3Q07 10-Q, also represented that "[w]e apply analytical procedures overlaid with sound practical judgment and work proactively with business areas before transactions occur to ensure appropriate risk mitigants are in place."  Contrary to this statement, however, while Lehman's mortgage-related risks had significantly increased as it accumulated illiquid assets, Lehman failed to ensure that appropriate risk mitigants were in place.  These illiquid assets included residential Alt-A assets that Lehman could not directly hedge.  In addition, Lehman did not increase the magnitude of its "macro hedges" – a technique used to eliminate the risks of a portfolio of assets – on its leveraged loan and commercial real estate portfolios.

82.     The statement that Lehman "work[s] proactively with business areas before transactions occur to ensure appropriate risk mitigants are in place" was also false and misleading because, unbeknownst to investors, by the start of the Class Period, Lehman had relaxed risk controls to accommodate growth of its commercial real estate business, including its bridge equity positions in the United States, which increased more than ten-fold from $116 million in 2Q06 to $1.33 billion in 2Q07, and then more than doubled to exceed $3 billion by the end of 2Q08. Lehman's real estate bridge equity deals were particularly risky because declining values of the underlying real estate prevented Lehman from selling bridge equity positions as planned, such as

with Archstone.  There, in addition to funding $8.5 billion in debt tranches, Lehman made an equity investment of $250 million and purchased bridge equity of approximately $2.3 billion.  Had the Archstone transaction been properly included in Lehman's risk controls, it would have caused Lehman to exceed its risk appetite limits and the limits on its real estate business.  As the Examiner stated in his Congressional testimony, "[w]ith the inclusion of Archstone, Lehman was clearly in excess of its established risk limits."

83.     Lehman also routinely violated its Value at Risk ("VaR") limits.  VaR is a statistical measure of the potential loss in the fair value of a portfolio due to adverse movement in the underlying risk factors, and is watched by the SEC and the market to assess a company's risks.  For example, GREG was in breach of its VaR limits *every day* for nearly one full year, from early October 2007 through September 15, 2008 – the day Lehman declared bankruptcy.  Similarly, Lehman's High Yield business repeatedly breached its VaR limits throughout the Class Period, including every day from mid-August 2007 through mid-May 2008.  Likewise, Lehman's FID repeatedly breached its VaR limits from the beginning of the Class Period through May 2008, including every day from mid-October 2007 through mid-May 2008.  As a consequence, Lehman breached its firm-wide VaR limit no less than 44 times during the Class Period.  Because Lehman routinely exceeded its VaR limits, the representation that "[a]s part of our risk management control processes, we monitor daily trading net revenues compared to reported historical simulation VaR" – included in each of the Forms 10-Q and 2007 10-K during the Class Period – was materially false and misleading when made.

84.     As the Examiner found, Lehman's persistent and repeated failure to adhere to its risk management policies rendered those policies "meaningless," and enabled Lehman to acquire billions of dollars of risky investments – and become exposed to billions of dollars of losses – that it would not have been exposed to had it adhered to its risk management limits.

### 3. The Offering Materials Contained Untrue Statements Regarding Lehman's Liquidity Risk And Risk Of Bankruptcy

85.     Liquidity was the lifeblood of Lehman.  As Lehman described in its 2007 Form 10-K, "liquidity, that is ready access to funds, is essential to our businesses."  The 2007 10-K also stated that companies like Lehman "rely on external borrowings for the vast majority of their funding, and failures in our industry are typically the result of insufficient liquidity."

86.     Regulation S-K required Lehman to disclose, in its MD&A, any known commitments "that will result in or that are reasonably likely to result in the registrant's liquidity increasing or decreasing in any material way," and any off-balance sheet arrangements "that have or are reasonably likely to have a current or future effect on the registrant's financial condition . . . results of operations, liquidity, capital expenditures or capital resources that is material to investors."  Lehman's requirement to repurchase the assets covered by the Repo 105 transactions within days of every quarter's end was a known event to Lehman that greatly exceeded the "reasonably likely to occur" standard, as Lehman was in fact, obligated to repurchase the assets, and it was certain to have a material effect on Lehman's financial condition and results of operation. However, Lehman's statements in the Liquidity, Funding and Capital Resources sections of the MD&A failed to disclose Lehman's obligation to repay the Repo 105 cash borrowings and to repurchase the underlying assets collateralizing the loans immediately after the quarter closed, even though such obligations directly and materially impacted its liquidity.  Lehman's disclosures should have included a discussion of the timing and amounts of the cash flow issues accompanying the repayment of the Repo 105 borrowing, including (1) the amount of cash available after the repayment; (2) the ability to borrow more capital in light of a reduction in debt rating or deterioration in leverage ratio due to the repayment of the Repo 105 borrowing; (3) the effect of the repayment on Lehman's cost of capital/credit rating; and (4) the economic substance and purpose of the Repo 105 arrangements.

87.     Lehman's SEC filings throughout the Class Period omitted and misrepresented the foregoing material facts about its repayment of Repo 105 cash borrowings.  Instead, Lehman's 2007

10-K simply claimed that the Company had a "very strong liquidity position" and represented that "we maintain a liquidity pool . . . that covers expected cash outflows for twelve months in a stressed liquidity environment."   Moreover, the 2007 10-K and the Forms 10-Q during the Class Period stated that Lehman's liquidity pool was sized to cover expected cash outflows associated with certain enumerated items – none of which were Repo 105.   These statements were false and misleading for failing to disclose Lehman's obligation to repay Repo 105 cash borrowings, which impacted the Company's liquidity pool.

88.    Lehman's statements concerning its liquidity were also false and misleading because, as a result of the failure to abide by its risk limits, Lehman had accumulated a heavy concentration of illiquid assets with deteriorating values, such as residential and commercial real estate.   Much of Lehman's balance sheet growth (37% during 2007) was attributable to illiquid assets that Lehman was unable to sell without incurring significant losses.   Thus, while Lehman publicly stated that "we maintain a liquidity pool . . . that covers expected cash outflows for twelve months in a stressed liquidity environment," by the start of the Class Period in July 2007, Lehman had already internally determined that its liquidity pool was short $400 million to meet commitments looking out one year forward.

### 4.    The Offering Materials Overstated The Value Of Lehman's Commercial Real Estate Holdings

89.    During the Class Period, Lehman represented that it had marked its commercial real estate assets to fair value, including, for example, its Archstone position and its Principal Transactions Group ("PTG") assets.

90.    SFAS 157 establishes a three-part hierarchy for inputs used to report "fair value." SFAS 157 gives the highest priority – Level 1 – to valuing assets at quoted market prices of similar assets.   Observed market data other than quoted prices are given a lower priority – Level 2.   Finally, the lowest priority inputs are designated as Level 3 and consist of non-observable, internal, model-driven inputs.   Regardless of the level, the objective is to determine the exit price from the perspective of a market participant that holds the asset (or owes the liability).   Accordingly, even

with regard to Level 3 inputs, SFAS 157 requires that unobservable inputs reflect the reporting entity's view as to the assumptions market participants would use in pricing the asset.

### a.  Archstone Valuations

91.  In May 2007, Lehman, along with Tishman Speyer, agreed to acquire Archstone, a publicly traded REIT involved in the acquisition, operation and development of apartment buildings.  The deal closed on October 5, 2007.  Lehman funded roughly $5.4 billion ($3 billion in debt and $2.4 billion of equity) of the $23.6 billion purchase price, making it Lehman's single largest commercial real estate investment.  Lehman intended to syndicate, or sell, large portions of its debt and equity interests after the closing, but was ultimately unable to do so.  By the time the Archstone deal closed on October 5, 2007, the stock prices of Archstone's publicly traded peers had declined over the summer and early fall of 2007, indicating that Archstone's enterprise value had declined as well.

92.  To value its Archstone positions, Lehman primarily used a discounted cash flow model that determined value by reducing future expected cash flows to their present value by applying a discount.  The cash flow was based on various assumptions, including rent growth, exit capitalization rates, and exit platform value.  Lehman, however, failed to consider market information in these assumptions.  For example, Lehman used a rental growth rate that was 1.9% to 3.5% higher than third-party projections for apartments within Archstone's primary markets, used net operating income growth rates that were 100% higher than the average growth rate for apartment REITs over a 15 year period, and failed to consider the higher capitalization rates that were being used for other comparable publicly traded REITs.

93.  Because Lehman failed to consider market-based information in assessing Archstone's value, the statements that (i) "[f]inancial instruments and other inventory positions owned . . . are presented at fair value" and (ii) "private equity investments are measured at fair value" – both of which were included in Lehman's 2007 10-K, 1Q08 10-Q, 6/9/08 8-K and 6/16/08 8-K – were materially false and misleading when made with respect to Archstone.  In addition,

because Lehman did not consider available data from comparable publicly traded REITs, it violated the policy set forth in its Accounting Policy Manual, which stated that under SFAS 157, a range of factors, including the "trading value on public exchanges for comparable securities," should be considered to determine fair value.

94.    Rather than use *current* market information, Lehman employed the assumptions from when it first committed to participate in the Archstone acquisition in May 2007.  As a result, Lehman's assumptions were unreasonably optimistic.  Lehman's valuation of Archstone was overstated by $200 million to $450 million as of the end of 1Q08, and by $200 to $500 million as of the end of 2Q08.  The overstatement was material because, had Lehman taken a write-down of at least $200 million in 1Q08 of its Archstone assets, (1) Lehman's mark-to-market adjustments for commercial mortgages and related real estate would have increased from $1 billion to $1.2 billion, or 20%, and (2) the Company's pretax income would have decreased from $489 million to $289 million, or 40%.  Similarly, had Lehman taken a write-down of at least $200 million in 2Q08 relating to Archstone, (1) Lehman's mark-to-market adjustments for commercial assets for that quarter would have increased from $1.3 billion to at least $1.5 billion, or 15%, and (2) the Company's net losses would have increased from $2.8 billion to $3.0 billion, or 7%.

95.    By overvaluing Archstone, Lehman overstated its 1Q08 income and understated its 2Q08 loss.  As such, the statements in Lehman's 3/18/08 8-K, 1Q08 10-Q, 6/9/08 8-K and 6/16/08 8-K concerning Lehman's reported income were materially false and misleading when made.

### b.    PTG Asset Valuations

96.    Lehman's PTG assets were generally highly leveraged debt or equity investments in real estate assets that Lehman intended to hold for its own account while a developer improved or developed the underlying assets, with the intent to monetize the investment through a sale after the development or improvement was completed.  Between 2005 and 2007, Lehman's PTG balance sheet grew from $6.1 billion in 2005 to $9.6 billion in fiscal year 2007.  During the same period, Lehman's PTG portfolio became riskier, as real estate investments were concentrated in California

and other boom markets, focused on land development projects, and included a higher proportion of equity investments.

97.     Until 2007, Lehman primarily valued its PTG assets using a method called "Cap * 105" that calculated the current capitalization of the property multiplied by 105%, with the additional 5% representing the presumed appreciation of the collateral. This method overvalues collateral significantly when real estate prices are in decline – as was occurring by mid 2007.

98.     In 2007, Lehman began to implement a different method ("IRR") to take the place of the Cap * 105 method. The implementation was significantly delayed, however, and the Cap * 105 method was still used to value at least a third of Lehman's PTG assets in 2Q08. Moreover, Lehman used a yield for its IRR method that did not correspond to market-based interest rates. To reflect fair value, the discount rate should have reflected the yield an investor would require to purchase the property. However, to the contrary, Anthony Barsanti, who was responsible for determining PTG to market adjustments, acknowledged to the Examiner that Lehman was "probably not marking to yield" but more on "gut feeling" about the position. Moreover, Aristides Koutouvides, who reported to Barsanti, confirmed that the PTG business desk valuations did not reflect what a buyer would pay on the open market in 2Q08, contrary to FAS 157. Jonathan Cohen, the Lehman Senior Vice President responsible for overseeing valuation of assets in GREG, also said that in the 2Q08 the PTG portfolio was generally not marked to prices at which the assets could be sold.

99.     Because neither of the methods Lehman used to value PTG assets employed market-based assumptions to reflect fair value, the statements concerning Lehman's fair value measurements in the Offering Materials were materially false and misleading when made.

100.     Additionally, a review by the Examiner of certain PTG positions valued using the Cap * 105 method at the end of 2Q08 – positions making up approximately 36% of Lehman's entire PTG portfolio by value – showed that the value of the collateral underlying these positions declined by 20% when transitioned to new valuation methods in July 2008. Further, when the Examiner reviewed 105 positions that specifically switched from Cap * 105 to IRR models, the results

showed that the marks for these positions were overvalued by $298 million as of July 31, 2008, and $90 million as of August 31, 2008.  The Examiner's analysis of certain positions valued using IRR indicated that the collateral underlying these positions was still overvalued by 15-20%, as the IRR models did not use appropriate market-based information.  Thus, Lehman's PTG assets were overvalued by tens or hundreds of millions of dollars as of 2Q08 and material write-downs were required for a significant number of PTG assets.

101.    Because Lehman's PTG assets were overvalued, the statements in Lehman's 6/9/08 8-K and its 6/16/08 8-K regarding its reported income were false and misleading.

### c.    Additional Facts Showing That Lehman's Commercial Real Estate Holdings Were Overvalued

102.    Days before filing for bankruptcy, Lehman tried to sell its commercial real estate assets to various banks.  Kenneth D. Lewis, CEO of Bank of America, told the Examiner that its due diligence regarding a potential transaction with Lehman in September 2008 revealed that Lehman's commercial real estate marks were too high.  In particular, Lewis described a massive "$66 billion hole" in Lehman's valuation of its assets.  An October 7, 2008 *The Wall Street Journal* article similarly reported that the executives from the firms which declined to buy Lehman's portfolio said that they believed Lehman's commercial portfolio was overvalued by as much as 35%.  Further, as reported by *The New York Times* on October 31, 2008, Treasury Secretary Henry Paulson later explained that the absence of a federal bailout of Lehman was due to its impaired assets, stating: "We didn't have the powers, because by law the Federal Reserve could bailout Lehman with a loan only if the bank had enough good assets to serve as collateral, which it did not."

103.    After Lehman's bankruptcy, certain of Lehman's assets were acquired by Barclay's for $1.54 billion.  Barclay's acquisition excluded Lehman's commercial real estate holdings precisely because they were overvalued.  As Robert E. Diamond, Jr., Barclay's President, recalled: "Our proposal was to buy everything out of Lehman, but leave the commercial real estate.  We did not feel the valuations [of the commercial real estate] were supportable . . . ."  Indeed, Barclay's

specifically carved out "all [of Lehman's] Archstone debt and equity positions" from the purchase agreement.

### 5. The Offering Materials Failed To Disclose Lehman's Risk Concentrations

104. GAAP requires disclosure of risk concentrations. AICPA Statement of Position ("SOP") No. 94-6, *Disclosure of Certain Significant Risks and Uncertainties* ("SOP 94-6"), requires disclosures specifically relating to risks and uncertainties that could significantly affect the amounts reported in the financial statements in the near term (*i.e.*, one year), particularly from current vulnerability as a result of significant concentrations in certain aspects of the entity's operations. FAS No. 107, *Disclosures about Fair Value of Financial Instruments* ("FAS 107"), as amended by FAS No. 133, *Accounting for Derivative Instruments and Hedging Activities* ("FAS 133"), requires disclosure of significant concentrations of credit risk for financial instruments such as loans. FASB Staff Position ("FSP") SOP 94-6-1, *Terms of Loan Products That May Give Rise to a Concentration of Credit Risk* ("FSP SOP 94-6-1"), addresses disclosure requirements for entities that originate, hold, guarantee, service, or invest in loan products whose terms may give rise to a concentration of credit risk.

105. Until the filing of its 2Q08 10-Q on July 10, 2008, when Lehman belatedly began to provide information concerning its commercial mortgage and real estate investment related portfolios, the required disclosures relating to significant concentrations of credit risk from Lehman's mortgage and real estate related assets were omitted. Throughout the Class Period, Lehman's Offering Materials failed to disclose adequately or meaningfully the Company's risk concentrations in, among other things, highly risky Alt-A loans, illiquid commercial real estate assets, and leveraged loan commitments. In addition, the Offering Materials failed to disclose that Lehman had heavy concentrations of illiquid assets, such as residential and commercial real estate with deteriorating values. These disclosures were especially important because the market for mortgage-backed securities and the real estate market had declined. In fact, an internal Lehman audit report dated February 26, 2007, advised that Lehman "address the main risks in the Firm's

portfolio," including "illiquidity" and "concentration of risk."  By failing to disclose material facts about Lehman's concentration of mortgage and real estate related risks, investors could not meaningfully assess the Company's exposure to the mortgage and real estate markets and the increasing riskiness of Lehman's portfolio of mortgage and real estate assets.

106.  **Alt-A Concentration**:  Lehman was a leading originator of Alternative A-paper, or Alt-A loans – a type of mortgage that is typically associated with borrowers who purportedly have the creditworthiness of "prime" quality, but have traits that prevent the loans from qualifying as "prime."  Lehman's Offering Materials did not even include the term "Alt-A" until Lehman filed its 1Q08 Form 10-Q on April 9, 2008 and even that filing was materially misleading.  When Lehman finally began to identify Alt-A holdings on its balance sheet in its 2Q08 Form 10-Q, Lehman consolidated its Alt-A holdings with prime holdings into a single category labeled "Alt-A/Prime," even though less than 7% ($1 billion of the reported $14.6 billion "Alt-A/Prime" exposure) actually consisted of "prime" loans.  By initially omitting Alt-A holdings altogether, and later grouping "Alt-A" with "Prime" mortgage-related assets, the Offering Materials did not adequately disclose Lehman's true exposure to the riskier Alt-A loans that were experiencing rising delinquencies and defaults throughout the Class Period.  Moreover, Lehman did not disclose that it had loosened its lending standards for Alt-A loans such that they were actually more akin to subprime than to prime.  As noted in an internal Lehman email on March 17, 2007:  "I have pointed out in the past that Aurora's product is far from Alt-A anymore.  The traditional Alt-A program is only 40% of Aurora's production . . . the rest 60% of production has 100% [] financing in lower FICOs with non-full documentation, and/or investment properties."

107.  **Commercial Real Estate Concentration**:  From the end of Lehman's 2006 fiscal year to the end of its 2007 fiscal year, Lehman increased its global CRE assets by more than 90%, from $28.9 billion to $55.2 billion.  However, by the start of the Class Period in July 2007, Lehman personnel had already recognized that the market for placing investments backed by commercial real estate was "virtually closed" and that the leveraged loan market had shut down.  Nevertheless,

Lehman had already committed to financing several large CRE deals that closed in October and November 2007, including Archstone. Indeed, the Company's involvement in Archstone and several other real estate bridge equity deals was so enormous that it dwarfed Lehman's entire pre-existing real estate book. On November 6, 2007, GREG made a presentation to Lehman's Executive Committee that recognized the significant risks inherent in the over-concentration of its global commercial real estate portfolio, stating that "under any circumstance an estimated $15 billion reduction in global balance sheet is warranted," and recommended reducing the global GREG balance sheet from $58 billion to $43.7 billion by March 31, 2008. Notwithstanding this instruction, however, by May 31, 2008, GREG's global commercial real estate portfolio remained over-concentrated at $49.3 billion. Furthermore, Lehman's commercial real estate portfolio included high risk PTG investments involving property development projects whose value could be materially affected if the developer failed to perform in accordance with the business plan. Lehman's PTG portfolio was especially risky because it focused on land development projects, which carried more risk than other property types; was concentrated in California and other boom markets; and because Lehman took equity stakes in the developments (approximately 30% as of fiscal 2007 year-end). The PTG balance sheet grew from $6.1 billion in fiscal 2005 to $6.9 billion in fiscal 2006, and then to $9.6 billion in fiscal 2007. These concentrated risks, however, were not disclosed. Due to Lehman's over-concentration of CRE assets, the Company ultimately had to write down its CRE positions by approximately $4 billion from 1Q08 to 3Q08.

108. **Leveraged Loan Concentration**: Between December 2006 and June 2007, Lehman participated in at least 11 leveraged buyout deals that each exceeded $5 billion; by April 2007, Lehman had a record (approximately 70) high yield contingent commitments; and in June 2007, Lehman's lending pace by dollar amount had already doubled its 2006 record-setting year for high grade and high yield combined. These concentrations were so large that Lehman's high yield book showed a risk appetite usage that was almost double the limit for these exposures. When the market slowed by the second quarter of 2007, Lehman had approximately $36 billion of contingent

commitments on its books, and FID was almost $20 billion over its net balance sheet limit. The Offering Materials failed to disclose this material concentration of risk in leveraged loan deals.

109.    As a result of the misrepresentations and/or omissions set forth above regarding Lehman's Repo 105 transactions, risk management overrides, liquidity, commercial real estate valuations and its failure to adequately disclose its concentration of credit risk, the Offering Materials were each materially false and misleading when issued.

### B.    The Lehman/UBS Structured Product Offerings

110.    The plaintiffs identified in Appendix B purchased certain structured products issued by Lehman and underwritten by UBS (the "Lehman/UBS Structured Products"), and hereby bring claims arising under the Securities Act, individually and on behalf of all persons and entities, except Defendants and their affiliates, who purchased or otherwise acquired any of the Lehman/UBS Structured Products from March 30, 2007 through September 15, 2008 (the "Lehman/UBS Structured Product Class Period") and who were damaged thereby.

111.    These Securities Act claims are brought against the Insider Defendants, Director Defendants, E&Y and UBS based on the sale of Lehman/UBS Structured Products pursuant to materially false or misleading offering materials.

112.    Plaintiffs specifically and intentionally incorporate by reference all of the allegations preceding this Section of the Complaint and additionally allege as follows.

113.    In 2007, UBS implemented an initiative to increase sales of "structured products" through its wealth management unit. Structured products, also known as "structured investments," traditionally consisted of two components—a fixed income security and a derivative. The derivative component was often an option linked to the performance of a single security, a basket of securities, an index, a commodity, a debt issuance, a foreign currency or the difference between currency swap rates. The fixed income component was customarily a U.S. Treasury security or other highly rated debt instrument. Because the purchaser of a structured product could look to the underlying fixed income security for repayment of principle, even if the performance of the

derivative component of the investment proved unfavorable, and the investor was not dependent on the fortunes of the sponsor of the investment for repayment, structured products were said to offer "principal protection."

114.    UBS conducted an auction process each month in which investment banks competed to be selected to issue structured products in accordance with UBS's specifications.  Unlike traditional structured products, the investments offered by UBS were not based on the purchase of a fixed income security and a derivative.  UBS structured products consisted, instead, of a note issued by an investment bank.  The terms of the note specified the conditions upon which investors could expect to receive the return of their principal and any additional amount at maturity.  Even though UBS did not purchase any debt instrument or other security to protect the investor's principal, UBS described these securities as offering "principal protection."

115.    Lehman was a major issuer of UBS structured products.  During the Lehman/UBS Structured Product Class Period, Lehman issued at least $1.24 billion of Lehman/UBS Structured Products.  The Lehman/UBS Structured Products that purported to offer full or partial principal protection (the "PPNs") appear in bold print in Appendix B.

116.    The Lehman/UBS Structured Product Offering Materials uniformly included, at all times throughout the Lehman/UBS Structured Products Class Period, untrue statements of material fact or omitted to state material facts necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading.  These untrue statements of material fact and omitted material facts, which are set forth at ¶¶ 26-108 above, are repeated and realleged as if set forth fully here.

117.    On April 9, 2007, Lehman filed with the SEC its quarterly report on Form 10-Q for the quarter ended February 28, 2007  ("1Q07 10-Q") (which largely repeated information that first appeared in Lehman's March 14, 2007 press release that was filed as a Form 8-K ("1Q07 8-K")).  In addition to the untrue statements of material fact and omitted material facts set forth at ¶¶ 26-108,

the 1Q07 10-Q and 1Q07 8-K, which were signed by O'Meara, contained untrue statements of material fact or omissions of material fact and were materially misleading as follows:

a.     The 1Q07 10-Q and 1Q07 8-K reported Lehman's net leverage ratio of 15.4, which was materially misleading because it failed to disclose at least $22 billion in Repo 105 assets that were temporarily removed from Lehman's financial statements.  Had the assets that were the subject of the Repo 105 transactions been included, Lehman's net leverage ratio would have been 16.4, representing an increase 10 times greater than Lehman's own materiality threshold of a change in net leverage of 0.1.

b.     The 1Q07 10-Q reported $153.332 billion in securities sold under agreements to repurchase.  This statement was materially false and misleading because it excluded at least $22 billion in Repo 105 assets that Lehman had temporarily removed from its balance sheet, which Lehman had agreed to repurchase days after the end of the quarter.

c.     In the 1Q07 10-Q, Lehman represented that "[m]anagement's Finance Committee oversees compliance with policies and limits," that "[w]e … ensure that appropriate risk mitigants are in place," and that "[d]ecisions on approving transactions . . . take into account . . . importantly, the impact any particular transactions under consideration would have on our overall risk appetite."  These statements were materially false and misleading for the reasons set forth at ¶¶ 70-80.

d.     The 1Q07 10-Q also represented that "[w]e apply analytical procedures overlaid with sound practical judgment and work proactively with business areas before transactions occur to ensure appropriate risk mitigants are in place."  This statement was materially false and misleading for the reasons set forth at ¶¶ 81-84.

e.     The 1Q07 10-Q contained an Interim Report signed by E&Y stating that based on its review of Lehman's consolidated financial statements and in accordance with the standards of the PCAOB, "we are not aware of any material modifications that should be made to the consolidated financial statements referred to above for them to be in conformity with U.S.

generally accepted accounting principles." This statement was materially false and misleading because Lehman's 1Q07 financial statements did not conform with GAAP.

118.   In addition to the untrue statements and omitted facts that are common to all of the Lehman/UBS Structured Products, the Offering Materials for the PPNs contained other untrue statements of material fact or omissions of material fact and were materially misleading as follows:

a.   Each PPN pricing supplement included "100% Principal Protection" or "Partial Protection" in the title of the security offered thereby. Each of the "100% Principal Protection" pricing supplements also stated that the PPN offered "100% Principal Protection [if /when] the Notes are held to maturity," and included one or more of the following statements: "At maturity, you will receive a cash payment equal to at least 100% of your principal"; "You will receive at least the minimum payment of 100% of the principal amount of your Notes if you hold your Notes to maturity"; and "Although the Notes are principal-protected if held to maturity, selling this or any other fixed income security prior to maturity may result in a dollar price less than 100% of the applicable principal amount of Notes sold." Each of the "Partial Protection" pricing supplements contained the phrase "partial principal protection," as well as one or more of the following statements: "partial principal protection when the Notes are held to maturity," "protection, at maturity of the Notes, of a percentage of your principal," "At maturity, [investors / you] will receive a cash payment equal to at least [percentage]% of [their / your] invested principal"; and "At maturity, investors will receive a cash payment equal to at least the applicable Protection Percentage multiplied by the principal amount." These and other similar statements about principal protection contained in each PPN pricing supplement were false or misleading because:

i.   Investors in the PPNs had no interest in any instruments used by Lehman to hedge its obligations under the PPNs;

ii.   There was no security interest or collateral supporting the PPNs; and

iii.     The PPNs did not offer "principal protection," and were actually no different from traditional bonds.

b.      PPN pricing supplements disseminated before October 2007 identified a number of "Key Risks," but failed to state that investors were lending money to Lehman and depended on Lehman's solvency for repayment of their principal.  The omission of any disclosure in each of these pricing supplements that investors were dependent on Lehman's ability to repay the principal rendered each pricing supplement misleading.

c.      PPN pricing supplements disseminated in or after October 2007 identified a number of "Key Risks," including a statement that the investments were subject to Lehman's "credit risk" (or "creditworthiness") and that Lehman's creditworthiness "may affect the market value of the Notes."  Only two of the PPN pricing supplements, with settlement dates of May 12, 2008 and June 30, 2008, included the additional statement that "The Notes are debt securities that are direct obligations of Lehman Brothers Holdings Inc."  Under all of the relevant circumstances, including Lehman's financial condition and business strategy at all relevant times (as alleged in ¶¶ 26-108), the Key Risk disclosure that an investment in the PPNs was subject to Lehman's credit risk or Lehman's creditworthiness was not sufficiently specific, prominent or complete, or conveyed with sufficient intensity and proximity, to counteract the misleading impression created by the repeated references to principal protection.

d.      For the reasons alleged in ¶¶ 26-108, including Lehman's change in business strategy from "moving" to "storage," Lehman's business strategy of accumulating illiquid, high risk assets in the face of a deteriorating economy, Lehman's business strategy of disregarding its own risk management policies, as well as Lehman's manipulation of its balance sheet to disguise its actual leverage ratios, the PPNs were incapable of providing full or partial principal protection, whether or not held to maturity, and were not suitable for persons who sought full or partial principal protection.

119.    After Lehman's bankruptcy, in response to questions from UBS financial advisors and their clients who had purchased Lehman/UBS Structured Products, UBS issued a 3-page "Structured Products Lehman Q&A."   In this September 23, 2008 document, UBS informed investors that they had no interest in any instruments used by Lehman to hedge its obligations under the PPNs, that the PPNs were not supported by any security interest or collateral, that investors would not receive principal protection, and that the PPNs were no different from traditional bonds.

## VI.    CAUSES OF ACTION UNDER THE SECURITIES ACT

### COUNT I

**Violations Of Section 11 Of The Securities
Act Against The Securities Act Defendants**

120.    Plaintiffs repeat and reallege each and every allegation contained above as if set forth fully herein and further allege as follows.  This Count is based on negligence and strict liability and does not sound in fraud.   Any allegations of fraud or fraudulent conduct and/or motive are specifically excluded from this Count.

121.    This Count is asserted against Defendants Fuld, O'Meara, Callan, the Director Defendants, E&Y, and the Underwriter Defendants (together, the "Securities Act Defendants") for violations of Section 11 of the Securities Act, 15 U.S.C. § 77k, on behalf of Plaintiffs and all members of the Class who purchased or otherwise acquired the Lehman securities set forth in Appendices A and B pursuant or traceable to the materially false and misleading Shelf Registration Statement and Offering Materials incorporated by reference in the Shelf Registration Statement.

122.    The Shelf Registration Statement, including the Offering Materials and Structured Note Offering Materials incorporated by reference therein at the time of each Offering, contained untrue statements of material fact and omitted to state other material facts necessary to make the statements made therein not misleading.  The specific documents containing such untrue statements and omissions that were incorporated by reference in the Shelf Registration Statement with regard to each Offering and Structured Note Offering are identified in Appendices A and B.

-41-

123.    Defendants Fuld, O'Meara and Callan were executive officers and representatives of the Company responsible for the contents and dissemination of the Shelf Registration Statement. Each of the Director Defendants was a director of Lehman at the time the Shelf Registration Statement became effective as to each Offering and Structured Note Offering. Defendants Fuld, O'Meara and Callan signed the Shelf Registration Statement, or documents incorporated by reference, in their capacities as officers or directors of Lehman, and caused and participated in the issuance of the Shelf Registration Statement. By reasons of the conduct alleged herein, each of these Defendants violated Section 11 of the Securities Act.

124.    E&Y was the auditor for Lehman. E&Y's audit report, included in Lehman's 2007 10-K and incorporated by reference into the Offering Materials and the Structured Note Offering Materials, falsely certified that Lehman's financial statements were prepared in accordance with GAAP and falsely represented that it conducted its audits or reviews in accordance with GAAS. In addition, E&Y's certifications of Lehman's quarterly financials, included within the Offering Materials and Structured Note Offering Materials, falsely stated that no material modifications of Lehman's financial statements were required for those statements to comply with GAAP, and that E&Y complied with GAAS in conducting its quarterly reviews.

125.    The Underwriter Defendants were underwriters of certain of the Offerings set forth in Appendices A and B. The Underwriter Defendants acted negligently and are liable to members of the Class who purchased or otherwise acquired Lehman securities sold pursuant or traceable to the Offering Materials and Lehman Structured Note Offering Materials for the respective Offerings in which each Underwriter Defendant participated.

126.    The Defendants named in this count owed to the purchasers of the securities identified on Appendices A and B the duty to make a reasonable and diligent investigation of the statements contained in the Shelf Registration Statement, and any incorporated documents, at the time each such Offering became effective to ensure that said statements were true and that there were no omissions of material fact which rendered the statements therein materially untrue or

misleading.  The Securities Act Defendants did not make a reasonable investigation or possess reasonable grounds to believe that the statements contained in the Shelf Registration Statement were true, were without omissions of any material facts, and were not misleading.  Accordingly, the Securities Act Defendants acted negligently and are therefore liable to Plaintiffs and members of the Class who purchased or otherwise acquired the securities sold pursuant or traceable to the materially false and misleading Offering Materials and Structured Note Offering Materials for the Offerings set forth on Appendices A and B.

127.    Plaintiffs and all members of the Class who purchased or otherwise acquired Lehman securities sold in or traceable to these Offerings did not know of the negligent conduct alleged herein or of the facts concerning the untrue statements of material fact and omissions alleged herein, and by the reasonable exercise of care could not have reasonably discovered such facts or conduct.

128.    None of the untrue statements or omissions alleged herein was a forward-looking statement but, rather, each concerned existing facts.  Moreover, the Defendants named in this Count did not properly identify any of these untrue statements as forward-looking statements and did not disclose information that undermined the validity of those statements.

129.    Less than one year elapsed from the time that Plaintiffs discovered or reasonably could have discovered the facts upon which this Count is based from the time that the initial complaint was filed asserting claims arising out of the Shelf Registration Statement.  Less than three years elapsed from the time that the securities upon which this Count is brought were offered in good faith to the public to the time that the initial complaint was filed.

130.    Plaintiffs and all members of the Class have sustained damages.  The value of the securities sold pursuant or traceable to the Offerings set forth in Appendices A and B has declined substantially due to the Securities Act Defendants' violations of Section 11 of the Securities Act.

131.    By reason of the foregoing, the Securities Act Defendants are liable for violations of Section 11 of the Securities Act to Plaintiffs and all members of the Class.

## COUNT II

### Violations Of Section 12(a)(2) Of The
### Securities Act Against Defendant UBS

132.    Plaintiffs repeat and reallege each and every allegation contained above as if set forth fully herein and further allege as follows.

133.    This Count is asserted against UBS for violations of Section 12(a)(2) of the Securities Act, 15 U.S.C. § 77l(a)(2), on behalf of all persons and entities who purchased or otherwise acquired the Lehman/UBS Structured Products set forth in Appendix B and were damaged thereby.

134.    UBS was a seller, offeror, and/or solicitor of sales of Lehman/UBS Structured Products issued in connection with the offerings set forth in Appendix B within the meaning of the Securities Act.  UBS used means and instrumentalities of interstate commerce and the United States mail.

135.    The Lehman/UBS Structured Product prospectuses, including the pricing supplements, contained untrue statements of material fact and omitted other material facts necessary to make the statements, in light of the circumstances under which they were made, not misleading.

136.    Plaintiffs and other members of the Class purchased or otherwise acquired Lehman/UBS Structured Products pursuant to the materially untrue and misleading Structured Note Offering Materials and did not know, or in the exercise of reasonable diligence could not have known, of the untruths and omissions contained in the pricing supplements.

137.    Less than one year elapsed from the time that Plaintiffs discovered or reasonably could have discovered the facts upon which this Count is based to the time that the initial complaint was filed asserting claims arising out of the falsity of the Lehman/UBS Structured Product prospectuses.  Less than three years elapsed from the time that the Lehman/UBS Structured Products upon which this Count is brought were offered to the public that the initial complaint was filed.

-44-

138.    Plaintiffs and other members of the Class offer to tender to UBS those Lehman/UBS Structured Products that Plaintiffs and other members of the Class purchased and continue to own in return for the consideration paid for those securities, together with interest.

139.    By virtue of the conduct alleged herein, UBS violated Section 12(a)(2) of the Securities Act.  Accordingly, Plaintiffs and other members of the Class who purchased Lehman/ UBS Structured Products pursuant to the prospectuses have the right to rescind and recover the consideration paid for their securities, and hereby elect to rescind and tender their securities to UBS. Plaintiffs and the members of the Class who have sold their Lehman/UBS Structured Products are entitled to rescissory damages.

**COUNT III**

**Violations Of Section 15 Of The Securities Act**
**Against Defendants Fuld, O'Meara, Callan, Gregory And Lowitt**

140.    Plaintiffs repeat and reallege each and every allegation contained above as if set forth fully herein and further allege as follows.

141.    This Count is asserted against Defendants Fuld, O'Meara, Callan, Gregory and Lowitt (collectively, the "Securities Act Control Person Defendants") for violations of Section 15 of the Securities Act, 15 U.S.C. § 77o, on behalf of Plaintiffs and the other members of the Class who purchased or otherwise acquired Lehman securities set forth in Appendices A and B pursuant or traceable to the Offering Materials and were damaged thereby.

142.    At all relevant times, the Securities Act Control Person Defendants were controlling persons of the Company within the meaning of Section 15 of the Securities Act.  Each of the Securities Act Control Person Defendants served as an executive officer or director of Lehman prior to and at the time of the Offerings.

143.    The Securities Act Control Person Defendants at all relevant times participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of Lehman's business affairs.  As officers and directors of a publicly owned company, the Securities Act Control Person Defendants had a duty to disseminate accurate and

truthful information with respect to Lehman's financial condition and results of operations. Because of their positions of control and authority as officers or directors of Lehman, the Securities Act Control Person Defendants were able to, and did, control the contents of the Offering Materials and Lehman Structured Note Offering Materials, which contained materially untrue financial information.

144.    By reason of the aforementioned conduct, each of the Securities Act Control Person Defendants is liable under Section 15 of the Securities Act, jointly and severally, to Plaintiffs and the other members of the Class.  As a direct and proximate result of the conduct of Lehman and the Securities Act Control Person Defendants, Plaintiffs and the other members of the Class suffered damages in connection with their purchase or acquisition of the Lehman securities identified in Appendices A and B.

## VII.    VIOLATIONS OF THE EXCHANGE ACT

145.    By June of 2007, Lehman had amassed an enormous and concentrated exposure to illiquid assets, including commercial real estate and risky subprime and Alt-A mortgage-related assets.  Facing increasing concerns over the rapidly deteriorating real estate market, the Insider Defendants publicly emphasized Lehman's comprehensive risk management framework as a mitigant against losses, and publicly announced the Company's goal to deleverage its balance sheet.

146.    In reality, however, the Insider Defendants knew that Lehman entered into Repo 105 transactions covering tens of billions of dollars in assets at the end of each quarter to manipulate Lehman's balance sheet, a contrivance having the purpose of appearing to reduce Lehman's net leverage ratio, improve its balance sheet, increase its liquidity, and deleverage its risk exposures. According to the Examiner, who conducted an investigation involving more than 250 interviews and collected in excess of five million documents estimated to comprise more than 40 million pages, "Lehman's approach to risk ultimately created the conditions that led Lehman's top managers to use Repo 105 transactions . . . ."

A.      **Repo 105 Transactions**

1.      **Lehman Utilized Repo 105 For A Fraudulent Purpose**

147.   The undisclosed Repo 105 transactions were sham transactions with no legitimate business purpose or economic substance.   They were undertaken solely to artificially reduce Lehman's net leverage and overstate Lehman's liquidity at the end of reporting periods.   As the Examiner found:

> The Examiner has investigated Lehman's use of Repo 105 transactions and has concluded that the balance sheet manipulation was intentional, for deceptive appearances, had a material impact on Lehman's net leverage ratio, and, because Lehman did not disclose the accounting treatment of these transactions, rendered Lehman's Forms 10-K and 10-Q (financial statements and MD&A) deceptive and misleading.

148.   Numerous members of Lehman's senior management have admitted as much, including the following:

(a)      Martin Kelly, Lehman's Global Financial Controller:

"[T]he only purpose or motive for the [Repo 105] transactions was reduction in balance sheet," and "there was no substance to the transactions."

[I]f an analyst or a member of the investing public were to read Lehman's Forms 10-Q and 10-K from cover to cover, taking as much time as she or he needed, "they would have no transparency into [Lehman's] Repo 105 program."

"[I]f there were more transparency to people outside the firm around the transactions, it would present a dim picture" of Lehman.

(b)      Joseph Gentile ("Gentile"), a FID executive who reported to Gerard Reilly, Lehman's Global Product Controller:

stated "unequivocally that no business purpose for Lehman's Repo 105 transactions existed other than obtaining balance sheet relief."   Gentile explained that Repo 105 transactions filled the gap between what Lehman could sell through normal business practices and the assets that Lehman needed to move off its balance sheet in order to meet balance sheet targets.

(c)      Edward Grieb ("Grieb"), Lehman's former Global Financial Controller who reported directly to O'Meara:

Repo 105 transactions were a balance sheet management mechanism; "a tool that could be used to reduce Lehman's net balance sheet."

(d)     Matthew Lee ("Lee"), a former Lehman Senior Vice President, Finance Division, in charge of Global Balance Sheet and Legal Entity Accounting through at least June 2008:

Lehman would "sell" assets through Repo 105 transactions approximately four or five days before the close of a quarter and then repurchase them approximately four or five days after the beginning of the next quarter in order to "reverse engineer" its net leverage ratio for its publicly filed financial statements.

(e)     Kaushik Amin ("Amin"), former Head of Liquid Markets:

Lehman reduced its net balance sheet at quarter-end by engaging in tens of billions of dollars of Repo 105 transactions and the Repo 105 inventory would return to Lehman's balance sheet a number of days after the opening of the new quarter.  Amin e-mailed Kieran Higgins regarding the group's balance sheet at quarter-end on February 28, 2008, stating, "We have a desperate situation and I need another 2 billion from you, either through Repo 105 or outright sales.  Cost is irrelevant, we need to do it."

(f)     Jerry Rizzieri ("Rizzieri"), a member of Lehman's Fixed Income Division:

E-mailed Mitchell King, the Head of Lehman's United States Agencies trading desk, just four days prior to the close of Lehman's 2007 fiscal year: "Can you imagine what this would be like without Repo 105?," in reference to meeting a balance sheet target.

Following the announcement of "new balance sheet targets for quarter end," Rizzieri wrote in an April 22, 2008 email to Kieran Higgins: "We will need to be focused very early in the process in order to meet these targets . . . [there is] no room for error this quarter," and "we also need to have a coordinated approach to repo 105 allocation."

(g)     Mitchell King, former Head of Lehman's United States Agencies trading desk, who on a weekly basis compiled lists of collateral available for Repo 105, told the Examiner:

[N]o business purpose existed for Repo 105 transactions other than to reduce Lehman's net balance sheet.

(h)     On April 12, 2008, Bart McDade ("McDade"), Lehman's Head of Equities from 2005-08 and COO from June to September 2008, received an email from Hyung Lee stating, "Not sure you are familiar with Repo 105 but it is used to reduce net balance sheet in

-48-

our governments businesses around the world."  McDade replied, "I am very aware . . . it is another drug we r on."

149.    Additional accounts by Lehman employees and contemporaneous e-mails during the Class Period confirm that there was no legitimate business purpose to the Repo 105 program.  For example:

- In July 2008, Michael McGarvey, a former senior vice president in FID, emailed a Lehman colleague, "[Repo 105] *is basically window-dressing.  We are calling repos true sales based on legal technicalities*.  The exec committee wanted the number cut in half."

- Paolo Tonucci, Lehman's former Treasurer, recalled that near the end of reporting periods, Lehman would deploy Repo 105 transactions to reduce its balance sheet. He also acknowledged that Lehman's use of Repo 105 transactions impacted Lehman's net leverage ratio.

- Defendant Lowitt admitted to the Examiner that Lehman established a "regime of limits," meaning balance sheet targets, for each business unit to manage to and that Repo 105 was one way to "sell down assets" to meet the targets.

- Marie Stewart, Lehman's Global Head of Accounting Policy, called Repo 105 "a lazy way of managing the balance sheet as opposed to legitimately meeting balance sheet targets at quarter end."

- John Feraca, who ran the Secured Funding Desk in Lehman's Prime Services Group, stated: "Senior people felt urgency only in the sense of trying to get to their targets because the Finance Division wanted to report as healthy a balance sheet and leverage ratio as possible for investors, creditors, rating agencies and analysts."  He added, "[i]t was universally accepted throughout the entire institution that Repo 105 was used for balance sheet relief at quarter end."

150.    That Lehman employed Repo 105 transactions for quarter-end balance sheet reduction is further confirmed by the fact that Lehman's use of Repo 105 transactions followed a conspicuous, cyclical pattern for each reporting period; they spiked significantly at each quarter end during the Class Period.  For example, as the close of the first quarter of 2008 approached, Lehman's Repo 105 usage increased from $24.217 billion on February 15, 2008; to $31.029 billion on February 22, 2008; to $40.003 billion on February 28, 2009; and then jumped to $49.102 billion on February 29, 2008 (quarter-end). Similarly, at the end of the second quarter of 2008, Repo 105

transactions exceeded $50 billion, whereas the intra-quarter dip as of April 30, 2008, was approximately $24.7 billion, and had been as low as $12.75 billion on March 14, 2008.

151.   The dollar values of Lehman's monthly outstanding Repo 105 transactions during the Company's fiscal quarters during the Class Period are shown in Table 4, below:

**Table 4**

| 08/31/07 | $36.4 billion (end of 3Q07 ) |
|----------|------------------------------|
| 09/30/07 | $24.4 billion |
| 10/31/07 | $29.9 billion |
| 11/30/07 | $38.6 billion (end of 4Q07) |
| 12/31/07 | n.a. |
| 01/31/08 | $28.9 billion |
| 02/28/08 | $49.1 billion (end of 1Q08) |
| 03/31/08 | $24.6 billion |
| 04/31/08 | $24.7 billion |
| 05/31/08 | $50.4 billion (end of 2Q08) |

**2.     Lehman Utilized Repo 105 To Avoid Recording
         Losses On Illiquid Or "Sticky" Assets While
         Creating The False Appearance Of Deleveraging**

152.   Throughout the Class Period, ratings agencies, analysts and other market participants focused on leverage ratios of investment banks, particularly those like Lehman with large exposures to commercial real estate and mortgage-related assets.  In mid-2007, ratings agencies began calling on investment banks to deleverage or risk ratings downgrades.

153.   However, deleveraging by selling real estate and mortgage-related assets proved difficult because many of Lehman's positions were illiquid and could not be sold without incurring substantial losses.  In addition, selling illiquid assets at discounted prices would have had a negative impact on Lehman's earnings, and would have led to a loss of market confidence in the valuations Lehman ascribed to its remaining assets.  As then head of the Federal Reserve Bank of New York, Timothy Geithner described, discounted sales would have revealed that Lehman had "a lot of air in [its] marks," which would have eroded investor confidence in Lehman's remaining assets.

-50-

154.    As the Examiner stated with respect to Lehman's inventory,

Lehman's expansion of its Repo 105 program mitigated, in part, the adverse impact its increasingly "sticky"/illiquid inventory – comprised mostly of the leveraged loans and residential and commercial real estate positions Fuld wanted to exit – was having on the firm's publicly reported net leverage and net balance sheet.

Many of Lehman's inventory positions had by then become increasingly "sticky" or difficult to sell without incurring substantial losses. It is against this backdrop of increased market focus on leverage that Lehman significantly increased its quarter-end use of Repo 105 transactions.

155.    Indeed, a February 10, 2007 Lehman document titled "Proposed Repo 105/108 Target Increase for 2007," recognized that "Repo 105 offers a low cost way to offset the balance sheet and leverage impact of current market conditions," and further stated that "[e]xiting large CMBS positions in Real Estate and sub prime loans in Mortgages before quarter end would incur large losses due to the steep discounts that they would have to be offered at and carry substantial reputation risk in the market. . . . A Repo 105 increase would help avoid this without negatively impacting our leverage ratios."

156.    In other words, finding itself unable to unload some of its most illiquid assets, and seeking to avoid reporting losses through writedowns, Lehman turned to Repo 105 transactions to create the illusion that it was delivering on its promise to the market to deleverage by selling assets when, in reality, Lehman was only able to achieve the appearance of deleveraging through undisclosed Repo 105 transactions that had no true economic substance.

157.    That Lehman turned to Repo 105 transactions as a sham to create the illusion of deleveraging is exemplified in a May 2008 written presentation to Moody's Investor Service, representing that Lehman had strengthened its capital position through "active deleveraging" including "approximately $50 billion reduction in net assets," and thus no negative rating action for the firm was justified.  The presentation claimed that net leverage was expected to decrease from 15.4x to 12.6x, and that the $50 billion reductions in the second quarter 2008 included key FID high-risk assets, such as commercial and residential mortgages.  Lehman made a similar presentation to Fitch on June 3, 2008, noting that "[c]apital position is stronger than ever with

delevering bringing both net and gross leverage to multi-year lows."  Nowhere did the presentations disclose Lehman's use of Repo 105 transactions to manage its balance sheet, reducing net assets by over $49 billion in 1Q08 and $50 billion in 2Q08.

**B.**      **Liquidity Risk And Overstated Liquidity Pool**

158.      As set forth above at ¶¶85-88, during the Class Period Lehman fundamentally misrepresented its liquidity risk and its liquidity pool – the amount supposedly available to Lehman to satisfy its short-term obligations.

159.      Further, as explained by the Examiner in his Congressional testimony:

> In June 2008, one of Lehman's clearing banks, Citibank, required that Lehman post $2 billion as a "comfort deposit" as a condition for Citi's continued willingness to clear Lehman's trades.  Lehman was technically free to withdraw the deposit, but it could not do so as a practical matter without shutting down or disrupting the business it ran through Citi.  Later in June, Lehman posted $5 billion of collateral to JPMorgan, Lehman's main clearing bank, in response to an earlier demand by JPMorgan.  Lehman continued to count virtually all of these deposits in its reported liquidity pool – ***nearly $7 billion of a reported $40 billion, 17.5% of the total.***  (emphasis added).

160.      On September 10, 2008, Lehman further publicly announced that its liquidity pool was $41 billion, even though at least $15 billion had been pledged to various banks, including JPMorgan, and was in fact not liquid at all.  By doing so, Lehman materially overstated its liquidity pool by as much as 38% during the Class Period.

**C.**      **Risk Management**

161.      As discussed above (¶¶70-84), by the start of the Class Period, Lehman had decided to take on more principal risk, a strategy that led directly to explosive balance sheet growth in fiscal 2007 of nearly 50% (from net assets of $269 billion in Q406 to $397 billion in Q108), including increased leverage exposure to residential mortgage-related and commercial real estate assets.  In so doing, however, and while the Company relaxed and exceeded its risk controls Defendants continued to misrepresent the Company's robust risk management to the investing public.

162.    The Insider Defendants knew and systematically disregarded that the resulting risk profile far exceeded Lehman's publicly stated risk policies and safeguards – particularly its risk limits, stress testing and hedging.  As the Examiner testified before Congress:

> Lehman was significantly and persistently in excess of its own risk limits.  **Lehman management decided to disregard the guidance provided by Lehman's risk management systems.**  Rather than adjust business decisions to adapt to risk limit excesses, management decided to adjust the risk limits to adapt to business goals.

163.    Based on his investigation, the Examiner found that Lehman's management:

- Chose to disregard or overrule the firm's risk controls on a regular basis.

- Decided to exceed risk limits with respect to Lehman's principal investments, namely the "concentration limits" on Lehman's leveraged loan and commercial real estate businesses, including the "single transaction limits" on the leveraged loans.

- Excluded certain risky principal investments from its stress tests.

- Decided to treat primary firm-wide risk limit – the risk appetite limit – as a "soft" guideline.

- Did not recalibrate the firm's pre-existing risk controls to ensure that its new investments were properly evaluated, monitored and limited.

164.    In fact, by the commencement of the Class Period, members of the Executive Committee had decided to ignore the "single transaction limit" that was designed to ensure that Lehman's investments were properly limited and diversified by business line and by counterparty. This allowed Lehman to engage in approximately 30 leveraged finance deals exceeding the single transaction limit policy during the Class Period.  For example, as the Examiner described to Congress, "Lehman committed to what was its largest single investment – Archstone – in May 2007, with closing to occur later.  It was clear prior to the commitment that the Archstone transaction would put Lehman over its then existing risk limits, but the deal was committed anyway. With the inclusion of Archstone, Lehman was clearly in excess of its established risk limits.  But in the face of exceeding its risk limits, Lehman did not take steps to reduce risk; rather, it simply raised the risk limits."  Moreover, several commitments exceeded Lehman's internal loss threshold by a

factor of six, and with respect to 24 of the largest high yield deals in which Lehman participated, Lehman committed over $10 billion more than the single transaction limit would have allowed.

165.    The Examiner further concluded that Lehman's stress tests – conducted on a monthly basis and reported to regulators and the Board of Directors – were "meaningless" because they excluded Lehman's commercial real estate investments, its private equity investments, and, for a time, its leveraged loan commitments.  According to the Examiner's Report,

> An internal audit advised that Lehman "address the main risks in the Firm's portfolio," including "illiquidity" and "concentration risk."  But Lehman did not take significant steps to include these private equity positions in the stress testing until 2008, even though these investments became an increasingly large portion of Lehman's risk profile.

166.    On May 31, 2007, just weeks prior to the commencement of the Class Period, an internal stress scenario identified a possible $3.2 billion loss for the Company, resulting in recommendations that Lehman reduce its forward commitments by nearly half, impose rules on leverage, and develop a framework for limiting and evaluating the leveraged lending business. Nevertheless, by the end of July 2007, Lehman entered into an additional $25.4 billion of leveraged loan commitments because of its unwillingness to terminate deals that were in the pipeline or under negotiation.

167.    Nor did Lehman hedge against its large exposures.  Lehman decided – ***but did not disclose*** – that it would not hedge its growing principal investment risks to the same extent as its other exposures.  The Company's large volume of unhedged illiquid assets ultimately contributed to Lehman's significant losses.

168.    The disregard for risk management policies and increased limits adversely impacted Lehman by mid-summer, 2007.  According to internal emails, the Company's overly taxed liquidity condition created difficulties in obtaining funding to finance commitments.  For example, although the investment community was unaware, liquidity concerns caused Lehman to delay the closing of its multi-billion dollar Archstone transaction from August 2007 to October 2007.

169.    Rather than disclose to the investing public its true liquidity condition, Lehman internally set up an Asset-Liability Committee ("ALCO") to "manage [the firm's] liquidity on a daily basis." ALCO promptly found that Lehman was well below its cash surplus policies and projected large deficits of cash capital. Specifically, by July 30, 2007, an ALCO study projected Lehman's month end cash capital for September, October, and November 2007 to be -$11.4 billion, -$14.5 billion, and -$9.4 billion, respectively. In September 2007, ALCO projected Lehman's average ending cash capital positions for September, October and November 2007 to be $0.05 billion, -$2.15 billion and -$1.75 billion respectively.

### D.    The Insider Defendants' False And Misleading Statements During The Class Period

170.    During the Class Period, the Insider Defendants made a series of materially false and misleading statements and omissions in Lehman's SEC filings. These untrue statements or material omissions are contained in Lehman's SEC filings identified above in ¶¶26-88, 104-09, and are also actionable under the Exchange Act.

171.    In addition to the untrue statements made in Lehman's Class Period SEC filings, the Insider Defendants made a series of materially false and misleading statements during Lehman's quarterly earnings conference calls and investor conferences as detailed below.

172.    **2Q07:** On June 12, 2007, Lehman held a conference call to discuss its financial results for the second quarter of 2007. During the conference call, Defendant O'Meara represented that Lehman's "net leverage ratio of 15.5 times is right in line with the 15.4 times we had at the end of the first quarter." O'Meara's statement was false and misleading because Lehman's net leverage ratio had been artificially reduced to 15.5 by Lehman's temporary removal of $31.943 billion of assets through Repo 105 transactions at quarter-end, and Lehman's actual net leverage ratio for the quarter was 16.9.

173.    During the conference call, O'Meara also reassured investors that "the subprime market challenges are . . . reasonably contained to this asset class" and that the "lion's share" of Lehman's originations were not in subprime, but rather in Alt-A, stating, "we actually had terrific

performance on the origination side around the Alt-A business." O'Meara's statement was false and misleading because market challenges were not contained to subprime, but had extended to other asset classes, including Alt-A. Indeed, a March 2007 internal Lehman analysis entitled "Risk Review: Aurora and BNC February 2007" concluded that "[t]he credit deterioration [in Alt-A] has been almost parallel to the one of the subprime market." Moreover, Lehman's "Alt-A" originations were particularly risky because Lehman had loosened its lending criteria to reach riskier borrowers. The Examiner found that Lehman's Alt-A lending reached borrowers of lesser credit quality than those who historically had been considered Alt-A borrowers, and that the Alt-A risk profile increased in much the same way as the risk in subprime mortgages. This is corroborated by the first-hand account of percipient witnesses (*see* Appendix C), and internal communications. In fact, Lehman Senior Vice President in Risk Management, Dimitrios Kritikos ("Kritikos"), stated in an internal January 30, 2007 email, that during the "last 4 months Aurora has originated the riskiest loans ever, with every month been riskier than the one before." Kritikos further made clear that the majority of Lehman's loan originations were, in fact, not truly Alt-A, stating in an internal March 12, 2007 email that "Aurora's product is far from Alt-A anymore. The traditional Alt-A program is only 40% of Aurora's production, . . . My concern is the rest 60% of the production, that has 100% financing in lower FICOs with non-full documentation and/or investment properties." Indeed, Lehman's Alt-A lending standards had so deteriorated that loans made pursuant to Aurora's Mortgage Maker were internally referred to as "Alt-B" rather than Alt-A.

174.    **3Q07:** On September 18, 2007, Lehman hosted a conference call with analysts and investors to discuss the Company's third quarter financial results. During the conference call, Defendant O'Meara stated that Lehman's net leverage ratio was 16.0, without disclosing that management had artificially reduced this ratio from its true level of 17.8, through $36.407 billion in Repo 105 transactions.

175.    In the conference call, O'Meara also repeatedly stressed the Company's "strong risk [] management," emphasizing particularly its "strong risk management culture with regard to the

setting of risk limits." These statements were false and misleading because, as set forth above at ¶¶70-84, 161-69, Lehman disregarded its risk limits and policies on a regular basis. For example, Lehman (a) exceeded its risk appetite limit by $41 million in July 2007 and $62 million in August 2007; (b) committed to over 30 deals that exceeded its $250 million loss threshold and $3.6 billion notional limit for single transactions; (c) exceeded the balance sheet limit by almost $20 billion for its Fixed Income Division; and (d) breached its VaR limits.

176.    With respect to the Company's liquidity, O'Meara represented that Lehman had a "strong liquidity framework," that it had "strong [] liquidity management," that Lehman's liquidity position "is now stronger than ever," that Lehman had a "conservative liquidity framework," and that "[w]e consider our liquidity framework to be a competitive advantage." These statements were false and misleading. As of the date O'Meara made these statements, an internal Lehman analysis by ALCO – of which O'Meara was a member – projected that Lehman would have a large cash capital deficit at month-end ($1.3 billion), and even larger cash capital deficits for the end of October ($6.4 billion) and November ($4.4 billion). Indeed, O'Meara had helped set up ALCO precisely because of liquidity concerns, which were so great that they caused Lehman to refrain from entering into new high yield deals in August 2007 and to delay the closing of the Archstone transaction. In addition, O'Meara – who actively managed Lehman's Repo 105 transactions – masked Lehman's true liquidity position by failing to disclose that the Company was required to repurchase $32 billion of assets from the Repo 105 transactions.

177.    Based upon the false information provided in Lehman's financial results and following the September 18, 2007 conference call, analysts David Trone and Ivy De Dianous from Fox-Pitt Kelton "urge[d] investors to buy LEH now"; Wachovia analyst Douglas Sipkin commented on Lehman's "strong liquidity position"; and Citi analyst Prashant Bhatia noted Lehman's "excellent risk management."

178.    On November 14, 2007, Lehman management presented at the Merrill Lynch Banking & Financial Services Investor Conference (the "Merrill Conference"). During the Merrill

Conference, Defendant Lowitt represented that Lehman continued to show very substantial growth despite challenging market conditions by, among other things, having an "extremely deep risk culture which is embedded through the firm," being "very conservative around risk," and "running a business where we could distribute all the risk."   In particular, Lowitt repeatedly stressed that Lehman had "stay[ed] true to the principle . . . of our strategy of being in the moving rather than the storage business. So essentially originating to distribute, not holding stuff on our balance sheet, not storing risk but moving it on."   These statements were false and misleading.   Contrary to these statements, Lehman's strategy was not to be in the "moving business," but the "storage business," which greatly increased Lehman's risk profile as it accumulated vast amounts of highly-leveraged, concentrated and illiquid assets.   In fact, a July 20, 2007 email from Lowitt to O'Meara acknowledged that Lehman's liquidity concerns stemmed from its failure to abide by risk limits, stating:   "In case we ever forget; this is why one has concentration limits and overall portfolio limits.  Markets do seize up."

179.    **4Q07:**   On December 13, 2007, Lehman hosted a conference call to discuss the Company's fourth quarter and record fiscal 2007 financial results.

180.    During the conference call, Defendant O'Meara stated that "[w]e ended the quarter with a net leverage ratio of approximately 16.1 times, in line with last quarter."  This statement was false and misleading because in reality Lehman's net leverage ratio was 17.8, an overstatement of 17 basis points, as net assets had been reduced by Lehman's temporary removal of $38.634 billion of assets through Repo 105 transactions that were without economic substance.

181.    During the conference call, O'Meara also stated that the fourth quarter results "reflects the strength of our risk management culture in terms of managing our overall risk appetite, seeking appropriate risk reward dynamics and exercising diligence around risk mitigation." Defendant Callan also represented that the Company's success was attributable to "our strong risk and liquidity management."  These statements were false and misleading because, as set forth above at ¶¶70-84, 161-69, Lehman disregarded its risk limits and policies on a regular basis.  Lehman

exceeded its risk appetite limits by $508 million in November, even after having increased the limit; Lehman disregarded the Company's single transaction limit, including committing $10 billion more than the limit had allowed with respect to 24 of its largest high yield deals; the balance sheet limit for Lehman's divisions were exceeded by tens of billions – for example, GREG exceeded its balance sheet limit by approximately $3.8 billion in 4Q07, and FID exceeded it by $11.17 billion at the end of 4Q07; and VaR limits were breached almost everyday for some of Lehman's divisions, including GREG and High Yield.

182.    Additionally, O'Meara stated that the fourth quarter results "reinforce[ed] the importance of our disciplined liquidity and capital management framework which sets us up to operate our business through periods of market stress"; that Lehman's liquidity position "continues to be very strong"; that the Company had "structured [its] liquidity framework to cover our funding commitment and cash outflows for a 12 month period without raising new cash in the unsecured markets or selling assets outside our liquidity pool"; and that "[w]e consider our liquidity framework to be a competitive advantage in today's markets."  Callan similarly echoed that "we currently have ample liquidity and capital in place."  These statements were false and misleading. The Company had significant liquidity concerns due to the illiquid assets it had accumulated as part of its countercyclical growth strategy.  In addition, Lehman's true liquidity position was overstated through the use of Repo 105 transactions that were without economic substance.

183.    Following the December 13, 2007 press release and conference call, analysts James Mitchell and John Grassano from Buckingham continued to rate Lehman a "Strong Buy," stating: "We continue to emphasize LEH's strong risk management abilities (which is enabling them to grab market share)."

184.    **1Q08:**  On March 18, 2008, shortly after Bear Stearns collapsed, Lehman hosted a conference call to discuss its first quarter 2008 financial results.  During the conference call, Defendant Callan stated:  "We did, very deliberately, take leverage down for the quarter.  We ended with a net leverage ratio of 15.4 times down from 16.1 at year end."  This statement was materially

false and misleading because Lehman's net leverage ratio for the quarter was actually 17.3, and had only been artificially reduced to 15.4 because Lehman engaged in $49.1 billion of Repo 105 transactions at quarter-end.  Moreover, as set forth in ¶180 above, the net leverage ratio for the fourth quarter was really 17.8, and had only been artificially reduced to 16.1 at year end because the figure was similarly manipulated through the use of almost $40 billion in Repo 105 transactions.

185.   During the call, Defendant Callan also "tried to relay the strengths and robustness of the liquidity position of the Firm."  Callan repeatedly referred to "the strength of our liquidity and capital base," Lehman's "disciplined liquidity and capital management," and Lehman's "robust liquidity."  Callan also specifically represented that Lehman's liquidity pool was structured "to cover expected cash outflows for the next 12 months . . . without being able to raise new cash in the unsecured markets, or without having to sell assets that are outside our liquidity pool"; that "[w]e have no reliance on secured funding that's supported by whole loans or other esoteric collateral"; that the Company had "approximately 100 billion of liquidity, plus additional 99 billion at the regulated subsidiaries" – which were "unencumbered"; and that Lehman had prefunded its liquidity needs to seize on "opportunities in the markets."  In fact, according to Callan, Lehman "took care of [its] full year needs" for capital when it raised $1.9 billion through its offering of preferred stock in February."

186.   These statements were false and misleading.  Lehman's liquidity was not strong or "robust" because the Company had significant liquidity concerns due to the illiquid assets it had accumulated.  As Co-Head of Lehman's Global Fixed Income Division, Eric Felder ("Felder"), stated in a February 20, 2008 email: "I remain concerned as a lehman shareholder about our resi[dential] and cmbs [commercial mortgage-backed securities] exposure. . . . having 18b of tangible equity and 90b in resi[dential] (including alt a) and cmbs (including bridge equity) scares me."  In fact, just six days prior to Callan's statements, Felder had emailed Callan about liquidity concerns, noting that "dealers are refusing to take assignment of any Bear or LEH trades for the

most part that are in-the-money" and that this was a "very slippery slope" because if dealer liquidity were to "seize up," it could lead to "true disaster."

187.    During the conference call, Callan also continued to stress Lehman's "continued diligence around risk management" and its "risk management discipline."  These statements were false and misleading because, as set forth above at ¶¶70-84, 161-69, Lehman disregarded its risk limits and policies on a regular basis.  For example, by the time of Callan's statement, Lehman had (a) not only increased its risk appetite four times from $2.3 billion in December 2006 to $4 billion in December 2007, but disregarded this "hard" limit by at least $500 million for every month from September 2007 through February 2008; (b) committed approximately $10 billion more than the single transaction limit allowed with respect to 24 of its largest high yield deals, and did not impose a limit on its risky leveraged-loan bridge equity commitments; (c) significantly exceeded its balance sheet limit, including by $18 billion for FID and $5.2 billion for GREG; and (d) repeatedly breached its VaR limits; in fact, Lehman's major business divisions, including GREG, High Yield, and FID, were breaching VaR limits virtually everyday.

188.    Callan's statements during the conference call were critically important to Lehman, which sought to dispel concerns about Lehman following Bear Stearns' collapse.  As Callan spoke during the conference call, Lehman's stock spiked.

189.    After the March 18, 2008 statements referenced above, analysts were reassured. Oppenheimer noted that "Lehman dispelled all doubts of a solvency crisis at the company." Buckingham continued its strong buy rating, stating "liquidity also remained strong" and "net leverage was brought down to 15.4x vs. 16.1x in the previous two quarters."  Fox-Pitt Kelton stated that "Mgmt's liquidity disclosures were extensive and comforting, while risk mgmt continues to be strong at Lehman."  And Punk Ziegel enthused:  "In one of the most impressive presentations ever made by a CFO, *Erin Callan reviewed all of the critical questions concerning Lehman's position convincingly arguing that the company was not in financial trouble*. . . .  Ms. Callan first demonstrated that Lehman had ample liquidity. . . .  The company also indicated that it has raised

approximately 2/3rds of the needed funding for the year by March.  There was a very detailed discussion of the company's assets and a table provided to demonstrate that the write downs taken were manageable. . . .  In sum, ***virtually no one listening to this call could have concluded that this company was in financial trouble.***"

190.    **2Q08:**  On June 9, 2008, Lehman held a conference call to discuss its preliminary results for 2Q08 (the quarter ended May 31, 2008).  In addition to repeating the materially false and misleading financial information in the Form 8-K (*see* ¶¶56-58), Callan affirmatively represented that a large part of the asset reduction in Lehman's net leverage came from selling "less liquid asset categories," including "residential and commercial mortgages and leveraged finance exposures" and that "[o]ur deleveraging was aggressive, as you can see, and is complete."  These statements were materially false and misleading when made because Callan failed to disclose that Lehman had removed $50 billion in assets from its balance sheet by using Repo 105 transactions that were without economic substance.  Further, the deleveraging was far from complete because Lehman continued to retain vast amounts of illiquid assets, which were masked by the Repo 105 transactions.  Moreover, the Repo 105 transactions shifted highly liquid assets off Lehman's balance sheet, leaving Lehman with an even greater concentration of illiquid assets.  If Lehman had, in fact, sold or otherwise divested itself of the "sticky" or illiquid assets, it would have been forced to record losses for the decline in value of similar assets.

191.    During the conference call, Callan represented that the Company grew its cash capital surplus to $15 billion and grew its liquidity pool to almost $45 billion – its "largest ever" – and that the "$45 billion of [its] liquidity pool was well in excess of [its] short-term unsecured financing liabilities."  These statements were false and misleading for failing to disclose that Lehman's undisclosed Repo 105 transactions required the Company to repurchase $50 billion in assets.

192.    Callan also stated that Lehman had "completed [its] entire budgeted funding plan for all of 2008 and do not need to revisit the debt markets."  In discussing the $6 billion of equity raised

by the Company on June 9, Callan stated: "To be clear, we do not expect to use the proceeds of this equity raise to further decrease leverage but rather to take advantage of future market opportunities. . . . we stand extremely well capitalized to take advantage of these new opportunities."  Contrary to Callan's suggestion that the Company had raised additional capital merely to take advantage of favorable market opportunities, however, the capital raise was actually necessary for the Company's very survival.  In fact, Lehman was aware at this time that it would need to begin posting billions of dollars more in collateral with JPMorgan.  Moreover, Treasury Secretary Paulson later told *The New York Times* that when "Lehman announced bad earnings around the middle of June, and we told Fuld that if he didn't have a solution by the time he announced his third-quarter earnings, there would be a serious problem.  We pressed him to get a buyer."

193.    Additionally, when asked by Merrill Lynch analyst Guy Moszkowski if Lehman dispensed of its "absolute easiest asset to sell," Callan stated that the opposite was true and, in fact, that Lehman sold many of its riskier, less-liquid assets during the quarter.  This statement was false and misleading because Callan failed to disclose Lehman's use of Repo 105 transactions to temporarily remove highly liquid – not illiquid/sticky – assets from the firm's balance sheet.

194.    On June 16, 2008, Lehman held another conference call to discuss its 2Q08 results.  During the call, Fuld and Lowitt also represented that Lehman's liquidity positions had "never been stronger" due to the Company's $45 billion liquidity pool.  Defendant Lowitt further stated that "we strengthened liquidity through the quarter," and "we have significantly increased. . . . our liquidity pool to $45 billion from $34 billion."  These statements were materially false and misleading because (1) Lehman's Repo 105 transactions, which required the Company to repurchase tens of billions in assets, masked the Company's true liquidity position; and (2) Lehman had accumulated an enormous volume of illiquid assets that adversely affected its liquidity.

195.    During the conference call, Lowitt further stated that "we reduced net leverage from 15.4 times to 12 times prior to the impact of last week's capital raise. . . .  Our deleveraging

included a reduction of assets across the Firm, including residential and commercial mortgages. . . ."  Fuld also stated that the "we reduced our gross assets by $147 billion over the quarter, which exceeded that target that we set," and that "the number of assets that were sold, especially in the commercial and residential mortgage area [] were the result of our deleveraging." These statements were materially false and misleading because Lehman's net leverage was actually 13.9, and had only been artificially reduced to 12.1 because Lehman engaged in $50 billion of Repo 105 transactions at quarter end.  Moreover, these statements gave investors the false and misleading impression that Lehman's deleveraging was the result of selling assets, including its toxic residential and commercial mortgage positions, while omitting to disclose:  (1) Lehman's extensive reliance on Repo 105 transactions to reduce its balance sheet at quarter end to decrease leverage which generally involved assets that were marketable and liquid; and (2) that Lehman was required to repurchase the assets and place them back on its balance sheet just days after the quarter-ended.

196.    On July 10, 2008, Lehman filed its Form 10-Q for second quarter of 2008, signed by Lowitt.  The 2Q08 10-Q reported that the "combined effect of an equity raise as well as the reduction of assets in the second quarter of 2008 resulted in a decrease in the Company's gross and net leverage ratios to 24.34x and 12.06x," respectively.  This statement was materially false and misleading for failing to disclose that $50 billion in Repo 105 assets which should have been included and reported in Lehman's financial statements were removed temporarily from Lehman's balance sheet at quarter-end.

197.    In addition, the 2Q08 10-Q reported $127.846 billion in securities sold under agreements to repurchase, and $269.409 billion in financial instruments and other inventory positions owned, which included $43.031 billion in assets pledged as collateral.  This was also materially misleading because the 2Q08 10-Q failed to disclose that, pursuant to Lehman's Repo 105 transactions, Lehman had pledged an additional $50.383 billion in securities as collateral, which it was under agreement to repurchase just days after the close of the quarter.

198.    The 2Q08 10-Q reported that the Company's liquidity pool was approximately $45 billion, up from $34 billion at February 29, 2008, and that Lehman "strengthened its liquidity position, finishing the quarter with record levels of liquidity."  The 2Q08 10-Q also stated that the Company's liquidity strategy "seeks to ensure that the Company maintains sufficient liquidity to meet funding obligations in all market environments," and that two of the principles of its liquidity strategy were (1) "[r]elying on secured funding only to the extent that the Company believes it would be available in all market environments"; and (2) "[m]aintaining a liquidity pool that is of sufficient size to cover expected cash outflows for one year in a stressed liquidity environment." These statements were false and misleading.  The undisclosed use of $50 billion in Repo 105 transactions, in particular, made Lehman appear more liquid that it really was because the increase was only temporary – Lehman had to repurchase the Repo assets just days following the quarter-end.

199.    Further, Lehman's 2Q08 10-Q contained a "Report of Independent Registered Public Accounting Firm" signed by E&Y (the "Interim Reports"), stating that, based on its review of Lehman's consolidated financial statements as of May 31, 2008, in accordance with the standards of the PCAOB, "we are not aware of any material modifications that should be made to the consolidated financial statements referred to above for them to be in conformity with U.S. generally accepted accounting principles."  This statement was false and misleading because E&Y was aware that Lehman's financial statements did not conform with GAAP.  Indeed, E&Y was not only aware of Lehman's use of Repo 105 generally, E&Y auditors were specifically informed on June 12, 2008, by Michael Lee that Lehman had used Repo 105 to move $50 billion off its books that quarter.

200.    **3Q08:** On September 10, 2008, Lehman issued a press release and held a conference call to discuss its preliminary third quarter 2008 financial results.  Lehman estimated a net loss of $3.9 billion, in large part due to gross mark-to-market adjustments of $7.8 billion ($5.6 billion net).

201.    The press release stated that Lehman had a net leverage ratio of 10.6x.  During the conference call, Fuld also repeated that "[w]e ended the quarter with more tangible equity than we

started and at a net leverage ratio of 10.6 versus 12.1 at the end of the second quarter," and Lowitt stated that "we ended the third quarter with a capital position and leverage ratio stronger than the second quarter. . . . we reduced net leverage to 10.6 times from 12.1 times. . . ." These statements were materially false and misleading because they failed to disclose that Lehman engaged in tens of billions of dollars in Repo 105 transactions at quarter-end, and that these undisclosed transactions were instrumental in Lehman's purported reduction in net leverage.

202.   The press release also stated that Lehman had an estimated liquidity pool of $42 billion. The liquidity pool figure was reiterated by Lowitt and Fuld during the conference call, who also represented that Lehman maintained a very strong liquidity position and that "[w]e have maintained our strong liquidity and capital profiles even in this difficult environment." These statements regarding Lehman's liquidity were false because, by September 2008, a substantial part – at least 24% – of Lehman's reported liquidity pool consisted of encumbered assets. Lehman fraudulently counted pledged assets in its liquidity pool, including:  (i) approximately $4 billion of CLOs pledged to JPMorgan; (ii) $2.7 billion in cash and money market funds pledged to JPMorgan; (iii) $2 billion Citibank cash deposit; (iv) $500 million Bank of America cash deposit; and (v) nearly $1 billion collateral deposit with HSBC. Lowitt also failed to disclose that, on the morning of September 10, Lehman granted JPMorgan a security interest in practically all Lehman accounts at JPMorgan for all Lehman exposures to JPMorgan that were beyond the exposures related to triparty clearance. Thus, when Fuld and Lowitt announced that Lehman had a liquidity pool of approximately $40.6 billion, Lehman only had a "high" ability to monetize approximately $25 billion, a "mid ability to monetize approximately $1 billion of the pool and only a 'low' ability to monetize approximately $15 billion, or 37%, of the total pool."

203.   In addition, the statements concerning Lehman's strong liquidity were false and misleading because prior to the September 10, 2008 conference call, Lehman received $5 billion in collateral calls from JPMorgan. On September 9, Steven Black, co-CEO of JPMorgan's Investment Bank, phoned Defendant Fuld and stated that JPMorgan needed $5 billion in additional collateral to

cover lending positions.  Jane Buyers-Russo, head of JPMorgan's broker-dealer unit, also phoned Lehman's treasurer, Paolo Tonucci, and told him Lehman would have to turn over $5 billion in collateral that JPMorgan had asked for days earlier. Fulfilling the request temporarily froze Lehman's computerized trading systems and nearly left Lehman with insufficient capital to fund its trading and other operations.

204.    By September 12, 2008, two days after Lehman publicly reported a $41 billion liquidity pool, the pool was overstated by approximately 95% as it actually contained less than $2 billion of readily monetizable assets.

205.    On September 15, 2008, the final day of the Class Period, Lehman petitioned for bankruptcy, making it the largest corporate bankruptcy in United States history.  In stark contrast to Defendant Lowitt's affirmative representations made just days before regarding Lehman's purportedly strong liquidity position, Lehman sought bankruptcy protection because it had "significant liquidity problems."

  **E.**  <u>**Additional Evidence Of Scienter**</u>

    **1.**  **The Insider Defendants Knew Of Repo 105**
        <u>**And The Artificial Balance Sheet Manipulation**</u>

206.    Documents and witnesses demonstrate that Lehman's use of Repo 105 was orchestrated and executed at the Company's highest levels.  Not only did the Insider Defendants fully appreciate how Repo 105 transactions was being used to manipulate Lehman's balance sheet, but they also regularly made decisions and communications about Lehman's use of such transactions in order to improve the Company's standing with analysts, credit ratings agencies and investors.

207.    Defendant O'Meara, in his position as CFO, actively managed Lehman's Repo 105 transactions from the commencement of the Class Period to December 1, 2007, when he became Lehman's head of Global Risk Management.  He was responsible for setting the Repo 105 usage limits or caps.  According to the Examiner, O'Meara had a duty to report "the impact of the [Repo

105] transactions on Lehman's balance sheet and the purpose for engaging in these transactions" to his superiors, including Fuld, Gregory, Lowitt and Callan.

208.    Defendant Callan, Lehman's new CFO as of December 2007, received calls as early as January 2008 regarding Lehman's Repo 105 program.  Several senior Lehman executives brought Repo 105 to Callan's attention.  Callan saw and ignored red flags alerting her to potential problems arising from Lehman's Repo 105 program before she signed Lehman's first quarter 2008 Form 10-Q.

209.    Defendant Lowitt was familiar with Repo 105 by the time he became CFO in June 2008.  According to the Examiner, despite knowledge of Lehman's Repo 105 program, "Lowitt certified Lehman's second quarter 2008 Form 10-Q, exposing Lehman to potential liability for making material misstatements and omissions in publicly filed financial statements and MD&A."

210.    Defendant Gregory assisted in setting balance sheet targets for Lehman as of March 2008.  As a member of Lehman's Executive Committee, Gregory received materials related to Lehman's use of Repo 105 transactions to manage its balance sheet at a special meeting requested by McDade on March 28, 2008.  McDade testified that the purpose of the meeting was to request Gregory's "blessing in freezing Lehman's Repo 105 usage."

211.    Defendant Fuld also had knowledge of Repo 105 transactions.  For example, the night before a March 28, 2008 Executive Committee meeting requested by McDade (Lehman's newly appointed "balance sheet czar") to discuss Lehman's Repo 105 program and to request Gregory's freezing of the Repo 105 usage, Fuld received an agenda of topics including "Repo 105/108" and "Delever v Derisk" and a presentation that referenced Lehman's $49.1 billion quarter-end Repo 105 usage for the first quarter 2008.  Although Fuld may not have attended the Executive Committee meeting, McDade recalled having specific discussions with Fuld about Lehman's Repo 105 usage in June 2008.  During that discussion, McDade walked Fuld through Lehman's Balance Sheet and Key Disclosures document, and discussed with Fuld Lehman's quarter-end Repo 105 usage – $38.6 billion at year-end 2007; $49.1 billion at 1Q08; and $50.3 billion at 2Q08.  Based

upon their conversation, McDade understood that Fuld "was familiar with the term Repo 105," "knew, at a basic level, that Repo 105 was used in the Firm's bond business" and "understood that [reduction of Repo 105 usage] would put pressure on traders." Fuld also met regularly, at least twice a week, with Gregory and members of the Executive Committee to discuss the state of the Company. Based on these facts, as well as the fact that Fuld was admittedly focused on balance sheet and net leverage reduction in 2008, the Examiner concluded that Fuld knew about Repo 105 transactions prior to signing Lehman's Forms 10-Q.

212. Class Period documents and Lehman employees further corroborate that each of the Insider Defendants knew about Lehman's Repo 105 program throughout the Class Period and understood its impact on Lehman's balance sheet. For example:

- Martin Kelly ("Kelly"), Lehman's Global Financial Controller, told the Examiner that he expressed concerns to Defendants Callan and Lowitt when each was serving as Lehman's CFO about: (1) the large volume of Repo 105 transactions undertaken by Lehman; (2) the fact that Repo 105 volume spiked at quarter-end; (3) the technical accounting basis for Lehman recording such transactions as "sales"; (4) the fact that Lehman's peers did not do Repo 105-style transactions; and (5) the reputational risk Lehman faced if its Repo 105 program were to be exposed.

- Callan "acknowledge[ed] she was aware, as CFO, that Lehman's Repo 105 practice impacted net balance sheet [and] that the transactions had to be routed through Europe."

- Lowitt acknowledged to the Examiner that "he was aware of Lehman's Repo 105 program for many years, that Lehman used the transactions to meet balance sheet targets, that Repo 105 transactions used only liquid inventory, and that Lehman set internal limits on Repo 105 usage but that Chris O'Meara was involved with limit-setting."

- According to a July 2006 Overview of Repo 105/108 Presentation, Grieb and O'Meara were "responsible for setting Lehman's limits" on Repo 105.

- According to a July 2006 document titled "Lehman, Global Balance Sheet Overview of Repo 105 (FID)/108 (Equities)," "per Chris O'Meara and Ed Grieb," "Repo 105 transactions must be executed on a continual basis and remain in force throughout the month. To meet this requirement, the amount outstanding at any time should be maintained at approximately 80% of the amount at month-end."

- From April 2008 to September 2008, O'Meara, Callan, Lowitt and others received a "Daily Balance Sheet and Disclosure Scorecard," as well as daily condensed versions in email form, which contained "frequent references" to Repo 105, including "the daily benefit that Repo 105 transactions provided to Lehman's balance sheet."

- In August 2007, O'Meara was involved in unsuccessful efforts by FID to use RMBS and CMBS in Repo 105 transactions. Kentaro Umezaki ("Umezaki") emailed colleague John Feraca, "not sure that is worth the effort . . . we need Chris [O'Meara] to opine."

- Umezaki emailed O'Meara on August 17, 2007, stating: "John Feraca is working on Repo 105 for our IG mortgage and real estate assets to reduce our Q3 balance sheet. . . . He will test the waters a bit in London with one counterparty."

- Ryan Traversari, Lehman's Senior Vice President of Financial Reporting, emailed O'Meara in May 2008 regarding Repo 105, stating that Citigroup and JPMorgan "likely do not do Repo 105 and Repo 108 which are UK-based specific transactions on opinions received by LEH from Linklaters. This would be another reason why LEH's daily balance sheet is larger intra-month then at month-end."

- On June 17, 2008, Gerard Reilly provided O'Meara, Lowitt, McDade and Morton a document entitled "Balance Sheet and Key Disclosures," "that incorporated McDade's plan to reduce Lehman's firm-wide Repo 105 usage by half – from $50 billion to $25 billion in third quarter 2008."

213.    Additionally, the Insider Defendants knew or recklessly disregarded the untrue or misleading nature of statements regarding Lehman's balance sheet, leverage, repo financing, financial results, and liquidity position because, *inter alia*:

(a)    there was no economic substance for the Repo 105 transactions, or for concealing their use from the public;

(b)    the singular purpose of Lehman's Repo 105 program was balance sheet management;

(c)    the magnitude of the Repo 105 program was so large and material to Lehman's reported financial results that the Insider Defendants could not have been unaware of its existence, or its impact on Lehman's balance sheet and leverage ratios, or at a minimum were reckless in not knowing;

(d)    Lehman's failure to disclose Repo 105, despite its magnitude and knowledge by the Insider Defendants, and its impact on reported deleveraging as set forth above, further demonstrates an intent to deceive;

-70-

(e)     Lehman was motivated to manage its balance sheet through Repo 105 transactions to avoid selling "sticky" assets and incurring reportable losses on both the sale of sticky assets and potential write-downs of similarly situated assets under GAAP; and

(f)     credit ratings agencies, analysts and investors were focused on Lehman's net leverage ratios as an indicator of the firm's liquidity.

214.    Additionally, Lehman attempted to get a United States law firm to provide a true sale opinion for Lehman's use of Repo 105.  When no law firm would, Lehman turned to a U.K. law firm and structured the transactions through a foreign subsidiary.  The fact that Lehman was unable to obtain a legal opinion from a United States law firm is further evidence of scienter.  Furthermore, the opinion obtained from a law firm in England did not mention U.S. GAAP or accounting standards and it stated that the opinion was limited to transactions that were undertaken solely for the benefit of Lehman's British subsidiary.

215.    Moreover, it was actually more expensive for Lehman to enter into Repo 105 transactions than it was to conduct Ordinary Repo transactions.  Lehman had the ability to conduct an Ordinary Repo transaction using the same securities and with substantially the same counterparties as in Repo 105 transactions, at a lower cost.  The Examiner described this as further evidence that the sole purpose of Repo 105 was to manipulate the balance sheet.

### 2.     Insider Defendants Knew Of Lehman's Disregard Of Risks And Its Liquidity Problems

216.    In pursuit of an aggressive growth strategy, the Insider Defendants knew of, but recklessly disregarded, the warnings of Lehman's risk managers.  For example:

a.   According to Lehman's 2007 10-K, the Executive Committee – including Fuld (Chair), Gregory, Callan and Lowitt – established Lehman's overall risk limits and risk management policies.

b.   Lehman's Risk Committee, which included the Executive Committee and CFO, reviewed "all exposures, position concentrations and risk-taking activities" on a weekly basis; determined "overall risk limits and risk management policies, including establishment of risk tolerance levels"; reviewed the firm's "risk exposures, position concentrations and risk-taking

activities on a weekly basis, or more frequently as needed"; and allocated "the usage of capital to each of our businesses and establishes trading and credit limits with a goal to maintain diversification of our businesses, counterparties and geographic presence."

      c. Pursuant to Lehman's policies, the Company's GRMG disclosed information regarding risk appetite to senior management, creating a weekly "Firm Wide Risk Snapshot" report, which contained "Risk Appetite limits and usage by business unit" and summarized "VaR by business unit and Top Market Risk positions."   In addition, Lehman circulated a "Daily Risk Appetite and VaR Report" to upper management, which included a cover e-mail detailing the firm's overall daily risk appetite and VaR usage figures and the day-over-day change in those figures.  The Risk Committee also received the "Firm-wide Risk Drivers" report, which contained detailed information regarding the firm's aggregated risks, reflected firm-wide risk appetite and VaR usage data, and explanations regarding week-over-week changes in the data.

      217.    Disregarding risk limits was a deliberate decision that Fuld and Gregory made over the objection of members of Lehman's management, including Alex Kirk, then head of Lehman's Credit Business, and Madelyn Antoncic, then Lehman's Chief Risk Officer.

      218.    The Insider Defendants were also aware of Lehman's related and growing liquidity problems.  According to the Examiner's Report:

      a. On May 31, 2007, Roger Nagioff ("Nagioff"), Lehman's then Global Head of FID provided Defendant Fuld with an internal stress scenario that identified a possible $3.2 billion loss for the Company, and recommended that Lehman reduce its forward commitments by nearly half, impose rules on leverage and develop a framework for limiting and evaluating the leveraged lending business.

      b. Also in May 2007, O'Meara expressed "significant concerns" about the "overall size" of Lehman's real estate book and how much of the firm's equity was "tied up" in bridge equity deals.

c.  On July 20, 2007, Nagioff emailed Lowitt, stating that his co-COO and head of Fixed Income Strategy were "panicky" about Lehman's liquidity position.  Lowitt responded that he was "anxious" about Lehman's liquidity position, and that "[i]f everything goes as badly as it could simultaneously it will be awful."  Lowitt added that "the discipline we had post 1998 about funding completely dissipated which adds to the alarm."

d.  On July 20, 2007, Lowitt shared his liquidity concerns with O'Meara, tracing Lehman's difficulty in funding its commitments directly to its failure to abide by its risk limits. Lowitt emailed O'Meara: "In case we ever forget; this is why one has concentration limits and overall portfolio limits.  Markets do seize up."

e.  O'Meara's liquidity concerns were heightened on July 27, 2007, when he was informed that Lehman might have to provide $9 billion in funding for the Archstone transaction, rather than the previously budgeted $6.8 billion, as a result of an "implosion" of the institutional market for investments backed by commercial real estate.  Lehman ultimately delayed closing the Archstone transaction from August 2007 to October 2007 as a result of liquidity concerns, while continuing to promote publicly Lehman's supposed strong liquidity.

f.  In July 2007, Defendants Lowitt and O'Meara – together with Paolo Tonucci ("Tonucci"), Lehman's Global Treasurer, Alex Kirk ("Kirk"), co-COO of FID, and Kentaro Umezaki, Head of Fixed Income Strategy – set up ALCO as a result of their liquidity concerns, to "manage [the firm's] liquidity on a daily basis."

g.  On July 30, 2007, ALCO members, including Defendants Lowitt and O'Meara, exchanged an analysis showing that, contrary to the firm's policy to always have a cash capital surplus of at least $2 billion, Lehman was projecting large deficits of cash capital.

h.  In early August 2007, Lowitt – together with Nagioff and Kirk – decided to suspend the leveraged loan and commercial real estate businesses until the end of the third quarter of 2007 as a result of Lehman's liquidity problems.

i.  On October 5, 2007, O'Meara received an email from Tonucci, Lehman's Global Treasurer, stating that Lehman was "looking at being $1-2 [billion] short [in equity] . . . should not really be surprised."

j.  In late October 2007, Defendant O'Meara prepared a presentation on the firm's equity adequacy for the Executive Committee.  The presentation concluded that the firm's capital adequacy over the last 5-6 quarters had "materially deteriorated"; that Lehman was at the bottom of its peer range with respect to the regulatory requirement of a minimum 10% total capital ratio imposed by the SEC; and that the firm's capital position decreased from a $7.2 billion surplus in the beginning of 2006 to a $42 million deficit at the end of the third quarter of 2007.

k.  In early November 2007, GREG made a presentation to Fuld in which they recommended reducing the group's global balance sheet by $15 billion.

l.  Defendant Callan told the Examiner that she had repeated discussions with Fuld and Gregory about reducing the balance sheet in January and February 2008 but "didn't get traction quickly on it."

m.  A January 2008 internal presentation made by Felder, a Lehman executive, acknowledged that the mortgage crisis was having a severe impact on the Company's operations and liquidity position.  Slides accompanying Felder's presentation stated that "[v]ery few of the top financial issuers have been able to escape damage from the subprime fallout." The presentation also warned that, because "a small number of investors account [] for a large portion of demand [for Lehman issues], liquidity can disappear quite fast."

n.  On March 12, 2008, Callan received an email from Eric Felder expressing concerns about dealer liquidity and shrinking leverage, and forwarding an email from a Lehman trader that warned that dealers were demanding increased haircuts and refusing to take assignments of any Bear or Lehman trades even if the trades were "in-the-money." Five days later, Felder warned Defendants Lowitt and Callan that collapsing equity values eventually would compel Lehman to

sell assets, and that the distressed prices available would create a need for additional capital, forcing further sales.

o.   After Bear Stearns' near-collapse, then Treasury Secretary Henry Paulson told Fuld that Lehman needed to raise capital, find a strategic partner or sell the firm.   After Lehman announced its second quarter results, Secretary Paulson warned Fuld that Lehman needed to have a buyer or other survival plan in place before announcing any further losses in the third quarter or Lehman's survival would be in doubt.

p.   On April 3, 2008, Callan emailed McDade, Lehman's "balance sheet czar," expressing dismay in the growth of the balance sheet.

q.   On May 13, 2008, two weeks before the end of the second quarter, Callan urged Fuld and Gregory to "deliver on the balance sheet reduction this quarter" and not give "any room to [Fixed Income Division] for slippage."

219.   Further evidencing scienter, Defendants Fuld and Gregory sought to remove – not reward – insiders who opposed Lehman's growing risk management practices and who voiced concerns about the growing liquidity crisis.   In 2007, for example, Fuld and Gregory removed Michael Gelband, head of Lehman's Fixed Income Division, and Madelyn Antoncic because of their opposition to management's growing accumulation of risky and illiquid investments.

220.   Lehman's senior officers were also aware of the deficiencies in Lehman's risk management practices.   According to the Examiner, O'Meara was aware that Lehman's principal investments were not considered in Lehman's stress testing.   For example, O'Meara told the Examiner that Lehman did not even start taking steps to include private equity transactions in its stress tests until 2008.   With regard to hedging, according to multiple Lehman executive interviews and internal emails, Lehman senior officers elected not to hedge many of Lehman's assets because of the difficulty and possible repercussions inherent in hedging investments as illiquid as Lehman's. In addition, on October 15, 2007, O'Meara informed Lehman's Board of Directors that Lehman was over its firm-wide risk appetite limit.

221.    The Insider Defendants were Lehman's highest ranking officers and oversaw the day-to-day management of Lehman's operations.  Defendant Fuld chaired, and Defendants Callan, Lowitt and Gregory were members of, the Company's Executive Committee, which was responsible for assessing Lehman's risk exposure and related disclosures.  The Executive Committee reviewed "risk exposures, position concentrations and risk-taking activities on a weekly basis, or more frequently as needed," and "allocate[d] the usage of capital to each of our businesses and establishes trading and credit limits for counterparties."

222.    According to Callan, the Executive Committee consisted of thirteen people, including herself and Fuld, who met twice a week for two hours at a time and "devote[d] a significant amount of that time to risk."  Callan stated that the Executive Committee addressed "any risk that passes a certain threshold, any risk that we think is a hot topic" and "anything else during the course of the week that's important."  Further, Callan stated that the Executive Committee was "intimately familiar with the risk that we take in all the different areas of our business.  And [Fuld] in particular . . . keeps very straight lines into the businesses on this topic."

223.    Additionally, Defendants Fuld, O'Meara, Callan and Lowitt signed quarterly and annual Sarbanes-Oxley certifications during the Class Period attesting to their responsibility for and knowledge of disclosure controls and procedures, as defined in Exchange Act Rules 13a-15(e) and 15d-15(e), as well as Lehman's internal control over financial reporting.

**F.**    **Section 10(b) Allegations Against E&Y**

**1.**    **Material Misstatements By E&Y**

224.    During the Class Period, E&Y issued a clean audit opinion that was included in Lehman's 2007 10-K representing "[w]e conducted our audit in accordance with the standards of the Public Company Accounting Oversight Board" and that Lehman's financial statements "present[ed] fairly, in all material respects, the consolidated financial position of Lehman . . . in conformity with U.S. generally accepted accounting principles."  E&Y also issued interim reports that were included in Lehman's Forms 10-Q which stated, "[w]e conducted our review in

accordance with the standards of the Public Company Accounting Oversight Board," and "[b]ased on our review, we are not aware of any material modifications that should be made to the consolidated financial statements . . . for them to be in conformity with U.S. generally accepted accounting principles."  E&Y's statements in Lehman's 2Q07 10-Q, 3Q07 10-Q, 2007 10-K, 1Q08 10-Q and 2Q08 10-Q were materially false and misleading for the reasons set forth above at ¶¶26-69, 104-09.

225.    E&Y provided continuing consent for Lehman's use of the clean audit opinion and clean quarterly reviews in the Offering Materials that post-dated the issuance of the 2007 10-K.  As a result, E&Y knew that Lehman securities were being sold on the basis of E&Y's clean audit opinion throughout the entirety of the Class Period.

## 2.    E&Y's Scienter

226.    The Examiner found that E&Y knew about Lehman's use of Repo 105 transactions to manage its balance sheet at the end of each quarter.  According to the Examiner, E&Y was specifically informed about Lehman's Repo 105 transactions on several occasions, and  E&Y "was made aware that [Lehman's] financial information may be materially misleading because of the failure to disclose the effect and timing and volume of Lehman's Repo 105 activities (which had a material effect on financial statement items)."

227.    In 2007, Lehman provided E&Y with a netting grid that identified and described various balance sheet mechanisms, including Repo 105 transactions.  The netting grid was provided to E&Y by no later than August 2007 (at the close of Lehman's 3Q07) and in November 2007 (at the close of its fiscal year).  Although E&Y used the netting grid in connection with the audit, E&Y's review and analysis did not take into account the large volumes of Repo 105 transactions Lehman undertook at quarter-ends, reflected therein.  When the Examiner asked William Schlich, E&Y's lead partner on the Lehman Audit Team, about the volume of Repo 105 transactions and whether E&Y should have considered the possibility that strict technical adherence to SFAS 140 or

another specific accounting rule could nonetheless lead to a material misstatement in Lehman's publicly reported financial statements, Schlich refused to comment.

228.   According to Martin Kelly, soon after he became Lehman's Global Financial Controller on December 1, 2007, he specifically spoke to Schlich in an effort to learn more about Lehman's Repo 105 program.  During that conversation, Kelly and Schlich specifically discussed the fact that Lehman was unable to obtain a true sale opinion under United States law for Repo 105 transactions.

229.   E&Y was also made aware of Lehman's improper use of Repo 105 transactions during its investigation of claims made by a whistleblower.  On May 16, 2008, Matthew Lee, a Senior Vice President in Lehman's Finance Division responsible for its Global Balance Sheet and Legal Entity Accounting, sent a letter to Lehman management – including Kelly and Defendants Callan and O'Meara – identifying possible violations of Lehman's Ethics Code related to accounting/balance sheet issues.  Subsequently, Lee prepared another writing addressing additional accounting control issues – including the use of "Repo 105" transactions – which was sent to a Managing Director in Lehman's corporate compliance department.  Shortly after sending his first letter, he was interviewed by Joseph Polizzotto, Lehman's General Counsel, and Elizabeth Rudofker, Head of Corporate Audit.  On May 22, 2008, the day after that interview, Lee was terminated without warning.

230.   Approximately two weeks after Lee's termination, *after* he had communicated additional warnings about Repo 105, Lee was interviewed by Schlich and Hillary Hansen of E&Y. According to Hansen's notes of the interview, Lee again warned E&Y about Lehman's Repo 105 practice including, notably, the enormous volume of Repo 105 activity that Lehman engaged in at quarter-end.  These E&Y notes recounted Lee's allegation that Lehman moved $50 billion of inventory off its balance sheet at quarter-end through Repo 105 transactions and that these assets returned to the balance sheet about a week later.  When interviewed by the Examiner, Hansen specifically recalled conferring with Schlich about Lee's Repo 105 allegations.  However, despite

E&Y's contemporaneous notes demonstrating the discussion of Repo 105, Schlich told the Examiner that he did not recall Lee saying anything about Repo 105 transactions during the interview with Lee.

231.    Indeed, E&Y took affirmative steps to cover-up the Repo 105 fraud.  On June 13, 2008, the day after Lee specifically informed E&Y of the $50 billion in Repo 105 transactions that Lehman undertook at the end of the second quarter 2008, E&Y spoke to Lehman's Audit Committee regarding Lee's allegations.  Despite the fact that the Chair of the Audit Committee had clearly stated that he wanted a full and thorough investigation of *every* allegation made by Lee, E&Y failed to mention anything about Repo 105.  Similarly, on July 8, 2008, when the Audit Committee met with E&Y to review Lehman's 2Q08 financial statements, E&Y again failed to mention Lee's allegations regarding Repo 105, and stated that E&Y would issue an unqualified review report. Then, on July 22, 2008, at an Audit Committee meeting where Lehman's Head of Corporate Audit made a presentation on the results of the investigation in to Lee's allegations, E&Y again failed to mention Repo 105.  At that meeting, the Audit Committee was told that "[c]orporate audit has largely completed an evaluation of [Lee's] observations in partnership with Financial Control and Ernst & Young."  In subsequent meetings and private executive sessions thereafter, E&Y also did not disclose that Lee made an allegation related to Repo 105 transactions being used to move assets off Lehman's balance sheet at quarter-end.  According to the Chair of the Audit Committee, he would have expected to be told about Lee's Repo 105 allegations.  Another Audit Committee member similarly said that the volume of Lehman's Repo 105 transactions mandated disclosure to the Audit Committee as well as further investigation.

232.    Additionally, despite the directive to investigate every claim raised by Lee, E&Y did not follow up on Lee's allegations or conduct any further inquiry into the Repo 105 transactions.  In fact, after E&Y's June 12, 2008 interview of Lee in which he described Lehman's moving $50 billion of inventory off its balance sheet at the end of the second quarter 2008, E&Y did not speak with him again.  Instead, less than four weeks after Schlich and Hansen interviewed Lee, E&Y

signed a Report of Independent Registered Public Accounting Firm for Lehman's 2Q08 10-Q on July 10, 2008, certifying that it was not aware of any material modifications that should be made to Lehman's financial statements for them to be in conformity with GAAP, and similarly failed to amend or correct its most recent audit opinion on the 2007 final financial statements or its report on the 1Q08 financial statements.

233.    The Examiner concluded "that sufficient evidence exists to support a colorable claim that":

> Ernst & Young should have made appropriate inquiries of management and performed analytical procedures concerning significant transactions that occurred at the ends of the quarters in 2008 and analyzed their impact upon the financial statements, including the footnotes.  Particularly after Lee alerted Ernst & Young to $50 billion in Repo 105 transactions prior to the filing of the second quarter Form 10-Q, Ernst & Young should have reported to senior management and the Audit Committee that Lehman was using Repo 105 transactions to temporarily and artificially reduce balance sheet and its net leverage ratio for reporting purposes, without disclosing the practice to the public.

> . . . Ernst & Young knew or should have known that the notes to the financial statements were false and misleading because, among other things, those notes describe all repos as "financings," which Ernst & Young knew was not the case, and those notes did not disclose the Repo 105 transactions.  Ernst & Young had a professional obligation to communicate the issue to both senior management and the Audit Committee and to recommend corrections of the Forms 10-Q, and also to either issue modified review reports noting the materially inadequate disclosures, or to withhold its review reports altogether.

### 3.    E&Y's Violation Of Auditing Standards

234.    One of the primary responsibilities of an external auditor is to express an opinion on whether the company's financial statements are presented fairly, in all material respects, in accordance with GAAP.  *See* AU § 110.  Similarly, "[t]he objective of a review of interim financial information is to provide the accountant with a basis for communicating whether . . . any material modifications that should be made to the interim financial information for it to conform with [GAAP]."  *See* AU § 722.09.  Interim Reviews also help facilitate the annual audit.  *See generally* AU § 722.

235.    GAAS standards have been established to ensure that external auditors fulfill their

obligations when auditing and reviewing financial statements and other information contained in SEC filings. GAAS consists of authoritative standards, originally established by the American Institute of Certified Public Accountants ("AICPA"), which were adopted, amended and expanded upon by the PCAOB, which auditors must comply with when they conduct audits and reviews. An auditor is required to perform its annual audits and quarterly reviews of financial information in accordance with GAAS, which include, *inter alia*: (1) ten basic standards establishing the objections of a financial statement audit and providing guidance for the quality of audit procedures to be performed; (2) interpretations of these standards by the AICPA, set forth in Statements on Auditing Standards ("AU"); and (3) additional standards promulgated by the PCAOB.

236.    E&Y's knowledge of Repo 105, the absence of a supportable business purpose and economic substance for such transactions, and the increased volume of Repo 105 transactions at quarter-end raised various obligations under GAAS that E&Y failed to meet.

237.    For example, General Standard No. 3 and AU § 230, *Due Professional Care in the Performance of Work*, required E&Y to exercise "due professional care" and "professional skepticism" in its quarterly reviews and annual audit of Lehman's Class Period financial results. E&Y violated GAAS in this regard because it knew of Lehman's use of Repo 105 but failed to: (1) review and/or audit adequately to address Repo 105 volumes at each period-end; (2) ensure that Repo 105 was not being employed to misstate materially Lehman's financial statements or to mislead investors; and (3) adequately address and resolve warnings regarding Lehman's potential misuse of these transactions. Further, E&Y failed to consider adequately the disclosures made (or not made) in the footnotes to Lehman's financial statements, and in comparison of the financial statements to disclosures included in the MD&A sections of Lehman's 2007 10-K and Forms 10-Q during the Class Period, regarding its Repo 105 transactions and secured financing arrangements.

238.    Standard of Fieldwork No. 1 and AU § 311 require an auditor to plan the audit engagement properly. AU § 316 further requires that an auditor specifically "assess the risk of material misstatement [of the financial statements] due to fraud" and should consider that

assessment in designing the audit procedures to be performed.  (AU § 316.02).  In violation of the foregoing GAAS, E&Y did not adequately plan its quarterly reviews and annual audit of Lehman during the Class Period to include procedures to address its knowledge of: (1) the magnitude and increased volume of Lehman's Repo 105 transactions at quarter-end; (2) Lehman's inability to obtain a U.S. legal opinion for "sale" treatment of these transactions under FAS 140; (3) Lehman's accounting for these transactions as "sales"; (4) Lehman's failure to ever disclose that it recorded repo arrangements as sales, instead asserting that all repos were recorded as financing arrangements; and (5) communications within Lehman and made to E&Y suggesting fraud through its Repo 105 program.  E&Y's failures in this regard were magnified by virtue of Lehman's own acknowledgement of the materiality of the Repo 105 transactions, as they clearly exceeded Lehman's own materiality threshold, measured by any transaction impacting the net leverage ratio by 0.1x, Lehman's expressed measure of materiality, which was communicated to E&Y.  Indeed, throughout the Class Period, Lehman's Repo 105 transactions moved this measure by a magnitude of 15 to 19 times Lehman's 0.1x net leverage ratio threshold.  *See* table 38, *infra*.

239.    GAAS also requires an auditor to sufficiently assess audit risk, defined as "the risk that the auditor may unknowingly fail to appropriately modify his or her opinion on financial statements that are materially misstated."  AU § 312.02, *Audit Risk and Materiality in Conducting an Audit*; *see also* AU § 722.16.  In assessing audit risk, AU § 312 and AU § 722 require analytical procedures be performed especially when an auditor becomes aware of information leading it to question whether the company's financial results comply with GAAP, or if/when it otherwise believes that audit risk is too high, and that particular attention be paid to materiality.  E&Y violated these GAAS provisions because it (1) was aware of Lehman's Repo 105 program and its impact, by virtue of the accounting treatments, on the balance sheet; (2) ignored that Repo 105 volumes spiked at period-end; (3) failed to conduct an adequate assessment of these known significant and unusually timed transactions; and (4) failed to ensure that Lehman made full and proper disclosure of the same in its public filings.

240.    AU §§ 336 and 9336 address an auditor's use of a legal opinion as evidential matter supporting, for instance, a management assertion that a financial asset transfer meets the "isolation" criterion in FASB 140.  AU § 9336 states that a legal letter that includes conclusions using certain qualifying language would not provide persuasive evidence that a transfer of financial assets has met the isolation criterion of FAS.  Not only was the Linklaters opinion replete with the kinds of qualifying statements discussed as examples in AU § 9336, but E&Y knew that no U.S. law firm would approve Lehman's "sale" treatment of its Repo 105 transactions and that Lehman had to conduct its Repo 105 transactions through its U.K.-based subsidiary, LBIE.  As E&Y ignored these red flags, it did not have a reasonable basis to rely upon the Linklaters Opinion and, thus, failed to obtain sufficient evidential matter to support its statements that Lehman's financial results complied with GAAP and, in all material respects, fairly presented its financial condition.

241.    AU § 561, *Subsequent Discovery of Facts Existing at the Date of the Auditor's Report*, requires an auditor to consider events or indications of potential errors in a company's financial statements and to determine whether the event, if known and recorded, would have had a material impact on the previously-issued financial statements.  In violation of the foregoing, E&Y took no action to adequately address the allegations communicated by Lee with respect to Repo 105, failed to withdraw or amend its prior audit opinions and/or interim reports, and failed to cause the Company to correct prior period financials.

### G.      Loss Causation

242.    Between June 12, 2007 and September 15, 2008, the price of Lehman common stock was artificially inflated as a result of the material misrepresentations and omissions set forth above. The artificial inflation was removed through a series of partial disclosures and the materialization of previously-concealed risks.

243.    On June 9, 2008, before the markets opened, Lehman issued a press release announcing its financial results for its second quarter of 2008 ending on May 31, 2008.  Despite having previously announced success with its delevering plan, its strong liquidity position, that it

had risk management policies in place and that its assets were fairly valued, the press release disclosed that Lehman took $4 billion in mark-to-market write downs, including $2.4 billion in residential mortgage related holdings, $700 million in commercial positions, and $300 million in real estate held for sale.  In addition, the Company announced that it would raise $6 billion through a combined offering of preferred and common shares.  On this news, Lehman's shares declined 8.7% and continued to fall an additional 19.44% over the next two days.  In addition, rating agencies Fitch and Moody's downgraded Lehman's credit rating.   However, the June 9 announcement only partially revealed the truth, and Lehman continued to misrepresent its financial condition.

244.    On September 8, 2008, Lehman announced that it would release its third quarter 2008 results and key strategic initiatives for the Company on September 18.  Analysts at Bernstein Research and Oppenheimer predicted further write downs in the third quarter of between $4 and $5 billion.  In addition, there were market reports of Lehman's potential sale of assets to raise capital, that market commentators said smacked of desperation and indicated problems with Lehman's liquidity position.  As a result of this news, Lehman's shares finished the trading day down 12.7%.

245.    On September 9, 2008, there were market reports that Lehman's attempts to obtain a capital infusion from the Korea Development Bank had failed, leading to concerns that "no one will inject capital" into Lehman.  In addition, S&P and Fitch both placed their ratings on Lehman on review for downgrade.  S&P specifically cited concerns about Lehman's ability to raise capital.  On this news, Lehman's shares declined 45% from the prior day's price to close at $7.79 per share.

246.    On September 10, 2008, Lehman reported a $3.9 billion loss for the third quarter of 2008, as well as $7 billion in gross write downs on its residential and commercial real estate holdings, despite having previously announced success with its delevering plan, its strong liquidity position, that it had risk management policies in place and that its assets had been fairly valued.  In announcing the results during the conference call, Defendant Lowitt, having replaced Callan as CFO, also disclosed that "[t]he majority of our write downs were in Alt-A driven by increase in Alt-

-84-

A delinquencies and loss expectations which were specific to Alt-A prices and did not affect the performance of our hedges."  Contrary to Defendants' earlier statements, Lowitt admitted that "unfortunately there is no direct hedge for Alt-A assets. . . ."  In addition, Fitch and Dunn & Bradstreet downgraded Lehman's credit rating.  On this news Lehman's shares declined 7% from the prior days close to $7.25 per share.

247.    On September 15, 2008, Lehman filed for bankruptcy protection because it had "significant liquidity problems."  As a result, Lehman's shares declined over 94% on that date.

248.    The disclosures regarding Lehman's massive write-downs and liquidity problems (which led to Lehman's bankruptcy) revealed the truth about Lehman's financial condition and represented the materialization of several interrelated, concealed risks from Lehman's disregard for its risk limits and its massive Repo 105 transactions which masked the Company's net leverage and true liquidity issues.  As set forth above, as a direct result of Lehman's failure to abide by its risk limits and risk management policies, Lehman acquired tens of billions of dollars of highly risky, illiquid assets that ultimately required enormous write-downs and triggered the liquidity crisis that ended Lehman's existence.  During the Class Period, in order to conceal the problems with its balance sheet, and in particular the amount of troubled assets it held, Lehman engaged in tens of billions of dollars worth of Repo 105 transactions in order to remove temporarily assets from its balance sheet solely for reporting purposes.  Through these sham transactions, Lehman artificially reduced its net leverage ratio, fraudulently preserved its credit ratings, and created the appearance that Lehman was more capitalized and liquid than it really was.  As the Examiner found, Lehman's Repo 105 program concealed the adverse impact its increasingly "sticky" inventory – which consisted mostly of illiquid residential and commercial real estate that Lehman could not sell without taking significant losses – was having on Lehman's publicly reported net leverage and balance sheet.

249.    Indeed, the Repo 105 transactions masked the marked deterioration in Lehman's illiquid assets by allowing Lehman to report reduced net leverage even while continuing to hold

such illiquid assets without selling or marking them down.  According to internal Lehman documents, Repo 105 was utilized to "offset the balance sheet and leverage impact of current market conditions"; "exiting large CMBS positions in Real Estate and subprime loans in Mortgages before quarter end" would otherwise require Lehman to "incur large losses due to the steep discounts that they would have to be offered at," but that "[a] Repo 105 increase would help avoid this without negatively impacting our leverage ratios."  In sum, through the use of Repo 105, Lehman led the market to believe that Lehman had effectively de-leveraged its balance sheet and reduced its exposure to risky assets when, in fact, the opposite was true.  Accordingly, the disclosures referenced above revealed what Repo 105 had concealed; namely, that Lehman held a massive amount of illiquid assets that required write-downs of billions of dollars, that Lehman's leverage was higher than reported, and that Lehman's liquidity had been misrepresented.

250.    The declines in the price of Lehman's common stock and resulting losses are directly attributable to the disclosure of information and materialization of risks that were previously misrepresented or concealed by the Insider Defendants and E&Y.  Had Plaintiffs and other members of the Class known of the material adverse information not disclosed by the Insider Defendants and E&Y or been aware of the truth behind their material misstatements, they would not have purchased Lehman common stock or call options at artificially inflated prices, and would not have sold put options.

## VIII.   CAUSES OF ACTION UNDER THE EXCHANGE ACT

### COUNT IV

**Violations Of Section 10(b) Of The Exchange Act And
Rule 10b-5 Promulgated Thereunder Against The Insider Defendants And E&Y**

251.    Plaintiffs repeat and reallege the allegations set forth above as though fully set forth herein, except for those allegations disclaiming any attempt to allege fraud, and further allege as follows.

252.    This claim is asserted against the Insider Defendants, namely, Fuld, O'Meara, Gregory, Callan and Lowitt, as well as against Lehman auditor E&Y ("Exchange Act Defendants")

-86-

on behalf of Plaintiffs and other members of the Class who purchased or otherwise acquired Lehman common stock and call options and/or who sold put options during the Class Period and were damaged thereby.  But for the fact that Lehman has filed for bankruptcy protection, the Company itself would have been named as a Defendant in this Count for violating Section 10(b) of the Exchange Act.

253.    Each of the Exchange Act Defendants, individually and/or in concert, by the use of means or instrumentalities of interstate commerce and/or of the United States mail (1) employed devices, schemes, and artifices to defraud; (2) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; (3) deceived the investing public, including Plaintiffs and other Class members; (4) artificially inflated and maintained the market price of Lehman common stock and options; and (5) caused Plaintiffs and other members of the Class to purchase Lehman common stock and options at artificially inflated prices and suffer losses.  The Insider Defendants were primary participants in the wrongful and illegal conduct charged herein.

254.    Each of the Insider Defendants was the top officer and controlling person of Lehman, and had direct involvement in its day-to-day operations.  The materially misstated information presented in group-published documents, including Lehman's Forms 8-K, 10-Q and 10-K, was the collective actions of these Defendants.  These Defendants were each involved in drafting, producing, reviewing and/or disseminating the group-published documents at issue in this action during his or her tenure with the Company.

255.    The Exchange Act Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were readily available to them. The Insider Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Lehman's financial condition and results of

operations, business practices and future business prospects from the investing public and supporting the artificially inflated price of its securities.

256.    As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of Lehman common stock and options was artificially inflated and caused loss to Plaintiffs when Lehman's stock price fell in response to the issuance of partial corrective disclosures and/or the materialization of risks previously concealed by the Exchange Act Defendants.

257.    By virtue of the foregoing, the Exchange Act Defendants each violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

258.    This claim was brought within two years after the discovery of the fraud and within five years of the making of the materially false and misleading statements alleged herein.

259.    As a direct and proximate result of the wrongful conduct of the Defendants named in this Count, Plaintiffs and the other Class members suffered damages in connection with their purchases or acquisitions of the Company's common stock and call options and/or sale of put options.

### COUNT V

### Violations Of Section 20(a) Of The
### Exchange Act Against The Insider Defendants

260.    Plaintiffs repeat and reallege each and every allegation contained above as if set forth fully herein, except for those allegations disclaiming any attempt to allege fraud, and further allege as follows.

261.    This claim is asserted against the Insider Defendants on behalf of Plaintiffs and other members of the Class who purchased or otherwise acquired Lehman common stock and call options and/or who sold put options during the Class Period and were damaged thereby.

262.    The Insider Defendants were and acted as controlling persons of Lehman within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions with the Company, participation in and/or awareness of the Company's operations, direct

involvement in the day-to-day operations of the Company, and/or intimate knowledge of the Company's actual performance, the Insider Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements, which Plaintiffs contend are false and misleading.  Each of the Insider Defendants was provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the false statements and material omission or cause such misleading statements and omissions to be corrected.  In addition, Defendants Fuld and Gregory, through their positions as CEO and President of Lehman, respectively, controlled the remaining Insider Defendants, including Callan, Lowitt and O'Meara.

263.    As set forth above, the Insider Defendants and Lehman itself each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint.  Due to their controlling positions over Lehman and, with respect to Fuld and Gregory, their control over the remaining Insider Defendants, the Insider Defendants are each liable pursuant to Section 20(a) of the Exchange Act having culpably participated in the fraud.  As a direct and proximate result of the Insider Defendants' wrongful conduct, Plaintiffs and other members of the Class suffered damages in connection with their purchases or acquisitions of the Company's common stock and call options and/or sale of put options.

## COUNT VI

### Violations Of Section 20A Of The
### Exchange Act Against Defendant Fuld

264.    Plaintiffs repeat and reallege each of the allegations set forth above as if fully set forth herein.

265.    This Count is brought pursuant to Section 20A of the Exchange Act against Defendant Fuld on behalf of all members of the Class damaged by Defendant Fuld's insider trading.

266.    As detailed herein, Defendant Fuld was in possession of material, non-public information concerning Lehman.  Defendant Fuld took advantage of his possession of material, non-public information regarding Lehman to obtain millions of dollars in insider trading profits during the Class Period.

267.    Defendant Fuld's sale of Lehman securities was made contemporaneously with Plaintiffs' and Class members' purchases of Lehman common stock during the Class Period.

268.    For example, on June 13, 2007, Defendant Fuld sold 291,864 shares of stock at average price of $77.83 per share for proceeds of $22,692,426.  On June 14, 2007, Lead Plaintiff NILGOSC purchased 1,300 shares of Lehman at $78.3963 per share, for a total cost of $101,915.19.  On June 15, 2007, NILGOSC purchased 1,800 shares of Lehman at $79.5325 per share, for a total cost of $143,158.50.  Also on June 15, 2007, NILGOSC purchased 100 shares of Lehman at $79.70 per share, for a total cost of $7,970.  On June 19, 2007, Lead Plaintiff Operating Engineers purchased 4,500 shares of Lehman at $80.9702 per share, for a total cost of $364,365.90.  Similarly, on June 20, 2007, Operating Engineers purchased 2,200 shares of Lehman at $81.6462 per share, for a total cost of $179,621.64.

269.    All members of the Class who purchased shares of Lehman common stock contemporaneously with sales by Defendant Fuld have suffered damages because: (1) in reliance on the integrity of the market, they paid artificially inflated prices as a result of the violations of Section 10(b) and 20(a) of the Exchange Act as alleged herein; and (2) they would not have purchased the securities at the prices they paid, or at all, if they had been aware that the market prices had been artificially inflated by the false and misleading statements and concealment alleged herein.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on their own behalf and on behalf of the Class, pray for judgment as follows:

(a)    Declaring this action to be a class action pursuant to Fed. R. Civ. P. 23(a) and (b)(3);

(b)     Awarding Plaintiffs and the other members of the Class damages in an amount which may be proven at trial, together with interest thereon;

(c)     Awarding Plaintiffs and the members of the Class pre-judgment and post-judgment interest, as well as their reasonable attorneys' and expert witness' fees and other costs;

(d)     Ordering Defendant Fuld to disgorge the profits of his insider sales of Lehman common stock during the Class Period;

(e)     Awarding Plaintiffs and the members of the Class rescission and/or rescissory damages; and

(f)     Such other relief as this Court deems appropriate.

**DEMAND FOR JURY TRIAL**

   Plaintiffs demand a trial by jury.

Dated: April 23, 2010

      BERNSTEIN LITOWITZ BERGER
       & GROSSMANN LLP

      DAVID R. STICKNEY

      MAX W. BERGER
      STEVEN B. SINGER
      BOAZ WEINSTEIN
      1285 Avenue of the Americas, 38th Floor
      New York, NY 10019
      Tel: (212) 554-1400
      Fax: (212) 554-1444
        -and-
      DAVID R. STICKNEY
      ELIZABETH P. LIN
      JON F. WORM
      12481 High Bluff Drive, Suite 300
      San Diego, CA 92130
      Tel: (858) 793-0070
      Fax: (858) 793-0323

      *Co-Lead Counsel for Plaintiffs*

      BARROWAY TOPAZ KESSLER
       MELTZER & CHECK, LLP

      DAVID KESSLER  *by DRS*

      DAVID KESSLER
      JOHN A. KEHOE
      BENJAMIN J. HINERFELD
      MICHELLE M. NEWCOMER
      RICHARD A. RUSSO, JR.
      NICOLE BROWNING
      280 King of Prussia Road
      Radnor, PA 19087
      Tel: (610) 667-7706
      Fax: (610) 667-7056

      *Co-Lead Counsel for Plaintiffs*

GIRARD GIBBS LLP
DANIEL C. GIRARD
JONATHAN K. LEVINE
AMANDA M. STEINER
CHRISTINA H. C. SHARP
601 California Street, 14th Floor
San Francisco, CA 94108
Tel:    (415) 981-4800
Fax:    (415) 981-4846

*Counsel for Plaintiffs Stephen A. Gott, Karim Kano,
Ronald Profili, Grace Wang, Mohan Ananda, Richard
Barrett, Neel Duncan, Nick Fotinos, Fred Mandell,
Barbara Moskowitz, Stacey Oyler, Lawrence Rose, Joe
Rottman, Roy Wiegert and Miriam Wolf*


GRANT & EISENHOFER P.A.
JAY W. EISENHOFER
JAMES J. SABELLA
KEITH FLEISCHMAN
485 Lexington Avenue
New York, NY  10017
Tel:    (646) 722-8500
Fax:    (646) 722-8501


LAW OFFICES BERNARD M. GROSS P.C.
DEBORAH R. GROSS
100 Penn Square East, Suite 450
Philadelphia, PA  19107
Tel:    (215) 561-3600
Fax:    (215) 561-3000

*Counsel for Plaintiff Belmont Holdings Corp.*

SPECTOR ROSEMAN KODROFF
   & WILLIS, P.C.
ROBERT M. ROSEMAN (RR-1103)
ANDREW D. ABRAMOWITZ
DAVID FELDERMAN
RACHEL E. KOPP
1818 Market Street, Suite 2500
Philadelphia, PA 19103
Tel:   (215) 496-0300
Fax:   (215) 496-6611

*Counsel for Lead Plaintiff Northern Ireland Local*
*Government Officers' Superannuation Committee*

LABATON SUCHAROW LLP
CHRISTOPHER J. KELLER
THOMAS A. DUBBS
ERIC J. BELFI
JONATHAN GARDNER
140 Broadway
New York, NY 10005
Tel:   (212) 907-0853
Fax:   (212) 818-0477

*Counsel for Lead Plaintiff City of Edinburgh Council*
*as Administering Authority of the Lothian Pension*
*Fund*

SAXENA WHITE P.A.
MAYA SAXENA
JOSEPH E. WHITE III
CHRISTOPHER S. JONES
LESTER R. HOOKER
2424 North Federal Highway, Suite 257
Boca Raton, FL 33431
Tel:   (561) 394-3399
Fax:   (561) 394-3382

*Counsel for Lead Plaintiff Operating Engineers Local*
*3 Trust Fund, named Plaintiff Brockton Contributory*
*Retirement System, and named Plaintiff Teamsters*
*Allied Benefit Funds*

MURRAY, FRANK & SAILER LLP
MARVIN L. FRANK
EVA HROMADKOVA
275 Madison Ave., Suite 801
New York, NY 10016
Tel:   (212) 682-1818
Fax:   (212) 682-1892

*Counsel for Plaintiff Marsha Kosseff*


POMERANTZ HAUDEK BLOCK
   GROSSMAN & GROSS LLP
MARC I. GROSS
100 Park Avenue
New York, NY 10017
Tel:   (212) 661-1100
Fax:   (212) 661-8665

*Counsel for Plaintiff American European Insurance Company*


BONNETT FAIRBOURN FRIEDMAN
   & BALINT, P.C.
ANDREW S. FRIEDMAN
2901 North Central Avenue, Suite 1000
Phoenix, AZ 85012
Tel:   (602) 274-1100
Fax:   (602) 274 1199

*Counsel for Plaintiff the Shea-Edwards Limited Partnership*


TIFFANY & BOSCO P.A.
RICHARD G. HIMELRICK
2525 East Camelback Road
Phoenix, AZ 85016
Tel:   (602) 255-6000
Fax:   (602) 255-0103

*Counsel for Plaintiffs MJB Living Trust dated February 12, 2002 and the Shea-Edwards Limited Partnership*

ZWERLING, SCHACHTER & ZWERLING, LLP
RICHARD A. SPEIRS
41 Madison Avenue
New York, NY 10010
Tel:     (212) 223-3900
Fax:     (212) 371-5969

*Counsel for Plaintiffs Rick Fleischman and Francisco Perez*

LAW OFFICES OF JAMES V. BASHIAN, P.C.
JAMES V. BASHIAN
500 Fifth Avenue, Suite 2700
New York, NY 10110
Tel:     (212) 921-4100
Fax:     (212) 921-4229

*Counsel for Plaintiffs Island Medical Group, Fred Telling, Carla LaGrassa, Robert Feinerman Irwin and Phyllis Ingwer, Stuart Bregman, Steven and Sydney Ratnow, and David Kotz*

## CERTIFICATION OF PLAINTIFF PURSUANT
## TO THE FEDERAL SECURITIES LAWS

I, Mohan Ananda, declare the following as to the claims asserted, or to be asserted, under the federal securities laws:

1.     I am the trustee of the Rajee Ananda Rollover IRA and the Mohan Ananda Traditional IRA. I have full authority to act on behalf of the Rajee Ananda Rollover IRA and the Mohan Ananda Traditional IRA (collectively, the "Ananda Entities"), including the authority to make all investment decisions and the authority to bring or participate in a lawsuit under the federal securities laws.

2.     I have reviewed the complaint against UBS Financial Services and the officers and directors of Lehman Brothers Holdings, Inc., among others, prepared by Girard Gibbs LLP, whom I designate as my counsel and counsel for the Ananda Entities in this action for all purposes.

3.     Neither I nor the Ananda Entities acquired any Lehman Brothers securities at the direction of Girard Gibbs LLP or in order to participate in any private action under the federal securities laws.

4.     I am willing to serve as a named plaintiff on behalf of the Ananda entities. On behalf of the Ananda Entities, I understand that a named plaintiff is a representative party who acts on behalf of other class members in directing the litigation, and whose duties may include testifying at deposition or trial.

5.     Neither I nor the Ananda Entities will accept any payment for serving as a representative party beyond the Ananda Entities' pro rata share of any recovery, except

reasonable costs and expenses, such as lost wages and travel expenses, directly related to the class representation, as ordered or approved by the Court pursuant to law.

6.      Neither I nor the Ananda Entities have sought to serve or served as a representative party for a class in an action under the federal securities laws within the past three years.

7.      I understand that this is not a claim form, and that the Ananda Entities' ability to share in any recovery as a class member is not affected by the decision to serve as a representative party.

8.      The Ananda Entities' purchases and sales of Lehman Brothers securities during the relevant time period are listed in **Attachment A** to this document.

9.      I declare under penalty of perjury that the foregoing is true and correct.

Executed this ____ day of April, 2010

Mohan Ananda

2

# MOHAN ANANDA

## ATTACHMENT A

### Account: Mohan Ananda Traditional IRA

| TRADE DATE | SECURITY | NUMBER OF SHARES | PRICE PER NOTE/UNIT | BUY OR SELL |
|---|---|---|---|---|
| 3/23/2007 | 100% Principal Protection Notes Linked to a Global Index Basket | 5,000 | $10.00 | Bought |
| 1/28/2008 | 100% Principal Protection Absolute Return Barrier Notes Linked to the S&P 500 Index | 20,000 | $10.00 | Bought |

### Account: Rajee Ananda Rollover IRA

| TRADE DATE | SECURITY | NUMBER OF SHARES | PRICE PER NOTE/UNIT | BUY OR SELL |
|---|---|---|---|---|
| 8/28/2007 | 100% Principal Protection Notes Linked to a Global Index Basket | 2,500 | $10.00 | Bought |
| 8/28/2007 | 100% Principal Protection Linked to an International Index Basket | 2,500 | $10.00 | Bought |

## CERTIFICATION OF PLAINTIFF PURSUANT
## TO THE FEDERAL SECURITIES LAWS

I, **Richard Barrett**, declare the following as to the claims asserted, or to be asserted, under the federal securities laws:

1.      I have reviewed the complaint against UBS Financial Services and the officers and directors of Lehman Brothers Holdings, Inc., among others, prepared by Girard Gibbs LLP, whom I designate as my counsel in this action for all purposes.  At this time, I adopt the allegations in the complaint.

2.      I did not acquire any Lehman Brothers securities at the direction of Girard Gibbs LLP or in order to participate in any private action under the federal securities laws.

3.      I am willing to serve as a named plaintiff.  I understand that a named plaintiff is a representative party who acts on behalf of other class members in directing the litigation, and whose duties may include testifying at deposition or trial.

4.      I will not accept any payment for serving as a representative party beyond my pro rata share of any recovery, except reasonable costs and expenses, such as lost wages and travel expenses, directly related to the class representation, as ordered or approved by the Court pursuant to law.

5.      I have not sought to serve or served as a representative party for a class in an action under the federal securities laws within the past three years.

6.      I understand that this is not a claim form, and that my ability to share in any recovery as a class member is not affected by my decision to serve as a representative party.

1

7.    My purchases and sales of Lehman Brothers securities during the relevant time period are listed in **Attachment A** to this document.

8.    I declare under penalty of perjury that the foregoing is true and correct.

Executed this 14th day of April, 2010

_Richard Barrett_

Richard Barrett

# RICHARD BARRETT

## ATTACHMENT A

| TRADE DATE | SECURITY | NUMBER OF SHARES | PRICE PER NOTE/UNIT | BUY OR SELL |
|---|---|---|---|---|
| 11/27/2007 | 100% Principal Protection Notes Linked to an Asian Currency Basket | 1,000 | $10.00 | Bought |

## CERTIFICATION OF NAMED PLAINTIFF
## PURSUANT TO FEDERAL SECURITIES LAWS

I, Stuart Bregman , ("Plaintiff") certify:

1.      I have reviewed the complaint and authorized its filing on behalf of Plaintiff. Plaintiff retains the Law Offices of James V. Bashian, P.C. to pursue such action on a contingent fee basis.

2.      Plaintiff did not purchase or acquire the securities that are the subject of this action at the direction of plaintiff's counsel or in order to participate in any private action arising under the Federal securities laws.

3.      Plaintiff is willing to serve as a representative party on behalf of a class, including providing testimony at deposition and trial, if necessary.  Plaintiff understands that if the litigation is not settled, this is not a claim form, and sharing in any recovery is not dependent upon execution of this certification.

4.      The following constitute Plaintiff's transactions in the security that is the subject of this litigation during the class period set forth in the complaint:

### TRANSACTIONS

| PRODUCT | DATE PURCHASED | NOTES PURCHASED | AMOUNT OF TRANSACTION | Price Per Note |
|---|---|---|---|---|
| Lehman Brothers Holding, Inc. Global Basket Part Protected Participation Note Due 8/2/2010 <br><br> Cusip 524908j92 | August 01, 2007 | 100 | 100,000 | 1,000 |

1

| Lehman Brothers Holding, Inc. Medium Term Notes at 9.50% Due 12/28/2022 Cusip 5252MOAY3 | December 28, 2007 | 200 | 200,000 | 1,000 |
| Lehman Brothers Holding, Inc. Buff Ret Enb Notes Due 2/22/10 Cusip 5252MOdh7 | February 20, 2008 | 200 | 200,000 | 1,000 |

5.    Plaintiff has not served as or sought to serve as a representative party on behalf of a class under this title during the last three years.

6.    I will not accept any payment for serving as a representative party, except to receive my pro rata share of any recovery or as ordered or approved by the court including the award to a representative of reasonable costs and expenses (including lost wages) directly relating to the representation of the class.

The foregoing are, to the best of my knowledge and belief, true and correct statements.

Dated:  New York, New York
        December 1, 2008

Stuart Bregman

2

## CERTIFICATION PURSUANT TO
## THE FEDERAL SECURITIES LAWS

I, John Buzanowski, hereby certify, as to the claims asserted under the federal securities laws, that:

1.  I have reviewed the complaint and authorized its filing.

2.  I did not purchase the securities that are the subject of this action at the direction of counsel or in order to participate in any action arising under the federal securities laws.

3.  I am willing to serve as a plaintiff and representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4.  My transactions in the Lehman securities that are the subject of this action during the proposed class period are set forth below:

| Transaction | Security | Price | Quantity | Trade Date |
|---|---|---|---|---|
| Purchase | 6.25% Notes (52519FFE6) | $1000 | 100 | 01/31/2008 |

5.  I have not sought to serve as a lead plaintiff and/or representative party on behalf of a class in any actions under the federal securities laws filed during the three-year period preceding the date of this Certification.

6.  I will not accept any payment for serving as a representative party on behalf of the Class beyond my pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the Class, as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct.  Executed  this  21 day of April, 2010.

John Buzanowski

## CERTIFICATION OF PLAINTIFF PURSUANT
## TO THE FEDERAL SECURITIES LAWS

I, Ed Davis, declare the following as to the claims asserted, or to be asserted, under the federal securities laws:

1.      I have reviewed the complaint against UBS Financial Services and the officers and directors of Lehman Brothers Holdings, Inc., among others, and have retained Zwerling, Schachter & Zwerling, LLP ("ZSZ") to represent me in connection therewith and in related litigation in connection with the securities that are set forth in this certification .

2.      I did not acquire any Lehman Brothers securities at the direction of ZSZ or in order to participate in any private action under the federal securities laws.

3.      I am willing to serve as a named plaintiff. I understand that a named plaintiff is a representative party who acts on behalf of other class members in directing the litigation, and whose duties may include testifying at deposition or trial.

4.      I will not accept any payment for serving as a representative party beyond my pro rata share of any recovery, except reasonable costs and expenses, such as lost wages and travel expenses, directly related to the class representation, as ordered or approved by the Court pursuant to law.

5.      I have not sought to serve or served as a representative party for a class in an action under the federal securities laws within the past three years.

6.      I understand that this is not a claim form, and that my ability to share in any recovery as a class member is not affected by my decision to serve as a representative party.

1

7.   My purchases and sales of Lehman Brothers securities during the relevant
time period are as follows:

| TRADE DATE | BUY | SELL | TOTAL PRICE |
|---|---|---|---|
| June 2008 | 100% Principal Protection Absolute Return Barrier Notes (CUSIP: 52523J255) | | $50,000 |
| June 2008 | 100% Principal Protection Absolute Return Barrier Notes (CUSIP: 52523J248) | | $50,000 |

8.   I declare under penalty of perjury that the foregoing is true and correct.

Executed this ___ day of April, 2010

Ed Davis
Ed Davis

2

## CERTIFICATION OF PLAINTIFF PURSUANT
## TO THE FEDERAL SECURITIES LAWS

I, Neel Duncan, declare the following as to the claims asserted, or to be asserted, under the federal securities laws:

1.  I have reviewed the complaint against UBS Financial Services and the officers and directors of Lehman Brothers Holdings, Inc., among others, prepared by Girard Gibbs LLP, whom I designate as my counsel in this action for all purposes.

2.  I did not acquire any Lehman Brothers securities at the direction of Girard Gibbs LLP or in order to participate in any private action under the federal securities laws.

3.  I am willing to serve as a named plaintiff. I understand that a named plaintiff is a representative party who acts on behalf of other class members in directing the litigation, and whose duties may include testifying at deposition or trial.

4.  I will not accept any payment for serving as a representative party beyond my pro rata share of any recovery, except reasonable costs and expenses, such as lost wages and travel expenses, directly related to the class representation, as ordered or approved by the Court pursuant to law.

5.  I have not sought to serve or served as a representative party for a class in an action under the federal securities laws within the past three years.

6.  I understand that this is not a claim form, and that my ability to share in any recovery as a class member is not affected by my decision to serve as a representative party.

7.  My purchases and sales of Lehman Brothers securities during the relevant time period are listed in **Attachment A** to this document.

1

8.   I declare under penalty of perjury that the foregoing is true and correct.

Executed this **19**ᵗʰ day of April, 2010

_____
Neel Duncan

2

**NEEL DUNCAN**

**ATTACHMENT A**

| TRADE DATE | SECURITY | NUMBER OF SHARES | PRICE PER NOTE/UNIT | BUY OR SELL |
|---|---|---|---|---|
| 10/25/2007 | 100% Principal Protection Notes Linked to an Asian Currency Basket | 8,000 | $10.00 | Bought |

## CERTIFICATION OF NAMED PLAINTIFF
## PURSUANT TO FEDERAL SECURITIES LAWS

I,  Robert Feinerman, ("Plaintiff") certify:

1.       I have reviewed the complaint and authorized its filing on behalf of Plaintiff.  Plaintiff retains James V. Bashian of the Law Offices of James V. Bashian, P.C. to pursue such action on a contingent fee basis.

2.       Plaintiff did not purchase or acquire the securities that are the subject of this action at the direction of plaintiff's counsel or in order to participate in any private action arising under the Federal securities laws.

3.       Plaintiff is willing to serve as a representative party on behalf of a class, including providing testimony at deposition and trial, if necessary.  Plaintiff understands that if the litigation is not settled, this is not a claim form, and sharing in any recovery is not dependent upon execution of this certification.

4.       The following constitute Plaintiff's transactions in the security that is the subject of this litigation during the class period set forth in the complaint:

### TRANSACTIONS

| PRODUCT | DATE PURCHASED | NOTES PURCHASED | AMOUNT OF TRANSACTION | Price Per Note |
|---|---|---|---|---|
| Lehman Brothers Holding, Inc. Medium Term Notes Due 12/28/2022 at 9.5% Cusip # 5252MOAY3 | December 28, 2007 | 100 | 100,000 | 1,000 |

1

| | | | | |
|---|---|---|---|---|
| Lehman Brothers Holding, Inc. Medium Term Notes Due 1/30/2023 at 9.5%<br><br>Cusip # 5252MOBX4 | January 30 , 2008 | 100 | 100,000 | 1,000 |
| Lehman Brothers Holding, Inc. Medium Term Notes Due 3/13/2023 at 10%<br><br>Cusip #5252MOEH6 | March 14, 2008 | 100 | 100,000 | 1,000 |
| Lehman Brothers Holding, Inc. Buffered Enhanced Notes due 2/22/2010<br><br>5252MODH7 | February 20, 2008 | 200 | 200,000 | 2,000 |
| | | | | |

5.      Plaintiff has not served as or sought to serve as a representative party on behalf of a class under this title during the last three years.

6.      I will not accept any payment for serving as a representative party, except to receive my pro rata share of any recovery or as ordered or approved by the court including the award to a representative of reasonable costs and expenses (including lost wages) directly relating to the representation of the class.

2

The foregoing are, to the best of my knowledge and belief, true and correct statements.

Dated:  New York, New York
        April 19   , 2010

_____
Robert Feinerman

3

## CERTIFICATION OF PLAINTIFF PURSUANT
## TO THE FEDERAL SECURITIES LAWS

I, Nick C. Fotinos, declare the following as to the claims asserted, or to be asserted, under the federal securities laws:

1.      I have reviewed the complaint against UBS Financial Services and the officers and directors of Lehman Brothers Holdings, Inc., among others, prepared by Girard Gibbs LLP, whom I designate as my counsel in this action for all purposes.  At this time, I adopt the allegations in the complaint.

2.      I did not acquire any Lehman Brothers securities at the direction of Girard Gibbs LLP or in order to participate in any private action under the federal securities laws.

3.      I am willing to serve as a named plaintiff.  I understand that a named plaintiff is a representative party who acts on behalf of other class members in directing the litigation, and whose duties may include testifying at deposition or trial.

4.      I will not accept any payment for serving as a representative party beyond my pro rata share of any recovery, except reasonable costs and expenses, such as lost wages and travel expenses, directly related to the class representation, as ordered or approved by the Court pursuant to law.

5.      I have not sought to serve or served as a representative party for a class in an action under the federal securities laws within the past three years.

6.      I understand that this is not a claim form, and that my ability to share in any recovery as a class member is not affected by my decision to serve as a representative party.

1

7.    My purchases and sales of Lehman Brothers securities during the relevant time period are listed in **Attachment A** to this document.

8.    I declare under penalty of perjury that the foregoing is true and correct.

Executed this _10_ day of April, 2010

Nick C. Fotinos

2

# NICK C. FOTINOS

## ATTACHMENT A

| TRADE DATE | SECURITY | NUMBER OF SHARES | PRICE PER NOTE/UNIT | BUY OR SELL |
|---|---|---|---|---|
| 10/26/2007 | 100% Principal Protection Absolute Return Barrier Notes Linked to the S&P 500 Index | 2,500 | $10.00 | Bought |
| 1/28/2008 | 100% Principal Protection Absolute Return Barrier Notes Linked to the S&P 500 Index | 5,184 | $10.00 | Bought |

**AMENDED CERTIFICATION OF NAMED PLAINTIFF
PURSUANT TO FEDERAL SECURITIES LAWS**

**Island Medical Group PC Retirement Trust f/b/o Irwin Ingwer**, ("Plaintiff") certify:

1.      I have reviewed the third amended complaint and authorized its filing on behalf of Plaintiff.  Plaintiff retains the Law Offices of James V. Bashian, P.C. to pursue such action on a contingent fee basis.

2.      Plaintiff did not purchase or acquire the securities that are the subject of this action at the direction of plaintiff's counsel or in order to participate in any private action arising under the Federal securities laws.

3.      Plaintiff is willing to serve as a representative party on behalf of a class, including providing testimony at deposition and trial, if necessary.  Plaintiff understands that if the litigation is not settled, this is not a claim form, and sharing in any recovery is not dependent upon execution of this certification.

4.      The following constitute Plaintiff's transactions in the security that is the subject of this litigation during the class period set forth in the complaint:

**TRANSACTIONS**

**Island Medical Group PC Retirement Trust f/b/o Irwin Ingwer**

| PRODUCT | DATE PURCHASED | NOTES PURCHASED | AMOUNT OF TRANSACTION | Price Per Note |
|---|---|---|---|---|
| Lehman Brothers Holding, Inc. Medium Term Notes at 9.50% Due 12/28/2022  - Cusip 5252m0ay3 | December 28, 2007 | 20 | 20,000 | 1,000 |
| Lehman Brothers Holdings, Inc. Medium Term Notes Due 05/19/2023 @ 10.00% Cusip 5252mofh5 | May 19, 2008 | 146 | 146,000 | 1,000 |
| Lehman Brothers Holdings, Inc. S&P Ann Rev Note w/Cont Prot Due 6/13/2011 5252m0gm3 | June 13, 2008 | 102 | 102,000 | 1,000 |

1

5.        Plaintiff has not served as or sought to serve as a representative party on behalf of a class under this title during the last three years.

6.        Plaintiff will not accept any payment for serving as a representative party, except to receive my pro rata share of any recovery or as ordered or approved by the court including the award to a representative of reasonable costs and expenses (including lost wages) directly relating to the representation of the class.

The foregoing are, to the best of my knowledge and belief, true and correct statements.

Dated:   New York, New York
         April 20, 2010

_____
Irwin Ingwer

_____
Steven Bourla, Trustee

2

## CERTIFICATION OF NAMED PLAINTIFF
## PURSUANT TO FEDERAL SECURITIES LAWS

**Irwin & Phyllis Ingwer,** ("Plaintiff") certify:

1.      We have reviewed the complaint and authorized its filing on behalf of Plaintiff.
Plaintiff retains the Law Offices of James V. Bashian, P.C. to pursue such action on a contingent fee
basis.

2.      Plaintiff did not purchase or acquire the securities that are the subject of this
action at the direction of plaintiff's counsel or in order to participate in any private action arising under the
Federal securities laws.

3.      Plaintiff is willing to serve as a representative party on behalf of a class,
including providing testimony at deposition and trial, if necessary.  Plaintiff understands that if the
litigation is not settled, this is not a claim form, and sharing in any recovery is not dependent upon
execution of this certification.

4.      The following constitute Plaintiff's transactions in the security that is the
subject of this litigation during the class period set forth in the complaint:

### TRANSACTIONS

**Irwin & Phyllis Ingwer**

| PRODUCT | DATE PURCHASED | NOTES PURCHASED | AMOUNT OF TRANSACTION | Price Per Note |
|---|---|---|---|---|
| Lehman Brothers Holding, Inc. SPX Index Buff Ann Rev Notes Due 8/22/2010<br><br>Cusip 52517 P4y4 | August 22, 2007 | 25 | 25,000 | 1,000 |
|  |  |  |  |  |

1

| Lehman Brothers Holding, Inc. Buff Ret Enh Notes Due 2/22/2010<br><br>Cusip 5252M0dh7 | February 20, 2008 | 70 | 70,000 | 1,000 |
|---|---|---|---|---|

**Irwin Ingwer IRA**

| PRODUCT | DATE PURCHASED | NOTES PURCHASED | AMOUNT OF TRANSACTION | Price Per Note |
|---|---|---|---|---|
| Lehman Brothers Holding, Inc. Medium Term Notes Due 2/16/2010<br><br>Cusip 5252M0dk0 | February 14, 2008 | 100 | 100,000 | 1,000 |
| Lehman Brothers Holding, Inc. Medium Term Notes Due 12/28/2022 @ 9.50%<br><br>Cusip 5252M0ay3 | December 28, 2007 | 15 | 15,000 | 1,000 |
| Lehman Brothers Holding, Inc. Medium Term Notes Due 1/30/2023 @ 9.50%<br><br>Cusip 5252 M0bx4 | January 31, 2008 | 40 | 40,000 | 1,000 |
| Lehman Brothers Holding, Inc. Medium Term Notes Due 2/27/2023 @ 9.00%<br><br>Cusip 5252 M0cq8 | February 27, 2008 | 6 | 6,000 | 1,000 |

2

Phyllis Ingwer IRA

| PRODUCT | DATE PURCHASED | NOTES PURCHASED | AMOUNT OF TRANSACTION | Price Per Note |
|---|---|---|---|---|
| Lehman Brothers Holding, Inc. Medium Term Notes Due 2/27/2023 at 9.00% CUSIP 5252 MOCQ 9 | February 27, 2008 | 35 | 35,000 | 1,000 |

5.    Plaintiff has not served as or sought to serve as a representative party on behalf of a class under this title during the last three years.

6.    Plaintiff will not accept any payment for serving as a representative party, except to receive my pro rata share of any recovery or as ordered or approved by the court including the award to a representative of reasonable costs and expenses (including lost wages) directly relating to the representation of the class.

The foregoing are, to the best of my knowledge and belief, true and correct statements.

Dated:  New York, New York
        December    , 2008

_____
Irwin Ingwer

_____
Phyllis Ingwer

3

## CERTIFICATION OF NAMED PLAINTIFF
## PURSUANT TO FEDERAL SECURITIES LAWS

I, David Kotz , ("Plaintiff") certify:

1.    I have reviewed the complaint and authorized its filing on behalf of Plaintiff.  Plaintiff retains James V. Bashian of the Law Offices of James V. Bashian, P.C. to pursue such action on a contingent fee basis.

2.    Plaintiff did not purchase or acquire the securities that are the subject of this action at the direction of plaintiff's counsel or in order to participate in any private action arising under the Federal securities laws.

3.    Plaintiff is willing to serve as a representative party on behalf of a class, including providing testimony at deposition and trial, if necessary.  Plaintiff understands that if the litigation is not settled, this is not a claim form, and sharing in any recovery is not dependent upon execution of this certification.

4.    The following constitute Plaintiff's transactions in the security that is the subject of this litigation during the class period set forth in the complaint:

### TRANSACTIONS

| PRODUCT | DATE PURCHASED | NOTES PURCHASED | AMOUNT OF TRANSACTION | Price Per Note |
|---|---|---|---|---|
| Lehman Brothers Return Optimization Security S&P 500 Financials 10% Principal Protection<br><br>Cusip 52523j230 | 05/27/08 | 10,000 | 100,000 | 10 |

1

5.    Plaintiff has not served as or sought to serve as a representative party on behalf of a class under this title during the last three years.

6.    I will not accept any payment for serving as a representative party, except to receive my pro rata share of any recovery or as ordered or approved by the court including the award to a representative of reasonable costs and expenses (including lost wages) directly relating to the representation of the class.

The foregoing are, to the best of my knowledge and belief, true and correct statements.

Dated: New York, New York
        April 19   , 2010

_____
DAVID KOTZ

2

## CERTIFICATION OF NAMED PLAINTIFF
## PURSUANT TO FEDERAL SECURITIES LAWS

I,  Carla La Grassa , ("Plaintiff") certify:

1.      I have reviewed the complaint and authorized its filing on behalf of Plaintiff.  Plaintiff retains James V. Bashian of the Law Offices of James V. Bashian, P.C. to pursue such action on a contingent fee basis.

2.      Plaintiff did not purchase or acquire the securities that are the subject of this action at the direction of plaintiff's counsel or in order to participate in any private action arising under the Federal securities laws.

3.      Plaintiff is willing to serve as a representative party on behalf of a class, including providing testimony at deposition and trial, if necessary.  Plaintiff understands that if the litigation is not settled, this is not a claim form, and sharing in any recovery is not dependent upon execution of this certification.

4.      The following constitute Plaintiff's transactions in the security that is the subject of this litigation during the class period set forth in the complaint:

### TRANSACTIONS

| PRODUCT | DATE PURCHASED | NOTES PURCHASED | AMOUNT OF TRANSACTION | Price Per Note |
|---|---|---|---|---|
| Lehman Brothers Holding, Inc. Medium Term Notes Due 08/29/2022  Cusip52517p4t5 | August 29, 2007 | 100 | 100,000 | 1,000 |

1

5.    Plaintiff has not served as or sought to serve as a representative party on behalf of a class under this title during the last three years.

6.    I will not accept any payment for serving as a representative party, except to receive my pro rata share of any recovery or as ordered or approved by the court including the award to a representative of reasonable costs and expenses (including lost wages) directly relating to the representation of the class.

The foregoing are, to the best of my knowledge and belief, true and correct statements.

Dated:  New York, New York
        2/20          , 2009

CARLA LAGRASSA

2

## CERTIFICATION OF PLAINTIFF PURSUANT
## TO THE FEDERAL SECURITIES LAWS

I, Fred H. Mandell, declare the following as to the claims asserted, or to be asserted, under the federal securities laws:

1.      I am the sole trustee of the Mandell & Shorr Inc. Defined Benefit Pension Plan (the "Plan") and the Fred H. Mandell Living Trust DTD 8/19/93 (the "Trust").  I have full authority to act on behalf of the Plan and the Trust, including the authority to make all investment decisions and the authority to bring or participate in a lawsuit under the federal securities laws.

2.      I have reviewed the complaint against UBS Financial Services and the officers and directors of Lehman Brothers Holdings, Inc., among others, prepared by Girard Gibbs LLP, whom I designate as my counsel and counsel for the Trust and the Plan in this action for all purposes.

3.      Neither the Plan nor the Trust acquired any Lehman Brothers structured notes at the direction of Girard Gibbs LLP or in order to participate in any private action under the federal securities laws.

4.      The Plan and the Trust are willing to serve as named plaintiffs.  On behalf of the Plan and the Trust, I understand that a named plaintiff is a representative party who acts on behalf of other class members in directing the litigation, and whose duties may include testifying at deposition or trial.

5.      Neither the Plan nor the Trust will accept any payment for serving as a representative party beyond the Plan's and Trust's pro rata share of any recovery, except reasonable costs and expenses, such as lost wages and travel expenses, directly related to the class representation, as ordered or approved by the Court pursuant to law.

1

6.      Neither the Plan nor the Trust have sought to serve or served as a representative party for a class in an action under the federal securities laws within the past three years.

7.      I understand that this is not a claim form, and that the Plan's and Trust's ability to share in any recovery as a class member is not affected by the decision to serve as a representative party.

8.      The Plan's and Trust's purchases and sales of Lehman Brothers securities during the relevant time period are listed in **Attachment A** to this document.

9.      I declare under penalty of perjury that the foregoing is true and correct.

Executed this ⸻day of April, 2010

Fred H. Mandell, as Trustee for
the Plan and the Trust

2

## ATTACHMENT A

## FRED H. MANDELL

### Account: MANDELL & SHORR INC. DEFINED BENEFIT PENSION PLAN

| TRADE DATE | SECURITY | NUMBER OF SHARES | PRICE PER NOTE/UNIT | BUY OR SELL |
|---|---|---|---|---|
| 3/23/2007 | 100% Principal Protection Notes Linked to a Global Index Basket | 1,650 | $10.00 | Bought |
| 12/21/2007 | Return Optimization Securities with Partial Protection Linked to the S&P 500® Index | 2,700 | $10.00 | Bought |
| 2/6/2008 | Autocallable Optimization Securities with Contingent Protection Linked to the S&P 500 Financials Index | 3,000 | $10.00 | Bought |

### Account: THE FRED H. MANDELL LIVING TRUST DTD 8/19/93

| TRADE DATE | SECURITY | NUMBER OF SHARES | PRICE PER NOTE/UNIT | BUY OR SELL |
|---|---|---|---|---|
| 2/26//2008 | Return Optimization Securities with Partial Protection Linked to the S&P 500® Index | 1,100 | $10.00 | Bought |

## CERTIFICATION OF THE MONTGOMERY COUNTY RETIREMENT BOARD PURSUANT TO THE FEDERAL SECURITIES LAWS

I, Diane Morgan, on behalf of the Montgomery County Retirement Board ("Montgomery County" or "Plaintiff"), hereby certify, as to the claims asserted under the federal securities laws, that:

1.      I am County Controller of Montgomery County and am authorized to make legal decisions on behalf of Plaintiff.

2.      Montgomery County has full power and authority to bring suit to recover for investment losses suffered as a result of its investments.

3.      Montgomery County has reviewed the Third Amended Complaint and has authorized its filing by Barroway Topaz Kessler Meltzer & Check, LLP.

4.      Montgomery County did not purchase the securities that are the subject of this action at the direction of counsel or in order to participate in any action arising under the federal securities laws.

5.      Montgomery County is willing to serve as a representative party on behalf of the Class, including providing testimony at deposition and trial, if necessary.

6.      Montgomery County's transactions in Lehman Brothers securities during the period covered by the Third Amended Complaint are set forth in Schedule A attached hereto.

7.      Montgomery County is currently serving as representative party for a class action filed under the federal securities laws during the three years prior to the date of this Certification in *In re Pilgrim's Pride Corp. Sec. Litig.*, No. 08-419 (E.D. Tex.)

8.      Montgomery County has not otherwise sought to serve as a representative party for a class action filed under the federal securities laws during the three years prior to the date of this Certification.

9.      Montgomery County intends to actively monitor and vigorously pursue this action for the benefit of the class, and it has retained the law firm of Barroway Topaz Kessler Meltzer & Check, LLP which has extensive experience in securities litigation and in the representation of institutional investors, to represent Plaintiff in this action.

10.     Montgomery County will endeavor to provide fair and adequate representation and work directly with the efforts of Class counsel to ensure that the largest recovery for the Class consistent with good faith and meritorious judgment is obtained

11.     Montgomery County will not accept any payment for serving as a representative party on behalf of the Class beyond Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the Class, as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 22 day of April, 2010

Diane Morgan
County Controller
*Montgomery County Retirement Board*

**SCHEDULE A**

| Date | Purchase or Sale | Type of Securities | Transaction Amount (in dollars) | Price of Securities |
|---|---|---|---|---|
| 7/12/2007 | Purchase | Sub Nt 6.5% | 345,000 | 99.826 |
| 8/3/2007 | Purchase | Sub Nt 6.5% | 50,000 | 98.269 |
| 4/10/2008 | Purchase | Sub Nt 6.5% | 45,000 | 99.261 |
| 7/23/2007 | Sale | Sub Nt 6.5% | 345,000 | 98.388 |
| | | | | |
| 7/16/2007 | Purchase | MTN 6% | 30,000 | 100.093 |
| 7/23/2007 | Purchase | MTN 6% | 345,000 | 99.676 |
| 8/23/2007 | Purchase | MTN 6% | 90,000 | 99.621 |
| 7/31/2007 | Sale | MTN 6% | 170,000 | 100.485 |
| 8/28/2007 | Sale | MTN 6% | 265,000 | 100.176 |

## CERTIFICATION OF PLAINTIFF PURSUANT
## TO THE FEDERAL SECURITIES LAWS

I, Barbara Moskowitz, declare the following as to the claims asserted, or to be asserted, under the federal securities laws:

1.     I have reviewed the complaint against UBS Financial Services and the officers and directors of Lehman Brothers Holdings, Inc., among others, prepared by Girard Gibbs LLP, whom I designate as my counsel in this action for all purposes.

2.     I did not acquire any Lehman Brothers securities at the direction of Girard Gibbs LLP or in order to participate in any private action under the federal securities laws.

3.     I am willing to serve as a named plaintiff.  I understand that a named plaintiff is a representative party who acts on behalf of other class members in directing the litigation, and whose duties may include testifying at deposition or trial.

4.     I will not accept any payment for serving as a representative party beyond my pro rata share of any recovery, except reasonable costs and expenses, such as lost wages and travel expenses, directly related to the class representation, as ordered or approved by the Court pursuant to law.

5.     I have not sought to serve or served as a representative party for a class in an action under the federal securities laws within the past three years.

6.     I understand that this is not a claim form, and that my ability to share in any recovery as a class member is not affected by my decision to serve as a representative party.

7.     My purchases and sales of Lehman Brothers securities during the relevant time period are listed in **Attachment A** to this document.

1

8.     I declare under penalty of perjury that the foregoing is true and correct.

Executed this _14_ day of April, 2010

_Barbara Moskowitz_
/ Barbara Moskowitz

2

# BARBARA MOSKOWITZ

## ATTACHMENT A

| TRADE DATE | SECURITY | NUMBER OF SHARES | PRICE PER NOTE/UNIT | BUY OR SELL |
|---|---|---|---|---|
| 3/26/2008 | 100% Principal Protection Absolute Return Barrier Notes Linked to the Russell 2000® Index | 2,000 | $10.00 | Bought |

## CERTIFICATION OF PLAINTIFF PURSUANT
## TO THE FEDERAL SECURITIES LAWS

I, Stacey Oyler, declare the following as to the claims asserted, or to be asserted, under the federal securities laws:

1.  I have reviewed the complaint against the officers and directors of Lehman Brothers Holdings, Inc., among others, prepared by Girard Gibbs LLP, whom I designate as my counsel in this action for all purposes.

2.  I did not acquire any Lehman Brothers securities at the direction of Girard Gibbs LLP or in order to participate in any private action under the federal securities laws.

3.  I am willing to serve as a named plaintiff.  I understand that a named plaintiff is a representative party who acts on behalf of other class members in directing the litigation, and whose duties may include testifying at deposition or trial.

4.  I will not accept any payment for serving as a representative party beyond my pro rata share of any recovery, except reasonable costs and expenses, such as lost wages and travel expenses, directly related to the class representation, as ordered or approved by the Court pursuant to law.

5.  I have not sought to serve or served as a representative party for a class in an action under the federal securities laws within the past three years.

6.  I understand that this is not a claim form, and that my ability to share in any recovery as a class member is not affected by my decision to serve as a representative party.

7.  My purchases and sales of Lehman Brothers securities during the relevant time period are listed in **Attachment A** to this document.

1

8.    I declare under penalty of perjury that the foregoing is true and correct.

Executed this /0th day of April, 2010

Stacey Oyler

2

**STACEY OYLER**

**ATTACHMENT A**

| TRADE DATE | SECURITY | NUMBER OF SHARES | PRICE PER NOTE/UNIT | BUY OR SELL |
|---|---|---|---|---|
| 6/1/2007 | Lehman Brothers Holdings Inc., Medium-Term Notes, Series I Due 6/15/27 CUSIP 52517P2S9 | 5,000 | $10.00 | Bought |

### CERTIFICATION OF GASTROENTEROLOGY ASSOCIATES PROFIT SHARING TRUST FBO CHARLES M. BROOKS M.D.

I, J. ~~Henry~~ *Harry* Pickle, Trustee, certifies that:

1.      On behalf of the Gastroenterology Associates Profit Sharing Trust FBO Charles M. Brooks M.D. (the "Trust") I have reviewed the complaint in *Azpiazu v. UBS Financial Services, Inc.*, Case No. 1:08-CV-10058-LAK (S.D.N.Y.) and authorize the filing of a lead plaintiff motion and filing of a complaint on behalf of the Trust.

2.      The Trust did not purchase or acquire the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in any private action under the federal securities laws.

3.      The Trust is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4.      The Trust's transactions in the security that is the subject of this action during the class period are as follows:

### TRANSACTIONS

| BUY | SELL | TRADE DATE | PRICE | TOTAL |
|---|---|---|---|---|
| 5,000 LB 100% Principal Protection Notes linked to an Asian Currency Basket due February 26, 2010. | | 02/26/08 | $10.00 | $50,000.00 |
| 3,000 LB Return Optimization Sec-PP Emerging Markets Index due September 30, 2009 | | 03/26/08 | $10.00 | $30,000.00 |

5.    During the three years preceding the date of this certification, the Trust has not sought to serve or served as a representative party on behalf of a class.

6.    The Trust will not accept any payment for serving as a representative party on behalf of a class, except to receive its *pro rata* share of any recovery or as ordered or approved by the Court, including the award to a representative of reasonable costs and expenses (including lost wages) directly relating to the representation of the class.

I, J. ~~Henry~~ Harry Pickle, Trustee, certify that the foregoing is true and correct.

Dated: ~~December __, 2008~~ January 2, 2009

J. ~~Henry~~ Harry Pickle, Trustee
Gastroenterology Associates Profit Sharing Trust
FBO Charles M. Brooks M.D.

2

## CERTIFICATION OF NAMED PLAINTIFF
## PURSUANT TO FEDERAL SECURITIES LAWS

I, Steven Ratnow, ("Plaintiff") certify:

1.      I have reviewed the complaint and authorized its filing on behalf of Plaintiff.  Plaintiff retains James V. Bashian of the Law Offices of James V. Bashian, P.C. to pursue such action on a contingent fee basis.

2.      Plaintiff did not purchase or acquire the securities that are the subject of this action at the direction of plaintiff's counsel or in order to participate in any private action arising under the Federal securities laws.

3.      Plaintiff is willing to serve as a representative party on behalf of a class, including providing testimony at deposition and trial, if necessary.  Plaintiff understands that if the litigation is not settled, this is not a claim form, and sharing in any recovery is not dependent upon execution of this certification.

4.      The following constitute Plaintiff's transactions in the security that is the subject of this litigation during the class period set forth in the complaint:

### TRANSACTIONS

### Steven Ratnow Keogh

| PRODUCT | DATE PURCHASED | NOTES PURCHASED | AMOUNT OF TRANSACTION | Price Per Note |
|---|---|---|---|---|
| Lehman Brothers Medium Term Note Due 4/21/2023 cusip 5252m0fa0 | April 21, 2008 | 25 | 25,000 | 1,000 |

1

5.   Plaintiff has not served as or sought to serve as a representative party on behalf of a class under this title during the last three years.

6.   I will not accept any payment for serving as a representative party, except to receive my pro rata share of any recovery or as ordered or approved by the court including the award to a representative of reasonable costs and expenses (including lost wages) directly relating to the representation of the class.

The foregoing are, to the best of my knowledge and belief, true and correct statements.

Dated:   New York, New York
        2/12            , 2009

                                            STEVE RATNOW

2

## CERTIFICATION OF NAMED PLAINTIFF
## PURSUANT TO FEDERAL SECURITIES LAWS

I, Sydney Ratnow, ("Plaintiff") certify:

1.      I have reviewed the complaint and authorized its filing on behalf of Plaintiff. Plaintiff retains James V. Bashian of the Law Offices of James V. Bashian, P.C. to pursue such action on a contingent fee basis.

2.      Plaintiff did not purchase or acquire the securities that are the subject of this action at the direction of plaintiff's counsel or in order to participate in any private action arising under the Federal securities laws.

3.      Plaintiff is willing to serve as a representative party on behalf of a class, including providing testimony at deposition and trial, if necessary. Plaintiff understands that if the litigation is not settled, this is not a claim form, and sharing in any recovery is not dependent upon execution of this certification.

4.      The following constitute Plaintiff's transactions in the security that is the subject of this litigation during the class period set forth in the complaint:

### TRANSACTIONS

### Sydney Ratnow

| PRODUCT | DATE PURCHASED | NOTES PURCHASED | AMOUNT OF TRANSACTION | Price Per Note |
|---|---|---|---|---|
| Lehman Brothers XLF Note Due 5/8/2009 cusip 5252m0fr3 | May 2, 2008 | 20 | 20,000 | 1,000 |

1

5.    Plaintiff has not served as or sought to serve as a representative party on behalf of a class under this title during the last three years.

6.    I will not accept any payment for serving as a representative party, except to receive my pro rata share of any recovery or as ordered or approved by the court including the award to a representative of reasonable costs and expenses (including lost wages) directly relating to the representation of the class.

The foregoing are, to the best of my knowledge and belief, true and correct statements.

Dated: New York, New York
        2/12        , 2009

SYDNEY KATNOW

2

## RALPH M. ROSATO, M.D. CERTIFICATION

I, Ralph M. Rosato, M.D., declare that:

1.     I have reviewed the amended complaint in *Azpiazu v. UBS Financial Services, Inc.*, Case No. 1:08-CV-10058-LAK (S.D.N.Y.) and have retained Zwerling, Schachter & Zwerling LLP to represent me in connection therewith and in related litigation in connection with the securities that are set forth in this certification.

2.     I did not purchase or acquire the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in any private action under the federal securities laws.

3.     I am willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4.     My transactions in the security that is the subject of this action during the class period are as follows:

### TRANSACTIONS

| BUY | SELL | TRADE DATE | PRICE | TOTAL |
|---|---|---|---|---|
| 5,000<br><br>LB PERFRM SEC-PP GLOBAL INDEX BASKET 07/30/2010 | | 7/26/07 | $10 | $50,000 |
| 2,000<br>LB 100% PPN-ABS RTN EUR/USD 07/29/2011 | | 6/11/08 | $10 | $20,000 |

5.    During the three years preceding the date of this certification, I have not sought to serve or served as a representative party on behalf of a class.

6.    I will not accept any payment for serving as a representative party on behalf of a class, except to receive my *pro rata* share of any recovery or as ordered or approved by the Court, including the award to a representative of reasonable costs and expenses (including lost wages) directly relating to the representation of the class.

I, Ralph M. Rosato, M.D., certify that the foregoing is true and correct.

Dated: February 3, 2009

Ralph M. Rosato, M.D.

2

## CERTIFICATION OF PLAINTIFF PURSUANT
## TO THE FEDERAL SECURITIES LAWS

I, Lawrence Rose, declare the following as to the claims asserted, or to be asserted, under the federal securities laws:

1.     I have reviewed the complaint against UBS Financial Services and the officers and directors of Lehman Brothers Holdings, Inc., among others, prepared by Girard Gibbs LLP, whom I designate as my counsel in this action for all purposes.  At this time, I adopt the allegations in the complaint.

2.     I have not acquired any Lehman Brothers securities at the direction of Girard Gibbs LLP or in order to participate in any private action under the federal securities laws.

3.     I am willing to serve as a named plaintiff.  I understand that a named plaintiff is a representative party who acts on behalf of other class members in directing the litigation, and whose duties may include testifying at deposition or trial.

4.     I will not accept any payment for serving as a representative party beyond my pro rata share of any recovery, except reasonable costs and expenses, such as lost wages and travel expenses, directly related to the class representation, as ordered or approved by the Court pursuant to law.

5.     I have not sought to serve or served as a representative party for a class in an action under the federal securities laws within the past three years.

6.     I understand that this is not a claim form, and that my ability to share in any recovery as a class member is not affected by the decision to serve as a representative party.

1

7.    My purchases and sales of Lehman Brothers securities during the relevant time period are listed in **Attachment A** to this document.

8.    I declare under penalty of perjury that the foregoing is true and correct.

Executed this ⎽⎽⎽⎽ day of April, 2010

Lawrence Rose

**LAWRENCE ROSE**

**ATTACHMENT A**

| TRADE DATE | SECURITY | NUMBER OF SHARES | PRICE PER NOTE/UNIT | BUY OR SELL |
|---|---|---|---|---|
| 4/23/2007 | 100% Principal Protection Callable Spread Daily Accrual Notes with Interest Linked to the Spread between the 30-year and the 2-year Swap Rates | 150,000 | $1.00 | Bought |
| 5/24/2007 | 100% Principal Protection Notes Linked to a Currency Basket | 10,000 | $10.00 | Bought |
| 11/27/2007 | Return Optimization Securities with Partial Protection Linked to the S&P 500® Index | 20,000 | $10.00 | Bought |
| 1/25/2008 | 100% Principal Protection Callable Spread Daily Accrual Notes with Interest Linked to the Spread between the 30-year and the 2-year Swap Rates | 100,000 | $1.00 | Bought |

## CERTIFICATION OF PLAINTIFF PURSUANT
## TO THE FEDERAL SECURITIES LAWS

I, **Joe Rottman**, declare the following as to the claims asserted, or to be asserted, under the federal securities laws:

1.     I have reviewed the complaint against UBS Financial Services and the officers and directors of Lehman Brothers Holdings, Inc., among others, prepared by Girard Gibbs LLP, whom I designate as my counsel in this action for all purposes.  At this time, I adopt the allegations in the complaint.

2.     I did not acquire any Lehman Brothers securities at the direction of Girard Gibbs LLP or in order to participate in any private action under the federal securities laws.

3.     I am willing to serve as a named plaintiff.  I understand that a named plaintiff is a representative party who acts on behalf of other class members in directing the litigation, and whose duties may include testifying at deposition or trial.

4.     I will not accept any payment for serving as a representative party beyond my pro rata share of any recovery, except reasonable costs and expenses, such as lost wages and travel expenses, directly related to the class representation, as ordered or approved by the Court pursuant to law.

5.     I have not sought to serve or served as a representative party for a class in an action under the federal securities laws within the past three years.

6.     I understand that this is not a claim form, and that my ability to share in any recovery as a class member is not affected by my decision to serve as a representative party.

1

7.     My purchases and sales of Lehman Brothers securities during the relevant time period are listed in **Attachment A** to this document.

8.     I declare under penalty of perjury that the foregoing is true and correct.

Executed this _7_ day of April, 2010.

_____
Joe Rottman

2

## JOE ROTTMAN

## ATTACHMENT A

| TRADE DATE | SECURITY | NUMBER OF SHARES | PRICE PER NOTE/UNIT | BUY OR SELL |
|---|---|---|---|---|
| 2/5/2008 | Autocallable Optimization Securities with Contingent Protection Linked to the S&P 500 Financials Index | 3,000 | $10.00 | Bought |

## CERTIFICATION OF PLAINTIFF PURSUANT
## TO THE FEDERAL SECURITIES LAWS

Shea-Edwards Limited Partnership ("Shea-Edwards"), by and through its Managing Member, Edwards Family Properties of Arizona, Inc., declares the following as to the claims asserted, or to be asserted, under the federal securities laws:

1.     Shea-Edwards has reviewed the complaint against UBS Financial Services and the officers and directors of Lehman Brothers Holdings, Inc., among others, prepared by counsel, whom Shea-Edwards designates as its counsel in this action for all purposes.

2.     Shea-Edwards did not acquire any Lehman Brothers securities at the direction of Girard Gibbs LLP, Tiffany & Bosco, P.A., any other counsel, or in order to participate in any private action under the federal securities laws.

3.     Shea-Edwards is willing to serve as a named plaintiff. Shea-Edwards understands that a named plaintiff is a representative party who acts on behalf of other class members in directing the litigation, and whose duties may include testifying at deposition or trial.

4.     Shea-Edwards will not accept any payment for serving as a representative party beyond its pro rata share of any recovery, except reasonable costs and expenses, such as lost wages and travel expenses, directly related to the class representation, as ordered or approved by the Court pursuant to law.

5.     Shea-Edwards has not sought to serve or served as a representative party for a class in an action under the federal securities laws within the past three years.

6.     Shea-Edwards understands that this is not a claim form, and that its ability to share in any recovery as a class member is not affected by its decision to serve as a representative party.

1

7.    Shea-Edwards' purchases and sales of Lehman Brothers securities during

the relevant time period are listed in **Attachment A** to this document.

8.    Shea-Edwards declares under penalty of perjury that the foregoing is true

and correct.

Executed this $\mathcal{31}$ day of April, 2010

*Suanne Johnson*

Shea-Edwards Limited Partnership
By its Managing Member Edwards Family
Properties of Arizona, Inc.,
By its CEO Suzanne Johnson


Shea-Edwards Limited Partnership
By its Managing Member Edwards Family
Properties of Arizona, Inc.,
By its President Phyllis LoDestro

2

7.     Shea-Edwards' purchases and sales of Lehman Brothers securities during the relevant time period are listed in **Attachment A** to this document.

8.     Shea-Edwards declares under penalty of perjury that the foregoing is true and correct.

Executed this 21 day of April, 2010

Shea-Edwards Limited Partnership
By its Managing Member Edwards Family
Properties of Arizona, Inc.,
By its CEO Suzanne Johnson

Shea-Edwards Limited Partnership
By its Managing Member Edwards Family
Properties of Arizona, Inc.,
By its President Phyllis LoDestro

# Attachment A

Schedule of Transactions in
LB 100% PPN-ABS RTN BAR (CUSIP: 52522L525)

| Date | Type | Quantity | Total Cost |
|---|---|---|---|
| 01/28/08 | Buy | 30,000 | 300,000 |

Schedule of Transactions in
LB RTN OPTMZ SEC-PP, S&P 500 (CUSIP: 52522L806)

| Date | Type | Quantity | Total Cost |
|---|---|---|---|
| 03/26/08 | Buy | 20,000 | 200,000 |

Schedule of Transactions in
LB BEAR AOS ENERGY SECTOR SPDR FUND (CUSIP: 52522L871)

| Date | Type | Quantity | Total Cost |
|---|---|---|---|
| 03/26/08 | Buy | 10,000 | 100,000 |

3

## CERTIFICATION OF PLAINTIFF PURSUANT
## TO THE FEDERAL SECURITIES LAWS

I, Arthur Simons, declare the following as to the claims asserted, or to be asserted, under the federal securities laws:

1.      I have reviewed the complaint against UBS Financial Services and the officers and directors of Lehman Brothers Holdings, Inc., among others, and have retained Zwerling, Schachter & Zwerling, LLP ("ZSZ") to represent me in connection therewith and in related litigation in connection with the securities that are set forth in this certification .

2.      I did not acquire any Lehman Brothers securities at the direction of ZSZ or in order to participate in any private action under the federal securities laws.

3.      I am willing to serve as a named plaintiff.  I understand that a named plaintiff is a representative party who acts on behalf of other class members in directing the litigation, and whose duties may include testifying at deposition or trial.

4.      I will not accept any payment for serving as a representative party beyond my pro rata share of any recovery, except reasonable costs and expenses, such as lost wages and travel expenses, directly related to the class representation, as ordered or approved by the Court pursuant to law.

5.      I have not sought to serve or served as a representative party for a class in an action under the federal securities laws within the past three years.

6.      I understand that this is not a claim form, and that my ability to share in any recovery as a class member is not affected by my decision to serve as a representative party.

1

7.     My purchases and sales of Lehman Brothers securities during the relevant

time period are as follows:

| TRADE DATE | BUY | SELL | TOTAL PRICE |
|---|---|---|---|
| 10/26/07 | Return Optimization Securities Linked to an Index (CUSIP: 52522L319) | | $50,000 |
| 10/26/07 | Return Optimization Securities Linked to an Index (CUSIP: 52522L335) | | $50,000 |

8.     I declare under penalty of perjury that the foregoing is true and correct.

Executed this ___ day of April, 2010

Arthur Simons

2

## AMENDED CERTIFICATION OF NAMED PLAINTIFF
## PURSUANT TO FEDERAL SECURITIES LAWS

I, Fred Telling, individually and on behalf of Fred Telling IRA , ("Plaintiff")
certify:

1.      I have reviewed the Third Amended Consolidated Class action Complaint For
Violations Of The Federal Securities Laws ("Complaint") in *In re Lehman Brothers Equity/Debt
Securities* Litigation, 08 Civ. 5523 (LAK), and authorized its filing.

2.      Plaintiff did not purchase or acquire the securities that are the subject of
this action at the direction of plaintiff's counsel or in order to participate in any private action
arising under the Federal securities laws.

3.      Plaintiff is willing to serve as a representative party on behalf of a class,
including providing testimony at deposition and trial, if necessary.  Plaintiff understands that if
the litigation is not settled, this is not a claim form, and sharing in any recovery is not dependent
upon execution of this certification.

4.      The following constitute Plaintiff's transactions in the security that is the
subject of this litigation during the class period set forth in the complaint:

### TRANSACTIONS

### Fred Telling Ira

| PRODUCT | DATE PURCHASED | NOTES PURCHASED | AMOUNT OF TRANSACTION | Price Per Note |
|---|---|---|---|---|
| Lehman Brothers Holding, Inc. Currency Basket Due | July 31, 2007 | | 300,000 | 100 |

1

P.2

| 07/31/2010 Cus. # 524908k25 | | | | |
|---|---|---|---|---|
| | | | | |

## TRANSACTIONS

### Fred Telling

| PRODUCT | DATE PURCHASED | NOTES PURCHASED | AMOUNT OF TRANSACTION | Price Per Note |
|---|---|---|---|---|
| Lehman Brothers Holding, Inc. Buffered Return Note due 2/22/10 Cus. # 5252modh7 | February 20, 2008 | | 350,000 | 100 |

5.      Plaintiff has not served as or sought to serve as a representative party on behalf of a class under this title during the last three years.

6.      I will not accept any payment for serving as a representative party, except to receive my pro rata share of any recovery or as ordered or approved by the court including the award to a representative of reasonable costs and expenses (including lost wages) directly relating to the representation of the class.

The foregoing are, to the best of my knowledge and belief, true and correct statements.

Dated:  New York, New York
         April 20, 2010

Fred Telling
Fred Telling

2

## CERTIFICATION OF PLAINTIFF PURSUANT
## TO THE FEDERAL SECURITIES LAWS

I, Juan Tolosa, declare the following as to the claims asserted, or to be asserted, under the federal securities laws:

1.  I have reviewed the complaint against UBS Financial Services and the officers and directors of Lehman Brothers Holdings, Inc., among others, and have retained Zwerling, Schachter & Zwerling, LLP ("ZSZ") to represent me in connection therewith and in related litigation in connection with the securities that are set forth in this certification .

2.  I did not acquire any Lehman Brothers securities at the direction of ZSZ or in order to participate in any private action under the federal securities laws.

3.  I am willing to serve as a named plaintiff.  I understand that a named plaintiff is a representative party who acts on behalf of other class members in directing the litigation, and whose duties may include testifying at deposition or trial.

4.  I will not accept any payment for serving as a representative party beyond my pro rata share of any recovery, except reasonable costs and expenses, such as lost wages and travel expenses, directly related to the class representation, as ordered or approved by the Court pursuant to law.

5.  I have not sought to serve or served as a representative party for a class in an action under the federal securities laws within the past three years.

6.  I understand that this is not a claim form, and that my ability to share in any recovery as a class member is not affected by my decision to serve as a representative party.

1

7.    My purchases and sales of Lehman Brothers securities during the relevant

time period are as follows:

| TRADE DATE | BUY | SELL | TOTAL PRICE |
|---|---|---|---|
| 9/25/07 | Performance Securities with Partial Protection Linked to a Global Index Basket (CUSIP: 52522L244) | | $30,000 |
| 10/25/07 | 100% Principal Protection Notes linked to an Asian Currency Basket due October 29, 2009. (CUSIP: 52520W341) | | $52,721.29 |

8.    I declare under penalty of perjury that the foregoing is true and correct.

Executed this __26__ day of April, 2010

_____
Juan Tolosa

2

## CERTIFICATION OF PLAINTIFF PURSUANT
## TO THE FEDERAL SECURITIES LAWS

I, Roy Wiegert, declare the following as to the claims asserted, or to be asserted, under the federal securities laws:

1.       I have reviewed the complaint against UBS Financial Services and the officers and directors of Lehman Brothers Holdings, Inc., among others, prepared by Girard Gibbs LLP, whom I designate as my counsel in this action for all purposes.

2.       I did not acquire any Lehman Brothers securities at the direction of Girard Gibbs LLP or in order to participate in any private action under the federal securities laws.

3.       I am willing to serve as a named plaintiff.  I understand that a named plaintiff is a representative party who acts on behalf of other class members in directing the litigation, and whose duties may include testifying at deposition or trial.

4.       I will not accept any payment for serving as a representative party beyond my pro rata share of any recovery, except reasonable costs and expenses, such as lost wages and travel expenses, directly related to the class representation, as ordered or approved by the Court pursuant to law.

5.       I have not sought to serve or served as a representative party for a class in an action under the federal securities laws within the past three years.

6.       I understand that this is not a claim form, and that my ability to share in any recovery as a class member is not affected by my decision to serve as a representative party.

///

///

1

7.      My purchases and sales of Lehman Brothers securities during the relevant time period are listed in **Attachment A** to this document.

8.      I declare under penalty of perjury that the foregoing is true and correct.

Executed this 8th day of April, 2010

_____
Roy Wiegert

**ROY WIEGERT**

**ATTACHMENT A**

| TRADE DATE | SECURITY | NUMBER OF SHARES | PRICE PER NOTE/UNIT | BUY OR SELL |
|---|---|---|---|---|
| 3/23/2007 | Performance Securities with Partial Protection Linked to a Global Index Basket | 5,000 | $10.00 | Bought |
| 4/24/2007 | Performance Securities with Partial Protection Linked to a Global Index Basket | 2,500 | $10.00 | Bought |

## CERTIFICATION OF PLAINTIFF PURSUANT
## TO THE FEDERAL SECURITIES LAWS

I, Miriam Wolf, declare the following as to the claims asserted, or to be asserted, under the federal securities laws:

1.      I have reviewed the complaint against UBS Financial Services and the officers and directors of Lehman Brothers Holdings, Inc., among others, prepared by Girard Gibbs LLP, whom I designate as my counsel in this action for all purposes.  At this time, I adopt the allegations in the complaint.

2.      I did not acquire any Lehman Brothers securities at the direction of Girard Gibbs LLP or in order to participate in any private action under the federal securities laws.

3.      I am willing to serve as a named plaintiff.  I understand that a named plaintiff is a representative party who acts on behalf of other class members in directing the litigation, and whose duties may include testifying at deposition or trial.

4.      I will not accept any payment for serving as a representative party beyond my pro rata share of any recovery, except reasonable costs and expenses, such as lost wages and travel expenses, directly related to the class representation, as ordered or approved by the Court pursuant to law.

5.      I have not sought to serve or served as a representative party for a class in an action under the federal securities laws within the past three years.

6.      I understand that this is not a claim form, and that my ability to share in any recovery as a class member is not affected by my decision to serve as a representative party.

1

7.   My purchases and sales of Lehman Brothers securities during the relevant

time period are listed in **Attachment A** to this document.

8.   I declare under penalty of perjury that the foregoing is true and correct.

Executed this **6** day of April, 2010

_____
Miriam Wolf

2

# MIRIAM WOLF

# ATTACHMENT A

| TRADE DATE | SECURITY | NUMBER OF SHARES | PRICE PER NOTE/UNIT | BUY OR SELL |
|---|---|---|---|---|
| 2/26/2008 | 100% Principal Protection Callable Spread Daily Accrual Notes with Interest Linked to the Spread between the 30-year and the 2-year Swap Rates | 75,000 | $1.00 | Bought |

# APPENDIX A

## APPENDIX A

## COMMON STOCK/PREFERRED STOCK OFFERINGS

| Issue Date | Security (CUSIP) | Amount | Price | Volume | Underwriter Defendants[1] | False and Misleading Documents Incorporated into Offering Materials | Plaintiffs |
|---|---|---|---|---|---|---|---|
| June 9, 2008 | Common Stock (524908100) | 143 million shares of common stock | $28 per share | $4,004,000,000 | | June 12, 2007 Form 8-K<br>July 10, 2007 Form 10-Q<br>September 18, 2007 Form 8-K<br>October 10, 2007 Form 10-Q<br>December 13, 2007 Form 8-K<br>January 29, 2008 Form 10-K<br>March 18, 2008 Form 8-K<br>April 8, 2008 Form 10-Q<br>June 9, 2008 Form 8-K | Brockton Contributory Retirement System;<br>The City of Edinburgh Council on behalf of The Lothian Pension Fund;<br>Government of Guam Retirement Fund;<br>Inter-Local Pension Fund of the Graphic Communications Conference of the International Brotherhood of Teamsters;<br>Northern Ireland Local Government Officers' Superannuantion Committee;<br>Operating Engineers Local 3 Trust Fund;<br>Police and Fire Retirement System of the City of Detroit;<br>Alameda County Employees' Retirement Association |

---

[1] "Underwriter Defendants" refers to:  A.G. Edwards & Sons, Inc. (Acquired by Wachovia Securities on October 1, 2007 which was acquired by Wells Fargo on December 31, 2008) ("A.G. Edwards");  ABN Amro Holding N.V. (Acquired by RFS Holdings B.V.) ("ABN Amro");  ANZ Securities, Inc. ("ANZ");  Banc of America Securities LLC ("BOA");  BBVA Securities Inc. ("BBVA");  BNP Paribas S.A. ("BNP Paribas");  BNY Mellon Capital Markets, LLC ("BNY");  Cabrera Capital Markets, LLC ("Cabrera");  Caja de Ahorros y Monte de Piedad de Madrid ("Caja Madrid");  Calyon Securities (USA) Inc. ("Caylon");  Charles Schwab & Co., Inc. ("Charles Schwab");  CIBC World Markets Corp. ("CIBC");  Citigroup Global Markets Inc. ("CGMI");  Commerzbank Capital Markets Corp. ("Commerzbank");  Daiwa Capital Markets Europe Limited (f/k/a Daiwa Securities SMBC Europe Limited) ("Daiwa");  DnB NOR Markets ("DnB NOR");  DZ Financial Markets LLC ("DZ Financial");   Edward D. Jones & Co., L.P. ("E. D. Jones");   Fidelity Capital Markets Services ("Fidelity Capital (footnote continued on next page)

## APPENDIX A

| ISSUE DATE | SECURITY (CUSIP) | AMOUNT | PRICE | VOLUME | UNDERWRITER DEFENDANTS[1] | FALSE AND MISLEADING DOCUMENTS INCORPORATED INTO OFFERING MATERIALS | PLAINTIFFS |
|---|---|---|---|---|---|---|---|
| February 5, 2008 (the "Series J Offering") | 7.95% Non-Cumulative Perpetual Preferred Stock, Series J (the "Series J Shares") (52520W317) | 75.9 million depositary shares representing 759,000 Series J Shares | $25 per Series J depositary share, or $2,500 per Series J Share | $1,897,500,000 | BOA (8,039,988 shares)[2] CGMI (8,112,456 shares) Merrill Lynch (8,040,120 shares) Morgan Stanley (8,039,988 shares) RBC Capital (990,000 shares) SunTrust (990,000 shares) UBS Securities (8,039,988 shares) Wachovia Capital Markets (8,039,988 shares) Wells Fargo (990,000 shares) (continued) | June 12, 2007 Form 8-K July 10, 2007 Form 10-Q September 18, 2007 Form 8-K October 10, 2007 Form 10-Q December 13, 2007 Form 8-K January 29, 2008 Form 10-K | American European Insurance Company; Belmont Holdings Corp.; Brockton Contributory Retirement System; Marsha Kosseff; Alameda County Employees' Retirement Association |

Markets");   Fortis Securities LLC ("Fortis");   Harris Nesbitt Corp. ("Harris Nesbitt");   HSBC Securities (USA) Inc. ("HSBC");   HVB Capital Markets, Inc. ("HVB");  Incapital LLC ("Incapital");  ING Financial Markets LLC ("ING");  Loop Capital Markets, LLC ("Loop Capital");  M.R. Beal & Company ("MR Beal"); Mellon Financial Markets, LLC ("Mellon");   Merrill Lynch, Pierce, Fenner & Smith Inc. ("Merrill Lynch");   Mizuho Securities USA, Inc. ("Mizuho");   Morgan Stanley & Co. Inc. ("Morgan Stanley");   Muriel Siebert & Co., Inc., ("Muriel Siebert");   nabCapital Securities, LLC ("nabCapital");   National Australia Bank Ltd. (NAB);   Natixis Bleichroeder Inc. ("Natixis");   Raymond James & Associates, Inc. ("Raymond James");   RBC Capital Markets Corporation (f/k/a RBC Dain Rauscher Inc.) ("RBC Capital");   RBS Greenwich Capital  ("RBS Greenwich");   Santander Investment Securities Inc. ("Santander");   Scotia Capital (USA) Inc. ("Scotia");   SG Americas Securities LLC ("SG Americas");   Siebert Capital Markets ("Siebert");   Société Générale Corporate and Investment Banking  ("Société Générale ");   Sovereign Securities Corporation, LLC ("Sovereign");   SunTrust Robinson Humphrey, Inc. ("SunTrust");   TD Securities (USA) LLC ("TD Securities");  UBS Investment Bank ("UBS Investment");  UBS Securities LLC ("UBS Securities");  Utendahl Capital Partners, L.P. (Acquired by Williams Capital Group, L.P. on or about Jan. 10, 2010) ("Utendahl");   Wachovia Capital Finance (Acquired by Wells Fargo Securities, LLC on Dec. 31, 2008 ) ("Wachovia Capital");  Wachovia Securities (Acquired by Wells Fargo Securities on Dec. 31, 2008) ("Wachovia Securities");  Wells Fargo Securities, LLC ("Wells Fargo"); Williams Capital Group, L.P. ("Williams Capital").  Where Lehman served as an underwriter, it does not appear on this table.

[2] The shares sold by each Underwriter Defendant in the Series J Offering reflect the 66 million depositary shares sold in the initial offering.  On information and belief, each underwriter sold an equivalent percentage of the additional shares sold pursuant to the over-allotment.

## APPENDIX A

| Issue Date | Security (CUSIP) | Amount | Price | Volume | Underwriter Defendants[1] | False and Misleading Documents Incorporated into Offering Materials | Plaintiffs |
|---|---|---|---|---|---|---|---|
| | | | | | ABN Amro (274,956 shares) BNY (274,956 shares) Charles Schwab (274,956 shares) Fidelity Capital Markets (274,956 shares) HSBC (274,956 shares) | | |
| April 4, 2008 (the "Series P Offering") | 7.25% Non-Cumulative Perpetual Convertible Preferred Stock, Series P (the "Series P Shares") (52523J453) | 4 million Series P Shares | $1,000 per Series P Share | $4,000,000,000 | | June 12, 2007 Form 8-K July 10, 2007 Form 10-Q September 18, 2007 Form 8-K October 10, 2007 Form 10-Q December 13, 2007 Form 8-K January 29, 2008 Form 10-K March 18, 2008 Form 8-K | Brockton Contributory Retirement System; Police and Fire Retirement System of the City of Detroit |
| June 12, 2008 (the "Series Q Offering") | 8.75% Non-Cumulative Mandatory Convertible Preferred Stock, Series Q (the "Series Q Shares") (52520W218) | 2 million Series Q Shares | $1,000 per Series Q Share | $2,000,000,000 | | June 12, 2007 Form 8-K July 10, 2007 Form 10-Q September 18, 2007 Form 8-K October 10, 2007 Form 10-Q December 13, 2007 Form 8-K January 29, 2008 Form 10-K March 18, 2008 Form 8-K April 8, 2008 Form 10-Q June 9, 2008 Form 8-K | Police and Fire Retirement System of the City of Detroit |

## APPENDIX A

## NOTES/BOND OFFERINGS[3]

| ISSUE DATE | SECURITY (CUSIP) | VOLUME | UNDERWRITER DEFENDANTS (EXTENT OF PARTICIPATION) | FALSE AND MISLEADING DOCUMENTS INCORPORATED INTO OFFERING MATERIALS | PLAINTIFFS |
|---|---|---|---|---|---|
| June 15, 2007 | Medium-Term Notes, Series I (52517P2S9) | $35,000,000 | | June 12, 2007 Form 8-K | Stacey Oyler |
| July 19, 2007 | 6% Notes Due 2012 (52517P4C2) | $1,500,000,000 | Calyon ($30 million) ING ($30 million) Mellon ($30 million) Scotia ($30 million) Williams Capital ($30 million) | June 12, 2007 Form 8-K July 10, 2007 Form 10-Q | Montgomery County Retirement Board |
| July 19, 2007 | 6.50% Subordinated Notes due 2017 (524908R36) | $2,000,000,000 | Caja Madrid ($30 million) HSBC ($30 million) HVB ($30 million) National ($30 million) Santander ($30 million) Société Générale ($30 million) | June 12, 2007 Form 8-K July 10, 2007 Form 10-Q | Brockton Contributory Retirement System; Police and Fire Retirement System of the City of Detroit |
| July 19, 2007 | 6.875% Subordinated Notes Due 2037 (524908R44) | $1,500,000,000 | BBVA ($15 million) BNY ($15 million) CGMI ($15 million) RBS Greenwich ($15 million) RBC Capital ($15 million) SunTrust ($15 million) | June 12, 2007 Form 8-K July 10, 2007 Form 10-Q | Brockton Contributory Retirement System; Police and Fire Retirement System of the City of Detroit; Alameda County Employees' Retirement Association |
| July 31, 2007 | 100% Principal Protected Notes Linked to a Basket Consisting of a Foreign Equity Component and a Currency Component (524908K25) | $7,775,000 | | June 12, 2007 Form 8-K July 10, 2007 Form 10-Q | Fred Telling |

---

[3] The "issue date" identified for the structured notes herein is the settlement date. The pricing date for the structured notes is typically a few days before the settlement date.

**APPENDIX A**

| ISSUE DATE | SECURITY (CUSIP) | VOLUME | UNDERWRITER DEFENDANTS (EXTENT OF PARTICIPATION) | FALSE AND MISLEADING DOCUMENTS INCORPORATED INTO OFFERING MATERIALS | PLAINTIFFS |
|---|---|---|---|---|---|
| August 1, 2007 | Partial Principal Protection Notes Linked to a Basket of Global Indices (524908J92) | $1,700,000 | | June 12, 2007 Form 8-K July 10, 2007 Form 10-Q | Stuart Bregman |
| August 22, 2007 | Annual Review Notes with Contingent Principal Protection Linked to an Index (52517P4Y4) | $2,500,000 | | June 12, 2007 Form 8-K July 10, 2007 Form 10-Q | Irwin and Phyllis Ingwer |
| August 29, 2007 | Medium-Term Notes, Series I (52517P4T5) | $1,000,000 | | June 12, 2007 Form 8-K July 10, 2007 Form 10-Q | Carla LaGrassa |
| September 26, 2007 | 6.2% Notes Due 2014 (52517P5X5) | $2,250,000,000 | ANZ ($22.5 million) BBVA ($22.5 million) Cabrera ($22.5 million) CGMI ($22.5 million) Daiwa ($22.5 million) DZ Financial ($22.5 million) Harris Nesbitt ($22.5 million) Mellon ($22.5 million) Mizuho ($22.5 million) Scotia ($22.5 million) Sovereign ($22.5 million) SunTrust ($22.5 million) Utendahl ($22.5 million) Wells Fargo ($22.5 million) | June 12, 2007 Form 8-K July 10, 2007 Form 10-Q September 18, 2007 Form 8-K | Brockton Contributory Retirement System |

**APPENDIX A**

| ISSUE DATE | SECURITY (CUSIP) | VOLUME | UNDERWRITER DEFENDANTS (EXTENT OF PARTICIPATION) | FALSE AND MISLEADING DOCUMENTS INCORPORATED INTO OFFERING MATERIALS | PLAINTIFFS |
|---|---|---|---|---|---|
| September 26, 2007 | 7% Notes Due 2027 (52517P5Y3) | $1,000,000,000 | ANZ ($10 million) BBVA ($10 million) Cabrera ($10 million) CGMI ($10 million) Daiwa ($10 million) DZ Financial ($10 million) Harris Nesbitt ($10 million) Mellon ($10 million) Mizuho ($10 million) Scotia ($10 million) Sovereign ($10 million) SunTrust ($10 million) Utendahl ($10 million) Wells Fargo ($10 million) | June 12, 2007 Form 8-K July 10, 2007 Form 10-Q September 18, 2007 Form 8-K | Inter-Local Pension Fund of the Graphic Communications Conference of the International Brotherhood of Teamsters; Teamsters Allied Benefit Funds |
| December 5, 2007 | Medium-Term Notes, Series I (5252M0AU1) | $8,000,000 | | June 12, 2007 Form 8-K July 10, 2007 Form 10-Q September 18, 2007 Form 8-K October 10, 2007 Form 10-Q | Francisco Perez |
| December 7, 2007 | Medium-Term Notes, Series I (5252M0AW7) | $3,000,000 | | June 12, 2007 Form 8-K July 10, 2007 Form 10-Q September 18, 2007 Form 8-K October 10, 2007 Form 10-Q | Francisco Perez |

**APPENDIX A**

| Issue Date | Security (CUSIP) | Volume | Underwriter Defendants (Extent of Participation) | False and Misleading Documents Incorporated into Offering Materials | Plaintiffs |
|---|---|---|---|---|---|
| December 21, 2007 | 6.75% Subordinated Notes Due 2017 (5249087M6) | $1,500,000,000 | ABN Amro ($15 million) ANZ ($15 million) BBVA ($15 million) BNY ($15 million) CGMI ($15 million) CIBC ($15 million) HSBC ($15 million) HVB ($15 million) Mizuho ($15 million) Santander ($15 million) Scotia ($15 million) Siebert ($15 million) SunTrust ($15 million) Wachovia Securities ($15 million) Wells Fargo($15 million) | June 12, 2007 Form 8-K July 10, 2007 Form 10-Q September 18, 2007 Form 8-K October 10, 2007 Form 10-Q December 13, 2007 Form 8-K | Brockton Contributory Retirement System; Inter-Local Pension Fund of the Graphic Communications Conference of the International Brotherhood of Teamsters |
| December 28, 2007 | Medium-Term Notes, Series I (5252M0AY3) | $32,000,000 | | June 12, 2007 Form 8-K July 10, 2007 Form 10-Q September 18, 2007 Form 8-K October 10, 2007 Form 10-Q December 13, 2007 Form 8-K | Island Medical Group PC Retirement Trust f/b/o Irwin Ingwer; Stuart Bregman; Irwin and Phyllis Ingwer; Robert Feinerman |
| January 22, 2008 | 5.625% Notes Due 2013 (5252M0BZ9) | $4,000,000,000 | BBVA ($40 million) BNP Paribas ($40 million) CGMI ($40 million) Commerzbank ($40 million) Daiwa ($40 million) Fortis ($40 million) ING ($40 million) Mellon ($40 million) MR Beal ($40 million) Natixis ($40 million) SG Americas ($40 million) SunTrust ($40 million) Wells Fargo ($40 million) | June 12, 2007 Form 8-K July 10, 2007 Form 10-Q September 18, 2007 Form 8-K October 10, 2007 Form 10-Q December 13, 2007 Form 8-K | Brockton Contributory Retirement System; Police and Fire Retirement System of the City of Detroit |

## APPENDIX A

| Issue Date | Security (CUSIP) | Volume | Underwriter Defendants (Extent of Participation) | False and Misleading Documents Incorporated into Offering Materials | Plaintiffs |
|---|---|---|---|---|---|
| January 30, 2008 | Medium-Term Notes, Series I (5252M0BX4) | $28,000,000 | | June 12, 2007 Form 8-K July 10, 2007 Form 10-Q September 18, 2007 Form 8-K October 10, 2007 Form 10-Q December 13, 2007 Form 8-K January 29, 2008 Form 10-K | Irwin and Phyllis Ingwer; Robert Feinerman |
| February 5, 2008 | Lehman Notes, Series D (52519FFE6) | $43,895,000 | A.G. Edwards BOA Charles Schwab CGMI E. D. Jones Fidelity Capital Incapital Morgan Stanley Muriel Siebert Raymond James RBC Capital UBS Investment Wachovia Securities | June 12, 2007 Form 8-K July 10, 2007 Form 10-Q September 18, 2007 Form 8-K October 10, 2007 Form 10-Q December 13, 2007 Form 8-K January 29, 2008 Form 10-K | John Buzanowski |
| February 14, 2008 | Medium-Term Notes, Series I Principal Protected Notes Linked to MarQCuS Portfolio A (USD) Index (5252M0DK0) | $14,600,000 | | June 12, 2007 Form 8-K July 10, 2007 Form 10-Q September 18, 2007 Form 8-K October 10, 2007 Form 10-Q December 13, 2007 Form 8-K January 29, 2008 Form 10-K | Irwin and Phyllis Ingwer |
| February 20, 2008 | Buffered Return Enhanced Notes Linked to the Financial Select Sector SPDR Fund (5252M0DH7) | $2,325,000 | | June 12, 2007 Form 8-K July 10, 2007 Form 10-Q September 18, 2007 Form 8-K October 10, 2007 Form 10-Q December 13, 2007 Form 8-K January 29, 2008 Form 10-K | Fred Telling; Stuart Bregman; Irwin and Phyllis Ingwer; Robert Feinerman |

## APPENDIX A

| ISSUE DATE | SECURITY (CUSIP) | VOLUME | UNDERWRITER DEFENDANTS (EXTENT OF PARTICIPATION) | FALSE AND MISLEADING DOCUMENTS INCORPORATED INTO OFFERING MATERIALS | PLAINTIFFS |
|---|---|---|---|---|---|
| February 27, 2008 | Medium-Term Notes, Series I (5252M0CQ8) | $15,000,000 | | June 12, 2007 Form 8-K July 10, 2007 Form 10-Q September 18, 2007 Form 8-K October 10, 2007 Form 10-Q December 13, 2007 Form 8-K January 29, 2008 Form 10-K | Irwin and Phyllis Ingwer |
| March 13, 2008 | Medium-Term Notes, Series I (5252M0EH6) | $23,000,000 | | June 12, 2007 Form 8-K July 10, 2007 Form 10-Q September 18, 2007 Form 8-K October 10, 2007 Form 10-Q December 13, 2007 Form 8-K January 29, 2008 Form 10-K | Robert Feinerman |
| April 21, 2008 | Medium-Term Notes, Series I (5252M0EY9) | $13,000,000 | | June 12, 2007 Form 8-K July 10, 2007 Form 10-Q September 18, 2007 Form 8-K October 10, 2007 Form 10-Q December 13, 2007 Form 8-K January 29, 2008 Form 10-K March 18, 2008 Form 8-K April 8, 2008 Form 10-Q | Francisco Perez |
| April 21, 2008 | Medium-Term Notes, Series I (5252M0FA0) | $20,000,000 | | June 12, 2007 Form 8-K July 10, 2007 Form 10-Q September 18, 2007 Form 8-K October 10, 2007 Form 10-Q December 13, 2007 Form 8-K January 29, 2008 Form 10-K March 18, 2008 Form 8-K April 8, 2008 Form 10-Q | Steven Ratnow |

**APPENDIX A**

| ISSUE DATE | SECURITY (CUSIP) | VOLUME | UNDERWRITER DEFENDANTS (EXTENT OF PARTICIPATION) | FALSE AND MISLEADING DOCUMENTS INCORPORATED INTO OFFERING MATERIALS | PLAINTIFFS |
|---|---|---|---|---|---|
| April 24, 2008 | 6.875% Notes Due 2018 (5252M0FD4) | $2,500,000,000 | BOA ($25 million)<br>BNY ($25 million)<br>CGMI ($25 million)<br>DnB NOR ($25 million)<br>HSBC ($25 million)<br>nabCapital ($25 million)<br>Scotia ($25 million)<br>Sovereign ($25 million)<br>SunTrust ($25 million)<br>TD Securities ($25 million)<br>Wells Fargo ($25 million)<br>Williams Capital ($25 million) | June 12, 2007 Form 8-K<br>July 10, 2007 Form 10-Q<br>September 18, 2007 Form 8-K<br>October 10, 2007 Form 10-Q<br>December 13, 2007 Form 8-K<br>January 29, 2008 Form 10-K<br>March 18, 2008 Form 8-K<br>April 8, 2008 Form 10-Q | Inter-Local Pension Fund of the Graphic Communications Conference of the International Brotherhood of Teamsters; Government of Guam Retirement Fund |
| April 29, 2008 | Lehman Notes, Series D (52519FFM8) | $7,876,000 | A.G. Edwards<br>BOA<br>Charles Schwab<br>CGMI<br>E. D. Jones<br>Fidelity Capital<br>Incapital<br>Morgan Stanley<br>Muriel Siebert<br>Raymond James<br>RBC Capital<br>UBS Investment<br>Wachovia Securities | June 12, 2007 Form 8-K<br>July 10, 2007 Form 10-Q<br>September 18, 2007 Form 8-K<br>October 10, 2007 Form 10-Q<br>December 13, 2007 Form 8-K<br>January 29, 2008 Form 10-K<br>March 18, 2008 Form 8-K<br>April 8, 2008 Form 10-Q | Ann Lee |
| May 7, 2008 | Buffered Semi-Annual Review Notes Linked to the Financial Select Sector SPDR® Fund (5252M0FR3) | $2,550,000 | | June 12, 2007 Form 8-K<br>July 10, 2007 Form 10-Q<br>September 18, 2007 Form 8-K<br>October 10, 2007 Form 10-Q<br>December 13, 2007 Form 8-K<br>January 29, 2008 Form 10-K<br>March 18, 2008 Form 8-K<br>April 8, 2008 Form 10-Q | Sydney Ratnow |

**APPENDIX A**

| Issue Date | Security (CUSIP) | Volume | Underwriter Defendants (Extent of Participation) | False and Misleading Documents Incorporated into Offering Materials | Plaintiffs |
|---|---|---|---|---|---|
| May 9, 2008 | 7.50% Subordinated Notes Due 2038 (5249087N4) | $2,000,000,000 | Cabrera ($20 million) Loop Capital ($20 million) Williams Capital ($20 million) | June 12, 2007 Form 8-K July 10, 2007 Form 10-Q September 18, 2007 Form 8-K October 10, 2007 Form 10-Q December 13, 2007 Form 8-K January 29, 2008 Form 10-K March 18, 2008 Form 8-K April 8, 2008 Form 10-Q | Inter-Local Pension Fund of the Graphic Communications Conference of the International Brotherhood of Teamsters |
| May 19, 2008 | Medium-Term Notes, Series I (5252M0FH5) | $3,000,000 | | June 12, 2007 Form 8-K July 10, 2007 Form 10-Q September 18, 2007 Form 8-K October 10, 2007 Form 10-Q December 13, 2007 Form 8-K January 29, 2008 Form 10-K March 18, 2008 Form 8-K April 8, 2008 Form 10-Q | Island Medical Group PC Retirement Trust f/b/o Irwin Ingwer |
| June 13, 2008 | Annual Review Notes with Contingent Principal Protection Linked to the S&P 500® Index (5252M0GM3) | $4,488,000 | | June 12, 2007 Form 8-K July 10, 2007 Form 10-Q September 18, 2007 Form 8-K October 10, 2007 Form 10-Q December 13, 2007 Form 8-K January 29, 2008 Form 10-K March 18, 2008 Form 8-K April 8, 2008 Form 10-Q June 9, 2008 Form 8-K | Island Medical Group PC Retirement Trust f/b/o Irwin Ingwer |

**APPENDIX A**

| Issue Date | Security (CUSIP) | Volume | Underwriter Defendants (Extent of Participation) | False and Misleading Documents Incorporated into Offering Materials | Plaintiffs |
|---|---|---|---|---|---|
| June 26, 2008 | Medium-Term Notes, Series I (5252M0GN1) | $25,000,000 | | June 12, 2007 Form 8-K<br>July 10, 2007 Form 10-Q<br>September 18, 2007 Form 8-K<br>October 10, 2007 Form 10-Q<br>December 13, 2007 Form 8-K<br>January 29, 2008 Form 10-K<br>March 18, 2008 Form 8-K<br>April 8, 2008 Form 10-Q<br>June 9, 2008 Form 8-K<br>June 16, 2008 Form 8-K | Michael Karfunkel |

# APPENDIX B

## APPENDIX B

## UBS-UNDERWRITTEN STRUCTURED PRODUCT OFFERINGS[1,2,3]

| ISSUE DATE | SECURITY (CUSIP) | VOLUME | UNDERWRITER DEFENDANTS | FALSE AND MISLEADING DOCUMENTS INCORPORATED INTO OFFERING MATERIALS | PLAINTIFFS |
|---|---|---|---|---|---|
| March 30, 2007 | 100% Principal Protection Notes Linked to a Global Index Basket (52520W564) (524908VP2)[4] | $32,000,000 | UBSF | March 14, 2007 Form 8-K | Mohan Ananda<br><br>Fred Mandell |
| March 30, 2007 | Performance Securities with Partial Protection Linked to a Global Index Basket (52520W556) (524908VQ0)[5] | $23,500,000 | UBSF | March 14, 2007 Form 8-K | Roy Wiegert |
| April 30, 2007 | 100% Principal Protection Callable Spread Daily Accrual Notes with Interest Linked to the Spread between the 30-year and the 2-year Swap Rates (52517PY21) | $6,000,000 | UBSF | March 14, 2007 Form 8-K April 9, 2007 Form 10-Q | |

---

[1] Where Lehman served as an underwriter, it does not appear on this table.

[2] Offerings in bold represent some form of principal protection.

[3] The "issue date" identified for the structured notes herein is the settlement date. The pricing date for the structured notes is typically a few days before the settlement date.

[4] This offering was issued under CUSIP 52520W564 but was later identified under CUSIP 524908VP2.

[5] This offering was issued under CUSIP 52520W556 but was later identified under CUSIP 524908VQ0.

**APPENDIX B**

| ISSUE DATE | SECURITY (CUSIP) | VOLUME | UNDERWRITER DEFENDANTS | FALSE AND MISLEADING DOCUMENTS INCORPORATED INTO OFFERING MATERIALS | PLAINTIFFS |
|---|---|---|---|---|---|
| April 30, 2007 | 100% Principal Protection Callable Spread Daily Accrual Notes with Interest Linked to the Spread between the 30-year and the 2-year Swap Rates (52517PX63) | $18,900,000 | UBSF | March 14, 2007 Form 8-K April 9, 2007 Form 10-Q | Lawrence Rose |
| April 30, 2007 | 100% Principal Protection Notes Linked to a Currency Basket (52520W549) | $24,066,340 | UBSF | March 14, 2007 Form 8-K April 9, 2007 Form 10-Q | |
| April 30, 2007 | Performance Securities with Partial Protection Linked to a Global Index Basket (52520W515) | $23,000,000 | UBSF | March 14, 2007 Form 8-K April 9, 2007 Form 10-Q | Ronald Profili Roy Wiegert |
| May 31, 2007 | 100% Principal Protection Callable Spread Daily Accrual Notes with Interest Linked to the Spread between the 30-year and the 2-year Swap Rates (52517PY62) | $23,000,000 | UBSF | March 14, 2007 Form 8-K April 9, 2007 Form 10-Q | |
| May 31, 2007 | 100% Principal Protection Callable Daily Range Accrual Notes with Interest Linked to the 10-Year Constant Maturity U.S. Treasury Rate (52517PY70) | $3,233,000 | UBSF | March 14, 2007 Form 8-K April 9, 2007 Form 10-Q | |
| May 31, 2007 | 100% Principal Protection Notes Linked to a Currency Basket (52520W440) | $12,997,600 | UBSF | March 14, 2007 Form 8-K April 9, 2007 Form 10-Q | Grace Wang Lawrence Rose |

**APPENDIX B**

| Issue Date | Security (CUSIP) | Volume | Underwriter Defendants | False and Misleading Documents Incorporated into Offering Materials | Plaintiffs |
|---|---|---|---|---|---|
| **June 22, 2007** | **100% Principal Protection Notes Linked to a Global Index Basket (52522L202)** | **$18,000,000** | **UBSF** | **March 14, 2007 Form 8-K April 9, 2007 Form 10-Q June 12, 2007 Form 8-K** | |
| **June 29, 2007** | **100% Principal Protection Callable Spread DailyAccrual Notes with Interest Linked to the Spread between the 30-year and the 2-year Swap Rates (52517P2P5)** | **$13,240,000** | **UBSF** | **March 14, 2007 Form 8-K April 9, 2007 Form 10-Q June 12, 2007 Form 8-K** | **Stephen Gott** |
| **June 29, 2007** | **100% Principal Protection Notes Linked to an Asian Currency Basket (52520W390)** | **$10,501,790** | **UBSF** | **March 14, 2007 Form 8-K April 9, 2007 Form 10-Q June 12, 2007 Form 8-K** | |
| **July 31, 2007** | **100% Principal Protection Callable Spread Daily Accrual Notes with Interest Linked to the Spread between the 30-year and the 2-year Swap Rates (52517P3H2)** | **$6,257,000** | **UBSF** | **March 14, 2007 Form 8-K April 9, 2007 Form 10-Q June 12, 2007 Form 8-K July 10, 2007 Form 10-Q** | **Stephen Gott** |
| **July 31, 2007** | **Performance Securities with Partial Protection Linked to a Global Index Basket (52520W358)** | **$17,008,330** | **UBSF** | **March 14, 2007 Form 8-K April 9, 2007 Form 10-Q June 12, 2007 Form 8-K July 10, 2007 Form 10-Q** | **Ralph Rosato** |
| August 31, 2007 | Performance Securities with Contingent Protection linked to the S&P 500® Index (52522L129) | $7,232,050 | UBSF | March 14, 2007 Form 8-K April 9, 2007 Form 10-Q June 12, 2007 Form 8-K July 10, 2007 Form 10-Q | |

## APPENDIX B

| ISSUE DATE | SECURITY (CUSIP) | VOLUME | UNDERWRITER DEFENDANTS | FALSE AND MISLEADING DOCUMENTS INCORPORATED INTO OFFERING MATERIALS | PLAINTIFFS |
|---|---|---|---|---|---|
| August 31, 2007 | Performance Securities with Contingent Protection linked to the Dow Jones EURO STOXX 50® Index (52522L137) | $10,115,520 | UBSF | March 14, 2007 Form 8-K<br>April 9, 2007 Form 10-Q<br>June 12, 2007 Form 8-K<br>July 10, 2007 Form 10-Q | |
| August 31, 2007 | Performance Securities with Contingent Protection linked to the Nikkei 225$^{SM}$ Index (52522L145) | $1,762,140 | UBSF | March 14, 2007 Form 8-K<br>April 9, 2007 Form 10-Q<br>June 12, 2007 Form 8-K<br>July 10, 2007 Form 10-Q | |
| **August 31, 2007** | **100% Principal Protection Notes Linked to an International Index Basket (52522L186)** | **$8,238,780** | **UBSF** | **March 14, 2007 Form 8-K**<br>**April 9, 2007 Form 10-Q**<br>**June 12, 2007 Form 8-K**<br>**July 10, 2007 Form 10-Q** | **Mohan Ananda** |
| **August 31, 2007** | **100% Principal Protection Notes Linked to a Global Index Basket (52522L889)** | **$16,946,020** | **UBSF** | **March 14, 2007 Form 8-K**<br>**April 9, 2007 Form 10-Q**<br>**June 12, 2007 Form 8-K**<br>**July 10, 2007 Form 10-Q** | **Mohan Ananda** |
| September 18, 2007 | Autocallable Optimization Securities with Contingent Protection Linked to the S&P 500® Financials Index (52522L251) | $13,997,350 | UBSF | March 14, 2007 Form 8-K<br>April 9, 2007 Form 10-Q<br>June 12, 2007 Form 8-K<br>July 10, 2007 Form 10-Q | |
| September 28, 2007 | Return Optimization Securities Linked to an International Index Basket (52522L236) | $16,785,040 | UBSF | March 14, 2007 Form 8-K<br>April 9, 2007 Form 10-Q<br>June 12, 2007 Form 8-K<br>July 10, 2007 Form 10-Q<br>September 18, 2007 Form 8-K | |
| **September 28, 2007** | **Performance Securities with Partial Protection Linked to a Global Index Basket (52522L244)** | **$21,821,000** | **UBSF** | **March 14, 2007 Form 8-K**<br>**April 9, 2007 Form 10-Q**<br>**June 12, 2007 Form 8-K**<br>**July 10, 2007 Form 10-Q**<br>**September 18, 2007 Form 8-K** | **Juan Tolosa** |

**APPENDIX B**

| ISSUE DATE | SECURITY (CUSIP) | VOLUME | UNDERWRITER DEFENDANTS | FALSE AND MISLEADING DOCUMENTS INCORPORATED INTO OFFERING MATERIALS | PLAINTIFFS |
|---|---|---|---|---|---|
| September 28, 2007 | 100% Principal Protection Callable Spread Daily Accrual Notes with Interest Linked to the Spread between the 30-year and the 2-year Swap Rates (52517P5K3) | $4,680,000 | UBSF | March 14, 2007 Form 8-K<br>April 9, 2007 Form 10-Q<br>June 12, 2007 Form 8-K<br>July 10, 2007 Form 10-Q<br>September 18, 2007 Form 8-K | Stephen Gott |
| October 12, 2007 | 100% Principal Protection Autocallable Absolute Return Barrier Notes Linked to the S&P 500® Index (52522L368) | $8,375,000 | UBSF | March 14, 2007 Form 8-K<br>April 9, 2007 Form 10-Q<br>June 12, 2007 Form 8-K<br>July 10, 2007 Form 10-Q<br>September 18, 2007 Form 8-K<br>October 10, 2007 Form 10-Q | |
| October 31, 2007 | Medium-Term Notes, Series I, 100% Principal Protection Notes Linked to an Asian Currency Basket (52520W341) | $32,861,710 | UBSF | March 14, 2007 Form 8-K<br>April 9, 2007 Form 10-Q<br>June 12, 2007 Form 8-K<br>July 10, 2007 Form 10-Q<br>September 18, 2007 Form 8-K<br>October 10, 2007 Form 10-Q | Neel Duncan<br><br>Juan Tolosa |
| October 31, 2007 | 100% Principal Protection Barrier Notes Linked to FTSE/Xinhua China 25 Index (52522L400) | $25,000,000 | UBSF | March 14, 2007 Form 8-K<br>April 9, 2007 Form 10-Q<br>June 12, 2007 Form 8-K<br>July 10, 2007 Form 10-Q<br>September 18, 2007 Form 8-K<br>October 10, 2007 Form 10-Q | |
| October 31, 2007 | Return Optimization Securities with Partial Protection Linked to the S&P 500 Index (52522L293) | $38,850,000 | UBSF | March 14, 2007 Form 8-K<br>April 9, 2007 Form 10-Q<br>June 12, 2007 Form 8-K<br>July 10, 2007 Form 10-Q<br>September 18, 2007 Form 8-K<br>October 10, 2007 Form 10-Q | Nick Fotinos |

**APPENDIX B**

| ISSUE DATE | SECURITY (CUSIP) | VOLUME | UNDERWRITER DEFENDANTS | FALSE AND MISLEADING DOCUMENTS INCORPORATED INTO OFFERING MATERIALS | PLAINTIFFS |
|---|---|---|---|---|---|
| October 31, 2007 | Return Optimization Securities Linked to an Index (52522L301) | $7,830,660 | UBSF | March 14, 2007 Form 8-K<br>April 9, 2007 Form 10-Q<br>June 12, 2007 Form 8-K<br>July 10, 2007 Form 10-Q<br>September 18, 2007 Form 8-K<br>October 10, 2007 Form 10-Q | |
| October 31, 2007 | Return Optimization Securities Linked to an Index (52522L319) | $11,876,070 | UBSF | March 14, 2007 Form 8-K<br>April 9, 2007 Form 10-Q<br>June 12, 2007 Form 8-K<br>July 10, 2007 Form 10-Q<br>September 18, 2007 Form 8-K<br>October 10, 2007 Form 10-Q | Arthur Simons |
| October 31, 2007 | Return Optimization Securities Linked to an Index (52522L327) | $2,666,260 | UBSF | March 14, 2007 Form 8-K<br>April 9, 2007 Form 10-Q<br>June 12, 2007 Form 8-K<br>July 10, 2007 Form 10-Q<br>September 18, 2007 Form 8-K<br>October 10, 2007 Form 10-Q | |
| October 31, 2007 | Return Optimization Securities Linked to an Index (52522L335) | $52,814,490 | UBSF | March 14, 2007 Form 8-K<br>April 9, 2007 Form 10-Q<br>June 12, 2007 Form 8-K<br>July 10, 2007 Form 10-Q<br>September 18, 2007 Form 8-K<br>October 10, 2007 Form 10-Q | Arthur Simons |
| **October 31, 2007** | **Return Optimization Securities with Partial Protection Linked to the S&P 500® Financials Index (52522L384)** | **$3,825,970** | **UBSF** | **March 14, 2007 Form 8-K**<br>**April 9, 2007 Form 10-Q**<br>**June 12, 2007 Form 8-K**<br>**July 10, 2007 Form 10-Q**<br>**September 18, 2007 Form 8-K**<br>**October 10, 2007 Form 10-Q** | |
| **November 7, 2007** | **Return Optimization Securities with Partial Protection Linked to the S&P 500 Index (52522L418)** | **$26,064,470** | **UBSF** | **March 14, 2007 Form 8-K**<br>**April 9, 2007 Form 10-Q**<br>**June 12, 2007 Form 8-K**<br>**July 10, 2007 Form 10-Q**<br>**September 18, 2007 Form 8-K**<br>**October 10, 2007 Form 10-Q** | |

**APPENDIX B**

| ISSUE DATE | SECURITY (CUSIP) | VOLUME | UNDERWRITER DEFENDANTS | FALSE AND MISLEADING DOCUMENTS INCORPORATED INTO OFFERING MATERIALS | PLAINTIFFS |
|---|---|---|---|---|---|
| November 14, 2007 | **Performance Securities with Partial Protection Linked to an International Index Basket (52522L426)** | **$12,000,000** | **UBSF** | **March 14, 2007 Form 8-K April 9, 2007 Form 10-Q June 12, 2007 Form 8-K July 10, 2007 Form 10-Q September 18, 2007 Form 8-K October 10, 2007 Form 10-Q** | |
| November 26, 2007 | **Performance Securities with Partial Protection Linked to a Global Index Basket (52522L475)** | **$5,339,000** | **UBSF** | **March 14, 2007 Form 8-K April 9, 2007 Form 10-Q June 12, 2007 Form 8-K July 10, 2007 Form 10-Q September 18, 2007 Form 8-K October 10, 2007 Form 10-Q** | |
| November 30, 2007 | **100% Principal Protection Notes Linked to an Asian Currency Basket (52520W333)** | **$53,027,100** | **UBSF** | **March 14, 2007 Form 8-K April 9, 2007 Form 10-Q June 12, 2007 Form 8-K July 10, 2007 Form 10-Q September 18, 2007 Form 8-K October 10, 2007 Form 10-Q** | **Richard Barrett** |
| November 30, 2007 | **100% Principal Protection Absolute Return Barrier Notes Linked to the MSCI EAFE Index (52522L376)** | **$16,707,020** | **UBSF** | **March 14, 2007 Form 8-K April 9, 2007 Form 10-Q June 12, 2007 Form 8-K July 10, 2007 Form 10-Q September 18, 2007 Form 8-K October 10, 2007 Form 10-Q** | |
| November 30, 2007 | Return Optimization Securities Linked to an International Index Basket (52522L392) | $4,045,800 | UBSF | March 14, 2007 Form 8-K April 9, 2007 Form 10-Q June 12, 2007 Form 8-K July 10, 2007 Form 10-Q September 18, 2007 Form 8-K October 10, 2007 Form 10-Q | |
| November 30, 2007 | **Return Optimization Securities with Partial Protection Linked to the S&P 500® Index (52522L459)** | **$29,713,150** | **UBSF** | **March 14, 2007 Form 8-K April 9, 2007 Form 10-Q June 12, 2007 Form 8-K July 10, 2007 Form 10-Q September 18, 2007 Form 8-K October 10, 2007 Form 10-Q** | **Lawrence Rose** |

**APPENDIX B**

| ISSUE DATE | SECURITY (CUSIP) | VOLUME | UNDERWRITER DEFENDANTS | FALSE AND MISLEADING DOCUMENTS INCORPORATED INTO OFFERING MATERIALS | PLAINTIFFS |
|---|---|---|---|---|---|
| December 31, 2007 | Return Optimization Securities Linked to an International Index Basket (52522L483) | $4,142,300 | UBSF | March 14, 2007 Form 8-K<br>April 9, 2007 Form 10-Q<br>June 12, 2007 Form 8-K<br>July 10, 2007 Form 10-Q<br>September 18, 2007 Form 8-K<br>October 10, 2007 Form 10-Q<br>December 13, 2007 Form 8-K | |
| **December 31, 2007** | **Return Optimization Securities with Partial Protection Linked to the S&P 500® Index (52522L491)** | **$36,010,650** | **UBSF** | **March 14, 2007 Form 8-K**<br>**April 9, 2007 Form 10-Q**<br>**June 12, 2007 Form 8-K**<br>**July 10, 2007 Form 10-Q**<br>**September 18, 2007 Form 8-K**<br>**October 10, 2007 Form 10-Q**<br>**December 13, 2007 Form 8-K** | **Fred Mandell** |
| **December 31, 2007** | **Performance Securities with Partial Protection Linked to a Global Basket Consisting of Indices and an Index Fund (52522L533)** | **$8,000,000** | **UBSF** | **March 14, 2007 Form 8-K**<br>**April 9, 2007 Form 10-Q**<br>**June 12, 2007 Form 8-K**<br>**July 10, 2007 Form 10-Q**<br>**September 18, 2007 Form 8-K**<br>**October 10, 2007 Form 10-Q**<br>**December 13, 2007 Form 8-K** | |
| **January 31, 2008** | **100% Principal Protection Callable Spread Daily Accrual Notes with Interest Linked to the Spread between the 30-year and the 2-year Swap Rates (52517P4N8)** | **$20,373,000** | **UBSF** | **March 14, 2007 Form 8-K**<br>**April 9, 2007 Form 10-Q**<br>**June 12, 2007 Form 8-K**<br>**July 10, 2007 Form 10-Q**<br>**September 18, 2007 Form 8-K**<br>**October 10, 2007 Form 10-Q**<br>**December 13, 2007 Form 8-K**<br>**January 29, 2008 Form 10-K** | **Lawrence Rose** |

**APPENDIX B**

| ISSUE DATE | SECURITY (CUSIP) | VOLUME | UNDERWRITER DEFENDANTS | FALSE AND MISLEADING DOCUMENTS INCORPORATED INTO OFFERING MATERIALS | PLAINTIFFS |
|---|---|---|---|---|---|
| **January 31, 2008** | **100% Principal Protection Notes Linked to an Asian Currency Basket (52520W325)** | **$15,000,000** | **UBSF** | **March 14, 2007 Form 8-K** **April 9, 2007 Form 10-Q** **June 12, 2007 Form 8-K** **July 10, 2007 Form 10-Q** **September 18, 2007 Form 8-K** **October 10, 2007 Form 10-Q** **December 13, 2007 Form 8-K** **January 29, 2008 Form 10-K** | **Grace Wang** |
| **January 31, 2008** | **100% Principal Protection Absolute Return Barrier Notes Linked to the S&P 500® Index (52522L525)** | **$77,681,740** | **UBSF** | **March 14, 2007 Form 8-K** **April 9, 2007 Form 10-Q** **June 12, 2007 Form 8-K** **July 10, 2007 Form 10-Q** **September 18, 2007 Form 8-K** **October 10, 2007 Form 10-Q** **December 13, 2007 Form 8-K** **January 29, 2008 Form 10-K** | **Stephen Gott** **Shea-Edwards Limited Partnership** **Nick Fotinos** **Mohan Ananda** |
| February 8, 2008 | Autocallable Optimization Securities with Contingent Protection Linked to the S&P 500® Financials Index (52522L657) | $48,310,620 | UBSF | March 14, 2007 Form 8-K April 9, 2007 Form 10-Q June 12, 2007 Form 8-K July 10, 2007 Form 10-Q September 18, 2007 Form 8-K October 10, 2007 Form 10-Q December 13, 2007 Form 8-K January 29, 2008 Form 10-K | Joe Rottman Fred Mandell |
| **February 13, 2008** | **Return Optimization Securities with Partial Protection (52522L673)** | **$2,161,670** | **UBSF** | **March 14, 2007 Form 8-K** **April 9, 2007 Form 10-Q** **June 12, 2007 Form 8-K** **July 10, 2007 Form 10-Q** **September 18, 2007 Form 8-K** **October 10, 2007 Form 10-Q** **December 13, 2007 Form 8-K** **January 29, 2008 Form 10-K** | |

**APPENDIX B**

| ISSUE DATE | SECURITY (CUSIP) | VOLUME | UNDERWRITER DEFENDANTS | FALSE AND MISLEADING DOCUMENTS INCORPORATED INTO OFFERING MATERIALS | PLAINTIFFS |
|---|---|---|---|---|---|
| February 13, 2008 | Return Optimization Securities with Partial Protection (52522L699) | $1,233,600 | UBSF | March 14, 2007 Form 8-K<br>April 9, 2007 Form 10-Q<br>June 12, 2007 Form 8-K<br>July 10, 2007 Form 10-Q<br>September 18, 2007 Form 8-K<br>October 10, 2007 Form 10-Q<br>December 13, 2007 Form 8-K<br>January 29, 2008 Form 10-K | |
| February 13, 2008 | Return Optimization Securities with Partial Protection (52522L707) | $2,028,100 | UBSF | March 14, 2007 Form 8-K<br>April 9, 2007 Form 10-Q<br>June 12, 2007 Form 8-K<br>July 10, 2007 Form 10-Q<br>September 18, 2007 Form 8-K<br>October 10, 2007 Form 10-Q<br>December 13, 2007 Form 8-K<br>January 29, 2008 Form 10-K | |
| February 13, 2008 | Return Optimization Securities with Partial Protection (52522L715) | $3,538,300 | UBSF | March 14, 2007 Form 8-K<br>April 9, 2007 Form 10-Q<br>June 12, 2007 Form 8-K<br>July 10, 2007 Form 10-Q<br>September 18, 2007 Form 8-K<br>October 10, 2007 Form 10-Q<br>December 13, 2007 Form 8-K<br>January 29, 2008 Form 10-K | |
| February 13, 2008 | Return Optimization Securities with Partial Protection (52522L723) | $3,807,570 | UBSF | March 14, 2007 Form 8-K<br>April 9, 2007 Form 10-Q<br>June 12, 2007 Form 8-K<br>July 10, 2007 Form 10-Q<br>September 18, 2007 Form 8-K<br>October 10, 2007 Form 10-Q<br>December 13, 2007 Form 8-K<br>January 29, 2008 Form 10-K | |

**APPENDIX B**

| ISSUE DATE | SECURITY (CUSIP) | VOLUME | UNDERWRITER DEFENDANTS | FALSE AND MISLEADING DOCUMENTS INCORPORATED INTO OFFERING MATERIALS | PLAINTIFFS |
|---|---|---|---|---|---|
| **February 29, 2008** | **100% Principal Protection Callable Spread Daily Accrual Notes with Interest Linked to the Spread between the 30-year and the 2-year Swap Rates (5252M0CZ8)** | **$15,827,000** | **UBSF** | **March 14, 2007 Form 8-K April 9, 2007 Form 10-Q June 12, 2007 Form 8-K July 10, 2007 Form 10-Q September 18, 2007 Form 8-K October 10, 2007 Form 10-Q December 13, 2007 Form 8-K January 29, 2008 Form 10-K** | **Miriam Wolf** |
| February 29, 2008 | Performance Securities Linked to an Asian Currency Basket (52522L632) | $3,380,240 | UBSF | March 14, 2007 Form 8-K April 9, 2007 Form 10-Q June 12, 2007 Form 8-K July 10, 2007 Form 10-Q September 18, 2007 Form 8-K October 10, 2007 Form 10-Q December 13, 2007 Form 8-K January 29, 2008 Form 10-K | |
| **February 29, 2008** | **Return Optimization Securities with Partial Protection Notes Linked to the S&P 500® Index (52522L574)** | **$51,565,320** | **UBSF** | **March 14, 2007 Form 8-K April 9, 2007 Form 10-Q June 12, 2007 Form 8-K July 10, 2007 Form 10-Q September 18, 2007 Form 8-K October 10, 2007 Form 10-Q December 13, 2007 Form 8-K January 29, 2008 Form 10-K** | **Fred Mandell** |
| **February 29, 2008** | **Return Optimization Securities with Partial Protection (52522L582)** | **$8,673,630** | **UBSF** | **March 14, 2007 Form 8-K April 9, 2007 Form 10-Q June 12, 2007 Form 8-K July 10, 2007 Form 10-Q September 18, 2007 Form 8-K October 10, 2007 Form 10-Q December 13, 2007 Form 8-K January 29, 2008 Form 10-K** | |

**APPENDIX B**

| ISSUE DATE | SECURITY (CUSIP) | VOLUME | UNDERWRITER DEFENDANTS | FALSE AND MISLEADING DOCUMENTS INCORPORATED INTO OFFERING MATERIALS | PLAINTIFFS |
|---|---|---|---|---|---|
| **February 29, 2008** | **100% Principal Protection Absolute Return Barrier Notes Linked to the Russell 2000® Index (52522L566)** | **$25,495,180** | **UBSF** | **March 14, 2007 Form 8-K April 9, 2007 Form 10-Q June 12, 2007 Form 8-K July 10, 2007 Form 10-Q September 18, 2007 Form 8-K October 10, 2007 Form 10-Q December 13, 2007 Form 8-K January 29, 2008 Form 10-K** | **Grace Wang** |
| February 29, 2008 | Securities Linked to the Relative Performance of the Consumer Staples Select Sector SPDR® Fund vs. the Consumer Discretionary Select Sector SPDR® Fund (52522L772) | $1,395,500 | UBSF | March 14, 2007 Form 8-K April 9, 2007 Form 10-Q June 12, 2007 Form 8-K July 10, 2007 Form 10-Q September 18, 2007 Form 8-K October 10, 2007 Form 10-Q December 13, 2007 Form 8-K January 29, 2008 Form 10-K | |
| **February 29, 2008** | **100% Principal Protection Notes Linked to an Asian Currency Basket (52523J412)** | **$13,692,000** | **UBSF** | **March 14, 2007 Form 8-K April 9, 2007 Form 10-Q June 12, 2007 Form 8-K July 10, 2007 Form 10-Q September 18, 2007 Form 8-K October 10, 2007 Form 10-Q December 13, 2007 Form 8-K January 29, 2008 Form 10-K** | **Harry Pickle (trustee of Charles Brooks)** |
| **March 7, 2008** | **100% Principal Protection Notes Linked to an Asian Currency Basket (52523J420)** | **$5,119,000** | **UBSF** | **March 14, 2007 Form 8-K April 9, 2007 Form 10-Q June 12, 2007 Form 8-K July 10, 2007 Form 10-Q September 18, 2007 Form 8-K October 10, 2007 Form 10-Q December 13, 2007 Form 8-K January 29, 2008 Form 10-K** | |

**APPENDIX B**

| ISSUE DATE | SECURITY (CUSIP) | VOLUME | UNDERWRITER DEFENDANTS | FALSE AND MISLEADING DOCUMENTS INCORPORATED INTO OFFERING MATERIALS | PLAINTIFFS |
|---|---|---|---|---|---|
| **March 19, 2008** | **100% Principal Protection Absolute Return Barrier Notes Linked to the SPDR® S&P® Homebuilders ETF (52523J115)** | **$5,250,000** | **UBSF** | **March 14, 2007 Form 8-K April 9, 2007 Form 10-Q June 12, 2007 Form 8-K July 10, 2007 Form 10-Q September 18, 2007 Form 8-K October 10, 2007 Form 10-Q December 13, 2007 Form 8-K January 29, 2008 Form 10-K March 18, 2008 Form 8-K** | |
| March 25, 2008 | Bearish Autocallable Optimization Securities with Contingent Protection Linked to the Energy Select Sector SPDR® Fund (52523J149) | $5,004,000 | UBSF | March 14, 2007 Form 8-K April 9, 2007 Form 10-Q June 12, 2007 Form 8-K July 10, 2007 Form 10-Q September 18, 2007 Form 8-K October 10, 2007 Form 10-Q December 13, 2007 Form 8-K January 29, 2008 Form 10-K March 18, 2008 Form 8-K | |
| **March 28, 2008** | **Performance Securities with Partial Protection Linked to a Global Index Basket (52523J131)** | **$10,865,000** | **UBSF** | **March 14, 2007 Form 8-K April 9, 2007 Form 10-Q June 12, 2007 Form 8-K July 10, 2007 Form 10-Q September 18, 2007 Form 8-K October 10, 2007 Form 10-Q December 13, 2007 Form 8-K January 29, 2008 Form 10-K March 18, 2008 Form 8-K** | |
| **March 31, 2008** | **100% Principal Protection Callable Spread Daily Accrual Notes with Interest Linked to the Spread between the 30-year and the 2-year Swap Rates (5252M0EK9)** | **$4,522,000** | **UBSF** | **March 14, 2007 Form 8-K April 9, 2007 Form 10-Q June 12, 2007 Form 8-K July 10, 2007 Form 10-Q September 18, 2007 Form 8-K October 10, 2007 Form 10-Q December 13, 2007 Form 8-K January 29, 2008 Form 10-K March 18, 2008 Form 8-K** | |

**APPENDIX B**

| ISSUE DATE | SECURITY (CUSIP) | VOLUME | UNDERWRITER DEFENDANTS | FALSE AND MISLEADING DOCUMENTS INCORPORATED INTO OFFERING MATERIALS | PLAINTIFFS |
|---|---|---|---|---|---|
| **March 31, 2008** | **100% Principal Protection Notes Linked to an Asian Currency Basket (52523J438)** | **$12,024,370** | **UBSF** | **March 14, 2007 Form 8-K April 9, 2007 Form 10-Q June 12, 2007 Form 8-K July 10, 2007 Form 10-Q September 18, 2007 Form 8-K October 10, 2007 Form 10-Q December 13, 2007 Form 8-K January 29, 2008 Form 10-K March 18, 2008 Form 8-K** | |
| **March 31, 2008** | **Return Optimization Securities with Partial Protection Notes Linked to the S&P 500® Index (52522L806)** | **$29,567,250** | **UBSF** | **March 14, 2007 Form 8-K April 9, 2007 Form 10-Q June 12, 2007 Form 8-K July 10, 2007 Form 10-Q September 18, 2007 Form 8-K October 10, 2007 Form 10-Q December 13, 2007 Form 8-K January 29, 2008 Form 10-K March 18, 2008 Form 8-K** | **Shea-Edwards Limited Partnership** |
| **March 31, 2008** | **Return Optimization Securities with Partial Protection Notes Linked to the MSCI EM Index (52522L814)** | **$4,314,700** | **UBSF** | **March 14, 2007 Form 8-K April 9, 2007 Form 10-Q June 12, 2007 Form 8-K July 10, 2007 Form 10-Q September 18, 2007 Form 8-K October 10, 2007 Form 10-Q December 13, 2007 Form 8-K January 29, 2008 Form 10-K March 18, 2008 Form 8-K** | **Harry Pickle (trustee of Charles Brooks)** |
| March 31, 2008 | Bearish Autocallable Optimization Securities with Contingent Protection Linked to the Energy Select Sector SPDR® Fund (52522L871) | $7,556,450 | UBSF | March 14, 2007 Form 8-K April 9, 2007 Form 10-Q June 12, 2007 Form 8-K July 10, 2007 Form 10-Q September 18, 2007 Form 8-K October 10, 2007 Form 10-Q December 13, 2007 Form 8-K January 29, 2008 Form 10-K March 18, 2008 Form 8-K | Shea-Edwards Limited Partnership |

**APPENDIX B**

| Issue Date | Security (CUSIP) | Volume | Underwriter Defendants | False and Misleading Documents Incorporated into Offering Materials | Plaintiffs |
|---|---|---|---|---|---|
| **March 31, 2008** | **100% Principal Protection Accrual Notes with Interest Linked to the Year-Over-Year Change in the Consumer Price Index (5252M0EV5)** | **$1,727,000** | **UBSF** | **March 14, 2007 Form 8-K April 9, 2007 Form 10-Q June 12, 2007 Form 8-K July 10, 2007 Form 10-Q September 18, 2007 Form 8-K October 10, 2007 Form 10-Q December 13, 2007 Form 8-K January 29, 2008 Form 10-K March 18, 2008 Form 8-K** | |
| **March 31, 2008** | **100% Principal Protection Absolute Return Barrier Notes Linked to the Russell 2000® Index (52522L798)** | **$13,688,610** | **UBSF** | **March 14, 2007 Form 8-K April 9, 2007 Form 10-Q June 12, 2007 Form 8-K July 10, 2007 Form 10-Q September 18, 2007 Form 8-K October 10, 2007 Form 10-Q December 13, 2007 Form 8-K January 29, 2008 Form 10-K March 18, 2008 Form 8-K** | **Barbara Moskowitz** |
| April 4, 2008 | Return Optimization Securities Linked to a Basket of Global Indices (52522L848) | $4,102,500 | UBSF | March 14, 2007 Form 8-K April 9, 2007 Form 10-Q June 12, 2007 Form 8-K July 10, 2007 Form 10-Q September 18, 2007 Form 8-K October 10, 2007 Form 10-Q December 13, 2007 Form 8-K January 29, 2008 Form 10-K March 18, 2008 Form 8-K | |
| **April 4, 2008** | **100% Principal Protection Absolute Return Barrier Notes Linked to a Basket of Global Indices (52522L830)** | **$11,307,500** | **UBSF** | **March 14, 2007 Form 8-K April 9, 2007 Form 10-Q June 12, 2007 Form 8-K July 10, 2007 Form 10-Q September 18, 2007 Form 8-K October 10, 2007 Form 10-Q December 13, 2007 Form 8-K January 29, 2008 Form 10-K March 18, 2008 Form 8-K** | |

**APPENDIX B**

| ISSUE DATE | SECURITY (CUSIP) | VOLUME | UNDERWRITER DEFENDANTS | FALSE AND MISLEADING DOCUMENTS INCORPORATED INTO OFFERING MATERIALS | PLAINTIFFS |
|---|---|---|---|---|---|
| April 23, 2008 | Return Optimization Securities with Partial Protection Linked to a Basket of Global Indices (52523J172) | $12,680,000 | UBSF | March 14, 2007 Form 8-K<br>April 9, 2007 Form 10-Q<br>June 12, 2007 Form 8-K<br>July 10, 2007 Form 10-Q<br>September 18, 2007 Form 8-K<br>October 10, 2007 Form 10-Q<br>December 13, 2007 Form 8-K<br>January 29, 2008 Form 10-K<br>March 18, 2008 Form 8-K<br>April 8, 2008 Form 10-Q | Rick Fleischman |
| April 30, 2008 | 100% Principal Protection Absolute Return Barrier Notes Linked to the Russell 2000 Index (52523J156) | $7,368,780 | UBSF | March 14, 2007 Form 8-K<br>April 9, 2007 Form 10-Q<br>June 12, 2007 Form 8-K<br>July 10, 2007 Form 10-Q<br>September 18, 2007 Form 8-K<br>October 10, 2007 Form 10-Q<br>December 13, 2007 Form 8-K<br>January 29, 2008 Form 10-K<br>March 18, 2008 Form 8-K<br>April 8, 2008 Form 10-Q | |
| May 12, 2008 | Return Optimization Securities with Partial Protection (52523J503) | $5,000,000 | UBSF | March 14, 2007 Form 8-K<br>April 9, 2007 Form 10-Q<br>June 12, 2007 Form 8-K<br>July 10, 2007 Form 10-Q<br>September 18, 2007 Form 8-K<br>October 10, 2007 Form 10-Q<br>December 13, 2007 Form 8-K<br>January 29, 2008 Form 10-K<br>March 18, 2008 Form 8-K<br>April 8, 2008 Form 10-Q | |

**APPENDIX B**

| ISSUE DATE | SECURITY (CUSIP) | VOLUME | UNDERWRITER DEFENDANTS | FALSE AND MISLEADING DOCUMENTS INCORPORATED INTO OFFERING MATERIALS | PLAINTIFFS |
|---|---|---|---|---|---|
| May 15, 2008 | Return Optimization Securities with Partial Protection Linked to the S&P 500 Financials Index (52523J206) | $25,009,640 | UBSF | March 14, 2007 Form 8-K<br>April 9, 2007 Form 10-Q<br>June 12, 2007 Form 8-K<br>July 10, 2007 Form 10-Q<br>September 18, 2007 Form 8-K<br>October 10, 2007 Form 10-Q<br>December 13, 2007 Form 8-K<br>January 29, 2008 Form 10-K<br>March 18, 2008 Form 8-K<br>April 8, 2008 Form 10-Q | Karim Kano |
| May 16, 2008 | Return Optimization Securities with Partial Protection Linked to a Portfolio of Common Stocks (52523J222) | $6,958,000 | UBSF | March 14, 2007 Form 8-K<br>April 9, 2007 Form 10-Q<br>June 12, 2007 Form 8-K<br>July 10, 2007 Form 10-Q<br>September 18, 2007 Form 8-K<br>October 10, 2007 Form 10-Q<br>December 13, 2007 Form 8-K<br>January 29, 2008 Form 10-K<br>March 18, 2008 Form 8-K<br>April 8, 2008 Form 10-Q | |
| May 21, 2008 | Performance Securities with Partial Protection Linked to Global Index Basket (52523J214) | $5,070,930 | UBSF | March 14, 2007 Form 8-K<br>April 9, 2007 Form 10-Q<br>June 12, 2007 Form 8-K<br>July 10, 2007 Form 10-Q<br>September 18, 2007 Form 8-K<br>October 10, 2007 Form 10-Q<br>December 13, 2007 Form 8-K<br>January 29, 2008 Form 10-K<br>March 18, 2008 Form 8-K<br>April 8, 2008 Form 10-Q | |

**APPENDIX B**

| Issue Date | Security (CUSIP) | Volume | Underwriter Defendants | False and Misleading Documents Incorporated into Offering Materials | Plaintiffs |
|---|---|---|---|---|---|
| May 30, 2008 | Return Optimization Securities with Partial Protection Linked to the S&P 500® Financials Index (52523J230) | $17,018,280 | UBSF | March 14, 2007 Form 8-K<br>April 9, 2007 Form 10-Q<br>June 12, 2007 Form 8-K<br>July 10, 2007 Form 10-Q<br>September 18, 2007 Form 8-K<br>October 10, 2007 Form 10-Q<br>December 13, 2007 Form 8-K<br>January 29, 2008 Form 10-K<br>March 18, 2008 Form 8-K<br>April 8, 2008 Form 10-Q | David Kotz |
| June 16, 2008 | 100% Principal Protection Absolute Return Notes Linked to the Euro/U.S. Dollar Exchange Rate (52520W283) | $8,083,300 | UBSF | March 14, 2007 Form 8-K<br>April 9, 2007 Form 10-Q<br>June 12, 2007 Form 8-K<br>July 10, 2007 Form 10-Q<br>September 18, 2007 Form 8-K<br>October 10, 2007 Form 10-Q<br>December 13, 2007 Form 8-K<br>January 29, 2008 Form 10-K<br>March 18, 2008 Form 8-K<br>April 8, 2008 Form 10-Q<br>June 9, 2008 Form 8-K | Ralph Rosato |
| June 20, 2008 | 100% Principal Protection Notes with Interest Linked to the Year-Over-Year Change in the Consumer Price Index (5252M0FU6) | $2,302,000 | UBSF | March 14, 2007 Form 8-K<br>April 9, 2007 Form 10-Q<br>June 12, 2007 Form 8-K<br>July 10, 2007 Form 10-Q<br>September 18, 2007 Form 8-K<br>October 10, 2007 Form 10-Q<br>December 13, 2007 Form 8-K<br>January 29, 2008 Form 10-K<br>March 18, 2008 Form 8-K<br>April 8, 2008 Form 10-Q<br>June 9, 2008 Form 8-K | |

**APPENDIX B**

| ISSUE DATE | SECURITY (CUSIP) | VOLUME | UNDERWRITER DEFENDANTS | FALSE AND MISLEADING DOCUMENTS INCORPORATED INTO OFFERING MATERIALS | PLAINTIFFS |
|---|---|---|---|---|---|
| June 30, 2008 | 100% Principal Protection Notes with Interest Linked to the Year-Over-Year Change in the Consumer Price Index (5252M0CD7) | $6,833,000 | UBSF | March 14, 2007 Form 8-K<br>April 9, 2007 Form 10-Q<br>June 12, 2007 Form 8-K<br>July 10, 2007 Form 10-Q<br>September 18, 2007 Form 8-K<br>October 10, 2007 Form 10-Q<br>December 13, 2007 Form 8-K<br>January 29, 2008 Form 10-K<br>March 18, 2008 Form 8-K<br>April 8, 2008 Form 10-Q<br>June 9, 2008 Form 8-K | |
| June 30, 2008 | Return Optimization Securities with Partial Protection Linked to the PowerShares WilderHill Clean Energy Portfolio (52523J263) | $3,365,520 | UBSF | March 14, 2007 Form 8-K<br>April 9, 2007 Form 10-Q<br>June 12, 2007 Form 8-K<br>July 10, 2007 Form 10-Q<br>September 18, 2007 Form 8-K<br>October 10, 2007 Form 10-Q<br>December 13, 2007 Form 8-K<br>January 29, 2008 Form 10-K<br>March 18, 2008 Form 8-K<br>April 8, 2008 Form 10-Q<br>June 9, 2008 Form 8-K | |
| June 30, 2008 | Return Optimization Securities with Partial Protection (524935129) | $6,800,100 | UBSF | March 14, 2007 Form 8-K<br>April 9, 2007 Form 10-Q<br>June 12, 2007 Form 8-K<br>July 10, 2007 Form 10-Q<br>September 18, 2007 Form 8-K<br>October 10, 2007 Form 10-Q<br>December 13, 2007 Form 8-K<br>January 29, 2008 Form 10-K<br>March 18, 2008 Form 8-K<br>April 8, 2008 Form 10-Q<br>June 9, 2008 Form 8-K | |

**APPENDIX B**

| ISSUE DATE | SECURITY (CUSIP) | VOLUME | UNDERWRITER DEFENDANTS | FALSE AND MISLEADING DOCUMENTS INCORPORATED INTO OFFERING MATERIALS | PLAINTIFFS |
|---|---|---|---|---|---|
| June 30, 2008 | 100% Principal Protection Absolute Return Barrier Notes (52523J248) | $12,167,700 | UBSF | March 14, 2007 Form 8-K<br>April 9, 2007 Form 10-Q<br>June 12, 2007 Form 8-K<br>July 10, 2007 Form 10-Q<br>September 18, 2007 Form 8-K<br>October 10, 2007 Form 10-Q<br>December 13, 2007 Form 8-K<br>January 29, 2008 Form 10-K<br>March 18, 2008 Form 8-K<br>April 8, 2008 Form 10-Q<br>June 9, 2008 Form 8-K | Ed Davis |
| June 30, 2008 | 100% Principal Protection Absolute Return Barrier Notes (52523J255) | $4,035,700 | UBSF | March 14, 2007 Form 8-K<br>April 9, 2007 Form 10-Q<br>June 12, 2007 Form 8-K<br>July 10, 2007 Form 10-Q<br>September 18, 2007 Form 8-K<br>October 10, 2007 Form 10-Q<br>December 13, 2007 Form 8-K<br>January 29, 2008 Form 10-K<br>March 18, 2008 Form 8-K<br>April 8, 2008 Form 10-Q<br>June 9, 2008 Form 8-K | Ed Davis |

# APPENDIX C

## APPENDIX C

1.      CW1, an underwriter in Aurora's correspondent division from late 2006 until April 2008, explained that Aurora offered high-risk products, such as Mortgage Maker, that were better described as "Alt-B," which comprised over half of Aurora's mortgage production by early 2007. CW1 also stated that approximately 80% of the loans s/he underwrote were "stated income" loans, often referred to in the mortgage industry as "liar loans," where the borrowers provided no documentation to support their claimed income.

2.      CW2, a Credit Policy Coordinator at Aurora from 2004 until the beginning of 2008, also recalled that Aurora began loan programs in mid-2004 which would be considered subprime, although Aurora did not label them as such, including a program that allowed for loans to be made to borrowers with lower credit scores in the 500s, lower income documentation requirements, and relaxed bankruptcy and mortgage delinquency restrictions.

3.      CW3, a Vice President of Credit Policy at Aurora from 2005 until January 2008, explained that Aurora started producing Alt-B products in late 2005, which accepted FICO scores as low as 540. CW3 recalled that even with a FICO score of 560 or 580 and a blemished credit history of recent bankruptcy, a borrower could get a "stated income" loan. Aurora also had products that allowed for financing of the entire purchase price of a home, another high-risk lending practice in which borrowers put no money down.

4.      CW4, a Vice President of Credit Policy for Aurora from late 2004 to the fall of 2007, also described how Aurora had numerous no documentation and stated income products. CW4 described that Aurora had a "very, very subprime product" called Expanded Options that started around mid to late 2006 and allowed for credit scores of approximately 540.

5.      According to CW5, a Vice President of Aurora from 2002 through the fall of 2007 who was responsible for buying bulk pools of loans from correspondents, Lehman and Aurora were much slower than the rest of the industry to tighten their underwriting guidelines.  CW5 said that Lehman had to approve the underwriting guidelines and dictated what Aurora bought from third party lenders.  CW5 also corroborated that Aurora's Mortgage Maker product was more of an "Alt-B" product and comprised of over half of Aurora's loan production.  CW5 also confirmed that Aurora's repurchase requests to correspondents increased.  CW5 described the group working on repurchases at Aurora as "buried" with repurchase work beginning in the fall of 2006.  Although Aurora needed the correspondents to repurchase the loans, many were going out of business.  According to CW5, there were a lot of outstanding repurchases, including repurchase requests that were two years old.  Yet, Aurora continued to do business with the company.

6.      CW6, a Transaction Analyst employed by Aurora from the fall of 2005 until April 2008, said that although the loans Aurora purchased were supposed to meet underwriting guidelines, Aurora "made hundreds and hundreds of exceptions" in order "to get the loans through." All the loans from Aurora were signed over to Lehman, and Lehman decided the security category in which to put the loans.  CW6 also said that, starting in 2007, Aurora "started to see a lot of loans default.  It seemed to just get worse after that."  According to CW6, Lehman then began "hiring like crazy" in the loan default area, such as the contract administration department, which was in charge of getting the defaulted loans repurchased by entities from which Aurora had purchased these loans. As the volume of defaults increased, the companies that originally made the loans either refused to buy back the loans or went out of business, so it was a "lost cause" trying to get these defaulted loans repurchased, and they sat on Lehman's books.  CW6 learned about these increased loan defaults in meetings and emails.

7.      CW7 and CW8, investigators in Aurora's Special Investigations Unit from 2005 until 2008, also corroborated that Aurora bought mortgages from thousands of brokers and originators around the country, including from certain "strategic partners" who produced high volume loans of lesser quality.  Even though Aurora had a Quality Control unit, Quality Control only spot checked a small percentage of the loans.

8.      CW9, a mortgage fraud analyst for Aurora from January 2007 to January 2008, also found that 30-40% of the 100 to 125 loans that s/he reviewed each month contained false information.

9.      Similarly, CW10, a High Risk Specialist/Mortgage Fraud Investigator for Aurora from late 2004 to March 2008, stated that 60-70% of the loans s/he reviewed were determined to contain false information.

10.     CW11, who worked on repurchase requests while employed by Aurora from 2004 to early 2008, said that the number of repurchase requests was high while s/he worked in the department.  During the last half of 2007, many of the correspondents were unable to honor the repurchase requests, and many were declaring bankruptcy.  When Lehman pushed one of its largest correspondents, First Magnus, to repurchase the defaulting and delinquent loans, First Magnus filed for bankruptcy.

11.     Likewise, according to CW12, a contract administrator and repurchase coordinator at Aurora from the fall of 2004 to the fall of 2006 who processed Aurora's repurchase claims to correspondents, many of the loans Aurora acquired went into default immediately upon their acquisition.  Given the early defaults, Lehman was faced with a large number of repurchase requests from its securitizations.  In turn, Aurora attempted to force the parties from which it acquired the loans to repurchase the problem loans.  CW12 recalled that many of the originators from which

Aurora bought loans were unable to repurchase problem loans, however, and large amounts of Aurora's repurchase requests to mortgage originators became outstanding, with some delinquent over 400 days.  Nonetheless, according to CW12, Aurora continued to buy loans from certain lenders even though they had large numbers of outstanding unpaid repurchase claims.

12.   CW13, a managing director in Lehman's contract finance department from 1987 to early 2008, also recalled that repurchase requests increased in 2007 and that Lehman "got stuck" with the loans because counterparties were not able to honor the repurchases.  According to CW13, Aurora's "loss management" unit (which reported to CW13) dealt with the various counterparties with respect to repurchases.

13.   In addition to making repurchase requests to correspondents, Lehman also received its own repurchase requests from investors who bought non-performing loans from Lehman. According to CW14, a due diligence underwriter who worked almost exclusively with repurchase requests from loan investors while employed at BNC from mid 2005 to October 2007, repurchase requests to Lehman from loan investors like GMAC increased from 2006 to 2007.  CW14 also said s/he started seeing problems with Lehman being unable to sell loans in the first or second quarter of 2007.

14.   Likewise, CW15, a former manager of the Due Diligence and Repurchase Department at BNC from January 2006 until late 2007, said that Lehman sent repurchase requests to BNC from loan investors such as Citigroup.  CW15 noticed a significant increase in repurchase requests in mid 2006, as the market changed and BNC was "bombarded" with requests.