UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------:
                                                                :
In re:                                                          :
                                                                :  Civil Action No. 09 MD 2017 (LAK)
LEHMAN BROTHERS SECURITIES                                      :
AND ERISA LITIGATION                                            :  ECF CASE
                                                                :
This Document Applies Only to:                                  :
                                                                :  **FIRST AMENDED COMPLAINT**
The State of New Jersey, Department of Treasury,               :
Division of Investment v. Richard S. Fuld., Jr.,               :  JURY TRIAL DEMANDED
*et al*., No. 10-cv-05201-LAK                                    :
                                                                :
---------------------------------------------------------------:

## TABLE OF CONTENTS

I.   INTRODUCTION .................................................................................................1

II.  THE PARTIES...................................................................................................8

     A.   Plaintiff ....................................................................................................8

     B.   Defendants ...............................................................................................11

          1.   Unnamed Additional Parties ....................................................11

          2.   Officer Defendants....................................................................11

          3.   Director Defendants..................................................................14

          4.   Auditor Defendant ...................................................................17

III. JURISDICTION AND VENUE .......................................................................18

IV.  FACTUAL ALLEGATIONS ..........................................................................19

     A.   Lehman Made Substantial Investments in Residential and Commercial
          Mortgage Backed Securities ....................................................................19

     B.   Lehman Aggressively Invested Directly and Indirectly in High-Risk
          Commercial Properties …………………………….......…………………21

     C.   The Collapse of the Real Estate Market Negatively Impacted Lehman's
          Capital Positions, but Lehman Continued to Misrepresent its Liquidity
          and Effective Risk Management.......................……………………………23

     D.   Lehman Raised Billions in Capital While Failing to Disclose that It
          Was Not Timely Recognizing Losses on Real Estate-Related Holdings .............26

          1.   Lehman Engaged In a Series of Direct Solicitations to Plaintiff..............27

               i.   Lehman Executives Including Defendant Callan Solicited
                    Plaintiff's Investment in the April 2008 Offering..............................32

               ii.  Lehman Executives Including Defendant Callan Solicited
                    Plaintiff's Investment in the June 2008 Offering................................35

          2.   Lehman Continued to Misrepresent to the Market its
               Financial Position.......................................................................39

i

E.       Lehman Collapses and Files for Bankruptcy ........................................................41

F.       The Bankruptcy Examiner's Report .....................................................................48

G.       Defendants' Use of Repo 105 ..............................................................................49

         1.       FAS 140 and Lehman's "True Sale" Opinion Obtained
                  From a Foreign Law Firm.........................................................................50

         2.       The Mechanics of Calculating Lehman's Net Leverage Ratio .................52

         3.       Lehman Increased its Use of Repo 105 Transactions in 2007-2008 .........54

         4.       The Bankruptcy Examiner's Findings of False Statements
                  and Omissions Regarding Repo 105.........................................................55

         5.       Plaintiff Relied On and Was Misled by Lehman's Disclosures
                  and Omissions Regarding Repo 105.........................................................57

H.       Defendants Overstated the Value of Lehman's Real Estate Assets......................58

         1.       Overstated Assets of Lehman's Principal Transactions Group .................58

         2.       Overstated Archstone Valuations .............................................................59

I.       Defendants Misrepresented Lehman's Liquidity...................................................60

         1.       Failure to Disclose Liquidity Impact of Repo 105....................................60

         2.       Failure to Disclose Effects of Illiquid Assets on Liquidity Pool ..............61

         3.       Inclusion of Encumbered Assets in Liquidity Pool ..................................62

J.       Defendants Misrepresented Lehman's Risk Management Practices ....................62

K.       Defendants Failed to Disclose Certain Concentrations of Credit ........................65

L.       GAAP Violations .................................................................................................66

         1.       Repo 105 ................................................................................................67

         2.       FAS 157 Asset Valuations .......................................................................67

         3.       General GAAP Principles........................................................................71

         4.       Internal Controls .....................................................................................72

M.    False Statements.......................................................................................73

    1.    2007 Quarterly Results ................................................................73

    2.    2007 Year-End Results ................................................................73

    3.    First Quarter 2008 Results ..........................................................74

    4.    Second Quarter 2008 Results.......................................................74

    5.    June 5, 2008 Conference Call Between Defendant Callan
        and Plaintiff............................................................................74

N.    E&Y's Violations of Accounting Standards.........................................76

    1.    E&Y's Deficient Auditing of Repo 105 .....................................76

    2.    The Bankruptcy Examiner's Conclusions Regarding
        E&Y's Repo 105 Involvement..................................................80

    3.    E&Y Failed to Comply With GAAP and GAAS.....................................81

    4.    E&Y's Quarterly Reviews ..........................................................85

    5.    E&Y's Consent for Inclusion of its Audit Opinion in the
        April and June 2008 Offering Materials ...................................87

O.    Plaintiff is Entitled to a Presumption of Reliance Under the
    Efficient Market Doctrine ......................................................................88

P.    Loss Causation .....................................................................................89

Q.    Causes of Action for Non Fraud-Based Claims......................................94

    COUNT I: Violations of Section 11 of the Securities Act Against
    the Securities Act Defendants and E&Y................................................94

    COUNT II: Violations of Section 12(a)(2) of the Securities Act Against
    Defendants Callan and Fuld................................................................97

    COUNT III: Violations of Section 15 of the Securities Act Against
    the Officer Defendants and Walsh........................................................99

    COUNT IV: Negligent Misrepresentation Claim Against the
    Lehman Defendants ...........................................................................100

COUNT V: Non Fraud-Based Breach of Fiduciary Duty Claim Against Defendant Callan ................................................................102

V. ADDITIONAL FACTUAL ALLEGATIONS REGARDING FRAUD-BASED CLAIMS ................................................................103

 A. Defendants' Knowledge of Repo 105 Misrepresentations ...................104

 B. Defendants' Knowledge of Liquidity Misrepresentations...................104

 C. Defendants' Knowledge of Risk Management Misrepresentations....................114

 D. The Director Defendants Rubber-Stamped the Actions of the Officer Defendants and Walsh...........................................................114

 E. E&Y's Prior Violations of GAAS Standards........................................116

 F. Causes of Action for Fraud-Based Claims...........................................118

  COUNT VI: Violations of Sections 14(a) and 14(d) of the New Jersey Uniform Securities Law Against the Lehman Defendants (N.J.S.A. 49:3-71(a), (d)) ...................................................................118

  COUNT VII: Fraud Claim Against the Officer Defendants ...............................120

  COUNT VIII: Aiding and Abetting Fraud Claim Against the Lehman Defendants and E&Y ...........................................................122

  COUNT IX: Fraud-Based Breach of Fiduciary Duty Claim Against Defendant Callan ...................................................................124

VI. PRAYER FOR RELIEF ...............................................................126

VII. DEMAND FOR JURY TRIAL ...............................................................126

Plaintiff, The State of New Jersey, Department of Treasury, Division of Investment ("Plaintiff" or the "Division"), alleges the following based on an investigation conducted by the Division and its counsel. Counsel's investigation included a review and analysis of the public filings of Lehman Brothers Holdings Inc. ("Lehman" or the "Company") with the Securities Exchange Commission ("SEC"); research reports by securities analysts; transcripts of Lehman investor conference calls; Lehman presentations at various financial conferences; press releases and media reports; publicly available filings in other lawsuits and legal proceedings involving Lehman; testimony and documents presented before the United States House of Representatives' Committee on Oversight and Government Reform ("House Committee"); and other publicly available documents and materials related to the Company.[1]

## I.  <u>INTRODUCTION</u>

1.    This action arises from the Division's purchase of approximately $385 million in common stock, preferred stock, and notes ("Notes") from Lehman. The Division's losses stemming from these transactions and Defendants' alleged misconduct total over $192 million.

2.    The Division purchased the bulk of these securities in the first half of 2008, when Defendants' misrepresentations and omissions were at their height. The Division's purchases consisted of: (i) $182 million in common and preferred stock issued by Lehman in an April 1, 2008 public offering (the "April 2008 Offering") and June 9, 2008 public offering (the "June 2008 Offering"); (ii) $184 million in Notes purchased on various dates from January 15, 2008 to August 26, 2008; and (iii) $19 million in open market purchases of common stock acquired on various dates from September 18, 2007 to July 16, 2008. The purchases took place just months

---

[1]  Plaintiff submits this Amended Complaint without prejudice to any of its rights, including its right to assert that this action should be remanded to New Jersey state court where it was originally filed, or transferred to New Jersey federal court where the action was pending before being transferred to New York federal court.

before Lehman unexpectedly filed for bankruptcy on September 15, 2008.

        3.      At the time of the Division's purchases, the values of Lehman's securities were artificially inflated due to a multitude of materially misleading statements and omissions contained in Lehman's public filings and oral statements made directly to the Division. Those misleading statements and omissions pertained to Lehman's "net leverage ratio" (a key ratio of certain assets to certain equity); real estate-related asset valuations; liquidity; risk management controls; and concentrations of credit, among other things. Critically, defendant Erin Callan ("Callan"), who was Lehman's Chief Financial Officer ("CFO"), made oral misrepresentations to the Division during a private one-hour conference call on June 5, 2008 during which Lehman directly solicited the Division's purchase of Lehman securities. On that call, Callan falsely stated that: (i) the market value of Lehman's assets was fairly stated based on sales of similar assets; (ii) Lehman had prudent risk management practices in place; (iii) if Lehman's credit rating were to be downgraded, Lehman would be exposed, at most, to a requirement to post an additional $500 million in collateral to third parties; (iv) Lehman's net leverage ratio had been favorably reduced to 12.1; (v) Lehman was decreasing the overall size of its assets and balance sheet (she omitted to disclose that part of the decrease was caused by Lehman's use of repurchase transactions – or "Repos" – geared toward temporarily removing tens of billions of dollars of assets from Lehman's balance sheet); (vi) Lehman's liquidity pool was strong; and (vii) Lehman would not be accessing the Federal Reserve's credit facility, the so-called "Fed window," in the future.

        4.      A few days after the June 5, 2008 call, the Division purchased $180 million in Lehman common and preferred stock in the June 2008 Offering.[2] The purchases were made in

---

[2]  The June 5, 2008 call was a follow-up to personal solicitations by Lehman personnel to the Division in February 2008 and a phone call by defendant Callan to the Division on April 1, 2008. Following those

direct reliance on misrepresentations made during the call.

5.      After the Division filed its original complaint on March 17, 2009, a bankruptcy examiner ("Examiner") examining events leading to Lehman's bankruptcy issued a 2,209 page report ("Report" or "Rpt.") containing numerous findings and conclusions on topics relevant to the Division's case.  For example, the Examiner concluded that Lehman's net leverage ratio, a key metric of capital adequacy that Lehman touted to investors and the Division, was materially understated throughout at least 2006 to 2008 due to Lehman's use of so-called "Repo 105" securities repurchase transactions.  The Examiner's Report (at p. 20) concluded that Lehman's Repo 105 transactions caused misstatements and omissions to be made in Lehman's public filings:

> Lehman's failure to disclose the use of an accounting device to significantly and temporarily lower leverage, at the same time that it affirmatively represented those "low" leverage numbers to investors as positive news, created a misleading portrayal of Lehman's true financial health.  Colorable claims exist against the senior officers who were responsible for balance sheet management and financial disclosure, who signed and certified Lehman's financial statements and who failed to disclose Lehman's use and extent of Repo 105 transactions to manage its balance sheet.

6.      Specifically, the Examiner's Report (at p. 23-24) concluded that "there are colorable claims against Richard Fuld, Jr., Christopher O'Meara, Erin Callan, and Ian Lowitt in connection with their failure to disclose the use of the [Repo 105] practice, and against Ernst & Young for its failure to meet professional standards in connection with that lack of disclosure." Each of those individuals and Ernst & Young are defendants in the Division's case.

7.      In addition to Repo 105 issues, the Examiner also made other findings that support the Division's claims regarding Lehman's real estate asset valuations, liquidity disclosures, and risk management practices.

_____

contacts, the Division purchased $2 million in common stock in the April 2008 Offering and $145 million in Lehman Notes from April 10, 2008 to May 13, 2008.

8.     The Division's First Amended Complaint ("Amended Complaint") alleges claims under Sections 11, 12(a)(2), and 15 of the Federal Securities Act of 1933 (the "Securities Act"). Those are essentially negligence-based claims for false or misleading statements and omissions in Lehman's shelf registration statement and future documents incorporated by reference therein – *i.e.*, various public filings including but not limited to Lehman's subsequently filed Forms 10-K and 10-Q.[3]

9.     The Amended Complaint also alleges state law claims for violation of New Jersey's blue-sky securities statute, as well as New Jersey common law claims for negligent misrepresentation, fraud, aiding and abetting fraud, and breach of fiduciary duty.

10.     The Amended Complaint is divided into two parts. The first part sets forth the factual allegations and causes of action regarding Plaintiff's non fraud-based claims. The second part sets forth additional factual allegations and causes of action regarding Plaintiff's fraud-based claims.

11.     At the time the defendants made their public and private misrepresentations, the disclosures were false and misleading and/or failed to properly disclose Lehman's then-existing financial position and results. Ultimately, the truth concerning Lehman's deteriorating financial position was revealed through a series of disclosures and, with no potential buyer willing to purchase Lehman's toxic assets, bankruptcy became the only alternative. This sequence of events left investors, including Plaintiff, with increasingly devalued securities.

12.     Lehman did not just collapse suddenly when it filed for bankruptcy a little over three months after the June 2008 Offering. Its financial situation had long been worsening

───────────────────────

[3]   The shelf registration statement was filed with the SEC on May 30, 2006 on Form S-3, which included a prospectus governing the future issuance of common stock, preferred stock, and debt securities, among other securities. The shelf registration statement and prospectus are together referred to as the "Registration Statement."

4

steadily, a fact that was not disclosed by Lehman and the defendants when Plaintiff's investments were solicited. In 2008, Lehman executives, including several defendants, kept telling investors that Lehman's financial position was solid when, in fact, the opposite was true.

13.     Though Lehman was a major participant in all aspects of the real estate market, originating both residential and commercial mortgages, securitizing loans, marketing and selling various asset-backed instruments, and investing directly in real estate, Lehman repeatedly assured investors that its exposure to the real estate meltdown was well contained. In September 2007, as other banks began taking losses, Lehman's then-CFO, defendant Christopher O'Meara ("O'Meara"), told investors: "our liquidity position is stronger than ever."

14.     Lehman increased its real estate investment exposure from $9 billion at the end of 2006, to $22 billion at the end of 2007. Lehman reported record earnings of $4.2 billion for fiscal year 2007. On the year-end earnings call with analysts on December 13, 2007, defendant Richard S. Fuld, Jr. ("Fuld"), Lehman's Chief Executive Officer ("CEO"), stated: "our global franchise and brand have never been stronger."

15.     With the help of its rosy portrayal of the Company's financial condition, Lehman raised tens of billions of dollars through stock offerings and Note offerings in the first half of 2008. Plaintiff purchased the vast majority of its Lehman holdings in those offerings.

16.     Throughout 2008, Lehman belatedly started to move to limit its exposure to at least certain of its losses from its massive real estate portfolio. Companies are required to "mark-to-market" their holdings, meaning to value them on their books at the level at which they could sell them right away. During the first quarter of 2008, Lehman wrote down just $4.7 billion in mortgage-related positions, a write down that was insufficient in size to capture the true asset values.

17.     On June 9, 2008, Lehman announced its preliminary results for the second quarter

of 2008 – an estimated loss of $2.8 billion. According to defendant Callan, this amount included "approximately $4.9 billion of mark-to-market adjustments, principal investment losses and other dynamic hedging losses." In addition to these write downs, defendant Callan reported that Lehman lowered its net leverage ratio to 12.1 (a purportedly positive event) and reduced its exposure to real estate-related assets. Unbeknownst to Plaintiff, Lehman's write downs were again wholly insufficient to capture the true deflation of its asset values. Also, unbeknownst to Plaintiff, Lehman's net leverage ratio was materially misstated due to Lehman's use of Repo 105 transactions, creating a false impression that Lehman's leverage position was more favorable than it actually was. The Repo 105 transactions also caused the balance of Lehman's real estate-related securities on its balance sheet to be materially understated, creating a false impression that Lehman was shedding itself of risky real estate securities.

18. Lehman's assurances that it was financially stable continued throughout 2008. These false assurances – and others like them – led to continued artificial inflation in the market value of Lehman's securities. The assurances also caused investors including Plaintiff to purchase and/or continue to hold Lehman's securities, believing that Lehman was financially stable and could weather any storms.

19. In July through September 2008, after Plaintiff purchased the vast majority of its Lehman securities, market participants began to anticipate that Lehman might need to book more mark-to-market write downs of its real estate assets. Rumors also swirled that Lehman was considering ways to raise needed capital, including selling part of its operations. Around September 10, 2008, media reports surfaced that JP Morgan & Co. ("JPMorgan") was demanding that Lehman provide it additional collateral to cover Lehman's lending positions, and that separately, Barclays, p.l.c. ("Barclays") and Bank of America were reviewing Lehman's books for a possible purchase of the Company.

20.    Lehman continued to falsely assure investors that its financial position and liquidity were solid even at this late date.  On September 10, 2008, Lehman held an earnings guidance call regarding its third quarter 2008 results.  Defendant Ian T. Lowitt ("Lowitt") stated that the Company's liquidity position "remains very strong" and Lehman "will have ample cash capital to sustain its business opportunities."

21.    Before the markets opened on Monday, September 15, 2008, Lehman, with its stock price in a rapid freefall as rumors flew, filed for bankruptcy protection.  Lehman's bankruptcy filing led to a decline in its common stock price on September 15, 2008 by over 94 percent from the previous trading day, Friday, September 12, to $0.21 per share.

22.    Throughout the period relevant to this Amended Complaint, Lehman's financial statements were audited by defendant Ernst & Young, LLP ("E&Y"), which received lucrative accounting and auditing fees, estimated at $31 million in 2007 alone.  Following its audit in 2007, E&Y issued an unqualified audit report on the annual financial statements of Lehman, thereby providing public investors – intended beneficiaries of the audit report including Plaintiff – with the assurance that Lehman was properly reporting its financial position in 2007.  The audit report was false because Lehman's financial statements were not prepared in accordance with Generally Accepted Accounting Principles ("GAAP") and E&Y's audits were not performed in accordance with Generally Accepted Auditing Standards ("GAAS").  E&Y also continued to review Lehman's quarterly financial statements in 2008.  Lehman issued unqualified review reports for its reviews of Lehman's Form 10-Q in the first two quarters of 2008.  Those review reports were false, as E&Y knew or should have known that Lehman's quarterly financial statements were not prepared in accordance with GAAP.

## II.    THE PARTIES

### A.    Plaintiff

23.    Plaintiff is a governmental entity dedicated to serving the citizens of New Jersey, and operates under New Jersey law. The Division of Investment ("DOI" or "Division") is part of the Department of Treasury of New Jersey. The Division is one of the largest managers of public pension funds in the United States, and manages investments for at least seven major retirement systems for New Jersey public employees. The bulk of assets the Division manages are pension and retirement plan funds for over 700,000 active and retired New Jersey employees.

24.    The Division invests the portfolios of numerous New Jersey pension funds, including, among others, the Public Employees' Retirement System ("PERS"); the Teachers' Pension and Annuity Fund ("TPAF"); the Police and Firemen's Retirement System ("PFRS"); the State Police Retirement System ("SPRS"); and the Judicial Retirement System ("JRS").

25.    The Division's investment analysts and portfolio managers review, among other things, regulatory filings, corporate reports, press releases, and other documents disseminated by public companies in order to invest in securities informed by the statements of those companies, their officers and directors, and their auditors. Division personnel also routinely participate in telephonic and live conferences with representatives from the companies in which the Division invests.

26.    The Division was headed by its Director, William G. Clark ("Director Clark"), when it made its investments relevant to this case. Division rules and policies are provided by the New Jersey State Investment Council ("Council").

27.    The Division, through its personnel, relied upon the accuracy, veracity, and completeness of Lehman's public filings, quarterly and annual reports, corporate disclosures, announcements, press releases, and other statements in making investment recommendations and

8

decisions concerning the investments in Lehman securities for the public pension and other public monies it manages. Moreover, the Division, through its personnel, relied upon the accuracy, veracity, and completeness of the representations and statements made by Lehman's officers and directors in public filings, quarterly and annual reports, corporate disclosures, announcements, press releases, teleconferences, analyst conferences, and in-person and telephonic meetings in making investment decisions concerning the investment in Lehman securities for the public pension and other public monies it manages.

28.    The Division was solicited to make its purchases directly by representatives of Lehman, as alleged more fully below. Several members of the Division, including Director Clark, spoke personally on several occasions with representatives from Lehman, including defendant Callan, and relied directly on these representations and Lehman's public disclosures in making the investment decisions.

29.    Defendants' misstatements and omissions caused Plaintiff to not only purchase Lehman securities, but also continue to hold many of those securities.

30.    In total, the Division purchased approximately $385 million in Lehman securities, summarized as follows:

a)    The Division purchased $182 million in Lehman common and preferred stock in the April and June 2008 Offerings, consisting of:

- A $2 million purchase of preferred stock in the April 2008 Offering, consisting of 2,000 shares of Lehman 7.25% Non-Cumulative Perpetual Convertible Preferred Series P at $1,000 per share, purchased on April 1, 2008;

- A $60 million purchase of preferred stock in the June 2008 Offering, consisting of 60,000 shares of Lehman 8.75% Non-Cumulative Mandatory Convertible Preferred Series Q at $1,000 per share, purchased on June 12, 2008; and

- A $120 million purchase of common stock in the June 2008 Offering,

consisting of 4,285,714 shares of Lehman common stock at $28 per share, purchased on June 12, 2008.

b) The Division purchased Lehman Notes with a face amount of $185.2 million for a purchase price of $183.9 million, consisting of:

- $40.2 million in face amount of 5.625% "Medium-Term Notes, Series I" due January 24, 2013 (CUSIP No. 5252M0BZ9), purchased on January 15, 2008 ($25 million face amount purchased for $24,886,000), February 20, 2008 ($15 million face amount purchased for $14,924,250), and August 26, 2008 ($190,000 face amount purchased for $176,753) for a total purchase price of $39,987,003.  The notes were issued pursuant to a "Pricing Supplement" Amendment No. 1 (prospectus) dated January 15, 2008, filed with the SEC on January 17, 2008 on Form 424B2;

- $30 million in face amount of "6.75% Subordinated Notes" due December 28, 2017 (CUSIP No. 5249087M6), purchased on April 10, 2008 for a purchase price of $29,818,800.  The notes were issued pursuant to a "Final Terms and Conditions" document (prospectus) filed with the SEC on December 18, 2007 on Form FWP;

- $50 million in face amount of 6.875% "Medium-Term Notes, Series I" due May 2, 2018 (CUSIP No. 5252M0FD4), purchased on April 17, 2008 for a purchase price of $49,834,500.  The notes were issued pursuant to a "Pricing Supplement" (prospectus) dated April 17, 2008, filed with the SEC on April 21, 2008 on Form 424B2;

- $25 million in face amount of "7.50% Subordinated Notes" due May 11, 2038 (CUSIP No. 5249087N4), purchased on May 1, 2008 for a purchase price of $24,819,750.  The notes were issued pursuant to a "Final Terms and Conditions" document (prospectus) filed with the SEC on May 5, 2008 on Form FWP; and

- $40 million in face amount of 6.20% "Medium-Term Notes, Series I" due September 26, 2014 (CUSIP No. 52517P5X5), purchased on May 13, 2008 for a purchase price of $39,397,200.  The notes were issued pursuant to a "Pricing Supplement" (prospectus) dated September 19, 2007, filed with the SEC on September 21, 2007 on Form 424B2.

The prospectuses for these Notes are collectively referred to herein as the "Note Prospectuses."  The Note Prospectuses, Registration Statement, and documents incorporated by reference into the Registration Statement are collectively referred to as the "Note Offerings."

c)  The Division paid $18.7 million for 467,000 shares of common stock in open-market purchases occurring on various dates from September 18, 2007 to July 16, 2008.

31.    Plaintiff sold virtually all of its Lehman securities on or before Lehman's September 15, 2008 bankruptcy date.  In total, Plaintiff incurred a loss of approximately $192 million as a result of its Lehman transactions, calculated as the purchase price minus sales price for each of the securities, and excluding any interest paid on the securities.

B.    **Defendants**

1.    **Unnamed Additional Parties**

32.    Lehman and its broker/dealer subsidiary, Lehman Brothers, Inc. ("LBI"), were involved as sellers, offerors, and solicitors of the April and June 2008 Offerings and Note Offerings to Plaintiff.  Lehman is in bankruptcy and direct claims against it are stayed under bankruptcy law.  LBI is in liquidation under the Securities Investor Protection Act of 1970, as amended (the "SIPA"), and claims against it are stayed by court order.  But for Lehman's bankruptcy filing and LBI's SIPA proceedings, both Lehman and LBI would have been named as defendants by the Division in this action.

2.    **Officer Defendants**

33.    Defendant Fuld joined Lehman full time in 1968 at the age of 23.  He rose steadily through the Company's ranks, becoming Chairman of its Board of Directors ("Board") in April 1994 and CEO in November 1993.  Between 2000 and September 15, 2008, Fuld received nearly $500 million in total compensation from Lehman.  He signed Lehman's Registration Statement and Form 10-K filed with the SEC for the fiscal year ending November 30, 2007 ("2007 Form 10-K").

34.    Defendant O'Meara served as Lehman's CFO, Controller, and Executive Vice

President from 2004 until December 1, 2007. O'Meara joined Lehman in 1994, and prior to serving as CFO was Lehman's Global Controller. As Controller, O'Meara supervised Lehman's internal accounting programs and procedures. Beginning on December 1, 2007, O'Meara served as head of Worldwide Risk Management. In his role as head of Risk Management, O'Meara was also responsible for supervising Lehman's risk mitigation strategies and procedures. For the fiscal 2007 year, O'Meara received an annual salary of $200,000, a cash bonus of $2,650,000, and a restricted stock award of $6,642,857, for total compensation of $9,492,857.

35.     Defendant Gregory joined Lehman in 1974 and served as Lehman's President and COO from May 2004 until resigning in June 2008. From May 2002 to May 2004, Gregory was Lehman's Co-COO. In his role as COO, Gregory oversaw the day-to-day management of Lehman's operations, while Defendant Fuld handled the external duties. From 2000 until May 2002, Gregory was Lehman's Chief Administrative Officer, and from 1996 to April 2000, he was head of Lehman's Global Equities Division, in charge of the overall equities business. For the fiscal year 2007, Gregory received an annual salary of $450,000, a cash bonus of $4.5 million, and a restricted stock award of $29 million, for total compensation of $34 million.

36.     Defendant Callan joined Lehman in 1995 and served as Lehman's CFO and Global Controller from December 2007 until June 12, 2008, when she was demoted. She resigned later that month. Callan had served in various capacities at Lehman, including head of the Investment Banking Global Hedge Fund Coverage Group, the Global Finance Solutions Group, and Global Finance Analytics Group, but never as a comptroller, the Treasury function that is the usual training ground for CFOs. She signed Lehman's 2007 Form 10-K and first quarter 2008 Form 10-Q.

37.     Defendant Lowitt joined Lehman in 1994 and replaced Callan as CFO on June 12, 2008. He also served as the Co-Chief Administrator Officer since October 2006, overseeing

Lehman's finance organization, including Financial Control, Investor Relations, Planning and

Analysis, Product Control, Tax, and Treasury.  In his role as Co-Chief Administrator Officer, he

was responsible for global oversight of Risk Management.  Lowitt served as Treasurer and

Global Head of Tax from 2000 until 2005.  For the fiscal year 2007, Lowitt received an annual

salary of $200,000, a cash bonus of $2.65 million, and a restricted stock award of $6.64 million,

for a total compensation of $9.49 million.  He signed Lehman's second quarter 2008 Form 10-Q.

38.    Defendant David Goldfarb ("Goldfarb") joined Lehman in 1993, after 14 years in

E&Y's Financial Services practice, where he was a partner.  He became Lehman's Global

Controller in 1995, and in April 2000 was promoted to CFO.  He served in that capacity until

2004, when he was promoted to Chief Administrative Officer, responsible for Finance, Risk

Management, and Investor Relations.  He also oversaw Strategy, Technology and Operations,

Corporate Communications, and Corporate Real Estate.  In 2006, Goldfarb served as the global

head of Strategic Partnerships, Principal Investing and Risk, and in June 2008, Goldfarb assumed

the position of Chief Strategic Officer.

39.    Defendant McDade joined Lehman in 1983.  He became co-head of the Fixed

Income Division in 2000, and in 2002 he became global head of the Fixed Income Division.  In

2005, he was named global head of the Equities Division.  In June 2008, McDade assumed the

position of President and COO, replacing Gregory.

40.    Defendant Thomas Russo ("Russo") was Chief Legal Officer of Lehman since

1993 and was an Executive Vice President of the Company and a member of, and counsel to, the

Executive Committee.  He has been a Vice Chairman of LBI since July 1999.  In addition, Russo

is a member of the Federal Reserve Bank of New York's International Advisory Committee and

the Committee on Capital Markets Regulation.  For the fiscal year 2007, Russo received an

annual salary of $450,000, a cash bonus of $4,550,000 and a restricted stock award of $9 million,

for total compensation of $14 million.

41.     Defendants Fuld, O'Meara, Gregory, Callan, Lowitt, Goldfarb, McDade and Russo are collectively referred to herein as the "Officer Defendants." The Officer Defendants all served on Lehman's Executive Committee, chaired by Defendant Fuld. The Executive Committee was responsible for assessing Lehman's risk exposure and related disclosures, reportedly meeting at least twice a week at which time they regularly spoke about managing risk.

42.     Defendant Mark Walsh ("Walsh") joined Lehman in 1988. By 1995, he was a managing director and head of Lehman's Commercial Real Estate Principal Transaction Group. In 2004, Walsh was made co-head of Lehman's Global Real Estate Group, becoming the sole head of the group in 2008 when the other co-head, Raymond Mikulich, retired at the year end 2007. Walsh was a member of Lehman's Management Committee and had primary responsibility for Lehman's entire real estate portfolio.

### 3.     Director Defendants

43.     Defendant Michael Ainslie ("Ainslie") was, at all relevant times, a director of Lehman. He signed the Registration Statement and 2007 Form 10-K in his capacity as a director of Lehman. Ainslie served on Lehman's Board for 22 years. He is the former President and CEO of Sotheby's Holdings, retiring in 1994. He is also a former director of the St. Joe Company and a current Trustee of Vanderbilt University. For the fiscal year of 2007, he received total compensation of $397,538 from Lehman.

44.     Defendant John F. Akers ("Akers") was, at all relevant times, a director of Lehman and signed the Registration Statement and 2007 Form 10-K in his capacity as a director of Lehman. Akers joined Lehman's Board in 1996, and served as Chairman of the Compensation and Benefits Committee and a member of the Finance and Risk Committee. He is the former Chairman and CEO of International Business Machine Corp., from which he retired

in 1993. For the fiscal year of 2007, he received total compensation of $360,538 from Lehman.

45.     Defendant Roger S. Berlind ("Berlind") was, at all relevant times, a director of Lehman and signed the Registration Statement and 2007 Form 10-K in his capacity as a director of Lehman. Berlind joined Lehman's Board in 1985, and also served as a member of the Audit Committee and the Finance and Risk Committee. Berlind is a theatrical producer. For the fiscal year 2007, he received total compensation of $352,538 from Lehman.

46.     Defendant Thomas H. Cruikshank ("Cruikshank") was, at all relevant times, a director of Lehman and signed the Registration Statement and 2007 Form 10-K in his capacity as a director of Lehman. Cruikshank joined Lehman's Board in 1996, and served on the Audit Committee and Nominating and Corporate Governance Committee. Cruikshank served as the Chairman and CEO of Halliburton Energy Services, retiring in 1995. For the fiscal year 2007, he received total compensation of $385,038 from Lehman.

47.     Defendant Marsha Johnson Evans ("Evans") was, at all relevant times, a director of Lehman and signed the Registration Statement and 2007 Form 10-K in her capacity as a director of Lehman. Evans joined Lehman's Board in 2004. She served as Chairperson of the Nominating and Corporate Governance Committee, a member of the Compensation and Benefits Committee, and member of the Finance and Risk Committee. She is also a director of Weight Watchers International, Inc., Office Depot, Inc. and Huntsman Corporation. For the fiscal year 2007, she received total compensation of $373,038 from Lehman.

48.     Defendant Christopher Gent ("Gent") was, at all relevant times, a director of Lehman and signed the Registration Statement and 2007 Form 10-K in his capacity as a director of Lehman. Gent joined Lehman's Board in 2003 and served as a member of the Audit Committee and Compensation and Benefits Committee. Beginning in 1997, he had been the CEO of Vodafone, retiring in 2003. He is currently the Non-Executive Chairman of

GlaxoSmithKline plc.  He is also a director of Ferrari SpA and senior advisor to Bain &

Company, Inc.  For the fiscal year 2007, he received total compensation of $365,538 from

Lehman.

      49.    Defendant Roland A. Hernandez ("Hernandez") was, at all relevant times, a

director of Lehman and signed the Registration Statement and 2007 Form 10-K in his capacity as

a director of Lehman.  Hernandez joined Lehman's Board in 2005, and served on the Finance

and Risk Committee.  He is the former Chairman and CEO of Telemundo Group, Inc., a Spanish

language television station, retiring in December 2000.  He is also a current director of MGM

Mirage, the Ryland Group, Inc., and Vail Resorts, Inc., and a former director of Wal-Mart

Stores, Inc.  For the fiscal year 2007, he received total compensation of $325,038 from Lehman.

      50.    Defendant Henry Kaufman ("Kaufman") was, at all relevant times, a director of

Lehman and signed the Registration Statement and 2007 Form 10-K in his capacity as a director

of Lehman.  Kaufman joined Lehman's Board in 1995 and served as the Chairman of the

Finance and Risk Committee.  For 26 years, Kaufman was with Salomon Brothers, Inc., where

he was a Managing Director, Member of the Executive Committee, and in charge of Salomon's

various research departments.  He is also a former Treasurer and Trustee of the Economic Club

of New York.  He received $349,388 in compensation from Lehman for 2007.  In 2007, the

Finance and Risk Committee, which Kaufman chaired, met twice.

      51.    Defendant John D. Macomber ("Macomber") was, at all relevant times, a director

of Lehman and signed the Registration Statement and 2007 Form 10-K in his capacity as a

director of Lehman.  He joined Lehman's Board in 1994 and served on the Compensation and

Benefits Committee, Executive Committee, and Nominating and Governance Committee.

Macomber has been a principal of JDM Investment Group since 1992.  Macomber is also a

director of Collexis Holdings, Inc. and Stewart & Stevenson, LLC., and a Trustee at Carnegie

Institution in Washington, DC and Folger Library in Washington.  For the fiscal year 2007, he received total compensation of $377,038 from Lehman.

52.     Defendants Ainslie, Akers, Berlind, Cruikshank, Evans, Gent, Hernandez, Kaufman, and Macomber are collectively referred to herein as the "Director Defendants."  The Director Defendants, among other responsibilities, were charged with reviewing significant capital transactions and the respective risks involved, and ensuring the accuracy and completeness of the applicable public filings they signed.

53.     The Officer Defendants, Defendant Walsh, and the Director Defendants are collectively referred to herein as the "Lehman Defendants."

54.     The Lehman Defendants, because of their senior positions at Lehman, were controlling persons of the Company and were empowered with the authority to control the contents of Lehman's reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, institutional investors, and individual investors.

### 4.     Auditor Defendant

55.     Defendant E&Y is a public accounting firm with offices throughout the world, including in the State of New Jersey.  Pursuant to the Sarbanes-Oxley Act of 2002 ("SOX"), E&Y is subject to oversight and annual inspection by the Public Company Accounting Oversight Board ("PCAOB") as a registered public accounting firm that regularly provides audit reports for more than 100 issuers.  E&Y served as Lehman's outside auditor for years and at all times relevant to the events at issue in this Amended Complaint.  Lehman engaged E&Y to audit its financial statements, as well as to provide a written opinion as to whether the financial statements were fairly presented in accordance with GAAP.  E&Y also reviewed Lehman's quarterly financial results and issued written review reports for its quarterly reviews.  For its work, E&Y earned tens of millions of dollars in annual fees, including over $31 million in 2007

alone for audit and tax fees. E&Y's audit opinion regarding Lehman's consolidated financial statements for the year ending November 30, 2007 is incorporated by reference in the Registration Statement and in each of the offering prospectuses which were issued in connection with the April and June 2008 Offerings. E&Y had to formally "consent" to this incorporation by reference, and by doing so lent its endorsement to the April and June 2008 Offerings.

56.    The Lehman Defendants and E&Y are collectively referred to herein as the "Defendants."

### III.    JURISDICTION AND VENUE

57.    Plaintiff was solicited to purchase Lehman securities by Lehman representatives, and the purchases were consummated in New Jersey.

58.    Each Defendant has sufficient contacts with New Jersey, is a citizen of New Jersey, or otherwise purposely availed himself, herself, or itself of benefits from New Jersey, or has property in New Jersey. Prior to its bankruptcy, Lehman conducted substantial business in New Jersey. Lehman maintained several offices and data centers in New Jersey. E&Y also conducts substantial business in New Jersey, and presently maintains several offices in the state.

59.    This action was originally filed in the Superior Court of New Jersey, Law Division, Mercer County, Case No. MER-L-677-09. Certain of the Defendants removed the action to New Jersey federal court, Docket No. 09-cv-1629, despite Plaintiff's objections and an appeal. The action was subsequently transferred to the Southern District of New York, Docket No. 10-cv-5201 (LAK), to be coordinated for pretrial purposes with the multidistrict proceedings, Master Docket No. 09 MD 2017 (LAK). By filing the instant Amended Complaint in this Court, Plaintiff does not consent to jurisdiction in this forum and does not waive its right to: (i) re-challenge the original removal from New Jersey state court; and/or (ii) seek a remand to New Jersey federal court, when such issues become ripe for adjudication.

## IV.    FACTUAL ALLEGATIONS

### A.    Lehman Made Substantial Investments in Residential and Commercial Mortgage Backed Securities

60.    Since the late 1990s, and especially in the five years preceding its bankruptcy, Lehman participated in all aspects of the residential and commercial mortgage markets. Lehman's mortgage-related business ultimately comprised its single largest revenue component. Lehman originated mortgages, purchased mortgages, packaged mortgages into securities, and marketed the securities to investors.  Essentially, Lehman morphed from a conservative investment bank to a speculator in the real estate market.

61.    Lehman participated in the origination and securitization of non-prime residential mortgages.  Non-prime mortgages are categorized as "Subprime" and "Alt-A."  "Subprime" describes residential mortgages to borrowers who do not qualify for prime interest rates because they exhibit one or more of the following characteristics: weakened credit histories typically characterized by payment delinquencies, previous charge-offs, judgments, or bankruptcies; low credit scores; high debt-burden ratios; or high loan-to-value ratios.  "Alt-A," short for Alternative-A, describes residential mortgages to borrowers whose income may not be documentable, or have other credit problems, although their financial circumstances are better than borrowers in the subprime category.

62.    Industry-wide, the nonprime mortgage market grew significantly in the late 1990s until in or around 2006.

63.    In tandem with the growth of the residential real estate market, the commercial real estate market also enjoyed explosive growth beginning in the early 2000s and extending through in or around 2006.  This in turn led to a sharp increase in the valuations of commercial properties and the commercial mortgage amounts financed by lenders.

19

64.     Both residential mortgages and commercial mortgages were packaged into residential mortgaged-backed securities ("RMBS") and commercial mortgage-backed securities ("CMBS") (collectively "MBS") and other complicated derivative structures for sale to investors.

65.     MBS are extremely dependent on interest rates.  In general, rising interest rates negatively affect all borrowers, especially those whose interest rates are adjustable.  In such situations, for example, if the RMBS is backed by a pool of subprime adjustable rate mortgages, a rise in the interest rates increases the borrowers' monthly payments, increasing the likelihood that some borrowers will default on their mortgages, thereby decreasing the overall value of the RMBS.  Similarly, falling interest rates can also have a negative effect on RMBS backed by fixed-rate residential mortgages because many borrowers chose to refinance, leaving the less credit-worthy borrowers who could not refinance in the remaining mortgage pool.

66.     The risk of default likewise extended to commercial borrowers.  Commercial lenders frequently provided mortgages for almost the entire value of a property.  Compounding risk, some commercial lenders originated mortgages with monthly payments greater than the projected monthly income on the commercial properties.

67.     Lehman promoted its acumen for managing the risks associated with MBS, claiming that its vertically-integrated mortgage business (*i.e.*, its involvement from loan origination through securitization) minimized risks associated with holding mortgage-related assets on its balance sheet.  In other words, Lehman told the market that it knew and could manage the risks of the mortgages it held because it had originated many of those mortgages.

68.     Defendant Callan articulated this point with regard to RMBS by stating during an investor conference on February 6, 2008 that Lehman "didn't look at participating in the residential mortgage market as taking a directional bet one way or the other way."  Comparing

Lehman to other investment banks, Defendant Callan stated:

> It doesn't come from Goldman's model of taking a proprietary bet, or Morgan Stanley's model, or even Merrill's model of warehousing a significant amount of product. It just comes from a basic focus and philosophy that we really didn't want to go long the product or short the product. We wanted to originate to distribute and we hedged that origination capability.

69.     According to its 2007 Form 10-K, Lehman originated approximately $60 billion in residential mortgages during 2006 and $47 billion during 2007. Approximately 25 percent of the loans Lehman originated through its subsidiaries were subprime loans.

70.     As a result of its many roles in all aspects of residential and commercial real estate finance, Lehman became one of the leaders in underwriting MBS. In 2007, according to its 2007 Form 10-K, Lehman securitized more than $100 billion in residential mortgages and $20 billion in commercial mortgages, making it the MBS leader in the world.

71.     Fueled by its dominance in the MBS area, Lehman purportedly achieved record profits, earning net income of $3.3 billion in 2005, $4.0 billion in 2006, and $4.2 billion in 2007.

72.     However, Lehman achieved these record profits by substantially increasing its risk exposure for real estate-related assets that it held. The aggregate value of Lehman's mortgage and other asset-backed securities ("ABS") totaled $58 billion at the end of 2006, and increased by a whopping 54 percent to over $89 billion by year-end 2007, almost four times its $22 billion in shareholder equity.

**B.      Lehman Aggressively Invested Directly and Indirectly in High-Risk Commercial Properties**

73.     Likewise, Lehman aggressively increased its commercial real estate investments. In 2005, it originated approximately $27 billion in commercial mortgages, with that number jumping to $34 billion in 2006 and an astonishing $60 billion in 2007. In addition to its MBS position of over $89 billion ($39 billion of which related to commercial whole loans and

securities), Lehman also directly held real estate inventory valued at $22 billion at year end 2007. According to a Goldman Sachs analyst, as of March 2008, Lehman had more commercial holdings than any other firm, including over $10 billion more than its nearest competitor, Citigroup, and more than double the holdings of Morgan Stanley, Bear Stearns and JPMorgan.

74.    Defendant Walsh headed Lehman's Global Real Estate Group. Defendant Walsh led Lehman into originating new commercial loans for real estate developers, a business Lehman had never been in, to the point that Lehman developed a reputation for being one of the most aggressive lenders in the commercial field. Defendant Walsh pushed Lehman into riskier loans and also into making direct real estate investments. He was one of the earliest and most aggressive lenders of so-called bridge equity. Bridge equity involved short term loans of equity that helped deals close quickly with the intent that Lehman would replace its loan or equity position with new investments from new investors after the deal closed and Lehman collected its fees. His approach is said to have generated huge short-term returns for Lehman, but there was significant risk if the market turned and Lehman was unable to exit from its positions.

75.    Undisclosed to investors, Defendant Walsh had extraordinary authority to commit capital as he saw fit. He did not have to go through Lehman's normal risk management channels, enjoying a broad swath of authority to commit large amounts of capital to projects without being questioned by senior Lehman executives. All of the different departments of Lehman's real estate business reported to him. This concentration of power and authority in a single individual was dramatically different from other firms' structure and also dangerous and risky, especially as the real estate market declined.

76.    In 2007, Lehman continued to invest heavily in the commercial property sector. In May 2007, Lehman partnered with Tishman Speyer to enter an agreement to pay $22.2 billion for a leveraged buyout of Archstone-Smith ("Archstone"), one of the largest owners of apartment

buildings in the country. Despite the fact that both residential and commercial real estate markets were plummeting at the time, Walsh went forward with the deal in October 2007 rather than paying a break-up fee that amounted to a fraction of the purchase price. As of October 1, 2008, Lehman still held on its books more than $2 billion in bridge equity in Archstone that it was unable to sell.

77.     In 2008, prior to its bankruptcy petition, Lehman reportedly marked down commercial real estate investments by $3.6 billion, and sold about $7 billion of commercial mortgages and mortgage securities at losses up to 20%.

**C.     The Collapse of the Real Estate Market Negatively Impacted Lehman's Capital Positions, but Lehman Continued to Misrepresent its Liquidity and Effective Risk Management**

78.     By 2007, the downturn in housing prices spread to the commercial real estate market. The downturn further worsened in the real estate loan market, wreaking havoc on the market value of the billions of dollars of whole mortgages and MBS on Lehman's balance sheet, as well as the value of real estate held for sale.

79.     Rising delinquencies and defaults in the MBS markets led the three main credit rating agencies – Standard & Poor's ("S&P"), Moody's, and Fitch – to downgrade some MBS in 2007, reflecting the overall reduced value of the securities and underlying loans.

80.     The downgrades of MBS by the credit rating agencies exacerbated the implosion of the residential and commercial real estate markets, creating a frenzied cycle in which the declining value of MBS led the rating agencies to downgrade even more MBS tranches.

81.     In 2007, various hedge funds with significant exposure to MBS and other sophisticated securities linked to the real estate market collapsed.

82.     Most significantly, two hedge funds run by Bear Stearns Companies Inc. ("Bear Stearns"), which reportedly at one point held $20 billion in MBS and other exotic securities

linked to the subprime market, collapsed in July 2007. The collapse of the two Bear Stearns hedge funds led to speculation that Lehman would announce that it had greater exposure to subprime mortgages and that it would start recognizing losses on these assets. On July 18, 2007, in response to the rumors, Lehman spokesperson Kerrie Cohan stated that the "rumors regarding [Lehman's] subprime exposure are totally unfounded."

83. A Lehman mortgage originator, BNC Mortgage LLC ("BNC"), which had large subprime mortgage portfolios, experienced a dramatic increase in delinquencies in 2007. On August 17, 2007, Lehman closed BNC.

84. Given the increasing problems in the mortgage market at the end of 2006 and in 2007, Lehman's origination and securitization businesses declined substantially, decreasing from $36 billion in mortgage origination and nearly $43 billion in mortgage securitization in the second quarter of 2007, to $2.5 billion in mortgage origination and $7 billion in securitization in the second quarter of 2008.

85. Faced with a slowing securitization market, Lehman was forced to account for many of the securitization deals as secured transactions instead of sales. Normally, securitizers such as Lehman prefer to account for securitization deals as sales rather than secured financings, because secured financings require the securitized assets to remain on the balance sheet. This inability to remove the assets from the balance sheet becomes important when these assets become non-performing or decrease in value.

86. The delinquent and defaulting mortgage-related assets accumulating on Lehman's balance sheet in 2007 also had a negative impact on Lehman's liquidity, leverage, and capital resources. Because Lehman purchased many of its mortgage-related assets using secured credit obtained under tri-party agreements, Lehman faced significant liquidity problems once the value of its mortgage-related assets started to drop. As the market value of the pledged mortgage-

related assets declined, secured lenders imposed "haircuts" – *i.e.* discounts – on Lehman's credit lines, thereby forcing Lehman to draw upon its own liquidity pool in order to execute transactions.

87.     Accordingly, Lehman's reported cash surplus declined significantly between year-end 2006 and the second quarter of 2007, dropping from $6 billion to $2.5 billion.  With the third quarter of 2007, Lehman's cash surplus appeared to stabilize – with $7 billion at year end 2007 and $8 billion in the first quarter of 2008.  When Lehman executives made positive statements about its liquidity position in 2008, these statements were material to the market, as the implication was that the market values of Lehman's mortgage-related assets were being properly reported and had no negative impact on its liquidity position.

88.     On a September 17, 2007 conference call with analysts to discuss Lehman's quarterly results, Defendant O'Meara said about the mortgage market that "[b]arring any unforeseen circumstances, **we feel that the worst of this credit correction is behind us**.  We have taken significant negative marks across all asset classes this period, and we have taken actions to resize our mortgage origination platform in-line with what we believe will be a smaller securitization market for the foreseeable future."  (Emphasis added).

89.     On December 1, 2007, Defendant O'Meara stepped down as CFO to head the global risk management division and was succeeded by Defendant Callan.

90.     On December 13, 2007, Lehman issued a press release filed with the SEC on Form 8-K announcing its financial results for the fourth quarter and full year ending November 30, 2007 ("December 13, 2007 Form 8-K"), which reported full-year earnings of $4.2 billion.

91.     On a December 13, 2007 earnings conference call with analysts, Defendant O'Meara, the former CFO, spoke in his new role as Global Head of Risk Management on the

record earnings of $4.2 billion:

> More fundamentally, it reflects the **strength of our risk management culture** in terms of **managing our overall risk appetite**, seeking appropriate risk/reward dynamics and exercising **diligence around risk mitigation**.  And lastly, it reinforces the importance of our **disciplined liquidity and capital management framework**, which sets us up to operate our business through periods of market stress.

(Emphasis added.)

92.    On January 29, 2008, Lehman filed its 2007 Form 10-K with the SEC.  That Form 10-K was signed by Defendants Fuld, Callan, Ainslie, Akers, Berlind, Cruishank, Evans, Gent, Hernandez, Kaufman and Macomber, and contained management certifications of Lehman's financial statements and internal controls over financial reporting by the CEO and CFO, as well as the certifications required by SOX signed by Defendants Fuld and Callan.  In the 2007 Form 10-K, Lehman reported record net revenue for the 2007 fiscal year of $19 billion, and record net income of $4.2 billion.  The 2007 Form 10-K showed that Lehman had a total exposure of $32 billion in residential mortgage holdings, including $14 billion in whole loans, $17 billion in RMBS, and $1 billion in mortgage servicing.

**D.    Lehman Raised Billions in Capital While Failing to Disclose that It Was Not Timely Recognizing Losses on Real Estate-Related Holdings**

93.    On May 30, 2006, Lehman filed its Registration Statement with the SEC, which included prospectuses governing the future issuance of common stock, preferred stock, and notes, among other securities.  Defendants Fuld, Ainslie, Akers, Berlind, Cruikshank, Evans, Gent, Hernandez, Kaufman, and Macomber each signed the Registration Statement.

94.    The Registration Statement allowed Lehman to issue and sell certain securities when it desired, hence it is often referred to as a "shelf registration."  The Registration Statement indicated that future filings such as Forms 10-K and 10-Q would be incorporated into the Registration Statement:

26

The SEC allows us to "incorporate by reference" the information [we file] with the SEC, which means that [we] can disclose important information to you by referring you to those documents. The information incorporated by reference is considered to be part of this prospectus. Information that we file after the date of this registration statement and prior to the effectiveness of this registration statement shall be deemed to be incorporated by reference into this prospectus and information that we file later with the SEC will automatically update information in this prospectus. . . . **We incorporate by reference . . . any future filings made with the SEC under Section 13(a), 13(c), 14, or 15(d) of the Securities Exchange Act of 1934 [including but not limited to Forms 10-K and 10-Q.**]

(Emphasis added.)

95.     The Forms 10-K and 10-Q incorporated into the Registration Statement contained numerous misstatements and omissions as set forth more fully below.

96.     In 2008, Lehman, although consistently reiterating its purportedly strong liquidity, leverage, and disciplined risk management, went on a capital-raising binge. Lehman issued millions of shares of common and preferred stock in February, April, and June 2008 that ultimately raised approximately $12 billion. Lehman also issued various Notes, raising billions of dollars. Throughout the capital raisings, Lehman and its top executives maintained that Lehman's liquidity, leverage, and financial position was solid, and that the additional capital it sought to raise would enhance Lehman's already strong capital base.

## 1.    Lehman Engaged In a Series of Direct Solicitations to Plaintiff

97.     Lehman personnel had frequent and direct communications with Plaintiff. Lehman was Plaintiff's number one domestic trading relationship by brokerage volume and equity commissions. As Lehman sought to raise capital in 2008, it contacted several of its most important clients to solicit purchases. On February 4, 2008, Lehman's Chris Albanese ("Albanese"), Senior Vice President, Fixed Income Sales and Lehman's sales representative to Plaintiff, sent Plaintiff's then-Director of the Division of Investment, Clark, the preliminary prospectus for a public offering of preferred shares, Series J, consisting of 1.9 million shares of

27

7.95% Convertible Preferred Stock, issued at $1,000 per share.  At the time, the Division

declined to participate in the February offering.

98.    On the public announcement of this $1.9 billion preferred offering on February 4,

2008, Lehman's common stock closed at $63.82 per share.

99.    Speaking at a February 6, 2008 Credit Suisse Financial Services Forum,

Defendant Callan commented on the reception to the $1.9 billion preferred stock offering and its

impact on the Company's balance sheet:

> [We are] so very happy with the market reception to our name and our brand.
> Diversifying investors going to retail investors on a particular transaction.  And a
> great way to grow the balance sheet, which we continue to see opportunities for,
> without putting more leverage onto the balance sheet.  So that's a key operating
> principle for us in 2007, is not to create more leverage, but if anything, to **de-
> lever** slightly in the environment.
>
> On the liquidity side, **our liquidity pool at the Holding Company is larger than
> it ever has been**, at $35 billion.  We look at unencumbered assets about $63
> billion that we could always finance against.
>
> (Emphasis added.)

100.    Defendant Callan also claimed that the February 4, 2008 $1.9 billion preferred

share offering was part of Lehman's normal capital-raising plan, stressing that it "has no

connection to any write-down experiences or expected write-down experiences," and that it

**should take "care of our full-year needs**."  (Emphasis added.)

101.    At the conference, Defendant Callan also touted Lehman's "**discipline around

liquidity, risk management**, capital and expenses" including during the second half of 2007,

which partially stemmed from Lehman's "active hedging of the residential mortgage book,

which [Lehman] started in fiscal 2006."  (Emphasis added.)

102.    As a result of Defendant Callan's comments at the February 6 Credit Suisse

forum, the price of Lehman common stock increased $2.30, or 3.95 percent, from its closing

price of $58.18 on February 6, 2008, to close at $60.48 per share on February 7, 2008.

103.    At the request of Lehman's Albanese, Director Clark met in February with Albanese and Ivan Gruhl, another Lehman Senior Vice President for Pension Solutions. The Lehman executives asked if Plaintiff would be interested in investing in new issues of Lehman securities as Plaintiff had done with Merrill Lynch and Citigroup. Director Clark indicated that Plaintiff would be interested in investing in Lehman under the right circumstances.

104.    During the second week of March 2008, Bear Stearns imploded. On Friday, March 14, 2008, shares of Bear Stearns opened at $54.24; by the next trading day, Monday, March 17, 2008, its common stock closed at $4.81. Over the weekend, JPMorgan agreed to purchase Bear Stearns at the bargain-basement price of $2 per share, later raised to $10 after the Federal Reserve Bank agreed to guarantee $29 billion of Bear Stearns's troubled assets.

105.    On March 14, 2008, on speculation that other investment banks might also collapse, Lehman common stock closed at $39.26, dropping from the prior day's close of $45.99 per share.

106.    On Monday, March 17, 2008, Lehman common stock closed at $31.75, a 19% drop from the prior day and a 4½ year low.

107.    On March 18, 2008, Lehman issued a press release filed with the SEC on Form 8-K announcing its financial results for the quarter ended February 29, 2008 ("March 18 Form 8-K"), reporting net revenues of $3.5 billion and net income of $489 million. "Net revenues in the first quarter of fiscal 2008 reflect negative mark to market adjustments of $1.8 billion, net of gains on certain risk mitigation strategies and certain debt liabilities." In the March 18, 2008 press release, Defendant Fuld was quoted as follows: "In what remains a challenging operating environment, our results reflect the value of our continued commitment to building a diversified platform and our focus on **managing risk and maintaining a strong capital and liquidity**

29

**position**. This strategy has allowed us to support our clients through these difficult and volatile markets, while continuing to build and strengthen our global franchise for our shareholders." (Emphasis added.)

108.    On March 18, 2008, Lehman, after issuing the press release, held a conference call to discuss the first quarter results. During the call, Defendant Callan stated that Lehman's "**continued diligence around risk management**, which includes the active involvement of [its] senior management team" and "**risk management discipline** allowed [it] to avoid any single outsize loss" during the quarter. Defendant Callan further addressed the Company's liquidity position, emphasizing that "**[w]e had disciplined liquidity and capital management, which we consider to be a core competency**, and maintained liquidity to date, and we've executed close to two-third of our full-year capital plan at the end of the first quarter." Accordingly, Defendant Callan concluded her introductory remarks "by noting that we don't expect that this extremely challenging period is going to end in the near term. However, we do believe we have the leadership, the experience, the **risk management discipline**, the capital strength, and **certainly the liquidity to ride out the cycle**." (Emphasis added.)

109.    Defendant Callan also then discussed the distinction between impairment and mark-to-market adjustments the Company recorded during the quarter:

> We look at the mark to market adjustments as more temporary in nature, as they reflect mark to market accounting related to the pricing of similar transactions in a liquidity constrained environment that we're living in and driven by many technical factors, which may not reflect intrinsic value.
>
> And I'd like to contrast that with write-offs, which are more permanent in nature and refer to impairment. So I know there's been a lot of dialogue in recent weeks about the whole mark to market accounting mechanism, but I just wanted to highlight that this is under the mark to marketing accounting framework and not necessarily reflective of permanent impairment of the assets.

* * *

So let me speak a moment about the composition of the net $1.8 [billion] write-down. Residential mortgage related positions accounted for 800 million, net. The 800 million net relates to 3 billion gross. So I think it's fair to say **we continue to do a very, very good job managing the risk on residential mortgages**, an area that I think we're credited with a lot of expertise, a great franchise.

(Emphasis added.)

110.    Defendant Callan also then reiterated the comments she made after Lehman's February 2008 $1.9 billion preferred stock issuance, indicating that Lehman "**took care of [its] full year needs when it raised $1.9 billion through its offering of preferred stock in February.**" (Emphasis added.)

111.    After the March 18, 2008 statements referenced above, analysts were reassured. For example, Oppenheimer noted that "Lehman dispelled all doubts of a solvency crisis at the company." Fox-Pitt Kelton stated that "Mgmt's liquidity disclosures were extensive and comforting, while risk mgmt continues to be strong at Lehman." And Punk Ziegel enthusiastically noted:

In one of the most impressive presentations ever made by a CFO, Erin Callan reviewed all of the critical questions concerning Lehman's position **convincingly arguing that the company was not in financial trouble**. . . .  Ms. Callan first demonstrated that Lehman had ample liquidity. . . .  The company also indicated that it has raised approximately 2/3rds of the needed funding for the year by March. There was a very detailed discussion of the company's assets and a table provided to demonstrate that the write downs taken were manageable. . . .  In sum, **virtually no one listening to this call could have concluded that this company was in financial trouble**.

(Emphasis added.)

112.    The investment community responded favorably to Lehman's first quarter results and Defendant Callan's explanations. By the end of the day, March 18, 2008, Lehman common stock rebounded over 46% from its prior day's close to close at $46.49 per share.

113.    Excerpts of an interview of Defendant Callan conducted on March 18, 2008 by Maria Bartiromo of CNBC appeared in *Business Week* on March 31, 2008. Asked whether

Lehman would follow Bear Stearns into a fire-sale, Defendant Callan said "Categorically, no."

Defendant Callan made the case that Bear Stearns had collapsed due to a liquidity situation

unique to that company:

> CNBC:   I have a hard time understanding how things could change so fast and
> furiously for Bear.  Can your business really reverse course like that in
> a 48-hour period, or was that perhaps a situation unique to Bear?

> Callan:   I think that will be the lingering question about our industry and our
> business model—and it should be.  Liquidity is the thing that will kill
> you in a moment.  It won't necessarily be writedowns.  We obviously
> saw huge writedowns taken by other members of Bear's peer group,
> and they raised capital and came back for another day.  So I think there
> were a number of factors related to how Bear managed its liquidity that
> were specific to that organization.

114.    Defendant Callan also discussed the impact of the opening by the Federal Reserve

of its credit facility to investment banks:

> CNBC:   So does the Fed opening the window, do you think that prevents a Bear
> Stearns type of run that so many people talk about?  And of course,
> when your colleagues go down in the business, your name always
> comes up.

> Callan:   **Yeah, I think it certainly takes the question of liquidity off the
> table**.  I think that's the great news about what happened.  I think
> what's the bad news is there's a real question about what's the optimal
> way to run this business model, and I think that's what people will
> grapple with over the next several months.

> (Emphasis added.)

> **i.    Lehman Executives Including Defendant Callan Solicited
> Plaintiff's Investment in the April 2008 Offering**

115.    On March 30 or 31, 2008, Director Clark learned from Lehman's Albanese that

Lehman was issuing another convertible preferred stock offering, the April 2008 Offering.  On

March 31, 2008, Albanese sent Director Clark the preliminary prospectus for the offering,

consisting of 3 million shares of preferred stock, soliciting investment by the Division.

116.    After declaring in February that it would not raise capital for the rest of the year,

Lehman announced on March 31, 2008 that the issuance of the April 2008 Offering was in response to "investor interest" and to "bolster the Firm's capital and increase financial flexibility."  Defendant Callan stated that, "[g]iven the challenging environment and our previously stated view that it will likely continue the balance of the year, issuing convertible preferred is appropriate as it optimizes our funding and accelerates our plan to **reduce leverage**, and at the same time minimizes dilution to our shareholders. . . .  We also felt that this was the right time as there was a window of opportunity in the market, as we have received significant interest from several key institutional investors, who have been strong supporters of the Firm over time."  (Emphasis added.)

117.    On March 31, 2008, Director Clark sent Lehman's Albanese an e-mail indicating he would talk to Albanese about the April 2008 Offering.  He was told by Albanese the following day that the deal had been priced and had closed the night before.

118.    In fact, in the interim, Lehman had changed the terms of the preliminary prospectus by increasing the size of the April 2008 Offering from $3 billion to $4 billion.  On April 1, 2008, Defendant Callan was quoted regarding the increase in the size of the offering as follows: "[t]he significant oversubscription for this deal demonstrates the confidence that investors have in Lehman Brothers.  The success of the transaction is also reflective of the **strength of the business model, the capital base and liquidity profile of the Firm as we continue to successfully weather challenging environments**." (Emphasis added.)  Upon this disclosure, Lehman's common stock rose 18 percent, increasing by $6.70 from the previous day's close to close at $44.34 per share.

119.    Director Clark and other members of the Division were invited by Lehman to participate in a conference call with Defendant Callan on April 1, 2008 to discuss the Division's potential purchase of Lehman securities in the April 2008 Offering.  On that call, Defendant

Callan reiterated her public comments concerning the alleged oversubscription for the deal and stated that, out of the $4 billion offering, $3 billion was purchased by four large shareholders of Lehman.  Defendant Callan also said that the CEO of General Electric Company, Jeffrey Immelt, personally contacted Defendant Fuld to participate in the offering.  She further indicated that the remaining $1 billion would be distributed to various market participants.

120.     On April 1, 2008, Plaintiff purchased 2,000 shares of preferred stock in the April 2008 Offering, at a cost of $2 million.

121.     The April 2008 Offering was pursuant to a Prospectus Supplement dated April 1, 2008 ("April 1, 2008 Prospectus Supplement"), with LBI as the sole underwriter.  The April 1, 2008 Prospectus Supplement incorporated by reference Lehman's 2007 Form 10-K and a series of current reports on Form 8-K filed with the SEC between December 13, 2007 and April 1, 2008, including the March 18, 2008 Form 8-K.

122.     On April 9, 2008, Lehman filed its first quarter 2008 Form 10-Q.  That Form 10-Q was signed by Defendant Callan, and included management's certifications of the Company's interim financial statements and internal controls over financial reporting, as well as the certifications required pursuant to SOX, which were signed by Defendants Fuld and Callan.  The Form 10-Q also contained statements concerning the Company's risk management and management's evaluation and the effectiveness of the Company's internal controls.

123.     The first quarter 2008 Form 10-Q contained a review opinion by Defendant E&Y regarding the Company's interim financial statements.  E&Y noted that it had conducted a review of the consolidated financial statements for the quarter, and stated that "we are not aware of any material modifications that should be made."

124.     In the first quarter 2008 Form 10-Q, Lehman reported net revenues of $3.5 billion and net income of $489 million.  Lehman also disclosed total assets of $786 billion and financial

instruments and inventory positions owned of $327 billion. Of the $327 billion, Lehman

disclosed that $85 billion related to mortgages and asset-backed positions.

125.    In the first quarter 2008 Form 10-Q, Lehman reported a breakdown of its

subprime and Alt-A/prime mortgage-related positions. Specifically, Lehman reported a $4

billion exposure to the subprime market, consisting of $1 billion in residential subprime whole

loans, $3 billion in retained interests in subprime-backed securitizations, and $30 million in other

subprime exposure. Regarding its exposure to non-subprime loans, Lehman reported Alt-

A/prime mortgage holdings of $15 billion, including $4 billion in whole loans, $9 billion in

retained interests in Alt-A/prime-backed securitizations, and $2 billion in other subprime

exposure. Its subprime exposure decreased to $4 billion from $5 billion as of November 30,

2007, while its Alt-A/prime holdings increased to $15 billion from $13 billion as of November

30, 2007.

126.    On April 15, 2008, speaking at the Lehman annual shareholder meeting,

Defendant Fuld told investors that the "**worst of the credit crisis is behind us**," but that the

environment "will remain challenging." (Emphasis added.)

127.    In early June 2008, Lehman common stock was trading in the mid to low thirties,

having fallen from the mid forties in May. Lehman sought to conduct another securities offering

to raise capital.

> ii.    **Lehman Executives Including Defendant Callan Solicited
>         Plaintiff's Investment in the June 2008 Offering**

128.    On June 5, 2008, Lehman contacted the Division and sought to discuss the June

2008 Offering and again directly solicit the Division's investment. Lehman executives asked

that the Division sign a confidentiality agreement and refrain from trading in Lehman securities

for a few days until confidential information it wished to disclose to the Division relating to the

35

Offering and Lehman's earnings was disclosed by Lehman publicly.  The Division agreed to do so, and received confidential information as to the June 2008 Offering and Lehman's second quarter earnings that would be subsequently released to the market on June 9, 2008.  Lehman executives offered to let Director Clark and other members of the Division speak with Defendants Callan and Fuld.  Director Clark was told by Lehman executives that Lehman was looking to raise $5 billion in a common share issuance with no preferred component.

129.    On June 5, 2008, a conference call was held among Defendant Callan (but not Fuld) and other Lehman executives and several individuals from the Division, including Director Clark.  The rationale for the June 2008 Offering imparted by Lehman executives on the call was that "we don't need to do this offering, but we're getting beaten up with the press over Lehman's liquidity position and want to shore up capital to take the issue off the table."  According to Defendant Callan, Lehman had evaluated the issue of shareholder dilution, but felt that "taking the insolvency issue off the table" warranted the issuance of the new stock.  Defendant Callan indicated that the second quarter 2008 numbers were still moving and that the numbers could be off one or two percent on the announcement, but decisions had been made to announce to the Street basically the numbers Lehman disclosed to the Division during the call: Lehman was going to report an unexpectedly large loss of $2.8 billion, whereas the Street was only expecting a $500 million loss.  Defendant Callan stated that Lehman had chosen to **aggressively write-down assets** to convey management's confidence in the transparency of its balance sheet.

130.    When asked by Director Clark: "How do you know that the market values are fair and reflective of the true market?," Defendant Callan replied that Lehman has **prudent risk management practices** and individual processes to value Lehman's assets, and that the **sales of similar assets were comparable to where they were marked**.  Defendant Callan also said that **if Lehman's credit rating was downgraded, Lehman would be exposed, at most, to a**

36

**requirement to post an additional $500 million in collateral to third parties**, not $5 billion as the media was reporting. The theme conveyed by Defendant Callan to the Division was that Lehman was **de-leveraging** and de-risking Lehman's balance sheet as a way to reduce Lehman's risk profile.

131. A list of statistics was verbally provided to the Division's representatives on the call as to the reductions made in the quarter in the overall size of Lehman's balance sheet as follows:

- Commercial – down from $36 billion to $25 billion

- Residential – down from $31 billion to $25 billion

- High yield – down from $17.7 billion to $11.7 billion

- Contingent leverage buyout paper – down to $0.5 billion

- High yield inventory – down from $31 billion to $23 billion

- **Overall balance sheet – down from $790 billion to $655 billion**

- Net balance sheet – down from $395 billion to $330 billion

- **Leverage ratio – gross balance sheet 24x, net balance sheet [net leverage ratio] 12.1x**

132. Defendant Callan also noted that Lehman had been successful in liquidating some of Lehman's Archstone bridge loan positions, and had exited all parts of the mortgage origination business.

133. Defendant Callan stated that Lehman was **decreasing the overall size of its assets and balance sheet** and **lowering its net leverage ratio**. However, at no time did she, or anyone else from Lehman, disclose to the Division that a significant part of the reported decrease in assets and net leverage ratio was caused by Lehman's use of Repo 105 transactions at quarter end. Nobody from Lehman mentioned Repo 105 by name or description, as described more

fully below.

134.    Defendant Callan also affirmed that Lehman's **liquidity pool had increased** to $45 billion, up from $34 billion in the first quarter of 2008. Defendant Callan also said the Company had "tested" the Federal Reserve discount window seven times, but **Lehman would not be tapping that Federal Reserve credit line in the future**. The Company was also engaging in discussions with sovereign funds to invest.

135.    This conference call between the Division and Lehman lasted approximately one hour.

136.    On Friday morning, June 6, 2008, after the June 5, 2008 call, the Division was told by Lehman's Matthew Johnson ("Johnson") that Lehman was adding a preferred stock component to the offering because of purportedly strong investor demand. Lehman was asking investors to put in an order both for common and preferred stock. Requests would then be granted on a pro rata basis. The intimation was that if investors only sought to purchase preferred shares, they would not get as much preferred as requested, and that preference would be given to investors who placed orders for both common and preferred shares.

137.    The Division had another call with Johnson on June 6, 2008 at approximately 5:00 p.m. Director Clark asked Johnson how the order book was going on the deal, and Johnson told him it was "well over-subscribed," indicating that investor demand for the deal was strong.

138.    Plaintiff purchased 60,000 shares of preferred stock in the June 2008 Offering at a cost of $60 million, and 4,285,714 shares of common stock at a cost of $120 million.

139.    The June 2008 Offering consisted of common stock at $28 per share and preferred stock, Series Q, consisting of 2 million shares of 8.75% Non-Cumulative Mandatory Convertible Preferred Stock, issued at $1,000 per share. The total common stock offering was $4 billion. The total Series Q preferred share offering was $2 billion, with $60 million paid to the

Company's broker/dealer subsidiary, LBI, as an underwriting discount.  Both types of shares were offered pursuant to a Prospectus Supplement dated June 9, 2008 ("June 9, 2008 Prospectus Supplement"), and were delivered by LBI on June 12, 2008.  The Division purchased its shares in the June 2008 Offering directly from LBI.

140.    The June 9, 2008 Prospectus Supplement incorporated the 2007 Form 10-K, the first quarter 2008 Form 10-Q, and a series of current SEC Reports on Form 8-K dated between December 13, 2007 and June 9, 2008.

### 2.    Lehman Continued to Misrepresent to the Market its Financial Position

141.    On June 9, 2008, Lehman reported its preliminary 2008 second quarter results in a press release filed with the SEC on Form 8-K ("June 9, 2008 Earnings Results Form 8-K"). There, Lehman reported that it expected a net loss of $2.8 billion (its first ever loss) on negative net revenues of $0.7 billion, compared with $5.5 billion in net revenues for the second quarter of 2007.  Lehman also reported that for the first half of 2008, it expected to report a net loss of approximately $2.3 billion.  Lehman further announced a gross write-down of $2.4 billion in its residential mortgage-related holdings and $1.0 billion in its commercial-related holdings.

142.    That day, Lehman also announced that it had closed on the June 2008 Offering, raising a total of $6 billion.

143.    On a June 9, 2008 conference call held in conjunction with the earnings press release, Defendant Callan stated that, despite Lehman's lackluster results and increasingly high leverage, "[w]e do not intend to lower our leverage ratios. . . .  To be clear, we do not expect to use proceeds of this equity raise to further decrease leverage, but rather to take advantage of future market opportunities. . . .  **[W]e stand extremely well capitalized** to take advantage of these new opportunities."  (Emphasis added.)

144.     In discussing mark-to-market adjustments taken by Lehman for the quarter, Defendant Callan defended Lehman's accounting practices and its hedging of risk, stating: "**It has been suggested we have not been sufficiently aggressive in marking our inventory. In fact, I believe our successful hedging performance over the past year has muted the magnitude of our gross markdowns**." (Emphasis added.) Defendant Callan emphasized the pro-activeness of Lehman's write-downs and positive impact of its hedging, noting that Lehman achieved "hedging benefits of approximately $7.5 billion."

145.     Deutsche Bank analyst Mike Mayo asked Defendant Callan, "[h]ow do we know that you have taken enough write-downs in your real estate book?" Defendant Callan replied: "**I think in terms of the confidence level on write-downs, you know it is the following two points. One is that the aggregate number is very large that we have taken since Q3 predictably last year. So that gives me confidence in the actual accumulated loss across those portfolios, resi[dential] and commercial.**" (Emphasis added.) Additionally, "**I think you [know that] the other piece though that is very, very important is we were probably the most active seller of assets in the market this quarter across all these asset classes. As I talked about earlier we weren't selling AAAs. We were selling the entire capital structure and we were selling risk assets**." (Emphasis added.) The inference was that Lehman was reducing its assets – and consequently its net leverage ratio – by writing down and selling risky assets. In reality, the reductions were caused in part by an increased use of undisclosed Repo 105 transactions.

146.     Callan further stated: "I think unquestionably our price visibility we got from these [sale] transactions was tremendous. So much more activity for us certainly than we did last quarter. **So I think the confidence level about the remaining inventory can only be higher than it was given all that sales activity, the visibility, the number of clients we dealt with,**

**and the resultant impact of our remaining inventory**." (Emphasis added.)  The inference was that Lehman could properly and realistically mark its assets using sales prices from recent sales. In reality, despite these assurances, Lehman failed to properly mark-to-market its real estate-related assets by the time Plaintiff purchased its Lehman securities.

147.    Defendant Callan further tried to allay any misgivings about Lehman's liquidity and its ability to repay counterparties on credit default swaps or other financing arrangements and lenders in general, asserting: "I don't think there is any question on the part of any of our counterparties or lenders that they will be repaid by Lehman Brothers.  I think there is a good debate that's being had about the investment banking sector, its return profile as we move forward in a lower leveraged environment.  But we are not having any conversation with counterparties or lenders about whether they feel confident extending funds and credit to us." This painted a misleading picture of Lehman's liquidity.

148.    Following the second quarter earnings announcement, the announcement of the June 2008 Offering, and Defendant Callan's comments on the conference call, the price of Lehman's common stock fell 8.7 percent from its closing price of $32.29 on June 6, 2008, to close at $29.48 on June 9, 2008, on heavy trading volume of 168 million shares.

### E.    Lehman Collapses and Files for Bankruptcy

149.    Following June 9, 2008, Lehman's stock price continued to drop and never again recovered above the June 9, 2008 close of $29.48.

150.    On June 12, 2008, Lehman issued a press release stating that CFO Callan and COO Gregory would be stepping down and replaced by Defendant Lowitt as CFO and Defendant McDade as COO.  On that day, the price of Lehman's common stock dropped to a closing price of $22.70, a 4% reduction from its closing price the prior day.

151.    On June 16, 2008, a week after disclosing its financial results for the second

quarter, Lehman held another conference call.  Defendant Fuld stated: "I am the one who ultimately signs off and am comfortable with our valuations at the end of the second quarter."  In particular, he explained:

> Years ago, we made a decision to build out the best-in-class commercial and residential mortgage origination and distribution platforms.  We created significant revenues and net income over those years that funded many of the Firm's investments that have diversified our core franchise today.  We made active decisions to deploy our capital.  **Some of which in hindsight were poor choices, because we really didn't react quickly enough to the eroding environment.**  For example, we accumulated positions in leveraged loans that we believed we could syndicate and clearly not all of those got sold.  Together, the accumulation of all these positions ultimately led to our decision this past quarter to aggressively delever.

> (Emphasis added).

But most importantly, Defendant Fuld reassured investors: "**our capital and liquidity positions have never been stronger.**"  (Emphasis added.)  This statement was made just three months before Lehman filed for bankruptcy.

152.    The newly appointed CFO, Defendant Lowitt, reiterated the liquidity point on the June 16, 2008 call: "In conclusion I reviewed with you the strength we continue to see in our client franchise and **our strong capital and liquid position**." (Emphasis added.)

153.    On July 10, 2008, Lehman filed its second quarter 2008 Form 10-Q, signed by Defendant Lowitt.  That filing showed that Lehman's most illiquid assets (called Level 3 assets), which have no direct observable market value, declined only slightly in the second quarter of 2008 to $41 billion from $42 billion at year end 2007.  Also, Lehman's total assets dropped by 8%.  Investors were expecting a larger decline in real estate assets and total assets because Lehman previously conveyed that it was reducing its real estate assets by writing down and/or selling risky assets.  Lehman shares closed at $17.30 per share, a 12.4% drop from the prior trading day close of $19.74 per share.

154.    Throughout the rest of the Summer of 2008, rumors swirled that Lehman was attempting to sell itself, get investments from sovereign funds, spin off its real estate portfolio, and sell its Investment Management Division ("IMD").  However, at no time during the Summer did Lehman or its executives disclose the truth concerning Lehman's imperiled liquidity and leverage position, or the true value of its illiquid assets.

155.    On July 15, 2008, the *New York Post* reported that Defendant Fuld was considering ways to take Lehman private.  Lehman's common stock closed at $13.22 per share.

156.    On July 18, 2008, Moody's cut its ratings on Lehman to reflect its expectations of more mark-to-market losses on Lehman's residential and commercial mortgage portfolios. Noting Lehman's proactive efforts at bolstering capital and de-leveraging its balance sheet, Moody's said: "Despite these notable risk reductions, Lehman's mortgage exposures and concentrations remain high and have weighed heavily on the firm's operating results and market confidence."

157.    On July 25, 2008, CNBC reported that Lehman was considering a sale of at least part of its IMD.  On that day, Lehman's common stock dropped to a closing price of $17.05, an 8% reduction from its closing price on July 24, 2008.

158.    On August 10, 2008, *The New York Times* reported that Lehman was preparing to cut 1,500 jobs.

159.    On August 22, 2008, *Reuters* reported that state-owned Korean Development Bank ("KDB") told it: "We are studying a number of options and are open to all possibilities, which include (buying) Lehman."  Lehman's common stock closed at $14.41 per share that day.

160.    On September 2, 2008, reports indicated that KDB was considering buying a 25% stake in Lehman.

161.    On September 6, 2008, Lehman announced that Jeremy Isaacs ("Isaacs"), its

London-based Head of European and Asian Operations, was leaving the Company.  In recent years, the European and Asian Operations had become a major contributor to Lehman's revenues, contributing nearly half of the consolidated revenues.

162.    On September 9, 2008, KDB announced it had ended talks with Lehman.  In addition, S&P and Fitch both placed their ratings on Lehman on review for downgrade.  S&P specifically cited concerns about Lehman's ability to raise capital.  Lehman's common stock fell by 45% to $7.79 per share from a prior day close of $14.15.

163.    On September 10, 2008, Lehman held an earnings guidance call on short notice, a week prior to its scheduled call.  Lehman reported a $3.9 billion loss (its largest quarterly loss ever) for the third quarter of 2008, as well as another $7.8 billion in gross write-downs including $7 billion on its residential and commercial real estate holdings.  On the call, Defendant Fuld stated that the "decisions announced today will best protect the core client franchise, and create a very clean, **liquid balance sheet**."  (Emphasis added.)  The plans presented included exiting commercial real estate and spinning off the unit, reducing residential loan exposures, and raising capital by selling an equity stake in Lehman's IMD.  On the call, Defendant Lowitt seconded Defendant Fuld's positive outlook, asserting: "I'll now provide an update on our **liquidity position which remains very strong**.  We have maintained our **strong liquidity** and capital profiles even in this difficult environment and the potential sale of IMD further improves our capital position."  Defendant Lowitt noted further: "Even under the scenario of limited debt issuing capacity in 2009 we anticipate the core **Lehman will have ample cash capital to sustain its business opportunities**."  (Emphasis added.)  Regarding the $7 billion write-downs in residential and commercial mortgages, Defendant Lowitt admitted that the "majority of our write-downs were in Alt-A driven by [an] increase in Alt-A delinquencies and loss expectations which were specific to Alt-A prices and did not affect the performance of our hedges.

44

Unfortunately, **there is no correct hedge for Alt-A assets as there is in subprime with ABX**."
(Emphasis added.)  This admission regarding hedging was in sharp contrast to prior statements
by Lehman executives, including Defendant Callan, stating that Lehman's hedging activities
were a means to minimize write downs.

164.    On the conference call, Defendant Lowitt also said the firm's recent sales of real
estate assets had been "in and around our marks."  This created a false impression that Lehman's
real estate assets were properly marked-to-market.

165.    On September 10, 2008, Fitch and Dunn & Bradstreet downgraded Lehman's
credit rating.

166.    On September 10, 2008, Lehman's common stock closed at $7.25, down 7% from
the prior day's close.  On September 11, 2008, Lehman's shares closed at $4.22, down 42% from
the prior day.  On Friday, September 12, 2008, Lehman's shares closed at $3.65, down 13% from
the prior day.

167.    Following the September 10, 2008 conference call, Lehman executives worked
feverishly to sell the Company or at least parts of its commercial holdings to various banks,
including Goldman Sachs, Credit Suisse, Barclays, Bank of America, and Merrill Lynch, all of
whom ultimately spurned Lehman's overtures.  In conjunction with management's attempts to
sell Lehman, various Wall Street executives reviewed Lehman's troubled real estate portfolio.
According to a report by the federal government's Financial Crisis Inquiry Commission
("FCIC") dated January 2011, "Merrill CEO John Thain told the FCIC that by Saturday morning
[September 13, 2008], the group of executives reviewing Lehman's assets had estimated that
they were overvalued by anywhere from $15 to $25 billion."  As reported in *The Wall Street
Journal* on October 6, 2008, the executives almost universally concluded that Lehman's $32.6
billion in commercial real estate holdings were overvalued by as much as 35 percent.  Media

reports also indicated that Defendant Walsh faced hostile questions from prospective buyers regarding Lehman's valuations of its commercial assets.

168.    On Saturday, September 13, 2008, Federal Reserve officials met with Merrill Lynch's then-CEO John Thain and other Wall Street executives and the SEC to discuss the future of Lehman.

169.    On Sunday, September 14, 2008, Lehman's talks with Bank of America and Barclays collapsed after the Federal Reserve said it would not guarantee Lehman's liabilities.

170.    Federal Reserve Chairman Ben Bernanke, who testified before Congress on October 15, 2008, stated that the government could not lend money to Lehman – and thereby prevent its bankruptcy – because the Company **lacked sufficient collateral** for a government loan.  Likewise, then Treasury Secretary Henry Paulson ("Paulson") corroborated Chairman Bernanke's evaluation, asserting in an interview with *The New York Times* on October 23, 2008 that the **value of Lehman's assets created "a huge hole" on its balance sheet**. (Emphasis added.)  These conclusions support Plaintiff's allegations that Lehman's asset values were overstated during 2007 and 2008.

171.    On Monday, September 15, 2008, unable to sell itself or even part of itself to another bank, Lehman filed for Chapter 11 bankruptcy protection in the Southern District of New York, Docket No. 08-13555.  The filing specifically did not include the Lehman broker-dealer subsidiary, LBI, which was forced into dissolution by the Securities Investor Protection Corporation ("SIPC"), also in the Southern District of New York, four days later.

172.    In stark contrast to Defendant Lowitt's affirmative representations made just days before regarding Lehman's purportedly strong liquidity position, Lehman sought bankruptcy protection because, as subsequently noted in an affidavit by Defendant Lowitt accompanying the bankruptcy petition, Lehman had "significant liquidity problems."

173.    On September 15, 2008, following its bankruptcy filing, Lehman's common stock closed at $0.21.  The market value of Lehman's preferred stock and Notes similarly collapsed that day.

174.    On September 16, 2008, Barclays agreed to buy certain of Lehman's North American investment banking and trading assets for $1.54 billion.  Of the portfolio of assets that Barclays acquired, less than 5% were regarded as real estate-related.  The Barclays acquisition specifically excluded Lehman's commercial real estate holdings due to Barclays' concerns that they were overvalued.  Barclays also bought Lehman's global headquarters at 745 Seventh Avenue in New York and two data centers in New Jersey for $1.5 billion.

175.    According to press reports, Lehman was the subject of multiple federal investigations.  Following Lehman's bankruptcy, government prosecutors reportedly subpoenaed Lehman executives including Defendants Fuld and Callan.  The U.S. Attorney's Office in Manhattan is or was reportedly investigating whether Lehman executives marked the firm's commercial real estate properties accurately on its balance sheet.  One subpoena went to Defendant Walsh.  The U.S. Attorney's Office in Brooklyn was reportedly investigating Lehman's sale of auction rate securities, as well as the conference call held by management on September 10, 2008, five days before the bankruptcy filing.  Defendant Lowitt received a subpoena.  The U.S. Attorney's Office in New Jersey reportedly is or was investigating misleading disclosures surrounding the sale of $6 billion in securities by Lehman in the June 2008 Offering.

176.    The FBI reportedly is or was investigating whether Lehman's senior executives intentionally misled investors about Lehman's financial health and whether Lehman pressured rating agencies to award top ratings to securities it issued in return for higher fees or the promise of more work.

47

177.    Also, the New York Attorney General ("NY AG") filed a civil complaint against E&Y in the Supreme Court of the State of New York on December 21, 2010 (the "NY AG Complaint").  After conducting an extensive investigation, including analyzing documents and obtaining witness testimony, the Attorney General charged E&Y with four counts of securities fraud relating to its audits and reviews of Lehman's financial statements.

### F.    The Bankruptcy Examiner's Report

178.    In conjunction with Lehman's bankruptcy proceeding, the bankruptcy court appointed Anton Valukas as the Examiner to investigate several issues related to the demise of Lehman.  By Order of the Bankruptcy Court dated January 16, 2009, one such issue was whether there are "colorable claims for breach of fiduciary duties" against the officers and directors of Lehman "arising in connection with the financial condition" of Lehman prior to bankruptcy. That Order also directed the Examiner to perform the duties specified in Section 1106(a)(3) and (4) of the Bankruptcy Code, *i.e.*, to "file a statement of . . . any fact ascertained pertaining to fraud, dishonesty, incompetence, misconduct, mismanagement, or irregularity in the management of the affairs of the debtor, or to a cause of action available to the estate."

179.    In response, the Examiner prepared a 2,209 page report ("Report" or "Rpt.") containing numerous findings and conclusions on a variety of topics.  Among the topics relevant to the Division's case are Lehman's use of Repo 105 transactions; Lehman's over-valuation of real estate-related assets; Lehman's liquidity disclosures; and Lehman's failure to adhere to its own risk management procedures.

180.    Notably, the Examiner had subpoena power and access to many documents and witnesses.  (Rpt. p. 29.)  The Examiner reviewed more than 5 million documents (primarily e-mails and attachments) comprising more than 40 million pages, and interviewed 250 witnesses. *Id*. p. 30-31, 36.  Moreover, the Examiner believed he should be held to a high standard of

finding a "colorable claim" under Second Circuit precedent, due to his access to substantial
evidence:

> The [Bankruptcy Court's] Order does not contain a definition of what constitutes
> a "colorable" claim. The Second Circuit has described colorable claims as ones
> "that on appropriate proof would support a recovery," "much the same as that
> undertaken when a defendant moves to dismiss a complaint for failure to state a
> claim." But under such a standard, the Examiner would find colorable claims
> wherever bare allegations might survive a motion to dismiss. Because he has
> conducted an extensive factual investigation, the Examiner believes it is more
> appropriate to use a higher threshold standard, and in this Report a colorable
> claim is one for which the Examiner has found that there is sufficient credible
> evidence to support a finding by a trier of fact.

(Rpt. p. 17.)

### G.    Defendants' Use of Repo 105

181.    The Examiner found that Lehman materially misstated the Company's "net
leverage ratio." The conduct involved the removal of tens of billions of dollars of securities
from the Company's balance sheet to create a false impression of Lehman's leverage and overall
financial strength.

182.    The Report discussed transactions that Lehman internally referred to as "Repo
105." Those transactions allowed Lehman to temporarily transfer tens of billions of dollars of
securities – assets normally recorded on Lehman's balance sheet – with European counterparty
banks for the purpose of reducing Lehman's net leverage ratio and total assets. The net leverage
ratio was an important financial metric for investors, stock analysts, lenders, and others involved
with Lehman because it illustrated Lehman's purported capital adequacy. Lehman actively
touted its net leverage ratio to those parties, including Plaintiff.

183.    The Examiner summarized Repo 105 as follows:

> Lehman did not disclose, however, that it had been using an accounting
> device (known within Lehman as "Repo 105") to manage its balance sheet – by
> temporarily removing approximately $50 billion of assets from the balance sheet
> at the end of the first and second quarters of 2008 [and $38.6 billion at the end of

fiscal 2007].  In an ordinary repo, Lehman raised cash by selling assets with a simultaneous obligation to repurchase them the next day or several days later; such transactions were accounted for as financings, and the assets remained on Lehman's balance sheet.  In a Repo 105 transaction, Lehman did exactly the same thing, but because the assets were 105% or more of the cash received, accounting rules [purportedly] permitted the transactions to be treated as sales rather than financings, so that the assets could be removed from the balance sheet. . . .

Contemporaneous Lehman e-mails describe the "function called repo 105 whereby you can repo a position for a week and it is regarded as a true sale to get rid of net balance sheet."  Lehman used Repo 105 for no articulated business purpose except "to reduce balance sheet at the quarter-end." . . .  Lehman's Global Financial Controller confirmed that "the only purpose or motive for [Repo 105] transactions was reduction in the balance sheet" and that "there was no substance to the transactions."

Lehman did not disclose its use – or the significant magnitude of its use – of Repo 105 to the Government, to the rating agencies, to its investors, or to its own Board of Directors.

(Rpt. pp. 6-7.)

184.    When Lehman was facing severe liquidity problems in 2007 and 2008, and its leverage ratios were too high (evidencing excessive risky assets in comparison to insufficient stockholders' equity) in its view and the view of the financial community, the use of Repo 105 grew even larger.  By 2007, analysts and other market participants called upon Lehman to reduce its leverage.  Lehman responded by accelerating its use of Repo 105 transactions, which gave the false impression of reduced leverage.

185.    Lehman had no legitimate business reason to enter into at least certain of these Repo 105 transactions.  Lehman could have obtained similar financing through less costly means, including the use of ordinary repo transactions.

### 1.    FAS 140 and Lehman's "True Sale" Opinion Obtained From a Foreign Law Firm

186.    Essentially, "repo" (short for repurchase) transactions are financing arrangements in which a financial institution such as Lehman uses assets, such as securities, as collateral for

50

short term loans, with an agreement to repurchase the same or equivalent assets at a later date. When recorded properly, these transactions are reflected on the borrower's books as "financings," meaning the company keeps the securities on its balance sheet as part of its assets while recording the receipt of cash from the loan and a corresponding liability to repay the loan. Lehman engaged in ordinary repo transactions for many years, which it properly accounted for as financings by keeping the securities on its balance sheet and recording the incoming cash proceeds from the loans as well as the increased liabilities (the obligation to repay the loans).

187.    However, in early 2000, the Financial Accounting Standards Board ("FASB") issued Statement of Financial Accounting Standards No. 140 ("FAS 140") regarding the transfer of financial assets.  Under FAS 140, certain transfers of securities in connection with financings may be – but usually are not – treated as sales rather than loans.  In order to be treated as sales, the transferring entity (here, Lehman) must surrender all "control" of the assets.  (FAS 140 ¶ 9.) FAS 140 sets forth various criteria that must be met in order to establish loss of control.  *Id*.

188.    In 2001, Lehman adopted an internal Repo 105 accounting policy that required the use of a third party legal opinion (referred to as a "true sale" opinion) relating to loss of control of the assets.  However, as the accounting policy acknowledged, Lehman "generally cannot obtain a true sale opinion under U.S. law."  (Rpt. pp. 776, 783.)  Therefore, Lehman decided to look to foreign jurisdiction for conducting the  Repo 105 transactions.

189.    Lehman approached Linklaters, a large United Kingdom law firm, to seek a true sale opinion under English law.  Linklaters indeed issued an opinion, addressed to "Lehman Brothers International (Europe)" ("LBIE"), a United Kingdom affiliate of Lehman.  By the letter's terms, it was intended solely for LBIE's benefit.  The letter set forth certain circumstances under which, in Linklaters' opinion, LBIE could engage in transactions that could be categorized as sales as opposed to financings.  However, the letter expressly stated that such

transactions had to be based in the United Kingdom and subject to English law.  (Rpt. pp. 740, 782-85.)

190.    Beginning in 2001, armed with the Linklaters letter, Lehman engaged in Repo 105 transactions by transferring securities to counterparty banks in the United Kingdom in return for short terms loans.  Typically, Lehman would transfer securities with a fair market value of, for example, $105 million or more, in return for cash of $100 million or less.  Lehman then recorded the transaction as a "sale," although pursuant to standard contractual agreements with the banks Lehman was obligated, within a few days or weeks, to repurchase the securities for the cash it received, thereby restoring Lehman to the same position it was in earlier but after paying a premium for interest.  (Rpt. pp. 786-88.)

191.    The Linklaters letter applied only to transactions between LBIE and counterparties based in the United Kingdom.  In order to comply with the terms of the letter, Lehman transferred billions of dollars of American-based securities from Lehman's American locations to LBIE for use in Repo 105 transactions at each quarter end.  (Rpt. p. 786.)

## 2.    The Mechanics of Calculating Lehman's Net Leverage Ratio

192.    In the Management's Discussion and Analysis ("MD&A") section of Lehman's 2007 Form 10-K, Lehman described the importance of its net leverage ratio as follows:

> The relationship of assets to equity is one measure of a company's capital adequacy.  Generally, this leverage ratio is computed by dividing assets by stockholders' equity.  We believe that a more meaningful, comparative ratio for companies in the securities industry is net leverage, which is the result of net assets divided by tangible equity capital.

> Our net leverage ratio is calculated as net assets divided by tangible equity capital.

(2007 Form 10-K p. 63.)

193.    Lehman defined net assets – the numerator for its net leverage ratio – by starting

with "total assets" and subtracting the following: "(i) cash and securities segregated and on deposit for regulatory and other purposes; (ii) collateralized lending agreements; and (iii) identifiable intangible assets and goodwill." *Id.* Repo 105 transactions affected only the total assets component of this calculation. Specifically, they lowered Lehman's total assets.

194.    Lehman calculated tangible equity capital – the denominator for its net leverage ratio – by starting with "stockholders' equity," adding "junior subordinated notes," and subtracting "identifiable intangible assets and goodwill." *Id.* Repo 105 transactions did not affect tangible equity capital.

195.    When properly categorized as "financings" under FAS 140, Lehman's repo transactions increased Lehman's net leverage ratio. Specifically, total assets (the numerator) were increased because the securities that were transferred to the repo counterparty remained on Lehman's balance sheet and cash was added to the balance sheet to reflect the incoming loan proceeds. This caused total assets to increase. Tangible equity capital (the denominator) was not affected by the repo transactions. Thus, net assets increased while tangible equity capital remained the same, causing an overall increase in the net leverage ratio. (Rpt. pp. 751-54.)

196.    When miscategorized as "sales" under FAS 140, Lehman's Repo 105 transactions lowered Lehman's net leverage ratio. Specifically, total assets (the numerator) were reduced because: (i) the securities were removed from Lehman's balance sheet; (ii) cash was added to the balance sheet to reflect the incoming loan proceeds; and (iii) Lehman immediately used the cash to pay off other short term liabilities, thus removing the cash from the balance sheet. This caused a net decrease in total assets. The latter step – using cash to pay off other liabilities – did not occur with regular repos. Tangible equity capital (the denominator) was not affected by the Repo 105 transactions. Thus, net assets decreased while tangible equity capital remained the same, causing an overall decrease in the net leverage ratio. (Rpt. pp. 733-34, 738 n.2869, 758-

60, 775.)

197.    In sum, the Repo 105 transactions led to an overall decrease in net assets and a resulting decrease in net leverage ratio, therefore creating a false picture of Lehman's financial position and results.

### 3.    Lehman Increased its Use of Repo 105 Transactions in 2007-2008

198.    Although Lehman regularly engaged in Repo 105 transactions after 2001, in mid-2007 Lehman engaged in increasing amounts of Repo 105 transactions.  At that time, de-leveraging by selling real estate and mortgage-related assets was problematic because many of Lehman's positions in such assets were illiquid and could not be sold without incurring substantial losses.  Selling illiquid assets at discounted prices would have had a negative impact on Lehman's earnings, and would have also provided pressure for Lehman to write down its remaining illiquid holdings to their then-observable depressed values under mark-to-market accounting.  (Rpt. p. 737-38.)  Essentially, Lehman increased its use of Repo 105 transactions in order to both mask problems with illiquid real estate assets and improve the Company's net leverage ratio.

199.    Lehman's Repo 105 usage, and the resulting effect on net leverage ratio, was at its highest in late 2007 and the first two quarters of 2008:

| Period End | Repo 105 Usage | Reported Net Leverage Ratio | What Net Leverage Ratio Should Have Been Absent Repo 105 | Difference |
|---|---|---|---|---|
| Q4 2006 | $24.5 Billion | 14.5 | 15.8 | 1.3 (9%) |
| Q1 2007 | $27.3 Billion | 15.4 | 16.8 | 1.4 (9%) |
| Q2 2007 | $31.9 Billion | 15.4 | 16.9 | 1.5 (10%) |
| Q3 2007 | $36.4 Billion | 16.1 | 17.8 | 1.7 (11%) |
| Q4 2007 | $38.6 Billion | 16.1 | 17.8 | 1.7 (11%) |
| Q1 2008 | $49.1 Billion | 15.4 | 17.3 | 1.9 (12%) |

| Q2 2008 | $50.4 Billion | 12.1 | 13.9 | 1.8 (15%) |

(Rpt. pp. 748, 889.)

200.    Lehman increasingly used Repo 105 prior to and during the time period in which

Plaintiff purchased its Lehman securities, as Plaintiff's purchases occurred primarily in the first

half of 2008.

<b>4.    The Bankruptcy Examiner's Findings of False Statements<br>and Omissions Regarding Repo 105</b>

201.    The Examiner concluded that "sufficient evidence exists from which a trier of fact

could conclude that Lehman's reported net leverage ratio was materially misleading during

[2007 and 2008]."  (Rpt. p. 988.)  Also, "sufficient evidence exists for a trier of fact to find that

Lehman's quarter-end Repo 105 practice was material and should have been disclosed."  *Id*. p.

749; *accord* pp. 962, 987.

202.    Lehman omitted any mention of its use of Repo 105 transactions in its public

filings in 2007 and 2008.  The Examiner noted:

> [E]ven a sophisticated reader of Lehman's financial statements would not have
> been able to ascertain from Lehman's 2007 Form 10-K or its first and second
> quarter 2008 Forms 10-Q the amount of Lehman's Repo 105 usage, nor even
> ascertain the fact that Lehman was engaged in these transactions.

(Rpt. p. 984.)

203.    Lehman's 2007 Form 10-K both omitted any discussion of the Repo 105

transactions and affirmatively misrepresented that all repurchase and resale agreements by

Lehman were accounted for as "financings" rather than "sales."  *See* 2007 Form 10-K p. 97.  In

truth, only a small fraction of Lehman's repurchase transactions were accounted for as

financings.  The remainder – the Repo 105 transactions – was accounted for as sales.  The

Examiner concluded that a "trier of fact could find that Lehman affirmatively misrepresented its

accounting treatment for repos by stating that Lehman treated repo transactions as financing

55

transactions rather than sales for financial reporting purposes, despite the fact that Lehman treated tens of billions of dollars in repo transactions – namely, Repo 105 transactions – as true sale transactions."  (Rpt. p. 962.)

204.    Lehman also failed to disclose both that it had an obligation to repurchase tens of billions of dollars in securities that were temporarily transferred to counterparties in the Repo 105 transactions, and the effect this had on Lehman's then-existing financial position and results. This obligation should have been disclosed, at a minimum, as both a commitment and contingency.  The Examiner concluded as follows:

> [T]here is sufficient evidence to support a determination that disclosure of the obligation to repurchase the securities and repay the cash borrowing was required in the Management's Discussion and Analysis ("MD&A") section of Lehman's publicly filed financial statements because the repurchase was a known event that was reasonably likely to occur and would have had a material effect on the company's financial condition or results of operations.

(Rpt. p. 749, *accord* pp. 750, 969-71, 988.)

205.    Further, the Examiner noted that Lehman's net leverage ratio was a key metric, so much so that E&Y used it as a basis for measuring materiality during its 2007 audit:

> [A]udit walk-through papers prepared by Lehman's outside auditor, Ernst & Young, regarding the process for reopening or adjusting a closed balance sheet stated: "Materiality is usually defined as any item individually, or in the aggregate, that moves net leverage by 0.1 or more (typically $1.8 billion)."  Repo 105 moved net leverage not by tenths, but by whole points.

(Rpt. p. 747; *accord* 889, 955.)

206.    The Examiner ultimately concluded that colorable claims existed against several of the defendants named in this Amended Complaint:

> Lehman's failure to disclose the use of an accounting device to significantly and temporarily lower leverage, at the same time that it affirmatively represented those "low" leverage numbers to investors as positive news, created a misleading portrayal of Lehman's true financial health.  Colorable claims exist against the senior officers who were responsible for balance sheet management and financial disclosure, who signed and certified Lehman's financial statements and who

failed to disclose Lehman's use and extent of Repo 105 transactions to manage its balance sheet.

(Rpt. p. 20, *accord* pp. 747, 963).

207.    More specifically, the Examiner concluded that "**there are colorable claims against Richard Fuld, Jr., Christopher O'Meara, Erin Callan, and Ian Lowitt in connection with their failure to disclose the use of the practice, and against Ernst & Young for its failure to meet professional standards in connection with that lack of disclosure**." *Id.* p. 23-24, *accord* pp. 750, 990 (emphasis added).

208.    Notably, the Examiner gave these defendants an opportunity to provide facts and materials that supported their alleged defenses.  Each of these defendants provided such materials and alleged defenses, but the Examiner still concluded that colorable claims existed. (Rpt. pp. 24 n.90, 990.)

### 5.    Plaintiff Relied On and Was Misled by Lehman's Disclosures and Omissions Regarding Repo 105

209.    As discussed above, on a June 5, 2008 conference call between Defendant Callan and Plaintiff, Callan stated that Lehman was financially well-positioned based on its second quarter 2008 net leverage ratio and decreased net assets.  Plaintiff directly relied on that information when deciding to purchase Lehman securities, including $180 million in common and preferred stock in the June 2008 Offering.

210.    Lehman made similar misrepresentations regarding its net leverage ratio and decreased net assets in its publicly filed financial statements, press releases, and investor conference calls during 2007 and 2008.  The Examiner noted that these misrepresentations occurred "particularly during the run-up to an equity raise," referring to the June 2008 Offering in which Plaintiff purchased securities.  (Rpt. p. 986.)  The Examiner noted that the "point of these announcements was to indicate to current and potentially new shareholders that Lehman

57

was financially healthy and a good investment." *Id.*  Indeed, Plaintiff was misled by those

disclosures.

### H.    Defendants Overstated the Value of Lehman's Real Estate Assets

211.    The Examiner also found that Lehman overstated certain real estate-related assets

in its commercial group headed by Defendant Walsh:

> The Examiner determines that there is sufficient evidence to conclude that certain
> of the Principal Transactions Group ("PTG") real estate assets were not
> reasonably valued during [the second and third quarters of 2008].  Furthermore,
> the Examiner finds sufficient evidence to support a finding that Lehman's
> valuations of its Archstone bridge equity investment were unreasonable as of the
> first, second and third quarters of 2008.

(Rpt. pp. 214-15.)

#### 1.    Overstated Assets of Lehman's Principal Transactions Group

212.    Lehman's Principal Transactions Group ("PTG") assets were investments in real

estate assets that Lehman held for its own account while a developer improved or developed the

underlying assets, with the intention of selling the investment after the development or

improvement was completed.

213.    The Examiner concluded that Lehman's "process for valuing its PTG portfolio

was **systemically flawed** because Lehman primarily valued these assets based on whether the

development was proceeding according to the project's business plan and not the price a buyer

would pay for the asset."  (Rpt. pp. 286-88; *accord* 329-49) (emphasis added).  The Examiner

did not quantify the amount by which the portfolio was overstated.  However, he noted that the

portfolio balance totaled $9.6 billion at the end of fiscal 2007.  It is reasonable to infer that the

portfolio balance was overstated by a material amount throughout 2007 and 2008.  This

conclusion is supported by Lehman's difficulties finding a willing buyer to purchase its assets,

and the prominent role those difficulties had in contributing to Lehman's bankruptcy.  In fact,

several potential buyers specifically cited the overvaluation of Lehman's real estate-related assets when deciding not to buy the Company or certain Company assets.

### 2.    Overstated Archstone Valuations

214.    Archstone, a publicly traded Real Estate Investment Trust ("REIT"), was among Lehman's largest commercial real estate investments.

215.    To value its Archstone positions, Lehman primarily used a discounted cash flow model that determined fair value by discounting back to present value future expected cash flows using the current cost of capital.  The future cash flow estimate was based on various assumptions including occupancy rates, rental growth rates, projected income and expenses, exit capitalization rates, and exit value.  Lehman, however, failed to consider market information in these assumptions.  For example, Lehman used a rental growth rate that was 1.9% to 3.5% higher than third-party projections for apartments within Archstone's primary markets; used net income growth rates that were 100% higher than the average net income growth rate for apartment REITs over a 15 year period; and failed to consider the lower capitalization rates that were being used for other comparable publicly traded REITs.  (Rpt. pp. 424, 429, 464.)

216.    The Examiner concluded that "evidence supports a finding that Lehman's valuation of $2.165 billion for its Archstone bridge and permanent equity investment was overvalued" by between 9% and 21% at the end of the first quarter of 2008.  (Rpt. p. 467.)  The overstatement was material because, among other things, had Lehman taken a write-down of at least $200 million (9% of the $2.165 billion valuation) in the first quarter of 2008 for its Archstone assets: (i) Lehman's mark-to-market write down adjustments for commercial mortgages and related assets would have increased by 20%; and (ii) the Company's pre-tax income would have decreased by 40%.

217.    Moreover, Archstone was regarded as a "Level 3" asset for purposes of mark-to-

market accounting under Statement of Financial Accounting Standards No. 157, Fair Value

Measurement ("SFAS 157"), meaning its value could not be determined from readily observable

market data.  (Rpt. p. 466.)  Lehman used significant judgment in valuing Archstone, as with all

other Level 3 assets.  The Examiner did not analyze all of Lehman's Level 3 assets.  However, it

is reasonable to infer that at least some of Lehman's other Level 3 assets (which totaled $42

billion and $43 billion at year-end 2007 and the first quarter of 2008, respectively) as well as the

Company's other real estate-related assets were similarly overstated throughout 2007 and 2008

given, among other things, Lehman's difficulties selling such assets to skeptical buyers and the

prominent role those difficulties had in contributing to Lehman's bankruptcy.

## I.    Defendants Misrepresented Lehman's Liquidity

218.    Regulation S-K, prescribed under the Securities Act of 1933, required Lehman to

disclose in its MD&A any known commitments "that will result in or that are reasonably likely

to result in the registrant's liquidity increasing or decreasing in any material way," as well as any

off-balance sheet arrangements "that have or are reasonably likely to have a current or future

effect on the registrant's financial condition, . . . results of operations, liquidity, capital

expenditures or capital resources that is material to investors."  17 C.F.R. § 229.303(a)(1),

(a)(4)(i).  GAAP also requires liquidity-related disclosures.  Lehman violated its liquidity

disclosure obligations in several ways, as discussed below.

### 1.    Failure to Disclose Liquidity Impact of Repo 105

219.    Lehman's requirement to repurchase tens of billions of dollars in Repo 105 assets

within days of quarter-end was a known event within Lehman – albeit not publicly – that greatly

exceeded the Regulation S-K disclosure requirement that such transactions be "reasonably

likely" to impact the Company's liquidity.  Lehman was contractually obligated to repurchase

the assets, and the cash needed for the repurchase transactions was certain to have a material

effect on Lehman's liquidity and financial condition.

220.    In its Forms 10-K and 10-Q MD&A during at least 2007 and 2008, Lehman failed to disclose both the Company's obligation to repurchase the underlying assets soon after the reporting period closed, and the impact such transactions had on Lehman's then-existing actual financial position and results.

221.    Under Regulation S-K, Lehman's disclosures should have included a discussion of the timing and amount of the cash flow accompanying the repayment of the borrowings.  This should have included: (i) the amount of cash available for operations after repayment of the borrowings; (ii) the ability or inability to borrow more cash in light of any reductions in debt ratings or deterioration in leverage ratios that might result from the repayment of the borrowings; and (iii) the economic substance and purpose of the transactions.  Lehman's public filings omitted these disclosures.  In fact, Lehman's 2007 Form 10-K misleadingly claimed that the Company had a "very strong liquidity position," and represented that "we maintain a liquidity pool . . . that covers expected cash outflows for twelve months in a stressed liquidity environment."  Similarly, the 2007 Form 10-K and the Forms 10-Q during 2007 and 2008 also stated that Lehman's liquidity pool was sized to cover expected cash outflows associated with certain enumerated items, however made no disclosure that Lehman used Repo 105 transactions which would require significant cash outflows soon after quarter end.

### 2.    Failure to Disclose Effects of Illiquid Assets on Liquidity Pool

222.    Lehman's statements concerning liquidity were also misleading because Lehman accumulated a heavy concentration of illiquid assets with deteriorating values that were included in the Company's liquidity pool.  Much of Lehman's balance sheet growth in 2007 and 2008 was attributable to illiquid assets that Lehman was unable to sell or could only sell by incurring significant losses.  Thus, while Lehman's 2007 Form 10-K stated that "we maintain a liquidity

pool . . . that covers expected cash outflows for twelve months in a stressed liquidity environment," the then-existing truth was that the Company's liquidity pool included illiquid assets and was insufficient to meet commitments one year forward. Virtually identical misrepresentations were made in Lehman's 2007 and 2008 Forms 10-Q.

### 3.    Inclusion of Encumbered Assets in Liquidity Pool

223.    Lehman's liquidity disclosures were also false and misleading because Lehman included in its reported liquidity pool assets that were either encumbered or otherwise difficult to monetize. This occurred at least as early as June 2008 (Rpt. p. 9), at the time Plaintiff invested significant amounts in Lehman securities.

224.    Lehman's misstatements and omissions continued after Plaintiff invested in Lehman securities. For example, on September 10, 2008, Lehman issued a press release and held a conference call noting that the Company had a liquidity pool of $42 billion. This statement was misleading because a substantial part of the liquidity pool consisted of encumbered assets including: (i) approximately $4 billion of collateralized loan obligations pledged to JPMorgan; (ii) $2.7 billion in cash and money market funds pledged to JPMorgan; (iii) a $2 billion Citibank cash deposit; (iv) a $500 million Bank of America cash deposit; and (v) a nearly $1 billion collateral deposit with HSBC. (Rpt. pp. 9, 1458.) These assets could not be readily monetized and should not have been included in the liquidity pool.

### J.    Defendants Misrepresented Lehman's Risk Management Practices

225.    Throughout at least 2007 and 2008, Lehman's public filings contained false and misleading statements concerning Lehman's risk management practices. These included, among other things, statements about Lehman's adherence to risk policies; compliance with internal risk limits; and stress-test procedures. Lehman's statements were material to investors because, as an investment bank, risk management was critical to loss prevention. In particular, Lehman's

disregard for its risk policies and procedures enabled the Company to amass billions of dollars of illiquid, risky assets that it could not monetize and that ultimately led to Lehman's bankruptcy.

226.    In 2006, Lehman began to pursue an aggressive growth strategy that caused the Company to assume greater risk. Lehman shifted from the "moving business" (*i.e.*, moving assets on to investors) to the "storage" business (*i.e.*, making longer-term investments parking the assets on Lehman's own balance sheet). This expansion strategy focused heavily on acquiring and holding commercial real estate and other real estate assets that entailed far greater risk and less liquidity than Lehman's traditional lines of business.

227.    In its SEC filings throughout at least 2007 and 2008, Lehman repeatedly assured investors that it had appropriate risk management policies in place and that the Company monitored and enforced strict adherence to those policies. For example, Lehman stated that "[w]e monitor and enforce adherence to our risk policies" (included in the 2007 Form 10-K and first quarter 2008 Form 10-Q) and that "[m]anagement's Finance Committee oversees compliance with policies and limits" (included in the second and third quarter 2007 Form 10-Qs, 2007 Form 10-K, and first quarter 2008 Form 10-Q). Lehman also stated that "[w]e . . . ensure that appropriate risk mitigants are in place" (included in the second and third quarter 2007 Form 10-Qs), and that "[d]ecisions on approving transactions . . . take into account . . . importantly, the impact any particular transaction under consideration would have on our overall risk appetite" (included in the second and third quarter 2007 Form 10-Qs). These statements were materially misleading because Lehman's risk management framework and risk limits were not followed, as alleged more fully below. The FCIC report noted that Lehman's "[s]enior management regularly disregarded the firm's risk policies and limits." (FCIC report p. 177.)

228.    For example, Lehman treated its "risk appetite" as a soft limit that was routinely exceeded throughout 2007 and 2008. The Examiner testified before Congress that "Lehman was

in breach of its established risk appetite limits on a persistent basis during the second half of 2007." Lehman even raised its risk appetite limit four times between December 2006 and December 2007, from $2.3 billion to $4.0 billion, but then regularly exceeded even those limits by material amounts. (Rpt. p. 49-51.)

229. Lehman also established "concentration limits," which were designed to ensure that the Company did not take too much risk in a single, undiversified business or area. However, Lehman routinely and consistently disregarded concentration limits with respect to its commercial real estate and leveraged loan business. For example, Lehman failed to enforce its "single transaction limits," which were meant to ensure that its investments were properly limited and diversified by business line and counterparty. (Rpt. p. 50.) Also, Lehman failed to consult with its Chief Risk Officer when deciding to acquire its $5.4 billion stake in Archstone. According to the FCIC report: "Although [Lehman] had proclaimed that 'Risk Management is at the very core of Lehman's business model,' the Executive Committee simply left its risk officer, Madelyn Antoncic, out of the loop when it made this [Archstone] investment." (FCIC report p. 176-77.)

230. Lehman also regularly exceeded its "balance sheet limits," which were designed to contain the overall risk of the firm and maintain certain financial ratios within the range required by the credit rating agencies. Instead, Lehman decided to exceed those limits. To mitigate the apparent effect of these overages, Lehman used Repo 105 transactions to take assets temporarily off the balance sheet before the ends of reporting periods. (Rpt. pp. 50, 157, 181.)

231. Lehman also made misleading statements concerning "stress tests," which were one of Lehman's purported risk controls. Stress tests were supposed to be used to determine the potential financial consequences of an economic shock to the Company's portfolio of real estate assets. Lehman was required by the SEC to conduct regular stress testing. Indeed, in its public

filings in 2007 and 2008, Lehman represented that "[w]e use stress testing to evaluate risks associated with our real estate portfolios."  However, although undisclosed to investors, Lehman excluded many of its most risky principal investments – including commercial real estate investments, private equity investments, and leveraged loan commitments – from its stress tests. The Examiner concluded that, because of the exclusion of those risky assets, "Lehman's management did not have a regular and systematic means of analyzing the amount of catastrophic loss that the firm could suffer from these increasingly large and illiquid investments."  In fact, experimental stress tests conducted in 2008 indicated that a large proportion of Lehman's risk resided with real estate and private equity positions that had not been included in its stress tests.  (Rpt. pp. 50, 66-70.)

232.     In sum, Lehman's disclosures regarding its risk management practices were misleading because they failed to disclose that Lehman routinely exceeded its internal risk limits and they exaggerated the protection afforded to the Company.

### K.     Defendants Failed to Disclose Certain Concentrations of Credit

233.     GAAP requires disclosure of material risk concentrations.  Specifically, AICPA Statement of Position ("SOP") No. 94-6, *Disclosure of Certain Significant Risks and Uncertainties* ("SOP 94-6"), requires disclosures relating to risks and uncertainties that could significantly affect the results reported in the financial statements in the near term (*i.e.*, one year), particularly from "[c]urrent vulnerability due to certain concentrations" of assets or liabilities in certain aspects of the entity's operations.  SOP 94-6, ¶ 8.  Also, FAS No. 107, *Disclosures About Fair Value of Financial Instruments* ("FAS 107"), as amended by FAS No. 133, *Accounting for Derivative Instruments and Hedging Activities* ("FAS 133"), requires disclosure of significant concentrations of credit risk for financial instruments such as loans, including information about the "economic characteristic that identifies the concentration."  FAS

107, ¶ 15A.  Also, FASB Staff Position ("FSP") SOP 94-6-1, *Terms of Loan Products That May Give Rise to a Concentration of Credit Risk* ("FSP SOP 94-6-1"), addresses disclosure requirements for entities that originate, hold, guarantee, service, or invest in loan products whose terms may give rise to a concentration of credit risk.

234.    Certain required disclosures regarding concentrations of credit risk were omitted until the filing of Lehman's second quarter 2008 Form 10-Q on July 10, 2008 – after Plaintiff purchased the vast majority of its Lehman securities – when Lehman belatedly began to provide certain partial disclosures concerning its commercial mortgage and real estate-related portfolios (which themselves omitted material facts).  Specifically, for example, throughout at least 2007 and 2008, Lehman's public filings failed to disclose adequately or meaningfully the Company's risk concentrations in highly risky Alt-A loans.

235.    Lehman was a leading originator of Alt-A loans.  Lehman's public filings did not even include the term Alt-A until the Company filed its first quarter 2008 Form 10-Q, and even that filing was materially misleading.  When Lehman finally began to identify Alt-A holdings in that Form 10-Q, Lehman consolidated its Alt-A holdings with prime holdings into a single category labeled "Alt-A/Prime," even though less than 7% actually consisted of "prime" loans.  By initially omitting Alt-A holdings altogether, and later grouping Alt-A with prime mortgage-related assets, the public filings did not adequately disclose Lehman's true exposure to the riskier Alt-A loans that dwarfed the prime loans and were experiencing rising delinquencies and defaults throughout 2007 and 2008.

236.    Moreover, Lehman did not disclose that it had loosened its lending standards for Alt-A loans such that they were actually more akin to subprime than to prime.

**L.    GAAP Violations**

237.    GAAP are those principles recognized by the accounting profession as the

66

conventions, rules, and procedures necessary to define accepted accounting practices at a particular time. GAAP principles are the official standards promulgated primarily by the FASB and American Institute of Certified Public Accountants ("AICPA"). GAAP consists of a hierarchy of authoritative literature. The highest priority is comprised of FASB Financial Accounting Standards ("FAS"), followed by FASB Interpretations ("FIN"), Accounting Principles Board Opinions ("APB"), Accounting Research Bulletins ("ARB"), and AICPA Statements of Position ("SOP"). GAAP provides other authoritative pronouncements including, among others, the FASB Concept Statements ("FASCON").

238.    Lehman violated numerous GAAP provisions relating to, among other things, its real estate-related asset valuations, net leverage ratios, liquidity disclosures, risk management disclosures, and concentration of credit disclosures.

### 1.    Repo 105

239.    As alleged more fully above, several of Lehman's public filings and public statements in 2007 and 2008 were false and misleading due to the improper recording of Repo 105 transactions, and the non-disclosure of related Repo 105 matters.

### 2.    FAS 157 Asset Valuations

240.    In general, under FAS 157, assets are assessed at three different levels, Levels 1, 2 and 3. The value of Level 1 assets is readily ascertainable, meaning that their "inputs are quoted prices (unadjusted) in active markets for identical assets or liabilities that the reporting entity has the ability to access at the measurement date." FAS 157, ¶ 24. Essentially, these assets are measured by stock market quotes. The value of Level 2 assets is mostly ascertainable, meaning that their "inputs are inputs other than quoted prices included within Level 1 that are observable for the asset or liability, either directly or indirectly." FAS 157, ¶ 28. Finally, the value of Level 3 assets is difficult to obtain because these assets do not rely on "observable" inputs, which are

inputs from sources independent of the reporting entity such as stock market quotes.  Rather,

Level 3 assets are valued based on "unobservable" inputs, which are the reporting entity's own

assumptions about what market participants would use to value the asset.  Level 3 assets are

valued at the discretion of management, often based on internal modeling.  *See, e.g.,* FAS 157, ¶¶

21-30.

241.    Specifically, with respect to Level 3 assets, FAS 157, ¶ 30 states:

[U]nobservable inputs shall reflect the reporting entity's own assumptions about
the assumptions that market participants would use in pricing the asset or liability
(including assumptions about risk).  Unobservable inputs shall be developed
based on the best information available in the circumstances, which might include
the reporting entity's own data. . . .  [T]he reporting entity's own data used to
develop unobservable inputs shall be adjusted if information is reasonably
available without undue cost and effort that indicates that market participants
would use different assumptions.

242.    Lehman, under FAS 157, was obligated to properly assess all of its assets at the

correct market value, no matter how obscure, opaque, or illiquid the market was for the asset in

question.  Lehman was also obligated to properly classify an asset using the correct valuation

techniques, by measuring the fair market value using one of the three levels under FAS 157 for

valuating assets.

243.    Under FAS 157, financial instruments and other inventory must be reported at fair

value.  "Fair value is the price that would be received to sell an asset or paid to transfer a liability

in an orderly transaction between market participants at the measurement date."  FAS 157, ¶ 5.

Moreover, "the objective of a fair value measurement is to determine the price that would be

received to sell the asset . . .  at the measurement date (an exit price.)." FAS 157, ¶ 7.  FAS 157

indicates that fair value is measured using valuation techniques that are appropriate in the

circumstances and for which sufficient data are available.

244.    In its 2007 Form 10-K, Lehman classified 28 percent of its MBS and ABS –

68

roughly $25 billion of its $89 billion total – as Level 3.  Similarly, in its first quarter 2008 Form 10-Q, Lehman classified 28 percent of its MBS and ABS – roughly $24 billion of its $85 billion total – as Level 3.  In its second quarter 2008 Form 10-Q, Lehman classified 28 percent of its MBS and ABS – roughly $21 billion of its $72 billion total – as Level 3.

245.    Lehman made numerous public representations indicating that the Company had significant pricing visibility for its MBS and ABS, such that Lehman could adequately value those assets on its books.  For example, on March 18, 2008, Defendant Callan remarked on the pricing transparency of some of Lehman's mortgage-related securities: "[W]e began to see a lot more transparency in the Alt-A sector late in the quarter, allowing us to mark positions based on observable prices, much less use of models."  On June 16, 2008, Defendant Fuld stated, in a conference call with investors, that Lehman "had the benefit of much greater price visibility, due to the number of assets that were sold, especially in the commercial and residential mortgage area."  Likewise, Defendant Lowitt said on the same call that "[a]lthough certain sectors of the markets are currently distressed, there has been recent sales activity in many asset classes, allowing us to benchmark prices.  The strong flows we've seen over the past quarter have given us very good transparency in the marks we have against our remaining positions."  Moreover, Lowitt stressed that Lehman sold approximately $11 billion of residential mortgage assets and purchased $6 billion during the quarter, including risky loan types such as Alt-A and subprime mortgages, which gave Lehman "good transparency in our pricing."

246.    These statements suggested that there was significant pricing transparency for assets on Lehman's balance sheet, including Level 3 assets.  However, in truth, the values reflected on Lehman's financial statements at year-end 2007, first quarter 2008, and second quarter 2008 for many of its real estate assets were overstated because they lacked significant price transparency, were not appropriately adjusted for risk, or were not marked in accordance

with the pricing transparency that Lehman did have. This occurred despite investors being told that Lehman had an adequate and informed basis on which to value the assets.

247.    Instead of recognizing necessary impairments to assets and writing the values down, Lehman allowed the Company's balance sheet to be materially misstated. Indeed, despite the continued turmoil in the residential and commercial mortgage markets, Lehman took a total write-down of only $1.5 billion on its mortgage and asset-backed holdings in the fourth quarter of 2007, $4.3 billion in the first quarter of 2008, and $3.7 billion in the second quarter of 2008. Those write downs were a fraction of what was then required. The inadequate write downs materially overstated Lehman's then-existing financial position and results.

248.    Moreover, Lehman's failure to timely write down impaired assets was due in part to improper shifts in large amounts of Lehman's mortgage assets into the Level 3 accounting category in order to avoid writing them down. Specifically, Level 2 assets were valued using, *inter alia*, market data such as the market prices of real estate-related assets as reflected in indices called "ABX" (a market index of subprime RMBS) and "CMBX" (a market index of CMBS). During 2007, the ABX index declined significantly, as did the CMBX. As a result, Level 2 assets that had to be valued in relation to market prices should have been marked down accordingly. Instead of doing so, however, Lehman improperly re-categorized large swaths of assets as Level 3. Level 3 assets were valued at management's discretion using internal models (some of which were flawed as noted by the Examiner) and other information instead of objective market data. By improperly categorizing assets as Level 3 and by using inappropriate models to inflate the reported values of those assets, Lehman reported inflated values for billions of dollars in Level 3 assets.

249.    In addition to failing to properly recognize FAS 157 losses on its real estate-related assets, Lehman's financial statements throughout at least 2007 and 2008 did not properly

disclose that certain losses were, at a minimum, "reasonably possible," in violation of FAS No. 5, *Accounting for Contingencies* ("FAS 5"). FAS 5, ¶ 3(b) defines "reasonably possible" as the chance that the future event occurring is more than remote but less than likely. Lehman's failure to properly disclose reasonably possible future losses related to real estate assets misled Plaintiff as to Lehman's true financial position.

### 3.    General GAAP Principles

250.    As a publicly traded company, Lehman was required to maintain books and records in sufficient detail to reflect the transactions and assets of the Company, and to prepare financial statements in accordance with GAAP. Specifically, the Securities Exchange Act of 1934, 15 U.S.C. §78m(b)(2) (the "Exchange Act"), requires public companies to:

(A)    make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the issuer; and

(B)    devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that –

i.    transactions are executed in accordance with management's general or specific authorization;

ii.    transactions are recorded as necessary (I) to permit preparation of financial statements in conformity with generally accepted accounting principles or any other criteria applicable to such statements, and (II) to maintain accountability for assets;

iii.    access to assets is permitted only in accordance with management's general or specific authorization; and

iv.    the recorded accountability for assets is compared with the existing assets at reasonable intervals and appropriate action is taken with respect to any differences[.]

251.    SEC Regulation S-X, 17 C.F.R. § 210.4-01(a)(1), states that financial statements filed with the SEC which are not prepared in compliance with GAAP are presumed to be misleading and inaccurate. Regulation S-X requires that interim financial statements must also

comply with GAAP.  17 C.F.R. § 210.10-01(a).

252.    In addition to the requirements of GAAP, Regulation S-K required Lehman to include certain disclosures in the MD&A section of its Forms 10-K and 10-Q.  Regulation S-K states as follows, in relevant part:

> Describe any known **trends or uncertainties** that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or income from continuing operations.  (17 C.F.R. §229.303(a)(3)(ii)).

> The discussion and analysis shall focus specifically on material events and **uncertainties known to management** that would cause reported financial information not to be necessarily indicative of future operating results or of future financial conditions.  (17 C.F.R. §229.303(a)).

> (Emphasis added.)

253.    The Company's MD&A in Forms 10-K and 10-Q filed in 2007 and 2008, in violation of Regulation S-K, did not adequately disclose the trends or uncertainties (*e.g.*, the illiquid market for Lehman's real estate assets, and Lehman's strained ability to raise capital) leading to, or threatening to lead to, a material change in the Company's financial position.

### 4.    <u>Internal Controls</u>

254.    Exchange Act Rules 13a-14 and 15d-14 require a company's principal executive officer and principal financial officer to quarterly and annually certify the effectiveness (or deficiencies in the effectiveness) of the Company's internal controls.  The company is also required to annually report on the effectiveness of its internal controls over financial reporting. PCAOB Auditing Standard No. 2, *An Audit of Internal Control Over Financial Reporting Performed in Conjunction with An Audit of Financial Statements*.

255.    In Lehman's 2007 Form 10-K and first and second quarter 2008 Forms 10-Q, Lehman falsely represented that the Company's internal controls over financial reporting were effective.  Moreover, Defendants Fuld, Callan, and Lowitt filed signed certifications attesting

that internal controls were effective.  In truth, however, Lehman's internal controls were not effective, allowing Lehman to issue financial statements that were materially misleading in multiple respects as alleged above.  Defendants Fuld, Callan, and Lowitt had no reasonable basis to conclude that Lehman's internal controls were effective.

**M.**    **False Statements**

256.    Lehman made numerous materially false or misleading statements throughout at least 2007 and 2008, summarized below.

**1.**    **2007 Quarterly Results**

257.    Lehman's 2007 Forms 10-Q contained numerous false and misleading statements for the following reasons, among others: total assets and net leverage ratio were understated due to Repo 105 transactions; real estate-related assets and net income were overstated due to Lehman's failure to properly and timely write down assets; and liquidity disclosures, risk management disclosures, and concentration of credit disclosures were misleading for the reasons noted above.

**2.**    **2007 Year-End Results**

258.    Lehman's 2007 Form 10-K, filed January 29, 2008, contained numerous false and misleading statements for the following reasons, among others: total assets and net leverage ratio were understated due to Repo 105 transactions; real estate-related assets and net income were overstated due to Lehman's failure to properly and timely write down assets; and liquidity disclosures, risk management disclosures, and concentration of credit disclosures were misleading for the reasons noted above.

259.    Similar misstatements were made in Lehman's December 13, 2007 press release and conference call regarding year-end 2007 financial results.

### 3.    First Quarter 2008 Results

260.    Lehman's first quarter 2008 Form 10-Q, filed April 9, 2008, contained numerous false and misleading statements for the following reasons, among others: total assets and net leverage ratio were understated due to Repo 105 transactions; real estate-related assets and net income were overstated due to Lehman's failure to properly and timely write down assets; and liquidity disclosures, risk management disclosures, and concentration of credit disclosures were misleading for the reasons noted above.

261.    Similar misstatements were made in Lehman's March 18, 2008 press release and conference call regarding first quarter 2008 financial results.

### 4.    Second Quarter 2008 Results

262.    Lehman's second quarter 2008 Form 10-Q, filed on July 10, 2008, contained numerous false and misleading statements for the following reasons, among others: total assets and net leverage ratio were understated due to Repo 105 transactions; real estate-related assets and net income were overstated due to Lehman's failure to properly and timely write down assets; and liquidity disclosures, risk management disclosures, and concentration of credit disclosures were misleading for the reasons noted above.

263.    Similar misstatements were made in Lehman's June 9, 2008 press release and conference call regarding second quarter 2008 financial results.

### 5.    June 5, 2008 Conference Call Between Defendant Callan and Plaintiff

264.    As set forth in detail above, Defendant Callan made several misrepresentations to Plaintiff during a conference call on June 5, 2008.

265.    Specifically, Defendant Callan stated that the market value of Lehman's assets was fairly stated based on sales of similar assets.  That statement was untrue because, as the Bankruptcy Examiner noted, Lehman used flawed valuation techniques in valuing certain assets.

74

Also, Lehman was unable to sell most of its assets prior to bankruptcy, illustrating their illiquid and over-valued nature.

266.    Callan also stated that Lehman had prudent risk management practices.  That statement was misleading because she failed to mention that Lehman routinely exceeded its internal risk limits.

267.    Callan further stated that if Lehman's credit rating were to be downgraded, Lehman would be exposed, at most, to a requirement to post an additional $500 million in collateral to third parties.  That statement was false, illustrated by the fact that Lehman was subjected to tens of billions of dollars in collateral calls just three months later.

268.    Callan also stated that Lehman was deleveraging, and its net leverage ratio was down to 12.1.  That statement was false and misleading because Lehman's then-existing net leverage ratio was materially understated due to Lehman's use of Repo 105 transactions.

269.    Similarly, Callan touted that Lehman was decreasing the overall size of its assets and balance sheet.  The inference was that Lehman was selling and/or properly writing down its asset values.  She omitted to disclose that part of the asset reduction was achieved from increasing the Company's use of Repo 105 transactions, which appeared to remove a growing number of assets from Lehman's balance sheet each quarter but which Lehman was obligated to buy back.

270.    Callan also stated that there were no problems with Lehman's liquidity, and that the liquidity pool was strong.  That statement was false and misleading because Lehman's liquidity was quickly worsening and Lehman was having a more difficult time selling its assets.  Also, Lehman included encumbered assets in its liquidity pool, which further overstated Lehman's actual then-existing liquidity.

271.    Finally, Callan stated that Lehman would not be accessing the Federal Reserve

credit facility in the future.  That statement was untrue both because Lehman had then-existing

liquidity issues, and because Lehman borrowed tens of billions of dollars from the Federal

Reserve credit facility just three months later.

      N.      **E&Y's Violations of Accounting Standards**

            1.      **E&Y's Deficient Auditing of Repo 105**

272.    The Bankruptcy Examiner concluded that colorable claims exist against E&Y for

its failure to meet professional standards in connection with Lehman's use and non-disclosure of

Repo 105.  (Rpt. p. 24.)

273.    After the Bankruptcy Examiner's Report was issued, the New York Attorney

General filed its civil complaint against E&Y.  The NY AG Compliant was based in part on the

Bankruptcy Examiner's Report and also contained facts and witness testimony derived from the

NY AG's own independent investigation.  The NY AG Complaint charged E&Y with several

counts relating to its audits and reviews of Lehman's financial statements.

274.    In 2001, Lehman adopted an internal Accounting Policy Statement (the "Policy")

that set forth Lehman's intention to use Repo 105 transactions.  Before issuing the Policy, senior

Lehman personnel including Kristine Smith ("Smith") discussed the proposed Policy with E&Y

Partners Kevin Reilly ("Reilly"), William Schlich ("Schlich"), and Matthew Kurzweil

("Kurzweil").  In their discussions, E&Y specifically approved the policy.  (NY AG Compl. ¶

16.)

275.    E&Y understood that the Repo 105 transactions were, as E&Y's Reilly described

it, designed to "manage balance sheet metrics."  As reflected in an August 19, 2001 memo from

Lehman's Smith to E&Y's Reilly, Schlich, and Kurzweil, titled "Rules of Road – Repo

Recharacterizations (Repo 105)," the Repo 105 transactions gave Lehman the ability to re-

characterize ordinary repo transactions as sales and allowed for an increased ability to reduce the

real estate related securities on Lehman's balance sheet.  (NY AG Compl. ¶ 17.)

276.    In October 2002, Lehman's Smith again discussed Repo 105 with E&Y's Reilly, Schlich, and Kurzweil at a time when Lehman was considering expanding the transactions to include a related "Repo 107" structure.  At that time, Lehman provided E&Y with a memo reaffirming that Repo 105 transactions were being done for the purpose of "reducing the balance sheet as firm inventory."  Subsequently, Lehman expanded into "Repo 108" transactions, which used equities rather than fixed income securities with a minimum of eight percent overcollateralization.  (NY AG Compl. ¶ 18.)

277.    On October 3, 2002, Lehman's Smith sent an email to E&Y noting that the Linklaters "true sale" opinion placed important limits on the use of Repo 105 transactions. Specifically, her email pointed out that the repurchase transactions must be executed in London and the counterparty must reside in a jurisdiction covered by English law.  (NY AG Compl. ¶ 21.)

278.    The Linklaters opinion meant that Repo 105 transactions must involve securities based in the United Kingdom.  Lehman's Smith and Martin Kelly (Global Financial Controller) testified to the NY AG's office that they specifically informed E&Y's Schlich of the use of American-based securities in Repo 105 transactions.  (NY AG Compl. ¶ 23.)  Also, E&Y had access to, or was aware of, financial and other information concerning the American-based securities that Lehman had then – and subsequently – been using.  Nevertheless, E&Y ignored the use of American-based securities, despite internal E&Y guidelines explicitly requiring auditors to consider whether a separate U.S. legal opinion would be required for foreign transactions governed by FAS 140.  E&Y's guidelines stated: "engagement teams should consider the need to receive a legal opinion in each country in which assets may have **originated** when auditing global transfers of financial assets."  (NY AG Compl. ¶ 42) (emphasis added).

77

279.     In 2006, one of E&Y's auditors, Bharat Jain ("Jain"), reviewed Lehman's Repo 105 Policy and became concerned about Lehman's heavy use of Repo 105 transactions.  In a September 7, 2006 email to his senior manager, Jennifer Jackson ("Jackson"), Jain stated that he would "like to know what is our thought process behind how much of these Lehman should do from reputational risk, etc. perspective.  Are we comparing to other competitors, are we referring to any industry publications, any regulatory guidance, etc.?"  (NY AG Compl. ¶ 43.)  When Jackson received Jain's e-mail, she viewed it as raising serious issues.  As Jackson testified to the NY AG's office, the "raising of the concern around reputational risk . . . didn't happen every day. . . .  I can't think of [another] example off the top of my head where Lehman entered into transactions, and we had a concern around reputational risk."  It is clear that E&Y auditors were concerned in 2006 that the Repo 105 transactions, if known to the public, could affect Lehman's reputation.  (NY AG Compl. ¶ 45.)

280.     A Lehman "Balance Sheet Analysis Package" dated February 2008, which was given to E&Y, included a detailed analysis of Repo 105 volume, including a chart showing a spike in Repo 105 deals at the end of the third quarter of 2007, year-end 2007, and first quarter of 2008.  (NY AG Compl. ¶ 46.)

281.     Lehman's Martin Kelly became familiar with Lehman's use of Repo 105 transactions soon after he became the Company's Global Financial Controller in December 2007.  He testified that upon learning about the matter in late 2007 or early 2008, he raised with E&Y (specifically, lead auditor Schlich) several concerns he had about Repo 105, including: (a) Lehman's reliance on the Linklaters "true sale" opinion, coupled with Lehman's inability to obtain a U.S. legal opinion; (b) Repo 105 transactions that utilized American securities transferred to Lehman's LBIE entity in England; (c) the significant increase in Repo 105 transactions at the end of each quarter; (d) the fact that the accounting justification for treating

the transactions as sales was "form-driven" and "legalistic"; and (e) the fact that none of Lehman's peer financial institutions appeared to be using such transactions.  Even after this discussion, E&Y failed to properly advise Lehman concerning the practice and E&Y continued to accept Lehman's accounting treatment.  (NY AG Compl. ¶ 29, 47.)

282.    In May 2008, E&Y received a copy of a letter sent to Lehman senior financial executives from Matthew Lee ("Lee"), a Senior Vice President in Lehman's finance division who was responsible for Lehman's Global Balance Sheet and Legal Entity Accounting.  The letter raised serious questions concerning several issues with Lehman's financial statements.  E&Y was directed by Lehman's Audit Committee to meet with Lee and to report back the results of its investigation of Lee's allegations.  (NY AG Compl. ¶ 51; Rpt. pp. 21, 956.)

283.    On June 12, 2008, E&Y's Schlich and another E&Y partner, Hillary Hansen ("Hansen"), interviewed Lee.  According to contemporaneous notes of Hansen and Lee's own testimony, one of the things Lee told Schlich and Hansen was that – as E&Y already knew – Lehman was removing up to $50 billion in securities from its balance sheet at each quarter-end by selling them to European counterparties, albeit for a short time and with the undisclosed obligation to by such assets back.  (NY AG Compl. ¶ 52, Rpt. p. 959.)

284.    Following the meeting, Hansen raised concerns about the Repo 105 transactions with Schlich, who dismissed the concerns.

285.    Schlich and Hansen then met with Lehman's Global Product Controller, Gerard Reilly, to review Lee's allegations.  In a brief meeting, they discussed Lee's other concerns but failed to even mention Repo 105.  Similarly, at a meeting with Lehman's Audit Committee on June 13, 2008, Schlich failed to mention Lee's concerns regarding Lehman's use of Repo 105 – even though E&Y had been specifically instructed to inform the Audit Committee of **all** concerns raised by Lee.  (NY AG Compl. ¶ 53; Rpt. p. 21, Rpt. p. 959.)

2.    **The Bankruptcy Examiner's Conclusions Regarding**
**E&Y's Repo 105 Involvement**

286.    The Bankruptcy Examiner made several notable conclusions regarding E&Y's

involvement in Repo 105.  For example:

> The Examiner concludes that sufficient evidence exists to support **colorable claims against Ernst & Young LLP ("Ernst & Young") for professional malpractice arising from Ernst & Young's failure to follow professional standards of care** with respect to communications with Lehman's Audit Committee, investigation of a whistleblower claim, and audits and reviews of Lehman's public filings.

(Rpt. p. 1027; *accord* pp. 17, 21, 23-24, 750, 764, 990, 1036, 1040, 1049) (emphasis added).

287.    The Examiner provided more specifics, noting that E&Y's wrongdoing dated

back to at least 2007:

> The Examiner finds that sufficient evidence exists to support **at least three colorable claims** that could be asserted against Ernst & Young relating to Lehman's Repo 105 activities and reporting: (1) negligence in connection with the investigation into whistleblower Matthew Lee's claims concerning $50 billion in Repo 105 activities at the end of the **second quarter 2008**, including failing to conduct an adequate inquiry into the allegations prior to the filing of Lehman's Form 10-Q, and failing to properly inform management and the Audit Committee of Lee's allegations; (2) at least with respect to Lehman's **first quarter and second quarter 2008 Forms 10-Q**, if not with respect to earlier filings, negligence by failing to take proper action when Ernst & Young was made aware that the financial information may be materially misleading because of the failure to disclose the effect of the timing and volume of Lehman's Repo 105 activities (which had a material effect on interim financial statement items), and failing to take proper action with respect to materially misleading statements contained in the MD&A sections of the Forms 10-Q for these quarters; and (3) at least with respect to Lehman's **2007 Form 10-K, if not with respect to earlier Forms 10-K**, negligence by failing to take proper action when Ernst & Young was made aware that the financial statements may be materially misleading because of the failure to disclose the effect of the timing and volume of Lehman's Repo 105 activities (which had a material effect on financial statement items), and failing to take proper action with respect to materially misleading statements contained in the MD&A sections of the Form 10-K.

(Rpt. pp. 1032-33, *accord* pp. 1027, 1040, 1044-47) (emphasis added).

288.    The Examiner consulted with an industry expert, Gary L. Holstrum, PhD, CPA, to

assist in the analysis of professional auditing standards.  Dr. Holstrum concurred with the Examiner's conclusion that a valid claim for professional malpractice could be raised against E&Y.  (Rpt. p. 1027 n.3901.)

### 3.    E&Y Failed to Comply With GAAP and GAAS

289.    E&Y served as Lehman's outside auditor since at least 2000, and was retained by Lehman to conduct annual audits and quarterly reviews of Lehman's financial statements.

290.    In its position as outside auditor, E&Y was responsible for issuing audit opinions, knowing they would be used, and relied on, by investors in evaluating the purchase, sale, or continued holding of Lehman securities.

291.    By virtue of its long history with Lehman, and Defendant Goldfarb's history as a former partner with E&Y, E&Y was intimately involved with Lehman's business model, its employees, its services, and its increasing risk exposure by virtue of its real estate-related holdings.  Moreover, in the course of its audit work, including its audit planning procedures for the 2007 audit, E&Y was required to audit management's assessment of the effectiveness of Lehman's internal controls, particularly Lehman's real estate asset valuations and risk exposure as a result of the deterioration of the real estate market.

292.    In addition, E&Y, as part of its standard procedures with public companies it audited, would have reviewed Lehman's quarterly press releases, which announced Lehman's performance, financial condition, asset valuations, and revenues.  E&Y reviewed drafts of Lehman's filings with the SEC prior to filing, and also attended and made presentations at Board and Audit Committee meetings where E&Y discussed the results of its examinations of Lehman's financial statements.  For its services, E&Y received significant compensation from Lehman.

293.    For the fiscal year 2007, Lehman provided a clean "unqualified" audit opinion

that was included in Lehman's 2007 Form 10-K. That audit opinion represented that E&Y conducted its audit in accordance with GAAS and that, based on its audit, Lehman's financial statements fairly represented the Company's financial position and results of operations in accordance with GAAP.

294.    The central purpose of an audit is to obtain an opinion that the financial statements comply with GAAP. AIPCA Auditing Standards ("AU") § 110.01. The auditor has an affirmative duty to plan and perform the audit to obtain reasonable assurance that the financial statements are free of material misstatement, whether by error or fraud. AU § 110.02.

295.    To obtain such reasonable assurance, the auditor must perform specific procedures required by GAAS and, after performing such procedures, determine if anything has come to its attention that would lead it to believe that the financial statements were not fairly presented in accordance with GAAP. AU § 722.09. The audit process requires professional skepticism in order to properly test management's representations so that the auditor has a reasonable basis on which to form an opinion regarding the financial statements. AU § 332.02.

296.    An auditor must consider both audit risk and materiality in: (i) planning the audit and designing audit procedures; and (ii) evaluating the results of the audit in relation to the financial statements as a whole. AU § 312.12. The auditor must plan the audit to obtain reasonable assurance of detecting material misstatements that it believes could be large enough, individually or in the aggregate, to be material to the financial statements. AU § 312.20.

297.    In performing audit work, an auditor must perform such work in conformity with GAAS, as well as the standard of care established by the AICPA, which includes GAAS's Ten Professional Standards of care:

*General Standards*

1.    The audit must be performed by a person or persons having adequate

technical training and proficiency as an auditor.

2.      In all matters relating to the assignment, independence in mental attitude is to be maintained by the auditor or auditors.

3.      Due professional care is to be exercised in the planning and performance of the audit and the preparation of the report.

*Standards of Field Work*

4.      The work is to be adequately planned and assistants, if any, are to be properly supervised.

5.      A sufficient understanding of internal controls is to be obtained to plan the audit and to determine the nature, timing, and extent of tests to be performed.

6.      Sufficient competent evidential matter is to be obtained through inspection, observation, inquiries and confirmations to afford a reasonable basis for an opinion regarding the financial statements under audit.

*Standards of Reporting*

7.      The report shall state whether the financial statements are presented in accordance with Generally Accepted Accounting Principles.

8.      The report shall identify those circumstances in which such principles have not been consistently observed in the current period in relation to the preceding period.

9.      Informative disclosures in the financial statements are to be regarded as reasonably adequate unless otherwise stated in the report.

10.     The report shall either contain an expression of opinion regarding the financial statements, taken as a whole, or an assertion to the effect than an opinion cannot be expressed. When an overall opinion cannot be expressed, the reasons therefore should be stated. In all cases where an auditor's name is associated with financial statements, the report should contain a clear-cut indication of the character of the auditor's work, if any, and the degree of responsibility the auditor is taking.

298.    With respect to E&Y's audit of Lehman, E&Y violated the following principles

of GAAS, including, among others:

a.      GAAS General Standard No. 3, which requires the auditor to exercise due professional care in the performance of the audit and preparation of the

83

audit report;

b.     GAAS Reporting Standard No. 1, which requires the audit report to state whether the financial statements are presented in accordance with GAAP;

c.     GAAS Field Standard No. 1, and the standards set forth in AU sections 310, 320, 327 and others, by failing to adequately plan its audit and properly supervise the work of assistants so as to establish and carry out procedures reasonably designed to search for and detect the existence of errors and irregularities which would have a material effect upon the financial statements; and

d.     AU section 316, which requires the auditor to plan and perform its examination of the financial statements with professional skepticism. In particular, in Lehman's case, there were numerous audit red flags and risk factors that alerted E&Y to the potential for misstatements, and E&Y failed to expand its audit procedures and perform effective audit testing to obtain more reliable, persuasive audit evidence of such significant factors and audit red flags.

299.     With respect to Repo 105, E&Y violated several provisions of GAAS. E&Y's knowledge and approval of the Repo 105 program, the absence of a business purpose for such transactions, and the increased volume of Repo 105 transactions at quarter-end, among other things, raised various obligations under GAAS that E&Y failed to meet. Specifically, E&Y violated the following GAAS standards, among others:

300.     *First*, E&Y was required to discuss with Lehman's Audit Committee the quality of Lehman's accounting principles as applied to financial reporting. AU § 380.11. This would include discussing, among other things, Lehman's Repo 105 transactions moving $30 billion to $50 billion temporarily off the balance sheet at quarter-ends, and using American-based securities in conjunction with an overseas "true sale" opinion that could not be obtained in the United States. AU § 380.11 states that auditors must discuss accounting policies, unusual transactions, and the clarity and completeness of the financial statements with the Audit Committee. Contrary to that standard, E&Y failed to properly communicate Lehman's use of Repo 105 transactions to Lehman's Audit Committee. Incredibly, E&Y failed to notify the

Audit Committee of Matthew Lee's concerns about Repo 105 even though the Audit Committee asked E&Y to discuss all of Lee's concerns related to the financial statements.

301.    *Second*, upon learning that: (i) Lehman intended to use Repo 105 transactions to manage balance sheet metrics; (ii) the use of Repo 105 transactions nearly doubled between year-end 2006 and mid-2008; (iii) Lehman's Martin Kelly raised concerns about Repo 105 transactions to E&Y; and (iv) Lehman's Matthew Lee discussed his concerns about Repo 105 with E&Y, E&Y was required by GAAS to conduct a bona fide investigation of Repo 105 and inform management and the Audit Committee of the relevant issues.  *E.g.*, AU § 316.79.  E&Y failed to properly investigate or alert the appropriate level of management.

302.    *Third*, AU §§ 336 and 9336 address an auditor's use of a legal opinion as evidential matter supporting, for instance, a management assertion that a financial asset transfer meets the "control" criterion in FAS 140.  AU § 9336 states that a legal letter that includes conclusions using certain qualifying language would not provide persuasive evidence that a transfer of financial assets has met the isolation criterion of FAS.  Not only was the Linklaters letter replete with qualifying statements, but E&Y knew it was unlikely that other reputable United States law firms would issue a similar letter and that Lehman had to conduct the Repo 105 transactions through a United Kingdom-based affiliate, LBIE.  E&Y failed to consider whether it could rely on the Linklaters opinion letter at all, much less in connection with securities that E&Y knew or should have known were originated in the United States.

303.    E&Y also failed to detect any of Lehman's numerous GAAP violations regarding real estate asset valuations, liquidity disclosures, risk management disclosures, and concentration of credit disclosures.

### 4.    E&Y's Quarterly Reviews

304.    Each of Lehman's Forms 10-Q during at least 2007 and 2008 contained a "Report

of Independent Registered Public Accounting Firm" signed by E&Y stating that, based on

E&Y's review of Lehman's financial statements in accordance with applicable standards, "we

are not aware of any material modifications that should be made to the consolidated financial

statements referred to above for them to be in conformity with U.S. generally accepted

accounting principles."

305.    These review reports were false and misleading because E&Y failed to comply

with the applicable standards for review engagements.  E&Y knew or should have known that

material modifications should be made to Lehman's financial statements beginning at least in

2007.

306.    Among other provisions of GAAP, E&Y violated AU section 722.18, which

states: "If, in performing a review of interim financial information, the accountant becomes

aware of information that leads him or her to question whether the interim financial institution to

be reported conforms with generally accepted accounting principles, the accountant should make

additional inquires or employ other procedures he or she considers appropriate to provide the

limited assurance for a review engagement."  E&Y should have made additional inquiries in

light of the various red flags made known to it at the time of its quarterly reviews.  For example,

E&Y was aware of Lehman's increasing Repo 105 usage by at least 2008.  More importantly,

E&Y learned of Matthew Lee's concerns about Lehman's increasing use of Repo 105 when

E&Y interviewed him on June 12, 2008, yet E&Y disregarded those concerns and signed their

second quarter quarterly review report on July 10, 2008.

307.    Plaintiff purchased over $300 million in Lehman securities after E&Y issued its

April 8, 2008 quarterly review report for the first quarter of 2008.  In making those purchases,

Plaintiff relied in part on Lehman's quarterly financial results, including the unqualified review

report received from E&Y.

5.     **E&Y's Consent for Inclusion of its Audit Opinion in the April and June 2008 Offering Materials**

308.    E&Y was responsible to timely conduct additional procedures subsequent to the issuance of its 2007 audit report, and prior to the date of its consent for Lehman to include E&Y's audit report in the April and June 2008 Offering Materials.  According to AU § 771.10, the "auditor should extend his procedures with respect to subsequent events from the date of his audit report up to the effective date [of the registration statement or prospectus]" to prove that "he has made a 'reasonable investigation' as required under the Securities Act."

309.    The procedures to be performed, according to AU §§ 711.10 and 560.12, include, among other things, reading interim financial statements and comparing them to the audited statements; inquiring of officers and executives having responsibility for financial and accounting matters; and assessing whether any subsequent events occurred that have a material effect on the audited financial statements.

310.    According to AU Section 711.12, if the auditor "discovers . . . subsequent events that require adjustments or disclosure" or "becomes aware that facts may have existed at the date of his report," the auditor, according to AU Section 561.06, "should advise his client to make appropriate disclosure of the newly discovered facts and their impact on the financial statements to persons who are known to be currently relying or who are likely to rely on the financial statements."  AU Section 711.12 further states that "the auditor should also consider . . . withholding his consent."  E&Y neither required appropriate disclosure nor withheld its consent.

311.    Numerous material events occurred after E&Y issued its 2007 audit opinion and before it issued its consent to incorporate that audit opinion into the April and June 2008 Offering Materials.  Those events should have prompted E&Y to reconsider the validity of its audit opinion and withhold its consent.  For example, the mortgage origination and related

securitization industries were facing a rapid deterioration by at least April 2008; Lehman's Repo 105 activity increased by a material amount (a $10 billion increase between year-end 2007 and the end of the first quarter of 2008); and in May 2008 E&Y received Matthew Lee's letter "alleging accounting improprieties" (Rpt. p. 21). Notably, E&Y received Lee's letter **before** it issued its consent for the June 2008 Offering dated June 9, 2008. However, E&Y did not interview Lee until June 12, 2008, after it issued its consent. E&Y should have insisted on interviewing Lee and investigating his allegations before issuing its consent, in accordance with AU Sections 711.12 and 560.12. E&Y's actions in delaying the interview and investigation were akin to inexcusable blindness.

### O.    Plaintiff is Entitled to a Presumption of Reliance Under the Efficient Market Doctrine

312.    Plaintiff directly relied on misrepresentations made by Defendants. Those misrepresentations included statements in Lehman's public filings, various oral statements made by Defendant Callan including on the June 5, 2008 conference call, and other direct communications between Lehman officials and Plaintiff as alleged above.

313.    In addition to actual reliance, Plaintiff is entitled to a presumption of reliance under the "efficient market" doctrine.

314.    At all relevant times, the market for Lehman's securities was an efficient market for the following reasons, among others:

a.    Lehman's common and preferred stock was listed and actively traded on the New York Stock Exchange (NYSE), a highly efficient national market exchange;

b.    Lehman's Notes traded on various electronic markets;

c.    Lehman filed periodic reports with the SEC;

d.    Lehman regularly communicated with public investors through established

88

market communication mechanisms, including through the dissemination of press releases and other wide-ranging public disclosures such as conference calls with analysts and communications with the financial press;

e.     Lehman was followed by several securities analysts employed by major brokerage firms whose analysts' reports were publicly available and affected the public market for Lehman's securities;

f.     Lehman Notes were followed by and rated by several credit rating agencies whose ratings were publicly available and affected the public market for Lehman's securities;

g.     news concerning Lehman was widely reported in the national and international press through major media outlets; and

h.     the market value of Lehman's securities reacted quickly to new information concerning Lehman's finances and operations.

315.    Lehman's false and misleading statements caused artificial inflation in the value of the Company's securities.  In reliance on the integrity of the market price of Lehman's securities, Plaintiff paid artificially inflated prices for the securities it purchased.

**P.    Loss Causation**

316.    From the date of Plaintiff's first purchase of Lehman securities on September 18, 2007 to the date of Lehman's bankruptcy one year later on September 15, 2008, the market price of Lehman's common stock, preferred stock, and Notes was artificially inflated as a result of the material misrepresentations and omissions alleged herein.

317.    The artificial inflation was removed through a series of partial disclosures of the truth and the materialization of previously concealed risks.  Examples of key partial disclosure dates include, but are not necessarily limited to, those noted in the following paragraphs.

318.    On June 9, 2008, before the markets opened, Lehman issued a press release announcing its financial results for the second quarter of 2008.  Lehman also held a conference call for investors and analysts.  Despite having previously announced purported success with its de-levering plan, its strong liquidity position, that it had risk management policies in place, and that its assets were fairly valued, Lehman's announcement revealed that the Company expected a net loss of $2.8 billion (its first ever loss) and took write-downs of $2.4 billion in its residential mortgage-related holdings and $1.0 billion in its commercial-related holdings.  On that day, rating agencies Fitch and Moody's downgraded Lehman's credit rating.  On this collective news, the market price of Lehman's common stock declined by 8.7% and continued to fall an additional 19% over the next two days, for a combined 3-day decline of over 26%.  The market price of the Series P preferred stock that Plaintiff held declined by 5% on June 9, 2008 and continued to fall an additional 11.7% over the next two days, for a combined 3-day decline of 16%.  The market price of all four Notes that Plaintiff held (CUSIP Nos. 5249087M6, 5252M0FD4, 5249087N4, and 52517P5X5) declined on or one day after June 9, 2008.  The June 9, 2008 announcement only partially revealed the truth about Lehman's weakening financial condition, and Lehman's securities continued to trade at artificially inflated prices.

319.    On July 10, 2008, Lehman filed its second quarter 2008 Form 10-Q.  In addition to the information disclosed in its June 9, 2008 press release and conference call, the Form 10-Q indicated that Lehman's most illiquid assets (Level 3 assets), which had no direct observable market value, declined only slightly in the second quarter to $41.3 billion from $42 billion at year end 2007.  Total assets declined by 8%.  Investors were expecting a larger decline in Lehman's assets, as Lehman previously conveyed that it was reducing its real estate-related assets by writing down and/or selling risky assets.  The market price of Lehman's common stock closed that day at $17.30 per share, a 12% drop from the prior trading day close of $19.74.  It fell

another 16% the following day, to $14.43.  The market price of the Series P and Series Q preferred stock that Plaintiff held declined by 10% and 14%, respectively, on July 10, 2008, and continued to fall an additional 11% and 13%, respectively, on July 11, 2008.  The market price of three of the four Notes that Plaintiff held (CUSIP Nos. 5249087M6, 5252M0FD4, and 52517P5X5) declined on or one day after July 10, 2008.

320.    On July 25, 2008, CNBC reported that Lehman was considering selling at least part of its IMD.  The move was an attempt to raise badly needed capital and improve liquidity.  This development partially revealed the truth concerning Lehman's increasingly urgent capital and liquidity needs.  It also evidenced the materialization of previously concealed risks regarding capital and liquidity – *e.g*., the risk that Lehman would need a major infusion of cash to sustain its operations, and that it might need to sell part of the Company to generate the necessary cash.  On that day, Lehman's common stock price dropped to a closing price of $17.05, an 8% decrease from the prior day close, and continued to fall an additional 10% on the next trading day.  The market price of the Series P and Series Q preferred stock that Plaintiff held declined by 5% and 11%, respectively, on July 25, 2008.  The market price of two of the three Notes that Plaintiff held (CUSIP Nos. 5249087M6 and 5252M0FD4) declined on or within two trading days after July 25, 2008.

321.    On September 9, 2008, there were market reports that Lehman's attempts to obtain a capital infusion from Korea Development Bank failed, leading to concerns that Lehman could not locate a source of new capital.  That day, S&P and Fitch both placed their ratings on Lehman on review for downgrade – S&P specifically cited concerns about Lehman's ability to raise capital.  These developments partially revealed the truth regarding Lehman's dire capital needs and its inability to locate a source of capital.  The developments also evidenced the materialization of previously concealed risks regarding Lehman's capital and liquidity needs,

including the risk that prospective buyers would be deterred by Lehman's toxic assets. The market price of Lehman's common stock declined 45% from the prior day's price to close at $7.79. The market price of the Series P and Series Q preferred stock that Plaintiff held declined by 30% and 43%, respectively, on September 9, 2008. The market price of all four Notes that Plaintiff held (CUSIP Nos. 5252M0BZ9, 5249087M6, 5252M0FD4, and 52517P5X5) declined on or one day after September 9, 2008.

322.    On September 10, 2008, Lehman held a conference call during which it reported a $3.9 billion loss for the third quarter of 2008 (its largest quarterly loss ever) and $7 billion in gross write downs of its residential and commercial real estate holdings. The loss and write downs occurred despite Lehman having previously announced purported success with its de-levering plan, its strong liquidity position, that it had risk management policies in place, and that its assets had been fairly valued. On this day, Fitch and Dunn & Bradstreet downgraded Lehman's credit rating. On this collective news, the market price of Lehman's common stock declined 7% from the prior day to close at $7.25, and it declined another 42% and 13.5% on the following two days. The market price of the Series P and Series Q preferred stock that Plaintiff held declined by 9% and 9%, respectively, on September 10, 2008, and they declined an additional 14% and 43%, respectively, over the next two days. The market price of all four Notes that Plaintiff held (CUSIP Nos. 5252M0BZ9, 5249087M6, 5252M0FD4, and 52517P5X5) declined on September 10, 2008. The September 10, 2008 announcement only partially revealed the truth about Lehman's true financial condition.

323.    On September 15, 2008, Lehman filed for bankruptcy protection, citing "significant liquidity problems." As a result, the market price of Lehman's common stock declined over 94% that day to close at $0.21. The market price of the Series P and Series Q preferred stock that Plaintiff held declined by 99% and 100%, respectively, on September 15,

2008. The market price of all three Notes that Plaintiff held (CUSIP Nos. 5252M0BZ9, 5252M0FD4, and 52517P5X5) declined from between 56% and 64% on September 15, 2008.

324. These partial disclosures of the truth, and the resulting decline in the market price of Lehman's securities, illustrate the gradual removal of artificial inflation in the value of the securities. The vast majority of Plaintiff's purchases of Lehman securities occurred before any of these partial disclosures, meaning Plaintiff purchased at the height of the artificial inflation.

325. The disclosures regarding Lehman's liquidity problems and massive write-downs revealed the truth about Lehman's financial condition and represented the materialization of several interrelated, concealed risks. The materialization stemmed from, *inter alia*, Lehman's massive Repo 105 transactions which masked the Company's true net leverage, Lehman's failure to write down its real estate assets in a timely manner, and Lehman's disregard for its risk management policies. As a direct result of Lehman's failure to abide by its risk policies, Lehman acquired tens of billions of dollars of highly risky, illiquid assets that ultimately required enormous write-downs and triggered the liquidity crisis that ended Lehman's existence. Lehman engaged in tens of billions of dollars worth of Repo 105 transactions in order to temporarily remove assets from its balance sheet solely for reporting purposes. Through these transactions, Lehman artificially reduced its net leverage ratio and created the false appearance that Lehman was more capitalized and liquid that it really was.

326. The partial disclosures of the truth revealed what Lehman previously failed to disclose – namely, that the Company held a massive amount of illiquid assets that required write downs of billions of dollars, that Lehman's leverage was higher than reported, that the Company's liquidity was misrepresented, and that the Company was in dire need of additional capital to sustain its existence.

327. Each of the disclosures above partially corrected misleading information that

previously existed in the market.

328.    The declines in the market values of Lehman's securities are directly attributable to Defendants' false statements and omissions and the materialization of previously misrepresented or concealed risks.  The declines were not caused by – or were in fact many times larger than any decline that could be attributed to – general industry news, stock market trends and activity, market randomness, or information unrelated to Defendants' misconduct.

**Q.    Causes of Action for Non Fraud-Based Claims**

**COUNT I**

**Violations of Section 11 of the Securities Act Against the
Securities Act Defendants and E&Y**

329.    Plaintiff repeats and re-alleges each and every allegation above as if fully set forth herein.  This claim is asserted under Section 11 of the Securities Act against Defendants Fuld, Callan, Lowitt, Ainslie, Akers, Berlind, Cruikshank, Evans, Gent, Hernandez, Kaufman and Macomber (the "Securities Act Defendants") and E&Y.  For purposes of this claim, Plaintiff alleges only strict liability and negligence and expressly disclaims any claim of fraud or intentional misconduct.

330.    Plaintiff purchased Lehman common and preferred stock issued pursuant to the Registration Statement, the April 1, 2008 Prospectus Supplement, and the June 9, 2008 Prospectus Supplement (collectively, the "Offerings Prospectuses").  The Offerings Prospectuses expressly incorporated by reference various documents, including but not limited to the 2007 Form 10-K and first quarter 2008 Form 10-Q.  Each of the Securities Act Defendants, with the exception of Defendant Lowitt, signed the 2007 Form 10-K and/or first quarter 2008 Form 10-Q.

331.    Plaintiff purchased Lehman Notes issued pursuant to the Registration Statement, Note Prospectuses, and documents incorporated therein.  The Registration Statement stated that

"[w]e incorporate by reference . . . any future filings made with the SEC under Section 13(a), 13(c), 14, or 15(d) of the Securities Exchange Act of 1934."  Those future filings included, among other things, Lehman's 2007 Form 10-K, first quarter 2008 Form 10-Q, and second quarter 2008 Form 10-Q, all of which became part of the Note Offerings.  Each of the Securities Act Defendants signed the 2007 Form 10-K, first quarter 2008 Form 10-Q, and/or second quarter 2008 Form 10-Q.

332.    The Registration Statement, Offerings Prospectuses, and Note Prospectuses, which incorporated by reference various publicly filed documents, were materially false and misleading for the reasons alleged above.

333.    Lehman was a registrant for the Registration Statement, Offerings Prospectuses, and Notes Prospectuses.  LBI was the sole underwriter for the securities issued pursuant to the Offerings Prospectuses and was one of many underwriters for the Notes Prospectuses.

334.    Though direct claims against Lehman at this time are barred by the bankruptcy code, Lehman, as an issuer of the securities sold to Plaintiff, would otherwise be strictly liable for the misstatements and omissions contained in the offering materials.  Similarly, because LBI is being dissolved pursuant to the SIPC, it is not a named defendant.

335.    The Securities Act Defendants were officers and directors of Lehman, the issuer of the securities within the meaning of Section 11(a)(3) of the Securities Act.  All Securities Act Defendants signed the Registration Statement and/or one or more of the false documents incorporated by reference therein.

336.    The Securities Act Defendants were responsible for ensuring the true and accurate contents of the Registration Statement, Offerings Prospectuses, Note Prospectuses, and all documents incorporated by reference therein.

337.    The Securities Act Defendants acted negligently and without reasonable care

95

concerning the accuracy of the information in the Registration Statement, Offerings

Prospectuses, Note Prospectuses, and documents incorporated by reference therein.  The

Securities Act Defendants lacked reasonable grounds to believe that such information was free of

material misstatements and omissions.  The Securities Act Defendants owed Plaintiff the duty to

make a reasonable and diligent investigation of the statements contained in the offerings

materials.  The Securities Act Defendants failed to properly investigate and timely disclose

necessary information concerning Lehman's financial position and results, as alleged in detail

above.

338.    Defendant E&Y audited the financial statements that were incorporated by

reference into the Registration Statement, Offerings Prospectuses, and Note Prospectuses.

E&Y's 2007 audit opinion was incorporated by reference into the offerings materials for the

April 2008 Offering, June 2008 Offering, and Note Offerings.  E&Y consented to its audit

opinion being incorporated by reference into the offerings and to being named as an expert

therein.  E&Y's audit opinion was false and misleading for the reasons alleged herein.  For

example, E&Y should have known that Lehman's financial statements and reports incorporated

into the offerings violated GAAP and did not fairly present Lehman's then-existing financial

position, all as alleged more fully above.  As such, E&Y is liable to Plaintiff for damages.

339.    Plaintiff did not know or in the exercise of due diligence could not have known of

the misstatements and omissions contained in the Offerings Prospectuses and Notes Offerings.

340.    Plaintiff sustained damages as a result of the misstatements and omissions

contained in the Offerings Prospectuses and Notes Offerings.

341.    Accordingly, the Securities Act Defendants and E&Y are liable to Plaintiff under

Section 11 of the Securities Act.

## COUNT II

### Violations of Section 12(a)(2) of the Securities Act
### Against Defendants Callan and Fuld

342.    Plaintiff repeats and re-alleges each and every allegation above as if fully set forth herein.  This claim is asserted under Section 12(a)(2) of the Securities Act against Defendants Callan and Fuld.  For purposes of this claim, Plaintiff alleges only strict liability and negligence and expressly disclaims any claim of fraud or intentional misconduct.

343.    Plaintiff purchased Lehman securities issued pursuant to the Registration Statement, Offerings Prospectuses, Notes Prospectuses, oral communications by Defendant Callan, and indirect communications by Defendant Fuld.

344.    Lehman, LBI, and Defendants Callan and Fuld were sellers, offerors, and/or solicitors of sales of securities pursuant to the Registration Statement, Offerings Prospectuses, and Notes Prospectuses.

345.    Defendant Callan directly solicited Plaintiff for the purchase of Lehman securities with oral communications that were false or misleading, as alleged above.  Lehman also offered to make Defendant Fuld available to speak with Plaintiff on the June 5, 2008 conference call during which Plaintiff was solicited to purchase Lehman securities.  Although Fuld did not speak with Plaintiff on that call, Lehman's offer to make Fuld available was part of Lehman's solicitation, and as such Fuld is an offeror and solicitor of the securities.  Moreover, Defendant Fuld falsely stated to investors at Lehman's annual shareholder meeting on April 18, 2008 that "the worst of the credit crisis is behind us."

346.    Defendants Callan and Fuld are offerors and solicitors within the meaning of the Securities Act because they solicited Plaintiff's purchases of securities in the Lehman offerings. Defendant Callan, in conjunction with Lehman and LBI, used the means and instrumentalities of

interstate commerce, including the telephone.

347.     The Registration Statement, Offerings Prospectuses, Notes Prospectuses, and documents incorporated by reference therein contained misrepresentations and omissions as alleged in detail above.  The misrepresentations and omissions would have been material to a reasonable investor and were material to Plaintiff.

348.     Defendants Callan and Fuld were responsible for the contents and dissemination of the Registration Statement, Offerings Prospectuses, Notes Prospectuses, and documents incorporated therein, as well as their oral statements.  Defendants Callan and Fuld are liable under Section 12(a)(2) of the Securities Act for any material misrepresentations or omissions contained in the offerings prospectuses and incorporated materials.

349.     Defendants Callan and Fuld did not make a reasonable investigation and did not possess reasonable grounds for believing that their oral statements and the statements contained in the Registration Statement, Offerings Prospectuses, Notes Prospectuses, and documents incorporated therein were true.  Further, Defendants Callan and Fuld did not possess reasonable grounds for believing the truth of the communications made to Plaintiff as part of the solicitation to purchase Lehman securities.

350.     Defendants Callan and Fuld owed Plaintiff the duty to make a reasonable and diligent investigation of the statements contained in the Registration Statement, Offerings Prospectuses, Notes Prospectuses, and documents incorporated therein to ensure that they were free of false or misleading information.  In addition, Defendants Callan and Fuld owed Plaintiff a duty to ensure that any oral communications for purposes of solicitation were not misleading.  In the exercise of reasonable care, Defendants Callan and Fuld knew or should have known of the material misstatements and omissions contained in the prospectuses and in their oral statements.

351.     Plaintiff did not know or in the exercise of due diligence could not have known of

98

the misstatements and omissions contained in the Registration Statement, Offerings

Prospectuses, Notes Prospectuses, and documents incorporated by reference therein, nor in the

oral communications of Defendants Callan and Fuld.

352.    Plaintiff has sustained damages as a result of the misstatements and omissions, for

which Plaintiff is entitled to compensation.

353.    Plaintiff offers to tender to Defendants and seek rescission of those Lehman

securities that Plaintiff purchased and continues to hold in return for the consideration paid for

those securities, together with interest.

354.    Accordingly, Defendants Callan and Fuld are liable to Plaintiff under

Section 12(a)(2) of the Securities Act.

## COUNT III

### Violations of Section 15 of the Securities Act Against the Officer Defendants and Walsh

355.    Plaintiff repeats and re-alleges each and every allegation above as if fully set forth

herein.  This claim is asserted under Section 15 of the Securities Act against the Officer

Defendants and Defendant Walsh.  For purposes of this claim, Plaintiff alleges only strict

liability and negligence and expressly disclaims any claim of fraud or intentional misconduct.

356.    The Officer Defendants and Defendant Walsh each acted as controlling persons of

Lehman and LBI within the meaning of Section 15 of the Securities Act.  By virtue of their high-

level positions, participation in and/or awareness of Lehman's operations, and/or knowledge of

or access to the statements filed by Lehman with the SEC and disseminated to the investing

public, the Officer Defendants and Defendant Walsh had the power to influence and control and

did influence and control, directly or indirectly, the decision-making of Lehman, including the

content and dissemination of the false and misleading statements.  The Officer Defendants and

Defendant Walsh were provided with or had unlimited access to drafts of the Company's

financial statements, reports, press releases, public filings, and other statements alleged by Plaintiff to be misleading prior to the time those statements were issued. The Officer Defendants and Defendant Walsh had the ability to prevent the issuance of the statements or cause the statements to be corrected.

357.    Further, the Officer Defendants and Defendant Walsh were officers of Lehman and had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, are presumed to have had the power to control or influence the particular transactions and statements giving rise to the securities violations as alleged herein.

358.    As alleged above, non-parties Lehman and LBI violated Sections 11 and 12 of the Securities Act by the acts and omissions as alleged in this Amended Complaint. By virtue of their positions as controlling persons of Lehman and LBI, the Officer Defendants and Defendant Walsh are therefore liable to Plaintiff pursuant to Section 15 of the Securities Act.

359.    As a direct and proximate result of the conduct of the Office Defendants and Defendant Walsh, Plaintiff has suffered damages in an amount to be determined at trial.

## COUNT IV

### Negligent Misrepresentation Claim Against the Lehman Defendants

360.    Plaintiff repeats and re-alleges each and every allegation above as if fully set forth herein. This Count is brought against the Lehman Defendants for negligent misrepresentation under New Jersey common law.

361.    In order to induce Plaintiff to purchase Lehman securities, the Lehman Defendants negligently made numerous misrepresentations and withheld material facts to the market generally and Plaintiff specifically. These misrepresentations included those contained in the Registration Statement, Offerings Prospectuses, Note Offerings, public filings, press releases, public oral statements, and private oral statements made by Defendant Callan directly to

Plaintiff.

362.    The Lehman Defendants made numerous false and misleading statements regarding the financial condition of Lehman.  Defendants' statements were negligent, material, and made with negligent indifference to their truth or falsity, with the intention and expectation that Plaintiff would rely on them.

363.    The Lehman Defendants' negligent misrepresentations are set forth more fully above, and include, among others, the following:

        a.      that Lehman's financial results were free of material misstatement and "fairly present" the Company's financial results;

        b.      that Lehman's accounting practices conformed to GAAP and SEC regulations;

        c.      that Lehman's net leverage ratio was fairly stated;

        d.      that Lehman timely and properly took appropriate charges to write down the value of certain of its real estate-related assets;

        e.      that Lehman's liquidity position was strong; and

        f.      that Lehman's risk management procedures were effective and were being followed.

364.    Defendant Callan's misrepresentations are set forth more fully above and include, among others, the following verbal statements made to Plaintiff on June 5, 2008: (i) that the market value of Lehman's assets was fairly stated based on sales of similar assets; (ii) that Lehman had prudent risk management practices; (iii) that if Lehman's rating were to be downgraded, Lehman would be exposed, at most, to a requirement to post an additional $500 million in collateral to third parties; (iv) that Lehman's net leverage ratio was reduced to 12.1; (v) that Lehman was decreasing the overall size of its assets and balance sheet (she did not

explain that part of the decrease was caused by Lehman's improper use of Repo 105 transactions); (vi) that Lehman's liquidity pool was strong; and (vii) that Lehman would not be accessing the Federal Reserve credit facility in the future.

365.    The disclosures containing misrepresentations and omissions were made by the Lehman Defendants with the purpose of inducing investors to purchase Lehman securities.

366.    Plaintiff reasonably relied on the misrepresentations and omissions when purchasing and continuing to hold Lehman securities.

367.    As a direct and proximate result of the misrepresentations and omissions, Plaintiff has incurred losses in an amount to be determined at trial.

## COUNT V

### Non Fraud-Based Breach of Fiduciary Duty Claim Against Defendant Callan

368.    Plaintiff repeats and re-alleges each and every allegation above as if fully set forth herein.  This Count is brought against Defendant Callan for breach of fiduciary duty under New Jersey common law.

369.    Defendant Callan was an officer of Lehman who controlled Lehman and LBI.

370.    Defendant Callan, as an officer of Lehman, spoke directly with Plaintiff to solicit its purchase of Lehman securities.

371.    Defendant Callan owed a fiduciary duty to Plaintiff as a shareholder of Lehman.

372.    Defendant Callan sought to induce, and did induce, Plaintiff to purchase Lehman securities.

373.    Defendant Callan owed Plaintiff a fiduciary duty to accurately disclose the truth concerning the Company's financial performance.  Defendant Callan owed this duty by virtue of her status as a senior official of Lehman; her verbal discussions with Plaintiff; her written and oral public statements about the Company; and her superior knowledge and access to

information concerning Lehman's then-existing actual financial performance and condition.

374.    Plaintiff reasonably reposed trust and confidence in the integrity and fidelity of Defendant Callan's statements.

375.    As a fiduciary, Defendant Callan owed all Lehman's shareholders including Plaintiff duties of loyalty, good faith, due care, and fair dealing, including but not limited to the duty to: (i) refrain from misleading Plaintiff regarding Lehman's financial position; (ii) refrain from performing any act knowingly injurious to Plaintiff; (iii) refrain from any act that would deprive Plaintiff of any profit or advantage; and (iv) not elevate her own interests ahead of the interests of Plaintiff and other Lehman investors.

376.    Defendant Callan had insider knowledge of adverse non-public information regarding Lehman's financial condition.  Defendant Callan withheld this adverse information from Plaintiff and misrepresented information regarding Lehman's financial condition.

377.    In the exercise of due diligence, Plaintiff could not have ascertained the truth regarding Lehman's financial position when the misrepresentations and omissions were made.

378.    Defendant Callan violated her fiduciary duty to Plaintiff by virtue of the wrongs alleged herein, and by placing her own interests ahead of those of Plaintiff.

379.    As a direct and proximate result of Defendant Callan's breaches of her fiduciary duty, Plaintiff acquired and continued to hold Lehman securities at artificially inflated prices and was damaged thereby.  Defendant Callan is liable for those damages in an amount to be determined at trial.

## V.    ADDITIONAL FACTUAL ALLEGATIONS REGARDING FRAUD-BASED CLAIMS

380.    Defendants, besides making a series of misstatements concerning Lehman's financial position, also committed acts displaying their intentional and fraudulent efforts to

conceal Lehman's true financial condition.

381.    A major concern of the Lehman Defendants was continuing their high compensation and senior executive positions, and increasing the value of their personal holdings of Lehman stock, which is why they knowingly or recklessly made these false statements. E&Y's major concern was preserving its relationship with Lehman and continuing to earn highly lucrative fees for its services.

### A.    Defendants' Knowledge of Repo 105 Misrepresentations

382.    The Examiner stated the following with respect to intentional wrongdoing:

> The Examiner has investigated Lehman's use of Repo 105 transactions and has concluded that the balance sheet manipulation was **intentional, for deceptive appearances**, had a material impact on Lehman's net leverage ratio, and, because Lehman did not disclose the accounting treatment of these transactions, rendered Lehman's Forms 10-K and 10-Q (financial statements and MD&A) deceptive and misleading.

(Rpt. p. 912 n.3497) (emphasis added).

383.    The Examiner further concluded that sufficient evidence exists to support a finding that Defendants Fuld, O'Meara, Callan, and Lowitt were "at least grossly negligent in causing Lehman to file deficient and misleading periodic reports that failed to disclose the firm's use of Repo 105 transactions."  (Rpt. p. 994) (emphasis added).

384.    Also, as alleged above, the Examiner found that sufficient evidence existed to support "at least three colorable claims" against E&Y arising from its repeated "failure to follow professional standards of care" with respect to the Repo 105 transactions.  (Rpt. pp. 1027, 1032-33).  The NY AG's complaint for fraud against E&Y further supports the notion that E&Y acted with an intentional or reckless state of mind regarding Repo 105.

### B.    Defendants' Knowledge of Liquidity Misrepresentations

385.    Internally, Lehman executives were aware of, yet recklessly ignored, Lehman's

precarious financial predicament and liquidity vulnerabilities and made misstatements and omitted material facts in statements made to the investing public and Plaintiff.

386.    For example, an internal January 2008 presentation indicated that "[v]ery few of the top financial issuers have been able to escape damage from the subprime fallout," and warned that since "a small number of investors account for a large portion of demand [for Lehman issues], liquidity can disappear quite fast."

387.    Following the fire-sale acquisition of Bear Stearns in March 2008, and an industry-wide market deterioration, Defendant Fuld focused on raising capital.  Lehman's April 2008 Offering, in which Plaintiff participated, represented for onlookers an intentionally crafted signal that the firm continued to have access to capital and the confidence of investors.

388.    A December 21, 2008 article in England's *The Sunday Times* stated that, according to Andrew Gowers ("Gowers"), who was Lehman's Head of Corporation Communications in London, Defendant Fuld was an "aggressive and domineering corporate chief who rules by fear, his closest underlings promoted above all for loyalty, his executives inculcated with the belief that to challenge his word was to breach his trust."

389.    At the time of the April and June 2008 Offerings, several Lehman executives, including the Officer Defendants, were fully aware of Lehman's worsening liquidity position and the need for action.  An internal talking point memorandum from June 2008 addressing the record $2.8 billion quarterly loss which Lehman announced on June 9, 2008 was produced to the House Committee.  In that memorandum, the question asked: "Why did we allow ourselves to be so exposed?"  The reasons cited for Lehman's exposure included that, "[c]onditions clearly [were] not sustainable.  Saw warning signs.  Did not move early, fast enough.  Not enough discipline in our capital allocation."  Also according to that memorandum, the firm had remained in "illiquid asset [origination] too much/too long".  Yet despite having multiple direct

communications with representatives of Plaintiff at this same time specifically concerning the

June 2008 Offering and Lehman's financial status, neither Defendant Callan nor any other

Officer Defendant disclosed to Plaintiff anything concerning that highly material internal

memorandum or any of the concerns expressed therein.

390.    According to Gowers, Defendant Callan initiated internal discussions as to how to

present the $2.8 billion loss in the second quarter of 2008.  The idea arrived at by the Officer

Defendants was to combine the announcement of the loss with the announcement of a capital

raise in order to mislead investors by minimizing any major fallout from the negative results.

According to Gowers, as quoted in the December 21, 2008 article in *The Sunday Times*:

> The worry, even then, was that it could be of a magnitude to cause a run on the
> bank.  There was, of course, no way to spin it.  The numbers would be atrocious.
> Lehman would simultaneously have to shore up confidence by raising fresh
> capital from increasingly wary investors.

This highly material fact also was concealed from Plaintiff, as was the fact that the capital that

Lehman raised in the June 2008 Offering was wholly insufficient for Lehman's then-existing

liquidity needs.

391.    According to Gowers, Defendant Fuld refused to admit how deeply in trouble

Lehman was.

392.    After *The Wall Street Journal* revealed on June 8, 2008 that Lehman was in

discussions about raising new capital, including with Plaintiff, Defendant Fuld ordered that no

Lehman employee anywhere in the world should talk to any reporter for *The Wall Street Journal*.

Fuld was reportedly more concerned about containing leaks and retaining control than in being

transparent with Plaintiff and other investors concerning Lehman's then-existing actual financial

condition and the value of many of its most significant assets.

393.    Apparently, the leak came from within Lehman as Defendant Fuld suspected, as

Lehman executives were concerned that the June 2008 Offering would not be fully subscribed on Monday, June 9, 2008, and used *The Wall Street Journal* over the weekend to leak information about the Division's investment to act as a stalking horse for other investors. Lehman's Johnson misled Director Clark on June 5, 2008 when he said the June 2008 Offering was "over-subscribed."

394. On June 11, 2008, following the first ever earnings loss announcement on June 9, 2008, Defendant Fuld had lunch with several of Lehman's senior investment bankers in his private dining room. Hugh Skip Magee, Lehman's Global Head of Investment Banking, requested the meeting. The Lehman investment bankers wanted a change in leadership. One of the Lehman investment bankers indicated that the Board is going to be under pressure "to deliver a head" to the Street. The investment bankers wanted Defendant Fuld to fire Defendants Gregory and Callan. They indicated to Defendant Fuld that either he (Fuld) would have to resign, or that he would have to fire or demote Callan and Gregory. Defendant Fuld accepted their demand in hopes of silencing Lehman's critics.

395. On June 12, 2008, only three days after the announcement of the second quarter loss and six days after Defendant Callan held her conference call with Plaintiff, Lehman demoted Defendants Callan and Gregory.

396. The selection of Defendant McDade to replace Defendant Gregory had significant ramifications. According to other Lehman executives, McDade had been jockeying for Fuld's own job. Among the consequences of the appointment of McDade was an ugly standoff at the very top of the firm over strategy and control. Isaacs, the London-based Head of European and Asian Operations, wanted the job and handed in his resignation on the day of McDade's appointment on June 12, 2008. Isaacs was responsible for half of Lehman's revenues and wanted equivalent recognition and power. Tellingly, his departure from Lehman was not

107

announced until September 6, 2008.  Defendant Fuld had determined not to reveal Isaacs'
departure to the market, fearing a negative reaction, especially given the European and Asian
operations recent and essential contributions to revenue as a result of Isaacs' leadership.

397.    A fissure that already existed between Lehman's New York operations and the
very profitable London operations widened, and when the bankruptcy was filed, only the North
American part of the Company filed, leaving the European and Asian operations in a lurch with
no funding.

398.    According to Treasury Secretary Paulson's interview with the *New York Times*
published on October 23, 2008, after "Lehman announced bad earnings around the middle of
June," the Federal Reserve "told Fuld that if he didn't have a solution by the time he announced
his third-quarter earnings, there would be a serious problem. . . .  We pressed him to get a
buyer."

399.    During the Summer of 2008, Lehman, not wanting to be seen using the Federal
Reserve credit facility so often, borrowed extensively from the European Central Bank through
Lehman's Frankfurt operation.  It is estimated that Lehman borrowed between $5 and $9 billion
from the European Central Bank.  This, too, was not disclosed to either the Plaintiff or the
market and was directly opposite to what Defendant Callan had told Plaintiff on June 5, 2008
about Lehman not using or needing the Federal Reserve credit facility.

400.    In addition, Lehman also reportedly did access the Federal Reserve credit facility
in the Summer of 2008 – less than two months after Defendant Callan told Plaintiff that Lehman
would not access the credit facility – and borrowed needed cash by using new, highly rated
securities backed by illiquid and un-saleable leveraged buyout loans as collateral.  Such abuses
of the system had subsequently led the Federal Reserve to change its rules for access to its credit
facility.

401.    Discussions within the firm included spinning off the bad real estate assets, selling the important IMD, finding a strategic investor to shore up confidence within the investment community, and the obvious solution, to sell the whole Company.

402.    According to Gowers, there were two problems with the solution of selling the Company: "Dick Fuld and Bart McDade." According to Gowers, "Lehman Brothers had been Fuld's life for 42 years. He had no desire to become part of a larger conglomerate or take orders from elsewhere." According to Gowers, "As for McDade, he had his own reasons to find a sale of the firm less than appealing. It might extinguish his hopes of ousting Fuld and landing the top job for himself." According to another former executive: "Bart [McDade] was completely fixated on controlling the firm at all costs. He thought it was only a matter of time before he could oust Fuld and take the prize." Defendants Fuld and McDade were clearly putting their own interests ahead of shareholders' interests in evaluating the Company's options.

403.    According to Gowers, as the Summer of 2008 wore on and Lehman's financial position weakened even further, the circle of interested investors shrank to one: KDB. According to Lehman insiders, the talks initiated by Isaacs' international team in Asia with KDB were serious.

404.    As it would be for Barclays and Bank of America in September 2008, the problem in the deal with KDB lay in the tens of billions of dollars of commercial real estate assets sitting on Lehman's balance sheet which had current and future losses. Before KDB would seal the deal, KDB wanted comfort that the toxic assets would be spun off into a separate entity limiting KDB's exposure. Lehman management was unable to meet the demand and shortly before Labor Day 2008, KDB pulled out, furiously accusing Defendant McDade in particular of acting in bad faith. McDade produced to KDB new data about commercial real estate losses in late August 2008. Supporters of Isaacs accused McDade of doing this to stop Isaacs from winning

the kudos of saving Lehman, and with it the possibility of being appointed to Defendant Fuld's job as CEO.

405.     On September 9, 2008, news surfaced in the market that KDB ended discussions with Lehman.  Lehman's stock plunged 45%, its largest daily percentage decline ever.

406.     JPMorgan was Lehman's clearing bank, acting as the financial middleman between Lehman and its clients.  As such, JPMorgan knew more about Lehman's financial predicament than most outsiders, and it did not like what it saw.  JPMorgan demanded $5 billion in additional collateral – liquid securities to cover lending positions that JPMorgan's clients had with Lehman.  This was in direct conflict with Defendant Callan's statement to Plaintiff on June 5, 2008 that if Lehman's rating was downgraded, the Company would be required to post no more than $500 million as collateral with third parties.

407.     On September 9, 2008, Steven Black, co-CEO of JPMorgan's Investment Bank, phoned Fuld.  He told the Lehman CEO that in order to protect itself and its clients, JPMorgan needed an additional $5 billion in collateral.  This $5 billion in additional collateral was over and above the $5 billion JPMorgan had demanded just five days earlier (September 4, 2008) which had yet to be paid.  This $10 billion capital call was well beyond the $500 million exposure that defendant Callan disclosed to Plaintiff just three months earlier.  Defendant Fuld managed to persuade Black to settle for $3 billion, leaving the prior $5 billion request unresolved.

408.     Meanwhile, Lehman executives arranged a conference call for September 10, 2008 to announce earnings ahead of schedule and to disclose plans for a restructuring.  That evening, investment bankers who were meeting with Lehman counseled Lehman executives against holding the conference call, warning that there were too many open questions about the Company's finances.  Top Lehman executives discussed the need to raise between $3 billion and $5 billion to shore up capital by early 2009.  Documents that discussed this need for more capital

were circulated to senior Lehman executives.  This urgent need for capital was not timely or properly disclosed to the market.

409.    Early the next morning, September 10, 2008, Lehman went ahead and hosted the conference call for investors anyway.  The Company announced that it expected its largest quarterly loss ever, $3.9 billion, driven largely by declines in real estate valuations.  Defendant Fuld said the firm intended to sell a majority stake in its IMD, spin off its commercial real estate division, and cut its dividend.  Lehman executives, however, did not say anything about the need to raise capital.  Mike Mayo, a Deutsche Bank AG bank analyst, asked whether Lehman would need to raise $4 billion as part of the plan, according to the transcript of the conference call.  Lehman's CFO, Defendant Lowitt, replied: "We don't feel that we need to raise that extra amount."  At another point, Defendant Lowitt said: (i) "**[o]ur capital position at the moment is strong**"; (ii) "**our liquidity position . . . remains very strong**"; and (iii) Lehman will have "**ample cash capital to sustain its business opportunities**."  (Emphasis added.)  These statements were knowingly or recklessly false.

410.    The fraudulent statements continued to give investors a false sense of security and caused Lehman's common stock, preferred stock, and Note prices to remain higher than they otherwise would have been, lulling investors including Plaintiff into continuing to hold Lehman securities.  Plaintiff continued to hold certain of its Lehman securities in hopes that the Company would weather the storm.

411.    On September 10, 2008, Lehman's stock price closed at $7.25.  Just five days later, when Lehman filed for bankruptcy, the stock price would close at $0.21.

412.    Prior to Lehman's bankruptcy, investors began getting increasingly concerned about Lehman's financial status.  Many of them did not want to have money tied up with Lehman in light of its financial uncertainty.  Christian Lawless, a Senior Vice President in

Lehman's European Mortgage Operation, said he fielded numerous calls from investors seeking to pull out assets.  "You guys are financial professionals," he recalls telling some skittish clients: "**Our balance sheet is better than ever**."  (Emphasis added.)

413.     In early September 2008, GLG Partners, a large London hedge fund in which Lehman held a stake, had grown increasingly concerned.  In a series of calls, Defendant Fuld and other Lehman executives assured GLG Partners that Lehman would survive.  Many similar calls were made by Lehman executives falsely assuring clients that Lehman was in good shape and would survive.

414.     JPMorgan as the clearing bank for Lehman was particularly concerned.  Jane Byers Russo, Head of JPMorgan's Broker Unit, phoned Lehman's Treasurer, Paolo Tonuci, to tell him Lehman would have to turn over the $5 billion in collateral that JPMorgan had asked for days earlier.  Lehman complied, but fulfilling the request temporarily froze Lehman's computerized trading system.  It immediately left the firm without sufficient capital to fund its trading and other operations.  Federal officials worked at Lehman's headquarters with its executives to determine which of its assets were not already pledged to other lenders and could be used as collateral for a federal loan.  Lehman borrowed roughly $30 billion from the Federal Reserve on an overnight basis, paying it back the next day.

415.     Over the weekend following the close of the market on September 12, 2008, Lehman hoped to strike a deal to sell itself to Bank of America or Barclays.  Neither bank, however, was interested in buying Lehman's commercial real estate operation.  The Federal Reserve asked executives from a group of firms, including Goldman Sachs Group, Inc. and Credit Suisse, to value Lehman's massive commercial real estate portfolio and to consider investing several billion dollars each to buy it.  The executives questioned Defendant Walsh.  They wanted to know why Lehman had not more aggressively marked down the value of its $33

billion commercial real estate holdings.  Executives examining Lehman's books were surprised by Lehman's high valuations of its real estate assets.  Two Wall Street executives who reviewed Lehman real estate documents say they believed the firm's **real estate valuations were roughly 35% higher than they should be**.  Some of its European real estate loans raised particular concern.  According to a Lehman document reviewed by *The Wall Street Journal,* Lehman marked some European securities backed by real estate loans at 97.9% of par value, or nearly 98¢ on the dollar.  Lehman valued similar U.S. assets at 56¢ on the dollar.  While the European market for such securities had been slightly better than the U.S. market, it had also been hammered by the credit crisis.  Further, Lehman executives knew for example that one of their commercial mortgage backed securities, Windermere XII, had received a very poor market reception and was certainly not worth anywhere near 98¢ on the dollar.  In September 2008, Lehman received from Cushman & Wakefield an appraisal which decreased the overall value of Lehman's "Coeur Defense" office complex in Paris by nearly 20% from its original purchase price.

416.    The negative reactions by prospective buyers of Lehman's assets illustrate that Lehman's real estate assets were highly overstated.  Lehman knowingly or recklessly failed to take timely write-downs on its real estate assets, including during the period in which it specifically solicited Plaintiff to invest.

417.    By Sunday, September 14, 2008, Lehman had run out of options.  Neither Barclays nor Bank of America would commit to a deal unless the government agreed to guarantee it.

418.    Shortly after midnight on September 15, 2008, Lehman sought bankruptcy protection.

C.    **Defendants' Knowledge of Risk Management Misrepresentations**

419.    The Examiner concluded that "Lehman's management chose to disregard or overrule the firm's risk controls on a regular basis."  Specifically, management knowingly and regularly exceed risk limits with respect to its "concentration limits," "balance sheet limits," and "risk appetite limits."  (Rpt. pp. 49-50.)  These practices were in sharp contrast to Lehman's financial statement disclosures, which painted a picture of robust risk management procedures.  Lehman's public filings did not disclose that Lehman's internal risk limits were exceeded.

420.    Those who raised concerns over the Company's risk management were replaced.  For example, both Michael Gelband ("Gelband"), head of Lehman's Fixed Income Division, and Madelyn Antoncic ("Antoncic"), Lehman's Chief Risk Officer, were "pushed aside" after they "urged caution" with respect to Lehman's mortgage positions.  Gelband left Lehman's Fixed Income Division in May 2007 to become head of Global Markets after he "balked at taking more risk."  In September 2007, Lehman removed Antoncic as Chief Risk Officer and reassigned her to a government relations position within the Company.

421.    Throughout 2007 and 2008, Lehman touted its risk management and risk mitigation practices, as alleged more fully above.  Despite this positive depiction, Lehman was secretly and intentionally exceeding its risk limits by material amounts on a regular basis, both prior to and during the time it solicited Plaintiff to invest.

D.    **The Director Defendants Rubber-Stamped the Actions of the**
      **Officer Defendants and Walsh**

422.    The supine Board that Defendant Fuld hand-picked provided no backstop to the Officer Defendants' reckless approach to the Company's financial statements, liquidity, and risk management practices.  The Director Defendants were considered inattentive, elderly, and woefully short on relevant structured finance expertise.  Many of them were professional

directors, but without any financial background.  The FCIC's report quoted the co-founder of a noted corporate governance research firm as stating: 'On Lehman Brothers' [board], . . . they had an actress, a theatrical producer, and an admiral, and not one person who understood financial derivatives.'"  The composition of the Board according to a filing in the Lehman bankruptcy proceedings allowed Defendant Fuld to "marginalize the Directors, who tolerated an absence of checks and balances at Lehman."

423.    Due to his long tenure and ubiquity at Lehman, Defendant Fuld was able to consolidate his power to a remarkable degree.  Defendant Fuld was both Chairman of the Board and CEO, a combination that had become more and more unusual as trends in corporate governance counseled for separating the positions.  Fuld was also the leader of Lehman's two-person Board executive committee.  The Board executive committee was responsible for making important decisions between Board meetings of the Director Defendants.  While the Board executive committee reportedly met 16 times in 2007, the full Board met only 8 times.  The other Board executive committee member was Defendant Macomber, who had served as a Director for 14 years and largely deferred to Defendant Fuld.

424.    The Director Defendants acted as a rubber stamp for the actions of Lehman's senior management, including the actions of Defendant Walsh.  There was little turnover on the Board.  By the date of Lehman's collapse, more than half of the Director Defendants had served for 12 or more years.  Service as a Director of Lehman was lucrative.  In 2007 alone, the Director Defendants received collective compensation of more than $3.2 million in cash and common shares from Lehman.

425.    The Director Defendants turned a blind eye in 2007 as Lehman continued to provide billions of dollars in subprime loans, even though the housing market was failing and many banks were closing their subprime operations.  After the Bear Stearns hedge funds

collapsed in 2007, the Director Defendants neither inquired into, nor acted on, concerns and investor questions regarding Lehman's subprime exposure or the contamination of Lehman's other real estate assets. Their lack of concern was exemplified by the fact that the Finance and Risk Committee of the Board met only twice in 2007 during a time of market turmoil and major industry change. Similarly, they provided no restrictions on Lehman's executives in the first quarter of 2008 with regard to Lehman's real estate exposure. Even after Lehman announced its first-ever quarterly loss in the second quarter of 2008, the Director Defendants took insufficient steps to examine the Company's financial position or to alter its course.

426.    By mid-2008 the Director Defendants knew and disregarded that Lehman would fail if a merger or government bailout did not occur, yet they did not counsel for a sale of the Company.

427.    The Director Defendants were recklessly asleep at the wheel. Their actions and inactions amounted to reckless conduct that was a root cause of Lehman's demise and Plaintiff's losses.

**E.    E&Y's Prior Violations of GAAS Standards**

428.    The PCAOB conducted a routine inspection of E&Y for the period of April 2007 to December 2007 in the normal course of regulating audit firms under its authority. The PCAOB identified several engagements among E&Y's audits in which it appeared that E&Y had not obtained sufficient competent evidential matter to support its audit opinion. The PCAOB publicly reported the details of such deficiencies because it considered the deficiencies to have reached a level of high significance. The PCAOB report does not publicly disclose the identity of E&Y's audit clients, but it does outline the degree of significance on an audit-by-audit basis. With regard to one particular issuer whose business model is like that of Lehman, the report noted as follows:

116

In this audit, [E&Y] failed in the following respects to obtain sufficient competent evidential matter to support its audit opinion –

-   The issuer originates, acquires, and sells mortgage loans.  The issuer sells whole pools of mortgage loans with certain recourse provisions, related to borrower defaults, which may require the issuer to repurchase loans from the buyers.  During the year under audit, the issuer had repurchased 600 percent more whole pool mortgage loans than in the previous year. [E&Y] failed to perform substantive procedures to test whether the repurchases of whole pool mortgage loans had been made in accordance with the terms of the related mortgage loan sales agreements, in order to determine whether the accounting treatment related to these loans was appropriate.

-   The issuer provided financing to certain non-affiliated entities, which used the financing to originate mortgage loans.  In certain cases, the issuer then purchased these mortgage loans.  There was no evidence in the audit documentation, and no persuasive other evidence, that [E&Y] had evaluated whether these non-affiliated entities were variable interest entities, as defined by Financial Accounting Standards Board Interpretation No. ("FIN") 46(R), *Consolidation of Variable Interest Entities* ("FIN 46(R)") that were required to be consolidated.

-   There was no evidence in the audit documentation, and no persuasive other evidence, that [E&Y] had traced to source documents or otherwise tested certain key inputs to the calculations used to estimate the allowance for loan losses, including the inputs related to non-performing loans. Further, [E&Y]'s work papers included multiple, inconsistent amounts for non-performing loans.

    After the inspection field work, [E&Y] and the issuer determined that each of these amounts was incorrect.  The issuer later corrected, in a subsequent filing, delinquency information that had been included in its Form 10-K.

429.    It is unclear whether these PCAOB findings relate to E&Y's audit of Lehman.  In any event, at a minimum, due to the similarities between the unnamed audit client and Lehman, the findings evidence E&Y's prior violation of GAAS standards similar or identical to those applied to the Lehman engagement.

F.      **Causes of Action for Fraud-Based Claims**

**COUNT VI**

**Violations of Sections 14(a) and 14(d) of the New Jersey Uniform Securities Law Against the Lehman Defendants (N.J.S.A. 49:3-71(a), (d))**

430.    Plaintiff repeats and re-alleges each and every allegation above as if fully set forth herein except those allegations alleging that Defendants acted only negligently.  This claim is asserted against the Lehman Defendants under Sections 14(a) and (d) of the New Jersey Uniform Securities Law, N.J.S.A. 49:3-47 *et seq*. (the "NJ Securities Law").

431.    Plaintiff purchased Lehman securities issued pursuant to the Registration Statement, Offerings Prospectuses, Notes Prospectuses, documents incorporated by reference therein, and statements made by the Lehman Defendants.  The Registration Statements, Offerings Prospectuses, and documents incorporated by reference therein were signed by or on behalf of the Securities Act Defendants.

432.    The Registration Statement, Offerings Prospectuses, Note Prospectuses, and documents incorporated therein, were false and misleading as alleged herein.  The misleading information would have been material to a reasonable person.

433.    The Lehman Defendants were responsible for the contents and dissemination of the Registration Statement, Offerings Prospectuses, Note Prospectuses, and documents incorporated by reference therein.  The Lehman Defendants are liable under Section 14(a) of the NJ Securities Law for the material misrepresentations or omissions contained therein.  The Lehman Defendants did not make a reasonable investigation and did not possess reasonable grounds for believing that the statements contained in the Registration Statement, Offerings Prospectuses, Note Prospectuses, and documents incorporated therein were true and not materially misleading.  As alleged more fully above, the Lehman Defendants knew of and/or

118

recklessly disregarded the untruths and omissions, and intended to deceive Plaintiff and other investors.

434.    The Lehman Defendants owed Plaintiff a duty to make a reasonable and diligent investigation of the statements contained in the Registration Statement, Offerings Prospectuses, Note Prospectuses, and documents incorporated therein to ensure they were true and not misleading.  The Lehman Defendants knowingly or recklessly caused material misstatements and omissions to be included in the Registration Statement, Offerings Prospectuses, Note Prospectuses, and documents incorporated by reference therein.

435.    In addition, Defendant Callan engaged in direct contact with Plaintiff that operated as a fraud and deceit upon Plaintiff to induce it to buy Lehman securities, as alleged in detail above.

436.    Each of the Lehman Defendants is also liable as a control person under Section 14(d) of the NJ Securities Law.  The Lehman Defendants directly or indirectly controlled Lehman and LBI.  By virtue of their high-level positions, participation in and/or awareness of Lehman's operations, and/or knowledge of or access to the statements filed by Lehman with the SEC and disseminated to the investing public, the Lehman Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of Lehman, including the content and dissemination of the false and misleading statements.  The Lehman Defendants were provided with, had unlimited access to drafts of, and/or received summaries of the Company's financial statements, reports, press releases, public filings, or other statements alleged by Plaintiff to be misleading prior to the time those statements were issued. The Lehman Defendants had the ability to prevent the issuance of the misstatements or cause the misstatements to be corrected, but failed to do so.  Each of the Lehman Defendants materially aided in the dissemination of false and misleading statements by virtue of their wrongful actions

and inactions alleged in detail above.

437.    Plaintiff did not know and in the exercise of due diligence could not have known of the misstatements and omissions.

438.    Plaintiff has sustained damages as a result of the Lehman Defendants' conduct, for which Plaintiff is entitled to compensation in an amount to be determined at trial.

## COUNT VII

## Fraud Claim Against the Officer Defendants

439.    Plaintiff repeats and re-alleges each and every allegation above as if fully set forth herein except those allegations alleging that Defendants acted only negligently.  This claim is asserted against the Officer Defendants for fraud under New Jersey common law.

440.    The Officer Defendants made material misrepresentations and omissions to Plaintiff that were false and misleading, including those contained in the Registration Statement, Offerings Prospectuses, Note Prospectuses, public filings, press releases, oral public statements, and oral statements made by Defendant Callan directly to Plaintiff.

441.    The Officer Defendants made numerous false and misleading statements to Plaintiff and to investors generally, as alleged in detail above.  The Officer Defendants' statements were fraudulent, material, and made with knowledge of their false and misleading character, or with reckless indifference to their truth or falsity.  The statements were made with the intention and expectation that investors would rely on them or, in the case of omissions, that investors would be ignorant of them in purchasing and/or holding Lehman securities.

442.    The Officer Defendants' fraudulent misrepresentations are set forth more fully above and include, among others, the following:

a.    that Lehman's financial results were free of material misstatement and "fairly present" the Company's financial results;

b.    that Lehman's accounting practices conformed to GAAP and SEC regulations;

c.    that Lehman's net leverage ratio was fairly stated;

d.    that Lehman timely and properly took appropriate charges to write down the value of certain of its real estate-related assets;

e.    that Lehman's liquidity position was strong; and

f.    that Lehman's risk management procedures were effective and were being followed.

443.    Defendant Callan's misrepresentations are set forth more fully above and include, among others, the following verbal statements made to Plaintiff on June 5, 2008: (i) that the market value of Lehman's assets was fairly stated based on sales of similar assets; (ii) that Lehman had prudent risk management practices; (iii) that if Lehman's rating were to be downgraded, Lehman would be exposed, at most, to a requirement to post an additional $500 million in collateral to third parties; (iv) that Lehman was deleveraging, and its net leverage ratio was reduced to 12.1; (v) that Lehman was decreasing the overall size of its assets and balance sheet (she did not explain that part of the decrease was caused by Lehman's improper use of Repo 105 transactions); (vi) that Lehman's liquidity pool was strong; and (vii) that Lehman would not be accessing the Federal Reserve credit facility in the future.

444.    The Officer Defendants had reason to expect that Plaintiff would rely on the misrepresentations and omissions.  Moreover, the Officer Defendants knew or recklessly disregarded that it was the regular practice of investors including Plaintiff to monitor and review the kinds of sources in which the Officer Defendants' misrepresentations were contained.  Moreover, Defendant Callan knew that her private conversation with Plaintiff would be considered material to Plaintiff's investment decisions.

445.    Plaintiff did in fact rely on the Officer Defendants' misrepresentations and omissions in making its decisions to acquire and/or continue to hold Lehman securities. Plaintiff's reliance was reasonable.  Unlike many investors who rely on third parties to manage their investments, Plaintiff employed its own investment analysts, whose general practice was to monitor and take into account, and who did monitor and take into account, pertinent material including but not limited to Lehman's SEC filings, press releases, and other communications originating from Lehman.  Plaintiff reasonably relied on those materials, and on the misrepresentations and omissions contained therein, in its decisions to acquire and/or continue to hold Lehman securities.  Plaintiff also reasonably relied on the direct misrepresentations and omissions made to it by Defendant Callan.

446.    By reason of Plaintiff's reasonable reliance on the Officer Defendants' misrepresentations, and as a proximate result thereof, Plaintiff has incurred losses in an amount to be determined at trial.

447.    The Officer Defendants are liable to Plaintiff, jointly and severally, for all losses sustained by Plaintiff.

448.    The Officer Defendants are also liable for punitive damages, as their acts and omissions alleged in detail above were accompanied by actual malice and/or a wanton and willful disregard of Lehman investors including Plaintiff.

## COUNT VIII

### Aiding and Abetting Fraud Claim Against the Lehman Defendants and E&Y

449.    Plaintiff repeats and re-alleges each and every allegation above as if fully set forth herein except those allegations alleging that Defendants acted only negligently.  This claim is brought against the Lehman Defendants and E&Y for aiding and abetting fraud under New Jersey common law.

450.    The Lehman Defendants and E&Y aided and abetted the Officer Defendants in committing fraud by their active participation, aid, encouragement, and/or ratification of the fraud alleged herein, for their own benefit.

451.    The Officer Defendants actively participated in, aided, encouraged, and/or ratified the fraud of each of the other Officer Defendants.

452.    The Director Defendants and Defendant Walsh aided and abetted the Officer Defendants' fraud by intentionally allowing and/or recklessly failing to detect or deter the Officer Defendants' misleading statements.  The Director Defendants provided little or no oversight of the Officer Defendants, allowing the Officer Defendants to engage in fraudulent or reckless conduct.

453.    The Officer Defendants intentionally allowed and/or recklessly failed to detect or deter the fraud of each of the other Officer Defendants.

454.    E&Y aided and abetted the fraud by, among other things, intentionally allowing Lehman's Repo 105 practice to continue despite a slew of red flags indicating that the practice was unwarranted and did not comply with GAAP.  E&Y also aided and abetted the fraud by issuing an unqualified audit opinion on Lehman's 2007 financial statements and issuing unqualified quarterly review reports for the first two quarters of 2008.  The audit and review reports should not have been issued under GAAP and GAAS.  E&Y knew and intended that the audit and review reports would be relied on by investors.  The audit and review reports were in fact relied on by Plaintiff in making its investment decisions.

455.    The Lehman Defendants' participation, aid, encouragement, and/or ratification of the Officer Defendants' fraud was done for each of their own benefit, to protect their compensation as officers and directors, and to facilitate and protect the payment of hundreds of millions of dollars in bonuses and total compensation as officers and directors.

456.     E&Y's participation, aid, encouragement, and/or ratification of the fraud was done for its benefit, which included, among other things, preserving its relationship with Lehman and securing tens of millions of dollars of compensation for its services provided to Lehman.

457.     By virtue of the Lehman Defendants' and EY's conduct in aiding and abetting fraud, Plaintiff suffered economic harm in an amount to be determined at trial. The Lehman Defendants and E&Y are jointly and severally liable for all damages sustained by Plaintiff.

458.     The Lehman Defendants and E&Y are also liable for punitive damages, as their acts and omissions alleged in detail above were accompanied by actual malice and/or a wanton and willful disregard of Lehman investors including Plaintiff.

## COUNT IX

### Fraud-Based Breach of Fiduciary Duty Claim Against Defendant Callan

459.     Plaintiff repeats and re-alleges each and every allegation above as if fully set forth herein except those allegations alleging that Defendants acted only negligently.  This Count is brought against Defendant Callan for breach of fiduciary duty under New Jersey common law.

460.     Defendant Callan was an officer of Lehman who controlled Lehman and LBI.

461.     Defendant Callan, as an officer of Lehman, spoke directly with Plaintiff to solicit its purchase of Lehman securities.

462.     Defendant Callan owed a fiduciary duty to Plaintiff as a shareholder of Lehman.

463.     Defendant Callan sought to induce, and did induce, Plaintiff to purchase Lehman securities.

464.     Defendant Callan owed Plaintiff a fiduciary duty to accurately disclose the truth concerning the Company's financial performance.  Defendant Callan owed this duty by virtue of her status as a senior official of Lehman; her verbal discussions with Plaintiff; her written and oral public statements about the Company; and her superior knowledge and access to

124

information concerning Lehman's then-existing actual financial performance and condition.

465.    Plaintiff reasonably reposed trust and confidence in the integrity and fidelity of Defendant Callan's statements.

466.    As a fiduciary, Defendant Callan owed all Lehman's shareholders including Plaintiff duties of loyalty, good faith, due care, and fair dealing, including but not limited to the duty to: (i) refrain from misleading Plaintiff regarding Lehman's financial position; (ii) refrain from performing any act knowingly injurious to Plaintiff; (iii) refrain from any act that would deprive Plaintiff of any profit or advantage; and (iv) not elevate her own interests ahead of the interests of Plaintiff and other Lehman investors.

467.    Defendant Callan had insider knowledge of adverse non-public information regarding Lehman's financial condition.  Defendant Callan intentionally or recklessly withheld this adverse information from Plaintiff and misrepresented information regarding Lehman's financial condition.

468.    In the exercise of due diligence, Plaintiff could not have ascertained the truth regarding Lehman's financial position when the misrepresentations and omissions were made.

469.    Defendant Callan violated her fiduciary duty to Plaintiff by virtue of the wrongs alleged herein, and by placing her own interests ahead of those of Plaintiff.

470.    Defendant Callan's actions as demonstrated above were not taken in good faith and were not in the best interests of the Company and therefore are not protected by the business judgment rule.

471.    As a direct and proximate result of Defendant Callan's breaches of her fiduciary duty, Plaintiff acquired and continued to hold Lehman securities at artificially inflated prices and was damaged thereby.  Defendant Callan is liable for those damages in an amount to be determined at trial.

472. Defendant Callan is also liable for punitive damages, as her acts and omissions alleged in detail above were accompanied by actual malice and/or a wanton and willful disregard of Plaintiff.

## VI.    **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff The State of New Jersey, Department of Treasury, Division of Investment, seeks the following relief:

(a)    entering judgment against each of the Defendants, jointly and severally;

(b)    ordering Defendants, jointly and severally, to pay Plaintiff's compensatory, consequential, incidental, and punitive damages to the full extent legally available, in an amount to be determined at trial;

(c)    awarding Plaintiff pre-judgment and post-judgment interest, as well as costs and reasonable attorneys' fees, expert witness fees, and other costs to the extent permitted by law; and

(d)    awarding Plaintiff all such other relief as the Court deems just and proper.

## VII.    **DEMAND FOR JURY TRIAL**

Plaintiff demands a trial by jury on all issues so triable.

Dated: April 13, 2011                    By: _____

Merrill G. Davidoff
Lawrence Lederer
Robin Switzenbaum
Gary Cantor
Jon Lambiras
Shoshana Savett
**BERGER & MONTAGUE, P.C.**
1622 Locust St.
Philadelphia, PA 19103
Tel: (215) 875-3000
Fax: (215) 875-4604

Peter S. Pearlman
Jeffrey W. Herrmann
**COHN LIFLAND PEARLMAN
HERRMANN & KNOPF LLP**
Park 80 Plaza West-One
Saddle Brook, NJ 07633
Tel: (201) 845-9600
Fax: (201) 845-9423


*Attorneys for Plaintiff
The State of New Jersey,
Department of Treasury,
Division of Investment*

kal654696

127

## CERTIFICATE OF SERVICE

I hereby certify that on April 13, 2011, a copy of the foregoing First Amended Complaint was served upon the counsel identified below via Federal Express. Additionally, all counsel who are registered with the Court's Electronic Filing System (ECF) in this matter may access this filing through the ECF system, and notice of the filing will be sent to those parties by operation of the ECF system.

Jon Lambiras

Jeffrey J. Greenbaum
**Sills Cummis & Gross, P.C.**
One Rockfeller Plaza
New York, NY 10020
Tel: 973-643-5430
Fax: 973-643-6500
Email: jgreenbaum@sillscummis.com

*Counsel for Defendants Fuld, O'Meara, Gregory,*
*Lowitt, Goldfarb, McDade, Russo, and Walsh*

Robert J. Cleary
Seth David Fier
**Proskauer Rose LLP**
11 Times Square
New York, NY 10036-8299
Tel: 212-969-3000
Fax: 212-969-2900
Email: rjcleary@proskauer.com
Email: sfier@proskauer.com

*Counsel for Defendant Callan*

Andrew J. Levander
Adam Jay Wasserman
**Dechert, LLP**
1095 Avenue of the Americas

New York, NY 10036-6797
Tel: 212-698-3500
Fax: 212-698-3500
Email: andrew.levander@dechert.com
Email: adam.wasserman@dechert.com

*Counsel for Defendants Ainslie, Akers, Berlind, Cruikshank,*
*Evans, Gent, Hernandez, Kaufman, and Macomber (the Director Defs.)*


Mary E. McGarry
**Simpson, Thacher & Bartlett**
425 Lexington Avenue
New York, NY 10017-3954
Tel:  212-455-2574
Fax:  212-455-2502
Email:  mmcgarry@stblaw.com

*Counsel for Lehman Defendants*


David John McLean
**Latham & Watkins LLP**
1 Newark Center, 16th Floor
Newark, NJ 07101
Tel:  973-639-1234
Fax: 973-639-7298
Email: david.mclean@lw.com

*Counsel for Defendant Ernst & Young, LLP*