## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| In re:  LEHMAN BROTHERS SECURITIES AND ERISA LITIGATION | Civil Action No. 09-MD-2017 (LAK) |
|  | ECF CASE |
| This Document Applies Only to: | **CONSOLIDATED FIRST AMENDED COMPLAINT** |
| *Vallejo Sanitation and Flood Control District v. Fuld, et al.*<br>S.D.N.Y. Case No. 1:09-cv-06040-LAK; | JURY TRIAL DEMANDED |
| *Mary A. Zeeb, Monterey County Treasurer, on Behalf of the Monterey County Investment Pool v. Fuld, et al.*<br>S.D.N.Y. Case No. 1:09-cv-01944-LAK; | |
| *Contra Costa Water District v. Fuld, et al.*<br>S.D.N.Y. Case No. 1:09-cv-06652-LAK; | |
| *City of Burbank v. Fuld, et al.*<br>S.D.N.Y. Case No. 1:09-cv-03475-LAK; | |
| *City of San Buenaventura v. Fuld, et al.*<br>S.D.N.Y. Case No. 1:09-cv-03476-LAK; | |
| *City of Auburn v. Fuld, et al.*<br>S.D.N.Y. Case No. 1:09-cv-03474-LAK; | |
| *The San Mateo County Investment Pool v. Fuld, et al.*<br>S.D.N.Y. Case No. 1:09-cv-01239-LAK; | |
| *Zenith Insurance Company v. Fuld, et al.*<br>S.D.N.Y. Case No. 1:09-cv-01238-LAK | |

## TABLE OF CONTENTS

PAGE NO.

I.      INTRODUCTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.     STATE LAW AUTHORITY AND REQUIREMENTS FOR MANAGEMENT OF
        PUBLIC FUNDS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

        A.      Cities and Special Districts. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

        B.      Local Government Investment Pools. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

III.    THE PARTIES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

        A.      Plaintiffs. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

                1.      City of Auburn . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

                2.      City of Burbank. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

                3.      Contra Costa Water District . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

                4.      Mary A. Zeeb, Monterey County Treasurer, on Behalf of The Monterey
                        County Investment Pool . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

                5.      City of San Buenaventura. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

                6.      The San Mateo County Investment Pool . . . . . . . . . . . . . . . . . . . . 19

                7.      Vallejo Sanitation & Flood Control District . . . . . . . . . . . . . . . . . 22

                8.      Zenith Insurance Co. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

        B.      Defendants. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

                1.      Officer Defendants. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

                2.      Finance and Risk Committee Defendants. . . . . . . . . . . . . . . . . . . . 30

                3.      Auditor Defendant. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

                4.      Underwriter Defendants. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

i

5.    Additional Individual Defendant. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

6.    Unnamed Additional Parties. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

7.    Unnamed Participants. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

III.    JURISDICTION AND VENUE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

IV.    FACTUAL ALLEGATIONS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

A.    Lehman Invested in Massive Portfolios of Risky Residential and Commercial
Mortgage Real Estate and Real Estate-Backed Securities. . . . . . . . . . . . . . . . 40

B.    Lehman's Highly Leveraged Business Model Created Unmanageable Liquidity
Risk. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

C.    Lehman Continued to Reassure the Market in the Days Before Declaring
Bankruptcy. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

D.    The Bankruptcy Examiner's Report. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

E.    Lehman's Use of Repo 105 TO Materially Reduce Reported Net Leverage
Was Never Disclosed to Plaintiffs. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

1.    Lehman's Repo 105 Transactions Were Misleading. . . . . . . . . . . . . . . . 54

2.    Lehman's Financial Condition Deteriorated and the Company Increased
the Amount of Repo 105 Transactions. . . . . . . . . . . . . . . . . . . . . . . . . 58

3.    Bankruptcy Examiner Concluded Repo 105 Transactions Were Material
and Should Have Been Disclosed. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61

4.    Documents and Witness Interviews Confirm Defendants Knew That Repo
105 Transactions Were Materially Misleading. . . . . . . . . . . . . . . . . . . . 66

5.    Investors, Like the Plaintiffs, Relied On and Were Misled by Lehman's
Disclosures and Omissions Regarding Repo 105. . . . . . . . . . . . . . . . . . 70

F.    Lehman Overstated Real Estate Assets. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 71

1.    Lehman's Overstated Assets in Principal Transactions Group. . . . . . . . . 71

2.    Lehman's Overstated Archstone Valuations. . . . . . . . . . . . . . . . . . . . . . 72

3.    Industry Peers and Governmental Entities Concluded that Lehman's Real Estate Portfolios Were Overstated. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 73

4.    Lehman Defendants Had Knowledge of Overstated Real Estate Valuations. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 75

5.    Investors, Like the Plaintiffs, Relied On and Were Misled by Lehman's Disclosures and Omissions Regarding Real Estate Valuations. . . . . . . . . 76

G.    Lehman's Liquidity Disclosures Were Misleading. . . . . . . . . . . . . . . . . . . . . . . 76

1.    Defendants Failed to Disclose the Liquidity Impact of Repo 105. . . . . . . 77

2.    Encumbered Assets Were Improperly Included in Lehman's Liquidity Pool. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 78

3.    Lehman Defendants Knowledge of Misleading Liquidity Representations. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 80

4.    Investors, Like the Plaintiffs, Relied On and Were Misled by Lehman's Disclosures and Omissions Regarding Liquidity. . . . . . . . . . . . . . . . . . . . 83

H.    Lehman Misrepresented Risk Management Practices. . . . . . . . . . . . . . . . . . . . . . 83

1.    Lehman Regularly Exceeded Internal Risk Limits. . . . . . . . . . . . . . . . . 86

2.    Defendants' Knowledge That Risk Limits Were Regularly Exceeded. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 88

3.    Investors, Like the Plaintiffs, Relied On and Were Misled by Lehman's Disclosures and Omissions Regarding Risk Management Practices. . . . . 91

I.    Lehman Failed to Disclose Material Concentrations of Credit. . . . . . . . . . . . . . 91

1.    Alt-A Loan Concentration. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 92

2.    Lehman Failed to Disclose Material Commercial Real Estate Concentration. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 93

3.    Investors, Like the Plaintiffs, Relied On and Were Misled by Lehman's Disclosures and Omissions Regarding Material Concentrations of Credit Risk. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 95

J.     GAAP Violations. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 96

       1.     Repo 105. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 98

            i.     Lehman's Repo 105 Transactions Failed to Comply with
                 FAS 140. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 99

       2.     SFAS 157 Asset Valuations. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 101

       3.     Lehman Failed to Make Required Credit Risk Concentration
            Disclosures. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 103

       4.     Lehman Made Misleading Disclosures Regarding the Sufficiency of
            Internal Controls. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 103

K.    E&Y's Violated GAAP and GAAS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 104

       1.     E&Y's Auditing of Repo 105 Transactions Was Improper. . . . . . . . . . 107

            i.     Lehman's Use of Repo 105 Raised Numerous Red Flags
                 Throughout the Relevant Period. . . . . . . . . . . . . . . . . . . . . . . 108

            ii.    E&Y Failed to Follow GAAS Standards. . . . . . . . . . . . . . . . . 110

            iii.   Bankruptcy Examiner Concluded E&Y Failed To Follow
                 Auditing and Accounting Standards. . . . . . . . . . . . . . . . . . . . 111

L.    E&Y's Knowledge That Lehman's Financial Statements Did Not Fairly Present
     Lehman's Financial Condition. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 112

       1.     Repo 105 Whistleblower. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 115

V.    MATERIAL MISSTATEMENTS AND OMISSIONS. . . . . . . . . . . . . . . . . . . . . . 118

   A.    E&Y's Misstatements. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 118

   B.    Repo 105 Misstatements. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 120

       1.     Repo 105 Misstatements and Omissions in Lehman's
            Offering Documents.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 120

       2.     Additional Material Misstatements And Omissions Relating
            to Repo 105. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 121

C. Misstatements and Omissions Related to Overstated Values of Real Estate Assets. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 125

    1. Real Estate Valuation Misstatements and Omissions in Lehman's Offering Documents. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 125

    2. Additional Real Estate Valuation Misstatements and Omissions. . . . . 126

D. Material Misstatements and Omissions Related to Liquidity. . . . . . . . . . . . . . 130

    1. Liquidity Misstatements and Omissions in Lehman's Offering Documents. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 130

    2. Additional Liquidity Misstatements and Omissions. . . . . . . . . . . . . . 131

E. Material Misstatements and Omissions Related to Risk Management. . . . . . . 136

    1. Misstatements and Omissions in Lehman's Offering Documents. . . . . 136

    2. Additional Misrepresentations and Omissions Related to Risk Management. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 138

F. Material Misstatements and Omissions Related to Concentrations of Credit Risk. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 141

    1. Misstatements and Omissions in Lehman's Offering Documents. . . . . 141

    2. Additional Misstatements and Omissions Related to Concentrations of Credit Risk. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 142

G. Lehman's False and Misleading Registration Statements. . . . . . . . . . . . . . . . 143

VI. PRESUMPTION OF RELIANCE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 146

VII. LOSS CAUSATION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 148

VIII. NO SAFE HARBOR. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 151

IX. CAUSES OF ACTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 152

A. Securities Act Claims. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 152

FIRST CAUSE OF ACTION
Violations of Section 11 of the Securities Act
Against the Securities Act Defendants and E&Y. . . . . . . . . . . . . . . . . 152

SECOND CAUSE OF ACTION
Violations of Section 15 of the Securities Act
Against Defendants Fuld, O'Meara, Callan and Lowitt. . . . . . . . . . . . 155

B.     Exchange Act Claims. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 156

THIRD CAUSE OF ACTION
Violations of § 10(b) of the Securities Exchange Act of 1934 and Rule
10b-5 Against the Officer Defendants and E&Y. . . . . . . . . . . . . . . . . . 156

FOURTH CAUSE OF ACTION
Violations of § 20(a) of the Exchange Act
Against the Lehman Defendants. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 158

C.     California Corporations Code Claims. . . . . . . . . . . . . . . . . . . . . . . . . . . . 159

FIFTH CAUSE OF ACTION
Violations of California Corp. Code §§ 25400 and 25500
Against the Selling Defendants. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 159

SIXTH CAUSE OF ACTION
Violations of California Corp. Code §25504
Against the Lehman Defendants and Underwriter Defendants. . . . . . . . 162

SEVENTH CAUSE OF ACTION
Violations of California Corp. Code §25504.1
Against the Officer Defendants. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 166

EIGHTH CAUSE OF ACTION
Violations of California Corp. Code §25504.2
Against E&Y. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 167

D.     Common Law Claims. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 169

NINTH CAUSE OF ACTION
Fraud and Deceit
Against the Officer Defendants and E&Y. . . . . . . . . . . . . . . . . . . . . . . 169

TENTH CAUSE OF ACTION
  Aiding and Abetting Fraud
  Against the Lehman Defendants and E&Y. . . . . . . . . . . . . . . . . . . . . . . 171

ELEVENTH CAUSE OF ACTION
  Negligent Misrepresentation
  Against the Lehman Defendants. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 173

TWELFTH CAUSE OF ACTION
  Fraudulent Conveyance
  Against Defendants Richard and Kathleen Fuld. . . . . . . . . . . . . . . . . . . 174

X. PRAYER FOR RELIEF.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 175

XI. DEMAND FOR JURY TRIAL. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 176

The **City of Auburn** ("Auburn"), **City of Burbank** ("Burbank"), **Contra Costa Water District** ("Contra Costa"**), Mary A. Zeeb, Monterey County Treasurer, on Behalf of The Monterey County Investment Pool** ("Monterey"), **City of San Buenaventura** ("Ventura"), **The San Mateo County Investment Pool** ("San Mateo"), **Vallejo Sanitation & Flood Control District** ("Vallejo"), and **Zenith Insurance Co.,** ("Zenith") (collectively, the "Plaintiffs"), allege the following based on an investigation conducted by Plaintiffs and their counsel.  The investigation included a review and analysis of press releases, analyst reports, media reports, conference call transcripts, books, documents and testimony provided to Congress, SEC filings, the findings of the Financial Crisis Inquiry Commission Report, and the March 11, 2010, Bankruptcy Examiner's report (the "Report" or "Rpt"), including all documents and interviews collected by the Bankruptcy Court-appointed examiner, Anton R. Valukas.

## I.    INTRODUCTION

1.    This action arises from the Plaintiffs' purchase(s) of notes (the "Securities")[1] issued by Lehman Brothers Holdings Inc. ("Lehman" or the "Company"), between September 25, 2004, and September 15, 2008, inclusive (the "Relevant Period").  The Plaintiffs purchased the Securities pursuant to Lehman's false and misleading Registration Statements filed on Form S-3 with the Securities and Exchange Commission ("SEC"),[2] as supplemented or amended by prospectuses,

---

[1]  Each Plaintiff purchased the Securities in connection with one or more "Offerings."  Appendix A sets forth in detail each Offering, including the underwriters who participated in the Offerings as well as the relevant SEC filings, e.g. Form 10-K, 10-Q and 8-K ("SEC Filings"), that were incorporated by reference therein.

[2]  The "Registration Statements" collectively refers to: (a) the registration statement filed on Form S-3 on May 9, 2001, as amended on Form S-3/A on June 5, 2001 (the "2001 Registration Statement"), (b) the registration statement filed on Form S-3 on December 8, 2004, as amended on Form S-3/A on May 16, 2005 (the "2005 Registration Statement"), and (c) the automatic shelf registration

1

prospectus supplements, product supplements and pricing supplements, each of which were issued in connection with the Company's shelf registration or continuous offering process. The "Registration Statements," together with the prospectuses, prospectus supplements, product supplements and pricing supplements, as well as all SEC Filings during the Relevant Period incorporated therein, are collectively referred to as the "Offering Documents." These claims are asserted against certain of Lehman's officers and/or directors, Ernst & Young LLP ("E&Y"), and underwriters participating in Offerings of Lehman Securities (collectively, the "Defendants") who made materially false and misleading statements during the Relevant Period in Lehman's Offering Documents, press releases, analyst conference calls and other public statements.

2.       At the time of the Plaintiffs' purchases, the Securities were artificially inflated due to a variety of materially misleading statements and omissions regarding critical aspects of Lehman's business, including, but not limited to: the "net leverage ratio" (a key ratio scrutinized by investors, ratings agencies and creditors that indicates how much debt a company uses to finance activities), portfolios of commercial real estate and asset backed securities, available liquidity, risk-management practices, and concentrations of credit risk.

3.       Throughout the Relevant Period, Lehman's financial statements were audited by Defendant E&Y, which received lucrative accounting and auditing fees, estimated at $86.1 million during the period of 2005-2007. Following each and every audit during the Relevant Period, E&Y issued an unqualified audit report on the annual financial statements of Lehman, thereby providing public investors – intended beneficiaries of the audit report – with the assurance that Lehman was

---

statement filed on Form S-3 on May 30, 2006, as amended on Form S-3/A on June 5, 2006 (the "2006 Registration Statement").

properly reporting its financial position. These audit reports were false because Lehman's financial statements were not prepared in accordance with Generally Accepted Accounting Principles ("GAAP") and E&Y's audits were not performed in accordance with Generally Accepted Auditing Standards ("GAAS").

4.      With the help of longtime auditor E&Y and the Underwriters named herein, Lehman raised tens of billions of dollars despite the fact that Lehman was already on a downward spiral to insolvency. Ultimately, the truth concerning Lehman's deteriorating financial condition was revealed when Lehman filed for the largest bankruptcy in United States history.

5.      Throughout 2007 and 2008, Lehman executives, including several Lehman Defendants, regularly told investors that Lehman's financial position was solid and that the Company's exposure to the real estate meltdown was well contained. For example, in September 2007, as other banks began taking losses, Lehman's former-CFO, defendant Christopher O'Meara ("O.Meara"), told investors: "our liquidity position is stronger than ever." On December 13, 2007, defendant Richard S. Fuld, Jr. ("Fuld"), Lehman's Chief Executive Officer ("CEO"), stated on a year-end conference call with analysts: "our global franchise and brand have never been stronger." On June 9, 2008, Lehman announced its preliminary results for the second quarter of 2008. Defendant Callan favorably reported that Lehman lowered its net leverage ratio to 12.1 and reduced its exposure to real estate-related assets. Unbeknownst to Plaintiffs, Lehman's net leverage ratio was materially misstated due to Lehman's use of Repo 105 transactions that created a false impression that Lehman's leverage position was more favorable than it actually was. The Repo 105 transactions also caused Lehman's real estate-related assets on its balance sheet to be materially understated, creating a false impression that Lehman was ridding itself of risky real estate securities.

6.      On September 10, 2008, just days before its bankruptcy, Lehman held an earnings guidance call regarding its third quarter 2008 results.  Defendant Ian T. Lowitt ("Lowitt") stated that the Company's liquidity position "remains very strong" and Lehman "will have ample cash capital to sustain its business opportunities."

7.      Lehman's assurances that it was financially stable were consistently made throughout 2008.  These false assurances led to continued artificial inflation in the market value of Lehman's securities.  The assurances also caused investors, including Plaintiffs, to purchase and/or continue to hold Lehman's securities, believing that Lehman was financially stable and capable of weathering any storm.

8.      In this Consolidated First Amended Complaint (the "Complaint"), Plaintiffs allege claims under Sections 11 and 15 of the Federal Securities Act of 1933 (the "Securities Act"), which are essentially negligence-based claims for false or misleading statements and omissions contained in Lehman's Registration Statements and Offering Documents incorporated by reference therein i.e., various public filings including, but not limited to, Lehman's subsequently filed Forms 10-K, 10-Q and 8-K.

9.      Plaintiffs also allege claims under Section 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), as well as state securities claims for violation of the California Corporations Code, and California common law claims for negligent misrepresentation, fraud and deceit, aiding and abetting fraud, and fraudulent conveyance.

## II.    STATE LAW AUTHORITY AND REQUIREMENTS FOR MANAGEMENT OF PUBLIC FUNDS

10.    Excluding Zenith Insurance, Plaintiffs are all California public entities subject to specific state law authority and requirement governing the management of public funds.

### A.    Cities and Special Districts

11.    California Government Code Section 53630.1 states, "The Legislature hereby finds that the solvency and creditworthiness of each individual local agency can impact the solvency and creditworthiness of the state and other local agencies within the state and all of its political subdivisions, the Legislature hereby declares that the deposit and investment of public funds by local officials and local agencies is an issue of state wide concern." Based on this policy, California Legislature enacted several statutes governing the investment of a city or county's surplus public funds, including the types and amounts of such investments. Cal. Govt. Code § 53600, *et seq*.

12.    Pursuant to state law, the primary objectives in managing public funds, in order of priority, are to: 1) safeguard the principal of the funds; 2) satisfy the liquidity needs of depositors; and 3) achieve a return on the funds. Cal. Govt. Code §§ 27000.5, 53600.6. Consistent with these objectives, state law places strict limitations on the instruments in which local agencies may invest, as well as the concentration of such investments. For example, treasury investments are limited, by statute, to conservative instruments such as U.S. Treasury obligations, highly-rated commercial paper, certificates of deposit, and the like.

13.    State law also places restrictions upon a public entities's concentration of investments. Such restrictions depend on the instruments at issue, as well as the type of local entity making the purchase. For example, Government Code Section 53601, which applies specifically to

local agencies, authorizes a city to invest up to 10% of fund proceeds into the commercial paper of a single issuer so long as the issuer has a rating of A-1/P-1/F-1. Section 53601 also allows up to 30% of a city's funds to be invested in "medium term notes," but only 20% of a city's funds to be invested in money market mutual funds.

      **B.**      **Local Government Investment Pools**

      14.      Under California Government Code Section 27000, each California county is required to maintain a pooled treasury, comprised of funds belonging to the county, as well as to school districts, special districts, cities and other local agencies within the county. The pool is referred to as a local government investment pool or "LGIP."

      15.      The benefits of pooling money are identified in Government Section 27130, which recognizes that "by pooling deposits from local agencies and other participants, county treasuries operate in the public interest when they consolidated banking and investment activities, reduce duplication, achieve economies of scale, and carry out coherent and consolidated investment strategies."

      16.      Pursuant to state law, the primary objectives in managing public funds, in order of priority, are to: 1) safeguard the principal of the funds; 2) satisfy the liquidity needs of depositors; and 3) achieve a return on the funds. Cal. Govt. Code § 27000.5. Consistent with these objectives, state law places strict limitations on the instruments in which local agencies may invest, as well as the concentration of such investments. For example, treasury pool investments are limited, by statute, to conservative instruments such as U.S. Treasury obligations, highly-rated commercial paper, certificates of deposit, and the like. Investment pools are prohibited, by statute, from investing in equities and are not allowed to purchase other instruments, such as "inverse floaters,"

6

"range notes," "interest only strips," and any other securities which could result in zero interest accrual if held to maturity.

17.    State law also places restrictions upon a pool's concentration of investments. Such restrictions depend on the instruments at issue, as well as the type of local entity making the purchase.  For example, Government Code Section 53636, which applies specifically to county pooled funds, authorizes county pools to invest up to 10% of fund proceeds into the commercial paper of a single issuer so long as the issuer has a rating of A-1/P-1/F-1.  Section 53635 also allows up to 30% of a pool's funds to be invested in "medium term notes," but only 20% of the pool's funds to be invested in mutual funds and money market mutual funds.

## III.    THE PARTIES

### A.    Plaintiffs

#### 1.    City of Auburn

18.    Plaintiff **City of Auburn** is one of California's earliest mining towns, situated in the heart of the Gold Country.  Auburn was first incorporated by the California State Legislature in 1860 and again in 1888.  Auburn invests its public funds pursuant to the California Government Code and the investments are managed by the Auburn City Treasurer and Director of Administrative Services on behalf of the City of Auburn.

19.    Auburn has invested its public funds for many years.  The funds are used to maintain sufficient liquidity of cash flow needs and attain maximum yield possible.  Funds supplement projects ranging from Special Revenue Funds to Capital Projects Funds.

20.    Auburn's investments are governed by the Auburn Investment Policy, which was developed and adopted pursuant to Government Code Section 53600, *et seq*.  The purpose of the

Auburn Investment Policy is to establish overall guidelines for the management and investment of Auburn's public funds. The Auburn Investment Policy sets forth controls relating to investment authority, the prudent investor standard, reporting, auditing, accounting methods, withdrawal request, and other related control matters. Finally, the Auburn Investment Policy sets forth the procedures to be followed in executing investment transactions.

21. The Director of Administrative Services prepares the Auburn Investment Policy which is reviewed by the Investment Review Committee and ultimately approved by the Auburn City Council. Pursuant to Auburn's Investment Policy, the responsibility for making investments resides with the Treasurer and Director of Administrative Services. The Director of Administrative Services and City Treasurer submit a quarterly investment report to the Auburn City Council and Auburn City Manager. The Director of Administrative Services is responsible for establishing and maintaining an internal control structure designed to ensure that Auburn's assets are protected from loss, theft, or misuse.

22. The investment objectives of Auburn's Investment Policy are consistent with California state law and can be summarized, in order of priority, as: (1) safety, (2) liquidity, and (3) yield.

23. As a result of these statutory mandates, Auburn has a long history of maintaining high quality investment portfolios governed by a disciplined investment strategy of diversification and conservatively designed to achieve a reasonable balance of risk and a stable source of earnings.

24. Unfortunately, in reliance on Defendants' misrepresentations and omissions, described in more detail below, on March 31, 2008, Auburn purchased $124,401.25 in Lehman Securities with the CUSIP No. 52517PSC6. These Securities paid interest of 6.625% and had a

maturity date of January 18, 2012. Auburn made its decision to purchase the Securities in California and held, and continues to hold them, in its custodial account in California. As a result Auburn has suffered substantial losses.

25.    It is probable, if not certain, that Auburn would not have purchased the subject Lehman Securities absent the misrepresentations and concealment of information in the Offering Documents described below. After March 31, 2008, Auburn continued to hold the Securities. The same statements described below remained available, material and important to Auburn at all relevant times and substantially influenced Auburn's decision to continue to hold the Lehman Securities following its purchase on March 31, 2008. It is probable, if not certain, that Auburn would not have continued to hold the Lehman Securities absent the misrepresentations and concealment of information in the Offering Documents described below. Indeed, had Auburn been informed of the true financial condition of Lehman, or the fact that Ernst & Young's certifications were false, or that Lehman's financial condition was not accurately represented in its audited financial statements, it would have immediately sold its entire interest in the Lehman Securities.

### 2.    City of Burbank

26.    Plaintiff **City of Burbank** was incorporated as a city by the California State Legislature in 1911. Burbank invests its public funds pursuant to the California Government Code and the investments are managed by the Burbank City Treasurer on behalf of the City of Burbank.

27.    Burbank has invested its public funds not required for immediate day-to-day operations for many years.

28.    Burbank's investments are governed by the Burbank Investment Policy, which was developed and adopted pursuant to Government Code Sections 53600-53683. The Burbank

Investment Policy sets forth the philosophy for investing the funds, the objectives, the allowable investment instruments, the maturity and average life of investments, and specific qualifications of the investments. The Burbank Investment Policy sets forth controls relating to investment authority, reporting, auditing, accounting methods, and other related control matters. Finally, the Burbank Investment Policy mandates an Investment Procedures Manual to set forth the procedures to be followed in executing investment transactions.

29.    In accordance with California law, the Treasurer of the City prepares the Burbank Investment Policy which is reviewed by the Investment Review Committee and ultimately approved by the Burbank City Council.

30.    Pursuant to the Burbank Investment Policy, the responsibility for making investments resides with the Treasurer who supervises the investment program within the guidelines of the Burbank Investment Policy and state law. The Treasurer's Oversight Review Committee meets to evaluate general strategies, to monitor results, and discuss the economic outlook, portfolio diversification, maturity structure and potential risks. An annual audit is also conducted of the portfolios, procedures, reports and operations.

31.    The Fiscal & Treasurer's Review Group, which consists of the Assistant City Manager, Financial Services Director, Assistant General Manager, Finance & Administration, BWP, and the two council liaisons to the Treasurer's office will also meet at least semi-annually to review the portfolio report that will be presented to Burbank City Council.

32.    The investment objectives of the Burbank Investment Policy are consistent with state law and can be summarized, in order of priority, as: (1) safety, (2) liquidity, and (3) return on investments.

33.     As a result of these statutory mandates, Burbank has a long history of maintaining high quality investment portfolios governed by a disciplined investment strategy of diversification and conservatively designed to achieve a reasonable balance of risk and a stable source of earnings.

34.     Unfortunately, in reliance on Defendants' misrepresentations and omissions, described in more detail below, on May 9, 2006, Burbank purchased $5,000,380.56 of Lehman Securities, CUSIP No. 52517PG96, paying 5.75% interest per annum and maturing on April 25, 2011, and on January 29, 2008, Burbank purchased $5,086,718.75 of Lehman Securities, CUSIP No. 5252M0BZ9, paying 5.625% interest per annum and maturing on January 24, 2013. Burbank made its decision to purchase these Securities in California and held, and continues to hold them, in its custodial account in California. As a result Burbank has suffered substantial losses.

35.     It is probable, if not certain, that Burbank would not have purchased the subject Lehman Securities absent the misrepresentations and concealment of information in the Offering Documents described below. After May 9, 2006, and January 29, 2008, Burbank continued to hold the Lehman Securities. The same statements described below remained available, material and important to Burbank at all relevant times and substantially influenced Burbank's decision to continue to hold the Lehman Securities following its purchases. It is probable, if not certain, that Burbank would not have continued to hold the Lehman Securities absent the misrepresentations and concealment of information in the Offering Documents described below. Had Burbank been informed of the true financial condition of Lehman, or the fact that Ernst & Young's certifications were false, or that Lehman's financial condition was not accurately represented in its audited financial statements, Burbank would have immediately sold its entire interest in its Lehman Securities.

11

### 3.    Contra Costa Water District

36.    Plaintiff **Contra Costa Water District** was formed in 1936 and is now one of the largest urban water districts in California, delivering water to approximately 500,000 people in Contra Costa County in Northern California.  Contra Costa is a special district public agency created under Contra Costa County Water District Law, and is governed by a Board of Directors who approves the District's audit, budget, and investment policy in accordance with the California Government Code.

37.    Contra Costa has invested its funds for many years.  As a special district, Contra Costa relies heavily on user fees to fund the costs of operation, maintenance, capital improvements, and recurring capital replacement.  The funds are used to finance services provided by the district including capital projects, and to meet liquidity and cash flow needs.

38.    Contra Costa's investments are governed by the Contra Costa Investment Policy, which was developed and adopted pursuant to Government Code Section 53600, *et seq*.  The Contra Costa Investment Policy sets the investing objectives, authorized investments, the maturity and average life of investments, and controls relating to investment authority and reporting.

39.    In accordance with California law, Contra Costa employees prepare and submit written statements of investment policy to the Board for review and approval.

40.    Pursuant to the Contra Costa Investment Policy, the responsibility for making investments resides with the Contra Costa Investment Committee, which makes investment decisions on behalf of Contra Costa within the guidelines of the policy and state laws.  In accordance with California statutes, Contra Costa annually issues a report on its financial position and results of operations, and this report is audited by independent certified public accountants.

12

41.     The investment objectives of the Contra Costa Investment Policy are consistent with state law and can be summarized, in order of priority, as: (1) safety, (2) liquidity, and (3) return on investments.

42.     As a result of these statutory mandates, Contra Costa has a long history of maintaining high quality investment portfolios governed by a disciplined investment strategy passive management techniques, "buy and hold," and conservatively designed to achieve a reasonable balance of risk and a stable source of earnings.

43.     Unfortunately, in reliance on Defendants' misrepresentations and omissions, described in more detail below, on February 5, 2008, Contra Costa purchased $10,514,565.73 in Lehman Securities, CUSIP No. 52517PR60, paying 5.25% per annum and maturing on February 6, 2012.

44.     It is probable, if not certain, that Contra Costa would not have purchased the subject Lehman Securities absent the misrepresentations and concealment of information in the Offering Documents described below.  After February 5, 2008, Contra Costa continued to hold the Securities. The same statements described below remained available, material and important to Contra Costa at all relevant times and substantially influenced Contra Costa's decision to continue to hold the Lehman Securities following its purchase on February 5, 2008.  It is probable, if not certain, that Contra Costa would not have continued to hold the Lehman Securities absent the misrepresentations and concealment of information in the Offering Documents described below.  Had Contra Costa been informed of the true financial condition of Lehman, or the fact that Ernst & Young's certifications were false, or that Lehman's financial condition was not accurately represented in its audited financial statements, Contra Costa would have immediately sold its entire interest in its

Lehman Securities.  Instead, Contra Costa sold these Securities for a substantial loss following Lehman's bankruptcy.

### 4.    Mary A. Zeeb, Monterey County Treasurer, on Behalf of The Monterey County Investment Pool

45.    Plaintiff **Mary A. Zeeb, Monterey County Treasurer**, brings this action on behalf of the Monterey County Investment Pool, a local government investment pool operating under the California Government Code.  Monterey's Investment Pool is managed by the Monterey County Treasurer on behalf of Monterey County, school districts, special districts, and other Monterey Investment Pool participants.

46.    The Monterey Investment Pool has existed for many years.  In addition to Monterey, numerous local agencies participate in the Pool, including school districts, cities, and many special districts.  The funds are used to finance virtually all services provided by Monterey County, cities and local agencies and districts, including payroll and purchases.

47.    The Monterey Investment Pool's investments are governed by the Monterey Investment Policy, developed and adopted pursuant to Government Code Section 27133.  The Monterey Investment Policy sets forth the philosophy for investing the funds in the Monterey Investment Pool, the objectives of the Monterey Investment Pool, the allowable investment instruments, the maturity and average life of Monterey Investment Pool investments, and specific qualifications of the investments.  The Monterey Investment Policy also sets forth controls relating to investment authority, reporting, auditing, accounting methods, withdrawal request and other related control matters.  Furthermore, the Monterey Investment Policy sets forth the procedures to be followed in executing investment transactions.

48.    In accordance with Section 27133, the Treasurer annually prepares the Monterey Investment Policy which is reviewed by the Monterey Treasury Oversight Committee and ultimately approved by the Monterey Board of Supervisors. Pursuant to Government Code Sections 27130 and 17131, the Monterey Treasury Oversight Committee: 1) insures participation by local agencies in the review of investment policies, 2) involves participating local agencies in the management of their funds, and 3) enhances the security and investment return of their funds by establishing criteria for the withdrawal of funds.

49.    Pursuant to the Monterey Investment Policy, the responsibility for making investments resides with the Monterey Treasurer, who supervises the investment program within the guidelines of the Monterey Investment Policy and state law. The Monterey Treasury Oversight Committee meets to evaluate general strategies and to monitor results and discuss the economic outlook, portfolio diversification, maturity structure and potential risks to the Monterey County Investment Pool. The Monterey Treasury Oversight Committee causes an annual audit to be conducted of the portfolios, procedures, reports and operations related to the Monterey Investment Pool. The investment objectives of the Monterey Investment Policy are consistent with state law and can be summarized, in order of priority, as: (1) safety, (2) liquidity, and (3) return on investment.

50.    As a result of these statutory mandates, the Monterey Investment Pool has a long history of maintaining high quality investment portfolios governed by a disciplined investment strategy of diversification and conservatively designed to achieve a reasonable balance of risk and a stable source of earnings. The Monterey Investment Pool's approved investments include U.S. Treasury and government securities, commercial paper, corporate bonds, and repurchase agreements with highly rated counterparties.

15

51.    Unfortunately, in reliance on Defendants' misrepresentations and omissions, described in more detail below, on October 1, 2007, the Monterey Investment Pool purchased $10,026,250.00 in Lehman Securities, CUSIP No. 52517PG21, which paid a floating rate of interest each quarter equal to 0.09% over the LIBOR Telerate, and had a stated maturity date of April 3, 2009.

52.    It is probable, if not certain, that Monterey would not have purchased the subject Lehman Securities absent the misrepresentations and concealment of information in the Offering Documents described below.  After October 1, 2007, Monterey continued to hold its Lehman Securities.  The same statements described below remained available, material and important to Monterey at all relevant times and substantially influenced Monterey's decision to continue to hold the Lehman Securities following its purchase on October 1, 2007.  It is probable, if not certain, that Monterey would not have continued to hold the Lehman Securities absent the misrepresentations and concealment of information in the Offering Documents described below.  Had Monterey been informed of the true financial condition of Lehman, or the fact that Ernst & Young's certifications were false, or that Lehman's financial condition was not accurately represented in its audited financial statements, Monterey would have immediately sold its entire interest in its Lehman Securities.  Instead, Monterey sold these Securities for a substantial loss following Lehman's bankruptcy.

### 5.    City of San Buenaventura

53.    Plaintiff **City of San Buenaventura** is one of the oldest settlements on the Pacific Coast.  It is the site of the San Buenaventura Mission founded in 1782, and incorporated as a town by the California Legislature in 1866.  Ventura invests its public funds pursuant to the California

16

Government Code and are managed by the Buenaventura City Treasurer on behalf of Ventura.

54.    Ventura has invested its surplus public funds for many years. The funds are used to finance virtually all services provided by Ventura, including payroll and purchases.

55.    Ventura's investments are governed by the Ventura Investment Policy, which was developed and adopted pursuant to Government Code Sections 53600-53683. Ventura's Investment Policy sets forth the philosophy for investing the funds, the objectives, the allowable investment instruments, the maturity and average life of investments, and specific qualifications of the investments. The Ventura Investment Policy also sets forth controls relating to investment authority, reporting, auditing, accounting methods, withdrawal request and other related control matters. Furthermore, the Ventura Investment Policy sets forth the procedures to be followed in executing investment transactions.

56.    In accordance with California law, the Treasurer of Ventura prepares the Ventura Investment Policy which is reviewed by the Ventura Investment Review Committee and ultimately approved by the Ventura City Council.

57.    Pursuant to the Ventura Investment Policy, the responsibility for making investments resides with the Ventura Treasurer, who supervises the investment program within the guidelines of the Ventura Investment Policy and state laws. The Ventura Investment Review Committee meets to evaluate general strategies and to monitor results and discuss the economic outlook, portfolio diversification, maturity structure and potential risks. An annual audit is also conducted of the portfolios, procedures, reports and operations.

58.    The investment objectives of the Ventura Investment Policy are consistent with state law and can be summarized, in order of priority, as: (1) safety, (2) liquidity, and (3) return on

investments.

59.     As a result of these statutory mandates, Ventura has a long history of maintaining high quality investment portfolios governed by a disciplined investment strategy of diversification and conservatively designed to achieve a reasonable balance of risk and a stable source of earnings.

60.     Unfortunately, in reliance on Defendants' misrepresentations and omissions, described in more detail below, on January 30, 2008, Ventura purchased $5,065,650 in Lehman Securities, CUSIP No. 5252M0BZ9, that paid interest at 5.625% per annum and had a stated maturity date of January 24, 2013.  Ventura made its decision to purchase these Securities in California and held, and continues to hold them, in its custodial account in California.

61.     It is probable, if not certain, that Ventura would not have purchased the subject Lehman Securities absent the misrepresentations and concealment of information in the Offering Documents described below.  After January 30, 2008, Ventura continued to hold the Securities.  The same statements described below remained available, material and important to Ventura at all relevant times and substantially influenced Ventura's decision to continue to hold the Lehman Securities following its purchase on January 30, 2008.  It is probable, if not certain, that Ventura would not have continued to hold the Lehman Securities absent the misrepresentations and concealment of information in the Offering Documents described below.  Had Ventura been informed of the true financial condition of Lehman, or the fact that Ernst & Young's certifications were false, or that Lehman's financial condition was not accurately represented in its audited financial statements, Ventura would have immediately sold its entire interest in its in the Lehman Securities.

18

### 6.    The San Mateo County Investment Pool

62.    Plaintiff **San Mateo County Investment Pool** is a local government investment pool operating under the California Government Code.  San Mateo investments are managed by the San Mateo County Treasurer on behalf of school districts, special districts, and other San Mateo investment pool participants.

63.    The San Mateo Investment Pool has existed for many years.  In addition to San Mateo, numerous local agencies participate in San Mateo's Investment Pool, including 25 school districts and 15 cities, as well as many special districts.  The funds are used to finance virtually all services provided by San Mateo, and the cities, local agencies and districts, including payroll and purchases.

64.    San Mateo's  investments are governed by the San Mateo Pooled Fund Investment Policy, developed and adopted pursuant to Government Code Section 27133.  The San Mateo Investment Policy sets forth the philosophy for investing the funds, the objectives, the allowable investment instruments, the maturity and average life of investments, and specific qualifications of the investments.  The San Mateo Investment Policy also sets forth controls relating to investment authority, reporting, auditing, accounting methods, withdrawal requests and other related control matters.  Furthermore, the San Mateo Investment Policy sets forth the procedures to be followed in executing investment transactions.

65.    In accordance with Section 27133, the Treasurer annually prepares the San Mateo Investment Policy, which is reviewed by the San Mateo Treasury Oversight Committee and ultimately approved by the San Mateo Board of Supervisors.  Pursuant to Government Code Sections 27130 and 17131, the San Mateo Treasury Oversight Committee:  1) insures participation by local

agencies in the review of investment policies, 2) involves participating local agencies in the management of their funds, and 3) enhances the security and investment return of their funds by establishing criteria for the withdrawal of funds.

66.    Pursuant to San Mateo's Investment Policy, the responsibility for making investments resides with the San Mateo Treasurer, who supervises the investment program within the guidelines of San Mateo's Investment Policy and state law. The San Mateo Treasury Oversight Committee meets quarterly to evaluate general strategies and to monitor results and discuss the economic outlook, portfolio diversification, maturity structure and potential risks to the funds. The San Mateo Treasury Oversight Committee causes an annual audit to be conducted of the portfolios, procedures, reports and operations related to the San Mateo Investment Pool.

67.    The investment objectives of San Mateo are consistent with state law and can be summarized, in order of priority, as (1) safety, (2) liquidity, and (3) return on investment.

68.    In addition to these investment objectives, San Mateo sets forth the following two general objectives:

**Leverage**:  The San Mateo Treasurer shall not leverage San Mateo through any borrowing collateralized or otherwise secured by cash or securities held unless authorized by the San Mateo Investment Policy.

**Public Trust**:  In managing the investment portfolio, the San Mateo Treasurer shall exercise a degree of professionalism that will sustain public confidence in San Mateo and San Mateo Pool participants, remembering that both investment instruments and the method of transacting investment business are subject to public scrutiny. The perception of safety and professionalism is as important as the reality of these concepts. To further public trust, the investment officer is prohibited from doing personal business with brokers that do business with San Mateo.

69.    As a result of these statutory mandates, San Mateo has a long history of maintaining a high quality investment portfolios governed by a disciplined investment strategy of

diversification and conservatively designed to achieve a reasonable balance of risk and a stable source of earnings.  San Mateo's approved investments include U.S. Treasury and government securities, commercial paper, corporate bonds, and repurchase agreements with highly rated counterparties.

70.    Unfortunately, in reliance on Defendants' misrepresentations and omissions, San Mateo purchased millions in Securities as described in more detail below:

I) On October 25, 2004, San Mateo purchased $9,990,380.00 in Lehman Securities, CUSIP No. 52517PXU0.  These Securities paid a floating rate of interest each quarter equal to 0.25% over the LIBOR Telerate and had a stated maturity date of November 10, 2009.

ii)  On October 24, 2005, San Mateo purchased $10,000,000.00 in Lehman Securities, CUSIP No. 52517PC58. These Securities paid a floating rate of interest each quarter equal to 0.09% over the LIBOR Telerate and had a stated maturity date of October 22, 2008.

iii) On August 21, 2006, San Mateo purchased $25,000,000.00 in Lehman Securities, CUSIP No. 52517PK83.  These Securities paid a floating rate of interest each quarter equal to 0.1% over the LIBOR Telerate and had a stated maturity date of August 21, 2009.

iv)  On November 16, 2006, San Mateo purchased $20,000,000.00 in Lehman Securities, CUSIP No. 52517PN98.  These Securities paid a floating rate of interest each quarter equal to 0.1% over the LIBOR Telerate and had a stated maturity date of November 16, 2009.

v)  On December 21, 2006, San Mateo purchased $20,000,000.00 in Lehman Securities, CUSIP No. 52517PQ46.  These Securities paid a floating rate of interest each quarter equal to 0.05% over the LIBOR Telerate and had a stated maturity date of December 23, 2008.

vi) On March 23, 2007, San Mateo purchased $20,000,000.00 in Lehman Securities, CUSIP No. 52517PW31.  These Securities paid a floating rate of interest each quarter equal to 0.07% over the LIBOR Telerate and had a stated maturity date of March 23, 2009.

vii)  On May 25, 2007, San Mateo purchased $25,000,000.00 in Lehman Securities, CUSIP No. 52517P2K6.  These Securities paid a floating rate of interest each quarter equal to 0.14% over the LIBOR Telerate and had a stated maturity date of May 25, 2010.

viii) On January 22, 2008, San Mateo purchased $14,931,600 in Lehman Securities, CUSIP No. 5252M0BZ9.  These Securities paid 5.625% interest per annum and had a stated maturity date of January 24, 2013.

21

ix)  On February 15, 2008, San Mateo purchased $9,851,047 in Lehman Securities, CUSIP No. 52517PK83.  These Securities paid a floating rate of interest each quarter equal to 0.1% over the LIBOR Telerate and had a stated maturity date of August 21, 2009.

71.    It is probable, if not certain, that San Mateo would not have purchased the subject Lehman Securities absent the misrepresentations and concealment of information in the Offering Documents described below.  After each purchase outlined above, San Mateo continued to hold the Lehman Securities.   The same statements described below remained available, material and important to San Mateo at all relevant times and substantially influenced San Mateo's decision to continue to hold the Lehman Securities following each purchase outlined above.  It is probable, if not certain, that San Mateo would not have continued to hold the Lehman Securities absent the misrepresentations and concealment of information in the Offering Documents for each of the Securities purchased, as described below.  Had San Mateo been informed of the true financial condition of Lehman, or the fact that Ernst & Young's certifications were false, or that Lehman's financial condition was not accurately represented in its audited financial statements, San Mateo would have immediately sold its entire interest in all of its Lehman Securities.

### 7.    Vallejo Sanitation & Flood Control District

72.    Plaintiff **Vallejo Sanitation & Flood Control District** is an independent agency that provides sanitary sewer and flood control services.  Vallejo's investments are made in compliance with investment policies approved annually by the Vallejo Board of Trustees and are in compliance with the California Government Code.

73.    Vallejo has invested its funds for many years.  As an enterprise special district, Vallejo relies heavily on non-tax fees to fund the costs of operation, maintenance, and recurring capital replacement.  The funds are used to finance services provided by Vallejo, including capital

projects, and to meet liquidity and cash flow needs.

74.     Vallejo's investments are governed by the Vallejo Investment Policy, which was developed and adopted pursuant to Government Code Section 53600, *et seq*.  The Vallejo Investment Policy sets the public investing objectives, authorized investments, the maturity and average life of investments, and controls relating to investment authority and reporting.

75.     In accordance with California law, the Vallejo Treasurer prepares and submits written statements of investment policy to the Vallejo Board of Trustees for review and approval.

76.     Pursuant to Vallejo's Investment Policy, the responsibility for making investments resides with the Vallejo Treasurer, who makes investment decisions on behalf of Vallejo within the guidelines of the policy and state law.  The Vallejo Treasurer submits a quarterly report within thirty days following the end of the covered quarter Vallejo's Board of Trustees for review and approval.

77.     In accordance with California statutes, Vallejo annually issues a report on its financial position and results of operations, which is audited by independent certified public accountants.

78.     The investment objectives of Vallejo's Investment Policy are consistent with state law and can be summarized, in order of priority, as: (1) safety, (2) liquidity, and (3) return on investments.

79.     As a result of these statutory mandates, Vallejo has a long history of maintaining high quality investment portfolios governed by a disciplined investment strategy passive management techniques, "buy and hold," and conservatively designed to achieve a reasonable balance of risk and a stable source of earnings.

23

80.     Unfortunately, in reliance on Defendants' misrepresentations and omissions, described in more detail below, on January 10, 2008, Vallejo purchased $936,929.70 of Lehman 4.25% Securities, CUSIP No. 52517PYN5, paying interest at 4.25% annually and maturing on January 27, 2010, and on January 22, 2008, Vallejo purchased $494,930.00 of Lehman Securities, CUSIP No. 52517PXT3, paying interest at 3.95% annually and maturing on November 10, 2009, and finally, on January 30, 2008, Vallejo purchased $3,055,287.12 of Lehman Securities, CUSIP No. 5252M0BZ9, paying interest at 5.625% annually and maturing on January 24, 2013.  Vallejo made its decision to purchase these Securities in California and held, and continues to hold them in its custodial account in California.

81.     It is probable, if not certain, that Vallejo would not have purchased the subject Lehman Securities absent the misrepresentations and concealment of information in the Offering Documents described below.  After January 10, 2008, and January 22, 2008, and January 30, 2008, Vallejo continued to hold the Securities.  The same statements described below remained available, material and important to Vallejo at all relevant times and substantially influenced Vallejo's decision to continue to hold the Lehman Securities following its respective purchases.  It is probable, if not certain, that Vallejo would not have continued to hold the Lehman Securities absent the misrepresentations and concealment of information in the Offering Documents described below.  Had Vallejo been informed of the true financial condition of Lehman or the fact that Ernst & Young's certifications were false, or that Lehman's financial condition was not accurately represented in its audited financial statements, Vallejo would have immediately sold its entire interest in its Lehman Securities.

/ / /

24

### 8.    Zenith Insurance Co.

82.    Plaintiff **Zenith Insurance Co.** is one of the largest workers' compensation insurers in California.  As an insurance provider, Zenith is subject to stringent California statutes and regulations that limit Zenith's investments in debt securities to highly rated securities approved by the Insurance Commissioner.

83.    Only certain types of debt securities, preferred stock and common stock, approved by the Insurance Commissioner, may be held.  As to debt securities, such as notes and bonds, the Insurance Commissioner requires that they be highly rated by national rating agencies.  Conversely, investments in debt securities with lower ratings, secured by interest in real estate, or with other specified attributes are typically limited to a very low percentage of an insurer's portfolio.

84.    In addition, as a condition of providing workers' compensation insurance in California, insurers are required to maintain a deposit which serves as security for the insurer's obligations to California workers in the event an insurer fails to pay claims.  To comply with this deposit requirement, the insurer can file a security bond or an irrevocable letter of credit with the Insurance Commissioner.  Alternatively, the insurer may deposit cash instruments or approved securities with the California State Treasurer or a bank, savings and loan association, or trust company.

85.    If the insurer elects to place the required deposit with an approved bank or trust company located in California, instead of the State Treasurer, the bank or trust company is subject to the approval of the Insurance Commissioner.  All records pertaining to the insurer's deposit must be kept in a single California office of the bank or trust company.  The deposit itself must be maintained in California.

86.     Similarly, the insurer and approved bank must regularly provide account information to the Insurance Commissioner.  The insurer, bank and Insurance Commissioner must execute a trust agreement, in a form approved by the Commissioner, that grants the Commissioner the authority to withdraw the deposit to pay claims.  The insurer must also give the Commissioner the power of attorney with the right to withdraw the deposit as required.

87.     The depository account is subject to even higher standards with respect to the types of investments that may be held.  For example, the deposit must be held in cash or alternative conservative investment vehicles to ensure their liquidity if needed and, with respect to debt securities, such as notes and bonds, the Insurance Commissioner requires that they be highly rated by national rating agencies.  Conversely, debt securities with lower ratings, secured by interest in real estate, or with other specified attributes are not eligible for deposit.  As a result, Zenith has a long history of maintaining a high quality investment portfolio governed by a disciplined investment strategy of diversification and conservatively designed to achieve a reasonable balance of risk and a stable source of earnings, in compliance with California regulations.

88.     Unfortunately, in reliance on Defendants' misrepresentations and omissions, described in more detail below, on August 18, 2005, Zenith purchased $1,990,750.00 of Lehman's 4.5% Securities, CUSIP No. 52517PA35, maturing on July 26, 2010, and on September 26, 2006, Zenith purchased $7,856,800.00 of Lehman's 4.5% Securities, CUSIP No. 52517PA35, maturing on July 26, 2010, and finally, on August 8, 2007, Zenith purchased  $1,939,400.00 of Lehman's 4.5% Securities, CUSIP No. 52517PA35, maturing on July 26, 2010.

89.     It is probable, if not certain, that Zenith would not have purchased the subject Lehman Securities absent the misrepresentations and concealment of information in the Offering Documents

26

described below.  After August 18, 2005, and September 26, 2006, and August 8, 2007, Zenith

continued to hold the Securities.  The same statements described below remained available, material

and important to Zenith at all relevant times and substantially influenced Zenith's decision to

continue to hold the Lehman Securities during the Relevant Period.  It is probable, if not certain, that

Zenith would not have continued to hold the Lehman Securities absent the misrepresentations and

concealment of information in the Offering Documents described below.  Had Zenith been informed

of the true financial condition of Lehman, or the fact that Ernst & Young's certifications were false,

or that Lehman's financial condition was not accurately represented in its audited financial

statements, Zenith would have immediately sold its entire interest in its Lehman Securities.

90.     As a result of Lehman's bankruptcy, on or about September 30, 2008, Zenith was

forced to write-down the Securities held in Zenith's deposit account by approximately $10 million

dollars.  On or about October 15, 2008, given the severe impairment in value, the Lehman Securities

were moved from Zenith's deposit account into its custodial account with City National Bank in

California, as they no longer qualified as a statutory deposit.  On November 21, 2008, Zenith sold

the Securities at a substantial loss.

B.     **Defendants**

1.     **Officer Defendants**

91.     Defendant **Richard S. Fuld Jr.** ("Fuld") served as Chief Executive Officer ("CEO")

and Chairman of the Board of Directors ("Board") of Lehman since 2000.  Between 2000 and

September 15, 2008, Fuld received nearly $500 million in total compensation from Lehman.  During

his tenure as CEO, Fuld signed each Form 10-K filed with the SEC, and following the enactment

of the Sarbanes-Oxley Act of 2002 ("SOX"), Fuld signed each certification statement attached to

Form 10-K and 10-Q pursuant to Rule 13a-14(a), 15d-14(a), and § 906 of SOX.  Fuld also signed the 2001 Registration Statement, 2005 Registration Statement and the 2006 Registration Statement.

92.    Defendant **Christopher M. O'Meara** ("O'Meara") served as Lehman's Chief Financial Officer ("CFO"), Controller, and Executive Vice President from 2004 until December 1, 2007.  As Controller, O'Meara supervised Lehman's internal accounting programs and procedures. Beginning December 1, 2007, O'Meara served as head of Worldwide Risk Management.  In his role as head of Risk Management, O'Meara was responsible for supervising Lehman's risk mitigation strategies and procedures.  O'Meara received $12.4 million between 2005 and 2007 in salary, bonuses, and restricted stock.  During his tenure as CFO in 2004-2007, O'Meara signed each Form 10-K and Form 10-Q filed with the SEC, and signed the certification statements on the Form 10-K and 10-Q pursuant to Rule 13a-14(a), 15d-14(a) and § 906 of SOX.  O'Meara also signed the 2005 Registration Statement and the 2006 Registration Statement.

93.    Defendant **Joseph M. Gregory** ("Gregory") served as Lehman's President and Chief Operating Officer ("COO") from May 2004 until resigning in June 2008.  From May 2002 to May 2004, Gregory was Lehman's Co-COO.  In his role as COO, Gregory oversaw the day-to-day management of Lehman's operations.  For the fiscal year 2007, Gregory received $34 million in total compensation.

94.    Defendant **Erin Callan** ("Callan") joined Lehman in 1995 and served as Lehman's Chief Financial Officer ("CFO") and Global Controller from December 2007 until June 12, 2008, when she was demoted.  She resigned later that month.  Prior to serving as Controller, Callan served in various capacities at Lehman, including head of the Investment Banking Global Hedge Fund Coverage Group, the Global Finance Solutions Group, and Global Finance Analytics Group.  Callan

signed Lehman's 2007 Form 10-K and first quarter 2008 Form 10-Q. Callan also signed the certification statements on Lehman's 2007 Form 10-K and first quarter 2008 Form 10-Q pursuant to Rule 13a-14(a), 15d-14(a) and § 906 of SOX.

95.    Defendant **Ian Lowitt** ("Lowitt") joined Lehman in 1994 and replaced Callan as CFO on June 12, 2008. He also served as the Co-Chief Administrator Officer since October 2006, overseeing Lehman's finance organization, including Financial Control, Investor Relations, Planning and Analysis, Product Control, Tax, and Treasury. In his role as Co-Chief Administrator Officer, he was responsible for global oversight of Risk Management. Lowitt served as Treasurer and Global Head of Tax from 2000 until 2005. For the fiscal year 2007, Lowitt received a total compensation of $9.49 million. Lowitt signed Lehman's second quarter 2008 Form 10-Q pursuant to Rule 13a-14(a), 15d-14(a) and § 906 of SOX.

96.    Defendant **David Goldfarb** ("Goldfarb") joined Lehman in 1993, after 14 years in E&Y's Financial Services practice, where he was a partner. He became Lehman's Global Controller in 1995, and in April 2000 was promoted to CFO. In 2004 he was promoted to Chief Administrative Officer, responsible for Finance, Risk Management, and Investor Relations. He also oversaw Strategy, Technology and Operations, Corporate Communications, and Corporate Real Estate. In 2006, Goldfarb served as the global head of Strategic Partnerships, Principal Investing and Risk, and in June 2008, Goldfarb assumed the position of Chief Strategic Officer. Goldfarb signed the 2001 Registration Statement.

97.    Defendant Fuld, O'Meara, Gregory, Callan, Lowitt, and Goldfarb are collectively referred to herein as the "**Officer Defendants**." The Officer Defendants all served on Lehman's Executive Committee, chaired by Defendant Fuld. The Executive Committee was responsible for

assessing Lehman's risk exposure and related disclosures, reportedly meeting at least twice a week at which time they regularly spoke about managing risk.

### 2.    Finance and Risk Committee Defendants

98.    Defendant **John F. Akers** ("Akers") served as a member of Lehman's Board of Directors at all times during the Relevant Period.  Akers joined Lehman's Board in 1996, and served as Chairman of the Compensation and Benefits Committee and a member of the Finance and Risk Committee.  For the fiscal year of 2007, he received a total compensation of $360,538 from Lehman.  During his tenure on Lehman's Board of Directors Akers signed each Form 10-K filed with the SEC.  Akers also signed the 2001 Registration Statement, 2005 Registration Statement and the 2006 Registration Statement.

99.    Defendant **Roger S. Berlind** ("Berlind") served as a member of Lehman's Board of Directors at all times during the Relevant Period.  Berlind joined Lehman's Board in 1985, and also served as a member of the Audit Committee and the Finance and Risk Committee.  For the fiscal year of 2007, he received a total compensation of $352,538 from Lehman.  During his tenure on the Board of Directors Berlind signed each Form 10-K filed with the SEC.  Berlind also signed the 2001 Registration Statement, 2005 Registration Statement and the 2006 Registration Statement.

100.    Defendant **Marsha Johnson Evans** ("Evans") joined Lehman's Board of Directors in 2004 and served as a Director of Lehman until September 15, 2008.  She served as Chairperson of the Nominating and Corporate Governance Committee, a member of the Compensation and Benefits Committee, and member of the Finance and Risk Committee.  For the fiscal year 2007, she received a total compensation of $373,038 from Lehman.  During her tenure on the Board of Directors, Evans signed each Form 10-K filed with the SEC.  Evans also signed the 2005

Registration Statement and the 2006 Registration Statement.

101.    Defendant **Roland A. Hernandez** ("Hernandez") joined Lehman's Board of Directors in 2005 and served as a Director of Lehman until September 15, 2008.  Hernandez served on the Finance and Risk Committee.  For the fiscal year 2007, he received a total compensation of $325,038 from Lehman.  During his tenure on the Board of Directors Hernandez signed each Form 10-K filed with the SEC.  Hernandez also signed the 2006 Registration Statement.

102.    Defendant **Henry Kaufman** ("Kaufman") served as a member of Lehman's Board of Directors at all times during the Relevant Period.  Kaufman joined Lehman's Board of Directors in 1995 and served as the Chairman of the Finance and Risk Committee.  He received $349,388 in compensation from Lehman for 2007.  In 2007, the Finance and Risk Committee, which Kaufman chaired, met twice.  During his tenure on the Board of Directors Kaufman signed each Form 10-K filed with the SEC.  Kaufman also signed the 2001 Registration Statement, 2005 Registration Statement and the 2006 Registration Statements.

103.    Defendants Akers, Berlind, Evans, Hernandez, and Kaufman are collectively referred to herein as the "**Risk Committee Defendants**."  The Risk Committee Defendants sat on the Finance and Risk Committee, which was charged with, among other responsibilities, the responsibility to review and advise the Board of Directors on the financial policies and practices of the company, reviewing significant capital transactions and the respective risks involved, and ensuring the accuracy and completeness of applicable public filings they signed.  The Risk Committee reportedly met only twice in 2007 and early 2008, when Lehman's risk exposure grew exponentially.

104.    The Officer Defendants and the Risk Committee Defendants are collectively referred to herein as the "**Individual Defendants**," or "**Lehman Defendants.**"

105.    The Lehman Defendants, because of their senior positions at Lehman, were controlling persons of the Company and were empowered with the authority to control and did control the contents of Lehman's reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, institutional advisors, and individual investors such as the Plaintiffs.

### 3.    Auditor Defendant

106.    Defendant **Ernst & Young, LLP** ("E&Y") is a public accounting firm with offices throughout the world, including in the State of California.  Pursuant to SOX, E&Y is subject to oversight and annual inspection by the Public Company Accounting Oversight Board ("PCAOB") as a registered public accounting firm that regularly provides audit reports for more than 100 issuers. E&Y served as Lehman's outside auditor during the Relevant Period, and issued audit opinions with respect to Lehman's consolidated financial statements.  Lehman engaged E&Y to audit its financial statements, as well as to provide a written opinion as to whether the financial statements were fairly presented in accordance with GAAP.  E&Y reviewed Lehman's quarterly financial results and issued written review reports for its quarterly reviews.  For its work, E&Y earned tens of millions of dollars in annual fees, including over $31 million in 2007 alone for audit and tax fees.

107.    E&Y's audit opinions were incorporated by reference in the 2001, 2005 and the 2006 Registration Statements filed with the SEC.  E&Y's audit opinions were also incorporated by reference in each of the Offering Documents, including all prospectuses, prospectus supplements, product supplements and pricing supplements, that were issued in connection with the Offerings.

108.    E&Y consented to be named as an expert as part of Lehman's Registration Statements and related Offering Documents, and for the registration of debt securities, warrants, purchase contracts, preferred stock, depository shares, units, common stock, and bonds – including the Securities at issue in this Consolidated Amended Complaint.

### 4.    Underwriter Defendants

109.    Defendant **ABN Amro Holding N.V.** (Acquired by RFS Holdings B.V.) ("ABN"), is based in Amsterdam, The Netherlands, and is an international bank that provides investment services.  ABN was an underwriter in the First Vallejo Offering, Second Vallejo Offering, Second Zenith Offering and Third Zenith Offering.

110.    Defendant **ANZ Securities, Inc.** ("ANZ"), is an affiliated company of ANZ Bank, based in Melbourne, Australia, that provides a full range of financial products and services to business, corporate, and institutional clients.  ANZ was an underwriter in the First Vallejo Offering, Second Vallejo Offering, Contra Costa Offering, Second Zenith Offering and Third Zenith Offering.

111.    Defendant **Banc of America Securities, LLC** ("BOA") is an investment bank offering a multitude of investment bank, corporate finance and broker/dealer services.  Banc of America was an underwriter in the First Vallejo Offering, Contra Costa Offering, and Auburn Offering.

112.    Defendant **BBVA Securities Inc.** ("BBVA"), based in New York City, provides securities brokerage and research services.  BBVA was an underwriter in the Third Vallejo Offering, Second Burbank Offering, Ventura Offering, and the Eighth San Mateo Offering.

113.    Defendant **BNP Paribas S.A.** ("BNP"), based in Paris, France, is a financial services institution that, through its subsidiaries and divisions, provides full range of financial

products and services business, corporate, institutional and consumer clients.  BNP was an underwriter in the Third Vallejo Offering, Second Burbank Offering, Ventura Offering, Auburn Offering, Eighth San Mateo Offering, Second Zenith Offering and Third Zenith Offering.

114.    Defendant **Calyon Securities (USA) Inc.** ("Calyon"), based in New York City, provides securities brokerage, investment banking and underwriting services.  Calyon is a subsidiary of Credit Agricole S.A. Calyon was an underwriter in the Second Vallejo Offering.

115.    Defendant **Citigroup Global Markets Inc.**, ("CGMI") is a large integrated financial services institution that through subsidiaries and divisions provides commercial and investment banking services, commercial loans to corporate entities, and acts as an underwriter in the sale of corporate securities.  CGMI was an underwriter in the First Vallejo Offering, Second Vallejo Offering, Third Vallejo Offering, Contra Costa Offering, Second Burbank Offering, Ventura Offering, Seventh San Mateo Offering, and the Eighth San Mateo Offering.

116.    Defendant **Commerzbank Capital Markets Corp.**, ("Commerzbank"), based in New York City, provides securities brokerage and underwriting services. Commerzbank is a subsidiary of Commerzbank Aktiengesellschaft.  Commerzbank was an underwriter in the Third Vallejo Offering, Second Burbank Offering, Ventura Offering, Third San Mateo Offering, Sixth San Mateo  Offering, Eighth San Mateo Offering, and the Ninth San Mateo Offering.

117.    Defendant **Daiwa Capital Markets Europe Ltd.,** (f/k/a Daiwa Securities SMBC Europe Limited) ("Daiwa"), is an investment banking firm that provides equity, fixed income, investment banking, derivatives, and strategic advisory services.  The firm also underwrites and manages new issues, and carries out trading and sales of secondary securities.  Daiwa was an underwriter in the First Vallejo Offering, Third Vallejo Offering, Contra Costa Offering, Second

34

Burbank Offering, Ventura Offering, Fifth San Mateo Offering, and the Eighth San Mateo Offering.

118.    Defendant **Fortis Securities, LLC** ("Fortis") is an integrated financial services provider engaged in providing business support services. Fortis was an underwriter in the Second Vallejo Offering, Third Vallejo Offering, Second Burbank Offering, Ventura Offering, and the Eighth San Mateo Offering.

119.    Defendant **Harris Nesbitt** ("Harris Nesbitt"), based in New York City, is an investment bank that provides investment, underwriting, and corporate banking services. Harris Nesbitt acted as an underwriter in the First Vallejo Offering, Second Zenith Offering, and the Third Zenith Offering.

120.    Defendant **HSBC Securities (USA) Inc**. ("HSBC"), based in New York City, is an investment banking firm. HSBC is a subsidiary of HSBC Holdings plc. HSBC was an underwriter in the First Vallejo Offering, Second Vallejo Offering, Auburn Offering, and the Fourth San Mateo Offering.

121.    Defendant **HVB Capital Markets, Inc.** ("HVB"), based in New York City, is a securities broker/dealer. HVB was an underwriter in the Second Vallejo Offering and the Contra Costa Offering.

122.    Defendant **ING Financial Markets, LLC** ("ING"), based in New York City, provides investment banking and corporate financial services. ING is a subsidiary of ING Groep NV. ING was an underwriter in the First Vallejo Offering, Second Vallejo Offering, Third Vallejo Offering, Second Burbank Offering, Ventura Offering, and the Eighth San Mateo Offering.

123.    Defendant **Loop Capital Markets, LLC** ("Loop") offers corporate and public finance, financial advisory, municipal finance, equity research, and securities sales and trading

services.  Loop is based in Chicago, Illinois.  Loop acted as an underwriter for the First San Mateo Offering.

124.    Defendant **Mellon Financial Markets, LLC**, n/k/a BNY Mellon Capital Markets, LLC, ("Mellon"), based in Pittsburgh, Pennsylvania, is an underwriting subsidiary of Mellon Financial Corporation and provides underwriting, trading, and sales services to investors.  Mellon was an underwriter in the Second Vallejo Offering, Third Vallejo Offering, Second Burbank Offering, Ventura Offering, and the Eighth San Mateo Offering.

125.    Defendant **M.R. Beal & Co.**, ("Beal") is a full-service investment banking firm, which includes public finance, corporate debt and equity, fixed-income sales and trading, and financial advisory services.  Beal was an underwriter in the Third Vallejo Offering, Second Burbank Offering, Ventura Offering, First San Mateo Offering, and the Eighth San Mateo Offering.

126.    Defendant **Natixis Bleichroeder Inc.**, ("Natixis") provides securities brokerage, equity trading, and research services to individuals, corporations, and institutional investors.  Natixis offers corporate financial services, including mergers and acquisitions, divestitures and investment advice.  Natixis is headquartered in New York, New York.  Natixis was an underwriter in the Third Vallejo Offering, Second Burbank Offering, Ventura Offering, and the Eighth San Mateo Offering.

127.    Defendant **RBS Greenwich Capital** ("RBS Greenwich"), based in Greenwich, Connecticut, is a securities brokerage firm. Greenwich operates as a subsidiary of Greenwich Capital Holdings, Inc.  Greenwich was an underwriter in the First Vallejo Offering, Second Vallejo Offering, Second Zenith Offering, and the Third Zenith Offering.

128.    Defendant **Santander Investment Securities Inc.** ("Santander"), based in New York City, is a wholly-owned subsidiary of Banco Santander, S.A. Santander provides various

financial services including asset management, brokerage, and corporate finance.  Santander was an underwriter in the First Vallejo Offering and the Second Vallejo Offering.

129.    Defendant **Siebert Capital Markets** ("Siebert"), is a stock discount brokerage firm which trades in municipal bonds, government agency bonds, corporate bonds and equities.  Siebert acted as an underwriter for the First San Mateo Offering.

130.    Defendant **Societe General Corporate & Investment Banking** ("Societe General") provides investment and corporate banking, retail banking, specialized financial services, and global investment management services.  Societe General was an underwriter in the Third Vallejo Offering, Second Burbank Offering, Ventura Offering, and the Eighth San Mateo Offering.

131.    Defendant **SunTrust Robinson Humphrey, Inc.** ("SunTrust"), based in Atlanta, Georgia, is a financial services institution that, through its subsidiaries and divisions, provides commercial and investment banking services and commercial loans to corporate entities. SunTrust is a division of SunTrust Banks.  SunTrust was an underwriter in the First Vallejo Offering, Second Vallejo Offering, Third Vallejo Offering, Contra Costa Offering, Second Burbank Offering, Ventura Offering, Auburn Offering, and the Eighth San Mateo Offering.

132.    Defendant **Wells Fargo Securities, LLC** ("Wells Fargo Securities") is an investment services division of Wells Fargo Bank.  Wells Fargo provides investment banking services in the United States and offers capital markets access through public offerings, private placements, and debt offerings which include new issue underwriting of high-yield bonds and 144A private placements, as well as market-making, research and equity trading.  Wells Fargo also provides advisory services for mergers and acquisitions.  Wells Fargo was an underwriter in the Third Vallejo Offering, Contra Costa Offering, Second Burbank Offering, Ventura Offering, Second San Mateo

Offering, and the Eighth San Mateo Offering.

133.     The Defendants described in ¶¶ 109-132 are referred to collectively as the "Underwriter Defendants."  The Underwriter Defendants are liable for the materially false and misleading statements and/or omissions in the Registration Statements, Prospectuses and Offering Documents that they participated in as underwriters.  In connection with the Offerings detailed in Appendix A, the Underwriters drafted and disseminated the Registration Statements, Prospectuses and other Offering Documents.  For each Offering that a Underwriter Defendant participated in, they were responsible for ensuring the truthfulness and accuracy of statements contained in or incorporated by reference in the Registration Statements, Prospectuses and Offering Documents that were associated with that particular Offering.  The Underwriter Defendants' failure to conduct an adequate due diligence investigation in connection with the Offerings was a substantial factor leading to Plaintiffs' harm.

### 5.     <u>Additional Individual Defendant</u>

134.     Defendant **<u>Mrs. Kathleen Fuld</u>** ("Mrs. Fuld") during the Relevant Period was, and still is, the wife of Defendant Richard Fuld.  Following the demise and bankruptcy, Mr. Fuld transferred a luxury home in Jupiter Island, Florida, purchased originally for $13.75 million, for consideration of $100.00.

### 6.     <u>Unnamed Additional Parties</u>

135.     Lehman and its broker/dealer subsidiary, Lehman Brothers, Inc. ("LBI"), were involved as sellers, offerors, and solicitors of the Securities to the Plaintiffs.  Lehman is in bankruptcy and direct claims against the Company are stayed under bankruptcy law.  LBI is in liquidation under the Securities Investor Protection Act of 1970, as amended (the "SIPA"), and

claims against it are stayed by court order.  But for Lehman's bankruptcy filing and LBI's SIPA proceedings, both Lehman and LBI would have been named as defendants by Plaintiffs in this action.

### 7.    Unnamed Participants

136.    Numerous individuals and entities participated actively during the course of and in furtherance of the conspiracy and concealed such information from the public.  There was a conspiracy and many acts were done in the course of and in furtherance of the conspiracy by statements, conduct, and intent to defraud.  The individuals and entities acted in concert by joint ventures and by acting as agents for principles, in order to advance the objectives of the conspiracy. The acts were intended to promote the conspiratorial objectives.

## III.    JURISDICTION AND VENUE

137.    In connection with the acts alleged herein, Defendants used the means of and instrumentalities of interstate commerce, including, but not limited to, the U.S. mails, interstate telephone communications, and the facilities of national securities exchanges.

138.    Each Plaintiff originally filed this action in the Superior Court of the State of California, in and for the District of San Francisco.[3]  Certain of the Defendants removed the actions to the Federal District Court in the Southern District of New York to be coordinated for pretrial purposes with multi-district proceedings, Master Docket No. 09-MD-2017 (LAK) and each plaintiff thereafter filed an amended complaint.[4]  Pursuant to Pre-Trial Order No. 23 (Docket Number 502),

---

[3]  Auburn filed its original complaint on February 19, 2009; Burbank filed its original complaint on February 18, 2009; Contra Costa filed its original complaint on June 12, 2009; Monterey filed its original complaint on December 1, 2008; Ventura filed its original complaint on February 17, 2009; San Mateo filed its original complaint on November 13, 2008; Vallejo filed its original complaint on May 15, 2009; Zenith filed its original complaint on November 19, 2008.

[4]  Auburn filed its First Amended Complaint on October 7, 2011 (1:09-cv-03474-LAK); Burbank filed its First Amended Complaint on October 7, 2011 (1:09-cv-03475-LAK); Contra Costa filed its First Amended Complaint on October 7, 2011 (1:09-cv-06652-LAK); Monterey filed its First Amended

Plaintiffs file this Consolidated First Amended Complaint.

139.    This Court and the Norther District of California have jurisdiction over the subject matter of this action pursuant to §22 of the 1933 Act, 15 U.S.C. §77v; §27 of the 1934 Act, 15 U.S.C. §78aa; and 28 U.S.C. §1331.

140.    Venue is proper in this District and the Northern District of California pursuant to §22 of the 1933 Act, 15 U.S.C. §77v; §27 of the 1934 Act, 15 U.S.C. §78aa; and 28 U.S.C. §1391(b), (c) and (d).   Many of the acts and transactions described herein, including the preparation and dissemination of materially false and misleading public filings, occurred in this District and the Northern District of California.   During the Relevant Period, Lehman maintained operations and offices in this District.

141.    The case is expected to return to the Northern District of California for trial. Accordingly, while this complaint is filed in the Southern District of New York, it is subject to trial in the Northern District of California.

## IV.    FACTUAL ALLEGATIONS

### A.    Lehman Invested in Massive Portfolios of Risky Residential and Commercial Mortgage Real Estate and Real Estate-Backed Securities

142.    Beginning in the late 1990s, Lehman transformed itself from a conservative investment bank to one of the largest speculators in the real estate market – and Lehman's mortgage related business ultimately comprised its single largest revenue component.

---

Complaint on October 7, 2011 (1:09-cv-01944-LAK); Ventura filed its First Amended Complaint on October 7, 2011 (1:09-cv-03476-LAK); San Mateo filed its First Amended Complaint on August 19, 2011 (1:09-cv-01239-LAK); Vallejo filed its First Amended Complaint on October 7, 2011 (1:09-cv-06040-LAK); Zenith filed its First Amended Complaint on September 23, 2011 (1:09-cv-01238-LAK).

143.    In its securitization business, Lehman pooled vast amounts of mortgages and packaged them into Mortgage Backed Securities, including residential mortgaged-backed securities ("RMBS") and commercial mortgage-backed securities ("CMBS") (collectively "MBS") and marketed them for sale to investors with the assistance of the Underwriters.  Lehman promoted itself as a market leader in securitization transactions, including securitizations on residential and commercial loans and the origination, structuring and underwriting of asset-backed securities. Lehman collected large fees for the structuring, underwriting, and servicing of MBSs.

144.    The mortgages underlying the MBS are highly sensitive to fluctuations in prevailing interest rates.  In general, rising interest rates negatively affect all borrowers, especially those whose interest rates are adjustable.  On the other hand, falling interest rates can also have a negative effect on RMBS backed by fixed-rate residential mortgages because many borrowers choose to refinance, leaving the less credit-worthy borrowers who could not refinance remaining in the mortgage pool.

145.    RMBS and CMBS derive their values from the underlying residential and commercial real estate properties, and thus values of these real-estate related securities are also highly dependent on interest rates.   Lehman originated and packaged countless numbers of ARMs, teaser rate mortgages, and other exotic instruments, including interest-only mortgages, and negative amortization loans, into RMBS.  The aggregate value of Lehman's mortgage and other asset-backed securities ("ABS") totaled $58 billion at the end of 2006, and increased by a whopping 54 percent to over $89.1 billion by year-end 2007, almost four times its $22 billion in shareholder equity.

146.    In order to allay investor concerns regarding Lehman's concentration in real estate and real estate-related assets, Lehman promoted its acumen for managing the risks associated with MBS, claiming that its vertically-integrated mortgage business (*i.e.*, its involvement from loan

origination through securitization) minimized risks associated with holding mortgage-related assets on its balance sheet. In other words, Lehman told the market that it knew and could manage the risks of the mortgages it held because it had originated many of those mortgages. Lehman also misled investors by touting the ability of hedges to mitigate losses from such a concentrated exposure to a class of assets. In reality, Lehman remained poised for failure by focusing so heavily on a real estate industry that was in the midst of collapse.

147.    Non-prime mortgages are categorized as "Sub-prime" and "Alt-A." "Sub-prime" describes residential mortgages to borrowers who do not qualify for prime interest rates because they exhibit one or more of the following characteristics: weakened credit histories typically characterized by payment delinquencies, previous charge-offs, judgments, or bankruptcies; low credit scores; high debt-burden ratios; or high loan-to-value ratios.

148.    "Alt-A," short for Alternative-A, describes residential mortgages to borrowers whose income may not be well documented, or who have credit problems, although their financial circumstances are better than borrowers in the sub-prime category. The term Alt-A is supposed to describe a mortgage that has a risk profile between prime and Sub-prime. However, Lehman's Alt-A portfolio was largely comprised of high-risk loans that did not resemble conventional Alt-A loans and were in fact more similar to Sub-prime loans. When the housing market exploded, the amount of Alt-A lending took off, increasing from less than $20 billion in 2001 to $300 billion in 2006.

149.    In 2003, Lehman acquired a controlling interest in Aurora, a mortgage loan originator based in Colorado. Lehman's acquisition of Aurora was part of its strategy to increase the Company's mortgage and real estate business, and soon Lehman transformed Aurora from a small-loan servicer into a nationwide lending powerhouse in the Alt-A market.

42

150.    In 2004, Lehman acquired BNC Mortgage LLC ("BNC"), a California-based subprime mortgage originator.  Lehman's acquisition of BNC was part of its strategy to increase the Company's presence in the mortgage origination market and also allow for vertical integration of their mortgage securitization businesses.

151.    Lehman's exposure to the non-prime real estate market skyrocketed after the acquisitions of Aurora and BNC.  Lehman's real estate activities, and in particular, the fees generated from the sales of its mortgage-backed securities, helped the Company report record earnings in 2005, 2006 and 2007.  Lehman's Capital Markets business segment, which included its mortgage origination and securitization activities, increased 56% from 2004 to 2006, and by 2006, Lehman had become one of the 10 largest mortgage lenders in the United States and one of the largest issuers of mortgage-backed securities, with a roughly 11% market share.

152.    Though Lehman began tightening its subprime lending operations at BNC in 2006, Lehman actually increased its Alt-A mortgage origination business through Aurora.  As Lehman expanded its Alt-A lending through its Aurora subsidiary, the Alt-A loans Aurora originated began to resemble the more risky subprime loans that Lehman was supposedly exiting by tightening its origination standards at BNC.  Aurora began marketing a product called the "Mortgage Maker," which allowed Aurora's lending to reach borrowers with worse credit quality than those who typically qualified for Alt-A loans.  For example, highly leveraged borrowers with lower credit scores were approved regularly, often without the required documentation of income or assets.  Loans referred to in the mortgage industry as "liar loans," named so because borrowers inflated the numbers or provided no documentation to support their claimed income, became a problem at Aurora, where employees were pressured to approve such loans.

153.    For example, at the end of 2006, while the industry was moving away from originating loans to borrowers with high combined loan-to-value ratios ("CLTV") and on non-owner occupied properties, Aurora was actually gaining considerable share in those areas. Aurora's underwriting guidelines also permitted loans to borrowers with 100% CLTV and a FICO score in the low 600s, which is generally considered to be subprime. By early 2007, Aurora's Mortgage Maker loans accounted for 55% of all loans originated, while its Alt-A originations had dropped to 40%. That is, more than half of the loans Aurora originated were in reality more like subprime than prime, or Alt-A.

154.    Lehman failed to disclose any meaningful information about its Alt-A portfolio until the first quarter of 2008, when Lehman first included a separate line item for Alt-A. Nevertheless, the disclosures remained misleading because Alt-A loans were grouped together with "prime" holdings and it was difficult to discern Lehman's true exposure to Alt-A holdings.

155.    Defendant Callan represented Lehman's ingenuity in managing the risks associated with RMBS during an investor conference on February 6, 2008, stating that Lehman "***didn't look at participating in the residential mortgage market as taking a directional bet one way or the other way***." Comparing Lehman to other investment banks, Defendant Callan stated:

> It doesn't come from Goldman's model of taking a proprietary bet, or Morgan Stanley's model, or even Merrill's model of warehousing a significant amount of product. ***It just comes from a basic focus and philosophy that we really didn't want to go long the product or short the product. We wanted to originate to distribute and we hedged that origination capability***.

156.    According to its 2007 Form 10-K, Lehman originated approximately $60 billion in residential mortgages during 2006 and $47 billion during 2007. Approximately 25 percent of the loans Lehman originated through its subsidiaries were sub-prime or Alt-A loans.

157.    In 2005, Lehman originated approximately $27 billion in commercial mortgages, with that number jumping to $34 billion in 2006 and an astonishing $60 billion in 2007.  In addition to its MBS position of over $76 billion ($39 billion of which related to commercial whole loans and securities), Lehman also held real estate inventory valued at $22 billion at year end 2007, including subprime residential mortgages valued at over $5 billion.  According to a Goldman Sachs analyst, as of March 2008, Lehman had more commercial holdings than any other firm, including over $10 billion more than its nearest competitor, Citigroup, and more than double the holdings of Morgan Stanley, Bear Stearns, and JPMorgan.

158.    In 2007, Lehman continued to invest heavily in the commercial property sector. In May 2007, Lehman partnered with Tishman Speyer to enter an agreement to pay $22.2 billion for a leveraged buyout of Archstone-Smith ("Archstone"), one of the largest owners of apartment buildings in the country.  Despite the fact that the real estate markets were plummeting at the time, Lehman went forward with the deal in October 2007 rather than paying a break-up fee that amounted to a fraction of the purchase price.

**B.    Lehman's Highly Leveraged Business Model Created Unmanageable Liquidity Risk**

159.    Lehman relied on short term debt to fund day-to-day operations and on a daily basis borrowed billions of dollars using repurchase agreements ("repos") as a means of short-term financing.  A typical repurchase agreement – as opposed to a Repo 105 discussed *infra* – is a financing transaction in which a borrower pledges securities as collateral for a short term loan of cash or liquid securities.  The pledged securities remain on the balance sheet as inventory, and the borrower books a liability to recognize the obligation to repurchase the inventory at a later date, typically at a higher price to reflect interest.  A repo is thus broadly similar to a collateralized loan,

45

and as with a collateralized loan, the lender of funds has rights to the borrower's securities over the term of the loan and can sell them if the borrower defaults on its obligation to repurchase.

160.    Repos allow for banks to leverage assets and securities held on the balance sheet – including MBS and real estate-related securities – in exchange for billions in cash.  It is a basic financial premise – known or recklessly disregarded by Defendants – that leverage magnifies gains to a firm and also greatly magnifies losses.  Significant short-term debt obligations place an unrelenting burden on liquidity when a firm faces a crisis.  The dangers of leverage became very apparent after the collapse of Bear Stearns.  In the aftermath of Bear Stearns' collapse, Lehman was widely regarded as the investment bank that was most dependent on repo financing, and thus the most prone to a liquidity crisis.  (Rpt. p. 1406).

161.    Lehman's balance sheet was heavily concentrated in long-term real estate and MBS assets that were illiquid, and decreasing in value by the day.  Contemporaneously, Lehman continued to incur billions in short-term debt liabilities.  This severe unbalance created a maturity mismatch on Lehman's balance sheet, and put an extreme strain on available liquidity when assets began decreasing in value.

162.    Eventually Lehman's counterparties began demanding that Lehman accept "haircuts" on lending arrangements, i.e. Lehman was required to over-collateralize its loans to compensate counterparties for the perceived risk.  Moreover, counterparties in Lehman's lending arrangements began demanding billions in collateral calls.  Lehman relied on these financing arrangements and the Company had no choice but to accept the counterparty haircuts, and agree to crippling collateral calls.

163.    In 2007, various hedge funds with significant exposure to MBS linked to the real estate market collapsed.  Most significantly, two hedge funds run by Bear Stearns Companies Inc. ("Bear Stearns"), which reportedly at one point held $20 billion in MBS and other exotic securities linked to the sub-prime market, collapsed in July 2007.  The collapse of the two Bear Stearns hedge funds led to speculation that Lehman would announce that the Company had greater exposure to Sub-prime mortgages than what was being disclosed, and that Lehman would soon recognize losses on these assets.

164.    While other Wall Street firms decreased their exposure to the real estate market in early 2007, Lehman instead chose to pursue a counter-cyclical business strategy that bet on the real estate market rebounding.  (Rpt. p. 45).  This gamble went against Lehman's risk management policies and ultimately resulted in catastrophic losses and eventually bankruptcy.  At the very time the real estate market was collapsing, and the market for MBS was drying up, Lehman increased its exposure to the real estate market.  In 2007, the aggregate value of Lehman's real estate portfolio grew 54% to a staggering $89.1 billion by year-end 2007.

165.    The decision to disregard risk management policies was not disclosed to the Plaintiffs.  Instead, Lehman continued to represent that the Company was risk averse and financially sound.  On July 18, 2007, Lehman spokesperson Kerrie Cohan stated that the "***rumors regarding [Lehman's] sub-prime exposure are totally unfounded***."

166.    On a September 17, 2007, conference call with analysts to discuss Lehman's quarterly results, Defendant O'Meara said about the mortgage market that "[b]arring any unforseen circumstances, ***we feel that the worst of this credit correction is behind us***.  We have taken significant negative marks across all asset classes this period, and we have taken actions to resize

our mortgage origination platform in-line with what we believe will be a smaller securitization market for the foreseeable future."

167.    On December 13, 2007, Lehman issued a press release filed with the SEC on Form 8-K announcing its financial results for the fourth quarter and full year ending November 30, 2007 ("December 13, 2007 Form 8-K"), which reported full-year earnings of $4.2 billion.

168.    That day, on a conference call with analysts, Defendant O'Meara, the new Global Head of Risk Management, discussed Lehman's record earnings of $4.2 billion:

> More fundamentally, it reflects the *strength of our risk management culture* in terms of *managing our overall risk appetite*, seeking appropriate risk/reward dynamics and exercising *diligence around risk mitigation*. And lastly, it reinforces the importance of our disciplined *liquidity and capital management framework*, which sets us up to operate our business through periods of market stress.

169.    On January 29, 2008, Lehman filed its 2007 Form 10-K with the SEC. That Form 10-K was signed by Defendants Fuld, Callan, Akers, Berlind, Evans, Hernandez, and Kaufman and contained management certifications of Lehman's financial statements and internal controls over financial reporting by the CEO and CFO, as well as the certifications required by SOX signed by Defendants Fuld and Callan. In the 2007 Form 10-K, Lehman reported record net revenue for the 2007 fiscal year of $19 billion, and record net income of $4.2 billion.

170.    On March 18, 2008, Lehman issued a press release filed with the SEC announcing its financial results for the first quarter 2008 ("March 18 Form 8-K"), reporting net revenues of $3.5 billion and net income of $489 million. "Net revenues in the first quarter of fiscal 2008 reflect negative mark to market adjustments of $1.8 billion, net of gains on certain risk mitigation strategies and certain debt liabilities."

171.    In the March 18, 2008 press release, Defendant Fuld stated:

> In what remains a challenging operating environment, our results reflect the value of our continued commitment to building a diversified platform and our focus on **managing risk and maintaining a strong capital and liquidity position**. This strategy has allowed us to support our clients through these difficult and volatile markets, while continuing to build and strengthen our global franchise for our shareholders.

172.    After the March 18, 2008, press release and contemporaneous Lehman statements discussed *infra*, analysts and investors – including the Plaintiffs – were reassured. For example, Oppenheimer noted that "Lehman dispelled all doubts of a solvency crisis at the company." Fox-Pitt Kelton stated that "Mgmt's liquidity disclosures were extensive and comforting, while risk mgmt continues to be strong at Lehman." Punk Ziegel enthusiastically noted:

> In one of the most impressive presentations ever made by a CFO, Erin Callan reviewed all of the critical questions concerning Lehman's position **convincingly arguing that the company was not in financial trouble**. . . . Ms. Callan first demonstrated that Lehman had ample liquidity. . . . The company also indicated that it has raised approximately 2/3rds of the needed funding for the year by March. There was a very detailed discussion of the company's assets and a table provided to demonstrate that the write downs taken were manageable. . . . In sum, **virtually no one listening to this call could have concluded that this company was in financial trouble.**

173.    The investment community responded favorably to Lehman's first quarter results and Defendant Callan's explanations. By the end of the day, March 18, 2008, Lehman common stock rebounded over 46% from its prior day's close to close at $46.49 per share.

174.    Excerpts of an interview of Defendant Callan conducted on March 18, 2008, by Maria Bartiromo of CNBC appeared in *Business Week* on March 31, 2008. Asked whether Lehman would follow Bear Stearns into a fire-sale, Defendant Callan said "***Categorically, no***." Defendant Callan made the case that Bear Stearns had collapsed due to a liquidity situation unique to that company:

| CNBC: | I have a hard time understanding how things could change so fast and furiously for Bear. Can your business really reverse course like that in a 48-hour period, or was that perhaps a situation unique to Bear? |
|---|---|
| Callan: | I think that will be the lingering question about our industry and our business model – and it should be. Liquidity is the thing that will kill you in a moment. It won't necessarily be write downs. We obviously saw huge write downs taken by other members of Bear's peer group, and they raised capital and came back for another day. ***So I think there were a number of factors related to how Bear managed its liquidity that were specific to that organization***. |

## C.    Lehman Continued to Reassure the Market in the Days Before Declaring Bankruptcy

175.    On September 10, 2008, Lehman held an earnings guidance call on short notice and reported a $3.9 billion loss (its largest quarterly loss ever) for the third quarter of 2008, as well as another $7.8 billion in gross write-downs, including $7 billion on its residential and commercial real estate holdings.

176.    Lehman reported its estimated liquidity pool to be $42 billion and on this emergency earnings call, Defendant Fuld positively stated that the "decisions announced today will ***best protect*** the core client franchise, and ***create a very clean***, ***liquid balance sheet***." The decisions presented included exiting large portions of Lehman's commercial real estate holdings or spinning off the unit entirely, reducing residential loan exposures, and raising capital by selling an equity stake in Lehman's IMD.

177.    On the call, Defendant Lowitt seconded Defendant Fuld's positive outlook, asserting: "I'll now provide an update on our ***liquidity position which remains very strong***. . . . We have ***maintained our strong liquidity and capital profiles even in this difficult environment and the potential sale of IMD further improves our capital position***." Lowitt noted further: "Even under the scenario of limited debt issuance capacity in 2009 we anticipate . . . ***Lehman will have ample***

50

*cash capital to sustain its business opportunities*."

178.    On the conference call, Defendant Lowitt also said the firm's recent sales of real estate assets had been "***in and around our marks***."  This created a false impression that Lehman's real estate assets were properly marked-to-market and valued accurately.

179.    On September 10, 2008, Fitch and Dunn & Bradstreet downgraded Lehman's credit rating.  It was clear within the Company that unless Lehman was able to sell portions of its failing real estate business, available liquidity would quickly dry up and the Company would quickly become insolvent.  Lehman failed to disclose the true state of affairs, and instead maintained that Lehman had valued its assets properly, and had sufficient liquidity to weather the protracted financial crisis.

180.    Following the September 10, 2008, conference call, Lehman executives attempted to sell the Company, or at least parts of its commercial holdings to various banks, including Goldman Sachs, Credit Suisse, Barclays, Bank of America, and Merrill Lynch, all of whom ultimately spurned Lehman's overtures.  Each of the banks eventually came to the conclusion that Lehman had grossly overstated its real estate holdings, and that it would be near impossible to sell or find value from these assets.  The Defendants remained stalwart in not disclosing to the Plaintiffs the extent that Lehman's assets were overstated.

181.    On Sunday, September 14, 2008, Lehman's talks with Bank of America and Barclays collapsed after the Federal Reserve said it would not guarantee Lehman's liabilities.  Federal Reserve Chairman Ben Bernanke, who testified before Congress on October 15, 2008, stated that the government could not lend money to Lehman – and thereby prevent its bankruptcy – because the Company lacked sufficient collateral for a government loan.

182.    On Monday, September 15, 2008, Lehman filed for Chapter 11 bankruptcy protection. The filing specifically did not include the Lehman broker-dealer subsidiary, LBI, which was forced into dissolution by the Securities Investor Protection Corporation ("SIPC") four days later.

183.    In stark contrast to Defendant Lowitt's affirmative representations made just days before, Lehman sought bankruptcy protection because, and as subsequently noted in an affidavit by Defendant Lowitt accompanying the bankruptcy petition, Lehman had "**significant liquidity problems**."

### D.    The Bankruptcy Examiner's Report

184.    In conjunction with Lehman's bankruptcy proceeding, the bankruptcy court appointed Anton Valukas as the Examiner to investigate several issues related to the demise of Lehman.  One of these issues was whether there were "colorable claims for breach of fiduciary duties" against the officers and directors of Lehman "arising in connection with the financial condition" of Lehman prior to bankruptcy.  That Order also directed the Examiner to perform the duties specified in Sections 1106(a)(3) and (4) of the Bankruptcy Code, *i.e.,* "file a statement of...any facts ascertained pertaining to fraud, dishonesty, incompetence, misconduct, mismanagement, or irregularity in the management of the affairs of the debtor, or to a cause of action available to the estate."

185.    In response, the Examiner prepared a 2,209 page report containing numerous findings and conclusions on a variety of topics including Lehman's use of Repo 105 transactions to lower the net leverage ratio, Lehman's over-valuation of real estate-related assets, Lehman's liquidity disclosures, Lehman's failure to adhere to Company risk management procedures, and Lehman's failure to make required disclosures of certain concentrations of credit risk.

186.    As part of the investigation the Examiner reviewed more than 5 million documents (primarily e-mails and attachments) comprising more than 40 million pages, and interviewed 250 witnesses.  (Rpt. p. 30-31, 36).  Notably, the Examiner believed he should be held to a higher standard than the "colorable claim" standard under Second Circuit precedent, due to his access to substantial evidence:

> The [Bankruptcy Court's] Order does not contain a definition of what constitutes a "colorable" claim.  The Second Circuit has described colorable claims as ones "that on appropriate proof would support a recovery," "much the same as that undertaken when a defendant moves to dismiss a complaint for failure to state a claim."  **But under such a standard, the Examiner would find colorable clams wherever bare allegations might survive a motion to dismiss**.  Because he has conducted an extensive factual investigation, the Examiner believes it is more appropriate to use a higher threshold standard, and **in this Report a colorable claim is one for which the Examiner has found that there is sufficient credible evidence to support a finding by a trier of fact**.

(Rpt. p. 17).

**E.    Lehman's Use of Repo 105 To Materially Reduce Reported Net Leverage Was Never Disclosed to Plaintiffs**

187.    On August 19, 2001, Lehman, with the assistance of its long-time auditor E&Y, implemented an accounting policy – "Rules of the Road: Repo Recharacterizations (Repo 105) (the "Repo 105 Policy") – to manage its balance sheet metrics.  Upon implementation of the Repo 105 Policy, Lehman began taking advantage of Financial Accounting Standard 140 ("SFAS 140") by treating certain short-term financing transactions as "sales" in order to temporarily remove illiquid assets from the balance sheet, pay down current liabilities, and reduce the Company's net leverage ratio in the days immediately prior to filing public reports with the SEC.  These Repo 105 transactions were then reversed immediately following a reporting period.

188.     In 2006 and 2007, rating agencies began to place an emphasis on total balance sheet and leverage positions, as opposed to profit and loss statements, when making determinations and reporting on the health of an investment bank.  This focus intensified throughout 2007 and into 2008 with the breakdown of the securitization and structured finance markets, especially with regard to investment banks heavily concentrated in distressed real estate assets.  Accordingly, rating agencies and analysts became even more concerned with the quality and quantity of an investment bank's inventory.  In response to this new focus, Lehman struggled to find legitimate ways to shrink its own balance sheet and leverage positions in order to obtain favorable recommendations from analysts and ratings from rating agencies.

189.     Throughout the Relevant Period, Lehman employed Repo 105 transactions to create transitory periods of reduced net leverage in order to falsely portray a sense of financial stability.  Lehman had no legitimate business reason for entering into such transactions, and could have obtained financing through ordinary repurchase agreements in which there is no haircut, or requirement to over-collateralize.  Lehman's only reason for engaging in Repo 105 transactions was to fraudulently mislead the investing public, including Plaintiffs.

### 1.     Lehman's Repo 105 Transactions Were Misleading

190.     In early 2000 the Financial Accounting Standards Board ("FASB"), issued SFAS 140, which states when a company can and cannot recognize a sale of a financial asset based upon whether the company has surrendered "control" over the asset.  (SFAS 140 ¶ 9).  Generally speaking, if a company maintains control of the asset under SFAS 140, then it is treated as a financing.  On the other hand, if a company surrenders control of an asset, the transaction may be accounted for as a sale.

54

191.    SFAS 140 provides, in relevant part, "to maintain effective control, the transferor must have *both* the contractual right and the contractual obligation to reacquire securities that are identical to or substantially the same as those concurrently transferred."  (SFAS 140, ¶ 217). Consistent with SFAS 140, a transferor of securities or assets who has the ability to "fund substantially all of the cost of purchasing the same, or substantially the same, replacement assets," is "considered not to have relinquished control of the assets."

192.    According to Lehman's Accounting Policy for Repo 105 and Repo 108, as updated in September 9, 2006, Lehman structured the transactions such that Lehman would overcollateralize by 5% - 8%, enough to relieve the Company of control over the asset, for purposes of SFAS 140. Thus, Lehman interpreted SFAS 140 to allow repurchase agreements to be treated as sales so long as Lehman sufficiently overcollateralized and did not have the ability to fund the cost of repurchasing the assets.

193.    In addition to the approval of its external auditor, Lehman also needed to obtain a third-party legal opinion – a "true sale opinion" – in order to categorize the repurchase agreements as sales under SFAS 140.  However, as the Repo 105 Policy acknowledged, Lehman "generally [could not] obtain a true sale opinion under U.S. law."  (Rpt. pp. 776, 783).  Therefore, Lehman decided to look to a foreign jurisdiction in order to receive a true sale opinion and conduct Repo 105 transactions.

194.    In March 2001 Lehman approached Linklaters, a United Kingdom law firm, to seek a true sale opinion under English law.  Linklaters issued a true sale opinion, addressed to "Lehman Brothers International (Europe)" ("LBIE"), a United Kingdom affiliate of Lehman.  By the letter's terms, it was intended **solely** for LBIE's benefit (the "Linklaters Letter" or "Letter").  The Letter,

55

effective May 2001, set forth certain circumstances under which, in Linklaters' opinion, LBIE could engage in transactions that could be categorized as sales as opposed to financings. However, the Letter expressly stated that such transactions had to be based in the United Kingdom and subject to English law. (Rpt. pp. 740, 782-85).

195.    The Linklaters Letter **applied only** to transactions between LBIE and counterparties based in the United Kingdom. Beginning in 2001 Lehman transferred billions of dollars of American-based securities from Lehman's American locations to LBIE for use in Repo 105 transactions at the end of each quarter to temporarily, and misleadingly reduce its net leverage ratio. (Rpt.p. 786). This practice was never disclosed to the Plaintiffs.

196.    In the Management's Discussion and Analysis ("MD&A") section of Lehman's 2007 Form 10-K, Lehman described the importance of its net leverage ratio.

> The relationship of assets to equity is one measure of a company's capital adequacy. Generally, this leverage ratio is computed by dividing assets by stockholders' equity. **We believe that a more meaningful, comparative ratio for companies in the securities industry is net leverage**, which is the result of net assets divided by tangible equity capital. Our net leverage ratio is calculated as net assets divided by tangible equity capital.

> (2007 Form 10-K p. 63).

197.    Lehman defined net assets – the numerator for its net leverage ratio – as total assets **less**: (1) cash and securities segregated and on deposit for regulatory and other purposes, (2) collateralized lending agreements, and (3) identifiable intangible assets and goodwill.

198.    Lehman defined tangible equity capital – the denominator – as stockholders' equity and junior subordinated notes **less** identifiable intangible assets and goodwill. *Id.*

56

199.    When properly categorized as "**financings**" under SFAS 140, Lehman's repo transactions increased Lehman's net leverage ratio, because a repurchase agreement is essentially a short term loan.  Specifically, total assets (the numerator) were increased because the securities that were transferred to the repo-counterparty remained on Lehman's balance sheet, and cash was added to the balance sheet to reflect the incoming loan proceeds.  As net assets increased, the tangible equity capital remained the same, causing an overall increase in the net leverage ratio.  (Rpt. pp. 751-54).

200.    When mis-characterized   as "**sales**" under SFAS 140, Lehman's Repo 105 transactions lowered Lehman's net leverage ratio.  Specifically, total assets (the numerator) were reduced because: (1) the securities were removed from Lehman's balance sheet; (2) cash was added to the balance sheet to reflect the incoming loan proceeds; and (3) Lehman immediately used the cash to pay off other short term liabilities, thus removing the cash from the balance sheet.

201.    This final step – using cash to pay off other liabilities – did not occur with regular repos.  Internal e-mails and interviews with Lehman executives gathered from the Examiner's Report demonstrates that "in order for Lehman to realize the benefit to its leverage ratio as a result of Repo 105 transactions, the firm had to use the cash received to pay off a different liability."  (Rpt. p. 733 n.2852).

202.    Tangible equity capital (the denominator) was not affected by the Repo 105 transactions.  Thus, net assets decreased while tangible equity capital remained the same, causing an overall decrease in the net leverage ratio.  (Rpt. pp. 733-34, 738 n.2869, 758-60, 775).

### 2.    Lehman's Financial Condition Deteriorated and the Company Increased the Amount of Repo 105 Transactions

203.    From 2001 until mid-2007, Lehman engaged in a relatively consistent volume of Repo 105 transactions at quarter-end, generally within a range between $20 and $25 billion.  (Rpt. at 762).  For example, in 2002, Lehman had informed E&Y that it intended to utilize approximately $20-$30 billion in Repo 105 transactions.

204.    By 2007 Lehman's financial condition worsened and the Company felt pressure to further reduce leverage.  The majority of Lehman's assets that could be sold to pay off debts and liabilities were locked into long term real estate investments.  De-leveraging using sales proceeds from real estate and mortgage-related assets was problematic for Lehman because of the depressed market for these assets and Lehman would have incurred substantial losses on a number of illiquid inventory positions.  (Rpt. p. 737).  Additionally, if Lehman resorted to selling this inventory at substantial discounts, the prices Lehman received in the open market would reveal the true prices of these assets, and cast substantial doubt on Lehman's internal valuations for these assets, especially the most illiquid, or Level Three, assets.  Since Lehman could not sell the inventory, to reduce leverage, Lehman increasingly relied on Repo 105 transactions as a cheap way to reduce net leverage.

205.    A February 10, 2007, Lehman document titled, "Proposed Repo 105/108 Target Increase for 2007  stated: "Repo 105 offers a low cost way to offset the balance sheet and leverage impact of current market conditions."  "[E]xiting large CMBS positions in Real Estate and sub prime loans in Mortgages before quarter end would incur large losses due to the steep discounts that they would have to be offered at and carry substantial reputation risk in the market. . . . *A Repo 105*

*increase would help avoid this without negatively impacting our leverage ratios*."  (Rpt. p. 738).

206.    Thereafter Lehman dramatically accelerated the use of Repo 105 transactions in 2007 and 2008.  The undisclosed use of Repo 105 transactions allowed Lehman to falsely portray a financially stable image to investors, and helped alleviate concerns from lenders and credit agencies. Internal communications between Lehman employees in 2007 and 2008 illustrates how the Company became accustomed to relying on the misleading use of Repo 105 transactions, rather than sound and transparent business practice:

- <u>November 26, 2007</u>: Four days prior to the close of the 2007 fiscal year, one employee in Lehman's Fixed Income Division ("FID") was searching for ways to meet a balance sheet target and wrote to a colleague in FID: "**Can you imagine what this would be like without 105?**"  (Rpt. p. 744).

- <u>May 21, 2008</u>: Ten days prior to the close of Lehman's second quarter of 2008, Kaushik Amin, head of Liquid Markets within FID, wrote to another Lehman employee: "**Let's max out on the Repo 105 for your stuff and see where we end up**."  When Amin asked for an update on the balance sheet, another employee replied: "**[A]nything that moves is getting 105' d**."  In another email in the same day, Amin stated: "**Do as much as you can in Repo 105**.  Can you find Repo 105 capacity among Japanese counterparties to take US Agencies?" (Rpt. pp. 865-66).

- <u>July 2008</u>: Michael McGarvey, a senior employee in Lehman's Finance Group, emailed a colleague saying he considered **Lehman's Repo 105 program to be balance sheet "window dressing"** that was "**based on legal technicalities**." (Rpt. p. 742).

207.    The Examiner determined, from the fourth quarter 2006 until second quarter 2008, Lehman's Repo 105 usage and its resulting effect on net leverage ratio.

| Period End | Repo 105 Usage | Reported Net Leverage Ratio | What Net Leverage Ratio Should have Been Absent Repo 105 | Difference |
|------------|----------------|------------------------------|-----------------------------------------------------------|------------|
| Q4 2006 | $24.5 Billion | 14.5 | 15.8 | 1.3 (9%) |

| Q1 2007 | $27.3 Billion | 15.4 | 16.8 | 1.4 (9%) |
| Q2 2007 | $31.9 Billion | 15.4 | 16.9 | 1.5 (10%) |
| Q3 2007 | $36.4 Billion | 16.1 | 17.8 | 1.7 (11%) |
| Q4 2007 | $38.6 Billion | 16.1 | 17.8 | 1.7 (11%) |
| Q1 2008 | $49.1 Billion | 15.4 | 17.3 | 1.9 (12%) |
| Q2 2008 | $50.4 Billion | 12.1 | 13.9 | 1.8 (15%) |

208.    These temporary reductions in Lehman's net leverage ratio were directly attributable to Repo 105 transactions.  Lehman represented throughout the Relevant Period that all repurchase agreements were treated as financings, while in fact Lehman treated billions of Repo 105 repurchase agreements as sales.  The effect of this accounting sleight of hand was not disclosed in any Registration Statement, Prospectus, SEC Filing, or any other public disclosure, during the Relevant Period.

209.    The effect of Lehman's Repo 105 transactions created material differences in Lehman's net leverage ratio.  According to E&Y audit walk-through papers for Lehman, materiality is defined as "any item individually, or in the aggregate, that moves net leverage by 0.1 or more (typically $1.8 billion)."  Since 2001, Lehman used Repo 105 transactions to move net leverage not by tenths, but by whole points.  (Rpt. p. 747).

210.    While predating the Examiner's analysis, internal emails uncovered in the Examiner's Report demonstrate that between $10 billion and $25 billion annually in Repo 105 transactions were used between 2001-2007.[5]  Based upon these emails, and financial data from Lehman's annual

---

[5]  From 2001, when Lehman first began using Repo 105 transactions, until early to mid 2007, Lehman engaged in a relatively consistent volume of Repo 105 transactions, including at quarter end, generally within a range of between $20 and $25 billion.  (Rpt. p. 762).  According to the Examiner's interview of John Feraca, Feraca recalled a firm wide range of between $10 billion and $20 billion when

reports (e.g. net assets and tangible equity), the reported net leverage for the fiscal years 2002-2005 was materially understated. Even using the most conservative amount of annual Repo 105 transactions – $10 billion – the effect is still many times greater[6] than what E&Y determined to be material when auditing Lehman's net leverage ratio.

| Period End | Approximate Repo 105 Usage | Reported Net Leverage Ratio | Net Leverage Ratio Absent Repo 105 | Difference | Materiality Multiple |
|---|---|---|---|---|---|
| Year End 2002 | $10 billion | 14.9 | 15.9 | 1.0 (7%) | 10x |
| Year End 2003 | $10 billion | 15.3 | 16.2 | 0.9 (6%) | 9x |
| Year end 2004 | $10 billion | 13.9 | 14.7 | 0.8 (6%) | 8x |
| Year End 2005 | $10 billion | 13.6 | 14.2 | 0.6 (4%) | 6x |

### 3. Bankruptcy Examiner Concluded Repo 105 Transactions Were Material and Should Have Been Disclosed

211. The Examiner concluded that "sufficient evidence exists from which a trier of fact could conclude that Lehman's reported net leverage ratio was materially misleading during [2007 and 2008]." (Rpt. p. 988). Also, the Examiner found that "sufficient evidence exists for a trier of fact to find that Lehman's quarter-end Repo 105 practice was material and should have been disclosed." (Rpt. p. 749; *accord* pp. 962, 987). Based upon these findings, the Examiner concluded that the failure to disclose the impact of the Repo 105 transactions on Lehman's financial statements

Lehman first conceived its Repo 105 program in 2001 and a month end trend between January 2005 and May 2006 of between approximately $11 billion and $21 billion. (Rpt. pp. 762, 890).

[6] The Material Multiple in the table above represents the amount that understatements in leverage caused by Repo 105 transactions surpass E&Y's materiality threshold of 0.1.

materially misrepresented Lehman's true financial position.  *Id.*

212.    Further, there was evidence to support a determination that Lehman was required to disclose the nature and impact of the Repo 105 transactions in the MD&A section of Lehman's Form 10-K.  (Rpt. p. 749).  Thus, the Examiner concluded that there were colorable claims that certain Lehman Executives breached their fiduciary duties by exposing Lehman to potential liability for filing misleading periodic reports.  (Rpt. p. 750).

213.    The Examiner summarized Lehman's Repo 105 policy:

> **Lehman did not disclose**, however, that it had been using an accounting device (known within Lehman as "Repo 105") to manage its balance sheet – by temporarily removing approximately $50 billion of assets from the balance sheet at the end of the first second quarters of 2008 [and $38.6 billion at the end of fiscal 2007].  In an ordinary repo, Lehman raised cash by selling assets with a simultaneous obligation to repurchase them the next day or several days later; such transactions were accounted for as financing, and the assets remained on Lehman's balance sheet. In a Repo 105 transaction, Lehman did exactly the same thing, but because the assets were 105% or more of the cash received, accounting rules purportedly permitted the transactions to be treated as sales rather than financing, so that the assets could be removed from the balance sheet . . .

> Contemporaneous Lehman e-mails describe the "function called repo 105 whereby you can repo a position for a week and it is regarded as a true sale to get rid of net balance sheet."  Lehman used Repo 105 for no articulated business purpose except "to reduce balance sheet at the quarter-end.". . . Lehman's Global Financial Controller confirmed that "**the only purpose or motive for [Repo 105] transactions was reduction in the balance sheet**" and that "**there was no substance to the transactions**."

> **Lehman did not disclose** its use – or the significant magnitude of its use – of Repo 105 to the Government, to the rating agencies, to its investors, or to its own Board of Directors.

(Rpt.p. 6-7)

214.    The Bankruptcy Examiner, after examining witnesses who worked at Lehman, concluded that Lehman had no legitimate business reason to enter into at least certain of these Repo

105 transactions.

- Mitch King, former head of Lehman's United States Agencies trading desk stated that no business purpose existed for Repo 105 transactions other than to reduce Lehman's net balance sheet.  King referred to Lehman's Repo 105 program as a "nuisance."  "There was no reason for me to go out and Repo 105."  King further stated that "[f]rom a trader's perspective, I would have rather never seen anything Repo 105-related.  It was just another thing I had to do that was not a trade and that was not a part of my business.  I would not go out and seek to Repo 105 [i.e., if he wasn't required to by superiors]." (Rpt. p. 869).

- John Feraca, who ran the Secured Funding Desk in Lehman's Prime Services Group, stated: "It was universally accepted throughout the entire institution that Repo 105 was used for balance sheet relief at quarter end."  (Rpt. p. 868).

- Marie Stewart, the former Global Head of Lehman's Accounting Policy Group, described Repo 105 transactions as "a lazy way of managing the balance sheet as opposed to legitimately meeting balance sheet targets at quarter end." (Rpt. p. 869).

- Murtaza Bhallo, the former Business/Risk Manager for Principal Transaction Group ("PTG") Liquid Markets, said that Repo 105 was "an accounting gimmick."  (Rpt. p. 869).

215.    Lehman could have obtained similar financing through less costly means, including the use of ordinary repo transactions with the same repo-lenders, but on terms in which Lehman was not required to over-collateralize; i.e. not post collateral equal to 105% of the loan.  Former Lehman personnel, "**uniformly acknowledged that the overarching goal of Repo 105 transactions was to meet net balance sheet targets** – i.e., reduce the net asset component (the numerator) of the net leverage ratio calculation – in connection with the filing of Lehman's financial statements."  (Rpt. p. 746).  Thus, the Examiner concluded, **"Repo 105 transactions were not used for a business purpose**, but instead for an accounting purpose: to reduce Lehman's publicly reported net leverage and net balance sheet." *Id.*

216.    Since 2001, Lehman omitted any mention of its use of Repo 105 transactions in its public filings.  For example, the Bankruptcy Examiner – who only reviewed the later portion of the Relevant Period, found:

> [E]ven a sophisticated reader of Lehman's financial statements would not have been able to ascertain from Lehman's 2007 Form 10-K or its first and second quarter 2008 Forms 10-Q the amount of Lehman's Repo 105 usage, nor even ascertain the fact that Lehman was engaged in these transactions.

(Rpt.p. 984).

217.    For example, Lehman's 2007 Form 10-K both **omitted** any discussion of the Repo 105 transactions and **affirmatively misrepresented** that all repurchase and resale agreements by Lehman were accounted for as "financings" rather than "sales."  (2007 Form 10-K p. 97).  In truth, only a small fraction of Lehman's repurchase transactions were accounted for as financings.  The remainder – the Repo 105 transactions – were accounted for as sales.  The Examiner concluded that a "trier of fact could find that Lehman **affirmatively misrepresented** its accounting treatment by stating that Lehman treated repo transactions as financing transactions rather than sales for financial purposes, despite the fact that Lehman treated tens of billions of dollars in repo transactions – namely, Repo 105 transactions – as true sales transactions."  (Rpt. p. 962).

218.    These misstatements and omissions began in 2001 and were made consistently throughout the Relevant Period.  (See 2001 10-K at p. 67; 2002 10-K at p. 69; 2003 10-K at p. 76; 2004 10-K at p. 89; 2005 10-K at p. 81; 2006 10-K at p. 85-86; Rpt. p. 974-77).

219.    Lehman also **failed to disclose** that it had an obligation to repurchase tens of billions of dollars in securities that were temporarily transferred to counterparties in the Repo 105 transactions, and the effect this had on Lehman's then-existing financial position and results.  This

should have been disclosed because Lehman was absolutely certain that they were obligated to repurchase its securities used as collateral in the Repo 105 transactions. Not disclosing this obligation violated SEC disclosure rules, directly violated GAAP, and materially misled investors, including the Plaintiffs. These misstatements and omissions began in 2001 and were made consistently throughout the Relevant Period. The Examiner concluded as follows:

> [T]here is sufficient evidence to support a determination that disclosure of the obligation to repurchase the securities and repay the cash borrowing was required in the Management's Discussion and Analysis ("MD&A") section of Lehman's publicly filed financial statements because the repurchase was a known event that was reasonably likely to occur and would have had a material effect on the company's financial condition or results of operations.

(Rpt. p. 749, *accord* pp. 750, 969-71, 988).

220.    The Examiner ultimately concluded that colorable claims existed against several of the Defendants named in this Amended Complaint:

> Lehman's failure to disclose the use of an accounting device to significantly and temporarily lower leverage, at the same time that it affirmatively represented those low" leverage numbers to investors as positive news, created a misleading portrayal of Lehman's true financial health. Colorable claims exist against the senior officers who were responsible for balance sheet management and financial disclosure, who signed and certified Lehman's financial statements and who failed to disclose Lehman's use and extent of Repo 105 transactions to manage its balance sheet.

(Rpt. p. 20, *accord* pp. 747, 963).

221.    More specifically, the Examiner concluded that "**there are colorable claims against Richard Fuld, Jr., Christopher O'Meara, Erin Callan, and Ian Lowitt in connection with their failure to disclose the use of the practice, and against Ernst & Young for its failure to meet professional standards in connection with that lack of disclosure**." (Rpt. p. 23-24, *accord* pp. 750, 990).

222.     Importantly, the Examiner gave the Lehman Defendants and E&Y an opportunity to provide facts and materials that supported their alleged defenses. Each of these defendants provided such materials and alleged defenses, but the Examiner still concluded that colorable claims existed. (Rpt. pp. 24 n.90, 990).

### 4.     Documents and Witness Interviews Confirm Defendants Knew That Repo 105 Transactions Were Materially Misleading

223.     Documents and witness interviews conducted by the Examiner demonstrate that Lehman's use of Repo 105 was orchestrated and executed at the Company's highest levels. Not only did the Officer Defendants fully appreciate how Repo 105 transactions were being used to manipulate Lehman's balance sheet, but they also regularly made decisions about Lehman's use of such transactions in order to improve the Company's standing with analysts, credit ratings agencies and investors.

224.     **Defendant O'Meara**, in his position as CFO, actively managed Lehman's Repo 105 transactions from December 2004 until December 1, 2007, when he became Lehman's head of Global Risk Management. (Rpt. p. 1002). O'Meara was responsible for setting the Repo 105 usage limits or caps, and according to the Examiner, O'Meara had a duty to report "the impact of the [Repo 105] transactions on Lehman's balance sheet and the purpose for engaging in these transactions" to his superiors, including Defendants Fuld, Gregory, Lowitt and Callan. (Rpt. pp. 1002-07).

225.     **Defendant Callan** became Lehman's CFO in December 2007, and received calls as early as January 2008 regarding Lehman's Repo 105 program. Several senior Lehman executives brought Repo 105 transactions to Callan's attention. Callan saw the red flags alerting potential problems arising from Lehman's Repo 105 program, but ignored them before signing Lehman's first

quarter 2008 Form 10-Q.  (Rpt. pp. 1013-15).

226.    **Defendant Lowitt** was familiar with Repo 105 when he became CFO in

June 2008.  (Rpt. pp. 937-45).  According to the Examiner, despite knowledge of Lehman's Repo

105 program, "Lowitt certified Lehman's second quarter 2008 Form 10-Q, exposing Lehman to

potential liability for making material misstatements and omissions in publicly filed financial

statements and MD&A."  (Rpt. pp. 1021-24).

227.    **Defendant Gregory** assisted in setting balance sheet targets for Lehman as of

March 2008.  As a member of Lehman's Executive Committee, Gregory received materials related

to Lehman's use of Repo 105 transactions to manage the balance sheet during a special meeting

requested by McDade on March 28, 2008.  McDade testified that the purpose of the meeting was to

request Gregory's "blessing in freezing Lehman's Repo 105 usage."  (Rpt. pp. 998-99).

228.    **Defendant Fuld** also had knowledge of Repo 105 transactions.  (Rpt. pp. 917-921).

For example, the night before a March 28, 2008 Executive Committee meeting requested by McDade

(Lehman's newly appointed "balance sheet czar") to discuss Lehman's Repo 105 program and to

request Gregory's freezing of the Repo 105 usage, Fuld received an agenda of topics including

"Repo 105/108" and "Delever v Derisk" and a presentation that referenced Lehman's $49.1 billion

quarter end Repo 105 usage for the first quarter 2008.  Additionally, McDade recalled having

specific discussions with Fuld about Lehman's Repo 105 usage in June 2008.  During that

discussion, McDade walked Fuld through Lehman's Balance Sheet and Key Disclosures document,

and discussed with Fuld Lehman's quarter-end Repo 105 usage: $38.6 billion at year-end 2007;

$49.1 billion at 1Q08; and $50.3 billion at 2Q08.  Based upon their conversation, McDade

understood that Fuld "was familiar with the term Repo 105," "knew, at a basic level, that Repo 105

was used in the Firm's bond business" and "understood that [reduction of Repo 105 usage] would put pressure on traders."

229.    Fuld also met regularly, at least twice a week, with Gregory and members of the Executive Committee to discuss the state of the Company.  Based on these facts, as well as the fact that Fuld was admittedly focused on balance sheet and net leverage reduction in 2008, the Examiner concluded that Fuld knew about Repo 105 transactions prior to signing Lehman's 2008 Forms 10-Q. (Rpt. pp. 996-1002).

230.    The Examiner's Report detailed other documents, emails, and conversations with Lehman employees that further corroborate that each of the Officer Defendants knew about the Company's Repo 105 practice throughout the Relevant Period.  For example:

- Martin Kelly ("Kelly"), Lehman's Global Financial Controller, told the Examiner that he expressed concerns to Defendants **Callan** and **Lowitt** when each was serving as Lehman's CFO about: (1) the large volume of Repo 105 transactions undertaken by Lehman; (2) the fact that Repo 105 volume spiked at quarter-end; (3) the technical accounting basis for Lehman recording such transactions as "sales"; (4) the fact that Lehman's peers did not do Repo 105-style transactions; and (5) the reputational risk Lehman faced if its Repo 105 program were to be exposed.  (Rpt. pp. 930-33).

- **Callan** "acknowledge[d] she was aware, as CFO, that Lehman's Repo 105 practice impacted net balance sheet [and] that the transactions had to be routed through Europe." (Rpt. p. 914 n.3505).

- **Lowitt** acknowledged to the Examiner that "he was aware of Lehman's Repo 105 program for many years, that Lehman used the transactions to meet balance sheet targets, that Repo 105 transactions used only liquid inventory, and that Lehman set internal limits on Repo 105 usage but that **Chris O'Meara** was involved with limit setting." *Id.*

- According to a July 2006 Overview of Repo 105/108 Presentation, Grieb and **O'Meara** were "responsible for setting Lehman's limits" on Repo 105.  (Rpt. p. 938).

68

- According to a July 2006 document: titled "Lehman, Global Balance Sheet Overview of Repo 105 (FID) & 108 (Equities)," "per Chris **O'Meara** and Ed Grieb," "Repo 105 transactions must be executed on a continual basis and remain in force throughout the month. To meet this requirement, the amount outstanding at any time should be maintained at approximately 80% of the amount at month-end." (Rpt.p. 922).

- From April 2008 to September 2008, **O'Meara**, **Callan**, **Lowitt** and others received a "Daily Balance Sheet and Disclosure: Scorecard," as well as daily condensed versions in email form, which contained "frequent references" to Repo 105, including "the daily benefit that Repo 105 transactions provided to Lehman's balance sheet." (Rpt. p. 928).

- In August 2007, **O'Meara** was involved in unsuccessful efforts to use RMBS and CMBS in Repo 105 transactions. Kentaro Umezaki ("Umezaki") emailed colleague John Feraca, "not sure that is worth the effort . . .  we need Chris [O'Meara] to opine." (Rpt. p. 1006 n.3840).

- Umezaki emailed **O'Meara** on August 17, 2007, stating: "John Feraca is working on Repo 105 for our IG mortgage and real estate assets to reduce our Q3 balance sheet . . . He will test the waters a bit in London with one counterparty." (Rpt. p. 796 n. 3050).

- Ryan Traversari, Lehman's Senior Vice President of Financial Reporting, emailed **O'Meara** in May 2008 regarding Repo 105, stating that Citigroup and JPMorgan "likely do not do Repo 105 and Repo 108 which are UK-based specific transactions on opinions received by LEH from Linklaters. This would be another reason why LEH's daily balance sheet is larger intra-month then at month-end." (Rpt. pp. 739-40 n.2872).

- On June 17, 2008, Gerard Reilly provided **O'Meara**, **Lowitt**, McDade and Morton a document entitled "Balance Sheet and Key Disclosures," "that incorporated McDade's plan to reduce Lehman's firm-wide Repo 105 usage by half -from $50 billion to $25 billion in third quarter 2008."  (Rpt. p. 819).

231.    The Examiner stated the following with respect to intentional conduct of Defendants:

The Examiner has investigated Lehman's use of Repo 105 transactions and has concluded that the balance sheet manipulation was ***intentional, for deceptive appearances***, had a material impact on Lehman's net leverage ratio, and, because Lehman did not disclose the accounting treatment of these transactions, rendered Lehman's Forms 10-K and 10-Q (financial statements and MD&A) deceptive and misleading.

(Rpt. p. 912 n.3497).

232. The Examiner further concluded that sufficient evidence exists to support a finding that Defendants Fuld, O'Meara, Callan and Lowitt were "at least *grossly negligent* in causing Lehman to file deficient and misleading periodic reports that failed to disclose the firm's use of Repo 105 transactions." (Rpt. p. 994).

233. Also, as alleged below, the Examiner found that sufficient evidence existed to support "at least three colorable claims" against E&Y arising from its repeated "failure to follow professional standards of care" with respect to Repo 105 transactions. (Rpt. pp. 1027, 1032-33).

**5. Investors, Like the Plaintiffs, Relied On and Were Misled by Lehman's Disclosures and Omissions Regarding Repo 105**

234. Since the inception of Repo 105 in 2001, Lehman made misrepresentations regarding its net leverage ratio in its: (1) Registration Statements Prospectuses and Offering Documents; (2) SEC Filings; (3) press releases; and (4) investor conference calls. The Examiner noted that misrepresentations occurred "particularly during the run-up to an equity raise." (Rpt. p. 986). The Examiner noted that the "point of these announcements was to indicate to current and potential new shareholders that Lehman was financially healthy and a good investment." *Id.*

235. It is probable, if not certain, that Plaintiffs would not have purchased the subject Lehman Securities absent the misrepresentations and concealment of information in the Offering Documents described above. The same statements described above remained available, material and important to Plaintiffs at all relevant times and substantially influenced each Plaintiff's decision(s) to continue to hold the Lehman Securities following their respective purchase(s). It is probable, if not certain, that the Plaintiffs would not have continued to hold the Lehman Securities absent the

70

misrepresentations and concealment of information in the Offering Documents described above. Indeed, had Plaintiffs been informed of the true financial condition of Lehman with regard to the Company's reported net leverage ratio, or the fact that Ernst & Young's certifications were false in attesting to the accuracy of Lehman's financial statements, including reported net leverage, the Plaintiffs would have immediately sold their respective interests in the Lehman Securities.

**F.    Lehman Overstated Real Estate Assets**

**1.    Lehman's Overstated Assets in Principal Transactions Group**

236.    Lehman's Principal Transactions Group ("PTG") assets were investments in real estate assets that Lehman held for its own account while a developer improved or developed the underlying assets, with the intention of selling the investment after the development or improvement was completed.

237.    The Examiner found that Lehman overstated certain real estate-related assets in its PTG:

> The Examiner determines that there is sufficient evidence to conclude that certain of the Principal Transactions Group ("PTG") real estate were not reasonably valued during [the second and third quarters of 2008].  Furthermore, the Examiner finds sufficient evidence to support a finding that Lehman's valuations of its Archstone bridge equity investment were unreasonable s of the first, second and third quarters of 2008.

> (Rpt. pp. 214-15).

238.    The Examiner concluded that Lehman's "process for valuing its PTG portfolio was systemically flawed because Lehman primarily valued these assets based on whether the development was **proceeding to the project's business plan**, and **not** the price a buyer would pay for the asset," as required by SFAS 157.  (Rpt. pp. 286-88; *accord* 329-49).  Moreover, in 2007, PTG

71

models overvalued PTG assets and did not account for risk. (Rpt. p. 313). In May 2008, at least 1/3 of the PTG assets continued to be valued using outdated and inaccurate pricing models that Lehman employees described as "worthless." (Rpt. pp. 317-18; 322). Lehman's portfolio balance totaled $9.6 billion at the end of fiscal 2007, and this balance was overstated by a material amount throughout at least 2007 and 2008. (Rpt. p. 289). This conclusion is supported by Lehman's difficulty in finding a willing buyer to purchase its PTG assets, and the prominent role those difficulties had in contributing to Lehman's bankruptcy. In fact, several potential buyers specifically cited the overvaluation of Lehman's real estate-related assets when deciding not to buy the Company or certain Company assets.

### 2. Lehman's Overstated Archstone Valuations

239.    Archstone, a publicly traded Real Estate Investment Trust ("REIT"), was among Lehman's largest commercial real estate investments when it was purchased for $22.2 billion in May of 2007.

240.    To value Archstone, Lehman used a discounted cash flow model that determined fair value by discounting future expected cash flows from the investment to present value using Lehman's cost of capital or the yield an investor would require to purchase the investment at the discount rate. This net present value cash flow estimate was based on a variety of assumptions including occupancy rates, rental growth rates, projected income and expenses, exit capitalization rates, and exit value.

241.    However, Lehman failed to consider relevant market information in these assumptions. For example, Lehman used a rental growth rate that was 1.9% to 3.5% higher than third-party projections for apartments within Archstone's primary markets, used net income growth

rates that were 100% higher than the average net income growth rate for apartment REITs over a 15 year period, and failed to consider the lower capitalization rates that were being used for other comparable publicly traded REITs. (Rpt. pp. 424, 429, 464). These overly optimistic assumptions resulted in overstating the value of the Archstone investment.

242.    The Examiner concluded that "evidence supports a finding that Lehman's valuation of $2.165 billion for its Archstone bridge and permanent equity investment was overvalued" by between 9% and 21% at the end of the first quarter of 2008. (Rpt. p. 467). The overstatement was material because, if Lehman had correctly valued the Archstone investment, it would have required a significant write-down, and cut pre-tax income nearly in half for the quarter. For example, if Lehman had taken a write-down of $200 million (9% of the $2.165 billion valuation) in the first quarter of 2008 for the Archstone investment, then: (1) Lehman's mark-to-market write down adjustments for commercial mortgages and related assets *would have increased* by 20%; and (2) the Company's pre-tax income *would have decreased* by 40%.

### 3.    Industry Peers and Governmental Entities Concluded that Lehman's Real Estate Portfolios Were Overstated

243.    In the months leading to bankruptcy, Lehman faced difficulty finding a buyer to save the Company primarily because of the huge hole that the MBS and real estate portfolio left on Lehman's balance sheet. The Federal Reserve asked executives from a group of firms, including Goldman Sachs and Credit Suisse, to value Lehman's massive commercial real estate portfolio and to each consider investing several billion dollars to buy it.

244.    On Saturday, September 13, 2008, Federal Reserve officials met with Merrill Lynch's then-CEO John Thain, other key Wall Street executives and the SEC to discuss the future of

73

Lehman. According to the FCIC Report, "Merrill CEO John Thain told the FCIC that by Saturday morning [September 13, 2008], the group of executives reviewing Lehman's [total] assets had estimated that they were overvalued by anywhere from $15 to $25 billion." As reported in *The Wall Street Journal* on October 6, 2008, the executives almost universally concluded that Lehman's $32.6 billion in commercial real estate holdings were overvalued by as much as 35 percent, or $11.4 billion.

245.    Another potential buyer of Lehman assets, Korea Development Bank ("KDB"), found problems in the tens of billions of dollars of commercial real estate assets sitting on Lehman's balance sheet which had current and future losses. Before KDB would close on the Lehman deal, KDB wanted comfort that the toxic assets would be spun off into a separate entity limiting KDB's exposure. Lehman was unable to and the deal fell through. (Rpt. pp. 668-87).

246.    Likewise, then Treasury Secretary Henry Paulson ("Paulson") expressed concern (related to Lehman's Archstone investment) that Lehman lacked sufficient collateral for a government loan, asserting in an interview with *the New York Times* on October 23, 2008 that the value of Lehman's assets created "a huge hole" on its balance sheet.

247.    The negative reactions by prospective buyers of Lehman's assets illustrate that Lehman's real estate assets were highly overstated. Lehman knowingly or recklessly failed to take timely write-downs on its real estate assets at least as early as 2007, and well into 2008, when the Plaintiffs purchased tens of millions in Lehman's Securities.

/ / /

/ / /

/ / /

74

### 4. Lehman Defendants Had Knowledge of Overstated Real Estate Valuations

248.    Lehman made numerous public representations indicating that the Company had significant pricing visibility for its MBS real estate portfolios, such that Lehman could adequately value those assets on its books.  For example, on March 18, 2008, **Defendant Callan** remarked on the pricing transparency of some of Lehman's mortgage-related securities: "We began to see a lot more transparency in the Alt-A sector late in the quarter, *allowing us to mark positions based on observable prices*, much less use of models."

249.    On June 16, 2008, **Defendant Lowitt** said on the same call that "[a]lthough certain sectors of the markets are currently distressed, there has been recent sales activity in many asset classes, allowing us to benchmark prices.  The strong flows we've seen over the past quarter have *given us very good transparency in the marks we have against our remaining positions*."  Moreover, Lowitt stressed that Lehman sold approximately $11 billion of residential mortgage assets and purchased $6 billion during the quarter, including risky loan types such as Alt-A and sub-prime mortgages, which gave Lehman "*good transparency in our pricing*."

250.    These statements suggest that there was significant pricing transparency for assets on Lehman's balance sheet, including Level Three assets.  However, in truth, the values reflected on Lehman's financial statements at year-end 2007, first quarter 2008, and second quarter 2008 for many of its real estate assets were overstated because they were not appropriately adjusted for risk, were based on faulty assumptions, or were not marked in accordance with Lehman's sales of same or similar assets.

### 5.    Investors, Like the Plaintiffs, Relied On and Were Misled by Lehman's Disclosures and Omissions Regarding Real Estate Valuations

251.    It is probable, if not certain, that Plaintiffs would not have purchased the subject Lehman Securities absent the misrepresentations and concealment of information in the Offering Documents described above. The same statements described above remained available, material and important to Plaintiffs at all relevant times and substantially influenced each Plaintiff's decision(s) to continue to hold the Lehman Securities following their respective purchases. It is probable, if not certain, that the Plaintiffs would not have continued to hold the Lehman Securities absent the misrepresentations and concealment of information in the Offering Documents described above. Indeed, had Plaintiffs been informed of the true financial condition of Lehman with regard to the Company's valuation of real estate assets, or the fact that Ernst & Young's certifications were false in attesting to the accuracy of Lehman's financial statements, including valuations of Lehman's real estate portfolios, the Plaintiffs would have immediately sold their respective interests in the Lehman Securities.

### G.    Lehman's Liquidity Disclosures Were Misleading

252.    Regulation S-K, prescribed under the Securities Act of 1933, required Lehman to disclose in its MD&A any known commitments "that will result in or that are reasonably likely to result in the registrant's liquidity increasing or decreasing in any material way," as well as any off-balance sheet arrangements "that have or are reasonably likely to have a current or future effect on the registrant's financial condition,... results of operations, liquidity, capital expenditures or capital resources that is material to investors." 17 C.F.R. § 229.303(a)(1), (a)(4)(I). GAAP also requires liquidity-related disclosures.

### 1.    Defendants Failed to Disclose the Liquidity Impact of Repo 105

253.    During the Relevant Period, and most often immediately after quarter-end, Lehman repurchased highly liquid securities that had been "sold" in Repo 105 transactions.  Because Lehman was already voluntarily taking at least a 5% haircut on Repo 105 transactions, Lehman was forced to use "the most liquid paper," otherwise the haircut would have been too great.  In fact, Lehman had "intermittent controls in place to ensure that Lehman personnel transferred only liquid securities as part of Repo 105 transactions, as required by Lehman's Repo 105 Accounting Policy."  (Rpt. p. 794 n.3045).  Thus, Lehman had knowledge of known commitments and arrangements in which billions of the Company's most liquid assets were pledged as collateral in order to carry out Repo 105 transactions.

254.    Regulation S-K requires disclosure of known commitments that will materially affect liquidity, and disclosure of off-balance sheet arrangements that are reasonably likely to have a current or future effect on financial condition or liquidity.  Under Regulation S-K, Lehman's disclosures should have included a discussion of the timing and amount of the cash flow accompanying the repayment of the borrowings.  This should have included: (1) the amount of cash available for operations after repayment of the borrowings; (2) the ability or inability to borrow more cash in light of any reductions in debt ratings or deterioration in leverage ratios that might result from the repayment of the borrowings; and (3) the economic substance and purpose of the transactions.  Lehman's public filings during the Relevant Period omitted these disclosures.

255.    In fact, Lehman's 2007 Form 10-K misleadingly claimed that the Company had a "very strong liquidity position," and represented that it "**maintain[ed] a liquidity pool . . . that cover[ed] expected cash outflows for twelve months in a stressed liquidity environment**."

Similarly, since the inception of the Repo 105 policy, Lehman's financial disclosures also stated that Lehman's liquidity pool was sized to cover expected cash outflows associated with certain enumerated items. However Lehman made no disclosures of the Repo 105 transactions that locked up billions of highly liquid assets as collateral and required significant cash outflows soon after quarter end to repurchase the collateral.

256.    Lehman reported the size of its liquidity pool as $34 billion at the end of the first quarter of 2008, $45 billion at the end of the second quarter, and $42 billion at the end of the third quarter of 2008. These numbers were disclosed both to the public and to government regulators such as the SEC and Federal Reserve Bank of New York. (Rpt. pp. 1409-10). Lehman represented that this liquidity pool was unencumbered, liquid and composed of investment grade securities, primarily cash instruments, and government and agency securities. *Id.* Lehman emphasized the easy-to-monetize nature of its liquidity pool – meaning an asset could be monetized within 5 days – to significant repo counterparties and clearing banks, including JPMorgan, Bank of America, and Citibank. (Rpt. p. 1412).

## 2.    Encumbered Assets Were Improperly Included in Lehman's Liquidity Pool

257.    As early as June 2008, Lehman's liquidity disclosures were also false and misleading because Lehman included in its reported liquidity pool assets that were either encumbered or otherwise difficult to monetize. While Lehman internally considered assets that could be monetized within five days to be appropriate for inclusion in the liquidity pool, SEC regulators had conveyed to Lehman that assets in a liquidity pool should be monetizable "within twenty-four hours." (Rpt. p. 1412). Repo counterparties, ratings agencies, and investors alike treat the liquidity pool as a

78

barometer for the health of an investment bank, and Lehman was cognizant of the fact that disclosing an insufficient liquidity pool could scare away sources of critical short term financing. (Rpt. pp. 1413-16).

258. JPMorgan was one of Lehman's largest creditors, and in 2008, after determining that Lehman's MBS and CRE portfolios, as well as securities posted as loan collateral, posed a risk of dropping in value, it informed Lehman that there would be additional haircuts based upon "collateral type, liquidation risk and price risk."[7] (Rpt. pp. 1420-21). This forced Lehman to transfer billions of dollars to JP Morgan to cover its risk-based margin requirements. *Id.*

259. In a September 10, 2008, earnings call, **Defendant Ian Lowitt**, Lehman's Chief Financial Officer, stated that Lehman's liquidity pool was **"strong at $42 billion"** for the quarter, and that through last night the liquidity pool remained **"essentially unchanged at $41 billion."** (Rpt. p. 1457).

260. This statement was misleading because it failed to disclose that approximately $15 billion (37%) of the liquidity pool contained assets pledged as collateral that had a "low" ability to monetize. (Rpt. p. 1459). Additionally, **Lowitt failed to disclose**, that as of the night before the earnings call, the liquidity pool consisted of:

- approximately $4 billion of collateralized loan obligations pledged to JPMorgan;

- $2.7 billion in cash and money market funds pledged to JPMorgan;

- a $2 billion Citibank cash deposit;

- a $500 million Bank of America cash deposit; and

---

[7] This was JPMorgan's "risk based margin." Liquidation risk was to account for one-day price risk volatility for illiquid securities and price risk was an estimate of potential vendor-price overstatement for illiquid securities.

• nearly $1 billion as a collateral deposit with HSBC.

(Rpt. pp. 9, 1458).

261.    Lowitt also **did not disclose** that Lehman and JPMorgan "executed expanded security documentation on the morning of September 10, 2008 before the earnings call," and that "this documentation granted JPMorgan a security interest in practically all Lehman accounts at JPMorgan for all Lehman exposures to JPMorgan." (Rpt. pp. 1458-59). As a result, billions in assets could not be easily monetized and the inclusion of these assets in Lehman's liquidity pool was materially misleading.

262.    A liquidity pool of $41 billion would have been sufficient to allow management to continue operations in the event of a liquidity crisis. However, in the days leading up to Lehman's bankruptcy filing, the available cash in the liquidity pool was quickly drained. On September 10, 2008, only 27% of Lehman's liquidity pool could be monetized and by September 12, 2008, only 7% of the liquidity pool could be monetized. (Rpt. p. 1452). Five days after the earnings call that Defendant Lowitt had stated Lehman's liquidity pool was "strong" and consisted of $41 billion, Lehman filed for the largest chapter 11 bankruptcy protection in history.

### 3.    Lehman Defendants Knowledge of Misleading Liquidity Representations

263.    Internally, Lehman executives were aware of yet recklessly ignored, Lehman's liquidity vulnerabilities and made misstatements and/or omitted material facts to the investigating public and the Plaintiffs. Examples are detailed below.

264.    On May 31, 2007, Roger Nagioff ("Nagioff"), Lehman's then Global Head of FID provided **Defendant Fuld** with an internal stress scenario that identified a possible $3.2 billion loss for the Company, and recommended that Lehman reduce its forward commitments by nearly half,

impose rules on leverage, and develop a framework for limiting and evaluating the leveraged lending business. (Rpt. p. 121).

265. On July 20, 2007, Nagioff emailed **Lowitt**, stating that his co-COO and head of Fixed Income Strategy were "panicky" about Lehman"s liquidity position. Lowitt responded that he was "anxious" about Lehman's liquidity position, and that "[i]f everything goes as badly as it could simultaneously it will be awful." Lowitt added that "the discipline we had post 1998 about funding completely dissipated which adds to the alarm." (Rpt. pp. 124-25).

266. In July 2007, **Defendants Lowitt** and **O'Meara**, together with, Paolo Tonucci ("Tonucci"), Lehman's Global Treasurer, Alex Kirk ("Kirk"), co-COO of FID, and Kentaro Umezaki, Head of Fixed Income Strategy created ALCO to "manage [the firm's] liquidity on a daily, basis." (Rpt. pp. 125-26).

267. On July 30, 2007, ALCO members, including **Defendants Lowitt** and **O'Meara**, exchanged an analysis showing that, contrary to the firm's policy to always have a cash capital surplus of at least $2 billion, Lehman projected large deficits of cash capital. (Rpt. pp. 127-28).

268. On October 5, 2007, **O'Meara** received an email from Tonucci, Lehman's Global Treasurer, stating that Lehman was "looking at being $1-2 [billion] short [in equity] . . . should not really be surprised." (Rpt. p. 135).

269. An internal January 2008 presentation indicated that "[v]ery few of the top financial issuers have been able to escape damage from the sub-prime fallout," and warned that since "a small number of investors account for a large portion of demand [for Lehman issues], liquidity can disappear quite fast."

81

270.    On March 12, 2008, **Callan** received an email from Eric Felder expressing concerns about dealer liquidity and shrinking leverage, and forwarding an email from a Lehman trader that warned that dealers were demanding increased haircuts and refusing to take assignments of any Bear or Lehman trades even if the trades were "in-the-money." Felder told Callan that this was a "very slippery slope," because if dealer liquidity were to "seize up," it could lead to "true disaster." Five days later, Felder warned **Defendants Lowitt** and **Callan** that collapsing equity values eventually would compel Lehman to sell assets, and that distressed prices would create a need for additional capital, forcing further sales. (Rpt. pp. 629-30).

271.    In 2008, several Lehman executives, including the **Officer Defendants**, were fully aware of Lehman's worsening liquidity position and the need for action. An internal talking point memorandum from June 2008 addressing the record $2.8 billion quarterly loss which Lehman announced on June 9, 2008 was produced to the House Committee. In that June 2008 memorandum, the question asked: "Why did we allow ourselves to be so exposed?" The reasons cited for Lehman's exposure included that, "[c]onditions clearly [were] not sustainable. Saw warning signs. Did not move early, fast enough. Not enough discipline in our capital allocation." Also according to that memorandum, the firm had remained in "illiquid asset [origination] too much/too long." **Defendant Callan** nor any other **Officer Defendants** disclosed to the Plaintiffs anything concerning that highly material internal memorandum or any of the concerns expressed herein.

272.    Further evidencing scienter, **Defendants Fuld** and **Gregory** sought to remove – not reward – insiders who voiced concerns about the growing liquidity crisis. In 2007, for example, Fuld and Gregory removed Michael Gelband, head of Lehman's Fixed Income Division, and Madelyn Antoncic because of their opposition to management's growing accumulation of risky and illiquid

investments.

> **4.      Investors, Like the Plaintiffs, Relied On and Were Misled by Lehman's Disclosures and Omissions Regarding Liquidity**

273.    It is probable, if not certain, that Plaintiffs would not have purchased the subject Lehman Securities absent the misrepresentations and concealment of information in the Offering Documents described above. The same statements described above remained available, material and important to Plaintiffs at all relevant times and substantially influenced each Plaintiff's decision(s) to continue to hold the Lehman Securities following their respective purchases. It is probable, if not certain, that the Plaintiffs would not have continued to hold the Lehman Securities absent the misrepresentations and concealment of information in the Offering Documents described above. Indeed, had Plaintiffs been informed of the true financial condition of Lehman with regard to the Company's available liquidity, or the fact that Ernst & Young's certifications were false in attesting to the accuracy of Lehman's financial statements, including representations regarding available liquidity, the Plaintiffs would have immediately sold their respective interests in the Lehman Securities.

> **H.      Lehman Misrepresented Risk Management Practices**

274.    Throughout the Relevant Period, Lehman's public filings contained false and misleading statements concerning Lehman's risk management practices. These included, among other things, statements about Lehman's adherence to risk policies, compliance with internal risk limits, and stress-test procedures. Lehman's statements were material to investors because, as an investment bank, risk management was critical to loss prevention. In particular, Lehman's disregard for its risk policies and procedures enabled the Company to amass billions of dollars of illiquid, risky

assets that were not easy to monetize when Lehman faced a liquidity crisis.

275.    Beginning at least in 2006, Lehman pursued an aggressive growth strategy that caused the Company to assume greater risk.  Lehman shifted from the "moving business" (*i.e.*, moving assets on to investors) to the "storage" business (*i.e.*, making longer-term investments parking the assets on Lehman's own balance sheet).  This expansion strategy focused heavily on acquiring and holding commercial real estate and other real estate assets that entailed far greater risk and less liquidity than Lehman's traditional lines of business.  (Rpt. pp. 413-415).

276.    In SEC filings as far back as 2004 Lehman repeatedly assured investors that it had appropriate risk management policies in place and that the Company monitored and enforced strict adherence to those policies.  For example, Lehman stated that "essential in our approach to risk management is a strong internal control environment with multiple overlapping and reinforcing elements" (included in the 2004 Form 10-K and first quarter 2008 Form 10-Q) and that "***[m]anagement's Finance Committee oversees compliance with policies and limits***" (included in the second and third quarter 2007 Form 10-Qs, 2007 Form 10-K, and first quarter 2008 Form 10-Q). Lehman also stated that "[w]e . . . ensure that appropriate risk mitigants are in place" (included in the second and third quarter 2007 Form 10-Qs), and that "[d]ecisions on approving transactions . . . take into account . . . importantly, the impact any particular transactions under consideration would have on our overall risk appetite" (included in the second and third quarter 2007 Form 10-Qs). These statements were materially misleading because Lehman's risk management framework and risk limits were not followed.  A report from the FCIC noted that Lehman's "[s]enior management regularly disregarded the firm's risk policies and limits."  (FCIC Report p. 177).

277. According to Lehman's 2007 10-K, the Executive Committee – including Fuld (Chair), Gregory, Callan and Lowitt – established Lehman's overall risk limits and risk management policies.

278. Lehman's Risk Committee, which included the Executive Committee and CFO, reviewed "all exposures, position concentrations and risk-taking activities" on a weekly basis, determined "overall risk limits and risk management policies, including establishment of risk tolerance levels," reviewed the firm's "risk exposures, position concentrations and risk-taking activities on a weekly basis, or more frequently as needed," and allocated "the usage of capital to each of our businesses and establishe[d] trading and credit limits with a goal to maintain diversification of our businesses, counterparties and geographic presence."

279. Pursuant to Lehman's policies, the Company disclosed information regarding risk appetite to senior management, creating a weekly "Firm Wide Risk Snapshot" report, which contained "Risk Appetite limits and usage by business unit," and summarized risk metrics including "VaR [Value at Risk] "by business unit and Top Market Risk positions." Additionally, Lehman circulated a "Daily Risk Appetite and VaR Report" to upper management, which included a cover e-mail detailing the firm's overall daily risk appetite and VaR usage figures and the day-over-day change in those figures. The Risk Committee also received the "Firm-Wide Risk Drivers" report, which contained detailed information regarding the firm's aggregated risks, reflected firm-wide risk appetite and VaR usage data, and explanations regarding week-over-week changes in the data. (Rpt. p. 116).

/ / /

/ / /

### 1.    Lehman Regularly Exceeded Internal Risk Limits

280.    Disregarding risk limits was a deliberate decision that Fuld and Gregory made over the objection of members of Lehman's management, including Alex Kirk, then head of Lehman's Credit Business, and Madlyn Antoncic, then Lehman's Chief Risk Officer. (Rpt. p. 101).

281.    Lehman treated its "**risk appetite**" as a soft limit and it was routinely exceeded throughout 2007 and 2008.  The Examiner testified before Congress that "Lehman was in breach of its established risk appetite limits on a persistent basis during the second half of 2007."  Lehman raised its risk appetite limit four times between December 2006 and December 2007, from $2.3 billion to $4.0 billion, and these limits were still consistently exceeded by material amounts.  (Rpt. pp. 49-51, 70-73).

282.    Lehman also established "**concentration limits**," which were designed to ensure that the Company did not take too much risk in a single, undiversified business or area.  However, Lehman routinely and consistently disregarded concentration limits with respect to its commercial real estate and Alt-A portfolios.  (Rpt. pp. 171-75).  For example, Lehman failed to enforce its "single transaction limits," which were meant to ensure that its investments were properly limited and diversified by business line and counterparty.  (Rpt. pp. 50, 73-76).

283.    Also, Lehman failed to consult with its Chief Risk Officer when deciding to acquire its multi-billion dollar stake in Archstone.  According to the FCIC report: "Although [Lehman] has proclaimed that 'Risk Management is at the very core of Lehman's business model,' the Executive Committee simply left its risk officer, Madelyn Antoncic, out of the loop when it made this [Archstone] investment."  (FCIC report p. 176-77).

284.    Lehman also regularly exceeded its "**balance sheet limits**," which were designed to contain the overall risk of the firm and maintain certain financial ratios within the range required by the credit rating agencies. Instead, Lehman decided to exceed those limits. To mitigate the apparent effect of these overages, Lehman used Repo 105 transactions to take assets temporarily off the balance sheet before the ends of reporting periods. (Rpt. pp. 50, 157, 181).

285.    Lehman also made misleading statements concerning "**stress tests**," which were one of Lehman's purported risk controls. Stress tests were supposed to be used to determine the potential financial consequences of an economic shock to the Company's portfolio of real estate assets. Lehman was required by the SEC to conduct regular stress testing. In public filings for 2007 and 2008, Lehman represented that **"[w]e use stress testing to evaluate risks associated with our real estate portfolios**." (Rpt. pp. 66-70).

286.    However, undisclosed to investors, Lehman **excluded many of its most risky principal investments** – including commercial real estate investments, private equity investments, and leveraged loan commitments – from its stress tests in the first half of 2007. (Rpt. p. 69). The Examiner concluded that, because of exclusion of those risky assets, "Lehman's management did not have a regular and systematic means of analyzing the amount of catastrophic loss that the firm could suffer from these increasingly large and illiquid investments." (Rpt. p. 50). In fact, experimental stress tests conducted in 2008 indicated that a large proportion of Lehman's risk resided with real estate and private equity positions that had not been included in its stress test. (Rpt. pp. 50, 66-70).

287.    Lehman also routinely violated its VaR limits. VaR is a statistical measure of potential losses in the fair value of a portfolio due to adverse movement in underlying risk factors,

and was watched by the SEC and market participants to assess the Company's risks. For example, GREG was in breach of its VaR limits every day for nearly one full year, from early October 2007 through September 15, 2008 – the day Lehman declared bankruptcy. Similarly, Lehman's High Yield business repeatedly breached its VaR limits throughout the Relevant Period, including every day from mid-August 2007 through mid-May 2008. Likewise, Lehman's FID repeatedly breached its VaR limits from mid-2007 through May 2008, including every day from mid-October 2007 through mid-May 2008. As a consequence, Lehman breached its firm-wide VaR limit at the very least 44 times from mid-2007 through September 15, 2008. Because Lehman routinely exceeded its VaR limits, the representation that "[a]s part of our risk management control processes, we monitor daily trading net revenues company to reported historical simulation VaR" included in each of the Forms 10-Q and 2007 10-K was materially false and misleading when made. (Rpt. p. 89, n.292; *see generally* Rpt. Appendix 9 comparing risk appetite and VaR usage).

288. In sum, Lehman's disclosures regarding its risk management practices were misleading because they failed to disclose that Lehman routinely exceeded its internal risk limits and they exaggerated the protection afforded to the Company. The lack of risk management enabled Lehman to acquire billions of dollars of risky investments, and become exposed to billions of dollars of losses that it would not have been exposed to had it adhered to its risk management limits.

## 2. Defendants' Knowledge That Risk Limits Were Regularly Exceeded

289. The **Officer Defendants** oversaw the day-to-day management of Lehman's operations. **Defendant Fuld** chaired, and **Defendants Callan**, **Lowitt** and **Gregory** were members of the Company's Executive Committee that was responsible for assessing Lehman's risk exposure and related disclosures. The Executive Committee reviewed "risk exposures, position concentrations

and risk-taking activities on a weekly basis, or more frequently as needed," and "allocate[d] the usage of capital to each of our businesses and establishes trading and credit limits for counterparties." (2007 10-K at p. 69).

290.    During a conference call to investors, **Callan** explained the Executive Committee consisted of thirteen people, including herself and **Fuld**, who met twice a week for two hours at a time and "devote[d] a significant amount of that time to risk." **Callan** stated that the Executive Committee addressed "any risk that passe[d] a certain threshold, any risk that we [thought was] a hot topic" and "anything else during the course of the week that [was] important." Moreover, **Callan** stated that the Executive Committee was "intimately familiar with the risk that we take in all the different areas of our business. And [**Fuld**] in particular . . . keeps very straight lines into the businesses on this topic."

291.    In a July 20, 2007 email from **Lowitt** to **O'Meara**, **Defendant Lowitt** acknowledged that Lehman's liquidity concerns were rooted in a failure to abide by Company risk limits, stating, "In case we ever forget; this is why one has concentration limits and overall portfolio limits. Markets do seize up." (Rpt. p. 178).

292.    According to the Examiner, **O'Meara** was aware that Lehman's principal investments were not considered in Lehman's stress testing. For example, **O'Meara** told the Examiner that Lehman did not even start taking steps to include private equity transactions in its stress tests until 2008. With regard to hedging, according to multiple Lehman executive interviews and internal emails, Lehman senior officers elected not to hedge many of Lehman's assets because of the difficulty and possible repercussions inherent in hedging investments as illiquid as Lehman's. In addition, on October 15, 2007, **O'Meara** informed Lehman's **Board of Directors** that Lehman was

over its firm-wide risk appetite limit.  (Rpt. p. 139-140).

293.    Additionally, **Defendants Fuld, O'Meara, Callan** and **Lowitt** signed quarterly and annual Sarbanes-Oxley certifications during the Relevant Period attesting to their responsibility for and knowledge of disclosure controls and procedures, as defined in Exchange Act Rules 13a-15(e) and 15d-15(e), as well as Lehman's internal control over financial reporting.

294.    The Examiner concluded that "Lehman's management chose to disregard or overrule the firm's risk controls on a regular basis."  Specifically, management knowingly and regularly exceed risk limits with respect to its "concentration limits," "balance sheet limits," VaR limits, and "risk appetite limits."  (Rpt. pp. 49-51).  These regular departures from risk management practices were contrary Lehman's financial statement disclosures, which painted a picture of robust risk management procedures.  Lehman's public filings did not disclose that Lehman's internal risk limits were exceeded.

295.    Those who raised concerns over the Company's risk management were replaced.  For example, both Michael Gelband ("Gelband"), head of Lehman's Fixed income Division, and Madelyn Antoncic ("Antoncic"), Lehman's Chief Risk Officer, were ignored and transferred after they "urged caution" with respect to Lehman's mortgage positions.  Gelband left Lehman's Fixed Income Division in May 2007 to become head of Global Markets after he "balked at taking more risk."  In September 2007, Lehman removed Antoncic as Chief Risk Officer and reassigned her to a government relations position within the Company.

/ / /

/ / /

/ / /

### 3.    Investors, Like the Plaintiffs, Relied On and Were Misled by Lehman's Disclosures and Omissions Regarding Risk Management Practices

296.    It is probable, if not certain, that Plaintiffs would not have purchased the subject Lehman Securities absent the misrepresentations and concealment of information in the Offering Documents described above.  The same statements described above remained available, material and important to Plaintiffs at all relevant times and substantially influenced each Plaintiff's decision(s) to continue to hold the Lehman Securities following their respective purchases.  It is probable, if not certain, that the Plaintiffs would not have continued to hold the Lehman Securities absent the misrepresentations and concealment of information in the Offering Documents described above. Indeed, had Plaintiffs been informed of the true financial condition of Lehman with regard to the Company's adherence to stated risk management practices, or the fact that Ernst & Young's certifications were false in attesting to the accuracy of Lehman's risk management and internal control practices, the Plaintiffs would have immediately sold their respective interests in the Lehman Securities.

### I.    <u>Lehman Failed to Disclose Material Concentrations of Credit Risk</u>

297.    Required disclosures regarding concentrations of credit risk were omitted until the filing of Lehman's second quarter 2008 Form 10-Q on July 10, 2008 – **after the Plaintiffs purchased all of their Lehman Securities** – when Lehman belatedly began to provide certain partial disclosures concerning its commercial mortgage and real estate-related portfolios. Specifically, throughout at least 2007 and 2008, Lehman's public filings failed to adequately or meaningfully disclose the Company's risk concentrations in risky Alt-A loans and Commercial Real Estate ("CRE").

91

### 1. Alt-A Loan Concentration.

298.    Lehman was a leading originator of Alt-A loans.  However, Lehman's public filings did not even include the term Alt-A until the Company filed its first quarter 2008 Form 10-Q, and even then disclosures of Alt-A were misleading.  When Lehman finally began to identify Alt-A holdings in that Form 10-Q, Lehman consolidated its Alt-A holdings with prime holdings into a single category labeled "Alt-A/Prime," notwithstanding less than 7% of Alt-A/Prime holdings actually consisted of "prime" loans.

299.    As discussed above, between 2006 and 2007, Lehman subsidiary Aurora Loan Services ("Aurora") was considered a primary originator of Alt-A loans for Lehman, producing up to $3 billion in Alt-A mortgages a month.  In this same time period, Lehman, through Aurora and other mortgage originators like BNC Mortgage, LLC, Delta Funding Corp., and First Alliance Mortgage Co., became increasingly concentrated in these risky Alt-A loans.  (Rpt. pp. 87-90).

300.    Lehman Senior Vice President in Risk Management, Dimitrios Kritikos ("Kritikos"), stated in an internal January 30, 2007 email, that during the "last 4 months Aurora has originated the **riskiest loans ever**, with every month being riskier than the one before."  (Rpt. p. 88).  Kritikos further made clear that the majority of Lehman's loan originations were, in fact, not truly Alt-A, stating in an internal March 12, 2007 email that "Aurora's product is far from Alt-A anymore.  The traditional Alt-A program is only 40% of Aurora's production . . . my concern is the rest 60% of the production, that has 100% financing in lower FICOs with non-full documentation and/or investment properties."  Lehman's Alt-A lending standards had so deteriorated that loans made pursuant to Aurora's Mortgage Maker were internally referred to as "Alt-B" rather than Alt-A.  (Rpt. p. 88, n.288).

301.    By initially omitting Alt-A holdings altogether, and later grouping Alt-A with prime mortgage-related assets, the **pubic filings did not adequately disclose** Lehman's true exposure to the riskier Alt-A loans, which dwarfed the prime loans, and were experiencing rising delinquencies and defaults throughout 2007 and 2008.  Moreover, Lehman **did not disclose** that it had loosened its lending standards for Alt-A loans such that they were actually more akin to sub-prime than to prime.

302.    A March 2007 internal Lehman analysis entitled "Risk Review: Aurora and BNC February 2007" concluded that "[t]he credit deterioration [in Alt-A] has been almost parallel to the one of the subprime market."  Moreover, Lehman's "Alt-A" originations were particularly risky because Lehman had loosened its lending criteria to reach riskier borrowers.  (*Id.* at n.277.)

### 2.    Lehman Failed to Disclose Material Commercial Real Estate Concentrations

303.    From the end of Lehman's 2006 fiscal year to the end of its 2007 fiscal year, Lehman increased its global real estate assets by more than 90%, from $28.9 billion to $55.2 billion and further increased its exposure to $60.5 billion in the first quarter of 2008.  (Rpt. p. 103).  However, by the summer of 2007, Lehman personnel had already recognized that the market for placing investments backed by commercial real estate (including GREG) was "virtually closed."  (Rpt. p. 128).  Also in May 2007, **O'Meara** expressed "significant concerns" about the "overall size" of Lehman's real estate book and how much of the firm's equity was "tied up" in bridge equity deals.  (Rpt. p. 107).

304.    In between the second quarters of 2006 and 2007, Lehman increased its exposure to commercial real estate bridge equity investments, which the Examiner identified as "potentially

riskier equity pieces of real estate investments." (Rpt. p. 60). From 2006 to 2007 Lehman's CRE bridge equity positions "increased ten-fold, from $116 million to $1.33 billion," and by the second quarter of 2008 Lehman's exposure had more than doubled again, to $3 billion. (Rpt. pp. 103-04). Thus, in only 2 years – and in the midst of a real estate crisis – Lehman had increased its portfolio of risky CRE bridge equity investments by over 2500%.

305.    Nevertheless, Lehman had already committed to financing several large CRE deals that closed in October and November 2007, including the multi-billion dollar Archstone bridge equity deal. Indeed, the Company's involvement in Archstone and several other real estate bridge equity deals was so enormous that it dwarfed Lehman's entire preexisting real estate book. On November 6, 2007, GREG made a presentation to Lehman's Executive Committee that recognized the significant risks inherent in the over-concentration of its global commercial real estate portfolio, stating that "under any circumstance an estimated $15 billion reduction in global balance sheet is warranted," and recommended reducing the global GREG balance sheet from $58 billion to $43.7 billion by March 31, 2008. (Rpt. p. 225). Notwithstanding this instruction, however, by May 31, 2008, GREG's global commercial real estate portfolio remained over-concentrated by approximately $50 billion. (Rpt. p. 226-27).

306.    Furthermore, Lehman's CRE portfolio included high risk PTG investments involving property development projects whose values could be materially affected if the developer failed to perform in accordance with the business plan. Lehman's PTG portfolio was especially risky because it focused on land development projects, which carried more risk than other property types, was concentrated in California and markets that suffered during the U.S real estate crisis, and because Lehman took equity stakes in the developments (approximately 30% as of fiscal 2007 year-end).

(Rpt. p. 301). The PTG balance sheet grew from $6.1 billion in fiscal 2005 to $6.9 billion in fiscal 2006, and then to $9.6 billion in fiscal 2007. These concentrated risks, however, **were never disclosed**. Due to Lehman's heavy concentration of CRE assets, the Company ultimately had to write down its CRE positions by approximately $4 billion from the first quarter to the third quarter of 2008. (Rpt. pp. 301-303).

307.    Eric Felder ("Felder"), co-Head of Lehman's Global Fixed Income Division, stated in a February 20, 2008 email: "I remain concerned as a Lehman shareholder about our resi[dential] and cmbs [commercial mortgage-backed securities] exposure . . . having 18b of tangible equity and 90b in resi[dential] (including alt-a) and cmbs (including bridge equity) scares me." This internal email indicates that at least as early as February 20, 2008, Lehman executives, including the **Lehman Defendants** were aware of the heavy concentration of RMBS – including Alt-A – and CRE on Lehman's balance sheet. (Rpt. p. 629, n.2550).

**3.    Investors, Like the Plaintiffs, Relied On and Were Misled by Lehman's Disclosures and Omissions Regarding Material Concentrations of Credit Risk**

308.    It is probable, if not certain, that Plaintiffs would not have purchased the subject Lehman Securities absent the misrepresentations and concealment of information in the Offering Documents described above. The same statements described above remained available, material and important to Plaintiffs at all relevant times and substantially influenced each Plaintiff's decision(s) to continue to hold the Lehman Securities following their respective purchases. It is probable, if not certain, that the Plaintiffs would not have continued to hold the Lehman Securities absent the misrepresentations and concealment of information in the Offering Documents described above. Indeed, had Plaintiffs been informed of the true financial condition of Lehman with regard to the

Company's material concentrations of credit risk, or the fact that Ernst & Young's certifications were false in attesting to the completeness of Lehman's Financial Statements in disclosing concentrations of credit risk, the Plaintiffs would have immediately sold their respective interests in the Lehman Securities.

J.    **GAAP Violations**

309.    Generally Accepted Accounting Principles ("GAAP") are recognized by the accounting profession as the principles, conventions, rules, and procedures necessary to define accepted accounting practices at a particular time.  GAAP comprises the official standards promulgated by the Financial Accounting Standards Board ("FASB") and American Institute of Certified Public Accountants ("AICPA").  GAAP consists of a hierarchy of authoritative literature. The highest priority is comprised of FASB Statements of Financial Accounting Standards ("SFAS"), followed by FASB Interpretations ("FIN"), Accounting Principles Board Opinions ("APB"), Accounting Research Bulletins ("ARB"), and AICPA Statements of Position ("SOP").  GAAP provides other authoritative pronouncements including, among others, the FASB Concept Statements ("FASCON").

310.    As a publicly traded company, Lehman was required to maintain books and records in sufficient detail to reflect the transactions and assets of the Company, and to prepare financial statements in accordance with GAAP.  Specifically, the Securities Exchange Act of 1934, 15 U.S. § 78m(b)(2) (the "Exchange Act"), requires public companies to:

(A)    make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the issuer; and

(B)    devise and maintain a system of internal accounting controls sufficient to provide reasonable assurance; and ensure

96

i.      transactions are executed in accordance with management's general or specific authorization;

ii.     transactions are recorded as necessary (1) to permit preparation of financial statements in conformity with generally accepted accounting principles or any other criteria applicable to such statements, and (2) to maintain accountability for assets;

iii.    access to assets is permitted only in accordance with management's general or specific authorization; and

iv.     the recorded accountability for assets is compared with the existing assets at reasonable intervals and appropriate action is taken with respect to any differences[.]

311.    SEC Regulation S-X, 17 C.F.R. § 210.4-01(a)(1), states that financial statements filed with the SEC that are not prepared in compliance with GAAP are presumed to be misleading and inaccurate.  Regulation S-X requires that interim financial statements must also comply with GAAP. 17 C.F.R. § 210.10-01(a).

312.    In addition to the requirements of GAAP, Regulation S-K required Lehman to include certain disclosures in the MD&A section of its Forms 10-K and 10-Q.  Regulation S-K states as follows, in relevant part:

Describe any known ***trends or uncertainties*** that have had or that the registrant ***reasonably expects*** will have a material favorable or unfavorable impact on net sales or income from continuing operations. (17 C.F.R. §229.303(a)(3)(ii)).

The discussion and analysis shall focus specifically on material events and ***uncertainties known to management*** that would cause reported financial information not to be necessarily indicative of future operating results or of future financial conditions.  (17 C.F.R. §229.303(a)).

313.    The Company's MD&A in Forms 10-K and 10-Q during the Relevant Period did not adequately disclose the trends or uncertainties (*e.g.*, the temporary effect of Repo 105 transactions on reported net leverage, illiquid market for Lehman's real estate assets, increasing concentrations

of certain assets, stringent collateral calls that decreased liquidity, and Lehman's strained ability to raise capital) leading to, or threatening to lead to, a material change in the Company's financial position.  Throughout the Relevant Period, Lehman failed to book liabilities in regard to obligations to repurchase securities from counterparties in Repo 105 transactions.  These obligations were reasonably certain events that would have had a material impact on Lehman's financial statements, and they were entirely omitted from Lehman's public filings, including the MD&A section.  This was in direct violation of Regulation S-K.

314.    Lehman, with the help of long-time auditor E&Y, violated numerous GAAP provisions relating to, among other things, calculations and disclosures of the net leverage ratio, application of SFAS 140 to Repo 105 transactions, real estate-related asset valuations under SFAS 157, GAAP required disclosures of concentrations of credit risk, and the sufficiency of internal controls.

### 1.    Repo 105 Violated GAAP

315.    During the Relevant Period, several of Lehman's public filings and public statements were false and misleading due to: (1) the improper recording of Repo 105 transactions as sales, (2) affirmative representations that all repo transactions were treated as financings when Repo 105 transactions were treated as sales, (3) the non-disclosure of the aggregate size of Repo 105 transactions, (4) the non-disclosure that Repo 105 transactions occurred most often, and in the largest amounts, immediately prior to the end of the quarter, and (5) the immediate reversal of Repo 105 transactions following quarter end.  As a result of the Repo 105 transactions, Lehman's reports did not fairly present the Company's financial status in accordance with GAAP.

316.     From 2001-2006 Lehman engaged in volumes of Repo 105 transactions generally within a range between $20 and $25 billion.  (Rpt. p. 762).  As Lehman's financial condition worsened in 2006-2007, Repo 105 transactions increased to $50 billion.  E&Y's walk-through papers for the Lehman audit defined as material, "any item that alone or in the aggregate had a one tenth (0.1) of a point impact on firm-wide net leverage ratio (or $1.8 billion)."  (Rpt. p. 964 n.3726).  Thus, throughout the Relevant Period, Lehman engaged in Repo 105 transactions that – by E&Y's definition in its Lehman audit work papers – were many times over the threshold for materiality.

## I.     Lehman's Repo 105 Transactions Failed to Comply with FAS 140

317.     In order to treat a transaction as a sale under SFAS 140 the transferring entity – Lehman – must not retain effective control over the asset.  Under SFAS 140 a transferor maintains effective control over an asset if, *inter alia*, "at all times during the contract term [the transferor] ha[s] obtained cash or other collateral sufficient to **fund substantially all** of the cost of purchasing replacement assets from others."  (SFAS 140 ¶ 49).

318.     In order to properly book Repo 105 transactions as a sale Lehman would need "cash or other collateral" to replace the assets that were exchanged.  Lehman was able to fund substantially all of the cost of exchanged assets because the Company improperly booked the difference between the cash received and securities pledged as an asset.  If the Repo 105 transactions were a "true sale" of assets, then Lehman should have booked a loss.  For example, in a typical Repo 105 transaction, Lehman would receive $100 in cash and "sell" $105 in securities.  If this were a true sale, Lehman should recognize a $5 loss on the sale of securities.  However, as Lehman's internal Repo 105 Accounting Policy explained, the Company would book this $5 difference as a derivative asset.  According to the Repo 105 Policy, this derivative asset represented Lehman's future interest in the

securities that were just "sold," because when it came time to repurchase the securities Lehman would receive $105 in securities for $100 in cash. Since the derivative had a positive fair value of $5, it was booked as an asset under SFAS 133.

319. Because the Company booked a $5 asset under SFAS 133 and received $100 in cash, for each Repo 105 Lehman booked a total $105 increase in assets that mirrored the amount pledged as collateral in a typical Repo 105 transaction. (Rpt. pp. 781-82). Accordingly, Lehman at all times during the term of a Repo 105 retained the ability to fund substantially all of the cost to replace collateral pledged in a Repo 105. Therefore Lehman's approach to treat Repo 105 transactions as sales did not comply with SFAS 140 true sale requirements.

320. Moreover, Lehman's "Repo 105 Accounting Policy Manual" dated December 1, 2004 addressed the "substantially all" requirement and concluded that collateralizations of 105% meet the control criteria such that the transferor (Lehman) retains control. *See* policy manual at http://lehmanreport.jenner.com/docs/DEBTORS/LBEX-DOCID%20647239.pdf (last visited Sept. 15, 2011) ("for purposes of this requirement the transferor is deemed to retain control if the contract is margined within a range of 95-105%"). Accordingly, because its Repo 105 transactions were collateralized at 105%, Lehman would be deemed to retain control of the securities and would be required - by their own internal policy - to record the transactions as financings rather than sales. Still, Lehman accounted for Repo 105 transactions as sales and misrepresented the Company's net leverage.

321. When market pressure forced Lehman to further reduce leverage, Lehman began increasing the amount of Repo 105 transactions. To accomplish this, the Company instituted a new Repo 105 policy whereby control was retained for collateralizations of "less than 105%." (Rpt. App.

17 p. 6).  Thus, for collateralizations of exactly 105%, control was retained under the old policy but relinquished under the new policy.  Lehman never disclosed the existence of either policy, nor the unexplained – and highly suspicious – shift in policy that allowed for an even greater amount of Repo 105 transactions to misleadingly be classified as sales.

### 2.    SFAS 157 Asset Valuations Violated GAAP

322.    SFAS 157 directs a company to classify assets and liabilities into three different hierarchies based upon the reliability and availability of inputs.  (SFAS 157 § 22).  In general, this hierarchy gives the highest priority to Level One assets, where "inputs are quoted prices (unadjusted) in active markets for identical assets or liabilities that the reporting entity has the ability to access at the measurement date."  SFAS 157, ¶ 24.  The value for Level Two assets is determined principally from or corroborated by observable market data by correlation or other means, such as the market prices of mortgage-related assets reflected in mortgage-backed securities indexes.  Level Three assets are valued at management's discretion using internal models instead of objective market data.

323.    In violation of GAAP, Lehman failed to timely and adequately write down the large amount of residential mortgages and mortgage-related assets as their value declined.  Lehman overstated the value of Level Three assets in the Company's financial statements because, (1) Lehman did not take into account what these assets would sell and focused improperly on entry prices, (2) Lehman believed that the exit-prices in the then-existing market were not accurate indicators of value, (3) Lehman valued Level Three assets according to how the asset was proceeding with its business plan, (4) Lehman valued Level Three assets on "gut feelings," and (5) Lehman used overly-optimistic assumptions in exercising its judgment under SFAS 157.  Moreover, Lehman was

required to take into account the relevant market, and what a willing market participant would pay for assets when valuing Level Three Assets, and Lehman failed to do so in violation of SFAS 157.

324.    For example, during the first quarter of 2008, the S&P 500 earnings Index was down 25.9%, yet Lehman remarkably reported a modest write-down of only $200 million on a $6.5 billion portfolio of "other asset-backed securities," of which approximately 25% were rated BB+ and lower, or in other words, rated non-investment grade or speculative. (LBHI First Quarter 2008 10-Q p. 55). Similarly, a $9.4 billion portfolio of corporate equities that was valued according to Lehman's internal methods posted a gain of $722 million in the first quarter of 2008.  Id at 25.

325.    Lehman also failed to disclose that related loss contingencies were reasonably possible, due to the fact that Lehman had engaged in high-risk residential lending practices through Aurora and BNC which resulted in very risky loan portfolios.  According to SFAS 157, the reporting entity must not ignore information about market participant assumptions that are reasonably available.  This includes assumptions about risk, including risk inherent in a particular valuation technique

326.    Finally, Lehman improperly re-categorized large swaths of Level Two assets as Level Three assets.  By improperly categorizing assets as Level Three Lehman avoided writing these assets down, which overstated the value of Lehman's Alt-A assets and inflated certain real estate and mortgage holdings far above what they were eventually sold for shortly thereafter.  For example, during a March 18, 2008 conference call, CFO Erin Callan stated that Lehman suffered a $875 million loss in total Level Three assets.  However, 22 days later the 10-Q reported a $228 million gain in total Level Three assets; a discrepancy of $1.1 billion.  These improper shifts of assets into Level Three allowed Lehman to materially misrepresent the true amount of decline in their distressed

asset portfolios, including Alt-A and commercial real estate holdings.

> **3.    Lehman Failed to Make Required Credit Risk Concentration Disclosures**

327.    GAAP requires disclosure of material risk concentrations.   SFAS No. 107, *Disclosures About Fair Value of Financial Instruments* ("SFAS 107"), as amended by SFAS No. 133, *Accounting for Derivative Instruments and Hedging Activities* ("SFAS 133"), requires disclosure of significant concentrations of credit risk for financial instruments such as loans, including information about the "economic characteristic that identified the concentration."  SFAS 107, ¶ 15A.  Also, FASB Staff Position ("FSP") SOP 94-6-1, *Terms of Loan Products That May Give Rise to a Concentration of Credit Risk* ("FSP SOP 94-6-1"), addresses disclosure requirements for entities that originate, hold, guarantee, service, or invest in loan products whose terms may give rise to a concentration of credit risk.

328.    As discussed *supra*, Lehman's public filings **failed to disclose** adequately or meaningfully the Company's risk concentrations in risky Alt-A loans and CRE in violation of SFAS 107.

> **4.    Lehman Made Misleading Disclosures Regarding the Sufficiency of Internal Controls**

329.    Following the massive Enron and Worldcom frauds, the SEC placed emphasis on the adequacy of a company's internal controls.  Exchange Act Rules 13a-14 and 15d-14 require a company's principal executive officer and principal financial officer to quarterly and annually certify the effectiveness (or deficiencies in the effectiveness) of the company's internal controls.  The company is also required to annually report on the effectiveness of its internal controls over financial reporting.  PCAOB Auditing Standard No. 2, *An Audit of Internal Control Over Financial Reporting*

*Performed in Conjunction with An Audit of Financial Statements.*

330.    In Lehman's 2007 Form 10-K and first and second quarter 2008 Forms 10-Q Lehman falsely represented that the its internal controls over financial reporting were effective.  Moreover, Defendants Fuld, Callan, and Lowitt filed signed certifications attesting that internal controls were effective, allowing Lehman to issue financial statements that were materially misleading in multiple respects as alleged above.  Additionally, Lehman violated GAAP provisions beginning in 2001 by failing to disclose billions in Repo 105 transactions, overstating real estate assets, and failing to disclose certain concentrations of credit.  **Defendants Fuld**, **Callan**, and **Lowitt**, and **E&Y** as Lehman's auditor, each had no reasonable basis to conclude that Lehman's internal controls were effective.

### K.    **E&Y's Violated GAAP and GAAS**

331.    E&Y served as Lehman's outside auditor since at least 2000, and was retained by Lehman to conduct annual audits and quarterly reviews of Lehman's financial statements.  In its position as outside auditor, E&Y was responsible for issuing audit opinions, knowing they would be used, and relied on, by investors - including the Plaintiffs - in evaluating the purchase, sale, or continued holding of Lehman securities.

332.    By virtue of its long history with Lehman, and **Defendant Goldfarb's** history as a former partner with E&Y, E&Y was intimately involved with Lehman's business model, its employees, its services, and its increasing risk exposure by virtue of its real estate-related holdings.  In the course of its audit work, E&Y was required to audit Lehman's management's assessment of the effectiveness of Lehman's internal controls, particularly Lehman's real estate asset valuations and risk exposure as a result of the deterioration of the real estate market.

333.    E&Y, as part of its standard procedures, would have reviewed Lehman's quarterly press releases, which announced Lehman's performance, financial condition, asset valuations, and revenues.  E&Y reviewed drafts of Lehman's filings with the SEC prior to filing, and also attended and made presentations at Board and Audit Committee meetings where E&Y discussed the results of its examinations of Lehman's financial statements.

334.    Each year during the Relevant Period, Lehman provided a clean "unqualified" audit opinion that was included in Lehman's Form 10-Ks.  These audit opinions represented that E&Y conducted the audits in accordance with GAAS and Lehman's financial statements fairly represented the Company's financial position and results of operations in accordance with GAAP.

335.    The central purpose of an audit is to obtain an opinion that the financial statements comply with GAAP.  AIPCA Auditing Standards ("AU") § 722.09.  The auditor has an affirmative duty to plan and perform the audit to obtain reasonable assurance that the financial statements are free of material misstatements, whether by error or fraud.  AU § 110.02.

336.    To obtain such reasonable assurance, the auditor must perform specific procedures required by GAAS and, after performing such procedures, determine if anything has come to its attention that would lead it to believe that the financial statements were not fairly presented in accordance with GAAP.  AU § 722.09.  The audit process requires professional skepticism in order to properly test management's representations so that the auditor has a reasonable basis on which to form an opinion regarding the financial statements.  AU § 332.02.

337.    An auditor must consider both audit risk and materiality in: (1) planning the audit and designing audit procedures; and (2) evaluating the results of the audit in relation to the financial statements as a whole.  AU § 312.12.  The auditor must plan the audit to obtain reasonable assurance

of detecting material misstatements that it believes could be large enough, individually or in the aggregate, to be material to the financial statements.  AU § 312.20.

338.    In performing audit work, an auditor must perform such work in conformity with GAAS, as well as the standard of care established by the AICPA, which includes GAAS's ten Professional Standards of care:

### General Standards

1.    The audit must be performed by a person or persons having adequate technical training and proficiency as an auditor.
2.    In all matters relating to the assignment, independence in mental attitude is to be maintained by the auditor or auditors.
3.    Due professional care is to be exercised in the planning and performance of the audit and the preparation of the report.

### Standards of Field Work

4.    The work is to be adequately planned and assistants, if any, are to be properly supervised.
5.    A sufficient understanding of internal controls is to be obtained to plan the audit and to determine the nature, timing, and extent of tests to be performed.
6.    Sufficient competent evidential matter is to be obtained through inspection, observation, inquires and confirmations to afford a reasonable basis for an opinion regarding the financial statements under audit.

### Standards of Reporting

7.    The report shall state whether the financial statements are presented in accordance with Generally Accepted Accounting Principles.
8.    The report shall identify those circumstances in which such principles have not been consistently observed in the current period in relation to the preceding period.
9.    Informative disclosures in the financial statements are to be regarded as reasonably adequate unless otherwise stated in the report.
10.    The report shall either contain an expression of opinion regarding the financial statements, taken as a whole, or an assertion to the effect than an auditor's name is associated with financial statements, the report should contain a clear-cut indication of the character of the auditor's work, if any, and the degree of responsibility the auditor is taking.

339.    With respect to the E&Y's audit of Lehman, E&Y violated the following principles of GAAS:

    a.    GAAS General Standard No. 3, which requires the auditor to exercise due professional care in the performance of the audit and preparation of the audit report;

    b.    GAAS Reporting Standard No. 1, which requires the audit report to sate whether the financial statements are presented in accordance with GAAP;

    c.    GAAS Field Standard No. 1, and the standards set forth in AU sections 310, 320, 327 and others, by failing to adequately plan its audit and properly supervise the work of assistants so as to establish and carry out procedures reasonably designed to search for and detect the existence of errors and irregularities which would have a material effect upon the financial statements; and

    d.    AU section 316, which requires the auditor to plan and perform its examination of the financial statements with professional skepticism.  In particular, in Lehman's case, there were numerous audit red flags and risk factors that alerted E&Y to the potential for misstatements, and E&Y failed to expand its audit procedures and perform effective audit testing to obtain more reliable, persuasive audit evidence of such significant factors and audit red flags.

### 1.    E&Y's Auditing of Repo 105 Transactions Was Improper

340.    In 2001, Lehman adopted the Repo 105 Policy setting forth its intentions to employ Repo 105 transactions.  Before issuing the Policy, senior Lehman personnel including Kristine Smith ("Smith") discussed the proposed Policy with E&Y Partners Kevin Reilly ("Reilly"), William Schlich ("Schlich"), and Matthew Kurzweil ("Kurzweil").  Thereafter, E&Y approved Lehman's Repo 105 Policy.

341.    E&Y understood that the Repo 105 transactions were, as E&Y's Reilly described it, designed to "manage balance sheet metrics."  As reflected in an August 19, 2001 memo from Lehman's Smith to E&Y's Reilly, Schlich, and Kurzweil, titled "Rules of Road – Repo Recharacterizations (Repo 105)," the Repo 105 transactions gave Lehman the ability to re-

characterize ordinary repo transactions as sales, and allowed for an increased ability to reduce the real estate securities on Lehman's balance sheet.

342.    In October 2002, Lehman's Smith again discussed Repo 105 with E&Y's Reilly, Schlich, and Kurzweil at a time when Lehman was considering expanding the transactions to include a related "Repo 107" structure.  At that time, Lehman provided E&Y with a memo reaffirming that Repo 107 transactions were being done for the purpose of "reducing the balance sheet as firm inventory."  Subsequently, Lehman expanded into "Repo 108" transactions, which used equities rather than fixed income securities with a minimum of eight percent over-collateralization.

> **i.**    **Lehman's Use of Repo 105 Raised Numerous Red Flags Throughout the Relevant Period**

343.    On October 3, 2002, Lehman's Smith sent an email to E&Y noting that the Linklaters "true sale" opinion (the "Linklaters Letter" or the "Letter") placed important limits on the use of Repo 105 transactions.  Specifically, her email pointed out that the repurchase transactions must be executed in London and the counterparty must reside in a jurisdiction covered by English law.  The Linklaters Letter specified that Repo 105 transactions **must** involve securities based in the United Kingdom.

344.    E&Y had access to, or was aware of, financial and other information concerning the American-based securities that Lehman was then, and had previously been using.  Nevertheless, E&Y ignored the use of American-based securities, despite internal E&Y guidelines explicitly requiring auditors to consider whether a separate U.S. legal opinion would be required for foreign transactions governed by SFAS 140.  E&Y's guidelines stated: "engagement teams should consider the need to receive a legal opinion in each country in which assets may be originated when auditing

global transfers of financial assets."

345.    In 2006, one of E&Y's auditors, Bharat Jain ("Jain"), reviewed Lehman's Repo 105 Policy and became concerned about Lehman's heavy use of Repo 105 transactions.  In a September 7, 2006 email to his senior manager, Jennifer Jackson ("Jackson"), Jain stated that he would "like to know what is our thought process behind how much of these Lehman should do from [a] reputational risk, etc. perspective.  Are we comparing to other competitors, are we referring to any industry publications, any regulatory guidance, etc.?"

346.    When Jackson received Jain's e-mail, she viewed it as "raising serious risk . . . didn't happen every day . . . I can't think of [another] example off the top of my head where Lehman entered into transactions, and we had a concern around reputational risk."  Thus, it is clear that E&Y auditors were concerned in 2006 that the Repo 105 transactions, if known to the public, could affect Lehman's reputation.  Soon after, Lehman's Repo 105 use dramatically increased.

347.    A Lehman "Balance Sheet Analysis Package" dated February 2008, which was given to E&Y, included a detailed analysis of Repo 105 volume, including a chart showing clear spikes in Repo 105 deals at the end of the third quarter of 2007, year-end 2007, and first quarter of 2008.  This suspicious timing of Repo 105 transactions provided further red flags (or should have) to E&Y that Lehman improperly used Repo 105 in managing its balance sheet.

348.    According to the New York Attorney General, Lehman's Smith and Martin Kelly (Global Financial Controller) testified that they **specifically informed** E&Y's Schlich of the use of American-based securities in Repo 105 transactions in late 2007 or early 2008.  Kelly raised with E&Y (specifically, lead auditors Schlich) several concerns he had about Repo 105, including: (a) Lehman's reliance on the Linklaters "true sale" opinion, coupled with Lehman's inability to obtain

a U.S. legal opinion; (b) Repo 105 transactions utilized American securities in contravention of the

Linklaters Letter; (c) the significant increase in Repo 105 transactions at the end of each quarter; (d)

the fact that the accounting justification for treating the transactions as sales was "form-driven" and

"legalistic"; and (e) the fact that none of Lehman's peer financial institutions appeared to be using

such transactions.  Even after this discussions, E&Y failed to properly advise Lehman concerning

the practice and E&Y continued to accept Lehman's accounting treatment.

### ii.    E&Y Failed to Follow GAAS Standards

349.    With respect to Repo 105, E&Y violated several provisions of GAAS.  E&Y's

knowledge and approval of the Repo 105 program, knowledge that the Repo 105 program began

using American-based securities, the absence of a business purpose for such transactions, the

increased volume of Repo 105 transactions at quarter-end, and the interview with Whistleblower

Lee, among other things, raised various obligations under GAAS that E&Y failed to meet.

Specifically, E&Y violated the following GAAS standards, among others:

a)    E&Y was required to discuss with Lehman's Audit Committee the quality of
Lehman's accounting principles as applied to financial reporting.  AU §
380.11.  This would include discussing, among other things, Lehman's Repo
105 transactions moving $20 billion to $50 billion temporarily off the balance
sheet at quarter-end, and using American-based securities in conjunction with
an overseas "true sale" opinion that could not be obtained in the United
States.  AU § 380.11 states that auditors must discuss accounting policies,
unusual transactions, and the clarity and completeness of the financial
statements with the Audit Committee.  Contrary to that standard, E&Y failed
to properly communicate Lehman's use of Repo 105 transactions to
Lehman's Audit Committee.  Incredibly, E&Y failed to notify the Audit
Committee of Matthew Lee's concerns about Repo 105 even though the
Audit Committee asked E&Y to discuss all of Lee's concerns related to the
financial statements.

b)    Upon learning that: (I) Lehman intended to use Repo 105 transactions to
manage balance sheet metrics; (ii) Lehman's Martin Kelly raised concerns

about Repo 105 transactions to E&Y; and (iii) Lehman's Matthew Lee discussed his concerns about Repo 105 with E&Y, E&Y was then required by GAAS to conduct a bona fide investigation of Repo 105 and inform management and the Audit Committee of the relevant issues. *E.g.*, AU § 316.79. E&Y failed to properly investigate or alert the appropriate level of management.

c)      AU §§ 336 and 9336 address an auditor's use of a legal opinion as evidential matter supporting, for instance, a management assertion that a financial asset transfer meets the "control" criterion in SFAS 140. AU § 9336 states that a legal letter that includes conclusions using certain qualifying language would not provide persuasive evidence that a transfer of financial assets has met the isolation criterion of SFAS 140. Not only was the Linklaters letter replete with qualifying statements, but E&Y knew it was unlikely that other reputable United States Law firms would issue a similar letter and that Lehman had to conduct the Repo 105 transactions through a United Kingdom-based affiliate, LBIE. E&Y failed to consider whether it could rely on the Linklaters opinion letter at all, much less in connection with securities that E&Y knew or should have known were originated in the United States.

### iii.    Bankruptcy Examiner Concluded E&Y Failed To Follow Auditing and Accounting Standards

350.    The Bankruptcy Examiner made several notable conclusions regarding E&Y's involvement in Repo 105. For example:

> The Examiner concludes that sufficient evidence exists to support **colorable claims against Ernst & Young LLP ("Ernst & Young") for professional malpractice arising from Ernst & Young's failure to follow professional standards of care** with respect to communications with Lehman's Audit Committee, investigation of a whistle blower claim, and audits and reviews of Lehman's public filings.
>
> (Rpt. p. 1027; *accord* pp. 17, 21, 23-24, 750, 764, 990, 1036, 1040, 1047, 1049) .

351.    The Examiner provided more specifics, noting that E&Y's wrongdoing dated back to at least 2007:[8]

---

[8] The Plaintiffs' investigation reveals improper employment of and accounting for Repo 105 transactions dating as far back as 2001 – a time period outside the scope of the Examiner's review.

111

The Examiner finds that sufficient evidence to support **at least three colorable claims** that could be asserted against Ernst & Young relating to Lehman's Repo 105 activities and reporting: (1) negligence in connection with the investigation into whistle blower Matthew Lee's claims concerning $50 billion in Repo 105 activities at the end of the **second quarter 2008**, including failing to conduct an adequate inquiry into the allegations prior to the filing of Lehman's Form 10-Q, and failing to properly inform management and the Audit Committee of Lee's allegations; (2) at least with respect to Lehman's **first quarter and second quarter 2008 Forms 10-Q**, if not with respect to earlier filings, negligence by failing to take proper action when Ernst & Young was made aware that the financial information may be materially misleading because of the failure to disclose the effect of the timing and volume of Lehman's Repo 105 activities (which had a material effect on interim financial statement items), and failing to take proper action with respect to materially misleading statements contained in the MD&A sections of the Forms 10-Q for these quarters; and (3) at least with respect to Lehman's **2007 Form 10-K, <u>if not with respect to earlier Forms 10-K</u>**, negligence by failing to take proper action when Ernst & Young was made aware that the financial statement may be materially misleading because of the failure to disclose the effect of the timing and volume of Lehman's Repo 105 activities (which had a material effect on financial statement items), and failing to take proper action with respect to materially misleading statements contained in the MD&A sections of the Form 10-K.

(Rpt. pp. 1032-33, *accord* pp. 1027, 1040, 1044-47).

352.    The Examiner consulted with an industry expert, Gary L. Holstrum, Ph.D, CPA, to assist in the analysis of professional auditing standards.  Dr. Holstrum concurred with the Examiner's conclusion that a valid claim for professional malpractice could be raised against E&Y.

(Rpt. p. 1027 n.3901).

### L.    <u>E&Y's Knowledge That Lehman's Financial Statements Did Not Fairly Present Lehman's Financial Condition</u>

353.    The Examiner found sufficient evidence that E&Y: (1) knew about Lehman's use of Repo 105 transactions; (2) approved Lehman's Repo 105 Policy beginning in 2001; (3) knew that the Policy's purpose was to manage Lehman's balance sheet at the end of each quarter; and (4) was aware of, and approved for the removal of approximately $20-$25 billion in assets from Lehman's

balance sheet during 2001-2007, and $30-$50 billion during 2007-2008.

354.    Additionally, E&Y's internal audit-plan determined that any transaction(s) that misstate the leverage ratio by 0.1 (approximately $1.8 billion), was considered material.  Thus, E&Y was aware or had no reasonable basis to believe that Lehman's financial statements were presented fairly and accurately in accordance with GAAP, and that the Lehman audits were conducted in accordance with GAAS.

355.    Other allegations of E&Y's scienter include:

- E&Y Partner Reilly, before approving the Repo 105 Policy in 2001, knew that it was designed to manage balance sheet metrics.

- E&Y Partners Reilly, Schlich, and Kurzweil knew as of August 19, 2001 that the Repo 105 Policy allowed for re-categorization of repurchase agreements as sales to reduce inventory on the balance sheet.

- E&Y Partners Reilly and Schlich received an email on January 16, 2002 that stated Lehman's intent to utilize $20-$25 billion in Repo 105 transactions to reduce balance sheet inventory.

- An email sent to E&Y on October 3, 2002 informed E&Y auditors that the Linklaters Letter required Lehman's Repo 105 counterparties to be based in the U.K., and that the transactions must use U.K. securities.

- Lehman's Martin Kelly, in late 2007 or early 2008, informed Schlich of the increased volume of the Repo 105 transactions, because of his concerns with the rapid expansion of the Repo 105 program, and the use of securities transferred from the United States.  Kelly and Schlick specifically discussed the fact that Lehman was unable to obtain a true sale opinion under U.S. law for Repo 105 transactions.

- E&Y had extensive access to financial information, including "Balance Sheet Analysis Packages" and "Repo 105 Netting Grids," which detailed the volume of Repo 105 transactions and the increase in Repo 105 transactions at the end of each quarter.

- On September 7, 2006, E&Y auditor Jain emailed E&Y senior manager Jennifer Jackson, who both expressed concern that Lehman's use of Repo 105 transactions could lead to reputational risk in the market if others knew about the transactions.

113

356.    Many of the red flags that were persistent throughout the Relevant Period mirrored the risk factors E&Y was required to consider according to AU §316, Fraud in a Financial Statement Audit, including:

- Unusually rapid growth or profitability, especially compared with that of other companies in the same industry.

- Specific indicators that include a motivation for management to engage in fraudulent financial reporting.

- An excessive interest by management in maintaining or increasing the entity's stock price or earnings trend through the use of unusually aggressive accounting practices.

- A practice by management of committing to analysts, creditors, and other third parties to achieve what appears to be unduly aggressive or clearly unrealistic forecasts.

- Domination of management by a single person or small group without compensating controls such as effective oversight by the board of directors or audit committee.

- Management failing to display an appropriate attitude towards internal controls and the financial reporting process.

- Management setting unduly aggressive financial targets and expectations for operating personnel.

- Significant related-party transactions not in the ordinary course of business or with related entities not audited or audited by another firm.

357.    E&Y was aware or recklessly disregarded the presence of significant and persisting red flags at Lehman.  E&Y was required to investigate these red flags but consistently chose to disregard warning signs that Lehman's financial statements were misleading and not prepared in accordance with GAAP.

/ / /

/ / /

114

### 1.    Repo 105 Whistleblower

358.    On May 16, 2008, Matthew Lee ("Lee"), a Senior Vice President in Lehman's finance division who was responsible for Lehman's Global Balance Sheet and Legal Entity Accounting, sent a letter to Lehman management – including Kelly and **Defendants Callan** and **O'Meara** – identifying possible violations of Lehman's Ethics Code related to accounting/balance sheet issues. Subsequently, Lee prepared another writing addressing additional accounting control issues – including the use of "Repo 105" transactions – which was sent to a Managing Director in Lehman's corporate compliance department.

359.    The letter brought Lehman's fraudulent Repo 105 practice to the direct attention of E&Y and Lehman's Audit Committee.  Shortly after sending his first letter, he was interviewed by Joseph Polizzotto, Lehman's General Counsel, and Elizabeth Rudofker, Head of Corporate Audit. On May 22, 2008, the day after that interview, Lee was terminated without warning.

360.    Approximately two weeks after Lee's termination, *after* he had communicated additional warnings about Repo 105, E&Y was directed by Lehman's Audit Committee to meet with Lee and to report back the results of its investigation of Lee's allegations.  (Rpt. pp. 21, 956). According to Hansen's notes of the interview, Lee again warned E&Y about Lehman's Repo 105 practice including, notably, the enormous volume of Repo 105 activity that Lehman engaged in at quarter-end.  These E&Y notes recounted Lee's allegation that Lehman moved $50 billion of inventory off its balance sheet about a week later.  When interviewed by the Examiner, Hansen specifically recalled conferring with Schlich about Lee's Repo 105 allegations.  However, despite E&Y's contemporaneous notes demonstrating the discussion of Repo 105, Schlich told the Examiner that he did not recall Lee saying anything about Repo 105 transactions during the interview with Lee.

361.    On June 13, 2008, the day after Lee specifically informed E&Y of the $50 billion in Repo 105 transactions that Lehman undertook at the end of the second quarter 2008, E&Y spoke to Lehman's Audit Committee regarding Lee's allegations.  Despite the fact that the Chair of the Audit Committee had clearly stated that he wanted a full and thorough investigation of *every* allegation made by Lee, E&Y **failed to even mention Repo 105**.  (Rpt. pp. 21, 959).  Similarly, on July 8, 2008, when the Audit Committee met with E&Y to review Lehman's 2Q08 financial statements, E&Y again failed to mention Lee's allegations regarding Repo 105, and stated that E&Y would issue an unqualified review report.

362.    Then, on July 22, 2008, at an Audit Committee meeting where Lehman's Head of Corporate Audit made a presentation on the results of the investigation in to Lee's allegations, E&Y again failed to mention Repo 105.  At that meeting, the Audit Committee was told that "[c]orporate audit has largely completed an evaluation of [Lee's] observations in partnership with Financial Control and Ernst & Young."  In subsequent meetings and private executive sessions thereafter, E&Y also did not disclose that Lee made an allegation related to Repo 105 transactions being used to move assets off Lehman's balance sheet at quarter-end.  According to the Chair of the Audit Committee, he would have expected to be told about Lee's Repo 105 allegations.  Another Audit Committee member similarly said that the volume of Lehman's Repo 105 transactions mandated disclosure to the Audit Committee as well as further investigation.

363.    Additionally, despite the directive to investigate every claim raised by Lee, E&Y did not follow up on Lee's allegations or conduct any further inquiry into the Repo 105 transactions. In fact, after E&Y's June 12, 2008 interview of Lee in which he described Lehman's moving $50 billion of inventory off its balance sheet at the end of the second quarter 2008, E&Y did not speak

116

with him again.  Instead, less than four weeks after Schlich and Hansen interviewed Lee, E&Y

signed a Report of Independent Registered Public Accounting Firm for Lehman's 2Q08 10-Q on July

10, 2008, certifying that it was not aware of any material modifications that should be made to

Lehman's financial statements for them to be in conformity with GAAP.  E&Y similarly failed to

amend or correct its most recent audit opinion in the 2007 Annual Report or its report on the First

Quarter 2008 financial statements.

364.    The Examiner concluded "that sufficient evidence exists to support a colorable claim

that":

> Ernst & Young should have made appropriate inquiries of management and
> performed analytical procedures concerning significant transactions that occurred at
> the ends of the quarters in 2008 and analyzed their impact upon the financial
> statements, including the footnotes.  Particularly after Lee alerted Ernst & Young to
> $50 billion in Repo 105 transactions prior to the filing of the second quarter Form 10-
> Q, Ernst & Young should have reported to senior management and the Audit
> Committee that Lehman was using Repo 105 transactions to temporarily and
> artificially reduce balance sheet and its net leverage ratio for reporting purposes,
> without disclosing the practice to the public.
>
> * * *
>
> Ernst & Young knew or should have known that the notes to the financial statements
> were false and misleading because, among other things, those notes describe all repos
> as "financings," which Ernst & Young knew was not the case, and those notes did not
> disclose the Repo 105 transactions.  Ernst & Young has a professional obligation to
> communicate the issue to both senior management and the Audit Committee and to
> recommend corrections of the Form 10-Q, and also to either issue modified review
> reports noting the materially inadequate disclosures, or to withhold its review reports
> altogether.

/ / /

/ / /

/ / /

117

## V.    MATERIAL MISSTATEMENTS AND OMISSIONS

### A.    E&Y's Misstatements

365.    Throughout the Relevant Period, each of Lehman's Annual Reports included E&Y's "Report of Independent Registered Public Accounting Firm," (the "Audit Report"). Each year during the Relevant Period the Audit Reports certified that Lehman's financial results were (1) prepared in accordance with GAAP, (2) fairly presented the financial condition and operations of Lehman in all material respects, and (3) audited in accordance with GAAS.

366.    These reports were false and misleading because E&Y failed to comply with the applicable standards for audit review engagements. E&Y knew of the existence of Repo 105 transactions dating back to 2001 and the material effect that these undisclosed transactions had on Lehman's balance sheet and net leverage numbers. As a result of this knowledge, beginning in 2001, E&Y had no reasonable basis to believe that material modifications should not be made to Lehman's financial statements.

367.    Throughout the Relevant Period E&Y also issued interim reports (the "Interim Reports") that were included in each of Lehman's Forms 10-Q that stated, "[w]e conducted our review in accordance with the standards of the Public Company Accounting Oversight Board," and "[b]ased on our review, we are not aware of any material modifications that should be made to the consolidated financial statements . . . for them to be in conformity with U.S. generally accepted accounting principles."

368.    These reviews were false and misleading because E&Y failed to comply with the applicable standards for review engagements. E&Y knew of the existence of Repo 105 transactions dating back to 2001, and the material effect that these undisclosed transactions had on Lehman's

118

balance sheet and net leverage numbers. As a result of this knowledge, beginning in 2001, E&Y had no reasonable basis to believe that material modifications should not be made to Lehman's financial statements.

369.    In addition to Repo 105 GAAP violations, E&Y also failed to correct any of Lehman's numerous GAAP violations regarding real estate asset valuations, and concentration of credit disclosures. As a result, E&Y had no reasonable basis to believe that Lehman's financial statements were presented fairly and accurately in accordance with GAAP.

370.    Among other provisions of GAAP, E&Y violated AU section 722.18, which states: "If, in performing a review of interim financial information, the accountant becomes aware of information that leads him or her to question whether the interim financial institution to be reported conforms with generally accepted accounting principles, the accountant should make additional inquiries or employ other procedures he or she considers appropriate to provide the limited assurance for a review engagement." E&Y should have made additional inquiries in light of the various red flags made known to it at the time of its quarterly reviews. For example, E&Y was aware of Lehman's increasing Repo 105 usage and E&Y learned of Matthew Lee's concerns about Lehman's increasing use of Repo 105 when E&Y interviewed him on June 12, 2008, yet E&Y disregarded those concerns and signed their second quarter quarterly review report on July 10, 2008.

371.    Throughout the Relevant Period E&Y consented to the incorporation of the Audit Reports and Interim Reports by reference into Lehman's registration statements, including the 2001 Registration Statement, the 2005 Registration, and 2006 Registration Statement, and any amendments, pricing supplements, and/or product supplements incorporated therein. These statements in E&Y's Audit Report and Interim Reports, as incorporated into the Registration

Statements, SEC Filings and Offering Documents, were false and misleading because, contrary to E&Y's representations, Lehman's financial results for the Relevant Period were not prepared in accordance with GAAP, did not fairly present the financial condition and operations of Lehman in all material respects, and they were not audited in accordance with GAAS.

### B. Repo 105 Misstatements

372.    Since 2001, Lehman used Repo 105 transactions to temporarily decrease the amount of the Company's publicly reported net leverage. Lehman failed to disclose the tens of billions of dollars in Repo 105 transactions, including, the accounting treatment for these transactions, the considerable escalation of its total Repo 105 usage in late 2007 and into 2008, that transitory nature of the transactions, or the material impact that these transactions had on the Company's publicly reported net leverage ratio. These material omissions were made consistently and throughout the entirety of the Relevant Period, and rendered each of Lehman's SEC Filings, Registration Statements, and Offering Documents materially false and misleading.

### 1. Repo 105 Misstatements and Omissions in Lehman's Offering Documents

373.    The following public disclosure statements by Lehman, made with E&Y's knowledge and approval, contained false and misleading misrepresentations:

(a)    <u>Forms 10-K</u>: Lehman's Annual Report on Form 10-K for the years 2001 through 2007 failed to reveal the existence of Repo 105 transactions, that certain repurchase transactions were treated as sales, and/or the temporary and material effect that Repo 105 transactions had on Lehman's net leverage. (Rpt. p. 974). Additionally, in the Company's 2007 Form 10-K, it states that Lehman "believe[s] that a **more meaningful, comparative ratio for companies in the securities industry is net leverage**, which is the result of net assets divided by tangible equity capital." This statement is misleading because it affirmatively states that the net leverage ratio is a "more meaningful" ratio, while failing to disclose the material effect of Repo 105 transactions on the ratio.

(b)  Forms 10-Q: Each Form 10-Q Lehman filed from 2001 through the final filing, in the second quarter of 2008, failed to disclose the existence of Repo 105 transactions, that certain repurchase transactions were treated as sales, and/or the temporary and material effect that these transactions had on Lehman's net leverage.  (Rpt. p. 974).

(c)  Sarbanes-Oxley Certifications: As part of the Sarbanes-Oxley Act of 2002, Lehman's CEO (Fuld) and CFO (Callan, Lowitt, O'Meara) were required to attest that for each 10-K and 10-Q issued during the Relevant Period, the financial statements were presented fairly and in accordance with GAAP, and further that each report, "does not contain any untrue statements of a material fact or omit to state a material fact" and that "the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flow of the registrant."  These certifications were false because the financial statements were not fairly presented in accordance with GAAP due to non-disclosure of Repo 105 transactions.

(d)  Press Releases and Form 8-K: Lehman pre-announced the Company's financial results in various press releases that each failed to disclose the existence of Repo 105 transactions, that certain repurchase transactions were treated as sales, and/or the temporary and material effect that these transactions had on Lehman's net leverage.

(e)  Registration Statements: The 2001, 2005 and 2006 Registration Statements, as well as the associated Prospectuses and Offering Documents, each incorporated by reference Lehman's relevant 10-Q and 10-K financial statements, and these financial statements updated the information contained in the prior Registration Statements. Thus, statements in the Registration Statements, Prospectuses, Offering Documents and SEC Filing, regarding leverage, repurchase agreements, and the net leverage ratio, were each, and all, rendered false and misleading throughout the Relevant Period due to: (I) the consistent and systematic omission in the Company's SEC Filings of Repo 105 transactions, (ii) failing to disclose that certain repurchase transactions were treated as sales, and (iii)failing to disclose the nature and resulting effect of Repo 105 transactions.

### 2.  Additional Material Misstatements And Omissions Relating to Repo 105

374.  In addition to the material misstatements and omissions made in Lehman's Registration Statements, SEC Filings, and Offering Documents, the Officer Defendants made a series of materially false and misleading statements during Lehman's quarterly earnings conference calls and investor conferences as detailed below.

**Second Quarter 2007**

375.    On June 12, 2007, Lehman held a conference call to discuss its financial

results for the second quarter of 2007.  During the conference call, **Defendant O'Meara** represented

that Lehman's "net leverage ratio of 15.5 times is right in line with the 15.4 times we had at the end

of the first quarter."  O'Meara's statement was false and misleading because Lehman's net leverage

ratio had been artificially reduced to 15.5 by Lehman's temporary removal of $31.94 billion of assets

through Repo 105 transactions at quarter-end.  Without Repo 105 transactions Lehman's net leverage

ratio for the quarter was 16.9.

**Third Quarter 2007**

376.    On September 18, 2007, Lehman hosted a conference call with analysts

and investors to discuss the Company's third quarter financial results.  During the conference call,

**Defendant O'Meara** stated that Lehman's net leverage ratio was 16.0.  O'Meara failed to disclose

that this ratio was artificially reduced due to $36.40 billion in Repo 105 transactions.  Without Repo

105 transactions Lehman's net leverage ratio was 17.8.

**Fourth Quarter and Fiscal Year 2007**

377.    On December 13, 2007, Lehman hosted a conference call to discuss the

Company's fourth quarter and 2007 fiscal year financial results.  During the conference call,

**Defendant O'Meara** stated that "[w]e ended the quarter with a net leverage ratio of approximately

16.1 times, in line with last quarter."  This statement was false and misleading because O'Meara

failed to disclose that this ratio was artificially reduced due to $38.63 billion in Repo 105

transactions.  Without Repo 105 transactions Lehman's net leverage ratio was 17.8.

### First Quarter 2008

378.    On <u>March 18, 2008</u>, shortly after Bear Steams collapsed, Lehman hosted a conference call to discuss its first quarter 2008 financial results.   During the conference call, **Defendant Callan** stated: "We did, very deliberately, take leverage down for the quarter.  We ended with a net leverage ratio of 15.4 times down from 16.1 at year end."  This statement was materially false and misleading because Callan failed to disclose that Lehman's net leverage ratio for the quarter was actually 17.3, and had only been artificially reduced to 15.4 because Lehman engaged in $49.1 billion of Repo 105 transactions at quarter-end.

### Second Quarter 2008

379.    On <u>June 9, 2008</u>, Lehman held a conference call to discuss preliminary results for the second quarter ended May 31, 2008. **Defendant Callan** affirmatively represented that a large part of the asset reduction in Lehman's net leverage came from selling "less liquid asset categories," including "residential and commercial mortgages and leveraged finance exposures" and that "[o]ur deleveraging was aggressive, as you can see, and is complete."  These statements were materially false and misleading when made because Callan failed to disclose that during the quarter Lehman had removed $50 billion in assets from its balance sheet by using Repo 105 transactions. Moreover, the de-leveraging was far from complete because the Repo 105 transactions shifted highly liquid assets off Lehman's balance sheet, leaving Lehman with an even greater concentration of illiquid assets.  If Lehman had, in fact, sold or otherwise divested itself of the most illiquid assets, it would have signaled that these assets were overstated and forced the Company to record losses for the decline in value of similar assets.

123

380.    On June 9, 2008, Lehman held a conference call to discuss its preliminary

results for second quarter ended May 31, 2008.   When asked by Merrilll Lynch analyst Guy

Moszkowski if Lehman dispensed of its "absolute easiest asset to sell," **Defendant Callan** stated

that the opposite was true and, in fact, that Lehman sold many of its riskier, less-liquid assets during

the quarter.  This statement was false and misleading because Callan failed to disclose Lehman's use

of Repo 105 transactions to temporarily remove highly liquid – not illiquid/sticky – assets from the

firm's balance sheet.

381.    On June 16, 2008, Lehman held a conference call to discuss its second quarter results.

During the conference call, **Defendant Lowitt** stated that "we reduced net leverage from 15.4 times

to 12 times prior to the impact of last week's capital raise . . . Our de-leveraging included a reduction

of assets . . . including residential and commercial mortgages . . ."  This statement was false and

misleading because the net leverage ration would have been 13.9 without $50.9 billion in Repo 105

transactions.

382.    On June 16, 2008, Lehman held a conference call to discuss its second quarter 2008

results.  **Defendant Fuld** stated that "we reduced our gross assets by $147 billion over the quarter,

which exceeded that target that we set," and that "the number of assets that were sold, especially in

the commercial and residential mortgage area [] were the result of our de-leveraging."   These

statements were materially false and misleading because Lehman's net leverage was actually 13.9,

and had only been artificially reduced to 12.1 because Lehman engaged in $50.4 billion of Repo 105

transactions at quarter end.   Moreover, these statements gave investors the false and misleading

impression that Lehman's deleveraging was the result of selling certain assets, including its toxic

residential and commercial mortgage positions, while failing to disclose: (l) Lehman's reliance on

Repo 105 transactions, which generally involved assets that were marketable and liquid; and (2) that Lehman was required to repurchase $50 billion in assets "sold" under Repo 105, and place them back on its balance sheet just days after the quarter-ended.

### Third Quarter 2008

383.    On September 10, 2008, Lehman issued a press release and held a conference call to discuss its preliminary third quarter 2008 financial results.  Lehman estimated a net loss of $3.9 billion, in large part due to gross mark-to-market adjustments of $7.8 billion ($5.6 billion net).  The press release stated that Lehman had a net leverage ratio of 10.6.  During the conference call, **Defendant Fuld** stated, "[w]e ended the quarter with more tangible equity than we started and at a net leverage ratio of 10.6 versus 12.1 at the end of the second quarter," and **Defendant Lowitt** stated that "we ended the third quarter with a capital position and leverage ratio stronger than the second quarter . . . we reduced net leverage to 10.6 times from 12.1 times . . ."  These statements were materially false and misleading because they failed to disclose that Lehman engaged in tens of billions of dollars in Repo 105 transactions at quarter-end to temporarily reduce net leverage.

### C.    Misstatements and Omissions Related to Overstated Values of Real Estate Assets

#### 1.    Real Estate Valuation Misstatements and Omissions in Lehman's Offering Documents

384.    2007 10-K and 2007-2008 10-Qs: In the first quarter of 2007 Lehman elected to "early adopt" SFAS 157.  Lehman represented in its SEC Filings during 2007-2008 that the Company valued the Level Three assets in accordance with GAAP and SFAS 157.  In these 2007-2008 filings, the Company made materially false and misleading statements by overstating the value of real estate assets classified as Level Three assets (including PTG and Archstone), and by

inappropriately classifying assets as Level Three that should have been classified and valued as Level Two assets. These statements were materially false and misleading when made because Lehman did not value assets according to SFAS 157, but valued assets according to internal Company business plans, using unreasonably flawed assumptions, outdated and inaccurate pricing models, and gut feelings. Lehman materially overstated the value of certain Level Three assets despite knowledge and awareness of substantially similar assets being priced in the market at much lower values.

385.    These misstatements and omissions in the SEC Filings were each incorporated by reference into the 2001, 2005 and 2006 Registration Statements, including the Prospectuses and relevant Offering Documents.

## 2.    Additional Real Estate Valuation Misstatements and Omissions

386.    On a March 14, 2007 conference call Lehman announced its financial results for the first quarter of 2007. **Defendant O'Meara** stated that "[subprime delinquencies are] subject to the same hedging principles that we talked bout earlier, and it's been working quite effectively." This statement was false and misleading because O'Meara failed to disclose that Lehman's Alt-A holdings, which included many mortgagors who are closer to subprime, did not have an effective hedge to offset downward trends in value.

387.    On a September 17, 2007 conference call with analysts to discuss Lehman's quarterly results, **Defendant O'Meara** said about the mortgage market that "[b]arring any unforseen circumstances, we feel that the worst of this credit correction is behind us. We have taken significant negative marks across all asset classes this period, and we have taken actions to resize our mortgage origination platform in-line with what we believe will be a smaller securitization market for the foreseeable future." This statement was false and misleading because Lehman had not taken

126

sufficient marks on certain assets, most notably Level Three assets, including PTG assets and the

Archstone bridge equity investments.

388.    On November 14, 2007, **Defendant Lowitt** gave a presentation at the Merrill Lynch

Banking and Financial Services Investor Conference.  **Lowitt** stated that "[w]e've had success in our

hedging and so we don't believe that there will be any requirement for substantial markdowns and

certainly no requirement for us to announce anything.  We're very comfortable with where we are

with regard to that."  This statement is false and misleading because Lowitt failed to disclose that

there was no effective hedge against Alt-A portfolios, and it also failed to disclose that Lehman's

methodology for marking down certain assets did not comply with SFAS 157, because Lehman did

not value assets according to the exit price or what a buyer would pay for them in the market.  At the

time Lowitt made the statement, there was in fact a high likelihood for mark downs on the

Company's real estate portfolio, in particular those classified as  Level Three assets**.**

389.    On a February 6, 2008 conference call, **Defendant Callan** discussed Lehman's mark-

to-market adjustments for the quarter, stating, "we look at the mark to market adjustments as more

temporary in nature, as they reflect mark to market accounting related to the pricing of similar

transactions in a liquidity constrained environment that we're living in and driven by many technical

factors, which may not reflect intrinsic value."  This statement was false and misleading because

Lehman did not appropriately, or accurately mark-to-market its illiquid assets, including PTG, CRE

(including Archstone) and additional Level Three assets.  According to the Examiner, Lehman's

process for valuing its PTG portfolio was systematically flawed because "Lehman primarily valued

these assets based on whether the development was proceeding according to the project's business

plan and not the price a buyer would pay for the asset."  Additionally, valuations for real estate

portfolios including Archstone used incorrect and outdated pricing models and assumptions.

390.     On a March 18, 2008 conference call, **Defendant Callan** discussed the distinction between impairment and mark-to-market adjustments, stating "I just wanted to highlight that [Lehman's mark-down of assets] is under the mark-to-market accounting framework and not necessarily reflective of permanent impairment of the assets." Defendant Callan also remarked on the pricing transparency of some of Lehman's mortgage-related securities: "[W]e began to see a lot more transparency in the Alt-A sector late in the quarter, allowing us to mark positions based on observable prices, much less use of models." These statements were false and misleading because Lehman overstated the values of Level Three assets, including Alt-A mortgages, RMBS backed by Alt-A or subprime mortgages, and Commercial Real Estate assets (e.g. PTG and Archstone). Lehman had no reasonable basis to believe that the mark-down of assets at the time the statement was made were sufficient. Lehman was required yet failed to acknowledge market and risk inputs when deriving a value under SFAS 157. Additionally, Lehman did not gain pricing transparency for its most illiquid Level Three assets. These toxic assets remained on Lehman's balance sheet. Contrary to Callan's representations, Lehman overstated the value of Alt-A holdings and Level Three Assets, as evidenced by statements from Lehman employees, Wall Street Executives, the Federal Reserve Bank of New York, and as ultimately seen by the prices that these assets sold for after Lehman's bankruptcy.

391.     On a June 9, 2008 conference call, **Defendant Callan** discussed mark-to-market adjustments taken by Lehman for the quarter. Callan stated, "It has been suggested we have not sufficiently aggressive in marking our inventory. In fact, I believe our successful hedging performance over the past year has muted the magnitude of our gross markdowns." This statement

is false and misleading because Lehman was overstating the value of inventory, in particular PTG, Archstone, and other Level Three Assets including Alt-A portfolios. Indeed, only three months later Defendant Lowitt stated, the "majority of our write-downs were driven by [an] increase in Alt-A delinquencies and loss expectations which were specific to Alt-A prices and did not effect the performance of our hedges." Additionally, Callan was misleading when stating that hedging was muting the magnitude of Lehman's gross writedowns, as Defendant Lowitt admitted only three months later that, "there is no correct hedge for Alt-A assets as there is in sub-prime with ABX."

392.   On a June 9, 2008 conference call, **Defendant Callan** expressed confidence that enough write-downs were taken because, "the aggregate number is very large that we have taken since Q3 [] last year. So that gives me confidence in the actual accumulated loss across those portfolios, resi[dential] and commercial." This statement was false and misleading, because Lehman still was required to take further asset write-downs under SFAS 157. Lehman's PTG, Archstone and other Level Three assets were still carried at overly-optimistic levels, which was only revealed when Wall Street firms looked into purchasing portions of Lehman, and when Lehman finally went bankrupt. Additionally, Callan stated "I think unquestionably our price visibility we got from these [sale] transactions was tremendous," and the "confidence level about the remaining inventory can only be higher that it was given all that sales activity." This statement was false and misleading because Lehman's "remaining inventory" still included massive volumes of toxic real estate and this inventory was a primary reason – if not, the reason – that no other firm would purchase Lehman's real estate portfolios.

393.   On a June 16, 2008 conference call, **Defendant Fuld** stated, "I am the one who ultimately signs off and am comfortable with our valuations at the end of the second quarter," and

129

that Lehman "had the benefit of much greater price visibility, due to the number of assets that were sold, especially in the commercial and residential mortgage area." This statement was false and misleading because it failed to disclose that Lehman continued to carry vast amounts of illiquid commercial and residential real estate assets on the balance sheet, that it was problematic for Lehman to sell these assets because they were so-called "sticky assets."

394.   On a June 16, 2008 conference call, **Defendant Lowitt** stated that Lehman sold approximately $11 billion of residential mortgage assets, including Alt-A and sub-prime mortgages, which gave Lehman "good transparency in [] pricing." This statement was false and misleading because at the time this statement was made Lehman continued to overstate the value of the Company's Alt-A and subprime assets especially those classified as Level Three Assets. These are the same assets that created prevented other Wall Street firms considered purchasing all or part of Lehman in the days before the Company filed for bankruptcy from doing so.

### D.   Material Misstatements and Omissions Related to Liquidity

#### 1.   Liquidity Misstatements and Omissions in Lehman's Offering Documents

395.   First, Second, Third and Fourth Quarter 2007 10-Q; 2007 10-K; First and Second Quarter 2008 10-Q: In each of these SEC Filings Lehman claimed that the Company had a "very strong liquidity position," "maintain[ed] a liquidity pool . . . that cover[ed] expected cash outflows for twelve months in a stressed liquidity environment," and had a liquidity pool was "unencumbered, liquid and composed of investment grade securities." Lehman stated the liquidity pool consisted of assets that are "easy to monetize," meaning they could be monetized within 5 days. These statements were false and misleading because, Lehman faced significant liquidity concerns due to illiquid assets

accumulated as part of its counter cyclical growth strategy. The SEC Filings failed to disclose that Lehman included encumbered assets, and/or assets that were not easily monetizable, in the Company's liquidity pool, failed to disclose an obligations to repurchase billions in assets for Repo 105 transactions following each quarter-end, and that the assets used as collateral in Repo 105 were some of Lehman's most liquid.

396.    These misstatements and omissions in the SEC Filings were each incorporated by reference into the 2001, 2005 and 2006 Registration Statements, including the amendments to the Registration Statements, and relevant Offering Documents.

### 2.    Additional Liquidity Misstatements and Omissions

397.    In a September 18, 2007 conference call **Defendant O'Meara** represented that Lehman had a "strong liquidity framework," that it had "strong [] liquidity management," that Lehman's liquidity position "is now stronger than ever," that Lehman had a "conservative liquidity framework," and that "[w]e consider our liquidity framework to be a competitive advantage." These statements were false and misleading. When O'Meara made these statements an internal Lehman analysis by ALCO – the Asset/Liability Management Committee, which O'Meara was a member – projected that Lehman would have a large cash capital deficit at month-end ($1.3 billion), and even larger cash capital deficits for the end of October 2007 ($6.4 billion) and November 2007 ($4.4 billion).

398.    On December 13, 2007, Lehman hosted a conference call to discuss the Company's fourth quarter and fiscal year 2007 financial results. **Defendant O'Meara** stated that the fourth quarter results "reinforce[ed] the importance of our disciplined liquidity and capital management framework which sets us up to operate our business through periods of market stress"; that Lehman's

liquidity position "continues to be very strong"; that the Company had "structured [its] liquidity framework to cover our funding commitment and cash outflows for a 12 month period without raising new cash in the unsecured markets or selling assets outside our liquidity pool"; and that "[w]e consider our liquidity framework to be a competitive advantage in today's markets." **Defendant Callan** stated, "we currently have ample liquidity and capital in place." These statements were false and misleading. At the time the statements were made, Lehman faced significant liquidity concerns due to illiquid assets accumulated as part of its counter cyclical growth strategy. Additionally, Lehman's true liquidity position was overstated through the use of Repo 105 transactions.

399. On March 18, 2008, shortly after Bear Stearns collapsed, Lehman hosted a conference call to discuss its first quarter 2008 financial results. When asked if Lehman would follow Bear Stearns into a fire-sale, **Defendant Callan** stated "categorically, no." During the call, Callan "tried to relay the strengths and robustness of the liquidity position of the Firm." Callan repeatedly referred to "the strength of our liquidity and capital base," Lehman's "disciplined liquidity and capital management," which Lehman considered a "core competency," and Lehman's "robust liquidity." Callan also specifically represented that Lehman's liquidity pool was structured "to cover expected cash outflows for the next 12 months . . . without having to raise new cash in the unsecured markets, or without having to sell assets that are outside our liquidity pool"; that "[w]e have no reliance on secured funding that's supported by whole loans or other esoteric collateral"; that the Company had "approximately $100 billion of liquidity, plus additional $99 billion at the regulated subsidiaries" which was "unencumbered"; and that Lehman had prefunded its liquidity needs to seize on "opportunities in the markets." According to Callan, Lehman "took care of [its] full year needs" for capital when it raised $1.9 billion through its offering of preferred stock in February." Finally,

132

Callan stated that, "we do believe we have the leadership, the experience, the risk management discipline, the capital strength, and certainly the liquidity to ride out the cycle." These statements are false and misleading because Lehman regularly breached a variety of risk management limits, which created a surplus of illiquid assets that could not be monetized easily. Lehman was subjected to collateral calls and increased haircuts on lending transactions due to the decreasing quality of assets, and these collateral calls and haircuts diminished Lehman's available liquidity in 2008 ultimately leading the Company to bankruptcy.

400. On June 9, 2008, Lehman held a conference call to discuss its preliminary results for the second quarter of 2008. **Defendant Callan** represented that Lehman grew its cash capital surplus to $15 billion and grew its liquidity pool to almost $45 billion – its "largest ever" – and that the "$45 billion of [its] liquidity pool was well in excess of [its] short-term unsecured financing liabilities."

401. These statements were false and misleading because Callan failed to disclose that Lehman included encumbered assets, or assets that were not easily monetizable, in the Company's liquidity pool, failed to disclose an additional $50 billion in short-term obligations to repurchase $50 billion in Repo 105 assets, and that the assets removed from the balance sheet in Repo 105 transactions were the most liquid.

402. On June 9, 2008, Lehman held a conference call to discuss its preliminary results for the second quarter of 2008. **Defendant Callan** stated that Lehman, "completed [its] entire budgeted funding plan for all of 2008 and do[es] not need to revisit the debt markets." In discussing the $6 billion of equity raised by the Company on June 9, Callan stated: "To be clear, we do not expect to use the proceeds of this equity raise to further decrease leverage but rather to take

133

advantage of future market opportunities . . . we stand extremely well capitalized to take advantage of these new opportunities." Contrary to Callan's suggestion, however, the capital raise was actually necessary for the Company to maintain enough liquidity to carry on day-to-day operations. When these statements were made, Lehman was aware that it would need to begin posting billions of dollars more in collateral with JPMorgan. Moreover, Treasury Secretary Paulson later told *The New York Times* that, "Lehman announced bad earnings around the middle of June [2008], and we told Fuld that if he didn't have a solution by the time he announced his third-quarter earnings, there would be a serious problem. We pressed him to get a buyer."

403.    On <u>June 9, 2008</u>, Lehman held a conference call to discuss preliminary results for the second quarter of 2008. **Defendant Callan** stated that "we are not having any conversation with counterparties or lenders about whether they feel confident extending funds and credit to us." This statement was false and misleading because, while counterparties and lenders may have continued to extend credit, Callan failed to disclose that lenders were demanding billions in additional collateral because of the Company's financial instability. Callan failed to disclose the material impact that the collateral calls had on the Company as a going concern, as it was ultimately a liquidity crisis – caused by multiple collateral calls – that drove Lehman to bankruptcy.

404.    On <u>June 16, 2008</u>, Lehman held another conference call to discuss its second quarter of 2008 results. During the call, **Defendant Fuld** and **Defendant Lowitt** represented that Lehman's liquidity positions had "never been stronger" due to the Company's $45 billion liquidity pool. **Defendant Lowitt** further stated that "we strengthened liquidity through the quarter," and "we have significantly increased . . . our liquidity pool to $45 billion from $34 billion." These statements were materially false and misleading because (1) Lehman's Repo 105 transactions, which required the

134

Company to repurchase tens of billions in assets, masked the Company's true liquidity position; and (2) Lehman balance sheet contained an enormous concentration of illiquid assets that adversely affected its liquidity.

405.    On September 10, 2008, Lehman issued a press release and held a conference call to discuss its preliminary third quarter 2008 financial results. **Defendant Lowitt** stated that Lehman's liquidity position "remained very strong," and that Lehman "w[ould] have ample cash capital to sustain its business opportunities." This statement was false and misleading because Lehman had already pledged billions of liquid assets – including nearly a quarter of Lehman's liquidity pool – to counterparties, and that out of the liquidity pool 37% had a "low" ability to monetize quickly. The press release also stated that Lehman had an estimated liquidity pool of $42 billion, and **Defendant Lowitt** remarked that through the night of September 10, the liquidity pool remained "essentially unchanged at $41 billion."

406.    These statements were false and misleading because billions of assets in Lehman's liquidity pool were encumbered or could not be monetized easily. The SEC informed Lehman that assets in a liquidity pool are those able to be exchanged for cash or cash equivalents within 24 hours, while Lehman classified liquid assets as those that may be exchanged for cash or cash equivalents within 5 days. The Examiner found that during June 19, 2008 to September 15, 2008 between $4.8 and $6.7 billion of Lehman's liquidity pool could not easily be monetized because it was pledged to JP Morgan as collateral. On September 10, 2008, $27.3 billion of Lehman's $37.6 billion liquidity pool had a "low" ability to monetize, and on the morning of September 12, 2008, $30.1 billion of $32.5 billion in total liquidity had a low ability to monetize. Incredibly, only $2.4 billion of a $32.5 billion liquidity pool was in fact able to be monetized within five days.

135

407.    The liquidity pool figure was reiterated by **Defendant Lowitt** and **Defendant Fuld**, who each represented that Lehman maintained a very strong liquidity position and that "[w]e have maintained our strong liquidity and capital profiles even in this difficult environment."  These statements regarding Lehman's liquidity were false because, by September 2008 at least 24% of Lehman's reported liquidity pool consisted of encumbered assets.  Lehman fraudulently included assets pledged as collateral in the Company's liquidity pool, including: (1) approximately $4 billion of CLOs pledged to JPMorgan; (2) $2.7 billion in cash and money market funds pledged to JPMorgan; (3) $2 billion Citibank cash deposit; (4) $500 million Bank of America cash deposit; and (5) nearly $1 billion collateral deposit with HSBC.

408.    **Defendant Lowitt** also failed to disclose that, on the morning of September 10, 2008, Lehman granted JPMorgan a security interest in practically all Lehman accounts at JPMorgan in addition to Lehman's exposures related to triparty clearance.  Thus, when **Fuld** and **Lowitt** announced that Lehman had a liquidity pool of approximately $40.6 billion, Lehman only had a "high" ability to monetize approximately $25 billion, a "mid" ability to monetize approximately $1 billion of the pool and only a "low" ability to monetize approximately $15 billion, or 37%, of the total pool.  By September 12, 2008, only 7% of Lehman's total pool was convertible to cash.

E.    **Material Misstatements and Omissions Related to Risk Management**

1.    **Misstatements and Omissions in Lehman's Offering Documents**

409.    2003 10-K: "The Company seeks to reduce risk . . . [t]he Company accomplishes this objective by . . . establishing trading limits and setting credit limits . . ."  This statement was false and misleading when made, because Lehman consistently disregarded risk limits, and allowed the Company to become heavily concentrated and exposed to real estate assets with high levels of risk.

410.     <u>2004 10-K</u>: "Essential in our approach to risk management is a strong internal control environment with multiple overlapping and reinforcing elements. We have developed policies and procedures to identify, measure, and monitor the risks involved in our global trading, brokerage and investment banking activities."  This statement was false and misleading when made because Lehman consistently disregarded key risk controls, and the Company's internal control system did not have overlapping safeguards, or these safeguards were consistently and systematically disregarded.

411.     <u>2005 10-K; 2006 10-K</u>: "Our overall risk limits and risk management policies are established by the Executive Committee.  On a weekly basis, our Risk Committee, which consists of the Executive Committee, the Chief Risk Officer and the Chief Financial Officer, reviews all risk exposures, position concentrations and risk-taking activities."  These statements were false and misleading at the time they were made because Lehman regularly disregarded and exceeded risk limits and risk management policies, including the risk appetite, balance sheet limits, single transaction limits, concentration limits, stress tests and risk mitigants.

412.     <u>2007 10-K; First Quarter 2008 10-Q</u>: Lehman stated that "[w]e monitor and enforce adherence to our risk policies."  This statement was false and misleading when made, because Lehman consistently disregarded key risk controls, including the risk appetite, balance sheet limits, single transaction limits, concentration limits, stress tests and risk mitigants.

413.     <u>Second, Third and Fourth Quarter 2007 10-Qs; 2007 10-K; First Quarter 2008 10-Q</u>: Lehman stated that, "[m]anagement's Finance Committee oversees compliance with policies and limits."  This statement was false and misleading when made, because Lehman consistently disregarded key risk controls, including the risk appetite, balance sheet limits, single transaction

137

limits, concentration limits, stress tests and risk mitigants.

414.    <u>Second and Third Quarter 2007 10-Q</u>: Lehman stated that "[w]e . . . ensure that appropriate risk mitigants are in place, and that "[d]ecisions on approving transactions . . . take into account . . . importantly, the impact any particular transactions under consideration would have on our overall risk appetite."  This statement was false and misleading when made, because Lehman consistently disregarded key risk controls, including the risk appetite, balance sheet limits, single transaction limits, concentration limits, stress tests and risk mitigants.

415.    These misstatements and omissions in the SEC Filings were each incorporated by reference into the 2001, 2005 and 2006 Registration Statements, and relevant Offering Documents.

## 2.    Additional Misrepresentations and Omissions Related to Risk Management

416.    In a <u>September 18, 2007</u> conference call, **Defendant O'Meara** repeatedly stressed the Company's "strong risk [] management," emphasizing particularly its "strong risk management culture with regard to the setting of risk limits."  O'Meara's statements were false and misleading because Lehman disregarded risk limits and policies on a regular basis.  For example, Lehman (a) exceeded its risk appetite limit by $41 million in July 2007 and $62 million in August 2007; (b) committed to over 30 deals that exceeded its $250 million loss threshold and $3.6 billion notional limit for single transactions; (c) exceeded the balance sheet limit by almost $20 billion for its Fixed Income Division; and (d) breached its VaR limits regularly since mid-2007.

417.    On <u>November 14, 2007</u>, Lehman management presented at the Merrill Lynch Banking & Financial Services Investor Conference (the "Merrill Conference").  During the Merrill Conference, **Defendant Lowitt** represented that Lehman continued to show very substantial growth

despite challenging market conditions by, among other things, having an "extremely deep risk culture which is embedded through the firm," being "very conservative around risk," and "running a business where we could distribute all the risk." In particular, **Lowitt** repeatedly stressed that Lehman had "stay[ed] true to the principle . . . of our strategy of being in the moving rather than the storage business. So essentially originating to distribute, not holding stuff on our balance sheet, not storing risk but moving it on." Contrary to these statements, Lehman's strategy was not in the "moving business," but the "storage business," which greatly increased Lehman's risk profile as the Company accumulated vast amounts of highly-leveraged, concentrated and illiquid assets.

418.    On December 13, 2007, Lehman hosted a conference call to discuss the Company's fourth quarter and fiscal year 2007 financial results. During the conference call, **Defendant O'Meara** stated that the fourth quarter results "reflect[] the strength of our risk management culture in terms of managing our overall risk appetite, seeking appropriate risk reward dynamics and exercising diligence around risk mitigation." These statements were false and misleading because Lehman disregarded risk limits and policies on a regular basis in 2007. Lehman exceeded its risk appetite limits by $508 million in November 2007, even after having increased the limit; Lehman disregarded the Company's single transaction limit, including committing $10 billion more than the limit allowed with respect to 24 of its largest high-yield deals; the balance sheet limit for Lehman's divisions were exceeded by tens of billions, for example, GREG exceeded its balance sheet limit by approximately $3.8 billion in the fourth quarter 2007, and FID exceeded it by $11.17 billion at the end of the same quarter; and VaR limits were breached almost everyday for some of Lehman's divisions, including GREG and High Yield since mid-2007.

419.    On <u>March 18, 2008</u>, shortly after Bear Stearns collapsed, Lehman hosted a conference call to discuss its first quarter 2008 financial results.  During the conference call, **Defendant Callan** stressed Lehman's "continued diligence around risk management, which includes the active involvement of senior management," and how the Company's "risk management discipline allowed [it] to avoid any single outsize loss" during the quarter.  Callan also touted the ability of Lehman's risk management, stating "we continue to do a very, very good job managing the risk on residential mortgages, an area that I think we're credited with a lot of expertise, a great franchise."  These statements were false and misleading because Lehman disregarded its risk limits and policies on a regular basis.  For example, by the time of Callan's statement, Lehman had (a) not only increased its risk appetite four times from $2.3 billion in December 2006 to $4 billion in December 2007, but disregarded this "hard" limit by at least $500 million during every month from September 2007 through February 2008; (b) with respect to 24 of Lehman's largest high-yield deals, Company management committed approximately $10 billion more than the single transaction limit allowed, and did not impose a limit on its risky leveraged-loan bridge equity commitments; (c) significantly exceeded its balance sheet limit, including by $18 billion for FID and $5.2 billion for GREG; and (d) repeatedly breached its VaR limits since mid-2007.  For example, Lehman's major business divisions, including GREG, High Yield, and FID, were breaching VaR limits virtually everyday in 2007.

420.    On <u>March 8, 2008</u> Lehman announced the financial results for the first quarter on Form 8-K**.  Defendant Fuld** was quoted as stating, "in what remains a challenging operating environment, our results reflect the value of our continued commitment to building a diversified platform and our focus on managing risk and maintaining a strong capital and liquidity position.

This strategy has allowed us to support our clients through these difficult and volatile markets, while continuing to build and strengthen our global franchise for our shareholders." This statement was false and misleading because Lehman did not focus on managing risk, but instead regularly disregarded risk limits. This statement was also false because at the time this statement was made Lehman was not building a diversified platform, and instead the Company had amassed large concentrations of risky, illiquid assets.

F.    **Material Misstatements and Omissions Related to Concentrations of Credit Risk**

1.    **Misstatements and Omissions in Lehman's Offering Documents**

421.    Required disclosures, under SFAS 107 as amended by SFAS 133, regarding concentrations of credit risk were omitted from Lehman's SEC Filings until the filing of Lehman's second quarter 2008 Form 10-Q on July 10, 2008 – **after the Plaintiffs purchased all of its Lehman securities.** Lehman belatedly began to provide certain partial disclosures concerning its commercial mortgage and real estate-related portfolios yet Lehman continued to omit material facts. Specifically, Lehman's public filings **failed to disclose** adequately or meaningfully the Company's risk concentrations in risky Alt-A loans and CRE assets.

422.    These SEC Filings were each incorporated by reference into the 2001, 2005 and 2006 Registration Statements, and relevant Offering Documents. Thus, the omissions in the SEC Filings that were incorporated in the 2001, 2005 and 2006 Registration Statements, rendered those Registration Statements, materially misleading.

/ / /

/ / /

2.    **Additional Misstatements and Omissions Related to Concentrations of Credit Risk**

423.    On <u>March 14, 2007</u> Lehman announced its financial results for the first quarter of 2007. **Defendant O'Meara** stated that Lehman saw "the subprime challenges as being a reasonably contained situation" and downplayed Lehman's subprime exposure, stating that it accounted for less than 3% of its firm-wide revenues over the past six quarters. This statement was false and misleading because O'Meara failed to disclose the true extent of Lehman's subprime concentration, and more importantly, the systemic risk to Lehman's entire operation caused by the vast exposure of subprime assets on the Company's balance sheet.

424.    During a <u>June 12, 2007</u> conference call, **Defendant O'Meara** reassured investors that "the subprime market challenges are . . . reasonably contained to this asset class" and that the "lion's share" of Lehman's originations were not in subprime, but rather in Alt-A, stating, "we actually had terrific performance on the origination side around the Alt-A business." Defendant O'Meara's statement was false and misleading because market challenges were not contained to subprime, but had extended to other asset classes, including Alt-A. The Examiner found that Lehman's Alt-A lending reached borrowers of lesser credit quality than those who historically had been considered Alt-A borrowers, and that the Alt-A risk profile increased in much the same way as the risk in subprime mortgages.

425.    During an investor conference on <u>February 6, 2008</u>, **Defendant Callan** stated that, in regard to Lehman's participation in the residential mortgage market the Company had, "a basic focus and philosophy that we really didn't want to go long the product or short the product. We wanted to originate to distribute and we hedged that origination capability." This statement was false

and misleading because Lehman had large, undisclosed concentrations of credit risk in Alt-A mortgages and RMBS backed by Alt-A mortgages. Additionally, the statement that Lehman "distribute[s]" is false and misleading because Lehman had moved to the "storage" business, and the Company's balance sheet was loaded with illiquid residential real estate and RMBS.

### G.    **Lehman's False and Misleading Registration Statements**

426.    The 2001, 2005, and 2006 Registration Statements, Prospectuses, SEC Filings and other incorporated materials therein, each contained material misstatements and omitted important information. The material misstatements and omissions, detailed above, included: (1) Lehman's Repo 105 practice, and the resulting effect that these transactions had on the reported amount of net leverage, (2) Lehman's risk management policies, the regular departure from adhering to risk limits and an internal "risk appetite," (3) Lehman's concentrated exposure to CRE assets, subprime, and Alt-A markets, the Company's risky lending practices, detrimental changes in the real estate market that affected the Offerings, and serious impairments in Lehman's portfolio of subprime mortgage securities, (4) Lehman's Level Three (including PTG and Archstone) asset portfolios overstating the value of illiquid real estate and real-estate related assets, and (5) Lehman overstating the amount of assets in the liquidity pool that could be easily monetized and available to withstand a crisis of twelve months.

427.    The Plaintiffs purchased Lehman Securities pursuant to, and/or traceable to Offering Documents that were issued in connection with one or more Offerings. Each of the Offerings were made pursuant to a Registration Statement and/or Prospectus, and either a prospectus supplement or pricing supplement issued in connection therewith.

428.    The Offerings were part of either a continuous or shelf offering.  The date of each Offering, rather than the prior date of the Registration Statement or Prospectus was the effective date of the Registration Statement for purposes of §11 liability under 17 C.F.R. §230.415. CFR §229.512(a)(2), and California Corporations Code §§ 25400 *et. seq.* and 25500 *et. seq.*

429.    For example, Lehman's 2001, 2005 and 2006 Registration Statements each stated:

That, for the purposes of determining any liability under the Act, each filing of Lehman Brothers Holdings' annual report pursuant to Section 13(a) or Section 15(d) of the Securities Exchange Act of 1934 that is incorporated by reference in the Registration Statement shall be deemed to be a new registration statement relating to the securities offered therein, and the offering of such securities at that time shall be deemed to be the initial bona fide offering thereof.

430.    Ernst & Young provided signed and written consent to be named as an expert in each of the Registration Statements, and agreed to incorporate by reference the audited financial statements of Lehman and unaudited interim financial information.

431.    Each Offering incorporated by reference certain SEC Filings and documents that contained materially false and untrue statements and/or omissions, as set forth in detail in Appendix A.  For instance, the Registration Statements each incorporated SEC Filings that were filed prior to the effective date of the particular Registration Statement.

432.    The Registration Statements each stated that the information incorporated by reference was considered a part of the Registration Statements and accompanying Offering Documents.  For example, the 2006 Registration Statement incorporated by reference Lehman's prior SEC Filings:

•    Annual Report on Form 10-K for the year ended November 30, 2005;

•    Quarterly Report on Form 10-Q for the quarter ended February 28, 2006;

144

- Current Reports on Form 8-K filed with the SEC on February 21, 2006, February 24, 2006, March 3, 2006, March 10, 2006 (two Form 8-K filings), March 15, 2006, March 16, 2006, March 24, 2006, March 28, 2006, March 31, 2006 (two Form 8-K filings), April 4, 2006, April 25, 2006, May 3, 2006 and May 24, 2006.

433.    Additionally, the Registration Statements and Prospectuses expressly incorporated by reference Lehman's SEC Filings that were filed <u>subsequent</u> to the filing of the relevant Registration Statement and prior to the date of each Offering conducted pursuant to said Registration Statement.  Any information that Lehman filed with the SEC after the date of each Registration Statement automatically updated information in the earlier Registration Statement or Prospectus, and Lehman's Registration Statements informed investors to rely on and reference the subsequent information over the information included in the earlier Registration Statement or Prospectus.  The Plaintiffs did so rely on such updated information when purchasing the Securities.  For example, the Registration Statements stated:

- All documents we [Lehman Brothers] file pursuant to Section 13(a), 13(c), 14 or 15(d) of the Exchange Act after the date of this prospectus and before the later of (1) the completion of the offering of the securities described in this prospectus and (2) the date our affiliates stop offering securities pursuant to this prospectus shall be incorporated by reference in this prospectus from the date of filing of such documents.

434.    Accordingly, on the date of a particular Offering, the Registration Statement and/or Prospectuses for that particular Offering incorporated by reference each of the documents that had been filed with the SEC on Forms 10-K, 10-Q or 8-K prior to the date of the Offering.  *See* Appendix A.

435.    The Registration Statements also included assurances that the undersigned registrants would:

[R]eflect in the prospectus any facts or events arising after the effective date of the Registration Statement (or the most recent post-effective amendment

145

thereof) which, individually or in the aggregate, represent a fundamental change in the information set forth in the Registration Statement.

436. Thus, Lehman was required to update the Offering Documents to reflect fundamental changes that had taken place since the initial release of a Registration Statement. This would include updating representations regarding Lehman's leverage, liquidity, risk management practices, and concentrations of credit risk.

437. The Plaintiffs' purchases of the Lehman Securities are pursuant to, and/or traceable to the Offering Documents issued in connection with each particular Offering. Each of the Offerings was conducted pursuant to the Registrations Statements, a Prospectus and/or other Offering Documents issued in connection with a particular Offering. Appendix A details the Offerings and purchases made by each respective Plaintiff, including the Registration Statement associated with an Offering, the Underwriters who participated in the Offering, and a sample of the SEC Filings incorporated by reference therein.

## VI.    PRESUMPTION OF RELIANCE

438. Plaintiffs directly relied on misrepresentations made by Defendants. Those misrepresentations included statements in Lehman's SEC Filings, various oral statements made by Defendants on conference calls, and other public communications from Lehman officials as alleged above.

439. In addition to actual reliance, Plaintiffs are entitled to a presumption of reliance under the "efficient market" doctrine. At all relevant times, the market for the Lehman Securities was an efficient market for the following reasons, among others:

a.    Lehman's common and preferred stock was listed and actively traded on the New

York Stock Exchange (NYSE), a highly efficient national market exchange;

b.    Lehman's notes and bonds, including the Securities, traded on various electronic markets;

c.    Lehman filed periodic reports with the SEC;

d.    Lehman regularly communicated with public investors through established market communication mechanisms, including through the dissemination of press releases and other wide-ranging public disclosures such as conference calls with analysts and communications with the financial press;

e.    Lehman was followed by several securities analysts employed by major brokerage firms whose analysts. reports were publicly available and affected the public market for Lehman's securities;

f.    Lehman Notes were followed by and rated by several credit rating agencies whose ratings were publicly available and affected the public market for Lehman's securities;

g.    news concerning Lehman was widely reported in the national and international press through major media outlets;

h.    the market value of Lehman's securities reacted quickly to new information concerning Lehman's finances and operations; and

I.    Lehman was eligible to file on SEC Form S-3.

440.    Lehman's false and misleading statements caused artificial inflation in the value of the Company's Securities.  In reliance on the integrity of the market price of Lehman's Securities, Plaintiffs paid artificially inflated prices for their respective Securities.

147

## VII.  LOSS CAUSATION

441.    From the date of the Plaintiffs' first purchase of Lehman Securities to the date of Lehman's bankruptcy on September 15, 2008, the market price of Lehman's Securities was artificially inflated as a result of the material misrepresentations and omissions alleged herein.

442.    In the latter half of 2008 Lehman began to make partial disclosures that removed some of the artificial inflation.  However, the true extent of the misstatements and omissions was not revealed until Lehman filed for bankruptcy and faced multiple investigations.  Examples of the materialization of risks and key partial disclosures include, but are not necessarily limited to, those noted in the following paragraphs.

443.    On June 9, 2008, Lehman issued a press release announcing its financial results for the second quarter of 2008 and held a conference call for investors and analysts.  Despite previous announcements and representations of success with the de-leveraging of Lehman, its strong liquidity position, that it had risk management policies in place, and that its assets were fairly valued, Lehman's announcement revealed that the Company expected a net loss of $2.8 billion (its first ever loss) and took write-downs of $2.4 billion in its residential mortgage-related holdings and $1.0 billion in its commercial-related holdings.  This same day, rating agencies Fitch and Moody's downgraded Lehman's credit rating.

444.    According to Andrew Gowers, Lehman's former head of Corporate Communications between June 2006 through September 2008, Defendant Callan internally discussed ideas as to how to spin the $2.8 billion loss in the second quarter of 2008 in a positive manner.  The Officer Defendants decided to combine the announcement of the loss with the announcement of raising additional capital in order to mislead investors by minimizing any major fallout from the negative

results.  According to Gowers, as quoted in the December 21, 2008, article in *The Sunday Times*: "The worry, even then, was that it could be of a magnitude to cause a run on the bank.  There was, of course, no way to spin it.  The numbers would be atrocious."

445.    On July 10, 2008, Lehman filed its second quarter 2008 Form 10-Q.  In addition to the information disclosed in its June 9, 2008, press release and conference call, the Form 10-Q indicated that Lehman's most illiquid assets (Level Three assets) were marked down only slightly in the second quarter to $41.3 billion from $42 billion at year end 2007.

446.    On July 25, 2008, CNBC reported that Lehman was considering selling at least part of its Investment Management Division.  The move was an attempt to raise much needed capital and improve liquidity.  This development partially revealed the truth concerning Lehman's increasingly urgent capital and liquidity needs.  It also evidenced the materialization of previously concealed risks regarding capital and liquidity – *e.g.*, the risk that Lehman would need a major infusion of cash to sustain its operations, and that it might need to sell part of the Company to generate the necessary cash.

447.    On September 9, 2008, there were market reports that Lehman's attempts to obtain a capital infusion from Korea Development Bank failed, leading to concerns that Lehman could not locate a source of new capital.  Also on September 9, 2008, Steven Black, co-CEO of JPMorgan's Investment Bank told Fuld that in order to protect itself and its clients JPMorgan needed $5 billion in collateral.  This $5 billion in collateral was over and above the $5 billion JPMorgan had demanded just five days earlier (September 4, 2008) which had yet to be paid.  Defendant Fuld managed to persuade Black to settle for $3 billion, leaving the prior $5 billion request unresolved.  These collateral calls were concealed until after Lehman filed for bankruptcy.

448.    On September 10, 2008, Fitch and Dunn & Bradstreet downgraded Lehman's credit rating.  Also that day, Jane Byers Russo, head of JPMorgan's Broker Unit, contacted Lehman's Treasurer, Paolo Tonuci, to tell him the Company would have to turn over the $5 billion in collateral that JPMorgan had asked for days earlier.  Lehman complied, but fulfilling the request temporarily froze Lehman's computerized trading system and immediately left the Company without sufficient capital to fund its trading operations.  Federal officials worked with executives at Lehman's headquarters to determine which assets were not already pledged to other lenders and could be used as collateral for a federal loan.  Lehman borrowed roughly $30 billion from the Federal Reserve on an overnight basis, paying it back the next day.  This was concealed from the Plaintiffs, and contemporaneous fraudulent statements further provided a false sense of security.  This caused the price of the Securities to remain higher than they otherwise would have been, lulling investors, including the Plaintiffs, into holding onto Lehman securities.

449.    On September 15, 2008, Lehman filed for bankruptcy protection, citing "significant liquidity problems."  As a result, the market price of Lehman's common stock declined over 94% that day to close at $0.21.  All of the Plaintiffs' purchases of Lehman Securities occurred before any materializations of concealed risks, or partial disclosures, meaning Plaintiffs purchased at the height of the artificial inflation.

450.    The disclosures regarding Lehman's liquidity problems and massive write-downs revealed the truth about Lehman's financial condition and represented the materialization of several interrelated, concealed risks.  The materialization stemmed from, *inter alia*, Lehman's massive Repo 105 transactions which masked the Company's true net leverage, Lehman's failure to write down its real estate assets in a timely manner, Lehman's disregard for its risk management policies, and

failure to disclose certain concentrations of credit risk.  As a direct result of Lehman's failure to abide by its risk policies, Lehman acquired tens of billions of dollars of highly risky, illiquid assets that ultimately required enormous write-downs and triggered the liquidity crisis that forced Lehman to bankruptcy.

451.    The declines in the market values of Lehman's securities were directly attributable to the Defendants' false statements and omissions and the materialization of previously misrepresented or concealed risks.  The declines were not caused by – or were in fact many times larger than any decline that could be attributed to – general industry news, stock market trends and activity, market randomness, or information unrelated to Defendants' misconduct.

## VIII.    <u>NO SAFE HARBOR</u>

452.    Defendants' verbal "Safe Harbor" warnings accompanying Lehman's oral forward-looking statements issued during the Relevant Period for this Amended Complaint were ineffective to shield those statements from liability.

453.    The Defendants are also liable for any false or misleading forward-looking statements because, at the time each forward-looking statement was made, the speaker knew the statement was false or misleading and the statement was authorized and/or approved by an executive officer of Lehman who knew that the statement was false.  None of the historic or present tense statements made by Defendants were assumptions underlying or relating to any plan, projection or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by Defendants expressly related to or stated to be dependent on those historic or present tense statements when made.

151

## IX.    CAUSES OF ACTION

### A.    Securities Act Claims

### FIRST CAUSE OF ACTION

### Violations of Section 11 of the Securities Act
### Against the Securities Act Defendants and E&Y

454.    The Plaintiffs repeat and re-allege each and every allegation above as if fully set forth herein.  Defendant Fuld, Akers Berlind and Kaufman signed the 2003-2007 Annual Reports filed on form 10-K and the 2001, 2005 and 2006 Registration Statements.  Defendant Evans signed the 2004-2007 Annual Reports on form 10-K and the 2005 and 2006 Registration Statements.  Defendant O'Meara signed the 2004-2006 Annual Reports on form 10-K and the 2005 and 2006 Registration Statements.  Defendant Hernandez signed the 2005-2007 Annual Reports on form 10-K and the 2006 Registration Statement.  Defendant Goldfarb signed the 2003 Annual Report on form 10-K and the 2001 Registration Statement.  Defendant Callan signed the 2007 Annual Report filed on form 10-K.  These individuals are collectively referred to as the "Securities Act Defendants."

455.    This claim is asserted under Section 11 of the Securities Act against the Securities Act Defendants (for the Registration Statements signed by those individuals) and E&Y, on behalf of Plaintiffs who purchased or otherwise acquired the Lehman Securities, pursuant to or traceable to the materially false and misleading Registration Statements and Offering Documents incorporated by references therein.  For purposes of this claim, Plaintiffs expressly excludes and disclaims any allegations that could be construed as alleging fraud or intentional or reckless misconduct, as this Count is based solely on claims of strict liability and/or negligence under the 1933 Act.

152

456.    The Securities Act Defendants were officers and directors of Lehman, the issuer of the securities within the meaning of Section 11(a)(3) of the Securities Act.

457.    The Plaintiffs purchased or otherwise acquired Lehman Securities issued pursuant to, and/or traceable to the 2001, 2005, and 2006 Registration Statements, as amended and supplemented by all relevant prospectuses, prospectus supplements, product supplements and pricing supplements, as well as other documents incorporated therein (collectively, the "Offering Documents"). The Offering Documents expressly incorporated by reference certain SEC Filings, including but not limited to Annual Reports on Form 10-K, Quarterly Reports on Form 10-Q, Current Reports on Form 8-K and previous registration statements on Form 8-A.

458.    The Registration Statements and Offering Documents, which incorporated by reference the SEC Filings during the Relevant Period, contained untrue statements of material fact and omitted to state other material facts necessary to make the statements made therein not misleading.

459.    Though direct claims against Lehman at this time are barred by the bankruptcy code, Lehman, as an issuer of the securities sold to the Plaintiffs, would otherwise be strictly liable for the misstatements and omissions contained in the offering materials. Similarly, because LBI is being dissolved pursuant to the SIPC, it is not named as a defendant.

460.    The Securities Act Defendants were responsible for ensuring the true and accurate contents of the Registration Statements, Offerings Documents, SEC Filings, and all documents incorporated by reference therein.

461.    The Securities Act Defendants acted negligently and without reasonable care concerning the accuracy of the information in the Registration Statements, Offerings Documents,

SEC Filings, and documents incorporated by reference therein. The Lehman Defendants lacked reasonable grounds to believe that such information was free of material misstatements and omissions. The Securities Act Defendants owed the Plaintiffs the duty to make a reasonable and diligent investigation of the statements contained in the Registration Statements, Offering Documents, SEC Filings, and documents incorporated by reference therein. The Lehman Defendants failed to properly investigate and timely disclose necessary information concerning Lehman's financial position and results, as alleged in detail above.

462.    At all times during the Relevant Period, Defendant E&Y audited the financial statements that were incorporated by reference into the Registration Statements and Offering Documents. At all times during the Relevant Period E&Y consented to its audit opinion being incorporated by reference into the Offering Documents and consented to be named as an expert therein. E&Y's audit opinion was false and misleading for the reasons alleged herein. E&Y knew, or had no reasonable basis not to have known, that Lehman's financial statements and reports incorporated into the Registration Statements and Offering Documents violated GAAP and did not fairly present Lehman's then-existing financial position. As such, E&Y is liable to the Plaintiffs for damages.

463.    Plaintiffs did not know or in the exercise of due diligence could not have known of the misstatements and omissions contained in the Registration Statements, Offering Documents and SEC Filings incorporated therein.

464.    The Plaintiffs sustained damages as a result of the misstatements and omissions contained in the Registration Statements, Offerings Documents and SEC Filings incorporated therein.

465.     Accordingly, the Securities Act Defendants and E&Y are liable to the Plaintiffs under Section 11 of the Securities Act.

## SECOND CAUSE OF ACTION

### Violations of Section 15 of the Securities Act
### Against Defendants Fuld, O'Meara, Callan and Lowitt

466.     The Plaintiffs repeat and re-allege each and every allegation above as if fully set forth herein.  This Count is asserted under Section 15 of the Securities Act against certain Officer Defendants.  For purposes of this Count, the Plaintiffs allege only strict liability and negligence and expressly disclaim any claim of fraud or intentional misconduct.

467.     These Officer Defendants each acted as controlling persons of Lehman and LBI within the meaning of Section 15 of the Securities Act.  By virtue of their high-level positions, participation in and/or awareness of Lehman's operations, and/or knowledge of or access to the Registration Statements and Offering Documents filed by Lehman with the SEC and disseminated to the investing public, the Officer Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of Lehman, including the content and dissemination of the false and misleading statements.  These Officer Defendants were provided with, or had unlimited access to, drafts of the Company's Registration Statements, Offering Documents, SEC Filings, reports, press releases, public filings, and other statements alleged by the Plaintiffs to be misleading prior to the time those statements were issued.  These Officer Defendants had the ability to prevent the issuance of the statements or cause the statements to be corrected.

468.     Further, the Officer Defendants were officers and directors of Lehman who had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, are

155

presumed to have had the power to control or influence the particular transactions and statements giving rise to the securities violations as alleged herein.

469.    As alleged herein, non-parties Lehman and LBI violated Section 11 of the Securities Act by the acts and omissions as alleged in this Amended Complaint.  By virtue of their positions as controlling persons of Lehman and LBI, these Officer Defendants are therefore liable to the Plaintiffs pursuant to Section 15 of the Securities Act.

470.    As a direct and proximate result of the conduct of the Officer Defendants, the Plaintiffs have suffered damages in an amount to be determined at trial.

**B.    Exchange Act Claims**

**THIRD CAUSE OF ACTION**

**Violations of § 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5
Against the Officer Defendants and E&Y**

471.    The Plaintiffs repeat and re-allege each and every allegation above as if fully set forth herein.

472.    The Officer Defendants and E&Y, individually and/or in concert, by use of the means or instrumentalities of interstate commerce and/or of the United Stated mail, violated § 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 in that they:

(a)    employed devices, schemes and artifices to defraud;

(b)    made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c)    engaged in acts, practices and a course of business that operated as a fraud or deceit upon the Plaintiffs in connection with their purchases of Lehman Securities during the Relevant Period.

473.    Each of the Officer Defendants was a top officer and controlling person of Lehman, and had direct involvement in the Company's day-to-day operations.  The materially misstated information presented in group-published documents, including certain portions of Lehman's SEC Filings, was the collective actions of these Officer Defendants.  The Officer Defendants were each involved in drafting, producing, reviewing and/or disseminating the group-published documents at issue in this action, during his or her tenure with Lehman.

474.    The Officer Defendants and E&Y had actual knowledge of the misrepresentations and omissions of material fact set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were readily available to them. The Officer Defendants' material misrepresentations and/or omissions were done knowingly or with severe recklessness, and for the purpose and effect of concealing Lehman's true financial condition and to artificially inflate the price of the Lehman Securities.  E&Y's material misrepresentations and/or omissions were made with knowledge or were made with no reasonable basis for believing the statements and/or omissions, for the purpose of a continued relationship with Lehman.

475.    As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of Lehman's Securities was artificially inflated during the Relevant Period, and caused losses to be suffered by Plaintiffs when

Lehman's stock price fell in response to the issuance of partial disclosures and/or the materialization of risks previously concealed by the Defendants.

476.    As a direct and proximate result of the wrongful conduct of the Officer Defendants and E&Y, the Plaintiffs have suffered damages in that, in reliance on Defendants' misrepresentations and the integrity of the market, the Plaintiffs paid artificially inflated prices for the Lehman Securities.  The Plaintiffs would not have purchased the Lehman Securities at the prices it paid, or at all, if the Plaintiffs had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements and omissions.

### FOURTH CAUSE OF ACTION

### Violations of § 20(a) of the Exchange Act
### Against the Lehman Defendants

477.    The Plaintiffs repeat and re-allege each and every allegation contained above as if set forth fully herein.

478.    The Lehman Defendants were and acted as controlling persons of Lehman within the meaning of §20(a) of the 1934 Act as alleged herein.  By virtue of their high-level positions with the Company, participation in and/or awareness of the Company's operations, direct involvement in the day-to-day operations of the Company, and/or intimate knowledge of the Company's actual performance, the Lehman Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements, which Plaintiffs contend were false and misleading.  Each of the Lehman Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiffs to be misleading prior

158

to and/or shortly after these statements were issued and had the ability to prevent the issuance of the false statements and material omission or cause such misleading statements and omissions to be corrected. In addition, Defendant Fuld, through his position as CEO of Lehman, controlled the Officer Defendants.

479. As set forth above, the Officer Defendants and Lehman itself each violated § 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Consolidated First Amended Complaint. Due to their controlling positions over Lehman and, with respect to Fuld, his control over the remaining Officer Defendants, the Lehman Defendants are each liable pursuant to § 20(a) of the 1934 Act, having culpably participated in the fraud. As a direct and proximate result of the Lehman Defendants' wrongful conduct, Plaintiffs have suffered damages in connection with their purchases or acquisitions of the Lehman Securities.

## C. California Corporations Code Claims

### FIFTH CAUSE OF ACTION

### Violations of California Corp. Code §§ 25400 and 25500
### Against the Selling Defendants

480. The Plaintiffs repeat and re-allege each and every allegation above as if fully set forth herein.

481. During the period from September 25, 2004 - September 25, 2008, certain Lehman Defendants bought and sold Lehman stock as follows:

**Officer Defendants:**

- **Richard S. Fuld Jr. (CEO)**
  | | | |
  |---|---|---|
  | January 20, 2005 | Sold: | 88,900 @ $88.55 - $88.62 |
  | February 7, 2005 | Sold: | 52,400 @ $92.80 - $93.55 |
  | February 8, 2005 | Sold: | 39,017 @ $93.18 - $93.86 |

159

February 11, 2005 Sold: 111,119 @ $94.01 - $94.49
July 19, 2005 Sold: 64,741 @ $106.40 - $106.70
September 21, 2005 Sold: 68,399 @ $113.20 - $113.71
March 16, 2006 Sold: 1,700 @ $143.35 - $143.42
March 17, 2006 Sold: 114,099 @ $143.00 - $114.60
July 20, 2006 Sold: 100,000 @ $62.80 - $63.19
July 24, 2006 Sold: 250,000 @ $62.55 - $63.12
July 25, 2006 Sold: 150,000 @ $63.00 - $63.37
September 14, 2006 Sold: 499,600 @ $69.60 - $70.41
June 13, 2007 Sold: 291,864 @ $77.20 - $77.75
September 15, 2008 Sold: 2,276,802 @ $0.16 - $0.30
September 16, 2008 Sold: 601,500 @ $0.20
September 18, 2008 Sold: 287,415 @ $0.07
September 23, 2008 Sold: 83,362 @ $0.14

- <u>Christopher M. O'Meara (CFO, Head of Risk Management)</u>
  April 6, 2006 Sold: 7,900 @ $150.40 - $150.46

- <u>Joseph M. Gregory (President, COO)</u>
  March 16, 2005 Sold: 496,750 @ $93.00 - $94.35
  January 30, 2006 Sold: 189,126 @ $139.00 - $139.36
  March 21, 2006 Sold: 152,219 @ $142.20 - $143.56
  April 23, 2007 Sold: 495,503 @ $77.59 - $78.12

- <u>Ian Lowitt (CAO, CFO)</u>
  September 17, 2008 Sold: 20,945 @ $0.14

- <u>David Goldfarb (CFO, CAO, CSO)</u>
  March 16, 2005 Sold: 1,700 @ $95.00 - $95.01
  March 17, 2005 Sold: 187,600 @ $95.00 - $95.25
  March 16, 2006 Sold: 50,134 @ $142.80 - $142.90
  March 17, 2006 Sold: 59,397 @ $143.00 - $143.50

**<u>Risk Committee Defendants</u>**

- <u>John F. Akers</u>
  September 15, 2008 Sold: 18,000 @ $0.30 - $0.310

- <u>Roger S. Berlind</u>
  September 23, 2008 Sold: 80,000 @ $0.14 - $0.16
  September 24, 2008 Sold: 4,808 @ $0.17

160

- <u>Roland A. Hernandez</u>
  November 2, 2005    Buy:    500 @ $122.00 - $122.01
  September 24, 2008    Sold:    1,000 @ $0.17

- <u>Henry Kaufman</u>
  June 19, 2006    Sold:    25,000 @ $61.78 - $61.95
  December 19, 2007    Sold:    41,788 @ $61.00 - $61.06
  January 9, 2008    Sold:    15,000 @ $54.50
  September 15, 2008    Sold:    5,000 @ $0.20.

482.    The Officer and Risk Committee Defendants listed above directly engaged in market activity, within the meaning of California Corporations Code §25400(d), by selling and purchasing shares of Lehman stock (the "Selling Defendants").

483.    In connection with the issuance, offer, and sale of the Securities, the Selling Defendants each prepared and issued false and misleading statements transmitted in California.

484.    The Selling Defendants systematically included material, untrue statements in the materials transmitted to the Plaintiffs.

485.    The Selling Defendants also systematically omitted facts necessary in order to make the statements, in light of the circumstances under which they were made, not misleading.

486.    The Selling Defendants' false statements and material omissions were made for the purpose of inducing the purchase of the Securities.  At the time the statements were made, the Selling Defendants knew, and/or had reasonable grounds to believe, that the false statements and material omissions were false and misleading.

487.    The Selling Defendants willfully participated in the above-described acts in violation of Cal. Corp. Code § 25400.

488.    As a direct and proximate result of the Selling Defendants' acts and omissions in violation of Cal. Corp. Code § 25400, the market price of Lehman's Securities was artificially

inflated, and the Plaintiffs suffered damages in connection with their ownership of Lehman's Securities. By reason of such conduct, the Selling Defendants are liable pursuant to Cal. Corp. Code § 25500.

## SIXTH CAUSE OF ACTION

### Violations of California Corp. Code §25504
### Against the Lehman Defendants and Underwriter Defendants

489.    The Plaintiffs repeat and re-allege each and every allegation above as if fully set forth herein.

490.    The Plaintiffs purchased Securities issued by Lehman pursuant to and/or traceable to the Registration Statements, which incorporated the Offering Documents and SEC Filings, in one or more Offerings. *See* Appendix A.

491.    During the Relevant Period the Underwriter Defendants engaged in the business of effecting transactions in the Lehman Securities by selling and offering to sell the Securities in multiple Offerings and as such the Underwriter Defendants acted as broker-dealers within the meaning of California Corporations Code § 25004(a).

492.    As set forth above, Lehman as a primary participant, violated Cal. Corp. Code §§ 25401 and 25501 by its acts and omissions as alleged in this Amended Complaint. The Defendants named herein provided material aid to Lehman in its acts and omissions alleged herein.

493.    The Lehman Defendants were all either principal executives or directors of Lehman within the meaning of Cal. Corp. Code § 25504. Additionally, by reason of their positions within the Company and/or their positions on the Lehman Risk Committee, and their ownership of Lehman stock, the Lehman Defendants had the power and authority to, directly or indirectly, control or

influence, Lehman to engage in the wrongful conduct, including making material misrepresentations and omissions in connection with the sale of Securities to the Plaintiffs, complained of herein. By reason of such conduct, the Lehman Defendants are jointly and severally liable for Lehman's violations of Cal. Corp. Code § 25401 and § 25501 pursuant to Cal. Corp. Code § 25504.

494. Specifically, the Officer Defendants each participated in the operation and management of Lehman, conducted and participated, directly and indirectly, in Lehman's business affairs and operations. These Officer Defendants also participated in the preparation and dissemination of the Registration Statements, Offering Documents, certain of the SEC Filings, and public statements incorporated by reference therein and/or otherwise participated in the process necessary to conduct the Offerings. Because of their positions of control and authority as senior officers of Lehman, each of the Officer Defendants were able to, and did, control the contents of certain or all of the Registration Statements, Offering Documents, certain of the SEC Filings, and public statements incorporated by reference therein, which contained materially false information, and omitted to state material information necessary to make the statement as a whole not misleading.

495. Similarly, the Risk Committee Defendants served as Directors on Lehman's Board at the time the Offerings were conducted and/or at the time that the Registration Statements were signed. As directors of a publicly-owned company, the Risk Committee Defendants had a duty to disseminate accurate and truthful information with respect to Lehman's financial condition and results of operation.

496. The Underwriter Defendants acted as broker-dealers, as defined by Cal. Corp. Code § 25004(a), and provided material aid to Lehman in connection with the sale of Securities to certain Plaintiffs within the meaning of Cal. Corp. Code § 25504. By reason of their relationship with

163

Lehman, the Underwriter Defendants had the power and authority to materially aid and did materially aid the wrongful conduct alleged in connection with the sale of Securities to certain Plaintiffs, complained of herein. By reason of such material aid and conduct, the Underwriter Defendants are jointly and severally liable for Lehman's violations of Cal. Corp. Code § 25401 and § 25501 pursuant to Cal. Corp. Code § 25504.

497. The Registration Statements for the Offerings were inaccurate and misleading, contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and omitted to state material facts required to be stated therein.

498. The Defendants named herein were responsible for the contents and dissemination of the Registration Statements.

499. The Underwriter Defendants were responsible for the contents and dissemination of the Registration Statements and did not perform adequate due diligence. The Underwriter Defendants were underwriters of certain of the Offerings, as detailed in Appendix A. The Underwriter Defendants are liable to the particular Plaintiffs who purchased or otherwise acquired the Lehman Securities sold pursuant to, and/or traceable to the Offering(s) in which each Underwriter Defendant participated.

500. None of the Defendants named herein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement were true and without omissions of any material facts and were not misleading.

501. The Defendants named in this cause of action owed to Plaintiffs the duty to make a reasonable and diligent investigation of statements contained in the Registration Statement, and any incorporated documents, at the time each Offering became effective to ensure that said statements

were true and that they were not misleading.

502.    The Lehman Defendants were responsible for ensuring the accuracy of Lehman's public financial reports and other public statements.  The Lehman Defendants publicly commented on Lehman's financial performance in quarterly and annual earnings press releases, in investor conference calls, and during interviews with the media.  Defendants Fuld, O'Meara, Callan and Lowitt signed certifications attesting to the accuracy of Lehman's annual and quarterly reports and all Offering Documents.

503.    As officers of a publicly-held company traded on the NYSE, the Officer Defendants possessed the power and authority to control, directly and/or indirectly, the content of Lehman's public statements and reports made in press releases, conference calls, news articles, and/or other public forums.  The Officer Defendants and Underwriter Defendants had a duty to disseminate accurate and truthful information with respect to Lehman's financial condition, debt and liabilities, assets, interest, earnings and present and future business prospects, and to correct any previously issued statements that were false and/or misleading.

504.    As a result of the foregoing, each of the Lehman and Underwriter Defendants are each personally liable, jointly and severally, for the misrepresentations and omissions described herein.

505.    At the time of its purchases of Lehman Securities, the Plaintiffs were without knowledge of the facts concerning the wrongful conduct alleged herein and could not have reasonably discovered those facts prior to September 15, 2008.  Less that two years, as tolled by the pending class action *In re Lehman Brothers Equity/Debt Securities Litigation*, No. 1:08-cv-05523 (LAK) (Dkt. Nos. 212, 439 in No. 1:09-md-02017-LAK), has elapsed from the time that the Plaintiffs discovered, or reasonably could have discovered the facts upon which this Count is based

165

from the time that the initial complaint was filed asserting claims arising out of the Registration Statements.  Less than five years have elapsed from the act or transaction giving rise to this claim.

506.    As a direct and proximate result of the Lehman Defendants' and Underwriter Defendants' acts and omissions in violation of Cal. Corp. Code § 25504, the market price of Lehman's Securities was artificially inflated, and the Plaintiffs suffered damages in connection with its ownership of Lehman's Securities.

**SEVENTH CAUSE OF ACTION**

**Violations of California Corp. Code §25504.1**
**Against the Officer Defendants**

507.    The Plaintiffs repeat and re-allege each and every allegation above as if fully set forth herein.

508.    As set forth above, Lehman as a primary participant, violated Cal. Corp. Code §§ 25401 and 25501 by its acts and omissions as alleged in this Amended Complaint.

509.    The Officer Defendants were principal executives and directors of Lehman and by reason of their positions within the Company as executives and directors, and their ownership of Lehman stock, the Officer Defendants had the power and authority to materially assist, directly and/or indirectly, in the wrongful conduct, including material misstatements and omissions made in connection with the sale of Securities, complained of herein.

510.    The Officer Defendants materially assisted the wrongful conduct complained of herein with the intent to deceive or defraud the Plaintiffs.  Because the Officer Defendants each materially assisted in the wrongful conduct of Lehman pursuant to Cal. Corp. Code §§ 25401 and 25501, and did so with the intent to deceive or defraud, they are each and all, jointly and severally

166

liable pursuant to Cal. Corp. Code § 25504.1.

511.    As a direct and proximate result of the Officer Defendants' acts and omissions in violation of Cal. Corp. Code § 25504.1, the market price of Lehman's Securities was artificially inflated, and the Plaintiffs suffered damages in connection with their ownership of Lehman's Securities.

## EIGHTH CAUSE OF ACTION

### Violations of California Corp. Code §25504.2
### Against E&Y

512.    The Plaintiffs repeat and re-allege each and every allegation above as if fully set forth herein.

513.    As set forth above, Lehman as a primary participant, violated Cal. Corp. Code §§ 25401, 25501 by its acts and omissions as alleged in this Amended Complaint.

514.    In connection with the issuance, offer, and sale of the Securities by Lehman, E&Y gave written consent to be named, and was in fact named as an expert, in the Registration Statements, Prospectuses, Offering Documents, all periodic filings with the SEC, including the annual reports on Form 10-K, quarterly reports on Form 10-Q, and current reports on Form 8-K. The portions of the Registration Statements, Offering Documents, SEC Filings that were prepared by, certified by or otherwise attributed to E&Y systematically included material untrue statements and/or omissions.

515.    E&Y provided authority and consent for inclusion of the materially misleading statements and omissions described herein that were distributed in connection with the sale of Securities to the Plaintiffs. At the time of the Plaintiffs' purchases E&Y was responsible for the

inclusion of material prepared by, certified by or otherwise attributable to E&Y. These materially misleading statements and omissions attributable to E&Y were fair and accurate representations of E&Y's reports and valuations and/or extracts from E&Y's reports and/or valuations.

516.    E&Y did not qualify or otherwise limit its consent in the Lehman Registration Statements, incorporated Offering Documents, and SEC Filings. As such, said consent is incorporated as required or requested by the California Commissioner of Corporations, or as required under the relevant California Corporations Codes.

517.    At all times while giving such consent, E&Y lacked a reasonable ground to believe, and did not believe, that the statements and materials prepared by, certified by, or otherwise attributable to E&Y were true and contained no material omissions that were necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading. E&Y owed the Plaintiffs the duty to make a reasonable and diligent investigation of the statements contained in the offerings materials. E&Y failed to properly investigate and timely disclose necessary information concerning Lehman's financial position and results, as alleged in detail above.

518.    The Plaintiffs relied on the accuracy and completeness of the statements that were prepared by, certified by or otherwise attributed to E&Y when purchasing the Lehman Securities. At the time of said misrepresentations and omissions, the Plaintiffs were unaware of their falsity, and believed the false statements and omissions to be true. Had the Plaintiffs known the true nature of Lehman's financial condition, the Plaintiffs would not have purchased or otherwise acquired the Lehman Securities, and would not have purchased or otherwise acquired the Securities at artificially inflated prices, and would not have held onto the Securities.

519.    As a direct and proximate result of E&Y's acts and omissions in violation of Cal. Corp. Code § 25504.2, the market price of Lehman's Securities was artificially inflated, and the Plaintiffs suffered damages in connection with its ownership of Lehman's Securities.

**D.    Common Law Claims**

**NINTH CAUSE OF ACTION**

**Fraud and Deceit**
**Against the Officer Defendants and E&Y**

520.    The Plaintiffs repeat and re-allege each and every allegation above as if fully set forth herein except those allegations alleging that Defendants acted only negligently.

521.    The Officer Defendants and E&Y made material misrepresentations and omissions to the Plaintiffs that were false and misleading, including those contained in the Registration Statements, Offering Documents, SEC Filings, press releases, and oral public statements.

522.    The Officer Defendants and E&Y made false and misleading statements to the Plaintiffs as alleged in detail above.  These Defendants' statements were fraudulent, material, and made with knowledge of their false and misleading character, or with reckless indifference to their truth or falsity.  The statements were made with the intention and expectation that investors would rely on them or, in the case of omissions, that investors would be ignorant of them in purchasing and/or holding Lehman securities

523.    The Officer Defendants' fraudulent misrepresentations are set forth more fully above and include, among others, the following:

    a.    that Lehman's financial results were free of material misstatement and "fairly presented" the Company's financial results;

  b.  that Lehman's accounting practices conformed to GAAP and SEC

     regulations;

  c.  that Lehman's net leverage ratio was fairly stated;

  d.  that Lehman timely and properly took appropriate charges to write down

     the value of certain of its real estate-related assets;

  e.  that Lehman's liquidity position was strong;

  f.  that Lehman's risk management procedures were effective and were being

     followed, and

  g.  that Lehman made required disclosures of certain concentrations of credit

     risk.

524.  E&Y's fraudulent misrepresentations included statements that:

  a.  Lehman's financial statements were prepared in accordance with GAAP;

  b.  Lehman's financial statements were presented fairly and accurately; and

  c.  E&Y conducted the audits of Lehman in accordance with GAAS.

525.  The Officer Defendants and E&Y had reason to expect that the Plaintiffs would rely on the misrepresentations and omissions.  The Plaintiffs reasonably relied on those materials, and on the misrepresentations and omissions contained therein, in its decisions to acquire and/or continue to hold Lehman securities.

526.  By reason of the Plaintiffs' reasonable reliance on the Defendants' misrepresentations, and as a direct and proximate result of the wrongful conduct, the Plaintiffs have suffered damages, all in an amount to be determined according to proof.

527.    These Defendants are also liable for punitive damages, as their acts and omissions alleged in detail above were accompanied by actual malice and/or a wanton and willful disregard of Lehman investors, including the Plaintiffs.

## TENTH CAUSE OF ACTION

### Aiding and Abetting Fraud
### Against the Lehman Defendants and E&Y

528.    The Plaintiffs repeat and re-allege each and every allegation above as if fully set forth herein except those allegations alleging that Defendants acted only negligently.

529.    The Lehman Defendants and E&Y aided and abetted the Defendants in committing fraud by their active participation, aid, encouragement, and/or ratification of the fraud alleged herein, for their own benefit.

530.    The Officer Defendants actively participated in, aided, encouraged, and/or ratified the fraud of each of the other Officer Defendants.

531.    The Officer Defendants intentionally allowed and/or recklessly failed to detect or deter the fraud of each of the other Officer Defendants.

532.    The Director Defendants aided and abetted the Officer Defendants' fraud by intentionally allowing and/or recklessly failing to detect or deter the Officer Defendants' misleading statements.  The Director Defendants provided little or no oversight of the Officer Defendants, allowing the Officer Defendants to engage in fraudulent or reckless conduct.

533.    E&Y aided and abetted the fraud by, among other things, intentionally allowing Lehman's Repo 105 practice to continue despite numerous red flags that began in 2001 and continued throughout the Relevant Period indicating that the practice was unwarranted and did not

comply with GAAP.  E&Y also aided and abetted the fraud by issuing an unqualified audit opinion on Lehman's financial statements and by issuing unqualified quarterly review reports during the Relevant Period.  The audits were not conducted in accordance with GAAS and the audit and review reports should not have been issued under GAAP and GAAS.  E&Y knew and intended that the audit and review reports would be relied on by investors.  The audit and review reports were in fact relied on.

534.    The Lehman Defendants' participation, aid, encouragement, and/or ratification of the Defendants' fraud was done for their own benefit, to protect their compensation as officers and directors, and to facilitate and protect the payment of hundreds of millions of dollars in bonuses and total compensation as officers and directors.

535.    E&Y's participation, aid, encouragement, and/or ratification of the fraud was done for its benefit, which included, among other things, preserving its relationship with Lehman and securing tens of millions of dollars of compensation for its services provided to Lehman.

536.    By virtue of these Defendants' conduct in aiding and abetting fraud, the Plaintiffs suffered damages in an amount to be determined according to proof.

537.    These Defendants are also liable for punitive damages, as their acts and omissions alleged in detail above were accompanied by actual malice and/or a wanton and willful disregard of Lehman investors, including the Plaintiffs.

/ / /

/ / /

/ / /

172

## ELEVENTH CAUSE OF ACTION

### Negligent Misrepresentation
### Against the Lehman Defendants

538.     The Plaintiffs repeat and re-allege each and every allegation above as if fully set forth herein.

539.     In order to induce the Plaintiffs to purchase Lehman securities, the Lehman Defendants negligently made misrepresentations and withheld material facts in the Registration Statements, Offerings Documents, SEC Filings, press releases, and public oral statements.

540.     The Lehman Defendants made numerous false and misleading statements regarding the financial condition of Lehman.  These statements were negligent, material, and made with negligent indifference to their truth or falsity, with the intention and expectation that the Plaintiffs would rely on them.

541.     The Lehman Defendants' negligent misrepresentations are set forth more fully above, and include, among others, the following:

a.     that Lehman's financial results were free of material misstatements and "fairly presented" the Company's financial results;

b.     that Lehman's accounting practices conformed to GAAP and SEC regulations;

c.     that Lehman's net leverage ratio was fairly stated;

d.     that Lehman timely and properly took appropriate charges to write down the value of certain of its real estate-related assets;

e.     that Lehman's liquidity position was strong;

173

f.     that Lehman's risk management procedures were effective and were bring

followed; and

g.     that Lehman made required disclosures for certain concentrations of credit

risk.

542.    The disclosures and materials containing misrepresentations and omissions were

made by the Lehman Defendants with the purpose of inducing investors to purchase Lehman

Securities.

543.    The Plaintiffs reasonably relied on the misrepresentations and omissions when

purchasing the Securities, and when deciding to hold, and continue holding the Securities.

544.    As a direct and proximate result of the misrepresentation and omission, the Plaintiffs

have incurred losses in an amount to be determined at trial.

## TWELFTH CAUSE OF ACTION

**Fraudulent Conveyance**
**Against Defendants Richard and Kathleen Fuld**

545.    The Plaintiffs incorporate by reference each of the substantive paragraphs of this

Amended Complaint.

546.    Based on a January 26, 2009, Bloomberg.com report found at

http://www.bloomberg.com/apps/news?pid=20601103&sid=alMpGZaBLtag,

http://cityfile.com/dailyfile/5866, and numerous other news reports, Defendants Mr. and Mrs. Fuld

jointly purchased a residence at Jupiter Island, Florida in March 2004 for the sum of $13,750,000.

547.    Defendant Mrs. Fuld "purchased" the Jupiter Island property from her husband,

Defendant Fuld, for the total sum of $100.00 in November 2008, according to Florida real estate

174

records, as reported by Reuters on January 25, 2009.

548.    At the time of the above transfer, Lehman was in bankruptcy and Defendant Fuld was unemployed, having been involuntarily removed from his positions without any bonus or severance.

549.    Defendants Mr. and Mrs. Fuld made the transfer alleged herein with actual intent to hinder, delay and defraud investors, such as Plaintiffs, without receiving a reasonably equivalent value in exchange therefor, and Mr. and Mrs. Fuld believed they would incur debts beyond the Fuld's ability to pay as they came due.

550.    Said transfer was fraudulent as to Plaintiffs, who are entitled to obtain avoidance of the transfers to the full extent necessary to satisfy their claims, and are also entitled to attachment or other provisional remedy against said transferred asset and the proceeds from any sale thereof, also an injunction against further disposition by Defendants Mr. and Mrs. Fuld, and also the appointment of a receiver to take charge of said property, all in accordance with the Uniform Fraudulent Transfer Act.

## X.    **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for judgment as follows:

1.    Full and complete rescission and all remedies ancillary thereto;

2.    Actual damages in an amount to be proven at trial;

3.    Prejudgement interest and post-judgment interest as allowed pursuant to statutory and common law;

4.    Reasonable attorneys' fees;

5.    Exemplary and punitive damages in an amount sufficient to punish the Defendants and make an example of them; and

6.    Such other and further relief as the Court may deem just and proper.

## XI.    DEMAND FOR JURY TRIAL

Plaintiffs demand a trial by jury.

Dated: November 29, 2011                    Respectfully submitted,

**COTCHETT, PITRE & McCARTHY, LLP**

By: _____
MATTHEW K. EDLING

Imtiaz A. Siddiqui (IS-4090)
One Liberty Plaza, 23rd Floor
New York, NY 10006
Telephone: (212) 201-6820
Facsimile: (646) 219-6678

Joseph W. Cotchett
Mark C. Molumphy
Matthew K. Edling (admitted *pro hac vice*)
Jordanna G. Thigpen (admitted *pro hac vice*)
840 Malcolm Road, Suite 200
Burlingame, California 94010
Tel: (650) 697-6000
Fax: (650) 697-0577

*Attorneys For Plaintiff City of Auburn*
*Attorneys for Plaintiff City of Burbank*
*Attorneys for Plaintiff Contra Costa Water District*
*Attorneys for Plaintiff Mary A. Zeeb, Monterey County*
*Treasurer, on Behalf of the Monterey County Investment Pool*
*Attorneys for Plaintiff City of San Buenaventura*
*Attorneys for Plaintiff The San Mateo County Investment Pool*
*Attorneys for Plaintiff Vallejo Sanitation and Flood Control District*
*Attorneys for Plaintiff Zenith Insurance Company*

176

Charles J. McKee
Monterey County Counsel
168 West Alisal Street
Salinas, CA 93901
Tel: (831) 755-5045
Fax: (831) 755-5283

*Attorneys for Mary A. Zeeb, Monterey County Treasurer, on Behalf of the Monterey County Investment Pool*

Ariel Piere Calonne
City of San Buenaventura
501 Poli Street
P.O. Box 99
Ventura, CA 93002-0099
Tel: (805) 654-7818
Fax: (805) 641-0253

*Attorneys for Plaintiff City of San Buenaventura*

**APPENDIX A**

| AUBURN | | | | | |
|---|---|---|---|---|---|
| **Purchase Date** | **Offering** | **Purchase Amount** | **CUSIP** | **Underwriter Defendants[1] (Extent of Participation)** | **False and Misleading SEC Filings Incorporated Into Offering Documents[2]** |
| 3/31/2008 | Auburn Offering | $124,401.25 | 52517PSC6 | BOA ($10 Million) BNP Paribas ($10 Million) HSBC ($10 Million) SunTrust ($10 Million) | January 29, 2008 Form 10-K February 13, 2007 Form 10-K February 13, 2006 Form 10-K October 10, 2007 Form 10-Q July 10, 2007 Form 10-Q April 9, 2007 Form 10-Q October 10, 2006 Form 10-Q July 10, 2006 Form 10-Q April 10, 2006 Form 10-Q December 13, 2007 Form 8-K 2001 Registration Statement |

---

[1] "Underwriter Defendants" refers to: ABN Amro Holding N.V. (Acquired by RFS Holdings B.V.) ("ABN Amro"); ANZ Securities, Inc. ("ANZ"); Banc of America Securities LLC ("BOA"); BBVA Securities Inc. ("BBVA"); BNP Paribas S.A. ("BNP"); Calyon Securities (USA) Inc. ("Caylon"); Citigroup Global Markets Inc. ("CGMI"); Commerzbank Capital Markets Corp. ("Commerzbank"); Daiwa Capital Markets Europe Limited (f/k/a Daiwa Securities SMBC Europe Limited) ("Daiwa"); Fortis Securities LLC ("Fortis"); Harris Nesbitt Corp. ("Harris Nesbitt"); HSBC Securities (USA) Inc. ("HSBC"); HVB Capital Markets, Inc. ("HVB"); ING Financial Markets LLC ("ING"); Loop Capital Markets, LLC ("Loop"); M.R. Beal & Company ("MR Beal"); Mellon Financial Markets, LLC ("Mellon"); Natixis Bleichroeder Inc. ("Natixis"); RBS Greenwich Capital ("RBS Greenwich"); Santander Investment Securities Inc. ("Santander"); Siebert Capital Markets ("Siebert"); Société Générale Corporate and Investment Banking ("Société Générale "); SunTrust Robinson Humphrey, Inc. ("SunTrust"); Wells Fargo Securities, LLC ("Wells Fargo"); Williams Capital Group, L.P. ("Williams Capital"). Where Lehman served as an underwriter, it does not appear on this table.

[2] Incorporated filings included SEC filings pursuant to Sections 13(a), 13(c), 14 and/or 15(d) of the Exchange Act of 1934.

**APPENDIX A**

| BURBANK | | | | | |
|---|---|---|---|---|---|
| **Purchase Date** | **Offering** | **Purchase Amount** | **CUSIP** | **Underwriter Defendants (Extent of Participation)** | **False and Misleading SEC Filings Incorporated Into Offering Documents** |
| 5/09/06 | First Burbank Offering | $5,000,380.56 | 52517PG96 | N/A[3] | February 13, 2006 Form 10-K<br>April 10, 2006 Form 10-Q<br>2005 Registration Statement |
| 1/29/2008 | Second Burbank Offering | $5,086,718.75 | 5252M0BZ9 | BBVA ($40 million)<br>BNP ($40 million)<br>CGMI ($40 million)<br>Commerzbank ($40 million)<br>Daiwa ($40 million)<br>Fortis ($40 million)<br>ING ($40 million)<br>Mellon ($40 million)<br>MR Beal ($40 million)<br>Natixis ($40 million)<br>Société Générale ($40 million)<br>SunTrust ($40 million)<br>Wells Fargo Securities ($40 million) | January 29, 2008 Form 10-K<br>February 13, 2007 Form 10-K<br>February 13, 2006 Form 10-K<br>October 10, 2007 Form 10-Q<br>July 10, 2007 Form 10-Q<br>April 9, 2007 Form 10-Q<br>October 10, 2006 Form 10-Q<br>July 10, 2006 Form 10-Q<br>April 10, 2006 Form 10-Q<br>December 13, 2007 Form 8-K<br>2006 Registration Statement |

---

[3]  Burbank does not name any Underwriter Defendants for the First Burbank Offering.

**APPENDIX A**

| CONTRA COSTA | | | | | |
| --- | --- | --- | --- | --- | --- |
| **Purchase Date** | **Offering** | **Purchase Amount** | **CUSIP** | **Underwriter Defendants (Extent of Participation)** | **False and Misleading SEC Filings Incorporated Into Offering Documents** |
| 2/5/2008 | Contra Costa Offering | $10,514,565.73 | 52517PR60 | ANZ ($15 Million)<br>BOA ($15 Million)<br>CGMI ($15 Million)<br>Daiwa ($15 Million)<br>HVB ($15 Million)<br>SunTrust ($15 Million)<br>Wells Fargo ($15 Million) | January 29, 2008 Form 10-K<br>February 13, 2007 Form 10-K<br>February 13, 2006 Form 10-K<br>October 10, 2007 Form 10-Q<br>July 10, 2007 Form 10-Q<br>April 9, 2007 Form 10-Q<br>October 10, 2006 Form 10-Q<br>July 10, 2006 Form 10-Q<br>April 10, 2006 Form 10-Q<br>December 13, 2007 Form 8-K<br>2006 Registration Statement |

## APPENDIX A

| MONTEREY | | | | | |
|---|---|---|---|---|---|
| **Purchase Date** | **Offering** | **Purchase Amount** | **CUSIP** | **Underwriter Defendants** | **False and Misleading SEC Filings Incorporated Into Offering Documents** |
| 10/01/07 | Monterey Offering | $10,026,250 | 52517PG21 | N/A[4] | February 13, 2007 Form 10-K<br>February 13, 2006 Form 10-K<br>July 10, 2007 Form 10-Q<br>April 9, 2007 Form 10-Q<br>October 10, 2006 Form 10-Q<br>July 10, 2006 Form 10-Q<br>April 10, 2006 Form 10-Q<br>2005 Registration Statement |

---

[4] Monterey County does not name any Underwriter Defendants.

**APPENDIX A**

| SAN MATEO | | | | | |
|---|---|---|---|---|---|
| **Purchase Date** | **Offering** | **Purchase Amount** | **CUSIP** | **Underwriter Defendants (Extent of Participation)** | **False and Misleading SEC Filings Incorporated Into Offering Documents** |
| 10/25/04 | First San Mateo Offering | $9,990,380 | 52517PXU0 | Loop ($625,000)<br>MR Beal ($625,000)<br>Siebert ($625,000)<br>Williams ($625,000) | 2001 Registration Statement |
| 10/24/05 | Second San Mateo Offering | $10,000,000 | 52517PC58 | Wells Fargo ($6 Million) | 2005 Registration Statement |
| 8/21/06 | Third San Mateo Offering | $25,000,000 | 52517PK83 | Commerzbank ($8.5 Million) | February 13, 2006 Form 10-K<br>July 10, 2006 Form 10-Q<br>April 10, 2006 Form 10-Q<br>2006 Registration Statement |
| 11/16/06 | Fourth San Mateo Offering | $20,000,000 | 52517PN98 | HSBC ($13.5 Million) | February 13, 2006 Form 10-K<br>October 10, 2006 Form 10-Q<br>July 10, 2006 Form 10-Q<br>April 10, 2006 Form 10-Q<br>2006 Registration Statement |
| 12/21/06 | Fifth San Mateo Offering | $20,000,000 | 52517PQ46 | Daiwa ($10 Million) | February 13, 2006 Form 10-K<br>October 10, 2006 Form 10-Q<br>July 10, 2006 Form 10-Q<br>April 10, 2006 Form 10-Q<br>2006 Registration Statement |

**APPENDIX A**

| SAN MATEO | | | | | |
|---|---|---|---|---|---|
| **Purchase Date** | **Offering** | **Purchase Amount** | **CUSIP** | **Underwriter Defendants (Extent of Participation)** | **False and Misleading SEC Filings Incorporated Into Offering Documents** |
| 3/23/07 | Sixth San Mateo Offering | $20,000,000 | 52517PW31 | Banc of America ($16 Million) Commerzbank ($16 Million) | February 13, 2007 Form 10-K February 13, 2006 Form 10-K October 10, 2006 Form 10-Q July 10, 2006 Form 10-Q April 10, 2006 Form 10-Q 2006 Registration Statement |
| 5/25/07 | Seventh San Mateo Offering | $25,000,000 | 52517P2K6 | CGMI ($27.5 Million) Williams ($27.5 Million) | February 13, 2007 Form 10-K February 13, 2006 Form 10-K April 9, 2007 Form 10-Q October 10, 2006 Form 10-Q July 10, 2006 Form 10-Q April 10, 2006 Form 10-Q 2006 Registration Statement |

**APPENDIX A**

| SAN MATEO | | | | | |
|---|---|---|---|---|---|
| **Purchase Date** | **Offering** | **Purchase Amount** | **CUSIP** | **Underwriter Defendants (Extent of Participation)** | **False and Misleading SEC Filings Incorporated Into Offering Documents** |
| 1/22/08 | Eighth San Mateo Offering | $14,931,600 | 5252M0BZ9 | BBVA ($40 million) BNP ($40 million) CGMI ($40 million) Commerzbank ($40 million) Daiwa ($40 million) Fortis ($40 million) ING ($40 million) Mellon ($40 million) MR Beal ($40 million) Natixis ($40 million) Société Générale ($40 million) SunTrust ($40 million) Wells Fargo Securities ($40 million) | February 13, 2007 Form 10-K February 13, 2006 Form 10-K October 10, 2007 Form 10-Q July 10, 2007 Form 10-Q April 9, 2007 Form 10-Q October 10, 2006 Form 10-Q July 10, 2006 Form 10-Q April 10, 2006 Form 10-Q December 13, 2007 Form 8-K 2006 Registration Statement |
| 2/15/08 | Ninth San Mateo Offering | $9,851,047 | 52517PK83 | Commerzbank ($8.5 Million) | January 29, 2008 Form 10-K February 13, 2007 Form 10-K February 13, 2006 Form 10-K October 10, 2007 Form 10-Q July 10, 2007 Form 10-Q April 9, 2007 Form 10-Q October 10, 2006 Form 10-Q July 10, 2006 Form 10-Q April 10, 2006 Form 10-Q December 13, 2007 Form 8-K 2006 Registration Statement |

**APPENDIX A**

| VALLEJO | | | | | |
|---|---|---|---|---|---|
| **Purchase Date** | **Offering** | **Purchase Amount** | **CUSIP** | **Underwriter Defendants (Extent of Participation)** | **False and Misleading Documents Incorporated Into Offering Materials** |
| 1/10/08 | First Vallejo Offering | $936,929.70 | 52517PYN5 | ABN ($10 million)<br>ANZ ($10 million)<br>BOA ($10 million)<br>CGMI ($10 million)<br>Daiwa ($10 million)<br>Harris Nesbitt ($10 million)<br>HSBC ($10 million)<br><br>RBS Greenwich ($10 million)<br>Santander ($10 million)<br>Suntrust ($10 million) | February 13, 2007 Form 10-K<br>February 13, 2006 Form 10-K<br>October 10, 2007 Form 10-Q<br>July 10, 2007 Form 10-Q<br>April 9, 2007 Form 10-Q<br>October 10, 2006 Form 10-Q<br>July 10, 2006 Form 10-Q<br>April 10, 2006 Form 10-Q<br>December 13, 2007 Form 8-K<br>2001 Registration Statement |
| 1/22/08 | Second Vallejo Offering | $494,930.00 | 52517PXT3 | ABN ($5 million)<br>ANZ ($5 million)<br>Calyon ($5 million)<br>CGMI ($5 million)<br>Fortis ($5 million)<br>HSBC ($5 million)<br>HVB ($5 million)<br>ING ($5 million)<br>Mellon ($5 million)<br>RBS Greenwich ($5 million)<br>Santander ($5 million)<br>SunTrust ($5 million) | February 13, 2007 Form 10-K<br>February 13, 2006 Form 10-K<br>October 10, 2007 Form 10-Q<br>July 10, 2007 Form 10-Q<br>April 9, 2007 Form 10-Q<br>October 10, 2006 Form 10-Q<br>July 10, 2006 Form 10-Q<br>April 10, 2006 Form 10-Q<br>December 13, 2007 Form 8-K<br>2001 Registration Statement |

**APPENDIX A**

| VALLEJO | | | | | |
|---|---|---|---|---|---|
| 1/30/08 | Third Vallejo Offering | $3,055,287.12 | 5252M0BZ9 | BBVA ($40 million)<br>BNP ($40 million)<br>CGMI ($40 million)<br>Commerzbank ($40 million)<br>Daiwa ($40 million)<br>Fortis ($40 million)<br>ING ($40 million)<br>Mellon ($40 million)<br>MR Beal ($40 million)<br>Natixis ($40 million)<br>Société Générale ($40 million)<br>SunTrust ($40 million)<br>Wells Fargo Securities ($40 million) | January 29, 2008 Form 10-K<br>February 13, 2007 Form 10-K<br>February 13, 2006 Form 10-K<br>October 10, 2007 Form 10-Q<br>July 10, 2007 Form 10-Q<br>April 9, 2007 Form 10-Q<br>October 10, 2006 Form 10-Q<br>July 10, 2006 Form 10-Q<br>April 10, 2006 Form 10-Q<br>December 13, 2007 Form 8-K<br>2006 Registration Statement |

APPENDIX A

| VENTURA | | | | | |
|---|---|---|---|---|---|
| **Purchase Date** | **Offering** | **Purchase Amount** | **CUSIP** | **Underwriter Defendants (Extent of Participation)** | **False and Misleading SEC Filings Incorporated Into Offering Documents** |
| 2/5/2008 | Ventura Offering | $5,065,650 | 5252M0BZ9 | BBVA ($40 million)<br>BNP ($40 million)<br>CGMI ($40 million)<br>Commerzbank ($40 million)<br>Daiwa ($40 million)<br>Fortis ($40 million)<br>ING ($40 million)<br>Mellon ($40 million)<br>MR Beal ($40 million)<br>Natixis ($40 million)<br>Société Générale ($40 million)<br>SunTrust ($40 million)<br>Wells Fargo Securities ($40 million) | January 29, 2008 Form 10-K<br>February 13, 2007 Form 10-K<br>February 13, 2006 Form 10-K<br>October 10, 2007 Form 10-Q<br>July 10, 2007 Form 10-Q<br>April 9, 2007 Form 10-Q<br>October 10, 2006 Form 10-Q<br>July 10, 2006 Form 10-Q<br>April 10, 2006 Form 10-Q<br>December 13, 2007 Form 8-K<br>2006 Registration Statement |

APPENDIX A

| ZENITH | | | | | |
|---|---|---|---|---|---|
| **Purchase Date** | **Offering** | **Purchase Amount** | **CUSIP** | **Underwriter Defendants** | **False and Misleading SEC Filings Incorporated Into Offering Documents** |
| 8/18/2005 | First Zenith Offering | $1,990,750.00 | 52517PA35 | N/A[5] | 2005 Registration Statement |
| 9/26/2006 | Second Zenith Offering | $7,856,800.00 | 52517PA35 | ABN ($15Million) ANZ ($15Million) BNP ($15Million) Harris Nesbitt ($15Million) RBS Greenwich ($15Million) | February 13, 2006 Form 10-K July 10, 2006 Form 10-Q April 10, 2006 Form 10-Q 2005 Registration Statement |
| 8/8/2007 | Third Zenith Offering | $1,939,400.00 | 52517PA35 | ABN ($15Million) ANZ ($15Million) BNP ($15Million) Harris Nesbitt ($15Million) RBS Greenwich ($15Million) | February 13, 2007 Form 10-K February 13, 2006 Form 10-K July 10, 2007 Form 10-Q April 9, 2007 Form 10-Q October 10, 2006 Form 10-Q July 10, 2006 Form 10-Q April 10, 2006 Form 10-Q 2005 Registration Statement |

---

[5] Zenith does not name any Underwriter Defendants for the First Zenith Offering.

## CERTIFICATE OF SERVICE

I hereby certify that on November 29, 2011, a copy of the foregoing Consolidated First Amended Complaint was served upon the counsel identified below via US Mail. Additionally, all counsel who are registered with the Court's Electronic Filing System (ECF) in this matter may access this filing through the ECF system, and notice of filing will be sent to those parties by operation of the ECF system.

Matthew K. Edling

Michael J. Chepiga
Mary E. McGarry
**Simpson Thacher & Bartlett LLP**
425 Lexington Avenue
New York, NY 10017-3954

*Counsel for Defendants Christopher M. O'Meara, Joseph M. Gregory, Ian Lowitt, and David Goldfarb*

Patricia M. Hynes
**Allen & Overy LLP**
1221 Ave of the Americas
New York, NY 10020

*Counsel for Defendants Richard S. Fuld and Kathleen Fuld*

Seth David Fier
Mark Davidson
**Proskauer Rose LLP**
11 Times Square
New York, NY 10036-8299

&

Al Pavlis
Richard Gora
**Finn Dixon & Herling**
177 Broad Street
Stamford, CT  06901-2048

*Counsel for Defendant Erin Callan*

Andrew J. Levander
Adam Jay Wasserman
**Dechert LLP**
1095 Avenue of the Americas
New York, NY 10036

*Counsel for Defendants John F. Akers, Roger S. Berlind, Marsha Johnson Evans, Roland A. Hernandez, and Henry Kaufman*

Peter A. Wald
**Latham & Watkins LLP**
505 Montgomery Street , Suite 2000
San Francisco, CA 94111

*Counsel for Defendant Ernst & Young, LLP*

Victor L. Hou
**Cleary Gottlieb Steen & Hamilton LLP**
One Liberty Plaza
New York, NY 10006

*Counsel for Defendants ABN Amro Holding N.V., ANZ Securities, Banc of America Securities, LLC, Inc., BBVA Securities Inc., BNP Paribas S.A., Calyon Securities (USA) Inc., Citigroup Global Markets Inc., Commerzbank Capital Markets Corp., Fortis Securities LLC, Harris Nesbitt, HSBC Securities (USA) Inc., ING Financial Markets LLC, Loop Capital Markets, LLC, Mellon Financial Markets, LLC, M.R. Beal & Co., Natixis Bleichroeder Inc., RBS Greenwich Capital, Santander Investment Securities Inc., Siebert Capital Markets, Societe General Corporate & Investment Banking, SunTrust Robinson Humphrey, Inc., and Wells Fargo Securities LLC*

Michael A. Hanin
**Kasowitz, Benson, Torres & Friedman LLP**
1633 Broadway
New York, New York 10019

*Counsel for Defendant HVB Capital Markets*