# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re LEHMAN BROTHERS SECURITIES AND ERISA LITIGATION | Civil Action 09-MD-2017-LAK |

In re LEHMAN BROTHERS SECURITIES AND ERISA LITIGATION

This Document Applies To:

City of South San Francisco v. Citigroup Global Markets, Inc., et al.
Case No.: 1:09-cv-01946-LAK

City of Long Beach v. Fuld, et al.
Case No.: l:09-cv-03467-LAK

County of Tuolumne v. Ernst & Young, LLP, et al.
Case No.: 1:09-cv-03468-LAK

City of Fremont v. Citigroup Global Markets, Inc., et al.
Case No.: 1:09-cv-03478-LAK

County of Alameda v. Ernst & Young, LLP, et al.
Case No.: 1:09-cv-07877-LAK

City of Cerritos v. Citigroup Global Market, Inc., et al.
Case No.: 1:09-cv-07878-LAK

Civil Action 09-MD-2017-LAK

**CONSOLIDATED FIRST AMENDED COMPLAINT FOR DAMAGES**

**(Plaintiffs Cities of South San Franciso, Long Beach, Fremont and Cerritos and Counties of Alameda and Tuolumne)**

1. **Violation of Section 11 of Securities Act;**
2. **Violation of California Corporations Code § 25400, *et seq.*;**
3. **Fraud and Deceit; and**
4. **Negligent Misrepresentation**

   **Jury Trial Demanded**

834450.1

Plaintiffs Cities of South San Francisco, Long Beach, Fremont and Cerritos and the Counties of Alameda and Tuolumne ("Plaintiffs")[1], by their undersigned attorneys, makes the following allegations on information and belief based upon the investigation of counsel, except as to the allegations pertaining specifically to Plaintiffs and Plaintiffs' counsel which are based on personal knowledge.  The investigation conducted by Plaintiffs' counsel included, but was not limited to, a review and analysis of: (i) public filings, including Lehman Brothers Holdings Inc.'s ("Lehman" or the "Company") filings and prospectuses with the United States Securities and Exchange Commission ("SEC"); (ii) securities analysts' reports and advisories about the Company;  (iii) press releases issued by Defendants and others; (iv) public statements made by Defendants including the Congressional testimony of Richard S. Fuld, Jr.; (v) the Report of Anton R. Valukas, Examiner dated March 11, 2010 and (v) publicly available news articles and reports.

## NATURE OF ACTION

1.      Plaintiffs are California public municipalities and counties that invested monies for their own account as permitted by the California Government Code.  Plaintiffs purchased medium term notes (the "Lehman Notes" or "Notes") and commercial paper issued by Lehman (the "Lehman Securities" or "Securities").  Certain Plaintiffs' claims (as identified below) are brought against underwriters of  certain public note offerings made to investors .  As to the Lehman Notes, certain Plaintiffs bring claims for violations of Section 11 of the Securities Act of 1933 ("Securities Act").   As to all of the Lehman Notes and Securities purchased by Plaintiffs, they bring claims for violations of California statutes and common law.  Plaintiffs also bring claims against Lehman's public auditor, Ernst & Young LLP ("Ernst"), for materially false and

---

[1] This Consolidated Complaint is filed pursuant to the Court's pre-trial order No. 23 dated November 9, 2011.  Pursuant to a written agreement between Plaintiffs and the Lehman Brothers Directors and Officers defendants those defendants are not named in this Consolidated Complaint since there is a pending settlement between plaintiffs and those defendants that will be final within the next thirty to sixty days.  This Consolidated Complaint is substantially the same as the First Amended Complaint filed by plaintiffs on or about October 7, 2011.

**CONSOLIDATED FIRST AMENDED COMPLAINT FOR DAMAGES**

misleading audit opinions issued by it on Lehman's consolidated financial statements for the fiscal years 2006, and 2007 and the quarterly reviews of Lehman's consolidated financial statements for the first and second quarters of fiscal year 2008.

2.      Plaintiff alleges, among other things, that the shelf registration statement filed by Lehman on May 30, 2006, SEC filings made by Lehman, audit opinions and quarterly reviews made by Ernst, and public statement made or approved by Defendants contained material misstatements and omissions.   ("Defendants" is used collectively to refer to defendant Ernst and the "Underwriter Defendants" as that term is defined in Paragraph 22 below.)  These representations were materially false and misleading because at the time Plaintiffs purchased the Lehman Notes and Securities, Lehman was experiencing a number of materially adverse events that were not revealed or sufficiently disclosed to investors such as Plaintiffs.  Those events include, but are not limited to: (i) the failure to disclose Lehman's continued and aggressive marketing of high risk securities secured with subprime mortgages that had suffered material increases in default rates due to declining home values; (ii) the failure to set aside adequate reserves to cover Lehman's ever increasing portfolio of underperforming subprime mortgage-backed securities and commercial mortgage-backed securities; (iii) the continued marketing of high risk mortgage bonds and Collateralized Debt Obligations ("CDOs") secured by assets that were declining sharply in market value even as the market for such securities collapsed; (iv) the promotion of unsustainable business practices designed to exploit the mortgage lending business despite the material, and mostly undisclosed, risks involved; (v) the insufficient capital levels of Lehman; (vi) the failure to timely and adequately write-down commercial and residential mortgage and real estate assets; (vii) materially misrepresented Lehman's net leverage ratio at the end of every fiscal reporting period beginning with the third quarter of 2007 by Lehman engaging in undisclosed repurchase and resale transactions known as Repo 105 and Repo 108 transactions;

3

**CONSOLIDATED FIRST AMENDED COMPLAINT FOR DAMAGES**

(viii) materially misrepresented Lehman's risk management practices, its liquidity and concentration of credit risk beginning in the third quarter of fiscal year 2007; and (ix) the failure to prevent and remedy such improper and harmful actions that resulted in Lehman filing for bankruptcy on September 15, 2008 under Chapter 11 of the United States Bankruptcy Code.[2]  As a result of  Defendants' efforts to keep adverse financial information from the investing public, including Plaintiffs, Lehman was able to raise money through investments right up to the point when bankruptcy became inevitable.  Given the lack of adequate disclosure in Lehman's financial statements, efforts to put a favorable public spin on Lehman's financial woes, and the push to deflect concern about the viability of investments in Lehman, Plaintiffs were not aware, and could not have become aware, of Lehman's serious financial problems before or after they purchased the Lehman Notes and Securities.

3.       Defendants knew, or should have known, of the material misstatements and omissions of material facts in the Lehman registration statement, SEC filings, and the public statements of Defendants prior to Plaintiffs' purchase of the Lehman Notes and Securities.

4.       A slight glimpse into the adverse facts affecting Lehman's business was first revealed on March 18, 2008 in a Company issued press release announcing decreasing net revenues and declining asset values due to "continued deterioration in the broader credit markets, in particular residential mortgages, commercial mortgages and acquisition finance."  However, the disclosure was incomplete and materially misleading as to the full extent of Lehman's financial problems.  Moreover, over the next several months, Lehman's officers directly denied the seriousness of such problems.  Lehman's CEO Richard Fuld ("Fuld") told shareholders in April

---

[2] No bankrupt party is being sued herein, nor do Plaintiffs seek any relief in the United States Bankruptcy Court through this action.  The outcome of Plaintiffs' claims herein will not alter the debtor's rights, liabilities, options, or freedom of actions.  Therefore, this action will have no effect (footnote continued)

2008 that "the worst is behind us" and on June 16, 2008 told investors that "[Lehman's] capital and liquidity positions have never been stronger."

5.     Within a few weeks after March 18, 2008, Lehman returned to the capital markets, raising $4 billion by issuing preferred stock.  These and similar efforts failed, and on September 15, 2008, Lehman filed a voluntary petition to reorganize under Chapter 11 in the United States Bankruptcy Court for the Southern District of New York.  This is the largest bankruptcy filing in history.  As a result, Plaintiffs wrote down to zero value their investment in Lehman Notes and Securities.

6.     Plaintiffs and their taxpayers have suffered significant financial damage as a result of Defendants' material misstatements and omissions.  Plaintiffs bring this action to recover damages incurred thereby as well as the costs and expenses of this litigation and further relief as may be just and proper.

## JURISDICTION AND VENUE

7.     The claims asserted herein arise under, and are made pursuant to, section 11 of the Securities Act, the California Corporations Code, and under California common law.

8.     The California Superior Court has jurisdiction over the subject matter of this action pursuant to Section 22(a) of the Securities Act, 15 U.S.C. § 77v(a), which provides: "Federal and State courts; venue; service of process; review; removal; costs.  The district courts of the United States and United States courts of any Territory shall have jurisdiction of offenses and violations under this title."  The Superior Court also has jurisdiction over the subject matter of this action pursuant to its statutory and other powers to afford damages and other relief on the matters stated herein.  The Superior Court also has personal jurisdiction over Defendants because the acts and

_____

on the estate being administered in bankruptcy.

omissions of Defendants, including the solicitation and sale of the Lehman Notes and Securities, took place and resulted in damages and other adverse effects upon Plaintiff within the State of California.  The amount in controversy exceeds the jurisdictional minimum of the Superior Court.[3]

9.      At all relevant times, each Defendant named herein maintained contacts with and conducted business in California.

10.     Venue is proper in California Superior Courts pursuant to California Code of Civil Procedure section 395, because the acts and omissions complained of herein, including the solicitation and sale of the Lehman Notes and Securities through the use of materially false and misleading information by Defendants took place and caused damages to, and had other adverse effects upon, Plaintiffs within the territorial jurisdiction of the California Superior Courts.

## PARTIES

11.     Plaintiff City of South San Francisco is a public entity that invested monies in an investment pool organized and managed by the County of San Mateo pursuant to California Government Code sections 27130 and 53635, and related statutes.  As a participant in the San Mateo County Investment Pool ("SM Pool"), Plaintiff purchased medium term notes issued by Lehman (the "Lehman Notes" or "Notes"). As a member of the SM Pool, Plaintiff invested financial assets obtained from tax collections, bond measures, and other public revenue sources in a common fund managed by the County of San Mateo.  Pursuant to the Investment Policy Statement dated January 2008, the SM Pool was to meet the needs of liquidity and long term investing of public entities in San Mateo County, including Plaintiff.  The Pool was managed by the San Mateo County Treasurer.  As of August 29, 2008, Plaintiff's interest in the SM Pool was

_____

[3] Certain of these actions were removed by certain defendants to the federal district courts in California and transferred to the Southern District of New York by order of the Panel for Multi-District Litigation.  Plaintiffs retain their originally allegations as to venue and jurisdiction.

$7,793,168 of the approximately $2.6 billion of the SM Pool's assets. Pursuant to the May 30th Offering Materials, except as noted in footnote two below, the SM Pool purchased a number of medium term Lehman Notes including the following:

| Purchase Date | Maturity Date | Cost |
|---|---|---|
| 10/24/2005[4] | 10/22/2008 | $10,000,000 |
| 8/21/2006 | 8/21/2009 | $25,000,000 |
| 11/16/2006 | 11/16/2009 | $20,000,000 |
| 12/21/2006 | 12/23/2008 | $20,000,000 |
| 3/23/2007 | 3/23/2009 | $20,000,000 |
| 5/25/2007 | 5/25/2010 | $25,000,000 |
| 1/22/2008 | 1/24/2013 | $14,931,600 |
| 2/19/2008 | 8/21/2009 | $9,724,000 |
| **Lehman Notes Total Cost** | | **$144,655,600** |

12.     Plaintiff City of Long Beach ("Long Beach") invested monies through its investment pool (the "Pool") organized and managed pursuant to the California Government Code. Through the Pool, Plaintiff purchased 27-day short-term commercial paper issued by Lehman (the "Lehman Securities" or "Securities") on September 3, 2008 in order to meet its liquidity needs on September 30, 2008. The amount invested by Long Beach in the Lehman Securities was $19,963,250. The Pool invests monies received from tax revenues, bond proceeds, and user fees for its public facilities. As a public municipality, Long Beach invests monies in a conservative and safe manner. All investments are made pursuant to its Investment Policy Statement, which sets standards above those established by the California Government Code. In 2000, Long Beach became the first municipal public investment pool to retain Standard & Poor's Rating Services ("S&P") to rate its investment portfolio. S&P's most recent review in September

---

[4] The Lehman medium term Notes purchased on October 24, 2005 were issued pursuant to the Shelf Registration Statement and prospectus dated May 18, 2005, and various prospectus supplements issued on later dates collectively referred to as the "Offering Materials."

of 2008 rated the Pool at AAAf/S1, S&P's highest rating. Despite the fact that Defendant Ernst was aware of materially adverse facts about Lehman's financial condition on September 3, 2008, a mere two weeks before the Company filed for bankruptcy, said Defendant did not disclose the financial disaster that was about to decimate Lehman. Instead, Defendant lulled the Plaintiff into a false sense of security that Lehman would survive, right up to the brink of the bankruptcy filing.

13.     Plaintiff City of Fremont purchased the Lehman Notes and Securities in reliance upon the false and misleading information issued or approved by each of the Defendants named herein, including the registration statement filed with the SEC, and was damaged thereby. Plaintiff purchased on the open market medium term Lehman Notes and Lehman commercial paper as follows:

**Medium Term Notes**

| **Purchase Date** | **Maturity Date** | **Cost** |
|---|---|---|
| 11/29/2007 | 2/06/2012 | $1,006,645 |
| 1/24/2008 | 8/15/2010 | $1,113,185 |
| **Lehman Notes Total Cost** | | **$2,119,830** |
| **Commercial Paper** | | |
| 1/24/2008 | 9/22/2008 | $1,958,494 |
| **Total Invested in Lehman Notes and Securities** | | $4,078,324 |

14.     Plaintiff City of Cerritos is a California public municipality that invested monies for its own account as permitted by the California Government Code. Plaintiff purchased medium term notes (the "Lehman Notes" or "Notes") issued by Lehman. Plaintiff purchased on the open market medium term Lehman Notes in the face amount of $4,100,000, paying $4,114,375 which included $14,375 of accrued interest. Plaintiff purchased the Lehman Notes on February 12, 2008. The Lehman Notes had a maturity date of January 24, 2013. These medium-term notes were issued to the public pursuant to a registration statements filed with the SEC.

15.     Plaintiff County of Alameda is a public entity organized under California law. The County has established a special purpose fund known as the Emerald Fund. That fund, in

8

**CONSOLIDATED FIRST AMENDED COMPLAINT FOR DAMAGES**

accordance with California law governing the investment by public entities of capital funds, invests monies it receives from the sale of surplus real property.  In January 2007, Plaintiff used funds maintained in the Emerald Fund to purchase medium term notes issued by Lehman (the "Lehman Note" or "Note").  Plaintiff purchased on the open market a Medium-Term Lehman Note on January 3, 2007.  The Note had a maturity date of March 13, 2009.  The purchase price of the Lehman Note was $4,848,200 with a face value of the Note of $5,000,000.  Plaintiff's claims are brought against Lehman's public auditor, Ernst, for materially false and misleading audit opinions issued by it on Lehman's consolidated financial statements for the fiscal years 2006, and 2007 and reviews by Ernst of Lehman's consolidated financial statements for the first and second quarters of fiscal year 2008.

16.     Plaintiff County of Tuolumne purchased the Lehman Notes in reliance upon the false and misleading information issued or approved by each of the Defendants named herein, and was damaged thereby.  Plaintiff purchased on the open market medium term Lehman Notes as follows:

| Purchase Date | Maturity Date | Cost |
|---|---|---|
| 12/4/2007 | 1/14/2011 | $1,009,081 |
| 1/3/2008 | 3/13/2009 | $998,740 |
| **Lehman Notes Total Cost** | | **$2,007,821** |

17.     Defendant Citigroup Global Markets, Inc. ("CITI") is a New York corporation with its headquarters located at 388 Greenwich Street, New York, New York.  CITI is a subsidiary of Citigroup, Inc.  CITI was an underwriter of the Lehman Notes purchased by Plaintiffs South San Francisco, Fremont and Cerritos.

18.     Defendant Banc of America Securities, LLC ("Banc of America") is a Delaware limited liability company headquartered at 100 North Tryon Street, Charlotte, North Carolina. Banc of America was an underwriter of the Lehman Notes purchased by Plaintiff Fremont.

19.     Defendant BNY Capital Markets, Inc. ("BNY"), now known as BNY Mellon Capital Markets, LLC, is a Delaware limited liability company headquartered at One Wall Street, New York, New York.  BNY was an underwriter of the Lehman Notes purchased by Plaintiffs Fremont.

20.     Defendant SunTrust Robinson Humphrey, Inc. ("SunTrust") is a Delaware company headquartered at 3333 Peachtree Road, North East, 10th Floor, Atlanta, Georgia. SunTrust is a subsidiary of SunTrust Banks, Inc.  SunTrust was an underwriter of the Lehman Notes purchased by Plaintiffs South San Francisco and Cerritos.

21.     Defendant Wells Fargo Securities, LLC ("Wells Fargo") is a Delaware company headquartered at 600 California Street, Suite 1600, San Francisco, California.  Wells Fargo is a subsidiary of Wells Fargo & Company.  Wells Fargo was an underwriter of the Lehman Notes purchased by Plaintiffs South San Francisco and Cerritos.

22.     Mellon Financial Markets, LLC ("Mellon") is a Delaware company headquartered at 1 Mellon Bank Center, Suite 475, Pittsburgh, Pennsylvania.  Mellon is a subsidiary of Mellon Financial Corporation.  Mellon was an underwriter of the Lehman Notes purchased by Plaintiffs South San Francisco and Cerritos.

23.     Defendants CITI, Banc of America, Wells Fargo, Mellon, Suntrust and BNY, are collectively referred to herein as the "Underwriter Defendants."  Each of the Underwriter Defendants participated in the distribution and sale of the Lehman Notes.  As underwriters of the Lehman Notes, each of the Underwriter Defendants is jointly and severally liable with the other Defendants for all damages Plaintiffs allege in connection with its purchase of the Lehman Notes.

24.     Defendant Ernst is a worldwide public accounting firm with numerous offices and partners located in New York and California.  For the fiscal years ended November 30, 2006, and 2007, Ernst acted as Lehman's public auditors and issued unqualified audit opinions on the

consolidated financial statements of Lehman for those fiscal years.

25.     Each of the Underwriter Defendants participated in the drafting, preparation, and/or approval of various false and misleading statements contained in the registration statement in connection with the offering of the Lehman Notes, as complained herein.  Each of these Defendants was responsible for ensuring the truth and accuracy of the representations contained in the registration statement in connection with the offering of the Lehman Notes.   Each of these Defendants was responsible for ensuring the truth and accuracy of the representations contained in Lehman's public statements and SEC filings.

26.     At all pertinent times, each Defendant was an agent and/or employee of the other Defendants, and each of them, and was acting in the course and scope of such agency and/or employment, and with the consent, permission, and/or authorization of the other Defendants, and each of them.  Defendants, and each of them, are individually sued herein as participants and aiders and abettors in the improper acts and transactions alleged herein.

27.     Each of the Defendants owed to the Plaintiffs, as purchasers of the Lehman Notes, a duty to make a reasonable and diligent investigation of all statements in registration statement, Lehman's SEC filings, and in statements made to the public by Defendants.  This duty included performing an appropriate investigation to ensure that the statements made were true, and that there were no omissions of material fact required to be stated in order to make the statements Defendants made not misleading.  As herein alleged, each of the Defendants violated these specific duties and obligations.

28.     Non-party Lehman Brothers Holdings Inc. was a Delaware corporation with its principal executive offices located at 745 Seventh Avenue, New York, New York.  Lehman was an investment banking firm which, through its subsidiaries, provided various financial services to corporations, governments and municipalities, institutions, and high-net-worth individuals

worldwide.  The Company's activities included raising capital for clients through securities underwriting and direct placements, corporate finance, mortgage and real estate related activities, merchant banking, securities sales and trading, research services, and private client services.  On September 15, 2008, Lehman filed a voluntary petition to reorganize under Chapter 11 of the United States Bankruptcy Code.  For this reason, Lehman has not been named as a Defendant in this Complaint.

## **FACTUAL ALLEGATIONS[5]**

29.     Since 1998, over seven million homeowners in the United States have purchased homes using subprime mortgages, loans made to borrowers who do not qualify for conventional mortgages.  By the end of 2007, over one million of those homeowners had defaulted on their loans.  Unbeknownst at the time, the origins of the current mortgage crisis and Lehman's involvement can be traced back to at least 2001.  Using the cheap money available after the Federal Reserve drastically cut interest rates following the attacks of September 11, 2001, Wall Street investment firms found a new money source in the emerging subprime mortgage market.  Lehman was the leading participant in this market during 2002-2003 and very nearly owned this new and profitable market.  Lehman became involved in all aspects of the subprime mortgage market – acting as underwriters for subprime lenders going public, providing lines of credit for their subprime loans, and buying the mortgages to be converted into asset-backed securities for resale to investors.  At all stages of this cycle, Lehman collected substantial amounts of fees and interest payments from its activities.

30.     By at least 2003, Lehman's involvement in the United States mortgage market, in

---

[5] Plaintiffs have read the Opinion of the Court dated July 27, 2011 on certain defendants' motions to dismiss the Third Amended Complaint of the Class Action Plaintiffs (Case No. 08 Civ. 5523 (LAK)).  Since Plaintiffs' original complaints has not been the subject of any motion to dismiss, (footnote continued)

**CONSOLIDATED FIRST AMENDED COMPLAINT FOR DAMAGES**

particular the subprime mortgage market, represented a significant and material portion of its

revenues and earnings.  Besides its support of numerous subprime lenders, Lehman participated in

all aspects of the mortgage market including origination, servicing, and securitization of

mortgages.  In 2003, Lehman acquired Aurora Loan Services LLC ("Aurora").  Aurora originated

and serviced mortgages mainly in what became known as the subprime mortgage market.

Lehman's exposure to mortgages, both residential and commercial, including subprime loans,

continued to increase by material amounts in 2004, 2005, 2006, and 2007.  For example, Lehman

originated about $27 billion of commercial mortgages in 2005.  In 2006, commercial loans by

Lehman increased to $34 billion and approximately $60 billion in 2007.  By early 2008, Lehman

held the largest dollar amount of commercial mortgages compared to any other financial company

in the United States.

   31.  In 2005, Lehman described itself as:

> a market leader in mortgage-backed securities trading.  We originate
> residential and commercial mortgage loans as part of our mortgage
> trading and securitization activities.  We originated approximately
> $85 billion and $65 billion of residential mortgage loans in 2005 and
> 2004, respectively.  We securitized approximately $133 billion and
> $101 billion of residential mortgage loans in 2005 and 2004,
> respectively….

   32.  Lehman's involvement in the subprime market was also providing a substantial and

increasing portion of its revenues and reported profits from 2004 through 2007.  In 2006, Lehman

alone underwrote $51.8 billion in securities backed by subprime loans.  With numerous

unscrupulous lenders promising borrowers zero percent down loans with no credit checks,

Lehman bankrolled such companies' massive fraud on homeowners while collecting substantial

fees at every step in the process.  Unbeknownst to the investing public, by September 2007 over

20% of the subprime loans that Lehman had securitized in 2006 were in default.

---

Plaintiffs have retained certain allegations from their original complaints.

13

**CONSOLIDATED FIRST AMENDED COMPLAINT FOR DAMAGES**

33.     As of the first quarter of fiscal year 2005 (quarter ended February 28, 2005), Lehman increasingly relied on the mortgage markets, particularly subprime mortgages, for its revenue and profit growth.  Net revenue from Lehman's Capital Markets division, which included its mortgage-backed and asset-backed securities operations, increased over the previous year by 21% to $2.7 billion.  Lehman stated that "[t]he record results in Fixed Income Capital Markets reflect a strong performance across all major businesses, and **in particular mortgages and interest rate products**."  (Emphasis added.)  Its reliance on the mortgage markets continued in the second quarter of 2005 (quarter ended May 31, 2005).  "[T]he Fixed Income business reported revenues of $1.8 billion in the second quarter of fiscal 2005, a 23% increase from $1.4 billion reported in the prior year….  Mortgages and real estate remained resilient, **driven by high levels of securitization and asset monetization activity**."  (Emphasis added.)  Lehman's Fuld stated in a Company press release dated June 14, 2005 that "[w]ith our continued discipline around expense and risk management, we are well-positioned to continue to deliver strong returns to our shareholders."

34.     In the second half of fiscal 2005, Lehman's financial results continued to be driven by its mortgage-backed and asset-backed securities business.  In the third quarter of fiscal 2005 (quarter ended August 31, 2005), Lehman reported fixed income revenues of $1.9 billion, up 37% from the previous year's third quarter.  "These results were attributable to increased contributions from the [Company's] commercial mortgage and real estate business, [and] continued strength in residential mortgages…."  On December 13, 2005, Lehman reported financial results for the fourth quarter and the full fiscal year.  Lehman's record results included fixed income revenues showing a 22% increase in the fourth quarter of 2005 over the fourth quarter of 2004.

35.     As disclosed in its Form 10-K for the fiscal year ended November 30, 2005, which was filed with the SEC on February 13, 2006 ("2005 10-K"), Lehman's mortgage business

14

represented a significant portion of its operations:

> *Mortgage Origination, Secured Lending and Mortgage- and Asset-Backed Securities.* Lehman Brothers Bank, FSB, offers traditional and online mortgage banking services to individuals as well as institutions and their customers.  Lehman Brothers Bankhaus AG, a German bank, offers lending and real estate financing to corporate and institutional borrowers worldwide.  We originate commercial and residential mortgage loans through Lehman Brothers Bank, Lehman Brothers Bankhaus and other subsidiaries in the U.S., Europe and Asia.  We are a leading underwriter of and market-maker in residential and commercial mortgage- and asset-backed securities and are active in all areas of secured lending, structured finance and securitized products.  We underwrite and make markets in the full range of U.S. agency-backed mortgage products, mortgage-backed securities, asset-backed securities and whole loan products.  We are also a leader in the global market for residential and commercial mortgages (including multi-family financing) and leases.  In 2005, we established Lehman Brothers Commercial Bank, a Utah-chartered industrial loan company, in order to issue certificates of deposit to institutions and conduct certain lending activities.

The 2005 10-K disclosed that fixed income revenue, which mainly represented revenues received from its mortgage operations, had increased by 28% over 2004 to $7.3 billion.  The 2005 10-K stated:

> Fixed Income net revenues were a record $7.3 billion in 2005, increasing 28% compared with 2004 driven by double digit revenue increases from each geographic region and record revenues across a number of businesses including commercial mortgage and real estate, residential mortgage origination and securitization, and interest rate products.  Revenues from our commercial mortgage and real estate businesses increased substantially in 2005 reaching record levels, as the strong demand for commercial real estate properties, the recovery in certain property markets and relatively low interest rates drove asset sales and robust levels of securitizations.  Revenues from our residential mortgage origination and securitization businesses increased in 2005 from the robust levels in 2004, reflecting record volumes and the continued benefits associated with the vertical integration of our mortgage origination platforms.  We originated approximately $85 billion and $65 billion of residential mortgage loans in 2005 and 2004, respectively.  We securitized approximately $133 billion and $101 billion of residential mortgage loans in 2005 and 2004, respectively, including both originated loans and those we acquired in the secondary market.  While the performance in our mortgage businesses reached record levels, these businesses were affected by somewhat lower levels of mortgage origination volumes and revenues in the U.S. in the latter half of 2005, partly offset by stronger volumes and revenues outside the U.S.  We originated approximately $27 billion and $13 billion of commercial mortgage loans in 2005 and 2004, respectively, the majority of which has been sold through

> securitization or syndication activities during both 2005 and 2004….
> The mortgage securitization business was notably strong, with
> revenues in mortgage products benefiting from the low rate
> environment as well as the continued vertical integration of our
> mortgage origination platforms.

36.     Throughout 2005, as Lehman reported record financial results, driven in large part by its mortgage-backed and asset-backed securities operations, problems began to emerge with many of the subprime lenders it had relied upon for such revenues.  A growing number of these lenders were failing in 2005.  Even as early as November 2004, Fuld recognized **privately** that low interest rates and cheap credit would create a bubble that could one day pop.  "It's paving the road with cheap tar," Fuld admitted to colleagues.  "When the weather changes, the potholes that were there will be deeper and uglier."  One reason, among others, that the statements made by Lehman' officers were materially false and misleading is because they failed to reveal the potential negative impact of Lehman's significant exposure in the mortgage-backed securities markets as the largest underwriter of such mortgage-backed securities.  Nowhere in Lehman's public statements and SEC filings was Lehman's substantial involvement with predatory subprime lenders disclosed, including its underwriting of wholesale lines of credit to such lenders and Lehman's purchase of their toxic loans for resale to investors through the securitization process.  Lehman's public statements also failed to disclose that as a result of the deteriorating market conditions and rapidly declining asset values, particularly relating to real estate assets, Lehman was in desperate need for capital and at substantial risk of defaulting on the Lehman Notes and Securities.

37.     Throughout 2005, as Lehman reported record financial results, driven in large part by its mortgage-backed and asset-backed securities operations, problems began to emerge with many of the subprime lenders it had relied upon for such revenues.  A growing number of these lenders were failing in 2005.  Even as early as November 2004, Fuld recognized **privately** that low interest rates and cheap credit would create a bubble that could one day pop.  "It's paving the

**CONSOLIDATED FIRST AMENDED COMPLAINT FOR DAMAGES**

road with cheap tar," Fuld admitted to colleagues.  "When the weather changes, the potholes that were there will be deeper and uglier."

38.    On May 30, 2006, Lehman filed with the SEC a Shelf Registration Statement on Form S-3 (the "May 30th Offering Materials") and a prospectus supplement for medium term Notes.  Thereafter, Lehman filed with the SEC pricing supplements whereby Lehman offered to the investing public certain medium term notes.  Plaintiffs purchased Lehman Notes through the public markets.  In addition, the May 30th Offering Materials incorporated by reference all future informational filings made by Lehman with the SEC, including its Form 10-Ks and 10-Qs.  Thus, by reference to the May 30th Offering Materials, Plaintiffs are also referring to all disclosures of material information and/or the omissions of any material facts made in SEC filings by Lehman prior to the dates Plaintiffs purchased the Lehman Notes and Securities.

39.    One reason, among others, that the May 30th Offering Materials for the Lehman Notes, and Lehman's SEC filings made prior to the date the Lehman Notes were purchased by Plaintiffs were materially false and misleading is because they failed to reveal Lehman's significant exposure in the mortgage-backed securities markets as the largest underwriter of such mortgage-backed securities.  Nowhere in the May 30th Offering Materials and/or Lehman's SEC filings did Lehman reveal its substantial involvement with predatory subprime lenders, including its underwriting of wholesale lines of credit to such lenders and Lehman's purchase of their toxic loans for resale to investors through the securitization process.  The May 30th Offering Materials also failed to disclose that as a result of the deteriorating market conditions and rapidly declining asset values, particularly as to real estate assets, Lehman was in desperate need for capital and at substantial risk of defaulting on the Notes.

40.    The May 30th Offering Materials, Lehman's SEC filings, and the public statement made or approved by Defendants materially misrepresented the risks associated with the purchase

of the Notes.  Significantly missing from the disclosures in the "Risk Factors" section of the May 30th Offering Materials was any reference to the effect a down market would have on Lehman's financial position or the price of Notes based upon the Company's business operations.  Nor did Lehman disclose that its residential and commercial mortgage and real estate assets were overvalued by **billions of dollars**.  Had the Underwriter Defendants conducted a proper and adequate due diligence investigation, they would have known that the softening mortgage market, weakening credit market, and declining real estate values would have a material impact on the price of the Lehman Notes purchased by Plaintiffs.

41.     During fiscal year 2006, Lehman's exposure to the commercial and residential mortgage markets expanded further.  In its Form 10-K for the fiscal year ended November 30, 2006, which was filed with the SEC on February 13, 2007 ("2006 10-K"), Lehman disclosed that fixed income revenue had increased to $8.4 billion, an increase of 15% over fiscal year 2005.  A material portion of fixed income revenues came from Lehman's operations in commercial and residential mortgage origination and securitization of mortgage loans.

42.     Nowhere in either the 2005 10-K or 2006 10-K did Lehman reveal the extreme risks it had taken upon itself or its material exposure to a decline in the residential and commercial real estate markets.  In fact, on March 14, 2007, when Lehman announced its "record net revenues" for the first quarter of fiscal year 2007, O'Meara, Lehman's CFO at the time, stated in a conference call with analysts that as a result of Lehman's real estate exposure, it was "well positioned to benefit from this evolving situation given our experience in this sector as well as our ample liquidity and risk management practices."  O'Meara represented that Lehman had no material exposure to rising delinquencies in the subprime mortgage market stating, "this is reasonably well contained at this point."

43.     Throughout the rest of 2007 and up until September 15, 2008, Lehman, through

SEC filings and the public statements of its officers, continued to deny that Lehman faced any material risk from the plummeting United States real estate markets.  While other financial firms took multi-billion dollar write-downs on their mortgage-backed securities, Lehman denied any significant problems with its mortgage related business.  On July 18, 2007, Lehman spokeswoman Kerrie Cohen responded to questions about the Company's exposure to subprime mortgage loan defaults by stating: "The rumors regarding subprime exposure are totally unfounded."  Despite having the largest mortgage related holdings of any Wall Street firm, Lehman disclosed on September 18, 2007 a write-down of only $700 million of assets, with no disclosure whatsoever as to what portion of that amount came from mortgage-backed assets.  In comparison, Citibank disclosed a credit loss of $5.9 **billion** on mortgage related securities, UBS a write-down of approximately $3.7 **billion** and Merrill Lynch an astounding $7.9 **billion** (more than 11 times Lehman's write-down), all around the same time.  In statements to analysts and investment professionals during the fall of 2007, Lehman officers continued to assert that it would not be necessary to write off any significant portion of Lehman's mortgage-backed securities portfolio. In fact, following the collapse of two Bear Stearns hedge funds in the summer of 2007, Lehman increased its exposure to the subprime market by purchasing additional mortgage-backed securities in early 2008.

44.     On January 29, 2008, Lehman filed its Form 10-K for the fiscal year ended November 30, 2007 ("2007 10-K").  While acknowledging some of the problems it faced from what it described as a "slowdown" in the United States housing market, Lehman again failed to disclose in its 2007 10-K the real and severe problems with its mortgage and real estate operations. Instead, Lehman reported:

> On the basis of a record first half and a reasonably successful navigation of difficult market conditions in the second half, we achieved our fourth consecutive year of record net revenues, net income and diluted earnings per common share in 2007.  Net

> income totaled $4.2 billion, $4.0 billion and $3.3 billion in 2007, 2006 and 2005, respectively, increasing 5% in 2007 and 23% in 2006 from the corresponding 2006 and 2005 periods, respectively. Diluted earnings per common share were $7.26, $6.81 and $5.43 in 2007, 2006 and 2005, respectively, up 7% in 2007 and 25% in 2006 from the corresponding prior periods, respectively.

45.     At the time Lehman sold the Lehman Notes and Securities to Plaintiffs, Defendants were aware of material adverse facts concerning the Company's mortgage-backed asset portfolio and the mortgage markets in general.  Despite such knowledge, Defendants failed to disclose the risks to the purchasers of the Lehman Notes, including Plaintiffs.  The market volatility was adversely and materially harming Lehman's business, which was driven by an aggressive pursuit of the mortgage-backed underwriting business, and market volatility would inevitably adversely affect the Company's business in the future.

46.     On March 18, 2008, Lehman released financial results for the quarter ended February 29, 2008.  The Company's press release stated the following about Lehman's Capital Markets division:

> [R]eported net revenues of $1.7 billion in the first quarter of fiscal 2008, a decrease of 52% from $3.5 billion in the first quarter of fiscal 2007.  Fixed Income Capital Markets reported net revenues of $262 million, a decrease of 88% from $2.2 billion in the first quarter of fiscal 2007 … [resulting from] continued deterioration in the broader credit markets, **in particular residential mortgages, commercial mortgages and acquisition finance.**

(Emphasis added.)

47.     Despite the sharp downturn in revenues for the quarter, Lehman's officers continued to deny that Lehman faced any serious financial problems.  Callan stated in a conference call on March 18, 2008, "I think it's fair to say we continue to do a very, very good job managing the risk of residential mortgages, an area that I think we're credited with a lot of expertise, a great franchise."  Lehman's common stock rose by over 45% on that date.  While the Company's prospects temporarily appeared to improve after March 2008, Lehman's continued exposure in the mortgage-backed asset markets, particularly in subprime mortgage-backed

securities, remained substantial.  Despite such exposure, Lehman officers continued their upbeat

assessments.  At Lehman's annual shareholders meeting in April 2008, Fuld stated that "the worst

is behind us."

48.     On June 3, 2008, *Bloomberg News* published an article titled "Lehman Loses up to

$700 million on Hedging Positions, FT Says."  The article noted that the Company lost between

$500 and $700 million in the second quarter of 2008 which "may prompt the bank to seek more

capital by selling a stake to an outside investor."

49.     The very same day, and a full week ahead of schedule, the Company issued a press

release announcing its financial results for the second quarter ended May 31, 2008.  The Company

reported a net loss of $2.8 billion.  The press release went on to state:

> **Capital Markets is expected to report net revenues of negative
> ($2.4) billion in the second quarter of fiscal 2008**, compared to
> $1.7 billion in the first quarter of fiscal 2008 and $3.6 billion in the
> second quarter of fiscal 2007.  **Fixed Income Capital Markets is
> expected to report net revenues of negative ($3.0) billion**,
> compared to $0.3 billion in the first quarter of 2008 and $1.9 billion
> in the second quarter of 2007.

(Emphasis added.)

50.     The almost $3 billion loss represented the Company's first-ever loss since

becoming a public company in 1994.  Lehman also said that it would attempt to raise an additional

$6 billion in new capital through the issuance of stock.

51.     On Monday, June 16, 2008, Lehman released its actual results for the second

quarter of 2008, which matched the $2.8 billion or $5.14 per share numbers announced a week

prior.  Most of the loss was due to about $3.7 billion in write-downs for bad loans.  Yet, on that

same date, Fuld again downplayed the serious financial problems at Lehman telling Lehman

investors that "[o]ur capital and liquidity positions have never been stronger."

52.     On August 22, 2008, Korea Development Bank ("KDB") expressed an interest in

buying Lehman.  The news sent Lehman's stock up more than $2.00, and shares closed up 5%.

**CONSOLIDATED FIRST AMENDED COMPLAINT FOR DAMAGES**

By September 3, 2008, a deal had still not been struck between KDB and Lehman, as the two sides

continued to negotiate a price, yet the continued possibility of an investment by KDB led to a rise

in Lehman shares of 4 cents.  On September 9, 2008, shares dropped 44.95% to $7.79, after

reports emerged that KDB had put talks on hold.  S&P placed Lehman on CreditWatch, but

notably did not downgrade Lehman's "A" long-term rating.

   53. On September 10, 2008, the Company issued a press release announcing

preliminary financial results for the third quarter ended August 31, 2008.  The Company reported

a net loss of $3.9 billion and announced "a comprehensive plan of initiatives to reduce

dramatically the firm's commercial real estate and residential mortgage exposure, generate

additional capital through the sale of a majority stake of the Investment Management Division and

reduce the annual dividend, in order to maximize value for clients, shareholders and employees."

The press release further stated in pertinent part:

> OVERVIEW OF PRELIMINARY THIRD QUARTER RESULTS
>
> Lehman Brothers reported a preliminary net loss of approximately
> ($3.9) billion, or ($5.92) per common share (diluted), for the third
> quarter ended August 31, 2008, compared to a net loss of ($2.8)
> billion, or ($5.14) per common share (diluted), for the second
> quarter of fiscal 2008 and net income of $887 million, or $1.54 per
> common share (diluted), for the third quarter of fiscal 2007.  The net
> loss was driven primarily by gross mark-to-market adjustments
> stemming from writedowns on commercial and residential mortgage
> and real estate assets.
>
> Net revenues (total revenues less interest expense) for the third
> quarter of fiscal 2008 are expected to be negative ($2.9) billion,
> compared to negative ($0.7) billion for the second quarter of fiscal
> 2008 and $4.3 billion for the third quarter of fiscal 2007.  Net
> revenues for the third quarter of fiscal 2008 reflect negative mark-to-
> market adjustments and principal trading losses, net of gains on
> certain risk mitigation strategies and certain debt liabilities.
>
> During the fiscal third quarter, the Firm is expected to incur negative
> gross mark-to-market adjustments on assets of ($7.8) billion,
> including gross negative mark-to-market adjustments of ($5.3)
> billion on residential mortgage-related positions, ($1.7) billion on
> commercial real estate positions, ($600) million on other asset-
> backed positions and ($200) million on acquisition finance
> positions. These mark-to-market adjustments were offset by $800

million of hedging gains during the quarter and $1.4 billion of debt valuation gains. The Firm is also expected to record losses on principal investments of approximately $760 million.

In order to increase operating efficiency, the Firm has eliminated approximately 1,500 positions since the beginning of the third quarter in discretionary corporate areas and businesses that are in secular decline.

54.     Despite the enormous losses reported in the press release, Lehman continued to downplay the gravity of the Company's financial situation.  In a conference call on September 10, 2008, the same day the press release was issued, Fuld stated, "We've been through adversity before, and we always come out a lot stronger."  Lehman tried to reassure investors by unveiling a plan to sell part of the Investment Management Division and create a separate unit for its real estate holdings.

55.     Also on September 10, 2008, S&P announced that Lehman remained on CreditWatch, thus affirming Lehman's underlying ratings, including the A-1 short-term counterparty credit rating.  (The second highest rating for commercial paper.)  S&P analyst Scott Sprinzen stated that S&P "continue[d] to view Lehman's near-term liquidity as satisfactory…."  S&P further stated that it expected to resolve the CreditWatch review within 90 days.

56.     By Friday, September 12, 2008, Fuld had approached Bank of America Chairman Kenneth D. Lewis about buying Lehman.  A U.S. Treasury official had contacted Barclays of Britain ("Barclays") to suggest it consider a stake in Lehman.  Both were apparently viable options for Lehman.  Later that day, federal officials announced that there would be no public bailout for Lehman.  Mr. Lewis informed Fuld that Bank of America could not complete a deal with Lehman without federal help.

57.     On Saturday, September 13, 2008, talks with Barclays were still in motion.  That evening, Barclays agreed to buy Lehman, as long as it did not have to take on any bad real estate assets.  Lehman's asset-management division would also have to be spun off.  Federal officials

**CONSOLIDATED FIRST AMENDED COMPLAINT FOR DAMAGES**

indicated that a group of banks and brokers had agreed to put up enough capital to support a separate company that would hold Lehman's bad real estate assets.  In the meantime, Fuld was still trying to broker a deal with Bank of America.

58.     The next morning, Sunday, September 14, 2008, the day before Lehman filed for bankruptcy, Fuld gathered the board of directors at the Company's offices.  He expected that the board would approve Lehman's sale to Barclays by midday.  The only problem was that Barclays needed a shareholder vote in order for the Lehman deal to go through, and there was no way to have the vote on a Sunday.  Barclays needed either the United States or British government to back Lehman's trading balances until the vote could be held.  Neither government provided the necessary backing, and the deal fell through.  Fuld postponed the board meeting, and attempted one more call to Mr. Lewis at Bank of America.  Later that afternoon, the news broke that Bank of America was in talks with Merrill Lynch.  At 8:00 p.m., Lehman's board of directors gathered. SEC chief Christopher Cox informed the board by telephone that it had "a grave matter before it." Director Macomber asked whether Cox was directing them to authorize a bankruptcy filing.  Cox replied, "You have a grave responsibility and you need to act accordingly."

59.     On September 15, 2008, approximately four hours after the conclusion of the board meeting, Lehman filed a voluntary petition to reorganize under Chapter 11.  This is the largest bankruptcy filing in history.  Up until the conclusion of the Lehman board meeting the night before, bankruptcy was inconceivable to the financial community.  The market for Lehman Notes and Securities became illiquid the morning of September 15, 2008.  As a result of Lehman's actions, Plaintiffs were forced to mark the value of the Lehman Notes and Securities to $0.

60.     The purpose and intent of Lehman's misleading statements regarding the state of their liquidity and assets was to lull the investing public into a false sense of security, including Plaintiffs.  Taken in the aggregate, all of these statements show that while some limited negative

financial information was being released before the bankruptcy, the picture being painted by

Lehman, and supported by Defendants, was that the situation was under control, the Company

would survive, and investments would be safe.  Because of the reassurances the Company

continued to provide up until the bankruptcy filing, investors such as Plaintiffs did not believe

they had to take any extraordinary action to protect their investments.

## LEHMAN'S FINANCIAL STATEMENTS ISSUED DURING FISCAL YEARS 2007 AND 2008 WERE FALSE AND MISLEADING

### Lehman's Failure to Disclose the Repo 105 Transactions

61.     At all times relevant, Lehman made public statements as to the importance of net

leverage to its business.  Thus, in its Form 10-K for fiscal year 2007 Lehman stated: "the

relationship of assets to equity is one measure of a company's capital adequacy.  Generally, this

leverage ratio is computed by dividing assets by stockholders' equity.  We believe that a more

meaningful, comparative ratio for companies in the securities industry is <u>net leverage</u>, which is the

result of net assets divided by tangible equity capital."  (Emphasis added.)  (Form 10-K for fiscal

year 2007 at 63.)

62.     The audit work papers prepared by Ernst affirmed the meaningfulness of net

leverage in relation to Lehman's business: "materiality is usually defined as any item individually,

or in the aggregate, that moves net leverage by 0.1 or more (typically one of $1.8 billion)."  Per

the Ernst engagement partner, this definition for materiality with respect to net leverage was

Lehman's own.  Thus, a one tenth of a point adjustment in net leverage, during this time an

increase or decrease in net assets or tangible equity capital of $1.8 billion, was material to

Lehman.

63.     Lehman, as was the practice of many investment banking firms on Wall Street, on a

regular basis entered into ordinary sale and repurchase agreements to meet short-term cash needs.

Under such repurchasing agreements Lehman would borrow cash from counterparties at fixed

**CONSOLIDATED FIRST AMENDED COMPLAINT FOR DAMAGES**

interest rates and put up collateral, usually in the form of financial instruments, to obtain financing.  Such transactions are referred to as "Ordinary Repo" transactions.  Under an Ordinary Repo transaction, Lehman would repay the cash to the counter party plus interest and reclaim its collateral upon maturity of the Repo Agreement.

64.     In accordance with US GAAP, Lehman accounted for Ordinary Repos as financings thereby treating the transaction as creating a debt obligation and recording both an asset (the cash proceeds of the Ordinary Repo traction) and a liability (an obligation to repay the Ordinary Repo loan.  Under such accounting treatment the collateral that securitized the Ordinary Repo stayed on Lehman's balance sheet resulting in an increase in Lehman's net leverage ratio as the numerator (net assets) increased while the denominator (tangible equity capital) remained the same.

65.     What was not disclosed to investors including Plaintiffs was that Lehman entered into tens of billions of dollars of undisclosed Repo 105 transactions.  These Repo 105 transactions resembled Ordinary Repo transactions in all material respects except that Lehman recorded the transaction on its books as though the asset collateralizing the loan had actually been sold and removed from its balance sheet.  The cash received from the Repo 105 loan would be used by Lehman to pay down other existing liabilities which had the effect of reducing Lehman's net leverage ratio.  The net result under the Repo 105 accounting treatment used by Lehman was to reduce Lehman's reported net leverage ratio as of the end of each financial reporting period.  Most important to understanding Lehman's reported financial results was the reduction in net leverage ratio as a result of Repo 105 transactions was only temporary and thus misleading.  Under the terms of the Repo 105 transactions, days after the Company's financial quarter ended, Lehman would repay the Repo 105 counterparty and the collateralized assets would go back on Lehman's balance sheet.  The net effect was an immediate and material increase in the net leverage ratio

shortly after a fiscal quarter had closed.  The bankruptcy examiner in testifying before Congress described Lehman's public disclosures were misleading as a result of its failure to disclose its use of Repo 105 transactions.  At no time did Lehman disclose that it had only temporarily reduced its net leverage ratio through Repo 105 transactions, "[c]onsequently, Lehman statements that the net leverage ratio was a 'more meaningful' measurement of leverage was rendered misleading because the ratio – as reported by Lehman – was not an accurate indicator of Lehman's actual leverage, and in fact, understated Lehman's leverage significantly."  Lehman's public statement regarding its liquidity was also rendered material and misleading because its financial statements, including its footnoted disclosures, failed to reveal Lehman's immediate obligation to repay tens of billions of dollars in Repo 105 transactions just days after the end of each fiscal quarter.  As a result, Lehman's reported short-term or current liabilities were similarly understated by a material amount.  As a further result, Lehman's liquidity was misrepresented to investors, including Plaintiffs.

66.     Lehman's use of the Repo 105 transactions, even if such transactions complied with US GAAP, which they did not, also made the disclosures issued in the "Management's Discussion and Analysis" ("MD&A") section of Lehman's periodic SEC reports false and misleading.  The Repo 105 transactions had the effect of temporarily removing tens of billions of dollars of assets off Lehman's balance sheets at the end of each fiscal quarter even though Lehman was contractually obligated to repurchase the Repo 105 assets.

67.     At the most basic level, Lehman's Repo 105 transactions were devoid of economic substance and as a result Lehman's financial statements failed to reflect its true financial condition.  Set forth below by quarter beginning with the second quarter of fiscal year 2007 are the amounts through Repo 105 transactions that Lehman reduced its balance sheet exposure and net leverage thereby creating the appearance of increased liquidity and making Lehman's financial

CONSOLIDATED FIRST AMENDED COMPLAINT FOR DAMAGES

condition appear significantly better than it was.

**Table 1 – Undisclosed Repo 105/108 Usage (*in billions*)**

|  | **2O07** | **3O07** | **4O07** | **1O08** | **2O08** |
|---|---|---|---|---|---|
| **Repo 105** | $23.1 | $29.1 | $29.7 | $42.2 | $44.5 |
| **Repo 108** | $ 8.6 | $ 6.9 | $ 8.9 | $ 6.9 | $ 5.8 |
| ***Total*** | **$31.9** | **$36.4** | **$38.6** | **$49.1** | **$50.3** |

68.     As a net result of the undisclosed Repo 105 transactions, Lehman's net leverage
was decreased by between 15 and 19 times its own materiality threshold as set forth in Paragraph
62 above.

**Table 2 – Repo 105 and 108 Transactions and Reported Net Leverage**

| Reporting Period | Repo 105 (*billions*) | Reported Net Leverage Ratio | Actual Net Leverage Ratio | Difference as Multiple of Lehman's 0.1 Materiality Threshold |
|---|---|---|---|---|
| 2O07 | $31.9 | 15.4x | 16.9x | 15 times |
| 3O07 | $36.4 | 16.1x | 17.8x | 17 times |
| 4O07 | $38.6 | 16.1x | 17.8x | 17 times |
| 1O08 | $49.1 | 15.4x | 17.3x | 19 times |
| 2Q08 | $50.4 | 12.1x | 13.9x | 18 times |

69.     Finally, at all times throughout the second quarter of fiscal year 2007 through the
second quarter of fiscal year 2008, the Repo 105 transactions caused Lehman's short term and
total liabilities to be materially understated as reflected in Table 3.

**Table 3 – Repo 105 Transactions and Total and Short Term Liabilities (*in billions*)**

|  | **2Q07** | **3Q07** | **2007 Year End** | **1Q08** | **2Q08** |
|---|---|---|---|---|---|
| **Total Reported Liabilities** | $584.73 | $637.48 | $668.57 | $761.20 | $613.16 |
| **Reported Short Term Liabilities** | $483.91 | $517.15 | $545.42 | $632.92 | $484.97 |
| **Repo 105's** | $31.90 | $36.40 | $38.60 | $49.10 | $50.40 |
| **% of Repo 105's to Total Liabilities** | 5.45% | 5.71% | 5.77% | 6.45% | 8.22% |
| **% of Repo 105's to Short-Term Liabilities** | 6.59% | 7.04% | 7.08% | 7.76% | 10.39% |

70.     The undisclosed Repo 105 transactions rendered the disclosures made in Lehman's

quarterly Form 10-Q, its fiscal year Form 2007 10-K and its quarterly Form 10-Qs for the first and second quarters of 2008 materially false and misleading as follows:

        a.      Form 10-Qs issued for the second and third quarters of fiscal year 2007 and the first and second quarters for fiscal year 2008, and Lehman's Form10-K for fiscal year 2007 represented that securities sold under agreements to repurchase, are "treated as collateralized agreements and financings for financial reporting purposes." That statement was materially false and misleading because it failed to disclose that tens of billions of dollars in securities sold each quarter under the Repo 105 transactions were not treated as "financings for financial reporting purposes" but as "sales" by Lehman;

        b.      Each of the Form 10-Qs and the 2007 10-K represented that all Lehman's material off-balance sheet arrangements were disclosed. In the MD&A section of its periodic SEC filings, Lehman included a discussion and table that purportedly summarized all off-balance sheet arrangements. The discussion and table were materially false and misleading because they failed to disclose the material fact that Lehman had agreed to tens of billions of dollars in off-balance sheet commitments pursuant to the Repo 105 transactions;

        c.      The Form 10-Qs filed by Lehman stated that the "consolidated financial statements are prepared in conformity with US generally accepted accounting principles" and accompanied by a certification from Defendant Fuld and either Callan or O'Meara stating that "this report does not contain any untrue statements of a material fact or omit to state a material fact" and that the "financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flow of the registrant." As with the other portions of the 10-Q, these statements were materially false and misleading for failing to disclose the Repo 105 transactions.

        d.      Each of the Form 10-Qs identified above contained a "report of independent

registered public accounting firm" signed by Ernst (the "10-Q reports"), stating that, based on its

review of Lehman's consolidated financial statements in accordance with the standards of the

PCAOB, "we are not aware of any material modifications that should be made to the consolidated

financial statements referred to above for them to be in conformity with US generally accepted

accounting principles."  The statement made in each of the Form 10-Q reports by Ernst were

materially false and misleading for failing to disclose the Repo 105 transactions which violated

US GAAP and artificially reduced net leverage and understated Lehman's liabilities;

       e.     The 2007 Form 10-K represented that Lehman's "consolidated financial

statements are prepared in conformity with US generally accepted accounting principles," and

included certifications from Fuld and Callan stating that "this report does not contain any untrue

statements of a material fact or omit to state a material fact" and that the "financial statements, and

other financial information included in this report, fairly present in all material respects financial

condition, results of operations and cash flows of the registrant."  These statements were false and

misleading for, among other reasons described in this Complaint, failing to disclose the Repo 105

transactions;

       f.     The 2007 Form 10-K included Ernst's "report of independent registered

public account firm" signed by Ernst on January 28, 2008, certifying that: (1) Lehman's fiscal year

2007 financial results: (a) were prepared in accordance with US GAAP; and (b) in all material

respects, fairly presented the financial condition and operations of Lehman as of November 30,

2007; and (2) Ernst conducted its audit of Lehman's fiscal year 2007 financial results with GAAS

(the 2007 audit report).  Ernst consented to the inclusion of its 2007 audit report in Lehman's 2007

Form 10-K and consented to the incorporation of the 2007 audit report by reference in all

registration statements, including the registration statement relied upon by Plaintiff in purchasing

the Lehman note.  Statements made by Ernst in the 2007 audit report were false and misleading

CONSOLIDATED FIRST AMENDED COMPLAINT FOR DAMAGES

because Lehman's fiscal year 2007 financial results were not prepared in accordance with US

GAAP because of the Repo 105 transactions which resulted in understating Lehman's net leverage

and Ernst's audit of the fiscal year 2007 financial results were not performed in accordance with

GAAS.

71.     The failures by Defendants to disclose the Repo 105 transactions violated SEC

regulations on disclosures in periodic reports.  Specifically, Item 303 of SEC Regulation S-K

provides that the registrant's MD&A section should provide users of financial statements with

relevant information in assessing the registrant's financial condition and results of operations,

including trends and uncertainties that would cause reported financial information to not be

indicative of its true future financial condition or future operating results.  The failure of Lehman

and its officers and directors to disclose the Repo 105 transactions and their effect on Lehman's

financial condition violated the disclosure requirements of Item 303.

## LEHMAN VIOLATED GAAP IN REPORTING ITS REPO 105 TRANSACTIONS

72.     In reporting its financial results for fiscal year 2007 and its quarterly financial

results for the first and second quarter of 2008 through the time of its bankruptcy filing, Lehman

violated GAAP and SEC disclosure requirements.  In its public reporting of its financial results,

Lehman stated that all transactions containing short-term repurchase commitments were recorded

as "secured financing transactions," which effectively had no net impact on Lehman's balance

sheet.  The true facts were that Lehman had reported its Repo 105 transactions as "sales" under

FAS 140 which had a material impact on Lehman's reported balance sheet.  By recording its

Repo 105 transactions as "sales," those securities were removed from Lehman's balance sheet and

cash was recorded but no liability was recorded.  Lehman used this cash to pay down existing,

short-term liabilities, effectively reducing its reported balance sheet.

73.     Lehman's reporting of the Repo 105 transactions violated FAS 140.  In order to

qualify as a sale under FAS 140, a company transferring the asset must divest itself of the asset and relinquish all control over that asset. Retention of any portion of control over the assets precludes treatment of a transfer of financial assets as a "sale." To qualify as a sale under FAS 140, the company divesting itself of the asset must relinquish any control over the asset. Only if the "transferor does not maintain effective control over the transferred asset through" for example "an agreement that both entitles and obligates the transferor to repurchase or redeem them before their maturity" can the transaction be deemed a "sale" under FAS 140.

74.     Thus, Lehman's Repo 105 transactions lack any necessary business purpose and economic substance to be recorded as sales under GAAP. As explained above, the Repo 105 transactions were a form of short-term financing for Lehman as opposed to engaging in an Ordinary Repo transaction. Unlike an actual sale, Lehman's repurchase agreements required Lehman to repurchase the collateral after a fixed period of time. Lehman's obligation was not optional. Thus, Lehman was legally obligated to repurchase the Repo 105 assets within days after the close of its financial reporting periods.

75.     Lehman's Repo 105 transactions also failed basic principles of financial reporting under GAAP. GAAP requires that the overall impression created by financial statements be consistent with the business realities of the company's financial position and operations, such that the financial statements are useful and comprehensible to users in making rational business and investment decisions. For example, FASCON states that "financial reporting should include explanations and interpretations to help users understand financial information." GAAP requires that "nothing material is left out of the information that may be necessary to [ensure] that [the report] validly represents the underlying events and conditions." *FASCON* 2. GAAP also requires that footnotes be an integral part of financial statements and are read in conjunction with the notes to the financial statements. Lehman's accounting treatment for its Repo 105 transactions and its

failure to make any disclosure about the Repo 105 transactions in footnotes or in any other section of its SEC filings created a false impression of Lehman's financial condition, violating GAAP.

76.    Since Lehman's Repo 105 transactions lacked any substances as "sales," and the amount of those transactions were material to the financial condition of Lehman, its failure to disclosure the substance of the Repo 105 transactions made the financial statements issued throughout fiscal year 2007 and the first and second quarter of fiscal year 2008 false and misleading.

## LEHMAN MISREPRESENTED ITS RISK MANAGEMENT PRACTICES IN THE OFFERING MATERIALS

77.    At all times material to Plaintiffs' claims Lehman issued false and misleading statements concerning its risk management including, among other things, false statements about Lehman's adherence to risk policies, compliance with risk limits, stress testing, risk appetite and the use of risk mitigants.  At all times Lehman's statements regarding its risk management practices was highly material to Plaintiffs.  As a result of these practices, Lehman took on billions of dollars of illiquid, risky assets that impaired its reporting liquidity and net leverage ratios.

78.    Starting in fiscal year 2006 and continuing though 2007 into 2008 up through its filing for bankruptcy, Lehman's officers pursued an aggressive growth strategy that resulted in the company assuming significantly greater risk.  The key to Lehman's strategy was to increase substantially the leverage on its capital.  Among other things, Lehman's strategy focused on acquiring and holding commercial real estate, leverage loans and private equity assets, a strategy that entailed far greater risk and less liquidity than Lehman's previous business model. Throughout fiscal year 2007 and into fiscal year 2008, Lehman continued its strategy as it sought to acquire assets priced at what it believed was the bottom of the economic cycle.  As a result, at a time when other financial institutions were reducing their exposure, Lehman increased its

exposure to commercial and residential real estate.

79.     Lehman's "risk appetite" allegedly measured aggregate market risk, credit risk and event risk faced by Lehman.  Pursuant to Lehman's risk policies in force at this time, the Firm's risk appetite limit was supposed to be a hard limit such that a breach of this limit required approval by its Risk Committee.  Lehman's Risk Committee was comprised of its Executive Committee which included Fuld, Callan and others.  However, instead of the risk appetite measure being treated as a hard limit, Lehman considered it a "soft" limit that it routinely exceeded throughout fiscal years 2007 and 2008.  As the Bankruptcy Court appointed Examiner testified before Congress, "Lehman was in breach of its established risk appetite limits on a persistent basis during the second half of 2007."

80.     Between December 2006 and December 2007, Lehman increased its risk appetite limit four times, from $2.3 to $3.3 billion and eventually to $4.0 billion.  Even with those increases, Lehman regularly exceeded its risk appetite limits by hundreds of millions of dollars.  In addition, between May and August 2007, Lehman excluded its $2.3 billion bridge equity position in Archstone, a publicly traded REIT, (as well as other large bridge equity positions) from its risk appetite limit usage calculations which, if included would have caused Lehman to further exceed its risk limits.  As the Bankruptcy Court Examiner found, "the Archstone transaction would put Lehman over its then existing risk limits, but the deal was committed anyway."  Following the completion of the acquisition of Archstone and other bridge equity positions, Lehman exceeded its risk appetite limits by $608 million in September 2007, $670 million in October 2007, $508 million in November 2007, $562 million in December 2007, $708 million in January 2008, and $578 million in February 2008.  As a direct result of Lehman's disregard for its "hard" limit on the amount of risk held by it, Lehman's risk profile increased dramatically throughout 2007 into 2008.

81.     Lehman also disregarded its "concentration limits" throughout 2007 and 2008 up

through its bankruptcy filing.  Such "concentration limits" were designed to prevent Lehman from taking on too much risk in an undiversified business or area.  Lehman routinely and consistently disregarded the concentration limits with respect to its leverage loan and commercial real estate business, including by failing to enforce the company's "single transaction limits," which were designed to insure its investments were properly limited and diversified by business line and by counter party.  Lehman's single transaction limit consisted of two aspects: (1) a limit applicable to the notional amount of the expected leverage loan; and (2) a limit applicable to the amount Lehman was at risk of losing on a leverage loan.  As found by the Bankruptcy Court Examiner, Lehman in late 2006 decided "to disregard the single transaction limit."  As of July 2007, Lehman had committed to approximately 30 deals that exceeded its $250 million loss threshold and five deals that violated the notional limit of $3.6 billion.  Lehman also committed approximately $10 billion more than the single transaction limit allowed with respect to 24 of its largest high yield deals.  In addition, the Company did not impose a limit on its leverage loan bridge equity commitments whereby Lehman took on riskier equity pieces of real estate investments.  Prior to its bankruptcy filing, Lehman exceeded its risk limits by margins of 70% for commercial real estate and 100% for its leverage loans.

82.     Lehman also made false and misleading statements in the offering materials relied upon by Plaintiff concerning its "stress tests," one of Lehman's most publicized risk controls.  These stress tests were supposed to be used to determine the potential financial consequences of an economic shock to Lehman's portfolio of real estate assets and investments.  Such stress tests by Lehman were required by the SEC.  In Lehman's SEC filings made in 2007 and 2008, Lehman publically represented that "[w]e use stress testing to evaluate risks associated with our real estate portfolios …."  This statement was false since Lehman excluded some of its most risky principal investments, including commercial real estate, private equity investments and leverage loan

commitments, from its stress tests.  Lehman's failure to conduct stress testing on its real estate investments have a materially adverse effect on the Company.  In reporting on Lehman's failure to include its risky real estate investments in its stress tests, the Bankruptcy Court Examiner found such stress tests to be "meaningless."  An experimental stress tests conducted in 2008 indicated that a large proportion of Lehman's risk contained in real estate and private equity positions that had not been included in the stress test.  One such stress test showed maximum potential losses of $9.4 billion which included $7.4 billion in losses on real estate and private equity positions excluded from the stress test.  Another stress test showed potential total losses of $13.4 billion, of which $10.9 billion was attributable to the previously excluded real estate and private equity positions.

83.     Lehman also stated in its SEC filings that were incorporated by reference into the offering materials that "[it] works proactively with business areas before transactions occur to ensure appropriate risk mitigates are in place."  However, this statement was false and misleading because Lehman failed to disclose that it had relaxed risk controls to accommodate growth of its commercial real estate business, including its bridge equity positions in the United States, which increased more than 10-fold from $116 million in the second quarter of 2006 to $1.33 billion in the second quarter of 2007.  By the end of the second quarter of fiscal year 2008, that amount had more than doubled to exceed $3 billion.  In particular, Lehman's real estate bridge equity deals were especially risky because declining values of the underlying real estate prevented Lehman from selling bridge equity positions as it had planned.  For example, as a result of its acquisition of Archstone, in addition to funding $8.5 billion in debt tranches, Lehman made an equity investment of $250 million and purchased bridge equity of approximately $2.3 billion.  Had the Archstone transaction been properly included in Lehman's risk controls, it would have caused Lehman to exceed its risk appetite limits and the limits on its real estate business.  The Bankruptcy Court

**CONSOLIDATED FIRST AMENDED COMPLAINT FOR DAMAGES**

Examiner stated before Congress that "[w]ith the inclusion of Archstone, Lehman was clearly in excess of its established risk limits."

84.     Lehman also routinely violated its value at risk ("VaR") limits.  VaR is a statistical measure of the potential loss of the fair value of a portfolio due to adverse movement in the underlying risk factors.  VaR is a key statistic examined by the SEC and watched by the market to accurately access a company's risk.  As a direct result of Lehman ignoring and violating its VaR limits, its statement made in its Forms 10-Q for 2007 and the first two quarters of 2008 and 2007 Form 10-K were materially false and misleading at the time those statements were made.

## LEHMAN MISREPRESENTED ITS LIQUIDITY RISK

85.     In its 2007 Form 10-K, Lehman stated "liquidity, that is ready access to funds, is essential to our business."  The 2007 Form 10-K also acknowledged that financial firms such as Lehman "rely on external borrowing for the vast majority of their funding, and failures in our industry are typically the result of insufficient liquidity."

86.     Under SEC regulation S-K, Lehman was required to disclose in its MD&A, any known commitments "that will result in or that are reasonably likely to result in the registrant's liquidity increasing or decreasing in any material way," and any off balance sheet arrangements "that have or are reasonably likely to have a current or future effect on the registrant's financial condition … result of operations, liquidity, capital expenditures or capital resources that is material to investors."  As described more fully above, the Repo 105 transactions engaged in by Lehman whereby Lehman was obligated to repurchase the assets, was certain to have a material effect on Lehman's financial condition and results of operations.

87.     Lehman's SEC filings made throughout fiscal years 2007 and 2008 up to the bankruptcy filing omitted and misrepresented the foregoing material facts about its repayment of Repo 105 cash borrowings.  Thus, the Company's statement in those filings that it had a "very

**CONSOLIDATED FIRST AMENDED COMPLAINT FOR DAMAGES**

strong liquidity position" and represented that "we maintain a liquidity pool … that covers

expected cash outflows for 12 months in a stress liquidity environment," was false and misleading.

### THE ROLE OF PUBLIC AUDITOR ERNST & YOUNG

88.     Defendant Ernst performed an annual audit of Lehman's consolidated financial

statements for the fiscal years ended November 30, 2006, and 2007.  In addition, Ernst reviewed

the quarterly consolidated financial statements for each of these years, which were in the

Company's 10-Q filings.  Defendant Ernst issued a "Report of Independent Registered Public

Accounting Firm" in the 10-Qs (the same title as used in the audit reports), which was based on

Ernst's review of whether material modifications were required to the consolidated financial

statements as reviewed by Ernst.  This quarterly review work also became part of the annual audit

work, and the quarterly review work was relied upon to complete the annual audits.

89.     By virtue of its longstanding position as Lehman's public auditors and its purported

expertise in real estate and complex debt securities markets, Defendant Ernst represented that it

was uniquely qualified to act as auditor of Lehman's increasingly complex business operations.

Among the critical tasks Ernst had in auditing Lehman's 2006, and 2007 consolidated financial

statements was to ensure that Lehman had properly stated the value of its asset-backed and

mortgage-backed securities and its risk of exposure in the real estate and mortgage markets.  In

particular, Lehman had material exposure to risk in real estate loans it originated on residential and

commercial properties, as well as mortgage-backed and asset-backed securities.  In certain notes to

the audit reports, Lehman touted itself as a "market leader" in both mortgage-backed and asset-

backed securitizations and other structured financing arrangements.  In essence, Lehman would

originate loans and package those loans to sell as securities.  In both instances, the quality of the

loans themselves, as well as the fair value of those loans, was critical to the financial position of

Lehman, and was by virtue of this importance, essential to disclose properly in the consolidated

**CONSOLIDATED FIRST AMENDED COMPLAINT FOR DAMAGES**

financial statements consistent with financial reporting requirements.

90.     For each of the fiscal years 2006, and 2007, Defendant Ernst, by virtue of its unique position as Lehman's auditor, was fully aware that Lehman's very survival depended in large part on the performance of its real estate loan portfolio, mortgage-backed securitizations, and asset-backed securitizations.  Defendant Ernst was also uniquely positioned to understand how the real estate market, and the subprime market in particular, could generate huge losses for Lehman. Moreover, at all times Ernst knew that investors, creditors, analysts, and rating agencies, among others, would rely upon the accuracy of Lehman's consolidated financial statements and that Ernst's audit opinion reflected a reasonable and complete examination of those consolidated financial statements by Ernst in accordance with the standards of the Public Company Accounting Oversight Board ("PCAOB").  The SEC has designated the PCAOB as a body with the authority to promulgate auditing and other professional standards relating to audits of public companies in the United States.  Public accounting firms who are registered with the PCAOB, such as Ernst, must adhere to all PCAOB standards in the audits of issuers such as Lehman.

91.     Lehman's consolidated financial statements for the fiscal years ended 2006, and 2007 were materially false and misleading because they, among other things, failed to accurately disclose the true financial condition of Lehman; overstated the fair value of Lehman's real estate assets, including residential and commercial real estate loans originated by Lehman; overstated income; and failed to make necessary disclosures, adjustments, write-downs, or establish adequate reserves related to the value of real estate loans, mortgage-backed securities held by Lehman, and contingencies associated with Lehman's mortgage-backed and asset-backed securitizations.  As a result, the Lehman consolidated financial statements were not prepared in accordance with United States Generally Accepted Accounting Principles ("US GAAP").  In performing its audits of Lehman's consolidated financial statements, Ernst failed to perform in accordance with the

standards of the PCAOB.

92.     For each of Lehman's consolidated financial statements for the fiscal years ended

2006, and 2007, Ernst issued an unqualified opinion as to the accuracy of those statements.  For

example, for fiscal year ended 2007 Ernst stated:

> **Board of Directors and Stockholders of Lehman Brothers Holdings Inc.**
>
> We have audited the accompanying consolidated statement of financial condition of Lehman Brothers Holdings Inc. (the "Company") as of November 30, 2007 and 2006, and the related consolidated statements of income, changes in stockholders' equity, and cash flows for each of the three years in the period ended November 30, 2007.  Our audits also included the financial statement schedule listed in the Index at Item 15(a).  These financial statements and schedule are the responsibility of the Company's management. Our responsibility is to express an opinion on these financial statements based on our audits.
>
> We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement.  An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements.  An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation.  We believe that our audits provide a reasonable basis for our opinion.
>
> In our opinion, the financial statements referred to above present fairly, in all material respects, the consolidated financial position of Lehman Brothers Holdings Inc. at November 30, 2007 and 2006, and the consolidated results of its operations and its cash flows for each of the three years in the period ended November 30, 2007, in conformity with U.S. generally accepted accounting principles. Also, in our opinion, the related financial statement schedule, when considered in relation to the basic financial statements taken as a whole, presents fairly in all material respects the information set forth therein.
>
> We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States), the effectiveness of Lehman Brothers Holdings Inc.'s internal control over financial reporting as of November 30, 2007, based on criteria established in Internal Control-Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission and our report dated January 28, 2008 expressed an unqualified opinion thereon.

93.     For the fiscal year ended 2006, Defendant Ernst issued a similar unqualified opinion.  The audit opinions by Ernst were materially false and misleading at the time it was made.  Ernst, as one of the largest public accounting firms in the world, knew that investors, creditors, and others were intended recipients of these audit reports and opinions, and that such users would rely upon the same in deciding to purchase and/or continue to hold Lehman Securities.  The continued issuance of clean audit opinions, and the failure to correct existing clean opinions, were critical to Lehman's efforts to maintain a public front of safety and security for investors even while the Company plummeted towards its demise.  In providing clean audit opinions, Defendant Ernst gave enormous credibility to Lehman and failed to fulfill its role as a public watchdog, as required by the United States Supreme Court.

94.     The purpose of Defendant Ernst's audits of Lehman's consolidated financial statements was to reach an opinion as to whether those statements set forth in all material respects Lehman's financial position and results in strict conformity with US GAAP.  In planning a complex audit of a company such as Lehman, Ernst had an affirmative duty to both plan and conduct the audits with due professional care so that it could obtain the audit evidence necessary to opine with reasonable assurance that Lehman's consolidated financial statements contained no material misstatements or omissions.  *See* AU[6] §§ 230 and 326.  Ernst also had the responsibility to plan and conduct the audits of Lehman so as to detect fraud and the extent to which any such fraud would have a materially adverse effect on the consolidated financial statements.  *See* AU § 316.  Because of its enormous knowledge of the real estate markets, including the markets for the origination and securitization of subprime loans, Ernst should have been even more cautious than usual in designing audit procedures to detect fraud or negligence that could materially impact

---

[6] "AU" is the codification of auditing standards prepared by the American Institute of Certified
(footnote continued)

Lehman's consolidated financial statements.  However, Ernst did not do so.

95.     A proper audit requires professional skepticism as shown both by independence from, and by questioning of, consolidated financial statements prepared by Lehman's management.  Only with such independence, intellectual detachment, and an attitude of professional skepticism towards management could Ernst's ultimate opinion regarding Lehman's consolidated financial statements have had a reasonable basis.  The audit opinions issued by Ernst for Lehman's 2006, and 2007 consolidated financial statements gave an unqualified opinion that the statements were prepared in accordance with US GAAP in all material respects.

96.     In fact, Lehman's consolidated financial statements for 2006, and 2007 violated US GAAP in that the statements materially overstated income and assets for each of those fiscal years.  As alleged above, beginning in fiscal year 2006 and continuing through fiscal year 2007, Lehman overstated the fair value of its real estate related assets, overstated the income derived from those assets and the securitization of mortgages, failed to establish adequate asset loan loss reserves, or reserves for the contingencies associated with its securitization of mortgages and assets, and overstated the value of such securities that it continued to hold and/or those in which it had a retained interest.  As a result, the 2006, and 2007 consolidated financial statements violated US GAAP, and Ernst's opinions, based upon its audits of those statements, were materially false and misleading.

97.     As set forth in the Statements of Financial Accounting Concepts ("SFAC"), Concept No. 1, financial statements are audited by independent accountants, such as Ernst, to enhance confidence in the reliability of those statements.  Indeed, according to SFAC Concept No. 1, financial reporting should provide information that is useful to investors and creditors,

_____

Public Accountants, Inc. as taken from Statements of Auditing Standards ("SAS").

amongst other users of financial statements, and financial statements are recognized to be a basis for making rational decisions as to whether to invest or not.  Companies, such as Lehman, and their management are described in SFAC Concept No. 1 as having "stewardship responsibility" to the users of financial statements.  The financial information contained therein, and in particular earnings, is commonly the focus for determining whether that stewardship has been properly carried out.  Lastly, financial statements need to include explanations and interpretations which help users to understand their contents.

98.      Under SFAC Concept No. 2, it is a central precept of accounting that financial reporting should be relevant and reliable.  "Reliable" means the information should be complete and financial statements should not leave out material facts, especially where such facts are adverse.  Management of Lehman, such as the Officer Defendants, knew more about the Company than investors, creditors or other outsiders, and had the responsibility to increase the usefulness of financial reporting by explaining those matters which had a material effect on the financial statements.  Defendant Ernst, as Lehman's auditor, was required under PCAOB standards, including AU section 431, to examine the disclosures in the consolidated financial statements and take appropriate action if Lehman management omitted material information required by US GAAP.

99.      Instead of adhering to these well established concepts, Lehman prepared and issued its note disclosures in a way that disaggregated the facts, and made it difficult to determine its true exposure to the downturn in the real estate market.  The note disclosures, and in particular the notes related to securitizations and other off-balance sheet arrangements, were incomplete and failed to disclose relevant facts in a manner that allowed the user of the consolidated financial statements to determine just how exposed Lehman was to such a downturn and the risks inherent in such an event.  The notes provided certain factual information, but did not put it in an

43
**CONSOLIDATED FIRST AMENDED COMPLAINT FOR DAMAGES**

appropriate context.  For example, in the consolidated financial statements for the fiscal year ended 2006 and issued on February 13, 2007, Lehman disclosed that it securitized approximately $146 billion of residential mortgages in 2006 and $133 billion in 2005.  However, the footnotes fail to adequately disclose how much of those securitizations were in subprime loans, the quality of the creditworthiness or collateral for these securities, or the contingent risk related to subprime securitizations wherein Lehman had retained an interest.

100.    These failures to adequately disclose, and to obfuscate by disaggregating material information are significant.  For example, the reported income before taxes for Lehman for 2005 was $4.829 billion and $5.905 billion in 2006.  In comparison, Lehman's interests in securitizations for residential mortgages were valued $7.4 billion for 2005 and $7.9 billion in 2006.  Write-downs, write-offs, or reserves for low quality loans and retained interests in securitizations, including those for subprime loans, would have a materially adverse impact on income as well as cash flow.  Furthermore, the risks inherent in the quantitative methods used to set values for such assets were not disclosed.

101.    In Note 11 to the 2006 audited financial statements, Lehman supposedly discloses "Commitments, Contingencies and Guarantees."  With respect to loan originations, the note discloses that at the end of fiscal year 2005, Lehman had $7.7 billion in residential mortgages, and $7.0 billion in 2006.  Note 11 refers back to Note 3 for further information about Lehman's securitization activities.  However, neither footnote makes any disclosure about reserves for bad real estate loans, potential write-downs, or write-offs.

102.    In the consolidated financial statements for the end of fiscal year 2007, Lehman disclosed its subprime residential loan portfolio for the first time.  The title of Note 3 for 2007 was changed from "Securitizations and Other Off-Balance Sheet Arrangements" to "Financial Instruments and Other Inventory Positions," a particularly obscure title given the financial

44

**CONSOLIDATED FIRST AMENDED COMPLAINT FOR DAMAGES**

problems that Lehman was already experiencing in its residential mortgage portfolio. That note also flatly states: "We do not consider ourselves to have economic exposure to the underlying assets in those securitization vehicles." This refers to balances in mortgage-backed and asset-backed securities, which were purportedly transferred, of approximately $12.8 billion in 2007 and $5.5 billion in 2006. The disclosures about non-investment grade retained interests in securitizations is relegated to a footnote, and the format for disclosing mortgage-backed and asset-backed securities is changed so as to make it harder to compare the same note in 2006 to the one in 2007. Lastly, the note discloses that Lehman's total portfolio of U.S. residential subprime mortgages was $5.276 billion in 2007 and $6.849 billion in 2006. There are no disclosures about the risks associated with this portfolio, including, but not limited to, foreclosures, write-offs, write-downs, and the necessity of reserves. Despite the fact that net income before taxes, as set forth in the 2007 income statement, was $6.013 billion for 2007 and $5.905 billion for 2006 (meaning that the total exposure to the subprime portfolio was greater than pre-tax income in 2006 and accounted for most of the Company's income in 2007), Lehman fails to adequately disclose critical facts about the impact of its subprime portfolio on its financial condition. Given the dire circumstances known to the Individual Defendants, and Defendant Ernst, as of the end of fiscal year 2007, the mere disclosure of the amount of the subprime portfolio, without disclosure of the risks associated therewith, is materially misleading.

103. In addition, for an investor to determine the true facts about Lehman's exposure to the subprime market, that investor would not only have to aggregate the information found in separate places in the consolidated financial statements, but it would also have to figure out the relationship between the loans originated by Lehman and the securitizations related thereto. Once real estate loans are originated by Lehman, they are then packaged as securities (*i.e.*, securitization), and sold to investors. Lehman "derecognizes" the financial assets transferred as

**CONSOLIDATED FIRST AMENDED COMPLAINT FOR DAMAGES**

securitizations once Lehman relinquishes control.  This has the effect of taking them off Lehman's balance sheet.

## DEFENDANT ERNST'S KNOWLEDGE OF LEHMAN'S FALSE AND MISLEADING FINANCIAL STATEMENTS

104.    Ernst was specifically informed about Lehman's Repo 105 transactions on a number of occasions.  As the Bankruptcy Court Examiner stated in his report, Ernst "was made aware that [Lehman's] financial information may be materially misleading because of a failure to disclosure the effect and timing and volume of Lehman's Repo 105 activities (which had a material effect on the financial statement items)."

105.    Sometime in 2007 and likely no later than August 2007, Ernst was provided by Lehman with a "netting grid" that identified and described certain balance sheet mechanisms, including the Repo 105 transactions.  At the time Ernst prepared its audit of Lehman's fiscal year 2007 financial statements and issued its unqualified audit opinion, Ernst had possession of the netting grid.  Despite being provided such information Ernst failed to take into account the large volume of Repo 105 transactions taken by Lehman at the end of its fiscal quarters and the effect of such transactions on Lehman's financial reporting.

106.    Martin Kelly, Lehman's Global Financial Controller appointed on December 1, 2007, spoke to William Schlich, Ernst's lead partner on the Lehman audit team, about the Repo 105 transactions.  Among other things, Kelly and Schlich specifically discussed the fact that Lehman was unable to obtain a true sale opinion under United States law for the Repo 105 transactions.

107.    Ernst also became aware of Lehman's improper use of Repo 105 transactions as a result of its investigation of claims made by Lehman employee and whistleblower Matthew Lee.  On May 16, 2008, Mr. Lee, a Senior Vice President in Lehman's Finance Division responsible for its global balance sheet and legal entity accounting, sent a letter to Lehman management

identifying possible violations of Lehman's ethics code relating to accounting/ balance sheet issues.  Following his May 16, 2008 letter he also prepared a writing addressing additional accounting control issues including the use of Repo 105 transactions.  This document was sent to a managing director in Lehman's Corporate Compliance Department.  Shortly after sending the May 16, 2008 letter, Mr. Lee was interviewed by Lehman's general counsel and Lehman's head of corporate audit.  The day after that interview on May 22, 2008, Lehman terminated Mr. Lee without warning.

108.    Approximately two weeks after Mr. Lee's termination, he was interviewed by Schlich and Hillary Hansen of Ernst.  As recorded in notes made by Hansen of that interview, Mr. Lee again warned Ernst about Lehman's Repo 105 transactions including the enormous volume of the Repo 105 activity that Lehman engaged in at quarter-end.  Ernst's notes repeat Mr. Lee's allegation that Lehman moved $50 billion of inventory off its balance sheet and quarter-end through Repo 105 transactions and that these assets returned to Lehman's balance sheet approximately one week later.  In an interview with the Bankruptcy Court Examiner, Hansen specifically recalled conferring with Schlich about Mr. Lee's Repo 105 allegations.

109.    In fact, Ernst, through its audit partner Schlich and others, took affirmative steps to cover-up the Repo 105 transactions.  On June 13, 2008, the day after Mr. Lee specifically informed Ernst of the $50 billion in Repo 105 transactions taken by Lehman at the end of the second quarter of fiscal year 2008, Ernst spoke to Lehman's audit committee regarding Mr. Lee's allegations.  Although the Chair of the Audit Committee had informed Ernst directly that he wanted a full and thorough investigation of every allegation made by Mr. Lee, Ernst failed to mention anything to the Audit Committee about the Repo 105 transactions.  Ernst's cover-up of the Repo 105 transactions continued on July 8, 2008, when the Audit Committee met with Ernst to review Lehman's second quarter fiscal year 2008 financial statements.  During that meeting Ernst

**CONSOLIDATED FIRST AMENDED COMPLAINT FOR DAMAGES**

again failed to mention Lee's allegations regarding the Repo 105 transactions and stated that Ernst would issue an unqualified review report. Later that month, on July 22, 2008, at an Audit Committee Meeting where Lehman's Head of Corporate Audit made a presentation on the results of the investigation into Mr. Lee's allegations, Ernst again failed to mention the Repo 105 transactions. The Audit Committee was told at that time that "Corporate Audit has largely completed an evaluation of [Lee's] observations in partnership with Financial Control and Ernst & Young."

110.    At all meetings subsequent to July 22, 2008 and in private executive sessions attended by Ernst, it failed to disclose that Mr. Lee had made any allegations regarding Repo 105 transactions and those transactions being used to move assets off Lehman's balance sheet at quarter-end. Despite the directive communicated by the Chair of Lehman's Audit Committee to investigate every claim raised by Mr. Lee, Ernst did not follow up on these allegations or conduct any further inquiry into the Repo 105 transactions. Following Ernst's June 12, 2008 interview of Mr. Lee, in which he described Lehman's use of Repo 105 transactions to move $50 billion of assets off its balance sheet at the end of the second quarter of fiscal year 2008, Ernst did not speak with Mr. Lee again. Instead, despite Ernst's knowledge of Mr. Lee's disturbing allegations of financial manipulation by Lehman, it signed a report of independent registered public accounting firm for Lehman's Form 10-Q for the second fiscal quarter of 2008. That report, signed on July 10, 2008, certified that Ernst was not aware of any material modifications that should be made to Lehman's financial statements for them to be in conformity with GAAP, and similarly failed to amend or correct its most recent audit opinion on the 2007 fiscal year financial statements or its report on the first quarter fiscal year 2008 financial statements.

111.    As the Bankruptcy Court Examiner concluded with regard to Ernst's knowledge of the Repo 105 transactions and their use to manipulate the reported financial results of Lehman:

Ernst should have made appropriate inquiries of management and performed analytical procedures concerning significant transactions that occurred at the ends of the quarters in 2008 and analyzed their impact upon the financial statements, including the footnotes. Particularly, after Lee alerted Ernst & Young to $50 billion in Repo 105 transactions prior to the filing of the second quarter Form 10-Q, Ernst & Young should have reported to senior management and the Audit Committee that Lehman was using Repo 105 transactions to temporarily and artificially reduce balance sheet in its net leverage ratio for reporting purposes, without disclosing the practice to the public. …

Ernst & Young knew or should have known that the notes to the financial statements were false and misleading because, among other things, those notes describe all repos as "financings," which Ernest & Young knew was not the case, and those notes did not disclose Repo 105 transactions.  Ernst & Young had a professional obligation to communicate the issue to both senior management and the Audit Committee and to recommend corrections of the Forms 10-Q and also to issue modified review reports noting the materially inadequate disclosures, or to withhold its review reports altogether.

112.   By failing to adhere to basic concepts of financial reporting and auditing, Defendant Ernst deprived Plaintiff of material information necessary to make an informed decision about their investments in Lehman Notes and Securities.

## FIRST CAUSE OF ACTION

### Violation of Section 11 of the Securities Act

#### (Against All Defendants)

113.   Plaintiff incorporates by reference all of the above allegations as though fully set forth herein.

114.   This claim is brought pursuant to Section 11 of the Securities Act, 15 U.S.C. § 77k, on behalf of Plaintiffs South San Francisco, Fremont and Cerritos against all Defendants. Plaintiffs City of Long Beach and the Counties of Alameda and Tuolumne are not parties to this claim.

115.   For the purposes of this claim for relief only, Plaintiffs explicitly disclaims any statement in the Complaint that alleges or can be construed to allege that Defendants committed intentional misconduct or that Defendants acted with scienter or intent to defraud.

116.   Lehman was the issuer of Lehman Notes covered by a registration statement filed with the SEC on May 30, 2006.  The Lehman Notes were also issued pursuant to pricing supplements filed with the SEC which incorporated by reference all subsequent informational filings made with the SEC by Lehman.

117.   Prior to Plaintiffs' purchases of the Lehman Notes, the May 30th Offering Materials became effective or were declared effective by the SEC.  The May 30th Offering Materials contained untrue statements of material facts and/or omissions of material facts required to be stated therein or necessary to make the statements therein not misleading, as alleged above.

118.   The Lehman Notes purchased by Plaintiffs were issued pursuant to the May 30th Offering Materials as filed by Lehman with the SEC, and the Lehman Notes purchased by Plaintiffs are directly traceable to the false and misleading Offering Materials used by Underwriting Defendants to solicit the purchase of the Lehman Notes.

119.   As a direct and proximate result of the making of false statements and/or omissions of material facts in the May 30th Offering Materials by Defendants, Plaintiffs are entitled to recover from Defendants, jointly and severally, such damages as represent the difference between the amount paid by Plaintiffs for the Lehman Notes and the true value of the Lehman Notes.

## SECOND CAUSE OF ACTION

### Violation of California Corporation Code § 25400, et seq.

### (Against All Defendants)

120.   Plaintiffs incorporate by reference all the above allegations as though fully set forth herein.

121.   This claim is made against all Defendants except that this claim as to the Underwriter Defendants is limited to the Lehman Notes purchased by Plaintiffs South San Francisco, Fremont and Cerritos.

122.   Defendants disseminated within California false and misleading documents and

**CONSOLIDATED FIRST AMENDED COMPLAINT FOR DAMAGES**

information concerning Lehman's financial condition, as hereinabove alleged, for the purpose of

inducing Plaintiffs to purchase and hold the Lehman Notes and Securities.  Defendants acted both

individually and as part of a conspiracy in performing such acts.  At all times, Defendants knew or

should have known that the documents and information they disseminated, or assisted in

disseminating, were false and misleading and/or failed to reveal material facts necessary to make

the statements not misleading.  As a direct result of such dissemination of false and misleading

documents and information, Defendants knew that persons purchasing and holding the Lehman

Notes and Securities, including Plaintiffs, would rely on such false statements in purchasing and

holding the Lehman Notes and Securities.  Defendants made such false and misleading statements

for the purpose of inducing Plaintiffs to purchase and retain the Lehman Notes and Securities.

123.     In violation of California Corporations Code section 25403, each of the Defendants

provided substantial assistance to each of the other Defendants in the dissemination of the false

and misleading statements.

124.     Each of the Defendants willfully participated in the wrongful acts alleged above.

As a direct and proximate result of the wrongful acts and conduct of Defendants as alleged above,

Plaintiffs have suffered financial harm and other general and special damages including damages

recoverable under California Corporations Code section 25500 and/or section 25501, in an amount

to be determined.  Plaintiffs also seek an award of prejudgment interest as provided by California

Corporations Code section 25500 and/or section 25501.

### **THIRD CAUSE OF ACTION**

### **Fraud and Deceit**

### **(Against All Defendants)**

125.     Plaintiffs incorporate by reference all the above allegations as though fully set forth

herein.

126.     This claim is made against all Defendants except that this claim as to the

Underwriter Defendants is limited to the Lehman Notes purchased by Plaintiffs South San Francisco, Fremont and Cerritos.

127.    The conduct of Defendants as alleged herein constituted a fraud against Plaintiff. Defendants made false representations, concealments, and omissions of material facts to Plaintiff, knew and/or were reckless in not knowing that the same were false, and in so doing intended to defraud Plaintiffs.  Plaintiffs did in fact innocently rely upon those false representations, concealments, and nondisclosures by Defendants.  In relying on the false and misleading statements of Defendants, Plaintiffs were induced to purchase and retain the Lehman Notes and Securities, and such reliance was justifiable in light of the circumstances.

128.    The conduct of Defendants, as alleged herein, violated sections 1709 and 1710 of the California Civil Code, and renders Defendants liable to Plaintiffs for fraud and deceit. Defendants violated those provisions in the following manner:  (i) making representations of fact that were not true and which Defendants did not believe to be true (Cal. Civ. Code § 1710(1)); (ii) suppressing and/or failing to disclose facts that Defendants were bound to disclose, or giving information or other facts that were likely to mislead for want of communication of the facts suppressed or undisclosed (Cal. Civ. Code § 1710(3)); and (iii) making promises without any intent of performing them (Cal. Civ. Code § 1710(4)).

129.    Defendants aided and abetted, encouraged, and rendered substantial assistance in accomplishing the wrongful conduct, their wrongful goals, and other wrongdoing complained of herein.  In taking such actions, each Defendant acted with an awareness of his, her, or its primary wrongdoing and realized that his, her, or its conduct would substantially assist the accomplishment of the wrongful conduct, wrongful goals, and other wrongdoing complained of herein.

130.    Defendants pursued a conspiracy, common enterprise, and common course of conduct to accomplish the wrongs complained of herein.  The purpose and effect of the

conspiracy, common enterprise, and common course of conduct complained of herein was, among other things, performed for the financial benefit of Defendants at Plaintiffs' expense by illegal, fraudulent, and wrongful activities.  Each Defendant was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and common course of conduct complained of herein, and was aware of his, her or its overall contribution to, and furtherance of, the conspiracy, common enterprise, and common course of conduct.  Defendants' acts of conspiracy include, among other things, all of the acts that each are alleged to have committed in furtherance of the wrongful conduct complained of herein.

131.    As a direct and proximate result of the wrongful and fraudulent conduct of Defendants, Plaintiffs have suffered and continues to suffer substantial economic losses and other general and specific damages, including but not limited to, out-of-pocket losses, payment of commissions and fees to Defendants, and lost interest, all in an amount to be determined according to proof at the time of trial.

132.    The wrongful acts of Defendants as complained of herein were done with malice, oppression, and intent to defraud, and with conscious disregard for the rights of Plaintiffs, and the wrongful acts of Defendants were committed at the behest and in furtherance of the business of each other Defendant and/or were authorized and/or ratified by each Defendant.  Plaintiffs are entitled under California Civil Code section 3294 to recover punitive damages from Defendants in an amount to be determined according to proof at the time of trial and which is appropriate to punish Defendants and make an example of Defendants in order to deter others from similar conduct.

## FOURTH CAUSE OF ACTION

### Negligent Misrepresentation

### (Against All Defendants)

133.    Plaintiffs incorporate by reference all the above allegations as though fully set forth

CONSOLIDATED FIRST AMENDED COMPLAINT FOR DAMAGES

herein.

134.     This claim is made against all Defendants except that this claim as to the Underwriter Defendants is limited to the Lehman Notes purchased by Plaintiffs South San Francisco, Fremont and Cerritos.

135.     Defendants made false representations, concealments, and nondisclosures to Plaintiffs.  In making said false representations, concealments, and nondisclosures to Plaintiffs, and in doing the things alleged above, Defendants, and each of them, acted without any reasonable grounds for believing said false representations, concealments, and nondisclosures were in fact true, and intended thereby to induce the reliance of Plaintiffs thereon.  Plaintiffs did in fact innocently rely upon said false representations, concealments, and nondisclosures in purchasing the Lehman Notes and  Securities and continuing to hold the Notes and Securities.  Such reliance was justifiable in light of the circumstances.

136.     Defendants, and each of them, aided and abetted, encouraged, and rendered substantial assistance in accomplishing the wrongful conduct, their wrongful goals, and other wrongdoing complained of herein.  In taking such actions, each Defendant acted with an awareness of his, her, or its primary wrongdoing and realized that his, her, or its conduct would substantially assist the accomplishment of the wrongful conduct, wrongful goals, and other wrongdoing complained of herein.

137.     As a direct and proximate result of Defendants' representations, concealments, and nondisclosures to Plaintiffs and Plaintiffs' justifiable reliance thereupon, Plaintiffs have suffered and continues to suffer substantial economic losses and other general and specific damages, including but not limited to, out-of-pocket losses, fees to Defendants.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs demand that judgment be rendered in favor of Plaintiffs against

Defendants as follows:

1.      For compensatory and general damages according to proof;

2.      For special damages according to proof;

3.      For prejudgment interest at the maximum legal rate;

4.      For punitive and exemplary damages according to proof;

5.      For the costs of the proceedings herein;

6.      For Plaintiff's reasonable attorneys' fees; and

7.      For all such other and further relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial by jury in this action.

DATED: November 28, 2011        By: _____

Bruce L. Simon
George S. Trevor
PEARSON, SIMON, WARSHAW & PENNY, LLP
44 Montgomery Street, Suite 2450
San Francisco, CA 94104
Telephone: (415) 433-9000
Facsimile:  (415) 433-9008
E-Mail:  bsimon@pswplaw.com
                gtrevor@pswplaw.com

Clifford H. Pearson
PEARSON, SIMON, WARSHAW & PENNY, LLP
15165 Ventura Boulevard, Suite 400
Sherman Oaks, CA 91403
Telephone: (818) 788-8300
Facsimile:  (818) 788-8104
E-Mail:  cpearson@pswplaw.com

*Attorneys for Plaintiffs City of South San Francisco,
City of Long Beach, County of Tuolumne, City of
Fremont, County of Alameda and City of Cerritos*

Thomas V. Girardi, Esq.
GIRARDI | KEESE LAWYERS
1126 Wilshire Boulevard
Los Angeles, CA 90017
Telephone: (213) 977-0211
Facsimile: (213) 481-1554

834450.1

**CONSOLIDATED FIRST AMENDED COMPLAINT FOR DAMAGES**

E-Mail: tgirardi@girardikeese.com

*Attorneys for Plaintiffs City of Long Beach and City of Cerritos*

Geoffrey Spellberg, Esq.
MEYERS, NAVE, RIBACK, SILVER & WILSON
575 Market Street, Suite 2600
San Francisco, CA 94105
Telephone: (415) 421-3767
Facsimile: (415) 398-2625
E-Mail: gspellberg@meyersnave.com

*Attorneys for Plaintiffs City of South San Francisco, City of Fremont, County of Alameda and County of Tuolumne*

**CONSOLIDATED FIRST AMENDED COMPLAINT FOR DAMAGES**