UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------X

In re                                                      Case No. 09-MD 2017 (LAK)

LEHMAN BROTHERS SECURITIES
AND ERISA LITIGATION,

                                                           JURY TRIAL DEMANDED

This Document Applies Only to:

Retirement Housing Foundation; Foundation
Property Management, Inc.; and RHF Foundation,
Inc., v. Richard S. Fuld, Jr.; Michael L. Ainslie;
Roland A. Hernandez; John F. Akers;
Roger S. Berlind; Joseph M. Gregory;
Thomas H. Cruikshank; Marsha Johnson Evans;
Henry Kaufman; John D. Macomber; Thomas
A. Russo; Christopher M. O'Meara; Christopher
Gent; Erin M. Callan; Ian T. Lowitt;
Ernst & Young, L.L.P.

Case No. 10-cv-06185-LAK

----------------------------------------------------------------X

# FIRST AMENDED COMPLAINT

TABLE OF CONTENTS

I.      INTRODUCTION ........................................................................................... 4

II.     THE PARTIES............................................................................................... 6

        A.  Plaintiffs ........................................................................................... 6

        B.  Defendants ........................................................................................ 8

III.    JURISDICTION AND VENUE ................................................................... 14

IV.     FACTUAL ALLEGATIONS ....................................................................... 15

        A.  Lehman's Residential and Commerical Mortgage Backed Securities Holdings...... 15

        B.  Lehman's Large Exposure to the Non-Prime Real Estate Market ........................... 17

        C.  Lehman's High-Risk Commercial Property Investments......................................... 18

        D.  Lehman's Liquidity Risk .................................................................... 20

        E.  Record Earnings Precede Lehman's Collapse........................................ 23

        F.  Lehman Collapses and Files For Bankruptcy ....................................... 25

            1. Lehman's Failed Attempts to Sell Toxic Assets ........................... 25

            2. Lehman Files For The Largest Bankruptcy in History .............................. 28

        G.  The Bankruptcy Examiner's Report.................................................... 28

        H.  Lehman's Employment of Repo 105.................................................... 29

            1. Accounting for Repo 105 Transactions ...................................... 30

                i.    SFAS 140 .................................................................... 30

                ii.   Lehman's "True Sale" Opinion .................................... 31

                iii.  Lehman's Misleading Net Leverage Ratio Characterization ........ 32

            2. Lehman's Repo 105 Transactions Increase ................................. 33

            3. Bankruptcy Examiner's Findings ............................................. 37

            4. Documents and Witness Interviews Confirm Defendants Knew That Repo 105 Transactions Were Materially Misleading .......................................... 42

            5. Investors, Like Plaintiffs, Relied On and Were Misled by Lehman's Disclosures and Omissions Regarding Repo 105....................................... 46

        I.  Overstated Real Estate Assets............................................................. 47

            1. Principal Transactions Group.................................................... 47

            2. Archstone Valuations ............................................................... 48

3. Industry Peers and Governmental Entities Concluded That Lehman's Real Estate Portfolios Were Overstated ............................................................... 49

4. Lehman Defendants' Knowledge of Overstated Real Estate Valuations ... 50

J. Misrepresented Liquidity ....................................................................... 51

1. Defendants Failed to Disclose the Liquidity Impact of Repo 105 ............ 52

2. Encumbered Assets Were Improperly Included in Lehman's Liquidity Pool ....................................................................................................... 53

3. Lehman Defendants' Knowledge of Liquidity Misrepresentations ........... 55

K. Misrepresented Risk Management Practices ........................................ 58

1. Lehman Regularly Exceeded Internal Risk Limits .................................... 60

2. Defendants' Knowledge of Regularly Exceeded Risk Limits ................... 63

L. Non-Disclosed Material Concentrations of Credit ................................. 65

1. Alt-A Loan Concentration........................................................................ 66

2. Commercial Real Estate Concentration .................................................. 67

M. GAAP Violations.................................................................................... 69

1. Repo 105 ................................................................................................ 72

2. SFAS 157 Asset Valuations ................................................................... 74

i. Insufficient Level Three Assets Write Downs.............................. 75

ii. Improper Internal Valuations........................................................ 75

3. Credit Risk Concentrations ..................................................................... 76

4. Internal Controls..................................................................................... 77

N. E&Y's Violations of GAAP and GAAS ................................................... 78

1. E&Y's Improper Repo 105 Auditing........................................................ 81

i. Repo 105 Red Flags.................................................................... 82

ii. Repo 105 Whistleblower.............................................................. 84

iii. E&Y Failed to Follow GAAS Standards ...................................... 85

iv. Bankruptcy Examiner's Conclusions ........................................... 86

O. E&Y's Scienter...................................................................................... 87

V. MATERIAL MISSTATEMENTS AND OMISSIONS.................................... 92

A. E&Y's Misstatements ........................................................................... 92

B. Repo 105 Misstatements ...................................................................... 94

1.  Additional Material Misstatements and Omissions Relating to Repo ....... 96

C.  Misstatements and Omissions Related to Overstated Values of Real Estate Assets
.................................................................................................................. 99

1.  Real Estate Valuation Misstatements and Omissions in Lehman's SEC
Filings ................................................................................................. 100

2.  Additional Real Estate Valuation Misstatements and Omissions ............ 100

D.  Material Misstatements and Omissions Related to Liquidity ................................ 105

1.  Liquidity Misstatements and Omissions in SEC Filings, Registration
Statements, Offering Documents and Press Releases ............................. 105

2.  Additional Liquidity Misstatements and Omissions ................................ 105

E.  Material Misstatements and Omissions Related to Risk Management .................. 111

1.  Misstatements and Omissions in Lehman's SEC Filings, Registration
Statements, Offering Documents and Press Releases ............................. 111

2.  Additional Misrepresentations and Omissions Related to Risk Management
.................................................................................................................. 113

F.  Material Misstatements and Omissions Related to Concentrations of Credit Risk
.................................................................................................................. 116

1.  Misstatements and Omissions in SEC Filings, Registration Statements,
Offering Documents and Press Releases .................................................. 116

2.  Additional Misstatements and Omissions Related to Concentrations of
Credit Risk ............................................................................................... 116

G. False and Misleading Registration Statement ........................................................ 117

VI.    LOSS CAUSATION ........................................................................................... 123

VII.   NO SAFE HARBOR ........................................................................................... 126

VIII.  CAUSES OF ACTION ........................................................................................ 127

A.  Exchange Act Claims ............................................................................................. 127

B.  State Law Claims ................................................................................................... 130

IX.    PRAYER FOR RELIEF ....................................................................................... 137

Plaintiffs Retirement Housing Foundation, Foundation Property Management, Inc., and RHF Foundation, Inc. (collectively, "Plaintiffs" or "RHF") allege the following based on an investigation conducted by Plaintiffs and their counsel.  The investigation included a review and analysis of press releases, analyst reports, media reports, conference call transcripts, books, documents and testimony provided to Congress, SEC filings, the findings of the Financial Crisis Inquiry Commission Report, and the March 11, 2010 report and documents collected by the Bankruptcy Court-appointed examiner, Anton R. Valukas ("Report" or "Rpt").

## I.   <u>INTRODUCTION</u>

1.    This action arises from the Plaintiffs' purchases of medium-term notes (the "Securities") issued by Lehman Brother Holdings, Inc. ("Lehman" or the "Company") between May 18, 2005 and September 15, 2008, inclusive (the "Relevant Period").  On or about May 16, 2005, Lehman filed a Registration Statement on Form S-3/A (amending its December 7, 2004 registration statement filed on Form S-3) ("2005 Registration Statement"), and on May 18, 2005, Lehman filed a Prospectus and Prospectus Supplement announcing the terms of its medium-term notes, Series H ("2005 Prospectus") pursuant to the 2005 Registration Statement.  The 2005 Prospectus expressly incorporated by reference Lehman's 10-K, 10-Q and 8-K forms filed after May 16, 2005, but before the effective date of the particular offering.  On July 6, 2005, Lehman issued a pricing supplement to the Series H notes, as amended on July 14, 2005.  According to the pricing supplement, Lehman intended to raise $1 billion through the sale of its notes priced at 99.86.  Plaintiffs purchased the Securities pursuant to this Prospectus, pricing supplement and all publically available financial information at the time of the purchase, including but not limited to the publically available financial information incorporated by reference into the 2005 Prospectus and/or pricing supplement.   The Registration Statement, together with the prospectuses,

prospectus supplements, pricing supplements, as well as all of Lehman's SEC filings during the Relevant Period incorporated therein, are collectively referred to as the "Offering Documents." These claims are asserted against certain of Lehman's officers and/or directors and Ernst & Young LLP ("E&Y") (collectively, the "Defendants") who made materially false and misleading statements during the Relevant Period in the Offering Documents, SEC filings, press releases, analyst conference calls and other public statements.  Defendants' misstatements and omissions caused the Plaintiffs to not only purchase Lehman securities, but also to hold those securities.

      2.     At the time of the Plaintiffs' purchases, the Securities were artificially inflated due to a variety of materially misleading statements and omissions regarding critical aspects of Lehman's business, including:  the "net leverage ratio" (a key ratio scrutinized by investors, ratings agencies and creditors that indicates how much debt a company uses to finance activities), portfolios of commercial real estate and asset backed securities, available liquidity, risk-management practices, and concentrations of credit risk.

      3.     Throughout the Relevant Period, Lehman's financial statements were audited by defendant E&Y, which received lucrative accounting and auditing fees, estimated at $31 million in 2007 alone.  Following each and every audit during the Relevant Period, E&Y issued an unqualified audit report on the annual financial statements of Lehman, thereby providing pubic investors – intended beneficiaries of the audit report – with the assurance that Lehman was properly reporting its financial position. These audit reports were false because Lehman's financial statements were not prepared in accordance with Generally Accepted Accounting Principles ("GAAP") and E&Y's audits were not performed in accordance with Generally Accepted Auditing Standards ("GAAS").

      4.     With the help of longtime auditor E&Y, Lehman raised tens of billions of dollars

in the first half of 2008 – including from Plaintiffs – despite the fact that Lehman was already on a downward spiral to insolvency.  Ultimately, Lehman filed for the largest bankruptcy in United States history.

5.     During the Relevant Period, and in reliance on Defendants' misrepresentations and omissions, Plaintiffs purchased approximately $1,180,000 in Securities.  Following Lehman's bankruptcy, Plaintiffs, which are not-for-profit corporations, sold the Securities at a substantial loss, hampering their mission to provide safe and affordable housing to senior citizens and other needy populations.

## II.     THE PARTIES

### A.     Plaintiffs

6.     Plaintiff Retirement Housing Foundation ("RHF") is, and at all times relevant to this Complaint was, a California not-for-profit corporation with its principal place of business in Long Beach, California.  RHF is a church-related, non-profit organization devoted to the mission of providing safe and affordable housing and services for senior citizens, persons with disabilities, and low income families.  Although its headquarters are in Southern California, RHF has sponsored, developed and/or managed senior citizen apartments, nursing facilities, and low income housing throughout the country.

7.     Plaintiff Foundation Property Management ("FPM") is, and at all times relevant to this Complaint was, a not-for-profit corporation incorporated and existing under the laws of the State of California and doing business in the County of Los Angeles in the State of California.

8.     Plaintiff RHF Foundation, Inc. ("RHFFI") is, and at all times relevant to this

Complaint was, a not-for-profit corporation incorporated and existing under the laws of the State of California and doing business in Long Beach, California.

9. On or about October 7, 2005, RHF entered into a written Agency Agreement with Merrill Lynch Trust Company, FSB ("Merrill Lynch") whereby RHF hired Merrill Lynch to act as its agent and investment advisor in order to manage the assets in RHF's investment portfolio. Merrill Lynch was appointed RHF's attorney-in-fact, and was granted full discretion and authority to retain or invest any asset of the Portfolio, or to sell, exchange, or otherwise dispose of any such assets and reinvest the proceeds consistent with RHF's stated investment objectives.

10. RHF selected the Private Portfolio Option – Trust Portfolio Group as its Investment Program. Pursuant to a merger between Merrill Lynch and BlackRock, Inc. ("Merrill Lynch/BlackRock"), on or about September 29, 2006, the Private Portfolio Option – Trust Portfolio Group was managed by Merrill Lynch/BlackRock.

11. Merrill Lynch/BlackRock analysts performed due diligence on Lehman, consulted with Lehman's officers and relied on their statements, and reviewed and relied on Lehman's past Form 10-K and Form 10-Q periodic financial filings. Based on this information, Merrill Lynch/BlackRock determined that the Securities would be a wise and relatively safe investment for RHF.

12. Plaintiffs' purchases are summarized below:

| CUSIP # | Purchaser | Date Acquired | Face Value |
|---------|-----------|---------------|------------|
| 52517PA35 | RHF | 10/19/07 | $120,000 |
| 52517PA35 | RHFFI | 10/19/07 | $190,000 |
| 52517PA35 | FPM | 10/19/07 | $85,000 |
| 52517PA35 | RHF | 10/19/07 | $20,000 |
| 52517PA35 | RHF | 10/19/07 | $165,000 |
| 52517PA35 | RHF | 10/19/07 | $130,000 |

| 52517PA35 | RHF | 10/19/07 | $75,000 |
| 52517PA35 | RHF | 10/19/07 | $250,000 |
| 52517PA35 | RHF | 5/21/08 | $80,000 |
| 52517PA35 | RHF | 10/19/07 | $40,000 |
| 52517PA35 | RHF | 10/19/07 | $25,000 |

## B. **Defendants**

### **Unnamed Additional Parties**

13.     Lehman and its broker/dealer subsidiary, Lehman Brothers, Inc. ("LBI"), were involved as sellers, offerors, and solicitors of the Securities. Lehman is in bankruptcy and direct claims against the Company are stayed under bankruptcy law.  LBI is in liquidation under the Securities Investor Protection Act of 1970, as amended (the "SIPA"), and claims against it are stayed by court order.  But for Lehman's bankruptcy filing and LBI's SIPA proceedings, both Lehman and LBI would have been named as defendants by the Plaintiffs in this action.

### **Officer Defendants**

14.     Defendant Richard S. Fuld Jr. ("Fuld"), at all times relevant to this Complaint, was the Chairman of the Board of Directors and Chief Executive Officer of both Lehman and LBI.  During the Relevant Period, Fuld signed each Form 10-K filed with the SEC, and each certification statement attached to Form 10-K and 10-Q pursuant to Rule 13a-14(a) and 15d-14(a) and §906 of the Sarbanes-Oxley Act of 2002.  Fuld also signed the 2005 Registration Statement, including all amendments to the Registration Statements.   On Plaintiffs' information and belief, Fuld is, and at all times relevant to this Complaint was, an individual residing in the State of New York.

15.     Defendant Christopher M. O'Meara ("O'Meara") was the Chief Financial Officer, Controller, and Executive Vice President of Lehman from 2004 through December

2007.  From December 2007, O'Meara served as Lehman's global head of risk management where O'Meara was responsible for all aspects of Lehman's risk profile, including oversight of risk-management policies, procedures, analytics, and metrics.  During his tenure as CFO in 2004-2007, O'Meara signed each Form 10-K and 10-Q filed with the SEC, and each certification statement attached to Form 10-K and 10-Q pursuant to Rule 13a-14(a) and 15d-14(a) and §906 of the Sarbanes-Oxley Act of 2002.   O'Meara also signed the 2005 Registration Statement, including all amendments to the Registration Statements.   On Plaintiffs' information and belief, O'Meara is, and at all times relevant to this Complaint was, an individual residing in the State of New York.

16.     Defendant Joseph M. Gregory ("Gregory"), at all times relevant to this Complaint, was Lehman's president and chief operating officer.  As COO, he oversaw the day-to-day management of Lehman's operations.   On Plaintiffs' information and belief, Gregory is, and at all times relevant to this Complaint was, an individual residing in the State of New York.

17.     Defendant Erin M. Callan ("Callan") was the Chief Financial Officer and Controller of Lehman from December 2007 to June 2008.  Callan signed Lehman's 2007 Form 10-K and first quarter 2008 Form 10-Q.  Callan also signed the certification statements on Lehman's 2007 Form 10-K and first quarter 2008 Form 10-Q pursuant to Rule 13a-14(a) and 15d-14(a) and §906 of the Sarbanes-Oxley Act of 2002.  On Plaintiffs' information and belief, Callan is, and at all times relevant to this Complaint was, an individual residing in the State of New York.

18.     Defendant Ian T. Lowitt ("Lowitt") was the Chief Administrative Officer of

Lehman from October 2006 through June 2008, and Chief Financial Officer, Controller, and Executive Vice President of Lehman from June 12, 2008 through Lehman's bankruptcy filing on September 15, 2008.  Lowitt signed Lehman's second quarter 2008 Form 10-Q and pursuant to Rule 13a-14(a) and 15d-14(a) and §906 of the Sarbanes-Oxley Act of 2002, Lowitt signed the certification statement attached to the first quarter 10-Q.  On Plaintiffs' information and belief, Lowitt is, and at all times relevant to this Complaint was, an individual residing in the State of New York.

19.     Defendant Fuld, O'Meara, Gregory, Callan, and Lowitt are collectively referred to herein as the "**Officer Defendants**." The Officer Defendants all served on Lehman's Executive Committee, chaired by Defendant Fuld. The Executive Committee was responsible for assessing Lehman's risk exposure and related disclosures, reportedly meeting at least twice a week at which time they regularly spoke about managing risk.

### Finance and Risk Committee Defendants

20.     Defendant John F. Akers ("Akers"), at all times relevant to this Complaint, was a member of the Board of Directors of both LBI and LB Holdings and was a member of Lehman's Finance and Risk Committee.  On Plaintiffs' information and belief, Akers is, and at all times relevant to this Complaint was, an individual residing in the State of Connecticut.

21.     Defendant Roger S. Berlind ("Berlind"), at all times relevant to this Complaint, was a member of the Board of Directors of both LBI and LB Holdings and was a member of Lehman's Audit and Finance and Risk Committees.  On Plaintiffs' information and belief, Berlind is, and at all times relevant to this Complaint was, an individual residing in the State of New York.

22. Defendant Marsha Johnson Evans ("Evans"), at all times relevant to this Complaint, was a member of the Board of Directors of LB Holdings and was a member of Lehman's Finance and Risk Committee. On Plaintiffs' information and belief, Evans is, and at all times relevant to this Complaint was, an individual residing in the District of Columbia.

23. Defendant Roland A. Hernandez ("Hernandez"), at all times relevant to this Complaint, was a member of the Board of Directors of LB Holdings and was a member of Lehman's Finance and Risk Committee. On Plaintiffs' information and belief, Hernandez is, and at all times relevant to this Complaint was, an individual residing in the State of California.

24. Defendant Henry Kaufman ("Kaufman"), at all times relevant to this Complaint, was a member of the Board of Directors of both LBI and LB Holdings, and was the chairman of Lehman's Finance and Risk Committee. On Plaintiffs' information and belief, Kaufman is, and at all times relevant to this Complaint was, an individual residing in the State of New Jersey.

25. Defendants Akers, Berlind, Evans, Hernandez, and Kaufman are collectively referred to herein as the "**Risk Committee Defendants**." The Risk Committee Defendants sat on the Finance and Risk Committee, which was charged with, among other responsibilities, the responsibility to review and advise the Board of Directors on the financial policies and practices of the company, reviewing significant capital transactions and the respective risks involved, and ensuring the accuracy and completeness of applicable public filings they signed. The Risk Committee reportedly met only twice in 2007 and early 2008, when Lehman's risk exposure grew exponentially.

11

**Additional Director Defendants**

26.     Defendant Michael L. Ainslie ("Ainslie"), at all times relevant to this Complaint, was a member of the Board of Directors of both LBI and LB Holdings and was a member of Lehman's Audit Committee.  On Plaintiffs' information and belief, Ainslie is, and at all times relevant to this Complaint was, an individual residing in the State of Florida.

27.     Defendant Thomas H. Cruikshank ("Cruikshank"), at all times relevant to this Complaint, was a member of the Board of Directors of both LBI and LB Holdings and was the chairman of Lehman's Audit Committee.  On Plaintiffs' information and belief, Cruikshank is, and at all times relevant to this Complaint was, an individual residing in the State of Texas.

28.     Defendant Christopher Gent ("Gent"), at all times relevant to this Complaint, was a member of the Board of Directors of Lehman.  On Plaintiffs' information and belief, Gent is, and at all times relevant to this Complaint was, an individual residing in the United Kingdom.

29.     Defendant John D. Macomber ("Macomber"), at all times relevant to this Complaint, was a member of the Board of Directors of both LBI and LB Holdings.  On Plaintiffs' information and belief, Macomber is, and at all times relevant to this Complaint was, an individual residing in the District of Columbia.

30.     Defendants Fuld, Ainslie, Hernandez, Akers, Berlind, Cruikshank, Evans, Kaufman, Macomber, and Gent are collectively referred to herein as the "**Director Defendants.**"  All of the Director Defendants were on the Boards of Directors of LBI and/or LB Holdings.  Each of the Director Defendants, other than Hernandez, signed the 2005

Registration Statement and Prospectus, pursuant to which Plaintiffs purchased Lehman securities. Further, each of the Director Defendants signed Lehman's 2005, 2006 and 2007 10-Ks, which were filed with the SEC.

31.     Fuld, Ainslie, Hernandez, Akers, Berlind, Gregory, Cruikshank, Evans, Kaufman, Macomber, Russo, O'Meara, Gent, Callan, and Lowitt are hereinafter referred to as the "**Individual Defendants**," or "**Lehman Defendants.**"

32.     The Lehman Defendants, because of their senior positions at Lehman, were controlling persons of the Company and were empowered with the authority to control and did control the contents of Lehman's reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, institutional advisors, and individual investors such as Plaintiffs.

### Auditor Defendant

33.     Defendant Ernst & Young, LLP ("E&Y") is a public accounting firm with offices throughout the world, including in the State of California. Pursuant to the Sarbanes-Oxley Act of 2002 ("SOX"), E&Y is subject to oversight and annual inspection by the Public Company Accounting Oversight Board ("PCAOB") as a registered public accounting firm that regularly provides audit reports for more than 100 issuers. E&Y served as Lehman's outside auditor during the Relevant Period, and issued audit opinions with respect to Lehman's consolidated financial statements. Lehman engaged E&Y to audit its financial statements, as well as to provide a written opinion as to whether the financial statements were fairly presented in accordance with GAAP. E&Y reviewed Lehman's quarterly financial results and issued written review reports for its quarterly reviews. For its work, E&Y earned

tens of millions of dollars in annual fees, including over $31 million in 2007 alone for audit and tax fees.

34.     E&Y's audit opinions were incorporated by reference in each Registration Statement filed on form S-3, S-3/A and/or S-3ASR with the SEC, and in each of the Offering Documents, including all prospectuses, prospectus supplements, product supplements and pricing supplements, that were issued in connection with the Offerings.

35.     E&Y consented to be named as an expert as part of Lehman's Registration Statements and related Offering Documents, and for the registration of debt securities, warrants, purchase contracts, preferred stock, depository shares, units, common stock, and bonds – including the Securities at issue in this Amended Complaint.

### Unnamed Participants

36.     Numerous individuals and entities participated actively during the course of and in furtherance of the conspiracy and concealed such information from the public.  There was a conspiracy and many acts were done in the course of and in furtherance of the conspiracy by statements, conduct, and intent to defraud.  The individuals and entities acted in concert by joint ventures and by acting as agents for principals, in order to advance the objectives of the conspiracy.  The acts were intended to promote the conspiratorial objectives.

## III.    JURISDICTION AND VENUE

37.     Each Defendant has sufficient contacts with California, is a citizen of California, or otherwise purposely availed himself, herself or itself of benefits from California, or has property in California so as to render the exercise of personal jurisdiction over each by the California courts consistent with traditional notions of fair play and

substantial justice.

38.     Many of the acts and transactions described herein, including the dissemination of materially false and misleading public filings, occurred in California.

39.     In connection with the acts alleged herein, defendants used the means of and instrumentalities of interstate commerce, including, but not limited to, the U.S. mails, interstate telephone communications, and the facilities of national securities exchanges.

40.     This action was originally filed in the Superior Court of the State of California, in and for the County of Los Angeles, Case No. BC 435633 on April 9, 2010.  Certain of the Defendants removed the action to the Federal District Court on April 15, 2010, and it was transferred to the Southern District of New York, docket No. 10-cv-06185-LAK, to be coordinated for pretrial purposes with multi-district proceedings, Master Docket No. 09-MD-2017 (LAK).  By virtue of the Pretrial Orders in effect in Case No. 09-MD-2017 (LAK), Plaintiffs were unable to amend their original complaint until the Court entered its Pretrial Order No. 23 on November 9, 2011.

41.     The case is expected to return to the Central District of California for trial. Accordingly, while this Complaint is filed in the Southern District of New York, it is subject to trial in the Central District of California.

## IV.     FACTUAL ALLEGATIONS

### A.     Lehman's Residential and Commercial Mortgage Backed Securities Holdings

42.     Beginning in the late 1990s, Lehman participated in all aspects of the residential and commercial mortgage markets, including mortgage origination, mortgage purchases, packaging mortgages into securities, and marketing the securities to investors.

Lehman transformed itself from a conservative investment bank to one of the largest speculators in the real estate market – and Lehman's mortgage-related business ultimately comprised its single largest revenue component.

43.     In its securitization business, Lehman pooled vast amounts of mortgages and packaged them into Mortgage Backed Securities, including residential mortgaged-backed securities ("RMBS") and commercial mortgage-backed securities ("CMBS") (collectively "MBS") and marketed them for sale to investors.  Lehman promoted itself as a "***market leader in securitization transactions***," including securitizations on residential and commercial loans and "the origination, structuring and underwriting of asset-backed securities."  Lehman collected large fees for the structuring, underwriting, and servicing of MBSs.

44.     The mortgages underlying the MBS are highly sensitive to fluctuations in prevailing interest rates.  In general, rising interest rates negatively affect all borrowers, especially those whose interest rates are adjustable.  On the other hand, falling interest rates can also have a negative effect on RMBS backed by fixed-rate residential mortgages because many borrowers choose to refinance, leaving the less credit-worthy borrowers who could not refinance remaining in the mortgage pool.

45.     RMBS and CMBS derive their values from the underlying residential and commercial real estate properties, and thus values of these real-estate related securities are also highly dependent on interest rates.  Lehman originated and packaged countless numbers of ARMs, teaser rate mortgages, and other exotic instruments, including interest-only mortgages, and negative amortization loans, into RMBS.  The aggregate value of Lehman's

mortgage and other asset-backed securities ("ABS") totaled $58 billion at the end of 2006, and increased by a whopping 54 percent to over $89.1 billion by year-end 2007, almost four times its $22 billion in shareholder equity.

46.     In order to allay investor concerns regarding Lehman's concentration in real estate and real estate-related assets, Lehman promoted its acumen for managing the risks associated with MBS, claiming that its vertically-integrated mortgage business (*i.e.*, its involvement from loan origination through securitization) minimized risks associated with holding mortgage- related assets on its balance sheet.  In other words, Lehman told the market that it knew and could manage the risks of the mortgages it held because it had originated many of those mortgages.  Lehman also misled investors by touting the ability of hedges to mitigate losses from such a concentrated exposure to a class of assets.  In reality, Lehman remained poised for failure by focusing so heavily on a real estate industry that was in the midst of collapse.

### B.     Lehman's Large Exposure to the Non-Prime Real Estate Market

47.     Non-prime mortgages are categorized as "Sub-prime" and "Alt-A."  "Sub-prime" describes residential mortgages to borrowers who do not qualify for prime interest rates because they exhibit one or more of the following characteristics: weakened credit histories typically characterized by payment delinquencies, previous charge-offs, judgments, or bankruptcies; low credit scores; high debt-burden ratios; or high loan-to-value ratios.

48.     "Alt-A," short for Alternative-A, describes residential mortgages to borrowers whose income may not be well documented, or who have credit problems, although their financial circumstances are better than borrowers in the sub-prime category.  The term Alt-A

is supposed to describe a mortgage that has a risk profile between prime and Sub-prime. However, Lehman's Alt-A portfolio was largely comprised of high-risk loans that did not resemble conventional Alt-A loans and were in fact more similar to Sub-prime loans. Lehman failed to disclose any meaningful information about its Alt-A portfolio until the first quarter of 2008 when Lehman first included a separate line item for Alt-A. Nevertheless, the disclosures remained misleading because Alt-A loans were grouped together with "prime" holdings and it was difficult to discern Lehman's true exposure to Alt-A holdings.

49.     Lehman became an industry leader in securitizing Alt-A and Sub-prime mortgages into RMBS, and Defendant Callan represented Lehman's ingenuity in managing the risks associated with RMBS during an investor conference on February 6, 2008, stating that Lehman "***didn't look at participating in the residential mortgage market as taking a directional bet one way or the other way***." Comparing Lehman to other investment banks, Defendant Callan stated:

> It doesn't come from Goldman's model of taking a proprietary bet, or Morgan Stanley's model, or even Merrill's model of warehousing a significant amount of product. ***It just comes from a basic focus and philosophy that we really didn't want to go long the product or short the product. We wanted to originate to distribute and we hedged that origination capability***.

50.     According to its 2007 Form 10-K, Lehman originated approximately $60 billion in residential mortgages in 2006 and $47 billion during 2007. Approximately 25 percent of the loans Lehman originated through its subsidiaries were Sub-prime or Alt-A loans.

### C.     Lehman's High-Risk Commercial Property Investments

51.     In 2005, Lehman originated approximately $27 billion in commercial

mortgages, with that number jumping to $34 billion in 2006 and an astonishing $60 billion in 2007.  In addition to its MBS position of over $76 billion ($39 billion of which related to commercial whole loans and securities), Lehman also held real estate inventory valued at $22 billion at year end 2007 including subprime residential mortgages valued at over $5 billion. According to a Goldman Sachs analyst, as of March 2008, Lehman had more commercial holdings than any other firm, including over $10 billion more than its nearest competitor, Citigroup, and more than double the holdings of Morgan Stanley, Bear Stearns and JPMorgan.

52.     Under Mark Walsh ("Walsh"), head of Lehman's Gold Real Estate Group ("GREG"), Lehman ventured into riskier loans and also into making direct real estate investments and developed a reputation for being one of the most aggressive lenders in the commercial field.  Walsh was also one of the earliest and most aggressive lenders of so-called bridge equity.  Bridge equity involved short term loans of equity that helped deals close quickly with the intent that Lehman would replace its loan or equity position with investments from new investors after the deal closed and Lehman collected its fees.  Walsh's approach is said to have generated huge short-term returns for Lehman, but there was significant risk involved if the market turned and Lehman was unable to exit from its positions.

53.     Walsh enjoyed extraordinary, unchecked authority to commit capital as he saw fit.  Walsh did not have to go through Lehman's normal risk management channels, and enjoyed a broad swath of authority to commit large amounts of capital to projects without ever being questioned by senior Lehman executives.  All of the different departments of Lehman's real estate business reported to him.  This concentration of power and authority in a

single individual is and was atypical for Wall Street firms, and inconsistent with effective risk management and checks on authority. This un-checked concentration of authority became particularly troublesome as the real estate market declined, and there was nothing inhibiting or questioning Walsh's risky approach. None of this was disclosed to Plaintiffs.

54.    In 2007, Lehman continued to invest heavily in the commercial property sector. In May 2007, Lehman partnered with Tishman Speyer to enter an agreement to pay $22.2 billion for a leveraged buyout of Archstone-Smith ("Archstone"), one of the largest owners of apartment buildings in the country. Despite the fact that the real estate markets were plummeting at the time, Walsh went forward with the deal in October 2007 rather than paying a break-up fee that amounted to a fraction of the purchase price.

### D.    Lehman's Liquidity Risk

55.    Lehman relied on short term debt to fund day-to-day operations and borrowed billions daily using repurchase agreements ("repos") as a means of short-term financing. A typical repurchase agreement – as opposed to a Repo 105 discussed *infra* – is a financing transaction in which a borrower pledges securities as collateral for a short term loan of cash or liquid securities. The pledged securities remain on the balance sheet as inventory, and the borrower books a liability to recognize the obligation to repurchase the inventory at a later date, typically at a higher price to reflect interest. A repo is thus broadly similar to a collateralized loan, and as with a collateralized loan, the lender of funds has rights to the borrower's securities over the term of the loan and can sell them if the borrower defaults on its obligation to repurchase.

56.    Repos allow for banks to leverage assets and securities held on the balance

sheet – including MBS and real estate-related securities – in exchange for billions in cash. While leverage magnifies gains to a firm, leverage also greatly magnifies losses. Significant short-term debt obligations place an unrelenting burden on liquidity when a firm faces a crisis. The dangers of leverage became very apparent after the collapse of Bear Stearns. In the aftermath of Bear Stearns' collapse, Lehman was widely regarded as the investment bank that was most dependent on repo financing, and thus the most prone to a liquidity crisis. (Rpt. p. 1406).

57.      Lehman's balance sheet was heavily concentrated in long-term real estate and MBS that were illiquid, and decreasing in value by the day. Contemporaneously, Lehman continued to incur billions in short-term debt obligations. This created a maturity mismatch on Lehman's balance sheet, and put an extreme strain on available liquidity.

58.      Lehman's counterparties became uneasy and demanded that Lehman accept "haircuts" on lending arrangements, i.e. Lehman was required to over-collateralize its loans to compensate counterparties for the perceived risk. Moreover, counterparties in Lehman's lending arrangements began demanding billions in collateral calls. Lehman relied on short term repos to finance day-to-day trading activities, and the Company had no choice but to accept the counterparty haircuts, and agree to crippling collateral calls.

59.      Rising delinquencies and defaults in the MBS markets led the three main credit rating agencies – Standard & Poor's ("S&P"), Moody's, and Fitch – to downgrade some of Lehman's MBS in 2007, reflecting the overall reduced value of the securities and underlying assets. The downgrades of MBS by the credit rating agencies exacerbated the implosion of the residential and commercial real estate markets, creating a frenzied downward spiral in

which the declining value of MBS led the rating agencies to downgrade even more MBS tranches.

60.     As a result, in 2007, various hedge funds with significant exposure to MBS linked to the real estate market collapsed.  Most significantly, two hedge funds run by Bear Stearns Companies Inc. ("Bear Stearns"), which reportedly at one point held $20 billion in MBS and other exotic securities linked to the sub-prime market, collapsed in July 2007.  The collapse of the two Bear Stearns hedge funds led to speculation that Lehman would announce that the Company had greater exposure to Sub-prime mortgages than what was being disclosed, and that Lehman would soon recognize losses on these assets.

61.     While other Wall Street firms decreased their exposure to the real estate market in early 2007, Lehman instead chose to pursue a counter-cyclical business strategy that bet on the real estate market rebounding.  (Rpt. p. 45).  This gamble went against Lehman's risk management policies and ultimately resulted in catastrophic losses and eventually bankruptcy.  The decision to disregard risk management policies was not disclosed to Plaintiffs.  Instead, Lehman maintained that the Company was risk averse and financially sound until, quite literally, the eve of bankruptcy.

62.     At the very time the real estate market was collapsing, and the market for MBS was drying up, Lehman increased its exposure to the real estate market.  In 2007, the aggregate value of Lehman's real estate portfolio grew 54% to a staggering $89.1 billion by year-end 2007.

63.     On July 18, 2007, Lehman spokesperson Kerrie Cohan stated that the "*rumors regarding [Lehman's] sub-prime exposure are totally unfounded*."   Meanwhile, BNC

Mortgage LLC ("BNC"), a Lehman mortgage originator that Lehman described as its "subprime origination platform," experienced a dramatic increase in delinquencies in 2007. On August 17, 2007, Lehman closed BNC.

### E.   Record Earnings Precede Lehman's Collapse

64.     On a September 17, 2007 conference call with analysts to discuss Lehman's quarterly results, Defendant O'Meara said about the mortgage market that "[b]arring any unforeseen circumstances, *we feel that the worst of this credit correction is behind us*.  We have taken significant negative marks across all asset classes this period, and we have taken actions to resize our mortgage origination platform in-line with what we believe will be a smaller securitization market for the foreseeable future."

65.     On December 13, 2007, Lehman issued a press release filed with the SEC on Form 8-K announcing its financial results for the fourth quarter and full year ending November 30, 2007 ("December 13, 2007 Form 8-K"), which reported full-year earnings of $4.2 billion.

66.     That day, on a conference call with analysts, Defendant O'Meara, the new Global Head of Risk Management, discussed Lehman's record earnings of $4.2 billion:

> More fundamentally, it reflects the *strength of our risk management culture* in terms of *managing our overall risk appetite*, seeking appropriate risk/reward dynamics and exercising *diligence around risk mitigation*.  And lastly, it reinforces the importance of our disciplined *liquidity and capital management framework*, which sets us up to operate our business through periods of market stress.

67.     On January 29, 2008, Lehman filed its 2007 Form 10-K with the SEC.  That Form 10-K was signed by Defendants Fuld, Callan, Akers, Berlind, Evans, Hernandez, and Kaufman and contained management certifications of Lehman's financial statements and

internal controls over financial reporting by the CEO and CFO, as well as the certifications required by SOX signed by Defendants Fuld and Callan.  In the 2007 Form 10-K, Lehman reported record net revenue for the 2007 fiscal year of $19 billion, and record net income of $4.2 billion.

68.     On March 18, 2008, Lehman issued a press release filed with the SEC announcing its financial results for the first quarter 2008 ("March 18 Form 8-K"), reporting net revenues of $3.5 billion and net income of $489 million.  "Net revenues in the first quarter of fiscal 2008 reflect negative mark to market adjustments of $1.8 billion, net of gains on certain risk mitigation strategies and certain debt liabilities."

69.     In the March 18, 2008 press release, Defendant Fuld stated: "In what remains a challenging operating environment, our results reflect the value of our continued commitment to building a diversified platform and our focus on *managing risk and maintaining a strong capital and liquidity position*. This strategy has allowed us to support our clients through these difficult and volatile markets, while continuing to build and strengthen our global franchise for our shareholders."

70.     After the March 18, 2008 press release and contemporaneous Lehman statements discussed *infra*, analysts and investors were reassured. For example, Oppenheimer noted that "Lehman dispelled all doubts of a solvency crisis at the company."  Fox-Pitt Kelton stated that "Mgmt's liquidity disclosures were extensive and comforting, while risk mgmt continues to be strong at Lehman."  Punk Ziegel enthusiastically noted:

> In one of the most impressive presentations ever made by a CFO, Erin Callan reviewed all of the critical questions concerning Lehman's position **convincingly arguing that the company was not in financial trouble**. . . . Ms. Callan first demonstrated that Lehman had ample liquidity. . . . The company also indicated

that it has raised approximately 2/3rds of the needed funding for the year by March.  There was a very detailed discussion of the company's assets and a table provided to demonstrate that the write downs taken were manageable. . . . In sum, **virtually no one listening to this call could have concluded that this company was in financial trouble.**

71.    The investment community responded favorably to Lehman's first quarter results and Defendant Callan's explanations.  By the end of the day, March 18, 2008, Lehman common stock rebounded over 46% from its prior day's close to close at $46.49 per share.

72.    Excerpts of an interview of Defendant Callan conducted on March 18, 2008 by Maria Bartiromo of CNBC appeared in *Business Week* on March 31, 2008.  Asked whether Lehman would follow Bear Stearns into a fire-sale, Defendant Callan said "***Categorically, no***."  Defendant Callan made the case that Bear Stearns had collapsed due to a liquidity situation unique to that company:

> CNBC: I have a hard time understanding how things could change so fast and furiously for Bear.  Can your business really reverse course like that in a 48-hour period, or was that perhaps a situation unique to Bear?

> Callan: I think that will be the lingering question about our industry and our business model – and it should be.  Liquidity is the thing that will kill you in a moment.  It won't necessarily be write downs.  We obviously saw huge write downs taken by other members of Bear's peer group, and they raised capital and came back for another day. ***So I think there were a number of factors related to how Bear managed its liquidity that were specific to that organization***.

**F.    Lehman Collapses and Files For Bankruptcy**

**1.    Lehman's Failed Attempts to Sell Toxic Assets**

73.    On July 18, 2008, the *New York Post* reported that Defendant Fuld was considering ways to take Lehman private, and on July 25, 2008, CNBC reported that Lehman was considering a sale of at least part of its Investment Management Division ("IMD").  On August 22, 2008, *Reuters* reported that state-owned Korean Development Bank ("KDB")

stated:  "We are studying a number of options and are open to all possibilities, which could include (buying) Lehman."  Almost two weeks later, on September 2, 2008, reports indicated that KDB was considering buying a 25% stake in Lehman.

74.     On September 6, 2008, Lehman announced that Jeremy Isaacs ("Isaacs"), head of Lehman's European and Asian Operations, had left the Company.  Isaacs' division was responsible for contributing nearly half of Lehman's consolidated revenues.   Despite resigning on June 12, 2008, Isaac's resignation was not announced until September 6, 2008. Days later on September 9, 2008, KDB announced it had ended talks with Lehman.   In addition, S&P and Fitch both placed their Lehman rating on review for a potential downgrade.  S&P specifically cited concerns about Lehman's ability to raise capital.

75.     On September 10, 2008, Lehman held an earnings guidance call on short notice and reported a $3.9 billion loss (its largest quarterly loss ever) for the third quarter of 2008, as well as another $7.8 billion in gross write-downs, including $7 billion on its residential and commercial real estate holdings.

76.     Lehman reported its estimated liquidity pool to be $42 billion and on this emergency earnings call, Defendant Fuld stated that the "decisions announced today will best protect the core client franchise, and *create a very clean, liquid balance sheet*."   The decisions presented included exiting large portions of Lehman's commercial real estate holdings or spinning off the unit entirely, reducing residential loan exposures, and raising capital by selling an equity stake in Lehman's IMD.

77.     On the call, Defendant Lowitt seconded Defendant Fuld's positive outlook, asserting:  "I'll now provide an update on our *liquidity position which remains very strong*. .

26

. . We have **maintained our strong liquidity and capital profiles even in this difficult environment and the potential sale of IMD further improves our capital position**."  Lowitt noted further: "Even under the scenario of limited debt issuance capacity in 2009 we anticipate . . . **Lehman will have ample cash capital to sustain its business opportunities**."

78.     On the conference call, Defendant Lowitt also said the firm's recent sales of real estate assets had been "**in and around our marks**."  This created a false impression that Lehman's real estate assets were properly marked-to-market.

79.     On September 10, 2008, Fitch and Dunn & Bradstreet downgraded Lehman's credit rating.  It was clear within the Company that unless Lehman was able to sell portions of its failing real estate business, available liquidity would quickly dry up and the Company would quickly become insolvent.  Lehman failed to disclose the true state of affairs, and instead maintained that Lehman had valued its assets properly, and had sufficient liquidity to weather the protracted financial crisis.

80.     Following the September 10, 2008 conference call, Lehman executives attempted to sell the Company, or at least parts of its commercial holdings to various banks, including Goldman Sachs, Credit Suisse, Barclays, Bank of America, and Merrill Lynch, all of whom ultimately spurned Lehman's overtures.  Each of the banks eventually came to the conclusion that Lehman had grossly overstated its real estate holdings, and that it would be near impossible to sell or find value from these assets.

81.     On Sunday, September 14, 2008, Lehman's talks with Bank of America and Barclays collapsed after the Federal Reserve said it would not guarantee Lehman's liabilities.  Federal Reserve Chairman Ben Bernanke, who testified before Congress on October 15,

2008, stated that the government could not lend money to Lehman – and thereby prevent its bankruptcy – because the Company lacked sufficient collateral for a government loan.

### 2.     Lehman Files For The Largest Bankruptcy in History

82.     On Monday, September 15, 2008 Lehman filed for Chapter 11 bankruptcy protection.  The filing specifically did not include the Lehman broker-dealer subsidiary, LBI, which was forced into dissolution by the Securities Investor Protection Corporation ("SIPC") four days later.

83.     In stark contrast to Defendant Lowitt's affirmative representations made just days before, Lehman sought bankruptcy protection because, and as subsequently noted in an affidavit by Defendant Lowitt accompanying the bankruptcy petition, Lehman had "**significant liquidity problems**."

### G.     The Bankruptcy Examiner's Report

84.     In conjunction with Lehman's bankruptcy proceeding, the bankruptcy court appointed Anton Valukas (the "Examiner") as the Examiner to investigate several issues related to the demise of Lehman.  One of these issues was whether there were "colorable claims for breach of fiduciary duties" against the officers and directors of Lehman "arising in connection with the financial condition" of Lehman prior to bankruptcy.  That Order also directed the Examiner to perform the duties specified in Sections 1106(a)(3) and (4) of the Bankruptcy Code, *i.e.,* "file a statement of . . . any facts ascertained pertaining to fraud, dishonesty, incompetence, misconduct, mismanagement, or irregularity in the management of the affairs of the debtor, or to a cause of action available to the estate."

85.     In response, the Examiner prepared a 2,209 page report containing numerous

findings and conclusions on a variety of topics including Lehman's use of Repo 105 transactions to lower the net leverage ratio, Lehman's over-valuation of real estate-related assets, Lehman's liquidity disclosures, Lehman's failure to adhere to Company risk management procedures, and Lehman's failure to make required disclosures of certain concentrations of credit risk.

86.     As part of the investigation the Examiner reviewed more than 5 million documents (primarily e-mails and attachments) comprising more than 40 million pages, and interviewed 250 witnesses.  (Rpt. p. 30-31, 36).  Notably, the Examiner believed he should be held to a higher standard than the "colorable claim" standard under Second Circuit precedent, due to his access to substantial evidence:

> The [Bankruptcy Court's] Order does not contain a definition of what constitutes a "colorable" claim.  The Second Circuit has described colorable claims as ones "that on appropriate proof would support a recovery," "much the same as that undertaken when a defendant moves to dismiss a complaint for failure to state a claim."  **But under such a standard, the Examiner would find colorable clams wherever bare allegations might survive a motion to dismiss**.  Because he has conducted an extensive factual investigation, the Examiner believes it is more appropriate to use a higher threshold standard, and **in this Report a colorable claim is one for which the Examiner has found that there is sufficient credible evidence to support a finding by a trier of fact**.

(Rpt.p. 17)

## H.     Lehman's Employment of Repo 105

87.     On August 19, 2001, Lehman, with the assistance of its long-time auditor E&Y, implemented an accounting policy – "Rules of the Road: Repo Recharacterizations (Repo 105) (the "Repo 105 Policy") – to manage its balance sheet metrics.  Upon implementation of the Repo 105 Policy, Lehman began taking advantage of Financial Accounting Standard 140 ("SFAS 140") by treating certain short-term financing transactions

as "sales" in order to temporarily remove illiquid assets from the balance sheet, pay down current liabilities, and reduce the Company's net leverage ratio in the days immediately prior to filing public reports with the SEC. These Repo 105 transactions were then reversed immediately following a reporting period.

88.    Throughout the Relevant Period, Lehman employed Repo 105 transactions to create transitory periods of reduced net leverage in order to falsely portray a sense of financial stability. Lehman had no legitimate business reason for entering into such transactions, and could have obtained financing through ordinary repurchase agreements in which there is no haircut, or requirement to over-collateralize. Lehman's only reason for engaging in Repo 105 transactions was to fraudulently mislead the investing public.

### 1.    Accounting for Repo 105 transactions

#### i.    SFAS 140

89.    In early 2000 the Financial Accounting Standards Board ("FASB"), issued SFAS 140, which states when a company can and cannot recognize a sale of a financial asset based upon whether the company has surrendered "control" over the asset. (SFAS 140 ¶ 9). Generally speaking, if a company maintains control of the asset under SFAS 140, then it is treated as a financing. On the other hand, if a company surrenders control of an asset, the transaction may be accounted for as a sale.

90.    SFAS 140 provides, in relevant part, "to maintain effective control, the transferor must have *both* the contractual right and the contractual obligation to reacquire securities that are identical to or substantially the same as those concurrently transferred." (SFAS 140, ¶ 217). Consistent with SFAS 140, a transferor of securities or assets who has

the ability to "fund substantially all of the cost of purchasing the same, or substantially the same, replacement assets," is "considered not to have relinquished control of the assets."

91.     According to Lehman's Accounting Policy for Repo 105 and Repo 108, as updated in September 9, 2006, Lehman structured the transactions such that Lehman would overcollateralize by 5% - 8%, enough to relieve the Company of control over the asset, for purposes of SFAS 140.  Thus, Lehman interpreted SFAS 140 to allow repurchase agreements to be treated as sales so long as Lehman sufficiently overcollateralized and did not have the ability to fund the cost of repurchasing the assets.

92.     In addition to the approval of its external auditor, Lehman also needed to obtain a third-party legal opinion – a "true sale opinion" – in order to categorize the repurchase agreements as sales under SFAS 140.   However, as the Repo 105 Policy acknowledged, Lehman "generally [could not] obtain a true sale opinion under U.S. law." (Rpt. pp. 776, 783).  Therefore, Lehman decided to look to a foreign jurisdiction in order to receive a true sale opinion and conduct Repo 105 transactions.

### ii.     Lehman's "True Sale" Opinion

93.     In March 2001, Lehman approached Linklaters, a United Kingdom law firm, to seek a true sale opinion under English law.  Linklaters issued a true sale opinion, addressed to "Lehman Brothers International (Europe)" ("LBIE"), a United Kingdom affiliate of Lehman.  By the letter's terms, it was intended solely for LBIE's benefit (the "Linklaters Letter" or "Letter").  The Letter, effective May 2001, set forth certain circumstances under which, in Linklaters' opinion, LBIE could engage in transactions that could be categorized as sales as opposed to financings.  However, the Letter expressly stated that such transactions

had to be based in the United Kingdom and subject to English law.  (Rpt. pp. 740, 782-85).

94.    The Linklaters Letter applied only to transactions between LBIE and counterparties based in the United Kingdom.  In order to comply with the terms of the Letter, Lehman transferred billions of dollars of American-based securities from Lehman's American locations to LBIE for use in Repo 105 transactions at the end of each quarter.  (Rpt.p. 786).  Beginning in 2001, Lehman engaged in counterparty banks in the United Kingdom in return for short term loans.  This practice was never disclosed to Plaintiffs.

### iii.    Lehman's Misleading Net Leverage Ratio Characterization

95.    In the Management's Discussion and Analysis ("MD&A") section of Lehman's 2007 Form 10-K, Lehman described the importance of its net leverage ratio

> The relationship of assets to equity is one measure of a company's capital adequacy.  Generally, this leverage ratio is computed by dividing assets by stockholders' equity.  **We believe that a more meaningful, comparative ratio for companies in the securities industry is net leverage**, which is the result of net assets divided by tangible equity capital.  Our net leverage ratio is calculated as net assets divided by tangible equity capital.

(2007 Form 10-K p. 63).

96.    Lehman defined net assets – the numerator for its net leverage ratio – as total assets **less**: (1) cash and securities segregated and on deposit for regulatory and other purposes, (2) collateralized lending agreements, and (3) identifiable intangible assets and goodwill.

97.    Lehman defined tangible equity capital – the denominator – as stockholders' equity and junior subordinated notes **less** identifiable intangible assets and goodwill. *Id.*

98.    When properly categorized as "**financings**" under SFAS 140, Lehman's repo transactions increased Lehman's net leverage ratio, because a repurchase agreement is

essentially a short term loan.  Specifically, total assets (the numerator) were increased because the securities that were transferred to the repo-counterparty remained on Lehman's balance sheet, and cash was added to the balance sheet to reflect the incoming loan proceeds.  As net assets increased, the tangible equity capital remained the same, causing an overall increase in the net leverage ratio.  (Rpt. pp. 751-54).

99.    When miscategorized as "**sales**" under SFAS 140, Lehman's Repo 105 transactions lowered Lehman's net leverage ratio.  Specifically, total assets (the numerator) were reduced because: (1) the securities were removed from Lehman's balance sheet; (2) cash was added to the balance sheet to reflect the incoming loan proceeds; and (3) Lehman immediately used the cash to pay off other short term liabilities, thus removing the cash from the balance sheet.

100.    This final step – using cash to pay off other liabilities – did not occur with regular repos.  Internal e-mails and interviews with Lehman executives gathered from the Examiner's Report demonstrate that "in order for Lehman to realize the benefit to its leverage ratio as a result of Repo 105 transactions, the firm had to use the cash received to pay off a different liability."  (Rpt. p. 733 n.2852).

101.    Tangible equity capital (the denominator) was not affected by the Repo 105 transactions.  Thus, net assets decreased while tangible equity capital remained the same, causing an overall decrease in the net leverage ratio.  (Rpt. pp. 733-34, 738 n.2869, 758-60, 775).

### 2.    Lehman's Repo 105 Transactions Increase

102.    From 2001 until early-to-mid-2007, Lehman engaged in a relatively consistent

volume of Repo 105 transactions, including at quarter-end, generally within a range between $20 and $25 billion.  (Rpt. at 762).  In 2002, Lehman had informed E&Y that it intended to utilize approximately $20-$30 billion in Repo 105 transactions.

103.   By 2007 Lehman's financial condition worsened and the Company faced mounting pressure to further reduce leverage.  The majority of Lehman's assets that could be sold to pay off debts and liabilities were locked into long term real estate investments.  De-leveraging using sales proceeds from real estate and mortgage-related assets was problematic for Lehman because of the depressed market for these assets and Lehman would have incurred substantial losses on a number of illiquid inventory positions.  (Rpt. p. 737).  Additionally, if Lehman resorted to selling this inventory at substantial discounts, the prices Lehman received in the open market would reveal the true prices of these assets, and cast substantial doubt on Lehman's internal valuations for these assets, especially the most illiquid, or Level Three, assets.  Since Lehman could not sell the inventory, to reduce leverage, Lehman increasingly relied on Repo 105 transactions as a cheap way to reduce net leverage.

104.   A February 10, 2007 Lehman document titled, "Proposed Repo 105/108 Target Increase for 2007" stated:  "Repo 105 offers a low cost way to offset the balance sheet and leverage impact of current market conditions."  "[E]xiting large CMBS positions in Real Estate and subprime loans in Mortgages before quarter end would incur large losses due to the steep discounts that they would have to be offered at and carry substantial reputation risk in the market. . . . *A Repo 105 increase would help avoid this without negatively impacting our leverage ratios*."  (Rpt. p. 738).

105.    Thereafter Lehman dramatically accelerated the use of Repo 105 transactions in 2007 and 2008.  The undisclosed use of Repo 105 transactions allowed Lehman to falsely portray a financially stable image to investors, and helped alleviate concerns from lenders and credit agencies.   Internal communications between Lehman employees in 2007 and 2008 illustrates how the Company became accustomed to relying on the misleading use of Repo 105 transactions, rather than sound and transparent business practice:

- November 26, 2007: Four days prior to the close of the 2007 fiscal year, one employee in Lehman's Fixed Income Division ("FID") was searching for ways to meet a balance sheet target and wrote to a colleague in FID: "**Can you imagine what this would be like without 105?**" (Rpt. p. 744).

- May 21, 2008: Ten days prior to the close of Lehman's second quarter of 2008, Kaushik Amin, head of Liquid Markets within FID, wrote to another Lehman employee:  "**Let's max out on the Repo 105 for your stuff and see where we end up**."  When Amin asked for an update on the balance sheet, another employee replied:   "**[A]nything that moves is getting 105'd**."  In another email in the same day, Amin stated: "**Do as much as you can in Repo 105**.  Can you find Repo 105 capacity among Japanese counterparties to take US Agencies?"  (Rpt. pp. 865-66).

- July 2008: Michael McGarvey, a senior employee in Lehman's Finance Group, emailed a colleague saying he considered **Lehman's Repo 105 program to be balance sheet** "**window dressing**" that was "**based on legal technicalities**." (Rpt. p. 742).

106.    The Examiner determined, from the fourth quarter 2006 until second quarter 2008, Lehman's Repo 105 usage and its resulting effect on net leverage ratio.

| Period End | Repo 105 Usage | Reported Net Leverage Ratio | What Net Leverage Ratio Should have Been Absent Repo 105 | Difference |
|---|---|---|---|---|
| Q4 2006 | $24.5 Billion | 14.5 | 15.8 | 1.3 (9%) |

| Q1 2007 | $27.3 Billion | 15.4 | 16.8 | 1.4 (9%) |
| Q2 2007 | $31.9 Billion | 15.4 | 16.9 | 1.5 (10%) |
| Q3 2007 | $36.4 Billion | 16.1 | 17.8 | 1.7 (11%) |
| Q4 2007 | $38.6 Billion | 16.1 | 17.8 | 1.7 (11%) |
| Q1 2008 | $49.1 Billion | 15.4 | 17.3 | 1.9 (12%) |
| Q2 2008 | $50.4 Billion | 12.1 | 13.9 | 1.8 (15%) |

107.    These temporary reductions in Lehman's net leverage ratio were directly attributable to Repo 105 transactions.  Lehman represented throughout the Relevant Period that all repurchase agreements were treated as financings, while in fact Lehman treated billions of Repo 105 repurchase agreements as sales.  The effect of this accounting sleight of hand was not disclosed in any SEC Filing, or any other public disclosure, during the Relevant Period.

108.    The effect of Lehman's Repo 105 transactions created material differences in Lehman's net leverage ratio.  According to E&Y audit walk-through papers for Lehman, materiality is defined as "any item individually, or in the aggregate, that moves net leverage by or more (typically $1.8 billion)."  Since 2001, Lehman used Repo 105 transactions to move net leverage not by tenths, but by whole points.  (Rpt. p. 747).

109.    While predating the Examiner's analysis, internal emails uncovered in the Examiner's Report demonstrate that between $10 billion and $25 billion annually in Repo 105 transactions were used between 2001-2007.  Based upon these emails, and financial data

from Lehman's annual reports (e.g. net assets and tangible equity), the reported net leverage

for the fiscal years 2002-2005 were materially understated.  Even using the most conservative

amount of annual Repo 105 transactions – $10 billion – the effect is still many times greater

than what E&Y determined to be material when auditing Lehman's net leverage ratio.

| Period End | Approximate Repo 105 Usage | Reported Net Leverage Ratio | Net Leverage Ratio Absent Repo 105 | Difference | Materiality Multiple |
|---|---|---|---|---|---|
| Year End 2002 | $10 billion | 14.9 | 15.9 | 1.0(7%) | 10x |
| Year End 2003 | $10 billion | 15.3 | 16.2 | 0.9(6%) | 9x |
| Year end 2004 | $10 billion | 13.9 | 14.7 | 0.8(6%) | 8x |
| Year End 2005 | $10 billion | 13.6 | 14.2 | 0.6(4%) | 6x |
| Year End 2002 | $20 Billion | 14.9 | 17.0 | 2.1(14%) | 21x |
| Year End 2003 | $20 billion | 15.3 | 17.2 | 1.9(12%) | 19x |
| Year End 2004 | $20 billion | 13.9 | 15.5 | 1.6(12%) | 16x |
| Year End 2005 | $20 billion | 13.6 | 14.9 | 1.9(10%) | 19x |

### 3.   Bankruptcy Examiner's Findings

110.   The Examiner concluded that "sufficient evidence exists from which a trier of

fact could conclude that Lehman's reported net leverage ratio was materially misleading during [2007 and 2008]."  (Rpt. p. 988).  Also, the Examiner found that "sufficient evidence exists for a trier of fact to find that Lehman's quarter-end Repo 105 practice was material and should have been disclosed."  (Rpt. p. 749; *accord* pp. 962, 987).  Based upon these findings, the Examiner concluded that the failure to disclose the impact of the Repo 105 transactions on Lehman's financial statements materially misrepresented Lehman's true financial position.  *Id*.

111.    Further, there was evidence to support a determination that Lehman was required to disclose the nature and impact of the Repo 105 transactions in the MD&A section of Lehman's Form 10-K.  (Rpt. p. 749).  Thus, the Examiner concluded that there were colorable claims that certain Lehman Executives breached their fiduciary duties by exposing Lehman to potential liability for filing misleading periodic reports.  (Rpt. p. 750).

112.    The Examiner summarized Lehman's Repo 105 policy:

> **Lehman did not disclose**, however, that it had been using an accounting device (known within Lehman as "Repo 105") to manage its balance sheet – by temporarily removing approximately $50 billion of assets from the balance sheet at the end of the first second quarters of 2008 [and $38.6 billion at the end of fiscal 2007].   In an ordinary repo, Lehman raised cash by selling assets with a simultaneous obligation to repurchase them the next day or several days later; such transactions were accounted for as financing, and the assets remained on Lehman's balance sheet.  In a Repo 105 transaction, Lehman did exactly the same thing, but because the assets were 105% or more of the cash received, accounting rules purportedly permitted the transactions to be treated as sales rather than financing, so that the assets could be removed from the balance sheet . . .

> Contemporaneous Lehman e-mails describe the "function called repo 105 whereby you can repo a position for a week and it is regarded as a true sale to get rid of net balance sheet."  Lehman used Repo 105 for no articulated business purpose except "to reduce balance sheet at the quarter-end.". . . Lehman's Global Financial Controller confirmed that "**the only purpose or motive for [Repo 105] transactions was reduction in the balance sheet**" and that "**there was no**

**substance to the transactions**."

**Lehman did not disclose** its use – or the significant magnitude of its use – of Repo 105 to the Government, to the rating agencies, to its investors, or to its own Board of Directors.

(Rpt.p. 6-7)

113.     The Bankruptcy Examiner, after examining witnesses who worked at Lehman, concluded that Lehman had no legitimate business reason to enter into at least certain of these Repo 105 transactions.

- Mitch King, former head of Lehman's United States Agencies trading desk stated that no business purpose existed for Repo 105 transactions other than to reduce Lehman's net balance sheet.  King referred to Lehman's Repo 105 program as a  "nuisance."  "There was no reason for me to go out and Repo 105."  King further stated that "[f]rom a trader's perspective, I would have rather never seen anything Repo 105-related.  It was just another thing I had to do that was not a trade and that was not a part of my business.  I would not go out and seek to Repo 105 [i.e., if he wasn't required to by superiors]." (Rpt. p. 869).

- John Feraca, who ran the Secured Funding Desk in Lehman's Prime Services Group, stated:  "It was universally accepted throughout the entire institution that Repo 105 was used for balance sheet relief at quarter end." (Rpt. p. 868).

- Marie Stewart, the former Global Head of Lehman's Accounting Policy Group, described Repo 105 transactions as "a lazy way of managing the balance sheet as opposed to legitimately meeting balance sheet targets at quarter end."  (Rpt. p. 869).

- Murtaza Bhallo, the former Business/Risk Manager for Principal Transaction Group ("PTG") Liquid Markets, said that Repo 105 was "an accounting gimmick." (Rpt. p. 869).

114.     Lehman  could  have  obtained  similar  financing  through  less  costly  means,

including the use of ordinary repo transactions with the same repo-lenders, but on terms in which Lehman was not required to over-collateralize; i.e. not post collateral equal to 105% of the loan. Former Lehman personnel, "**uniformly acknowledged that the overarching goal of Repo 105 transactions was to meet net balance sheet targets** – i.e., reduce the net asset component (the numerator) of the net leverage ratio calculation – in connection with the filing of Lehman's financial statements." (Rpt. p. 746). Thus, the Examiner concluded, **"Repo 105 transactions were not used for a business purpose**, but instead for an accounting purpose: to reduce Lehman's publicly reported net leverage and net balance sheet." *Id*.

115.    Since 2001, Lehman omitted any mention of its use of Repo 105 transactions in its public filings.

116.    For example, Lehman's 2007 Form 10-K both **omitted** any discussion of the Repo 105 transactions and **affirmatively misrepresented** that all repurchase and resale agreements by Lehman were accounted for as "financings" rather than "sales." (2007 Form 10-K p. 97). In truth, only a small fraction of Lehman's repurchase transactions were accounted for as financings. The remainder – the Repo 105 transactions – were accounted for as sales. The Examiner concluded that a "trier of fact could find that Lehman **affirmatively misrepresented** its accounting treatment by stating that Lehman treated repo transactions as financing transactions rather than sales for financial purposes, despite the fact that Lehman treated tens of billions of dollars in repo transactions – namely, Repo 105 transactions – as true sales transactions." (Rpt. p. 962). These misstatements and omissions began in 2001 and were made consistently throughout the Relevant Period. (See 2005 10-K at p. 81; 2006 10-K at p. 85-86; Rpt. p. 974-77).

117.    Lehman also **failed to disclose** that it had an obligation to repurchase tens of billions of dollars in securities that were temporarily transferred to counterparties in the Repo 105 transactions, and the effect this had on Lehman's then-existing financial position and results.  This should have been disclosed because Lehman was absolutely certain that they were obligated to repurchase its securities used as collateral in the Repo 105 transactions. Not disclosing this obligation violated SEC disclosure rules, directly violated GAAP, and materially misled investors, including Plaintiffs.  These misstatements and omissions began in 2001 and were made consistently throughout the Relevant Period.  The Examiner concluded as follows:

> [T]here is sufficient evidence to support a determination that disclosure of the obligation to repurchase the securities and repay the cash borrowing was required in the Management's Discussion and Analysis ("MD&A") section of Lehman's publicly filed financial statements because the repurchase was a known event that was reasonably likely to occur and would have had a material effect on the company's financial condition or results of operations.

(Rpt. p. 749, *accord* pp. 750, 969-71, 988).

118.    The Examiner ultimately concluded that colorable claims existed against several of the Defendants named in this Amended Complaint:

> Lehman's failure to disclose the use of an accounting device to significantly and temporarily lower leverage, at the same time that it affirmatively represented those low" leverage numbers to investors as positive news, created a misleading portrayal of Lehman's true financial health.  Colorable claims exist against the senior officers who were responsible for balance sheet management and financial disclosure, who signed and certified Lehman's financial statements and who failed to disclose Lehman's use and extent of Repo 105 transactions to manage its balance sheet.

(Rpt. p. 20, *accord* pp. 747, 963).

119.    More specifically, the Examiner concluded that "**there are colorable claims**

41

against Richard Fuld, Jr., Christopher O'Meara, Erin Callan, and Ian Lowitt in connection with their failure to disclose the use of the practice, and against Ernst & Young for its failure to meet professional standards in connection with that lack of disclosure."  (Rpt. p. 23-24, *accord* pp. 750, 990).

120.    Importantly, the Examiner gave the Lehman Defendants and E&Y an opportunity to provide facts and materials that supported their alleged defenses.  Each of these defendants provided such materials and alleged defenses, but the Examiner still concluded that colorable claims existed.  (Rpt. pp. 24 n.90, 990).

### 4.    Documents and Witness Interviews Confirm Defendants Knew That Repo 105 Transactions Were Materially Misleading

121.    Documents and witness interviews conducted by the Examiner demonstrate that Lehman's use of Repo 105 was orchestrated and executed at the Company's highest levels.  Not only did the Officer Defendants fully appreciate how Repo 105 transactions were being used to manipulate Lehman's balance sheet, but they also regularly made decisions about Lehman's use of such transactions in order to improve the Company's standing with analysts, credit ratings agencies and investors.

122.    Defendant O'Meara, in his position as CFO, actively managed Lehman's Repo 105 transactions from December 2004 until December 1, 2007, when he became Lehman's head of Global Risk Management.  (Rpt. p. 1002).  O'Meara was responsible for setting the Repo 105 usage limits or caps, and according to the Examiner, O'Meara had a duty to report "the impact of the [Repo 105] transactions on Lehman's balance sheet and the purpose for engaging in these transactions" to his superiors, including Defendants Fuld, Gregory, Lowitt

and Callan.  (Rpt. pp. 1002-07).

123.  Defendant Callan became Lehman's CFO in December 2007, and received calls as early as January 2008 regarding Lehman's Repo 105 program.  Several senior Lehman executives brought Repo 105 transactions to Callan's attention.  Callan saw the red flags alerting potential problems arising from Lehman's Repo 105 program, but ignored them before signing Lehman's first quarter 2008 Form 10-Q.  (Rpt. pp. 1013-15).

124.  Defendant Lowitt was familiar with Repo 105 when he became CFO in June 2008.  (Rpt. pp. 937-45).  According to the Examiner, despite knowledge of Lehman's Repo105 program, "Lowitt certified Lehman's second quarter 2008 Form 10-Q, exposing Lehman to potential liability for making material misstatements and omissions in publicly filed financial statements and MD&A."  (Rpt. pp. 1021-24).

125.  Defendant Gregory assisted in setting balance sheet targets for Lehman as of March 2008.  As a member of Lehman's Executive Committee, Gregory received materials related to Lehman's use of Repo 105 transactions to manage the balance sheet during a special meeting requested by McDade on March 28, 2008.  McDade testified that the purpose of the meeting was to request Gregory's "blessing in freezing Lehman's Repo 105 usage." (Rpt. pp. 998-99).

126.  Defendant Fuld also had knowledge of Repo 105 transactions.  (Rpt. pp. 917-921).  For example, the night before a March 28, 2008 Executive Committee meeting requested by McDade (Lehman's newly appointed "balance sheet czar") to discuss Lehman's Repo 105 program and to request Gregory's freezing of the Repo 105 usage, Fuld received an agenda of topics including "Repo 105/108" and "Delever v Derisk" and a presentation that

referenced Lehman's $49.1 billion quarter end Repo 105 usage for the first quarter 2008. Additionally, McDade recalled having specific discussions with Fuld about Lehman's Repo 105 usage in June 2008.   During that discussion, McDade walked Fuld through Lehman's Balance Sheet and Key Disclosures document, and discussed with Fuld Lehman's quarter-end Repo 105 usage: $38.6 billion at year-end 2007; $49.1 billion at 1Q08; and $50.3 billion at 2Q08.   Based upon their conversation, McDade understood that Fuld "was familiar with the term Repo 105," "knew, at a basic level, that Repo 105 was used in the Firm's bond business" and "understood that [reduction of Repo 105 usage] would put pressure on traders."

127.    Fuld also met regularly, at least twice a week, with Gregory and members of the Executive Committee to discuss the state of the Company.   Based on these facts, as well as the fact that Fuld was admittedly focused on balance sheet and net leverage reduction in 2008, the Examiner concluded that Fuld knew about Repo 105 transactions prior to signing Lehman's 2008 Forms 10-Q.   (Rpt. pp. 996-1002)

128.    The Examiner's Report detailed other documents, emails, and conversations with Lehman employees that further corroborate that each of the Officer Defendants knew about the Company's Repo 105 practice throughout the Relevant Period.   For example:

- Martin Kelly ("Kelly"), Lehman's Global Financial Controller, told the Examiner that he expressed concerns to Defendants Callan and Lowitt when each was serving as Lehman's CFO about: (1) the large volume of Repo 105 transactions undertaken by Lehman; (2) the fact that Repo 105 volume spiked at quarter-end; (3) the technical accounting basis for Lehman recording such transactions as "sales"; (4) the fact that Lehman's peers did not do Repo 105-style transactions; and (5) the reputational risk Lehman faced if its Repo 105 program were to be exposed.  (Rpt. pp. 930-33).

- Callan "acknowledge[ed] she was aware, as CFO, that Lehman's Repo 105 practice impacted net balance sheet [and] that the transactions had to

44

be routed through Europe."  (Rpt. p. 914 n.3505).

- Lowitt acknowledged to the Examiner that "he was aware of Lehman's Repo 105 program for many years, that Lehman used the transactions to meet balance sheet targets, that Repo 105 transactions used only liquid inventory, and that Lehman set internal limits on Repo 105 usage but that Chris O'Meara was involved with limit setting."  *Id.*

- According to a July 2006 Overview of Repo 105/108 Presentation, Grieb and O'Meara were "responsible for setting Lehman's limits" on Repo 105. (Rpt. p. 938).

- According to a July 2006 document: titled "Lehman, Global Balance Sheet Overview of Repo 105 (FID) & 108 (Equities)," "per Chris O'Meara and Ed Grieb," "Repo 105 transactions must be executed on a continual basis and remain in force throughout the month. To meet this requirement, the amount outstanding at any time should be maintained at approximately 80% of the amount at month-end."  (Rpt.p. 922).

- From April 2008 to September 2008, O'Meara, Callan, Lowitt and others received a "Daily Balance Sheet and Disclosure: Scorecard," as well as daily condensed versions in email form, which contained "frequent references" to Repo 105, including "the daily benefit that Repo 105 transactions provided to Lehman's balance sheet."  (Rpt. p. 928).

- In August 2007, O'Meara was involved in unsuccessful efforts to use RMBS and CMBS in Repo 105 transactions. Kentaro Umezaki ("Umezaki") emailed colleague John Feraca, "not sure that is worth the effort . . . we need Chris [O'Meara] to opine."  (Rpt. p. 1006 n.3840).

- Umezaki emailed O'Meara on August 17, 2007, stating: "John Feraca is working on Repo 105 for our IG mortgage and real estate assets to reduce our Q3 balance sheet . . . He will test the waters a bit in London with one counterparty."  (Rpt. p. 796 n. 3050).

- Ryan Traversari, Lehman's Senior Vice President of Financial Reporting, emailed O'Meara in May 2008 regarding Repo 105, stating that Citigroup and JPMorgan "likely do not do Repo 105 and Repo 108 which are UK-based specific transactions on opinions received by LEH from Linklaters. This would be another reason why LEH's daily balance sheet is larger intra-month then at month-end."  (Rpt. pp. 739-40 n.2872).

- On June 17, 2008, Gerard Reilly provided O'Meara, Lowitt, McDade and Morton a document entitled "Balance Sheet and Key Disclosures," "that incorporated McDade's plan to reduce Lehman's firm-wide Repo 105

usage by half -from $50 billion to $25 billion in third quarter 2008."  (Rpt.
p. 819).

129.    The Examiner stated the following with respect to intentional conduct of

Defendants:

> The Examiner has investigated Lehman's use of Repo 105 transactions and has
> concluded that the balance sheet manipulation was ***intentional, for deceptive
> appearances***, had a material impact on Lehman's net leverage ratio, and, because
> Lehman did not disclose the accounting treatment of these transactions, rendered
> Lehman's Forms 10-K and 10-Q (financial statements and MD&A) deceptive and
> misleading.
>
> (Rpt. p. 912 n.3497).

130.    The Examiner further concluded that sufficient evidence exists to support a

finding that Defendants Fuld, O'Meara, Callan and Lowitt were "at least ***grossly negligent*** in

causing Lehman to file deficient and misleading periodic reports that failed to disclose the

firm's use of Repo 105 transactions."  (Rpt. p. 994).

131.    Also, as alleged below, the Examiner found that sufficient evidence existed to

support "at least three colorable claims" against E&Y arising from its repeated "failure to

follow professional standards of care" with respect to the Repo 105 transactions.  (Rpt. pp.

1027, 1032-33).

### 5.    Investors, Like Plaintiffs, Relied On and Were Misled by Lehman's Disclosures and Omissions Regarding Repo 105

132.    Since the inception of Repo 105 in 2001, Lehman made misrepresentations

regarding its net leverage ratio in its: (1) Registration Statements and Offering Documents;

(2) publicly filed financial statements; (3) press releases; and (4) investor conference calls.

The Examiner noted that misrepresentations occurred "particularly during the run-up to an

equity raise."  (Rpt. p. 986).  The Examiner noted that the "point of these announcements was

to indicate to current and potential new shareholders that Lehman was financially healthy and a good investment." *Id.* Plaintiffs relied on and were misled by those disclosures.

## I.   **Overstated Real Estate Assets**

### 1. **Principal Transactions Group**

133.   The Examiner found that Lehman overstated certain real estate-related assets in its PTG:

> The Examiner determines that there is sufficient evidence to conclude that certain of the Principal Transactions Group ("PTG") real estate were not reasonably valued during [the second and third quarters of 2008]. Furthermore, the Examiner finds sufficient evidence to support a finding that Lehman's valuations of its Archstone bridge equity investment were unreasonable as of the first, second and third quarters of 2008.

(Rpt. pp. 214-15).

134.   Lehman's PTG assets were investments in real estate assets that Lehman held for its own account while a developer improved or developed the underlying assets, with the intention of selling the investment after the development or improvement was completed.

135.   The Examiner concluded that Lehman's "process for valuing its PTG portfolio was systemically flawed because Lehman primarily valued these assets based on whether the development was **proceeding to the project's business plan**, and **not** the price a buyer would pay for the asset," as required by SFAS 157. (Rpt. pp. 286-88; *accord* 329-49). Moreover, in 2007, PTG models overvalued PTG assets and did not account for risk. (Rpt. p. 313). In May 2008, at least 1/3 of the PTG assets continued to be valued using outdated and inaccurate pricing models that Lehman employees described as "worthless." (Rpt. pp. 317-18; 322). Lehman's portfolio balance totaled $9.6 billion at the end of fiscal 2007, and this balance was overstated by a material amount throughout at least 2007 and 2008. (Rpt. p.

289).  This conclusion is supported by Lehman's difficulty in finding a willing buyer to purchase its PTG assets, and the prominent role those difficulties had in contributing to Lehman's bankruptcy.  In fact, several potential buyers specifically cited the overvaluation of Lehman's real estate-related assets when deciding not to buy the Company or certain Company assets.

### 2. Archstone Valuations

136.   Archstone, a publicly traded Real Estate Investment Trust ("REIT"), was among Lehman's largest commercial real estate investments when it was purchased for $22.2 billion in May of 2007.

137.   To value Archstone, Lehman used a discounted cash flow model that determined fair value by discounting future expected cash flows from the investment to present value using Lehman's cost of capital or the yield an investor would require to purchase the investment at the discount rate.  This net present value cash flow estimate was based on a variety of assumptions including occupancy rates, rental growth rates, projected income and expenses, exit capitalization rates, and exit value.

138.   However, Lehman failed to consider relevant market information in these assumptions.  For example, Lehman used a rental growth rate that was 1.9% to 3.5% higher than third-party projections for apartments within Archstone's primary markets, used net income growth rates that were 100% higher than the average net income growth rate for apartment REITs over a 15 year period, and failed to consider the lower capitalization rates that were being used for other comparable publicly traded REITs.  (Rpt. pp. 424, 429, 464).  These overly optimistic assumptions resulted in overstating the value of the Archstone

investment.

139.    The Examiner concluded that "evidence supports a finding that Lehman's valuation of $2.165 billion for its Archstone bridge and permanent equity investment was overvalued" by between 9% and 21% at the end of the first quarter of 2008.  (Rpt. p. 467). The overstatement was material because, if Lehman had correctly valued the Archstone investment, it would have required a significant write-down, and cut pre-tax income nearly in half for the quarter.  For example, if Lehman had taken a write-down of $200 million (9% of the $2.165 billion valuation) in the first quarter of 2008 for the Archstone investment, then: (1) Lehman's mark-to-market write down adjustments for commercial mortgages and related assets **would have increased** by 20%; and (2) the Company's pre-tax income **would have decreased** by 40%.

### 3.    Industry Peers and Governmental Entities Concluded that Lehman's Real Estate Portfolios Were Overstated

140.    In the months leading to bankruptcy, Lehman faced difficulty finding a buyer to save the Company primarily because of the huge hole that the MBS and real estate portfolio left on Lehman's balance sheet.  The Federal Reserve asked executives from a group of firms, including Goldman Sachs and Credit Suisse, to value Lehman's massive commercial real estate portfolio and to each consider investing several billion dollars to buy it.

141.    On Saturday, September 13, 2008, Federal Reserve officials met with Merrill Lynch's then-CEO John Thain, other key Wall Street executives and the SEC to discuss the future of Lehman.  According to the FCIC Report, "Merrill CEO John Thain told the FCIC that by Saturday morning [September 13, 2008], the group of executives reviewing Lehman's [total] assets had estimated that they were overvalued by anywhere from $15 to $25 billion."

As reported in *The Wall Street Journal* on October 6, 2008, the executives almost universally concluded that Lehman's $32.6 billion in commercial real estate holdings were overvalued by as much as 35 percent, or $11.4 billion.

142.     Another potential buyer of Lehman assets, Korea Development Bank ("KDB"), found problems in the tens of billions of dollars of commercial real estate assets sitting on Lehman's balance sheet which had current and future losses.  Before KDB would close on the Lehman deal, KDB wanted comfort that the toxic assets would be spun off into a separate entity limiting KDB's exposure.  Lehman was unable to do this, and the deal fell through.  (Rpt. pp. 668-87).

143.     Likewise, then Treasury Secretary Henry Paulson ("Paulson") expressed concern (related to Lehman's Archstone investment) that Lehman lacked sufficient collateral for a government loan, asserting in an interview with *the New York Times* on October 23, 2008 that **the value of Lehman's assets created "a huge hole" on its balance sheet**.

144.     The negative reactions by prospective buyers of Lehman's assets illustrate that Lehman's real estate assets were highly overstated.  Lehman knowingly or recklessly failed to take timely write-downs on its real estate assets at least as early as 2007, and well into 2008, when Plaintiffs purchased millions in Lehman's Securities.

### 4.     Lehman Defendants' Knowledge of Overstated Real Estate Valuations

145.     Lehman made numerous public representations indicating that the Company had significant pricing visibility for its MBS real estate portfolios, such that Lehman could adequately value those assets on its books.  For example, on March 18, 2008, Defendant Callan remarked on the pricing transparency of some of Lehman's mortgage-related

securities: "We began to see a lot more transparency in the Alt-A sector late in the quarter, *allowing us to mark positions based on observable prices*, much less use of models."

146.    On June 16, 2008, Defendant Lowitt said on the same call that "[a]lthough certain sectors of the markets are currently distressed, there has been recent sales activity in many asset classes, allowing us to benchmark prices.  The strong flows we've seen over the past quarter have *given us very good transparency in the marks we have against our remaining positions*."  Moreover, Lowitt stressed that Lehman sold approximately $11 billion of residential mortgage assets and purchased $6 billion during the quarter, including risky loan types such as Alt-A and sub-prime mortgages, which gave Lehman "*good transparency in our pricing*."

147.    These statements suggest that there was significant pricing transparency for assets on Lehman's balance sheet, including Level Three assets.  However, in truth, the values reflected on Lehman's financial statements at year-end 2007, first quarter 2008, and second quarter 2008 for many of its real estate assets were overstated because they were not appropriately adjusted for risk, were based on faulty assumptions, or were not marked in accordance with Lehman's sales of same or similar assets.

**J.    Misrepresented Liquidity**

148.    Regulation S-K, prescribed under the Securities Act of 1933, required Lehman to disclose in its MD&A any known commitments "that will result in or that are reasonably likely to result in the registrant's liquidity increasing or decreasing in any material way," as well as any off-balance sheet arrangements "that have or are reasonably likely to have a current or future effect on the registrant's financial condition, . . . results of operations,

liquidity, capital expenditures or capital resources that is material to investors." 17 C.F.R. §
229.303(a)(1), (a)(4)(I). GAAP also requires liquidity-related disclosures.

### 1. Defendants Failed to Disclose the Liquidity Impact of Repo 105

149.    During the Relevant Period, and most often immediately after quarter-end,
Lehman repurchased highly liquid securities that had been "sold" in Repo 105 transactions.
Because Lehman was already voluntarily taking at least a 5% haircut on Repo 105
transactions, Lehman was forced to use "the most liquid paper," otherwise the haircut would
have been too great. In fact, Lehman had "intermittent controls in place to ensure that Lehman
personnel transferred only liquid securities as part of Repo 105 transactions, as required by
Lehman's Repo 105 Accounting Policy."   (Rpt. p. 794 n.3045).   Thus, Lehman had
knowledge of known commitments and arrangements in which billions of the Company's
most liquid assets were pledged as collateral in order to carry out Repo 105 transactions.

150.    Regulation S-K requires disclosure of known commitments that will materially
affect liquidity, and disclosure of off-balance sheet arrangements that are reasonably likely to
have a current or future effect on financial condition or liquidity. Under Regulation S-K,
Lehman's disclosures should have included a discussion of the timing and amount of the cash
flow accompanying the repayment of the borrowings. This should have included: (1) the
amount of cash available for operations after repayment of the borrowings; (2) the ability or
inability to borrow more cash in light of any reductions in debt ratings or deterioration in
leverage ratios that might result from the repayment of the borrowings; and (3) the economic
substance and purpose of the transactions. Lehman's public filings during the Relevant Period
omitted these disclosures.

151.    In fact, Lehman's 2007 Form 10-K misleadingly claimed that the Company had a "very strong liquidity position," and represented that it "**maintain[ed] a liquidity pool . . . that cover[ed] expected cash outflows for twelve months in a stressed liquidity environment**."   Similarly, since the inception of the Repo 105 policy, Lehman's financial disclosures also stated that Lehman's liquidity pool was sized to cover expected cash outflows associated with certain enumerated items.   However Lehman made no disclosures that it employed Repo 105 transactions that locked up billions of highly liquid assets as collateral and required significant cash outflows soon after quarter end to repurchase the collateral

152.    **Lehman reported** the size of its liquidity pool as $34 billion at the end of the first quarter of 2008, $45 billion at the end of the second quarter, and $42 billion at the end of the third quarter of 2008. These numbers were disclosed both to the public and to government regulators such as the SEC and Federal Reserve Bank of New York.  (Rpt. pp. 1409-10). **Lehman represented** that this liquidity pool was unencumbered, liquid and composed of investment grade securities, primarily cash instruments, and government and agency securities.  *Id.*  **Lehman emphasized** the easy-to-monetize nature of its liquidity pool – meaning an asset could be monetized within 5 days – to significant repo counterparties and clearing banks, including JPMorgan, Bank of America, and Citibank.  (Rpt. p. 1412).

### 2.    Encumbered   Assets   Were   Improperly   Included   in Lehman's Liquidity Pool

153.    As early as June 2008, Lehman's liquidity disclosures were also false and misleading because Lehman included in its reported liquidity pool assets that were either encumbered or otherwise difficult to monetize.   While Lehman internally considered assets that could be monetized within five days to be appropriate for inclusion in the liquidity pool,

SEC regulators had conveyed to Lehman that assets in a liquidity pool should be monetizable "within twenty-four hours."  (Rpt. p. 1412).   Repo counterparties, ratings agencies, and investors alike treat the liquidity pool as a barometer for the health of an investment bank, and Lehman was cognizant of the fact that disclosing an insufficient liquidity pool could scare away sources of critical short term financing.  (Rpt. pp. 1413-16).

154.    JPMorgan was one of Lehman's largest creditors, and in 2008, after determining that Lehman's MBS and CRE portfolios, as well as securities posted as loan collateral, posed a risk of dropping in value, it informed Lehman that there would be additional haircuts based upon "collateral type, liquidation risk and price risk."[1]  (Rpt. pp. 1420-21).  This forced Lehman to transfer billions of dollars to JP Morgan to cover its risk-based margin requirements.  *Id.*

155.    In a September 10, 2008 earnings call, Defendant Ian Lowitt, Lehman's Chief Financial Officer, stated that Lehman's liquidity pool was **"strong at $42 billion"** for the quarter, and that through last night the liquidity pool remained **"essentially unchanged at $41 billion**."  (Rpt. p. 1457).

156.    This statement was misleading because it failed to disclose that approximately $15 billion (37%) of the liquidity pool contained assets pledged as collateral that had a "low" ability to monetize.  (Rpt. p. 1459).   Additionally, Lowitt failed to disclose, that as of the night before the earnings call, the liquidity pool consisted of:

- approximately $4 billion of collateralized loan obligations pledged to JPMorgan;

---

[1] This was JPMorgan's "risk based margin."  Liquidation risk was to account for one-day price risk volatility for illiquid securities and price risk was an estimate of potential vendor-price overstatement for illiquid securities.

- $2.7 billion in cash and money market funds pledged to JPMorgan;

- a $2 billion Citibank cash deposit;

- a $500 million Bank of America cash deposit; and

- nearly $1 billion as a collateral deposit with HSBC.

    (Rpt. pp. 9, 1458).

157.    Lowitt also **did not disclose** that Lehman and JPMorgan "executed expanded security documentation on the morning of September 10, 2008 before the earnings call," and that "this documentation granted JPMorgan a security interest in practically all Lehman accounts at JPMorgan for all Lehman exposures to JPMorgan."  (Rpt. pp. 1458-59).  As a result, billions in assets could not be easily monetized and the inclusion of these assets in Lehman's liquidity pool was materially misleading.

158.    A liquidity pool of $41 billion would have been sufficient to allow management to continue operations in the event of a liquidity crisis.  However, in the days leading up to Lehman's bankruptcy filing, the available cash in the liquidity pool was quickly drained.  On September 10, 2008, only 27% of Lehman's liquidity pool could be monetized and by September 12, 2008, only 7% of the liquidity pool could be monetized.  (Rpt. p. 1452). Five days after the earnings call that Defendant Lowitt had stated Lehman's liquidity pool was "strong" and consisted of $41 billion, Lehman filed for chapter 11 bankruptcy protection.

### 3.    Lehman Defendants' Knowledge of Liquidity Misrepresentations

159.    Internally, Lehman executives were aware of yet recklessly ignored, Lehman's liquidity vulnerabilities and made misstatements and/or omitted material facts to the investigating public and Plaintiffs.  Examples are detailed below.

160.    On May 31, 2007, Roger Nagioff ("Nagioff"), Lehman's then Global Head of FID, provided Defendant Fuld with an internal stress scenario that identified a possible $3.2 billion loss for the Company, and recommended that Lehman reduce its forward commitments by nearly half, impose rules on leverage, and develop a framework for limiting and evaluating the leveraged lending business.  (Rpt. p. 121).

161.    On July 20, 2007, Nagioff emailed Lowitt, stating that his co-COO and head of Fixed Income Strategy were "panicky" about Lehman"s liquidity position.  Lowitt responded that he was "anxious" about Lehman's liquidity position, and that "[i]f everything goes as badly as it could simultaneously it will be awful."  Lowitt added that "the discipline we had post 1998 about funding completely dissipated which adds to the alarm."  (Rpt. pp. 124-25).

162.    In July 2007, Defendants Lowitt and O'Meara, together with Paolo Tonucci ("Tonucci"), Lehman's Global Treasurer, Alex Kirk ("Kirk"), co-COO of FID, and Kentaro Umezaki, Head of Fixed Income Strategy, created ALCO to "manage [the firm's] liquidity on a daily, basis."  (Rpt. pp. 125-26).

163.    On July 30, 2007, ALCO members, including Defendants Lowitt and O'Meara, exchanged an analysis showing that, contrary to the firm's policy to always have a cash capital surplus of at least $2 billion, Lehman was projecting large deficits of cash capital. (Rpt. pp. 127-28).

164.    In early August 2007, Lowitt, Nagioff and Kirk suspended the leveraged loan and commercial real estate businesses until the end of the third quarter of 2007 as a result of Lehman's liquidity problems.  *Id.*

165.    On October 5, 2007, O'Meara received an email from Tonucci, Lehman's

Global Treasurer, stating that Lehman was "looking at being $1-2 [billion] short [in equity] . . . should not really be surprised."  (Rpt. p. 135).

166.    An internal January 2008 presentation indicated that "[v]ery few of the top financial issuers have been able to escape damage from the sub-prime fallout," and warned that since "a small number of investors account for a large portion of demand [for Lehman issues], liquidity can disappear quite fast."

167.    On March 12, 2008, Callan received an email from Eric Felder expressing concerns about dealer liquidity and shrinking leverage, and forwarding an email from a Lehman trader that warned that dealers were demanding increased haircuts and refusing to take assignments of any Bear or Lehman trades even if the trades were "in-the-money." Felder told Callan that this was a "very slippery slope," because if dealer liquidity were to "seize up," it could lead to "true disaster."  Five days later, Felder warned Defendants Lowitt and Callan that collapsing equity values eventually would compel Lehman to sell assets, and that the distressed prices available would create a need for additional capital, forcing further sales. (Rpt. pp. 629- 30).

168.    In 2008, several Lehman executives, including the Officer Defendants, were fully aware of Lehman's worsening liquidity position and the need for action.  An internal talking point memorandum from June 2008 addressing the record $2.8 billion quarterly loss which Lehman announced on June 9, 2008 was produced to the House Committee.  In that June 2008 memorandum, the question asked: "Why did we allow ourselves to be so exposed?"  The reasons cited for Lehman's exposure included that, "[c]onditions clearly [were] not sustainable.  Saw warning signs.  Did not move early, fast enough.  Not enough

discipline in our capital allocation."   Also according to that memorandum, the firm had remained in "illiquid asset [origination] too much/too long."   Defendant Callan nor any other Officer Defendants disclosed anything concerning that highly material internal memorandum or any of the concerns expressed therein.

169.    Further evidencing scienter, Defendants Fuld and Gregory sought to remove – not reward – insiders who voiced concerns about the growing liquidity crisis.   In 2007, for example, Fuld and Gregory removed Michael Gelband, head of Lehman's Fixed Income Division, and Madelyn Antoncic because of their opposition to management's growing accumulation of risky and illiquid investments.

### K.    Misrepresented Risk Management Practices

170.    Throughout the Relevant Period, Lehman's public filings contained false and misleading statements concerning Lehman's risk management practices. These included, among other things, statements about Lehman's adherence to risk policies, compliance with internal risk limits, and stress-test procedures.   Lehman's statements were material to investors because, as an investment bank, risk management was critical to loss prevention.   In particular, Lehman's disregard for its risk policies and procedures enabled the Company to amass billions of dollars of illiquid, risky assets that were not easy to monetize when Lehman faced a liquidity crisis.

171.    Beginning at least in 2006, Lehman pursued an aggressive growth strategy that caused the Company to assume greater risk.   Lehman shifted from the "moving business" (*i.e.*, moving assets on to investors) to the "storage" business (*i.e.*, making longer-term investments parking the assets on Lehman's own balance sheet).   This expansion strategy

focused heavily on acquiring and holding commercial real estate and other real estate assets that entailed far greater risk and less liquidity than Lehman's traditional lines of business. (Rpt. pp. 413-415).

172.    In SEC filings as far back as 2004 Lehman repeatedly assured investors that it had appropriate risk management policies in place and that the Company monitored and enforced strict adherence to those policies.  For example, Lehman stated that "essential in our approach to risk management is a strong internal control environment with multiple overlapping and reinforcing elements" (included in the 2004 Form 10-K and first quarter 2008 Form 10-Q) and that "*[m]anagement's Finance Committee oversees compliance with policies and limits*" (included in the second and third quarter 2007 Form 10-Qs, 2007 Form 10-K, and first quarter 2008 Form 10-Q).  Lehman also stated that "[w]e . . . ensure that appropriate risk mitigants are in place" (included in the second and third quarter 2007 Form 10-Qs), and that "[d]ecisions on approving transactions . . . take into account . . . importantly, the impact any particular transactions under consideration would have on our overall risk appetite" (included in the second and third quarter 2007 Form 10-Qs).  These statements were materially misleading because Lehman's risk management framework and risk limits were not followed.  A report from the FCIC noted that Lehman's "[s]enior management regularly disregarded the firm's risk policies and limits."  (FCIC Report p. 177).

173.    According to Lehman's 2007 10-K, the Executive Committee – including Fuld (Chair), Gregory, Callan and Lowitt – established Lehman's overall risk limits and risk management policies.

174.    Lehman's Risk Committee, which included the Executive Committee and

CFO, reviewed "all exposures, position concentrations and risk-taking activities" on a weekly basis, determined "overall risk limits and risk management policies, including establishment of risk tolerance levels," reviewed the firm's "risk exposures, position concentrations and risk-taking activities on a weekly basis, or more frequently as needed," and allocated "the usage of capital to each of our businesses and establishe[d] trading and credit limits with a goal to maintain diversification of our businesses, counterparties and geographic presence."

175.    Pursuant to Lehman's policies, the Company disclosed information regarding risk appetite to senior management, creating a weekly "Firm Wide Risk Snapshot" report, which contained "Risk Appetite limits and usage by business unit," and summarized risk metrics including "VaR [Value at Risk] "by business unit and Top Market Risk positions." Additionally, Lehman circulated a "Daily Risk Appetite and VaR Report" to upper management, which included a cover e-mail detailing the firm's overall daily risk appetite and VaR usage figures and the day-over-day change in those figures.   The Risk Committee also received the "Firm-Wide Risk Drivers" report, which contained detailed information regarding the firm's aggregated risks, reflected firm-wide risk appetite and VaR usage data, and explanations regarding week-over-week changes in the data.  (Rpt. p. 116).

### 1.    Lehman Regularly Exceeded Internal Risk Limits

176.    Disregarding risk limits was a deliberate decision that Fuld and Gregory made over the objection of members of Lehman's management, including Alex Kirk, then head of Lehman's Credit Business, and Madlyn Antoncic, then Lehman's Chief Risk Officer.  (Rpt. p. 101).

177.    Lehman treated its "**risk appetite**" as a soft limit and it was routinely exceeded

throughout 2007 and 2008.  The Examiner testified before Congress that "Lehman was in breach of its established risk appetite limits on a persistent basis during the second half of 2007."  Lehman raised its risk appetite limit four times between December 2006 and December 2007, from $2.3 billion to $4.0 billion, and these limits were still consistently exceeded by material amounts.  (Rpt. pp. 49-51, 70-73).

178.    Lehman also established "**concentration limits**," which were designed to ensure that the Company did not take too much risk in a single, undiversified business or area. However, Lehman routinely and consistently disregarded concentration limits with respect to its commercial real estate and Alt-A portfolios.  (Rpt. pp. 171-75).  For example, Lehman failed to enforce its "single transaction limits," which were meant to ensure that its investments were properly limited and diversified by business line and counterparty.  (Rpt. pp. 50, 73-76).

179.    Also, Lehman failed to consult with its Chief Risk Officer when deciding to acquire its multi-billion dollar stake in Archstone.  According to the FCIC report:  "Although [Lehman] has proclaimed that 'Risk Management is at the very core of Lehman's business model,' the Executive Committee simply left its risk officer, Madelyn Antoncic, out of the loop when it made this [Archstone] investment."  (FCIC report p. 176-77).

180.    Lehman also regularly exceeded its "**balance sheet limits**," which were designed to contain the overall risk of the firm and maintain certain financial ratios within the range required by the credit rating agencies.  Instead, Lehman decided to exceed those limits. To mitigate the apparent effect of these overages, Lehman used Repo 105 transactions to take assets temporarily off the balance sheet before the ends of reporting periods.  (Rpt. pp. 50,

157, 181).

181.    Lehman also made misleading statements concerning "**stress tests**," which were one of Lehman's purported risk controls.  Stress tests were supposed to be used to determine the potential financial consequences of an economic shock to the Company's portfolio of real estate assets.  Lehman was required by the SEC to conduct regular stress testing.  In public filings for 2007 and 2008, Lehman represented that **"[w]e use stress testing to evaluate risks associated with our real estate portfolios**."  (Rpt. pp. 66-70).

182.    However, undisclosed to investors, Lehman **excluded many of its most risky principal investments** – including commercial real estate investments, private equity investments, and leveraged loan commitments – from its stress tests in the first half of 2007.  (Rpt. p. 69).   The Examiner concluded that, because of exclusion of those risky assets, "Lehman's management did not have a regular and systematic means of analyzing the amount of catastrophic loss that the firm could suffer from these increasingly large and illiquid investments."  (Rpt. p. 50).  In fact, experimental stress tests conducted in 2008 indicated that a large proportion of Lehman's risk resided with real estate and private equity positions that had not been included in its stress test.  (Rpt. pp. 50, 66-70).

183.    Lehman also routinely violated its **Value at Risk** ("VaR") limits.  VaR is a statistical measure of the potential loss in the fair value of a portfolio due to adverse movement in the underlying risk factors, and is watched by the SEC and the market to assess a company's risks.  For example, GREG was in breach of its VaR limits every day for nearly one full year, from early October 2007 through September 15, 2008 – the day Lehman declared bankruptcy.  Similarly, Lehman's High Yield business repeatedly breached its VaR

limits throughout the Relevant Period, including every day from mid-August 2007 through mid-May 2008.  Likewise, Lehman's FID repeatedly breached its VaR limits from mid-2007 through May 2008, including every day from mid-October 2007 through mid-May 2008.  As a consequence, Lehman breached its firm-wide VaR limit no less than 44 times from mid-2007 through September 15, 2008.  Because Lehman routinely exceeded its VaR limits, the representation that "[a]s part of our risk management control processes, we monitor daily trading net revenues company to reported historical simulation VaR" included in each of the Forms 10-Q and 2007 10-K was materially false and misleading when made.  (Rpt. p. 89, n.292; see generally Appendix 9 comparing risk appetite and VaR usage).

184.    In sum, Lehman's disclosures regarding its risk management practices were misleading because they failed to disclose that Lehman routinely exceeded its internal risk limits and they exaggerated the protection afforded to the Company.  The lack of risk management enabled Lehman to acquire billions of dollars of risky investments, and become exposed to billions of dollars of losses that it would not have been exposed to had it adhered to its risk management limits.

### 2.    Defendants' Knowledge of Regularly Exceeded Risk Limits

185.    The Officer Defendants oversaw the day-to-day management of Lehman's operations.  Defendant Fuld chaired, and Defendants Callan, Lowitt and Gregory were members of the Company's Executive Committee that was responsible for assessing Lehman's risk exposure and related disclosures.  The Executive Committee reviewed "risk exposures, position concentrations and risk-taking activities on a weekly basis, or more frequently as needed," and "allocate[d] the usage of capital to each of our businesses and

establishes trading and credit limits for counterparties."  (2007 10-K at p. 69).

186.    During a conference call to investors, Callan explained the Executive Committee consisted of thirteen people, including herself and Fuld, who met twice a week for two hours at a time and "devote[d] a significant amount of that time to risk."  Callan stated that the Executive Committee addressed "any risk that passe[d] a certain threshold, any risk that we [thought was] a hot topic" and "anything else during the course of the week that [was] important."  Moreover, Callan stated that the Executive Committee was "intimately familiar with the risk that we take in all the different areas of our business.  And [Fuld] in particular . . . keeps very straight lines into the businesses on this topic."

187.    In a July 20, 2007 email from Lowitt to O'Meara, Defendant Lowitt acknowledged that Lehman's liquidity concerns were rooted in a failure to abide by Company risk limits, stating, "In case we ever forget; this is why one has concentration limits and overall portfolio limits.  Markets do seize up." (Rpt. p. 178).

188.    According to the Examiner, O'Meara was aware that Lehman's principal investments were not considered in Lehman's stress testing.  For example, O'Meara told the Examiner that Lehman did not even start taking steps to include private equity transactions in its stress tests until 2008.  With regard to hedging, according to multiple Lehman executive interviews and internal emails, Lehman senior officers elected not to hedge many of Lehman's assets because of the difficulty and possible repercussions inherent in hedging investments as illiquid as Lehman's.  In addition, on October 15, 2007, O'Meara informed Lehman's Board of Directors that Lehman was over its firm-wide risk appetite limit.  (Rpt. p. 139-140).

189.    Additionally, Defendants Fuld, O'Meara, Callan and Lowitt signed quarterly and annual Sarbanes-Oxley certifications during the Relevant Period attesting to their responsibility for and knowledge of disclosure controls and procedures, as defined in Exchange Act Rules 13a-15(e) and 15d-15(e), as well as Lehman's internal control over financial reporting

190.    The Examiner concluded that "Lehman's management chose to disregard or overrule the firm's risk controls on a regular basis."  Specifically, management knowingly and regularly exceed risk limits with respect to its "concentration limits," "balance sheet limits," VaR limits, and "risk appetite limits."  (Rpt. pp. 49-51).  These regular departures from risk management practices were contrary Lehman's financial statement disclosures, which painted a picture of robust risk management procedures.  Lehman's public filings did not disclose that Lehman's internal risk limits were exceeded.

191.    Those who raised concerns over the Company's risk management were replaced. For example, both Michael Gelband ("Gelband"), head of Lehman's Fixed income Division, and Madelyn Antoncic ("Antoncic"), Lehman's Chief Risk Officer, were ignored and transferred after they "urged caution" with respect to Lehman's mortgage positions. Gelband left Lehman's Fixed Income Division in May 2007 to become head of Global Markets after he "balked at taking more risk."   In September 2007, Lehman removed Antoncic as Chief Risk Officer and reassigned her to a government relations position within the Company.

**L.    Non-Disclosed Material Concentrations of Credit**

192.    Required disclosures regarding concentrations of credit risk were omitted until

the filing of Lehman's second quarter 2008 Form 10-Q on July 10, 2008 – **after Plaintiffs purchased all of their Lehman securities** – when Lehman belatedly began to provide certain partial disclosures concerning its commercial mortgage and real estate-related portfolios. Specifically, throughout at least 2007 and 2008, Lehman's public filings failed to adequately or meaningfully disclose the Company's risk concentrations in risky Alt-A loans and Commercial Real Estate ("CRE").

        **1.      Alt-A Loan Concentration**.

193.    Lehman was a leading originator of Alt-A loans.  However, Lehman's public filings did not even include the term Alt-A until the Company filed its first quarter 2008 Form 10-Q, and even then disclosures of Alt-A were misleading.  When Lehman finally began to identify Alt-A holdings in that Form 10-Q, Lehman consolidated its Alt-A holdings with prime holdings into a single category labeled "Alt-A/Prime," notwithstanding less than 7% of Alt-A/Prime holdings actually consisted of "prime" loans.

194.    Between 2006 and 2007, Lehman subsidiary Aurora Loan Services ("Aurora") was considered a primary originator of Alt-A loans for Lehman, producing up to $3 billion in Alt-A mortgages a month.  In this same time period, Lehman, through Aurora and other mortgage originators like BNC Mortgage LLC, Delta Funding Corp., and First Alliance Mortgage Co., became increasingly heavily concentrated in these risky Alt-A loans.  (Rpt. pp. 87-90).

195.    Lehman Senior Vice President in Risk Management, Dimitrios Kritikos ("Kritikos"), stated in an internal January 30, 2007 email, that during the "last 4 months Aurora has originated the riskiest loans ever, with every month been riskier than the one

before."  (Rpt. p. 88).  Kritikos further made clear that the majority of Lehman's loan originations were, in fact, not truly Alt-A, stating in an internal March 12, 2007 email that "Aurora's product is far from Alt-A anymore.  The traditional Alt-A program is only 40% of Aurora's production . . . my concern is the rest 60% of the production, that has 100% financing in lower FICOs with non-full documentation and/or investment properties." Lehman's Alt-A lending standards had so deteriorated that loans made pursuant to Aurora's Mortgage Maker were internally referred to as "Alt-B" rather than Alt-A.  (Rpt. p. 88, n.288).

196.    By initially omitting Alt-A holdings altogether, and later grouping Alt-A with prime mortgage-related assets, the **public filings did not adequately disclose** Lehman's true exposure to the riskier Alt-A loans, which dwarfed the prime loans, and were experiencing rising delinquencies and defaults throughout 2007 and 2008.  Moreover, Lehman **did not disclose** that it had loosened its lending standards for Alt-A loans such that they were actually more akin to sub-prime than to prime.

197.    A March 2007 internal Lehman analysis entitled "Risk Review: Aurora and BNC February 2007" concluded that "[t]he credit deterioration [in Alt-A] has been almost parallel to the one of the subprime market."  Moreover, Lehman's "Alt-A" originations were particularly risky because Lehman had loosened its lending criteria to reach riskier borrowers. (*Id.* at n.277.)

### 2.    Commercial Real Estate Concentration

198.    From the end of Lehman's 2006 fiscal year to the end of its 2007 fiscal year, Lehman increased its global real estate assets by more than 90%, from $28.9 billion to $55.2 billion and further increased its exposure to $60.5 billion in the first quarter of 2008.  (Rpt. p.

67

103).  However, by the summer of 2007, Lehman personnel had already recognized that the market for placing investments backed by commercial real estate (including GREG) was "virtually closed."  (Rpt. p. 128).  Also in May 2007, O'Meara expressed "significant concerns" about the "overall size" of Lehman's real estate book and how much of the firm's equity was "tied up" in bridge equity deals.  (Rpt. p. 107).

199.    In between the second quarters of 2006 and 2007, Lehman increased its exposure to commercial real estate bridge equity investments, which the Examiner identified as "potentially riskier equity pieces of real estate investments."  (Rpt. p. 60).  From 2006 to 2007 Lehman's CRE bridge equity positions "increased ten-fold, from $116 million to $1.33 billion," and by the second quarter of 2008 Lehman's exposure had more than doubled again, to $3 billion.  (Rpt. pp. 103-04).  Thus, in only 2 years – and in the midst of a real estate crisis – Lehman had increased its portfolio of risky CRE bridge equity investments by over 2500%.

200.    Nevertheless, Lehman had already committed to financing several large CRE deals that closed in October and November 2007, including the multi-billion dollar Archstone bridge equity deal.  Indeed, the Company's involvement in Archstone and several other real estate bridge equity deals was so enormous that it dwarfed Lehman's entire preexisting real estate book.  On November 6, 2007, GREG made a presentation to Lehman's Executive Committee that recognized the significant risks inherent in the over-concentration of its global commercial real estate portfolio, stating that "under any circumstance an estimated $15 billion reduction in global balance sheet is warranted," and recommended reducing the global GREG balance sheet from $58 billion to $43.7 billion by March 31, 2008.  (Rpt. p. 225).  Notwithstanding this instruction, however, by May 31, 2008, GREG's global commercial real

estate portfolio remained over-concentrated by approximately $50 billion.  (Rpt. p. 226-27).

201.    Furthermore, Lehman's CRE portfolio included high risk PTG investments involving property development projects whose values could be materially affected if the developer failed to perform in accordance with the business plan.  Lehman's PTG portfolio was especially risky because it focused on land development projects, which carried more risk than other property types, was concentrated in California and other boom markets, and because Lehman took equity stakes in the developments (approximately 30% as of fiscal 2007 year-end).  (Rpt. p. 301).  The PTG balance sheet grew from $6.1 billion in fiscal 2005 to $6.9 billion in fiscal 2006, and then to $9.6 billion in fiscal 2007.  These concentrated risks, however, **were never disclosed**.  Due to Lehman's heavy concentration of CRE assets, the Company ultimately had to write down its CRE positions by approximately $4 billion from the first quarter to the third quarter of 2008.  (Rpt. pp. 301-303).

202.    Eric Felder ("Felder"), co-Head of Lehman's Global Fixed Income Division, stated in a February 20, 2008 email: "I remain concerned as a Lehman shareholder about our resi[dential] and cmbs [commercial mortgage-backed securities] exposure . . . having 18b of tangible equity and 90b in resi[dential] (including alt-a) and cmbs (including bridge equity) scares me."  This internal email indicates that at least as early as February 20, 2008, Lehman executives were aware of the heavy concentration of RMBS – including Alt-A – and CRE on Lehman's balance sheet.  (Rpt. p. 629, n.2550).

## M.    GAAP Violations

203.    Generally Accepted Accounting Principles ("GAAP") are recognized by the accounting profession as the principles, conventions, rules, and procedures necessary to

define accepted accounting practices at a particular time. GAAP comprises the official standards promulgated by the Financial Accounting Standards Board ("FASB") and American Institute of Certified Public Accountants ("AICPA").   GAAP consists of a hierarchy of authoritative literature. The highest priority is comprised of FASB Statements of Financial Accounting Standards ("SFAS"), followed by FASB Interpretations ("FIN"), Accounting Principles Board Opinions ("APB"), Accounting Research Bulletins ("ARB"), and AICPA Statements of Position ("SOP"). GAAP provides other authoritative pronouncements including, among others, the FASB Concept Statements ("FASCON").

204.   As a publicly traded company, Lehman was required to maintain books and records in sufficient detail to reflect the transactions and assets of the Company, and to prepare financial statements in accordance with GAAP.  Specially, the Securities Exchange Act of 1934, U.S. § 78m(b)(2) (the "Exchange Act"), requires public companies to:

(A) make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the issuer; and

(B) devise and maintain a system of internal accounting controls sufficient to provide reasonable assurance; and ensure

i.   transactions are executed in accordance with management's general or specific authorization;

ii.   transactions are recorded as necessary (1) to permit preparation of financial statements in conformity with generally accepted accounting principles or any other criteria applicable to such statements, and (2) to maintain accountability for assets;

iii.   access to assets is permitted only in accordance with management's general or specific authorization; and

iv.   the recorded accountability for assets is compared with the existing assets at reasonable intervals and appropriate action is taken with

respect to any differences[.]

205.    SEC Regulation S-X, 17 C.F.R. § 210.4-01(a)(1), states that financial statements filed with the SEC that are not prepared in compliance with GAAP are presumed to be misleading and inaccurate.  Regulation S-X requires that interim financial statements must also comply with GAAP.  17 C.F.R. § 210.10-01(a).

206.    In addition to the requirements of GAAP, Regulation S-K required Lehman to include certain disclosures in the MD&A section of its Forms 10-K and 10-Q.  Regulation S-K states as follows, in relevant part:

> Describe any known ***trends or uncertainties*** that have had or that the registrant ***reasonably expects*** will have a material favorable or unfavorable impact on net sales or income from continuing operations.  (17 C.F.R. §229.303(a)(3)(ii)).

> The discussion and analysis shall focus specifically on material events and ***uncertainties known to management*** that would cause reported financial information not to be necessarily indicative of future operating results or of future financial conditions.  (17 C.F.R. §229.303(a)).

207.    The Company's MD&A in Forms 10-K and 10-Q filed in 2007 and 2008 did not adequately disclose the trends or uncertainties (*e.g.*, the illiquid market for Lehman's real estate assets, increasing concentrations of certain assets, stringent collateral calls that decreased liquidity, and Lehman's strained ability to raise capital) leading to, or threatening to lead to, a material change in the Company's financial position.  Throughout the Relevant Period, Lehman failed to book liabilities in regard to obligations to repurchase securities from counterparties in Repo 105 transactions.  These obligations were reasonably certain events that would have had a material impact on Lehman's financial statements, and they were entirely omitted from Lehman's public filings, including the MD&A section.  This was in direct violation of Regulation S-K.

71

208.     Lehman, with the help of long-time auditor E&Y, violated numerous GAAP provisions relating to, among other things, calculations and disclosures of the net leverage ratio, application of SFAS 140 to Repo 105 transactions, real estate-related asset valuations under SFAS 157, GAAP required disclosures of concentrations of credit risk, and internal controls.

### 1.     Repo 105

209.     During the Relevant Period, several of Lehman's public filings and public statements were false and misleading due to: (1) the improper recording of Repo 105 transactions as sales, (2) affirmative representations that all repo transactions were treated as financings when Repo 105 transactions were treated as sales, (3) the non-disclosure of the aggregate size of Repo 105 transactions, (4) the non-disclosure that Repo 105 transactions occurred most often, and in the largest amounts, immediately prior to the end of the quarter, and (5) the immediate reversal of Repo 105 transactions following quarter end.  As a result of the Repo 105 transactions, Lehman's reports did not fairly present the Company's financial status in accordance with GAAP.

210.     From 2001-2006 Lehman engaged in volumes of Repo 105 transactions generally within a range between $20 and $25 billion.  (Rpt. p. 762).  As Lehman's financial condition worsened in 2006-2007, Repo 105 transactions increased to $50 billion.  E&Y's walk-through papers for the Lehman audit defined as material, "any item that alone or in the aggregate had a one tenth (0.1) of a point impact on firm-wide net leverage ratio (or $1.8 billion)."  (Rpt. p. 964 n.3726).  Thus, throughout the Relevant Period, Lehman engaged in Repo 105 transactions that – by E&Y's definition in its Lehman audit work papers – were

many times over the threshold for materiality.

211.    Lehman improperly booked the difference between the cash received and securities pledged as an asset.  If the transaction were a "true sale" of assets, then Lehman should have booked a loss.  For example, in a typical Repo 105 transaction, Lehman would receive $100 in cash and "sell" $105 in securities.  If this were a true sale, Lehman should recognize a $5 loss on the sale of securities.  However, as Lehman's internal Repo 105 Accounting Policy explained, the Company would book this $5 difference as a derivative asset.  According to the Repo 105 Policy, this derivative asset represented Lehman's future interest in the securities that were just "sold," because when it came time to repurchase the securities Lehman would receive $105 in securities for $100 in cash.  Since the derivative had a positive fair value of $5, it was booked as an asset under SFAS 133.

212.    However, in order to treat a transaction as a sale under SFAS 140 the transferring entity – Lehman – must not retain effective control over the asset.  Under SFAS 140, a transferor maintains effective control over an asset if, *inter alia*, "at all times during the contract term [the transferor] ha[s] obtained cash or other collateral sufficient to fund substantially all of the cost of purchasing replacement assets from others."  (SFAS 140 ¶ 49).

213.    Because the Company booked a $5 derivative asset under SFAS 133 – rather than a $5 loss – and received $100 in cash, Lehman booked a total $105 increase in assets that mirrored the amount pledged as collateral in a typical Repo 105 transaction.  (Rpt. pp. 781-82).  Accordingly, Lehman at all times during the term of a Repo 105 retained the ability to fund substantially all of the cost to replace collateral pledged in a Repo 105.  Therefore Lehman's approach to treat Repo 105 transactions as sales did not comply with SFAS 140

true sale requirements.

214.     Moreover, during the Relevant Period, Lehman misleadingly stated that its repurchase agreements were treated as financings but contemporaneously failed to disclose that these billions of dollars in transactions were treated as sales.  As such, these Repo 105 transactions created temporary, material understatements in Lehman's net leverage ratio that violated GAAP by failing to present Lehman's financial statements accurately and fairly.

### 2.     SFAS 157 Asset Valuations

215.     SFAS 157 directs a company to classify assets and liabilities into three different hierarchies based upon the reliability and availability of inputs.  (SFAS 157 § 22).  In general, this hierarchy gives the highest priority to Level One assets, where "inputs are quoted prices (unadjusted) in active markets for identical assets or liabilities that the reporting entity has the ability to access at the measurement date."  SFAS 157, ¶ 24.  The value of Level Two assets are ascertained using "inputs other than quoted prices included within Level One that are observable for the asset or liability, either directly or indirectly."  SFAS 157, ¶ 28.  Level Three is reserved for assets or liabilities that have no observable inputs upon which to formulate a price.  Lehman was required to take into account the relevant market, and what a willing market participant would pay for an asset, when valuing Level Three Assets.

216.     According to SFAS 157, "the reporting entity must not ignore information about market participant assumptions that [are] reasonably available."  This includes assumptions about risk, including "risk inherent in a particular valuation technique."

217.     Archstone and PTG were regarded as "Level Three" assets for the purpose of mark-to-market accounting under SFAS 157.  Lehman overstated the value of Level Three

assets in the Company's financial statements because, (1) Lehman did not take into account what these assets would sell and focused improperly on entry prices, (2) Lehman believed that the exit-prices in the then-existing market were not accurate indicators of value, (3) Lehman valued Level Three assets according to how the asset was proceeding with its business plan, (4) Lehman valued Level Three assets on "gut feelings," and (5) Lehman used overly-optimistic assumptions in exercising its judgment under SFAS 157.

### i        Insufficient Level Three Assets Write Downs

218.    As of November 13, 2007, Lehman's Level Three assets increased to $41.9 billion including $11.4 billion in MBS.  (2007 10-K, F-6).  Instead of recognizing necessary impairments and taking appropriate write downs, Lehman and E&Y allowed the Company's balance sheet to be materially misstated by overstating Lehman's then-existing financial position and results.

### ii.        Improper Internal Valuations

219.    During the first quarter of 2008, the S&P 500 earnings Index was down 25.9%, yet Lehman reported a modest write-down of only $200 million on a $6.5 billion portfolio of "other asset-backed securities," of which approximately 25% were rated BB+ and lower, or in other words, rated non-investment grade or speculative.  (LBHI First Quarter 2008 10-Q p. 55).  A $9.4 billion portfolio of corporate equities that was valued according to Lehman's internal methods posted a **gain** of $722 million in the first quarter of 2008.  *Id* at 25.

220.    Additionally, as a result of the indices decline, Level Two assets that had to be valued in relation to market prices should have been marked down accordingly.  Instead of doing so, however, Lehman improperly re-categorized large swaths of assets as Level Three

assets.  For example, during a March 18, 2008 conference call, CFO Erin Callan stated that Lehman suffered a $875 million loss in total Level Three assets.  However, 22 days later the 10-Q reported a $228 million gain in total Level Three assets; a discrepancy of $1.1 billion.

221.    These valuations overstated Lehman's ABS and corporate equities by failing to price the assets according to SFAS 157.  Lehman valued Level Three assets – including ABS – according to a Company-held belief that the market was not a reliable indicator of the value of the investments.  This methodology of valuing Level Three assets is contrary to guidance set forth in SFAS 157 (Level Three asset value should be based upon what a buyer in the current market would pay for the asset).  Lehman's failure to timely write down impaired assets was due in part to improper shifts in large amounts of Lehman's mortgage assets into the Level Three accounting category in order to avoid writing them down.  Specifically, Level Two assets were valued using, *inter alia*, market data such as the market prices of real estate-related assets as reflected in indices called "ABX" (a market of sub-prime RMBS) and "CMBX" (a market index of CMBS).

222.    Level Three assets were valued at management's discretion using internal models (some of which the Examiner noted were flawed) and other information instead of objective market data.  By improperly categorizing assets as Level Three and then using inappropriate models to inflate the reported values of those assets, Lehman reported inflated values for billions of dollars in assets.

### 3.    Credit Risk Concentrations

223.    GAAP requires disclosure of material risk concentrations.  SFAS No. 107, *Disclosures About Fair Value of Financial Instruments* ("SFAS 107"), as amended by SFAS

No. 133, *Accounting for Derivative Instruments and Hedging Activities* ("SFAS 133"), requires disclosure of significant concentrations of credit risk for financial instruments such as loans, including information about the "economic characteristic that identified the concentration."  SFAS 107, ¶ 15A.  Also, FASB Staff Position ("FSP") SOP 94-6-1, *Terms of Loan Products That May Give Rise to a Concentration of Credit Risk* ("FSP SOP 94-6-1"), addresses disclosure requirements for entities that originate, hold, guarantee, service, or invest in loan products whose terms may give rise to a concentration of credit risk.

224.    As discussed *supra*, Lehman's public filings **failed to disclose** adequately or meaningfully the Company's risk concentrations in risky Alt-A loans and CRE in violation of SFAS 107.

### 4.    Internal Controls

225.    Following the massive Enron and Worldcom frauds, the SEC placed emphasis on the adequacy of a company's internal controls.  Exchange Act Rules 13a-14 and 15d-14 require a company's principal executive officer and principal financial officer to quarterly and annually certify the effectiveness (or deficiencies in the effectiveness) of the company's internal controls. The company is also required to annually report on the effectiveness of its internal controls over financial reporting.  PCAOB Auditing Standard No. 2, *An Audit of Internal Control Over Financial Reporting Performed in Conjunction with An Audit of Financial Statements.*

226.    In Lehman's 2007 Form 10-K and first and second quarter 2008 Forms 10-Q Lehman falsely represented that its internal controls over financial reporting were effective.  Moreover, Defendants Fuld, Callan, and Lowitt filed signed certifications attesting that

internal controls were effective, allowing Lehman to issue financial statements that were materially misleading in multiple respects as alleged above.  Additionally, Lehman violated GAAP provisions beginning in 2001 by failing to disclose billions in Repo 105 transactions, overstating real estate assets, and failing to disclose certain concentrations of credit. Defendants Fuld, Callan, and Lowitt, and E&Y as Lehman's auditor, each had no reasonable basis to conclude that Lehman's internal controls were effective.

**N.    E&Y's Violations of GAAP and GAAS**

227.    E&Y served as Lehman's outside auditor since at least 2000, and was retained by Lehman to conduct annual audits and quarterly reviews of Lehman's financial statements. In its position as outside auditor, E&Y was responsible for issuing audit opinions, knowing they would be used, and relied on, by investors in evaluating the purchase, sale, or continued holding of Lehman securities.

228.    By virtue of its long history with Lehman, and former Chief Financial Officer David Goldfarb's history as a former partner with E&Y, E&Y was intimately involved with Lehman's business model, its employees, its services, and its increasing risk exposure by virtue of its real estate-related holdings.  In the course of its audit work, E&Y was required to audit Lehman's management's assessment of the effectiveness of Lehman's internal controls, particularly Lehman's real estate asset valuations and risk exposure as a result of the deterioration of the real estate market.

229.    E&Y, as part of its standard procedures, would have reviewed Lehman's quarterly press releases, which announced Lehman's performance, financial condition, asset valuations, and revenues.  E&Y reviewed drafts of Lehman's filings with the SEC prior to

filing, and also attended and made presentations at Board and Audit Committee meetings where E&Y discussed the results of its examinations of Lehman's financial statements.

230.    Each year during the Relevant Period, Lehman provided a clean "unqualified" audit opinion that was included in Lehman's Form 10-Ks.  These audit opinions represented that E&Y conducted the audits in accordance with GAAS and Lehman's financial statements fairly represented the Company's financial position and results of operations in accordance with GAAP.

231.    The central purpose of an audit is to obtain an opinion that the financial statements comply with GAAP.  AIPCA Auditing Standards ("AU") § 722.09.  The auditor has an affirmative duty to plan and perform the audit to obtain reasonable assurance that the financial statements are free of material misstatements, whether by error or fraud.  AU § 110.02.

232.    To obtain such reasonable assurance, the auditor must perform specific procedures required by GAAS and, after performing such procedures, determine if anything has come to its attention that would lead it to believe that the financial statements were not fairly presented in accordance with GAAP.  AU § 722.09.  The audit process requires professional skepticism in order to properly test management's representations so that the auditor has a reasonable basis on which to form an opinion regarding the financial statements. AU § 332.02.

233.    An auditor must consider both audit risk and materiality in: (1) planning the audit and designing audit procedures; and (2) evaluating the results of the audit in relation to the financial statements as a whole.  AU § 312.12.  The auditor must plan the audit to obtain

reasonable assurance of detecting material misstatements that it believes could be large enough, individually or in the aggregate, to be material to the financial statements.   AU § 312.20.

234.   In performing audit work, an auditor must perform such work in conformity with GAAS, as well as the standard of care established by the AICPA, which includes GAAS's ten Professional Standards of care:

### General Standards

1.   The audit must be performed by a person or persons having adequate technical training ad proficiency as an auditor.
2.   In all matters relating to the assignment, independence in mental attitude is to be maintained by the auditor or auditors.
3.   Due professional care is to be exercised in the planning and performance of the audit and the preparation of the report.

### Standards of Field Work

4.   The work is to be adequately planned and assistants, if any, are to be properly supervised.
5.   A sufficient understanding of internal controls is to be obtained to plan the audit and to determine the nature, timing, and extent of tests to be performed.
6.   Sufficient competent evidential matter is to be obtained through inspection, observation, inquires and confirmations to afford a reasonable basis for an opinion regarding the financial statements under audit.

### Standards of Reporting

7.   The report shall state whether the financial statements are presented in accordance with Generally Accepted Accounting Principles.
8.   The report shall identify those circumstances in which such principles have not been consistently observed in the current period in relation to the preceding period.
9.   Informative disclosures in the financial statements are to be regarded as reasonably adequate unless otherwise stated in the report.
10.   The report shall either contain an expression of opinion regarding the financial statements, taken as a whole, or an assertion to the effect than an auditor's name is associated with financial statements, the report should contain a clear-cut

indication of the character of the auditor's work, if any, and the degree of responsibility the auditor is taking.

235.     With respect to the E&Y's audit of Lehman, E&Y violated the following principles of GAAS:

i.      GAAS General Standard No. 3, which requires the auditor to exercise due professional care in the performance of the audit and preparation of the audit report;

ii.     GAAS Reporting Standard No. 1, which requires the audit report to sate whether the financial statements are presented in accordance with GAAP;

iii.    GAAS Field Standard No. 1, and the standards set forth in AU sections 310, 320, and others, by failing to adequately plan its audit and properly supervise the work of assistants so as to establish and carry out procedures reasonably designed to search for and detect the existence of errors and irregularities which would have a material effect upon the financial statements; and

iv.     AU section 316, which requires the auditor to plan and perform its examination of the financial statements with professional skepticism. In particular, in Lehman's case, there were numerous audit red flags and risk factors that alerted E&Y to the potential for misstatements, and E&Y failed to expand its audit procedures and perform effective audit testing to obtain more reliable, persuasive audit evidence of such significant factors and audit red flags.

**1.       E&Y's Improper Repo 105 Auditing**

236.     In 2001, Lehman adopted the Repo 105 Policy setting forth its intentions to employ Repo 105 transactions.  Before issuing the Policy, senior Lehman personnel including Kristine Smith ("Smith") discussed the proposed Policy with E&Y Partners Kevin Reilly ("Reilly"), William Schlich ("Schlich"), and Matthew Kurzweil ("Kurzweil").  Thereafter, E&Y approved Lehman's Repo 105 Policy.

237.     E&Y understood that the Repo 105 transactions were, as E&Y's Reilly described it, designed to "manage balance sheet metrics."  As reflected in an August 19, 2001

memo from Lehman's Smith to E&Y's Reilly, Schlich, and Kurzweil, titled "Rules of Road – Repo Recharacterizations (Repo 105)," the Repo 105 transactions gave Lehman the ability to re-characterize ordinary repo transactions as sales, and allowed for an increased ability to reduce the real estate securities on Lehman's balance sheet.

238.    In October 2002, Lehman's Smith again discussed Repo 105 with E&Y's Reilly, Schlich, and Kurzweil at a time when Lehman was considering expanding the transactions to include a related "Repo 107" structure.  At that time, Lehman provided E&Y with a memo reaffirming that Repo 107 transactions were being done for the purpose of "reducing the balance sheet as firm inventory."  Subsequently, Lehman expanded into "Repo 108" transactions, which used equities rather than fixed income securities with a minimum of eight percent over-collateralization.

### i.        Repo 105 Red Flags

239.    On October 3, 2002, Lehman's Smith sent an email to E&Y noting that the Linklaters "true sale" opinion (the "Linklaters Letter" or the "Letter") placed important limits on the use of Repo 105 transactions.  Specifically, her email pointed out that the repurchase transactions must be executed in London and the counterparty must reside in a jurisdiction covered by English law.  The Linklaters Letter specified that Repo 105 transactions **must** involve securities based in the United Kingdom.

240.    E&Y had access to, or was aware of, financial and other information concerning the American-based securities that Lehman was then, and had previously been using.  Nevertheless, E&Y ignored the use of American-based securities, despite internal E&Y guidelines explicitly requiring auditors to consider whether a separate U.S. legal

opinion would be required for foreign transactions governed by SFAS 140.  E&Y's guidelines stated: "**engagement teams should consider** the need to receive a legal opinion in each country in which assets may be originated when auditing global transfers of financial assets."

241.    In 2006, one of E&Y's auditors, Bharat Jain ("Jain"), reviewed Lehman's Repo 105 Policy and became concerned about Lehman's heavy use of Repo 105 transactions. In a September 7, 2006 email to his senior manager, Jennifer Jackson ("Jackson"), Jain stated that he would "like to know what is our thought process behind how much of these Lehman should do from [a] reputational risk, etc. perspective.  Are we comparing to other competitors, are we referring to any industry publications, any regulatory guidance, etc.?"

242.    When Jackson received Jain's e-mail, she viewed it as "raising serious risk . . . didn't happen every day . . . I can't think of [another] example off the top of my head where Lehman entered into transactions, and we had a concern around reputational risk."  Thus, it is clear that E&Y auditors were concerned in 2006 that the Repo 105 transactions, if known to the public, could affect Lehman's reputation.   Soon after, Lehman's Repo 105 use dramatically increased.

243.    A Lehman "Balance Sheet Analysis Package" dated February 2008, which was given to E&Y, included a detailed analysis of Repo 105 volume, including a chart showing clear spikes in Repo 105 deals at the end of the third quarter of 2007, year-end 2007, and first quarter of 2008.  This suspicious timing of Repo 105 transactions provided further red flags (or should have) to E&Y that Lehman improperly used Repo 105 in managing its balance sheet.

244.    According to the New York Attorney General, Lehman's Smith and Martin

Kelly (Global Financial Controller) testified that they **specifically informed** E&Y's Schlich of the use of American-based securities in Repo 105 transactions in late 2007 or early 2008. According to the New York Attorney General's Complaint, Kelly testified that upon learning about the matter in late 2007 or early 2008 (before the release of the 2007 10K), Kelly raised with E&Y (specifically, lead auditors Schlich) several concerns he had about Repo 105, including: (a) Lehman's reliance on the Linklaters "true sale" opinion, coupled with Lehman's inability to obtain a U.S. legal opinion; (b) Repo 105 transactions utilized American securities in contravention of the Linklaters Letter; (c) the significant increase in Repo 105 transactions at the end of each quarter; (d) the fact that the accounting justification for treating the transactions as sales was "form-driven" and "legalistic"; and (e) the fact that none of Lehman's peer financial institutions appeared to be using such transactions. Even after this discussion, E&Y failed to properly advise Lehman concerning the practice and E&Y continued to accept Lehman's accounting treatment.

### ii.    Repo 105 Whistleblower

245.    In May 2008, E&Y received a copy of a letter sent to Lehman senior financial executives from Matthew Lee ("Lee"), a Senior Vice President in Lehman's finance division who was responsible for Lehman's Global Balance Sheet and Legal Entity Accounting. E&Y was directed by Lehman's Audit Committee to meet with Lee and to report back the results of its investigation of Lee's allegations. (Rpt. pp. 21, 956). The letter brought Lehman's fraudulent Repo 105 practice to the direct attention of E&Y and Lehman's Audit Committee.

246.    On June 12, 2008, E&Y's Schlich and another E&Y partner, Hillary Hansen ("Hansen"), interviewed Lee. According to contemporaneous notes of Hansen and Lee's own

testimony, one of the things Lee told Schlich and Hansen was that – as **E&Y already knew** – Lehman was removing up to $50 billion in securities from its balance sheet at each quarter-end by selling them to European counter parties, albeit for a short time and with the undisclosed obligation to by such assets back. (Rpt. p. 959). Following the meeting, Hansen raised concerns about the Repo 105 transactions with Schlich, who dismissed the concerns.

247.   Schlich and Hansen then met with Lehman's Global Product Controller, Gerard Reilly, to view Lee's allegations. They discussed Lee's other concerns but **failed to even mention Repo 105**. Similarly, at a meeting with Lehman's Audit Committee on June 13, 2008, **Schlich failed to mention Lee's concerns regarding Lehman's use of Repo 105**, even though E&Y had been specifically instructed to inform the Audit Committee of all concerns raised by Lee. (Rpt. pp. 21, 959).

### iii.   E&Y Failed to Follow GAAS Standards

248.   With respect to Repo 105, E&Y violated several provisions of GAAS. E&Y's knowledge and approval of the Repo 105 program, knowledge that the Repo 105 program began using American-based securities, the absence of a business purpose for such transactions, the increased volume of Repo 105 transactions at quarter-end, and the interview with Whistleblower Lee, among other things, raised various obligations under GAAS that E&Y failed to meet. Specifically, E&Y violated the following GAAS standards, among others:

   a.   E&Y was required to discuss with Lehman's Audit Committee the quality of Lehman's accounting principles as applied to financial reporting. AU § 380.11. This would include discussing, among other things, Lehman's Repo 105 transactions moving $20 billion to $50 billion temporarily off the balance sheet at quarter-end, and using American-based securities in conjunction with an overseas "true sale" opinion that could not be obtained

in the United States. AU § 380.11 states that auditors must discuss accounting policies, unusual transactions, and the clarity and completeness of the financial statements with the Audit Committee. Contrary to that standard, E&Y failed to properly communicate Lehman's use of Repo 105 transactions to Lehman's Audit Committee. Incredibly, E&Y failed to notify the Audit Committee of Matthew Lee's concerns about Repo 105 even though the Audit Committee asked E&Y to discuss all of Lee's concerns related to the financial statements.

b.   Upon learning that: (i) Lehman intended to use Repo 105 transactions to manage balance sheet metrics; (ii) Lehman's Martin Kelly raised concerns about Repo 105 transactions to E&Y; and (iv) Lehman's Matthew Lee discussed his concerns about Repo 105 with E&Y, E&Y was then required by GAAS to conduct a bona fide investigation of Repo 105 and inform management and the Audit Committee of the relevant issues. *E.g.*, AU § 316.79. E&Y failed to properly investigate or alert the appropriate level of management.

c.   AU §§ 336 and 9336 address an auditor's use of a legal opinion as evidential matter supporting, for instance, a management assertion that a financial asset transfer meets the "control" criterion in SFAS 140. AU § 9336 states that a legal letter that includes conclusions using certain qualifying language would not provide persuasive evidence that a transfer of financial assets has met the isolation criterion of SFAS 140. Not only was the Linklaters letter replete with qualifying statements, but E&Y knew it was unlikely that other reputable United States law firms would issue a similar letter and that Lehman had to conduct the Repo 105 transactions through a United Kingdom-based affiliate, LBIE. E&Y failed to consider whether it could rely on the Linklaters opinion letter at all, much less in connection with securities that E&Y knew or should have known were originated in the United States.

### iv. Bankruptcy Examiner's Conclusions

249.   The Bankruptcy Examiner made several notable conclusions regarding E&Y's

involvement in Repo 105. For example:

The Examiner concludes that sufficient evidence exists to support **colorable claims against Ernst & Young LLP ("Ernst & Young") for professional malpractice arising from Ernst & Young's failure to follow professional standards of care** with respect to communications with Lehman's Audit Committee, investigation of a whistle blower claim, and audits and reviews of Lehman's public filings.

(Rpt. p. 1027; *accord* pp. 17, 21, 23-24, 750, 764, 990, 1036, 1040, 1047, 1049) .

86

250.    The Examiner provided more specifics, noting that E&Y's wrongdoing dated back to at least 2007:

> The Examiner finds that sufficient evidence to support **at least three colorable claims** that could be asserted against Ernst & Young relating to Lehman's Repo 105 activities and reporting: (1) negligence in connection with the investigation into whistle blower Matthew Lee's claims concerning $50 billion in Repo 105 activities at the end of the **second quarter 2008**, including failing to conduct an adequate inquiry into the allegations prior to the filing of Lehman's Form 10-Q, and failing to properly inform management and the Audit Committee of Lee's allegations; (2) at least with respect to Lehman's **first quarter and second quarter 2008 Forms 10-Q**, if not with respect to earlier filings, negligence by failing to take proper action when Ernst & Young was made aware that the financial information may be materially misleading because of the failure to disclose the effect of the timing and volume of Lehman's Repo 105 activities (which had a material effect on interim financial statement items), and failing to take proper action with respect to materially misleading statements contained in the MD&A sections of the Forms 10-Q for these quarters; and (3) at least with respect to Lehman's **2007 Form 10-K, if not with respect to earlier Forms 10-K**, negligence by failing to take proper action when Ernst & Young was made aware that the financial statement may be materially misleading because of the failure to disclose the effect of the timing and volume of Lehman's Repo 105 activities (which had a material effect on financial statement items), and failing to take proper action with respect to materially misleading statements contained in the MD&A sections of the Form 10-K.

(Rpt. pp. 1032-33, *accord* pp. 1027, 1040, 1044-47) .

251.    The Examiner consulted with an industry expert, Gary L. Holstrum, Ph.D, CPA, to assist in the analysis of professional auditing standards.  Dr. Holstrum concurred with the Examiner's conclusion that a valid claim for professional malpractice could be raised against E&Y.  (Rpt. p. 1027 n.3901).

**O.    E&Y's Scienter**

252.    The Examiner found sufficient evidence that E&Y: (1) knew about Lehman's use of Repo 105 transactions; (2) approved Lehman's Repo 105 Policy beginning in 2001; (3) knew that the Policy's purpose was to manage Lehman's balance sheet at the end of each

quarter; and   (4) was aware of, and approved for the removal of approximately $20-$25 billion in assets from Lehman's balance sheet during 2001-2007 and $30-$50 billion during 2007-2008.

253.    Additionally, E&Y's internal audit-plan determined that any transaction(s) that misstate the leverage ratio by 0.1 (approximately $1.8 billion), was considered material. Thus, E&Y was aware or had no reasonable basis to believe that Lehman's financial statements were presented fairly and accurately in accordance with GAAP, and that the Lehman audits were conducted in accordance with GAAS.

254.    Other allegations of E&Y's scienter include:

- E&Y Partner Reilly, before approving the Repo 105 Policy in 2001, knew that it was designed to manage balance sheet metrics.

- E&Y Partners Reilly, Schlich, and Kurzweil knew as of August 19, 2001 that the Repo 105 Policy allowed for re-categorization of repurchase agreements as sales to reduce inventory on the balance sheet.

- E&Y Partners Reilly and Schlich received an email on January 16, 2002 that stated Lehman's intent to utilize $20-$25 billion in Repo 105 transactions to reduce balance sheet inventory.

- An email sent to E&Y on October 3, 2002 informed E&Y auditors that the Linklaters Letter required Lehman's Repo 105 counterparties to be based in the U.K., and that the transactions must use U.K. securities.

- Lehman's Martin Kelly, in late 2007 or early 2008, informed Schlich of the increased volume of the Repo 105 transactions, because of his concerns with the rapid expansion of the Repo 105 program, and the use of securities transferred from the United States. Kelly and Schlick specifically discussed the fact that Lehman was unable to obtain a true sale opinion under U.S. law for Repo 105 transactions.

- E&Y had extensive access to financial information, including "Balance

Sheet Analysis Packages" and "Repo 105 Netting Grids," which detailed the volume of Repo 105 transactions and the increase in Repo 105 transactions at the end of each quarter.

- On September 7, 2006, E&Y auditor <u>Jain</u> emailed E&Y senior manager <u>Jennifer Jackson</u>, who both expressed concern that Lehman's use of Repo 105 transactions could lead to reputational risk in the market if others knew about the transactions.

- In May of 2008, Lehman whistleblower <u>Matthew Lee</u> approached E&Y Partners <u>Schlich</u> and <u>Hansen</u>, informing them of Lehman's practice to remove up to $50 billion in assets from the balance sheet each quarter.

255.    On May 16, 2008, Matthew Lee, a Senior Vice President in Lehman's Finance Division responsible for its Global Balance Sheet and Legal Entity Accounting, sent a letter to Lehman management – including Kelly and Defendants Callan and O'Meara – identifying possible violations of Lehman's Ethics Code related to accounting/balance sheet issues. Subsequently, Lee prepared another writing addressing additional accounting control issues – including the use of "Repo 105" transactions – which was sent to a Managing Director in Lehman's corporate compliance department.   Shortly after sending his first letter, he was interviewed by Joseph Polizzotto, Lehman's General Counsel, and Elizabeth Rudofker, Head of Corporate Audit.   On May 22, 2008, the day after that interview, Lee was terminated without warning.

256.    Approximately two weeks after Lee's termination, **after** he had communicated additional warnings about Repo 105, Lee was interviewed by Schlich and Hillary Hansen of E&Y.   According to Hansen's notes of the interview, Lee again warned E&Y about Lehman's Repo 105 practice including, notably, the enormous volume of Repo 105 activity that Lehman engaged in at quarter-end.   These E&Y notes recounted Lee's allegation that Lehman moved

$50 billion of inventory off its balance sheet about a week later.  When interviewed by the Examiner, Hansen specifically recalled conferring with Schlich about Lee's Repo 105 allegations.  However, despite E&Y's contemporaneous notes demonstrating the discussion of Repo 105, Schlich told the Examiner that he did not recall Lee saying anything about Repo 105 transactions during the interview with Lee.

257.   Indeed, E&Y took affirmative steps to cover-up the Repo 105 fraud.  On June 13, 2008, the day after Lee specifically informed E&Y of the $50 billion in Repo 105 transactions that Lehman undertook at the end of the second quarter 2008, E&Y spoke to Lehman's Audit Committee regarding Lee's allegations.  Despite the fact that the Chair of the Audit Committee had clearly stated that he wanted a full and thorough investigation of *every* allegation made by Lee, E&Y failed to mention anything about Repo 105.  Similarly, on July 8, 2008, when the Audit Committee met with E&Y to review Lehman's 2Q08 financial statements, E&Y again failed to mention Lee's allegations regarding Repo 105, and stated that E&Y would issue an unqualified review report.  Then, on July 22, 2008, at an Audit Committee meeting where Lehman's Head of Corporate Audit made a presentation on the results of the investigation in to Lee's allegations, E&Y again failed to mention Repo 105.  At that meeting, the Audit Committee was told that "[c]orporate audit has largely completed an evaluation of [Lee's] observations in partnership with Financial Control and Ernst & Young."  In subsequent meetings and private executive sessions thereafter, E&Y also did not disclose that Lee made an allegation related to Repo 105 transactions being used to move assets off Lehman's balance sheet at quarter-end.  According to the Chair of the Audit Committee, he would have expected to be told about Lee's Repo 105 allegations.  Another Audit Committee

member similarly said that the volume of Lehman's Repo 105 transactions mandated disclosure to the Audit Committee as well as further investigation.

258.    Additionally, despite the directive to investigate every claim raised by Lee, E&Y did not follow up on Lee's allegations or conduct any further inquiry into the Repo 105 transactions.  In fact, after E&Y's June 12, 2008 interview of Lee in which he described Lehman's moving $50 billion of inventory off its balance sheet at the end of the second quarter 2008, E&Y did not speak with him again.  Instead, less than four weeks after Schlich and Hansen interviewed Lee, E&Y signed a Report of Independent Registered Public Accounting Firm for Lehman's 2Q08 10-Q on July 10, 2008, certifying that it was not aware of any material modifications that should be made to Lehman's financial statements for them to be in conformity with GAAP, and similarly failed to amend or correct its most recent audit opinion on the 2007 final financial statements or its report on the 1Q08 financial statements.

259.    The Examiner concluded "that sufficient evidence exists to support a colorable claim that":

> Ernst & Young should have made appropriate inquiries of management and performed analytical procedures concerning significant transactions that occurred at the ends of the quarters in 2008 and analyzed their impact upon the financial statements, including the footnotes.  Particularly after Lee alerted Ernst & Young to $50 billion in Repo 105 transactions prior to the filing of the second quarter Form 10-Q, Ernst & Young should have reported to senior management and the Audit Committee that Lehman was using Repo 105 transactions to temporarily and artificially reduce balance sheet and its net leverage ratio for reporting purposes, without disclosing the practice to the public.
>
> . . . Ernst & Young knew or should have known that the notes to the financial statements were false and misleading because, among other things, those notes describe all repos as "financings," which Ernst & Young knew was not the case, and those notes did not disclose the Repo 105 transactions.  Ernst & Young has a professional obligation to communicate the issue to both senior management and the Audit Committee and to recommend corrections of the Form 10-Q, and also to

either issue modified review reports noting the materially inadequate disclosures, or to withhold its review reports altogether.

## V.  MATERIAL MISSTATEMENTS AND OMISSIONS

### A.  E&Y's Misstatements

260.    Throughout the Relevant Period, each of Lehman's Annual Reports included E&Y's "Report of Independent Registered Public Accounting Firm," (the "Audit Report"). Each year during the Relevant Period the Audit Reports certified that Lehman's financial results were (1) prepared in accordance with GAAP, (2) fairly presented the financial condition and operations of Lehman in all material respects, and (3) audited in accordance with GAAS.

261.    These reports were false and misleading because E&Y failed to comply with the applicable standards for audit review engagements.  E&Y knew of the existence of Repo 105 transactions dating back to 2001 and the material effect that these undisclosed transactions had on Lehman's balance sheet and net leverage numbers.  As a result of this knowledge, beginning in 2001, E&Y had no reasonable basis to believe that no material modifications should be made to Lehman's financial statements.

262.    Throughout the Relevant Period, E&Y also issued interim reports (the "Interim Reports") that were included in each of Lehman's Forms 10-Q that stated, "[w]e conducted our review in accordance with the standards of the Public Company Accounting Oversight Board," and "[b]ased on our review, we are not aware of any material modifications that should be made to the consolidated financial statements . . . for them to be in conformity with U.S. generally accepted accounting principles."

263.    These reviews were false and misleading because E&Y failed to comply with

the applicable standards for review engagements.  E&Y knew of the existence of Repo 105 transactions dating back to 2001, and the material effect that these undisclosed transactions had on Lehman's balance sheet and net leverage numbers.  As a result of this knowledge, beginning in 2001, E&Y had no reasonable basis to believe that no material modifications should be made to Lehman's financial statements.

264.   In addition to Repo 105 GAAP violations, E&Y also failed to correct any of Lehman's numerous GAAP violations regarding real estate asset valuations, and concentration of credit disclosures.  As a result, E&Y had no reasonable basis to believe that Lehman's financial statements were presented fairly and accurately in accordance with GAAP.

265.   Among other provisions of GAAP, E&Y violated AU section 722.18, which states:  "If, in performing a review of interim financial information, the accountant becomes aware of information that leads him or her to question whether the interim financial institution to be reported conforms with generally accepted accounting principles, the accountant should make additional inquiries or employ other procedures he or she considers appropriate to provide the limited assurance for a review engagement."  E&Y should have made additional inquiries in light of the various red flags made known to it at the time of its quarterly reviews. For example, E&Y was aware of Lehman's increasing Repo 105 usage and E&Y learned of Matthew Lee's concerns about Lehman's increasing use of Repo 105 when E&Y interviewed him on June 12, 2008, yet E&Y disregarded those concerns and signed their second quarter quarterly review report on July 10, 2008.

266.   Throughout the Relevant Period, E&Y consented to the incorporation of the

Audit Reports and Interim Reports by reference into Lehman's registration statements, including the 2001 Registration Statement, the 2004 Registration, and 2006 Registration Statement, and any amendments, pricing supplements, and/or product supplements incorporated therein. These statements in E&Y's Audit Report and Interim Reports, as incorporated into the Registration Statements, SEC Filings and Offering Documents, were false and misleading because, contrary to E&Y's representations, Lehman's financial results for the Relevant Period were not prepared in accordance with GAAP, did not fairly present the financial condition and operations of Lehman in all material respects, and they were not audited in accordance with GAAS.

> **B.**     **Repo 105 Misstatements**

267.     Since 2001, Lehman used Repo 105 transactions to temporarily decrease the amount of the Company's publicly reported net leverage. Lehman failed to disclose the tens of billions of dollars in Repo 105 transactions, including, the accounting treatment for these transactions, the considerable escalation of its total Repo 105 usage in late 2007 and into 2008, the transitory nature of the transactions, or the material impact that these transactions had on the Company's publicly reported net leverage ratio. These material omissions were made consistently and throughout the entirety of the Relevant Period, and rendered each of Lehman's SEC Filings, Registration Statements, and Offering Documents materially false and misleading.

268.     The following public disclosure statements by Lehman, made with E&Y's knowledge and approval, contained false and misleading misrepresentations:

> a.     <u>Forms 10-K</u>: Lehman's Annual Report on Form 10-K for the years 2001 through 2007 failed to reveal the existence of Repo 105 transactions, that certain

repurchase transactions were treated as sales, and/or the temporary and material effect that Repo 105 transactions had on Lehman's net leverage. Additionally, in the Company's 2007 Form 10-K, it states that Lehman "believe[s] that a more meaningful, comparative ratio for companies in the securities industry is net leverage, which is the result of net assets divided by tangible equity capital." This statement is misleading because it affirmatively states that the net leverage ratio is a "more meaningful" ratio, while failing to disclose the material effect of Repo 105 transactions on the ratio.

b. <u>Forms 10-Q</u>:  Each Form 10-Q Lehman filed from 2001 through the final filing, in the second quarter of 2008, failed to disclose the existence of Repo 105 transactions, that certain repurchase transactions were treated as sales, and/or the temporary and material effect that these transactions had on Lehman's net leverage.

c. <u>Sarbanes-Oxley Certifications</u>:  As part of the Sarbanes-Oxley Act of 2002, Lehman's CEO (Fuld) and CFO (Callan, Lowitt, O'Meara) were required to attest that for each 10-K and 10-Q issued during the Relevant Period, the financial statements were presented fairly and in accordance with GAAP, and further that each report, "does not contain any untrue statements of a material fact or omit to state a material fact" and that "the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flow of the registrant."  These certifications were false because the financial statements were not fairly presented in accordance with GAAP due to non-disclosure of Repo 105 transactions.

d. <u>Press Releases and Form 8-K</u>:  Lehman pre-announced the Company's financial results in various press releases that each failed to disclose the existence of Repo 105 transactions, that certain repurchase transactions were treated as sales, and/or the temporary and material effect that these transactions had on Lehman's net leverage.

e. <u>Registration Statements</u>:   The statements in the Registration Statements, prospectuses, supplemental prospectuses, and periodic filings incorporated therein, regarding leverage, repurchase agreements, and the net leverage ratio, were each, and all, rendered false and misleading due to the consistent and systematic omission in the Company's SEC Filings of Repo 105 transactions, that certain repurchase transactions were treated as sales, and the nature and resulting effect of Repo 105 transactions, throughout the Relevant Period.

**1  Additional Material Misstatements And Omissions Relating to Repo 105**

269.    In addition to the material misstatements and omissions made in Lehman's SEC Filings, Registration Statements and Offering Documents, the Officer Defendants made a series of materially false and misleading statements during Lehman's quarterly earnings conference calls and investor conferences as detailed below.

**Second Quarter 2007**

270.    On June 12, 2007, Lehman held a conference call to discuss its financial results for the second quarter of 2007.   During the conference call, **Defendant O'Meara** represented that Lehman's "net leverage ratio of 15.5 times is right in line with the 15.4 times we had at the end of the first quarter."   O'Meara's statement was false and misleading because Lehman's net leverage ratio had been artificially reduced to 15.5 by Lehman's temporary removal of $31.94 billion of assets through Repo 105 transactions at quarter-end. Without Repo 105 transactions Lehman's net leverage ratio for the quarter was 16.9.

**Third Quarter 2007**

271.    On September 18, 2007, Lehman hosted a conference call with analysts and investors to discuss the Company's third quarter financial results.   During the conference call, **Defendant O'Meara** stated that Lehman's net leverage ratio was 16.0.   O'Meara failed to disclose that this ratio was artificially reduced due to $36.40 billion in Repo 105 transactions. Without Repo 105 transactions Lehman's net leverage ratio was 17.8.

**Fourth Quarter and Fiscal Year 2007**

272.    On December 13, 2007, Lehman hosted a conference call to discuss the Company's fourth quarter and 2007 fiscal year financial results.   During the conference call, **Defendant O'Meara** stated that "[w]e ended the quarter with a net leverage ratio of

96

approximately 16.1 times, in line with last quarter."  This statement was false and misleading because O'Meara failed to disclose that this ratio was artificially reduced due to $38.63 billion in Repo 105 transactions.  Without Repo 105 transactions Lehman's net leverage ratio was 17.8.

### First Quarter 2008

273.    On <u>March 18, 2008</u>, shortly after Bear Stearns collapsed, Lehman hosted a conference call to discuss its first quarter 2008 financial results.  During the conference call, **Defendant Callan** stated:  "We did, very deliberately, take leverage down for the quarter. We ended with a net leverage ratio of 15.4 times down from 16.1 at year end."   This statement was materially false and misleading because Callan failed to disclose that Lehman's net leverage ratio for the quarter was actually 17.3, and had only been artificially reduced to 15.4 because Lehman engaged in $49.1 billion of Repo 105 transactions at quarter-end.

### Second Quarter 2008

274.    On <u>June 9, 2008</u>, Lehman held a conference call to discuss preliminary results for the second quarter ended May 31, 2008.  **Defendant Callan** affirmatively represented that a large part of the asset reduction in Lehman's net leverage came from selling "less liquid asset categories," including "residential and commercial mortgages and leveraged finance exposures" and that "[o]ur deleveraging was aggressive, as you can see, and is complete." These statements were materially false and misleading when made because Callan failed to disclose that during the quarter Lehman had removed $50 billion in assets from its balance sheet by using Repo 105 transactions.  Moreover, the de-leveraging was far from complete because the Repo 105 transactions shifted highly liquid assets off Lehman's balance sheet,

leaving Lehman with an even greater concentration of illiquid assets.  If Lehman had, in fact, sold or otherwise divested itself of the most illiquid assets, it would have signaled that these assets were overstated and forced the Company to record losses for the decline in value of similar assets.

275.  On June 9, 2008, Lehman held a conference call to discuss its preliminary results for second quarter ended May 31, 2008.  When asked by Merrilll Lynch analyst Guy Moszkowski if Lehman dispensed of its "absolute easiest asset to sell," **Defendant Callan** stated that the opposite was true and, in fact, that Lehman sold many of its riskier, less-liquid assets during the quarter.  This statement was false and misleading because Callan failed to disclose Lehman's use of Repo 105 transactions to temporarily remove highly liquid – not illiquid/sticky – assets from the firm's balance sheet.

276.  On June 16, 2008, Lehman held a conference call to discuss its second quarter results.  During the conference call, **Defendant Lowitt** stated that "we reduced net leverage from 15.4 times to 12 times prior to the impact of last week's capital raise . . . Our de-leveraging included a reduction of assets . . . including residential and commercial mortgages . . ."  This statement was false and misleading because the net leverage ratio would have been 13.9 without $50.9 billion in Repo 105 transactions.

277.  On June 16, 2008, Lehman held a conference call to discuss its second quarter 2008 results. **Defendant Fuld** stated that "we reduced our gross assets by $147 billion over the quarter, which exceeded that target that we set," and that "the number of assets that were sold, especially in the commercial and residential mortgage area [] were the result of our de-leveraging."  These statements were materially false and misleading because Lehman's net

leverage was actually 13.9, and had only been artificially reduced to 12.1 because Lehman engaged in $50.4 billion of Repo 105 transactions at quarter end.  Moreover, these statements gave investors the false and misleading impression that Lehman's deleveraging was the result of selling certain assets, including its toxic residential and commercial mortgage positions, while failing to disclose:  (l) Lehman's reliance on Repo 105 transactions, which generally involved assets that were marketable and liquid; and (2) that Lehman was required to repurchase $50 billion in assets "sold" under Repo 105, and place them back on its balance sheet just days after the quarter-ended.

### Third Quarter 2008

278.   On September 10, 2008, Lehman issued a press release and held a conference call to discuss its preliminary third quarter 2008 financial results.  Lehman estimated a net loss of $3.9 billion, in large part due to gross mark-to-market adjustments of $7.8 billion ($5.6 billion net).  The press release stated that Lehman had a net leverage ratio of 10.6.  During the conference call, **Defendant Fuld** stated, "[w]e ended the quarter with more tangible equity than we started and at a net leverage ratio of 10.6 versus 12.1 at the end of the second quarter," and **Defendant Lowitt** stated that "we ended the third quarter with a capital position and leverage ratio stronger than the second quarter . . .  we reduced net leverage to 10.6 times from 12.1 times . . . "  These statements were materially false and misleading because they failed to disclose that Lehman engaged in tens of billions of dollars in Repo 105 transactions at quarter-end to temporarily reduce net leverage.

### C.    Misstatements and Omissions Related to Overstated Values of Real Estate Assets

### 1. Real Estate Valuation Misstatements and Omissions in Lehman's SEC Filings

279.  <u>2007-2008 10-Ks and 10-Qs</u>:  In the first quarter of 2007 Lehman elected to "early adopt" SFAS 157.  Lehman represented in its SEC Filings during 2007-2008 that the Company valued the Level Three assets in accordance with GAAP and SFAS 157.  In these 2007-2008 filings, the Company made materially false and misleading statements by overstating the value of real estate assets classified as Level Three assets (including PTG and Archstone), and by inappropriately classifying assets as Level Three that should have been classified and valued as Level Two assets.  These statements were materially false and misleading when made because Lehman did not value assets according to SFAS 157, but valued assets according to internal Company business plans, using unreasonably flawed assumptions, outdated and inaccurate pricing models, and gut feelings.  Lehman materially overstated the value of certain Level Three assets despite knowledge and awareness of substantially similar assets being priced in the market at much lower values.

### 2. Additional Real Estate Valuation Misstatements and Omissions

280.  On a <u>March 14, 2007</u> conference call Lehman announced its financial results for the first quarter of 2007.  **Defendant O'Meara** stated that "[subprime delinquencies are] subject to the same hedging principles that we talked about earlier, and it's been working quite effectively."  This statement was false and misleading because O'Meara failed to disclose that Lehman's Alt-A holdings, which included many mortgagors who are closer to subprime, did not have an effective hedge to offset downward trends in value.

281.  On a <u>September 17, 2007</u> conference call with analysts to discuss Lehman's quarterly results, **Defendant O'Meara** said about the mortgage market that "[b]arring any

unforseen circumstances, we feel that the worst of this credit correction is behind us.  We have taken significant negative marks across all asset classes this period, and we have taken actions to resize our mortgage origination platform in-line with what we believe will be a smaller securitization market for the foreseeable future."  This statement was false and misleading because Lehman had not taken sufficient marks on certain assets, most notably Level Three assets, including PTG assets and the Archstone bridge equity investments.

282.    On November 14, 2007, **Defendant Lowitt** gave a presentation at the Merrill Lynch Banking and Financial Services Investor Conference.  **Lowitt** stated that "[w]e've had success in our hedging and so we don't believe that there will be any requirement for substantial markdowns and certainly no requirement for us to announce anything.  We're very comfortable with where we are with regard to that."  This statement is false and misleading because Lowitt failed to disclose that there was no effective hedge against Alt-A portfolios, and it also failed to disclose that Lehman's methodology for marking down certain assets did not comply with SFAS 157, because Lehman did not value assets according to the exit price or what a buyer would pay for them in the market.  At the time Lowitt made the statement, there was in fact a high likelihood for mark downs on the Company's real estate portfolio, in particular those classified as Level Three assets**.**

283.    On a February 6, 2008 conference call, **Defendant Callan** discussed Lehman's mark-to-market adjustments for the quarter, stating, "we look at the mark to market adjustments as more temporary in nature, as they reflect mark to market accounting related to the pricing of similar transactions in a liquidity constrained environment that we're living in and driven by many technical factors, which may not reflect intrinsic value."  This statement

was false and misleading because Lehman did not appropriately, or accurately mark-to-market its illiquid assets, including PTG, CRE (including Archstone) and additional Level Three assets.  According to the Examiner, Lehman's process for valuing its PTG portfolio was systematically flawed because "Lehman primarily valued these assets based on whether the development was proceeding according to the project's business plan and not the price a buyer would pay for the asset."  Additionally, valuations for real estate portfolios including Archstone used incorrect and outdated pricing models and assumptions.

284.   On a <u>March 18, 2008</u> conference call, **Defendant Callan** discussed the distinction between impairment and mark-to-market adjustments, stating "I just wanted to highlight that [Lehman's mark-down of assets] is under the mark-to-market accounting framework and not necessarily reflective of permanent impairment of the assets."  Defendant Callan also remarked on the pricing transparency of some of Lehman's mortgage-related securities:  "[W]e began to see a lot more transparency in the Alt-A sector late in the quarter, allowing us to mark positions based on observable prices, much less use of models."  These statements were false and misleading because Lehman overstated the values of Level Three assets, including Alt-A mortgages, RMBS backed b**y** Alt-A or subprime mortgages, and Commercial Real Estate assets  (e.g. PTG and Archstone).  Lehman had no reasonable basis to believe that the mark-down of assets at the time the statement was made were sufficient. Lehman was required yet failed to acknowledge market and risk inputs when deriving a value under SFAS 157.  Additionally, Lehman did not gain pricing transparency for its most illiquid Level Three assets.  These toxic assets remained on Lehman's balance sheet.  Contrary to Callan's representations, Lehman overstated the value of Alt-A holdings and Level Three

Assets, as evidenced by statements from Lehman employees, Wall Street Executives, the Federal Reserve Bank of New York, and as ultimately seen by the prices that these assets sold for after Lehman's bankruptcy.

285.    On a June 9, 2008 conference call, **Defendant Callan** discussed mark-to-market adjustments taken by Lehman for the quarter.  Callan stated, "It has been suggested we have not sufficiently aggressive in marking our inventory.  In fact, I believe our successful hedging performance over the past year has muted the magnitude of our gross markdowns." This statement is false and misleading because Lehman was overstating the value of inventory, in particular PTG, Archstone, and other Level Three Assets including Alt-A portfolios.  Indeed, only three months later Defendant Lowitt stated, the "majority of our write-downs were driven by [an] increase in Alt-A delinquencies and loss expectations which were specific to Alt-A prices and did not affect the performance of our hedges." Additionally, Callan was misleading when stating that hedging was muting the magnitude of Lehman's gross write downs, as Defendant Lowitt admitted only three months later that, "there is no correct hedge for Alt-A assets as there is in sub-prime with ABX."

286.    On a June 9, 2008 conference call, **Defendant Callan** expressed confidence that enough write-downs were taken because, "the aggregate number is very large that we have taken since Q3 [] last year.  So that gives me confidence in the actual accumulated loss across those portfolios, resi[dential] and commercial."   This statement was false and misleading, because Lehman still was required to take further asset write-downs under SFAS 157.  Lehman's PTG, Archstone and other Level Three assets were still carried at overly-optimistic levels, which was only revealed when Wall Street firms looked into purchasing

103

portions of Lehman, and when Lehman finally went bankrupt. Additionally, Callan stated "I think unquestionably our price visibility we got from these [sale] transactions was tremendous," and the "confidence level about the remaining inventory can only be higher that it was given all that sales activity." This statement was false and misleading because Lehman's "remaining inventory" still included massive volumes of toxic real estate and this inventory was a primary reason – if not, the reason – that no other firm would purchase Lehman's real estate portfolios.

287.     On a <u>June 16, 2008</u> conference call, **Defendant Fuld** stated, "I am the one who ultimately signs off and am comfortable with our valuations at the end of the second quarter," and that Lehman "had the benefit of much greater price visibility, due to the number of assets that were sold, especially in the commercial and residential mortgage area." This statement was false and misleading because it failed to disclose that Lehman continued to carry vast amounts of illiquid commercial and residential real estate assets on the balance sheet, that it was problematic for Lehman to sell these assets because they were so-called "sticky assets."

288.     On a <u>June 16, 2008</u> conference call, **Defendant Lowitt** stated that Lehman sold approximately $11 billion of residential mortgage assets, including Alt-A and sub-prime mortgages, which gave Lehman "good transparency in [] pricing." This statement was false and misleading because at the time this statement was made Lehman continued to overstate the value of the Company's Alt-A and subprime assets especially those classified as Level Three Assets. These are the same assets that prevented other Wall Street firms to considered purchasing all or part of Lehman in the days before the Company filed for bankruptcy from doing so.

**D.      Material Misstatements and Omissions Related to Liquidity**

      **1.      Liquidity Misstatements and Omissions in SEC Filings, Registration Statements, Offering Documents and Press Releases**

289.   First, Second, Third and Fourth Quarter 2007 10-Q; 2007 10-K; First and Second Quarter 2008 10-Q:  In each of these SEC Filings Lehman claimed that the Company had a "very strong liquidity position," "maintain[ed] a liquidity pool . . . that cover[ed] expected cash outflows for twelve months in a stressed liquidity environment," and had a liquidity pool was "unencumbered, liquid and composed of investment grade securities." Lehman stated the liquidity pool consisted of assets that are "easy to monetize," meaning they could be monetized within 5 days.  These statements were false and misleading because, Lehman faced significant liquidity concerns due to illiquid assets accumulated as part of its counter cyclical growth strategy.  The SEC Filings failed to disclose that Lehman included encumbered assets, and/or assets that were not easily monetizable, in the Company's liquidity pool, failed to disclose an additional $50 billion in obligations to repurchase billions in Repo 105 assets following each quarter-end, and that the assets used as collateral in Repo 105 were some of Lehman's most liquid.

      **2.      Additional Liquidity Misstatements and Omissions**

290.   In a September 18, 2007 conference call **Defendant O'Meara** represented that Lehman had a "strong liquidity framework," that it had "strong [] liquidity management," that Lehman's liquidity position "is now stronger than ever," that Lehman had a "conservative liquidity framework," and that "[w]e consider our liquidity framework to be a competitive advantage."  These statements were false and misleading.  When O'Meara made these statements an internal Lehman analysis by ALCO – the Asset/Liability Management

Committee, which O'Meara was a member – projected that Lehman would have a large cash capital deficit at month-end ($1.3 billion), and even larger cash capital deficits for the end of October 2007 ($6.4 billion) and November 2007 ($4.4 billion).

291.    On December 13, 2007, Lehman hosted a conference call to discuss the Company's fourth quarter and fiscal year 2007 financial results. **Defendant O'Meara** stated that the fourth quarter results "reinforce[ed] the importance of our disciplined liquidity and capital management framework which sets us up to operate our business through periods of market stress"; that Lehman's liquidity position "continues to be very strong"; that the Company had "structured [its] liquidity framework to cover our funding commitment and cash outflows for a 12 month period without raising new cash in the unsecured markets or selling assets outside our liquidity pool"; and that "[w]e consider our liquidity framework to be a competitive advantage in today's markets." **Defendant Callan** stated, "we currently have ample liquidity and capital in place." These statements were false and misleading. At the time the statements were made, Lehman faced significant liquidity concerns due to illiquid assets accumulated as part of its counter cyclical growth strategy. Additionally, Lehman's true liquidity position was overstated through the use of Repo 105 transactions.

292.    On March 18, 2008, shortly after Bear Steams collapsed, Lehman hosted a conference call to discuss its first quarter 2008 financial results. When asked if Lehman would follow Bear Stearns into a fire-sale, **Defendant Callan** stated "categorically, no." During the call, Callan "tried to relay the strengths and robustness of the liquidity position of the Firm." Callan repeatedly referred to "the strength of our liquidity and capital base," Lehman's "disciplined liquidity and capital management," which Lehman considered a "core

competency," and Lehman's "robust liquidity."   Callan also specifically represented that Lehman's liquidity pool was structured "to cover expected cash outflows for the next 12 months . . . without having to raise new cash in the unsecured markets, or without having to sell assets that are outside our liquidity pool"; that "[w]e have no reliance on secured funding that's supported by whole loans or other esoteric collateral"; that the Company "approximately $100 billion of liquidity, plus additional $99 billion at the regulated subsidiaries" which was "unencumbered"; and that Lehman had prefunded its liquidity needs to seize on "opportunities in the markets."   According to Callan, Lehman "took care of [its] full year needs" for capital when it raised $1.9 billion through its offering of preferred stock in February."   Finally, Callan stated that, "we do believe we have the leadership, the experience, the risk management discipline, the capital strength, and certainly the liquidity to ride out the cycle."   These statements are false and misleading because Lehman regularly breached a variety of risk management limits, which created a surplus of illiquid assets that could not be monetized easily.   Lehman was subjected to collateral calls and increased haircuts on lending transactions due to the decreasing quality of assets, and these collateral calls and haircuts diminished Lehman's available liquidity in 2008 ultimately leading the Company to bankruptcy.

293.    On June 9, 2008, Lehman held a conference call to discuss its preliminary results for the second quarter of 2008.  **Defendant Callan** represented that Lehman grew its cash capital surplus to $15 billion and grew its liquidity pool to almost $45 billion – its "largest ever" – and that the "$45 billion of [its] liquidity pool was well in excess of [its] short-term unsecured financing liabilities."   These statements were false and misleading

because Callan failed to disclose that Lehman included encumbered assets, or assets that were not easily monetizable, in the Company's liquidity pool, failed to disclose an additional $50 billion in short-term obligations to repurchase $50 billion in Repo 105 assets, and that the assets removed from the balance sheet in Repo 105 transactions were the most liquid.

294.    On June 9, 2008, Lehman held a conference call to discuss its preliminary results for the second quarter of 2008. **Defendant Callan** stated that Lehman, "completed [its] entire budgeted funding plan for all of 2008 and do[es] not need to revisit the debt markets."   In discussing the $6 billion of equity raised by the Company on June 9, Callan stated:   "To be clear, we do not expect to use the proceeds of this equity raise to further decrease leverage but rather to take advantage of future market opportunities . . . we stand extremely well capitalized to take advantage of these new opportunities."   Contrary to Callan's suggestion, however, the capital raise was actually necessary for the Company to maintain enough liquidity to carry on day-to-day operations.   When these statements were made, Lehman was aware that it would need to begin posting billions of dollars more in collateral with JPMorgan.   Moreover, Treasury Secretary Paulson later told *The New York Times* that, "Lehman announced bad earnings around the middle of June [2008], and we told Fuld that if he didn't have a solution by the time he announced his third-quarter earnings, there would be a serious problem.   We pressed him to get a buyer."

295.    On June 9, 2008, Lehman held a conference call to discuss preliminary results for the second quarter of 2008. **Defendant Callan** stated that "we are not having any conversation with counterparties or lenders about whether they feel confident extending funds and credit to us."   This statement was false and misleading because, while counterparties and

lenders may have continued to extend credit, Callan failed to disclose that lenders were demanding billions in additional collateral because of the Company's financial instability. Callan failed to disclose the material impact that the collateral calls had on the Company as a going concern, as it was ultimately a liquidity crisis – caused by multiple collateral calls – that drove Lehman to bankruptcy.

296.    On June 16, 2008, Lehman held another conference call to discuss its second quarter of 2008 results. During the call, **Defendant Fuld** and **Defendant Lowitt** represented that Lehman's liquidity positions had "never been stronger" due to the Company's $45 billion liquidity pool. **Defendant Lowitt** further stated that "we strengthened liquidity through the quarter," and "we have significantly increased . . . our liquidity pool to $45 billion from $34 billion." These statements were materially false and misleading because (1) Lehman's Repo 105 transactions, which required the Company to repurchase tens of billions in assets, masked the Company's true liquidity position; and (2) Lehman balance sheet contained an enormous concentration of illiquid assets that adversely affected its liquidity.

297.    On September 10, 2008, Lehman issued a press release and held a conference call to discuss its preliminary third quarter 2008 financial results. **Defendant Lowitt** stated that Lehman's liquidity position "remained very strong," and that Lehman "w[ould] have ample cash capital to sustain its business opportunities." This statement was false and misleading because Lehman had already pledged billions of liquid assets – including nearly a quarter of Lehman's liquidity pool – to counterparties, and that out of the liquidity pool 37% had a "low" ability to monetize quickly. The press release also stated that Lehman had an estimated liquidity pool of $42 billion, and **Defendant Lowitt** remarked that through the

night of September 10, the liquidity pool remained "essentially unchanged at $41 billion."

298.    These statements were false and misleading because billions of assets in Lehman's liquidity pool were encumbered or could not be monetized easily.   The SEC informed Lehman that assets in a liquidity pool are those able to be exchanged for cash or cash equivalents within 24 hours, while Lehman classified liquid assets as those that may be exchanged for cash or cash equivalents within 5 days.   The Examiner found that during June 19, 2008 to September 15, 2008 between $4.8 and $6.7 billion of Lehman's liquidity pool could not easily be monetized because it was pledged to JP Morgan as collateral.   On September 10, 2008, $27.3 billion of Lehman's $37.6 billion liquidity pool had a "low" ability to monetize, and on the morning of September 12, 2008, $30.1 billion of $32.5 billion in total liquidity had a low ability to monetize. Incredibly, only $2.4 billion of a $32.5 billion liquidity pool was in fact able to be monetized within five days.

299.    The liquidity pool figure was reiterated by **Defendant Lowitt** and **Defendant Fuld**, who each represented that Lehman maintained a very strong liquidity position and that "[w]e have maintained our strong liquidity and capital profiles even in this difficult environment."   These statements regarding Lehman's liquidity were false because, by September 2008 at least 24% of Lehman's reported liquidity pool consisted of encumbered assets.  Lehman fraudulently included assets pledged as collateral in the Company's liquidity pool, including: (1) approximately $4 billion of CLOs pledged to JPMorgan; (2) $2.7 billion in cash and money market funds pledged to JPMorgan; (3) $2 billion Citibank cash deposit; (4) $500 million Bank of America cash deposit; and (5) nearly $1 billion collateral deposit with HSBC.

300.   **Defendant Lowitt** also failed to disclose that, on the morning of <u>September</u> <u>10, 2008</u>, Lehman granted JPMorgan a security interest in practically all Lehman accounts at JPMorgan in addition to Lehman's exposures related to triparty clearance.  Thus, when **Fuld** and **Lowitt** announced that Lehman had a liquidity pool of approximately $40.6 billion, Lehman only had a "high" ability to monetize approximately $25 billion, a "mid" ability to monetize approximately $1 billion of the pool and only a "low" ability to monetize approximately $15 billion, or 37%, of the total pool.  By September 12, 2008, only 7% of Lehman's total pool was convertible to cash.

### E.   Material Misstatements and Omissions Related to Risk Management

#### 1.   Misstatements and Omissions in Lehman's SEC Filings, Registration Statements, Offering Documents and Press Releases

301.   <u>2003 10-K</u>:  "The Company seeks to reduce risk . . . [t]he Company accomplishes this objective by . . . establishing trading limits and setting credit limits . . ." This statement was false and misleading when made, because Lehman consistently disregarded risk limits, and allowed the Company to become heavily concentrated and exposed to real estate assets with high levels of risk.

302.   <u>2004 10-K</u>:  "Essential in our approach to risk management is a strong internal control environment with multiple overlapping and reinforcing elements.  We have developed policies and procedures to identify, measure, and monitor the risks involved in our global trading, brokerage and investment banking activities."   This statement was false and misleading when made because Lehman consistently disregarded key risk controls, and the Company's internal control system did not have overlapping safeguards, or these safeguards were consistently and systematically disregarded.

303.   <u>2005 10-K; 2006 10-K</u>:  "Our overall risk limits and risk management policies are established by the Executive Committee.  On a weekly basis, our Risk Committee, which consists of the Executive Committee, the Chief Risk Officer and the Chief Financial Officer, reviews all risk exposures, position concentrations and risk-taking activities."  These statements were false and misleading at the time they were made because Lehman regularly disregarded and exceeded risk limits and risk management policies, including the risk appetite, balance sheet limits, single transaction limits, concentration limits, stress tests and risk mitigants.

304.   <u>2007 10-K; First Quarter 2008 10-Q</u>:  Lehman stated that "[w]e monitor and enforce adherence to our risk policies."  This statement was false and misleading when made, because Lehman consistently disregarded key risk controls, including the risk appetite, balance sheet limits, single transaction limits, concentration limits, stress tests and risk mitigants.

305.   <u>Second, Third and Fourth Quarter 2007 10-Qs; 2007 10-K; First Quarter 2008 10-Q</u>:  Lehman stated that, "[m]anagement's Finance Committee oversees compliance with policies and limits."  This statement was false and misleading when made, because Lehman consistently disregarded key risk controls, including the risk appetite, balance sheet limits, single transaction limits, concentration limits, stress tests and risk mitigants.

306.   <u>Second and Third Quarter 2007 10-Q</u>:  Lehman stated that "[w]e . . . ensure that appropriate risk mitigants are in place, and that "[d]ecisions on approving transactions . . . take into account . . . importantly, the impact any particular transactions under consideration would have on our overall risk appetite."  This statement was false and misleading when

made, because Lehman consistently disregarded key risk controls, including the risk appetite, balance sheet limits, single transaction limits, concentration limits, stress tests and risk mitigants.

### 2. Additional Misrepresentations and Omissions Related to Risk Management

307.   In a September 18, 2007 conference call, **Defendant O'Meara** repeatedly stressed the Company's "strong risk [] management," emphasizing particularly its "strong risk management culture with regard to the setting of risk limits."   O'Meara's statements were false and misleading because Lehman disregarded risk limits and policies on a regular basis. For example, Lehman (a) exceeded its risk appetite limit by $41 million in July 2007 and $62 million in August 2007; (b) committed to over 30 deals that exceeded its $250 million loss threshold and $3.6 billion notional limit for single transactions; (c) exceeded the balance sheet limit by almost $20 billion for its Fixed Income Division; and (d) breached its VaR limits regularly since mid-2007.

308.   On November 14, 2007, Lehman management presented at the Merrill Lynch Banking & Financial Services Investor Conference (the "Merrill Conference").   During the Merrill Conference, **Defendant Lowitt** represented that Lehman continued to show very substantial growth despite challenging market conditions by, among other things, having an "extremely deep risk culture which is embedded through the firm," being "very conservative around risk," and "running a business where we could distribute all the risk."   In particular, **Lowitt** repeatedly stressed that Lehman had "stay[ed] true to the principle . . . of our strategy of being in the moving rather than the storage business.   So essentially originating to distribute, not holding stuff on our balance sheet, not storing risk but moving it on." Contrary

to these statements, Lehman's strategy was not in the "moving business," but the "storage business," which greatly increased Lehman's risk profile as the Company accumulated vast amounts of highly-leveraged, concentrated and illiquid assets.

309.    On <u>December 13, 2007</u>, Lehman hosted a conference call to discuss the Company's fourth quarter and fiscal year 2007 financial results.  During the conference call, **Defendant O'Meara** stated that the fourth quarter results "reflect[] the strength of our risk management culture in terms of managing our overall risk appetite, seeking appropriate risk reward dynamics and exercising diligence around risk mitigation."  These statements were false and misleading because Lehman disregarded risk limits and policies on a regular basis in 2007.  Lehman exceeded its risk appetite limits by $508 million in November 2007, even after having increased the limit; Lehman disregarded the Company's single transaction limit, including committing $10 billion more than the limit allowed with respect to 24 of its largest high-yield deals; the balance sheet limit for Lehman's divisions were exceeded by tens of billions, for example, GREG exceeded its balance sheet limit by approximately $3.8 billion in the fourth quarter 2007, and FID exceeded it by $11.17 billion at the end of the same quarter; and VaR limits were breached almost everyday for some of Lehman's divisions, including GREG and High Yield since mid-2007.

310.    On <u>March 18, 2008</u>, shortly after Bear Steams collapsed, Lehman hosted a conference call to discuss its first quarter 2008 financial results.  During the conference call, **Defendant Callan** stressed Lehman's "continued diligence around risk management, which includes the active involvement of senior management," and how the Company's "risk management discipline allowed [it] to avoid any single outsize loss" during the quarter.

Callan also touted the ability of Lehman's risk management, stating "we continue to do a very, very good job managing the risk on residential mortgages, an area that I think we're credited with a lot of expertise, a great franchise."   These statements were false and misleading because Lehman disregarded its risk limits and policies on a regular basis.   For example, by the time of Callan's statement, Lehman had (a) not only increased its risk appetite four times from $2.3 billion in December 2006 to $4 billion in December 2007, but disregarded this "hard" limit by at least $500 million during every month from September 2007 through February 2008; (b) with respect to 24 of Lehman's largest high-yield deals, Company management committed approximately $10 billion more than the single transaction limit allowed, and did not impose a limit on its risky leveraged-loan bridge equity commitments; (c) significantly exceeded its balance sheet limit, including by $18 billion for FID and $5.2 billion for GREG; and (d) repeatedly breached its VaR limits since mid-2007. For example, Lehman's major business divisions, including GREG, High Yield, and FID, were breaching VaR limits virtually everyday in 2007.

311.   On <u>March 8, 2008</u> Lehman announced the financial results for the first quarter on Form 8-K**.   Defendant Fuld** was quoted as stating, "in what remains a challenging operating environment, our results reflect the value of our continued commitment to building a diversified platform and our focus on managing risk and maintaining a strong capital and liquidity position.   This strategy has allowed us to support our clients through these difficult and volatile markets, while continuing to build and strengthen our global franchise for our shareholders."   This statement was false and misleading because Lehman did not focus on managing risk, but instead regularly disregarded risk limits.   This statement was also false

because at the time this statement was made Lehman was not building a diversified platform, and instead the Company had amassed large concentrations of risky, illiquid assets.

F.   **Material Misstatements and Omissions Related to Concentrations of Credit Risk**

1.   **Misstatements and Omissions in SEC Filings, Registration Statements, Offering Documents and Press Releases**

312.   Required disclosures, under SFAS 107 as amended by SFAS 133, regarding concentrations of credit risk were omitted from Lehman's SEC Filings until the filing of Lehman's second quarter 2008 Form 10-Q on July 10, 2008 – **after Plaintiffs purchased all of their Lehman securities.** Lehman belatedly began to provide certain partial disclosures concerning its commercial mortgage and real estate-related portfolios yet Lehman continued to omit material facts.  Specifically, Lehman's public filings **failed to disclose** adequately or meaningfully the Company's risk concentrations in risky Alt-A loans and CRE assets.

2.   **Additional Misstatements and Omissions Related to Concentrations of Credit Risk**

313.   On March 14, 2007 Lehman announced its financial results for the first quarter of 2007. **Defendant O'Meara** stated that Lehman saw "the subprime challenges as being a reasonably contained situation" and downplayed Lehman's subprime exposure, stating that it accounted for less than 3% of its firm-wide revenues over the past six quarters. This statement was false and misleading because O'Meara failed to disclose the true extent of Lehman's subprime concentration, and more importantly, the systemic risk to Lehman's entire operation caused by the vast exposure of subprime assets on the Company's balance sheet.

314.   During a June 12, 2007 conference call, **Defendant O'Meara** reassured

116

investors that "the subprime market challenges are . . . reasonably contained to this asset class" and that the "lion's share" of Lehman's originations were not in subprime, but rather in Alt-A, stating, "we actually had terrific performance on the origination side around the Alt-A business."   Defendant O'Meara's statement was false and misleading because market challenges were not contained to subprime, but had extended to other asset classes, including Alt-A.  The Examiner found that Lehman's Alt-A lending reached borrowers of lesser credit quality than those who historically had been considered Alt-A borrowers, and that the Alt-A risk profile increased in much the same way as the risk in subprime mortgages.

315.   During an investor conference on <u>February 6, 2008</u>, **Defendant Callan** stated that, in regard to Lehman's participation in the residential mortgage market the Company had, "a basic focus and philosophy that we really didn't want to go long the product or short the product. We wanted to originate to distribute and we hedged that origination capability." This statement was false and misleading because Lehman had large, undisclosed concentrations of credit risk in Alt-A mortgages and RMBS backed by Alt-A mortgages. Additionally, the statement that Lehman "distribute[s]" is false and misleading because Lehman had moved to the "storage" business, and the Company's balance sheet was loaded with illiquid residential real estate and RMBS.

### G.   <u>False and Misleading Registration Statement</u>

316.   The 2005 Registration Statement, including the Offering Documents, SEC Filings and other incorporated materials therein, each contained material misstatements and omitted important information regarding (1) Lehman's Repo 105 practice, and the resulting effect that these transactions had on the reported amount of net leverage, (2) Lehman's risk

management policies, the regular departure from adhering to risk limits and an internal "risk appetite," (3) Lehman's concentrated exposure to CRE assets, subprime, and Alt-A markets, the Company's risky lending practices, detrimental changes in the real estate market that affected the Offerings, and serious impairments in Lehman's portfolio of subprime mortgage securities, (4) Lehman's Level Three (including PTG and Archstone) asset portfolios overstating the value of illiquid real estate and real-estate related assets, and (5) Lehman overstating the amount of assets in the liquidity pool that could be easily monetized and available to withstand a crisis of 12 months.

317.    On May 16, 2005, Lehman filed with the SEC a Form S-3/A Registration Statement, Registration Number 333-121067 (the "2005 Registration Statement"). Defendants Fuld, O'Meara Akers, Berlind, Evans, and Kaufman each signed the 2005 Registration Statement.  Ernst & Young provided signed and written consent to be named as an expert in the 2005 Registration Statement, and agreed to incorporate by reference the audited financial statements of Lehman. As such, the 2005 Registration Statement incorporated Lehman's public filings with the SEC.

318.    The 2005 Registration Statement also incorporated by reference subsequently filed Prospectuses and supplements:

> That, for the purposes of determining any liability under the Act, each such post-effective amendment shall be deemed to be a new Registration Statement relating to the securities offered therein, and the offering of such securities at that time shall be deemed to be the initial bona fide offering thereof.

319.    The 2005 Registration Statement also included assurances that Lehman would:

> [R]eflect in the prospectus any facts or events arising after the effective date of the

Registration Statement (or the most recent post-effective amendment thereof) which, individually or in the aggregate, represent a fundamental change in the information set forth in the Registration Statement.

320.     The 2005 Registration Statement incorporated Lehman's FY 2004 Form 10-K, filed on February 14, 2005.  The MD&A section in Lehman's 2004 Form 10-K provided the following in regard to the Company's mortgage-related activities:

**Capital Markets Net Revenues**

\*          \*          \*

Net revenues totaled $7.7 billion, $6.0 billion and $3.6 billion in 2004, 2003 and 2002, respectively. Net revenues rose 28% in 2004 compared with 2003 on higher customer flow levels and reflect strong contributions from both Fixed Income and Equities. Fixed Income revenues improved in 2004 compared with 2003 as a favorable interest rate environment helped drive strength in mortgage originations and securitizations as well as interest rate products, and the declining dollar drove higher foreign exchange activity. Equities delivered improved revenues in 2004 compared with 2003 on higher customer flow levels, particularly in equity derivatives products and our prime broker business, as equity market valuations improved compared with 2003. Capital Markets net revenues in 2004 represent the fifth consecutive year of record performance in Fixed Income and the second highest revenue level in Equities. Net revenues rose 66% in 2003 compared with 2002, reflecting strong growth in both Fixed Income and Equities.

Fixed Income net revenues were a record $5.7 billion, increasing 31% in 2004 compared with 2003. Market conditions were generally favorable in 2004 as evidenced by continued low interest rates, tightening credit spreads and volatile currency markets. Our diverse set of fixed income asset classes experienced improved results across a broad range of asset classes reflecting the increased scale and regional diversity of our business. The mortgage securitization business was notably strong, with revenues in mortgage products benefiting from the low rate environment as well as the continued vertical integration of our mortgage origination platforms. Interest rate products benefited from robust customer flow activity as investors sought derivative hedging solutions amid an environment of increased interest rate volatility in the first half of 2004. Foreign exchange revenues also rose as the U.S. dollar weakened in the latter half of 2004. Partially offsetting these increases were reduced contributions from credit products in 2004 compared with 2003. High grade credit products saw reduced customer flow activity as investors sought additional yield amid the further tightening of credit spreads. High yield credit products benefited from the continued tightening of credit spreads in 2004, although at a reduced level compared with 2003 record results. Fixed Income net revenues increased 68% in 2003 compared

with 2002 as historically low interest rates, significant credit spread tightening, and volatile currency markets all contributed to a highly favorable environment for fixed income products and strong customer flow activities. Results improved across a broad range of asset classes in 2003 compared with 2002 including high yield, mortgage, interest rate, and municipal products. High yield products had record results, driven by strong customer trading activities and improved proprietary position revenues. Mortgage-related products were bolstered by robust refinancings driven by the historically low interest rate environment, slightly offset by a softening of certain sectors within the commercial real estate market.

Equities net revenues grew 20% in 2004 compared with 2003 on higher customer flow levels, particularly in equity derivative products and our prime broker activities, as equity market valuations improved compared with 2003. Derivative revenues were particularly strong, as customers increasingly used customized derivative products to hedge risk and reduce concentrations. Prime broker activity continued to benefit from growth in customer financing balances and an expanding client base, as total balances increased 72% compared with November 30, 2003. The 2004 results also reflect higher private equity gains compared with 2003. These improvements were partially offset by lower revenues from our convertibles business due to a sharp drop in market volatility globally resulting in lower valuations on convertible debt coupled with a lower level of origination activity, which also affected secondary activity. Equities net revenues rose 63% in 2003 compared with 2002 as improvements in the global economy and stronger corporate earnings fueled a steady improvement in global equity indices that began in March 2003 and continued through year end. The rise in global equity indices contributed to improved performance in a number of asset classes including derivatives, convertibles, and private equity investments. While U.S. equity trading volumes declined slightly, European and Asian markets experienced a rise in trading volumes contributing to improved performance in these regions. Derivatives benefited from improved customer flow activity, as customers increasingly used customized derivative products to hedge risk and reduce concentrations. Convertibles revenues were bolstered by improved credit markets and strong customer activity on the heels of increased new issuance activity.

* * *

## Liquidity, Funding and Capital Resources

Management's Finance Committee is responsible for developing, implementing and enforcing our liquidity, funding and capital policies. These policies include recommendations for capital and balance sheet size as well as the allocation of capital and balance sheet to the business units. Through the establishment and enforcement of capital and funding limits, management's Finance Committee oversees compliance with policies and limits with the goal of ensuring we are not exposed to undue funding or liquidity risk.

## Liquidity Risk Management

We view liquidity and liquidity management as critically important in our industry. Our funding strategy seeks to ensure we maintain sufficient liquid financial resources to continually fund our balance sheet and meet all of our funding obligations across all market environments.

Our liquidity strategy is based on the following principles:

•       Liquidity providers are credit and market sensitive and quick to react to any perceived market or firm-specific risks. Consequently, we remain in a state of constant liquidity readiness.

•       During a liquidity event, certain secured lenders will require higher quality collateral, resulting in a lower availability of secured funding for "hard-to-fund" asset classes. Consequently, we rely on secured funding only to the extent we believe it would be available in all market environments.

•       A firm's legal entity structure may constrain liquidity. Some regulators or rating agency considerations may prevent the free flow of funds between the subsidiaries they supervise ("Restricted Subsidiaries") and Holdings and its other subsidiaries ("Unrestricted Subsidiaries"). Consequently, we seek to ensure the Restricted Subsidiaries on the one hand, and Holdings and its Unrestricted Subsidiaries collectively on the other, have sufficient "stand-alone" liquidity and that there is no "cross subsidization" of liquidity from these Restricted Subsidiaries to Holdings and its Unrestricted Subsidiaries.

•       For planning purposes, we do not assume that, in a liquidity crisis, assets can be sold to generate cash, unsecured debt can be issued or any cash and unencumbered liquid collateral outside of the liquidity pool can be used to support the liquidity of Holdings and its Unrestricted Subsidiaries.

C       When managing liquidity, we pay particularly close attention to the size of our liquidity pool, our long-term funding sources and requirements and our reliable secured funding capacity. Each of these measures is explained in more detail below.

*       *       *

## Risk Management

As a leading global investment bank, risk is an inherent part of our business. Global markets, by their nature, are prone to uncertainty and subject participants to a variety of risks. The principal risks we face are credit, market, liquidity, legal, reputation and operational risks. Risk management is considered to be of paramount importance in our day-to-day operations. Consequently, we devote significant resources (including investments in personnel and technology) to the measurement,

analysis and management of risk.

While risk cannot be eliminated it can be mitigated to the greatest extent possible through a strong internal control environment. Essential in our approach to risk management is a strong internal control environment with multiple overlapping and reinforcing elements. We have developed policies and procedures to identify, measure, and monitor the risks involved in our global trading, brokerage and investment banking activities. Our approach applies analytical rigor overlaid with sound practical judgment working proactively with the business areas before transactions occur to ensure appropriate risk mitigants are in place.

We also seek to reduce risk through the diversification of our businesses, counterparties and activities in geographic regions. We accomplish this objective by allocating the usage of capital to each of our businesses, establishing trading limits and setting credit limits for individual counterparties. Our focus is balancing risk versus return. We seek to achieve adequate returns from each of our businesses commensurate with the risks they assume. Nonetheless, the effectiveness of our approach to managing risks can never be completely assured. For example, unexpected large or rapid movements or disruptions in one or more markets or other unforeseen developments could have an adverse effect on our results of operations and financial condition. The consequences of these developments can include losses due to adverse changes in inventory values, decreases in the liquidity of trading positions, increases in our credit exposure to customers and counterparties and increases in general systemic risk.

Our overall risk limits and risk management policies are established by the Executive Committee. On a weekly basis, our Risk Committee, which consists of the Executive Committee, the Chief Risk Officer and the Chief Financial Officer, reviews all risk exposures, position concentrations and risk taking activities. The Global Risk Management Division (the "Division") is independent of the trading areas and reports directly to the Firm's Chief Administrative Officer. The Division includes credit risk management, market risk management, quantitative risk management and operational risk management. Combining these disciplines facilitates a fully integrated approach to risk management. The Division maintains staff in each of our regional trading centers as well as in key sales offices. Risk management personnel have multiple levels of daily contact with trading staff and senior management at all levels within the Company. These discussions include reviews of trading positions and risk exposures.

321.   The material misstatements and omissions reproduced above are in addition to the misstatements and omissions contained in the SEC Filings described in detail in this Amended Complaint.

## VI.   <u>LOSS CAUSATION</u>

322.   From the date of the Plaintiffs' first purchase of Lehman Securities on October 19, 2007 to the date of Lehman's bankruptcy on September 15, 2008, the market price of Lehman's Securities was artificially inflated as a result of the material misrepresentations and omissions alleged herein.

323.   The artificial inflation was removed through the materialization of previously concealed risks and a series of partial disclosures of the truth.   Examples of the materialization of risks and key partial disclosures include, but are not necessarily limited to, those noted in the following paragraphs.

324.   On June 9, 2008, before the markets opened, Lehman issued a press release announcing its financial results for the second quarter of 2008.   Lehman also held a conference call for investors and analysts.   Despite having previously announced purported success with its de-levering plan, its strong liquidity position, that it had risk management policies in place, and that its assets were fairly valued, Lehman's announcement revealed that the Company expected a net loss of $2.8 billion (its first ever loss) and took write-downs of $2.4 billion in its residential mortgage-related holdings and $1.0 billion in its commercial-related holdings.   This same day, rating agencies Fitch and Moody's downgraded Lehman's credit rating.

325.   According to Andrew Gowers, Lehman's former head of Corporate Communications between June 2006 through September 2008, Defendant Callan internally discussed ideas as to how to spin the $2.8 billion loss in the second quarter of 2008 in a positive manner.   The Officer Defendants decided to combine the announcement of the loss

123

with the announcement of raising additional capital in order to mislead investors by minimizing any major fallout from the negative results.  According to Gowers, as quoted in the December 21, 2008 article in *The Sunday Times*:  "The worry, even then, was that it could be of a magnitude to cause a run on the bank.  There was, of course, no way to spin it.  The numbers would be atrocious."

326.    On July 10, 2008, Lehman filed its second quarter 2008 Form 10-Q.  In addition to the information disclosed in its June 9, 2009 press release and conference call, the Form 10-Q indicated that Lehman's most illiquid assets (Level Three assets) were marked down only slightly in the second quarter to $41.3 billion from $42 billion at year end 2007.

327.    On July 25, 2008, CNBC reported that Lehman was considering selling at least part of its Investment Management Division.  The move was an attempt to raise much needed capital and improve liquidity.  This development partially revealed the truth concerning Lehman's increasingly urgent capital and liquidity needs.   It also evidenced the materialization of previously concealed risks regarding capital and liquidity – *e.g*., the risk that Lehman would need a major infusion of cash to sustain its operations, and that it might need to sell part of the Company to generate the necessary cash.

328.    On September 9, 2008, there were market reports that Lehman's attempts to obtain a capital infusion from Korea Development Bank failed, leading to concerns that Lehman could not locate a source of new capital.  Also on September 9, 2008, Steven Black, co-CEO of JPMorgan's Investment Bank told Fuld that in order to protect itself and its clients JPMorgan needed $5 billion in collateral.  This $5 billion in collateral was over and above the $5 billion JPMorgan had demanded just five days earlier (September 4, 2008) which had yet

to be paid.  Defendant Fuld managed to persuade Black to settle for $3 billion, leaving the prior $5 billion request unresolved.  These collateral calls were concealed until after Lehman filed for bankruptcy.

329.    On September 10, 2008, Fitch and Dunn & Bradstreet downgraded Lehman's credit rating.  Also that day, Jane Byers Russo, head of JPMorgan's Broker Unit, contacted Lehman's Treasurer, Paolo Tonucci, to tell him the Company would have to turn over the $5 billion in collateral that JPMorgan had asked for days earlier.  Lehman complied, but fulfilling the request temporarily froze Lehman's computerized trading system and immediately left the Company without sufficient capital to fund its trading operations. Federal officials worked with executives at Lehman's headquarters to determine which assets were not already pledged to other lenders and could be used as collateral for a federal loan. Lehman borrowed roughly $30 billion from the Federal Reserve on an overnight basis, paying it back the next day.  This was concealed from Plaintiffs, and contemporaneous fraudulent statements further provided a false sense of security.  This caused the price of the Securities to remain higher than they otherwise would have been, lulling investors, including Plaintiffs, into holding onto Lehman securities.

330.    On September 15, 2008, Lehman filed for bankruptcy protection, citing "significant liquidity problems."  As a result, the market price of Lehman's common stock declined over 94% that day to close at $0.21.  All of the Plaintiffs' purchases of Lehman Securities occurred before any materializations of concealed risks, or partial disclosures, meaning Plaintiffs purchased at the height of the artificial inflation.

331.    The disclosures regarding Lehman's liquidity problems and massive write-

downs revealed the truth about Lehman's financial condition and represented the materialization of several interrelated, concealed risks. The materialization stemmed from, *inter alia*, Lehman's massive Repo 105 transactions which masked the Company's true net leverage, Lehman's failure to write down its real estate assets in a timely manner, Lehman's disregard for its risk management policies, and failure to disclose certain concentrations of credit risk. As a direct result of Lehman's failure to abide by its risk policies, Lehman acquired tens of billions of dollars of highly risky, illiquid assets that ultimately required enormous write-downs and triggered the liquidity crisis that forced Lehman to bankruptcy.

332.   The declines in the market values of Lehman's securities were directly attributable to the Defendants' false statements and omissions and the materialization of previously misrepresented or concealed risks. The declines were not caused by – or were in fact many times larger than any decline that could be attributed to – general industry news, stock market trends and activity, market randomness, or information unrelated to Defendants' misconduct.

**VII.   NO SAFE HARBOR**

333.   Defendants' verbal "Safe Harbor" warnings accompanying Lehman's oral forward-looking statements issued during the Relevant Period for this Amended Complaint were ineffective to shield those statements from liability.

334.   The Defendants are also liable for any false or misleading forward-looking statements because, at the time each forward-looking statement was made, the speaker knew the statement was false or misleading and the statement was authorized and/or approved by an executive officer of Lehman who knew that the statement was false. None of the historic or

present tense statements made by Defendants were assumptions underlying or relating to any plan, projection or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by Defendants expressly related to or stated to be dependent on those historic or present tense statements when made.

## VIII.   CAUSES OF ACTION

### A.   Exchange Act Claims

### FIRST CAUSE OF ACTION

### Violations of § 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 Against the Officer Defendants and E&Y

335.   Plaintiffs repeat and re-allege each and every allegation above as if fully set forth herein.

336.   The Officer Defendants and E&Y, individually and/or in concert, by use of the means or instrumentalities of interstate commerce and/or of the United Stated mail, violated § 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 in that they:

a)   employed devices, schemes and artifices to defraud;

b)   made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

c)   engaged in acts, practices and a course of business that operated as a fraud or deceit upon Plaintiffs in connection with their purchases of Lehman Securities during the Relevant Period.

337.   Each of the Officer Defendants was the top officer and controlling person of

Lehman, and had direct involvement in the Company's day-to-day operations. The materially misstated information presented in group-published documents, including certain portions of Lehman's SEC Filings, was the collective actions of these Officer Defendants.  The Officer Defendants were each involved in drafting, producing, reviewing and/or disseminating the group-published documents at issue in this action, during his or her tenure with Lehman.

338.    The Officer Defendants and E&Y had actual knowledge of the misrepresentations and omissions of material fact set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were readily available to them. The Officer Defendants' material misrepresentations and/or omissions were done knowingly or with severe recklessness, and for the purpose and effect of concealing Lehman's true financial condition and to artificially inflate the price of the Lehman Securities.  Ernst & Young's material misrepresentations and/or omissions were made with knowledge or were made with no reasonable basis for believing the statements and/or omissions, for the purpose of a continued relationship with Lehman.

339.    As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of Lehman's Securities was artificially inflated during the Relevant Period, and caused losses to Plaintiffs when Lehman's stock price fell in response to the issuance of partial disclosures and/or the materialization of risks previously concealed by the Defendants.

340.    As a direct and proximate result of the wrongful conduct of the Officer Defendants and Ernst & Young, Plaintiffs have suffered damages in that, in reliance on

Defendants' misrepresentations and the integrity of the market, Plaintiffs paid artificially inflated prices for the Lehman Securities.  Plaintiffs would not have purchased the Lehman Securities at the prices it paid, or at all, if Plaintiffs had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements and omissions.

341.   This action was filed within two years after the discovery of the fraud and within five years of the making of the materially false and misleading statements alleged herein.

## SECOND CAUSE OF ACTION

### Violations of § 20(a) of the Exchange Act
### Against the Officer Defendants

342.   Plaintiffs repeat and re-allege each and every allegation above as if fully set forth herein.

343.   Lehman violated Section 10(b) of the Exchange Act by failing to disclose the true nature of Lehman's financial condition as described above.  The Officer Defendants acted as controlling persons of Lehman within the meaning of § 20(a) of the Exchange Act. By reason of their positions with the Company, and their ownership of Lehman stock, the Officer Defendants had the power and authority to influence and cause, and did influence and cause, Lehman to engage in the wrongful conduct complained of herein.  Each Officer Defendant had direct involvement in the day-to-day operations of Lehman and with respect to the transactions in question and had the power to influence and control and did influence and control, directly or indirectly, the decision-making of Lehman, including the content and dissemination of the various statements which Plaintiffs contend are false and misleading. Each Officer Defendant was provided with or had unlimited access to copies of Lehman's

129

reports, press releases, public filings, and other statements alleged by Plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statement or cause the statements to be corrected.

344.   By reason of such conduct, the Officer Defendants are liable pursuant to § 20(a) of the Exchange Act.  As a direct and proximate result of the Officer Defendants' wrongful conduct, Plaintiffs suffered damages in connection with their purchases of Lehman securities.

## B.   State Law Claims

## THIRD CAUSE OF ACTION

### Fraud and Deceit
### Against the Officer Defendants and E&Y

345.   Plaintiffs repeat and re-allege each and every allegation above as if fully set forth herein.

346.   The Officer Defendants and E&Y made material misrepresentations and omissions to the Plaintiffs that were false and misleading, including those contained in the Registration Statement, Offering Documents, SEC Filings, press releases, and oral public statements.

347.   The Officer Defendants and E&Y made false and misleading statements to the Plaintiffs as alleged in detail above.  These Defendants' statements were fraudulent, material, and made with knowledge of their false and misleading character, or with reckless indifference to their truth or falsity.  The statements were made with the intention and expectation that investors would rely on them or, in the case of omissions, that investors would be ignorant of them in purchasing and/or holding Lehman securities

130

348.     The Officer Defendants' fraudulent misrepresentations are set forth more fully above and include, among others, the following:

       a.    that Lehman's financial results were free of material misstatement and "fairly presented" the Company's financial results;

       b.    that Lehman's accounting practices conformed to GAAP and SEC regulations;

       c.    that Lehman's net leverage ratio was fairly stated;

       d.    that Lehman timely and properly took appropriate charges to write down the value of certain of its real estate-related assets;

       e.    that Lehman's liquidity position was strong;

       f.    that Lehman's risk management procedures were effective and were being followed, and

       g.    that Lehman made required disclosures of certain concentrations of credit risk.

349.     E&Y's fraudulent misrepresentations included statements that:

       a.    Lehman's financial statements were prepared in accordance with GAAP;

       b.    Lehman's financial statements were presented fairly and accurately; and

       c.    E&Y conducted the audits of Lehman in accordance with GAAS.

350.     The Officer Defendants and E&Y had reason to expect that the Plaintiffs would rely on the misrepresentations and omissions. The Plaintiffs reasonably relied on those materials, and on the misrepresentations and omissions contained therein, in its decisions to acquire and/or continue to hold Lehman securities.

351.     By reason of the Plaintiffs' reasonable reliance on the Defendants' misrepresentations, and as a direct and proximate result of the wrongful conduct, the Plaintiffs have suffered damages, all in an amount to be determined according to proof.

352.     These Defendants are also liable for punitive damages, as their acts and omissions alleged in detail above were accompanied by actual malice and/or a wanton and willful disregard of Lehman investors, including Plaintiffs.

### FOURTH CAUSE OF ACTION

### Aiding and Abetting Fraud
### Against the Lehman Defendants and E&Y

353.     Plaintiffs repeat and re-allege each and every allegation above as if fully set forth herein.

354.     The Lehman Defendants and E&Y aided and abetted the Defendants in committing fraud by their active participation, aid, encouragement, and/or ratification of the fraud alleged herein, for their own benefit.

355.     The Officer Defendants actively participated in, aided, encouraged, and/or ratified the fraud of each of the other Officer Defendants.

356.     The Officer Defendants intentionally allowed and/or recklessly failed to detect or deter the fraud of each of the other Officer Defendants.

357.     The Director Defendants aided and abetted the Officer Defendants' fraud by intentionally allowing and/or recklessly failing to detect or deter the Officer Defendants' misleading statements. The Director Defendants provided little or no oversight of the Officer Defendants, allowing the Officer Defendants to engage in fraudulent or reckless conduct.

358.     E&Y aided and abetted the fraud by, among other things, intentionally allowing Lehman's Repo 105 practice to continue despite numerous red flags that began in 2001 and continued throughout the Relevant Period indicating that the practice was unwarranted and did not comply with GAAP.  E&Y also aided and abetted the fraud by

issuing an unqualified audit opinion on Lehman's financial statements and by issuing unqualified quarterly review reports during the Relevant Period.  The audits were not conducted in accordance with GAAS and the audit and review reports should not have been issued under GAAP and GAAS.  E&Y knew and intended that the audit and review reports would be relied on by investors.  The audit and review reports were in fact relied on.

359.   The Lehman Defendants' participation, aid, encouragement, and/or ratification of the Defendants' fraud was done for their own benefit, to protect their compensation as officers and directors, and to facilitate and protect the payment of hundreds of millions of dollars in bonuses and total compensation as officers and directors.

360.   E&Y's participation, aid, encouragement, and/or ratification of the fraud was done for its benefit, which included, among other things, preserving its relationship with Lehman and securing tens of millions of dollars of compensation for its services provided to Lehman.

361.   By virtue of these Defendants' conduct in aiding and abetting fraud, Plaintiffs suffered damages in an amount to be determined according to proof.

362.   These Defendants are also liable for punitive damages, as their acts and omissions alleged in detail above were accompanied by actual malice and/or a wanton and willful disregard of Lehman investors including Plaintiffs.

## FIFTH CAUSE OF ACTION

### Violation of California Corporations Code § 1507
### Against the Lehman Defendants

363.   Plaintiffs repeat and re-allege each and every allegation above as if fully set forth herein.

364. On Plaintiffs' information and belief, the Lehman Defendants intentionally and knowingly misrepresented or omitted information regarding their use of Repo 105 transactions, Lehman's accounting treatment for those transactions, the considerable escalation of its total Repo 105 usage in 2007 and 2008, and the material impact these transactions had on the firm's publicly reported net leverage ratio in Lehman's 2007 Form 10-K and 2008 Form 10-Q financial filings and other public statements.

365. At all relevant times mentioned herein, all of the Lehman Defendants, each of whom was an officer and/or director of Lehman, had knowledge of and directed, made, participated in the making of, and/or approved of the above-described misrepresentations and material omissions published in Lehman's Form 10-K and Form 10-Q financial statements.

366. On Plaintiffs' information and belief, the Lehman Defendants intentionally made the above-described misrepresentations and material omissions in order to deceive investors and rating agencies by reporting lower leverage and lower net leverage ratios than Lehman actually had.

367. On Plaintiffs' information and belief, the Plaintiffs, through their agent Merrill Lynch/BlackRock, reasonably relied upon the above-described misrepresentations and omissions in deciding to invest in Lehman securities and in deciding to maintain their investment of Lehman securities.

368. Plaintiffs, at the time the above-described representations were made, were ignorant of the misrepresentations and omissions, and believed Lehman's financial filings and other statements to be true.

369. The conduct of the Lehman Defendants as alleged herein constitutes an unlawful violation of California Corporations Code Section 1507, and each of the Lehman

Defendants is liable, jointly and severally, for all the damages resulting therefrom to the Plaintiffs.

370.    On Plaintiffs' information and belief, in making, directing, approving, and/or ratifying the above-described false 10-K and 10-Q financial filings, the Individual Lehman Defendants, as the officers and directors of Lehman Brothers, acted with fraud, oppression and malice, in that their conduct was despicable and was carried on with a willful and conscious disregard for the rights of Plaintiffs; and in that their conduct subjected Plaintiffs to cruel and unjust hardship in conscious disregard of their rights or otherwise causing injury to Plaintiffs.  On Plaintiffs' information and belief, each of the Individual Lehman Defendants had advance knowledge and authorized and ratified these acts of fraud, oppression and malice performed by themselves.  Thus, Plaintiffs are therefore entitled to the assessment of all the damages resulting from the unlawful acts of the Lehman Defendants in an amount to be proven at trial.

## SIXTH CAUSE OF ACTION

### Negligent Misrepresentation
### Against the Officer Defendants

371.    Plaintiffs repeat and re-allege each and every allegation above as if fully set forth herein.

372.    In order to induce Plaintiffs to purchase Lehman securities, the Officer Defendants negligently made misrepresentations and withheld material facts in the Registration Statement, Offerings Documents, SEC Filings, press releases, and public oral statements.

373.    The Officer Defendants made numerous false and misleading statements

regarding the financial condition of Lehman.  These statements were negligent, material, and made with negligent indifference to their truth or falsity, with the intention and expectation that Plaintiffs would rely on them.

374.    The Officer Defendants' negligent misrepresentations are set forth more fully above, and include, among others, the following:

a.    that Lehman's financial results were free of material misstatements and "fairly presented" the Company's financial results;

b.    that Lehman's accounting practices conformed to GAAP and SEC regulations;

c,    that Lehman's net leverage ratio was fairly stated;

d.    that Lehman timely and properly took appropriate charges to write down the value of certain of its real estate-related assets;

e.    that Lehman's liquidity position was strong;

f.    that Lehman's risk management procedures were effective and were bring followed, and

g.    that Lehman made required disclosures for certain concentrations of credit risk.

375.    The disclosures and materials containing misrepresentations and omissions were made by the Officer Defendants with the purpose of inducing investors to purchase Lehman Securities.

376.    Plaintiffs reasonably relied on the misrepresentations and omissions when purchasing the Securities, and when deciding to hold, and continue holding the Securities.

377.    As a direct and proximate result of the misrepresentation and omission, Plaintiffs have has incurred losses in an amount to be determined at trial.

## IX.  **<u>PRAYER FOR RELIEF</u>**

WHEREFORE, Plaintiff prays for judgment as follows:

1.      Actual damages in an amount to be proven at trial, but in excess of $1,000,0000;

2.      Prejudgment interest and post-judgment interest as allowed pursuant to statutory and common law;

3.      Reasonable attorney's fees, expert fees and costs;

4.      Exemplary and punitive damages in an amount sufficient to punish the Defendants and make an example of them; and

5.      Such other and further relief as the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial by jury in this action.


Dated:  November 29, 2011                    By: _/s/ John E. Jureller, Jr._____
                                             Tracy L. Klestadt
                                             John E. Jureller
                                             KLESTADT  & WINTERS, LLP
                                             570 Seventh Avenue, 17th Floor
                                             New York, New York 10018
                                             (212) 972-3000 (Telephone)
                                             (212) 972-2245 (Telephone)

                                             Timothy D. Reuben (*pro hac vice*)
                                             Stephen L. Raucher (*pro hac vice*)
                                             REUBEN RAUCHER & BLUM
                                             10940 Wilshire Blvd., 18th Floor
                                             Los Angeles, CA 90024
                                             (310) 777-1990 (Telephone)
                                             (310) 777-1989 (Facsimile)

                                             *Attorneys for Plaintiffs*