UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |  |
|---|---|---|
| ———————————————— x | | |
| In re LEHMAN BROTHERS SECURITIES AND ERISA LITIGATION | : : : | Civil Action No. 09-md-02017-LAK SECOND AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS |
| ———————————————— | : | |
| This Document Relates To: | : | |
| *The California Public Employees' Retirement System vs. Richard S. Fuld, Jr., et al.*, Civil Action No. 11-cv-01281-LAK | : : : | |
| ———————————————— x | : | |
| THE CALIFORNIA PUBLIC EMPLOYEES' RETIREMENT SYSTEM, | : : | |
| Plaintiff, | : : | |
| vs. | : : | |
| RICHARD S. FULD, JR., CHRISTOPHER M. O'MEARA, ERIN M. CALLAN, MICHAEL L. AINSLIE, JOHN F. AKERS, ROGER S. BERLIND, THOMAS H. CRUIKSHANK, MARSHA JOHNSON EVANS, SIR CHRISTOPHER GENT, ROLAND A. HERNANDEZ, HENRY KAUFMAN, JOHN D. MACOMBER, CABRERA CAPITAL MARKETS, LLC, THE WILLIAMS CAPITAL GROUP, L.P., LOOP CAPITAL MARKETS, LLC, BBVA SECURITIES INC., BNY CAPITAL MARKETS, INC., | : : : : : : : : : : : : : | |
| ———————————————— x | : | DEMAND FOR JURY TRIAL |
| [Caption continued on following page.] | | |

———————————————————————— x
: 
CITIGROUP GLOBAL MARKETS INC.,          :
RBC CAPITAL MARKETS CORPORATION, :
GREENWICH CAPITAL MARKETS, INC.,       :
SUNTRUST CAPITAL MARKETS, INC.,          :
ABN AMRO INC., ANZ SECURITIES, INC.,    :
CIBC WORLD MARKETS CORP., HSBC         :
SECURITIES (USA) INC., HVB CAPITAL      :
MARKETS, INC., CAJA DE AHORROS Y       :
MONTE DE PIEDAD DE MADRID,               :
NATIONAL AUSTRALIA CAPITAL               :
MARKETS, LLC, SANTANDER                      :
INVESTMENT SECURITIES INC., BNP          :
PARIBAS S.A., ING FINANCIAL                   :
MARKETS LLC, MELLON FINANCIAL          :
MARKETS, LLC, M.R. BEAL & COMPANY, :
NATEXIS BLEICHROEDER INC., SG            :
AMERICAS SECURITIES, LLC, WELLS          :
FARGO SECURITIES, LLC, WACHOVIA        :
CAPITAL MARKETS, LLC, HARRIS               :
NESBITT CORP., DZ FINANCIAL                  :
MARKETS LLC, MIZUHO SECURITIES          :
USA INC., SCOTIA CAPITAL (USA) INC.,     :
SOVEREIGN SECURITIES                             :
CORPORATION, LLC, UTENDAHL               :
CAPITAL PARTNERS, L.P., FORTIS              :
SECURITIES LLC, MURIEL SIEBERT &        :
CO., INC., DAIWA SECURITIES SMBC         :
EUROPE LIMITED and ERNST & YOUNG    :
LLP,                                                                  :
:
                         Defendants.                          :
:
———————————————————————— x

**TABLE OF CONTENTS**

Page

I.    INTRODUCTION ................................................................................................. 1

II.   NATURE OF THE ACTION ................................................................................ 2

III.  JURISDICTION AND VENUE ........................................................................... 3

IV.   PARTIES .............................................................................................................. 4

      A.    Plaintiff ...................................................................................................... 4

      B.    Relevant Non-Parties ................................................................................ 4

      C.    Defendants ................................................................................................. 5

V.    VIOLATIONS OF THE 1933 ACT ................................................................... 14

      A.    The Offering Documents Were Materially False and Misleading .......... 15

            1.    The Offering Documents Failed to Disclose Lehman's Repo 105
                  Transactions ................................................................................. 15

                  a.    Additional Material Misstatements and Omissions Relating
                        to Repo 105 ....................................................................... 22

                  b.    GAAP Violations Relating to Repo 105 ........................ 25

            2.    The Offering Documents Misrepresented Lehman's Risk
                  Management Practices .................................................................. 26

            3.    The Offering Documents Failed to Disclose Lehman's Risk
                  Concentrations ............................................................................. 33

VI.   CAUSES OF ACTION UNDER THE 1933 ACT ............................................. 36

COUNT I ......................................................................................................................... 36

      Violations of Section 11 of the 1933 Act Against All Defendants ................... 36

COUNT II ........................................................................................................................ 38

      Violations of Section 15 of the 1933 Act Against the Officer Defendants ...... 38

VII.  VIOLATIONS OF THE 1934 ACT .................................................................. 39

      A.    Repo 105 Transactions .............................................................................. 40

- i -

Page

1.  Lehman Utilized Repo 105 for a Fraudulent Purpose ...............................40

2.  Lehman Utilized Repo 105 to Avoid Recording Losses on Illiquid or "Sticky" Assets While Creating the False Appearance of Deleveraging ....................................................................................44

B.  Risk Management ...............................................................................................46

C.  The Officer Defendants' False and Misleading Statements During the Relevant Period.................................................................................................48

D.  Additional Evidence of Scienter ......................................................................57

1.  The Officer Defendants Knew of Repo 105 and the Artificial Balance Sheet Manipulation .........................................................57

2.  The Officer Defendants Knew of Lehman's Disregard of Risks and Its Liquidity Problems.......................................................................61

E.  E&Y'S Participation in the Issuance of False Financials ...............................65

1.  E&Y's Audit and Review Reports Were Materially False and Misleading......................................................................................68

2.  E&Y Knew or Was Reckless in Not Knowing Its Audit and Review Reports Were Materially False and Misleading .........................70

3.  E&Y's Violation of Auditing Standards....................................................74

F.  Loss Causation ...................................................................................................81

VIII.  CAUSES OF ACTION UNDER THE 1934 ACT .....................................................84

COUNT III...............................................................................................................................84

Violations of Section 10(b) of the 1934 Act and Rule 10b-5 Promulgated Thereunder Against the Officer Defendants and E&Y ......................................84

COUNT IV...............................................................................................................................87

Violations of Section 20(a) of the 1934 Act Against the Officer Defendants ..................87

COUNT V.................................................................................................................................88

Violations of Section 20A of the 1934 Act Against Defendant Fuld ...............................88

667944_1

**Page**

COUNT VI......................................................................................................................89

    Claim for Professional Negligence and Negligent Misrepresentation Against
        Defendant E&Y ......................................................................................89

PRAYER FOR RELIEF .................................................................................................91

JURY DEMAND.............................................................................................................92

667944_1

## I.      INTRODUCTION

1.      Based on the same claims alleged in the Third Amended Class Action Complaint for Violations of the Federal Securities Laws filed by plaintiffs in the securities class action litigation (*see* Dkt. No. 212),[1] The California Public Employees' Retirement System ("CalPERS" or "plaintiff") brings this action to recover losses suffered due to its purchases of Lehman Brothers Holdings Inc.'s ("Lehman" or the "Company")[2] common stock and bonds ("Lehman securities") between June 12, 2007 and September 15, 2008, inclusive (the "Relevant Period").  These include certain bonds purchased pursuant and/or traceable to the Company's false and misleading Registration Statement and Prospectus, dated May 30, 2006, and filed with the U.S. Securities and Exchange Commission ("SEC") on Form S-3 (the "Registration Statement"), issued in connection with the Company's shelf registration or continuous offering process, seeking to pursue remedies under the Securities Act of 1933 ("1933 Act") and the Securities Exchange Act of 1934 ("1934 Act").  The Registration Statement, together with the prospectuses, prospectus supplements, product supplements and pricing supplements (the "Prospectuses"), as well as all SEC filings incorporated therein, are collectively referred to herein as the "Offering Documents."[3]  Plaintiff asserts these

---

[1]      *See also* Dkt. No. 439 (Court's opinion granting and denying in part defendants' motion to dismiss).

[2]      Lehman is not a defendant in this lawsuit due to its filing, on September 15, 2008, for bankruptcy protection under Chapter 11 of the Bankruptcy Code.  Similarly, Lehman Brothers, Inc. ("LBI") is not a defendant in this lawsuit due to its forced dissolution on September 19, 2008.  LBI was wholly owned by Lehman and was Lehman's primary broker-dealer subsidiary.

[3]      "Offerings" collectively refers to: (a) 7.50% Subordinated Notes Due 2038 ("7.50% Notes") issued on May 9, 2008 ("7.50% Offering"); (b) 6.875% Subordinated Notes Due 2037 ("6.875% Notes") issued on July 19, 2007 ("6.875% Offering"); (c) 6.75% Subordinated Notes Due 2017 ("6.75% Notes") issued on December 31, 2007 ("6.75% Offering"); (d) 6.50% Subordinated Notes Due 2017 ("6.50% Notes") issued on July 19, 2007 ("6.50% Offering"); (e) Medium Term 7% Notes Due September 27, 2027 ("7.0% Notes") issued on September 26, 2007 ("7.0% Offering");

claims against certain Lehman officers and/or directors, in addition to the underwriters, who made materially false and misleading statements during the Relevant Period in press releases, analyst conference calls and filings with SEC.

## II.    NATURE OF THE ACTION

2.    As alleged herein, the Offering Documents contained untrue statements and omitted materials facts concerning the following aspects of Lehman's financial results and operation, which allowed Lehman to raise over $31 billion through the Offerings set forth herein:

- **Repo 105**: Lehman used undisclosed repurchase and resale ("repo") transactions, known as "Repo 105" and "Repo 108" transactions (collectively referred to herein as "Repo 105"), to temporarily remove tens of billions of dollars from its balance sheet at the end of financial reporting periods, usually for a period of seven to ten days. These transactions were materially misrepresented and lacked any economic substance. While Lehman affirmatively represented throughout the Relevant Period that it used ordinary repo agreements and recorded these repos as short-term financings, *i.e.*, borrowings, Lehman failed to disclose that: (i) it simultaneously engaged in Repo 105 transactions for tens of billions of dollars in assets; (ii) it was recording the Repo 105 transactions as if the underlying assets had been permanently sold and removed from the books; and (iii) it had an obligation to repurchase these assets just days after the end of each quarter. Even if technically compliant with certain sections of Generally Accepted Accounting Principles ("GAAP") this undisclosed practice had the effect of artificially and temporarily reducing Lehman's net leverage ratio each quarter during the Relevant Period – an important metric to securities analysts, credit agencies and investors. As a result, Lehman's presentations concerning its net leverage and financial condition were materially false and misleading when made, as well as being violative of GAAP.

- **Risk Management**: Lehman publicly and consistently promoted its robust and sophisticated risk management system, including its use of "stress tests." In truth, however, Lehman regularly disregarded and exceeded its risk limits (or simply raised them) as it accumulated illiquid assets, including the mammoth $5.4 billion Archstone project discussed *infra*.

---

and (f) Medium Term 5.625% Notes Due January 24, 2013 ("5.625% Notes") issued on January 22, 2008 ("5.625% Offering"). The notes issued pursuant to the Offerings will be collectively referred to herein as the "Notes." The relevant Lehman SEC filings incorporated into these Offerings can be located in Appendix A, attached hereto.

- **Concentration of Credit Risk**: GAAP requires disclosure of significant concentrations of credit risk. Lehman, however, failed to disclose material facts concerning its concentration of mortgage- and real estate-related assets in its 2007 Form 10-K and post-February 20, 2008 documents and filings, preventing investors from meaningfully assessing the Company's exposure to these risky assets.

3. In short, as the Bankruptcy Examiner testified before the United States House of Representatives' Committee on Financial Services, "the public did not know there were holes in the reported liquidity pool, nor did it know that Lehman's risk controls were being ignored, or that reported leverage numbers were artificially deflated. Billions of Lehman shares traded on misinformation."

## III.    JURISDICTION AND VENUE

4. This action was originally filed in the United States District Court for the Northern District of California and then transferred to the United States District Court for the Southern District of New York, No. 1:11-cv-01281-LAK, pursuant to the United States Judicial Panel on Multidistrict Litigation's conditional transfer order, to be coordinated for pretrial purposes with multidistrict proceeding No. 1:09-md-02017-LAK.

5. This Court and the Northern District of California have jurisdiction over the subject matter of this action pursuant to §22 of the 1933 Act, 15 U.S.C. §77v; §27 of the 1934 Act, 15 U.S.C. §78aa; and 28 U.S.C. §1331.

6. Venue is proper in this District and the Northern District of California pursuant to §22 of the 1933 Act, 15 U.S.C. §77v; §27 of the 1934 Act, 15 U.S.C. §78aa; and 28 U.S.C. §1391(b), (c) and (d). Many of the acts and transactions described herein, including the preparation and dissemination of materially false and misleading public filings, occurred in this District and the Northern District of California. At all times relevant, Lehman maintained operations and offices in this District.

- 3 -

7.     This case is expected to return to the Northern District of California for trial. Accordingly, while this Complaint is filed in the Southern District of New York, it is subject to trial in the Northern District of California.

## IV.    PARTIES

### A.    Plaintiff

8.     Plaintiff CalPERS is the largest public employee retirement system in the United States, with assets of approximately $218 billion and nearly 1.6 million beneficiaries, including active and retired public employees.  CalPERS purchased Lehman securities as described below and was damaged thereby.  CalPERS purchased the following Lehman common stock and notes (the "Lehman Notes") during the Relevant Period:

| Lehman Common Stock | 3,893,586 shares |
|---|---|
| Lehman 7.50% Notes | $341,075,000 |
| Lehman 6.875% Notes | $176,000,000 |
| Lehman 6.75% Notes | $775,000 |
| Lehman 6.50% Notes | $101,140,000 |
| Lehman 7.0% Notes | $81,000,000 |
| Lehman 5.625% Notes | $3,300,000 |

### B.    Relevant Non-Parties

9.     Lehman was a corporation organized under the laws of the state of Delaware with its headquarters located at 1271 Avenue of Americas, New York, New York.  Lehman operated as a global investment bank and purported to be "an innovator in global finance" with a "leadership position in equity and fixed income sales, trading and research."  Lehman's common stock traded on the New York Stock Exchange.  On September 15, 2008, Lehman filed a voluntary petition for bankruptcy protection under Chapter 11 of the Bankruptcy Code.  For this reason, Lehman is not named as a defendant in this action.

- 4 -

10.     LBI, based in New York, New York, was a wholly owned subsidiary of Lehman and operated as a registered broker-dealer under the 1934 Act.  LBI's services included brokerage, mergers and acquisitions and restructuring advice, debt and equity underwriting, market making, debt and equity research, and real estate and private equity investments.  On September 17, 2008, the Securities Investor Protection Corporation moved for an order commencing liquidation and protection under the automatic stay provisions of the Bankruptcy Code.  The Bankruptcy Court granted the request on September 19, 2008.  For this reason, LBI is not named as a defendant in this action.

C.      **Defendants**

11.     Defendant Fuld had served as the Chairman of the Board of Directors and Chief Executive Officer ("CEO") of Lehman since 2000.  Fuld received $111.8 million from fiscal year ("FY") 2003 to FY 2007 in salary, bonuses and restricted stock unit awards, including $3.75 million in salary, $36.9 million in bonuses and $71.2 million in restricted stock unit awards.  Fuld's bonus amount was a substantial portion of his compensation as it was nearly ten times his base salary.  Additionally, Fuld received $190.8 million in insider trading proceeds from FY 2003 through FY 2007.  Fuld signed the Registration Statement.

12.     Defendant Christopher M. O'Meara ("O'Meara") served as the Company's Chief Financial Officer ("CFO"), Controller and Executive Vice President from 2004 until December 1, 2007, when he assumed the role of Global Head of Risk Management.  O'Meara received $12.4 million from FY 2005 to FY 2007 in salary, bonuses and restricted stock unit awards, including $600,000 in salary, $4.8 million in bonuses and $6.7 million in restricted stock unit awards.  O'Meara's bonus amount was a substantial portion of his compensation as it was eight times his base

salary. Additionally, O'Meara received $1.2 million in insider trading proceeds from FY 2003 through FY 2007. O'Meara signed the Registration Statement.

13.    Defendant Erin M. Callan ("Callan") served as the Company's CFO, Controller and Executive Vice President from December 2007 until June 2008. Callan resigned from the Company in July 2008. Previously, Callan served in various positions at Lehman after joining the Company in 1995.

14.    Defendant Michael L. Ainslie ("Ainslie") was a director of Lehman during the Relevant Period. Ainslie signed the Registration Statement.

15.    Defendant John F. Akers ("Akers") was a director of Lehman during the Relevant Period. Akers signed the Registration Statement.

16.    Defendant Roger S. Berlind ("Berlind") was a director of Lehman during the Relevant Period. Berlind signed the Registration Statement.

17.    Defendant Thomas H. Cruikshank ("Cruikshank") was a director of Lehman during the Relevant Period. Cruikshank was also a director of LBI. Cruikshank signed the Registration Statement.

18.    Defendant Marsha Johnson Evans ("Evans") was a director of Lehman during the Relevant Period. Evans signed the Registration Statement.

19.    Defendant Sir Christopher Gent ("Gent") was a director of Lehman during the Relevant Period. Gent signed the Registration Statement.

20.    Defendant Roland A. Hernandez ("Hernandez") was a director of Lehman during the Relevant Period. Hernandez signed the Registration Statement.

21.    Defendant Henry Kaufman ("Kaufman") was a director of Lehman during the Relevant Period. Defendant Kaufman signed the Registration Statement.

- 6 -

22.    Defendant John D. Macomber ("Macomber") was a director of Lehman from 1996 until Lehman's bankruptcy on September 15, 2008.  Defendant Macomber signed the Registration Statement.

23.    The defendants identified in ¶¶11-13 are referred to herein as the "Officer Defendants."

24.    The defendants identified in ¶¶11 and 14-22 are referred to herein as the "Director Defendants."

25.    Defendant Cabrera Capital Markets, LLC ("Cabrera") is an investment bank and full-service institutional brokerage firm which provides services worldwide to a substantial and diversified client base that includes financial institutions, unions, governments, corporations, hedge funds, and foundations/endowments.  Cabrera is based in Chicago, Illinois.  Cabrera was an underwriter of the 7.50% Offering and the 7.0% Offering.

26.    The Williams Capital Group, L.P. ("Williams Capital") is an investment bank providing institutional investors and corporate, governmental, and municipal clients with products and services in equities, fixed income, corporate finance, investment management and private equity. Williams Capital is based in New York, New York.  Williams Capital was an underwriter of the 7.50% Offering.

27.    Defendant Loop Capital Markets, LLC ("Loop") is a boutique investment banking and brokerage firm.  The firm offers corporate and public finance, financial advisory, municipal finance, equity research, and securities sales and trading services.  Loop is based in Chicago, Illinois. Loop was an underwriter of the 7.50% Offering.

28.    Defendant BBVA Securities Inc. ("BBVA") is a security broker/dealer which provides securities brokerage and research services.  BBVA is based in New York, New York.

- 7 -

BBVA was an underwriter of the 6.875% Offering, the 6.75% Offering, the 7.0% Offering and the 5.625% Offering.

29.     Defendant BNY Capital Markets, Inc. ("BNY") is a boutique investment banking firm that offers corporate finance advisory services and fixed-income securities.  BNY is a subsidiary of The Bank of New York Mellon Corporation.  BNY was an underwriter of the 6.875% Offering and the 6.75% Offering.

30.     Defendant Citigroup Global Markets Inc. ("CGMI") is a large integrated financial services institution that through subsidiaries and divisions provides commercial and investment banking services, commercial loans to corporate entities, and acts as underwriter in the sale of corporate securities.  CGMI was an underwriter of the 6.875% Offering, the 6.75% Offering, the 5.625% Offering and the 7.0% Offering.

31.     Defendant RBC Capital Markets Corporation ("RBC Capital") offers corporate and investment banking services to corporations, governments, and institutions.  The firm's services include public and private placement of debt and equity securities, strategic alliances, mergers and acquisitions advice, corporate finance, equity and debt underwriting, and structured and project finance.  RBC Capital is based in Toronto, Canada.  RBC Capital was an underwriter of 6.875% Offering.

32.     Defendant Greenwich Capital Markets, Inc. ("Greenwich"), now-known as RBS Securities, Inc., is the Royal Bank of Scotland Group's U.S. investment bank/broker-dealer that specializes in fixed income arbitrage and other fixed income strategies.  Greenwich is based in Stamford, Connecticut.  Greenwich was an underwriter of the 6.875% Offering.

33.     Defendant SunTrust Capital Markets, Inc. ("SunTrust") is a full-service investment banking and capital markets company that provides capital raising, strategic advisory, risk

- 8 -

management, and investment solutions to corporate clients across the nation.  SunTrust was an underwriter of the 6.75% Offering, the 6.875% Offering, the 7.0% Offering and the 5.625% Offering.

34.    Defendant ABN AMRO Inc. ("ABN") provides investment advice and related services regarding securities, fixed income, and futures products.  ABN provides its services to financial institutions, corporations, governments, fiduciaries, individual investors, professional investors, and securities and commodities dealers.  ABN operates as a subsidiary of ABN AMRO Bank N.V.  ABN was an underwriter of the 6.75% Offering.

35.    Defendant ANZ Securities, Inc. ("ANZ") is a boutique investment banking firm that offers financial advisory services.  The firm provides merger and acquisition, trade finance, export finance, structured finance, corporate banking, currency options, and structured credit derivatives.  ANZ operates as a subsidiary of ANZ Bank based in Melbourne, Australia.  ANZ is headquartered in New York, New York.  ANZ was an underwriter of the 6.75% Offering and the 7.0% Offering.

36.    Defendant CIBC World Markets Corp. ("CIBC") is the investment banking subsidiary of the Canadian Imperial Bank of Commerce.  The firm operates as an investment bank both in the domestic and international equity and debt capital markets.  CIBC is headquartered in Toronto, Ontario.  CIBC was an underwriter of the 6.75% Offering.

37.    Defendant HSBC Securities (USA) Inc. ("HSBC") is an investment banking firm that provides financial advisory services.  The firm's services include mergers and acquisitions, capital raising, privatization, and strategic advice.  HSBC operates as a subsidiary of HSBC Investments (North America) Inc.  HSBC was an underwriter of the 6.75% Offering and the 6.50% Offering.

38.    Defendant HVB Capital Markets, Inc. ("HVB") is a securities broker/dealer.  HVB was an underwriter of the 6.75% Offering and the 6.50% Offering.

- 9 -

39.     Defendant Caja de Ahorros y Monte de Piedad de Madrid ("Caja Madrid") operates as a savings bank in Spain.  It primarily offers products and services in banking, insurance, and asset management and brokerage sectors.  Caja Madrid provides an array of products and services, including guarantees, credit lines, loans, leasing products, bill discounting, mutual funds, factoring, customized financing, financial advice, and foreign trade operations.  Caja Madrid was an underwriter of the 6.50% Offering.

40.     Defendant National Australia Capital Markets, LLC ("NACM") is a securities broker/dealer.  NACM was an underwriter of the 6.50% Offering.

41.     Defendant Santander Investment Securities Inc. ("Santander") is a securities and money management firm that offers full securities brokerage services, including retail and institutional sales, trading, investment banking, asset management and research.  Santander is the U.S. retail securities broker-dealer arm of Grupo Santander, the largest financial group in Spain and Latin America.  Santander was an underwriter of the 6.50% Offering.

42.     Defendant BNP Paribas S.A. ("BNP") is a France-based bank group with operations throughout the world.  BNP was an underwriter of the 5.625% Offering.

43.     Defendant ING Financial Markets LLC ("ING") offers investment banking and corporate financial services.  ING is based in New York, New York and operates as a subsidiary of ING Groep NV.  ING was an underwriter of the 5.625% Offering.

44.     Defendant Mellon Financial Markets, LLC ("Mellon") is an investment banking and full-service securities dealer firm specializing in public finance, asset-backed finance and institutional sales, servicing hundreds of institutional client.  Mellon was an underwriter of the 5.625% Offering and the 7.0% Offering.

667944_1

45.     Defendant M.R. Beal & Company ("MR Beal") is a full-service investment banking firm, which includes public finance, corporate debt and equity, fixed-income sales and trading, and financial advisory services.  MR Beal was an underwriter of the 5.625% Offering.

46.     Defendant Natexis Bleichroeder Inc. ("Natexis") provides securities brokerage, equity trading, and research services to individuals, corporations, and institutional investors.  Natexis offers corporate finance services, including mergers and acquisitions, divestitures, and investment advice. Natexis is headquartered in New York, New York.  Natexis was an underwriter of the 5.625% Offering.

47.     Defendant SG Americas Securities, LLC ("SG Americas") provides investment banking services.  It focuses on capital markets, securities, underwriting, mergers and acquisitions, derivatives, and trading services.  SG Americas is based in New York, New York and operates as a subsidiary of Societé Generale Group.  SG Americas was an underwriter of the 5.625% Offering.

48.     Defendant Wells Fargo Securities, LLC ("Wells Fargo") is an investment services division of Wells Fargo Bank.  Wells Fargo provides investment banking services in the United States and offers capital markets access through public offerings, private placements, and debt offerings, which include new issue underwriting of high yield bonds and 144A private placements, as well as market making, research, and equity trading.  Wells Fargo also provides advisory services for mergers and acquisitions.  Wells Fargo was an underwriter of the 5.625% Offering, the 6.75% Offering and the 7.0% Offering.

49.     Defendant Wachovia Capital Markets, LLC ("Wachovia"), which became part of defendant Wells Fargo in 2009, provides debt and equity underwriting, mergers and acquisitions, loan syndications, debt and equity sales and trading, tax-exempt products, research and economics,

and certain hedging products such as equity derivatives. Wachovia was an underwriter of the 6.75% Offering.

50.     Defendant Harris Nesbitt Corp. ("Harris Nesbitt") an investment bank, provides investment and corporate banking services in the United States. It offers various financial products and services, including equity and debt underwriting, corporate lending and project financing, merger and acquisitions advisory services, merchant banking, securitization, treasury and market risk management, debt and equity research and institutional sales and trading. Harris Nesbitt is headquartered in New York, New York. Harris Nesbitt was an underwriter of the 7.0% Offering.

51.     Defendant DZ Financial Markets LLC ("DZ Financial") provides securities brokerage and underwriting services and is based in New York, New York. DZ Financial was an underwriter of the 7.0% Offering

52.     Defendant Mizuho Securities USA Inc. ("Mizuho") offers underwriting, sales and trading of securities and is a financial derivatives brokerage. Mizuho is based in New York, New York and operates as a subsidiary of Mizuho Securities Co., Ltd. Mizuho was an underwriter of the 6.75% Offering and the 7.0% Offering.

53.     Defendant Scotia Capital (USA) Inc. ("Scotia") is a wholly owned subsidiary of Scotia Capital Inc., which offers multi-product solutions to clients' financial needs in the United States. Additionally, it offers mergers and acquisitions advisory, private placement, negotiation assistance, due diligence, and restructuring services and provides research, equity sales and trading. Scotia was an underwriter of the 6.75% Offering and the 7.0% Offering.

54.     Defendant Sovereign Securities Corporation, LLC ("Sovereign") is a security brokerage firm. The firm underwrites municipal debt focusing on short-term instruments such as tax bond, and tax and revenue anticipatory notes. Additionally, Sovereign advises, structures,

underwrites, and services the needs of issuers of taxable and tax exempted debt.  Sovereign is headquartered in Philadelphia, Pennsylvania and operates as a subsidiary of Santander Holdings USA, Inc.  Sovereign was an underwriter of the 7.0% Offering.

55.    Defendant Utendahl Capital Partners, L.P. ("Utendahl") is a boutique investment bank.  Utendahl's products and services include underwriting and trading of fixed-income, equity and convertible securities, general corporate finance, structured finance, mergers and acquisitions and asset management.  Utendahl was acquired by Williams Capital on or about January 10, 2010.  Utendahl was an underwriter of the 7.0% Offering.

56.    Defendant Fortis Securities LLC ("Fortis") is an integrated financial services provider engaged in providing business support services.  Fortis was an underwriter of the 5.625% Offering.

57.    Defendant Muriel Siebert & Co., Inc. ("Siebert") is a stock discount brokerage firm which traded in municipal bonds, government agency bonds, corporate bonds and equities.  Siebert was an underwriter of the 6.75% Offering.

58.    Defendant Daiwa Securities SMBC Europe Limited ("Daiwa") is an investment banking firm that provides equity, fixed income, investment banking, derivatives, and strategic advisory services.  The firm also underwrites and manages new issues, and carries out trading and sales of secondary securities.  Daiwa Securities SMBC Europe Limited changed its name to Daiwa Capital Markets Europe Limited in January 2010.  Daiwa was an underwriter of the 5.625% Offering and the 7.0% Offering.

59.    The defendants referenced in ¶¶25-58 above are referred to herein as the "Underwriter Defendants."

60.    The Underwriter Defendants are liable for the false and misleading statements in the Registration Statement.  In connection with the Offerings, the Underwriter Defendants drafted and

disseminated the Registration Statement and were paid fees in connection therewith. The Underwriter Defendants' failure to conduct an adequate due diligence investigation was a substantial factor leading to the harm complained of herein.

61.    Defendant Ernst & Young LLP ("E&Y") acted as the Company's independent outside auditor during the Relevant Period. E&Y audited the Company's false and misleading financial statements contained in Lehman's Forms 10-K for FY 2006-FY 2007, falsely certified that those financial statements were prepared in accordance with GAAP, and falsely represented that it conducted its audits or reviews in accordance with Generally Accepted Auditing Standards ("GAAS"). E&Y also reviewed Lehman's interim financial statements and falsely represented that no material modifications needed to be made to them to conform with GAAP.

## V.    VIOLATIONS OF THE 1933 ACT

62.    The 1933 Act claims are based on strict liability and negligence. The 1933 Act claims are not based on any allegation that any defendant engaged in fraud or any other deliberate and intentional misconduct, and plaintiff specifically disclaims any reference to or reliance upon fraud allegations.

63.    The 1933 Act claims arise from CalPERS' purchase of Lehman debt securities (*i.e.*, the Notes) in or traceable to the Offering Documents issued in connection with the Offerings. Each of the Offerings was conducted pursuant to the Shelf Registration Statement, a prospectus dated May 30, 2006 (the "2006 Prospectus"), and either a prospectus supplement or pricing supplement issued in connection with a particular Offering. The 2006 Prospectus stated that it was part of the Shelf Registration Statement. The date of each Offering – and not the prior date of the Shelf Registration Statement – was the "effective date" of the Shelf Registration Statement for purposes of §11 liability under 17 C.F.R. §230.415 and 17 C.F.R. §229.512(a)(2).

- 14 -

64.     The 2006 Prospectus expressly incorporated by reference Lehman's Forms 10-K, 10-Q and 8-K that were filed with the SEC subsequent to the 2006 Prospectus and prior to the date of each Offering conducted pursuant to the 2006 Prospectus.  As to each Offering, certain documents containing untrue statements and material omissions were also incorporated in the Shelf Registration Statement and 2006 Prospectus, as set forth in Appendix A.

**A.      The Offering Documents Were Materially False and Misleading**

        **1.      The Offering Documents Failed to Disclose Lehman's Repo 105 Transactions**

65.     Throughout the Relevant Period, Lehman consistently described the importance of net leverage to its business as follows: "The relationship of assets to equity is one measure of a company's capital adequacy.  Generally, this leverage ratio is computed by dividing assets by stockholders' equity.  We believe that a more meaningful, comparative ratio for companies in the securities industry is net leverage, which is the result of net assets divided by tangible equity capital."

66.     In calculating the numerator for its net leverage ratio, Lehman defined "net assets" in its 2007 Form 10-K as total assets less: (i) cash and securities segregated and on deposit for regulatory and other purposes; (ii) collateralized lending agreements; and (iii) identifiable intangible assets and goodwill.  For the denominator, Lehman included stockholders' equity and junior subordinated notes in "tangible equity capital," but excluded identifiable intangible assets and goodwill. Lehman's publicly reported net leverage ratio, therefore, supposedly compared the Company's riskiest assets to its available stockholders' equity to absorb losses sustained by such assets.

67.     In fact, net leverage was so meaningful that E&Y's audit workpapers stated that "[m]ateriality is usually defined as any item individually, or in the aggregate, that moves net

leverage by 0.1 or more (typically $1.8 billion)." According to E&Y's engagement partner, William Schlich, this was Lehman's own definition for materiality with respect to net leverage. Accordingly, a "one-tenth" of a point adjustment in net leverage, which during the Relevant Period meant either an increase or decrease in net assets or tangible equity capital of $1.8 billion, was material to Lehman.

68.    Lehman, along with the majority of investment banking firms on Wall Street, routinely entered ordinary sale and repurchase agreements to satisfy short-term cash needs, borrowing cash from counterparties at fixed interest rates and putting up collateral, typically in the form of financial instruments, to secure financing (referred to herein as "Ordinary Repo" transactions). Upon maturity of these Ordinary Repo transactions, Lehman would repay the cash to the counterparty, plus interest, and reclaim its collateral, thereby ending the arrangement.

69.    Lehman accounted for Ordinary Repos as financings (*i.e.*, debt) recording both an asset (the cash proceeds of the Ordinary Repo loan) and a liability (an obligation to repay the Ordinary Repo loan). Significantly, the collateral securitizing the Ordinary Repo remained on Lehman's balance sheet, and the incoming cash and corresponding liability *increased* Lehman's net leverage ratio as the numerator (net assets) increased, while the denominator (tangible equity capital) remained unchanged.

70.    Unbeknownst to investors, Lehman entered into tens of billions of dollars worth of undisclosed Repo 105 transactions, which resembled Ordinary Repo transactions in all material respects. In reality, however, Lehman recorded the transaction on its books as though the asset collateralizing the loan had actually been *sold* and removed from its balance sheet. Lehman then used the cash received from the Repo 105 loan to pay down other existing liabilities. This practice *reduced* Lehman's net leverage ratio because it reduced the numerator in the net leverage ratio (net

- 16 -

assets) through the "sale" of the collateralizing asset and the use of cash to pay down other short-term debt, while leaving the denominator in the net leverage ratio (tangible equity ratio) untouched. As a result, the Repo 105 accounting treatment reduced Lehman's reported net leverage ratio by the end of each reporting period during the Relevant Period.

71.    Significantly, this "reduction" in the net leverage ratio was not only temporary, but complete fiction.  Pursuant to the terms of these Repo 105 transactions, Lehman would repay the Repo 105 counterparty days after the Company's quarter ended, and the collateralized assets would then return to Lehman's balance sheet; resulting in an immediate and material increase in the net leverage shortly after the close of the quarter.

72.    In prepared testimony before Congress, the Bankruptcy Examiner explained that Lehman's public disclosures were misleading by failing to disclose its use of Repo 105 transactions. Lehman did not disclose that it had only temporarily reduced its net leverage ratio through Repo 105 transactions, "[c]onsequently, Lehman's statement that the net leverage ratio was a 'more meaningful' measurement of leverage was rendered misleading because that ratio – as reported by Lehman – was not an accurate indicator of Lehman's actual leverage, and in fact, understated Lehman's leverage significantly."

73.    Lehman also made material misrepresentations in the Management's Discussion and Analysis ("MD&A") section of its periodic SEC filings; specifically concerning its rationale behind the reported "decreases" to its net leverage ratio (either quarter-over-quarter or year-over-year). Regardless if Lehman's accounting for its Repo 105 transactions technically complied with GAAP, these representations were materially false and misleading because Lehman was contractually obligated to repurchase the Repo 105 assets.

- 17 -

74.    At bottom, Lehman's Repo 105 transactions lacked economic substance, and Lehman's reported de-leveraging failed to reflect its true financial condition.  The quarterly cycle of temporarily "removing" as much as $50 billion of assets off its balance sheet (as reflected in Table 1 below) for only days at quarter-end created the false impression that Lehman reduced its balance sheet exposure and net leverage.  This helped create and maintain the façade that Lehman's financial health was not in jeopardy.

### Table 1 – Undisclosed Repo 105/108 Usage (in billions)

|  | **2Q07** | **3Q07** | **4Q07** | **1Q08** | **2Q08** |
|---|---|---|---|---|---|
| Repo 105 | $23.1 | $29.1 | $29.7 | $42.2 | $44.5 |
| Repo 108 | $8.6 | $6.9 | $8.9 | $6.9 | $5.8 |
| ***Total*** | **$31.9** | **$36.4** | **$38.6** | **$49.1** | **$50.3** |

75.    Notably, throughout the Relevant Period, Repo 105 transactions decreased Lehman's net leverage between 15 and 19 times its own materiality threshold (0.1), as set forth in Table 2 below:

### Table 2 – Repo 105 and 108 Transactions and Reported Net Leverage

| Reporting Period | Repo 105 (*billions*) | Reported Net Leverage Ratio | Actual Net Leverage Ratio | Difference as Multiple of Lehman's 0.1 Materiality Threshold |
|---|---|---|---|---|
| 2Q07 | $31.9 | 15.4x | 16.9x | 15 times |
| 3Q07 | $36.4 | 16.1x | 17.8x | 17 times |
| 4Q07 | $38.6 | 16.1x | 17.8x | 17 times |
| 1Q08 | $49.1 | 15.4x | 17.3x | 19 times |
| 2Q08 | $50.4 | 12.1x | 13.9x | 18 times |

76.    In addition, the Repo 105 transactions also caused Lehman's short-term and total liabilities to be materially understated throughout the Relevant Period, as reflected in Table 3 below:

- 18 -

**Table 3 – Repo 105 Transactions and Total and Short-Term Liabilities (in billions)**

|  | 2Q07 | 3Q07 | 2007 Year End | 1Q08 | 2Q08 |
|---|---|---|---|---|---|
| Total Reported Liabilities | $584.73 | $637.48 | $668.57 | $761.20 | $613.16 |
| Reported Short-Term Liabilities | $483.91 | $517.15 | $545.42 | $632.92 | $484.97 |
| Repo 105's | $31.90 | $36.40 | $38.60 | $49.10 | $50.40 |
| % of Repo 105's to Total Liabilities | 5.45% | 5.71% | 5.77% | 6.45% | 8.22% |
| % of Repo 105's to Short-Term Liabilities | 6.59% | 7.04% | 7.08% | 7.76% | 10.39% |

77.    Lehman's failure to disclose the tens of billions of dollars in Repo 105 transactions throughout the Relevant Period consistently rendered its statements in quarterly and annual SEC filings materially false and misleading.  For example:

(a)    Lehman's Forms 10-Q and 2007 Form 10-K represented that securities sold under agreements to repurchase are "[t]reated as collateralized agreements and financings for financial reporting purposes."  This material misrepresentation failed to disclose that through Lehman's Repo 105 program, tens of billions of dollars in securities sold each quarter pursuant to agreements to repurchase were not treated as "financings for financial reporting purposes" but in fact were treated as sales by Lehman;

(b)    Lehman's Forms 10-Q and 2007 Form 10-K also purported to describe all of the Company's material off-balance sheet arrangements.  In fact, each filing by the SEC expressly included a discussion and table purportedly summarizing all "Off-Balance Sheet Arrangements" in the MD&A section.  Such descriptions were materially false and misleading because Lehman failed to list or discuss the material fact that it had agreed to tens of billions of dollars in off-balance sheet commitments not included in these descriptions;

(c)    Lehman's Forms 10-Q stated that the "Consolidated Financial Statements are prepared in conformity with generally accepted accounting principles," and included certifications

- 19 -

from Fuld and either Callan or O'Meara stating that "this report does not contain any untrue statement of a material fact or omit to state a material fact" and that "the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant." These statements were materially false and misleading for, *inter alia*, failing to disclose the Repo 105 transactions, which falsely reduced net leverage and understated Lehman's liabilities.

(d)    Each Form 10-Q contained a "Report of Independent Registered Public Accounting Firm" signed by E&Y (the "Interim Reports"), stating that, based on its review of Lehman's consolidated financial statements and in accordance with the standards of the Public Company Accounting and Oversight Board ("PCAOB"), "we are not aware of any material modifications that should be made to the consolidated financial statements referred to above for them to be in conformity with U.S. generally accepted accounting principles." This statement was materially false for, among other reasons described herein, failing to disclose the Repo 105 transactions, which falsely reduced net leverage and understated liabilities, and violated GAAP.

(e)    Lehman's 2007 Form 10-K represented that the Company's "Consolidated Financial Statements are prepared in conformity with U.S. generally accepted accounting principles." It also included certifications from defendants Fuld and Callan stating that "this report does not contain any untrue statement of a material fact or omit to state a material fact" and that "the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant." All of these statements were false and misleading for, *inter alia*, failing to disclose the Repo 105 transactions, which falsely reduced net leverage and understated liabilities.

- 20 -

(f)    The 2006 Form 10-K and the 2007 Form 10-K included E&Y's "Report of Independent Registered Public Accounting Firm," signed on February 13, 2007 and January 28, 2008, respectively, certifying that: (1) Lehman's financial results: (a) were prepared in accordance with GAAP; and (b) in all material respects, fairly presented the financial condition and operations of Lehman; and (2) E&Y conducted its audit of Lehman's FY 2006 and FY 2007 financial results in accordance with GAAS.  E&Y consented to the inclusion of its audit reports in Lehman's FY 2006 and FY 2007 Forms 10-K, and consented to the incorporation of the audit reports by reference in registration statements, including Lehman's May 30, 2006 S-3 Shelf Registration Statement (No. 333-134553), and post effective amendments.  These statements in E&Y's audit reports were false and misleading because, contrary to E&Y's representation, Lehman's FY 2006 and FY 2007 financial results were not prepared in accordance with GAAP because the Company's net leverage was materially understated through the use of Repo 105 transactions, and E&Y's audit of Lehman's FY 2006 and FY 2007 financial results was not performed in accordance with GAAS.

78.    As further discussed in ¶¶81-89, the failure to disclose Lehman's use and accounting treatment of Repo 105 transactions in its financial statements and related footnotes incorporated into the Offering Documents caused Lehman's financial reports to present an unrealistic and unreliable picture of the Company's business realities by misrepresenting its net leverage, violating, *inter alia*, Accounting Series Release No. 173 ("[I]t is important that the overall impression created by the financial statements be consistent with the business realities of the company's financial position and operations.") and FASCON 1 (specifically, ¶¶32, 34, 42) and FASCON 2 (specifically, ¶¶15, 33, Figure 1, ¶¶58, 79-80, 91-97, 160).

79.    Moreover, the SEC requires that certain information be disclosed in the MD&A section of periodic reports.  Specifically, Item 303 of SEC Regulation S-K ("Item 303") states that

- 21 -

the registrant's MD&A section of its SEC filings should provide users of financial statements with relevant information in assessing the registrant's financial condition and results of operations, including trends and uncertainties that would cause reported financial information to not be indicative of its future financial condition or future operating results.  By omitting any mention of Repo 105, the Offering Documents violated Item 303's disclosure requirements.  Nowhere did the Offering Documents disclose, *inter alia*, the material effect Repo 105 transactions had on the Company's balance sheet, net leverage or the overall nature of these transactions.

80.    In addition to the false and misleading statements referenced above at ¶¶65-77, which appear in Lehman's Forms 10-Q and 10-K filed by Lehman during the Relevant Period and which were incorporated by reference into the Offering Documents issued in connection with the challenged Offerings, additional false and misleading statements regarding Repo 105 are set forth below in chronological order.

### a.    Additional Material Misstatements and Omissions Relating to Repo 105

81.    **2Q07**: On July 10, 2007, Lehman filed with the SEC its quarterly report on Form 10-Q for the quarter ended May 31, 2007 ("2Q07 10-Q") (which largely repeated information in its June 12, 2007 Form 8-K) signed by defendant O'Meara.  The 2Q07 10-Q reported that Lehman's net leverage ratio was 15.4, which was materially false and misleading because it failed to take into account $31.943 billion in Repo 105 assets that were temporarily removed from Lehman's financial statements.  Had the aforementioned assets been included, Lehman's net leverage ratio would have been 16.9; 15 times more than Lehman's own materiality threshold of a change in net leverage of 0.1.  In addition, the 2Q07 10-Q reported $137.948 billion in securities sold under agreements to repurchase.  This statement was materially false and misleading because it excluded almost $32

- 22 -

billion in Repo 105 assets that Lehman temporarily removed from its balance sheet, which it agreed to repurchase days after the end of the quarter.

82.    **3Q07**: On October 10, 2007, Lehman filed with the SEC its quarterly report on Form 10-Q for the quarter ended August 31, 2007 ("3Q07 10-Q") (which largely repeated information in its September 18, 2007 Form 8-K), signed by defendant O'Meara.  The 3Q07 10-Q reported that Lehman's net leverage ratio was 16.1.  This metric leverage was materially misleading because it failed to take into account $36.407 billion in Repo 105 assets that Lehman temporarily removed from its financial statements.  Had Lehman included the Repo 105 transactions, the Company's net leverage ratio would have been 17.8; 17 times more than Lehman's own materiality threshold of a change in net leverage of 0.1.  In addition, the 3Q07 10-Q reported $169.302 billion in securities sold under agreements to repurchase.  This statement was materially false and misleading because it excluded over $36 billion in Repo 105 assets that Lehman temporarily removed from its balance sheet, which it agreed to repurchase days after the end of the quarter.

83.    **FY 2007**: On January 29, 2008, Lehman filed with the SEC its annual report on Form 10-K for the fiscal year ended November 30, 2007 ("2007 10-K") (which largely repeated information in its December 13, 2007 Form 8-K), signed by defendants Fuld, Callan, Ainslie, Akers, Berlind, Cruikshank, Evans, Gent, Hernandez, Kaufman and Macomber.  The 2007 10-K reported that Lehman's net leverage ratio was 16.1, which was materially misleading because it failed to take into account $38.634 billion in Repo 105 assets that were temporarily removed from Lehman's financial statements.  Had the Repo 105 transactions been included, Lehman's net leverage ratio would have been 17.8; 17 times more than Lehman's own materiality threshold of a change in net leverage of 0.1.  In addition, the 2007 10-K reported $181.732 billion in securities sold under agreements to repurchase.  This statement was materially false and misleading because it excluded

almost $39 billion in Repo 105 assets that Lehman temporarily removed from its balance sheet, which it agreed to repurchase days after the end of the quarter.

84.    **1Q08**: On April 8, 2008, Lehman filed with the SEC its quarterly report on Form 10-Q for the first quarter ended February 29, 2008 ("1Q08 10-Q") (which largely repeated information in its March 18, 2008 Form 8-K), signed by defendant Callan and incorporated by reference into the Offerings, as set forth in Appendix A.  The 1Q08 10-Q reported that Lehman's net leverage ratio was 15.4, which was materially misleading because it failed to take into account $49.102 billion in Repo 105 assets that were temporarily removed from Lehman's financial statements.  Had Lehman included the Repo 105 transactions, its net leverage ratio would have been 17.3, representing an increase 19 times greater than Lehman's own materiality threshold of a change in net leverage of 0.1.  In addition, the 1Q08 10-Q reported $197.128 billion in securities sold under agreements to repurchase.  This statement was materially false and misleading because it excluded over $49 billion in Repo 105 assets that Lehman temporarily removed from its balance sheet, which it agreed to repurchase days after the end of the quarter.

85.    **2Q08**: On June 9, 2008, Lehman issued a press release, filed with the SEC on Form 8-K, pre-announcing its financial results for the second quarter ended May 31, 2008 ("June 9, 2008 8-K"), and claiming that Lehman had reduced its net leverage ratio to below 12.5.  This statement was materially misleading because the June 9, 2008 8-K failed to take into account $50.383 billion in Repo 105 assets that Lehman temporarily removed from its financial statements.  The June 9, 2008 8-K was incorporated by reference into Lehman's common stock offering, as set forth in Appendix A.

**b.**     **GAAP Violations Relating to Repo 105**

86.     Lehman's accounting for its Repo 105 transactions also failed fundamental tenets of financial reporting under GAAP.  GAAP requires that the overall impression created by financial statements be consistent with the business realities of the company's financial position and operations, such that the financial statements are ***useful*** and comprehensible to users in making rational business and investment decisions.  *See, e.g.*, FASCON 1, ¶¶9, 16, 33-34; FASCON 5, ¶5. FASCON 1 states that "Financial reporting should include explanations and interpretations to help users understand financial information provided."  FASCON 1, ¶54.  Under GAAP, "***nothing material is left out of the information*** that may be necessary to [ensure] that [the report] validly represents the underlying events and conditions."  FASCON 2, ¶¶79-80.  FASCON 5 explains that footnotes are an integral part of financial statements and are read in conjunction with the notes to the financial statements.  Here, Lehman's accounting treatment for its Repo 105 transactions, and the total absence of any disclosures about Repo 105 in footnotes, the MD&A section of the SEC filings or elsewhere created a false impression of Lehman's business condition.  Any analyst or actual or potential investor reading Lehman's SEC filings cover to cover, even with unlimited time, would still not have learned about the Repo 105 program or Lehman's true net leverage because Lehman affirmatively represented that, under FAS 140, its repurchase agreements were treated as financial arrangements and not sales.

87.     In addition, GAAP requires that financial statements place substance over form. FASCON 2, for example, states in relevant part:

> The quality of reliability and, in particular, of representational faithfulness leaves no room for accounting representations that subordinate substance to form.

FASCON 2, ¶160.

88.    Additionally, AU §411 states, in relevant part:

Generally accepted accounting principles recognize the importance of reporting transactions and events in accordance with their substance.

AU §411.06.

89.    Lehman's Repo 105 transactions lacked substance as "sales."  Whereas Ordinary Repo transactions provide financing but do not impact the balance sheet, Lehman's Repo 105 transactions did.  Elevating form over substance, Lehman engaged in tens of billions of Repo 105 transactions at the end of its quarters for the purpose of improving the appearance of its balance sheet and net leverage ratio.

## 2.    The Offering Documents Misrepresented Lehman's Risk Management Practices

90.    Throughout the Relevant Period, the Offering Documents included material misrepresentations concerning Lehman's risk management, including, *inter alia*, statements about Lehman's adherence to risk policies, compliance with risk limits, stress testing, risk appetite and use of risk mitigants.  Lehman's statements were unquestionably material to investors at this time because, as an investment bank (let alone one of the largest in the world), its risk management policies and practices were critical to loss prevention.  In particular, by overriding its own risk management policies and systems, Lehman amassed billions of dollars of illiquid, risky assets that it could not monetize in order to maintain its net leverage ratio.

91.    Prior to 2006, Lehman focused primarily on the "moving business" – a business strategy of originating assets for securitization or syndication and distribution to others.  In this regard, Lehman's wholly owned subsidiaries, BNC Mortgage LLC ("BNC"), a California-based subprime mortgage originator, and Aurora Loan Services LLC ("Aurora"), a leading Alt-A mortgage

- 26 -

originator based in Colorado, originated subprime and other non-prime mortgages for Lehman's securitization business, which were then sold to investors.

92.     However, in 2006 and the outset of 2007, Lehman's management began to pursue an aggressive growth strategy that caused the Company to assume significantly greater risk. This growth strategy depended on Lehman's ability to substantially increase the leverage on its capital. As a result, Lehman shifted from the "moving business" to the "storage" business, making longer-term investments using its own balance sheet. This expansion strategy focused heavily on acquiring and holding commercial real estate, leveraged loans and private equity assets – areas entailing far greater risk and less liquidity than Lehman's traditional lines of business. Despite the collapsing real estate markets, Lehman continued with this strategy from 2007 through the first quarter of 2008; *modus operandi* considered "counter-cyclical" in that Lehman sought to acquire assets priced at the bottom of the economic cycle. Thus, as other institutions sought to reduce their risk exposure to commercial and residential real estate assets and loans, Lehman did just the opposite.

93.     Although Lehman increased its net assets through this growth strategy (by almost $128 billion, or 48%, from the fourth quarter of 2006 through the first quarter of 2008), the market remained unaware that Lehman saddled itself with a massive albatross of illiquid assets that would be exceedingly difficult to sell in case of a national (or global) economic downturn. For example, BNC and Aurora continued to originate subprime and other non-prime mortgages to a greater extent than other mortgage originators, many of whom had gone out of business. These mortgages could not be securitized and sold off to investors and, thus, remained "parked" on Lehman's books. At the same time, Lehman continued to grow its portfolio of leveraged loans, commercial real estate and principal investment business during the first two quarters of 2007 – culminating with the acquisition of the Archstone REIT in May 2007, the largest transaction in Lehman's history.

- 27 -

94.     In SEC filings from the Relevant Period, Lehman constantly reassured investors that it had appropriate risk management policies in place, and that it both monitored and strictly enforced adherence to those policies.[4]   Lehman further stated that "[m]anagement's Finance Committee oversees compliance with policies and limits."[5]   Lehman also represented that "[w]e . . . ensure that appropriate risk mitigants are in place,"[6] and that "[d]ecisions on approving transactions . . . take into account . . . importantly, the impact any particular transaction under consideration would have on our overall risk appetite."[7]   These material misrepresentations did not disclose, however, that Lehman ignored and violated its own purported risk management framework and "risk appetite" limits throughout the Relevant Period.

95.     Lehman's risk appetite was intended to aggregate market credit and event risk faced by the Company.   According to Lehman's risk management policies, the firm-wide risk appetite limit was supposed to be the "hardest" of all Lehman's risk limits; such that any deviation required approval and direction from the Risk Committee[8] for the approved course of action.   In reality, however, risk appetite was treated more as a "soft" limit, routinely disregarded and exceeded during the Relevant Period.   As the Bankruptcy Examiner testified before Congress, "Lehman was in breach of its established risk appetite limits on a persistent basis during the second half of 2007."

---

[4]     Included in the 2007 10-K and 1Q08 10-Q.

[5]     Included in the 2Q07 10-Q, 3Q07 10-Q, 2007 10-K and 1Q08 10-Q.

[6]     Included in the 2Q07 10-Q and 3Q07 10-Q.

[7]     Included in the 2Q07 10-Q and 3Q07 10-Q.

[8]     Comprised of the Executive Committee (which included defendants Fuld and Callan), the Chief Risk Officer and the CFO.   Furthermore, all of the Officer Defendants served on the Risk Committee at varying times during the Relevant Period.

96.     In fact, in order to engage in riskier transactions, Lehman raised its risk appetite limit four times between December 2006 and December 2007 (from $2.3 billion to $4.0 billion), and then proceeded to regularly exceed even these mammoth limits by hundreds of millions of dollars. Furthermore, between May and August 2007, Lehman excluded its $2.3 billion bridge equity position in Archstone (as well as other large bridge equity positions) from its risk appetite usage calculations which, if included, would have caused Lehman to further exceed its risk limits. In May 2007, when Lehman committed to Archstone, "it was clear," according to the Examiner, "that the Archstone transaction would put Lehman over its then existing risk limits, but the deal was committed anyway." Lehman exceeded its risk appetite limit by: (a) $41 million in July 2007; (b) $62 million in August 2007; (c) $608 million in September 2007; (d) $670 million in October 2007; (e) $508 million in November 2007; (f) $562 million in December 2007; (g) $708 million in January 2008; and (h) $578 million in February 2008. As the Examiner found, Lehman's disregard for this "hard" limit facilitated a dramatic departure from the firm's stated risk profile between 2006 and 2007.

97.     Lehman also had "concentration limits" designed to ensure that the Company did not take on too much risk in a single, undiversified business or area. However, Lehman routinely and consistently disregarded and exceeded the concentration limits with respect to its leveraged loan and commercial real estate business, including failing to enforce the Company's "single transaction limits" meant to ensure that it appropriately limited and diversified its investments by business line and counterparty. The single transaction limit was composed of two limits: (1) a limit applicable to the notional amount of the expected leveraged loan (*i.e.*, the total value of a leveraged position's assets); and (2) a limit applicable to the amount that Lehman was at risk of losing on the leveraged loan. The Bankruptcy Examiner testified that Lehman decided, in late 2006, "to disregard the single

transaction limit." By July 2007, Lehman committed to approximately 30 deals that exceeded its $250 million loss threshold, and 5 deals that violated the notional limit of $3.6 billion. In regard to 24 of its largest high yield deals, Lehman also committed approximately $10 billion more than the single transaction limit allowed. Moreover, the Company did not impose a limit on its leveraged loan bridge equity commitments, wherein Lehman acquired riskier equity pieces of real estate investments and which could directly affect its balance sheet and liquidity position if not sold. Lehman ultimately exceeded its risk limits by margins as high as 70% for commercial real estate assets and by as much as 100% for its leveraged loans.

98.    Lehman also exceeded the balance sheet limits designed to contain its overall risk and maintain a net leverage ratio within the range required by ratings agencies. For example, Lehman's Fixed Income Division ("FID") exceeded its balance sheet limit by almost $20 billion at the end of 2Q07; by $11.17 billion at the end of 4Q07; and by $18 billion at the end of 1Q08; with overages concentrated in securitized products and real estate. Furthermore, despite the fact that Lehman almost doubled its Global Real Estate Group's ("GREG") balance sheet limit for commercial real estate transactions from $36.5 billion in 1Q07 to $60.5 billion in 1Q08, GREG still exceeded its balance sheet limit by approximately $600 million in 3Q07, approximately $3.8 billion in 4Q07, and nearly $5.2 billion in 1Q08.

99.    During the Relevant Period, Lehman's Offering Documents also materially represented its "stress tests"; one of Lehman's well-publicized risk controls. Lehman's stress tests were intended to determine the potential financial consequences of a major economic disruption to its portfolio of real estate assets and investments, testing required by the SEC. Indeed, in its SEC filings from the Relevant Period, Lehman publicly acclaimed that "[w]e use stress testing to evaluate risks associated with our real estate portfolios." On the contrary, Lehman actually excluded some of

- 30 -

its most risky principal investments (*e.g.*, commercial real estate investments, private equity investments, and leveraged loan commitments) from its stress tests.

100.    Lehman's failure to conduct stress testing of its real estate investments materially and adversely affected the Company.    As the Bankruptcy Examiner found, this failure rendered Lehman's stress tests "meaningless," and "Lehman's management did not have a regular and systematic means of analyzing the amount of catastrophic loss that the firm could suffer from those increasingly large and illiquid investments."    In fact, experimental stress tests conducted in 2008 indicated that a large proportion of Lehman's risk stemmed from real estate and private equity positions not included in the Company's stress tests.    For example, one of these experimental stress tests showed maximum potential losses of $9.4 billion, which included $7.4 billion in losses on real estate and private equity positions previously excluded from Lehman's woefully inadequate stress testing.    Another experimental stress test showed potential total losses of $13.4 billion, of which $10.9 billion was attributable to the previously excluded real estate and private equity positions, and only $2.5 billion to previously included trading positions.

101.    Lehman also materially misrepresented that it "work[s] proactively with the business areas before transactions occur to ensure appropriate risk mitigants are in place."    The truth, unbeknownst to investors, was that by the start of the Relevant Period, Lehman relaxed risk controls to accommodate the exponential growth of its commercial real estate business, including its bridge equity positions in the United States, which rapidly increased more than twenty-fold from $116 million in 2Q06 to more than $3 billion by the end of 2Q08.    Lehman's real estate bridge equity deals were particularly risky because declining values of the underlying real estate assets prevented Lehman from selling bridge equity positions as planned, such as with Archstone.    There, in addition to funding $8.5 billion in debt tranches, Lehman made an equity investment of $250 million and

- 31 -

purchased bridge equity of approximately $2.3 billion. Had Lehman appropriately included the Archstone transaction included in the Company's risk controls, it would have caused Lehman to exceed its risk appetite limits, in addition to its overall limits, on its real estate business. As the Bankruptcy Examiner testified before Congress, "[w]ith the inclusion of Archstone, Lehman was clearly in excess of its established risk limits."

102.    Lehman also routinely violated its Value at Risk ("VaR") limits. VaR is a statistical measure of the potential loss in the fair value of a portfolio due to adverse movement in the underlying risk factors, and is watched by the SEC and the market to assess a company's risks. For example, GREG was in breach of its VaR limits *every day* from early October 2007 through September 15, 2008 (the day Lehman declared bankruptcy). Similarly, Lehman's High Yield business repeatedly breached its VaR limits throughout the Relevant Period, including every day from mid-August 2007 through mid-May 2008. Likewise, Lehman's FID repeatedly breached its VaR limits from the beginning of the Relevant Period through May 2008, including every day from mid-October 2007 through mid-May 2008. As a consequence, Lehman breached its firm-wide VaR limit no less than 44 times during the Relevant Period. Because Lehman routinely exceeded its VaR limits, the representation that "[a]s part of our risk management control processes, we monitor daily trading net revenues compared to reported historical simulation VaR" was materially false and misleading when made. This material misrepresentation was included in Lehman's Forms 10-Q and 2007 10-K filed with the SEC during the Relevant Period.

103.    As the Bankruptcy Examiner found, Lehman's repeated failure to adhere to its own risk management policies rendered those policies "meaningless," enabling the Company to acquire billions of dollars of risky investments, thereby exposing itself to billions of dollars of losses that

otherwise would not have existed had Lehman actually adhered to the risk management limits it so publicly and proudly touted.

### 3.    The Offering Documents Failed to Disclose Lehman's Risk Concentrations

104.    GAAP requires disclosure of risk concentrations.  FAS No. 107, *Disclosures about Fair Value of Financial Instruments* ("FAS 107"), as amended by FAS No. 133, *Accounting for Derivative Instruments and Hedging Activities* ("FAS 133"), requires disclosure of significant concentrations of credit risk for financial instruments such as loans.

105.    Until the filing of its quarterly report on Form 10-Q for the quarter ended May 31, 2008 on July 10, 2008 ("2Q08 10-Q") – when Lehman finally (yet belatedly) began to provide information concerning its commercial mortgage and real estate investment related portfolios – Lehman omitted the required disclosures concerning significant concentrations of credit risk from its mortgage and real estate related assets.  Throughout the Relevant Period, Lehman's Offering Documents materially misrepresented the Company's risk concentrations in, among other things, highly risky Alt-A loans, illiquid commercial real estate assets and leveraged loan commitments.  In addition, the Offering Documents failed to disclose that Lehman had heavy concentrations of illiquid assets, such as residential and commercial real estate with deteriorating values.  Because of the rapid decline in values of mortgage-backed securities and the real estate market as a whole, such disclosures were especially important to the investing public.  In fact, an internal Lehman audit report dated February 26, 2007 advised that the Company "address the main risks in the Firm's portfolio," including "illiquidity" and "concentration risk."  By failing to disclose material facts about Lehman's concentration of mortgage- and real-estate related risks, investors could not meaningfully assess the Company's exposure to the mortgage and real estate markets, as well as the

increasing riskiness of Lehman's portfolio of real estate-related assets (*e.g.*, mortgage loans, properties, etc.).

106.    **Alt-A Concentration**: Lehman was a leading originator of Alternative A-paper or Alt-A loans – a type of mortgage that is typically associated with borrowers who purportedly have the creditworthiness of "prime" quality, but have traits that prevent the loans from qualifying as "prime." Lehman's Offering Documents did not even include the term "Alt-A" until Lehman filed its 1Q08 10-Q on April 9, 2008, and even that filing was materially misleading. When Lehman finally began to identify Alt-A holdings on its balance sheet in its 2Q08 10-Q, Lehman consolidated its Alt-A and prime holdings into a single category, labeled "Alt-A/Prime." Lehman did this even though less than 7% ($1 billion of the reported $14.6 billion "Alt-A/Prime" exposure) actually consisted of "prime" loans. By initially omitting Alt-A holdings altogether (only to later group them with "Prime" mortgage-related assets), the Offering Documents failed to sufficiently disclose Lehman's true exposure to the riskier Alt-A loans experiencing rising delinquencies and defaults throughout the Relevant Period. Moreover, Lehman failed to disclose that it loosened its lending standards for Alt-A loans so much that the quality of these loans resembled subprime much more than prime. As reflected in a March 12, 2007 internal Lehman e-mail: "I have pointed out in the past that Aurora's product is far from Alt-A anymore. The traditional Alt-A program is only 40% of Aurora's production . . . the rest 60% of production . . . has 100% financing in lower FICOs with non-full documentation and/or investment properties."

107.    **Commercial Real Estate Concentration**: From the close of Lehman's 2006 fiscal year to the end of its 2007 fiscal year, Lehman increased its global commercial real estate assets by more than 90%, from $28.9 billion to $55.2 billion. However, by the start of the Relevant Period in July 2007, Lehman personnel already recognized internally that the market for placing investments

- 34 -

backed by commercial real estate was "virtually closed" and that the leveraged loan market had shut down. Nevertheless, Lehman already committed to financing several large commercial real estate deals that closed in October and November 2007, including Archstone. Indeed, the Company's involvement in Archstone and several other real estate bridge equity deals was so enormous, it dwarfed Lehman's entire pre-existing real estate book. On November 6, 2007, GREG made a presentation to Lehman's Executive Committee pointing out the significant risks inherent in the over-concentration of its global commercial real estate portfolio. This presentation stated that "under any circumstances an estimated $15[ billion] reduction in global balance sheet is warranted," and GREG recommended reducing the global GREG balance sheet from $58 billion to $43.7 billion by March 31, 2008. Furthermore, Lehman's commercial real estate portfolio included high-risk Principal Transactions Group ("PTG") investments involving property development projects whose value would be materially affected if the developer failed to perform in accordance with the business plan. Lehman's PTG portfolio was especially risky because it focused on land development projects, which carried more risk than other property types; was concentrated in California and other boom markets; and because Lehman took equity stakes in the developments (approximately 30% as of fiscal 2007 year-end). The PTG balance sheet grew from $6.1 billion in fiscal 2005 to $6.9 billion in fiscal 2006, and then to $9.6 billion in fiscal 2007. Lehman, however, did not disclose these concentrated risks. Due to Lehman's over-concentration of commercial real estate assets, the Company ultimately had to write down its commercial real estate positions by approximately $4 billion from 1Q08 to 3Q08.

108.    As a result of the material misrepresentations set forth above regarding Lehman's Repo 105 transactions' risk management overrides and its failure to adequately disclose its

- 35 -

concentration of credit risk, the Offering Documents were each materially false and misleading when issued.

## VI.    CAUSES OF ACTION UNDER THE 1933 ACT

### COUNT I

### Violations of Section 11 of the 1933 Act
### Against All Defendants

109.    Plaintiff repeats and realleges each and every allegation contained above as if set forth fully herein and further alleges as follows.  This Count is based on negligence and strict liability and does not sound in fraud.  Any allegations of fraud or fraudulent conduct and/or motive are specifically excluded from this Count.

110.    This Count is asserted against all defendants for violations of §11 of the 1933 Act, 15 U.S.C. §77k, on behalf of plaintiff who purchased or otherwise acquired the Lehman Notes, pursuant or traceable to the materially false and misleading Shelf Registration Statement and Offering Documents incorporated by reference in the Shelf Registration Statement.

111.    The Shelf Registration Statement, including the Offering Documents and Structured Note Offering Materials incorporated by reference therein at the time of each Offering, contained untrue statements of material fact and omitted to state other material facts necessary to make the statements made therein not misleading.  The specific documents containing such untrue statements and omissions that were incorporated by reference in the Shelf Registration Statement with regard to each Offering are identified in Appendix A.

112.    Defendants Fuld, O'Meara and Callan were Lehman executive officers and representatives responsible for the contents and dissemination of the Shelf Registration Statement. Each of the Director Defendants was a director of Lehman at the time the Shelf Registration Statement became effective as to each Offering and Structured Note Offering.  Defendants Fuld,

- 36 -

O'Meara and Callan signed the Shelf Registration Statement (or documents incorporated by reference) in their capacities as officers or directors of Lehman, and caused and participated in the issuance of the Shelf Registration Statement. By reasons of the conduct alleged herein, each of these defendants violated §11 of the 1933 Act.

113.    The Underwriter Defendants were underwriters of the Offerings. The Underwriter Defendants acted negligently and are liable to plaintiff for the respective Offerings in which each Underwriter Defendant participated.

114.    E&Y acted as Lehman's auditor and was named by consent as having certified a part of the Registration Statement as well as Lehman's financial results included in its 2006 and 2007 Forms 10-K. E&Y further reviewed Lehman's financial results included in its 1Q07-2Q08 Forms 10-Q, which were incorporated into the Prospectuses.

115.    Defendants owed plaintiff the duty to make a reasonable and diligent investigation of the statements contained in the Shelf Registration Statement, and any incorporated documents, at the time each such Offering became effective to ensure that said statements were true and that there were no omissions of material fact which rendered the statements therein materially untrue or misleading. Defendants did not make a reasonable investigation or possess reasonable grounds to believe that the statements contained in the Shelf Registration Statement were true, were without omissions of any material facts, and were not misleading. Accordingly, defendants acted negligently and are therefore liable to plaintiff for the Offerings.

116.    Plaintiff does not know of the negligent conduct alleged herein or of the facts concerning the untrue statements of material fact and omissions alleged herein, and by the reasonable exercise of care could not have reasonably discovered such facts or conduct.

117.     None of the untrue statements or omissions alleged herein was a forward-looking statement but, rather, each concerned existing facts.  Moreover, defendants did not properly identify any of these untrue statements as forward-looking statements and did not disclose information that undermined the validity of those statements.

118.     Less than one year elapsed from the time that plaintiff discovered, or reasonably could have discovered, the facts upon which this Count is based from the time that the initial complaint was filed asserting claims arising out of the Shelf Registration Statement.  Less than three years elapsed from the time that the securities upon which this Count is brought were offered in good faith to the public to the time that the initial complaint was filed.  Moreover, each of the claims at issue in this action were alleged, and were found to be alleged in a timely manner, on behalf of a class, including plaintiff in *In re Lehman Brothers Equity/Debt Securities Litigation*, No. 1:08-cv-05523-LAK (Dkt. Nos. 212, 439 in No. 1:09-md-02017-LAK), as well as similarly related actions, and any statute of limitations or repose applicable to this action were tolled based upon the filing of the claims in that action.

119.     Plaintiff has sustained damages.  The value of the securities sold pursuant or traceable to the Offerings has declined substantially due to defendants' violations of §11 of the 1933 Act.

120.     By reason of the foregoing, defendants are liable for violations of §11 of the 1933 Act to plaintiff.

**COUNT II**

**Violations of Section 15 of the 1933 Act**
**Against the Officer Defendants**

121.     Plaintiff repeats and realleges each and every allegation contained above as if set forth fully herein and further alleges as follows.

667944_1

122.     This Count is asserted against the Officer Defendants, namely, Fuld, O'Meara and Callan, for violations of §15 of the 1933 Act, 15 U.S.C. §77o, on behalf of plaintiff who purchased or otherwise acquired Lehman Notes, pursuant or traceable to the Offering Documents and was damaged thereby.

123.     At all relevant times, the Officer Defendants were controlling persons of the Company within the meaning of §15 of the 1933 Act.  Each of the Officer Defendants served as an executive officer or director of Lehman prior to and at the time of the Offerings.

124.     The Officer Defendants at all relevant times participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of Lehman's business affairs.  As officers and directors of a publicly owned company, the Officer Defendants had a duty to disseminate accurate and truthful information with respect to Lehman's financial condition and results of operations.  Because of their positions of control and authority as officers or directors of Lehman, the Officer Defendants were able to, and did, control the contents of the Offering Documents, which contained materially untrue financial information.

125.     By reason of the aforementioned conduct, each of the Officers Defendants is liable under §15 of the 1933 Act, jointly and severally, to plaintiff.  As a direct and proximate result of the conduct of Lehman and the Officer Defendants, plaintiff suffered damages in connection with its purchase or acquisition of the Lehman Notes.

## VII.     VIOLATIONS OF THE 1934 ACT

126.     By June of 2007, Lehman amassed an enormous and concentrated exposure to illiquid assets, including commercial real estate and risky subprime and Alt-A mortgage-related assets. Facing increasing concerns over the rapidly deteriorating real estate market, the Officer Defendants (Fuld, O'Meara and Callan) took pains to publicly emphasize Lehman's comprehensive risk

- 39 -

management framework as a mitigant, while also highlighting its goal to deleverage its balance sheet.

127.    In reality, however, the Officer Defendants knew that Lehman entered into Repo 105 transactions covering tens of billions of dollars in assets at the end of each quarter to manipulate Lehman's balance sheet, a contrivance having the purpose of appearing to reduce Lehman's net leverage ratio, improve its balance sheet and deleverage its risk exposures.  According to the Bankruptcy Examiner who conducted over 250 interviews and reviewed over more than five million documents: "Lehman's approach to risk ultimately created the conditions that led Lehman's top managers to use Repo 105 transactions . . . ."

### A.    Repo 105 Transactions

#### 1.    Lehman Utilized Repo 105 for a Fraudulent Purpose

128.    The undisclosed Repo 105 transactions were sham transactions with no legitimate business purpose or economic substance.  Lehman participated and executed these transactions primarily to artificially reduce its net leverage and overstate Lehman's liquidity at the end of reporting periods.  As the Bankruptcy Examiner found:

> The Examiner has investigated Lehman's use of Repo 105 transactions and has concluded that the balance sheet manipulation was intentional, for deceptive appearances, had a material impact on Lehman's net leverage ratio, and, because Lehman did not disclose the accounting treatment of these transactions, rendered Lehman's Forms 10-K and 10-Q (financial statements and MD&A) deceptive and misleading.

129.    Numerous members of Lehman's senior management have admitted as much, including the following:

(a)    Martin Kelly ("Kelly"), Lehman's former Global Financial Controller:

> "[T]he only purpose or motive for [Repo 105] transactions was reduction in balance sheet," and "there was no substance to the transactions."

*    *    *

"[I]f there were more transparency to people outside the firm around the transactions, it would present a dim picture" of Lehman.

. . . [I]f an analyst or a member of the investing public were to read Lehman's Forms 10-Q and 10-K from cover to cover, taking as much time as she or he needed, "they would have no transparency into [Lehman's] Repo 105 program."

(b)    Joseph Gentile ("Gentile"), a FID executive who reported to Gerard Reilly

("Reilly"), Lehman's Global Product Controller,

stated unequivocally that no business purpose for Lehman's Repo 105 transactions existed other than obtaining balance sheet relief. Gentile explained that Repo 105 transactions filled the gap between what Lehman could sell through normal business practices and the assets that Lehman needed to move off its balance sheet in order to meet balance sheet targets.

(c)    Edward Grieb ("Grieb"), Lehman's former Global Financial Controller who

reported directly to O'Meara:

Repo 105 transactions were a balance sheet management mechanism; "a tool that could be used to reduce Lehman's net balance sheet."

(d)    Matthew Lee ("Lee"), a former Lehman Senior Vice President, Finance

Division, in charge of Global Balance Sheet and Legal Entity Accounting through at least June 2008:

Lehman would "sell" assets through Repo 105 transactions approximately four or five days before the close of a quarter and then repurchase them approximately four or five days after the beginning of the next quarter in order to "reverse engineer" its net leverage ratio for its publicly filed financial statements.

(e)    Kaushik Amin ("Amin"), former Head of Liquid Markets:

Lehman reduced its net balance sheet at quarter-end by engaging in tens of billions of dollars of Repo 105 transactions and the Repo 105 inventory would return to Lehman's balance sheet a number of days after the opening of the new quarter. Amin e-mailed Kieran Higgins regarding the group's balance sheet at quarter-end on February 28, 2008, stating: "We have a desperate situation and I need another 2 billion from you, either through Repo 105 or outright sales. Cost is irrelevant, we need to do it."

(f)    Jerry Rizzieri ("Rizzieri"), a member of Lehman's FID:

E-mailed Mitchell King, the Head of Lehman's United States Agencies trading desk, just four days prior to the close of Lehman's 2007 fiscal year: "Can you imagine

- 41 -

what this would be like without [Repo] 105?," in reference to meeting a balance sheet target.

Following the announcement of "new balance sheet targets for quarter end," Rizzieri wrote in an April 22, 2008 email to Kieran Higgins: "We will need to be focused very early in the process in order to meet these targets . . . [there is] no room for error this quarter," and "we also need to have a coordinated approach to repo 105 allocation."

       (g)     Mitchell King, former Head of Lehman's United States Agencies trading desk, who on a weekly basis compiled lists of collateral available for Repo 105, told the Examiner:

[N]o business purpose existed for Repo 105 transactions other than to reduce Lehman's net balance sheet.

       (h)     On April 2, 2008, Bart McDade ("McDade"), Lehman's Head of Equities from 2005-2008 and COO from June to September 2008, received an e-mail from Hyung Lee stating, "Not sure you are familiar with Repo 105 but it is used to reduce net balance sheet in our governments businesses around the world." McDade replied, "I am very aware . . . it is another drug we r on."

130.     Additional accounts by Lehman employees and contemporaneous e-mails during the Relevant Period confirm that there was no legitimate business purpose to the Repo 105 program. For example:

- In July 2008, Michael McGarvey, a former senior vice president in FID, e-mailed a Lehman colleague, "[Repo 105] is basically window-dressing. We are calling repos true sales based on legal technicalities. The exec committee wanted the number cut in half."

- Paolo Tonucci, Lehman's former Treasurer, recalled that near the end of reporting periods, Lehman would deploy Repo 105 transactions to reduce its balance sheet. He also acknowledged that Lehman's use of Repo 105 transactions impacted Lehman's net leverage ratio.

- Lehman CFO Ian Lowitt ("Lowitt") admitted to the Examiner that Lehman established a "regime of limits," meaning balance sheet targets, for each business unit to manage to and that Repo 105 was one way to "sell down assets" to meet the targets.

- Marie Stewart, Lehman's Global Head of Accounting Policy, called Repo 105 "a lazy way of managing the balance sheet as opposed to legitimately meeting balance sheet targets at quarter end."

- John Feraca, who ran the Secured Funding Desk in Lehman's Prime Services Group, stated: "Senior people felt urgency only in the sense of trying to get to their targets because the Finance Division wanted to report as healthy a balance sheet and leverage ratio as possible for investors, creditors, rating agencies and analysts." He added, "[i]t was universally accepted throughout the entire institution that Repo 105 was used for balance sheet relief at quarter end."

131.    That Lehman utilized Repo 105 transactions for quarter-end balance sheet reduction is further confirmed by the fact that its use of these transactions followed a conspicuous, cyclical pattern for each reporting period; spiking significantly at each quarter end during the Relevant Period. For example, as the close of 2008's first quarter approached, Lehman's Repo 105 usage increased from $24.217 billion on February 15, 2008 to $31.029 billion on February 22nd; to $40.003 billion on February 28th; and then jumped to $49.102 billion on February 29th (quarter-end). Similarly, at the end of the second quarter of 2008, Repo 105 transactions exceeded $50 billion, whereas the intra-quarter dip was approximately $24.7 billion (as of April 30, 2008), and had been as low as $12.75 billion on March 14, 2008.

132.    The dollar values of Lehman's monthly outstanding Repo 105 transactions in the Company's fiscal quarters during the Relevant Period are shown below in Table 4:

| Table 4 | |
|---|---|
| 08/31/07 | $36.4 billion (end of 3Q07) |
| 09/30/07 | $24.4 billion |
| 10/31/07 | $29.9 billion |
| 11/30/07 | $38.6 billion (end of 4Q07) |
| 12/31/07 | N/A |
| 01/31/08 | $28.9 billion |
| 02/28/08 | $49.1 billion (end of 1Q08) |
| 03/31/08 | $24.6 billion |

- 43 -

| Table 4 | |
|---|---|
| 04/31/08 | $24.7 billion |
| 05/31/08 | $50.4 billion (end of 2Q08) |

### 2. Lehman Utilized Repo 105 to Avoid Recording Losses on Illiquid or "Sticky" Assets While Creating the False Appearance of Deleveraging

133.    Throughout the Relevant Period, ratings agencies, analysts and other market participants focused on the leverage ratios of investment banks like Lehman with large exposures to commercial real estate and mortgage-related assets.  In mid-2007, ratings agencies began calling on investment banks to deleverage or risk ratings downgrades.

134.    However, Lehman found it difficult to deleverage by selling real estate and mortgage-related assets because many of its positions were illiquid and could not be sold without incurring substantial losses.  In addition, selling illiquid assets at discounted prices would have negatively impacted Lehman's earnings, resulting in a loss of market confidence in the valuations Lehman ascribed to its remaining assets.  As the former head of the Federal Reserve Bank of New York, Timothy Geithner, described, discounted sales would have revealed that Lehman had "a lot of air in [its] marks," which would have eroded investor confidence in the Company's remaining assets.

135.    As the Bankruptcy Examiner stated with respect to Lehman's inventory,

Lehman's expansion of its Repo 105 program mitigated, in part, the adverse impact its increasingly "sticky"/illiquid inventory – comprised mostly of the leveraged loans and residential and commercial real estate positions Fuld wanted to exit – was having on the firm's publicly reported net leverage and net balance sheet.

\*       \*       \*

[M]any of Lehman's inventory positions had by then become increasingly "sticky" or difficult to sell without incurring substantial losses. It is against this backdrop of increased market focus on leverage that Lehman significantly increased its quarter-end use of Repo 105 transactions.

136.    Indeed, a February 10, 2007 Lehman document entitled "Proposed Repo 105/108 Target Increase for 2007," recognized that "Repo 105 offers a low cost way to offset the balance sheet and leverage impact of current market conditions," and further stated that "[e]xiting large CMBS positions in Real Estate and sub prime loans in Mortgages before quarter end would incur large losses due to the steep discounts that they would have to be offered at and carry substantial reputation risk in the market. . . .   A Repo 105 increase would help avoid this without negatively impacting our leverage ratios."

137.    In other words, finding itself unable to unload some of its most illiquid assets, but desperately trying to avoid reporting losses with write-downs, Lehman resorted turned to improperly using Repo 105 transactions in order to create the illusion that it was delivering on its promise to the market to deleverage by selling assets when, in reality, Lehman was only able to achieve the appearance of deleveraging through undisclosed Repo 105 transactions that had no true economic substance.

138.    That Lehman turned to Repo 105 transactions to create the illusion of deleveraging is best exemplified in a May 2008 written presentation to Moody's Investor Service.   In this presentation, Lehman represented that it strengthened its capital position through "active deleveraging," including "approximately $50 billion reduction in net assets" and, thus, no negative rating action for the firm was justified.  Lehman claimed within this presentation that net leverage was expected to decrease from 15.4x to 12.6x, and that the $50 billion reductions in the second quarter 2008 included key FID high-risk assets, such as commercial and residential mortgages. Lehman made a similar presentation to Fitch on June 3, 2008, noting that "[c]apital position is stronger than ever with delevering bringing both net and gross leverage to multi-year lows."

- 45 -

Nowhere did Lehman disclose in these presentations its use of Repo 105 transactions to manage its balance sheet by reducing net assets by over $49 billion in 1Q08 and $50 billion in 2Q08.

### B.    Risk Management

139.    As discussed above (¶¶90-103), by the start of the Relevant Period, Lehman decided to take on more principal risk.  This strategy led directly to an explosive balance sheet growth for fiscal 2007 of nearly 50% (from net assets of $269 billion in 4Q06 to $397 billion in 1Q08), including increased leverage exposure to residential mortgage-related and commercial real estate assets.  By doing this, however, defendants continued to misrepresent Lehman's robust risk management to the investing public, while, at the same time, internally relaxing and exceeding its risk controls.

140.    The Officer Defendants knew and systematically disregarded that its internally known and actual risk profile significantly deviated from Lehman's publicly stated risk policies and safeguards, especially regarding its risk limits and stress testing.  As the Bankruptcy Examiner testified before Congress:

> Lehman was significantly and persistently in excess of its own risk limits. ***Lehman management decided to disregard the guidance provided by Lehman's risk management systems***. Rather than adjust business decisions to adapt to risk limit excesses, management decided to adjust the risk limits to adapt to business goals.

141.    Based on his investigation, the Examiner found that Lehman's management:

- Chose to disregard or overrule the firm's risk controls on a regular basis.

- Decided to exceed risk limits with respect to Lehman's principal investments, namely the "concentration limits" on Lehman's leveraged loan and commercial real estate businesses, including the "single transaction limits" on the leveraged loans.

- Excluded certain risky principal investments from its stress tests.

- Decided to treat primary firm-wide risk limit – the risk appetite limit – as a "soft" guideline.

- Did not recalibrate the firm's pre-existing risk controls to ensure that its new investments were properly evaluated, monitored and limited.

142.    In fact, by the beginning of the Relevant Period, members of the Executive Committee decided to ignore the "single transaction limit" designed to ensure that Lehman's investments were properly limited and diversified by business line and counterparty.  This allowed Lehman to engage in approximately 30 leveraged finance deals exceeding the single transaction limit policy during the Relevant Period.  For example, as the Examiner described in his Congressional testimony:

> Lehman committed to what was its largest single investment – Archstone – in May 2007, with closing to occur later.  It was clear prior to the commitment that the Archstone transaction would put Lehman over its then existing risk limits, but the deal was committed anyway.  With the inclusion of Archstone, Lehman was clearly in excess of its established risk limits.  But in the face of exceeding its risk limits, Lehman did not take steps to reduce risk; rather, it simply raised the risk limits.

143.    Moreover, several commitments exceeded Lehman's internal loss threshold by a factor of 6, and with respect to 24 of the largest high yield deals in which Lehman participated, Lehman committed over $10 billion more than the single transaction limit would have allowed.

144.    The Bankruptcy Examiner further concluded that Lehman's stress tests – conducted on a monthly basis and reported to regulators and the Board of Directors – were "meaningless" because they excluded Lehman's commercial real estate investments, private equity investments and, for a time, its leveraged loan commitments.  According to the Examiner's Report:

> An internal audit advised that Lehman "address the main risks in the Firm's portfolio," including "illiquidity" and "concentration risk."  But Lehman did not take significant steps to include these private equity positions in the stress testing until 2008, even though these investments became an increasingly large portion of Lehman's risk profile.

145.    On May 31, 2007, only weeks prior to the start of the Relevant Period, an internal stress scenario identified a possible $3.2 billion loss for Lehman, resulting in recommendations that

- 47 -

it reduce its forward commitments by nearly half, impose rules on leverage, and develop a framework for limiting and evaluating the leveraged lending business. Ignoring its own internal recommendations, Lehman entered into an additional $25.4 billion of leveraged loan commitments by the end of July 2007 because of its unwillingness to terminate deals that were in the pipeline or under negotiation.

### C. The Officer Defendants' False and Misleading Statements During the Relevant Period

146.     During the Relevant Period, the Officer Defendants made a series of materially false and misleading statements and omissions in Lehman's SEC filings. These material misrepresentations are contained in Lehman's SEC filings identified above in ¶¶65-77 and 104-108, and are also actionable under the 1934 Act.

147.     In addition to the false and misleading statements and omissions in Lehman's Relevant Period SEC filings, the Officer Defendants also made a series of material misrepresentations during Lehman's quarterly earnings conference calls and investor conferences as detailed below.

148.     **2Q07**: On June 12, 2007, Lehman held a conference call to discuss its financial results for the second quarter of 2007. During the conference call, defendant O'Meara represented that Lehman's "net leverage ratio of 15.5 times is right in line with the 15.4 times we had at the end of the first quarter." O'Meara's statement was false and misleading because Lehman's net leverage ratio had been artificially reduced to 15.5 by Lehman's temporary removal of $31.943 billion of assets through Repo 105 transactions at quarter-end, and Lehman's actual net leverage ratio for the quarter was 16.9.

149.     During the conference call, O'Meara also reassured investors that "the subprime market challenges are . . . reasonably contained to this asset class" and that the "lion's share" of

- 48 -

Lehman's originations were not in subprime, but rather in Alt-A, stating, "we actually had terrific performance on the origination side around the Alt-A business." O'Meara's statement was false and misleading because market challenges were not contained to subprime, but extended to other asset classes, including Alt-A.

150.    Indeed, a March 2007 internal Lehman analysis entitled "Risk Review: Aurora and BNC February 2007" concluded that "[t]he credit deterioration [in Alt-A] has been almost parallel to the one of the subprime market." Moreover, Lehman's "Alt-A" originations were particularly risky because Lehman had loosened its lending criteria to reach riskier borrowers. The Bankruptcy Examiner found that Lehman's Alt-A lending reached borrowers of lesser credit quality than those who historically had been considered Alt-A borrowers, and that the Alt-A risk profile increased in much the same way as the risk in subprime mortgages.

151.    In fact, Lehman Senior Vice President in Risk Management, Dimitrios Kritikos ("Kritikos"), stated in an internal January 30, 2007 e-mail that during the "last 4 months Aurora has originated the riskiest loans ever, with every month been riskier than the one before." Kritikos further made clear that the majority of Lehman's loan originations were, in fact, not truly Alt-A, stating in an internal March 12, 2007 e-mail that "Aurora's product is far from Alt-A anymore. The traditional Alt-A program is only 40% of Aurora's production . . . . My concern is the rest 60% of production, that has 100% financing in lower FICOs with non-full documentation and/or investment properties." Indeed, Lehman's Alt-A lending standards had so deteriorated that loans made pursuant to Aurora's Mortgage Maker were internally referred to as "Alt-B" rather than Alt-A.

152.    **3Q07**: On September 18, 2007, Lehman hosted a conference call with analysts and investors to discuss the Company's third quarter financial results. During the conference call, defendant O'Meara stated that Lehman's net leverage ratio was 16.0, without disclosing that

- 49 -

management had artificially reduced this ratio from its true level of 17.8, through $36.407 billion in Repo 105 transactions.

153.    In the conference call, O'Meara also repeatedly stressed the Company's "strong risk . . . management," emphasizing particularly its "strong risk management culture with regard to the setting of risk limits." These statements were false and misleading because, as set forth above in ¶¶90-108, Lehman disregarded its risk limits and policies on a regular basis. For example, Lehman (a) exceeded its risk appetite limit by $41 million in July 2007 and $62 million in August 2007; (b) committed to over 30 deals that exceeded its $250 million loss threshold and $3.6 billion notional limit for single transactions; (c) exceeded the balance sheet limit by almost $20 billion for its FID; and (d) breached its VaR limits.

154.    Based upon the false information provided in Lehman's financial results and following the September 18, 2007 conference call, Fox-Pitt Kelton analysts, David Trone and Ivy De Dianous, "urge[d] investors to buy LEH now" and Wachovia analyst Douglas Sipkin commented on Lehman's "strong liquidity position."

155.    On November 14, 2007, Lehman management presented at the Merrill Lynch Banking & Financial Services Investor Conference (the "Merrill Conference"). During the Merrill Conference, Lowitt represented that Lehman continued to show very substantial growth despite challenging market conditions by, among other things, having an "extremely deep risk culture which is embedded through the firm," being "very conservative around risk," and "running a business where we could distribute all the risk." In particular, Lowitt repeatedly stressed that Lehman had "stay[ed] true to the principle . . . of our strategy of being in the moving rather than the storage business. So essentially originating to distribute, not holding stuff on our balance sheet, not storing risk but moving it on." These statements were false and misleading. Contrary to these statements,

- 50 -

Lehman's strategy was not to be in the "moving business," but the "storage business," which greatly increased Lehman's risk profile as it accumulated vast amounts of highly leveraged, concentrated and illiquid assets.  In fact, a July 20, 2007 e-mail from Lowitt to O'Meara acknowledged that Lehman's liquidity concerns stemmed from its failure to abide by its own risk limits, stating: "In case we ever forget; this is why one has concentration limits and overall portfolio limits.  Markets do seize up."

156.    **4Q07**: On December 13, 2007, Lehman hosted a conference call to discuss the Company's fourth quarter and record fiscal 2007 financial results.

157.    During the conference call, defendant O'Meara stated that "[w]e ended the quarter with a net leverage ratio of approximately 16.1 times, in line with last quarter."  This statement was false and misleading because in reality Lehman's net leverage ratio was 17.8, an overstatement of 17 basis points, as net assets had been reduced by Lehman's temporary removal of $38.634 billion of assets through Repo 105 transactions that were without economic substance.

158.    During the conference call, O'Meara also stated that the fourth quarter results "reflect[] the strength of our risk management culture in terms of managing our overall risk appetite, seeking appropriate risk reward dynamics and exercising diligence around risk mitigation." Defendant Callan also represented that the Company's success was attributable to "our strong risk and liquidity management."  These statements were false and misleading because, as set forth above in ¶¶90-108, Lehman disregarded its own risk limits and policies on a regular basis.  Lehman exceeded its risk appetite limits by $508 million in November 2007, even after it increased the limit. Further, Lehman disregarded the Company's single transaction limit, including committing $10 billion more than the limit had allowed with respect to 24 of its largest high yield deals.  The balance sheet limit for Lehman's divisions was exceeded by tens of billions – for example, GREG exceeded

- 51 -

its balance sheet limit by approximately $3.8 billion in 4Q07, and FID exceeded it by $11.17 billion at the end of 4Q07; and VaR limits were breached almost every day for some of Lehman's divisions, including GREG and High Yield.

159.     Additionally, O'Meara stated that the fourth quarter results "reinforce[ed] the importance of our disciplined liquidity and capital management framework which sets us up to operate our business through periods of market stress"; that Lehman's liquidity position "continues to be very strong"; that the Company had "structured [its] liquidity framework to cover our funding commitment and cash outflows for a 12 month period without raising new cash in the unsecured markets or selling assets outside [its] liquidity pool"; and that "[w]e consider our liquidity framework to be a competitive advantage in today's markets."  Callan similarly echoed that "we currently have ample liquidity and capital in place."  These statements were false and misleading. The Company had significant liquidity concerns due to the illiquid assets it had accumulated as part of its countercyclical growth strategy.  In addition, Lehman overstated its true liquidity position through the use of Repo 105 transactions that were without economic substance.

160.     Following the December 13, 2007 press release and conference call, analysts James Mitchell and John Grassano from Buckingham continued to rate Lehman a "Strong Buy," stating: "We continue to emphasize LEH's strong risk management abilities (which is enabling them to grab market share) . . . ."

161.     **1Q08**: On March 18, 2008, shortly after Bear Stearns collapsed, Lehman hosted a conference call to discuss its first quarter 2008 financial results.  During the conference call, defendant Callan stated: "We did, very deliberately, take leverage down for the quarter. We ended with a net leverage ratio of 15.4 times down from 16.1 at year end."  This statement was materially false and misleading because Lehman's net leverage ratio for the quarter was actually 17.3, and had

- 52 -

only been artificially reduced to 15.4 because Lehman engaged in $49.1 billion of Repo 105 transactions at quarter-end. Moreover, as set forth in ¶¶65-77 above, the net leverage ratio for the fourth quarter was really 17.8, and had only been artificially reduced to 16.1 at year end because the figure was similarly manipulated through the use of almost $40 billion in Repo 105 transactions.

162.    During the conference call, Callan also continued to stress Lehman's "continued diligence around risk management" and its "risk management discipline." These statements were false and misleading because, as set forth above in ¶¶90-108, Lehman disregarded its risk limits and policies on a regular basis. For example, by the time of Callan's statement, Lehman not only increased its risk appetite four times from $2.3 billion in December 2006 to $4 billion in December 2007, but disregarded this "hard" limit by at least $500 million for every month from September 2007 through February 2008. Moreover, Lehman committed approximately $10 billion more than the single transaction limit allowed with respect to 24 of its largest high yield deals, and did not impose a limit on its risky leveraged-loan bridge equity commitments. Additionally, Lehman exceeded its balance sheet limit, including going over by $18 billion for FID and $5.2 billion for GREG. Lehman also repeatedly breached its VaR limits (sometimes daily) within its major business divisions, including GREG, High Yield and FID.

163.    Callan's statements during the conference call were critically important to Lehman, and intended to dispel concerns about Lehman following Bear Stearns' collapse. As Callan spoke during the conference call, Lehman's stock price spiked.

164.    After the March 18, 2008 statements referenced above (*see* ¶¶161-163, *supra*), analysts felt reassured. Oppenheimer noted that "Lehman dispelled all doubts of a solvency crisis at the company." Buckingham continued its strong buy rating, stating "[l]iquidity also remained strong" and "net leverage was brought down to 15.4x vs. 16.1x in the previous two quarters." Fox-

Pitt Kelton stated that "Mgmt's liquidity disclosures were extensive and comforting, while risk mgmt continues to be strong at Lehman." And Punk Ziegel enthused:

> In one of the most impressive presentations ever made by a CFO, Erin Callan reviewed all of the critical questions concerning Lehman's position convincingly arguing that the company was not in financial trouble. . . . Ms. Callan first demonstrated that Lehman had ample liquidity. . . . The company also indicated that it had raised approximately 2/3rds of the needed funding for the year by March. There was a very detailed discussion of the company's assets and a table provided to demonstrate that the write downs taken were manageable. . . . In sum, virtually no one listening to this call could have concluded that this company was in financial trouble.

165.    **2Q08**: On June 9, 2008, Lehman held a conference call to discuss its preliminary results for 2Q08 (the quarter ended May 31, 2008). In addition to repeating the materially false and misleading financial information in the Form 8-K (*see* ¶85), Callan affirmatively represented that a large part of the asset reduction in Lehman's net leverage came from selling "less liquid asset categories," including "residential and commercial mortgages and leveraged finance exposures" and that "[o]ur deleveraging was aggressive, as you can see, and is complete." These material misrepresentations by Callan failed to disclose that Lehman removed $50 billion in assets from its balance sheet by using Repo 105 transactions that were without economic substance. Further, Lehman's deleveraging was far from complete, as it continued to retain vast amounts of illiquid assets masked by the Repo 105 transactions. Moreover, the Repo 105 transactions shifted highly liquid assets off Lehman's balance sheet, in return saddling the Company with an even greater concentration of illiquid assets. If Lehman in fact sold or otherwise divested itself of the "sticky" or illiquid assets, it would have no choice but to record losses for the decline in value of similar assets.

166.    During the conference call, Callan represented that the Company grew its cash capital surplus to $15 billion and grew its liquidity pool to almost $45 billion – its "largest ever" – and that the "$45 billion of [its] liquidity pool was well in excess of [its] short-term unsecured financing

- 54 -

liabilities." These material misrepresentations failed to disclose that Lehman's undisclosed Repo 105 transactions required the Company to repurchase $50 billion in assets.

167. Callan also stated that Lehman "completed [its] entire budgeted funding plan for all of 2008 and do not need to revisit the debt markets." In discussing the $6 billion of equity raised by the Company on June 9, Callan stated: "To be clear, we do not expect to use the proceeds of this equity raise to further decrease leverage but rather to take advantage of future market opportunities. . . . we stand extremely well capitalized to take advantage of these new opportunities." Contrary to Callan's suggestion that the Company raised additional capital merely to take advantage of favorable market opportunities, the capital raise was crucial to the Company's very survival. In fact, at the time, Lehman was aware that it would need to begin posting billions of dollars more in collateral with JPMorgan. Moreover, Treasury Secretary Paulson later told *The New York Times* that when "Lehman announced bad earnings around the middle of June, and we told Fuld that if he didn't have a solution by the time he announced his third-quarter earnings, there would be a serious problem. We pressed him to get a buyer."

168. Additionally, when asked by Merrill Lynch analyst, Guy Moszkowski, if Lehman liberated itself from its "absolute easiest assets to sell," Callan falsely and misleadingly stated that the opposite was true and, in fact, that Lehman sold many of its riskier, less-liquid assets during the quarter. Callan's statement materially omitted Lehman's use of Repo 105 transactions to temporarily remove highly liquid – not illiquid/sticky – assets from the firm's balance sheet.

169. During a June 16, 2008 conference call, Lowitt further stated that "we reduced net leverage from 15.4 times to 12 times prior to the impact of last week's capital rates. . . . Our deleveraging included a reduction of assets across the Firm, including residential and commercial mortgages . . . ." Fuld also stated that "we reduced our gross assets by $147 billion over the quarter,

- 55 -

which exceeded the targets that we set," and that "the number of assets that were sold, especially in the commercial and residential mortgage area . . . were the result of our deleveraging." These statements were materially false and misleading because Lehman's net leverage was actually 13.9, and had only been artificially reduced to 12.1 because Lehman engaged in $50 billion of Repo 105 transactions at quarter end. Moreover, these statements gave investors the false and misleading impression that Lehman's deleveraging was the result of selling assets, including its toxic residential and commercial mortgage positions, while omitting to disclose: (1) Lehman's extensive reliance on Repo 105 transactions to reduce its balance sheet at quarter end to decrease leverage which generally involved assets that were marketable and liquid; and (2) that Lehman was required to repurchase the assets and place them back on its balance sheet just days after the quarter-ended.

170.    On July 10, 2008, Lehman filed its 2Q08 10-Q, with Lowitt as one of its signators. The 2Q08 10-Q reported that the "combined effect of an equity raise as well as the reduction of assets in the second quarter of 2008 resulted in a decrease in the Company's gross and net leverage ratios to 24.34x and 12.06x," respectively. This material misrepresentation failed to disclose that $50 billion in Repo 105 assets which should have been included and reported in Lehman's financial statements were removed temporarily from Lehman's balance sheet at quarter-end.

171.    In addition, the 2Q08 10-Q reported $127.846 billion in securities sold under agreements to repurchase, and $269.409 billion in financial instruments and other inventory positions owned, which included $43.031 billion in assets pledged as collateral. This was also materially misleading because the 2Q08 10-Q failed to disclose that, pursuant to Lehman's Repo 105 transactions, Lehman had pledged an additional $50.383 billion in securities as collateral, which it was under agreement to repurchase just days after the close of the quarter.

172.  **3Q08**: On September 10, 2008, Lehman issued a press release and held a conference call to discuss its preliminary third quarter 2008 financial results.  Lehman estimated a net loss of $3.9 billion, in large part due to gross mark-to-market adjustments of $7.8 billion ($5.6 billion net).

173.  The press release stated that Lehman had a net leverage ratio of 10.6x.  During the conference call, Fuld also repeated that "[w]e ended the quarter with more tangible equity than we started and at a net leverage ratio of 10.6 versus 12.1 at the end of the second quarter," and Lowitt stated that "we ended the third quarter with a capital position and leverage ratio stronger than the second quarter . . . we reduced net leverage to 10.6 times from 12.1 times."  These statements were materially false and misleading because they failed to disclose that Lehman engaged in tens of billions of dollars in Repo 105 transactions at quarter-end, and that these undisclosed transactions were instrumental in Lehman's purported reduction in net leverage.

174.  On September 15, 2008, the final day of the Relevant Period, Lehman petitioned for bankruptcy, making it the largest corporate bankruptcy in United States history.  In stark contrast to Lowitt's affirmative representations made just days before regarding Lehman's purportedly strong liquidity position, Lehman sought bankruptcy protection because it had "significant liquidity problems."

  **D.  Additional Evidence of Scienter**

  **1.  The Officer Defendants Knew of Repo 105 and the Artificial Balance Sheet Manipulation**

175.  Documents and witnesses cited in the Bankruptcy Examiner's Report demonstrate that Lehman's use of Repo 105 was orchestrated and executed at the most senior levels within the Company.  Not only were the Officer Defendants fully aware of how Repo 105 transactions misrepresented Lehman's balance sheet, but these defendants also regularly ordered and/or allowed

the use of such transactions in order to improve the Company's standing with analysts, credit ratings agencies and investors at large.

176.    Defendant O'Meara, in his position as CFO, actively managed Lehman's Repo 105 transactions from the commencement of the Relevant Period to December 1, 2007, when he became Lehman's head of Global Risk Management.  He was responsible for setting the Repo 105 usage limits or caps.  According to the Examiner, O'Meara had a duty to report "the impact of the [Repo 105] transactions on Lehman's balance sheet and the purpose for engaging in these transactions" to his superiors, including Fuld and Callan.

177.    Defendant Callan, Lehman's new CFO as of December 2007, received calls as early as January 2008 regarding Lehman's Repo 105 program.  Several senior Lehman executives brought Repo 105 to Callan's attention. Callan saw and ignored red flags alerting her to potential problems arising from Lehman's Repo 105 program before she signed Lehman's 1Q08 10-Q.

178.    Defendant Fuld also was aware of Lehman's Repo 105 transactions.  For example, the night before a March 28, 2008 Executive Committee meeting requested by McDade (Lehman's newly appointed "balance sheet czar") to discuss Lehman's Repo 105 program and to request freezing of the Repo 105 usage, Fuld received an agenda of topics including "Repo 105/108" and "Delever v Derisk" and a presentation that referenced Lehman's $49.1 billion quarter-end Repo 105 usage for 1Q08.  Although Fuld may not have attended the Executive Committee meeting, McDade recalled having specific discussions with Fuld about Lehman's Repo 105 usage in June 2008. During that discussion, McDade walked Fuld through Lehman's Balance Sheet and Key Disclosures document, and discussed with Fuld Lehman's quarter-end Repo 105 usage – $38.6 billion at year-end 2007; $49.1 billion at 1Q08; and $50.3 billion at 2Q08.  Based upon their conversation, McDade understood that Fuld "was familiar with the term Repo 105," "knew, at a basic level, that Repo 105

- 58 -

was used in the Firm's bond business" and "understood that [reduction of Repo 105 usage] would put pressure on traders."  Fuld also met regularly (at least twice a week) with members of the Executive Committee to discuss the state of the Company.  Based on these facts, as well as the fact that Fuld was admittedly focused on balance sheet and net leverage reduction in 2008, the Examiner concluded that Fuld knew about Repo 105 transactions prior to signing Lehman's Forms 10-Q.

179.    Documents and Lehman employees further corroborate that each of the Officer Defendants knew about Lehman's Repo 105 program throughout the Relevant Period and understood its impact on Lehman's balance sheet.  For example:

- Kelly, Lehman's Global Financial Controller, told the Examiner that he expressed concerns to Callan and Lowitt when each was serving as Lehman's CFO about: (1) the large volume of Repo 105 transactions undertaken by Lehman; (2) the fact that Repo 105 volume spiked at quarter-end; (3) the technical accounting basis for Lehman recording such transactions as "sales"; (4) the fact that Lehman's peers did not do Repo 105-style transactions; and (5) the reputational risk Lehman faced if its Repo 105 program were to be exposed.

- Callan "acknowledge[ed] she was aware, as CFO, that Lehman's Repo 105 practice impacted net balance sheet [and] that the transactions had to be routed through Europe."

- Lowitt acknowledged to the Examiner that "he was aware of Lehman's Repo 105 program for many years, that Lehman used the transactions to meet balance sheet targets, that Repo 105 transactions used only liquid inventory, and that Lehman set internal limits on Repo 105 usage but that Chris O'Meara was involved with limit-setting."

- According to a July 2006 Overview of Repo 105/108 Presentation, Grieb and O'Meara were "responsible for setting Lehman's limits" on Repo 105.

- According to a July 2006 document titled "Overview of Repo 105 (FID)/108 (Equities)," "per Chris O'Meara and Ed Grieb," "Repo 105 transactions must be executed on a continual basis and remain in force throughout the month.  To meet this requirement, the amount outstanding at any time should be maintained at approximately 80% of the amount at month-end."  From April 2008 to September 2008, O'Meara, Callan, Lowitt and others received a "Daily Balance Sheet and Disclosure Scorecard," as well as daily condensed versions in e-mail form, which contained "frequent references" to Repo 105, including "the daily benefit that Repo 105 transactions provided to Lehman's balance sheet."

- In August 2007, O'Meara was involved in unsuccessful efforts by FID to use RMBS and CMBS in Repo 105 transactions. Kentaro Umezaki ("Umezaki") e-mailed colleague John Feraca, "not sure that is worth the effort . . . we need Chris [O'Meara] to opine."

- Umezaki e-mailed O'Meara on August 17, 2007, stating: "John Feraca is working on Repo 105 for our IG mortgage and real estate assets to reduce our Q3 balance sheet. . . .  He will test the waters a bit in London with one counterparty."

- Ryan Traversari, Lehman's Senior Vice President of Financial Reporting, e-mailed O'Meara in May 2008 regarding Repo 105, stating that Citigroup and JPMorgan "likely do not do Repo 105 and Repo 108 which are UK-based specific transactions on opinions received by LEH from Linklaters.  This would be another reason why LEH's daily balance sheet is larger intra-month then at month-end."

- On June 17, 2008, Reilly provided O'Meara, Lowitt, McDade and Morton a document entitled "Balance Sheet and Key Disclosures," "that incorporated McDade's planned directive to reduce Lehman's firm-wide Repo 105 usage by half — from $50 billion to $25 billion in third quarter 2008."

180.    Additionally, the Officer Defendants knew or recklessly disregarded the untrue or misleading nature of statements regarding Lehman's balance sheet, leverage, repo financing and financial results because, *inter alia*:

(a)    there was no economic substance for the Repo 105 transactions, or for concealing their use from the public;

(b)    the singular purpose of Lehman's Repo 105 program was balance sheet management;

(c)    the magnitude of the Repo 105 program was so large and material to Lehman's reported financial results that the Officer Defendants could not have been unaware of its existence, or its impact on Lehman's balance sheet and leverage ratios, or at a minimum were reckless in not knowing;

(d)    Lehman's failure to disclose Repo 105, despite its magnitude and knowledge by the Officer Defendants, and its impact on reported deleveraging as set forth above, further demonstrates an intent to deceive;

(e)    Lehman was motivated to manage its balance sheet through Repo 105 transactions to avoid selling "sticky" assets and incurring reportable losses on both the sale of sticky assets and potential write-downs of similarly situated assets under GAAP; and

(f)    credit ratings agencies, analysts and investors were focused on Lehman's net leverage ratios as an indicator of the firm's liquidity.

### 2.    The Officer Defendants Knew of Lehman's Disregard of Risks and Its Liquidity Problems

181.    In pursuit of an aggressive growth strategy, the Officer Defendants knew of, but recklessly disregarded, the warnings of Lehman's risk managers.  For example:

(a)    According to Lehman's 2007 10-K, the Executive Committee – including Fuld (Chair) and Callan – established Lehman's overall risk limits and risk management policies.

(b)    Lehman's Risk Committee, which included the Executive Committee and CFO, reviewed "risk exposures, position concentrations and risk-taking activities" on a weekly basis; determined "overall risk limits and risk management policies, including establishment of risk tolerance levels"; reviewed the firm's "risk exposures, position concentrations and risk-taking activities on a weekly basis, or more frequently as needed"; and allocated "the usage of capital to each of our businesses and establishes trading and credit limits for counterparties with a goal to maintain diversification of our businesses, counterparties and geographic presence."

(c)    Pursuant to Lehman's policies, the Company's Global Risk Management Group disclosed information regarding risk appetite to senior management, creating a weekly "Firm Wide Risk Snapshot" report, which contained "Risk Appetite limits and usage by business unit" and

summarized "VaR by business unit and Top Market Risk positions." In addition, Lehman circulated a "Daily Risk Appetite and VaR Report" to upper management, which included a cover e-mail detailing the firm's overall daily risk appetite and VaR usage figures and the day-over-day change in those figures. The Risk Committee also received the "Firm-wide Risk Drivers" report, which contained detailed information regarding the firm's aggregated risks, reflected firm-wide risk appetite and VaR usage data, and explanations regarding week-over-week changes in the data.

182. Disregarding risk limits was a deliberate decision that Fuld made over the objection of members of Lehman's management, including Alex Kirk, then head of Lehman's Credit Business, and Madelyn Antoncic, then Lehman's Chief Risk Officer.

183. The Officer Defendants were also aware of Lehman's related and growing liquidity problems. According to the Bankruptcy Examiner's Report:

(a) On May 31, 2007, Roger Nagioff ("Nagioff"), Lehman's then Global Head of FID provided defendant Fuld with an internal stress scenario that identified a possible $3.2 billion loss for the Company, and recommended that Lehman reduce its forward commitments by nearly half, impose rules on leverage and develop a framework for limiting and evaluating the leveraged lending business.

(b) Also in May 2007, O'Meara expressed "significant concerns" about the "overall size" of Lehman's real estate book and how much of the firm's equity was "tied up" in bridge equity deals.

(c) In late October 2007, defendant O'Meara prepared a presentation on the firm's equity adequacy for the Executive Committee. The presentation concluded that the firm's capital adequacy over the last 5-6 quarters had "materially deteriorated"; that Lehman was at the bottom of its peer range with respect to the regulatory requirement of a minimum 10% total capital

- 62 -

ratio imposed by the SEC; and that the firm's capital position decreased from a $7.2 billion surplus in the beginning of 2006 to a $42 million deficit at the end of the third quarter of 2007.

(d)    In early November 2007, GREG made a presentation to Fuld in which they recommended reducing the group's global balance sheet by $15 billion.

(e)    Defendant Callan told the Examiner that she had repeated discussions with Fuld about reducing the balance sheet in January and February 2008 but "didn't get traction quickly on it."

(f)    A January 2008 internal presentation made by Eric Felder ("Felder"), a Lehman executive, acknowledged that the mortgage crisis was having a severe impact on the Company's operations and liquidity position.  Slides accompanying Felder's presentation stated that "[v]ery few of the top financial issuers have been able to escape damage from the subprime fallout." The presentation also warned that, because "a small number of investors account[] for a large portion of demand [for Lehman issues], liquidity can disappear quite fast."

(g)    On March 12, 2008, Callan received an e-mail from Felder expressing concerns about dealer liquidity and shrinking leverage, and forwarding an e-mail from a Lehman trader that warned that dealers were demanding increased haircuts and refusing to take assignments of any Bear or Lehman trades even if the trades were "in-the-money."  Five days later, Felder warned Lowitt and Callan that collapsing equity values eventually would compel Lehman to sell assets, and that the distressed prices available would create a need for additional capital, forcing further sales.

(h)    After Bear Stearns' near-collapse, then Treasury Secretary Henry Paulson told Fuld that Lehman needed to raise capital, find a strategic partner or sell the firm.  After Lehman announced its second quarter results, Secretary Paulson warned Fuld that Lehman needed to have a

- 63 -

buyer or other survival plan in place before announcing any further losses in the third quarter or Lehman's survival would be in doubt.

(i)    On April 3, 2008, Callan e-mailed McDade, Lehman's "balance sheet czar," expressing dismay in the growth of the balance sheet.

(j)    On May 13, 2008, two weeks before the end of the second quarter, Callan urged Fuld to "deliver on the balance sheet reduction this quarter" and not give "any room to FID for slippage."

184.    Further evidencing scienter, defendant Fuld sought to remove – not reward – insiders who opposed Lehman's growing risk management practices and who voiced concerns about the growing liquidity crisis.  In 2007, for example, Fuld removed Michael Gelband, head of Lehman's FID, and Madelyn Antoncic because of their opposition to management's growing accumulation of risky and illiquid investments.

185.    Lehman's senior officers were also aware of the deficiencies in Lehman's risk management practices.  According to the Bankruptcy Examiner, O'Meara was aware that Lehman's principal investments were not considered in Lehman's stress testing.  For example, O'Meara told the Examiner that Lehman did not even start taking steps to include private equity transactions in its stress tests until 2008.  With regard to hedging, according to multiple Lehman executive interviews and internal e-mails, Lehman senior officers elected not to hedge many of Lehman's assets because of the difficulty and possible repercussions inherent in hedging investments as illiquid as Lehman's.  In addition, on October 15, 2007, O'Meara informed Lehman's Board of Directors that Lehman was over its firm-wide risk appetite limit

186.    The Officer Defendants were Lehman's highest ranking officers and oversaw the day-to-day management of Lehman's operations.  Defendant Fuld chaired, and defendant Callan was

- 64 -

member of, the Company's Executive Committee, which was responsible for assessing Lehman's risk exposure and related disclosures.  The Executive Committee reviewed "risk exposures, position concentrations and risk-taking activities on a weekly basis, or more frequently as needed," and "allocate[d] the usage of capital to each of our businesses and establishes trading and credit limits for counterparties."

187.    According to Callan, the Executive Committee consisted of 13 people, including herself and Fuld, who met twice a week for two hours at a time and "devote[d] a significant amount of that time to risk."  Callan stated that the Executive Committee addressed "any risk that passes a certain threshold, any risk that we think is a hot topic" and "anything else during the course of the week that's important."  Further, Callan stated that the Executive Committee was "intimately familiar with the risk that we take in all the different areas of our business.  And [Fuld] in particular . . . keeps very straight lines into the businesses on this topic."

188.    Additionally, defendants Fuld, O'Meara and Callan signed quarterly and annual Sarbanes-Oxley certifications during the Relevant Period attesting to their responsibility for and knowledge of disclosure controls and procedures, as defined in 1934 Act Rules 13a-15(e) and 15d-15(e), as well as Lehman's internal control over financial reporting.

## E.    E&Y'S Participation in the Issuance of False Financials

189.    E&Y, a firm of certified public accountants, was engaged by Lehman to provide independent auditing and accounting services at all times relevant to this action.  E&Y was engaged to examine and report on Lehman's financial statements for FY 2006 and FY 2007 and to perform review services on Lehman's interim results for FY 2007 and FY 2008.  As a result of E&Y's long history with Lehman and the far-reaching scope of services provided to the Company, E&Y

- 65 -

personnel were intimately familiar with Lehman's business, including Lehman's accounting for its Repo 105 transactions.

190.    E&Y enjoyed a long-standing business relationship with Lehman, serving as the Company's auditor from at least 1992 though September 2008 when Lehman filed for bankruptcy. Defendant O'Meara, who was the Company's CFO from 2004 to 2007 and subsequently headed the firm's risk management division, previously worked for E&Y in the firm's Financial Services practice as a senior manager.  Defendant O'Meara joined Lehman in 1994 after leaving E&Y. Additionally, David Goldfarb, who was O'Meara's predecessor CFO, serving in the role from 2000 to 2004 until he was promoted to the position of Chief Administrative Office, had been a partner with E&Y when he joined the Company in 1993.

191.    The extensive amount of work provided to Lehman by E&Y is demonstrated by the lucrative fees it received for its work.  As Lehman was one of the firm's major audit clients, E&Y enjoyed an extremely profitable relationship with Lehman's senior management for which it received over $150 million in fees for auditing, consulting, tax and due diligence services from 2001 until 2008.  For FY 2007, the last complete year before Lehman's collapse, E&Y earned over $31 million from the Lehman engagement, making Lehman E&Y's eighth-biggest U.S. client by audit fees.  Previously, Lehman had been one of E&Y's top 15 clients in each of the previous 7 years. These fees were particularly important to the partners in E&Y's New York office as their incomes were dependent on the continued business from Lehman.  Moreover, the relationship with Lehman grew more lucrative for E&Y as Lehman's business increased exponentially during the years in which the Company engaged in Repo 105 transactions.  *See* the charts below:





**1.    E&Y's Audit and Review Reports Were Materially False and Misleading**

192.    E&Y falsely represented that E&Y's audit/reviews of Lehman's financial statements had been performed in accordance with GAAS and further that Lehman's financial results for FY 2006 through 2Q08 were presented in accordance with GAAP. E&Y consented to the incorporation of its false reports on Lehman's financial statements in Lehman's Forms 10-K and 10-Q, which were filed with the SEC. E&Y also consented to the inclusion of its audit reports in Lehman's Offering Documents.

193.    During the Relevant Period, E&Y issued unqualified or "clean" audit reports for FY 2006 and FY 2007 representing that "[w]e conducted our audit[s] in accordance with the standards of the Public Company Accounting Oversight Board" and certifying that Lehman's financial statements "present[ed] fairly, in all material respects, the consolidated financial position of Lehman Brothers Holdings" and were "in conformity with U.S. generally accepted accounting principles."

194.    E&Y also signed off on and approved Lehman's quarterly financial results for 1Q07-3Q07 and 1Q08 and 2Q08 prior to their issuance to the public.  In its interim review reports, E&Y represented that "[w]e conducted our review in accordance with the standards of the Public Company Accounting Oversight Board" and further certified that Lehman's financial statements presented fairly the Company's financial results.  According to the review reports, E&Y purported that "[b]ased on our review, we are not aware of any material modifications that should be made to the consolidated financial statement . . . for them to be in conformity with U.S. generally accepted accounting principles."

195.    E&Y further consented to the incorporation of its false reports into the Offering Documents.  E&Y's issuance of and multiple consents to reissue materially false reports for Lehman's FY 2006 and FY 2007 financial statements and interim reports for 1Q07-3Q07 and 1Q08 and 2Q08 financial statements were themselves violations of GAAS.

196.    E&Y's clean audit and review reports for 1Q07 through 2Q08 were materially false and misleading due to E&Y's failure to comply with GAAS, as discussed below, and because Lehman's financial statements for 1Q07 through 2Q08 did not present fairly, in all material respects the Company's results of operations or its financial condition in accordance with GAAP, as set forth above.  E&Y knew its reports and approval of the financial statements would be relied upon by the Company as well as by present and potential investors in Lehman's securities.

- 69 -

### 2.    E&Y Knew or Was Reckless in Not Knowing Its Audit and Review Reports Were Materially False and Misleading

197.    According to the Bankruptcy Examiner's Report made public March 11, 2010, E&Y was specifically informed about Lehman's Repo 105 transactions on various occasions since Lehman first initiated the program in 2001.  The Examiner found that E&Y knew about Lehman's use of Repo 105 transactions to manage its balance sheet at the end of each quarter and that E&Y was "made aware that [Lehman's] financial information may be materially misleading because of the failure to disclose the effect and the timing and volume of Lehman's Repo 105 activities (which had a material effect on financial statement items)."

198.    In 2001, Lehman adopted an internal accounting policy concerning Lehman's intention to use Repo 105 transactions to manage debt.  Before issuing the policy, senior Lehman personnel discussed the proposed policy with E&Y partners William Schlich ("Schlich"), Matthew Kurzweil ("Kurzweil") and Kevin Reilly ("Reilly").  Schlich was the engagement partner for the Lehman account and Reilly was the partner in charge of the firm's relationship with Lehman.  E&Y understood that the Repo 105 transactions were designed to manage balance sheet metrics and approved of the policy, including approving of Lehman's decision not to disclose the Repo 105 transactions in its financial statements.

199.    Under Lehman's proposed policy, in order to categorize the transactions as "true sales" under FAS 140, Lehman was required to obtain a legal opinion that the transfers complied with certain legal criteria relating to transfer of control of the securities.  Lehman was unable to get a U.S. law firm to provide a true sales opinion for Lehman's use of Repo 105 under U.S. law so Lehman decided to turn to foreign jurisdictions for Repo 105 transactions.

200.    In March 2001, Lehman approached Linklaters, a United Kingdom law firm, to obtain a true sales opinion under English law.  Linklaters issued an opinion to LBIE, a U.K. affiliate of

Lehman.  Per the Linklaters opinion, LBIE could engage in transactions that under FAS 140 could be categorized as "sales."  However, the letter expressly stated that such transactions had to be based in the U.K., subject to U.K. law and had to involve securities that were "sited" in the U.K.

201.    Beginning in November 2001 and continuing through 2008, Lehman, through its U.K. affiliate, began engaging in billions of dollars worth of highly questionable Repo 105 transactions based upon its reliance on the Linklaters opinion.  Thereafter, Lehman ignored the limitations of the Linklaters opinion, including the limitation to only utilize U.K.-based securities in the transactions and expanded its Repo 105 program to include billions of dollars of U.S.-based fixed income government securities, which were transferred to LBIE from Lehman's U.S. affiliates.  E&Y knew of the limitations of the Linklaters opinion but ignored them in reporting on Lehman's financial statements.

202.    In October 2002, senior Lehman personnel again discussed the Repo 105 transactions with Schlich, Kurzweil and Reilly as Lehman was considering expanding the program to include a related Repo 108 structure.  Subsequently Lehman expanded into Repo 108 transactions, which utilized equities rather than fixed income securities, with a minimum of 8% overcollateralization.

203.    In 2006, prior to E&Y issuing its report on Lehman's FY 2006 financial statements, Bharat Jain ("Jain"), an E&Y auditor, reviewed the Lehman Policy and became concerned about the heavy use of Repo 105 transactions.  On September 7, 2006, Jain sent an e-mail to his senior manager, Jennifer Jackson ("Jackson") stating that he would "like to know what is our thought process behind *how much of these Lehman should do from reputational risk*, etc. perspective.  Are we comparing to other competitors, are we referring to any industry publications, any regulatory guidance, etc?"  Jackson advised Jain that she would take up the issue of "reputational risk" with Schlich.

- 71 -

204.    Throughout 2007, Lehman maintained a document entitled "Accounting Policy Review Balance Sheet Netting and Other Adjustments" (known as the "Netting Grid"), which identified and described balance sheet mechanisms, including Repo 105 transactions.  Lehman provided E&Y with the Netting Grid in August 2007 (the close of Lehman's 3Q07) and again in November 2007 (the close of Lehman's FY 2007).  Although E&Y used the Netting Grid in connection with its FY 2007 audit, E&Y's review and analysis did not take into account the large volumes of Repo 105 transactions, Lehman undertook at quarter-ends as reflected therein.  These transactions were highly material to Lehman's financial statements in FY 2006-FY 2008 and, as a result, required greater scrutiny on E&Y's part in evaluating the transactions.  E&Y, however, failed to require that Lehman revise the accounting for these transactions.

205.    In late 2007 or early 2008, Martin Kelly ("Kelly"), who became Lehman's Global Financial Controller on December 1, 2007, spoke to Schlich concerning Lehman's Repo 105 program.  Kelly raised the following concerns that he had about the program with Schlich: (1) the reliance on the Linklaters "true sale" opinion, combined with Lehman's inability to obtain a legal opinion in the United States; (2) Repo 105 transactions that utilized U.S. securities transferred to LBIE; (3) the spike in Repo 105 transactions at the end of each quarter; (4) the fact that the accounting justification for treating the transactions as "sales" was "form-driven" and "legalistic"; and (5) the fact that none of Lehman's peer financial institutions appeared to be using such transactions.

206.    In May 2008, E&Y was given a copy of a letter dated May 16, 2008 from Matthew Lee, a Senior Vice President in Lehman's Finance Division responsible for the Company's Global Balance Sheet and Legal Entity Accounting, to senior Lehman financial executives.  Lee's letter raised serious questions concerning Lehman's financial statements as it identified possible violations

- 72 -

of Lehman's Ethics Code related to accounting/balance sheet issues. Subsequently, Lee prepared another letter addressing additional accounting control issues, including the use of Repo 105 transactions. Shortly after Lee sent his first letter, several Lehman executives interviewed him. The next day, Lee was terminated without warning on May 22, 2008.

207.    Thereafter, E&Y was directed by Lehman's Audit Committee to meet with Lee and to report back the results of its investigation of Lee's allegations. On June 12, 2008, Schlich and another E&Y partner, Hillary Hansen ("Hansen"), interviewed Lee. According to Lee, which was corroborated by notes Hansen took of the meeting, Lee warned E&Y about Lehman's Repo 105 practice including, notably, the enormous volume of Repo 105 activity that Lehman engaged in at the end of each quarter. Specifically, Lee told E&Y that Lehman was removing $50 billion in fixed income securities from its balance sheet each quarter by purporting to "sell them" to European counterparties for a short time. Immediately following the meeting, Hansen raised concerns about the Repo 105 transactions with Schlich, who casually dismissed the concerns by telling Hansen that the Repo 105 transactions were being properly recorded as "true sales."

208.    Despite the fact that the Chair of the Audit Committee stated that he had wanted a full and thorough investigation of *every* allegation made by Lee, E&Y not only failed to follow up on Lee's allegations or conduct any further inquiry into the Repo 105 transactions but E&Y further failed to advise the Audit Committee about the allegations concerning the Repo 105 program. On June 13, 2008, Schlich met with Lehman's Audit Committee and he failed to mention the Repo 105 concerns that Lee had conveyed to him only the day before. Furthermore, on July 8, 2008, when E&Y met with the Audit Committee to review Lehman's 2Q08 financial statements, E&Y again failed to mention Lee's allegations regarding Repo 105 and stated that E&Y would issue an unqualified review report.

209.    On July 10, 2008, E&Y signed off on Lehman's 2Q08 financial statements, certifying that the firm was not aware of any material modifications that should be made to Lehman's financial statements for them to be in conformity with GAAP.  Similarly, E&Y failed to amend or correct its review report for Lehman's 1Q08 financial statements or its audit report for Lehman's FY 2007 financial statements.

210.    The Examiner concluded that "sufficient evidence exists to support a colorable claim that":

> Ernst & Young should have made appropriate inquiries of management and performed analytical procedures concerning significant transactions that occurred at the ends of the quarters in 2008 and analyzed their impact upon the financial statements, including the footnotes.  Particularly after Lee alerted Ernst & Young to $50 billion in Repo 105 transactions prior to the filing of the second quarter Form 10-Q, Ernst & Young should have reported to senior management and the Audit Committee that Lehman was using Repo 105 transactions to temporarily and artificially reduce balance sheet and its net leverage ratio for reporting purposes, without disclosing the practice to the public.

> . . . Ernst & Young knew or should have known that the notes to the financial statements were false and misleading because, among other things, those notes describe all repos as "financings," which Ernst & Young knew was not the case, and those notes did not disclose the Repo 105 transactions.  Ernst & Young had a professional obligation to communicate the issue to both senior management and the Audit Committee and to recommend corrections of the Forms 10-Q, and also to either issue modified review reports noting the materially inadequate disclosures, or to withhold its review reports altogether.

### 3.    E&Y's Violation of Auditing Standards

211.    GAAS has been established to ensure that external auditors fulfill their obligations when auditing and reviewing financial statements and other information contained in SEC filings.  It consists of authoritative standards, originally established by the American Institute of Certified Public Accountants ("AICPA"), which were adopted, amended and expanded upon the by the PCAOB, which auditors must comply with when they conduct audits and reviews.  An auditor is required to perform its audits and reviews of financial information in accordance with GAAS, which

- 74 -

include, *inter alia*: (1) ten basic standards establishing the objectives of a financial statement audit and providing guidance for the quality of audit procedures to be performed; (2) interpretations of these standards by the AICPA, set forth in Statements on Auditing Standards (codified and referred to as "AU §___"); and (3) additional standards promulgated by the PCAOB.

212.    One of the primary responsibilities of an independent auditor is to express an opinion on whether a company's financial statements are presented fairly, in all material respects, in accordance with GAAP. AU §110.01. Similarly, the objective of an interim review is to provide a basis for reporting whether the reviewer is aware of any material modifications that should be made to the interim financial information in order for the financial statements to conform to GAAP. AU §722.07.

213.    The ten basic auditing standards consist of the following three general standards, three fieldwork standards and four reporting standards:

- The audit should be performed by persons having adequate technical training and proficiency as auditors;

- The auditor should maintain an independence in mental attitude in all matters relating to the engagement;

- Due professional care is to be exercised in the performance of the audit and preparation of the report;

- The audit is to be adequately planned and that assistants should be properly supervised;

- The auditor should obtain a sufficient understanding of internal controls so as to plan the audit and determine the nature, timing and extent of tests to be performed;

- Sufficient, competent evidential matter is to be obtained to afford a reasonable basis for an opinion on the financial statements under audit;

- The report shall state whether the financial statements are presented in accordance with GAAP;

- The report shall identify circumstances in which GAAP has not been consistently observed;

- 75 -

- Informative disclosures are regarded as reasonably adequate unless otherwise stated in the report; and

- The report shall contain an expression of opinion or the reasons why an opinion cannot be expressed.

*See* AU §150.02.

214. E&Y's knowledge of Repo 105, the absences of a supportable business purpose and economic substance for such transactions, and the increasing volume of Repo 105 transactions at quarter-end raised various obligations under GAAS that E&Y failed to meet.

215. For example, Fieldwork Standard No. 3 and AU §326, *Evidential Matter*, requires auditors to obtain sufficient competent evidential matter through inspection, observation, inquiries and confirmations to afford a reasonable basis for an opinion regarding the financial statements under audit:

> In evaluating evidential matter, the auditor considers whether specific audit objectives have been achieved. The independent auditor should be thorough in his or her search for evidential matter and unbiased in its evaluation. In designing audit procedures to obtain competent evidential matter, he or she should recognize the possibility that the financial statements may not be fairly presented in conformity with generally accepted accounting principles or a comprehensive basis of accounting other than generally accepted accounting principles. In developing his or her opinion, the auditor should consider relevant evidential matter regardless of whether it appears to corroborate or to contradict the assertions in the financial statements. To the extent the auditor remains in substantial doubt about any assertion of material significance, he or she must refrain from forming an opinion until he or she has obtained sufficient competent evidential matter to remove such substantial doubt, or the auditor must express a qualified opinion or a disclaimer of opinion.

AU §326.25 (footnotes omitted).

216. E&Y's responsibility, as Lehman's independent auditor, was to obtain "[s]ufficient competent evidential matter . . . to afford a reasonable basis for an opinion regarding the financial statements under audit" as to "the fairness with which they present, in all material respects, financial position, results of operations, and its cash flows in conformity with generally accepted accounting

- 76 -

principles." AU §§110.01, 150.02. AU §336, *Using the Work of a Specialist*, and AU §9336, *Using the Work of a Specialist: Auditing Interpretations of Section 336*, address an auditor's use of a legal opinion as evidential matter supporting for instance, a management assertion that a financial asset transfer meets the "isolation" criteria in FASB 140. AU §9336 states that a legal letter that includes conclusions using certain qualifying language would not provide persuasive evidence that a transfer of assets has met the isolation criteria of FAS.

217.    Here, not only was the Linklaters opinion replete with qualifying language, but E&Y also knew that no law firm in the United States would approve the Repo 105 transactions and that as a result, Lehman had to conduct the Repo 105 transactions through LBIE, its U.K.-based affiliate. E&Y never considered the propriety of Lehman's transfer of U.S. securities to LBIE, despite internal E&Y guidelines explicitly requiring the auditors to consider whether a separate legal opinion was required for transactions governed by FAS 140:

> **Foreign Jurisdictions –** Achieving the legal isolation criterion when the transaction occurs in a foreign market is even more complex. It is important to remember that the requirement is the same (i.e., the assets must be legally isolated from the transferor, even in the event of bankruptcy or other receivership or the applicable jurisdiction's equivalent). However, the language requirements in the legal opinion supporting legal isolation may differ due to the different legal environments in various countries. ***In addition, engagement teams should consider the need to receive a legal opinion in each country in which assets may have originated when auditing global transfers of financial assets***.

218.    Moreover, General Standard No. 3 and AU §230, *Due Professional Care in the Performance of Work*, required E&Y to exercise "due professional care" and "professional skepticism" in its quarterly reviews and annual audit of Lehman's financial results. E&Y violated GAAS in this regard because it knew of Lehman's use of Repo 105 transactions but failed to: (1) review and/or audit adequately to address Repo 105 volumes at each period-end; (2) ensure that Repo 105 was not being employed to misstate materially Lehman's financial statements or to

- 77 -

mislead investors; and (3) adequately address and resolve warnings regarding Lehman's potential misuse of these transactions. Additionally, E&Y failed to consider adequately the disclosures made (or not made) in the footnotes to Lehman's financial statements, and in comparison of the financial statements to disclosures included in the MD&A sections of Lehman's 2006-2007 Forms 10-K and Forms 10-Q for 2007 and 2008, regarding its Repo 105 transactions and secured financing arrangements.

219.    As mandated by AU §380, *Communication With Audit Committees*, an independent auditor is required to discuss the consistency and application of the company's accounting policies and the clarity and completeness of the financial statements with the audit committee. The auditor should further discuss

> items that have a significant impact on the representational faithfulness, the verifiability, and neutrality of the accounting information included in the financial statements. Examples of items that may have such an impact are the following:
>
> - Selection of new or changes to accounting policies
>
> - Estimates, judgments, and uncertainties
>
> - Unusual transactions
>
> - Accounting policies relating to significant financial statement items, including the timing of transactions and the period in which they are recorded.

AU §380.11 (footnote omitted).

220.    Moreover, AU §316, *Consideration of Fraud in a Financial Statement Audit*, provides that:

> Whenever the auditor has determined that there is evidence that fraud may exist, that matter should be brought to the attention of an appropriate level of management. This is appropriate even if the matter might be considered inconsequential . . . . Fraud involving senior management and fraud . . . that causes a material misstatement of the financial statements should be reported directly to the audit committee.

AU §316.79; *see also* AU §317, *Illegal Acts by Clients* (if an auditor becomes aware of possible violations of laws or regulations which may have a direct or indirect effect on the financial statements, he or she must make inquiries, perform additional tests, and inform management and the audit committee). In violation of the foregoing, E&Y never communicated anything to the Audit Committee about Repo 105 transactions. E&Y did not discuss any of the concerns raised about the propriety of the transactions, including concerns regarding "reputation risks" as raised by Jain, the use of U.S.-based securities in the program and the increasing volume of Repo 105 transactions. Moreover, notably, upon learning of Lee's claims concerning the Repo 105 transactions, E&Y failed to conduct a bona fide investigation into Lee's claims and failed to inform management and the Audit Committee of the relevant issues, despite having been specifically instructed to do so by the Chair of the Audit Committee.

221.    Under AU §561, *Subsequent Discovery of Facts Existing at the Date of the Auditor's Report*, if an auditor becomes aware of information that may have existed at the date of the previously issued audit report, which may have had a material impact on the financial statements on which the auditor opined, then the auditor is required to investigate whether the new information is reliable and existed at the time of the original report and whether the new information indicates that the previously issued audit opinion is incorrect. If the auditor determines that the audit opinion is incorrect, then the auditor should consider taking action to prevent further reliance on the earlier report. AU §§561.04-.06. An auditor is required to take the same approach to subsequently discovered facts when performing a review of a company's interim financial statements. AU §722.46. In violation of the foregoing, E&Y took no action to adequately investigate Lee's allegations concerning Lehman's Repo 105 transactions or to consider the effect the allegations may have on its previously issued audit opinion and review report.

- 79 -

222.    Finally, AU §550, *Other Information in Documents Containing Audited Financial Statements*, provides that while an independent auditor's responsibility for disclosures and other information contained in filings containing audited financial statements is more limited in scope than his or her responsibilities for the financial statements themselves, an auditor is required to "read the other information [*e.g.*, the MD&A] and consider whether such information, or the manner of its presentation, is materially inconsistent with information, or the manner of its presentation, appearing in the financial statements." AU §550.04. If the auditor determines that there is a material inconsistency, then he or she should determine whether the financial statements and/or the audit report should be revised. If the auditor determines that the financial statements and/or audit report do not need to be revised, then the auditor should take further action such as requesting that the client revise the other information to eliminate the material inconsistency or consider revising or withholding his or her audit report. *Id*.

223.    Furthermore, if while reading the other information, the auditor becomes aware of information that he or she believes is a material misstatement of fact even if it is not materially inconsistent with the financial statements, then he or she should take further action such as requesting that the client revise the other information to eliminate the material inconsistency or notifying the client in writing of the auditor's beliefs concerning the material misstatement and consider consulting legal counsel. AU §§550.05-.06. An auditor is required to take the same approach to other information accompanying financial information when performing a review of a company's interim financial statements. AU §722.18(f).

224.    In violation of the foregoing, E&Y failed to take any action concerning material misstatements and inconsistencies made in Lehman's disclosures in the MD&A section of its SEC filings. The Examiner concluded, "sufficient evidence" existed to support a colorable claim against

Ernst & Young for **malpractice** in connection with the misleading statements concerning Lehman's net leverage ratio contained in the MD&A sections of Lehman's two 2008 Forms 10-Q. Sufficient evidence exists to find that those disclosures were materially inadequate and misleading because Lehman did not disclose the fact that the reported assets, net assets, leverage ratio and the reduction in the net leverage ratio were materially affected by temporary Repo 105 transactions.

*    *    *

In addition, the MD&A section to Lehman's 2007 Form 10-K discussed the net leverage ratio without disclosing the role that Repo 105 transactions played in that calculation. Ernst & Young's failure to require proper disclosures in the MD&A section and in footnotes to the financial statements constitutes sufficient evidence to find a colorable claim of malpractice.

### F.    Loss Causation

225.    Between June 12, 2007 and September 15, 2008, the price of Lehman common stock was artificially inflated as a result of the material misrepresentations and omissions set forth above. The artificial inflation was removed through a series of partial disclosures and the materialization of previously concealed risks. And yet, although Leman made partial disclosures in the latter part of 2008, the full truth behind Lehman's fraudulent conduct was not revealed until (at the very least) September 15, 2008, *i.e.*, Lehman's announcement that it had filed for bankruptcy protection.

226.    On June 9, 2008, before the markets opened, Lehman issued a press release announcing its financial results for its second quarter of 2008 ending on May 31, 2008. Despite having previously announced success with its delevering plan, its strong liquidity position, that it had risk management policies in place and that its assets were fairly valued, the press release disclosed that Lehman took $4 billion in mark-to-market write-downs, including $2.4 billion in residential mortgage related holdings, $700 million in commercial positions, and $300 million in real estate held for sale. In addition, the Company announced that it would raise $6 billion through a combined offering of preferred and common shares. On this news, Lehman's shares declined 8.7% and continued to fall an additional 19.44% over the next two days. In addition, rating agencies Fitch and

- 81 -

Moody's downgraded Lehman's credit rating. However, the June 9 announcement only partially revealed the truth, and Lehman continued to misrepresent its financial condition.

227. On September 8, 2008, Lehman announced that it would release its third quarter 2008 results and key strategic initiatives for the Company on September 18. Analysts at Bernstein Research and Oppenheimer predicted further write-downs in the third quarter of between $4 and $5 billion. In addition, there were market reports of Lehman's potential sale of assets to raise capital, that market commentators said smacked of desperation and indicated problems with Lehman's liquidity position. As a result of this news, Lehman's shares finished the trading day down 12.7%.

228. On September 9, 2008, there were market reports that Lehman's attempts to obtain a capital infusion from the Korea Development Bank had failed, leading to concerns that "no one will inject capital" into Lehman. In addition, S&P and Fitch both placed their ratings on Lehman on review for downgrade. S&P specifically cited concerns about Lehman's ability to raise capital. On this news, Lehman's shares declined 45% from the prior day's price to close at $7.79 per share.

229. On September 10, 2008, Lehman reported a $3.9 billion loss for the third quarter of 2008, as well as $7 billion in gross write-downs on its residential and commercial real estate holdings, despite having previously announced success with its delevering plan, its strong liquidity position, that it had risk management policies in place and that its assets had been fairly valued. In announcing the results during the conference call, Lowitt, having replaced Callan as CFO, also disclosed that "[t]he majority of our write-downs were in Alt-A driven by increase in Alt-A delinquencies and loss expectations which were specific to Alt-A prices and did not affect the performance of our hedges." Contrary to defendants' earlier statements, Lowitt admitted that "[u]nfortunately there is no direct hedge for Alt-A assets." In addition, Fitch and Dunn & Bradstreet downgraded Lehman's credit rating. On this news Lehman's shares declined 7% from the prior

- 82 -

day's close to $7.25 per share.  However, this disclosure still did not reveal the entire truth behind Lehman's fraudulent conduct.

230.    On September 15, 2008, Lehman filed for bankruptcy protection because it had "significant liquidity problems."  As a result, Lehman's shares declined over 94% on that date.

231.    The disclosures regarding Lehman's massive write-downs and liquidity problems (which led to Lehman's bankruptcy) revealed the truth about Lehman's financial condition and represented the materialization of several interrelated, concealed risks from Lehman's disregard for its risk limits and its massive Repo 105 transactions which masked the Company's net leverage and true liquidity issues.  As set forth above, as a direct result of Lehman's failure to abide by its risk limits and risk management policies, Lehman acquired tens of billions of dollars of highly risky, illiquid assets that ultimately required enormous write-downs and triggered the liquidity crisis that ended Lehman's existence.  During the Relevant Period, in order to conceal the problems with its balance sheet, and in particular the amount of troubled assets it held, Lehman engaged in tens of billions of dollars worth of Repo 105 transactions in order to remove temporarily assets from its balance sheet solely for reporting purposes.  Through these sham transactions, Lehman artificially reduced its net leverage ratio, fraudulently preserved its credit ratings, and created the appearance that Lehman was more capitalized and liquid than it really was.  As the Bankruptcy Examiner found, Lehman's Repo 105 program concealed the adverse impact its increasingly "sticky" inventory – which consisted mostly of illiquid residential and commercial real estate that Lehman could not sell without taking significant losses – was having on Lehman's publicly reported net leverage and balance sheet.

232.    Indeed, the Repo 105 transactions masked the marked deterioration in Lehman's illiquid assets by allowing Lehman to report reduced net leverage even while continuing to hold such

- 83 -

illiquid assets without selling or marking them down.  According to internal Lehman documents, Repo 105 was utilized to "offset the balance sheet and leverage impact of current market conditions"; "[e]xiting large CMBS positions in Real Estate and sub prime loans in Mortgages before quarter end" would otherwise require Lehman to "incur large losses due to the steep discounts that they would have to be offered at," but that "[a] Repo 105 increase would help avoid this without negatively impacting our leverage ratios."  In sum, through the use of Repo 105, Lehman led the market to believe that Lehman had effectively de-leveraged its balance sheet and reduced its exposure to risky assets when, in fact, the opposite was true.  Accordingly, the disclosures referenced above revealed what Repo 105 had concealed; namely, that Lehman held a massive amount of illiquid assets that required write-downs of billions of dollars, that Lehman's leverage was higher than reported, and that Lehman's liquidity had been misrepresented.

233.    The declines in the price of Lehman's common stock and resulting losses are directly attributable to the disclosure of information and materialization of risks that were previously misrepresented or concealed by the Officer Defendants and E&Y.  Had plaintiff known of the material adverse information not disclosed by the Officer Defendants and E&Y or been aware of the truth behind their material misstatements, it would not have purchased Lehman common stock or call options at artificially inflated prices, and would not have sold put options.

## VIII.  CAUSES OF ACTION UNDER THE 1934 ACT

### COUNT III

### Violations of Section 10(b) of the 1934 Act and Rule 10b-5 Promulgated Thereunder Against the Officer Defendants and E&Y

234.    Plaintiff repeats and realleges the allegations set forth above as though fully set forth herein, except for those allegations disclaiming any attempt to allege fraud, and further alleges as follows.

- 84 -

235.     This claim is asserted against the Officer Defendants, namely, Fuld, O'Meara and Callan, as well as against Lehman's auditor E&Y, on behalf of plaintiff who purchased or otherwise acquired Lehman common stock during the Relevant Period and was damaged thereby.  But for the fact that Lehman has filed for bankruptcy protection, the Company itself would have been named as a defendant in this Count for violating §10(b) of the 1934 Act.

236.     Each of the Officer Defendants and E&Y, individually and/or in concert, by the use of means or instrumentalities of interstate commerce and/or of the United States mail (1) employed devices, schemes, and artifices to defraud; (2) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; (3) deceived the investing public, including plaintiff; (4) artificially inflated and maintained the market price of Lehman common stock; and (5) caused plaintiff to purchase Lehman common stock at artificially inflated prices and suffer losses.  The Officer Defendants and E&Y were primary participants in the wrongful and illegal conduct charged herein.

237.     Each of the Officer Defendants was the top officer and controlling person of Lehman, and had direct involvement in its day-to-day operations.  The materially misstated information presented in group-published documents, including Lehman's Forms 8-K, 10-Q and 10-K, was the collective actions of these defendants.  These defendants were each involved in drafting, producing, reviewing and/or disseminating the group-published documents at issue in this action during his or her tenure with the Company.

238.     The Officer Defendants and E&Y had actual knowledge of the misrepresentations and omissions of material facts set forth herein or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were readily available to them. The Officer Defendants' and E&Y's material misrepresentations and/or omissions were done

- 85 -

knowingly or recklessly and for the purpose and effect of concealing Lehman's financial condition and results of operations, business practices and future business prospects from the investing public and supporting the artificially inflated price of its securities.

239.    As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of Lehman common stock and options was artificially inflated and caused loss to plaintiff when Lehman's stock price fell in response to the issuance of partial corrective disclosures and/or the materialization of risks previously concealed by the Officer Defendants and E&Y.

240.    By virtue of the foregoing, the Officer Defendants and E&Y each violated §10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder.

241.    This claim was brought within two years after the discovery of the fraud and within five years of the making of the materially false and misleading statements alleged herein.  Moreover, each of the claims at issue in this action were alleged, and were found to be alleged in a timely manner, on behalf of a class, including plaintiff in *In re Lehman Brothers Equity/Debt Securities Litigation*, No. 1:08-cv-05523-LAK (Dkt. Nos. 212, 439 in No. 1:09-md-02017-LAK), as well as similarly related actions, and any statute of limitations or repose applicable to this action were tolled based upon the filing of the claims in that action.

242.    As a direct and proximate result of the wrongful conduct of the defendants named in this Count, plaintiff suffered damages in connection with its purchases or acquisitions of the Company's common stock.

## COUNT IV

### Violations of Section 20(a) of the 1934 Act
### Against the Officer Defendants

243.     Plaintiff repeats and realleges each and every allegation contained above as if set forth fully herein, except for those allegations disclaiming any attempt to allege fraud, and further alleges as follows.

244.     This claim is asserted against the Officer Defendants on behalf of plaintiff who purchased or otherwise acquired Lehman common stock during the Relevant Period and was damaged thereby.

245.     The Officer Defendants were and acted as controlling persons of Lehman within the meaning of §20(a) of the 1934 Act as alleged herein.  By virtue of their high-level positions with the Company, participation in and/or awareness of the Company's operations, direct involvement in the day-to-day operations of the Company, and/or intimate knowledge of the Company's actual performance, the Officer Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements, which plaintiff contends are false and misleading.  Each of the Officer Defendants was provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the false statements and material omission or cause such misleading statements and omissions to be corrected.  In addition, defendant Fuld, through his position as CEO of Lehman, controlled the remaining Officer Defendants, including Callan and O'Meara.

246.     As set forth above, the Officer Defendants and Lehman itself each violated §10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. Due to their controlling

- 87 -

positions over Lehman and, with respect to Fuld, his control over the remaining Officer Defendants, the Officer Defendants are each liable pursuant to §20(a) of the 1934 Act, having culpably participated in the fraud. As a direct and proximate result of the Officer Defendants' wrongful conduct, plaintiff suffered damages in connection with its purchases or acquisitions of the Company's common stock.

### COUNT V

**Violations of Section 20A of the 1934 Act
Against Defendant Fuld**

247.    Plaintiff repeats and realleges each of the allegations set forth above as if fully set forth herein.

248.    This Count is brought pursuant to §20A of the 1934 Act against defendant Fuld on behalf of plaintiff who was damaged by defendant Fuld's insider trading.

249.    As detailed herein, defendant Fuld was in possession of material, non-public information concerning Lehman. Defendant Fuld took advantage of his possession of material, non-public information regarding Lehman to obtain millions of dollars in insider trading profits during the Relevant Period.

250.    Defendant Fuld's sale of Lehman securities was made contemporaneously with plaintiff's purchases of Lehman common stock during the Relevant Period.

251.    For example, on June 13, 2007, defendant Fuld sold 291,864 shares of stock at average price of $77.83 per share for proceeds of $22,692,426. On June 13, 2007, plaintiff purchased 53,000 shares of Lehman stock at $77.49 per share, for a total cost of $4.15 million. Additionally, between June 14 and June 15, 2007, plaintiff purchased 34,225 shares of Lehman stock (at prices ranging from $78.16 to $79.27), for a total cost of nearly $2.70 million.

- 88 -

252.    Plaintiff, who purchased shares of Lehman common stock contemporaneously with sales by defendant Fuld, suffered damages because: (1) in reliance on the integrity of the market, it paid artificially inflated prices as a result of the violations of §§10(b) and 20(a) of the 1934 Act as alleged herein; and (2) it would not have purchased the securities at the prices it paid, or at all, if it had been aware that the market prices had been artificially inflated by the false and misleading statements and concealment alleged herein.

**COUNT VI**

**Claim for Professional Negligence and Negligent Misrepresentation
Against Defendant E&Y**

253.    Plaintiff incorporates the above paragraphs and allegations.

254.    This cause of action is brought against defendant E&Y for negligence.

255.    E&Y is in the business of auditing financial statements of public companies, issuing opinion letters concerning the financial statements audited, and providing and certifying such information for the benefit of investors and others to use in their dealings with others.

256.    As the independent auditor of Lehman, E&Y had a duty to examine the financial statements of Lehman in accordance with GAAS to determine, among other things, whether they were fairly presented and in accordance with GAAP.

257.    E&Y knew and intended that its reports concerning Lehman's financial statements would be distributed to prospective purchasers of Lehman's  securities and that such purchasers would rely, and had a right to rely, upon the information provided by E&Y concerning the financial condition of Lehman in making their investment decisions.  E&Y knew and intended that its audit opinions and the annual financial statements of Lehman to which they related would be included in Lehman's financial statements and would further be incorporated by reference in and constituted a material part of the Offerings and E&Y expressly consented to such inclusion and incorporation.

- 89 -

E&Y understood that a primary intent of Lehman was for E&Y's professional services to benefit or influence prospective purchasers of Lehman's securities, including plaintiff, since one of the primary purposes of having an accounting firm certify financial statements is to provide independent certification of the accuracy thereof to those who must rely on those financial statements when deciding whether to transact in the company's securities.

258.    E&Y owed plaintiff a duty of reasonable care in connection with the provision of information concerning the financial condition of Lehman, including E&Y's certifications that the Company's financial statements fairly and accurately reported its financial condition and were presented in accordance with GAAP, which certifications were included (or incorporated) into the Company's financial statements and into the Offerings.

259.    E&Y breached these duties knowingly, wantonly, recklessly, or at least negligently, by including untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading in Lehman's financial statements disseminated to plaintiff and its agents.  Among other things, E&Y falsely represented that it had audited Lehman's financial statements in accordance with GAAS and that those financial statements were fairly presented in accordance with GAAP.

260.    At the time of the misrepresentations and omissions of material facts by E&Y, plaintiff and its agents were ignorant of their falsity and believed them to be true.  Plaintiff and its agents relied upon the superior knowledge and expertise of E&Y and justifiably relied (to their detriment) on the financial statements audited and certified by E&Y, and on the unqualified opinions issued by E&Y in connection with Lehman's financial statements.  Had plaintiff and/or its agents been aware of the true facts, they would not have purchased or continued to hold Lehman Notes and/or would have disposed of them immediately.

- 90 -

261.    Neither plaintiff nor its agents knew of any of the false and/or misleading statements and omissions and reasonably relied upon the representations made by the defendants.  Neither plaintiff nor its agents could have learned of many of the facts showing E&Y's negligence until the Examiner's Report was made public in March 2010.

262.    E&Y's conduct constitutes the making of negligent misrepresentations (including negligent omissions to state facts in connection with statements that were made) under applicable California state law.

263.    As a direct and proximate results of the negligent misrepresentations (and omissions) by E&Y, and in reliance thereon, plaintiff suffered damages in connection with its investment in Lehman's securities.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff prays for judgment as follows:

A.    Awarding plaintiff damages in an amount which may be proven at trial, together with interest thereon;

B.    Awarding plaintiff pre-judgment and post-judgment interest, as well as its reasonable attorneys' and expert witness' fees and other costs;

C.    Ordering defendant Fuld to disgorge the profits of his insider sales of Lehman common stock during the Relevant Period;

D.    Awarding plaintiff rescission and/or rescissory damages; and

E.    Such other relief as this Court deems appropriate.

## JURY DEMAND

Plaintiff demands a trial by jury.

DATED:  December 15, 2011

ROBBINS GELLER RUDMAN
  & DOWD LLP
DARREN J. ROBBINS
MICHAEL J. DOWD
THOMAS E. EGLER
MATTHEW I. ALPERT
MAUREEN E. MUELLER


THOMAS E. EGLER

655 West Broadway, Suite 1900
San Diego, CA  92101-3301
Telephone: 619/231-1058
619/231-7423 (fax)
darrenr@rgrdlaw.com
miked@rgrdlaw.com
tome@rgrdlaw.com
malpert@rgrdlaw.com
mmueller@rgrdlaw.com

Attorneys for Plaintiff The California Public
Employees' Retirement System

667944_1

**APPENDIX A**

| COMMON STOCK/PREFERRED STOCK OFFERINGS | | | | | | |
|---|---|---|---|---|---|---|
| ISSUE DATE | SECURITY (CUSIP) | AMOUNT | PRICE | VOLUME | UNDERWRITER DEFENDANTS[1] | FALSE AND MISLEADING DOCUMENTS INCORPORATED INTO OFFERING MATERIALS |
| June 9, 2008 | Common Stock (524908100) | 143 million shares of common stock | $28 per share | $4,004,000,000 | | June 12, 2007 Form 8-K July 10, 2007 Form 10-Q September 18, 2007 Form 8-K October 10, 2007 Form 10-Q December 13, 2007 Form 8-K January 29, 2008 Form 10-K March 18, 2008 Form 8-K April 8, 2008 Form 10-Q June 9, 2008 Form 8-K |

---

[1]      "Underwriter Defendants" refer to: Cabrera Capital Markets, LLC ("Cabrera"); The Williams Capital Group, L.P. ("Williams Capital"); Loop Capital Markets, LLC ("Loop"); BBVA Securities Inc. ("BBVA"); BNY Capital Markets, Inc. ("BNY"); Citigroup Global Markets Inc. ("CGMI"); RBC Capital Markets Corporation ("RBC Capital"); Greenwich Capital Markets, Inc. ("Greenwich") (now known as RBS Securities, Inc.); SunTrust Capital Markets, Inc. ("SunTrust"); ABN AMRO Inc. ("ABN"); ANZ Securities, Inc. ("ANZ"); CIBC World Markets Corp. ("CIBC"); HSBC Securities (USA) Inc. ("HSBC"); HVB Capital Markets, Inc. ("HVB"); Caja de Ahorros y Monte de Piedad de Madrid ("Caja Madrid"); National Australia Capital Markets, LLC ("NACM"); Santander Investment Securities Inc. ("Santander"); BNP Paribas S.A. ("BNP"); ING Financial Markets LLC ("ING"); Mellon Financial Markets, LLC ("Mellon"); M.R. Beal & Company ("MR Beal"); Natexis Bleichroeder Inc. ("Natexis"); SG Americas Securities, LLC ("SG Americas"); Wells Fargo Securities, LLC ("Wells Fargo"); Wachovia Capital Markets, LLC ("Wachovia") (which became part of defendant Wells Fargo in 2009); Harris Nesbitt Corp. ("Harris Nesbitt"); DZ Financial Markets LLC ("DZ Financial"); Mizuho Securities USA Inc. ("Mizuho"); Scotia Capital (USA) Inc. ("Scotia"); Sovereign Securities Corporation, LLC ("Sovereign"); Utendahl Capital Partners, L.P. ("Utendahl"); Fortis Securities LLC ("Fortis"); Muriel Siebert & Co., Inc. ("Siebert"); and Daiwa Securities SMBC Europe Limited ("Daiwa").

## APPENDIX A

| NOTES/BOND OFFERINGS[2] | | | | |
|---|---|---|---|---|
| **ISSUE DATE** | **SECURITY (CUSIP)** | **VOLUME** | **UNDERWRITER DEFENDANTS (EXTENT OF PARTICIPATION)** | **FALSE AND MISLEADING DOCUMENTS INCORPORATED INTO OFFERING MATERIALS** |
| July 19, 2007 | 6.50% Subordinated Notes Due 2017 (524908R36) | $2,000,000,000 | Caja Madrid ($30 million)<br>HSBC ($30 million)<br>HVB ($30 million)<br>NACM ($30 million)<br>Santander ($30 million) | June 12, 2007 Form 8-K<br>July 10, 2007 Form 10-Q |
| July 19, 2007 | 6.875% Subordinated Notes Due 2037 (524908R44) | $1,500,000,000 | BBVA ($15 million)<br>BNY ($15 million)<br>CGMI ($15 million)<br>Greenwich ($15 million)<br>RBC Capital ($15 million)<br>SunTrust ($15 million) | June 12, 2007 Form 8-K<br>July 10, 2007 Form 10-Q |
| September 26, 2007 | Medium Term 7.0% Notes Due 2027 (52517P5Y3) | $1,000,000,000 | ANZ ($10 million)<br>BBVA ($10 million)<br>Cabrera ($10 million)<br>CGMI ($10 million)<br>Daiwa ($10 million)<br>DZ Financial ($10 million)<br>Harris Nesbitt ($10 million)<br>Mellon ($10 million)<br>Mizuho ($10 million)<br>Scotia ($10 million)<br>Sovereign ($10 million)<br>SunTrust ($10 million)<br>Utendahl ($10 million)<br>Wells Fargo ($10 million) | June 12, 2007 Form 8-K<br>July 10, 2007 Form 10-Q<br>September 18, 2007 Form 8-K |

---

[2]    The "issue date" identified for the structured notes herein is the settlement date.  The pricing date for the structured notes is typically a few days before the settlement date.

**APPENDIX A**

| NOTES/BOND OFFERINGS[2] | | | | |
|---|---|---|---|---|
| **ISSUE DATE** | **SECURITY (CUSIP)** | **VOLUME** | **UNDERWRITER DEFENDANTS (EXTENT OF PARTICIPATION)** | **FALSE AND MISLEADING DOCUMENTS INCORPORATED INTO OFFERING MATERIALS** |
| December 31, 2007 | 6.75% Subordinated Notes Due 2017 (5249087M6) | $1,500,000,000 | ABN Amro ($15 million) ANZ ($15 million) BBVA ($15 million) BNY ($15 million) CGMI ($15 million) CIBC ($15 million) HSBC ($15 million) HVB ($15 million) Mizuho ($15 million) Santander ($15 million) Scotia ($15 million) Siebert ($15 million) SunTrust ($15 million) Wachovia ($15 million) Wells Fargo ($15 million) | June 12, 2007 Form 8-K July 10, 2007 Form 10-Q September 18, 2007 Form 8-K October 10, 2007 Form 10-Q December 13, 2007 Form 8-K |
| January 22, 2008 | Medium Term 5.625% Notes Due 2013 (5252M0BZ9) | $4,000,000,000 | BBVA ($40 million) BNP ($40 million) CGMI ($40 million) Daiwa ($40 million) Fortis ($40 million) ING ($40 million) Mellon ($40 million) MR Beal ($40 million) Natexis ($40 million) SG Americas ($40 million) SunTrust ($40 million) Wells Fargo ($40 million) | June 12, 2007 Form 8-K July 10, 2007 Form 10-Q September 18, 2007 Form 8-K October 10, 2007 Form 10-Q December 13, 2007 Form 8-K |

## APPENDIX A

| NOTES/BOND OFFERINGS[2] | | | | |
|---|---|---|---|---|
| **ISSUE DATE** | **SECURITY (CUSIP)** | **VOLUME** | **UNDERWRITER DEFENDANTS (EXTENT OF PARTICIPATION)** | **FALSE AND MISLEADING DOCUMENTS INCORPORATED INTO OFFERING MATERIALS** |
| May 9, 2008 | 7.50% Subordinated Notes Due 2038 (5249087N4) | $2,000,000,000 | Cabrera ($20 million) Loop ($20 million) Williams Capital ($20 million) | June 12, 2007 Form 8-K July 10, 2007 Form 10-Q September 18, 2007 Form 8-K October 10, 2007 Form 10-Q December 13, 2007 Form 8-K January 29, 2008 Form 10-K March 18, 2008 Form 8-K April 8, 2008 Form 10-Q |

## DECLARATION OF SERVICE BY MAIL

I, the undersigned, declare:

1.      That declarant is and was, at all times herein mentioned, a citizen of the United States and a resident of the County of San Diego, over the age of 18 years, and not a party to or interested party in the within action; that declarant's business address is 655 West Broadway, Suite 1900, San Diego, California 92101.

2.      That on December 15, 2011, declarant served the  by depositing a true copy thereof in a United States mailbox at San Diego, California in a sealed envelope with postage thereon fully prepaid and addressed to the parties listed on the attached Service List.

3.      That there is a regular communication by mail between the place of mailing and the places so addressed.

I declare under penalty of perjury that the foregoing is true and correct. Executed on this fifteenth day of December, 2011, at San Diego, California.

_____
Terree DeVries

67944_1

LEHMAN BONDS CALPERS
Service List - 12/15/2011  (11-0020)
Page 1 of 2

**Counsel For Defendant(s)**

Patricia  Hynes
Todd  Fishman
Allen & Overy LLP
1221 Avenue of the Americas
New York, NY  10020
    212/610-6300
    212/610-6399(Fax)


Andrew J. Levander
Kathleen N. Massey
Adam J. Wasserman
Dechert LLP
1095 Avenue of the Americas
New York, NY  10036-6797
    212/698-3500
    212/698-3599(Fax)


Robert J. Cleary
Mark  Davidson
Proskauer Rose LLP
Eleven Times Square
New York, NY  10036-8299
    212/969-3000
    212/969-2900(Fax)


Michael J. Chepiga
Bryce A. Pashler
Simpson Thacher & Bartlett LLP
425 Lexington Avenue
New York, NY  10017-3954
    212/455-2000
    212/455-2502(Fax)


Mitchell A. Lowenthal
Meredith E. Kotler
Victor L. Hou
Cleary Gottlieb Steen & Hamilton LLP
One Liberty Plaza
New York, NY  10006
    212/225-2000
    212/225-3999(Fax)


Mark P. Ressler
Michael  Hanin
Kasowitz, Benson, Torres & Friedman, LLP
1633 Broadway
New York, NY  10019-6799
    212/506-1700
    212/506-1800(Fax)


James G. Kreissman
Simpson Thacher & Bartlett LLP
2550 Hanover Street
Palo Alto, CA  94304
    650/251-5000
    650/251-5002(Fax)

LEHMAN BONDS CALPERS
Service List - 12/15/2011  (11-0020)
Page 2 of 2

**Counsel For Plaintiff(s)**

David C. Walton
Thomas E. Egler
Matthew I. Alpert
Robbins Geller Rudman & Dowd LLP
655 West Broadway, Suite 1900
San Diego, CA  92101
  619/231-1058
  619/231-7423 (Fax)

Shawn A. Williams
Robbins Geller Rudman & Dowd LLP
Post Montgomery Center
One Montgomery Street, Suite 1800
San Francisco, CA  94104
  415/288-4545
  415/288-4534 (Fax)