**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE LEHMAN BROTHERS ERISA LITIGATION | **Civil Action No.: 08 Civ. 5598 (LAK)** |

**SECOND CONSOLIDATED AMENDED COMPLAINT FOR VIOLATIONS**
**OF THE EMPLOYEE RETIREMENT INCOME SECURITY ACT**

**CONFIDENTIAL INFORMATION**
**SUBJECT TO PROTECTIVE ORDER**

**FILED UNDER SEAL**

Dated: New York, New York
           September 22, 2010

Plaintiffs Alex E. Rinehart, Monique Miller Fang, Jo Anne Buzzo, Maria DeSousa, and Linda Demizio (collectively, the "Plaintiffs") allege the following based upon personal information as to themselves and the investigation of Plaintiffs' counsel, which includes, among other things, a review of U.S. Securities and Exchange Commission ("SEC") filings by Lehman Brothers Holdings Inc. ("Lehman" or the "Company"), including the Company's proxy statements (Forms DEF-14A), annual reports (Forms 10-K), quarterly reports (Forms 10-Q), current reports (Forms 8-K), and the annual reports (Forms 11-K) filed on behalf of the Lehman Brothers Savings Plan (the "Plan"); a review of the Forms 5500 filed by the Plan with the U.S. Department of Labor ("DOL") and U.S. Department of the Treasury; a review of published accounts surrounding Lehman's bankruptcy; review of documents governing the operations of the Lehman Brothers Savings Plan (the "Plan"); and a review of the March 11, 2010 report and documents collected by the Bankruptcy Court-appointed examiner, Anton R. Valukas ("the Examiner"), submitted in Lehman's bankruptcy proceedings, *In re Lehman Brothers Holdings Inc.*, 08-13555 (JMP) (Bankr. S.D.N.Y.).

I.    **NATURE OF THE ACTION**

1.    This action is brought on behalf of the Plan and all Plan participants to recover losses to the Plan for which Defendants are personally liable pursuant to Sections 409 and 502(a)(2) of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §§ 1109 and 1132(a)(2).  In addition, under ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), Plaintiffs seek other equitable relief from Defendants, including, without limitation, injunctive relief and, as available under applicable law, constructive trust, restitution, equitable tracing, and other monetary relief.

2.    The Plan is a 401(k) retirement plan sponsored by the Company to provide Plan participants an easy and convenient way to save toward their retirement (LEHMAN-ERISA0000345).

3.      Plaintiffs' claims arise from the failure of Defendants, who were or are fiduciaries of the Plan, to act solely in the interest of the Plan and its participants and beneficiaries and to exercise the required skill, care, prudence, and diligence in administering the Plan and its assets during the period from March 16, 2008, to June 10, 2009 (the "Class Period").

4.      Throughout the Class Period, Defendants allowed the Plan to acquire and hold Lehman common stock ("Lehman Stock" or "Company Stock") through the Lehman Brothers Common Stock Fund ("Company Stock Fund"), which invested primarily in Lehman Stock, even as the Company headed for bankruptcy and even though they knew or should have known that Company Stock was an imprudent means of saving for retirement because, among other things: (i) the run on the bank that caused the virtual collapse of Bear Stearns put the Defendants on notice that Lehman very well might be the next in line to fail; (ii) the Company was the most highly leveraged of the large remaining investment clearing firms after Bear Stearns' collapse, indeed, as of April 2008, it was leveraged 30.7 to 1, *i.e.*, it borrowed $30.70 dollars for each dollar of equity; (iii) the Company was exposed to significant risk that it would not be able to fund its ongoing operations if there was a deterioration in the credit, subprime, or other financial markets or if its counterparties withdrew funds or demanded additional collateral from it; (iv) the Company used undisclosed repurchase and resale ("repo") transactions, known as "Repo 105" and "Repo 108" transactions (together, "Repo 105"), to artificially and temporarily reduce Lehman's net leverage ratio, an important measure of the Company's inherent risk; (v) the Company was exposed to catastrophic losses from trading in subprime mortgage backed derivatives, the nature and extent of which the Company failed to disclose fully; (vi) the Company was exposed to catastrophic losses from collateralized debt obligations ("CDOs"), and had failed to timely write down its positions in these securities, the nature and extent of which

the Company failed to disclose fully; (vii) the Company was exposed to catastrophic losses from mortgage backed security originations, and had failed to timely write down its positions in these securities, the nature and extent of which the Company failed to disclose fully; (viii) the Company had materially overvalued its positions in commercial and subprime mortgages, and in securities tied to these mortgages; (ix) the Company had inadequate reserves for its mortgage and credit related exposure; (x) the Company was exposed to catastrophic losses from its investments in commercial real estate, and had failed to timely write down its positions in these securities, the nature and extent of which the Company failed to disclose fully; and (xi) the Company lacked adequate internal and financial controls.

5.     Accordingly, Plaintiffs allege in Count I that certain Defendants, each having certain responsibilities regarding the management and investment of Plan assets, breached their fiduciary duties to the Plan and Plan participants by failing to prudently and loyally manage the Plan's investment in Company Stock by, among other things: (i) continuing to offer Company Stock as a retirement saving option; (ii) continuing to acquire and hold shares of Company Stock in the Plan when it was imprudent to do so; (iii) failing to provide complete and accurate information to Plan participants regarding the Company's financial condition and the prudence of investing in Company Stock; and (iv) maintaining the Plan's pre-existing investment in Company Stock when Company Stock was no longer a prudent investment for the Plan.

6.     Defendants' actions and inactions conflicted with the express purpose of ERISA retirement plans, which is to provide funds for participants' retirement.  *See* ERISA § 2, 29 U.S.C. § 1001 ("Congressional Findings And Declaration Of Policy").

7.      In Count II, Plaintiffs allege that certain Defendants failed to avoid or ameliorate inherent conflicts of interests which crippled their ability to function as independent, "single-minded" fiduciaries with only the Plan's and its participants' best interests in mind.

8.      In Count III, Plaintiffs allege that the Director Defendants, and in particular the Compensation Committee Defendants (defined below), breached their fiduciary duties by failing to adequately monitor other persons to whom management/administration of Plan assets was delegated, despite the fact that such defendants knew or should have known that such other fiduciaries were imprudently allowing the Plan to continue offering Company Stock as an investment option and investing Plan assets in Company Stock when it was no longer prudent to do so.

9.      As alleged below, Defendants responsible for selecting and monitoring the Plan's retirement savings options imprudently permitted the Plan to offer, acquire, and hold Company Stock during the Class Period despite the Company's serious mismanagement, improper business practices, and dire financial circumstances.  Defendants' breaches have caused the Plan and its participants to suffer millions of dollars in losses of retirement savings.

10.     ERISA §§ 409(a) and 502(a)(2), 29 U.S.C. §§ 1109 and 1132(a)(2), authorize participants, such as Plaintiffs, to sue in a representative capacity for losses suffered by the Plan as a result of breaches of fiduciary duty.  Pursuant to that authority, Plaintiffs bring this action on behalf of the Plan and as a class action under Fed. R. Civ. P. 23 on behalf of all participants in the Plan whose Plan accounts were invested in the Company Stock Fund during the Class Period.

## II.    <u>JURISDICTION AND VENUE</u>

11.     The Court has subject-matter jurisdiction over this action pursuant to ERISA § 502(e)(1), 29 U.S.C. § 1132(e)(1), and 28 U.S.C. § 1331.

12.      ERISA provides for nationwide service of process.  ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2).  All Defendants are either residents of the United States or subject to service in the United States.  Therefore, the Court has personal jurisdiction over them.  The Court also has personal jurisdiction over Defendants pursuant Fed. R. Civ. P. 4(k)(1)(A) because Defendants are all subject to the jurisdiction of a court of general jurisdiction in the State of New York.

13.      Venue is proper in this District pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because the Plan is administered in this District, some or all of the fiduciary breaches for which relief is sought occurred in this District, and Lehman had its principal place of business in this District.

## III.   PARTIES

### A.   Plaintiffs

14.      Plaintiff Alex E. Rinehart is a participant in the Plan, within the meaning of ERISA § 3(7), 29 U.S.C. § 1102(7), and held Company Stock in his individual Plan account during the Class Period.

15.      Plaintiff Monique Miller Fang is a participant in the Plan, within the meaning of ERISA § 3(7), 29 U.S.C. § 1102(7), and held Company Stock in her individual Plan account during the Class Period.

16.      Plaintiff Jo Anne Buzzo is a participant in the Plan, within the meaning of ERISA § 3(7), 29 U.S.C. § 1102(7), and held Company Stock in her individual Plan account during the Class Period.

17.      Plaintiff Maria DeSousa is a participant in the Plan, within the meaning of ERISA § 3(7), 29 U.S.C. § 1102(7), and held Company Stock in her individual Plan account during the Class Period.

18.     Plaintiff Linda Demizio is a participant in the Plan, within the meaning of ERISA § 3(7), 29 U.S.C. § 1102(7), and held Company Stock in her individual Plan account during the Class Period.

### B.     The Company

19.     The Company, through predecessor entities, was founded in 1850.  For more than a century, Lehman and its predecessor entities served the financial needs of corporations, governments and municipalities, institutional clients, and high-net-worth individuals worldwide. The Company provided a full array of services in equity and fixed income sales, trading and research, investment banking, asset management, private investment management and private equity.  The Company's worldwide headquarters in New York and regional headquarters in London and Tokyo were complemented by a network of offices in North America, Europe, the Middle East, Latin America and the Asia Pacific region.  Through its subsidiaries, the Company was a global market-maker in all major equity and fixed income products.

20.     On September 15, 2008, Lehman filed a voluntary petition for relief under Chapter 11 of Title 11 of the United States Code in the United States Bankruptcy Court for the Southern District of New York captioned *In re Lehman Brothers Holdings Inc., et. al.*, Case Number 08-13555 (JMP).

21.     On September 17, 2008, NYSE Regulation, Inc. ("NYSE Regulation") announced the immediate suspension of trading of Company Stock on the New York Stock Exchange ("NYSE").  Lehman Stock now trades over the counter for approximately six cents a share.

22.     Claims are not asserted against Lehman in this action because of the automatic stay of proceedings against it under Section 362(a) of the Bankruptcy Code, 11 U.S.C. § 362(a).

C.      **Defendants**

23.      All Defendants named below are fiduciaries of the Plan within the meaning of ERISA, and all Defendants breached their fiduciary duties in various ways, as is alleged herein.

(i)      **Director Defendants**

24.      ***Defendant Richard S. Fuld, Jr.*** ("Fuld") served as Chairman of the Board of Directors (the "Board") and Chief Executive Officer ("CEO") of Lehman during the Class Period.  According to the Company's proxy statement filed with the SEC on or about March 5, 2008 (the "March 5 Proxy Statement"), Defendant Fuld also served as chairman of the Executive Committee of the Board.  Defendant Fuld was a fiduciary of the Plan, within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), in that he exercised discretionary authority with respect to the management and administration of the Plan and management or disposition of the Plan's assets.

25.      ***Defendant Michael L. Ainslie*** ("Ainslie") served as a director of Lehman during the Class Period.  According to the March 5 Proxy Statement, Defendant Ainslie was a member of the Audit Committee.  Defendant Ainslie was a fiduciary of the Plan, within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), in that he exercised discretionary authority with respect to the management and administration of the Plan and management or disposition of the Plan's assets.

26.      ***Defendant John F. Akers*** ("Akers") served as a director of Lehman during the Class Period.  According to the Company's March 5 Proxy Statement, Defendant Akers was Chairman of the Compensation and Benefits Committee (the "Compensation Committee"), and a member of the Finance and Risk Committee.  Defendant Akers was a fiduciary of the Plan, within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), in that he exercised

discretionary authority with respect to the management and administration of the Plan and management or disposition of the Plan's assets.

27.     **Defendant Roger S. Berlind** ("Berlind") served as a director of Lehman during the Class Period.  According to the Company's March 5 Proxy Statement, Defendant Berlind was a member of the Audit Committee and the Finance and Risk Committee.  Defendant Berlind was a fiduciary of the Plan, within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), in that he exercised discretionary authority with respect to the management and administration of the Plan and management or disposition of the Plan's assets.

28.     **Defendant Thomas H. Cruikshank** ("Cruikshank") served as a director of Lehman during the Class Period.  According to the Company's March 5 Proxy Statement, Defendant Cruikshank was a member of the Nominating and Corporate Governance Committee. Defendant Cruikshank was a fiduciary of the Plan, within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), in that he exercised discretionary authority with respect to the management and administration of the Plan and management or disposition of the Plan's assets.

29.     **Defendant Marsha Johnson Evans** ("Evans") served as a director of Lehman. Defendant Evans was a fiduciary of the Plan, within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), in that she exercised discretionary authority with respect to the management and administration of the Plan and management or disposition of the Plan's assets. According to the March 5 Proxy Statement, Defendant Evans was a member of the Compensation Committee and the Finance and Risk Committee, and served as the Chairman of the Nominating and Corporate Governance Committee.

30.     **Defendant Sir Christopher Gent** ("Gent") served as a director of Lehman during the Class Period.  Defendant Gent was a fiduciary of the Plan, within the meaning of ERISA §

3(21)(A), 29 U.S.C. § 1002(21)(A), in that he exercised discretionary authority with respect to the management and administration of the Plan and management or disposition of the Plan's assets.   According to the March 5 Proxy Statement, Defendant Gent was a member of the Compensation Committee and the Audit Committee.

31.   **Defendant Jerry A. Grundhofer** ("Grundhofer") served as a director of Lehman during the Class Period.  Defendant Grundhofer was a fiduciary of the Plan, within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), in that he exercised discretionary authority with respect to the management and administration of the Plan and management or disposition of the Plan's assets.

32.   **Defendant Roland A. Hernandez** ("Hernandez") served as a director of Lehman during the Class Period.  According to the Company's March 5 Proxy Statement, Defendant Hernandez was a member of the Finance and Risk Committee.  Defendant Hernandez was a fiduciary of the Plan, within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), in that he exercised discretionary authority with respect to the management and administration of the Plan and management or disposition of the Plan's assets.

33.   **Defendant Henry Kaufman** ("Kaufman") served as a director of Lehman during the Class Period.  According to the Company's March 5 Proxy Statement, Defendant Kaufman was the Chairman of the Finance and Risk Committee.  Defendant Kaufman was a fiduciary of the Plan, within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), in that he exercised discretionary authority with respect to the management and administration of the Plan and management or disposition of the Plan's assets.

34.   **Defendant John D. Macomber** ("Macomber") served as a director of Lehman during the Class Period.  Defendant Macomber was a fiduciary of the Plan, within the meaning

of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), in that he exercised discretionary authority with respect to the management and administration of the Plan and management or disposition of the Plan's assets.  According to the March 5 Proxy Statement, Defendant Macomber was a member of the Compensation Committee, Executive Committee and the Nominating and Corporate Governance Committee.

35.    Defendants Fuld, Ainslie, Akers, Berlind, Cruikshank, Evans, Gent, Grundhofer, Hernandez, Kaufman, and Macomber are collectively referred to herein as the "Director Defendants."

36.    The Director Defendants were and are fiduciaries of the Plan within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), in that they: (i) were named fiduciaries of the Plan; and (ii) exercised discretionary authority with respect to the management and administration of the Plan and management or disposition of the Plan's assets.

37.    According to Article X, Section 10.1 of the Plan Document at LEHMAN-ERISA0000082, the Board was responsible for appointing the members of the Benefit Committee:

> The complete authority and discretion to control and manage the operation and administration of the Plan shall be placed in the Employee Benefit Plans Committee of the Company.  The Committee shall consist of at least three members appointed from time to time by the Board of Directors or its delegate(s) to serve at the pleasure thereof.  Any member of the Committee may resign by delivering his written resignation to the Company.

38.    The Board was ultimately responsible for monitoring and administering the Plan. Because of their positions as directors of the Company, the Director Defendants had access to material, non-public information concerning Lehman, including the Company's true financial condition and outlook, which they had an obligation to share with the other Plan fiduciaries so

they could properly evaluate the prudence of Lehman Stock as a Plan investment option.  The Board had a responsibility to carry out its duties in such a manner as to best serve the interests of the Plan's participants.

39.     Indeed, Defendant Fuld chaired, and Defendant Macomber was a member of, the Company's Executive Committee, which was responsible for assessing Lehman's risk exposure and related disclosures.  Lehman's Executive Committee reviewed "risk exposures, position concentrations and risk-taking activities on a weekly basis, or more frequently as needed."  *See* Form 10-Q for the second quarter of 2008, filed with the SEC on or about July 10, 2008. Additionally, the Executive Committee "allocate[d] the usage of capital to each of [the Company's] businesses and establishes trading and credit limits for counterparties." *Id.*   In a conference just prior to the Class Period, Ms. Callan, Lehman's Chief Financial Officer for the first half of the Class Period, explained that the Executive Committee consisted of thirteen people, including herself and Fuld, who met twice a week for two hours at a time and "devote[d] a significant amount of that time to risk."  *Lehman Brothers Holdings Inc. at Credit Suisse Group Financial Services Forum*, February 6, 2008.  Ms. Callan stated that the Executive Committee addressed "any risk that passes a certain threshold, any risk that we think is a hot topic" and "anything else during the course of the week that's important." *Id.*   Further, Ms. Callan stated that the Executive Committee was "intimately familiar with the risk that we take in all the different areas of our business.  And [Defendant Fuld] in particular . . . keeps very straight lines into the businesses on this topic." *Id.*

40.     The other committees of the Board also had specialized knowledge about Lehman's financial condition.  According to the March 5 Proxy Statement, the Finance and Risk Committee, which consisted of Defendant Kaufman, who chaired the Committee, and

Defendants Akers, Berlind, Evans and Hernandez, "reviews and advises the Board of Directors on the financial policies and practices of the Company, including risk management. The Finance [and Risk] Committee also periodically reviews, among other things, budget, capital and funding plans and recommends a dividend policy and Common Stock repurchase plan to the Board of Directors."

41.     According to the March 5 Proxy Statement, the Nominating and Corporate Governance Committee, which consisted of Defendant Evans, who chaired the Committee, and Defendants Cruikshank and Macomber, "is responsible for overseeing the Company's corporate governance and recommending to the Board of Directors corporate governance principles applicable to the Company. The Nominating [and Corporate Governance] Committee also considers and makes recommendations to the Company's Board of Directors with respect to the size and composition of the Board of Directors and its Committees and with respect to potential candidates for membership on the Board of Directors."

42.     According to the March 5 Proxy Statement, the Audit Committee, which consisted of Defendant Cruikshank, who chaired the Committee, and Defendants Ainslie, Berlind and Gent:

> assists the Board of Directors in fulfilling its oversight of the quality and integrity of the Company's financial statements and the Company's compliance with legal and regulatory requirements. The Audit Committee is responsible for retaining (subject to stockholder ratification) and, as necessary, terminating, the independent registered public accounting firm. The Audit Committee annually reviews the qualifications, performance and independence of the independent registered public accounting firm and the audit plan, fees and audit results, and pre-approves audit and non-audit services to be performed by the independent registered public accounting firm and related fees. The Audit Committee also oversees the performance of the Company's corporate audit and compliance functions.

43.     Further, as described below, the Board was a named fiduciary of the Plan under

the Plan Document and was expressly authorized and empowered to appoint and remove the Benefit Committee members.  *See* Plan Document, Article X, Section 10.1 at LEHMAN-ERISA0000082; *see also* Lehman Brothers Savings Plan Summary Plan Description, dated January 1, 2008 (the "SPD") at LEHMAN-ERISA0000364 ("The Plan is administered by the Employee Benefit Plans Committee (called the 'Committee' in this booklet) which is appointed by the Compensation and Benefits Committee of the Board of Directors of Lehman Brothers Holdings Inc.").

(ii)     <u>The Compensation Committee Defendants</u>

44.     ***Defendant Compensation and Benefits Committee***.  The Board delegated Plan administration to the Compensation and Benefits Committee of the Board (the "Compensation Committee").  *See* Lehman Brothers Holdings Inc. Compensation and Benefits Committee of the Board of Directors Charter (the "Charter") at p. 1 ("The purpose of the Compensation and Benefits Committee (the 'Compensation Committee') shall be to: . . . [d]ischarge the responsibilities of the Board of Directors with respect to the Corporation's compensation and benefits programs and compensation of the Corporation's executives"); *see also* SPD at LEHMAN-ERISA0000364.

45.     The Compensation Committee and its members were and are fiduciaries of the Plan within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), in that they:  (i) were named fiduciaries of the Plan; and (ii) exercised discretionary authority with respect to the management and administration of the Plan and management or disposition of the Plan's assets. *See* Plan Document, Article X, Section 10.1 at LEHMAN-ERISA0000082; *see also* SPD at LEHMAN-ERISA0000364 ("The Plan is administered by the Employee Benefit Plans

14

Committee (called the 'Committee' in this booklet) which is appointed by the Compensation and Benefits Committee of the Board of Directors of Lehman Brothers Holdings Inc.").

46.     According to the March 5 Proxy Statement, the members of the Compensation Committee were as follows: (i) Defendant Akers served as Chair of the Compensation Committee; and (ii) Defendants Evans, Gent, and Macomber were members of the Compensation Committee.

47.     The Company, acting through the Employee Benefit Plans Committee (the "Benefit Committee") (with respect to amendments) and the Compensation Committee (with respect to either amendment or termination), reserves the right to amend, modify, suspend, or terminate the Plan at any time.  *See* SPD at 20 (LEHMAN-ERISA0000363).

48.     Because of their positions as directors of the Company, the Compensation Committee Defendants had access to material, non-public information concerning Lehman, including the Company's true financial condition and outlook, which they had an obligation to share with the other Plan fiduciaries so they could properly evaluate the prudence of Lehman Stock as a Plan investment option.

**(iii)     Benefit Committee Defendants**

49.     ***Defendant Lehman Brothers Holdings Inc. Employee Benefit Plans Committee****. The Plan is and was administered by the Benefit Committee, which is and was appointed by the Compensation Committee.  *See* SPD at 21 (LEHMAN-ERISA0000364).   The Benefit Committee has and had "complete authority and discretion to control and manage the operation and administration of the Plan."  *See* Plan Document, Article X, Section 10.1 (LEHMAN-ERISA0000082); *see also* SPD at 2 (LEHMAN-ERISA00000345).

50.     The Benefit Committee was designated the "Plan Administrator" and a "Named

Fiduciary" under the Plan Document.  *See* Plan Document, Article X, Section 10.9 (LEHMAN-ERISA0000085) ("For purposes of the Act, the 'Named Fiduciary' for operation and administration of the Plan and the 'Plan Administrator' shall be the Committee, and the Committee is hereby designated as agent for service of legal process").

51.     The members of the Benefit Committee were appointed by, and served at the pleasure of, the Board or the Compensation Committee as its delegate.

52.     Throughout the Class Period, the Benefit Committee consisted of at least three members.  *See* Plan Document, Article X, Section 10.1 (LEHMAN-ERISA0000082).

53.     The Benefit Committee had full discretion and authority to make all decisions in connection with the administration of the Plan, including, but not limited to, decisions concerning eligibility to participate in the Plan and concerning benefits to which any participant or beneficiary is entitled, as well as with regard to Plan interpretation and determination of any fact under the Plan.  *See* SPD at 21 (LEHMAN-ERISA0000364).

54.     The Benefit Committee had all powers and discretion necessary or helpful for the carrying out its responsibilities, including the discretion and exclusive right to determine any question arising in connection with the interpretation, application, or administration of the Plan.  *See* Plan Document, Article X, Section 10.2 (LEHMAN-ERISA0000075).

55.     Among other powers, the Benefit Committee had the power and discretion to:

(a)     determine all questions arising out of or in connection with the provisions of the Plan or its administration, including, without limitation, the power and discretion to resolve ambiguities, to determine relevant facts, to rectify errors, and to supply omissions;

(b)     make rules and regulations for the administration of the Plan which are not inconsistent with the terms and provisions of the Plan;

(c)    construe all terms, provisions, conditions and limitations of the Plan;

(d)    determine all questions relating to the eligibility of persons to receive benefits hereunder, all other matters upon which the benefits or other rights of a Member or other person shall be based hereunder;

(e)    determine all questions relating to the administration of the Plan (1) when disputes arise between an Employer and a member or his Beneficiary, spouse or legal representatives, and (2) in order to promote the uniform administration of the Plan for the benefit of all parties concerned;

(f)    direct the Trustee as to the method by which and persons to whom benefits will be paid;

(g)    establish procedures for determining whether a domestic relations order is a qualified domestic relations order ("QDRO") as described in Section 7.12 and for complying with any such QDRO;

(h)    determine the method of making corrections necessary or advisable as a result of operating defects in order to preserve qualification of the Plan under Section 401(a) of the Code pursuant to procedures of the Internal Revenue Service applicable in such cases (such as those set forth in Revenue Procedure 2006-27 and similar guidance);

(i)    compromise or settle claims against the Plan and direct the Trustee to pay amounts required in any such settlements or compromise;

(j)    appoint an Administrator and delegate to such Administrator those tasks of recordkeeping, Plan valuation, communication with Members, and other such ministerial and administrative tasks as the Committee deems appropriate; and

(k)    exercise, in its capacity as named fiduciary under the Plan, all discretion that the Trust Agreement or any other contract with the Administrator provides shall or may be exercised by the Company.

*See* Plan Document, Article X, Section 10.2 (LEHMAN-ERISA0000075-76).

56.    Further, the Benefit Committee was a named fiduciary with respect to control or management of the assets of the Plan, and had the following authority:

> (a)   to appoint an investment manager or managers (within the meaning of Section 3(38) of the Act) to manage (including the power to acquire and dispose of any assets of the Plan), and
>
> (b)   to direct the Trustee with respect to the management of assets of the Plan not subject to the authority of such an investment manager (including, without limitation, the selection of such mutual funds or other investment options as it may deem appropriate to carry out the investment objectives of each of the respective Investment Funds established by the Committee as provided in Section 9.2).

*See* Plan Document, Article X, Section 10.12 (LEHMAN-ERISA0000085-86).

57.   In addition to the foregoing, under the Plan Document, the Benefit Committee also had exclusive fiduciary responsibility for determining whether Plan provisions requiring the establishment and maintenance of the Company Stock Fund should continue to be given effect in accordance with their terms as required by ERISA § 401(a)(1)(D), 29 U.S.C. § 1101(a)(1)(D), or whether such provisions were inconsistent with ERISA to any extent, including in particular the fiduciary duty rules of ERISA §§ 404(a)(1) and (a)(2), 29 U.S.C. §§ 1104(a)(1) and (2).  *See id.*

58.   Article IX, Section 9.2(a) of the Plan Document similarly provided plan fiduciaries the right to eliminate or curtail investments in Lehman Stock:

> (a)   The Trust Fund shall consist of the Lehman Stock Fund and, until January 31, 2007, the American Express Stock Fund, each as described more fully in Section 1.32, and such other Investment Funds as the Committee shall establish from time to time. ***The Committee shall have the right*** (i) to establish and disestablish such other Investment Funds from time to time to implement and carry out investment objectives and policies established by the Committee, and (ii) ***to eliminate or curtail investments in Lehman Stock*** (or, prior to January 31, 2007, American Express Stock) if and to the extent that the Committee determines that such action is required in order to comply with the fiduciary duty rules of section 404(a)(1) of ERISA, as modified by section 404(a)(2) of ERISA.

*See* Plan Document, Article IX, Section 9.2(a) (LEHMAN-ERISA0000079) (Emphasis added).

59.     As a named fiduciary, the Benefit Committee had full and exclusive responsibility for monitoring, with the requisite prudence, diligence, skill and care required thereby, the suitability of acquiring and holding Company Stock within the meaning of the fiduciary duty rules of section ERISA §§ 404(a)(1) and (a)(2).  *See* Trust, RecordKeeping and Administrative Services Agreement between Lehman Brothers Holdings Inc. and Fidelity Management Trust Company – Lehman Brothers Savings Plan Trust (the "Trust Agreement"), Section 5(e)(ii)(A) (LEHMAN-ERISA00000203).

60.     As a named fiduciary, the Benefit Committee also was responsible for filing all reports required under Federal or state securities laws with respect to the Trust's ownership of Company Stock, including, without limitation, any reports required under section 13 or 16 of the Securities Exchange Act of 1934 ("Exchange Act").  *See* Trust Agreement, Section 5(e)(v) (LEHMAN-ERISA00000205).

61.     As a named fiduciary, the Benefit Committee was responsible for notifying the Trustee in writing of any requirement to stop purchases or sales of Company Stock pending the filing of any report required by law or otherwise.  *See id.*

62.     **Defendant Wendy M. Uvino** ("Uvino") served as the Chair of the Benefit Committee during the Class Period.  Defendant Uvino was a Senior Vice President and Global Head of Lehman's employee benefits functions during the Class Period.  In her role, Defendant Uvino managed all aspects of the benefits programs and oversaw the Human Resources data management functions.  Defendant Uvino signed the Plan's 2007 Form 11-K (filed on June 26, 2008) as the Chairperson of the Benefit Committee.  Defendant Uvino also signed the Form 5500 for year ended 2006.  Defendant Uvino was a fiduciary of the Plan, within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), in that she was a named fiduciary and exercised

discretionary authority with respect to the management and administration of the Plan and management or disposition of the Plan's assets.

63.     **Defendant Amitabh Arora** ("Arora") served as a member of the Benefit Committee during the Class Period.  Defendant Arora was Lehman Brothers' Global Head of Rates Strategy at Lehman during the Class Period.  Prior to his employment at Lehman in this capacity, he was the Chief of Mortgage Research at Morgan Stanley.  Before that, he spent seven years at Lehman in mortgage modeling.  By virtue of his position at Lehman, as well as his background and expertise in the mortgage industry, Defendant Arora knew or should have known of Lehman's exposure to catastrophic losses from *inter alia*, trading and holding for its own account in subprime mortgage backed derivatives and mortgage backed securities, and that Lehman had had materially overvalued its positions in commercial and subprime mortgages, and in securities tied to these mortgages.  Defendant Arora either did share, or should have shared, the benefits of his knowledge and expertise with the other members of the Benefit Committee. Defendant Arora was a fiduciary of the Plan, within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), in that he was a named fiduciary and exercised discretionary authority with respect to the management and administration of the Plan and management or disposition of the Plan's assets.

64.     **Defendant Mary Pat Archer** ("Archer") served as a member of the Benefit Committee during the Class Period.  Defendant Archer was a Managing Director at Lehman during the Class Period.  Defendant Archer worked as the lead on real estate transactions for Lehman.  In that capacity, she was fully familiar with Lehman's exposure to the vagaries of the mortgage markets and that the failure of Bear Stearns had started with its exposure to the mortgage backed securities market.  In late 2001 or early 2002, she transitioned into a more

administrative role, as the Head of Human Resources for Lehman's fixed income businesses, including mortgages, government bonds, corporate bonds and others, in which position she knew or should have know of Lehman's exposure to catastrophic losses from *inter alia*, trading and holding for its own account in subprime mortgage backed derivatives and mortgage backed securities, and that Lehman had had materially overvalued its positions in commercial and subprime mortgages, and in securities tied to these mortgages. Defendant Archer either did share, or should have shared, the benefits of her knowledge and expertise with the other members of the Benefit Committee. Defendant Archer was a fiduciary of the Plan, within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), in that she was a named fiduciary and exercised discretionary authority with respect to the management and administration of the Plan and management or disposition of the Plan's assets.

65.     ***Defendant Michael Branca*** ("Branca") served as a member of the Benefit Committee during the Class Period. Defendant Branca was a Research Analyst during the Class Period. As a research analyst, Defendant Branca knew about Lehman's growing exposure to the financial crisis long before the Company became insolvent. Defendant Branca either did share, or should have shared, the benefits of his knowledge and expertise with the other members of the Benefit Committee. Defendant Branca was a fiduciary of the Plan, within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), in that he was a named fiduciary and exercised discretionary authority with respect to the management and administration of the Plan and management or disposition of the Plan's assets.

66.     ***Defendant Evelyne Estey*** ("Estey") served as a member of the Benefit Committee during the Class Period. Defendant Estey was a Managing Director and Chief Administrative Officer prior to the Class Period. Defendant Estey's husband, Arthur S. Estey, was also a

Managing Director at Lehman.  Defendant Estey's senior executive position makes it more probable than not that she knew about Lehman's growing exposure to the financial crisis long before the Company became insolvent.  Defendant Estey either did share, or should have shared, the benefits of her knowledge and expertise with the other members of the Benefit Committee. Defendant Estey was a fiduciary of the Plan, within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), in that she was a named fiduciary and exercised discretionary authority with respect to the management and administration of the Plan and management or disposition of the Plan's assets.

67.     ***Defendant Adam Feinstein*** ("Feinstein") served as a member of the Benefit Committee during the Class Period.  Defendant Feinstein was Managing Director, Equity Research at Lehman during the Class Period.  By virtue of his expertise in equity research, Defendant Feinstein had the necessary skills and expertise to evaluate Lehman's financial condition and knew after the run on the bank at Bear Stearns that Lehman, which was highly leveraged, was extremely susceptible to a "run on the bank," and was likely to be the next firm to collapse.  Defendant Feinstein either did share, or should have shared, the benefits of his knowledge and expertise with the other members of the Benefit Committee.  Defendant Feinstein was a fiduciary of the Plan, within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), in that he was a named fiduciary and exercised discretionary authority with respect to the management and administration of the Plan and management or disposition of the Plan's assets.

68.     ***Defendant David Romhilt*** ("Romhilt") served as a member of the Benefit Committee during the Class Period.  Defendant Romhilt was the Chief Investment Officer of Lehman Brothers Trust Company, N.A., charged with, *inter alia*, working with trust personnel to assist clients in implementing portfolio strategies and in diversifying their portfolios to avoid

22

undue risk during the Class Period.  Defendant Romhilt's work as Chief Investment Officer gave him both the expertise and timely information about Lehman's high risk portfolio and leveraged balance.  Defendant Romhilt either did share, or should have shared, the benefits of his knowledge and expertise with the other members of the Benefit Committee.  Defendant Romhilt was a fiduciary of the Plan, within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), in that he was a named fiduciary and exercised discretionary authority with respect to the management and administration of the Plan and management or disposition of the Plan's assets.

69.     Defendants Uvino, Arora, Archer, Branca, Estey, Feinstein, and Romhilt are collectively referred to herein as the "Benefit Committee Defendants."

70.     As alleged herein, by virtue of their senior executive and management positions, the Benefit Committee Defendants had, or had access to, knowledge about Lehman's financial and operating condition and prospects during the Class Period.

### (iv)     Additional "John Doe" Defendants

71.     Without limitation, unknown ***"John Doe" Defendants 1-10*** include other individuals, including members of the Benefit and Compensation committees, directors of Lehman, as well as other Company officers and employees who are or were fiduciaries of the Plan, within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), during the Class Period.  The identities of the John Doe Defendants are currently unknown to Plaintiffs; once their identities are ascertained, Plaintiffs will seek leave to join them to the instant action under their true names.

## IV.     THE PLAN

72.     The Plan is an employee pension benefit plan, as defined by ERISA § 3(2)(A), 29 U.S.C. § 1002(2)(A).  Specifically, the Plan is a defined contribution plan within the meaning of ERISA § 3(34), 29 U.S.C. § 1002(34).  The Plan is a legal entity that can sue and be sued.

ERISA § 502(d)(1), 29 U.S.C. § 1132(d)(1).  However, the Plan is not a party in an action for breach of fiduciary duty such as this.  Rather, pursuant to ERISA § 409, 29 U.S.C. § 1109, and the law interpreting it, the relief requested in this action is for the benefit of the Plan and its participants and beneficiaries.

73.    The assets of an employee benefit plan, such as the Plan here, must be "held in trust by one or more trustees."  ERISA § 403(a), 29 U.S.C. § 1103(a).  During the Class Period, the assets of the Plan were held in trust by the Plan Trustee, Fidelity Management Trust Company.  *See* SPD at 22 (LEHMAN-ERISA0000365); 2007 Form 11-K at 6; Trust Agreement at 6 (LEHMAN-ERISA0000197).

74.    The Plan, formerly known as the Lehman Brothers Holdings Inc. Tax Deferred Savings Plan, was adopted effective January 1, 1984, as the Shearson Lehman Brothers Holdings Inc. Tax Deferred Savings Plan.

75.    As stated in the Summary Plan Document, the purpose of the Plan was and is to help participants plan for retirement.  *See* SPD at 2 (LEHMAN-ERISA00000345) ("The Lehman Brothers Savings Plan ('Plan') is a 401(k) plan that provides you with an easy and convenient way to save toward your retirement").

76.    Employees were eligible to participate in the Plan immediately upon their hire date, if the employee is paid on an hourly, salaried, or commission basis, except if (i) the employee is employed outside of the United States, unless the employee is paid through a U.S. based payroll in U.S. dollars, (ii) the employee is employed in a special purpose program (such as student intern), (iii) the employee does not have a valid Social Security Number, or (iv) the employee is a leased employee, or the employee performs services for an Employer under an arrangement in which the employee is treated as a consultant, an independent contractor or an

employee of another entity. *See* SPD at 3 (LEHMAN-ERISA0000346); *see also* Plan Document, Article II, Section 2.1 (LEHMAN-ERISA0000025).

77.    Plan participants have multiple accounts under the Plan, each containing a specific type of contribution;

- Before-Tax Account and Catch-up Contributions Account ("Before-Tax Accounts");
- Roth 401(k) Account and Roth Catch-up Contributions Account ("Roth Accounts");
- Employer Contributions Account Rollover Account
- After-Tax; and
- Rollover Account.

*See* SPD at 3 (LEHMAN-ERISA0000346).

78.    The Plan invested in Company Stock through the Company Stock Fund. Investment in the Company Stock Fund consists exclusively of (i) shares of Company Stock and (ii) such cash or short-term fixed income investments. *See* Trust Agreement, Section 5(e) (LEHMAN-ERISA0000201); Plan Document, Section 8.3(a) (LEHMAN-ERISA000076).

79.    Throughout the Class Period, Plan participants were permitted to contribute a whole percentage of their pay, up to 50 percent (50%), for investment in the Plan. *See* Plan Document Section 3.1(a) (LEHMAN-ERISA0000027); *see also* SPD January 1, 2008 at 3 ("You can contribute between 1% and 50% (in 1% increments) of your Pay to the Plan as Before-Tax or as Roth Contributions. You must select the percentage of your Pay you wish to contribute in each payroll period, whether the contributions will be Before-Tax Contributions or Roth Contributions, and specify the investment fund(s) in which you want your contributions invested").

80.     Throughout the Class Period, Plan participants were permitted to allocate 20 percent (20%) of their Plan contributions to the Company Stock Fund in the Plan.  Pursuant to the Plan Document, Article VII, Section 6.1(c):

> Company Stock Fund Limitations.   A Participant shall not be entitled to direct investment in the Company Stock Fund of (i) more than fifty percent (50%) of his or her Section 401 (k) Contributions prior to such pay date as of which the Committee determines that the procedures necessary to implement the reduced limit set forth in clause (ii) hereof are in place (the "New Limit Effective Date"), or (ii) more than twenty percent (20%) of the total of his or her Section 401(k) Contributions as of any pay date on or after the New Limit Effective Date (or after January 1, 2008, in the case of a Participant's initial election for the investment of Section 401(k) Contributions).   In the event that a Participant's investment election for the allocation of Section 401(k) Contributions exceeded the 20% limit in clause (ii) prior to the New Limit Effective Date and the Participant fails to make a new investment election compliant with such 20% limit by the deadline established by the Committee, the excess of his or her Section 401(k) Contributions for pay dates on and after the New Limit Effective Date shall be invested in such other Investment Fund as the Committee shall direct, until such time as the Participant shall make a new election or new elections compliant with such 20% limit.  The limitations of this Section 6.l(c) shall also apply to initial elections for the investment of Rollover Contributions (and the date of such contribution shall be treated as a pay date in applying the New Limit Effective Date).

81.     Throughout the Class Period, the Plan Document expressly authorized the Benefit Committee to limit, curtail, or eliminate altogether Plan participants' allocation of their Plan contributions to the Company Stock Fund to permit the Benefit Committee members to comply with their fiduciary duties under ERISA §§ 404(a)(1) and (a)(2), 29 U.S.C. §§ 1004(a)(1) and (a)(2).  *See supra* ¶¶ 57-58.

82.     Pursuant to Section 6.3(a) of the Plan Document, the Company made matching contributions:

> Basic and Matching Contributions.   Effective for Plan Years ending on or after December 31, 2007, Basic and Matching

> Contributions for Plan Years ending after the Spinoff Date and prior to December 31, 2007 shall be invested in the Company Stock Fund, subject to the Member's right thereafter to elect transfers out of the Company Stock Fund in accordance with Section 6.2(a). Basic and Matching Contributions for Plan Years ending December 31, 2007 and thereafter shall be invested in accordance with the Participant's current election on file for the investment of Section 401(k) Contributions or, if no such election shall be on file, in the Investment Fund or Funds designated from time to time by the Committee.

*See* Plan Document, Section 6.3(a) (LEHMAN-ERISA0000054).

83.     The Company Stock Fund is one of the investment options available for Plan participants.  In its 2007 Form 11-K, filed on June 26, 2008, Lehman reported that the Plan had approximately $228,691,000 invested in the Company Stock Fund as of December 31, 2007, when Company Stock was trading at $65.44 per share.  At that time, there were 13,743,452.374 shares of Lehman stock in the Company Stock Fund, representing 10.63% of the assets of the entire Plan and the third largest investment fund.   *See* 2007 Form 11-K, LEHMAN-ERISA0000563.  The Plan explicitly authorized the Benefit Committee to limit or curtail any investment option, including the Company Stock Fund or divest assets invested in any investment option as prudence dictates.

84.     As proof that the Benefit Committee had the power to do so, it decided on June 10, 2009, nine months after Lehman filed for bankruptcy, that Lehman Brothers Stock Fund should be liquidated -- long after the stock had become worthless.  *See, e.g.*, Minutes of the Benefit Committee, dated June 10, 2009 at LEHMAN-ERISA0000997 ("The Lehman Brothers Stock Fund should be liquidated.  Since it has been determined that the Lehman Brothers Holdings Inc. common stock is deemed to be worthless, the Committee determined that the Fund should be liquidated after adequate notice to participants").

85.     During the Class Period, the Committee failed to consider whether Company Stock was a prudent retirement investment for Plan participants, and therefore took no action to eliminate or curtail Company Stock as a Plan investment option before the stock became worthless.

86.     Plan participants are 100% vested in their own contributions and Company matching contributions upon completion of three (3) years of vesting service.  *See* Plan Document, Article VII, Section 7.1.1 (LEHMAN-ERISA0000057) ("[a] Member shall have a fully vested and non-forfeitable interest in the portion of his Employer Contributions Account attributable to Basic and Matching Contributions for Plan Years beginning on and after January 1, 2005 upon completion of three Years of Vesting Service, or death while employed by an Employer or Affiliate").

87.     The following documents, previously filed by the Company with the SEC pursuant to the Exchange Act, are incorporated by reference into the operative SPD, dated January 1, 2008:

> The Company's Annual Report on Form 10-K for the fiscal year ended November 30, 2006, filed with the Commission on February 13, 2007 pursuant to Section 13 or 15(d) of the Exchange Act, the Company's Quarterly Report on Form 10-Q for the quarterly period ended August 31, 2006, filed with the Commission on October 10, 2006 pursuant to Section 13 or 15(d) of the Exchange Act; the Company's Quarterly Report on Form 10-Q for the quarterly period ended May 31, 2006, filed with the Commission on July 10, 2006 pursuant to Section 13 or 15(d) of the Exchange Act; the Company's Quarterly Report on Form 10-Q for the quarterly period ended February 28, 2006, filed with the Commission on April 10, 2006 pursuant to Section 13 or 15(d) of the Exchange Act; the Company's Current Report on Form 8-K, filed with the Commission on February 2, 2007 pursuant to Section 13 or 15(d) of the Exchange Act, the Company's Current Report on Form 8-K, filed with the Commission on February 9, 2007 pursuant to Section 13 or 15(d) of the Exchange Act; the Company's Current Report on Form 8-K, filed with the

Commission on February 2, 2007 pursuant to Section 13 or 15(d) of the Exchange Act; the Company's Current Report on Form 8-K, filed with the Commission on January 31, 2007 pursuant to Section 13 or 15(d) of the Exchange Act; the Company's Current Report on Form 8-K, filed with the Commission on January 19, 2007 pursuant to Section 13 or 15(d) of the Exchange Act; the Company's Current Report on Form 8-K, filed with the Commission on December 29, 2006 pursuant to Section 13 or 15(d) of the Exchange Act; the Company's Current Report on Form 8-K, filed with the Commission on December 28, 2006 pursuant to Section 13 or 15(d) of the Exchange Act; the Company's Current Report on Form 8-K, filed with the Commission on December 27, 2006 pursuant to Section 13 or 15(d) of the Exchange Act; the Company's Current Report on Form 8-K, filed with the Commission on December 21 2006 pursuant to Section 13 or 15(d) of the Exchange Act; the Company's Current Report on Form 8-K, filed with the Commission on December 14, 2006 pursuant to Section 13 or 15(d) of the Exchange Act; the Company's Current Report on Form 8-K, filed with the Commission on December 12, 2006 pursuant to Section 13 or 15(d) of the Exchange Act; the Company's Current Report on Form 8-K, filed with the Commission on December 7, 2006 pursuant to Section 13 or 15(d) of the Exchange Act; the Company's Current Report on Form 8-K, filed with the Commission on December 4, 2006 pursuant to Section 13 or 15(d) of the Exchange Act; the Company's Current Report on Form 8-K, filed with the Commission on December 1, 2006 pursuant to Section 13 or 15(d) of the Exchange Act; the Company's Current Report on Form 8-K, filed with the Commission on November 22, 2006 pursuant to Section 13 or 15(d) of the Exchange Act; the Company's Current Report on Form 8-K, filed with the Commission on November 13, 2006 pursuant to Section 13 or 15(d) of the Exchange Act; the Company's Current Report on Form 8-K, filed with the Commission on October 30, 2006 pursuant to Section 13 or 15(d) of the Exchange Act; the Company's Current Report on Form 8-K, filed with the Commission on October 27, 2006 pursuant to Section 13 or 15(d) of the Exchange Act; the Company's Current Report on Form 8-K, filed with the Commission on October 25, 2006 pursuant to Section 13 or 15(d) of the Exchange Act; the Company's Current Report on Form 8-K, filed with the Commission on October 24, 2006 pursuant to Section 13 or 15(d) of the Exchange Act; the Company's Current Report on Form 8-K, filed with the Commission on October 2, 2006 pursuant to Section 13 or 15(d) of the Exchange Act; the Company's Current Report on Form 8-K, filed with the Commission on September 15, 2006

pursuant to Section 13 or 15(d) of the Exchange Act; the Company's Current Report on Form 8-K, filed with the Commission on September 13, 2006 pursuant to Section 13 or 15(d) of the Exchange Act; the Company's Current Report on Form 8-K, filed with the Commission on August 30, 2006 pursuant to Section 13 or 15(d) of the Exchange Act; the Company's Current Report on Form 8-K, filed with the Commission on August 16, 2006 pursuant to Section 13 or 15(d) of the Exchange Act; the Company's Current Report on Form 8-K, filed with the Commission on August 3, 2006 pursuant to Section 13 or 15(d) of the Exchange Act; the Company's Current Report on Form 8-K, filed with the Commission on July 26, 2006 pursuant to Section 13 or 15(d) of the Exchange Act; the Company's Current Report on Form 8-K, filed with the Commission on July 21, 2006 pursuant to Section 13 or 15(d) of the Exchange Act; the Company's Current Report on Form 8-K, filed with the Commission on July 3, 2006 pursuant to Section 13 or 15(d) of the Exchange Act; the Company's Current Report on Form 8-K, filed with the Commission on January 30, 2004 pursuant to Section 13 or 15(d) of the Exchange Act; the Company's Current Report on Form 8-K, filed with the Commission on June 29, 2006 pursuant to Section 13 or 15(d) of the Exchange Act; the Company's Current Report on Form 8-K, filed with the Commission on June 12, 2006 pursuant to Section 13 or 15(d) of the Exchange Act; the Company's Current Report on Form 8-K, filed with the Commission on May 31, 2006 pursuant to Section 13 or 15(d) of the Exchange Act; the Company's Current Report on Form 8-K, filed with the Commission on May 30, 2006 pursuant to Section 13 or 15(d) of the Exchange Act; the Company's Current Report on Form 8-K, filed with the Commission on May 24, 2006 pursuant to Section 13 or 15(d) of the Exchange Act; the Company's Current Report on Form 8-K, filed with the Commission on May 3, 2006 pursuant to Section 13 or 15(d) of the Exchange Act; the Company's Current Report on Form 8-K, filed with the Commission on April 25, 2006 pursuant to Section 13 or 15(d) of the Exchange Act; the Company's Current Report on Form 8-K, filed with the Commission on April 4, 2006 pursuant to Section 13 or 15(d) of the Exchange Act; the Company's Current Report on Form 8-K, filed with the Commission on March 31, 2006 pursuant to Section 13 or 15(d) of the Exchange Act; the Company's Current Report on Form 8-K, filed with the Commission on March 31, 2006 pursuant to Section 13 or 15(d) of the Exchange Act; the Company's Current Report on Form 8-K, filed with the Commission on March 28, 2006 pursuant to Section 13 or 15(d) of the Exchange Act; the Company's Current Report on Form 8-K, filed with the Commission on March 24, 2006 pursuant to Section

> 13 or 15(d) of the Exchange Act; the Company's Current Report on Form 8-K, filed with the Commission on March 16, 2006 pursuant to Section 13 or 15(d) of the Exchange Act; the Company's Current Report on Form 8-K, filed with the Commission on March 15, 2006 pursuant to Section 13 or 15(d) of the Exchange Act; the Company's Current Report on Form 8-K, filed with the Commission on March 10, 2006 pursuant to Section 13 or 15(d) of the Exchange Act; the Company's Current Report on Form 8-K, filed with the Commission on March 10, 2006 pursuant to Section 13 or 15(d) of the Exchange Act; the Company's Current Report on Form 8-K, filed with the Commission on March 3, 2006 pursuant to Section 13 or 15(d) of the Exchange Act; the Company's Current Report on Form 8-K, filed with the Commission on February 28, 2006 pursuant to Section 13 or 15(d) of the Exchange Act; the Company's Current Report on Form 8-K, filed with the Commission on February 21, 2006 pursuant to Section 13 or 15(d) of the Exchange Act; the Company's Current Report on Form 8-K, filed with the Commission on February 10, 2006 pursuant to Section 13 or 15(d) of the Exchange Act; the Company's Current Report on Form 8-K, filed with the Commission on January 26, 2006 pursuant to Section 13 or 15(d) of the Exchange Act; the Company's Current Report on Form 8-K, filed with the Commission on January 23, 2006 pursuant to Section 13 or 15(d) of the Exchange Act; the Company's Current Report on Form 8-K, filed with the Commission on January 17, 2006 pursuant to Section 13 or 15(d) of the Exchange Act.

*See* SPD at 22-23 (LEHMAN-ERISA0000365-367).

88.     Certain other documents, filed by the Company with the SEC pursuant to the Exchange Act after publication of the SPD, also were incorporated by reference into the SPD:

> In addition, each other document filed by the Company or by the Plan pursuant to Section 13(a), 13(c), 14 or 15(d) of the Exchange Act after the date of this booklet and prior to the termination of the Company's offering of Plan interests and common stock in connection with the Plan shall be automatically incorporated by reference into this booklet and constitute part of the aforementioned prospectus from the date of filing of such document. In the event of any inconsistency between any information in this booklet and any document incorporated by reference, the latest information shall prevail and shall be deemed to replace any prior inconsistent information.

*Id.*

31

V.      **DEFENDANTS' FIDUCIARY STATUS**

      A.      **The Nature of Fiduciary Status**

      89.      **Named Fiduciaries**.  ERISA requires every plan to have one or more "named fiduciaries."  ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1).  The person named as the "administrator" in the plan instrument is automatically a named fiduciary, and in the absence of such a designation, the sponsor is the administrator.  ERISA § 3(16)(A), 29 U.S.C. § 1002(16)(A).

      90.      *De Facto* **Fiduciaries**.  ERISA treats as fiduciaries not only persons explicitly named as fiduciaries under § 402(a)(1), but also any other persons who in fact perform fiduciary functions.  *See* ERISA § 3(21)(A)(i), 29 U.S.C. § 1002(21)(A)(i).  Thus, a person is a fiduciary to the extent "(i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan."  *Id*.

      91.      Each Defendant was a fiduciary with respect to the Plan and owed fiduciary duties to the Plan the participants in the manner and to the extent set forth in the Plan's documents, under ERISA, and through their conduct.

      92.      As fiduciaries, Defendants were required by ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1), to manage and administer the Plan and the Plan's investments solely in the interest of the Plan participants and beneficiaries and with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.

93.     Plaintiffs do not allege that each defendant was a fiduciary with respect to all aspects of the Plan's management and administration.  Rather, as set forth below, Defendants were fiduciaries to the extent of the fiduciary discretion and authority assigned to or exercised by each of them, and the claims against each Defendant are based on such specific discretion and authority.

94.     Instead of delegating all fiduciary responsibility for the Plan to external service providers, Lehman chose to assign the appointment and removal of fiduciaries to itself and the other Defendants named herein.  These persons and entities in turn selected Lehman employees, officers and agents to perform most fiduciary functions.

95.     ERISA permits fiduciary functions to be delegated to insiders without an automatic violation of the rules against prohibited transactions.  ERISA § 408(c)(3), 29 U.S.C. § 1108(c)(3).  However, insider fiduciaries, like external fiduciaries, must act solely in the interest of participants and beneficiaries, not in the interest of the Plan sponsor.

**B.      Director Defendants' Fiduciary Status**

96.     Lehman, as a corporate entity, cannot act on its own without any human counterpart.  In this regard, during the Class Period, Lehman relied directly on the Director Defendants to carry out their fiduciary responsibilities under the Plan and ERISA.

97.     The Director Defendants were responsible for appointing, and hence monitoring, and removing, the members of the following committees: (i) the Benefit Committee, *see* LEHMAN-ERISA0000082 ("The Committee shall consist of at least three members appointed from time to time by the Board of Directors or its delegate(s) to serve at the pleasure thereof"); SPD at 20 (LEHMAN-ERISA0000364) ("The Plan is administered by the Employee Benefit Plans Committee (called the 'Committee' in this booklet) which is appointed by the Compensation and Benefits Committee of the Board of Directors of Lehman Brothers Holdings

Inc."); and (ii) the Compensation Committee, *see* Charter at 1-2 ("Members of the Compensation Committee shall be appointed by the Board of Directors, and each member shall serve until a successor is duly elected and qualified or until earlier resignation or removal.  The members of the Compensation Committee may be removed, with or without cause, by a majority vote of the Board of Directors").  Thus, according to DOL regulations, the Director Defendants exercised a fiduciary function under ERISA.  29 C.F.R. § 2509.75-8 (D-4).

98.     The Director Defendants' duty to monitor included the responsibility to appoint, evaluate, and monitor other fiduciaries, including, without limitation, the members of the Compensation Committee and the Benefit Committee.

99.     As monitoring fiduciaries, the Director Defendants, had the control and authority, and indeed had the duty to:

(a)     ensure that the monitored fiduciaries possess the needed credentials and experience, or use qualified advisors and service providers to fulfill their duties.  They must be knowledgeable about the operations of the Plan, the goals of the Plan, and the behavior of the Plan's participants;

(b)     ensure that the monitored fiduciaries are provided with adequate financial resources to do their job;

(c)     ensure that the monitored fiduciaries have adequate information to do their job of overseeing the Plan's investments;

(d)     ensure that the monitored fiduciaries have ready access to outside, impartial advisors when needed;

(e)     ensure that the monitored fiduciaries maintain adequate records of the information on which they base their decisions and analysis with respect to the Plan's investment

options; and

(f)      ensure that the monitored fiduciaries report regularly to the Director Defendants.  The Director Defendants must then review, understand, and approve the conduct of the hands-on fiduciaries.

100.    The Director Defendants were obligated to review and oversee the Compensation Committee Defendants and the Benefit Committee Defendants, to ensure that these monitored fiduciaries were performing their fiduciary obligations, including those with respect to the investment of the Plan's assets, and were obligated to take prompt and effective action to protect the Plan and its participants when they were not.  In addition, the Director Defendants were obligated to provide the monitored fiduciaries with complete and accurate information in their possession that they knew or reasonably should have known that the monitored fiduciaries must have in order to prudently manage a plan and a plan's assets.

101.    Additionally, the Board had the following discretion:

The Board of Directors or any other person or persons entitled to act as the representative of the Company exercising the rights of the Company as settlor and plan sponsor.  The persons acting as the Committee or, to the extent determined by such persons, any member or members of the Committee designated by such persons, shall be the Company Representative, except to the extent the Board of Directors determines otherwise or designates other person(s) (by name or position) to be Company Representative for any or all of such purposes.

See Plan Document § 1.15 – Company Representative (LEHMAN-ERISA0000012).

102.    Further, each of the Director Defendants exercised his or her discretionary authority with respect to the Plan by determining or participating in decisions about the substantive content of Lehman's SEC filings, which were incorporated by reference into the SPD.  Such filings were intended to communicate to Plan participants information necessary for them to manage their retirement benefits under the Plan.

103. Consequently, in light of the foregoing duties, responsibilities and actions, the Director Defendants were named fiduciaries of the Plan pursuant to ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1), or *de facto* fiduciaries within the meaning of ERISA § 3(21), 29 U.S.C. § 1002(21), during the Class Period in that they exercised discretionary authority or discretionary control respecting management of the Plan, exercised authority or control respecting management or disposition of the Plan's assets, and had discretionary authority or discretionary responsibility in the administration of the Plan.

C.   **Compensation Committee Defendants' Fiduciary Status**

104. The Compensation Committee and its members had the following powers and duties:

- Oversee evaluation of the Corporation's management;
- Discharge the responsibilities of the Board of Directors with respect to the Corporation's compensation ***and benefits programs*** and compensation of the Corporation's executives; and
- Produce an annual Compensation Committee report for inclusion in the Corporation's annual proxy statement, in accordance with applicable rules and regulations of the New York Stock Exchange, Inc. ("NYSE"), Securities and Exchange Commission ("SEC") and other regulatory bodies.

*See* Charter at 1 (Emphasis added).

105. Additionally, the Compensation Committee had the discretion to appoint the members of the Benefit Committee. *See* SPD at 21 (LEHMAN-ERISA0000364).

106. The Compensation Committee Defendants' duty to monitor included the responsibility to appoint, evaluate, and monitor other fiduciaries, including, without limitation, the members of the Benefit Committee.

107.    As monitoring fiduciaries, the Compensation Committee Defendants had the control and authority, and indeed the duty, to:

(a)    ensure that the monitored fiduciaries possess the needed credentials and experience, or use qualified advisors and service providers to fulfill their duties.  They must be knowledgeable about the operations of the Plan, the goals of the Plan, and the behavior of the Plan's participants;

(b)    ensure that the monitored fiduciaries are provided with adequate financial resources to do their job;

(c)    ensure that the monitored fiduciaries have adequate information to do their job of overseeing the Plan's investments;

(d)    ensure that the monitored fiduciaries have ready access to outside, impartial advisors when needed;

(e)    ensure that the monitored fiduciaries maintain adequate records of the information on which they base their decisions and analysis with respect to the Plan's investment options; and

(f)    ensure that the monitored fiduciaries report regularly to the Compensation Committee Defendants.   The Compensation Committee Defendants must then review, understand, and approve the conduct of the hands-on fiduciaries.

108.    The Compensation Committee Defendants were obligated to review and oversee the Benefit Committee Defendants, to ensure that these monitored fiduciaries were performing their fiduciary obligations, including those with respect to the investment of the Plan's assets, and were obligated to take prompt and effective action to protect the Plan and its participants when they were not.   In addition, the Compensation Committee Defendants were obligated to

provide the monitored fiduciaries with complete and accurate information in their possession that they knew or reasonably should have known that the monitored fiduciaries must have in order to prudently manage the Plan and the Plan's assets.

109.    The Compensation Committee also had the discretion to amend, modify, suspend, or terminate the Plan at any time.  *See* SPD at 20 (LEHMAN-ERISA0000363).

110.    Consequently, in light of the foregoing duties, responsibilities, and actions, the Compensation Committee Defendants were named fiduciaries of the Plan pursuant to ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1), or *de facto* fiduciaries within the meaning of ERISA § 3(21), 29 U.S.C. § 1002(21), during the Class Period in that they exercised discretionary authority or discretionary control respecting management of the Plan, exercised authority or control respecting management or disposition of the Plan's assets, and had discretionary authority or discretionary responsibility for the administration of the Plan.

## D.    The Benefit Committee Defendants' Fiduciary Status

111.    The Benefit Committee has the following powers and duties:

> The Committee shall be the "Named Fiduciary" with respect to control or management of the assets of the Plan, and shall have authority (a) to appoint an investment manager or managers (within the meaning of Section 3(38) of the Act) to manage (including the power to acquire and dispose of) any assets of the Plan), and (b) to direct the Trustee with respect to the management of assets of the Plan not subject to the authority of such an investment manager (including, without limitation, the selection of such mutual funds or other investment options as it may deem appropriate to carry out the investment objectives of each of the respective Investment Funds established by the Committee as provided in Section 9.2).  Without limiting the generality of the foregoing, the Committee as such Named Fiduciary shall have exclusive responsibility for determining whether the Plan provisions requiring the establishment and maintenance of the Company Stock Fund (and the American Express Stock Fund until January 31, 2007) may continue to be given effect in accordance with their terms as required by Section 401(a)(1)(D) of the Act, or whether such provisions are to any extent inconsistent with

> applicable requirements of the Act, including in particular the
> fiduciary duty rules of Section 404(a)(1) of the Act as modified by
> Section 404(a)(2) of the Act; and no other fiduciary of the Plan
> shall have responsibility therefor.

*See* Plan Document Section 10.12 – Named Fiduciary with Respect to Asset Management (LEHMAN-ERISA0000085-86).

112.    The Benefit Committee (and its members) also had the power and discretion to amend the Plan at any time. *See* SPD at 20 (LEHMAN-ERISA0000363), as well as the other responsibilities delineated at length *supra*, ¶¶ 49-61.

113.    Consequently, the Benefit Committee Defendants were named fiduciaries of the Plan pursuant to ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1), or *de facto* fiduciaries within the meaning of ERISA § 3(21), 29 U.S.C. § 1002(21), during the Class Period in that they exercised discretionary authority or discretionary control respecting management of the Plan, exercised authority or control respecting management or disposition of the Plan's assets, and had discretionary authority or discretionary responsibility in the administration of the Plan.

## VI.    FACTUAL BACKGROUND TO BREACHES OF FIDUCIARY DUTY

### A.    Background Of The Subprime Industry

114.    Subprime lending is the practice of making mortgage loans to persons who are generally unable to access credit from traditional financial institutions.  This is because the borrowers do not satisfy income, credit, documentation, or other underwriting standards mandated by traditional mortgage lenders and loan buyers, which typically lend only to more credit-worthy borrowers.

115.    Because subprime borrowers are seen as "higher risk," their loans carry interest rates that are at least two percentage points higher than those offered to borrowers with better

credit.  So, for example, while a credit-worthy borrower could obtain a mortgage at 5% interest, the same mortgage would cost a subprime customer 7% interest or more.

116.    Instead of holding mortgage loans themselves, lenders generally sold subprime mortgages bundled with other mortgages into pools of securities.  These mortgage-backed securities were offered for sale to institutional and individual investors.

117.    In *The Impact Of Securitization On The Emergency Economic Stabilization Act Of 2008* (October 2, 2008), Talcott J. Franklin explained the process by which mortgage-backed securities are created:

> The process by which mortgage-backed securities are created begins when a Borrower obtains a loan from a Lender.  The Lender sells that loan to a Purchaser.  The Purchaser generally holds the loan for a period of weeks or months, and then sells the loan to a Depositor, who immediately deposits that loan (and many other loans) into the Trust.  The Trust is administered by a Servicer (who is the face of the Trust with the Borrowers) and a Trustee (who is the face of the Trust with the investors, typically called Certificateholders).  Once the loans are sold into the Trust, Borrowers begin making their payments to the Servicer, who sends those payments to the Trustee.  The Trustee then distributes those payments to the Certificateholders based on a pre-established priority of payment.

118.    The following simplified graphic generally depicts how mortgage loans are originated, purchased and sold, in order to create mortgage backed securities:[1]

---

[1] Printed with permission from the interactive supplement to Talcott J. Franklin & Thomas F. Nealon III, Mortgage and Asset Backed Securities Litigation Handbook (Thomson West).



119.    Often, the cash flow from these mortgage backed securities supported a second investment, called a collateralized debt obligation ("CDO").  *Id.*  A CDO is an investment-grade derivative security backed by a pool of bonds, loans, or other assets, such as mortgages.  Rights to the CDO's cash flow is typically divided into a number of tranches rated by credit risks, with the lower tranches offering higher premiums to compensate for the higher risk assumed, and vice versa.

120.    In essence, issuers like Lehman and others created instruments that appeared to be investment grade out of what was essentially subprime paper.  Ultimately, the purchasers of even these supposedly safe, triple-A-rated CDO tranches found their investments tainted by the poisonous subprime loans, which began to default at alarming rates during the Class Period.

121.    Such a system works best if the underlying asset backed securities held by the CDO are uncorrelated – that is, if they are unlikely to go bad all at once.  CDOs holding only

subprime investments (*e.g.*, notes, bonds, or other instruments dependent upon mortgages for their value) were highly correlated because they held only subprime securities and were therefore vulnerable to a rise in defaults on subprime mortgage loans. However, because of the high yields on subprime mortgages, they were very attractive for investment banks creating CDOs. *See* FDIC Outlook, A New Plateau for the U.S. Securitization Market, available at http://www.fdic.gov/bank/analytical/regional/ro20063q/na/2006_fall01.html.

122.    One type of CDO is a "cash" CDO. A cash CDO represents real credit-sensitive assets (*e.g.*, bonds or loans) which are sold. This can be done for a number of reasons, including to remove assets from the originator's balance sheet, to receive cash by monetizing assets, or to transfer risk.

123.    Another type of CDO is a "synthetic" CDO. Synthetic CDOs are inherently riskier than cash CDOs, as they do not represent real cash assets like bonds or loans. Instead, synthetic CDOs add credit exposure to a portfolio of fixed income assets, without owning those assets, through the use of credit derivatives such as credit default swaps. Mark P. Zimmett, *A Primer on the ABCs of CDO Litigation*, 239 N.Y.L.J. 62 (2008).

124.    In essence, synthetic CDOs are simply ***wagers*** on the performance of other assets, like subprime mortgages.

125.    In the event of default of a cash CDO, there are assets that can be sold to offset any loss. By contrast, for a synthetic CDO using credit default swaps, credit protection is offered by the seller of the swap, who receives periodic cash payments, called premiums, in exchange for agreeing to assume the risk of loss on a specific asset in the event that asset experiences a default or other credit event. In the event of a synthetic CDO default, the swap is exercised and the loss is borne by the credit protection seller.

126.     In short, credit default swaps are a form of unregulated insurance.   Unlike traditional insurance, however, credit default swaps carry a significant risk factor.   In a typical insurance policy, the seller is required to have capital reserves to be able to pay in case the insurance is called upon or triggered.   However, in the case of credit default swaps, there is no similar requirement that adequate capital reserves be put to the side.   Credit default swaps are privately negotiated contracts that are "traded over the counter," meaning they are not regulated by a public exchange, and they are an investment vehicle in their own right, unrelated to the synthetic CDOs.

127.     Moreover, while credit default swaps give speculators a means of earning large profits from changes in a company's credit quality, sellers of credit default swaps (like Lehman) effectively have an unfunded exposure to the risk of default on the underlying debt instruments. This is a market that represents the "weapons of financial mass destruction" label which Warren Buffett gave to the derivatives.

128.     When a company participates in the credit derivatives market, it increases its exposure to credit and liquidity risk.   Credit risk refers to the risk of loss arising from the default by a borrower, counterparty, or other obligor when it is unable or unwilling to meet its obligations.   Liquidity and funding risk refers to the risk that the company will be unable to finance its operations due to a loss of access to the capital markets or difficulty in liquidating its assets.

129.     Furthermore, because they were little more than "side bets," the value of many credit derivatives now far exceeds the value of the underlying instruments they protect.

130.     On October 18, 2008, Christopher Cox, Chairman of the SEC, estimated that there were $55 trillion in credit default swaps outstanding, which is "more than the gross domestic

product of all nations on earth combined."  The International Swaps and Derivatives Association, a trade group, recently estimated that there are approximately $62 trillion worth of credit default swaps outstanding, with approximately one-third of the credit default swaps contracts lacking collateral (*i.e.*, that issuers of the swaps had not set aside assets in case the CDOs default).

131.   By comparison, according to data from the New York State Insurance Department, where most credit default swaps are sold, there is only approximately $6 trillion in outstanding corporate debt and $7.5 trillion in mortgage-backed debt in the United States.

132.   The subprime market has grown rapidly in recent years.  According to the Federal Reserve Bulletin, Higher-Priced Home Lending and the 2005 HMDA Data, Summer 2006, in 1994, fewer than 5% of mortgage originations in the United States were subprime.  However, by 2005, subprime mortgages accounted for approximately 26% of all mortgage loans.

133.   Subprime mortgages totaled approximately $600 billion in 2007, and accounted for approximately one-fifth of the total U.S. home loan market.  Approximately $1.3 trillion in subprime mortgages are currently outstanding.

134.   After the dot-com technology bubble burst in 2001, the housing market in the United States began a rapid and sustained increase in perceived value.  With dramatically decreased interest rates and widely available credit, even those who could not afford a down-payment or had checkered credit histories were afforded access to credit to purchase homes.  Loan incentives and a long-term trend of rising housing prices encouraged borrowers to grant adjustable-rate mortgages ("ARMs") with lower payment streams in the early years, based on the expectation that refinancing would be available later when the increased payments were triggered, secured by ever increasing home values.  Speculation fueled rapidly increasing prices, as numerous Americans sought to purchase homes only to "flip" or quickly sell them for a profit.

135.    The rapid growth of the subprime lending industry has been attributed to a number of factors that occurred in 2004 and 2005.  These factors include rising home prices, declining affordability, historically low interest rates, intense lender competition, innovations in the structure and marketing of mortgages, and an abundance of capital from lenders and mortgage securities investors.

136.    The mortgage market was further fueled by significant mortgage-backed securities liquidity, with investors increasingly seeking higher yields through higher-risk securitizations that provided lenders with access to capital markets to fund mortgage operations while simultaneously transferring credit risk away from the lenders to securitization investors. The share of U.S. mortgage debt held outside the government-sponsored enterprises by private mortgage-backed securitizations doubled between 2003 and 2005, helping to fuel the growth of subprime and non-traditional mortgages.

137.    From 2001 to mid-2004, prime borrowers with a preference for fixed-rate mortgages refinanced in record numbers as long-term interest rates fell to the lowest rates in a generation.  As interest rates began to rise in 2004 and the pool of potential prime borrowers looking to refinance shrank, lenders struggled to maintain or grow market share in a declining origination environment, and did so by extending loans to subprime borrowers with troubled credit histories.

138.    Lenders accommodated these borrowers by diversifying mortgage offerings as they competed to attract borrowers and meet prospective homebuyers' financing needs.  Because of the affordability aspect alleged above, borrowers increasingly sought mortgage loans with payment option and interest-only structures in 2004 and 2005.  Such non-traditional mortgages

were designed to minimize initial mortgage payments by eliminating or relaxing the requirement to repay principal during the early years of the loan.

139.     Lenders also turned to Alternative-documentation loans, or "Alt-A" loans, which are flexible instruments primarily credit-score driven, since the candidates for these loans tend to lack proof of income from traditional employment, and, in exchange, pay a higher rate of interest than fully documented loans.   Alt-A loans are made to people with purportedly better than subprime credit.

140.     Payment option and interest-only loans appear to have made up as much as 40 to 50 percent of all subprime and Alt-A loans securitized by private issuers of mortgage-backed securities during 2004 and 2005, up from 10 percent in 2003.

141.     The majority of subprime originations over the past several years were "2/28 and 3/27" hybrid loan structures.   These hybrid loans provide an initial fixed-rate period of two or three years, after which the loan converts to an ARM and the interest rate adjusts to the designated loan index rate for the remaining 28 or 27 years of the loan.   These 2/28 and 3/27 loans accounted for almost three-quarters of subprime securitized mortgages in 2004 and 2005.

142.     In late 2004 and early 2005, there was a growing sense of concern regarding the subprime industry, and in particular over eased lending standards.   To address those concerns, the Federal Reserve and other banking agencies issued guidance on subprime lending.   The Interagency Guidance on Nontraditional Mortgage Product Risks highlighted sound underwriting procedures, portfolio risk management, and consumer protection practices that were recommended to prudently originate and manage non-traditional mortgage loans.   A major recommendation was that a lender's analysis of repayment capacity should include an evaluation of the borrower's ability to repay debt by final maturity at the fully indexed interest rate, assuming

a fully amortizing repayment schedule, rather than just under the initial interest rate. The guidance also reminded institutions to communicate clearly the risks and features of these products to consumers in a timely manner, before consumers applied for a loan.

143.   In late 2005, however, house prices began to level off and then began to decline. The vast bulk of mortgages that had originated earlier in the decade with adjustable rates began to reset, causing families to experience rapid and significant increases in monthly payments just as home prices were leveling off or declining.

144.   Increasing foreclosure rates in 2006 and 2007 led to faster decreases in home prices by mid-2007 and thereafter. Defaults and foreclosure activity increased dramatically as ARM interest rates reset higher. Subprime borrowers with ARMs experienced a large increase in delinquency and foreclosure rates, while prime borrowers experienced almost no increase in delinquencies and foreclosures. Borrowers were not able to avoid sharp payment increases as they could in earlier years. Even borrowers with enough equity to refinance their adjustable rate mortgages faced difficulty finding a loan with affordable payments, as interest rates edged higher than in earlier years.

145.   Moreover, an unusually large number of subprime loans defaulted shortly after origination. In many of these "early payment defaults," borrowers stopped making payments before they faced payment shocks, suggesting that in 2006 some lenders had lowered their underwriting standards in response to reduced borrower demand for credit.

146.   In 2006, approximately 80,000 subprime borrowers who took out mortgages that were packaged into securities fell into delinquency. In 2006 and early 2007, dozens of lenders participating in the subprime mortgage business ceased operating as defaults and delinquencies on recent loans skyrocketed. This includes, among others:

(a)      Merit Financial Inc., of Kirkland, Washington, filed for bankruptcy and closed its doors, firing all but 80 of its 410 employees; Merit's marketplace had declined about 40% and sales were not bringing in enough revenue to support overhead.  "'Bottom fell out' at Merit Financial," *Seattle Post-Intelligencer* (May 5, 2006).

(b)      On December 28, 2006, Ownit Mortgage Solutions, the 11th largest United States issuer of subprime mortgages, filed for bankruptcy.  Earlier in the month, Ownit abruptly shut its doors and told its 800 workers not to return.

(c)      On February 5, 2007, Mortgage Lenders Network USA Inc., a company that catered to borrowers with weak credit, filed for bankruptcy.  880 of its 1,600 employees had been laid off earlier in the year.

(d)      On February 12, 2007, ResMae Mortgage, a subprime lender, filed for bankruptcy.  According to Bloomberg, in its Chapter 11 filing, ResMae stated that "[t]he subprime mortgage market has recently been crippled and a number of companies stopped originating loans and United States housing sales have slowed and defaults by borrowers have risen."  Also in its filing, ResMae stated that it could not cope with the "enormous" surge in loan defaults.

(e)      On February 20, 2007, NovaStar Financial, a company specializing in originating, investing, and servicing non-conforming residential mortgages, reported a substantial loss.  Floyd Norris of The New York Times noted: "The class of 2006 may live on as a very bad memory in subprime land."

(f)      On March 1, 2007, Fremont General announced it was delaying fourth-quarter results in an annual filing with the SEC, sparking concern about its subprime mortgage business.  The next day, Fremont General announced it was going to stop making subprime loans

and put its subprime business up for sale.

(g)     On March 8, 2007, New Century Financial, the second largest subprime lender in 2006, stopped making loans.

(h)     On March 20, 2007, People's Choice Home Loan, Inc., a mortgage lender for people with credit problems, filed for bankruptcy.

(i)     On April 2, 2007, New Century Financial filed for bankruptcy.

(j)     On April 6, 2007, American Home Mortgage Investment Corporation, the tenth largest retail mortgage lender in the United States, wrote down the value of risky mortgages rated one step above subprime.

(k)     On August 6, 2007, American Home Mortgage, one of the United States' largest home lenders, filed for bankruptcy.  According to the Associated Press on August 7, 2007, "A weak housing market and a spike in payment defaults scared investors from mortgage debt including bonds and other securities backed by home loans."

(l)     On August 13, 2007, Aegis Mortgage Corp, one of the United States' top 30 mortgage lenders, filed for bankruptcy.  The company also fired 782 out of 1,302 employees.

(m)     On September 21, 2007, HSBC Holdings announced its plans to close its U.S. subprime unit, Decision One Mortgage, and to record an impairment charge of about $880 million.  HSBC stated that it no longer believed the mortgage business was sustainable.  Approximately 750 U.S. employees were expected to be affected by the decision.  *See* The Joint Economic Committees' Subprime Mortgage Market Crisis Timeline, July 10, 2008.

147.     During 2007, nearly 1.3 million U.S. housing properties were subject to foreclosure activity, up 79% from 2006.  In a speech at Georgetown University School of Law

on October 16, 2007, Treasury Secretary Henry M. Paulson, Jr., called the bursting housing bubble "the most significant risk to our economy."

148.    Even back in 2006, "[a]mong those who tried to sound the alarm was Michael Gelband, who had been Lehman's head of fixed-income trading for two years. In late 2006, in a discussion with Fuld about his bonus, Gelband remarked that the good times were about to hit a rough patch, for which the firm was not well positioned. 'We're going to have to change a lot of things,' he warned. Fuld, looking unhappy, said little in reply." *See Too Big to Fail*, Andrew Ross Sorkin, at p. 123.

### B.    Lehman's Involvement In The Subprime Industry

149.    Over the past decade, Lehman became a major participant in the mortgage market and in underwriting securities backed by subprime mortgages. The Company was heavily invested in CDOs and purchased several mortgage originators to fuel its securitization of mortgage-backed CDOs.

150.    Despite the staggering risks associated with investments in derivative instruments such as CDOs and credit default swaps, Lehman sought short-term profits at the expense of the Company's long-term viability, all in the face of a growing market consensus that the subprime market was highly risky and would subject those involved to significant losses when the "music stopped."

151.    Lehman established itself as a leader in the market for subprime mortgage backed securities back to the mid-1990s, when the sector was still tiny. "How Wall Street Stoked The Mortgage Meltdown," *The Wall Street Journal* (June 28, 2007).

152.    In 1999, Lehman started operating its own subprime lending unit, called Finance America, in a joint venture with subprime lender Amresco Inc., which was as a minority partner. *Id.* In 2001, Lehman bought out Amresco and another minority investor in 2004. *Id.*