UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
In re:

LEHMAN BROTHERS SECURITIES AND                          09 MD 2017 (LAK)
ERISA LITIGATION

This document applies to:

*Stichting Pensioenfonds ABP v. Merrill Lynch & Co., Inc.*,
10 Civ. 6637 (LAK)
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## MEMORANDUM OPINION

Appearances:

| | |
|---|---|
| Jay W. Eisenhofer | Robert F. Serio |
| GRANT & EISENHOFER P.A. | Aric Hugo Wu |
| | Laura Kathryn O'Boyle |
| *Attorneys for Plaintiff* | Jason William Myatt |
| | GIBSON, DUNN & CRUTCHER LLP |

*Attorneys for Defendants Financial Asset Securities Corporation, RBS Acceptance Inc. (f/k/a Greenwich Capital Acceptance, Inc.), RBS Securities Inc. (f/k/a Greenwich Capital Financial Products, Inc.), Robert J. McGinnis, Carol P. Mathis, Joseph N. Walsh III, John C. Anderson, and James Esposito*

L̲EWIS̲ A. K̲APLAN̲, *District Judge*.

This case is part of the multidistrict litigation involving investor claims arising out of the collapse of Lehman Brothers in 2007. The plaintiff in this action, Stichting Pensioenfonds ABP ("ABP"),[1] invested in a single residential mortgage backed security ("RMBS") issued and underwritten by RBS and lost money when the housing market collapsed and the security dropped in value.[2] ABP now asserts claims under the Securities Exchange Act of 1934 (the "Exchange Act") and New York common law against certain RBS corporate entities and certain officers of those entities.

The RBS Defendants[3] move to dismiss the amended complaint for failure to state a claim upon which relief may be granted.[4] For the reasons that follow, the motion is granted.

---

[1] Plaintiff Stichting Pensioenfonds ABP is a pension fund for public employees in the Netherlands. With approximately €250 billion in assets under its control, it is one of the three largest pension funds in the world. Amended Complaint ¶ 15 (hereinafter "Cpt. ¶ __").

[2] ABP invested also in Merrill Lynch and Lehman Brothers RMBS and included certain Merrill Lynch and Lehman Brothers entities and officers as defendants in this action. These defendants are no longer in the case.

[3] The RBS Defendants are Financial Asset Securities Corporation, RBS Acceptance Inc. (f/k/a Greenwich Capital Acceptance, Inc.), RBS Securities Inc. (f/k/a Greenwich Capital Financial Products, Inc.), Robert J. McGinnis, Carol P. Mathis, Joseph N. Walsh III, John C. Anderson, and James Esposito.

[4] They move also to strike certain allegations. In view of the dismissal, this branch of the motion is moot.

I.  Background

    A.  The Securitization Process

A residential mortgage backed security is a financial product created by aggregating mortgage loans to collateralize securities through a process called securitization. The process starts with the mortgage originators who extend loans to borrowers to purchase homes.[5] After issuing the loan, the originator becomes entitled to a stream of payments from the borrower consisting of principal and interest.[6] Instead of waiting for the payments to be made over the term of the loan, the originator can sell the rights to these payments and earn an immediate but discounted profit.[7]

To create a RMBS, a "sponsor" either originates or purchases a large number of mortgages and sells them to a "depositor" that deposits the mortgages in a trust.[8] In return for the pool of mortgages, the trust issues certificates to the depositor. These certificates entitle the depositor to receive a stream of payments.[9] The depositor then works with underwriters to sell these certificates, known as RMBS, to investors.[10]

---

[5] *See* Cpt. ¶¶ 53–54.

[6] *See id.*

[7] *See id.*

[8] Cpt. ¶ 54.

[9] *Id.*

[10] Cpt. ¶¶ 54–56.

3

Multiple classes or "tranches" of certificates are issued by each trust.[11] The most senior tranche is entitled to receive payments first.[12] The middle tranches are the next to receive payment. And the bottom or "equity" tranches are the last to receive payment.[13] In other words, if a certain percentage of the borrowers default on their loans, the equity holders absorb those losses first while the more senior certificate holders continue to receive payments.[14] Each tranche is rated by a rating agency with the most senior tranche being the most highly rated, typically AAA.[15]

The relative risk of the securities thus is dependent, at least in part, on the riskiness of the underlying mortgage loans.[16] Mortgage originators normally have guidelines that they are supposed to follow in order to ensure the ability and willingness of borrowers to repay.[17] These guidelines are detailed in the prospectus supplements for the RMBS.[18] Compliance with the guidelines is important because it ensures the quality of the loan pool and thus permits the RMBS issuers to accurately structure the collateralization of the various tranches. Compliance is important

---

[11] *Id.*

[12] *Id.*

[13] *Id.*

[14] *Id.*

[15] *Id.*

[16] *See* Cpt. ¶ 66.

[17] *See id.*

[18] Cpt. ¶¶ 65–80.

4

also so that the rating agencies can accurately assess the riskiness of the RMBS tranches.[19] Compliance thus is important to the average RMBS investor.[20]

The securitization process provides opportunities for abuse at the expense of investors. Apparent abuses by numerous participants in the RMBS industry in the last decade now are widely known. And the collapse of the residential mortgage market had and continues to have wide-ranging deleterious effects on the national and global economy. Many disappointed RMBS investors have sought relief in court. ABP is one such investor.

### B. *ABP's Claims*

ABP invested in one RMBS issued and underwritten by the RBS Defendants, First Franklin Mortgage Loan Trust, Series 2006-FF16.[21] The RMBS allegedly dropped in value when the housing market collapsed. As of January 2012, the RMBS certificates were trading at 94 percent of par.[22] ABP now sues to recover its alleged loss on its investment.

The amended complaint purports to state claims under Section 10(b) of the Exchange Act, Rule 10b-5 thereunder, and Sections 11 and 12(a)(2) of the Securities Act of 1933 (the

---

[19] *See id.*

[20] *See id.*

[21] Cpt. ¶ 64.

[22] Cpt. ¶ 371. Par in this situation means the original price of the security at issuance.

5

"Securities Act").[23]   ABP, however, has withdrawn its Securities Act claims against the RBS Defendants.[24]

The theory of the remaining aspects of the amended complaint, at the risk of some slight overstatement, seems to be that things were bad in RMBS the industry, that many claims have been made of problems in the offering of RMBS generally, and that this offering therefore must have been improper.  More specifically, ABP alleges that the defendants knowingly or recklessly made false or misleading statements in the RMBS offering documents bearing (directly or indirectly) on the quality of the underlying mortgage loans.  The amended complaint alleges that a mortgage company named First Franklin originated the mortgages backing the RMBS issued and underwritten by the RBS Defendants.  The defendants allegedly misrepresented First Franklin's compliance with its stated underwriting guidelines and, relatedly, its use of quality control procedures and property appraisals.  The RBS Defendants allegedly knowingly or recklessly securitized the defective First Franklin mortgages, resulting in inaccurate data about the aggregate quality of the loans in the RMBS mortgage pool, which the defendants allegedly published in the offering documents, gave to rating agencies to receive inflated ratings, and falsely represented to be accurate.[25]

---

[23] Plaintiff brings also Section 20(a) claims under the Exchange Act and aiding and abetting fraud claims under the common law.  It is unnecessary to discuss these claims because, as discussed below, plaintiff has failed to allege a primary violation of the Exchange Act or common law fraud.

[24] DI 739 at 1 n.3.

[25] The amended complaint contained allegations related to transfers of title to the underlying mortgages, but ABP withdrew them in its response to the motion to dismiss. *Id.*

6

## II. Discussion

In deciding a motion to dismiss, a court ordinarily accepts as true all well pleaded factual allegations and draws all reasonable inferences in the plaintiff's favor.[26] In order to survive such a motion, however, a plaintiff must allege "sufficient factual matter . . . 'to state a claim for relief that is plausible on its face.'"[27] A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."[28]

Any complaint alleging fraud must satisfy the heightened pleading requirements of Fed. R. Civ. P. 9(b) and, in the case of securities fraud, the Private Securities Litigation Reform Act, by stating with particularity the circumstances constituting the fraud or mistake."[29]

### A. The Fraud Claims

To state a claim for relief under Section 10(b) and Rule 10b-5, a plaintiff must allege "(1) a material misrepresentation or omission by the defendant; (2) *scienter*; (3) a connection

---

[26] *See Levy v. Southbrook Int'l Invs., Ltd.*, 263 F.3d 10, 14 (2d Cir. 2001), *cert. denied*, 535 U.S. 1054 (2002).

[27] *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

[28] *Id.*

[29] *ECA, Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 196 (2d Cir. 2009).

7

between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation."[30]

Common law fraud and fraudulent inducement share essentially the same elements as Rule 10b-5. The elements of fraud and fraudulent inducement under New York law are (1) a material misrepresentation of fact, (2) knowledge of its falsity, (3) an intent to induce reliance, (4) justifiable reliance by the plaintiff, and (5) damages.[31]

The amended complaint contains only sparse allegations specific to the RBS Defendants and First Franklin Mortgage Loan Trust, Series 2006-FF16. All of the alleged misstatements or omissions are based directly on, or derived from, the notion that First Franklin failed to follow underwriting and appraisal guidelines in originating the mortgages. But these allegations fail to satisfy Rule 9(b). The amended complaint therefore fails to plead adequately that the offering documents for the Series 2006-FF16 RMBS contained material misstatements or omissions.

*1.     Allegations Based on Confidential Witness Statements*

First Franklin was a mortgage originator that Merrill Lynch acquired in 2006.[32] The amended complaint alleges that First Franklin originated the mortgages backing the RMBS. Merrill disclosed in its 2007 Form 10-K a liability of approximately $520 million relating to obligations to

---

[30] *Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.*, 552 U.S. 148, 156–57; *see* 15 U.S.C. § 78j; 17 C.F.R. § 240.10b-5.

[31] *Eurycleia Partners, LP v. Seward & Kissel, LLP*, 883 N.Y.S.2d 147, 150 (N.Y. 2009); *Perrotti v. Becker, Glynn, Melamed & Muffly LLP*, 918 N.Y.S.2d 423, 426 (1st Dep't 2011).

[32] Cpt. ¶ 104.

repurchase defective First Franklin loans.[33] By May of 2008, Merrill Lynch had ceased lending through First Franklin and had begun to explore selling the company.[34]

The only allegations in the amended complaint relating directly to First Franklin underwriting practices are based on confidential witness statements originally recounted in a separate complaint filed by separate counsel in a separate action between AIG and Bank of America.[35] One witness allegedly was an underwriter at First Franklin between 2005 and 2007.[36] She allegedly stated that First Franklin required its underwriters to depart from the stated mortgage underwriting guidelines and that managers would call appraisers directly if they did not provide the desired home values and would keep requesting reappraisal until a desirable value was given.[37] A second First Franklin underwriter and confidential witness allegedly stated that the branch manager frequently overrode her decisions not to fund mortgages because First Franklin only audited about five percent of its closed loans. She stated also that managers instructed appraisers to omit problematic details from their appraisals.[38] A third First Franklin underwriter and confidential witness allegedly asserted that First Franklin's compensation structure created an incentive to fund

---

[33] Cpt. ¶ 111.

[34] Cpt. ¶ 112.

[35] Cpt. ¶¶ 107–09.

[36] Cpt. ¶ 107.

[37] *Id.*

[38] Cpt. ¶ 108.

9

risky mortgages because compensation was based on quantity not quality of originations.[39] The amended complaint does not say whether the second or third witnesses worked at First Franklin during the period in which any of the loans backing the RMBS at issue here were originated.[40]

Defendants argue that ABP cannot rely on confidential witnesses cited in another complaint to meet its pleading burden. While the Second Circuit does not appear to have ruled on this exact issue, many district courts have held allegations relying on allegations drawn from other complaints to be improper.[41] Nevertheless, at least one court in this district has held that it is appropriate for a plaintiff at the pleading stage to rely on confidential witness statements recounted in other complaints.[42]

In this Court's opinion, it would be inappropriate to give any weight to these alleged confidential witness statements. There is no suggestion that counsel in this action has spoken with these confidential witnesses or even knows who they are. Fed. R. Civ. P. 11 provides that by presenting a pleading to the court, counsel certifies that to the best of his or her "knowledge, information, and belief, formed after an inquiry reasonable under the circumstances: . . . the factual

---

[39] Cpt. ¶ 109.

[40] ABP relies also on a New York Times article to allege that First Franklin manipulated software to approve risky loans. Cpt. ¶ 110. A review of the article shows that it does not bear ABP's reading.

[41] *See, e.g.*, *RSM Prod. Corp. v. Fridman*, 643 F.Supp.2d 382, 403 (S.D.N.Y. 2009) (citing *Lipsky v. Commonwealth United Corp.*, 551 F.2d 887, 892–94 (2d Cir. 1976)).

[42] *380544 Canada, Inc. v. Aspen Tech., Inc.*, 544 F.Supp.2d 199, 224–25 (S.D.N.Y. 2008) ("Although the confidential informants are not personally known to Plaintiffs or Plaintiffs' counsel, the fact that the informants' accounts are derived from an earlier pleading in a different case simply does not render the instant pleading inadequate.").

10

contentions have evidentiary support."[43] When citing alleged confidential witnesses in a complaint, the certification means that counsel has spoken with these confidential witnesses and knows who they are. Allowing counsel to rely on confidential witness statements recounted in a separate complaint would provide the Court little assurance that the factual contentions have any evidentiary support.

While it is true that a plaintiff may rely in its complaint on witness statements recounted in newspaper articles and government reports, the probative value of an independent news article or government report is much greater than that of confidential witness statements recounted in another complaint. There is significant motive and opportunity for counsel in any case to misuse or mischaracterize confidential witness statements in a pleading. A court can remedy such abuses only through sanctions, but the threat of sanctions often is ineffective because the misconduct normally will come to light, if it ever does, only during discovery when much damage already has been done. The unfairness of permitting a plaintiff in a separate action to rely blindly at the pleading stage primarily on confidential witness statements from another case to meet its pleading burden is patent.

Even if the Court were to give weight to the confidential witness statements, the allegations would be insufficient to allege adequately that the offering documents contained misrepresentations. They provide no basis upon which to infer a wholesale abandonment of underwriting standards at First Franklin during the relevant time period such that the Court could infer that the particular loans backing the RMBS were not underwritten properly. The confidential witnesses were loan level underwriters, not managers or corporate officers who could have spoken

---

[43] FED. R. CIV. P. 11(b).

to the company's practices broadly. The amended complaint does not even allege the time period in which two of the witnesses worked at First Franklin. These isolated accounts of problems with certain managers at certain branches do not provide a basis upon which to infer that First Franklin was engaged in systematic misconduct.

### 2. *Other Allegations*

In an effort to bolster these tenuous underwriter-specific allegations, the amended complaint alleges that RBS received due diligence reports from an outside firm, Clayton Holdings, that indicated significant problems with mortgages that RBS intended to securitize. The amended complaint makes the vague assertion that Clayton provided due diligence reports to RBS "during the housing boom," but does not allege with any specificity when Clayton provided due diligence reports to RBS or whether Clayton's due diligence implicated in any way the mortgages underlying the security at issue. These allegations are insufficient to satisfy Rule 9(b).

Plaintiff relies also on a complaint filed by the Federal Housing Finance Agency ("FHFA") in a separate action that alleges that Greenwich Capital (an RBS company) violated the securities laws in underwriting certain RMBS.[44] In preparing its complaint, the FHFA reviewed samples of loans underlying sixty-eight RMBS that Greenwich Capital underwrote.[45] The FHFA concluded that the prospectuses for all of the RMBS had materially misstated owner-occupancy rates, loan-to-value ratios, and the underwriting standards used for the loans underlying the RMBS.[46]

---

[44] Cpt. ¶ 127.

[45] Cpt. ¶ 128.

[46] *Id.*

12

This review included an analysis of the loans underlying the First Franklin Mortgage Loan Trust, Series 2006-FF16 in which ABP invested.[47]  But the FHFA reviewed only loans backing Group I Certificates issued by that trust.[48]  A review of the prospectus supplement for the Series 2006-FF16 Trust reveals that it consisted of two distinct loan groups with different risk profiles.  The Trust issued two classes of certificates with each class being backed by only one of the loan groups.[49]  ABP does not allege that it purchased a certificate backed by the same loans as the certificate purchased by the FHFA.

ABP's reliance on the FHFA's analysis is unavailing.  The analysis provides no basis for supposing that the offering documents for the specific offering in which ABP invested were materially inaccurate.  ABP has not alleged facts sufficient to infer that the FHFA's alleged review included any of the loans backing the certificate in which ABP invested.  Nor is it alleged that the review revealed that First Franklin had abandoned its underwriting standards systematically.

Finally, the 164 page complaint contains a plethora of allegations that either are unrelated to RBS or are far too general to help ABP satisfy its pleading burden.  These allegations do not merit any extended discussion.

In sum, ABP's allegations that the RBS Defendants made material misstatements or omissions in the offering documents are insufficiently particular to satisfy Rule 9(b).  And, in any event, were the allegations sufficient, the complaint still would fail to state a claim for failure to plead a strong inference of scienter.

---

[47] Cpt. ¶ 127.

[48] DI 603 at 13 (relying on FHFA complaint (DI 606, Ex. G).

[49] DI 603 at 13 (relying on Prospectus Supplement (DI 606, Ex. B, at S-6).

### III.  *Negligent Misrepresentation Claims*

In order to state a claim for negligent misrepresentation, ABP must allege: (1) the existence of a special relationship imposing a duty on the defendants to impart correct information; (2) that the defendants imparted incorrect information; and (3) that ABP reasonably relied on that incorrect information.[50]  "[A]n arm's length business arrangement between sophisticated and experienced parties" is "insufficient to create a 'special relationship'"[51] Nor does a seller's superior knowledge of its own business create a special relationship with a sophisticated purchaser.[52] At least one New York court has held explicitly that knowledge about the contents of loan files does not create a special relationship with insurers of the RMBS that those loans back.[53]

Here, ABP fails to allege anything beyond an arm's length relationship between sophisticated parties. Therefore, its negligent misrepresentation claim against the RBS Defendants are dismissed.

*    *    *

---

[50] *See J.A.O. Acquisition Corp. v. Stavitsky*, 831 N.Y.S.2d 364, 366 (N.Y. 2007).

[51] *Amusement Indus, Inc. v. Stern*, 786 F.Supp.2d 758, 779 (S.D.N.Y. 2011); *see Aurthur Props., S.A. v. ABA Gallery, Inc.*, No. 11 Civ. 4409 (LAK), 2011 WL 5910192, at *4 (S.D.N.Y. Nov. 28, 2011).

[52] *Sebastian Holds., Inc. v. Deutsche Bank AG*, 912 N.Y.S. 2d 13, 15 (1st Dep't 2010).

[53] *See MBIA Ins. Co. v. GMAC Mortg., LLC*, 914 N.Y.S.2d 604, 611 (N.Y. Sup. 2010).

14

The Court has considered plaintiff's remaining contentions and finds them to be without merit.

IV.     *Conclusion*

For the foregoing reasons, the defendants' motion [DI 599], is granted to the extent it seeks dismissal of the amended complaint and is denied as moot to the extent it seeks to strike portions of the amended complaint. The Court declines to rule on plaintiff's ability to amend again its complaint in the absence of a motion for leave to amend that includes a proposed amended pleading.

SO ORDERED.

Dated:      July 31, 2013

_____
Lewis A. Kaplan
United States District Judge

(The manuscript signature above is not an image of the signature on the original document in the Court file.)