March 19, 2014

Clerk of Court

500 Pearl Street

New York, New York 10007

RE: LEHMAN BROTHERS Debt/Equity

SECURITIES LITIGATION 08-CV-5523-LAK,

Chris Andrews,

Objector, Pro Se

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC#
DATE FILED: 3/24/14

Case No. 09-MD-2017 (LAK)

**OBJECTION TO PROPOSED E&Y**

**SETTLEMENT**

Date: April 15, 2014

Time: 4:30 pm EST

Courtroom 12D of Judge Lewis Kaplan

**Class Action Lawsuit**

Tables of Authorities...................................................................1
Table Of Contents.......................................................................5
Introduction...............................................................................7
Preliminary Statement.................................................................9
Argument.................................................................................13

TABLE OF AUTHORITIES

Cases:

re Vioxx Prods. Liab. Litig., 802 F. Supp. 2d 740 (E.D. La. 2011)..........................26

National Association of Attorneys General, Master Settlement Agreement (1998)

(multi-state tobacco litigation);........................................................................26

Matthew T. Lee, The Ford Pinto Case and the Development of Auto Safety Regulations, 1893–

1978, 22 Bus. & Econ. Hist. 390, 399–400 (1998) (Ford Pinto exploding gas tank);.......26

Erin Brockovich (Universal Studios 2000) (polluted groundwater in Hinkley,

California).................................................................................................26

_Auriga Capital Corp. v. Gatz Properties, LLC_, No. C.A. 4390-CS, 2012 WL 361677 (Del. Ch. Jan. 27, 2012) (slip op.),

In Mercury Interactive Corp., 618 F. 3rd 988, 994-95 (9th Cir. 2010),....................... 34

re Washington Pub. Power Supply Systems Lit. 19 F. 3d 1291, 1302 (9th Cir 1994))... ..34

Rule 23(e), ................................................................................................34

In re Relafen Antitrust Litigation, 360 F. Supp.2d 166, 192-94 (D.Mass. 2005),citing inter alia Amchem Prods. Inc v Windsor, 521 U.S. 591, 617, 623 (1997)Rule 239e)................34

Reynolds v. Beneficial Nat't Bank, 288 F. 3d 277, 279-80 (7th Cir. 2002),................34

In re General Motors Corp, Pick-Up Truck Fuel Tank Prod. Liab. Litig., 55F. 3d 768, 785 (3d Cir. 1995), (quoting Grunin v International House of Pancakes, 513 f. 2d 114, 123 (8th Cir.1975)). ................................................................................................34

" True v American Honda co. 749 F. Supp. 2nd 1052, 1080 (C.D.Cal. 2010) ( citing 4 newberg on Class actions $ 11:42 (4th ed 2009)). Accord American Law Institute, Principles of the Law of Aggregate Litig. $3.05 © (2010) (Ali Principles"),......................................... 35

Hanlon v. Chrysler Corp., 150F. 3d 1011, 1021 (9th Cir. 1998); In Bluetooth Handset Prods. Liability Litig., 654 F. 3d 935, 947 (9th Cir. 2011,23 9e), .....................................35

Bluetooth, 654 F. 3d at 948 (quoting Staton v Boeing Co., 327 F. 3d 938 , 960 (9th Cir 2003)),................................................................................................35

Stanton, 327F,3d A 964...........    ............................    ...........................35

Torrisi v Tucson Elec. Co. 8 F. 3d 1370, 1376 (9th Cir 1993),...............................35

Report of the Third Circuit Task Force, Court Awarded attorney Fees, 108 F.R. D. 237, 266 (1985),................................................................................................31

Grovev Principal Mut. Life Ins. Co., 200 F.R.D. 434, 447 (S.D. Iowa 2001) citing In re Gen

Motors Pick-Up Litig., 55 F. 3d at 789.),.............................................................36

In re Gen. Motors PickUp Litig,. 55 F. 3d at 813,.................................................36

Thedore Eisenberg & Empericial Issues, 57 VAND .L. Rev. 1529, 1532 (2004).,............37

Summary Judgment should be filed...................................................................34

Rule 23(a)(4), .........................................................................................34

23(g), ..................................................................................................34

See VTech Holdings, Ltd. v. Pricewaterhouse Coopers, LLP 348 F. Supp 2d 255, 262 (S.D.N.Y.

2004),...................................................................................................59

Works, Inc. v. Turner, 179 F. Supp. 2d 177, 215 (S.D.N.Y. 2001),............................59

VTech Holdings , 348 F. Supp. 2d at 262 (quoting Parrott v. Coopers & Lybrand, L.L.P. 741

N.E.2d 506, 508 (N.Y. App. Div. 2000)).,..........................................................59

Cumis Ins. Soc'y v. Tooke , 739 N.Y.S.2d 489, 493 (App. Div. 2002),.......................60

William Iselin & Co. v. Landau , 522 N.E.2d 21, 23 (N.Y. 1988),............................60

Collins v. Esserman & Pelter , 681N.Y.S.2d 399, 401 (App. Div. 1998),.....................60

Kantor, Geisler & Oppenheimer, P.A. , PCAOB Release No. 105 - 2007 - 009 (Dec. 14, 2007).

Silverman v. KPMG LLP (In re Allou Distribs., Inc.), 395 B.R. 246, 272 - 73 (Bankr. E.D.N.Y.

2008),...................................................................................................60

Spring.r Exchange Act Release No. 44858, 75 S.E.C. Docket 2095 (Sept. 27, 2001)...........

Stanley L. Bloch, Inc. v. Klein , 258 N.Y.S.2d 501, 508 (Sup. Ct.

1965)....................................................................................................60

Crowley v. Chait, Civ. No. 85 -2441 (HAA), 2004 WL 5434953, at *12 (D.N.J. Aug. 25,

2004);...................................................................................................61

World Radio Labs., Inc. v. Coopers & Lybrand, 557 N.W.2d 1, 15 (Neb. 1996)803 N E.2d 460

(Ill. 2003); see also Plan Comm. v. PricewaterhouseCoopers, LLP , 335 B.R. 234, 249 .... 51

(D.D.C. 2005),...................................................................................................62

## Statutes, rules and regulations

Delaware General Corporation Law's principles of fiduciary law...............................17

Regulation S-K.....................................................................................................18

AU 380................................................................................................................18

Sarbanes-Oxley Law...............................................................................................19

PSLRA................................................................................................................24

Rule 23...............................................................................................................24

Due Process........................................................................................................24

54(D)(2)(D)........................................................................................................30

Rules 23(a)(4) and (g)...........................................................................................30

Commission's Rule of Practice 102(e) and PCAOB (Public Company

Accounting Oversight Board) *Section 105(c)(5)(A) of the Act, 15 U.S.C. § 7215(c)(5*...............37

Management Discussion and Analysis ("MD&A")...........................................................55

GAAP accounting..................................................................................................55

Regulation S-K.....................................................................................................56

Generally Accepted Auditing Standards ("GAAS")..........................................................57

Auditor Malpractice.................................................................................57

SFAS 140...............................................................................................61

23(e)......................................................................................................80

**Table of Contents**

INTRODUCTION.....................................................................................4

Preliminary Statement.............................................................................6

Insufficient Evidence for Approval Due to Missing Expert Reports..........................6

Argument..............................................................................................10

Proposed settlement fails the following two sets of tests..........................................10

Reason to reject or modify settlement to obtain more money...................................14

$6.6 billion to $30 billion in damages calculation.................................................18

Defendant is guilty of the following allegations in the complaint and a jury would agree.....20

The Notice to the Settlement Class does not satisfy the requirements of the PSLRA, Rule 23 and

Due Process........................................................................................25

Plan of Allocation is flawed.....................................................................26

The "Few Objectors" Issue.......................................................................26

The high on drugs attorney fee and expense issue.............................................28

A class should not be certified when the primary beneficiaries are class counsel................29

The Court Has A Fiduciary Duty to The Unrepresented Members OF The Class................30

A showing of explicit collusion is not required to demonstrate settlement unfairness............32

Public Policy Reasons Mean That the Court Should Not Infer Settlement Approval from a Low

Number of Objectors...............................................................................33

Lead Counsel stated "$90 million is a drop in the bucket for what we lost

here".................................................................................................34

The real recoverable damage amount from defendant exposed............................35

EY reports 2013 global revenues of US$25.8 billion.....................................36

Defendant violated Commission's Rule of Practice 102(e) and PCAOB (Public Company

Accounting Oversight Board) *Section 105(c)(5)(A) of the Act, 15 U.S.C. § 7215(c)(5)*............*36*

Examples of defendant's typical business practices........................................37

$99 Million Buys EY Ticket Out Of Private Lehman Litigation (Objector says not yet)..........45

Evidence from the Examiner's Report that $99 million doesn't cut it.............................49

Meet Ms. Hillary Hansen.............................................................................51

Statement by Anton R. Valukas Examiner, Lehman Brothers Bankruptcy before the Committee

on Financial Services United States House of Representatives.................................52

Ernst & Young's Knowledge of Lehman's Repo 105 Program During several Rule 30(b)(6)

interviews.............................................................................................60

Big Lehman Brothers Troubles For Ernst & Young................................................61

Ernst & Young failed to follow professional standards of care with respect to

communications with Lehman's Audit Committee................................................63

Ernst & Young failed to follow professional standards of care with respect to an investigation of a whistleblower claim.................................................................63

Ernst & Young failed to follow professional standards of care with respect to audits and reviews of Lehman's public filings.................................................65,66

Historical Prices Lehman Brothers Holdings Inc...................................................70

*State of New York's complaint snippets*.................................................75

Summary Judgment Standard.................................................................77

Objector Fee Award.................................................................78

Suggested attorney fee.................................................................78

CONCLUSION.................................................................78

Deny motion to certify.................................................................79

## INTRODUCTION

- Objector was a purchaser of Lehman common stock during the class period and is a member of the settlement class, therefore has standing to object to the settlement. See attached three page document (labeled A) as proof. Objector's mailing address is P.O. Box 530394 Livonia, MI 48158. The telephone number is 1-248-635-3810. E-mail is caaloa@gmail.com. Objector does intend at the present time, based on work schedule, to appear at the fairness hearing on April 15, 2014. Per counsel's request, objector has filed objections in approximately five cases over the past six year period. The cases were ??? Vs. Tyco International, Friedman vs. Penson

Worldwide, Inc., Freudenberg vs. E-Trade Financial Corp., ??????? Vs. Nutella, and this case. There could be one more in there somewhere, maybe. Counsel should perform an electronic search using a data base check since this objector does not have the ability to do so. Objector has also attached at the end of the objection a 16 page document of defendant's current Global Code of Conduct (labeled B) and a 41 page NERA report dated January 21, 2014 (labeled C) showing the average attorney fee in a settlement this size for the latest reporting period ending in 2013 is 25% vs. the 30% located on page 34 that counsel is essentially requesting for their fee.

Objector requests the following:

- Plaintiff Counsels are to list the hundreds of class action suits they have filed over the past five year period in their response to this objection.

- An opportunity to speak to the Court and the option to cross-examine any witnesses who may testify at the hearing in support of settlement approval.

- A list of any witness to be called with their cv and the specific scope of their testimony and copies of any evidence they may or will introduce at the hearing.

- The option to perform discovery on certain issues that are described below per Rule 23, 4 paragraph 2, if necessary.

- Objector reserves the right to file a sur-reply if it's necessary and there is time available before the nearing.

- Objector reserves the right to supplement this objection at any time if the parties introduce new facts, evidence, arguments or valuation after Counsels' settlement filing made on March 14, 2014.

- Objector does not intend to call any witnesses at the fairness hearing but reserves

the right to make use of all documents entered on to the docket by any settling party/objector/witness or any visual items used at the fairness hearing like a display.

- Objector adopts all of counsel's Table of Abbreviations as described in their latest settlement filing papers dated March 11, 2014.

On November 12, 2013 objector sent an email to Co-lead counsel requesting copies of any filings to be made from that date forward relating to the proposed settlement be sent to the objector via email for review "to determine if everything is OK." Well, it's not, as evidenced by this objection which started taking shape the end of November 2013. The missing, neglected, overlooked issues and facts in this proposed settlement "…… look(s) like a jigsaw puzzle with a couple of pieces gone." (Jim Croce- Bad Bad Leroy Brown-1973)

**Preliminary Statement**

**Insufficient Evidence for Approval Due to Missing Expert Reports**

Plaintiffs' Counsel wrote in document 1340 "Plaintiffs Memo in Support of Motion for Authorization to Notify the Settlement Class of Proposed Settlement with Ernst and Young LLP and to schedule a Settlement Hearing" filed on 11-27-13 page 1 of 12 specifically page 5 (but not in the settlement notice for all 916,000 class members to see) "Following the substantial completion of fact discovery and just prior to the deadline for exchanging expert reports, the parties reached an agreement in principle to settle the Action against E&Y for $99 million." Wait, hold it, stop right there.  What?

First, why was this crucial fact not in the settlement notice? By not including this critical information in the notice counsel has violated Rule 23 that requires notice in clear, concise, accurate and easily understood language as it relates to the issues. In this case failing to mention the expert reports creates inaccuracy, the missing reports are a material "issue" to the class and so is clearly a failure in the "accurate" department. The notice is flawed and unacceptable. This is material information and not including it is exactly what defendant did in this case, hiding material information that caused billions in damages to the class, ironic.

Second, why did lead counsel NOT demand that the reports be exchanged prior to agreeing to a settlement figure? Counsel may be leaving tens, hundreds of millions or even billions on the table. The class paid for all that work which is included in their proposed outrageous, high on meth attorney fee and expense request. Objector strenuously requests copies of both reports be provided to the Court (in camera if necessary) and to the objector for review. Objector agrees to sign a confidentiality agreement and/or protective order (if necessary) to be allowed to review, comment on both reports, (under seal if applicable) and return to The Court within two weeks from receipt to ensure the class is not getting defrauded and shafted in what appears to be a quid pro quo settlement scheme. The Court would benefit from a second set of "devil advocate eyes" on these reports. Something is not right and being hidden here.

Third, the class representative is OK with this? It's time to disqualify them and acquire some new named plaintiffs since they clearly are not qualified to look after the best interests of the class and are being used as a rubber stamp.  Someone has to look out for the class beside the Court so the objector plays guardian on behalf of the class, again. Where is the declaration form from the class representative that they approve of this proposed settlement? Missing in all the settlement papers. Was the class representative aware the reports are missing? If so what did they

have to say about this? A sworn statement is needed from them explaining the reasoning for allowing this to happen and how is the class supposed to read, comment on and object if necessary?

Fourth, why did Plaintiff's Counsel believe they could get this proposed settlement by the Court without the reports to begin with after what happened in the D&O hearing? Do they not learn?

Fifth, how can the Court even consider approving this proposed settlement with Plaintiffs' and Defense Counsel intentionally failing to provide this missing, critical and key information? It will not cause a major delay or incur costs for counsels to exchange the reports and provide them to the court and the objector. This ruling will forever bar 916,000 class members from asserting up to $30 billion dollars in claims against the defendant E&Y for their participation in this year's long accounting manipulation, balance sheet misrepresentation and cover up scheme so transparency is demanded and required.

The concrete, undeniable truth and irrefutable facts in this case known as "E&Y Gate" as shown in the publically available evidence, such as but not limited to the court files, the Examiner's Report, the Court's issued opinion related to defendant's request for dismissal, and evidence throughout this objection prove defendant Ernest & Young, the gatekeeper, is guilty of the following and should pay more than a token $99 million for the billions of damages it caused by being a willing enabler in this accounting manipulation, balance sheet, financial fraud and cover up scheme.

This proposed $99 million settlement does not fit approval guidelines under Rule 23 of the Federal Rules of Civil Procedure as more fully described in this objection because:

- Substantial recovery of more than $99 million based on the evidence in this case as shown below against the Defendant is a slam dunk and is an unacceptable fraction of damages caused by defendant.

- Not fair, reasonable and adequate in all respects.

- Not in the best interests of the class members, including lead plaintiffs.

- Not in the public interest.

- Does not satisfy the Grinnell factors for settlement approval.

- The notice and notice packet are flawed and failed for settlement purposes.

- Lead counsel has breached it's fiduciary duty of the class by putting it's own interest ahead of the class by accepting this proposed settlement without demanding the reports first, a clear conflict of interest. No explanation in the settlement papers had been given for NOT exchanging the reports, unacceptable.

- This proposed settlement only creates an illusion of relief for the class.

- Continued litigation does not pose substantial risks of reducing defendants' ability to fund a settlement or judgment, rather it is more likely the settlement will rise by many, many multiples. This first settlement offer is a trial balloon offer that is punctured and useless.

- The Settlement does not appropriately balance the risks of litigation and the benefit to the settlement class victims of a far superior recovery.

- Continued litigation does not pose substantial risks in establishing liability.

- Continued litigation does not pose substantial risks in establishing damages.
- Balancing the certainty of a curb high immediate recovery against the recovery of many, many multiples of $99 million in a future summary judgment filing, logically an increased offer the closer to trial or trial verdict dictates and favors the continuation of the suit and rejecting the cheap shell game settlement offer.
- Approving this settlement would be a failure of due process for the class.

**Argument**

**Proposed settlement fails the following two sets of tests:**

If the Court faithfully applies the first six factor test below in determining the appropriateness of the proposed settlement, there is no way this should be ever approved as is. Those six factors are:

(1) evidence that the settlement was obtained by fraud or collusion. Where are the missing reports? Some might say that is a form of fraud and/or collusion, (2) the complexity, expense, and likely duration of the litigation, there is enough evidence today to file for summary judgment or go to trial tomorrow and win more than $99 million. The jury's jaws would hit the ground after knowing all the facts in this objection, (3) the stage of the litigation and available discovery, The Examiner's $50 million dollar two thousand two hundred page report, the Examiner's depositions, Plaintiffs counsels 50 depositions, 40 million pages of available documents produced by the Examiner is all the discovery that is needed. (4) the probability of plaintiffs' prevailing on the merits, 95% range, no reason to settle for a token $99 million today. (5) the range of possible recovery and certainty of damages, $6.6 billion to $30.00 billion in damages based on the artificial inflation and stock price dropping to zero as will be explained below, $50 million refund for the

Examiner's Report from E&Y and a refund of the applicable portion of the $160 million paid to defendant by Lehman over seven years for what turned out to be dishonest and fraudulent services, certainly of damages, slam dunk (6) the opinions of class counsel, class representatives, and absent class members. This objection will clearly prove why the settlement should be rejected based on the merits contained above and below.

This Court used the following nine factor Grinnell test criteria below in deciding whether or not to approve the D&O settlement. Using the same criteria against defendant E&Y, the evidence above and continued below clearly calls for outright rejection, more money or no approval from this Court. Defendant HAS the means to pay for the billions in damages it helped cause contrary to counsels' claims in their brief and the class has the same if not a greater amount of evidence to use against E&Y.

Those nine factors are: (1) the complexity, expense and likely duration of the litigation, The trial could start in three months based on the proof that is out there that is in the Examiner's report, the evidence in the hands of both counsels, the testimony that is already on the record and depositions completed. Just a few subpoenas for testimony on the stand at trial are needed. (2) The reaction of the class to the settlement, the class as a whole have a don't care attitude relating to class action lawsuits, lawyers and courts. (Nothing personal Judge Kaplan.) 99.9% of class members don't have the skill, knowledge or wish to throw good money after bad to compose an objection that they believe would make an impact and help improve it. (3) The stage of the proceedings and the amount discovery completed, a two thousand two hundred page, $50 million discovery road map is all that is needed today that proves without a doubt the defendant is guilty of the grocery store misconduct list described below. Those missing expert's reports might also come in handy here, (4) the risks of

establishing liability, piece of cake, it's all here in the objection, Plaintiffs' files and Examiner's Report. (5) the risks of establishing damages, piece of cake, billions, so admit Plaintiffs' Counsel at the D&O Fairness hearing not counting punitive damages, interest etc. just look at the stock price drops, the Examiner says it's $30 billion in damages, (6) the risks of maintaining the class action through the trial, walk in the park. (7) The ability of the defendant to withstand a greater judgment, the $99 million represents one and a half days worth of $25 billion in revenue for the defendant based on a seven day, 365 day a year schedule in their 2013 fiscal year for just the minimum $6.6 billion in damages. The damages represent a maximum of just 1.7% of the minimum $6.6 billion minimum in damages caused from July 8, 2008 all the way down to .37 the day of the filing. (8) the range of reasonableness of the settlement fund in light of the best possible recovery, an unreasonable $99 million fund vs. $6.6 to $30.0 billion in damages, interest, attorney fees, costs, punitive damages, no contest, (9) the range of reasonableness of the settlement fund to a possible recovery in light of all attendant risks of litigation, very unreasonable to approve, makes no sense, $99 million vs. billions. Seems counsel knows the price of everything in this settlement concerning their costs and fees, hours spent copying costs etc. but knows the value of nothing as it pertains to the class's losses and their fair recovery of damages in this proposed useless settlement.

Counsel has not produced sufficient evidence to obtain approval of the settlement.

Counsel never focused in it's TAC or settlement papers on any of the non security related issues that the objector addresses below that directly relate to and are also separate from the security violation in question and reasons why we should forge ahead.  Issues that involve the colorable claims mentioned in the Examiner's report which translate into issues like

professional malpractice, bad faith conduct, wrongful misconduct all of these and more come into play that are more than enough with the one security claim to obtain hundreds of millions in a settlement or billions from the defendant on the court room steps or at trial even taking into account proportionate fault defenses. Objector will address the colorable claims issues below and the resulting violations that come after that. A jury will not let E&Y off the hook without a nine or ten figure verdict when they see the evidence, what they did and how much money was lost by stakeholders. Unfortunately our counsel is focused on all the wrong reasons to quit rather than on the right reasons to march on except for that darn $30 million fee is clouding their thought process and vision.

**Reasons to reject or modify settlement**

Specific reasons based on the evidence as to why the settlement should be rejected and allowing a jury to find the defendant guilty of many of the following actions and awarding a Tyco size settlement amount for damages none of which were addressed in Plaintiffs' Counsel's regional telephone book size final settlement papers are listed below: Should and does counsel need to file a fourth amended complaint or is it too late?

- intentionally failing to inform Lehman's Audit Committee over numerous meetings of the whistleblower allegations, specifically the existence of Repo 105 and Repo 108 fraud making the Quarter 2 2008 results misleading and fraudulent in violation of various securities law. The risks taken by Lehman due to the concealment of Repo 105 and 108 directly contributed to the liquidly crisis later on down the line when Lehman could not afford to correctly address it. Defendant is therefore responsible in part for the bankruptcy and the damages and expenses incurred.  Defendant additionally and

intentionally failed for 26 days to interview the whistleblower after receiving the letter! Gross negligence at the least, cover up at the most with Lehman's only valuable option, time, running out.  Therefore defendant is now guilty of the following:

- E&Y is guilty of tortuous interference with Lehman's audit board and stakeholders.

- E&Y is guilty of breach of duty to Lehman Brothers and stakeholders.

- E&Y is guilty of aiding and abetting breaches of fiduciary duties in collusion with Lehman officers against the best interests of the company and stakeholders. Defendant intentionally hid Repo 105 transactions from the audit committee and stakeholders for the entire class period and through the use of what this objector calls fraud by silence making the applicable SEC filing intentionally false and misleading.

- Guilty of willful dishonesty.

- Guilty of willfully violating its duty of care during the course of its work to Lehman's Board and Audit Committee and the company for years by not disclosing the Repo scheme.

- Guilty of violating its duty to monitor its employees in the discharge of their duties.

- Guilty of participating in Lehman's balance sheet manipulation scheme while not withdrawing from the Lehman engagement if necessary to alert the stakeholders.

- Guilty of fraud by omission.

- Guilty of allowing accounting manipulation, a mortal sin in defendant's profession.

- Guilty of fraud by misrepresentation.

- Guilty of allowing accounting gimmicks and false statements to be used in the applicable SEC filing, in Lehman conference calls and in written disclosures, which means it is...

- Guilty of enabling a wire fraud through the use of the phone system for those specific conference calls and use of the computer systems crossing state lines because defendant knew the statements were false before, while and after they were made and told no one making them a co-conspirator and liable for any and all damages caused by their actions and inactions.

- Guilty of enabling mail fraud if any of the paperwork back and forth from Lehman to defendant went through the mail system.

- Guilty of unjust enrichment by overcharging Lehman for services that were overpriced, delivered improperly and substandard compared to the standards expected of a Big 4 accounting firm while assisting in an accounting manipulation scheme unbeknownst to the victimized class.

- Guilty of violations of Delaware General Corporation Law's principles of fiduciary law and also allowing Lehman officers to intentionally breach those very same principles and duties to stakeholders for years by remaining silent. Since Lehman and defendant are both incorporated there, defendant can't claim they didn't know about these principles. (Ernst & Young Americas LLC is a Delaware limited liability company that coordinates the activities of the Americas Area Firms.)

- Guilty of willful gross negligence and more so the business judgment rule.

- Guilty of willful misconduct.

- Guilty of wrongful conduct.

- Guilty of reckless conduct.

- Guilty of willful misrepresentation.

- Guilty of auditor malpractice.

- Guilty of willful breach of legal duty.

- Guilty of willful bad faith.

- Guilty of willful bad faith fiduciary conduct.

- Guilty of violating Regulation S-K

- Guilty of willfully violating AU 380, auditor communications.

- Guilty of obstruction in the Lehman bankruptcy case by willfully lying to the Examiner in his investigation with the evidence shown further below.

- Guilty of willfully violating the Sarbanes-Oxley Law by essentially doing internal audit work, a prohibited service under Sarbanes-Oxley as described further below.

- E&Y is guilty of willfully violating its own internal conduct guidelines. Attached is the 2013 version. I assume Plaintiff's counsel has reviewed a copy of the 2007-2008 versions during the discovery process, right? They are pretty close, right? The objectors requests a copy and please include it in the reply to this objection for the objector and Court to review.

- E&Y is guilty of intentional improper professional conduct and professional malpractice so is liable for $6.6 billion to $30 billion in share price damages as shown further below.

- E&Y should be liable to stakeholders for the entire $50 million cost of the Examiner's Report since it's took that amount to obtain the evidence of E&Y's remaining security violation and intentional, improper malpractice conduct in propping up Lehman's strength perception, remaining silent for the entire class period and more crucially the last 120 days or 2880 hours leading up to the bankruptcy filing in what turned out to be an enabling, in concert, dishonest, accounting, conspiracy, and wire fraud scheme.

- E&Y should refund to the class the entire $160 million paid to Lehman over the previous seven year period for the accounting manipulation scheme it allowed to be created and the damages it intentionally helped cause by keeping Repo 105 hidden from everyone and which helped allow Lehman executives to start overextending themselves in the first place.

- E&Y by its actions or lack thereof, helped cause, in part, the Lehman bankruptcy and up to $30 billion in damages and expenses that occurred due to its bankruptcy filing.

Plaintiff's Counsel has the burden of proof in obtaining approval, not for the objector to disprove the fairness of it, a huge difference. Based on the above, defendant has caused billions in damages and is required to pay more than curb high token $99 million in damages.

**$6.6 billion to $30 billion in damages calculation**

Let's figure out the how the minimum $6.6 billion to $30.0 in losses to the class was calculated before going any further. The Examiner in his report used the date of 2-29-2008 and found there were 554 million shares outstanding and the average price of Lehman shares was $50 a share down from a high of $65.73 a share in January 2008. 554 million shares multiplied by $50.00 a share equals a market cap of $30 billion dollars. This $30 billion wipeout in equity over the next eight months which is part of the class period, ended at .37 a share is the maximum that defendant E&Y is on the hook for minus the offset arguments, the objector gets it. $99 million is just partial interest on the final settlement and/or verdict after offsets.  For example take $30 billion and divide the damages between the Lehman officers and the defendant now apply offsets. Take even half that number and $99 million is still a grain of sand compared to the

amount of grains of sand on the entire beach, which represent stakeholder's losses.

***Objector states that the minimum loss defendant is on the hook for rides from $13.00 a share all the way down to zero starting on July 10, 2008 to the date of bankruptcy just using the one securities violation claim alone***

The stock loss from just 07-10-08 forward  ($13.49 a share)  to .37 the day of the bankruptcy filing we have a maximum loss of $13.00 a share multiplied by 509 million shares equals a $6.6 billion in stakeholder losses plus punitive damages, costs and interest. Had defendant forced Lehman management to disclose Repo 105 and 108 or not allowed Lehman to ever use it the bankruptcy may not have ever occurred and the sooner had it been disclosed the less risk Lehman would have been forced NOT to take which ultimately, in part caused it's demise

That $99 million offer is a joke and lead counsel knows it when looking at the guilty actions of the defendant above and will most likely be just a fraction of the interest on a judgment that is awarded to the class at trial. $99 million is pocket change and Plaintiff's counsel wants $30 million of it and $4 million in expenses for all the evidence the Examiner produced? Counsel, pass me your crack pipe.  In addition as this Court noted at the last fairness hearing, if not for the Examiner's Report this case would most likely have been dismissed. The Court also noted in defendant's motion to dismiss opinion, Plaintiffs' counsel did not plead well enough resulting in part of the complaint being dismissed.  Who pays for that counsel? Care to throw in a few tens of millions or reduce the fee to a dollar to make up for the errors?

Does The Court really believe that anyone with more than a two digit IQ would have invested even a penny with Lehman had any investor been informed there was a cooked leverage, balance sheet, accounting manipulation scheme going on that the defendant and it's client were engaged in, not disclosing and were remaining silent about from the start of the class period forward? No, and this objector like many others would not have invested even a penny. This fraud artificially made the strength of Lehman appear better than it really was all during the class period. E&Y could have forced Lehman, at any time during the class period to disclose the truth about Repo 105 and leverage accounting fraud scheme to the Lehman audit committee especially when asked, but defendant did nothing and as a result allowed billions of stakeholder's money from unsuspecting investors during the class period to simply evaporate, especially in the final few months of Lehman's life.

The audit committee might have been able to take extremely drastic and possible creative actions to avoid the bankruptcy filing starting at the beginning of the class period forward had it been told the truth by E&Y especially when asked instead of covering it up which is a well-known method of deception. Since the problems were bigger than the board thought, they were unaware of the scheme so dramatic actions could not and were not planned and executed in an attempt to save the firm until it was way too late. Defendant is responsible and now on the hook for big damages.

**Defendant is guilty of the following allegations in the complaint and a jury would agree:**

The first set allegations come right out of Plaintiffs Counsels Document 1340 page 6. The objector has added the word "guilty" in front of each allegation, (now proven based on the publically available evidence) in Plaintiffs' Counsels amended complaint making the $99 million offer too little:

- Guilty of knowingly allowing Lehman's financial statements during the relevant period
  to be misrepresented and/or omitting material facts about the business and financial
  condition of Lehman; (Objector plucked the following gem of a quote from the
  Examiner's report page 744. For example, "four days prior to the close of fiscal Year
  2007, Jerry Rizzieri was in search of a way to meet his balance sheet target and wrote to
  Mitchell King: "Can you imagine what this would be like without 105?" 2888n  Objector
  says yes, the stock price would have plummeted many dollars  causing half a billion
  dollars in damages per dollar drop to stakeholders but defendant E&Y says that's OK we
  will put ourselves on the hook if this should ever get out. Time to pay up E&Y. Lehman
  employees could easily see the artificial benefit derived by using Repo 105 and 108 and
  so could the defendant who allowed it to continue to be used all for the fees it was
  receiving from Lehman, a quid pro quo if you will.

- Guilty of allowing the market price of Lehman's securities during the class period to be
  artificially inflated due to its material misrepresentations and failures to disclose full
  material facts. Duh. Who would buy anything from Lehman, at any price if they knew a
  balance sheet, accounting manipulation scheme was in progress that was NOT being fully
  disclosed? No one would. Just look at the price drop whenever bad news came out.


- Guilty of allowing class members to suffer huge damages which deserve compensation.
  (Objector says it's $6.6 billion to $30.0 billion plus punitive damages and all expenses
  incurred in this case. (The objector's damage calculation estimate is in writing, something
  that is missing in all of counsels' settlement papers.)

Plaintiffs' Counsel as usual applaud themselves heartily for the brilliant settlement they supposedly extracted from E&Y based entirely on the fact that defendant strenuously denied any liability of any kind in the face of a Mount Everest amount size of evidence accumulated by the Examiner. But defendants always deny liability when faced with a meritorious lawsuit. Merck didn't roll over and play dead when it was first sued over the people it killed while raking in billions selling Vioxx. Merck was brought to heel only when counsel obtained—through discovery—internal documents making it clear that Merck continued hawking a drug that it knew induced heart attacks in unsuspecting patients. See generally In re Vioxx Prods. Liab. Litig., 802 F. Supp. 2d 740 (E.D. La. 2011) (discussing "extensive discovery" undertaken by various law firms). There are countless other cases where companies have played possum until they were confronted with internal documents and/or expert reports proving them liable. See, e.g., National Association of Attorneys General, Master Settlement Agreement (1998) (multi-state tobacco litigation); Matthew T. Lee, The Ford Pinto Case and the Development of Auto Safety Regulations, 1893–1978, 22 Bus. & Econ. Hist. 390, 399–400 (1998) (Ford Pinto exploding gas tank); Erin Brockovich (Universal Studios 2000) (polluted groundwater in Hinkley, California) and this case based on the Examiner's report! The simple fact is, Plaintiffs' Counsel has overlooked their basic responsibility to discover and address the facts pro and con from the defendant. This Court should not approve the settlement unless and until Plaintiffs' Counsel exchange expert's reports and this objector can review and comment on both of them.

Finally, Plaintiffs' Counsel has locked the class into a settlement that our counsel requests 30% or $30 million of plus $4 million in expenses in what this objector calls the equivalent of a get

out of jail free "wink, wink" cheap settlement for the defendant. Plaintiff's Counsel no longer has an incentive to look for evidence establishing the amount of real liability and real damages; their incentive was to get the settlement finalized so they could cash in their Inca size bounty. Finding a smoking gun in that expert report is the last thing counsel wanted, as it could call into question their judgment in having settled the case without exchanging expert's reports. The Court should heavily ding counsel's fee for this Three Card Monte game they just played. Would counsel have settled if they knew their fee was going to be 5%, No.

Plaintiffs' Counsel claim the settlement is a great deal, but this is just a guess, and a poor guess at that based on the evidence. They have a strong financial incentive to guess that way. This Court has no basis for making an approval decision for the simple reason that the parties have not provided sufficient information to do so.

Plaintiffs' Counsel wrote in document 1380 page 21 of 34. "Defendant argued it only had limited responsibility when conducting a quarterly interim review". How about the responsibility to reveal the Repo scam to the audit committee anytime during the class period? Had that been done Lehman would not have had the cushion to overextend itself and maybe no bankruptcy would have occurred. Defendant allowed Lehman to use it, become comfortable and rely on it to obscure the true numbers for many years and couldn't take the crack away from the addict. Allowing the Repo scam to exist contributed to the liquidly crisis that doomed Lehman so logically E&Y is equally responsible for the bankruptcy as are the Lehman officers as we all know. We can let the jury pick the damage amount.


**The Notice to the Settlement Class does not satisfy the requirements of the PSLRA, Rule 23 and Due Process**

The failure in the notice is that of a failure in the substance in that the notice fails to fairly inform the 916,000 class members, large and small, that the expert reports were not swapped before the settlement amount was reached, a clear material and critical fact that class members should have been told about as this objector wrote about many pages above in more detail.

**Plan of Allocation is flawed**

Under Appendix D, Plan of Allocation for the net settlement fund A. Preliminary Matters. There seems to be an indication that our counsel has thrown in the towel to get this approved. Under the first paragraph counsel wrote to the class, "In accordance with the requirements established by the District Court, an which are approved for payment from the Net Settlement Fund (collectectively "Authorized Claimants"), and whose payment from the Net Settlement fund equals or exceeds ten dollars.($10.00).  Why is the dollar amount ten dollars when the D&O amount started at $50.00, $25.00 then eventually $10.00? Is that because counsel knows now that hardly anyone got anything even at $10.00? Reduce the minimum to $5.00. Something is better than nothing. In fact why not take the token amount left over for the class to divide up after Lead Counsel's extortionist type fees and expenses are and divide it evenly among the 916,000 class members? That would give each class member regardless of size of loss just an average check of $70.00. It seems a bit low vs the billions in damages that are being left on the table. It appears the class is being shafted.

Counsel wrote in the Notice to the class Appendix D page 17,. "At this time, it is not possible to make any determination as to how much a Settlement Class Member may receive from the Settlement." That is not true. Have counsel bring to the hearing a computerized statement from

the claims administrator showing how much each claimant received in the D&O and the underwriter settlement than do something math. Fair?

Paragraph two, "The objective of the proposed plan of allocation set forth below (the Plan of allocation") is to equitably distribute the Net Settlement Fund to those Authorized Claimants who suffered losses as a result of the misstatements alleged in the action".  Stop right there. MISSTATEMENTS? No, the proper term is an intentional, ongoing accounting manipulation balance sheet and misrepresentation scheme. Now that it's fee time counsel forgot that defendant actively engaged in and covered up for years a scheme that cost stakeholders billions as a result of the scheme maxing itself out when the liquidly run for Lehman came calling, just like a Ponzi scheme. It's now all about obtaining their fee and to heck with the class. Objector will now be forced to expand on that glossing over of the fraudulent actions by defendant in greater detail below since counsel has forgotten what it is fighting for. Counsel is attempting to downplay the seriousness of E&Y's actions and resulting damages solely to make the class position look weaker than it really is, just like what defendant did to make Lehman's position appear stronger! Counsel is clearly acting in the best interests' of the defendant not the class so this settlement should be rejected.


Page 21 Objection. Objector states that three lawyers from the NY bar should not be judge and jury with the class's money. This is a fraud on the class. It's not their money to decide what to do with and who gets it. The list of who gets any remaining distributed funds should have been made available in the notice sent to the class for them to comment on. Objector says that one nonprofit should receive any class money that is left over. The Center for Class Action Fairness is a non-profit public interest law firm that represents consumers and shareholders in the class-

action settlement process. http://centerforclassactionfairness.blogspot.com/. Isn't everyone interested in making sure class action settlements are made with the best interests of the class at heart? The Center has cut $260 million in attorney fees from lawyer's demands that were deemed excessive by numerous federal courts around the country that flowed back into the hands of victimized class members around the country. They have won seven appeals in just four years using only $1.5 million and they just hired their fourth lawyer! A great return for past and future victimized class members everywhere. Place them on the list to show good faith and a sense of fairness. The figures come from the director Ted Frank shortly after he starts speaking. http://www.c-span.org/video/?317417-1/manhattan-institute-forum-class-action-suits

Same page, last sentence. "Co-Lead Counsel's motion will include a declaration detailing the means by which the proposed recipients were selected". Objection. Why is that done right now in the settlement notice? Will the class have a chance to review this and object in the future? No. Fix this as described above.

## The "Few Objectors" Issue.

Plaintiffs' Counsel makes much of the fact that only three class members have objected so far. So what? Before objecting you should see the final settlement papers, right? But a low number of objections and opt-outs isn't unusual. People seldom object, doing so is a complicated process that requires understanding complex technical and legal issues and investing significant time and effort. Most class members have no idea of the legal consequences of opting out and fear losing a valuable benefit. The Class notice helped bolster this fact by not stating in the notice sent to the class that the expert reports were not exchanged prior to the settlement figure being negotiated. Given the misrepresentation that the parties have engaged in, it is very likely that many more

people would have objected had they known of the fact above and/or had the knowledge and legal wherewithal to evaluate the settlement; as does this objector. Plaintiffs' Counsel did nothing to bring the hidden expert reports to the attention of the class in the notice, their own clients!

The Class Notice does direct class members seeking further information to the Settlement Administrator's website. Counsel filed their settlement papers on March 11, 2014 but the 500+ pages of that filing did not appear on the site until March 18, 2014, a bit late don't you think? Those three objectors never saw the filing documents. Anyone of the 916,000 class members ranging from individuals to hedge funds, to institutional investors, etc. who were looking at the site from March 11, 2014 to March 18, 2014 would assume that these are all relevant court documents were visible and they would be given no hint that objections have been filed, the fees sought and reasons sought for the settlement. Counsel and the Settlement Administrator has seen fit to stock the website only with only the proposed order and not any of the 500+ filing papers made on March 11, 2014 with the Court and reviewed by this objector like The Preliminary Approval Order, the Settlement Agreement, the Motion for Attorneys' Fees etc. More important any class member who was considering filing an objection might have decided not to file because there was nothing worth objecting to except what was included in the failed notice packet. Is it very likely that if these final papers had been filed on the website along with the objections, others might have objected as well (maybe even some institutions) and made even a better objection than this one.  Anyone considering objecting now has only have seven days to read the entire 500+ pages, compose an objection and send it next day air to all parties.

At the very least, the class was misled as to the consequences of counsels negotiating a settlement before the expert's reports were exchanged. This is grounds to require Plaintiffs'

Counsel to issue a new notice, post the missing filing papers for the class to see and disclose that the reports were being hidden in a black hole for no one to see. One can reasonably expect that this would result in a substantial increase in the number who choose to opt out or object. Better yet post the reports on the website for the class to see and comment on.

**The high on drugs attorney fee and expense issue**

The Examiner's $50,000,000.00 report collected five million documents that comprised forty million pages converted to electronic form which were stored in three separate databases for easy search and retrieval, all reviewed by attorneys. All the work has already been done for our counsel. Counsel claims to have "obtained and analyzed over twenty six million pages of documents". This objector asks, so how many of those twenty six million pages of documents counsel analyzed out of the forty million pages the Examiner collected, reviewed and analyzed did counsel re-review for a second time which is simply duplicating the Examiners work that got charged to the class? The class should not have to pay for duplicative work product. They all were computerized and tagged making search very easy for anyone to see but our counsel seems to have done it the hard and expensive way, page by page for the class.

If counsel reviewed and analyzed 26,000,000 pages as they claim at 1 minute each that is 150,000 hours of work billed to the class. This is a naked greedy money grab and a substantial portion of hours may not and were not needed by the class for this $99 million settlement. All they needed was the Report itself! Since all counsels combined are billing at an alleged reduced rate of $349 an hour, multiplied by 150,000 billable hours means counsel wants the class to pay them $52,350,000.00? Excuse me while I head to the rest room. ................They are all under the influence of illegal narcotics.. If they only spent 30 seconds on each document that is

$26,175,000.00 billed to the class.  Not believable, no way, no how, period end of story.  This work was done to pad the bill and no client paying this bill monthly would ever agree to pay for all this duplicate work even with a gun to his head.  Something is not right here, mathematically speaking. So the 50 depositions ate up $4,000,000.00? How many of those same 50 depositions did the Examiner perform, all of them? There is no substantial difference between the paper review and fifty depositions that each side performed so why should the class pay for duplicate work with the same results? It's all duplicate work product and the attorney fee and expenses should be reduced substantially as a result. Objector requests that a special master review the time sheets and records for overbilling and compare what work was duplicated by counsel that was already performed by the Examiner under 54(D)(2)(D). Incredible, these people have no shame and could care less about the class members and their losses come second.

As the Court noted in the D&O hearing if not for the Examiner's report Plaintiffs' Counsel might not have a case at all. All the evidence and the case itself was handed to anyone including Plaintiffs' Counsel on a silver platter by the Examiner to who ever wanted to see it. Their TAC is taken word for word right out of the report but counsel screwed up and did not include enough detail to get it all the claims past defendant's motion to dismiss. Counsel does not deserve 30% or $30,000,000.00 just 12% or $12,000,000.00. That is even a bonus for letting someone else do all the heavy lifting and unfairly taking credit for it themselves by duplicating the Examiner's work product for a report that cost $50,000,000.00! Can the Court see this clearly now?

**A class should not be certified when the primary beneficiaries are class counsel.**

Odds are that the number of claims will overwhelm the settlement fund and leave class members with no compensation, just like in the D&O settlement did. This objector did not receive a penny. Class counsel's papers preliminary approval brief mentions the risk of class certification

denial. Without informing class members that the experts reports were not swapped but intentionally withheld, the class would be better off if they each opted out and each brings a small claims case instead for the average maximum of $5,000.00 each, is a *per se* breach of fiduciary duty and demonstrates the need for class decertification under Rules 23(a)(4) and (g).The problem is the class does not know about the missing reports so they can't take action like opting out or objecting. This is exactly like what happened to Lehman's Audit Committee. They were never informed at the beginning from the beginning and could not object to the balance sheet manipulation, not act accordingly to save the firm and as a result stakeholders lost billions. See the irony in that?

## The Court Has A Fiduciary Duty to The Unrepresented Members OF The Class.

A district court must act as a "fiduciary for the class," "with a jealous regard" for the rights and interests of absent class members. In Mercury Interactive Corp., 618 F. 3rd 988, 994-95 (9th Cir. 2010) (quoting In re Washington Pub. Power Supply Systems Lit. 19 F. 3d 1291, 1302 (9th Cir 1994)). " Both the United States Supreme Court and the Court of Appeals have repeatedly emphasized the important duties and responsibilities that devolve upon a district court pursuant to Rule 23(e) prior to final adjudication and settlement of a class action suit." In re Relafen Antitrust Litigation, 360 F. Supp.2d 166, 192-94 (D.Mass. 2005), citing inter alia Amchem Prods., Inc v Windsor, 521 U.S. 591, 617, 623 (1997) (Rule 239e) protects unnamed class members from unjust or unfair settlements' agreed to by "fainthearted" or self-interested class "representatives"'): Reynolds v. Beneficial Nat't Bank, 288 F. 3d 277, 279-80 (7th Cir. 2002) (district judges /are/ to exercise the highest degree of vigilance in scrutinizing proposed settlements of class actions" prior to settlement).

"The court cannot accept a settlement that the proponents have not shown to be fair, reasonable and adequate." In re General Motors Corp. Pick-Up Truck Fuel Tank Prod. Liab. Litig., 55F. 3d 768, 785 (3d Cir. 1995) (quoting Grunin v International House of Pancakes, 513 f. 2d 114, 123 (8th Cir.1975)). A trial court has a continuing duty in a class action case to scrutinize the class attorney to see that he or she is adequately protecting the interests of the class."

The district court must ensure that the representative plaintiff fulfils his fiduciary toward the absent class members"). There should be no presumption in favor of settlement approval: the proponents of a settlement bear the burden of proving its fairness." True v American Honda co. 749 F. Supp. 2nd 1052, 1080 (C.D.Cal. 2010) ( citing 4 newberg on Class actions $ 11:42 (4th ed 2009)). Accord American Law Institute, Principles of the Law of Aggregate Litig. $3.05© (2010) (Ali Principles").

Concerns warrant special attention when the record suggests that settlement is driven by fees; that is, when counsel receive a disproportionate distribution of the settlement>" Hanlon v. Chrysler Corp., 150F. 3d 1011, 1021 (9th Cir. 1998); In Bluetooth Handset Prods. Liability Litig., 654 F. 3d 935, 947 (9th Cir. 2011

**A showing of explicit collusion is not required to demonstrate settlement unfairness.**

This objection also does not argue that the settlement is a product of explicit collusion. However, demonstrating that a settlement lacks collusion does not thereby demonstrate that the settlement passes muster. Lack of collusion is *necessary* for settlement approval, but it is not *sufficient.* Courts "must be particularly vigilant not only for explicit collusion, but also for more subtle signs that class counsel have allowed pursuit of their own self-interests and that of certain class members to infect the negotiations." *Bluetooth,* 654 F.3d at 947. An objector need not

demonstrate collusion to demonstrate an unfair settlement, for all it takes to make a settlement unfair is a defendant's indifference to class counsel's self-dealing. *Staton*, 327 F.3d at 964. *Bluetooth's* distinction between collusion and impermissible self-dealing is at the heart of this objection: when the Rule 23(h) attorney award is too large, this is evidence of self-dealing whether collusion is established or not.

**Public Policy Reasons Mean That the Court Should Not Infer Settlement Approval from a Low Number of Objectors**

Any given class settlement no matter how much it betrays and cheats the interests of the class and unjustly makes millionaires of class counsel in this case at the expense of the class, will produce only a small percentage of objectors. Sometimes just one good objection can speak clearly for all the unnamed class members who don't have the knowledge, skill, time, patience or know how to spot an unfair settlement and deconstruct it to show the court how flawed it really is under its face. This objection is written on behalf of all unnamed class members who can't put together an objection that can actually make a difference. The predominating response will always be apathy, because objectors- unless they can use pro bono counsel, or do it themselves- must expend significant resources on an endeavor that may not benefit themselves directly. Another common response from non-lawyers will be avoidance whenever possible of anything related to lawyers and courtrooms. Class counsel may argue that this understandable tendency to ignore notices or free ride on the work of other objectors is best understood as acquiescence in or evidence of support for the settlement. This is wrong. Silence is simply not consent. Grove v Principal Mut. Life Ins. Co., 200 F.R.D. 434, 447 (S.D. Iowa 2001) citing In re Gen Motors

Pick-Up Litig., 55 F. 3d at 789.). "Silence may be a function of ignorance about the settlement terms or may reflect an insufficient of time to object."

When class members have little at stake, the rate of response will be predictably low as in this settlement. As such, the response from class members cannot be seen as something akin to an election or public opinion poll. See In re Gen. Motors PickUp Litig,. 55 F. 3d at 813 (finding that "class reaction factor" does not weigh in favor of approval, even when low numbers of objectors in large class, when "those who did object did so quite vociferously") Thedore Eisenberg & Emperical Issues, 57 VAND .L. Rev. 1529, 1532 (2004).

**At the D&O hearing Lead Counsel stated "$99 million is a drop in the bucket for what we lost here" and "damages are in the many billions of dollars" so why take just $99 million?**

As Plaintiffs counsel stated above and was also quoted by this Court below in its Memo and Order approving the D&O settlement:

"Lead Plaintiffs state they potentially could recover a judgment of "many billions of dollars" from the directors and officers at trial." The same judgment recovery amount ("many billions of dollars") also applies against the defendant E&Y since they both engaged in and helped cover up the very same fraud, like conjoined twins, all the way through the bankruptcy itself. The difference with this enabler is we have even more evidence of liability from the Examiner against E&Y but we are not limited to a maxed out $90 million insurance policy, right?

This is slam dunk for the class against E&Y in establishing liability and damages right now that is far in excess of the pan handler $99 million being dangled offered today in front of the class based on the evidence available. More evidence below shows a Tyco size settlement or verdict

awaits the class. The class can and should also go after the 2000+ partner's personal wealth at the proper time. Like the Tyco settlement, E&Y can very easily take out a loan to pay for the multiple billion dollar settlement or verdict with the revenues they are generating. How about $99 million a year for ten years? Get creative counsels.

**The real recoverable damage amount from defendant exposed**

Document 551 page 20 bottom of page paragraph 70 states "Lead Counsel engaged a consultant to assist in estimating potentially recoverable damages for purchases of Lehman securities. This estimate before taking into account defenses to causation, proportionate fault or other defenses, amounts to billions of dollars in the aggregate. Not only does E&Y lack the ability to satisfy such an enormous judgment was obtained at trial and upheld through appeals, but E&Y vigorously challenged Plaintiffs' theory of damages, the "disaggregation" of amounts attributable to E&Y's review opinion and causation. E&Y also assigned a high degree of fault to others". That is an untrue statement as shown below made to make the defendant seem uncollectable just like the Lehman officers, all to get this settlement approved and their fee wired into their bank account.

Document 551 page 21 at the bottom paragraph 74 counsel writes:

"Moreover, even in the event Plaintiffs obtainment a judgment (Objector states or even a larger settlement amount) E&Y's ability to pay a hypothetical judgment for billions of dollars (after a trial and inevitable appeals) is improbable". That is false as shown below.

Press release

**EY reports 2013 global revenues of US$25.8 billion**

**London, 8 October 2013**

**Newsroom**

EY today announced combined global revenues of US$25.8 billion for its financial year ended 30 June 2013. This represents 7.7% growth over the previous financial year in local-currency terms, EY's fastest growth since 2008. Revenues grew 5.8% in US dollar terms. All EY's service lines and geographies continued to grow revenues and headcount despite uneven market conditions in many parts of the world.

- Fastest growth in five years of 7.7%
- Revenues improve across all service lines and geographies
- Emerging-market practices see combined revenue growth of 12%
- Headcount reaches all-time high of 175,000
- *In FY14 we are demonstrating our confidence in the future of the global economy and our profession by investing heavily in new markets and new services as well as planning to add 55,000 new recruits and interns over the next 12 months."*

http://www.ey.com/US/en/Newsroom/News-releases/EY-reports-2013-global-revenues-of-US-25-8-billion-dollars#.UyKvjoX8uoM

Should defendant have held off starting to hire 55,000 new employees and reimburse the class for damages it caused in the billions first? If defendant hires all 55,000 new employees at just $30,000.00 each (a very low average in that profession) that would cost defendant um, let's do the math. 55,000 employees x $30,000.00 a year equals $1,650,000,000.00 a year plus FICA match and benefits.  At $60,000 a year that is $3.2 billion a year plus FICA match and benefits which are all ongoing expenditures. Who is conning who here? Objector thinks

the settlement papers were written by counsel for the defense and Lead Counsel for the Plaintiffs' slapped it's name on it on behalf of both counsels'. Did they? Defendant is not serious about settling this case with a $99 million tip offer. It's tin cup change, pan handler change for them but not for counsel as it concerns their $30 million undeserved Fort Knox fee.

Based on it's revenues, E&Y can very easily pay a lump sum in the eight or nine figure range and/or take out a loan like Tyco did to pay for a low single, ten digit larger settlement or judgment. This Court knows how this objector feels about allowing the guilty to get off scot-free paying nothing or next to nothing for the damages they caused.

This objector left out the additional eight pages in that release but The Court and counsels should get the point, defendant can afford more. Who offers the most on the first offer if they really want to "put this behind us" as the defendant publically stated when the proposed settlement was announced? They will offer more based on the evidence and damages in this case the closer we get to trial. Objector requests that defendant admit to wrongful conduct in the settlement papers before settlement approval just like the SEC is now starting to require after all these decades, finally. An example of defendant pleading guilty and admitting fault is below in their recent $123 million criminal tax fraud settlement with the government recently is summarized below. It's all about the money in this case but not for the Lehman stakeholder victims.

When examined under the applicable criteria above, and continuing below, this proposed settlement is a Gold Medal winner for rejection.

**Defendant violated Commission's Rule of Practice 102(e) and PCAOB (Public Company Accounting Oversight Board)** *Section 105(c)(5)(A) of the Act, 15 U.S.C. § 7215(c)(5),*

The evidence above and continuing below shows numerous E&Y partners (there are only 2000ish out of 175,000 employees worldwide, not the rank and file employees) engaging in conduct similar to what they did at Lehman on a regular basis and these partners admitted guilt or were found guilty of improper professional conduct. The defendant's partner's were found in violation of the Commission's Rule of Practice 102(e) and PCAOB (Public Company Accounting Oversight Board) *Section 105(c)(5)(A) of the Act, 15 U.S.C. § 7215(c)(5), which* are sanctionable conduct violations  Examples of E&Y engaging in serial improper conduct actions follow further below:

This objector states that the named partners) in the Examiner's Report (and other more senior unnamed partners higher up the food chain) engaged in improper professional conduct as defined in the Securities and Exchange Commission's Rule of Practice 102(e) "in that their conduct constituted (A) intentional or knowing conduct, including reckless conduct, that resulted in a violation of the applicable professional standards, or in the alternative, (B) negligent conduct, consisting of a single instance of highly unreasonable conduct that resulted in a violation of applicable professional standards in circumstances in which the partners knew, or should have known, that heightened scrutiny was warranted." Objector states they and others are responsible for the damages to the class, period, $99 million is not reality.

*PACOB definition of sanctionable conduct:*

*Section 105(c)(5)(A) of the Act, 15 U.S.C. § 7215(c)(5), which provides that certain sanctions may be imposed in the event of (A) intentional or knowing conduct, including reckless conduct, that results in a violation of the applicable statutory, regulatory, or professional standard; or (B)*

*repeated instances of negligent conduct, each resulting in a violation of the applicable statutory,*

*regulatory, or professional standard.*

## Defendant's typical business practices

*Examples of defendant getting caught engaging in intentional and unethical bad faith fiduciary*

*conduct, breaches of duty, fraud and/or malpractice conduct.*

## Ernst & Young to Pay $123 Million to End Tax-Fraud Probe
By Bob Van Voris Mar 2, 2013 12:01 AM

Ernst & Young LLP will pay $123 million to resolve a U.S. tax-fraud probe as part of a non-prosecution agreement, according to a statement by the Manhattan U.S. Attorney's Office.

The accounting firm "admitted wrongful conduct" by its partners and employees in connection with four tax shelters from 1999 to 2004, according to yesterday's statement. About 200 Ernst & Young clients used the shelters to try to avoid more than $2 billion in taxes, prosecutors said.

In addition to the money and the admissions, Ernst & Young agreed to a series of permanent restrictions on its tax practice and will continue to cooperate with the government's tax-shelter investigation. The firm's cooperation began in 2003, according to the statement.

In exchange, prosecutors agreed not to charge the firm in connection with the case. The non-prosecution agreement doesn't cover individual Ernst & Young partners and employees, according to the statement.

"Ernst & Young is pleased to put this matter from a decade ago behind us," spokeswoman Amy Call Well said in an e-mailed statement. "As the settlement with the U.S. Attorney's office recognizes, these activities represent an isolated period in the firm's long history of providing ethical and professional tax services."

## Earlier Settlement

Ernst & Young settled an IRS examination in 2003, paying $15 million and agreeing to improve its internal quality monitoring system, according to the firm.