## Analysis of Motions

Starting last year, NERA has added a section on motions to this publication series.[9] Motion outcomes are of interest to many because they affect the likelihood with which a case will settle and the settlement amount. NERA research has confirmed that a statistically robust relationship exists between motion outcomes and settlement outcomes. Yet, we caution the reader that these relationships are complex (partly because of the strategic decisions litigants make about the litigation stage in which to settle) and that, to estimate the impact of the motion outcome on the predicted settlement of a specific case, one needs to go beyond the simple charts published in this paper and use a statistical model such as the proprietary NERA model.

NERA collects and analyzes data on three types of motions: motion to dismiss, motion for class certification, and motion for summary judgment. In this edition of this report, we show only the information pertaining to the first two types.

Unless otherwise specified, the statistics in this section refer to cases filed and resolved in the 2000-2013 period.

## Motion to Dismiss

A motion to dismiss was filed in 95% of cases. However, the court reached a decision on only 80% of the motions filed. In the remaining 20% of cases in which a motion to dismiss was filed by defendants, the case resolved before a decision was taken, or plaintiffs voluntarily dismissed the action, or the motion to dismiss itself was withdrawn by defendants. See Figure 18. (We have made a methodological change since the last edition of this report: we have now stopped including among the cases in which the decision was reached prior to case resolution those cases in which plaintiffs voluntarily dismiss the action and cases in which defendants voluntarily withdraw the motion to dismiss.)

Out of the motions to dismiss for which a court decision was reached, the following three outcomes account for the vast majority of the decisions: granted (48%),[10] granted in part and denied in part (25%), and denied (21%). See Figure 18.

Note that for settled cases, we record the status of any motions at the time of settlement. For example, if a case has a motion to dismiss granted but then denied on appeal, followed immediately by settlement, we would record the motion as denied.[11]

Figure 18. **Filing and Resolutions of Motions to Dismiss**
Cases Filed and Resolved January 2000 – December 2013



Note: Includes cases in which a violation of any of Rule 10b-5, Section 11, Section 12 is alleged and in which common stock is part of the class.

## Motion for Class Certification

Most cases were settled or dismissed before a motion for class certification was filed: 73% of cases fell into this category. The court reached a decision in only in 56% of the cases where a motion for class certification was filed. So, overall, only 15% of the securities class actions filed (or 56% of the 27% of cases for which a motion for class certification was filed) reached a decision on the motion for class certification. See Figure 19. (We have made a parallel methodological changed for our categorization of outcomes of motion for class certification as we have done for motion to dismiss: currently, we have stopped including cases in which the motion for class certification was voluntarily withdrawn by plaintiffs among the cases in which a decision was reached prior to case resolution.)

Our data show that 77% of the motions for class certification that were decided were granted. See Figure 19 for more details.

Both the 2011 Supreme Court decision in *Halliburton* and the February 2013 Supreme Court decision in *Amgen* are likely to have an impact on the statistics presented here. Please keep in mind that the vast majority of the court decisions at motion for class certification stage included in these statistics precede these two Supreme Court decisions. Moreover, the expected 2014 Supreme Court *Halliburton* decision also has the potential of changing the likely outcomes of future decisions on motion for class certification.

Figure 19. **Filing and Resolutions of Motions for Class Certification**
Cases Filed and Resolved January 2000 – December 2013



Note: Includes cases in which a violation of any of Rule 10b-5, Section 11, Section 12 is alleged and in which common stock is part of the class.

Approximately 66% of the decisions on motions for class certification that were reached were reached within three years from the original filing date of the complaint. See Figure 20. The median time is about 2.4 years.

Figure 20. **Time From First Complaint Filing to Class Certification Decision**
Cases Filed and Resolved January 2000 – December 2013



## Trends in Case Resolutions

### Number of Cases Settled or Dismissed

Only 100 securities class actions settled in 2013, a level very close to the record low of the previous year. In 2012, 94 settlements were reached, the lowest level since at least 1996, after the passage of the PSLRA.[12] In contrast, the average number of settlements in the period 1996-2011 was 127 per year. See Figure 21.

The number of securities class actions dismissed in 2013 appears to be relatively low compared to recent experience.[13] At least 79 securities class actions were dismissed.[14]

Consequently, resolved cases, which combine settlements, dismissals and verdicts appear to be relatively few compared to historical norm.

Last year, we wondered whether the pace of resolutions would pick up after the then-awaited Supreme Court decision in *Amgen*. But just about six months after *Amgen* was decided, a second writ of *certiorari* was filed in the *Halliburton* case, *certiorari* that was then granted in November 2013. So we now wonder whether the pace of resolution will pick up after the Supreme Court reaches its second decision on *Halliburton* sometime in 2014. We do note, though, that in the roughly six months between the *Amgen* decision and the filing of *Halliburton's* second writ, 51 securities class actions alleging violation of Rule 10b-5 settled, which is 14% less than the 59 settled during the average six-month period in the 2005-2012 period.[15]

Figure 21. **Number of Resolved Cases: Dismissed or Settled**
January 1996 – December 2013



Note: Analysis excludes IPO laddering cases. Dismissals may include dismissals without prejudice and dismissals under appeal.

In the filings section of this paper, we showed 10b-5 monthly filings surrounding the first Supreme Court decision in *Halliburton* and the *Amgen* decision. In this section, we show equivalent charts for the monthly number of settlements of 10b-5 class actions. See Figure 22. Again, we also show figures specific to the 5th and the 2nd Circuits. See Figures 23 and 24, respectively.[16] Again we caution that over the time period depicted here, there were factors additional to the Supreme Court decisions affecting the level of settlement activity.

Figure 22. **Monthly 10b-5 Settlements – All Circuits**
January 2007 – December 2013





Figure 23. **Monthly 10b-5 Settlements – Fifth Circuit**
January 2007 – December 2013



Figure 24. **Monthly 10b-5 Settlements – Second Circuit**
January 2007 – December 2013

## Dismissal Rates

Dismissal rates have been on a rising trend since 2000, but two opposing factors—the large fraction of cases awaiting resolution among those filed in recent years and the possibility that recent dismissals will be successfully appealed or re-filed—make it difficult to draw a conclusion with respect to recent years, barring further analysis.

Dismissal rates have increased from 32%-36% for cases filed in 2000-2002 to 43%-47% for cases filed in 2004-2006. Remembering the caveat above, dismissal rates appear to have continued to increase, given that 44%-51% of cases filed in 2007-2009 have been dismissed. For cases filed since 2010, it may be too early to tell.

Figure 25 shows the dismissal rate by filing cohort. It is calculated as the fraction of cases ultimately dismissed out of all cases filed in a given year.[17]

**Figure 25. Status of Cases as Percentage of Federal Filings by Filing Year**
January 2000 – December 2013



Note: Analysis excludes IPO laddering, merger objection cases and verdicts.
Dismissals may include dismissals without prejudice and dismissals under appeal.

## Time to Resolution

We use the expression "time to resolution" to indicate the time between filing of the first complaint and resolution (whether settlement or dismissal). After grouping cases by filing year, we show the time it takes for 50% of cases each year to resolve, i.e. the median time to resolution. We exclude IPO laddering cases and merger objection cases from our computations because the former took much longer to resolve and the latter usually much shorter.

Median time to resolution varied between 2.3 and 3.1 years in the period 1996-2010, but was remarkably stable in the sub-period 2005-2010, varying between 2.3 and 2.5 years.

Time to resolutions for 75% of the cases filed in any year between 1996 and 2009 has varied between 3.4 and 4.9 years

Figure 26. **Median Years from Filing of Complaint to Resolution of the Case**
Cases Filed January 1996 - December 2010 and Resolved January 1996 – December 2013



Note: Resolutions exclude IPO laddering and merger objection cases.
At present, more than 50% of cases are pending in the period 2011-2013; hence, the latest year for which median time to resolution can be computed is 2010.

## Trends in Settlements

### Settlement Amounts

The average settlement amount in 2013 broke prior records, reaching $55 million, an increase of 53% over the previous year and 31% over the previous high in 2009. See Figure 27. This average calculation excludes settlements above $1 billion, settlements in IPO laddering cases and settlements in merger objection cases, since the inclusion of any of these may obscure trends in more usual cases.

These record high average settlement amounts were driven by eight very large settlements (although not so large as to be excluded by our $1 billion cut off). Yet, this year's record average settlement does not imply that cases have generally become more expensive to settle. Reality is much more nuanced than that, as we will show when we discuss median settlement amount and the distribution of settlement values below in Figures 29 and 30.

Figure 27. **Average Settlement Value ($Million), Excluding Settlements over $1 Billion, IPO Laddering, and Merger Objection Cases**
January 1996 – December 2013



For completeness, Figure 28 shows average settlements if all cases are included. The 2013 average settlement across all federal securities class actions was $68 million. This average is even higher than the one discussed above because of the inclusion of the $2.4 billion mega settlement of Bank of America Merrill Lynch. That settlement was announced in 2012, but we followed our protocol of recording settlements as of the date of the approval hearing, which happened in 2013.

Figure 28. **Average Settlement Value ($Million), All Cases**
January 1996 – December 2013



Notes: Excludes merger objection settlements with no payment to class

The median settlement amount in 2013 was $9.1 million, a 26% decrease compared to the previous year. See Figure 29. Average and median settlements are two ways of looking at typical settlement values; the median settlement is the value that is larger than half of the settlement values in that year. Medians are more robust to extreme values than averages. As mentioned previously, this year's average and median reflect two different facets of settlement activity: a few large settlements drove the average up, while many small settlements drove the median down; hence the title for this paper "Large settlements get larger; small settlements get smaller."

The figure below also depicts an increasing trend in median settlement amounts between 1996 and 2013: from $3.7 million in 1996 to $9.1 million in 2013, a 146% increase. Naturally, part of this increase is due to inflation.

Figure 29. **Median Settlement Value ($Million)**
January 1996 – December 2013



Notes: Settlements exclude IPO laddering and merger objection cases.

The distribution of settlements depicted in Figure 30 below illustrates the different facets of the 2013 settlement activity alluded to above. Specifically, by grouping settlement amounts by size, we see an increase in the fraction of settlements smaller than $10 million, which represents 51% of settlements. We also see a slight increase in the fraction of settlements larger than $100 million, which represents 12% of the settlements.

Note that Figure 30 excludes settlements of IPO laddering cases, which would change the 2009 distribution altogether, as well as settlements in merger objection cases.

Figure 30. **Distribution of Settlement Values**
January 2009 – December 2013



Note: Settlements exclude IPO laddering and merger objection cases.

The 10 largest settlements of securities class actions of all time are shown in Table 1. The newest addition to the list is the $2.43 billion Bank of America settlement associated with the acquisition of Merrill Lynch. It was announced in 2012 and approved in 2013. It is the sixth-largest federal securities class action settlement ever.

Table 1.  **Top 10 Securities Class Action Settlements (As of December 31, 2013)**

| Ranking | Case Name | Settlement Years | Total Settlement Value ($MM) | Financial Institutions Value ($MM) | Accounting Firms Value ($MM) | Plaintiffs' Attorneys' Fees and Expenses Value ($MM) |
|---|---|---|---|---|---|---|
| 1 | ENRON Corp. | 2003-2010 | $7,242 | $6,903 | $73 | $798 |
| 2 | WorldCom, Inc. | 2004-2005 | $6,196 | $6,004 | $103 | $530 |
| 3 | Cendant Corp. | 2000 | $3,692 | $342 | $467 | $324 |
| 4 | Tyco International, Ltd. | 2007 | $3,200 | No codefendant | $225 | $493 |
| 5 | In re AOL Time Warner Inc. | 2006 | $2,650 | No codefendant | $100 | $151 |
| 6 | Bank of America Corp. | 2013 | $2,425 | No codefendant | No codefendant | $177 |
| 7 | Nortel Networks (I) | 2006 | $1,143 | No codefendant | $0 | $94 |
| 8 | Royal Ahold, NV | 2006 | $1,100 | $0 | $0 | $170 |
| 9 | Nortel Networks (II) | 2006 | $1,074 | No codefendant | $0 | $89 |
| 10 | McKesson HBOC, Inc. | 2006-2008 | $1,043 | $10 | $73 | $88 |
| | **Total** | | **$29,764** | **$13,259** | **$1,040** | **$2,913** |

## Aggregate Settlements

The total dollar value of all settlements in 2013 exceeded $6.5 billion, almost twice as much as the previous year. See Figure 31. More than $2.4 billion is represented by the BofA Merrill settlement that, as noted, we record according to our usual protocol as of the date of judicial approval.

Even excluding the BofA Merrill settlement, the aggregate settlement amount for 2013 was substantially higher than the previous year. It is worth noting again that the number of settlements in 2013 remained essentially the same.

Figure 31 also illustrates that much of the large fluctuations in aggregate settlements over the years has been driven by settlements over $1 billion, while relatively small settlements, those under $10 million, account for a very small fraction of aggregate settlements despite often accounting for about half of the number of settlements reached in a given year.

Figure 31. **Aggregate Settlement Value by Settlement Size**
January 1996 – December 2013



**Investor Losses versus Settlements**

As noted above, our investor losses measure is a proxy for the aggregate amount that investors lost from buying the defendant's stock rather than investing in the broader market during the alleged class period.

In general, settlement sizes grow as investor losses grow, but the relationship is not linear. Settlement size grows less than proportionately with investor losses, based on analysis of data from 1996 to 2013. Small cases typically settle for a higher fraction of investor losses (i.e., more cents on the dollar) than larger cases. For example, the median settlement for cases with investor losses of less than $20 million has been 17.1% of the investor losses, while the median settlement for cases with investor losses over $1 billion has been 0.7% of the investor losses. See Figure 32.

Our findings on the ratio of settlement to investor losses should not be interpreted as the share of damages recovered in settlement, but rather as the recovery compared to a rough measure of the "size" of the case.

Figure 32. **Median of Settlement Value as a Percentage of Investor Losses**
By Level of Investor Losses; January 1996 – December 2013



Median investor losses for settled cases have been on an upward trend since the passage of the PSLRA. As just described, the median ratio of settlement to investor losses decreases as investor losses increase. Indeed, the increase in median investor losses over time has translated to a decrease of the median ratio of settlement to investor losses.

Focusing specifically on the change from 2012 to 2013, median investor losses for settled cases decreased by 7.6% in 2013, meaning that, according to this measure of case "size," cases settled in 2013 were smaller than cases settled in 2012. The median ratio of settlements to investor losses increased between 2012 and 2013 to 2.1%. This change has the expected direction given the relationship just described between the two quantities. See Figure 33.

Figure 33. **Median Investor Losses and Median Ratio of Settlement to Investor Losses**
By Settlement Year; January 1996 – December 2013



Note: Settlements exclude IPO laddering and merger objection cases.

## Plaintiffs' Attorneys' Fees and Expenses

Usually, plaintiffs' attorneys' remuneration is awarded as a fraction of any settlement amount in the forms of fees, plus expenses. Figure 34 depicts plaintiffs' attorneys' fees and expenses as a proportion of settlement values.[18] The data shown in this Figure exclude settlements without cash payment to the class, almost all of which are merger objections.

In Figure 34, we illustrate two patterns: 1) Typically, fees grow with settlement size but less than proportionally, i.e., the percentage of fees shrinks as the settlement size grows  2) Broadly speaking, fees have been decreasing over time.

First, to illustrate that percentage fees typically shrink as settlement size grows, we subdivided settlements by settlement value and report median percentage fees and expenses for each value group. Focusing on 2011-2013, we see that for settlements below $5 million, median fees represented 30% of the settlement; these percentages fall with settlement size, reaching 9.6% in fees for settlements above $1 billion.

To illustrate that, broadly speaking, fees have been decreasing over time, we report our findings both for the period 1996-2013 and for the sub-period 2011-2013. The comparison shows that percentage fees have decreased over time for settlements up to $500 million. For settlements between $500 million and $1 billion, percentage fees have increased slightly, while for settlements above $1 billion they have increased more markedly, although there are only two settlements in this last category in the 2011-2013 period.

Figure 34. **Median of Plaintiffs' Lawyers' Fees and Expenses, by Size of Settlement**



Notes: Analysis excludes settlements with no cash payment to the class.   ■ Median Plaintiffs' Attorneys' Fees   ▓ Median Plaintiffs' Attorneys' Expenses

Aggregate plaintiffs' attorneys' fees and expenses for all federal settlements were $1.1 billion in 2013, almost twice as much as the previous year. This doubling was brought about by just four cases that settled for more than $500 million, including the BofA Merrill case.

Although settlements of less than $10 million represented the majority of settlements in 2013, the aggregate plaintiffs' attorneys' fees and expenses for these settlements were only 5% of the total. See Figure 35. This finding is parallel to the finding, described above, that such cases made up a small fraction of total settlements.

Figure 35. **Aggregate Plaintiffs' Attorneys' Fees and Expenses by Settlement Size**
January 1996 – December 2013



Note: Analysis excludes settlements with no cash payment to the class. If only fees or only expenses are known, they are included in the aggregate.

## Trials

Very few securities class actions reach the trial stage and even fewer reach a verdict. Indeed, there were no new trials in 2013, and Table 2 remains identical to the version included in the previous edition of this paper.

Of the 4,226 class actions filed since the PSLRA, only 20 have gone to trial and only 14 of them reached a verdict.

Table 2.  **Post-PSLRA Securities Class Actions That Went to Trial**
As of December 31, 2013

| Case Name (1) | Federal Circuit (2) | File Year (3) | Trial Start Year (4) | Verdict (5) | Date of Last Decision (6) | Outcome (7) |
|---|---|---|---|---|---|---|
| | | | | | Appeal and Post-Trial Proceedings | |
| **Verdict or Judgment Reached** | | | | | | |
| In re Health Management, Inc. Securities Litigation | 2 | 1996 | 1999 | Verdict in favor of defendants | 2000 | Settled during appeal |
| Koppel, et al v. 4987 Corporation, et al | 2 | 1996 | 2000 | Verdict in favor of defendants | 2002 | Judgment of the District Court in favor of defendants was affirmed on appeal |
| In re JDS Uniphase Corporation Securities Litigation | 9 | 2002 | 2007 | Verdict in favor of defendants | | |
| Joseph J Milkowski v. Thane Intl Inc, et al | 9 | 2003 | 2005 | Verdict in favor of defendants | 2010 | Judgment of the District Court in favor of defendants was affirmed on appeal |
| In re American Mutual Funds Fee Litigation | 9 | 2004 | 2009 | Judgment in favor of defendants | 2011 | Judgment of the District Court in favor of defendants was affirmed on appeal |
| Claghorn, et al v. EDSACO, Ltd., et al | 9 | 1998 | 2002 | Verdict in favor of plaintiffs | 2002 | Settled after verdict |
| In re Real Estate Associates Limited Partnership Litigation | 9 | 1998 | 2002 | Verdict in favor of plaintiffs | 2003 | Settled during appeal |
| In re Homestore.com, Inc. Securities Litigation | 9 | 2001 | 2011 | Verdict in favor of plaintiffs | | |
| In re Apollo Group, Inc. Securities Litigation | 9 | 2004 | 2007 | Verdict in favor of plaintiffs | 2012 | Judgment of the District Court in favor of defendants was overturned and jury verdict reinstated on appeal; case settled thereafter |
| In re BankAtlantic Bancorp, Inc. Securities Litigation | 11 | 2007 | 2010 | Verdict in favor of plaintiffs | 2012 | Judgment of the District Court in favor of defendants was affirmed on appeal |
| In re Clarent Corporation Securities Litigation | 9 | 2001 | 2005 | Mixed verdict | | |
| In re Vivendi Universal, S.A. Securities Litigation | 2 | 2002 | 2009 | Mixed verdict | | |
| Jaffe v. Household Intl Inc, et al | 7 | 2002 | 2009 | Mixed verdict | | |
| In re Esquisure, Inc. Sec, et al v., et al | 8 | 1997 | 1998 | Default judgment | | |
| **Settled with at Least Some Defendants before Verdict** | | | | | | |
| Goldberg, et al v. First Union National, et al | 11 | 2000 | 2003 | Settled before verdict | | |
| In re AT&T Corporation Securities Litigation | 3 | 2000 | 2004 | Settled before verdict | | |
| In re Safety Kleen, et al v. Bondholders Litigati, et al | 4 | 2000 | 2005 | Partially settled before verdict, default judgment | | |
| White v. Heartland High-Yield, et al | 7 | 2000 | 2005 | Settled before verdict | | |
| In re Globalstar Securities Litigation | 2 | 2001 | 2005 | Settled before verdict | | |
| In re WorldCom, Inc. Securities Litigation | 2 | 2002 | 2005 | Settled before verdict | | |

Note: Data are from case dockets.

## Notes

[1]  This edition of NERA's research on recent trends in securities class action litigation expands on previous work by our colleagues Lucy Allen, the late Frederick C. Dunbar, Vinita M. Juneja, Sukaina Klein, Denise Neumann Martin, Jordan Milev, John Montgomery, Robert Patton, Stephanie Plancich, David I. Tabak, and others. We gratefully acknowledge their contribution to previous editions as well as the current one. The authors also thank David Tabak for helpful comments on this version. In addition, we thank current and past researchers in NERA's Securities and Finance Practice for their valuable assistance with this paper. These individuals receive credit for improving this paper; all errors and omissions are ours. Data for this report are collected from multiple sources, including RiskMetrics Group/Securities Class Action Services (SCAS), complaints, case dockets, Dow Jones Factiva, Bloomberg Finance L.P., FactSet Research Systems, Inc., SEC filings, and the public press.

[2]  NERA tracks class actions filed in federal courts that involve securities. Most of these cases allege violations of federal securities laws, others allege violation of common law, including breach of fiduciary duty as with some merger objection cases; still others are filed in US Federal court under foreign or state law. If multiple such actions are filed against the same defendant, are related to the same allegations, and are in the same circuit, we treat them as a single filing. However, multiple actions filed in different circuits are treated as separate filings. If cases filed in different circuits are consolidated, we revise our count to reflect that consolidation. Therefore, our count for a particular year may change over time. Different assumptions for consolidating filings would likely lead to counts that are directionally similar but may, in certain circumstances, lead observers to draw a different conclusion about short-term trends in filings.

[3]  We have classified cases as credit crisis-related based on the allegations in the complaint. The category includes cases with allegations related to subprime mortgages, mortgage-backed securities, and auction rate securities, as well as some other cases alleged to involve the credit crisis. Our categorization is intended to provide a useful picture of trends in litigation but is not based on detailed analysis of any particular case.

[4]  Note that Figures 5, 6, and 7 are not comparable to the figure of filings by circuit, because these refer only to 10b-5 class actions, while the figure of filings by circuit refers to all securities class actions.

[5]  For all countries other than China, we use the country of domicile for the issuing company. Many of the defendant Chinese companies, however, obtained their US listing through a reverse merger and, consequently, report a US domicile. For this reason, the Chinese counts also include companies with their principal executive offices in China.

[6]  Note that in Figure 13 the percentages of federal cases in which financial institutions are named as defendants are computed on the basis of the first available complaint.

[7]  In Figure 14, we follow the protocol started in the edition of Trends for 2012 and consider only the first available complaints in analyzing accounting codefendants. Based on past experience, accounting codefendants were added relatively often to cases in subsequent complaints.

[8]  Most complaints include a wide variety of allegations. Due to multiple types of allegations in complaints, the percentages in Figure 15 could sum to more than 100%.

[9]  Cases for which investor losses are not calculated are excluded from the statistics shown in this paper. The largest excluded groups are IPO laddering cases and merger objection cases.

[10]  These are cases in which the language of the docket or decision referred to the motion being granted in its entirety or simply "granted," but not cases in which the motion was explicitly granted without prejudice.

[11]  Moreover, it is possible that there are some cases that we have categorized as resolved that are, or will in future, be subject to appeal.

[12]  Unless otherwise noted, tentative settlements (those yet to receive court approval) and partial settlements (those covering some but not all non-dismissed defendants) are not included in our settlement statistics. We define "Settlement Year" as the year of the first court hearing related to the fairness of the entire settlement or the last partial settlement.

[13]  Here the word "dismissed" is used as shorthand for all cases resolved without settlement: it includes cases where a motion to dismiss was granted (and not appealed or appealed unsuccessfully), voluntary dismissals, cases terminated by a successful motion for summary judgment, or an unsuccessful motion for class certification. The majority of these cases are those where a motion to dismiss was granted.

[14]  It is possible that not all our sources have updated the dismissal status yet. Thus, more cases may have been dismissed in 2013 than we include in our counts at present.

[15]  To compute the number of settlements between the Amgen decision and the filing of Halliburton's second writ we have used the period March-August. For the average number in the period 2005-2012 we have subdivided each year in two periods January-June and July-December.

[16]  Note that Figures 22, 23, and 24 refer to 10b-5 settlements, while the other figures refer to securities class actions (with the limitations explained in the footnotes of each figure).

[17]  See footnote 13 for the definition of "dismissed." The dismissal rates shown here do not include resolutions for IPO laddering cases, merger objection cases, or cases with trial verdicts. When a dismissal is reversed, we update our counts.

[18]  The settlement values that we report include plaintiffs' attorneys' fees and expenses in addition to the amounts ultimately paid to the class.

## About NERA

NERA Economic Consulting (**www.nera.com**) is a global firm of experts dedicated to applying economic, finance, and quantitative principles to complex business and legal challenges. For over half a century, NERA's economists have been creating strategies, studies, reports, expert testimony, and policy recommendations for government authorities and the world's leading law firms and corporations. We bring academic rigor, objectivity, and real world industry experience to bear on issues arising from competition, regulation, public policy, strategy, finance, and litigation.

NERA's clients value our ability to apply and communicate state-of-the-art approaches clearly and convincingly, our commitment to deliver unbiased findings, and our reputation for quality and independence. Our clients rely on the integrity and skills of our unparalleled team of economists and other experts backed by the resources and reliability of one of the world's largest economic consultancies. With its main office in New York City, NERA serves clients from more than 25 offices across North America, Europe, and Asia Pacific.

## Contacts
For further information, please contact:

**Dr. Renzo Comolli**
Senior Consultant
+1 212 345 6025
renzo.comolli@nera.com

**Svetlana Starykh**
Senior Consultant
+1 212 345 8931
svetlana.starykh@nera.com

The opinions expressed herein do not necessarily represent the views of NERA Economic Consulting or any other NERA consultant.

# NERA
ECONOMIC CONSULTING



Visit **www.nera.com** to learn
more about our practice areas
and global offices.

© Copyright 2014
National Economic Research
Associates, Inc

All rights reserved.
Printed in the USA.

This packaging is the property of the U.S. Postal Service® and is provided solely for use in sending Priority Mail® shipments. Misuse may be a violation of federal law. This packaging is not for resale. EP14F © U.S. Postal Service; July 2013; All rights reserved.

**UNITED STATES POSTAL SERVICE** 

$8.50
0001 6492-10

1006      10007

## PRIORITY MAIL®
UNITED STATES POSTAL SERVICE
**For Domestic and International Use**

From: CHRIS DAMMERS
P.O. BOX 530-6036
VENTURA, CA 93053-6036    1-805-635-2810

TO
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
CLERK OF THE COURT
500 PEARL STREET
NEW YORK, NEW YORK 10007

Label 228, January 2008

VISIT US AT USPS.COM®
ORDER FREE SUPPLIES ONLINE

FROM:

MAR 2 4 2014

PRO SE OFFICE

EP14F July 2013
OD: 12.5 x 9.5

## PRIORITY
★ MA
United States Postal Service®
**SIGNATURE CONFIRMATION**™

DATE OF [
USPS TRA[
INSURANC[
PICKUP A[
* Domestic o

2305 0270 0000 9100 6884

WHEN USED INTERNATIONALLY,
A CUSTOMS DECLARATION
LABEL MAY BE REQUIRED.



P S00001000014

♻ This envelope is made from post-consumer waste. Please recycle - again.

