E4G7LEHC

1  UNITED STATES DISTRICT COURT
   SOUTHERN DISTRICT OF NEW YORK
2  ------------------------------x

3  IN RE LEHMAN BROTHERS                    09 MD 2017 (LAK)

4  ------------------------------x

5                                           April 16, 2014
                                            10:15 a.m.
6
   Before:
7
                      HON. LEWIS A. KAPLAN
8
                                            District Judge
9
                          APPEARANCES
10
   BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP
11      Attorneys for Plaintiffs
   BY:  MAX BERGER
12      DAVID STICKNEY

13 KESSLER TOPAZ MELTZER & CHECK LLP
        Attorneys for Plaintiffs
14 BY:  DAVID KESSLER

15 LATHAM & WATKINS LLP
        Attorneys for Defendant Ernst & Young LLP
16 BY:  MILES RUTHBERG
        KEVIN MCDONOUGH
17
   ALSO PRESENT:   JOSEPH WHITE, ESQ.
18                 CHRIS ANDREWS, Objector

19

20

21

22

23

24

25

                  SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

E4G7LEHC

1          (Case called)

2          (In open court)

3          THE COURT:  Good morning, folks.  I've read the

4   papers.  I will be happy to hear you briefly, Mr. Berger, or

5   whoever is going to speak.  Mr. Stickney?

6          MR. BERGER:  Thank you, your Honor.  Good morning.

7          THE COURT:  Good morning.

8          MR. BERGER:  Good morning, your Honor.  Max Berger

9   from Bernstein Litowitz Berger & Grossmann, colead counsel for

10  the class.  With me this morning is my partner David Stickney

11  and the colead counsel David Kessler from the Kessler Topaz

12  Meltzer & Check firm.

13          First, I want to thank the court for adjusting the

14  schedule for the hearing with the Passover holiday.  It's much

15  appreciated.  We had someone from my firm by the courtroom

16  yesterday at the time originally scheduled for the hearing just

17  in case a class member showed up for the hearing, and only one

18  did.  Laura Campell, and I believe she is in the courtroom.

19  Did I pronounce that correctly?  She is in the courtroom today.

20  She indicated that she had a problem with a claim that she

21  filed, and we assured Ms. Campell that we would try to work

22  with her to resolve any issue she has with respect to her

23  claim.  And of course if they can't be resolved, we would

24  provide her with an appropriate amount of time, subject to your

25  Honor, to apply to the court.

1         Other than Mr. Andrews, who is the objector who is in

2    the courtroom today, no objectors or class members wishing to

3    be heard are in the courtroom today.

4         After over five years of hard fought litigation, and

5    almost two years to the day that I stood before your Honor

6    presenting the underwriter and D&O settlements, I am delighted

7    to present for final approval the proposed settlement of our

8    claim against Ernst & Young, the sole remaining defendant in

9    the equity/debt action.  The settlement is $99 million.  If

10   approved, this settlement will bring the total settlements to

11   $615,218,000, not including the structured note settlement of

12   $120 million.  The settlement funds have already been

13   deposited.

14        We are very proud of the results achieved here, and we

15   hope the court agrees that this settlement is an excellent

16   result for the class.  The court certified the settlement class

17   and approved the notice program leading up to the settlement on

18   December 3.  Since then, over 930,000 notices have been mailed

19   to class members.  Summary notice has also been published in

20   the Wall Street Journal and Investor's Business Daily, as well

21   as on two websites established by lead counsel.

22        Moreover, the proposed settlement has received

23   widespread publicity in the media.

24        Class members comprising the majority of this class

25   are some of the largest and most sophisticated institutional

E4G7LEHC

 1    investors in the world.  Many routinely object to settlements

 2    and fee requests.  We are very pleased to report that not one

 3    institutional investor has objected to the settlement, the plan

 4    of allocation, or the fee request.  In fact, three investors

 5    that filed individual actions have now chosen to opt back into

 6    the class.

 7            It's also virtually unprecedented that only two

 8    individuals have filed objections.  Of those two, only one,

 9    Mr. Andrews, whose losses total $600, have even provided any

10    evidence that he is a class member.  Mr. Gao has not.  Both

11    also objected to the prior settlements.

12            The objections have been addressed in our papers.  We

13    believe they are wholly without merit.  Mr. Andrews, who

14    submitted an 83-page objection, has largely recycled his

15    objections to the D&O settlement.  Suffice it to say, that

16    despite his characterization of this case as a "slam dunk," "a

17    piece of cake" and "a walk in the park," it was anything but.

18            THE COURT:  I think I dismissed almost all of it,

19    right?

20            MR. BERGER:  I'm sorry.

21            THE COURT:  I think I had dismissed almost all of it,

22    right?

23            MR. BERGER:  Yes, your Honor.  We respectfully submit

24    that the paucity of objections is because this is an

25    outstanding settlement which was achieved only after the

E4G7LEHC

1    conclusion of fact discovery and retention of experts, and also

2    the plan of allocation and fee request fit well within the

3    established guidelines for approval in this Circuit.

4           It bears noting that the reaction of the class has

5    been described by the Second Circuit in the Walmart v. Visa

6    case as the most significant Grinnell factor for the court to

7    consider in considering approval.  So, our papers -- your Honor

8    has read the papers -- our papers in support of a settlement

9    and plan of allocation are quite detailed, so if it please your

10   Honor, I would just like to briefly summarize them.

11          This settlement with Ernst & Young is one of the

12   largest securities class action settlements by an audit firm

13   ever achieved without a financial restatement or parallel SEC

14   or criminal proceeding.  For that matter, the Department of

15   Justice and SEC specifically declined to bring any charges

16   against E&Y.

17          According to the New York Times account, they

18   concluded that "Repo 105" -- which was at the heart of our

19   claim -- "had nothing to do with Lehman's failure or was

20   technically allowed under an obscure accounting rule."

21          In general, this case against E&Y was fraught with

22   risk, particularly after Lehman filed for the largest

23   bankruptcy in history three months after the case began and

24   Lehman was no longer a viable defendant.

25          Following the court's decision on E&Y's motion to

1   dismiss, our case was reduced to our having to prove fraud in

2   connection with one statement by E&Y arising from a single

3   quarterly review for the second quarter of 2008 and not a

4   year-end audit report.  The claims centered around Lehman's use

5   of Repo 105 to artificially deflate Lehman's reported net

6   leverage ratio to create the appearance of a strong balance

7   sheet.

8           It was extraordinarily difficult to establish fraud

9   against D&Y.  The examiner's report, while very helpful, did

10  not contain evidence of fraud by E&Y.  E&Y denied there was

11  even a misstatement, let alone one that was material.

12          E&Y also contended that if there was a 10b violation,

13  a hundred percent of the fault resided with others, like the

14  officers and directors and Lehman itself under the

15  Proportionate Fault Doctrine.

16          E&Y also argued the class' losses of billions of

17  dollars were directly attributed to the financial tsunami in

18  2008 and not wrongdoing at Lehman.  In other words, the losses

19  had nothing whatsoever to do with Lehman's use of Repo 105.

20  That was a very real and threatening argument, because our

21  allegations against E&Y are based on Lehman's use of Repo 105.

22  However, the disclosure of Repo 105 at Lehman was not revealed

23  until 18 months after Lehman's bankruptcy.  So, according to

24  E&Y, that revelation could not have been responsible for the

25  losses incurred by class members.

E4G7LEHC

1          We had to depend on the doctrine of "materialization

2     of the concealed risk" to satisfy loss causation, which was

3     exceedingly difficult to prove in light of the overall

4     financial meltdown which engulfed the country at that time.

5          Between this argument and proportional fault, damages

6     were very problematic.  Moreover, E&Y damages would have to be

7     disaggregated from other causes.

8          Also, plaintiffs believed that any appeal of the

9     dismissed claims was likely to fail.

10          Obviously, the law during the period of pendency of

11    this case was evolving rapidly.  For example, the Supreme Court

12    took the Halliburton petition challenging "fraud-on-the-market"

13    presumption -- which would have effectively ended our case if

14    they abandoned that presumption -- they took that up one month

15    after the settlement, and I'm sure we would not be here now

16    with this settlement if the Supreme Court took the Halliburton

17    case before our settlement was reached.

18          So, just to very briefly summarize, your Honor,

19    regarding the stage of the proceedings in which this settlement

20    was reached, the counsel conducted an extensive investigation,

21    we first preserved our claims with a tolling agreement, then

22    filed the first complaint against E&Y.  We barely survived the

23    motion to dismiss after the court limited plaintiffs' claims.

24    We successfully moved for class cert.  We reviewed 26 million

25    pages of documents, took 50 depositions on three continents.

E4G7LEHC

1    We moved for discovery in the UK under the Hague Convention.

2    We consulted with and retained multiple experts, and

3    coordinated discovery with all related state and federal

4    litigation.

5            The settlement was reached only after the conclusion

6    of fact discovery and immediately before expert reports were

7    due to be exchanged.

8            The negotiations leading up to the settlement were

9    very protracted, spanning over two years and quite difficult.

10   E&Y would not settle unless all claims including the dismissed

11   claims were covered.  The discussions involved both formal

12   mediations and direct talks between the general counsel of E&Y

13   and their lawyers and plaintiffs' lead counsel.  Lead counsel

14   had the opportunity to settle for significantly less throughout

15   the discovery period, thus minimizing our risk, but we refused,

16   even though we knew that our lodestar would far exceed any

17   settlement with E&Y.

18           Discussions were overseen by a very highly regarded

19   mediator, Judge Phillips, and the settlement amount was

20   endorsed by him.

21           The settlement class here is substantially the

22   settlement class previously approved by the court in the D&O

23   settlement.

24           In light of the above, lead counsel believe that we

25   have obtained the best recovery reasonably possible for the

1    class while taking enormous risks that the recovery would

2    amount to little or nothing at all.

3            If the court has questions, that ends my presentation

4    on the proposed settlement, and for the reasons I articulated

5    and those set forth in greater detail in our papers, we

6    respectfully urge the court to approve the proposed settlement.

7            THE COURT:  Are you going to address the attorneys fee

8    issue?

9            MR. BERGER:  Yes, your Honor.

10           THE COURT:  Do that.

11           MR. BERGER:  OK.  Should I address the plan of

12   allocation, or are you satisfied with that, your Honor?

13           THE COURT:  I haven't heard any reason not to be so

14   far.  I have a specific question about -- well, why don't I

15   hear you first on attorney fees, because you may answer my

16   questions.

17           MR. BERGER:  OK.  So, we respectfully ask the court it

18   to approve the attorney fees in the amount of $29.7 million and

19   reimbursement of expenses in the amount of $4,279,706.87.

20           Again, our papers in support of the fee request are

21   quite detailed.  In light of this, I would just like to briefly

22   summarize my arguments.  I will also explain why we believe

23   this extraordinary settlement -- which together with the prior

24   settlements, as I said, total over $615 million -- was achieved

25   by prosecuting this case efficiently and with a minimum of

E4G7LEHC

1    duplication.

2           Significantly, and as stated, the class is comprised

3    primarily of institutional investors, many of which lost their

4    entire investments in Lehman when they filed for bankruptcy.

5    They have every reason to be angry, yet not one institutional

6    investor has chosen to object to plaintiffs' fee or expense

7    request.  And, as I said before, this is virtually

8    unprecedented.

9           Further, only two individuals have generally objected

10   to the fee request, and as I said, one of them is not even

11   establishing membership in the class.

12          I respectfully submit the fee requested is well

13   within -- in fact, well below -- the fee guidelines set by the

14   courts in this District and Circuit.

15          Viewing the fee request on a lodestar multiplier

16   basis -- which we know is favored by your Honor -- yields a

17   negative multiplier err of .63 of plaintiff's counsel's time

18   based on a lodestar of over $47 million.

19          I emphasize that none of this time was included in any

20   prior fee request.

21          If the court awards the fee requested, and it is

22   combined with the prior fee awards made by your Honor,

23   plaintiffs counsel would be receiving a total fee approximately

24   equal to their lodestar, in other words, no multiplier

25   whatsoever despite almost six years of high risk contingent

E4G7LEHC

 1    litigation.

 2              As recognized by the Second Circuit in Walmart v.

 3    Visa, multipliers of 3 to 4.5 are common in this Circuit.

 4              Also, to quote your Honor, for those keeping score,

 5    the fee would represent an overall fee award when combined with

 6    the others of 14 percent of the aggregate recovery for the

 7    classes.

 8              The Goldberger criteria have been discussed:  The

 9    magnitude and complexity of the action; the risks to

10    plaintiffs' counsel.  In sum, as I say, loss causation and

11    damages were hotly contested.  As I have stated previously,

12    both the SEC and Justice Department specifically declined to

13    sue E&Y.  Proportionate fault was a significant issue.  Lehman

14    filed for the largest bankruptcy in history.  Prior to our

15    filing our case against E&Y, the legal landscape was changing

16    dramatically, and faith, for example, in the Second Circuit,

17    and obviously I mentioned Halliburton before.

18              The Lehman examiner's report, while very helpful to

19    us, only found that there may be evidence to support the Lehman

20    estate's claim against E&Y for negligence, not fraud, as we

21    were required to prove, and proof of fraud was very

22    problematic.  And of course E&Y challenged the accuracy of that

23    report throughout.

24              Despite these risks, lead counsel achieved a record

25    result for the class while seeking to recover only 60 percent

E4G7LEHC

1   of the time they spent in prosecuting this complex action.

2              THE COURT:  Just to anticipate what I expect to hear

3   from Mr. Andrews, why didn't you sue them for negligence?

4              MR. BERGER:  Well, we couldn't, your Honor.

5              THE COURT:  Because?

6              MR. BERGER:  I'm sorry?

7              THE COURT:  Because?

8              MR. BERGER:  The only claim we had against E&Y, your

9   Honor, was for securities fraud on behalf of the investors.

10             THE COURT:  My question is:  Why didn't you sue them

11  for negligence also?

12             MR. BERGER:  It's not a claim that we could legally

13  assert against --

14             THE COURT:  Because?

15             MR. BERGER:  Because we couldn't really sort of get a

16  -- we couldn't represent investors suing for negligence, and

17  it's not a cognizable claim.

18             THE COURT:  Because of *ultra mares*?

19             MR. BERGER:  Yes.

20             Your Honor, also SLUSA would have prevented that claim

21  for us.  On behalf of investors suing a class, we're basically

22  limited to suing for fraud.

23             THE COURT:  Thank you.

24             MR. BERGER:  OK.  So, your Honor, I mentioned the

25  things that we had done in terms of the work that was done in

1    the case.  The work that we did is set forth in paragraphs 18

2    through 60 of the joint declaration, but this was a very, very

3    difficult claim for us to prove.

4            As I said, throughout the three and a half years that

5    we were prosecuting this claim we certainly could have folded

6    our tent and settled for significantly less.  We believed in

7    the claim.  We worked very hard to prosecute it, and that

8    required us to examine, as I say, 26 million documents, and

9    take over 50 depositions on three continents.

10           We also spent approximately 117,000 hours doing over a

11   three and a half year prosecution of the litigation.  None of

12   this time was included in any prior application by any

13   plaintiffs' counsel seeking a fee here.

14           We are well aware of the court's predisposition to

15   avoiding duplicative hours, as well as prosecuting the case

16   efficiently, and of course that's our goal in every case.

17           From the outset in pretrial order number one, your

18   Honor established an executive committee of plaintiff's counsel

19   and was charged with certain responsibilities.  I serve as

20   chair.  And in that capacity we allocated work to plaintiffs'

21   counsel.

22           In connection with the fee applications here, there

23   were a number of firms that were assigned work.  We referred

24   all counsel to the pretrial order number one, which provided

25   that no time would be compensable unless it was performed at

E4G7LEHC

1   the direction of the executive committee.  And we believe that

2   the time was accurately reported.

3          No time was included in connection with --

4          THE COURT:  I have a specific question about at least

5   one of these firms.

6          MR. BERGER:  OK.

7          THE COURT:  Where is Saxena White located?

8          MR. BERGER:  Saxena White is located in Florida.

9   Actually, Mr. White is in court this morning.

10          THE COURT:  And the reason that the fee application on

11   behalf of that firm is for a 23 month period only is what, as

12   distinguished from the inception of the case?

13          MR. BERGER:  Your Honor, the class representative came

14   in at that point.

15          MR. WHITE:  Yes, your Honor.  We provided one of the

16   lead plaintiffs, your Honor, but our direct representation in

17   this action was related to Oklahoma Fire's participation as the

18   sole class representative.

19          MR. BERGER:  And when your Honor decided your motion

20   to dismiss and narrowed the class, Mr. White's client came in

21   to represent that limited class that remained in the

22   litigation.

23          THE COURT:  And I note that Mr. White's declaration

24   says the hourly rates in computing the lodestar for that firm

25   were the same as those accepted in other securities or

E4G7LEHC

1   shareholder litigation.  He doesn't say they are the rates his

2   firm usually charges.  I take it they're not, is that accurate?

3           MR. BERGER:  Sorry?

4           THE COURT:  I take it they're not their regular rates,

5   right?

6           MR. WHITE:  Your Honor, I am happy to respond.  They

7   are our regular rates, and those are rates that we have

8   submitted in these District on numerous occasions.

9           THE COURT:  So, if I wanted to come to your firm --

10  what town in Florida are you from?

11          MR. WHITE:  Boca Raton.

12          THE COURT:  Boca Raton.  And if I wanted to come to

13  your firm and hire you to contest a will, that's what you'd

14  charge me, those rates?

15          MR. WHITE:  My firm doesn't contest wills, your Honor.

16  Our practice is limited solely to securities litigation both on

17  the derivative side and the class side.

18          THE COURT:  Why is it you submitted an affidavit

19  saying this is what other people charge, not this is what we

20  regularly charge?

21          MR. WHITE:  I'm not sure of the distinction, your

22  Honor.  I think what we were trying to --

23          THE COURT:  I know the distinction.  I have an idea

24  what my old firm charges, and I also know what the guys who

25  have the law office down the street from my country house

E4G7LEHC

1      charges; they're different.

2              MR. WHITE:  Yes.  The rates that we have submitted in

3      this district previously in front of Judge Castel and other

4      judges are consistent with the rates and actually much less

5      than the rates of defense counsel that we have opposing us.

6              THE COURT:  Mr. White, that's not what I'm asking you,

7      and if I don't get a straight answer you are going to take the

8      witness stand here.

9              The question is:  Are the rates that were used in

10     computing your lodestar the rates that you customarily charge

11     paying clients in noncontingency work?

12              MR. WHITE:  Yes, your Honor.

13              THE COURT:  OK.

14              MR. BERGER:  Your Honor, may I add to that, if you

15     don't mind, just very briefly?  I think most, if not all, of

16     the firms reference rates customarily charged in the

17     affidavits, the reason being that the vast majority of the

18     practices that the law firms engage in who do this work on

19     primarily a contingency basis.  So, at least for most of the

20     firms -- I know we do con charge work, for example, your Honor,

21     and our rates are what we say they are, however, the percentage

22     of hourly work that we do is so limited that it's not really a

23     fair reflection.

24              THE COURT:  Well, I understand that, and this is one

25     of my problems with these fee applications generally, and that

E4G7LEHC

1    is that the lodestar is truly an imaginary figure in an

2    important sense, not entirely.

3            MR. BERGER:  I mean I appreciate that, your Honor.  I

4    think it really is -- and we tried to sort of be accurate in

5    our affidavits.  What we measure it against -- in all honesty,

6    what we measure it against is every year our firm takes a look,

7    for example, at what is an appropriate hourly rate.  Those are

8    our hourly rates.  That is where if someone comes to us and

9    says to us we want to retain you on an hourly basis, what do

10   you charge.  And it's based upon we look at a whole landscape

11   of what firms in our geographical area are charging, what

12   defense firms that are defending our cases are charging, and so

13   on and so forth, and invariably we find that our fees are

14   somewhat lower than the defense fees of the lawyers defending

15   our cases.

16           THE COURT:  No, I'm familiar with that.  And of course

17   I've had a lot of experience with your firm and some of the

18   other firms here, but that was only the first thing that struck

19   me about Saxena White.

20           The second thing that struck me about it is that with

21   the exception of a few people at your firm and Kessler Topaz --

22   who as far as I saw did most of the work in all of this --

23   there are only four lawyers in the hordes of them for which

24   this overall application was made who billed 1,000 hours or

25   more, and they are all from Saxena White, and they managed to

E4G7LEHC

1    do it not in six years of litigation but in 23 months, and one

2    of them averaged 224 hours per month for the whole 23 month

3    period, in other words, claims to have been working 60 hours a

4    week roughly year round for 23 months.  Another one averaged

5    191 hours a month, another one 140 hours a month, and I must

6    say it sticks out at me quite dramatically.  What the devil

7    were they doing, assuming they were doing this?

8              MR. BERGER:  I think, your Honor, Mr. White can also

9    respond, but there was an enormous amount of document --

10   Mr. White came in at a very concentrated period of time.  After

11   your Honor decided the motion to dismiss was really when we had

12   to add Mr. White's client as a lead in the case because they

13   were the best representative for that period of time.

14             In addition, Mr. White had to staff the case with

15   lawyers from his firm.  We began a very intensive document

16   review during that period of time, and also preparing for

17   depositions and so on and so forth.  So I think that's --

18             THE COURT:  How many depositions did Mr. White's firm

19   take?

20             MR. WHITE:  Your Honor, lead counsel did not ask us to

21   take any of the depositions.  We defended the deposition of the

22   class representative and of class representative's money

23   manager.

24             THE COURT:  Two depositions you defended, is that

25   right?

E4G7LEHC

```
 1              MR. WHITE:  Yes, your Honor.

 2              THE COURT:  OK.  And how did you eat up the rest of

 3    the 15,000 hours?

 4              MR. WHITE:  Your Honor, the majority of the people

 5    that you are asking questions about were document reviewers

 6    that received their assignments directly from lead counsel.

 7    The hours that they billed were reviewing documents of the 26

 8    million pages that were reviewed.  And I can tell you

 9    personally, because he worked in my office, that the attorney

10    that you highlight was in the office 60 hours a week for that

11    period of time.

12              THE COURT:  For 23 months?

13              MR. WHITE:  Your Honor, he reported --

14              THE COURT:  Right down to January 15th of this year,

15    long after this settlement was agreed to?

16              MR. WHITE:  Your Honor, there were still assignments

17    that were being assigned to us by lead counsel that he was

18    working on, yes.

19              THE COURT:  Mr. Berger, has your firm gone through

20    their time records?

21              MR. BERGER:  We have not, your Honor.  What we did was

22    we cautioned everyone -- as we had done previously -- about

23    pretrial order number one.  We received their time.  We

24    basically received affidavits from each of them with respect to

25    their time.  We made sure that they were not including any time
```

1     in their application which related to non E&Y-related work in

2     connection with this settlement.  But there were not audits.

3     We did not review either Mr. White's or any of the other

4     plaintiff's time records.  We simply relied upon their

5     responsibility as officers of the court to report their time

6     accurately, subject to pretrial order number one, your Honor.

7               THE COURT:  And the ratio here of associate hours --

8     which I take to be the document reviewers, right, Mr. White?

9               MR. WHITE:  Yes, your Honor, that's correct.

10              THE COURT:  OK -- to partner hours was approximately

11    15,000 associate hours to 300 partner hours.

12              MR. WHITE:  Your Honor, I have not computed the math,

13    but it would seem that's correct.

14              THE COURT:  Right.  So basically an hour of partner

15    supervision for every 50 hours of associate work.

16              MR. WHITE:  Understand, your Honor, that those

17    associates at my firm were being directed as well by lead

18    counsel as well as Saxena White.

19              So, in an effort to be efficient in the way we

20    employed our efforts in the case, handing the assignments given

21    to us by lead counsel, we at the partner level of the firm were

22    involved in the deposition of defendants and the drafting of

23    some of the papers, but the document supervision was largely

24    done by lead counsel.

25              THE COURT:  Were all of these associates who were

E4G7LEHC

1    doing the document review full-time employees of your firm?

2            MR. WHITE:  Yes, your Honor.

3            THE COURT:  And are they still, or were they

4    contracted in?

5            MR. WHITE:  No, there are a couple of people who are

6    no longer with the firm, your Honor, but the majority of them

7    all are.

8            THE COURT:  The majority of them all are.

9            MR. WHITE:  Yes, sir.

10           THE COURT:  That's an interesting formulation.  Any

11   contract lawyers who were hired for the task?

12           MR. WHITE:  The only name that sticks out, your Honor,

13   is Ms. Martinez, who I believe was a document reviewer we had

14   who was a contract employee who was in New York actually.

15           THE COURT:  And you think that $360 to $445 an hour

16   for people to look at documents is an appropriate rate in

17   Florida?

18           MR. WHITE:  Well, your Honor, yes, it is, it's

19   consistent with the rates that some of the large defense firms

20   --

21           THE COURT:  You think I couldn't find you as many

22   lawyers as you could possibly hire for half that in your

23   market?

24           MR. WHITE:  It's possible, your Honor.  Part of what

25   we are looking for is the quality of representation.  Many of

1    these people have joint degrees with MBAs and JDs and

2    experience in the securities area, you know, that is part of

3    the reason.  But I am certain if your Honor were to look, you

4    might be able to find people cheaper, yes, your Honor, but we

5    were looking for quality as well.

6         MR. BERGER:  Just to fully respond to your Honor's

7    question, my partner Mr. Stickney was supervising the work of

8    the lawyers in the case, and if he could just -- and I think

9    Mr. White and other law firms, but particularly Mr. White's

10   firm, was responsible for more than document review.

11        MR. STICKNEY:  Yes.  Sort of listening to the

12   presentation and the questions about the work that Saxena White

13   performed, in addition to the document review they were

14   involved very much in -- we had allocated responsibilities for

15   certain categories of discovery, and there was propounding

16   discovery to rating agencies.

17        THE COURT:  I can't understand you, sir.

18        MR. STICKNEY:  I'm sorry.  In addition to document

19   review -- because we have been focusing on document review --

20   the Saxena White firm also was very focused on a part of our

21   case involving the rating agencies and how rating agencies

22   viewed net leverage issues, and so there was drafting and

23   propounding of discovery following up with the rating agencies,

24   all of which I coordinated with lawyers at Mr. White's firm.

25   So, we are focusing on document review aspects of it, but there

 1  was more to his --

 2          THE COURT:  What motions, briefs and legal memoranda

 3  did they write?

 4          MR. STICKNEY:  Well, it's internal memoranda on

 5  evidence particularly related to rating agencies.  Motions and

 6  briefs, there would have been the efforts surrounding class

 7  certification, particularly the Oklahoma --

 8          THE COURT:  When did I certify the class?

 9          MR. STICKNEY:  I think it was in January 23.

10          THE COURT:  Of what year?

11          MR. STICKNEY:  2013.

12          So, all the efforts predating that, there was a

13  briefing period over a number of months where Mr. White's firm

14  was involved in the drafting of our motion, particularly as it

15  relates to the challenges to his kind as an adequate

16  representative and the trading strategies that his kind's money

17  managers used.

18          And separate and apart from that, internally we had

19  organized the entire team across a number of law firms to have

20  different parts of the prosecution specialize in different

21  issues in the case, and the Saxena White firm, one of their

22  main areas would have been concerning the efforts surrounding

23  the rating agencies, and it involved more than just document

24  review; it involved serving discovery.  Ultimately we obtained

25  affidavits from people.  We served deposition requests.  So,

E4G7LEHC

1    the involvement of the firm I think is just better described as

2    more than just document review.

3              THE COURT:  I want to see the contemporaneous time

4    records and work product from that firm.

5              MR. WHITE:  Yes, your Honor.

6              THE COURT:  OK.  Anything else?

7              MR. BERGER:  Well, just very briefly, your Honor, two

8    more Goldberger factors just bear mentioning.  I think your

9    Honor has had an opportunity to witness firsthand the quality

10   of the representation here, both lead counsel and defense

11   counsel, and you have surely formed your own judgment.  Suffice

12   it to say that the case was defended by one of the best and

13   most aggressive defense firms in the country.

14             Finally, your Honor, public policy:  I believe that

15   this Goldberger factor is very significant here because we have

16   seen far too few prosecutions by our regulatory agencies and

17   prosecutors arising out of the financial crisis that enveloped

18   our country and the world these past seven years.  This had

19   engendered a greater reliance on the institutional investor

20   community and the private securities bar.  They helped the

21   investor victims of this disaster recover their losses.

22             We respectfully submit that the result achieved here

23   is a great example of the institutional investor community and

24   the plaintiffs' securities bar stepping in to provide redress

25   for Lehman's defrauded investors when the SEC and the Justice

E4G7LEHC

1    Department affirmatively chose not to prosecute E&Y.

2            This is the only recovery from E&Y arising out of

3    Lehman's collapse.

4            Respectfully, plaintiffs' counsel deserve to be paid

5    60 percent of their well spent time in achieving this result.

6            Our fee objections have been address in our papers,

7    and I won't reiterate them here.

8            The expenses, your Honor, are also addressed in our

9    papers.  They consist primarily of payments for experts,

10   database, photocopying and travel.  As I say, we had to take 50

11   depositions on three continents.  We very carefully monitored

12   our expenses and out-of-pocket expenses in these litigations.

13           If the court has any further questions, I'm happy to

14   address them.

15           THE COURT:  Well, I guess just one that I can't

16   resist:  How did it just happen that the overall multiplier if

17   you aggregate all three of the settlements magically comes out

18   to one if I approve this fee application?  It wasn't magic, was

19   it?

20           MR. BERGER:  Well, no, it was clearly -- well, it

21   wasn't -- let's put it this way --

22           THE COURT:  That's where you wanted to come out, and

23   you backed this fee into it, right?

24           MR. BERGER:  No, your Honor.  That would make

25   everything we said in our joint affidavit a felony.

E4G7LEHC

 1            THE COURT:  Well, I wouldn't go that far.

 2            MR. BERGER:  No.

 3            THE COURT:  I mean I'd like to know the one thing that

 4   really worries me here.

 5            MR. BERGER:  Your Honor, you know, I respect the fact

 6   that your Honor knows me and knows my firm, and we have one

 7   abiding core value at the firm, and that is we prosecute every

 8   case the same way whether we're going to make money or lose

 9   money or whatever we do.  We believe very strongly in what we

10   do and we try to put our best effort forward.

11            THE COURT:  I know you do.

12            MR. BERGER:  So in all honesty it was kind of -- it

13   was stunning to me when I saw this, and I basically said, OK,

14   if you add it all together this is what it comes out to.

15            THE COURT:  OK, I accept that.

16            MR. BERGER:  Thank you, your Honor.

17            THE COURT:  Thank you.  OK.  Mr. Andrews I guess wants

18   to have a word.

19            MR. BERGER:  Thank you very much, your Honor.

20            THE COURT:  Thank you.

21            MR. ANDREWS:  Good morning, Judge Kaplan.

22            THE COURT:  Good morning.

23            MR. ANDREWS:  My name is Chris Andrews, pro se

24   objector.  The presentation will take less than five minutes.

25   Do I have that amount of time to speak?

E4G7LEHC

1          THE COURT:  Pardon me?

2          MR. ANDREWS:  Can you grant me five minutes?

3          THE COURT:  Sure.

4          MR. ANDREWS:  The objector made the objection and this

5     presentation on behalf of 930,000 victims, individuals and

6     entities who lost money due in part to defendant's inactions

7     and actions in this case.  It would take 18 Yankee Stadiums

8     filled to capacity to see every claim holder if they could be

9     here today.

10         THE COURT:  Well, and if they wanted to object, which

11    they haven't.

12         MR. ANDREWS:  I have some concerns.

13         THE COURT:  Yes, I understand you do, and I appreciate

14    that, and that's your right, and I am hear to listen to you,

15    but to tell me that you would fill 18 Yankee Stadiums with

16    people if they had the time to come is not exactly advancing

17    the ball down the field, to stay with the sports metaphor.

18         MR. ANDREWS:  I have a couple of questions.  I don't

19    understand why lead counsel intentionally sent the supplemental

20    filing memorandum in further support of motion for final

21    approval to an address where this objector moved from over two

22    years ago, resulting in the objector receiving the documents a

23    few days ago on Sunday, April 13, 2014 at 1:45 p.m.  This

24    caused the objector to be unable to file a surreply by design.

25    Nowhere in the objections is that old address mentioned, only

E4G7LEHC

1    the PO box.

2           I have four questions.  Number one:  Is there a

3    contingency --

4           THE COURT:  Well, the number is seasonal, I will give

5    you that.

6           MR. ANDREWS:  I have four questions:

7           Is there a contingency fee arrangement with any

8    counsel in this case -- written, verbal, or just understood --

9    containing a percentage that could, if applied, result in a

10   lower fee award?  I'd like to see it if it's available.

11          Number two:  What was the class representative's

12   understanding of the hourly rate that was to be billed to the

13   class; and is that in writing, or just given verbally?

14          Three:  How is the $99 million figure arrived at?

15          Four:  Were the copies of the other objections filed

16   in this case for the objector and the class to review, and for

17   me to decide whether or not to incorporate them into my

18   objection?

19          A quick statement which relates back to something

20   Mr. Berger mentioned.  He mentioned that there were several

21   claims that were dismissed, and he felt that any appeal of any

22   dismissed claims would fail.  This court ruled in the past --

23   most likely based on staff research -- that the use of Repo 105

24   complied with --

25          THE COURT:  Mr. Andrews, it would be a grave error to

E4G7LEHC

1    think that I relied on staff in the way you implied.

2            MR. ANDREWS:  OK.  The court ruled in the past most

3    likely that the use of Repo 105 complied with SFAS 140, which

4    basically caused a domino effect and thus dismissal of certain

5    claims in 2011 and 2012.  The objector believes that it might

6    be a mistake of law or error.

7            I also have a proposal to make.  This objector has a

8    proposal to make to the court, plaintiffs' counsel and defense

9    counsel, which will also be passed on to directly to defendant

10   E&Y after the hearing.  While this proposal is being evaluated

11   by all applicable parties, the court and objector should be

12   able to review the missing expert reports.  None of the counsel

13   here today have heard this proposal before, at least from this

14   objector.  Here it goes:

15           Plaintiff and defense counsel should get together and

16   arrange to submit a joint proposal to the New York State

17   Attorney General's office to solve an additional pending issue.

18   The idea is for a proposed regional settlement which would

19   cause the class fund to be revised and increased a minimum of

20   51 percent from $99 million to $150 million or more, and in

21   return the New York Attorney General agrees to drop its claim

22   for an additional $150 million it seeks as a penalty for the

23   recovery of the fees Lehman paid to defendant that should

24   really go into the class victim settlement fund rather than New

25   York State's treasury.

E4G7LEHC

1          Plaintiffs' counsel and the class win by substantially

2     increasing the sum of the fund to whatever the final number is.

3     Defense counsel wins by saving their client up to an additional

4     $100 million payment to the State of New York.  Under the

5     Martin Act there will be no interim audit and failure to

6     conform issues.  The court wins by clearing its docket.  The

7     New York AG agrees and clears its docket.  It looks good for

8     Lehman stakeholder victims and in the eyes of New York voters.

9     I think it's an idea worth exploring in the next couple of

10    weeks.

11         I have two things to bring up as far as lead counsel's

12    presentation relating to the fee issue.

13         Mr. Berger's firm and Mr. Kessler's firm are in the

14    top four of the whole country as far as securities litigation.

15    The other firms that are involved in this litigation -- one of

16    which you mentioned earlier today -- have less experience but

17    yet they're still billing out at rates like they reside in New

18    York.  When you go through those reports that I went through in

19    the D&O hearing, you come away with the fact that it seems

20    everyone is billing what is customarily approved in a court

21    rather than what is reasonable in the area that they do

22    business in, which you also articulated earlier.

23         I think the fees that all the other law firms are

24    charging are too high, I think they should be reduced, and I

25    think as you read in my objection the number of hours that were

1   billed should be substantially reduced.

2          They're asking for $30 million and $5 million in

3   expenses.  I think if they were to receive 12 percent of the

4   $99 million, that would be extremely fair based on all the work

5   that was done for them.

6          I did not see a lot of rebuttal in their reply to my

7   objection relating to the fee issue, because there is no

8   objection.  I think if you are going to go through some of the

9   billing audit for the firm that you mentioned, you should maybe

10  look at some of the other law firms as well.  It might not just

11  start with them and end with them.

12         That is all I have to say, unless you have any

13  questions.

14         THE COURT:  No, thank you.

15         Does anyone else wish to be heard?  OK.

16         I have reviewed the voluminous papers.  With respect

17  to the settlement itself, I have considered the Grinnell

18  factors and the other governing authorities.  I have done so

19  also with respect to the plan of allocation.  The settlement is

20  fair, reasonable and adequate by any standard.

21         There were in fact major problems with damages in this

22  case, even assuming liability.  The only claim that survived

23  the motions to dismiss was very narrow, it involved a quarterly

24  review and was therefore very much tougher on that account.

25         Plaintiffs' counsel is entitled to either prescience

E4G7LEHC

1   or great good luck for settling this case just before cert was

2   granted.   In Halliburton, the odds, from my own personal

3   judgment -- though I have no inside information, of course --

4   is that if I were to reject this settlement, we would go back

5   to square zero, but the class what the class would get here

6   would be zero.   I think the Supreme Court is likely to rule

7   adversely to the plaintiffs' bar and to the plaintiffs'

8   securities world in Halliburton, and if they do that -- and

9   that seems to be the early morning line anyway -- this case

10   would be dead in the water.   So, $99 million is a whole lot

11   better than that; I really have no doubt about that.   I see no

12   reason to write on it; I will simply sign the order approving

13   the settlement.

14           The fee application is another matter.   I have said on

15   other occasions in other places that I am very dissatisfied

16   personally with the lack of any wholly satisfactory way of

17   fixing fees in cases like this.   There are all kinds of

18   incentives that are at work.   Without meaning to imply bath

19   faith on anybody's part, I am talking about economic

20   incentives, and other circumstances that make percentage

21   recovery very difficult as a measure, that make the lodestar

22   measure very difficult as a measure; and until someone brighter

23   than I comes to a happy medium, we just have to do the best we

24   can.

25           I haven't come out in my mind yet on exactly what I

E4G7LEHC

1    will do with the fee application.  It is I think noteworthy

2    that the fee requested is such a big discount from the

3    lodestar, but the significance of that fact is undermined by

4    how questionable the lodestar is as a measure of value in these

5    cases to begin with.

6              I am most deeply troubled with the application on

7    behalf of Saxena White, which is based on a lodestar of nearly

8    $6 million for 23 months' work, and until I picked up the fee

9    applications I had never heard of the fact that they were in

10   the case at all.

11             The work in this case was done by the Bernstein firm

12   and the Kessler firm, and I know it and everybody else does, in

13   the main.  I don't mean to denigrate some of the other firms

14   that did significant amounts, but this case was handled by

15   them.

16             So, I will let you know where I come out, but I am

17   quite troubled about the Saxena firm, and anything they can

18   provide me to substantiate the fairness, the reasonableness of

19   anything approaching the fee that they are seeking, would be in

20   their interest to provide.  So, I will reserve decision on that

21   one.

22             So far as Mr. Andrews' objection is concerned,

23   Mr. Andrews, I know where you are coming from.  The collapse of

24   Lehman Brothers was a horror.  All sorts of bad things appear

25   to have happened that brought that about.  There is now a vast

E4G7LEHC

1   literature on the subject, there are at least two movies, I

2   think.  I know I've seen at least one and maybe two.  I will

3   never know how accurate any of it is, of course.  But there it

4   is.  You've got every right to be angry.  I'm angry.  Being

5   angry doesn't necessarily make a good law case.

6          What seems to have been the centerpiece of your

7   written objections, the so-called missing expert reports, seems

8   in my mind to be based on a misapprehension of the way the

9   world works in relation to the settlement of cases and in

10  relation to expert reports in litigation.

11         I didn't ask your professional background, and I'm not

12  sure I know what it is.  I don't know if you are a lawyer.  But

13  quite typically -- and of course I don't know exactly what

14  happened here -- but quite typically plaintiffs hire experts

15  who make the most aggressive case for the plaintiff's point of

16  view, defendants hire experts who make the most aggressive case

17  for the defendant's point of view.

18         I am confident, based on 45 years of litigation

19  experience both as a lawyer and as a judge that the release of

20  any defense expert reports that may have existed would not have

21  made plaintiff class members very happy.  They would have

22  tended to show, if believed, that this case wasn't worth

23  anywhere near what you may think it's worth and perhaps not

24  even anything near what ultimately is being paid, though I

25  don't know that.  And I can be sure that the plaintiffs'

1    experts were telling them that they could justify figures well

2    above $99 million.  And, moreover, I don't know for a fact that

3    any of these reports were ever reduced to writing.  I'm sure in

4    the colloquial sense experts were consulted and views

5    exchanged.  Certainly a lot of money was spent on experts.

6            But I think can take to the bank what I have just said

7    about what likely happened, and the release of partisan expert

8    views on one side or the other would not have added greatly to

9    your store of knowledge or mine, to tell you the truth.  It's

10   just the way the world works.

11           There are occasions when courts have appointed their

12   own experts in circumstances not so dissimilar to this.  I have

13   done it myself in the settlement of an antitrust case.  It was

14   in that particular case for very specialized reasons extremely

15   helpful.  It is my judgment that it would not have been helpful

16   here, and it would have just added to the expense, and it would

17   have added significantly, and it would have reduced the money

18   eventually paid out to the class.  That's what it would have

19   done, in my judgment.

20           So, once again, I appreciate your taking the time and

21   the effort that went into this on your part.  It was something

22   you thought in your own interest, and you had every right to do

23   it, and I accept that in your mind it was in the interest of

24   others, and that's all fine and laudatory.  But in the end the

25   objections are all overruled; I think they are not meritorious

E4G7LEHC

1   despite having been made in good faith.

2          As for your interesting proposition about the New York

3   Attorney General and all of that, I think you have come to the

4   party too late.  All of this could have been proposed by you

5   earlier.  You could probably propose it now, and if everybody

6   thinks it's a great idea, I'm sure they will come running back

7   and ask me to change my order, but I'm not expecting anyone to

8   beat a path to my door, and the line around the courthouse

9   every morning would be for other reasons.

10          Anything further, folks?

11          MR. BERGER:  Thank you, your Honor.  Your Honor, I

12   have proposed orders in the E&Y judgment with regard to the

13   settlement, and the plan of allocation separate orders because

14   they are separate.

15          THE COURT:  I think I have those.  My law clerk just

16   handed me a letter dated the day before yesterday which had a

17   motion for approval of payment of eligible claims in process,

18   etc.  I guess that's what it had.  Is there an order on that

19   that you want to provide me with?

20          MR. STICKNEY:  No, your Honor.  I believe there is a

21   transmittal letter that comes with that.  I believe, because

22   certain claims are being denied, there is an opportunity for

23   people to contest that, so I think we need to give it another

24   week or so.

25          THE COURT:  OK.  So that's just going to be pending

E4G7LEHC

1   for a short time.

2             MR. STICKNEY:  Yes.

3             THE COURT:  OK.  And on the fee order, it would be

4   helpful to me if you would submit it in a different form.

5             I don't wish to sign an order that says I approve X

6   million dollars in fees and Y million dollars in expenses.

7             I would like to sign an order that says I approve the

8   fees and expenses set forth firm by firm on the attached

9   schedule.  You can give me that form of order, and you can

10  stick the expense numbers in.  You can type them in because I

11  see no problem with those.  And you can leave the fee numbers

12  blank, and I will fill them in.  OK?

13            MR. BERGER:  Yes, we will get that down to you.

14            THE COURT:  Thank you.

15            Mr. White?

16            MR. WHITE:  Your Honor asked us to provide you with

17  material.  I would just ask that we be provided with a little

18  bit of time with the Easter holidays.  I am actually out of the

19  country starting tomorrow at ten a.m. until Tuesday, so if we

20  could have until the end of next week, that would be perfect.

21            THE COURT:  That's fine.  I trust there are actual

22  contemporaneous records, right?

23            MR. WHITE:  There is, your Honor.  Well, they're done

24  digitally.

25            THE COURT:  But the entries were made

E4G7LEHC

```
 1    contemporaneously, that's the point.

 2              MR. WHITE:  Yes, your Honor.

 3              THE COURT:  I would like an affidavit to that fact.

 4              MR. WHITE:  Yes, your Honor.

 5              THE COURT:  And, Mr. Berger, just one more thing.  I

 6    think when you were, at least in my eye, sitting listening to

 7    me talking about securities litigation at the Bar Association a

 8    couple years ago with what I took to be a horrified look on

 9    your face, I think I said on that occasion that one of the

10    strong arguments for the private securities system continuing

11    if not entirely in the form it's in today is the fact that it

12    is a means of securities law enforcement independent of the

13    political fortunes in Washington and the SEC's budget, and

14    you're right to point out that this case proves that.

15              MR. BERGER:  Thank you so much, your Honor.  And

16    although I may have had that look in my eye, I did take heart

17    because you were looking maybe a little bit at my direction

18    when you said that there are exceptions.

19              THE COURT:  Don't worry about it.

20              MR. BERGER:  Thank you very much for that, your Honor.

21

22

23

24

25
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300