**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Civil Action No. 09 MD 2017 (LAK) |
| LEHMAN BROTHERS SECURITIES AND ERISA LITIGATION | ECF CASE |
| This Document Applies to: | |
| *Starr International U.S.A. Investments LC, et al. v. Ernst & Young LLP*, No. 11-cv-3745-LAK; | |
| *The State of New Jersey, Department of Treasury, Division of Investment v. Richard S. Fuld, Jr., et al.*, No. 10-cv-05201-LAK; | |
| *Vallejo Sanitation and Flood Control District v. Fuld, et al.*, No. 1:09-cv-06040-LAK; *Mary A. Zeeb, Monterey County Treasurer, on Behalf of the Monterey County Investment Pool v. Fuld, et al.*, No. 1:09-cv-01944-LAK; *Contra Costa Water District v. Fuld, et al.*, No. 1:09-cv-06652-LAK; *City of Burbank v. Fuld, et al.*, No. 1:09-cv-03475-LAK; *City of San Buenaventura v. Fuld, et al.*, No. 1:09-cv-03476-LAK; *City of Auburn v. Fuld, et al.*, No. 1:09-03474-LAK; *The San Mateo County Investment Pool v. Fuld, et al.*, No. 1:09-cv-01239-LAK; *Zenith Insurance Company v. Fuld, et al.*, No. 1:09-cv-01238-LAK; | |
| *American National Insurance Company et al. v. Richard S. Fuld, Jr., et. al.*, No. 1:09-cv-02363-LAK; and | |
| *Retirement Housing Foundation et al., v. Fuld, et al.*, No. 1:10-cv-06185-LAK. | |

**MEMORANDUM OF LAW IN SUPPORT OF CERTAIN OPT-OUT PLAINTIFFS'**
**MOTION TO EXCLUDE THE TESTIMONY OF ALLEN FERRELL**

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................. 1

LEGAL STANDARD............................................................................................... 4

ARGUMENT ......................................................................................................... 6

I.    FERRELL SEEKS TO IMPROPERLY USURP THE JURY'S ROLE BY OPINING ON MATERIALITY ......................................................................... 6

II.    FERRELL IS NOT EVEN QUALIFIED TO OPINE ON WHAT WOULD HAVE MEANINGFULLY IMPACTED LEHMAN INVESTORS AND ANALYSTS............. 8

III.    FERRELL'S OPINION IS UNHELPFUL TO THE TRIER OF FACT BECAUSE HE ANSWERS THE WRONG FACTUAL QUESTION................................................. 12

IV.    FERRELL USURPS THE JURY'S ROLE BY INTERPRETING ANALYST REPORTS AND OTHER EVIDENCE THAT THE JURY COULD EASILY DO WITHOUT HIS ASSISTANCE ............................................................................ 14

V.    THE FERRELL REGRESSION MODEL SHOULD ALSO BE EXCLUDED AS UNHELPFUL AND UNRELIABLE ............................................................... 17

    A.    The Ferrell Regression Model is Unhelpful to the Trier of Fact Because it Studies Commercial Banks and not Investment Banks ........................................ 18

    B.    The Ferrell Regression Model is Unreliable Because It Failed to Follow Generally Accepted Methodology for Asset Pricing Models ............................. 21

        1.    Lack of a Market Factor.................................................................... 22

        2.    Insufficient Period of Time.................................................................. 23

    C.    The Ferrell Regression Model's Methodology is Unhelpful in Testing The Market Impact of a Disclosure About Lehman's Repo 105s and Net Leverage......................................................................................................... 24

    D.    The Ferrell Regression Model Is Also Unreliable Because It Did Not Follow the Cooper Study's Methodology And Reached the Opposite Conclusion ......................................................................................... 27

VI.    FERRELL'S MONTE CARLO ANALYSIS SHOULD BE EXCLUDED AS IRRELEVANT AND UNHELPFUL ............................................................. 29

CONCLUSION..................................................................................................... 33

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Amorgianos v. Nat'l R.R. Passenger Corp.*,
  303 F.3d 256 (2d Cir. 2002)...............................................................................6, 18

*Basic v. Levinson*,
  485 U.S. 224 (1988).........................................................................................26, 27

*Booth v. Black & Decker, Inc.*,
  166 F. Supp. 2d 215 (E.D. Pa. 2001) .....................................................................23

*Bricklayers and Trowel Trades Intern. Pension Fund v. Credit Suisse*,
  853 F. Supp. 2d 181 (D. Mass. 2012) .....................................................................27

*Certain Underwriters at Lloyd's v. SSDD LLC*,
  No. 4:13-CV-1, 2014 WL 3097284 (E.D. Mo. July 7, 2014)...............................6, 7

*Daubert v. Merrell Dow*,
  509 U.S. 579 (1993).................................................................. *passim*

*In re Fresh Del Monte Pineapples Antitrust Litig.*,
  04-md-1628, 2009 WL 3241401 (S.D.N.Y. Sept. 30, 2009)...................................17

*Gen. Elec. Co. v. Joiner*,
  522 U.S. 136 (1997).....................................................................6, 12, 18, 21

*Halliburton Co. v. Erica P. John Fund, Inc.*,
  No. 13-317, 536 U.S. __ (June 23, 2014) ..............................................................27

*Highland Cap. Mgmt., L.P. v. Schneider*,
  379 F. Supp. 2d 461 (S.D.N.Y. 2005)..........................................................*passim*

*Hill v. Equitable Bank*,
  No. 82-220, 1987 WL 8953 (D. Del. Mar. 3, 1987) .................................................7

*IBEW Local 90 Pension Fund v. Deutsche Bank AG*,
  No. 11-Civ-4209, 2013 WL 5815472 (S.D.N.Y. Oct. 29, 2013)............................13

*IBEW Local 90 Pension Fund v. Deutsche Bank AG*,
  No. 11 Civ. 4209 (KBF), 2013 WL 1223844 (S.D.N.Y. Mar. 27, 2013) ...............12

*Kumho Tire Co., Ltd v. Carmichael*,
  526 U.S. 137 (1999)......................................................................5, 12

*In re Lehman Bros. Sec. & ERISA Litig.*,
    799 F. Supp. 2d 258 (S.D.N.Y. 2011) ................................................................................13

*Longtop Fin. Tech. Ltd. Secs. Litig.*,
    No. 11-cv-3658, 2014 WL 2998524 (S.D.N.Y. July 3, 2014) ................................................16

*Malletier v. Dooney Burke, Inc.*,
    525 F. Supp. 558 (S.D.N.Y. 2007) ......................................................................................22

*In re Rezulin Prod. Liab. Litig*,
    309 F. Supp. 2d 531 (S.D.N.Y. 2004)........................................................................... *passim*

*SEC v. Tourre*,
    950 F. Supp. 2d 666 (S.D.N.Y. 2013)........................................................................... *passim*

*Snyder v. Wells Fargo Bank*,
    No. Civ. 4496(SAS), 2012 WL 4876938 (S.D.N.Y. Oct. 15, 2012) ....................................5, 6

*United States v. Mejia*,
    543 F.3d 179 (2d Cir. 2008)..............................................................................................17

*United States v. Williams*,
    506 F.3d 151 (2d Cir. 2007)................................................................................................4

*In re Xcelera.com Sec. Litig.*,
    No. 00-11649-RWZ, 2008 WL 7084626 (D. Mass. Apr. 25, 2008).................................21, 23

## Other Authorities

4 Jack B. Weinstein & Margaret A. Berger, *Weinstein's Federal Evidence* (Joseph
    M. McLaughlin, ed. Matthew Bender 2d ed. 2014) § 702.02.................................................4, 5

Federal Rule of Evidence 702 .................................................................................... *passim*

The Opt-Out Plaintiffs[1] respectfully submit this Memorandum of Law in Support of their Motion to Exclude the Testimony of Professor Allen Ferrell ("Ferrell"), proffered as an expert by defendant Ernst & Young ("EY") in the Lehman MDL, pursuant to Federal Rule of Evidence 702 and *Daubert v. Merrell Dow*, 509 U.S. 579 (1993).[2]

## PRELIMINARY STATEMENT

EY retained Ferrell to provide expert testimony in this action on the issue of materiality. He is many things – an economist, law professor, and professional defense expert – but he is no expert on investing in the stock market, analyzing investments and/or SEC disclosures, and/or knowing what the market would deem material.  He opines, nonetheless, "that there is no economic basis establishing that a specific disclosure of Lehman's Repo 105s would have meaningfully impacted the market's perception of Lehman's financial condition."  (Ferrell Report ¶ 8.)[3]  Ferrell's opinion should be excluded for several reasons.

*First,* determinations of materiality are for a jury to decide, not an expert.  To be sure, Ferrell attempts to dress up his opinion with words like "economic basis" and "meaningfully impacts," but his use of those phrases "does not somehow transform what is a legal proposition and a finding of fact into an admissible opinion."[4]

---

[1] Unless otherwise stated, the abbreviations herein are the same as in Certain Opt-Out Plaintiffs' Omnibus Memorandum of Law in Opposition to Defendant Ernst & Young LLP's Motion for Summary Judgment, filed under seal on September 19, 2014 (a redacted public version was filed on October 6, 2014 at Master Dkt. No. 1521).

[2] EY submitted the entirety of the Expert Report of Allen Ferrell ("Ferrell Report"), dated October 21, 2013, as Exhibit 3 to the Declaration of Kevin McDonough, dated September 19, 2014, in support of its Motion for Summary Judgment.  The McDonough Decl. was filed under seal on August 8, 2014.  A redacted public version was filed on August 8, 2014 at Master Dkt. No. 1485.

[3] The Ferrell Report is attached to the Declaration of Matthew K. Edling, dated October 17, 2014 ("Edling Decl.") as Exhibit 2.  Ferrell also submitted a Rebuttal Expert Report, dated November 22, 2103 ("Ferrell Rebuttal Report"), attached to the Edling Declaration as Exhibit 3.  The Ferrell Rebuttal Report repeats the same arguments made in the Ferrell Report and, therefore must be excluded for the same reasons.

[4] *SEC v. Tourre*, 950 F. Supp. 2d 666, 678 (S.D.N.Y. 2013).

*Second*, Ferrell is not even qualified to speak to the issue of materiality and/or how a reasonable investor would have reacted to a (hypothetical) disclosure about Repo 105.  He has no expertise on which to give such opinions.  He is a lifetime academic with no real world experience, certainly none involving investment decisions or market analysis of SEC disclosures. No company has ever hired Ferrell to give investment advice, and he has not taught or written on that topic.  He has no investment banking background whatsoever.  In short, he has absolutely no expertise allowing him to provide an opinion on what disclosures would be material to a reasonable investor of Lehman in 2007 and 2008.

*Third*, Ferrell does not even ask – let alone answer – the right question.  He says his analysis assumes that a hypothetical disclosure about Lehman's Repo 105s would have disclosed "the volume of Repo 105 transactions and the nature of the assets used in those transactions." (Ferrell Report ¶ 6.)  That is the wrong disclosure.  As this Court previously held, the real question is how the market would have reacted had Lehman also disclosed:  (i) the spiking of Repo 105 transactions at quarter-end well beyond the average usage throughout the quarter, and their reversal only days after quarter-end and (ii) their resultant impact on Lehman's reported net leverage.  Because Ferrell does not address or answer that central question, his analysis is irrelevant and thus unhelpful to the jury.  Indeed, Ferrell's opinion is misleading because jurors are unlikely to identify the disconnect between Ferrell's answer and the true (and unasked) question.

*Fourth*, even had Ferrell asked the right question, his answer would necessarily invade the province of the jury for yet another reason.  His answer rests mostly on his review and interpretation of data and quotes from analyst reports and other public documents.  However, the jury is equally able to review and interpret those documents and reach its own conclusions of

what they say.  The jury does not require the assistance of an "expert" interpreter of analyst reports, which Ferrell clearly is not in any event.

*Fifth*, the empirical veneer in which Ferrell wraps his opinion – principally his regression analysis (the "Ferrell Regression Model"), which Ferrell claims is an "asset pricing model" and purportedly patterned after another peer-reviewed study – is inherently unreliable.  He does not employ generally accepted methodology for an asset pricing model; indeed, he deviates from the methodology he himself employed outside this proceeding in connection with similar models.  More fundamentally, his opinion makes too big an "analytical leap" when it assumes that the relationship he observes between leverage and stock price returns among **commercial banks** is the same as would exist for **investment banks**.  As EY's other experts acknowledged, there are too many differences between commercial and investment banks to make reliable comparisons possible.  Also, not surprisingly, having fundamentally modified the study on which his model was purportedly based, the Ferrell Regression Model comes to the **opposite conclusion** of the other study.  Indeed, Ferrell's constructed results regarding leverage and stock returns directly contradicts the most basic finance concepts.

*Sixth*, the only other economic analysis Ferrell conducted using so-called "Monte Carlo" simulations (the "Monte Carlo Analysis") – the results of which he claims show Lehman easily could have covered certain decreases in value assumed by Ferrell in its Repo 105 assets – is also unreliable.  First, Ferrell admittedly and inexplicably failed to analyze Q3 2008, which includes the period from September 7-15, 2008 (the week leading up to Lehman's bankruptcy) – and the period that was the most volatile period in Lehman's history.  Second, Ferrell also admittedly and inexplicably failed to analyze what would happen to Lehman's liquidity if counterparties withdrew funding from Lehman completely, and/or if the counterparties took significantly larger

haircuts than those that Ferrell analyzed.  These two omissions are crucial because they misleadingly imply to a trier of fact that Lehman would have had no problem rolling over its repo financing, regardless of the circumstances.  As evidenced by reality and, indeed, Lehman's bankruptcy, that simply was not true.  In fact, even Ferrell admits that Lehman's bankruptcy was precipitated by an inability to roll over its repo financing.

Taken as a whole, Ferrell's "expert" opinion is nothing more than impermissible attempt by EY to put before the jury someone who looks and sounds like an expert to narrate from analyst reports, provide a patina of empirical analysis, and then answer the wrong question for the jury.  That is precisely the type of unreliable and misleading testimony that *Daubert* and its progeny were designed to preclude.

## LEGAL STANDARD

The Supreme Court has explicitly recognized the "danger of prejudice resulting from the presentation of expert testimony  . . . because of the potential for the jury to automatically accept an expert witness' testimony."  4 Jack B. Weinstein & Margaret A. Berger, *Weinstein's Federal Evidence* (Joseph M. McLaughlin, ed. Matthew Bender 2d ed. 2014) ("Weinstein") § 702.02.  That potential danger is even greater where, as here, the expert's impressive pedigree is likely to place "scientific evidence [proffered by the expert in the] posture of mythic infallibility."  Weinstein § 702.02.

In *Daubert*, the Supreme Court charged trial courts with a "gatekeeping" role to "ensure that any and all [expert] testimony or evidence admitted is *not only relevant, but reliable*."  *In re Rezulin Prod. Liab. Litig*, 309 F. Supp. 2d 531, 546-47 (S.D.N.Y. 2004) (citing *Daubert*, 509 U.S. at 589) (internal quotations omitted) (emphasis added); *see also United States v. Williams*, 506 F.3d 151, 160 (2d Cir. 2007) (trial court should ensure "that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand.").  Rule 702 incorporates the

principles established in *Daubert*.

As to the relevance prong (*i.e.,* whether the testimony "will help the trier of fact"), the key question is "whether this particular expert had sufficient specialized knowledge to assist the jurors in deciding the particular issues in the case." *Kumho Tire Co., Ltd v. Carmichael*, 526 U.S. 137, 156 (1999). Expert testimony is also irrelevant if it "usurp[s] either the role of the trial [district] court judge in instructing the jury as to the applicable law or the role of the jury in applying that law to the facts before it." *Snyder v. Wells Fargo Bank*, No. Civ. 4496(SAS), 2012 WL 4876938, at *2 (S.D.N.Y. Oct. 15, 2012) (citing *United States v. Bilzerian*, 926 F.2d 1285, 1294 (2d Cir. 1991)).

As to the reliability prong, *Daubert* instructs a district court to be guided by the following factors: (1) whether the expert's theory/technique "can be (and has been) tested"; (2) whether the theory "has been subjected to peer review and publication"; (3) the "known or potential rate of error"; and (4) whether the theory has "general acceptance." *Daubert*, 509 U.S. at 593-94. In undertaking this gatekeeping inquiry, the court must focus on the "principles and methodology" employed by the expert, not on the conclusions reached. *Id.* at 594-95. This inquiry requires "a preliminary assessment of whether the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." *Id.* at 592-93. "When an expert witness purports to apply principles and methods in accordance with standards accepted within the witness's discipline, but reaches a conclusion at odds with the conclusions of other experts in the field with respect to the same or a closely related question, the trial court may fairly suspect that the witness has failed to apply the principles and methods faithfully." Weinstein § 702.05.

Likewise, "[w]hen an expert opinion is based on data, a methodology, or studies that are

simply inadequate to support the conclusions reached, *Daubert* or Rule 702 mandate the exclusion of that unreliable opinion testimony." *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 267 (2d Cir. 2002). While a "minor flaw" in an expert's reasoning will not render it inadmissible, it must be excluded "if the flaw is large enough that the expert lacks good grounds for his or her conclusions." *Id.*; *see also Gen. Elec. Co. v. Joiner,* 522 U.S. 136, 146 (1997) ("a court may conclude that there is too great an analytical gap between the data and the opinion proffered.").

"The party seeking to introduce and rely on expert testimony bears the burden of establishing that the proposed expert and his or her testimony meets the requirements of Rule 702 by a preponderance of the evidence." *Tourre*, 950 F. Supp. 2d at 674 (internal quotations omitted). As discussed below, EY cannot meet its burden.

## ARGUMENT

### I.      FERRELL SEEKS TO IMPROPERLY USURP THE JURY'S ROLE BY OPINING ON MATERIALITY

Expert testimony is only relevant if it "does not usurp either the role of the trial court judge in instructing the jury as to the applicable law or the role of the jury in applying that law to the facts before it." *Snyder*, 2012 WL 4876938, at *2. In spite of "whatever expertise [an expert] may possess, no expert may supplant the role of counsel in making argument at trial, and the role of the jury [in] interpreting evidence." *Highland Cap. Mgmt., L.P. v. Schneider*, 379 F. Supp. 2d 461, 469 (S.D.N.Y. 2005) (internal citations and quotations omitted).

Courts regularly hold that an expert's "opinion on materiality is inadmissible and will be excluded because it intrudes on the jury's role as fact finder and creates a serious danger of confusing or misleading the jury into substituting the expert's assessment for the jury's own assessment." *Certain Underwriters at Lloyd's v. SSDD LLC*, No. 4:13-CV-1, 2014 WL

3097284, at *6 (E.D. Mo. July 7, 2014); *see also Tourre*, 950 F. Supp. 2d at 678 (holding that

expert opinion "on whether or not all 'economically material' information has been disclosed

improperly invades both the province of the judge to instruct on the law and the jury to find the

facts;" contention that expert opinion as to "'economically material' information is based on

'economic logic' is simply a form of inadmissible ipse dixit . . . because it is not based on

reliable methodology"); *Hill v. Equitable Bank*, No. 82-220, 1987 WL 8953, at *1 (D. Del. Mar.

3, 1987) ("The question of materiality depends in large part upon the reasonable man standard.

Determining what effect a particular fact would have upon the action of a reasonable man is, in

all areas of the law, an area of inquiry typically belonging to the finder of fact.").

 At base, Ferrell is simply opining on materiality, which intrudes on the role of the fact

finder, and thus Ferrell's entire opinion must be excluded, for this reason alone.  Specifically,

Ferrell opines "that there is no ***economic basis*** establishing that a specific disclosure of

Lehman's Repo 105s would have ***meaningfully impacted*** the market's perception of Lehman's

financial condition."  (Ferrell Report ¶ 8) (emphasis added).  When asked what he meant by the

phrase "meaningfully impacted," Ferrell tried hard to obfuscate that he was truly opining on

materiality:



  (Edling Decl. Ex. 12,
Expert Deposition of Allen Ferrell in *In re Lehman Bros. Secs. &
ERISA Litig*., 09 MD 2017, dated April 24, 2014 ("Ferrell Dep.")
at 313:14-314:2.)

 Ferrell's disclaimers aside, opining about what the "market cared about" from an

"economic perspective" or otherwise is clearly an opinion on materiality.  Such expert testimony

is patently improper and must be excluded. *See Certain Underwriters*, 2014 WL 3097284, at *6

(holding that expert "may not testify that he has reached a legal conclusion that the alleged

misrepresentations were not material.").  Indeed, as Judge Forrest aptly observed:

> "No party would doubt—one hopes—that an expert cannot testify
> as to whether the specific information at issue in a case is or is not
> 'material.' ***Inserting the word 'economically' material does not
> somehow transform what is a legal proposition and a finding of
> fact into an admissible opinion.***  Setting that problem aside, the
> opinion would, in any event, be excludable under Rule 403 as
> unduly confusing to a jury.  Even with a cautionary instruction to
> the jury, expert testimony that all 'economically material'
> information was disclosed may suggest to the jury that their job is
> done, that they have been told the answer to an ultimate question."
> *Tourre*, 950 F. Supp. 2d at 678 (emphasis added).

## II.     FERRELL IS NOT EVEN QUALIFIED TO OPINE ON WHAT WOULD HAVE MEANINGFULLY IMPACTED LEHMAN INVESTORS AND ANALYSTS

Expert testimony should be precluded where the expert's qualifications do not "fit" the

expert's proffered testimony.  *See Rezulin*, 309 F. Supp. 2d at 542.  Specifically, Rule 702

requires that "expert testimony rest on knowledge, a term that connotes more than subjective

belief or unsupported speculation."  *Id.* at 543 (internal citations and quotations omitted).  Thus,

"an expert basing his opinion solely on experience must do more than aver conclusorily that his

experience led to his opinion, and . . . must do more than propound a particular interpretation of

[particular] conduct."  *Highland*, 379 F. Supp. 2d at 473 (internal citations and quotations

omitted).  An expert "must explain how that experience leads to the conclusion reached, why that

experience is a sufficient basis for the opinion, and how that experience is reliably applied to the

facts."  *Id.* (internal citations and quotations omitted).  Ferrell's qualifications do not fit his

proffered testimony.

Ferrell is an economist with an alleged expertise in "empirical corporate finance."

Essentially, he is an expert on running economic models.  (Edling Decl. Ex. 12, Ferrell Dep. at

56:15-16, 59:8-10, 59:17-19; *see also* Ferrell Report ¶ 1.)  He is a Harvard Law School

professor, who teaches legal courses such as contracts, law and finance, and corporate finance.

(Edling Decl. Ex. 12, Ferrell Dep. at 53:9-54:2.) ███████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████ (*Id.* at 10:3-10, 47:15-48:16, 62:4-

65:3.)

These credentials aside, Ferrell is not an expert on investing, on investment banks in

general, Lehman in particular, Repos in general, or Repo 105s in particular. ████████████

██████████████████



- ████████████████████████ (*id.* at 56:9-11);[5]

- ████████████████ (*id.* at 56:12-14);

- ██████████████████ (*id.* at 76:8-11);

- ██████████████████████████████ (*id.* at 76:12-17);

- ██████████████████████████████ (*id.* at 76:18-22);

- ██████████████████████████████████ (*id.* at 77:19-23; 78:16-21);

- ██████████████████████████ (*id.* at 77:24-78:3; 78:22-25);

- ██████████████████████████████████ (*id.* at 78:4-15; 79:2-5);

- ████████████████ (*id.* at 79:13-14);

- ██████████ 105s (*id.* at 79:15-17);

─────────────────
[5] Ferrell worked in an entry level position for a private company for 13 months; he spent the rest of his professional career working as an academic.  (Ferrell Report, App'x A.)

- ██████████████████████████████████████ (*id.* at 79:18-21); or

- ██████████████████████████████████████ (*id.* at 80:7-15).

Notwithstanding his lack of qualifications in all of these areas, Ferrell spends the bulk of

his report and testimony opining on everything from:

- the alleged lack of importance of net leverage to the market (Ferrell Report ¶¶ 55-75);

- the market's purported focus in 2007 and 2008 (*id.* ¶¶ 42-53);

- the financial banking crisis in 2007 and 2008, including a history of Lehman and its peers, and the financial risks suffered by investment banks, including Lehman (*id.* ¶¶ 12-18, 27-40, 86-115);

- the use and purpose of repos in the investment banking industry (*id.* ¶¶ 19-23); and

- the purpose of Lehman's use of Repo 105s (*id.* ¶¶ 24-26).[6]

Indeed, despite his lack of expertise in the area of investing and investment banking,

████████████████████████████████████████████████████████

██████████████████████████████████████████████████ (Edling Decl.

Ex. 12, Ferrell Dep. at 371:16-372:5); (ii) ████████████████████████████

████████████████ (*see id.* at 83:25-84:17, 327); (iii) ███████████████████████

████████████████████ (*see id.* at 327:2-16, 335:23-337:9); (iv) ██████████████

████████████████████████████████████ (*see id.* at 422:12-20,

423:19-424:21); and (v) ████████████████████████████████████

██████████████████████████ (*see id.* at 340:21-341:8).

---

[6] EY proferred each of these opinions in support of its summary judgment motion. *See, e.g.*, EY 56.1 ¶¶ 4-7, 10, 12, 23, 26, 29, 34-35, 72, 145; EY Mem. at 18, 20, 21 n.18.

Ferrell's boasts aside, there is nothing in his professional background that suggests he has any expertise regarding investing, the investment banking industry, Lehman, Ordinary Repos and Repo 105s, and/or how investors, credit rating agencies, or market analysts might have reacted to disclosures of Lehman's use of Repo 105. ████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

(*Id.* at 30:3-7, 341:19-342:8.)  His opinions on these subjects, therefore, are not based on any expertise he had at the time, but on "expertise" he allegedly acquired later, mostly from reviewing historical articles and analyst reports.

*Tourre* is instructive.  In that case, the court precluded the expert from testifying because the expert was not qualified to offer testimony on highly specific and technical matters.  *Tourre*, 950 F. Supp. 2d at 674.  Judge Forrest observed that "[the expert's] main experience is as a professional testifying expert."  *Id.*  He was "not qualified to present this opinion" because he had "no experience in the CDO (collateral debt obligation) industry apart from acting as an expert witness, yet he intend[ed] to opine about ***what information would and would not matter to CDO investors***."  *Id.* (emphasis added).   Judge Forrest noted, however, that he had "no education, expertise, or experience in this area upon which to make such a statement."  *Id*. at 677.  He never "analyzed a CDO outside the context of providing expert services; he cannot speak to industry practices, and cannot answer what a typical CDO buyer would do."  *Id.*

Ferrell is similarly unqualified to testify regarding the financial risks to investment banks, the practices of the financial or investment banking industries or Lehman's practices, or what

disclosures regarding Repo 105 would or would not matter to the market.  *See Tourre*, 950 F. Supp. 2d at 674; *Highland*, 379 F. Supp. 2d at 473 n.2 (excluding testimony where expert stated that his experience "led him to reach his conclusions" because "this fact alone does not make his opinion reliable"); *IBEW Local 90 Pension Fund v. Deutsche Bank AG*, No. 11 Civ. 4209 (KBF), 2013 WL 1223844, at *13 (S.D.N.Y. Mar. 27, 2013) (holding that "being an expert in plaintiffs' securities cases . . . is not sufficient to qualify as an expert").  Ferrell's opinions on these areas must be excluded as well.

### III.  FERRELL'S OPINION IS UNHELPFUL TO THE TRIER OF FACT BECAUSE HE ANSWERS THE WRONG FACTUAL QUESTION

Expert testimony that is not "helpful" to the trier of fact must be excluded.  *Kumho*, 526 U.S. at 154-56 (questioning the "reasonableness of [the expert's] approach, along with [the expert's] particular method of analyzing the data thereby obtained, to draw a conclusion regarding *the particular matter which the expert testimony was directly relevant*.") (emphasis added).  Specifically, "nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data only by the *ipse dixit* of the expert."  *Gen. Elec. Co.*, 522 U.S. at 146; *see also Highland*, 379 F. Supp. 2d at 473 (quoting *Rezulin*, 309 F. Supp. 2d at 540) (the "'helpfulness requirement' [of Rule 702] is 'akin to the relevance requirement of Rule 401, which is applicable to all proffered evidence[,][but] . . . goes beyond mere relevance . . . because it also requires expert testimony to have *a valid connection to the pertinent inquiry*.'") (emphasis added).

In reaching his opinions, Ferrell asked the following limited question:  assuming Lehman's disclosure of its Repo 105s "would [only] include information on the ***volume*** of Repo 105 transactions and the ***nature of the assets*** used in those transactions," how would the

market have reacted to such a disclosure?  (Ferrell Report ¶ 10) (emphasis added).  That is not the question the Court framed.

The relevant question, as previously identified by this Court, is:  had Lehman disclosed the "repetitive, temporary, and undisclosed reduction of net leverage" caused by Repo 105s (*i.e.*, that Lehman was window-dressing its period-end balance sheets) would the market's perception of Lehman changed?[7]  That is not the question Ferrell sought to answer.  ████████████

████████████████████████████████████████████████████████

██████████████████████████████████████████ (Edling Decl. Ex. 12, Ferrell Dep. at 354:22-355:5; *see also id.* 409:18-22.)

In addition to being unhelpful, Ferrell's failure to "focus[] on" the relevant disclosure – the nature and timing of Lehman's Repo 105s – is likely to mislead the jury into likewise focusing on Ferrell's answer to the wrong question that he posed (*i.e.*, that a more general disclosure about Repo 105s would have had no meaningful impact on the market).

Judge Forrest dealt with a similar situation in *IBEW Local 90 Pension Fund v. Deutsche Bank* AG, 11-Civ-4209, 2013 WL 5815472 (S.D.N.Y. Oct. 29, 2013).  She excluded the expert's testimony for, among other reasons, "fail[ure] to tackle plainly important considerations."  *Id.* at *14.  Specifically, the expert "fail[ed] to adequately account for the fact that over 90% of DB's [securities] traded in a market [German] other than the one he studied [U.S.]."  *Id.* at *15.  Thus, the expert failed to:

---

[7] *See In re Lehman Bros. Sec. & ERISA Litig.*, 799 F. Supp. 2d 258, 279 (S.D.N.Y. 2011) ("This repetitive, temporary, and undisclosed reduction of net leverage at the end of each quarter is sufficient to make out a claim that the Offering Materials . . . about net leverage violated the overriding GAAP requirement to present the financial condition of the company accurately, assuming the changes in net leverage that resulted from the Repo 105 transactions were material."); *see also id.* at 303-04 ("have plaintiffs sufficiently alleged that E & Y knew enough about Lehman's use of Repo 105s to 'window dress' its period-end balance sheets").

recognize this fact in his analysis, let alone perform any work to determine whether the German pricing was occurring in an efficient or inefficient market.  As a result, [the expert's] analysis is limited to the U.S. market's ability to efficiently impound one piece of information:  German pricing.  That says nothing about whether <u>that</u> pricing itself is based upon efficient impoundment of information.  *Id.* (emphasis in original).

Likewise, Ferrell did not consider the impact of a complete and accurate disclosure – including the timing and nature – of Lehman's Repo 105s.  Thus, his opinion says nothing about how such a disclosure would have impacted the market's perception of Lehman.  Accordingly, Ferrell's analysis should be excluded because it is irrelevant, unhelpful and, indeed, misleading to the trier of fact because it answers the wrong question.

## IV.   FERRELL USURPS THE JURY'S ROLE BY INTERPRETING ANALYST REPORTS AND OTHER EVIDENCE THAT THE JURY COULD EASILY DO WITHOUT HIS ASSISTANCE

As discussed in Section I *supra*, expert testimony that seeks to usurp the jury's role must be excluded.  Here, Ferrell also seeks to usurp the jury's role by interpreting analyst reports and other evidence that the jury can easily review and interpret for itself.  Specifically, Ferrell opines that:  (i) market participants were "focused on Lehman's holdings of real estate-related and other illiquid assets" (Ferrell Report ¶ 42) and (ii) there is "***no economic basis*** establishing that a disclosure by Lehman of Repo 105s" would have "meaningfully impacted the market's perception" of Lehman's capital adequacy (*id.* ¶ 54), liquidity risk (*id.* ¶ 85), or bankruptcy risk (*id.* ¶ 111) (emphasis added).  These opinions, however, are nothing more than Ferrell's regurgitation of carefully selected quotes from carefully selected analyst reports and documents.

This Court has previously – and rightly – rejected such testimony.  In *Rezulin*, this Court decried the practice of introducing an expert to narrate from documents and evaluate such documents for jurors as a lawyer would in closing argument:

14

> A practice [that] has become fashionable among some well-financed litigants [is] the engagement of "expert" witnesses whose intended role is more to argue the client's cause from the witness stand than to bring to the fact-finder specialized knowledge or expertise that would be helpful in resolving the issues of fact presented by the lawsuit.  These "experts" thus are loosely analogous to compurgators, also known as oath helpers, in that they lend their credentials and reputations to the party who calls them without bringing much if any relevant knowledge to bear on the facts actually at issue.  *Rezulin*, 309 F. Supp. 2d at 538

Ferrell – an economist and law professor by day, and highly-paid defense expert by night – is just such a witness.

In reaching his "opinion" that market participants were "focused on Lehman's holdings of real estate-related and other illiquid assets" (Ferrell Report ¶ 42), Ferrell:  (i) reviews the disclosures in Lehman's 10-K concerning Lehman's asset exposure between 2007 and 2008  (*id.* ¶¶ 43-46); (ii) cites to "some" analyst reports that arguably support his conclusion that "[e]quity analysts were focused on the increasingly detailed information provided by Lehman about its real estate and illiquid assets" (*id.* ¶¶ 47-49); and (iii) after quoting the analyst reports, simply repeats his conclusion that because "the market was clearly focused on Lehman's exposures to real estate–related and illiquid assets. . . . a specific disclosure of Lehman's Repo 105s would not have affected Lehman's reported holdings of real estate and illiquid assets, which were the primary concern of market participants during the financial crisis" (*id.* ¶ 53).

Similarly, in reaching his conclusion that there is "no economic basis" to conclude that a Repo 105 disclosure would have "meaningfully impacted" the market's perception of Lehman's capital adequacy,[8] liquidity risk,[9] or bankruptcy risk,[10] Ferrell merely regurgitates analyst reports

---

[8] *See*, *e.g.*, Ferrell Report ¶ 57 ("The SEC, Moody's, and the Lehman Bankruptcy Examiner have each explained how net leverage ratios did not capture asset risk."); *id.* ¶ 58 ("*See* Exhibit 22 for a compilation of relevant quotations from analyst reports discussing this issue."); *id.* ¶ 59 (quoting Buckingham Research, Citigroup, and

and other publicly available materials and then states his *ipse dixit* conclusion.  (Ferrell Report

¶ 8.)



(Ferrell Dep. at 321:24-25; 322:18-23.)

(Edling Decl. Ex. 12, Ferrell Dep. at 442:10-19; 443:4-18) (emphasis added).

Such testimony is patently improper.  As courts in this circuit regularly hold, "an expert

may not offer testimony that simply regurgitates what a party has told him or constructs a factual

narrative based on record evidence."  *Longtop Fin. Tech. Ltd. Secs. Litig.*, 11-cv-3658, 2014 WL

---

Credit Suisse reports); *id.* ¶ 66 (quoting Bank of America Report); *id.* ¶ 73 ("*See* Exhibit 25 for a compilation of relevant quotations from analyst reports.").

[9] *See, e.g.*, Ferrell Report ¶ 88 ("*See* Exhibit 28 for a compilation of relevant quotations from analyst reports."); *id.* ¶ 90 (quoting Citigroup and Buckingham Research reports).

[10] *See, e.g.*, Ferrell Report ¶ 113 (quoting Merrill Lynch, Fox-Pitt Kelton, Ladenburg Thalmann reports); *id.* ¶ 114 (quoting Bank of America and HSBC reports); *id.* ¶ 115 (quoting FCIC Report by the Financial Crisis Inquiry Commission).

2998524, at *1, 5 (S.D.N.Y. July 3, 2014) (precluding expert from "summarizing facts and documents in the record that the jury is capable of understanding on its own" such as "various third party audits and reports on [company's] finances."); *see also United States v. Mejia*, 543 F.3d 179, 197 (2d Cir. 2008) (holding that an expert may not "repeat[] hearsay evidence [to the jury] without applying any expertise whatsoever."); *Rezulin*, 309 F. Supp. 2d at 551 (rejecting portions of expert testimony that was a "narrative reciting selected regulatory events" because "[s]uch material, to the extent it is admissible, is properly presented through percipient witnesses and documentary evidence"); *Highland*, 379 F. Supp. 2d at 466, 468-69  (excluding expert testimony that "simply rehash[es] otherwise admissible evidence" such as deposition testimony and documentary evidence); *In re Fresh Del Monte Pineapples Antitrust Litig.*, 04-md-1628, 2009 WL 3241401, at *16 (S.D.N.Y. Sept. 30, 2009) (excluding testimony of economist who appeared to "recite selective facts in the record and then offer his own legal conclusions"). Accordingly, Ferrell's opinions based on his quotation of analyst reports or public documents should be excluded.

## V.     THE FERRELL REGRESSION MODEL SHOULD ALSO BE EXCLUDED AS UNHELPFUL AND UNRELIABLE

The primary (arguably) "economic analysis" that Ferrell conducts is the Ferrell Regression Model.  In a two-pronged effort to lend credence to the Ferrell Regression Model, Ferrell asserts that the Ferrell Regression Model:  (i) is an asset pricing model and (ii) is patterned after a regression model from Cooper et al. (2003) in "Evidence of Predictability in the Cross-Section of Bank Stock Returns" (the "Cooper Study").[11]  As demonstrated below, these assertions are insufficient to support the Ferrell Regression Model, which should be excluded as both unhelpful and unreliable because:  (i) it only studied the relationship between net leverage

---

[11] *See* Declaration of H. Nejat Seyhun, dated October 17, 2014 ("Seyhun Decl.") ¶ 23, Ex. C.

and stock prices of commercial banks, which are, even according to EY's own expert, completely different from investment banks such as Lehman; (ii) it failed to follow generally accepted methodology of asset pricing models; (iii) the methodology of the Cooper Study cannot be used to test what Ferrell asserts he is testing; and (iv) the Ferrell Regression Model, in fact, does not follow the Cooper Study's methodology and, in fact, reaches the opposite conclusion as the Cooper Study.  Indeed, Ferrell admitted he had not identified a single peer reviewed study that reached the same conclusion that he reached – *i.e.*, that stock prices do not correlate with net leverage changes.

### A.    The Ferrell Regression Model is Unhelpful to the Trier of Fact Because it Studies Commercial Banks and not Investment Banks

A court should exclude expert opinion testimony that is "based on data, methodology, or studies that are simply inadequate to support the conclusions reached." *Amorgianos*, 303 F.3d at 267.  Moreover, if there is "too great an analytical gap between the data and the opinion proferred," exclusion is required because the opinion is simply not "helpful." *Gen. Elec. Co.*, 522 U.S. at 146.

The Ferrell Regression Model is unhelpful because the data it is based on – from commercial banks – cannot support a conclusion about investment banks.  The "analytical gap" between data on commercial banks and the opinion proferred by Ferrell on investment banks is simply too great for Ferrell to overcome. *Gen. Elec. Co.*, 522 U.S. at 146.

Indeed, EY's purported expert on the investment banking industry (Glenn Okun) admitted that investment banks and commercial banks are not comparable:

> Q.· · Do you think comparing commercial banks to investment banks is like comparing apples and oranges or are they relevant for comparison purposes in your mind?
>
> A.· · I think it is critically important whenever making comparisons between companies or between companies in distinct

industries to carefully select peer companies for purposes of that analysis that are substantially similar to each other.

***And I would conclude that commercial banks especially over the time period of the Allen and Saunders study [in 2006] <u>are not substantially similar to investment banks in that time period</u>.***

\*        \*        \*

Q.· · Are commercial banks in the time period 2006 through 2008 similar enough to investment banks that we could make comparisons from them?  . . .


THE WITNESS:· I would never generally conclude as an investment analyst, as an investor, if I were doing as one often does in trying to understand a company, one tries to compare the company to its relevant industry, ***I would not generally be comfortable as a general matter comparing an investment bank that I was trying to understand to a group of companies generally sourced from the commercial banking industry***.  . . .

Q.·   Who in 2007 and 2008 were Lehman's peers in your mind?

A.   . . . I would look at and consider as possibly being substantially similar so that I ***could benchmark Lehman's [financial] results in some way to those other companies***, that the other major investment banks, Goldman Sachs, Morgan Stanley, would be the kind of companies that I would initially consider for possible inclusion in that peer group.  (Edling Decl. Ex. 11, Okun Dep. at 124:22-125:14, 127:19-128:12, 128:14-129:21) (emphasis added).

████████████████████████████████████████████████

██████████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████  (Edling Decl. Ex. 12, Ferrell Dep. at 194:14-17, 21;

*see also id.* at 197:3-5  ████████████████████████████████████████

█████████████████████████████████████████████



████████████████████████████████████████████

████████████████████████████     ██████████████

- ███████████████████████████████████████████ (*id.* at 222:15-225:15.);

- ███████████████████████████████████████████ (*id.* at 226:13-228:4, 232:18-233:10);

- ███████████████████████████████████████████ (*id.* at 233:20-234:22);

- ███████████████████████████████████████████ (*id.* at 240:17-241:9); and

- ███████████████████████████████████████ (*id.* at 235:12-17; 236:16-237:13).

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████

████████████████   (*Id.* at 186:24-187:5; 189:9-23.)  However, Ferrell did not believe that Leman was a "peer" of any of these commercial banks at the time of his report.  In Ferrell's Exhibit 1, which is entitled "Lehman Brothers and Peers," Ferrell did not list *any* commercial banks as a Lehman "peer;" and not Citigroup, J.P. Morgan, Deutsche Bank, or Bank of America. (Ferrell Report, Ex. 1; *see also* Edling Decl. Ex. 12, Ferrell Dep. at 343:14-25.)  ████████████████

████████████████████████████████████████████

████████████████   (Edling Decl. Ex. 12, Ferrell Dep. at 344:19-24.)

████████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

20

██████████        (*Id*. at 208:4-15.)   ████████████████████████████

██████████

Without doubt, commercial and investment banks are entirely different creatures.  For

example, in 2007 and 2008, commercial banks had higher assets and lower leverage than the

investment banks.[12]  Moreover, commercial banks do not report net leverage in their 10-Ks

and 10-Qs.[13]  ████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████        (*Id*. at 187:6-188:22.)

In short, the Ferrell Regression Model is unhelpful.  At best, it can be relied on to draw

conclusions about the impact of net leverage on commercial banks' stock prices only.  A study of

commercial banks, however, cannot reliably be used to draw conclusions about investment banks

such as Lehman.  Accordingly, the Ferrell Regression Model is unhelpful and must be excluded

under Rule 702.  *See*, *e.g.*, *Gen. Elec. Co.*, 522 U.S. at 146; *Highland*, 379 F. Supp. 2d at 473;

*Rezulin*, 309 F. Supp. 2d at 540.

**B.     The Ferrell Regression Model is Unreliable Because It Failed to Follow
         Generally Accepted Methodology for Asset Pricing Models**

Even if the Ferrell Regression Model was helpful to the trier of fact – which it is not – it

is also unreliable.  Expert testimony should be excluded when the methodology used is "contrary

to the generally accepted literature."  *In re Xcelera.com Sec. Litig.*, No. 00-11649-RWZ, 2008

---

[12] *See* 2007 and 2008 10-K filings of Lehman, Goldman Sachs, Morgan Stanley, Merrill Lynch, and Bear Stearns *compared to* Citigroup, JPMorgan Chase, and Bank of America.  For example, at year-end 2007, the gross leverage ratio (assets/equity) of the comparable investment banks were as follows:  Lehman (30.7), Goldman Sachs (22.4), Morgan Stanley (33.4), Merrill Lynch (31.9), and Bear Stearns (33.5).  *Id.*  By contrast, at year-end 2007, the gross leverage ratio of the three U.S. commercial banks identified by Ferrell purportedly as "peers" of Lehman were as follows:  Citigroup (18.4), JPMorgan Chase (12.6), and Bank of America (11.7).  *Id.*

[13] *Id.*

WL 7084626 (D. Mass. Apr. 25, 2008); *see also Malletier v. Dooney Burke, Inc.*, 525 F. Supp.

558, 600 n.75 (S.D.N.Y. 2007) (excluding unreliable dilution survey in trademark matter due to

fatal methodological flaws in spite of the survey being designed by expert who was "responsible

for numerous, highly significant publications in the area of consumer behavior").

███████████████████████████████████████████████████████████████

█████████████████████████████████   (Edling Decl. Ex. 12, Ferrell Dep. at 212:24-

213:2) ████████████████████████████████████████

████   However, Ferrell failed to follow the generally accepted methodology for asset pricing

models because he:  (i) excluded a key factor used in such models – the "market factor" and (ii)

studied too short a time period – a mere 18 months of data.

### 1.   *Lack of a Market Factor*

An asset pricing model measures a security's (or a stock portfolio's) expected rate of

return.[14]  To determine the expected rate of return, asset pricing models take into consideration

the impact of various factors on the rate of return.[15]  The "market factor," or "beta," is a variable

used in asset pricing models to control for movements in the price of the security caused by

general market movement.[16]  In other words, use of the market factor allows the asset pricing

model to discern what movements in the stock price are attributed to factors related the

individual company from those movements caused by general stock market activity.[17]

---

[14] *See* Seyhun Decl. ¶ 7.  *See also* Ferrell Dep. at 213:6-7 (an asset pricing model "look[s] at factors that affect stock
return behavior").

[15] *See* Seyhun Decl. ¶¶ 8-13 (explaining the most popular types of asset pricing models and the factors evaluated).
*See also* Ferrell Dep. at 61:10-24 (explaining that he teaches the CAPM, the Fama-French model, and the Carhart
model, in his corporate finance class).

[16] *Id.* ¶ 14.

[17] *Id.*

As a result, the use of the market factor in asset pricing models has become the generally accepted methodology.[18]  Indeed, in each of the twenty asset pricing models of peer-reviewed literature we surveyed – including one that was co-authored by Ferrell – every single one included the market factor.[19]

However, the Ferrell Regression Model does ***not*** include the market factor (*see* Ferrell Report, App'x C, at 1-4).  Because the Ferrell Regression Model does not apply generally accepted methodology, it must be excluded.  *See In re Xcelera.com Sec. Litig.*, 2008 WL 7084626, at *2; *Booth v. Black & Decker, Inc.*, 166 F. Supp. 2d 215, 220 (E.D. Pa. 2001) (finding expert's mere claim "that he followed the general methodology" was insufficient).

### 2. *Insufficient Period of Time.*

Asset pricing models must study much longer periods of time because the more data that is collected and analyzed, the lower the likelihood that the correlation or causation is attributable to factors other than those factors being studied – *i.e.*, the longer the time period, the more accurate the model.[20]

One peer-reviewed article including an asset pricing model that Ferrell has published covered nine years.[21]  He also testified that an article that has not yet been published includes an asset pricing model that covers 30 years.[22]  Indeed, the Cooper Study, on which Ferrell says he

---

[18] *Id.* ¶ 15.

[19] *Id.* ¶¶ 18, 21, Ex. A.  Ferrell also recently made use of an asset pricing model in his article, titled "Thirty Years of Shareholder Rights and Stock Returns."  *See* Seyhun Decl. ¶ 24, Ex. D.  That asset pricing model also included the market factor.  *Id.*

[20] Seyhun Decl. ¶ 22, Ex. A.

[21] *Id.* ¶ 22, Ex. B.

[22] For example, Ferrell recently conducted an asset pricing model for a 30 year period in his article, titled "Thirty Years of Shareholder Rights and Stock Returns."  *See* Seyhun Decl. ¶ 24, Ex. D; Ferrell Dep. at 258:7-15.

based the Ferrell Regression Model, covers thirteen years.[23]  Finally, a survey of peer-reviewed

asset pricing models covered periods ranging from seven years to more than 40 years.[24]



(Edling Decl. Ex. 12,

Ferrell Dep. at 241:18-242:3.)

(*Id*. at 253:7-22-258:21.)

.[25]  (*Id*. at 253:7-22-258:21.)  This should be the end

of the Ferrell Regression Model.

(Edling Decl. Ex. 12, Ferrell Dep. at 127:11-19, 241:18-242:3; *see id*. at

246:13-25.)  That week saw drastic drops in Lehman's stock price and, resultant dramatic

changes in Lehman's net leverage.  If anything, this key week should have been a primary focus

of the Ferrell Regression Model.

> **C.    The Ferrell Regression Model's Methodology is Unhelpful in Testing The Market Impact of a Disclosure About Lehman's Repo 105s and Net Leverage**

To meet the reliability prong of *Daubert*, Ferrell must also show that the Ferrell

Regression Model "can be (and has been) tested," is based on methodology that has been

"subjected to peer review and publication;" and the methodology has "general acceptance."

*Daubert*, 509 U.S. at 593-94.  In a transparent but ill-fated attempt to meet this standard, Ferrell

asserts that he modeled the Ferrell Regression Model after the Cooper Study, a peer-reviewed

---

[23] Seyhun Decl. ¶ 23, Ex. C.

[24] *Id.* ¶ 22, Ex. A.

[25] Ferrell recently conducted an asset pricing model for a 30 year period in his article, titled "Thirty Years of Shareholder Rights and Stock Returns."  *See* Seyhun Decl. ¶ 24, Ex. D; Ferrell Dep. at 258:7-15.

article.  (Ferrell Report ¶ 77.) ████████████████████████████████

████████████████████████████████████████████████

(Edling Decl. Ex. 12, Ferrell Dep. at 296:17-22.)  However, the Cooper Study's methodology

cannot be used to test the real question in this case – whether a net leverage disclosure impacted

the market's perception of Lehman's riskiness.

 The purpose of the Cooper Study, by contrast, was to test whether actual changes in a

company's leverage (and other factors) could be used to predict a company's *future* stock

returns.  (Cooper Study at 818.)  To test this hypothesis, the Cooper Study's methodology was as

follows:

> a Fed quarterly report date of March 31 would be assumed, using
> our previously stated policy of waiting two months after the Fed
> date, to be publicly known at the end of May.  Thus, the [March 31
> data] would be used as lagged accounting data for June returns.
> Additionally, this data would be matched with return data for July
> and August.  Once new quarterly data is known, that data is used to
> match accounting data with returns data for September, October,
> and so on."  (Cooper Study at 826.)

 However, the Cooper Study's methodology does not work to test the relevant question in

this case – whether ***a disclosure*** about Lehman's Repo 105s and net leverage would have

affected Lehman's *contemporaneous* stock return (*i.e.*, the market's reaction to such

information).  Indeed, the Ferrell Regression Model requires one to assume that a change in a

company's net leverage ratio, which necessarily measures financial risk, and which is publicly

disclosed one and half months later, directly correlates to that company's stock returns another

***month to three months after*** such information was publicly released.  This assumption is

unsupported in fact and leads to absurd results.

 Consider the following illustration of the Cooper Study as applied in the Ferrell

Regression Model, testing how the market responded to Lehman's June 2007 net leverage ratio:

 [26] (*Id.* at 279:9-17.)  Per the Cooper Study methodology, Ferrell then assumed that the June 2007 net leverage information *was not made public* until August 9, 2007.[27]  Ferrell thus did not begin to calculate the percent change in the company's stock prices (*i.e.*, the "stock price returns") until September 2007.

(*see, e.g., id.* at 282:17-21),

(*Id.*)

(*Id.* at 292:15-19; 293:14-10.)

In reality, Lehman's June 2007 net leverage would have been digested by the market and factored into the stock price *immediately when it was publicly released in August 2007*,[28] with analysts and news sources digesting new information and updating estimates and assessments of Lehman's financial condition as it was received.  In an efficient market, disclosures regarding leverage are realized *immediately*, not many months later.  *See Basic v. Levinson*, 485 U.S. 224 (1988) (fraud on the market theory of reliance is based in the "efficient market hypothesis" such that the price of company stock's incorporates available information regarding the company); *see*

---

[26] This, of course, requires us to ignore the fact that investment banks (unlike commercial banks) are not required to file Form Y-9s at all.  *See* Section V(A) *infra*.

[27] Form Y-9C forms are "generally available within 42 days after the end of the quarter."  *See* http://www.ffiec.gov/nicpubweb/content/help/HelpFrequencyUpdate.htm.

[28] This requires us to (incorrectly) assume that Lehman's net leverage was not publicly disclosed to the market until a month and a half after it was reported.  Rather, as shown by Ferrell's Exhibit 22 and consistent with market efficiency, Lehman regularly disclosed its net leverage numbers to the market as part of its quarterly earnings reports just days after quarter-end.  *See, e.g.,* Ferrell Ex. 22, p. 15 (June 9, 2008 articles reporting Lehman's net leverage for the second quarter, *i.e.*, May 31, 2008, had been reduced).

*also Halliburton Co. v. Erica P. John Fund, Inc.*, No. 13-317, 536 U.S. __ (June 23, 2014)

(upholding *Basic* presumption). ███████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

██████████████████████████████████ Thus, in the example

above, what moves the stock price between November 1 and November 30 – three months later –

cannot be based on information that became public months earlier.  Accordingly, the Cooper

Study's methodology simply is not useful in assessing the relevant question, rendering the Ferrell

Regression Model unhelpful to the trier of fact. [29]

### D. The Ferrell Regression Model Is Also Unreliable Because It Did Not Follow the Cooper Study's Methodology And Reached the Opposite Conclusion

Even if the Cooper Study was a useful model for testing the impact of the disclosure of

the change to net leverage on the market (which it is not), Ferrell so fundamentally modified the

Cooper Study's methodology in conducting the Ferrell Regression Model that he managed to

reach the *opposite* conclusion that the Cooper Study reached.  It should be excluded for this

additional reason.  *See* Weinstein § 702.05 (if an expert reaches "a conclusion at odds with the

conclusions of other experts in the field with respect to the same or a closely related question, the

trial court may fairly suspect that the witness has failed to apply the principles and methods

faithfully.").

---

[29] If Ferrell wanted to test how *the market* promptly reacted to a disclosure of changes to Lehman's net leverage, he should have run an event study. ███████████████████ (*Id.* at 213:3-10.)  He chose not to do so.  In any event, courts have excluded event studies that failed to consider the efficient market principle.  *See Bricklayers and Trowel Trades Intern. Pension Fund v. Credit Suisse*, 853 F. Supp. 2d 181, 189-90 (D. Mass. 2012) (finding event study "unreliable because it repeatedly ignores the efficient market principle.  The study attributes volatility in AOL's stock price to the [news] when, at the time of the information or deflation, an efficient market would have already priced in the reports.").

Ferrell asserts that the Ferrell Regression Model demonstrates that there is "no statistically significant relationship between the net leverage ratio and stock price returns." (Ferrell Report ¶ 77.)  By contrast, the Cooper Study found the opposite – that there ***is a correlation*** between leverage and stock price returns, *i.e.*, that leverage levels can predict stock price returns.  (Cooper Study at 834) (noting that both economic analyses performed by the Cooper Study "provide reasonably strong evidence for the existence of bank-industry-wide cross-sectional predictability arising from changes in . . . leverage.)

█████████████████████████████████████████████████████████████████

████████████████████████████████████████████ (Edling Decl. Ex. 12, Ferrell Dep. at 183:11-25.)  By contrast, the Cooper Study itself cites another study that likewise found a correlation between leverage and stock returns.  *See* Cooper Study at 830 (citing consistent results of Cantor and Johnson (1992)).  Indeed, even EY's expert, Kenneth Lehn, admits that "the increase in Lehman's net leverage ratio during 2005 to 2007 coincided with increases in its stock price."[30]  (Edling Decl. Ex. 10, Expert Report of Kenneth Lehn, dated October 22, 2013 ("Lehn Report") ¶ 22; Ex. 9.)

It should come as no surprise that the Ferrell Regression Model's conclusion is the opposite of the Cooper Study's conclusion.  In constructing the Ferrell Regression Model, Ferrell modified the ***precise variable*** from the Cooper Study that Ferrell asserts he was studying – leverage.  The leverage metric used by the Cooper Study was "book value of equity as a percent

---

[30] Likewise, simple finance principles show that the higher the leverage of a company (*i.e.*, a measure of financial risk), the greater the potential rate of return on stock (*i.e.*, a measure of profitability).  *See* Seyhun Decl. ¶¶ 26-35 (example of finance calculation).  Moreover, as Lehn acknowledged, whether an increase in leverage is a good or bad thing depends on the economic times.  *See* Lehn Report ¶ 22 ("Lehman's business model was similar to the business models of other investment banks in that they historically relied on high levels of leverage. . . . Exhibit 8 shows that the net leverage ratio of Lehman and its peers increased from 2004 to 2007 when economic conditions were strong. . . . Bart McDade and Paolo Tonucci both noted the beneficial effect of leverage during certain times."). *See also* Seyhun Decl. ¶¶ 28-34 (example of finance calculation).

of total assets." (Cooper Study at 830.) Instead of using the same leverage metric used by the Cooper Study, Ferrell used an entirely different leverage metric, *i.e.*, he "constructed a net leverage ratio for each financial institution based upon Lehman's methodology as well as two different decompositions" of the net leverage ratio. (Ferrell Report ¶ 79; *id.*, App'x C, at 2.)

The Ferrell Regression Model also completely dropped another variable used in the Cooper Study – the "interest rate swaps as a percent of total assets."[31] (*Id.*) █████████

████████████████████████████████████████

████████████████████████████████████████

(Edling Decl. Ex. 12, Ferrell Dep. at 297:19-298:4; *id.* at 300:11-19.)

By dropping the market factor, changing the precise variable he was studying, and dropping another variable, and as a result, reaching the opposite conclusion of the Copper Study, Ferrell rendered the Ferrell Regression Model unreliable. It should be excluded. *See* Weinstein § 702.05.

## VI.   FERRELL'S MONTE CARLO ANALYSIS SHOULD BE EXCLUDED AS IRRELEVANT AND UNHELPFUL

As discussed in Section III *supra*, expert testimony that is not "helpful" to the trier of fact must be excluded. Based upon his analysis of "Monte Carlo" simulations (the "Monte Carlo Analysis"), Ferrell opined that, even if the assets underlying Lehman's Repo 105s lost some of their value, Lehman would have little difficulty in rolling over its repo financing because the additional collateral Lehman would be required to post only amounted to a fraction of Lehman's liquidity pool. (*See* Ferrell Report ¶ 93.) However, Ferrell's Monte Carlo Analysis is irrelevant to any question at hand and unhelpful to the trier of fact for two simple and related reasons: (i)

---

[31] Ferrell claims that he had to remove this variable because he "wouldn't have enough data" for that variable thus he "just decided [he] was not going to include it." (Ferrell Dep. at 297:6-9, 297:24-298:4.) He acknowledged the Cooper Study did not have this problem. (*Id.* at 298:5-23.)

Ferrell did not analyze Q3 2008, *i.e.*, the period from June 2008 through September 15, 2008 (the day Lehman filed for bankruptcy) and (ii) Ferrell did not determine if Lehman would have been able to roll over its repo financing if Lehman's counterparties fully withdrew their repo financing or demanded massive haircuts, which as studies have shown, was what actually occurred just before Lehman filed for bankruptcy.

Before detailing the problems of Ferrell's Monte Carlo Analysis, we first explain what a Monte Carlo simulation is.  At a very basic level, a Monte Carlo simulation uses a computer algorithm to run repeated random sampling to determine the probability of a particular event occurring, *i.e.*, if a pair of dice is rolled 5,000 times, how many times would a "7" come up.[32]

Here, the purpose of Ferrell's Monte Carlo Analysis was "to obtain the expected amount of additional collateral that Lehman would have needed to have available to ensure it could continue rolling over its Repo 105s over the next fiscal quarter."  (Ferrell Report ¶ 94.)  To do so, Ferrell first calculated the historical volatility of Lehman's Repo 105 assets for Q4 2007, Q1 2008, and Q2 2008.  (*Id.*; Exs. 30.1 and 30.2.)  Ferrell then ran 5,000 simulations "where Lehman would have needed to provide additional collateral whenever the value of the assets fell below a hypothetical required margin, which ranges from 105% to 102% for Repo 105s and between 108% and 102% for Repo 108s."  (Ferrell Report ¶¶ 93-94.)  Leaving aside whether a Monte Carlo simulation is proper at all in this situation or if Ferrell properly ran his Monte Carlo Analysis, Ferrell's Monte Carlo Analysis is, quite simply, unhelpful here.

First, as Ferrell admitted, his Monte Carlo Analysis (inexplicably) failed to analyze the period from June 2008 through September 15, 2008, the day Lehman filed for bankruptcy. (Edling Decl. Ex. 12, Ferrell Dep. at 164:20-22; █████████████████████

---

[32] *See* http://www.investopedia.com/terms/m/montecarlosimulation.asp.



The period Ferrell failed to analyze was, without doubt, the most volatile period in Lehman's history.

(*Id.* at 128:16-22, citing A. Copeland, "The Tri-Party Repo Market before the 2010 Reforms" (2010) ("Copeland") at 56-57 (Edling Decl. Ex. 44).)

(Edling Decl. Ex. 12, Ferrell Dep. at 132:9-133:19.)

(*Id.* at 134:3-135:12.)

(*Id.* at 163:20-25.)

(*Id.* at 162:13-22.)  Moreover, he also failed to test the haircut at any levels beyond 102-105% for Repo 105s and 102-108% for Repo 108s.  (Ferrell Report Ex. 30.1-30.2.)

Those omissions are critical.  Similar to what happened to Bear Stearns in March 2008, in the week before Lehman's September 2008 bankruptcy, Lehman's counterparties ***simply withdrew their Repo funding*** from Lehman (as Ferrell admitted), regardless of the haircut and

the type of collateral.  That series of events resulted in Lehman's liquidity crisis and thereafter its

bankruptcy.  (*See* Copeland at 56-57 (showing that value of Lehman's total tri-party repo book

fell from $150 billion and over 60 investors on September 8, 2008 to approximately $20 billion

and fewer than 20 investors on September 15, 2008).)  Moreover, for those counterparties that

remained willing to deal with Lehman, during Lehman's last week, haircuts even for liquid

assets were upwards of 115-120%.  (Copeland at 62.)

Indeed, Ferrell's results are divorced from reality.  In May and July 2008 (the same

period analyzed by Ferrell), in response to Bear Stearns' collapse caused by a "run-on-the-bank,"

the U.S. Federal Reserve conducted two separate liquidity tests of Lehman.[33]  Lehman failed

both liquidity tests, by $15 billion and $84 billion.[34]  The Fed also determined that Lehman only

had 78% of the liquidity it would need under a stress scenario.[35]  Moreover, the Fed determined

that the reason for Lehman's failure of the liquidity tests was because Lehman's repo assets

contained less-liquid and devalued assets.[36]

In short, the Monte Carlo Analysis (and Ferrell's opinion based on it) must be excluded

as irrelevant and unhelpful under Rule 702 because Ferrell failed to analyze:  (i) the volatility of

the correct period (*i.e.*, Q3 2008 and, more specifically, September 7-15, 2008) and (ii) the

correct haircut (*i.e.*, either a complete withdrawal by counterparties and/or significantly larger

haircuts).

---

[33] Edling Decl. Ex. 40, Financial Crisis Inquiry Commission Final Report of the National Commission on the Cause of the Financial Economic Crisis in the United States (2011) at 297-298.

[34] *Id.*

[35] *Id.*

[36] *Id.* at 298.

## CONCLUSION

In sum, the entirety of Ferrell's opinion must be excluded because: (i) Ferrell is opining on materiality, which is an issue for the jury, (ii) Ferrell is not qualified to render the opinions he reached; (iii) Ferrell seeks to usurp the jury's role by interpreting analyst reports and other documents; (iv) the Ferrell Regression Model is irrelevant, unhelpful, and not based on generally accepted and testable methodologies; and (v) Ferrell's Monte Carlo Analysis is irrelevant and unhelpful. Accordingly, Opt-Out Plaintiffs respectfully request that the Court exclude Ferrell's opinions and testimony in their entirety.

Dated: October 17, 2014

Respectfully submitted,

Matthew Edling AEF

**COTCHETT, PITRE & MCCARTHY, LLP**
Matthew K. Edling (medling@cpmlegal.com)
Bryan M. Payne (bpayne@cpmlegal.com)
840 Malcolm Road, Suite 200
Burlingame, California 94010
Tel: (650) 697-6000

*Counsel for Plaintiffs Vallejo Sanitation & Flood
Control District, the Monterey County Investment
Pool (through Mary Zeeb, Monterey County
Treasurer), Contra Costa Water District, City of
Burbank, City of San Buenaventura, City of Auburn,
the San Mateo County Investment Pool, and Zenith
Insurance Company*

33

*(signature)*

**MCDERMOTT WILL & EMERY LLP**
John J. Calandra (jcalandra@mwe.com)
Banks Brown (bbrown@mwe.com)
Michael Huttenlocher (mhuttenlocher@mwe.com)
Audrey Lu (aulu@mwe.com)
Allison E. Fleischer (afleischer@mwe.com)
340 Madison Avenue
New York, NY 10173
Tel: (212) 547-5400
Fax: (212) 547-5444

*Counsel for Plaintiffs Starr International USA Inv.
LC and C.V. Starr & Co., Inc. Trust*

*(signature)* /AEF

**BERGER & MONTAGUE, P.C.**
Merrill G. Davidoff (mdavidoff@bm.net)
Lawrence Lederer (llederer@bm.net)
Robin Switzenbaum (rswitzenbaum@bm.net)
Gary Cantor (gcantor@bm.net)
Jon Lambiras (jlambiras@bm.net)
1622 Locust St.
Philadelphia, PA 19103
Tel: (215) 875-3000
Fax (215) 875-4604

*Counsel for Plaintiff The State of New Jersey,
Department of Treasury, Division of Investment*

*(signature)* /AEF

**GREER, HERZ & ADAMS, LLP**
Andrew Mytelka (amytelka@greerherz.com)
David LeBlanc (dleblanc@greerherz.com)
Jeanne Urbani Walser (jwalser@greerherz.com)
One Moody Plaza, 18th Floor
Galveston, Texas 77550
Tel: (409) 797-3200
Fax: (409) 766-6424

*Counsel for American National Insurance Company
and its subsidiaries and The Moody Foundation*

34

_Timothy Reuben_ /AEF

**REUBEN RAUCHER & BLUM**
Timothy D. Reuben, *pro hac vice*
Stephen L. Raucher, *pro hac vice*
(sraucher@rrbattorneys.com)
Ashley J. Brick, *pro hac vice*
(abrick@rrbattorneys.com)
10940 Wilshire Blvd., 18th Floor
Los Angeles, CA 90024
Tel: (310) 777-1990
Fax: (310) 777-1989

*Counsel for Plaintiffs Retirement Housing
Foundation and Foundation Property Management,
Inc.*