UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
In re:

LEHMAN BROTHERS SECURITIES AND                                    09-md-2017 (LAK)
ERISA LITIGATION

This document applies to:

*Starr Int'l U.S.A. Invs. LC, et ano. v.*
*Ernst & Young LLP*, 11-cv-3745 (LAK)

*Retirement Housing Foundation, et al. v.*
*Fuld, et al.*, 10-cv-6185 (LAK)
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

# OPINION

Appearances:

John J. Calandra
Banks Brown
Michael R. Huttenlocher
Audrey Lu
Allison E. Fleischer
MCDERMOTT WILL & EMERY LLP
*Attorneys for Plaintiffs Starr International*
*USA Investments LC and*
*C. V Starr & Co., Inc. Trust*

Timothy D. Reuben
Stephen L. Raucher
REUBEN RAUCHER & BLUM
*Attorneys for Plaintiffs Retirement Housing*
*Foundation and Foundation*
*Property Management, Inc.*

Miles N. Ruthberg
Jamie L. Wine
Kevin M. McDonough
LATHAM & WATKINS LLP
*Attorneys for Defendant Ernst & Young LLP*
*in the* Starr *action*

Daniel L. Brown
SHEPPARD, MULLIN,
RICHTER & HAMPTON LLP
*Attorney for Defendant Ernst & Young LLP in*
*the* Retirement Housing Foundation *action*

Lewis A. Kaplan, *District Judge.*

The September 2008 collapse of Lehman Brothers Holdings Inc. ("Lehman") disrupted the entire economy and greatly affected owners of the company's securities. It led also to much litigation, including suits under the federal securities laws on behalf of purchasers of Lehman debt and equity securities.

Almost all of the securities litigation ultimately was settled, much of it as part of a class action and some in individual settlements of cases brought by plaintiffs who opted out of the class action. The matter now is before the Court on motions by Ernst & Young LLP ("EY"), the only remaining defendant in the securities cases, for summary judgment dismissing the complaints of the only remaining opt out plaintiffs in those cases: Starr International USA Investments LLC ("Starr International") and C.V. Starr & Co. Inc. ("C.V. Starr") (collectively "Starr") as well as Retirement Housing Foundation ("RHF") and Foundation Property Management Inc. ("FPM") (collectively, "RHF Plaintiffs").

The *Starr* and *RHF* actions arise from plaintiffs' purchases of Lehman stock and the substantial losses plaintiffs suffered when Lehman failed. Starr sues under Section 11 of the Securities Act of 1933[1] (the "Securities Act"), while both Starr and the RHF plaintiffs sue under Section 10(b) of the Securities Exchange Act of 1934[2] (the "Exchange Act") and Rule 10b-5 thereunder[3] as well as on various state-law causes of action. Plaintiffs allege that EY made statements in Lehman's financial filings that were false and misleading, principally in relation to

---

[1]    15 U.S.C. § 77k.

[2]    15 U.S.C. § 78j(b).

[3]    17 C.F.R. § 240.10b-5.

Lehman's use of "Repo 105" transactions and their effect on Lehman's reported net leverage.[4] The motions to dismiss raise issues similar to those addressed in prior opinions in this multidistrict litigation, familiarity with which is assumed.[5]

## *Facts*

I.    *Plaintiffs' Purchases of Securities and Claims Against EY*

    A.    *Starr*

On June 12, 2008, Starr International purchased 75,000 preferred shares of Lehman for $75 million and 2,700,000 shares of Lehman common stock for $75.6 million.[6]  That same day, C.V. Starr purchased 25,000 preferred shares of Lehman for $25,000,000, and 900,000 shares of Lehman common stock for $25.2 million.[7]  Neither plaintiff sold any Lehman securities prior to Lehman's bankruptcy.[8]  Starr brings claims for (I) alleged violation of Section 11 of the Securities

---

[4]

    DI 1470 (motion for summary judgment in *Starr*); DI 1472 (motion for summary judgment in *RHF*).

[5]

    *See In re Lehman Bros. Sec. & ERISA Litig.*, 799 F. Supp. 2d 258, 268-70, 276-83 (S.D.N.Y. 2011) ("*Lehman I*") (describing Repo 105 transactions and granting in part and denying in part defendants' motion to dismiss the Third Amended Class Action Complaint in the consolidated securities class action, No. 08-cv-5523).

[6]

    EY *Starr* Rule 56.1 Statement, ¶ 204.

[7]

    *Id.* ¶ 204.

    The purchases occurred in an equity offering rather than on the open market.  *Id*. ¶206.

[8]

    *Id.* ¶ 212.

    Starr alleges that it purchased Lehman stock in reliance on "Lehman's shelf registration statement dated May 30, 2006 as tiled on form S-3, and a prospectus supplement, dated June 9, 2008, to Lehman's May 30, 2006 prospectus as well as the documents incorporated by

3

Act,[9] (ii) professional negligence under New York law,[10] (iii) violations of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder,[11] and (iv) common law fraud.[12]

B.      RHF

RHF purchased $1.615 million in Lehman mid-term notes between October 19, 2007, and September 3, 2008[13] and other Lehman notes on May 21, May 27, and September 3, 2008, for $80,000, $40,000, and $90,000, respectively.[14]

The RHF Plaintiffs allege that EY made false or misleading statements in all of Lehman's annual and quarterly reports dating back to 2001.[15]   More specifically, they offer evidence

---

reference in those [materials], including Lehman's financial statements as audited by [EY]." *Starr* Am. Compl. ¶ 7 (internal parentheticals omitted). It claims that EY made false or misleading statements in connection with Lehman's 2007 second quarter report on Form 10-Q (filed July 10, 2007) ("1Q-07"), its 2007 third quarter report on Form 10-Q (filed October 10, 2007) ("3Q-07"), its 2007 annual report on Form 10-K (filed January 29, 2008) ("2007 10-K"), its 2008 first quarter report on Form 10-Q (filed April 8, 2008) ("1Q-08"), and its 2008 second quarter report on Form 10-Q (filed July 10, 2008) ("2Q-08").  *See* Decl. of M. Edling in Opposition to EY's Motions for Summary Judgment [DI 1525] Exs. 53 (3Q-07), 60 (2007 10-K), 74 (1Q-08), 95 (2Q-08).

[9]

    *Starr* Am. Compl. ¶¶ *59-79.*

[10]

    *Id.* ¶¶ 80-91.

[11]

    *Id.* ¶¶ 92-125.

[12]

    *Id.* ¶¶ 126-32.

[13]

    EY's *RHF* Rule 56.1 Statement ¶ 203.   The CUSIP number for all purchases was 52517PA35.

[14]

    *Id.*

[15]

    *RHF* First Am. Compl. ¶¶ 260-63.

that their advisors at relied on financial filings made by Lehman in 2007 and 2008[16] and that RHF's treasury director, Brian Mangone, reviewed Lehman's 2007-10K and relied on Lehman's net leverage as there reported when communicating with RHF's advisors about the prudence of continued investment in Lehman.[17]  The RHF Plaintiffs sue for alleged (I) violations of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder,[18] (ii) fraud and deceit under California law,[19] (iii) and aiding and abetting fraud under California law.[20]

## II.     *Lehman's Use of Repo 105*

Allegations concerning a type of transaction known as a "Repo 105," and its effect on Lehman's net leverage, are critical to plaintiffs' claims against EY.[21]

"Repo" is short for repurchase agreement.  A repo is a two-step transaction that may be used to obtain short-term funding.[22]   In the first step, the entity needing funds—the transferor—transfers securities or other assets to a counter-party in exchange for cash.   It

---

16

     *See* Pltfs.' Mem. in Opposition to EY's Motions for Summary Judgment [DI 1521] at 121.

17

     *Id.* at 123.

18

     *RHF* First Am. Compl. ¶¶ 335–31.

19

     *Id.* ¶¶ 345-52.

20

     *Id.* ¶¶ 353-62.

21

     The following discussion is adapted from *Lehman I*, 799 F. Supp. 2d at 268-69.

22

     ACCOUNTING FOR TRANSFERS AND SERVICING OF FINANCIAL ASSETS AND EXTINGUISHMENTS OF LIABILITIES, Statement of Financial Accounting Standards No. 140 ¶ 96. (Fin. Accounting Standards Bd. 2000) ("SFAS 140").

5

concurrently agrees to reacquire the transferred assets at a future date for an amount equal to the cash exchanged plus an agreed-upon charge that may be analogized to, and here is referred to, as interest.  In the second stage, the transferor pays the counter-party the original cash amount plus the agreed-upon interest, and the counter-party returns the originally transferred assets.  The repo thus is like a loan.  In the first step, the counter-party provides cash to the transferor in exchange for a promise by the transferor to repurchase the transferred assets.  In the second step, the transferor repays the counter-party with interest and gets its collateral back.  The length of time between the initial transfer and the repurchase date can vary, as can the interest and the transferee's ability to use the assets while the repo is in place.

Plaintiffs' allegations against EY rest on the differences between two types of repo transactions.  The first is what plaintiffs call an "Ordinary Repo."[23]  Starr and the RHF plaintiffs allege that Lehman accounted for Ordinary Repos as financings, recording the cash it received from counter-parties as an asset and its obligation to repurchase the securities plus the "interest" as a liability.  The collateral—the transferred assets—remained on Lehman's balance sheet as assets.[24] Hence, Ordinary Repos, depending upon whether Lehman held the financing proceeds or used them to reduce other debt, increased or did not change Lehman's reported net leverage.  The effect of this accounting was to keep the transferred assets on Lehman's balance sheet and increase its reported net leverage.

---

[23]  *Starr* Am. Compl. ¶ 22; *RHF* First Am. Compl. ¶¶ 112, 114.

[24]  *Starr* Am. Compl. ¶ 23; *RHF* First Am. Compl. ¶ 98.

6

The second type of repo transaction was known as a "Repo 105."[25]   Repo 105 transactions involved the same two steps as Ordinary Repos, but Lehman treated them differently for financial reporting purposes.   The asset that was the collateral for a Repo 105 was treated as though it actually had been sold in consequence of which it was removed from Lehman's balance sheet.[26]   Further, Lehman then used the cash received from Repo 105 transactions to pay down other existing liabilities.   This practice decreased its net leverage ratio because it reduced the numerator in the net leverage ratio (net assets) by (a) the "sale" of the "collateral," and (b) the use of the cash thus obtained to pay down other debt, while having no effect on the denominator (tangible equity).

Plaintiffs allege that Lehman repeatedly used Repo 105 transactions near the ends of its quarterly reporting periods solely to lower its net leverage as of the last date of each quarter. They allege also that Lehman's net leverage was an important financial metric because it was an indicator of the company's ability to absorb any losses sustained by its riskiest assets.   A lower net leverage ratio allegedly indicated that Lehman was better positioned to absorb such losses had its net leverage ratio been higher.   The effect of the Repo 105 transactions therefore allegedly was to present Lehman as being in a stronger financial position than it actually was.

Lehman's lower reported net leverage at the end of each quarter allegedly did not last long.   Shortly after each quarter closed, Lehman executed the second step of the Repo 105

---

25

The Court uses the term "Repo 105" to refer collectively to Repo 105 and Repo 108 transactions.  Report of Anton R. Valukas, Examiner, at 732 n.2847, *In re Lehman Bros. Holdings, Inc.*, No. 08–13555 (Bankr. S.D.N.Y. Mar. 11, 2010) [DI 7531].  Repo 108 transactions were largely the same as Repo 105 transactions except that they were overcollateralized by at least eight percent (hence the name Repo 108) rather than the five percent minimum as occurred in Repo 105.  *Id.* at 732 n.2847.

26

*Starr* Am. Compl. ¶ 24; *RHF* First Am. Compl. ¶ 99.

transactions, transferring cash to the counter-parties in the amounts it initially had paid plus the agreed-upon interest and reacquiring the assets it had transferred.  Lehman then restored the assets to its balance sheet.  It thereby returned its net leverage to the pre-Repo 105 level.  The entire process was repeated prior to and after the next quarterly reporting date.[27]

Lehman's use of Repo 105 increased dramatically throughout 2007 and 2008, as indicated by the table below:[28]

| Quarter | Quarter-End Repo 105 Balance | Quarter | Quarter-End Repo 105 Balance |
|---------|------------------------------|---------|------------------------------|
| Q1 2004 | $11 billion | Q2 2006 | $21 billion |
| Q2 2004 | $13 billion | Q3 2006 | $27 billion |
| Q3 2004 | $16 billion | Q4 2006 | $25 billion |
| Q4 2004 | $16 billion | Q1 2007 | $29 billion |
| Q1 2005 | $13 billion | Q2 2007 | $32 billion |
| Q2 2005 | $18 billion | Q3 2007 | $36 billion |
| Q3 2005 | $14 billion | Q4 2007 | $39 billion |
| Q4 2005 | $15 billion | Q1 2008 | $49 billion |
| Q1 2006 | $14 billion | Q2 2008 | $50 billion |

III.    *EY's Alleged Misstatements*

As Lehman's auditor, EY issued year-end audit letters on Lehman's financial

---

[27]

*Starr* Am. Compl. ¶¶ 24-25; *RHF* First Am. Compl. ¶¶ 87-88.

[28]

EY's Reply Rule 56.1 Statement [DI 1573] at 54-55.

8

statements.[29]  EY's audit letters, which appeared in Lehman's filings on Form 10-K, contained

passages that are at the heart of plaintiffs' claims:[30]

> We conducted our audits in accordance with the standards of the Public Company
> Accounting Oversight Board (United States). Those standards require that we plan
> and perform the audit to obtain reasonable assurance about whether the financial
> statements are free of material misstatement.  An audit includes examining, on a test
> basis, evidence supporting the amounts and disclosures in the financial statements.
> An audit also includes assessing the accounting principles used and significant
> estimates made by management, as well as evaluating the overall financial statement
> presentation.  We believe that our audits provide a reasonable basis for our opinion.
>
> In our opinion, the financial statements referred to above present fairly, in all
> material respects, the consolidated financial position of Lehman Brothers Holdings
> Inc. at November 30, 2007 and 2006, and the consolidated results of its operations
> and its cash flows for each of the three years in the period ending November 30,
> 2007, in conformity with U.S. generally accepted accounting principles.

The first quoted paragraph is referred to as the "GAAS opinion," as it opines that

EY's audit was conducted in accordance with generally accepted auditing standards.  The second

expresses the opinion that Lehman's financial statements fairly presented Lehman's financial

position and results of operations in accordance with generally accepted accounting principles,

which is referred to as the "GAAP opinion.[31]

Now that discovery has closed, Starr and the RHF Plaintiffs articulate three primary

---

[29]

*Lehman I*, 799 F. Supp.2d at 298 (quoting Lehman's 2007 10-K).

[30]

The quoted language is from the letter accompanying the financial statements for the period
ended November 30, 2007 but is identical in all material respects to letters accompanying
financial statements for all other periods relevant here.

[31]

In addition, EY "reviewed and issued review reports on, but did not express opinions on,
Lehman's unaudited quarterly financial statemetns in [Lehman's] Forms 10-Q.  EY *Starr*
Rule 56.1 Statement ¶ 48.  Those reports "did not express an opinion regarding that interim
financial information" but stated that EY was not "aware of any material modification that
should be made to the consolidated  financial statements . . . for them to be in conformity
with U.S. generally accepted accounting principles."  *Id.* ¶ 52.

theories on which they assert that EY is liable.  *First*, they allege that the GAAP opinion was materially misleading because it "omitted to disclose Lehman's usage of Repo 105 transactions at quarter-end to temporarily manipulate Lehman's reported financial metrics, including its net leverage ratio."[32]  *Second*, plaintiffs contend that the GAAS opinion was materially false and misleading because EY's audits were not conducted in accordance with PCAOB standards.[33]  *Third*, plaintiffs assert that EY is strictly liable under Section 11 of the Securities Act (subject to a due diligence defense) because it "expertized" Lehman's misrepresentations in the company's financial statements. In particular, plaintiffs argue that a footnote to Lehman's financial statements said that Lehman had accounted for all repo transactions as financings although Lehman, to EY's knowledge, in fact accounted for its Repo 105 transactions as sales.[34]

## Discussion

I. *The Summary Judgment Standard*

        Summary judgment is warranted if there is no genuine issue of material fact and the

---

[32] Pltfs.' Supplemental Mem. of Law [DI 1652] at 7.

[33] *See id.* at 7-8 ("Among other things, EY failed to: (i) test Repo 105 transactions, and instead relied on management to advise as to them, in violation of AU § 316.13; (ii) exercise professional skepticism, in violation of AU § 316.13; (iii) read documents that Lehman provided to it . . . in violation of AU §110.02; (iv) identify Repo 105 as an area of fraud risk and design the audit accordingly, in violation of AU § 316; (v) identify and understand Lehman's 'objectives and strategies' relating to its usage of Repo 105, in violation of AU § 314.29; (vi) obtain sufficient competent evidential matter under AU § 150.02 with regard to Lehman's use and disclosure of Repo 105 transactions; and (vii) state in its audit opinion that Lehman's disclosures about Repo 105 were not reasonable and adequate, in violation of AU § 431.01.").

[34] *Id.* at 8.  *See, e.g.*, 2007 10-K at 97 (stating that "[s]ecurities purchased under agreements to resell and securities sold under agreements to repurchase" are "[t]reated as collateralized agreements and financings for financial reporting purposes").

10

moving party is entitled to judgment as a matter of law.[35]  The moving party must demonstrate the

absence of any genuine issue of material fact, and the Court must view the facts in the light most

favorable to the nonmoving party.[36]  Where, as here, the burden of proof at trial would fall on the

nonmoving party, it ordinarily is sufficient for the movant to point to a lack of evidence to go to the

trier of fact on an essential element of the non-movant's claim.[37]  In that event, the non-moving party

must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in

order to avoid summary judgment.[38]


II.     *Whether Plaintiffs Have Raised a Genuine Issue of Fact as to Whether EY's GAAS and
        GAAP Opinions Were False or Misleading*

        Section 10(b) of the Exchange Act makes it unlawful to "use or employ, in

connection with the purchase or sale of any security . . . any manipulative or deceptive device or

contrivance in contravention of such rules and regulations as the Commission may prescribe."[39]

And SEC Rule 10b-5, which implements the statute, prohibits making "any untrue statement of a

material fact or [omitting] to state a material fact necessary in order to make the statements made,

---

[35]
        FED. R. CIV. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986); *White v. ABCO Eng'g Corp.*, 221 F.3d 293, 300 (2d Cir. 2000).

[36]
        *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970).

[37]
        *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Virgin Atl. Airways Ltd. v. British Airways PLC*, 257 F.3d 256, 273 (2d Cir. 2001).

[38]
        *Celotex*, 477 U.S. at 322-323; *Raskin v. Wyatt Co.*, 125 F.3d 55, 65-66 (2d Cir. 1997).

[39]
        15 U.S.C. § 78j(b).

in the light of the circumstances under which they were made, not misleading."[40]  To recover for a

violation of Section 10(b) and Rule 10b-5, a private securities plaintiff must prove six elements:

"(1) a material misrepresentation or omission by the defendant; (2) *scienter*; (3) a connection

between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon

the misrepresentation or omission; (5) economic loss; and (6) loss causation."[41]

Under Section 11 of the Securities Act, plaintiffs "need not allege *scienter*, reliance,

or loss causation,"[42] but they must assert that "the registration statement contained an untrue

statement of a material fact or omitted to state a material fact required to be stated therein or

necessary to make the statements therein not misleading."[43]

EY moves for summary judgment on the ground that plaintiffs have failed to adduce

evidence sufficient to create a genuine issue of material fact as to whether EY's statements in

Lehman's financial filings were false or misleading.

A.    *Statements of Opinion and* Omnicare

The parties now agree that EY's statements concerning Lehman's compliance with

---

[40]

17 C.F.R. § 240.10b-5(b).

[41]

*Halliburton Co. v. Erica P. John Fund, Inc.*, 134 S. Ct. 2398, 2407 (2014) (internal quotation marks omitted); *see also ECA & Local 134 IBEW Joint Pension Trust of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 197 (2d Cir. 2009) ("[T]o succeed on a claim, a plaintiff must establish that the defendant, in connection with the purchase or sale of securities, made a materially false statement or omitted a material fact, with *scienter*, and that the plaintiff's reliance on the defendant's action caused injury to the plaintiff." (internal quotation marks omitted)).

[42]

*In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d at 359.

[43]

*Id.* at 358-59.

GAAP and EY's compliance with GAAS were statements of opinion.[44]  In *Lehman I*, the Court

determined that the same standard governs whether such statements are false or misleading under

Section 10(b) of the Exchange Act and Section 11 of the Securities Act.[45]  The Court stated that

plaintiffs seeking damages against EY on the basis of its audit opinion had to allege plausibly "facts

that, if true, would permit a conclusion that [EY] either did not in fact hold that opinion or knew that

---

[44]

This Court held in *Lehman I* that both the GAAP and GAAS statements in EY's audit reports were statements of opinion.  *Lehman I,* 799 F. Supp.2d at 298-304.  It their initial memorandum in opposition to EY's motion, these plaintiffs did not dispute that holding as to the GAAP statements, repeatedly characterizing them as statements of opinion.  *E.g.,* Pltfs.' Mem. in Opposition to EY's Motions for Summary Judgment [DI 1521] ("Pl. Mem.") at 2, 6-7, 35-36, 51 et al..  At that point, however, they urged the Court to reconsider its holding with respect to the GAAS statements, contending that whether EY "conducted its audits and reviews in accordance with PCAOB standards," "[s]imply put, . . . . is not a matter of opinion – it is a matter of fact."  *Id.* at 69-70.  In their supplemental memorandum following *Omnicare, Inc. v. Laborers Dist. Council Constr. Ind. Pension Fund,* 135 S. Ct. 1318 (2015), however, plaintiffs expressly conceded that EY's statements that it had conducted GAAS-complaint audits were "statement[s] of opinion, just like its GAAP/fair presentation opinion[s]."  Pl. Mem. at 5.

In any case, an auditor's statement that the auditor conducted an audit in conformity with GAAS cannot properly be characterized as a statement of fact given the general and often inherently subjective nature of the standards that make up significant parts of generally accepted auditing standards.  *See, e.g., Lehman I,* 799 F. Supp.2d at 300.  This view is supported even by a cursory examination of many of the relevant auditing standards, which make compliance with GAAS depend upon such things as the exercise of "due professional care" (AU § 230.01), the maintenance of "an attitude that includes a questioning mind and a critical assessment of audit evidence" (*id.* § 230.07), possession of "'the degree of skill commonly possessed' by other auditors" (*id.* § 230.05),  "proper supervision of the work of engagement team members" by the engagement partner (Auditing Standard ["AS"] 10.3), and the requirement that the auditor, in forming an opinion as to whether the financial statements fairly present the financial conditions and results of operations, "take into account all relevant audit evidence, regardless of whether it appears to corroborate or to contradict the assertions in the financial statements" (AS 14.3).  Many other examples could be given.  And the point is that whether an auditor has exercised due professional care, possessed a "questioning attitude" or the skills commonly possessed by other auditors, and so on, all involve judgments as to which reasonable persons could differ except, perhaps, in the most obvious cases.

[45]

*See Lehman I*, 799 F. Supp. 2d at 300.

it had no reasonable basis for it."[46]

Not long after briefing was completed on EY's motions for summary judgment, the Supreme Court decided *Omnicare, Inc. v. Laborers District Council Construction Industry Pension Fund,*[47] which directly addressed how courts should treat allegedly false or misleading statements of opinion under the securities laws.[48]  This Court subsequently afforded the parties an opportunity to submit supplemental briefing in light of *Omnicare*.[49]  So the logical starting point is to state with precision exactly what *Omnicare* said and the context in which it said it.[50]

Much could be said about the development of the securities laws with respect to whether and when statements of opinion or belief can give rise to liability.  For present purposes, however, it suffices to begin by noting that the Supreme Court in *Virginia Bankshares v. Sandberg*[51] made clear that the securities laws do not impose an absolute bar to liability for statements of

---

[46]

    *Id.* at 302.

[47]

    135 S. Ct. 1318 (2015).

[48]

    The Court recognizes that *Omnicare* was a Section 11 case.  Nonetheless, its reasoning applies with equal force to other provisions of the federal securities laws, including, as relevant to this case, Section 10(b) and Rule 10b-5, which uses very similar language.  *See City of Omaha Civilian Emps.' Ret. Sys. v. CBS Corp.*, 679 F.3d 64, 67-68 (2d Cir. 2012) (noting that Section 10(b) and Section 11 claims, which "share a material misstatement or omission element," involve "the same reasoning").

[49]

    Pretrial Order No. 100  [DI 1644].

[50]

    The following discussion draws heavily on this Court's opinion in *City of Westland Police and Fire Ret. Syst.v. MetLife, Inc.,* ___ F. Supp.3d ___, No. 12-0256 (LAK)*,* 2015 WL 531196 (S.D.N.Y. Sept. 11, 2015)

[51]

    501 U.S. 1083 (1991).

14

opinion or belief. But the Court in *Omnicare*[52] made just as clear that it is substantially more difficult for a securities plaintiff to allege adequately (or, ultimately, to prove) that such a statement is false than it is to allege adequately (or prove) that a statement of pure fact is false.

To allege adequately that a statement of fact (*e.g.*, "the New York Yankees today have the best won-lost record in baseball") is false within the meaning of the securities laws, a plaintiff need plead only facts that, if true, would be sufficient to show that the statement is, in fact, false – *i.e.*, that the Yankees today do not have the best won-lost record in baseball. In this context, the speaker's belief as to the accuracy of the statement is irrelevant: if the Yankees do not today have the best record in baseball – and they do not – the statement is "untrue" for purposes of Rule 10b-5 regardless of whether the speaker knew it was false or thought, mistakenly, that it was correct.[53]

To allege adequately that a statement of opinion or belief (*e.g.*, "*I believe* the New York Yankees have the best won-lost record in baseball") is false within the meaning of the securities laws, on the other hand, a plaintiff must plead facts that, if true, would be sufficient to show one of two things: that (1) the opinion or belief itself "constitutes a factual *misstatement*," or (2) the opinion or belief is "rendered misleading by the *omission* of discrete factual representations."[54] However, while there are two ways for a plaintiff who challenges a statement of opinion or belief to state a legally sufficient claim under Rule 10b-5, courts considering whether such a plaintiff has met its burden must remember that each of these methods is tied to a separate and distinct provision

---

[52]

     135 S. Ct. 1318 (2015).

[53]

     *See id.* at 1326 (noting that where a "determinate, verifiable statement" is in fact incorrect, it matters not that the speaker's mistaken assertion was "innocent[]").

[54]

     *Id.* at 1325 (emphasis added).

15

of the Rule.[55]

A plaintiff who asserts that a statement of opinion or belief violates the first provision of the Rule – a plaintiff who asserts, in other words, that the opinion or belief in itself is an "*untrue statement* of a material fact" – must do more than allege that the underlying fact is false (*i.e.*, that the Yankees do not have the best record in baseball).  Rather, such a plaintiff must plead facts that, if true, would be sufficient to show that the speaker did not "actually hold[] the stated belief" (*i.e.*, that the speaker knew the Yankees did not have the best record in baseball but said they did anyway).[56]

Similarly, a plaintiff who asserts that a statement of opinion or belief violates the second provision of the Rule – a plaintiff who asserts, in other words, that the speaker "*omit*[*ted*] to state a material fact necessary in order to make" its opinion or belief "not misleading" – "cannot state a claim by alleging only that [the] opinion was wrong."  "[A] statement of opinion is not

---

55

 *See id.* (noting that the question whether a statement of a material fact is untrue "present[s] different issues" than the question whether the speaker has omitted to state a material fact necessary to make its statement(s) not misleading).

56

 *Id.* at 1326; *see also Fait v. Regions Fin. Corp.*, 655 F.3d 105, 113 (2d Cir. 2011) (noting that statements of opinion "not honestly believed when they were made" are actionable).

 Unlike with statements of pure fact, it is of no importance that a "sincere statement" of opinion or belief "turn[s] out to be wrong."  *Omnicare*, 135 S. Ct. at 1327.  Where the speaker's opinion or belief is genuine, a bare allegation that her opinion or belief ultimately proved incorrect is not enough to survive a motion to dismiss after *Omnicare*.  *Id.* ("[A] sincere statement of pure opinion is not an 'untrue statement of material fact,' regardless whether an investor can ultimately prove the belief wrong.").  Indeed, the securities laws do "not allow investors to second-guess inherently subjective and uncertain assessments;" they are not, in other words, "an invitation to Monday morning quarterback an issuer's opinions."  *Id.*

misleading just because external facts show the opinion to be incorrect."[57]  Instead, recognizing that

statements of opinion or belief in some circumstances "are reasonably understood to rest on a factual

basis that justifies them as accurate,"[58] a plaintiff who asserts that the defendant omitted to state a fact

(or facts) necessary to make a statement of opinion or belief "not misleading" must "call into

question the issuer's basis for offering the opinion."[59]  But before explaining what a plaintiff must

do to satisfy this standard, it is important to explain why the standard exists in the first place.

Rule 10b-5's "omissions clause . . . necessarily brings the reasonable person into the

analysis, and asks what she would naturally understand a statement to convey beyond its literal

meaning."[60]  With respect to statements of opinion or belief, "that means considering the foundation

she would expect an issuer to have before making the statement."[61]  For example, in the context of

"formal documents," like financial statements filed with the SEC, reasonable investors "do not, and

are not right to, expect opinions contained in those statements to reflect baseless, off-the-cuff

judgments."[62]  Rather, they properly may assume that expressions of opinion contained therein

"convey facts about how the speaker has formed the opinion" – *i.e.*, facts "about the speaker's basis

---

[57]      *Id.* at 1328, 1332.

[58]      *Va. Bankshares*, 501 U.S. at 1093; *see also Weiss v. SEC*, 468 F.3d 849, 855 (D.C. Cir. 2006) ("Under the securities laws, a statement of opinion includes an implied representation that the speaker rendered the opinion in good faith and with a reasonable basis.").

[59]      *Omnicare*, 135 S. Ct. at 1332.

[60]      *Id.* at 1331-32.

[61]      *Id.* at 1332.

[62]      *Id.* at 1330.

for holding that view."[63]   Where they do not, such statements may mislead their audiences in violation of Rule 10b-5.[64]   One or two examples may be illustrative.

If the directors of Company X tell their shareholders that a proposed merger offers a "fair" price for Company X's shares, they have stated their opinion about the deal.   Whether a particular deal is "fair" is, after all, not a determinate, verifiable statement like "this ring is 24-carat gold" or "water boils at 212 degrees Fahrenheit (at standard atmospheric pressure)." But financial professionals have developed specific metrics – such as the residual income model, the dividend discount model, and discounted cash flow analysis, among others – to perform valuations of companies, their stock prices, and the like.[65]   Thus, a statement that a deal is "fair" reasonably may be understood as a statement, or at least as an implication, that the opinion reflects or is based upon one or more accepted valuation metrics.   In other words, even assuming that the directors actually believe that the offered price is "fair," they arguably may have liability under Rule 10b-5's omissions clause if (1) their opinion rests solely upon subjective views and does not reflect or rest upon an accepted valuation metric, and (2) they fail to disclose that fact.

Similarly, if an appraiser states that a piece of real estate is worth $100,000, the appraiser, in effect, has said that it is the appraiser's opinion or belief that the property is worth $100,000.   But there are widely-accepted methods by which appraisers form judgments as to the

---

[63]       *Id.* at 1328.

[64]       *See id.*

[65]       *See generally* MARIO MASSARI ET AL., THE VALUATION OF FINANCIAL COMPANIES (2014).

18

value of real estate.[66]  So, just as in the preceding example, an real estate appraiser who offers an

opinion as to value, depending upon the context, reasonably might be regarded as having said in

substance (or implied) that the appraiser's view reflects or is supported by accepted principles of real

estate valuation applied to appropriate data.  Liability therefore perhaps could follow on the theory

that it was materially misleading for the appraiser to omit the fact that the opinion was unsupported

by accepted principles and relevant data if, in fact, that were so.

> The point, in each example, is the same.  If the directors' statements about the

fairness of the deal or the appraiser's valuation of the real estate are not grounded in "the customs

and practices of the relevant industry," they "could be misleadingly incomplete,"[67] at least in some

contexts.  That is so because the reasonable person, who "understands a statement of opinion in its

full context," would expect "not just that the issuer believes the opinion (however irrationally)," but

that the opinion "rest[s] on some meaningful . . . inquiry – rather than, say, on mere intuition,

however sincere."[68]

---

[66]

> *See CSX Transp., Inc. v. Ga. State Bd. of Equalization*, 552 U.S. 9, 17 (2007) ("Valuation is not a matter of mathematics . . . .  Rather, the calculation of true market value is an applied science, even a craft. Most appraisers estimate market value by employing not one methodology but a combination. These various methods generate a range of possible market values which the appraiser uses to derive what he considers to be an accurate estimate of market value, based on careful scrutiny of all the data available.").

[67]

> *Omnicare*, 135 S. Ct. at 1328, 1330.

[68]

> *Id.* at 1328-30.
>
> While a reasonable investor undoubtedly expects that an issuer's opinion statement "fairly aligns with the information in the issuer's possession at the time," the reasonable investor "does not expect that *every* fact known to an issuer supports its opinion statement."  *Id.* at 1329.  Thus, an "opinion statement . . . is not necessarily misleading when an issuer knows, but fails to disclose, some fact cutting the other way."  *Id.*

So what, then, must a plaintiff plead to state a legally sufficient claim that the defendant "omit[ted] to state a material fact necessary" to make its statement of opinion "not misleading?"[69] *Omnicare* holds that a plaintiff "cannot just say that the issuer failed to reveal [the] basis" for the opinion.[70] Such a "conclusory assertion[]" may be enough to allege adequately that an omission has occurred, but it offers no reason to think the omission "rendered a published statement misleading."[71] Nor may the plaintiff merely "recit[e] . . . the statutory language" or offer bare "conclusory allegation[s]" that the issuer "lacked reasonable grounds for the belief it stated."[72] Rather, the plaintiff "must identify particular (and material) facts going to the basis for the issuer's opinion – facts about the inquiry the issuer did or did not conduct or the knowledge it did or did not have – whose omission makes the opinion statement at issue misleading to a reasonable person reading the statement fairly and in context."[73] In the context of a financial statement filed with the SEC, a plaintiff who asserts a claim under the *omissions* clause of Rule 10b-5 must allege, in other words, not only that the financial statement "omits material facts about the issuer's inquiry into or knowledge concerning a statement of opinion," but also that "those facts conflict with what a

---

[69]     17 C.F.R. § 240.10b-5(b).

[70]     135 S. Ct. at 1329.

[71]     *Id.* at 1332.

[72]     *Id.* at 1333 (internal quotation marks omitted).

[73]     *Id.* at 1332.  Indeed, "whether an omission makes an expression of opinion misleading always depends on context," and the securities laws "create[] liability only for the omission of material facts that cannot be squared with" reading an expression of opinion "in its full context."  *Id.* at 1330.

20

reasonable investor would take from the statement itself."[74]  "That is no small task for an investor."[75]

In sum, then, a plaintiff who asserts that a statement of opinion or belief is false or misleading must plead facts that, if true, would be sufficient to show one of two things: (1) if asserting that the statement of opinion or belief "constitutes a factual misstatement" in itself,  that the speaker did not "actually hold[] the stated belief," or (2) if asserting that the statement of opinion of belief is misleading due to the omission of "discrete factual representations," that the statement did not "rest on some meaningful . . . inquiry," rendering it "misleading to a reasonable person reading the statement fairly and in context."[76]

---

[74]

*Id.* at 1329.

Another way of stating this is that the plaintiff must plead facts that, if true, would be sufficient to show (1) that the financial statement omitted facts that would be material to a reasonable investor, and (2) that the omission of those facts rendered the issuer's statements of opinion or belief misleading by revealing that the issuer "lacked the basis for making those statements that a reasonable investor would expect."  *Id.* at 1333.

[75]

*Id.* at 1332.

[76]

*Id.* at 1325-28, 1332.

This Court held more than four years ago that a plaintiff challenging a statement of opinion or belief adequately alleges a violation of the securities laws by pleading facts that, if true, would be sufficient to show that the defendant "either did not in fact hold that opinion or knew that it had no reasonable basis for it." *In re Lehman Bros. Sec. & ERISA Litig.*, 799 F. Supp. 2d at 302.  Other courts have hinted at the same.  *See, e.g.*, *Kowal v. MCI Commc'ns Corp.*, 16 F.3d 1271, 1277 (D.C. Cir. 1994) (statements of opinion or belief are "misleading for the purposes of the securities laws if they . . . lacked a reasonable basis when made").  And at common law, a misrepresentation was fraudulent if the plaintiff could show, among other things, that it was made "recklessly, careless whether it be true or false." *Bose Corp. v. Consumers Union of U.S.*, 466 U.S. 485, 502 n.19 (1984) (internal quotation marks omitted); *see also* RESTATEMENT (SECOND) OF TORTS § 526 (1977); RESTATEMENT (THIRD) OF TORTS: LIAB. FOR ECON. HARM § 10 (Tentative Draft No. 2, 2014).

The Court recognizes that its formulation of the standard in *In re Lehman Brothers Securities & ERISA Litigation* was not as precise as that articulated in *Omnicare*.  In substance, however, it regards them as similar or even identical.

Applied to this case, the *Omnicare* standard is straightforward.  To survive EY's motion for summary judgment, Starr and RHF were obliged to come forward with admissible evidence sufficient to create a genuine issue of material fact as to (I) whether EY *did not actually believe* that its audit of Lehman complied with GAAS, (ii) whether EY *did not actually believe* that Lehman's financial statements fairly presented the company's financial position and results in accordance with GAAP, or (iii) whether a reasonable investor, in the pertinent context, could have been misled about the validity of EY's GAAS and GAAP opinion or about the accuracy of Lehman's financial statements, in either case by virtue of one or more material omissions by EY. In other words, the question is whether plaintiffs have offered evidence sufficient to create a genuine issue of material fact regarding whether EY's GAAS and GAAP opinions could have been materially "misleading to a reasonable person reading the statement[s] fairly and in context."[77]

### B.    *Plaintiffs' Evidence*

Plaintiffs point to six "red flags" that, they claim, create a genuine issue of material fact on this question.

*First*, plaintiffs cite a series of documents entitled "Consolidated Global Balance Sheet Analysis" reports ("CGBSAs") that Lehman prepared quarterly and transmitted to EY.[78] According to plaintiffs, each CGBSA contained "(I) a chart indicating a huge upward spike in

---

[77]

 *Id.* at 1325-28, 1332.

[78]

 *See* Decl. of K McDonough [DI 1485] Ex. 98 (Nov. 30, 2005 CGBSA) at Bates EY-SEC-LBHI-WP-2001-2006-000451; Ex. 99 (Aug. 31, 2007 CGBSA) at Bates EY-SEC-LBHI-WP-3Q07 000374; Ex. 96 (Nov. 30, 2007 CGBSA) at Bates LBHI_DE_04049686; Ex. 102 (May 31, 2008 CGBSA) at Bates EY-SEC-LBHI-WP-2Q08 000217.

22

volume of Repo 105s at the quarter-end and a corresponding downward spike a mere days after period end . . . and (ii) a chart that computed Repo 105s upon which plaintiffs rely' precise numerical impact on net assets and net leverage at the end of each reporting period for the previous seven quarters."[79]

EY argues that plaintiffs cannot prove that anyone at EY actually read the pages of the CGBSAs containing information about Repo 105s, nor that anyone at EY had any duty to do so.[80] It contends that it used the CGBSAs, under its audit plan, only to compare the current year's balance sheet line items with the previous year's, and that the pages about Repo 105 were mere surplusage. Plaintiffs insist that EY in fact had an affirmative duty to review the CGBSAs under applicable auditing standards.[81]

*Second*, plaintiffs point to a meeting between Lehman controller Martin Kelly and EY coordinating partner William Schlich. The meeting, which took place at some point between late 2007 and early 2008, allegedly included discussion of the dollar volume of Repo 105 transactions

---

[79]

DI 1521 at 6.

[80]

*See Stephenson v. PricewaterhouseCoopers LLP*, 768 F. Supp. 2d 562, 573 (S.D.N.Y. 2011) ("An unseen red flag cannot be heeded."); *see also id.* at 574 ("[E]ven if 'there was certainly a monster under the bed', for the Court 'the question is whether anyone had a reason to look there.'" (quoting *In re Refco, Inc. Sec. Litig.*, 503 F. Supp. 2d 611, 649 (S.D.N.Y. 2007))).

[81]

*See* DI 1521 at 61-62 (identifying seven reasons that plaintiffs contend, show that information about Repo 105 merited special scrutiny); AU § 110.02 (SAS 1) (requiring auditors "to plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement, whether caused by error or fraud.").

and their higher use at quarter-end.[82]  EY argues that this evidence falls short of showing that "Kelly expressed any concern about the transactions or Lehman's financial reporting or [that he] indicated that Lehman used the Repo 105s for a manipulative purpose" and therefore that this evidence is not a true "red flag."[83]

The timing of the meeting is hotly contested.  EY argues that there is no documentary evidence that the meeting occurred before Lehman issued its 2007 10-K on January 29, 2008.  If the meeting occurred after that date, then plaintiffs who made purchases in reliance on the 2007 10-K could not cite the Kelly/Schlich meeting as a "red flag."  While Schlich himself testified that the meeting occurred after the filing of the 10-K,[84] Kelly testified that he cannot remember the exact date but remembers that the meeting occurred sometime between December 2007 and February 2008[85] Plaintiffs maintain that, despite the ambiguity over timing, "the fact of Kelly's conversation with Schlich alone suffices to raise triable issues of fact as to [EY's] awareness that Lehman could have been using Repo 105s to window dress Lehman's balance sheet."[86]

*Third*, plaintiffs point to a June 12, 2008 interview that EY conducted with Matthew Lee, a Lehman vice president who allegedly told EY that Lehman used Repo 105 transactions to

---

[82]

    *See* DI 1525 Ex. 190 (Kelly Dep. Tr. (Sept. 10, 2013)) at 199:3-12; Ex. 192 (N.Y. Att'y Gen. Tr. (Nov. 17, 2010)) at 49:6-19.

[83]

    EY's Reply Mem. of Law [DI 1572] at 22.

[84]

    *See* DI 1485 Ex. 57 (Schlich Dep. Tr. (Sept. 11-12, 2013)) at 364:6-366:3.

[85]

    *See* DI 1485 Ex. 164 (Kelly SEC Tr. (Jul. 20, 2010)) at 172:4-14.

[86]

    DI 1521 at 64.

"remove temporarily $50 billion from its balance sheet at the end of the second quarter of 2008."[87]

While this interview took place too late to affect EY's conduct before the filing of Lehman's 2Q-08, plaintiffs cite the deposition testimony of Hillary Hansen, an EY senior partner. Hansen testified that Lee's June 2008 disclosures were "nothing new" to her.[88] They assert that "[i]f Lee's disclosures in June 2008 were sufficient to put [EY] on notice that Lehman may be using Repo 105 to manipulate the balance sheet, Hansen's testimony that she already knew this information is surely enough to raise a triable issue of fact."[89] EY argues that plaintiffs "blatantly mischaracterize Hillary Hansen's deposition testimony" because she testified only that "she was aware prior to the Lee meeting on June 12, 2008, that Lehman engaged in short-term repo transactions accounted for as sales under SFAS 140."[90]

*Fourth*, plaintiffs argue more generally that EY long had been aware that Lehman used Repo 105 transactions to massage its reported net leverage.  They cite two pieces of evidence.  The first is deposition testimony of former EY coordinating partner Kevin Reilly.  Plaintiffs argue that Lehman told Reilly in 2001 that one "advantage" of Repo 105 is that it positively impacted Lehman's leverage and balance sheet.[91]  The second is deposition testimony of Matthew Kurzweil, another EY partner, who stated that EY "understood 'the possibility' that 'Lehman could have been

---

[87]

     *Id*. at 301.

[88]

     Supplemental Decl. of Kevin McDonough [DI 1571] Ex. 265 (Hansen Dep. Tr. (Aug. 29, 2013)) at 203:15-204:8.

[89]

     DI 1521 at 58.

[90]

     DI 1572 at 16-17.

[91]

     *See* DI 1525 Ex. 182 (Reilly N.Y. Att'y Gen. Tr. (Sept. 20, 2010)) at 107:17-108:9.

motivated to engage in . . . repo 105 transactions in order to . . . reduce its balance sheet' and that they could be 'construed' as window-dressing."[92]

EY argues that Reilly was speaking from a "general perspective" and that he was "unaware of any effort by Lehman to use Repo 105 for the purpose of impacting its financial reporting."[93]  As to the Kurzweil testimony, EY asserts that he was speaking retrospectively and that he never testified that Lehman in fact used Repo 105 to manipulate its balance sheet.[94]

*Fifth*, plaintiffs rely on evidence that EY had "vetted and approved" Lehman's Repo 105 program and conducted a "comprehensive" review of the program in 2006.  They contend that a jury therefore could infer that EY understood before Lehman's collapse that Lehman was using Repo 105 to manipulate its balance sheet.[95]  EY responds that it discussed only accounting issues involving Repo 105 with Lehman and never discussed any information that would have been a "red flag" about balance sheet manipulation.

*Sixth*, plaintiffs argue that EY had a duty to audit Lehman's Repo 105 transactions more carefully in all the circumstances.  In particular, plaintiffs argue that the "significant size [and]

---

[92]  DI 1521 at 65 (quoting DI 1525 Ex. 194 (Kurzweil Dep. Tr. (June 11, 2013)) at 172:19-173:3, 86:3-15).

[93]  DI 1572 at 23 (citing DI 1571 Ex. 284 (Reilly Dep. Tr. (July 22, 2014)) at 159:9–160:11).

[94]  DI 1572 at 23 n.29.

[95]  DI 1521 at 66 (citing *In re IMAX Sec. Litig.*, 587 F. Supp. 2d 471, 485 (S.D.N.Y. 2008) (denying motion to dismiss claims against auditor where the auditor was "actively advising" defendant company as to the accounting policy at issue).  EY distinguishes *IMAX* on the grounds that the auditor in that case accounted for the transactions at issue *incorrectly*, where as the Court has ruled that EY complied with SFAS 140.  *See* DI 1572 at 23.

unusual and off balance sheet nature" of the transactions required more searching scrutiny.[96] Plaintiffs cite AU § 316.66 for the proposition that EY had a duty to "gain an understanding of the business rationale" for "significant transactions that are outside of the normal course of business . . . or that otherwise appear to be unusual."[97]  EY argues that plaintiffs' claim is a "red herring" and that its role was to "plan and perform audit procedures to obtain reasonable assurance about whether the financial statements [were] free of material misstatement, whether caused by error or fraud"—not to second-guess Lehman's business decisions.[98]

Taken as a whole, these six so-called "red flags" demonstrate that summary judgment would be inappropriate on the question of whether EY made false or misleading statements.  Some of this evidence appears compelling.  The CGBSAs and their "spike graphs," for example, would permit a jury to infer that EY had information in hand that strongly suggested that Lehman's quarter- and year-end balance sheets were misleading as to its net leverage ratio by virtue of its use of Repo 105s, perhaps with the purpose but certainly with the result of window dressing its balance sheets and presenting a misleading picture of its financial condition.  The issue over the timing and content of the Kelly/Schlich meeting likewise presents a *bona fide* factual dispute which, if resolved in plaintiffs' favor, points to the same conclusion.  Other pieces of evidence appear weaker.  But such determinations involve weighing the parties' proposed inferences, assessing witnesses' credibility, and otherwise assessing the persuasiveness of various arguments in a manner that would be

---

[96]     DI 1521 at 67.

[97]     DI 1521 at 46.

[98]     DI 1572 (quoting AU § 110.02).

27

inappropriate in the summary judgment context.[99]

Plaintiffs are not required at this juncture to demonstrate as a matter of law that EY made false or misleading statements.  They must demonstrate only that there is a genuine issue of material fact that EY did so.  The Court is satisfied that they have achieved that objective.

A final word is appropriate.  EY repeatedly argues that its statements could not have been false or misleading because "EY's audit reports divulged the bases for both its GAAP and GAAS opinions."[100]  It asserts that "[t]he GAAP opinion is expressly based on the GAAS opinion" and that the GAAS opinion, too, "divulges its basis—*i.e.*, EY's belief that it conducted its audits in accordance with PCAOB standards."[101]  The ultimate – if tacit – implication here is that an audit opinion *never* can be false or misleading so long as the auditor's opinion about fair presentation of a company's financial position and results itself is predicated on a good faith opinion that the auditor performed its audit in compliance with GAAS.  Like philosophy's apocryphal turtles, EY's view of auditing is that "it's opinions all the way down."[102]  But this argument is too clever by half and does

---

99

     *See In re Parmalat Sec. Litig.*, 640 F. Supp. 2d 243, 254 (S.D.N.Y. 2009) ("[I]t is beyond the Court's proper function to resolve the conflicting inferences and conclusions that may be drawn from evidence that, in the Court's view, quite plainly cuts in different directions.").

100

     EY's Supplemental Reply Mem. of Law [DI 1648] at 9.

101

     *Id.*

102

     *See* Andrew A. Schwartz, *The Perpetual Corporation*, 80 GEO. WASH. L. REV. 764, 821 n.403 (2012) (citing Steven W. Hawking, A BRIEF HISTORY OF TIME (1988)).  As there recounted:

     A well-known scientist (some say it was Bertrand Russell) once gave a public lecture on astronomy.  He described how the earth orbits around the sun and how the sun, in turn, orbits around the center of a vast collection of stars called our galaxy.  At the end of the lecture, a little old lady at the back of the room got up and said: "What you have told us is

28

not absolve EY from liability under the securities laws *ex ante*.  The logic of *Omnicare* indicates that an auditor, like any other speaker, may omit matter from its opinions on a company's financial statements and its compliance with GAAS that would render those opinions materially misleading to an informed reader.[103]  Furthermore, a sufficient accumulation of "red flags" perhaps could permit the inference that the auditor *did not actually believe* that it had conducted a GAAS-compliant audit (*i.e.*, that it intentionally or recklessly cut corners or otherwise skirted auditing standards) when it rendered its opinions.[104]

In any case, all that it necessary here is for plaintiffs to have proffered evidence sufficient to create a genuine issue of material fact as to whether EY made false and misleading statements.  This they have done.

C.      *Starr's Theory of False and Misleading Statements under the Securities Act*

With respect to its Section 11 claim, Starr argues that EY is liable both for its own audit opinions *and* "for the false and materially misleading statements *made by Lehman* in its financial statements (and footnote disclosures), namely, (i) *Lehman's* false and materially misleading statement that Lehman accounted for repos as 'financings;' and (ii) *Lehman's* materially misleading

---

[103]    rubbish.  The world is really a flat plate supported on the back of a giant tortoise."  The scientist gave a superior smile before replying, "What is the tortoise standing on?"  "You're very clever, young man, very clever," said the old lady.  "But it's turtles all the way down!"

Whether such statements are made with the requisite *scienter* is, of course, another question.

[104]    *Cf. In re BioScrip, Inc. Sec. Litig.*, No. 13-cv-6922 (AJN), 2015 WL 1501620, at *12 (S.D.N.Y. Mar. 31, 2015) ("In light of their knowledge of the CID and the common belief amongst those most directly involved in the conduct at issue that BioScrip was skirting regulatory requirements, Plaintiffs' allegations allow for the inference that BioScrip could not have believed the veracity of its legal compliance statements.").

statements of its 'net assets,' total repo liabilities, and 'net leverage.'"[105]  EY disputes this. It argues

that the provision of Section 11 that creates liability for statements that auditors "prepare" or

"certify" does not apply to EY's audit opinions, which EY asserts are not "certifications" within the

meaning of the statute.[106]  EY is mistaken.

The relevant provision of Section 11 of the Securities Act states:[107]

> In case any part of the registration statement, when such part became effective,
> contained an untrue statement of a material fact or omitted to state a material fact
> required to be stated therein or necessary to make the statements therein not
> misleading, any person acquiring such security (unless it is proved that at the time of
> such acquisition he knew of such untruth or omission) may . . . sue . . . every
> accountant . . . or any person whose profession gives authority to a statement made
> by him, who has with his consent been named as having prepared or certified any part
> of the registration statement, or as having prepared or certified any report or valuation
> which is used in connection with the registration statement, with respect to the
> statement in such registration statement, report, or valuation, which purports to have
> been prepared or certified by him.

Accountants may be found liable under Section 11 for portions of registration

statements that they audited.[108]  Certainly Lehman's arguably false statement in the footnote to its

financial statements to the effect that it accounted for repos as "financings" when, in fact, it

---

[105]

DI 1521 at 73 (emphasis in original).

[106]

See DI 1572 at 42-43 ("It is undisputed that EY issued audit opinions—not
certifications—regarding Lehman's year-end financial statements.").

[107]

15 U.S.C. § 77k(a)(4).

[108]

*See In re Wachovia Equity Secs. Litig.,* 753 F. Supp.2d 326, 378–79 (S.D.N.Y. 2011);
*Amorosa v. Ernst & Young LLP,* 672 F. Supp.2d 493, 513 (S.D.N.Y. 2009), *aff'd,* 409
Fed.Appx. 412 (2d Cir. 2011); *In re WorldCom, Inc. Secs. Litig.,* 352 F. Supp.2d 472, 492-
93 (S.D.N.Y. 2005); *In re Global Crossing, Ltd. Secs. Litig.,* 322 F. Supp.2d 319, 348–49
(S.D.N.Y. 2004); *Escott v. BarChris Constr. Corp.,* 283 F. Supp. 643, 683–84 (S.D.N.Y.
1968).

accounted for Repo 105 as sales comes within that rule.  Indeed, one of my colleagues has stated that "[i]t is difficult to imagine what Congress might have meant by an accountant's certification if not an audit affirming the accuracy of the documents in question."[109]  And while I would rephrase that statement to reflect the fact that an auditor's GAAP opinion expresses the view that the issuer's financial statements fairly present the issuer's financial position and the results of its operations – as distinguished from "affirm[ing] the[] accuracy" of the financial statements – the basic point remains the same.  It is difficult to imagine what Congress might have meant by an accountant's certification if not auditor's opinions such as those at issue in this case.  Accordingly, Starr is free to pursue its Section 11 claims against EY with respect to matters covered by its GAAP opinion. EY will remain free to raise its due diligence defense as appropriate.

### III.    *Whether Plaintiffs Have Raised a Genuine Issue of Fact as to* Scienter

Both Starr and the RHF Plaintiffs bring Section 10(b) and Rule 10b-5 claims.  To succeed on such a claim, a plaintiff must prove that the defendant acted with *scienter—i.e.*, that the defendant made an untrue statement of material fact or omitted to state a material fact necessary to prevent her statement from misleading a reasonable person with the "intent to deceive, manipulate, or defraud."[110]

In *Lehman I*, the Court stated that allegations about "red flags" bear "not only on

---

[109]    *In re OSG Secs. Litig.*, 971 F. Supp.2d 387, 399 (S.D.N.Y. 2013).

[110]
         *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 (1976); *see also Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 323 (2007) (internal quotation marks omitted); *ECA & Local 134 IBEW Joint Pension Trust of Chi.*, 553 F.3d at 197 (noting that the misrepresentation or omission must be made "with *scienter*" to be actionable under Section 10(b) and Rule 10b-5 (internal quotation marks omitted))

whether [EY] violated the pertinent GAAS requirements, but also on whether it did so with the requisite state of mind."[111]  EY nevertheless argues that since the Court issued its opinion in *Lehman I*, the Second Circuit has reiterated that *scienter* requirements as to auditors are especially demanding.  It points to *In re Advanced Battery Technologies, Inc.*,[112] where the Circuit affirmed the grant of a motion to dismiss securities fraud claims against a company's independent auditor.  The Circuit there stated that in a case predicated on an auditor's recklessness, the plaintiff must establish that the auditor's conduct was "highly unreasonable, representing an extreme departure from the standards of ordinary care,"[113] and not "merely a heightened form of negligence."[114]  Moreover, the alleged "conduct 'must, in fact, approximate an actual intent to aid in the fraud being perpetrated by the audited company,' as, for example, when a defendant conducts an audit so deficient as to amount to no audit at all, or disregards signs of fraud so obvious that the defendant must have been aware of them."[115]  GAAP violations, accounting irregularities, and a lack of due diligence are not sufficient.[116]

      To be sure, these are not easy standards to meet.  There are many securities fraud

---

[111]
    *Lehman I*, 799 F. Supp. 2d at 303 & n.304 (citing *In re AOL Time Warner*, 381 F. Supp. 2d 192, 240 (S.D.N.Y.2004) ("Allegations of 'red flags,' when coupled with allegations of GAAP and GAAS violations, are sufficient to support a strong inference of *scienter*.")).

[112]
    781 F.3d 638, 644 (2d Cir. 2015).

[113]
    *Id.* (quoting *Rothman v. Gregor*, 220 F.3d 81, 98 (2d Cir. 2000)).

[114]
    *Id.* (quoting *Novak v. Kasaks*, 216 F.3d 300, 312 (2d Cir. 2000)).

[115]
    *Id.* (quoting *Rothman*, 220 F.3d at 98, and citing *Gould v. Winstar Commc'ns, Inc.*, 692 F.3d 148, 160–61 (2d Cir. 2012)).

[116]
    *Id.*

cases against auditors that founder for failure to allege sufficiently or prove a plausible claim. But the question in the present context is whether a rational jury reasonably could conclude that EY acted with the requisite intent. This arguably boils down to the question whether EY knew enough about Lehman's use of Repo 105s to 'window-dress' its period-end balance sheets to permit a finding that [EY] had no reasonable basis for believing that those balance sheets fairly presented the financial condition of Lehman"?[117] Regardless of the precise phrasing of the question, however, the same red flags that on this record support a denial of summary judgment as to whether EY made false or misleading statements require denial of summary judgment as to the issue of *scienter*.

IV.     *Whether Plaintiffs Have Raised a Genuine Issue of Fact as to Loss Causation*

"A private plaintiff who claims securities fraud must prove that the defendant's fraud caused an economic loss."[118] Generally, a plaintiff does not prove loss causation by showing merely that the price of a security on the date of purchase was inflated as a result of the misrepresentation or omission. Such evidence "explains why particular investment was made, but does not speak to the relationship between the fraud and the loss of the investment."[119] Instead, to establish loss causation, a plaintiff must prove "that the *subject* of the fraudulent statement or omission was the cause of the actual loss suffered."[120]

---

[117]     *Lehman I*, 799 F. Supp. 2d at 303-04.

[118]     *Dura Pharm., Inc. v. Broudo,* 544 U.S. 336, 338 (2005).

[119]     *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 174 (2d Cir. 2005).

[120]     *Id*. at 175 (quoting *Suez Equity Investors, L.P. v. Toronto-Dominion Bank*, 250 F.3d 87, 95 (2d Cir. 2001) (emphasis added by *Lentell*)).

The Court addressed loss causation in *Lehman I*.  It stated that in a "materialization of a concealed risk" case like this, a complaint "must allege that the loss was (1) foreseeable and (2) caused by the materialization of the concealed risk."[121]  A loss is "foreseeable" if it is "within the zone of risk concealed by the misrepresentations and omissions alleged by the disappointed investor."[122]  Applying those standards, the Court denied defendants' motion to dismiss the class plaintiffs' case on loss causation grounds for two reasons.  *First*, such plaintiffs "need not allege that their entire loss was caused by the misstatements and omissions," so long as they allege that an "'ascertainable portion'" of that loss was due to the fraud.[123]  Second, plaintiffs were not "required to allege that the particular misstatements and omissions directly caused the alleged losses."[124]  Instead, "the alleged misstatements and omissions concealed the extent of Lehman's exposure to asset classes, the precarious nature of which, a jury could find, was foreseeable."[125]  Moreover, Lehman's accounting manipulations "overstated Lehman's financial strength generally and understated the extent to which it was leveraged."[126]

Now that discovery has concluded, EY argues that "Lehman's bankruptcy is among

---

[121]
*Lehman I*, 799 F. Supp. 2d at 304 (citing *Lentell v. Merrill Lynch & Co., Inc.*, 396 F.3d 161, 172 (2d Cir. 2005)).

[122]
*Id*. at 305 (citing *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 574 F.3d 29, 40 (2d Cir. 2009)).

[123]
*Id.* (quoting *Lentell*, 396 F.3d at 175).

[124]
*Id.*

[125]
*Id.* at 306.

[126]
*Id.*

34

the most studied financial events ever" and that there is widespread agreement that "[t]he cause of Lehman's decline into bankruptcy was a run on the bank spurred by market concern about Lehman's declining real estate assets."[127]   EY asserts, therefore, that Lehman's Repo 105 transactions had nothing whatsoever to do with the market panic that led to Lehman's demise.   Accordingly, it claims that plaintiffs cannot prove loss causation.   It makes four specific arguments to this effect.

*First*, EY contends that Repo 105 did not conceal Lehman's capital adequacy risk. While it concedes that Repo 105 allowed Lehman to report a lower net leverage ratio, it argues that, to market participants, "the net leverage ratio is a very limited tool for assessing capital adequacy because it treats all assets as equally risky."[128]   The nub of the argument is that, "[b]y the time Plaintiffs purchased Lehman securities, the market was not focused on the sheer volume of a bank's assets but instead on the liquidity and quality of those assets—precisely the kind of information not captured by the crude net leverage ratio."[129]

Plaintiffs attack this argument on two fronts.   First, they argue that net leverage and a bank's capital adequacy ratio "both assess a company's financial health, namely, its ability to absorb write downs in its assets without becoming insolvent."[130]   Second, they cite evidence – including statements of Lehman's own executives—to the effect that net leverage was an important

---

[127]

  DI 1572 at 29-30.

[128]

  EY's Mem. of Law in Support of Summary Judgment in *Starr* [DI 1480] at 18.

[129]

  *Id*. at 20.

[130]

  *Id*. at 81.

metric for the bank and market participants treated it seriously.[131]  EY responds that it "stretches the concept of loss causation too far" to accept plaintiffs' theory,[132] essentially because that theory improperly allows plaintiffs to claim that "any adverse news even demonstrating Lehman's declining financial condition" was a "materialization of the concealed risk."[133]  By contrast, EY asserts that the risk of insolvency simply had no connection to its Repo 105 transactions.

> *Second*, EY argues that Repo 105 did not conceal any liquidity risks.  It claims that Repo 105 transactions "involved the exchange of highly liquid, high-quality securities for cash and cannot by any measure be said to have materially affected Lehman's liquidity."[134]

> Plaintiffs counter that Lehman's access to the repo market was essential to its liquidity.  On their theory, Lehman's misleading use of Repo 105 transactions concealed "the risk that Lehman would lose liquidity virtually overnight by losing its ability to rollover its repo positions when its repurchase obligations came due on a daily basis."[135]  Since "Lehman's lack of liquidity eventually caused Lehman's bankruptcy," plaintiffs argue that EY "cannot 'demonstrate that a jury could not reasonably infer from the available evidence that some portion of plaintiffs losses were

---

[131]      DI 1521 at 82-84.

[132]      DI 1572 at 32.

[133]      *Id.  See McCabe v. Ernst & Young LLP*, 494 F.3d 418, 436-37 (3d Cir. 2007); *Delshah Group LLC v. Javeri*, No. 09-cv-6909, 2013 WL 23222488, at *20 (S.D.N.Y. May 28, 2013) ("The mere fact that a misrepresentation 'touches' upon a loss is not enough.").

[134]      DI 1572 at 21.

[135]      DI 1521 at 85.

caused by defendants fraud.'"[136]   EY responds that Lehman simply would have sold the assets underlying the Repo 105 transactions if it had faced a liquidity crunch.  It argues also that a run on the bank at Lehman would have wiped out its liquidity irrespective of Repo 105.[137]

  *Third*, EY argues that the questionable quality of Lehman's illiquid assets was known to the general public.  Since plaintiffs rely on a theory of "materialization of a *concealed* risk," EY claims, proof of loss causation is impossible because the risk was a matter of common knowledge.  Plaintiffs respond that, while the market may have been partially aware of the problems attendant to Lehman's illiquid assets, the firm's use of Repo 105 nonetheless allowed it partially to conceal the scope of those problems from the public.  Plaintiffs argue that, in the absence of Repo 105, Lehman might have had to sell some of its toxic assets in order to bolster is liquidity.[138]   They contend that Lehman wanted to avoid doing so precisely because of the negative signals that course would have sent to the market.  EY calls this argument a "false dilemma" and a "far-fetched theory," and insists Lehman would have sold the assets underlying its repo transactions before selling illiquid assets.[139]

  *Fourth*, EY asserts that, pursuant to *Lentell v. Merrill Lynch & Co.,*[140] plaintiffs have failed to adduce evidence sufficient to prove that the alleged misrepresentations proximately caused

---

[136]

  *Id.* at 88 (quoting *Abu Dhabi Commercial Bank v. Morgan Stanley & Co. Inc.*, 888 F. Supp. 2d 431, 472 (S.D.N.Y. 2012)).

[137]

  DI 1572 at 33-34.

[138]

  *See* DI 1521 at 89.

[139]

  DI 1572 at 38.

[140]

  396 F.3d 161 (2d Cir. 2005).

their losses.  It argues that plaintiffs cannot show that "the risk that caused the loss was within the zone of risk concealed by the misrepresentations and omissions alleged by a disappointed investor."[141]  EY posits that it was entirely unforeseeable that manipulating net leverage ratios could lead to Lehman's bankruptcy and that it is implausible to suppose that the run on Lehman would not have occurred if investors had more information about the bank's net leverage.[142]  Plaintiffs respond that Lehman's collapse was within the "zone of risk" of the alleged misstatements because investor panic over  Lehman's financial health ultimately doomed the firm.[143]

To be sure, loss causation is not obvious in this case.  EY's argument—that Lehman's implosion was unexpected and was not caused in any meaningful sense by its use of Repo 105 transactions—has an intuitive appeal.  It may well prevail at trial.  Nevertheless, the Court concludes that plaintiffs have presented enough information to withstand summary judgment.

In the first place, the evidence thus far has not altered the Court's initial conclusion in *Lehman I*.  Whatever else Repo 105 did, it had the effect of "conceal[ing] the extent of Lehman's exposure" to troubled asset classes.[144]  This alone could warrant finding a connection between the "risk" and its "materialization" in the form of Lehman's bankruptcy.

More fundamentally, the relationship between the "concealed risk" and the consequences of its "materialization" need not be one-to-one.  A particularly perceptive discussion

---

[141] 
     *Lentell*, 396 F.3d at 173.

[142] 
     *See* DI 1572 at 40.

[143] 
     *See* DI 1521 at 92-93.

[144] 
     799 F. Supp. 2d at 306.

38

of this question appears in former Judge Holwell's opinion in *In re Vivendi Universal, S.A. Securities Litigation*.[145]   Plaintiffs there alleged that Vivendi's executives "saddled Vivendi with massive amounts of debt and concealed the risk to Vivendi's liquidity through various false and misleading public statements."[146]   The *Vivendi* plaintiffs introduced an expert study that isolated certain drops in the company's stock price due to events like ratings downgrades and unexpected asset sales which, plaintiffs alleged, involved the materialization of the company's concealed liquidity risk.   Defendants argued that plaintiffs' conception of liquidity risk was "so amorphous and all encompassing as to render it meaningless" and claimed that plaintiffs could not prove that any alleged misstatements caused drops in stock price.[147]

> Judge Holwell analyzed the issue as follows:[148]
>
> [P]roving actual causation, at least in the way *Lentell* uses the phrase, is part of plaintiffs' burden to show a causal connection between the materialization of the risk and the stock price declines, not the causal connection between the allegedly false and misleading statements and the materialization of the risk.  Establishing the latter connection does not, as defendants appear to believe, require plaintiffs to establish a one-to-one correspondence between concealed facts and the materialization of the risk.  In other words, if a company misrepresents fact *A* (we have plenty of free cash flow), which conceals risk *X* (liquidity), the risk can still materialize by revelation of fact *B* (a ratings downgrade), an indication of risk *X* (liquidity).  As discussed above, to prove the causal connection between misrepresenting fact *A* and the revelation of fact *B*, plaintiffs must establish only that the revelation of fact *B* was foreseeable, *i.e.*, within the zone of risk *X*, and that fact *B* reveals information about risk *X*.  When fact *B* is revealed, the market need not be aware of fact *A* or that fact *A* had been previously misrepresented.  The way defendants describe the law, only a corrective

---

[145]

634 F. Supp. 2d 352 (S.D.N.Y. 2009).

[146]

*Id*. at 354.

[147]

*Id.* at 366.

[148]

*Id*. at 367.

39

disclosure would prove loss causation.

In support of this analysis, *Vivendi* cited *Castellano v. Young & Rubicam, Inc.*,[149] "one of the only Court of Appeals cases to address loss causation at summary judgment rather than a motion to dismiss."[150]  The plaintiff there sued his former business associates who had bought his shares before he departed the company.  But in doing so, the defendants concealed negotiations over a transaction that would have increased the value of the company's stock.  The defendants argued that they later actually engaged in a transaction with an entity *different* than the one as to which they had concealed their pre-purchase negotiations.  They therefore claimed that the plaintiff could not recover for their misstatements about a possible transaction with "company one" when they had ultimately consummated a transaction with "company two."  The Circuit rejected this argument, reasoning that "defendants' concealment of the merger negotiations and other facts misled plaintiff 'as to the zone of risk that [the company] might soon enter into a major corporate transaction,'" not the risk of a *particular* transaction.[151]

In other words, *Lentell*'s directive to consider a "zone of risk" means that proof of loss causation does not require a perfect connection between the false statements and the precise risk that materialized.  The collapse of Lehman was not precipitated by a truly random event, such as an attack on its computer network that erased customers' financial data or a flood in Manhattan.  Instead, Lehman's collapse flowed from investor panic over the quality of its balance sheet, and

---

[149]        257 F.3d 171 (2d Cir. 2001).

[150]        *Vivendi*, 634 F. Supp. 2d at 368.

[151]        *Id.* (quoting *Castellano*, 257 F.3d at 188).

Repo 105 allegedly aimed to make, and in any event allegedly made, that balance sheet look healthier than arguably it was.

Summary judgment as to loss causation would be inappropriate.[152]

## V.   State-Law Claims

Both *Starr* and *RHF* involve state-law claims.  Starr asserts claims of common law fraud[153] and professional negligence under New York law.[154]  RHF asserts claims of fraud and deceit and aiding and abetting fraud under California law.[155]  EY moves for summary judgment on these claims on a theory of preclusion under the Securities Litigation Uniform Standards Act[156] ("SLUSA").

In relevant part, SLUSA states:[157]

No covered class action based upon the statutory or common law of any State or

---

[152]

> There is an affirmative defense under Section 11 for "negative causation."  *See* 15 U.S.C. § 77k(e).  While the defendant bears the burden of proof of negative causation under Section 11 (as opposed to the plaintiff under Section 10(b)), "the negative causation defense in Section 11 and the loss causation element in Section 10(b) are [otherwise] mirror images."  *In re WorldCom, Inc. Sec. Litig.*, No. 02-cv-3288, 2005 WL 375314, at *6 (S.D.N.Y. Feb. 17, 2005).  EY moves for summary judgment dismissing Starr's Section 11 claims on this ground as well.  The motion is denied for the same reasons as under Section 10(b).

[153]

> *Starr* Am. Compl. ¶¶ 126-132.

[154]

> *Id.* ¶¶ 80-91.

[155]

> *See RHF* First Am. Compl. ¶¶ 345-52 (fraud and deceit), 353-62 (aiding and abetting fraud).

[156]

> 15 U.S.C. § 78bb(f).

[157]

> 15 U.S.C. §§ 78bb(f)(1)(A), 78bb(f)(5)(B)(ii).

subdivision thereof may be maintained in any State or Federal court by any private party alleging . . . a misrepresentation or omission of a material fact in connection with the purchase or sale of a covered security.

*     *     *

The term 'covered class action' means . . . any group of lawsuits filed in or pending in the same court and involving common questions of law or fact, in which damages are sought on behalf of more than 50 persons; and the lawsuits are joined, consolidated, or otherwise proceed as a single action for any purpose.

Earlier in the litigation over Lehman's collapse, the Court rejected the argument that SLUSA does not apply to state-law claims raised in individual actions that, "by virtue of a Section 1407 consolidation or coordination by the Multidistrict Panel," become part of a "covered class action."[158]  The Court stated:[159]

This case is pending in the same court as a large number of others, all of which relate to Lehman Brothers and all of which involve common questions of law or fact, most notably common issues as to whether offering materials for many offerings of Lehman securities contained material false statements or made material omissions. These cases collectively meet any definition of the word "group."  Although this case is brought only on behalf of this plaintiff, damages are sought in these cases on behalf of thousands, tens of thousands, or even more persons.  The actions are consolidated here for pretrial purposes by Pretrial Order No. 1 and the orders of the Judicial Panel on Multidistrict Litigation.  Hence, there is no serious question that this is a "covered class action" within the plain terms of the statutory definition. Indeed, many courts have reached that conclusion on facts substantially identical to these.

Starr and the RHF Plaintiffs disagree with EY's arguments about proper application of SLUSA in this context.  They argue that (I) SLUSA, by its terms, applies only to "any group of

---

[158]

*In re Lehman Bros. Sec. & ERISA Litig.*, 09-md-2017 (LAK), 2012 WL 6603321, at *2 (Dec. 17, 2012).

[159]

*Id.* at *1.

42

lawsuits filed in or pending in the same court" in which "damages are sought on behalf of more than 50 persons,"[160] and (ii) SLUSA no longer applies because there now are fewer than 50 plaintiffs in lawsuits pending before this Court

The key phrase in the statute defines a "covered class action" as "any group of lawsuits *filed in or pending in the same court* and involving common questions of law or fact."[161] The two criteria in this sentence—"pending" or "filed in"—are disjunctive, meaning that satisfaction of either is sufficient to render a case part of a "covered class action."

We first must ask what it means to say that a lawsuit is "pending." The most natural reading of "pending" is "unresolved now on the court's docket" *i.e.*, at the time a court is reaching its decision on SLUSA preclusion. On this reading, settled cases no longer are "pending." One of my colleagues adopted this position in *Krys v. Sugrue (In re Refco Inc. Securities Litigation)*,[162] there declining to apply SLUSA to an opt-out action because parallel "settled and dismissed cases [were] no longer 'pending' in this Court."[163] The court there reasoned that "Congress' clear use of the present tense for 'pending cases'" compelled this conclusion.[164]

The Supreme Court's recent decision in *Kellogg Brown & Root Services, Inc. v.*

---

[160]

    15 U.S.C. § 78bb(f)(5)(B).

[161]

    15 § 78bb(f)(5)(B)(ii)(emphasis added).

[162]

    859 F. Supp. 2d 644 (S.D.N.Y. 2012).

[163]

    *Id*. at 652-53.

[164]

    *Id.* at 653.

*United States ex rel. Carter*[165] supports that reading. The Court there considered application of the False Claims Act's "first-to-file" bar, which "precludes a *qui tam* suit 'based on the facts underlying [a] pending action.'"[166] The Court interpreted "pending" in the statute to have its ordinary meaning—*i.e.*, "remaining undecided," "awaiting decision," or "in continuance; in suspense."[167] On this plain reading, the Court concluded that the False Claims Act bars a second-filed action only "while the earlier suit remains undecided but ceases to bar that suit once it is dismissed."[168] By analogy, a case remains pending under SLUSA only while it is undecided.[169] There no longer are more than 50 persons seeking damages in pending Lehman cases.

The second criterion is whether a case was "filed in . . . the same court" as other cases "in which damages are sought on behalf of more than 50 persons."[170] In *Krys*, the court interpreted this to mean "originally filed."[171] This is certainly a natural reading of the phrase. Note that "filed in" is a past-tense modifier, meaning that *settled* class actions *do* count towards the 50-person

---

[165]

135 S. Ct. 1970 (2015).

[166]

*Id.* at 1974 (quoting 31 U.S.C. § 3730(b)(2)).

[167]

*Id.* at 1978 (citing various dictionaries).

[168]

*Id.*

[169]

*See Liberty Media Corp. v. Vivendi Universal, S.A.*, 861 F. Supp. 2d 262, 266 (S.D.N.Y. 2012) (denying a motion for reconsideration of a prior opinion holding that "the present tense of SLUSA—precluding state-law claims where multiple lawsuits 'are joined, consolidated, or otherwise proceed as a single action for any purpose'—means that suits not currently consolidated are not properly subject to SLUSA preclusion").

[170]

15 § 78bb(f)(5)(B)(ii).

[171]

859 F. Supp. 2d at 653.

SLUSA threshold on this score even if they *do not* satisfy the "pending" criterion.  Here, *Starr* was filed in the Southern District of New York on June 2, 2011.[172]  The case underlying the consolidated securities class action was filed in the Southern District on June 18, 2008.[173]  Consequently, *Starr* was filed in "the same court . . . in which damages are sought on behalf of more than 50 persons."   The state-law claims it raises therefore are precluded by SLUSA.

*RHF* is different.  It was filed in the Superior Court of the State of California, Los Angeles County, on or about April 9, 2010.[174]  It then was removed to the United States District Court for the Central District of California on or about April 15, 2010.[175]  On April 28, 2010, the Judicial Panel on Multidistrict Litigation issued Conditional Transfer Order 10, conditionally transferring *RHF* to the Southern District of New York.[176]  The Panel later confirmed that decision by way of a Transfer Order entered on August 17, 2010[177]

Because *RHF* is neither part of a group of pending cases in which 50 or more persons are seeking damages, nor was it filed in the same court where that was once the case, it might appear at first blush that SLUSA preclusion does not apply.  But there is another wrinkle.

---

[172]

No. 11-cv-3745, DI 1.

[173]

*Operative Plasterers & Cement Masons Int'l Assoc. Local 262 Annuity Fund v. Lehman Bros. Holdings, Inc.*, No. 08-cv-5523, DI 1.  *See also* Pretrial Order No. 1 (Jan. 9, 2009) (consolidating numerous cases into case no. 08-cv-5523).

[174]

*See* no. 10-cv-6185, Notice of Removal ¶ 1 (Apr. 15, 2010) [DI 1].

[175]

No. 10-cv-6185, DI 1.

[176]

No. 10-cv-6185, DI 29-1.

[177]

No. 10-cv-6185, DI 79.

*RHF* alleged claims against both EY and a number of Lehman's former executives and officers.  In January of 2012, the individual defendants moved, among other things, to dismiss the RHF Plaintiffs' state-law claims on the basis of SLUSA preclusion.[178]  The Court granted that motion in December 2012.[179]  This raises the question of whether the Court's dismissal of *RHF*'s state-law claims as to the individual defendants had the effect of dismissing those claims as to all defendants or whether, alternatively, the dismissal did not apply to EY as a non-moving party.  The Court concludes that the prior dismissal was effective as against EY and that the RHF Plaintiffs' state-law claims were dismissed in their entirety as of December 2012.

When the Court determined in December of 2012 that *RHF* was a "covered class action" and granted the individual defendants' motion to dismiss the RHF plaintiffs' state-law claims on that basis, the effect under the statute was that the "action" could not be "maintained in any State or Federal court" insofar as it alleged "a misrepresentation or omission of a material fact in connection with the purchase or sale of a covered security" under a state-law theory.[180]  If the Court were to conclude that the RHF Plaintiffs' state law claims still were viable *now*, it necessarily would mean that those claims had been "maintained" between December 2012 and the present date.  That is not a permissible outcome under SLUSA.[181]  Accordingly, the state-law claims of both Starr and

---

[178]

     DI 601.

[179]

     Pretrial Order No. 49 [DI 1101] ¶ 1(b) (Dec. 17, 2012).

[180]

     15 U.S.C. § 78bb(f)(1)(A).

[181]

     *See, e.g.*, *Atkinson v. Morgan Asset Mgmt., Inc.*, 658 F.3d 549, 556 (6th Cir. 2011) ("[O]nce a case is a 'covered class action,' or has more than fifty members, the action 'may [not] be maintained' if it is based on allegations of fraud," even where litigants seek to amend their complaint to include fewer than fifty plaintiffs.).

46

the RHF Plaintiffs must be dismissed.

*Conclusion*

Accordingly, EY's motion for summary judgment dismissing the *Starr* action [09-md-2017 DI 1470; 11-cv-3745 DI 51] is granted to the extent that Starr's claims under New York law are dismissed.  It is denied in all other respects.  Likewise, EY's motion for summary judgment dismissing the *RHF* action [09-md-2017 DI 1472; 10-cv-6185 DI 213] is granted to the extent that the RHF Plaintiffs' California law claims are dismissed.  It is denied in all other respects.

The Court will hold conferences in each of these cases on October 13, 2015 beginning at 9:30 a.m.  Among the subjects for discussion will be trial settings, settlement, and possible remand of the *RHF* case.  Joint pretrial orders in each of these cases shall be filed no later than November 20, 2015.

SO ORDERED.

Dated:          September 18, 2015

Lewis A. Kaplan
United States District Judge

(The manuscript signature above is not an image of the signature on the original document in the Court file.)